**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CARBONLITE HOLDINGS LLC, *et al.*,[1] | ) | Case No. 21-10527 (JTD) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS UNDER SECTIONS 105, 345, 363, 364, 503, 1107 AND 1108 OF THE BANKRUPTCY CODE AUTHORIZING (I) MAINTENANCE OF EXISTING BANK ACCOUNTS; (II) CONTINUANCE OF EXISTING CASH MANAGEMENT SYSTEM, BANK ACCOUNTS, CHECKS, AND RELATED FORMS; (III) CONTINUED PERFORMANCE OF INTERCOMPANY TRANSACTIONS; (IV) LIMITED WAIVER OF SECTION 345(b) DEPOSIT AND INVESTMENT REQUIREMENTS; AND (V) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (the "Debtors") hereby file this motion (the "Motion") for entry of interim and final orders, pursuant to sections 105, 345, 364, 363, 503, 1107 and 1108 of Title 11 of the United States Code (the "Bankruptcy Code"), authorizing the (i) maintenance of the Debtors' existing bank accounts, including the authority to pay routine prepetition banking fees owed to financial institutions; (ii) continued use of the Debtors' existing cash management system, bank accounts, and checks (the "Cash Management System"); (iii) continued performance of intercompany transactions (as described herein, the "Intercompany Transactions"); (iv) limited waiver of section 345(b) deposit and investment requirements to the extent applicable; (v) grant of administrative expense status to postpetition

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: CarbonLite Holdings LLC (8957); CarbonLite Industries LLC (3596); CarbonLite P Holdings LLC (8957); CarbonLite P LLC (5453); CarbonLite PI Holdings LLC (8957); CarbonLite Pinnpack LLC (8957); CarbonLite Recycling Holdings LLC (8957); CarbonLite Sub-Holdings, LLC (8957); Pinnpack P, LLC (8322); CarbonLite Recycling LLC (3727); and Pinnpack Packaging LLC (9948). The address of the Debtors' corporate headquarters is 10250 Constellation Blvd., Los Angeles, CA 90067.

Intercompany Claims (as defined below); and (vi) grant of related relief.   In support of the

Motion, the Debtors respectfully represent as follows:

**Jurisdiction and Venue**

1.     The United States Bankruptcy Court for the District of Delaware (the

"Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the

*Amended Standing Order of Reference from the United States District Court for the District of*

*Delaware*, dated February 29, 2012.  This matter is a core proceeding within the meaning of 28

U.S.C. § 157(b)(2), and the Debtors confirm their consent pursuant to Rule 9013-1(f) of the

Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the

District of Delaware (the "Local Rules") to the entry of a final order by the Court in connection

with this Motion to the extent that it is later determined that the Court, absent consent of the

parties, cannot enter final orders or judgments in connection herewith consistent with Article III

of the United States Constitution.

2.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

3.     The statutory bases for the relief sought in this Motion are sections 105,

345, 363, 364, 503, 1107 and 1108 of title 11 of the Bankruptcy Rules; Rules 6003, 6004 and

9013 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"); and Local Rule

9013-1(f).

**Background**

4.     On the date hereof (the "Petition Date"), each Debtor filed a voluntary

petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their

2

businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated.

5.    The Debtors are on the forefront of processing post-consumer recycled polyethylene terephthalate ("rPET") plastic products and producing high-quality rPET and polyethylene terephthalate ("PET") beverage and food packaging products.  As of the Petition Date, the Debtors operate three facilities at which they process PET bottles and flake into rPET pellets, which are later incorporated into other products and packaging.  The Debtors also operate PinnPack, which processes the rPET and PET into high-quality thermoformed tubs, bowls, domes, and clamshell packaging for food applications.  A detailed description of the Debtors' business and facts precipitating the filing of the Debtors' chapter 11 proceedings are set forth in the *Declaration of Brian Weiss in Support of Debtors' Chapter 11 Petitions and First Day Relief* (the "First Day Declaration"), incorporated herein by reference.[2]

## **Relief Requested**

6.    By this Motion, the Debtors seek interim and final orders (a) authorizing the Debtors to (i) maintain their existing Bank Accounts (as hereinafter defined), including to pay any prepetition routine banking fees imposed by the financial institutions where the Bank Accounts (as hereinafter defined) are maintained, and to continue to use their existing business forms and check stock; (ii) continue to use their existing Cash Management System, as provided herein; (iii) continue to perform certain intercompany transactions among the Debtors;

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration.

DOCS_LA:335344.12 13044/001

(b) granting a limited waiver of the requirements pursuant to section 345(b) of the Bankruptcy Code to the extent required; and (c) granting related relief as set forth herein.

**Debtors' Cash Management System and Bank Accounts**

**B.      Cash Management System Overview**

7.      To facilitate the efficient operation of their businesses, in the ordinary course, the Debtors maintain a cash management system (the "Cash Management System"). In summary, the primary components of the Cash Management System are as follows:

8.      Debtors CarbonLite Holdings LLC ("Holdings"); CarbonLite Industries LLC ("Industries"), CarbonLite Pinnpack LLC; CarbonLite Sub-Holdings, LLC; Pinnpack P, LLC; and Pinnpack Packaging LLC ("PinnPack") (collectively, the "CA Debtors"), have an interrelated set of bank accounts. Under that system, most customer receipts are deposited into two lockbox accounts (one for operations by Industries at the Riverside Facility and one for operations by PinnPack at the PinnPack Facility), which are swept automatically to apply to the secured loan balance with prepetition lender Bank Leumi USA ("Leumi"), after which Leumi makes new advances for disbursement from disbursement accounts. In addition, the proceeds of term loan advances (the "DIP Term Loan Advances") pursuant to the *Senior Secured Super-Priority Debtor-In-Possession Term Loan Credit Agreement* (the "DIP Term Credit Agreement") by and among the CA Debtors, the lenders thereto (the "DIP Term Lenders"), and Orion Energy Partners Investment Agent, LLC, as administrative agent and collateral agent (in such capacities, the "DIP Term Agent"), are deposited into a segregated account of Holdings, which are then

4

disbursed as needed for operations. That account qualifies as the "DIP Funding Account" and/or "DIP Term Priority Accounts," as those terms are defined in the DIP Term Credit Agreement.

9.      With respect to certain of the Debtors' operations in Texas and Pennsylvania, Debtors CarbonLite P Holdings LLC; CarbonLite P LLC; and CarbonLite PI Holdings LLC (collectively, the "PA Debtors"), and Debtors CarbonLite Recycling Holdings LLC and CarbonLite Recycling LLC (collectively, the "TX Debtors") each have separate centralized systems of their own whereby customer receipts are collected and disbursed through a system of accounts that are controlled manually by the applicable Debtor's personnel, except as otherwise described herein.

10.     Each component of the Cash Management System is comparable to the centralized cash management systems used by similarly situated companies to manage cash in a cost-effective, efficient manner. The Debtors use the Cash Management System in the ordinary course of their businesses to collect, transfer, and disburse funds generated from their operations and to facilitate cash monitoring, forecasting, and reporting, including wire and automated-clearing-house transfers. The Debtors' personnel maintain daily oversight of the Cash Management System and controls are in place for receiving, accounting for and disbursing funds.

## C.   **Bank Accounts**

11.     Altogether, the Cash Management System currently is comprised of several bank accounts (collectively, the "Bank Accounts"),[3] each of which is identified on

---

[3] For the avoidance of doubt, this Motion applies to all of the Bank Accounts irrespective of whether such account is identified herein.

**Exhibit C** attached hereto, that are held at six (6) different banks (collectively, the "Cash Management Banks").  The Debtors maintain Bank Accounts with the following banking institutions: (a) Leumi; (b) Pacific Western Bank ("PWB"); (c) UMB Bank ("UMB"); (d) M&T Bank Corporation ("M&T"); (e) East West Bank ("EWB"); and (f) Israel Discount Bank of New York ("IDB").  A general diagram of the movement of funds within the Cash Management System is attached hereto as **Exhibit D**.

12.  <u>Industries / Riverside, CA</u>.  The Bank Accounts used by Industries consist of three (3) Bank Accounts maintained at Leumi and PWB as follows:

a.  *Lockbox – Acct. No. *8500*.  Industries maintains a lockbox account at Leumi fonotice parties

r the deposit of almost all of its customers' receipts.  On average, approximately $2.9 million is deposited into the lockbox per month.  The balance of the funds in the lockbox is swept automatically on a daily basis to pay down the prepetition secured debt owing to Leumi.

b.  *Legacy Depository Account – Acct. No. *0727*.  Industries also maintains a depository account at PWB into which a small portion of customer receipts that do not go into the lockbox is deposited.  The PWB depository account does not sweep to pay Leumi.  Rather, funds are manually transferred by Industries' personnel to the disbursement account at Leumi. It is anticipated that customer receipts will be redirected and this account will be closed postpetition to the extent it would not jeopardize future collections.

c.  *Disbursement Account – Acct. No. *2801*.  Industries maintains a disbursement account at Leumi.  In accordance with the DIP Term Credit Agreement, loan advances will be transferred from an account of Holdings at Leumi as they are needed for operations. Additionally, advances from Bank Leumi will be credited directly to the disbursement account.  From the disbursement account, Industries makes payments to vendors and other operations creditors.

13.    <u>PinnPack</u>.  The Bank Accounts used by PinnPack consist of two (2) Bank

Accounts maintained at Leumi as follows:

> *a. Lockbox – Acct. No. *4801*.  PinnPack maintains a lockbox account at Leumi for the deposit of all of its customers' receipts.  On average, approximately $3 million is deposited into the lockbox per month. The balance of the funds in the lockbox is swept automatically on a daily basis to pay down the prepetition secured debt owing to Leumi.

> *b. Disbursement Account – Acct. No. *2900*.  PinnPack maintains a disbursement account at Leumi.  In accordance with the DIP Term Credit Agreement, loan advances will be transferred from an account of Holdings at Leumi as they are needed for operations. Additionally, advances from Leumi will be credited directly to the disbursement account.  From the disbursement account, PinnPack makes payments to vendors and other operations creditors.

14.    <u>CLP / PA Debtors</u>.  The Bank Accounts used by CLP consist of five (5)

Bank Accounts maintained at PWB, M&T, UMB, and EWB as follows:

> *a. Depository/Disbursement Account – Acct. No. *3525*.  CLP maintains a depository and disbursement account at PWB for the deposit of its customers' receipts.  From the account at PWB, funds are disbursed manually either directly to third party payees or to a disbursement account at M&T.  To date, average customer receipts deposited into the PWB account has been $334,000 per month, which amount is projected to ramp up going forward as the facility expands capacity.  As of the Petition Date, the approximate balance in the PWB depository account is less than $5,000.

> *b. Disbursement Account – Acct. No. *4155*.  CLP also maintains a disbursement account at M&T from which certain operating expenses have been paid.

> *c. Debt Service Reserve Account – Acct. No. *0570*.  Master and sub-accounts established pursuant to the PA Prepetition Indenture which were initially funded at close of CLP's initial bond funding and subsequent bond funding and are held as reserves, including funds held temporarily to pay bond principal and interest, and which are funded via monthly payments (i.e. funded for six months then disbursed in total. Example: payments in June - November from the Debtors, disbursed to PA Prepetition Bondholders in December).  As of the Petition Date, the approximate balance of this account is $5.9 million.

7

*d. LC Collateral Account – Acct. No. *4592.* CLP maintains a letter of credit issued by EWB in the amount of $2.05 million, for the benefit of the lessor of the Reading Facility and which is backed by a restricted cash deposit held at EWB. The cash remains on balance and only accessed if the letter of credit is drawn upon by the lessor.

e. *Inactive Account – Acct. No. *9368.* CLP established this account at PWB pursuant to the Debtors' prepetition bond financing requirements but this account has been dormant.

15.    <u>Recycling / TX Debtors</u>.  The Bank Accounts used by Recycling consist of five (5) Bank Accounts maintained at PWB, Leumi, UMB, and IDB as follows:

*a. Depository/Disbursement Account – Acct. No. *3707.* Recycling maintains a depository and disbursement account at PWB for the deposit of its customers' receipts.  From the account at PWB, funds are disbursed manually either directly to third party payees or to a disbursement account at Leumi.  On average, approximately $2.5 million is deposited into this account per month.  As of the Petition Date, the approximate balance in the PWB depository account is less than $5,000.

*b. Disbursement Account – Acct. No. *8900.* Recycling also maintains a disbursement account at Leumi from which certain operating expenses have been paid.

*c. Debt Service Reserve Account – Acct. No. *5229.* Master and sub-accounts established pursuant to the TX Prepetition Indenture which were initially funded at close of Recycling's initial bond funding and subsequent bond funding and are held as reserves, including funds held temporarily to pay bond principal and interest, and which are funded via monthly payments (i.e. funded for six months then disbursed in total. Example: payments in June - November from the Debtors, disbursed to TX Prepetition Bondholders in December).  As of the Petition Date, the approximate balance of this account is $4.3 million.

*d. LC Collateral Account – Acct. No. *1461.* Recycling maintains a letter of credit issued by IDB in the amount of $734,000, for the benefit of the lessor of the Dallas Facility and which is backed by a restricted cash deposit held by IDB.  The cash remains on balance and only accessed if the letter of credit is drawn upon by the lessor.

e. *Inactive Account – Acct. No. *5856.* Recycling established this account at PWB pursuant to the Debtors' prepetition bond financing requirements but this account has been dormant.

16.     <u>Holdings</u>.    The Bank Accounts used by Holdings consist of two (2) depository/disbursement accounts, one at Leumi (Acct. No. *7201) and one at PWB (Acct. No. *2405), which are used to pay certain shared expenses and costs of the corporate family. Additionally, as already described above, Holdings has a depository account at Leumi (Acct. No. *9301), wherein, in accordance with the DIP Term Credit Agreement, the proceeds of DIP Term Facility will be deposited and held pending transfer to the disbursement accounts of the other CA Debtors to pay operating expenses.  Such transfers from Holdings to the other CA Debtors of proceeds of the DIP Term Facility to be used for operations will be documented as intercompany claims with administrative expense priority in favor of Holdings.

## D.     The Intercompany Transactions

17.     *Shared Expenses*. In connection with the Debtors' ordinary course operations, certain shared expenses are paid by one of the Debtors and subsequently reimbursed by way of intercompany accounts and transfers.[4]  Specifically, Holdings pays health insurance premiums for the Debtors under a group policy and is then reimbursed for a proportionate share of such premiums from each of Industries, Recycling, CLP, and PinnPack.  Approximately $3.5 million of such expenses are paid by Holdings per year. Additionally, there are fourteen (14) individual employees (the "<u>Corporate Employees</u>") who perform corporate services for some or all of the Debtors, thirteen (13) of whom receive their paychecks from Industries and one of

---

[4] There are no shared non-Debtor intercompany transactions.

whom receives his paycheck from CLP, with proportionate shares of all fourteen (14) Corporate

Employees' compensation reimbursed by the other Debtors.[5]

18.     *DIP Term Loan Intercompany*. As noted above, it is contemplated that the

CA Debtors will receive the proceeds of the DIP Term Facility for operations as transfers from

Holdings.

**The Court Should Authorize the**
**Debtors to Maintain Existing Bank Accounts**

19.     The United States Trustee for the District of Delaware (the "United States

Trustee") has established certain operating guidelines for debtors in possession.  One such

provision requires chapter 11 debtors in possession to close all existing bank accounts and open

new bank accounts.  The guidelines also require that debtors open new bank accounts in certain

financial institutions designated as authorized depositories by the United States Trustee.  This

requirement, designed to provide a clear line of demarcation between prepetition and postpetition

claims and payments, helps protect against the inadvertent payment of prepetition claims by

preventing banks from honoring checks drawn before the Petition Date.

20.     The Debtors seek a waiver of the United States Trustee's requirement for

the closure of the Bank Accounts and opening of new postpetition bank accounts at depositories

authorized by the United States Trustee.  If strictly enforced in these cases, the requirement to

close and open new accounts would cause a severe disruption in the Debtors' activities and

would impair the Debtors' ability to operate under chapter 11.  Maintenance of the Bank

---

[5] Five (5) of the Corporate Employees also are employed by non-debtor HPC Industries, LLC ("HPC"), which is owned by Leon Farahnik, the Debtors' Chief Executive Officer.  These employees render enterprise-wide services. HPC is reimbursed proportionately by the Debtors.

Accounts and the Cash Management System will greatly facilitate the Debtors' operations in chapter 11. The continued maintenance of the Bank Accounts is of paramount importance for several reasons. First, the accounts are used to collect revenues and effectuate payments to employees and vendors. Closing these accounts would jeopardize the flow of cash from customers for use in the Debtors' operations. Second, certain components of the system are mandated by the requirements of the Prepetition Secured Parties and DIP Lenders. Third, two of the accounts that were established to hold deposits for letters of credit at EWB and IDB secure the Debtors' obligations to the lessors of the Dallas Facility and Reading Facility in accordance with the relevant real property leases. Closing these accounts and opening new accounts would be a significant burden on the Debtors.

21.     Almost all of the Bank Accounts are maintained by financial institutions (*e.g.*, Leumi and UMB) that are on the United States Trustee's approved depository list for the District of Delaware.[6] If the Bank Accounts were closed, the Debtors would have to open new accounts and then attempt to arrange alternative electronic and manual payment procedures for payments into and out of the Debtors' accounts, which would disrupt the flow of postpetition receipts and disbursements. In addition, closing the Bank Accounts would require the Debtors to cancel and reinstitute wire transfer instructions which would be difficult to modify under exigent circumstances. This disruption would severely impact and could irreparably harm the Debtors' ability to operate at this critical juncture. The Debtors should be permitted to maintain their

---

[6] While PWB is not on the approved depository list, (a) 100% of the TX Debtors' and the PA Debtors' respective customer receipts flow through PWB such that shutting them down precipitously risks interruption of cash flow, and (b) almost immediately upon receipt of customer deposits, the Debtors manually transfer the funds to non-PWB accounts (as reflected on Exhibit D and in paragraphs 14a., 14b., 15a. and 15b. above, such that the balance at PWB is almost always *de minimis*.

existing Bank Accounts and, if necessary, open new accounts as debtors in possession accounts, and/or close any unneeded existing Bank Accounts.

22.     To guard against improper transfers resulting from the postpetition honoring of prepetition checks, the Debtors will promptly notify each bank at which a Bank Account is maintained not to honor checks drawn on the Debtors' accounts before the Petition Date, except upon limited Court-approved exceptions (such as first day orders with respect to certain prepetition employee wage, tax and other liabilities).  Subject to a prohibition against honoring prepetition checks or offsets without specific authorization from this Court, the Debtors request that they be authorized to maintain and continue the use of their Bank Accounts in the same manner and with the same account numbers, styles, and document forms as those employed prepetition.

23.     If the relief requested herein is granted, the Debtors will not pay, and each of the banks where the Bank Accounts are maintained will be required not to pay, any debts incurred before the Petition Date, other than as specifically authorized through this the orders approving this Motion or otherwise ordered by the Court.

<strong>The Court Should Authorize the Debtors to<br>Continue Their Existing Cash Management System</strong>

24.     The Debtors hereby seek authority to continue to use their existing Cash Management System as such system may be modified by the Debtors upon notice to the Prepetition Secured Parties and DIP Lenders, as set forth in the Interim Order (as defined below) and Final Order (as defined below).  For the reasons set forth above, the Cash Management System constitutes an essential business practice and was created and implemented by the

12

management of the Debtors in the exercise of their business judgment.  The Cash Management

System provides numerous benefits, including the ability to (a) receive customer payments; (b)

allow a mechanism for debt service and reserves; (c) pay employee wages and benefits; and (d)

pay vendors, in addition to preserving a "business as usual" atmosphere and avoiding the

unnecessary distractions that inevitably would be associated with a substantial disruption of the

Cash Management System.  Moreover, the Debtors submit that the relief requested is consistent

with the relief provided to debtors in a number of other cases pending in this district, as

explained below.

### The Court Should Authorize the Payment of Outstanding Routine<br>Prepetition Expenses Relating to the Operation of the Cash Management System

25.    In the ordinary course of the operation and maintenance of the Cash

Management System, the Debtors incur routine bank charges and fees relating to the

administration of the Cash Management System.  While it is difficult to readily determine the

aggregate amount of unpaid prepetition banking fees as of the Petition Date (given, for example,

the applicable banks' varying timing of charging/deducting such fees from a given account), on

average, the Debtors pay approximately $30,000 per month for banking fees and charges.  The

Debtors seek authority, in their discretion, to pay any such routine and ordinary course

prepetition banking fees and charges owed to any affected bank and to continue the postpetition

payment of such fees and charges in the ordinary course of business.

**The Debtors Should Be Allowed to Continue the Intercompany
Transactions and Preserve Intercompany Setoff Rights**

26.     The Intercompany Transactions allow the Debtors to cover certain critical

costs in an efficient and in a cost-effective manner by sharing common employees and

centralizing the payment of premiums.  Accordingly, the Debtors believe that the continuation of

the Intercompany Transactions is beneficial to their estates, their creditors and other parties in

interest and, therefore, should be authorized by the Court.  As discussed above, for purposes of

this Motion, Intercompany Transactions include only those undertaken to reimburse for the cost

of shared Corporate Employees and health insurance described in paragraph 17 above.[7]

27.     To ensure each individual entity will not, at the expense of its creditors,

fund the operations of another entity, the Debtors respectfully request that, pursuant to sections

503(b)(1) and 364(b) of the Bankruptcy Code, all intercompany claims between and among

affiliated Debtors arising after the Petition Date as a result of Intercompany Transactions

(collectively, "Intercompany Claims"), be accorded administrative priority expense status against

the applicable Debtor only.  If Intercompany Claims are accorded administrative priority expense

status, each entity utilizing funds flowing through the Cash Management System should continue

to bear ultimate repayment responsibility for such ordinary course transactions.

---

[7] The Debtors engaged in the Intercompany Transactions on a regular basis prior to the Petition Date.  Such transactions are common for enterprises such as the Debtors.  The Debtors believe that these transactions are in the ordinary course within the meaning of section 363(c)(1) of the Bankruptcy Code and, thus, do not require this Court's approval.  Nevertheless, out of an abundance of caution, the Debtors are seeking express authority to engage in such transactions except to the extent such transactions are prohibited under any DIP Documents or debtor-in-possession financing orders (the "Financing Orders").

28.     The Debtors also seek authorization to preserve and exercise intercompany setoff rights with respect to the Intercompany Transactions described in paragraph 17 above.  Section 553(a) of the Bankruptcy Code provides that:

> Except as otherwise provided in this section and in sections 362 and 363 of this title, this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the Debtors that arose before the commencement of the case under this title against a claim of such creditor against the Debtors that arose before the commencement of the case . . . .

11 U.S.C. § 553(a).  A creditor need only establish two elements before a setoff may be asserted: mutuality and timing.  *Official Comm. of Unsecured Creditors v. Mfrs. & Traders Trust Co. (In re The Bennett Funding Group, Inc.)*, 212 B.R. 206, 212 (2d Cir. B.A.P. 1997); *see also In re Verco Industries*, 704 F.2d 1134, 1139 (9th Cir. 1983); *In re Lundell Farms*, 86 B.R. 582, 584 (Bankr. W.D. Wis. 1988).  Although courts have not uniformly defined the elements of mutuality, most courts require the following elements: that the debts be (a) owed between the same parties and (b) in the same right or capacity.  *See* 5 COLLIER ON BANKRUPTCY ¶ 553.03[3][a] (15th rev. ed. 2004) (citing *Davidovich v. Welton (In re Davidovich)*, 901 F.2d 1533, 1537 (10th Cir. 1990)); *Lubman v. Sovran Bank, N.A. (In re A & B Homes, Ltd.)*, 98 B.R. 243, 248 (Bankr. E.D. Va. 1989); *see also Cohen v. Savs. Bldg. & Loan Co. (In re Bevill, Bresler & Schulman Asset Mgmt. Corp.)*, 896 F.2d 54, 57 (3d Cir. 1990) (explaining that the right of setoff depends on the existence of mutual debts and claims between the creditor and debtor).  Timing requires that both claims arose prepetition.  *See Cooper Jarrett, Inc. v. Cent. Transp., Inc.*, 726 F.2d 93, 96 (3d Cir. 1984) (noting that a creditor may not [setoff] its prepetition claims against a debt owed to a debtor which came into existence after filing the bankruptcy petition);

15

*see also In re Sentinel Prods. Corp.*, 192 B.R. 41, 45 (S.D.N.Y. 1996) ("Section 553(a) of the bankruptcy code preserves a creditor's right to set off . . . between the Debtors and creditor as long as both debts arose before the commencement of the [bankruptcy] case"); *In re Westchester Structures*, 181 B.R. 730, 739 (Bankr. S.D.N.Y. 1995) (same); Arnold M. Quittner, *Setoff and Recoupment*, 715 PLI/Comm 633, 661 (1995) (same).[8]  As a result, "a creditor may not set off a prepetition claim against a post-petition debt it owes the debtor, and likewise it may not set off a post-petition claim that it has against a pre-petition debt it owes to a debtor." *In re Metco Mining and Minerals, Inc.*, 171 B.R. 210, 216 (Bankr. W.D. Pa. 1994); *see also Westchester Structures*, 181 B.R. at 739.

29.    The Cash Management System and other processes allow the Debtors to track all obligations owing between related entities and thereby ensure that all setoffs of Intercompany Transactions will meet both the mutuality and timing requirements of section 553 of the Bankruptcy Code.   The Debtors seek the authority to continue their Intercompany Transactions in the ordinary course of business except to the extent certain transactions are prohibited under the terms of any DIP Document.   The Debtors also respectfully request, therefore, that the Debtors expressly be authorized to set off obligations postpetition arising on account of Intercompany Transactions between the Debtors.   For the avoidance of doubt, the Debtors are not seeking authority by this Motion to satisfy prepetition claims arising out of

---

[8] In addition, courts have allowed parties to offset claims postpetition in the same manner as a prepetition setoff, as long as the mutuality requirements are met.  *See, e.g., United States v. Gordon Sel Way, Inc. (In re Gordon Sel-Way, Inc.)*, 239 B.R 741, 751 (E.D. Mich. 1999), *aff'd*, 270 F.3d 280 (6th Cir. 2001); *In re Mohawk Indus., Inc.*, 82 B.R. 174, 179 (Bankr. D. Mass. 1987).

Intercompany Transactions by offsetting such prepetition Intercompany Transactions against prepetition or postpetition Intercompany Transactions.

**The Court Should Grant a Limited Waiver**
**Pursuant to Section 345(b) of the Bankruptcy Code**

30.     The Debtors seek a waiver of section 345(b) of the Bankruptcy Code to the extent required.  The waiver would permit the Debtors to maintain the Bank Accounts without posting a bond or other security, as would otherwise be required under section 345(b) whenever the funds on deposit exceed the amount permitted under section 345(b).  As explained above, all of the Bank Accounts are maintained at the Banks, which are federally insured institutions.

**Authority for the Requested Relief**

A.     **The Continued Use of the Debtors' Routine Cash Management System**
**and Bank Accounts Is Essential and Approval to Maintain the Status**
**Quo Is Routinely Granted Under Bankruptcy Code Sections 363 and 105**

31.     Bankruptcy courts routinely grant chapter 11 debtors authority to continue utilizing existing cash management systems, and treat requests for such authority as a relatively "simple matter."  *In re Baldwin-United Corp.*, 79 B.R. 321, 327 (Bankr. S.D. Ohio 1987).  This is particularly true where, as here, the chapter 11 cases involve affiliated entities with complex financial affairs.  In *In re Charter Co.*, 778 F.2d 617 (11th Cir. 1985), for example, the bankruptcy court entered an order authorizing the debtors and forty-three (43) of their subsidiaries "to continue to consolidate the management of their cash as has been usual and customary in the past, and to transfer monies from affiliated entity to entity, including operating entities that are not debtors."  *Id*. at 620.  The Eleventh Circuit Court of Appeals then affirmed a

17

subsequent district court decision denying a creditor's motion for leave to appeal the bankruptcy court's cash management order, holding that authorizing the debtors to utilize their prepetition "routine cash management system" was "entirely consistent" with applicable provisions of the Bankruptcy Code. *Id*. at 621.

32.     Likewise, in another context, the bankruptcy court in the *Columbia Gas* chapter 11 case explained that a centralized cash management system "allows efficient utilization of cash resources and recognizes the impracticability of maintaining separate cash accounts for the many different purposes that require cash." *In re Columbia Gas Sys., Inc.*, 136 B.R. 930, 934 (Bankr. D. Del. 1993), *aff'd in part and rev'd in part*, 997 F.2d 1039 (3d Cir. 1993), *cert. denied sub nom Official Comm. of Unsecured Creditors v. Columbia Gas Transmission Corp.*, 114 S. Ct. 1050 (1994).  The United States Court of Appeals for the Third Circuit agreed, emphasizing that a requirement to maintain all accounts separately "would be a huge administrative burden and economically inefficient." *Columbia Gas*, 997 F.2d at 1061.  *See also In re Southmark Corp.*, 49 F.3d 111, 114 (5th Cir. 1995) (cash management system allows debtors "to administer more efficiently and effectively their financial operations and assets"); *In re UNR Indus., Inc.*, 46 B.R. 25, 27 (Bankr. N.D. Ill. 1984).

33.     Section 363(c)(1) of the Bankruptcy Code authorizes the debtors in possession to "use property of the estate in the ordinary course of business without notice or a hearing." 11 U.S.C. § 363(c)(1).  The purpose of section 363(c)(1) of the Bankruptcy Code is to provide debtors in possession with the flexibility to engage in the ordinary transactions required to operate their business without undue oversight by creditors or the court. *Medical Malpractice*

DOCS_LA:335344.12 13044/001

*Ins. Ass'n. v. Hirsch (In re Lavigne)*, 114 F.3d 379, 384 (2d Cir. 1997). Included within the purview of section 363(c) is a debtor's ability to continue the "routine transactions" necessitated by a debtor's cash management system. *Amdura Nat'l Distrib. Co. v. Amdura Corp. (In re Amdura Corp.)*, 75 F.3d 1447, 1453 (10th Cir. 1996). Accordingly, the Debtors seek authority under section 363(c)(1) of the Bankruptcy Code to continue the collection and disbursement of cash pursuant to their existing Cash Management System. Additionally, the Court may exercise their equitable powers to grant the relief requested herein. Section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary to carry out the provisions of this title." 11 U.S.C. § 105(a). Continuing the Debtors' Cash Management System without interruption is vital to the success of their chapter 11 cases.

34.    In other cases in the District of Delaware, this Court has granted relief substantially similar to that requested in this Motion. *See, e.g.*, *In re RTI Holding Co., LLC*, Case No. 20-12456 (JTD) (Bankr. D. Del. Nov. 5, 2020); *In re TZEW Holdco, LLC*, Case No. 20-10910 (CSS) (Bankr. D. Del. Apr. 14, 2020); *In re Videology, Inc.*, Case No. 18-11120 (BLS) (Bankr. D. Del. May 11, 2018); *In re Gibson Brands, Inc.*, Case No. 18-11025 (CSS) (Bankr. D. Del. May 2, 2018) (same); *In re Bertucci's Holdings, Inc.*, Case No. 18-10894 (MFW) (Bankr. D. Del. May 3, 2018) (on final basis); *In re The Bon-Ton Stores, Inc.*, Case No. 18-10248 (MFW) (Bankr. D. Del. Mar. 6, 2018) (same); *In re Aerospace Holdings, Inc.*, Case No. 17-10635 (KG) (Bankr. D. Del. April 19, 2017) (same). Accordingly, the Debtors request that the Court approve the continued use of the Debtors' Cash Management System and Bank Accounts.

DOCS_LA:335344.12 13044/001

**B.**    **The Bank Accounts Are In Compliance With
Section 345(b) of the Bankruptcy Code**

35.    Section 345(a) authorizes deposits or investments of money "as will yield

the maximum reasonable net return on such money, taking into account the safety of such

deposit or investment."  Section 345(b) provides:

> Except with respect to a deposit or investment that is insured or
> guaranteed by the United States or by a department, agency, or
> instrumentality of the United States or backed by the full faith and
> credit of the United States, the trustee shall require from an entity
> with which such money is deposited or invested --
>
> 1)    a bond –
>
>     A.    in favor of the United States;
>
>     B.    secured by the undertaking of a corporate
>         surety approved by the United States trustee
>         for the district in which the case is pending;
>         and
>
>     C.    conditioned on --
>
>         i)    a proper accounting of all money so
>             deposited or invested and for any
>             return on such money;
>
>         ii)    prompt repayment of such money
>             and return; and
>
>         iii)    faithful performance of duties as a
>             depository; or
>
> 2)    the deposit of securities of the kind specified in
>     section 9303 of title 31 unless the court for cause
>     orders otherwise.

36.    As noted above, most of the Bank Accounts and substantially all cash

balances are located at Leumi, UMB, and other financial institutions which are parties to

standing collateral agreements with the United States Trustee.  Moreover, Bank Accounts at

other institutions have cash balances well below the FDIC-insured limits.  Therefore, the Bank

Accounts are in compliance with the security or bonding requirements prescribed by section

20

345(b) of the Bankruptcy Code and no security or bonds are necessary to secure the funds in such accounts. Alternatively, the Debtors seek a limited waiver of the requirements of section 345(b) of the Bankruptcy Code solely as required to enable the Debtors' continued use of their Cash Management System as described herein.

**C.    The Court Should Grant the Debtors Authority
to Use Existing Checks and Related Forms**

37.    To minimize expense to their estates, the Debtors request authority to continue using their respective existing pre-printed check stock, deposit slips, and related forms without reference to their "debtors in possession" status until the existing stock has been exhausted, provided that the Debtors shall add the "debtor in possession" designation to any new checks ordered after the depletion of the existing stock. As a result of the notice that will be sent of the filing of the Debtors' chapter 11 cases and the publicity of the filing, parties doing business with the Debtors undoubtedly will be aware of the Debtors' status as a chapter 11 debtors in possession. For this reason, the Debtors request that they be authorized to use existing checks and deposit slips without placing the label "debtor in possession" on each such form until such a time as their existing stocks are depleted. In addition, the Debtors request a reasonable amount of time to alter their software to provide for the insertion of "debtor in possession" on postpetition purchase orders and invoices, which the Debtors estimate may take up to four (4) weeks to implement.

38.    Similar relief has been granted in this district. *See, e.g., In re RTI Holding Co., LLC*, Case No. 20-12456 (JTD) (Bankr. D. Del. Nov. 5, 2020); *In re Highland Capital Management, L.P.*, Case No. 19-12239 (CSS) (Bankr D. Del. Dec. 4, 2019); *In re iPic-Gold*

*Class Entertainment LLC*, Case No. 19-11739 (LSS) (Bankr. D. Del. Aug. 6, 2019); *In re Fuse, LLC*, Case No. 19-10872 (KG) (Bankr. D. Del. June 18, 2019); *In re The Walking Company Holdings, Inc.*, Case No. 18-10474 (LSS) (Bankr. D. Del. Mar. 8, 2018); *In re TerraVia Holdings, Inc.*, Case No. 17-11655 (CSS) (Bankr. D. Del. Aug. 30, 2017); *In re CST Indus. Holding Inc.*, Case No. 17-11292 (BLS) (Bankr. D. Del. July 13, 2017); *In re True Religion Apparel, Inc.* Case No. 17-11460 (CSS) (Bankr. D. Del. July 31, 2017); *In re Aquion Energy, Inc.*, Case No. 17-10500 (KJC) (Bankr. D. Del. March 10, 2017)*; In re Malibu Lighting* Corporation*, et al.*, Case No. 15-12082 (KG) (Bankr. D. Del. Oct. 9, 2015).

## **Waiver of Bankruptcy Rules 6003 and 6004**

39.     Pursuant to Bankruptcy Rule 6003(b), "a motion to pay all or part of a claim that arose before the filing of the petition" shall not be granted by the Court within 21 days of the Petition Date "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm . . . ." Fed. R. Bankr. P. 6003(b).  For the reasons described more fully above, and as supported by the First Day Declaration, and to the extent that the relief requested herein implicates Bankruptcy Rule 6003(b), the Debtors submit that the requirements of Bankruptcy Rule 6003 have been met and that the relief requested in this Motion is necessary to avoid immediate and irreparable harm.

40.     Finally, to implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h), to the extent these rules are applicable.

DOCS_LA:335344.12 13044/001

## **Notice**

41.    Notice of this Motion shall be given to the following parties or, in lieu thereof, to their counsel, if known: (a) the Office of the United States Trustee for the District of Delaware; (b) counsel to the DIP Term Agent, DIP Term Lenders, and Prepetition Term Secured Parties; (c) counsel to the DIP ABL Lender and Prepetition ABL Secured Parties (d) counsel to the TX/PA DIP Agents and Prepetition Trustees; (e) the Debtors' forty largest unsecured creditors on a consolidated basis; and (f) all parties entitled to notice pursuant to Local Rule 9013-1(m)(iii).  As the Motion is seeking "first day" relief, within two business days after the hearing on the Motion, the Debtors will serve copies of the Motion and any order entered respecting the Motion as required by Local Rule 9013-1(m)(iv).  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## **No Prior Request**

42.    No prior motion for the relief requested herein has been made to this or any other Court.

WHEREFORE, the Debtors respectfully request that the Court enter an interim order substantially in the form attached hereto as **Exhibit A** (the "Interim Order") and a final order substantially in the form attached hereto as **Exhibit B** (the "Final Order"), in each case (a) granting the relief requested herein, and (b) granting such other relief as is just and proper.

Dated:   March 8, 2021

PACHULSKI STANG ZIEHL & JONES LLP

*/s/ James E. O'Neill*
Richard M. Pachulski (CA Bar No. 90073)
Gabriel I. Glazer (CA Bar No. 246384)
James E. O'Neill (DE Bar No. 4042)
Steven W. Golden (NY Bar No. 5374152)
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899 (Courier 19801)
Tel:  (302) 652-4100
Fax: (302) 652-4400
Email: rpachulski@pszjlaw.com
        gglazer@pszjlaw.com
        joneill@pszjlaw.com
        sgolden@pszjlaw.com

*Proposed Attorneys for Debtors and Debtors in Possession*

DOCS_LA:335344.12 13044/001