## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CARBONLITE HOLDINGS LLC, *et al.*,[1] | ) | Case No. 21-10527 (JTD) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**TX/PA DEBTORS' MOTION PURSUANT TO SECTIONS 105, 361, 362, 363, 364, 503 AND 507 OF THE BANKRUPTCY CODE SEEKING ENTRY OF INTERIM AND FINAL ORDERS  (I) AUTHORIZING THE TX/PA DEBTORS TO OBTAIN SENIOR SECURED SUPERPRIORITY POSTPETITION FINANCING; (II) GRANTING (A) LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, AND (B) ADEQUATE PROTECTION TO THE PREPETITION SECURED PARTIES; (III) AUTHORIZING THE USE OF CASH COLLATERAL; (IV) MODIFYING THE AUTOMATIC STAY; (V) SCHEDULING A FINAL HEARING; AND (VI) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession CarbonLite Recycling Holdings, LLC ("TX Holdings"), CarbonLite Recycling, LLC ("Recycling", and together with TX Holdings, the "TX Debtors"), CarbonLite P Holdings, LLC ("PA Holdings"), CarbonLite P, LLC ("CLP", and together with PA Holdings, the "PA Debtors", and together the TX Debtors, the "TX/PA Debtors", and collectively with the other above-captioned debtors and debtors in possession, the "Debtors") in these chapter 11 cases (the "Chapter 11 Cases"),[2] respectfully state as follows in support of this Motion (as defined below):

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: CarbonLite Holdings LLC (8957); CarbonLite Industries LLC (3596); CarbonLite P Holdings LLC (8957); CarbonLite P LLC (5453); CarbonLite PI Holdings LLC (8957); CarbonLite Pinnpack LLC (8957); CarbonLite Recycling Holdings LLC (8957); CarbonLite Sub-Holdings, LLC (8957); Pinnpack P, LLC (8322); CarbonLite Recycling LLC (3727); and Pinnpack Packaging LLC (9948).  The address of the Debtors' corporate headquarters is 10250 Constellation Blvd., Los Angeles, CA 90067.

[2] Where applicable to the rights, remedies and protections sought in connection with the approval of the DIP Facilities (defined below), references to the Chapter 11 Cases refer to the Chapter 11 Cases of the TX/PA Debtors.

**Overview**

1.    The TX/PA Debtors bring this financing motion (the "Motion")[3] pursuant to sections 105, 361, 362, 363, 364(c)(l), 364(c)(2), 364(c)(3), 364(d), 364(e), 503, and 507 of title 11 of the United States Code (the "Bankruptcy Code"), rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rule 4001-2 and 9013-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), for entry of interim orders (respectively, the "TX Interim Order"[4] and the "PA Interim Order,"[5] together, the "Interim Orders") and, following a final hearing, final orders (respectively, the "TX Final Order" and the "PA Final Order", and together, the "Final Orders", and collectively with the Interim Orders, the "DIP Orders"): (i) authorizing the TX/PA Debtors to obtain senior secured superpriority postpetition financing pursuant to section 364 of the Bankruptcy Code, (ii) authorizing each of the TX/PA Debtors to use cash collateral of the TX/PA Debtors, (iii) granting liens and superpriority administrative expense claims, (iv) granting adequate protection to the Prepetition Secured Parties (defined below), (v) modifying the automatic stay, (vi) scheduling a final hearing, and (viii) granting related relief.[6]

---

[3] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the applicable DIP Orders or DIP Credit Agreements (each as defined below).

[4] The TX Interim Order is attached hereto as **Exhibit A**.

[5] The PA Interim Order is attached hereto as **Exhibit B**.

[6] For the avoidance of doubt, there are separate debtor-in-possession facilities for each of the TX Debtors and the PA Debtors. The obligations under each facility will be secured by separate liens on the respective collateral and will not be cross-collateralized.

DOCS_NY:42509.9

2.      The Debtors commenced these cases in order to maximize their collective going concern value for the benefit of all stakeholders.  The Debtors intend to conduct a marketing and sale process through these Chapter 11 Cases to preserve jobs and yield distributions to their creditors.  However, the TX/PA Debtors need financing and access to cash collateral in order to maintain their operations and facilitate the sale and restructuring process.

3.      For the avoidance of doubt, only the TX/PA Debtors are seeking debtor-in-possession financing and authorization to use cash collateral of the TX/PA Debtors by this Motion.  Concurrently herewith, Debtors CarbonLite Holdings, LLC ("Holdings"), CarbonLite Sub-Holdings, LLC ("Sub-Holdings"), CarbonLite Industries LLC ("CL Industries"), CarbonLite Pinnpack, LLC ("CL Pinnpack"), Pinnpack Packaging, LLC ("Pinnpack"), CarbonLite PI  Holdings LLC ("CA Holdings"), and Pinnpack P, LLC ("Pinnpack P", and collectively with Holdings, Sub-Holdings, CL Industries, CL Pinnpack, Pinnpack, and CA Holdings, the "CA Debtors") are seeking the Court's approval to obtain separate debtor-in-possession financing and authorization to use cash collateral of the CA Debtors to finance their respective operations (the "CA DIP Motion").

4.      The proceeds of the DIP Facilities (defined below) will be used to (a) pay costs, fees, and expenses related to the Chapter 11 Cases of the TX/PA Debtors and in connection with the DIP Facilities, including, without limitation, payments of interest, fees and expenses owed to the DIP Lenders and the DIP Agents (each as defined below); (b) make permitted adequate protection payments in respect of the Prepetition Obligations (as defined

below) as provided for in this Interim Order; and (c) provide financing for working capital and general corporate purposes (including capital expenditures) of the TX/PA Debtors.

5.      The DIP Facilities present these estates with the best economic terms available and provide the TX/PA Debtors with adequate liquidity to maintain operations in the ordinary course and satisfy ongoing administrative expenses associated with the Chapter 11 Cases of the TX/PA Debtors.

6.      An immediate and ongoing need exists for the TX/PA Debtors to (a) obtain the DIP Facilities in order to permit, among other things, the orderly continuation of the operation of their business; (b) maintain vital business relationships with vendors, suppliers and customers and to meet payroll obligations; and (c) satisfy other working capital, development, and operational needs in order to maximize the value of their respective businesses and assets as debtors in possession under chapter 11 of the Bankruptcy Code.   The TX/PA Debtors do not have sufficient available resources of working capital to operate their businesses in the ordinary course without post-petition financing and the use of cash collateral.   The TX/PA Debtors' ability to maintain business relationships, pay employees, and otherwise fund operations is essential to the TX/PA Debtors' viability and to the preservation of the going concern value of their businesses pending a sale of their assets or other restructuring.

7.      The TX/PA Debtors seek entry of the interim and final orders, substantially in the forms of the Interim Orders and Final Orders (to be submitted at a later date):

    a.    authorizing the TX Debtors to obtain senior secured postpetition term financing on a superpriority basis in the aggregate principal amount of $15.0 million (the "<u>TX DIP Facility</u>," the commitments made under the TX DIP Facility, the "<u>TX DIP Commitments</u>," and the loans made under

the TX DIP Facility, the "<u>TX DIP Loans</u>") on the terms and conditions substantially in the form annexed hereto as **<u>Exhibit C</u>** (as the same may be amended, restated, amended and restated, supplemented, waived, extended, or otherwise modified from time to time, the "<u>TX DIP Credit Agreement</u>," together with any other related agreements, documents, security agreements, pledge agreements, or intercreditor agreements, including the TX Interim Order and the TX Final Order, collectively, the "<u>TX DIP Documents</u>"), by and among Recycling (the "<u>TX Borrower</u>"), Recycling Holdings (together with the Borrower, the "<u>TX DIP Loan Parties</u>"), UMB Bank, N.A. ("<u>UMB</u>"), as administrative agent and collateral agent (in such capacities, the "<u>TX DIP Agent</u>"), and the lenders party thereto from time to time (the "<u>TX DIP Lenders</u>," and, together with the TX DIP Agent, the "<u>TX DIP Secured Parties</u>");

b.      authorizing the TX DIP Facility to consist of a new money term loan facility in the aggregate principal amount of $15.0 million;

c.      authorizing the TX Debtors, upon entry of the TX Interim Order and satisfaction or waiver of the other conditions set forth therein and in the TX DIP Documents, to make a single draw of TX DIP Commitments in the principal amount of $7 million (the "<u>TX Interim Amount</u>");

d.      authorizing the TX Debtors, upon entry of the TX Final Order and satisfaction or waiver of the other conditions set forth therein and in the TX DIP Documents, to make a final draw of the full remaining amount of the TX DIP Commitments;

e.      authorizing the PA Debtors to obtain senior secured postpetition term financing on a superpriority basis in the aggregate principal amount of $25 million (the "<u>PA DIP Facility</u>," and, together with the TX DIP Facility, the "<u>DIP Facilities</u>") on the terms and conditions substantially in the form annexed hereto as **<u>Exhibit D</u>** (as the same may be amended, restated, amended and restated, supplemented, waived, extended, or otherwise modified from time to time, the "<u>PA DIP Credit Agreement</u>,"[7] together with any other related agreements, documents, security agreements, pledge agreements, or intercreditor agreements, including the PA Interim Order and the PA Final Order, collectively, the "<u>PA DIP Documents</u>" and, together with the TX DIP Documents, the "<u>DIP Documents</u>"), by and among CLP (the "<u>PA Borrower</u>"), PA Holdings (together with the Borrower, the "<u>PA DIP Loan Parties</u>," and, together with the TX DIP Loan Parties, the "<u>DIP Loan Parties</u>"), UMB, as administrative agent and collateral agent (in such capacities, the "<u>PA DIP Agent</u>," and, together with the TX DIP Agent, the "<u>DIP Agents</u>"), and the lenders party thereto from time to time (the "<u>PA DIP Lenders</u>," and, together with the TX DIP

---

[7] The TX DIP Credit Agreement and the PA DIP Credit Agreement are referred to herein as the "<u>DIP Credit Agreements</u>."

Lenders, the "<u>DIP Lenders</u>," and, the PA DIP Lenders and the  PA DIP Agent collectively, the "<u>PA DIP Secured Parties,</u>" and, together with the TX DIP Secured Parties, the "<u>DIP Secured Parties</u>");

f.    authorizing the PA DIP Facility to consist of (a) a new money term loan facility in an aggregate principal amount of up to $25 million (the "<u>PA New Money DIP Facility</u>," the commitments under the PA New Money DIP Facility, the "<u>PA New Money DIP Commitments</u>," and the loans made under the PA New Money DIP Facility, the "<u>PA New Money DIP Loans</u>"), and (b) a roll-up facility (the "<u>PA Roll-Up Facility</u>," and the loans deemed made under the PA Roll-Up Facility, the "<u>PA Roll-Up Loans</u>," and the PA Roll-Up Loans together with the PA New Money DIP Loans, the "<u>PA DIP Loans</u>," and the PA DIP Loans together with the TX DIP Loans, the "<u>DIP Loans</u>"), which will "roll-up" the PA Series 2019 Bonds (as defined below) of each DIP Lender or its designated affiliate(s) into PA Roll-Up Loans on a basis of $2.00 dollars for each $1.00 dollar of PA New Money DIP Loan made by such PA DIP Lender;

g.    authorizing the PA Debtors, upon entry of the PA Interim Order and satisfaction or waiver of the other conditions set forth therein and in the PA DIP Documents, to (x) make a single draw of PA New Money DIP Commitments in the principal amount of $14 million (the "<u>PA Interim Amount</u>," and, together with the TX Interim Amount, the "<u>TX/PA Interim Amounts</u>"); and (y) borrow (or be deemed to borrow) PA Roll-Up Loans in an aggregate principal amount of $28 million;

h.    authorizing the PA Debtors, upon entry of the PA Final Order and satisfaction or waiver of the other conditions set forth therein and in the PA DIP Documents, to (x) make a final draw of the full remaining amount of the PA New Money DIP Commitments, and (y) borrow (or be deemed to borrow) PA Roll-Up Loans in an aggregate principal amount of $22 million;

i.    authorizing the TX/PA Debtors to execute and deliver the applicable DIP Documents and to perform such other acts as may be necessary or desirable in connection with such DIP Documents;

j.    authorization for the DIP Loan Parties, immediately upon entry of the Interim Orders, to use proceeds of the applicable DIP Facility (collectively, the "<u>DIP Loan Proceeds</u>") as expressly provided in the applicable DIP Documents and solely in accordance with the Interim Orders and the applicable Budget (as defined below);

k.    granting the DIP Facilities and all obligations owing thereunder and under, or secured by, the applicable DIP Documents to the applicable DIP Agent and the applicable DIP Lenders (collectively, and including all "Obligations" as defined in § 1.01 of the respective DIP Credit

Agreements, the "<u>DIP Obligations</u>") allowed superpriority administrative expense claim status in each of the Chapter 11 Cases of the applicable TX/PA Debtors and any Successor Cases (as defined below) of the applicable TX/PA Debtors;

l.　　　granting the applicable DIP Agent, for the benefit of itself and the applicable DIP Lenders, automatically perfected security interests in and liens on all of the applicable DIP Collateral (as defined below), including all property constituting "cash collateral" as defined in section 363(a) of the Bankruptcy Code ("<u>Cash Collateral</u>"), which liens shall have the priorities described below;

m.　　　authorizing the TX/PA Debtors to pay the principal, interest, premiums, fees, expenses, and other amounts payable under the applicable DIP Documents as such become earned, due and payable, to the extent provided in, and in accordance with, the applicable DIP Documents and the applicable Interim Orders;

n.　　　authorizing the TX/PA Debtors to use the applicable Prepetition Collateral (as defined below), including the Cash Collateral of the applicable Prepetition Secured Parties (as defined below) under the applicable Prepetition Documents (as defined below), and providing adequate protection to the applicable Prepetition Secured Parties for, among other things, any diminution in value resulting from the imposition of the automatic stay, the applicable TX/PA Debtors' use, sale, or lease of the applicable Prepetition Collateral, including Cash Collateral of the applicable TX/PA Debtors, and the priming of the applicable Prepetition Secured Parties' respective interests in the applicable Prepetition Collateral (including by the Carve-Out (as defined below)) ("<u>Diminution in Value</u>") of their respective interests in the applicable Prepetition Collateral;

o.　　　vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and the Interim Orders;

p.　　　scheduling a final hearing (the "<u>Final Hearing</u>") within 35 days of the Petition Date (as defined below) to consider the relief requested in the Motion and approving the form of notice with respect to the Final Hearing; and

q.　　　granting related relief.

**Jurisdiction and Venue**

8.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtors confirm their consent pursuant to Local Rule 9013-1(f) to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

9.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

10.      The statutory bases for the relief requested herein are sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d), 364(e), 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001(c), 6003, and 9014, and Local Rules 4001-2 and 9013-1.

**Background**

11.      On the date hereof (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The TX/PA Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases, and no committees have been appointed or designated.

12.     The Debtors are on the forefront of processing post-consumer recycled polyethylene terephthalate ("rPET") plastic products and producing high-quality rPET and polyethylene terephthalate ("PET") beverage and food packaging products.  As of the Petition Date, the Debtors operate two facilities, one in Dallas, Texas (the "Dallas Facility") and the other in Riverside, California (the "Riverside Facility") at which they process PET bottles and flake into rPET pellets, which are later incorporated into other products and packaging.  The Debtors are scheduled to begin operations at a third processing facility in Reading, Pennsylvania (the "PA Facility") in April 2021.  The Debtors also operate PinnPack, which processes the rPET and PET into high-quality thermoformed packaging and similar products at a facility in Oxnard, California (the "Pinnpack Facility")[8] which the Debtors sell to customers including restaurants and grocery stores.  A detailed description of the Debtors' business and facts precipitating the filing of the Debtors' Chapter 11 Cases are set forth in the *Declaration of Brian Weiss in Support of Debtors' Chapter 11 Petitions and First Day Relief* (the "First Day Declaration"), incorporated herein by reference.  Additionally, the TX/PA Debtors submit *Declaration of Richard W. Morgner in Support of the Debtors' Motions for Entry of Interim and Final Orders (A) Authorizing the Debtors to Obtain Postpetition Financing, (B) Authorizing the Debtors to Use Cash Collateral, (C) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (D) Granting Adequate Protection to Prepetition Secured Parties, (E) Modifying the Automatic Stay, (F) Scheduling a Final Hearing, and (G) Granting*

---

[8] The Pinnpack Facility and the Riverside Facility are referred to, collectively, as the "CA Facilities".

*Related Relief* (the "Morgner Declaration"), filed contemporaneously herewith, in further support of this Motion.

<u>**Overview of Prepetition Secured Financing**</u>

**A.    Debtors' Prepetition Capital Structure**

      **i.    Ownership Structure**

13.    Holdings, a Delaware limited liability company, is the ultimate parent of the other Debtor entities and is privately held.   As of the Petition Date, Holdings had issued 11 series of membership units, which are held of record by approximately 67 parties.   All of the entities listed below are limited liability companies organized under the Limited Liability Company Act of the State of Delaware.  *See* First Day Declaration, at ¶ 18.

14.    Holdings owns 100% of the membership interests in Subholdings. Subholdings, in turn, owns 100% of the membership interests in each of TX Holdings and PA Holdings.  *See id.* at ¶ 19.

15.    TX Holdings owns 100% of the membership interests in Recycling which operates the Dallas Facility.  *See id.* at ¶ 21.

16.    PA Holdings owns 100% of the membership interests in CLP which operates the Reading Facility.  *See id.*

17.    Subholdings also owns 100% of the membership interests in CA Holdings. CA Holdings owns 100% of the membership interests in each of Industries and CL Pinnpack. Industries operates the Riverside Facility, an rPET plastic beverage container recycling and processing facility, under a long term lease.  CL Pinnpack owns 99.295% of the membership

10

interests in PinnPack,[9] which owns the Pinnpack Facility producing high-quality, food-grade thermoformed PET and rPET packaging products. Pinnpack owns 100% of the membership interests in Pinnpack P an inactive entity with no assets or liabilities. *See id.* at ¶¶ 19-20.

      **ii.**        **TX Prepetition Bonds - TX Debtors**

      18.     *TX Prepetition Documents.* Mission Economic Development Corporation (the "TX Bonds Issuer") and UMB, as trustee (in such capacity, the "TX Prepetition Trustee"), are parties to that certain Indenture, dated as of October 1, 2016 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "TX Prepetition Indenture" and, collectively, with all other agreements, documents, and instruments executed and/or delivered with, to or in favor of the TX Prepetition Secured Parties, including, without limitation, the TX Loan Agreement (as defined below), the TX Bonds Guaranty (as defined below), all security agreements (including the TX Bonds Deed of Trust (defined below) and TX Bonds Security Agreement (defined below)), notes, guarantees, mortgages, Uniform Commercial Code financing statements, documents, and instruments, including any fee letters, executed and/or delivered in connection therewith or related thereto, the "TX Prepetition Documents") pursuant to which the Solid Waste Disposal Revenue Bonds (CarbonLite Recycling LLC Project), Series 2016 (AMT) (the "TX Bonds" and, the holders of TX Bonds, the "TX Prepetition Bondholders" and, the TX Prepetition Bondholders together with the TX Prepetition Trustee, the "TX Prepetition Secured Parties") were issued in an aggregate principal amount of $50,000,000. The TX Bonds Issuer loaned the proceeds of the TX Bonds to Recycling pursuant

---

[9] The other .705% of the membership interests in Pinnpack are held by non-Debtor Leading Industry, Inc., an unrelated entity which formerly owned the business conducted by Pinnpack.

to that certain Loan Agreement, dated as of October 1, 2016 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "TX Loan Agreement") to finance the acquisition, construction and equipping of the Dallas Facility.  Pursuant to the terms of the TX Prepetition Indenture, the TX Bonds Issuer's rights and interest in the TX Loan Agreement, the related note, all revenues and amounts held in any funds established under the TX Prepetition Indenture, and all of the collateral security held by the TX Bonds Issuer in connection with the TX Loans Agreement have been assigned to the TX Prepetition Trustee for the benefit of the holders of the TX Bonds.  TX Holdings (together with the TX Bonds Issuer, the "TX Prepetition Obligors") guarantees the payment of the obligations of the TX Bonds and under the TX Loan Agreement pursuant to that certain Guaranty Agreement dated October 1, 2016 (the "TX Bonds Guaranty") between TX Holdings and the TX Prepetition Trustee.

19.    *TX Prepetition Obligations*.  As of the Petition Date, the TX Prepetition Obligors were indebted and liable, without defense, challenge, objection, claim, counterclaim, or offset of any kind, in the aggregate principal amount of not less than $45,765,000 in respect of outstanding principal amount of the TX Bonds, plus any accrued and unpaid interest, fees, expenses, and disbursements (including, without limitation, any attorneys', advisors', accountants', appraisers', financial advisors', and other consultants' fees and expenses, in each case that are chargeable or reimbursable under the TX Prepetition Documents), indemnification obligations, and other charges, amounts, and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the TX Prepetition Obligors' obligations pursuant to the TX Prepetition Documents, including,

for the avoidance of doubt, all interest, fees, costs, and other charges allowable under section 506(b) of the Bankruptcy Code (collectively, the "TX Prepetition Obligations").

20.     *TX Prepetition Liens*.   Payment of the TX Prepetition Obligations is guaranteed by TX Holdings and is secured by substantially all of the real and personal property assets of the TX Prepetition Obligors, and all proceeds, products, accessions, rents, and profits thereof, in each case, whether then owned or existing or thereafter acquired or arising (the "TX Prepetition Collateral") pursuant to that (i) certain Leasehold Deed of Trust Security Agreement and Assignment of Rents and Leases (the "TX Bonds Deed of Trust") dated as of October 27, 2016, between Recycling and the TX Prepetition Trustee, and that certain (ii) Pledge and Security Agreement (the "TX Bonds Security Agreement") dated as of October 27, 2016, among Recycling, TX Holdings and the TX Prepetition Trustee.

### iii.     PA Prepetition Bonds – PA Debtors

21.     *PA Prepetition Documents*.   The acquisition, construction, installation, and certain improvements and equipping of the Reading Facility was principally financed through the issuance by the Pennsylvania Economic Development Financing Authority, a public instrumentality of the Commonwealth of Pennsylvania organized under the Pennsylvania Development Financing Law (the "PA Bonds Issuer"), of those certain (i) Solid Waste Disposal Revenue Bonds (CarbonLite P, LLC Project) Series 2019 issued in the aggregate original principal amount of $61.8 million (the "PA Series 2019 Bonds") pursuant to an Indenture of Trust dated as of June 1, 2019 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "2019 PA Bond Indenture") between the PA Bonds

13

Issuer and UMB, as trustee (in such capacity, the "PA Prepetition Trustee") and (ii) Subordinate

Solid Waste Disposal Revenue Bonds (CarbonLite P, LLC Project) Series 2020 (the "PA Series

2020 Bonds", and, together with the PA Series 2019 Bonds, the "PA Bonds" and, the holders of

PA Bonds, the "PA Prepetition Bondholders" and, the PA Prepetition Bondholders together with

the PA Prepetition Trustee, the "PA Prepetition Secured Parties," and, together with the TX

Prepetition Secured Parties, the "Prepetition Secured Parties") issued in the aggregate original

principal amount of $10 million pursuant to that certain First Supplemental Indenture of Trust

dated as of September 1, 2020 (the 2019 PA Bond Indenture, as amended by the First

Supplemental Indenture of Trust, and as further amended, restated, amended and restated,

supplemented, or otherwise modified from time to time, the "PA Bond Indenture") between the

PA Bonds Issuer and the PA Prepetition Trustee.  The funds raised from the issuance of the PA

Bonds were loaned by the PA Bonds Issuer to CLP pursuant to that certain Loan Agreement,

dated as of June 1, 2019 (as amended, restated, amended and restated, supplemented, or

otherwise modified from time to time, the "PA 2019 Bond Loan") in the aggregate principal

amount of $61.8 million.   The PA 2019 Bond Loan was amended by that certain First

Amendment to Loan Agreement dated as of September 1, 2020, which provided for the

borrowing of an additional $10 million (as amended, restated, amended and restated,

supplemented, or otherwise modified from time to time, the "PA 2020 Bond Loan" and, together

with the PA 2019 Bond Loan, the "PA Bond Loans").  Pursuant to the terms of the PA Bond

Indenture, the PA Bonds Issuer's rights and interest in the PA Bond Loans, the related note, all

revenues and amounts held in any funds established under the PA Bond Indenture and all of the

collateral security held by the PA Bonds Issuer in connection with the PA Bond Loans have been assigned to the PA Prepetition Trustee for the benefit of the PA Prepetition Bondholders.  PA Holdings (together with the PA Bonds Issuer, the "PA Prepetition Obligors") guarantees the payment of the obligations of the PA Bonds and the PA Bond Loans pursuant to that certain Guaranty Agreement dated June 1, 2019 (the "PA Bonds Guaranty") between PA Holdings and the PA Prepetition Trustee.  The PA Bond Indenture, the PA Bonds Guaranty, the PA Bond Loans, collectively, with all other agreements, documents, and instruments executed and/or delivered with, to or in favor of the PA Prepetition Secured Parties, including, without limitation, all security agreements (including the PA Bonds Leasehold Mortgage (defined below) and PA Bonds Security Agreement (defined below)), notes, guarantees, mortgages, Uniform Commercial Code financing statements, documents, and instruments, including any fee letters, executed and/or delivered in connection therewith or related thereto, the "PA Prepetition Documents," and together with the TX Prepetition Documents, the "Prepetition Documents").

22.    *PA Prepetition Obligations*.  As of the Petition Date, the PA Prepetition Obligors were indebted and liable, without defense, challenge, objection, claim, counterclaim, or offset of any kind, in (i) the aggregate principal amount of not less than $61,800,000 in respect of outstanding principal amount of the PA Series 2019 Bonds, plus any accrued and unpaid interest, fees, expenses, and disbursements (including, without limitation, any attorneys', advisors', accountants', appraisers', financial advisors', and other consultants' fees and expenses, in each case that are chargeable or reimbursable under the PA Prepetition Documents), indemnification obligations, and other charges, amounts, and costs of whatever nature owing, whether or not

15

contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of

the PA Prepetition Obligors' obligations pursuant to the PA Prepetition Documents, including,

for the avoidance of doubt, all interest, fees, costs, and other charges allowable under section

506(b) of the Bankruptcy Code (collectively, the "PA 2019 Prepetition Obligations"), and (ii) the

aggregate principal amount of not less than $10,000,000 in respect of outstanding principal

amount of the PA Series 2020 Bonds, plus any accrued and unpaid interest, fees, expenses, and

disbursements (including, without limitation, any attorneys', advisors', accountants', appraisers',

financial advisors', and other consultants' fees and expenses, in each case that are chargeable or

reimbursable under the PA Prepetition Documents), indemnification obligations, and other

charges, amounts, and costs of whatever nature owing, whether or not contingent, whenever

arising, accrued, accruing, due, owing, or chargeable in respect of any of the PA Prepetition

Obligors' obligations pursuant to the PA Prepetition Documents, including, for the avoidance of

doubt, all interest, fees, costs, and other charges allowable under section 506(b) of the

Bankruptcy Code (collectively, the "PA 2020 Prepetition Obligations" and, together with the PA

2019 Prepetition Obligations and the TX Prepetition Obligations, the "Prepetition Obligations").

23.     *PA Prepetition Liens*.  The obligations of the PA Prepetition Obligors

under the PA Prepetition Documents are secured by substantially all of the real and personal

property assets of PA Prepetition Obligors (the "PA Prepetition Collateral" and, together with the

TX Prepetition Collateral, the "Prepetition Collateral") pursuant to that (i) certain *Open-End*

*Leasehold Mortgage Security Agreement, Assignment of Rents and Leases and Fixtures Filing*

(the "PA Bonds Leasehold Mortgage") dated as of June 1, 2019, between CLP and the PA

16

Prepetition Trustee, and that certain (ii) *Pledge and Security Agreement* (the "<u>PA Bonds Security Agreement</u>") dated as of June 1, 2019, among CLP, PA Holdings and the PA Prepetition Trustee.

**B.    <u>Acknowledgments</u>**

24.    Pursuant to the DIP Orders,[10] the applicable TX/PA Debtors have stipulated that, as of the Petition Date (a)  the Liens of the Prepetition Secured Parties on the applicable Prepetition Collateral were valid, binding, enforceable, non-avoidable, and properly perfected and were granted to, or for the benefit of, the applicable Prepetition Secured Parties for fair consideration and reasonably equivalent value; and (b) the Liens of the Prepetition Secured Parties were senior in priority over any and all other liens on the applicable Prepetition Collateral, subject only to certain liens otherwise permitted by the applicable Prepetition Documents (solely to the extent any such permitted liens were valid, properly perfected, non-avoidable, and senior in priority to the respective Liens of the applicable Prepetition Secured Parties or were valid non-avoidable senior liens that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, the "<u>Prepetition Permitted Prior Liens</u>").

25.    The applicable TX/PA Debtors have further acknowledged that the applicable Prepetition Obligations constitute legal, valid, binding, and non-avoidable obligations of the applicable TX/PA Debtors, enforceable in accordance with the terms of the applicable Prepetition Documents and that neither the applicable Prepetition Liens nor the applicable Prepetition Obligations are subject to any challenge or defense, including avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise)

---

[10] The following summary description is qualified by the "<u>Stipulations</u>", as defined under, and set forth in, each of the DIP Orders.

DOCS_NY:42509.9

pursuant to the Bankruptcy Code or applicable non-bankruptcy law.  The applicable TX/PA Debtors have further waived, discharged, and released any right to challenge any of the applicable Prepetition Obligations, the priority of the applicable TX/PA Debtors' obligations thereunder, and the validity, extent, and priority of the liens securing the applicable Prepetition Obligations.

26.     Last, pursuant to the Stipulations, the applicable TX/PA Debtors have acknowledged that the Prepetition Obligations constitute allowed, secured claims within the meaning of sections 502 and 506 of the Bankruptcy Code (provided that, the value of the Prepetition Liens at the Petition Date and whether the Prepetition Obligations are fully secured within the meaning of Section 506 of the Bankruptcy Code shall be reserved notwithstanding the Stipulations).

**C.      Cash Collateral**

27.     The applicable TX/PA Debtors submit that all of the applicable TX/PA Debtors' cash, including any cash in their deposit accounts, wherever located, whether as original collateral or proceeds of other Prepetition Collateral, constitutes or will constitute Cash Collateral of the applicable Prepetition Secured Parties and DIP Lenders, as applicable. The Prepetition Secured Parties agree to the use of the Cash Collateral on the terms set forth in the DIP Orders and the DIP Documents.

**Background to Proposed DIP Facilities**

28.     Prior to the Petition Date, the TX/PA Debtors recognized a need for further outside financing and began the process of considering potential funding sources.  The

TX/PA Debtors, through their advisors, discussed with various third parties the opportunity to provide financing to the TX/PA Debtors.  Ultimately, none of those parties was prepared to provide DIP financing on an unsecured or junior basis, and, further, all would have required priming liens on existing collateral of the Prepetition Secured Parties.   The Prepetition Secured Parties informed the TX/PA Debtors that they would not consent to such terms and, accordingly, taking into account the circumstances and the proposal provided by the DIP Lenders, the TX/PA Debtors determined, in an exercise of their business judgment, to accept the applicable DIP Lenders' proposal. *See* First Day Declaration, at ¶ 93.

29.     Separately, the TX/PA Debtors performed due diligence regarding the reasonableness of the terms proposed for the applicable DIP Facilities by the respective DIP Lenders, including by comparing such terms to other comparable and recent debtor-in-possession credit facilities provided in the marketplace.  Based on such analysis, the TX/PA Debtors believe that each of the DIP Facilities is provided on reasonable market terms in light of the circumstances of this case.  The DIP Lenders are unwilling to provide financing to the TX/PA Debtors on an unsecured or subordinated basis. *See id.* at ¶ 94.

30.     After careful review of their financing options, the TX/PA Debtors concluded that the DIP Lenders' proposed terms would allow the TX/PA Debtors to meet their respective goals and provide each of the TX/PA Debtors with sufficient liquidity on the best available economic terms.  Through the applicable DIP Documents, the TX/PA Debtors will continue to have access to sufficient liquidity for their accruing administrative expenses pending a sale of their assets or reorganization.  All negotiations with the DIP Lenders were conducted at

19

arms' length and in good faith.  The outcome of such negotiations culminated in the proposed

DIP Credit Agreements pending before this Court.  *See id.* at ¶ 95.

31.    The TX/PA Debtors now seek to move forward with the proposed DIP

Facilities on the terms set forth in the DIP Documents.  Subject to this Court's approval, the

TX/PA Debtors intend to draw on the applicable DIP Facilities in order to satisfy the TX/PA

Debtors' ongoing working capital needs through their restructuring process.  The TX/PA Debtors

have a need to use Cash Collateral on an interim basis and to obtain credit in an amount equal to

the applicable TX/PA Interim Amounts pursuant to the applicable DIP Facilities in order to,

among other things, enable the orderly continuation of their operations and to administer and

preserve the value of their estates.  The ability of the TX/PA Debtors to maintain business

relationships with their vendors, suppliers, and customers, to pay their employees, and otherwise

finance their operations requires both the availability of working capital from the DIP Facilities

and the use of Cash Collateral, the absence of either of which would immediately and irreparably

harm the TX/PA Debtors, their estates, and parties-in-interest.  The TX/PA Debtors do not have

sufficient available sources of working capital and financing to operate their businesses or

maintain their properties in the ordinary course of business before the entry of the Interim Orders

without the authorization to use Cash Collateral and to borrow the TX/PA Interim Amounts.  *See*

*id.* at ¶ 97.

32.    The DIP Facilities are the best source of debtor-in-possession financing

available to the TX/PA Debtors.  Given their current financial condition, financing arrangements,

and capital structure, the TX/PA Debtors have been, and continue to be, unable to obtain

financing from sources other than the DIP Lenders on terms more favorable than the DIP Facilities.  The TX/PA Debtors are unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  The TX/PA Debtors have also been unable to obtain (a) unsecured credit having priority over that of administrative expenses of the kind specified in sections 503(b), 507(a), and 507(b) of the Bankruptcy Code; (b) credit secured solely by a lien on property of the TX/PA Debtors and their estates that is not otherwise subject to a lien; or (c) credit secured solely by a junior lien on property of the TX/PA Debtors and their estates that is subject to a lien.  Financing on a postpetition basis on better terms is not available without granting the applicable DIP Agents, for the benefit of themselves and the applicable DIP Lenders, (a) perfected security interests in and liens on (each as provided herein) the applicable DIP Collateral, with the priorities described herein; (b) superpriority claims; and (c) the other protections set forth in the Interim Orders.

   33. As a condition to entry into the DIP Credit Agreements, the extension of credit under the DIP Facilities, and the authorization to use the applicable Prepetition Collateral, including Cash Collateral, the DIP Agents, the DIP Lenders, and the Prepetition Secured Parties require, and the TX/PA Debtors have agreed, that proceeds of the applicable DIP Facilities and the applicable Prepetition Secured Parties' Cash Collateral shall be used in a manner consistent with the terms and conditions of the applicable Interim Orders and the applicable DIP Documents and in accordance with the TX Budget (defined below) and the PA Budget (defined below) (as each may be modified from time to time consistent with the terms of the applicable DIP Documents and subject to such variances and exclusions as permitted in the applicable DIP

Documents  and the Interim Orders, the "Budgets"),[11] solely for the purposes set forth in the DIP

Documents and the Interim Orders, including (a) ongoing working capital and other general

corporate purposes of the applicable TX/PA Debtors and (b) permitted payment of costs of

administration of the Chapter 11 Cases of the applicable TX/PA Debtors. *See* First Day

Declaration, at ¶ 96.

### Concise Statement of Relief Requested

34.   In accordance with Bankruptcy Rule 4001(b) and Local Rule 4001-2,

below is a summary[12] of the essential terms of the proposed financing and use of cash collateral,

as well as a reference to the corresponding provisions of the applicable Interim Order or DIP

Credit Agreement:

(a)   <u>Borrowers</u>.

    (i)   *TX DIP Facility*:  CarbonLite Recycling, LLC, as debtor and debtor-in possession.

    (ii)   *PA DIP Facility*:   CarbonLite P, LLC, as a debtor and debtor-in-possession.

(b)   <u>Guarantors</u>.

    (i)   *TX DIP Facility*: CarbonLite Recycling Holdings, LLC, as a debtor and debtor-in-possession.

    (ii)   *PA DIP Facility*: CarbonLite P Holdings, LLC, as debtor and debtor-in-possession.

---

[11] A copy of the budget relating to the Dallas Facility is attached hereto as **Exhibit E** (the "TX Budget") and a copy of the budget relating to the Reading Facility is attached hereto as **Exhibit F** (the "PA Budget").

[12]   The summaries and descriptions of the terms and conditions for the proposed financings and use of cash collateral and the provisions of the Interim Orders set forth in this Motion are intended solely for informational purposes to provide the Court and parties in interest with an overview of the significant terms thereof.  The summaries and descriptions are qualified in their entirety by the Interim Orders and the DIP Documents.  In the event there is any conflict between this Motion and the Interim Orders or the DIP Documents, the Interim Orders and the DIP Documents shall control in all respects.

(c)    <u>Lenders</u>.

    (i)    *TX DIP Facility*:  Those Lenders party to the TX DIP Credit Agreement as defined in §1.01 of the TX DIP Credit Agreement.[13]

    (ii)    *PA DIP Facility*: Those Lenders party to the PA DIP Credit Agreement as defined in §1.01 of the PA DIP Credit Agreement.[14]

(d)    <u>DIP Facilities</u>.  The DIP Facilities are senior secured superpriority debtor-in-possession loan facilities consisting of:

    (i)    *TX DIP Facility*:  a $15.0 million new money term loan facility.  Upon entry of the TX Interim Order, $7.0 million, will be available for the TX Debtors to borrow under the TX DIP Facility in order to avoid immediate and irreparable harm to the estates pending a final hearing on the Motion. [*TX DIP Credit Agreement* § 2.01].

    (ii)    *PA DIP Facility*: (a) a $25 million new money term loan facility, and (b) $50 million of PA DIP Loans resulting from a "roll-up" of the obligations relating to the PA 2019 Series Bonds held by such PA DIP Lenders. Upon entry of the PA Interim Order, $14 million in new money term loans and $28 million in roll-up loans, will be available for the PA Debtors to borrow under the PA DIP Facility in order to avoid immediate and irreparable harm to the estates pending a final hearing on the Motion. [*PA DIP Credit Agreement* § 2.01].

(e)    <u>Roll-Up –PA DIP Facility</u>.  In accordance with the terms of the PA DIP Credit Agreement, the following pre-petition indebtedness of the PA Debtors under the PA Prepetition Documents will be converted into PA DIP Loans under the PA DIP Facility: the PA Series 2019 Bonds of each PA DIP Lender will convert into PA Roll-Up Loans of the PA DIP Facility on a basis of $2.00 dollars for each $1.00 dollar of PA New Money DIP Loan made by such PA DIP Lender and shall constitute DIP Obligations under the PA DIP Facility. [*PA Interim Order* ¶ 2(b); *PA DIP Credit Agreement* § 2.01(b)].

(f)    <u>Interest Rates</u>.

    (i)    *TX DIP Facility*: The Interest Rate with respect to the loans made pursuant to the TX DIP Facility is 12.00% per annum.  Following an Event of Default, the interest rate will be the Applicable Rate *plus* 2.00%. [*TX DIP Credit Agreement* §1.01, §2.06].

---

[13] UMB Bank, N.A., as trustee, is acting as administrative agent (and collateral agent) for and on behalf of the lenders party to the TX DIP Credit Agreement.

[14] UMB Bank, N.A., as trustee, is acting as administrative agent (and collateral agent) for and on behalf of the lenders party to the PA DIP Credit Agreement.

(ii)    *PA DIP Facility*: The Interest Rate with respect to the PA New Money DIP Loans made pursuant to the PA DIP Facility is 12.00% per annum. The Interest Rate with respect to the PA Roll-Up Loans made pursuant to the PA DIP Facility is 12.00% per annum, payable in kind. Following an Event of Default, the interest rate will be the Applicable Rate *plus* 2.00%. [*PA DIP Credit Agreement* § 1.01, § 2.06].

(g)    <u>Fees and Expenses</u>.

(i)    *TX DIP Facility*:  The TX DIP Lenders will receive a 3% commitment fee with respect to any TX New Money DIP Loans and will otherwise receive administration fees, including customary agency fees for the TX DIP Agent, other fees, costs and expense reimbursements, including attorney's fees, consistent with similar financings and the terms of the TX Prepetition Documents. [*TX DIP Credit Agreement* §2.05, § 10.03].

(ii)    *PA DIP Facility*:  The PA DIP Lenders will receive a 3% commitment fee with respect to any PA New Money DIP Loans and will otherwise receive administration fees, including customary agency fees for the PA DIP Agent, other fees, costs and expense reimbursements, including attorney's fees, consistent with similar financings and the terms of the PA Prepetition Documents. [*PA DIP Credit Agreement* §2.05, §10.03].

(h)    <u>Maturity Date – Both DIP Facilities</u>. The earliest to occur of:

(i)    the date that is 180 days after the Petition Date,
(ii)   the date that is 35 days after the Petition Date if the respective Final Order has not been entered,
(iii)  the date the Chapter 11 Cases are dismissed or converted to chapter 7 case(s);
(iv)   the acceleration and termination of the TX DIP Facility or PA DIP Facility;
(v)    the date on which the DIP Loan Parties (or any of the other Debtors) seek approval of a disclosure statement for a plan of reorganization or liquidation, other than a plan acceptable to the Required Lenders (as defined in the applicable DIP Credit Agreements §1.01); or
(vi)   the date of the sale of all or substantially all of the assets of the DIP Loan Parties.

[*DIP Credit Agreements* §1.01].

(i)    <u>Purpose of Funding – Both DIP Facilities</u>.  Proceeds of the applicable DIP Facilities and the Prepetition Secured Parties' Cash Collateral shall be used in accordance with the applicable Budgets for the purposes set forth in, and subject to, the DIP Documents, including (y) ongoing working capital and other general corporate purposes of the applicable TX/PA Debtors and (z) permitted payment of

24

costs of administration of the Chapter 11 Cases of the applicable TX/PA Debtors. [*Interim Orders* ¶ 4; *DIP Credit Agreements* §5.08].

(j)     <u>Use of Cash Collateral – Both DIP Facilities</u>.  The DIP Facilities contemplate the TX/PA Debtors' continued use of Cash Collateral of the applicable TX/PA Debtors, according to the applicable Budgets on the terms and conditions set forth in the Interim Orders.  The parties with an interest in Cash Collateral are the applicable Prepetition Secured Parties.  [*Interim Orders* ¶ 17].

(k)     <u>Budget- Both DIP Facilities</u>.  The Budgets attached to this Motion have been approved by the respective TX/PA Debtors, the DIP Agents, and the DIP Lenders. The TX/PA Debtors shall comply with the applicable Budgets and any applicable updated Budgets that may be approved by the applicable DIP Lenders (according to the procedures set forth in the applicable DIP Credit Agreement), subject to Permitted Variances (as defined in § 1.01 of the respective DIP Credit Agreements).  Compliance with the respective Budget shall be tested weekly (starting the first full calendar week after the Petition Date).  Any adverse deviation from a Budget beyond any applicable Permitted Variance shall constitute an event of default (a "<u>Budget Event</u>") unless waived in writing by the applicable DIP Lenders.  [*DIP Credit Agreements* § 8.01(oo)].

(l)     <u>Restrictions on Use of Funds – Both DIP Facilities</u>.  Proceeds of the DIP Facilities may only be used in accordance with the applicable Budgets or as permitted in the DIP Documents.  No portion of the Carve-Out, the proceeds of any DIP Loans, or any Cash Collateral may be used to (or support any other party to) litigate, object to, contest, or challenge in any manner or raise any defenses to the debt, collateral position, liens, or claims of any of the DIP Lenders, the DIP Agents, or the Prepetition Secured Parties; *provided, however* that proceeds of the DIP Facilities, DIP Collateral or Cash Collateral may be used for allowed fees and expenses, in an amount not to exceed $50,000 (the "<u>Investigation Budget Amount</u>") incurred solely by a Committee (if appointed), in investigating (but not prosecuting or challenging) the validity of the Stipulations made by the applicable TX/PA Debtors under the DIP Orders (the "<u>Investigation</u>").  [*Interim Orders* ¶ 17; *DIP Credit Agreements* § 5.08].

(m)    <u>DIP Liens and Superpriority Claims - Both DIP Facilities</u>.  The DIP Facilities and all other obligations of the applicable TX/PA Debtors to the applicable DIP Lenders under or in connection with the applicable DIP Documents (collectively, the "<u>DIP Obligations</u>"), shall (a) pursuant to section 364(c)(1) of the Bankruptcy Code, be entitled to superpriority administrative expense claim status in the Chapter 11 Cases of the applicable TX/PA Debtors with priority over any and all administrative expenses, and (b) pursuant to sections 364(c)(2), (c)(3) and (d) of the Bankruptcy Code, be secured by liens on the applicable DIP Collateral, in all cases subject and subordinate to the Carve-Out and the priorities set forth in the applicable DIP Documents and the applicable Interim Order. [*Interim Orders* ¶¶ 6, 7; *DIP Credit Agreements* § 5.15].

(n)      DIP Collateral.

(i)      *TX DIP Facility*:  For purposes of the Motion, "TX DIP Collateral" means, collectively, without limitation (a) all prepetition and postpetition personal property assets of the TX Debtors and their estates; (b) all prepetition and postpetition owned real property and all real property leases of the TX Debtors; (c) actions brought under section 549 of the Bankruptcy Code to recover any post-petition transfer of TX DIP Collateral; (d) subject to entry of a Final Order, the proceeds of any avoidance actions (such actions, "TX Avoidance Actions" and the proceeds of such Avoidance Actions, the "TX Avoidance Action Proceeds"); *provided*, that no liens shall attach to Avoidance Actions.  The TX DIP Collateral includes all assets of the TX DIP Loan Parties that are not otherwise subject to valid, perfected, enforceable, and unavoidable security interests or liens in existence as of the Petition Date, or valid liens properly perfected after the Petition Date as permitted under the Bankruptcy Code (the "TX Unencumbered Collateral"), in each case subject and subordinate to the Carve-Out and the Prepetition Permitted Prior Liens (all such liens and security interests granted to the TX DIP Agent for its benefit and for the benefit of the TX DIP Lenders, pursuant to the TX Interim Order and the TX DIP Documents, the "TX DIP Liens"). [*TX Interim Order* ¶ 6].

(ii)     *PA DIP Facility*:  For purposes of the Motion, "PA DIP Collateral"[15] means, collectively, without limitation (a) all prepetition and postpetition personal property assets of the PA Debtors and their estates; (b) all prepetition and postpetition owned real property and all real property leases of the PA Debtors; (c) actions brought under section 549 of the Bankruptcy Code to recover any post-petition transfer of PA DIP Collateral; (d) subject to entry of a Final Order, the proceeds of any avoidance actions (such actions, "PA Avoidance Actions" and the proceeds of such Avoidance Actions, the "PA Avoidance Action Proceeds," and together with the TX Avoidance Action Proceeds, the "TX/PA Avoidance Action Proceeds"); *provided*, that no liens shall attach to PA Avoidance Actions.  The PA DIP Collateral includes all assets of the PA DIP Loan Parties that are not otherwise subject to valid, perfected, enforceable, and unavoidable security interests or liens in existence as of the Petition Date, or valid liens properly perfected after the Petition Date as permitted under the Bankruptcy Code (the "PA Unencumbered Collateral," and, together with TX Unencumbered Collateral, the "TX/PA Unencumbered Collateral"), in each case subject and subordinate to the Carve-Out and the Prepetition Permitted Prior Liens (all such liens and security interests granted to the PA DIP Agent for its benefit and for the benefit of the PA DIP Lenders, pursuant to the PA Interim Order and the PA DIP Documents, the "PA

---

[15] For purposes of this Motion, the PA DIP Collateral together with the TX DIP Collateral are referred to as the "DIP Collateral")

DIP Liens," and, together with the TX DIP Liens, the "DIP Liens").  [*PA Interim Order* ¶ 6].

(o)    Adequate Protection Prepetition Secured Parties- Both DIP Facilities.  As security for any Diminution in Value of the Prepetition Collateral (i) the TX Prepetition Secured Parties will be granted a valid, perfected replacement security interest in and lien on all of the TX DIP Collateral, including, subject to entry of the TX Final Order, TX Avoidance Action Proceeds (the "TX Adequate Protection Liens"), and (ii) the PA Prepetition Secured Parties will be granted a valid, perfected replacement security interest in and lien on all of the PA DIP Collateral, including, subject to entry of the PA Final Order, PA Avoidance Action Proceeds (the "PA Adequate Protection Liens," and, together with the TX Adequate Protection Liens, the "TX/PA Adequate Protection Liens"). The TX/PA Adequate Protection Liens shall be subject and subordinate only to (i) the Carve-Out, (ii) the Prepetition Permitted Prior Liens, and (iii) the DIP Liens.  The adequate protection obligations of the applicable TX/PA Debtors to the applicable Prepetition Secured Parties shall constitute superpriority claims against the applicable TX/PA Debtors as provided in section 507(b) of the Bankruptcy Code, to the extent of any Diminution in Value of the applicable Prepetition Secured Parties' interests in the applicable Prepetition Collateral, with priority in payment as provided in the Interim Orders and the Final Orders.  As additional adequate protection the applicable TX/PA Debtors shall pay all interest on the applicable Bonds under the applicable Prepetition Indentures, including accrued and unpaid interest as of the Petition Date and interest accruing thereafter, which interest shall accrue at the non-default rate as set forth in the respective Prepetition Indentures and shall be payable in-kind in arrears on a monthly basis on the last business day of each month by being capitalized.  The TX/PA Debtors shall also be authorized and directed to pay, as adequate protection, all accrued and unpaid fees and reasonable and documented disbursements incurred by the respective Prepetition Secured Parties and their advisors whether accrued before, on, or after the Petition Date. [*Interim Orders* ¶ 9].

(p)    Credit Bid - Both DIP Facilities. In connection with any sale process authorized by the Court, whether effectuated through sections 363, 725, or 1123 of the Bankruptcy Code, the DIP Agents, DIP Lenders, and the Prepetition Secured Parties may credit bid up to the full amount of the applicable outstanding DIP Obligations and/or the applicable Prepetition Obligations, in each case including any accrued and unpaid interest, expenses, fees, and other obligations for their respective priority collateral (each such bid, a "Credit Bid") pursuant to section 363(k) of the Bankruptcy Code.  [*Interim Order* ¶ 34].

(q)    Conditions to Borrowing - Both DIP Facilities. The conditions precedent to borrowing under the DIP Facilities after the entry of the Interim Orders will consist of those conditions precedent customarily required in similar financings, including, without limitation, entry of the Final Orders. [*DIP Credit Agreements* §§ 4.01, 4.02].

(r)    <u>Case Milestones - Both DIP Facilities</u>.  Each of the TX/PA Debtors agree to satisfy each of the following milestones during the Chapter 11 Cases (each, a "<u>Milestone</u>"):

(i)    By no later than 3 days following the Petition Date, the Bankruptcy Court shall enter the Interim Orders.

(ii)    By no later than 10 days following the Petition Date, the TX/PA Debtors shall have filed a motion seeking approval of the bidding procedures.

(iii)    By no later than 30 days following the Petition Date, the TX/PA Debtors shall have obtained entry of an order from the Bankruptcy Court approving bidding procedures (the "<u>Bidding Procedures Order</u>") in respect of a sale of all or substantially all of the TX/PA Debtors' assets to be implemented pursuant to section 363 of the Bankruptcy Code (a "<u>Sale Transaction</u>").

(iv)    By no later than 35 days following the Petition Date, the Bankruptcy Court shall enter the Final Orders.

(v)    By no later than 60 days following the Petition Date, the TX/PA Debtors shall conduct the auction, if necessary, for all or substantially all of the TX/PA Debtors' consolidated assets pursuant to Section 363 of the Bankruptcy Code and in accordance with the Bidding Procedures Order.

(vi)    By no later than 65 days following the Petition Date, the Bankruptcy Court shall enter an order approving the Sale Transaction.

(vii)    By no later than 75 days following the Petition Date, the Sale Transaction shall have closed; provided that if regulatory approvals associated with a Sale Transaction remain pending as of such date, such date shall be automatically extended to the date that is the third Business Day following receipt of all necessary regulatory approvals.

(viii)    Not later than March 31, 2021, the third of three Starlinger extrusion lines shall have been fully installed, commissioned and operational at the Pennsylvania Facility; and

(ix)    Not later than April 30, 2021, the 2t/hr. and the 7t/hr. wash lines and related de-baling equipment shall have been fully installed, commissioned and operational at the Pennsylvania Facility.[16]

Notwithstanding the foregoing, if the Loan Parties decide to pursue the consummation a Chapter 11 plan of reorganization in lieu of a sale of all or substantially of their assets pursuant to Section 363 of the Bankruptcy Code, then in lieu of the Milestones set forth in clauses (ii)-(iii) and (v)-(vii) the following Milestones shall apply:

(x)    The TX/PA Debtors shall file with the Bankruptcy Court by no later than April 8, 2021, an Acceptable Plan and Acceptable Disclosure Statement (each as defined in §1.01 *DIP Credit Agreements*);

(xi)    The Bankruptcy Court shall enter an Acceptable Disclosure Statement Order by no later than May 23, 2021;

---

[16] Provisions (viii) and (ix) are only applicable to the PA DIP Facility.

(xii)    The Bankruptcy Court shall enter an Acceptable Confirmation Order (as defined in §1.01 *DIP Credit Agreements*) by no later than July 6, 2021; and

(xiii)    The effective date for the Acceptable Plan shall occur by no later than July 21 2021.

[*DIP Credit Agreements* §5.16].

(s)    <u>Negative Covenants – Both DIP Facilities</u>.  Customary for financings of this type. [*DIP Credit Agreements* Article 6].

(t)    <u>Representations and Warranties – Both DIP Facilities</u>.  Customary for financings of this type.  [*DIP Credit Agreements* Article 3].

(u)    <u>Carve-Out</u>.[17]  As used in this Motion and the Interim Orders, means the sum of the following, in all respects solely with respect to the DIP Loan Parties: (A) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code and section 3717 of title 31 of the United States Code plus interest at the statutory rate (without regard to the Carve-Out Trigger Notice (as defined below) and without being subject to any budget (collectively, the "<u>Statutory Fees</u>")); (B) all reasonable and documented fees and out-of-pocket expenses incurred by a trustee under section 726(b) of the Bankruptcy Code and allowed by the Court in an amount not to exceed $25,000 (without regard to the Carve-Out Trigger Notice); (C) to the extent allowed by the Court at any time, whether by interim order, procedural order, or otherwise, all accrued and unpaid fees, costs, and out-of-pocket expenses incurred by persons or firms retained by the Debtors (including Force Ten Partners LLC) pursuant to section 327, 328, or 363 of the Bankruptcy Code (collectively, the "<u>Debtor Professionals</u>") and any Committee pursuant to section 328 or 1103 of the Bankruptcy Code (collectively, the "<u>Committee Professionals</u>" and, together with the Debtor Professionals, the "<u>Professional Persons</u>," and such fees, costs, and out-of-pocket expenses of each Professional Person as and when allowed solely to the extent related to the DIP Loan Parties, the "<u>Allowed Professional Fees</u>") at any time on or prior to the Carve-Out Trigger Date (as defined below), whether allowed by the Court prior to or after the Carve-Out Trigger Date, to the extent that such fees, costs, and out-of-pocket expenses are provided for in the applicable Budget, less the aggregate amount of all retainers held by Professional Persons as of the Carve-Out Trigger Date (the amounts set forth in clauses (A) through (C), the "<u>Pre-Carve Out Trigger Notice Cap</u>"); and (D) Allowed Professional Fees in an aggregate amount not to exceed $250,000 incurred on and after the Carve-Out Trigger Date, to the extent allowed by the Court at any time, whether by interim order, procedural order, or otherwise, but excluding any "success" or "transaction" fees payable to any

---

[17] The Carve-Out provisions are the same in each of the Interim Orders and any references to Carve-Out herein apply separately to the TX Debtors and the PA Debtors.  For the avoidance of doubt, any amounts referred to herein with respect to the Carve-Out are not combined but are the amounts for each the TX Debtors and PA Debtors, respectively.

financial advisor or investment banker, allocated $200,000 to the Debtor Professionals and $50,000 to the Committee Professionals (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap" and, together with the Pre-Carve Out Trigger Notice Cap, the "Carve-Out Cap"); *provided*, that under no circumstances shall any success, completion or similar fees be paid from the Carve-Out following delivery of a Carve-Out Trigger Notice unless such fee was earned and payable before the Carve-Out Trigger Date; *provided*, *further*, that nothing herein shall be construed to impair the ability of any party to object to the fees, expenses, reimbursement, or compensation described in the Carve-Out Cap on any grounds.

(i)     For purposes of the foregoing, "Carve-Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent to the DIP Loan Parties, their lead restructuring counsel, the U.S. Trustee, and counsel to the Committee (if any), counsel to the DIP Agent, counsel to the DIP Term Agent, and counsel to the DIP ABL Lender, which notice (x) may be delivered only following the occurrence and during the continuation of a DIP Termination Event, and (y) shall state that the Post-Carve Out Trigger Notice Cap has been invoked (the day on which a Carve-Out Trigger Notice is received by the parties above, the "Carve-Out Trigger Date"). So long as the Carve-Out Trigger Notice has not been delivered as provided above, the DIP Loan Parties shall be permitted to (x) make disbursements to the Pre-Carve Out Trigger Notice Reserve (as defined below) on amounts set forth in the Budget for Professional Persons related solely to the DIP Loan Parties at the times and in the amounts contemplated thereby, and (y) pay Allowed Professional Fees, including on an interim basis, in accordance with the Budget as they become due and payable, including from amounts held in the Pre-Carve Out Trigger Notice Reserve. For the avoidance of doubt, notwithstanding anything to the contrary contained in the Interim Order, nothing in the Interim Order or any Budget shall be construed as a cap or limitation on the amount of Statutory Fees that are due and payable by the DIP Loan Parties.

(ii)    On the Carve-Out Trigger Notice Date, the Carve-Out Trigger Notice (x) shall be deemed a draw request and notice of borrowing by the DIP Loan Parties for loans to be made under the DIP Facility in an amount equal to the sum of (1) the amounts set forth in paragraphs 33(u)(A) and 33(u)(B) above, plus (2) unpaid amounts of the Allowed Professional Fees (if any), up to the Carve-Out Cap, less any amounts previously funded for Professional Persons at the times and in the amounts contemplated under the Budget (any such amounts actually advanced shall constitute DIP Obligations), and (y) shall also constitute a demand to the DIP Loan Parties to utilize all cash on hand as of such date and any available cash thereafter held by any DIP Loan Party to fund a reserve in an amount equal to the sum of the amounts set forth in paragraphs 33(u)(A)– 8(u)(C) above (which cash amounts actually utilized or reserved (including from

cash on hand) shall reduce, on a dollar for dollar basis, the draw requests and applicable DIP Obligations pursuant to the foregoing sentence of this paragraph 33(u)(ii)).  The DIP Loan Parties shall deposit and hold such amounts in a segregated account held by lead bankruptcy counsel for the DIP Loan Parties in trust exclusively to pay such unpaid Allowed Professional Fees and amounts set forth in paragraphs 33(u)(A) and 8(u)(B) (the "Pre-Carve Out Trigger Notice Reserve").  For the avoidance of doubt, the Pre-Carve Out Trigger Notice Reserve shall comprise three separate and independent reserves made up of the following: (x) a reserve to pay the obligations set forth in paragraph 33(u)(A) above; (y) a reserve to pay the obligations set forth in paragraph 33(u)(B) above, and (z) a reserve to pay the obligations set forth in paragraph 33(u)(C) above.

(iii)    On the Carve-Out Trigger Notice Date, the Carve-Out Trigger Notice shall also be deemed a request by the DIP Loan Parties for loans to be made under the DIP Facility from the Funding Account (as defined in ¶ 4(a) of the *Interim Orders*) in an amount equal to any unfunded portion of the Post-Carve Out Trigger Notice Cap (any such amounts actually advanced shall constitute DIP Obligations), and shall also constitute a demand to the DIP Loan Parties to utilize all cash on hand as of such date (including in the Funding Account) and any available cash thereafter held by any DIP Loan Party, after the funding in full of the Pre-Carve Out Trigger Notice Reserve, to fund a reserve in an amount equal to the Post-Carve Out Trigger Notice Cap (which cash amounts actually utilized or reserved (including from cash on hand) shall reduce, on a dollar for dollar basis, the draw requests.  The DIP Loan Parties shall deposit and hold such amounts in a segregated account held by lead bankruptcy counsel for the DIP Loan Parties in trust exclusively to pay such Allowed Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "Post-Carve Out Trigger Notice Reserve" and, together with the Pre-Carve Out Trigger Notice Reserve, the "Carve-Out Reserves").

(iv)    Notwithstanding anything to the contrary in the DIP Documents, the Prepetition Documents, or the Interim Orders, following delivery of a Carve-Out Trigger Notice, the applicable DIP Agent and the applicable Prepetition Trustee shall not sweep or foreclose on cash of the DIP Loan Parties in excess of the amount necessary to fully fund the Carve-Out Reserves until the Carve-Out Reserves have been fully funded, but shall have a security interest in any residual interest in the Carve-Out Reserves.

(v)    Except to the extent expressly provided by further order of the Court, the DIP Loan Parties may use funds held in the Carve-Out Reserves only to pay Allowed Professional Fees, to pay the other amounts included in the Carve-Out in the manner set forth in the Interim Orders, and to distribute remaining funds in the Carve-Out Reserves pursuant to the terms of the Interim Orders.

[*Interim Orders* ¶ 8].

(v)     <u>Events of Default – Both DIP Facilities</u>.   Substantially consistent with the Prepetition Documents with additional customary events of default to reflect the debtor-in-possession nature of the DIP Facilities, including, without limitation, the occurrence of a Budget Event or the TX/PA Debtors failure to perform or comply with, in any respect, any of the terms, provisions, conditions, covenants, or obligations under the applicable Interim Order shall constitute an Event of Default.   Additional Events of Default include the conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, the dismissal of the Chapter 11 Cases, or the appointment of a trustee in the Chapter 11 Cases, among other events that are specific to the conduct of the Chapter 11 Cases.

[*Interim Order* ¶ 10; *DIP Credit Agreements* §8.01].

(w)     <u>Remedies upon Default – Both DIP Facilities</u>.   Upon the occurrence and during the continuation of an Event of Default or the "Maturity Date" under the applicable DIP Credit Agreement, notwithstanding the provisions of section 362 of the Bankruptcy Code, without any application, motion or notice to, hearing before, or order of this Court, but subject to the terms of the Interim Orders, (a) each of the DIP Agents may declare (i) all outstanding DIP Obligations owing under the respective DIP Documents to be immediately due and payable, (ii) the termination of any further commitment to extend credit to the applicable TX/PA Debtors to the extent any such commitment remains under the respective DIP Facilities, (iii) termination of the respective DIP Facilities and the respective DIP Documents as to any future liability or obligation of the applicable DIP Agents, and the applicable DIP Lenders, without affecting any of the DIP Liens or the DIP Obligations, and (iv) that the application of the applicable Carve-Out has occurred through the delivery of the Carve-Out Trigger Notice to the applicable TX/PA Debtors; and (b) subject to the terms of the Interim Orders, the Prepetition Trustees may declare the termination of the applicable TX/PA Debtors' ability to use Cash Collateral (any such declaration shall be referred to as a "<u>DIP Termination Declaration</u>" and the date on which a DIP Termination Declaration is delivered shall be referred to as the "<u>DIP Termination Date</u>").   A DIP Termination Declaration shall be delivered to counsel to certain notice parties, including, but not limited to, the TX/PA Debtors, counsel to a Committee (if appointed), and the U.S. Trustee.   The automatic stay shall be modified so that five days after the date a DIP Termination Declaration is delivered (such five-day period, the "<u>Remedies Notice Period</u>"), the DIP Agents and the DIP Lenders shall be entitled to exercise their rights and remedies in accordance with their respective DIP Documents (as applicable), and the applicable Interim Order, subject in all respects, to the applicable Carve-Out.

[*Interim Orders* ¶ 11; DIP Credit Agreements §8.01].

(x)     <u>Stipulations/Challenge Deadline</u>.   The applicable TX/PA Debtors will stipulate, acknowledge, and release the Prepetition Secured Parties with respect to the

Prepetition Obligations and the Prepetition Liens, subject to a customary Challenge Deadline (as defined below) for parties in interest. The applicable TX/PA Debtors will also release and indemnify the Prepetition Secured Parties from any claims relating to the Prepetition Obligations, the Prepetition Documents or the negotiation and implementation of the applicable DIP Facility. [*Interim Orders* ¶ E, ¶ 13]. The "Challenge Deadline" is the date that is no later than seventy-five (75) days from the entry of the applicable Interim Order and as such Challenge Deadline may be extended to the extent permitted by the applicable Interim Order. [*Interim Orders* ¶ 13(b)(1)]. Nothing in the Interim Order vests or confers on any entity, including the Committee, standing or authority to pursue any claim or cause of action belonging to the TX/PA Debtors or their estates, including, without limitation, Challenge Proceeding with respect to the Stipulations, and all rights to object to such standing are expressly reserved.

(y)  <u>Releases</u>. The applicable TX/PA Debtors will release the DIP Agents and the DIP Lenders, (among other related or representative parties) (collectively, the "<u>DIP Released Parties</u>") from any and all obligations and liabilities to the TX/PA Debtors arising in connection with or relating to the applicable DIP Facilities, the DIP Liens, or any of the DIP Documents; *provided*, that nothing in such release shall relieve the DIP Released Parties from fulfilling their obligations under the applicable DIP Documents and the DIP Orders. [*Interim Orders* ¶ 30].

(z)  <u>Indemnity – Both DIP Facilities</u>. Each of the DIP Credit Agreements provides for indemnification by the applicable TX/PA Debtors of the applicable DIP Lenders and the applicable DIP Agent from, or on account of, losses, claims, damages and liabilities related to the applicable DIP Documents. [*DIP Credit Agreements* §10.03(b)].

## **Disclosures**

35.  Pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2, a debtor in possession seeking authority to use cash collateral or obtain financing must disclose the presence and location of certain provisions contained in the documentation evidencing the cash collateral usage or financing. The debtor in possession must also justify the inclusion of such provisions.

Set forth below are the disclosures required in accordance with such rules:

a.  Local Rule 4001-2(a)(i)(A) requires a debtor to disclose the amount of cash collateral the debtor seeks permission to use or the amount of credit the debtor seeks to obtain under the proposed loan agreement, including the committed amount of the proposed loan agreement and the amount of new funding that will actually be available for borrowing by the debtor: **Under the terms of the proposed DIP Facilities, the (i) TX DIP Lenders will provide a commitment of $15,000,000 under the TX DIP Loan, and (ii)  PA DIP Lenders will**

provide a commitment of $75,000,000 under the PA DIP Loans, including $25,000,000 of new funding available for borrowing.  [*Interim Orders ¶ 2; DIP Credit Agreements § 2.01*].

   b. Local Rule 4001-2(a)(i)(B) requires a debtor to disclose the pricing and economic terms, including letter of credit fees, commitment fees, and any other fees:

    (i) *TX DIP Facility*:  The TX DIP Lenders will receive a 3% commitment fee with respect to any TX New Money DIP Loans and will otherwise receive administration fees, including customary agency fees for the TX DIP Agent, other fees, costs and expense reimbursements, including attorney's fees, consistent with similar financings and the terms of the TX Prepetition Documents. [*TX DIP Credit Agreement §§2.05, 10.03*].

    (ii) *PA DIP Facility*:  The PA DIP Lenders will receive a 3% commitment fee with respect to any PA New Money DIP Loans and will otherwise receive administration fees, including customary agency fees for the PA DIP Agent, other fees, costs and expense reimbursements, including attorney's fees, consistent with similar financings and the terms of the PA Prepetition Documents. [*PA DIP Credit Agreement §2.05, §10.03*].

   c. Local Rule 4001-2(a)(i)(C) requires a debtor to disclose any provision that specifically limits the Court's power or discretion to enter future orders in the case:  **The Interim Orders and DIP Documents do not contain any provision that, except insofar as the Remedies Notice Period, which is consistent with Local Rule 4001-2(a)(i)(S), specifically modifies or terminates the automatic stay, and permits the DIP Lenders to exercise remedies, unless the Court orders otherwise within five (5) days' following notice of an Event of Default.  [*Interim Orders ¶ 11*].**

   d. Local Rule 4001-2(a)(i)(D) requires a debtor to disclose any provision that provides for the funding of non-debtor affiliates with cash collateral or proceeds of the loan, as applicable, and the approximate amount of such funding:  **The Interim Orders and DIP Documents do not contain any provision that provides for the funding of non-debtor affiliates with Cash Collateral or proceeds of the DIP Facilities**.

   e. Local Rule 4001-2(a)(i)(E) requires a debtor to disclose any material conditions to closing and borrowing, including budget provisions:  **The conditions to closing and borrowing are similar to other financings of this type:  [*DIP Credit Agreements §§4.01, 4.02*].  The proceeds of the DIP Facilities may only be used in accordance with the applicable Budgets subject to Permitted Variances (as defined in §1.01 of the *DIP Credit Agreements*).  [*Interim Orders ¶ 2; DIP Credit Agreements §8.01*].**

   f. Local Rule 4001-2(a)(i)(F) requires a debtor to disclose any carve-outs from liens or superpriority claims, including the material terms of any professional fee carve-out: **Each of the Interim Orders provide for a Carve Out that includes the sum of: (i) all fees required to be paid to the Clerk of this Court and to the U.S. Trustee**

**under 28 U.S.C. § 1930(a); (ii) reasonable fees and expenses up to $25,000 incurred by a trustee under section 726(b) of the Bankruptcy Code; (iii) to the extent allowed at any time, whether by interim or final compensation order, procedural order, or otherwise, certain Allowed Professional Fees, on the terms and conditions more fully described in the Interim Orders.** [*Interim Orders* ¶ 8]**.**

g.      Local Rule 4001-2(a)(i)(G) requires a debtor to disclose any provision that provides for postpetition liens on unencumbered assets, including the identification of such assets: **Each of the Interim Orders provides that the applicable DIP Lenders will be granted postpetition liens on all assets of the applicable DIP Loan Parties that do not constitute Prepetition Collateral and are not otherwise subject to valid, perfected, enforceable, and unavoidable security interests or liens in existence as of the Petition Date or valid liens perfected (but not granted) after the Petition Date.** [*Interim Orders* ¶ 6]**.**

h.      Bankruptcy Rule 4001(c)(1)(B)(vi) and Local Rule 4001-2(a)(i)(H) require a debtor to disclose any provision that provides for sale or plan milestones: **The DIP Documents provide for the achievement of Milestones relating to the sale of substantially all of the assets of the TX/PA Debtors.** [*DIP Credit Agreements* §5.16]**.**

i.      Local Rule 4001-2(a)(i)(I) requires a debtor to disclose any provision that provides any prepayment penalty or other provision that affects the debtor's right or ability to repay the financing in full during the course of the chapter 11 case: **The Interim Orders and the DIP Documents do not provide for any prepayment penalties with respect to the DIP Facilities.**

j.      Local Rule 4001-2(a)(i)(J) requires a debtor to disclose, in jointly administered cases, any provision that governs joint liability of the TX/PA Debtors, including any provision that would cause one jointly administered debtor to become liable for the prepetition debt of another jointly administered debtor for which it was not previously subject to: **The Interim Orders and the DIP Documents do not provide for any jointly administered debtor to become liable for the prepetition debt of another jointly administered debtor for which it was not previously obligated.**

k.      Local Rule 4001-2(a)(i)(K) requires a debtor to disclose any provision that requires the debtor to pay an agent's or lender's expenses and attorneys' fees in connection with the proposed financing or use of cash collateral, without any notice or review by the Office of the United States Trustee, the committee appointed under section 1102 of the Bankruptcy Code (if formed) or, upon objection by either of the foregoing parties, the Court: **The Interim Orders provide for notice to the United States Trustee and any committee appointed under section 1102 of the Bankruptcy Code of any fees or expenses of the DIP Lenders, including attorney's fees, and provides that such parties may file objections with the Court with respect to such fees and expenses.** [*Interim Orders* ¶ 9(c)]**.**

l.       Local Rule 4001-2(a)(i)(L) requires a debtor to disclose any provision that prohibits the use of estate funds to investigate the liens and claims of the prepetition lender:  **Each of the Interim Orders permit the use of Cash Collateral and proceeds of the applicable DIP Loans, up to a specified maximum amount, for a Committee to investigate the liens and claims of the applicable Prepetition Secured Parties, among other matters that are subject to the Stipulations.  [*Interim Orders* ¶ 13].**

m.      Local Rule 4001-2(a)(i)(M) requires a debtor to disclose any termination or default provisions concerning the use of cash collateral or the availability of credit:  **The Interim Orders and the DIP Credit Agreements contain termination and default provisions relating to the use of Cash Collateral and/or the availability of credit under the DIP Loans.  [*Interim Orders* ¶ 10; *DIP Credit Agreements* §8.01].**

n.      Local Rule 4001-2(a)(i)(N) requires a debtor to disclose any provision that grants cross-collateralization protection or elevates prepetition debt–to administrative expense (or higher) status or that secures prepetition debt with liens on postpetition assets (which liens the creditor would not otherwise have by virtue of the prepetition security agreement or applicable law):  **The PA DIP Credit Agreement provides for a roll-up (and conversion into DIP Loans) of certain of the PA Prepetition Obligations.  Each of the Interim Orders also provide for the grant of Adequate Protection Liens to the extent of any Diminution in Value of the applicable Prepetition Secured Parties' interests in the Prepetition Collateral and also provide for certain Adequate Protection Payments for the benefit of the Prepetition Secured Parties.  [*Interim Orders* ¶¶ 2, 9].**

o.      Local Rule 4001-2(a)(i)(O) requires a debtor to disclose any provision that applies the proceeds of postpetition financing to pay, in whole or in part, prepetition debt or which otherwise has the effect of converting (or "rolling up") prepetition debt to postpetition debt:  **The PA Interim Order provides for a roll-up of certain of the PA Prepetition Obligations.  [*PA Interim Order* ¶ 2].**

p.      Local Rule 4001-2(a)(i)(P) requires a debtor to disclose any provision that immediately primes valid, perfected and non-avoidable liens existing immediately prior to the petition date or that are perfected subsequent to the petition date as permitted by section 546(b) of the Bankruptcy Code, in each case that are senior to the lender's prepetition liens under applicable law, without the consent of the affected secured creditors, and the proposed notice to be provided to such affected secured creditors:  **None of the Interim Orders or the DIP Documents provide for the immediate priming of any valid, perfected and non-avoidable liens existing immediately prior to the Petition Date or that are perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code.  The DIP Liens are junior and subordinate to such liens pursuant to Section 364(c)(3) of the Bankruptcy Code.**

q.      Bankruptcy Rule 4001(c)(1)(B)(iii) and Local Rule 4001-2(a)(i)(Q) require a debtor to disclose any provision that (i) binds the estate or other parties in

interest with respect to the validity, perfection or amount of the secured creditor's prepetition lien or the waiver of claims against the secured creditor without first giving parties in interest, including, but not limited to, any official committee appointed in these cases, at least seventy-five (75) days from the entry of the initial interim order to investigate such matters or (ii) limits the Court's ability to grant relief in the event of a successful challenge: **Each of the Interim Orders contain stipulations and waivers in favor of the Prepetition Secured Parties, subject to the Challenge Period which is the date that is no later than seventy-five (75) days from the entry of the applicable Interim Order as such Challenge Period may be extended to the extent permitted by the applicable Interim Order.  [*Interim Orders* ¶ 13].**

r.    Local Rule 4001-2(a)(i)(R) requires a debtor to disclose any provision that immediately approves all terms and conditions of the underlying loan agreement (provided that provisions in the order that provide that the debtor is authorized to enter into and be bound by the terms and conditions of such loan agreement do not need to be summarized): **Each of the Interim Orders approve the terms and conditions of the DIP Facilities with respect to amounts advanced during the interim period prior to entry of the Final Orders.   [*Interim Orders* ¶¶ 1, 2].**

s.    Local Rule 4001-2(a)(i)(S) requires a debtor to disclose any provisions that modify or terminate the automatic stay or permit the lender to enforce remedies following an event of default that do not require at least five (5) days' written notice to the trustee or debtor in possession, the Office of the United States Trustee and each committee appointed under sections 1102 and 1114 of the Bankruptcy Code (the "Remedies Notice Period"), prior to such modification or termination of the automatic stay or the enforcement of the lender's remedies: **Each of the Interim Orders require at least five (5) days' written notice to the applicable TX/PA Debtors, the Office of the United States Trustee and each committee appointed under sections 1102 and 1114 of the Bankruptcy Code, prior to the modification or termination of the automatic stay or the enforcement of the DIP Lenders' remedies. [*Interim Orders* ¶ 11].**

t.    Local Rule 4001-2(a)(i)(T) requires a debtor to disclose any provisions that seek to limit what parties in interest (other than the debtor) may raise at any emergency hearing scheduled during the Remedies Notice Period:  **Each of the Interim Orders do not contain any provisions that limit what other parties in interest (other than the debtor) may raise at any emergency hearing scheduled during the Remedies Notice Period.  [*Interim Orders* ¶ 11].**

u.    Bankruptcy Rule 4001(c)(1)(B)(xi) and Local Rule 4001-2(a)(i)(U) require a debtor to disclose any provisions that grant to the prepetition secured creditor liens on the debtor's claims and causes of action arising under sections 544, 545, 547, and 548 of the Bankruptcy Code (the "Avoidance Actions") or, in each case, the proceeds thereof:  **Each of the Interim Orders provide, subject to entry of the Final Orders, that proceeds of Avoidance Actions are included in the applicable DIP Collateral, provided that the applicable DIP Liens shall attach to proceeds from the applicable**

**Avoidance Actions arising under section 549 of the Bankruptcy Code.  [*Interim Order*s ¶ 6].**

v.      Bankruptcy Rule 4001(c)(1)(B)(x) and Local Rule 4001-2(a)(i)(V) require a debtor to disclose any provisions that immediately waive the debtor's rights under section 506(c) of the Bankruptcy Code: **The Interim Orders do not provide for the immediate waiver of the TX/PA Debtors' rights under 506(c) and any such waiver is subject to entry of the Final Orders. [*Interim Orders* ¶ 25].**

w.      Local Rule 4001-2(a)(i)(W) requires a debtor to disclose any provisions that immediately seek to affect the Court's power to consider the equities of the case doctrine under section 552(b)(1) of the Bankruptcy Code: **The Interim Orders do not immediately affect the Court's power to consider the "equities of the case" exception under section 552(b) of the Bankruptcy Code, and the application of the "equities of the case" exception under section 552 of the Bankruptcy Code to the DIP Agents, the DIP Lenders, the Prepetition Trustees or the Prepetition Secured Parties with respect to proceeds, products, offspring or profits of any of the Prepetition Collateral and any such limitations remain subject to entry of the Final Orders. [*Interim Orders* ¶ 26].**

x.      Local Rule 4001-2(a)(i)(X) requires a debtor to disclose any provisions that immediately seek to shield the DIP Lenders or the Prepetition Secured Parties from the equitable doctrine of "marshalling" or any similar doctrine: **The Interim Orders do not immediately seek to shield the DIP Lenders or the Prepetition Secured Parties from the equitable doctrine of "marshalling" or any similar doctrine, and the application of the equitable doctrine of "marshalling" or any similar doctrine to the DIP Lenders or the Prepetition Secured Parties with respect to proceeds, products, offspring or profits of any of the DIP Collateral and/or Prepetition Collateral and any such limitations remain subject to entry of the Final Orders. [*Interim Orders* ¶ 27].**

y.      Bankruptcy Rule 4001(c)(1)(B)(viii) requires the disclosure of any provisions that release, waive, or limit any claim or other cause of action belonging to the estate or any trustee: **Each of the Interim Orders provide for certain releases of claims or causes of action against the DIP Lenders and, subject to the Investigation Period, the Prepetition Secured Parties. [*Interim Orders* ¶ 13].  The stipulations by the TX/PA Debtors include, subject to the Investigation Period and Challenge Period, the release of the Prepetition Secured Parties. [*Interim Orders* ¶ 13(b)].**

z.      Bankruptcy Rule 4001(c)(1)(B) requires a debtor to disclose a grant of priority or a lien on property of the estate under 364(c) or (d):  **Each of the Interim Orders provide a grant of a priority liens pursuant to sections 364(c) and (d) to the DIP Secured Parties. [*Interim Orders* ¶ 6].**

DOCS_NY:42509.9

aa.    Bankruptcy Rule 4001(c)(1)(B)(ii) requires disclosure of the provision of adequate protection or priority for claims arising prior to the commencement of the case: **Each of the Interim Orders provide that the Prepetition Secured Parties will be granted adequate protection, in the form of Adequate Protection Liens, Adequate Protection Payments and the superpriority Adequate Protection Claims (junior in all cases to the claims and liens relating to the DIP Facilities and payment of the Carve-Out), to the extent of any Diminution in Value of the Prepetition Secured Parties' interests in the Prepetition Collateral as of the Petition Date.  [*Interim Orders* ¶ 9].**

bb.    Bankruptcy Rule 4001(c)(1)(B)(iv) requires disclosure of provisions that constitute a waiver or modification of the automatic stay:  **Each of the Interim Orders describe the modification of the automatic stay to the extent necessary to implement the Interim Orders and enforce remedies thereunder.  [*Interim Orders* ¶ 12].**

cc.    Bankruptcy Rule 4001(c)(1)(B)(v) requires disclosure of provisions that waive or modify the applicability of nonbankruptcy law relating to the perfection of a lien on property of the estate:  **Each of the Interim Orders include provisions that provide for the automatic perfection and validity of the DIP Liens without the necessity of any further filing or recording under the laws of any jurisdiction**.  [*Interim Order* ¶ 6(c)].

dd.    Bankruptcy Rule 4001(c)(1)(B)(vii) requires disclosure of provisions that waive or modify any entity's authority or right to file a plan, request the use of cash collateral under section 363(c), or request authority to obtain credit under section 364:  **The DIP Credit Agreements include provisions that limit the applicable TX/PA Debtors' ability to request the use of cash collateral or request to obtain credit under section 364.  [*DIP Credit Agreements* § 8.01(hh)].**

## Need for Financing and Use of Cash Collateral

36.    The TX/PA Debtors have an urgent and immediate need for access to funds available under the DIP Facilities and the use of the Cash Collateral.  The TX/PA Debtors lack sufficient liquidity and do not generate sufficient cash from operations to fund their respective businesses.  Accordingly, without the DIP Facilities and the ability to use Cash Collateral, the TX/PA Debtors will not have the liquidity needed to operate their respective businesses, fund their respective ordinary course expenditures (including paying employees), or pay the expenses necessary to administer their applicable Chapter 11 Cases.  Absent

39

increased funding in the form of the DIP Facilities, the TX/PA Debtors could be forced to terminate their businesses as going concerns to the detriment of the Debtors, their estates, and all stakeholders. *See* Morgner Declaration, at ¶ 10; First Day Declaration, at ¶ 98.

37.    The TX/PA Debtors also submit that the DIP Facilities and access to Cash Collateral will provide a clear message to their respective customers, vendors, employees, and contract counterparties that each of the TX/PA Debtors' operations are appropriately funded and that the TX/PA Debtors have sufficient liquidity to meet their current and future obligations. The financing will demonstrate that each of the TX/PA Debtors' ability to continue meeting the needs of their respective customers, provide compensation to their respective employees, and operate their respective businesses in the ordinary course. *See* Morgner Declaration, at ¶ 11. Accordingly, the TX/PA Debtors strongly urge the Court to authorize the DIP Facilities and the continued use of Cash Collateral on the terms contemplated in the Interim Orders, the Final Orders and the DIP Documents, initially on an interim basis and, following the Final Hearing, on a final basis.

## **Basis for Relief**

**A.**    **The TX/PA Debtors Should Be Permitted to Obtain Postpetition Financing Pursuant to Section 364(c) of the Bankruptcy Code**

38.    Section 364(c) of the Bankruptcy Code requires a finding, made after notice and a hearing, that the debtors seeking postpetition financing on a secured basis cannot "obtain unsecured credit allowable under section 503(b)(l) of [the Bankruptcy Code] as an administrative expense." 11 U.S.C. § 364(c).

39.    In evaluating proposed postpetition financing under section 364(c) of the Bankruptcy Code, courts perform a qualitative analysis and generally consider similar factors, including whether:

a.    unencumbered credit or alternative financing without superpriority status is available to the debtor;

b.    the credit transactions are necessary to preserve assets of the estate;

c.    the terms of the credit agreement are fair, reasonable, and adequate;

d.    the proposed financing agreement was negotiated in good faith and at arm's-length and entry thereto is an exercise of sound and reasonable business judgment and in the best interest of the debtors' estate and its creditors; and

e.    the proposed financing agreement adequately protects the prepetition secured parties.

*See, e.g.*, *In re Aqua Assoc.*, 123 B.R. 192 (Bankr. E.D. Pa. 1991) (applying the first three factors in making a determination under section 364(c)).

40.    For the reasons discussed below, the TX/PA Debtors satisfy the standards required to obtain postpetition financing in these cases on a secured superpriority basis as to the Collateral under sections 364(c)(1), (2), and (3) of the Bankruptcy Code.

**B.    The TX/PA Debtors Were Unable to Obtain Financing on More Favorable Terms**

41.    Prior to the Petition Date, the TX/PA Debtors, through their advisors, discussed with various third parties the opportunity to provide financing to the TX/PA Debtors, but none of those parties was prepared to provide DIP financing on an unsecured or junior basis, and, further, all would have required priming liens on existing collateral of the Prepetition

Secured Parties.  None of the Prepetition Secured Parties were willing to consent to priming liens

and so pursuit of such third-party financing likely would have led to a dispute with each of the

Prepetition Secured Parties.    Accordingly, taking into account the circumstances and the

proposals provided by the DIP Lenders, the TX/PA Debtors determined, in an exercise of their

business judgment, that the DIP Lenders offered the best available economic proposals under the

circumstances.  The DIP Lenders are unwilling to lend into the DIP Facilities except on a fully

secured and first priority basis as to the applicable DIP Collateral.  *See* Morgner Declaration, at

¶¶ 13-15; First Day Declaration, at ¶¶ 93-95.

42.    The TX/PA Debtors respectfully submit that their efforts to obtain

postpetition financing therefore satisfy the standard required under section 364(c) of the

Bankruptcy Code.  *See, e.g., In re Sky Valley, Inc.,* 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988)

(where few lenders can or will extend the necessary credit to a debtor, "it would be unrealistic

and unnecessary to require [the debtor] to conduct such an exhaustive search for financing").

### C.    The Proposed Financing Is Necessary to Maximize the Value of the TX/PA Debtors' Estates

43.    The TX/PA Debtors seek to use the proceeds of the DIP Facilities for

general working capital purposes in accordance with the applicable Budgets and in order to allow

the TX/PA Debtors to maximize value through an orderly sale process with respect to all or a

portion of their businesses or a plan of reorganization focused on restructuring of their

obligations enabling their businesses to operate as a going concern.  The DIP Facilities represent

the best economic alternative for a debtor-in-possession lending arrangement. *See* First Day

Declaration, at ¶ 99.

42

44.     The use of the proceeds of the financing requested by the TX/PA Debtors is subject to the Budgets, which accommodate certain permitted variances. The Budgets will be periodically updated at the times and according to the procedures set forth in the applicable Interim Orders and applicable DIP Credit Agreements. The initial Budgets have been approved by the applicable TX/PA Debtors and each of the applicable DIP Agents. The Budgets show the respective TX/PA Debtors' projected weekly receipts and disbursements for the period commencing on the Petition Date through the anticipated Maturity Date of the applicable DIP Loans. Each of the Budgets has been carefully crafted by the TX/PA Debtors' advisors and management to provide each of the TX/PA Debtors with the minimum liquidity needed to prudently operate their business and meet their anticipated post-petition operating and non-recurring expenses (such as professional fees, costs and expenses incurred under the DIP Loans, and adequate protection payments made to the Prepetition Secured Parties. The TX/PA Debtors believe that the respective Budgets will be adequate, considering all of the applicable TX/PA Debtors' available assets, to pay the administrative expenses that may become due or accrued during the period covered by the Budgets. The amounts that the TX/PA Debtors seek to borrow by this Motion on an interim basis under the applicable DIP Facilities reflect the payment of expenses that, in each of the TX/PA Debtors' business judgment, are necessary to avoid immediate and irreparable harm to the estates pending the final hearing to approve the proposed DIP Facilities. *See id.* at ¶ 100.

45.     Without immediate access to the DIP Facilities, the TX/PA Debtors would be forced to convert to chapter 7 and liquidate their assets. Stated simply, failure to access the

DIP Facilities would irreparably damage the TX/PA Debtors' efforts to consummate the sale of their businesses or assets or to restructure as a going concern in a manner that would maximize value for the benefit of all constituents. Accordingly, the TX/PA Debtors urge the Court to authorize the DIP Facilities on the terms contemplated herein.

### D.    The Terms of the Proposed Financing are Fair, Reasonable, and Appropriate

46.    In considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.)*, 65 B.R. 358, 365 (W.D. Mich. 1986) (a debtor may have to enter into hard bargains to acquire funds).

47.    The terms of each of the DIP Credit Agreements were negotiated in good faith and at arm's-length between the each of the TX/PA Debtors and the applicable DIP Lenders, resulting in agreements that are designed to permit the TX/PA Debtors to maximize the value of their assets and to effectuate an orderly sale process. *See* First Day Declaration, at ¶ 99. The TX/PA Debtors submit that the proposed terms of the DIP Facilities are fair, reasonable, and appropriate under the circumstances. *See, e.g.*, *Bray v. Shenandoah Fed. Sav. and Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) (stating that section 364(d) of the Bankruptcy Code imposes no duty to seek credit from every possible lender); *In re Western Pacific Airlines, Inc.*, 223 B.R. 567 (Bankr. D. Colo. 1997) (authorizing postpetition financing that would preserve the value of the debtor's assets).

44

**E.      Entry Into the Proposed Financing Reflects
the TX/PA Debtors' Sound Business Judgment**

48.      A debtor's decision to enter into a postpetition lending facility under

section 364 of the Bankruptcy Code is governed by the business judgment standard.  *See, e.g.*,

*Trans World Airlines, Inc. v. Travelers Int'l AG (In re Trans World Airlines, Inc.)*, 163 B.R. 964,

974 (Bankr. D. Del. 1994) (approving postpetition credit facility because such facility

"reflect[ed] sound and prudent business judgment"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34,

38 (Bankr. S.D.N.Y. 1990) (financing decisions under section 364 of the Bankruptcy Code must

reflect a debtor's business judgment).

49.      Bankruptcy courts routinely accept a debtor's business judgment on many

business decisions, including the decision to borrow money.  *See, e.g., Group of Inst. Investors v.*

*Chicago, Mil., St. P. & Pac.*, 318 U.S. 523, 550 (1943) (holding that decisions regarding

assumption or rejection of leases are left to the business judgment of the debtor); *In re Simasko*

*Prod. Co.*, 47 B.R. 444, 449 (D. Colo. 1985) ("[b]usiness judgments should be left to the board

room and not to this Court").  Further, one court has noted that "[m]ore exacting scrutiny

[of the debtors' business decisions] would slow the administration of the debtor's estate and

increase its cost, interfere with the Bankruptcy Code's provision for private control of

administration of the estate, and threaten the court's ability to control a case impartially."

*Richmond Leasing Co. v. Capital Bank, N.A.,* 762 F.2d 1303, 1311 (5th Cir. 1985).

50.      Bankruptcy courts generally will defer to a debtor in possession's business

judgment regarding the need for and the proposed use of funds, unless such decision is arbitrary

and capricious, *In re Curlew Valley Assocs.,* 14 B.R. 506, 511-13 (Bankr. D. Utah 1981); *see*

*also Trans World Airlines, Inc.,* 163 B.R. at 974 (approving interim loan, receivables facility and asset-based facility based upon prudent business judgment of the debtor), and generally will not second-guess a debtor in possession's business decisions involving "a business judgment made in good faith, upon a reasonable basis, and within the scope of his authority under the Code." *Curlew Valley,* 14 B.R. at 513-14 (footnotes omitted).

51.     For the reasons set forth above, the TX/PA Debtors' sound business judgment clearly supports approval of the DIP Facilities in order to allow the TX/PA Debtors to gain access to needed financing and thereby maximize value for all constituents through an orderly sale process.

**F.      The Proposed Roll-Up with Respect to Certain of
the Prepetition Obligations Should Be Approved**

52.     Section 363(b) of the Bankruptcy Code permits a debtor to use, sell or lease property, other than in the ordinary course of business, with court approval.  In the Third Circuit, such transactions should be approved when they are supported by a sound business purpose.  *See In re Culp*, 545 B.R. 827, 844 (Bankr. D. Del. 2016) ("Transactions under section 363 must be based upon the sound business judgement of the [debtor in possession]"), *aff'd In re Culp*, 681 Fe. Appx. 140 (3d Cir. 2017); *In re Filene's Basement, LLC*, 2014 WL 1713416, at *12 (Bankr. D. Del. Apr. 29, 2014).  The business judgment rule shields a debtor's management from judicial second-guessing.  *In re Johns-Manville Corp.*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("[T]he [Bankruptcy] Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").

53.    Repayment of prepetition debt (often referred to as a "roll-up") is a common feature in debtor in possession financing arrangements. Courts in this jurisdiction have approved similar financing features in postpetition loans. *See, e.g.*, *In re Blackhawk Mining LLC*, No. 19-11595 (LSS) (Bankr. D. Del. Aug. 13, 2019) (authorizing roll-up of $70 million in prepetition term loans and up to $82 million of prepetition ABL in interim order); *In re ATD Corporation*, No. 18-12221 (KJC) (Bankr. D. Del. Oct. 26, 2018) (authorizing a full roll-up of the prepetition ABL outstanding principal of $639 million pursuant to interim order); *In re Remington Outdoor Co., Inc.*, No. 18-10684 (BLS) (Bankr. D. Del. Mar. 28, 2018) (authorizing a roll-up of approximately $150 million which included a full ABL roll-up of $114 million pursuant to interim order); *In re Forever 21, Inc.*, No. 19-12122 (KG) (approving the repayment in full of all outstanding amounts under the prepetition revolving credit agreement); *In re Charming Charlie LLC*, No. 19-11534 (CSS) (Bankr. D. Del. July 12, 2019) (authorizing a "creeping" roll-up of prepetition ABL facility of $9.5 million pursuant to interim order); *In re Bon-Ton Stores, Inc.*, No. 18-10248 (MFW) (Bankr. D. Del. Feb. 6, 2018) (authorizing full roll-up of all $489 million outstanding prepetition revolving obligations pursuant to interim order); *In re American Apparel, Inc.*, No. 15-12055 (Bankr. D. Del. Oct. 6, 2017) (approving on an interim basis the repayment in full of all outstanding amounts under the prepetition revolving credit agreement).

54.    Courts in other jurisdictions have similarly approved roll-ups of prepetition debt. *See In re Toys "R" Us. Inc.*, No. 17-34665 (KLP) (Bankr. E.D. Va. Oct. 24, 2017) (approving use of debtor in possession financing to pay down or "roll-up" prepetition

47

debt); *In re The Gymboree Corp.*, No. 17-32968 (Bankr. E.D. Va. June 12, 2017) (approving on an interim basis the conversion and "roll-up" of all outstanding prepetition revolving obligations and $70 million of prepetition term loan obligations); *In re rue21, inc.*, No. 17-22045 (Bankr. W.D. Pa. May 18, 2017) (approving on an interim basis the conversion and "roll-up" of all outstanding prepetition revolving obligations and $100 million of prepetition term loans); *In re BCBG Max Azria Glob. Holdings, LLC*, No. 17-10466 (Bankr. S.D.N.Y. March 28, 2017) (approving on a final basis the conversion and "roll-up" of $35 million of prepetition term loan obligations); *In re BCBG Max Azria Glob. Holdings, LLC*, No. 17-10466 (Bankr. S.D.N.Y. March 2, 2017) (approving the conversion and "roll-up" of all outstanding prepetition revolving obligations on a rolling basis following entry of the interim order); *In re Aéropostale, Inc.*, No. 16 11275 (Bankr. S.D.N.Y. May 6, 2016) (approving on an interim basis the conversion and "roll-up" of all outstanding prepetition revolving obligations).

55.     As set forth above, the PA DIP Credit Agreement provides that $50,000,000 of the PA 2019 Prepetition Obligations will be fully repaid by the PA DIP Facility. The repayment of the PA 2019 Prepetition Obligations is a sound exercise of the PA Debtors' business judgment and is a material component of the structure of the PA DIP Facility. The holders of the PA 2019 Bond Loan were unlikely to continue to lend postpetition without some assurance regarding their prepetition claims. The conversion of certain of the PA 2019 Prepetition Obligations into the DIP PA DIP Facility should be authorized as compensation for, in consideration for, and solely on account of, the agreement of the holders of the PA 2019 Bond Loan to provide new-money liquidity and permit access to Cash Collateral of the PA Debtors,

48

and not as payments under, adequate protection for, or otherwise on account of, any PA 2019

Prepetition Obligations.  The conversion and "roll-up" of certain of the PA 2019 Prepetition

Obligations into the PA DIP Facility will enable the PA Debtors to obtain urgently needed

financing to free up liquidity to fund the chapter 11 process. Without the liquidity provided under

the PA DIP Facility necessary to fund the administration of these Chapter 11 Cases and the sale

process, the PA Debtors would be unable to conduct the sale process and maximize value for

their stakeholders.  Maintaining the ability to fund the administration of these Chapter 11 Cases

and complete a sale transaction is of immense benefit to all of the PA Debtors' stakeholders.  *See*

First Day Declaration, at ¶ 97.

56.    In light of the foregoing, and taking into account the circumstances of

these Chapter 11 Cases, the roll-up of certain of the existing PA 2019 Prepetition Obligations

upon entry of the Interim Order is reasonable, appropriate, a sound exercise of the PA Debtors'

business judgment, and ultimately in the best interest of all stakeholders given the alternatives.

### G.    Section 363 of the Bankruptcy Code Authorizes the TX/PA Debtors' Use of Cash Collateral

57.    Section 363(c)(2) of the Bankruptcy Code provides that a debtor in

possession may not use cash collateral unless (A) each entity that has an interest in such cash

collateral provides consent, or (B) the court approves the use of cash collateral after notice and a

hearing.  *See* 11 U.S.C. § 363(c).  Section 363(e) of the Bankruptcy Code provides that, "on

request of an entity that has an interest in property used . . . or proposed to be used . . . by the

[debtor in possession], the court . . . shall prohibit or condition such use . . . as is necessary to

provide adequate protection of such interest."  11 U.S.C. § 363(e).

49

58.     Here, the TX/PA Debtors seek authority to use the Cash Collateral of the applicable TX/PA Debtors pursuant to the Budgets and on terms consistent with the Interim Orders.

59.     Bankruptcy Rule 4001(b) permits a court to approve a debtor's request for use of cash collateral during the 14-day period following the filing of a motion requesting authorization to use cash collateral, "only . . . as is necessary to avoid immediate and irreparable harm to the estate pending a final hearing."  Bankruptcy Rule 4001(b)(2).  In examining requests for interim relief under this rule, courts apply the same business judgment standard applicable to other business decisions.  *See, e.g., In re Simasko Production Co.*, 47 B.R. 444, 449 (D. Colo. 1985); *see also In re Ames Dep't Stores Inc.,* 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990).  After the 14-day period, the request for use of cash collateral is not limited to those amounts necessary to prevent harm to the debtor's business.

60.     As previously noted, in order to satisfy accruing administrative expenses and continue their orderly sale efforts, the TX/PA Debtors require access to the DIP Facilities and the use of Cash Collateral of the applicable TX/PA Debtors.  Such use will provide the TX/PA Debtors with the necessary funds to remain administratively solvent, while allowing the TX/PA Debtors to maximize value through the pending sale process.  Notably, the Prepetition Secured Parties consent to the TX/PA Debtors' use of Cash Collateral of the applicable TX/PA Debtors on the terms of the Interim Orders. *See* First Day Declaration, at ¶¶ 98-99.

61.     Absent access to Cash Collateral, the TX/PA Debtors would face immediate and irreparable harm.  The TX/PA Debtors would be forced to convert their cases to

chapter 7 and their assets would be liquidated.  Thus, immediate access to Cash Collateral is essential to the TX/PA Debtors' ability to maximize value for the benefit of all constituents.

**H.    Interim Order and Final Hearing**

62.    Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the TX/PA Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, and fix the time and date prior to the final hearing for parties to file objections to the Motion.

63.    The urgent need to avoid immediate and irreparable harm to the TX/PA Debtors' estates makes it imperative that the TX/PA Debtors be authorized to access the applicable DIP Facilities and use Cash Collateral of the applicable TX/PA Debtors, pending the Final Hearing, in order to allow the TX/PA Debtors to administer their cases.  Without the ability to make draws under the applicable DIP Facilities and use Cash Collateral, the TX/PA Debtors would be unable to meet their ongoing obligations and would be unable to implement their pending orderly sale process, thus causing irreparable harm to the TX/PA Debtors and the value of their estates.  *See* First Day Declaration, at ¶¶ 98-99.  Accordingly, the TX/PA Debtors respectfully request that, pending the hearing on a Final Orders, the Interim Orders be approved in all respects and that the terms and provisions of the Interim Orders be implemented and be deemed binding and that, after the Final Hearing, the Final Orders be approved in all respects and the terms and provisions of the Final Orders be implemented and be deemed binding.

**Waiver of Bankruptcy Rule 6004(a) and 6004(h)**

64.    To implement the foregoing successfully, the TX/PA Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy

Rule 6004(a) and that the TX/PA Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## Notice

65.     Notice of this Motion shall be given to the following parties or, in lieu thereof, to their counsel, if known: (a) the Office of the United States Trustee for the District of Delaware; (b) counsel to the DIP Term Agent, DIP Term Lenders, and Prepetition Term Secured Parties; (c) counsel to the DIP ABL Lender and Prepetition ABL Secured Parties (d) counsel to the TX/PA DIP Agents and Prepetition Trustees; (e) the Debtors' forty largest unsecured creditors on a consolidated basis; (f) any other known party that asserts a lien against the Debtors' assets; and (g) all parties entitled to notice pursuant to Local Rule 9013-1(m)(iii).  As the Motion is seeking "first day" relief, within two business days after the hearing on the Motion, the Debtors will serve copies of the Motion and any order entered respecting the Motion as required by Local Rule 9013-1(m)(iv).  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## No Prior Request

66.     No prior request for the relief sought in this Motion has been made to this or any other court.

DOCS_NY:42509.9

WHEREFORE, the TX/PA Debtors respectfully request entry of each of the Interim Orders and the Final Orders (a) granting the relief requested herein, and (b) granting such other relief as is just and proper.

Dated:    March 8, 2021                    PACHULSKI STANG ZIEHL & JONES LLP

                                           /s/ James E. O'Neill
                                           Richard M. Pachulski (CA Bar No. 90073)
                                           Gabriel I. Glazer (CA Bar No. 246384)
                                           James E. O'Neill (DE Bar No. 4042)
                                           Steven W. Golden (NY Bar No. 5374152)
                                           919 N. Market Street, 17th Floor
                                           P.O. Box 8705
                                           Wilmington, DE 19899 (Courier 19801)
                                           Tel:  (302) 652-4100
                                           Fax: (302) 652-4400
                                           Email: rpachulski@pszjlaw.com
                                                  gglazer@pszjlaw.com
                                                  joneill@pszjlaw.com
                                                  sgolden@pszjlaw.com

                                           *Proposed Attorneys for Debtors and Debtors in Possession*