## EXHIBIT D

**PA DIP Credit Agreement**

**SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

**dated as of March [_], 2021,**

**among**

**CARBONLITE P, LLC,**
a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code,

**as Borrower,**

**and**

**CARBONLITE P HOLDINGS, LLC,**
a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code,

**as Guarantor**,

**and**

**THE LENDERS PARTY HERETO,**

**and**

**UMB BANK, N.A.,**

**as**
**Administrative Agent and Collateral Agent**

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS ...................................................................................................1

    Section 1.01      Defined Terms ..........................................................................1
    Section 1.02      [Reserved] ...............................................................................29
    Section 1.03      Terms Generally .....................................................................29
    Section 1.04      Accounting Terms; GAAP .....................................................30
    Section 1.05      [Reserved] ...............................................................................30
    Section 1.06      Resolution of Drafting Ambiguities ......................................30

ARTICLE II THE COMMITMENTS AND CREDIT EXTENSIONS ...................................30

    Section 2.01      The Loans ...............................................................................30
    Section 2.02      Borrowings of Loans ..............................................................32
    Section 2.03      [Reserved] ...............................................................................33
    Section 2.04      Evidence of Debt; Repayment of Loans .................................33
    Section 2.05      Fees .........................................................................................34
    Section 2.06      Interest on Loans ....................................................................34
    Section 2.07      Termination of Commitments .................................................35
    Section 2.08      [Reserved] ...............................................................................35
    Section 2.09      Repayment of Loans ...............................................................35
    Section 2.10      Optional and Mandatory Prepayments of Loans ...................35
    Section 2.11      [Reserved] ...............................................................................36
    Section 2.12      [Reserved] ...............................................................................36
    Section 2.13      [Reserved] ...............................................................................36
    Section 2.14      Payments Generally; Pro Rata Treatment; Sharing of Setoffs ...................37
    Section 2.15      Taxes ......................................................................................38
    Section 2.16      Mitigation Obligations; Replacement of Lenders ..................41
    Section 2.17      Withdrawal of Funds from the Funding Account....................42

ARTICLE III REPRESENTATIONS AND WARRANTIES ...............................................44

    Section 3.01      Organization; Powers .............................................................44
    Section 3.02      Authorization; Enforceability.................................................45
    Section 3.03      No Conflicts; No Default ........................................................45
    Section 3.04      Financial Condition; No Material Adverse Effect...................45
    Section 3.05      Properties.................................................................................45
    Section 3.06      Intellectual Property ...............................................................46
    Section 3.07      Equity Interests and Subsidiaries ..........................................47
    Section 3.08      Litigation; Compliance with Legal Requirements .................47
    Section 3.09      Material Agreements ...............................................................47
    Section 3.10      Federal Reserve Regulations ..................................................47
    Section 3.11      Investment Company Act, etc .................................................48
    Section 3.12      Use of Proceeds ......................................................................48
    Section 3.13      Taxes ......................................................................................48
    Section 3.14      No Material Misstatements .....................................................48
    Section 3.15      Labor Matters .........................................................................48

## TABLE OF CONTENTS
(continued)

Section 3.16    Agreements with Affiliates .......................................................48
Section 3.17    Employee Benefit Plans ..........................................................49
Section 3.18    Environmental Matters............................................................49
Section 3.19    Insurance ................................................................................50
Section 3.20    No Bank Accounts ..................................................................50
Section 3.21    Anti-Terrorism Law; Foreign Corrupt Practices Act ..................50
Section 3.22    Cases; DIP Orders; Secured Super-Priority Obligations.............51
Section 3.23    Commercial Activity; Absence of Immunity ..............................53

ARTICLE IV CONDITIONS TO CREDIT EXTENSIONS ..........................................53

Section 4.01    Conditions to Initial Credit Extension........................................53
Section 4.02    Conditions to All Credit Extensions and Withdrawals.................55

ARTICLE V AFFIRMATIVE COVENANTS ..............................................................56

Section 5.01    Financial Statements, Reports, etc ...........................................56
Section 5.02    Litigation and Other Notices ...................................................58
Section 5.03    Existence; Businesses and Properties .......................................59
Section 5.04    Insurance ................................................................................60
Section 5.05    Obligations and Taxes .............................................................61
Section 5.06    Employee Benefits ...................................................................61
Section 5.07    Maintaining Records; Access to Properties and Inspections;......61
Section 5.08    Use of Proceeds ......................................................................62
Section 5.09    Compliance with Environmental Laws; Environmental Reports ....62
Section 5.10    Additional Collateral ...............................................................62
Section 5.11    Security Interests; Further Assurances ......................................63
Section 5.12    Post-Closing Matters ...............................................................63
Section 5.13    Maintenance of Corporate Separateness ..................................63
Section 5.14    Hiring Plan .............................................................................63
Section 5.15    Priority of Liens ......................................................................63
Section 5.16    Milestones ..............................................................................64
Section 5.17    Bankruptcy Related Matters.....................................................66
Section 5.18    Budget Compliance .................................................................66
Section 5.19    Lender Calls ...........................................................................67
Section 5.20    Chief Restructuring Officer; Investment Banker .......................67
Section 5.21    Material Agreements ................................................................68

ARTICLE VI NEGATIVE COVENANTS ....................................................................68

Section 6.01    Indebtedness...........................................................................68
Section 6.02    Liens ......................................................................................69
Section 6.03    Sale and Leaseback Transactions .............................................71
Section 6.04    Investments, Loans and Advances ............................................71
Section 6.05    Mergers and Consolidations.....................................................72
Section 6.06    Asset Sales..............................................................................72
Section 6.07    Acquisitions.............................................................................73

# TABLE OF CONTENTS
(continued)

| | | |
|---|---|---|
| Section 6.08 | Dividends | 73 |
| Section 6.09 | Transactions with Affiliates | 73 |
| Section 6.10 | Minimum Liquidity | 74 |
| Section 6.11 | Prepayments of Other Indebtedness; Modifications of Organizational Documents, Acquisition and Certain Other Documents, etc | 74 |
| Section 6.12 | Limitation on Certain Restrictions on Subsidiaries | 75 |
| Section 6.13 | Business | 76 |
| Section 6.14 | Limitation on Issuance of Capital Stock | 76 |
| Section 6.15 | Limitation on Accounting Changes; Change of Fiscal Year | 76 |
| Section 6.16 | Permitted Accounts | 76 |
| Section 6.17 | No Further Negative Pledge | 76 |
| Section 6.18 | Anti-Terrorism Law; Anti-Money Laundering | 76 |
| Section 6.19 | Embargoed Person | 77 |
| Section 6.20 | No Hedging or Speculative Transactions | 77 |
| Section 6.21 | Change of Auditors | 77 |
| Section 6.22 | Subsidiaries | 77 |
| Section 6.23 | Change in Name or Location | 77 |
| Section 6.24 | Additional Bankruptcy Matters | 77 |
| Section 6.25 | Budget Variance | 79 |
| Section 6.26 | Capital Expenditures | 79 |
| Section 6.27 | Passive Holding Company | 79 |
| **ARTICLE VII GUARANTEE** | | 79 |
| Section 7.01 | The Guarantee | 79 |
| Section 7.02 | Obligations Unconditional | 79 |
| Section 7.03 | Reinstatement | 80 |
| Section 7.04 | Subrogation; Subordination | 80 |
| Section 7.05 | Remedies | 81 |
| Section 7.06 | Instrument for the Payment of Money | 81 |
| Section 7.07 | Continuing Guarantee | 81 |
| Section 7.08 | General Limitation on Guarantee Obligations | 81 |
| **ARTICLE VIII EVENTS OF DEFAULT** | | 81 |
| Section 8.01 | Events of Default | 81 |
| Section 8.02 | Rescission | 87 |
| Section 8.03 | [Reserved] | 87 |
| Section 8.04 | Application of Proceeds | 87 |
| **ARTICLE IX THE ADMINISTRATIVE AGENT AND THE COLLATERAL AGENT** | | 88 |
| Section 9.01 | Appointment | 88 |
| Section 9.02 | Agent in Its Individual Capacity | 89 |
| Section 9.03 | Exculpatory Provisions | 89 |
| Section 9.04 | Reliance by Agent | 90 |
| Section 9.05 | Delegation of Duties | 91 |

# TABLE OF CONTENTS

(continued)

| | | |
|---|---|---|
| Section 9.06 | Successor Agent | 91 |
| Section 9.07 | Non-Reliance on Agent and Other Lenders | 91 |
| Section 9.08 | [Reserved] | 92 |
| Section 9.09 | Indemnification | 92 |
| Section 9.10 | [Reserved] | 92 |
| Section 9.11 | Lender Action | 92 |
| Section 9.12 | Withholding Taxes | 93 |
| Section 9.13 | Lender's Representations, Warranties and Acknowledgements | 93 |
| Section 9.14 | Security Documents and Guarantee | 93 |
| Section 9.15 | Administrative Agent May File Bankruptcy Disclosure and Proofs of Claim. | 95 |

ARTICLE X MISCELLANEOUS ................................................................96

| | | |
|---|---|---|
| Section 10.01 | Notices | 96 |
| Section 10.02 | Waivers; Amendment | 99 |
| Section 10.03 | Expenses; Indemnity; Damage Waiver | 101 |
| Section 10.04 | Successors and Assigns | 103 |
| Section 10.05 | Survival of Agreement | 107 |
| Section 10.06 | Counterparts; Integration; Effectiveness | 107 |
| Section 10.07 | Severability | 107 |
| Section 10.08 | Right of Setoff; Marshalling; Payments Set Aside | 108 |
| Section 10.09 | Governing Law; Jurisdiction; Consent to Service of Process | 108 |
| Section 10.10 | Waiver of Jury Trial | 109 |
| Section 10.11 | Headings | 109 |
| Section 10.12 | Confidentiality | 109 |
| Section 10.13 | Interest Rate Limitation | 110 |
| Section 10.14 | Assignment and Assumption | 110 |
| Section 10.15 | Obligations Absolute | 110 |
| Section 10.16 | Waiver of Defenses; Absence of Fiduciary Duties | 110 |
| Section 10.17 | Reinstatement | 111 |
| Section 10.18 | USA Patriot Act | 111 |
| Section 10.19 | DIP Orders | 111 |

ANNEXES

Annex I                    Commitment Schedule

SCHEDULES

Schedule 1.01(a)          Excluded Accounts
Schedule 1.01(b)          Permitted Accounts
Schedule 3.05(c)          Real Property
Schedule 3.07(b)          Organizational Chart
Schedule 3.09             Material Agreements
Schedule 3.13             Taxes
Schedule 3.16             Agreements with Affiliates
Schedule 3.18             Environmental Matters
Schedule 3.19             Insurance
Schedule 5.12(a)          Mortgage Deliverables
Schedule 6.01(b)          Existing Indebtedness
Schedule 6.02(c)          Existing Liens
Schedule 6.04(a)          Existing Investments
Schedule 6.12(f)          Existing Restrictive Agreements

EXHIBITS

Exhibit A                 Form of Assignment and Assumption
Exhibit B                 Form of Borrowing Request
Exhibit C                 Form of Compliance Certificate
Exhibit D                 [Reserved]
Exhibit E                 Interim Order
Exhibit F                 Form of Funding Account Withdrawal Notice
Exhibit G                 Form of Note
Exhibit H                 Form of Non-Bank Certificate

**SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

This SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION CREDIT AGREEMENT (this "**Agreement**"), dated as of March [_], 2021, among CarbonLite P, LLC, a Delaware limited liability company and a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code ("**Borrower**"), CarbonLITE P Holdings, LLC, a Delaware limited liability company and a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code ("**Guarantor**"), the Lenders, UMB Bank, N.A., as administrative agent for the Lenders (in such capacity, the "**Administrative Agent**") and as collateral agent for the Secured Parties (in such capacity, the "**Collateral Agent**").

**WITNESSETH:**

WHEREAS, on March [_], 2021 (the "**Petition Date**"), Borrower and Guarantor (each a "**PA Debtor**" and collectively, the "**PA Debtors**") together with certain of their Affiliates, filed voluntary petitions with the Bankruptcy Court commencing their respective cases that are pending under Chapter 11 of the Bankruptcy Code (each case of Borrower and each other Debtor, a "**Case**" and collectively, the "**Cases**") and have continued in the possession of their assets and management of their business pursuant to Section 1107(a) and 1108 of the Bankruptcy Code.

WHEREAS, Borrower has requested that the Lenders extend credit to Borrower in the form of (i) new money term loans in an aggregate principal amount of up to $25,000,000 and (ii) roll-up loans in respect of the indebtedness outstanding under the Prepetition Indenture (as defined below) in an aggregate principal amount equal to two times the amount of the aggregate principal amount of new money term loans funded hereunder pursuant to this Agreement (collectively, the "**DIP Term Facility**"), with all of Borrower's obligations under the DIP Term Facility to be guaranteed by each Guarantor.

WHEREAS, the priority of the DIP Term Facility with respect to the Collateral granted to secure the Obligations shall be as set forth in the Interim Order and the Final Order, as applicable, in each case upon entry thereof by the Bankruptcy Court.

WHEREAS, Borrower and Guarantor are engaged in related businesses, and Guarantor will derive substantial direct and indirect benefit from the making of the extensions of credit under this Agreement.

NOW, THEREFORE, in consideration of the premises and the agreements, provisions and covenants herein contained, the parties hereto agree as follows:

**ARTICLE I**
**DEFINITIONS**

**Section 1.01    Defined Terms.** As used in this Agreement, the following terms shall have the meanings specified below:

"**Acceptable Confirmation Order**" means an order of the Bankruptcy Court confirming an Acceptable Plan, in form and substance satisfactory to the Required Lenders and the Administrative Agent in their sole discretion (as the same may be amended, supplemented, or modified from time to time after entry thereof with the consent of the Required Lenders in their sole discretion).

"**Acceptable Disclosure Statement**" means the disclosure statement relating to the Acceptable Plan, in form and substance satisfactory to the Required Lenders in their reasonable discretion (as the

same may be amended, supplemented, or modified from time to time after the initial filing thereof with the consent of the Required Lenders in their sole discretion).

"**Acceptable Disclosure Statement Order**" means an order of the Bankruptcy Court approving the Acceptable Disclosure Statement, in form and substance satisfactory to the Required Lenders in their sole discretion (as the same may be amended, supplemented, or modified from time to time after entry thereof so long as such amendment, supplement, or modification is satisfactory to the Required Lenders in their sole discretion).

"**Acceptable Plan**" shall mean a plan of reorganization for each of the Cases, in form and substance acceptable to the Required Lenders and the Administrative Agent, that, among other things, (i) provides for the payment of all Obligations in full, in cash upon the effective date of such plan of reorganization, (ii) either provides for (x) the payment of all Prepetition Obligations in full, in cash upon the effective date of such plan of reorganization or (y) is acceptable to the Required Lenders in their sole discretion, and (iv) provides for releases and other exculpatory provisions for the Administrative Agent, the Collateral Agent, the Lenders and the Prepetition Secured Parties under the Prepetition Bond Documents and their respective Related Persons in form and substance satisfactory to the Required Lenders and the Prepetition Bondholders (as defined in the DIP Orders) of a majority in aggregate principal amount of the Bonds (as defined in the DIP Orders).

"**Acceptable Sale**" shall have the meaning assigned to such term in Section 5.16(g).

"**Additional Roll-Up Loans**" shall have the meaning assigned to such term in Section 2.01(b).

"**Additional Roll-Up Schedule**" shall have the meaning assigned to such term in Section 2.01(b).

"**Adequate Protection Obligations**" as defined in the Interim Order or Final Order, as applicable.

"**Administrative Agent**" shall have the meaning assigned to such term in the preamble hereto and includes each other Person appointed as the successor administrative agent pursuant to Article IX.

"**Administrative Agent Fees**" shall have the meaning assigned to such term in Section 2.05(b).

"**Administrative Questionnaire**" shall mean an Administrative Questionnaire in the form supplied from time to time by the Administrative Agent.

"**Advisors**" shall mean legal counsel (including local, foreign and in-house counsel), auditors, accountants, consultants, appraisers, engineers or other advisors.

"**Affiliate**" shall mean, when used with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified; *provided*, *however*, that, solely for purposes of Section 6.09, the term "**Affiliate**" shall also include (i) any Person that directly or indirectly owns more than 10% of any class of Equity Interests of the Person specified or (ii) any Person that is an officer or director of the Person specified.

"**Agents**" shall mean the Administrative Agent and the Collateral Agent; and "**Agent**" shall mean any of them as the context may require.

"**Agreement**" shall have the meaning assigned to such term in the preamble hereto.

"**Amendment**" shall have the meaning assigned to such term in Section 6.11(a).

"**Ankura**" shall mean Ankura Consulting Group, LLC.

"**Anti-Terrorism Laws**" shall have the meaning assigned to such term in Section 3.21(a).

"**Applicable Rate**" shall mean, (i) with respect to New Money DIP Loans, a per annum rate of 12% and (ii) with respect to Roll-Up Loans, a per annum rate of 12%.

"**Approved Budget**" shall mean the Initial Budget or then most current Updated Budget prepared by Borrower and approved by the Required Lenders pursuant to Section 5.01(c), as applicable.

"**Approved Electronic Communications**" shall mean any notice, demand, communication, information, document or other material that any Loan Party provides to the Administrative Agent pursuant to any Loan Document or the transactions contemplated therein which is distributed to the Agents or the Lenders by means of electronic communications pursuant to Section 10.01(b).

"**Approved Fund**" shall mean any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or investing in bank and other commercial loans and similar extensions of credit in the ordinary course of its business and that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"**Asset Sale**" shall mean (a) any disposition of any property, by any Loan Party (including any disposition of property to a Delaware Divided LLC pursuant to a Delaware LLC Division) and (b) any issuance or sale of any Equity Interests of any Subsidiary of Borrower, in each case, to any Person other than a Loan Party.  Notwithstanding the foregoing, none of the following shall constitute "**Asset Sales**": any disposition of assets permitted by, or expressly referred to in, 6.06(a), 6.06(f), 6.06(g), 6.06(h), 6.06(i), 6.06(j) or 6.06(k).

"**Assignment and Assumption**" shall mean an assignment and assumption entered into by a Lender and an assignee (with the consent of any party whose consent is required pursuant to Section 10.04(b)), and accepted by the Administrative Agent, substantially in the form of Exhibit A, or such other form (including electronic documentation generated by MarkitClear or other electronic platform) as shall be approved by the Administrative Agent.

"**Avoidance Actions**" shall mean the Debtors' claims and causes of action under Sections 502(d), 542, 544, 545, 547, 548, 549, 550, 551, 553(b) and 724(a) of the Bankruptcy Code.

"**Avoidance Proceeds**" shall mean any proceeds or property recovered, unencumbered or otherwise in connection with successful Avoidance Actions, whether by judgment, settlement or otherwise.

"**Bankruptcy Code**" shall mean Chapter 11 of Title 11 of the United States Code, as amended from time to time and any successor statute and all rules and regulations promulgated thereunder.

"**Bankruptcy Court**" shall mean the United States Bankruptcy Court for Delaware, or any appellate court having jurisdiction over the Cases from time to time.

"**Bankruptcy Rules**" shall mean the Federal Rules of Bankruptcy Procedure, as the same may from time to time be in effect and applicable to the Cases, including any local rules of the Bankruptcy Court.

"**Bidding Procedures**" shall have the meaning assigned to such term in Section 5.16(c).

"**Bidding Procedures Order**" shall have the meaning assigned to such term in Section 5.16(d).

"**Board**" shall mean the Board of Governors of the Federal Reserve System of the United States.

"**Board of Directors**" shall mean, with respect to any Person, (i) in the case of any corporation, the board of directors of such Person, (ii) in the case of any limited liability company, the board of managers or board of directors, as applicable, of such Person, or if such limited liability company does not have a board of managers or board of directors, the functional equivalent of the foregoing, (iii) in the case of any partnership, the board of directors or board of managers, as applicable, of the general partner of such Person and (iv) in any other case, the functional equivalent of the foregoing.

"**Borrower**" shall have the meaning assigned to such term in the preamble hereto.

"**Borrowing Request**" shall mean a request by Borrower in accordance with the terms of Section 2.03 and substantially in the form of Exhibit B, or such other form as shall be approved by the Administrative Agent.

"**Borrowing**" shall mean a borrowing (or deemed borrowing) of Loans of the same Class made on the same date.

"**Budget**" shall mean the Initial Budget and each Updated Budget.

"**Budget Variance Report**" shall mean a weekly variance report provided by Borrower to the Administrative Agent (i) showing, in each case, by line item the actual cash receipts, disbursements and shipments of pellet pounds sold for the immediately preceding week, noting therein all variances, on a line-item and aggregate basis, from the amounts set forth for such period in (x) the Approved Budget and (y) the 13-week cash flow forecast then most recently delivered pursuant to Section 5.01(d), and, in each case, shall include explanations for any variance of actual performance to projected performance for the prior calendar week, and (ii) certified by a Responsible Officer of Borrower as being prepared in good faith and fairly presenting in all material respects the information set forth therein. The Budget Variance Report shall be in a form reasonably satisfactory to the Required Lenders, and shall contain supporting information reasonably requested by the Administrative Agent (acting at the direction of the Required Lenders) and reasonably satisfactory to the Required Lenders.

"**Business Day**" shall mean any day other than a Saturday, Sunday or other day on which banks in New York City, New York are authorized or required by law or other governmental action to close.

"**California DIP ABL Credit Facility**" shall mean the Credit Agreement, dated September 16, 2019, among CarbonLITE PI Holdings LLC, CarbonLite Industries LLC, Carbonlite PinnPack, LLC, PinnPack, the guarantors party thereto and Bank Leumi USA, as ratified and amended by that certain Ratification and Amendment Agreement, dated as of March [●], 2021, among CarbonLITE PI Holdings LLC, CarbonLite Industries LLC, Carbonlite PinnPack, LLC, PinnPack Packaging, LLC, the guarantors party thereto and Bank Leumi USA.

"**Capital Expenditures**" shall mean, without duplication, for any period (a) any expenditure or commitment to expend money made during such period for any purchase or other acquisition of any asset including capitalized leasehold improvements, which would be classified as a fixed or capital asset on a consolidated balance sheet of Guarantor and its Subsidiaries prepared in accordance with GAAP, and (b) Capital Lease Obligations incurred by such Persons during such period with respect to real or personal property acquired during such period, or Synthetic Lease Obligations incurred by such Persons during such period, but excluding (i) expenditures made in connection with the replacement, substitution or restoration of property pursuant to Section 2.10(e) and (ii) the purchase price of equipment that is purchased substantially contemporaneously with the trade-in of existing equipment to the extent that the gross amount of such purchase price is reduced by the credit granted by the seller of such equipment for the equipment being traded in at such time.

"**Capital Lease**" shall mean, with respect to any Person, any lease of, or other arrangement conveying the right to use, any property by such Person as lessee that has been or should be accounted for as a capital lease on a balance sheet of such Person prepared in accordance with GAAP.

"**Capital Lease Obligations**" of any Person shall mean the obligations of such Person to pay rent or other amounts under any Capital Lease, any lease entered into as part of any Sale and Leaseback Transaction or any Synthetic Lease, or a combination thereof, which obligations are (or would be, if such Synthetic Lease or other lease were accounted for as a Capital Lease) required to be classified and accounted for as Capital Leases on a balance sheet of such Person under GAAP, and the amount of such obligations shall be the capitalized amount thereof (or the amount that would be capitalized, if such Synthetic Lease or other lease were accounted for as a Capital Lease) determined in accordance with GAAP.

"**CarbonLITE Holdings**" shall mean CarbonLITE Holdings, LLC, a Delaware limited liability company and a Debtor.

"**Carve-Out**" as defined in the Interim Order or the Final Order, as applicable.

"**Carve-Out Trigger Date**" as defined in the Interim Order or the Final Order, as applicable.

"**Carve-Out Trigger Notice**" as defined in the Interim Order or the Final Order, as applicable.

"**Case**" and "**Cases**" shall have the meaning specified in the Preliminary Statements.

"**Cash Collateral**" as defined in the Interim Order or the Final Order, as applicable.

"**Cash Equivalents**" shall mean (a) securities issued, or directly, unconditionally and fully guaranteed or insured, by the United States or any agency or instrumentality thereof (*provided* that the full faith and credit of the United States is pledged in support thereof) having maturities of not more than one year from the date of acquisition by such Person, (b) time deposits and certificates of deposit of any Lender or any commercial bank having, or which is the principal banking subsidiary of a bank holding company organized under the laws of the United States, any state thereof or the District of Columbia having, capital and surplus aggregating in excess of $500,000,000 and a rating of "BBB+" (or such other similar equivalent rating) or higher by at least one nationally recognized statistical rating organization (as defined in Rule 436 under the Securities Act) with maturities of not more than one year from the date of acquisition by such Person, (c) repurchase obligations with a term of not more than 30 days for underlying securities of the types described in clause (a) above entered into with any Person meeting the qualifications specified in clause (b) above, (d) commercial paper issued by any Person incorporated in the United States having one of the two highest ratings obtainable from Standard & Poor's Rating Service

or Moody's Investors Service Inc., in each case maturing not more than one year after the date of acquisition by such Person, (e) investments in money market funds or overnight sweep accounts with a Lender or an Affiliate thereof, in each case, at least 95% of whose assets are comprised of securities of the types described in clauses (a) through (d) above, and (f) demand deposit accounts maintained in the ordinary course of business with any bank meeting the qualifications specified in clause (b) above.

"**Casualty Event**" shall mean any loss of title (other than through a consensual disposition of such property in accordance with this Agreement) or any loss of or damage to or any destruction of, or any condemnation or other taking (including by any Governmental Authority) of, any property of any Loan Party. "**Casualty Event**" shall include any taking of all or any part of any Real Property of any Person or any part thereof, in or by condemnation or other eminent domain proceedings pursuant to any Legal Requirement, or by reason of the temporary requisition of the use or occupancy of all or any part of any Real Property of any Person or any part thereof by any Governmental Authority, or any settlement in lieu thereof.

"**CERCLA**" shall mean the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. § 9601 *et seq*.

A "**Change in Control**" shall mean the occurrence of any of the following:

(a)    CarbonLITE Holdings at any time ceases to own directly 100% of the Equity Interests of CarbonLITE Sub Holdings, LLC or ceases to have the power to vote, or direct the voting of, any such Equity Interests;

(b)    CarbonLITE Sub Holdings, LLC ceases to own directly 100% of the Equity Interests of Guarantor or ceases to have the power to vote, or direct the voting of, any such Equity Interests;

(c)    Guarantor at any time ceases to own directly 100% of the Equity Interests of Borrower or ceases to have the power to vote, or direct the voting of, any such Equity Interests;

(d)    the consummation of any transaction (including, without limitation, any merger or consolidation), the result of which is that any "person" or "group" of related persons (as such terms are used in Sections 13(d) and 14(d) of the Exchange Act) becomes the beneficial owner (as defined in Rules 13d-3 and 13d-5 under the Exchange Act, except that such person or group shall be deemed to have "beneficial ownership" of all shares that any such person or group has the right to acquire, whether such right is exercisable immediately or only after passage of time), directly or indirectly, of more than 35% of the total voting power of the Voting Stock of CarbonLITE Holdings (for the purposes of this clause, such person or group shall be deemed to beneficially own any Voting Stock of CarbonLITE Holdings held by a parent entity, if such person or group "beneficially owns" (as defined above), directly or indirectly, more than 35% of the voting power of the Voting Stock of such parent entity); or

(e)    the sale, lease, transfer, conveyance or other disposition (other than by way of merger or consolidation), in one or a series of related transactions, of all or substantially all of the assets of Guarantor and Borrower taken as a whole to any "person" (as such term is used in Sections 13(d) and 14(d) of the Exchange Act) other than Guarantor or Borrower; or

(f)    the adoption by the members or managers, as applicable, of Borrower or Guarantor of a plan or proposal for the liquidation or dissolution of Borrower or Guarantor.

"**Change in Law**" shall mean the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, order, rule, regulation, policy, or treaty by any Governmental Authority, (b) any change in any law, order, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; *provided* that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"**Charges**" shall have the meaning assigned to such term in Section 10.13.

"**Chief Restructuring Officer**" means Brian Weiss of Force Ten Partners, LLC, as the chief restructuring officer of the Loan Parties.

"**Claim**" shall mean all claims, demands, rights, actions, causes of action, liabilities, duties, damages, losses, obligations, diminution in value, judgments, decrees, suits, liens, undertakings, rights to property or information, and controversies of any kind or nature whatsoever, whether absolute or contingent, due or to become due, accrued or unaccrued, disclosed or undisclosed, foreseen or unforeseen, apparent or not apparent, disputed or undisputed, liquidated or unliquidated, at law or in equity, or known or unknown, and whether existing, accrued or arising on, before or after the Petition Date, including all claims arising under state, federal or foreign laws, common law, statutes, rules, regulations or agreements. Without limiting the generality of the foregoing, the term "Claim" shall include the items described in the definition of "Claim" in 11 U.S.C. § 101(5), all claims or causes of action under Chapter 5 of the Bankruptcy Code (including Sections 542, 544, 545, 546, 547, 548, 549 and 550 of the Bankruptcy Code), all claims or causes of action under Sections 105 or 362 of the Bankruptcy Code, all claims or causes of action under any other Bankruptcy Law, all claims or causes of action arising under the Uniform Fraudulent Conveyance Act, Uniform Fraudulent Transfer Act, or Uniform Voidable Transactions Act as in effect in any state, and all rights of contribution, subrogation, exoneration or indemnity.

"**Class**" (a) when used with respect to any Lender, refers to whether such Lender has a Loan with respect to a particular Class of Loans, and (b) when used with respect to Loans or a Borrowing, refers to whether such Loans, or the Loans comprising such Borrowing, are New Money DIP Loans or Roll-Up Loans.

"**Closing Date**" shall mean the first date on which all conditions precedent in Section 4.01 are satisfied or waived in accordance with Section 10.02, which date shall not be later than two (2) Business Days after the Interim Order Entry Date.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended.

"**Collateral**" shall mean, all the "DIP Collateral" (or equivalent term, including "Collateral") as defined in the Interim Order (and, when entered, the Final Order) or in any Security Document and shall include any and all amounts held in the Funding Account and all proceeds thereof. Without limitation of the foregoing, subject to the terms of the Orders, the Collateral shall exclude all Avoidance Actions, but shall include Avoidance Proceeds upon entry of the Final Order.

"**Collateral Agent**" shall have the meaning assigned to such term in the preamble hereto.

"**Commitment**" shall mean a New Money DIP Commitment. The aggregate amount of the Commitments as of the Closing Date is $25,000,000, as set forth on Annex I.

"**Commitment Fee**" shall have the meaning assigned to such term in Section 2.05(a).

"**Commitment Schedule**" shall mean the Schedule attached hereto as Annex I.

"**Commodity Exchange Act**" shall mean the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"**Communications**" shall have the meaning assigned to such term in Section 10.01(b).

"**Compliance Certificate**" shall mean a certificate of a Financial Officer of Borrower substantially in the form of Exhibit C or such other form as may be approved by the Required Lenders and Borrower.

"**Contingent Obligation**" shall mean, as to any Person, any obligation, agreement, understanding or arrangement of such Person guaranteeing or intended to guarantee any Indebtedness, leases, dividends or other obligations ("**primary obligations**") of any other Person (the "**primary obligor**") in any manner, whether directly or indirectly, including any obligation, agreement, understanding or arrangement of such Person, whether or not contingent, (a) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (b) to advance or supply funds (i) for the purchase or payment of any such primary obligation or (ii) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth, net equity, liquidity, level of income, cash flow or solvency of the primary obligor, (c) to purchase property, securities or services primarily for the purpose of assuring the primary obligor of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation, (d) with respect to bankers' acceptances, letters of credit and similar credit arrangements, until a reimbursement or equivalent obligation arises (which reimbursement obligation shall constitute a primary obligation), or (e) otherwise to assure or hold harmless the primary obligor of any such primary obligation against loss (in whole or in part) in respect thereof; *provided*, *however*, that the term "Contingent Obligation" shall not include endorsements of instruments for deposit or collection in the ordinary course of business or any product warranties given in the ordinary course of business. The amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation, or portion thereof, in respect of which such Contingent Obligation is made (or, if less, the maximum amount of such primary obligation for which such Person may be liable, whether singly or jointly, pursuant to the terms of the instrument, agreements or other documents or, if applicable, unwritten agreement, evidencing such Contingent Obligation) or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder) as determined by such Person in good faith.

"**Control**" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise, and the terms "**Controlling**" and "**Controlled**" shall have meanings correlative thereto.

"**Control Agreement**" shall have the meaning assigned to such term in the Security Agreement.

"**Credit Extension**" shall mean the making (or deemed making) of a Loan by a Lender.

"**Debt Issuance**" shall mean the incurrence by any Loan Party of any Indebtedness after the Closing Date (other than as permitted by Section 6.01).

"**Debtor**" and "**Debtors**" as defined in the Interim Order or the Final Order, as applicable.

"**Debtor Relief Laws**" shall mean the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect.

"**Default**" shall mean any event, occurrence or condition which is, or upon notice, lapse of time or both would constitute, an Event of Default.

"**Default Excess**" shall have the meaning assigned to such term in Section 2.16(c).

"**Default Period**" shall have the meaning assigned to such term in Section 2.16(c).

"**Default Rate**" shall have the meaning assigned to such term in Section 2.06(c).

"**Defaulted Loan**" shall have the meaning assigned to such term in Section 2.16(c).

"**Defaulting Lender**" shall mean any Lender that (a) has failed (i) to fund all or any portion of its Loans within two (2) Business Days of the date such Loans were required to be funded hereunder, unless such Lender notifies the Administrative Agent and Borrower in good faith in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (which conditions precedent, together with the applicable Default, if any, shall be specifically identified in such writing) has not been satisfied, or (ii) to pay to the Administrative Agent, the Collateral Agent or any Lender any other amount required to be paid by it hereunder within two (2) Business Days of the date when due, (b) has notified Borrower and the Administrative Agent in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect (unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with the applicable Default, if any, shall be specifically identified in such writing or public statement) cannot be satisfied), (c) has failed, within three (3) Business Days after written request by the Administrative Agent or Borrower, to confirm in writing to the Administrative Agent and Borrower that it will comply with its prospective funding obligations hereunder (*provided* that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Administrative Agent and Borrower), or (d) is, or a direct or indirect parent company of such Lender is, (i) insolvent, or is generally unable to pay its debts as they become due, or admits in writing its inability to pay its debts as they become due, or makes a general assignment for the benefit of its creditors or (ii) the subject of a proceeding under any Debtor Relief Laws, or a receiver, trustee, conservator, intervenor or sequestrator or the like (including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in a like capacity with respect to such Lender) has been appointed for such Lender or its direct or indirect parent company, or such Lender or its direct or indirect parent company has taken any action in furtherance of or indicating its consent to or acquiescence in any such proceeding or appointment; *provided* that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any Equity Interests in such Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made

with such Lender. Any determination by the Administrative Agent or the Required Lenders that a Lender is a Defaulting Lender under any one or more clauses (a) through (d) above shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender upon delivery of written notice of such determination by the Administrative Agent or the Required Lenders to Borrower and each Lender, and, if such determination is made by the Required Lenders, to the Administrative Agent.

"**Delaware LLC**" shall mean any limited liability company organized or formed under the laws of the State of Delaware.

"**Delaware Divided LLC"** shall mean any Delaware LLC which has been formed upon consummation of a Delaware LLC Division.

"**Delaware LLC Division**" shall mean the statutory division of any Delaware LLC into two or more Delaware LLCs pursuant to Section 18-217 of the Delaware Limited Liability Company Act.

"**DIP Orders**" shall mean the Interim Order and the Final Order, as applicable, in each case upon entry thereof by the Bankruptcy Court.

"**DIP Credit Facilities**" shall mean, collectively, the DIP Term Facility, the Texas DIP Credit Facility, the Orion DIP Term Loan Facility and the California DIP ABL Credit Facility.

"**DIP Term Facility**" shall have the meaning specified in the Preliminary Statements.

"**disposition**" shall mean, with respect to any property, any conveyance, sale, lease, sublease, assignment, transfer or other disposition of such property (including (i) by way of merger or consolidation or amalgamation, (ii) any Sale and Leaseback Transaction, (iii) any Synthetic Lease and (iv) any disposition of property to a Delaware Divided LLC pursuant to a Delaware LLC Division).

"**Disqualified Capital Stock**" shall mean any Equity Interest which, by its terms (or by the terms of any security or instrument into which it is convertible or for which it is exchangeable or exercisable), or upon the happening of any event, (a) matures (excluding any maturity as the result of an optional redemption by the issuer thereof) or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof, in whole or in part, on or prior to the first anniversary of the Maturity Date, (b) is convertible into or exchangeable or exercisable (unless at the sole option of the issuer thereof) for (i) debt securities or other indebtedness or (ii) any Equity Interests referred to in (a) above, in each case at any time on or prior to the first anniversary of the Maturity Date, or (c) contains any repurchase or payment obligation which may come into effect prior to the first anniversary of the Maturity Date.

"**Dividend**" shall mean, with respect to any Person, that such Person has declared or paid a dividend or returned any equity capital to the holders of its Equity Interests or authorized or made any other distribution, payment or delivery of property (other than Qualified Capital Stock of such Person) or cash to the holders of its Equity Interests as such, or redeemed, retired, purchased or otherwise acquired, directly or indirectly, for consideration any of its Equity Interests outstanding (or any options or warrants issued by such Person with respect to its Equity Interests), or set aside or otherwise reserved, directly or indirectly, any funds for any of the foregoing purposes, or shall have permitted any of its Subsidiaries to purchase or otherwise acquire for consideration any of the outstanding Equity Interests of such Person (or any options or warrants issued by such Person with respect to its Equity Interests). Without limiting the foregoing, "**Dividends**" with respect to any Person shall also include all payments made or required to be

made by such Person with respect to any stock appreciation rights, plans, equity incentive or achievement plans or any similar plans or setting aside of or otherwise reserving any funds for the foregoing purposes.

"**Dollars**" or "**$**" shall mean lawful money of the United States.

"**Eligible Assignee**" shall mean any Person that meets the requirements to be an assignee under Section 10.04(b) (subject to such consents, if any, as may be required under Section 10.04(b)).

"**Embargoed Person**" shall have the meaning assigned to such term in Section 6.19.

"**Employee Benefit Plan**" shall mean any "**employee benefit plan**" as defined in Section 3(3) of ERISA which is or was maintained, contributed to, or required to be maintained or contributed to by any Loan Party or any of its ERISA Affiliates.

"**Environment**" shall mean any surface or subsurface physical medium or natural resource, including air, land, soil, surface waters, ground waters, stream and river sediments, biota and any indoor area, surface or physical medium.

"**Environmental Claim**" shall mean any claim, notice, demand, Order, action, suit, proceeding, or other communication alleging or asserting liability or obligations under or relating to Environmental Law, including liability or obligation for investigation, assessment, remediation, removal, cleanup, response, corrective action, monitoring, post-remedial or post-closure studies, investigations, operations and maintenance, injury, damage, destruction or loss to natural resources, personal injury, wrongful death, property damage, fines, penalties or other costs resulting from, related to or arising out of (i) the presence, Release or threatened Release of Hazardous Material in, on, into or from the Environment at any location or (ii) any violation of or non-compliance with Environmental Law, and shall include any claim, notice, demand, Order, action, suit or proceeding seeking damages (including the costs of remediation), contribution, indemnification, cost recovery, penalties, fines, indemnities, compensation or injunctive relief resulting from, related to or arising out of the presence, Release or threatened Release of Hazardous Material or alleged injury or threat of injury to human health, safety or the Environment.

"**Environmental Law**" shall mean any and all applicable current and future Legal Requirements relating to human health or safety or the Environment, the Release or threatened Release of Hazardous Material, natural resources or natural resource damages, or, to the extent relating to exposure to Hazardous Materials, occupational safety or health.

"**Environmental Permit**" shall mean any permit, license, approval, consent, registration, notification, exemption or other authorization required by or from a Governmental Authority under any Environmental Law.

"**Equity Interest**" shall mean, with respect to any Person, any and all shares, interests, rights to purchase, warrants, options, participations or other equivalents, including membership interests (however designated, whether voting or nonvoting), of equity of such Person, including, if such Person is a partnership, partnership interests (whether general or limited), or if such Person is a limited liability company, membership interests and any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of property of, such partnership, whether outstanding on the date hereof or issued on or after the Closing Date, but excluding debt securities convertible or exchangeable into such equity.

"**Equity Issuance**" shall mean, without duplication, (i) any issuance or sale by Guarantor after the Closing Date of any Equity Interests in Guarantor (including any Equity Interests issued upon exercise

of any warrant or option or equity-based derivative) or any warrants or options or equity-based derivatives to purchase Equity Interests in Guarantor, (ii) any Preferred Stock Issuance or (iii) any contribution to the capital of Guarantor.

"**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time, the regulations promulgated thereunder and any successor statute.

"**ERISA Affiliate**" shall mean, with respect to any Person, any trade or business (whether or not incorporated) that, together with such Person, is treated as a single employer under Section 414(b) or (c) of the Code, or solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.  Any former ERISA Affiliate of a Person or any of its Subsidiaries shall continue to be considered an ERISA Affiliate of such Person or such Subsidiary within the meaning of this definition with respect to the period such entity was an ERISA Affiliate of such Person or such Subsidiary and with respect to liabilities arising after such period for which such Person or such Subsidiary could reasonably be expected to be liable under the Code or ERISA, but in no event for more than six years after such period if no such liability has been asserted against such Person or such Subsidiary; *provided*, *however*, that such Person or such Subsidiary shall continue to be an ERISA Affiliate of such Person or such Subsidiary after the expiration of the six-year period solely with respect to any liability asserted against such Person or such Subsidiary prior to the expiration of such six-year period.

"**ERISA Event**" shall mean (i) a "**reportable event**" within the meaning of Section 4043 of ERISA and the regulations issued thereunder with respect to any Pension Plan; (ii) the failure to meet the minimum funding standard of Section 412 of the Code with respect to any Pension Plan (whether or not waived) or the failure to make by its due date a required installment of a material amount under Section 430(j) of the Code with respect to any Pension Plan or the failure to make any required contribution of a material amount to a Multiemployer Plan; (iii) the provision by the administrator of any Pension Plan pursuant to Section 4041(a)(2) of ERISA of a notice of intent to terminate such plan in a distress termination described in Section 4041(c) of ERISA; (iv) the withdrawal by any Loan Party or any of its ERISA Affiliates from any Pension Plan with two or more contributing sponsors or the termination of any such Pension Plan resulting in liability to any Loan Party pursuant to Section 4063 or 4064 of ERISA; (v) the institution by the PBGC of proceedings to terminate any Pension Plan, or the occurrence of any event or condition which could reasonably be expected to constitute grounds under ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan; (vi) the imposition of liability of a material amount on any Loan Party or any of its ERISA Affiliates pursuant to Section 4062(e) or 4069 of ERISA or by reason of the application of Section 4212(c) of ERISA; (vii) the withdrawal of any Loan Party or any of its ERISA Affiliates in a complete or partial withdrawal (within the meaning of Sections 4203 and 4205 of ERISA) from any Multiemployer Plan, or the receipt by any Loan Party or any of its ERISA Affiliates of notice from any Multiemployer Plan that it is in reorganization or insolvency pursuant to Section 4241 or 4245 of ERISA, or that it intends to terminate or has terminated under Section 4041A or 4042 of ERISA, if, in any such case, there is potential liability of a material amount of any Loan Party therefor; (viii) the assertion of a material claim (other than routine claims for benefits) against any Employee Benefit Plan, or the assets thereof, or against any Loan Party or any of its ERISA Affiliates in connection with any Employee Benefit Plan; (ix) receipt from the Internal Revenue Service of notice of the failure of any Pension Plan (or any other Employee Benefit Plan intended to be qualified under Section 401(a) of the Code) to qualify under Section 401(a) of the Code, or the failure of any trust forming part of any Pension Plan to qualify for exemption from taxation under Section 501(a) of the Code; (x) the imposition of a Lien pursuant to Section 401(a)(29) or 430(k) of the Code or pursuant to ERISA with respect to any Pension Plan; or (xi) the occurrence of a non-exempt prohibited transaction (within the meaning of Section 4975 of the Code or Section 406 of ERISA) which could reasonably be expected to result in liability of a material amount to any Loan Party or any of its ERISA Affiliates.

"**Event of Default**" shall have the meaning assigned to such term in <u>Section 8.01</u>, and shall include any Default.

"**Exchange Act**" shall mean the Securities Exchange Act of 1934.

"**Excluded Accounts**" means the escrow accounts and deposit account listed on <u>Schedule 1.01(a)</u> hereto, which in each only hold assets that are pledged or otherwise encumbered pursuant to Permitted Liens; *provided*, that the aggregate daily maximum balance for all such accounts on any day does not exceed $25,000.

"**Excluded Taxes**" shall mean, with respect to the Administrative Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of Borrower hereunder, (a) income or franchise taxes imposed on (or measured by) net income imposed as a result of such recipient being organized under the laws of, or having its principal office located in, or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such tax, (b) in the case of a Foreign Lender (other than an Eligible Assignee pursuant to a request by Borrower under <u>Section 2.16</u>), any United States federal withholding tax that is imposed on amounts payable to such Foreign Lender at the time such Foreign Lender becomes a party to this Agreement (or designates a new lending office) or is attributable to such Foreign Lender's failure or inability (other than as a result of a Change in Law) to comply with <u>Section 2.15(f)</u>, except, in each case, to the extent that such Foreign Lender (or its assignor, if any) was entitled, at the time of designation of a new lending office (or assignment), to receive additional amounts from Borrower with respect to such withholding tax pursuant to <u>Section 2.15(a)</u> (it being understood and agreed, for the avoidance of doubt, that any withholding tax imposed on a Foreign Lender as a result of a Change in Law occurring after the time such Foreign Lender became a party to this Agreement shall not be an Excluded Tax) and (c) any United States federal withholding tax imposed as a result of FATCA.

"**Executive Order**" shall have the meaning assigned to such term in <u>Section 3.21(a)</u>.

"**Existing Lien**" shall have the meaning assigned to such term in <u>Section 6.02(c)</u>.

"**Facilities**" means, individually and collectively, the Pennsylvania Facility, the PinnPack Facility, the PinnPack P Facility, the Riverside Facility and the Texas Facility.

"**Fair Market Value**" shall mean, with respect to any asset (including any Equity Interests of any Person), the price at which a willing buyer, not an Affiliate of the seller, and a willing seller who does not have to sell, would agree to purchase and sell such asset, as determined in good faith by the Board of Directors or, pursuant to a specific delegation of authority by such Board of Directors or a designated senior executive officer, of Borrower, or of the Loan Party selling such asset.

"**FATCA**" shall mean Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with) and any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Code.

"**Federal Funds Effective Rate**" shall mean, for any day, the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System of the United States arranged by federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average (rounded upwards, if necessary to the next 1/100th of 1%) of the quotations for the day for such

transactions received by the Administrative Agent from three federal funds brokers of recognized standing selected by it.

"**Fee Letter**" shall mean the Fee Letter, dated March [_], 2021, between Borrower and the Agents.

"**Fees**" shall mean the Commitment Fee, the Administrative Agent Fees and the other fees referred to in Section 2.05(d).

"**Final Order**" shall mean an order of the Bankruptcy Court authorizing and approving on a final basis, among other things, the DIP Term Facility and the transactions contemplated by this Agreement in the form of the Interim Order (with only such modifications thereto as are necessary to convert the Interim Order to a final order and such other modifications as are satisfactory to the Required Lenders in their sole discretion) (as the same may be amended, supplemented, or modified from time to time after entry thereof with the consent of the Required Lenders in their sole discretion) as to which no stay has been entered.

"**Final Order Entry Date**" shall mean the date on which the Final Order is entered by the Bankruptcy Court.

"**Financial Officer**" of any Person shall mean the chief financial officer, principal accounting officer, treasurer or controller of such Person or the Chief Restructuring Officer.

"**Foreign Lender**" shall mean any Lender that is not, for United States federal income tax purposes, (i) a citizen or resident of the United States, (ii) a corporation or entity treated as a corporation created or organized in or under the laws of the United States, or any political subdivision thereof, (iii) an estate whose income is subject to U.S. federal income taxation regardless of its source or (iv) a trust if a court within the United States is able to exercise primary supervision over the administration of such trust and one or more United States Persons have the authority to control all substantial decisions of such trust.

"**Foreign Plan**" shall mean each "employee pension benefit plan" (within the meaning of Section 3(2) of ERISA, whether or not subject to ERISA) that is not subject to U.S. law and is maintained, contributed to, or required to be maintained or contributed to, by any Loan Party.

"**Funding Account**" shall mean a blocked, non-interest bearing trust account maintained by the Administrative Agent in which the proceeds of the Loans shall be deposited and held as provided in this Agreement.  None of Borrower or the other Loan Parties shall have any property interest of any kind in the Funding Account or the funds held therein.

"**Funding Account Withdrawal Notice**" shall have the meaning specified in Section 2.17.

"**Funding Authorization Letter**" shall mean that certain letter agreement, dated as of the Closing Date, made by Borrower in favor of the Administrative Agent, pursuant to which, among other things, Borrower has authorized and directed the Administrative Agent to disburse or otherwise apply the proceeds of the Loans on the Closing Date in accordance with a funds flow memorandum attached to such letter.

"**GAAP**" shall mean generally accepted accounting principles in the United States of America as in effect from time to time, including those set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements

and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as approved by a significant segment of the accounting profession.

"**Governmental Authority**" shall mean any federal, state, local or foreign (whether civil, criminal, military or otherwise) court, central bank or governmental agency, tribunal, authority, instrumentality or regulatory body or any subdivision thereof or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"**Governmental Real Property Disclosure Requirements**" shall mean any Legal Requirement of any Governmental Authority requiring notification of the buyer, lessee, mortgagee, assignee or other transferee of any Real Property, facility, establishment or business, or any notification, registration or filing to or with any Governmental Authority, in connection with the disposition (including any transfer of control) of any Real Property, facility, establishment or business, as may be required under any applicable Environmental Law or of any actual or threatened presence or Release in, on, into or from the Environment, or the use, disposal or handling of Hazardous Material on, at, under, from or near the Real Property, facility, establishment or business to be sold, acquired, leased, mortgaged, assigned or transferred.

"**Granting Lender**" shall have the meaning assigned to such term in Section 10.04(h).

"**Guaranteed Obligations**" shall have the meaning assigned to such term in Section 7.01.

"**Guarantee**" shall mean the guarantees issued pursuant to Article VII by Guarantor.

"**Guarantor**" shall have the meaning assigned to such term in the preamble hereto.

"**Hazardous Materials**" shall mean hazardous substances, hazardous wastes, hazardous materials, polychlorinated biphenyls ("**PCBs**") or any substance or compound containing PCBs, asbestos or any asbestos-containing materials in any form or condition, lead-based paint, urea formaldehyde, pesticides, radon or any other radioactive materials including any source, special nuclear or by-product material, petroleum, petroleum products, petroleum-derived substances, crude oil or any fraction thereof, any toxic mold, microbial or fungal contamination that could pose a risk to human health or the Environment or would negatively impact the condition of the Real Property in any material respect or any other pollutants, contaminants, chemicals, wastes, materials, compounds, constituents or substances subject to regulation under, or which can give rise to liability or obligations under, any Environmental Laws.

"**Hedging Agreement**" means any agreement with respect to any swap, cap, collar, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions.

"**Indebtedness**" of any Person shall mean, without duplication, (a) all obligations of such Person for borrowed money or advances; (b) all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or similar instruments; (c) all obligations of such Person under conditional sale or other title retention agreements relating to property purchased by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property); (d) all obligations of such Person issued or assumed as part of the deferred purchase price of property or services (excluding trade accounts payable and accrued obligations incurred

in the ordinary course of business on normal trade terms and not overdue by more than 90 days); (e) all Indebtedness secured by any Lien on property owned or acquired by such Person, whether or not the obligations secured thereby have been assumed, but limited to the lower of (i) the Fair Market Value of such property and (ii) the amount of the Indebtedness secured; (f) all Capital Lease Obligations, Purchase Money Obligations and Synthetic Lease Obligations of such Person; (g) all obligations of such Person, contingent or otherwise, to purchase, redeem, retire or otherwise acquire for value any Equity Interests of such Person, valued, in the case of a redeemable preferred Equity Interest, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends; (h) the Net Hedging Obligations under interest rate or currency Hedging Agreements and all other agreements or arrangements designed to protect against fluctuations in interest rates, commodity prices and currency exchange rates; (i) all obligations of such Person for the reimbursement of any obligor in respect of letters of credit, letters of guaranty, bankers' acceptances and similar credit transactions, but excluding obligations with respect to letters of credit (including trade letters of credit) securing obligations of such Person described in clause (c) above or entered into in the ordinary course of business of such Person to the extent such letters of credit are not drawn upon; and (j) all Contingent Obligations of such Person in respect of Indebtedness or obligations of others of the kinds referred to in clauses (a) through (i) above.  The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except (other than in the case of general partner liability) to the extent that terms of such Indebtedness expressly provide that such Person is not liable therefor.

"**Indemnified Liabilities**" shall have the meaning specified in Section 10.03(b).

"**Indemnified Taxes**" shall mean Taxes other than Excluded Taxes.

"**Indemnitee**" shall have the meaning assigned to such term in Section 10.03(b).

"**Independent Auditor**" means (i) RSM US LLP, (ii) any "big four" accounting firm selected by Borrower and notified to the Administrative Agent or (iii) any other firm of independent public accountants of recognized national standing in the United States selected by Borrower and reasonably acceptable to the Administrative Agent.

"**Information**" shall have the meaning assigned to such term in Section 10.12.

"**Initial Budget**" shall mean the 17-week cash flow forecast delivered on or prior to the Closing Date setting forth all forecasted receipts and disbursements of the Loan Parties and their Subsidiaries on a weekly basis during the 17-week period commencing on the Petition Date, which shall include, among other things, available cash, revenue, cash flow, trade payables, ordinary course expenses, total expenses, capital expenditures, vendor disbursements, liquidity, net operating cash flow and net cash flow, fees and expenses related to the DIP Term Facility and the Cases (including, for the avoidance of doubt, professional fees), working capital and other general corporate financial needs.

"**Initial Roll-Up Date**" has the meaning specified in Section 2.01(b).

"**Initial Roll-Up Loans**" has the meaning specified in Section 2.01(b).

"**Initial Roll-Up Schedule**" has the meaning specified in Section 2.01(b).

"**Insolvency Laws**" shall mean the Bankruptcy Code and all other insolvency, bankruptcy, receivership, liquidation, conservatorship, assignment for the benefit of creditors, moratorium,

rearrangement, reorganization, or similar federal or state Legal Requirements of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"**Insolvency Proceeding**" shall mean (i) any case, action or proceeding before any court or other Governmental Authority relating to bankruptcy, reorganization, insolvency, liquidation, receivership, dissolution, winding-up or relief of debtors, or (ii) any general assignment for the benefit of creditors, formal or informal moratorium, composition, marshaling of assets for creditors or other, similar arrangement in respect of its creditors generally or any substantial portion of its creditors, in each case, undertaken under United States federal or state or non-United States Legal Requirements, including the Bankruptcy Code of the United States.

"**Insurance Policies**" shall mean the insurance policies and coverages required to be maintained by each Loan Party that is an owner or lessee of Mortgaged Property with respect to the applicable Mortgaged Property pursuant to Section 5.04 and all renewals and extensions thereof.

"**Insurance Requirements**" shall mean, collectively, all provisions of the Insurance Policies, all requirements of the issuer of any of the Insurance Policies and all Orders, rules, regulations and any other requirements of the National Board of Fire Underwriters (or any other body exercising similar functions) binding upon any Loan Party that is an owner of Mortgaged Property and applicable to the Mortgaged Property or any use or condition thereof.

"**Intellectual Property**" shall have the meaning assigned to such term in Section 3.06(a).

"**Interest Payment Date**" shall mean, with respect to any Loan, the last Business Day of each month, commencing April 30, 2021, and the Maturity Date.

"**Interim Order**" shall mean an order of the Bankruptcy Court, in the form set forth in Exhibit E, authorizing on an interim basis, among other things, the DIP Term Facility and the transactions contemplated by this Agreement, with only such modifications as are satisfactory to Borrower and the Required Lenders in their sole discretion (as the same may be amended, supplemented, or modified from time to time after entry thereof with the consent of the Required Lenders in their sole discretion) as to which no stay has been entered.

"**Interim Order Entry Date**" shall mean the date on which the Interim Order is entered by the Bankruptcy Court.

"**Investment Banker**" shall mean Jefferies LLC.

"**Investment Banker Report**" shall have the meaning assigned to such term in Section 5.20(b).

"**Investments**" shall have the meaning assigned to such term in Section 6.04.

"**Leases**" shall mean any and all leases, subleases, tenancies, options, concession agreements, rental agreements, occupancy agreements, franchise agreements, access agreements and any other agreements (including all amendments, extensions, replacements, renewals, modifications and/or guarantees thereof), whether or not of record and whether now in existence or hereafter entered into, affecting the use or occupancy of all or any portion of any Real Property.

"**Legal Requirements**" shall mean, as to any Person, the Organizational Documents of such Person, and any treaty, law (including the common law), statute, ordinance, code, rule, regulation, guidelines, license, permit requirement, Order or determination of an arbitrator or a court or other

Governmental Authority, and any interpretation thereof published by the applicable Governmental Authority or administrative procedures relating thereto established by the applicable Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject, in each case whether or not having the force of law.  For purposes of <u>Section 2.15</u>, the term "applicable Legal Requirements" shall include FATCA.

"**Lender Advisors**" shall mean Arnold & Porter Kaye Scholer LLP and Ankura, as advisors to the Lenders or certain members thereof.

"**Lender Group**" shall mean the ad hoc group of Lenders represented by Arnold & Porter Kaye Scholer LLP.

"**Lenders**" shall mean (a) the financial institutions and other Persons party hereto as "**Lenders**" on the date hereof, and (b) each financial institution or other Person that becomes a party hereto pursuant to an Assignment and Assumption, other than, in each case, any such financial institution or Person that has ceased to be a party hereto pursuant to an Assignment and Assumption.

"**Lien**" shall mean, with respect to any property, (a) any mortgage, deed of trust, lien (statutory or other), judgment liens, pledge, encumbrance, claim, charge, assignment, hypothecation, deposit arrangement, security interest or encumbrance of any kind or any arrangement to provide priority or preference, including, without limitation, all "liens" as defined by Section 101(37) of the Bankruptcy Code, or any filing of any financing statement under the UCC or any other similar notice of Lien under any similar notice or recording statute of any Governmental Authority, including any easement, servitude, right-of-way or other encumbrance on title to Real Property, in each of the foregoing cases whether voluntary or imposed or arising by operation of law, and any agreement to give any of the foregoing, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such property, and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"**Liquidity**" shall mean, as of any date of determination, sum of (x) Qualified Cash on such date plus (y) the aggregate amount of cash on deposit in the Funding Account on such date.

"**Loan**" shall mean a loan made or deemed made by a Lender to Borrower under <u>Article II</u>, including any New Money DIP Loan and any Roll-Up Loan (and including any PIK Interest that has been added to the outstanding principal amount of such Roll-Up Loan as provided herein).

"**Loan Documents**" shall mean this Agreement, the Notes (if any), the Security Documents, the Fee Letter, the DIP Orders, any other document executed in connection with this Agreement.

"**Loan Parties**" shall mean, collectively, Borrower and Guarantor.

"**Margin Stock**" shall have the meaning assigned to such term in Regulation U.

"**Material Additional Agreements**" means each Material Agreement (or series of related Material Agreements) entered into by, or assigned to any Loan Party subsequent to the Closing Date that (i) provides for the payment by any Loan Party, or the provision to any Loan Party, of goods, inventory or services equal to or in excess of $100,000 in the aggregate thereunder, (ii) provides revenue or income to any Loan Party equal to or in excess of $100,000 in the aggregate thereunder or (iii) provides for a deposit or prepayment of revenue equal to or in excess of $100,000 in the aggregate thereunder.

"**Material Adverse Effect**" shall mean (a) a material adverse effect on, or material adverse change in, the condition (financial or otherwise), results of operations, assets, liabilities (contingent or otherwise), properties, solvency, business or value of the Loan Parties, taken as a whole, or the Loan Parties, taken as a whole, (b) material impairment of the ability of the Loan Parties to fully and timely perform any of their obligations under any Loan Document, (c) a material impairment of the rights of or benefits or remedies available to the Lenders or any Agent under any Loan Document, or (d) a material adverse effect on the Collateral (or any portion thereof) or the Liens in favor of the Collateral Agent (for its benefit and for the benefit of the other Secured Parties) on the Collateral or the validity, enforceability, perfection or priority of such Liens.  For the avoidance of doubt, solely for purposes of clause (a) hereof, "Material Adverse Effect" shall expressly exclude (x) any matters disclosed in any "first day" pleadings or declarations and (y) the effect of filing the Cases, the events and conditions related to, resulting from and/or leading up to the effects thereon and any action required to be taken under the Loan Documents or the DIP Orders.

"**Material Agreements**" means, individually and collectively, (1)(a) any contracts or agreements related to (a) the acquisition of and/or the sale to other converters of post-consumer plastic waste ("**Post-Consumer Materials**") or any derivative products thereof, (b) the recycling and/or conversion of Post-Consumer Materials into food-grade post-consumer recycled polyethylene terephthalate resins ("**pcrPET**") and other finished products, (c) the acquisition, construction, servicing (including ancillary services), maintenance, repair or operation of recycling facilities and any associated equipment or (d) any other agreement or contract, in each case, entered into by any Loan Party and any other Person, or assigned to any Loan Party, in each case that (i) provides for the payment by any Loan Party, or the provision to any Loan Party, of goods, inventory or services equal to or in excess of $100,000 in the aggregate thereunder, (ii) provides revenue or income to any Loan Party equal to or in excess of $100,000 in the aggregate thereunder or (iii) provides for a deposit or prepayment of revenue equal to or in excess of $100,000 in the aggregate thereunder; (2) any Material Additional Agreement and (3) any Material Agreement entered into by a Loan Party in replacement of any of the foregoing.

"**Material Counterparty**" means each Person (other than any Agent, Lender, or Debtor) from time to time party to any Material Agreement.

"**Maturity Date**" shall mean the earliest of (a) thirty-five (35) days following the Interim Order Entry Date (or such later date as may be agreed to by the Required Lenders) if the Final Order shall not have been entered by such date, (b) the effective date of any Chapter 11 plan for the reorganization of Borrower or any other Loan Parties, (c) one hundred eighty (180) days following the Petition Date, (d) the date that all Loans shall become due and payable in full in accordance with the terms of the DIP Term Facility, including due to acceleration, (e) the consummation of a sale pursuant to Section 363 of the Bankruptcy Code of all or substantially all of the assets of the Loan Parties and (f) the date on which the Loan Parties (or any of the other Debtors) seek approval of a disclosure statement for a plan of reorganization or liquidation, other than a plan acceptable to the Required Lenders.

"**Maximum Rate**" shall have the meaning assigned to such term in Section 10.13.

"**Milestone**" shall have the meaning assigned to such term in Section 5.16.

"**Mortgage**" shall mean an agreement, including a mortgage, deed of trust or any other document, creating and evidencing a first priority Lien (subject to Permitted Collateral Liens) on a Mortgaged Property, which shall be in form reasonably satisfactory to the Collateral Agent and Required Lenders, in each case, with such schedules and including such provisions as shall be necessary to conform such document to applicable local or foreign law or as shall be customary under applicable local or foreign Legal Requirements.

"**Mortgaged Property**" shall mean each Real Property, if any, which shall be subject to a Mortgage pursuant to Section 5.11 or Section 5.12.

"**Multiemployer Plan**" shall mean a multiemployer plan within the meaning of Section 4001(a)(3) or Section 3(37) of ERISA, (a) to which any Loan Party or any of its ERISA Affiliates is then making or accruing an obligation to make contributions, (b) to which any Loan Party or any of its ERISA Affiliates has within the preceding six plan years made or been obligated to make contributions, or (c) with respect to which any Loan Party could incur liability.

"**New Money DIP Commitment**" means, with respect to each Lender, the commitment of such Lender to make a New Money DIP Loan to Borrower hereunder in an aggregate principal amount not to exceed the amount set forth opposite such Lender's name on the Commitment Schedule under the heading "New Money DIP Commitment", as such commitment may be (a) reduced from time to time pursuant to Section 2.01(c) and (b) reduced or increased from time to time pursuant to assignments by or to such Lender pursuant to an Assignment and Assumption. The aggregate amount of the Lenders' New Money DIP Commitments on the Closing Date is $25,000,000.

"**New Money DIP Loan**" means a Loan made pursuant to Section 2.01(a).

"**Net Cash Proceeds**" shall mean:

(a)     with respect to any Asset Sale (other than any issuance or sale of Equity Interests), the proceeds thereof in the form of cash, cash equivalents and marketable securities (including any such proceeds received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable, or by the sale, transfer or other disposition of any non-cash consideration received in connection therewith or otherwise, but only as and when received) received by any Loan Party (including cash proceeds subsequently received (as and when received by any Loan Party) in respect of non-cash consideration initially received) net of (i) reasonable and customary selling expenses (including reasonable brokers' fees or commissions, legal, accounting and other professional and transactional fees, transfer and similar taxes (but excluding any such amounts payable to any Affiliate of Borrower) and Borrower's good faith estimate of income taxes paid or payable in connection with such sale (after taking into account any available tax credits or deductions and any tax sharing arrangements)), (ii) amounts provided as a reserve, in accordance with GAAP, against (x) any liabilities under any indemnification obligations associated with such Asset Sale or (y) any other liabilities retained by any Loan Party associated with the properties sold in such Asset Sale (*provided* that, to the extent and at the time any such amounts are released from such reserve, such amounts shall constitute Net Cash Proceeds), and (iii) the principal amount, premium or penalty, if any, interest and other amounts on any Indebtedness for borrowed money that is secured by a Lien on the properties sold in such Asset Sale (so long as such Lien was permitted to encumber such properties under the Loan Documents at the time of such sale) and which is repaid with such proceeds (other than any such Indebtedness assumed by the purchaser of such properties);

(b)     with respect to any (i) Debt Issuance, (ii) Equity Issuance or (iii) other issuance or sale of Equity Interests by Borrower, the cash proceeds thereof received by any Loan Party, net of reasonable and customary fees (including legal, accounting and other professional and transaction fees and brokers' fees), commissions, costs and other expenses incurred in connection therewith;

(c)     with respect to any Casualty Event, the cash insurance proceeds, condemnation awards and other compensation received by any Loan Party in respect thereof, net of all reasonable costs and expenses (including legal, accounting and other professional and transaction fees and brokers' fees) incurred in connection with the collection of such proceeds, awards or other compensation

in respect of such Casualty Event (including legal, accounting and other professional and transaction fees and brokers' fees); and

(d)          with respect to any receipt of termination payments, liquidated damages, indemnity payments or other extraordinary payments under the Material Agreements or the Pennsylvania Lease, the aggregate amount of payments received by the Loan Parties (including, as an Investment from a Debtor other than a Loan Party) in respect of such event, net of all reasonable costs and expenses incurred in connection with the collection of such proceeds.

"**Net Hedging Obligations**" means, as of any date, the Termination Value of any Hedging Agreement on such date.

"**Non-Public Information**" shall mean (i) material non-public information (within the meaning of United States federal, state or other applicable securities laws) with respect to Borrower or its Subsidiaries or their securities and (ii) information of a type that would be material non-public information (within the meaning of United States federal, state or other applicable securities laws) relating to Borrower if Borrower were a public reporting company with respect to Borrower or its Subsidiaries or their respective securities.

"**Notes**" shall mean any notes evidencing the Loans pursuant to Section 2.04(e), if any, substantially in the form of Exhibit G.

"**Obligations**" shall mean (a) all obligations of Borrower and the other Loan Parties from time to time arising under or in respect of the due and punctual payment of (i) the principal of and premium, if any, and interest (including interest accruing during the pendency of any Insolvency Proceeding, regardless of whether allowed or allowable in such Insolvency Proceeding) on the Loans, when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise, and (ii) all other monetary obligations, including fees, costs, expenses and indemnities, whether primary, secondary, direct, contingent, fixed or otherwise (including monetary obligations incurred during the pendency of any Insolvency Proceeding, regardless of whether allowed or allowable in such Insolvency Proceeding), of Borrower and the other Loan Parties under this Agreement and the other Loan Documents, and (b) the due and punctual performance of all covenants, agreements, obligations and liabilities of Borrower and the other Loan Parties under or pursuant to this Agreement and the other Loan Documents, in each case, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising.

"**OFAC**" shall have the meaning assigned to such term in Section 3.21(b).

"**Officer's Certificate**" shall mean a certificate executed by the chairman of the Board of Directors (if an officer), the chief executive officer, the president or one of the Financial Officers, each in his or her official (and not individual) capacity.

"**Order**" shall mean any judgment, decree, verdict, order, consent order, consent decree, writ, declaration or injunction.

"**Organizational Documents**" shall mean, with respect to any Person, (i) in the case of any corporation, the certificate of incorporation or deed of incorporation and by-laws (or similar documents) of such Person, (ii) in the case of any limited liability company, the certificate or articles of formation or organization and operating agreement or memorandum and articles of association (or similar constitutive documents) of such Person, (iii) in the case of any limited partnership, the certificate of formation and limited partnership agreement (or similar constitutive documents) of such Person (and, where applicable,

the equityholders or shareholders registry of such Person), (iv) in the case of any general partnership, the partnership agreement (or similar constitutive document) of such Person, (v) in any other case, the functional equivalent of the foregoing, and (vi) any shareholder, voting trust or similar agreement between or among any holders of Equity Interests of such Person.

"**Orion DIP Term Loan Facility**" shall mean the Senior Secured Super-Priority Debtor-in-Possession Term Loan Credit Agreement, dated as of March [●], 2121, among CarbonLITE Holdings, a Debtor, certain Subsidiaries of CarbonLITE Holdings, the lenders named therein and Orion Energy Partners Investment Agent, LLC, as DIP term loan agent and DIP collateral agent.

"**Outstanding Amount**" means, with respect to the Loans, on any date, the aggregate outstanding principal amount thereof after giving effect to any borrowings and prepayments or repayments of Loans occurring on such date.

"**Other Taxes**" shall mean any and all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes or any excise or property Taxes, charges (including fees and expenses to the extent incurred with respect to any such Taxes or charges) or similar levies (including interest, fines, penalties and additions with respect to any of the foregoing) arising from any payment made or required to be made under any Loan Document or from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document.

"**PA 2019 Bonds**" shall mean the Solid Waste Disposal Revenue Bonds (CarbonLITE P, LLC Project), Series 2019.

"**Participant**" shall have the meaning assigned to such term in Section 10.04(e).

"**Participant Register**" shall have the meaning assigned to such term in Section 10.04(e).

"**Patriot Act**" shall have the meaning assigned to such term in Section 3.21(a).

"**PBGC**" shall mean the Pension Benefit Guaranty Corporation referred to and defined in ERISA.

"**pcrPET**" shall have the meaning assigned to such term in the definition of "Material Agreements".

"**Pension Plan**" shall mean any Employee Benefit Plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA which is maintained, contributed to, or required to be maintained or contributed to by any Loan Party or any of its ERISA Affiliates or with respect to which any Loan Party could reasonably be expected to incur liability, contingent or otherwise, under ERISA (including under Section 4069 of ERISA).

"**Pennsylvania Facility**" shall mean the pcrPET processing facility in Reading, Pennsylvania owned and operated by Borrower.

"**Pennsylvania Lease**" shall mean the Industrial Lease Agreement, dated as of May 13, 2019, by and between Berks 61 Owner, LLC, as landlord, and Borrower, as tenant.

"**Petition Date**" shall have the meaning specified in the Preliminary Statements.

"**Permitted Accounts**" means the accounts listed on Schedule 1.01(b) hereto, which shall include each Excluded Account.

"**Permitted Collateral Liens**" shall mean (a) in the case of Collateral other than Mortgaged Property, Permitted Liens and (b) in the case of Mortgaged Property, "Permitted Collateral Liens" shall mean the Liens described in clauses (a), (b), (d), (e), (g) and (l) of Section 6.02; *provided*, *however*, upon the date of delivery of each Mortgage under Section 5.10 or 5.11, Permitted Collateral Liens shall mean only those Liens that are (i) identified on a schedule to the applicable Mortgage, (ii) excepted as being prior to the Lien of such Mortgage as set forth in the title insurance policy (or commitment) relating to such Mortgaged Property issued by the applicable Title Company and (iii) otherwise Permitted Liens.

"**Permitted Liens**" shall have the meaning assigned to such term in Section 6.02.

"**Permitted Third Party Liens**" shall have the meaning assigned to such term in Section 3.22(k).

"**Permitted Variances**" shall mean (i) all variances that are favorable to the financial condition and the interests of the Loan Parties and the interests of the Lenders, and (ii) any variance that is unfavorable to the financial condition and the interests of the Loan Parties or the interests of the Lenders and does not exceed (x) with respect to operating disbursements (excluding professional fees and expenses and adequate protection claims), 10%, tested every week on a cumulative basis since the Petition Date (or, in the event an Updated Budget is provided and becomes the Approved Budget pursuant to Section 5.01(c), since the date of such Updated Budget), (y) with respect to receipts, 15%, tested every week on a cumulative basis since the Petition Date (or, in the event an Updated Budget is provided and becomes the Approved Budget pursuant to Section 5.01(c), since the date of such Updated Budget) and (z) with respect to shipments of pellet pounds sold, 10%, tested every week on a non-cumulative basis, in each case based upon the most recent Approved Budget, and as reflected in the Budget Variance Report.

"**Person**" shall mean any natural person, corporation, business trust, joint venture, trust, association, company (whether limited in liability or otherwise), partnership (whether limited in liability or otherwise) or Governmental Authority, or any other entity, in any case, whether acting in a personal, fiduciary or other capacity.

"**Petition Date**" shall have the meaning specified in the Preliminary Statements.

"**PIK Interest**" shall have the meaning assigned to such term in Section 2.06(d).

"**PinnPack**" shall mean PinnPack Packaging, LLC, a Delaware limited liability company.

"**PinnPack Facility**" shall mean the PET thermoforming and processing facility located in Oxnard, California, directly owned by PinnPack P.

"**PinnPack P**" shall mean Pinnpack P, LLC, a Delaware limited liability company.

"**PinnPack P Facility**" shall mean the PET thermoforming and processing facility contemplated in Eastern Pennsylvania, directly owned by PinnPack P.

"**Platform**" shall have the meaning assigned to such term in Section 10.01(d).

"**Post-Consumer Materials**" shall have the meaning assigned to such term in the definition of "Material Agreements".

"**Post-Petition**" shall mean the time period commencing immediately upon the filing of the Cases.

"**Preferred Stock**" shall mean, with respect to any Person, any and all preferred or preference Equity Interests (however designated) of such Person whether now outstanding or issued after the Closing Date.

"**Preferred Stock Issuance**" shall mean the issuance or sale by any Loan Party of any Preferred Stock after the Closing Date.

"**Projections**" shall have the meaning assigned to such term in Section 3.14(b).

"**Premises**" shall have the meaning assigned thereto in the applicable Mortgage.

"**Prepetition Bond Documents**" shall mean (i) the Prepetition Indenture, (ii) the Prepetition Loan Agreement and (iii) all documents, instruments and agreements (including all pledge, collateral, security and guarantee documents and agreements) entered into in connection therewith.

"**Prepetition Indenture**" shall mean the Indenture of Trust, dated as of June 1, 2019, by and between The Pennsylvania Economic Development Financing Authority, as issuer, and UMB Bank, N.A., as trustee, as supplemented by the First Supplemental Indenture, effective as of September 1, 2020, by and between The Pennsylvania Economic Development Financing Authority, as issuer, and UMB Bank, N.A., as trustee.

"**Prepetition Loan Agreement**" shall mean the Loan Agreement, dated as of June 1, 2019 (as amended by the First Amendment to Loan Agreement, effective as of September 1, 2020), by and between The Pennsylvania Economic Development Financing Authority and Borrower.

"**Prepetition Obligations**" as defined in the Interim Order or Final Order, as applicable.

"**Prepetition Secured Parties**" as defined in the Interim Order or Final Order, as applicable.

"**property**" shall mean any right, title or interest in or to property or assets of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible and including Equity Interests of any Person and whether now in existence or owned or hereafter entered into or acquired, including all Real Property, cash, securities, accounts, revenues and contract rights.

"**Public Lenders**" shall mean Lenders that do not wish to receive Non-Public Information with respect to Borrower or its Subsidiaries.

"**Purchase Money Obligation**" shall mean, for any Person, the obligations of such Person in respect of Indebtedness (including Capital Lease Obligations) incurred for the purpose of financing all or any part of the purchase price of any fixed or capital assets (including Equity Interests of any Person owning fixed or capital assets) or the cost of installation, construction or improvement of any fixed or capital assets.

"**Qualified Capital Stock**" of any Person shall mean any Equity Interests of such Person that are not Disqualified Capital Stock.

"**Qualified Cash**" shall mean, as of any date of determination, the amount of unrestricted (other than restrictions imposed pursuant to the Loan Documents) cash and Cash Equivalents of Borrower that is

in a deposit account or in a securities account, or any combination thereof, and which deposit account and securities account, as the case may be, and all cash and Cash Equivalents are subject to a perfected security interest in favor of the Collateral Agent prior to all Liens.  For the avoidance of doubt, cash in the Funding Account shall not constitute Qualified Cash.

"**Real Property**" shall mean, collectively, all right, title and interest (including any leasehold, fee, mineral or other estate) in and to any and all parcels of or interests in real property owned, leased or operated by any Person, whether by lease, license or other means, together with, in each case, all easements, hereditaments and appurtenances relating thereto, all improvements and appurtenant fixtures and equipment, all general intangibles and contract rights and other property and rights incidental to the ownership, lease or operation thereof.

"**Register**" shall have the meaning assigned to such term in Section 10.04(c).

"**Regulation D**" shall mean Regulation D of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"**Regulation T**" shall mean Regulation T of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"**Regulation U**" shall mean Regulation U of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"**Regulation X**" shall mean Regulation X of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"**Related Person**" shall mean, with respect to any Person, (a) each Affiliate of such Person and each of the officers, directors, partners, trustees, employees, affiliates, shareholders, investors, potential investors, Advisors, agents, attorneys-in-fact and Controlling Persons of each of the foregoing, and (b) if such Person is an Agent, each other Person designated, nominated or otherwise mandated by or assisting such Agent pursuant to Section 9.05 or any comparable provision of any Loan Document.

"**Release**" shall mean any spilling, leaking, seepage, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, disposing, dispersing, emanating or migrating of any Hazardous Materials in, into, onto, from or through the Environment or any Real Property (including the abandonment or discarding of barrels, containers and other closed receptacles containing any Hazardous Materials).

"**Remedies Notice Period**" shall have the meaning assigned to such term in Section 8.01.

"**Required Lenders**" shall mean, at any date of determination, Lenders holding more than 50.0% of the sum of (a) the Outstanding Amount of the Loans and (b) the aggregate unused Commitments as of such date. For purposes of this definition, the Outstanding Amount of the Loans and the aggregate unused Commitments shall be determined by excluding the sum of the Outstanding Amount of the Loans of each Defaulting Lender and the aggregate unused Commitments of each Defaulting Lender at such time.

"**Required Roll-Up Lenders**" means, as of any date of determination, Lenders holding more than 50.0% of the sum of the aggregate principal amount of the Roll-Up Loans as of such date.

"**Response**" shall mean (a) "**response**" as such term is defined in CERCLA, 42 U.S.C. § 9601(25) or any other applicable Environmental Law, or (b) all other actions required by any

Governmental Authority or voluntarily undertaken to (i) clean up, remove, treat, remediate, contain, assess, abate, monitor or in any other way address any Hazardous Materials at, in, on, under or from any Real Property, or otherwise in the Environment, (ii) prevent, stop, control or minimize the Release or threat of Release, or minimize the further Release, of any Hazardous Material, or (iii) perform studies, investigations, maintenance or monitoring in connection with, following, or as a precondition to or to determine the necessity of, the actions set forth in clause (i) or (ii) above.

"**Restricted Indebtedness**" shall mean Indebtedness of any Loan Party, the payment, prepayment, repurchase, defeasance or acquisition for value of which is restricted under Section 6.11.

"**Responsible Officer**" of any Person shall mean any executive officer or Financial Officer of such Person and any other officer or similar official thereof with significant responsibility for the administration of the obligations of such Person in respect of this Agreement.

"**Roll-Up Lenders**" means the financial institutions listed on the Initial Roll-Up Schedule and/or the Additional Roll-Up Schedule.

"**Roll-Up Loans**" has the meaning assigned to such term in Section 2.01(b).

"**Roll-Up Schedules**" has the meaning assigned to such term in Section 2.01(b).

"**Sale and Leaseback Transaction**" shall have the meaning assigned to such term in Section 6.03.

"**Sarbanes-Oxley Act**" shall mean the United States Sarbanes-Oxley Act of 2002, as amended from time to time, and any successor statute.

"**SEC**" shall mean the Securities and Exchange Commission (or successors thereto or an analogous Governmental Authority).

"**Secured Obligations**" shall mean the Obligations.

"**Secured Parties**" shall mean, collectively, the Administrative Agent, the Collateral Agent and the Lenders.

"**Securities Act**" shall mean the Securities Act of 1933, as amended from time to time, and any successor statute.

"**Securities Collateral**" shall have the meaning assigned to such term in the Security Agreement.

"**Security Agreement**" shall mean the Debtor-In-Possession Security Agreement, dated as of the date hereof, among the Loan Parties and the Collateral Agent for the benefit of the Secured Parties, as the same may be amended, restated, modified or supplemented from time to time.

"**Security Documents**" shall mean the Security Agreement, the Mortgages, each Control Agreement, each other security document or pledge agreement delivered in accordance with applicable local or foreign Legal Requirements to grant a valid, enforceable, perfected security interest (with the priority required under the DIP Orders) in any property as collateral for the Secured Obligations, all UCC or other financing statements (including fixture filings) or instruments of perfection required by this Agreement, the Security Agreement, any Mortgage, any Control Agreement or any other such security document or pledge agreement to be filed or registered with respect to the security interests in property

created pursuant to the Security Agreement, any Mortgage, any Control Agreement, the DIP Orders and any other document or instrument utilized to pledge any property as collateral for the Secured Obligations.

"**SPC**" shall have the meaning assigned to such term in Section 10.04(h).

"**Specified Material Agreements**" shall have the meaning assigned to such term in Section 3.09(a).

"**Subordinated Indebtedness**" shall mean Indebtedness of any Loan Party that is by its terms subordinated in right of payment to all or any portion of the Secured Obligations.

"**Subsidiary**" shall mean, with respect to any Person (the "**parent**") at any date, (i) any Person the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, (ii) any other corporation, limited liability company, association or other business entity of which securities or other ownership interests representing more than 50% of the voting power of all Equity Interests entitled (without regard to the occurrence of any contingency) to vote in the election of the Board of Directors thereof are, as of such date, owned, controlled or held by the parent and/or one or more subsidiaries of the parent, (iii) any partnership (a) the sole general partner or the managing general partner of which is the parent and/or one or more subsidiaries of the parent or (b) the only general partners of which are the parent and/or one or more subsidiaries of the parent and (iv) any other Person that is otherwise Controlled by the parent and/or one or more subsidiaries of the parent.  Unless the context requires otherwise, "**Subsidiary**" refers to a Subsidiary of Borrower.

"**Superpriority Claim**" shall mean any administrative expense claim in the Case of any Loan Party having priority under Section 364(c)(1) of the Bankruptcy Code over any and all other administrative expenses, diminution claims and all other priority claims against the Loan Parties, subject only to the Carve-Out, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under Sections 105, 326, 328, 330, 331, 365, 503(b), 506(c) (subject only to and effective upon the Final Entry Order Date), 507(a), 507(b), 726, 1113, 1114 or any other provisions of the Bankruptcy Code in favor of the Collateral Agent for the benefit of the Secured Parties.

"**Synthetic Lease**" shall mean, as to any Person, (a) any lease (including leases that may be terminated by the lessee at any time) of any property (i) that is accounted for as an operating lease under GAAP and (ii) in respect of which the lessee retains or obtains ownership of the property so leased for U.S. federal income tax purposes, other than any such lease under which such Person is the lessor or (b) (i) a synthetic, off-balance sheet or tax retention lease, or (ii) an agreement for the use or possession of property (including a Sale and Leaseback Transaction), in each case under this clause (b), creating obligations that do not appear on the balance sheet of such Person but which, upon the application of any Insolvency Laws to such Person, would be characterized as the indebtedness of such Person (without regard to accounting treatment).

"**Synthetic Lease Obligations**" shall mean, as to any Person, an amount equal to the capitalized amount of the remaining lease payments under any Synthetic Lease that would appear on a balance sheet of such Person in accordance with GAAP if such obligations were accounted for as Capital Lease Obligations.

"**Synthetic Purchase Agreement**" shall mean any swap, derivative or other agreement or combination of agreements pursuant to which any Loan Party is or may become obligated to make (a) any payment in connection with a purchase by any third party from a Person other than a Loan Party of any Equity Interest or Restricted Indebtedness or (b) any payment (other than on account of a permitted purchase by it of any Equity Interest or Restricted Indebtedness) the amount of which is determined by reference to the price or value at any time of any Equity Interest or Restricted Indebtedness.

"**Tax Returns**" shall mean all returns, statements, filings, attachments and other documents or certifications filed or required to be filed in respect of Taxes.

"**Taxes**" shall mean (i) any and all present or future taxes, duties, levies, imposts, assessments, fees, deductions, withholdings or other similar charges, whether computed on a separate, consolidated, unitary, combined or other basis and any and all liabilities (including interest, fines, penalties or additions with respect to any of the foregoing) with respect to the foregoing, and (ii) solely for purposes of Sections 3.13 and 5.05, any transferee, successor, joint and several, contractual or other liability (including liability pursuant to Treasury Regulation § 1.1502-6 (or any similar provision of state, local or non-U.S. law)) in respect of any item described in clause (i).

"**Termination Value**" means, in respect of any one or more Hedging Agreement, after taking into account the effect of any legally enforceable netting agreement relating to such Hedging Agreements, (a) for any date on or after the date such Hedging Agreements have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Hedging Agreements, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Hedging Agreements (which may include a Lender or any Affiliate of a Lender).

"**Texas DIP Credit Facility**" shall mean the Superpriority Secured Debtor-in-Possession Credit Agreement, dated as of March [●], 2021 among CarbonLite Recycling LLC, a Debtor, CarbonLite Recycling Holdings LLC, a Debtor, the lenders party thereto and UMB Bank, N.A., as administrative agent and collateral agent.

"**Texas Facility**" shall mean the perPET processing facility located in Dallas, Texas, directly owned by Borrower.

"**Transactions**" shall mean collectively, (a) the execution and delivery of, and the performance under, the Loan Documents, in each case by the Loan Parties party thereto, (b) the making (or deemed making) of the Loans hereunder, and (c) the payment of fees, costs and expenses related to the foregoing.

"**Treasury Rate**" shall mean the weekly average yield on actually traded United States Treasury securities adjusted to a constant maturity of one year.

"**UCC**" shall mean the Uniform Commercial Code as in effect from time to time (except as otherwise specified) in any applicable state or jurisdiction.

"**Unfunded Pension Liability**" shall mean the excess of a Pension Plan's benefit liabilities under Section 4001(a)(16) of ERISA, over the current value of that Pension Plan's assets, determined in accordance with the actuarial assumptions used for funding the Pension Plan pursuant to Section 412 of the Code for the applicable plan year.

"**United States**" and "**U.S.**" shall mean the United States of America.

"**Updated Budget**" shall mean a 13-week cash flow forecast covering the 13-week period commencing on the first day of the week in which such 13-week cash flow forecast is required to be delivered pursuant to Section 5.01(c), setting forth all forecasted receipts and disbursements of the Loan Parties and their Subsidiaries on a weekly basis during such 13-week period, which shall include, among other things, available cash, revenue, cash flow, trade payables, ordinary course expenses, total expenses, capital expenditures, vendor disbursements, liquidity, net operating cash flow and net cash flow, fees and expenses related to the DIP Term Facility and the Cases (including, for the avoidance of doubt, professional fees), working capital and other general corporate financial needs.

"**Variance Testing Date**" shall mean the last Business Day of (i) the first full calendar week after the Petition Date and (ii) every week thereafter.

"**Variance Testing Period**" shall mean, with respect to any Variance Testing Date, the one week period ending on such Variance Testing Date.

"**Voting Stock**" shall mean, with respect to any Person, any class or classes of Equity Interests pursuant to which the holders thereof have the general voting power under ordinary circumstances to elect at least a majority of the Board of Directors of such Person.

"**Withdrawal**" shall mean a disbursement of funds from the Funding Account. "**Withdraw**" and "**Withdrawn**" shall have correlative meanings thereto.

"**Withdrawal Date**" shall have the meaning assigned to such term in Section 2.17.

"**Withdrawal Termination Instruction**" shall have the meaning assigned to such term in Section 2.17.

**Section 1.02**    [**Reserved**].

**Section 1.03**    **Terms Generally.**  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  The phrase "Material Adverse Effect" shall be deemed to be followed by the phrase ", individually or in the aggregate".  The words "asset" and "property" shall be construed to have the same meaning and effect.  The word "will" shall be construed to have the same meaning and effect as the word "shall."  Unless the context requires otherwise (a) any definition of or reference to any Loan Document, agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth in any Loan Document), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, and (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement, unless otherwise indicated and (e) any reference to any law or regulation shall (i) include all statutory and regulatory provisions consolidating, amending, replacing or interpreting or supplementing such law or regulation, and (ii) unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time.  This Section 1.03 shall apply, *mutatis mutandis*, to all Loan Documents.

Section 1.04    **Accounting Terms; GAAP.**  Except as otherwise expressly provided herein, all financial statements to be delivered pursuant to this Agreement shall be prepared in accordance with and all terms of an accounting or financial nature shall be construed and interpreted in accordance with GAAP as in effect from time to time.  If Borrower notifies the Administrative Agent that Borrower wishes to amend any provision hereof to eliminate the effect of any change occurring after the date hereof in GAAP or in the application thereof on the operation of such provision, regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then Borrower's compliance with such provision shall be determined on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in a manner satisfactory to Borrower and Administrative Agent; *provided* that any obligations under a Synthetic Lease shall be construed in accordance with GAAP as in effect on the Closing Date, notwithstanding any changes to GAAP occurring after the Closing Date.  Notwithstanding any provision contained herein or in any other Loan Document, any lease (or similar arrangement) that would have been characterized, classified or reclassified as an operating lease in accordance with GAAP prior to the date of Borrower's adoption of ASC 842 (or any other ASC having a similar result or effect) (and related interpretations) (whether or not such lease was in effect on such date) shall not constitute an obligation under a Synthetic Lease, and any such lease shall be, for all purposes of this Agreement and the other Loan Documents, treated as though it were reflected on Borrower's consolidated financial statements in the same manner as an operating lease would have been reflected prior to Borrower's adoption of ASC 842.

Section 1.05    **[Reserved].**

Section 1.06    **Resolution of Drafting Ambiguities.**  Each Loan Party acknowledges and agrees that it was represented by counsel in connection with the execution and delivery of the Loan Documents to which it is a party, that it and its counsel reviewed and participated in the preparation and negotiation hereof or thereof and that any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not be employed in the interpretation hereof or thereof.

**ARTICLE II**
**THE COMMITMENTS AND CREDIT EXTENSIONS**

Section 2.01    **The Loans.**

(a)    New Money DIP Loans.  Subject to the terms and conditions hereof and in the DIP Orders, each Lender agrees, following the Interim Order Entry Date and the satisfaction (or waiver) of the conditions to Borrowing set forth in Sections 4.01 and 4.02, to make term loans to Borrower in no more than two (2) Borrowings from time to time during the period commencing on the Closing Date and ending on the Maturity Date, in an aggregate principal amount in Dollars for each such Borrowing not to exceed such Lender's unused New Money DIP Commitment (the "**New Money DIP Loans**") at such time; *provided* that the total outstanding New Money DIP Loans of all Lenders shall not exceed (A) prior to the Final Order Entry Date, $14,000,000 and (B) following the Final Order Entry Date, the aggregate amount of the New Money DIP Commitments in effect on the Closing Date (immediately prior to any funding thereof).

(b)    Roll-Up Loans.

(i)    Subject to the terms and conditions hereof and in the Orders, on the Closing Date (or, in the case of any Roll-Up Lender that is not a Lender on the Closing Date, the date such Roll-Up Lender becomes a Lender hereunder) (the "**Initial Roll-Up Date**"), a principal amount of Indebtedness outstanding pursuant to the PA 2019 Bonds held by bondholders thereunder, as set forth on

the Initial Roll-Up Schedule (as defined below), which are also Roll-Up Lenders or Affiliates of Roll-Up Lenders hereunder, shall be automatically substituted and exchanged for (and prepaid by) Loans hereunder, in a principal amount equal to $2.00 of principal amount of Indebtedness outstanding pursuant to the PA 2019 Bonds of such Roll-Up Lender or such Affiliate of such Roll-Up Lender for each $1.00 of New Money DIP Loans held by such Roll-Up Lender or such Affiliate of such Roll-Up Lender hereunder on the Initial Roll-Up Date (roll-up loans pursuant hereto, the "**Initial Roll-Up Loans**").  The parties hereto hereby agree that set forth on the Initial Roll-Up Schedule will be the name of each Roll-Up Lender or Affiliate of a Roll-Up Lender whose PA 2019 Bonds will be exchanged for (and prepaid by) Initial Roll-Up Loans on the Initial Roll-Up Date, and the amount of Initial Roll-Up Loans to be received by each such Roll-Up Lender or Affiliate of such Roll-Up Lender on the Initial Roll-Up Date.  On the Closing Date, Ankura, as financial advisor to the Lender Group, shall deliver to the Administrative Agent a schedule setting forth the name of each Roll-Up Lender or Affiliate of such Roll-Up Lender whose PA 2019 Bonds will be exchanged for (and prepaid by) Initial Roll-Up Loans hereunder on the Initial Roll-Up Date (the "**Initial Roll-Up Schedule**") and the amount of Initial Roll-Up Loans to be received by such Roll-Up Lender or Affiliate of such Roll-Up Lender on the Initial Roll-Up Date (and the parties hereto hereby agree that the Administrative Agent (and the trustee under the Prepetition Indentures) may each conclusively rely on the Initial Roll-Up Schedule in adjusting the Register (and the equivalent document under the Prepetition Indenture) to reflect the cancellation of the PA 2019 Bonds under the Prepetition Indenture and the Initial Roll-Up Loans to be received by the Roll-Up Lenders on the Initial Roll-Up Date).  Furthermore, the parties agree that each Roll-Up Lender and each Affiliate of a Roll-Up Lender that will receive Initial Roll-Up Loans hereunder and that is not already a Lender hereunder at the time thereof must become a Lender hereunder, by executing a joinder to this Agreement in form and substance reasonably satisfactory to the Administrative Agent, on or prior to the applicable Initial Roll-Up Date in order to receive its portion of the Initial Roll-Up Loans.  Notwithstanding anything to the contrary in this Agreement or otherwise, with respect to any Initial Roll-Up Loan that is received by a Roll-Up Lender or Affiliate thereof after the Closing Date as a result of such Roll-Up Lender or Affiliate becoming a Lender hereunder after the Closing Date, for all purposes under this Agreement and the other Loan Documents (including for purposes of calculating interest accruing on the Initial Roll-Up Loans under <u>Section 2.06</u>), immediately upon such Roll-Up Lender or Affiliate becoming a Lender hereunder, the Initial Roll-Up Loan of such Lender or Affiliate shall be deemed to have been made by such Roll-Up Lender or Affiliate (and the exchange and prepayment of the applicable PA 2019 Bonds of such Roll-Up Lender or Affiliate under the Prepetition Indenture shall be deemed to have occurred) on the Closing Date.

(ii)    Subject to the terms and conditions hereof and in the Orders, upon any Borrowing of New Money DIP Loans on or after the Final Order Entry Date, a principal amount of Indebtedness outstanding pursuant to the PA 2019 Bonds held by bondholders thereunder, as set forth on the Additional Roll-Up Schedule (as defined below), which are also Roll-Up Lenders or Affiliates of Roll-Up Lenders hereunder, shall be automatically substituted and exchanged for (and prepaid by) Loans hereunder, in a principal amount equal to $2.00 of principal amount of Indebtedness outstanding pursuant to the PA 2019 Bonds of such Roll-Up Lender or such Affiliate of such Roll-Up Lender for each $1.00 of New Money DIP Loans advanced by such Roll-Up Lender or such Affiliate of such Roll-Up Lender hereunder in connection with such Borrowing of New Money DIP Loans on or after the Final Order Entry Date (collectively, the "**Additional Roll-Up Loans**" and, together with the Initial Roll-Up Loans, "**Roll-Up Loans**").  The parties hereto hereby agree that set forth on each Additional Roll-Up Schedule will be the name of each Roll-Up Lender or Affiliate of a Roll-Up Lender whose PA 2019 Bonds under the Prepetition Indenture will be exchanged for (and prepaid by) Additional Roll-Up Loans upon the applicable Borrowing, and the amount of Additional Roll-Up Loans to be received by each such Roll-Up Lender or Affiliate of such Roll-Up Lender upon the applicable Borrowing.  Prior to the Borrowing of New Money DIP Loans on or after the Final Order Entry Date, Ankura shall deliver to the Administrative Agent a schedule setting forth the name of each Roll-Up Lender or Affiliate of such Roll-Up Lender whose PA 2019 Bonds under the Prepetition Indenture will be exchanged for (and prepaid by) Additional

Roll-Up Loans hereunder upon the applicable Borrowing (each, an "**Additional Roll-Up Schedule**" and, together with the Initial Roll-Up Schedule, the "**Roll-Up Schedules**") and the amount of Additional Roll-Up Loans to be received by such Roll-Up Lender or Affiliate of such Roll-Up Lender upon such Borrowing of New Money DIP Loans on or after the Final Order Entry Date (and the parties hereto hereby agree that the Administrative Agent (and the trustee under the Prepetition Indenture) may each conclusively rely on each Additional Roll-Up Schedule in adjusting the Register (and the equivalent document under the Prepetition Indenture) to reflect the cancellation of the PA 2019 Bonds under the Prepetition Indenture and the Additional Roll-Up Loans to be received by the Roll-Up Lenders upon such Borrowing of New Money DIP Loans on or after the Final Order Entry Date).  Furthermore, the parties agree that each Affiliate of a Roll-Up Lender that will receive Additional Roll-Up Loans hereunder and that is not already a Lender hereunder at the time thereof must become a Lender hereunder, by executing a joinder to this Agreement in form and substance reasonably satisfactory to the Administrative Agent, on or prior to the date of such applicable Borrowing in order to receive its portion of the Additional Roll-Up Loans.

(c)     Loans Generally.  Following the making of any New Money DIP Loan by a Lender, the New Money DIP Commitment of such Lender shall be automatically and permanently reduced by the amount of such New Money DIP Loan so made by such Lender, and shall automatically and permanently terminate when reduced to $0.  Once funded, each New Money DIP Loan shall be a "Loan" for all purposes under this Agreement and the other Loan Documents.  Amounts borrowed under Section 2.01 and repaid or prepaid may not be reborrowed.

**Section 2.02    Borrowings of Loans.**  (a) Each New Money DIP Loan shall be made as part of a Borrowing consisting of New Money DIP Loans made by the Lenders ratably in accordance with their applicable Commitments.  Each Borrowing of New Money DIP Loans shall me made upon Borrower's irrevocable notice to the Administrative Agent, which shall be given in writing by delivering to the Administrative Agent a written Borrowing Request appropriately completed and signed by a Responsible Officer of Borrower.  Each such notice must be received by the Administrative Agent not later than 11:00 a.m. New York City time (i) one Business Day prior to the requested date of any Borrowing of Loans (in the case of the Borrowing on the Closing Date) or (ii) three (3) Business Days prior to the requested date of any Borrowing of New Money DIP Loans (in the case of the Borrowing to occur on or after the Final Order Entry Date.  Any Borrowing shall be in an aggregate principal amount that is (i) an integral multiple of $500,000 and not less than $1,000,000 or (ii) equal to the remaining available balance of the applicable Commitments.

(b)     Following receipt of a Borrowing Request in accordance with Section 2.02(a), the Administrative Agent shall promptly notify each Lender of such Borrowing Request, of its New Money DIP Loan to be made as part of the requested Borrowing.

(c)     Each Lender shall make each New Money DIP Loan to be made by it hereunder on the proposed date thereof by not later than 11:00 a.m., New York City time by wire transfer of immediately available funds to such account as the Administrative Agent may designate from time to time, and upon satisfaction or waiver of the applicable conditions precedent specified herein and receipt by the Administrative Agent of all of the proceeds of the New Money DIP Loans, the Administrative Agent will remit the amounts so received, in like funds, to the Funding Account except, in the case of the New Money DIP Loans being made on the Closing Date, as provided in the Funding Authorization Letter (which, for the avoidance of doubt, may provide that a portion of such funds be remitted to the Funding Account).

(d)     Unless the Administrative Agent shall have received written notice from a Lender prior to the date of any Borrowing that such Lender will not make available to the Administrative

Agent such Lender's portion of such Borrowing, the Administrative Agent may assume that such Lender has made such portion available to the Administrative Agent on the date of such Borrowing in accordance with Section 2.02(c), and the Administrative Agent may (but shall not be obligated to), in reliance upon such assumption, make available to Borrower on such date a corresponding amount.  If the Administrative Agent shall have so made funds available, then, to the extent that such Lender shall not have made such portion available to the Administrative Agent, each of such Lender and Borrower severally agrees to repay to the Administrative Agent forthwith on demand such corresponding amount together with interest thereon, for each day from the date such amount is made available to Borrower until the date such amount is repaid to the Administrative Agent at, for each such day, the Federal Funds Effective Rate plus any standard administrative or processing fees charged by the Administrative Agent in connection with such Lender's non-payment.  If such Lender shall repay to the Administrative Agent such corresponding amount, such amount shall constitute such Lender's Loan as part of such Borrowing for purposes of this Agreement, and Borrower's obligation to repay the Administrative Agent such corresponding amount pursuant to this Section 2.02(d) shall cease.

(e)     The failure of any Lender to make the Loan to be made by it as part of any Borrowing shall not relieve any other Lender of its obligation, if any, hereunder to make its Loan on the date of such Borrowing, but no Lender shall be responsible for the failure of any other Lender to make the Loan to be made by such other Lender on the date of any Borrowing.

(f)     Notwithstanding anything to the contrary in this Section 2.02, subject to the terms and conditions set forth herein and in the Interim Order, the Initial Roll-Up Loans will be deemed made and fully funded hereunder on the Initial Roll-Up Date in such amounts as set forth in Section 2.01(b) above and the applicable Additional Roll-Up Loans will be deemed made and fully funded hereunder on the date of the Borrowing of New Money DIP Loans on or after the Final Order Entry Date hereunder concurrently with such Borrowing in such amounts as set forth in Section 2.01(b) above.

**Section 2.03     [Reserved].**

**Section 2.04     Evidence of Debt; Repayment of Loans.**  (a) Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of each Lender, the unpaid principal amount of each Loan (including all Roll-Up Loans and all PIK Interest capitalized and added to the aggregate outstanding principal amount of Roll-Up Loans) of such Lender on the Maturity Date.

(b)     Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of Borrower to such Lender resulting from each Loan made by such Lender from time to time, including the amounts of principal and interest payable and paid to such Lender from time to time under this Agreement.

(c)     The Administrative Agent shall maintain an account in which it will record (i) the amount of each Loan made hereunder, (ii) the amount of any principal or interest due and payable or to become due and payable from Borrower to each Lender hereunder, and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.

(d)     The entries made in the accounts maintained pursuant to Sections 2.04(b) and (c) shall be *prima facie* evidence of the existence and amounts of the obligations therein recorded; *provided* that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligations of Borrower and the other Loan Parties to pay, and perform, the Obligations in accordance with the Loan Documents.  In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the

Administrative Agent in respect of such entries, the accounts and records of the Administrative Agent shall control in the absence of manifest error.

(e)     Any Lender by written notice to Borrower (with a copy to the Administrative Agent) may request that Loans made by it be evidenced by a promissory note.  In such event, Borrower shall promptly (and, in all events, within five (5) Business Days of receipt of such request) prepare, execute and deliver to such Lender a promissory note payable to the order of such Lender (or, if requested by such Lender, to such Lender and its registered assigns) in the form of Exhibit G.  Thereafter, the Loans evidenced by such promissory note and interest thereon shall at all times (including after assignment pursuant to Section 10.04) be represented by one or more promissory notes in such form payable to the order of the payee named therein (or, if such promissory note is a registered note, to such payee and its registered assigns).

**Section 2.05     Fees.**

(a)     On the Closing Date, Borrower shall pay to each Lender party to this Agreement on the Closing Date, as fee compensation for such Lender's New Money DIP Commitments on the Closing Date, a commitment fee (the "**Commitment Fee**") in an amount equal to 3.00% of such Lender's New Money DIP Commitments on the Closing Date.  The Commitment Fee shall be fully and irrevocably due and payable in cash on the Closing Date and shall be paid as original issue discount as indicated below in this clause (a). The Commitment Fee shall be earned by the Lenders on the Closing Date as a fee in consideration of the New Money DIP Commitments and the making of the New Money DIP Loans and for the time and costs expended in extending the New Money DIP Commitments and the making of the New Money DIP Loans. Such Commitment Fee shall be fully earned when paid and shall not be refundable for any reason whatsoever.  The Commitment Fee shall, to the extent permitted by applicable law, be paid as original issue discount such that the advance of the New Money DIP Loans on the Closing Date shall be advanced net of such original issue discount (which original issue discount will be retained by the applicable Lenders according to their respective shares thereof).  For all purposes other than funding of the New Money DIP Loans on the Closing Date, the aggregate outstanding principal balance of the New Money DIP Loans funded on the Closing Date immediately after giving effect to the borrowing of the New Money DIP Loans on the Closing Date and the amount of the New Money DIP Loans to be repaid hereunder shall be the aggregate amount borrowed under Section 2.01(a).  For all purposes other than funding of the New Money DIP Loans on the Closing Date, the aggregate outstanding principal balance of the New Money DIP Loans funded on the Closing Date immediately after giving effect to the borrowing of the New Money DIP Loans on the Closing Date and the amount of the New Money DIP Loans to be repaid hereunder shall be the aggregate amount borrowed under Section 2.1(a).

(b)     Administrative Agent Fees.  Borrower agrees to pay to the Administrative Agent, for its own account, the fees set forth in the Fee Letter in the amounts and at the times set forth in the Fee Letter (the "**Administrative Agent Fees**"). Such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever. Such fees will be in addition to the payment of the Administrative Agents' fees, costs and expenses pursuant to the terms hereof.

**Section 2.06     Interest on Loans.**  (a) Subject to the provisions of Section 2.06(c), each New Money DIP Loan shall bear interest on the outstanding principal amount therefrom from the date made or deemed made (including through funding of New Money DIP Loans into the Funding Account) through repayment (whether by acceleration or otherwise) at a rate per annum equal to the Applicable Rate for New Money DIP Loans.

(b)     Each Roll-Up Loan shall bear interest on the outstanding principal amount therefrom from the date deemed made through repayment (whether by acceleration or otherwise) at a rate

per annum equal to the Applicable Rate for Roll-Up Loans. Once capitalized and added to the outstanding amount of the Roll-Up Loans on each Interest Payment Date in accordance with clause (d) below, amounts so added to principal shall bear interest as set forth in this <u>Section 2.06</u>.

(c) Upon the occurrence and during the continuance of an Event of Default, upon notification by the Administrative Agent (acting at the direction of the Required Lenders) to Borrower, all outstanding Obligations shall bear interest at a per annum rate equal to (i) with respect to principal and interest of any Loan, the Applicable Rate applicable to such Loan <u>plus</u> 2.00% and (ii) with respect to other Obligations, the Applicable Rate with respect to New Money DIP Loans <u>plus</u> 2.00% (clauses (i) and (ii) being referred to herein collectively as the "**Default Rate**") and thereafter such Obligations shall bear interest at the Default Rate to the fullest extent permitted by applicable laws and without further notice, motion or application to, or hearing before, or order from, the Bankruptcy Court.

(d) Accrued interest on each Loan shall be payable in arrears in cash on each Interest Payment Date and at such other times as may be specified herein; *provided* that in the case of each Roll-Up Loan, interest accruing on such Roll-Up Loan at the Applicable Rate for Roll-Up Loans shall be capitalized and added to the aggregate outstanding principal amount of such Roll-Up DIP Loan on such Interest Payment Date in lieu of cash payment (and shall be treated as principal of such Roll-Up DIP Loan at all times thereafter) (such capitalized interest, "**PIK Interest**"); *provided further* that (i) interest accrued pursuant to <u>Section 2.06(c)</u> (including interest on past due interest and interest accruing on Roll-Up DIP Loans) and all interest accrued but unpaid on or after the Maturity Date shall be payable on demand in cash and (ii) in the event of any repayment or prepayment of any Loan, accrued interest on the principal amount repaid or prepaid shall be payable in cash on the date of such repayment or prepayment. Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law.

(e) All interest hereunder shall be computed on the basis of a year of 360 days, and shall be payable for the actual number of days elapsed (including the first day but excluding the last day); *provided* that any Loan that is repaid on the same day on which it is made shall, subject to <u>Section 2.14</u>, bear interest for one day. Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid; *provided* that any Loan that is repaid on the same day on which it is made shall, subject to <u>Section 2.14</u>, bear interest for one day. Each determination by the Administrative Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

**Section 2.07    Termination of Commitments.** To the extent not terminated earlier, the New Money DIP Commitments of each Lender shall terminate immediately and without further action on the Maturity Date.

**Section 2.08    [Reserved].**

**Section 2.09    Repayment of Loans.** Borrower shall repay to the Administrative Agent for the ratable account of the Lenders on the Maturity Date the aggregate principal amount of all Loans (including all Roll-Up Loans) outstanding on such date, together with all accrued and unpaid interest thereon. On the Maturity Date, all funds in the Funding Account shall be applied by the Administrative Agent on behalf of Borrower in accordance with the priorities of payment set forth in <u>Section 8.04</u>.

**Section 2.10    Optional and Mandatory Prepayments of Loans.** (a) <u>Optional Prepayments</u>. Borrower shall have the right at any time and from time to time to prepay any Borrowing, in whole or in part, without premium or penalty, subject to the requirements of this <u>Section 2.10</u>; *provided* that each

partial prepayment shall be in an amount that is an integral multiple of $100,000 and not less than $250,000 or, if less, the outstanding principal amount of such Borrowing.

(b)        Material Agreements.  Not later than three (3) Business Days following the receipt of any Net Cash Proceeds of any termination payments, damages (including liquidated damages), indemnity payments or other extraordinary payments under or in respect of any Material Agreement of any Loan Party, in excess of $50,000 individually or $100,000 in the aggregate per calendar year, Borrower shall apply 100% of such Net Cash Proceeds to make prepayments in accordance with Section 2.10(g).

(c)        Asset Sales.  Not later than three (3) Business Days following the receipt of any Net Cash Proceeds of any Asset Sale by any Loan Party, Borrower shall apply 100% of such Net Cash Proceeds to make prepayments in accordance with Section 2.10(g).

(d)        Debt Issuance or Equity Issuance.  Not later than three (3) Business Days following the receipt of any Net Cash Proceeds of any Debt Issuance or Equity Issuance by any Loan Party, Borrower shall make prepayments in accordance with Section 2.10(g) in an aggregate principal amount equal to 100% of such Net Cash Proceeds.

(e)        Casualty Events.  Not later than three (3) Business Days following the receipt of any Net Cash Proceeds from a Casualty Event by any Loan Party, unless otherwise agreed to in writing by the Required Lenders, Borrower shall apply an amount equal to 100% of such Net Cash Proceeds to make prepayments in accordance with Section 2.10(g)

(f)        [Reserved].

(g)        Application of Prepayments.  Any prepayments made pursuant to this Section 2.10 shall be applied ratably to the Loans then outstanding:  (i) *first*, towards payment of interest then due to the Lenders with respect to such Loans, ratably among the Lenders in accordance with their respective pro rata shares of such prepayment and (ii) *second*, towards payment of principal of such Loans, ratably among the Lenders in accordance with their respective pro rata shares of such prepayment; *provided* that with respect to such prepayment, the amount of such prepayment shall be applied first to New Money DIP Loans to the full extent thereof before application to Roll-Up Loans.

(h)        Notice of Prepayment.  Borrower shall notify the Administrative Agent by written notice of any prepayment hereunder not later than 11:00 a.m., New York City time, three (3) Business Days before the date of prepayment.  Each such notice shall be irrevocable.  Each such notice shall specify the prepayment date, the principal amount of the Loans to be prepaid, and, in the case of a mandatory prepayment, a reasonably detailed calculation of the amount of such prepayment.  Promptly following receipt of any such notice, the Administrative Agent shall advise the Lenders of the contents thereof.  Such notice to the Lenders may be by electronic communication.  Each partial prepayment of Loans shall be in an amount that would be permitted in the case of a Borrowing of New Money DIP Loans as provided in Section 2.02, except as necessary to apply fully the required amount of a mandatory prepayment.  Prepayments shall be accompanied by accrued interest to the extent required by Section 2.06.

Section 2.11        [Reserved].

Section 2.12        [Reserved].

Section 2.13        [Reserved].

**Section 2.14    Payments Generally; Pro Rata Treatment; Sharing of Setoffs.** (a) Borrower shall make each payment required to be made by it hereunder or under any other Loan Document (whether of principal, interest or fees, or of amounts payable under Section 2.15, or otherwise) on or before the time expressly required hereunder or under such other Loan Document for such payment (or, if no such time is expressly required, prior to 1:00 p.m., New York City time), on the date when due, in (except for payments of PIK Interest) immediately available funds, without setoff, deduction or counterclaim.  Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon.  All such payments shall be made to the Administrative Agent at its account most recently designated by it for such purpose by notice to Borrower and the Lenders except that payments pursuant to Sections 2.15 and 10.03 shall be made directly to the Persons entitled thereto and payments pursuant to other Loan Documents shall be made to the Persons specified therein.  The Administrative Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof.  Except as otherwise provided herein, if any payment under any Loan Document shall be due on a day that is not a Business Day, unless specified otherwise, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension.  All payments under each Loan Document shall be made in Dollars.

(b)    If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, interest and fees then due hereunder, such funds shall be applied (i) *first*, towards payment of interest and fees then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties, (ii) *second*, towards payment of principal then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal then due to such parties, and (iii) *third*, towards the payment of all other Obligations then due hereunder, ratably among the parties entitled thereto in accordance with the amount of such amounts then due to such parties.

(c)    If any Lender shall, by exercising any right of setoff or counterclaim (including pursuant to Section 10.08) or otherwise (including by exercise of its rights under the Security Documents), obtain payment in respect of any principal of or interest on any of its Loans resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Loans and accrued interest thereon than the proportion received by any other Lender, then the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Loans of other Lenders to the extent necessary so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans; *provided* that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this Section 2.14(c) shall not be construed to apply to any payment made by Borrower pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any Eligible Assignee or participant.  Each Loan Party consents to the foregoing and agrees, to the extent it may effectively do so under applicable Legal Requirements, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against each Loan Party rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of such Loan Party in the amount of such participation.  If under applicable Insolvency Law any Secured Party receives a secured claim in lieu of a setoff or counterclaim to which this Section 2.14(c) applies, such Secured Party shall to the extent practicable, exercise its rights in respect of such secured claim in a manner consistent with the rights to which the Secured Party is entitled under this Section 2.14(c) to share in the benefits of the recovery of such secured claim.

(d)         Unless the Administrative Agent shall have received written notice from Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that Borrower will not make such payment, the Administrative Agent may assume that Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due.  In such event, if Borrower has not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules or practices on interbank compensation.

(e)         If any Lender shall fail to make any payment required to be made by it pursuant to Section 2.02(c), 2.14(d), or 10.03(e), then the Administrative Agent may, in its discretion (notwithstanding any contrary provision hereof), apply any amounts thereafter received by the Administrative Agent for the account of such Lender to satisfy such Lender's obligations under such Sections until all such unsatisfied obligations are fully paid.

**Section 2.15    Taxes.**    (a)  Any and all payments by or on account of any obligation of the Loan Parties hereunder or under any other Loan Document shall be made without setoff, counterclaim or other defense and free and clear of and without deduction, reduction or withholding for any and all Taxes, except as required by applicable Legal Requirements; *provided* that if any Taxes shall be required by applicable Legal Requirements (as determined in the good faith discretion of an applicable withholding agent) to be deducted or withheld from such payments, then (i) if such Tax is an Indemnified Tax or Other Tax, the sum payable by the relevant Loan Party shall be increased as necessary so that after making all required deductions, reductions or withholdings (including deductions, reductions or withholdings applicable to additional sums payable under this Section 2.15) the Administrative Agent or any Lender, as the case may be, receives an amount equal to the sum it would have received had no such deductions, reductions or withholdings been made, (ii) the applicable withholding agent shall be entitled to make such deductions, reductions or withholdings and (iii) the applicable withholding agent shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable Legal Requirements.In addition, the Loan Parties shall timely pay to the relevant Governmental Authority in accordance with applicable Legal Requirements, or at the option of the Administrative Agent timely reimburse it for payment of, any Other Taxes.

(c)         The Loan Parties shall jointly and severally indemnify the Administrative Agent and each Lender, within ten (10) Business Days after written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes paid or payable by the Administrative Agent or such Lender, as the case may be, on or with respect to any payment by or on account of any obligation of any Loan Party hereunder or under any other Loan Document or required to be withheld or deducted from a payment to such recipient (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section 2.15) and any penalties, interest and expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to Borrower by a Lender (in each case, with a copy delivered concurrently to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(d)         Each Lender shall severally indemnify the Administrative Agent, within ten (10) days after demand therefor, for (i) any Indemnified Taxes or Other Taxes attributable to such Lender (but only to the extent that a Loan Party has not already indemnified the Administrative Agent for such Indemnified Taxes or Other Taxes and without limiting the obligation of the Loan Parties to do so), (ii)

any Taxes attributable to such Lender's failure to comply with the provisions of Section 10.04(e) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (d).

(e)       As soon as practicable after any payment of Taxes and in any event within twenty (20) Business Days following any such payment being due, by any Loan Party to a Governmental Authority, Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the Tax Return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent. If any Loan Party fails to pay any Indemnified Taxes or Other Taxes when due to the appropriate Governmental Authority or Borrower fails to remit to the Administrative Agent the required receipts or other documentary evidence, the Loan Parties shall jointly and severally indemnify the Administrative Agent, each Lender for any incremental Taxes or expenses that may become payable by the Administrative Agent or such Lender, as the case may be, as a result of any such failure.

(f)       Any Foreign Lender that is entitled to an exemption from or reduction of withholding tax under the law of the jurisdiction in which Borrower is resident for tax purposes, or under any treaty to which such jurisdiction is a party, with respect to payments under any Loan Document shall deliver to Borrower (with a copy to the Administrative Agent), at the time or times reasonably requested by Borrower or the Administrative Agent and at the time or times prescribed by applicable Legal Requirements, such properly completed and executed documentation prescribed by applicable Legal Requirements or reasonably requested by Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding. Notwithstanding anything to the contrary in the preceding sentence, the completion, execution, and submission of such documentation (other than such documentation set forth in part (i) of the following sentence or in Section 2.15(g)) shall not be required if in the Foreign Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender. Without limiting the generality of the foregoing, each Foreign Lender shall, to the extent it is legally entitled to do so, (i) furnish to Borrower and the Administrative Agent whichever of the following is applicable: (a) two accurate and complete executed copies of U.S. Internal Revenue Service Form W-8BEN (or successor form), *provided* that any Foreign Lender that is relying on the so-called "portfolio interest exemption" within the meaning of Section 881(c) of the Code shall also furnish a "Non-Bank Certificate" in the form of Exhibit H, (b) two accurate and complete executed copies of U.S. Internal Revenue Service Form W-8ECI (or successor form), (c) two accurate and complete executed copies of U.S. Internal Revenue Service Form W-8EXP (or successor form), or (d) two accurate and complete executed copies of U.S. Internal Revenue Service Form W-8IMY (or successor form) (with any required attachments), certifying, in each case, to such Foreign Lender's legal entitlement to an exemption or reduction from U.S. federal withholding tax with respect to all withholdable payments under any Loan Document, and (ii) to the extent it may lawfully do so at such times, upon reasonable request by Borrower or the Administrative Agent, provide a new Form W-8BEN (or successor form), Form W-8ECI (or successor form), Form W-8EXP (or successor form), Form W-8IMY (or successor form), and/or certification upon the expiration or obsolescence of any previously delivered form or certification to reconfirm any complete exemption from, or any entitlement to a reduction in, U.S. federal withholding tax with respect to any withholdable payment under any Loan

Document. Any Lender that is not a Foreign Lender shall (i) furnish to Borrower and the Administrative Agent two accurate and complete executed copies of U.S. Internal Revenue Service Form W-9 (or successor form), or shall otherwise establish an exemption from U.S. backup withholding and (ii) to the extent it may lawfully do so at such times, upon reasonable request by Borrower or the Administrative Agent, provide a new Form W-9 (or successor form) upon the expiration or obsolescence of any previously delivered form.

(g)        If a payment made to a Lender hereunder would be subject to U.S. federal withholding Tax under FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to Borrower and the Administrative Agent, at the time or times prescribed by law and at such time or times reasonably requested by Borrower or the Administrative Agent, such documentation prescribed by applicable Legal Requirements (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by Borrower or the Administrative Agent as may be necessary for Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this <u>Section 2.15(g)</u>, the term "FATCA" shall include any amendments to FATCA after the date hereof.

(h)        If the Administrative Agent or a Lender (or an assignee) determines in its sole discretion exercised in good faith, that it has received a refund of any Indemnified Taxes or Other Taxes as to which it has been indemnified by Borrower or with respect to which Borrower has paid additional amounts pursuant to this <u>Section 2.15</u>, it shall pay over an amount equal to such refund to Borrower (but only to the extent of indemnity payments made, or additional amounts paid, by Borrower under this <u>Section 2.15</u> with respect to the Indemnified Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of the Administrative Agent or such Lender (or assignee) and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); *provided*, *however,* that if the Administrative Agent or such Lender (or assignee) is required to repay all or a portion of such refund to the relevant Governmental Authority, Borrower, upon the request of the Administrative Agent or such Lender (or assignee), shall repay the amount paid over to Borrower that is required to be repaid (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent or such Lender (or assignee) within five (5) Business Days after receipt of written notice that the Administrative Agent or such Lender (or assignee) is required to repay such refund (or a portion thereof) to such Governmental Authority. Nothing contained in this <u>Section 2.15(h)</u> shall require the Administrative Agent or any Lender (or assignee) to make available its Tax Returns or any other information which it deems confidential or privileged to Borrower or any other Person. Notwithstanding anything to the contrary, in no event will the Administrative Agent or any Lender (or assignee) be required to pay any amount to Borrower the payment of which would place the Administrative Agent or such Lender (or assignee) in a less favorable net after-tax position than the Administrative Agent or such Lender (or assignee) would have been in if the Indemnified Taxes or Other Taxes subject to indemnification and giving rise to such refund had not been deducted, withheld, or otherwise imposed and the indemnification payments or additional amounts with respect to such Taxes had never been paid.

(i)        <u>Survival</u>. Each party's obligations under this <u>Section 2.15</u> shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

**Section 2.16    Mitigation Obligations; Replacement of Lenders.** (a) Mitigation of Obligations. If Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.15, then such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the reasonable judgment of such Lender, such designation or assignment (i) would eliminate or reduce materially amounts payable pursuant to Section 2.15, as the case may be, in the future, (ii) would not subject such Lender to any unreimbursed cost or expense, (iii) would not require such Lender to take any action inconsistent with its internal policies or legal or regulatory restrictions, and (iv) would not otherwise be disadvantageous to such Lender. Borrower shall pay all reasonable out-of-pocket costs and expenses incurred by any Lender in connection with any such designation or assignment. A certificate setting forth such costs and expenses submitted by such Lender to the Administrative Agent shall be conclusive and binding absent manifest error.

(b) Replacement of Lenders. In the event (i) Borrower is required to pay any additional amount to any Lender or any Governmental Authority on account of any Lender pursuant to Section 2.15, (ii) any Lender fails to consent to any amendment, waiver or other modification of any Loan Document requested by Borrower that requires the consent of 100% of the Lenders or 100% of all affected Lenders and, which, in each case, has been consented to by all other Lenders or all other affected Lenders, as the case may be, or (iii) any Lender defaults in its obligations to make Loans, Borrower may, at its sole expense and effort (including with respect to the processing and recordation fee referred to in Section 10.04(b)), upon notice to such Lender and the Administrative Agent, require such Lender to transfer and assign, without recourse (in accordance with and subject to the restrictions contained in Section 10.04), all of its interests, rights and obligations under this Agreement to an Eligible Assignee which shall assume such assigned obligations (which Eligible Assignee may be another Lender, if a Lender accepts such assignment); provided that (w) except in the case of clause (ii) above if the effect of such amendment, waiver or other modification of the applicable Loan Document would cure any Default or event of Default then ongoing, no such Default or Event of Default shall have occurred and be continuing, (x) such assignment shall not conflict with any applicable Legal Requirement, (y) Borrower shall have received the prior written consent of the Administrative Agent (at the direction of the Required Lenders), which consent shall not unreasonably be withheld or delayed, and (z) Borrower or such assignee shall have paid to the affected Lender in immediately available funds an amount equal to the sum of the principal of and interest and any prepayment premium or penalty (if any) accrued to the date of such payment on the outstanding Loans of such Lender affected by such assignment plus all Fees and other amounts owing to or accrued for the account of such Lender hereunder; provided further that, if prior to any such transfer and assignment the circumstances or event that resulted in the amounts paid pursuant to Section 2.15 cease to result in amounts being payable under Section 2.15, as the case may be (including as a result of any action taken by such Lender pursuant to Section 2.16(a)), or if such Lender shall waive its right to further payments under Section 2.15 in respect of such circumstances or event, as the case may be, then such Lender shall not thereafter be required to make any such transfer and assignment hereunder. Each Lender hereby grants to the Administrative Agent an irrevocable power of attorney (which power is coupled with an interest) to execute and deliver, on behalf of such Lender as assignor, any Assignment and Assumption necessary to effectuate any assignment of such Lender's interests hereunder in the circumstances contemplated by this Section 2.16(b).

(c) Defaulting Lenders. Anything contained herein to the contrary notwithstanding, in the event that any Lender becomes a Defaulting Lender, then (i) during any Default Period (as defined below) with respect to such Defaulting Lender, such Defaulting Lender shall be deemed not to be a "**Lender**", and the amount of such Defaulting Lender's Commitments and Loans shall be excluded for purposes of voting, and the calculation of voting, on any matters (including the granting of any consents or waivers) with respect to any of the Loan Documents; provided, however, that such

Defaulting Lender shall continue to be deemed a Lender for purposes of Section 10.02(b)(i), (ii) and (iii); and (ii) to the extent permitted by applicable Legal Requirements, until such time as the Default Excess (as defined below) with respect to such Defaulting Lender shall have been reduced to zero, (A) any voluntary prepayment of the Loans pursuant to Section 2.10(a) shall, if Borrower so directs at the time of making such voluntary prepayment, be applied to the Loans of other Lenders in accordance with Section 2.10(a) as if such Defaulting Lender had no Loans outstanding, and (B) any mandatory prepayment of the Loans pursuant to Section 2.10 shall, if Borrower so directs at the time of making such mandatory prepayment, be applied to the Loans of other Lenders (but not to the Loans of such Defaulting Lender) in accordance with Section 2.10 as if such Defaulting Lender had funded all Defaulted Loans of such Defaulting Lender, it being understood and agreed that Borrower shall be entitled to retain any portion of any mandatory prepayment of the Loans that is not paid to such Defaulting Lender solely as a result of the operation of the provisions of this clause (B).

For purposes of this Agreement, (i) "**Funding Default**" means, with respect to any Defaulting Lender, the occurrence of any of the events set forth in the definition of "Defaulting Lender," (ii) "**Defaulted Loan**" means the Loans of a Defaulting Lender, (iii) "**Default Period**" means, with respect to any Defaulting Lender, the period commencing on the date of the applicable Funding Default and ending on the earliest of the following dates: (a) the date on which all Commitments are cancelled or terminated and/or the Secured Obligations are declared or become immediately due and payable, (b) with respect to any Funding Default (other than any such Funding Default arising pursuant to clause (e) of the definition of "**Defaulting Lender**"), the date on which (1) the Default Excess with respect to such Defaulting Lender shall have been reduced to zero (whether by the funding by such Defaulting Lender of any Defaulted Loans of such Defaulting Lender or by the non-pro rata application of any voluntary or mandatory prepayments of the Loans in accordance with the terms hereof or any combination thereof) and (2) such Defaulting Lender shall have delivered to Borrower and the Administrative Agent a written reaffirmation of its intention to honor its obligations under this Agreement with respect to its Commitment(s), and (c) the date on which Borrower, the Administrative Agent and the Required Lenders waive all Funding Defaults of such Defaulting Lender in writing, and (iv) "**Default Excess**" means, with respect to any Defaulting Lender, the excess, if any, of such Defaulting Lender's Pro Rata Percentage of the aggregate outstanding principal amount of Loans of all Lenders (calculated as if all Defaulting Lenders (including such Defaulting Lender) had funded all of their respective Defaulted Loans) over the aggregate outstanding principal amount of Loans of such Defaulting Lender.

No amount of the Commitment of any Lender shall be increased or otherwise affected, and, except as otherwise expressly provided in Section 2.16(c), performance by Borrower of its obligations under this Agreement and the other Loan Documents shall not be excused or otherwise modified, as a result of any Funding Default or the operation of Section 2.16(c). The rights and remedies against a Defaulting Lender under Section 2.16(c) are in addition to other rights and remedies that Borrower may have against such Defaulting Lender with respect to any Funding Default and that the Administrative Agent or any Lender may have against such Defaulting Lender with respect to any Funding Default.

**Section 2.17    Withdrawal of Funds from the Funding Account**. Borrower shall have the right, no more than one (1) time each calendar week, to withdraw the funds on deposit in the Funding Account by delivering written notice to the Administrative Agent in the form attached as Exhibit F hereto (each such notice, a "**Funding Account Withdrawal Notice**") not later than 12:00 (noon), two (2) Business Days before the proposed Withdrawal Date; *provided* that (i) Borrower shall concurrently provide a forecast of its Qualified Cash immediately after giving effect to the disbursements to be made with such requested withdrawal and all other cash disbursements and all cash receipts to be  made or received, as applicable, during the one week period following the applicable Withdrawal Date, in a form substantially consistent with the Approved Budget, certified by the Chief Restructuring Officer, demonstrating, to the satisfaction of the Required Lenders or their advisors, that the aggregate amount of

Qualified Cash at the end of such one-week period will not exceed $500,000 and (ii) all conditions set forth in this Section 2.17 and Section 4.02 shall be satisfied prior to and after giving effect to such withdrawal.  Each Funding Account Withdrawal Notice shall specify the following information:

(a)     the amount of such withdrawal;

(b)     the date of such proposed withdrawal (which shall be on the second Business Day following the delivery of a Funding Account Withdrawal Notice) (the "**Withdrawal Date**");

(c)     specifying, in reasonable detail with reference to applicable lines items in the Approved Budget, all amounts to be Withdrawn on the applicable Withdrawal Date in accordance with the Approved Budget for the applicable week;

(d)     that as of the date of such withdrawal, the conditions set forth in Section 4.02 and this Section 2.17 are satisfied; and

(e)     the wiring instructions of the account of Borrower to which the proceeds of such withdrawal are to be disbursed.

To the extent any proceeds of any requested withdrawal from the Funding Account relates to a Capital Expenditure, the related Funding Account Withdrawal Notice shall, in addition to the items specified above in this Section 2.17, be accompanied by a requisition (and supporting invoices) from the Chief Restructuring Officer with respect to such Capital Expenditure and shall be subject to the prior approval of the Administrative Agent (at the direction of the Required Lenders) or Ankura.

On the Withdrawal Date specified in the Funding Account Withdrawal Notice, the Administrative Agent shall disburse funds from the Funding Account in an aggregate principal amount equal to the amount specified in such Funding Account Withdrawal Notice to the account of Borrower specified in such Funding Account Withdrawal Notice, unless the Administrative Agent has received a Withdrawal Termination Instruction from the Required Lenders prior to 10:00 a.m., New York City time, on such Withdrawal Date (and such Withdrawal Termination Instruction has not been withdrawn by the Required Lenders in writing prior to 10:00 a.m., New York City time on such Withdrawal Date).  All proceeds of the Loans (except to the extent otherwise applied on the Closing Date in accordance with the Borrowing Request) shall be held in the Funding Account at all times until such proceeds are disbursed or otherwise applied in accordance with this Section 2.17.

For the avoidance of doubt, funds withdrawn or applied from the Funding Account shall be used solely to pay (x) one or more disbursements set forth in the then effective Approved Budget (subject to Permitted Variances thereto), (y) any fees or other amounts due and payable to the Lenders or Agents or (z) such other amounts that are due and payable under the Loan Documents.

On and after the date of receipt by the Administrative Agent of a written direction from the Required Lenders instructing the Administrative Agent that it may no longer honor instructions from Borrower with respect to the Funding Account due to any of the conditions set forth in this Section 2.17 or in Section 4.02 being unsatisfied or incapable of satisfaction (a "**Withdrawal Termination Instruction**"), Borrower shall have no right to request withdrawals from the Funding Account and the Administrative Agent shall not honor any such request; *provided*, *however*, that the Administrative Agent shall not be liable for (i) any disbursements pursuant to instructions from Borrower or (ii) irrevocable electronic funds transfers or wire transfers that are subject to cut-off times, in each case, that were processed or initiated prior to receipt of such Withdrawal Termination Instruction.  Any Withdrawal Termination Instruction received by the Administrative Agent from the Required Lenders shall remain in

effect until such time, if any, as the Administrative Agent shall have received a written termination of such Withdrawal Termination Instruction from the Required Lenders.

Each submission by Borrower to the Administrative Agent of a Funding Account Withdrawal Notice shall be deemed to constitute a representation and warranty by Borrower that the conditions set forth in <u>Section 4.02</u> and this <u>Section 2.17</u> have been satisfied as of the applicable Withdrawal Date (both before and after giving effect to the proposed withdrawal). With respect to any disbursement, withdrawal, transfer, or application of funds from the Funding Account hereunder, the Administrative Agent shall be entitled to conclusively rely upon, and shall be fully protected in relying upon, (i) any Funding Account Withdrawal Notice submitted by Borrower as evidence that all conditions precedent to a withdrawal and disbursement from the Funding Account to Borrower have been satisfied (including, without limitation, those set forth in this <u>Section 2.17</u> and <u>Section 4.02</u>), unless the Administrative Agent has received a Withdrawal Termination Instruction from the Required Lenders prior to 10:00 a.m., New York City time, on the applicable Withdrawal Date (and such Withdrawal Termination Instruction has not been subsequently withdrawn by the Required Lenders in writing prior to 10:00 a.m., New York City time, on such Withdrawal Date), and (ii) any Withdrawal Termination Instruction received by it. Notwithstanding anything herein to the contrary, the Administrative Agent shall have no obligation to disburse any amount from the Funding Account in excess of the amounts then held in the Funding Account. The Agents shall have no duty to inquire or investigate whether any condition precedent to a withdrawal from the Funding Account has been satisfied, and shall not be deemed to have any knowledge that a condition is not satisfied unless it has received a Withdrawal Termination Instruction.

For the avoidance of doubt, all proceeds of Loans held in the Funding Account shall be Loans for all purposes hereunder and, notwithstanding that the proceeds of such Loans are held in the Funding Account, shall bear interest in accordance with this Agreement and shall be subject to all other terms and provisions of this Agreement and the other Loan Documents to the same extent as all other Loans.

Notwithstanding anything to the contrary contained herein, the Administrative Agent shall be entitled to apply funds held in the Funding Account to the payment of the fees owing under the Fee Letter and all expenses and indemnities payable to the Collateral Agent, the Administrative Agent or the Lenders hereunder or under any other Loan Document, regardless of whether any condition precedent in <u>Article IV</u> has been satisfied and regardless of whether a Withdrawal Termination Instruction has been delivered to the Administrative Agent; *provided* that notice of such application is provided to Borrower and the Lenders.

**ARTICLE III**
**REPRESENTATIONS AND WARRANTIES**

Each Loan Party represents and warrants to the Administrative Agent and each of the Lenders on the Closing Date and on the date of each Credit Extension and on each Withdrawal Date that:

**Section 3.01    Organization; Powers.** Each Loan Party (a) is duly organized and validly existing under the laws of the jurisdiction of its incorporation or organization, (b) subject to the entry of the DIP Orders and any other orders of the Bankruptcy Court, if applicable, has all requisite power and authority to carry on its business as now conducted and (c) is qualified, licensed and in good standing (to the extent such concept is legally recognized in the applicable jurisdiction) to do business in every jurisdiction where such qualification is required, except in such jurisdictions where the failure to so qualify, be licensed or be in good standing could not reasonably be expected to result in a Material Adverse Effect.

**Section 3.02    Authorization; Enforceability.**  Subject to the entry of the DIP Orders and the terms thereof, the Transactions to be entered into by each Loan Party are within such Loan Party's powers and have been duly authorized by all necessary corporate or other organizational action on the part of each such Loan Party.  Subject to the entry of the DIP Orders and the terms thereof, this Agreement has been duly executed and delivered by each Loan Party and constitutes, and each other Loan Document to which any Loan Party is to be a party, when executed and delivered by such Loan Party, will constitute, a legal, valid and binding obligation of such Loan Party, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally, regardless of whether considered in a proceeding in equity or at law.

**Section 3.03    No Conflicts; No Default.**  Subject to the entry of the DIP Orders and the terms thereof, the Transactions (a) do not require any consent, exemption, authorization or approval of, registration or filing with, or any other action by, any Governmental Authority, except (i) such as have been obtained or made and are in full force and effect and (ii) consents, approvals, exemptions, authorizations, registrations, filings, permits or actions the failure of which to obtain or perform could not reasonably be expected to result in a Material Adverse Effect, (b) will not violate the Organizational Documents of any Loan Party, (c) will not violate or result in a default or require any consent or approval (other than such as have been obtained and are in full force and effect) under (x) any Post-Petition indenture, instrument, agreement, or other document binding upon any Loan Party or its property or to which any Loan Party or its property is subject, or give rise to a right thereunder to require any payment to be made by any Loan Party or (y) any Organizational Document, (d) will not violate any Legal Requirement in any material respect (other than violations arising as a result of the commencement of the Cases and except as otherwise excused by the Bankruptcy Code), and (e) will not result in the creation or imposition of any Lien on any property of any Loan Party, except Liens created by the Security Documents and the DIP Orders.  No Default or Event of Default has occurred and is continuing.

**Section 3.04    Financial Condition; No Material Adverse Effect.**

(a)    All financial statements relating to any Loan Party prepared on or after December 10, 2020 which have been or may hereafter be delivered by any Loan Party to the Administrative Agent and the Lenders pursuant to the terms of the Agreement have been prepared in accordance with GAAP and present fairly, in all material respects, the financial position and results of operations and cash flows of Guarantor and its consolidated Subsidiaries as of such dates and for such periods.  The representations in this Section 3.04(a), as applicable, are subject, in the case of unaudited financial statements, to normal year-end audit adjustments and accruals and the absence of notes.  The representations in this Section 3.04(a), as applicable, are subject, in the case of unaudited financial statements, to normal year-end audit adjustments and accruals and the absence of notes.

(b)    Since the Closing Date, there has been no event or circumstance, either individually or in the aggregate, that has had or would reasonably be expected to have a Material Adverse Effect (it being understood that the commencement of the Cases and any defaults under agreements that have no material adverse effect on the Loan Parties under the terms of the Bankruptcy Code as a result of the commencement of the Cases).  As of the Closing Date, no Default or Event of Default shall have occurred and be continuing on such date or after giving effect to the extensions of credit requested to be made on such date.

**Section 3.05    Properties.**  (a) Each Loan Party has good title to, or valid leasehold interests in, all its property material to its business, free and clear of all Liens and irregularities, deficiencies and defects in title except for Permitted Liens (or, in the case of Collateral, Permitted Collateral Liens) and minor irregularities, deficiencies and defects in title that, individually or in the aggregate, do not, and

could not reasonably be expected to, interfere in any material respect with its ability to conduct its business as currently conducted or to utilize such property for its intended purpose.

(b)      The property of the Loan Parties, taken as a whole, (i) is in good operating order, condition and repair (ordinary wear and tear excepted), and (ii) constitutes all the property which is required for the business and operations of the Loan Parties as presently conducted.

(c)      Schedule 3.05(c) contains a true and complete list of each ownership and leasehold interest in Real Property (i) owned by any Loan Party as of the Closing Date and describes the type of interest therein held by such Loan Party and (ii) leased, subleased or otherwise occupied or utilized by any Loan Party, as lessee, sublessee, franchisee or licensee, as of the Closing Date and describes the type of interest therein held by such Loan Party.  As of the Closing Date, no Loan Party owns Real Property in fee.

(d)      [Reserved].

(e)      Each Loan Party owns or has rights to use all of its property and all rights with respect to any of the foregoing used in or necessary for each Loan Party's business as currently conducted, except for those the failure to own or have rights to use which, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.  The use by each Loan Party of its property and all such rights with respect to the foregoing do not infringe on the rights or other interests of any Person, other than any infringement that could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.  No claim has been made and remains outstanding that any Loan Party's use of any of its property does or may violate the rights of any third party that, individually or in the aggregate, has had, or could reasonably be expected to result in, a Material Adverse Effect.  The Real Property is zoned in all material respects to permit the uses for which such Real Property is currently being used.  The present uses of the Real Property and the current operations of each Loan Party's business do not violate in any material respect any provision of any applicable building codes, subdivision regulations, fire regulations, health regulations or building and zoning by-laws.

**Section 3.06**    **Intellectual Property.**  (a)  Each Loan Party owns or is licensed to use, free and clear of all Liens (other than Permitted Liens), all patents and patent applications, trademarks, trade names, service marks, copyrights, domain names and applications for registration thereof, and technology, trade secrets, proprietary information, inventions, know-how and processes, in each case necessary for the conduct of its business as currently conducted (the "**Intellectual Property**"), except for those the failure to own or license which, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, and the use thereof by such Loan Party does not, to the knowledge of any Loan Party infringe in any material respect upon the rights of any other Person.

(b)      Each Loan Party has obtained the necessary intellectual property licenses that such Loan Party reasonably believes are required for the conduct of its business as currently conducted, the absence of any of which could reasonably be expected to have a Material Adverse Effect.

(c)      With respect to each material license in or to Intellectual Property held by each Loan Party: (i) such license is valid and bind and in full force and effect and represents the entire agreement between the respective licensor and licensee and with respect to the subject matter of such license and (ii) such license will not cease to be valid and binding and in full force and effect on terms identical to those currently in effect as a result of the rights and interests granted herein, nor will the grant of such rights and interests constitute a breach or default under such license or otherwise give the licensor or sublicensor a right to terminate such license.

**Section 3.07    Equity Interests and Subsidiaries.** (a) Guarantor has no Subsidiaries other than Borrower.  Borrower has no Subsidiaries. All Equity Interests of each Loan Party are duly and validly issued and are fully paid and non-assessable.  All Equity Interests of Borrower are owned directly by Guarantor.  Each Loan Party is the record and beneficial owner of, and has good and marketable title to, the Equity Interests pledged by (or purporting to be pledged by) it under the Security Documents, free of any and all Liens, rights or claims of other Persons, except the security interest created by the Security Documents and any Permitted Liens that arise by operation of applicable Legal Requirements and are not voluntarily granted, and, as of the Closing Date, there are no outstanding warrants, options or other rights (including derivatives) to purchase, or shareholder, voting trust or similar agreements outstanding with respect to, or property that is convertible into, or that requires the issuance or sale of, any such Equity Interests (or any economic or voting interests therein).

(b)         An accurate organizational chart, showing CarbonLITE Holdings and each of its Subsidiaries as of the Closing Date, and after giving effect to the Transactions, is set forth on Schedule 3.07(b).

**Section 3.08    Litigation; Compliance with Legal Requirements.** (a)  Except for the Cases, there are no actions, suits, claims, disputes or proceedings at law or in equity by or before any Governmental Authority now pending or, to the best of the knowledge of any Loan Party, threatened against or affecting any Loan Party or any business, property or rights of any Loan Party (i) that purport to affect or involve any Loan Document or any of the Transactions or (ii) that have resulted, or as to which there is a reasonable possibility of an adverse determination and that, if adversely determined, could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

**Section 3.09    Material Agreements.** To the knowledge of any Responsible Officer of any Loan Party, each Material Agreement with liabilities of, or revenues to, the Loan Parties in excess of $500,000 (the "**Specified Material Agreements**") in existence on the Closing Date is listed on Schedule 3.09.  The copies of each of the Specified Material Agreements, and any amendments thereto provided or to be provided by any Loan Party to the Administrative Agent are, or when delivered will be, true and complete copies of such agreements and documents.  Except as permitted under Section 6.11 or disclosed on Schedule 3.09, as of the Closing Date, to the knowledge of any Responsible Officer of any Loan Party, no termination event has occurred under any Specified Material Agreement, each Specified Material Agreement is in full force and effect, and no Loan Party has received any written notice of a material default, expiration, breach or termination pursuant to any Specified Material Agreement.   To the knowledge of any Responsible Officer of any Loan Party, except as disclosed on Schedule 3.09, each Loan Party is in compliance in all material respects with the terms of the Specified Material Agreements to which it is a party, excluding any effects arising from the filing of the Cases or from any action required to be taken under the Loan Documents under the DIP Orders.  To the knowledge of any Responsible Officer of any Loan Party, no Material Counterparty is in default of any of its obligations under any Specified Material Agreement other than defaults which, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

**Section 3.10    Federal Reserve Regulations.** (a)  No Loan Party is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing, buying or carrying Margin Stock.

(b)         No part of the proceeds of any Credit Extension will be used, whether directly or indirectly, and whether immediately, incidentally or ultimately, for any purpose that entails a violation of, or that is inconsistent with, the provisions of the regulations of the Board, including Regulation T, U or X.  The pledge of the Securities Collateral pursuant to the Security Agreement does not violate such regulations.

Section 3.11    **Investment Company Act, etc.**  No Loan Party is (a) an "investment company" or a company "controlled" by an "investment company," as defined in, or subject to regulation under, or required to be registered pursuant to, the Investment Company Act of 1940, as amended, or (b) subject to regulation under any Legal Requirement (other than Regulation X) that limits its ability to incur, create, assume or permit to exist Indebtedness or grant any Contingent Obligation in respect of Indebtedness.

Section 3.12    **Use of Proceeds.**  Borrower will use the proceeds of any Borrowing and Withdrawal solely in accordance with Section 5.08.

Section 3.13    **Taxes.**  (a) Except for Taxes that need not be paid pursuant to an order of the Bankruptcy Court or pursuant to the Bankruptcy Code and are listed on Schedule 3.13 and Taxes that are being contested in good faith by appropriate proceedings and for which such Loan Party has set aside on it its books adequate reserves in accordance with GAAP, duly and timely paid or caused to be duly and timely paid all material Taxes (whether or not shown on any Tax Return) due and payable by it and all assessments received by it and (b) each Loan Party has timely filed or caused to be timely filed all material federal, state, local and foreign Tax Returns required to have been filed by it and all such Tax Returns are true and correct in all material respects.  Each Loan Party has made adequate provision in accordance with GAAP for all Taxes not yet due and payable.  No Loan Party has knowledge of any proposed or pending tax assessments, deficiencies, audits or other proceedings and no proposed or pending tax assessments, deficiencies, audits or other proceedings have resulted, or could, individually or in the aggregate, reasonably be expected to result, in a Material Adverse Effect.  No Loan Party has ever "participated" in a "reportable transaction" within the meaning of Treasury Regulation Section 1.6011-4. No Loan Party is party to any tax sharing or similar agreement. Property owned by any Loan Party is not subject of any temporary abatement or any other temporary tax reduction.  Each Loan Party has been properly treated as a disregarded entity or a partnership for U.S. federal income tax purposes.

Section 3.14    **No Material Misstatements.**  Borrower has disclosed to the Lenders all agreements, instruments and corporate or other restrictions to which it or Guarantor is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.  None of the reports, financial statements, certificates or other information furnished by or on behalf of Borrower to the Administrative Agent or any Lender in connection with the negotiation of any Loan Document or delivered pursuant thereto (as modified or supplemented by other information so furnished) contained or contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading as of the date such information is dated or certified; *provided* that, with respect to projected financial information, Borrower represents only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time.  The Initial Budget and each Updated Budget and cash flow forecast delivered thereafter are prepared in good faith based upon estimates and assumptions believed by management of Borrower to be reasonable in light of the current conditions and facts known to Borrower at the time delivered.

Section 3.15    **Labor Matters.**  There are no strikes, lockouts or slowdowns against any Loan Party pending or, to the best of the knowledge of the Loan Parties, threatened that have resulted in, or could reasonably be expected to result in, a Material Adverse Effect.  The hours worked by and payments made to employees of any Loan Party have not been in violation of the Fair Labor Standards Act of 1938, as amended, or any other applicable Legal Requirement dealing with such matters in any manner that has resulted in, or could reasonably be expected to result in, a Material Adverse Effect.

Section 3.16    **Agreements with Affiliates.**  Schedule 3.16 sets forth any and all agreements, transactions or series of related transactions among, on the one hand, one or more Loan Parties, and on

the other hand, one or more Affiliates of a Loan Party (other than the Loan Parties), in each case, that involve payment of more than $250,000 and that are in existence as of the Closing Date.

Section 3.17    **Employee Benefit Plans.**  (a)  Except to the extent the failure to comply could reasonably be expected to result in a Material Adverse Effect, each Loan Party and each of its ERISA Affiliates is in compliance with all applicable Legal Requirements, including all applicable provisions of ERISA and the Code and the regulations and published interpretations thereunder, with respect to all Employee Benefit Plans.  Each Employee Benefit Plan complies in all material respects, and is operated and maintained in compliance in all material respects, with all applicable Legal Requirements, including all applicable provisions of ERISA and the Code and the regulations and published interpretations thereunder.  Each Employee Benefit Plan that is intended to qualify under Section 401(a) of the Code has received a favorable determination from the Internal Revenue Service for all required amendments and nothing has occurred which could reasonably be expected to prevent, or cause the loss of, such qualification.

(b)    No ERISA Event has occurred or is expected to occur.  No Pension Plan has any Unfunded Pension Liability.  Except as could not reasonably be expected to result in a Material Adverse Effect (either individually or in the aggregate), within the last six years, no Pension Plan has been terminated, whether or not in a "standard termination" as that term is used in Section 4041 of ERISA, nor has any Pension Plan (determined at any time within the last six years) with an Unfunded Pension Liability been transferred outside of the "controlled group" (within the meaning of Section 4001(a)(14) of ERISA) of any Loan Party or any of its ERISA Affiliates.  Using actuarial assumptions and computation methods consistent with subpart I of subtitle E of Title IV of ERISA, the aggregate liabilities of any Loan Party or any of its ERISA Affiliates to all Multiemployer Plans in the event of a complete withdrawal therefrom, as of the close of the most recent fiscal year of each such Multiemployer Plan, have not resulted in, and could not reasonably be expected to result in, a Material Adverse Effect.

(c)    All Foreign Plans are in material compliance with, and have been established, administered and operated in accordance with, the terms of such Foreign Plans and applicable law.  All contributions or other payments which are due with respect to each Foreign Plan have been made in full and there are no funding deficiencies thereunder, except as would not reasonably be expected to result in a material liability to any Loan Party.  All amounts payable under any Foreign Plan are properly reflected on the financial statements of the applicable Loan Party.

Section 3.18    **Environmental Matters**.

(a)    Except as set forth on Schedule 3.18:

(i)    the Loan Parties and their businesses, operations and Real Property are and have at all times during the Loan Parties' ownership or lease thereof been in compliance in all material respects with, and the Loan Parties have no liability under, any applicable Environmental Law;

(ii)    the Loan Parties (x) have obtained all Environmental Permits required for the conduct of their businesses and operations, and the ownership, operation and use of their Real Property, under all applicable Environmental Laws and (y) are in compliance with the terms and conditions of such Environmental Permits, and all such Environmental Permits are valid and in good standing;

(iii)    there has been no Release or threatened Release or any handling, management, generation, treatment, storage or disposal of Hazardous Materials on, at, under or from any Real Property or facility presently or formerly owned, leased or operated by any of the Loan Parties or

49

their predecessors in interest that has resulted in, or is reasonably likely to result in, material liability or obligations by any of the Loan Parties under Environmental Law or in an Environmental Claim;

(iv)    there is no Environmental Claim pending or, to the knowledge of the Loan Parties, threatened against any of the Loan Parties, or relating to the Real Property currently or formerly owned, leased or operated by any of the Loan Parties or relating to the operations of the Loan Parties, and, to the knowledge of the Loan Parties, there are no actions, activities, circumstances, conditions, events or incidents that are reasonably likely to form the basis of such an Environmental Claim;

(v)    no Loan Party is obligated to perform any action or otherwise incur any expense under Environmental Law, including pursuant to any Order or agreement by which it is bound or has assumed by contract or agreement, and no Loan Party is conducting or financing any Response pursuant to any Environmental Law with respect to any Real Property or any other location;

(vi)    to the best knowledge of the Loan Parties, no Real Property or facility owned, operated or leased by the Loan Parties and, to the knowledge of the Loan Parties, no Real Property or facility formerly owned, operated or leased by any of the Loan Parties or any of their predecessors in interest is (i) listed or proposed for listing on the National Priorities List as defined in and promulgated pursuant to CERCLA or (ii) listed on the Comprehensive Environmental Response, Compensation and Liability Information System promulgated pursuant to CERCLA or (iii) included on any similar list maintained by any Governmental Authority that indicates that any Loan Party has or is reasonably likely to have an obligation to undertake investigatory or remediation obligations under applicable Environmental Laws;

(vii)    there are no underground or aboveground storage tanks, whether empty or containing any Hazardous Material, located on any Real Property; and

(viii)    the execution, delivery and performance of this Agreement and the other Loan Documents and the consummation of the Transactions and the other transactions contemplated hereby and thereby will not require any notification, registration, filing, reporting, disclosure, investigation, remediation or cleanup obligations pursuant to any Governmental Real Property Disclosure Requirements or any other Environmental Law.

**Section 3.19    Insurance.**  Schedule 3.19 sets forth a true, complete and accurate description in reasonable detail of all insurance maintained by each Loan Party as of the Closing Date.  Each Loan Party has insurance in such amounts and covering such risks and liabilities as are customary for companies of a similar size engaged in similar businesses in similar locations or as are otherwise deemed prudent by Borrower, in the exercise of its reasonable business judgment.  All material insurance maintained by the Loan Parties is in full force and effect, all premiums have been duly paid and, except as set forth on Schedule 3.19, no Loan Party has received notice of violation, invalidity or cancellation thereof.  The Premises, and the use, occupancy and operation thereof, comply in all material respects with all Insurance Requirements, and there exists no default under any Insurance Requirement.

**Section 3.20    No Bank Accounts.**  No Loan Party maintains any accounts other than Permitted Accounts.

**Section 3.21    Anti-Terrorism Law; Foreign Corrupt Practices Act.**  (a)  No Loan Party and, to the knowledge of each Loan Party, none of its Affiliates is in violation of, or shall use any proceeds of the Loans in violation of, any Legal Requirements relating to terrorism or money laundering ("**Anti-Terrorism Laws**"), including Executive Order No. 13224 on Terrorist Financing, effective September

24, 2001 (the "**Executive Order**"), and the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Public Law 107-56 (the "**Patriot Act**").

(b)        No Loan Party and to the knowledge of each Loan Party, no Affiliate or broker or other agent of any Loan Party acting or benefiting in any capacity in connection with the Credit Extensions, is currently subject to any U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department ("**OFAC**"); and Borrower will not directly or indirectly use the proceeds of the Loans or otherwise make available such proceeds to any Person, for the purpose of financing the activities of any Person currently subject to any U.S. sanctions administered by OFAC.

(c)        No Loan Party and, to the knowledge of each Loan Party, no Affiliate or broker or other agent of any Loan Party acting in any capacity in connection with the Loans (i) conducts any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of any Person described in <u>Section 3.21(b)</u>, (ii) deals in, or otherwise engages in any transaction relating to, any property or interests in property blocked or frozen pursuant to the Executive Order, or (iii) engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law.

(d)        No Loan Party nor any director or officer, nor to the knowledge of any Loan Party, any agent, employee or other Person acting, directly or indirectly, on behalf of any Loan Party, has, in the course of its actions for, or on behalf of, any Loan Party, directly or indirectly (i) used any corporate funds for any unlawful contribution, gift, entertainment or other unlawful expenses relating to political activity; (ii) made any direct or indirect unlawful payment to any foreign or domestic government official or employee from corporate funds; (iii) violated or is in violation of any provision of the U.S. Foreign Corrupt Practices Act of 1977; or (iv) made any unlawful bribe, rebate, payoff, influence payment, kickback or other unlawful payment to any foreign or domestic government official or employee.

**Section 3.22        <u>Cases; DIP Orders; Secured Super-Priority Obligations</u>.**

(a)        The Cases were commenced on the Petition Date in accordance with applicable Laws and notice thereof was given for (i) the motion seeking approval of the Loan Documents and the Interim Order and, when applicable, Final Order, (ii) the hearing for the entry of the Interim Order, and (iii) the hearing for the entry of the Final Order (*provided* that notice of the final hearing will be given as soon as reasonably practicable after such hearing has been scheduled).

(b)        The provisions of the Loan Documents and the Interim Order (with respect to the period prior to the Final Order Entry Date) or the Final Order (with respect to the period on and after the Final Order Entry Date), as the case may be are effective to create in favor of the Collateral Agent, for the benefit of the Secured Parties, legal, valid and perfected Liens on and security interests in all right, title and interest in the Collateral, having the priority provided for herein and in the Interim Order (with respect to the period prior to the Final Order Entry Date) or the Final Order (with respect to the period on and after the Final Order Entry Date), as the case may be, and enforceable against the Loan Parties.

(c)        After the Interim Order Entry Date, and pursuant to and to the extent permitted in the Interim Order and the Final Order, the Obligations will constitute allowed administrative expense claims in the Cases having priority over all other costs and expenses of the kinds specified in, or ordered pursuant to, Sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provision of the Bankruptcy Code or otherwise, as provided under Section 364(c)(1) of the Bankruptcy Code, subject only to payment of the Carve-Out in accordance with the Orders, and any Claims secured by valid, enforceable, and non-avoidable Liens that (A) are in existence on the Petition

Date and (B) are either perfected as of the Petition Date or perfected subsequent to the Petition Date solely to the extent permitted by Section 546(b) of the Bankruptcy Code.

    (d)  After the Interim Order Entry Date and pursuant to and to the extent provided in the Interim Order and the Final Order, the Secured Obligations will be secured by a valid and perfected Lien on all of the Collateral of the Loan Parties subject, as to priority, to the Carve-Out in accordance with the DIP Orders.

    (e)  The Interim Order (with respect to the period on and after the Interim Order Entry Date and prior to the Final Order Entry Date) or the Final Order (with respect to the period on and after the Final Order Entry Date), as the case may be, is in full force and effect and has not been reversed, stayed (whether by statutory stay or otherwise), vacated, or, without the Administrative Agent's consent, modified or amended.  The Loan Parties are in compliance in all material respects with the Interim Order (with respect to the period on and after he Interim Order Entry Date and prior to the Final Order Entry Date) or the Final Order (with respect to the period on and after the Final Order Entry Date).

    (f)  Notwithstanding the provisions of Section 362 of the Bankruptcy Code, and subject to the applicable provisions of the Interim Order or the Final Order, as the case may be, upon the Maturity Date (whether by acceleration or otherwise) of any of the Obligations, the Administrative Agent and Lenders shall be entitled to immediate payment of such Obligations and to enforce the remedies provided for hereunder or under applicable Laws, without further notice, motion or application to, hearing before, or order from, the Bankruptcy Court.

    (g)  To the best of the Loan Parties' knowledge, the stipulations of the Loan Parties in each of the DIP Orders are true, accurate and correct in all material respects.

    (h)  Subject to the applicable provisions of the Interim Order or the Final Order, as the case may be, neither the Obligations nor the obligations under the Prepetition Bond Documents shall be subject to setoff or recoupment or any such rights under Section 553 of the Bankruptcy Code or otherwise with respect to any claim the Loan Parties may have against the Lenders arising on or before the Petition Date.

    (i)  Pursuant to Section 364(c)(1) of the Bankruptcy Code and the DIP Order, all Obligations and all other obligations of the Loan Parties under the Loan Documents at all times shall constitute allowed Superpriority Claims, and shall at all times be senior to the rights of Loan Parties, the estates of Loan Parties, and any successor trustee or estate representative in the Cases or any subsequent proceeding or case under the Bankruptcy Code, subject only to the Carve-Out.

    (j)  Pursuant to Section 364(c)(2) of the Bankruptcy Code and the DIP Orders, all Obligations are secured by a first priority perfected Lien on all unencumbered assets of the Loan Parties (now existing or hereafter acquired) and all proceeds thereof that were not subject to a perfected, non-avoidable Lien as of the Petition Date, subject only to the Carve-Out.

    (k)  Pursuant to Section 364(c)(3) of the Bankruptcy Code and the DIP Orders, and subject and subordinate in all respects to the Carve-Out, all Obligations are secured by valid, binding, continuing, fully-perfected junior Lien on and security interests in all Collateral that, on or as of the Petition Date, is subject to a valid, perfected and unavoidable senior Liens or valid and non-avoidable senior Liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date as permitted by Section 546(c) of the Bankruptcy Code ("**Permitted Third Party Liens**"), in each case other than the Prepetition Liens.

(l)        Pursuant to Section 364(d)(1) of the Bankruptcy Code, and subject in all respects to the Carve-Out, all Obligations are secured by a perfected first priority senior priming Lien on and security interest in all Collateral, subject and junior to Permitted Third Party Liens.

**Section 3.23    Commercial Activity; Absence of Immunity.**  Each Loan Party is subject to civil and commercial law with respect to its obligations under the Loan Documents, and the making and performance of the Loan Documents by the Loan Parties constitute private and commercial acts rather than public or governmental acts.  The Loan Parties are not entitled to any immunity on the ground of sovereignty or the like from the jurisdiction of any court or from any action, suit, setoff or proceeding, or the service of process in connection therewith, arising under the Loan Documents.

## ARTICLE IV
## CONDITIONS TO CREDIT EXTENSIONS

**Section 4.01    Conditions to Initial Credit Extension.** The obligation of each Lender to fund the initial Credit Extension requested to be made by it shall be subject to the prior or concurrent satisfaction (or waiver) of each of the conditions precedent set forth in this <u>Section 4.01</u>.

(a)        <u>Loan Documents</u>.  The Credit Extensions hereunder and the other Loan Documents shall be satisfactory to the Lenders and there shall have been delivered to the Administrative Agent a properly executed counterpart of each of the Loan Documents.

(b)        <u>Corporate Documents</u>.  The Administrative Agent shall have received:

(i)        a certificate of the secretary or assistant secretary of each Loan Party dated the Closing Date, certifying (A) that attached thereto is a true and complete copy of each Organizational Document of such Loan Party certified (to the extent applicable) as of a recent date by the Secretary of State of the state of its organization, (B) that attached thereto is a true and complete copy of resolutions duly adopted by the Board of Directors of such Loan Party authorizing the execution, delivery and performance of the Loan Documents to which such Person is a party and, in the case of Borrower, the Credit Extensions hereunder, and that such resolutions have not been modified, rescinded or amended and are in full force and effect and (C) as to the incumbency and specimen signature of each officer executing any Loan Document or any other document delivered in connection herewith on behalf of such Loan Party (together with a certificate of another officer as to the incumbency and specimen signature of the secretary or assistant secretary executing the certificate required by this clause (i)); and

(ii)        a certificate as to the good standing (to the extent such concept is legally recognized in the applicable jurisdiction) of each Loan Party as of a recent date, from such Secretary of State.

(c)        <u>Officer's Certificate</u>.  The Administrative Agent shall have received a certificate, dated the Closing Date and signed by the chief executive officer or the chief financial officer of Borrower, confirming compliance with the conditions precedent set forth in this <u>Section 4.01</u> and <u>Sections 4.02(b)</u>, <u>(c)</u> and <u>(d)</u>.

(d)        [Reserved].

(e)        [Reserved].

(f)        [Reserved].

(g)        Bank Regulatory Documentation.  To the extent requested two (2) Business Days prior to the Closing Date, the Administrative Agent and the Lenders shall have received, in form and substance satisfactory to them, all documentation and other information required by bank regulatory authorities or reasonably requested by the Administrative Agent or any Lender under or in respect of applicable Anti-Terrorism Laws or "know-your-customer" Legal Requirements, including the Executive Order.

(h)        Occurrence of Petition Date. The Petition Date shall have occurred, and Borrower and each Guarantor shall be a debtor and debtor-in-possession in the Cases.

(i)        Fees and Expenses.  The Commitment Fee and all fees and expenses required to be paid hereunder and invoiced at least one (1) business day prior to the Closing Date shall have been paid in full in cash or will be paid on the Closing Date out of the initial Credit Extension.   The Administrative Agent shall have received a fully executed copy of the Fee Letter.

(j)        Initial Budget.   The Administrative Agent shall have received the Initial Budget, in form and substance satisfactory to the Required Lenders.

(k)        No Material Adverse Effect.  No change in the business, assets, management, operations, financial condition or prospects of the Loan Parties, other than the filing of the Cases, shall have occurred since the Petition Date, which change has had or would reasonably be expected to have a Material Adverse Effect.

(l)        No Action.   Except for the Cases, there shall exist no unstayed action, suit, investigation, litigation or proceeding pending or (to the knowledge of the Loan Parties) threatened in any court or before any arbitrator or governmental instrumentality (other than the Cases) that would reasonably be expected to have a Material Adverse Effect.

(m)        Material Agreements. To the extent not previously delivered to the Administrative Agent, a copy of each of the Material Agreements executed prior to the Closing Date and any amendments thereto shall have been made available to the Administrative Agent and the Lenders for their review.

(n)        [Reserved].

(o)        DIP Credit Facilities.  The Administrative Agent shall have received copies of the loan documentation evidencing the other DIP Credit Facilities.

(p)        Bankruptcy Related Items.

(i)        The Cases of any of the Loan Parties shall have not been dismissed or converted to cases under Chapter 7 of the Bankruptcy Code.

(ii)        A motion, in form and substance satisfactory to the Required Lenders and the Administrative Agent, seeking approval of the DIP Term Facility, shall have been filed in each of the Cases on the Petition Date.

(iii)        All "first day" orders and all related pleadings intended to be entered on or prior to the Interim Order Entry Date shall have been entered by the Bankruptcy Court and shall be reasonably acceptable in form and substance to the Required Lenders and the Administrative Agent.

(iv)    Borrower shall have made no payments after the Petition Date on account of any Indebtedness arising prior to the Petition Date unless such payment is made (x) with the consent of the Required Lenders or (y) pursuant to "first day" orders acceptable to the Required Lenders.

(v)    No trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code or examiner (other than a fee examiner) shall have been appointed in any of the Cases.

(vi)    The Interim Order Entry Date shall have occurred not later than three (3) calendar days following the Petition Date, and the Interim Order shall be in full force and effect and shall not have been vacated or reversed, shall not be subject to a stay, and shall not have been modified or amended in any respect without the prior written consent of the Required Lenders.

Each Lender, by delivering its signature page to this Agreement, and funding its Loans on the Closing Date, shall be deemed to have acknowledged receipt of, and consented to and approved or accepted or to be satisfied with, each Loan Document and each other document required to be approved by, acceptable or satisfactory to any Agent, the Required Lenders or any Lenders, as applicable, on the Closing Date.

**Section 4.02    Conditions to All Credit Extensions and Withdrawals.**  The obligation of each Lender to make any Credit Extension (including the initial Credit Extension on the Closing Date) and Borrower's right to make a Withdrawal from the Funding Date on each Withdrawal Date, shall be subject to, and to the satisfaction of, each of the conditions precedent set forth below.

(a)    Notice.  The Administrative Agent shall have received a Borrowing Request as required by Section 2.03 if Loans are being requested or a Funding Account Withdrawal Notice (and all other required deliveries under Section 2.17) if a Withdrawal from the Funding Account is being requested.

(b)    No Default.  Borrower and each other Loan Party shall be in compliance in all material respects with all the terms and provisions set forth herein and in each other Loan Document on its part to be observed or performed, and, at the time of and immediately after giving effect to such Credit Extension or Withdrawal and the application of the proceeds thereof, no Default or Event of Default shall have occurred and be continuing on such date.

(c)    Representations and Warranties.  Each of the representations and warranties made by any Loan Party set forth in Article III or in any other Loan Document shall be true and correct in all material respects on and as of the date of such Credit Extension or Withdrawal with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct in all material respects on and as of such earlier date); *provided* that any representation and warranty that is qualified as to "materiality", "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such respective dates.

(d)    DIP Orders.  The Interim Order or the Final Order, as the case may be, shall be in full force and effect, and shall not (in whole or in part) have been reversed, modified, amended, stayed, vacated or subject to a stay pending appeal.

(e)    Second Day Orders.  With regard to any Credit Extension after the Closing Date, all "second day orders" approving on a final basis any "first day orders" intended to be entered on or prior to the Final Order Entry Date shall have been entered by the Bankruptcy Court, shall be acceptable to the Required Lenders, shall be in full force and effect, shall not have been vacated or

reversed, shall not be subject to a stay and shall not have been modified or amended other than as reasonably acceptable to the Required Lenders (or the Administrative Agent at the direction of the Required Lenders).

(f)    Entry of Final Order.  With respect to any Withdrawal Date that is on or after the date which is thirty-five (35) days following the Interim Order Entry Date, the Final Order shall have been signed and entered by the Bankruptcy Court, and such order shall be in full force and effect and shall not have been reversed, modified, amended, stayed or vacated absent the prior written consent of the Required Lenders.

(g)    DIP Credit Facilities. The "Interim DIP Order" (as defined in the Orion DIP Term Loan Facility), the "Interim Financing Order" (as defined in the California DIP ABL Credit Facility), the "Final DIP Order" (as defined in the Orion DIP Term Loan Facility) and the "Final Financing Order" (as defined in the California DIP ABL Credit Facility), as the case may be, shall be acceptable in form and substance to the Required Lenders and the Administrative Agent and shall be in full force and effect, and shall not (in whole or in part) have been reversed, modified, amended, stayed, vacated or subject to a stay pending appeal.

Each Borrowing Request or Funding Account Withdrawal Notice submitted by Borrower after the Closing Date shall be deemed to be a representation and warranty that the conditions specified in Section 4.02(b), (c), (d), (e), (f) and (g) have been satisfied on and as of the date of the applicable Credit Extension.

## ARTICLE V
## AFFIRMATIVE COVENANTS

Each Loan Party warrants, covenants and agrees with the Administrative Agent, the Collateral Agent and each Lender that so long as this Agreement shall remain in effect and until the Commitments have been terminated and the principal of and interest and premium (if any) on each Loan and all Fees and all other expenses or amounts payable under any Loan Document shall have been paid in full in cash, each Loan Party will, and will cause each of its Subsidiaries to, at their sole cost and expense:

**Section 5.01    Financial Statements, Reports, etc.**  Furnish to the Administrative Agent (for prompt distribution to each Lender):

(a)    Quarterly Reports.  As soon as available and in any event within forty-five (45) days after the end of each fiscal quarter of each fiscal year, the consolidated balance sheet of Guarantor as of the end of such fiscal quarter and related consolidated statements of income and cash flows for such fiscal quarter and for the then elapsed portion of the fiscal year, in comparative form with the consolidated statements of income and cash flows for the comparable periods in the previous fiscal year (if any)], all prepared in accordance with GAAP and accompanied by a certificate of a Financial Officer stating that such financial statements fairly present, in all material respects, the consolidated financial condition, results of operations and cash flows of Borrower as of the date and for the periods specified in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes;

(b)    Monthly Reports.  As soon as available and in any event within thirty (30) days after the end of each fiscal month, the consolidated balance sheet of Guarantor as of the end of such fiscal month and related consolidated statements of income and cash flows for such fiscal month and for the then elapsed portion of the fiscal year, in comparative form with the consolidated statements of income and cash flows for the comparable periods in the previous fiscal year, all prepared in accordance

with GAAP and accompanied by a certificate of a Financial Officer stating that such financial statements fairly present, in all material respects, the consolidated financial condition, results of operations and cash flows of Borrower as of the date and for the periods specified in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes;

(c)      Updated Budget.  Following a request by the Administrative Agent (acting at the direction of the Required Lenders) for an Updated Budget, by no later than by 5:00 p.m. (New York City time) on the first Wednesday after such request of the Administrative Agent (or, to the extent such Wednesday is not a Business Day, the next Business Day thereafter), an Updated Budget covering the 13-week period beginning on the first day of the week in which it is delivered.  Each Updated Budget delivered after the Closing Date shall be subject to the consent of the Required Lenders and no such Updated Budget shall be effective as the Approved Budget until so approved; *provided,* that in the event the Required Lenders have not approved an Updated Budget as being the "Approved Budget" within five (5) Business Days after delivery thereof, the then-existing Approved Budget shall continue to constitute the Approved Budget and shall continue to be effective, including for testing purposes, until such time as an Updated Budget is approved by the Required Lenders; *provided*, *further* that Administrative Agent and the Lenders (i) may assume that the Loan Parties will comply with the Approved Budget, (ii) shall have no duty to monitor such compliance, (iii) shall not be obligated to pay (directly or indirectly from the Collateral) any unpaid expenses incurred or authorized to be incurred pursuant to any Approved Budget, (iv) the line items in the Approved Budget for payment of interest, expenses and other amounts to the Administrative Agent and the Lenders shall be estimates only, and the Loan Parties remain obligated to pay any and all Obligations in accordance with the terms of the Loan Documents and the applicable DIP Order regardless of whether such amounts exceed such estimates, and (v) nothing in any Approved Budget  shall constitute an amendment or other modification of any Loan Document, and (vi) for the avoidance of doubt, Approved Budgets will be the only basis for measuring Budget variance covenants;

(d)      13-Week Cash Flow Forecast, Liquidity Certificate and Flash Revenue Report. No later than 5:00 p.m. (New York City time) on the Wednesday of the fourth (4th) full week after the Closing Date, and on each four (4) week anniversary thereof, to the extent an Updated Budget is not required to be delivered on such day pursuant to Section 5.01(c), a 13-week cash flow forecast for the Loan Parties prepared in a manner consistent with the most recent Budget and otherwise in form and substance satisfactory to, the Required Lenders.  No later than 5:00 p.m. (New York City time) on the first Wednesday after the Closing Date and each Wednesday thereafter (or, to the extent any such Wednesday is not a Business Day, the next Business Day thereafter), (x) a certificate of a Responsible Officer of Borrower reporting Liquidity as of the last Business Day of the immediately preceding week and (y) a flash revenue report, including details in respect of shipments and sales by customer during the immediately preceding week, in form and substance reasonably satisfactory to the Lenders;

(e)      Compliance Certificate.   Concurrently with any delivery of financial statements under Section 5.01(a) or (b) above, a Compliance Certificate certifying that no Default has occurred or, if such a Default has occurred, specifying in reasonable detail the nature and extent thereof and any corrective action taken or proposed to be taken with respect thereto;

(f)      [Reserved].;

(g)      Budget Variance Report.  Together with the delivery of each Updated Budget pursuant to Section 5.01(c) and each 13-week cash flow forecast pursuant to Section 5.01(d), a Budget Variance Report;

(h)      Operating Metrics. No later than 5:00 p.m. (New York City time) on March 17, 2021 (with respect to the weeks ended March 7, 2021 and March 14, 2021) and each Tuesday

thereafter, in each case, with respect to the immediately preceding week (ending on Sunday of such immediately preceding week), schedules detailing certain operating metrics, including, without limitation, shipments by customer, bale consumed, flake production, flake purchases, pellet production, bale inventory, pellet inventory and utilization, such schedules to be in form and substance satisfactory to the Lenders.

(i)        Certification of Public Information.  Borrower and each Lender acknowledge that certain of the Lenders may be Public Lenders and, if documents or notices required to be delivered pursuant to this Section 5.01 or otherwise are being distributed through a Platform, any document or notice that Borrower has not specifically labeled "Public—Contains Only Public Information" shall not be posted on that portion of the Platform designated for such Public Lenders.  If Borrower has not so labeled a document or notice delivered pursuant to this Section 5.01, the Administrative Agent reserves the right to post such document or notice solely on that portion of the Platform designated for Lenders who wish to receive material Non-Public Information with respect to Borrower, its Subsidiaries and their securities.  Notwithstanding anything in any Loan Document to the contrary, documents required to be delivered pursuant to Section 5.01(b) may be posted on that portion of the Platform designated for Public Lenders regardless of whether Borrower has or has not specifically labeled any such document "Public—Contains Only Public Information";

(j)        Bank Accounts.  Within five (5) Business Days of the end of each calendar month, in electronic format, an itemized summary of all withdrawals from the Permitted Accounts made during such calendar month; and

(k)        Other Information.  Promptly, from time to time, such other information regarding the operations, business affairs and financial condition of CarbonLITE Holdings or any of its Subsidiaries (including, without limitation, balance sheets and related statements of income and cash flow for CarbonLite Industries LLC and PinnPack), or compliance with the terms of any Loan Document, or the environmental condition of any Real Property, or the 363 sale process as the Administrative Agent or any Lender may reasonably request.

**Section 5.02    Litigation and Other Notices.**  Furnish to the Administrative Agent and each Lender written notice of the following promptly (and, in any event, within five (5) Business Days following the date on which a Responsible Officer obtains knowledge thereof):

(a)        any Default or Event of Default, specifying the nature and extent thereof and the corrective action (if any) taken or proposed to be taken with respect thereto;

(b)        the filing or commencement of, or any threat or notice of intention of any Person to file or commence, any action, suit, litigation or proceeding (other than before the Bankruptcy Court), whether at law or in equity or otherwise by or before any Governmental Authority, (i) against CarbonLITE Holdings or any Subsidiary or Affiliate thereof that has had, or could reasonably be expected to result in, a Material Adverse Effect, (ii) with respect to any Loan Document or any of the other DIP Credit Facilities or (iii) with respect to any of the other Transactions;

(c)        any development that has resulted, or could reasonably be expected to result, in a Material Adverse Effect after the Petition Date;

(d)        the occurrence of a Casualty Event in excess of $500,000 (whether or not covered by insurance);

(e)        the occurrence of any ERISA Event or any event with respect to a Foreign Plan, that, alone or together with any other ERISA Events or any other events with respect to a Foreign Plan that have occurred, could reasonably be expected to result in liability of the Loan Parties in an aggregate amount exceeding $100,000;

(f)        the receipt by any Loan Party of any notice of any Environmental Claim or violation of or potential liability under, or knowledge by any Loan Party that there exists a condition that has resulted, or could reasonably be expected to result, in an Environmental Claim or a violation of or liability under, any Environmental Law, except for Environmental Claims, violations and liabilities the consequence of which, in the aggregate, have not and could not be reasonably likely to subject the Loan Parties collectively to liabilities exceeding $100,000;

(g)        (i) the incurrence of any Lien (other than Permitted Collateral Liens) on, or claim asserted against, all or any substantial portion of the Collateral or (ii) the occurrence of any other event which could reasonably be expected to materially and adversely affect the value of the Collateral (other than the commencement of the Cases and related matters);

(h)        no later than five (5) Business Days prior to the execution and delivery thereof (which period may be shortened in any instance at the Administrative Agent's discretion), notice of any amendment to any Material Agreement;

(i)        within ten (10) Business Days of any documents becoming available, true and complete copies of any amendment of any Material Agreement and of any Material Agreements executed after the Closing Date;

(j)        within three (3) days of delivery or receipt, copies of all notices (including but not limited to all formal correspondence and all correspondence relating to any potential or anticipated litigation) received from, or delivered to, any counterparty to a Material Agreement or any other vendor or customer agreement that could reasonably be expected to require payments by, or to, the Loan Parties in excess of $50,000, outside the ordinary course of business;

(k)        within five (5) Business Days after the earlier of (i) a Responsible Officer of any Loan Party obtaining knowledge thereof and (ii) receipt of any notice thereof, the occurrence of any material default under any Material Agreements;

(l)        as soon as practicable, and in any event within three (3) days of any documents becoming available, true and complete copies of any Amendment to any DIP Credit Facility (other than this DIP Credit Facility); and

(m)        within three (3) days of delivery or receipt by CarbonLITE Holdings or any of its Subsidiaries, copies of (x) all notices (including but not limited to all formal correspondence and all correspondence relating to any default or potential or anticipated litigation) delivered or received in connection with any of the DIP Credit Facilities (other than this DIP Term Facility) and (y) financial or other periodic reporting provided under any of the DIP Credit Facilities (other than this DIP Term Facility).

**Section 5.03    Existence; Businesses and Properties.**  (a)  Do or cause to be done all things necessary to preserve, renew and maintain in full force and effect its legal existence and all rights and franchises, licenses and permits material to the conduct of its business, except as otherwise expressly permitted under Section 6.05 or Section 6.06.

(b)        Do or cause to be done all things necessary to maintain or cause to be maintained in good repair, working order and condition, ordinary wear and tear excepted, all properties material to the conduct of the business of Borrower and from time to time will make or cause to be made all appropriate repairs, renewals and replacements thereof necessary in order that the business carried on in connection therewith may be properly conducted at all times; *provided* that nothing in this <u>Section 5.03(b)</u> shall prevent any abandonment or other disposition of property or assets permitted to be made pursuant to <u>Section 6.06</u>.

        **Section 5.04    <u>Insurance</u>.** (a) Maintain such insurance, to such extent and against such risks as is customary with companies in the same or similar businesses operating in the same or similar locations or as is otherwise deemed prudent by Borrower in the exercise of its reasonable business judgment, including (i) physical hazard insurance on an "all risk" basis, (ii) commercial general liability against claims for bodily injury, death or property damage covering any and all insurable claims, (iii) business interruption insurance, (v) worker's compensation insurance and such other insurance as may be required by any Legal Requirement and (vi) such other insurance against risks (including "key-man" life insurance) as the Required Lenders may from time to time require (in each case, such policies to be in such form and amounts and having such coverage as may be reasonably satisfactory to the Required Lenders); *provided* that with respect to physical hazard insurance, (x) neither the Required Lenders nor the applicable Loan Party shall agree to the adjustment of any claim thereunder without the consent of the other (such consent not to be unreasonably conditioned, withheld or delayed), and (y) no consent of any Loan Party shall be required during an Event of Default.  Each such policy of insurance maintained by or on behalf of the Loan Parties shall (a) in the case of liability insurance policies, name the Collateral Agent, for the benefit of the Secured Parties, as an additional insured thereunder and (b) in the case of business interruption and casualty insurance policies, contain a lender's loss payable clause or endorsement, reasonably satisfactory in form and substance to the Requisite Lenders, that names the Collateral Agent, for the benefit of the Secured Parties, as the lender's loss payee thereunder, and shall provide that it shall not be canceled or not renewed (i) by reason of nonpayment of premium upon not less than ten (10) days' prior written notice thereof by the insurer to the Collateral Agent (giving the Collateral Agent the right to cure defaults in the payment of premiums) or (ii) for any other reason upon not less than thirty (30) days' (or such shorter number of days as may be agreed to by the Collateral Agent or as may be the maximum number of days permitted by applicable law) prior written notice thereof by the insurer to the Collateral Agent.

        (b)        Notify the Administrative Agent and the Collateral Agent immediately whenever any separate insurance concurrent in form or contributing in the event of loss with that required to be maintained under this <u>Section 5.04</u> is taken out by any Loan Party; and promptly (and, in any event, within five (5) Business Days) deliver to the Administrative Agent and the Collateral Agent a duplicate original copy of such policy or policies.

        (c)        With respect to each Mortgaged Property, obtain flood insurance in such total amount as the Required Lenders may from time to time reasonably require, if at any time the area in which any improvements located on any Mortgaged Property is designated a "flood hazard area" in any Flood Insurance Rate Map published by the Federal Emergency Management Agency (or any successor agency), and otherwise comply with the National Flood Insurance Program as set forth in the Flood Disaster Protection Act of 1973.

        (d)        No Loan Party that is an owner of any Mortgaged Property shall take any action that is reasonably likely to be the basis for termination, revocation or denial of any insurance coverage required to be maintained under such Loan Party's respective Mortgage or that could reasonably be the basis for a defense to any claim under any Insurance Policy maintained in respect of the Premises, and each Loan Party shall otherwise comply in all material respects with all Insurance Requirements in

respect of the Premises; *provided*, *however*, that each Loan Party may, at its own expense and after written notice to the Administrative Agent, (i) contest the applicability or enforceability of any such Insurance Requirements by appropriate legal proceedings, the prosecution of which does not constitute a basis for cancellation or revocation of any insurance coverage required under this Section 5.04 or (ii) cause the Insurance Policy containing any such Insurance Requirement to be replaced by a new policy complying with the provisions of this Section 5.04.

Section 5.05    **Obligations and Taxes.**  (a)  In accordance with the Bankruptcy Code and subject to any required approval by the Bankruptcy Court (it being understood that no Debtor shall be obligated to make any payments hereunder that may, in its reasonable judgment, result in a violation of any applicable law, including the Bankruptcy Code, without an order of the Bankruptcy Court authorizing such payments), pay its material postpetition obligations promptly and in accordance with their terms and pay and discharge promptly when due all material postpetition Taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits or in respect of its property, before the same shall become delinquent or in default, as well as all lawful claims for labor, services, materials and supplies or otherwise that, if unpaid, might give rise to a Lien other than a Permitted Lien upon such properties or any part thereof; *provided* that such payment and discharge shall not be required with respect to any such Tax, assessment, charge, levy or claim so long as (i) the validity or amount thereof shall be contested in good faith by appropriate proceedings timely instituted and diligently conducted and the applicable Loan Party shall have set aside on its books adequate reserves or other appropriate provisions with respect thereto in accordance with GAAP, and (ii) such contest operates to suspend collection of the contested obligation, Tax, assessment or charge and enforcement of a Lien other than a Permitted Lien.

Section 5.06    **Employee Benefits.**  (a)  Comply in all material respects with all applicable Legal Requirements, including the applicable provisions of ERISA and the Code with respect to all Employee Benefit Plans and Foreign Plans and (b) furnish to the Administrative Agent (x) as soon as possible after, and in any event within five (5) Business Days after any Responsible Officer of any Loan Party or any ERISA Affiliate of any Loan Party knows or has reason to know that, any ERISA Event or other event with respect to an Employee Benefit Plan or Foreign Plan has occurred that, alone or together with any other ERISA Event could reasonably be expected to result in liability of the Loan Parties or any of their ERISA Affiliates in an aggregate amount exceeding $1,000,000 or the imposition of a Lien, a statement of a Financial Officer of Borrower setting forth details as to such ERISA Event and the action, if any, that the Loan Parties propose to take with respect thereto, and (y) upon request by the Administrative Agent, copies of (i) annual report (Form 5500 Series) filed by any Loan Party or any of its ERISA Affiliates with the Employee Benefits Security Administration with respect to each Employee Benefit Plan; (ii) the most recent actuarial valuation report for each Pension Plan; (iii) all notices received by any Loan Party or any of its ERISA Affiliates from a Multiemployer Plan sponsor or any governmental agency concerning an ERISA Event; and (iv) such other information, documents or governmental reports or filings relating to any Employee Benefit Plan or Foreign Plan as the Administrative Agent shall reasonably request.

Section 5.07    **Maintaining Records; Access to Properties and Inspections;.**  Keep proper books of record and account in which full, true and correct entries in conformity with GAAP and all Legal Requirements are made of all dealings and transactions in relation to its business and activities. Each Loan Party will permit any representatives designated by the Administrative Agent or any Lender (i) to visit and inspect the financial records and the property of such Loan Party upon reasonable prior notice and at reasonable times, and (ii) to make extracts from and copies of such financial records, and permit any representatives designated by the Administrative Agent (or, upon the occurrence and during the continuation of any Event of Default, any Lender) to discuss the affairs, finances, accounts and condition

of any Loan Party with the officers and employees thereof, advisors therefor (including independent accountants) and the Chief Restructuring Officer.

Section 5.08    Use of Proceeds.    Use the proceeds of the Initial Term Loans solely in accordance with the DIP Orders and the Approved Budget, (i) to pay fees and expenses in connection with the Loan Documents, (ii) for working capital of the Loan Parties following the commencement of the Cases, and (iii) to make payments in respect of Adequate Protection Obligations provided to the trustee and bondholders under the Prepetition Bond Documents as authorized by the Bankruptcy Court in the applicable DIP Order. Except to the extent set forth in the DIP Orders, no proceeds of the DIP Term Facility, any Collateral or any Cash Collateral may be used (i) to finance any investigation (including discovery proceedings), initiation or prosecution of any adversary action, suit, arbitration, proceeding, application, motion or other litigation of any type adverse to the Agents or Lenders, the trustee and bondholders under the Prepetition Bond Documents, or their respective rights and remedies under or in respect of the Loan Documents, the Prepetition Bond Documents, any DIP Order, or any Adequate Protection Obligations provided to the trustee and bondholders under the Prepetition Bond Documents, (ii) in connection with challenging, invalidating, disallowing, recharacterizing, setting aside, avoiding, subordinating, in whole or in part, or taking or attempting to take any other action to render unenforceable, the liens, claims, interests and Adequate Protection Obligations of the Agents and the Lenders or the trustee, lenders and bondholders under the Prepetition Bond Documents, including for the avoidance of doubt, (A) objecting to or contesting the validity, extent, amount, perfection, priority, or enforceability of the obligations under the Loan Documents or the Prepetition Bond Documents or the Liens securing the Loan or the Prepetition Obligations outstanding under the Prepetition Bond Documents, or (B) objecting to or contesting the validity, extent, amount, perfection, priority, or enforceability of the Obligations or the Prepetition Obligations and Liens under the Loan Documents or Prepetition Bond Documents, (iii) for any purpose that is prohibited under the Bankruptcy Code or the DIP Orders, (iv) repayment of existing Indebtedness (other than Adequate Protection Obligations owing to the Prepetition Secured Parties), (v) to make payments or transfers to any Affiliate of a Loan Party that is not a Loan Party, which payment is not provided for in the Approved Budget and (v) to make any payment in settlement of any claim, action or proceeding, before any court, arbitrator or other governmental body, which payment is not provided for in the Approved Budget, without the prior written consent of the Required Lenders.

Section 5.09    Compliance with Environmental Laws; Environmental Reports.    (a) Comply, and use commercially reasonable efforts to cause all lessees and other Persons occupying its properties to comply, in all material respects with all Environmental Laws applicable to its operations and properties; obtain and renew all material environmental permits necessary for its operations and properties; and conduct any remedial action in accordance with Environmental Laws; *provided*, *however*, that none of Borrower shall be required to undertake any remedial action required by Environmental Laws to the extent that its obligation to do so is being contested in good faith and by proper proceedings and appropriate reserves are being maintained with respect to such circumstances in accordance with GAAP.

Section 5.10    Additional Collateral.    Subject to this Section 5.10, with respect to any property acquired after the Closing Date by any Loan Party that is intended to be subject to the Lien created by any of the Security Documents but is not so subject, promptly (and in any event within fifteen (15) Business Days after the acquisition thereof, unless extended by the Required Lenders in writing in their sole discretion) (i) execute and deliver to the Administrative Agent and the Collateral Agent such amendments or supplements to the relevant Security Documents or such other documents as the Administrative Agent or the Required Lenders shall deem necessary or advisable to grant to the Collateral Agent, for its benefit and for the benefit of the other Secured Parties, a Lien on such property subject to no Liens other than Permitted Collateral Liens, (ii) [reserved], and (iii) take all actions necessary to cause such Lien to be duly perfected to the extent required by such Security Documents in accordance with all applicable Legal

Requirements, including, if requested by the Administrative Agent, the filing of financing statements in such jurisdictions as may be reasonably requested by the Administrative Agent. Borrower and the other Loan Parties shall otherwise take such actions and execute and/or deliver to the Collateral Agent such documents as the Administrative Agent or the Required Lenders shall require to confirm the validity, perfection and priority of the Lien of the Security Documents against such after-acquired properties.

Section 5.11 **Security Interests; Further Assurances.** (a) Promptly, upon the reasonable request of the Administrative Agent, the Collateral Agent or any Lender, at the Loan Parties' expense, execute, acknowledge and deliver, or cause the execution, acknowledgment and delivery of, and thereafter register, file or record, or cause to be registered, filed or recorded, in an appropriate governmental office, any document or instrument supplemental to or confirmatory of the Security Documents or otherwise deemed by the Administrative Agent, the Collateral Agent or Required Lenders reasonably necessary or desirable for the continued validity, enforceability, perfection and priority of the Liens on the Collateral covered thereby subject to no other Liens except Permitted Liens, or obtain any consents or waivers as may be necessary or appropriate in connection therewith.

(b) Deliver or cause to be delivered to the Administrative Agent and the Collateral Agent from time to time such other documentation, instruments, consents, authorizations, approvals and Orders in form and substance reasonably satisfactory to the Required Lenders as the Required Lenders shall reasonably deem necessary or advisable to perfect or maintain the validity, enforceability, perfection and priority of the Liens on the Collateral pursuant to the Security Documents.

Section 5.12 **Post-Closing Matters.** (a) <u>Mortgage</u> The Loan Parties shall use commercially reasonable efforts to obtain a Mortgage in respect of Borrower's leasehold interest in the Pennsylvania Facility, together with the deliverables set forth on <u>Schedule 5.12(a)</u>.

(b) <u>Insurance</u>. No later than five (5) Business Days after the Closing Date, the Administrative Agent shall have received a copy of, or a certificate as to coverage under, the insurance policies required by <u>Section 5.04</u> and the applicable provisions of the Security Documents, each of which shall be endorsed or otherwise amended to include a "standard" or "New York" lender's loss payable or mortgagee endorsement (as applicable) and shall name the Collateral Agent, on behalf of the Secured Parties, as additional insured, in form and substance satisfactory to the Administrative Agent and the Collateral Agent.

Section 5.13 **Maintenance of Corporate Separateness.** Satisfy in all material respects, customary corporate, limited liability company or other like formalities, including the accurate maintenance of separate organizational and business records.

Section 5.14 **Hiring Plan.** On or prior to March __, 2021, Borrower shall provide a written hiring plan to the Administrative Agent (for distribution to the Lenders), which shall be in form and substance reasonably satisfactory to the Required Lenders, and thereafter, Borrower shall at all times thereafter remain in compliance with the terms thereof.

Section 5.15 **Priority of Liens.** Each Loan Party hereby covenants, represents and warrants that, upon entry of the Interim Order (and when applicable, the Final Order) and to the extent provided for in such Order, its Obligations hereunder and under the other Loan Documents:

(a) pursuant to Section 364(c)(1) of the Bankruptcy Code, shall at all times constitute an allowed Superpriority Claim payable from and have recourse to all pre- and post-petition property of the Debtors and all proceeds thereof (including Avoidance Proceeds), having the priority of the Liens in respect of the DIP Term Facility as set forth in the DIP Order;

(b)         pursuant to Sections 364(c)(2), (c)(3) and (d)(1) of the Bankruptcy Code and subject to the Carve-Out to the extent provided in the Orders, shall be secured by a Lien on all Collateral of the Loan Parties, which Lien shall have the priority of the Liens in respect of the DIP Term Facility as set forth in the DIP Orders; and

(c)         shall not be subject or subordinate to (i) any lien or security interest that is avoided and preserved for the benefit of the Loan Parties and their estates under Section 551 of the Bankruptcy Code or (ii) unless otherwise provided for in the Loan Documents, any liens arising after the Petition Date including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other domestic or foreign governmental unit (including any regulatory body), commission, board or court for any liability of the Loan Parties.

For the avoidance of doubt, the Collateral shall exclude Avoidance Actions, but shall include Avoidance Proceeds upon entry of the Final Order.

Subject to and effective only upon the Final Order Entry Date and the terms of the Final Order, except to the extent of the Carve-Out, no costs or expenses of administration of the Cases or any future proceeding that may result therefrom, including a case under Chapter 7 of the Bankruptcy Code, shall be charged against or recovered from the Collateral pursuant to Sections 105 or 506(c) of the Bankruptcy Code, the enhancement of collateral provisions of Section 552 of the Bankruptcy Code, or any other legal or equitable doctrine (including, without limitation, unjust enrichment) or any similar principle of law, without the prior written consent of the Administrative Agent and the Required Lenders, with respect to their respective interests, and no consent shall be implied from any action, inaction or acquiescence by the Administrative Agent or the Lenders. In no event shall the Administrative Agent or the Lenders be subject to (i) the "equities of the case" exception contained in Section 552(b) of the Bankruptcy Code (subject only to and effective upon entry the Final Order Entry Date), or (ii) the equitable doctrine of "marshaling" or any other similar doctrine with respect to the Collateral.

Except for the Carve-Out, subject to the entry of the DIP Orders and the terms thereof, the Superpriority Claims shall at all times be senior to the rights of Borrower, any Chapter 11 trustee and, subject to Section 726 of the Bankruptcy Code, any Chapter 7 trustee, or any other creditor (including, without limitation, post-petition counterparties and other post-petition creditors) in the Cases or any subsequent proceedings under the Bankruptcy Code, including, without limitation, any Chapter 7 cases (if any of the Cases are converted to cases under Chapter 7 of the Bankruptcy Code).

Each Loan Party hereby confirms and acknowledges that, pursuant to the Interim Order (and, when entered, the Final Order), the Liens on the Collateral of the Loan Parties in favor of the Collateral Agent on behalf of and for the benefit of the Secured Parties in all of the assets of the Loan Parties shall be created and (to the extent the Interim Order (and, when entered, the Final Order) is effective to perfect under local law) perfected, without the necessity of the execution, recordation of filings by any Loan Party of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the Collateral Agent of, or over, any Collateral of the Loan Parties, as set forth in the Interim Order and the Final Order, as applicable.

**Section 5.16    Milestones.**  The Loan Parties shall ensure the satisfaction of the following milestones (collectively, the "**Milestones**" and each a "**Milestone**"), unless waived or extended with the consent of the Required Lenders or the Administrative Agent (with the written consent of the Required Lenders):

(a)         No later than three (3) days after the Petition Date, the Bankruptcy Court shall enter the Interim Order;

(b)        No later than thirty-five (35) days after the Petition Date, the Bankruptcy Court shall enter the Final Order;

(c)        The Debtors shall have filed a motion with the Bankruptcy Court, in form and substance satisfactory to the Required Lenders, no later than ten (10) days after the Petition Date, seeking approval of bid procedures for a sale pursuant to Section 363 of the Bankruptcy Code of all or a portion of the Loan Parties' assets (the "**Bidding Procedures**");

(d)        No later than thirty (30) days after the Petition Date, the Bankruptcy Court shall have entered the order approving the Bidding Procedures (the "**Bidding Procedures Order**"), acceptable to the Required Lenders;

(e)        If qualifying bids are received in accordance with the Bidding Procedures Order, no later than sixty (60) days after entry of the Bidding Procedures Order, an auction shall have been conducted;

(f)        No later than sixty-five (65) days after the Petition Date, the Bankruptcy Court shall have entered an order approving the sale of all or substantially all of the Loan Parties' assets that either (i) pays all Obligations and all Prepetition Obligations in full, in cash or (ii) is acceptable to the Required Lenders in their sole discretion (an "**Acceptable Sale**") to a successful bidder in accordance with the Bidding Procedures Order, in form and substance acceptable to the Required Lenders;

(g)        The closing of an Acceptable Sale shall have occurred no later than seventy-five (75) days after the Petition Date, *provided* that if regulatory approvals associated with an Acceptable Sale remain pending as of such date, such date shall be automatically extended to the date that is the third Business Day following receipt of all necessary regulatory approvals;

(h)        Not later than March 31, 2021, the third of three Starlinger extrusion lines shall have been fully installed, commissioned and operational at the Pennsylvania Facility; and

(i)        Not later than April 30, 2021, the 2t/hr. and the 7t/hr. wash lines and related de-baling equipment shall have been fully installed, commissioned and operational at the Pennsylvania Facility.

Notwithstanding the foregoing, if the Loan Parties decide to pursue the consummation a Chapter 11 plan of reorganization in lieu of a sale of all or substantially of their assets pursuant to Section 363 of the Bankruptcy Code, then in lieu of the Milestones set forth in clauses (c) through (g) above, the following Milestones shall apply:

(a)        The Loan Parties shall file with the Bankruptcy Court by no later than April 8, 2021, an Acceptable Plan and Acceptable Disclosure Statement;

(b)        The Bankruptcy Court shall enter an Acceptable Disclosure Statement Order by no later than May 23, 2021;

(c)        The Bankruptcy Court shall enter an Acceptable Confirmation Order by no later than July 6, 2021; and

(d)        The effective date for the Acceptable Plan shall occur by no later than July 21 2021.

**Section 5.17**    **Bankruptcy Related Matters.**  Borrower and Guarantor will:

(a)        cause all proposed (i) "first day" orders, (ii) "second day" orders, (iii) orders related to or affecting the Obligations, the Prepetition Obligations, the Loan Documents and the Prepetition Bond Documents, any other financing or use of Cash Collateral, any sale or other disposition of Collateral outside the ordinary course, cash management, adequate protection, any plan of reorganization and/or any disclosure statement related thereto, (iv) orders concerning the financial condition of Borrower or other Indebtedness of the Loan Parties or seeking relief under Section 363, 365, 1113 or 1114 of the Bankruptcy Code or Section 9019 of the Federal Rules of Bankruptcy Procedure, and (v) orders establishing procedures for administration of the Cases or approving significant transactions submitted to the Bankruptcy Court, in each case, proposed by the Loan Parties to be in accordance with and permitted by the terms of this Agreement and reasonably acceptable to the Required Lenders in all respects, it being understood and agreed that the forms of orders approved by the Required Lenders prior to the Petition Date are in accordance with and permitted by the terms of this Agreement and are reasonably acceptable in all respects;

(b)        comply with each Order entered by the Bankruptcy Court in connection with the Cases;

(c)        comply in a timely manner with their obligations and responsibilities as debtors-in-possession under the Bankruptcy Code, the Bankruptcy Rules, the Interim Order and the Final Order, as applicable, and any other order of the Bankruptcy Court;

(d)        provide the Administrative Agent and the Lenders with reasonable access to non-privileged information (including historical information) and relevant personnel regarding strategic planning, cash and liquidity management, operational and restructuring activities, in each case subject to customary confidentiality restrictions;

(e)        (i) deliver to the Administrative Agent (for distribution to the Lenders) and to counsel to the Administrative Agent promptly as soon as available but not later than two (2) Business Days prior to filing, copies of pleadings, motions, applications, orders, financial information and other documents to be filed by or on behalf of the Debtors with the Bankruptcy Court in the Cases, or distributed by or on behalf of the Debtors to any official or unofficial committee appointed or appearing in the Cases or any other party in interest related to a plan, a disclosure statement, plan exclusivity, assumption or rejection of executory contracts and unexpired leases, key employee incentive or retention plans, and each such pleading motion and (ii) use reasonable best efforts to deliver any other pleading, motion, application, order, financial information or other document as set forth in, and with the timing set forth in, preceding clause (i) to the Administrative Agent (for distribution to the Lenders) and to counsel to the Administrative Agent and Lenders; and

(f)        if not otherwise provided through the Bankruptcy Court's electronic docketing system, as soon as available, deliver to the Administrative Agent (for distribution to the Lenders) and to counsel to the Administrative Agent promptly as soon as available, copies of all final pleadings, motions, applications, orders, financial information and other documents filed by or on behalf of the Loan Parties with the Bankruptcy Court in the Cases.

**Section 5.18**    **Budget Compliance.**  The Loan Parties shall comply with, and the proceeds of the Loans and all Withdrawals shall be used by the Loan Parties in accordance with, the Approved Budget, subject to Permitted Variances.

**Section 5.19    Lender Calls.**  Upon advance written request of the Lender Advisors, Borrower shall, at its own expense, facilitate and hold calls between the Lender Advisors, on the one hand, and members of Borrower's executive management team and, to the extent appropriate, their advisors, on the other hand, not less than once every week, which calls may also be attended by any Lenders who are not Public Lenders.

**Section 5.20    Chief Restructuring Officer; Investment Banker**.

(a)    Chief Restructuring Officer.

(i)    Borrower shall retain, at all times during which this Agreement remains in effect, on terms and conditions acceptable to the Lenders and at the sole cost and expense of Borrower, Force 10 Partners LLC as represented by Brian Weiss, or such other Person acceptable to the Lenders, in their sole discretion, as its Chief Restructuring Officer.  The Chief Restructuring Officer shall assume in all respects the management of the businesses, accounts and properties of Borrower and shall, among other things, assist in the preparation of the Budget and compliance with the terms and conditions set forth in the Loan Documents. The Chief Restructuring Officer shall report directly to the Board of Directors or Members, as applicable, of Borrower.  Borrower hereby irrevocably authorizes and directs the Chief Restructuring Officer to consult with the Lenders and to share with the Lenders all budgets, records, projections, financial information, reports and other information prepared by or in the possession of the Chief Restructuring Officer relating to the Collateral, or the financial condition or operations of the business of Borrower and respond fully to any inquiries of the Lenders regarding the assets, prospects, business and operations of Loan Parties and communicate and fully cooperate with the Lenders.  Promptly following any request therefor, each Loan Party shall provide, and cause the Chief Restructuring Officer to provide, the Lenders with such information regarding the operations, business affairs and financial condition of Borrower as the Lenders may request.  Borrower agrees to provide the Chief Restructuring Officer with complete access to and supervision over all of the books and records of Borrower, all of the premises of Borrower and to all management and employees of Borrower as and when deemed necessary by the Chief Restructuring Officer.  Borrower shall not amend or modify, or terminate, the retention agreement with the Chief Restructuring Officer without the prior written consent of the Lenders.  If the Chief Restructuring Officer resigns, Borrower shall immediately notify the Lenders in writing and provide the Lenders with a copy of any notice of resignation immediately upon the sending of such notice by such Chief Restructuring Officer.  Any replacement or successor Chief Restructuring Officer shall be acceptable to the Lenders, in their sole discretion, and shall be retained pursuant to a new retention agreement on terms and conditions acceptable to the Lenders within five (5) Business Days immediately following the notice of resignation of the resigning Chief Restructuring Officer, or within such longer period of time as the Lenders may agree in writing.  Failure to comply with the terms and conditions of this Section shall constitute an Event of Default.

(ii)    On [Thursday] of each week, the Loan Parties and Chief Restructuring Officer or his support staff shall have a call with Ankura to give Ankura an update as to the business of the Loan Parties, including without limitation, updates on operations, production volumes, sales, collections, vendor management, employee matters, recent cash disbursements, budget variances, and upcoming expected spending;

(b)    Sales Process.

(i)    On [Thursday] of each week, Borrower shall furnish to Ankura a report acceptable to Ankura (the "**Investment Banker Report**") which shall include: (i) updates on the

process of securing potential investors and/or purchasers, (ii) a list of contacted and target potential investors and/or purchasers, (iii) material feedback from such potential investors and/or purchasers, (iv) upcoming process and discussion in respect of Milestones, (v) copies of all final marketing materials associated with a potential sale of the business, and (vi) copies of any term sheets, bona fide proposals or other relevant information and materials relating to any debtor-in-possession financing proposals from any party for the Loan Parties;

(ii)    On [Thursday] of each week, the Loan Parties and the Investment Banker shall have a call with Ankura to give Ankura an update as to the current marketing process, along with a follow-up email on such date with any requested marketing materials, correspondence and other material information regarding the sales process; and

(iii)    On [Thursday] of each week, a report in form acceptable to Ankura with respect to the immediately prior week ended the last Business Day of such week, setting forth (1) discussion of any and all communications regarding the sales process with critical vendors and customers and (2) to the extent not covered by the Investment Banker Report, copies of any draft terms sheets, proposals or other relevant information and materials relating to the sale process.

**Section 5.21    Material Agreements.**    Other than as consented to by the Administrative Agent (such consent not to be unreasonably withheld, conditioned or delayed), as excused as a consequence of the Cases, or as authorized by an order of the Bankruptcy Court, but without limiting the rights of the Administrative Agent in Section 6.11, each Loan Party shall (a) duly and punctually perform and observe all of its material covenants and obligations contained in each Material Agreement to which it is a party and (b) enforce against the relevant Material Counterparty each material covenant or obligation of such Material Agreement, as applicable, in accordance with its terms.

## ARTICLE VI
## NEGATIVE COVENANTS

Each Loan Party warrants, covenants and agrees with the Administrative Agent, the Collateral Agent and each Lender that, so long as this Agreement shall remain in effect and until the Commitments have been terminated and the principal of and interest and premium (if any) on each Loan. and all Fees and all other expenses or amounts payable under any Loan Document have been paid in full, no Loan Party will, nor will they cause or permit any Subsidiaries to:

**Section 6.01    Indebtedness.**    Incur, create, assume or permit to exist, directly or indirectly, any Indebtedness, except:

(a)    Indebtedness incurred under this Agreement and the other Loan Documents;

(b)    Indebtedness outstanding on the Closing Date and listed on Schedule 6.01(b);

(c)    Indebtedness created under the Prepetition Bond Documents in an aggregate principal amount not to exceed the aggregate principal amount thereunder as of the Petition Date (plus any interest or other amounts capitalized and added thereto in accordance with the DIP Orders) (less any amounts rolled up pursuant to the terms hereof);

(d)    [reserved];

(e)    Indebtedness of Borrower in respect of Purchase Money Obligations and Capital Lease Obligations in an aggregate amount not to exceed $100,000 at any time outstanding;

*provided, however*, that in the case of Purchase Money Obligations, (i) such Indebtedness is incurred within ninety (90) days after such acquisition, installation, construction or improvement of such fixed or capital assets by such Person and (ii) the amount of such Indebtedness does not exceed 100% of the cost of such acquisition, installation, construction or improvement, as the case may be;

(f)        Indebtedness in respect of workers' compensation claims, self-insurance obligations, bankers' acceptances and bid, performance or surety bonds issued for the account of any Loan Party in the ordinary course of business, including guarantees or obligations of any Loan Party with respect to letters of credit supporting such workers' compensation claims, self-insurance obligations, bankers' acceptances and bid, performance or surety obligations (in each case other than for an obligation for money borrowed), in each case consistent with the Approved Budget;

(g)        Contingent Obligations of any Loan Party in respect of Indebtedness otherwise permitted under this <u>Section 6.01</u>; *provided*, that in the event that such Indebtedness in respect of which such Contingent Obligation relates is Subordinated Indebtedness, then the related Contingent Obligation shall be subordinated to the Obligations on the same terms;

(h)        Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently (except in the case of daylight overdrafts) drawn against insufficient funds in the ordinary course of business; *provided, however*, that such Indebtedness is extinguished within five (5) Business Days of incurrence;

(i)        Indebtedness arising in connection with endorsement of instruments for deposit in the ordinary course of business and consistent with the Approved Budget; and

(j)        in each case consistent with the Approved Budget, Indebtedness owed to any Person providing property, casualty, liability, or other insurance to Borrower that is incurred in the ordinary course of business, so long as the amount of such Indebtedness is not in excess of the amount of the unpaid cost of, and shall be incurred only to defer the cost of, such insurance for the period in which such Indebtedness is incurred and such Indebtedness is outstanding only during the period covered by such insurance.

**Section 6.02    Liens.** Create, incur, assume or permit to exist, directly or indirectly, any Lien on any property now owned or hereafter acquired by it or on any income or revenues or rights in respect of any thereof, except the following (collectively, the "**Permitted Liens**"):

(a)        inchoate Liens for taxes, assessments or governmental charges or levies, in each case arising Post-Petition, not yet due and payable or delinquent and Liens for taxes, assessments or governmental charges or levies, which are being contested in good faith by appropriate proceedings promptly initiated and diligently conducted for which adequate reserves have been established in accordance with GAAP, which proceedings (or Orders entered in connection with such proceedings) have the effect of preventing the forfeiture or sale of the property subject to any such Lien, and (i) which do not in the aggregate materially detract from the value of the property of the Loan Parties, taken as a whole, or the Loan Parties, taken as a whole, and do not materially impair the use thereof in the operation of the business of the Loan Parties, taken as a whole, or the Loan Parties, taken as a whole, and (ii) which, if they secure obligations that are then due and unpaid, are being contested in good faith by appropriate proceedings promptly initiated and diligently conducted for which adequate reserves have been established in accordance with GAAP, which proceedings (or Orders entered in connection with such proceedings) have the effect of preventing the forfeiture or sale of the property subject to any such Lien;

(b)        Liens in respect of property of any Loan Party imposed by law, which were incurred in the ordinary course of business and do not secure Indebtedness for borrowed money, such as carriers', warehousemen's, materialmen's, landlords', workmen's, suppliers', repairmen's and mechanics' Liens and other similar Liens arising in the ordinary course of business;

(c)        any Lien in existence on the Closing Date and set forth on Schedule 6.02(c) (any such Lien, an "**Existing Lien**");

(d)        easements, rights-of-way, restrictions (including zoning restrictions), covenants, licenses, encroachments, protrusions, servitudes and other similar charges or encumbrances, and minor title deficiencies, in each case, on or with respect to any Real Property, whether now or hereafter in existence, not (i) securing Indebtedness, (ii) in the aggregate materially impairing the value of such Real Property or (iii) in the aggregate materially interfering with the ordinary conduct of the business of the Loan Parties at or otherwise with respect to such Real Property;

(e)        Liens arising Post-Petition out of judgments, attachments or awards not resulting in a Default and in respect of which such Loan Party shall in good faith be diligently prosecuting an appeal or proceedings for review in respect of which there shall be secured a subsisting stay of execution pending such appeal or proceedings;

(f)        Liens (other than any Lien imposed by ERISA) (x) imposed by law or deposits made in connection therewith in the ordinary course of business and subject to the DIP Orders and the terms thereof in connection with workers' compensation, unemployment insurance and other types of social security legislation, (y) incurred in the ordinary course of business to secure the performance of tenders, statutory obligations (other than excise taxes), surety, stay, customs and appeal bonds, statutory bonds, bids, leases, government contracts, trade contracts, performance and return of money bonds and other similar obligations (in each case, exclusive of obligations for the payment of Indebtedness) or (z) arising by virtue of deposits made, subject to the DIP Orders and the terms thereof, in the ordinary course of business to secure liability for premiums to insurance carriers; *provided* that (i) with respect to clauses (x), (y) and (z) of this Section 6.02(f), such Liens are for amounts not yet due and payable or delinquent or, to the extent such amounts are so due and payable, such amounts are being contested in good faith by appropriate proceedings for which adequate reserves have been established in accordance with GAAP, which proceedings (or Orders entered in connection with such proceedings) have the effect of preventing the forfeiture or sale of the property subject to any such Lien, and (ii) to the extent such Liens are not imposed by Legal Requirements, such Liens shall in no event encumber any property other than cash and Cash Equivalents;

(g)        Leases of the properties of any Loan Party, in each case entered into in the ordinary course of such Loan Party's business so long as such Leases do not, individually or in the aggregate, (i) interfere in any material respect with the ordinary conduct of the business of any Loan Party or (ii) materially impair the use (for its intended purposes) or the value of the property subject thereto;

(h)        Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale of goods entered into by any Loan Party in the ordinary course of business in accordance with the past practices of such Loan Party;

(i)        bankers' Liens, rights of setoff and other similar Liens existing solely with respect to cash and Cash Equivalents on deposit in one or more accounts maintained by any Loan Party, in each case granted in the ordinary course of business in favor of the bank or banks with which such accounts are maintained, securing amounts owing to such bank with respect to cash management and operating account arrangements, including those involving pooled accounts and netting arrangements;

*provided* that, unless such Liens are non-consensual and arise by operation of applicable Legal Requirements, in no case shall any such Liens secure (either directly or indirectly) the repayment of any Indebtedness;

(j)        Liens securing the Secured Obligations;

(k)        licenses of Intellectual Property granted by any Loan Party in the ordinary course of business and not interfering in any material respect with the ordinary conduct of business of the Loan Parties;

(l)        the filing of UCC financing statements prior to the Petition Date solely as a precautionary measure in connection with operating leases or consignment of goods;

(m)        Liens of a collecting bank arising in the ordinary course of business under Section 4-208 of the UCC (or any equivalent provision of the UCC) covering only the items being collected upon;

(n)        Liens in the nature of the right of setoff in favor of counterparties to contractual agreements with Borrower in the ordinary course of business; and

(o)        Liens created under the Prepetition Bond Documents securing the Prepetition Obligations.

**Section 6.03    Sale and Leaseback Transactions.**    Enter into any arrangement, directly or indirectly, with any Person whereby it shall sell or transfer any property used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property or other property which it intends to use for substantially the same purpose or purposes as the property being sold or transferred (a "**Sale and Leaseback Transaction**").

**Section 6.04    Investments, Loans and Advances.**    Directly or indirectly, lend money or credit (by way of guarantee, assumption of debt or otherwise) or make advances to any Person, or purchase or acquire any stock, bonds, notes, debentures or other obligations or securities of, or any other interest in, or make any capital contribution to, any other Person, or create, purchase or other acquisition of the Equity Interests of any Subsidiary (or other Person that following such creation, purchase or other acquisition would be a Subsidiary) or purchase or own a futures contract or otherwise become liable for the purchase or sale of currency or other commodities at a future date in the nature of a futures contract (all of the foregoing, collectively, "**Investments**"), except that the following shall be permitted:

(a)        Investments outstanding on the Closing Date and identified on Schedule 6.04(a);

(b)        the Loan Parties may (i) acquire and hold accounts receivables owing to any of them if created or acquired in the ordinary course of business and payable or dischargeable in accordance with customary terms, (ii) invest in, acquire and hold cash and Cash Equivalents, (iii) endorse negotiable instruments held for collection in the ordinary course of business or (iv) make lease, utility and other similar deposits in the ordinary course of business;

(c)        Investments by Guarantor in Borrower;

(d)        Investments in securities of trade creditors or customers in the ordinary course of business and consistent with such Loan Party's past practices that are received in settlement of

bona fide disputes or pursuant to any plan of reorganization or liquidation or similar arrangement upon the bankruptcy or insolvency of such trade creditors or customers;

      (e)      [reserved];

      (f)      [reserved];

      (g)      acquisitions of property in compliance with Section 6.07 (other than Section 6.07(a)); and

      (h)      Dividends in compliance with Section 6.08.

**Section 6.05**    **Mergers and Consolidations.**  Wind up, liquidate or dissolve its affairs, change its legal form to liquidate or dissolve, or enter into any transaction of merger or consolidation (including, in each case, pursuant to a Delaware LLC Division), or agree to do any of the foregoing at any time, except for dispositions of assets in compliance with Section 6.06 (other than Section 6.06(d) and Section 6.06(e)).

**Section 6.06**    **Asset Sales.**  Effect any Asset Sale, or agree to effect any disposition of any property, except that the following shall be permitted:

      (a)      dispositions consistent with the Approved Budget of obsolete property by Borrower in the ordinary course of business and the abandonment or other disposition of Intellectual Property that is, in the reasonable good faith judgment of Borrower, no longer economically practicable to maintain or useful in the conduct of the business of the Loan Parties taken as a whole;

      (b)      [reserved];

      (c)      [reserved];

      (d)      Investments in compliance with Section 6.04;

      (e)      mergers and consolidations in compliance with Section 6.05;

      (f)      Dividends in compliance with Section 6.08;

      (g)      sales of inventory in the ordinary course of business and dispositions of cash and Cash Equivalents consistent with the Approved Budget and in the ordinary course of business;

      (h)      any disposition of property that constitutes a Casualty Event;

      (i)      [reserved];

      (j)      dispositions of Investments or receivables in connection with the compromise, settlement or collection thereof in the ordinary course of business or in bankruptcy or similar proceedings and exclusive of factoring or similar arrangements;

      (k)      the non-exclusive licensing or sublicensing of intellectual property or other general intangibles and non-exclusive licenses, sublicenses, leases or subleases of other property in the ordinary course of business which do not materially interfere with the business of Borrower.

Section 6.07    **Acquisitions.**    Purchase or otherwise acquire (in one or a series of related transactions) any part of the property of any Person (including through the creation, purchase or other acquisition of the Equity Interests of any Subsidiary (or other Person that following such creation, purchase or other acquisition would be a Subsidiary)) (or agree to do any of the foregoing at any time), except that the following shall be permitted:

(a)    Investments in compliance with Section 6.04;

(b)    Capital Expenditures by Borrower to the extent reflected in the Approved Budget and permitted under Section 6.26;

(c)    purchases and other acquisitions of inventory, materials, equipment and intangible property in the ordinary course of business and consistent with the Approved Budget;

(d)    leases or licenses of real or personal property in the ordinary course of business and in accordance with this Agreement and the applicable Security Documents and consistent with the Approved Budget;

(e)    mergers and consolidations in compliance with Section 6.05; and

(f)    Dividends in compliance with Section 6.08.

*provided* that the Lien on and security interest in such property granted or to be granted in favor of the Collateral Agent under the Security Documents shall be maintained or created in accordance with the provisions of Section 5.10 or Section 5.11, as applicable.

Section 6.08    **Dividends.**    Authorize, declare or pay, directly or indirectly, any Dividends with respect to any Loan Party (including pursuant to any Synthetic Purchase Agreement) or incur any obligation (contingent or otherwise) to do so.

Section 6.09    **Transactions with Affiliates.**    Enter into, directly or indirectly, any transaction or series of related transactions, whether or not in the ordinary course of business, except that the following shall be permitted:

(a)    Dividends permitted by Section 6.08;

(b)    Investments permitted by Section 6.04(g);

(c)    transactions set forth on Schedule 3.16 hereto and reasonable modifications, renewals or extensions thereto as contemplated by the Approved Budget;

(d)    transactions between or among the Loan Parties not involving any other Affiliate; and

(e)    transactions consented to in writing by the Administrative Agent (at the direction of the Required Lenders).

Notwithstanding the foregoing Section 6.09 or anything else contained in this Agreement to the contrary, on and after the Closing Date, no Loan Party directly or indirectly enter into any transaction or series of related transactions with an Affiliate of such Loan Party without the prior written consent of the Administrative Agent (at the direction of the Required Lenders), other than (i) sales of

inventory or assets between Debtors (A) in the ordinary course of such Loan Party's (and such Affiliate's) business and upon fair and reasonable terms no less favorable to such Debtor than it would obtain in comparable arm's-length transactions with a Person acting in good faith which is not an Affiliate, (B) for which the party making payment actually makes full payment in cash upon delivery and (C) expressly referenced in, and permitted by, the Approved Budget, (ii) transactions among the Loan Parties in the ordinary course of business, and (iii) transactions expressly referenced in, and permitted by, by the Approved Budget (it being acknowledged and agreed that no Loan Party shall pay any costs in respect of any non-Loan Party).

For the avoidance of doubt, in no event shall any Loan Party make any voluntary or optional payment or prepayment on or redemption, retirement, defeasance, or acquisition for value of, or any prepayment or redemption as a result of any asset sale, change of control or similar event of, any Indebtedness of an Affiliate (other than a Loan Party).

Notwithstanding anything to the contrary contained herein, the Loan Parties shall not make any payment to (or make any Withdrawal for a payment to be made to) HPC Industries LLC or any Affiliate thereof  (including Leon Farahnik) in respect of the real property located at 10250 Constellation Blvd., Suite 2820, Los Angeles, California, regardless of whether or not such payment is included in the Approved Budget (including to the extent reflected in the Approved Budget as part of any management fee to be paid to HPC Industries LLC), unless Borrower has provided the Administrative Agent with a written request for such payment signed by the Chief Restructuring Officer and such payment is approved by the Required Lenders.

**Section 6.10**    **Minimum Liquidity.**  Permit Liquidity at any time to be less than $1,000,000.

**Section 6.11**    **Prepayments of Other Indebtedness; Modifications of Organizational Documents, Acquisition and Certain Other Documents, etc.**  Directly or indirectly:

(a)    amend, modify, supplement or grant a consent, approval or waiver under, or permit or consent to the amendment, modification, supplement, consent, approval or waiver of (collectively, an "**Amendment**"), (i) the Pennsylvania Lease, (ii) any Material Agreement or (iii) the Texas DIP Credit Facility or the Prepetition Bond Documents, in each case, except to the extent the Chief Restructuring Officer has provided written notice of such request along with a final draft copy of such Amendment to the Administrative Agent as soon as reasonably practicable (and in any event at least five (5) days advance notice) of any such Amendment and has used commercially reasonable efforts to agree with the Administrative Agent (acting at the direction of the Required Lenders) as to the approach taken in respect of such proposed Amendment;

(b)    transfer, terminate, cancel or permit or consent to the transfer, termination or cancellation (including by exercising any contractual option to terminate, or failing to exercise any contractual option to extend) of any Material Agreement, in each case, except to the extent the Chief Restructuring Officer has provided written notice of such request to the Administrative Agent as soon as reasonably practicable (and in any event at least five (5) days advance notice) of any such transfer, termination or cancellation and has used commercially reasonable efforts to agree with the Administrative Agent (acting at the direction of the Required Lenders) as to the approach taken (including whether to transfer, terminate or cancel such Material Agreement);

(c)    enter into any Material Agreement, except to the extent the Chief Restructuring Officer has provided written notice of such request and a final draft copy of such Material Agreement to the Administrative Agent as soon as reasonably practicable (and in any event at least five (5) days advance notice) of any such new Material Agreement and has used commercially reasonable

efforts to agree with the Administrative Agent (acting at the direction of the Required Lenders) as to the approach taken (including whether to so enter such Material Agreement);

(d)        make or offer to make (or give any notice in respect thereof) any voluntary or optional payment or prepayment on or redemption, retirement, defeasance, or acquisition for value of, or any prepayment or redemption as a result of any asset sale, change of control or similar event of, any Subordinated Indebtedness or any Indebtedness (including pursuant to any Synthetic Purchase Agreement) incurred prior to the Petition Date;

(e)        amend or modify any of its Organizational Documents to the extent any such amendment, modification or waiver would be materially adverse to the Lenders;

(f)        terminate, amend, modify (including electing to treat any Pledged Interests (as defined in the Security Agreement) as a "security" under Section 8-103 of the UCC) or change any of its Organizational Documents (including by the filing or modification of any certificate of designation) or any agreement to which it is a party with respect to its Equity Interests (including any stockholders' agreement), or enter into any new agreement with respect to its Equity Interests;

(g)        amend the "Interim DIP Order" (as defined in the Orion DIP Term Loan Facility), the "Interim Financing Order" (as defined in the California DIP ABL Credit Facility), the "Final DIP Order" (as defined in the Orion DIP Term Loan Facility) or the "Final Financing Order" (as defined in the California DIP ABL Credit Facility), as the case may be, in a manner adverse to the Lenders, without the prior written consent of the Required Lenders; or

(h)        permit the "Final DIP Order" (as defined in the Orion DIP Term Loan Facility) or the "Final Financing Order" (as defined in the California DIP ABL Credit Facility) to differ from the "Interim DIP Order" (as defined in the Orion DIP Term Loan Facility) or the "Interim Financing Order" (as defined in the California DIP ABL Credit Facility), respectively, in a manner adverse to the Lenders, without the prior written consent of the Required Lenders.

        **Section 6.12    Limitation on Certain Restrictions on Subsidiaries.**  Directly or indirectly, create or otherwise cause or suffer to exist or become effective any encumbrance, restriction or condition on the ability of any Subsidiary to (i) pay Dividends or make any other distributions on its Equity Interests or any other interest or participation in its profits owned by any Loan Party, or pay any Indebtedness owed to any Loan Party, (ii) make loans or advances to any Loan Party or (iii) transfer any of its properties to any Loan Party, except for such encumbrances, restrictions or conditions existing under or by reason of:

(a)        applicable Legal Requirements;

(b)        this Agreement, the other Loan Documents and the Prepetition Bond Documents;

(c)        customary provisions restricting subletting or assignment of any lease governing a leasehold interest of a Subsidiary;

(d)        customary provisions restricting assignment of any agreement entered into by a Subsidiary in the ordinary course of business;

(e)        customary restrictions and conditions contained in any agreement relating to the sale or other disposition of any property pending the consummation of such sale; *provided* that (i)

such restrictions and conditions apply only to the property to be sold, and (ii) such sale or other disposition is permitted hereunder; or

        (f)        agreements listed on <u>Schedule 6.12(f)</u>.

**Section 6.13**   <u>**Business.**</u>  With respect to Borrower, engage (directly or indirectly) in any businesses other than those businesses in which Borrower is engaged on the Closing Date.

**Section 6.14**   <u>**Limitation on Issuance of Capital Stock.**</u>  With respect to any Loan Party, issue any Equity Interest (including by way of sales of treasury stock) or any options or warrants to purchase, or securities convertible into, any Equity Interest, except (i) for stock splits, stock dividends and additional issuances of Equity Interests which do not decrease the percentage ownership of any Loan Party in any class of the Equity Interests of such Loan Party and (ii) Borrower may issue common stock that is Qualified Capital Stock to Guarantor. All Equity Interests issued in accordance with this <u>Section 6.14</u> shall, to the extent required by <u>Sections 5.11</u> and <u>5.12</u> or any Security Document, be delivered to the Collateral Agent for pledge pursuant to the applicable Security Document.

**Section 6.15**   <u>**Limitation on Accounting Changes; Change of  Fiscal Year.**</u>  Make or permit, any material change in accounting policies or reporting practices, without the consent of the Required Lenders, except changes that are required by GAAP. No Loan Party shall change its fiscal year which currently ends on December 31.

**Section 6.16**   <u>**Permitted Accounts.**</u>  No Loan Party shall open or maintain, or instruct any Person to open or maintain, any securities accounts, deposit accounts or other bank accounts other than Permitted Accounts.

**Section 6.17**   <u>**No Further Negative Pledge.**</u>  Enter into any agreement, instrument, deed or lease which prohibits or limits the ability of any Loan Party to create, incur, assume or suffer to exist any Lien upon any of its properties or assets, whether now owned or hereafter acquired, or which requires the grant of any security for an obligation if security is granted for another obligation, except the following: (a) this Agreement and the other Loan Documents and the Prepetition Bond Documents; (b) covenants in documents creating Liens permitted by <u>Section 6.02</u> prohibiting further Liens (other than Liens permitted under <u>Section 6.02(j)</u>) on the properties encumbered thereby; (c) any prohibition or limitation that (i) exists pursuant to applicable Legal Requirements, or (ii) consists of customary restrictions and conditions contained in any agreement relating to the sale of any property pending the consummation of such sale; *provided* that (1) such restrictions apply only to the property to be sold and such sale is permitted hereunder, and (2) such sale is permitted hereunder, or (iii) restricts subletting or assignment of any lease governing a leasehold interest of Borrower or one of its Subsidiaries; (d) prohibitions and limitations contained in any agreement to which a Subsidiary is a party that was in effect at the time such Subsidiary became a Subsidiary of a Borrower, so long as such agreement was not entered into in anticipation or contemplation of such Person becoming a Subsidiary and such prohibitions and limitations only relate to such Subsidiary; (e) customary non-assignment provisions in customer contracts and licenses of (or any other grants of rights to use) Intellectual Property, in each case entered into in the ordinary course of business; and (f) is imposed by any amendments that are otherwise permitted by the Loan Documents of the contracts, instruments or obligations referred to in this <u>Section 6.17</u>; *provided* that such amendments are no more restrictive with respect to the prohibitions and limitations in such contracts, instruments or obligations as in effect prior to any such amendment.

**Section 6.18**   <u>**Anti-Terrorism Law; Anti-Money Laundering.**</u>

(a)        Directly or indirectly, (i) knowingly conduct any business or engage in making or receiving any contribution of funds, goods or services to or for the benefit of any Person described in <u>Section 3.21</u>, (ii) knowingly deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked pursuant to the Executive Order or any other Anti-Terrorism Law, or (iii) knowingly engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law (and the Loan Parties shall deliver to the Lenders any certification or other evidence requested from time to time by any Lender in its reasonable discretion, confirming the Loan Parties' compliance with this <u>Section 6.18</u>).

(b)        Cause or permit any of the funds of such Loan Party that are used to repay the Credit Extensions to be derived from any unlawful activity with the result that the making of the Credit Extensions would be in violation of Legal Requirements.

**Section 6.19    <u>Embargoed Person</u>.**  Cause or permit (a) any of the funds or properties of the Loan Parties that are used to repay the Loans or other Credit Extensions to constitute property of, or be beneficially owned directly or indirectly by, any Person subject to sanctions or trade restrictions under United States law ("**Embargoed Person**" or "**Embargoed Persons**") that is identified on (1) the "List of Specially Designated Nationals and Blocked Persons" maintained by OFAC and/or on any other similar list maintained by OFAC pursuant to any authorizing statute including the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 et seq., The Trading with the Enemy Act, 50 U.S.C. App. 1 et seq., and any Executive Order or regulation promulgated thereunder, with the result that the investment in the Loan Parties (whether directly or indirectly) is prohibited by applicable Legal Requirements, or the Loans or other Credit Extensions made by the Lenders would be in violation of Legal Requirements, or (2) the Executive Order, any related enabling legislation or any other similar executive orders (the Legal Requirements referred to in clauses (1) and (2), collectively, "**Sanctions Laws**"), (b) any Embargoed Person to have any direct or indirect interest, of any nature whatsoever in the Loan Parties, with the result that the investment in the Loan Parties (whether directly or indirectly) is prohibited by applicable Legal Requirements or the Credit Extensions are in violation of applicable Legal Requirements or (c) any Loan Party to conduct any business or engage in any action that is in violation of any Sanctions Law.

**Section 6.20    <u>No Hedging or Speculative Transactions</u>.**  Enter into, or suffer to exist, any Hedging Agreement for speculative purposes.

**Section 6.21    <u>Change of Auditors</u>.**  Change its Independent Auditor, except (i) with the prior written consent of the Administrative Agent, such consent not to be unreasonably withheld, conditioned or delayed, and (ii) to the extent not prohibited by the Prepetition Bond Documents.

**Section 6.22    <u>Subsidiaries</u>.**  Create, acquire or otherwise permit to exist any Subsidiary that is not in existence as of the Closing Date.

**Section 6.23    <u>Change in Name or Location</u>.**  No Loan Party shall (a) change its name as it appears in official filings in the state of its incorporation or organization, (b) (change its chief executive office or principal place of business, (c) change the type of entity that it is, (d) change its organization identification number, if any, issued by its state of incorporation or other organization, or (e) change its state of incorporation or organization.

**Section 6.24    <u>Additional Bankruptcy Matters</u>.**  Without the Required Lenders' prior written consent, Borrower will not, directly or indirectly:

(a)        enter into any agreement to return any of its inventory to any of its creditors for application against any pre-petition Indebtedness, pre-petition trade payables or other pre-petition claims under Section 546(c) of the Bankruptcy Code or allow any creditor to take any setoff or recoupment against any of its pre-petition Indebtedness, pre-petition trade payables or other pre-petition claims based upon any such return pursuant to Section 553(b)(1) of the Bankruptcy Code or otherwise if, after giving effect to any such agreement, setoff or recoupment, the aggregate amount applied to pre-petition Indebtedness, pre-petition trade payables and other pre-petition claims subject to all such agreements, setoffs and recoupments since the Petition Date would exceed $100,000;

(b)        incur, create, assume, suffer to exist or permit any other superpriority administrative claim which is pari passu with or senior to the claim of the Administrative Agent or the Lenders against the Loan Parties;

(c)        assert or prosecute any claim or cause of action against any of the Secured Parties (in their capacities as such), unless such claim or cause of action is in connection with the enforcement of the Loan Documents against the Administrative Agent or the Lenders;

(d)        subject to the terms of the Interim Order or the Final Order, as applicable, object to, contest, delay, prevent or interfere with in any material manner the exercise of rights and remedies by the Administrative Agent, the Collateral Agent or the Lenders with respect to the Collateral following the occurrence of an Event of Default (*provided* that any Loan Party may contest or dispute whether an Event of Default has occurred);

(e)        seek, consent to, or permit to exist, without the prior written consent of the Administrative Agent, at the direction of Required Lenders, any order granting authority to take any action that is prohibited by the terms of this Agreement, the Interim Order, the Final Order or the other Loan Documents or refrain from taking any action that is required to be taken by the terms of this Agreement, the Interim Order, the Final Order or any of the other Loan Documents;

(f)        except (i) as expressly provided or permitted hereunder (it being understood that any payment made pursuant to any "first day" or "second day" orders complying with the terms of this Agreement is permitted hereunder), (ii) with the prior consent of the Required Lenders in their sole discretion or (iii) as provided pursuant to any other order of the Bankruptcy Court acceptable to the Required Lenders, make any payment or distribution on account of any Indebtedness arising prior to the Petition Date;

(g)        make any payment, or set aside funds for the purpose of making any payments, or otherwise transfer any economic value (including the payment of any fees, costs or expenses of any advisors) to any direct or indirect equity holder of Borrower solely in its capacity as such); or

(h)        without the prior written consent of the Required Lenders, make, enter into or implement any amendment, waiver, supplement or other modification to any employment agreement or employee compensation plan, in each case, solely to the extent such agreement or compensation plan relates to an Executive Officer (as defined below), or pay or cause to be paid any amount contemplated by such agreements or plans before the date on which such amount becomes due and payable pursuant to the terms of the such agreements or plans, as applicable, or pay or cause to be paid any bonus, incentive, retention, severance, change of control or termination payments pursuant to the terms of such agreements or plans, as applicable, including, without limitation, any transaction or other bonus previously awarded but unpaid (it being understood that "Executive Officer" means Borrower's Chief Executive Officer, Chief Operating Officer, Chief Revenue Officer, Chief Financial Officer, Chief Technology Officer or Executive Vice President and General Counsel).

Section 6.25    **Budget Variance.**    As of any Variance Testing Date, for the immediately preceding Variance Testing Period, Borrower shall not allow any variances to exist from the Approved Budget (including, without limitation, variances with respect to shipments of pellet pounds sold), except for Permitted Variances.

Section 6.26    **Capital Expenditures.**    Make any Capital Expenditure in excess of $250,000 unless Borrower has provided the Administrative Agent with a written notice at least five (5) Business Days prior to making such Capital Expenditure, which notice shall (i) set forth the Capital Expenditure and the line item in the Approved Budget to which it relates, (ii) attach invoices therefor and (iii) be executed by the Chief Restructuring Officer.

Section 6.27    **Passive Holding Company**.    Except as required by the Bankruptcy Code or any order of the Bankruptcy Court, Guarantor shall not engage in any business activities or own any property other than (i) ownership of the Equity Interests of Borrower, (ii) activities and contractual rights incidental to maintenance of its corporate existence and (iii) performance of its obligations under this Agreement or the Prepetition Bond Documents to which it is a party.

## ARTICLE VII
## GUARANTEE

Section 7.01    **The Guarantee.**    Guarantor hereby guarantees, as primary obligors and not as surety, to each Secured Party and their respective successors and assigns, the prompt payment and performance in full when due (whether at stated maturity, by required prepayment, declaration, demand, by acceleration or otherwise) of the principal of, and premium and interest on the Loans made by the Lenders to, and the Notes held by each Lender of, Borrower, and all other Secured Obligations from time to time owing to the Secured Parties by any Loan Party in each case strictly in accordance with the terms thereof (such obligations being herein collectively called the "**Guaranteed Obligations**").    Guarantor hereby agrees that if Borrower shall fail to pay in full when due (whether at stated maturity, by acceleration or otherwise) any of the Guaranteed Obligations, Guarantor will promptly pay the same in cash, without any demand or notice whatsoever, and that in the case of any extension of time of payment or renewal of any of the Guaranteed Obligations, the same will be promptly paid in full when due (whether at extended maturity, by acceleration or otherwise) in accordance with the terms of such extension or renewal.

Section 7.02    **Obligations Unconditional.**    The obligations of Guarantor under Section 7.01 shall constitute a guaranty of payment and performance and not of collection and to the fullest extent permitted by applicable Legal Requirements, are primary, absolute, irrevocable and unconditional, joint and several, irrespective of the value, genuineness, validity, regularity or enforceability of the Guaranteed Obligations under this Agreement, the Notes, if any, or any other agreement or instrument referred to herein or therein, or any substitution, release or exchange of any other guarantee of or security for any of the Guaranteed Obligations, and, irrespective of any other circumstance whatsoever that might otherwise constitute a legal or equitable discharge or defense of a surety or Guarantor (except for payment in full of the Guaranteed Obligations).    Without limiting the generality of the foregoing, it is agreed that the occurrence of any one or more of the following shall not alter or impair the liability of Guarantor hereunder which shall remain absolute, irrevocable and unconditional under any and all circumstances as described above:

(a)    at any time or from time to time, without notice to Guarantor, the time for any performance of or compliance with any of the Guaranteed Obligations shall be extended, or such performance or compliance shall be waived;

(b)        any of the acts mentioned in any of the provisions of this Agreement, the other Loan Documents or the Notes, if any, or any other agreement or instrument referred to herein or therein shall be done or omitted;

(c)        the maturity of any of the Guaranteed Obligations shall be accelerated, or any of the Guaranteed Obligations shall be amended in any respect, or any right under the Loan Documents or any other agreement or instrument referred to herein or therein shall be amended or waived in any respect or any other guarantee of any of the Guaranteed Obligations or any security therefor shall be released or exchanged in whole or in part or otherwise dealt with; or

(d)        any Lien or security interest granted to, or in favor of, any Secured Party as security for any of the Guaranteed Obligations shall fail to be valid, perfected or to have the priority required under the Loan Documents.

Subject to the terms of the Interim Order and the Final Order, Guarantor hereby expressly waives diligence, presentment, demand of payment, protest and all notices whatsoever, and any requirement that any Secured Party exhaust any right, power or remedy or proceed against Borrower under this Agreement or the Notes, if any, or any other agreement or instrument referred to herein or therein, or against any other Person under any other guarantee of, or security for, any of the Guaranteed Obligations.  Subject to the terms of the Interim Order and the Final Order, Guarantor waives any and all notice of the creation, renewal, extension, waiver, termination or accrual of any of the Guaranteed Obligations and notice of or proof of reliance by any Secured Party upon this Guarantee or acceptance of this Guarantee, and the Guaranteed Obligations, and any of them, shall conclusively be deemed to have been created, contracted or incurred in reliance upon this Guarantee, and all dealings between Borrower and the Secured Parties shall likewise be conclusively presumed to have been had or consummated in reliance upon this Guarantee.  This Guarantee shall be construed as a continuing, absolute, irrevocable and unconditional guarantee of payment and performance without regard to any right of offset with respect to the Guaranteed Obligations at any time or from time to time held by the Secured Parties, and the obligations and liabilities of Guarantor hereunder shall be primary and shall not be conditioned or contingent upon the pursuit by the Secured Parties or any other Person at any time of any right or remedy against Borrower or against any other Person which may be or become liable in respect of all or any part of the Guaranteed Obligations or against any collateral security or guarantee therefor or right of offset with respect thereto.  This Guarantee shall remain in full force and effect and be binding in accordance with and to the extent of its terms upon Guarantor and its successors and assigns, and shall inure to the benefit of the Secured Parties, and their respective successors and assigns, notwithstanding that from time to time during the term of this Agreement there may be no Guaranteed Obligations outstanding.

**Section 7.03    Reinstatement.**    The obligations of Guarantor under this <u>Article VII</u> shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of Borrower or other Loan Party in respect of the Guaranteed Obligations is rescinded or must be otherwise restored by any holder of any of the Guaranteed Obligations, whether as a result of any proceedings in bankruptcy or reorganization or otherwise.

**Section 7.04    Subrogation; Subordination.**    Guarantor hereby agrees that until the indefeasible payment and satisfaction in full in cash of all Guaranteed Obligations and the expiration and termination of the Commitments of the Lenders under this Agreement it shall waive any claim and shall not exercise any right or remedy, direct or indirect, arising by reason of any performance by it of its guarantee in <u>Section 7.01</u>, whether by subrogation or otherwise, against Borrower of any of the Guaranteed Obligations or any security for any of the Guaranteed Obligations.

Section 7.05    **Remedies.**    Subject to the terms of the Interim Order and the Final Order, Guarantor agrees that, as between Guarantor and the Lenders, the obligations of Borrower under this Agreement and other Loan Documents may be declared to be forthwith due and payable as provided in Article VIII (and shall be deemed to have become automatically due and payable in the circumstances provided in Article VIII) for purposes of Section 7.01, notwithstanding any stay, injunction or other prohibition preventing such declaration (or such obligations from becoming automatically due and payable) as against Borrower and that, in the event of such declaration (or such obligations being deemed to have become automatically due and payable), such obligations (whether or not due and payable by Borrower) shall forthwith become due and payable by Guarantor for purposes of Section 7.01.

Section 7.06    **Instrument for the Payment of Money.**    Guarantor hereby acknowledges that the guarantee in this Article VII constitutes an instrument for the payment of money, and, subject to the terms of the Interim Order and the Final Order, consents and agrees that any Lender or Agent, at its sole option, in the event of a dispute by Guarantor in the payment of any moneys due hereunder, shall have the right to bring a motion-action under New York CPLR Section 3213.

Section 7.07    **Continuing Guarantee.**    The guarantee in this Article VII is a continuing guarantee of payment and performance, and shall apply to all Guaranteed Obligations whenever arising.

Section 7.08    **General Limitation on Guarantee Obligations.**    In any action or proceeding involving any state corporate limited partnership or limited liability company law, or any applicable state, federal or foreign bankruptcy, insolvency or reorganization law or other Legal Requirement affecting the rights of creditors generally, if the obligations of Guarantor under Section 7.01 would otherwise be held or determined to be void, voidable, invalid or unenforceable, or subordinated to the claims of any other creditors, on account of the amount of its liability under Section 7.01, then, notwithstanding any other provision to the contrary, the amount of such liability shall, without any further action by Guarantor, any Loan Party or any other Person, be automatically limited and reduced to the highest amount (after giving effect to the rights of subrogation established in Section 7.04) that is valid and enforceable, not void or voidable and not subordinated to the claims of other creditors as determined in such action or proceeding.

## ARTICLE VIII
## EVENTS OF DEFAULT

Section 8.01    **Events of Default.**    Upon the occurrence and during the continuance of any of the following events (each, an "**Event of Default**"):

(a)    default shall be made in the payment of any principal of any Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment (whether voluntary or mandatory) thereof or by acceleration thereof or otherwise;

(b)    default shall be made in the payment of any interest on any Credit Extension or any Fee or any other amount (other than an amount referred to in paragraph (a) above) due under any Loan Document, when and as the same shall become due and payable, whether at the due date thereof (including an Interest Payment Date) or at a date fixed for prepayment (whether voluntary or mandatory) or by acceleration or demand thereof or otherwise;

(c)    any representation or warranty made or deemed made in or in connection with any Loan Document or the borrowings of Loans or Withdrawals hereunder, or any representation, warranty, statement or information contained in any report, certificate, financial statement or other instrument furnished in connection with or pursuant to any Loan Document, shall prove to have been false or misleading in any material respect when so made, deemed made or furnished;

(d)         default shall be made in the due observance or performance by any Loan Party of any covenant, condition or agreement contained in <u>Sections 5.01</u>, <u>5.02</u>, <u>5.03(a)</u>, <u>5.04(a)</u>, <u>5.07</u>, <u>5.08</u>, <u>5.11</u> <u>5.15</u>, <u>5.16</u>, <u>5.17</u>, <u>5.18</u>, <u>5.19</u>, <u>5.20</u>, <u>5.21</u> or in <u>Article VI</u>;

(e)         default shall be made in the due observance or performance by any Loan Party of any covenant, condition or agreement contained in any Loan Document (other than those specified in paragraphs (a), (b) or (d) immediately above) and such default shall continue unremedied or shall not be waived for a period of three (3) days after the earlier of (i) written notice thereof to such Loan Party and (ii) knowledge of such default by a Responsible Officer of any Loan Party; *provided* that, if (A) such default cannot be cured within such 3-day period, (B) such default is capable of cure and (C) the applicable Loan Party is proceeding with diligence and in good faith to cure such default, then such three (3) day cure period shall be extended to such date, not to exceed a total of five (5) days, as shall be necessary for such Loan Party to diligently cure such default;

(f)         any Loan Party shall (i) fail to pay any principal or interest, regardless of amount, due in respect of any Indebtedness (other than (x) the Obligations and (y) Indebtedness that is created or incurred prior to the Petition Date), when and as the same shall become due and payable beyond any applicable grace period, or (ii) fail to observe or perform any other term, covenant, condition or agreement contained in any agreement or instrument evidencing or governing any such Indebtedness (other than (x) the Obligations and (y) Indebtedness that is created or incurred prior to the Petition Date) beyond the period of grace, if any, provided in the instrument or agreement under which such Indebtedness was created if the effect of any failure referred to in this clause (ii) is to cause, or to permit the holder or holders of such Indebtedness or a trustee or other representative on its or their behalf (with or without the giving of notice, the lapse of time or both) to cause, such Indebtedness to become due prior to its stated maturity or become subject to a mandatory offer to purchase by the obligor;

(g)         [reserved];

(h)         [reserved];

(i)         except for allowance in the Cases of a general unsecured claim, (x) one or more judgments, non-interlocutory orders, decrees or arbitration awards shall be entered against one or more of the Loan Parties or Secured Parties (in respect of matters relating to the Loan Documents) involving an aggregate liability of $100,000 or more (excluding amounts covered by insurance to the extent the relevant independent third-party insurer has affirmatively confirmed coverage therefor), and the same shall remain unsatisfied, unvacated and unstayed pending appeal for a period of thirty (30) days after the entry thereof or (y) one or more non-monetary judgments, orders or decrees shall be rendered against any one or more of the Loan Parties which has or would reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect, and there shall be any period of twenty (20) consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect;

(j)         one or more ERISA Events, or any events with respect to any Foreign Plan, shall have occurred that, when taken together with all other such ERISA Events, or any other events with respect to any Foreign Plan, that have occurred, could reasonably be expected to result in a Material Adverse Effect or the imposition of a Lien on any properties of a Loan Party;

(k)         any security interest and Lien purported to be created by any Security Document shall cease to be in full force and effect, or shall cease to give the Collateral Agent, for the benefit of the Secured Parties, the Liens, rights, powers and privileges purported to be created and granted under such Security Documents (including a valid, enforceable, perfected first priority security interest in

and Lien on, all of the Collateral thereunder (except as otherwise expressly provided in the DIP Orders) in favor of the Collateral Agent, or shall be asserted by or on behalf of any Loan Party not to be, a valid, enforceable, perfected, first priority (except as otherwise expressly provided in the DIP Orders) security interest in or Lien on the Collateral covered thereby;

(l)      any Loan Document or any material provisions thereof shall at any time and for any reason be declared by a court of competent jurisdiction to be null and void, or a proceeding shall be commenced by or on behalf of any Loan Party or any other Person, or by any Governmental Authority, seeking to establish the invalidity or unenforceability thereof (exclusive of questions of interpretation of any provision thereof), or any Loan Party (directly or indirectly) shall repudiate, revoke, terminate or rescind (or purport to do any of the foregoing) or deny any portion of its liability or obligation for the Obligations; or

(m)      there shall have occurred a Change in Control;

(n)      [reserved];

(o)      any Post-Consumer Materials or any other materials located at the Pennsylvania Facility or Collateral of the Loan Parties shall be moved or otherwise relocated to the Riverside Facility, the PinnPack Facility or the Texas Facility or otherwise invested in Debtors that are not Loan Parties; or

(p)      any of the Cases of the Loan Parties shall be converted to a case under Chapter 7 of the Bankruptcy Code;

(q)      a trustee, responsible officer or an examiner with expanded powers (other than a fee examiner) is appointed or elected in the any of the Cases, or the Bankruptcy Court shall have entered an order providing for such appointment;

(r)      an Order of the Bankruptcy Court shall be entered denying or terminating use of Cash Collateral by the Loan Parties and the Loan Parties shall have not obtained use of Cash Collateral pursuant to an order consented to by, and in form and substance acceptable to, the Required Lenders;

(s)      any Loan Party, or any person claiming by or through any Loan Party, with any Loan Party's consent, shall obtain court authorization to commence, or shall commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding against (A) the Administrative Agent, the Collateral Agent or any of the Lenders relating to the DIP Term Facility or (B) the trustee or any bondholder relating to the Prepetition Bond Documents;

(t)      the existence of any claims or charges, or the entry of any order of the Bankruptcy Court authorizing (i) any claims or charges, other than in respect of the DIP Term Facility and the Carve-Out or as otherwise permitted under the applicable Loan Documents or the DIP Orders, entitled to superpriority administrative expense claim status in any Case pursuant to Section 364(c)(1) of the Bankruptcy Code that are pari passu with or senior to the claims of the Agents and the Lenders under the DIP Term Facility, or there shall arise or be granted by the Bankruptcy Court any claim having priority over any or all administrative expenses of the kind specified in clause (b) of Section 503 or clause (b) of Section 507 of the Bankruptcy Code (other than the Carve-Out), or (ii) any Lien on the Collateral having a priority senior to or pari passu with the Liens and security interests provided for herein securing the Obligations hereunder, except, in each case, as expressly provided in the Loan Documents or in the DIP Order then in effect (but only in the event specifically consented to by the Required Lenders (or the Administrative Agent with the consent of the Required Lenders));

83

(u)        the Bankruptcy Court shall enter an order or orders granting relief from any stay of proceeding (including, the automatic stay applicable under Section 362 of the Bankruptcy Code to the holder or holders of any security interest) to (i) permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of any of the Loan Parties which have a value in excess of $100,000 in the aggregate or (ii) permit other actions that would have a Material Adverse Effect on the Loan Parties or their estates (taken as a whole);

(v)        an Order of the Bankruptcy Court shall be entered reversing, amending, supplementing, staying, vacating or otherwise amending, supplementing or modifying the Interim Order or the Final Order, without the prior written consent of the Required Lenders (and, with respect to any provision that affects the rights or duties of any Agent, the Administrative Agent), or a Loan Party shall apply for the authority to do so;

(w)        the Interim Order (prior to the Final Order Entry Date) or the Final Order (on and after the Final Order Entry Date) shall cease to create a valid and perfected Lien on the Collateral or to be in full force and effect, shall have been reversed, modified, amended, stayed, vacated, or subject to stay pending appeal, in the case of modification or amendment, without the prior written consent of the Required Lenders (or the Administrative Agent with the consent of the Required Lenders);

(x)        an Order shall have been entered by the Bankruptcy Court avoiding or requiring disgorgement by any Agent or any of the Lenders of any amounts received in respect of the Obligations;

(y)        an Order shall have been entered by the Bankruptcy Court terminating or modifying the exclusive right of any Loan Party to file a Chapter 11 plan pursuant to Section 1121 of the Bankruptcy Code, without the prior written consent of the Required Lenders (or the Administrative Agent with the consent of the Required Lenders);

(z)        [reserved];

(aa)        any of the Loan Parties shall fail to comply with the Interim Order (prior to the Final Order Entry Date) or the Final Order (on and after the Final Order Entry Date);

(bb)        other than with respect to the Carve-Out, an Order in the Cases shall be entered charging any of the collateral securing the Prepetition Obligations under Section 506(c) of the Bankruptcy Code against the Lenders or the bondholders under the Prepetition Bond Documents, or the commencement of other actions by any Debtor that are materially adverse to Administrative Agent, the Collateral Agent or the Lenders, or the trustee or the bondholders under the Prepetition Bond Documents or their respective rights and remedies under the DIP Term Facility in any of the Cases or inconsistent with any of the Loan Documents;

(cc)        any Order shall be entered which dismisses any of the Cases of the Loan Parties and which Order does not provide for termination of the Commitments and indefeasible payment in full in cash of the Obligations under the Loan Documents (other than contingent indemnification obligations not yet due and payable) and continuation of the Liens with respect thereto until the effectiveness thereof, or any of the Loan Parties and their Subsidiaries shall seek, support or fail to contest in good faith the entry of any such Order;

(dd)        any Loan Party shall take any action in support of any matter set forth in this Section 8.01 or any other Person shall do so and, to the extent the Lenders do not have standing to contest any such action taken by such other Person in respect of such matters, such application is not contested in

good faith by the Loan Parties and the relief requested is granted in an order that is not stayed pending appeal;

(ee)    any Loan Party shall obtain court authorization to commence, or shall commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding seeking, or otherwise consenting to (i) the invalidation, subordination or other challenging of the Superpriority Claims and Liens granted to secure the Obligations or any other rights granted to the Administrative Agent, the Collateral Agent and the Lenders in the DIP Orders or this Agreement or (ii) any relief under Section 506(c) of the Bankruptcy Code with respect to any Collateral;

(ff)    any Loan Party shall challenge, support or encourage a challenge of any payments made to the Administrative Agent or any Lender with respect to the Obligations or the trustee or any bondholder under the Prepetition Bond Documents with respect to the obligations thereunder, other than to challenge the occurrence of a Default or Event of Default;

(gg)    without the consent of the Administrative Agent and the Required Lenders, the filing of any motion by the Loan Parties seeking approval of (or the entry of an Order by the Bankruptcy Court approving) adequate protection to any pre-petition agent, trustee, bondholder or lender that is inconsistent with the Interim Order (prior to the Final Order Entry Date) or the Final Order (on and after the Final Order Entry Date);

(hh)    without the Required Lenders' consent, the entry of any Order by the Bankruptcy Court granting, or the filing by any Loan Party of any motion or other request with the Bankruptcy Court (in each case, other than the DIP Orders and motions seeking entry thereof or permitted amendments or modifications thereto) seeking, authority to use any cash proceeds of any of the Collateral without the Administrative Agent's and the Required Lenders' consent or to obtain any financing under Section 364 of the Bankruptcy Code other than the facility hereunder unless such motion or order contemplates payment in full in cash of the Obligations immediately upon consummation of the transactions contemplated thereby;

(ii)    any Debtor or any person on behalf of any Debtor shall file any motion seeking authority to consummate a sale of (x) assets of the Loan Parties or the Collateral (other than an Acceptable Sale) having a value in excess of $100,000 outside the ordinary course of business and not otherwise permitted hereunder or (y) any Equity Interests of any direct or indirect parent of Borrower that does not provide for termination of the Commitments and indefeasible payment in full in cash of the Obligations  and the Prepetition Obligations or is not otherwise acceptable to the Required Lenders in their sole discretion;

(jj)    the filing by any of the Debtors of a plan of reorganization under Chapter 11 of the Bankruptcy Code which is not an Acceptable Plan;

(kk)    entry of an Order by the Bankruptcy Court (A) terminating or modifying the exclusive right of any Debtor to file a chapter 11 plan pursuant to Section 1121 of the Bankruptcy Code, without the prior written consent of the Required Lenders or (B) confirming a plan of reorganization or liquidation in any of the Cases which is not an Acceptable Plan;

(ll)    if any Loan Party is enjoined, restrained, or in any way prevented by court Order from continuing to conduct all or any part of the business affairs of the Loan Parties and their Subsidiaries, taken as a whole, which could reasonably be expected to have a Material Adverse Effect; *provided*, that the Loan Parties shall have five (5) Business Days after the entry of such an Order to obtain

a court Order vacating, staying or otherwise obtaining relief from the Bankruptcy Court or another court to address any such court Order;

(mm)    any Loan Party shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise on account of any pre-petition Indebtedness or payables other than payments in respect of the repayment of the Indebtedness outstanding under the Prepetition Bond Documents or as otherwise permitted under this Agreement, in each case, to the extent authorized by one or more "first day" orders or "second day" orders, the Interim Order or the Final Order and consistent with the Approved Budget;

(nn)    without the Required Lenders' consent, any Loan Party shall file any motion or other request with the Bankruptcy Court seeking (i) to grant or impose, under Section 364 of the Bankruptcy Code or otherwise, liens or security interests in any Collateral, whether senior, equal or subordinate to the Collateral Agent's liens and security interests; (ii) to use, or seek to use, Cash Collateral; (iii) to obtain any financing under Section 364 of the Bankruptcy Code other than the facility hereunder unless such motion or order contemplates payment in full in cash of the Obligations immediately upon consummation of the transactions contemplated thereby; or (iv) to modify or affect any of the rights of the Agents, or the Lenders under the DIP Orders or the Loan Documents, by any Order entered in the Cases;

(oo)    Permitted Variances under the Approved Budget are exceeded for any relevant Variance Test Period; or

(pp)    any Event of Default under and as defined in any DIP Credit Facility (other than this DIP Term Facility) occurs;

then, and in every such event, and at any time thereafter during the continuance of such event, subject to the terms of the Interim Order and the Final Order, the Administrative Agent may, and at the written request of the Required Lenders shall, subject to the terms and conditions of the DIP Orders, take any one or more of the following actions, at the same or different times:  (i) declare the Commitment of each Lender to make Loans to be terminated, whereupon such commitments and obligation shall be terminated; (ii) declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by Borrower and each other Loan Party; (iii) terminate the DIP Term Facility and any Loan Documents as to any future liability or obligation of the Lenders hereunder, but without affecting any of the Obligations or the Liens securing the Obligations; (iv) invoke the right to charge interest at the Default Rate; and (v) exercise any and all of its other rights and remedies under applicable Legal Requirements, hereunder and under the other Loan Documents.

In addition, without limiting the foregoing, subject to the terms of the Interim Order and the Final Order, in the event of a foreclosure (or other similar exercise of remedies) by Collateral Agent on any of the Collateral pursuant to a public or private sale or other disposition, the Collateral Agent, the Administrative Agent or any Secured Party may be the purchaser of any or all of such Collateral at any such sale or other disposition and, in addition, the Collateral Agent or the Administrative Agent, as agent for and representative of all of Secured Parties (but not any Lender or Lenders in its or their respective individual capacities unless Required Lenders shall otherwise agree in writing) shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such sale or other disposition, to use and apply any of the Obligations as a credit on account of the purchase price for any Collateral payable by Collateral Agent at such sale.

Notwithstanding anything to the contrary herein, subject to the provisions of the Interim Order (and, when entered, the Final Order), (x) with respect to enforcement of Liens or remedies with respect to Collateral, the Collateral Agent shall provide Borrower five (5) days' notice prior to taking such action (the "**Remedies Notice Period**"), and (y) after expiration of the Remedies Notice Period, the Agents shall, at the request of, or may, with the consent of, the Required Lenders, (x) terminate the consensual use of Cash Collateral and (y) exercise all other rights and remedies provided for in this Agreement, the Collateral Documents, the DIP Orders and under applicable law.  Solely during the Remedies Notice Period, the Loan Parties may continue to use Cash Collateral in the ordinary course of business, consistent with past practices, including for the purpose of funding the Carve-Out.  During the Remedies Notice Period, any party in interest shall be entitled to seek an emergency hearing with the Bankruptcy Court with respect to any attempt by the Administrative Agent, the Collateral or any Lender to exercise rights and/or remedies.

Section 8.02    **Rescission.**  If at any time after termination of the Commitments or acceleration of the maturity of the Loans, the Loan Parties shall pay all arrears of interest and all payments on account of principal of the Loans owing by them that shall have become due otherwise than by acceleration (with interest on principal and, to the extent permitted by law, on overdue interest, at the rates specified herein) and all Defaults (other than non-payment of principal of and accrued interest on the Loans due and payable solely by virtue of acceleration) shall be remedied or waived pursuant to Section 10.02, then upon the written consent of the Required Lenders (which may be given or withheld in their sole discretion) and written notice to Borrower, the termination of the Commitments or the acceleration and their consequences may be rescinded and annulled; but such action shall not affect any subsequent Default or Event of Default or impair any right or remedy consequent thereon.  The provisions of the preceding sentence are intended merely to bind the Lenders, and the other Secured Parties to a decision that may be made at the election of the Required Lenders, and such provisions are not intended to benefit Borrower or any of the other Loan Parties and do not give Borrower and/or any of the Loan Parties the right to require the Lenders to rescind or annul any acceleration hereunder, even if the conditions set forth herein are met.**[Reserved].**

Section 8.04    **Application of Proceeds.**  After the exercise of remedies provided for in this Article XIII (or after the Loans have automatically become immediately due and payable), any amounts received under any Loan Documents, and all funds credited to the Funding Account, shall be applied by the Administrative Agent and Collateral Agent as follows:

(a)    *First*, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (including fees, charges and disbursements of counsel to the Agents) then due and payable to the Agents in their respective capacities as such, until payment in full of all such fees shall have been made;

(b)    *Second*, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (other than principal and interest) payable to the Lenders, ratably among them in proportion to the amounts described in this clause *second* payable to them;

(c)    *Third*, to pay ratably all accrued and unpaid interest on the New Money DIP Loans, until payment in full of all such interest shall have been made;

(d)    *Fourth*, to pay the unpaid principal amount of the New Money DIP Loans ratably, until payment in full of the principal of all New Money DIP Loans shall have been made;

(e)    *Fifth*, to pay ratably all accrued and unpaid interest on the Roll-Up Loans, until payment in full of all such interest shall have been made;

(f)  *Sixth*, to pay the unpaid principal amount of the Roll-Up Loans ratably, until payment in full of the principal of all Roll-Up Loans shall have been made;

(g)  *Seventh*, to pay all other Obligations ratably, until payment in full of all such other Obligations shall have been made; and

(h)  *Eighth*, the balance, if any, to the Person lawfully entitled thereto (including the applicable Loan Party or its successors or assigns) or as a court of competent jurisdiction may direct.

In the event that any such proceeds are insufficient to pay in full the items described in clauses (a) through (h) above, the Loan Parties shall remain liable, jointly and severally, for any deficiency.

## ARTICLE IX
## THE ADMINISTRATIVE AGENT AND THE COLLATERAL AGENT

**Section 9.01    Appointment.**  (a)  Each Lender hereby irrevocably designates and appoints UMB Bank, N.A. as the Administrative Agent and the Collateral Agent under this Agreement and the other Loan Documents and UMB Bank, N.A. hereby accept such designations and appointments.  Each Lender irrevocably authorizes each Agent, in such capacity, through its agents or employees, to take such actions on its behalf under the provisions of this Agreement and the other Loan Documents and to exercise such powers and perform such duties as are delegated to such Agent by the terms of this Agreement and the other Loan Documents, together with such actions and powers as are reasonably incidental thereto.  The provisions of this Article IX are solely for the benefit of the Agents and the Lenders, and no Loan Party shall have rights as a third party beneficiary of any such provisions.  Without limiting the generality of the foregoing, the Agents are hereby expressly authorized to execute any and all documents (including releases) with respect to the Collateral and any rights of the Secured Parties with respect thereto as contemplated by and in accordance with the provisions of this Agreement and the other Loan Documents.  In performing its functions and duties hereunder, each Agent shall act solely as an agent of the Lenders and does not assume and shall not be deemed to have assumed any obligation towards or relationship of agency or trust with or for Borrower or Guarantor.  Without limiting the generality of the foregoing, the use of the term "agent" in this Agreement with reference to the Administrative Agent or the Collateral Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law.  Instead, such term is used merely as a matter of market custom and is intended to create or reflect only an administrative relationship between independent contracting parties.

(b)  Each Lender hereby irrevocably authorizes the Administrative Agent and the Collateral Agent, based upon the instruction of the Required Lenders, to credit bid and purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral at any sale thereof conducted by Collateral Agent under the provisions of the UCC, including pursuant to Sections 9-610 or 9-620 of the UCC (or any equivalent provision of the UCC), at any sale thereof conducted under the provisions of the Bankruptcy Code, including Section 363 of the Bankruptcy Code, or at any other sale or foreclosure conducted by Collateral Agent (whether by judicial action or otherwise) in accordance with applicable Legal Requirements.

(c)  Each Lender irrevocably appoints each other Lender as its agent and bailee for the purpose of perfecting Liens (whether pursuant to Section 8-301(a)(2) of the UCC or otherwise), for the benefit of the Secured Parties, in assets in which, in accordance with the UCC or any other applicable Legal Requirement a security interest can be perfected by possession or control.  Should any Lender (other than the Collateral Agent) obtain possession or control of any such Collateral, such Lender shall notify the Collateral Agent thereof, and, promptly following the Collateral Agent's request therefor,

shall deliver such Collateral to the Collateral Agent or otherwise deal with such Collateral in accordance with the Collateral Agent's instructions.

(d)      Any corporation or association into which any Agent may be converted or merged, or with which it may be consolidated, or to which it may sell or transfer all or substantially all of its corporate trust business and assets as a whole or substantially as a whole, or any corporation or association resulting from any such conversion, sale, merger, consolidation or transfer to which such Agent is a party, will be and become the successor Agent, as applicable, under this Agreement and will have and succeed to the rights, powers, duties, immunities and privileges as its predecessor, without the execution or filing of any instrument or paper or the performance of any further act.

Section 9.02     **Agent in Its Individual Capacity.**  Each Person serving as an Agent hereunder shall have the same rights and powers in its capacity as a Lender, if applicable, as any other Lender and may exercise the same as though it were not an Agent, and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as an Agent hereunder, if applicable, in its individual capacity.  Such Person and its Affiliates may accept deposits from, lend money to, act as financial advisor or in any other advisory capacity for, and generally engage in any kind of business with, any Loan Party or Affiliate thereof as if it were not an Agent hereunder and without duty to account therefor to the Lenders.

Section 9.03     **Exculpatory Provisions.**  No Agent shall have any duties or obligations except those expressly set forth in the Loan Documents.  Without limiting the generality of the foregoing, (a) no Agent shall be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred and is continuing, (b) no Agent shall have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated by the Loan Documents that such Agent is required to exercise in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 10.02); *provided* that no Agent shall be required to take any action that, in its opinion or the opinion of its counsel, may expose such Agent to liability, if the Agent is not indemnified to its satisfaction, or that is contrary to any Loan Document or applicable Legal Requirements including, for the avoidance of doubt any action that may be in violation of the automatic stay under any Insolvency Law or that may effect a foreclosure, modification or termination of Property of a Defaulting Lender under any Debtor Relief Law, and (c) except as expressly set forth in the Loan Documents, no Agent shall have any duty to disclose or shall be liable for the failure to disclose, any information relating to any Loan Party or any of its Affiliates that is communicated to or obtained by the Person serving as such Agent or any of its Affiliates in any capacity.  No Agent shall be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as any Agent shall believe in good faith shall be necessary, under the circumstances as provided in Section 8.04 or Section 10.02) or (ii) in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction by a final and nonappealable judgment.  No Agent shall be deemed to have knowledge of any Default or Event of Default unless and until written notice thereof describing such Default or Event of Default is given to such Agent by Borrower or a Lender, and no Agent shall be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with any Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth in any Loan Document or the occurrence of any Default or Event of Default, (iv) the validity, enforceability, effectiveness or genuineness of any Loan Document or any other agreement, instrument or document or (v) the satisfaction of any condition set forth in Article IV or elsewhere in any Loan Document.  Each party to this Agreement acknowledges and agrees that the Administrative Agent may from time to time use one or more outside service providers for the tracking of

all UCC financing statements (and/or other collateral related filings and registrations from time to time) required to be filed or recorded pursuant to the Loan Documents and the notification to the Administrative Agent, of, among other things, the upcoming lapse or expiration thereof, and that each of such service providers will be deemed to be acting at the request and on behalf of Borrower and the other Loan Parties. No Agent shall be liable for any action taken or not taken by any such service provider. Neither any Agent nor any of its officers, partners, directors, employees or agents shall be liable to the Lenders for any action taken or omitted by any Agent under or in connection with any of the Loan Documents.  In no event shall any Agent be liable for any failure or delay in the performance of their respective obligations under this Agreement or any related documents because of circumstances beyond such Agent's control, including, but not limited to, a failure, termination, or suspension of a clearing house, securities depositary, settlement system or central payment system in any applicable part of the world or acts of God, flood, war (whether declared or undeclared), civil or military disturbances or hostilities, nuclear or natural catastrophes, political unrest, explosion, severe weather or accident, earthquake, terrorism, fire, riot, labor disturbances, strikes or work stoppages for any reason, embargo, government action, including any laws, ordinances, regulations or the like (whether domestic, federal, state, county or municipal or foreign) which delay, restrict or prohibit the providing of the services contemplated by this Agreement or any related documents, or the unavailability of communications or computer facilities, the failure of equipment or interruption of communications or computer facilities, or the unavailability of the Federal Reserve Bank wire or telex or other wire or communication facility, or any other causes beyond the Agent's control whether or not of the same class or kind as specified above.

Nothing in this Agreement or any other Loan Document shall require the Administrative Agent or the Collateral Agent to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties or in the exercise of any of its rights or powers hereunder.

The Agents shall have no obligation for (a) perfecting, maintaining, monitoring, preserving or protecting the security interest or Lien granted under the Credit Agreement, any other Loan Document, or any agreement or instrument contemplated hereby or thereby; (b) the filing, re-filing, recording, re-recording, or continuing of any document, financing statement, mortgage, assignment, notice, instrument of further assurance, or other instrument in any public office at any time or times; or (c) providing, maintaining, monitoring, or preserving insurance on or the payment of taxes with respect to any Collateral.

The Agents shall not be responsible or have any liability for, or have any duty to ascertain, inquire into, monitor or enforce, compliance with the provisions hereof relating to Borrower Competitors. Without limiting the generality of the foregoing, the Agents shall not (a) be obligated to ascertain, monitor or inquire as to whether any Lender or Participant or prospective Lender or Participant is a Borrower Competitor or (b) have any liability with respect to or arising out of any assignment or participation of Loans, or disclosure of confidential information, to any Borrower Competitor.

**Section 9.04**   **Reliance by Agent.**  Each Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent, or otherwise authenticated by a proper Person.  Each Agent also may rely upon any statement made to it orally and believed by it to be made by a proper Person, and shall not incur any liability for relying thereon.  In determining compliance with any condition hereunder to the making of a Loan that by its terms must be fulfilled to the satisfaction of a Lender, each Agent may presume that such condition is satisfactory to such Lender unless each Agent shall have received written notice to the contrary from such Lender prior to the making of such Loan.  Each Agent may consult with legal counsel (who may be counsel for Borrower), independent

accountants and other advisors selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or advisors.

**Section 9.05    Delegation of Duties.**  Each Agent may perform any and all of its duties and exercise its rights and powers by or through, or delegate any and all such rights and powers to, any one or more sub-agents appointed by such Agent.  Each Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Affiliates.  The exculpatory provisions of the preceding paragraphs shall apply to any such sub-agent and to the Affiliates of each Agent and any such sub-agent, and shall apply, without limiting the foregoing, to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Agent.  The Agents shall not be responsible for the negligence or misconduct of any sub-agent except to the extent that a court of competent jurisdiction determines in a final and nonappealable judgment that such Agent acted with gross negligence or willful misconduct in the selection of such sub-agent.

**Section 9.06    Successor Agent.**  Each Agent may resign as such at any time upon at least ten (10) days' prior notice to the Lenders and Borrower.  Upon any such resignation, the Required Lenders shall have the right, in consultation with Borrower, to appoint a successor Agent.  If no successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within ten (10) days after the retiring Agent gives notice of its resignation, then the retiring Agent may, on behalf of the Lenders, appoint a successor Agent, which successor shall be a commercial banking institution organized under the laws of the United States (or any State thereof) or a United States branch or agency of a commercial banking institution, in each case, having combined capital and surplus of at least $500,000,000. If no successor Agent shall have been appointed by the Required Lenders and shall have accepted such appointment within thirty (30) days after the retiring Agent gives notice of its resignation, the retiring Agent's resignation shall nevertheless thereupon become effective and the retiring (or retired) Agent shall be discharged from its duties and obligations under the Loan Documents, and the Required Lenders shall assume and perform all of the duties of the Agent under the Loan Documents until such time, if any, as the Required Lenders appoint a successor Agent.

Upon the acceptance of its appointment as an Agent hereunder by a successor, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Agent, and the retiring (or retired) Agent shall be discharged from its duties and obligations under the Loan Documents (if not already discharged therefrom as provided in this paragraph).  The fees payable by Borrower to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between Borrower and such successor.  After an Agent's resignation hereunder, the provisions of this Article IX, Section 10.03 and Sections 10.08 to 10.10 shall continue in effect for the benefit of such retiring Agent, its sub-agents and their respective Affiliates in respect of any actions taken or omitted to be taken by any of them while it was acting as Agent.

**Section 9.07    Non-Reliance on Agent and Other Lenders.**  Each Lender acknowledges that it has, independently and without reliance upon any Agent or any other Lender or any of their respective Affiliates and based on such documents and information as it has deemed appropriate, conducted its own independent investigation of the financial condition and affairs of the Loan Parties and their Subsidiaries and made its own credit analysis and decision to enter into this Agreement.  Each Lender further represents and warrants that it has reviewed each document made available to it on the Platform in connection with this Agreement and has acknowledged and accepted the terms and conditions applicable to the recipients thereof (including any such terms and conditions set forth, or otherwise maintained, on the Platform with respect thereto).  Each Lender also acknowledges that it will, independently and without reliance upon any Agent or any other Lender or any of their respective Affiliates and based on such documents and information as it shall from time to time deem appropriate, continue to make its own

decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or related agreement or any document furnished hereunder or thereunder.

     **Section 9.08**    **[Reserved].**

     **Section 9.09**    **Indemnification.**  The Lenders severally agree to indemnify each Agent in its capacity as such and each of its Related Persons (to the extent not reimbursed by Borrower or Guarantor and without limiting the obligation of Borrower or Guarantor to do so), ratably according to their respective outstanding Loans and Commitments in effect on the date on which indemnification is sought under this <u>Section 9.09</u> (or, if indemnification is sought after the date upon which all Commitments shall have terminated and the Loans shall have been paid in full, ratably in accordance with such outstanding Loans and Commitments as in effect immediately prior to such date), from and against any and all Indemnified Liabilities (IN ALL CASES, WHETHER OR NOT CAUSED OR ARISING , IN WHOLE OR IN PART, OUT OF THE COMPARATIVE, CONTRIBUTORY OR SOLE NEGLIGENCE OF ANY AGENT OR RELATED PERSON); *provided* that no Lender shall be liable for the payment of any portion of such Indemnified Liabilities that are found by a final and nonappealable judgment of a court of competent jurisdiction to have directly resulted solely and directly from such Agent's or Related Person's, as the case may be, gross negligence or willful misconduct; *provided*, *however*, that no action taken in accordance with the directions of the Required Lenders (or such other number or percentage of the Lenders as shall be provided by the Loan Documents) shall be deemed to constitute gross negligence or willful misconduct for purposes of this <u>Section 9.09</u>.  In the case of any investigation, litigation or proceeding giving rise to any Indemnified Liabilities, this <u>Section 9.09</u> shall apply whether or not any such investigation, litigation or proceeding is brought by any Lender or any other Person. Without limiting the foregoing, the Lenders shall reimburse the Agents upon demand ratably according to their respective outstanding Loans and Commitments in effect on the date on which reimbursement is sought under this <u>Section 9.09</u> (or if such reimbursement payment is sought after the date on which the Loans have been paid in full and the Commitments have terminated, ratably in accordance with the outstanding Loans and Commitments as in effect immediately prior to such date) any costs or out-of-pocket expenses (including the fees, disbursements and other charges of counsel) incurred by the Agents in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise and including the enforcement of this <u>Section 9.09</u>) of, or legal advice in respect of rights or responsibilities under, this Agreement, any other Loan Document, or any document contemplated by or referred to herein, to the extent that the Agents are not reimbursed for such expenses by or on behalf of Borrower. Each Lender hereby authorizes the Agents to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Agents to such Lender from any source against any amount due to the Agents under this <u>Section 9.09</u>.   The undertaking in this <u>Section 9.09</u> shall survive termination of the Commitments, the payment of all other Obligations and the resignation or removal of the Agents.  The agreements in this <u>Section 9.09</u> shall survive the payment of the Loans and all other amounts payable hereunder.

     **Section 9.10**    **[Reserved].**

     **Section 9.11**    **Lender Action.**  Each Lender agrees that it shall not take or institute any actions or proceedings, judicial or otherwise, for any right or remedy against any Loan Party or any other obligor under any of the Loan Documents (including the exercise of any right of setoff, rights on account of any banker's lien or similar claim or other rights of self-help), or institute any actions or proceedings, or otherwise commence any remedial procedures or cause any of the foregoing (through Affiliates or otherwise), with respect to any Collateral or any other Property of any such Loan Party, without the prior written consent of the Administrative Agent.  Without limiting the foregoing, each Lender agrees that, except as otherwise provided in any Loan Documents or with the written consent of the Administrative

Agent, it will not take any enforcement action, accelerate Obligations under any Loan Documents, or exercise any right that it might otherwise have under applicable Legal Requirements to credit bid or purchase any portion of the Collateral at any sale or foreclosure thereof referred to in Section 9.01(b); *provided* that nothing contained in this Section shall affect any Lender's right to credit bid its pro rata share of the Obligations pursuant to Section 363(k) of the Bankruptcy Code.

Section 9.12    **Withholding Taxes.**    To the extent required by any applicable law, the Administrative Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding Tax.  If the U.S. Internal Revenue Service or any other Governmental Authority asserts a claim that the Administrative Agent did not properly withhold Tax from amounts paid to or for the account of any Lender because the appropriate form was not delivered or was not properly executed or because such Lender failed to notify the Administrative Agent of a change in circumstance which rendered the exemption from, or reduction of, withholding Tax ineffective or for any other reason, or if Administrative Agent reasonably determines that a payment was made to a Lender pursuant to this Agreement without deduction of applicable withholding tax from such payment, such Lender shall indemnify the Administrative Agent fully for all amounts paid, directly or indirectly, by the Administrative Agent as Tax or otherwise, including any penalties or interest and together with all expenses (including legal expenses, allocated internal costs and out-of-pocket expenses) incurred.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document against any amount due to the Administrative Agent under this Section 9.12. The agreements in this Section 9.12 shall survive the resignation and/or replacement of the Administrative Agent, any assignment of rights by, or the replacement of, a Lender, the termination of this Agreement and the repayment, satisfaction or discharge of all other obligations under any Loan Document.

Section 9.13    **Lender's Representations, Warranties and Acknowledgements.**    (a) Each Lender represents and warrants that it has made its own independent investigation of the financial condition and affairs of Borrower in connection with Credit Extensions hereunder and that it has made and shall continue to make its own appraisal of the creditworthiness of Borrower.  No Agent shall have any duty or responsibility, either initially or on a continuing basis, to make any such investigation or any such appraisal on behalf of Lenders or to provide any Lender with any credit or other information with respect thereto, whether coming into its possession before the making of the Loans or at any time or times thereafter, and no Agent shall have any responsibility with respect to the accuracy of or the completeness of any information provided to the Lenders.  Each Lender acknowledges that no Agent or Related Person of any Agent has made any representation or warranty to it.  Except for documents expressly required by any Loan Document to be transmitted by an Agent to the Lenders, no Agent shall have any duty or responsibility (either express or implied) to provide any Lender with any credit or other information concerning any Loan Party, including the business, prospects, operations, Property, financial and other condition or creditworthiness of any Loan Party or any Affiliate of a Loan Party, that may come in to the possession of an Agent or any of its Related Persons.

(b)        Each Lender, by delivering its signature page to this Agreement or an Assignment and Assumption and funding its Loan, shall be deemed to have acknowledged receipt of, and consented to and approved, each Loan Document and each other document required to be approved by any Agent, the Required Lenders or the Lenders, as applicable, on the Closing Date.

Section 9.14    **Security Documents and Guarantee.**

(a)        *Agents under Security Documents and Guarantee.*    Each Secured Party hereby further authorizes the Administrative Agent or the Collateral Agent, as applicable, on behalf of

and for the benefit of the Secured Parties, to be the agent for and representative of the Secured Parties with respect to the Guarantee, the Collateral and the Loan Documents.  Subject to <u>Section 10.02</u>, without further written consent or authorization from any Secured Party, the Administrative Agent or the Collateral Agent, as applicable, may execute any documents or instruments necessary to in connection with a sale or disposition of assets permitted by this Agreement or to which the Required Lenders (or such other Lenders as may be required to give such consent under <u>Section 10.02</u>) have otherwise consented.

(b)      <u>Right to Realize on Collateral and Enforce Guarantee</u>.  Anything contained in any of the Loan Documents to the contrary notwithstanding, Borrower, the Administrative Agent, the Collateral Agent and each Secured Party hereby agree that (i) no Secured Party shall have any right individually to realize upon any of the Collateral or to enforce the Guarantee, it being understood and agreed that all powers, rights and remedies hereunder and under any of the Loan Documents may be exercised solely by the Administrative Agent or the Collateral Agent, as applicable, for the benefit of the Secured Parties in accordance with the terms hereof and thereof and all powers, rights and remedies under the Security Documents may be exercised solely by the Collateral Agent for the benefit of the Secured Parties in accordance with the terms thereof, and (ii) in the event of a foreclosure or similar enforcement action by the Collateral Agent on any of the Collateral pursuant to a public or private sale or other disposition (including, without limitation, pursuant to Section 363(k), Section 1129(b)(2)(a)(ii) or otherwise of the Bankruptcy Code), the Collateral Agent (or any Lender, except with respect to a "credit bid" pursuant to Section 363(k), Section 1129(b)(2)(a)(ii) or otherwise of the Bankruptcy Code) may be the purchaser or licensor of any or all of such Collateral at any such sale or other disposition and the Collateral Agent, as agent for and representative of the Secured Parties (but not any Lender or Lenders in its or their respective individual capacities) shall be entitled, upon instructions from the Required Lenders, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such sale or disposition, to use and apply any of the Obligations as a credit on account of the purchase price for any collateral payable by the Collateral Agent at such sale or other disposition.

(c)      <u>Release of Collateral, Termination of Loan Documents</u>.

(i)      Notwithstanding anything to the contrary contained herein or in any other Loan Document, the Administrative Agent shall, subject to, and to the extent required by the Bankruptcy Court, take such actions as shall be required to release its security interest in any Collateral subject to any disposition permitted by the Loan Documents.

(ii)      Notwithstanding anything to the contrary contained herein or any other Loan Document, when all Secured Obligations (other than contingent expense reimbursement and indemnity obligations that are not then due and payable) have been paid in full and all Commitments have terminated or expired, upon request of Borrower, the Administrative Agent and the Collateral Agent shall (without notice to, or vote or consent of, any Lender, or any other Secured Party) take such actions as shall be required to release its security interest in all Collateral, and to release all guarantee obligations provided for in any Loan Document, whether or not on the date of such release there may be outstanding Secured Obligations under clause (c) of the definition thereof.  Any such release of guarantee obligations shall be deemed subject to the provision that such guarantee obligations shall be reinstated if after such release any portion of any payment in respect of the Obligations guaranteed thereby shall be rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of Borrower or Guarantor, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, Borrower or Guarantor or any substantial part of its Property, or otherwise, all as though such payment had not been made.

(iii)     The Collateral Agent shall not be responsible for or have a duty to ascertain or inquire into any representation or warranty regarding the existence, value or collectability of the Collateral, the existence, priority or perfection of the Collateral Agent's Lien thereon, or any certificate prepared by any Loan Party in connection therewith, nor shall the Collateral Agent be responsible or liable to the Lenders for any failure to monitor or maintain any portion of the Collateral.

Section 9.15    **Administrative Agent May File Bankruptcy Disclosure and Proofs of Claim.** The Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on Borrower) shall be entitled and empowered (but not obligated) by intervention in such proceeding or otherwise:

(a)        to file a verified statement pursuant to rule 2019 of the Federal Rules of Bankruptcy Procedure that, in its sole opinion, complies with such rule's disclosure requirements for entities representing more than one creditor;

(b)        to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders, the Collateral Agent and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders, the Collateral Agent and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders, the Collateral Agent and the Administrative Agent Administrative Agent under Sections 2.05 and 10.03) allowed in such judicial proceeding; and

(c)        to collect and receive any monies or other Property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender and the Collateral Agent to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders and the Collateral Agent, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under this Agreement.   To the extent that the payment of any such compensation, expenses, disbursements and advances of the Administrative Agent, its agents and counsel, and any other amounts due the Administrative Agent under this Agreement out of the estate in any such proceeding, shall be denied for any reason, payment of the same shall be secured by a Lien on, and shall be paid out of, any and all distributions, dividends, money, securities and other properties that the Lenders may be entitled to receive in such proceeding whether in liquidation or under any plan of reorganization or arrangement or otherwise.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or to authorize the Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

## ARTICLE X
## MISCELLANEOUS

**Section 10.01    Notices.** (a)  Generally.  Notices and other communications provided for herein shall, except as provided in Section 10.01(b), be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopy or e-mail, as follows:

(i)        if to any Loan Party, to Borrower:

c/o CarbonLite P, LLC
10250 Constellation Boulevard, Suite 2820
Los Angeles, CA 90067
Attention:  both Leon Farahnik, Chief Executive Officer;
            and Gregg Milhaupt
Email:  both lfarahnik@hpcindustries.com; and
            gregg@carbonliterecycling.com

With a copy to:

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, California 90067-4003
Attention:  Richard Pachulski and Gabriel Glazer
Email:  rpachulski@pszjlaw.com and gglazer@pszjlaw.com

And a copy to:

Force 10 Partners LLC
20341 SW Birch Street, Suite 220
Newport Beach, CA 92660
Attention:  Brian Weiss
Email:  bweiss@force10partners.com

(ii)        if to the Administrative Agent or the Collateral Agent, to it at:

UMB Bank, N.A.
120 South Sixth Street, Suite 1400
Minneapolis, MN 55402
Attention: Gordon Gendler and Jay Smith
Email: gordon.gendler@umb.com and Jay.Smith@umb.com;

And a copy to:

Arnold & Porter Kaye Scholer LLP
70 West Madison Street, Suite 4200
Chicago, Illinois 60602
Attn: Michael Messersmith
Fax: (312) 583-2574
Email: michael.messersmith@arnoldporter.com

(iii)     if to a Lender, to it at its address (or telecopy number) set forth on its Administrative Questionnaire.

Notices and other communications to the Lenders hereunder may (subject to Section 10.01(b)) be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent.  Any party hereto may change its address, telecopier number or e-mail address for notices and other communications hereunder by notice to the other parties hereto.  The Administrative Agent or Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, *provided* that approval of such procedures may be limited to particular notices or communications. Unless the Administrative Agent otherwise prescribes, (A) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgment from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgment), *provided* that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (B) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (A) of notification that such notice or communication is available and identifying the website address therefor.

(b)     Posting.     Each Loan Party hereby agrees that it will provide to the Administrative Agent all information, documents and other materials that it is obligated to furnish to the Administrative Agent pursuant to this Agreement and any other Loan Document, including all notices, requests, financial statements, financial and other reports, certificates and other information materials, but excluding any such communication that (i) relates to a request for a new, or a conversion of an existing, Borrowing or other extension of credit (including any election of an interest rate or interest period relating thereto), (ii) relates to the payment of any principal or other amount due under this Agreement prior to the scheduled date therefor, (iii) provides notice of any Default under this Agreement or (iv) is required to be delivered to satisfy any condition precedent to the effectiveness of this Agreement and/or any borrowing or other extension of credit hereunder (all such non-excluded communications, collectively, the "**Communications**"), by transmitting the Communications in an electronic/soft medium in a format reasonably acceptable to the Administrative Agent at such e-mail address(es) provided to Borrower by the Administrative Agent from time to time or in such other form, including hard copy delivery thereof, as the Administrative Agent shall require.  In addition, each Loan Party agrees to continue to provide the Communications to the Administrative Agent in the manner specified in this Agreement or any other Loan Document or in such other form, including hard copy delivery thereof, as the Administrative Agent shall reasonably require. Nothing in this Section 10.01 shall prejudice the right of the Agents, any Lender or any Loan Party to give any notice or other communication pursuant to this Agreement or any other Loan Document in any other manner specified in this Agreement or any other Loan Document or as any such Agent shall reasonably require.

(c)     To the extent consented to by the Administrative Agent in writing from time to time, the Administrative Agent agrees that receipt of the Communications by the Administrative Agent

at its e-mail address(es) set forth above shall constitute effective delivery of the Communications to the Administrative Agent for purposes of the Loan Documents.

(d)         Each Loan Party further agrees that the Administrative Agent may make the Communications available to the other Agents or the Lenders by posting the Communications on IntraLinks, SyndTrak or a substantially similar electronic transmission system (the "**Platform**").  The Platform is provided "as is" and "as available."  The Agents do not warrant the accuracy or completeness of the Communications, or the adequacy of the Platform and expressly disclaim liability for errors or omissions in the communications.  No warranty of any kind, express, implied or statutory, including, without limitation, any warranty of merchantability, fitness for a particular purpose, non-infringement of third party rights or freedom from viruses or other code defects, is made by any Agent in connection with the Communications or the Platform.  In no event shall any Agent have any liability to any Loan Party, any Lender or any other Person for damages of any kind, whether or not based on strict liability and including direct or indirect, special, incidental or consequential damages, losses or expenses (whether in contract, tort or otherwise) arising out of or related to any Loan Party's or any Agent's transmissions of Communications through Internet (including the Platform), except to the extent caused by the willful misconduct or gross negligence of such Agent, as determined by a final, non-appealable judgment of a court of competent jurisdiction.  Notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address of notification that such notice or communication is available and identifying the website address therefor.  Each Loan Party understands that the distribution of material through an electronic medium is not necessarily secure and that there are confidentiality and other risks associated with such distribution and agrees and assumes the risks associated with such electronic distribution, except to the extent caused by the willful misconduct or gross negligence of the Administrative Agent, as determined by a final, non-appealable judgment of a court of competent jurisdiction.

(e)         The Administrative Agent agrees that the receipt of the Communications by the Administrative Agent at its e-mail address shall constitute effective delivery of the Communications to the Administrative Agent for purposes of the Loan Documents.  Each Lender agrees that receipt of notice to it (as provided in the next sentence) specifying that the Communications have been posted to the Platform shall constitute effective delivery of the Communications to such Lender for purposes of the Loan Documents.  Each Lender agrees to notify the Administrative Agent in writing (including by electronic communication) from time to time of such Lender's e-mail address to which the foregoing notice may be sent by electronic transmission and that the foregoing notice may be sent to such e-mail address.  Nothing herein shall prejudice the right of the Administrative Agent or any Lender to give any notice or other communication pursuant to any Loan Document in any other manner specified in such Loan Document.

(f)         Each Loan Party, each Lender and each Agent agrees that the Administrative Agent may, but shall not be obligated to, store any Approved Electronic Communications on the Platform in accordance with the Administrative Agent's customary document retention procedures and policies.

(g)         Each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable law, including United States federal and state securities laws, to make reference to information that is not made available through the "Public Side Information" portion of the Platform and that may contain Non-Public Information with respect to Borrower, its Subsidiaries or their securities for purposes of United States federal or state securities laws.  In the event that any Public Lender has determined for itself to not access any information disclosed through the Platform or otherwise, such Public Lender acknowledges that (i) other

Lenders may have availed themselves of such information and (ii) neither Borrower nor the Administrative Agent has any responsibility for such Public Lender's decision to limit the scope of the information it has obtained in connection with this Agreement and the other Loan Documents.

**Section 10.02    Waivers; Amendment.** (a) No failure or delay by any Agent or any Lender in exercising any right or power hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of each Agent and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of any Loan Document or consent to any departure by any Loan Party therefrom shall in any event be effective unless the same shall be permitted by Section 10.02(b), and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. Without limiting the generality of the foregoing, the making of a Loan or Withdrawal from the Funding Account shall not be construed as a waiver of any Default, regardless of whether any Agent or any Lender may have had notice or knowledge of such Default at the time. No notice or demand on Borrower or any other Loan Party in any case shall entitle Borrower or any other Loan Party to any other or further notice or demand in similar or other circumstances.

(b)    Subject to Section 2.16(c) and Section 10.02(c), this Agreement nor any other Loan Document nor any provision hereof or thereof may be waived, amended, supplemented or modified except, in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by Borrower and the Required Lenders or, in the case of any other Loan Document, pursuant to an agreement or agreements in writing entered into by the Administrative Agent, the Collateral Agent (in the case of any Security Document) and the Loan Party or Loan Parties that are parties thereto, in each case with the written consent of the Required Lenders; *provided* that no such agreement shall:

(i)    increase or extend the expiry date of the Commitment of any Lender without the written consent of such Lender (it being understood that no amendment, modification, termination, waiver or consent with respect to any condition precedent, covenant or Default (or any definition used, respectively, therein) shall constitute an increase in or an extension of the expiry date of the Commitment of any Lender for purposes of this clause (i));

(ii)    reduce the principal amount or premium, if any, of any Loan or reduce the rate of interest thereon (other than interest pursuant to Section 2.06(c)) , or reduce any Fees payable hereunder, or change the form or currency of payment of any Obligation, without the written consent of each Lender directly affected thereby (it being understood that any amendment or modification to the financial definitions in this Agreement shall not constitute a reduction in the rate of interest for purposes of this clause (ii));

(iii)    postpone or extend the maturity of any Loan, or any scheduled date of payment of or the installment otherwise due on the principal amount of any Loan under Section 2.09, or any date for the payment of any interest or fees payable hereunder, or reduce the amount of, waive or excuse any such payment (other than a waiver of any increase in the interest rate pursuant to Section 2.06(c)), or postpone the scheduled date of expiration of any Commitment, without the written consent of each Lender directly affected thereby;

(iv)    change (A) Section 8.04 in a manner that would alter the application of payments required thereby without the written consent of each Lender affected thereby or (B) Section

2.14(b) or (c) in a manner that would alter the order of or the *pro rata* sharing of payments or setoffs required thereby, without the written consent of each Lender;

(v)        change the percentage set forth in the definition of "Required Lenders" or any other provision of any Loan Document (including this Section 10.02) specifying the number or percentage of Lenders required to waive, amend or modify any rights thereunder or make any determination or grant any consent thereunder, without the written consent of each Lender;

(vi)        release Guarantor from its Guarantee (except as expressly provided in Article VII), or limit its liability in respect of such Guarantee, without the written consent of each Lender;

(vii)        except as expressly permitted in this Agreement or any Security Document, release all or substantially all of the Collateral from the Liens of the Security Documents or alter the relative priorities of the Secured Obligations entitled to the Liens of the Security Documents except in connection with a "credit bid" undertaken by the Collateral Agent at the direction of the Required Lenders pursuant to Section 363(k), Section 1129(b)(2)(a)(ii) or any other section of the Bankruptcy Code or any other sale or other disposition of assets in connection with other Debtor Relief Laws or an enforcement action with respect to the Collateral permitted pursuant to the Loan Documents;

(viii)        change the percentage set forth in the definition of "Required Roll-Up Lenders" or any other provision of any Loan Document (including this Section 10.02) specifying the number or percentage of Roll-Up Lenders required to waive, amend or modify any rights thereunder or make any determination or grant any consent thereunder, without the written consent of each Roll-Up Lender;

(ix)        change Section 10.04(h) without the consent of each Granting Lender all or any part of whose Loans are being funded by any SPC at the time of any such amendment, waiver or modification;

(x)        [reserved];

(xi)        change Section 10.04(b) in a manner which further restricts assignments thereunder without the written consent of each Lender;

(xii)        permit assignments by any Loan Party of its rights or obligations under the DIP Term Facility without the written consent of each Lender, the Administrative Agent and the Collateral Agent;

(xiii)        subordinate the Obligations under the Loan Documents to any other Indebtedness; or

(xiv)        except as provided by operation of law and otherwise permitted hereunder, amend or modify the Superpriority Claims status of the Loan Obligations under the Orders or under any Loan Document;

*provided*, *further*, that (1) no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent or the Collateral Agent without the prior written consent of the Administrative Agent or the Collateral Agent, as the case may be, (2) any amendment or waiver to the Agent Fee Letter, or waiver of any rights or privileges thereunder, shall only require the consent of Borrower and the Agents and (3) the consent of Lenders holding more than 50% of any Class of

Commitments or Loans shall be required with respect to any amendment that by its terms adversely affects the rights of such Class in respect of payments or Collateral hereunder in a manner different than such amendment affects other Classes.

(c)    Without the consent of any other Person, the applicable Loan Party or Loan Parties and the Administrative Agent and/or Collateral Agent may (at the direction of the Required Lenders) enter into any amendment or waiver of any Loan Document, or enter into any new agreement or instrument, to effect the granting, perfection, protection, expansion or enhancement of any security interest in any Collateral or additional property to become Collateral for the benefit of the Secured Parties, or as required by applicable Legal Requirements to give effect to, or protect any security interest for the benefit of the Secured Parties, in any property or assets so that the security interests therein comply with applicable Legal Requirements.

Notwithstanding anything to the contrary contained in this Section 10.02 or otherwise, for purposes of determining the treatment of the Roll-Up Loans in any plan of reorganization or liquidation of the Debtors or any sale transaction involving all or substantially all of the assets of the Loan Parties or the Equity Interests in any Loan Party, such determination shall be made by the Required Roll-Up Lenders and, so long as all Lenders are treated ratably with respect to their Roll-Up Loans, all Lenders hereby agree to approve, and shall be subject to, any such treatment of the Roll-Up Loans as determined by the Required Roll-Up Lenders.

**Section 10.03    Expenses; Indemnity; Damage Waiver.**    (a) The Loan Parties jointly and severally agree to pay (i) all reasonable and documented out-of-pocket costs and expenses for the Administrative Agent, the Collateral Agent or any Lender or the Lender Advisors incurred by any Agent, the Lenders and any of their respective Affiliates, in connection with the structuring, documentation, negotiation, arrangement and syndication of the credit facilities provided for herein and any credit or similar facility refinancing, extending or replacing, in whole or in part, the credit facilities provided herein, including the preparation, negotiation, execution, delivery and administration of this Agreement and the other Loan Documents or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated) or any other document or matter requested by Borrower or any other Loan Party, (ii) all reasonable and documented out-of-pocket costs and expenses of creating, perfecting, recording, maintaining and preserving Liens in favor of the Collateral Agent for the benefit of the Secured Parties, including filing and recording fees, expenses and taxes, stamp or documentary taxes, search fees, title insurance premiums and reasonable fees, expenses and other charges of counsel to the Collateral Agent and of counsel providing any opinions that the Required Lenders (or the Administrative Agent at the direction of the Required Lenders) may reasonably request in respect of the Collateral or the Liens created pursuant to the Collateral Documents and (iii) all out-of-pocket expenses incurred by the Administrative Agent or any Lender (including the fees, charges and disbursements of any counsel or other advisor for the Administrative Agent, Collateral Agent or any Lender, including the Lender Advisors) in connection with the enforcement or protection of its rights (A) in connection with this Agreement and the other Loan Documents, including its rights under this Section 10.03, or (B) in connection with the Loans made hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans; *provided* that the Loan Parties shall not be required to reimburse the legal fees and expenses of more than (x) one outside counsel (in addition to any special counsel and up to one local counsel in each applicable local jurisdiction) for the Agents and their Related Persons, taken as a whole, (y) one outside counsel (in addition to any special counsel and up to one local counsel in each applicable local jurisdiction) for the Lenders and their Related Persons, taken as a whole, or, in the case of an actual or potential conflict of interest, of one additional counsel to the affected Lenders to the extent such Lenders are similarly situated and (z) one additional outside counsel for the Fortress Lenders and their respective Related Persons.

(b)    The Loan Parties agree, jointly and severally, to indemnify the Agents, each Lender and each of their respective Related Persons (each such Person being called an "**Indemnitee**") against, and to hold each Indemnitee harmless from, all reasonable out-of-pocket costs and any and all losses, claims, damages, liabilities, fees, fines, penalties, actions, judgments, suits and related expenses, including reasonable Advisors fees, charges and disbursements, incurred by, imposed on or asserted against any Indemnitee, directly or indirectly, arising out of, in any way connected with, or as a result of (i) the execution, delivery, performance, administration or enforcement of the Loan Documents or any agreement or instrument contemplated thereby or the performance by the parties thereto of their respective obligations thereunder, (ii) any actual or proposed use of the proceeds of the Loans, (iii) any claim, litigation, investigation or proceeding relating to any of the foregoing, whether or not any Indemnitee is a party thereto, (iv) any actual or alleged presence or Release or threatened Release of Hazardous Materials, on, at, under or from any property owned, leased or operated by any Loan Party at any time, or any Environmental Claim or threatened Environmental Claim related in any way to any Loan Party, (v) any past, present or future non-compliance with, or violation of, Environmental Laws or Environmental Permits applicable to any Loan Party, or any Loan Party's business, or any property presently or formerly owned, leased, or operated by any Loan Party or their predecessors in interest, (vi) the environmental condition of any property owned, leased, or operated by any Loan Party at any time, or the applicability of any Legal Requirements relating to such property, whether or not occasioned wholly or in part by any condition, accident or event caused by any act or omission of any Loan Party, (vii) the imposition of any environmental Lien encumbering any Real Property, (viii) the consummation of the Transactions and the other transactions contemplated hereby or (ix) any actual or prospective action, claim, suit, litigation, investigation, inquiry or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by any Loan Party or otherwise, and regardless of whether any Indemnitee is a party thereto (all of the foregoing, collectively, the "**Indemnified Liabilities**"); *provided* that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have directly resulted solely from the gross negligence or willful misconduct of such Indemnitee.

(c)    [Reserved].

(d)    The provisions of this Section 10.03 shall remain operative and in full force and effect regardless of the expiration of the term of this Agreement, the consummation of the Transactions and the other transactions contemplated hereby, the repayment of the Loans, and any other Secured Obligations, the release of Guarantor or of all or any portion of the Collateral, the expiration of the Commitments, the invalidity or unenforceability of any term or provision of this Agreement or any other Loan Document, or any investigation made by or on behalf of the Agents, the or any Lender.  All amounts due under this Section 10.03 shall be accompanied by reasonable documentation with respect to any reimbursement, indemnification or other amount requested.

(e)    To the extent that the Loan Parties fail to pay any amount required to be paid by them to the Agents under Sections 10.03(a) or (b), each Lender severally agrees to pay to the Agents, such Lender's *pro rata* share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought (or, if such payment is sought after the date on which the Loans have been paid in full and the Commitments terminated, determined immediately prior to the time that the Loans were paid in full and the Commitments terminated)) of such unpaid amount (such indemnity shall be effective whether or not the related losses, claims, damages, liabilities and related expenses are incurred or asserted by any party hereto or any third party); *provided* that the unreimbursed amount was incurred by or asserted against any of the Agents in its capacity as such.  For purposes of this Section 10.03(d), a Lender's "*pro rata* share" shall be determined based upon its share of the sum of the total outstanding Loans and unused Commitments at the time.  Each Lender hereby authorizes the Agents to set off and

apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Agents to such Lender from any source against any amount due to the Agents under this Section 10.03(e).

(f)        To the fullest extent permitted by applicable Legal Requirements, no Loan Party shall assert, and each Loan Party hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, exemplary, consequential, or punitive damages (including any loss of profits, business or anticipated savings) arising out of, in connection with, or as a result of, any Loan Document or any agreement or instrument contemplated hereby or thereby, the Transactions, or the use of the proceeds thereof.  No Indemnitee shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with the Loan Documents or the transactions contemplated hereby or thereby.

(g)        All amounts due under this Section 10.03 shall be payable not later than ten (10) days after demand therefor.

(h)        The agreements in this Section 10.03 shall survive the resignation of the Administrative Agent, the replacement of any Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all the other Obligations.

**Section 10.04    Successors and Assigns.**  (a)  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that the Loan Parties may not assign or otherwise transfer any of their respective rights or obligations hereunder without the prior written consent of the Administrative Agent, the Collateral Agent, and each Lender, which consent may be withheld in their respective sole discretion (and any attempted assignment or transfer by any Loan Party without such consent shall be null and void).  Nothing in this Agreement or any other Loan Document, express or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent expressly provided in Section 10.04(e) and, to the extent expressly contemplated hereby, the other Indemnitees) any legal or equitable right, remedy or claim under or by reason of this Agreement or any other Loan Document.

(b)        Any Lender shall have the right at any time to assign to one or more assignees (other than any Loan Party or any Affiliate thereof, a natural Person or a Borrower Competitor) all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it); *provided* that:

(i)        except in the case of (A) an assignment to a Lender, a direct or indirect owner of a Lender, an Affiliate of the foregoing or an Approved Fund, (B) contemporaneous assignments to related Approved Funds that equal at least the amount specified in this Section 10.04(b)(i) in the aggregate, (C) [reserved] or (D) an assignment of the entire remaining amount of the assigning Lender's Commitment or Loans, the amount of the Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $1,000,000; *provided* that the foregoing may be reduced with the consent of the Administrative Agent;

(ii)        each partial assignment shall be made as an assignment of a proportionate part of all of the assigning Lender's rights and obligations under this Agreement;

(iii)    the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with any Tax forms required to be delivered by Section 2.15(f), and a processing and recordation fee of $3,500; *provided* that in its sole discretion the Administrative Agent may elect to waive such processing and recordation fee in connection with any such assignment;

(iv)    the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire;

(v)    [reserved]; and

(vi)    except in the case of an assignment to a Lender, a direct or indirect owner of a Lender, an Affiliate of the foregoing or an Approved Fund, the Administrative Agent must give its prior written consent to such assignment (which consent shall not be unreasonably withheld, delayed or conditioned).

Subject to acceptance and recording thereof pursuant to Section 10.04(d), from and after the effective date specified in each Assignment and Assumption the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement (*provided* that any liability of Borrower to such assignee under Section 2.15 shall be limited to the amount, if any, that would have been payable thereunder by Borrower in the absence of such assignment, except to the extent any such amounts are attributable to a Change in Law occurring after the date of such assignment), and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Section 2.15 and 10.03).

(c)    The Administrative Agent, acting for this purpose as a non-fiduciary agent of Borrower, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts of and stated interest on the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "**Register**").  The entries in the Register shall be conclusive and binding in the absence of manifest error, and Borrower, the Administrative Agent, and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by Borrower, the Collateral Agent, and any Lender (with respect to its own interest only), at any reasonable time and from time to time upon reasonable prior notice.

(d)    Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in Section 10.04 and any written consent to such assignment required by Section 10.04(b), the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register.  No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this Section 10.04(b).  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with the requirements of this Section 10.04 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 10.04(e).

(e)        Any Lender shall have the right at any time, without the consent of, or notice to Borrower, the Administrative Agent, or any other Person to sell participations to any Person (other than any Loan Party or any Affiliate thereof or a natural Person) (a "**Participant**") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans owing to it); *provided* that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) Borrower, the Administrative Agent, the Collateral Agent, and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce the Loan Documents and to approve any amendment, modification or waiver of any provision of the Loan Documents; *provided* that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver that (1) is described in clauses (i), (ii) or (iii) of the proviso to Section 10.02(b) and (2) directly affects such Participant.  Subject to Section 10.04(f), each Participant shall be entitled to the benefits of Section 2.15 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 10.04(b) (it being understood that the documentation required under Section 2.15(f) shall be delivered to the participating Lender).  To the extent permitted by Legal Requirements, each Participant also shall be entitled to the benefits of Section 10.08 as though it were a Lender; *provided* that such Participant agrees in writing to be subject to Section 2.14(c) as though it were a Lender.  Each Lender that sells a participation shall, acting for this purpose as a non-fiduciary agent of Borrower, maintain at one of its offices a register for the recordation of the names and addresses of its Participants, the principal amounts of and stated interest on, and terms of, its participations (the "**Participant Register**").  The entries in the Participant Register shall be conclusive and binding absent manifest error, and such Lender (and Borrower, to the extent that the Participant requests payment from Borrower) shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  No Lender shall have any obligation to disclose all or any portion of the Participant Register to any Person (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) except to the extent that such disclosure is necessary to establish that such commitment, loan, or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(f)        A Participant shall not be entitled to receive any greater payment under Section 2.15 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the prior written consent of Borrower (which consent shall not be unreasonably withheld, delayed or conditioned) or the greater payment results from a Change in Law after the date the participation was sold to such Participant.

(g)        Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or any other central bank, and this Section 10.04(g) shall not apply to any such pledge or assignment of a security interest; *provided* that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.  Without limiting the foregoing, in the case of any Lender that is a fund that invests in bank loans or similar extensions of credit, such Lender may, without the consent of Borrower, the Administrative Agent or any other Person, collaterally assign or pledge all or any portion of its rights under this Agreement, including the Loans and Notes or any other instrument evidencing its rights as a Lender under this Agreement, to any holder of, trustee for,

or any other representative of holders of, obligations owed or securities issued, by such fund, as security for such obligations or securities.

(h)        Notwithstanding anything to the contrary contained herein, any Lender (a "**Granting Lender**") may grant to a special purpose funding vehicle (an "**SPC**"), identified as such in writing from time to time by the Granting Lender to the Administrative Agent and Borrower, the option to provide to Borrower all or any part of any Loan that such Granting Lender would otherwise be obligated to make to such Borrower pursuant to this Agreement; *provided* that (i) nothing herein shall constitute a commitment by any SPC to make any Loan and (ii) if an SPC elects not to exercise such option or otherwise fails to provide all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof; *provided further* that nothing herein shall make the SPC a "**Lender**" for the purposes of this Agreement, obligate Borrower or any other Loan Party or the Administrative Agent to deal with such SPC directly, obligate Borrower or any other Loan Party in any manner to any greater extent than they were obligated to the Granting Lender, or increase costs or expenses of Borrower.  The Loan Parties and the Administrative Agent shall be entitled to deal solely with, and obtain good discharge from, the Granting Lender and shall not be required to investigate or otherwise seek the consent or approval of any SPC, including for the approval of any amendment, waiver or other modification of any provision of any Loan Document.  The making of a Loan by an SPC hereunder shall utilize the Commitment of the Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender.  Each party hereto hereby agrees that no SPC shall be liable for any indemnity or similar payment obligation under this Agreement (all liability for which shall remain with the Granting Lender).  In furtherance of the foregoing, each party hereto hereby agrees (which agreement shall survive the termination of this Agreement) that, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper or other senior indebtedness of any SPC, it will not institute against, or join any other Person in instituting against, such SPC any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings under the laws of the United States of America or any state thereof.  In addition, notwithstanding anything to the contrary contained in this Section 10.04(h), any SPC may (i) with notice to, but without the prior written consent of, Borrower and the Administrative Agent and without paying any processing fee therefor, assign all or a portion of its interests in any Loans to the Granting Lender or to any financial institutions (consented to by Borrower and the Administrative Agent) providing liquidity and/or credit support to or for the account of such SPC to support the funding or maintenance of Loans and (ii) disclose on a confidential basis any non-public information relating to its Loans to any rating agency, commercial paper dealer or provider of any surety, guarantee or credit or liquidity enhancement to such SPC.

(i)        This Agreement, any other Loan Document and any document, amendment, approval, consent, information, notice, certificate, request, statement, disclosure or authorization related to this Agreement or any other Loan Document (each, for purposes of this clause (i), a "**Communication**"), including Communications required to be in writing, may be in the form of an Electronic Record and may be executed using Electronic Signatures.  Each of the Loan Parties agrees that any Electronic Signature on or associated with any Communication shall be valid and binding each of the Loan Parties to the same extent as a manual, original signature, and that any Communication entered into by Electronic Signature, will constitute the legal, valid and binding obligation of each of the Loan Parties enforceable against such in accordance with the terms thereof to the same extent as if a manually executed original signature was delivered.  Any Communication may be executed in as many counterparts as necessary or convenient, including both paper and electronic counterparts, but all such counterparts are one and the same Communication.  For the avoidance of doubt, the authorization under this paragraph may include, without limitation, use or acceptance by the Administrative Agent, the Collateral Agent and each of the Lenders of a manually signed paper Communication which has been converted into electronic form (such as scanned into PDF format), or an electronically signed Communication converted into another format, for transmission, delivery and/or retention.  The

Administrative Agent, the Collateral Agent and each of the Lenders may, at its option, create one or more copies of any Communication in the form of an imaged Electronic Record ("**Electronic Copy**"), which shall be deemed created in the ordinary course of the such Person's business, and destroy the original paper document.  All Communications in the form of an Electronic Record, including an Electronic Copy, shall be considered an original for all purposes, and shall have the same legal effect, validity and enforceability as a paper record.  Notwithstanding anything contained herein to the contrary, neither the Administrative Agent nor the Collateral Agent is under any obligation to accept an Electronic Signature in any form or in any format unless expressly agreed to by the Administrative Agent or Collateral Agent pursuant to procedures approved by it; *provided*, *further*, without limiting the foregoing, (a) to the extent the Administrative Agent or Collateral Agent has agreed to accept such Electronic Signature, the Administrative Agent, the Collateral Agent and each of the Lenders shall be entitled to rely on any such Electronic Signature purportedly given by or on behalf of any Loan Party without further verification and (b) upon the request of the Administrative Agent, the Collateral Agent or any Lender, any Electronic Signature shall be promptly followed by such manually executed counterpart.  For purposes hereof, "**Electronic Record**" and "**Electronic Signature**" shall have the meanings assigned to them, respectively, by 15 USC §7006, as it may be amended from time to time.

Section 10.05  **Survival of Agreement.**    All covenants, agreements, representations and warranties made by the Loan Parties in the Loan Documents and in the reports, certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the making of any Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Agents, or any Lender may have had notice or knowledge of any Default or Event of Default, failure of any condition set forth in Article IV to be satisfied or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as any Obligation (other than contingent indemnification obligations not then payable) is outstanding and so long as the Commitments have not expired or terminated.  The provisions of Article IX and Sections 2.15, 10.03 and 10.08 to 10.10 shall survive and remain in full force and effect regardless of the consummation of the Transactions and the other transactions contemplated hereby, the repayment of the Loans, the expiration or termination of the Commitments or the termination of this Agreement or any provision hereof.

Section 10.06  **Counterparts; Integration; Effectiveness.**  This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement and the other Loan Documents, and any separate letter agreements with respect to fees payable to the Administrative Agent and/or the Arrangers, constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.  Delivery of an executed counterpart of a signature page of this Agreement by telecopy or other electronic transmission shall be effective as delivery of a manually executed counterpart of this Agreement.

Section 10.07  **Severability.**  Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

**Section 10.08    Right of Setoff; Marshalling; Payments Set Aside.**  If an Event of Default shall have occurred and be continuing, each Lender and each of their respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by applicable Legal Requirements, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender or any such Affiliate to or for the credit or the account of any Loan Party against any and all of the obligations of any Loan Party now or hereafter existing under this Agreement or any other Loan Documents held by such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement or any other Loan Document and although such obligations may be contingent or unmatured or are owed to a branch or office of such Lender different from the branch or office holding such deposit or obligated on such indebtedness.  The rights of each Lender under this Section 10.08 are in addition to other rights and remedies (including other rights of setoff) which such Lender may have.  Each Lender agrees to notify Borrower and the Administrative Agent promptly after any such setoff and application; *provided*, *however*, that in no event shall the failure to give such notice effect the validity or enforceability of any such setoffs.  None of any Agent or any Lender shall be under any obligation to marshal any assets in favor of any Loan Party or any other Person or against or in payment of any or all of the Obligations.  To the extent that any Loan Party makes a payment or payments to Administrative Agent or Lenders (or to Administrative Agent, on behalf of Lenders), or any Agent or Lender enforces any security interests or exercises any right of setoff, and such payment or payments or the proceeds of such enforcement or setoff or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, receiver or any other party under any Debtor Relief Law or any equitable cause, then, to the extent of such recovery, the obligation or part thereof originally intended to be satisfied, shall be revived and continued in full force and effect as if such payment or payments had not been made or such enforcement or setoff had not occurred.

**Section 10.09    Governing Law; Jurisdiction; Consent to Service of Process.**  (a)  This Agreement and the other Loan Documents and any claims, controversy, dispute or cause of action (whether sounding n contract law or tort law or otherwise) based upon, arising out of or relating to this Agreement or any other Loan Document (except, as to any other Loan Document, as expressly set forth therein) and the transactions contemplated hereby and thereby shall be governed by, and construed in accordance with, the law of the State of New York without giving effect to any choice of law principles that would apply the laws of another jurisdiction and, to the extent applicable, the Bankruptcy Code.

(b)  Each Loan Party hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Bankruptcy Court and, if the Bankruptcy Court does not have, or abstains from jurisdiction, the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to any Loan Document, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding shall be heard and determined in the Bankruptcy Court and, if the Bankruptcy Court does not have, or abstains from jurisdiction, such New York State court or, to the extent permitted by applicable Legal Requirements, in such federal court.  Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable Legal Requirements.  To the extent not required to be brought in Bankruptcy Court, nothing in this Agreement or any other Loan Document or otherwise shall affect any right that the Administrative Agent, any other Agent or any Lender may otherwise have to bring any action or proceeding relating to this Agreement or any other Loan Document against any Loan Party or its properties in the courts of any jurisdiction, and hereby submits to the jurisdiction of any such court.

(c)        Each Loan Party hereby irrevocably and unconditionally waives, to the fullest extent permitted by applicable Legal Requirements, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any other Loan Document in any court referred to in <u>Section 10.09(b)</u>.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by applicable Legal Requirements, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)        Each party to this Agreement irrevocably consents to service of process in any action or proceeding arising out of or relating to any Loan Document, in the manner provided for notices (other than telecopy or email) in <u>Section 10.01</u>.  Nothing in this Agreement or any other Loan Document will affect the right of any party to this Agreement to serve process in any other manner permitted by applicable Legal Requirements.

**Section 10.10  <u>Waiver of Jury Trial</u>.  EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LEGAL REQUIREMENTS, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO ANY LOAN DOCUMENT, THE TRANSACTIONS OR THE OTHER TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 10.10</u>.**

Section 10.11   <u>Headings</u>.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

Section 10.12   <u>Confidentiality</u>.  Each of the Administrative Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its and its Affiliates' and Approved Funds' directors, officers, employees, investors and potential investors, agents, advisors and other representatives, including accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential pursuant to the terms hereof), (b) to the extent requested by any regulatory authority or any quasi-regulatory authority (such as the National Association of Insurance Commissioners), (c) to the extent required by applicable Legal Requirements or by any subpoena or similar legal process, (d) to any other party to this Agreement, (e) in connection with the exercise of any remedies under the Loan Documents or any suit, action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this <u>Section 10.12</u>, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement, (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to Borrower and its obligations, (iii) any actual or prospective investor in an SPC or (iv) any rating agency for the purpose of obtaining a credit rating applicable to any Loan or Loan Party, (g) with the consent of Borrower, (h) to any assignee or pledgee under <u>Section 10.04(g)</u> or to any other party to this Agreement, or (i) to the extent such Information (i) is publicly available at the time of disclosure or becomes publicly available other than as a result of a breach of this <u>Section 10.12</u> or (ii) becomes available to the Administrative Agent or any Lender on a

nonconfidential basis from a source other than a Loan Party. In addition, the Agents and the Lenders may disclose the existence of the Loan Documents and information about the Loan Documents to market data collectors, similar service providers to the financing community, and service providers to the Agents and the Lenders. For the purposes of this Section 10.12, "**Information**" shall mean all information received from Borrower relating to any Loan Party or its business that is clearly identified at the time of delivery as confidential, other than any such information that is available to the Administrative Agent or any Lender on a nonconfidential basis prior to disclosure by Borrower. Any Person required to maintain the confidentiality of Information as provided in this Section 10.12 shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Section 10.13    **Interest Rate Limitation.**    Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts which are treated as interest on such Loan under applicable law (collectively, the "**Charges**"), shall exceed the maximum lawful rate (the "**Maximum Rate**") which may be contracted for, charged, taken, received or reserved by the Lender holding such Loan in accordance with applicable Legal Requirements, the rate of interest payable in respect of such Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan but were not payable as a result of the operation of this Section 10.13 shall be cumulated and the interest and Charges payable to such Lender in respect of other Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by such Lender.

Section 10.14    **Assignment and Assumption.**    Each Lender to become a party to this Agreement (other than the Administrative Agent and any other Lender that is a signatory hereto) shall do so by delivering to the Administrative Agent an Assignment and Assumption duly executed by such Lender and the Administrative Agent.

Section 10.15    **Obligations Absolute.**    To the fullest extent permitted by applicable law, all obligations of the Loan Parties hereunder shall be absolute and unconditional irrespective of:

(a)    any lack of validity or enforceability of any Loan Document or any other agreement or instrument relating thereto against any Loan Party;

(b)    any change in the time, manner or place of payment of, or in any other term of, all or any of the Secured Obligations, or any other amendment or waiver of or any consent to any departure from any Loan Document or any other agreement or instrument relating thereto;

(c)    any exchange, release or non-perfection or loss of priority of any Liens on any or all of the Collateral, or any release or amendment or waiver of or consent to any departure from any guarantee, for all or any of the Secured Obligations;

(d)    any exercise or non-exercise, or any waiver of any right, remedy, power or privilege under or in respect hereof or any Loan Document; or

(e)    any other circumstances which might otherwise constitute a defense available to, or a discharge of, the Loan Parties.

Section 10.16    **Waiver of Defenses; Absence of Fiduciary Duties.**    (a)  Each of the Loan Parties hereby waives any and all suretyship defenses available to it as a Guarantor arising out of the joint

and several nature of its respective duties and obligations hereunder (including any defense contained in Article VII).

(b)       Each Agent, each Lender and their Affiliates (collectively, solely for purposes of this paragraph, the "**Lenders**"), may have economic interests that conflict with those of the Loan Parties, their stockholders and/or their affiliates.  Each Loan Party agrees that nothing in the Loan Documents or otherwise will be deemed to create an advisory, fiduciary or agency relationship or fiduciary or other implied duty between any Lender, on the one hand, and such Loan Party, its stockholders or its affiliates, on the other.  The Loan Parties acknowledge and agree that (i) the transactions contemplated by the Loan Documents (including the exercise of rights and remedies hereunder and thereunder) are arm's-length commercial transactions between the Lenders, on the one hand, and the Loan Parties, on the other, and (ii) in connection therewith and with the process leading thereto, (x) no Lender has assumed an advisory or fiduciary responsibility in favor of any Loan Party, its stockholders or its affiliates with respect to the transactions contemplated hereby or the exercise of rights or remedies with respect thereto) or the process leading thereto (irrespective of whether any Lender has advised, is currently advising or will advise any Loan Party, its stockholders or its Affiliates on other matters) or any other obligation to any Loan Party except the obligations expressly set forth in the Loan Documents and (y) each Lender is acting solely as principal and not as the agent or fiduciary of any Loan Party, its management, stockholders, creditors or any other Person.  Each Loan Party acknowledges and agrees that it has consulted its own legal and financial advisors to the extent it deemed appropriate and that it is responsible for making its own independent judgment with respect to such transactions and the process leading thereto.  Each Loan Party agrees that it will not claim that any Lender has rendered advisory services of any nature or respect, or owes a fiduciary or similar duty to such Loan Party, in connection with such transaction or the process leading thereto.

**Section 10.17    Reinstatement.**    To the extent that any payments on the Indebtedness or proceeds of any Collateral are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, debtor in possession, receiver, receiver and manager, interim receiver or other Person under any bankruptcy law or other Insolvency Law, common law or equitable cause, then to such extent, the Indebtedness so satisfied shall be revived and continue as if such payment or proceeds had not been received and the Secured Parties' Liens, security interests, rights, powers and remedies under this Agreement and each Loan Document shall continue in full force and effect.  In such event, each Loan Document shall be automatically reinstated and each Loan Party shall take (and shall cause each other Loan Party to take) such action as may be requested by the Administrative Agent, the Collateral Agent or the Required Lenders to effect such reinstatement.

**Section 10.18    USA Patriot Act.**  Each Lender hereby notifies each Loan Party that pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies the Loan Parties, which information includes the name, address  and taxpayer identification number of each Loan Party and other information that will allow such Lender to identify such Loan Party in accordance with the Patriot Act.

**Section 10.19    DIP Orders.**  In the event of any conflict between the terms of the DIP Orders and the terms of this Agreement or any other Loan Document, the terms of the DIP Orders shall govern and control.

(Signature Pages Follow)

IN WITNESS WHEREOF, the parties hereto have caused this Credit Agreement to be duly executed by their respective authorized officers or other authorized signatories as of the day and year first above written.

**CARBONLITE P, LLC**, as Borrower

By:_____
Name:_____
Title:_____

**CARBONLITE P HOLDINGS, LLC**, as Guarantor

By:_____
Name:_____
Title:_____

**UMB BANK, N.A.**, as Administrative Agent and Collateral Agent

By:_____
Name:_____
Title:_____

**Commitment Schedule**

| Lender | Amount of New Money DIP Commitment |
|---|---|
|  | $ |
|  | $ |
|  | $ |