## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CARBONLITE HOLDINGS LLC, *et al.*,[1] | ) | Case No. 21-10527 (JTD) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**CA DEBTORS' MOTION SEEKING ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE CA DEBTORS TO OBTAIN POSTPETITION SECURED FINANCING PURSUANT TO SECTION 364 OF THE BANKRUPTCY CODE; (II) AUTHORIZING THE CA DEBTORS TO USE CASH COLLATERAL; (III) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS; (IV) GRANTING ADEQUATE PROTECTION TO THE PREPETITION LENDERS; (V) MODIFYING THE AUTOMATIC STAY; (VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF**

The following above-captioned debtors and debtors in possession in these chapter 11 cases (the "Chapter 11 Cases"),[2] CarbonLite Holdings, LLC ("Holdings"), CarbonLite Sub-Holdings, LLC ("Sub-Holdings"), CarbonLite Industries LLC ("CL Industries"), CarbonLite Pinnpack, LLC ("CL Pinnpack"), Pinnpack Packaging, LLC ("Pinnpack"), CarbonLite PI Holdings LLC ("CA Holdings"), and Pinnpack P, LLC ("Pinnpack P" and, together with Holdings, Sub-Holdings, CL Industries, CL Pinnpack, Pinnpack, and CA Holdings the "CA Debtors" and, collectively with the other above-captioned debtors and debtors in possession, the "Debtors"), respectfully state as follows in support of this motion (the "Motion"):

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: CarbonLite Holdings LLC (8957); CarbonLite Industries LLC (3596); CarbonLite P Holdings LLC (8957); CarbonLite P LLC (5453); CarbonLite PI Holdings LLC (8957); CarbonLite Pinnpack LLC (8957); CarbonLite Recycling Holdings LLC (8957); CarbonLite Sub-Holdings, LLC (8957); Pinnpack P, LLC (8322); CarbonLite Recycling LLC (3727); and Pinnpack Packaging LLC (9948). The address of the Debtors' corporate headquarters is 10250 Constellation Blvd., Los Angeles, CA 90067.

[2] Where applicable to the rights, remedies and protections sought in connection with the approval of the DIP Facilities (defined below), references to the Chapter 11 Cases refer to the Chapter 11 Cases of the CA Debtors.

**Overview**

1.      The CA Debtors bring this financing Motion pursuant to sections 105, 361, 362, 363, 364(c)(l), 364(c)(2), 364(c)(3), 364(d), 364(e), and 507 of title 11 of the United States Code (the "Bankruptcy Code"), rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), for entry of an interim order (the "Interim Order") and, following a hearing, a final order (the "Final Order" and, together with the Interim Order, the "DIP Orders") (i) authorizing the CA Debtors to obtain postpetition secured financing pursuant to section 364 of the Bankruptcy Code, (ii) authorizing the CA Debtors to use cash collateral of the CA Debtors, (iii) granting liens and superpriority administrative expense claims, (iv) granting adequate protection to the CA Prepetition Secured Parties (defined below), (v) modifying the automatic stay, (vi) scheduling a final hearing, and (viii) granting related relief.

2.      The Debtors commenced these cases in order to maximize their collective going concern value for the benefit of all stakeholders.  The Debtors intend to conduct a marketing and sale process through these chapter 11 cases that will preserve jobs and yield distributions to their creditors.  However, the CA Debtors need financing and access to cash collateral in order to maintain their operations and facilitate the sale and restructuring process.

3.      For the avoidance of doubt, only the CA Debtors are seeking debtor-in-possession financing and authorization to use cash collateral of the CA Debtors by this Motion.  Concurrently herewith, (a) Debtors CarbonLite P Holdings, LLC ("PA Holdings") and

2

CarbonLite P, LLC ("CLP") (together PA Holdings and CLP, the "PA Debtors"), and (b) CarbonLite Recycling Holdings, LLC ("TX Holdings") and CarbonLite Recycling, LLC ("Recycling" and, together with TX Holdings, the "TX Debtors"), are seeking the Court's approval to obtain separate debtor-in-possession financing and authorization to use cash collateral of the TX Debtors and PA Debtors (together the "TX/PA Debtors"),[3] to finance their respective operations.

4.      As of the Petition Date, the CA Debtors had not less than $99.36[4] million in outstanding secured obligations due under the Prepetition Term Loan (as defined below), and approximately $7.8 million in outstanding secured principal obligations due under the Prepetition ABL Loan (as defined below).  By this Motion, the CA Debtors seek authority to consummate the DIP Facilities (as defined below) with the DIP Lenders (as defined below) on the terms set forth in the DIP Documents (as defined below), consisting of (a) new term loan availability of up to $20 million and (b) new ABL availability of up to $18.5 million.[5]  Generally speaking, under the approved Budget (defined below), the CA Debtors will first use availability under the DIP

---

[3] For the purposes of this Motion, the debtor-in-possession lenders with respect to the TX/PA Debtors are referred to as the "TX/PA DIP Secured Parties" and the prepetition secured lenders with respect to the TX/PA Debtors are referred to as the "TX/PA Prepetition Secured Parties" and any orders entered relating to the motion of the TX/PA Debtors for debtor-in-possession financing are referred to as the "TX/PA DIP Orders."

[4] As described more fully below, the Prepetition Term Loan has three separate tranches (each a "Tranche").  With respect to Tranches A and C, which will be subject to the roll-up described below, approximately $86,116,278.32 in aggregate principal for Tranche A is outstanding plus $5,484,035 in aggregate principal for Tranche C is outstanding plus approximately $2,418,561 million in accrued and unpaid interest for Tranches A and C.  Tranche B, which will not be subject to the roll-up, has approximately $5.25 million in principal outstanding plus approximately $97,708 in accrued and unpaid interest.  LF Investment Holdings, LLC, an entity controlled by Leon Farahnik, bought a participation in all of the Tranche B portion of the Prepetition Term Loan.

[5] The maximum credit of $18.5 million available under the DIP ABL Facility is inclusive of any outstanding prepetition obligations under the Prepetition ABL Loan Documents.

ABL Facility and, to the extent needed according to the expenditures forecast in the Budget, undertake further borrowings under the DIP Term Facility.

5.      The proceeds of the DIP Facilities will be used to pay (a) postpetition operating expenses and other working capital requirements of the CA Debtors, (b) costs and expenses incurred in administering the Chapter 11 Cases of the CA Debtors, and (c) interest, fees (including professional fees and expenses) and other charges due under the DIP Documents.

6.      The DIP Facilities present the CA Debtors' estates with the best economic terms available and provide the CA Debtors with adequate liquidity to maintain operations in the ordinary course and satisfy ongoing administrative expenses associated with the Chapter 11 Cases of the CA Debtors.

7.      An immediate need exists for the CA Debtors to obtain authority to enter into the DIP Facilities in order to permit, among other things, the orderly continuation of the operation of their business, to maintain vital business relationships with vendors, suppliers and customers, to meet payroll obligations, and to satisfy other working capital, development, and operational needs in order to maximize the value of their respective businesses and assets as debtors in possession under chapter 11 of the Bankruptcy Code.  The CA Debtors do not have sufficient available resources of working capital to operate their businesses in the ordinary course without post-petition financing and the use of cash collateral.  The CA Debtors' ability to maintain business relationships, to pay employees, and otherwise to fund operations is essential to the CA Debtors' viability and to the preservation of the going concern value of their business pending a sale of their assets or other restructuring.

DOCS_NY:42377.9

8.    The CA Debtors seek entry of the Interim Order, substantially in the form

attached hereto as **Exhibit A** and the Final Order to be submitted at a later date:

a.    authorizing the CA Debtors to obtain senior secured postpetition term financing on a superpriority basis in the aggregate principal amount of $65,484,035.34 (the "DIP Term Facility," and all amounts extended or deemed to be outstanding under the DIP Term Facility, the "DIP Term Loans"), consisting of (i) a $20,000,000 new money delayed-draw term loan facility ("New Money DIP Term Loans") and (b) subject to entry of the Final Order, $45,484,035.34 (the "Term Roll-Up Amount") of DIP Term Loans resulting from a "roll-up" of $45,484,035.34 of obligations outstanding under the Prepetition Term Credit Agreement (as defined below), pursuant to the terms and conditions of that certain *Senior Secured Super-Priority Debtor-in-Possession* Term *Loan Credit Agreement* (as the same may be amended, restated, supplemented, waived, or otherwise modified from time to time, the "DIP Term Credit Agreement"), by and among Holdings, as borrower (the "DIP Term Borrower"), Subholdings, CA Holdings, CL Industries, CL Pinnpack, Pinnpack and Pinnpack P, as guarantors (the "DIP Term Guarantors" and, together with the DIP Term Borrower, the "DIP Term  Loan Parties"), and Orion Energy Partners Investment Agent, LLC ("Orion"), as administrative agent and collateral agent (in such capacities, the "DIP Term Agent") for and on behalf of itself and the lenders party thereto (collectively, including the DIP Term Agent, the "DIP Term Lenders"), substantially in the form of **Exhibit B** attached hereto;

b.    authorizing the CA Debtors to borrow $7.0 million in New Money DIP Term Loans under the DIP Term Facility (the "Interim Term Amount") upon entry of the Interim Order to avoid immediate and irreparable harm;

c.    authorizing the CA Debtors to obtain senior secured postpetition asset-based revolving financing on a superpriority basis in the aggregate principal amount of up to $18.5 million (the "DIP ABL Facility," and all amounts extended under the DIP ABL Facility (inclusive of all Prepetition ABL Obligations (as defined below)) the "DIP ABL Loans"),[6] pursuant to that certain Prepetition ABL Credit Agreement  (as defined below) by and among CL Industries, CL Pinnpack, and Pinnpack (together collectively "DIP ABL Borrowers", the DIP ABL Borrowers, together with the DIP Term Loan Parties, the "DIP Loan Parties")), and Bank Leumi USA (the "Prepetition ABL Lender"), as ratified and amended by that certain *Ratification and Amendment Agreement* (the "Ratification Agreement"), by and among the DIP Loan Parties and Bank Leumi USA (the "DIP ABL

---

[6] Collectively, the DIP Term Facility and the DIP ABL Facility are referred to hereinafter as the "DIP Facilities."

Lender" and, together with the DIP Term Agent and the DIP Term Lenders, the "DIP Lenders") a copy of which is attached as **Exhibit C**[7] hereto (as amended, supplemented or otherwise modified from time to time in accordance with the terms and conditions set forth herein, the "DIP ABL Credit Agreement" and, together with the DIP Term Credit Agreement, the "DIP Credit Agreements").  Subject to entry of the Final Order, the balance of the DIP ABL Facility shall be made available, with all then outstanding Prepetition ABL Obligations deemed to be DIP ABL Obligations at such time pursuant to the terms and conditions of the DIP ABL Credit Agreement;[8]

d.     authorizing the CA Debtors to borrow up to an aggregate amount of $7.0 million in postpetition DIP ABL Loans ("Interim DIP ABL Loans" together with the Interim Term Amount, the "Interim Amount") during the period between the entry of the Interim Order and the Final Order (the "Interim Financing Period");

e.     authorizing the CA Debtors to execute and deliver the DIP Credit Agreements and any other agreements, instruments, pledge agreements, guarantees, fee letters, control agreements related thereto, and other loan documents and documents related thereto, including any intercreditor agreements, security agreements, and notes (in each case, as amended, restated, supplemented, waived, or modified from time to time, collectively, such documents with respect to the DIP Term Credit Agreement, the "DIP Term Documents" and with respect to the DIP ABL Credit Agreement, the "DIP ABL Documents") (the DIP Term Documents and the DIP ABL Documents, collectively, the "DIP Documents"), and to perform such other acts as may be necessary or desirable in connection with the DIP Documents;

f.     granting the DIP Term Facility and all obligations owing thereunder and under, or secured by, the DIP Term Documents to the DIP Term Agent and DIP Term Lenders (collectively, and including all "Obligations" as defined in the DIP Term Credit Agreement § 1.01, the "DIP Term Obligations") allowed superpriority administrative expense claim status in each of the Chapter 11 Cases of the CA Debtors and any Successor Cases (as defined below) of the CA Debtors;

---

[7] The Ratification Agreement sets forth the terms and conditions under which the Existing Credit Agreement (as defined therein), will be amended and deemed to constitute the DIP ABL Credit Agreement.  Accordingly, a copy of the Existing Credit Agreement is attached hereto as **Exhibit D**.

[8] Under the DIP ABL Facility, during the Interim Financing Period, the CA Debtors will remit collections, asset proceeds and payments received in respect of Prepetition ABL Priority Collateral (as defined below) and DIP ABL Priority Collateral (as defined below) to the DIP ABL Lender for application first to all Prepetition ABL Obligations (as defined below) until such obligations are fully repaid, and then to the repayment of all DIP ABL Obligations (as defined below).  As a result, during the Interim Financing Period, a portion of the Prepetition ABL Obligations will be deemed satisfied and, to the extent available, re-borrowed as DIP ABL Obligations.  The deemed conversion of any remaining Prepetition ABL Obligations to DIP Obligations remains subject to entry of the Final Order.

g.      granting the DIP ABL Facility and all obligations owing thereunder and under, or secured by, the DIP ABL Loan Documents, to the DIP ABL Lender (collectively, and including all "Obligations" as described in the DIP ABL Credit Agreement § 1.2(g), the "DIP ABL Obligations" and, together with the DIP Term Obligations, the "DIP Obligations") allowed superpriority administrative expense claim status in each of the Chapter 11 Cases of the CA Debtors and any Successor Cases of the CA Debtors;

h.      granting each of (a) the DIP Term Agent, for the benefit of itself and the DIP Term Lenders and the other Secured Parties (as defined in the DIP Term Credit Agreement) under the applicable DIP Term Documents and (b) the DIP ABL Lender (as defined in the DIP ABL Credit Agreement) under the applicable DIP ABL Loan Documents, automatically perfected security interests in and liens on all of the DIP Collateral (as defined below), including all DIP Collateral constituting "cash collateral" of the CA Debtors as defined in section 363(a) of the Bankruptcy Code ("Cash Collateral"), which liens shall have the priorities set forth in the Interim Order and the Final Order;

i.      authorizing the CA Debtors to pay the principal, interest, premiums, fees, expenses, and other amounts payable under the DIP Documents as such become earned, due and payable, to the extent provided in, and in accordance with, the DIP Documents, the Interim Order and the Final Order;

j.      authorizing the CA Debtors to use the Prepetition Collateral (as defined below), including the Cash Collateral of the Prepetition Term Secured Parties (as defined below) under the Prepetition Term Documents (as defined below) and of the Prepetition ABL Secured Party (as defined below) under the Prepetition ABL Documents ( as defined below), and providing adequate protection to the Prepetition Term Secured Parties and Prepetition ABL Secured Party for, among other things, any diminution in value resulting from the imposition of the automatic stay, the CA Debtors' use, sale, or lease of the Prepetition Collateral, including Cash Collateral, and the priming of the CA Prepetition Secured Parties' (as defined below) respective interests in the Prepetition Collateral (including by the Carve-Out (as defined below)) ("Diminution in Value") of their respective interests in the Prepetition Collateral;

k.      vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents, the Interim Order and the Final Order;

7

l.       scheduling a final hearing (the "Final Hearing") to consider the relief requested in the Motion and approving the form of notice with respect to the Final Hearing; and

m.     granting related relief.

## Jurisdiction and Venue

9.     The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtors confirm their consent pursuant to Local Rule 9013-1(f) to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

10.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

11.    The statutory bases for the relief requested herein are sections 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d), 364(e) and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, and 9014, and Local Rule 4001-2.

## Background

12.    On the date hereof (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The CA Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a)

8

and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases, and no committees have been appointed or designated.

13.     The Debtors are on the forefront of processing post-consumer recycled polyethylene terephthalate ("rPET") plastic products and producing high-quality rPET and polyethylene terephthalate ("PET") beverage and food packaging products. As of the Petition Date, the Debtors operate two facilities, one in Riverside, California (the "Riverside Facility") and the other in Dallas, Texas (the "TX Facility") at which they process PET bottles and flake into rPET pellets, which are later incorporated into other products and packaging. The Debtors are scheduled to begin operations at a third processing facility in Reading, Pennsylvania (the "PA Facility") in April 2021. The Debtors also operate PinnPack, which processes the rPET and PET into high-quality thermoformed tubs, bowls, domes and clamshell packaging at a facility in Oxnard, California (the "Pinnpack Facility")[9] which the Debtors sell to customers including restaurants and grocery stores. A detailed description of the Debtors' business and the facts precipitating the filing of the Debtors' Chapter 11 Cases are set forth in the *Declaration of Brian Weiss in Support of Debtors' Chapter 11 Petitions and First Day Relief* (the "First Day Declaration"), incorporated herein by reference. Additionally, the CA Debtors submit the *Declaration of Richard W. Morgner in support of Debtors' Motions Authorizing the Debtors to Obtain Postpetition Secured Financing and Related Relief* (the "Morgner Declaration"), filed contemporaneously herewith, in further support of this Motion.

---

[9] The Pinnpack Facility and the Riverside Facility are referred to collectively hereinafter as the "CA Facilities."

## Overview of Prepetition Secured Financing

**A. Debtors' Prepetition Capital Structure**

**i.      Ownership Structure**

14.    Holdings, a Delaware limited liability company, is the ultimate parent of the other Debtor entities and is privately held.   As of the Petition Date, Holdings had issued 11 series of membership units, which are held of record by approximately 67 parties.  All of the entities listed below are limited liability companies organized under Delaware law.  *See* First Day Declaration, at ¶ 18.

15.    Holdings owns 100% of the membership interests in Subholdings. Subholdings, in turn, owns 100% of the membership interests in CA Holdings.  *See id.* at ¶ 19.

16.    CA Holdings owns 100% of the membership interests in CL Industries and CL Pinnpack.  CL Industries operates the Riverside Facility, a rPET plastic beverage container recycling and processing facility, under a long term lease.  CL Pinnpack owns 99.295% of the membership interests in PinnPack,[10] which owns the Pinnpack Facility producing high-quality, food-grade thermoformed PET and rPET packaging products.  Pinnpack owns 100% of the membership interests in Pinnpack P an inactive entity with no assets or liabilities. *See id.* at ¶¶ 19-20.

17.    Subholdings also owns 100% of the membership interests in (i) TX Holdings and (ii) PA Holdings.  TX Holdings owns 100% of the membership interests in

---

[10] The other .705% of the membership interests in Pinnpack are held by non-Debtor Leading Industry, Inc., an unrelated entity which formerly owned the business conducted by Pinnpack.

DOCS_NY:42377.9

Recycling, which operates the Dallas Facility.  PA Holdings owns 100% of the membership interests in CLP, which operates the Reading Facility. *See id.* at ¶¶ 19, 21.

> ii.     **Prepetition Term Facility -  CA Debtors**

18.     *Prepetition Term Documents*.  Pursuant to that certain *Credit Agreement*, dated as of August 2, 2019 (as amended, amended and restated, supplemented, or otherwise modified from time to time, the "Prepetition Term Credit Agreement" and, collectively with the Loan Documents (as defined in the Prepetition Term Credit Agreement) and any other agreements and documents executed or delivered in connection therewith, each as amended, restated, supplemented, waived, or otherwise modified from time to time, the "Prepetition Term Documents") among (a) Holdings (in such capacity, the "Prepetition Term Borrower"), (b) Orion Energy Partners Investment Agent, LLC, as administrative agent and collateral agent (in such capacities, the "Prepetition Term Agent"), (c) the guarantors thereunder (the "Prepetition Term Guarantors" and, together with the Prepetition Term Borrower, the "Prepetition Term Obligors"), and (d) the lenders party thereto (the "Prepetition Term Lenders" and, collectively with the Prepetition Term Agent, the "Prepetition Term Secured Parties"), the Prepetition Term Lenders provided term loans to the Prepetition Term Borrower (the "Prepetition Term Facility").

19.     *Prepetition Term Obligations.*  As of the Petition Date, the Prepetition Term Obligors were indebted to the Prepetition Term Secured Parties in respect of the loans incurred under the Prepetition Term Facility (collectively, the "Prepetition Term Loans"), in an aggregate amount, as of the Petition Date, of not less than $99.36 million (collectively, together

with accrued and unpaid interest, fees, expenses, and disbursements and other charges, amounts, and costs in respect of any of the Prepetition Term Obligors' obligations pursuant to the Prepetition Term Documents, the "Prepetition Term Obligations").  The Prepetition Term Loans more specifically comprise $80 million in principal amount of Tranche A Loans plus approximately $2.38 million in accrued and unpaid interest , (B) $5.25[11] in principal amount of Tranche B Loans plus approximately $97,700 in accrued and unpaid interest, and (C) $5.48 million in principal amount of Tranche C Loans, the Tranche A Loans and Tranche C Loans (together, the "Prepetition Term A/C Loans") plus approximately $38,500 in accrued and unpaid interest.

20.     *Prepetition Term Liens*.  As more fully set forth in the Prepetition Term Documents, before the Petition Date, the Prepetition Term Borrower and the Prepetition Term Guarantors granted to the Prepetition Term Agent, for the benefit of itself and the Prepetition Term Lenders, a security interest in and continuing lien (the "Prepetition Term Liens") on substantially all of their assets and property (with certain exceptions set out in the Prepetition Term Documents).  As of the Petition Date, subject to the terms of the Prepetition Intercreditor Agreement (as defined below), the Prepetition Term Agent holds, for the benefit of itself and the Prepetition Term Lenders, (a) a first-priority security interest in and continuing lien on Term Loan Priority Collateral (as defined in the Prepetition Intercreditor Agreement and proceeds, products, and rents thereof (collectively, the "Prepetition Term Priority Collateral") and (b) a second priority security interest in and continuing lien on ABL Priority Collateral (as defined in

---

[11] LF Investment Holdings, LLC, an entity controlled by Leon Farahnik, bought a participation in all of the Tranche B portion of the Prepetition Term Loan.

the Prepetition Intercreditor Agreement) and all proceeds, products, accessions, rents, and profits thereof, in each case, whether then owned or existing or thereafter acquired or arising (collectively, the "Prepetition ABL Priority Collateral" and, together with the Prepetition Term Priority Collateral, the "Prepetition Collateral"), subject in the case of (b) only to the liens of the Prepetition ABL Lender (as defined below) on the Prepetition ABL Priority Collateral and Prepetition Term Permitted Prior Liens (as defined below).  For the avoidance of doubt, the Prepetition Collateral does not include any property or assets of any Debtor that is not a CA Debtor.

### iii.       Prepetition ABL Facility - CA Debtors

21.     *Prepetition ABL Documents*.  Pursuant to that certain *Credit Agreement*, dated as of September 16, 2019 (as amended, amended and restated, supplemented, or otherwise modified from time to time, the "Prepetition ABL Credit Agreement"[12] and, collectively with the Prepetition Loan Documents (as defined in the Prepetition ABL Credit Agreement) and any other agreements, documents, and instruments executed and/or delivered with, to, or in favor of Prepetition ABL Lender in connection therewith, including, without limitation, all security agreements, notes, instruments, guarantees, Uniform Commercial Code financing statements, each as amended, restated, supplemented, waived, or otherwise modified from time to time, the "Prepetition ABL Documents" and, together with the Prepetition Term Documents, the "Prepetition Documents") among (a) CL Industries, CL PinnPack, and PinnPack (the "Prepetition ABL Borrowers"), (b) Bank Leumi USA ("Leumi"), as Lender (in such

---

[12] The Prepetition ABL Credit Agreement is attached hereto as **Exhibit D**.

capacity, the  "Prepetition ABL Lender"), and (c) as guarantors, CA Holdings and non-Debtor

Leon Farahnik (the "Prepetition ABL Guarantors" and, together with the Prepetition ABL

Borrowers,   the "Prepetition   ABL   Obligors"),   and   the   Prepetition   ABL   Lender

(the "Prepetition ABL Secured Party", together with the Prepetition Term Secured Parties,

the "CA Prepetition Secured Parties"), provided revolving loans to the Prepetition ABL

Borrowers on a secured basis (the "Prepetition ABL Facility" and, together with the Prepetition

Term Facility, the "Prepetition Secured Facilities").

22.     *Prepetition ABL Obligations*.   As of the Petition Date, the Prepetition

ABL Obligors were indebted to the Prepetition ABL Lender under the Prepetition ABL Loan

Documents, in respect of outstanding Revolving Loans (as defined in the Prepetition Credit

Agreement) in the aggregate principal amount of not less than $7.8 million  under the Prepetition

ABL Facility (the  "Prepetition ABL Loans"), plus interest accrued and accruing thereon,

together with all costs, fees, termination fees, fees and expenses and other charges, amounts, and

costs in respect of any of the Prepetition ABL Borrowers' or the Prepetition ABL Guarantors'

obligations pursuant to, or secured by, the Prepetition ABL Documents (collectively, the

"Prepetition ABL Obligations," and, together with the Prepetition Term Obligations, the

"Prepetition Obligations").

23.     *Prepetition ABL Liens*.   As more fully set forth in the Prepetition ABL

Loan Documents, as of the Petition Date, the Prepetition ABL Borrowers and the Prepetition

ABL Guarantors granted to the Prepetition ABL Lender, security interests in and continuing

liens (the "Prepetition ABL Liens" and, together with the Prepetition Term Liens,

the "<u>Prepetition Liens</u>") upon substantially all of their assets and properties (with certain exceptions set out in the Prepetition ABL Documents).  As of the Petition Date, subject to the terms of the Prepetition Intercreditor Agreement, the Prepetition ABL Lender holds (a) a first-priority security interest in and continuing lien on Prepetition ABL Priority Collateral and (b) a second priority security interest in and continuing lien on Prepetition Term Priority Collateral, subject in the case of (b) only to the liens of the Prepetition Term Agent on the Prepetition Term Priority Collateral and Prepetition ABL Permitted Prior Liens (as defined below).

<b>iv.        Intercreditor Agreement</b>

24.        The Prepetition Term Agent and the Prepetition ABL Lender entered into that certain Intercreditor Agreement, dated as of September 16, 2019 (as amended, amended and restated, supplemented, or otherwise modified from time to time, the "<u>Prepetition Intercreditor Agreement</u>") to govern the respective rights, interests, obligations, priority, and positions of the Prepetition Term Secured Parties and Prepetition ABL Secured Parties with respect to the assets and properties of certain of the Debtors.

**B.  Acknowledgments**

25.        Pursuant to the DIP Orders,[13] the CA Debtors have stipulated that, as of the Petition Date, subject to the terms of the Prepetition Intercreditor Agreement, (a) the Prepetition Liens of the CA Prepetition Secured Parties on the Prepetition Collateral were valid, binding, enforceable, non-avoidable, and properly perfected and were granted to, or for the benefit of, the CA Prepetition Secured Parties for fair consideration and reasonably equivalent

---

[13] The following summary description is qualified by the "<u>Stipulations</u>", as defined under, and set forth in, each of the DIP Orders.

15

value; and (b) the Prepetition Liens of the CA Prepetition Secured Parties were senior in priority

over any and all other liens on the Prepetition Collateral, subject only to certain liens otherwise

permitted by the Prepetition Loan Documents (solely to the extent any such permitted liens were

valid, properly perfected, non-avoidable, and senior in priority to respective liens of the CA

Prepetition Secured Parties or were valid non-avoidable senior liens that are perfected

subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, the

"Prepetition Permitted Prior Liens").

        26.    The CA Debtors have further acknowledged that the Prepetition

Obligations constitute legal, valid, binding, and non-avoidable obligations of the CA Debtors

enforceable in accordance with the terms of the applicable Prepetition Loan Documents and that

neither the Prepetition Liens nor the Prepetition Obligations are subject to any challenge or

defense, including avoidance, disallowance, disgorgement, recharacterization, or subordination

(equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

The CA Debtors have further waived, discharged, and released any right to challenge any of the

Prepetition Obligations, the priority of the CA Debtors' obligations thereunder, and the validity,

extent, and priority of the liens securing the Prepetition Obligations.

        27.    Last, pursuant to the Stipulations, the CA Debtors have acknowledged that

(a) the Prepetition Term Obligations constitute allowed, secured claims against the CA Debtors

within the meaning of sections 502 and 506 of the Bankruptcy Code (provided that, the value of

the Prepetition Term Liens at the Petition Date and whether the Prepetition Term Obligations are

fully secured within the meaning of Section 506 of the Bankruptcy Code is reserved

DOCS_NY:42377.9

notwithstanding the Stipulations), and (b) and that the Prepetition ABL Obligations are fully secured claims against the CA Debtors.

**C. Cash Collateral**

28.     The CA Debtors submit that all of the CA Debtors' cash, including any cash in their deposit accounts, wherever located, whether as original collateral or proceeds of other Prepetition Collateral, constitutes or will constitute Cash Collateral of the CA Prepetition Secured Parties and DIP Lenders, as applicable.   The CA Prepetition Secured Parties agree to permit the use of the Cash Collateral on the terms set forth in the DIP Orders.

## **Background to Proposed DIP Facilities**

29.     Prior to the Petition Date, the CA Debtors recognized a need for further outside financing and began the process of considering potential funding sources.   The CA Debtors, through their advisors, discussed with various third parties the opportunity to provide financing to the CA Debtors.   Ultimately, none of those parties was prepared to provide DIP financing on an unsecured or junior basis, and, further, all would have required priming liens on existing collateral of the Prepetition Secured Parties.   The Prepetition Secured Parties informed the CA Debtors that they would not consent to such terms and, accordingly, taking into account the circumstances and the proposal provided by the DIP Lenders, the CA Debtors determined, in an exercise of their business judgment, to accept the applicable DIP Lenders' proposal.  *See* First Day Declaration, at ¶ 93.

30.     Separately, the CA Debtors performed due diligence regarding the reasonableness of the terms proposed for the DIP Facilities by the DIP Lenders, including by

comparing such terms to other comparable and recent debtor-in-possession credit facilities provided in the marketplace.  Based on such analysis, the CA Debtors believe that the DIP Facilities are provided on reasonable market terms in light of the circumstances of this case.  The DIP Lenders are unwilling to provide financing to the CA Debtors on an unsecured or subordinated basis. *See id.* at ¶ 94.

31.    After careful review of their financing options, the CA Debtors concluded that the DIP Lenders' proposed terms would allow the CA Debtors to meet their goals and provide the CA Debtors with sufficient liquidity on the best available economic terms.  Through the DIP Documents, the CA Debtors will continue to have access to sufficient liquidity for their accruing administrative expenses pending a sale of their assets or reorganization.  All negotiations with the DIP Lenders were conducted at arms' length and in good faith.  The outcome of such negotiations are the proposed DIP Agreements pending before this Court. *See id.* at ¶ 95.

32.    The CA Debtors now seek to move forward with the proposed DIP Facilities on the terms set forth in the DIP Documents.  Subject to this Court's approval, the CA Debtors intend to draw on the DIP Facilities in order to satisfy the CA Debtors' ongoing working capital needs through their restructuring process.  The CA Debtors have a need to use Cash Collateral on an interim basis and to obtain credit in an amount equal to the Interim Amounts pursuant to the DIP Facilities in order to, among other things, enable the orderly continuation of their operations and to administer and preserve the value of their estates.  The ability of the CA Debtors to maintain business relationships with their vendors, suppliers, and customers, to pay

DOCS_NY:42377.9

their employees, and otherwise finance their operations requires both the availability of working capital from the DIP Facilities and the use of Cash Collateral; the absence of either would immediately and irreparably harm the CA Debtors, their estates, and parties in interest.  The CA Debtors do not have sufficient available sources of working capital and financing to operate their businesses or maintain their properties in the ordinary course of business before the entry of the Final Order without the authorization to use Cash Collateral and to borrow the Interim Amounts. *See id.* at ¶ 97.

33.     The DIP Facilities are the best source of debtor-in-possession financing available to the CA Debtors.  Given their current financial condition, financing arrangements, and capital structure, the CA Debtors have been and continue to be unable to obtain financing from sources other than the DIP Lenders on terms more favorable than the DIP Facilities.  The CA Debtors are unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  The CA Debtors have also been unable to obtain (a) unsecured credit having priority over that of administrative expenses of the kind specified in sections 503(b), 507(a), and 507(b) of the Bankruptcy Code; (b) credit secured solely by a lien on property of the CA Debtors and their estates that is not otherwise subject to a lien; or (c) credit secured solely by a junior lien on property of the CA Debtors and their estates that is subject to a lien.  Financing on a postpetition basis on better terms is not available without granting the DIP Term Agent and the DIP ABL Lender, for the benefit of themselves and the other DIP Lenders, (1) perfected security interests in and liens on (each as provided herein) the

DIP Collateral, with the priorities described herein; (2) superpriority claims; and (3) the other protections set forth in the Interim Order and the Final Order.

34.    As a condition to entry into the DIP Agreements, the extension of credit under the DIP Facilities, and the authorization to use the Prepetition Collateral, including Cash Collateral, the DIP Term Agent, the DIP Lenders, and the CA Prepetition Secured Parties require, and the CA Debtors have agreed, that proceeds of the DIP Facilities and the CA Prepetition Secured Parties' Cash Collateral shall be used in a manner consistent with the terms and conditions of the Interim Order, the Final Order and the DIP Documents and in accordance with the budget (as the same may be modified from time to time consistent with the terms of the DIP Documents and subject to such variances and exclusions as permitted in the DIP Documents, and as set forth in paragraphs 17 and 18 of the Interim Order, the "Budget"),[14] solely for the purposes set forth in the DIP Documents, the Interim Order and the Final Order, including (a) ongoing working capital and other general corporate purposes of the CA Debtors and (b) permitted payment of costs of administration of the Chapter 11 Cases of the CA Debtors.

## Concise Statement of Relief Requested

35.    In accordance with Bankruptcy Rule 4001(b) and Local Rule 4001-2, below is a summary[15] of the essential terms of the proposed financing and use of cash collateral, as well as a reference to the corresponding provisions of the order or agreement:

---

[14] A copy of the Budget is attached hereto as **Exhibit E**.

[15]    The summaries and descriptions of the terms and conditions for the proposed financing and use of Cash Collateral and the provisions of the Interim Order set forth in this Motion are intended solely for informational purposes to provide the Court and parties in interest with an overview of the significant terms thereof. The summaries and descriptions are qualified in their entirety by the Interim Order and the DIP Documents. In the event there is any conflict between this Motion and the Interim Order or the DIP Documents, the Interim Order and the DIP Documents will control in all respects.

(a)  <u>Borrowers</u>.

  (i)  *DIP Term Facility*:  CarbonLite Holdings, LLC, as debtor and debtor-in possession.

  (ii)  *DIP ABL Facility*:  CarbonLite Industries LLC, CarbonLite Pinnpack LLC, and Pinnpack Packaging LLC, each as a debtor and debtor-in-possession.

(b)  <u>Guarantors</u>.

  (i)  *DIP Term Facility*: CarbonLite Subholdings LLC, CarbonLite PI Holdings LLC, CarbonLite Industries LLC, CarbonLite Pinnpack LLC, Pinnpack Packaging LLC, and Pinnpack P, LLC each as a debtor and debtor-in-possession.

  (ii)  *DIP ABL Facility*: CarbonLite PI Holdings as debtor and debtor-in-possession.

(c)  <u>Lenders</u>.

  (i)  *DIP Term Facility*:  Those Lenders party to the DIP Term Credit Agreement identified in Annex 1 to such agreement.[16]

  (ii)  *DIP ABL Facility*: Bank Leumi USA ("<u>Leumi</u>"), as lender pursuant to the DIP ABL Facility.

(d)  <u>DIP Facilities</u>.  The DIP Facilities are senior secured superpriority debtor-in-possession loan facilities consisting of:

  (i)  *DIP Term Facility*: (a) a $20.0 million new money delayed-draw term loan facility and (b) subject to entry of the Final Order, $45.5 million of DIP Term Loans resulting from a "roll-up" of approximately $45.5 million of the Tranche A Loans plus the Tranche C Loans  outstanding under the Prepetition Term Credit Agreement as described below. Upon entry of the Interim Order, $7.0 million will be available for the CA Debtors to borrow under the DIP Term Facility in order to avoid immediate and irreparable harm to the estates pending a final hearing on the Motion. [*DIP Term Credit Agreement* § 2.01].

  (ii)  *DIP ABL Facility*: (a) a $18.5 million[17] new money revolving loan facility and (b) subject to entry of the Final Order, the remaining principal amount

---

[16] Orion Energy Partners Investment Agent, LLC, is acting as administrative agent (and collateral agent) for and on behalf of the lenders party to the DIP Term Credit Agreement.

of prepetition revolving loans outstanding under the Prepetition ABL Credit Agreement will be deemed to be DIP ABL Loans.  Upon entry of the Interim Order, $7.0 million, will be available for the CA Debtors to borrow under the DIP ABL Facility in order to avoid immediate and irreparable harm to the estates pending a final hearing on the Motion. [*DIP ABL Credit Agreement* §2.4]

(e)     Roll-Up.  Subject to the entry of the Final Order, in accordance with the terms of the DIP Credit Agreements, the following pre-petition indebtedness of the CA Debtors under the Prepetition Documents will be converted into DIP Loans under the applicable DIP Facility:

(i)     *DIP Term Loan*:  Subject to entry of the Final Order, $45.5 million of the Prepetition Term A/C Loans owing to the respective Prepetition Term Loan Lenders shall be rolled-up and deemed to be, and shall thereafter constitute, obligations under the DIP Term Loan. [*Interim Order* ¶ 2; *DIP Term Credit Agreement* § 2.01(b)][18]

(ii)    *DIP ABL Loan*:Subject to entry of the Final Order, the remaining principal amount of prepetition revolving loans outstanding under the Prepetition ABL Credit Agreement (which have not then been rolled up) shall be converted to DIP ABL Loans. Following entry of the Interim Order, during the Interim Financing Period, the CA Debtors will remit collections, asset proceeds and payments received in respect of Prepetition ABL Priority Collateral and DIP ABL Priority Collateral to the DIP ABL Lender for application first to all Prepetition ABL Obligations until such obligations are fully repaid, and then to the repayment of all DIP ABL Obligations.  As a result, during the Interim Financing Period, a portion of the Prepetition ABL Obligations will be deemed satisfied and, to the extent available, re-borrowed as DIP ABL Obligations.  [*Interim Order* ¶ 2; *DIP ABL Credit Agreement* §2.4]

(f)     Interest Rates.

(i)     *DIP Term Loan*:  The Interest Rate with respect to the loans made pursuant to the DIP Term Facility is 11.00% per annum.  Following an Event of Default (as defined in the *DIP Term Credit Agreement* § 7.01), the interest rate is the rate per annum which is equal to the lesser of (a) the sum of the Interest Rate *plus* 2.00% and (b) with respect to each DIP

---

[17] The maximum credit of $18.5 million available under the DIP ABL Facility is inclusive of any outstanding prepetition obligations under the Prepetition ABL Loan Documents.

[18] The Term Roll-Up Amount shall be the (a) the greater of (i) principal obligations in respect of the Tranche A Loans based on a 2:1 ratio of New Money Loans (defined in DIP Term Credit Agreement § 1.01 ) and (ii) $40 million plus (b) all of the Tranche C Principal.] [*DIP Term Credit Agreement* § 1.01 (definition of "Rolled-Up Term Loan Commitment"), § 2.01(b)].

Lender, the applicable maximum non-usurious interest rate, if any. [*DIP Term Credit Agreement* §1.01, §2.04].

(ii)     *DIP ABL Loan*:  The interest rate with respect to the loans made pursuant to the DIP ABL Facility is 8% per annum.  This is derived from the Base Rate (as defined in the Prepetition ABL Credit Agreement §1.1) plus the Applicable Margin (4.00%) (as defined at §1.2 of the *DIP ABL Credit Agreement*).  [*DIP ABL Credit Agreement* §6.3].  The Base Rate is the Prime Rate (each as defined in the *Prepetition ABL Credit Agreement* §1.1) but is subject to a 4% floor.

(g)     <u>Fees and Expenses</u>.

(i)     *DIP Term Facility*:  Pursuant to the Loan Discount Letter (as defined in the *DIP Term Credit Agreement* §1.01), the DIP Term Lenders will receive a 3% discount with respect to the principal amounts loaned in connection with the DIP Term Facility as a fee for the DIP Term Facility and will otherwise receive fees, costs and expense reimbursements, including attorney's fees, consistent with similar financings and the terms of the Prepetition Term Credit Agreement.  Additionally, Orion, in its capacity as Prepetition Agent and DIP Agent, for its own account, shall receive a nonrefundable reimbursement equal to $4,166.667 per month (the "<u>Agent Reimbursement</u>").  [*DIP Term Credit Agreement* §10.03].

(ii)     *DIP ABL Facility*: The DIP ABL Lender shall be entitled to a closing fee of two percent (2%) of the Maximum Credit (as defined at §1.2(j) of the *DIP ABL Credit Agreement* on the DIP Closing Date (as defined at §1.1 of the *DIP ABL Credit Agreement*), which shall be fully earned on account of the financing provided by DIP ABL Lender, and shall be payable one percent 1% on the DIP Closing Date and one percent 1% on the Maturity Date, and will otherwise receive fees, costs and expense reimbursements, including attorney's fees, consistent with similar financings and the terms of the Prepetition ABL Credit Agreement [*DIP ABL Credit Agreement* §10.6].

(h)     <u>Maturity Date – Both DIP Facilities</u>. The earliest to occur of:

(i)     the date that is 120 days after the Petition Date;
(ii)     the date that is 35 days after the Petition Date if the Final DIP Order has not been entered;
(iii)     the date the Chapter 11 Cases are dismissed or converted to chapter 7 case(s);
(iv)     the acceleration and termination of the DIP Term Loan Facility or DIP ABL Facility; or
(v)     the date of the sale of all or substantially all of the assets of the DIP Loan Parties.
[*DIP Term Credit Agreement* §1.01; *DIP ABL Credit Agreement* §1.2(i)].

23

(i)     <u>Purpose of Funding – Both DIP Facilities</u>.  Proceeds of the DIP Facilities and the CA Prepetition Secured Parties' Cash Collateral shall be used in accordance with the Budget for the purposes set forth in and subject to the DIP Documents, including (y) ongoing working capital and other general corporate purposes of the CA Debtors and (z) permitted payment of costs of administration of the Chapter 11 Cases of the CA Debtors.  [*Interim Order ¶¶ 12, 31; DIP Term Credit Agreement §5.13; DIP ABL Credit Agreement §4*].

(j)     <u>Use of Cash Collateral – Both DIP Facilities</u>.  The DIP Facilities contemplate the CA Debtors' continued use of Cash Collateral, according to the Budget on the terms and conditions set forth in the Interim Order and the Final Order.  The parties with an interest in Cash Collateral are the Prepetition Term Secured Parties and the Prepetition ABL Secured Parties.  [*Interim Order ¶ 13*].

(k)     <u>Budget- Both DIP Facilities</u>.  The Budget attached to this Motion has been approved by the CA Debtors, the DIP Agent, the DIP Terms Lenders and the DIP ABL Lender.  The CA Debtors shall comply with the Budget and any updated Budget that may be approved by the DIP Lenders (according to the procedures set forth in the applicable agreement), subject to Permitted Variances (as defined in the *DIP Term Credit Agreement* §1.01) or a Material Budget Deviation (as defined in the *DIP ABL Credit Agreement* §4.).  Compliance with the Budget shall be tested weekly (starting the second full week after the Petition Date).  Any adverse deviation from the Budget beyond any applicable Permitted Variance or Material Budget Deviation shall constitute an event of default unless waived in writing by the DIP Lenders (a "<u>Budget Event</u>").  [*Interim Order ¶¶ 12, 17, 18; DIP Term Credit Agreement § 5.13; DIP ABL Credit Agreement §4.3*].

(l)     <u>Restrictions on Use of Funds – Both DIP Facilities</u>.  Proceeds of the DIP Facilities may only be used in accordance with the Budget or as permitted in the DIP Documents.  No portion of the Carve-Out, the proceeds of any DIP Term Loans or DIP ABL Loans, or any Cash Collateral may be used to (or support any other party to) litigate, object to, contest, or challenge in any manner or raise any defenses to the debt, collateral position, liens, or claims of any of the DIP Lenders, the DIP Term Agent, DIP ABL Lender, the CA Prepetition Secured Parties, the TX/PA DIP Secured Parties, or the TX/PA Prepetition Secured Parties; *provided, however* that the Carve-Out and such collateral proceeds and loans under the DIP Documents may be used for allowed fees and expenses, in an amount not to exceed $75,000 (the "<u>Investigation Budget Amount</u>") incurred solely by a Committee (if appointed), in investigating (but not prosecuting or challenging) the validity of the Stipulations made by the CA Debtors under the DIP Orders (the "<u>Investigation</u>") (as defined below).  [*Interim Order ¶ 31; DIP Term Credit Agreement §5.13; DIP ABL Credit Agreement §4*].

(m)     <u>DIP Liens and Superpriority Claims - Both DIP Facilities</u>.  The DIP Obligations shall (a) pursuant to section 364(c)(1) of the Bankruptcy Code, be entitled to superpriority administrative expense claim status in each of the CA Debtors' Chapter 11 Cases with priority over any and all administrative expenses against

the CA Debtors, and (b) pursuant to sections 364(c)(2), (c)(3) and (d) of the Bankruptcy Code, be secured by liens on the DIP Collateral (as defined below), subject and subordinate to the Carve-Out (except as expressly provided in paragraph 30 of the Interim Order) and the priorities set forth in the DIP Documents and the Interim Order. [*Interim Order* ¶¶ 8, 10; *DIP Term Credit Agreement* §§2.12(b), 2.13; *DIP ABL Credit Agreement* §6.1(b)].

(n)    <u>DIP Collateral - Both DIP Facilities</u>.    For purposes of the Motion, "<u>DIP Collateral</u>" means, collectively, without limitation (a) all personal property assets of the CA Debtors and their estates; (b) all owned real property of the CA Debtors and all real property leases of the CA Debtors; (c) proceeds of actions brought under section 549 of the Bankruptcy Code to recover any post-petition transfer of DIP Collateral; (d) subject to entry of a Final Order, the proceeds of any avoidance actions (such actions, "<u>Avoidance Actions</u>" and the proceeds of such Avoidance Actions, the "<u>Avoidance Action Proceeds</u>") brought pursuant to chapter 5 of the Bankruptcy Code or section 724(a) of the Bankruptcy Code or any other avoidance actions under the Bankruptcy Code or applicable state law equivalent; *provided*, that no liens shall attach to Avoidance Actions. The DIP Collateral includes all assets of the DIP Loan Parties that do not constitute DIP Term Priority Collateral or DIP ABL Priority Collateral (each as defined in the Interim Order) and that are not otherwise subject to valid, perfected, enforceable, and unavoidable security interests or liens in existence as of the Petition Date, or valid liens properly perfected after the Petition Date as permitted under the Bankruptcy Code (the "<u>Unencumbered Collateral</u>"), subject and subordinate to the Carve-Out and the Permitted Prior Liens (all such liens and security interests granted to the DIP Term Agent and the DIP ABL Lender, for their benefit and for the benefit of the DIP Lenders, pursuant to the Interim Order and the DIP Documents, the "<u>DIP Liens</u>"). For the avoidance of doubt, the DIP Collateral and the Unencumbered Collateral shall not include any property or assets of any Debtor that is not a CA Debtor. [*Interim Order* ¶ 8].

(o)    <u>Adequate Protection - CA Prepetition Secured Parties</u>.    As security for any Diminution in Value of the Prepetition Collateral, the CA Prepetition Secured Parties will be granted a valid, perfected replacement security interest in and lien on all of the DIP Collateral, including, subject to entry of the Final Order, Avoidance Action Proceeds (the "<u>Adequate Protection Liens</u>"), subject and subordinate only to (i) the Carve-Out, (ii) the Permitted Prior Liens, and (iii) the DIP Liens (subject to the priorities as between the Prepetition ABL Secured Parties and the Prepetition Term Secured Parties set forth in the Interim Order and the Final Order). The adequate protection obligations of the CA Debtors to the CA Prepetition Secured Parties shall constitute superpriority claims against each of the CA Debtors as provided in section 507(b) of the Bankruptcy Code, to the extent of any Diminution in Value of the Prepetition Term Secured Parties' interests in the Prepetition Collateral, with priority in payment as provided in the Interim Order and the Final Order. Additionally, the CA Debtors shall be authorized and directed to pay, as adequate protection, all accrued and unpaid fees and reasonable and documented disbursements incurred by the Prepetition Term

DOCS_NY:42377.9

Agent and the Prepetition ABL Lender and their advisors whether accrued before, on, or after the Petition Date. [*Interim Order* ¶ 14].

(p)    <u>Credit Bid - Both DIP Facilities and CA Prepetition Secured Parties</u>. In connection with any sale process authorized by this Court, whether effectuated through sections 363, 725, or 1123 of the Bankruptcy Code, the DIP Term Agent, the DIP ABL Lender, the DIP Lenders, and the CA Prepetition Secured Parties may credit bid up to the full amount of the outstanding DIP Obligations and/or the relevant Prepetition Obligations, as applicable, in each case including any accrued and unpaid interest, expenses, fees, and other obligations for their respective priority collateral (each such bid, a "<u>Credit Bid</u>") in any sale of the DIP Collateral or the Prepetition Collateral, respectively, constituting property or assets of the CA Debtors, pursuant to section 363(k) of the Bankruptcy Code, subject in each case to any applicable intercreditor agreement, the priorities set forth in the Interim Order, Final Order, and the TX/PA DIP Orders; *provided*, that any Credit Bid for the equity of any direct or indirect parent of a TX/PA Debtor shall have no effect on (or release, terminate or reduce in any respect) (a) the debt obligations of any TX/PA Debtors or (b) the liens on, or security interests in, any property or assets of any TX/PA Debtors, which shall remain in full force and effect. [*Interim Order* ¶ 21].   Any Credit Bid would be subject to the terms of the Prepetition Intercreditor Agreement (as defined in the Interim Order ¶ G).

(q)    <u>Conditions to Borrowing - Both DIP Facilities</u>. The conditions precedent to borrowing under the DIP Facilities after the entry of the Interim Oder will consist of those conditions precedent customarily required in similar financings, including, without limitation, entry of the Final DIP Order. [*DIP Term Credit Agreement* §§ 4.01, 4.02; *DIP ABL Credit Agreement* §§6.1, 7; *Prepetition ABL Credit Agreement* §4.2].

(r)    <u>Case Milestones - Both DIP Facilities</u>.  The CA Debtors agree to satisfy each of the following milestones during the Chapter 11 Cases (each, a "<u>Milestone</u>"):

   (i)    By no later than 3 days following the Petition Date, the Court shall enter the Interim DIP Order.

   (ii)    By no later than 10 days following the Petition Date, the CA Debtors shall have filed a motion seeking approval of the bidding procedures.

   (iii)    By no later than 35 days following the Petition Date, the Court shall enter the Final DIP Order.

   (iv)    By no later than 30 days following the Petition Date, the Borrower shall have obtained entry of an order from the Court approving bidding procedures (the "<u>Bidding Procedures Order</u>") in respect of a sale of all or substantially all of the Loan Parties' assets to be implemented pursuant to section 363 of the Bankruptcy Code (a "<u>Sale Transaction</u>").

   (v)    By no later than 60 days following the Petition Date, the Borrower shall conduct the auction, if necessary, for all or substantially all of the Borrower's consolidated assets pursuant to Section 363 of the Bankruptcy Code and in accordance with the Bidding Procedures Order.

26

(vi)    By no later than 62 days following the Petition Date, the Court shall hold a hearing regarding approval of the Sale Transaction.

(vii)   By no later than 65 days following the Petition Date, the Court shall have approved the Sale Transaction and entered an order approving the Sale Transaction.

(viii)  By no later than 75 days following the Petition Date, the Sale Transaction shall have closed; provided that if regulatory approvals associated with a Sale Transaction remain pending as of such date, such date shall be automatically extended to the date that is the third Business Day following receipt of all necessary regulatory approvals.

[*DIP Term Credit Agreement* §5.22; *DIP ABL Credit Agreement* §4.4].

(s)    <u>Negative Covenants – Both DIP Facilities</u>.    Substantially consistent with the Prepetition Documents with certain modifications and additional customary negative covenants to reflect the debtor-in-possession nature of the DIP Facilities. [*DIP Term Credit Agreement* Article 6; *DIP ABL Credit Agreement* §6.7].

(t)    <u>Representations and Warranties – Both DIP Facilities</u>.    Substantially consistent with the Prepetition Documents and customary for debtor-in-possession financings of this type.    [*DIP Term Credit Agreement* Article 3; *DIP ABL Credit Agreement* §4].

(u)    <u>Carve-Out</u>.  As used in this Motion and the Interim Order, the term "<u>Carve-Out</u>" means the sum of (in each case, solely with respect to the DIP Loan Parties): (i) fees required to be paid to the Clerk of the Court and to the U.S. Trustee under 28 U.S.C. § 1930(a) plus interest at the statutory rate (without regard to the Carve-Out Trigger Notice); (ii) reasonable fees and expenses up to $25,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the Carve-Out Trigger Notice); (iii) to the extent allowed at any time, whether by interim or final compensation order, procedural order, or otherwise, all unpaid fees and expenses, solely to the extent related to the DIP Loan Parties (the "<u>Allowed Professional Fees</u>") incurred by persons or firms retained by the DIP Loan Parties pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "<u>CA Debtor Professionals</u>") and, subject to the amounts set forth in the Budget, the Committee (if any) pursuant to section 328 or 1103 of the Bankruptcy Code (the "<u>Committee Professionals</u>" and, together with the CA Debtor Professionals, the "<u>Professional Persons</u>") at any time before or on the first business day following delivery by the DIP Term Agent or the DIP ABL Lender of a Carve-Out Trigger Notice, whether allowed by this Court before or after delivery of a Carve-Out Trigger Notice (the amounts set forth in clauses (i) through (iii), the "<u>Pre-Carve-Out Trigger Notice Cap</u>"); and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $500,000 incurred after the first business day following the date of delivery by the DIP Term Agent or the DIP ABL Agent of the Carve-Out Trigger Notice (such date, the "<u>Trigger Date</u>"), allocated $400,000 to the Debtors Professionals and $100,000 to the Committee Professionals, to the extent allowed at any time, whether by interim

27

order, procedural order, or otherwise (the amounts set forth in clause (iv) above and this clause (v) being the "Post-Carve-Out Trigger Notice Cap" and, together with the Pre-Carve-Out Trigger Notice Cap, the "Carve-Out Cap").

(i)     For purposes of the foregoing, a "Carve-Out Trigger Notice" means a written notice delivered by email (or other electronic means) by the DIP Term Agent or the DIP ABL Lender to each other, the DIP Loan Parties, their lead restructuring counsel, counsel to the TX/PA DIP Agent, the U.S. Trustee, counsel to the Committee (if any), and counsel to each of the DIP Term Agent and the DIP ABL Lender, following the occurrence and during the continuation of an Event of Default and acceleration of the obligations under either of the DIP Facilities, stating that the Post-Carve-Out Trigger Notice Cap has been invoked.

(ii)    Under the Interim Order, the CA Debtors are permitted to establish a segregated account held by lead bankruptcy counsel for the DIP Loan Parties (the "Escrow Account") for purposes of holding periodic deposits and withdrawals on account of the Carve-Out for Professional Persons. Specifically, the CA Debtors may (a) make disbursements to the Escrow Account on account of amounts set forth in the Budget for Professional Persons at the times and in the amounts contemplated thereby, and (b) make payments from the Escrow Account to pay fees and expenses of Professional Persons that have been allowed, or are payable, from time to time.

(iii)   On the day on which a Carve Out Trigger Notice is given by either the DIP Term Agent or the DIP ABL Lender to the DIP Loan Parties with a copy to counsel to the Committee (if any) (the "Termination Declaration Date"), the Carve-Out Trigger Notice shall constitute a demand to the DIP Loan Parties to utilize (i) first, all cash in the DIP Funding Account (as defined in the Cash Management Motion (as defined in the DIP Term Credit Agreement §1.01) at ¶ 8)), notwithstanding anything in the DIP Term Documents to the contrary, and (ii) second, to the extent the cash set forth in clause (i) is insufficient, any available cash thereafter generated from the sale of DIP Term Priority Collateral by the CA Debtors to deposit in the Escrow Account an amount equal to the Carve-Out Cap (less the amounts previously funded to the Escrow Account for Professional Persons at the times and in the amounts contemplated under the Budget), and hold in trust to pay such amounts to the persons benefiting from the Carve-Out.

(iv)    Proceeds from the DIP Facilities not to exceed the Investigation Budget Amount (as defined below) may be used on account of professional fees and expenses of Committee Professionals in connection with the Investigation, which obligations will benefit from the Carve-Out in an amount not to exceed the Investigation Budget Amount to the extent unpaid as of the delivery of a Carve-Out Trigger Notice.

(v)     Notwithstanding anything to the contrary set forth in the Interim Order, none of the DIP ABL Liens, DIP ABL Superpriority Claims, the ABL Adequate Protection Liens or the ABL 507(b) Claims (as each are defined in the *Interim Order* ¶ 30(i)) shall be subject or subordinate to the Carve Out].

[*Interim Order* ¶ 30].

(v)    <u>Events of Default – Both DIP Facilities</u>.  Substantially consistent with the Prepetition Loan Documents with additional customary events of default to reflect the debtor-in-possession nature of the DIP Facilities, including, without limitation, the occurrence of a Budget Event or the failure to meet any Milestone. The failure of the CA Debtors to perform or comply with, in any respect, any of the terms, provisions, conditions, covenants, or obligations under the Interim Order shall also constitute an Event of Default (as defined in the respective DIP Credit Agreements .  Additional Events of Default include the conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, the dismissal of the Chapter 11 Cases, or the appointment of a trustee in the Chapter 11 Cases, among other events that are specific to the conduct of the Chapter 11 Cases.

[*Interim Order* ¶ 27; *DIP Term Credit Agreement* §7.01; *DIP ABL Credit Agreement* §6.20].

(w)    <u>Remedies upon Default – Both DIP Facilities</u>.  Upon the occurrence and during the continuation of an Event of Default or the "Maturity Date" under the applicable DIP Credit Agreement, notwithstanding the provisions of section 362 of the Bankruptcy Code, without any application, motion or notice to, hearing before, or order of this Court, but subject to the terms of the Interim Order and the Prepetition Intercreditor Agreement, (a) each of the DIP Term Agent and the DIP ABL Lender may declare (i) all outstanding DIP Obligations owing under the respective DIP Documents to be immediately due and payable, (ii) the termination of any further commitment to extend credit to the CA Debtors to the extent any such commitment remains under the respective DIP Facilities, (iii) termination of the respective DIP Facilities and the respective DIP Documents as to any future liability or obligation of the applicable DIP Term Agent, the DIP ABL Lender and the DIP Term Lenders, without affecting any of the DIP Liens or the DIP Obligations, and (iv) that the application of the Carve-Out has occurred through the delivery of the Carve-Out Trigger Notice to the CA Debtors; and (b) subject to paragraph 26 of the Interim Order, the Prepetition Term Agent and the Prepetition ABL Lender may declare the termination of the CA Debtors' ability to use Cash Collateral (any such declaration shall be referred to as a "<u>DIP Termination Declaration</u>" and the date on which a DIP Termination Declaration is delivered shall be referred to as the "<u>DIP Termination Date</u>"); *provided*, that any exercise of rights or remedies against a CA Debtor or any collateral securing the DIP Obligations, including the equity of any direct or indirect parent of a TX/PA Debtor shall have no effect on (or release, terminate or reduce in any respect) (a)

the debt obligations of any TX/PA Debtors or (b) the liens on, or security interests in, any property or assets of any TX/PA Debtors, which shall remain in full force and effect.  A DIP Termination Declaration shall be delivered to counsel to certain notice parties, including, but not limited to, the CA Debtors, counsel to a Committee (if appointed), and the U.S. Trustee.  The automatic stay shall be modified so that five business days after the date a DIP Termination Declaration is delivered (such five-day period, the "Remedies Notice Period"), the DIP Term Agent, the DIP Term Lenders, and the DIP ABL Lender shall be entitled to exercise their rights and remedies in accordance with their respective DIP Documents (as applicable), the Interim Order subject in all respects to the Carve-Out.  During the Remedies Notice Period, the CA Debtors or a Committee (if appointed) or any party in interest shall be entitled to seek an emergency hearing from this Court, and upon and after delivery of the DIP Termination Declaration, each of DIP Term Agent and/or DIP ABL Lender delivering such DIP Termination Declaration shall be deemed to have consented to such emergency hearing.  Unless this Court orders otherwise, the automatic stay shall terminate at the end of the Remedies Notice Period without further notice or order as to the DIP Term Agent, the DIP Term Lenders, and the DIP ABL Lender.

[*Interim Order* ¶ 28; *DIP Term Credit Agreement* §7.01; *DIP ABL Credit Agreement* §6.20].

(x)     Stipulations/Challenge Deadline.  The CA Debtors will stipulate, acknowledge, and release the CA Prepetition Secured Parties with respect to the Prepetition Obligations and the Prepetition Liens, subject to a customary Challenge Deadline (as defined below) for parties in interest.  The CA Debtors will also release and indemnify the CA Prepetition Secured Parties from any claims relating to the Prepetition Secured Facilities, the Prepetition Documents or the negotiation and implementation of the DIP Facilities.  [Interim Order ¶¶ G, ¶ 37].  The "Challenge Deadline" is the date that is seventy-five (75) days from the date of entry of the Interim Order as such Challenge Deadline may be extended to the extent permitted by the Interim Order.  [*Interim Order* ¶ 37(c)].  Nothing in the Interim Order vests or confers on any entity, including the Committee, standing or authority to pursue any claim or cause of action belonging to the CA Debtors or their estates, including, without limitation, Challenges with respect to the Stipulations, and all rights to object to such standing are expressly reserved.

(y)     Releases.  Subject to entry of the Final Order, the CA Debtors will release the DIP Term Agent, the DIP Term Lenders, the DIP ABL Lender (among other related or representative parties) (collectively, the "DIP Released Parties") from any and all obligations and liabilities to the CA Debtors arising in connection with or relating to the DIP Facilities, the DIP Liens, or any of the DIP Documents; *provided*, that nothing in such release shall relieve the DIP Released Parties from fulfilling their obligations under the DIP Documents and the DIP Orders.  [*Interim Order* ¶ 44].

(z)     Indemnity – Both DIP Facilities.  Each of the DIP Credit Agreements provides for indemnification by the applicable CA Debtors of the applicable DIP Lenders and

the DIP Agent from, or on account of, losses, claims, damages and liabilities related to the DIP Documents.   [*DIP Term Credit Agreement* §10.03(b); *DIP ABL Credit Agreement* §2.4 *Prepetition ABL Credit Agreement* §11.5].

## <u>Disclosures</u>

36.     Pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2, a debtor in possession seeking authority to use cash collateral or obtain financing must disclose the presence and location of certain provisions contained in the documentation evidencing the cash collateral usage or financing.  The debtor in possession must also justify the inclusion of such provisions. Set forth below are the disclosures required in accordance with such rules:

a.     Local Rule 4001-2(a)(i)(A) requires a debtor to disclose the amount of cash collateral the debtor seeks permission to use or the amount of credit the debtor seeks to obtain under the proposed loan agreement, including the committed amount of the proposed loan agreement and the amount of new funding that will actually be available for borrowing by the debtor;  **Under the terms of the proposed DIP Facilities, the DIP Lenders will provide a commitment of (i) $65.5 million under the DIP Term Loan, including $20 million of new funding available for borrowing, and (ii)  up to $18.5 million under the DIP ABL Loan which amount, depending on borrowing base eligibility and the extent to which Pre-Petition Obligations under the DIP ABL Credit Agreement may be repaid by the application of post-petition payments and collections, may represent new funding available for borrowing.  [*Interim Order* ¶ 2; *DIP Term Credit Agreement* § 2.01; *DIP ABL Credit Agreement* §2.4].**

b.     Local Rule 4001-2(a)(i)(B) requires a debtor to disclose the pricing and economic terms, including letter of credit fees, commitment fees, and any other fees:

(i)     *DIP Term Facility*:   The Interest Rate with respect to the DIP Term Facility is 11%.  Following an Event of Default, the interest rate is the rate per annum which is equal to the lesser of (a) the sum of the Interest Rate *plus* 2.00% and (b) with respect to each DIP Lender, the applicable maximum non-usurious interest rate, if any.  *DIP Term Credit Agreement* §1.01, §2.04. Pursuant to the Loan Discount Letter (as defined in the *DIP Term Credit Agreement* §1.01), the DIP Term Lenders will receive a 3% discount with respect to the principal amounts loaned in connection with the DIP Term Facility as a fee for the DIP Term Facility and will otherwise receive fees, costs and expense reimbursements, including attorney's fees, consistent with similar financings and the Prepetition Term Credit Agreement.  Additionally Orion, in its capacity as Prepetition

Agent and DIP Agent will receive the Agent Reimbursement. [*DIP Term Credit Agreement* §10.03].

(ii)     *DIP ABL Facility*: The interest rate with respect to the loans made pursuant to the DIP ABL Facility is 8% per annum.  This is derived from the Base Rate (as defined in the Prepetition ABL Credit Agreement §1.1) plus the Applicable Margin (4.00%) (as defined at §1.2 of the *DIP ABL Credit Agreement*) [*DIP ABL Credit Agreement* §6.3.]  The DIP ABL Lender shall be entitled to a closing fee of two percent (2%) of the Maximum Credit (as defined at §1.2(j) of the *DIP ABL Credit Agreement* on the DIP Closing Date (as defined at §1.1 of the *DIP ABL Credit Agreement*), on account of the financing provided by DIP ABL Lender and will otherwise receive fees, costs and expense reimbursements, including attorney's fees, consistent with similar financings and the Prepetition ABL Credit Agreement [*DIP ABL Credit Agreement* §§ 5, 10.6].

c.      Local Rule 4001-2(a)(i)(C) requires a debtor to disclose any provision that specifically limits the Court's power or discretion to enter future orders in the case:  **The Interim Order and DIP Documents do not contain any provision that specifically limits the Court's power or discretion except insofar as (i) the Remedies Notice Period, which is consistent with Local Rule 4001-2(a)(i)(S), modifies or terminates the automatic stay, and permits the DIP Lenders to exercise remedies, unless the Court orders otherwise within five (5) business days' following notice of an Event of Default, and (ii) the Interim Order provides that, until all DIP Obligations shall have been indefeasibly paid and satisfied in full in cash in accordance with the terms of the DIP Credit Agreements and the other Loan Documents, no other party shall foreclose any junior lien or claim in any DIP Collateral. [*Interim Order* at ¶¶ 28, 42]**.

d.      Local Rule 4001-2(a)(i)(D) requires a debtor to disclose any provision that provides for the funding of non-debtor affiliates with cash collateral or proceeds of the loan, as applicable, and the approximate amount of such funding:  **The Interim Order and DIP Documents do not contain any provision that provides for the funding of non-debtor affiliates with Cash Collateral or with proceeds of the DIP Facilities**.

e.      Local Rule 4001-2(a)(i)(E) requires a debtor to disclose any material conditions to closing and borrowing, including budget provisions:  **The conditions to closing and borrowing are similar to other financings of this type:  [*DIP Term Credit Agreement* §§4.01, 4.02; *DIP ABL Credit Agreement* §§6.1, 7; *Prepetition ABL Credit Agreement* §4.2]**.  **The proceeds of the DIP Facilities may only be used in accordance with the Budget subject to Permitted Variances (as defined in the *DIP Term Credit Agreement* §1.01) or a Material Budget Deviation (as defined in the *DIP ABL Credit Agreement* §4.3).  [*Interim Order* ¶¶ 12, 17, 18; *DIP Term Credit Agreement* § 5.13; *DIP ABL Credit Agreement* §4.3]**.

f.      Local Rule 4001-2(a)(i)(F) requires a debtor to disclose any carve-outs from liens or superpriority claims, including the material terms of any professional fee carve-out: **The Interim Order provides for a Carve Out that includes the sum of: (i) all fees required to be paid to the Clerk of this Court and to the U.S. Trustee under 28 U.S.C. § 1930(a); (ii) reasonable fees and expenses up to $25,000 incurred by a trustee under section 726(b) of the Bankruptcy Code; (iii) to the extent allowed at any time, whether by interim or final compensation order, procedural order, or otherwise, certain Allowed Professional Fees, on the terms and conditions more fully described in the Interim Order.** [*Interim Order* **at ¶ 30**].

g.      Local Rule 4001-2(a)(i)(G) requires a debtor to disclose any provision that provides for postpetition liens on unencumbered assets, including the identification of such assets: **The Interim Order provides that the DIP Lenders will be granted postpetition liens on all assets of the DIP Loan Parties that do not constitute DIP Term Priority Collateral or DIP ABL Priority Collateral and are not otherwise subject to valid, perfected, enforceable, and unavoidable security interests or liens in existence as of the Petition Date or valid liens perfected (but not granted) after the Petition Date.** [*Interim Order* **at ¶ 8**].

h.      Bankruptcy Rule 4001(c)(1)(B)(vi) and Local Rule 4001-2(a)(i)(H) requires a debtor to disclose any provision that provides for sale or plan milestones: **The DIP Documents provide for the achievement of specified Milestones relating to the sale of substantially all of the assets of the CA Debtors.** [*DIP Term Credit Agreement* **§5.22;** *DIP ABL Credit Agreement* **§4.4**].

i.      Local Rule 4001-2(a)(i)(I) requires a debtor to disclose any provision that provides any prepayment penalty or other provision that affects the debtor's right or ability to repay the financing in full during the course of the chapter 11 case: **The Interim Order and the DIP Documents do not provide for any prepayment penalties with respect to the DIP Facilities.**

j.      Local Rule 4001-2(a)(i)(J) requires a debtor to disclose, in jointly administered cases, any provision that governs joint liability of the CA Debtors, including any provision that would cause one jointly administered debtor to become liable for the prepetition debt of another jointly administered debtor for which it was not previously subject to: **The Interim Order and the DIP Documents do not provide for any jointly administered debtor to become liable for the prepetition debt of another jointly administered debtor for which it was not previously obligated.**

k.      Local Rule 4001-2(a)(i)(K) requires a debtor to disclose any provision that requires the debtor to pay an agent's or lender's expenses and attorneys' fees in connection with the proposed financing or use of cash collateral, without any notice or review by the Office of the United States Trustee, the committee appointed under section 1102 of the Bankruptcy Code (if formed) or, upon objection by either of the foregoing parties, the Court: **The Interim Order provides for notice to the United States Trustee**

and any committee appointed under section 1102 of the Bankruptcy Code of any fees or expenses of the DIP Lenders, including attorney's fees, and provides that such parties may file objections with the Court with respect to such fees and expenses. [*Interim Order* at ¶ 14(c)].

l.    Local Rule 4001-2(a)(i)(L) requires a debtor to disclose any provision that prohibits the use of estate funds to investigate the liens and claims of the prepetition lender:  **The Interim Order permits the use of Cash Collateral and proceeds of DIP Loans, up to a specified maximum amount, for a Committee to investigate the liens and claims of the CA Prepetition Secured Parties, among other matters that are subject to the Stipulations.  [*Interim Order* at ¶ 31].**

m.    Local Rule 4001-2(a)(i)(M) requires a debtor to disclose any termination or default provisions concerning the use of cash collateral or the availability of credit: **The Interim Order and the DIP Credit Agreements contain termination and default provisions relating to the use of Cash Collateral and/or the availability of credit under the DIP Loans.  [*Interim Order* ¶ 27; *DIP Term Credit Agreement* §7.01; *DIP ABL Credit Agreement* §6.18].**

n.    Local Rule 4001-2(a)(i)(N) requires a debtor to disclose any provision that grants cross-collateralization protection or elevates prepetition debt–to administrative expense (or higher) status or that secures prepetition debt with liens on postpetition assets (which liens the creditor would not otherwise have by virtue of the prepetition security agreement or applicable law):  **Following entry of the Interim Order, the CA Debtors are authorized to remit collections and payments received in respect of Prepetition ABL Priority Collateral and DIP ABL Priority Collateral for application first to Prepetition ABL Obligations until such obligations are fully repaid and then to the repayment of DIP ABL Obligations, in accordance with the DIP ABL Credit Agreement and the other DIP ABL Loan Documents.  Subject to entry of a Final Order, the DIP Loan Agreements provide for a roll-up (and conversion into DIP Loans) of certain of the Prepetition Term Loan Obligations and the Prepetition ABL Loan Obligations.  The Interim Order also provides for the grant of Adequate Protection Liens and Adequate Protection Claims to the extent of any Diminution in Value of the CA Prepetition Secured Parties' interests in the Prepetition Collateral and also provides for certain Adequate Protection Payments for the benefit of the CA Prepetition Secured Parties. [*Interim Order* at ¶¶ 2, 14, 15].**

o.    Local Rule 4001-2(a)(i)(O) requires a debtor to disclose any provision that applies the proceeds of postpetition financing to pay, in whole or in part, prepetition debt or which otherwise has the effect of converting (or "rolling up") prepetition debt to postpetition debt:  **Subject to entry of the Final Order, the Interim Order provides for a roll-up of the obligations under Prepetition Term A/C Loans and a roll-up of the Prepetition ABL Loan Obligations. [*Interim Order* at ¶ 2].**

p.       Local Rule 4001-2(a)(i)(P) requires a debtor to disclose any provision that immediately prime valid, perfected and non-avoidable liens existing immediately prior to the petition date or that are perfected subsequent to the petition date as permitted by section 546(b) of the Bankruptcy Code, in each case that are senior to the lender's prepetition liens under applicable law, without the consent of the affected secured creditors, and the proposed notice to be provided to such affected secured creditors:  **The Interim Order and DIP Documents do not provide for the immediate priming of any valid, perfected and non-avoidable liens existing immediately prior to the Petition Date or that are perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code.  The DIP Liens are junior and subordinate to such liens pursuant to Section 364(c)(3) of the Bankruptcy Code.**

q.       Bankruptcy Rule 4001(c)(1)(B)(iii) and Local Rule 4001-2(a)(i)(Q) requires a debtor to disclose any provision that (i) binds the estate or other parties in interest with respect to the validity, perfection or amount of the secured creditor's prepetition lien or the waiver of claims against the secured creditor without first giving parties in interest, including, but not limited to, any official committee appointed in these cases, at least seventy-five (75) days from the entry of the initial interim order to investigate such matters or (ii) limits the Court's ability to grant relief in the event of a successful challenge:  **The Interim Order contains stipulations and waivers in favor of the CA Prepetition Secured Parties subject to the Challenge Period which shall be 75 days after the entry of the Interim Order, as such deadline may be extended under the terms set forth in the Interim Order.  [*Interim Order* at ¶ 37].**

r.       Local Rule 4001-2(a)(i)(R) requires a debtor to disclose any provision that immediately approve all terms and conditions of the underlying loan agreement (provided that provisions in the order that provide that the debtor is authorized to enter into and be bound by the terms and conditions of such loan agreement do not need to be summarized):  **The Interim Order approves the terms and conditions of the DIP Facilities with respect to amounts advanced during the interim period prior to entry of the Final Order.   [*Interim Order* at ¶¶ 1, 2].**

s.       Local Rule 4001-2(a)(i)(S) requires a debtor to disclose any provisions that modify or terminate the automatic stay or permit the lender to enforce remedies following an event of default that do not require at least five (5) days' written notice to the trustee or debtor in possession, the Office of the United States Trustee and each committee appointed under sections 1102 and 1114 of the Bankruptcy Code (the "Remedies Notice Period"), prior to such modification or termination of the automatic stay or the enforcement of the lender's remedies:  **The Interim Order requires at least five (5) business days' written notice to the CA Debtors, the Office of the United States Trustee, counsel to the respective agents for the TX/PA DIP Lenders, and any committee appointed under sections 1102 and 1114 of the Bankruptcy Code, prior to the modification or termination of the automatic stay or the enforcement of the lender's remedies. [*Interim Order* at ¶ 28].**

t.      Local Rule 4001-2(a)(i)(T) requires a debtor to disclose any provisions that limit what parties in interest (other than the debtor may raise at any emergency hearing scheduled during the Remedies Notice Period: **The Interim Order does not contain any provisions that limit what other parties in interest may raise at any emergency hearing scheduled during the Remedies Notice Period.  Following the expiration of the Remedies Notice Period, the DIP Term Agent, the DIP ABL Lender, and any liquidator or other professional, will have the right to access and utilize, at no cost or expense, any trade names, trademarks, copyrights, or other intellectual property of the CA Debtors to the extent necessary or appropriate in order to sell, lease, or otherwise dispose of any of the DIP Collateral, including pursuant to any Court-approved sale process.  [*Interim Order* at ¶ 28].**

u.      Bankruptcy Rule 4001(c)(1)(B)(xi) and Local Rule 4001-2(a)(i)(U) requires a debtor to disclose any provisions that grant to the prepetition secured creditor liens on the debtor's claims and causes of action arising under sections 544, 545, 547, and 548 of the Bankruptcy Code or, in each case, the proceeds thereof: **The Interim Order provides, subject to entry of the Final Order, that proceeds of Avoidance Actions are included in the DIP Collateral, provided that the DIP Liens shall attach to proceeds from Avoidance Actions arising under section 549 of the Bankruptcy Code.  [*Interim Order* at ¶ 8].**

v.      Bankruptcy Rule 4001(c)(1)(B)(x) and Local Rule 4001-2(a)(i)(V) requires a debtor to disclose any provisions that immediately waive the debtor's rights under section 506(c) of the Bankruptcy Code: **The Interim Order does not provide for the immediate waiver of the debtor's rights under 506(c) and any such waiver is subject to entry of the Final Order.  [*Interim Order* at ¶ 39].**

w.      Local Rule 4001-2(a)(i)(W) requires a debtor to disclose any provisions that immediately seek to affect the Court's power to consider the equities of the case doctrine under section 552(b)(1) of the Bankruptcy Code: **The Interim Order does not immediately affect the Court's power to consider the "equities of case" exception under section 552(b) of the Bankruptcy Code, and the application of the "equities of the case" exception under section 552 of the Bankruptcy Code to the DIP Agent, the DIP Lenders, the Prepetition Agent or the Prepetition Lenders with respect to proceeds, products, offspring or profits of any of the Collateral and/or Prepetition Collateral and any such limitations remain subject to entry of the Final Order. [*Interim Order* at ¶ 41].**

x.      Local Rule 4001-2(a)(i)(X) requires a debtor to disclose any provisions that immediately seek to shield the DIP Lenders or the Prepetition Lenders from the equitable doctrine of "marshalling" or any similar doctrine: **The Interim Order does not immediately seek to shield the DIP Lenders or the CA Prepetition Secured Parties from the equitable doctrine of "marshalling" or any similar doctrine, and the application of the equitable doctrine of "marshalling" or any similar doctrine to the DIP Lenders or the CA Prepetition Secured Parties with respect to proceeds,**

products, offspring or profits of any of the Collateral and/or Prepetition Collateral and any such limitations remain subject to entry of the Final Order. [*Interim Order at ¶ 40*].

       y.      Bankruptcy Rule 4001(c)(1)(B)(viii) requires the disclosure of any provisions that release, waive, or limit any claim or other cause of action belonging to the estate or any trustee: **The Interim Order provides for certain releases of claims or causes of action against the DIP Lenders and, subject to the Investigation and the Challenge Rights, the CA Prepetition Secured Parties.** [*Interim Order* **at ¶ 43**]. **The Stipulations by the CA Debtors include, subject to the Investigation and Challenge Rights, the release of the CA Prepetition Secured Parties.** [*Interim Order at ¶ 37*].

       z.      Bankruptcy Rule 4001(c)(1)(B) requires a debtor to disclose a grant of priority or a lien on property of the estate under 364(c) or (d): **The Interim Order provides a grant of a priority liens pursuant to sections 364(c) and (d) to the DIP Lenders with respect to the property and assets of the CA Debtors.** [*Interim Order at ¶ 8*].

       aa.     Bankruptcy Rule 4001(c)(1)(B)(ii) requires disclosure of the provision of adequate protection or priority for claims arising prior to the commencement of the case: **The Interim Order provides that the CA Prepetition Secured Lenders will be granted adequate protections in the form of Adequate Protection Replacement Liens, Adequate Protection Payments and the superpriority Adequate Protection Claims[19] (junior to the claims and liens relating to the DIP Facilities and payment of the Carve-Out), to the extent of any Diminution in Value of the CA Prepetition Secured Lenders' interests in the Prepetition Collateral as of the Petition Date. [*Interim Order* at ¶¶ 14, 15].**

       bb.     Bankruptcy Rule 4001(c)(1)(B)(iv) requires disclosure of provisions that constitute a waiver or modification of the automatic stay: **The Interim Order describes the modification of the automatic stay to the extent necessary to implement the Interim Order and enforce remedies thereunder. [*Interim Order at ¶ 19*].**

       cc.     Bankruptcy Rule 4001(c)(1)(B)(v) requires disclosure of provisions that waive or modify the applicability of nonbankruptcy law relating to the perfection of a lien on property of the estate: **The Interim Order includes provisions that provide for the automatic perfection and validity of the DIP Liens without the necessity of any further filing or recording under the laws of any jurisdiction. [*Interim Order at ¶ 20*].**

       dd.     Bankruptcy Rule 4001(c)(1)(B)(vii) requires disclosure of provisions that waive or modify any entity's authority or right to file a plan, request the use of cash

---

[19] The terms Adequate Protection Liens, Adequate Protection Claims and Adequate Protection Payments are each as defined in the Interim Order at ¶¶ 14, 15.

collateral under section 363(c), or request authority to obtain credit under section 364: **The DIP Agreements include provisions that limit the CA Debtors' ability to request the use of cash collateral or request to obtain credit under section 364.  [*DIP Term Credit Agreement §7.01(w); DIP ABL Credit Agreement §4.9*].**

## Need for Financing and Use of Cash Collateral

37.     The CA Debtors have an urgent and immediate need for access to funds available under the DIP Facilities and the use of the Cash Collateral.  The CA Debtors lack sufficient liquidity and do not generate sufficient cash from operations to fund their businesses. Accordingly, without the DIP Facilities and the ability to use Cash Collateral, the CA Debtors will not have the liquidity needed to operate their businesses, fund their ordinary course expenditures (including paying employees), or pay the expenses necessary to administer these chapter 11 cases.  Absent increased funding in the form of the DIP Facilities, the CA Debtors could be forced to terminate their businesses as going concerns to the detriment of the CA Debtors, their estates, and all stakeholders.  *See* Morgner Declaration, at ¶ 10.

38.     The CA Debtors also believe that the DIP Facilities and access to Cash Collateral will provide a clear message to their customers, vendors, employees, and contract counterparties that the CA Debtors' operations are appropriately funded and that the CA Debtors have sufficient liquidity to meet their current and future obligations.  The financing will demonstrate the CA Debtors' ability to continue meeting the needs of their customers, provide compensation to their employees, and operate their businesses in the ordinary course.  *See id.* at ¶ 11. Accordingly, the CA Debtors strongly urge the Court to authorize the DIP Facilities and the continued use of Cash Collateral on the terms contemplated in the Interim Order, the Final Order and the DIP Documents, initially on an interim basis and, following the Final Hearing, on a final basis.

**Basis for Relief**

A.     **The CA Debtors Should Be Permitted to Obtain Postpetition Financing Pursuant to Section 364(c) of the Bankruptcy Code**

39.     Section 364(c) of the Bankruptcy Code requires a finding, made after notice and a hearing, that the debtors seeking postpetition financing on a secured basis cannot "obtain unsecured credit allowable under section 503(b)(l) of [the Bankruptcy Code] as an administrative expense."  11 U.S.C. § 364(c).

40.     In evaluating proposed postpetition financing under section 364(c) of the Bankruptcy Code, courts perform a qualitative analysis and generally consider similar factors, including whether:

> a.     unencumbered credit or alternative financing without superpriority status is available to the debtor;
>
> b.     the credit transactions are necessary to preserve assets of the estate;
>
> c.     the terms of the credit agreement are fair, reasonable, and adequate;
>
> d.     the proposed financing agreement was negotiated in good faith and at arm's-length and entry thereto is an exercise of sound and reasonable business judgment and in the best interest of the debtors' estate and their creditors; and
>
> e.     the proposed financing agreement adequately protects the prepetition secured parties.

*See, e.g.*, *In re Aqua Assoc.*, 123 B.R. 192 (Bankr. E.D. Pa. 1991) (applying the first three factors in making a determination under section 364(c)).

41.     For the reasons discussed below, the CA Debtors satisfy the standards required to obtain postpetition financing in these cases on a secured superpriority basis as to the DIP Collateral under sections 364(c)(1), (2), and (3) of the Bankruptcy Code.

**B.      The CA Debtors Were Unable to Obtain Financing on More Favorable Terms**

42.     Prior to the Petition Date, the CA Debtors, through their advisors, discussed with various third parties the opportunity to provide financing to the CA Debtors, but none of those parties was prepared to provide DIP financing on an unsecured or junior basis, and, further, all would have required priming liens on existing collateral of the CA Prepetition Secured Parties.  None of the CA Prepetition Secured Parties were willing to consent to priming liens and so pursuit of such third-party financing likely would have led to a dispute with each of the CA Prepetition Secured Parties.  Accordingly, taking into account the circumstances and the proposal provided by the DIP Lenders, the CA Debtors determined, in an exercise of their business judgment, that the DIP Lenders offered the best available economic proposal under the circumstances.  The DIP Lenders are unwilling to lend into the DIP Facilities except on a fully secured and first priority basis as to the Collateral.  *See* First Day Declaration, at ¶¶ 93-95; Morgner Declaration, at ¶¶ 12-15.

43.     The CA Debtors respectfully submit that their efforts to obtain postpetition financing therefore satisfy the standard required under section 364(c) of the Bankruptcy Code. *See, e.g., In re Sky Valley, Inc.,* 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988) (where few lenders can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing").

**C.**     **The Proposed Financing Is Necessary to Maximize the Value of the CA Debtors'**
            **Estates**

44.     The CA Debtors seek to use the proceeds of the DIP Facilities for general
working capital purposes in accordance with the Budget and in order to allow the CA Debtors to
maximize value through an orderly sale process with respect to all or a portion of their
businesses or a plan of reorganization focused on restructuring of its obligations enabling their
businesses to operate as a going concern.   The DIP Facilities represent the best economic
alternative for a new debtor-in-possession lending arrangement. *See* First Day Declaration, at ¶
99.

45.     The use of the proceeds of the financing requested by the CA Debtors is
subject to the Budget, which accommodates certain permitted variances.   The Budget will be
periodically updated at the times and according to the procedures set forth in the DIP Credit
Agreements.   The initial Budget has been approved by the CA Debtors and each of the DIP Term
Agent and the DIP ABL Lender.   The Budget shows the CA Debtors' projected weekly receipts
and disbursements for the period commencing on the Petition Date through the anticipated
Maturity Date of the DIP Loans (i.e., 120 days following the Petition Date).   The Budget has
been carefully crafted by the CA Debtors' advisors and management to provide the CA Debtors
with the minimum liquidity needed to prudently operate their business and meet their anticipated
post-petition operating and non-recurring expenses (such as professional fees, costs and expenses
incurred under the DIP Loans, and adequate protection payments made on account of the
Prepetition Secured Facilities).   The CA Debtors believe that the Budget will be adequate,
considering all of the CA Debtors' available assets, to pay the administrative expenses that may

become due or accrue during the period covered by the Budget.  The amounts that the CA Debtors seek to borrow by this Motion on an interim basis under the DIP Facilities reflect the payment of expenses that, in the CA Debtors' business judgment, are necessary to avoid immediate and irreparable harm to the estates pending the Final Hearing to approve the proposed Final Order.  *See id.* at ¶ 100.

46.    Without immediate access to the DIP Facilities, the CA Debtors would be forced to convert to chapter 7 and liquidate their assets.  Stated simply, failure to access the DIP Facilities would irreparably damage the CA Debtors' efforts to consummate the sale of their businesses or assets or to restructure as a going concern in a manner that would maximize value for the benefit of all constituents.  Accordingly, the CA Debtors urge the Court to authorize the DIP Facilities on the terms contemplated herein.  *See id.* at ¶ 98.

**D.**    **The Terms of the Proposed Financing are Fair, Reasonable, and Appropriate**

47.    In considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender.  *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.)*, 65 B.R. 358, 365 (W.D. Mich. 1986) (a debtor may have to enter into hard bargains to acquire funds).

48.    The terms of the DIP Facilities were negotiated in good faith and at arm's-length between the CA Debtors and the DIP Lenders, resulting in an agreement that is designed to permit the CA Debtors to maximize the value of their assets and to effectuate an orderly sale

42

process.  *See* First Day Declaration, at ¶ 95.  The CA Debtors submit that the proposed terms of

the DIP Facilities are fair, reasonable, and appropriate under the circumstances.  *See, e.g.*, *Bray v.*

*Shenandoah Fed. Sav. and Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986)

(stating that section 364(d) of the Bankruptcy Code imposes no duty to seek credit from every

possible lender); *In re Western Pacific Airlines, Inc.*, 223 B.R. 567 (Bankr. D. Colo. 1997)

(authorizing postpetition financing that would preserve the value of the debtor's assets).

E.   **Entry Into the Proposed Financing Reflects the CA Debtors' Sound Business Judgment**

49.   A debtor's decision to enter into a postpetition lending facility under

section 364 of the Bankruptcy Code is governed by the business judgment standard.  *See, e.g.*,

*Trans World Airlines, Inc. v. Travelers Int'l AG (In re Trans World Airlines, Inc.)*, 163 B.R. 964,

974 (Bankr. D. Del. 1994) (approving postpetition credit facility because such facility

"reflect[ed] sound and prudent business judgment"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34,

38 (Bankr. S.D.N.Y. 1990) (financing decisions under section 364 of the Bankruptcy Code must

reflect a debtor's business judgment).

50.   Bankruptcy courts routinely accept a debtor's business judgment on many

business decisions, including the decision to borrow money.  *See, e.g., Group of Inst. Investors v.*

*Chicago, Mil., St. P. & Pac.*, 318 U.S. 523, 550 (1943) (holding that decisions regarding

assumption or rejection of leases are left to the business judgment of the debtor); *In re Simasko*

*Prod. Co.,* 47 B.R. 444, 449 (D. Colo. 1985) ("[b]usiness judgments should be left to the board

room and not to this Court").  Further, one court has noted that "[m]ore exacting scrutiny

[of the debtors' business decisions] would slow the administration of the debtor's estate and

increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.,* 762 F.2d 1303, 1311 (5th Cir. 1985).

51.    Bankruptcy courts generally will defer to a debtor in possession's business judgment regarding the need for and the proposed use of funds, unless such decision is arbitrary and capricious, *In re Curlew Valley Assocs.,* 14 B.R. 506, 511-13 (Bankr. D. Utah 1981); *see also Trans World Airlines, Inc.,* 163 B.R. at 974 (approving interim loan, receivables facility and asset-based facility based upon prudent business judgment of the debtor), and generally will not second-guess a debtor in possession's business decisions involving "a business judgment made in good faith, upon a reasonable basis, and within the scope of his authority under the Code." *Curlew Valley,* 14 B.R. at 513-14 (footnotes omitted).

52.    For the reasons set forth above, the CA Debtors' sound business judgment clearly supports approval of the DIP Facilities in order to allow the CA Debtors to gain access to needed financing and thereby maximize value for all constituents through an orderly sale process.

## F.    The Proposed Roll-Up with Respect to Certain of the Prepetition Obligations Should Be Approved

53.    Section 363(b) of the Bankruptcy Code permits a debtor to use, sell or lease property, other than in the ordinary course of business, with court approval.  In the Third Circuit, such transactions should be approved when they are supported by a sound business purpose.  *See In re Culp*, 545 B.R. 827, 844 (Bankr. D. Del. 2016) ("Transactions under section 363 must be based upon the sound business judgement of the [debtor in possession]"), *aff'd In re*

44

*Culp*, 681 Fe. Appx. 140 (3d Cir. 2017); *In re Filene's Basement, LLC*, 2014 WL 1713416, at *12 (Bankr. D. Del. Apr. 29, 2014).  The business judgment rule shields a debtor's management from judicial second-guessing.  *In re Johns-Manville Corp.*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("[T]he [Bankruptcy] Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").

54.    Repayment of prepetition debt (often referred to as a "roll-up") is a common feature in debtor in possession financing arrangements.  Courts in this jurisdiction have approved similar financing features in postpetition loans.  *See, e.g.*, *In re Blackhawk Mining LLC*, No. 19-11595 (LSS) (Bankr. D. Del. Aug. 13, 2019) (authorizing roll-up of $70 million in prepetition term loans and up to $82 million of prepetition ABL in interim order); *In re ATD Corporation*, No. 18-12221 (KJC) (Bankr. D. Del. Oct. 26, 2018) (authorizing a full roll-up of the prepetition ABL outstanding principal of $639 million pursuant to interim order); *In re Remington Outdoor Co., Inc.*, No. 18-10684 (BLS) (Bankr. D. Del. Mar. 28, 2018) (authorizing a roll-up of approximately $150 million which included a full ABL roll-up of $114 million pursuant to interim order); *In re Forever 21, Inc.*, No. 19-12122 (KG) (approving the repayment in full of all outstanding amounts under the prepetition revolving credit agreement); *In re Charming Charlie LLC*, No. 19-11534 (CSS) (Bankr. D. Del. July 12, 2019) (authorizing a "creeping" roll-up of prepetition ABL facility of $9.5 million pursuant to interim order); *In re Bon-Ton Stores, Inc.*, No. 18-10248 (MFW) (Bankr. D. Del. Feb. 6, 2018) (authorizing full roll-up of all $489 million outstanding prepetition revolving obligations pursuant to interim order); *In re American Apparel, Inc.*, No. 15-12055 (Bankr. D. Del. Oct. 6, 2017) (approving on an interim

basis the repayment in full of all outstanding amounts under the prepetition revolving credit agreement).

55.    Courts in other jurisdictions have similarly approved roll-ups of prepetition debt.  *See In re Toys "R" Us. Inc.*, No. 17-34665 (KLP) (Bankr. E.D. Va. Oct. 24, 2017) (approving use of debtor in possession financing to pay down or "roll-up" prepetition debt); *In re The Gymboree Corp.*, No. 17-32968 (Bankr. E.D. Va. June 12, 2017) (approving on an interim basis the conversion and "roll-up" of all outstanding prepetition revolving obligations and $70 million of prepetition term loan obligations); *In re rue21, inc.*, No. 17-22045 (Bankr. W.D. Pa. May 18, 2017) (approving on an interim basis the conversion and "roll-up" of all outstanding prepetition revolving obligations and $100 million of prepetition term loans); *In re BCBG Max Azria Glob. Holdings, LLC*, No. 17-10466 (Bankr. S.D.N.Y. March 28, 2017) (approving on a final basis the conversion and "roll-up" of $35 million of prepetition term loan obligations); *In re BCBG Max Azria Glob. Holdings, LLC*, No. 17-10466 (Bankr. S.D.N.Y. March 2, 2017) (approving the conversion and "roll-up" of all outstanding prepetition revolving obligations on a rolling basis following entry of the interim order); *In re Aéropostale, Inc.*, No. 16 11275 (Bankr. S.D.N.Y. May 6, 2016) (approving on an interim basis the conversion and "roll-up" of all outstanding prepetition revolving obligations).

56.    As set forth above, the DIP Credit Agreement provides that, subject to entry of the Final Order, the Term Roll-Up Amount of the Prepetition Term A/C Loans will be repaid by the DIP Term Facility, and any outstanding amounts of Prepetition ABL Obligations (which have not been rolled-up) will be repaid by the DIP ABL Facility.  The repayment of the

Term Roll-Up Amount and any outstanding amounts of the Prepetition ABL Obligations is a sound exercise of the CA Debtors' business judgment and is a material component of the structure of the DIP Facilities. The CA Prepetition Secured Parties were unlikely to continue to lend postpetition without some assurance regarding their prepetition claims. The conversion of certain of the Term Roll-Up Amount and repayment of any outstanding amounts of Prepetition ABL Obligations (which have not been rolled-up) into the applicable DIP Facilities should be authorized as compensation for, in consideration for, and solely on account of, the agreement of the Prepetition Term Lenders and Prepetition ABL Lender to provide new-money liquidity and permit access to Cash Collateral, and not as payments under, adequate protection for, or otherwise on account of, any Prepetition Obligations. The conversion and "roll-up" of Prepetition Term Loans into DIP Term Loans and Prepetition ABL Loans into DIP ABL Loans will enable the CA Debtors to obtain urgently needed financing that will allow them to free up liquidity to fund the chapter 11 process. Without the liquidity provided under the DIP Facilities necessary to fund the administration of the CA Debtors' Chapter 11 Cases and the sale process, the CA Debtors would be unable to conduct the sale process and would accordingly be unable to maximize value for their stakeholders. Maintaining the ability to fund the administration of the CA Debtors' Chapter 11 Cases and complete a sale transaction is of immense benefit to all of the CA Debtors' stakeholders. *See* First Day Declaration, at ¶¶ 97-98.

57.    In light of the foregoing, and taking into account the circumstances of these Chapter 11 Cases, the roll-up of certain of the existing Prepetition Obligations upon entry

of the Interim Order is reasonable, appropriate, a sound exercise of the CA Debtors' business

judgment, and ultimately in the best interest of all stakeholders given the alternatives.

**G.     Section 363 of the Bankruptcy Code Authorizes the CA Debtors' Use of Cash Collateral**

58.     Section 363(c)(2) of the Bankruptcy Code provides that a debtor in

possession may not use cash collateral unless (A) each entity that has an interest in such cash

collateral provides consent, or (B) the court approves the use of cash collateral after notice and a

hearing.  *See* 11 U.S.C. § 363(c).  Section 363(e) of the Bankruptcy Code provides that, "on

request of an entity that has an interest in property used . . . or proposed to be used . . . by the

[debtor in possession], the court . . . shall prohibit or condition such use . . . as is necessary to

provide adequate protection of such interest."  11 U.S.C. § 363(e).

59.     Here, the CA Debtors seek authority to use the Cash Collateral pursuant to

the Budget and on terms consistent with the Interim Order.

60.     Bankruptcy Rule 4001(b) permits a court to approve a debtor's request for

use of cash collateral during the 14-day period following the filing of a motion requesting

authorization to use cash collateral, "only . . . as is necessary to avoid immediate and irreparable

harm to the estate pending a final hearing."  Bankruptcy Rule 4001(b)(2).  In examining requests

for interim relief under this rule, courts apply the same business judgment standard applicable to

other business decisions.  *See, e.g., In re Simasko Production Co.*, 47 B.R. 444, 449 (D. Colo.

1985); *see also In re Ames Dep't Stores Inc.,* 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990).  After the

14-day period, the request for use of cash collateral is not limited to those amounts necessary to

prevent harm to the debtor's business.

61.     As previously noted, in order to satisfy accruing administrative expenses and continue their orderly sale efforts, the CA Debtors require access to the DIP Facilities and the use of Cash Collateral.  Such use will provide the CA Debtors with the necessary funds to remain administratively solvent, while allowing the CA Debtors to maximize value through the pending sale process.  *See* First Day Declaration, at ¶ 95.  Notably, the CA Prepetition Secured Parties consent to the CA Debtors' use of Cash Collateral on the terms of the Interim Order.

62.     Absent access to Cash Collateral, the CA Debtors would face immediate and irreparable harm.  The CA Debtors would be forced to convert their cases to chapter 7 and their assets would be liquidated.  *See id.* at ¶ 98. Thus, immediate access to Cash Collateral is essential to the CA Debtors' ability to maximize value for the benefit of all constituents.

## H.     Interim Order and Final Hearing

63.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the CA Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, and fix the time and date prior to the Final Hearing for parties to file objections to the Motion.

64.     The urgent need to avoid immediate and irreparable harm to the CA Debtors' estates makes it imperative that the CA Debtors be authorized to access the DIP Facilities and use Cash Collateral, pending the Final Hearing, in order to allow the CA Debtors to administer their cases.  Without the ability to make draws under the DIP Facilities and use Cash Collateral, the CA Debtors would be unable to meet their ongoing obligations and would be unable to implement their pending orderly sale process, thus causing irreparable harm to the CA Debtors and the value of these estates.  Accordingly, the CA Debtors respectfully request that,

DOCS_NY:42377.9

pending the Final Hearing on a Final Order, the Interim Order be approved in all respects and

that the terms and provisions of the Interim Order be implemented and be deemed binding and

that, after the Final Hearing, the Final Order be approved in all respects and the terms and

provisions of the Final Order be implemented and be deemed binding.

### Waiver of Bankruptcy Rule 6004(a) and 6004(h)

65.     To implement the foregoing successfully, the CA Debtors request that the

Court enter an order, substantially in the form attached hereto as Exhibit A, providing that notice

of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the CA Debtors have

established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule

6004(h).

### Notice

66.     Notice of this Motion shall be given to the following parties or, in lieu

thereof, to their counsel, if known: (a) the Office of the United States Trustee for the District of

Delaware; (b) counsel to the DIP Term Agent, DIP Term Lenders, and Prepetition Term Secured

Parties; (c) counsel to the DIP ABL Lender and Prepetition ABL Secured Parties (d) counsel to

the TX/PA DIP Agents and Prepetition Trustees; (e) the Debtors' forty largest unsecured

creditors on a consolidated basis; (f) any other known party that asserts a lien against the

Debtors' assets; and (g) all parties entitled to notice pursuant to Local Rule 9013-1(m)(iii).  As

the Motion is seeking "first day" relief, within two business days after the hearing on the Motion,

the Debtors will serve copies of the Motion and any order entered respecting the Motion as

required by Local Rule 9013-1(m)(iv).  The Debtors submit that, in light of the nature of the

relief requested, no other or further notice need be given.

### No Prior Request

67.     No prior request for the relief sought in this motion has been made to this

or any other court.

WHEREFORE, the CA Debtors respectfully request entry of the Interim Order

and the Final Order (a) granting the relief requested herein, and (b) granting such other relief as

is just and proper.

Dated:   March 8, 2021                          PACHULSKI STANG ZIEHL & JONES LLP

*/s/ James E. O'Neill*

Richard M. Pachulski (CA Bar No. 90073)
Gabriel I. Glazer (CA Bar No. 246384)
James E. O'Neill (DE Bar No. 4042)
Steven W. Golden (NY Bar No. 5374152)
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899 (Courier 19801)
Tel:  (302) 652-4100
Fax: (302) 652-4400
Email: rpachulski@pszjlaw.com
        gglazer@pszjlaw.com
        joneill@pszjlaw.com
        sgolden@pszjlaw.com

*Proposed Attorneys for Debtors and Debtors in Possession*