## **EXHIBIT B**

**DIP Term Loan Credit Agreement**

*Execution Version*

SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION TERM LOAN CREDIT AGREEMENT

dated as of March 8, 2021

among

CARBONLITE HOLDINGS LLC,
as the Borrower, a Debtor and a Debtor-in-Possession under
Chapter 11 of the Bankruptcy Code,

CERTAIN SUBSIDIARIES OF CARBONLITE HOLDINGS LLC,
as Guarantors, each as a Debtor and a Debtor-in-Possession under
Chapter 11 of the Bankruptcy Code,

THE LENDERS PARTY HERETO,

and

ORION ENERGY PARTNERS INVESTMENT AGENT, LLC,
as DIP Term Loan Agent and DIP Term Loan Collateral Agent

# TABLE OF CONTENTS

**ARTICLE I DEFINITIONS** ...........................................................................................1
    Section 1.01  Certain Defined Terms ....................................................1
    Section 1.02  Terms Generally ..............................................................29
    Section 1.03  Accounting Terms ...........................................................30

**ARTICLE II THE CREDITS** ....................................................................................31
    Section 2.01  Loans ...............................................................................31
    Section 2.02  Funding of the Loans ......................................................32
    Section 2.03  Termination and Reduction of the Commitments .........32
    Section 2.04  Repayment of Loan; Evidence of Debt .........................32
    Section 2.05  Prepayment of the Loans ................................................33
    Section 2.06  Reimbursements. .............................................................35
    Section 2.07  Interest ............................................................................35
    Section 2.08  Taxes ...............................................................................36
    Section 2.09  Payments Generally; Pro Rata Treatment; Sharing of Setoffs .......39
    Section 2.10  Mitigation Obligations; Replacement of Lenders .........41
    Section 2.11  Acknowledgement and Consent to Bail-In of EEA Financial Institutions ......................................................41
    Section 2.12  Reorganization Matters ..................................................42
    Section 2.13  Superpriority Nature .......................................................43

**ARTICLE III REPRESENTATIONS AND WARRANTIES** ...................................43
    Section 3.01  Due Organization, Etc. ...................................................43
    Section 3.02  Authorization, Etc. ..........................................................44
    Section 3.03  No Conflict .....................................................................44
    Section 3.04  Approvals, Etc. ................................................................44
    Section 3.05  Financial Statements .......................................................45
    Section 3.06  Litigation ........................................................................45
    Section 3.07  Environmental Matters ...................................................45
    Section 3.08  Compliance with Laws and Obligations .......................46
    Section 3.09  Material Agreements; Bond Documents .........................46
    Section 3.10  Intellectual Property; Licenses ......................................47
    Section 3.11  Taxes ...............................................................................47
    Section 3.12  Disclosure .......................................................................48
    Section 3.13  [Reserved] .......................................................................48
    Section 3.14  Regulatory Restrictions on the Loan ..............................48
    Section 3.15  Title; Security .................................................................48
    Section 3.16  ERISA .............................................................................49
    Section 3.17  Insurance .........................................................................49
    Section 3.18  Use of Proceeds ..............................................................49
    Section 3.19  Membership Interests and Related Matters ...................49
    Section 3.20  [Reserved] .......................................................................50
    Section 3.21  No Agreements with Affiliates .......................................50
    Section 3.22  No Bank Accounts ..........................................................50
    Section 3.23  No Default or Event of Default ......................................50

i

Section 3.24    Foreign Assets Control Regulations ................................................50
Section 3.25    Commercial Activity; Absence of Immunity ................................51

**ARTICLE IV CONDITIONS** ....................................................................................**51**
Section 4.01    Conditions to the Closing Date ....................................................51
Section 4.02    Conditions to Each Extension of Credit .......................................53
Section 4.03    Satisfaction of Conditions ...........................................................55

**ARTICLE V AFFIRMATIVE COVENANTS** ..........................................................**55**
Section 5.01    Corporate Existence; Etc. ............................................................55
Section 5.02    Conduct of Business .....................................................................55
Section 5.03    Compliance with Laws and Obligations .......................................55
Section 5.04    Governmental Authorizations ......................................................56
Section 5.05    Maintenance of Title .....................................................................56
Section 5.06    Insurance .......................................................................................56
Section 5.07    Keeping of Books ..........................................................................57
Section 5.08    Access to Property/Records ..........................................................57
Section 5.09    Taxes ..............................................................................................57
Section 5.10    Financial Statements; Other Reporting Requirements ..................58
Section 5.11    Notices ...........................................................................................59
Section 5.12    [Reserved] ......................................................................................60
Section 5.13    Use of Proceeds ............................................................................61
Section 5.14    Security ..........................................................................................61
Section 5.15    Further Assurances ........................................................................61
Section 5.16    Security in Newly Acquired Property and Revenues .....................61
Section 5.17    Material Agreements .....................................................................61
Section 5.18    Collateral Accounts .......................................................................62
Section 5.19    Intellectual Property ......................................................................63
Section 5.20    DIP Budget ....................................................................................64
Section 5.21    Post-Closing Covenants ................................................................65
Section 5.22    Required Milestones ......................................................................65
Section 5.23    DIP Agent's Advisors/Specified Lender Advisors ........................66
Section 5.24    Investment Banker .........................................................................66
Section 5.25    Chief Restructuring Officer ...........................................................67
Section 5.26    Additional Bankruptcy Matters .....................................................68
Section 5.27    Debtor-In-Possession Obligations .................................................68
Section 5.28    Monthly Reports ............................................................................68

**ARTICLE VI NEGATIVE COVENANTS** ................................................................**68**
Section 6.01    Subsidiaries; Equity Issuances .....................................................69
Section 6.02    Loan Party Indebtedness ...............................................................69
Section 6.03    Loan Party Liens, Etc. ...................................................................70
Section 6.04    Investments ....................................................................................72
Section 6.05    Chief Executive Office; Business Activities ................................73
Section 6.06    Restricted Payments ......................................................................73
Section 6.07    Fundamental Changes; Asset Dispositions ...................................73
Section 6.08    Accounting Changes ......................................................................74

Section 6.09   Material Agreements, Bond Documents and Permitted Revolving Facilities ...................................................................74
Section 6.10   Transactions with Affiliates ........................................................75
Section 6.11   Permitted Accounts ....................................................................76
Section 6.12   Change of Advisors ....................................................................76
Section 6.13   Hazardous Materials ...................................................................76
Section 6.14   No Hedging or Speculative Transactions .....................................76
Section 6.15   Change of Auditors ....................................................................76
Section 6.16   Purchase of Capital Stock...........................................................77
Section 6.17   Use of Proceeds. No portion of the proceeds of the New Money DIP Term Loans or the Collateral may be used: ...........................77
Section 6.18   Capital Expenditures ..................................................................77
Section 6.19   Prepetition Payables ...................................................................77

**ARTICLE VII EVENTS OF DEFAULT**...............................................................**77**
Section 7.01   Events of Default........................................................................77
Section 7.02   Application of Proceeds ..............................................................83

**ARTICLE VIII THE AGENTS** ............................................................................**84**
Section 8.01   Appointment and Authorization of the Agents .............................84
Section 8.02   Rights as a Lender ......................................................................85
Section 8.03   Duties of Agent; Exculpatory Provisions .....................................85
Section 8.04   Reliance by Agent ......................................................................85
Section 8.05   Delegation of Duties...................................................................86
Section 8.06   Withholding of Taxes by the DIP Term Loan Agent; Indemnification ..........................................................................86
Section 8.07   Resignation of Agent..................................................................86
Section 8.08   Non-Reliance on Agent or Other Lenders.....................................87
Section 8.09   No Other Duties; Etc. .................................................................87

**ARTICLE IX GUARANTY** ...................................................................................**87**
Section 9.01   Guaranty ....................................................................................87
Section 9.02   Guaranty Unconditional ..............................................................88
Section 9.03   Discharge Only Upon Payment in Full; Reinstatement in Certain Circumstances ...........................................................................89
Section 9.04   Waiver by the Guarantors............................................................89
Section 9.05   Subrogation.................................................................................89
Section 9.06   Acceleration................................................................................90

**ARTICLE X MISCELLANEOUS** .........................................................................**90**
Section 10.01 Notices.......................................................................................90
Section 10.02 Waivers; Amendments ................................................................91
Section 10.03 Expenses; Indemnity; Etc............................................................92
Section 10.04 Successors and Assigns ...............................................................94
Section 10.05 Survival .....................................................................................97
Section 10.06 Counterparts; Integration; Effectiveness .......................................98
Section 10.07 Severability................................................................................98

US-DOCS\121174693.21

Section 10.08 Right of Setoff ...................................................................98
Section 10.09 Governing Law; Jurisdiction; Etc. .........................................98
Section 10.10 Headings ............................................................................99
Section 10.11 Confidentiality ....................................................................99
Section 10.12 No Third Party Beneficiaries ..............................................101
Section 10.13 Reinstatement ...................................................................101
Section 10.14 USA PATRIOT Act .............................................................101

| | | |
|---|---|---|
| Exhibit A | – | Form of Assignment and Assumption |
| Exhibit B | – | Form of Note |
| Exhibits B-1 through B-4 | | Tax Certificates |
| Exhibit C | – | Form of Borrowing Request |
| Exhibit D | – | [Reserved] |
| Exhibit E | – | Form of Initial DIP Budget |
| Exhibit F | – | [Reserved] |
| Exhibit G | – | Form of Security Agreement |
| Exhibit H | – | [Reserved] |
| Exhibit I | – | Form of Interim DIP Order |

| | | |
|---|---|---|
| Annex I | – | Loans; Commitments |
| Schedule 1.01(a) | – | Non-Guarantor Subsidiaries |
| Schedule 1.01(b) | – | Initial DIP Budget |
| Schedule 1.01(c) | – | Shareholder Notes |
| Schedule 3.01(b) | – | Equity Shareholders |
| Schedule 3.06 | – | Litigation |
| Schedule 3.07 | – | Environmental Matters |
| Schedule 3.09 | – | Material Agreements |
| Schedule 3.11 | – | Taxes |
| Schedule 3.17 | – | Insurance |
| Schedule 3.19(b) | – | Subsidiaries |
| Schedule 3.19(c) | – | Warrants |
| Schedule 3.21 | – | Transactions with Affiliates |
| Schedule 5.04 | – | Governmental Authorizations |
| Schedule 5.05 | – | Title Defects |
| Schedule 6.02 | – | Permitted Indebtedness |
| Schedule 6.03 | – | Permitted Liens |
| Schedule 6.04 | – | Permitted Investments |

iv

This SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION TERM LOAN CREDIT AGREEMENT is dated as of March 8, 2021 (the "Effective Date"), among CARBONLITE HOLDINGS LLC, a Delaware limited liability company, a debtor and a debtor-in-possession (the "Borrower"), CERTAIN SUBSIDIARIES OF BORROWER, as Guarantors, each as a debtor and a debtor-in-possession, each LENDER designated as a "Lender" on Annex I from time to time party hereto (collectively, the "Lenders" and individually, a "Lender") and ORION ENERGY PARTNERS INVESTMENT AGENT, LLC, as the DIP Term Loan Agent and the DIP Term Loan Collateral Agent.

WHEREAS, the Loan Parties have commenced voluntary cases (the "Chapter 11 Cases") under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), and the Loan Parties continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, in connection with the Chapter 11 Cases, the Borrower has requested that (x) the Lenders provide a senior secured debtor-in-possession term loan facility in an aggregate principal amount not to exceed $20,000,000 pursuant to this Agreement (the "DIP Term Loan Facility") and (y) the DIP ABL Lender (as defined below) provide a senior secured debtor-in-possession asset-based revolving credit facility with aggregate principal commitments not to exceed $18,500,000 (the "DIP ABL Facility" and, together with the DIP Term Loan Facility, the "DIP Facilities") pursuant to the DIP ABL Credit Agreement (as defined below); and

WHEREAS, to provide security for the repayment of the Loans, and the payment of the other Obligations of the Loan Parties hereunder and under the other Financing Documents, the Loan Parties will grant to the DIP Term Loan Agent, for its benefit and the benefit of the Lenders, certain security interests, liens, and other rights and protections pursuant to the terms hereof and pursuant to Sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, and super-priority administrative expense claims pursuant to Section 364(c)(1) of the Bankruptcy Code, all as more fully described herein.

The Lenders are willing to extend such credit to the Borrower on the terms and subject to the conditions set forth herein.   Accordingly, in consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

ARTICLE I

DEFINITIONS

Section 1.01   Certain Defined Terms.   As used in this Agreement, the following terms shall have the following meanings:

"7% Notes" means those certain Subordinated Promissory Notes in an original aggregate principal amount of $4,400,000, issued by CL Industries between November 27, 2012 and May 1, 2013, as disclosed on Schedule 1.01(c) and as in effect on the date hereof.

"10% Notes" means those certain Senior Subordinated Promissory Notes in an original aggregate principal amount of $10,000,000, issued by CL Industries in connection with that

certain Amended and Restated Note Purchase Agreement dated as of September 26, 2011, as disclosed on Schedule 1.01(c) and as in effect on the date hereof.

"Accrued Interest" means the payment-in-kind of interest in respect of the Loans by increasing the outstanding principal amount of the Loans.

"Additional Equity Raise Amount" means the net cash proceeds received by the Loan Parties in connection with (i) the issuance of additional shares of Capital Stock in the Borrower and/or (ii) subordinated notes of the Loan Parties permitted to be incurred under this Agreement and which are subordinated pursuant to agreements reasonably satisfactory to the DIP Term Loan Agent.

"Additional Loans" means each Loan funded after the Closing Date in accordance with Section 2.01.

"Additional Subordinated Notes" means those certain Subordinated Notes in an original aggregate principal amount of $6,000,000, issued by the Borrower in connection with (i) that Promissory Note, dated February 6, 2020, by and between the Borrower and Windmill Realty Advisors, Inc., in an aggregate principal amount of $1,000,000 as disclosed on Schedule 1.01(c) (ii) Promissory Note, dated February 6, 2020, by and between the Borrower and KRT Trust, in an aggregate principal amount of $2,000,000 as disclosed on Schedule 1.01(c) and (iii) Promissory Note, dated February 6, 2020, by and between the Borrower and Emil Halimi, in an aggregate principal amount of $3,000,000 as disclosed on Schedule 1.01(c).

"Administrative Questionnaire" means a questionnaire, in a form supplied by the DIP Term Loan Agent, completed by a Lender.

"Affected Property" means any property of any Loan Party that suffers an Event of Loss.

"Affiliate" means, with respect to a specified Person, another Person that at such time directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.  Each Guarantor and Non-Guarantor Subsidiary shall be considered an "Affiliate" of the Borrower.

"Agent Reimbursement Letter" means the Amended and Restated Reimbursement Letter, dated as of the Closing Date, among Borrower and the Agents.

"Agents" means, collectively, the DIP Term Loan Agent and the DIP Term Loan Collateral Agent.

"Agreement" means this Credit Agreement, as amended, restated, replaced, supplemented or otherwise modified from time to time.

"Anti-Corruption Laws" means any law of any jurisdiction relating to corruption in which any Loan Party performs business, including without limitation, the FCPA and where applicable, legislation relating to corruption enacted by member states and signatories implementing the OECD Convention Combating Bribery of Foreign Officials.

"Anti-Corruption Prohibited Activity" means the offering, payment, promise to pay, authorization of the payment of any money or the offer, promise to give, giving, or authorizing the giving of anything of value, to any Government Official or to any person under the circumstances where the Person, such Person's Affiliate's or such Person's representative knew or had reason to know that all or a portion of such money or thing of value would be offered, given or promised, directly or indirectly, to any Government Official, for the purpose of (a) influencing any act or decision of such Government Official in his or her official capacity, (b) inducing such Government Official to do or omit to do any act in relation to his or her lawful duty, (c) securing any improper advantage, or (d) inducing such Government Official to influence or affect any act or decision of any Governmental Authority, in each case, in order to assist such Person in obtaining or retaining business for or with, or in directing business to, any person.

"Anti-Money Laundering Laws" means the U.S. Currency and Foreign Transaction Reporting Act of 1970, as amended, and all money laundering-related laws of the United States and other jurisdictions where such Person conducts business or owns assets, and any related or similar law issued, administered or enforced by any Governmental Authority.

"Applicable Law" means with respect to any Person, property or matter, any of the following applicable thereto:  any constitution, writ, injunction, statute, law, regulation, ordinance, rule, judgment, principle of common law, order, decree, court decision, Authorization, approval, concession, grant, franchise, license, agreement, directive, guideline, policy, requirement, or other governmental restriction or any similar form of decision of, or determination by, or any interpretation or administration of any of the foregoing, by any Governmental Authority, whether in effect as of the date hereof or thereafter and in each case as amended, including Environmental Laws.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an assignee (with the consent of any party whose consent is required by Section 10.04), in the form of Exhibit A or any other form approved by the DIP Term Loan Agent.

"Authorization" means any consent, waiver, variance, registration, filing, declaration, agreement, notarization, certificate, license, tariff, approval, permit (including water and environmental permits), orders, authorization, exception or exemption from, by or with any Governmental Authority, whether given by express action or deemed given by failure to act within any specified period, and all corporate, creditors', shareholders' and partners' approvals or consents.

"Authorized Representative" means, with respect to any Person, the chief executive officer, the chief financial officer, Chief Restructuring Officer (if any), president, secretary, assistant secretary or any other officer or authorized representative of such Person as may be designated from time to time by such Person in writing by a notice delivered to the DIP Term Loan Agent.  Any document or certificate delivered under the Financing Documents that is signed by an Authorized Representative may be conclusively presumed by the DIP Term Loan Agent and Lenders to have been authorized by all necessary corporate, limited liability company or other action on the part of the relevant Person.

US-DOCS\121174693.21

"<u>Bail-In Action</u>" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"<u>Bail-In Legislation</u>" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"<u>Bankruptcy</u>" means with respect to any Person (i) commencement by such Person of any case or other proceeding (x) under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization or relief of debtors, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it or its debts, or (y) seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or any substantial part of its assets; or (ii) commencement against such Person of any case or other proceeding of a nature referred to in clause (x) or (y) above which (a) results in the entry of an order for relief or any such adjudication or appointment or (b) remains undismissed, undischarged or unbonded for a period of sixty (60) days; or (iii) commencement against such Person of any case or other proceeding seeking issuance of a warrant of attachment, execution or similar process against all or any substantial part of its assets which results in the entry of an order for any such relief which shall not have been vacated, discharged, or stayed or bonded pending appeal within sixty (60) days from the entry thereof; or (iv) such Person shall take any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in clause (i), (ii) or (iii) above; or (v) such Person shall admit in writing its inability to pay its debts as they become due or shall make a general assignment for the benefit of its creditors.

"<u>Bankruptcy Code</u>" means Title 11 of the United States Code, as amended from time to time.

"<u>Bankruptcy Court</u>" has the meaning assigned to such term in the recitals hereto.

"<u>Bankruptcy Court DIP Order</u>" means the Interim DIP Order or the Final DIP Order, as applicable.

"<u>Bidding Procedures Order</u>" has the meaning assigned to such term in <u>Section 5.22(e)</u>.

"<u>Board</u>" means the Board of Governors of the Federal Reserve System of the United States of America.

"<u>Bond Documents</u>" means, individually and collectively, the Pennsylvania Bond Documents and the Texas Bond Documents.

"<u>Borrower</u>" has the meaning assigned to such term in the introductory paragraph.

"<u>Borrower Group Members</u>" means, collectively, (a) the Borrower, (b) the Guarantors, and (c) the Non-Guarantor Subsidiaries.

4

"Borrower Operating Agreement" means that certain Fourth Amended and Restated Operating Agreement of Borrower, dated as of December 20, 2018, by the members of the Borrower.

"Borrowing Request" means a request by the Borrower for Loans in accordance with Section 2.01.

"Budgeted Disbursements" means in any period, the Loan Parties' operating disbursements and Capital Expenditures, including claims payable under Section 503(b)(9) of the Bankruptcy Code and payments made to "cure" defaults existing under certain executory contracts and unexpired lease agreements, in each case, pursuant to an order entered by the Bankruptcy Court (excluding Professional Fees and restructuring charges arising on account of the Chapter 11 Cases (including U.S. Trustee fees and professional fees and expenses incurred by any official committee appointed in the Chapter 11 Cases or the Agents, the Lenders and/or the Loan Parties or paid by the Loan Parties as adequate protection)), provided that, the Loan Parties may fund an escrow account with amounts attributable to the Carve-Out in the amounts and at the times contemplated by the DIP Budget.

"Budget Event" means mean any of the following:

(a)      the actual amount of aggregate receipts during any Budget Testing Period shall be less than the projected aggregate receipts in the DIP Budget for such Budget Testing Period by an amount greater than the Permitted Variance (this clause (a), the "Budgeted Receipts Test"); or

(b)      the actual amount of aggregate disbursements (excluding Professional Fees and restructuring charges arising on account of the Chapter 11 Cases) (including U.S. Trustee fees and professional fees and expenses incurred by any official committee appointed in the Chapter 11 Cases or the DIP Term Loan Agent and/or Lenders or paid by the Loan Parties as adequate protection) during any Budget Testing Period shall exceed the projected aggregate disbursements in the DIP Budget for such Budget Testing Period by more than the Permitted Variance (this clause (b), the "Budgeted Disbursements Test").

"Budget Testing Date" means (a) in the case of the Budgeted Receipts Test, the first Thursday to occur after the date that is two full weeks after the Petition Date and on Thursday of each week thereafter and (b) in the case of the Budgeted Disbursements Test, the first Thursday to occur after the date that is two full weeks after the Petition Date and on Thursday of each week thereafter.

"Budget Testing Period" shall mean:

(a)      for the Budgeted Receipts Test, (i) with respect to the first Budget Testing Date, the period beginning on the Closing Date and ending on the first Sunday that precedes the first Budget Testing Date and (ii) with respect to each Budget Testing Date thereafter, the period beginning on the second Monday that precedes such Budget Testing Date and ending on the first Sunday that precedes such Budget Testing Date; and

(b)      for the Budgeted Disbursements Test, (i) with respect to the first Budget Testing Date, the period beginning on the Closing Date and ending on the first Sunday that precedes the

first Budget Testing Date and (ii) with respect to each Budget Testing Date thereafter, the period beginning on the second Monday that precedes such Budget Testing Date and ending on the first Sunday that precedes such Budget Testing Date.

"Business" means, collectively, (A) the recycling and/or conversion of PET materials into products for resale directly or through one or more Subsidiaries, including (i) the acquisition of Post-Consumer Materials or any derivative products thereof, (ii) the recycling of Post-Consumer Materials including all aspects of the recycling process, (iii) the sale to other converters of PET or any derivative products thereof, (iv) the conversion of PET into finished products, including but not limited to pcrPET Resins; and (B) activities reasonably related or incidental thereto or representing a reasonable expansion thereof.

"Business Day" means a day other than a Saturday, Sunday or other day on which commercial banks in New York City, New York are authorized or required by law to close.

"Business Revenues" means, for any period (without duplication), all revenue received by or on behalf of the Loan Parties during such period, interest paid in respect of any Permitted Accounts and proceeds from any business interruption insurance.

"Capital Expenditures" means with respect to any Person, the aggregate of all expenditures and costs (whether paid in cash or accrued as liabilities and including that portion of payments under Capital Lease Obligations that are capitalized on the balance sheet of such Person) by such Person and its Subsidiaries which are required to be capitalized under GAAP on a balance sheet of such Person.

"Capital Lease Obligations" means, with respect to any Person, the obligations of such Person to pay rent or any other amounts under any lease of (or other arrangements conveying the right to use) real or personal property, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person in accordance with GAAP.

"Capital Stock" means, with respect to any Person, any and all shares, interests, participations and/or rights in or other equivalents (however designated, whether voting or nonvoting, ordinary or preferred) in the equity or capital of such Person, now or hereafter outstanding, and any and all rights, warrants or options exchangeable for or convertible into any of the foregoing.

"Carve-Out" has the meaning assigned to such term in the Bankruptcy Court DIP Order.

"Cash Equivalent Investments" means:

(a)     direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the United States of America), in each case maturing within one year from the date of acquisition thereof;

(b)     investments in commercial paper maturing within one year from the date of acquisition thereof and having, at such date of acquisition, the highest credit rating obtainable from S&P or from Moody's;

6

(c)    investments in certificates of deposit, banker's acceptances and time deposits maturing within one year from the date of acquisition thereof issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, any domestic office of any commercial bank organized under the laws of the United States of America or any State thereof that has a combined capital and surplus and undivided profits of not less than $100,000,000;

(d)    fully collateralized repurchase agreements with a term of not more than thirty (30) days for securities described in clause (a) above and entered into with a financial institution satisfying the criteria described in clause (c) above; and

(e)    money market funds that (x)(i) comply with the criteria set forth in SEC Rule 2a-7 under the Investment Company Act of 1940, (ii) are rated AAA by S&P and Aaa by Moody's and (iii) have portfolio assets of at least $5,000,000,000 or (y) invest exclusively in Investments described in clauses (a) through (d) above.

"Cash Management Motion" means that certain Cash Management Motion of the Borrower, dated as of the date hereof, filed with the Bankruptcy Court on the date hereof.

"Change of Control" means:

(a)    The Equity Shareholders at the time of the Closing Date shall cease to own, directly or indirectly, beneficially or of record (1) at least 51% of the aggregate voting interests in the Capital Stock of the Borrower or (2) the right to at least 51% of the profits of the Borrower, or (3) the right to at least 51% of the assets of the Borrower upon its dissolution (excluding the Obligations and any Permitted Indebtedness that is *pari passu* with or prior to the Obligations), in each case, on a fully diluted basis;

(b)    the Equity Shareholders at the time of the Closing Date collectively shall otherwise fail to have the right to elect a majority of the Board of Directors of the Borrower;

(c)    prior to the conversion of any Preferred Units into Common Units (as each such term is defined in the Borrower Operating Agreement) in accordance with the Borrower Operating Agreement, the failure of Leon Farahnik (including his spouse, parents, siblings or members of his or her immediate family (including adopted children and step children) and/or direct lineal descendants) or the HPC Member to hold at least 66-2/3% of the Common Class Membership Units (as such term is defined in the Borrower Operating Agreement) in the Borrower;

(d)    the majority of the seats (other than vacant seats) on the Board of Directors of Borrower shall cease to be occupied by (i) the directors of Borrower on the Closing Date and (ii) other directors of Borrower whose nomination for election to the Board of Directors of Borrower is recommended by at least 66-2/3% of the votes of directors then qualifying under clause (i) or this clause (ii), or such other director receives the vote of the Equity Shareholders at the time of the Closing Date in his or her election by the shareholders of Borrower;

(e)    the Borrower shall fail to directly or indirectly own at least 100% on a fully diluted basis of the aggregate voting and economic interests in the Capital Stock of each of the Guarantors (other than PinnPack);

(f)     the Borrower shall fail to directly or indirectly own at least 99.3% on a fully diluted basis of the aggregate voting and economic interests in the Capital Stock of PinnPack; or

(g)     the Borrower shall fail to directly or indirectly own at least 100% on a fully diluted basis of the aggregate voting and economic interests in the Capital Stock of the Non-Guarantor Subsidiaries.

"Chapter 11 Cases" has the meaning specified in the recitals hereto.

"Chapter 11 Plan" means a chapter 11 plan of liquidation or reorganization in the Chapter 11 Cases.

"Chief Restructuring Officer" has the meaning assigned to such term in Section 5.25..

"CL Industries" means CarbonLite Industries LLC, a Delaware limited liability company.

"CL Intermediate Holdco" means CarbonLite Sub-Holdings, LLC, a Delaware limited liability company.

"CL P" means CarbonLite P LLC, a Delaware limited liability company.

"CL P Holdings" means CarbonLite P Holdings LLC, a Delaware limited liability company.

"CL PI Holdings" means CarbonLITE PI Holdings, LLC, a Delaware limited liability company.

"CL Pinnpack" means CarbonLite Pinnpack, LLC, a Delaware limited liability company.

"CL Recycling" means CarbonLite Recycling LLC, a Delaware limited liability company.

"CL Recycling Holdings" means CarbonLite Recycling Holdings LLC, a Delaware limited liability company.

"Closing Date" means the first date on which all conditions precedent specified in Section 4.01 are satisfied (or waived by the DIP Term Loan Agent and the Lenders in their sole and absolute discretion in accordance with Section 10.02), which shall not be later than three Business Days after the Interim DIP Order Entry Date.

"Code" means the Internal Revenue Code of 1986, as amended from time to time (unless as indicated otherwise), the regulations thereunder and publicly available interpretations thereof.

"Collateral" means all Property of the Loan Parties (including all Capital Stock of the Subsidiaries of the Borrower) now owned or hereafter acquired, which is intended to be subject to the security interests or Liens granted pursuant to any of the Security Documents and the "DIP Collateral" as defined in the Bankruptcy Court DIP Orders.

US-DOCS\121174693.21

"Collateral Accounts" means (a) the DIP Term Priority Accounts and (b) the DIP Additional Accounts, in each case, other than any Excluded Account.

"Commitment" means, with respect to any Lender, such Lender's New Money Commitment and/or such Lender's Rolled-Up Term Loans Commitment.

"Compliance Certificate" has the meaning assigned to such term in Section 5.10(e).

"Condemnation" means any taking, seizure, confiscation, requisition, exercise of rights of eminent domain, public improvement, inverse condemnation, condemnation, expropriation, nationalization or similar action of or proceeding by any Governmental Authority affecting the Business.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Control Agreement" means an account control agreement in respect of one or more deposit accounts or securities accounts of the Loan Parties, in form and substance reasonably satisfactory to the DIP Term Loan Collateral Agent, executed by the financial institution at which an account is maintained.

"Copyrights" means all works of authorship, United States and foreign copyrights (whether or not the underlying works of authorship have been published), designs, whether registered or unregistered, registrations and applications for registration of the foregoing and all extensions, renewals, and restorations thereof.

"CRO Report" has the meaning assigned to such term in Section 5.10(l).

"Debt Prepayment Offer" has the meaning assigned to such term in Section 2.05(b)(iv).

"Default" means any event, condition or circumstance that, with notice or lapse of time or both, would (unless cured or waived) become an Event of Default.

"Depositary Bank" means Bank Leumi USA, and any successor thereto selected by the applicable Loan Party and reasonably acceptable to the DIP Term Loan Agent.

"DIP ABL Agent" has the meaning assigned to the term "Agent" in the DIP ABL Credit Agreement.

"DIP ABL Credit Agreement" means that certain Credit Agreement, dated as of September 19, 2019, by and among CL PI Holdings, CL Industries, CL Pinnpack, Pinnpack, the DIP ABL Agent and the DIP ABL Lender, as amended by First Amendment and Waiver to Credit Agreement, dated as of September 16, 2020, Second Amendment and Waiver to Credit Agreement, dated as of December 10, 2020, and the Ratification and Amendment Agreement, dated as of the date hereof.

"DIP ABL Facility" has the meaning assigned to such term in the recitals hereto.

"DIP ABL Lender" has the meaning assigned to the term "Lender" in the DIP ABL Credit Agreement.

"DIP ABL Priority Collateral" has the meaning assigned to such term in the Interim DIP Order and, once issued, the Final DIP Order.

"DIP Additional Accounts" means (a) the accounts of each of CL PI Holdings, CL Industries, CL Pinnpack and Pinnpack, in each case, specified in the Cash Management Motion and in each case, other than any DIP Term Priority Account and (b) each account opened by any of CL PI Holdings, CL Industries, CL Pinnpack and/or Pinnpack, in each case, on or after the Closing Date. The rights to, and priority of, the Secured Parties and the lender under the DIP ABL Facility to the amounts in any DIP Additional Account shall be as set forth in the Interim DIP Order and Final DIP Order.

"DIP Agents" means the DIP Term Loan Agent, the DIP Term Loan Collateral Agent and the DIP ABL Agent.

"DIP Budget" means the then most current budget (which may be a combination of separate budgets for the PinnPack Facility and the Riverside Facility) prepared by the Borrower and approved by the DIP Term Loan Agent in accordance with Section 5.20 (it being acknowledged and agreed that the Initial DIP Budget attached hereto as Schedule 1.01(b) is approved by and satisfactory to the DIP Term Loan Agent and is and shall be the DIP Budget unless and until replaced in accordance with terms of Section 5.20).

"DIP Facilities" has the meaning assigned to such term in the recitals hereto.

"DIP Superpriority Claim" has the meaning assigned to such term in the Bankruptcy Court DIP Orders.

"DIP Term Loan Agent" means Orion Energy Partners Investment Agent, LLC, in its capacity as administrative agent for the Lenders hereunder, and any successor thereto pursuant to Article VIII.

"DIP Term Loan Counsel" means Latham & Watkins LLP, as counsel to the DIP Term Loan Agent, DIP Term Loan Collateral Agent and the Lenders, in each case, in connection with this Agreement and the other Financing Documents.

"DIP Term Priority Accounts" means (a) any account of Borrower or CL Intermediate Holdco, including, without limitation, the account of the Borrower specified in the Cash Management Motion and (b) each account opened by the Loan Parties on or after the Closing Date holding solely DIP Term Priority Collateral.  For the avoidance of doubt, as of the closing date, the following account is a DIP Term Priority Account: 7779959301 held with Bank Leumi USA.

"DIP Term Loan Collateral Agent" means Orion Energy Partners Investment Agent, LLC, in its capacity as collateral agent for the Secured Parties under the Security Documents, and any successor thereto pursuant Article VIII.

"DIP Term Loan Facility" has the meaning assigned to such term in the recitals hereto.

"DIP Term Priority Collateral" has the meaning assigned to such term in the Interim DIP Order and, once issued, the Final DIP Order.

"Discharge of the DIP and Prepetition Term Loan Obligations" means the receipt by DIP Term Loan Agent of an amount of net cash proceeds in connection with a Sale Transaction sufficient to repay in full in cash the Obligations and the Prepetition Term Loan Obligations and result in the discharge of the Obligations and the Prepetition Term Loan Obligations.

"Discharge Date" has the meaning assigned to such term in the Security Agreement.

"Disposition" means any sale, transfer or other disposition of any assets or property by any Loan Party, other than any Event of Loss.

"Disposition Proceeds Prepayment Offer" has the meaning assigned to such term in Section 2.05(b)(iii).

"Dollars" or "$" refers to the lawful currency of the United States of America.

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clause (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Effective Date" has the meaning assigned to such term in the introductory paragraph.

"Environmental Claim" means any administrative or judicial action, suit, proceeding, notice, claim or demand by any Person seeking to enforce any obligation or responsibility arising under or relating to Environmental Law or alleging or asserting liability for investigatory costs, cleanup or other remedial costs, legal costs, environmental consulting costs, governmental response costs, damages to natural resources or other property, personal injuries, fines or penalties related to (a) the presence, or Release into the environment, of any Hazardous Material at any location, whether or not owned by the Person against whom such claim is made, or (b) any noncompliance with, or alleged noncompliance with, or liability arising under any

11

Environmental Law.  The term "Environmental Claim" shall include, without limitation any claim by any Person for damages, contribution, indemnification, cost recovery, compensation or injunctive relief or costs associated with any remediation plan, in each case, under any Environmental Law.

"Environmental Laws" means any Applicable Laws regulating or imposing liability or standards of conduct concerning or relating to pollution or the protection of human health, safety the environment, natural resources or special status species and their habitat, including all Applicable Laws concerning the presence, use, manufacture, generation, transportation, Release, threatened Release, disposal, arrangement for disposal, dumping, discharge, treatment, storage, handling, control or cleanup of Hazardous Materials.

"Equity Shareholders" means the equity owners of the Borrower from time to time.  The Equity Shareholders as at the time of the Closing are listed on Schedule 3.01(b) to the as Agreement.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that, together with the Borrower, is treated as a single employer under Sections 414(b), (c), (m) or (o) of the US Code.

"ERISA Event" means (a) a Reportable Event with respect to any Pension Plan, (b) the failure by any Pension Plan to satisfy the minimum funding standard (within the meaning of Section 412 of the US Code or Section 302 of ERISA) applicable to such plan, whether or not waived, (c) the filing of a notice of intent to terminate a Pension Plan in a distress termination (as described in Section 4041(c) of ERISA), (d) a complete or partial withdrawal by the Borrower or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization or insolvent (within the meaning of Title IV of ERISA), (e) the imposition or incurrence of any liability under Title IV of ERISA, other than PBGC premiums due but not delinquent under Section 4007 of ERISA, upon the Borrower or any ERISA Affiliate, (f) the institution by the PBGC of proceedings to terminate a Pension Plan or Multiemployer Plan, (g) the appointment of a trustee to administer any Pension Plan under Section 4042 of ERISA, or (h) the imposition of a Lien upon the Borrower pursuant to Section 430(k) of the US Code or Section 303(k) of ERISA.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Event of Default" has the meaning assigned to such term in Section 7.01.

"Event of Loss" means any loss of, destruction of or damage to, or any Condemnation or other taking of any property of any Loan Party.

"Event of Loss Prepayment Offer" has the meaning assigned to such term in Section 2.05(b)(ii).

"Excluded Account" means (a) any deposit account that is used solely as a payroll account for the employees of Borrower or its Subsidiaries or the funds in which consist solely of funds held by the owner of such deposit account in trust for any director, officer or employee of any Loan Party or any employee benefit plan maintained by any Loan Party or funds representing deferred compensation for the directors and employees of any Loan Party, (b) cash collateral account, escrow accounts, deposit accounts and trust accounts, in each case holding assets that are pledged or otherwise encumbered pursuant to Permitted Liens and (c) accounts containing no (zero) balance at any time, and accounts that by their terms are swept to a zero balance on a daily basis to a deposit account that is subject to a control agreement in favor of the DIP Term Loan Collateral Agent (including, in the case of this clause (c), the Permitted Accounts); provided that the aggregate daily maximum balance for all accounts described in clauses (a) and (b) on any day shall not exceed $500,000.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to any Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of any Loan Party hereunder, (a) Taxes imposed on or measured by net income and franchise Taxes (imposed in lieu of net income tax), in each case, (i) imposed by the jurisdiction under the laws of which such recipient is organized, in which its principal office (or other fixed place of business) is located or, in which its applicable lending office is located, in each case, as a result of such recipient's connection to the jurisdiction imposing such Taxes or (ii) that are Other Connection Taxes, (b) any branch profits Taxes imposed by the jurisdictions listed in clause (a) of this definition, (c) any Taxes attributable to the failure of the applicable Agent, Lender or any such other applicable recipient to comply with Section 2.09(e), (d) in the case of an Agent or a Lender (other than an assignee pursuant to a request by Borrower under Section 2.11), any United States federal withholding Tax that is imposed on amounts payable to such Agent or Lender under the laws effective at the time such Agent or Lender becomes a party hereto (or designates a new lending office), except to the extent that such Agent or Lender (or its assignor, if any) was entitled, at the time of designation of a new lending office (or assignment), to receive additional amounts from a Loan Party with respect to such withholding Tax pursuant to Section 2.09(a), and (e) any United States federal withholding Taxes imposed under FATCA.

"Facilities" means, individually and collectively, the Pennsylvania Facility, the PinnPack Facility, the PinnPack P Facility, the Riverside Facility and the Texas Facility.

"FATCA" means Sections 1471 through 1474 of the US Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with) and any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Code.

"FCPA" means the United States Foreign Corrupt Practices Act of 1977, as amended.

"Federal Funds Effective Rate" means, for any day, the weighted average (rounded upwards, if necessary, to the next 1/100 of 1%) of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers,

as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average (rounded upwards, if necessary, to the next 1/100 of 1%) of the quotations for such day for such transactions received by the DIP Term Loan Agent from three Federal funds brokers of recognized standing selected by it.

"Final DIP Order" means the final order of the Bankruptcy Court, approving the DIP Term Loan Facility on a final basis, in form and substance satisfactory to the DIP Term Loan Agent, as the same may be amended, modified or supplemented from time to time with the express written consent of the DIP Term Loan Agent.

"Final DIP Order Entry Date" means the date on which the Final DIP Order is entered on the docket of the Bankruptcy Court.

"Financing Documents" means (a) this Agreement, (b) each Note (if requested by a Lender), (c) the Bankruptcy Court DIP Order, (d) the Loan Discount Letter, (e) the Agent Reimbursement Letter, (f) the Security Documents, and (g) each certificate, agreement, instrument, waiver, consent or document executed by a Loan Party and delivered to Agent or any Lender in connection with or pursuant to any of the foregoing and designated as a "Financing Document".

"Foreign Plan" means any employee pension benefit plan, program, policy, arrangement or agreement maintained or contributed to by any Loan Party or with respect to which any Loan Party could reasonably be expected to have any liability, in each case with respect to employees employed outside the United States (as such term is defined in Section 3(10) of ERISA) (other than any arrangement with the applicable Governmental Authority).

"Funding Date" has the meaning assigned to such term in Section 2.01(d)(i).

"GAAP" means generally accepted accounting principles in effect from time to time in the United States of America, applied on a consistent basis.

"Governmental Authority" means any federal, regional, state or local government, or political subdivision thereof or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government and having jurisdiction over the Person or matters in question, including all agencies and instrumentalities of such governments and political subdivisions.

"Government Official" means any official of any Governmental Authority, including, without limitation, all officers or employees of a government department, agency, instrumentality or permitting agency.

"Guarantee" means as to any Person (the "*guaranteeing person*"), any obligation of (a) the guaranteeing person or (b) another Person (including any bank under any letter of credit), if to induce the creation of such obligation of such other Person, the guaranteeing person has issued a reimbursement, counterindemnity or similar obligation, in either case guaranteeing or in effect guaranteeing any Indebtedness, leases, dividends or other obligations (the "*primary obligations*") of any other third Person (the "*primary obligor*") in any manner, whether directly or indirectly,

14

including any obligation of the guaranteeing person, whether or not contingent, (w) to purchase any such primary obligation or any Property constituting direct or indirect security therefor, (x) to advance or supply funds (i) for the purchase or payment of any such primary obligation or (ii) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (y) to purchase Property, securities or services, in each case, primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (z) otherwise to assure or hold harmless the owner of any such primary obligation against loss in respect thereof; provided that the term Guarantee shall not include endorsements of instruments for deposit or collection in the ordinary course of business.  The amount of any Guarantee of any guaranteeing person shall be deemed to be the lower of (A) an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee is made and (B) the maximum amount for which such guaranteeing person may be liable pursuant to the terms of the instrument embodying such Guarantee, unless such primary obligation and the maximum amount for which such guaranteeing person may be liable are not stated or determinable, in which case the amount of such Guarantee shall be such guaranteeing person's maximum reasonably anticipated liability in respect thereof as determined by Borrower in good faith.

"Guaranteed Obligations" means, with respect to any Guarantor, the Obligations whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest, reimbursements and fees that accrue after the commencement by or against any Loan Party or any Affiliate thereof of any proceeding under any debtor relief law naming such Person as the debtor in such proceeding, regardless of whether such interest, reimbursements and fees are allowed claims in such proceeding.

"Guarantors" means each Subsidiary of the Borrower (including, for the avoidance of doubt, CL Intermediate Holdco), other than the Non-Guarantor Subsidiaries.

"Hazardous Material" means any hazardous, toxic or dangerous substances, materials and wastes, including, without limitation, hydrocarbons (including naturally occurring or man-made petroleum and hydrocarbons), flammable explosives, asbestos, urea formaldehyde insulation, radioactive materials, biological substances, polychlorinated biphenyls, pesticides, herbicides and any other kind and/or type of pollutants or contaminants (including, without limitation, materials which include hazardous constituents), sewage, sludge, industrial slag, solvents and/or any other similar substances, materials, or wastes and including any other substances, materials or wastes that are or become regulated under any Environmental Laws (including, without limitation, any that are or become classified as hazardous or toxic under any Environmental Laws).

"Hedging Agreement" means any agreement with respect to any swap, cap, collar, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions.

"HPC Member" means HPC Industries LLC, a Delaware limited liability company.

15

"Indebtedness" of any Person means, without duplication, all (a) indebtedness for borrowed money and every reimbursement obligation with respect to letters of credit, bankers' acceptances or similar facilities, (b) obligations evidenced by bonds, debentures, notes or other similar instruments, (c) obligations to pay the deferred purchase price of property or services, except accounts payable and accrued expenses arising in the ordinary course of business and payable within ninety (90) days after the due date therefor as specified in, or determined from, the applicable contract or purchase order, (d) the Net Hedging Obligations under interest rate or currency Hedging Agreements and all other agreements or arrangements designed to protect against fluctuations in interest rates, commodity prices and currency exchange rates, (e) the capitalized amount (determined in accordance with GAAP) of all payments due or to become due under all leases and agreements to enter into leases required to be classified and accounted for as a capital lease in accordance with GAAP, (f) reimbursement obligations (contingent or otherwise) pursuant to any performance bonds or collateral security, (g) Indebtedness of others described in clauses (a) through (f) above secured by (or for which the holder thereof has an existing right, contingent or otherwise, to be secured by) a Lien on the property of such Person, whether or not the respective Indebtedness so secured has been assumed by such Person and (h) Guarantees by such Person of Indebtedness of others described in clauses (a) through (g) above. The Indebtedness of any Person shall include the Indebtedness of any partnership in which such Person is a general partner to the extent such Person is liable therefor as a result of such Person's general partner interest in such partnership, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor.

"Indemnified Party" has the meaning assigned to such term in Section 10.03(b).

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Loan Parties under any Financing Document and (b) to the extent not otherwise described in (a), Other Taxes.

"Independent Auditor" means (i) RSM US LLP, (ii) any "big four" accounting firm selected by the Borrower and notified to the DIP Term Loan Agent or (iii) any other firm of independent public accountants of recognized national standing in the United States selected by the Borrower and reasonably acceptable to the DIP Term Loan Agent.

"Initial DIP Budget" means the DIP Budget in effect on the Closing Date and attached hereto as Schedule 1.01(b).

"Initial Funding Commitments" means, with respect to each Lender, the commitment of such Lender to make Loans to the Borrower pursuant to Section 2.01(a), in an aggregate principal amount not to exceed the amount set forth opposite such Lender's name on Annex I under the heading "Initial Funding Commitments".

"Intellectual Property" means (a) the collective reference to all rights, priorities and privileges relating to intellectual property, whether arising under United States, multinational or foreign laws or otherwise, including, without limitation, all Copyrights, Patents, Trademarks and trade secrets, (b)  all rights to sue or otherwise recover for any past, present and future infringement, dilution, misappropriation, or other violation or impairment thereof, (c) all proceeds of any of the foregoing, including without limitation license fees, royalties, income

16

payments, claims, damages and proceeds of suit, now or hereafter due and/or payable with respect thereto, (d) all written agreements, licenses and covenants providing for the grant to or from any Person any rights in any such intellectual property that is owned by another Person.

"Interest Rate" means individually or collectively as the context may require, (i) with respect to the New Money Loans, 11.00% per annum and (ii) with respect to the Rolled-Up Term Loans, 11.00% per annum.

"Interim DIP Order" means the order of the Bankruptcy Court, approving the DIP Facilities on an interim basis, substantially in the form of Exhibit I hereto, and otherwise satisfactory to the DIP Term Loan Agent.

"Interim DIP Order Entry Date" means the date on which the Interim DIP Order is entered on the docket of the Bankruptcy Court.

"Investment" means for any Person (a) the acquisition (whether for cash, Property of such Person, services or securities or otherwise) of Capital Stock, bonds, notes, debentures, debt securities, partnership or other ownership interests or other securities of, or any Property constituting an ongoing business, line of business, division or business unit of or constituting all or substantially all the assets of, or the making of any capital contribution to, any other Person, (b) the making of any advance, loan or other extension of credit to, any other Person (including the purchase of Property from another Person subject to an understanding or agreement, contingent or otherwise, to resell such Property to such Person, but excluding any such advance, loan or extension of credit having a term not exceeding ninety (90) days representing the purchase price of inventory or supplies sold in the ordinary course of business), (c) the entering into of any Guarantee with respect to Indebtedness or other liability of any other Person, and (d) any other investment that would be classified as such on a balance sheet of such Person in accordance with GAAP.  For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment but giving effect to any returns or distributions of capital or repayment of principal actually received in case by such Person with respect thereto.

"Investment Banker" has the meaning assigned to such term in Section 5.24.

"Investment Banker Report" has the meaning assigned to such term in Section 5.10(j).

"Lenders" has the meaning assigned to such term in the preamble.

"Lien" means any mortgage, charge, pledge, lien (statutory or other), privilege, security interest, hypothecation, collateral assignment or preference, priority or other security agreement, mandatory deposit arrangement, preferential arrangement or other encumbrance upon or with respect to any property of any kind, real or personal, movable or immovable, now owned or hereafter acquired (including, without limitation, any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing).

"Loan Discount Letter" means that certain loan discount letter, dated as of the Closing Date, among the Loan Parties and the Lenders.

17

"<u>Loan Parties</u>" means, collectively, the Borrower and the Guarantors.

"<u>Loans</u>" means, individually and collectively, the New Money DIP Term Loans and the Rolled-Up Term Loans.

"<u>Loss Proceeds</u>" means insurance proceeds, condemnation awards or other similar compensation, awards, damages and payments or relief (exclusive, in each case, of proceeds of business interruption, workers' compensation, employee theft or embezzlement, employment practices, environmental or product liability, automobile liability, builders' all risk liability, directors and officers insurance and general liability insurance) with respect to any Event of Loss.

"<u>Loss Proceeds (ABL)</u>" means Loss Proceeds that are proceeds of DIP ABL Priority Collateral.

"<u>Loss Proceeds (Term Loans)</u>" means Loss Proceeds that are proceeds of DIP Term Priority Collateral.

"<u>Material Additional Agreements</u>" means each Material Agreement (or series of related Material Agreements) entered into by, or assigned to any Loan Party subsequent to the Closing Date that (i) provides for the payment by any Loan Party, or the provision to any Loan Party, of goods, inventory or services equal to or in excess of $100,000 in the aggregate thereunder, (ii) provides revenue or income to any Loan Party equal to or in excess of $100,000 in the aggregate thereunder or (iii) provides for a deposit or prepayment of revenue equal to or in excess of $100,000 in the aggregate thereunder.

"<u>Material Adverse Effect</u>" means a material adverse effect on: (a) the business, assets, properties, operations or financial condition of the Borrower Group Members, taken as a whole; (b) the ability of any Loan Party to perform its material obligations under the Financing Documents; (c) the validity of, enforceability of the material rights or remedies of, or benefits available to the Secured Parties under, the Financing Documents or (d) the validity and perfection of the Secured Parties' Liens in a material portion of the Collateral.  For the avoidance of doubt, solely for purposes of clause (a) hereof, "Material Adverse Effect" shall expressly exclude (x) any matters disclosed in any "first day" pleadings or declarations and (y) the effect of filing the Cases, the events and conditions related to, resulting from and/or leading up to the effects thereon and any action required to be taken under the Financing Documents or the Bankruptcy Court DIP Order.

"<u>Material Agreements</u>" means, individually and collectively, (1)(a) any contracts or agreements related to (a) the acquisition of and/or the sale to other converters of post-consumer plastic waste ("<u>Post-Consumer Materials</u>") or any derivative products thereof, (b) the recycling and/or conversion of Post-Consumer Materials into food-grade post-consumer recycled polyethylene terephthalate resins ("<u>pcrPET Resins</u>") and other finished products, (c) the acquisition, construction, servicing (including ancillary services), maintenance, repair or operation of recycling facilities and any associated equipment or (d) any other agreement or contract, in each case, entered into by any Loan Party and any other Person, or assigned to any Loan Party, in each case that (i) provides for the payment by any Loan Party, or the provision to

18

any Loan Party, of goods, inventory or services equal to or in excess of $100,000 in the aggregate thereunder, (ii) provides revenue or income to any Loan Party equal to or in excess of $100,000 in the aggregate thereunder or (iii) provides for a deposit or prepayment of revenue equal to or in excess of $100,000 in the aggregate thereunder; (2) any Material Additional Agreement and (3) any Material Agreement entered into by a Loan Party in replacement of any of the foregoing.

"Material Agreements Prepayment Offer" has the meaning assigned to such term in Section 2.05(b)(i).

"Material Counterparty" means each Person (other than any Agent, Lender, or Borrower Group Member) from time to time party to any Material Agreement.

"Material Indebtedness" has the meaning assigned to such term in Section 7.01(r).

"Material Indebtedness Facility" means each of the DIP ABL Facility, the Texas DIP Facility or the Pennsylvania DIP Facility, the Indebtedness represented by the Bond Documents and the Indebtedness represented by any Prepetition Loan Documents.

"Maturity Date" means the earliest to occur of (i) the date that is 120 days after the Petition Date, (ii) the date that is 35 days (or such later date as the DIP Term Loan Agent may agree) after the Petition Date if the Final DIP Order has not been entered prior to the expiration of such 35-day period, (iii) the date the Bankruptcy Court orders the conversion of the Chapter 11 Cases to a Chapter 7 liquidation or the dismissal of the Chapter 11 Cases, (iv) the acceleration of the loans and the termination of the Commitment under the DIP Term Loan Facility or the DIP ABL Facility or (v) the sale of all or substantially all of the Loan Parties' assets under Section 363 of the Bankruptcy Code, including the Sale Transaction.

"Milestones" has the meaning assigned to such term in Section 5.22.

"Monthly Payment Date" means the last Business Day of each calendar month in each calendar year.

"Multiemployer Plan" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA that is subject to Title IV of ERISA to which any Loan Party contributes or is obligated to contribute, or with respect to which any Loan Party has or could reasonably be expected to have any liability.

"Net Available Amount" means:

(a)      in the case of any receipt of termination payments, liquidated damages, indemnity payments or other extraordinary payments under the Material Agreements or any real property lease for the Facilities, the aggregate amount of payments received by the Loan Parties (including, as a distribution from a Non-Guarantor Subsidiary) or any of their respective Affiliates in respect of such event, net of (i) reasonable costs and expenses incurred by the Borrower Group Members or any of their respective Affiliates in connection with the collection of such proceeds and (ii) in the case of the Non-Guarantor Subsidiaries, mandatory redemption payments to be made under the Bond Documents;

19

(b)      in the case of any Event of Loss, the aggregate amount of Loss Proceeds received by the Borrower Group Members or any of their respective Affiliates in respect of such Event of Loss, net of (i) reasonable costs and expenses incurred by the Loan Parties (including, as a distribution from a Non-Guarantor Subsidiary) in connection with the collection of such Loss Proceeds and (ii) in the case of the Non-Guarantor Subsidiaries, mandatory redemption payments to be made under the Bond Documents; and

(c)      in the case of any Disposition, the aggregate amount received by the Loan Parties (including, as a distribution from a Non-Guarantor Subsidiary) or any of their respective Affiliates in respect of such Disposition, net of (i) reasonable costs and expenses incurred by the Borrower Group Members in connection with such Disposition and (ii) in the case of the Non-Guarantor Subsidiaries, mandatory redemption payments to be made under the Bond Documents.

"Net Hedging Obligations" means, as of any date, the Termination Value of any Hedging Agreement on such date.

"New Money Commitment" means as to each Lender, its obligation to make a New Money DIP Term Loan to Borrower hereunder, expressed as an amount representing the maximum principal amount of New Money DIP Term Loans to be made by such Lender under this Agreement, as such commitment may be reduced or increased from time to time pursuant to assignments by or to such Lender pursuant to an Assignment and Assumption. The amount of each Lender's New Money Commitment is set forth on Annex I under the caption "New Money DIP Term Loans" or, otherwise, in the Assignment and Assumption or election joinder pursuant to which such Lender shall have assumed its New Money Commitment, as the case may be. The aggregate amount of the New Money Commitments on the Closing Date is $20,000,000.

"New Money DIP Term Loans" means the Loans made pursuant to Section 2.01 under the New Money Commitment.

"Niagara Promissory Note" means that certain promissory note, dated September 2, 2020, by and between the Borrower and Niagara Bottling, LLC, pursuant to which Niagara Bottling, LLC has loaned $5,000,000 to the Borrower. The final version of the Niagara Promissory Note was delivered by the Borrower to the Prepetition Term Loan Agent at 3:28 pm New York Time on Friday, September 4, 2020.

"Non-Guarantor Subsidiaries" means, collectively, (i) the Pennsylvania Facility Group, (ii) the Texas Facility Group and (iii) any other Person approved in writing by DIP Term Loan Agent as a Non-Guarantor Subsidiary (not to be unreasonably withheld, conditioned or delayed in the case of Subsidiaries to be subject to Indebtedness permitted in reliance on Section 6.02(j)).

"Note" has the meaning assigned to such term in Section 2.04(b)(ii).

"Obligations" means all advances to, and debts (including Accrued Interest, interest accruing after the maturity of the Loans and interest accruing after the filing of any Bankruptcy), liabilities (including, without limitation, expense reimbursement pursuant to Section 10.03(a)), obligations, covenants and duties of, any Loan Party arising under any Financing Document, or otherwise with respect to any Loan, in each case whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter

arising and including interest, reimbursements and fees that accrue after the commencement by or against the Borrower or any of its Subsidiaries of any proceeding under any debtor relief law naming such Person as the debtor in such proceeding, regardless of whether such interest, reimbursements and fees are allowed claims in such proceeding.

"Officer's Certificate" means, with respect to any Loan Party, a certificate signed by an Authorized Representative of such Loan Party.

"Organizational Documents" means, with respect to any Person, (i) in the case of any corporation, the certificate of incorporation and by-laws (or similar documents) of such Person, (ii) in the case of any limited liability company, the certificate of formation and operating agreement (or similar documents) of such Person, (iii) in the case of any limited partnership, the certificate of formation and limited partnership agreement (or similar documents) of such Person, (iv) in the case of any general partnership, the partnership agreement (or similar document) of such Person and (v) in any other case, the functional equivalent of the foregoing.

"Other Connection Taxes" means, with respect to any Agent or any Lender, Taxes imposed as a result of a present or former connection between such Agent or Lender and the jurisdiction imposing such Tax (other than connections arising from such Agent or Lender having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Financing Document, or sold or assigned an interest in any Loan or Financing Document).

"Other Taxes" means any and all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes arising from any payment made under any Financing Document or from the execution, delivery, performance, registration or enforcement of, from the receipt or perfection of a security interest under or otherwise with respect to, any Financing Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 2.10).  For the avoidance of doubt, "Other Taxes" shall not include any Excluded Taxes.

"Participant" has the meaning assigned to such term in Section 10.04(f).

"Participant Register" has the meaning assigned to such term in Section 10.04(f).

"Patents" means all patentable inventions and designs, United States, foreign, and multinational patents, certificates of invention, and similar industrial property rights, and applications for any of the foregoing, including, without limitation, all reissues, substitutes, divisions, continuations, continuations-in-part, extensions, renewals, and reexaminations thereof.

"PBGC" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

"Pennsylvania Bond Documents" means (i) the Indenture of Trust, dated as of June 1, 2019, by and between The Pennsylvania Economic Development Financing Authority, as issuer and UMB Bank, N.A., as trustee, (ii) supplemented by the First Supplemental Indenture, effective as of September 1, 2020, by and between The Pennsylvania Economic Development

Financing Authority, as issuer and UMB Bank, N.A., as trustee, (iii) the Loan Agreement, dated as of June 1, 2019 (as amended by the First Amendment to Loan Agreement, effective as of September 1, 2020), by and between The Pennsylvania Economic Development Financing Authority and CL P and (iv) the documents entered into in connection therewith.

"Pennsylvania DIP Budget" means the cash flow projections required to be delivered under the Pennsylvania DIP Facility.

"Pennsylvania DIP Facility" means that certain Superpriority Secured Debtor-In-Possession Credit Agreement, dated as of March 8, 2021, among CL P, as borrower, CL P Holdings, the other parties party thereto, as subsidiary guarantors and UMB Bank, N.A. as administrative agent and collateral agent, in respect of the Pennsylvania Facility Group, delivered pursuant to Section 4.01(t).

"Pennsylvania Facility" means the pcrPET processing facility under construction in Reading, Pennsylvania, to be owned and operated by CL P.

"Pennsylvania Facility Group" means CL P, CL P Holdings and any of their respective Subsidiaries.

"Pension Plan" means any employee pension benefit plan as defined in Section 3(2) of ERISA (other than a Multiemployer Plan) that is subject to the provisions of Title IV or Section 302 of ERISA, or Section 412 of the US Code, and in respect of which any Loan Party is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA or with respect to which any Loan Party has or could reasonably be expected to have any liability.

"Permitted Accounts" means (a) the Collateral Accounts and (b) the Excluded Accounts.

"Permitted Contest Conditions" means, with respect to any Loan Party, a contest, pursued in good faith, challenging the enforceability, validity, interpretation, amount or application of any law, tax or other matter (legal, contractual or other) by appropriate proceedings timely instituted if (a) such Loan Party diligently pursues such contest, (b) such Loan Party establishes adequate reserves with respect to the contested claim if and to the extent required by GAAP and (c) such contest (i) could not reasonably be expected to result in a Material Adverse Effect and (ii) does not involve any material risk or danger of any criminal or unindemnified civil liability being incurred by the DIP Term Loan Agent or the Lenders.

"Permitted Indebtedness" has the meaning assigned to such term in Section 6.02.

"Permitted Lien" has the meaning assigned to such term in Section 6.03.

"Permitted Variance" means, for purposes of testing whether a Budget Event has occurred, during any Budget Testing Period, a variance of, (a) with respect to the Budgeted Receipts Test, 15% and (b) with respect to the Budgeted Disbursements Test, 10%.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"PET" means polyethylene terephthalate.

"Petition Date" means March 8, 2021.

"PinnPack" means PinnPack Packaging, LLC, a Delaware limited liability company.

"PinnPack Facility" means the PET thermoforming and processing facility located in Oxnard, California, directly owned by PinnPack P.

"PinnPack P" means Pinnpack P, LLC, a Delaware limited liability company.

"PinnPack P Facility" means the PET thermoforming and processing facility contemplated in Eastern Pennsylvania, directly owned by PinnPack P.

"Post-Default Rate" means a rate per annum which is equal to the lesser of (a) the sum of the Interest Rate *plus* 2.00% and (b) with respect to each Lender, the maximum nonusurious interest rate, if any, that may be contracted for, taken, reserved, charged or received on the Loans under laws applicable to such Lender which are in effect at the relevant time.

"Prepetition ABL Agent" means Bank Leumi USA, in its capacity as administrative agent under any of the Prepetition ABL Loan Documents or any successor administrative agent.

"Prepetition ABL Agreement" means that certain Credit Agreement, dated as of September 16, 2019, among CL PI, CL Industries, CL P, Pinnpack and Bank of Leumi USA, as lender, as amended by that certain First Amendment and Waiver to Credit Agreement, dated as of September 16, 2020, as amended by that certain Second Amendment and Waiver to Credit Agreement, dated as of December 10, 2020.

"Prepetition ABL Lender" means Bank Leumi USA in its capacity as lender of the Prepetition ABL Loans.

"Prepetition ABL Loan Documents" means the Prepetition ABL Agreement and the other "Loan Documents" under and as defined in the Prepetition ABL Agreement.

"Prepetition ABL Loan Indebtedness" means Indebtedness of the Borrower or any Guarantor outstanding, or secured, under the Prepetition ABL Loan Documents.

"Prepetition ABL Loans" means the "Revolving Loans" under and as defined in the Prepetition ABL Agreement.

"Prepetition Agents" means the Prepetition Term Loan Agent and the Prepetition ABL Agent.

"Prepetition Intercreditor Agreement" means that certain Intercreditor Agreement, dated as of September 16, 2019, among the Prepetition ABL Agent, the Prepetition Term Loan Agent and the Loan Parties, as amended by that certain First Amendment to Intercreditor Agreement, dated as of December 10, 2020.

"Prepetition Loan Documents" means the Prepetition ABL Loan Documents and the Prepetition Term Loan Documents.

"Prepetition Obligations" means the Prepetition Term Loan Obligations and the Prepetition ABL Loan Indebtedness.

"Prepetition Term A/C Loans" means, collectively, the "Tranche A Loans" and "Tranche C Loans" under and as defined in the Prepetition Term Loan Agreement.

"Prepetition Term Loan Agent" means Orion Energy Partners Investment Agent, LLC, in its capacity as administrative agent under the Prepetition Term Loan Documents or any other successor administrative agent.

"Prepetition Term Loan Agreement" means that certain Credit Agreement, dated as of August 2, 2019 (as amended by Amendment No. 1 to Credit Agreement and Waiver, dated March 20, 2020, Amendment No. 2 to Credit Agreement, dated September 9, 2020, Amendment No. 3 to Credit Agreement, dated October 23, 2020, Amendment No. 4 and Waiver to Credit Agreement, dated December 10, 2020 and Forbearance Agreement and Amendment No. 5 to Credit Agreement, dated February 8, 2021, and as may be further amended, amended and restated, supplemented or otherwise modified from time to time), among the Borrower, certain subsidiaries of the Borrower, as Guarantors, the several banks and other financial institutions or entities from time to time party thereto as lenders and Orion Energy Partners Investment Agent, LLC as administrative agent and collateral agent.

"Prepetition Term Loan Collateral Agent" means Orion Energy Partners Investment Agent, LLC, in its capacity as collateral agent under any of the Prepetition Term Loan Documents or any successor collateral agent.

"Prepetition Term Loan Documents" means the "Financing Documents" as defined in the Prepetition Term Loan Agreement.

"Prepetition Term Loan Lenders" means the lenders of the Prepetition Term Loans.

"Prepetition Term Loan Obligations" means the "Obligations" under and as defined in the Prepetition Term Loan Agreement.

"Prepetition Term Loans" mean the "Loans" under and as defined in the Prepetition Term Loan Agreement.

"Prepetition Term Loan Secured Parties" means the "Secured Parties" as defined in the Prepetition Term Loan Credit Agreement.

"Professional Fees" means, to the extent allowed at any time, whether by interim or final compensation order, all unpaid fees and expenses incurred by persons or firms retained by the Loan Parties pursuant to sections 327, 328, or 363 of the Bankruptcy Code.

"Projection" has the meaning assigned to such term in Section 3.12(b).

US-DOCS\121174693.21

"Property" means any right or interest in or to property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible.

"Proposed DIP Budget" has the meaning assigned to such term in Section 5.20(b).

"Register" has the meaning assigned to such term in Section 10.04(c).

"Regulation D" means Regulation D of the Board.

"Regulation U" means Regulation U of the Board.

"Rejected Proceeds" has the meaning assigned to such term in Section 2.05(c)(iii).

"Rejected Proceeds Account" means an account of the Borrower to be established and maintained at the Depositary Bank for the deposit of Rejected Proceeds as provided herein.

"Related Fund" means with respect to any Lender, any fund that invests in loans and is managed or advised by the same investment advisor as such Lender, by such Lender or an Affiliate of such Lender.

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, employees, agents and advisors of such Person and such Person's Affiliates.

"Release" means any release, spill, emission, emanation, leaking, pumping, injection, deposit, disposal, discharge, dispersal, leaching or migration into or through the indoor or outdoor environment, including, the movement through ambient air, soil, surface water, ground water, wetlands, land or subsurface strata.

"Replacement Obligor" means a Person (or guarantor of such Person's obligations) that is approved by the DIP Term Loan Agent, such approval to be in the DIP Term Loan Agent's reasonable discretion.

"Reportable Event" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the 30-day notice period has been waived.

"Restoration" means, with respect to any Affected Property, the rebuilding, repair, restoration or replacement of such Affected Property.

"Restricted Payment" means:

(a)    all dividends paid by any Loan Party (in cash, Property or obligations) on, or other payments or distributions on account of, or the setting apart of money for a sinking or other analogous fund for, or the purchase, redemption, retirement or other acquisition by any Loan Party of, any portion of any membership interests in any Loan Party or any warrants, rights or options to acquire any such membership interests;

25

(b)    any payment of development, management or other fees, or of any other amounts, by any Loan Party to any Affiliate thereof;

(c)    any other payment in cash, Property or obligations to a parent company of the Loan Parties or Affiliate of the Loan Parties;

(d)    any other payment in cash, Property or obligations in respect of the Shareholder Notes; and/or

(e)    any other payment in cash, Property or obligations to a parent company of the Loan Parties or Affiliate of the Loan Parties in respect of any Indebtedness subordinated to the Obligations hereunder.

"Riverside Facility" means the pcrPET processing facility located in Riverside, California, directly owned by CL Industries.

"Rolled-Up Term Loan Lenders" means the Lenders with a Rolled-Up Term Loan Commitment as set forth on Annex I.

"Rolled-Up Term Loans" means the loans deemed made pursuant to Section 2.01(b) under the Rolled-Up Term Loans Commitment.

"Rolled-Up Term Loans Commitment" means, as to each Rolled-Up Term Loan Lender, its obligation to be deemed to make a Rolled-Up Term Loan to the Borrower pursuant to Section 2.01(b) in an aggregate principal amount not to exceed the amount set forth opposite such Lender's name on Annex I under the caption "Rolled-Up Term Loans Commitment" or in the election joinder, as applicable.

"S&P" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., or any successor to the rating agency business thereof.

"Sale Order" means an order approving the Sale Transaction in form and substance satisfactory to the DIP Term Loan Agent.

"Sale Process" means the marketing and sale process for the Sale Transaction, in accordance with the Milestones and otherwise satisfactory to the DIP Term Loan Agent.

"Sale Transaction" has the meaning assigned to such term in Section 5.22(d).

"Sanctioned Country" means, at any time, a country or territory that is subject to comprehensive Sanctions.  For the avoidance of doubt, as of the Closing Date, Sanctioned Countries are the Crimea region of Ukraine, Cuba, Iran, North Korea and Syria.

"Sanctioned Person" means, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, or by the United Nations Security Council, the European Union or any EU member state, (b) any Person operating, organized or resident in a Sanctioned Country, or (c) any Person owned or controlled by any such Person.

"Sanctions" means economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, or (b) the United Nations Security Council, the European Union or Her Majesty's Treasury of the United Kingdom.

"Secured Obligations" has the meaning assigned to such term in the Security Agreement.

"Secured Parties" means (a) the Agents and (b) the Lenders.

"Security Agreement" means the Pledge and Security Agreement, entered into on the Closing Date, among the Loan Parties and the DIP Term Loan Collateral Agent, a copy of which is attached hereto as Exhibit G.

"Security Documents" means the Bankruptcy Court DIP Order, Security Agreement, the Control Agreements, all Uniform Commercial Code financing statements required by any Security Document, mortgages in respect of real or leased property (if any) and any other security agreement or instrument to be executed pursuant hereto or any Security Document.

"Specified Lender Advisors" means (i) Latham & Watkins LLP, as legal counsel and (ii) AlixPartners, as financial advisor.

"Specified Material Agreement" has the meaning assigned to such term in Section 3.09(a).

"Shareholder Notes" means, collectively, the 7% Notes, the 10% Notes, the Additional Subordinated Notes.

"Subsidiary" means, with respect to any Person (the "parent"), any other corporation, limited liability company, partnership, association or other entity (a) of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date, owned, controlled or held, or (b) that is, as of such date, otherwise controlled, by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Termination Value" means, in respect of any one or more Hedging Agreement, after taking into account the effect of any legally enforceable netting agreement relating to such Hedging Agreements, (a) for any date on or after the date such Hedging Agreements have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) or any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Hedging Agreements, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Hedging Agreements (which may include a Lender or any Affiliate of a Lender).

US-DOCS\121174693.21

"<u>Texas Bond Documents</u>" means (i) the Indenture, dated as of October 1, 2016, by and between The Mission Economic Development Corporation, as issuer and UMB Bank, N.A., as trustee, (ii) the Loan Agreement, dated as of October 1, 2016, by and between The Mission Economic Development Corporation and CL Recycling and (iii) the documents entered into in connection therewith.

"<u>Texas DIP Budget</u>" means the cash flow projections required to be delivered under the Texas DIP Facility.

"<u>Texas DIP Facility</u>" means that certain Superpriority Secured Debtor-In-Possession Credit Agreement, dated as of March 8, 2021, among CL Recycling, as borrower, CL Recycling Holdings, the other parties party thereto, as subsidiary guarantors and UMB Bank, N.A. as administrative agent and collateral agent, in respect of the Texas Facility Group, delivered pursuant to <u>Section 4.01(s)</u>.

 "<u>Texas Facility</u>" means the pcrPET processing facility located in Dallas, Texas, directly owned by CL Recycling.

"<u>Texas Facility Group</u>" means CL Recycling, CL Recycling Holdings and any of their respective Subsidiaries.

"<u>Trademarks</u>" means all domestic, foreign and multinational trademarks, service marks, trade names, corporate names, company names, business names, fictitious business names, trade dress, trade styles, logos, Internet domain names, other indicia of origin or source identification, and general intangibles of a like nature, whether registered or unregistered, and, with respect to the foregoing, all registrations and applications for registration thereof, all extensions and renewals thereof, and all of the goodwill of the business connected with the use of and symbolized by any of the foregoing.

"<u>UCC</u>" means the Uniform Commercial Code as in effect from time to time in the State of New York; <u>provided</u> that if, with respect to any filing statement or by reason of any mandatory provisions of law, the perfection or the effect of perfection or non-perfection of the security interests granted to the DIP Term Loan Collateral Agent pursuant to the applicable Security Document is governed by the Uniform Commercial Code as in effect in a jurisdiction of the United States other than New York, UCC means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions of each applicable Financing Document and any filing statement relating to such perfection or effect of perfection or non-perfection.

"<u>Uniform Commercial Code</u>" means the Uniform Commercial Code as in effect from time to time in the applicable jurisdiction.

"<u>US Code</u>" means the U.S. Internal Revenue Code of 1986, as amended.

"<u>US Person</u>" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"<u>USA PATRIOT Act</u>" has the meaning assigned to such term in <u>Section 10.14</u>.

"<u>Variance Report</u>" shall mean a report provided by the Borrower to the DIP Term Loan Agent and the Lenders (a) showing, in each case, on a line item by line item and cumulative basis, the actual cash receipts and disbursements with respect to the Budget Testing Period then most recently ended, setting forth (i) all variances, on a line item by line item basis and a cumulative basis, from the actual receipts and disbursements for such period from those reflected for the corresponding period in the DIP Budget as in effect for such period, (ii) a description of the nature of any material positive or negative variance in each line item in the DIP Budget as in effect for such period, (iii) containing an indication as to whether each variance is temporary or permanent and analysis and explanations for all material variances, (iv) certifying compliance or non-compliance with such maximum variances set forth therein, and (v) including explanations for all material variances and violations, if any, of such covenant and if any such violation exists, setting forth the actions which the Borrower has taken or intends to take with respect thereto, and (b) which such reports shall be certified by a Responsible Officer of the Borrower and shall be in a form, and shall contain supporting information, satisfactory to the DIP Term Loan Agent in its sole discretion.

"<u>Vehicles</u>" has the meaning assigned to such term in the Security Agreement.

"<u>Voting Stock</u>" means, with respect to any Person, Capital Stock the holders of which are ordinarily, in the absence of contingencies, entitled to vote for the election of directors (or persons performing similar functions) of such Person, even if the right so to vote has been suspended by the happening of a contingency.

"<u>Write-Down and Conversion Powers</u>" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

Section 1.02    <u>Terms Generally</u>.  Except as otherwise expressly provided, the following rules of interpretation shall apply to this Agreement and the other Financing Documents:

(a)    the definitions of terms herein shall apply equally to the singular and plural forms of the terms defined;

(b)    whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms;

(c)    the words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation";

(d)    the word "will" shall be construed to have the same meaning and effect as the word "shall";

(e)    unless the context requires otherwise, any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or

29

modifications set forth herein or therein) and shall include any appendices, schedules, exhibits, clarification letters, side letters and disclosure letters executed in connection therewith;

(f)     any reference herein to any Person shall be construed to include such Person's successors and assigns to the extent permitted under the Financing Documents and, in the case of any Governmental Authority, any Person succeeding to its functions and capacities;

(g)     the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision;

(h)     all references herein to Articles, Sections, Appendices, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Appendices, Exhibits and Schedules to, this Agreement;

(i)     the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights; and

(j)     any reference herein to a merger, transfer, consolidation, amalgamation, consolidation, assignment, sale, disposition or transfer, or similar term, shall be deemed to apply to a division of or by a limited liability company, or an allocation of assets to a series of a limited liability company (or the unwinding of such a division or allocation), as if it were a merger, transfer, consolidation, amalgamation, consolidation, assignment, sale or transfer, or similar term, as applicable, to, of or with a separate Person.  Any division of a limited liability company shall constitute a separate Person hereunder (and each division of any limited liability company that is a Subsidiary, joint venture or any other like term shall also constitute such a Person or entity).

Section 1.03   Accounting Terms.  Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP.  If the Borrower notifies the DIP Term Loan Agent that the Borrower wishes to amend any provision hereof to eliminate the effect of any change occurring after the date hereof in GAAP or in the application thereof on the operation of such provision, regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then the Borrower's compliance with such provision shall be determined on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in a manner satisfactory to the Borrower and the DIP Term Loan Agent; provided that Capital Lease Obligations shall be construed in accordance with GAAP as in effect on the Closing Date, notwithstanding any changes to GAAP occurring after the Closing Date. Notwithstanding any provision contained herein or in any other Financing Document, any lease (or similar arrangement) that would have been characterized, classified or reclassified as an operating lease in accordance with GAAP prior to the date of the Borrower's adoption of ASC 842 (or any other ASC having a similar result or effect) (and related interpretations) (whether or not such lease was in effect on such date) shall not constitute a Capital Lease Obligation, and any such lease shall be, for all purposes of this Agreement and the other Financing Documents, treated as though it were reflected on the Borrower's consolidated financial statements in the

30

same manner as an operating lease would have been reflected prior to the Borrower's adoption of ASC 842.

## ARTICLE II

## THE CREDITS

Section 2.01    Loans.

(a)    New Money DIP Term Loans.  Subject to the terms and conditions set forth herein and in the Bankruptcy Court DIP Order, each Lender severally agrees to make loans to the Borrower denominated in Dollars on the applicable borrowing date in an amount up to such Lender's New Money Commitment, if any.  Subject to the terms and conditions set forth herein, the New Money Commitments shall be funded as follows:

(i)    the first Loans shall be funded on the Closing Date in an aggregate principal amount of up to $7,000,000;

(ii)    the first Additional Loans shall be funded on or following the Final DIP Order Entry Date in an aggregate principal amount of $8,000,000; and

(iii)    each Additional Loan thereafter will be made on the date(s) and in the amount(s) specified for the funding of such Additional Loan in the DIP Budget;

provided, further that the aggregate principal amount of all Loans shall not exceed $20,000,000. Proceeds of the New Money DIP Term Loans shall be deposited in the DIP Term Priority Accounts and used as permitted herein.

(b)    Rolled-Up Term Loans.  Subject to the terms and conditions set forth herein and in the Bankruptcy Court DIP Order, $45,484,035.34 of the Prepetition Term A/C Loans owing to the respective Prepetition Term Loan Lenders, in their capacities as Prepetition Term Loan Secured Parties, as of the Final DIP Order Entry Date, shall be rolled-up and converted into, and shall thereafter constitute, Obligations hereunder and shall be deemed loans made hereunder.

(c)    No Reborrowing.  Amounts prepaid or repaid in respect of any Loan may not be reborrowed.

(d)    Procedures for Borrowing.

(i)    Subject to Sections 4.01 through 4.03, as applicable, and except as otherwise provided herein, the Borrower may request the Lenders to make Loans to the Borrower by delivery to the DIP Term Loan Agent, on any Business Day, of a Borrowing Request.  The date of the proposed borrowing (each such date, a "Funding Date") specified in a Borrowing Request shall be no earlier than two (2) business days after the delivery of such Borrowing Request.  Unless otherwise provided herein, each Borrowing Request shall be irrevocable and shall (i) specify the aggregate principal amount of the borrowing requested, (ii) specify the proposed Funding Date (which shall be a Business Day) and (iii) request a borrowing only up to the amount specified in the DIP Budget.

31

(ii)    Borrower shall not deliver a Borrowing Request for Loans, and the Lenders shall be under no obligation to make available any funds for any Loans, on the Closing Date and any Funding Date for Additional Loans, in an aggregate amount for all Lenders exceeding the applicable Commitments.

(e)    <u>Notice by the DIP Term Loan Agent to the Lenders</u>.  Promptly following receipt of a Borrowing Request in accordance with this <u>Section 2.01</u>, the DIP Term Loan Agent shall advise each Lender of the details thereof and of the amount of such Lender's Loan to be made as part of the requested borrowing.

(f)    <u>Tax Considerations</u>. For U.S. federal income tax purposes, each of the Borrower, the Guarantors and the Lenders agree to treat the Loans as a debt instrument, and not as a "contingent payment debt instrument," for U.S. federal and state income tax purposes.  The Borrower will provide any information reasonably requested from time to time by any Lender regarding the original issue discount associated with the Loans for U.S. federal income tax purposes.

Section 2.02    <u>Funding of the Loans</u>.  Each Lender shall make each New Money DIP Term Loan to be made by it hereunder on the proposed date thereof by wire transfer of immediately available funds by 12:00 noon, New York City time, to the DIP Term Priority Accounts in accordance with the DIP Budget.

Section 2.03    <u>Termination and Reduction of the Commitments</u>.  The undrawn Commitments of each Lender shall be automatically and permanently reduced to $0 upon the earlier of (i) date on which all Additional Loans are borrowed pursuant to this Agreement and (ii) the Maturity Date.

Section 2.04    <u>Repayment of Loan; Evidence of Debt</u>.

(a)    <u>Promise to Repay at Maturity</u>.

(i)    Borrower hereby unconditionally promises to pay to the DIP Term Loan Agent for the account of the Lenders, the unpaid principal amount of the Loans then outstanding (including all amounts added to principal as Accrued Interest pursuant to <u>Section 2.07(e))</u> on the Maturity Date.  Borrower hereby further agrees to pay interest on the unpaid principal amount of each Loan from time to time outstanding from the applicable Funding Date until payment in full in cash thereof at the rates per annum, and on the dates, set forth in <u>Section 2.07</u>.

(b)    <u>Evidence of Debt</u>.

(i)    Each Lender may maintain in accordance with its usual practice an account or accounts evidencing the Indebtedness of the Borrower to such Lender resulting from the Loans made by such Lender from time to time, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.  In the case of a Lender that does not request execution and delivery of a Note evidencing the Loans made by such Lender to the Borrower, such account or accounts shall, to the extent not inconsistent with the notations made by the DIP Term Loan Agent in the Register, be conclusive and binding on the Borrower absent manifest error; <u>provided</u> that the

failure of any Lender to maintain such account or accounts or any error in any such account shall not limit or otherwise affect any obligations of the Borrower.

(ii)     The Borrower agrees that, upon the request by the DIP Term Loan Agent to Borrower from any Lender, the Borrower will promptly execute in favor of such Lender and deliver to DIP Term Loan Agent a promissory note (a "Note") substantially in the form of Exhibit B payable to such Lender in an amount equal to such Lender's Loan evidencing the Loans made by such Lender.  The Borrower hereby irrevocably authorizes each Lender to make (or cause to be made) appropriate notations on the grid attached to such Lender's Notes (or on any continuation of such grid) with respect to each payment or prepayment of, and each addition of Accrued Interest to, the principal of the Loans evidenced thereby, which notations, if made, shall evidence, inter alia, the date of, the outstanding principal amount of, and the interest rate applicable to the Loans evidenced thereby; provided that (i) notwithstanding any such notation or the absence thereof, as set forth in Section 2.07(f), the Agent's determination of the principal amount of the Loans outstanding at any time shall be conclusive and binding on all parties absent manifest error; and (ii) the failure of any Lender to make any such notations or any error in any such notations shall not limit or otherwise affect any obligations of the Borrower. A Note and the obligation evidenced thereby may be assigned or otherwise transferred in whole or in part only in accordance with Section 10.04(b).

Section 2.05   Prepayment of the Loans.

(a)     Optional Prepayments.  The Borrower shall have the right at any time and from time to time, upon at least ten (10) Business Days' prior written notice to the DIP Term Loan Agent stating the prepayment date and aggregate principal amount of the prepayment, to voluntarily prepay any Loan in whole or in part, and subject to the requirements of this Section 2.05(a).

(i)     Each partial prepayment of any Loans under this Section 2.05(a) shall be in an aggregate amount for the Loans of all Lenders at least equal to $1,000,000 or an integral multiple of $500,000 in excess thereof (or such lesser amount as may be necessary to prepay the aggregate principal amount then outstanding with respect to all of the Loans of all Lenders).

(ii)     Each prepayment of Loans pursuant to this Section 2.05(a) shall be applied ratably to the Loans then outstanding.

(iii)     Each prepayment of Loans shall be accompanied by payment of all accrued interest on the amount prepaid and any additional amounts required pursuant to Section 2.11.

(b)     Mandatory Prepayments and Offers to Prepay.

(i)     Material Agreement.   If any Loan Party receives any termination payments, damages (including liquidated damages), indemnity payments or other extraordinary payments under or in respect of any Material Agreement, in excess of $50,000 individually or $100,000 in the aggregate per calendar year, the Loan Parties

33

shall, or shall cause their Affiliates to, within five (5) Business Days of the receipt of such termination or other payment, offer to prepay the Loans with an amount equal to 100% of the Net Available Amount of such payments, pursuant to a written notice sent to the DIP Term Loan Agent and the Lenders describing in reasonable detail the event giving rise to the obligation under this Section 2.05(b)(i) to make such offer (each such offer to prepay referred to in this clause (b)(i), a "Material Agreements Prepayment Offer").

(ii)    Event of Loss. If the Loan Parties (including, as a distribution from a Non-Guarantor Subsidiary) receive any proceeds in respect of Events of Loss which are not applied to the Restoration of the related Affected Property as permitted by the DIP Budget then in effect, then the Loan Parties shall, or shall cause their Affiliates to, offer to prepay the Loans with an amount equal to 100% of the Net Available Amount with respect to such Event of Loss, pursuant to a written notice sent to the DIP Term Loan Agent and the Lenders describing in reasonable detail the event giving rise to the obligation under this Section 2.05(b)(ii) to make such offer (each such offer to prepay referred to in this Section 2.05(b)(ii), an "Event of Loss Prepayment Offer").

(iii)    Disposition of Assets. Without limiting the obligation of the Borrower to obtain the consent of the DIP Term Loan Agent to any Disposition not otherwise permitted under the DIP Budget, the Borrower shall offer to prepay the Loans ratably in an amount equal to 100% of the Net Available Amount of any Disposition not permitted hereunder immediately following receipt by the Borrower of the relevant proceeds. (each such offer to prepay referred to in this Section 2.05(b)(iii), a "Disposition Proceeds Prepayment Offer").

(iv)    Incurrence of Debt.  If any Loan Party issues or incurs any Indebtedness (other than Permitted Indebtedness), Borrower shall, within one (1) Business Day of the receipt of the net cash proceeds therefrom, offer to prepay the Loans with an amount equal to 100% of the cash proceeds of such Indebtedness, pursuant to a written notice sent to the DIP Term Loan Agent and the Lenders describing in reasonable detail the event giving rise to the obligation under this Section 2.05(b)(iv) to make such offer (each such offer to prepay referred to in this Section 2.05(b)(iv), a "Debt Prepayment Offer").

(v)    Incurrence of Equity.  If any Loan Party receives any Additional Equity Raise Amounts, then the Borrower shall, within one (1) Business Day of the receipt of the net cash proceeds therefrom, prepay the Obligations with an amount equal to the amount of Obligations due and outstanding as of such date, pursuant to a written notice sent to the DIP Term Loan Agent and the Lenders describing in reasonable detail the event giving rise to the obligation under this Section 2.05(b)(v) to make such prepayment.  In furtherance of the foregoing, the Loan Parties, the DIP Term Loan Agent and the Lenders acknowledge and agree that any Additional Equity Raise Amount shall be used to first pay any Obligations then outstanding, then may be used for any other purpose permitted by this Agreement and the DIP Budget then in effect.

(c)    Terms of All Prepayments.

(i)     Any partial prepayments of the Loans pursuant to any provision of this Agreement shall be applied as specified in <u>Section 7.02</u> to the Obligations of each Lender.

(ii)    Each prepayment of Loans shall be accompanied by payment of all accrued interest on the amount prepaid, together with any additional amounts required pursuant to <u>Section 2.08</u>.

(iii)   No later than ten (10) Business Days after receiving a Material Agreements Prepayment Offer, an Event of Loss Prepayment Offer, a Disposition Proceeds Prepayment Offer or a Debt Prepayment Offer, each Lender shall advise the Borrower in writing whether it has elected to accept such prepayment offer, which it shall determine in its sole and absolute discretion. Each of the Lenders shall have the right, but not the obligation, to accept or reject such prepayment offer by the Borrower. In connection with any prepayment pursuant to <u>Section 2.05(b)(i)</u>, <u>(ii)</u>, and/or <u>(iii)</u>, the amount of the Loans prepaid shall be calculated so that the total amount of Loans prepaid, the accrued but unpaid interest on such Loans applicable to such prepayment of Loans shall be no more than the Net Available Amount. Any amount rejected by any Lender after receiving a Material Agreements Prepayment Offer, an Event of Loss Prepayment Offer, a Disposition Proceeds Prepayment Offer or a Debt Prepayment Offer (any such amounts, "<u>Rejected Proceeds</u>") shall be deposited into the Rejected Proceeds Account of the Borrower.

(iv)    [Reserved].

(v)     [Reserved].

Section 2.06   <u>Reimbursements.</u>

(a)     <u>Agent Reimbursements</u>.  The Borrower agrees to pay to each of the DIP Term Loan Agent and the DIP Term Loan Collateral Agent, for its own account, amounts payable in the amounts and at the times separately agreed upon in the Agent Reimbursement Letter.

(b)     <u>Payment of Reimbursements</u>.  All reimbursements payable hereunder shall be paid on the dates due, in Dollars and immediately available funds, to the DIP Term Loan Agent for distribution to the Lenders entitled thereto.  Reimbursements paid shall not be refundable under any circumstances absent manifest error.

Section 2.07   <u>Interest</u>.

(a)     <u>Loans</u>.  With respect to any Loan, for each day on and after the Funding Date of such Loan until the date on which such Loan has been fully repaid (including the first day but excluding the last), the outstanding principal amount of such Loan (including any Accrued Interest previously added to the principal on a prior Monthly Payment Date) shall bear interest at a rate per annum equal to the Interest Rate applicable thereto.

(b)     <u>Default Interest</u>.  If all or a portion of the principal amount of any Loan, interest in respect thereof or any other amount due under the Financing Documents shall not be paid when

35

due (whether at the stated maturity, by acceleration or otherwise) or there shall occur and be continuing any other Event of Default, then, to the extent so elected by the DIP Term Loan Agent, the outstanding principal amount of the Loans (whether or not overdue) (to the extent legally permitted) shall bear interest at a rate per annum equal to the Post-Default Rate, from the date of such nonpayment or occurrence of such Event of Default, respectively, until such amount is paid in full (after as well as before judgment) or until such Event of Default is no longer continuing, respectively.

(c)    Payment of Interest.  Accrued interest on each New Money DIP Term Loan shall be payable in arrears in cash on each Monthly Payment Date; provided that (i) interest accrued pursuant to paragraph (b) of this Section shall be payable on demand and (ii) in the event of any repayment or prepayment of any Loan, accrued interest on the principal amount repaid or prepaid shall be payable in cash on the date of such repayment or prepayment.

(d)    Computation.  All interest hereunder shall be computed on the basis of a year of 360 days, and, in each case, shall be payable for the actual number of days elapsed (including the first day but excluding the last).  The computation of interest shall be determined by the DIP Term Loan Agent, and such determination shall be conclusive absent manifest error.

(e)    Payment in Kind. On each Monthly Payment Date, the Borrower shall pay all of the accrued interest on each Rolled-Up Term Loan at the Interest Rate applicable thereto in kind. The aggregate outstanding principal amount of the Rolled-Up Term Loans shall be automatically increased on each such Monthly Payment Date by the amount of such interest paid in kind (and such increased principal shall bear interest at a rate per annum equal to the Interest Rate).

Section 2.08    Taxes.

(a)    Payments Free of Taxes. Any and all payments by or on account of any obligation of any Loan Party hereunder or under any other Financing Document shall be made without withholding or deduction for any Taxes except as required by Applicable Law; provided that if such Loan Party or Agent shall be required by Applicable Law (as determined in the good faith discretion of the applicable withholding agent) to withhold or deduct any Taxes from such payments, then (i) to the extent such Taxes are Indemnified Taxes, the sum payable shall be increased as necessary so that after making all required withholdings and deductions (including withholdings and deductions applicable to additional sums payable under this Section) the DIP Term Loan Agent or the Lender (as the case may be) receives an amount equal to the sum it would have received had no such withholdings or deductions been made, (ii) such Loan Party or Agent shall make or shall cause to be made such withholdings and deductions and (iii) such Loan Party or Agent shall pay or shall cause to be paid the full amount withheld and deducted to the relevant Governmental Authority in accordance with Applicable Law.

(b)    Payment of Other Taxes by the Borrower.  In addition, the Loan Parties shall pay or cause to be paid any Other Taxes to the relevant Governmental Authority in accordance with Applicable Law.

(c)    Indemnification by Borrower.  Loan Parties shall jointly and severally indemnify, or cause to be indemnified, the DIP Term Loan Agent and each Lender, within thirty (30) days

36

after written demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) paid or payable by the DIP Term Loan Agent or such Lender, as the case may be, and any reasonable expenses arising therefrom or with respect thereto whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Borrower by the DIP Term Loan Agent or a Lender shall be conclusive absent manifest error.

(d)    Evidence of Payments.  As soon as practicable after any payment of Indemnified Taxes or Other Taxes by any Loan Party to a Governmental Authority, the relevant Loan Party shall deliver or cause to be delivered to the DIP Term Loan Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment satisfactory to the DIP Term Loan Agent.

(e)    Forms.  (i) Any of the DIP Term Loan Agent or any Lender (including any assignee Lender) that is legally entitled to an exemption from or reduction of withholding tax under the law of the jurisdiction in which any Loan Party is located with respect to payments under any Financing Document shall deliver to the Borrower (with a copy to the DIP Term Loan Agent), at the time or times reasonably requested by the Borrower or DIP Term Loan Agent, such properly completed and executed documentation prescribed by Applicable Law as will permit such payments to be made without or at a reduced rate of withholding.  In addition, any of the DIP Term Loan Agent or any Lender, if reasonably requested by the Borrower or the DIP Term Loan Agent, shall deliver such other documentation prescribed by Applicable Law or reasonably requested by the Borrower or the DIP Term Loan Agent as will enable the Borrower or the DIP Term Loan Agent to determine whether or not such Lender is subject to any withholding tax or information reporting requirements.  Upon the reasonable written request of the Borrower or the DIP Term Loan Agent, or if any form or certification previously delivered expires or becomes obsolete or inaccurate, any Lender shall update any such form or certification previously delivered pursuant to this Section 2.08(e).  Notwithstanding anything to the contrary in the preceding three sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 2.08(e)(ii)(A), (B) and Section 2.08(g)) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)    Without limiting the generality of the foregoing, in the event that the Borrower is a US Person,

(A)    any Lender that is a US Person shall deliver to the Borrower and the DIP Term Loan Agent on or about the date on which such Lender becomes a party to this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the DIP Term Loan Agent), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)    any Lender who is not a US Person shall, to the extent it is legally entitled to do so, deliver to the Borrower and the DIP Term Loan Agent (in such number of

37

copies as shall be requested by the recipient) on or about the date on which such Lender becomes a party to this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the DIP Term Loan Agent), whichever of the following is applicable:

(I)       in the case of a Lender who is not a US Person claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under this Agreement or any Financing Document, executed copies of IRS Form W-8BEN or W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under this Agreement or any Financing Document, IRS Form W-8BEN or W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(II)      executed copies of IRS Form W-8ECI;

(III)     in the case of a Lender who is not a US Person claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit B-1 to the effect that such Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code and (y) executed copies of IRS Form W-8BEN or W-8BEN-E; or

(IV)      to the extent a Lender who is not a US Person is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN or W-8BEN-E, a U.S. Tax compliance certificate substantially in the form of Exhibit B-2 or Exhibit B-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if such Lender is a partnership and one or more direct or indirect partners of such Lender are claiming the portfolio interest exemption, such Lender may provide a U.S. Tax compliance certificate substantially in the form of Exhibit B-4 on behalf of each such direct and indirect partner.

(f)       If the DIP Term Loan Agent or any Lender determines, in its sole discretion exercised in good faith, that it has received a refund of any Indemnified Taxes or Other Taxes as to which it has been indemnified by a Loan Party or with respect to which a Loan Party has paid additional amounts pursuant to this Section 2.08, it shall pay over such refund (but only to the extent of indemnity payments made under this Section 2.08 with respect to the Taxes giving rise to such refund), to the Borrower, net of all of its out-of-pocket expenses (including Taxes with respect to such refund) and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); provided that the Borrower, upon the request of the DIP Term Loan Agent or any Lender, as the case may be, agrees to repay as soon as reasonably practicable the amount paid over to the Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the DIP Term Loan Agent or any Lender, as the case may be, in the event the DIP Term Loan Agent or any Lender, as the case may be, is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this paragraph (f), in no event will the DIP Term Loan Agent or any Lender be required to pay any amount to the Borrower pursuant to this paragraph (f) the payment

38

of which would place the DIP Term Loan Agent or the Lender, as the case may be, in a less favorable net after-Tax position than it would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This paragraph shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(g)     If a payment made to the DIP Term Loan Agent or any Lender under this Agreement would be subject to U.S. federal withholding Tax imposed by FATCA if such DIP Term Loan Agent or Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such DIP Term Loan Agent or Lender shall deliver to the Borrower and the DIP Term Loan Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the DIP Term Loan Agent such documentation prescribed by Applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the DIP Term Loan Agent as may be necessary for the Borrower and the DIP Term Loan Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Person's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause, "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(h)     Survival. Each party's obligations under this Section shall survive the resignation and replacement of the DIP Term Loan Agent or any assignment of rights by, or the replacement of, a Lender.

Section 2.09   Payments Generally; Pro Rata Treatment; Sharing of Setoffs.

(a)     Payments by Borrower. Unless otherwise specified, the Borrower shall make each payment required to be made by it hereunder (whether of principal, interest, reimbursements, fees, or under Section 2.08 or otherwise) or under any other Financing Document (except to the extent otherwise provided therein) prior to 1:00 p.m., New York City time, on the date when due, in immediately available funds, without setoff or counterclaim. Any amounts received after such time on any date may, in the discretion of the DIP Term Loan Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon. All such payments shall be made to the DIP Term Loan Agent at its offices at Orion Energy Partners Investment Agent, LLC (payment instructions: Bank Name: JPMorgan Chase Bank, N.A., Bank Address: 270 Park Avenue, New York, New York 10017, ABA/Routing No.: 021000021, Account Name: ORION ENERGY PARTNERS INVESTMENT AGENT, LLC, Account No.: 700846822, Swift No.: CHASUS33, Reference: "CarbonLITE" + [purpose of the payment]) except as otherwise expressly provided in the relevant Financing Document and payments pursuant to Sections 2.08 and 10.03, which shall be made directly to the Persons entitled thereto. The DIP Term Loan Agent shall distribute any such payments received by it for account of any other Person to the appropriate recipient promptly following receipt thereof. If any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be set to the immediately preceding Business Day and, in the case of any payment

39

accruing interest, interest thereon shall be payable for the period up to and including such immediately preceding Business Day, with the day(s) following such immediately preceding Business Day to be included in the calculation of interest for the following monthly period in accordance with the terms hereof.  All amounts owing under this Agreement or under any other Financing Document are payable in Dollars.

(b)      Application of Insufficient Payments.  If at any time insufficient funds are received by and available to the DIP Term Loan Agent to pay fully all amounts of principal, interest, reimbursements, fees and other amounts then due hereunder, such funds shall be applied (i) first, to pay interest, reimbursements, fees and other amounts (except for the amounts required to be paid pursuant to the following clause (ii)) then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest, reimbursements, fees and such other amounts then due to such parties, and (ii) second, to pay principal then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal then due to such parties.

(c)      Pro Rata Treatment.  Except to the extent otherwise provided herein (including, without limitation, the waterfall provisions set forth in Section 2.05(c)(i) and Section 7.02):  (i) the Loans shall be made from the Lenders, and each termination or reduction of the amount of the Commitments under Section 2.03 shall be applied to the respective Commitments of the Lenders, *pro rata* according to the amounts of their respective applicable Commitments; (ii) each payment or prepayment of principal of the Loans by the Borrower shall be made for account of the Lenders *pro rata* in accordance with the respective unpaid principal amounts of the Loans held by them being paid or prepaid; and (iii) each payment of interest on the Loans by the Borrower shall be made for account of the Lenders *pro rata* in accordance with the amounts of interest on the Loans then due and payable to the respective Lenders.

(d)      Sharing of Payments by Lenders.  If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment or recover any amount in respect of any principal of or interest on any of its Loan resulting in such Lender receiving a greater proportion of the aggregate amount of the Loans and accrued interest thereon then due than the proportion received by any other Lender, then, unless otherwise agreed in writing by the Lenders, the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Loans of other Lenders to the extent necessary so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans; provided that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this paragraph shall not be construed to apply to any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or Participant, other than to the Borrower or any Affiliate thereof (as to which the provisions of this paragraph shall apply).  Each Loan Party consents to the foregoing and agrees, to the extent it may effectively do so under Applicable Law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against such Loan Party rights of setoff and counterclaim with respect to such

40

participation as fully as if such Lender were a direct creditor of such Loan Party in the amount of such participation.

(e)    Presumptions of Payment.  Unless the DIP Term Loan Agent shall have received notice from the Borrower prior to the date on which any payment is due to the DIP Term Loan Agent for account of the Lenders hereunder that the Borrower will not make such payment, the DIP Term Loan Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due.  In such event, if the Borrower has not in fact made such payment, then each of the Lenders severally agrees to repay to the DIP Term Loan Agent forthwith on demand the amount so distributed to such Lender with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the DIP Term Loan Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the DIP Term Loan Agent in accordance with banking industry rules on interbank compensation.

(f)    Certain Deductions by the DIP Term Loan Agent.  If any Lender shall fail to make any payment required to be made by it pursuant to Section 2.02, 2.09(e) or 10.03(c), then the DIP Term Loan Agent may, in its discretion (notwithstanding any contrary provision hereof), apply any amounts thereafter received by the DIP Term Loan Agent for account of such Lender to satisfy such Lender's obligations under such Sections until all such unsatisfied obligations are fully paid.

Section 2.10    Mitigation Obligations; Replacement of Lenders.  If the Borrower is required to pay any Indemnified Taxes or additional amount to any Lender or any Governmental Authority for account of any Lender pursuant to Section 2.08 then such Lender shall (i) file any certificate or document reasonably requested in writing by the Borrower and/or (ii) use reasonable efforts to designate a different lending office for funding or booking its Loan hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the sole judgment of such Lender exercised in good faith, such designation or assignment (x) would eliminate or reduce amounts payable pursuant to Section 2.09 in the future and (y) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender in any material respect.  The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

Section 2.11    Acknowledgement and Consent to Bail-In of EEA Financial Institutions. Notwithstanding anything to the contrary in any Financing Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Financing Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)    the effects of any Bail-In Action on any such liability, including, if applicable:

(c)        a reduction in full or in part or cancellation of any such liability;

(d)        a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Financing Document; or

(e)        the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of any EEA Resolution Authority.

Section 2.12    Reorganization Matters.

(a)        The Chapter 11 Cases were commenced on the Petition Date in accordance with applicable law and proper notice thereof was given for (x) the motion seeking approval of the Interim DIP Order, (y) the hearing for the entry of the Interim DIP Order and (z) the hearing for the entry of the Final DIP Order.  The Debtors shall give, on a timely basis as specified in the Bankruptcy Court DIP Order, all notices required to be given to all parties specified in the Bankruptcy Court DIP Order.

(b)        After entry of the Interim DIP Order, and pursuant to and to the extent permitted in the Interim DIP Order and the Final DIP Order, the Obligations will constitute allowed administrative expense claims in the Chapter 11 Cases having priority over all administrative expense claims and unsecured claims against each Loan Party now existing or hereafter arising of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1113, 1114 or any other provision of the Bankruptcy Code or otherwise, as provided under Section 364(c)(1) of the Bankruptcy Code, subject only to the Carve-Out and the priorities set forth in the Interim DIP Order or the Final DIP Order, as applicable.

(c)        After entry of the Interim DIP Order (and the Final DIP Order when applicable) and pursuant to and to the extent provided in the Interim DIP Order and the Final DIP Order, as applicable, the Obligations will be secured by a valid and perfected first priority Lien on all of the Collateral, (i) encumbered by no Liens other than Liens permitted by Section 6.02 and (ii) prior and superior to any other Person or Lien, in each case, other than the Carve-Out and subject to the priorities set forth in the Interim DIP Order or the Final DIP Order, as applicable.

(d)        The Interim DIP Order (with respect to the period on and after the entry of the Interim DIP Order and prior to the entry of the Final DIP Order) or the Final DIP Order (with respect to the period on and after the entry of the Final DIP Order), as the case may be, is in full force and effect and has not been reversed, stayed (whether by statutory stay or otherwise), modified or amended without the written consent of the DIP Term Loan Agent.

(e)        Notwithstanding the provisions of Section 362 of the Bankruptcy Code and subject to the applicable provisions of the Interim DIP Order or the Final DIP Order, as the case may be, upon the Maturity Date (whether by acceleration or otherwise), the DIP Term Loan Agent and Lenders shall be entitled to immediate payment of such Obligations in cash and to

enforce the remedies provided for hereunder or under applicable law, without further notice, motion or application to, hearing before, or order by the Bankruptcy Court.

Section 2.13    <u>Superpriority Nature</u>.

(a)    The priority of the Obligations and the DIP Term Loan Agent's liens on the Collateral, claims and other interests shall be as set forth in the Bankruptcy Court DIP Order.

(b)    Upon the maturity (whether by acceleration or otherwise) of any of the Obligations under this Agreement or any of the other Financing Documents, the DIP Term Loan Agent and the Lenders shall be entitled to immediate payment of such Obligations without application to or order of the Bankruptcy Court.

ARTICLE III

REPRESENTATIONS AND WARRANTIES

Each Loan Party represents and warrants to each Agent and the Lenders that:

Section 3.01    <u>Due Organization, Etc.</u>

(a)    Each Borrower Group Member is a limited liability company, duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization. Each Borrower Group Member (i) subject to the entry of the Bankruptcy Court DIP Order, and subject to any restrictions arising on account of any Loan Party's status as a "debtor" under the Bankruptcy Code, has all requisite limited liability company or other organizational power and authority to own or lease and operate its assets and to carry on its business as now conducted and as proposed to be conducted by it and (ii) subject to the entry of the Bankruptcy Court DIP Order, is duly qualified to do business and is in good standing in each jurisdiction where necessary in light of its business as now conducted and as proposed to be conducted (including performance of each Material Agreement to which it is party) except, in the case of this clause (ii), where the failure to so qualify could not reasonably be expected to have a Material Adverse Effect. No filing, recording, publishing or other act by a Borrower Group Member, that has not been made or done, is necessary in connection with the existence or good standing of such Borrower Group Member.

(b)    As of the Closing Date, the Equity Shareholders listed on <u>Schedule 3.01(b)</u> are the only members of the Borrower. As of the Closing Date, there has been no Change of Control.

(c)    The only member of each Guarantor is the Borrower or another Guarantor, with the Borrower owning, directly or indirectly, 100% of each Guarantor's (other than PinnPack's) Capital Stock. All Capital Stock in each Guarantor (other than PinnPack) is beneficially owned and controlled by the Borrower free and clear of all Liens other than Permitted Liens.

(d)    The only member of each Non-Guarantor Subsidiary is a Guarantor, with a Guarantor owning 100% of each Non-Guarantor Subsidiary's Capital Stock.

43

Section 3.02    <u>Authorization, Etc.</u>  Each Loan Party has full corporate, limited liability company or other organizational powers, authority and legal right to enter into, deliver and perform its respective obligations under each of the Financing Documents to which it is a party and to consummate each of the transactions contemplated herein and therein, and has taken all necessary corporate, limited liability company or other organizational action to authorize the execution, delivery and performance by it of each of the Financing Documents to which it is a party. Each of the Financing Documents to which any Loan Party is a party has been duly executed and delivered by such Loan Party and is in full force and effect and constitutes a legal, valid and binding obligation of such Loan Party, enforceable against such Loan Party in accordance with its respective terms, except as enforcement may be limited (i) by Bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance or other similar laws affecting creditors' rights generally, (ii) by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law) and (iii) by implied covenants of good faith and fair dealing.

Section 3.03    <u>No Conflict</u>.  The execution, delivery and performance by each Loan Party of each of the Financing Documents to which it is a party and all other documents and instruments to be executed and delivered hereunder by it, as well as the consummation of the transactions contemplated herein and therein, do not and will not (i) conflict with the Organizational Documents of such Loan Party (except where such is excused by the Bankruptcy Code), (ii) subject to the entry of the Interim DIP Order or Final DIP Order, as applicable, conflict with or result in a breach of, or constitute a default under, in any material respect, any Applicable Law or (iii) with respect to each Loan Party, result in the creation or imposition of any Lien (other than a Permitted Lien, including the Bankruptcy Court DIP Order, any restrictions arising on account of such Loan Party's status as a "debtor" under the Bankruptcy Code) upon any of such Loan Party's property or the Collateral.

Section 3.04    <u>Approvals, Etc.</u>

(a)    Except for the entry of, or pursuant to the terms of, the Bankruptcy Court DIP Order, each Loan Party has obtained all material Authorizations required under any Applicable Law to be issued to, assigned to, or otherwise assumed by, such Loan Party and necessary for (i) the Business or (ii) the execution, delivery and performance by each Loan Party of the Financing Documents to which it is a party other than, in each case, Authorizations that are not currently necessary and are obtainable in the ordinary course of business.

(b)    Except for the entry of, or pursuant to the terms of, the Bankruptcy Court DIP Order as of the Closing Date, all of the material Authorizations required under any Applicable Law to be issued to, assigned to, or otherwise assumed by, any Borrower Group Member and necessary for (i) the Business or (ii) the execution, delivery and performance by any Loan Party of the Financing Documents to which it is a party, other than, in each case, Authorizations that are not currently necessary and are obtainable in the ordinary course of business, are set forth in <u>Schedule 5.04</u> hereto.

(c)    Each Borrower Group Member is in material compliance with each Authorization by a Governmental Authority currently in effect.

Section 3.05    <u>Financial Statements</u>.

(a)    The Loan Parties will use commercially reasonable efforts to ensure that, to the knowledge of any Authorized Representative of any Loan Party, as of the date of delivery thereof, (x) the financial statements delivered to the Lenders pursuant to this Agreement will present fairly in all material respects the financial condition, results of operations and cash flows of such Borrower Group Member as of the dates set forth therein, (y) such balance sheets and the notes thereto will disclose all material liabilities (contingent or otherwise) of such Borrower Group Member as of the dates thereof to the extent required to be disclosed by GAAP and (z) such financial statements were prepared in accordance with GAAP.

(b)    Since the Closing Date, there has been no event or circumstance, either individually or in the aggregate, that has had or would reasonably be expected to have a Material Adverse Effect (it being understood that the commencement of the Chapter 11 Cases, the events that customarily occur following the commencement of a proceeding under Chapter 11 of the Bankruptcy Code, any defaults under agreements that have no material adverse effect on the Loan Parties under the terms of the Bankruptcy Code as a result of the commencement of the Chapter 11 Cases, and any "going concern" or other qualification, exception or explanatory note in the Loan Parties' audited financial statements shall not be deemed a material adverse change). Since the Closing Date, no Default or Event of Default shall have occurred and be continuing on such date or after giving effect to the extensions of credit requested to be made on such date.

Section 3.06    <u>Litigation</u>.

(a)    Except for the Chapter 11 Cases, there is no pending or, to the knowledge of any Authorized Representative of any Borrower Group Member, threatened (in writing) litigation, investigation, action or proceeding of or before any court, arbitrator or Governmental Authority (in the case of any of the foregoing not involving the Loan Parties, to the knowledge of any Authorized Representative of any Borrower Group Member) (i) seeking to restrain or prohibit the consummation of the transactions contemplated by the Financing Documents or (ii) purporting to affect the legality, validity or enforceability of any of the Financing Documents.

(b)    Except for the Chapter 11 Cases and those actions set forth on <u>Schedule 3.06</u>, to the knowledge of any Authorized Representative of any Loan Party, there is no pending or, to the knowledge of any Authorized Representative of any Borrower Group Member, threatened (in writing) litigation, investigation, action or proceeding of or before any court, arbitrator or Governmental Authority against any Borrower Group Member that affects the Business which (either individually or in the aggregate) could reasonably be expected to have a Material Adverse Effect.

Section 3.07    <u>Environmental Matters</u>.  Except as set forth on <u>Schedule 3.07</u>:

(a)    each Loan Party (and each Non-Guarantor Subsidiary) and the conduct of the Business is in compliance in all material respects with all applicable Environmental Laws;

(b)    each Loan Party  (and each Non-Guarantor Subsidiary), (i) holds or has applied for all material Authorizations required under Environmental Laws (each of which is in full force

and effect) required for the conduct of the Business and any of its current operations or for any property owned, leased or otherwise operated by it; and (ii) is in compliance in all material respects with all Authorizations required under Environmental Law;

(c)     to the knowledge of any Authorized Representative of any Loan Party (and each Non-Guarantor Subsidiary), (x) there are no material pending Environmental Claims asserted against any Loan Party (and each Non-Guarantor Subsidiary) or the Business and (y) no Loan Party (and each Non-Guarantor Subsidiary) has received any written notice, claim or information regarding, or otherwise has knowledge of, a past or threatened material Environmental Claim asserted against any Loan Party (and each Non-Guarantor Subsidiary) or the Business, except for such Environmental Claims that have been fully resolved;

(d)     there are no outstanding consent decrees, orders, settlements or other material agreements concerning any Loan Party (and each Non-Guarantor Subsidiary)  or the Business relating to compliance with or liability under Environmental Law;

(e)     no Loan Party (and each Non-Guarantor Subsidiary) and, to the knowledge of any Authorized Representative of any Loan Party, no other Person has Released Hazardous Materials at, on, from or under any real property currently or formerly owned, leased or operated by any Loan Party (and each Non-Guarantor Subsidiary) in a manner that would reasonably be expected to result in a material liability of any Loan Party (and each Non-Guarantor Subsidiary) pursuant to Environmental Laws; and

(f)     each Loan Party (and each Non-Guarantor Subsidiary) has made available copies of all significant reports, correspondence and other documents in its possession, custody or control regarding compliance by any of the Loan Party (and each Non-Guarantor Subsidiary), or potential liability of any of the Loan Party (and each Non-Guarantor Subsidiary) under Environmental Laws or Authorizations required under Environmental Laws.

Section 3.08    Compliance with Laws and Obligations.  Subject to Section 3.07, each Loan Party (and each Non-Guarantor Subsidiary) and the Business are in compliance with all Applicable Laws applicable to the Borrower Group Members and the Business, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

Section 3.09    Material Agreements; Bond Documents.

(a)     To the knowledge of any Authorized Representative of any Loan Party, each Material Agreement with liabilities of, or revenues to, the Loan Parties in excess of $500,000 (the "Specified Material Agreements") in existence on the Closing Date is listed on Schedule 3.09.  The copies of each of the Specified Material Agreements, and any amendments thereto provided or to be provided by any Loan Party to the DIP Term Loan Agent are, or when delivered will be, true and complete copies of such agreements and documents.  Except as permitted under Section 6.09 or disclosed on Schedule 3.09, as of the Closing Date, to the knowledge of any Authorized Representative of any Loan Party, no termination event has occurred under any Specified Material Agreement, each Specified Material Agreement is in full force and effect, and no Loan Party has received any written notice of a material default,

expiration, breach or termination pursuant to any Specified Material Agreement.  To the knowledge of any Authorized Representative of any Loan Party, except as disclosed on Schedule 3.09, each Loan Party is in compliance in all material respects with the terms of the Specified Material Agreements to which it is a party, excluding any effects arising from the filing of the Chapter 11 Cases or from any action required to be taken under the Financing Documents or under the Bankruptcy Court DIP Order.  To the knowledge of any Authorized Representative of any Loan Party, except as disclosed on Schedule 3.09,  no Material Counterparty is in default of any of its obligations under any Specified Material Agreement other than defaults which, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

(b)      To the knowledge of any Authorized Representative of any Loan Party, the copies of each of the Bond Documents, and any amendments thereto provided or to be provided by any Borrower Group Member to the DIP Term Loan Agent are, or when delivered will be, true and complete copies of such agreements and documents.

Section 3.10    Intellectual Property; Licenses.

(a)      Each Loan Party owns, or is licensed to use, free and clear of all Liens except for Permitted Liens, all Intellectual Property necessary for its business and that are necessary for the performance by it of its obligations under the Financing Documents to which it is a party, in each case, as to which the failure of such Loan Party to so own or be licensed could reasonably be expected to have a Material Adverse Effect, and the use thereof by such Loan Party does not, to the knowledge of any Loan Party, infringe in any material respect upon the rights of any other Person.

(b)      Each Loan Party has obtained the necessary intellectual property licenses that the Loan Parties reasonably believe are required for the Business, the absence of any of which could reasonably be expected to have a Material Adverse Effect.

(c)      With respect to each material license in or to Intellectual Property held by each Loan Party: (i) such license is valid and binding and in full force and effect and represents the entire agreement between the respective licensor and licensee with respect to the subject matter of such license; and (ii) such license will not cease to be valid and binding and in full force and effect on terms identical to those currently in effect as a result of the rights and interests granted herein, nor will the grant of such rights and interests constitute a breach or default under such license or otherwise give the licensor or sublicensor a right to terminate such license.

Section 3.11    Taxes.  Except as specified on Schedule 3.11:

(a)      each Loan Party has timely filed or caused to be filed all material tax returns and reports required to have been filed by it and has paid, or has caused to be paid, all material taxes required to have been paid by it, other than taxes that are being contested in accordance with the Permitted Contest Conditions; and

(b)      property owned by any Loan Party is not the subject of any temporary tax abatement or any other temporary tax reduction; and

(c)      each Loan Party has been properly treated as a disregarded entity or a partnership for U.S. federal income tax purposes.

Section 3.12    Disclosure; DIP Budget and Financial Plan.

(a)      After the use of commercially reasonable efforts by the Loan Parties and to the knowledge of any Authorized Representative of any Loan Party, none of the written reports, financial statements, certificates or other written information (other than projections and information of a general economic or industry nature) furnished by or on behalf of any Borrower Group Member to the DIP Term Loan Agent or any Lender in connection with the negotiation of this Agreement or delivered hereunder (as modified or supplemented by other written information so furnished), taken as a whole, contains any material misstatement of fact or omits to state any material fact necessary to make such statements therein (when taken as a whole), in the light of the circumstances under which they were made, not materially misleading.

(b)      Each DIP Budget, statements, estimates, forecasts and projections regarding the Borrower Group Members and the future performance of the Business or other expressions of view as to future circumstances (including the Initial DIP Budget) that have been made available to any Secured Party by or on behalf of any Borrower Group Member or any of its representatives or Affiliates (collectively, "Projections") have been prepared in good faith based upon assumptions believed to be reasonable at the time of preparation thereof; provided that it is understood and acknowledged that such Projections are based upon a number of estimates and assumptions and are subject to business, economic and competitive uncertainties and contingencies, that actual results during the period or periods covered by any such Projections may differ from the projected results and such differences may be material and that, accordingly, no assurances are given and no representations, warranties or covenants are made that any of the assumptions are correct, that such Projections will be achieved or that the forward-looking statements expressed in such Projections will correspond to actual results.  On and after the delivery of any Variance Report in accordance with this Agreement, such Variance Report shall be complete and correct in all material respects and fairly represent in all material respects the matters set forth therein for the period covered thereby.

Section 3.13    [Reserved].

Section 3.14    Regulatory Restrictions on the Loan.  Each Loan Party is not required to be registered as an "investment company" within the meaning of the Investment Company Act of 1940 of the United States (including the rules and regulations thereunder), as amended.

Section 3.15    Title; Security.

(a)      Each Loan Party owns and has good, legal and defensible title to the property purported to be covered by the Security Documents to which it is party, free and clear of all Liens other than Permitted Liens.

(b)      The provisions of the Interim DIP Order and the Final DIP Order, as applicable, are effective to create in favor of the DIP Term Loan Collateral Agent for the benefit of the Secured Parties a legal, valid and enforceable security interest (subject, in the case of any Collateral, to Liens permitted by Section 6.03) on all right, title and interest of the respective

48

Loan Parties in the Collateral described therein (with such priority as provided for in the Bankruptcy Court DIP Order). Except for, and as permitted by, the Interim DIP Order and the Final DIP Order, as applicable, no filing or other action will be necessary to perfect the Liens on any Collateral under the Laws of the United States of America.

Section 3.16    <u>ERISA</u>.

(a)    No ERISA Event has occurred or is reasonably expected to occur which has or could reasonably be expected to have a Material Adverse Effect. Each Pension Plan has complied in all material respects with the applicable provisions of ERISA and the Code. No termination of a Pension Plan has occurred resulting in any liability that has remained underfunded and no Lien against any Loan Party or any of its ERISA Affiliates in favor of the PBGC or a Pension Plan has arisen during the five-year period prior to the date hereof.

(b)    None of the Loan Parties has incurred any obligation which has or could reasonably be expected to have a Material Adverse Effect on account of the termination or withdrawal from any Foreign Plan.

Section 3.17    <u>Insurance</u>. Except as set forth in <u>Schedule 3.17</u>, all insurance policies required to be obtained by the Loan Parties pursuant to <u>Section 5.06</u> and under any Material Agreement, if any, have been obtained and are in full force and effect as required under <u>Section 5.06</u> and all premiums then due and payable thereon have been paid in full. No Loan Party has received any notice from any insurer that any insurance policy has ceased to be in full force and effect or claiming that the insurer's liability under any such insurance policy can be reduced or avoided.

Section 3.18    <u>Use of Proceeds</u>. The proceeds of the Loans on each Funding Date will be used solely in accordance with, and solely for the purposes contemplated by, <u>Section 5.13</u>. No part of the proceeds of any Loan and other extensions of credit hereunder will be used, either directly or indirectly, by any Borrower Group Member to purchase or carry any Margin Stock (as defined in Regulation U) or to extend credit to others for the purpose of purchasing or carrying any Margin Stock or for any purpose that entails a violation of any of the regulations of the Board.

Section 3.19    <u>Membership Interests and Related Matters</u>.

(a)    The only member of CL Intermediate Holdco is the Borrower.

(b)    Other than as set forth on <u>Schedule 3.19(b)</u>, no Loan Party has any Subsidiaries and no Loan Party owns any equity interest in, or otherwise Controls any Voting Stock of or has any ownership interest in, any Person.

(c)    All of the membership interests in the Borrower and each Guarantor have been duly authorized and validly issued in accordance with its operating agreement and any other constitutive documents, are fully paid and non-assessable (subject to the applicable Loan Parties' obligation to contribute capital to another Loan Party, in accordance with the terms of such Loan Party's governing documents) and free and clear of all Liens. Other than as set forth on <u>Schedule 3.19(c)</u>, neither the Borrower nor any Guarantor has outstanding any securities convertible into or exchangeable for any of its membership interests in or any rights to subscribe for or to purchase, or any warrants or options for the purchase of, or any agreements providing

49

for the issuance (contingent or otherwise) of, or any calls, commitments or claims of any character relating to any such membership interests (except as expressly provided for or permitted herein or in the Security Documents).

Section 3.20    [Reserved].

Section 3.21    No Agreements with Affiliates. To the knowledge of any Authorized Representative of any Loan Party, Schedule 3.21 sets forth any and all agreements, transactions or series of related transactions among, on one hand, one or more Loan Parties, and on the other hand, one or more Affiliates of a Loan Party (other than the Loan Parties), in each case, that involve payment of more than $250,000.

Section 3.22    No Bank Accounts. No Loan Party maintains any accounts other than Permitted Accounts.

Section 3.23    No Default or Event of Default. No Default or Event of Default has occurred and is continuing.

Section 3.24    Foreign Assets Control Regulations.

(a)    None of the Borrower Group Members, and none of their respective, principals, owners, officers or directors, or, to any of the Loan Parties' knowledge, their respective Affiliates or agents (i) is a Sanctioned Person; or (ii) engages in any dealings or transactions in or with a Sanctioned Country or that are otherwise prohibited by Sanctions.

(b)    Each of the Borrower Group Members maintains reasonable policies and procedures to ensure compliance with Sanctions, Anti-Corruption Laws and Anti-Money Laundering Laws (as such compliance is required under this Agreement).

(c)    Each of the Borrower Group Members and their respective officers, directors, employees and, to the Borrower Group Members' knowledge, agents are in compliance with Anti-Corruption Laws, Anti-Money Laundering Laws and Sanctions.

(d)    No part of the proceeds of the Loans will be used, directly or indirectly (i) in violation of the FCPA, Anti-Money Laundering Laws or Sanctions or (ii) to offer or make payments or to take any other action that would constitute a violation, or implicate any Lender, DIP Term Loan Agent, DIP Term Loan Collateral Agent or their respective Affiliates in a violation, of Anti-Corruption Laws.

(e)    Each of the Borrower Group Members has disclosed all facts known to it regarding (a) all claims, damages, liabilities, obligations, losses, penalties, actions, judgment, and/or allegations of any kind or nature that are asserted against, paid or payable by such Person, any of its Affiliates or any of its representatives in connection with non-compliance with Anti-Corruption Laws, Sanctions or Anti-Money Laundering Laws by such Person, and (b) any investigations involving possible non-compliance with Anti-Corruption Laws, Sanctions or Anti-Money Laundering Laws by such Person or such Affiliate or such representative. No proceeding by or before any Governmental Authority involving any Borrower Group Member with respect

50

to Anti-Corruption Laws, Sanctions or Anti-Money Laundering Laws is pending or, to the knowledge of the Borrower Group Members, threatened.

Section 3.25   Commercial Activity; Absence of Immunity.   Each Loan Party is subject to civil and commercial law with respect to its obligations under the Financing Documents, and the making and performance of the Financing Documents by the Loan Parties constitute private and commercial acts rather than public or governmental acts.   The Loan Parties are not entitled to any immunity on the ground of sovereignty or the like from the jurisdiction of any court or from any action, suit, setoff or proceeding, or the service of process in connection therewith, arising under the Financing Documents.

ARTICLE IV

CONDITIONS

Section 4.01   Conditions to the Closing Date and the Initial Extension of Credit.   The occurrence of the Closing Date, the effectiveness of this Agreement and the obligations of each Lender to make Loans hereunder are subject to the receipt by the DIP Term Loan Agent (except as set forth otherwise below) of each of the following documents, and the satisfaction of the conditions precedent set forth below, each of which must be satisfied to the satisfaction of the DIP Term Loan Agent (unless waived in accordance with Section 10.02):

(a)      Financing Documents.   Each of the Financing Documents shall have been duly executed and delivered by each of the Loan Parties, Agent and Lenders intended to be parties thereto and shall be in full force and effect.

(b)      Corporate Documents.   An Officer's Certificate of each Loan Party dated as of the Closing Date, (i) certifying that there have been no changes to any of the corporate documents delivered previously to the Prepetition Term Loan Agent on August 2, 2019 pursuant to a secretary's certificate delivered on the closing date in respect thereof and (ii) attaching good standing certificates for each Borrower Group Member.

(c)      Material Agreements and Bond Documents.   To the extent not previously delivered under the Prepetition Term Loan Agreement, a copy of each of the Material Agreements and the Bond Documents executed prior to the Closing Date and any amendments thereto shall have been made available to the DIP Term Loan Agent and the Lenders for their review.

(d)      Authorizations.   All material Authorizations required under any Applicable Law to be issued to, assigned to, or otherwise assumed by any Loan Party and necessary for (i) conduct of the Business or (ii) subject to the Bankruptcy Court DIP Order, the execution, delivery and performance by such Loan Party of the Financing Documents to which it is a party, other than, in each case, Authorizations that are not currently necessary and are obtainable in the ordinary course of business, (A) have been duly obtained and, to the knowledge of Borrower, validly issued, (B) are in full force and effect and not subject to any pending or, to the knowledge of Borrower, threatened, appeal or legal proceeding that could reasonably be expected to result in a material adverse modification to or withdrawal, cancellation, suspension or revocation of such

51

Authorization, (C) are issued to, assigned to, or otherwise assumed by, a Loan Party (or such Loan Party is entitled to the benefit thereof), (D) are free from any unsatisfied condition the failure of which to satisfy could reasonably be expected to have a Material Adverse Effect and (E) with respect to such Authorizations, all applicable statutory, judicial and administrative review periods have expired.

(e)    Representations and Warranties.  The representations and warranties of each of the Loan Parties set forth in the Financing Documents shall be true and correct in all material respects on and as of the Closing Date (except where already qualified by materiality or Material Adverse Effect, in which case, in all respects).

(f)    Officer's Certificate.  An Officer's Certificate of the Borrower dated as of the Closing Date certifying that each of the conditions set forth in this Section 4.01 have been satisfied.

(g)    Commencement of Chapter 11 Cases.  The Loan Parties shall have commenced the Chapter 11 Cases in the Bankruptcy Court by no later than March 8, 2021.  The Loan Parties shall have complied in full with the notice and other requirements of the Bankruptcy Code, in a manner acceptable to the DIP Term Loan Agent with respect to the Interim DIP Order and the DIP Term Loan Agent shall have received such evidence thereof as it shall require.  No trustee, or other disinterested person with expanded powers pursuant to Section 1104(c) of the Bankruptcy Code, shall have been appointed or designated with respect to any Loan Party or their respective business, properties or assets and no motion shall be pending seeking any such relief.  All of the "first day orders" entered by the Bankruptcy Court in the Chapter 11 Cases shall be in form and substance reasonably satisfactory to the DIP Term Loan Agent.

(h)    Cash Management Orders.  All orders entered by the Bankruptcy Court pertaining to the Loan Parties' cash management ("Cash Management Orders") and all motions and other documents filed, and submitted to, the Bankruptcy Court in connection therewith shall be in form and substance reasonably satisfactory to the DIP Term Loan Agent;

(i)    Interim DIP Order. The Interim DIP Order shall have been entered by the Bankruptcy Court and the DIP Term Loan Agent have received a true and complete copy of such order, and such order shall be in full force and effect and shall not have been reversed, modified, amended, stayed or vacated absent prior written consent of the DIP Term Loan Agent and such order shall not be subject to a stay pending appeal or motion for leave to appeal or other proceeding to set aside any such order or the challenge to the relief provided for in it, except as consented to by the DIP Term Loan Agent.

(j)    DIP Budget. The DIP Term Loan Agent shall have received, in form and substance satisfactory to the DIP Term Loan Agent, the  DIP Budget.

(k)    [Reserved].

(l)    [Reserved].

(m)    [Reserved].

US-DOCS\121174693.21

(n)     Texas DIP Facility. The DIP Term Loan Agent shall have received all documentation in connection with the Texas DIP Facility, in form and substance satisfactory to the DIP Term Loan Agent.

(o)     Pennsylvania DIP Facility. The DIP Term Loan Agent shall have received all documentation in connection with the Pennsylvania DIP Facility, in form and substance satisfactory to the DIP Term Loan Agent.

(p)     Riverside Facility Lease Extension.  The Borrower shall have entered into an extension of the real property lease for the Riverside Facility in form and substance satisfactory to the DIP Term Loan Agent.

(q)     DIP ABL Credit Agreement.  The DIP Term Loan Agent shall have received the DIP ABL Credit Agreement and all other documentation in connection with the DIP ABL Facility, in form and substance satisfactory to the DIP Term Loan Agent.

Section 4.02    Conditions to Each Extension of Credit. The occurrence of each Funding Date (including, without limitation, the initial extension of credit) and each Lender's obligations to make the Loans pursuant to Section 2.01 on such date are subject to the satisfaction of the conditions precedent set forth below, each of which must be satisfied to the satisfaction of the DIP Term Loan Agent (unless waived in accordance with Section 10.02):

(a)     Documents.  DIP Term Loan Agent shall have received:

(i)     To the extent requested by any Lender prior to such Funding Date pursuant to Section 2.07(b), a duly executed Note or Notes, as applicable, dated such Funding Date, payable to such Lender in a principal amount equal to such Lender's Loan.

(ii)     An Officer's Certificate of the Borrower, dated as of such Funding Date, certifying that each of the conditions set forth in this Section 4.02 (and, in the case of the initial Funding Date, Section 4.01) has been satisfied.

(b)     Representations and Warranties.  The representations and warranties of each Loan Party set forth in the Financing Documents shall be true and correct in all material respects on and as of such Funding Date (except where already qualified by materiality or Material Adverse Effect).

(c)     No Default or Event of Default; No Material Adverse Effect.  No Default or Event of Default shall have occurred and be continuing on, or shall result as a result of the transactions contemplated to occur on, such Funding Date. As of such Funding Date, no development, event or circumstance that has had or would reasonably be expected to have a Material Adverse Effect shall have occurred following the Closing Date and be continuing, or shall result from the transactions contemplated to occur on such Funding Date.

(d)     Borrowing Request.  The DIP Term Loan Agent shall have received a Borrowing Request.

(e)    <u>Compliance with Budget</u>.  The DIP Term Loan Agent shall have received all periodic updates required under the DIP Budget pursuant to <u>Section 5.20</u> and any Variance Reports pursuant to <u>Section 5.20</u>, in each case required to be delivered pursuant to such applicable Section prior to the delivery of the applicable Borrowing Request.

(f)    <u>Final DIP Order</u>.  With respect to the first Additional Loans funded after the Closing Date, the Final DIP Order shall have been entered by the Bankruptcy Court and (i) the DIP Term Loan Agent shall have received a true and complete copy of such order, (ii) such order shall be in form and substance satisfactory to the DIP Term Loan Agent in its sole discretion and (iii) such order shall be in full force and effect and shall not have been reversed, modified, amended, stayed or vacated in a manner inconsistent with the terms of this Agreement absent the prior written consent of the DIP Term Loan Agent. All of the "second day orders" entered by the Bankruptcy Court in the Chapter 11 Cases shall be in form and substance reasonably satisfactory to the DIP Term Loan Agent.

(g)    <u>Fees and Expenses</u>.  The Borrower has arranged for payment on such Funding Date (including arrangement for payment out of the proceeds of the Loan to be made on such Funding Date in accordance with <u>Section 5.13</u>) of all reasonable and documented out-of-pocket fees, reimbursements and expenses then due and payable pursuant to the Financing Documents.

(h)    <u>Security Documents and Collateral Perfection Matters</u>.

(i)    The Security Documents shall have been duly executed and delivered by the Persons intended to be parties thereto and shall be in full force and effect.

(ii)    Subject to the Bankruptcy Court DIP Order, the security interests in and to the Collateral intended to be created under the Security Documents shall have been created in favor of the DIP Term Loan Collateral Agent for the benefit of the Secured Parties, are in full force and effect and the necessary notices, consents, acknowledgments, filings, registrations and recordings to preserve, protect and perfect the security interests in the Collateral have been made immediately prior to the Funding Date such that the security interests granted in favor of the DIP Term Loan Collateral Agent for the benefit of the Secured Parties are filed, registered and recorded and will constitute a first priority (subject to Permitted Liens), perfected security interest in the Collateral free and clear of any Liens, other than Permitted Liens, and all related recordation, registration and/or notarial fees of such Collateral have been paid to the extent required.

(iii)    Appropriately completed UCC financing statements (Form UCC-1) or UCC financing statement amendments (Form UCC-3), which have been duly authorized for filing by the appropriate Person, naming the Loan Parties as debtors and DIP Term Loan Collateral Agent as secured party, in form appropriate for filing under each jurisdiction as may be necessary to perfect the security interests purported to be created by the Security Documents, covering the applicable Collateral.

(i)    <u>Texas and Pennsylvania DIP Credit Facilities</u>. The "Interim Order" (as defined in the Texas DIP Facility), the "Interim Order" (as defined in the Pennsylvania DIP Facility), the "Final Order" (as defined in the Texas DIP Facility) and the "Final Order" (as defined in the

Pennsylvania DIP Facility), as the case may be, shall be acceptable in form and substance to the DIP Term Loan Agent and shall be in full force and effect, and shall not (in whole or in part) have been reversed, modified, amended, stayed, vacated or subject to a stay pending appeal.

Section 4.03   <u>Satisfaction of Conditions</u>.  Except to the extent that Borrower has disclosed in the Borrowing Request that an applicable condition specified in <u>Section 4.01</u> or <u>4.02</u> will not be satisfied as of the Closing Date or applicable Funding Date, as applicable, Borrower shall be deemed to have made a representation and warranty as of such time that the conditions specified in such Section have been satisfied.  No such disclosure by Borrower that a condition specified in <u>Section 4.01</u> or <u>4.02</u>, as applicable, will not be satisfied as of Closing Date or the applicable Funding Date, as applicable, shall affect the right of each Lender not to make the Loans requested to be made by it if such condition has not been satisfied at such time.

ARTICLE V

AFFIRMATIVE COVENANTS

Each Loan Party hereby agrees that, from and after the Closing Date until the Discharge Date:

Section 5.01   <u>Corporate Existence; Etc</u>. Each Loan Party shall at all times preserve and maintain in full force and effect (a) its existence as a corporation or a limited liability company, as applicable, (b) its good standing under the laws of the jurisdiction of its organization, and (c) its qualification to do business and its good standing in each jurisdiction in which the character of properties owned by it or in which the transaction of its business as conducted or proposed to be conducted makes such qualification necessary.

Section 5.02   <u>Conduct of Business</u>.  Each Loan Party shall operate, maintain and preserve or cause to be operated, maintained and preserved, the Business in compliance, in all material respects, with Applicable Laws and Authorizations by Governmental Authorities and the terms of its insurance policies.   Other than as consented to by the DIP Agent, as permitted as a consequence of the Chapter 11 Cases, or as authorized by an order of the Bankruptcy Court, but without limiting the rights of the DIP Term Loan Agent in <u>Section 6.09</u>, each Loan Party shall act in accordance in all material respects with the requirements of the Material Agreements to which it is a party.

Section 5.03   <u>Compliance with Laws and Obligations</u>.

(a)      Each Loan Party shall comply in all material respects with applicable Environmental Laws, including occupational health and safety regulations, and all other Applicable Laws and Authorizations. Other than as consented to by the DIP Agent (such consent not to be unreasonably withheld, conditioned or delayed), as permitted as a consequence of the Chapter 11 Cases, or as authorized by an order of the Bankruptcy Court, but without limiting the rights of the DIP Term Loan Agent in <u>Section 6.09</u>, each Loan Party shall comply with and perform its respective contractual obligations in all material respects, and enforce against Material Counterparties their respective material contractual obligations in all material respects, under each Material Agreement to which it is a party.  Each Loan Party shall not violate

55

applicable Sanctions, Anti-Money Laundering Laws, the FCPA or any other Anti-Corruption Laws and shall not undertake or cause to be undertaken any Anti-Corruption Prohibited Activity.

Section 5.04    <u>Governmental Authorizations</u>.    Each Loan Party shall obtain, preserve and maintain in full force and effect (or where appropriate, renew in a timely manner), or cause to be obtained and maintained in full force and effect all material Authorizations (including all material Authorizations required by Environmental Law) required under any Applicable Law for (i) conduct of the Business or (ii) the execution, delivery and performance by such Loan Party of the Financing Documents to which it is a party, in each case, at or before the time the relevant Authorization becomes necessary for such purposes.

Section 5.05    <u>Maintenance of Title</u>.    Except as provided on <u>Schedule 5.05</u>, each Loan Party shall maintain (a) good title to the property owned by such Loan Party necessary for the conduct of the Business free and clear of Liens, other than Permitted Liens; (b) legal and valid and subsisting leasehold interests to the properties leased by such Loan Party necessary for the conduct of the Business, free and clear of Liens, other than Permitted Liens and (c) legal and valid possessory rights to the properties possessed and not otherwise held in fee or leased by such Loan Party necessary for the conduct of the Business.

Section 5.06    <u>Insurance</u>.

(a)    Each Loan Party shall maintain insurance with insurance companies rated A- (or the then equivalent grade) or better, with a minimum size rating of VII (or the then equivalent grade) by A.M. Best Company (or an equivalent rating by another nationally recognized insurance rating agency of similar standing if A.M. Best Company shall no longer publish its Best's Credit Ratings or if S&P shall no longer publish its ratings for insurance companies, as the case may be) or other insurance companies of recognized responsibility satisfactory to the DIP Term Loan Agent against at least such risks and in at least such amounts as are customarily maintained by prudent similar businesses and as may be required by Applicable Law and as are required by the Material Agreements and/or Security Documents.  Within 10 days following the Closing Date (or the date any such insurance is obtained, in the case of insurance obtained after the Closing Date), all such insurance (other than business interruption insurance (if any), director and officer insurance and worker's compensation insurance) shall, (a) provide that no cancellation or material modification thereof shall be effective until at least thirty (30) days (or, in the case of cancellation for non-payment of premiums, ten (10) days) after receipt by the DIP Term Loan Agent of written notice thereof, (b) in the case of any liability insurance and property insurance, name the DIP Term Loan Collateral Agent and the Secured Parties as an additional insured party thereunder and (c) in respect of any such policy relating to the Property of the Loan Parties, in the case of each casualty insurance policy, name the DIP Term Loan Collateral Agent as lender's loss payee. On the Closing Date and from time to time thereafter deliver to the DIP Term Loan Agent upon its reasonable request information in reasonable detail as to the insurance then in effect, stating the names of the insurance companies, the amounts and rates of the insurance, the dates of the expiration thereof and the properties and risks covered thereby.

(b)    Each Loan Party shall maintain (or cause to be maintained) the insurance required to be maintained pursuant to the Material Agreements in accordance with the terms of the same.

(c)      The applicable Loan Party shall instruct the relevant insurers to pay (i) Loss Proceeds (ABL) of the insurance policies provided or obtained by or on behalf of the Loan Parties directly to a segregated DIP Additional Account (and the applicable Loan Party shall open a new segregated DIP Additional Account for such purpose) and (ii) Loss Proceeds (Term Loans) of the insurance policies provided or obtained by or on behalf of the Loan Parties directly to a segregated DIP Term Priority Account  (and the applicable Loan Party shall open a new segregated DIP Term Priority Account for such purpose).  If any Loss Proceeds that are required under the preceding sentence to be paid to a DIP Additional Account or a DIP Term Priority Account, as applicable are received by any other Loan Party, such Loss Proceeds shall be received in trust for the DIP Term Loan Collateral Agent, shall be segregated from other funds of the recipient, and shall be forthwith paid into the newly-opened and segregated DIP Additional Account or the newly-opened and segregated DIP Term Priority Account, as applicable in the same form as received (with any necessary endorsement).

Section 5.07    <u>Keeping of Books</u>.  The Loan Parties will use commercially reasonable efforts to ensure that each Loan Party shall maintain an accounting and control system, management information system and books of account and other records, which to the knowledge (after due inquiry) of any Authorized Representative of any Loan Party together adequately reflect truly and fairly the financial condition of such Loan Party and the results of operations in accordance with GAAP and all Applicable Laws.

Section 5.08    <u>Access to Property/Records</u>.  Each Loan Party shall permit (i) officers and designated representatives of the DIP Term Loan Agent to visit and inspect any of its properties accompanied by officers or designated representatives of such Loan Party and (ii) officers and designated representatives of the DIP Term Loan Agent to examine and make copies of the books of record and accounts of such Loan Party (provided that such Loan Party shall have the right to be present) and discuss the affairs, finances and accounts of such Loan Party with the chief financial officer, the chief operating officer, the chief executive officer and the Chief Restructuring Officer of such Loan Party (subject to reasonable requirements of safety and confidentiality, including requirements imposed by Applicable Law or by contract) at any time during normal business hours and as often as may be reasonably desired upon advance notice to the Borrower.

Section 5.09    <u>Taxes</u>.

(a)      Except as set forth on <u>Schedule 3.11</u>, each Loan Party shall pay and discharge, before the same shall become delinquent, all material Taxes imposed upon it or upon its property to the extent required under the Financing Documents to which such Loan Party is a party or under Applicable Law that, if unpaid, might become a Lien (other than a Permitted Lien of the type referenced in <u>clause (a)(i)</u> of the definition of Permitted Lien) upon its property; <u>provided</u> that such Loan Party shall not be required to pay or discharge any such Tax for so long as such Loan Party satisfies the Permitted Contest Conditions in relation to such tax, assessment, charge or claim.

(b)      No Loan Party shall make an election pursuant to Treasury Regulations Section 301.7701-3(c) to be treated as an association taxable as a corporation for U.S. federal

income tax purposes or take any other action inconsistent with such Loan Party's status as an entity treated as a partnership or disregarded for U.S. federal income tax purposes.

Section 5.10    <u>Financial Statements; Other Reporting Requirements</u>.    Each Loan Party shall furnish to the DIP Term Loan Agent:

(a)    within thirty (30) days after each annual policy renewal date, a certificate of an Authorized Representative of the Borrower certifying that the insurance requirements of <u>Section 5.06</u> have been implemented and are being complied with by the Loan Parties and on or prior to the expiration of each policy required to be maintained pursuant to <u>Section 5.06</u>, certificates of insurance with respect to each renewal policy and each other insurance policy required to be in effect under this Agreement that has not previously been furnished to the DIP Term Loan Agent under this Agreement.  If at any time requested by the DIP Term Loan Agent, the Borrower shall deliver to the DIP Term Loan Agent a duplicate of any policy of insurance required to be in effect under this Agreement;

(b)    on Thursday of each week, the Loan Parties and Chief Restructuring Officer or his support staff shall have a call with the DIP Term Loan Agent to give the DIP Term Loan Agent an update as to the business of the Loan Parties, including without limitation, updates on operations, production volumes, sales, collections, vendor management, employee matters, recent cash disbursements, budget variances, and upcoming expected spending;

(c)    within three (3) Business Days following delivery of any financial statements, operating or construction reports and/or any other material notices or reporting information as required under any Material Indebtedness Facility, a copy of such document, notice or information delivered in connection with such Material Indebtedness Facility, as applicable;

(d)    within five (5) Business Days of the end of each calendar month, in electronic format, an itemized summary of all withdrawals from the Permitted Accounts made during such calendar month;

(e)    within three (3) days prior to the filing thereof with the Bankruptcy Court by or on behalf of the Loan Parties, proposed forms of the Bankruptcy Court DIP Order, all other proposed orders and pleadings related to the DIP Facility, any 363 sale, any plan of reorganization or liquidation, and any disclosure statement related to such plan;

(f)    on Thursday of each week a report in form acceptable to the DIP Term Loan Agent (the "<u>Investment Banker Report</u>") which shall include: (1) updates on the process of securing potential investors and/or purchasers, (2) a list of contacted and target potential investors and/or purchasers, (3) material feedback from such potential investors and/or purchasers, (4) upcoming process and discussion in respect of Milestones, (5) copies of all final marketing materials associated with a potential Acceptable Sale and (6) copies of any term sheets, bona fide proposals or other relevant information and materials relating to any debtor-in-possession financing proposals from any party for the Loan Parties;

(g)    on Thursday of each week, the Loan Parties and the Investment Banker shall have a call with the DIP Term Loan Agent to give the DIP Term Loan Agent an update as to the current marketing process, along with a follow up email on such date with any requested

marketing materials, correspondence and other material information regarding the sales process; and

(h)     on Thursday of each week a report in form acceptable to the DIP Term Loan Agent (the "CRO Report") with respect to the immediately prior week ended the last Business Day of such week, setting forth (1) discussion of any and all communications regarding the Sale Process with critical vendors and customers, (2) any variance reports and/or non-compliance reports in relation to the Texas DIP Budget and/or Pennsylvania DIP Budget prepared by the Borrower Group Members and delivered under the Texas DIP Facility and/or Pennsylvania DIP Facility, as applicable and (3) to the extent not covered by the Investment Banker Report, copies of any draft term sheets, proposals or other relevant information and materials relating to the Sale Process; and

(i)     to the DIP Term Loan Administrative Agent and the Specified Lender Advisors at least two (2) calendar days (or such shorter review period as is necessary in the event of exigent circumstances as determined by the Borrower in its reasonable discretion) prior to the filing with the Bankruptcy Court or delivering to the Committee appointed in a Chapter 11 Case, if any, or to the U.S. Trustee, as the case may be, any material pleading or filing (but excluding retention applications, fee applications and other declaration in support thereof or related thereto).

Section 5.11   Notices. The Loan Parties shall promptly (and, unless a subsection of this Section 5.11 is expressly made subject to another time period, within five (5) Business Days) upon an Authorized Representative of any Loan Party obtaining knowledge thereof (or as otherwise provided in the case of clauses (a) and (h) below), give notice to the DIP Term Loan Agent of:

(a)     within five (5) Business Days after the earlier of (i) an Authorized Representative of any Loan Party obtaining knowledge thereof and (ii) receipt of any notice thereof, the occurrence of any material default under any Material Agreements;

(b)     within ten (10) Business Days of any documents becoming available, any agreement or transaction (or series of related transactions) entered into with an Affiliate of a Loan Party (that is not a Loan Party), regardless of whether such transaction or transactions are permitted under Section 6.10;

(c)     within three (3) days, any development that has resulted, or could reasonably be expected to result, in a Material Adverse Effect after the Closing Date;

(d)     [Reserved];

(e)     within ten (10) Business Days of any documents becoming available, true and complete copies of any amendment of any Material Agreement and of any Material Agreements executed after the Closing Date;

(f)     any Investments made by any Loan Party in a Non-Guarantor Subsidiary, to the extent not permitted by this Agreement;

(g)     (x) the sale, lease, transfer or other Disposition of, in one transaction or a series of transactions, all or any part of the property of the Loan Parties in excess of $500,000 in the

aggregate per calendar year, (y) the entry of any contract contemplated by, and any Disposition pursuant to, Section 6.07(e)(iii) (including the fair market value of any such Disposition) and (z) the occurrence of any Event of Loss in excess of $500,000 (whether or not covered by insurance);

(h)    notice received by it with respect to the cancellation of, adverse change in, or default under, any insurance policy required to be maintained in accordance with Section 5.06;

(i)    the filing or commencement of any litigation, investigation, action or proceeding (including any Environmental Claim but excluding the Chapter 11 Cases) of or before any court, arbitrator or Governmental Authority against or affecting any Loan Party or the Business;

(j)    the occurrence of a Default or an Event of Default;

(k)    the occurrence of any ERISA Event, together with a written notice setting forth the nature thereof and the action, if any, that such Loan Party or ERISA Affiliate proposes to take with respect thereto;

(l)    no later than five (5) Business Days prior to the execution and delivery thereof (which period may be shortened in any instance at DIP Term Loan Agent's discretion), notice of any amendment to any Material Agreement;

(m)    within five (5) days of delivery, copies of all statements, reports and notices (including board kits) made available to Borrower's employees, Equity Shareholders or its Board of Directors; provided that, with respect to any materials made available to its Board of Directors, any such material may be redacted by Borrower to exclude information relating to the Lenders (including Borrower's strategy regarding the Loans) or any material that Borrower determines in good faith, upon advice of counsel, the exclusion of which is reasonably necessary to preserve attorney-client privilege;

(n)    within three (3) days of delivery or receipt, copies of all material notices (including but not limited to all formal correspondence and all correspondence relating to any defaults or potential or anticipated litigation) delivered or received in connection with the Niagara Promissory Note;

(o)    within three (3) days of delivery or receipt, copies of all notices (including but not limited to all formal correspondence and all correspondence relating to any default or potential or anticipated litigation) delivered or received in connection with the Texas DIP Facility, Pennsylvania DIP Facility and Bond Documents; and

(p)    within three (3) days of delivery or receipt, copies of all notices (including but not limited to all formal correspondence and all correspondence relating to any potential or anticipated litigation) received from, or delivered to, any counterparty to a Material Agreement or any other vendor or customer agreement that could reasonably be expected to require payments by, or to, the Loan Parties in excess of $50,000, outside the ordinary course of business.

Section 5.12    [Reserved]

Section 5.13    Use of Proceeds. The proceeds of the Loans funded on the Closing Date and the Additional Loans shall be used in accordance with the DIP Budget then in effect. For the avoidance of doubt, (i) Borrower is permitted to lend or contribute the proceeds of the Loans to one or more of the Guarantors, (ii) no Loan Party is permitted to lend or contribute the proceeds of the Loans to any of the Non-Guarantor Subsidiaries and (iii) the proceeds of the Loans shall not be used to repay any Indebtedness for borrowed money of the Loan Parties or the Non-Guarantor Subsidiaries. The proceeds of the Loans will not be used in violation of Anti-Corruption Laws or applicable Sanctions.

Section 5.14    Security.    The Loan Parties shall preserve and maintain the security interests granted under the Security Documents and undertake all actions which are necessary or appropriate to:  (a) maintain the DIP Term Loan Collateral Agent's security interest in the Collateral in full force and effect at all times (including the priority thereof (subject to Permitted Liens)), and (b) preserve and protect the Collateral and protect and enforce the Loan Parties' rights and title and the rights of the DIP Term Loan Collateral Agent and the other Secured Parties to the Collateral (subject to Permitted Liens), including, if requested, the making or delivery of all filings and recordations, the payment of all reimbursements, fees and other charges and the issuance of supplemental documentation.

Section 5.15    Further Assurances.    The Loan Parties shall execute, acknowledge where appropriate, and deliver, and cause to be executed, acknowledged where appropriate, and delivered, from time to time promptly at the reasonable request of any Agent all such instruments and documents as are necessary or appropriate to carry out the intent and purpose of the Financing Documents (including filings, recordings or registrations required to be filed in respect of any Security Document or assignment thereto) necessary to maintain, to the extent permitted by Applicable Law, the DIP Term Loan Collateral Agent's perfected security interest in the Collateral to the extent and in the priority required by the Financing Documents. In furtherance and not in limitation of the foregoing, each Loan Party shall take such actions as the DIP Term Loan Agent may reasonably request from time to time to ensure that the Obligations are guaranteed by the Guarantors and the Liens granted by the Security Documents and the Bankruptcy Court DIP Order are perfected to the extent and with the priority required by the Financing Documents and the Bankruptcy Court DIP Order.

Section 5.16    Security in Newly Acquired Property and Revenues.  Without limiting any other provision of any Financing Document, if any Loan Party shall at any time acquire interests in property in a single transaction or series of transactions, as applicable, not otherwise subject to the Lien created by the Security Documents having a value of at least $100,000 individually or $500,000 in the aggregate, promptly upon such acquisition, such Loan Party shall execute, deliver and record a supplement to the Security Documents or other documents, subjecting such interest to the Lien created by the Security Documents.

Section 5.17    Material Agreements.      Other than as consented to by the DIP Agent (such consent not to be unreasonably withheld, conditioned or delayed), as excused as a consequence of the Chapter 11 Cases, or as authorized by an order of the Bankruptcy Court, but without limiting the rights of the DIP Term Loan Agent in Section 6.09, each Loan Party shall (a) duly and punctually perform and observe all of its material covenants and obligations contained in each Material Agreement to which it is a party and (b) enforce against the relevant Material

Counterparty each material covenant or obligation of such Material Agreement, as applicable, in accordance with its terms.

Section 5.18    Collateral Accounts.

(a)    The Loan Parties shall at all times maintain the Collateral Accounts in accordance with the Financing Documents.  To the extent (x) not already covered by a Control Agreement or (y) covered by a blocked account Control Agreement as of the Closing Date, the Loan Parties shall cause each DIP Term Priority Account and DIP Additional Account to be covered by a springing account Control Agreement within thirty (30) days after the Closing Date.

(b)    At all times each Loan Party shall deposit and maintain, or cause to be deposited and maintained, all Business Revenues, insurance proceeds and other amounts received that are proceeds of the DIP Term Priority Collateral or the DIP ABL Priority Collateral into the Collateral Accounts in accordance with the provisions below and request or make only such payments and transfers out of the Collateral Accounts as permitted by the provisions below (except as otherwise consented to in writing by the DIP Term Loan Collateral Agent, subject to the Interim DIP Order and Final DIP Order).

(i)    DIP Term Priority Accounts.

(A)    From and after the Closing Date, the Loan Parties shall deposit into the DIP Term Priority Accounts (i) proceeds of the Loans, (ii) all Business Revenues that are proceeds of the DIP Term Priority Collateral, and (iii) all other amounts received by any Loan Party and not required or permitted to be deposited into another Permitted Account pursuant to this Agreement (including proceeds in respect of Events of Loss (including Loss Proceeds) and Dispositions, proceeds from the incurrence of Indebtedness, termination payments and other extraordinary payments under project contracts (including the Material Agreements), damages and other proceeds received by the Loan Parties that are proceeds of the DIP Term Priority Collateral).

(B)    The Loan Parties may make withdrawals, transfers and payments from the DIP Term Priority Account solely to the extent such withdrawals, transfers and payments are in compliance with, and expected to be necessary in accordance with, the DIP Budget then in effect (as confirmed in writing by the Chief Restructuring Officer).

(ii)    DIP Additional Accounts.

(A)    From and after the Closing Date, the Loan Parties shall (and shall use commercially reasonable efforts to cause third parties to) deposit into one or more DIP Additional Accounts all Business Revenues, insurance proceeds and other amounts received that are proceeds of the DIP ABL Priority Collateral.

(B)    The Loan Parties may make withdrawals, transfers and payments from the DIP Additional Accounts solely to the extent such withdrawals, transfers and payments are in compliance with this Agreement, the DIP Budget then in effect and the DIP ABL Credit Agreement.

(C)    For the avoidance of doubt, the parties hereto acknowledge and agree that (1) to the extent DIP Term Priority Collateral is deposited into a DIP Additional Account, such DIP Term Priority Collateral remains DIP Term Priority Collateral and shall promptly be transferred to a DIP Term Priority Account, (2) the "disbursement" accounts specified in the Cash Management Motion are DIP Additional Accounts, with each of the Secured Parties and the lender under the DIP ABL Facility having the priority therein as described in the Interim DIP Order and Final DIP Order and (3)  nothing herein shall be construed as a waiver by any Secured Party of the Secured Parties' priority in any DIP Term Priority Collateral.

(c)    Nothing set forth in this Agreement shall prohibit the Borrower Group Members from depositing or holding in the Excluded Accounts the amounts described in the definition thereof.

Section 5.19    Intellectual Property.

(a)    Each Loan Party shall own, or be licensed to use, all Intellectual Property that such Loan Party reasonably believes is necessary for its conduct of the Business, in each case, as to which the failure of such Loan Party to so own or be licensed could reasonably be expected to have a Material Adverse Effect.

(b)    If a Loan Party licenses any Intellectual Property from another Person and such Intellectual Property is material to the conduct of the business of any Loan Party, and the license is rejected in an insolvency proceeding, such Loan Party shall use commercially reasonable efforts to maintain its rights under the license, which efforts shall include making an election under Section 365(n) of the Bankruptcy Code, if an election is available to such Loan Party.

(c)    Each Loan Party agrees that, should it hereafter (i) obtain an ownership interest in any issued Copyrights, Trademarks, or Patents, (ii) obtain an exclusive license to any Copyrights, (iii) either by itself or through any agent, employee, licensee, or designee, file any application for the registration or issuance of any Copyrights, Trademarks or Patents with the United States Patent and Trademark Office or the United States Copyright Office, or (iv) should it file a statement of use or an amendment to allege use with respect to any "intent-to-use" Trademark application (the items in clauses (i), (ii) (iii) and (iv), collectively, the "After-Acquired Intellectual Property"), then, unless it constitutes Excluded Assets under the Pledge and Security Agreement, any such After-Acquired Intellectual Property shall automatically become part of the Collateral, and such Loan Party shall give written notice thereof within 60 days of the registration or issuance thereof to the DIP Term Loan Collateral Agent in accordance herewith.

(d)    Each Loan Party agrees to use commercially reasonable efforts so as not to permit the inclusion in any contract to which it hereafter becomes a party of any provision that would materially impair or prevent the creation of a security interest in such Loan Party's rights and interests in any property described in Section 5.19(c) that is material to the business of any Loan Party, other than the Financing Documents, the DIP ABL Credit Agreement and the other loan documents thereunder and the Prepetition Loan Documents.

(e)     Each Loan Party shall promptly notify the DIP Term Loan Collateral Agent if it knows or has reason to know that any registered or issued Copyrights, Trademarks or Patents that it owns or licenses becomes (i) abandoned or dedicated to the public or placed in the public domain, (ii) invalid or unenforceable, (iii) subject to any adverse determination or development regarding such Loan Party's ownership, registration or use or the validity or enforceability of such item of Intellectual Property (including the institution of, or any adverse development with respect to, any action or proceeding in the United States Patent and Trademark Office, the United States Copyright Office, any state registry, any foreign counterpart of the foregoing, or any court) or (iv) the subject of any reversion or termination rights.

(f)     Each Loan Party shall not intentionally infringe, misappropriate, dilute, or otherwise violate the Intellectual Property rights of any other Person in any manner which could reasonably be expected to have a Material Adverse Effect.  In the event that any Person initiates, or threatens in writing to initiate, any action or proceeding alleging that such Loan Party, or the conduct of such Loan Party's business, infringes, misappropriates, dilutes, or otherwise violates the Intellectual Property of any other Person, and such action or proceeding could reasonably be expected to have a Material Adverse Effect, such Loan Party shall promptly notify the DIP Term Loan Collateral Agent after it learns thereof.

Section 5.20     DIP Budget; Non-Guarantor Subsidiaries.

(a)     The use of Loans by the Loan Parties under this Agreement and the other Financing Documents shall be limited in accordance with the DIP Budget (subject to the Permitted Variances).  The DIP Budget shall set forth, on a weekly basis, among other things, anticipated cash receipts and Budgeted Disbursements for the period commencing with the week that includes the Closing Date through the Maturity Date and shall be approved by, and be in form and substance reasonably satisfactory to, the DIP Term Loan Agent.

(b)     The Borrower shall deliver an updated DIP Budget one time in each six (6) consecutive week period, commencing with the sixth (6th) full week after the Closing Date (such proposed updated, modified or supplemented budget, the "Proposed DIP Budget"), and such Proposed DIP Budget shall be in form and substance satisfactory to the DIP Term Loan Agent in its sole discretion, and no such Proposed DIP Budget shall be effective unless the DIP Term Loan Agent consents in writing (which may be by email) within five (5) calendar days of receipt; provided, however, that in the event the DIP Term Loan Agent does not consent in writing (which may be by email) within seven (7) calendar days of receipt of such Proposed DIP Budget, the DIP Budget then in effect shall continue as the then-effective DIP Budget. Each Proposed DIP Budget delivered to the DIP Term Loan Agent shall be accompanied by such supporting documentation as reasonably requested by the DIP Term Loan Agent.  Each Proposed DIP Budget shall be prepared in good faith based upon assumptions believed by the Borrower to be reasonable.

(c)     The Lenders (i) may assume that the Loan Parties will comply with the DIP Budget, (ii) shall have no duty to monitor such compliance and (iii) shall not be obligated to pay (directly or indirectly from the Collateral) any unpaid expenses incurred or authorized to be incurred pursuant to any DIP Budget.  The line items in the DIP Budget for payment of interest, expenses and other amounts to the DIP Term Loan Agent and the Lenders are estimates only,

and the Loan Parties remain obligated to pay any and all Obligations in accordance with the terms of the Financing Documents regardless of whether such amounts exceed such estimates. Nothing in any DIP Budget shall constitute an amendment or other modification of any Financing Document or other lending limits set forth therein.

(d)     The Borrower shall deliver to the DIP Term Loan Agent and the Lenders on or before 8:00 p.m. New York Time on Thursday of each week (commencing on the Thursday of the first full calendar week following the Closing Date) (i) a certificate signed by a Responsible Officer of the Borrower certifying that (x) the Loan Parties are in compliance with the covenants contained in Sections 5.20(a) and (b) above and (y) no Default or Event of Default has occurred or, if such a Default or Event of Default has occurred, specifying the nature and extent thereof and any corrective action taken or proposed to be taken with respect thereto and (ii) a Variance Report;

(e)     Non-Guarantor Subsidiaries shall utilize such Non-Guarantor Subsidiary's revenues and any other receipts otherwise arising or derived from or paid or payable to such Non-Guarantor Subsidiaries under agreements or otherwise in respect of the Business (including any extraordinary receipts) to pay operating expenses, debt service, Capital Expenditures and other amounts generally in accordance with the applicable Texas DIP Budget and the Pennsylvania DIP Budget, as applicable, and shall distribute, to the extent permitted by the Texas DIP Facility and the Pennsylvania DIP Facility, as applicable.

Section 5.21   Post-Closing Covenants.

(a)     Notwithstanding Section 5.20 or anything else herein to the contrary, all expenditures, transfers, payments and withdrawals of the Loan Parties occurring on or after the Closing Date shall be made solely (A) to the extent such amounts are in compliance with the DIP Budget then in effect and (B) to repay the Obligations (if elected by the Loan Parties).

(b)     The Loan Parties shall satisfy the milestones set forth in the Investment Banker Report in accordance with the requirements set forth therein.

Section 5.22   Required Milestones. The "Milestones" shall include each of the following (as any such milestone may be extended in writing by the DIP Term Loan Agent (in its sole and absolute discretion) (collectively, the "Milestones"), in each case on terms and conditions, and subject to documentation (including, in all cases, forms of all applicable orders) in form and substance acceptable to the Loan Parties and the DIP Term Loan Agent in all respects:

(a)     By no later than 3 days following the Petition Date, the Bankruptcy Court shall enter the Interim DIP Order, in form and substance acceptable to the DIP Term Loan Agent.

(b)     By no later than 10 days following the Petition Date, the Loan Parties shall have filed a motion seeking approval of the bidding procedures in form and substance acceptable to the DIP Term Loan Agent.

(c)     By no later than 35 days following the Petition Date, the Bankruptcy Court shall enter the Final DIP Order, in form and substance acceptable to the DIP Term Loan Agent.

US-DOCS\121174693.21

(d)      By no later than 30 days following the Petition Date, the Borrower shall have obtained entry of an order from the Bankruptcy Court approving bidding procedures in respect of a sale of all or substantially all of the Loan Parties' assets to be implemented pursuant to Section 363 of the Bankruptcy Code and that, in all respects, is acceptable to the DIP Term Loan Agent (a "Sale Transaction"), which procedures are in form and substance acceptable to the DIP Term Loan Agent (the "Bidding Procedures Order").

(e)      By no later than 60 days following the Petition Date, the Borrower shall conduct the auction, if necessary, for all or substantially all of the Borrower's consolidated assets pursuant to Section 363 of the Bankruptcy Code and in accordance with the Bidding Procedures Order.

(f)      By no later than 62 days following the Petition Date, the Bankruptcy Court shall hold a hearing regarding approval of the Sale Transaction.

(g)      By no later than 65 days following the Petition Date, the Bankruptcy Court shall have approved the Sale Transaction and entered an order in form and substance acceptable to the DIP Term Loan Agent approving the Sale Transaction.

(h)      By no later than 75 days following the Petition Date, the Sale Transaction shall have closed; provided that if regulatory approvals associated with a Sale Transaction remain pending as of such date, such date shall be automatically extended to the date that is the third business day following receipt of all necessary regulatory approvals.

(i)      Following the Petition Date, the Loan Parties shall satisfy the milestones set forth in the Investment Banker Report, in a form to be agreed between the Loan Parties and the DIP Term Loan Agent, in accordance with the requirements set forth therein.

(j)      The Loan Parties shall use commercially reasonable efforts to obtain mortgages in favor of the DIP Term Loan Collateral Agent in respect of CL Industries' and PinnPack's leasehold interest in the applicable Facility, pursuant to documentation and a mortgage reasonably satisfactory to the DIP Term Loan Collateral Agent.

Section 5.23    DIP Agent's Advisors/Specified Lender Advisors.  The DIP Term Loan Agent, on behalf of itself and the Lenders, the Specified Lender Advisors, and the Prepetition Term Loan Lenders, shall each be entitled to retain or continue to retain (either directly or through counsel) any advisor of the DIP Term Loan Agent that the DIP Term Loan Agent may deem necessary, to provide advice, analysis and reporting for the benefit of the DIP Agent and some or all of the Lenders.  The Loan Parties shall pay all fees and expenses of such advisors to the extent permitted under the Bankruptcy Court DIP Order or any other order of the Bankruptcy Court and all such fees and expenses shall constitute Obligations and be secured by the Collateral.  Subject to the limitations set forth in this Agreement, the Loan Parties and their advisors shall grant access to, and cooperate in all respects with, the DIP Term Loan Agent, the Lenders and the Specified Lender Advisors and any other representatives of the foregoing and provide all information that such parties may request in a timely manner.

Section 5.24    Investment Banker.  Borrower has advised the DIP Term Loan Agent that Borrower has retained Jefferies LLC as an investment banker (together with its successors and

assigns, including any replacement in such capacity, the "Investment Banker"), to assist Loan Parties in the sale of all or substantially all businesses and properties of Loan Parties, which shall, among other things, include assistance in the preparation of a confidential sale memorandum, the distribution to prospective purchasers of the confidential information memorandum and other disclosure materials and the solicitation and management of bids. Each Loan Party has authorized and directed the Investment Banker to share with Lenders all reports and other information prepared by or in the possession of the Investment Banker relating to the sale process. Each Loan Party shall cause the Investment Banker to keep the DIP Term Loan Agent fully informed of the progress of the sale of the business pursuant to the reports and other information to be provided as set forth in Section 5.10 hereof and to the extent that the DIP Term Loan Agent may from time to time request any additional information related thereto as may be appropriate in the determination of the DIP Term Loan Agent, after notice to Borrower, to provide such information to Lender. If the Investment Banker resigns, Borrower shall immediately notify the DIP Term Loan Agent in writing and provide the DIP Term Loan Agent with a copy of any notice of resignation immediately upon the sending of such notice by such Investment Banker. Any replacement or successor Investment Banker shall be subject to the approval of the DIP Term Loan Agent, such approval not to be unreasonably withheld and shall be retained pursuant to a new retention agreement on terms and conditions reasonably acceptable to the DIP Term Loan Agent within five (5) Business Days immediately following the notice of resignation of the resigning Investment Banker, or within such longer period of time as the DIP Term Loan Agent may agree in writing. Notwithstanding the foregoing, in the event the consulting parties are not able to agree to the identity of, or the terms and conditions for the retention of, a successor Investment Banker, the Borrower may seek approval for such retention with the Bankruptcy Court. Failure to comply with the terms and conditions of this Section shall constitute an Event of Default.

Section 5.25    Chief Restructuring Officer.  Borrower shall retain, at all times during which this Agreement remains in effect,  on terms and conditions acceptable to the DIP Term Loan Agent and at the sole cost and expense of Borrower, Force 10 Partners LLC as  represented by Brian Weiss, or such other Person acceptable to the DIP Term Loan Agent, in its sole discretion, as its chief restructuring officer (the "Chief Restructuring Officer").  The DIP Term Loan Agent acknowledges and agrees that the terms and conditions of the retention of the Chief Restructuring Office as in effect on the date hereof are acceptable to Lender.  The Chief Restructuring Officer shall assume the management of the businesses, accounts and properties of Loan Parties and shall, among other things, assist in the preparation of the DIP Budget and compliance with the terms and conditions set forth in the Financing Documents. The Chief Restructuring Officer shall report directly to the Board of Directors or Members, as applicable, of Loan Parties.  Each Loan Party hereby irrevocably authorizes and directs the Chief Restructuring Officer to consult with DIP Term Loan Agent and to share with DIP Term Loan Agent all budgets, records, projections, financial information, reports and other information prepared by or in the possession of the Chief Restructuring Officer relating to the Collateral, or the financial condition or operations of the business of each Loan Party and subject to the other terms of this Section 5.25, respond fully to any reasonable inquiries of DIP Term Loan Agent regarding the assets, prospects, business and operations of Loan Parties and communicate and fully cooperate with the DIP Term Loan Agent.  Promptly following any request therefor, each Loan Party shall provide, and cause the Chief Restructuring Officer to provide, the DIP Term Loan Agent with such information regarding the operations, business affairs and financial

condition of any Loan Party as the DIP Term Loan Agent may request.  Each Loan Party agrees to provide the Chief Restructuring Officer with reasonable access to the books and records of such Loan Party, all of the premises of such Loan Party and to all management of Loan Parties as and when deemed necessary or appropriate by the Chief Restructuring Officer. Each Loan Party shall not amend or modify, or terminate, the retention agreement with the Chief Restructuring Officer without the prior written consent of the DIP Term Loan Agent.  If the Chief Restructuring Officer resigns, Loan Parties shall immediately notify the DIP Term Loan Agent in writing and provide the DIP Term Loan Agent with a copy of any notice of resignation immediately upon the sending of such notice by such Chief Restructuring Officer.  Any replacement or successor Chief Restructuring Officer shall be subject to approval by Lender, such approval not to be unreasonably withheld, and shall be retained pursuant to a new retention agreement on terms and conditions reasonably acceptable to the DIP Term Loan Agent within five (5) Business Days immediately following the notice of resignation of the resigning Chief Restructuring Officer, or within such longer period of time as the DIP Term Loan Agent may agree in writing. Notwithstanding the foregoing, in the event the consulting parties are not able to agree to the identity of, or the terms and conditions for the retention of, a successor Chief Restructuring Officer, the Borrower may seek approval for such retention with the Bankruptcy Court.  Failure to comply with the terms and conditions of this Section shall constitute an Event of Default.

Section 5.26    <u>Additional Bankruptcy Matters</u>.  Promptly provide the DIP Term Loan Agent, the Lenders and the Specified Lender Advisors with updates of any material developments in connection with the Loan Parties' efforts under the Chapter 11 Cases.

Section 5.27    <u>Debtor-In-Possession Obligations</u>.   Comply in a timely manner with their obligations and responsibilities as debtors-in-possession under the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Court DIP Order, and any other order of the Bankruptcy Court.

Section 5.28    <u>Monthly Reports</u>.  As soon as available and in any event within thirty (30) days after the end of each fiscal month, the consolidated balance sheet of Borrower as of the end of such fiscal month and related consolidated statements of income and cash flows for such fiscal month and for the then elapsed portion of the fiscal year, in comparative form with the consolidated statements of income and cash flows for the comparable periods in the previous fiscal year, all prepared in accordance with the standard set forth in <u>Section 5.07</u> and accompanied by an Officer's Certificate stating that such financial statements fairly present, in all material respects, the consolidated financial condition, results of operations and cash flows of Borrower as of the date and for the periods specified in accordance with the standard set forth in <u>Section 5.07</u>.

ARTICLE VI

NEGATIVE COVENANTS

Each Loan Party agrees that from and after the Closing Date until the Discharge Date:

Section 6.01   Subsidiaries; Equity Issuances.

(a)      No Loan Party shall (i) form or have any subsidiary other than another wholly-owned U.S. domestic subsidiary whose equity interests become subject to the Security Documents as contemplated by the Security Documents (other than the Non-Guarantor Subsidiaries and any Subsidiaries that are not wholly-owned on the Closing Date) or (i) subject to Section 6.04 hereof, own, or otherwise Control any Capital Stock in, any other Person.

(b)      Borrower shall not issue any additional shares of Capital Stock.

Section 6.02   Loan Party Indebtedness.  No Loan Party shall create, incur, assume or suffer to exist any Indebtedness, other than (each of the following, "Permitted Indebtedness"):

(a)      Indebtedness incurred under the (i) Financing Documents, (ii) the DIP ABL Facility not to exceed $18,500,000 and (iii) the Prepetition Term Loan Agreement;

(b)      Capital Lease Obligations or purchase money obligations to the extent incurred in the ordinary course of business to finance the acquisition or licensing of intellectual property or discrete items of equipment (and Indebtedness incurred to finance any such obligations) in an amount not to exceed $6,700,000; provided that the annual debt service payments in respect of all such Indebtedness (inclusive of interest, principal and fees) does not exceed $1,350,000 per calendar year;

(c)      current accounts payable not more than ninety (90) days past due or which are that are being contested in accordance with the Permitted Contest Conditions, interest thereon, regulatory bonds, surety obligations and accrued expenses incurred, in the ordinary course of business;

(d)      Indebtedness (not for borrowed money) existing as of the Closing Date which, as of the Closing Date the Loan Parties are unaware of (after due inquiry), in an amount not to exceed $1,000,000;

(e)      Unsecured Indebtedness (for borrowed money) existing as of the Closing Date which, as of the Closing Date the Loan Parties are unaware of (after due inquiry), in an amount not to exceed $250,000;

(f)      Indebtedness existing on the Closing Date and set forth in Schedule 6.02;

(g)      (i) Guarantees by any Loan Party of Indebtedness otherwise permitted hereunder of any other Loan Party, and (ii) performance guarantees provided by a Loan Party to support the obligations of any Loan Party in the ordinary course of business under the Material Agreements;

(h)      Indebtedness under the Shareholder Notes;

(i)      unsecured intercompany Indebtedness incurred prior to the Effective Date among the Borrower Group Members, to the extent unsecured and, if in favor of any Loan Party, pledged to the Collateral Agent, for the benefit of the Secured Parties, under the Security

69

Agreement; provided further, that in no event shall the Loan Parties incur any additional Indebtedness pursuant to this clause (i) on or after the Effective Date;

(j)     Indebtedness in the form of adequate protection pursuant to an order of the Bankruptcy Court;

(k)     Indebtedness with respect to letters of credit in favor of the landlord under any real property leases, in each case, issued in accordance with the applicable real property lease and in an aggregate stated amount not exceeding $500,000 at any time outstanding;

(l)     [Reserved];

(m)     Indebtedness of the Borrower in respect of the Niagara Promissory Note (as in effect as of September 9, 2020, without giving effect to any modifications that are not consented to by the DIP Term Loan Agent, in its reasonable discretion); and

(n)     Unsecured Indebtedness incurred under the "paycheck protection program" under Section 1102 of the CARES Act (as in effect on the Closing Date, hereinafter the "PPP") in an aggregate principal amount not exceeding $5,850,000 plus any additional amounts for which the applicant would be entitled to obtain forgiveness under the terms of the PPP.

Notwithstanding the foregoing Section 6.02 or anything in this Agreement to the contrary, on and after the Closing Date, other than indebtedness incurred under the DIP ABL Credit Agreement, none of the Loan Parties shall incur (i) any intercompany Indebtedness or similar obligations owing to any Affiliate or (ii) any Indebtedness for borrowed money, in either case, other than (A) such amounts that are in compliance with the DIP Budget, (B) Indebtedness incurred in respect of the DIP ABL Facility or (C) Indebtedness incurred hereunder.

Section 6.03    Loan Party Liens, Etc.    No Loan Party shall create, incur,    assume or suffer to exist any Lien upon or with respect to any of its properties of any character (including accounts receivables) whether now owned or hereafter acquired, or assign any accounts or other right to receive income, other than (each of the following, a "Permitted Lien"):

(a)     Liens arising by reason of:

(i)     Taxes either secured by a bond or which are not yet due or which are being contested pursuant to the Permitted Contest Conditions;

(ii)     security, pledges or deposits in the ordinary course of business for payment of workmen's compensation or unemployment insurance or other types of social security benefits; and

(iii)     good faith deposits or pledges incurred or created in connection with or to secure the performance of bids, tenders, contracts (other than contracts for the payment of money), leases, statutory obligations, surety bonds or appeal bonds entered into in the ordinary course of business or under Applicable Law;

(b)      Liens of mechanics, carriers, landlords, warehousemen, materialmen, laborers, repairmen's, employees or suppliers or any similar Liens (including purchase money Liens) arising by statute or operation of law, incurred in the ordinary course of business with respect to obligations which are not overdue by more than forty-five (45) days, or which are adequately bonded and which are being contested pursuant to the Permitted Contest Conditions;

(c)      Liens arising out of judgments, orders or awards that have been adequately bonded, are fully covered by insurance (subject to applicable deductibles) or with respect to which a stay of execution has been obtained pending an appeal or proceeding for review pursuant to the Permitted Contest Conditions;

(d)      Liens arising with respect to zoning restrictions, easements, licenses, reservations, covenants, rights-of-way, utility easements, building restrictions and other similar charges or encumbrances on the use of real property which, individually or in the aggregate, do not materially detract from the value of the affected property and do not materially interfere with the ordinary conduct of the business of such Loan Party;

(e)      Liens or the interests of lessors to secure purchase money obligations permitted under Section 6.02(b); provided that such Lien encumbers only the specific goods, equipment or software so financed, any accessions thereto, proceeds thereof and related books and records;

(f)      Liens arising under ERISA and Liens arising under the US Code with respect to an employee benefit plan (as defined in Section 3(2) of ERISA) that do not constitute an Event of Default under Section 7.01(i);

(g)      to the extent constituting Liens, leases, licenses, subleases or sublicenses granted to others in the ordinary course of business that do not (i) interfere in any material respect with the ordinary conduct of the Business of the Loan Parties, (ii) secure any Indebtedness or (iii) individually or in the aggregate detract from the expected value of the property of the Loan Parties in any material respect;

(h)      (i) Liens arising solely by virtue of any statutory or common law provision relating to banker's liens, rights of set-off or similar rights and remedies and burdening only deposit accounts or other funds maintained with a creditor depository institution, in each case, granted in the ordinary course of business in favor of such creditor depositary institution, provided that no such deposit account is a dedicated cash collateral account or is subject to restrictions against access by the depositor in excess of those set forth by regulations promulgated by the Board and no such deposit account is intended by Borrower to provide collateral to the depository institution and (ii) Liens in favor of a banking or other financial institution arising as a matter of law or in the ordinary course of business under customary general terms and conditions encumbering deposits or other funds maintained with a financial institution (including the right of setoff) and that are within the general parameters customary in the banking industry or arising pursuant to such banking institution's general terms and conditions;

(i)        any Lien on any property or asset of the Borrower or any of its Subsidiaries existing on the Closing Date and set forth in Schedule 6.03; provided that such Lien shall not apply to any other property or asset of the Borrower or any Subsidiary of the Borrower;

(j)        Liens arising under or in respect of (i) the Financing Documents and (ii) subject to the Interim DIP Order and Final DIP Order, the DIP ABL Facility;

(k)        Liens in effect as of the Closing Date in respect of the Prepetition Term Loan Agreement;

(l)        Liens granted as adequate protection pursuant to an order of the Bankruptcy Court;

(m)        cash collateral arrangements with respect to letters of credit issued in accordance with Section 6.02(k);

(n)        Liens which, as of the Closing Date the Loan Parties were unaware of (after due inquiry), securing Indebtedness (other than Indebtedness for borrowed money) not exceeding $250,000 in the aggregate;

(o)        Liens consisting of Investments permitted in reliance on Section 6.04(i); and

(p)        Liens that extend, renew or replace in whole or in part a Lien referred to above.

Notwithstanding the foregoing Section 6.03 or anything in this Agreement to the contrary, on and after the Closing Date, no Loan Party shall create, incur or assume any Lien in favor of (i) providers of Indebtedness for borrowed money (other than as provided in Section 6.03(j) above) or (ii) counterparties to Material Agreements, in either case, upon or with respect to any of its properties of any character (including accounts receivables) whether now owned or hereafter acquired, or assign any accounts or other right to receive income.

Section 6.04    Investments.  No Loan Party shall make any Investment, except:

(a)        [Reserved];

(b)        Investments between Loan Parties;

(c)        (i) Cash Equivalent Investments and (ii) bank deposits in the ordinary course of business;

(d)        deposits described in Section 6.03(a)(ii);

(e)        [Reserved];

(f)        [Reserved];

(g)        Investments listed on Schedule 6.04 as of the Closing Date; and

(h)      Investments consisting of security deposits with utilities, landlords and other like Persons made in the ordinary course of business.

Notwithstanding the foregoing <u>Section 6.04</u> or anything else contained in this Agreement to the contrary, on and after the Closing Date, (A) no Loan Party shall make any Investments except in compliance with the DIP Budget and (B) to the extent the Loan Parties are entering into agreements, transactions or otherwise conducting business with the Texas Facility Group and/or the Pennsylvania Facility Group, (i) each of the Texas Facility Group and/or the Pennsylvania Facility Group, as applicable, must pre-pay in full in cash for any services, products, goods or other value provided by the Loan Parties to the Texas Facility Group and/or the Pennsylvania Facility Group, as applicable and (ii) such agreements, transactions or other conduct of business shall have been approved in writing by the Chief Restructuring Officer and the Administrative Agent or shall be in accordance with the DIP Budget.

Section 6.05   <u>Chief Executive Office; Business Activities; Personnel Changes</u>.

(a)      Each Loan Party shall maintain its chief executive office at the address specified in <u>Section 10.01</u>, and no such Person shall change such chief executive office unless it has given at least ten (10) days' prior notice thereof to the DIP Term Loan Agent and the DIP Term Loan Collateral Agent, and each Loan Party has taken all steps then required pursuant to the Security Agreements to ensure the maintenance and perfection of the security interests created or purported to be created thereby.

(b)      No Loan Party shall at any time to any material extent conduct any activities other than those related to the Business and the other Material Agreements and any activities incidental to the foregoing.

(c)      No Loan Party shall make any changes to its executive personnel, except with the prior written consent of the DIP Term Loan Agent, such consent not to be unreasonably withheld, conditioned or delayed.

Section 6.06   <u>Restricted Payments</u>.  No Loan Party shall declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment other than (i) dividends, distributions or other payments in respect of Investments by any Borrower Group Member to any Loan Party, (ii) Restricted Payments among Loan Parties or (iii) Restricted Payments made by any Non-Guarantor Subsidiary to any Loan Party that are not prohibited by the Texas DIP Facility (with respect to the Texas Facility Group) or the Pennsylvania DIP Facility (with respect to the Pennsylvania Facility Group).

Section 6.07   <u>Fundamental Changes; Asset Dispositions</u>.  Except in connection with the Sale Transaction, no Loan Party shall:

(a)      in one transaction or a series of transactions, merge into or consolidate with, or acquire all or any substantial part of the assets or any class of stock or other ownership interests of, any other Person or sell, transfer or otherwise dispose of all or substantially all of its assets to any other Person;;

(b)      change its legal form, liquidate or dissolve (provided that any Non-Guarantor Subsidiary may do any of the foregoing to the extent not prohibited by the Bond Documents);

(c)      make or agree to make any amendment to its Organizational Documents to the extent that such amendment could reasonably be expected to be adverse to the interests of the Agents or the Lenders;

(d)      [Reserved]; and

(e)      Dispose of, in one transaction or a series of transactions, all or any part of the property owned by the Loan Party other than: (i) sales or other Dispositions of equipment (either worn out or defective, or no longer used or useful, or to be replaced with improved equipment) for fair market value, in each case, with the consent of the DIP Term Loan Agent or as otherwise permitted under the DIP Budget; (ii) Dispositions of assets, including equity interests, from any Loan Party to any other Loan Party, (iii) Dispositions of cash and Cash Equivalent Investments in the ordinary course of business and for fair market value, (iv) licensing of Intellectual Property in the ordinary course of business, so long as it does not interfere in any material respect with the ordinary conduct of the Business of the Loan Parties and (v) the sale of inventory (if any) in ordinary course of business.  For the avoidance of doubt, maintenance capital expenditures treated as a disposition for accounting purposes shall not be subject to this clause (e) solely by virtue of such accounting treatment.

Notwithstanding the foregoing <u>Section 6.07</u> or anything else contained in this Agreement to the contrary, on and after the Closing Date, no Loan Party shall (i) acquire any property or dispose of all or any part of the property owned by the Loan Party or (ii) reinvest the Net Available Amount of any such disposition, in each case, except in compliance with the DIP Budget, and, in each case, expressly approved in writing by the Chief Restructuring Officer and the DIP Term Loan Agent.

Section 6.08    <u>Accounting Changes</u>.  No Loan Party shall change its fiscal year.

Section 6.09    <u>Material Agreements, Bond Documents and Permitted Revolving Facilities</u>.  No Loan Party shall, directly or indirectly:

(a)      amend, modify, supplement or grant a consent, approval or waiver under, or permit or consent to the amendment, modification, supplement, consent, approval or waiver of (collectively, an "<u>Amendment</u>"), (i) any Material Agreement, (ii) the Texas DIP Facility, the Pennsylvania DIP Facility or the Bond Documents or (iii) the DIP ABL Facility, in each case, except to the extent the Chief Restructuring Officer has provided written notice of such request along with a final draft copy of such Amendment to the DIP Term Loan Agent as soon as reasonably practicable (and in any event at least five (5) calendar days advance notice) of any such Amendment and has used commercially reasonable efforts to agree with the DIP Term Loan Agent as to the approach taken in respect of such proposed Amendment;

(b)      make any voluntary or optional prepayment under the Niagara Promissory Note or make any voluntary or optional prepayment or return of customer deposit under any Material Agreements, in either case, without the prior written consent of the DIP Term Loan Agent;

(c)      directly or indirectly transfer, terminate, cancel or permit or consent to the transfer, termination or cancellation (including by exercising any contractual option to terminate, or failing to exercise any contractual option to extend) of any Material Agreement, in each case, except to the extent the Chief Restructuring Officer has provided written notice of such request to the DIP Term Loan Agent as soon as reasonably practicable (and in any event at least five (5) calendar days advance notice) of any such transfer, termination or cancellation and has used commercially reasonable efforts to agree with the DIP Term Loan Agent as to the approach taken (including whether to transfer, terminate or cancel such Material Agreement);

(d)      enter into any Material Agreement, except to the extent the Chief Restructuring Officer has provided written notice of such request and a final draft copy of such Material Agreement to the DIP Term Loan Agent as soon as reasonably practicable (and in any event at least five (5) calendar days advance notice) of any such new Material Agreement and has used commercially reasonable efforts to agree with the DIP Term Loan Agent as to the approach taken (including whether to so enter such Material Agreement);

(e)      (1) amend, modify or supplement, or permit or consent to the amendment, modification, supplement of, or (2) grant a consent, approval or waiver under, or permit or consent to a consent, approval or waiver of any real estate lease relating to the Facilities without the prior written consent of the DIP Term Loan Agent (not to be unreasonably withheld, conditioned or delayed);

(f)      amend the "Interim Order" (as defined in the Texas DIP Facility), the "Interim Order" (as defined in the Pennsylvania DIP Facility), the "Final Order" (as defined in the Texas DIP Facility) and the "Final Order" (as defined in the Pennsylvania DIP Facility), as the case may be, in a manner adverse to the Secured Parties, without the prior written consent of the DIP Term Loan Agent; or

(g)      permit the "Final Order" (as defined in the Texas DIP Facility) or  the "Final Order" (as defined in the Pennsylvania DIP Facility),  to differ from the "Interim Order" (as defined in the Texas DIP Facility) or the "Interim Order" (as defined in the Pennsylvania DIP Facility), respectively, in a manner adverse to the Secured Parties, without the prior written consent of the DIP Term Loan Agent.

Section 6.10    Transactions with Affiliates.  No Loan Party shall directly or indirectly enter into any transaction or series of related transactions with an Affiliate of such Loan Party, except for (a) transactions expressly referenced in, and permitted by, the DIP Budget, (b) transactions between or among the Loan Parties not involving any other Affiliate and (c) transactions consented to in writing by the DIP Term Loan Agent.

Notwithstanding the foregoing Section 6.10 or anything else contained in this Agreement to the contrary, on and after the Closing Date, no Loan Party directly or indirectly enter into any transaction or series of related transactions with an Affiliate of such Loan Party without the prior written consent of the DIP Term Loan Agent, other than (i) sales of inventory or assets between Borrower Group Members (A) in the ordinary course of such Loan Party's (and such Affiliate's) business and upon fair and reasonable terms no less favorable to such Borrower Group Member than it would obtain in comparable arm's-length transactions with a Person acting in good faith

75

which is not an Affiliate and (B) for which the party making payment actually makes full payment in cash upon delivery, (ii) transactions among the Loan Parties in the ordinary course of business, and (iii) transactions expressly referenced in, and permitted by, by the DIP Budget (it being acknowledged and agreed that each of the Loan Parties, on one hand, and the Non-Guarantor Subsidiaries, on the other hand, shall directly pay any overhead charged and other costs as specified in the Interim DIP Order and Final DIP Order, and (1) no Loan Party shall pay any costs in respect of any Non-Guarantor Subsidiary and (2) no Non-Guarantor Subsidiary shall pay any costs in respect of any Loan Party).

Notwithstanding anything to the contrary contained herein, the Loan Parties shall not make any payment to (or make any withdrawal for a payment to be made to) HPC Industries LLC or any Affiliate thereof (including Leon Farahnik) in respect of the real property located at 10250 Constellation Blvd., Suite 2820, Los Angeles, California, regardless of whether or not such payment is included in the DIP Budget (including to the extent reflected in the DIP Budget as part of any management fee to be paid to HPC Industries LLC), unless Borrower has provided the DIP Term Loan Agent with a written request for such payment signed by the Chief Restructuring Officer and such payment is approved by the DIP Term Loan Agent.

Section 6.11    Permitted Accounts.  No Loan Party shall open or maintain, or instruct any Person to open or maintain, any securities accounts, deposit accounts or other bank accounts other than Permitted Accounts. Prior to the Discharge Date, no Loan Party shall change (or permit any other Person to change) the name or account number of any Collateral Account without prior written notice to the DIP Term Loan Collateral Agent.  No amounts may be transferred or withdrawn from any Permitted Account other than in accordance with and as permitted by Section 5.18.

Section 6.12    Change of Advisors.  The Loan Parties shall not directly or indirectly remove or replace any investment banking firm, crisis manager, the Chief Restructuring Officer, consultant, financial advisor and/or other third-party professional without the prior written consent of the DIP Term Loan Agent.

Section 6.13    Hazardous Materials.  No Loan Party shall cause any Releases of Hazardous Materials at, on, from or under any real property currently or formerly owned, leased or operated by such Loan Party, except to the extent such Release is otherwise in compliance in all material respects with all Applicable Laws, including Environmental Laws, and applicable insurance policies.

Section 6.14    No Hedging or Speculative Transactions.  No Loan Party shall enter into, or suffer to exist, any Hedging Agreement for speculative purposes or any other speculative transaction.

Section 6.15    Change of Auditors.  No Borrower Group Member shall change its Independent Auditor, except (i) with the prior written consent of the DIP Term Loan Agent, such consent not to be unreasonably withheld, conditioned or delayed, and (ii) in the case of any Non-Guarantor Subsidiary, to the extent not prohibited by the Bond Documents.

Section 6.16    <u>Purchase of Capital Stock</u>.  No Loan Party shall purchase, redeem or otherwise acquire any of such Loan Party's issued Capital Stock or otherwise reduce its Capital Stock.

Section 6.17    <u>Use of Proceeds</u>. No portion of the proceeds of the New Money DIP Term Loans or the Collateral may be used:

(a)    for any purpose that is prohibited under the Bankruptcy Code or the Bankruptcy Court DIP Order;

(b)    to finance in any way: any contested matter, adversary proceeding, suit, arbitration, application, or other litigation of any type against the DIP Term Loan Agent, the Lenders, the Prepetition Agents, the Prepetition ABL Lender or the Prepetition Term Loan Lenders or to contest their respective rights and remedies under the Financing Documents, the Bankruptcy Court DIP Order or the Prepetition Loan Documents;

(c)    to prevent, hinder or delay enforcement or realization upon the DIP Collateral or the exercise of rights once an event of default has occurred and is continuing (subject to the Bankruptcy Court DIP Order) by any of the Secured Parties; and

(d)    to make any distribution under a plan of reorganization confirmed in the Chapter 11 Cases that does not provide for the indefeasible payment of the Loans in full and in cash on the effective date of such plan.

Nothing herein shall in any way prejudice or prevent the DIP Term Loan Agent or the Lenders from objecting, for any reason, to any requests, motions, or applications made in the Bankruptcy Court, including any application of final allowances of compensation for services rendered or reimbursement of expenses incurred under Sections 105(a), 330 or 331 of the Bankruptcy Code, by any party in interest.

Section 6.18    <u>Capital Expenditures</u>.  No Loan Party will make any Capital Expenditures other than Capital Expenditures in accordance with the DIP Budget.

Section 6.19    <u>Prepetition Payables</u>.  No Loan Party shall pay any prepetition claim arising under Section 503(b)(9) of the Bankruptcy Code or otherwise except to the extent specifically set forth in the DIP Budget or with the consent of DIP Term Loan Agent.


ARTICLE VII

EVENTS OF DEFAULT

Section 7.01    <u>Events of Default</u>.  If any of the following events ("<u>Events of Default</u>") shall occur:

(a)    the Borrower shall fail to pay any principal of any Loan (including any Accrued Interest that has been added to principal) when and as the same shall become due and payable,

whether at the due date thereof or, in the case of payments of principal due pursuant to Section 2.05(b), at a date fixed for prepayment thereof, or otherwise; or

(b)    the Borrower shall fail to pay any other amount (other than an amount referred to in Section 7.01(a)) payable under this Agreement or under any other Loan Document when and as the same shall become due and payable; or

(c)    any representation or warranty made by or deemed made by any Loan Party in this Agreement or any other Loan Document, or in any certificate furnished to any Secured Party by or on behalf of such Loan Party in accordance with the terms hereof or thereof, shall prove to have been incorrect in any material respect (to the extent not already qualified by materiality) as of the time made or deemed made, confirmed or furnished; or

(d)    any Loan Party shall fail to observe or perform any covenant or agreement, as applicable, contained in the following Sections:

(i)    the last sentence of Section 2.07(c), Sections 5.01 (as to existence), 5.10, 5.11, 5.13, 5.21, 5.22, 5.24, 5.25 or Article VI; or

(ii)    Sections 5.06(a), 5.10(b), 5.10(c), 5.10(h) or 5.20(c) and such failure has continued unremedied for a period of three (3) Business Days after the occurrence thereof; or

(iii)    Sections 5.10(e) or 5.10(h) and such failure has continued unremedied for fifteen (15) days after the occurrence thereof; or

(e)    any Loan Party shall fail to observe or perform any covenant, condition or agreement contained in this Agreement or any other Financing Document to which it is a party (other than those specified in Section 7.01(a), (b), (c), (d) or (l)), and such failure shall continue unremedied for a period of three (3) days after the earlier of (i) written notice thereof to such Loan Party and (ii) knowledge of such default by an Authorized Representative of any Loan Party; provided that, if (A) such default cannot be cured within such 3-day period, (B) such default is susceptible of cure and (C) the applicable Loan Party is proceeding with diligence and in good faith to cure such default, then such three (3) day cure period shall be extended to such date, not to exceed a total of five (5) days, as shall be necessary for such Loan Party to diligently cure such default; or

(f)    [Reserved];

(g)    except for the allowance in the Chapter 11 Cases of a general unsecured claim, (i) one or more judgments, non-interlocutory orders, decrees or arbitration awards shall be entered against one or more of the Loan Parties or Secured Parties (in respect of matters relating to the Financing Documents) involving an aggregate liability of $100,000 or more (excluding amounts covered by insurance to the extent the relevant independent third-party insurer has affirmatively confirmed coverage therefor), and the same shall remain unsatisfied, unvacated and unstayed pending appeal for a period of thirty (30) days after the entry thereof or (ii) one or more non-monetary judgments, orders or decrees shall be rendered against any one or more of the Loan Parties which has or would reasonably be expected to have, either individually or in the

US-DOCS\121174693.21

aggregate, a Material Adverse Effect, and there shall be any period of twenty (20) consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect; or

(h)     the Interim DIP Order and the Final DIP Order, as applicable, together with the Financing Documents shall cease to create a valid and perfected Lien with such priority required by this Agreement; or

(i)     (i) any Security Document (A) is revoked, terminated or otherwise ceases to be in full force and effect (except in connection with its expiration in accordance with its terms in the ordinary course (and not related to any default thereunder)), or the enforceability thereof shall be challenged in writing by any Borrower Group Member, (B) ceases to provide (to the extent permitted by law and to the extent required by the Financing Documents) a first priority perfected Lien on the Collateral in favor of the DIP Term Loan Collateral Agent (other than any Vehicles), free and clear of all other Liens (other than Permitted Liens), or (C) becomes unlawful or is declared void or (ii) any Financing Document (A) is revoked, terminated or otherwise ceases to be in full force and effect (except in connection with its expiration in accordance with its terms in the ordinary course (and not related to any default thereunder)), or (B) becomes unlawful or is declared void; or

(j)     an ERISA Event has occurred which, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect; or

(k)     a Change of Control has occurred; or

(l)     a Budget Event has occurred; or

(m)     without limiting the rights of the DIP Term Loan Agent in Section 6.09, any Material Agreement shall at any time for any reason cease to be valid and binding and in full force and effect (in each case, except in connection with its expiration in accordance with its terms in the ordinary course (and not related to any default thereunder, other than any default arising from the filing of the Chapter 11 Cases or from any action required to be taken under the Financing Documents or under the Bankruptcy Court DIP Order) or as approved by an order of the Bankruptcy Court) on the applicable Material Counterparty; or

(n)     any Authorization by a Governmental Authority necessary for the execution, delivery and performance of any obligation under the Financing Documents is terminated or ceases to be in full force or is not obtained, maintained, or complied with; or

(o)     an uninsured Event of Loss or a Condemnation, in each case with respect to a portion of the property of the Loan Parties in excess of $750,000 in value shall occur; or

(p)     (i) the abandonment by any Loan Party of all or a material portion of its activities to operate or maintain the Business, which abandonment shall be deemed to have occurred if any Loan Party fails to operate any material part of the Business for a period of thirty (30) or more consecutive days; provided that any such failure to operate the Business caused by an Event of Loss or other force majeure event shall not constitute a Material Adverse Effect so long as, to the extent feasible during such Event of Loss or other force majeure event, the Borrower is diligently

79

attempting to restart operation of the Business, or (ii) the written announcement by any Loan Party of its intention to do any of the foregoing in <u>clause (i)</u>; or

(q)        without limiting the rights of the DIP Term Loan Agent in <u>Section 6.09</u>, any Loan Party shall, following the Closing Date and other than as approved by an order of the Bankruptcy Court, default in in the observance or performance of any Material Agreement in a manner that would cause a Material Adverse Effect and such default shall continue after the expiration of any cure period therefor; or

(r)        any Borrower Group Member shall (i) default in making any payment of any principal, interest or premium of (x) any Indebtedness incurred following the Petition Date (excluding the Obligations) the outstanding principal amount of which exceeds at such time $350,000, or (y) without limiting the foregoing clause (x), the DIP ABL Facility, the Texas DIP Facility and/or the Pennsylvania DIP Facility (such Indebtedness in clauses (x) and (y), "<u>Material Indebtedness</u>") on the scheduled or original due date with respect thereto; or (ii) default in the observance or performance of any other agreement or condition relating to any Material Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist, in each case, beyond any grace periods applicable thereto, the effect of which default or other event or condition is to cause, or to permit (or, subject to the proviso below, would have permitted) the holder or beneficiary of such Material Indebtedness (or a trustee or agent on behalf of such holder or beneficiary) to cause, with or without the giving of notice, the lapse of time or both, such Material Indebtedness to become due prior to its stated maturity or to become subject to a mandatory offer to purchase by the obligor thereunder or (in the case of any such Indebtedness constituting a Guarantee) to become payable; <u>provided</u>, that for purposes of this clause (r), references to the Texas DIP Facility and/or the Pennsylvania DIP Facility shall be references to such Indebtedness as in effect as of the date hereof without giving effect to any amendments, modifications, consents or waivers thereto; or

(s)        [Reserved];

(t)        any Post-Consumer Materials or any other materials located at the Riverside Facility or the PinnPack Facility or Collateral of the Loan Parties shall be moved or otherwise relocated to the Texas Facility or the Pennsylvania Facility or otherwise invested in Borrower Group Members that are not Loan Parties; or

(u)        the proceeds of any Loan shall have been expended or withdrawn from a DIP Term Priority Account in a manner which is not in accordance in all material respects with the DIP Budget then in effect (subject to Permitted Variances), absent the consent of the DIP Term Loan Agent; or

(v)        any Loan Party shall file a motion in the Chapter 11 Cases without the express written consent of the DIP Term Loan Agent and the Lenders to obtain additional financing from a party other than the Lenders under Section 364(d) of the Bankruptcy Code that does not provide for the payment of the Obligations in full in cash upon the incurrence of such additional financing; or

US-DOCS\121174693.21

(w)      any Loan Party shall file a motion seeking, or the Bankruptcy Court shall enter, an order, other than pursuant to a plan of reorganization, (i) approving payment of any prepetition claim other than (x) as provided for in the "first day" or "second day" orders, (y) contemplated by the DIP Budget then in effect (including Permitted Variances), or (z) otherwise consented to by the DIP Term Loan Agent in writing (such approval not to be unreasonably withheld), (ii) granting relief from the automatic stay under Section 362 of the Bankruptcy Code to any holder of any security interest to permit foreclosure on any assets having a value of no less than $250,000, or (iii) except with respect to the Prepetition Obligations as provided in the Bankruptcy Court DIP Orders, approving any settlement or other stipulation not approved by the DIP Term Loan Agent (such approval not to be unreasonably withheld) and not included in the DIP Budget then in effect with any secured creditor of any Loan Party providing for payments as adequate protection or otherwise to such secured creditor; or

(x)      an order is entered in any of the Chapter 11 Cases appointing, or any Loan Party shall file an application for an order seeking the appointment of, (i) a trustee under Section 1104, or (ii) an examiner or disinterested person with enlarged powers relating to the operation of the Loan Parties' business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code; or

(y)      an order shall be entered by the Bankruptcy Court dismissing any of the Chapter 11 Cases (or any subsequent Chapter 7 case) or converting any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code, in each case, which does not contain a provision for termination of the Commitment, and payment in full in cash of all Obligations (other than contingent Obligations not due and owing) of the Loan Parties hereunder and under the other Financing Documents upon entry thereof; or

(z)      an order is entered by the Bankruptcy Court in any of the Chapter 11 Cases without the express prior written consent of the DIP Term Loan Agent (i) to revoke, reverse, stay, modify, supplement or amend the Bankruptcy Court DIP Order in a manner that is inconsistent with this Agreement that is not otherwise consented to by the DIP Term Loan Agent, (ii) to permit any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority as to the Loan Parties equal or superior to the priority of the DIP Superpriority Claim without the express prior written consent of the Lenders in respect of the Obligations, (iii) to grant or permit the grant of a Lien on the Collateral (other than Liens permitted under Section 6.03); or

(aa)      (i) an application is made by the Loan Parties for any of the orders described in Section 7.01(w), (x), (y), (z) and (bb), (ii) the Loan Parties support any such application made by any third party or (iii) to the extent the Secured Parties do not have standing to contest such matters, any third party makes an application for any such order and the Loan Parties do not contest such application in good faith, or any Person obtains a final order under § 506(c) of the Bankruptcy Code against the DIP Term Loan Agent or obtains a final order adverse to the DIP Term Loan Agent or the Lenders or any of their respective rights and remedies under the Financing Documents or in the Collateral; or

(bb)    an entry of an order by the Bankruptcy Court terminating or modifying the exclusive right of any Loan Party to file a Chapter 11 plan pursuant to Section 1121 of the Bankruptcy Code, without the prior written consent of the DIP Term Loan Agent; or

(cc)    (i) any Loan Party shall attempt to invalidate, reduce or otherwise impair the Liens or security interests of the DIP Term Loan Agent and/or the Lenders, claims or rights against such Person or to subject any Collateral to assessment pursuant to Section 506(c) of the Bankruptcy Code,  (ii) the Lien or security interest created by Security Documents or the Bankruptcy Court DIP Orders with respect to the Collateral shall, for any reason, cease to be valid or (iii) any action is commenced by the Loan Parties which contests the validity, perfection or enforceability of any of the Liens and security interests of the DIP Term Loan Agent and/or the Lenders created by any of the Bankruptcy Court DIP Order, this Agreement, or any Security Document; or

(dd)    any Loan Party shall seek to, or shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court) (i) any other Person's motion to, disallow in whole or in part the Lenders' claim in respect of the Obligations or contest any material provision of any Financing Document or any material provision of any Financing Document shall cease to be effective (other than in accordance with its terms) or (ii) a sale of any of the Collateral pursuant to any transaction other than a Sale Transaction without the consent of the DIP Term Loan Agent; or

(ee)    the failure of any Loan Party to comply with the Interim DIP Order or the Final DIP Order; or

(ff)    the (i) commencement of, (ii) support of, or (iii) to the extent the Secured Parties do not have standing to contest such matters, failure to oppose, in any case, any action against any of the DIP Term Loan Agent or any Lender by or on behalf of any Loan Party or any Loan Party's affiliates or officers; or

(gg)    the failure to meet any of the Milestones by the applicable date for such Milestone set forth in Section 5.22 herein; or

(hh)    any Loan Party pays for any obligations of the Texas Facility Group or the Pennsylvania Facility Group and such Loan Party is not reimbursed by the Texas Facility Group or the Pennsylvania Facility Group, as applicable, within three (3) Business Days thereof;

then, and in every such event, and at any time thereafter during the continuance of such event, the DIP Term Loan Agent may, at its sole discretion, following written notice to the Borrower, take any or all of the following actions, at the same or different times:  (i) terminate the Commitments, and thereupon the Commitments shall terminate immediately; and (ii) declare the Loans and all other amounts due under the Financing Documents then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all reimbursements, fees and other obligations of the Borrower accrued hereunder or under the Financing Documents, shall become due and payable immediately, without presentment, demand, protest or other notice

of any kind, all of which are hereby waived by the Loan Parties, subject to the Bankruptcy Court DIP Order. Upon the occurrence and during the continuance of any Event of Default, in addition to the exercise of remedies set forth above in this paragraph, each Secured Party shall be, subject to the terms of the Security Agreement, entitled to exercise the rights and remedies available to such Secured Party under and in accordance with the provisions of the other Financing Documents to which it is a party or any Applicable Law. For the purpose of enabling the DIP Term Loan Collateral Agent to exercise the rights and remedies under this <u>Section 7.01</u> (including in order to take possession of, collect, receive, assemble, process, appropriate, remove, realize upon, sell, assign, license out, convey, transfer or grant options to purchase any Collateral) at such time as the DIP Term Loan Collateral Agent shall be lawfully entitled to exercise such rights and remedies, each Loan Party hereby grants to the DIP Term Loan Collateral Agent, for the benefit of the DIP Term Loan Collateral Agent and each other Secured Party, a nonexclusive and assignable license (exercisable without payment of royalty or other compensation to such Loan Party), subject, in the case of Intellectual Property licenses, to the terms of the applicable license, and subject, in the case of Trademarks, to sufficient rights to quality control and inspection in favor of such Loan Party to avoid the risk of invalidation of such Trademarks, to use, practice, license, sublicense, and otherwise exploit any and all Intellectual Property now owned or held or hereafter acquired or held by such Loan Party.

Section 7.02   <u>Application of Proceeds</u>. The proceeds of any collection, sale or other realization of all or any part of the Collateral and/or the proceeds of a partial or full prepayment in accordance with <u>Section 2.05</u> shall be applied in the following order of priority (subject, in all respects to the Carve-Out and the other terms of the Bankruptcy Court DIP Order):

(a)      <u>first</u>, to any fees, costs, charges, expenses and indemnities then due and payable to DIP Term Loan Agent and DIP Term Loan Collateral Agent under any Financing Document *pro rata* based on such respective amounts then due to such Persons;

(b)      <u>second</u>, to the respective outstanding fees, costs, charges, expenses and indemnities then due and payable to the other Secured Parties under any Financing Document *pro rata* based on such respective amounts then due to such Persons;

(c)      <u>third</u>, to any accrued but unpaid interest on the Obligations owed to the Secured Parties in respect of, or relating to, New Money Commitments and/or New Money DIP Term Loans, pro rata based on such respective amounts then due to the Secured Parties;

(d)      <u>fourth</u>, to any principal amount of the Obligations owed to the Secured Parties in respect of, or relating to, New Money Commitments and/or New Money DIP Term Loans, pro rata based on such respective amounts then due to the Secured Parties;

(e)      <u>fifth</u>, to any other unpaid Obligations then due and payable to Secured Parties in respect of, or relating to, New Money Commitments and/or New Money DIP Term Loans, *pro rata* based on such respective amounts then due to the Secured Parties;

(f)      <u>sixth</u>, to any accrued but unpaid interest on the Obligations owed to the Secured Parties in respect of, or relating to, Rolled-Up Term Loans Commitment and/or Rolled-Up Term Loans, pro rata based on such respective amounts then due to the Secured Parties;

(g)      seventh, to any principal amount of the Obligations owed to the Secured Parties in respect of, or relating to, Rolled-Up Term Loans Commitment and/or Rolled-Up Term Loans, pro rata based on such respective amounts then due to the Secured Parties;

(h)      eighth, to any other unpaid Obligations then due and payable to Secured Parties *pro rata* based on such respective amounts then due to the Secured Parties;

(i)      ninth, after final payment in full of the amounts described in clauses *first* through *eighth* above and the Discharge Date shall have occurred, to the Prepetition Agents for the payment of the Prepetition Obligations in accordance with the terms of the Prepetition Loan Documents and the Prepetition Intercreditor Agreement;

(j)      tenth, after final payment in full of the amounts described in clauses *first* through *ninth* above and the Discharge of the DIP and Prepetition Term Loan Obligations shall have occurred, to the Borrower or as otherwise required by Applicable Law.

It is understood that the Loan Parties shall remain liable to the extent of any deficiency between the amount of the proceeds of the Collateral and the aggregate of the sums referred to in clauses *first* through *seventh* above.  For the avoidance of doubt, subject to the terms of the Prepetition Intercreditor Agreement, nothing contained in this Agreement shall relieve or waive payment of the Pre-Petition Obligations in accordance with the Prepetition Priority Loan Agreement.

## ARTICLE VIII

## THE AGENTS

Section 8.01    Appointment and Authorization of the Agents.

(a)      Each of the Lenders hereby irrevocably appoints each Agent to act on its behalf as its agent hereunder and under the other Financing Documents and authorizes each Agent in such capacity, to take such actions on its behalf and to exercise such powers as are delegated to it by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto.  Each Agent, by executing this Agreement, hereby accepts such appointment.

(b)      Each Agent is hereby authorized to execute, deliver and perform each of the Financing Documents to which such Agent is intended to be a party.  Each Agent hereby agrees, and each Lender hereby authorizes such Agent, to enter into the amendments and other modifications of the Security Documents (subject to Section 10.02(b)).

(c)      Each Lender hereby irrevocably authorizes the DIP Term Loan Agent, to credit bid and purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral at any sale thereof conducted by the DIP Term Loan Agent or the DIP Term Loan Agent under the provisions of the UCC, including pursuant to Sections 9-610 or 9-620 of the UCC (or any equivalent provision of the UCC), at any sale thereof conducted under the provisions of the Bankruptcy Code, including Section 363 of the Bankruptcy Code, or at any other sale or foreclosure conducted by the DIP Agent (whether by judicial action or otherwise) in accordance with Applicable Law and subject to bidding procedures approved by the Bankruptcy

Court.  In no event shall the DIP Term Loan Agent be obligated to take title to or possession of Collateral in its own name, or otherwise in a form or manner that may, in its reasonable judgment, expose it to liability.

(d)     Each Lender irrevocably appoints the DIP Term Loan Collateral Agent as its agent and bailee for the purpose of perfecting Liens (whether pursuant to Section 8-301(a)(2) of the UCC or otherwise), for the benefit of the Secured Parties, in assets in which, in accordance with the UCC or any other Applicable Law a security interest can be perfected by possession or control.  Should any Lender obtain possession or control of any such Collateral, such Lender shall notify the DIP Term Loan Agent thereof, and, promptly following the DIP Term Loan Agent's request therefor, shall deliver such Collateral to the DIP Term Loan Collateral Agent or otherwise deal with such Collateral in accordance with the DIP Term Loan Agent's instructions.

Section 8.02   Rights as a Lender.  Each Agent shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not an Agent, and such Person and its Affiliates may accept deposits from, lend money to and generally engage in any kind of business with the Borrower or any of Subsidiary or other Affiliate thereof as if it were not an Agent hereunder.

Section 8.03   Duties of Agent; Exculpatory Provisions.  No Agent shall have any duties or obligations except those expressly set forth herein and in the other Financing Documents. Without limiting the generality of the foregoing, no Agent (a) shall be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred and is continuing, (b) shall have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Financing Documents that such Agent is required to exercise, and (c) shall, except as expressly set forth herein and in the other Financing Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Subsidiaries that is communicated to or obtained by the financial institution serving as an Agent or any of its Affiliates in any capacity.  No Agent shall be liable for any action taken or not taken by it with the consent or at the request of the Lenders or in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction in a final, non-appealable decision.  No Agent shall be deemed to have knowledge of any Default or Event of Default unless and until written notice thereof is given to such Agent by the Borrower or a Lender, and no Agent shall be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Financing Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Financing Document or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in Article IV or elsewhere herein or therein, other than to confirm receipt of items expressly required to be delivered to such Agent.

Section 8.04   Reliance by Agent.  Each Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing believed by it to be genuine and to have been signed or sent by the

proper Person.  Each Agent also may rely upon any statement made to it orally or by telephone and believed by it to be made by the proper Person, and shall not incur any liability for relying thereon.  Each Agent may consult with legal counsel, independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

Section 8.05    Delegation of Duties.  Each Agent may perform any and all its duties and exercise its rights and powers by or through any one or more sub-agents appointed by such Agent.  Each Agent and any such sub-agent may perform any and all its duties and exercise its rights and powers through their respective Related Parties.  The exculpatory provisions of the preceding paragraphs shall apply to any such sub-agent and to the Related Parties of each Agent and any such sub-agent, and shall apply to their respective activities as well as activities as each Agent.

Section 8.06    Withholding of Taxes by the DIP Term Loan Agent; Indemnification.  To the extent required by any Applicable Law, the DIP Term Loan Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding Taxes.  If any Governmental Authority asserts a claim that the DIP Term Loan Agent did not properly withhold Taxes from amounts paid to or for the account of any Lender because the appropriate form was not delivered or was not properly executed or because such Lender failed to notify the DIP Term Loan Agent of a change in circumstance which rendered the exemption from, or reduction of, withholding Taxes ineffective or for any other reason, or if the DIP Term Loan Agent reasonably determines that a payment was made to a Lender pursuant to this Agreement without deduction of applicable withholding tax from such payment, such Lender shall promptly indemnify the DIP Term Loan Agent fully for all amounts paid, directly or indirectly, by DIP Term Loan Agent as Taxes or otherwise, including any penalties or interest and together with all expenses (including legal expenses, allocated internal costs and out-of-pocket expenses) incurred.  Each Lender shall severally indemnify the DIP Term Loan Agent, within ten (10) days after demand therefor, for (i) any Indemnified Taxes attributable to such Person (but only to the extent that the Borrower has not already indemnified the DIP Term Loan Agent for such Indemnified Taxes and without limiting the obligation of the Borrower to do so), (ii) any Taxes attributable to such Person's failure to comply with the provisions of Section 10.04(f) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Person, in each case, that are payable or paid by the DIP Term Loan Agent in connection with any Financing Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the DIP Term Loan Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the DIP Term Loan Agent to set off and apply any and all amounts at any time owing to such Lender under any Financing Document or otherwise payable by the DIP Term Loan Agent to the Lender from any other source against any amount due to the DIP Term Loan Agent under this Section 8.06.

Section 8.07    Resignation of Agent.  Each Agent may resign at any time upon thirty (30) days' notice by notifying the Lenders and the Borrower, and the DIP Term Loan Collateral Agent may be removed at any time by the DIP Term Loan Agent (with a prior written notice to the Borrower).  Upon any such resignation or removal, the DIP Term Loan Agent shall have the right, with the consent of the Borrower (such consent not to be unreasonably withheld),

to appoint a successor.  If no successor shall have been so appointed by the DIP Term Loan Agent and approved by the Borrower and shall have accepted such appointment within thirty (30) days after the retiring Agent gives notice of its resignation or after the DIP Term Loan Agent's removal of the retiring DIP Term Loan Collateral Agent, then the retiring Agent may, on behalf of the Lenders, appoint a successor Agent, which shall be a Lender with an office in New York, New York, an Affiliate of a Lender or a financial institution with an office in New York, New York having a combined capital and surplus that is not less than $250,000,000.  Upon the acceptance of its appointment as Agent hereunder by a successor, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring (or retired) Agent and the retiring Agent shall be discharged from its duties and obligations hereunder (if not already discharged therefrom as provided above in this paragraph).  The reimbursements and fees payable by the Borrower to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor.  After the Agent's resignation or removal hereunder, the provisions of this Article and Section 10.03 shall continue in effect for its benefit in respect of any actions taken or omitted to be taken by it while it was acting as Agent.

Section 8.08    Non-Reliance on Agent or Other Lenders.  Each Lender acknowledges that it has, independently and without reliance upon any Agent, the Affiliates of any Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender also acknowledges that it will, independently and without reliance upon any Agent, the Affiliates of any Agent or any other Lender and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Financing Document or any related agreement or any document furnished hereunder or thereunder.

Section 8.09    No Other Duties; Etc. The parties agree that neither the DIP Term Loan Agent nor the DIP Term Loan Collateral Agent shall have any obligations, liability or responsibility under or in connection with this Agreement and the other Financing Documents and that none of the Agents shall have any obligations, liabilities or responsibilities except for those expressly set forth herein and in the other Financing Documents.  The DIP Term Loan Collateral Agent shall have all of the rights (including indemnification rights), powers, benefits, privileges, exculpations, protections and immunities granted to the DIP Term Loan Collateral Agent under the other Financing Documents, all of which are incorporated herein *mutatis mutandis*.

ARTICLE IX

GUARANTY

Section 9.01    Guaranty.

(a)    For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Guarantor hereby unconditionally and irrevocably, jointly and severally, Guarantees the full and punctual payment and performance (whether at stated maturity, upon acceleration or otherwise) of all Guaranteed Obligations, in each case as primary obligor and not merely as surety and with respect to all such Guaranteed Obligations howsoever

US-DOCS\121174693.21

created, arising or evidenced, whether direct or indirect, absolute or contingent, now or hereafter existing, or due or to become due. This is a guaranty of payment and not merely of collection.

(b)    All payments made by any Guarantor under this Article IX shall be payable in the manner required for payments by the Borrower hereunder, including: (i) the obligation to make all such payments in Dollars, free and clear of, and without deduction for, any Taxes, and subject to the gross-up and indemnity as provided under Section 2.08, (ii) the obligation to pay interest at the Post-Default Rate and (iii) the obligation to pay all amounts due under the Loans in Dollars.

(c)    Any term or provision of this guaranty to the contrary notwithstanding the aggregate maximum amount of the Guaranteed Obligations for which such Guarantor shall be liable under this guaranty shall not exceed the maximum amount for which such Guarantor can be liable without rendering this guaranty or any other Financing Document, as it relates to such Guarantor, void or voidable under Applicable Law relating to fraudulent conveyance or fraudulent transfer.

Section 9.02    Guaranty Unconditional. The Guaranteed Obligations shall be unconditional and absolute and, without limiting the generality of the foregoing, shall not be released, discharged or otherwise affected by:

(a)    any extension, renewal, settlement, compromise, waiver or release in respect of any obligations of any Loan Party under the Financing Documents and/or any Commitments under the Financing Documents, by operation of law or otherwise (other than with respect to any such extension, renewal, settlement, compromise, waiver or release agreed in accordance with the terms hereunder as expressly applying to the Guaranteed Obligations),

(b)    any modification or amendment of or supplement to this Agreement or any other Financing Document (other than with respect to any modification, amendment or supplement agreed in accordance with the terms hereunder as expressly applying to the Guaranteed Obligations),

(c)    any release, impairment, non-perfection or invalidity of any Collateral,

(d)    any change in the corporate existence, structure or ownership of any Loan Party or any other Person, or any event of the type described in Sections 5.01, 6.01 or 6.07 with respect to any Person,

(e)    the existence of any claim, set-off or other rights that any Guarantor may have at any time against any Loan Party, any Secured Party or any other Person, whether in connection herewith or with any unrelated transactions,

(f)    any invalidity or unenforceability relating to or against any Loan Party for any reason of any Financing Document, or any provision of Applicable Law purporting to prohibit the performance by any Loan Party of any of its obligations under the Financing Documents (other than any such invalidity or unenforceability with respect solely to the Guaranteed Obligations),

US-DOCS\121174693.21

(g)     the failure of any Material Counterparty to make payments owed to any Loan Party, or

(h)     any other act or omission to act or delay of any kind by any Loan Party, any Secured Party or any other Person or any other circumstance whatsoever that might, but for the provisions of this Section 9.02, constitute a legal or equitable discharge of the obligations of any Loan Party under the Financing Documents.

Section 9.03   Discharge Only Upon Payment in Full; Reinstatement in Certain Circumstances. The Guaranteed Obligations shall remain in full force and effect until all of the Borrower's obligations under the Financing Documents shall have been paid or otherwise performed in full and all of the Commitments shall have terminated. If at any time any payment made under this Agreement or any other Financing Document is rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy, reorganization or similar event of any Loan Party or any other Person or otherwise, then the Guaranteed Obligations with respect to such payment shall be reinstated at such time as though such payment had been due but not made at such time.

Section 9.04   Waiver by the Guarantors.

(a)     Each Guarantor hereby irrevocably and unconditionally waives, to the fullest extent permitted by Applicable Law: (i) notice of acceptance of the guaranty provided in this Article IX and notice of any liability to which this guaranty may apply, (ii) all notices that may be required by Applicable Law or otherwise to preserve intact any rights of any Secured Party against any Loan Party, including any demand, presentment, protest, proof of notice of non-payment, notice of any failure on the part of any Loan Party to perform and comply with any covenant, agreement, term, condition or provision of any agreement and any other notice to any other party that may be liable in respect of the Guaranteed Obligations (including any Loan Party) except any of the foregoing as may be expressly required hereunder, (iii) any right to the enforcement, assertion or exercise by any Secured Party of any right, power, privilege or remedy conferred upon such Person under the Financing Documents or otherwise and (iv) any requirement that any Secured Party exhaust any right, power, privilege or remedy, or mitigate any damages resulting from any Default or Event of Default under any Financing Document, or proceed to take any action against any Collateral or against any Loan Party or any other Person under or in respect of any Financing Document or otherwise, or protect, secure, perfect or ensure any Lien on any Collateral.

(b)     Each Guarantor agrees and acknowledges that the DIP Term Loan Agent and each holder of any Guaranteed Obligations may demand payment of, enforce and recover from any Guarantor or any other Person obligated for any or all of such Guaranteed Obligations in any order and in any manner whatsoever, without any requirement that the DIP Term Loan Agent or such holder seek to recover from any particular Guarantor or other Person first or from any Guarantors or other Persons *pro rata* or on any other basis.

Section 9.05   Subrogation.   Upon any Guarantor making any payment under this Article IX, such Guarantor shall be subrogated to the rights of the payee against the Borrower with respect to such obligation; provided that no Guarantor shall enforce any payment by way of subrogation, indemnity, contribution or otherwise, or exercise any other right, against any Loan Party (or

89

otherwise benefit from any payment or other transfer arising from any such right) so long as any obligations under the Financing Documents (other than on-going but not yet incurred indemnity obligations) remain unpaid and/or unsatisfied.

Section 9.06    Acceleration.  All amounts then subject to acceleration under Section 7.01 of this Agreement shall be payable by the Guarantors hereunder immediately upon demand by the DIP Term Loan Agent.

ARTICLE X

MISCELLANEOUS

Section 10.01 Notices.  Except as otherwise expressly provided herein or in any Financing Document, all notices and other communications provided for hereunder or thereunder shall be (i) in writing and (ii) sent by overnight courier (if for inland delivery) or international courier (if for overseas delivery); provided, that such notice or communication may be sent by email so long as (x) such email or electronic transmission is promptly followed by a communication or notice in sent in accordance with (i) and (ii) above, (y) any Loan Party is delivering documents and information required to be provided under Article IV, Article V or Article VI, or (z) the express terms of any Financing Document permit electronic transmissions, in each case, to a party hereto at its address and contact number specified below, or at such other address and contact number as is designated by such party in a written notice to the other parties hereto:

(a)    Borrower or Guarantors:

> CarbonLite Holdings LLC
> 10250 Constellation Boulevard, Suite 2820
> Los Angeles, CA 90067
> Attention:    both Leon Farahnik, Chief Executive Officer; and Gregg Milhaupt
> Email:    both lfarahnik@hpcindustries.com; and gregg@carbonliterecycling.com

> With a copy to:

> Pachulski Stang Ziehl & Jones LLP
> 10100 Santa Monica Blvd., 13th Floor
> Los Angeles, California 90067-4003 Attention:    Richard Pachulski Gabriel Glazer
> Email:    rpachulski@pszjlaw.com gglazer@pszjlaw.com

> And a copy to:

> Force 10 Partners LLC
> 20341 SW Birch Street, Suite 220

90

Newport Beach, CA 92660
Attention:      Brian Weiss
Email:          bweiss@force10partners.com

(b)      DIP Term Loan Agent and DIP Term Loan Collateral Agent:

Orion Energy Partners Investment Agent, LLC
292 Madison Avenue, Suite 2500
New York, NY 10118
Attention:      Gerrit Nicholas, Chris Leary and Mark Friedland
Email:          Gerrit@OrionEnergyPartners.com;
                Chris@OrionEnergyPartners.com;
                Mark@OrionEnergyPartners.com;
                CarbonLiteDealTeam@orionenergypartners.com

And a copy to:

AlixPartners, LLP
2000 Town Center, Suite 2400
Southfield, MI 48075
Attention:      Rodi Blokh and David Orlofsky
Email:          rblokh@alixpartners.com;
                dorlofsky@alixpartners.com;
                ENG-Project-Renew@groups.alixpartners.com

And a copy to:

Latham & Watkins LLP
885 Third Avenue
New York, NY 10022
Email:          carbonlite.lwteam@lw.com


(c)      If to a Lender, to it at its address (mail or email) set forth in its Administrative Questionnaire.

All notices and communications shall be effective when received by the addressee thereof during business hours on a Business Day in such Person's location as indicated by such Person's address in paragraphs (a) to (c) above, or at such other address as is designated by such Person in a written notice to the other parties hereto.

Section 10.02  Waivers; Amendments.

(a)      No Deemed Waivers; Remedies Cumulative.  No failure or delay on the part of any Agent or any Lender in exercising any right, power or privilege hereunder or under any other Financing Document and no course of dealing between any Loan Party, or any of the Borrower's Affiliates, on the one hand, and any Agent or Lender on the other hand, shall impair any such

91

right, power or privilege or operate as a waiver thereof; nor shall any single or partial exercise of any right, power or privilege hereunder or under any other Financing Document preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder or thereunder.  The rights, powers and remedies herein or in any other Financing Document expressly provided are cumulative and not exclusive of any rights, powers or remedies which any party thereto would otherwise have.  No notice to or demand on the Borrower in any case shall entitle the Borrower to any other or further notice or demand in similar or other circumstances or constitute a waiver of the rights of any Agent or any Lender to any other or further action in any circumstances without notice or demand.

(b)    <u>Amendments</u>.  No amendment or waiver of any provision of this Agreement or any other Financing Document (other than any Security Document, each of which may only be waived, amended or modified in accordance with such Security Document), and no consent to any departure by the Borrower shall be effective unless in writing signed by the DIP Term Loan Agent and the Borrower; <u>provided</u> that no such amendment, waiver or consent shall change the *pro rata* agreements in Section 7.02 without the consent of each Lender affected thereby, and <u>provided</u> <u>further</u> that (A) no amendment, waiver or consent shall, without the written consent of the relevant Agent, affect the rights or duties of such Agent under this Agreement or any other Financing Document and (B) any separate reimbursement or fee agreement between the Borrower and the DIP Term Loan Agent in its capacity as such or between the Borrower and the DIP Term Loan Collateral Agent in its capacity as such may be amended or modified by such parties.  Notwithstanding anything herein to the contrary, (x) the Loan Parties and the DIP Term Loan Collateral Agent may (but shall not be obligated to) amend or supplement any Security Document without the consent of the DIP Term Loan Agent to cure any ambiguity, defect or inconsistency which is not material, or to make any change that would provide any additional rights or benefits to the Lenders and (y) any Loan Party may amend, modify or supplement any annexes or schedules to the Security Documents as expressly provided therein (without the consent of any Agent, Lender or other secured party).

Section 10.03    <u>Expenses; Indemnity; Etc.</u>

(a)    <u>Costs and Expenses</u>.  Subject in all respects to the terms of the DIP Orders, the Loan Parties shall, jointly and severally, pay promptly following demand all legal, accounting, appraisal, consulting, financial advisory and other fees, costs and expenses (including, without limitation, in respect of the Specified Lender Advisors and the DIP Term Loan Counsel) incurred by the DIP Term Loan Agent,  the Lenders and their respective Affiliates in connection with the negotiation, preparation and administration of the Financing Documents, the Interim DIP Order, the Final DIP Order and the Sale Transaction or incurred in connection with, whether occurring before or after the Closing Date, the Chapter 11 Cases.  Without limiting the generality of the foregoing, such expenses, costs, charges and fees may include: fees, costs and expenses of accountants, sales consultants, financial advisors, the DIP Term Loan Counsel, any Specified Lender Advisor, environmental advisors, appraisers, investment bankers, management and other consultants and paralegals; court costs and expenses; photocopying and duplication expenses; court reporter fees, costs and expenses; air express charges, and expenses for travel, lodging and food paid or incurred in connection with the performance of such legal, professional or other advisory services.  All amounts reimbursable by the Borrower under this <u>Section 10.03</u> shall constitute Obligations secured by the Collateral.  The agreements in this <u>Section 10.03</u> shall

survive the termination of the Commitments and repayment of all other Obligations. All amounts due under this <u>Section 10.03</u> shall be paid within five (5) Business Days of receipt by the Borrower of an invoice relating thereto. If the Borrower fails to pay when due any amounts payable by it hereunder or under any Loan Document, such amount may be paid on behalf of the Borrower by the DIP Agent in its discretion by charging any loan account(s) of the Borrower, without notice to or consent from the Borrower, and any amounts so paid shall constitute Obligations hereunder. For the avoidance of doubt, this <u>Section 10.03</u> shall not apply to Taxes, except any Taxes that represent fees, costs and expenses arising from any non-Tax claim.

(b)    <u>Indemnification by the Loan Parties</u>.    Each Loan Party agrees jointly and severally to indemnify and hold harmless each of the Agents and the Lenders and their affiliates and their respective directors, officers, employees, administrative agents, attorneys-in-fact and controlling persons (each, an "<u>Indemnified Party</u>") from and against any and all losses, claims, damages and liabilities, joint or several, to which such Indemnified Party may become subject related to or arising out of any transaction contemplated by the Financing Documents or the execution, delivery and performance of the Financing Documents or any other document in any way relating to the Financing Documents and the transactions contemplated by the Financing Documents (including, for avoidance of doubt, any liabilities arising under or in connection with Environmental Law) and will reimburse any Indemnified Party for all expenses (including reasonable and documented outside counsel fees and expenses) as they are incurred in connection therewith. No Loan Party shall be liable under the foregoing indemnification provision to an Indemnified Party to the extent that any loss, claim, damage, liability or expense is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct. Each Loan Party also agrees that no Indemnified Party shall have any liability (whether direct or indirect, in contract or tort or otherwise) to it, or any of its security holders or creditors related to or arising out of the execution, delivery and performance of any Financing Document or any other document in any way relating to the Financing Documents or the other transactions contemplated by the Financing Documents, except to the extent that any loss, claim, damage or liability is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct as determined by a court of competent jurisdiction. To the extent permitted by Applicable Law, no party hereto shall assert and each party hereto hereby waives, any claim against any Indemnified Party or any other party hereto, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any Financing Document or any agreement or instrument contemplated hereby, any Loan or the use of the proceeds thereof. Paragraph (b) of this Section shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

(c)    <u>Indemnification by Lenders</u>.    To the extent that the Borrower fails to pay any amount required to be paid to any Agent, their affiliates or agents under <u>Section 10.03(a)</u> or <u>(b)</u>, each Lender severally agrees to pay ratably in accordance with the aggregate principal amount of the Loans held by the Lender to such Agent, affiliate or agent such unpaid amount; <u>provided</u> that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the

case may be, was incurred by or asserted against such Agent, affiliate or agent in its capacity as such.

(d)     Settlements; Appearances in Actions.  The Borrower agrees that, without each Indemnified Party's prior written consent, it will not settle, compromise or consent to the entry of any judgment in any pending or threatened claim, action or proceeding in respect of which indemnification could be sought by or on behalf of such Indemnified Party under this Section (whether or not any Indemnified Party is an actual or potential party to such claim, action or proceeding), unless such settlement, compromise or consent includes an unconditional release of such Indemnified Party from all liability arising out of such claim, action or proceeding.  In the event that an Indemnified Party is requested or required to appear as a witness in any action brought by or on behalf of or against the Borrower or any Affiliate thereof in which such Indemnified Party is not named as a defendant, the Borrower agrees to reimburse such Indemnified Party for all reasonable expenses incurred by it in connection with such Indemnified Party's appearing and preparing to appear as such a witness, including the reasonable and documented fees and disbursements of its legal counsel.  In the case of any claim brought against an Indemnified Party for which the Borrower may be responsible under this Section 10.03, the Agents and the Lenders agree (at the expense of the Borrower) to execute such instruments and documents and cooperate as reasonably requested by the Borrower in connection with the Borrower's defense, settlement or compromise of such claim, action or proceeding.

Section 10.04  Successors and Assigns.

(a)     Assignments Generally.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) the Loan Parties may not assign or otherwise transfer any of their rights or obligations hereunder without the prior written consent of the DIP Term Loan Agent (and any attempted assignment or transfer by such Loan Party without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section 10.04.  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants (to the extent provided in paragraph (f) of this Section) and, to the extent expressly contemplated hereby, the Indemnified Parties referred to in Section 10.03(b) and the Related Parties of each of the DIP Term Loan Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)     Assignments by Lenders.  Any Lender may assign to one or more Persons all or a portion of its rights and obligations under this Agreement (including all or a portion of its Loan at the time owing to it); provided that:

(i)     except in the case of an assignment to a Lender or an Affiliate or Related Fund of a Lender, the amount of the Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the DIP Term Loan Agent) shall not be less than $500,000 unless the DIP Term Loan Agent otherwise consent;

94

(ii)     except in the case of an assignment to a Lender or an Affiliate or Related Fund of a Lender, the DIP Term Loan Agent must give its prior written consent to such assignment; provided that such consent shall not be unreasonably withheld, conditioned or delayed;

(iii)     each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement;

(iv)     except in the case of an assignment to an Affiliate, the parties to each assignment shall execute and deliver to the DIP Term Loan Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500; and

(v)     the assignee, if it shall not be a Lender, shall deliver to the DIP Term Loan Agent an Administrative Questionnaire.

Upon acceptance and recording pursuant to paragraph (d) of this Section, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.09, 2.10 and 10.03). Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this paragraph shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (f) of this Section.

(c)     Maintenance of Register by the DIP Term Loan Agent. The DIP Term Loan Agent, acting for this purpose as an agent of the Borrower, shall maintain at one of its offices in New York City a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, principal amount of the Loans owing to each Lender pursuant to the terms hereof from time to time and the amount of any Accrued Interest owing from time to time (the "Register"). The entries in the Register shall be conclusive absent manifest error, and the Borrower, the DIP Term Loan Agent and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(d)     Effectiveness of Assignments. Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in paragraph (b) of this Section and any written consent to such assignment required by paragraph (b) of this Section, the DIP Term Loan Agent shall accept such Assignment and Assumption and record the information contained therein in

95

the Register.  No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

(e)     <u>Limitations on Rights of Assignees</u>.  An assignee Lender shall not be entitled to receive any greater payment under <u>Sections 2.09</u> or <u>2.10</u> than the assigning Lender would have been entitled to receive with respect to the interest assigned to such assignee (based on the circumstances existing at the time of the assignment), unless the Borrower's prior written consent has been obtained therefor.

(f)     <u>Participations</u>.  Any Lender may, without the consent of the Borrower or the DIP Term Loan Agent, sell participations to one or more banks or other entities (a "<u>Participant</u>") in all or a portion of such Lender's rights and obligations under this Agreement and the other Financing Documents (including all or a portion of the Loans owing to it); <u>provided</u> that (i) such Lender's obligations under this Agreement and the other Financing Documents shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (iii) the Loan Parties, the DIP Term Loan Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement and the other Financing Documents.  Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and the other Financing Documents and to approve any amendment, modification or waiver of any provision of this Agreement or any other Financing Document; <u>provided</u> that, such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in the first proviso to <u>Section 10.02(b)</u> that affects such Participant.  Subject to paragraph (g) of this Section, the Borrower agrees that each Participant shall be entitled to the benefits of <u>Sections 2.08</u> and <u>2.09</u> (subject to the requirements and limitations therein, including the requirements under <u>Section 2.08(e)</u> (it being understood that the documentation required under <u>Section 2.08(e)</u> shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section.  Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Financing Documents held by it (the "<u>Participant Register</u>"); <u>provided</u> that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any Commitments, Loan or its other obligations under any Financing Document) to any Person except to the extent that such disclosure is necessary to establish that such participation complies with <u>Section 10.14</u> and that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the Treasury Regulations and Section 1.163-5(b) of the Proposed Treasury Regulations (or any amended or successor version).  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  For the avoidance of doubt, the DIP Term Loan Agent (in its capacity as DIP Term Loan Agent) shall have no responsibility for maintaining a Participant Register.

(g)    <u>Limitations on Rights of Participants</u>.    A Participant shall not be entitled to receive any greater payment under <u>Sections 2.08</u> or <u>2.09</u> than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant.    A Participant shall not be entitled to the benefits of <u>Section 2.08</u> unless the Participant agrees, for the benefit of the Borrower, to comply with <u>Section 2.08(e)</u> as though it were a Lender (it being understood that the documentation required under <u>Section 2.08(e)</u> shall be delivered to the participating Lender).

(h)    <u>Certain Pledges</u>.

(i)    Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any such pledge or assignment to a Federal Reserve Bank, the European Central Bank or any other central bank or similar monetary authority in the jurisdiction of such Lender, and this Section shall not apply to any such pledge or assignment of a security interest; <u>provided</u> that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto; and <u>provided</u> <u>further</u> that any payment in respect of such pledge or assignment made by any Loan Party to or for the account of the pledging or assigning Lender in accordance with the terms of this Agreement shall satisfy such Loan Party's obligations hereunder in respect of such pledged or assigned Loan to the extent of such payment.

(ii)    Notwithstanding any other provision of this Agreement, any Lender may, without informing, consulting with or obtaining the consent of any other Party to the Financing Documents and without formality under any Financing Document, assign by way of security, mortgage, charge or otherwise create security by any means over, its rights under any Financing Document to secure the obligations of that Lender to any Person that would be a permitted assignee (without the consent of the Borrower or any Agent) pursuant to <u>Section 10.04(b)</u> including (A) to the benefit of any of its Affiliates and/or (B) within the framework of its, or its Affiliates, direct or indirect funding operations.

(i)    <u>No Assignments to the Borrower or Affiliates</u>.    Anything in this Section to the contrary notwithstanding, no Lender may assign or participate any interest in any Loan held by it hereunder to any Loan Party or any Affiliate of the Borrower without the prior written consent of each other Lender.

Section 10.05  <u>Survival</u>.    All covenants, agreements, representations and warranties made by the Loan Parties herein and in the certificates or other instruments delivered in connection with or pursuant to this Agreement shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement and the making of any Loan, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the DIP Term Loan Agent or any Lender may have had notice or knowledge of any Default or Event of Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any reimbursement, fee or any other amount

payable under this Agreement (other than any contingent indemnification or reimbursement amount not then due and payable) is outstanding and unpaid.  The provisions of <u>Sections 2.09</u>, <u>2.10</u>, <u>10.03</u>, <u>10.12</u>, <u>10.13</u> and <u>Article VIII</u> shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loan, the expiration or termination of the Commitments or the termination of this Agreement or any provision hereof.

Section 10.06 <u>Counterparts; Integration; Effectiveness</u>.  This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement and the other Financing Documents to which a Loan Party is party constitute the entire contract between and among the parties relating to the subject matter hereof and thereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  This Agreement shall become effective when it shall have been executed by the DIP Term Loan Agent and when the DIP Term Loan Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.  Delivery of an executed counterpart of a signature page to this Agreement by electronic transmission shall be effective as delivery of a manually executed counterpart of this Agreement.

Section 10.07 <u>Severability</u>.  Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

Section 10.08 <u>Right of Setoff</u>.  If an Event of Default shall have occurred and be continuing, each Lender and any of its Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held, and any other indebtedness at any time owing, by such Lender or any such Affiliate to or for the credit or the account of the Borrower against any of and all the obligations of the Borrower now or hereafter existing under this Agreement held by such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement and although such obligations may be unmatured or denominated in a currency other than Dollars.  The rights of each Lender or any such Affiliate under this Section are in addition to other rights and remedies (including other rights of setoff) which such Lender may have.

Section 10.09 <u>Governing Law; Jurisdiction; Etc.</u>

(a)     <u>Governing Law</u>.  This Agreement shall be construed in accordance with and governed by the law of the State of New York.

(b)     <u>Submission to Jurisdiction</u>.  Any legal action or proceeding with respect to this Agreement or any other Financing Document to which a Loan Party is a party shall be brought in the Bankruptcy Court and, by execution and delivery of this Agreement, each party hereto

US-DOCS\121174693.21

hereby irrevocably accepts for itself and in respect of its property, generally and unconditionally, the jurisdiction of the Bankruptcy Court.  Each party hereto agrees that a judgment, after exhaustion of all available appeals, in any such action or proceeding shall be conclusive and binding upon it, and may be enforced in any other jurisdiction, including by a suit upon such judgment, a certified copy of which shall be conclusive evidence of the judgment.

(c)     Waiver of Venue.  Each party hereto hereby irrevocably waives any objection that it may now have or hereafter have to the laying of the venue of any suit, action or proceeding arising out of or relating to this Agreement or any other Financing Document to which it is a party brought in the Bankruptcy Court and hereby further irrevocably waives any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

(d)     WAIVER OF JURY TRIAL.    EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING UNDER ANY FINANCING DOCUMENT OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO ANY FINANCING DOCUMENT, OR THE TRANSACTIONS RELATED THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER FOUNDED IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE SIGNATORIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

(e)     Service of Process.  Each party hereto irrevocably consents to the service of process in the manner provided for notices in Section 10.01.

(f)     Waiver of Immunity.  To the extent that a Loan Party has or hereafter may acquire any immunity from jurisdiction of any court or from any legal process (whether through service of notice, attachment prior to judgment, attachment in aid of execution, execution, sovereign immunity or otherwise) with respect to itself or its property, it hereby irrevocably waives such immunity, to the fullest extent permitted by law, in respect of its obligations under this Agreement and the other Financing Documents.

Section 10.10  Headings.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

Section 10.11  Confidentiality.

(a)     Each of the Agents and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (i) to its and its Affiliates' directors, officers, employees, board members (and members of committees thereof),

current or prospective limited partners, agents, consultants, Persons providing administration and settlement services and other professional advisors, including accountants, auditors, legal counsel and other advisors with a need to know (for purposes of this <u>Section 10.11</u>, the "<u>Representatives</u>") (it being understood that the Representatives will be informed of the confidential nature of such Information and instructed to keep such Information confidential, and that the applicable Agent or Lender responsible for such disclosure shall be responsible for any non-compliance with the foregoing by any such Representatives that do not have a separate confidentiality obligation to such Agent or Lender), (ii) to the extent requested by any applicable regulatory or supervisory body or authority, by applicable laws or regulations or by any subpoena, oral question posed at any deposition, interrogatory or similar legal process (including, for the avoidance of doubt, to the extent requested in connection with any pledge or assignment pursuant to <u>Section 10.04(h)</u>); <u>provided</u> that the party from whom disclosure is being required shall give notice thereof to the Borrower as soon as practicable (unless restricted from doing so and except where disclosure is to be made to a regulatory or supervisory body or authority during the ordinary course of its supervisory or regulatory function), (iii) to any other party to this Agreement, (iv) subject to an agreement containing provisions substantially the same as those of this paragraph, to any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement, (v) with the written consent of the Borrower, (vi) to the extent such Information (A) becomes publicly available other than as a result of a breach of this paragraph or (B) becomes available to any Agent or any Lender on a nonconfidential basis from a source other than the Borrower and such source is not, to the knowledge of such Agent or Lender, subject to subject to a confidentiality agreement with any Loan Party or (vii) to any Person with whom any Loan Party, an Agent or a Lender has entered into (or potentially may enter into), whether directly or indirectly, any transaction under which payments are to be made or may be made by reference to one or more Financing Documents and/or the Loan Parties or to any of such Person's Affiliates and Representatives. For the purposes of this paragraph, "Information" means all information received from any Loan Party or relating to any Borrower Group Member, or its respective business (including, for the avoidance of doubt, any information with respect to which any Loan Party owes any duty or obligation of confidentiality to any third-party), other than any such information that is available to the Agents or any Lender on a nonconfidential basis prior to disclosure by a Loan Party. Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

(b)     Upon written request after a discharge contemplated by <u>Section 9.03</u>, but no later than ten (10) Business Days thereafter, by any Loan Party, each Agent and Lender agrees to promptly return or destroy all copies of confidential Information and all notes, correspondence, documents or other records based thereon or which contain confidential Information ("<u>Derivate Documents</u>") which are then in the such Agent's or Lender's possession. Notwithstanding the foregoing, the Agents and Lenders and their Representatives shall be entitled to (i) retain copies of all Information provided to such Agent or Lender for legal, regulatory, and compliance purposes, in a manner consistent with the such Agent's or Lender's document archiving procedures, and which information shall remain confidential for the term of this Agreement so long as such Information is retained in a manner consistent with such Agent's or Lender's internal confidentiality policies, or (ii) to the extent that such Agent or Lender and its

Representatives have copies of computer records and files containing Information, which have been created as a result of automatic archiving or backup procedures, may retain such number of copies of the Information for legal, regulatory, and compliance purposes, in a manner consistent with such Agent's or Lender's and its Representatives' document archiving procedure, and which information shall remain confidential so long as such Information is retained in a manner consistent with such Agent's or Lender's and its Representatives' internal confidentiality policies. The Loan Party remains the owner of all its Information contained in all Derivate Documents. In addition, the Agents and Lenders shall not be obligated to return or destroy any Information contained in any documents or packages prepared for its board of directors or like body, but may retain such documents or packages in a manner consistent with such Agent's or Lender's internal confidentiality policies.

(c)     Notwithstanding anything to the contrary contained herein, the parties hereto acknowledge that the DIP Term Loan Agent and its respective affiliates and advisors and investors in funds managed by the foregoing Persons (collectively, the "Orion Energy Persons") are subject to compliance obligations mandated by various regulators, governmental agencies and taxation authorities; and in satisfaction of those compliance obligations, the Orion Energy Persons may disclose confidential Information in response to a broad information request not specifically targeted at Borrower, as required by such regulators, governmental agencies, and taxation authorities without notice to the Borrower and without obtaining assurances that information will be treated confidentially; and such disclosure shall not be a violation of this agreement; provided that if such regulators, governmental agencies and taxation authorities make information requests specifically targeted at or regarding the Borrower or any of its affiliates, the Orion Energy Persons will promptly notify the Borrower of such information request.

Section 10.12  No Third Party Beneficiaries.  The agreement of the Lenders to make the Loans to the Borrower on the terms and conditions set forth in this Agreement, is solely for the benefit of the Loan Parties, the Agents and the Lenders, and no other Person (including any Material Counterparty, contractor, subcontractor, supplier, workman, carrier, warehouseman or materialman furnishing labor, supplies, goods or services to or for the benefit of the Business) shall have any rights under this Agreement or under any other Financing Document or Material Agreement as against the Agent or any Lender or with respect to any extension of credit contemplated by this Agreement.

Section 10.13  Reinstatement.  The obligations of the Borrower under this Agreement shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of the Borrower in respect of the Secured Obligations is rescinded or must be otherwise restored by any holder of any of the Secured Obligations, whether as a result of any proceedings in Bankruptcy or reorganization or otherwise, and the Borrower agrees that it will indemnify each Secured Party on demand for all reasonable costs and expenses (including fees of counsel) incurred by such Secured Party in connection with such rescission or restoration, including any such costs and expenses incurred in defending against any claim alleging that such payment constituted a preference, fraudulent transfer or similar payment under any Bankruptcy, insolvency or similar law.

Section 10.14  USA PATRIOT Act.  Each Lender hereby notifies the Loan Parties that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law

October 26, 2001)) (the "USA PATRIOT Act"), it is required to obtain, verify and record information that identifies such Loan Party, which information includes the name and address of such Loan Party and other information that will allow such Lender to identify such Loan Party in accordance with the USA PATRIOT Act.

[Remainder of page intentionally left blank]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**CARBONLITE HOLDINGS LLC**, as the Borrower, a Debtor and a Debtor-in-Possession under Chapter 11 of the Bankruptcy Code

By:_____
    Name: Brian Weiss
    Title:  Chief Restructuring Officer

**CARBONLITE SUB-HOLDINGS LLC**, as a Guarantor, as a Debtor and a Debtor-in-Possession under Chapter 11 of the Bankruptcy Code

By CarbonLite Holdings, LLC, its sole member

By:_____
    Name: Brian Weiss
    Title:  Chief Restructuring Officer

**CARBONLITE PI HOLDINGS LLC**, as a Guarantor, as a Debtor and a Debtor-in-Possession under Chapter 11 of the Bankruptcy Code

By CarbonLite Sub-Holdings, LLC, its sole Member
    By CarbonLite Holdings, LLC, its sole member

By:_____
    Name: Brian Weiss
    Title:  Chief Restructuring Officer

**CARBONLITE INDUSTRIES LLC**,
as a Guarantor, as a Debtor and a Debtor-in-Possession under Chapter 11 of the Bankruptcy Code

> By CarbonLITE PI Holdings LLC, its sole Member
>> By CarbonLite Sub-Holdings, LLC, its sole Member
>>> By CarbonLite Holdings, LLC, its sole member

By:_____
　　Name: Brian Weiss
　　Title:　Chief Restructuring Officer

**CARBONLITE PINNPACK LLC**,
as a Guarantor, as a Debtor and a Debtor-in-Possession under Chapter 11 of the Bankruptcy Code

> By CarbonLITE PI Holdings LLC, its sole Member
>> By CarbonLite Sub-Holdings, LLC, its sole Member
>>> By CarbonLite Holdings, LLC, its sole member

By:_____
　　Name: Brian Weiss
　　Title:　Chief Restructuring Officer

*[Signature Page to DIP Term Loan Credit Agreement]*

**PINNPACK PACKAGING LLC**,
as a Guarantor, as a Debtor and a Debtor-in-Possession under Chapter 11 of the Bankruptcy Code

    By CarbonLITE Pinnpack, LLC, its Managing Member
        By CarbonLITE PI Holdings, LLC, its sole Member
            By CarbonLite Sub-Holdings, LLC, its sole Member
                By CarbonLite Holdings, LLC, its sole member

By:_____
    Name: Brian Weiss
    Title:  Chief Restructuring Officer

**PINNPACK P LLC**,
as a Guarantor, as a Debtor and a Debtor-in-Possession under Chapter 11 of the Bankruptcy Code

By:_____
    Name: Brian Weiss
    Title:  Chief Restructuring Officer

*[Signature Page to DIP Term Loan Credit Agreement]*

**ORION ENERGY PARTNERS INVESTMENT AGENT, LLC,**
as DIP Term Loan Agent and DIP Term Loan Collateral Agent


By:_____
    Name: Gerrit Nicholas
    Title: Managing Partner

ORION ENERGY CREDIT OPPORTUNITIES FUND II, L.P.,
as a Lender

By: Orion Energy Credit Opportunities Fund II GP, L.P.
Its: General Partner

By: Orion Energy Credit Opportunities Fund II Holdings, LLC
Its: General Partner


By:_____
    Name: Gerrit Nicholas
    Title: Managing Partner


ORION ENERGY CREDIT OPPORTUNITIES FUND II PV, L.P.,
as a Lender

By: Orion Energy Credit Opportunities Fund II GP, L.P.
Its: General Partner

By: Orion Energy Credit Opportunities Fund II Holdings, LLC
Its: General Partner


By:_____
    Name:             Gerrit           Nicholas
    Title: Managing Partner


*[Signature Page to DIP Term Loan Credit Agreement]*

ORION ENERGY CREDIT OPPORTUNITIES FUND II GPFA, L.P.,
as a Lender

By: Orion Energy Credit Opportunities Fund II GP, L.P.
Its: General Partner

By: Orion Energy Credit Opportunities Fund II Holdings, LLC
Its: General Partner


By:_____
    Name: Gerrit Nicholas
    Title: Managing Partner


ORION ENERGY CREDIT OPPORTUNITIES CARBONLITE CO-INVEST, L.P.,
as a Lender

By: Orion Energy Credit Opportunities Fund II GP, L.P.
Its: General Partner

By: Orion Energy Credit Opportunities Fund II Holdings, LLC
Its: General Partner


By:_____
    Name:    Gerrit    Nicholas
    Title: Managing Partner


*[Signature Page to DIP Term Loan Credit Agreement]*

**EXHIBIT A**
**TO**
**CREDIT AGREEMENT**

**Form of Assignment and Assumption**

This Assignment and Assumption (the "Assignment and Assumption") is dated as of the Effective Date set forth in item 9 below and is entered into by and between [the][each][1] Assignor identified in item 1 below ([the][each, an] "Assignor") and [the][each][2] Assignee identified in item 2 below ([the][each, an] "Assignee"). [It is understood and agreed that the rights and obligations of [the Assignors][the Assignees][3] hereunder are several and not joint.][4]  Capitalized terms used but not defined herein shall have the meanings given to them in the DIP Term Loan Credit Agreement identified in item 7 below (as amended, restated, supplemented or otherwise modified and in effect from time to time, the "DIP Term Loan Credit Agreement"), receipt of a copy of which is hereby acknowledged by [the][each] Assignee. The Standard Terms and Conditions set forth in Annex 1 (the "Standard Terms and Conditions") attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment and Assumption as if set forth herein in full.

For an agreed consideration, [the][each] Assignor hereby irrevocably sells and assigns to [the Assignee][the respective Assignees], and [the][each] Assignee hereby irrevocably purchases and assumes from [the Assignor][the respective Assignors], subject to and in accordance with the Standard Terms and Conditions and the DIP Term Loan Credit Agreement, as of the Effective Date inserted by the DIP Term Loan Agent as contemplated in item 9 below (the "Effective Date") (i) all of [the Assignor's][the respective Assignors'] rights and obligations in [its capacity as a Lender] [their respective capacities as Lenders] under the DIP Term Loan Credit Agreement and any other Financing Document or other documents or instruments delivered pursuant thereto to the extent related to the amount and percentage interest identified in item 8 below of all of such outstanding rights and obligations of [the Assignor][the respective Assignors] related to the tranche identified below and (ii) to the extent permitted to be assigned under Applicable Law, all claims, suits, causes of action and any other right of [the Assignor (in its capacity as a Lender)][the respective Assignors (in their respective capacities as Lenders)] against any Person, whether known or unknown, arising under or in connection with the DIP Term Loan Credit Agreement or other Financing Document, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including, but not limited to, contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned by [the] [any] Assignor to [the] [any] Assignee pursuant to clauses (i) and (ii) above being referred to herein

---

[1] *Note to Form*:  For bracketed language here and elsewhere in this form relating to the Assignor(s), if the assignment is from a single Assignor, choose the first bracketed language.  If the assignment is from multiple Assignors, choose the second bracketed language.

[2] *Note to Form*:  For bracketed language here and elsewhere in this form relating to the Assignee(s), if the assignment is to a single Assignee, choose the first bracketed language.  If the assignment is to multiple Assignees, choose the second bracketed language.

[3] *Note to Form*:  Select as appropriate.

[4] *Note to Form*:  Include and adjust as appropriate if there are either multiple Assignors or multiple Assignees.

Exhibit A-1

collectively as [the][an] "Assigned Interest"). Each such sale and assignment is without recourse to [the][any] Assignor and, except as expressly provided in this Assignment and Assumption, without representation or warranty by [the][any] Assignor.

1.      Assignor[s]:

2.      Assignee[s]: _____

        [if applicable, for each Assignee, indicate [Affiliate][Related Fund] of [identify Lender]]

3.      Borrower: CarbonLite Holdings, LLC

4.      Guarantors: CarbonLite Sub-Holdings, LLC, CarbonLite PI Holdings, LLC, CarbonLite Industries LLC, CarbonLite Pinnpack, LLC, PinnPack Packaging, LLC and PinnPack P, LLC

5.      DIP Term Loan Agent: Orion Energy Partners Investment Agent, LLC

6.      DIP Term Loan Collateral Agent: Orion Energy Partners Investment Agent, LLC

7.      DIP Term Loan Credit Agreement: The Senior Secured Super-Priority Debtor-in-Possession Term Loan Credit Agreement, dated as of March 8, 2021 among the Borrower, the Guarantors, the Lenders from time to time party thereto, the DIP Term Loan Agent and the DIP Term Loan Collateral Agent.

8.      Assigned Interest[s]:

| Assignor[s] | Assignee[s] | Aggregate Amount of Commitment/Loans of Assignor[s] | Amount of Commitment/ Loans Assigned[5] | Percentage Assigned of Commitment/ Loans[6] |
|---|---|---|---|---|
| | | $ | $ | % |
| | | $ | $ | % |
| | | $ | $ | % |

9.      Effective Date: _____ _____, 20____[7]

10.     [[Each][The] Assignor attaches the Note[s] held by it [and requests that the DIP Term Loan Agent exchange such Note[s] for new Note[s] payable to the [respective] Assignee in [an amount/amounts] equal to the [Commitment][and] [Loan[s]] assumed by the [respective] Assignee pursuant hereto [and to the [respective] Assignor in [an

---

[5] *Note to Form*: Include if the Assignee holds a Note, adjusting language as appropriate if the Assignee also elects to hold Notes.

[6] *Note to Form*: Set forth, to at least 9 decimals, as a percentage of the Commitment/Loans of all Lenders thereunder.

[7] *Note to Form*: To be inserted by DIP Term Loan Agent and to be the effective date of recordation of transfer in the register therefor.

Exhibit A-6

amount/amounts] equal to the [Commitment][and][Loan[s]] retained by the [respective] Assignor].]⁸

The terms set forth in this Assignment and Assumption are hereby agreed to as of the Effective Date:⁹

ASSIGNOR[S]

**[NAME OF ASSIGNOR]**

By: _____
     Name:
     Title:

**[NAME OF ASSIGNOR]**

By: _____
     Name:
     Title:

ASSIGNEE[S]

**[NAME OF ASSIGNEE]**

By: _____
     Name:
     Title:

**[NAME OF ASSIGNEE]**

By: _____
     Name:
     Title:

---

⁸ *Note to Form*: Include if the Assignee holds a Note, adjusting language as appropriate if the Assignee also elects to hold Notes.

⁹ *Note to Form*: Add signature blocks as necessary.

Exhibit A-6

Accepted by:

**ORION ENERGY PARTNERS INVESTMENT AGENT, LLC**, as DIP Term Loan Agent

By:  _____
                Name:
                Title:

Exhibit A-4

ANNEX 1
to Assignment and Assumption

**STANDARD TERMS AND CONDITIONS FOR
ASSIGNMENT AND ASSUMPTION**

1.      <u>Representations and Warranties</u>.

1.1      <u>Assignor[s]</u>. [The][Each] Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of [the][the relevant] Assigned Interest, (ii) [the][such] Assigned Interest is free and clear of any lien, encumbrance or other adverse claim and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the DIP Term Loan Credit Agreement or any other Financing Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Financing Documents or any collateral thereunder, (iii) the financial condition of the Borrower, any of its Affiliates or any other Person obligated in respect of any Financing Document or (iv) the performance or observance by the Borrower, any of its Affiliates or any other Person of any of their respective obligations under any Financing Document.

1.2      <u>Assignee[s]</u>. [The][Each] Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby and to become a Lender under the DIP Term Loan Credit Agreement, (ii) it meets all the requirements to be an assignee under Section 10.04(b) of the DIP Term Loan Credit Agreement (subject to such consents, if any, as may be required under Section 10.04(b) of the DIP Term Loan Credit Agreement), (iii) from and after the Effective Date, it shall be bound by the provisions of the DIP Term Loan Credit Agreement as a Lender thereunder and, to the extent of [the][the relevant] Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it is sophisticated with respect to decisions to acquire assets of the type represented by the Assigned Interest and either it, or the person exercising discretion in making its decision to acquire the Assigned Interest, is experienced in acquiring assets of such type, (v) it has received a copy of the DIP Term Loan Credit Agreement and the other Financing Documents to which the Assignor[s] [was][were] party, and has received or has been accorded the opportunity to receive copies of the most recent financial statements delivered pursuant to Section 5.10 of the DIP Term Loan Credit Agreement (if any), as applicable, and such other documents and information as it deems appropriate to make its own credit analysis and decision to enter into this Assignment and Assumption and to purchase [the][such] Assigned Interest, (vi) [it has duly executed and delivered to the

Exhibit A-5

DIP Term Loan Agent an Administrative Questionnaire,][10] (vii) it has, independently and without reliance upon the DIP Term Loan Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Assignment and Assumption and to purchase [the][such] Assigned Interest, and (ix) if it is entitled to an exemption from or reduction of withholding tax under the law of the jurisdiction in which the Borrower is organized (or any treaty to which such jurisdiction is a party), attached to the Assignment and Assumption is any documentation required to be delivered by it pursuant to the terms of the DIP Term Loan Credit Agreement, duly completed and executed by [the][such] Assignee; and (b) agrees that (i) [it will pay to the DIP Term Loan Agent, on or before the Effective Date, a processing and recordation fee in an amount of US $3,500.00,][11] (ii) it will, independently and without reliance on the DIP Term Loan Agent, [the] [any] Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Financing Documents, and [(ii)] [(iii)] it will perform in accordance with their terms all of the obligations which by the terms of the Financing Documents are required to be performed by it as a Lender.

2.      <u>Payments</u>. From and after the Effective Date, the DIP Term Loan Agent shall make all payments in respect of [the][each] Assigned Interest (including payments of principal, interest, fees and other amounts) to [the][the relevant] Assignor for amounts which have accrued to but excluding the Effective Date and to [the][the relevant] Assignee for amounts which have accrued from and after the Effective Date. Each party hereto agrees that it will hold any interest, fees or other amounts that it may receive to which the other party hereto shall be entitled pursuant to the preceding sentence for account of such other party and pay, in like money and funds, any such amounts that it may receive to such other party promptly upon receipt.

3.      <u>General Provisions</u>. This Assignment and Assumption shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns. This Assignment and Assumption may be executed in any number of counterparts, which together shall constitute one instrument. Delivery of an executed counterpart of a signature page of this Assignment and Assumption by telecopy shall be effective as delivery of a manually executed counterpart this Assignment and Assumption. This Assignment and Assumption shall be governed by, and construed in accordance with, the law of the State of New York.

---

[10] *Note to Form*: Delete if there is an assignment to a Lender pursuant to Section 10.04(b)(v) of the DIP Term Loan Credit Agreement.

[11] *Note to Form*: Delete with respect to Affiliate Assignees in accordance with Section 10.04(b)(iv) of the DIP Term Loan Credit Agreement.

**EXHIBIT B**
**TO**
**CREDIT AGREEMENT**

**Form of Note**

$[ ● ]                                                                                    [ ● ], 20[ ● ]

New York, New York

FOR VALUE RECEIVED, the undersigned (the "Borrower"), hereby promises to pay to [ ● ] (the "Lender"), at the office of the DIP Term Loan Agent as provided for by the DIP Term Loan Credit Agreement referred to below, for the account of the Lender, the principal sum of $[ ● ] (or such lesser amount as shall equal the aggregate unpaid principal amount of the Loans made by the Lender to the Borrower under the DIP Term Loan Credit Agreement), in lawful money of the United States of America and in immediately available funds, on the dates and in the principal amounts provided in the DIP Term Loan Credit Agreement, and to pay interest on the unpaid principal amount of each such Loan, at such office, in like money and funds, for the period commencing on the date of such Loan until such Loan shall be paid in full, at the rate per annum and on the dates provided in the DIP Term Loan Credit Agreement.

The date, amount and interest rate of each Loan made by the Lender to the Borrower, and each payment made on account of the principal thereof, shall be recorded by the Lender on its books and, prior to any transfer of this Note, endorsed by the Lender on the schedule attached hereto or any continuation thereof, provided that the failure of the Lender to make any such recordation or endorsement shall not affect the obligations of the Borrower to make a payment when due of any amount owing under the DIP Term Loan Credit Agreement or hereunder in respect of the Loans made by the Lender.

This Note evidences Loans made by the Lender under the Senior Secured Super-Priority Debtor-in-Possession Term Loan Credit Agreement dated as of March 8, 2021 (as amended, restated, supplemented or otherwise modified and in effect from time to time, the "DIP Term Loan Credit Agreement") among, the Borrower, the Guarantors, the Lenders from time to time party thereto, the DIP Term Loan Agent and the DIP Term Loan Collateral Agent. Terms used but not defined in this Note have the respective meanings assigned to them in the DIP Term Loan Credit Agreement.

The DIP Term Loan Credit Agreement provides for the acceleration of the maturity of this Note upon the occurrence of certain events and for prepayments of the Loans upon the terms and conditions specified therein.

Except as permitted by Section 10.04(b) of the DIP Term Loan Credit Agreement, this Note may not be assigned by the Lender to any other Person.

This Note shall be governed by, and construed in accordance with, the law of the State of New York.

US-DOCS\121409029.3

**CARBONLITE HOLDINGS, LLC,**
as Borrower

By:    _____
       Name:
       Title:

Exhibit B – 2

**Schedule of Loans**

This Note evidences Loans made under the within described DIP Term Loan Credit Agreement to the Borrower, on the dates, in the principal amounts and bearing interest at the rates set forth below, subject to the payments and prepayments of principal set forth below:

| Date | Principal Amount of Loan | Interest Rate | Amount Paid or Prepaid | Notation made by |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

US-DOCS\121409029.3

**EXHIBIT B-1**
**TO**
**CREDIT AGREEMENT**

FORM OF

U.S. TAX COMPLIANCE CERTIFICATE

(For Foreign Lenders That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Senior Secured Super-Priority Debtor-in-Possession Term Loan Credit Agreement, dated as of March 8, 2021 (as amended, restated, supplemented or otherwise modified and in effect from time to time, the "DIP Term Loan Credit Agreement"), among CarbonLite Holdings, LLC (the "Borrower"), the Guarantors, the Lenders from time to time party thereto and Orion Energy Partners Investment Agent, LLC (the "DIP Term Loan Agent").

Pursuant to the provisions of Section 2.08 of the DIP Term Loan Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) it is not a bank within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (iv) it is not a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the DIP Term Loan Agent and the Borrower with a certificate of its non-U.S. Person status on IRS Form W-8BEN or IRS Form W-8BEN-E. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrower and the DIP Term Loan Agent, and (2) the undersigned shall have at all times furnished the Borrower and the DIP Term Loan Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the DIP Term Loan Credit Agreement and used herein shall have the meanings given to them in the DIP Term Loan Credit Agreement.

[NAME OF LENDER]

By:_____
    Name:
    Title:
Date: _____ __, 20[  ]

Exhibit B-1– 1

**EXHIBIT B-2**
**TO**
**CREDIT AGREEMENT**

FORM OF

U.S. TAX COMPLIANCE CERTIFICATE
(For Foreign Participants That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Senior Secured Super-Priority Debtor-in-Possession Term Loan Credit Agreement, dated as of March 8, 2021 (as amended, restated, supplemented or otherwise modified and in effect from time to time, the "DIP Term Loan Credit Agreement"), among CarbonLite Holdings, LLC (the "Borrower"), the Guarantors, the Lenders from time to time party thereto and Orion Energy Partners Investment Agent, LLC (the "DIP Term Loan Agent").

Pursuant to the provisions of Section 2.08 of the DIP Term Loan Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the participation in respect of which it is providing this certificate, (ii) it is not a bank within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code, and (iv) it is not a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with a certificate of its non-U.S. Person status on IRS Form W-8BEN or IRS Form W-8BEN-E. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender in writing, and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the DIP Term Loan Credit Agreement and used herein shall have the meanings given to them in the DIP Term Loan Credit Agreement.

[NAME OF PARTICIPANT]

By:_____
    Name:
    Title:
Date: _____ __, 20[  ]

**EXHIBIT B-3**
**TO**
**CREDIT AGREEMENT**

FORM OF

U.S. TAX COMPLIANCE CERTIFICATE
(For Foreign Participants That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Senior Secured Super-Priority Debtor-in-Possession Term Loan Credit Agreement, dated as of March 8, 2021 (as amended, restated, supplemented or otherwise modified and in effect from time to time, the "DIP Term Loan Credit Agreement"), among CarbonLite Holdings, LLC (the "Borrower"), the Guarantors, the Lenders from time to time party thereto and Orion Energy Partners Investment Agent, LLC (the "DIP Term Loan Agent").

Pursuant to the provisions of Section 2.08 of the DIP Term Loan Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the participation in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such participation, (iii) with respect such participation, neither the undersigned nor any of its direct or indirect partners/members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or IRS Form W-8BEN-E or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN or IRS Form W-8BEN-E from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the DIP Term Loan Credit Agreement and used herein shall have the meanings given to them in the DIP Term Loan Credit Agreement.

[NAME OF PARTICIPANT]

By:_____
     Name:
     Title:
Date: _____ __, 20[  ]

US-DOCS\121409029.3

**EXHIBIT B-4**
**TO**
**CREDIT AGREEMENT**

FORM OF

U.S. TAX COMPLIANCE CERTIFICATE
(For Foreign Lenders That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Senior Secured Super-Priority Debtor-in-Possession Term Loan Credit Agreement, dated as of March 8, 2021 (as amended, restated, supplemented or otherwise modified and in effect from time to time, the "DIP Term Loan Credit Agreement"), among CarbonLite Holdings, LLC (the "Borrower"), the Guarantors, the Lenders from time to time party thereto and Orion Energy Partners Investment Agent, LLC (the "DIP Term Loan Agent").

Pursuant to the provisions of Section 2.08 of the DIP Term Loan Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such Loan(s) (as well as any Note(s) evidencing such Loan(s)), (iii) with respect to the extension of credit pursuant to this DIP Term Loan Credit Agreement or any other Financing Document, neither the undersigned nor any of its direct or indirect partners/members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the DIP Term Loan Agent and the Borrower with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or IRS Form W-8BEN-E or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN or IRS Form W-8BEN-E from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption.  By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrower and the DIP Term Loan Agent, and (2) the undersigned shall have at all times furnished the Borrower and the DIP Term Loan Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the DIP Term Loan Credit Agreement and used herein shall have the meanings given to them in the DIP Term Loan Credit Agreement.


[NAME OF LENDER]


By:_____
      Name:
      Title:
Date: _____ __, 20[  ]

**EXHIBIT C**
**TO**
**CREDIT AGREEMENT**

**Form of Borrowing Request**

[INSERT DATE]

Orion Energy Partners Investment Agent, LLC, as DIP Term Loan Agent and DIP Term
Loan Collateral Agent
292 Madison Avenue, Suite 2500
New York, NY 10118
Attention: Gerrit Nicholas, Chris Leary and Mark Friedland
Email: Gerrit@OrionEnergyPartners.com;
       Chris@OrionEnergyPartners.com;
       Mark@OrionEnergyPartners.com;
       CarbonLiteDealTeam@orionenergypartners.com

RE:    CarbonLite Holdings, LLC

Ladies and Gentlemen:

The undersigned refers to that certain Senior Secured Super-Priority Debtor-in-Possession Term Loan Credit Agreement dated as of March 8, 2021 (as amended, restated, supplemented or otherwise modified from time to time, the "DIP Term Loan Credit Agreement"), among CarbonLite Holdings, LLC, a Delaware limited liability company (the "Borrower"), the Guarantors, the Lenders from time to time party thereto, the DIP Term Loan Agent and the DIP Term Loan Collateral Agent. All capitalized terms used herein shall have the respective meanings specified in the DIP Term Loan Credit Agreement unless otherwise defined herein.

The undersigned hereby requests a borrowing of Loans under the DIP Term Loan Credit Agreement (the "Proposed Borrowing"), as follows:

(1)    The aggregate amount of the Proposed Borrowing by the Borrower is $[_____].[1]

(2)    The date of the Proposed Borrowing is [ ● ][2], 202[ ● ], which is a Business Day (the "Drawdown Date").

The undersigned Authorized Representative of the Borrower hereby certifies that, as of the date of this Borrowing Request and the Drawdown Date:

---

[1] *Note to Form*: The aggregate amount of the Borrowing on the Closing Date and any Funding Date shall not exceed the aggregate Commitment applicable to such Funding Date.

[2] *Note to Form*: In accordance with Section 2.01(d) of the DIP Term Loan Credit Agreement, each Funding Date shall be no earlier than 3 days after delivery of this Borrowing Request, unless consented to by the DIP Term Loan Agent.

Exhibit C – 1

US-DOCS\121409029.3

i.     the representations and warranties of each of the Loan Parties set forth in the DIP Term Loan Credit Agreement and the other Financing Documents are true and correct in all material respects (except where already qualified by materiality or Material Adverse Effect, in such case, in all respects);

ii.     no Default or Event of Default has occurred and is continuing on, or will result as a result of the transactions contemplated to occur on the date hereof or the Drawdown Date; and

iii.     no development, event or circumstance that has had or could reasonably be expected to have a Material Adverse Effect has occurred and is continuing, or will result from the transactions contemplated to occur on the date hereof or the Drawdown Date.

*[signature page follows]*

Exhibit C – 3

**CARBONLITE HOLDINGS, LLC,**
as Borrower


By:  _____
      Name:
      Title:

Exhibit C – 3

**EXHIBIT D**
**TO**
**CREDIT AGREEMENT**

[Reserved]

US-DOCS\121409029.3

**EXHIBIT E**
**TO**
**CREDIT AGREEMENT**

**Form of Initial 13-Week Budget**

[*Please see attached*]

US-DOCS\121409029.3

**EXHIBIT F**
**TO**
**CREDIT AGREEMENT**

[Reserved]

US-DOCS\121409029.3

**EXHIBIT G**
**TO**
**CREDIT AGREEMENT**

<u>**Form of Security Agreement**</u>

[*Please see attached*]

**EXHIBIT H**
**TO**
**CREDIT AGREEMENT**

[Reserved]

**EXHIBIT I**
**TO**
**CREDIT AGREEMENT**

## Form of Interim DIP Order

[*Please see attached*]

Exhibit I – 1

**EXHIBIT J**
**TO**
**CREDIT AGREEMENT**

[Reserved]

US-DOCS\121409029.3