# **EXHIBIT C**

**DIP ABL Credit Agreement**

[Execution Version]

<u>RATIFICATION AND AMENDMENT AGREEMENT</u>

This RATIFICATION AND AMENDMENT AGREEMENT, dated as of March ___, 2021  (this "Ratification Agreement" as hereinafter further defined), is entered into by and among Bank Leumi USA ("Lender"), Carbonlite PI Holdings, LLC, a Delaware limited liability company, as Debtor and Debtor-in-Possession ("CL PI Holdings" or "Guarantor"), Carbonlite Industries LLC, a Delaware limited liability company, as Debtor and Debtor-in-Possession ("CL Industries"), Carbonlite Pinnpack, LLC, a Delaware limited liability company, as Debtor and Debtor-in-Possession ("CL Pinnpack"), and Pinnpack Packaging, LLC, a Delaware limited liability company, as Debtor and Debtor-in-Possession ("Pinnpack", and together with, CL Industries and CL Pinnpack, individually, a "Borrower", and collectively, the "Borrowers," and together with Guarantor, individually, a "Loan Party" and collectively, "Loan Parties").

<u>W I T N E S S E T H</u>:

WHEREAS, each Loan Party has commenced a case under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the District of Delaware, and each Loan Party has retained possession of its assets and is authorized under the Bankruptcy Code to continue the operation of its businesses as a debtor-in-possession;

WHEREAS, prior to the commencement of the Chapter 11 Cases (as defined below), Lender has made loans and advances and provided other financial accommodations to Borrowers secured by substantially all of the assets and properties of Loan Parties as set forth in the Existing Loan Documents (as defined below);

WHEREAS, Borrowers have requested that Lender make post-petition loans and advances and provide other financial accommodations to Borrowers secured by substantially all of the assets and properties of Loan Parties as set forth in the Financing Orders (as defined below) and the Loan Documents (as defined below) and make certain amendments to the Existing Credit Agreement, and Lender is willing to do so, subject to (a) entry by the Bankruptcy Court (as defined below) of an Interim Financing Order (as defined below) and (b) the other terms and conditions contained herein; and

WHEREAS, each Loan Party desires to reaffirm its obligations to Lender pursuant to the Existing Loan Documents and acknowledge its continuing liabilities to Lender thereunder in order to induce Lender to make such post-petition loans and advances and provide such other financial accommodations, to Borrowers;

NOW, THEREFORE, in consideration of the foregoing, the mutual covenants and agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Lender and Borrowers mutually covenant, warrant and agree as follows:

1.    <u>Definitions</u>.

1.1    <u>Additional Definitions</u>.  The Existing Credit Agreement and the other Existing Loan Documents shall be deemed and are hereby amended to include, in addition and not in limitation, each of the following definitions:

"Approved Budget" has the meaning set forth in Section 4.3 of the Ratification Agreement.

"Bankruptcy Code" shall mean the United States Bankruptcy Code, being Title 11 of the United States Code as enacted in 1978, as the same has heretofore been or may hereafter be amended, recodified, modified or supplemented, together with all rules, regulations and interpretations thereunder or related thereto.

"Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware.

"Budget" means, collectively, the CL Industries Budget and the Pinnpack Budget.

"Budget Compliance Report" shall have the meaning assigned to such term in Section 4.3 of the Ratification Agreement.

"Carve-Out" has the meaning set forth in the Financing Orders.

"Chapter 11 Cases" means the Chapter 11 cases of the Debtors, which are being jointly administered under the Bankruptcy Code and are pending in the Bankruptcy Court.

"CL Industries Budget" means a thirteen (13) consecutive week (or such longer or other period as is acceptable to Lender) budget for CL Industries received by Lender, in form and substance satisfactory to Lender, which sets forth cash receipts, manufacturing expenditures, operating expenditures, capital expenditures, restructuring items (including professional fees), financing cash flows, cash and loan balances, gross accounts receivable, inventory, and borrowing base rollforwards, available collateral, and net availability for each week of such thirteen (13) consecutive week (or such other) period, as it may be updated from time to time and as updated, in form and substance satisfactory to Lender.

"CL P" means CarbonLite P LLC, a Delaware limited liability company.

"CL P Holdings" means CarbonLite P Holdings LLC, a Delaware limited liability company.

"CL Recycling" means CarbonLite Recycling LLC, a Delaware limited liability company.

"CL Recycling Holdings" means CarbonLite Recycling Holdings LLC, a Delaware limited liability company.

"CRO Report" has the meaning set forth in Section 6.9 of the Ratification Agreement.

"Debtors" means, collectively, Loan Parties, each as debtor and debtor-in-possession in the Chapter 11 Cases.

"DIP Closing Date" means the date on which each of the conditions precedent set forth in Section 7 of the Ratification Agreement has been satisfied or waived, but in no event later than March [__], 2021.

"DIP ABL Facility" means the senior secured asset-based loan facility provided by Lender to Debtors as debtors and debtors-in-possession during the Chapter 11 Cases pursuant to the Existing Credit Agreement as ratified and amended pursuant to the terms of the Ratification Agreement.

"DIP Term Agent" means Orion Energy Partners Investment Agent, LLC, a Delaware limited liability company, as administrative agent and collateral agent, under the DIP Term Loan Agreement.

"DIP Term Loan Facility" means the senior secured term loan facility provided to Holdings as borrower as debtor and debtor-in-possession in an aggregate principal amount not to exceed $20,000,000 (for new money commitments) pursuant to the DIP Term Loan Agreement.

"DIP Term Loan Agreement" means the Senior Secured Super-Priority Debtor-in-Possession Term Loan Credit Agreement, dated as of March ___, 2021, among Holdings, as borrower, a Debtor and a Debtor-in-Possession, certain other subsidiaries of Holdings, as guarantors, each as a Debtor and a Debtor-in-Possession, the lenders party thereto, and Orion Energy Partners Investment Agent, LLC, a Delaware limited liability company, as administrative agent and collateral agent.

"Existing Credit Agreement" means the Credit Agreement, dated as of September 19, 2019, by and among Lender and Loan Parties, as amended by First Amendment and Waiver to Credit Agreement, dated as of September 16, 2020 and Second Amendment and Waiver to Credit Agreement, dated as of December 10, 2020, as in effect immediately prior to the Petition Date.

"Existing Loan Documents" means the Loan Documents, as defined in the Existing Credit Agreement, in each instance, as in effect immediately prior to the Petition Date.

"Final Financing Order" means the final order of the Bankruptcy Court entered in the Chapter 11 Cases authorizing the DIP ABL Facility after a final hearing of the Bankruptcy Court, which order shall be in form and substance satisfactory to Lender, together with all extensions, modifications and amendments thereto, on the terms and conditions set forth in the Ratification Agreement, granting to Lender the senior security interests and liens described therein and super-priority administrative expense claims described therein (except as otherwise expressly provided in the Interim Financing Order), and modifying the automatic stay and other provisions required by Lender and its counsel, and such order shall be in full force and effect and shall not have been reversed, modified, amended, stayed or vacated in a manner inconsistent with the terms of this Ratification Agreement without the prior written consent of Lender.

"Financing Order" means the Interim Financing Order, the Final Financing Order and such other orders relating thereto or authorizing the granting of credit by Lender to Debtors on an emergency, interim or permanent basis pursuant to Section 364 of the Bankruptcy Code as may be issued or entered by the Bankruptcy Court in the Chapter 11 Cases.

"Holdings" means CarbonLite Holdings, LLC, a Delaware limited liability company, as debtor and debtor-in-possession.

"Initial Budget" means the CL Industries Budget and Pinnpack Budget each included as Exhibit A to the Ratification Agreement, for the period commencing with the week ending March 14, 2021, as the same may be updated, amended, or modified from time to time with the written consent of Lender. Lender acknowledges and agrees that the Initial Budget attached hereto is approved by, and satisfactory to, Lender.

"Interim Financing Order" means an order of the Bankruptcy Court entered in the Chapter 11 Cases after an interim hearing, in the form included as Exhibit B to the Ratification Agreement or otherwise in form and substance satisfactory to Lender, together with all extensions, modifications, and amendments thereto consented to by Lender, which, among other matters but not by way of limitation, authorizes, on an interim basis, Loan Parties to execute and perform under the terms of Existing Credit Agreement and the other Existing Loan Documents, in each case, as ratified and amended by the terms and conditions of the Ratification Agreement.

"Investment Banker Report" has the meaning set forth in Section 6.9 of the Ratification Agreement.

"Material Budget Deviation" has the meaning set forth in Section 4.3 of the Ratification Agreement.

"Material Indebtedness Facility" means each of the DIP ABL Facility, the Texas DIP Facility, the Pennsylvania DIP Facility, the Indebtedness represented by the Pennsylvania Bond Documents or the Texas Bond Documents and the Indebtedness represented by any Term Loan Documents.

"Measurement Period" has the meaning set forth in Section 4.3 of the Ratification Agreement.

"Milestones" has the meaning set forth in Section 4.4 of the Ratification Agreement.

"Pinnpack Budget" means a thirteen (13) consecutive week (or such longer or other period as is acceptable to Lender) budget for Pinnpack received by Lender, in form and substance satisfactory to Lender, which sets forth cash receipts, manufacturing expenditures, operating expenditures, capital expenditures, restructuring items (including professional fees), financing cash flows, cash and loan balances, gross accounts receivable, inventory, and borrowing base rollforwards, available collateral, and net availability for each week of such thirteen (13) consecutive week (or such other) period, as it may be updated from time to time and as updated, in form and substance satisfactory to Lender.

"Pinnpack Facility" means the PET thermoforming and processing facility located in Oxnard, California, directly owned by Pinnpack.

"Pennsylvania Bond Documents" means (i) the Indenture of Trust, dated as of June 1, 2019, by and between The Pennsylvania Economic Development Financing Authority, as issuer and UMB Bank, N.A., as trustee, (ii) supplemented by the First Supplemental Indenture, effective as of September 1, 2020, by and between The Pennsylvania Economic Development Financing Authority, as issuer and UMB Bank, N.A., as trustee, (iii) the Loan Agreement, dated as of June 1, 2019 (as amended by the First Amendment to Loan Agreement, effective as of September 1, 2020), by and between The Pennsylvania Economic Development Financing Authority and CL P and (iv) the documents entered into in connection therewith.

"Pennsylvania DIP Budget" means the budget required to be delivered under the Pennsylvania DIP Facility.

"Pennsylvania DIP Facility" means the Superpriority Secured Debtor-In-Possession Credit Agreement, dated as of March [__], 2021, among CL P, as borrower, CL P Holdings, the other parties party thereto, as subsidiary guarantors and UMB Bank, N.A. as administrative agent and collateral agent, delivered pursuant to Section 7.9.

"Pennsylvania Facility" means the pcrPET processing facility under construction in Reading, Pennsylvania, to be owned and operated by CL P.

"Petition Date" means the date of the commencement of the Chapter 11 Cases.

"Post-Petition Collateral" means, collectively, all now existing and hereafter acquired real and personal property of each Debtor's estate, wherever located, of any kind, nature or description, including any such property in which a lien is granted to Lender pursuant to the Loan Documents or a Financing Order, and shall include, without limitation:

      (a)  all of the Pre-Petition Collateral;

(b)  Accounts;

(c)  Chattel Paper;

(d)  Commercial Tort Claims;

(e)  Deposit Accounts;

(f)  Documents;

(g)  General Intangibles;

(h)  Goods, including Equipment and Fixtures;

(i)  Instruments;

(j)  Inventory;

(k)  Investment Property;

(l)  Letters of Credit and Letter-of-Credit Rights;

(m) Money and other assets of Grantor that now or later come into possession, custody, or control of Lender;

(n)  all Accessions and Supporting Obligations;

(o)  all books and records relating to the above property or any other Post-Petition Collateral;

(p)  all proceeds (as such term is defined in the UCC) and products, whether tangible or intangible of any of the above property, all proceeds of any condemnation award relating to any of the above property, all proceeds of insurance covering or relating to any or all of the above property and all rebates and returns relating to any of the above property;

(q)  all proceeds recovered by or on behalf of each Debtor or any trustee of such Debtor (whether in the Chapter 11 Cases or any subsequent case to which any of the Chapter 11 Cases is converted) as a result of transfers or obligations avoided or actions maintained or taken pursuant to Sections 542, 545, 547, 548, 549, 550, 551, 552 and 553 of the Bankruptcy Code, subject to the entry of the Final Financing Order;

(r)  all assets of such Debtor not otherwise subject to a valid and enforceable security interest and lien in favor of Lender on the Petition Date, subject to the entry of the Interim Financing Order; and

(s)  to the extent not otherwise included, all proceeds of the foregoing.

"Post-Petition Obligations" means those Obligations arising on and after the Petition Date and whether arising on or after the conversion or dismissal of the Chapter 11 Cases, or before, during and after the confirmation of any plan of reorganization in the Chapter 11 Cases, and whether arising under or related to the Ratification Agreement, the Credit Agreement, the other Loan Documents, a Financing Order, by operation of law or otherwise, and whether incurred by such Loan Party as principal, surety, endorser, guarantor or otherwise and including, without limitation, all principal, interest, financing charges, letter of credit fees, unused line fees, servicing fees, line increase fees, debtor-in-possession

facility fees, early termination fees, other fees, commissions, costs, expenses and attorneys', accountants' and consultants' fees and expenses incurred in connection with any of the foregoing.

"Pre-Petition Collateral" means, collectively, (a) all "Collateral" as such term is defined in the Existing Credit Agreement as in effect immediately prior to the Petition Date, (b) all "Collateral" and "Pledged Collateral" as such terms are defined in each of the other Existing Loan Documents as in effect immediately prior to the Petition Date, and (c) all other security for the Pre-Petition Obligations as provided in the Existing Credit Agreement and the other Existing Loan Documents immediately prior to the Petition Date.

"Pre-Petition Intercreditor Agreement" means the Intercreditor Agreement, dated as of September 16, 2019, between Lender and Pre-Petition Term Agent.

"Pre-Petition Obligations" means those Obligations arising at any time before the Petition Date under the Existing Loan Documents.

"Pre-Petition Term Agent" means Orion Energy Partners Investment Agent, LLC, as administrative agent and collateral agent under the Credit Agreement, dated as of August 2, 2019, among Holdings, as borrower, and certain other subsidiaries of Holdings, as guarantors, the lenders party thereto, and Orion Energy Partners Investment Agent, LLC, a Delaware limited liability company, as administrative agent and collateral agent.

"Professional Fees" means, to the extent allowed at any time, whether by interim or final compensation order, all unpaid fees and expenses incurred by persons or firms retained by the Loan Parties pursuant to sections 327, 328, or 363 of the Bankruptcy Code.

"Ratification Agreement" means the Ratification and Amendment Agreement dated as of March ___, 2021, by and among Loan Parties and Lender, as the same may be amended, modified, supplemented, extended, renewed, restated or replaced.

"Riverside Facility" means the pcrPET processing facility located in Riverside, California, directly owned by CL Industries.

"Sale Process" means the marketing and sale process for the Sale Transaction, in accordance with the Milestones and otherwise satisfactory to Lender.

"Sale Transaction" has the meaning set forth in Section 4.4 of the Ratification Agreement.

"Specified Defaults" means all Events of Default that exist or have occurred as of the DIP Closing Date immediately prior to the effectiveness of the DIP ABL Facility.

"Texas Bond Documents" means (a) the Indenture, dated as of October 1, 2016, by and between The Mission Economic Development Corporation, as issuer and UMB Bank, N.A., as trustee, (b) the Loan Agreement, dated as of October 1, 2016, by and between The Mission Economic Development Corporation and CL Recycling and (c) the documents entered into in connection therewith.

"Texas DIP Budget" means the budget required to be delivered under the Texas DIP Facility.

"Texas DIP Facility" means the Superpriority Secured Debtor-In-Possession Credit Agreement, dated as of March [___], 2021, among CL Recycling, as borrower, CL Recycling Holdings, the other

parties party thereto, as subsidiary guarantors and UMB Bank, N.A. as administrative agent and collateral agent delivered pursuant to Section 7.9.

"Texas Facility" means the pcrPET processing facility located in Dallas, Texas, directly owned by CL Recycling.

1.2    Amendments to Definitions.

(a)    The definition of "Agreement" in the Existing Credit Agreement or "Credit Agreement" in the other Existing Loan Documents is hereby amended by adding immediately prior to the "." at the end thereof:

(including as amended by the Ratification Agreement and as ratified, assumed and adopted by each Loan Party as debtor and debtor-in-possession pursuant to the terms thereof and the Financing Orders, and as amended and supplemented thereby, as the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced).

(b)    The definition of "Applicable Margin" in the Existing Credit Agreement is hereby amended and restated in its entirety as follows:

"Applicable Margin" means four percent (4.00%).

(c)    The definition of "Collateral" in the Existing Credit Agreement and the other Existing Loan Documents, or any other term referring to the security for the Pre-Petition Obligations, is hereby amended by adding immediately prior to the "." at the end thereof:

(including, collectively, the Pre-Petition Collateral and the Post-Petition Collateral).

(d)    The definition of "Borrower," "Borrowers," "Guarantor", "Guarantors", "Debtor", "Debtors," "Loan Party" or "Loan Parties" in the Existing Credit Agreement and the other Existing Loan Documents are each hereby amended by adding immediately prior to the "." at the end thereof:

(and including its or their respective successors and assigns, including any trustee or other fiduciary hereafter appointed as its legal representative or with respect to the property of the estate of such entity whether under Chapter 11 of the Bankruptcy Code or any subsequent Chapter 7 case and its successor upon conclusion of the Chapter 11 Case of such entity).

(e)    The definition of "Loan Documents" in the Existing Credit Agreement and the other Existing Loan Documents is hereby amended by adding immediately prior to the "." at the end thereof:

(and including, in addition and not in limitation, the Ratification Agreement and all of the Existing Loan Documents, as ratified, assumed and adopted by each Loan Party as debtor and debtor-in-possession pursuant to the terms of the Ratification Agreement, and as amended and supplemented thereby, and each Financing Order, as each of the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced).

(f)    The definition of "Material Adverse Effect" in the Existing Credit Agreement and the other Existing Loan Documents is hereby amended by adding immediately prior to the "." at the end thereof:

(it being understood that the commencement of the Chapter 11 Cases, the events that customarily occur following the commencement of a proceeding under Chapter 11 of the Bankruptcy Code (including any action required to be taken under the Loan Documents or under a Financing Order), any defaults under agreements that have no material adverse effect on the Loan Parties either currently existing as of the Petition Date or under the terms of the Bankruptcy Code as a result of the commencement of the Chapter 11 Cases, and any "going concern" or other qualification, exception or explanatory note in the Loan Parties' audited financial statements shall not be deemed a material adverse change).

(g)  The definition of "Obligations" in the Existing Credit Agreement and the other Existing Loan Documents is hereby amended by adding immediately prior to the "." at the end thereof:

(and including, the Pre-Petition Obligations and the Post-Petition Obligations).

(h)  The definition of "Reserves" in the Existing Credit Agreement is hereby amended by adding the following at the end thereof:

In addition, and without limitation of, any of the foregoing,  reserves will be established in respect of (a) reserves provided for in any Financing Order to the extent provided for therein, if any, (b) the amount of any senior liens or senior claims in or against the types or categories of assets constituting RCF Priority Collateral (as defined in the Pre-Petition Intercreditor Agreement) that have priority over the liens and claims of Lender, and (c) the amount of priority or administrative expense claims which are superior to or rank in parity with Lender's superpriority claim (other than the superpriority claim of DIP Term Agent under the DIP Term Loan Facility or the Carve-Out so long as the Carve-Out does not at any time constitute such a senior claim with respect to the claim of Lender) or which Lender determines may need to be paid in order to preserve or protect such assets or would be required to be paid before any of the Obligations due Lender during the Chapter 11 Cases.  Specific reserves established in respect of liabilities that have been paid will be released based on the amount paid in respect of such liabilities.  To the extent that fees, costs or expenses of Lender are included in, and paid in accordance with, an Approved Budget, so long as there is no Default or Event of Default, Lender will release the reserves for such items.  Upon receipt of confirmation satisfactory to Lender that there are no liens in respect of California real property or personal property taxes on the assets of Borrowers, Lender will release the existing reserves in respect of such liabilities.

(i)  The definition of "Maturity Date" in the Existing Credit Agreement is hereby amended and restated in its entirety as follows:

"Maturity Date" means the earliest to occur of (a) the date that is one hundred twenty (120) days after the Petition Date, (b) the date that is thirty-five (35) days (or such later date as Lender may agree) after the Petition Date if the Final Financing Order has not been entered prior to the expiration of such thirty-five (35) day period, (c) the date the Bankruptcy Court orders the conversion of the Chapter 11 Cases to a Chapter 7 liquidation or the dismissal of the Chapter 11 Cases, (d) the acceleration of the loans and the termination of the commitment under the DIP Term Loan Facility or the DIP ABL Facility or (e) the sale of all or substantially all of the Loan Parties' assets under Section 363 of the Bankruptcy Code, including the Sale Transaction.

(j)  The definition of "Maximum Credit" in the Existing Credit Agreement is hereby amended and restated in its entirety as follows:

"Maximum Credit" means the amount of $18,500,000, subject to reduction as provided in Section 6.4 of the Ratification Agreement.

1.3    Interpretation.

(a)    For purposes of this Ratification Agreement, unless otherwise defined or amended herein, including, but not limited to, those terms used or defined in the recitals hereto, all terms used herein shall have the respective meanings assigned to such terms in the Existing Credit Agreement, as amended by this Ratification Agreement.

(b)    All references to the terms "Borrowers", "Guarantors", "Debtors" or "Loan Parties" in any of the Existing Loan Documents shall be deemed and each such reference is hereby amended to mean and include (as applicable) the Debtors, each as defined herein, and their successors and assigns (including any trustee or other fiduciary hereafter appointed as any Debtor's legal representative, as applicable, or with respect to any Debtor the property of the estate of such Debtor whether under Chapter 11 of the Bankruptcy Code or any subsequent Chapter 7 case or cases and its successor upon conclusion of the Chapter 11 Case of such Debtor, as the case may be).

(c)    All terms not expressly defined herein which are defined in the Uniform Commercial Code, as in effect in the State of New York as of the date hereof, shall have the meaning set forth therein, except that the term "Lien" or "lien" shall have the meaning set forth in Section 101(37) of the Bankruptcy Code.

(d)    All limits and sublimits set forth in the Credit Agreement, and any formula or other provision to which a limit or sublimit may apply, shall be determined on an aggregate basis considering together both the Pre-Petition Obligations and the Post-Petition Obligations.

(e)    Unless otherwise indicated herein, all references to time of day refer to Eastern Standard Time or Eastern Daylight Saving Time, as in effect in New York City on such day. For purposes of the computation of a period of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each means "to and including"; provided, that, with respect to a computation of fees or interest payable to Lender, such period shall in any event consist of at least one full day.

2.    Acknowledgment.

2.1    Pre-Petition Obligations.  Each Loan Party hereby acknowledges, confirms and agrees that, as of March 5, 2021, Loan Parties are jointly and severally indebted to Lender in respect of all Pre-Petition Obligations in the aggregate principal amount of not less than $7,784,755.94, consisting of Revolving Loans to Borrowers made pursuant to the Existing Loan Documents, together with interest accrued and accruing thereon, and all costs, expenses, fees (including attorneys' fees and legal expenses) accrued and owing by Borrowers pursuant to the terms of the Existing Loan Documents, all of which are unconditionally owing by Loan Parties to Lender, without offset, defense or counterclaim of any kind, nature and description whatsoever.

2.2    Acknowledgment of Security Interests.  Each Loan Party hereby acknowledges, confirms and agrees that Lender, (a) has and shall continue to have valid, enforceable and perfected first priority and senior security interests in and liens (subject as to priority to those Permitted Liens that have priority by operation of law, which shall not include the Carve-Out) upon all Pre-Petition Collateral that is RCF Priority Collateral (as defined in the Pre-Petition Intercreditor Agreement) heretofore granted to Lender pursuant to the Existing Loan Documents as in effect immediately prior to the Petition Date to

secure all of the Obligations, (b) has and shall continue to have valid, enforceable and perfected second priority and subordinate security interests in and liens upon all Pre-Petition Collateral that is Term Loan Priority Collateral (i) subject as to priority as to those Permitted Liens that have priority by operation of law, (ii) with respect to the claims of Lender, subject to the Carve-Out and (iii) to the extent provided in the Pre-Petition Intercreditor Agreement, subject to the senior security interests and liens in favor of the Pre-Petition Term Agent upon all Pre-Petition Collateral that is Term Loan Priority Collateral, and (c) shall have valid and enforceable security interests in and liens upon all Post-Petition Collateral granted to Lender  under the Loan Documents or hereunder or under any of the other Loan Documents or otherwise granted to or held by Lender having the priorities set forth in the Loan Documents and the Financing Orders, as the case may be, and (i) subject as to priority as to those Permitted Liens that have priority by operation of law, (ii) to the extent provided in the Pre-Petition Intercreditor Agreement, subject to the senior security interests and liens in favor of the Pre-Petition Term Agent upon all Pre-Petition Collateral that is Term Loan Priority Collateral, and (iii) any other Liens expressly permitted by the Financing Orders that under the terms thereof have priority over the security interests and liens in favor of Lender.

2.3  Binding Effect of Documents.  Each Loan Party hereby acknowledges, confirms and agrees that: (a) each of the Existing Loan Documents to which it is a party was duly executed and delivered to Lender by such Loan Party and each is in full force and effect as of the date hereof, (b) the agreements and obligations of such Loan Party contained in the Existing Loan Documents constitute the legal, valid and binding obligations of such Loan Party enforceable against it in accordance with the terms thereof, and such Loan Party has no valid defense, offset or counterclaim to the enforcement of such obligations, and (c) Lender is and shall be entitled to all of the rights, remedies and benefits provided for in the Loan Documents and the Financing Orders.

2.4  Adoption and Ratification for DIP ABL Facility.  Each Loan Party hereby (a) ratifies, restates, assumes, adopts, affirms and confirms all of the terms and conditions of the Existing Loan Documents, as amended and supplemented pursuant hereto and pursuant to the Financing Orders, and each Loan Party agrees to be fully bound, as Debtor and Debtor-in-Possession, by the terms of the Loan Documents to which such Loan Party is a party and (b) agrees to pay all of the Pre-Petition Obligations in accordance with the terms of such Existing Loan Documents, as amended by this Ratification Agreement, and in accordance with the Financing Orders.  All of the Existing Loan Documents are hereby incorporated herein by reference and hereby are and shall be deemed adopted and assumed in full by each Loan Party, each as Debtor and Debtor-in-Possession, and considered as agreements between such Loan Party, on the one hand, and Lender, on the other hand.

3.  Grant of Security Interest for DIP ABL Facility.  As collateral security for the prompt performance, observance and payment in full of all of the Obligations (including the Pre-Petition Obligations and the Post-Petition Obligations), each Loan Party, each as debtor and debtor-in-possession, hereby grants, pledges and assigns to Lender, and also confirms, reaffirms and restates the prior grant to Lender of, continuing security interests in and liens upon, and rights of setoff against, all of the Collateral.

4.  Additional Representations, Warranties and Covenants for DIP ABL Facility.  In addition to the continuing representations, warranties and covenants heretofore and hereafter made by Loan Parties to Lender, whether pursuant to the Loan Documents or otherwise, and not in limitation thereof, each Loan Party hereby represents, warrants and covenants to Lender the following (which shall survive the execution and delivery of this Ratification Agreement), the truth and accuracy of which, or compliance with, shall be a continuing condition of the making of Revolving Loans or issuance of a Letter of Credit by Lender:Financing Order.  Each of the Interim Financing Order (with respect to the period on and after the entry of the Interim Financing Order and prior to the entry of the Final Financing Order) and the Final Financing Order (with respect to the period on and after the entry of the Final Financing Order) has been

duly entered and (a) has not been vacated, reversed on appeal, or stayed, or modified or amended (other than, in the case of a modification or amendment, as consented to by Lender), and (b) after the DIP Closing Date, is not subject to any pending appeal or motion for leave to appeal or other proceeding to set aside any such order or other challenge in any material respect to any of the terms of such order with respect to Lender, its rights or remedies or the term of the DIP ABL Facility provided for in such order, provided, that, after review of the subject of any such appeal, motion or other proceeding, Lender may in its discretion waive or agree to modify this condition to the making of Revolving Loans thereafter.  If requested by Borrower Agent, without limitation of the rights of Lender hereunder, Agent will consult with Borrower Agent with respect to such appeal, motion or other proceeding.Use of Proceeds.  All Revolving Loans and Letters of Credit provided by Lender to Borrowers under the DIP ABL Facility pursuant to the Financing Orders, the Credit Agreement or otherwise, shall be used by Borrowers to repay the Obligations under the Existing Credit Agreement in accordance with the Financing Orders, and for working capital and general corporate purposes of Borrowers, including allowed administrative expenses incurred during the Chapter 11 Cases, all substantially consistent with each Budget pursuant to Section 4.3 of this Ratification Agreement; provided, that, in no event shall the use of such proceeds result in variances from any Budget that would be an Event of Default and in no event shall any proceeds be used in connection with the Pennsylvania Facility or Texas Facility or any business other than the businesses of CL Industries and Pinnpack.  In addition, no portion of the proceeds of the Revolving Loans, Letters of Credit or the Collateral may be used:for any purpose that is prohibited under the Bankruptcy Code or any Financing Order;

(b)  to commence or support, or to pay any professional fees incurred in connection with, any adversary proceeding, motion or other action that seeks to challenge, contest or otherwise seek to impair or object to the validity, extent, enforceability or priority of any liens or other rights under the Existing Credit Agreement or any of the Loan Documents or to otherwise finance in any way any contested matter, adversary proceeding, suit, arbitration, application or other litigation of any type against Lender or to contest its rights and remedies under the Loan Documents (including any of the Existing Loan Documents) or any Financing Order, except to the extent for any investigation as permitted by a Financing Order;

(c)  to prevent, hinder or delay enforcement or realization upon the Collateral or the exercise of rights once an Event of Default has occurred and is continuing (subject to the Financing Order) by Lender; and

(d)  to make any distribution under a plan of reorganization confirmed in the Chapter 11 Cases that does not provide for the indefeasible payment of the Obligations in full and in cash on the effective date of such plan.

Nothing herein shall in any way prejudice or prevent Lender from objecting, for any reason, to any requests, motions, or applications made in the Bankruptcy Court, including any application of final allowances of compensation for services rendered or reimbursement of expenses incurred under Sections 105(a), 330 or 331 of the Bankruptcy Code, by any party in interest.

4.3    Budget.

(a)  Borrowers have prepared and delivered to Lender each Initial Budget.  Each Initial Budget has been prepared by Borrowers in good faith and based upon Borrowers' best information as to the items contained therein.  Lender hereby acknowledges and agrees that each Initial Budget is approved by and satisfactory to Lender.  The Initial Budget is and shall be the DIP Budget unless and until replaced in accordance with terms of Section 4.3(b).  Borrowers will act strictly in accordance with, and comply with, each Budget that is in form and substance satisfactory to Lender and has been approved by it (in the

case of a CL Industries Budget, each, an "Approved CL Industries Budget" and in the case of a Pinnpack Budget, each an "Approved Pinnpack Budget," and together with an Approved CL Industries Budget, an "Approved Budget"), and Lender has relied upon each Initial Budget in determining to enter into this Ratification Agreement and has relied upon, and will be relying on, in providing the DIP ABL Facility. No Budget shall be updated, amended or modified except with the prior written consent of Lender.

(b)  Borrowers shall deliver to Lender an updated CL Industries Budget and an updated Pinnpack Budget (in each case which shall be in form and substance acceptable to Lender) one time in each six (6) consecutive week period commencing with the sixth (6th) full week after the DIP Closing Date for the thirteen (13) week period (or other period through the Maturity Date) commencing on the Sunday immediately following such Thursday (provided, that, any revisions projected in any Budget for the same periods covered by the most recent prior Budget shall be satisfactory to Lender and such updated Budget shall identify such variances and the amounts thereof and include an explanation with reasonable detail as to the basis for such variances). Each such updated CL Industries Budget and Pinnpack Budget delivered to Lender shall be accompanied by such supporting documentation as is consistent with documentation and information provided in connection with each Initial Budget or as modified or supplemented to address any events, conditions or circumstances since the preparation of the Initial Budget at times and in a manner reasonably requested by Lender.   Each such Budget shall be prepared in good faith based upon assumptions believed by Borrowers to be reasonable.

(c)  Borrowers shall deliver to Lender on or before 8:00 p.m. on Thursday of each week commencing on the Thursday of the second full calendar week following the DIP Closing Date: (i) a certificate signed by a Responsible Officer of Borrowers certifying that Borrowers are in compliance with Sections 4.3(a) and (b) above and that no Default or Event of Default has occurred, or if such a Default or Event of Default has occurred, specifying the nature and extent thereof and any corrective action taken or proposed to be taken with respect thereto and (ii) a report in form reasonably satisfactory to Lender (a "Budget Compliance Report") that sets forth as of the preceding Sunday of each such week, for the prior week and on a cumulative basis from the Petition Date through the second (2nd) full week after the Petition Date and then (A) on a cumulative basis, (B) on a weekly basis and (C) on a rolling two-week basis, in each case at all times thereafter, the actual cash receipts, disbursements and other line items from time to time specified by Lender with respect to the Measurement Period then most recently ended, and setting forth (1) all variances, on a line item by line item basis and a cumulative basis, from the actual receipts and disbursements for such period against those reflected for the corresponding period in the applicable Approved Budget as in effect for such period, (2) a description of the nature of any material positive or negative variance in each line item in the applicable Approved Budget as in effect for such period, (3) an indication as to whether such variance is temporary or permanent and analysis and explanations for such variance, (4) compliance or non-compliance with such maximum variances set forth therein, and (5) explanations for all violations, if any, of any covenant and if any such violation exists, the actions which Borrowers have taken or intend to take with respect thereto.  Such reports shall be certified by the Chief Restructuring Officer (or other senior financial officer acceptable to Lender) and shall be in a form (to be supplied by Lender), and shall contain supporting information reasonably requested by Lender.

(d)  Borrowers shall be deemed in compliance with the then applicable Approved Budget to the extent:

(i)  the aggregate operating disbursements (which shall consist of manufacturing expenditures, operating expenditures, capital expenditures, and restructuring items as set forth therein, but exclude Professional Fees and restructuring charges arising on account of the Chapter 11 Cases (including U.S. Trustee fees and professional fees and expenses incurred by any official committee appointed in the Chapter 11 Cases or Lender, DIP Term Loan Agent, the lenders under the DIP Term Loan Facility and/or

the Loan Parties or paid by the Loan Parties as adequate protection) made by CL Industries do not exceed one hundred ten percent (110%) of the operating disbursements set forth in the Approved CL Industries Budget with respect to any Measurement Period;

(ii)    the aggregate receipts of CL Industries are not less than eighty-five percent (85%) of the receipts set forth in the Approved CL Industries Budget with respect to any Measurement Period;

(iii)    the aggregate amount of pounds shipped of CL Industries shall not be less than ninety percent (90%) of the projected amount set forth in the Approved CL Industries Budget with respect to any Measurement Period;

(iv)    the Excess Availability of CL Industries shall be not less than $1.00 at any time;

(v)    the aggregate operating disbursements (which shall consist of manufacturing expenditures, operating expenditures, capital expenditures, and restructuring items as set forth therein, but exclude Professional Fees and restructuring charges arising on account of the Chapter 11 Cases (including U.S. Trustee fees and professional fees and expenses incurred by any official committee appointed in the Chapter 11 Cases or Lender, DIP Term Loan Agent, lenders under the Term Loan Facility and/or the Loan Parties or paid by the Loan Parties as adequate protection) made by Pinnpack do not exceed one hundred ten percent (110%) of the operating disbursements set forth in the Approved Pinnpack Budget with respect to any Measurement Period;

(vi)    the aggregate receipts of Pinnpack are not less than eighty-five percent (85%) of the receipts set forth in the Approved Pinnpack Budget with respect to any Measurement Period;

(vii)    the aggregate amount of pounds shipped of Pinnpack shall not be less than ninety percent (90%) of the projected amount set forth in the Approved Pinnpack Budget with respect to any Measurement Period;

(viii) the Excess Availability of Pinnpack shall be not less than $1.00 at any time.

(ix)    the Obligations do not exceed the availability under the Borrowing Base for the applicable period.

For purposes hereof, the term "Measurement Period" means, as to operating disbursements, receipts and sales, the immediately preceding rolling two-week period based on the weekly periods provided for in each Budget.  Any variance in amounts for such disbursements, receipts or pounds shipped excess of the variance provided for such item above shall be a "Material Budget Deviation."

(e)  Each Loan Party hereby confirms, acknowledges and agrees that, unless waived in writing by Lender, (i) a Material Budget Deviation, (ii) the failure to deliver any Budget or Budget Compliance Report as required by Section 4.3(b) hereof, or (iii) if the Revolving Loans exceed the Borrowing Base, it shall in each case constitute an Event of Default.  Notwithstanding any approval by Lender of any Budget, Lender will not, and shall not be required to, provide any Revolving Loans or Letters of Credit to Borrowers pursuant to any Budget, but shall only provide Revolving Loans and Letters of Credit in accordance with the terms and conditions set forth in the Existing Credit Agreement as amended by this Ratification Agreement, the other Loan Documents and the Financing Orders.  Lender is relying upon the Borrowers' delivery of, and compliance with, each Budget in accordance with this Section 4.3 in determining to enter into the post-petition financing arrangements provided for herein.

(f)  Notwithstanding any projected amounts set forth in any Budget relating to the costs and expenses of Lender that are reimbursable by any Loan Party or any other amounts owing by any Loan Party to Lender (including, without limitation, reasonable attorneys and consulting fees and expenses) in accordance with the Credit Agreement and the other Loan Documents, such projections shall not limit, impair, modify or waive the obligations of any Loan Party to pay the actual amounts due to Lender in respect of such costs, expenses and other amounts owing to Lender in accordance with the Credit Agreement and the other Loan Documents.

(g)  Each Loan Party acknowledges and agrees that Lender shall not be responsible for, or have any liability or obligation to ensure the payment of, any costs and expenses set forth in any Budget or any other claims asserted or incurred in connection with any Loan Parties' business or in the Chapter 11 Cases, and nothing in this Ratification Agreement or otherwise shall be construed to obligate Lender in any way, to pay, fund, or ensure that any Loan Party has sufficient funds to pay any such costs and expenses.

(h)  Notwithstanding anything to the contrary in the Loan Documents, or otherwise, all Revolving Loans shall be used by Borrowers only in accordance with the then applicable Approved Budget.  Each Loan Party agrees that it shall be an additional Event of Default under the Loan Documents if Borrowers use proceeds of any Revolving Loans made by Lender on and after the DIP Closing Date for any expense that is not set forth in the Approved Budget for the period of time on or before the date such expense is to be paid in the applicable Approved Budget, except as Lender may consent in writing.

4.4  <u>Bankruptcy and Sale Milestones</u>.  Each Loan Party covenants and agrees to satisfy each of the following conditions (the "Milestones"):

(a)  On the Petition Date, Loan Parties shall file a motion, in form and substance satisfactory to Lender, requesting approval from the Bankruptcy Court of the DIP ABL Facility on the terms and conditions contemplated by the Credit Agreement (as amended by this Ratification Agreement), granting to Lender the security interests and liens and super-priority administrative expense claim status described above, modifying the automatic stay and other provisions required by Lender and its counsel.

(b)  By no later than three (3) days following the Petition Date, the Bankruptcy Court shall enter the Interim Financing Order, in form and substance acceptable to Lender.

(c)  By no later than ten (10) days following the Petition Date, the Loan Parties shall have filed a motion seeking approval of the bidding procedures in form and substance acceptable to Lender, including a form of asset purchase agreement, in form and substance acceptable to Lender.

(d)  By no later than thirty-five (35) days following the Petition Date, the Bankruptcy Court shall enter the Final Financing Order, in form and substance acceptable to Lender.

(e)  By no later than thirty (30) days following the Petition Date, Loan Parties shall have obtained entry of an order from the Bankruptcy Court approving bidding procedures in respect of a sale of all or substantially all of Loan Parties' assets to be implemented pursuant to Section 363 of the Bankruptcy Code and that, in all respects, is acceptable to Lender (a "Sale Transaction"), which procedures are in form and substance acceptable to Lender (the "Bidding Procedures Order").

(f)  By no later than sixty (60) days following the Petition Date, Loan Parties shall conduct the auction, if necessary, for all or substantially all of Loan Parties' assets pursuant to Section 363 of the Bankruptcy Code and in accordance with the Bidding Procedures Order.

(g)  By no later than sixty-two (62) days following the Petition Date, the Bankruptcy Court shall hold a hearing regarding approval of the Sale Transaction, which shall be on terms and conditions acceptable to Lender.

(h)  By no later than sixty-five (65) days following the Petition Date, the Bankruptcy Court shall have approved the Sale Transaction and entered an order in form and substance acceptable to Lender approving the Sale Transaction, which order shall (i) approve the asset purchase agreement, which shall be in form and substance acceptable to Lender and (ii) shall provide for, among other things, distribution of sale proceeds to Lender in a minimum cash amount not less than the amount required to pay in full all of the Obligations and the termination of the DIP ABL Facility.

(i)  By no later than seventy-five (75) days following the Petition Date, the Sale Transaction shall have closed; provided that if regulatory approvals associated with a Sale Transaction remain pending as of such date, such date shall be automatically extended to the date that is the third business day following receipt of all necessary regulatory approvals.

(j)  Following the Petition Date, the Loan Parties shall satisfy the milestones set forth in the Investment Banker Report, in a form to be agreed between the Loan Parties and Lender, in accordance with the requirements set forth therein.

Each Loan Party confirms, acknowledges and agrees that notwithstanding anything to the contrary contained in the Credit Agreement, any failure to comply with the requirements set forth in this Section 4.4 shall constitute an additional immediate Event of Default under the Credit Agreement; provided, that, in the event that the DIP Term Agent agrees to extend any sale milestone set forth in any of Section 5.22(b), (d), (e), (f), (g) or (h) of the DIP Term Loan Agreement  from the date of such milestone set forth in the DIP Term Loan Agreement (as in effect on the date hereof), Lender shall consent to the same extension of the same sale milestone set forth in Section 4.4(c), (e), (f), (g), (h) or (i) of this Ratification Agreement (as in effect on the date hereof) that corresponds to such milestone in the DIP Term Loan Agreement, as applicable, provided, that, (i) the aggregate number of days of all of such extensions shall not exceed thirty (30) days from the date of such milestones as set forth herein (as in effect on the date hereof) and (ii) the Excess Availability at each of CL Industries and Pinnpack shall, during each such extension period, be in an amount not less than $1.00 at any time.

4.5    [Reserved]

4.6    Investment Banker. Borrowers have advised Lender that Borrowers have retained Jeffries LLC as an investment banker (together with its successors and assigns, including any replacement in such capacity, the "Investment Banker"), to assist Loan Parties in the sale of all or substantially all businesses and properties of Loan Parties, which shall, among other things, include assistance in the preparation of a confidential sale memorandum, the distribution to prospective purchasers of the confidential information memorandum and other disclosure materials and the solicitation and management of bids.  Each Loan Party has authorized and directed the Investment Banker to share with Lender all reports and other information prepared by or in the possession of the Investment Banker relating to the sale process.  Each Loan Party shall cause the Investment Banker to keep Lender fully informed of the progress of the sale of the business pursuant to the reports and other information to be provided as set forth in Section 6.9 hereof and to the extent that Lender may from time to time request any additional information related thereto as may be appropriate in the determination of Lender, after notice to Borrower Agent, to provide such information to Lender. Lender shall use reasonable efforts to coordinate any requests for additional information with DIP Term Agent under the DIP Term Loan Agreement to the extent reasonably practical.  If the Investment Banker resigns, Borrowers shall immediately notify Lender in writing and provide Lender with a copy of any notice of resignation

immediately upon the sending of such notice by such Investment Banker. Any replacement or successor Investment Banker shall be subject to the approval of Lender, such approval not to be unreasonably withheld and shall be retained pursuant to a new retention agreement on terms and conditions reasonably acceptable to Lender (in consultation with Borrower Agent and the DIP Term Agent) within five (5) Business Days immediately following the notice of resignation of the resigning Investment Banker, or within such longer period of time as Lender may agree in writing.  Notwithstanding the foregoing, in the event the consulting parties are not able to agree to the identity of, or the terms and conditions for the retention of, a successor Investment Banker, the Borrowers may seek approval for such retention with the Bankruptcy Court.  Failure to comply with the terms and conditions of this Section shall constitute an Event of Default.

4.7    Chief Restructuring Officer.  Borrowers shall retain, at all times during which this Ratification Agreement remains in effect,  on terms and conditions acceptable to Lender and at the sole cost and expense of Borrowers, Force 10 Partners LLC as  represented by Brian Weiss, or such other Person acceptable to Lender, in its sole discretion, as its chief restructuring officer (the "Chief Restructuring Officer").  Lender acknowledges and agrees that the terms and conditions of the retention of the Chief Restructuring Office as in effect on the date hereof are acceptable to Lender.  The Chief Restructuring Officer shall assume the management of the businesses, accounts and properties of Loan Parties and shall, among other things, assist in the preparation of the Budget and compliance with the terms and conditions set forth in the Loan Documents. The Chief Restructuring Officer shall report directly to the Board of Directors or Members, as applicable, of Loan Parties.  Each Loan Party hereby irrevocably authorizes and directs the Chief Restructuring Officer to consult with Lender and to share with Lender all Budgets, records, projections, financial information, reports and other information prepared by or in the possession of the Chief Restructuring Officer relating to the Collateral, or the financial condition or operations of the business of each Loan Party and subject to the other terms of this Section 4.7, respond fully to any reasonable inquiries of Lender regarding the assets, prospects, business and operations of Loan Parties and communicate and fully cooperate with Lender.  Promptly following any request therefor, each Loan Party shall provide, and cause the Chief Restructuring Officer to provide, Lender with such information regarding the operations, business affairs and financial condition of any Loan Party as Lender may request, provided, that, Lender shall use reasonable efforts to obtain such information at the same time and in the same manner as such information may be made available to DIP Term Agent under the DIP Term Loan Agreement to the extent reasonably practical.  Each Loan Party agrees to provide the Chief Restructuring Officer with reasonable access to the books and records of such Loan Party, all of the premises of such Loan Party and to all management of Loan Parties as and when deemed necessary or appropriate by the Chief Restructuring Officer.  Each Loan Party shall not amend or modify, or terminate, the retention agreement with the Chief Restructuring Officer without the prior written consent of Lender.  If the Chief Restructuring Officer resigns, Loan Parties shall immediately notify Lender in writing and provide Lender with a copy of any notice of resignation immediately upon the sending of such notice by such Chief Restructuring Officer.  Any replacement or successor Chief Restructuring Officer shall be subject to approval by Lender, such approval not to be unreasonably withheld, and shall be retained pursuant to a new retention agreement on terms and conditions reasonably acceptable to Lender (in consultation with Borrower Agent and the DIP Term Agent) within five (5) Business Days immediately following the notice of resignation of the resigning Chief Restructuring Officer, or within such longer period of time as Lender may agree in writing. Notwithstanding the foregoing, in the event the consulting parties are not able to agree to the identity of, or the terms and conditions for the retention of, a successor Chief Restructuring Officer, the Borrowers may seek approval for such retention with the Bankruptcy Court.  Failure to comply with the terms and conditions of this Section shall constitute an Event of Default.

4.8    Lender Financial Consultant.  Each Loan Party hereby acknowledges and agrees that, without limitation of any rights or remedies of Lender under the Credit Agreement, the other Loan

Documents or applicable law, (a) Lender or its counsel may at any time and from time to time on and after the DIP Closing Date, retain one or more financial or business consultant(s) (each, a "Consultant") on terms and conditions acceptable to Lender or its counsel in connection with this Ratification Agreement and the other Loan Documents; (b) subject to the terms of the Financing Orders, and consistent with the customary practice of Lender, Lender may charge all fees and out-of-pocket costs and expenses of any such Consultant to any Loan Account of Borrowers with Lender, which fees and out-of-pocket costs and expenses shall constitute expenses of Lender subject to Section 7.13 of the Credit Agreement and shall be payable upon demand; and (c) Loan Parties shall cooperate with Lender and the Consultant and provide Lender and Consultant with reasonable access to the books and records of the Loan Parties, all of the premises of the Loan Parties, and to all management of the Loan Parties as and when deemed reasonably necessary by Lender or such Consultant, in each case with reasonable advance notice to any Borrower.

4.9   <u>Waiver of Certain Rights</u>.  Each Loan Party hereby agrees that it shall not, and hereby waives any right that it may have to, seek authority (a) to use cash collateral of Lender under Section 363 of the Bankruptcy Code, except to the extent provided in any Financing Order, without the prior written consent of Lender, (b) to obtain post-petition loans or other financial accommodations, other than from Lender and under the DIP Term Loan Facility, pursuant to Sections 364(c) or (d) of the Bankruptcy Code without the prior written consent of Lender, (c) to challenge, contest or otherwise seek to impair or object to the validity, extent, enforceability or priority of Lender's post-petition liens and claims, (d) to challenge the application of any payments or collections received by Lender to the obligations of the Loan Parties as provided for herein, (e) to propose or support a plan of reorganization in the Chapter 11 Cases that does not provide for the indefeasible payment in full and satisfaction of all Obligations on the effective date of such plan, (f) to surcharge the Collateral pursuant to Section 506(c) of the Bankruptcy Code, or (g) subject to the terms of a Financing Order, to seek relief under the Bankruptcy Code, including, without limitation, under Section 105 of the Bankruptcy Code, to the extent any such relief would in any way restrict or impair the rights and remedies of Lender as provided herein, in the Loan Documents or the Financing Orders.  If any Loan Party violates such covenant, the Loan Parties agree to pay, in addition to such other damages as Lender may sustain as a result of such violation, all reasonable and documented attorneys' fees and costs incurred by Lender as a result of such violation.

5.   <u>DIP ABL Facility Fee</u>.  Borrowers shall pay to Lender a debtor-in-possession financing facility fee, in the amount of two percent (2%) of the Maximum Credit (as in effect on the DIP Closing Date), on account of the financing provided by Lender to Borrowers in the Chapter 11 Cases, which fee shall be fully earned on the DIP Closing Date and due and payable in the amount of one percent (1%) of the Maximum Credit on the DIP Closing Date and with the other one percent (1%) of the Maximum Credit due and payable on the the Maturity Date (or if earlier, the termination of the DIP ABL Facility or such other time as all of the other Obligations are payable, whether upon an Event of Default or for any other reason).  Such fee may be charged directly to the loan account of any Borrower maintained by Lender.

6.   <u>DIP ABL Facility Amendments</u>.

6.1   <u>Revolving Loans</u>.

(a)   In accordance with the rights of Lender in the Credit Agreement, at all times hereafter, any Revolving Loan made by Lender and the issuance of any Letter of Credit shall be in their sole and absolute discretion; except, that, subject to the terms and conditions of the Credit Agreement, the other Loan Documents and the Financing Order, and including the satisfaction of all conditions precedent thereto (other than (i) the absence of a Default or Event of Default to the extent of the Specified Defaults, but not any other Events of Default, and (ii) the accuracy of representations and warranties, to the extent

such representations and warranties are not accurate as a result of the Specified Defaults, but not any other Events of Default), Lender shall make Revolving Loans upon the request of a Borrower each Business Day to the operating account of the applicable Borrower in such amounts as are requested by such Borrower for use in funding disbursements in accordance with the applicable Approved Budget in each case to the extent necessary to provide for payment of such amounts that are to be presented for payment from such operating account on such Business Day or the next Business Day.  The making of any Revolving Loan or issuance of any Letter of Credit by Lender at any time after the date hereof shall not be deemed to be a waiver of any Event of Default which may at any time exist or of any of the rights or remedies of Lender pursuant to the Credit Agreement, the other Loan Documents, applicable law or otherwise.

(b)  With respect to further credit after expiration of the Interim Financing Order, on or before the expiration of the Interim Financing Order, the Bankruptcy Court shall have entered a Final Financing Order authorizing the secured financing on the terms and conditions set forth in this Ratification Agreement, granting to Lender the senior security interests and liens described herein and super-priority administrative expense claims described herein (except as otherwise specifically provided in the Interim Financing Order), and modifying the automatic stay and other provisions required by Lender.  Lender shall not provide any Revolving Loans (or other financial accommodations) other than those authorized under the Interim Financing Order unless, on or before the expiration of the Interim Financing Order, the Final Financing Order shall have been entered, and such order shall be in full force and effect and shall not have been reversed, modified, amended, stayed or vacated in a manner inconsistent with the terms of this Ratification Agreement without the prior written consent of Lender.

6.2    Borrowing Base Certificate.  Commencing with the week beginning March 8, 2021, the Loan Parties shall deliver to Lender a Borrowing Base Certificate, together with a payables aging, on Wednesday of each week showing the Borrowing Base and all payables as of the close of business on the immediately preceding week. From time to time, upon the request of Lender, Borrowers shall provide to Lender a list of disbursements prior to 2:00 p.m. on any day that a Borrowing is requested which shall be received by Lender prior to the delivery of any such request.

6.3    Interest Rate.  Notwithstanding anything to the contrary contained in Section 3.1(a) of the Credit Agreement or otherwise, all Revolving Loans and other Obligations shall accrue interest only with reference to the Applicable Margin in respect of Base Rate Loans and no Revolving Loans that accrue interest based on the LIBOR Rate shall be available. Following the Petition Date, the Obligations shall not bear interest at the Default Rate unless and until the occurrence of an Event of Default during the Chapter 11 Cases.

6.4    Mandatory Prepayment; Allocation of Proceeds.

(a)  Subject to the Pre-Petition Intercreditor Agreement, or the Financing Order, as applicable, in the event of the sale of all or substantially all of the assets of CL Pinnpack or Pinnpack or the Equity Interests of CL Pinnpack or Pinnpack, within one (1) Business Day after the consummation of such sale, Borrowers shall make a payment in respect of the Obligations in an amount not less than the book value of the Accounts and Inventory of CL Pinnpack and Pinnpack, with the proceeds of such sale, and at Lender's option there shall be a permanent reduction in the Maximum Credit in an amount equal to the greater of the amount of such payment or $5,500,000.  Subject to the Pre-Petition Intercreditor Agreement or the Financing Order, as applicable, in the event of the sale of all or substantially all of the assets of CL Industries or CL PI Holdings, or the Equity Interests of CL Industries or CL PI Holdings, within one (1) Business Day of the consummation of such sale, Borrowers shall make a payment in respect of the Obligations in an amount not less than the book value of the Accounts and Inventory of CL Industries and CL PI Holdings, plus the greater of the book value or Hard Costs with respect to the RCF

Priority Equipment (as defined in the Pre-Petition Intercreditor Agreement) of CL Industries and CL PI Holdings, with the proceeds of such sale, and at Lender's option there shall be a permanent reduction in the Maximum Credit in an amount equal to such payment.

(b)  Without limiting any other rights of Lender in connection with any sale or other disposition of assets, in the event that Proceeds of Collateral are received from (or are otherwise attributable to the value of a sale or other disposition, whether voluntary or involuntary) of Collateral that directly or indirectly involves some or all of the RCF Priority Collateral (as defined in the Pre-Petition Intercreditor Agreement)  and some or all of the Term Loan Priority Collateral (as defined in the Pre-Petition Intercreditor Agreement) (it being understood and agreed that if a Loan Party is sold or otherwise disposed of such sale or other disposition is structured as a sale of Equity Interests, for purposes of this Section, such sale shall be treated as a sale of assets and the Proceeds shall be allocated as set forth in this Section), the portion of such Proceeds that shall be allocated as Proceeds of RCF Priority Collateral for application to the Obligations shall be an amount not less than the sum of (i) the book value (determined in accordance with GAAP as applied  thereto for purposes of the DIP ABL Facility) of any ABL Priority Collateral consisting of Inventory that is the subject of such sale or other disposition, determined as of the date of such sale or other disposition, (ii) the book value (determined in accordance with GAAP as applied thereto for purposes of the DIP ABL Facility) of any RCF Priority Collateral consisting of Accounts and other Payment Intangibles that are the subject of such sale or other disposition, determined as of the date of such sale or other disposition, and (iii) the greater of the book value (determined in accordance with GAAP as applied thereto for purposes of the DIP ABL Facility) or Hard Costs (as defined in the Credit Agreement ) with respect to the RCF Priority Equipment (as defined in the Pre-Petition Intercreditor Agreement), determined as of the date of such sale or other disposition.

6.5    Additional Field Examinations; Appraisals.  Notwithstanding anything to the contrary in the Loan Documents, including, without limitation, Section 7.8 of the Credit Agreement, Lender may at any time and from time to time upon reasonable prior notice to a Borrower conduct, or engage third party professionals to conduct commercial finance field examinations and appraisals of inventory, equipment, intellectual property, customer lists or other assets of Loan Parties in form, scope and methodology acceptable to Lender and by such field examination firm or appraiser, as the case may be, in each case acceptable to Lender, and with such field examination or appraisal, as the case may be, addressed to Lender and upon which Lender is expressly permitted to rely, in each case as to any such field examinations or appraisals as Lender may determine to be necessary or appropriate in its discretion, all at the sole cost and expense of Loan Parties, and each Loan Party agrees to permit reasonable access to its premises, and books and records and otherwise to cooperate with Lender and such professionals in connection with any of the foregoing.

6.6    Bank Accounts.  Except as otherwise provided in the cash management order, as approved by Lender, on or before ten (10) Business Days after the Petition Date, Loan Parties shall have closed all of its deposit accounts at Pacific Western Bank, Union Bank, and Texas Capital Bank and the CarbonLite Recycling Texas account numbers #xxx2198900 and xxx0216801.

6.7    Affirmative and Negative Covenants Generally.  Notwithstanding anything to the contrary in the Loan Documents, each Loan Party hereby acknowledges, confirms and agrees that to the extent that any Loan Party would otherwise be prohibited from engaging in any transactions otherwise permitted under Section 8 of the Credit Agreement solely due to the occurrence of a Default or an Event of Default, such Loan Party shall be prohibited from engaging in any such transactions on and after the DIP Closing Date.

6.8    Amendment to Second Amendment.  Sections 3.9 and 3.10 of the Second Amendment and Waiver to Credit Agreement, dated December 10, 2020 are hereby deleted in their entirety and there

shall be no changes to the definition of "Permitted Dispositions" or "Permitted Liens" as provided for therein.  Loan Parties hereby confirm and agree that no Loan Party has entered into any arrangements with respect to the sale or other disposition of the Amcor Receivables and have not sold or assigned, and shall not sell or assign, any interest in or to any of such receivables.

      6.9  <u>Additional Reporting Requirements</u>.  In addition to the information and reports to be delivered to Lender pursuant to Section 7.1 of the Credit Agreement and this Ratification Agreement, each Loan Party shall also provide Lender with copies of all financial reports, schedules and other materials and documents at any time filed by or on behalf of any Loan Party with the Bankruptcy Court or the U.S. Trustee or distributed by or on behalf of any Loan Party to any creditors' committee, substantially concurrently with the delivery thereof to the Bankruptcy Court, creditors' committee or U.S. Trustee, as the case may be. Without limitation of the generality of the foregoing, each Loan Party shall deliver or shall cause to be delivered to Lender or to occur, as applicable:

      (a)  within three (3) days prior to the filing thereof with the Bankruptcy Court by or on behalf of the Loan Parties, proposed forms of each Financing Order, all other proposed orders and pleadings related to the DIP ABL Facility, any 363 sale, any plan of reorganization or liquidation, and any disclosure statement related to such plan;

      (b)  on Thursday of each week, the Loan Parties and Chief Restructuring Officer or his support staff shall have also a call with Lender to give Lender an update as to the business of the Loan Parties, including without limitation, updates on operations, production volumes, sales, collections, vendor management, employee matters, recent cash disbursements, budget variances, and upcoming expected spending;

      (c)  within three (3) Business Days following delivery of any financial statements, operating or construction reports and/or any other material notices or reporting information as required under any Material Indebtedness Facility, a copy of such document, notice or information delivered in connection with such Material Indebtedness Facility, as applicable;

      (d)  on Thursday of each week a report in form acceptable to the Lender (the "Investment Banker Report") which shall include: (1) updates on the process of securing potential investors and/or purchasers, (2) a list of contacted and target potential investors and/or purchasers, (3) material feedback from such potential investors and/or purchasers, (4) upcoming process and discussion in respect of Milestones, (5) copies of all final marketing materials associated with a potential Sale Transaction and (6) copies of any term sheets, bona fide proposals or other relevant information and materials relating to any debtor-in-possession financing proposals from any party for the Loan Parties;

      (e)  on Thursday of each week, the Loan Parties and the Investment Banker shall have a call with Lender to give Lender an update as to the current marketing process, along with a follow up email on such date with any requested marketing materials, correspondence and other material information regarding the sales process; and

      (f)  on Thursday of each week a report in form acceptable to Lender (the "CRO Report") with respect to the immediately prior week ended the last Business Day of such week, setting forth (1) discussion of any and all communications regarding the Sale Process with critical vendors and customers, (2) any variance reports and/or non-compliance reports in relation to the budgets delivered under the Texas DIP Facility and/or Pennsylvania DIP Facility, as applicable and (3) to the extent not covered by the Investment Banker Report, copies of any term sheets, written proposals or other relevant information and materials relating to the Sale Process;

(g)  to Lender at least two (2) calendar days (or such shorter review period as is necessary in the event of exigent circumstances as determined by the Borrowers in their reasonable discretion) prior to the filing with the Bankruptcy Court or delivering to the Committee appointed in a Chapter 11 Case, if any, or to the U.S. Trustee, as the case may be, any material pleading or filing (but excluding retention applications, fee applications and other declarations in support thereof or related thereto);

(h)  within three (3) days of delivery or receipt, copies of all notices (including but not limited to all formal correspondence and all correspondence relating to any default or potential or anticipated litigation) delivered or received in connection with the Texas DIP Facility, Pennsylvania DIP Facility, the Pennsylvania Bond Documents and the Texas Bond Documents.

6.10  <u>Indebtedness</u>.  Notwithstanding anything to the contrary contained in Section 8.1 of the Credit Agreement or otherwise, after the Petition Date, no Loan Party shall incur, create, assume, become or be liable in any manner with respect to, or permit to exist, any new or additional Indebtedness, or guarantee, assume, endorse, or otherwise become responsible for (directly or indirectly), the Indebtedness, obligations, or dividends of any other Person, except for the Obligations and Indebtedness under the DIP Term Loan Agreement to the extent provided in the Financing Order, without in each case the prior written consent of Lender.

6.11  <u>Liens</u>.  Notwithstanding anything herein to the contrary in Section 8.2 of the Credit Agreement or otherwise, after the Petition Date, no new or additional security interests, liens or other encumbrances shall be permitted to be created or granted without the consent of Lender, provided, that, Loan Parties may create or grant security interests, liens or other encumbrances pursuant to the Ratification Agreement and/or the Financing Orders, including the Carve-Out and any adequate protection liens in favor of Lender or the DIP Term Agent pursuant to the DIP Term Loan Facility.

6.12  <u>Disposition of Assets</u>.  Notwithstanding anything to the contrary contained in Section 8.4 of the Credit Agreement or otherwise, each Loan Party will not sell, issue, assign, lease, license, transfer, abandon or otherwise dispose of any of its assets (including Equity Interests in any Subsidiary) to any other Person, including, without limitation, to assume, reject or assign any leasehold interest or enter into any agreement to return Inventory to vendor, whether pursuant to section 546 of the Bankruptcy Code or otherwise, except (a) in each case with the prior written consent of Lender (and no such consent shall be implied, from any other action, inaction or acquiescence by Lender), (b) to the extent specifically set forth in the Budget or otherwise permitted pursuant to this Ratification Agreement, (c) dispositions of assets with a value less than $25,000, or of equipment that is defective, no longer needed or outdated, and (d) the sale of inventory in the ordinary course of business.

6.13  <u>Investments</u>.  Notwithstanding anything to the contrary contained in Section 8.5 of the Credit Agreement or otherwise, after the Petition Date, no Loan Party shall, directly or indirectly, make any Investment except to the extent specifically set forth in the Budget or with the consent of Lender.

6.14  <u>Transactions with Affiliates</u>.  Notwithstanding anything to the contrary contained in Section 8.6 of the Credit Agreement or otherwise, after the Petition Date, no Loan Party shall, directly or indirectly, enter into any transaction or series of related transactions with an Affiliate of such Loan Party, except for (a) transactions expressly referenced in, and permitted by, an Approved Budget, (b) transactions between or among the Loan Parties not involving any other Affiliate and (c) transactions consented to in writing by Lender.  Notwithstanding the foregoing, or anything else contained in this Ratification Agreement to the contrary, on and after the DIP Closing Date, no Loan Party shall directly or indirectly enter into any transaction or series of related transactions with an Affiliate of such Loan Party without the prior written consent of Lender, other than (i) sales of inventory or assets (A) in the ordinary course of such Loan Party's (and such Affiliate's) business and upon fair and reasonable terms no less

favorable to such Loan Party than it would obtain in comparable arm's-length transactions with a Person acting in good faith which is not an Affiliate and (B) for which the party making payment actually makes full payment in cash upon delivery, (ii) transactions among the Loan Parties in the ordinary course of business, and (iii) transactions expressly referenced in, and permitted by, by an Approved Budget (it being acknowledged and agreed that each of the Loan Parties, on one hand, and any other Subsidiary of Holdings, on the other hand, shall directly pay any overhead charged and other costs as specified in the Interim Financing Order and Final Financing Order, and (1) no Loan Party shall pay any costs in respect of any Subsidiary of Holdings that is not a Loan Party and (2) no Subsidiary of Holdings that is not a Loan Party shall pay any costs in respect of any Loan Party).

6.15  Restricted Payments.  Notwithstanding anything to the contrary contained in Section 8.8 of the Credit Agreement or otherwise, after the Petition Date, no Loan Party shall declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment, except with the consent of Lender.

6.16  Certain Payments of Indebtedness, Etc.  Notwithstanding anything to the contrary contained in Section 8.10 of the Credit Agreement or otherwise, after the Petition Date, no Loan Party shall make or agree to make, directly or indirectly, any payment or other distribution (whether in cash, securities or other property) of or in respect of principal of or interest on any Indebtedness, or any payment or other distribution (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Indebtedness, except to the extent specifically set forth in the Budget or with the consent of Lender.

6.17  Prepetition Payables.  No Loan Party shall pay any prepetition claim arising under Section 503(b)(9) of the Bankruptcy Code or otherwise except to the extent specifically set forth in the Budget or with the consent of Lender.

6.18  Tangible Net Worth.  Notwithstanding anything to the contrary contained in Section 9 of the Credit Agreement or otherwise, after the Petition Date, Loan Parties shall not be required to comply with Section 9 of the Credit Agreement.

6.19  Bankruptcy Related Matters.

(a)  The Chapter 11 Cases were commenced on the Petition Date in accordance with applicable law and proper notice thereof was given for (i) the motion seeking approval of the Interim Financing Order, (ii) the hearing for the entry of the Interim Financing Order and (iii) the hearing for the entry of the Final Financing Order.  Debtors shall give, on a timely basis as specified in the Bankruptcy Court DIP Order, all notices required to be given to all parties specified in any Financing Order.

(b)  After entry of the Interim Financing Order, and pursuant to and to the extent permitted in the Interim Financing Order and the Final Financing Order, the Obligations will constitute allowed administrative expense claims in the Chapter 11 Cases having priority over all administrative expense claims and unsecured claims against each Loan Party now existing or hereafter arising of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1113, 1114 or any other provision of the Bankruptcy Code or otherwise, as provided under Section 364(c)(1) of the Bankruptcy Code, subject only to the Carve-Out and the priorities set forth in the Interim Financing Order or the Final Financing Order, as applicable.

(c)  After entry of the Interim Financing Order (and the Final Financing Order when applicable) and pursuant to and to the extent provided in the Interim Financing Order and the Final

Financing Order, as applicable, the Obligations will be secured by a valid and perfected first priority security interest in and lien on all of the Collateral, (i) encumbered by no security interests or liens other than Permitted Liens and (ii) prior and superior to any other Person or security interest or liens, in each case, other than the Carve-Out and subject to the priorities set forth in the Interim Financing Order or the Final Financing Order, as applicable.

(d)   The Interim Financing Order (with respect to the period on and after the date of entry of the Interim DIP Order and prior to the date of entry of the Final Financing Order) or the Final Financing Order (with respect to the period on and after the date of entry of the Final Financing Order), as the case may be, is in full force and effect and has not been reversed, stayed (whether by statutory stay or otherwise), modified or amended without the written consent of Lender.

(e)   Notwithstanding the provisions of Section 362 of the Bankruptcy Code and subject to the applicable provisions of the Interim Financing Order or the Final Financing Order, as the case may be, upon the Maturity Date (whether by acceleration or otherwise), Lender shall be entitled to immediate payment of the Obligations in cash and to enforce the remedies provided for hereunder or under applicable law, without further notice, motion or application to, hearing before, or order by the Bankruptcy Court.

(f)   The priority of the Obligations and Lender's security interests in the Collateral, claims and other interests shall be as set forth in the Financing Orders. Upon the maturity (whether by acceleration or otherwise) of any of the Obligations under this Agreement or any of the other Financing Documents, Lender shall be entitled to immediate payment of such Obligations without application to or order of the Bankruptcy Court in accordance with the Financing Orders.

(g)   Loan Parties shall:

(i)    cause all proposed (A) "first day" orders, (B) "second day" orders, (C) orders related to or affecting the Revolving Loans, the Pre-Petition Obligations and the Loan Documents, any other financing or use of cash collateral, any sale or other disposition of Collateral outside the ordinary course, adequate protection, (D) any plan of reorganization or liquidation and/or any disclosure statement related thereto, (E) orders concerning the financial condition of any Loan Party or other Indebtedness of the Loan Parties and (F) orders establishing procedures for administration of the Chapter 11 Cases or approving significant transactions submitted to the Bankruptcy Court, in each case, proposed by Loan Parties to be in accordance with and permitted by the terms of this Ratification Agreement and satisfactory to Lender in all respects, it being understood and agreed that the forms of orders approved by Lender prior to the Petition Date are in accordance with and permitted by the terms of this Ratification Agreement and are reasonably acceptable to Lender in all respects; provided, that, nothing in this paragraph shall prevent a Loan Party from filing any pleading in an exercise of its fiduciary duties;

(ii)    deliver to Lender, Lender's Financial Consultant and Lender's counsel updates of any material developments in connection with the Loan Parties' efforts under the Chapter 11 Cases; and

(iii)    if not otherwise provided through the Bankruptcy Court's electronic docketing system, as soon as available, deliver to Lender and to counsel to Lender and promptly as soon as available, copies of all final pleadings, motions, applications, orders, financial information and other documents filed by or on behalf of the Loan Parties with the Bankruptcy Court in the Chapter 11 Cases, or distributed by or on behalf of the Loan Parties to any official or unofficial committee appointed or appearing in the Chapter 11 Cases;

(iv)   not support any motion filed by persons in the Bankruptcy Court to lift the stay on the Collateral (other than motions filed by Lender), any motion filed by persons in the Bankruptcy Court to terminate the exclusive ability of the Loan Parties to file a plan of reorganization, and any other motion filed by persons in the Bankruptcy Court that, if granted, could reasonably be expected to have a material adverse effect on Lender or any Collateral.

6.20   Events of Default.

(a)   Section 10.1 of the Credit Agreement is hereby amended by deleting Section 10.1(e) and Section 10.1(f) thereof in their entirety and replacing each with the following:  "Reserved".

(b)   Section 10.1 of the Credit Agreement is hereby amended by adding the following at the end of Section 10.1(c):

provided, that, the foregoing shall only apply to a judgment which is not effectively stayed during the Chapter 11 Cases;

(c)   Section 10.1 of the Credit Agreement is hereby amended by adding the following at the end of Section 10.1(g):

provided, that, it shall not constitute an Event of Default hereunder to the extent that any default with respect to such Material Contract or Material Indebtedness as described in this Section 10.1(g), is solely as a result of the commencement of the Chapter 11 Cases,

(d)   Section 10.1 of the Credit Agreement is hereby amended by adding a new Section 10.1(o) at the end thereof as follows:

(i)   conversion of any Chapter 11 Case to a Chapter 7 case under the Bankruptcy Code;

(ii)   dismissal of any Chapter 11 Case or any subsequent Chapter 7 case either voluntarily or involuntarily;

(iii)   grant of a lien on or other interest in any property of any Loan Party, other than a Permitted Lien prior to the Petition Date, or a lien or encumbrance permitted by any Financing Order (including the Carve-Out), which is superior to or ranks in parity with Lender's security interest in or lien upon the Collateral;

(iv)   the grant of an administrative expense claim in any Chapter 11 Case which is superior to or ranks in parity with the rights of Lender (other than administrative expense claim permitted by any Financing Order or the Ratification Agreement or the Carve-Out to the extent set forth herein);

(v)   the failure of any Loan Party to comply with any Financing Order or any Financing Order shall be revoked, remanded, vacated, reversed, stayed or rescinded or modified (other than, in the case of a modification, as consented to by Lender) without the prior written consent of Lender (and no such consent shall be implied from any other authorization or acquiescence by Lender);

(vi)   the appointment of a trustee, examiner or disinterested person with special powers relating to the operations or the business of any Loan Party (powers beyond those set forth in section 1106(a) and section 1106(b) of the Bankruptcy Code) in the Chapter 11 Cases;

(vii)  the filing of a plan of reorganization or liquidation by or on behalf of any Loan Party, to which Lender has not consented in writing, which does not provide for  payment in full of all Obligations on the effective date of such plan, unless otherwise consented to by Lender;

(viii)  the confirmation of any plan of reorganization or liquidation in the Chapter 11 Case of any Loan Party, to which Lender has not consented to in writing, which does not provide for payment in full of all Obligations on the effective date of such plan, unless otherwise consented to by Lender;

(ix)  the payment of, or granting adequate protection with respect to, the DIP Term Loan Facility, other than to the extent permitted by, and in a manner consistent with, the Pre-Petition Intercreditor Agreement and a Financing Order;

(x)  the filing of a motion by any Debtor (or any Affiliate) that is not dismissed or denied within thirty (30) days after the date of filing such motion seeking, or the entry of any order permitting, recovery from any portion of the Collateral (or from Lender directly) any costs or expenses of preserving or disposing of the Collateral under section 506(c) or section 552(b) of the Bankruptcy Code (or otherwise);

(xi)  any Material Budget Deviation shall occur at any time during the Chapter 11 Cases;

(xii)  Liens or super-priority claims with respect to the Credit Agreement created under the Financing Orders shall at any time cease to be valid, perfected and enforceable in all respects with the priority described in the Financing Orders;

(xiii) any "Event of Default" as such term is defined in the DIP Term Loan Agreement, the Pennsylvania DIP Facility or the Texas DIP Facility;

(xiv)  the occurrence of any condition or event which permits Lender to exercise any of the remedies set forth in any Financing Order, including, without limitation, the failure to pay all administrative expense claims then due in accordance with the Budget (except as set forth in the Financing Order or the Loan Documents, as amended by the Ratification Agreement) or any other "Event of Default" (as defined in any Financing Order);

(xv)  any post-consumer plastic waste or any other materials located at the Riverside Facility or the Pinnpack Facility or Collateral of the Loan Parties shall be moved or otherwise relocated to the Texas Facility or the Pennsylvania Facility or otherwise invested in any Subsidiary of Holdings that is not a Loan Party;

(xvi)    any Loan Party shall file a motion in the Chapter 11 Cases without the express written consent of Lender to obtain additional financing from a party other than Lenders (and under the DIP Term Loan Facility) under Section 364(d) of the Bankruptcy Code that does not provide for the payment of the Obligations in full in cash upon the incurrence of such additional financing;

(xvii) any Loan Party shall file a motion seeking, or the Bankruptcy Court shall enter, an order, other than pursuant to a plan of reorganization, (A) approving payment of any prepetition claim other than (1) as provided for in the "first day" or "second day" orders, (2) contemplated by an Approved Budget then in effect (including variance that is not a Material Budget Deviation), or (3) otherwise consented to by Lender in writing (such approval not to be unreasonably withheld), (B) granting relief from the automatic stay under Section 362 of the Bankruptcy Code

to any holder of any security interest to permit foreclosure on any assets, or (C) except with respect to the Pre-Petition Obligations as provided in the Financing Orders, approving any settlement or other stipulation not approved by Lender (such approval not to be unreasonably withheld) and not included in an Approved Budget then in effect with any secured creditor of any Loan Party providing for payments as adequate protection or otherwise to such secured creditor;

(xviii) an entry of an order by the Bankruptcy Court terminating or modifying the exclusive right of any Loan Party to file a Chapter 11 plan pursuant to Section 1121 of the Bankruptcy Code, without the prior written consent of Lender;

(xiv) any Loan Party shall seek to, or shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court) (i) any other Person's motion to, disallow in whole or in part Lender's claim in respect of the Obligations or contest any material provision of any Loan Document or any material provision of any Loan Document shall cease to be effective (other than in accordance with its terms) or (ii) a sale of any of the Collateral pursuant to any transaction other than a Sale Transaction;

(xv) the commencement of, support of or failure to oppose any action against Lender by or on behalf of any Loan Party or any Loan Party's affiliates or officers; or

(xvi) the failure to meet any of the Milestones by the applicable date for such Milestone.

6.21 <u>Governing Law and Jurisdiction</u>. Section 11.1(a) of the Credit Agreement is hereby amended by inserting the following at the beginning thereof:

Except to the extent that the provisions of the Bankruptcy Code are applicable and conflict with the following:

6.22 <u>Governing Law and Jurisdiction</u>. Section 11.1(b) of the Credit Agreement is hereby further amended by inserting the following new paragraph at the end thereof:

Notwithstanding anything to the contrary contained in Section 11.1, each party hereto irrevocably and unconditionally submits to the personal jurisdiction of the Bankruptcy Court for purposes of any action, suit or proceeding or other contested matter arising out of or relating to the Loans, or for recognition or enforcement of any judgment rendered or order entered in any such action, suit, proceeding or other contested matter.

7. <u>Conditions Precedent to DIP Closing Date</u>. In addition to any other conditions contained herein or in Section 4.2 of the Credit Agreement (but not Section 4.1 of the Credit Agreement), as in effect immediately prior to the Petition Date, with respect to the Revolving Loans and Letters of Credit (all of which conditions, except as modified or made pursuant to this Ratification Agreement (including the modification with respect to the definition of the term "Material Adverse Effect" provided for herein and other than (i) the absence of a Default or Event of Default to the extent of the Specified Defaults, but not any other Events of Default, and (ii) the accuracy of representations and warranties, to the extent such representations and warranties are not accurate as a result of the Specified Defaults, but not any other Events of Default), shall remain applicable to the Revolving Loans, Letters of Credit and be applicable to other financial accommodations available to Borrowers), the following are conditions to Lender's obligation to make any Revolving Loans or issue any Letters of Credit to Borrowers pursuant to the Credit Agreement:

7.1    Lender shall have received this Ratification Agreement and any other Loan Document required by the terms hereof to be delivered in connection herewith by Loan Parties in form and substance satisfactory to Lender, duly authorized, executed and delivered by the parties thereto.

7.2    Loan Parties shall have commenced the Chapter 11 Cases in the Bankruptcy Court and Loan Parties shall have complied in full with the notice and other requirements of the Bankruptcy Code in a manner acceptable to Lender and its counsel, with respect to the Interim Financing Order, and Lender shall have received such evidence thereof as it shall reasonably require.  No trustee or other disinterested person with special powers pursuant to Section 1104(a) of the Bankruptcy Code shall have been appointed or designated with respect to any Loan Party, as debtor and debtor-in-possession, or its respective business, properties and assets and no motion or proceeding shall be pending seeking such relief.  All of the "first day orders" and "second day orders" entered by the Bankruptcy Court at the time of the commencement of the Chapter 11 Cases and prior to the Interim DIP Order shall be in form and substance reasonably satisfactory to Lender.

7.3    A cash management order approving the cash management arrangements of the Loan Parties in form and substance reasonably satisfactory to Lender, shall have been entered and shall be in full force and effect.

7.4    The Interim Financing Order shall have been entered within three (3) Business Days after the Petition Date and be in full force and effect and shall not have been vacated, reversed, stayed, modified or amended (except in the case of a modification or amendment as consented to by Lender) and not be subject to a stay pending appeal except as consented to by Lender.

7.5    Lender shall have received (a) each Initial Budget, which shall be in form and substance satisfactory to Lender and (b) a current Borrowing Base Certificate as of the DIP Closing Date, which shall be in form and substance satisfactory to Lender.

7.6    As of the date hereof and after giving effect to the provisions of this Ratification Agreement, except for the Specified Defaults, no Default or Event of Default shall exist or have occurred and be continuing.

7.7    Lender shall hold perfected, first priority security interests in and Liens upon the RCF Priority Collateral and perfected, second priority security interests in and liens upon the Term Loan Priority Collateral (subordinate only to the security interests and liens under the DIP Term Loan Facility to the extent provided in the Financing Order), and in each case subject to the Carve-Out and other valid, non-avoidable prepetition perfected security interests and liens permitted under the Credit Agreement, and Lender shall have received a copy of the Interim Financing Order entered by the Bankruptcy Court reflecting the foregoing.

7.8    Lender shall have received the DIP Term Loan Agreement, which shall be in full force and effect and in form and substance acceptable to Lender.

7.9    Lender shall have received (a) the Pennsylvania DIP Budget and the Texas DIP Budget, (b) all documentation in connection with the Pennsylvania DIP Facility and the Texas DIP Facility, and (c) the extension of the real property lease for the Riverside Facility in form and substance satisfactory to Lender.

7.10    Lender shall have received on or about the Petition Date payment of all fees required to be paid on or before the Petition Date and reimbursement of all of its expenses through the Petition Date required to be paid under the terms of Credit Agreement and this Ratification Agreement.

8.   Reserved.

9.   Release.

    9.1   Release of Pre-Petition Claims.

        (a)   Upon the entry of the Final Financing Order, in consideration of the agreements of Lender contained herein and the making of any Revolving Loans by Lender, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, each Loan Party on behalf of itself and its respective successors, assigns, and other legal representatives, hereby absolutely, unconditionally and irrevocably releases, remises and forever discharges Lender and its successors and assigns, and its present and former shareholders, affiliates, subsidiaries, divisions, predecessors, directors, officers, attorneys, employees and other representatives (Lender and all such other parties being hereinafter referred to collectively as the "Releasees" and individually as a "Releasee"), of and from all demands, actions, causes of action, suits, covenants, contracts, controversies, agreements, promises, sums of money, accounts, bills, reckonings, damages and any and all other claims, counterclaims, defenses, rights of set-off, demands and liabilities whatsoever (individually, a "Pre-Petition Released Claim" and collectively, "Pre-Petition Released Claims") of every nature and nature, known or unknown, suspected or unsuspected, both at law and in equity, which any Loan Party, or any of its successors, assigns, or other legal representatives may now or hereafter own, hold, have or claim to have against the Releasees or any of them for, upon, or by reason of any nature, cause or thing whatsoever which arises at any time on or prior to the day and date of this Ratification Agreement, including, without limitation, for or on account of, or in relation to, or in any way in connection with the Credit Agreement, as amended and supplemented through the date hereof, and the other Loan Documents.

        (b)   Upon the entry of the Final Financing Order, each Loan Party, on behalf of itself and its successors, assigns, and other legal representatives, as Debtors. but not on behalf of the bankruptcy estate of any Loan Party, hereby absolutely, unconditionally and irrevocably, covenants and agrees with each Releasee that it will not sue (at law, in equity, in any regulatory proceeding or otherwise) any Releasee on the basis of any Pre-Petition Released Claim released, remised and discharged by each Loan Party pursuant to this Section 9.1.  If any Loan Party violates the foregoing covenant, the Loan Parties agree to pay, in addition to such other damages as any Releasee may sustain as a result of such violation, all attorneys' fees and costs incurred by any Releasee as a result of such violation.

    9.2   Release of Post-Petition Claims.  Upon (a) the receipt by Lender of payment in full of all Obligations (other than contingent and indemnification obligations for which no claim has been asserted) in cash or other immediately available funds, plus cash collateral or other collateral security acceptable to Lender to secure any Obligations that survive or continue beyond the termination of the Loan Documents, and (b) the termination of the Loan Documents (the "Payment Date"), in consideration of the agreements of Lender contained herein and the making of any Revolving Loans by Lender, each Loan Party hereby covenants and agrees to execute and deliver in favor of Lender a valid and binding termination and release agreement, in form and substance satisfactory to Lender (and the terms of which as to the release shall be substantially consistent with the terms of the release provided for in this Section 9, subject to being supplemented to reflect any requirements of applicable state law).  If any Loan Party violates such covenant, the Loan Parties agree to pay, in addition to such other damages as any Releasee may sustain as a result of such violation, all attorneys' fees and costs incurred by any Releasee as a result of such violation.

    9.3   Releases Generally.

(a) Each Loan Party understands, acknowledges and agrees that the releases set forth above in Sections 9.1 and 9.2 hereof may be pleaded as a full and complete defense and may be used as a basis for an injunction against any action, suit or other proceeding which may be instituted, prosecuted or attempted in breach of the provisions of such releases.

(b) Each Loan Party agrees that no fact, event, circumstance, evidence or transaction which could now be asserted or which may hereafter be discovered shall affect in any manner the final and unconditional nature of the releases set forth in Section 9.1 hereof and, when made, Section 9.2 hereof.

10. Miscellaneous.

10.1 Amendments and Waivers. Neither this Ratification Agreement nor any other instrument or document referred to herein or therein may be changed, waived, discharged or terminated orally, but only by an instrument in writing executed in accordance with the requirements of Section 12.6 of the Existing Credit Agreement.

10.2 Further Assurances. Each Loan Party shall, at its expense, at any time or times duly execute and deliver, or shall use its commercially reasonable efforts to cause to be duly executed and delivered, such further agreements, instruments and documents, including, without limitation, additional security agreements, collateral assignments, UCC financing statements or amendments or continuations thereof, that may be requested by Lender, consents to the exercise by Lender of all the rights and remedies hereunder, under any of the other Loan Documents, any Financing Order or applicable law with respect to the Collateral, and do or use its commercially reasonable efforts to cause to be done such further acts as may be reasonably necessary or proper in Lender's reasonable opinion to evidence, perfect, maintain and enforce the security interests of Lender, and the priority thereof, in the Collateral and to otherwise effectuate the provisions or purposes of this Ratification Agreement, any of the other Loan Documents or the Financing Order. Upon the request of Lender, at any time and from time to time, each Loan Party shall, at its cost and expense, do, make, execute, deliver and record, register or file updates to the filings of Lender with respect to the Intellectual Property with the United States Patent and Trademark Office, the financing statements, mortgages (with respect to each parcel of real property with a fair market value of greater than $1,000,000), deeds of trust, deeds to secure debt, and other instruments, acts, pledges, assignments and transfers (or use its best efforts to cause the same to be done) and will deliver to Lender such instruments evidencing items of Collateral as may be available and reasonably requested by Lender.

10.3 Headings. The headings used herein are for convenience only and do not constitute matters to be considered in interpreting this Ratification Agreement.

10.4 Counterparts; Electronic Execution. This Ratification Agreement, any documents executed in connection herewith and any notices delivered under this Ratification Agreement may be executed by means of (i) an electronic signature that complies with the federal Electronic Signatures in Global and National Commerce Act, state enactments of the Uniform Electronic Transactions Act, or any other relevant and applicable electronic signatures law; (ii) an original manual signature; or (iii) a faxed, scanned, or photocopied manual signature. Each electronic signature or faxed, scanned, or photocopied manual signature shall for all purposes have the same validity, legal effect, and admissibility in evidence as an original manual signature. Lender reserves the right, in its sole discretion, to accept, deny, or condition acceptance of any electronic signature on this Ratification Agreement or on any notice delivered to Lender under this Ratification Agreement. This Ratification Agreement and any notices delivered under this Ratification Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but such counterparts shall, together, constitute only one instrument. Delivery of an executed counterpart of a signature page of this Ratification Agreement and

any notices as set forth herein will be as effective as delivery of a manually executed counterpart of the Ratification Agreement or notice.

10.5  <u>Additional Events of Default</u>.  The parties hereto acknowledge, confirm and agree that the failure of any Loan Party to comply with any of the covenants, conditions and agreements by such Loan Party contained herein shall constitute an Event of Default under the Loan Documents.

10.6  <u>Costs and Expenses</u>.  Subject to the terms of the Financing Orders (including any requirements set forth therein with respect to the information to be provided to Loan Parties with respect thereto), Loan Parties shall pay to Lender on demand all costs and expenses that Lender pays or incurs in connection with the negotiation, preparation, consummation, administration, enforcement, and termination of this Ratification Agreement and the other Loan Documents and the Financing Orders, including, without limitation: (a) reasonable attorneys' and paralegals' fees and disbursements of counsel to, and reasonable fees and expenses of consultants, accountants and other professionals retained by, Lender; (b) costs and expenses (including reasonable attorneys' and paralegals' fees and disbursements) for any amendment, supplement, waiver, consent, or subsequent closing in connection with this Ratification Agreement, the other Loan Documents, the Financing Orders and the transactions contemplated thereby; (c) taxes, fees and other charges for recording any agreements or documents with any governmental authority, and the filing of UCC financing statements and continuations, and other actions to perfect, protect, and continue the security interests and liens of Lender in the Collateral; (d) sums paid or incurred to pay any amount or take any action required of any Loan Party under the Loan Documents or the Financing Orders that such Loan Party fails to pay or take; (e) costs of appraisals, inspections and verifications of the Collateral and including travel, lodging, and meals for inspections of the Collateral and the operations of Loan Party by Lender and to attend court hearings or otherwise in connection with the Chapter 11 Cases; (f) costs and expenses of preserving and protecting the Collateral; (g) all out-of-pocket expenses and costs heretofore and from time to time hereafter incurred by Lender during the course of periodic field examinations of the Collateral and Debtors' operations, plus a fee of $1,000 per day, per field examiner, plus reasonable out-of-pocket expenses for each field examination of the Loan Parties performed by personnel employed by Lender; (h) in accordance with the terms of this Ratification Agreement, the actual charges paid or incurred by Lender if it elects to employ the services of one or more third persons as a consultant or financial advisor during the Chapter 11 Cases; (i) the actual charges paid or incurred by Lender if it elects to employ the services of one or more third-persons to perform field examinations, to appraise the Collateral, or any portion thereof, or to assess the Loan Parties' business valuation; and (k) costs and expenses (including attorneys' and paralegals' fees and disbursements) paid or incurred to obtain payment of the Obligations, enforce the security interests and liens of Lender, sell or otherwise realize upon the Collateral, and otherwise enforce the provisions of this Ratification Agreement, the other Loan Documents and the Financing Orders, or to defend any claims made or threatened against Lender arising out of the transactions contemplated hereby (including, without limitation, preparations for and consultations concerning any such matters).  The foregoing shall not be construed to limit any other provisions of the Loan Documents regarding costs and expenses to be paid by Loan Parties.  Subject to the terms of the Financing Order(s), all sums provided for in this Section 10.6 shall be part of the Obligations, shall be payable on demand, and shall accrue interest after demand for payment thereof at the highest rate of interest then payable under the Loan Documents.  Lender is hereby irrevocably authorized to charge any amounts payable hereunder directly to any of the account(s) maintained by Lender with respect to any Borrower.

10.7  <u>Effectiveness</u>.  This Ratification Agreement shall become effective upon the satisfaction of the conditions precedent set forth in Section 7 hereof and the entry of the Interim Financing Order.

10.8  <u>Financing Orders</u>.  In the event of any inconsistency between the terms of the Financing Orders and the Loan Documents, the terms of the Financing Orders shall control.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the parties hereto have caused this Ratification Agreement to be duly executed as of the day and year first above written.

<u>LENDER</u>

**BANK LEUMI USA**

By:_____
Name:
Title:


By:_____
Name:
Title:

[Signature Page to Ratification and Amendment Agreement (CarbonLITE)]

<u>CL PI HOLDINGS:</u>

**CARBONLITE PI HOLDINGS, LLC**

By:      _____
Name: _____
Title:   _____

<u>BORROWERS</u>:

**CARBONLITE INDUSTRIES LLC**

By:      _____
Name: _____
Title:   _____

**CARBONLITE PINNPACK, LLC**

By:      _____
Name: _____
Title:   _____

**PINNPACK PACKAGING, LLC**

By:      _____
Name: _____
Title:   _____

EXHIBIT A
to
<u>RATIFICATION AND AMENDMENT AGREEMENT</u>

<u>Summary of Budget</u>

EXHIBIT B
to
RATIFICATION AND AMENDMENT AGREEMENT

Form of Interim Financing Order