## EXHIBIT D

**Prepetition ABL Credit Agreement**

**CREDIT AGREEMENT**

**Among**

**CARBONLITE PI HOLDINGS LLC**,

**as CL PI Holdings,**

**CARBONLITE INDUSTRIES LLC,**

**CARBONLITE PINNPACK, LLC,**

**and**

**PINNPACK PACKAGING, LLC**

**as Borrowers,**

**the Guarantors party hereto,**

**and**

**BANK LEUMI USA,**
**as Lender**

**Dated: September 16, 2019**

## TABLE OF CONTENTS

SECTION 1.    DEFINITIONS ................................................................................. 1

    1.1    Defined Terms ................................................................. 1
    1.2    Interpretative Provisions ................................................ 19
    1.3    Accounting Terms ........................................................... 20
    1.4    Rounding ........................................................................ 21
    1.5    Letter of Credit Amounts ............................................... 21

SECTION 2.    CREDIT FACILITY ...................................................................... 21

    2.1    Revolving Loans ............................................................. 21
    2.2    Letters of Credit ............................................................. 21
    2.3    Requests for Borrowings. ............................................... 24

SECTION 3.    INTEREST AND FEES ................................................................. 25

    3.1    Rates and Payment of Interest ....................................... 25
    3.2    Computation of Interest and Fees .................................. 25
    3.3    Unused Line Fee ............................................................. 25
    3.4    Letter of Credit Fee ........................................................ 25
    3.5    Administration Fee ......................................................... 26
    3.6    Closing Fee .................................................................... 26
    3.7    Inability to Determine Applicable Interest Rate ............ 26
    3.8    Illegality ......................................................................... 27
    3.9    Increased Costs .............................................................. 27
    3.10   Capital Requirements ..................................................... 27
    3.11   Certificates for Reimbursement ..................................... 27
    3.12   Delay in Requests .......................................................... 27
    3.13   Maximum Interest .......................................................... 28

SECTION 4.    CONDITIONS PRECEDENT ....................................................... 28

    4.1    Conditions Precedent to Effectiveness of Agreement to Make Initial Revolving Loans and Letters of Credit ....................................................... 28
    4.2    Conditions Precedent to All Revolving Loans and Letters of Credit ................ 28

SECTION 5.    PAYMENTS AND ADMINISTRATION ....................................... 29

    5.1    Payments Generally, Allocation of Proceeds ................ 29
    5.2    Indemnity for Returned Payments ................................. 30
    5.3    Repayments .................................................................... 30
    5.4    Prepayments; Early Termination ................................... 30
    5.5    Statements ...................................................................... 31
    5.6    Borrowers' Loan Account; Evidence of Debt ............... 31
    5.7    Taxes. ............................................................................. 31
    5.8    Nature and Extent of Each Loan Party's Liability. ........ 32
    5.9    Borrower Agent .............................................................. 34

SECTION 6.    REPRESENTATIONS AND WARRANTIES ............................... 34

    6.1    Organization; Powers ..................................................... 34
    6.2    Authorization; Enforceability ........................................ 35
    6.3    No Conflicts ................................................................... 35
    6.4    Governmental Approvals ............................................... 35
    6.5    Financial Statements; No Material Adverse Effect; Solvent ........................... 35

i

| | | |
|---|---|---|
| 6.6 | Properties; No Liens | 36 |
| 6.7 | Litigation | 36 |
| 6.8 | Compliance with Laws | 36 |
| 6.9 | Environmental Condition | 36 |
| 6.10 | No Defaults | 36 |
| 6.11 | Material Contracts | 36 |
| 6.12 | Restrictive Agreements | 36 |
| 6.13 | Taxes | 37 |
| 6.14 | ERISA | 37 |
| 6.15 | Insurance | 37 |
| 6.16 | Capitalization and Subsidiaries | 37 |
| 6.17 | Security Interest in Collateral | 37 |
| 6.18 | Brokers | 37 |
| 6.19 | Intellectual Property | 37 |
| 6.20 | Trade Relations | 38 |
| 6.21 | Labor Relations | 38 |
| 6.22 | Payable Practices | 38 |
| 6.23 | Margin Regulations, Investment Company Act, Etc. | 38 |
| 6.24 | OFAC | 38 |
| 6.25 | Complete Disclosure | 38 |

**SECTION 7.    AFFIRMATIVE COVENANTS** ........ 38

| | | |
|---|---|---|
| 7.1 | Financial Statements, Borrowing Base Certificate and Other Information | 38 |
| 7.2 | Notices of Material Events | 39 |
| 7.3 | Existence | 39 |
| 7.4 | Payment of Obligations | 39 |
| 7.5 | Maintenance of Properties | 39 |
| 7.6 | Compliance with Laws | 39 |
| 7.7 | Insurance | 39 |
| 7.8 | Inspection Rights; Field Examinations | 40 |
| 7.9 | Use of Proceeds | 40 |
| 7.10 | Cash Management; Collection of Proceeds of Collateral | 40 |
| 7.11 | Additional Collateral; Further Assurances | 40 |
| 7.12 | End of Fiscal Years; Fiscal Quarters | 41 |
| 7.13 | Costs and Expenses | 41 |
| 7.14 | PepsiCo Contract Extension | 41 |

**SECTION 8.    NEGATIVE COVENANTS** ........ 42

| | | |
|---|---|---|
| 8.1 | Indebtedness | 42 |
| 8.2 | Liens | 42 |
| 8.3 | Fundamental Changes | 42 |
| 8.4 | Asset Sales | 42 |
| 8.5 | Investments | 42 |
| 8.6 | Transactions with Affiliates | 42 |
| 8.7 | Change in Business | 42 |
| 8.8 | Restricted Payments | 43 |
| 8.9 | Restrictive Agreements | 43 |
| 8.10 | Certain Payments of Indebtedness, Etc. | 43 |
| 8.11 | Amendment of Material Documents | 43 |
| 8.12 | Sale and Leasebacks | 43 |
| 8.13 | Segregation of ABL Priority Collateral; Deposit Accounts | 44 |

SECTION 9.      TANGIBLE NET WORTH ............................................................................................ 44

SECTION 10.     EVENTS OF DEFAULT AND REMEDIES .................................................................. 44

    10.1      Events of Default ........................................................................................................ 44
    10.2      Remedies...................................................................................................................... 46

SECTION 11.     JURY TRIAL WAIVER; OTHER WAIVERS CONSENTS; GOVERNING LAW....... 47

    11.1      Governing Law; Choice of Forum; Service of Process; Jury Trial Waiver...................... 47
    11.2      Waiver of Notices ........................................................................................................ 48
    11.3      Amendments and Waivers ............................................................................................ 48
    11.4      Waiver of Counterclaims ............................................................................................. 48
    11.5      Indemnification............................................................................................................ 49

SECTION 12.     NOTICES; MISCELLANEOUS ..................................................................................... 49

    12.1      Notices ......................................................................................................................... 49
    12.2      Partial Invalidity .......................................................................................................... 50
    12.3      Successors..................................................................................................................... 50
    12.4      Entire Agreement ......................................................................................................... 51
    12.5      USA Patriot Act ........................................................................................................... 51
    12.6      Counterparts, Etc. ........................................................................................................ 51

INDEX
TO
EXHIBITS AND SCHEDULES

Exhibit A                     Form of Borrowing Base Certificate

Exhibit B                     Form of Compliance Certificate

Schedule 1.1                  Definition of Eligible Accounts

Schedule 4.1                  Conditions Precedent to Initial Revolving Loans, the Letters of Credit

Schedule 6.7                  Litigation

Schedule 6.9                  Environmental Matters

Schedule 6.11                 Material Agreements

Schedule 6.12                 Restrictive Agreements

Schedule 6.15                 Insurance

Schedule 6.16                 Subsidiaries

Schedule 6.19                 Intellectual Property

Schedule 6.21                 Collective Bargaining Agreements

Schedule 7.1                  Financial and Collateral Reporting

Schedule 7.10                 Collateral Account; Borrowing Request Account; Bank Accounts

Schedule 8.1                  Permitted Indebtedness

Schedule 8.2                  Certain Permitted Liens

Schedule 8.5                  Certain Permitted Investments

Schedule 8.6                  Certain Transactions with Affiliates

# CREDIT AGREEMENT

This Credit Agreement ("Agreement") dated September 16, 2019, is entered into by and among **CARBONLITE PI HOLDINGS, LLC**, a Delaware limited liability company ("CL PI Holdings"), **CARBONLITE INDUSTRIES LLC**, a Delaware limited liability company ("CL Industries"), **CARBONLITE PINNPACK, LLC**, a Delaware limited liability company ("CL Pinnpack"), and **PINNPACK PACKAGING, LLC**, a Delaware limited liability company ("Pinnpack", and together with CL Industries and CL Pinnpack, individually, a "Borrower", and collectively, the "Borrowers"), the Guarantors (as defined herein), and **BANK LEUMI USA** ("Lender").

# W I T N E S S E T H:

WHEREAS, Borrowers have requested that Lender provide a credit facility to Borrowers, and Lender is willing to provide such credit facility on the terms and conditions set forth herein and in the other Loan Documents (as defined below);

NOW, THEREFORE, in consideration of the mutual conditions and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

## SECTION 1.    DEFINITIONS

1.1    Defined Terms.  For purposes of this Agreement, the following terms shall have the respective meanings given to them below:

"7% Notes" means those certain Subordinated Promissory Notes in an original aggregate principal amount of $4,400,000, issued by CL Industries between November 27, 2012 and May 1, 2013, as in effect on the date hereof and as further amended with the consent of Lender.

"10% Notes" means those certain Senior Subordinated Promissory Notes in an original aggregate principal amount of $10,000,000, issued by CL Industries in connection with that certain Amended and Restated Note Purchase Agreement dated as of September 26, 2011,  as in effect on the date hereof and as further amended with the consent of Lender.

"ABL Priority Collateral" has the meaning given to such term in the Intercreditor Agreement.

"Accounts" means "accounts" as defined in the UCC, including all present and future rights of any Borrower to payment of a monetary obligation, whether or not earned by performance, which is not evidenced by chattel paper or an instrument, (a) for property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of, (b) for services rendered or to be rendered, (c) for a secondary obligation incurred or to be incurred, or (d) arising out of the use of a credit or charge card or information contained on or for use with the card.

"Affiliate" means, with respect to a specified Person, any other Person (excluding any Subsidiary) which directly or indirectly, through one or more intermediaries, controls or is controlled by or is under common control with such Person.  For the purposes of this definition, the term "control" (including with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power either (a) to vote ten percent (10%) or more of the securities having ordinary voting power for the election of directors of such Person or (b) to direct or cause the direction of the management and policies, whether through the ownership of Equity Interests, by agreement or otherwise.

"Applicable Margin" means, subject to and without limitation upon Sections 3.7 and 3.8 hereof, (a) with respect to Revolving Loans that are LIBOR Rate Loans, 2.375%, and with respect to Revolving Loans that are Base Rate Loans, 0.000%).

"Bank Product Agreement" means an agreement entered into at any time by any Borrower with Lender or its Affiliates governing the terms and conditions with respect to a Bank Product provided by Lender or its Affiliates to any Borrower.

"Bank Product Obligations" means any obligation of any Borrower on account of any Bank Product.

"Bank Products" means any one or more of the following types of services or facilities provided to any Borrower by Lender (or an Affiliate of Lender):  (a) credit cards, debit cards or stored value cards or the processing of payments and other administrative services with respect to credit cards, debit cards or stored value cards or (b) cash management or related services, including (i) the automated clearinghouse transfer of funds for the account of any Borrower pursuant to agreement or overdraft for any accounts of any Borrower maintained at Lender, (ii) controlled disbursement services and (iii) Hedge Agreements if and to the extent permitted hereunder.

"Base Rate" means, for any day, a fluctuating rate per annum equal the rate of interest designated as the "Prime Rate" which appears in each publication of *The Wall Street Journal* under the designation entitled "Money Rates."  This rate of interest fluctuates and is subject to change without prior notice.  If and when the Wall Street Journal Prime Rate changes, the rate of interest on this hereunder will automatically change effective on the date of any such change, without notice to Borrowers.  In the event that the Wall Street Journal Prime Rate cannot be ascertained from publication of *The Wall Street Journal*, the rate of interest which shall be used in substitution thereof and until such time as the Wall Street Journal Prime Rate can be ascertained by reference to *The Wall Street Journal* shall be a rate equal to the average of the prime rate of interest announced from time to time by three (3) New York banks selected by Lender in its sole and absolute discretion.

"Base Rate Loans" means any Revolving Loans on which interest is payable based on the Base Rate in accordance with the terms hereof.  For the avoidance of doubt, Base Rate Loans will only be available to Borrowers if the LIBOR Rate cannot be ascertained in accordance with Sections 3.7 and 3.8 hereof.

"Beneficial Ownership Certification" means a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation.

"Beneficial Ownership Regulation" means 31 C.F.R. § 1010.230.

"Borrower Agent" has the meaning set forth in Section 5.9 hereof.

"Borrowing Base" means, at any time of calculation, an amount equal to:

    (a)   Eighty-five percent (85%) multiplied by the aggregate face amount of Eligible Accounts; minus

    (b)   Reserves.

"Borrowing Base Certificate" means a certificate substantially in the form of Exhibit A hereto, as such form, subject to the terms hereof, may from time to time be modified by Lender, which is duly completed (including all schedules thereto) and executed by a Responsible Officer of each Borrower and delivered to Lender.

"Borrowing Request Account" has the meaning set forth in Section 2.3(a)(iii) hereof.

"Business Day" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized or required to close under the Laws of the State of New York, and a day on which Lender is open for the transaction of business, except that if a determination of a Business Day shall relate to any LIBOR Loans, the term Business Day shall also exclude any day on which banks are closed for dealings in dollar deposits in the London interbank market.

"Capital Lease Obligations" means, as to any Person, the obligations of such Person under a lease that are required to be classified and accounted for as capital lease obligations under GAAP and, for purposes of this definition, the amount of such obligations at any date shall be the capitalized amount of such obligations at such date on a balance sheet prepared in accordance with GAAP.

"Cash Equivalents" means: means (a) marketable direct obligations issued by, or unconditionally guaranteed by, the United States or issued by any agency thereof and backed by the full faith and credit of the United States, in each case maturing within 1 year from the date of acquisition thereof, (b) marketable direct obligations issued or fully guaranteed by any state of the United States or any political subdivision of any such state or any public instrumentality thereof maturing within 1 year from the date of acquisition thereof and, at the time of acquisition, having one of the two highest ratings obtainable from either Standard & Poor's Rating Group ("S&P") or Moody's Investors Service, Inc. ("Moody's"), (c) commercial paper maturing no more than 270 days from the date of creation thereof and, at the time of acquisition, having a rating of at least A-1 from S&P or at least P-1 from Moody's, (d) certificates of deposit, time deposits, overnight bank deposits or bankers' acceptances maturing within 1 year from the date of acquisition thereof issued by any bank organized under the Laws of the United States or any state thereof or the District of Columbia or any United States branch of a foreign bank having at the date of acquisition thereof combined capital and surplus of not less than $1,000,000,000, (e) Deposit Accounts maintained with (i) any bank that satisfies the criteria described in clause (d) above, or (ii) any other bank organized under the Laws of the United States or any state thereof so long as the full amount maintained with any such other bank is insured by the Federal Deposit Insurance Corporation, (f) repurchase obligations of any commercial bank satisfying the requirements of clause (d) of this definition or recognized securities dealer having combined capital and surplus of not less than $1,000,000,000, having a term of not more than seven days, with respect to securities satisfying the criteria in clauses (a) or (d) above, (g) debt securities with maturities of six months or less from the date of acquisition backed by standby letters of credit issued by any commercial bank satisfying the criteria described in clause (d) above, and (h) Investments in money market funds substantially all of whose assets are invested in the types of assets described in clauses (a) through (g) above.

"Cash Management Bank" shall have the meaning set forth in Section 7.10.

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any Law, rule, regulation or treaty, (b) any change in any Law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority or (c) the making or issuance of any request, guideline or directive (whether or not having the force of Law) by any Governmental Authority; provided, that, notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"Change of Control" means an event or series of events by which: (a) the Permitted Holders shall cease to own and control legally and beneficially (free and clear of all liens), either directly or indirectly, equity securities in any Borrower representing more than 51% of the combined voting power of all of Equity Interests entitled to vote for members of the board of directors or equivalent governing body of such Borrower on a fully-diluted basis; (b) during any period of twelve (12) consecutive months, a majority of the members of the board of

directors or other equivalent governing body of any Borrower cease to be composed of individuals (i) who were members of that board or equivalent governing body on the first day of such period, (ii) whose election or nomination to that board or equivalent governing body was approved by individuals referred to in clause (i) above constituting at the time of such election or nomination at least a majority of such board or equivalent governing body or (iii) whose election or nomination to such board or other equivalent governing body was approved by individuals referred to in clauses (i) and (ii) above constituting at the time of such election or nomination at least a majority of such board or equivalent governing body (excluding, in the case of both clause (ii) and clause (iii), any individual whose initial nomination for, or assumption of office as, a member of such board or equivalent governing body occurs as a result of an actual or threatened solicitation of proxies or consents for the election or removal of one or more directors by any person or group other than a solicitation for the election of one or more directors by or on behalf of the board of directors); or (c) any Person (other than a Permitted Holder) or two or more Persons acting in concert (other than Permitted Holders) shall have acquired by contract or otherwise, or shall have entered into a contract or arrangement that, upon consummation thereof, will result in its or their acquisition of the power to exercise, directly or indirectly, a controlling influence over the management or policies of any Borrower, or control over the Equity Interests of any Borrower entitled to vote for members of the board of directors or equivalent governing body of any Borrower on a fully-diluted basis representing twenty-five percent (25%) or more of the combined voting power of such securities.

"CL PI Holdings" has the meaning set forth in the preamble hereto.

"Closing Date" means the date on which the conditions specified in <u>Section 4.1</u> are satisfied or waived in writing by Lender.

"Code" means the Internal Revenue Code of 1986, as the same now exists or may from time to time hereafter be amended, modified, recodified or supplemented, together with all rules, regulations and interpretations thereunder or related thereto.

"Collateral" means any and all property owned, leased or operated by a Person covered by the Security Documents and any and all other property of any Loan Party, now existing or hereafter acquired, that may at any time be, become or be intended to be, subject to a security interest or lien in favor of Lender to secure the Obligations.

"Collection Account" means the deposit account of any Borrower identified on <u>Schedule 7.10</u> as the collection account and such other accounts as may be established after the Closing Date in accordance with the terms hereof used to receive payments on Accounts and proceeds of other Collateral.

"Commercial Letter of Credit" means any Letter of Credit issued for the purpose of providing the primary manner of payment for the purchase price of goods or services by any Borrower in the ordinary course of the business of such Borrower (and not in the event that such Borrower fails to make payment).

"Commitment" means, for Lender, its obligation to make Revolving Loans, and to participate in Letter of Credit Obligations subject to, and in accordance with, the terms hereof.

"Compliance Certificate" means a certificate substantially in the form of <u>Exhibit B</u>.

"Control Agreement" means a control agreement, in form and substance reasonably satisfactory to Lender, executed and delivered by each Borrower, Lender and the applicable securities intermediary (with respect to a securities account) or bank (with respect to a deposit account) with respect to a securities account or deposit account, as the case may be, that is sufficient to perfect the security interests of Lender therein and provides such other rights with respect thereto as Lender requires.

"Credit Facility" means the Revolving Loans and Letters of Credit provided to or for the benefit of each Borrower pursuant to Sections 2.1 and 2.2 hereof.

"Customer Deposit" means any deposit made by a counterparty to a bona fide contract with any Borrower for goods to be delivered or services to be rendered by any Borrower.

"Debtor Relief Laws" means the Bankruptcy Code of the United States (the "Bankruptcy Code"), and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Default" means an act, condition or event which with notice or passage of time or both would constitute an Event of Default.

"Default Rate" means, for any Obligation (including, to the extent permitted by Law, interest not paid when due), the interest rate otherwise applicable thereto plus two percentage points (2.0%) in excess thereof.

"Eligible Accounts" has the meaning set forth in Schedule 1.1.

"Environmental Laws" means all Laws, rules, regulations, codes, ordinances, orders, decrees, judgments, injunctions, notices or binding agreements issued, promulgated or entered into by any Governmental Authority, relating in any way to the environment, preservation or reclamation of natural resources, the management, release or threatened release of any Hazardous Material or to health and safety matters.

"Equipment" means now owned and hereafter acquired equipment of any Loan Party, wherever located, including machinery, data processing and computer equipment (whether owned or leased and including embedded software that is licensed as part of such computer equipment), vehicles, rolling stock, tools, furniture, fixtures, all attachments, accessions and property now or hereafter affixed thereto or used in connection therewith, and substitutions and replacements thereof, wherever located.

"Equity Interests" means, with respect to any Person, all of the shares, interests, participations or other equivalents (however designated) of such Person's capital stock or partnership, limited liability company or other equity, ownership or profit interests at any time outstanding, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other interests in) such Person, all of the securities convertible into or exchangeable for shares of capital stock of (or other interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), but excluding any interests in phantom equity plans and any debt security that is convertible into or exchangeable for such shares, and all of the other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination.

"ERISA" means the Employee Retirement Income Security Act of 1974.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that, together with any Borrower, is treated as a single employer under Section 414(b) or (c) of the Code or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"ERISA Event" means (a) any "reportable event", as defined in Section 4043 of ERISA or the regulations issued thereunder, with respect to a Plan (other than an event for which the 30 day notice period is waived); (b) the failure to satisfy the "minimum funding standard" (as defined in Section 412 of the Code or Section 302 of ERISA), whether or not waived; (c) the filing pursuant to Section 412(c) of the Code or Section

5

302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan; (d) the incurrence by any Borrower or any of its ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any Plan; (e) the receipt by any Borrower or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan; (f) the incurrence by any Borrower or any of its ERISA Affiliates of any liability with respect to the withdrawal or partial withdrawal of such Borrower or any of its ERISA Affiliates from any Plan or Multiemployer Plan; or (g) the receipt by any Borrower or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from such Borrower or any ERISA Affiliate of any notice, concerning the imposition upon such Borrower or any of its ERISA Affiliates of withdrawal liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA.

"Event of Default" shall have the meaning set forth in Section 10.1 hereof.

"Excess Availability" means the amount, as determined by Lender, calculated at any date, equal to the Maximum Revolving Loan Amount (after giving effect to any applicable Reserves), minus, without duplication, (b) the sum of:  (i) the amount of all then outstanding and unpaid Obligations in respect of Revolving Loans and Letter of Credit Obligations, plus (ii) the aggregate amount of all then outstanding and unpaid trade payables and other obligations of any Borrower which are outstanding more than sixty (60) days past due as of the end of the immediately preceding month (other than trade payables or other obligations being contested or disputed by any Borrower in good faith), except to the extent such payables are subject to a scheduled payment arrangement that is satisfactory to Lender.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to Lender or required to be withheld or deducted from a payment to Lender: (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, imposed as a result of Lender being organized under the Laws of, or having its principal office or its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof), and (b) any U.S. Federal withholding Taxes imposed under Sections 1471 through 1474 of the Code.

"Facility Guaranty" means any Guaranty Obligation made by a Guarantor in favor of Lender, in form and substance reasonably satisfactory to Lender, as the same now exists or may hereafter be amended, modified, supplemented, renewed, restated or replaced.

"Federal Funds Rate" means (a) the weighted average of interest rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers on the applicable Business Day (or on the preceding Business Day, if the applicable day is not a Business Day), as published by the Federal Reserve Bank of New York on the next Business Day; or (b) if no such rate is published on the next Business Day, the average rate (rounded up, if necessary, to the nearest 1/8 of 1%) charged to Lender on the applicable day on such transactions, as determined by Lender.

"GAAP" means generally accepted accounting principles in the United States of America as in effect from time to time as set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and the statements and pronouncements of the Financial Accounting Standards Board which are applicable to the circumstances as of the date of determination consistently applied.

"Governmental Authority" means the government of the United States of America, any other nation, or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national body exercising such function, such as the European Union or the European Central Bank).

"Guarantor" means any Person that guarantees any of the Obligations and/or provides collateral security for the performance and/or payment thereof, each of which shall be required to execute and deliver a Facility Guaranty pursuant to <u>Section 7.11</u>.  As of the Closing Date, the only Guarantor is CL PI Holdings.

"Guaranty Obligations" means, with respect to any Person, without duplication, any obligations of such Person (other than endorsements in the ordinary course of business of negotiable instruments for deposit or collection) guaranteeing or intended to guarantee any Indebtedness of any other Person in any manner, whether direct or indirect, and including, without limitation, any obligation, whether or not contingent, (a) to purchase any such Indebtedness or any property constituting security therefor, (b) to advance or provide funds or other support for the payment or purchase of any such Indebtedness or to maintain working capital, solvency or other balance sheet condition of such other Person (including, without limitation, keep-well agreements, maintenance agreements, comfort letters or similar agreements or arrangements) for the benefit of any holder of Indebtedness of such other Person, (c) to lease or purchase property, securities or services primarily for the purpose of assuring the holder of such Indebtedness, or (d) to otherwise assure or hold harmless the holder of such Indebtedness against loss in respect thereof. The amount of any Guaranty Obligation hereunder shall (subject to any limitations set forth therein) be deemed to be an amount equal to the outstanding principal amount (or maximum principal amount, if larger) of the Indebtedness in respect of which such Guaranty Obligation is made.

"Hazardous Materials" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

"Hedge Agreement" means any agreement with respect to any swap, forward, spot, future, credit default or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions.

"Indebtedness" means, with respect to any Person, without duplication, (a) all obligations of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person upon which interest charges are customarily paid or accrued, (d) all obligations of such Person under conditional sale or other title retention agreements relating to property purchased by such Person, (e) all obligations of such Person issued or assumed as the deferred purchase price of property or services purchased by such Person, and including, without limitation, customary indemnification, adjustment of purchase price or similar obligations, earn-outs or other similar obligations, (but excluding trade debt and accrued expenses incurred in the ordinary course of business on normal trade terms and not overdue by more than ninety (90) days), (f) all obligations of such Person under take-or-pay or similar arrangements or under commodities agreements, (g) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any security interest in, lien or other encumbrance upon, or payable out of the proceeds of production from property owned or acquired by such Person, whether or not the obligations secured thereby have been assumed, (h) all Guaranty Obligations of such Person with respect to Indebtedness of another Person, (i) the principal portion of all Capital Lease Obligations of such Person, (j) all obligations of such Person under Hedge Agreements, (k) the maximum amount of all standby letters of credit issued or bankers' acceptances facilities created for the account of such Person and, without duplication, all drafts drawn thereunder (to the extent unreimbursed), (l) all preferred Equity Interests issued by such Person and which by the terms thereof could be (at the request of the holders thereof or otherwise) subject to mandatory sinking fund payments, redemption or other acceleration prior to the date which is ninety-one (91) days after the Maturity Date and other Disqualified Equity Interests, (m) the principal balance outstanding under any synthetic lease, tax retention operating lease, off-balance sheet loan or similar off-balance sheet financing product and (n) the Indebtedness of any partnership or unincorporated joint venture in which such Person is a general partner or a joint venturer, but only to the extent such Person is liable for such Indebtedness.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Borrower under any Loan Document and (b) to the extent not otherwise described in subsection (a), Other Taxes.

"Intangible Assets" means assets that in accordance with GAAP are properly classifiable as intangible assets, including, but not limited to, goodwill, franchises, licenses, patents, trademarks, trade names and copyrights.

"Intellectual Property" means any Borrower's now owned and hereafter arising or acquired:  patents, patent rights, patent applications, copyrights, works which are the subject matter of copyrights, copyright applications, copyright registrations, trademarks, servicemarks, trade names, trade styles, trademark and service mark applications, and licenses and rights to use any of the foregoing and all applications, registrations and recordings relating to any of the foregoing as may be filed in the United States Copyright Office, the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof, any political subdivision thereof or in any other country or jurisdiction, together with all rights and privileges arising under applicable Law with respect to any Borrower's use of any of the foregoing; all extensions, renewals, reissues, divisions, continuations, and continuations-in-part of any of the foregoing; all rights to sue for past, present and future infringement of any of the foregoing; inventions, trade secrets, formulae, processes, compounds, drawings, designs, blueprints, surveys, reports, manuals, and operating standards; goodwill (including any goodwill associated with any trademark or servicemark, or the license of any trademark or servicemark); customer and other lists in whatever form maintained; trade secret rights, copyright rights, rights in works of authorship; software and contract rights relating to computer software programs, in whatever form created or maintained.

"Intercreditor Agreement" means that certain Intercreditor Agreement by and between Lender and Term Agent, dated as of the Closing Date, as amended, restated supplemented or otherwise modified from time to time.

"Interest Expense" means, for any period, as to any Person, as determined in accordance with GAAP, the amount equal to total interest expense of such Person and its Subsidiaries on a consolidated basis for such period, whether paid or accrued (including the interest component of any Capital Lease for such period), and in any event, including, without limitation, (a) discounts in connection with the sale of any Accounts, (b) bank fees, commissions, discounts and other fees and charges owed with respect to letters of credit, banker's acceptances or similar instruments or any factoring, securitization or similar arrangements, (c) interest payable by addition to principal or in the form of property other than cash and any other interest expense not payable in cash, and (d) the costs or fees for such period associated with Hedge Agreements to the extent not otherwise included in such total interest expense (excluding breakage costs incurred in connection with the termination of Hedge Agreements on or about the Closing Date, if any).

"Interest Rate" means (a) subject to clause (c) of this definition below, as to all LIBOR Loans, a rate equal to the then Applicable Margin on a per annum basis plus the LIBOR Rate, (b) only to the extent available pursuant to Sections 3.7 and 3.8 hereof, and subject to clause (c) of this definition below, as to all Base Rate Loans, a rate equal to the then Applicable Margin on a per annum basis plus the Base Rate, and (c) notwithstanding anything to the contrary contained herein, to the extent provided for herein, the Default Rate. Lender may, at its option, increase the Interest Rate to the Default Rate for that amount of Revolving Loans outstanding in excess of the Borrowing Base (in each case whether or not such excess(es) arise or are made with or without the knowledge or consent of Lender and whether made before or after an Event of Default).

"Investment" shall have the meaning set forth in Section 8.5 hereof.

"Issuing Bank" means Bank Leumi USA, or such other bank as may be approved by Lender following notice to Borrowers.

"Laws" means each international, foreign, Federal, state and local statute, treaty, rule, guideline, regulation, ordinance, code and administrative or judicial precedent or authority, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and each applicable administrative order, directed duty, request, license, authorization and permit of, and agreement with, any Governmental Authority, in each case whether or not having the force of law.

"Lender Payment Account" means account no. 7651428500 of Lender, or such other account of Lender as Lender may from time to time designate in writing to Borrowers as Lender Payment Account for purposes of this Agreement and the other Loan Documents.

"Letter of Credit Documents" means, with respect to any Letter of Credit, such Letter of Credit, any amendments thereto, any documents delivered in connection therewith, any application therefor, and any agreements, instruments, guarantees or other documents (whether general in application or applicable only to such Letter of Credit) governing or providing for (a) the rights and obligations of the parties concerned or at risk or (b) any collateral security for such obligations.

"Letter of Credit Limit" means (a) as of the Closing Date, $500,000.00, and (b) thereafter, such other amount as may be acceptable to Lender in its discretion, from time to time.

"Letter of Credit Obligations" means, at any time, the sum of (a) the aggregate undrawn amount of all Letters of Credit outstanding at such time, plus, (b) without duplication, the aggregate amount of all drawings under Letters of Credit for which Issuing Bank has not at such time been reimbursed.

"Letters of Credit" means all letters of credit issued by Issuing Bank for the account of any Borrower pursuant to this Agreement, and all amendments, renewals, extensions or replacements thereof.

"LIBOR Loans" means any Revolving Loans, on which interest is payable based on the LIBOR Rate in accordance with the terms hereof.

"LIBOR Period" means, with respect to any LIBOR Loan, each period commencing on the first day of a calendar month and ending on the last day of such calendar month.

"LIBOR Rate" shall mean, with respect to any LIBOR Loans or other Obligations in respect of which interest is payable based on the LIBOR Rate in accordance with the terms hereof for any LIBOR Period, the greater of (i) the interest rate per annum determined by Lender by dividing (a) the rate quoted by the ICE Benchmark Administration Limited as its "LIBOR" rate for U.S. dollar deposits of one-month duration at or about 11:00 a.m., London time, (or, if Lender adopts generally in its business a different rate quoting system or service for obtaining the rate of interest commonly known as "LIBOR" for U.S. dollar deposits, then upon giving prompt notice thereof to Borrowers, such alternative rate quoting system or service shall be utilized for determining "LIBOR" in lieu of the rate quoted by the ICE Benchmark Administration Limited); provided, however, that if such rate cannot be determined by Lender as provided in the preceding clause (a) for any reason, as determined by Lender in its reasonable judgment, then a comparable replacement rate determined by Lender in its Permitted Discretion at such time (which determination shall be conclusive absent manifest error) by (b) a number equal to 1.00 minus the LIBOR Reserve Percentage, and (ii) the Federal Funds Rate plus one quarter of one percent (0.25%). For purposes hereof, "LIBOR Reserve Percentage" shall mean the percentage (expressed as a decimal, rounded upward to the next 1/100th of 1%) in effect on such day (whether or not applicable to Lender) under regulations issued from time to time by the Federal Reserve System Board for determining the maximum reserve requirement (including any emergency, supplemental or other marginal reserve requirement) with respect to Eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Federal Reserve System Board). Notwithstanding anything to the contrary contained herein, for the purposes of this Agreement, in no event shall the LIBOR Rate ever be less than two percent (2.0%) per annum.

"Loan Documents" means, collectively, this Agreement, the Security Documents, each Facility Guaranty and all notes, guarantees, intercreditor agreements and all other agreements, documents and instruments now or at any time hereafter executed and/or delivered by any Borrower in connection with this Agreement; provided, that, the Loan Documents shall not include Bank Product Agreements.

"Loan Parties" means, collectively, Borrowers and Guarantors, and Loan Party means any one of them.

"Material Adverse Effect" means a material adverse effect on (a) business, assets, liabilities, results of operations, property or financial condition of the Loan Parties, taken as a whole; (b) the ability of the Loan Parties, taken as a whole to perform any material obligation, when such material obligation is required to be performed under this Agreement or any of the other Loan Documents or (c) the validity or enforceability of this Agreement or any of the other Loan Documents or the rights or remedies of Lender hereunder or thereunder or the perfection or priority of any security interest or lien in favor of Lender.

"Material Contract" means (a) any contract or other agreement (other than the Loan Documents and Bank Product Agreements), written or oral, of any Borrower involving monetary liability of or to any Person in an amount in excess of $2,000,000 in any fiscal year (but excluding for this purpose contracts or other agreements for the purchase and sale of goods or services where the other party thereto has no obligation to purchase or sell such goods or services under such contract or other agreement) and (b) any other contract or other agreement (other than the Loan Documents and Bank Product Agreements), whether written or oral, to which any Borrower is a party as to which the breach, nonperformance, cancellation or failure to renew by any party thereto has or could reasonably be expected to have a Material Adverse Effect.

"Material Indebtedness" means Indebtedness (other than the Revolving Loans and Letters of Credit, or obligations in respect of one or more Bank Product Agreements), of any Borrower in an aggregate principal amount exceeding $3,500,000. For purposes of determining Material Indebtedness, the "principal amount" of the obligations of Borrower in respect of any Hedge Agreement at any time shall be the maximum aggregate amount (giving effect to any netting agreements) that any Borrower would be required to pay if such Hedge Agreement were terminated at such time. For the avoidance of doubt, "Material Indebtedness" includes the Term Loan Indebtedness.

"Maturity Date" means September 16, 2022.

"Maximum Credit" means the amount of $10,000,000.00.

"Maximum Interest Rate" means the maximum non-usurious rate of interest under applicable Federal or State Law as in effect from time to time that may be contracted for, taken, reserved, charged or received in respect of the indebtedness of Borrower to Lender, or to the extent that at any time such applicable Law may thereafter permit a higher maximum non-usurious rate of interest, then such higher rate.

"Maximum Revolving Loan Amount" means the lesser of (a) the Borrowing Base or (b) the Maximum Credit.

"Multiemployer Plan" means a "multi-employer plan" as defined in Section 4001(a)(3) of ERISA which is or was at any time during the current year or the immediately preceding six (6) years contributed to by any Borrower or any ERISA Affiliate or with respect to which any Borrower or any ERISA Affiliate may incur any liability.

"Net Cash Proceeds" means the aggregate cash proceeds received by any Borrower in respect of any sale, lease, transfer or other disposition of any assets or properties, or interest in assets and properties or as proceeds of any loans or other financial accommodations provided to it or as proceeds from the issuance and/or sale of any Equity Interests or Indebtedness, in each case net of the reasonable and customary direct costs relating to such

sale, lease, transfer or other disposition or loans or other financial accommodation or issuance and/or sale (including, without limitation, legal, accounting and investment banking fees, and sales commissions) and taxes paid or payable as a result thereof and in the case of a sale of any assets or properties or interest in assets and properties, amounts applied to the repayment of Indebtedness secured by a valid and enforceable lien (other than a lien created under the Loan Documents) on the asset or assets that are the subject of such sale or other disposition required to be repaid in connection with such transaction.

"Obligations" means any and all Revolving Loans, Letter of Credit Obligations, Bank Product Obligations, and all other obligations, liabilities and indebtedness of every kind, nature and description owing by any Borrower to Lender (or in the case of Bank Product Agreements, Affiliates of Lender), including, without limitation, principal, interest, charges, fees, costs and expenses, however evidenced, whether as principal, surety, endorser, guarantor or otherwise, arising under any of the Loan Documents or the Bank Product Agreements, whether now existing or hereafter arising, whether arising before, during or after the initial or any renewal term of this Agreement or after the commencement of any case with respect to under the Bankruptcy Code or any similar statute (including the payment of interest and other amounts which would accrue and become due but for the commencement of such case, whether or not such amounts are allowed or allowable in whole or in part in such case), whether direct or indirect, absolute or contingent, joint or several, due or not due, primary or secondary, liquidated or unliquidated, or secured or unsecured.

"OFAC" means the U.S. Department of the Treasury's Office of Foreign Assets Control.

"Organization Documents" means, with respect to any Person, the certificate or articles of incorporation, by-laws, operating agreement, or other organizational documents of such Person.

"Other Taxes" means present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies of the United States or any political subdivision thereof or any applicable foreign jurisdiction, and all liabilities with respect thereto, in each case arising from any payment made hereunder or under any of the other Loan Documents or from the execution, delivery or registration of, or otherwise with respect to, this Agreement or any of the other Loan Documents.

"Pass-Through Tax Liabilities" means the amount of state and federal income tax paid or to be paid by the owner of any Equity Interest in any Borrower on taxable income earned by such Borrower and attributable to such owner as a result of such Borrower's "pass-through" tax status, assuming the highest marginal income tax rate for federal and state (for the state or states in which any equity owner is liable for income taxes with respect to such income) income tax purposes, after taking into account any deduction for state income taxes in calculating the federal income tax liability and all other deductions, credits, deferrals and other reductions available to such owners from or through such Borrower.

"Pension Plan" means a pension plan (as defined in Section 3(2) of ERISA) subject to Title IV of ERISA which any Borrower sponsors, maintains, or to which such Borrower or an ERISA Affiliate makes, is making, or is obligated to make contributions, other than a Multiemployer Plan.

"Permitted Discretion" means as used in this Agreement with reference to Lender, a determination made in good faith in the exercise of its reasonable business judgment, in accordance with its customary business practices, based on how an asset-based lender with similar rights providing a credit facility of the type set forth herein would act in similar circumstances at the time with the information then available to it.

"Permitted Dispositions" means each of the following:

    (a)   the sale of accounts receivable in connection with the collection or compromise thereof in the ordinary course of business consistent with the practices of Borrowers as of the Closing Date;

(b)  the issuance of Equity Interests of any Borrower consisting of common stock pursuant to an employee stock option or grant or similar equity plan or 401(k) plans of such Borrower for the benefit of its employees, directors and consultants; provided, that, in no event shall any Borrower be required to issue, or shall any Borrower issue, Equity Interests pursuant to such stock plans or 401(k) plans which would result in a Change of Control or other Default or Event of Default;

(c)  the abandonment or other disposition of Intellectual Property that is not material and is no longer used or useful in any material respect in the business of a Borrower or is not necessary in connection with the Records or have any material value;

(d)  any transfer of property or assets, or issuance of Equity Interests, that is a Restricted Payment permitted under Section 8.8 or Permitted Investment permitted under Section 8.5;

(e)  the transfer of cash for the payment of Indebtedness to the extent such payments are permitted hereunder and for the payment of other payables in the ordinary course of the business of any Borrower;

(f)  the licensing of Intellectual Property on a non-exclusive basis to third parties in the ordinary course of business consistent with past practice; and

(g)  transactions permitted under Section 6.07(e) of the Term Loan Agreement.

"Permitted Holders" means the equity owners of the Borrowers as of the Closing Date, and each of their respective Affiliates.

"Permitted Indebtedness" means:

(a)  Indebtedness arising pursuant to the Term Loan Agreement, in accordance with, and subject to, the terms of the Intercreditor Agreement (and provided that the Intercreditor Agreement is at all times in full force and effect);

(b)  the Obligations;

(c)  Indebtedness (including Capital Lease Obligations) arising after the date hereof to the extent secured by security interests in Equipment and mortgages on Real Property acquired after the date hereof in an aggregate outstanding principal amount not to exceed $1,000,000 at any time; provided, that, (i) such security interests and mortgages do not apply to any property of any Loan Party other than specific items of Equipment or Real Property (and, in each case, the products or proceeds thereof and accessions thereto and related books and records) , (ii) the Indebtedness secured thereby does not exceed the cost of the applicable Equipment or Real Property, as the case may be,  plus, if applicable, taxes thereon and related installation and delivery charges , and (ii)  as of the date any such Indebtedness is incurred and immediately after giving effect thereto, no Default or Event of Default shall exist or have occurred and be continuing;

(d)  Indebtedness of any Borrower entered into in the ordinary course of business pursuant to a Hedge Agreement; provided, that, (i) such arrangements are not for speculative purposes, and (ii) such Indebtedness shall be unsecured, except to the extent such Indebtedness constitutes part of the Obligations;

(e)  Indebtedness in respect of netting services, overdraft protections and otherwise in connection with deposit accounts and Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently (except in the case of daylight overdrafts) drawn against insufficient funds in the ordinary course of business; provided, that, such Indebtedness is extinguished within five (5) Business Days of incurrence;

(f)    Guaranty Obligations in respect of Indebtedness of any Borrower to the extent that such Indebtedness is otherwise permitted pursuant to this definition of Permitted Indebtedness;

(g)    Indebtedness of any Borrower in respect of bid, payment and performance bonds, workers' compensation claims, unemployment insurance, health, disability and other employee benefits or property, casualty or liability insurance, or guarantees of the foregoing types of Indebtedness, in the ordinary course of business and consistent with current practices as of the Closing Date;

(h)    Refinancing Indebtedness;

(i)    unsecured Indebtedness incurred after the Closing Date and not otherwise specifically described in this definition so long as each of the following conditions is satisfied:  (i) such Indebtedness shall have a maturity date that is at least ninety-one (91) days after the Maturity Date, and shall not include covenants, defaults and remedy provisions that are more restrictive in any material respect to any Borrower than the terms of this Agreement taken as a whole, (ii) such Indebtedness shall not have scheduled amortization payments in excess of one percent (1%) of the principal amount thereof in any fiscal year of such Borrower, (iii) the aggregate principal amount of all such Indebtedness outstanding at any time shall not exceed $1,000,000, and (iv) as of the date of incurring such Indebtedness and immediately after giving effect thereto, no Default or Event of Default shall exist or have occurred and be continuing;

(j)    the Indebtedness set forth in Schedule 8.1;

(k)    Subordinated Debt which is also set forth in Schedule 8.1;

(l)    Indebtedness under the Shareholder Notes; and

(m)    "Permitted Indebtedness" as defined in the Term Loan Agreement

"Permitted Investments" means each of the following:

(a)    Investments consisting of accounts receivables owing to any Borrower if created or acquired in the ordinary course of business and payable or dischargeable in accordance with customary terms;

(b)    the endorsement of instruments for collection or deposit in the ordinary course of business;

(c)    Investments in Cash Equivalents acceptable to Lender or the Cash Management Bank;

(d)    deposits of cash for leases, utilities, worker's compensation and similar matters in the ordinary course of business;

(e)    obligations under Hedge Agreements permitted under clause (d) of the definition of Permitted Indebtedness hereof;

(f)    payroll, travel, commission and similar advances to cover matters that in good faith are expected at the time of such advances to be treated as expenses for accounting purposes in accordance with GAAP and that are made in the ordinary course of business consistent with current practices as of the Closing Date;

(g)    loans and advances by any Borrower to directors, officers and employees of such Borrower in the ordinary course of business for bona fide (including, without limitation, in connection with the purchase of Equity Interests by such directors, officers and employees) business purposes not in excess of $250,000 at any time outstanding, which shall be evidenced by a promissory note and pledged to Lender as additional Collateral;

(h)    stock or obligations issued to any Borrower by any Person (or the representative of such Person) in respect of Indebtedness of such Person owing to such Borrower in connection with the insolvency, bankruptcy, receivership or reorganization of such Person or a composition or readjustment of the debts of such Person;

(i)    obligations of account debtors to any Borrower arising from Accounts which are past due evidenced by a promissory note made by such account debtor payable to such Borrower;

(j)    Investments after the Closing Date by any Borrower in or to any Person (including, without limitation, a joint venture, partnership or other similar arrangement, whether in corporate, partnership or other legal form) not otherwise subject to the provisions above; provided, that, as to any such Investment, each of the following conditions is satisfied:  (i) as of the date of the Investment or any payment in respect thereof and after giving effect to the Investment or such payment, no Default or Event of Default shall exist or have occurred and be continuing; (ii) the Excess Availability for the period of sixty (60) consecutive days immediately preceding the date of such Investment or any payment in respect thereof shall be not less than $1,000,000; (iii) as of the date of such Investment and after giving effect thereto and to any payments in connection therewith, using the most recent calculation of the Borrowing Base prior to the date of any such Investment and payment, on a pro forma basis, Excess Availability shall be not less than $1,000,000; (iv) the Investment shall be in or to a Person that engages in a line of business substantially similar to, or ancillary or related to, or used or useful to, the business that such Borrower is engaged in on the Closing Date; and (v) Lender shall have received a certificate of a Responsible Officer of such Borrower certifying to Lender that such transaction complies with this definition;

(k)    Investments consisting of loans and advances set forth on Schedule 8.5 which are not otherwise permitted by the other clauses of this definition; and

(l)    Investments permitted under Section 6.04 of the Term Loan Agreement.

"Permitted Liens" means:

(a)    the security interests and liens of Lender and the rights of setoff of Lender provided for herein, in any of the other Loan Documents, or under applicable Law;

(b)    the security interest and liens of Term Agent arising pursuant to the Term Loan Agreement, in accordance with, and subject to, the terms of the Intercreditor Agreement (and provided that the Intercreditor Agreement is at all times in full force and effect);

(c)    liens securing the payment of taxes, assessments or other governmental charges or levies either not yet overdue or the validity of which are being contested in good faith by appropriate proceedings diligently pursued and available to any Borrower, which proceedings (or orders entered in connection with such proceedings) have the effect of preventing the forfeiture or sale of the property subject to any such lien and with respect to which adequate reserves have been set aside on its books in accordance with GAAP;

(d)    non-consensual statutory liens (other than liens arising under ERISA or securing the payment of taxes) arising in the ordinary course of any Borrower's business that do not secure Indebtedness for borrowed money, such as carriers', warehousemen's, materialmen's, landlords', workmen's suppliers', repairmen's and mechanics' liens, to the extent:  (i) such liens do not in the aggregate materially detract from the value of the property of such Borrower and do not materially impair the use thereof in the operation of such Borrower, (ii) such liens secure Indebtedness which is not overdue or is fully insured and being defended at the sole cost and expense and at the sole risk of the insurer or being contested in good faith by appropriate proceedings diligently pursued and available to such Borrower, in each case prior to the commencement of foreclosure or other similar proceedings, which proceedings (or orders entered in connection with such proceeding) have the effect of preventing the forfeiture or sale of the property subject to any such lien and with respect to which adequate reserves have been set aside on its books in accordance with GAAP;

(e)  zoning restrictions, easements, licenses, covenants and other restrictions affecting the use of Real Property which do not interfere in any material respect with the use of such Real Property or ordinary conduct of the business of any Borrower as presently conducted thereon or materially impair the value or marketability of the Real Property which may be subject thereto;

(f)  pledges and deposits of cash by any Borrower after the Closing Date in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security benefits consistent with the current practices of such Borrower as of the Closing Date;

(g)  pledges and deposits of cash by any Borrower after the Closing Date to secure the performance of tenders, bids, leases, trade contracts (other than for the repayment of Indebtedness), statutory obligations and other similar obligations in each case in the ordinary course of business consistent with the current practices of such Borrower as of the Closing Date;

(h)  statutory or common Law liens or rights of setoff of depository banks with respect to funds of any Borrower at such banks to secure fees and charges in connection with returned items or the standard fees and charges of such banks in connection with the deposit accounts maintained by such Borrower at such banks (but not any other Indebtedness or obligations);

(i)  judgments and other similar liens arising in connection with court proceedings that do not constitute an Event of Default; provided, that, (i) such liens are being contested in good faith and by appropriate proceedings diligently pursued, (ii) adequate reserves or other appropriate provision, if any, as are required by GAAP have been made therefor, (iii) a stay of enforcement of any such liens is in effect and (iv) Lender may establish a Reserve with respect thereto;

(j)  leases or subleases of Real Property granted by any Borrower in the ordinary course of business and consistent with current practices of such Borrower to any Person so long as any such leases or subleases do not interfere in any material respect with the ordinary conduct of the business of such Borrower as presently conducted thereon;

(k)  liens on goods in favor of customs and revenue authorities arising as a matter of Law to secure custom duties in connection with the importation of such goods;

(l)  the security interests and liens set forth on Schedule 8.2 which are not otherwise permitted under the other clauses of this definition and any security interests and liens to secure Refinancing Indebtedness of the Indebtedness secured by such security interests and liens to the extent permitted under the definition of Refinancing Indebtedness; and

(m)  "Permitted Liens" as defined in the Term Loan Agreement.

"Person" or "person" means any individual, sole proprietorship, partnership, corporation (including any corporation which elects subchapter S status under the Code), limited liability company, limited liability partnership, business trust, unincorporated association, joint stock corporation, trust, joint venture or other entity or any government or any agency or instrumentality or political subdivision thereof.

"Plan" means an employee benefit plan (as defined in Section 3(3) of ERISA) which Borrower sponsors, maintains, or to which it makes, is making, or is obligated to make contributions, or in the case of a Multiemployer Plan has made contributions at any time during the immediately preceding six (6) plan years or with respect to which Borrower may incur liability.

"Provision for Taxes" means an amount equal to all taxes imposed on or measured by net income, whether Federal, State, county or local, and whether foreign or domestic, that are paid

"Qualified Cash" means, as of any date of determination, the aggregate amount of unrestricted cash and Cash Equivalents held at such time by any Borrower at a deposit account maintained with Cash Management Bank and subject to a Control Agreement or other control arrangements satisfactory to Lender.

"Real Property" means all now owned and hereafter acquired real property of any Loan Party, including leasehold interests, together with all buildings, structures, and other improvements located thereon and all licenses, easements and appurtenances relating thereto, wherever located.

"Records" means all of Loan Parties' present and future books of account of every kind or nature, purchase and sale agreements, invoices, ledger cards, bills of lading and other shipping evidence, statements, correspondence, memoranda, credit files and other data relating to the Collateral or any account debtor, together with the tapes, disks, diskettes and other data and software storage media and devices, file cabinets or containers in or on which the foregoing are stored (including any rights of any Loan Party with respect to the foregoing maintained with or by any other person).

"Refinancing Indebtedness" means Indebtedness of any Loan Party arising after the Closing Date issued in exchange for, or the proceeds of which are used to extend, refinance, replace or substitute for other Permitted Indebtedness (such extended, refinanced, replaced or substituted Indebtedness, the "Refinanced Obligations") to the extent permitted hereunder; provided, that:  (a) Lender shall have received not less than ten (10) Business Days' prior written notice of the intention to incur such Indebtedness, which notice shall set forth in reasonable detail reasonably satisfactory to Lender the amount of such Indebtedness, the schedule of repayments and maturity date with respect thereto and such other information with respect thereto as Lender may reasonably request; (b) the principal amount of such Refinancing Indebtedness shall not exceed the principal amount of the Refinanced Obligations (plus the amount of reasonable refinancing fees and expenses incurred in connection therewith), any prepayment premiums and any accrued interest on account thereof; (c) such Indebtedness shall have a final maturity that is no earlier than the final maturity of the Refinanced Obligations; (d) such Indebtedness shall have a Weighted Average Life to Maturity not less than the Weighted Average Life to Maturity of the Refinanced Obligations; (e) such Indebtedness shall rank in right of payment no more senior than, and be subordinated (if subordinated) to the Obligations on terms no less favorable to such Loan Party and Lender than the Refinanced Obligations; (f) if the Refinanced Obligations or any guarantees thereof are unsecured, such Indebtedness and any guarantees thereof shall be unsecured; (g) if the Refinanced Obligations or any guarantees thereof are secured, such Indebtedness and any guarantees thereof shall be secured in all material respects by substantially the same or less collateral as secured such Refinanced Obligations or any guarantees thereof; (h) if the Refinanced Obligations or any guarantees thereof are secured, the liens to secure such Indebtedness shall not have a priority more senior than the liens securing the Refinanced Obligations and if subordinated to any other liens on such property, shall be subordinated to Lender's security interests; (i) if the Refinanced Obligations or any guarantees thereof are subordinated to any Indebtedness of such Loan Party other than the Obligations, such Refinancing Indebtedness and any guarantees thereof shall be subordinated to the Obligations on terms (including intercreditor terms) no less favorable to Lender; (j) the obligors in respect of the Refinanced Obligations immediately prior to such refinancing, refunding, extending, renewing or replacing thereof shall be the only obligors on such Indebtedness; and (k) the terms and conditions (excluding as to pricing, premiums and optional prepayment or redemption provisions) of any such Indebtedness, taken as a whole, are not more restrictive with respect to such Loan Party, as reasonably determined by such Loan Party in good faith, than the terms and conditions of the Refinanced Obligations.

"Reserves" means as of any date of determination, such amounts as Lender may from time to time establish and revise in its Permitted Discretion reducing the amount of Revolving Loans and Letters of Credit which would otherwise be available to Borrowers under the lending formula(s) provided for herein:  (a) to reflect events, conditions, contingencies or risks which, as determined by Lender in its Permitted Discretion, adversely affect, or would have a reasonable likelihood of adversely affecting, either (i) the Collateral or any other property which is security for the Obligations, its value or the amount that might be received by Lender from the sale or other disposition or realization upon such Collateral, or (ii) the assets or business of any Borrower, or (iii) the

security interests and other rights of Lender in the Collateral (including the enforceability, perfection and priority thereof), or (b) to reflect Lender's good faith belief that any collateral report or financial information furnished by or on behalf of any Borrower to Lender is or may have been incomplete, inaccurate or misleading in any material respect or (c) in respect of any Default or an Event of Default.  To the extent that such Reserve is in respect of amounts that may be payable to third parties, Lender may, at its option, deduct such Reserve from the Maximum Credit at any time that such limit is less than the amount of the Borrowing Base.  So long as Excess Availability exceeds the aggregate amount of all Customer Deposits by at least $1,500,000, and no Default or Event of Default has occurred and is continuing, Lender agrees that it shall not establish a Reserve for Customer Deposits; provided, however, that if at any date of determination Excess Availability does not exceed the aggregate amount of all Customer Deposits by at least $1,500,000, or a Default or an Event of Default has occurred and is continuing, Lender may establish a Reserve in an amount equal to the potential offset created by all Customer Deposits.

"Responsible Officer" means the chief executive officer, president, or chief financial officer of each Borrower or any of the other individuals designated in writing by an existing Responsible Officer of each Borrower as an authorized signatory of any certificate or other document to be delivered hereunder.  Any document delivered hereunder that is signed by a Responsible Officer of any Borrower shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Borrower and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Borrower.

"Restricted Payment" means any (a) dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests of any Borrower, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interests or on account of any return of capital to such Borrower's stockholders, partners or members (or such Borrower's equivalent Person thereof), or payment made to redeem, purchase, repurchase or retire, or to obtain the surrender of, any outstanding warrants, options or other rights to acquire any Equity Interests of such Borrower, or any setting apart of funds or property for any of the foregoing, and (b) the payment by any Borrower of any management, advisory or consulting fee to any Person or the payment of any extraordinary salary, bonus or other form of compensation to any Person who is directly or indirectly a significant partner, shareholder, owner or executive officer of any such Person, to the extent such extraordinary salary, bonus or other form of compensation is not included in the corporate overhead of such Borrower.

"Revolving Loans" means loans now or hereafter made by Lender on a revolving basis pursuant to the Credit Facility (involving advances, repayments and re-advances) as set forth in Section 2.1 hereof.

"Sale and Leaseback Transaction" shall have the meaning set forth in Section 8.12.

"Sanctioned Entity" means an agency of the government of, or an organization directly or indirectly controlled by, or a person resident in, a country that is subject to Sanctions, or a country or territory that is at any time subject to Sanctions.

"Sanctioned Person" means a person named on the list of Specially Designated Nationals or Blocked Persons maintained by OFAC.

"Sanctions" means (a) economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by the U.S. government and administered by OFAC and (b) economic or financial sanctions imposed, administered or enforced from time to time by the U.S. State Department, the U.S. Department of Commerce or the U.S. Department of the Treasury.

"Security Agreement" means the Security Agreement, dated of even date herewith, by and between Borrower and Lender.

"Security Documents" means, collectively, the Security Agreement and any other agreements, instruments and documents at any time executed by Borrower or any other Person in connection with this Agreement that are intended to create, perfect or evidence security interests or liens to secure the Obligations.

"Shareholder Notes" means, collectively, the 7% Notes and the 10% Notes.

"Solvent" means, at any time with respect to any Person, that at such time such Person (a) is able to pay its debts as they mature and has (and has a reasonable basis to believe it will continue to have) sufficient capital (and not unreasonably small capital) to carry on its business consistent with its practices as of the Closing Date, and (b) the assets and properties of such Person at a fair valuation (and including as assets for this purpose at a fair valuation all rights of subrogation, contribution or indemnification arising pursuant to any guarantees given by such Person) are greater than the Indebtedness of such Person, and including subordinated and contingent liabilities computed at the amount which, such person has a reasonable basis to believe, represents an amount which can reasonably be expected to become an actual or matured liability (and including as to contingent liabilities arising pursuant to any guarantee the face amount of such liability as reduced to reflect the probability of it becoming a matured liability).

"Standby Letter of Credit" means all Letters of Credit other than Commercial Letters of Credit.

"Subordinated Debt" means any Indebtedness of Borrower that is subject to, and subordinate in right of payment to, the right of Lender to receive payment in full of all of the Obligations and is otherwise on terms (including maturity, interest, fees, repayment, covenants and subordination) satisfactory to Lender.

"Subsidiary" or "subsidiary" means, with respect to any Person, any corporation, limited liability company, limited liability partnership or other limited or general partnership, trust, association or other business entity of which an aggregate of at least a majority of the outstanding Equity Interests or other interests entitled to vote in the election of the board of directors of such corporation (irrespective of whether, at the time, Equity Interests of any other class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency), managers, trustees or other controlling persons, or an equivalent controlling interest therein, of such Person is, at the time, directly or indirectly, owned by such Person and/or one or more subsidiaries of such Person.

"Tangible Net Worth" means, as to CL PI Holdings and its subsidiaries on a consolidated basis, Total Assets minus the sum of (i) Intangible Assets and (ii) Total Liabilities.

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Term Agent" means, collectively, the "Administrative Agent" and the "Collateral Agent" under the Term Loan Agreement.

"Total Assets" means total assets determined in accordance with GAAP.

"Term Collateral" has the meaning given to "Collateral" in the Term Loan Agreement (as of the date hereof, substantially all personal property of Borrowers and the other grantors of liens under the Term Loan Documents).

"Total Liabilities" means total indebtedness determined in accordance with GAAP.

"Term Loan Agreement" means that certain Credit Agreement, dated as of August 2, 2019, among CarbonLite Holdings, LLC, a Delaware limited liability company ("Holdings"), as borrower, Borrowers and certain other subsidiaries of Holdings, as guarantors, the lenders party thereto, and Orion Energy Partners Investment Agent, LLC, a Delaware limited liability company, as administrative agent and collateral agent, as amended, restated, supplemented or otherwise modified from time to time.

"Term Loan Documents" has the meaning given to "Financing Document" in the Term Loan Agreement.

"Term Loan Indebtedness" means all Indebtedness incurred pursuant to the Term Loan Documents.

"Type" means, with respect to Revolving Loans, its character as a Base Rate Loan or a LIBOR Loan.

"UCC" means the Uniform Commercial Code as in effect in the State of New York and any successor statute, as in effect from time to time (except that terms used herein which are not otherwise defined herein and defined in the Uniform Commercial Code as in effect in the State of New York on the Closing Date shall continue to have the same meaning notwithstanding any replacement or amendment of such statute except as Lender may otherwise determine).

"Weighted Average Life to Maturity" means, when applied to any Indebtedness at any date, the number of years obtained by dividing (a) the then outstanding principal amount of such Indebtedness into (b) the total of the product obtained by multiplying (i) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect thereof, by (ii) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment.

1.2    Interpretative Provisions.  With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)    General.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  The word "will" has the same meaning and effect as the word "shall."  Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document shall be construed as referring to such agreement, instrument or other document as from time to time amended, modified, supplemented, extended, renewed, restated or replaced (subject to any restrictions on such amendments, supplements or modifications set forth herein or in any other Loan Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "herein," "hereof" and "hereunder," and words of similar import when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision thereof, (iv) all references in a Loan Document to Sections, Exhibits and Schedules shall be construed to refer to Sections of, and Exhibits and Schedules to, the Loan Document in which such references appear, (v) any reference to any Law shall include all statutory and regulatory provisions consolidating, amending, replacing, recodifying, supplementing or interpreting such Law and any reference to any Law or regulation shall, unless otherwise specified, refer to such Law or regulation as amended, modified or supplemented from time to time, and (vi) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.  Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.  An Event of Default shall exist or continue or be continuing until such Event of Default is waived in accordance with Section 11.3 or is cured.  Borrower shall have the burden of establishing any alleged negligence, misconduct or lack of good faith by Lender or Issuing Bank under any Loan Documents.  No provision of any Loan Documents shall be construed against any party by reason of such party having, or being deemed to have, drafted the provision.  Reference to a

Borrower's "knowledge" or similar concept means actual knowledge of a Responsible Officer, or knowledge that a Responsible Officer would have obtained if he or she had engaged in good faith and diligent performance of his or her duties, including reasonably specific inquiries of employees or agents and a good faith attempt to ascertain the matter.

(b)    UCC Terms.  Any terms used in this Agreement that are defined in the UCC shall be construed and defined as set forth in the UCC unless otherwise defined herein; provided, that, to the extent that the UCC is used to define any term herein and such term is defined differently in different Articles of the UCC, the definition of such term contained in Article 9 of the UCC shall govern.

(c)    Time References.  Unless otherwise indicated herein, all references to time of day refer to Eastern Standard Time or Eastern Daylight Saving Time, as in effect in New York City on such day.  For purposes of the computation of a period of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each means "to and including"; provided, that, with respect to a computation of fees or interest payable to Lender, such period shall in any event consist of at least one full day.

(d)    Payment in Full.  Any reference herein or in any other Loan Document to the satisfaction, repayment, or payment in full of the Obligations shall mean (i) the payment in full in cash of the principal and accrued and unpaid interest with respect to the Revolving Loans, (ii) the payment in full of all fees, charges and expenses that have accrued and are unpaid regardless of whether payment has been demanded or are otherwise due, (iii) the delivery to Lender of cash collateral, or at Lender's option, the delivery to Lender of a letter of credit payable to Lender issued by a bank acceptable to Lender and in form and substance satisfactory to Lender, in either case in respect of (A) Letter of Credit Obligations not to exceed one hundred five (105%) percent of such amount, (B) Bank Product Obligations (or, at the option of Lender, the termination of the applicable Bank Product or cash management arrangements and the payment in full in cash of the Bank Product Obligations due and payable in connection with such termination), (C) continuing obligations of Lender under Control Agreements and (D) other contingent Obligations for which a claim or demand for payment has been made at such time or in respect of matters or circumstances known to Lender at the time, and which are reasonably expected to result in any loss, cost, damage or expense (including attorneys' fees and legal expenses) to Lender for which Lender would be entitled to indemnification by Borrower hereunder, and (iv) the termination of the Commitment of Lender and the financing arrangements provided by Lender to Borrower hereunder.

(e)    LLC Division. Any reference herein to a merger, transfer, consolidation, amalgamation, consolidation, assignment, sale, disposition or transfer, or similar term, shall be deemed to apply to a division of or by a limited liability company, or an allocation of assets to a series of a limited liability company (or the unwinding of such a division or allocation), in each case, pursuant to Chapter 18, Title 6, Section 18-217 of the Delaware Limited Liability Company Act, as if it were a merger, transfer, consolidation, amalgamation, consolidation, assignment, sale or transfer, or similar term, as applicable, to, of or with a separate Person.  Any division of a limited liability company shall constitute a separate Person hereunder (and each division of any limited liability company that is a Subsidiary, joint venture or any other like term shall also constitute such a Person or entity).

1.3    Accounting Terms.  Unless otherwise specified herein, all accounting terms used herein shall be interpreted, all accounting determinations hereunder shall be made, and all financial statements required to be delivered hereunder shall be prepared in accordance with GAAP applied on a basis consistent with the most recent audited consolidated and consolidating financial statements of Borrower delivered to Lender; provided, that, in the event of any change in GAAP after the Closing Date that affects the covenant in Section 9 hereof, Borrower may by notice to Lender, or Lender may by notice to Borrower require that such covenants be calculated in accordance with GAAP as in effect, and as applied by Borrower immediately before the applicable change in GAAP became effective, until either the notice from the applicable party is withdrawn or such covenant is amended in a manner satisfactory to Borrower and Lender.  Borrower shall deliver to Lender at the

same time as the delivery of any financial statements given in accordance with the provisions of Section 7.1 hereof (a) a description in reasonable detail of any material change in the application of accounting principles employed in the preparation of such financial statements from those applied in the most recently preceding monthly, quarterly or annual financial statements and (b) a reasonable estimate of the effect on the financial statements on account of such changes in application.  Notwithstanding anything to the contrary contained herein, (i) all financial statements delivered hereunder shall be prepared, and the financial covenant contained herein shall be calculated, without giving effect to any election under the Statement of Financial Accounting Standards No. 159 (or any similar accounting principle) permitting a Person to value its financial liabilities or Indebtedness at the fair value thereof, and (ii) the term "unqualified opinion" as used herein to refer to opinions or reports provided by accountants shall mean an opinion or report that is (A) unqualified, and (B) does not include any explanation, supplemental comment, or other comment concerning the ability of the applicable Person to continue as a going concern or concerning the scope of the audit.

1.4     Rounding.  Any financial ratios required to be maintained by Borrower pursuant to this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

1.5     Letter of Credit Amounts.  Unless otherwise specified, all references herein to the amount of a Letter of Credit at any time shall be deemed to be the maximum amount for which it may be honored in effect at such time; provided, that, with respect to any Letter of Credit that, by its terms, provides for one or more automatic increases in the stated amount thereof, the amount of such Letter of Credit shall be deemed to be the maximum stated amount of such Letter of Credit after giving effect to all such increases, whether or not such maximum stated amount is in effect at such time.

## SECTION 2.    CREDIT FACILITY

2.1     Revolving Loans.  Subject to, and upon the terms and conditions contained herein, Lender agrees to make Revolving Loans to Borrower from time to time in amounts requested by Borrower; provided, that, after giving effect to any such Revolving Loan, the aggregate principal amount of the Revolving Loans and Letter of Credit Obligations outstanding shall not exceed the Maximum Revolving Loan Amount. Subject to the terms and conditions hereof, Borrower may from time to time borrow, prepay and re-borrow Revolving Loans.

2.2     Letters of Credit.

(a)     General.  Subject to, and upon the terms and conditions contained herein and in the Letter of Credit Documents, at the request of Borrower, Lender agrees to arrange for Issuing Bank to issue, for the account of Borrower, one or more Letters of Credit, containing terms and conditions acceptable to Lender and Issuing Bank.

(b)     Notice of Issuance, Amendment, Renewal, Extension. Borrower shall give Lender and Issuing Bank three (3) Business Days' prior written notice of Borrower's request for the issuance of a Letter of Credit (or the amendment, renewal or extension of an outstanding Letter of Credit).  Such notice shall be irrevocable and shall (i) specify the original face amount of the Letter of Credit requested (or identify the Letter of Credit to be amended, renewed or extended), (ii) the effective date (which date shall be a Business Day and in no event shall be a date less than ten (10) days prior to the end of the then current term of this Agreement) of issuance of such requested Letter of Credit (or such amendment, renewal or extension), (iii) whether such Letter of Credit may be drawn in a single or in partial draws, (iv) the date on which such requested Letter of Credit is to expire, (v) the purpose for which such Letter of Credit is to be issued, (vi) the name and address of the beneficiary of the requested Letter of Credit, (vii) such other information as shall be necessary to enable Issuing Bank to prepare, amend, renew or extend such Letter of Credit and (viii) if requested by Issuing Bank or Lender, Borrower shall have delivered to Issuing Bank with respect thereto at such times and in such manner as Issuing

Bank may require, an application, in form and substance satisfactory to Issuing Bank and Lender, for the issuance of the Letter of Credit and such other Letter of Credit Documents as may be required pursuant to the terms thereof. If requested by the Issuing Bank, Borrower shall attach to the request the proposed terms of the Letter of Credit. In no event shall a Letter of Credit be issued, amended, renewed or extended unless the forms and terms of the proposed Letter of Credit (as amended, renewed or extended, as the case may be) is satisfactory to Lender and Issuing Bank. The renewal or extension of, or increase in the amount of, any Letter of Credit shall, for purposes hereof, be treated in all respects the same as the issuance of a new Letter of Credit hereunder.

(c)     Certain Conditions.  In addition to being subject to the satisfaction of the applicable conditions precedent contained in Section 4 hereof and the other terms and conditions contained herein, a Letter of Credit shall be issued, amended, renewed or extended only if (and on issuance, amendment, renewal or extension of each Letter of Credit, Borrower shall be deemed to represent and warrant that) immediately after giving effect to such issuance, amendment, renewal or extension:  (i)  no order of any court, arbitrator or other Governmental Authority shall purport by its terms to enjoin or restrain money center banks generally from issuing letters of credit of the type and in the amount of the proposed Letter of Credit, and no Law, rule or regulation applicable to money center banks generally and no request or directive (whether or not having the force of Law) from any Governmental Authority with jurisdiction over money center banks generally shall prohibit, or request that Issuing Bank refrain from, the issuance of letters of credit generally or the issuance of such Letter of Credit, (ii) except as otherwise expressly permitted hereunder, after giving effect to the issuance, amendment, renewal or extension of such Letter of Credit, the Letter of Credit Obligations shall not exceed the Letter of Credit Limit, and (iii) after giving effect to the issuance, amendment, renewal or extension of any such Letter of Credit, (A) the aggregate principal amount of the Revolving Loans and Letter of Credit Obligations outstanding shall not exceed the Maximum Revolving Loan Amount.  Promptly after the delivery of any Letter of Credit or amendment to a Letter of Credit, Issuing Bank will also deliver to Borrower and Lender a true and complete copy of such Letter of Credit or amendment.  Except in Lender's discretion, the amount of all outstanding Letter of Credit Obligations shall not at any time exceed the Letter of Credit Limit.

(d)     Expiration.  Each Standby Letter of Credit shall expire at or prior to the earlier of (i) twelve (12) months after the date of the issuance of such Standby Letter of Credit (or in the case of any renewal or extension thereof, twelve (12) months after such renewal or extension) and (ii) the date that is ten (10) Business Days prior to the Maturity Date; provided, that, (A) any Standby Letter of credit with a one year tenor may provide for automatic renewal or extension thereof for additional one year periods (which in no event shall extend beyond the date referred to in clause (ii) above) so long as such Standby Letter of Credit permits Issuing Bank to prevent any such extension at least once in each twelve-month period (commencing with the date of issuance of such Standby Letter of Credit) by giving prior notice to the beneficiary thereof within a time period during such twelve-month period to be agreed upon at the time such Standby Letter of Credit is issued and (B) if Issuing Bank and Lender each consent, the expiration date on any Standby Letter of Credit may extend beyond the date referred to in clause (ii) above.  Each Commercial Letter of Credit shall expire on the earlier of one hundred eighty (180) days after such Commercial Letter of Credit's date of issuance, renewal or extension (as applicable) or the date ten (10) Business Days prior to the Maturity Date.

(e)     Reimbursement.  If Issuing Bank shall make any payment in respect of a Letter of Credit, Borrower shall reimburse Issuing Bank by paying to Lender an amount equal to such payment by Issuing Bank not later than 12:00 noon on the date that such payment by Issuing Bank is made, if Borrower shall have received notice of such payment by Issuing Bank prior to 10:00 a.m. on such date, or, if such notice shall not have been received by Borrower prior to such time on such date, then not later than 12:00 noon on the Business Day immediately following the day that Borrower receives such notice, if such notice is not received prior to such time on the day of receipt; provided, that, each drawing under any Letter of Credit or other amount payable in connection therewith when due shall constitute a request by Borrower to Lender for a LIBOR Loan in the amount of such drawing or other amount then due, and shall be made by Lender as a Revolving Loan in an equivalent amount with the proceeds payable to Issuing Bank, and, to the extent so financed, Borrower's obligation to make such payment shall be discharged and replaced by the resulting Revolving Loan.

(f)     <u>Obligations Absolute</u>.  The obligations of Borrower to pay each Letter of Credit Obligation(s) and the obligations of Lender to make payments to Issuing Bank with respect to Letters of Credit shall be absolute, unconditional and irrevocable and shall be performed strictly in accordance with the terms of this Agreement under any and all circumstances, whatsoever, notwithstanding the occurrence or continuance of any Default, Event of Default, the failure to satisfy any other condition set forth in <u>Section 4</u> hereof or any other event or circumstance, and irrespective of (i) any lack of validity or enforceability of any Letter of Credit or this Agreement, or any term or provision therein, (ii) any draft or other document presented under a Letter of Credit proving to be forged, fraudulent or invalid in any respect or any statement therein being untrue or inaccurate in any respect, (iii) payment by Issuing Bank under a Letter of Credit against presentation of a draft or other document that does not comply with the terms of such Letter of Credit, or (iv) any other event or circumstance whatsoever, whether or not similar to any of the foregoing, that might, but for the provisions of this Section, constitute a legal or equitable discharge of, or provide a right of setoff against, Borrower's obligations hereunder. Lender and Issuing Bank shall not have any liability or responsibility by reason of or in connection with the issuance or transfer of any Letter of Credit or any payment or failure to make any payment thereunder (irrespective of any of the circumstances referred to in the preceding sentence), or any error, omission, interruption, loss or delay in transmission or delivery of any draft, notice or other communication under or relating to any Letter of Credit (including any document required to make a drawing thereunder), any error in interpretation of technical terms or any consequence arising from causes beyond the control of Issuing Bank; <u>provided</u>, <u>that</u>, the foregoing shall not be construed to excuse Issuing Bank from liability to Borrower to the extent of any direct damages (as opposed to consequential damages, claims in respect of which are hereby waived by Borrower to the extent permitted by applicable Law) suffered by Borrower that are caused by Issuing Bank's failure to exercise care when determining whether drafts and other documents presented under a Letter of Credit comply with the terms thereof. The parties hereto expressly agree that, in the absence of gross negligence or willful misconduct on the part of Issuing Bank (as determined pursuant to a final, non-appealable order of a court of competent jurisdiction), Issuing Bank shall be deemed to have exercised care in each such determination. In furtherance of the foregoing and without limiting the generality thereof, with respect to documents presented which appear on their face to be in substantial compliance with the terms of a Letter of Credit, Issuing Bank may, in its discretion, either accept and make payment upon such documents without responsibility for further investigation, regardless of any notice or information to the contrary, or refuse to accept and make payment upon such documents if such documents are not in strict compliance with the terms of such Letter of Credit.

(g)     <u>Disbursement Procedures</u>. Issuing Bank shall, promptly following its receipt thereof, examine all documents purporting to represent a demand for payment under a Letter of Credit. Issuing Bank shall promptly notify Lender and Borrower by telephone (confirmed by facsimile or otherwise as Borrower and Issuing Bank may agree) of such demand for payment and whether Issuing Bank has made or will make any payment in respect thereof; <u>provided</u>, <u>that</u>, any failure to give or delay in giving such notice shall not relieve Borrower of its obligation to reimburse Issuing Bank and Lender with respect to any such payment.

(h)     <u>Interim Interest</u>. If Issuing Bank shall make any payment in respect of a Letter of Credit, or otherwise be owed any amounts in respect thereof, then, unless Borrower shall reimburse Issuing Bank for such payment or other amount in full on the date such payment is made or amount due, the unpaid amount thereof shall bear interest, for each day from and including the date such payment is made or amount due but excluding the date that Borrower reimburses such payment or other amount, at the rate per annum then applicable to LIBOR Loans. Interest accrued pursuant to this paragraph shall be for the account of Issuing Bank, except that interest accrued on and after the date of payment by Lender pursuant to <u>Section 2.2(e)</u> above to reimburse Issuing Bank shall be for the account of Lender to the extent of such payment, and shall be payable on demand or, if no demand has been made, on the date on which Borrower reimburses such payment in full.

(i)     <u>Cash Collateralization</u>.  If any Event of Default shall occur and be continuing, on the Business Day that Borrower receives notice from Lender demanding the deposit of cash collateral pursuant to this paragraph, Borrower shall deposit in an account with Lender, in the name and for the benefit of Issuing Bank (the "<u>LC Collateral Account</u>"), an amount in cash equal to one hundred five percent (105%) of the amount of the

Letter of Credit Obligations as of such date plus accrued and unpaid interest thereon; provided, that, the obligation to deposit such cash collateral shall become effective immediately, and such deposit shall become immediately due and payable, without demand or other notice of any kind, upon the occurrence of any Event of Default with respect to Borrower described in Section 10.1(e) or 10.1(f). Such deposit shall be held by Lender as collateral for the payment and performance of the Letter of Credit Obligations, until such Event of Default is cured to the satisfaction of Lender or waived in a writing executed and delivered by Lender, in which case such deposit shall be returned by Lender to Borrower promptly following the written request of Borrower. Lender shall have exclusive dominion and control, including the exclusive right of withdrawal, over the LC Collateral Account and Borrower hereby grants Lender a security interest in the LC Collateral Account. Other than any interest earned on the investment of such deposits, which investments shall be made at the option and sole discretion of Lender and at Borrower's risk and expense, such deposits shall not bear interest. Interest or profits, if any, on such investments shall accumulate in the LC Collateral Account. Moneys in the LC Collateral Account shall be applied by Lender for Letter of Credit Obligations and, to the extent not so applied, shall be held for the satisfaction of the reimbursement obligations of Borrower for the Letter of Credit Obligations at such time or, if the maturity of the Revolving Loans has been accelerated, be applied to satisfy other Obligations.

(j)      Indemnification. Borrower shall indemnify and hold Lender and Issuing Bank harmless from and against any and all losses, claims, damages, liabilities, costs and expenses which Lender or Issuing Bank may suffer or incur in connection with any Letter of Credit and any documents, drafts or acceptances relating thereto, including any losses, claims, damages, liabilities, costs and expenses due to any action taken by Lender or Issuing Bank or correspondent with respect to any Letter of Credit, except for such losses, claims, damages, liabilities, costs or expenses that are a direct result of the gross negligence or willful misconduct of Lender or Issuing Bank, as the case may be, as determined pursuant to a final non-appealable order of a court of competent jurisdiction. Borrower assumes all risks for, and agrees to pay, all foreign, Federal, State and local taxes, duties and levies relating to any goods subject to any Letter of Credit or any documents, drafts or acceptances thereunder. Borrower hereby releases and holds Lender and Issuing Bank harmless from and against any acts, waivers, errors, delays or omissions with respect to or relating to any Letter of Credit, except for the gross negligence or willful misconduct of Lender or Issuing Bank, as the case may be, as determined pursuant to a final, non-appealable order of a court of competent jurisdiction. The provisions of this Section shall survive the payment of Obligations and the termination of this Agreement.

(k)      Account Party. Each Borrower hereby irrevocably authorizes and directs Issuing Bank to name the applicable Borrower as the account party therein and to deliver to Lender all instruments, documents and other writings and property received by Issuing Bank pursuant to the Letter of Credit and to accept and rely upon Lender's instructions and agreements with respect to all matters arising in connection with the Letter of Credit or the Letter of Credit Documents with respect thereto. Nothing contained herein shall be deemed or construed to grant Borrower any right or authority to pledge the credit of Lender in any manner. Borrower shall be bound by any reasonable interpretation made in good faith by Lender, or Issuing Bank under or in connection with any Letter of Credit or any documents, drafts or acceptances thereunder, notwithstanding that such interpretation may be inconsistent with any instructions of Borrower.

2.3      Requests for Borrowings.

(a)      To request a Revolving Loan, Borrower Agent shall notify Lender of such request by telephone not later than 11:00 a.m. on the same Business Day as the date of the proposed Revolving Loan. Each such telephonic request shall be irrevocable and to the extent required by Lender, shall be confirmed promptly by hand delivery, facsimile, or e-mail transmission to Lender of a written request in a form approved by Lender and signed by a Responsible Officer of Borrower Agent. Each such telephonic and written request shall specify the following information:

(i)      the aggregate amount of such Revolving Loan;

(ii)      the date of such Revolving Loan, which shall be a Business Day; and

(iii)     the deposit account to which proceeds of the Revolving Loan are to be deposited, which deposit account shall be identified on Schedule 7.10 or any other account with Lender that shall be specified in a written notice signed by a Responsible Officer of Borrower and delivered to and approved by Lender (such approval not to be unreasonably withheld) (the "Borrowing Request Account").

(b)      All Revolving Loans and Letters of Credit under this Agreement shall be conclusively presumed to have been made to, and at the request of and for the benefit of, Borrower when deposited to the credit of Borrower or otherwise disbursed or established in accordance with the instructions of Borrower or in accordance with the terms and conditions of this Agreement.  Except in Lender's discretion, or as otherwise provided herein, the aggregate amount of the Revolving Loans and the Letter of Credit Obligations outstanding at any time shall not exceed the lesser of the Maximum Revolving Loan Amount or the Borrowing Base.

## SECTION 3.    INTEREST AND FEES

3.1      Rates and Payment of Interest.

(a)      All Revolving Loans and Letters of Credit Obligations (including, to the extent permitted by Law, interest not paid when due) shall bear interest at the LIBOR Rate as in effect from time to time plus the Applicable Margin for LIBOR Loans, except as otherwise provided in this Section 3 below.  At any time an Event of Default exists or has occurred and is continuing, Obligations shall bear interest at the Default Rate (whether before or after any judgment).

(b)      Interest shall accrue from the date a Revolving Loan is made or Obligation is incurred or payable until paid in full by Borrower.  If a Revolving Loan is repaid on the same day made, one day's interest shall accrue.  Interest accrued on the Revolving Loans shall be due and payable in arrears, (i) on the first day of each month and (ii) on the Maturity Date.  Interest accrued on any other Obligations shall be due and payable as provided in the Loan Documents and, if no payment date is specified, shall be due and payable on earlier of the first day of the month after incurred or demand or the Maturity Date.  Notwithstanding the foregoing, interest accrued at the Default Rate shall be due and payable on demand.

3.2      Computation of Interest and Fees.  Interest and fees calculated on a per annum basis shall be calculated on the basis of a three hundred sixty (360) day year and actual days elapsed (or, subject to Sections 3.7 and 3.8 hereof, in the case of a Revolving Loan which are Base Rate Loans, a 365 or 366 day year, as the case may be).  The interest rate on non-contingent Obligations shall increase or decrease as of the first day of each month as of any adjustment to the LIBOR Rate.  Each determination by Lender of any interest, fees or interest rate hereunder shall be final, conclusive and binding for all purposes, absent manifest error.  All fees shall be fully earned when due and shall not be subject to rebate, refund or proration.  With respect to the computation of outstanding interest, collections will be credited to the loan account of a Borrower on a daily basis, allowing one (1) business day after the receipt by Lender of a wire transfer of federal funds into its payment account designated for such purpose.

3.3      Unused Line Fee.  Borrowers shall pay to Lender monthly an unused line fee at a rate equal to thirty-five one hundredths of one percent (0.35%) (on a per annum basis) multiplied by the amount by which the Maximum Credit exceeds the average daily principal balance of the outstanding Revolving Loans and Letters of Credit during the immediately preceding calendar month (or part thereof) so long as any Obligations are outstanding.  Such fees shall be payable on the first day of each month in arrears.

3.4      Letter of Credit Fee.  Borrower shall pay to Lender, in the case of Standby Letters of Credit, monthly in arrears a fee at a rate equal to the Applicable Margin for LIBOR Loans multiplied by the average

daily outstanding balance of Standby Letters of Credit, and in the case of Commercial Letters of Credit, a fee at a rate equal to the Applicable Margin for LIBOR Loans multiplied by the average daily outstanding balance of Commercial Letters of Credit per annum, computed for each day from the date of issuance to the date of expiration; provided, that, Borrower shall, at Lender's option, pay such fees at a rate two percentage points (2.00%) greater than the highest rate above on such average daily maximum amount for: (A) the period from and after the date of termination or non-renewal hereof until Lender has received payment in full of all Obligations (notwithstanding entry of a judgment against Borrower) and (B) the period from and after the date of the occurrence of an Event of Default for so long as such Event of Default is continuing as determined by Lender. The obligation of Borrower to pay such fee shall survive the termination or non-renewal of this Agreement. In addition to the letter of credit fees provided above, Borrower shall pay to Issuing Bank for its own account the letter of credit fronting fee of one eighth of one percent (0.125%) per annum and the other customary charges from time to time of Issuing Bank with respect to the issuance, amendment, transfer, administration, cancellation and conversion of, and drawings under, such Letters of Credit.

3.5    Administration Fee. Borrowers shall pay to Lender a monthly administration fee in the amount of One Thousand Dollars ($1,000.00) for each calendar month (or part thereof), which administration fee shall be payable monthly in advance beginning on the Closing Date and on the first day of calendar month thereafter in advance. The administration fee shall be deemed fully earned by Lender on the first day of each calendar month and shall be due and payable in full on that date.

3.6    Closing Fee. Borrowers shall pay to Lender a closing fee in an amount equal to Fifty Thousand Dollars ($50,000.00). The entire closing fee shall be deemed fully earned by Lender and shall be due and payable in full on the Closing Date.

3.7    Inability to Determine Applicable Interest Rate.

(a)    If Lender shall determine in good faith (which determination shall, absent manifest error, be final and conclusive and binding on each Borrower) that on any date by reason of circumstances affecting the London interbank market adequate and fair means do not exist for ascertaining the interest rate applicable to LIBOR Loans on the basis provided for in the definition of LIBOR, Lender shall on such date give notice to Borrowers of such determination. Upon such date no Revolving Loans may be made as LIBOR Loans until such time as Lender notifies Borrowers that the circumstances giving rise to such notice no longer exist and any Revolving Loans (and then existing Revolving Loans) shall be made (or, with respect to outstanding Revolving Loans, shall continue) as Base Rate Loans until such time as such event or circumstance no longer exists, at which time such Loan(s) shall convert to LIBOR Loans.

(b)    In the event Lender shall have determined that (i) by reason of circumstances affecting the LIBOR Rate adequate and reasonable means do not exist for ascertaining the LIBOR Rate for any Interest Period with respect to any advance hereunder and such circumstances are unlikely to be temporary or (ii) the circumstances set forth in clause (i) have not arisen but the supervisor for the administrator of LIBOR or a Governmental Authority having jurisdiction over Lender has made a public statement identifying a specific date after which the rate of interest commonly known as "LIBOR" shall no longer be used for determining interest rates for loans, then Lender and Borrowers shall endeavor to establish an alternate rate of interest to LIBOR Rate that gives due consideration to the then-prevailing market convention for determining a rate of interest for loans in the United States in Dollars at a rate based upon the applicable rate at such time, and Lender and Borrowers shall enter into a mutually acceptable amendment to this Agreement to reflect such alternate rate of interest and such other related changes to this Note as may be applicable. Notwithstanding the foregoing, if any alternate rate of interest established pursuant to this subsection (without giving effect to the applicable margin or any alternative spread that may have been agreed upon over Lender's cost of funds) shall be less than zero, such rate shall be deemed to be zero for all purposes of this Agreement.

3.8     Illegality.  Notwithstanding anything to the contrary contained herein, if (a) any Change in Law makes it unlawful for Lender to make or maintain a LIBOR Loan or to maintain any Commitment with respect to a LIBOR Loan or (b) Lender determines in good faith (which determination shall, absent manifest error, be final and conclusive and binding upon all parties hereto) that it has become impracticable as a result of a circumstance that adversely affects the London interbank market or the position of Lender in such market, then Lender shall give notice thereof to Borrowers and may (i) declare that LIBOR Loans will not thereafter be made by Lender, such that any Revolving Loans made shall be a Base Rate Loan unless Lender's declaration has been withdrawn (and it shall be withdrawn promptly upon the cessation of the circumstances described in clause (a) or (b) above and (ii) require that all outstanding LIBOR Loans made by Lender be converted to Base Rate Loans immediately, in which event all outstanding LIBOR Loans shall be so converted.

3.9     Increased Costs.  If any Change in Law shall:  (a) impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, Lender or the Issuing Bank; (b) subject Lender or Issuing Bank to any tax of any kind whatsoever with respect to this Agreement, any Letter of Credit, any participation in a Letter of Credit or any LIBOR Loan made by it, or change the basis of taxation of payments to Lender or Issuing Bank in respect thereof (except for Taxes or Other Taxes covered by Section 5.7 and the imposition of, or any change in the rate of, any taxes payable by Lender or Issuing Bank described in Section 5.7); or (c) impose on Lender or Issuing Bank or the London interbank market any other condition, cost or expense affecting this Agreement or LIBOR Loans made by Lender or any Letter of Credit or participation therein, and the result of any of the foregoing shall be to increase the cost to Lender of making or maintaining any LIBOR Loan (or of maintaining its obligation to make any such LIBOR Loan), or to increase the cost to Lender or Issuing Bank of participating in, issuing or maintaining any Letter of Credit (or of maintaining its obligation to participate in or to issue any Letter of Credit), or to reduce the amount of any sum received or receivable by Lender or Issuing Bank hereunder (whether of principal, interest or any other amount) then, upon request of Lender or Issuing Bank, Borrowers will pay to Lender or Issuing Bank, as the case may be, such additional amount or amounts as will compensate Lender or Issuing Bank, as the case may be, for such additional costs incurred or reduction suffered.

3.10     Capital Requirements.  If Lender or Issuing Bank determines that any Change in Law affecting Lender or Issuing Bank or any lending office of Lender or Lender's or Issuing Bank's holding company, if any, regarding capital requirements has or would have the effect of reducing the rate of return on Lender's or Issuing Bank's capital or on the capital of Lender's or Issuing Bank's holding company, if any, as a consequence of this Agreement, the Commitment of Lender or the Revolving Loans made by, or participations in Letters of Credit held by, Lender, or the Letters of Credit issued by Issuing Bank, to a level below that which Lender or Issuing Bank or Lender's or Issuing Bank's holding company could have achieved but for such Change in Law (taking into consideration Lender's or Issuing Bank's policies and the policies of Lender's or Issuing Bank's holding company with respect to capital adequacy), then from time to time Borrowers will pay to Lender or Issuing Bank, as the case may be, such additional amount or amounts as will compensate Lender or Issuing Bank or Lender's or Issuing Bank's holding company for any such reduction suffered.

3.11     Certificates for Reimbursement.  A certificate of Lender or Issuing Bank setting forth the amount or amounts necessary to compensate Lender or Issuing Bank or its holding company, as the case may be, as specified in Sections 3.9 or 3.10 and delivered to Borrowers shall be conclusive absent manifest error.  Borrowers shall pay Lender or Issuing Bank, as the case may be, the amount shown as due on any such certificate within fifteen (15) days after receipt thereof.

3.12     Delay in Requests.  Failure or delay on the part of Lender or Issuing Bank to demand compensation pursuant to Sections 3.9 or 3.10 shall not constitute a waiver of Lender's or Issuing Bank's right to demand such compensation; provided, that, no Borrower shall be required to compensate Lender or Issuing Bank pursuant to this Section for any increased costs incurred or reductions occurring more than one hundred eighty (180) days prior to the date that Lender or Issuing Bank, as the case may be, becomes aware of the event giving

rise to Lender's or Issuing Bank's claim for compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the one hundred eighty (180) day period referred to above shall be extended to include the period of retroactive effect thereof).

3.13    Maximum Interest.  Notwithstanding anything to the contrary contained in this Agreement or any of the other Loan Documents, in no event whatsoever shall the aggregate of all amounts that are contracted for, charged or received by Lender pursuant to the terms of this Agreement or any of the other Loan Documents and that are deemed interest under applicable Law exceed the Maximum Interest Rate (including, to the extent applicable, the provisions of Section 5197 of the Revised Statutes of the United States of America as amended, 12 U.S.C. Section 85, as amended).  In the event any interest is charged or received in excess of the Maximum Interest Rate ("Excess"), each Borrower acknowledges and stipulates that any such charge or receipt shall be the result of an accident and bona fide error, and that any Excess received by Lender shall be applied, first, to the payment of the then outstanding and unpaid principal hereunder; second to the payment of the other Obligations then outstanding and unpaid; and third, returned to Borrower.  All monies paid to Lender hereunder or under any of the other Loan Documents, whether at maturity or by prepayment, shall be subject to any rebate of unearned interest as and to the extent required by applicable Law.

## SECTION 4.   CONDITIONS PRECEDENT

4.1    Conditions Precedent to Effectiveness of Agreement to Make Initial Revolving Loans and Letters of Credit.  The agreement of Lender to make the Revolving Loans and of Issuing Bank to issue Letters of Credit, shall become effective upon the satisfaction, or waiver, immediately prior to or concurrently therewith of each of the conditions precedent set forth on Schedule 4.1.

4.2    Conditions Precedent to All Revolving Loans and Letters of Credit.  The obligation of Lender to make the Revolving Loans (including the initial Revolving Loans) or of Issuing Bank to issue any Letter of Credit (including any initial Letters of Credit), is subject to the further satisfaction of, or waiver of, immediately prior to or concurrently with the making of each such Revolving Loan or the issuance of such Letter of Credit, as applicable, of each of the following conditions precedent:

(a)    All representations and warranties contained herein and in the other Loan Documents that are qualified as to materiality or Material Adverse Effect shall be true and correct and the representations and warranties that are not so qualified shall be true and correct in all material respects, in each case with the same effect as though such representations and warranties had been made on and as of the date of the making of each such Loan or providing each such Letter of Credit and after giving effect thereto, except to the extent that such representations and warranties expressly relate solely to an earlier date (in which case such representations and warranties shall have been true and correct in all material respects to the extent required hereunder or under the other Loan Documents on and as of such earlier date).

(b)    As of the date of any such Revolving Loan or the issuance, amendment, renewal or extension of such Letter of Credit, as applicable, or the use of the proceeds thereof, and after giving effect to any of the foregoing, no Default or Event of Default shall exist or have occurred and be continuing.

(c)    Lender shall have received a request for such Revolving Loan or such Letter of Credit (or for the amendment, renewal or extension thereof) in accordance with the requirements of this Agreement.

(d)    As of the date of any such Revolving Loan or the issuance, amendment, renewal or extension of such Letter of Credit, as applicable, or the use of the proceeds thereof, and after giving effect to any of the foregoing, no event, condition or circumstance that has or individually or in the aggregate could reasonably be expected to have a Material Adverse Effect shall have occurred.

(e)      As of the date of any such Revolving Loan or the issuance, amendment, renewal or extension of such Letter of Credit, as applicable, or the use of the proceeds thereof, and after giving effect to any of the foregoing, the aggregate principal amount of the Revolving Loans and the Letter of Credit Obligations shall not exceed the Maximum Revolving Loan Amount.

Each request for a Revolving Loan or the issuance, amendment, renewal or extension of any Letter of Credit submitted by any Borrower shall be deemed to be a representation and warranty by such Borrower that the conditions specified in <u>Section 4.2</u> have been satisfied on and as of the date of the applicable Revolving Loan or issuance, amendment, renewal or extension of a Letter of Credit.  The making of any Revolving Loan or the issuance, amendment, renewal or extension of any Letter of Credit shall not be deemed a modification or waiver by Lender of any of the terms of this Agreement or any Default or Event of Default.

## SECTION 5.    PAYMENTS AND ADMINISTRATION

5.1    <u>Payments Generally, Allocation of Proceeds</u>.

(a)      All payments of Obligations shall be made in Dollars, without offset, counterclaim or defense of any kind, free and clear of (and without deduction for) any Taxes, and in immediately available funds, not later than 12:00 noon on the due date.  Any payment after such time shall be deemed made on the next Business Day.  If any payment is due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day.  All Obligations shall be payable to Lender Payment Account or such other place as Lender may designate in writing to Borrowers from time to time.

(b)      Subject to the other terms and conditions contained herein, Lender shall apply payments received or collected from Loan Parties or for the account of Loan Parties (including the monetary proceeds of collections or of realization upon any Collateral) as follows: <u>first</u>, to the payment in full of any fees, indemnities or expense reimbursements then due to Lender from any Loan Party; <u>second</u>, ratably, to the payment in full of any fees, indemnities, or expense reimbursements then due to Lender and Issuing Bank from any Loan Party; <u>third</u>, ratably, to the payment in full of interest due in respect of any Revolving Loans and Letter of Credit Obligations; <u>fourth</u>, ratably, to the payment in full of principal in respect of the Revolving Loans  and the Bank Product Obligations then due (but as to Bank Product Obligations, only up to the amount of any then effective Reserve established in respect of such Bank Product Obligations), and <u>fifth</u>, to pay or prepay any other Obligations, whether or not then due, in such order and manner as Lender directs and for Lender to hold as cash collateral in respect of the Letter of Credit Obligations.  All references to the term "ratably" as used in this Section means pro rata on the basis of the amount owing to any one Person in relationship to the amounts owing to all Persons of the same category of Obligations within the same level of priority.

(c)      Except as otherwise provided in this Agreement, to the extent any Loan Party uses any proceeds of the Revolving Loans or Letters of Credit to acquire rights in or the use of any Collateral or to repay any Indebtedness used to acquire rights in or the use of any Collateral, payments in respect of the Obligations shall be deemed applied first to the Obligations arising from Revolving Loans and Letter of Credit Obligations that were not used for such purposes and second to the Obligations arising from Revolving Loans and Letter of Credit Obligations the proceeds of which were used to acquire rights in or the use of any Collateral in the chronological order in which such Loan Party acquired such rights in or the use of such Collateral.

(d)      At the election of Lender, all payments of principal, interest, fees, expenses and other amounts payable under the Loan Documents may be paid from the proceeds of Revolving Loans made hereunder whether made following a request by any Loan Party or a deemed request as provided in this Section or may be deducted from any deposit account of any Loan Party maintained with Lender.  Each Loan Party is hereby irrevocably deemed to request that, and authorizes Lender to (i) make a Revolving Loan for the purpose of paying each payment of principal, interest, fees, expenses and other amounts as it becomes due hereunder or under any other Loan Document and agrees that all such amounts charged shall constitute Revolving Loans and

29

(ii) charge any deposit account of any Loan Party maintained with Lender for each payment of principal, interest, fees, expenses and other amounts due hereunder or under any other Loan Document.  Lender shall be entitled to charge the loan account of any Loan Party that it maintains for any sum due and payable by any Loan Party to Lender hereunder or under any of the other Loan Documents.

(e)    For purposes of calculating the amount of the Revolving Loans available to Borrowers, such payments will be applied (conditional upon final collection) to the Obligations on the Business Day of receipt by Lender of immediately available funds in Lender Payment Account provided such payments and notice thereof are received in accordance with Lender's usual and customary practices as in effect from time to time and within sufficient time to credit the applicable loan account on such day, and if not, then on the next Business Day.

5.2    Indemnity for Returned Payments.  If after receipt of any payment of, or proceeds of Collateral applied to the payment of, any of the Obligations, Lender or Issuing Bank is required to surrender or return such payment or proceeds to any Person for any reason, then the Obligations intended to be satisfied by such payment or proceeds shall be reinstated and continue and this Agreement shall continue in full force and effect as if such payment or proceeds had not been received by Lender or Issuing Bank.  Each Loan Party shall be liable to pay to Lender, and does hereby agree to indemnify and hold Lender and Issuing Bank harmless for the amount of any payments or proceeds surrendered or returned.  This Section shall remain effective notwithstanding any contrary action which may be taken by Lender or Issuing Bank in reliance upon such payment or proceeds.  The preceding two sentences of this Section shall survive the payment of the Obligations and the termination of this Agreement.

5.3    Repayments.  Revolving Loans shall be due and payable in full on the Maturity Date, unless payment is sooner required hereunder.  Revolving Loans may be prepaid from time to time, without penalty or premium.  All Obligations other than Revolving Loans, including Letter of Credit Obligations and fees and reimbursement for expenses, shall be paid by Borrowers as provided herein and in the other Loan Documents or, if no payment date is specified, on demand.  Borrowers shall make payment in full of the Obligations on the Maturity Date or any other effective date of termination of the Commitment.

5.4    Prepayments; Early Termination.

(a)    Any Borrower may prepay without penalty or premium the principal of any Revolving Loan, in whole or in part.

(b)    Borrower Agent has the option, at any time upon thirty (30) days prior written notice by Borrower Agent to Lender, to terminate this Agreement upon payment to Lender of all Obligations (including, without limitation, (i) either (A) providing cash collateral to Lender in an amount equal to one hundred and five percent (105%) of the Letter of Credit Obligations or (B) causing the original Letters of Credit to be returned to Lender, marked "cancelled" by the beneficiary thereof, and (ii) providing cash collateral to Lender in an amount to be reasonably determined by Lender to satisfy its estimated credit exposure); provided, that, Borrower Agent shall have also (A) provided Lender with an executed release of any and all claims which Borrowers may have or thereafter have under this Agreement and/or any other Loan Documents and (B) paid to Lender an early payment fee in an amount equal to (x) two percent (2.0%) of the Maximum Credit if such termination occurs on or prior to the first anniversary of the Closing Date; (y) one percent (1.0%) of the Maximum Credit if such termination occurs after the first anniversary of the Closing Date, but on or prior to the second anniversary of the Closing Date, and (z) zero percent (0.0%) of the Maximum Credit if such termination occurs after the second anniversary of the Closing Date, but either prior to the third anniversary of the Closing Date (the "Termination Fee").  If Borrower Agent has sent a notice of termination pursuant to the provisions of this Section, then Lender shall make no further Revolving Loans to any Borrower and Borrowers shall be obligated to repay the Obligations together with the applicable Termination Fee, if applicable, on the date set forth as the date of termination of this Agreement in such notice.  In view of the impracticability and extreme difficulty of ascertaining the actual amount of damages to Lender or profits lost by Lender as a result of such early termination, and by mutual

agreement of the parties as to a reasonable estimation and calculation of the lost profits or damages of Lender, Borrowers shall pay the applicable Termination Fee to Lender in the event of the termination of this Agreement at any time prior to the Maturity Date, for any reason, including (w) termination after the occurrence and during the continuation of an Event of Default, (x) foreclosure and sale of Collateral, (y) sale of the Collateral in any insolvency proceeding, or (z) restructure, reorganization, or compromise of the Obligations by the confirmation of a plan of reorganization, or any other plan of compromise, restructure, or arrangement in any insolvency proceeding.

(c)    In the event that (i) the aggregate principal amount of the Revolving Loans and the Letter of Credit Obligations outstanding at any time exceed the Maximum Credit, or (ii) the aggregate principal amount of the Revolving Loans and Letter of Credit Obligations outstanding exceed the Borrowing Base, such event shall not limit, waive or otherwise affect any rights of Lender in such circumstances or on any future occasions and Borrowers shall, upon demand by Lender, which may be made at any time or from time to time, repay within two (2) Business Days of any such demand to Lender the entire amount of any such excess(es) for which payment is demanded. All such excess outstanding amounts shall accrue interest at the Default Rate until repaid in full, whether or not such excess(es) are permitted by Lender at any time.

5.5    <u>Statements</u>.  Lender shall render to Borrowers each month a statement setting forth the balance in Borrowers' loan account(s) maintained by Lender for Borrower pursuant to the provisions of this Agreement, including principal, interest, fees, costs and expenses. Each such statement shall be subject to subsequent adjustment by Lender but shall, absent manifest errors or omissions, be considered correct and deemed accepted by each Borrower and conclusively binding upon each Borrower as an account stated except to the extent that Lender receives a written notice from Borrowers of any specific exceptions of Borrowers thereto within thirty (30) days after the date such statement has been received by Borrowers. Until such time as Lender shall have rendered to Borrowers a written statement as provided above, the balance in Borrowers' loan account(s) shall be presumptive evidence of the amounts due and owing to Lender by Borrowers, absent manifest error.

5.6    <u>Borrowers' Loan Account; Evidence of Debt</u>.  Lender shall maintain in accordance with its usual practice an account or accounts evidencing the Obligations of Borrowers to Lender, including the amounts of the Revolving Loans made by it and each repayment and prepayment in respect thereof, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder. Any such records shall be presumptively correct, absent manifest error; <u>provided</u>, <u>that</u>, the failure to make any entry or any error in such records, shall not affect any of the Obligations in respect of any applicable Revolving Loans. Lender may request that Revolving Loans made by it be evidenced by a promissory note. In such event, Borrowers shall execute and deliver to Lender one or more promissory notes payable to the order of Lender (or, if requested by Lender, to Lender and its registered assigns) and in a form approved by Lender. Thereafter, the Revolving Loans evidenced by such promissory note(s) and interest thereon shall at all times be represented by one or more promissory notes in such form payable to the order of the payee named therein (or, if such promissory note is a registered note, to such payee and its registered assigns).

5.7    <u>Taxes</u>.

(a)    <u>Withholding of Taxes; Gross-Up</u>.  Any and all payments by or on account of any obligation of any Loan Party under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable Law. If any applicable Law (as determined in the good faith discretion of an applicable withholding agent) requires the deduction or withholding of any Tax from any such payment by a withholding agent, then the applicable withholding agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable Law and, if such Tax is an Indemnified Tax, then the sum payable by Loan Parties shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section <u>5.7</u>) Lender receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b)    <u>Payment of Other Taxes by Loan Parties</u>.  Each Loan Party shall timely pay to the relevant Governmental Authority in accordance with applicable Law, or at the option of Lender timely reimburse it for, Other Taxes.

(c)    <u>Evidence of Payments</u>.  As soon as practicable after any payment of Taxes by any Loan Party to a Governmental Authority pursuant to this Section, such Loan Party shall deliver to Lender the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to Lender.

(d)    <u>Indemnification by Loan Party</u>.  Each Loan Party shall indemnify Lender, within ten (10) days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this <u>Section</u>) payable or paid by Lender or required to be withheld or deducted from a payment to Lender and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to Loan Parties by Lender shall be conclusive absent manifest error.

(e)    <u>Treatment of Certain Refunds</u>.  If Lender determines, in its sole discretion, exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section (including by the payment of additional amounts pursuant to this Section), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of Lender and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund).  Such indemnifying party, upon the request of Lender, shall repay to Lender the amount paid over pursuant to this <u>Section 5.7(e)</u> (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that Lender is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this <u>Section 5.7(e)</u>, in no event will Lender be required to pay any amount to an indemnifying party pursuant to this Section the payment of which would place Lender in a less favorable net after-Tax position than Lender would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts giving rise to such refund had never been paid.  This <u>Section 5.7(e)</u> shall not be construed to require Lender to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(f)    <u>Survival</u>.  Each party's obligations under this Section shall survive the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

5.8    <u>Nature and Extent of Each Loan Party's Liability</u>.

(a)    <u>Joint and Several Liability</u>.  Each Loan Party agrees that it is jointly and severally liable for, and absolutely and unconditionally guarantees to Lender the prompt payment and performance of, all Obligations.  Each Loan Party agrees that its guaranty obligations hereunder constitute a continuing guaranty of payment and performance and not of collection, that such obligations shall not be discharged until payment in full of the Obligations, and that such obligations are absolute and unconditional, irrespective of (a) the genuineness, validity, regularity, enforceability, subordination or any future modification of, or change in, any Obligations or Loan Document, or any other document, instrument or agreement to which any Loan Party is or may become a party or be bound; (b) the absence of any action to enforce this Agreement (including this Section) or any other Loan Document, or any waiver, consent or indulgence of any kind by Lender with respect thereto; (c) the existence, value or condition of, or failure to perfect a lien or to preserve rights against, any security or guaranty for any Obligations or any action, or the absence of any action, by Lender in respect thereof (including the release of any security or guaranty); (d) the insolvency of any Loan Party; (e) any election by Lender in an insolvency proceeding for the application of Section 1111(b)(2) of the Bankruptcy Code; (f) any borrowing or

grant of a lien by any other Loan Party, as debtor-in-possession under Section 364 of the Bankruptcy Code or otherwise; (g) the disallowance of any claims of Lender against any Loan Party for the repayment of any Obligations under Section 502 of the Bankruptcy Code or otherwise; or (h) any other action or circumstances that might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor, except payment in full of the Obligations.

      (b)    <u>Waivers</u>.

        (i)    Each Loan Party expressly waives all rights that it may have now or in the future under any statute, at common law, in equity or otherwise, to compel Lender to marshal assets or to proceed against any Loan Party, other Person or security for the payment or performance of any Obligations before, or as a condition to, proceeding against such Loan Party. Each Loan Party waives all defenses available to a surety, guarantor or accommodation co-obligor other than payment in full of Obligations and waives, to the maximum extent permitted by law, any right to revoke any guaranty of Obligations as long as it is a Loan Party. It is agreed among each Loan Party and Lender that the provisions of this Section are of the essence of the transaction contemplated by the Loan Documents and that, but for such provisions, Lender would decline to make Loans and issue Letters of Credit. Each Loan Party acknowledges that its guaranty pursuant to this Section is necessary to the conduct and promotion of its business, and can be expected to benefit such business.

        (ii)    Lender may, in its discretion, pursue such rights and remedies as it deems appropriate, including realization upon Collateral, without affecting any rights and remedies under this Section. If, in taking any action in connection with the exercise of any rights or remedies, Lender shall forfeit any other rights or remedies, including the right to enter a deficiency judgment against any Loan Party or other Person, whether because of any applicable laws pertaining to "election of remedies" or otherwise, each Loan Party consents to such action and waives any claim based upon it, even if the action may result in loss of any rights of subrogation that any Loan Party might otherwise have had. Any election of remedies that results in denial or impairment of the right of Lender to seek a deficiency judgment against any Loan Party shall not impair any other Loan Party's obligation to pay the full amount of the Obligations. Each Loan Party waives all rights and defenses arising out of an election of remedies, such as non-judicial foreclosure with respect to any security for Obligations, even though that election of remedies destroys such Loan Party's rights of subrogation against any other Person. Lender may bid Obligations, in whole or part, at any foreclosure, trustee or other sale, including any private sale, and the amount of such bid need not be paid by Lender but shall be credited against the Obligations. The amount of the successful bid at any such sale, whether Lender or any other Person is the successful bidder, shall be conclusively deemed to be the fair market value of the Collateral, and the difference between such bid amount and the remaining balance of the Obligations shall be conclusively deemed to be the amount of the Obligations guaranteed under this Section, notwithstanding that any present or future law or court decision may have the effect of reducing the amount of any deficiency claim to which Lender might otherwise be entitled but for such bidding at any such sale.

      (c)    <u>Extent of Liability; Contribution</u>.

        (i)    Notwithstanding anything herein to the contrary, each Loan Party's liability under this Section shall not exceed the greater of (i) all amounts for which such Loan Party is primarily liable, as described in clause (iii) below, and (ii) such Loan Party's Allocable Amount (as defined below).

        (ii)    If any Loan Party makes a payment under this Section of any Obligations (other than amounts for which such Loan Party is primarily liable) (a "<u>Guarantor Payment</u>") that, taking into account all other Guarantor Payments previously or concurrently made by any other Loan Party, exceeds the amount that such Loan Party would otherwise have paid if each Loan Party had paid the aggregate

Obligations satisfied by such Guarantor Payments in the same proportion that such Loan Party's Allocable Amount bore to the total Allocable Amounts of all Loan Parties, then such Loan Party shall be entitled to receive contribution and indemnification payments from, and to be reimbursed by, each other Loan Party for the amount of such excess, ratably based on their respective Allocable Amounts in effect immediately prior to such Guarantor Payment. The "<u>Allocable Amount</u>" for any Loan Party shall be the maximum amount that could then be recovered from such Loan Party under this Section without rendering such payment voidable under Section 548 of the Bankruptcy Code or under any applicable state fraudulent transfer or conveyance act, or similar statute or common law.

(iii)     <u>Section 5.8(c)(i)</u> shall not limit the liability of any Loan Party to pay or guarantee Revolving Loans made directly or indirectly to it (including Revolving Loans advanced hereunder to any other Person and then re-loaned or otherwise transferred to, or for the benefit of, such Loan Party), Letter of Credit Obligations relating to Letters of Credit issued to support its business, Bank Products incurred to support its business, and all accrued interest, fees, expenses and other related Obligations with respect thereto, for which such Loan Party shall be primarily liable for all purposes hereunder. Lender shall have the right, at any time in its discretion, to condition Revolving Loans and Letters of Credit upon a separate calculation of borrowing availability for each Loan Party and to restrict the disbursement and use of Loans and Letters of Credit to a Loan Party based on that calculation.

(d)     <u>Joint Enterprise</u>. Each Loan Party has requested that Lender make this credit facility available to Borrowers on a combined basis, in order to finance Loan Parties' business most efficiently and economically. Loan Parties' business is a mutual and collective enterprise, and the successful operation of each Loan Party is dependent upon the successful performance of the integrated group. Loan Parties believe that consolidation of their credit facility will enhance the borrowing power of each Borrower and ease administration of the facility, all to their mutual advantage. Loan Parties acknowledge that Lender's willingness to extend credit and to administer the Collateral on a combined basis hereunder is done solely as an accommodation to Loan Parties and at Loan Parties' request.

(e)     <u>Subordination</u>. Each Loan Party hereby subordinates any claims, including any rights at law or in equity to payment, subrogation, reimbursement, exoneration, contribution, indemnification or set off, that it may have at any time against any other Loan Party, howsoever arising, to the payment in full of its Obligations.

5.9     <u>Borrower Agent</u>. Each Borrower hereby designates CL PI Holdings as ("Borrower Agent") as its representative and agent for all purposes under the Loan Documents, including requests for and receipts of Revolving Loans and Letters of Credit, designation of interest rates, delivery or receipt of communications, delivery of the Borrowing Base Certificate, financial information and reports, payment of Obligations, requests for waivers, amendments or other accommodations, actions under the Loan Documents (including in respect of compliance with covenants), and all other dealings with Lender. Borrower Agent hereby accepts such appointment. Lender shall be entitled to rely upon, and shall be fully protected in relying upon, any notice or communication delivered by Borrower Agent on behalf of any Borrower. Lender may give any notice or communication with a Borrower hereunder to Borrower Agent on behalf of such Borrower. Lender shall have the right, in its discretion, to deal exclusively with Borrower Agent for all purposes under the Loan Documents. Each Borrower agrees that any notice, election, communication, delivery, representation, agreement, action or undertaking on its behalf by Borrower Agent shall be binding upon and enforceable against it.

## SECTION 6.   REPRESENTATIONS AND WARRANTIES

Each Loan Party hereby represents and warrants to Lender and Issuing Bank the following:

6.1     <u>Organization; Powers</u>. Each Loan Party is duly organized, validly existing and in good standing under the Laws of the jurisdiction of its organization, has all requisite power and authority to carry on its business

as now conducted and is qualified to do business, and is in good standing in, every jurisdiction where such qualification is required, except in the case where the failure to so qualify could not reasonably be expected to have a Material Adverse Effect.

6.2    <u>Authorization; Enforceability</u>.  The execution, delivery and performance by each Loan Party of the Loan Documents to which it is a party have been duly authorized by all necessary organizational actions and, if required, actions by equity holders.  Each Loan Document to which any Loan Party is a party has been duly executed and delivered by such Loan Party and constitutes a legal, valid and binding obligation of such Loan Party, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other Laws affecting creditors' rights generally, subject to general principles of equity, regardless of whether considered in a proceeding in equity or at Law and subject to implied covenants of good faith and fair dealing.

6.3    <u>No Conflicts</u>.  The execution, delivery, and performance by each Loan Party of the Loan Documents to which it is a party do not and will not (a) violate any material provision of Federal, State, or local Law or regulation applicable to such Loan Party, the Organization Documents of such Loan Party, or any order, judgment, or decree of any court or other Governmental Authority binding on such Loan Party or its property, (b) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any material agreement of such Loan Party where any such conflict, breach or default could individually or in the aggregate reasonably be expected to have a Material Adverse Effect, (c) result in the creation or imposition of, or require or give rise to any obligation to grant, any lien, security interest, charge or other encumbrance upon any property of Loan Party, other than Permitted Liens, or (d) require any approval of any holder of Equity Interests of such Loan Party or any approval or consent of any Person under any material agreement of any Loan Party, other than consents or approvals that have been obtained and that are still in force and effect and except, in the case of material agreements, for consents or approvals, the failure to obtain could not individually or in the aggregate reasonably be expected to cause a Material Adverse Effect.

6.4    <u>Governmental Approvals</u>.  The execution, delivery, and performance by each Loan Party of the Loan Documents to which such Loan Party is a party and the consummation of the transactions contemplated by the Loan Documents do not and will not require any registration with, consent, or approval of, or notice to, or other action with or by, any Governmental Authority, other than registrations, consents, approvals, notices, or other actions that have been obtained and that are still in force and effect and except for filings and recordings with respect to the Collateral to be made, or otherwise delivered to Lender for filing or recordation, as of the Closing Date.

6.5    <u>Financial Statements; No Material Adverse Effect; Solvent</u>.  The consolidated and consolidating balance sheets, and related statements of income, cash flow and shareholders' equity, of each Loan Party that have been and are hereafter delivered to Lender, have been prepared in accordance with GAAP (except, in the case of unaudited financial statements, for the lack of footnotes and being subject to year-end audit adjustments) and present fairly in all material respects, the financial condition of each Loan Party as of the date thereof and results of operations for the period then ended.  Since December 31, 2018, no event, circumstance, or change has occurred that has or could reasonably be expected to have a Material Adverse Effect with respect to any Loan Party.  No financial statement delivered to Lender at any time contains any materially untrue statement of a material fact, nor fails to disclose any material fact necessary to make such statement not materially misleading. The projections delivered to Lender on or about September 3, 2019 (the "Projections") have been prepared in light of the past operations of the businesses of each Loan Party and are based upon estimates and assumptions stated therein, all of which each Loan Party believes to be reasonable and fair in light of the then current conditions and current facts and reflect the good faith and reasonable estimates of such Loan Party of the future financial performance of such Loan Party and of the other information projected therein for the periods set forth therein; provided that it is understood and acknowledged that such Projections are based upon a number of estimates and assumptions and are subject to business, economic and competitive uncertainties and contingencies, that actual results during the period or periods covered by any such Projections may differ from

the projected results and such differences may be material and that, accordingly, no assurances are given and no representations, warranties or covenants are made that any of the assumptions are correct, that such Projections will be achieved or that the forward-looking statements expressed in such Projections will correspond to actual results. Each Loan Party is Solvent and will continue to be Solvent after the creation of the Obligations, the security interests of Lender and the other transaction contemplated hereunder.

6.6    Properties; No Liens. Each Loan Party has (a) good, sufficient and legal title to (in the case of fee interests in Real Property), (b) valid leasehold interests in (in the case of leasehold interests in real or personal property), and (c) good and marketable title to (in the case of all other personal property), all of its assets reflected in its most recent financial statements delivered pursuant to Section 7.1, in each case except for assets disposed of since the date of such financial statements to the extent permitted hereby. All of such assets are free and clear of liens except for Permitted Liens.

6.7    Litigation. Except as set forth on Schedule 6.7, there are no actions, suits, proceedings or investigations pending or, to best of any Loan Party's knowledge, threatened against any Loan Party, or its business or assets, that (a) relate to any Loan Documents or transactions contemplated thereby or (b) either individually or in the aggregate has or could reasonably be expected to have a Material Adverse Effect.

6.8    Compliance with Laws. Each Loan Party is in compliance with the requirements of all applicable Laws, rules, regulations, executive orders or codes (including Environmental Laws) and all final judgments, orders, writs, injunctions, decrees, rules or regulations of any court or any Governmental Authority, in each case where the failure to comply individually or in the aggregate has or could reasonably be expected to have a Material Adverse Effect. There have been no citations, notices or orders of material noncompliance issued to any Loan Party by any Governmental Authority under any applicable Laws, rules, regulations, executive orders or codes, alleging an event that could reasonably be expected to have a Material Adverse Effect.

6.9    Environmental Condition. Except as set forth on Schedule 6.9, (a) no assets of any Loan Party have been used by any Loan Party, or by previous owners or operators in the disposal of, or to produce, store, handle, treat, release, or transport, any Hazardous Materials, where such disposal, production, storage, handling, treatment, release or transport was in violation, in any material respect, of any applicable Environmental Law, (b) no assets of any Loan Party have been designated or identified in any manner pursuant to any environmental protection statute as a Hazardous Materials disposal site, (c) no Loan Party has received notice that a security interest, lien or other encumbrance arising under any Environmental Law has attached to any assets of any Loan Party, and (d) no Loan Party nor any of its assets are subject to any outstanding written order, consent decree, or settlement agreement with any Person relating to any Environmental Law or liability thereunder that, individually or in the aggregate, has or could reasonably be expected to have a Material Adverse Effect.

6.10    No Defaults. No event or circumstance has occurred or exists that constitutes a Default or Event of Default.

6.11    Material Contracts. Schedule 6.11 sets forth all Material Contracts to which any Loan Party is a party or is bound as of the Closing Date. Each Loan Party has delivered true, correct and complete copies of such Material Contracts to which it is a party that are in effect as of the Closing Date to Lender on or before the Closing Date, other than those Material Contracts which cannot be so delivered as a result of confidentiality restrictions therein. No Loan Party is in breach or in default in any material respect under any Material Contract nor has received any notice of the intention of any other party thereto to terminate any Material Contract (it being understood that an expiration of any such Material Contract by its terms shall not be deemed a termination thereof; provided, that, prior to such expiration, each Loan Party shall have used its commercially reasonable efforts to have entered into a replacement agreement or arrangement on commercially reasonable terms).

6.12    Restrictive Agreements. Except as set forth on Schedule 6.12, as of the Closing Date, no Loan Party is party or subject to any agreement or other arrangement that prohibits, restricts or imposes any condition

upon (a) the ability of such Loan Party to create, incur or permit to exist any security interest, lien or other encumbrance on any of its property or assets, or (b) the ability of such Loan Party to pay dividends or other distributions with respect to any of its Equity Interests or to make or repay loans or advances to such Loan Party or to guarantee Indebtedness or to transfer assets.

6.13    <u>Taxes</u>.  Each Loan Party has timely filed or caused to be filed all Tax returns and reports required to have been filed and has paid or caused to be paid all Taxes required to have been paid by it, except Taxes that are being contested in good faith by appropriate proceedings and for which such Loan Party has set aside on its books adequate reserves.  As of the Closing Date, no tax liens have been filed and no claims are being asserted with respect to any such Taxes.

6.14    <u>ERISA</u>.  No ERISA Event has occurred or is reasonably expected to occur that, when taken together with all other such ERISA Events for which liability is reasonably expected to occur, could reasonably be expected to have a Material Adverse Effect.  The present value of all accumulated benefit obligations under each Plan (based on the assumptions used for purposes of Statement of Financial Accounting Standards No. 87) did not, as of the date of the most recent financial statements reflecting such amounts, exceed by more than $1,000,000 the fair market value of the assets of such Plan, and the present value of all accumulated benefit obligations of all underfunded Plans (based on the assumptions used for purposes of Statement of Financial Accounting Standards No. 87) did not, as of the date of the most recent financial statements reflecting such amounts, exceed by more than $1,000,000 the fair market value of the assets of all such underfunded Plans.

6.15    <u>Insurance</u>.  <u>Schedule 6.15</u> sets forth a description of all insurance maintained by or on behalf of any Loan Party as of the Closing Date.  As of the Closing Date, all premiums in respect of such insurance have been paid.  Each Loan Party maintains with financially sound and reputable insurance companies, insurance on all of its property in such amounts, subject to such deductibles and self-insurance retentions and covering such properties and risks as are adequate and customarily maintained by companies engaged in the same or similar businesses operating in the same or similar locations.

6.16    <u>Capitalization and Subsidiaries</u>.  <u>Schedule 6.16</u> sets forth (a) a correct and complete list of the name and relationship to each Loan Party of each Subsidiary, (b) a true and complete listing of each class of each of such Loan Party's authorized Equity Interests, all of which issued shares are validly issued, outstanding, fully paid and non-assessable, and owned beneficially and of record by the Persons identified on <u>Schedule 6.16</u>, and (c) the type of entity of each Loan Party and each Subsidiary.  There are no outstanding commitments or other obligations of any Loan Party to issue, and no options, warrants or other rights of any Person to acquire, any shares of any class of capital stock or other equity interests of any Loan Party.

6.17    <u>Security Interest in Collateral</u>.  The Security Documents create legal and valid security interests in all of the Collateral in favor of Lender, and such security interests constitute perfected and continuing security interests on the Collateral, securing the Obligations, enforceable against each Loan Party and having priority over all other security interests, liens or other encumbrances on the Collateral except (a) Permitted Liens, to the extent any such Permitted Liens would have priority over the security interests of Lender pursuant to any applicable Law and (b) security interests perfected only by possession or the notation of the security interest on the certificate of title with respect thereto to the extent Lender has not obtained or does not maintain possession of such Collateral or has not had its security interest noted on the certificate of title.

6.18    <u>Brokers</u>.  There are no brokerage commissions, finder's fees or investment banking fees payable in connection with any transactions contemplated by the Loan Documents, except those due to FocalPoint Securities, LLC.

6.19    <u>Intellectual Property</u>.  Each Loan Party owns, or is licensed to use, all Intellectual Property necessary to its business as currently conducted, a correct and complete list of which, as of the date of this Agreement, is set forth on <u>Schedule 6.19</u>, and the use thereof by such Loan Party does not infringe on the rights

of any other Person, and except as set forth on such Schedule, no Loan Party's rights thereto are subject to any licensing agreement or similar arrangement.

6.20    <u>Trade Relations</u>.  There exists no actual or threatened termination, limitation or modification of any business relationship between any Loan Party and any customer or supplier, or any group of customers or suppliers, who individually or in the aggregate are material to the business of any Loan Party.  There exists no condition or circumstance that could reasonably be expected to impair the ability of any Loan Party to conduct its business at any time hereafter in substantially the same manner as conducted on the Closing Date.

6.21    <u>Labor Relations</u>.  Except as described on <u>Schedule 6.21</u>, no Loan Party is party to or bound by any collective bargaining agreement, management agreement or consulting agreement.  There are no material grievances, disputes or controversies with any union or other organization of any Loan Party's employees or any threatened strikes, work stoppages or demands for collective bargaining.

6.22    <u>Payable Practices</u>.  No Loan Party has made any material change in its historical accounts payable practices from those in effect on the Closing Date.

6.23    <u>Margin Regulations, Investment Company Act, Etc.</u>  No Loan Party is engaged, principally or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying any Margin Stock.  No proceeds of Revolving Loans or Letters of Credit will be used by any Loan Party to purchase or carry, or to reduce or refinance any Indebtedness incurred to purchase or carry, any Margin Stock or for any related purpose governed by Regulations T, U or X of the Board of Governors.  No Loan Party is (a) an "investment company" or a "person directly or indirectly controlled by or acting on behalf of an investment company" within the meaning of the Investment Company Act of 1940, or (b) subject to regulation under the Federal Power Act, the Interstate Commerce Act, any public utilities code or any other Applicable Law regarding its authority to incur Indebtedness.

6.24    <u>OFAC</u>.  No Loan Party is, and no affiliate or its or their respective directors, officers, employees, agents or representatives   acting or benefiting in any capacity in connection with this Agreement (i) is a Sanctioned Person; (ii) is a Person that is owned or controlled by a Sanctioned Person; (iii) is located, organized or resident in a country or territory that is subject to Sanctions; or (iv) has directly or indirectly engaged in, or is now directly or indirectly engaged in, any dealings or transactions with any Sanctioned Person or Sanctioned Entity or is otherwise in violation of any Sanctions.

6.25    <u>Complete Disclosure</u>.  No Loan Document contains any untrue statement of a material fact, nor fails to disclose any material fact necessary to make the statements contained therein not materially misleading.  There is no fact or circumstance that any Loan Party has failed to disclose to Lender in writing that has, or could reasonably be expected to have, a Material Adverse Effect.

## SECTION 7.    AFFIRMATIVE COVENANTS

7.1    <u>Financial Statements, Borrowing Base Certificate and Other Information</u>.  Each Loan Party (a) will deliver to Lender each of the financial statements, reports, and other items set forth on <u>Schedule 7.1</u> no later than the times specified therein, (b) maintain a system of accounting that enables such Loan Party to produce financial statements in accordance with GAAP,  (c) will (i) keep a reporting system that shows all additions, sales, claims, returns, and allowances with respect to its sales, and (ii) maintain its billing systems and practices substantially as in effect as of the Closing Date and shall only make material modifications thereto with notice to, and with the consent of, Lender, and (d) confirm the accuracy of the information set forth in the most recent Beneficial Ownership Certification for such Loan Party provided to Lender, and will provide a new Beneficial Ownership Certification for such Loan Party (which such Loan Party shall provide when the individual(s) to be identified as a beneficial owner have changed, regardless of whether Lender has made a request therefor).

7.2     Notices of Material Events.  Loan Parties will promptly notify Lender in writing of:  (a) the occurrence of any Default or Event of Default; (b) the occurrence of any Default or Event of Default under the Term Loan Agreement; (c) any matter that has, or could reasonably be expected to have, a Material Adverse Effect; (d) any breach or non-performance of, or any default under, a Material Contract or with respect to Material Indebtedness of any Loan Party thereof; (e) any material dispute, litigation, investigation, proceeding or suspension between any Loan Party and any Governmental Authority or the commencement of, or any material development in, any litigation or proceeding affecting any Loan Party, including pursuant to any applicable Environmental Laws; (f) the occurrence of any ERISA Event; (g) any material change in accounting policies or financial reporting practices of any Loan Party; (h) any change in any Loan Party's senior executive officers; (i) the discharge by any Loan Party of its independent accountants or any withdrawal or resignation by such accountants; (j) any collective bargaining agreement or other labor contract to which any Loan Party becomes a party, or the application for the certification of a collective bargaining agent; (k) the filing of any lien for unpaid Taxes against any Loan Party; (l) any loss, damage, or destruction to, or commencement of any action or proceeding for the taking under eminent domain, condemnation or similar proceeding, of Collateral in the amount of $500,000 or more, whether or not covered by insurance; and (m) any transaction occurring after the Closing Date consisting of:  (i) the entry into a Material Contract, (ii) the incurrence of Material Indebtedness, (iii) the voluntary or involuntary grant of any lien other than a Permitted Lien upon any property of any Loan Party; (iv) the making of any Permitted Investments in excess of $1,000,000; provided, that, each such notice under these clauses (i), (ii), (iii)(as to a voluntary grant) or (iv) shall be received by Lender not less than ten (10) Business Days prior thereto, together with such other information with respect thereto as Lender may request. Each notice pursuant to this Section shall be accompanied by a statement of a Responsible Officer of each Loan Party setting forth details of the occurrence referred to therein and stating what action such Loan Party has taken and proposes to take with respect thereto.

7.3     Existence.  Each Loan Party will do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence and the rights, qualifications, licenses, permits, franchises, governmental authorizations, intellectual property rights, licenses and permits material to the conduct of its business, and maintain all requisite authority to conduct its business in each jurisdiction in which its business is conducted.

7.4     Payment of Obligations.  Each Loan Party will pay or discharge all Material Indebtedness and all other material liabilities and obligations, including Taxes, before the same shall become delinquent or in default, except where (a) the validity or amount thereof is being contested in good faith by appropriate proceedings, and (b) each Loan Party has set aside on its books adequate reserves with respect thereto in accordance with GAAP; provided, that, each Loan Party will remit withholding taxes and other payroll taxes to the appropriate Governmental Authority as and when claimed to be due, notwithstanding the foregoing exceptions.

7.5     Maintenance of Properties.  Each Loan Party will keep and maintain all property material to the conduct of its business in good working order and condition, ordinary wear and tear excepted.

7.6     Compliance with Laws.  Each Loan Party will (a) comply in all material respects with all material Laws, rules, regulations, licenses, approvals and orders applicable to it and duly observe in all material respects all material requirements of any foreign, Federal, State or local Governmental Authority applicable to it or its property (including without limitation Environmental Laws), and (b) perform in all material respects its material obligations under Material Contracts to which it is a party.

7.7     Insurance.  Each Loan Party will maintain with financially sound and reputable carriers, in form, substance and amounts, and under agreements, satisfactory to Lender, insurance in such amounts (with no greater risk retention) and against such risks and such other hazards, as is customarily maintained by companies of established repute engaged in the same or similar businesses operating in the same or similar locations. Each Loan Party will from time to time upon Lender's request furnish to Lender information in reasonable detail as to the insurance so maintained. Each Loan Party shall provide to Lender evidence of property insurance and

certificates of liability insurance, together with lender loss payee endorsements naming Lender as an additional insured, in form and substance reasonably satisfactory to Lender.  No Loan Party shall use any Collateral in any manner that would void any insurance required to be carried on such Collateral.

7.8    Inspection Rights; Field Examinations.  Upon the request of Lender after reasonable prior notice to Loan Parties, each Loan Party will permit Lender or a firm engaged by Lender for such purpose to conduct field examinations, including, without limitation, with respect to each Borrower's practices in the calculation of the Borrowing Base and the assets included in the Borrowing Base and related financial information such as, but not limited to, sales, gross margins, payables, accruals and reserves; provided, that, absent the existence of an Event of Default, Lender may conduct no more than two (2) such field examinations during any year of this Agreement, which shall be at Loan Parties' cost and expense; and provided, further, that Lender may, it its sole cost and expense, conduct field examinations more frequently if no Default or Event of Default has occurred and is continuing.  Upon the request of Lender, after reasonable prior notice to Loan Parties, each Loan Party will permit representatives and other professionals (including investment bankers, consultants, accountants, and lawyers) engaged by Lender for such purpose to visit and inspect any of its properties, to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom, and to discuss its affairs, finances and accounts with its directors, officers, and accountants, all at the expense of Loan Parties and at such reasonable times during normal business hours and as often as may be reasonably desired.

7.9    Use of Proceeds.  Borrowers shall use the initial proceeds of the Revolving Loans and Letters of Credit hereunder only for:  (a) payments to each of the persons listed in the disbursement direction letter furnished by Borrowers to Lender on or about the Closing Date and (b) costs, expenses and fees in connection with the preparation, negotiation, execution and delivery of this Agreement and the other Loan Documents.  All other Revolving Loans made or Letters of Credit shall be used by Borrowers only for general operating, working capital and other corporate purposes of Borrowers not otherwise prohibited by the terms of the Organization Documents of any Loan Party or hereunder.

7.10    Cash Management; Collection of Proceeds of Collateral.

Each Loan Party has established and maintains, at its expense, with Bank Leumi USA or an Affiliate thereof ("Cash Management Bank"), the Collection Account identified on Schedule 7.10.  Each Loan Party shall, not later than sixty (60) days after the Closing Date, direct all account debtors or other obligors in respect of any Collateral to make payment of all such Collateral to the Collection Account and otherwise take all reasonable actions to cause such payments to be made to the Collection Account.  Each Loan Party and its respective employees, agents and Subsidiaries shall, acting as trustee for Lender, receive, as the property of Lender, any monies, checks, notes, drafts or any other payment relating to and/or proceeds of Accounts or other Collateral which come into its possession or under its control and promptly upon receipt thereof, shall deposit or cause the same to be deposited in the Collection Account, or remit the same or cause the same to be remitted, in kind, to Lender.  In no event shall the same be commingled with any Loan Party's own funds.  All payments made to the Collection Account shall be treated as payments to Lender in respect of the Obligations and therefore shall constitute the property of Lender to the extent of the then outstanding Obligations.

7.11    Additional Collateral; Further Assurances.

(a)    In the case of the formation or acquisition by any Loan Party of any Subsidiary after Closing Date, as to any such Subsidiary, (i) such Loan Party shall cause such Subsidiary to execute and deliver to Lender, in form and substance reasonably satisfactory to Lender, a joinder agreement to the Loan Documents in order to make such Subsidiary a party to this Agreement as a guarantor and shall cause it to execute and deliver a guarantee and such other agreements, documents or instruments and to deliver other consents, waivers, acknowledgments and other agreements from third persons which Lender may deem reasonably necessary in order to permit, protect and perfect its security interests in and liens upon the assets of such Subsidiary and the Equity Interests of such Loan Party in such Subsidiary, corporate resolutions and other organization and

authorizing documents of such Person, and favorable opinions of counsel to such person and (ii) such Loan Party shall execute and deliver to Lender, a pledge and security agreement, in form and substance reasonably satisfactory to Lender, granting to Lender a first pledge of and lien on all of the issued and outstanding shares of Equity Interests of any such Subsidiary, such other agreements, documents and instruments as Lender may require in connection with the documents referred to above, including, but not limited to, supplements and amendments hereto, corporate resolutions and other organization and authorizing documents and favorable opinions of counsel to such person.

(b)        Without limiting the foregoing, each Loan Party will, and will cause each Subsidiary to, execute and deliver, or cause to be executed and delivered, to Lender such documents, agreements and instruments, and take or cause to be taken such further actions (including the filing and recording of financing statements, fixture filings, mortgages, deeds of trust and other documents and such other actions or deliveries of the type required by <u>Section 4.1</u>, as applicable), which Lender may, from time to time, reasonably request to carry out the terms and conditions of this Agreement and the other Loan Documents and to ensure perfection and priority of the security interests and liens created or intended to be created by the Security Documents, all in form and substance reasonably satisfactory to Lender and at the expense of Loan Parties.

7.12    <u>End of Fiscal Years; Fiscal Quarters</u>.  Each Loan Party shall, for financial reporting purposes, cause its fiscal year to end on December 31 of each year, and fiscal quarters to end on the last day of each of March, June, September and December of each year.

7.13    <u>Costs and Expenses</u>.  Loan Parties shall pay to Lender on demand all reasonable and documented costs, expenses, filing fees and taxes paid or payable in connection with the preparation, negotiation, execution, delivery, recording, syndication, administration, collection, liquidation, enforcement and defense of the Obligations, Lender's rights in the Collateral, this Agreement, the other Loan Documents and all other documents related hereto or thereto, including any amendments, supplements or consents which may hereafter be contemplated (whether or not executed) or entered into in respect hereof and thereof, including:  (a) all documented costs and expenses of filing or recording (including UCC financing statement filing taxes and fees, documentary taxes, intangibles taxes and mortgage recording taxes and fees, if applicable), (b) subject to <u>Section 7.8</u> hereof, costs and expenses and fees for insurance premiums, environmental audits, title insurance premiums, surveys, assessments, engineering reports and inspections, and search fees, background checks, costs and expenses of remitting loan proceeds, collecting checks and other items of payment, together with Lender's customary charges and fees with respect thereto; (c) customary charges, fees or expenses charged by Issuing Bank in connection with any Letter of Credit; (d) actual costs and expenses of preserving and protecting the Collateral; (e) actual documented costs and expenses paid or incurred in connection with obtaining payment of the Obligations, enforcing the security interests and liens of Lender in the Collateral, selling or otherwise realizing upon the Collateral, and otherwise enforcing the provisions of this Agreement and the other Loan Documents or defending any claims made or threatened against Lender arising out of the transactions contemplated hereby and thereby (including preparations for and consultations concerning any such matters); (f) all documented out-of-pocket expenses and costs heretofore and from time to time hereafter incurred by Lender during the course of periodic field examinations, plus a per diem charge at Lender's then standard rate for Lender's examiners in the field and office (which rate as of the Closing Date is $1,000.00 per person per day); and (g) the reasonable fees and disbursements of counsel (including legal assistants) to Lender in connection with any of the foregoing.

7.14    <u>PepsiCo Contract Extension</u>.  Borrowers shall cause the PCR Resin Agreement, dated as of June 28, 2018, by and between Pepsi-Cola Advertising and Marketing, Inc., and CL Industries, expiring on December 31, 2019, together with all related agreements and documents, to be extended, on or before December 1, 2019, to a date not sooner than December 31, 2020, it being acknowledged and agreed that in addition to constituting an Event of Default hereunder, any failure to cause such extensions to be effected in accordance with this Section 7.14 shall automatically render all Accounts owning from PepsiCo, Inc. and its Affiliates, including without limitation, Pepsi-Cola Advertising and Marketing, Inc., to be ineligible.

**SECTION 8.    NEGATIVE COVENANTS**

8.1     <u>Indebtedness</u>.  No Loan Party shall incur, create, assume, become or be liable in any manner with respect to, or permit to exist, any Indebtedness, or guarantee, assume, endorse, or otherwise become responsible for (directly or indirectly), the Indebtedness, obligations, or dividends of any other Person, except for the Permitted Indebtedness.

8.2     <u>Liens</u>.  No Loan Party shall create, incur, assume or suffer to exist any security interest, mortgage, pledge, lien, charge or other encumbrance of any nature whatsoever on any of its assets or properties, including the Collateral, or file or permit the filing of, or permit to remain in effect, any financing statement or other similar notice of any security interest or lien with respect to any such assets or properties, except Permitted Liens.

8.3     <u>Fundamental Changes</u>.  No Loan Party shall, directly or indirectly, (a) change its name or conduct business under any fictitious name; (b) change its tax, charter or other organizational identification number; (c) change its form or state of organization; (d) suspend operations, wind up, liquidate or dissolve; or (e) except in a transaction where such Loan Party is the surviving Person, merge, divide, combine, or consolidate with any Person, whether in a single transaction or in a series of related transactions; <u>provided</u>, <u>that</u>, the surviving Loan Party execute and deliver such documents and agreements to evidence the foregoing as Lender may reasonably request.

8.4     <u>Asset Sales</u>.  No Loan Party shall sell, issue, assign, lease, license, transfer, abandon or otherwise dispose of any of its assets (including Equity Interests in any Subsidiary) to any other Person, except for Permitted Dispositions or agree to do any of the foregoing, except to the extent that such agreement contains a condition requiring the consent of Lender if the agreement to do any of the foregoing is otherwise prohibited by the terms hereof.

8.5     <u>Investments</u>.  No Loan Party shall, directly or indirectly, (i) (a) purchase, hold or acquire (including pursuant to any merger with any Person that was not a wholly owned Subsidiary immediately prior to such merger) any Equity Interests, evidences of indebtedness or other securities (including any option, warrant or other right to acquire any of the foregoing) of, (b) make or permit to exist any loans or advances to, or (c) make or permit to exist any capital contribution or other investment or any other interest in, any other Person, or (ii) purchase or otherwise acquire (in one transaction or a series of transactions) any assets of any other Person constituting a business unit or all or a substantial part of the assets or property of any other Person (whether through purchase of assets, merger or otherwise), or form or acquire any Subsidiaries, or (iii) agree to do any of the foregoing (each of the foregoing an "Investment"), except Permitted Investments.

8.6     <u>Transactions with Affiliates</u>.  Except as disclosed on <u>Schedule 8.6</u>,  no Loan Party shall, directly or indirectly, purchase, acquire or lease any property from, or sell, transfer or lease any property to, any officer, director or other Affiliates of any Loan Party, except pursuant to the reasonable requirements of such Loan Party's business and upon fair and reasonable terms no less favorable to Loan Party than Loan Party would obtain in a comparable arm's length transaction with an unaffiliated person, except for the following:  (a) any employment or compensation arrangement or agreement, employee benefit plan or arrangement, officer or director indemnification agreement or any similar arrangement or other compensation arrangement entered into by such Loan Party in the ordinary course of business and payments, issuance of securities or awards pursuant thereto, and including the grant of stock options, restricted stock, stock appreciation rights, phantom stock awards or similar rights to employees and directors in each case approved by the board of directors or equivalent governing body of such Loan Party, and (b) Restricted Payments permitted under <u>Section 8.8</u> hereof.

8.7     <u>Change in Business</u>.  No Loan Party shall engage in any business other than the business of such Loan Party on the Closing Date and any business reasonably related, ancillary or complimentary to the business in which such Loan Party is engaged on the Closing Date.

8.8    _Restricted Payments_. No Loan Party shall declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment, except Loan Parties may (a) declare and make dividend payments or other distributions payable solely in the Equity Interests of a Loan Party, (b) so long as it is permitted by Law, and so long as no Default or Event of Default exists or has occurred and is continuing or would result from such payment and so long as such Loan Party is a "pass-through" tax entity for United States federal income tax purposes, and after first providing such supporting documentation as Lender may request in its Permitted Discretion (including the state and federal tax returns) of each owner of Stock in such Loan Party, such Loan Party may declare and pay Pass-Through Tax Liabilities, net of any prior year loss carry-forwards and (c) make payments on interest due pursuant to the Shareholder Notes in amounts not to exceed 25% of the annual interest outstanding on such Indebtedness.

8.9    _Restrictive Agreements_. No Loan Party shall, directly, or indirectly, create or otherwise cause or suffer to exist any agreement or other arrangement that prohibits, restricts or imposes any condition on the ability of such Loan Party to pay dividends or make other distributions or pay any Indebtedness owed by or to such Loan Party or make loans or advances or grant security interests in or liens on any of its assets or transfer any of its assets, except such an agreement or other arrangement that (a) is in effect on the Closing Date, (b) relates to secured Indebtedness permitted hereunder, as long as the restrictions apply only to collateral for such Indebtedness or (c) constitute customary restrictions on assignment in leases and other contracts.

8.10    _Certain Payments of Indebtedness, Etc._ No Loan Party shall make or agree to make, directly or indirectly, any payment or other distribution (whether in cash, securities or other property) of or in respect of principal of or interest on any Indebtedness, or any payment or other distribution (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Indebtedness, except: (a) payment of the Obligations; (b) payment of regularly scheduled principal and interest payments, and other mandatory payments, as and when due in respect of any Permitted Indebtedness, other than payments in respect of Subordinated Debt prohibited by the subordination provisions thereof; (c) payments in respect of Permitted Indebtedness in each case with proceeds of Refinancing Indebtedness with respect thereto to the extent permitted under the definition of Permitted Indebtedness; and (d) payment of secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness to the extent such sale or transfer is permitted under Section 8.4.

8.11    _Amendment of Material Documents_. No Loan Party shall amend, modify or waive any of the terms of: (a) its Organization Documents except for amendments, modifications or other changes that do not materially adversely affect the rights and privileges of such Loan Party and do not affect the ability of such Loan Party to amend, modify, renew or supplement the terms of this Agreement or any of the other Loan Documents, or otherwise adversely affect the interests of Lender and so long as at the time of any such amendment, modification or waiver, no Default or Event of Default shall exist or have occurred and be continuing or (b) any agreement, document or instrument evidencing or governing any Material Indebtedness in a manner that could reasonably be expected to result in a Material Adverse Effect; except, that, the Loan Parties may, after prior written notice to Lender, (i) amend or modify the terms of the Term Loan Agreement in accordance with the terms of the Intercreditor Agreement, and (ii) amend or modify the terms of any other Material Indebtedness to forgive, or cancel any portion of such Indebtedness or to reduce the interest rate or any fees in connection therewith, or to make the terms thereof less restrictive or burdensome to the Loan Parties or which are otherwise immaterial to the rights or obligations of the Loan Parties thereunder.

8.12    _Sale and Leasebacks_. No Loan Party shall enter into any arrangement, directly or indirectly, whereby it shall sell or transfer any property, real or personal, used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property or other property that it intends to use for substantially the same purpose or purposes as the property sold or transferred (a "Sale and Leaseback Transaction"), except for any such sale of any fixed or capital assets by such Loan Party that is made for cash

consideration in an amount not less than the fair value of such fixed or capital asset and is consummated within ninety (90) days after such Loan Party acquires or completes the construction of such fixed or capital asset.

8.13    Segregation of ABL Priority Collateral; Deposit Accounts.  No Loan Party shall deposit ABL Priority Collateral into a Deposit Account or Securities Account that is not subject to a Control Agreement, nor shall Loan Parties, in the aggregate, maintain an average daily balance in any Deposit Account or Security Account that is not subject to a Control Agreement (including, for the avoidance of doubt, those Deposit Accounts identified on Schedule 7.10) in excess of $250,000 with respect to any one such Deposit Account and/or Security Account, or all such Deposit and/or Security Accounts in the aggregate.

## SECTION 9.    TANGIBLE NET WORTH

Borrowers shall not permit Tangible Net Worth for the period ending on each date set forth below to be less than the corresponding amount set forth below:

| Period Ending | Tangible Net Worth |
|---|---|
| As of September 30, 2019 | $84,013,900 |
| As of December 31, 2019 | $83,543,850 |
| As of March 31, 2020 | $83,623,000 |
| As of June 30, 2020 | $84,459,300 |
| As of September 30, 2020 | $85,282,200 |
| As of December 31, 2020 | $83,927,700 |

The forgoing amounts shall be reduced on a dollar-for-dollar basis by the amount, if any, applied to the reduction of the outstanding principal balance of the Shareholder Notes with proceeds of the Debt Service Reserve Account (as defined in the Term Loan Agreement).  With respect to periods from and after January 1, 2020, the foregoing covenant shall be reset annually by Lender, as of January 1 of each year, based upon fifty percent (50%) of the projected Tangible Net Worth set forth in the annual projections delivered to Lender as required by Schedule 7.1(f), and accepted by Lender.

## SECTION 10.    EVENTS OF DEFAULT AND REMEDIES

10.1    Events of Default.  The occurrence or existence of any one or more of the following events are referred to herein individually as an "Event of Default", and collectively as "Events of Default":

(a)    (i) Borrowers fail to make any principal payment hereunder when due or fail to pay interest, fees or any of the other Obligations within three (3) Business Days after the due date thereof, or (ii) any Loan Party fails to perform any of the covenants contained in Sections 3, 7.1, 7.2, 7.7, 7.10, 8 and 9, or (iii) any Loan Party fails to perform any of the terms, covenants, conditions or provisions contained in this Agreement or any of the other Loan Documents other than those described in Sections 10.1(a)(i) and 10.1(a)(ii) above and such failure shall continue for thirty (30) days; provided, that, such thirty (30) day period shall not apply in the case of any failure to observe any such covenant which is not capable of being cured at all or within such thirty (30) day period;

(b)    any representation, warranty or statement of fact made by any Loan Party to Lender in this Agreement, the other Loan Documents or any other written agreement, schedule, confirmatory assignment or otherwise that are qualified as to materiality or Material Adverse Effect shall when made or deemed made be materially incorrect, false or misleading and any other such representation, warranty or statement of fact made by

such Loan Party to Lender shall when made or deemed made be materially incorrect, false or misleading in any material respect;

(c)    any judgment for the payment of money is rendered against any Loan Party in excess of $1,000,000 in the aggregate (to the extent not covered by independent third party insurance where the insurer has not declined or disputed coverage) and shall remain undischarged or unvacated for a period in excess of ninety (90) days or execution shall at any time not be effectively stayed, or any judgment other than for the payment of money, or injunction, attachment, garnishment or execution is rendered against any Loan Party or any of the Collateral having a value in excess of $1,000,000;

(d)    Any Loan Party makes an assignment for the benefit of creditors or makes or sends notice of a bulk transfer;

(e)    a case or proceeding under the bankruptcy Laws of the United States of America now or hereafter in effect or under any Debtor Relief Law, any insolvency, reorganization, receivership, readjustment of debt, dissolution or liquidation Law or statute of any jurisdiction now or hereafter in effect (whether at Law or in equity) is filed against any Loan Party or all or any part of its properties and such petition or application is not dismissed within sixty (60) days after the date of its filing or such Loan Party shall file any answer admitting or not contesting such petition or application or indicates its consent to, acquiescence in or approval of, any such action or proceeding or the relief requested is granted sooner;

(f)    a case or proceeding under the any Debtor Relief Law of the United States of America now or hereafter in effect or under any insolvency, reorganization, receivership, readjustment of debt, dissolution or liquidation Law or statute of any jurisdiction now or hereafter in effect (whether at a Law or equity) is filed by any Loan Party or for all or any part of its property;

(g)    (i) any "event of default" or similar event by a Loan Party exists or occurs and is continuing in respect of any Material Contract, which default continues for more than the applicable cure period, if any, with respect thereto, and (x) in connection with which the counterparty with respect thereto, or its agents or designees, elects to terminate such Material Contract, and (y) such Material Contract is not replaced within thirty days by a comparable Material Contract of substantially equivalent or greater value, or (ii) any "event of default" or similar event by a Loan Party occurs in respect of any Material Indebtedness, which would entitle the lender(s) with respect thereto, or its or their agents or designees, to accelerate the obligations thereunder, or (iii) the subordination provisions contained in any agreement related to any Subordinated Debt shall cease to be in full force and effect or to give Lender the rights, powers and privileges purported to be created thereby,

(h)    any material provision hereof or of any of the other Loan Documents shall for any reason (other than solely an action or inaction of Lender) cease to be valid, binding and enforceable with respect to any party hereto or thereto (other than Lender) in accordance with its terms, or any such party shall challenge the enforceability hereof or thereof, or shall assert in writing, or take any action or fail to take any action based on the assertion that any provision hereof or of any of the other Loan Documents has ceased to be or is otherwise not valid, binding or enforceable in accordance with its terms, or any security interest provided for herein or in any of the other Loan Documents shall cease to be a valid and perfected first priority security interest in any of the Collateral purported to be subject thereto (except as otherwise permitted herein or therein or due to the action or inaction of Lender);

(i)    an ERISA Event shall occur which results in or could reasonably be expected to result in liability of Borrower in an aggregate amount in excess of $1,000,000;

(j)    any Loan Party shall be prohibited or otherwise restrained from conducting the business theretofore conducted by it in any manner that has or could reasonably be expected to result in a Material

Adverse Effect by virtue of any determination, ruling, decision, decree or order of any court or Governmental Authority of competent jurisdiction;

(k)     any Change of Control;

(l)     any default by any Loan Party under or with respect to any Hedge Agreement with a notional amount in excess of $500,000 entered into with Lender or any of its Affiliates, or any agreement, document, or instrument executed and/or delivered in connection therewith;

(m)     an Event of Default occurs under the Term Loan Agreement; or

(n)     The Intercreditor Agreement ceases to be in full force or effect for any reason (other than a waiver or release by Lender).

10.2    <u>Remedies</u>.

(a)     At any time an Event of Default exists or has occurred and is continuing, Lender shall have all rights and remedies provided in this Agreement, the other Loan Documents, the UCC and other applicable Law, all of which rights and remedies may be exercised without notice to or consent by Borrower, except as such notice or consent is expressly provided for hereunder or required by applicable Law. All rights, remedies and powers granted to Lender hereunder, under any of the other Loan Documents, the UCC or other applicable Law, are cumulative, not exclusive and enforceable, in Lender's discretion, alternatively, successively, or concurrently on any one or more occasions, and shall include, without limitation, the right to apply to a court of equity for an injunction to restrain a breach or threatened breach by any Loan Party of this Agreement or any of the other Loan Documents.  Lender may at any time or times an Event of Default exists or has occurred and is continuing, proceed directly against any Loan Party to collect the Obligations without prior recourse to the Collateral.

(b)     Without limiting the generality of the foregoing, at any time an Event of Default exists or has occurred and is continuing, Lender may (i) accelerate the payment of all Obligations and demand immediate payment thereof to Lender (<u>provided</u>, <u>that</u>, upon the occurrence of any Event of Default described in <u>Sections 10.1(e)</u> and <u>10.1(f)</u>, all Obligations shall automatically become immediately due and payable), (B) terminate the commitment of Lender to make Revolving Loans or arrange Letters of Credit hereunder whereupon the obligation of Lender to make any Revolving Loan and of Issuing Bank to issue, amend, renew or extend any Letter of Credit shall immediately terminate (<u>provided</u>, <u>that</u>, upon the occurrence of any Event of Default described in <u>Sections 10.1(e)</u> and <u>10.1(f)</u>, the commitments and any other obligation of Lender or Issuing Bank hereunder shall automatically terminate), (iii) require Borrowers to provide cash collateral to Lender to be used to secure and fund the reimbursement obligations to Issuing Bank in connection with any Letter of Credit Obligations in the amount equal to one hundred five (105%) percent of the amount of the Letter of Credit Obligations, (iv) cease making Revolving Loans or arranging for Letters of Credit or reduce the lending formulas or amounts of Revolving Loans and Letters of Credit available to Borrowers and/or (v) establish such Reserves as Lender determines, without limitation or restriction, notwithstanding anything to the contrary contained herein.

(c)     Each Loan Party hereby irrevocably makes, constitutes and appoints Lender (and any of Lender's officers, employees or agents designated by Lender) as such Loan Party's true and lawful attorney with power:

(i)     To sign the name of such Loan Party on any of the documents pertaining to any Collateral, or on any other similar documents that need to be executed, recorded and/or filed in order to perfect or continue perfected Lender's liens upon any of the Collateral, if such Loan Party fails or refuses to comply, or delays in complying, with its undertakings hereunder;

46

(ii)       To endorse such Loan Party's name on any checks, notes, acceptances, money orders, drafts or other forms of payment or security that may come into Lender's possession;

(iii)       After the occurrence and during the continuance of an Event of Default, to sign such Loan Party's name on drafts against Account Debtors, on schedules and assignments of Accounts, on notices to Account Debtors and on any invoice or bill of lading relating to any Account;

(iv)       To do all things necessary to carry out this Agreement;

(v)       After the occurrence and during the continuance of an Event of Default, to notify the post office authorities to change the address for delivery of such Loan Party's mail to any address designated by Lender, to receive and open all mail addressed to such Loan Party, and to retain all mail relating to the Collateral; and

(vi)       To send requests for verification of Accounts, and to contact Account Debtors in any other manner in order to verify the Accounts.

The appointment of Lender as each Loan Party's attorney and each and every one of Lender's rights and powers, being coupled with an interest, are irrevocable until such time as all of the Obligations have been fully paid and performed. Each Loan Party ratifies and approves all acts of the attorney. Neither Lender nor its employees, officers, or agents shall be liable for any acts or omissions or for any error in judgment or mistake of fact or Law made in good faith except for gross negligence or willful misconduct.

## SECTION 11.  JURY TRIAL WAIVER; OTHER WAIVERS CONSENTS; GOVERNING LAW

11.1    Governing Law; Choice of Forum; Service of Process; Jury Trial Waiver.

(a)       The validity, interpretation and enforcement of this Agreement and the other Loan Documents (except as otherwise provided therein) and any dispute arising out of the relationship between the parties hereto, whether in contract, tort, equity or otherwise, shall be governed by the internal Laws of the State of New York but excluding any principles of conflicts of Law or other rule of Law that would cause the application of the Law of any jurisdiction other than the Laws of the State of New York.

(b)       Each Loan Party, Lender and Issuing Bank irrevocably consent and submit to the non-exclusive jurisdiction of the of the Supreme Court of the State of New York, New York County and the United States District Court for the Southern District of New York, whichever Lender may elect, and waive any objection based on venue or forum *non conveniens* with respect to any action instituted therein arising under this Agreement or any of the other Loan Documents or in any way connected with or related or incidental to the dealings of the parties hereto in respect of this Agreement or any of the other Loan Documents or the transactions related hereto or thereto, in each case whether now existing or hereafter arising, and whether in contract, tort, equity or otherwise, and agree that any dispute with respect to any such matters shall be heard only in the courts described above (except that Lender shall have the right to bring any action or proceeding against any Loan Party or its property in the courts of any other jurisdiction which Lender deems necessary or appropriate in order to realize on the Collateral or to otherwise enforce its rights against Borrower or its or their property).

(c)       Each Loan Party hereby waives personal service of any and all process upon it and consents that all such service of process may be made by certified mail (return receipt requested) directed to its address set forth herein and service so made shall be deemed to be completed five (5) days after the same shall have been so deposited in the U.S. mails, or, at Lender's option, by service upon Borrower in any other manner provided under the rules of any such courts.  Within thirty (30) days after such service, each Loan Party shall appear in answer to such process, failing which each Loan Party shall be deemed in default and judgment may be entered by Lender against Borrower for the amount of the claim and other relief requested.

(d)        EACH LOAN PARTY, LENDER AND ISSUING BANK EACH HEREBY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING UNDER THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO IN RESPECT OF THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS OR THE TRANSACTIONS RELATED HERETO OR THERETO IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER IN CONTRACT, TORT, EQUITY OR OTHERWISE. EACH LOAN PARTY, LENDER AND ISSUING BANK EACH HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT EACH LOAN PARTY, LENDER OR ISSUING BANK MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

(e)        Lender shall not have any liability to any Loan Party (whether in tort, contract, equity or otherwise) for losses suffered by any Loan Party in connection with, arising out of, or in any way related to the transactions or relationships contemplated by this Agreement, or any act, omission or event occurring in connection herewith, unless it is determined by a final and non-appealable judgment or court order binding on Lender and Issuing Bank, that the losses were the result of its acts or omissions constituting gross negligence or willful misconduct. Each Loan Party: (i) certifies that neither Lender, Issuing Bank nor any representative, agent or attorney acting for or on behalf Lender or Issuing Bank has represented, expressly or otherwise, that Lender and Issuing Bank would not, in the event of litigation, seek to enforce any of the waivers provided for in this Agreement or any of the other Loan Documents and (ii) acknowledges that in entering into this Agreement and the other Loan Documents, Lender and Issuing Bank are relying upon, among other things, the waivers and certifications set forth in this Section and elsewhere herein and therein.

11.2    <u>Waiver of Notices</u>. Each Loan Party hereby expressly waives demand, presentment, protest and notice of protest and notice of dishonor with respect to any and all instruments and chattel paper, included in or evidencing any of the Obligations or the Collateral, and any and all other demands and notices of any kind or nature whatsoever with respect to the Obligations, the Collateral and this Agreement, except such as are expressly provided for herein or required by applicable Law and cannot be waived thereunder. No notice to or demand on any Loan Party which Lender may elect to give shall entitle any Loan Party to any other or further notice or demand in the same, similar or other circumstances.

11.3    <u>Amendments and Waivers</u>. Neither this Agreement nor any other Loan Document nor any terms hereof or thereof may be amended, waived, discharged or terminated unless such amendment, waiver, discharge or termination is in writing signed by Lender, and as to amendments, waivers, discharges and terminations to any of the Loan Documents, by any Loan Party and such amendment, waiver, discharge or termination shall be effective and binding as to Lender and Issuing Bank only in the specific instance and for the specific purpose for which given. Lender and Issuing Bank shall not, by any act, delay, omission or otherwise be deemed to have expressly or impliedly waived any of its or their rights, powers and/or remedies unless such waiver shall be in writing and signed as provided herein. Any such waiver shall be enforceable only to the extent specifically set forth therein. A waiver by Lender or Issuing Bank of any right, power and/or remedy on any one occasion shall not be construed as a bar to or waiver of any such right, power and/or remedy which Lender or Issuing Bank would otherwise have on any future occasion, whether similar in kind or otherwise.

11.4    <u>Waiver of Counterclaims</u>. Each Loan Party waives all rights to interpose any claims, deductions, setoffs or counterclaims of any nature (other than compulsory counterclaims) in any action or proceeding with respect to this Agreement, the Obligations, the Collateral or any matter arising therefrom or relating hereto or thereto.

11.5    <u>Indemnification</u>.  Each Loan Party shall indemnify and hold Lender and Issuing Bank, and their respective officers, directors, agents, employees, advisors and counsel and their respective Affiliates (each such person being an "Indemnitee"), harmless from and against any and all losses, claims, damages, penalties, liabilities, costs or expenses (including attorneys' fees and expenses) imposed on, incurred by or asserted against any of them in connection with any litigation, investigation, claim or proceeding commenced or threatened related to the negotiation, preparation, execution, delivery, enforcement, performance or administration of this Agreement, any other Loan Documents, or any undertaking or proceeding related to any of the transactions contemplated hereby or any act, omission, event or transaction related or attendant thereto, including amounts paid in settlement, court costs, and the fees and expenses of counsel except no Loan Party shall have any obligation under this Section to indemnify an Indemnitee with respect to a matter covered hereby resulting from the gross negligence or willful misconduct of such Indemnitee as determined pursuant to a final, non-appealable order of a court of competent jurisdiction (but without limiting the obligations of any Loan Party as to any other Indemnitee).   To the extent that the undertaking to indemnify, pay and hold harmless set forth in this Section may be unenforceable because it violates any Law or public policy, Loan Parties shall pay the maximum portion which it is permitted to pay under applicable Law to Lender in satisfaction of indemnified matters under this Section.  To the extent permitted by applicable Law, No Loan Party shall assert, and each Loan Party hereby waives, (i) any claim against any Indemnitee, on any theory of liability for punitive damages (as opposed to direct, actual or consequential damages) arising out of, in connection with, or as a result of, this Agreement, any of the other Loan Documents or any undertaking or transaction contemplated hereby and (ii) any claim against any Indemnitee, on any theory of liability for special, indirect or consequential damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, any breach by Lender of this Agreement, any of the other Loan Documents or any undertaking or transaction contemplated hereby that is cured by Lender within three (3) Business Days.  No Indemnitee referred to above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or any of the other Loan Documents or the transaction contemplated hereby or thereby.  All amounts due under this Section shall be payable upon demand. The foregoing indemnity shall survive the payment of the Obligations and the termination or non-renewal of this Agreement.

## SECTION 12.  NOTICES; MISCELLANEOUS

12.1    <u>Notices</u>.

(a)    Except in the case of notices and other communications expressly permitted to be given by telephone or electronic method of transmission (and subject in each case to clause (c) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, or mailed by certified or registered mail, as follows:

| If to Borrower Agent: | CarbonLite PI Holdings LLC |
| | 10250 Constellation Boulevard, Suite 2820 |
| | Los Angeles, CA 90067 |
| | Attention:  both Leon Farahnik, Chief Executive Officer; and Gregg Milhaupt |
| | Email:  both lfarahnik@hpcindustries.com; and gregg@carbonliterecycling.com |
| | |
| If to Lender or Issuing Bank: | Bank Leumi USA |
| | 579 Fifth Avenue |
| | New York, New York 10017 |
| | Attention:  Portfolio Manager, Head of ABL |
| | Tel:  (212) 407-4464 |

49

E-mail: jason.schumacher@leumiusa.com

With a copy to (which shall not constitute notice):

Riemer & Braunstein LLP
Times Square Tower
Seven Times Square, Suite 2506
New York, NY  10036
Attention:  Lon M. Singer, Esq.
Tel:  (212) 789-3110
Email: lsinger@riemerlaw.com

Any party hereto may change its address or e-mail address for notices and other communications hereunder by notice to the other parties hereto.

(b)      All such notices and other communications (i) sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received or (ii) delivered through an electronic method of transmission to the extent provided in clause (c) below shall be effective as provided in such clause.

(c)      Notices and other communications to Lender hereunder may be delivered or furnished by e-mail or any internet or extranet-based site providing for access to data protected by passcodes or other security systems approved by Lender for such purpose and in each case to the extent that Lender may approve a pursuant to procedures approved by Lender; provided, that, the foregoing shall not apply to notices pursuant to Section 2 or Section 7.2 or such other notices as Lender may specifically hereafter agree. Unless otherwise specified by Lender, all such notices and other communications (i) sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement; provided, that, if not given during the normal business hours of the recipient, such notice or communication shall be deemed to have been given at the opening of business on the next Business Day for the recipient, and (ii) posted to an internet or extranet-based site shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor; provided, that, for both clauses (i) and (ii) above, if such notice, e-mail or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day of the recipient.

12.2    Partial Invalidity.  If any provision of this Agreement is held to be invalid or unenforceable, such invalidity or unenforceability shall not invalidate this Agreement as a whole, but this Agreement shall be construed as though it did not contain the particular provision held to be invalid or unenforceable and the rights and obligations of the parties shall be construed and enforced only to such extent as shall be permitted by applicable Law.

12.3    Successors.  This Agreement, the other Loan Documents and any other document referred to herein or therein shall be binding upon and inure to the benefit of and be enforceable by Lender and each Loan Party and their respective successors and assigns, except that no Loan Party may assign its rights under this Agreement, the other Loan Documents and any other document referred to herein or therein without the prior written consent of Lender.  Any such purported assignment without such express prior written consent shall be void.  The terms and provisions of this Agreement and the other Loan Documents are for the purpose of defining the relative rights and obligations of each Loan Party and Lender with respect to the transactions contemplated hereby and there shall be no third party beneficiaries of any of the terms and provisions of this Agreement or any of the other Loan Documents.  Any assignment by Lender to another Person at any time that no Default or Event

of Default exists or has occurred and is continuing, shall be subject to the prior written consent of Borrowers (which consent shall not be unreasonably withheld, conditioned, or delayed).

12.4    <u>Entire Agreement</u>.  This Agreement, the other Loan Documents, any supplements hereto or thereto, and any instruments or documents delivered or to be delivered in connection herewith or therewith represents the entire agreement and understanding concerning the subject matter hereof and thereof between the parties hereto, and supersede all other prior agreements, understandings, negotiations and discussions, representations, warranties, commitments, proposals, offers and contracts concerning the subject matter hereof, whether oral or written.  In the event of any inconsistency between the terms of this Agreement and any schedule or exhibit hereto, the terms of this Agreement shall govern.

12.5    <u>USA Patriot Act</u>.  Lender hereby notifies Borrowers that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub.L. 107-56 (signed into law October 26, 2001) (the "Act"), it is required to obtain, verify and record information that identifies each person or corporation who opens an account and/or enters into a business relationship with it, which information includes the name and address of Borrower and other information that will allow Lender to identify such person in accordance with the Act  and any other applicable Law.  Borrowers are hereby advised that any Revolving Loans or Letters of Credit hereunder are subject to satisfactory results of such verification.

12.6    <u>Counterparts, Etc.</u>

(a)    This Agreement or any of the other Loan Documents may be executed in any number of counterparts, each of which shall be an original, but all of which taken together shall constitute one and the same agreement. Delivery of an executed counterpart of this Agreement or any of the other Loan Documents by telefacsimile or other electronic method of transmission shall have the same force and effect as the delivery of an original executed counterpart of this Agreement or any of such other Loan Documents.  Any party delivering an executed counterpart of any such agreement by telefacsimile or other electronic method of transmission shall in a timely manner also deliver an original executed counterpart, but the failure to do so shall not affect the validity, enforceability or binding effect of such agreement.

(b)    The words "execution," "signed," "signature," and words of like import in any Loan Document shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable Law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state Laws based on the Uniform Electronic Transactions Act.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the undersigned have caused these presents to be duly executed as of the day and year first above written.

**CL PI HOLDINGS**:

**CARBONLITE PI HOLDINGS, LLC**

By: _____
Name: Leon Farahnik
Title:  Chief Executive Officer

**BORROWERS**:

**CARBONLITE INDUSTRIES LLC**

By: _____
Name: Leon Farahnik
Title:  Chief Executive Officer

**CARBONLITE PINNPACK, LLC**

By: _____
Name: Leon Farahnik
Title:  Chief Executive Officer

**PINNPACK PACKAGING, LLC**

By: _____
Name: Leon Farahnik
Title:  Chief Executive Officer

[Signature Page to Credit Agreement]

**LENDER:**

**BANK LEUMI USA**

By: _____
Name: _Jason Schumacher_____
Title: _Vice President_____

By: _Edna R. Buxton_____
Name: _Elsa R. Buxton_____
Title: _SVP / Group Head_____

[Signature Page to Credit Agreement]

EXHIBIT A
TO
CREDIT AGREEMENT

Form of Borrowing Base Certificate

See attached

**Leumi**

| | | Borrower's Name: | CarbonLITE PI |
|---|---|---|---|
| **Borrowing Base Certificate (the "BBC")** | | | |
| BBC Submission Date: | Template | **Type of Aging** | Invoice Date |
| Line # | Date: | **AR- CarbonLITE** | **AR- Pinnpack** |

| Line # | | | | AR- CarbonLITE | AR- Pinnpack |
|---|---|---|---|---|---|
| 1 | Opening Accounts Receivable Balance | | 9/6/2019 | 0 | 0 |
| 2 | Invoicing for the Period | (+) | | 0 | 0 |
| 3 | Credits for the Period | (-) | | 0 | 0 |
| 4 | Discounts for the Period | (-) | | 0 | 0 |
| 5 | Collections for the Period | (-) | | 0 | 0 |
| 6 | Other Increases | (+) | | 0 | 0 |
| 7 | Other Decreases | (-) | | 0 | 0 |
| 8 | Ending Accounts Receivable | | 9/13/2019 | 0 | 0 |
| | | | | | |
| 9 | Total A/R Ineligibles Per Worksheet | (-) | | 0 | 0 |
| 10 | Total Eligible Accounts Receivable | | | 0 | 0 |
| 11 | Receivables Advance Rate | | 85% | | |
| 12 | Net Eligible Accounts Receivable | | | | 0 |
| | | | | | |
| 13 | Reserve #1 | (-) | | 0 | |
| 14 | Reserve #2 | (-) | | 0 | |
| 15 | Reserve #3 | (-) | | 0 | |
| 16 | Total Reserves | | | | 0 |
| 17 | Revolver Limit | | | **10,000,000** | |
| | | | | | |
| 18 | Beginning Loan Balance | | | 0 | |
| 19 | Collections | (-) | | 0 | |
| 20 | Interest and Fees | (+) | | 0 | |
| 21 | Advance Requested | (+) | | 0 | |
| 22 | Increase (Decrease) Adjustment | | | 0 | |
| 23 | Ending Loan Balance | | | 0 | |
| 24 | Final Availability | | | 0 | |

'Reference is hereby made to that certain Loan and Security Agreement dated as of  [DATE] (as amended, restated or otherwise modified from time to time, the "Loan Agreement") between CarbonLITE Industries, LLC and Pinnpack Packaging, LLC ("Borrower") and  Leumi Business Credit a division of Bank Leumi USA ("Lender"). Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to them in the Loan Agreement.

Borrower hereby certifies all of the information contained in this Borrowing Base Certificate is true and correct in all material respects as of the date hereof, and such calculations have been made in accordance with the eligibility

Borrower

By:_____
Authorized Signer

# Leumi

| | Borrowing Base Certificate (the "BBC") Ineligibles Worksheet | | | |
|---|---|---|---|---|
| | BBC Submission Date: | Template | Borrower's Name: | CarbonLITE PI |
| Line # | Description | CarbonLITE | PinnPACK | |
| 8a | Current | 0 | 0 | |
| 8a | 31-60 | 0 | 0 | |
| 8a | 61-90 | 0 | 0 | |
| 8a | Over 90 | 0 | 0 | |
| 8a | **Total** | **0** | **0** | |
| 9a | Past Due Receivables | 0 | 0 | 90 days fron Invoice or 60 days Past Due Date |
| 9a | Credits past due | 0 | 0 | Credits that also meet past due criteria |
| 9a | Cross aged 50% | 0 | 0 | greater than 50% of the Debtors balance is Ineligible |
| 9a | Accounts Payable Contras | 0 | 0 | There is an Account Payable owed, subtract from A/R |
| 9a | Intercompany Receivables | 0 | 0 | |
| 9a | Foreign | 0 | 0 | Outside of US and Canada considered foreign |
| 9a | Government | 0 | 0 | |
| 9a | COD/ Credit Card/ DUR | 0 | 0 | Cash on delivery, Due upon receipt terms |
| 9a | Rebate | 0 | 0 | GL Account #2009000- Pepsi |
| 9a | PreBill estimate | 0 | 0 | Terms include FOB destination |
| 9a | Other Ineligible | 0 | 0 | |
| 9a | Other Ineligible | 0 | 0 | |
| 9a | Concentration Limits (20%) | 0 | 0 | |
| 9a | Total A/R Ineligibles | 0 | 0 | |



| Borrowing Base Certificate (the "BBC") | | Certificate Number |
|---|---|---|
| Cash Reconciliation | | |
| Line #  Balance from Collateral Section | $ | |
| 5  Collections for the Period | | 0 |
| | | |
| Line #  Leumi Actual Balance | $ | |
| 19  Collections | | 0 |
| | | |
| Unswept Cash Applied to the Collateral | (+) | 0 |
| Fees taken from the Bank Account | (+) | 0 |
| Other | | 0 |
| Other | | 0 |
| Other | | 0 |
| Add additional Lines as needed | | 0 |
| Adjusted Collections Balance | | 0 |
| Difference (should be zero) | | 0 |

Start Date  8/31/2019
End Date    9/6/2019

|                                              | CarbonLITE |   | PinnPack |   |
|----------------------------------------------|------------|---|----------|---|
| Starting Balance (As of Start Date above)    | $          | - | $        | - |
| Add: Shipments for the period                | $          | - | $        | - |
| Less: Cash Receipts for the period           | $          | - | $        | - |
|                                              |            |   |          |   |
| Interim AR Balance                           | $          | - | $        | - |

| Customer Name | Sales Price | Pounds | Revenue | |
|---|---|---|---|---|
| Western Container Corp | $ - | - | $ - | |
| Graham | $ - | - | $ - | |
| Niagara Bottling | $ - | - | $ - | |
| Amcor | $ - | - | $ - | |
| Nestle Waters | $ - | - | $ - | |
| Burcham International | $ - | - | $ - | |
| Pinnpack Leading Industries | $ - | - | $ - | Intercompany, exclude |

|  |  |  |  |  |
|---|---|---|---|---|
|  | Total Revenue Summary |  | $ - | |
|  | Total Pounds Summary |  | - | |
| Start Delivery Date | 9/1/2019 | Total Pounds Detail | 0 | |
| End Delivery Date | 9/6/2019 | Sales Price Updated | 8/31/2019 | |

| BOL | SO | Load Date | Deliver Date | Customer | Location | Product | Cust PO | SCALE Lbs | BOL Weight | Pounds |
|---|---|---|---|---|---|---|---|---|---|---|

2540819.1

| Date | Bank Account Received | Method | Customer | Amount | Total Cash In |
|------|----------------------|--------|----------|--------|---------------|
| 9/3/2019 | TCB - Depository | Wire/ACH | Graham | | |
| 9/4/2019 | TCB - Depository | Wire/ACH | Oldcastle | | |
| 9/4/2019 | TCB - Depository | Wire/ACH | CJB International | | |
| 9/5/2019 | TCB - Depository | Wire/ACH | Graham | | |
| 9/6/2019 | TCB - Depository | Wire/ACH | Amcor | | |
| 9/6/2019 | TCB - Depository | Wire/ACH | Graham | | |

$          -

| Date:<br>Invoice #<br>Order # | Inv Date | Cust # | Company | Link<br>Code | Net Amount | Sales Tax | Invoice Total |
|---|---|---|---|---|---|---|---|
| | | | | | 0.00 | 0.00 | 0.00 **Total:** |

| Date | Bank Account Received | Method | Customer | Amount | Total Cash In | $ | - |
|------|----------------------|--------|----------|--------|---------------|---|---|
| 9/3/2019 | TCB - Depository | Check Depo | Various | | | | |
| 9/3/2019 | TCB - Depository | Wire/ACH | Niche | | | | |
| 9/3/2019 | TCB - Depository | Wire/ACH | Best Express | | | | |
| 9/3/2019 | TCB - Depository | Wire/ACH | Kroger | | | | |
| 9/4/2019 | TCB - Depository | Wire/ACH | Bunzl | | | | |
| 9/4/2019 | TCB - Depository | Wire/ACH | Landsberg | | | | |
| 9/4/2019 | TCB - Depository | Wire/ACH | WCP Solutions | | | | |
| 9/4/2019 | TCB - Depository | Wire/ACH | Rancho Las Palmeras | | | | |
| 9/4/2019 | TCB - Depository | Wire/ACH | Datilera Del Desierto | | | | |
| 9/4/2019 | TCB - Depository | Wire/ACH | Rancho Las Palmeras | | | | |
| 9/4/2019 | TCB - Depository | Check Depo | Various | | | | |
| 9/5/2019 | TCB - Depository | Wire/ACH | Kroger | | | | |
| 9/6/2019 | TCB - Depository | Check Depo | Various | | | | |
| 9/6/2019 | TCB - Depository | Wire/ACH | Rich Products | | | | |
| 9/6/2019 | TCB - Depository | Wire/ACH | Bunzl | | | | |
| 9/6/2019 | TCB - Depository | Wire/ACH | Cima-Pak | | | | |

EXHIBIT B
TO
CREDIT AGREEMENT

Form of Compliance Certificate

Bank Leumi USA
579 Fifth Avenue
New York, NY 10017
Attention:  Portfolio Manager

      Re:     Loan Arrangement with CARBONLITE PI HOLDINGS, LLC, et al.

Ladies and Gentlemen:

      I hereby certify to you pursuant to Section 7.1 of the Credit Agreement (as defined below) as follows:

      1.     I am the duly elected [_____] of CARBONLITE PI HOLDINGS, LLC, ("Borrower Agent").  Capitalized terms used herein without definition shall have the meanings given to such terms in the Credit Agreement, dated September 16, 2019, by and between, among others, Bank Leumi USA ("Lender") and Borrowers (as such Credit Agreement is amended, modified or supplemented, from time to time, the "Credit Agreement").

      2.     I have reviewed the terms of the Credit Agreement, and have made, or have caused to be made under my supervision, a review in reasonable detail of the transactions and the financial condition of each Borrower, during the immediately preceding [fiscal quarter] [fiscal month].

      3.     The review described in Section 2 above did not disclose the existence during or at the end of such [fiscal quarter] [fiscal month], and I have no knowledge of the existence and continuance on the Closing Date, of any condition or event which constitutes a Default or an Event of Default, except as set forth on Schedule I attached hereto.  Described on Schedule I attached hereto are the exceptions, if any, to this Section 3 listing, in detail, the nature of the condition or event, the period during which it has existed and the action which any Borrower has taken, is taking, or proposes to take with respect to such condition or event.

      4.     Financial Statements.

*[Use following paragraph (a) for fiscal quarter-end financial statements]*

      a.     Attached hereto as Schedule II are the consolidated and consolidating balance sheets of each Borrower, as required by Schedule 7.1(b) of the Credit Agreement for such fiscal quarter ending _____, and the consolidated and consolidating balance sheet and related statements of operations and cash flows as of the end of and for such fiscal quarter, all in reasonable detail, fairly presenting in all material respects the financial position and the results of the operations of each Borrower as of the end of and through such fiscal month, setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal year, in accordance with GAAP consistently applied, subject to normal

year-end audit adjustments and the absence of footnotes (all of the foregoing, collectively, the "Quarterly Financial Statements").

[*Use following paragraph (b) for fiscal month-end financial statements*]

b.    Attached hereto as <u>Schedule II</u> are the consolidated and consolidating balance sheets of each Borrower, as required by Schedule 7.1(c) of the Credit Agreement for the fiscal month ending _____, and its consolidated and consolidating balance sheet and related statements of operations and cash flows as of the end of and for such fiscal month, all in reasonable detail, fairly presenting in all material respects the financial position and the results of the operations of each Borrower as of the end of and through such fiscal month, setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal year, in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes (all of the foregoing, collectively, the "Monthly Financial Statements").

5.    Attached hereto as <u>Schedule III</u> are the calculations used in determining, as of the end of such [fiscal quarter] [fiscal month] whether each Borrower is or would be in compliance with the covenant set forth in <u>Section 9</u> of the Credit Agreement for such [fiscal quarter] [fiscal month], whether or not such compliance is required under the terms thereof.

6.    Except as set forth in <u>Schedule IV</u>, there has been no change in generally accepted accounting principles used in the preparation of the [Quarterly Financial Statements][Monthly Financial Statements] furnished to Lender for the [fiscal year/fiscal month] ended _____.  If any such change has occurred, (i) a statement of reconciliation conforming such financial statements to GAAP is attached hereto in <u>Schedule IV</u> and (ii) a discussion and analysis prepared by management of each Borrower with respect to the [Quarterly Financial Statements][Monthly Financial Statements] delivered herewith is attached hereto as <u>Schedule V</u>.

The foregoing certifications are made and delivered this day of _____, 20__.

CARBONLITE PI HOLDINGS, LLC,
as Borrower Agent


By: _____
Title: _____

SCHEDULE 1.1

Definition of Eligible Accounts

As used in the Credit Agreement, "Eligible Accounts" means Accounts created by any Borrower that, in each case, at the time of creation, and at all times thereafter, satisfy the criteria set forth below as determined by Lender in its Permitted Discretion.  Except as otherwise agreed by Lender, any Account shall not constitute an Eligible Account:

(a)    which is not subject to a first-priority perfected security interest in favor of Lender;

(b)    which is subject to any security interest, lien or other encumbrance other than the security interest and lien of Lender and those permitted in clauses (b), (c) and (j) of the definition of the term Permitted Liens (but as to liens referred to in clause (j) only to the extent that Lender has established a Reserve as provided therein) and any other liens permitted under this Agreement that are subject to an intercreditor agreement in form and substance satisfactory to Lender between the holder of such security interest or lien and Lender;

(c)    such Accounts are not unpaid more than sixty-one (61) days after the original due date for them or ninety (90) days (or if Lender so elects in its sole and absolute discretion, such ninety (90) day period may be extended to one hundred twenty (120) days with respect to account debtors approved by Lender) after the date of the original invoice for them, or which has been written off the books of such Person or otherwise designated as uncollectible;

(d)    which is owing by an account debtor for which more than fifty percent (50%) of the Accounts owing by such account debtor and its Affiliates are ineligible under paragraph (c) above;

(e)    (i) which is owing by any of Nestlé S.A., The Coca-Cola Company, PepsiCo, Inc., Niagara Bottling LLC, or any of their Affiliates, to the extent the aggregate amount of Eligible Accounts owing by any such account debtor and its Affiliates to any Borrower exceeds thirty-five percent (35%) of the aggregate amount of Eligible Accounts thereof, (ii) which is owing by an account debtor who is investment grade to the extent the aggregate amount of Eligible Accounts owing by such account debtor and its Affiliates to any Borrower exceeds twenty percent (20%) of the aggregate amount of Eligible Accounts thereof, or (iii) which are owing by an account debtor who is not investment grade or an account debtor none of the securities of which are rated by the rating agencies, to the extent the aggregate amount of Accounts owing by such account debtor and its Affiliates to any Borrower exceeds twenty percent (20%) of the aggregate amount of Eligible Accounts thereof (but the portion of the Accounts not in excess of such applicable percentage may be deemed Eligible Accounts and for purposes hereof "investment grade" means that the account debtor has outstanding securities that have a received a then current credit rating of BBB or higher from Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. and its successors and assigns or a rating of Baa2 or higher from Moody's Investors Services, Inc. or its successors);

(f)    with respect to which any covenant, representation, or warranty contained in this Agreement or in the other Loan Documents has been breached or is not true in any material respect;

(g)    which (i) does not arise from the sale of goods or performance of services in the ordinary course of business, (ii) is not evidenced by an invoice or other documentation satisfactory to Lender in its Permitted Discretion and which has been sent to the account debtor; except only as to account debtors invoiced by Borrowers only on a monthly basis in the ordinary course of business, even if such invoice has not yet been sent; provided, that, Borrowers shall have provided Lender with such documentation and information with respect to such account debtor as Lender may require, in each case in form and substance

satisfactory to Lender; <u>provided</u>, further, that any failure by Borrowers to provide any monthly invoice to such account debtor shall render all Accounts payable by such account debtor ineligible, (iii) represents a progress billing, (iv) is contingent upon such Person's or its Affiliates' completion of any further performance, (v) represents a sale on a bill-and-hold, sale on approval, consignment, cash-on-delivery or any other repurchase or return basis (other than the customary customer right-of-return, consistent with standard industry practices and past practice of any Borrower), (vi) relates to payments of interest or (vii) has been invoiced more than once;

(h)     with respect to which any check or other instrument of payment has been returned uncollected for any reason;

(i)     which is owed by an account debtor which has (i) applied for, suffered, or consented to the appointment of any receiver, interim receiver, receiver-manager, custodian, trustee, or liquidator of its assets, (ii) had possession of all or a material part of its property taken by any receiver, interim receiver, receiver-manager, custodian, trustee or liquidator, (iii) filed, or had filed against it, any request or petition for liquidation, reorganization, arrangement, adjustment of debts, adjudication as bankrupt, winding-up, or voluntary or involuntary case under any Federal, State or territorial bankruptcy Laws (other than post-petition accounts payable of an account debtor that is a debtor-in-possession under the Bankruptcy Code and reasonably acceptable to Lender in its Permitted Discretion), (iv) admitted in writing its inability, or is generally unable to, pay its debts as they become due, (v) become insolvent, or (vi) ceased operation of its business;

(j)     which is owed by any account debtor that has sold all or substantially all its assets (unless such Account has been assumed by a Person that shall have acquired such assets and otherwise satisfies the requirements set forth in this definition);

(k)     which is owed by an account debtor that (i) does not maintain its chief executive office in the United States (or Puerto Rico and the United States Virgin Islands) and or Canada or (ii) is not organized under applicable Law of the United States, any State of the United States, Puerto Rico, the United States Virgin Islands, Canada, or any Province of Canada, unless, in either case, such Account is backed by a letter of credit acceptable to Lender and which has been assigned to and is directly drawable by Lender;

(l)     which is owed in any currency other than U.S. Dollars;

(m)     which is owed by (i) the government (or any department, agency, public corporation, or instrumentality thereof) of any country other than the United States (including Puerto Rico and the U.S. Virgin Islands) or Canada, unless such Account is backed by a letter of credit acceptable to Lender and which has been assigned to and is directly drawable by Lender, or (ii) the government of the United States (including Puerto Rico and the U.S. Virgin Islands) or Canada, or any department, agency, public corporation, or instrumentality thereof, unless the Federal Assignment of Claims Act of 1940, as amended, or the Financial Administration Act (Canada), as amended, as applicable, and any other steps necessary to perfect the security interest and lien of Lender in such Account have been complied with to Lender's satisfaction;

(n)     which is owed by any Affiliate, employee, officer, director or agent of any Borrower;

(o)     which, for any account debtor, exceeds any credit limit with respect to such account debtor determined by any Borrower from time to time, and such credit limit is acceptable to Lender in its Permitted Discretion (and otherwise such credit limit as Lender may determine after notice and consultation with Borrowers), to the extent of such excess;

(p)    which is owed by an account debtor or any Affiliate of such account debtor to which any Borrower is indebted, but only to the extent of such indebtedness, or which is subject to any security, deposit, progress payment, retainage or other similar advance made by or for the benefit of an account debtor, in each case to the extent thereof;

(q)    which is subject to any asserted counterclaim, or deduction, defense, setoff or dispute, in each case to the extent thereof;

(r)    which is evidenced by or arising under any promissory note, lease, chattel paper, or instrument, unless the same is pledged to Lender;

(s)    which is owed by an account debtor located in any jurisdiction which requires filing of a "Notice of Business Activities Report" or other similar report in order to permit such Person to seek judicial enforcement in such jurisdiction of payment of such Account, unless such Person has filed such report or qualified to do business in such jurisdiction;

(t)    with respect to which such Person has made any agreement with the account debtor for any reduction thereof (to the extent of such reduction), other than discounts and adjustments given in the ordinary course of business, or any Account which was partially paid and such Person created a new receivable for the unpaid portion of such Account;

(u)    which does not comply in all material respects with the requirements of all applicable Laws and regulations, whether Federal, State or local;

(v)    which is for goods that have been sold under a purchase order or pursuant to the terms of a contract or other agreement or understanding (written or oral) that indicates or purports to indicate that any Person other than such Person has or has had an ownership interest in such goods, or which indicates any party other than such Person as payee or remittance party;

(w)    which was created on cash on delivery terms;

(x)    which Lender determines in its Permitted Discretion may not be paid by reason of the account debtor's financial condition or inability to pay; or

(y)    which Lender determines is otherwise unacceptable in its Permitted Discretion.

The criteria for Eligible Accounts set forth above may be changed upon notice to Borrower Agent and any new criteria for Eligible Accounts may be established by Lender in the exercise of its Permitted Discretion upon notice to Borrower Agent and may be based on, among other things:  (i) an event, condition or other circumstance arising after the Closing Date, or (ii) an event, condition or other circumstance existing on the Closing Date to the extent that such event, condition or circumstance has not been identified by Borrower Agent to the field examiners of Lender prior to the Closing Date, in either case under clause (i) or (ii) which adversely affects or would reasonably be expected to adversely affect the Accounts or Lender's ability to realize upon the Accounts as determined by Lender in its Permitted Discretion.  Any Accounts that are not Eligible Accounts shall nevertheless be part of the Collateral.  In determining the amount of the Account to be included in the Borrowing Base, the face amount of an Account shall be reduced, to the extent not reflected in such face amount, by (i) the amount of all accrued and actual discounts, claims, credits or credits pending, promotional program allowances, price adjustments, finance charges or other allowances (including any amount that any Borrower may be obligated to rebate to a customer pursuant to the terms of any agreement or understanding (written or oral)) and (ii) the aggregate amount of all cash received in respect of such Account but not yet applied by any Borrower to reduce the amount of such Eligible Accounts.

SCHEDULE 4.1

Conditions Precedent to Initial Revolving Loans and Letters of Credit

The obligation of Lender to make its initial Revolving Loans and any Letters of Credit on the Closing Date is subject to the satisfaction of the conditions precedent to all Revolving Loans and Letters of Credit provided for in Section 4.2 and each of the following conditions precedent:

(a)    Closing Excess Availability.  The Excess Availability as of the Closing Date shall be not less than $1,000,000.00 after giving effect to the initial Revolving Loans made or to be made and Letters of Credit issued or to be issued in connection with the initial transactions hereunder and after payment of all fees and expenses payable on the Closing Date.

(b)    Field Examination.  Lender shall have conducted, or received the final report of a firm engaged by Lender to conduct, a field examination of the Collateral, the books and records and other matters relating to the operation of the business of each Borrower the results of which are satisfactory to Lender, and Lender (or a firm engaged by Lender for such purpose) shall have completed an updated field review of the books and records of each Borrower and such other updated information with respect to the Accounts as Lender may require to determine the amount of Revolving Loans available to Borrowers (including, without limitation, roll-forwards of Accounts), with results as of a date not more than five (5) days prior to the Closing Date (or such earlier date as may be acceptable to Lender), the results of which shall be reasonably satisfactory to Lender.

(c)    Receipt of Term Loan Agreement.  Lender shall have received a true and complete fully-executed copy of each of the Term Loan Agreement and the "Security Agreement" as defined therein.

(d)    Know Your Customer; Patriot Act.  Lender shall have received at least five (5) Business Days prior to the Closing Date all documentation and information as is requested by Lender that is required by regulatory authorities under applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the Patriot Act, in each case to the extent requested in writing at least seven (7) Business Days prior to the Closing Date.

(e)    Financial Statements; Projections.  Lender shall have received at least ten (10) Business Day prior to the Closing Date:  (i) projected balance sheets, income statements, statements of cash flows and availability of each Borrower on a monthly basis for the period through the end of 2019, in each case with the results and assumptions in such projections in form and substance reasonably satisfactory to Lender, and an opening pro forma balance sheet for each Borrower in form and substance reasonably satisfactory to Lender, (ii) projected balance sheets, income statements, statements of cash flows and availability of each Borrower on an annual basis for the period through the end of the fiscal year 2022, in each case with the results and assumptions in such projections in form and substance reasonably satisfactory to Lender, and (iii) any updates or modifications to the projected financial statements of each Borrower previously received by Lender, in each case in form and substance reasonably satisfactory to Lender.

(f)    Legal Due Diligence. Lender and its counsel shall have completed all legal due diligence, the results of which shall be satisfactory to Lender.

(g)    Borrowing Base Certificate and Request.  Lender shall have received a borrowing request and a Borrowing Base Certificate which calculates the Borrowing Base as of the end of the Business Day immediately preceding the Closing Date completed in a manner reasonably satisfactory to Lender and duly authorized, executed and delivered by a Responsible Officer of each Borrower

(h)    Solvency Certificate.  Lender shall have received a solvency certificate signed by a Responsible Officer of each Borrower in form and substance satisfactory to Lender and as of the Closing Date and after giving effect to the Agreement and the transactions contemplated thereby, no Borrower shall be insolvent or become insolvent as a result thereof.

(i)    Good Standing Certificates.  Lender shall have received, if applicable, a certificate of status with respect to each Borrower, dated within ten (10) days of the Closing Date, such certificate to be issued by the appropriate officer of the jurisdiction of organization of each Borrower, which certificate shall indicate that such Borrower is in good standing in such jurisdiction.

(j)    Certificate of Directors' Resolutions, Incumbency, Etc.  Lender shall have received a certificate of a Responsible Officer of each Loan Party, in form and substance satisfactory to it, certifying (i) that attached copies of the Organization Documents of such Loan Party are true and complete, and in full force and effect, without amendment except as shown; (ii) that an attached copy of resolutions authorizing execution, delivery and performance of the Loan Documents is true and complete, and that such resolutions are in full force and effect, were duly adopted, have not been amended, modified or revoked, and constitute all resolutions adopted with respect to this Credit Facility; and (iii) to the title, name and signature of each Person authorized to sign the Loan Documents.

(k)    Closing Certificate.  Lender shall have received a certificate, signed by a Responsible Officer of each Borrower, dated as of the Closing Date, stating (i) that no Default or Event of Default exists or has occurred and is continuing, (ii) all of the conditions to the closing of the Credit Facility have been satisfied, (iii) the representations and warranties contained in the Loan Documents are true and correct in all material respects (except where already qualified by materiality or Material Adverse Effect), (iv) such Borrower believes it has complied with all agreements and conditions to be satisfied by it under the Loan Documents as of the Closing Date to the satisfaction of Lender as set forth in Section 4.1 of the Credit Agreement and (iv) certifying any other factual matters as may be reasonably requested by Lender.

(l)    Lien Searches.  Lender shall have received the results of a recent lien search in each jurisdiction where any Loan Party is organized and where the assets of any Loan Party are located, and such search shall reveal no security interests, liens or other encumbrances on any of the assets of any Borrower except for Permitted Liens or security interests, liens or other encumbrances to be discharged on or prior to the Closing Date pursuant to a pay-off letter or other documentation satisfactory to Lender.

(m)    Pay-Off Letter.  Lender shall have received pay-off letters, in form and substance satisfactory to Lender, for all existing Indebtedness to be repaid from the proceeds of the initial Revolving Loans (if any), confirming that all security interests and liens upon any of the property of each Borrower constituting Collateral will be terminated concurrently with such payment and all letters of credit issued or guaranteed as part of such Indebtedness shall have been cash collateralized or supported by a Letter of Credit.

(n)    Insurance.  Lender shall have received evidence of insurance coverage in form, scope and substance reasonably satisfactory to Lender, and loss payee endorsements required under the Credit Agreement, in form and substance reasonably satisfactory to Lender, and certificates of insurance policies and/or endorsements naming Lender as loss payee and additional insured (as its interests may appear, and subject to the terms of the Intercreditor Agreement).

(o)    Letter of Credit Application.  If a Letter of Credit is requested to be issued on the Closing Date, Lender shall have received a properly completed letter of credit application (whether standalone or pursuant to a master agreement, as applicable) not less than three (3) Business Days prior to the Closing Date.

(p)    <u>Tax Withholding</u>.  Lender shall have received a properly completed and signed IRS Form W-8 or W-9, as applicable, for each Loan Party.

(q)    <u>Cash Management</u>.  Each Borrower shall have established a cash management system as provided in the Credit Agreement.

(r)    <u>Perfected Security Interest</u>.  Lender shall have received evidence, in form and substance reasonably satisfactory to Lender, that Lender has a valid perfected first-priority (subject to the terms of the Intercreditor Agreement) security interest in all of the Collateral (including the filing of UCC financing statements covering the Collateral, and except as to priority, subject to the liens permitted under clauses (b), (c), (i) and (j) of the definition of Permitted Liens, to the extent that such liens have priority over the liens of Lender under applicable Law and except for such items of Collateral as Lender may determine not to perfect its security interest in and none of the Collateral shall be subject to any other pledges, security interests, mortgages or assignments as security, except for Permitted Liens.

(s)    <u>No Material Adverse Change</u>. No material adverse change in the business, operations, profits, assets or prospects of Loan Parties shall have occurred since the date of the most recent financial statements received by Lender or its latest field examination.

(t)    <u>Credit Agreement and other Loan Documents</u>.  Lender shall have received each of the following documents, in form and substance reasonably satisfactory to Lender, duly executed and delivered, and each such document shall be in full force and effect and each Loan Party shall be in compliance with the terms thereof:

    (i)    the Credit Agreement,

    (ii)    the Intercreditor Agreement,

    (iii)    the Security Documents,

    (iv)    the Control Agreements,

    (v)    the Facility Guaranty;

    (vi)    the Perfection Certificate,

    (vii)    a disbursement letter executed and delivered by Borrower Agent to Lender regarding the extensions of credit to be made on the Closing Date, and

    (viii)    opinion letters of counsel to Loan Parties with respect to the Loan Documents and such other matters as Lender may reasonably request as well as any local counsel to Loan Parties.

<u>SCHEDULE 6.7</u>

<u>Litigation</u>

None.

SCHEDULE 6.9

Environmental Matters

On March 14, 2012 sodium hydroxide was released from CL Industries, Riverside California and allegedly contaminated soil near the facility.  In October 2013, the California Department of Fish and Wildlife entered into a Settlement Agreement with CL Industries for a total payment of $42,424.00 to be paid $4,243.20 semiannually through August 1, 2018.  All payments have been made and no further monies are owed. All cleanup required by the Department of Fish and Wildlife has been completed.

SCHEDULE 6.11

Material Agreements

1. Material Agreements Pinnpack

    a.  Leases:

        i.  Standard Industrial Single-Tenant Lease – Net, dated as of June 1, 2016, by and between Pinnpack and Duris Corporation, as amended, restated, supplemented or otherwise modified from time to time.

        ii.  Master Lease Agreement, dated as of March 15, 2017, by and between Pinnpack and Jules and Associates, Inc, as amended, restated, supplemented or otherwise modified from time to time.

2. Material Agreements Riverside

    a.  Customer Contracts:

        i.  Contract, dated as of September 1, 2011, by and between CL Industries and Nestle Waters North America Inc., as amended, restated, supplemented or otherwise modified from time to time.

        ii.  PCR Resin Agreement, dated as of February 22, 2018, by and between CL Industries and Pepsi-Cola Advertising and Marketing, Inc., as amended, restated, supplemented or otherwise modified from time to time.

        iii.  Agreement, dated as of July 29, 2010, by and between CL Industries and Pepsi-Cola Advertising and Marketing, Inc., as amended, restated, supplemented or otherwise modified from time to time.

        iv.  Agreement, dated as of April 29, 2016, by and between CL Industries and Pepsi-Cola Advertising and Marketing, Inc., as amended, restated, supplemented or otherwise modified from time to time.

        v.  PCR Resin Agreement, dated as of June 28, 2018, by and between CL Industries and Pepsi-Cola Advertising and Marketing, Inc., as amended, restated, supplemented or otherwise modified from time to time.

    b.  Leases:

        i.  Standard Multi-Tenant Office Lease – Gross, dated as of February 12, 2016, by and between CL Industries and 2245 Valley Blvd, LLC, as amended, restated, supplemented or otherwise modified from time to time.

        ii.  Standard Industrial/Commercial Multi-Tenant Lease – Gross, dated as of June 23, 2016, by and between CL Industries and One Miracle Property, as amended, restated, supplemented or otherwise modified from time to time.

iii.  Columbia Business Center Building Lease, dated as of October 1, 2010, by and between CL Industries and Columbia Business Center, LLC, as amended, restated, supplemented or otherwise modified from time to time.

SCHEDULE 6.12

Restrictive Agreements

See Schedule 8.1.

SCHEDULE 6.15

Insurance

*See attached*

ACORD®

# CERTIFICATE OF LIABILITY INSURANCE

OP ID: CW

**DATE (MM/DD/YYYY)**
09/09/2019

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: Chermine M. Wiltsey | | |
|---|---|---|---|
| Nahai Insurance Services, Inc. 465 S. Beverly Drive, #200 Beverly Hills, CA 90212 Bijan Nahai | PHONE (A/C, No, Ext): 310-282-0900 | | FAX (A/C, No): 310-282-0976 |
| 310-282-0900 | E-MAIL ADDRESS: chermine@nahai.com | | |
| | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| | INSURER A: Aspen Specialty Insurance | | 10717 |
| INSURED CarbonLite Industries, LLC 10250 Constellation Bl., #2820 Los Angeles, CA 90067 | INSURER B: American Fire & Casualty Co | | 24066 |
| | INSURER C: ACE American Insurance Co. | | |
| | INSURER D: | | |
| | INSURER E: | | |
| | INSURER F: | | |

## COVERAGES   CERTIFICATE NUMBER:   REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X **COMMERCIAL GENERAL LIABILITY** | X | | CR006PY18 | 09/19/2018 | 09/19/2019 | EACH OCCURRENCE | $ 1,000,000 |
| | ☐ CLAIMS-MADE  X OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 50,000 |
| | X GL Ded $2,500 | | | | | | MED EXP (Any one person) | $ EXCLUDED |
| | X EBL Ded $1,000 | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | X POLICY ☐ PRO-JECT ☐ LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | OTHER: | | | | | | Emp Ben. | $ 1,000,000 |
| A | **AUTOMOBILE LIABILITY** | | | CR006PY18 | 09/19/2018 | 09/19/2019 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | ☐ ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ☐ OWNED AUTOS ONLY ☐ SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | X HIRED AUTOS ONLY X NON-OWNED AUTOS ONLY | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| B | **UMBRELLA LIAB** ☐ OCCUR | | | EUA1854898347 | 09/19/2018 | 09/19/2019 | EACH OCCURRENCE | $ 25,000,000 |
| | X **EXCESS LIAB** ☐ CLAIMS-MADE | | | | | | AGGREGATE | $ 25,000,000 |
| | ☐ DED X RETENTION $ 0 | | | | | | | $ |
| C | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY** Y / N | N/A | | C64385951 | 06/01/2019 | 06/01/2020 | X PER STATUTE ☐ OTHER | |
| | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH) | | | | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - POLICY LIMIT | $ 1,000,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
**Bank Leumi USA and its successors &/or assigns, ATIMA is hereby named Additional Insured as respects to General Liability as their interest may appear. All policy terms, conditions and exclusions apply. Covered Location: 875 Michigan Avenue, Riverside, CA 92507**

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| **Bank Leumi USA and its successors &/or assigns, ATIMA 579 Fifth Avenue New York, NY 10017** | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. AUTHORIZED REPRESENTATIVE  |

ACORD 25 (2016/03)

© 1988-2015 ACORD CORPORATION. All rights reserved.

The ACORD name and logo are registered marks of ACORD

OP ID: CW

# ACORD

# EVIDENCE OF COMMERCIAL PROPERTY INSURANCE

DATE (MM/DD/YYYY)
**09/09/2019**

THIS EVIDENCE OF COMMERCIAL PROPERTY INSURANCE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE ADDITIONAL INTEREST NAMED BELOW. THIS EVIDENCE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS EVIDENCE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE ADDITIONAL INTEREST.

| PRODUCER NAME, CONTACT PERSON AND ADDRESS | PHONE (A/C, No, Ext): **310-282-0900** | COMPANY NAME AND ADDRESS | NAIC NO: **10647** |
|---|---|---|---|
| Nahai Insurance Services, Inc.<br>465 S. Beverly Drive, #200<br>Beverly Hills, CA 90212<br>Bijan Nahai | | Travelers Insurance Co.<br>CL Remittance Center<br>One Tower Square<br>Hartford, CT 06183-1001 | |

| FAX (A/C, No): **310-282-0976** | E-MAIL ADDRESS: | IF MULTIPLE COMPANIES, COMPLETE SEPARATE FORM FOR EACH |
|---|---|---|

| CODE: **CHM12** | SUB CODE: | POLICY TYPE |
|---|---|---|
| AGENCY CUSTOMER ID #: **CARBO-1** | | **Property** |

| NAMED INSURED AND ADDRESS | LOAN NUMBER | POLICY NUMBER |
|---|---|---|
| CarbonLITE Industries, LLC<br>10250 Constellation Bl., #2820<br>Los Angeles, CA 90067 | | **KTJCMB3L24100818** |

| | EFFECTIVE DATE **09/19/18** | EXPIRATION DATE **09/19/19** | CONTINUED UNTIL TERMINATED IF CHECKED |
|---|---|---|---|

| ADDITIONAL NAMED INSURED(S) | THIS REPLACES PRIOR EVIDENCE DATED: |
|---|---|

**PROPERTY INFORMATION (Use REMARKS on page 2, if more space is required)** ☐ BUILDING  OR ☒ BUSINESS PERSONAL PROPERTY

LOCATION / DESCRIPTION
**875 Michigan Avenue**
**Riverside, CA 92507**

THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS EVIDENCE OF PROPERTY INSURANCE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

## COVERAGE INFORMATION

| PERILS INSURED | BASIC | | BROAD | X | SPECIAL |
|---|---|---|---|---|---|

COMMERCIAL PROPERTY COVERAGE AMOUNT OF INSURANCE: **$ 50,000,000**              DED: **25,000**

| | YES | NO | N/A | | | | |
|---|---|---|---|---|---|---|---|
| ☒ BUSINESS INCOME  ☐ RENTAL VALUE | X | | | If YES, LIMIT: | **22,500,000** X | Actual Loss Sustained; # of months: | **12** |
| BLANKET COVERAGE | X | | | If YES, indicate value(s) reported on property identified above: $ | | | |
| TERRORISM COVERAGE | X | | | Attach Disclosure Notice / DEC | | | |
| IS THERE A TERRORISM-SPECIFIC EXCLUSION? | | X | | | | | |
| IS DOMESTIC TERRORISM EXCLUDED? | | X | | | | | |
| LIMITED FUNGUS COVERAGE | X | | | If YES, LIMIT: | | DED: | |
| FUNGUS EXCLUSION (If "YES", specify organization's form used) | | X | | | | | |
| REPLACEMENT COST | X | | | | | | |
| AGREED VALUE | X | | | | | | |
| COINSURANCE | | X | | If YES,        % | | | |
| EQUIPMENT BREAKDOWN (If Applicable) | X | | | If YES, LIMIT: | **50,000,000** | DED: | **25,000** |
| ORDINANCE OR LAW  - Coverage for loss to undamaged portion of bldg | X | | | If YES, LIMIT: | **5,000,000** | DED: | **25,000** |
| - Demolition Costs | X | | | If YES, LIMIT: | **2,500,000** | DED: | **25,000** |
| - Incr. Cost of Construction | X | | | If YES, LIMIT: | **2,500,000** | DED: | **25,000** |
| EARTH MOVEMENT (If Applicable) | | X | | If YES, LIMIT: | | DED: | |
| FLOOD (If Applicable) | X | | | If YES, LIMIT: | **10,000,000** | DED: | **100,000** |
| WIND / HAIL INCL ☒ YES ☐ NO Subject to Different Provisions: | | | | If YES, LIMIT: | | DED: | |
| NAMED STORM INCL ☒ YES ☐ NO Subject to Different Provisions: | | | | If YES, LIMIT: | | DED: | |
| PERMISSION TO WAIVE SUBROGATION IN FAVOR OF MORTGAGE HOLDER PRIOR TO LOSS | X | | | | | | |

## CANCELLATION

SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.

## ADDITIONAL INTEREST

| | MORTGAGEE | CONTRACT OF SALE | LENDER SERVICING AGENT NAME AND ADDRESS |
|---|---|---|---|
| X | LENDERS LOSS PAYABLE | | |

NAME AND ADDRESS

Bank Leumi USA and its
successors &/or assigns, ATIMA
579 Fifth Avenue
New York, NY 10017

AUTHORIZED REPRESENTATIVE

*[signature]*

The ACORD name and logo are registered marks of ACORD

**EVIDENCE OF COMMERCIAL PROPERTY INSURANCE REMARKS - Including Special Conditions (Use only if more space is required)**

**365 DAYS EXTENDED PERIOD OF INDEMNITY**
**EXTRA EXPENSE INCLUDED**
**THEFT INCLUDED**
**EQUIPMENT BREAKDOWN INCLUDED**
**EARTHQUAKE SPRINKLER LEAKAGE INCLUDED SUBJECT TO DEDUCTIBLE OF 1%**
**EARTH MOVEMENT EXCLUDED**
**30 DAY NOTICE OF CANCELLATION EXCEPT 10 DAY NOTICE FOR NON-PAYMENT OF**
**PREMIUM**
**\*ALL POLICY TERMS, CONDITIONS AND EXCLUSIONS APPLY**

| ACORD® | | | | |
|---|---|---|---|---|
| | | OP ID: CW | | |

# CERTIFICATE OF LIABILITY INSURANCE

**DATE (MM/DD/YYYY)** 09/09/2019

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW.  THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT:  If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed.  If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement.  A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER 310-282-0900 | CONTACT NAME: Chermine M. Wiltsey | |
|---|---|---|
| Nahai Insurance Services, Inc. 465 S. Beverly Drive, #200 Beverly Hills, CA 90212 Bijan Nahai | PHONE (A/C, No, Ext): 310-282-0900 | FAX (A/C, No): 310-282-0976 |
| | E-MAIL ADDRESS: chermine@nahai.com | |
| | **INSURER(S) AFFORDING COVERAGE** | **NAIC #** |
| | INSURER A: Aspen Specialty Insurance | 10717 |
| INSURED PinnPack Packaging, LLC 10250 Constellation Bl., #2820 Los Angeles, CA 90067 | INSURER B: American Fire & Casualty Co | 24066 |
| | INSURER C: ACE American Insurance Co. | |
| | INSURER D: | |
| | INSURER E: | |
| | INSURER F: | |

## COVERAGES        CERTIFICATE NUMBER:        REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED.  NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | **X** COMMERCIAL GENERAL LIABILITY | X | | CR006PY18 | 09/19/2018 | 09/19/2019 | EACH OCCURRENCE | $ 1,000,000 |
| | CLAIMS-MADE **X** OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 50,000 |
| | **X** GL Ded $2,500 | | | | | | MED EXP (Any one person) | $ EXCLUDED |
| | **X** EBL Ded $1,000 | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | **X** POLICY  PRO-JECT  LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | OTHER: | | | | | | Emp Ben. | $ 1,000,000 |
| A | AUTOMOBILE LIABILITY | | | CR006PY18 | 09/19/2018 | 09/19/2019 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | OWNED AUTOS ONLY  SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | **X** HIRED AUTOS ONLY  **X** NON-OWNED AUTOS ONLY | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| B | UMBRELLA LIAB  OCCUR | | | EUA1854898347 | 09/19/2018 | 09/19/2019 | EACH OCCURRENCE | $ 25,000,000 |
| | **X** EXCESS LIAB  CLAIMS-MADE | | | | | | AGGREGATE | $ 25,000,000 |
| | DED **X** RETENTION$ 0 | | | | | | | $ |
| C | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY  Y / N | | | C64385951 | 06/01/2018 | 06/01/2019 | **X** PER STATUTE  OTH-ER | |
| | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH) | N / A | | | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - POLICY LIMIT | $ 1,000,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES  (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)

Bank Leumi USA and its successors &/or assigns, ATIMA is hereby named Additional Insured as respects to General Liability as their interest may appear. All policy terms, conditions and exclusions apply. Covered Locations: 1151 & 1351 Pacific Avenue, Oxnard, CA 93033 and 301 South Rose Avenue, Oxnard, CA  93030

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Bank Leumi USA and its successors &/or assigns, ATIMA 579 Fifth Avenue New York, NY 10017 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| | AUTHORIZED REPRESENTATIVE  |

**ACORD 25 (2016/03)**

© 1988-2015 ACORD CORPORATION.  All rights reserved.

The ACORD name and logo are registered marks of ACORD

**ACORD®**

OP ID: CW

# EVIDENCE OF COMMERCIAL PROPERTY INSURANCE

DATE (MM/DD/YYYY)
09/09/2019

THIS EVIDENCE OF COMMERCIAL PROPERTY INSURANCE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE ADDITIONAL INTEREST NAMED BELOW. THIS EVIDENCE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS EVIDENCE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE ADDITIONAL INTEREST.

| PRODUCER NAME, CONTACT PERSON AND ADDRESS | PHONE (A/C, No, Ext): 310-282-0900 | COMPANY NAME AND ADDRESS | NAIC NO: 10647 |
|---|---|---|---|
| Nahai Insurance Services, Inc. 465 S. Beverly Drive, #200 Beverly Hills, CA 90212 Bijan Nahai | | Travelers Insurance Co. CL Remittance Center One Tower Square Hartford, CT 06183-1001 | |

| FAX (A/C, No): 310-282-0976 | E-MAIL ADDRESS: | IF MULTIPLE COMPANIES, COMPLETE SEPARATE FORM FOR EACH |
|---|---|---|

| CODE: CHM12 | SUB CODE: | POLICY TYPE |
|---|---|---|
| AGENCY CUSTOMER ID #: CARBO-1 | | **Property** |

| NAMED INSURED AND ADDRESS | LOAN NUMBER | POLICY NUMBER |
|---|---|---|
| Pinnpack Packaging, LLC 10250 Constellation Bl., #2820 Los Angeles, CA 90067 | | KTJCMB3L24100818 |

| | EFFECTIVE DATE | EXPIRATION DATE | |
|---|---|---|---|
| | 09/19/18 | 09/19/19 | CONTINUED UNTIL TERMINATED IF CHECKED |

| ADDITIONAL NAMED INSURED(S) | THIS REPLACES PRIOR EVIDENCE DATED: |
|---|---|

**PROPERTY INFORMATION** (Use REMARKS on page 2, if more space is required)     ☐ BUILDING   OR ☒ BUSINESS PERSONAL PROPERTY

| LOCATION / DESCRIPTION |
|---|
| 1151 & 1351 Pacific Avenue Oxnard, CA 93033 |

THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS EVIDENCE OF PROPERTY INSURANCE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

## COVERAGE INFORMATION

| | PERILS INSURED | | BASIC | | BROAD | X | SPECIAL |
|---|---|---|---|---|---|---|---|

COMMERCIAL PROPERTY COVERAGE AMOUNT OF INSURANCE: $ 50,000,000                    DED: **25,000**

| | YES | NO | N/A | |
|---|---|---|---|---|
| ☒ BUSINESS INCOME   ☐ RENTAL VALUE | X | | | If YES, LIMIT: 15,000,000 X   Actual Loss Sustained; # of months: 12 |
| BLANKET COVERAGE | X | | | If YES, indicate value(s) reported on property identified above: $ |
| TERRORISM COVERAGE | X | | | Attach Disclosure Notice / DEC |
|    IS THERE A TERRORISM-SPECIFIC EXCLUSION? | | X | | |
|    IS DOMESTIC TERRORISM EXCLUDED? | | X | | |
| LIMITED FUNGUS COVERAGE | X | | | If YES, LIMIT:                                DED: |
| FUNGUS EXCLUSION (If "YES", specify organization's form used) | | X | | |
| REPLACEMENT COST | X | | | |
| AGREED VALUE | X | | | |
| COINSURANCE | | X | | If YES,            % |
| EQUIPMENT BREAKDOWN (If Applicable) | X | | | If YES, LIMIT: 50,000,000        DED: 25,000 |
| ORDINANCE OR LAW   - Coverage for loss to undamaged portion of bldg | X | | | If YES, LIMIT: 5,000,000        DED: 25,000 |
|    - Demolition Costs | X | | | If YES, LIMIT: 2,500,000        DED: 25,000 |
|    - Incr. Cost of Construction | X | | | If YES, LIMIT: 2,500,000        DED: 25,000 |
| EARTH MOVEMENT (If Applicable) | | X | | If YES, LIMIT:                                DED: |
| FLOOD (If Applicable) | X | | | If YES, LIMIT: 10,000,000        DED: 100,000 |
| WIND / HAIL INCL ☒ YES ☐ NO Subject to Different Provisions: | | | | If YES, LIMIT:                                DED: |
| NAMED STORM INCL ☒ YES ☐ NO Subject to Different Provisions: | | | | If YES, LIMIT:                                DED: |
| PERMISSION TO WAIVE SUBROGATION IN FAVOR OF MORTGAGE HOLDER PRIOR TO LOSS | X | | | |

## CANCELLATION

SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.

## ADDITIONAL INTEREST

| | | |
|---|---|---|
| ☐ MORTGAGE X LENDERS LOSS PAYABLE | ☐ CONTRACT OF SALE | LENDER SERVICING AGENT NAME AND ADDRESS |
| NAME AND ADDRESS | | |
| Bank Leumi USA and its successors &/or assigns, ATIMA 579 Fifth Avenue New York, NY 10017 | | AUTHORIZED REPRESENTATIVE *[signature]* |

CARBO-1                                                          OP ID: CW

**EVIDENCE OF COMMERCIAL PROPERTY INSURANCE REMARKS - Including Special Conditions (Use only if more space is required)**

365 DAYS EXTENDED PERIOD OF INDEMNITY
EXTRA EXPENSE INCLUDED
THEFT INCLUDED
EQUIPMENT BREAKDOWN INCLUDED
EARTHQUAKE SPRINKLER LEAKAGE INCLUDED SUBJECT TO DEDUCTIBLE OF 1%
EARTH MOVEMENT EXCLUDED
30 DAY NOTICE OF CANCELLATION EXCEPT 10 DAY NOTICE FOR NON-PAYMENT OF
PREMIUM
*ALL POLICY TERMS, CONDITIONS AND EXCLUSIONS APPLY

# EVIDENCE OF PROPERTY INSURANCE
## PROPERTY SCHEDULE

DATE (MM/DD/YY)
**09/09/2019**

PAGE **3**

| PROPERTY INFORMATION |
|---|
| LOCATION/DESCRIPTION |
| **301 South Rose Avenue**<br>**Oxnard, CA 93030** |

| PROPERTY INFORMATION |
|---|
| LOCATION/DESCRIPTION |

| PROPERTY INFORMATION |
|---|
| LOCATION/DESCRIPTION |

| PROPERTY INFORMATION |
|---|
| LOCATION/DESCRIPTION |

| PROPERTY INFORMATION |
|---|
| LOCATION/DESCRIPTION |

| PROPERTY INFORMATION |
|---|
| LOCATION/DESCRIPTION |

| PROPERTY INFORMATION |
|---|
| LOCATION/DESCRIPTION |

| PROPERTY INFORMATION |
|---|
| LOCATION/DESCRIPTION |

ATTACH TO EVIDENCE OF PROPERTY APPLICATION

SCHEDULE 6.16

Subsidiaries

| 1<br>Loan Party | 2<br>Loan Party's Type of Organization | 3<br>Loan Party's authorized Equity Interests (each class) | 4<br>Owner(s) of Equity Interests Listed in Column 3 | 5<br>Loan Party's Subsidiaries |
|---|---|---|---|---|
| CL PI Holdings | limited liability company | n/a | CarbonLite Sub-Holdings, LLC, a Delaware limited liability company | CL Industries CL Pinnpack |
| CL Industries | limited liability company | n/a | CL PI Holdings | None |
| CL Pinnpack | limited liability company | n/a | CL PI Holdings | Pinnpack |
| Pinnpack | limited liability company | n/a | CL Pinnpack | None |

SCHEDULE 6.19

Intellectual Property

1.

    (a)    Trademarks—NONE.

        (i)    Owned—NONE.

| Trademark | Registration Number | Registration Date | Expiration Date |
|---|---|---|---|

| Trademark Application | Application/Serial Number | Application Date |
|---|---|---|

        (ii)    Licensed—NONE.

| Trademark | Registration Number | Registration Date | Expiration Date | Owner/Licensor |
|---|---|---|---|---|

| Trademark Application | Application/Serial Number | Application Date | Owner/Licensor |
|---|---|---|---|

    (b)    Patents

| Patent Owner | Patent Name | Status | App. No. | Country/State | App. Date |
|---|---|---|---|---|---|
| PINNPACK PACKAGING, LLC | Food Package with Window | Pending | 15/654505 | U.S. Federal | 7/19/2017 |
| PINNPACK PACKAGING, LLC | Modular Food Storage System | Pending | 15/684390 | U.S. Federal | 8/23/2017 |

| PINNPACK PACKAGING, LLC | Food Container | Pending | 29/589912 | U.S. Federal | 1/5/2017 |
|---|---|---|---|---|---|
| PINNPACK PACKAGING, LLC | Container for Displaying & Serving Multiple Types of Food | Pending | 62/462262 | U.S. Federal | 2/22/2017 |
| PINNPACK PACKAGING, LLC | 3 Loaf Cake Package | Pending | 29/611912 | U.S. Federal | 7/26/2017 |
| PINNPACK PACKAGING, LLC | Cup Cake Tray | Pending | 15/693795 | U.S. Federal | 9/1/2017 |
| PINNPACK PACKAGING, LLC | Modular Storage System | Pending | 16/156881 | U.S. Federal | 10/10/18 |
| PINNPACK PACKAGING, LLC | Tamper-Evident Containers | Pending | 16/151660 | U.S. Federal | 10/4/18 |
|  |  |  |  |  |  |
| Patent Owner | Patent Name | Status | Patent No. |  | Issued |
| PINNPACK PACKAGING, LLC | Brownie Package | Issued | D834410 | U.S. Federal | Yes |
|  |  |  |  |  |  |

Patent Licenses – None

 

 

      (c)    Copyrights—NONE.

          (i)    Owned—NONE.

     Copyright         Registration Number        Registration Date

 

 

          (ii)    Licensed—NONE.

     Copyright     Registration Number     Registration Date     Owner/Licensor

SCHEDULE 6.21

Collective Bargaining Agreements; Management Agreements; Consulting Agreements

Management Agreement dated as of April 1, 2010, by and among CarbonLite Industries, HPC Industries LLC, Leon Farahnik, Neville Browne and Richard Zirkler, as amended, restated, supplemented or otherwise modified from time to time.

SCHEDULE 7.1

Financial and Collateral Reporting

Borrowers shall deliver, or cause to be delivered to Lender each of the following:

(a)    Annual Financial Statement.  As soon as available, but in any event within one hundred fifty (150) days after the end of each fiscal year of each Borrower, audited consolidated and consolidating balance sheet and related statements of operations, stockholders' equity and cash flows as of the end of and for such year, setting forth in each case in comparative form the figures for the previous fiscal year, and the accompanying notes thereto, all in reasonable detail, fairly presenting in all material respects the financial position and results of operations of such Borrower;

(b)    Quarterly Financial Statements.  As soon as available, but in any event within forty-five (45) days after the end of each of the first three fiscal quarters of each fiscal year of each Borrower, its consolidated and consolidating balance sheet and related statements of operations, and cash flows as of the end of and for such fiscal quarter, all in reasonable detail, fairly presenting in all material respects the financial position and the results of the operations of such Borrower as of the end of and through such fiscal quarter, setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal year, subject to normal year-end audit adjustments and the absence of footnotes;

(c)    Monthly Financial Statements.  As soon as available, but in any event within thirty (30) days after the end of each fiscal month of each Borrower (and ninety (90) days after the end of each fiscal year), its consolidated and consolidating balance sheet and related statements of operations and cash flows as of the end of and for such fiscal month, all in reasonable detail, fairly presenting in all material respects the financial position and the results of the operations of such Borrower as of the end of and through such fiscal month, setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal year, subject to normal year-end audit adjustments and the absence of footnotes;

(d)    Accountant's Certificate.  Concurrently with the delivery of the financial statements referred to in clause (a) above, the unqualified opinion of independent certified public accountants with respect to the audited consolidated and consolidating financial statements, which independent accounting firm shall be selected by Borrowers and reasonably acceptable to Lender, that such audited consolidated and consolidating financial statements have been prepared in accordance with GAAP, and present fairly in all material respects the results of operations and financial condition of each Borrower as of the end of and for the fiscal year then ended;

(e)    Compliance Certificate.  Concurrently with the delivery of the financial statements referred to in clauses (a), (b) and (c) above, a Compliance Certificate by a Responsible Officer of each Borrower, (i) certifying, in the case of the financial statements delivered under clause (b) or (c), as presenting fairly in all material respects the financial condition and results of operations of Borrowers on a consolidated basis in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes, (ii) certifying as to whether an Event of Default has occurred and, if an Event of Default has occurred, specifying the details thereof and any action taken or proposed to be taken with respect thereto, (iii) setting forth reasonably detailed calculations demonstrating compliance with Section 9 and (iv) stating whether any change in GAAP or in the application thereof has occurred since the date of the audited financial statements referred to in clause (a) above and, if any such change has occurred, specifying the effect of such change on the financial statements accompanying such certificate;

(f)    Annual Projections.  As soon as available, but in any event no later than thirty (30) days after the end of each fiscal year of each Borrower, a copy of the plan and forecast (including a projected consolidated and consolidating balance sheet, income statement, funds flow statement and availability) of such Borrower for each month of the upcoming fiscal year in form reasonably satisfactory to Lender;

(g)    Borrowing Base Certificate.  As soon as possible, but by no later than 12:00 p.m. (prevailing ET) on Wednesday of each week after the Closing Date (or on a more frequent basis as Lender may require) and continuing through the Maturity Date, a Borrowing Base Certificate setting forth the calculation of the Borrowing Base as of the close of business on the last day of the immediately preceding week, duly completed and executed by a Responsible Officer of each Borrower (and nothing contained in any Borrowing Base Certificate shall be deemed to limit, impair or otherwise affect the rights of Lender contained herein and in the event of any conflict or inconsistency between the calculation of the Borrowing Base as set forth in any Borrowing Base Certificate and as determined by Lender in good faith, the determination of Lender shall govern and, absent manifest error, be conclusive and binding upon such Borrower), together with such other reporting as Lender may require in connection therewith, including, without limitation (i) a detailed aging of accounts receivable (together with a reconciliation to the previous period's aging and the general ledger) aged by invoice date (with an explanation of the terms offered), prepared in a manner reasonably acceptable to Lender, (ii) a worksheet of calculations prepared by such Borrower to determine Eligible Accounts, such worksheet detailing the Accounts excluded from Eligible Accounts and the reason for such exclusion, and (iii) as of the period then ended, each Borrower's sales journal, cash receipts journal (identifying trade and non-trade cash receipts) and debit memo/credit memo journal;

(h)    Collateral Reports.  As soon as possible after the end of each calendar month (but in any event within fifteen (15) Business Days after the end thereof), or more frequently as Lender may require at any time in the exercise of its Permitted Discretion:

(i)    Agings of outstanding accounts payable (and including information indicating the amounts owing to owners and lessors of leased premises, warehouses, processors, and other third parties from time to time in possession of any Collateral);

(ii)    A reconciliation of Accounts between (A) the amounts shown in each Borrower's general ledger and financial statements and the reports delivered pursuant to clauses (i) and (ii) above, and (B) the amounts and dates shown in the reports delivered pursuant to clauses (i) and (ii) above and the Borrowing Base Certificate delivered pursuant to clause (f) above as of such date; and

(iii)    A reconciliation of the loan balance per each Borrower's general ledger to the loan balance under this Agreement.

(i)    Account Debtor Information.  As soon as possible, but by no later than March 1st and September 1st of each calendar year, a detailed summary specifying the name, address, phone and balance due for each account debtor, prepared in a manner reasonably acceptable to Lender;

(j)    Additional Collateral Items.  Promptly upon Lender's request:

(i)    copies of specific invoices issued by any Borrower in connection with any accounts receivable, credit memos, shipping and delivery documents, and other information related thereto pursuant to Lender's written request therefor; and

(ii)    a schedule detailing the balance of all intercompany accounts of any Borrower;

(k)      Tax Returns.  As soon as possible and in any event within thirty (30) days of filing thereof, copies of all tax returns filed by each Borrower with the U.S. Internal Revenue Service;

(l)      Good Standing Certificates.  At Lender's written request, given not more frequently than twice in any calendar year, a certificate of good standing or the substantive equivalent available in the jurisdiction of incorporation, formation or organization for each Borrower from the appropriate governmental officer in such jurisdiction;

(m)      Public Information.  Promptly after the same are available, copies of each annual report, proxy or annual or quarterly financial statement to the equity holders of each Borrower, and copies of all annual, regular, periodic and special reports and registration statements which each Borrower may file or be required to file with the Securities and Exchange Commission under Section 13 or 15(d) of the Securities Exchange Act of 1934, in each case to the extent applicable with respect to any Borrower or Guarantor.

(n)      Management Letters, Etc.  Promptly after any request by Lender, copies of any detailed audit reports, management letters or recommendations submitted to the board of directors or equivalent governing body (or the audit committee of the board of directors or such equivalent governing body) of any Borrower by independent accountants in connection with the accounts or books of such Borrower, or any audit of any of them;

(o)      Notices of Investigations. Promptly, and in any event within five (5) Business Days after receipt thereof by any Borrower, copies of each notice or other correspondence received from the Securities and Exchange Commission (or comparable agency in any applicable non-U.S. jurisdiction) concerning any investigation or possible investigation or other inquiry by such agency regarding financial or other operational results of such Borrower;

(p)      Insurance.  Concurrently with the delivery of the financial statements referred to in clause (a) above, a certificate by a Responsible Officer of each Borrower attaching the insurance binder or other evidence of insurance for any insurance coverage of such Borrower that was renewed, replaced or modified during the period covered by such financial statements, to the extent that the insurance is different from that which was previously provided Lender.

(q)      Customer Deposits.  Concurrently with the delivery of the financial statements referred to in clause (c) above, a report of Customer Deposits consisting of bank statements of any Deposit Accounts not maintained with Lender, in form and substance reasonably satisfactory to Lender.

(r)      Additional Information.  As soon as possible after the end of each calendar month (but in any event within ten (10) Business Days after the end thereof), on a monthly basis or more frequently as Lender may request,

(i)      a certificate by a Responsible Officer of each Borrower consisting of: (A) a statement confirming the payment of rent and other amounts due to owners and lessors of real property used by such Borrower in the immediately preceding month, subject to year-end or monthly percentage rent payment adjustments, (B) the addresses of all locations of such Borrower acquired or opened since the date of the most recent certificate delivered to Lender containing the information required under this clause, (C) a report of any new deposit account established or used by such Borrower with any bank or other financial institution and any existing deposit account currently established or used by such Borrower with any bank or other financial institution that is at any time identified after the Closing Date and was not set forth in the schedules thereto or to the Security Agreement or Perfection Certificate, including in each case, the account number, the name and address of the financial institution at which such account is maintained, the purpose of such account

and, if any, the amount held in such account on or about the date of such report, (D) a statement that all sales and use and excise taxes have been paid when due as of the date of the certificate, except as specifically described in such certificate, (E) a list of (1) all applications, if any, for Intellectual Property made since the date of the prior certificate (or, in the case of the first such certificate, the Closing Date), (2) all issuances of registrations or letters on existing applications for Intellectual Property received since the date of the prior certificate (or, in the case of the first such certificate, the Closing Date),

(ii)     upon Lender's request, (A) summary reports on sales and use tax collections, deposits and payments, including monthly sales and use tax accruals, (B) true, correct and complete copies of all agreements, documents or instruments evidencing or otherwise related to Indebtedness that Lender has not otherwise received and (C) a certificate of a Responsible Officer of each Borrower listing (1) all applications, if any, for Intellectual Property made since the date of the prior certificate (or, in the case of the first such certificate, the Closing Date), and (2) all issuances of registrations or letters on existing applications for Intellectual Property received since the date of the prior certificate (or, in the case of the first such certificate, the Closing Date);

(s)     <u>Assignments</u>.   Upon Lender's request, assignments in writing and delivery to Lender of all Accounts, contracts, leases and other Chattel Paper, Instruments, Documents and other evidences thereof;

(t)     Upon receipt thereof, of (i) notice of any Commercial Tort Claim with a value in excess of $500,000 it may have against any Person, including a detailed description of such Commercial Tort Claim and, upon receipt of such description by Lender the description of Collateral shall be deemed to be amended to include such description of each such Commercial Tort Claim, and (ii) such documents as Lender may require to grant Lender a security interest in Grantor's rights in such Commercial Tort Claim; and

(u)     <u>General</u>.  Promptly following any request therefor, such other information regarding the operations, business affairs and financial condition of any Borrower or compliance with the terms of this Agreement, as Lender may reasonably request in the exercise of its Permitted Discretion.

Any documents, schedules, invoices or other papers delivered to Lender may be destroyed or otherwise disposed of by Lender one (1) year after the same are delivered to Lender.

SCHEDULE 7.10

Collateral Account, Borrowing Request Account; Bank Accounts

**Collateral Account**:

| Bank | Account No. | Type |
|------|-------------|------|
| Bank Leumi USA | 7651428500 | Checking – Blocked |

**Borrowing Request Account**:

As set forth on funds flow/disbursement request provided by Borrower on the Closing Date.

**Deposit Accounts**:

| Loan Party | Bank | Account No. | Type |
|------------|------|-------------|------|
| CarbonLite Industries, LLC | Pacific Western Bank | 1000260727 | Operating Account |
| CarbonLite Industries, LLC | Texas Capital Bank | 1111209035 | Operating |
| CarbonLite Industries, LLC | Texas Capital Bank | 1111204630 | Depository |
| CarbonLite Industries, LLC | Texas Capital Bank | 1118000783 | CDA |
| PinnPack Packaging, LLC | Texas Capital Bank | 1111209043 | Operating |
| PinnPack Packaging, LLC | Texas Capital Bank | 1111205405 | Depository |
| PinnPack Packaging, LLC | Texas Capital Bank | 1118000775 | CDA |

<u>SCHEDULE 8.1</u>

<u>Permitted Indebtedness</u>

<u>Description</u>                                                                    <u>Balance</u>

1.      Indebtedness, in the original principal amount of $2,000,000, incurred in connection with that certain Business Loan Agreement (Loan #2016-431), dated December 11, 2017, between Pinnpack, as borrower, and State of California, Department of Resources Recycling and Recovery, as lender.

      a.    Guarantees thereof by Borrower, CL Pinnpack and CL PI Holdings.

      b.    $2,000,000 promissory note issued thereunder on December 11, 2017 by Pinnpack.

2.    Term Loan Indebtedness, in the original principal amount of $100,000,000.

<u>SCHEDULE 8.2</u>

<u>Certain Permitted Liens</u>

1.      Liens, securing the Indebtedness described in Paragraph 1 of Schedule 8.1, on the equipment thereby financed and related change orders, accessions, additions, replacements, substitutions, records, and proceeds.

2.      Liens, securing the Indebtedness described in Paragraph 2 of Schedule 8.1, on all personal property of the Borrowers and Guarantors, subject to the Intercreditor Agreement.

SCHEDULE 8.5

Certain Permitted Investments

None.

<u>SCHEDULE 8.6</u>

<u>Certain Transactions with Affiliates</u>

The outstanding Shareholder Notes.