## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| CARBONLITE HOLDINGS LLC, *et al.*,[1] | ) ) ) | Case No. 21-10527 (JTD) |
| Debtors. | ) ) ) | (Joint Administration Requested) |

**DECLARATION OF RICHARD W. MORGNER IN SUPPORT OF THE DEBTORS'
MOTIONS FOR ENTRY OF INTERIM AND FINAL ORDERS
(A) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING,
(B) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL,
(C) GRANTING LIENS AND PROVIDING CLAIMS WITH SUPERPRIORITY
ADMINISTRATIVE EXPENSE STATUS, (D) GRANTING ADEQUATE PROTECTION
TO PREPETITION SECURED PARTIES, (E) MODIFYING THE AUTOMATIC STAY,
(F) SCHEDULING A FINAL HEARING, AND (G) GRANTING RELATED RELIEF**

I, Richard W. Morgner, hereby declare under penalty of perjury as follows:

1. I submit this declaration (this "Declaration") in support of the DIP Motions[2] of the above-captioned debtors and debtors in possession (the "Debtors") for entry of interim and final orders: (a) authorizing the Debtors' to obtain postpetition financing, (b) authorizing the Debtors' use of cash collateral, (c) granting liens and superpriority administrative claims, and (d) granting adequate protection to certain prepetition secured parties, among other relief.

2. Unless otherwise indicated, the statements set forth in this Declaration are based on (a) my personal knowledge or views based on my experience; (b) information I have received from the Debtors, my colleagues at Jefferies working directly with me or under my supervision,

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: CarbonLite Holdings LLC (8957); CarbonLite Industries LLC (3596); CarbonLite P Holdings LLC (8957); CarbonLite P LLC (5453); CarbonLite PI Holdings LLC (8957); CarbonLite Pinnpack LLC (8957); CarbonLite Recycling Holdings LLC (8957); CarbonLite Sub-Holdings, LLC (8957); Pinnpack P, LLC (8322); CarbonLite Recycling LLC (3727); and Pinnpack Packaging LLC (9948). The address of the Debtors' corporate headquarters is 10250 Constellation Blvd., Los Angeles, CA 90067.

[2] This Declaration is submitted in support of two separate motions for financing. One by the CA Debtors (as defined herein) [Docket No. 16] (the "CA DIP Motion"), and one by the TX Debtors and PA Debtors (each as defined herein) [Docket No. 11] (the "TX/PA DIP Motion" and, together with the CA DIP Motion, the "DIP Motions").

direction, or control, or other advisors of the Debtors; and/or (c) my review of relevant documents.

3. I am over the age of 18 and authorized to submit this Declaration on behalf of the Debtors. I am not being specifically compensated for this testimony other than through payments received by Jefferies, as engaged by the Debtors; none of those payments are specifically payable on account of this testimony. If I were called upon to testify, I would testify competently to the facts and views set forth herein.

## Professional Background and Qualifications

4. I am a Managing Director and Joint Global Head of the Debt Advisory & Restructuring Group at Jefferies, a global investment banking firm founded over 50 years ago, with its principal office located at 520 Madison Avenue, New York, New York 10022. Jefferies is a registered broker-dealer with the United States Securities and Exchange Commission and is a member of the Financial Industry Regulatory Authority and the Securities Investor Protection Corporation. Jefferies, together with its investment banking advisory affiliates, has approximately 3,900 employees located in more than 30 offices around the world. Jefferies and its senior professionals have extensive expertise providing investment banking services to financially distressed companies, creditors, committees, equity holders, asset purchasers, and other constituencies in reorganization proceedings and complex financial restructurings, both in and out of court.

5. I have more than 28 years of investment banking and restructuring experience. Since joining Jefferies in 2009, I have provided investment banking expertise, and distressed mergers and acquisition and financing advice to companies, lenders, and investors in both in- and out-of-court restructurings. Prior to joining Jefferies, I was a Managing Director and Co-Head of

the mergers and acquisitions group at Miller Buckfire, where my primary responsibilities included advising companies and investors in restructuring, distressed mergers and acquisitions, distressed financing, and special situations.

## General Background

6.  A detailed description of the Debtors' business and facts precipitating the filing of the Debtors' chapter 11 proceedings are set forth in the *Declaration of Brian Weiss in Support of Debtors' Chapter 11 Petitions and First Day Relief* (the "First Day Declaration"), incorporated herein by reference.[3]

7.  As more fully set forth in the First Day Declaration, the Debtors are on the forefront of processing post-consumer recycled polyethylene terephthalate ("rPET") plastic products and producing high-quality rPET and polyethylene terephthalate ("PET") beverage and food packaging products.  As of the Petition Date, the Debtors operate three facilities at which they process PET bottles and flake into rPET pellets, which are later incorporated into other products and packaging.  The Debtors also operate PinnPack, which processes rPET and PET into high-quality thermoformed tubs, bowls, domes, and clamshell packaging for food service applications.

## Retention of Jefferies

8.  The Debtors engaged Jefferies in January 2021 as their investment banker to provide advice regarding obtaining financing and pursuing strategic alternatives, including initiating chapter 11 cases, in the midst of an increasingly difficult liquidity situation. In the weeks prior to the Petition Date, it became increasingly clear that the Debtors would likely need to

---

[3] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration and/or the DIP Motions, as applicable.

3

file these chapter 11 cases to obtain a breathing spell and pursue an orderly sale of their businesses through an in-court process.

### The Debtors' Need for the DIP Facilities and Access to Cash Collateral

9. As part of the Debtors' preparations for these chapter 11 cases, Jefferies assisted the Debtors with the evaluation of their immediate financing needs and funding alternatives. Jefferies also assisted the Debtors in their assessment of the current DIP financing market, taking into account the impact of the ongoing COVID-19 pandemic. As part of the foregoing evaluation, Jefferies worked with the Debtors and their chief restructuring officer (the "CRO") in analyzing the Debtors' immediate and long term financing needs. Among other things, this evaluation focused on the Debtors' anticipated cash receipts and disbursements during the projected period, the necessary funding required to continue operations, the effect of potential chapter 11 filings on the operations of the businesses, the expenses of administration of chapter 11 cases, as well as the fees and interest expenses associated with the proposed DIP Facilities.

10. Based on discussions with the Debtors' management and the CRO, I understand that the Debtors lack sufficient liquidity and do not generate sufficient cash from operations to fund their businesses. Accordingly, without the DIP Facilities and the ability to use Cash Collateral,[4] the Debtors will not have the liquidity needed to operate their businesses, fund their ordinary course expenditures (including paying employees), or pay the expenses necessary to administer these chapter 11 cases. Absent increased funding in the form of the DIP Facilities,

---

[4] "Cash Collateral" shall collectively have the meanings ascribed to it in the: (i) interim order approving the CA DIP Facility at subpart (x) of the introduction (utilizing the definition of cash collateral set forth in section 363(a) of the Bankruptcy Code); and (ii) interim orders approving the TX DIP Facility and PA DIP Facility at ¶ E(v) (including within the definition of cash collateral, "all of the cash of the Prepetition Obligors, wherever located, and all cash equivalents, including any cash in deposit accounts of the Prepetition Obligors, whether as Prepetition Collateral, as income, proceeds, products, rents, issues, or profits of Prepetition Collateral, or otherwise").

4

the Debtors could be forced to terminate their businesses as going concerns to the detriment of the Debtors, their estates, and all stakeholders.

11. The Debtors also believe that the DIP Facilities and access to Cash Collateral will provide a clear message to their customers, vendors, employees, and contract counterparties that the Debtors' operations are appropriately funded and that the Debtors have sufficient liquidity to meet their current and future obligations. The financing will demonstrate the Debtors' ability to continue meeting the needs of their customers, provide compensation to their employees, and operate their businesses in the ordinary course.

### The Debtors' Efforts to Obtain Postpetition Financing

12. Recognizing the need to move quickly while also securing the best available financing under the circumstances, the Debtors sought financing from numerous third-party sources as well as from the Prepetition Secured Parties.

13. The status of the Debtors' operations presented a number of challenges that limited the universe of potential lenders. Specifically, Jefferies sought lenders that (a) would be able to fund on an expedited timeline, (b) had capacity to fund loans of the sizes required by the Debtors, and (c) were prepared to fund into an operationally challenged company without the benefit of an extended due diligence timeline. Additionally, the three separate and siloed prepetition financing arrangements, with respect to each of the CA Debtors, the TX Debtors, and the PA Debtors (each as defined below) further challenged the search for third-party financing.

14. With these considerations, starting in January 2021, Jefferies contacted 61 potential financing candidates to fund an operational turnaround aimed at increasing capacity utilization, optimizing manufacturing costs, securing lower cost feedstock, restructuring customer contracts at the recycling facilities, and providing working capital needed for each of

the Debtors' facilities. These potential financing parties included competitors, traditional private equity sponsors, private credit investors, and turnaround/special situation investors.

15.   Of these institutions, 33 executed non-disclosure agreements and began conducting due diligence. Jefferies responded to requests for information and facilitated the due diligence process with these potential lenders. Six of these potential lenders provided expressions of interest. However, ultimately, none of those parties was prepared to provide DIP financing on an unsecured or junior basis, and, further, all would have required priming liens on existing collateral of the Prepetition Secured Parties. None of the Prepetition Secured Parties were willing to consent to priming liens and so pursuit of such third-party financing likely would have led to a dispute with each of the Prepetition Secured Parties.

16.   Accordingly, the Debtors focused their efforts on obtaining postpetition financing from the Prepetition Secured Parties and engaged in good faith, arm's-length negotiations concerning the economics, milestones, covenants, and other provisions typical in debtor in possession financings with each of the existing constituencies comprising the Prepetition Secured Parties. During the weeks leading up to the Petition Date, the Debtors and the Prepetition Secured Parties finalized the terms of the DIP Documents, and as a result of these negotiations, the Debtors were able to improve certain terms of the financing in comparison to the initial proposals.

### The DIP Facilities[5]

17.   As more fully set forth in the DIP Motions, the Debtors seek the following debtor-in-possession financing facilities:

---

[5] The material terms of the proposed DIP Facilities are set forth in detail in the respective of the DIP Motions. For the avoidance of doubt, any description of the proposed terms of the DIP Facilities herein or in the DIP Motions is qualified in its entirety by reference to the applicable DIP Credit Agreement.

   i. <u>The CA Debtors</u>. CarbonLite Holdings, LLC ("<u>Holdings</u>"), CarbonLite Sub-Holdings, LLC ("<u>Sub-Holdings</u>"), CarbonLite Industries LLC ("<u>CL Industries</u>"), CarbonLite Pinnpack, LLC ("<u>CL Pinnpack</u>"), Pinnpack Packaging, LLC ("<u>Pinnpack</u>"), CarbonLite PI Holdings LLC ("<u>CA Holdings</u>"), and Pinnpack P, LLC ("<u>Pinnpack P</u>", and collectively with Holdings, Sub-Holdings, CL Industries, CL Pinnpack, Pinnpack, and CA Holdings, the "<u>CA Debtors</u>") seek to access debtor-in-possession financing facilities (the "<u>CA DIP Facilities</u>") from their existing term lenders (anticipated to be approximately $20 million) and revolving lenders (anticipated to be approximately $37 million);

   ii. <u>The TX Debtors</u>. CarbonLite Recycling Holdings, LLC ("<u>TX Holdings</u>") and CarbonLite Recycling, LLC ("<u>Recycling</u>", and together with TX Holdings, the "<u>TX Debtors</u>") seek to obtain a debtor-in-possession financing facility (the "<u>TX DIP Facility</u>") of approximately $15 million. The TX DIP Facility is being provided by certain prepetition holders (the "<u>TX Prepetition Bondholders</u>") of the TX Bonds more fully described in the TX/PA DIP Motion and the First Day Declaration; and

   iii. <u>The PA Debtors</u>. Debtors CarbonLite P Holdings, LLC ("<u>PA Holdings</u>") and CarbonLite P, LLC ("<u>CLP</u>", together with PA Holdings, the "<u>PA Debtors</u>") seek to obtain a debtor-in-possession financing facility (the "<u>PA DIP Facility</u>", and collectively with the CA DIP Facilities and the TX DIP Facility, the "<u>DIP Facilities</u>") of approximately $25 million. The PA DIP Facility is being provided by certain prepetition holders (the "<u>PA Prepetition Bondholders</u>") of the PA Bonds as more fully described in the TX/PA DIP Motion and the First Day Declaration.

7

18. The Debtors are also each seeking the use of Cash Collateral of the Prepetition Secured Parties subject to the terms and conditions of the proposed Financing Orders and applicable DIP Credit Agreements.

19. While the terms and conditions of the DIP Facilities are more particularly described in each of the DIP Motions, I note that certain of the prepetition indebtedness of certain Prepetition Secured Parties is also contemplated to be subject to a roll-up (the "Roll-Up") converting such prepetition indebtedness into indebtedness under the applicable DIP Facility. The Roll-Up was a topic of significant negotiation between the Debtors and the Prepetition Secured Parties and was a necessary condition to obtaining the DIP Facilities. Based on my observations, I believe the Debtors would not have access to any DIP financing from the Prepetition Secured Parties without the proposed Roll-Up.

### The DIP Financing Is the Best Postpetition Financing Arrangement Available to the Debtors

20. Based on my experience as a restructuring professional and involvement in the process described above, I believe the DIP Facilities represent the best available postpetition financing under the circumstances. As noted above, no party that Jefferies is aware of was interested in providing, or willing to provide, DIP financing to the Debtors on an unsecured or junior basis. The Debtors and the DIP Lenders, moreover, agreed to terms that will provide the Debtors with access to adequate and necessary liquidity during the pendency of these chapter 11 cases. Furthermore, based on my knowledge of similar financings in the market, I believe that the principal economic terms reflected in the DIP Facilities are customary and usual and reasonable under the circumstances.

**Conclusion**

21.  Given the financing efforts and process described above and based on my experience as a restructuring professional and involvement in other financing transactions, I believe that the DIP Facilities are the best financing option presently available to the Debtors and that the terms of the DIP Facilities are reasonable under the circumstances.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: March 8, 2021                             */s/ Richard W. Morgner*
New York, New York                          Richard W. Morgner
                                                                  Managing Director and Joint Global Head of
                                                                  the Recapitalization & Restructuring Group
                                                                  Jefferies LLC