# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| CARBONLITE HOLDINGS LLC, *et al.*,[1] | Case No. 21-10527 (JTD) |
| Debtors. | (Jointly Administered) |
|  | Hearing Date: April 8, 2021 at 1:00 p.m.<br>Objection Deadline: April 5, 2021 at 5:00 p.m. |

## COMBINED OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO THE TX/PA DIP MOTION, THE CA DIP MOTION AND THE BID PROCEDURES MOTION

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: CarbonLite Holdings LLC (8957); CarbonLite Industries LLC (3596); CarbonLite P Holdings LLC (8957); CarbonLite P LLC (5453); CarbonLite PI Holdings LLC (8957); CarbonLite Pinnpack LLC (8957); CarbonLite Recycling Holdings LLC (8957); CarbonLite Sub-Holdings, LLC (8957); Pinnpack P, LLC (8322); CarbonLite Recycling LLC (3727); and Pinnpack Packaging LLC (9948). The address of the Debtors' corporate headquarters is 10250 Constellation Blvd., Los Angeles, CA 90067.

\\LA - 764615/000002 - 2086958 v9

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................. 2

BACKGROUND ................................................................................................... 7

OBJECTION TO DIP MOTIONS ........................................................................ 10

I.     The DIP Facilities Stifle a Fair, Full and Well-Developed Process. ................... 11

II.    The DIP Facilities Are a Value Grab of the Debtors' Assets. ............................ 15

    A.    The Court Should Not Approve the Roll-Ups. ......................................... 15

    B.    If the Court Approves the Rolls-Ups, They Should be Subject To Disgorgement If Court Finds the Prepetition Debt Is Not Fully Secured. 17

    C.    The DIP Facilities Improperly Grant the DIP Lenders Liens on Unencumbered Assets............................................................................. 17

    D.    The Proposed Adequate Protection Provisions Violate The Bankruptcy Code. ....................................................................................................... 20

    E.    The Court Should Cut Back The Extravagant DIP Economics. ............... 22

    F.    The Waivers in the DIP Facilities Are Premature and Overbroad........... 23

    G.    The DIP Facilities Do Not Adequately Provide For Wind-Down of the Estates or Payment of All Administrative Expense Claims..................... 27

III.   The DIP Lenders and the Prepetition Lenders Are Seeking to Avoid Scrutiny of Their Prepetition and Postpetition Actions. .......................................................... 27

    A.    The Budgeted Amounts for Committee Professionals In These Cases Are Inadequate and Inappropriate.................................................................. 28

    B.    The Carve-Outs Are Insufficient, Discriminatory and Should be Fully Funded Following a Sale. ......................................................................... 29

    C.    The Committee's Investigation Budget Is Too Restrictive....................... 30

    D.    The Challenge Period and Prepetition Lender Releases Should Be Modified................................................................................................... 32

OBJECTION TO BID PROCEDURES MOTION ................................................ 33

    A.    The Milestones Should be Extended........................................................ 33

    B.    The Lenders Should Not Be Consent Parties............................................ 35

    C.    The Bid Protections Are Excessive and Should be Limited to a Total of 3% of the Cash Purchase Price. ............................................................... 38

    D.    Adequate Assurance Procedures.............................................................. 39

    E.    Objection to Limited Cash Sale Proceeds................................................ 40

    F.    Credit Bidding......................................................................................... 40

i

RESERVATION OF RIGHTS ................................................................................................... 40

CONCLUSION.................................................................................................................. 41

\\LA - 764615/000002 - 2086958 v9

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Aegean Marine Petroleum Network Inc.*,
No. 18-13374 (MEW) (Bankr. S.D.N.Y. Jan. 15, 2019) ........................................................31

*In re Aleris Int'l, Inc.*,
09-10478 (BLS) (Bankr. D. Del. Mar. 18, 2009) ..................................................................31

*In re Ames Dep't Stores, Inc.*,
115 B.R. 34 (Bankr. S.D.N.Y. 1990) ..............................................................................11, 28

*Baybank-Middlesex v. Radar Distributions, Inc., et al.*,
69 F.3d 1200 (1st Cir. 1995) ........................................................................................22

*In re Berry Good, LLC*,
400 B.R. 741 (Bankr. D. Ariz. 2008) ...............................................................................10

*In re Beauty Brands, LLC*,
No. 19-10031 (CSS) (Bankr. D. Del. Jan. 30, 2019) ............................................................31

*In re Breitburn Energy Partners LP*,
No. 16-11390 (SMB) (Bankr. S.D.N.Y. Aug. 19, 2016) ........................................................31

*Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm L.P. IV*,
229 F.3d 245 (3d Cir. 2000) ..........................................................................................18

*In re Caesars Entm't Operating Co.*,
No. 15-01145 (ABG) (Bank. N.D. Ill. March 25, 2015) ........................................................24

*In re Channel Master Holdings, Inc.*,
2004 Bankr. LEXIS 576 ...............................................................................................27

*In re Chemtura Corp.*,
No. 09-11233 (REG) (Bankr. S.D.N.Y. Apr. 29, 2009) ........................................................31

*In re Colad Grp., Inc.*,
324 B.R. 208 (Bankr. W.D.N.Y. 2005) ............................................................................25

*In re Cybridge Corp.*,
304 B.R. 681 (Bankr. D.N.J.), *aff'd*, 312 B.R. 262 (D.N.J. 2004).........................................23

*In re DiToro*,
22 B.R. 392 (Bankr. E.D. Pa. 1982) ...............................................................................23

*In re Encore Healthcare Assoc.*,
    312 B.R. 52 (Bankr. E.D. Pa. 2004) ..................................................................13

*In re Fleetstar LLC*,
    614 B.R. 767 (Bankr. E.D. La. 2020) ...............................................................27

*General Elec. Capital Corp. v. Hoerner* (*In re Grand Valley Sport & Marine*),
    143 B.R. 840 (Bankr. W.D. Mich. 1992)...........................................................10

*In re Goody's Family Clothing, Inc.*,
    08-11133 (KJC) (Bankr. D. Del. Jul. 16, 2008)................................................30

*Hartford Underwriters Ins. Co. v. Union Planters Bank*, N.A.,
    530 U.S. 1 (2000)...............................................................................................25

*Hartford Underwriters Ins. Co. v. Magna Bank, N.A. (In re Hen House Interstate, Inc.)*,
    150 F.3d 868 (8th Cir. 1998), *vacated on other grounds*, 177 F.3d 719 (8th
    Cir. 1999).............................................................................................................25

*In re iHeartMedia, Inc.*,
    No. 18-31274 (MI) (Bankr. S.D. Tex. Jun. 7, 2018) .........................................31

*In re JER/Jameson Mezz Borrower II, LLC*,
    461 B.R. 293 (Bankr. D. Del. 2011) ..................................................................27

*In re Laffite's Harbor Dev. I, LP*,
    No. 17-36191-H5-11, 2018 WL 272781 (Bankr. S.D. Tex. Jan. 2, 2018) ............10

*In re LATAM Airlines Grp. S.A.*,
    620 B.R. 722 (Bankr. S.D.N.Y. 2020) ...............................................................15

*In re Local Insight Media Holdings, Inc.*,
    10-13677 (KG) (Bankr. D. Del. Dec. 29, 2010) ................................................30

*McAlpine v. Comerica Bank- Detroit (In re Brown Bros. Inc.)*,
    136 B.R. 470 (W.D. Mich. 1991) .......................................................................25

*McFarland v. Leyh (In re Tex. Gen. Petrol. Corp.)*,
    52 F.3d 1330 (5th Cir. 1995) .............................................................................18

*In re Metaldyne Corp.*,
    No. 09-13412 MG, 2009 WL 2883045 (Bankr. S.D.N.Y. June 23, 2009)............24

*Meyer v. United States*,
    375 U.S. 233 (1963).............................................................................................26

iv

*In re Molycorp, Inc.*,
  15- 11357 (CSS) (Bankr. D. Del. Jul. 24, 2015)....................................................30

*In re Muma Servs., Inc.*,
  322 B.R. 541 (Bankr. D. Del. 2005) (Walrath, J.) .................................................24

*In re NEC Holdings Corp.*,
  No. 10-11890 (PJW) (Bankr. D. Del. July 13, 2010) ...........................................39

*In re O'Brien Env't Energy, Inc.*,
  181 F.3d 527 (3d Cir. 1999)..........................................................................33, 37

*Official Comm. of Unsecured Creditors of New World Pasta Co. v. New World
  Pasta Co.*,
  322 B.R. 560 (M.D. Pa. 2005) ..............................................................................15

*Official Comm. of Unsecured Creditors v. Chinery (In re Cybergenics Corp.)*,
  330 F.3d 548 (3d Cir. 2000)..................................................................................17

*In re Patio & Porch Sys., Inc.*,
  194 B.R. 569 (Bankr. D. Md. 1996) ......................................................................23

*Precision Steel Shearing, Inc. v. Fremont Fin. Corp. (In re Visual Indus., Inc.)*,
  57 F.3d 321 (3d Cir. 1995).....................................................................................25

*In re R.H. Donnelley Corp.*,
  09-11833 (KG) (Bankr. D. Del. Jun. 25, 2009) ....................................................30

*In re Reliant Energy Channelview LP*,
  403 B.R. 308 (D. Del. 2009), *aff'd*, 594 F.3d 200 (3d Cir. 2010) .........................38

*In re Ridgeline Structures, Inc.*,
  154 B.R. 831 (Bankr. D.N.H. 1993) ......................................................................25

*In re Sandridge Energy, Inc.*,
  No. 16-32488 (DRJ) (Bankr. S.D. Tex. Jul. 5, 2016) ...........................................31

*In re Semcrude, L.P.*,
  08-11525 (BLS) (Bankr. D. Del. Sept. 18, 2008) .................................................31

*Sprint Nextel Corp. v. U.S. Bank Nat'l Ass'n (In re TerreStar Networks, Inc.)*,
  457 B.R. 254 (Bankr. S.D.N.Y. 2011) ..................................................................24

*In re Tenney Vill. Co.*,
  104 B.R. 562 (Bankr. D.N.H. 1989) ......................................................................15

*In re Trump Entm't Resorts, Inc.*,
  No. 14-12103 (KG) (Bankr. D. Del. Oct 6, 2014) .................................................24

v

*United Savings Assoc. of Texas v. Timbers of Inwood Forest Assoc., Ltd.*,
    484 U.S. 365 (1988)................................................................................................21

*United Va. Bank v. Slab Fork Coal Co.*,
    784 F.2d 1188 (4th Cir. 1986) ..................................................................23, 24

*In re Werner Holding Co. (DE), Inc.*
    No. 06-10578 (KJC) (Bank. D. Del. Jul. 25, 2006) .................................31

**Statutes**

11 U.S.C. § 361 ......................................................................................................20

11 U.S.C. § 363(k) ...........................................................................................37, 40

11 U.S.C. § 363(p) .................................................................................................22

11 U.S.C. Chapter 5 ..............................................................................................17

11 U.S.C. § 506(b) .................................................................................................21

11 U.S.C. § 506(c) .......................................................................................... *passim*

11 U.S.C. § 507(b) .................................................................................................20

11 U.S.C. § 552(b) ......................................................................................4, 23, 24

11 U.S.C. § 1107(a) .................................................................................................7

11 U.S.C. § 1108 ......................................................................................................7

11 U.S.C. § 1129 ....................................................................................................15

UCC Article 9 ........................................................................................................19

UCC § 9-108(e)(1) .................................................................................................19

UCC § 9-203(b)(3)(A) ...........................................................................................19

UCC § 9-204(b)(2) .................................................................................................19

\\LA - 764615/000002 - 2086958 v9

The Official Committee of Unsecured Creditors (the "Committee") of CarbonLite Holdings, LLC, *et al.* (the "Debtors"), by and through its undersigned proposed counsel, hereby submits this combined objection (the "Objection")[2] to (i) the *TX/PA Debtors' Motion Pursuant to Sections 105, 361, 362, 363, 364, 503 and 507 of the Bankruptcy Code Seeking Entry of Interim and Final Orders (I) Authorizing the TX/PA Debtors to Obtain Senior Secured Superpriority Postpetition Financing; (II) Granting (A) Liens and Superpriority Administrative Expense Claims, (B) Adequate Protection to the Prepetition Secured Parties; (III) Authorizing the Use of Cash Collateral; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief* [D.I. 11] (the "TX/PA DIP Motion"), (ii) the *CA Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the CA Debtors to Obtain Postpetition Secured Financing Pursuant to Section 364 of the Bankruptcy Code; (II) Authorizing the CA Debtors to Use Cash Collateral; (III) Granting Liens and Superpriority Administrative Expense Claims; (IV) Granting Adequate Protection to the Prepetition Lenders; (V) Modifying the Automatic Stay; (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [D.I. 16] (the "CA DIP Motion," and together with the TX/PA DIP Motion, the "DIP Motions") and (iii) the *Debtors' Motion for (I) An Order (A) Approving Bid Procedures for the Sale of Substantially All of the Debtors' Assets; (B) Approving Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases; (C) Approving Certain Bid Protections in Connection With the Debtors' Entry Into Any Potential Stalking Horse Agreements; (D) Scheduling the Auction and Sale Hearing; (E) Approving the Form and Manner of Notice Thereof; and (F) Granting Related Relief* [D.I. 112]

---

[2] Capitalized terms used but not defined in this Objection shall have the meanings ascribed to such terms in the DIP Motions (as defined below) and the Bid Procedures Motion.

(the "Bid Procedures Motion").  The Committee will also file the Declaration of Edward Kim of

Province, LLC (the "Kim Declaration") in support of the Objection.[3]

### PRELIMINARY STATEMENT[4]

1.       The Debtors' management, perhaps in collusion with its equity owners (in

particular Leon Farahnik, whom the Committee understands is deeply interested in retaining

ownership of one of the Debtors' crown jewels) have permitted the DIP Lenders and Prepetition

Lenders to put in place an underfunded and artificially truncated sale process that weaponizes the

DIP facilities to allow them to take control of these chapter 11 cases and capture for themselves

all of the Debtors' value, while severely limiting scrutiny of their prepetition actions.  The result

is an unfair process that prevents the Committee from properly exercising its fiduciary duties,

hamstrings the Debtors' ability to maximize value for *all* stakeholders—not just the secured

lenders—and places significant risk on trade creditors, who are thus deprived of a meaningful

voice in the process.  Importantly, many of these trade creditors are single- or limited-source

suppliers, whose goods and services are critical to the survival of the Debtors, and also to any

potential third-party purchaser's realizing value from the acquisition of the Debtors' businesses.

Of particular concern:

- **The process is too short and too limited**:  Each of the DIP Facilities mandates approval
  of bidding procedures by April 8, 2021, an auction by May 7, 2021 and Court approval of
  a sale by May 12, 2021.  While the TX and PA DIP Facilities ostensibly permit a plan
  process (the CA DIP Facilities explicitly prohibit that option), the Debtors must file any
  such plan and disclosure statement by April 8, 2021.  This timeline does not provide the
  Committee with any meaningful opportunity to vet the sales process or to determine if there
  exist actionable alternatives.  It also prevents third parties who may be willing to
  recapitalize one or more of the Debtors through a chapter 11 plan with inadequate time to

---

[3] The Kim Declaration will rely in substantial part on the Debtors' budget projections.  The Committee is
informed that the Debtors will provide updated budget information on Monday, April 5, 2021.  The Committee
will promptly finalize and submit the Kim Declaration upon reviewing the updated productions, so as to ensure
that the Court has the most updated information before it at the hearing on these matters.

[4] Certain defined terms are used in this Preliminary Statement and defined below.

work with the Debtors and the Committee to formulate and propose a value-enhancing alternative to the proposed sales. This option, therefore, is illusory.

- **The process is underfunded, to the detriment of unsecured creditors**:  The proposed DIP Facilities provide inadequate funding for these chapter 11 cases because (1) they do not adequately fund ongoing business operations, including critical vendor payments, and (2) they do not afford sufficient runway for foreign or strategic buyers to obtain regulatory approvals.   The Debtors entered bankruptcy without earmarked funding to procure adequate feedstock from critical vendors.  Without this funding, single- and limited-source suppliers were foreseeably unwilling to continue supplying feedstock to the Debtors postpetition. ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ As proposed, the DIP budgets give the Debtors an 18 week runway to consummate a sale or plan of reorganization, assuming that the wind-down is funded from sale proceeds.  The allotted runway—even as initially proposed—would not have permitted strategic and foreign buyers the time necessary to obtain antitrust and/or CFIUS approvals for their respective transactions (which could require four months or more), even if a sale were approved on the Debtors' currently proposed timetable. ██████████████████ ███████████████████████████████████████████████████████████ ████████████████████████████████████████████ and (2) the Debtors likely cannot consummate a sale to a strategic buyer before running out of runway, advantaging the Lenders and former owner in the sale process.  A longer process, and funding sufficient to repair relationships with trade vendors, is necessary to address these concerns.

- **The process provides the DIP Lenders and Prepetition Lenders with complete control, thereby impairing the Debtors' ability to act in the interests of all stakeholders**:  In the bidding procedures, the DIP Lenders and Prepetition Lenders reserve to themselves consent rights over, among other things, whether to choose a stalking horse, the selection of any stalking horse bid, what forms of consideration will be acceptable as part of a purchase price, and whether an auction is even held.  This is unacceptable because it transforms section 363 of the Bankruptcy Code from its intended purpose of allowing Debtors to enter into transactions that maximize value for all creditors into a tool for the Lenders to control the sale of the Debtors' assets for their own benefit.

---

[5] After nearly four weeks of negotiations, the Debtors finally reached agreements with two of their vendors. One vendor will be paid a modest amount of its unsecured claim pre-closing; the other will be paid from sale proceeds at closing (as there is insufficient funding in the DIP).  While the Debtors have been attempting to patch vendor issues on a one-by-one basis with individual vendors through proposed stipulations, the Committee believes that the Debtors' management, as it had pre-bankruptcy, is severely underestimating and under-addressing serious problems that will have potentially destructive effects.

3

- **The process provides the Committee with inadequate funding to exercise its fiduciary duties**:  The total budgeted professional fees across all Debtors in these chapter 11 cases are heavily and unreasonably skewed in favor of the Debtors and, remarkably the Prepetition Lenders/DIP Lenders and against the Committee and unsecured creditors: (i) Debtors: $8,720,000; (ii) *DIP Lenders and Prepetition Lenders: $7,040,000*; and (iii) Committee: $1,200,000.  *The fees allocated to Committee professionals are a mere 13.8% of the Debtor professional fees and 17% of the Lender professional fees*.  Indeed, the exorbitant fee budget provided to the Prepetition Lenders and DIP Lenders suggests that the DIP budget may be used to permit the DIP Lenders to fund work for bidding on the Debtors' assets or other matters not properly compensable by the Debtors' estates.  Similarly, the Committee's investigation budget is a mere $75,000 for the Prepetition CA Facilities and $50,000 each for the Prepetition TX Bonds and Prepetition PA Bonds, even though the DIP Lenders are seeking extensive roll-ups of prepetition debt and the right to credit bid both their prepetition debt and DIP loans in the proposed sale.  The amounts allocated to the Committee professionals and inappropriate and insufficient.

- **The DIP Lenders and Prepetition Lenders Seek a Value Grab of the Debtors' Assets.**

  o <u>Rollup</u>:  As set forth in more detail below, the CA DIP Term Facility and PA DIP Facility each seeks a 2:1 roll-up of prepetition debt (in the case of the CA DIP Term Facility, greater than 2:1) without any evidence that the 2:1 roll-up is necessary and justified.  Moreover, there is no evidence that the prepetition facilities being refinanced by the roll-ups are fully secured.  The 2:1 roll-ups should be reduced or denied.  However, if the Court is inclined to permit the roll-ups, if the Prepetition CA Term Facility and Prepetition PA Bonds are not fully secured, the roll-ups should be denied as improperly repaying unsecured debt.  The Debtors must demonstrate on a facility-by-facility basis that the debt sought to be rolled-up is fully secured.  It is particularly inappropriate to permit the roll-up before the Debtors receive potential stalking horse bids, which would provide an indication of market value for the Debtors' assets.

  o <u>Liens on Unencumbered Assets</u>:  The DIP Lenders seek DIP liens and adequate protection liens on previously unencumbered assets, including the proceeds of avoidance actions and D&O liability claims.  DIP liens on previously unencumbered assets, particularly on rolled-up debt for which no value has been given and that may be undersecured, are improper.  As to adequate protection liens, the roll-ups assume fully secured prepetition debt, yet the DIP Lenders also claim to require adequate protection liens on previously unencumbered collateral.  Unencumbered assets, especially avoidance actions and their proceeds, should be preserved for unsecured creditors.

  o <u>Overbroad Adequate Protection</u>:  The Prepetition Lenders are entitled to adequate protection only to the extent of the diminution in value of their interests in the Prepetition Collateral securing the Prepetition Obligations. The definition of Diminution in Value contained in the proposed Final DIP Orders, however, expands what is permitted under the Bankruptcy Code by allowing adequate protection on account of the roll-ups, which inappropriately benefits the Prepetition Lenders.

4

o <u>Overmarket DIP Economics:</u> The DIP economics, especially the fees, are extravagant and are approximately 3% higher than comparable DIP facilities, resulting in further impairment of potential unsecured creditor recoveries.

o <u>Waiver of Meaningful Estate Rights and Powers:</u> The Lenders seek to strip unsecured creditors of valuable protections by demanding surcharge waivers under Bankruptcy Code section 506(c), "equities of the case exception" waivers under Bankruptcy Code section 552(b) and marshalling waivers. This is especially inappropriate where the DIP budgets have not sufficiently provided for payment of all administrative expense claims and there is a risk of administrative insolvency.

o <u>Failure to Provide for Winddown and Administrative Expenses:</u> The DIP Facilities do not adequately provide for payment of wind-down costs and administrative expense claims, including section 503(b)(9) claims, thus further demonstrating that the DIP Lenders and Prepetition Lenders, while taking full advantage of chapter 11, have failed to fund an adequate chapter 11 process.

- **The DIP Lenders Seek to Avoid Scrutiny of Their Prepetition and Postpetition Actions and Grant Inappropriate Releases**: The Committee investigation budgets for each of the DIP Facilities should each be expanded by $50,000. The Final DIP Orders must also explicitly state that proceeds of any sale of the Debtors' assets shall not be paid to the Prepetition Lenders on account of Prepetition Debt or DIP Loans to the extent of any roll-up unless and until the lien challenge period has expired without a lien challenge having been filed, or if a lien challenge action is filed, until such action is resolved by a final non-appealable order. Any such releases should be narrowly tailored and should exclude Leon Farahnik, any of his controlled entities and any other insiders.

- **Excessive Bid Protections**: The bidding protections provided to any stalking horse bidder or bidders (a 3% break-up fee plus expense reimbursement up to $350,000 per production facility, for a maximum of $1,400,000) are excessive and likely to chill bidding by increasing the required overbid amounts. The bid protections should be limited to an all-in total of 3% of the cash purchase price provided and the expense reimbursement portion of the 3% to a maximum of $250,000 per production facility. In addition, no insider (including Leon Farahnik or any of his controlled entities) should be entitled to receive bid protections.

- **Blanket Approval of Bid Protections**: The Debtors ask the court for unfettered discretion to provide bid protections to one or more stalking horse bidders up to pre-approved caps. This is not appropriate in this case, where the Debtors could pay as much as $1,400,000 in expense reimbursement to one bidder. The Debtors should be required to come back to court and obtain approval of all of the bid protections (both break-up fee and expense reimbursement) after one or more stalking horse bidders has been selected.

- **Consent Rights for DIP Lenders and Prepetition Lenders**. As set forth above, the DIP Lenders and Prepetition Lenders are given consent over whether to choose a stalking horse, the choice of the stalking horse, the acceptable form of consideration, and even whether or

not an auction takes place.  This will chill bidding and give the Lenders an unwarranted advantage over third-party bidders in the sale process.

- **Treatment of Executory Contract Counterparties**:  The Bid Procedures also do not provide fair assumption and assignment procedures for contract counterparties, by failing to give them information regarding the Successful Bidder and adequate assurance of future performance until after the cure and assignment objection deadline.

- **Failure to Provide for Administrative Expenses and Wind-Down**:  The Bid Procedures do not require there to be sufficient cash from a sale to ensure all administrative expense claims will be satisfied and funding in place to permit confirmation of a plan of liquidation and a distribution to unsecured creditors.  As there is insufficient funding from the DIP to fund these vital elements of any chapter 11 process, the Bid Procedures must be modified to require cash from a sale to be set aside to pay administrative expenses and fund a plan of liquidation.

2.      The cumulative result of the foregoing and other features of the DIP and the Bid Procedures is a process of the secured lenders, by the secured lenders and for the secured lenders, funded on the backs of trade creditors.  The process must be slowed, and it must be designed to *maximize* value.  The Debtors have claimed that "[t]he Company is poised to play a leading role in the growing environmental sustainability movement" and that "industry estimates project that the total rPET market for bottle production will skyrocket from 550 million pounds in 2019 to more than 1.9 billion pounds by 2025.  As the only independent PET recycler of scale, the Company is therefore well-positioned for incredible growth." [6]  However, the Debtors, DIP Lenders and Prepetition Lenders have set up a sale process amounting to nothing short of a fire sale—one over which the lenders have nearly unfettered control.  This creates the likelihood that the sales process will fail to maximize the going concern value of the Debtors' enterprise, and instead will surrender that value entirely to the Debtors' DIP Lenders and Prepetition Lenders, potentially leaving the Debtors' critical trade creditors with no recovery at all.  This is not mere conjecture. ███████████████████████████████████████████████████████████████

---

[6] *See Declaration of Brian Weiss In Support of Debtors' Chapter 11 Petitions and First Day Relief*  [D.I. 13] (the "<u>First Day Decl.</u>") ¶ 6.

██████████████████████████████████████████████

██████████████████████████ The DIP Lenders, who have chosen to use the

bankruptcy process and the significant advantages that it provides rather than foreclose, must

provide the time (and funding necessary) to explore this opportunity and others that may exist.

3.      For the reasons set forth in this Objection, the Committee respectfully requests that

the Court only approve the Motions if the Debtors make the modifications requested herein.

**BACKGROUND**

4.      On March 8, 2021 (the "Petition Date"), each of the Debtors commenced a

voluntary case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code")

with this Court.   The Office of the United States Trustee (the "U.S. Trustee") appointed the

Committee on March 23, 2021 [D.I. 118].  The Debtors are authorized to continue to operate their

business and manage their properties as debtors in possession pursuant to sections 1107(a) and

1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been

made in these Chapter 11 Cases.

5.      On the Petition Date, the Debtors filed the DIP Motions.  The final relief sought in

the DIP Motions, and the relief granted on an interim basis, is summarized in the chart below:

|  | CA DIP ABL Facility | CA DIP Term Facility | PA DIP Facility | TX DIP Facility |
|---|---|---|---|---|
| **Relief Granted On Interim Basis** | $7 million draw (deemed to repay $7 million of prepetition ABL) | $7 million draw on new money facility | $14 million new money draw<br><br>$28 million roll-up | $7 million draw |
| **Final Relief Sought** | $18.5 million ABL (any draws made on final basis will be deemed to repay | $20 million new money facility<br><br>$45.5 million ("roll-up, i.e. $2.275 roll- | $25 million new money term loan<br><br>$50 million roll-up (i.e. $2.00 roll-up | $15 million term loan |

7

| | CA DIP ABL Facility | CA DIP Term Facility | PA DIP Facility | TX DIP Facility |
|---|---|---|---|---|
| | prepetition ABL not already "rolled up" | up for each $1.00 of new money) | for each $1.00 of new money) | |
| **Total Relief** | $18.5 million ABL (which rolls up $7.8 million under the Prepetition CA ABL Facility) | $65.5 million (including roll-up of $45.5 million; i.e. $2.275 of roll-up for each $1.00 of new money) | $75 million (including $50 million roll-up, i.e. $2.00 roll-up for each $1.00 of new money) | $15 million |

6.     On March 10, the Court entered interim DIP orders approving the interim relief summarized above with respect to (i) the CA DIP Term Facility and the CA DIP ABL Facility (collectively, the "CA DIP Facilities") [D.I. 74] (the "CA Interim DIP Order"); (ii) the TX DIP Facility [D.I. 90] (the "TX Interim DIP Order"); and (iii) the PA DIP Facility (together with the CA DIP Facilities and the TX DIP Facility, the "DIP Facilities") [D.I. 91] (the "PA Interim DIP Order" and, together with the CA Interim DIP Order and the PA Interim DIP Order, the "Interim DIP Orders").

7.     The obligors and lenders under the DIP Facilities are the obligors and lenders under prepetition facilities that correspond to the applicable debt "silo": California, Texas and Pennsylvania.  The silos were designed to be completely independent of one another, and there is no cross-collateralization.  According to the Debtors, the applicable outstanding funded debt amounts are:

- Approximately $99.4 million[7] in obligations under the Credit Agreement, dated as of August 2, 2019, among Holdings as borrower, Orion, as administrative agent and collateral agent, the other CA Debtors as guarantors, and the lenders party thereto, as lenders (the "Prepetition CA Term Facility");

- Approximately $7.8 million in obligations under the Credit Agreement, dated as of September 16, 2019, between CL Industries, CL PinnPack and PinnPack as borrowers, Leumi, as lender, CarbonLite PI Holdings LLC and non-debtor Leon Farahnik, as

---

[7] This is the figure given in the First Day Decl. at ¶ 25.  The CA DIP Motion (Stipulations at ¶ G.(ii) references $96.9 million in principal.  It is unclear whether the difference between the two figures is accounted for by interest, fees and other amounts purportedly owed.

guarantors, and the lenders party thereto, as lenders (the "Prepetition CA ABL Facility" and, together with the Prepetition CA Term Facility, the "Prepetition CA Facilities");

- Approximately $45.7 million in obligations of the TX Debtors with respect to the Solid Waste Disposal Revenue Bonds (CarbonLite Recycling LLC Project), Series 2016 (AMT) bonds (the "Prepetition TX Bonds") issued by Mission Economic Development Corporation; and

- Approximately $71.8 million in obligations of the PA Debtors with respect to two series of bonds issued by the Pennsylvania Economic Development Financing Authority: the Solid Waste Disposal Revenue Bonds (CarbonLite P, LLC Project), Series 2019 and the Solid Waste Disposal Revenue Bonds (CarbonLite P, LLC Project), Series 2020 (collectively, the "Prepetition PA Bonds" and, together with the Prepetition CA Facilities and the Prepetition TX Facility, the "Prepetition Facilities" and the indebtedness thereunder, the "Prepetition Debt" and, each of the lenders with respect to the Prepetition Facilities, the "Prepetition Lenders").

The Prepetition Facilities are also summarized in the following chart:

| | Prepetition CA Term Facility | Prepetition CA ABL Facility | Prepetition TX Bonds | Prepetition PA Bonds |
|---|---|---|---|---|
| **CA Debtors** | Tranches A and C: $94 million Tranche B: $5.4 million[8] | $7.8 million | | |
| **TX Debtors** | | | $45.6 million | |
| **PA Debtors** | | | | $71.8 million in 2019 and 2020 Bonds |

8.    On March 18, 2021, the Debtors filed the Bid Procedures Motion.  The milestones under the Bid Procedures Motion are set forth below:

| Date | Milestone |
|---|---|
| April 8, 2021 at 1:00 p.m. | Bid Procedures Hearing |
| April 10, 2021 | • Deadline to File Bid Procedures Notice • Deadline to File Assumption and Assignment Notice |
| April 12, 2021 | Stalking Horse Bid Deadline |
| April 16, 2021 | Deadline to (i) Designate Stalking Horse Bidder(s) and (ii) Execute Stalking Horse Agreement(s) |

---

[8] A participation in the entire Tranche B is held by LF Investment Holdings, LLC, an entity owned by Leon Farahnik. Tranche B is not participating in the CA DIP Facilities or receiving a roll-up under the CA DIP Facilities.  *See* First Day Decl. ¶ 19.  See FN 7 above for comments on the principal amount purported to be outstanding under the Prepetition CA Term Facility.

| April 17, 2021 | Deadline to File (i) Stalking Horse Bidder Notice and (ii) Proposed Sale Order |
| --- | --- |
| April 26, 2021 at 4:00 p.m. | Deadline to Submit Qualified Bids |
| April 30, 2021 at 5:00 p.m. | Cure/Assignment Objection Deadline |
| May 1, 2021 at 4:00 p.m. | Deadline to File Auction Notice |
| May 3, 2021 at 10:00 a.m. | Sale Auction(s) |
| May 5, 2021 at 5:00 p.m. | Deadline to File Notice of Successful Bidder(s) and Backup Bidder(s) |
| May 6, 2021 at 4:00 p.m. | • Adequate Assurance Objection Deadline<br>• Deadline to Object to Sales |
| May 7, 2021 | Sale Hearing |
| May 22, 2021 | Deadline to Close Transaction(s) |

## OBJECTION TO DIP MOTIONS

9.      The proposed DIP Facilities impermissibly benefit the secured creditors at the expense of unsecured creditors by (i) giving the secured creditors a vice-like grip over the administration and ultimate outcome of the Debtors' chapter 11 cases without paying for the benefits that they are obtaining from Bankruptcy Code protection and (ii) granting secured creditors inappropriate and unnecessary protections and benefits over and above an already highly favorable financing package.

10.      Courts examining DIP financing proposals should assess "whether the proposed terms would prejudice the powers and rights that the [Bankruptcy] Code confers for the benefit of all creditors, thereby leveraging the chapter 11 process by granting a lender excessive control over the debtor or its assets to the prejudice of other parties in interest." *In re Berry Good, LLC*, 400 B.R. 741, 747 (Bankr. D. Ariz. 2008); *see also In re Def. Drug Stores, Inc.*, 145 B.R. 312, 317 (B.A.P. 9th Cir. 1992) ("[C]ourts look to whether the proposed terms would prejudice the powers and rights that the Code confers for the benefit of all creditors and leverage the Chapter 11 process by granting the lender excessive control over the debtor or its assets as to unduly prejudice the rights of other parties in interest."); *In re Laffite's Harbor Dev. I, LP*, No. 17-36191-H5-11, 2018 WL 272781, at *3 (Bankr. S.D. Tex. Jan. 2, 2018) ("While certain favorable terms may be permitted as a reasonable exercise of the debtor's business judgment, bankruptcy courts do not

10

allow terms in financing arrangements that convert the bankruptcy process from one designed to benefit all creditors to one designed for the unwarranted benefit of the postpetition lender.").

11.    A DIP financing will not be approved when "a creditor leverages a debtor in possession into making a concession unauthorized by, or in conflict with, the Bankruptcy Code as a condition for the requested credit."  *General Elec. Capital Corp. v. Hoerner* (*In re Grand Valley Sport & Marine*), 143 B.R. 840, 852 (Bankr. W.D. Mich. 1992); *see also In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 39 (Bankr. S.D.N.Y. 1990) ("Moreover, a proposed financing will not be approved where it is apparent that the purpose of the financing is to benefit a creditor rather than the estate . . . [C]ourts, correctly, examine all the facts and circumstances to determine if the estate is being benefitted rather than principally the pre-petition creditor.").  Here, the combination of provisions detailed below impermissibly convert the bankruptcy process from one designed to benefit, or at least protect, all creditors to one designed for the sole benefit of prepetition secured creditors.  Therefore, the Final Orders should be modified consistent with this Objection.

I.    **The DIP Facilities Stifle a Fair, Full and Well-Developed Process.**

12.    The DIP Facilities stifle a fair, full and well-developed process for maximizing the Debtors' value by imposing artificial and aggressive milestones, forcing events of default if the Debtors fail to comply with the DIP Lenders' self-serving process, underfunding the DIP Facilities, and failing to provide an adequate budget for the Committee.

13.    Each of the DIP Facilities handcuffs the Debtors to unrealistic case milestones or forces an Event of Default, thereby giving the DIP Lenders total control of the chapter 11 cases. Each requires this Court to approve bidding procedures by April 8, 2021, requires an auction to be conducted by May 7, 2021 and a sale transaction to be closed no later than May 22, 2021.  In addition, each DIP Facility requires the bid procedures, sale order and sale transaction to be acceptable to the applicable DIP Lenders, with the PA DIP Facility and the TX DIP Facility, ***going***

*so far as to require that the sale provide for payment of all prepetition obligations of, as applicable, the PA Debtors and the TX Debtors in cash*, unless the applicable DIP Lenders agree otherwise.

14.    Moreover, although the PA DIP Facility and the TX DIP Facility (but not the CA DIP Facilities with respect to the CA Debtors) permit the PA Debtors and the TX Debtors, respectively, to pursue a plan alternative, the proposed timeline for this process renders the option illusory.  The deadline to file a plan and disclosure statement is April 8, 2021, the deadline for a disclosure statement to be approved by the Court is May 23, 2021 and deadline for confirmation and effectiveness of a plan are July 6, 2021 and July 21, 2021, respectively.  Moreover, each of the PA DIP Facility and the TX DIP Facility only permit the plan option if the Debtors file an "Acceptable Disclosure Statement" and an "Acceptable Plan," *the latter of which requires payment in full in cash* on the effective date of all prepetition obligations of, as applicable, the PA Debtors and the TX Debtors unless the DIP Lenders agree otherwise and requires the plan to contain releases and exculpations of the applicable DIP Lenders and prepetition bondholders.  This plan "process" is illusory and unachievable.  Collectively, these provisions afford the DIP Lenders total control over the case – forcing the Debtors to run a process for the Lenders' sole and absolute benefit.

15.    The truncated process being proposed is hardly surprising given the DIP Lenders' significant underfunding of the cases.  The proposed DIP Facilities provide inadequate funding for these chapter 11 cases because (1) they do not adequately fund ongoing business operations, including critical vendor payments, and (2) they do not afford sufficient runway for foreign or strategic buyers to obtain regulatory approvals.  The Debtors entered bankruptcy without earmarked funding to procure adequate feedstock from critical vendors.  Without this funding,

single- and limited-source suppliers were foreseeably unwilling to continue supplying feedstock to the Debtors postpetition. ████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████ As proposed, the DIP budgets give the Debtors an 18 week runway to consummate a sale or plan of reorganization, assuming that the wind-down is funded from sale proceeds. The allotted runway—even as initially proposed—would not have permitted strategic and foreign buyers the time necessary to obtain antitrust and/or CFIUS approvals for their respective transactions (which could require four months or more ), even if a sale were approved on the Debtors' currently proposed timetable. ██

████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ and (2) the Debtors likely cannot consummate a sale to a strategic buyer before running out of runway, advantaging the Lenders and former owner in the sale process. A longer process, and funding sufficient to repair relationships with trade vendors, is necessary to address these concerns.

16.    The bankruptcy process should not be used *solely* to benefit secured lenders, and secured lenders should not be permitted to use the bankruptcy process for the limited purpose of foreclosing on their collateral for their benefit. *See In re Encore Healthcare Assoc.*, 312 B.R. 52, 54, 56 (Bankr. E.D. Pa. 2004) (denying a bidding procedures motion where "the sole purpose of which was to liquidate assets for the benefit of the secured creditor" and noting that an "asset sale

13

can easily be accomplished outside of bankruptcy either with the consent of the secured creditor or by abandoning the asset to the secured creditor to sell on its own"). Here, the DIP Motions work hand in glove with the Bid Procedures Motion (which requires consent of the secured creditors for a sale of the assets that constitute their prepetition collateral and DIP collateral) to set an expedited timetable to allow the Prepetition Lenders to foreclose on their purported collateral with little time or scrutiny from third parties, particularly the Committee.

17.    The Court should deny the DIP Motions unless each of the sale and plan milestones in each DIP Facility are extended to permit *all* restructuring options to be meaningfully explored for each of the Debtors. The extensions requested by the Committee are set forth below:[9]

| Deadline | Current Date | Requested Date |
|---|---|---|
| Entry of Bid Procedures Order | April 7, 2021 | April 8, 2021 |
| Filing of Plan and Disclosure Statement (PA and TX only) | April 8, 2021 | May 10, 2021 |
| Deadline for Auction | May 7, 2021 | June 7, 2021 |
| Deadline for Sale Hearing | May 9, 2021 | June 9, 2021 |
| Court Approval of Sale | May 12, 2021 | June 14, 2021 |
| Closing of Sale Transaction | May 22, 2021 | June 21, 2021 |
| Approval of Disclosure Statement | May 23, 2021 | June 22, 2021 |
| Approval of Confirmation Order (PA and TX only) | July 6, 2021 | August 5, 2021 |
| Effective Date of Plan (PA and TX only) | July 21, 2021 | August 18, 2021 |

---

[9] As set forth in the Bid Procedures Objection, the Committee is proposing shorter extensions for certain timelines in the Bid Procedures. However, it is important that there be room in the DIP milestones in case there are any delays with respect to a sale.

14

The Committee also believes that the CA DIP Facilities should be amended to permit a plan option on the same modified timeline as that proposed for the PA and TX DIP Facilities.

18.     Moreover, the DIP Lenders should not be permitted to declare defaults under the DIP Facilities based on milestones that are inconsistent with those ultimately approved by the Court, and the CA DIP Order should expressly acknowledge that the milestones set forth in the CA DIP Facility do not supplant the Debtors' fiduciary duty to pursue any value-maximizing transaction, including a reorganization.  Finally, the lenders under the TX DIP Facility and the PA DIP Facility should not be permitted to dictate the treatment of non-DIP claims through the guise of DIP facility events of default, especially treatment (payment of prepetition secured obligations in full in cash on the effective date of a plan) that is not required by Bankruptcy Code section 1129. "[A]sking the Court to approve a transaction that will fix now, some of the terms of a plan yet to be filed" is the hallmark of an impermissible sub rosa plan.  *In re LATAM Airlines Grp. S.A.*, 620 B.R. 722, 819 (Bankr. S.D.N.Y. 2020) (refusing to approve DIP facility tranche that provided for a 20% discount to plan value to stock on stock to be issued to insider DIP lenders as impermissible sub rosa plan).

## II.    **The DIP Facilities Are a Value Grab of the Debtors' Assets.**

19.     The DIP Lenders are inappropriately seeking to take all value for themselves through roll-ups, expansive DIP liens and adequate protection liens on unencumbered assets, and waivers of key unsecured creditor protections.

### A.    **The Court Should Not Approve the Roll-Ups.**

20.     Roll-ups are disfavored because they provide little or no economic benefit to a debtor and solely benefit prepetition lenders by circumventing the priorities and distribution framework of the Bankruptcy Code.  *See, e.g., Official Comm. of Unsecured Creditors of New World Pasta Co. v. New World Pasta Co.*, 322 B.R. 560, 569 n.4 (M.D. Pa. 2005) (stating that

roll-up provisions "have the effect of improving the priority of a prepetition creditor"); *In re Tenney Vill. Co.*, 104 B.R. 562, 570 (Bankr. D.N.H. 1989) (holding that § 364 does not authorize the granting of administrative expense priority for prepetition debt). Here, the 2:1 roll-ups contained in the PA DIP Facility and the CA DIP Term Facility should be denied.

21.    While courts will sometimes approve roll-ups based upon the specific facts and circumstances of a case, nothing here justifies the 2:1 roll-up[10] sought by the PA DIP Lenders and Orion (the "CA DIP Term Lender"). *First*, the DIP Facilities have been designed by the DIP Lenders for their own benefit, and they thus do not need extra inducement to lend. Funding and selling a going-concern business will undoubtedly enhance the value of the applicable Prepetition Lenders' collateral. This motive is even more salient for the PA DIP Lender, given that completing the PA Debtors' new production facility in Reading, Pennsylvania—and thus allowing the PA Debtors to ramp up operations—is vital to preserving the value of the collateral for both itself and the Prepetition PA Bonds. An unfinished, barely operational production facility is as useless to the PA lenders as it is to the PA Debtors.

22.    *Second*, as will be shown in the Kim Declaration, a 2:1 roll-up is, significantly, approximately double the roll-ups approved in comparable DIP financings.

23.    *Third*, if approved at a final hearing, $50 million of the Prepetition PA Bonds and $45.5 million of the Prepetition CA Term Facility will be repaid. The Debtors have not submitted any evidence to show that the Prepetition PA Bonds and Prepetition PA Facility are oversecured, and the pleadings filed by the Debtors in these cases are devoid of any references to a return to unsecured creditors. It is particularly inappropriate to permit the roll-up before the Debtors receive

---

[10] The roll-up sought by the CA DIP Term Lender *is in fact 2.3:1* (a $45.5 million roll-up for $20 million of new money).

potential stalking horse bids, which would provide an indication of market value for the Debtors' assets. Absent evidence that the Debtors are oversecured, which must be demonstrated on a facility-by-facility basis, the Court should deny the requested roll-ups, or the Prepetition Lenders may receive repayment of undersecured debt.

24.     *Fourth*, the roll-ups further exacerbate lender control over these chapter 11 cases and the Debtors and their estates by transforming tens of millions of dollars in potentially undersecured debt into debt with administrative priority that must be repaid in full to confirm a plan of reorganization, thus rendering any option other than the DIP Lenders' lightning-fast fire sale process virtually impossible to achieve.

**B.     If the Court Approves the Rolls-Ups, They Should be Subject To Disgorgement If Court Finds the Prepetition Debt Is Not Fully Secured.**

25.     If the Court approves any rollups in these cases, certain modifications should be made to the Final DIP Orders to protect the rights and interests of unsecured creditors and other parties-in-interest.  Specifically, if this Court eventually determines that the amount of the roll-ups was not fully secured following the successful prosecution of one or more claims against the CA Prepetition Secured Parties or the PA Prepetition Bondholders, language should be added to the Final DIP Orders to provide that (a) such portion of the roll-up is void and of no effect, and (b) UMB (in the case of the PA DIP Facility), Orion (in the case of the CA DIP Term Facility) and Leumi (in the case of the CA DIP ABL Facility), each in their individual capacity and in their capacities as agents for the applicable Prepetition Lenders and agents for the applicable DIP Lenders, and any Prepetition Lenders, shall be required to disgorge any principal, interest, fees or expenses (including adequate protection payments) paid to it on account of the roll-ups.

**C.     The DIP Facilities Improperly Grant the DIP Lenders Liens on Unencumbered Assets.**

26.     The DIP Lenders seek DIP liens and adequate protection liens on the proceeds of

17

avoidance actions brought under chapter 5 of the Bankruptcy Code and other similar provisions of applicable law.  This is improper here because there is ***no other obvious source of recovery for unsecured creditors***.  Avoidance actions and their proceeds are intended to benefit unsecured creditors and therefore should not be encumbered for the benefit of secured creditors.  *See Official Comm. of Unsecured Creditors v. Chinery (In re Cybergenics Corp.),* 330 F.3d 548, 573 (3d Cir. 2000) (finding "avoidance actions are designed to protect" the interests of "unsecured creditors"). Accordingly, courts have restricted the pledge of avoidance actions and proceeds as collateral. The primary reason for such restriction, as recognized by the Fifth Circuit, is that avoidance actions and their proceeds are to be reserved for unsecured creditors.  *See McFarland v. Leyh (In re Tex. Gen. Petrol. Corp.),* 52 F.3d 1330, 1335–36 (5th Cir. 1995) ("[T]he proceeds recovered in an avoidance action satisfy the claims of priority and general unsecured creditors before the debtor benefits. . . . The proceeds recovered in avoidance actions should not benefit the reorganized debtor; rather, the proceeds should benefit the unsecured creditors."); *see also Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm L.P. IV*, 229 F.3d 245, 250 (3d Cir. 2000) ("[A]ny recovery [under avoidance powers] is for the benefit of all unsecured creditors, including those who individually had no right to avoid the transfer.").

27.     Here the DIP Lenders' and Prepetition Lenders' attempt to take avoidance actions proceeds and other forms of recovery is particularly egregious, as they do not even make an exception for proceeds from causes of action against the Prepetition Lenders themselves.  It is inequitable to allow the Prepetition Lenders and the DIP Lenders to receive liens on and claims to what may be a source of recovery for unsecured creditors, particularly in light of the roll-ups, which give no new value to the estates and elevate prepetition claims into administrative expense claims.  Moreover, these provisions would render illusory the fundamental rights of the unsecured

18

creditors otherwise acknowledged by all parties and enshrined in the Interim DIP Orders to investigate and if appropriate avoid and/or recover in respect of prepetition debt. CA Interim DIP Order ¶ 31; TX Interim DIP Order ¶ 17; PA Interim DIP Order ¶ 17. If the value of a recovery to be paid by defendants would merely be turned over to those defendants, the utility of the recovery effort – here, a fundamental tenet of bankruptcy law – would be undermined. Moreover, granting liens to the DIP Lenders and Prepetition Lenders on avoidance action proceeds could allow those Lenders to collude with Leon Farahnik to bury prepetition claims against him ██████████████ ████████████████████████████████████████████████████████████████ ████████████████ while harrying unsecured trade creditors with preference claims. Therefore, the Committee objects to any liens on avoidance action proceeds.

28.     In addition to avoidance proceeds, there could also be other claims or causes of action that benefit the unsecured creditors which may be lost if the DIP Facilities' proposed liens on unencumbered assets are approved. Under the DIP Facilities, ***all*** prepetition claims or causes of action appear to be the subject of the DIP Lenders' postpetition liens. This would include commercial tort claims. However, based on the Committee's review of the Prepetition Facilities to date, there is no evidence that the Prepetition Lenders are properly perfected in any commercial tort claims.[11] The Committee therefore objects to granting DIP liens and adequate protection liens

---

[11] Under Article 9 of the Uniform Commercial Code, commercial tort claims are not "general intangibles"; rather, they constitute an independent category of collateral requiring special steps in order to obtain an effective security interest. A security interest does not attach to a commercial tort claim unless and until such claim is described with specificity in the underlying security documents between the parties. *See* UCC § 9-108(e)(1) (stating that a security agreement that purports to create a security interest in a commercial tort claim must describe such commercial tort claim specifically, rather than by any mere "description only by type of collateral"); UCC § 9-203(b)(3)(A). In other words, a secured party cannot obtain a security interest by simply referencing "all commercial tort claims" in the underlying security agreement. To obtain an effective security interest in a commercial tort claim, the subject commercial tort claim must be described with specificity and reliance on an after-acquired property clause is prohibited. See UCC § 9-204(b)(2) (stating that la] security interest does not attach under a term constituting an after-acquired property clause to . . . a commercial tort claim."). Based on the Committee's investigation to date, the none of the security documents governing the

on commercial tort claims, and the proceeds of any directors' and officers' insurance policies with respect to the same, which may also be sources of value for unsecured creditors, to the extent they are currently unencumbered.

### D.    The Proposed Adequate Protection Provisions Violate The Bankruptcy Code.

29.    The Interim DIP Orders provide several forms of adequate protection to the Prepetition Lenders.  The DIP Lenders to the CA DIP Facilities receive replacement liens, payment of fees, expenses and disbursements of their advisors, and superpriority administrative expense claims under Bankruptcy Code section 507(b).  CA Interim DIP Order  ¶ 14-15.  The TX DIP Lenders and PA DIP Lenders also receive the same adequate protection (including, with respect to the superpriority administrative expense claims, a claim under Bankruptcy Code section 503(b)), but will also receive interest payments on the Prepetition TX Bonds and Prepetition PA Bonds, as applicable, "including accrued and unpaid interest as of the Petition Date and interest accruing thereafter, which interest shall accrue at the non-default rate as set forth in the Prepetition Indenture and be payable in-kind in arrears on a monthly basis on the last business day of each month by being capitalized."  TX Interim DIP Order ¶ 9; PA Interim DIP Order ¶ 9.  The proposed adequate protection violates the Bankruptcy Code in several ways.

### (i)    Definition of Diminution in Value Is Overbroad

30.    The proposed adequate protection includes diminution in value resulting from the priming of prepetition liens.  But here, under each DIP Facility, the Prepetition Lenders are priming themselves not only with new money but – as a technical matter – with the roll-ups.  It is impermissible to include over $100 million in roll-ups (over $45 million under the CA DIP Term Facility, almost $8 million under the CA DIP ABL Facility and $50 million under the PA DIP

---

Prepetition Facilities contain any qualifying identification or specificity with respect to any commercial tort claims of the Debtors.

Facility) as an extra quantum of adequate protection claims for the applicable Prepetition Lenders. Such roll-ups – a **benefit** to insulate a large portion of the prepetition debt from cramdown treatment – cannot and do not constitute any actual diminution in value, rendering such rolls-up in violation of sections 361 and 507(b) of the Bankruptcy Code and applicable law. They should not be included in any calculation of diminution of value.

> **(ii)** **The Final DIP Orders Should Require Payment of Postpetition Interest, Fees, Costs and Charges To Be Recharacterized As Principal if the Prepetition Obligations Are Determined to be Undersecured.**

31.     A prepetition secured lender is entitled to payment of postpetition interest and reimbursement of legal fees and expenses only if and to the extent that it was oversecured prepetition. *See* 11 U.S.C. § 506(b). By the DIP Motions, the Debtors seek authorization to (i) pay interest, fees (including attorneys' fees), costs and expenses to the Prepetition Lenders with respect to the prepetition debt and (ii) in the case of the PA DIP Loan and the TX DIP Loan, to pay accrued and unpaid interest on the applicable bonds, and then monthly interest payments on the bonds (albeit payment-in-kind) under the guise of adequate protection against diminution in value of their prepetition collateral.

32.     Undersecured creditors are not entitled to postpetition interest on their prepetition claims, and cannot circumvent this prohibition simply by attempting to characterize interest payments or payments of fees, cost and expenses as adequate protection. *See United Savings Assoc. of Texas v. Timbers of Inwood Forest Assoc., Ltd.*, 484 U.S. 365, 372 (1988). The Supreme Court, in *Timbers of Inwood*, observed that allowing postpetition interest to undersecured creditors under the guise of adequate protection would render section 506(b) totally meaningless:

> If the Code had meant to give the undersecured creditor, who is thus denied interest on his claim, interest on the value of his collateral, surely this is where that disposition would have been sent forth, and not obscured within the "adequate protection" provision of § 362(d)(1). Instead of the intricate phraseology set forth

21

above, § 506(b) would simply have said that the secured creditor is entitled to interest "on his allowed claim, or on the value of the property securing his allowed claim, whichever is lesser." Petitioner's interpretation of § 362(d)(1) should be regarded as contradicting the carefully drawn disposition of § 506(b).

*Id*. at 373; *see also Baybank-Middlesex v. Radar Distributions, Inc., et al.*, 69 F.3d 1200, 1203 (1st Cir. 1995) ("We need not determine whether there was a failure of adequate protection because . . . an undersecured creditor [] is not entitled to postpetition fees and interest under § 506(b) . . . .").

33.    The Prepetition Lenders bear the burden of establishing that their prepetition loans are oversecured. *See* 11 U.S.C. § 363(p). They have not. Moreover, the Prepetition Lenders have not demonstrated that payment of their fees, expenses and (in the case of the PA DIP Loan and the TX DIP Loan) interest, as well as the fees and expenses of their professionals, are required to protect the Prepetition Lenders against the diminution in value of their prepetition collateral postpetition. Accordingly, the Prepetition Lenders are not entitled to (i) their own fees, (ii) reimbursement of their professionals' fees and costs or (iii) postpetition interest, in connection with the prepetition loans. If the Court should permit payment of such fees, costs and interest, the Court should require the Final DIP Orders to reclassify such payments as repayments of principal on the Prepetition Debt if undersecured.

**E.    The Court Should Cut Back The Extravagant DIP Economics.**

34.    The DIP Facilities provide for the following interest rates and fees:

|  | CA DIP Term Facility | CA DIP ABL Facility | PA DIP Facility | TX DIP Facility |
|---|---|---|---|---|
| **Interest Rate** | 11% per annum | 8% per annum | 12% per annum | 12% per annum |
| **Fees** | 3% discount rate with respect to principal amounts loaned under DIP Facility (applies to new money loans) | 2.00% closing fee (1.00% payable at closing; 1.00% at maturity) | 3% commitment fee on new money loans | 3% commitment fee on new money loans |

As will be set forth in the Kim Declaration, the all-in costs for the DIP Facilities range from 18% to 20%, whereas the comparable all-in market rate for DIP loans of a similar size to similar companies is in the 14% to 17% range.  These excessive fees should be reduced.

F.    **The Waivers in the DIP Facilities Are Premature and Overbroad.**

35.    Each of the DIP Facilities provides for waiver of (i) the Bankruptcy Code section 552(b) "equities of the case" exception, (ii) surcharge of collateral under Bankruptcy Code section 506(c) and (iii) waiver of marshalling.   The section 552(b) and section 506(c) waivers are premature and overbroad, while the marshalling waiver should simply be denied.

(i)    **Prospective Waiver of Section 552(b) Is Inappropriate.**

36.    Section 552(b) of the Bankruptcy Code provides that a secured lender's lien will attach to the proceeds of its collateral "except to any extent that the court, after notice and a hearing *and based on the equities of the case*, orders otherwise."  11 U.S.C. § 552(b) (emphasis added). The DIP Orders seek to waive this protection upon entry of final orders.  CA Interim DIP Order ¶ 41; TX Interim DIP Order ¶ 26; PA Interim DIP Order ¶ 26.

37.    This waiver is wholly inappropriate at this point in these Chapter 11 Cases.  The equities of the case exception is designed to "prevent secured creditors from receiving windfalls and to allow bankruptcy courts broad discretion in balancing the interests of secured creditors against the general policy of the Bankruptcy Code."  *In re Patio & Porch Sys., Inc.*, 194 B.R. 569, 575 (Bankr. D. Md. 1996).  The exception gives the court "considerable latitude in applying pre-petition security interests to post-petition proceeds." *United Va. Bank v. Slab Fork Coal Co.*, 784 F.2d 1188, 1191 (4th Cir. 1986); *In re DiToro*, 22 B.R. 392, 393 n.5 (Bankr. E.D. Pa. 1982) ("[S]ection 552(b) grants the bankruptcy court discretion, on equitable grounds, to modify or alter the security interest."); *In re Cybridge Corp.*, 304 B.R. 681, 690 (Bankr. D.N.J.), *aff'd*, 312 B.R. 262 (D.N.J. 2004).  Here, it is far too early to understand or prejudge how the Debtors' bankruptcy

23

cases will be resolved and whether an equities of the case argument would be appropriate against the Debtors' prepetition secured creditors.

38.     Given the fact-intensive, equitable nature of the exception, courts have declined to make final rulings on its applicability on an incomplete factual record. *See, e.g.*, *Slab Fork*, 784 F.2d at 1191 (remanding to supplement the record); *Sprint Nextel Corp. v. U.S. Bank Nat'l Ass'n (In re TerreStar Networks, Inc.)*, 457 B.R. 254, 272-73 (Bankr. S.D.N.Y. 2011) (declining to rule on basis of incomplete record). Moreover, even if a party could agree, in advance, not to assert the exception, the *Court* should not be bound to such a waiver. *In re Muma Servs., Inc.*, 322 B.R. 541, 558 (Bankr. D. Del. 2005) (engaging in section 552(b) equities of the case analysis).

39.     Consistent with the foregoing, many courts will not grant prospective waivers of the equities of the case exception in the face of Committee objections. *See, e.g.*, *In re Metaldyne Corp.*, No. 09-13412 MG, 2009 WL 2883045, at *6 (Bankr. S.D.N.Y. June 23, 2009) ("[T]he Court . . . declines to waive prospectively an argument that other parties in interest may make."); *In re Caesars Entm't Operating Co.*, No. 15-01145 (ABG) (Bankr. N.D. Ill. Mar. 25, 2015), § 19 [Dkt. No. 988] (final order excising 552(b) waiver for committee following objection); Hr'g Tr. at 110:14-17, *In re Trump Entm't Resorts, Inc.*, No. 14-12103 (KG) (Bankr. D. Del. Oct 6, 2014) [Dkt. No. 246] (declining to approve final order with 552(b) waiver).

40.     The Committee is not asking the Court to make any finding at this time regarding whether application of the "equities of the case" exception is appropriate. It is simply asking the Court to preserve the Committee's ability to make these arguments in the future and the Court's ability to grant such relief, if appropriate. While the Debtors may be free to waive their right to assert the "equities of the case" exception, neither the Court nor the Committee should be so limited.

### (ii)    Prospective Waiver of Section 506(c) Is Inappropriate.

41.    Section 506(c) of the Bankruptcy Code allows a debtor to recover from property securing a claim "the reasonable, necessary costs and expenses of preserving, or disposing of, such property." 11 U.S.C. § 506(c).  The DIP Orders seeks to waive this right.  CA Interim DIP Order ¶ 39; TX Interim DIP Order ¶ 25; PA Interim DIP Order ¶ 25.  These waivers are inappropriate.

42.    Section 506(c) is a rule of fundamental fairness for all parties in interest, providing that secured creditors share some of the burden of administrative expenses in a bankruptcy case where it is reasonable and appropriate for surcharges to be ordered.  *See Hartford Underwriters Ins. Co. v. Union Planters Bank*, N.A., 530 U.S. 1 (2000).  This section is designed to "prevent a windfall to the secured creditor . . . [Section 506(c)] understandably shifts to the secured party . . . the costs of preserving or disposing of the secured party's collateral, which costs might otherwise be paid from the unencumbered assets of the bankruptcy estate."  *Precision Steel Shearing, Inc. v. Fremont Fin. Corp. (In re Visual Indus., Inc.)*, 57 F.3d 321, 325 (3d Cir. 1995). In light of this, a number of courts have held that section 506(c) waivers are unenforceable.  *See, e.g., Hartford Underwriters Ins. Co. v. Magna Bank, N.A. (In re Hen House Interstate, Inc.)*, 150 F.3d 868, 872 (8th Cir. 1998) (concluding section 506(c) waiver was "unenforceable"), *vacated on other grounds*, 177 F.3d 719 (8th Cir. 1999); *In re Ridgeline Structures, Inc.*, 154 B.R. 831, 832 (Bankr. D.N.H. 1993) (noting section 506(c) waiver is "against public policy and unenforceable per se"); *McAlpine v. Comerica Bank- Detroit (In re Brown Bros. Inc.)*, 136 B.R. 470, 474 (W.D. Mich. 1991) (finding section 506(c) waiver was "not enforceable"); *In re Colad Grp., Inc.*, 324 B.R. 208, 224 (Bankr. W.D.N.Y. 2005) (finding no basis to "ignore" section 506(c)).

43.    In addition, in *Hartford Underwriters*, the United States Supreme Court ruled that only the debtor is vested with standing to seek administrative surcharges under section 506(c).  530 U.S. at 12.  Thus, if the Court were to approve the abrogation of the Debtors' section 506(c) rights,

all parties in interest could lose this valuable Bankruptcy Code protection.  Accordingly, the Committee requests that the advanced waiver of the Debtors' section 506(c) rights be stricken. Alternatively, if the Court is unwilling to strike the Debtors' waiver of their section 506(c) rights, the Committee should, in the final DIP orders, be explicitly vested with standing to seek a surcharge against the DIP collateral if the facts ultimately prove that a surcharge is appropriate. Providing the Committee with standing to seek a section 506(c) surcharge, if appropriate, will preserve estate assets for the benefit of all unsecured creditors.

**(iii)**    **The Marshalling Waiver Should be Denied.**

44.    "[Marshalling] requires the senior secured creditor to first collect its debt against the collateral other than that in which the junior secured creditor holds an interest, thereby leaving that collateral for the junior secured creditor's benefit."  *In re Advanced Marketing Servs.*, Inc., 360 B.R. 421, 427 n.8 (Bankr. D. Del. 2007).  Marshalling also "prevent[s] the arbitrary action of a senior lienor from destroying the rights of a junior lienor or a creditor having less security." *Meyer v. United States*, 375 U.S. 233, 237 (1963).  The DIP Orders seeks to waive this right.  CA Interim DIP Order ¶ 40; TX Interim DIP Order ¶ 27; PA Interim DIP Order ¶ 27.  These waivers are inappropriate.

45.    Analogous to the equitable doctrine of marshalling, if the Court permits the DIP Lenders to have liens on previously unencumbered collateral, the DIP Lenders should be required to look to assets that were subject to their prepetition liens before seeking satisfaction of the applicable DIP obligations from any previously unencumbered assets, the value of which would otherwise be available for the benefit of unsecured creditors.  Here, where no other obvious source of recovery for unsecured creditors is apparent, satisfaction of claims and liens from unencumbered assets (particularly in respect of avoidance action proceeds, commercial tort claims

26

and insurance proceeds arising from the same) – if such liens and claims are granted – should be the last available source of recovery under the DIP Facilities (particularly the roll-ups).

### G.    The DIP Facilities Do Not Adequately Provide For Wind-Down of the Estates or Payment of All Administrative Expense Claims.

46.    The currently filed DIP budgets do not contemplate a budget for winding down the estates or paying any Bankruptcy Code section 503(b)(9) claims.  This is particularly egregious in light of the Debtors' waiver under the DIP Facilities' of their section 506(c) surcharge rights, which could be a valuable source of funds to pay administrative expenses.  Under the Bankruptcy Code, administrative insolvency constitutes "cause" to convert a case from chapter 11 to chapter 7.  *See, e.g., In re Fleetstar LLC*, 614 B.R. 767, 781 (Bankr. E.D. La. 2020) (citing *In re BH S & B Holdings, LLC*, 439 B.R. 342, 349 (Bankr. S.D.N.Y. 2010) ("Although section 1112(b)(4) does not list administrative insolvency as a cause to convert or dismiss a chapter 11 case, a court may still consider this factor."); *In re JER/Jameson Mezz Borrower II, LLC*, 461 B.R. 293, 306 (Bankr. D. Del. 2011) ("Allowing such a case to remain in chapter 11 when it is administratively insolvent is not appropriate.").  The Lenders have chosen to avail themselves of the benefits of the chapter 11 process , and thus should provide budgets reasonably calculated to fund a solvent chapter 11 process.  The Court should not approve financing and a sales process that does not ensure the estates remain administratively solvent.

### III.    The DIP Lenders and the Prepetition Lenders Are Seeking to Avoid Scrutiny of Their Prepetition and Postpetition Actions.

47.    In order for the Committee to properly and adequately meet its fiduciary duty to investigate matters relating to the Debtors' prepetition secured creditor relationships and otherwise diligently carry out its statutory duties, various provisions of the proposed Final DIP Orders require modification.

48.     The Committee's fiduciary role is of paramount importance in the chapter 11 reorganization process, and it is essential that the Committee professionals are not artificially restrained from aiding the Committee in fulfilling that role.  *See In re Channel Master Holdings, Inc.*, 2004 Bankr. LEXIS 576 (holding that a $75,000 cap on committee's professional fees under a DIP facility was unreasonable compared to the larger budgets for other professionals in the case and determining that the cap on the committee's fees provided for inadequate compensation).  This is so because courts recognize that the bankruptcy process works most effectively when it is a truly and adversary process, with debtor and creditor constitutes both adequately represented. See *In re Ames Dep't Stores, Inc*., 115 B.R. at 38 ("Absent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced.").

A.     **The Budgeted Amounts for Committee Professionals In These Cases Are Inadequate and Inappropriate.**

49.     The budgeted amounts the Debtors have allocated to pay the Committee professionals' fees in these cases are inadequate and inappropriate.  The latest budgets provided to the Committee by the Debtors provide for the following professional fees over an 18 week period: (i) Debtors: $8,720,000; (ii) DIP Lenders and Prepetition Lenders: $7,040,000; and (iii) Committee: $1,200,000.  Indeed, the budget for professionals for Orion, the CA DIP Term Lender, is an astonishing $3,240,000 for counsel and $600,000 for a financial advisor over that 18 week period.[12]  The Debtors and their lenders have designated this unreasonably low limit on payment of Committee professionals' fees (mere 13.8% of the Debtor professional fees and 17% of the

---

[12] In light of this, The DIP Lenders' professionals should be required to provide time entries (not just summary invoices) to the Debtors, the U.S. Trustee and the Committee.  Given the lavish budget provided to the DIP Lenders' professionals in the DIP Facilities budgets, the U.S. Trustee and the Committee need assurance that the DIP Lenders are not inappropriately seeking de facto expense reimbursement for a stalking horse credit bid by including in the DIP budget an expense reimbursement to which it would be entitled only (i) if it is the stalking horse; (ii) if it loses the auction and (iii) up to the limits prescribed in a bidding procedures order.

Lender professional fees) in an attempt to correspondingly limit the performance of the Committee professionals in a case in critical need of just such an exercise. The Debtors' and DIP Lenders' attempt to cripple the Committee's task is transparent. The Committee respectfully submits that 40% of the aggregate budgeted fees and costs for the Debtor professionals—or $3,500,000— would constitute a more reasonable and appropriate allocation to Committee professional fees given the complexity of these chapter 11 cases.

     **B.**      **The Carve-Outs Are Insufficient, Discriminatory and Should be Fully Funded Following a Sale.**

     50.     The CA Interim DIP Order currently provides for a $500,000 carve-out for payment of the fees of case professionals (both Debtor and Committee professionals) following an event of default. The PA Interim DIP Order and the TX Interim DIP Order include just $250,000 each for this purpose. All of the DIP Orders allocate just one-fifth of the post-default carveout available to Committee professionals, with the remainder going to Debtor professionals. While the Committee and the Court have insufficient evidence to determine whether the proposed post-default carve-out amounts for professional fees will be adequate to respond to such events of default and/or wind down the estates' operations and conclude these cases following an event of default, these Carve-Outs appear to be patently insufficient for cases of this size and complexity, particularly in light of the significant inter-debtor issues that will likely arise.[13] Accordingly, the Committee submits that the post-default carve-outs should be doubled to $1,000,000 for the CA DIP Facilities and

---

[13] At the first day hearing held on March 10, 2021, Richard Pachulski, lead counsel for the Debtors, told the Court "When I was first retained by the company and learned more about this, ***one of the first things I said was based on the complexity of this case, we were missing a zero***. And the DIP issue is a major reason why we're missing the zero." Mar. 9, 2021 Hr'g Tr. 7:24-8:3. These chapter 11 cases involve issues of the same complexity as in restructurings of multinational corporate groups with billions of dollars of debt on the balance sheet. A larger carve-out is thus appropriate.

\\LA - 764615/000002 - 2086958 v9

$500,000 each for the PA DIP Facility and the TX DIP Facility.  Moreover, the post-default professional fee carve-out should be equally available to Debtor and Committee professionals.

51.    Finally, the lien priorities in the CA DIP ABL Facility should be modified to provide that the carve-out ranks ahead of the DIP ABL Liens, the Prepetition ABL Liens and the Prepetition Adequate Protection Liens, whereas at the moment it currently ranks behind them in priority.  CA Interim DIP Order, Exhibit B.

### C.    The Committee's Investigation Budget Is Too Restrictive.

52.    In a transparent attempt by the DIP Lenders to limit the Committee's ability to investigate the validity and extent of the Prepetition Lenders' liens, the Final DIP Orders propose to limit the funds available to the Committee to investigate such claims to $75,000 under each of the CA DIP Facilities and $50,000 under each of the PA DIP Facility and the TX DIP Facility.

53.    In light of the importance of the Committee's investigation in these Chapter 11 Cases, which are premised upon a sale of substantially all of the Debtors' assets in which one or more of the Prepetition Lenders may be credit bidders, the Committee needs ample time, and an adequate budget, to determine whether the Prepetition Lenders' claims and liens are valid and whether there exists any unencumbered assets that could provide for a recovery to unsecured creditors.

54.    The current investigation budgets are inadequate and should be increased by $50,000 per DIP Facility to $125,000 for each of the CA DIP Facilities and $100,000 for each of the PA DIP Facility and the TX DIP Facility.  The current caps are significantly lower than those allowed in similarly complex chapter 11 cases.  *See, e.g., In re Molycorp, Inc.*, 15- 11357 (CSS) (Bankr. D. Del. Jul. 24, 2015) [Docket No. 278] ($250,000 cap); *In re Local Insight Media Holdings, Inc.*, 10-13677 (KG) (Bankr. D. Del. Dec. 29, 2010) [Docket No. 228] ($200,000 cap); *In re R.H. Donnelley Corp.*, 09-11833 (KG) (Bankr. D. Del. Jun. 25, 2009) [Docket No. 147]

($250,000 cap); *In re Aleris Int'l, Inc.*, 09-10478 (BLS) (Bankr. D. Del. Mar. 18, 2009) [Docket No. 299] ($300,000 cap); *In re Goody's Family Clothing, Inc.,* 08-11133 (KJC) (Bankr. D. Del. Jul. 16, 2008) [Docket No. 317] ($250,000 cap); *In re WCI Communities, Inc.*, 08-11643 (KJC) (Bankr. D. Del. Sept. 23, 2008) [Docket No. 409] (same); *In re Semcrude, L.P.*, 08-11525 (BLS) (Bankr. D. Del. Sept. 18, 2008) [Docket No. 1420] (same); *In re Werner Holding Co. (DE), Inc.*, 06-10578 (KJC) (Bankr. D. Del. Jul. 25, 2006) [Docket No. 252] (same).  The investigation budgets should therefore be increased as requested in this paragraph.

55.    In addition, the Final DIP Orders should expressly provide that, notwithstanding the investigation budgets, the Committee's professionals are permitted to seek allowance and payment, as administrative expenses, of any amounts expended in excess of the investigation budgets.  While the Prepetition Lenders and DIP Lenders may want to impose limitations on the quantum of cash collateral and proceeds of the DIP Facilities that may be used to pay professional fees that may be incurred to their potential detriment, there is no basis to restrict the Committee's ability to pursue its entitlement to an administrative expense claim for reasonable fees and expenses incurred by its professionals. *See, e.g.*, *In re iHeartMedia, Inc.*, No. 18-31274 (MI) (Bankr. S.D. Tex. Jun. 7, 2018) [Docket No. 918] (providing that amounts incurred by the committee's professionals in excess of the investigation budget constituted, subject to court approval, allowed administrative expenses); *In re Sandridge Energy, Inc.*, No. 16-32488 (DRJ) (Bankr. S.D. Tex. Jul. 5, 2016) [Docket No. 464] (same); *In re Aegean Marine Petroleum Network Inc.*, No. 18-13374 (MEW) (Bankr. S.D.N.Y. Jan. 15, 2019) [Docket No. 290] (same); *In re Breitburn Energy Partners LP*, No. 16-11390 (SMB) (Bankr. S.D.N.Y. Aug. 19, 2016) [Docket No. 431] (same); *In re Chemtura Corp.*, No. 09-11233 (REG) (Bankr. S.D.N.Y. Apr. 29, 2009) [Docket No. 281] (same); *see also In re Beauty Brands, LLC*, No. 19-10031 (CSS) (Bankr. D. Del.

31

Jan. 30, 2019) [Docket No. 219] (expressing Chief Judge Sontchi's view on the record of the hearing that a judge has discretion with respect to how "pain [is] to be shared").

### D.    The Challenge Period and Prepetition Lender Releases Should Be Modified.

56.    While the Committee recognizes that a 75-day challenge period from the date of entry of an interim DIP order is in line with the local rules, certain modifications to the challenge period provisions are required. Each Final DIP Order should be revised to ensure sufficient standing of the Committee to challenge prepetition liens and claims.  As such the Committee requests that each Final DIP Order be revised to include the following language.

> Nothing herein shall limit the Committee's ability to (x) file a motion in respect of any timely Challenge Proceeding for which it cannot obtain standing as a matter of law because the applicable Debtor is a limited liability company (an "***LLC Challenge Motion***"), and (y) seek pursuant to such LLC Challenge Motion a mechanism by which to prosecute such Challenge.  If the Committee files an LLC Challenge Motion for which it cannot obtain standing, the expiration of the Challenge Period solely for the specific Challenge Proceeding set forth in the LLC Challenge Motion shall be tolled pending further order of the Court, and applicable parties shall meet and confer with respect to an appropriate process for the prosecution of any such Challenge Proceeding.  If timely notified of a Challenge Proceeding for which the Committee cannot gain standing because the applicable Debtor is a limited liability company, the Debtors (or a designated representative) shall retain the authority to prosecute such Challenge Proceeding in the exercise of their business judgment and subject to any applicable further order of the Court.

*Third*, in order to effectively preserve the Committee's challenge rights, the Final DIP Orders should specify that the proceeds of any sale of the Debtors' assets shall not be paid to the Prepetition Lenders on account of Prepetition Debt or to any DIP Loans representing rolled-up Prepetition Debt unless and until the lien challenge period has expired without a lien challenge having been filed, or if a lien challenge action is filed, until such action is resolved by a final non-appealable order. *Fourth*, as insider Leon Farahnik, the Debtors' CEO, holds a participation in the entire Tranche B of the Prepetition CA Term Facility through his controlled entity LF Investment Holdings, LLC, Tranche B should expressly be excluded from the Debtors' stipulations in the CA

DIP Facilities and the releases with respect to the Prepetition CA Facilities should expressly exclude Leon Farahnik, any entity that he owns or controls and any other insiders.

## OBJECTION TO BID PROCEDURES MOTION

57.     Bidding procedures must be designed to ensure that the process does not discourage potential bidders from participating in the process.  *See In re O'Brien Env't Energy, Inc.,* 181 F.3d 527, 535-37 (3d Cir. 1999) (recognizing that more competitive bidding will bring greater benefit to the estate).   As submitted, the Bid Procedures deter competitive bidding and provide unnecessary and unwarranted bid protections for any Stalking Horse Bidder.

### A.     The Milestones Should be Extended

58.     For the reasons set forth in the objection to the DIP Motions, certain milestones in the Bid Procedures should be delayed to permit the Committee, which has only recently been appointed, the opportunity to test whether there are better or alternative value maximizing options for the estates.  The proposed changes are set forth in the chart below.

| Milestone | Current Date | Proposed New Date |
|---|---|---|
| Bid Procedures Hearing | April 8, 2021 at 1:00 p.m. | Same |
| • Deadline to File Bid Procedures Notice<br>• Deadline to File Assumption and Assignment Notice | April 10, 2021 | Same |
| Stalking Horse Bid Deadline | April 12, 2021 | Same |
| Deadline to (i) Designate Stalking Horse Bidder(s) and (ii) Execute Stalking Horse Agreement(s) | April 16, 2021 | April 26, 2021 |
| Deadline to File (i) Stalking Horse Bidder Notice and (ii) Proposed Sale Order | April 17, 2021 | April 27, 2021 |
| Deadline to Submit Qualified Bids | April 26, 2021 at 4:00 p.m. | May 17, 2021 at 4:00 p.m. |
| Cure/Assignment Objection Deadline | April 30, 2021 at 5:00 p.m.[14] | June 4, 2021 at 4:00 p.m. |
| Deadline to File Auction Notice | May 1, 2021 at 4:00 p.m. | May 24, 2021 at 4:00 p.m. |

---

[14] The Bid Procedures inconsistently state this deadline as 4:00 p.m. and 5:00 p.m.

| Milestone | Current Date | Proposed New Date |
|---|---|---|
| Sale Auction(s) | May 3, 2021 at 10:00 a.m. | May 25, 2021 at 10:00 a.m. |
| • Deadline to File Notice of Successful Bidder(s) and Backup Bidder(s)<br>• Deadline to finalize | May 5, 2021 at 5:00 p.m. | May 28, 2021 at 5:00 p.m. |
| • Adequate Assurance Objection Deadline<br>• **Deadline to Finalize Potential Assumed/Assigned Contracts and Cure Schedule [NEW PROPOSED DEADLINE]** | May 6, 2021 at 4:00 p.m. | June 4, 2021 at 4:00 p.m. |
| Sale Hearing | May 7, 2021 | June 7, 2021 |
| Deadline to Close Transaction(s) | May 22, 2021 | June 21, 2021 |

59.     Extending the deadline to designate the Stalking Horse Bidder by 10 days (from April 16, 2021 to April 26, 2021) will inject unsecured creditors into the DNA of the sale process by allowing time to negotiate the treatment of unsecured creditors (including assumption of vendor contracts and assumption of trade liabilities) as a critical component in selecting a Stalking Horse Bidder.  Likewise, extending the deadline to submit Qualified Bids by three weeks to May 17, 2021 will foster competitive tension by allowing time to negotiate with potential bidders, as well as to explore alternative options. █████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ The DIP Lenders, who have chosen to use the bankruptcy process and the significant advantages that it provides rather than foreclose, must provide the time (and funding necessary) to explore this opportunity and others that may exist.  Finally, as described in more detail below, the assumption and assignment procedures must be amended to provide contract counterparties with meaningful

time to assess the Successful Bidder and proposed adequate assurance and determine whether to object.

**B.    The Lenders Should Not Be Consent Parties**

60.    The proposed Bid Procedures define "Consent Parties" as follows:

(i)    with respect to the assets of the CA Debtors (including the Riverside Facility and the PinnPack Facility), the CA Prepetition Secured Parties, DIP ABL Lender, and DIP Term Lender (collectively, the "CA Secured Parties");

(ii)    with respect to the assets of the TX Debtors (including the Dallas Facility), the requisite TX Prepetition Secured Parties and the requisite TX DIP Secured Parties (the "TX Secured Parties"); and

(iii)    with respect to the assets of the PA Debtors (including the Reading Facility), the requisite PA Prepetition Secured Parties and the requisite PA DIP Secured Parties (the "PA Secured Parties" and, together with the CA Secured Parties and the TX Secured Parties, the "Secured Parties").

Bid Procedures, Section B.3.  The rights of the Consent Parties include (i) selecting the stalking horse bidder (Proposed Bid Procedures Order ¶ 7; Bid Procedures, Section B.1), (ii) determining what form of consideration is acceptable for the Purchase Price (Bid Procedures, Section C.2.iv) and (iii) whether an auction takes place (Bid Procedures, Section D).

61.    These consent rights will chill bidding because the DIP Lenders and Prepetition Lenders can veto any stalking horse bid in favor of a credit bid, even if the stalking horse (or stalking horses) offers a sufficiently attractive price to repay both their DIP Loans and Prepetition Debt in full.  If the Debtors are able to satisfy one of the grounds set forth in section 363(f) to permit a sale free and clear of the liens and claims of the DIP Lenders and Prepetition Lenders, the Debtors should not be restricted from doing so.  The DIP Lenders and Prepetition Lenders should not, through the Bid Procedures, receive greater rights than the Bankruptcy Code gives them.

35

62.     Recognizing the obvious conflict of interest involved in the Lenders being both potential bidders and Consent Parties, the Debtors include procedures that purport to address this issue:

> Notwithstanding the foregoing, to the extent that any Secured Party submits a credit bid for one or more of the Facilities, such Secured Party's respective rights as a Consent Party and Consultation Party shall be terminated solely with respect to Bids related to the same Facility or Facilities as that for which the Secured Party submitted a credit bid, and the Debtors shall establish reasonable procedures to prevent such Secured Party or its representatives from being privy to confidential information concerning the Bids of other Bidders for such Facility or Facilities for so long as such Secured Party remains a Bidder; provided, however that (i) any Secured Party who submits a credit bid and later withdraws such Bid shall immediately resume being treated as a Consent Party and Consultation Party, as applicable, for purposes of these Bid Procedures and (ii) any Secured Party who does not submit a credit bid shall at all times be a Consent Party and Consultation Party, as applicable, for purposes of these Bid Procedures.

However, these procedures do not achieve this purpose. *First*, the applicable Secured Party does not cease to be a Consent Party or Consultation Party with respect to any production facility for which it is not submitting a bid. The Secured Party will therefore have the right to be consulted about bids for other production facilities, which is likely to give it a competitive advantage by providing information on the level of bidding for the other facilities and insight into the bidding competition generally. *Second*, the Bid Procedures do not prevent a Secured Party from withdrawing a credit bid, obtaining sensitive bidding information, and then renewing its credit bid. *Third*, there is no justification for a Secured Party to be a Consultation Party with respect to any bid for any production facility that is not for its collateral. The Prepetition Lenders and DIP Lenders have, in multiple contexts in this case, insisted on rigid separation of the CA Debtors, the TX Debtors and the PA Debtors. There are separate DIP loans, separate DIP budgets, and the Lenders have even insisted on case professionals billing to separate billing numbers for tasks for

36

separate Debtors.[15]  In light of this, and because the lenders are ***not even creditors of the Debtors to whom they are not lenders***, the bid procedures should be modified to prohibit a Secured Party from (i) being a Consent Party, (ii) being a Consultation Party with respect to any bid that does not involve its collateral, (iii) being a Consultation Party for any purpose for so long as it is a bidder and (iv) renewing its bid if it withdraws a credit bid.  They should also be modified to provide that no Secured Party may be a Consultation Party with respect to any Debtor or Facility against which it does not hold a perfected lien.

63.     Moreover, if an auction takes place, the auction procedures provide that "Unless the Successful Bid(s) in the aggregate provide for cash consideration sufficient to pay in full the debt and debt securities of the applicable Secured Parties (with respect to each applicable Facility), the selection of, and the terms of, the Successful Bid(s) must be acceptable to the applicable Secured Parties."  As with the "Consent Rights," the Lenders should not receive greater rights than under the Bankruptcy Code.  If a third-party makes a bid that provides value for unsecured creditors by say, assuming significant vendor liabilities and vendor contracts, the Debtors should be entitled to rely on any applicable basis permitted under section 363(f) to sell free and clear of the Lenders' liens.  The Lenders are free to argue that, because the Debtor cannot satisfy section 363(f)(3) ("such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property"), the Court should not allow a free and clear sale.  Likewise, if the Lenders believe that bids for their collateral are too low, they are free to credit bid to the extent permitted by section 363(k).

---

[15] See, e.g., *Debtors' Motion for an Administrative Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals* [D.I. 108] ¶ 10 ("All Professionals proposed to be compensated, in whole or in part, on an hourly basis shall maintain separate time entries with respect to tasks performed with respect to each of: (i) the CA Debtors; (ii) the TX Debtors; (iii) the PA Debtors; and (iv) all Debtors.")

**C.**     **The Bid Protections Are Excessive and Should be Limited to a Total of 3% of the Cash Purchase Price.**

64.     Bid protections in bankruptcy cases are not presumptively valid.  *See In re O'Brien Env't Energy, Inc.*, 181 F.3d at 534-35.  Break-up fees and expenses are only appropriate when there is evidence that "the fees were actually necessary to preserve the value of the estate."  *Id.* at 535; *see also In re Reliant Energy Channelview LP*, 403 B.R. 308, 311 (D. Del. 2009), *aff'd*, 594 F.3d 200, 210 (3d Cir. 2010).

65.     The Bid Procedures provide for a 3% break-up fee with respect to the cash purchase price and expense reimbursement of up to $350,000 per production facility for a stalking horse, which could lead to a maximum expense reimbursement of $1,400,000 for a bidder selected as stalking horse for all four facilities, who ultimately is not the winning bidder.  Proposed Bid Procedures Order ¶ 6; Bid Procedures, Section B.1.  As will be set forth in the Kim Declaration, the market standard for aggregate bid protections in comparable cases is 3% of the purchase price, so the Bid Procedures must be modified to provide that a stalking horse bidder is entitled only to aggregate bid protections (break-up fee plus expense reimbursement) equal to not more than 3% of the cash purchase price (with the expense reimbursement component to be limited to no more than $250,000).  The current bid protections are excessive and will likely chill bidding by increasing the required overbid amounts.[16]  The Debtors should also be required return to Court and obtain approval of all of the bid protections (both break-up fee and expense reimbursement)

---

[16] The Committee believes that it has reached an agreement with the Debtors and DIP Lenders that the minimum overbid increments be reduced by 50% (from $500,000 to $250,000 for a Riverside or PinnPack bid; from $250,000 to $125,000 for a TX Facility or PA Facility bid; from $500,000 to $250,000 for a bid for both the TX Facility and PA Facility; and from $1,000,000 to $500,000 for a bid for two or more production facilities other than a bid solely for the TX Facility and the PA Facility).  If the Bid Procedures Order does not contain these modifications, the Committee objects to the overbid increments as being unnecessarily high and inclined to chill bidding.

after a stalking horse bidder has been selected, as opposed to having them pre-approved by the Court.

       **D.**     **Adequate Assurance Procedures.**

     66.     The Bid Procedures Motion and the Bid Procedures require Cure Objections and Assignment Objections to be filed on or before April 30, 2021. [17]  However, the notice of Successful Bidder will not be filed until May 5, 2021 (Bid Procedures Motion ¶ 4) and the Successful Bidder is not required to provide public evidence of adequate assurance of future performance until the May 7, 2021 sale hearing (Bid Procedures Motion ¶ 29).  This puts a significant burden on contract and lease counterparties, who will be forced to object to assumption and assignment without any information on the identity of the Successful Bidder or its financial wherewithal.  The timelines should be modified to require the Debtors to provide the identity of the Successful Bidder and adequate assurance information to counterparties to Transferred Contracts at least 5 business days before the Cure/Assignment Objection Deadline.

     67.     Also, the Bid Procedures permit the Debtors to add and remove executory contracts from the Potential Assumed/Assigned Contract and Cure Schedule at any time prior to Closing of any Sale.  *Id.* ¶ 23 n. 7; Bid Procedures, Section II.  This is unfair to contract counterparties, who will be left in the dark about whether or not the Debtors propose to assume their contracts and assign them to the Successful Bidder and may incur significant expense objecting to a contract that the Debtors ultimately remove from the list.  The Bid Procedures should require the Debtor to fix the list no later than the date that the Successful Bidder is announced.

---

[17] The Debtors should clarify whether the deadline is 4:00 p.m. (ET) or 5:00 p.m. (ET) because both deadlines are referenced in the Bid Procedures.

**E.**    **Objection to Limited Cash Sale Proceeds**

68.    Further, the Bid Procedures fail to address the liquidity needed to fund distributions under a confirmable and feasible chapter 11 plan.  The Debtors should not be permitted to sell their assets solely to pay down their secured indebtedness.  Bids should include a cash component sufficient (a) to satisfy all Chapter 11 administrative expenses and priority claims as part of a Chapter 11 plan, (b) to provide sufficient funding for the plan process and the expenses that will accrue during the post-confirmation or post-closing wind-down period, and (c) to provide for a recovery for unsecured creditors sufficient to fund a distribution under a confirmable and feasible Chapter 11 plan.  *See* Hr'g Tr. (D.I. 224) at 100, *In re NEC Holdings Corp.*, Case No. 10-11890 (PJW) (Bankr. D. Del. July 13, 2010) (requiring that secured creditors pay the "freight" of the bankruptcy by ensuring an administratively solvent estate).

**F.**    **Credit Bidding.**

69.    The Bid Procedures must expressly state that the Lenders' credit bid rights are confined to the rights provided by Bankruptcy Code section 363(k) and are subject to expiry of the lien challenge period, or if a lien challenge action has been filed, resolution of such action by a final non-appealable order.

## RESERVATION OF RIGHTS

70.    This Objection is without prejudice to, and the Committee hereby fully reserves, its right to raise additional arguments in respect of the DIP Facilities, the DIP Motions, any final order approving the DIP Motions the DIP Motions, the Bid Procedures Motion, the Bid Procedures and the Sale.  The Objection is also without prejudice to the Committee's right to seek other appropriate relief, including reconsideration of the relief granted in the Interim DIP Orders.

\\LA - 764615/000002 - 2086958 v9

## <u>CONCLUSION</u>

WHEREFORE, the Committee respectfully requests that the Court enter an order (i) denying the DIP Motions on a final basis or, alternatively, modifying the terms of the Debtors' DIP Facilities and DIP Orders in a manner consistent with the relief requested herein, (ii) denying the Bid Procedures Motion, or alternatively, modifying the Bid Procedures in a manner consistent with the relief requested herein, and (iii) granting such other and further relief as the Court deems just.

*[Remainder of Page Intentionally Left Blank]*

\\LA - 764615/000002 - 2086958 v9

Dated: April 5, 2021

Respectfully submitted,

**BLANK ROME LLP**

*/s/ Stanley B. Tarr*
Regina Stango Kelbon (DE No. 5444)
Stanley B. Tarr (DE No. 5535)
Jose F. Bibiloni (DE No. 6261)
1201 Market Street, Suite 800
Wilmington, Delaware 19801
Telephone:    (302) 425-6400
Facsimile:    (302) 425-6464
E-mail:        Kelbon@BlankRome.com
                Tarr@BlankRome.com
                JBibiloni@BlankRome.com

-and-

**HOGAN LOVELLS US LLP**
Erin N. Brady
David P. Simonds
Edward McNeilly
1999 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone:    (310) 785-4600
Facsimile:    (310) 785-4601
Email:        erin.brady@hoganlovells.com
                david.simonds@hoganlovells.com
                edward.mcneilly@hoganlovells.com

-and-

Kevin J. Carey
1735 Market St., Floor 23
Philadelphia, PA 19103
Telephone:    (267) 675-4600
Facsimile:    (267) 675-4601
Email:        kevin.carey@hoganlovells.com

*Proposed Counsel to the Official Committee of Unsecured Creditors*

\\LA - 764615/000002 - 2086958 v9