IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>CARBONLITE HOLDINGS LLC, *et al.*,[1]<br><br>          Debtors. | Chapter 11<br><br>Case No. 21-10527 (JTD)<br><br>(Jointly Administered) |

**DECLARATION OF EDWARD KIM IN SUPPORT OF COMBINED OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO THE TX/PA DIP MOTION, THE CA DIP MOTION AND THE BID PROCEDURES MOTION**

I, Edward Kim, declare pursuant to 28 U.S.C. § 1746 and under penalty of perjury as follows:

**I. BACKGROUND AND QUALIFICATIONS**

  1. I am over the age of 18, competent to testify, and authorized to submit this declaration (this "Declaration") in support of the above-captioned debtors and debtors in possession (collectively, the "Debtors") in support of the *Combined Objection of the Official Committee of Unsecured Creditors to the TX/PA DIP Motion, the CA DIP Motion and the Bid Procedures Motion* [D.I. 180] (the "Objection").[2]

  2. I am a Managing Director of Province, LLC ("Province"), which is the proposed financial advisor for the Official Committee of Unsecured Creditors of CarbonLite Holdings, LLC, *et al.* (the "Committee").

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: CarbonLite Holdings LLC (8957); CarbonLite Industries LLC (3596); CarbonLite P Holdings LLC (8957); CarbonLite P LLC (5453); CarbonLite PI Holdings LLC (8957); CarbonLite Pinnpack LLC (8957); CarbonLite Recycling Holdings LLC (8957); CarbonLite Sub-Holdings, LLC (8957); Pinnpack P, LLC (8322); CarbonLite Recycling LLC (3727); and Pinnpack Packaging LLC (9948). The address of the Debtors' corporate headquarters is 10250 Constellation Blvd., Los Angeles, CA 90067.

[2] Capitalized terms used but not defined in this Declaration shall have the meanings ascribed to such terms in the Objection.

3.     Except as otherwise indicated, all statements in this Declaration are based upon my personal or expert knowledge, my review of the Debtors' financial records, relevant documents, and other information prepared or collected by the Debtors' representatives and provided to the Committee, or my expert opinion based on my experience with or analysis of companies similarly situated to the Debtors.

4.     I have 20 years of experience in financial advisory, acquisitions, and corporate finance, with a specialization in healthcare services and in commercial real estate.  Prior to joining Province, I worked at Alvarez & Marsal, where I executed distressed M&A sale processes.  During my career, I have served in numerous capacities as a financial advisor in bankruptcy-related matters, representing debtors and unsecured creditors, as well as unsecured creditor committees.  The bankruptcies I have been involved with cover various industries, including retail, restaurants, healthcare, consumer goods, and energy.  I have extensive experience evaluating operating and financing budgets, projections, cash flows, and debtor-in-possession financing facilities in bankruptcy matters, including assessing market comparables by utilizing industry-standard methodologies.  I received a B.A. in Economics from Columbia University in 1998.

5.     I have previously submitted expert reports in insolvency matters involving Inspirada Builders, LLC (two expert reports on matters related to the non-performance of a member of a syndicate of investor-builders that focused on (i) an evolving operating and project finance budget, (ii) the member's share of the amounts owing under the development and takedown agreements and the credit facility, and (iii) both the ratable and incremental costs of adjudicating the bankruptcy of the venture and ensuing litigation with respect to the member) and Global Gaming Ventures (Group) Limited (an initial valuation opinion and supplemental valuation report for the majority investor in a newly built casino project that was subject to a UK insolvency

receivership). I have testified as a fact witness in litigation and bankruptcy matters involving Rhodes Homes, Superior Linen, LLC, Prestige Industries, LLC, Cal-Neva Lodge, LLC, American Blue Ribbon Holdings, LLC and Cinemex USA Real Estate Holdings, Inc. My curriculum vitae is attached to this Declaration as **Exhibit A**.

II. **SUMMARY OF DIP FUNDING AND SALES PROCESS**

A. **Prepetition Funding**

6. The obligors and lenders under the DIP Facilities are the obligors and lenders under one of four prepetition facilities that correspond to an applicable debt "silo": California, Texas and Pennsylvania. The silos were designed to be completely independent of one another, and there is no cross-collateralization. According to the First Day Declaration, the applicable outstanding funded debt amounts are:

- Approximately $99.4 million[3] in obligations under the Credit Agreement, dated as of August 2, 2019, among Holdings as borrower, Orion, as administrative agent and collateral agent, the other CA Debtors as guarantors, and the lenders party thereto, as lenders (the "Prepetition CA Term Facility");

- Approximately $7.8 million in obligations under the Credit Agreement, dated as of September 16, 2019, between CL Industries, CL PinnPack and PinnPack as borrowers, Leumi, as lender, CarbonLite PI Holdings LLC and non-debtor Leon Farahnik, as guarantors, and the lenders party thereto, as lenders (the "Prepetition CA ABL Facility" and, together with the Prepetition CA Term Facility, the "Prepetition CA Facilities");

- Approximately $45.7 million in obligations of the TX Debtors with respect to the Solid Waste Disposal Revenue Bonds (CarbonLite Recycling LLC Project), Series 2016 (AMT) bonds (the "Prepetition TX Bonds") issued by Mission Economic Development Corporation; and

- Approximately $71.8 million in obligations of the PA Debtors with respect to two series of bonds issued by the Pennsylvania Economic Development Financing Authority: the Solid Waste Disposal Revenue Bonds (CarbonLite P,

---

[3] This is the figure given in the First Day Declaration at ¶ 25. The CA DIP Motion (Stipulations at ¶ G.(ii)) references $96.9 million in principal. It is unclear whether the difference between the two figures is accounted for by interest, fees and other amounts purportedly owed.

3

LLC Project), Series 2019 and the Solid Waste Disposal Revenue Bonds (CarbonLite P, LLC Project), Series 2020 (collectively, the "Prepetition PA Bonds" and, together with the Prepetition CA Facilities and the Prepetition TX Facility, the "Prepetition Facilities").

The Prepetition Facilities are also summarized in the following chart:

|  | Prepetition CA Term Facility | Prepetition CA ABL Facility | Prepetition TX Bonds | Prepetition PA Bonds |
|---|---|---|---|---|
| CA Debtors | Tranches A and C: $94 million<br>Tranche B: $5.4 million[4] | $7.8 million |  |  |
| TX Debtors |  |  | $45.6 million |  |
| PA Debtors |  |  |  | $71.8 million in 2019 and 2020 Bonds |

### B. The DIP Facilities

7. On the Petition Date, the Debtors filed the DIP Motions. The final relief sought in the DIP Motions, and the relief granted on an interim basis, is summarized in the chart below:

|  | CA DIP ABL Facility | CA DIP Term Facility | PA DIP Facility | TX DIP Facility |
|---|---|---|---|---|
| **Relief Granted On Interim Basis** | $7 million draw (deemed to repay $7 million of prepetition ABL) | $7 million draw on new money facility | $14 million new money draw<br><br>$28 million roll-up | $7 million draw |
| **Final Relief Sought** | $18.5 million ABL (any draws made on final basis will be deemed to repay prepetition ABL not already "rolled up" | $20 million new money facility<br><br>$45.5 million ("roll-up, i.e. $2.275 roll-up for each $1.00 of new money) | $25 million new money term loan<br><br>$50 million roll-up (i.e. $2.00 roll-up for each $1.00 of new money) | $15 million term loan |
| **Total Relief** | $18.5 million ABL (which rolls up $7.8 million under the Prepetition CA ABL Facility) | $65.5 million (including roll-up of $45.5 million; i.e. $2.275 of roll-up for each $1.00 of new money) | $75 million (including $50 million roll-up, i.e. $2.00 roll-up for each $1.00 of new money) | $15 million |

---

[4] A participation in the entire Tranche B is held by LF Investment Holdings, LLC, an entity owned by Leon Farahnik. Tranche B is not participating in the CA DIP Facilities or receiving a roll-up under the CA DIP Facilities. *See* First Day Decl. ¶ 19. See FN 3 above for comments on the principal amount purported to be outstanding under the Prepetition CA Term Facility.

4

8. The DIP Facilities provide for the following interest rates and fees:

|  | CA DIP Term Facility | CA DIP ABL Facility | PA DIP Facility | TX DIP Facility |
|---|---|---|---|---|
| **Interest Rate** | 11% per annum | 8% per annum | 12% per annum | 12% per annum |
| **Fees** | 3% original issue with respect to principal amounts loaned under DIP Facility (applies to new money loans) | 2.00% closing fee (1.00% payable at closing; 1.00% at maturity) | 3% commitment fee on new money loans | 3% commitment fee on new money loans |

### C. Bid Procedures Deadlines

9. On March 18, 2021, the Debtors filed the Bid Procedures Motion. The proposed milestones under the Bid Procedures Motion are set forth below:

| Date | Milestone |
|---|---|
| April 8, 2021 at 1:00 p.m. | Bid Procedures Hearing |
| April 10, 2021 | • Deadline to File Bid Procedures Notice<br>• Deadline to File Assumption and Assignment Notice |
| April 12, 2021 | Stalking Horse Bid Deadline |
| April 16, 2021 | Deadline to (i) Designate Stalking Horse Bidder(s) and (ii) Execute Stalking Horse Agreement(s) |
| April 17, 2021 | Deadline to File (i) Stalking Horse Bidder Notice and (ii) Proposed Sale Order |
| April 26, 2021 at 4:00 p.m. | Deadline to Submit Qualified Bids |
| April 30, 2021 at 5:00 p.m. | Cure/Assignment Objection Deadline |
| May 1, 2021 at 4:00 p.m. | Deadline to File Auction Notice |
| May 3, 2021 at 10:00 a.m. | Sale Auction(s) |
| May 5, 2021 at 5:00 p.m. | Deadline to File Notice of Successful Bidder(s) and Backup Bidder(s) |
| May 6, 2021 at 4:00 p.m. | • Adequate Assurance Objection Deadline<br>• Deadline to Object to Sales |
| May 7, 2021 | Sale Hearing |
| May 22, 2021 | Deadline to Close Transaction(s) |

### III. EXPERT TESTIMONY

10. In my capacity as financial advisor to the Committee, I have become familiar with the Debtors' assets and liabilities and its business. Since Province's retention by the Committee in these chapter 11 cases approximately 12 days ago, I and various other employees of Province under my supervision have been in frequent contact with the Debtors' financial advisor, Force Ten

5

\\LA - 764615/000002 - 2086981 v6

Partners, LLC ("Force Ten"), and its investment banker, Jefferies, LLC, regarding the Debtors' budgets, cash flows, and goals/intentions in these chapter 11 cases.

11. Province received the working DIP budget models from Force Ten on or around March 31, 2021 (the "March 31 Models"). The March 31 Models provide an operations and cashflow forecast from the week ending March 14, 2021 through the week ending July 11, 2021 for the CA Debtors and through the week ending July 4, 2021 for the TX/PA Debtors. I and various other employees of Province under my supervision have closely reviewed the March 31 Models.

12. The Debtors' professionals informed me and my colleagues that they were reforecasting the DIP budget ███████████████████████ and that we could expect the reforecasted budget on April 5, 2021. The Debtors' professionals have not yet sent Province the reforecasted budget. However, on April 5, 2021, they provided the variances of forecasted budgeted performance to actual budgeted performance for the three-week period of the week ending March 14, 2021 to the week ending March 28, 2021.

A. **The DIP Facilities Are Inadequate.**

13. The March 31 Models gave the Debtors a 17- to 18-week runway to consummate a sale or plan of reorganization, assuming that the wind-down is funded from sale proceeds.



\\LA - 764615/000002 - 2086981 v6



15. ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ That the chapter 11 cases are underfunded is problematic for

many reasons, of which the two most critical are that the budget is insufficient to (a) allow the Debtors to operate during any regulatory approval periods and (b) pay critical vendors, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

16.  First, it is my understanding based on my professional experience and from discussions with the Debtors' professionals that certain of the strategic bidders will likely be subject to federal antitrust approvals and certain of the foreign strategic bidders will likely be subject to CFIUS approval for their respective transactions, even if a sale were approved on the Debtors' currently proposed timetable.  It will likely take buyers between four and six months to obtain CFIUS approvals.  Assuming a buyer submitted its CFIUS application within one week of winning the currently proposed May 3, 2021 auction, the sale would likely not close before mid-September 2021.  The Debtors' budget, however, only extends on an operating basis through July 11, 2021 (for the CA Debtors) and July 4, 2021 (for the PA Debtors and the TX Debtors). ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ This will put these buyers at a disadvantage in the auction process because, to choose them as a successful bidder or bidders, as the Debtors will first be required to procure additional funding to operate through a significantly delayed closing.  Moreover, unless the DIP Lenders are required to set aside sale proceeds to fund a wind down, any delayed closing could leave the estate administratively insolvent.

17.  Second, the Debtors entered bankruptcy without earmarked funding in the DIP budgets to procure adequate feedstock from critical vendors.  As a result, critical trade single- and limited-source suppliers have been unwilling to continue supplying feedstock to the Debtors

postpetition. ▮

▮

▮

▮ It took the Debtors took 26 days (from the March 8, 2021 Petition Date to April 2, 2021) to reach an agreement with two critical feedstock suppliers, Cedarwood-Young Company d/b/a Allan Company ("Allan") and Replenysh, Inc ("Replenysh") to supply feedstock to the California and Texas facilities. ▮

▮

▮

▮

▮

▮

▮

18.     While the relatively modest payment to Replenysh is funded by the Texas DIP Budget, the agreement with Allan contemplates the use of sale proceeds at closing to make critical vendor payments to Allan.  A true and correct copy of *Debtor Carbonlite Industries LLC's Motion to Assume Executory Contract, As Amended, With Cedarwood-Young Company D/B/A Allan Company* [D.I. 167] is attached to this Declaration as **Exhibit B.**

19.     Collectively, the impact of the underfunded DIP Facility and resulting budget shortfalls is twofold: ▮

▮

▮ and (2) the Debtors likely cannot consummate a sale to a strategic buyer without

9

procuring additional or alternative funding, advantaging the Lenders and former owner in the sale process.

20.     The March 31 Models pose a distinct risk of administrative insolvency in these chapter 11 cases. They make no provision for the full payment of administrative trade claims arising under section 503(b)(9) of the Bankruptcy Code, nor do they make any provision for the funding of winddown expenses or, if there is a sale, a liquidating plan process. The March 31 Models also do not adequately fund the Committee's professionals: the Committee's professionals are afforded $1,200,000 in the aggregate through the week of July 11, 2021, while the Debtors' professional fees are budgeted at $8,720,000 (of which approximately 5% relates to fees other than fees of outside counsel and financial advisors) and in and the lenders' professional fees are budgeted at $7,940,000[5] over the same period. Finally, there is no provision in the current March 31 Models for any funding of the Debtors' anticipated cash shortfall from and after mid-June 2021 for an orderly wind-down of the Debtors' estates.

### B.  The DIP Facility Is Over-Priced

21.     I and various other employees of Province under my supervision have closely reviewed the terms of the proposed DIP Facilities and have compared the proposed DIP Facilities with other debtor-in-possession facilities that have been approved in recent comparable cases. My analysis of the market is summarized in **Exhibit C** to this Declaration.

22.     Based on my analysis, I have determined that the average "all-in-cost" of comparable DIP facilities ranges from 14% to 17% whereas the "all-in costs" of the TX DIP Facility is 18.0%, the PA DIP Facility is 18.0% and the CA DIP Term Facility is 20.2%. It is my

---

[5] The Objection references the Lender's fees as $7,040,000. The Objection excluded $900,000 in professional fees for Bank Leumi.

expert opinion that the "all-in-costs" of these DIP Facilities are around 3% to 4% higher than comparable market DIPs.

23. I also analyzed the "roll-up" component of the DIP Facilities. The CA DIP Term Facility has an approximately 2.3:1 roll-up, the PA DIP Facility has a 2:1 roll-up and the CA DIP ABL Facility a 0.7:1 roll-up. In the comparison groups, the mean roll-up was 0.9:1 and the median roll-up was 1.0:1. It is my expert opinion that the roll-up to new money ratios under the CA DIP Term Facility and the PA DIP Facility are approximately twice as high as those under comparable market debtor-in-possession financing facilities.

C. **The DIP Budget Fails to Allocate Sufficient Funds for Committee Professionals**

24. I and Province employees under my supervision undertook an analysis of the ratio of committee professionals' fees to Debtors' professional fees in comparable chapter 11 cases (the "Committee Fee Ratio"). The Committee Fee Ratio in these chapter 11 cases is approximately 13.7%. The list of comparable cases is attached as **Exhibit D** to this Declaration. Based on my analysis, it is my opinion that the market ratio of creditors' committee professional fees to debtors' professional fees in comparable chapter 11 cases 30% to 40%. It is my opinion that, based on the complexity of these chapter 11 cases, the Committee professional fee budget should be increase to $3,500,000 (or 40% of the Debtors' professional fee budget), which would bring it in line with comparable chapter 11 cases.

D. **Additional Time Is Required For the Sales Process**

25. It is my opinion that the deadlines and milestones for the sales process should be extended as set forth below:

| Milestone | Current Date | Proposed New Date |
|---|---|---|
| Bid Procedures Hearing | April 8, 2021 at 1:00 p.m. | Same |
| • Deadline to File Bid Procedures Notice | April 10, 2021 | Same |

11

| Milestone | Current Date | Proposed New Date |
|---|---|---|
| • Deadline to File Assumption and Assignment Notice | | |
| Stalking Horse Bid Deadline | April 12, 2021 | Same |
| Deadline to (i) Designate Stalking Horse Bidder(s) and (ii) Execute Stalking Horse Agreement(s) | April 16, 2021 | April 26, 2021 |
| Deadline to File (i) Stalking Horse Bidder Notice and (ii) Proposed Sale Order | April 17, 2021 | April 27, 2021 |
| Deadline to Submit Qualified Bids | April 26, 2021 at 4:00 p.m. | May 17, 2021 at 4:00 p.m. |
| Cure/Assignment Objection Deadline | April 30, 2021 at 5:00 p.m.[6] | June 5, 2021 at 4:00 p.m. |
| Deadline to File Auction Notice | May 1, 2021 at 4:00 p.m. | May 24, 2021 at 4:00 p.m. |
| Sale Auction(s) | May 3, 2021 at 10:00 a.m. | May 25, 2021 at 10:00 a.m. |
| • Deadline to File Notice of Successful Bidder(s) and Backup Bidder(s)<br>• **Deadline to Finalize Potential Assumed/Assigned Contracts and Cure Schedule [NEW PROPOSED DEADLINE]**[7] | May 5, 2021 at 5:00 p.m. | May 28, 2021 at 5:00 p.m. |
| • Adequate Assurance Objection Deadline | May 6, 2021 at 4:00 p.m. | June 4, 2021 at 4:00 p.m. |
| Sale Hearing | May 7, 2021 | June 7, 2021 |
| Deadline to Close Transaction(s) | May 22, 2021 | June 21, 2021 |

26.  Extending the deadline to designate the Stalking Horse Bidder by 10 days (from April 16, 2021 to April 26, 2021) will permit time to negotiate the treatment of unsecured creditors (including assumption of vendor contracts and assumption of trade liabilities) as a critical component in selecting a Stalking Horse Bidder.  Likewise, extending the deadline to submit Qualified Bids to May 17, 2021 will foster competitive tension by allowing time to negotiate with potential bidders.

---

[6] The Bid Procedures inconsistently state this deadline as 4:00 p.m. and 5:00 p.m.

[7] The chart after paragraph 58 of the Objection inadvertently stated that the "Deadline to Finalize Potential Assumed/Assigned Contracts and Cure Schedule" should be June 5, 2021 at 4:00 p.m. instead of May 28, 2021 at 5:00 p.m.

\\LA - 764615/000002 - 2086981 v6



### E. The Bid Protections Are Excessive

28. The Bid Procedures Motion requests the following bid protections for a stalking horse bid or bidders: (i) a break-up fee of 3% of the cash purchase price; and (ii) expense reimbursement of up to $350,000 per production facility for a total aggregate maximum of $1,400,000 for a bidder selecting as stalking horse for all four production facilities.

29. Attached as **Exhibit E** to this Declaration is a list of 12 comparable chapter 11 cases. Each of the comparable cases was filed within five years of the Petition Date. The debtors in each of the comparable cases had total liabilities ranging from $200 million to $400 million and operated in industries with a focus on manufacturing and with business models that are similar to

13

those of the Debtors.  In addition, the form of exit in each of the comparable cases was either a section 363 asset sale or a plan sale, with a stalking horse purchaser or a plan sponsor.

30.    The total bid protections for the comparable cases averaged roughly 3% of stalking horse bid values.  The break-up fees reflected an average of 2% of the stalking horse bid.  Expense reimbursements reflected an average of $900k or 1% of the stalking horse bid, and bid increments averaged roughly 1% of the stalking horse bid.

31.    It is my opinion that the total aggregate bid protections for a stalking horse bidder or bidders for the Debtors (break-up fee and expense reimbursement combined) should be limited to 3% of the cash purchase price, of which the expense reimbursement component should be limited to $250,000 per production facility.

I declare under penalty of perjury under the United States of America that the foregoing is true and correct.

Executed this 6th day of April 2021, at Manhattan Beach, California.

/s/ Edward Kim
Edward Kim

\\LA - 764615/000002 - 2086981 v6