**Exhibit B**

**Allan Company Assumption Motion**

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CARBONLITE HOLDINGS LLC, *et al.*,[1] | ) | Case No. 21-10527 (JTD) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## DEBTOR CARBONLITE INDUSTRIES LLC'S MOTION TO ASSUME EXECUTORY CONTRACT, AS AMENDED, WITH CEDARWOOD-YOUNG COMPANY D/B/A ALLAN COMPANY

CarbonLite Industries LLC, a debtor and debtor in possession in the above-captioned chapter 11 cases ("Industries", and collectively, with its above-captioned affiliated debtors and debtors in possession, the "Debtors"), hereby moves the Court (this "Motion") for entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Proposed Order"), pursuant to sections 105, 363(b), and 365(a) of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code") and Rule 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), authorizing Industries to assume the Supply Agreement (defined below), as modified by the Amendments (defined below) with Cedarwood-Young Company d/b/a Allan Company ("Allan"). Industries operates the Riverside Facility and is one of the CA Debtors, as those terms are defined in the First Day Declaration (defined below). In support of the Motion, Industries, by and through its undersigned counsel, states as follows:

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: CarbonLite Holdings LLC (8957); CarbonLite Industries LLC (3596); CarbonLite P Holdings, LLC (8957); CarbonLite P, LLC (5453); CarbonLite PI Holdings, LLC (8957); CarbonLite Pinnpack, LLC (8957); CarbonLite Recycling Holdings LLC (8957); CarbonLite Recycling LLC (3727); CarbonLite Sub-Holdings, LLC (8957); Pinnpack P, LLC (8322); and Pinnpack Packaging, LLC (9948). The address of the Debtors' corporate headquarters is 10250 Constellation Blvd., Los Angeles, CA 90067.

**Jurisdiction and Venue**

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Industries confirms its consent pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory and rule bases for the relief sought herein are sections 105(a) 363(b), and 365(a) of the Bankruptcy Code and Bankruptcy Rule 6006.

**Background**

4.      On March 8, 2021 (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases.

5.      On March 23, 2021, the Office of the United States Trustee appointed the following members to the Official Committee of Unsecured Creditors (the "Committee") pursuant to section 1102(a)(1) of the Bankruptcy Code: (i) Niagara Bottling, LLC; (ii) Everrank Investment Group, Inc.; (iii) Bantam Materials International (iv) Replenysh, Inc.; (v) rPlanet

2

Earth Los Angeles LLC; (vi) Bayan Plastics LLC; and (vii) Exact Staff, Inc. *See* Docket No. 118.

6.      The Debtors are on the forefront of processing post-consumer recycled polyethylene terephthalate ("rPET") plastic products and producing high-quality rPET and polyethylene terephthalate ("PET") beverage and food packaging products. As of the Petition Date, the Debtors operate three facilities at which they process PET bottles and flake into rPET pellets, which are later incorporated into other products and packaging. The Debtors also operate PinnPack, which processes the rPET and PET into high-quality thermoformed tubs, bowls, domes, and clamshell packaging for food applications. A detailed description of the Debtors' business and facts precipitating the filing of the Debtors' chapter 11 proceedings are set forth in the *Declaration of Brian Weiss in Support of Debtors' Chapter 11 Petitions and First Day Relief* (the "First Day Declaration"), incorporated herein by reference.[2]

### The Supply Agreement

7.      Industries and Allan are parties to that certain *Post Consumer PET Supply Agreement* dated as of April 28, 2010 (collectively with all amendments and exhibits thereto, the "Supply Agreement"). A copy of the Supply Agreement is attached hereto as **Exhibit B**. The Supply Agreement provides for the supply by Allan of used PET bottles in compressed bale form ("Bales") for recycling by Industries at its Riverside, California facility (the "Riverside Facility"). The monthly supply of Bales required by the Supply Agreement (as revised in 2016) is approximately 2.1 million pounds of Bales, with a permitted variance of 5% (defined as the "New Monthly Quantity"). *See* Supply Agreement, at ¶ 5.1. This amount equates to approximately fifty (50) truckloads of Bales. Unless otherwise agreed by Industries and Allan,

---

[2] Unless otherwise indicated, capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration.

payment for the Bales is due within thirty days of delivery or the date of Allan's invoice. *See* Supply Agreement, at ¶ 6.4. The term of the Supply Agreement currently expires on May 31, 2021 (the "Expiration Date").

8.    Prepetition, Allan was Industries' single largest supplier of Bales, which constitute the crucial feedstock used in Industries' rPET manufacturing processes. At various times prepetition, Allan and Industries agreed to modify the volume, pricing and payment terms for the sale of Bales under the Supply Agreement. As of the Petition Date, Industries owes Allan $3,667,372.46 (the "Prepetition Balance").

9.    Postpetition, Industries needs Bales in excess of the current New Monthly Quantity under the Supply Agreement. Furthermore, as a consequence of the accrued Prepetition Balance, Industries and Allan agreed to certain interim modifications to the payment terms under the Supply Agreement in order to ensure uninterrupted shipments of Bales consistent with the operating needs at the Riverside Facility. These interim changes are described more fully below as the Temporary Arrangement. As described below, the parties intend that this Temporary Arrangement will be superseded if this Motion is granted and terminated if this Motion is denied.

10.    Industries now seeks a longer-term arrangement with Allan that will meet its future operating needs and provide assurances to Allan that the purchase obligations of Industries under the Supply Agreement will be satisfied. In particular, Industries seeks to increase the New Monthly Quantity of Bale deliveries and also extend the Expiration Date of the Supply Agreement in order to avoid a potential cessation of deliveries by Allan that would result in critical harm to its business. In order to reach this arrangement, Industries has determined, in the exercise of its business judgment, to assume the Supply Agreement as modified by the Amendments.

11.     Specifically, Industries and Allan have agreed to modify the Supply Agreement, effective as of the date of entry of the Proposed Order authorizing the assumption by Industries of the Supply Agreement, as follows (together, the "Amendments")[3]:

a.      The Expiration Date shall be changed to the earlier of (i) termination by a buyer/assignee after closing of a Transaction (as defined below) with 30 days' prior written notice to Allan, and (ii) May 31, 2022.

b.      The New Monthly Quantity under the Supply Agreement shall be changed to a range of 5.04 to 7.14 million pounds of Bales, which amount equates to approximately 120 to 170 truckloads of Bales per month.

c.      The payment terms of paragraph 6.4 of the Supply Agreement shall be modified to allow Industries to carry up to a $500,000 post-petition account credit limit (notwithstanding the Prepetition Balance).  If at any time the aggregate post-petition amount due from Industries to Allan exceeds the $500,000 account credit limit but is not past-due, Industries shall remain entitled to purchase Bales but such further shipments shall require payment in advance of shipment, until such time as the outstanding post-petition balance is reduced below the $500,000 limit.  If at any time any amount due from Industries to Allan is past-due (other than the Prepetition Balance that shall be paid as provided by paragraph 12 below), Allan shall have no obligation to continue to supply Bales, until such time as any and all past-due amounts (other than then

---

[3] Except as modified by the Amendments, the other terms and conditions of the Supply Agreement shall remain in full force and effect.

Prepetition Balance that shall be paid as provided by paragraph 12 below) are paid in full.

d.       Notwithstanding Sections 6.1 through 6.3 of the Supply Agreement, Industries shall not be required to establish a Standby LC in favor of Allan so long as it is not in default of its payment obligations to Allan (other than the Prepetition Balance that shall be paid as provided by paragraph 12 below).

12.       Allan and Industries have further agreed to the terms for a cure under the Supply Agreement pursuant to section 365(b)(1) of the Bankruptcy Code as follows (the "Cure")[4]:

a.       Industries shall pay the Prepetition Balance in full, in cash, upon the earlier of to occur: (i) August 15, 2021, and (ii) the date of closing of a sale of substantially all of Industries' assets pursuant to sections 363 or 1129 of the Bankruptcy Code (a "Transaction").

b.       Alternatively, solely in the event that the buyer (or a material provider of its debt or equity capital financing) in a Transaction is either of the DIP Term Lender and/or the Prepetition Term Lenders[5], or their designee(s) for purposes of a Transaction ("Orion Buyer"), and solely to the extent that Allan determines in its discretion that Orion Buyer is of sufficient creditworthiness or that Orion is otherwise able to provide Allan

---

[4] Industries and Allan have agreed that the Cure shall constitute full and final settlement and satisfaction of all amounts due in cure of, and compensation for any pecuniary loss resulting from, any and all defaults under the Supply Agreement, which defaults are deemed waived.

[5] As such terms are defined in the *Interim Order (I) Authorizing CA Debtors to (A) Obtain Postpetition Financing, et seq.*, entered on March 10, 2021 [Docket No. 74] (the "Interim DIP Order").

sufficient assurances of future payment, the Cure shall be satisfied on the closing date of a Transaction involving Orion Buyer by: (i) a cash payment equal to 50% of the then outstanding Prepetition Balance, and (ii) the issuance by Orion Buyer of a promissory note (the "Note") payable to Allan in the face amount of the remaining Prepetition Balance and providing for, *inter alia*, (v) an interest rate not to exceed 4% per annum; (w) California venue and application of California law; (x) a term of 12 months, beginning on the earlier closing date of a Transaction or August 15, 2021; (y) equal monthly principal and interest payments for the term of the Note; and (z) such other terms, covenants, and conditions as may be agreed upon by both Allan and Orion Buyer, in their respective independent discretion, including, without limitation, continued and uninterrupted performance of the Supply Agreement (as amended) but only so long so Orion Buyer remains current on payment of the Note and all payments and obligations as provided by the Supply Agreement.

13.     In order to support Industries' ongoing operations prior to the assumption of the Supply Agreement, Industries and Allan reached a temporary arrangement (the "Temporary Arrangement") to supply Bales to Industries to help meet its post-petition operating needs while Industries, Allan, and Orion engage in good faith negotiations and pending the outcome of this Motion.  Pursuant to the Temporary Arrangement, Allan agreed to supply 120 to 170 truckloads of Bales per month subject to (a) payment one business day in advance of shipment, and (b) Allan's receipt of a $300,000 postpetition security deposit (the "Deposit") to act as security and assurance of future payment for any Bales supplied post-petition to Industries.

14.     Upon the entry of the Proposed Order, the Temporary Arrangement shall be superseded by the parties' continued performance under the Supply Agreement, as modified by the Amendments.  At such time, Allan will promptly apply the Deposit against future post-petition purchases of contracted Bales by Industries.  On the other hand, in the event this Motion is denied, the Temporary Arrangement shall terminate on the seventh (7th) calendar day after the Court denies the Motion, and Allan will refund the unused portion of the Deposit to Industries on or before the 8th day after the Court denies the Motion.

### Relief Requested

15.     By this Motion, Industries respectfully requests entry of an order, in substantially the form attached hereto as **Exhibit A**, approving the assumption of the Supply Agreement, as modified by the Amendments and the assurances of Cure set forth herein, pursuant to sections 105, 363(b), 365(a) of the Bankruptcy Code.

### Basis for Relief Requested

16.     Section 365(a) of the Bankruptcy Code provides that, subject to the court's approval, a trustee "may assume or reject any executory contracts or unexpired leases of the debtor." 11 U.S.C. § 365(a). Upon finding that a trustee has exercised its sound business judgment in determining to assume an executory contract or unexpired lease, courts will approve the assumption under section 365(a) of the Bankruptcy Code.  *See Nostas Assocs. v. Costich (In re Klein Sleep Prods., Inc.)*, 78 F.3d 18, 25 (2d Cir. 1996); *see also Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1099 (2d Cir. 1993).

17.     Section 105(a) of the Bankruptcy Code provides in relevant part that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  Section 105(a) has been interpreted to

8

expressly empower bankruptcy courts with broad equitable powers to "craft flexible remedies that, while not expressly authorized by the Code, effect the result the Code was designed to obtain." *Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 568 (3d Cir. 2003) (*en banc*). Furthermore, a court may approve the assumption of an executory contract with modifications, where there is an agreement between the debtor and the counterparty to the executory contract. *See Official Comm. for Unsecured Creditors v. Aust (In re Network Access Sols., Corp.)*, 330 B.R. 67, 74 (Bankr. D. Del. 2005) (concluding that a debtor may assume a modified prepetition agreement where the parties to the agreement consented to such modifications).

18.     Industries believes that assumption of the Supply Agreement is in the best interest of its estate and creditors. Without Allan's continued supply of Bales to Industries, Industries' ability to operate the Riverside Facility, and thus to generate revenue, would be significantly constrained, if not critically impaired. While Industries could source PET from other suppliers, no other single supplier (or combination of multiple, local suppliers) is able to provide Industries with the amount of feedstock it currently requires to efficiently operate. Even if Industries could source feedstock from replacement vendors,[6] Industries would experience significant delays as it establishes or rehabilitates relationships with such vendors and manages a more complex supply chain. Accordingly, Industries believes that the assumption of the Supply Agreement, as modified by the Amendments, is in the best interests of Industries, its estate, and all stakeholders.

19.     Although Industries believes that the Amendments are largely consistent with past practice, and well-within the range of customary modifications, to the extent that the

---

[6] Many other local suppliers of PET are unsecured creditors in Industries' chapter 11 case.

Amendments are determined to be outside of the ordinary course of business, the Amendments are justified by Industries' sound and reasonable business judgment. Section 363(b) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use sell, or lease, other than in the ordinary course of business, property of the estate . . . ." Courts normally defer to the trustee's or debtor in possession's business judgment so long as there is a legitimate business justification. *See id.; see also Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (Bankr. D. Del. 1999) (trustee need only have a "sound business purpose" to justify use of estate property pursuant to section 363(b)).

20.    Here, Industries submits that the Bankruptcy Court's approval of the assumption of the Supply Agreement is plainly in the best interests of creditors. The amounts that Industries plan to incur on a post-petition basis under this updated arrangement would otherwise be spent in the ordinary course of business because Industries is, in any event, required to acquire post-petition feedstock. Furthermore, the delays, lost revenue, and potential loss of customer relationships could outweigh the costs associated with the Cure. Moreover, without an extension of the Supply Agreement, Industries faces the potential loss of a key ingredient to its future business. Therefore, Industries' decision to expend the amounts to be paid pursuant to the Supply Agreement is a sound business purpose in providing Industries efficient access to the feedstock it requires to operate.

21.    Industries has been advised that Orion has reviewed and supports the relief requested herein. The relief requested by the Motion, thus, also serves the broader interests of the estate it meeting the sale milestones established under the Interim DIP Order and maximizing the potential value of the Riverside Facility.

10

22.     For all the reasons set forth above, Industries, in an exercise of its sound business judgment, submits that the Court should approve the assumption of the Supply Agreement, as modified by the Amendments.

**Notice**

23.     Notice of this Application will be provided to the following parties, or, in lieu thereof, their counsel, if known: (a) the Office of the United States Trustee for the District of Delaware; (b) counsel to the DIP Term Agent, DIP Term Lenders, and Prepetition Term Secured Parties; (c) counsel to the DIP ABL Lender and Prepetition ABL Secured Parties; (d) counsel to the TX/PA DIP Agents and Prepetition Trustees; (e) the Committee; and (f) any party that has requested notice pursuant to Bankruptcy Rule 2002.  Industries submits that no other or further notice need be provided.


WHEREFORE, Industries respectfully requests that the Court grant the Motion authorizing the assumption of the Supply Agreement, as modified by the Amendments and subject to the assurances of Cure, and grant the Debtors such other relief as is just and proper.


Dated:   April 2, 2021                      PACHULSKI STANG ZIEHL & JONES LLP


                                             /s/   James E. O'Neill_____
                                             Richard M. Pachulski (CA Bar No. 90073)
                                             Gabriel I. Glazer (CA Bar No. 246384)
                                             James E. O'Neill (DE Bar No. 4042)
                                             Steven W. Golden (NY Bar No. 5374152)
                                             919 N. Market Street, 17th Floor
                                             P.O. Box 8705
                                             Wilmington, DE 19899 (Courier 19801)
                                             Tel:  (302) 652-4100
                                             Fax: (302) 652-4400
                                             Email: rpachulski@pszjlaw.com
                                                     gglazer@pszjlaw.com

11

joneill@pszjlaw.com
sgolden@pszjlaw.com

*Proposed Attorneys for Debtors and Debtors in Possession*

# **EXHIBIT A**

Proposed Order

1

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CARBONLITE HOLDINGS LLC, *et al.*,[1] | ) | Case No. 21-10527 (JTD) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) | Ref. Docket No. ___ |

## ORDER GRANTING DEBTOR CARBONLITE INDUSTRIES LLC'S MOTION TO ASSUME EXECUTORY CONTRACT, AS MODIFIED, WITH CEDARWOOD-YOUNG COMPANY D/B/A ALLAN COMPANY

Upon consideration of the *Debtor CarbonLite Industries LLC's Motion to Assume Executory Contract, as Amended, with Cedarwood-Young Company d/b/a Allan Company* (the "Motion");[2] the Court having reviewed the Motion and having considered the relief requested therein and the record in the above-captioned cases; and having determined that the relief requested in the Motion (i) is fair, reasonable, appropriate and in the best interests of the Industries' estate, (ii) represents a sound exercise of the Industries' business judgment, and (iii) is in the best interests of Industries, its estates and creditors; the Court having determined that notice of the Motion was sufficient under the circumstances; and the Court having determined that the legal and factual bases set forth in the Motion and at the hearing thereon establish just cause for the relief granted herein,  it is HEREBY ORDERED THAT:

1.      The Motion is granted as set forth herein.

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: CarbonLite Holdings LLC (8957); CarbonLite Industries LLC (3596); CarbonLite P Holdings, LLC (8957); CarbonLite P, LLC (5453); CarbonLite PI Holdings, LLC (8957); CarbonLite Pinnpack, LLC (8957); CarbonLite Recycling Holdings LLC (8957); CarbonLite Recycling LLC (3727); CarbonLite Sub-Holdings, LLC (8957); Pinnpack P, LLC (8322); and Pinnpack Packaging, LLC (9948). The address of the Debtors' corporate headquarters is 10250 Constellation Blvd., Los Angeles, CA 90067.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

2.      The Supply Agreement, as modified by the Amendments, shall be deemed assumed by Industries pursuant to Sections 365(a) and (b) of the Bankruptcy Code effective as of the date of entry of this Order.

3.      Industries is authorized to implement the Cure due under the Supply Agreement at the time and in the manner provided under the Motion.

4.      Industries and Allan are hereby authorized to take such additional actions or execute such additional documents as are necessary or appropriate to implement the terms of this Order.

5.      Notwithstanding the possible applicability of Rules 7062 or 9014 of the Bankruptcy Rules, any other Bankruptcy Rule, this Order shall be immediately effective and enforceable upon its entry and there shall be no stay of effectiveness or execution of this Order.

6.      The Court shall retain exclusive jurisdiction over any and all matters arising from or related to the implementation, interpretation, or enforcement of the Supply Agreement, as modified by the Amendments, or this Order.

# EXHIBIT B

Supply Agreement

DOCS_NY:42668.7 13044/001

# POST-CONSUMER PET SUPPLY AGREEMENT

This **POST-CONSUMER PET SUPPLY AGREEMENT** ("Agreement") is made as of
_____, 2010 (the "Contract Date") for initial supplies to commence delivery on
_____, 2010 (the "Start Date") by and between Cedarwood-Young Company, a
California corporation doing business as Allan Company ("Allan" or "ALLAN"), having
a principal place of business at 14620 Joanbridge Street, Baldwin Park, California 91706,
and CarbonLITE Industries LLC, a Delaware limited liability company ("CLI"), having a
principal place of business at 10250 Constellation Boulevard, Suite 2820, Los Angeles,
California 90067.  Allan and CLI are sometimes referred to in this Agreement individually
as the "Party" or "PARTY" and collectively as the "Parties" or "PARTIES".

1.     <u>**Term.**</u>

This Agreement shall be operative as of the Contract Date set forth above and continue in
force for five (5) successive years from the Start Date (the "Term") unless earlier
terminated as set forth in this Agreement or as provided by law.

2.     <u>**Purchase and Sale of Products.**</u>

2.1     The goods subject to this Agreement (the "Products" or "PRODUCTS") are
post-consumer PET bottles in bale form.  The Products shall have specifications as agreed
to from time to time by the Parties (the "Specification"). The initial Specification is
set forth in Exhibit "A".  Allan shall sell the Products to CLI, and CLI shall purchase and pay
for the Products, as set forth herein.

2.2     CLI agrees to use the Products only for its own manufacturing needs and
under no circumstances to resell the Products unless the Products have undergone
additional processing.  The term "processing" as used in the preceding sentence shall
mean physically applying the materials and labor necessary to substantially change the
characteristics of the Products, including, without limitation, the grinding or shredding of
the Products.

3.      **Pricing.**

3.1      The price per gross pound for the Products shall be determined as set forth on Exhibit "B".

3.2      If Allan is required or permitted by law to collect sales tax, use tax, or any other tax (including, without limitation, any *ad valorem* tax, value added tax [VAT], goods and services tax [GST], consumption tax, environment affecting tax, excise tax, tariff, or gross receipts tax) from CLI on behalf of any taxing jurisdiction, Allan will issue invoices to CLI which separately state and clearly indicate the amount of tax and CLI will remit any and all such taxes to Allan within 30 days of invoice.  If applicable, in lieu of payment for any such tax, Allan will accept a properly executed exemption from CLI; provided that CLI indemnify and hold Allan and Allan's directors, officers, employees, agents, successors and assigns harmless from and against any and all such taxes.

3.3      CLI shall, upon written request by Allan, no more than twice each calendar year during the Term of this Agreement, and for a period of one (1) year after the expiration of this Agreement, make available to Allan's auditor, or independent public accountant designated by Allan, copies of documentation such as purchase orders, certified scale tickets, accounts receivable and payable ledgers specific to the CLI's purchases of post-consumer PET bottles to the extent necessary to determine the accuracy of the amounts paid to Allan hereunder.  If such examination results in a determination that payments have been understated, unpaid amounts due shall be paid promptly, with interest at a rate of ten percent (10%) per annum.  The fees and expenses of Allan's auditor or independent public accountant shall be paid by Allan, unless the examination results in a determination that Allan has been underpaid by two percent (2%) or more for the period examined, in which case CLI shall pay all costs and expenses incurred by Allan in the course of making such determination, including without limitation, the fees and expenses of such auditor or independent public accountant.

3.4      Allan shall, upon written request by CLI, no more than twice each calendar year during the Term of this Agreement, and for a period of one (1) year after the expiration of this Agreement, make available to CLI's auditor, or independent public accountant designated by CLI, copies of documentation such as purchase orders, certified scale tickets, accounts receivable ledgers specific to the Allan's sales of post-consumer PET bottles to the extent necessary to determine the accuracy of the amounts charged by Allan to CLI for the PET Bottle Price under the Pricing Formula set forth in Exhibit "B".  If such examination results in a determination that payments have been understated, unpaid amounts due shall be paid promptly, with interest at a rate of ten percent (10%) per annum.  The fees and expenses of CLI's auditor or independent public accountant shall be paid by CLI, unless the examination results in a determination that CLI has been

2

overcharged by two percent (2%) or more for the period examined, in which case Allan shall pay all costs and expenses incurred by CLI in the course of making such determination, including without limitation, the fees and expenses of such auditor or independent public accountant.

4. **Orders and Acceptance.**

4.1     CLI's purchases shall be made by issuance of CLI purchase orders ("Orders") and this Agreement shall be deemed to be incorporated into all such Orders. In each instance, CLI's issuance of a purchase order is a warranty and representation by CLI that CLI is solvent as of the date of such purchase order. Allan shall be deemed to have accepted all Orders unless it notifies CLI to the contrary within 48 office hours of the receipt of such Orders, office hours being weekdays from 9:00 AM to 5:00 PM.

4.2     CLI agrees that during the Term CLI shall give greatest preference to Allan over other suppliers for CLI's purchases of post-consumer PET, and that at all times during the Term when CLI's Riverside facility is operational, CLI must first procure its post-consumer PET supply by purchasing Products from Allan before purchasing from others. CLI shall have no obligation to purchase from Allan during periods of time when CLI's Riverside facility is not operational, provided that CLI gives Allan reasonable advance notice of such non-operation.

4.3     All Products shall be subject to CLI's initial inspection upon arrival at CLI's Riverside facility ("Riverside"), notwithstanding prior payment. Products not accepted will be held for Allan's instructions, at Allan's risk of loss. Nonconforming Products may be returned to Allan at Allan's expense.

4.4     CLI shall notify Allan upon receipt of Products of all discoverable defects, including quantity shortages, incorrect product, and visible defects, but no later than two (2) days after CLI's receipt.

4.5     Subject to the limits set forth in Section 4.6, in the event that CLI does not either complete final inspection and accept the Products or present a rejection notice to Allan in writing within ten (10) days of delivery of the Products, the Products shall be conclusively deemed accepted and the Products shall be conclusively deemed to meet the Specifications. CLI's rejection notice must specifically identify the Products rejected, contain photographs accurately and clearly depicting the defect claimed, must reference this Agreement, and must specifically describe each defect of the Products on which CLI intends to rely as a basis for CLI's rejection. CLI's inspection and acceptance tests shall be at CLI's expense.

3

4.6     CLI shall not be entitled to reject more than four (4) loads of Products during a rolling, consecutive 10-day period.

4.7     Notwithstanding anything to the contrary, use of the Products or any portion of them constitutes acceptance of same as complying with all the terms and specifications of this Agreement, and all claims for damages, errors, shortage or otherwise in connection therewith are waived.

5.     **Anticipated Volumes and Delivery.**

5.1     CLI shall purchase from Allan, and Allan shall sell to CLI, four (4) million pounds of Products per month, plus or minus 400,000 pounds (the "Monthly Quantity"). If Allan anticipates any difficulties in producing Products to meet the Monthly Quantity, Allan shall promptly notify CLI. If CLI anticipates any difficulties in receiving Products to meet the Monthly Quantity, CLI shall promptly notify Allan. For the first six (6) months after the Start Date, CLI will be in a ramp up phase and will build to the normal 4 million pound per month requirement over that period. The Parties acknowledge and understand that Allan's ability to supply Products depends in significant part on the California Beverage Container Recycling and Litter Reduction Act (the "Act"). Any adverse change to the current Act or the regulations promulgate in connection with the Act may result in a Force Majeure event described in Section 11 below.

5.2     Delivery of Products shall be made FOB point of origin or destination, as agreed by the Parties on a load by load basis. Title, possession and risk of loss of all Products sold hereunder shall pass to CLI upon delivery of Products. If delivery is made FOB destination, Allan is responsible for freight and other miscellaneous transportation expenses, otherwise CLI shall be responsible for freight and other miscellaneous transportation expenses.

5.3     In the event that delivery is made FOB destination, CLI shall use commercially reasonable efforts to unload each arriving shipment of Product promptly after arrival at its receiving facility. For each shipment that is not unloaded within one (1) hour of arrival at CLI's facility, CLI shall pay to Allan the sum of $80 per hour to compensate Allan for such delay.

5.4     CLI shall make available no less than five (5) dock spaces for delivery of Products by Allan. CLI agrees that Allan may, at its option, spot approximately five (5) empty trailers at the Riverside facility in order to reduce delays and facilitate the swapping of trailers, such that Allan may physically exchange a trailer having Products for an empty trailer. The Parties agree to meet and confer in good faith as reasonably

4

necessary to help ensure the safe, efficient and timely delivery and unloading of Products.

6.      **Payment Terms.**

6.1      No later than thirty (30) days before the Start Date, CLI shall at its expense establish in favor of Allan a confirmed irrevocable standby letter of credit reasonably acceptable to Allan in a face amount equal to $1,000,000.00 (the "Standby LC"). The Standby LC is to be confirmed by and payable through the bank set forth in Section 6.3.1 below or such other bank as may be designated by Allan to CLI in writing.  The Standby LC shall provide for payments to Allan in U.S. currency at sight against partial shipments of the Products, as evidenced by presentation of the following documents and no others: Allan's invoice, packing list, and proof of delivery (e.g. bill of lading or other like document).  It is the intention of the Parties that Allan not draw upon the Standby LC unless CLI fails to strictly comply with each of the terms and conditions of this Agreement, including, without limitation, CLI's obligation to make full and timely payment to Allan.  If at any time the amount available under the Standby LC is less than $1,000,000.00, CLI shall immediately replenish or increase the amount to $1,000,000.00 or obtain a substitute confirmed irrevocable standby letter of credit meeting all of the requirements set forth herein.

6.2      CLI will at its sole expense maintain and, if necessary, extend the Standby LC for the duration of this Agreement and until Allan has been paid in full. All payments to Allan must be free from withholding, retention, deduction or deferment of any kind, including, without limitation, on account of any claims, counterclaim, set-off or bank charges.

6.3      The Standby LC shall be issued with the following terms:

6.3.1    Confirming Bank:    UNION BANK OF CALIFORNIA
Southern California Int'l Operations Center
1980 Saturn Street
Monterey Park, California 91755, U.S.A.
SWIFT ADDRESS: ████████████

6.3.2    All banking charges are for CLI's account, except advising bank or confirming bank charges that are for Allan's account.

6.3.3    Beneficiary:    ALLAN COMPANY, 14618 Arrow Highway, Baldwin Park, CA 91706, U.S.A.

6.4     Unless expressly specified otherwise on the Allan's sales confirmation, where Allan has extended credit to CLI, terms of payment shall be NET 30 days from the later of: (a) the date of delivery of the Products and (b) from the date of Allan's invoice. Subject to the terms and conditions of this Agreement, CLI's account credit limit shall be established at $1,000,000 and, if and when necessary, CLI will pay invoices sooner than 30 days to maintain the account within this credit limit.  All payments shall be in U.S. Dollars without deduction or offset of any kind.  If CLI fails to make payment for goods delivered as herein provided, or if, in Allan's opinion, a change in CLI's financial condition or other circumstances has created reasonable concerns as to CLI's credit worthiness, CLI agrees that Allan may at any time draw against the Standby LC, and limit or cancel the credit of CLI as to time and amount and may demand payment in cash before delivery of any part of the goods. On any order on which credit is not extended by Allan, shipment or delivery shall be made at Allan's election. Payment shall be made for the Products without regard to whether CLI has made or will make any inspection of the Products.

7.     **Warranties.**

7.1     Allan warrants that any and all Products furnished pursuant to this Agreement shall: (a) conform to the Specifications; and (b) be of good title and free and clear of all liens and encumbrances.  EXCEPT FOR THE WARRANTIES IN THE PRECEDING SENTENCE, ALLAN HAS NOT MADE AND MAKES NO REPRESENTATIONS OR WARRANTIES OF ANY KIND OR NATURE, DIRECTLY OR INDIRECTLY, EXPRESSED OR IMPLIED.  Notwithstanding the provisions of Cal. Com. Code § 2317(b), CLI and Allan agree that, in the event of a conflict between the language of this Agreement and any sample or model shown by Allan to CLI, the written terms of this Agreement accurately express the intentions of the Parties. CLI and Allan intend that the terms of this Agreement will displace any conflicting warranty based on a sample or model.

7.2     In the event of a breach of an express or implied warranty, CLI's exclusive remedy shall be, at Allan's sole option, replacement of the Product or nonconforming portion of the Product. Allan limits its obligations to replacement and CLI shall have no other remedy against Allan. If Allan fails to replace the Product within a reasonable time and the remedy fails of its essential purpose, CLI may return the sold Product in exchange for a full refund of the purchase price of the Product. Refund shall be the sole and exclusive remedy of CLI in the event that the remedy of replacement fails of its essential purpose.

7.3     Without in any way limiting the provisions of the Limitation of Liability paragraphs below, in no event shall Allan be liable to CLI for consequential, incidental,

economic, special or punitive damages stemming from any breach of express or implied warranty.

8.    **Indemnification.**

8.1    Allan shall defend, indemnify and hold harmless CLI and its employees, agents, officers, shareholders and directors, from and against all claims, actions, demands, liabilities, costs and expenses, including, without limitation, reasonable attorney's fees and expenses arising out of or in connection with any act or omission of Allan or any of its employees, representatives or agents on CLI's premises and/or the use of any vehicle, equipment, fixture or material of Allan or CLI.

8.2    Allan's liability under Section 8.1 shall not, however, exceed the aggregate amount of $2,000,000.00.  CLI shall have the right to be represented by counsel of its own choosing in any action, at its own expense.

8.3    CLI shall defend, indemnify and hold harmless Allan and its affiliates and suppliers, and their respective employees, agents, officers, shareholders and directors, from and against all claims, actions, demands, liabilities, costs and expenses, including, without limitation, reasonable attorney's fees and expenses arising out of or in connection with:

8.3.1    any act or omission of CLI or any of its employees, representatives or agents on Allan's premises and/or the use of any vehicle, equipment, fixture or material of Allan or CLI;

8.3.2    any actual or alleged death or injury to any person, damage to any property or any other damage or loss by whomsoever suffered, claimed to result in whole or in part from its use or misuse of the Products or any actual or alleged defect therein, whether latent or patent; or

8.3.3    Allan's compliance with CLI's Specifications or instructions, or modification of any Products, or use or misuse in combination with other products.

8.4    CLI's liability arising from those things set forth in Section 8.3.1 shall not, however, exceed the aggregate amount of $2,000,000.00.  Allan shall have the right to be represented by counsel of its own choosing in any action, at its own expense.

7

9. **Limitation of Liability.**

9.1     THE ESSENTIAL PURPOSE OF THIS SECTION 9 IS TO LIMIT EACH
PARTY'S AGGREGATE LIABILITY.  For purposes of this Section 9, the term "ALLAN
GROUP" shall include Allan, its affiliates, and its suppliers, or each of their respective
employees, agents, officers, shareholders, directors, successors and assigns; and the term
"CLI GROUP" shall also include CLI and its employees, agents, officers, shareholders,
directors, successors and assigns.

9.2     EXCEPT AS PROVIDED IN SECTION 8, THE AGGREGATE LIABILITY OF
ALLAN GROUP FOR ALL CLAIMS ARISING FROM, CONNECTED WITH, OR
RELATED TO THIS AGREEMENT SHALL NOT EXCEED $500,000.00.  UNDER NO
CIRCUMSTANCES WILL ALLAN GROUP BE LIABLE TO ANYONE UNDER ANY
LEGAL OR EQUITABLE THEORY, WHETHER OR NOT FORESEEABLE OR
FORESEEN, FOR ANY CONSEQUENTIAL, SPECIAL OR EXEMPLARY DAMAGES;
REGARDLESS OF WHETHER ALLAN GROUP HAS BEEN ADVISED OF THE
POSSIBILITY OF SUCH DAMAGES, THERE IS A BREACH OF THIS AGREEMENT OR
WHETHER ANY REMEDY PROVIDED HEREIN FAILS OF ITS ESSENTIAL PURPOSE.

9.3     CLI SHALL BE DEEMED TO ASSUME ALL LIABILITY FOR ANY AND
ALL DAMAGES ARISING FROM OR IN CONNECTION WITH THE USE OR MISUSE
OF THE PRODUCTS BY CLI, ITS EMPLOYEES, CUSTOMERS AND OTHERS.

9.4     EXPECT FOR CLI'S OBLIGATIONS SET FORTH IN SECTIONS 6 AND 8
(AS LIMITED THEREIN) AND SUB-SECTION 3.2, THE AGGREGATE LIABILITY OF
CLI GROUP TO ALLAN GROUP FOR ALL CLAIMS ARISING FROM, CONNECTED
WITH, OR RELATED TO THIS AGREEMENT SHALL NOT EXCEED $1,000,000.00.
UNDER NO CIRCUMSTANCES WILL CLI GROUP BE LIABLE TO ALLAN GROUP
UNDER ANY LEGAL OR EQUITABLE THEORY, WHETHER OR NOT FORESEEABLE
OR FORESEEN, FOR ANY CONSEQUENTIAL, SPECIAL OR EXEMPLARY DAMAGES,
REGARDLESS OF WHETHER CLI GROUP HAS BEEN ADVISED OF THE POSSIBILITY
OF SUCH DAMAGES, THERE IS A BREACH OF THIS AGREEMENT OR WHETHER
ANY REMEDY PROVIDED HEREIN FAILS OF ITS ESSENTIAL PURPOSE.

9.5     EACH PARTY RECOGNIZES AND AGREES THAT THE WARRANTY
DISCLAIMERS AND LIABILITY AND REMEDY LIMITATIONS HEREIN ARE
MATERIAL, BARGAINED FOR BASES OF THIS AGREEMENT AND THAT THEY
HAVE BEEN TAKEN INTO ACCOUNT AND REFLECTED IN DETERMINING THE
CONSIDERATION TO BE GIVEN BY EACH PARTY UNDER THIS AGREEMENT AND
IN THE DECISION BY EACH PARTY TO ENTER INTO THIS AGREEMENT.

10. **Insurance.**

10.1    At all times during the term of this Agreement, each of the Parties shall procure and maintain, at its sole cost and expense, the following insurance coverages required of it from insurance companies reasonably acceptable to the other Party covering activities performed under, and obligations undertaken in, this Agreement:

10.1.1 **Commercial General Liability** for bodily injury, personal injury and property damage with combined limits of not less than $10,000,000.00 per occurrence.  Additionally, CLI 's Commercial General Liability policy shall include coverage for products/completed operations with combined limits of not less than $10,000,000.00 per occurrence.

10.1.2 **Automobile Liability** covering "any auto" to insure owned, non-owned and hired automobiles, trucks and all other vehicles utilized by the Party in performance of this Agreement. The policy limits shall be not less than $2,000,000.00 combined single limit per accident for bodily injury and property damage.

10.1.3 **Workers Compensation and Employer's Liability**: Workers compensation insurance providing statutory benefits and employer's liability including occupational disease with limits of not less than $1,000,000.00.

10.2    Each Party may satisfy the limits of its required insurance with any combination of primary and umbrella/excess insurance policies.

10.3    Policy Requirements:

10.3.1 All policies required shall satisfy the following requirements: (1) be written by insurance companies with a A.M. Best rating of no less than "A-: VII" and (2) provide that coverage shall not be suspended, voided, canceled, non-renewed, reduced in scope or limits except after thirty (30) days prior written notice by certified mail, return receipt requested, has been given to the Party named as an additional insured.

10.3.2 The required Commercial General Liability (subsection 10.1.1) and Automobile Liability (subsection 10.1.2) policies shall provide endorsements protecting as additional insureds the other Party, and its employees, agents, officers, shareholders and directors (the "Additional Insureds").  With respect to Allan as an additional insured, Allan's affiliates and suppliers shall also be included in the term "Additional Insureds".  Such coverage shall contain no special limitations on the scope of protection afforded to additional insureds, be

primary with respect to each of the Additional Insureds and non-contributory with any insurance carried by any of the Additional Insureds or against whom claim is made or suit is brought, except with respect to the limits of the insurer's liability.

10.4    Any deductibles or self-insured retention shall not exceed $100,000.00 without the prior written consent of the other Party, which shall not be unreasonably withheld.

10.5    Promptly after the request of a Party, the other Party shall provide evidence of all required insurance coverage in the form of valid certificates issued directly by the appropriate insurance carriers.

11.    **Force Majeure.**

11.1    Except for CLI's obligations set forth in Section 6, in the event that CLI fails to perform or is delayed in performing the terms of this Agreement as a result of Force Majeure (as defined below) that was beyond CLI's reasonable control, then CLI shall provide written notice to Allan of such event and its expected consequences. Thereafter, CLI shall be excused from performing such obligation for as long as such Force Majeure consequences continue.

11.2    In the event that Allan fails to perform or is delayed in performing the terms of this Agreement as a result of Force Majeure (as defined below) that was beyond Allan's reasonable control, then Allan shall provide written notice to CLI of such event and its expected consequences. Thereafter, Allan shall be excused from performing such obligation for as long as such Force Majeure consequences continue, even though any of such Force Majeure consequences are foreseeable or exist at the time of the Order. This provision is in addition to any excuse provided by California Uniform Commercial Code §§ 2613 to 2615 or other applicable law, and unless otherwise provided in this Agreement CLI shall have all rights provided thereunder. If Allan's obligation to furnish Products is excused, CLI's obligation to purchase such Products is also excused.

11.3    If the consequences of any Force Majeure event persist for more than 30 days, the Party to whom performance is otherwise due shall have the right to terminate this Agreement upon written notice to the other Party without further obligation or liability except for the obligation to pay for Products previously shipped, delivered and accepted and obligations and liabilities that are to survive the Agreement's termination.

11.4    "Force Majeure" means an act of God including but not limited to fire, flood, earthquake, windstorm or other natural disaster; act of any government including but not limited to war, invasion, act of foreign enemies, hostilities (whether war declared

or not), civil war, rebellion, revolution, insurrection, military or usurped power or confiscation, nationalization, requisition, destruction or damage to property by or under the order of any government sanction, embargo or similar action; change in statute, regulation, rule, code, or ordinance; judgment, order, decree, embargo, blockade, sabotage, epidemics, acts of public enemy, acts of terrorism, or riots; interruption or failure of utility service including but not limited to electric power, gas, water or telephone service; and inability timely to obtain necessary and proper labor, materials, energy, fuel, transportation, authorizations, consents, permits or licenses.

### 12.    Permits, Laws and Regulations.

12.1    Allan covenants that it shall obtain and pay for all necessary permits and shall comply with applicable laws, rules and regulations, including all reporting requirements required to process and sell the Products.

12.2    CLI covenants that it shall obtain and pay for all necessary permits and shall comply with applicable laws, rules and regulations, required to buy and process the Products.

### 13.    Termination.

13.1    This Agreement may be terminated as follows:

13.1.1  In the event of voluntary or involuntary bankruptcy, receivership, insolvency or reorganization proceedings involving either Party or its property or the assignment of all or substantially all of the assets of either Party for the benefit of creditors, the other Party may terminate its obligations hereunder by giving written notice of termination, which shall become effective on its receipt.

13.1.2  If either Party is in material default of any of its obligations under this Agreement and such default continues for 10 days after written notice thereof by the Party not in default, such non-defaulting Party may terminate this Agreement and/or any unfulfilled Orders which may be affected by such default.

13.1.3  In the event of any sale or actual or attempted assignment, delegation or transfer by either Party of any of its rights or obligations under this Agreement in contravention of the provisions of Section 17.

13.1.4  By either Party upon 60 days prior written notice to the other Party if the Parties, following good faith negotiations, are unable to agree to changes in the Specifications as provided for in Section 2.1.  In the event of such termination, CLI shall not be excused from its payment obligations for deliveries of Products made

11

prior to the effective date of termination.  Termination as provided in this subsection shall be in addition to, and not in lieu of, a Party's right to terminate for breach.

14.    **Notices.**

All notices or other communications hereunder (other than Orders and similar communications) shall be in writing and made by one of the following methods:  (a) personal delivery; (b) certified mail, return receipt requested; (c) national courier service; or (d) email or facsimile transmission (provided that the email or facsimile transmission is promptly confirmed by return transmission or verbal communication).  Notices shall be sent to a Party at the address set forth below such Party's signature, or such other address as a Party may designate in writing in the same manner.  Notwithstanding anything to the contrary in this Agreement, failure to strictly conform to the notice provisions specified herein shall not defeat the effectiveness of notice actually received.  Orders and similar communication may be given in any commercially reasonable fashion based on the Parties' course of dealing.

15.    **Survival of Remedies; Cumulative Remedies.**

Neither the expiration of the Term nor the earlier termination of this Agreement shall affect any rights of any Party which shall have accrued prior to the date of such expiration or termination.  Without limiting the generality of the foregoing, the rights of each Party under the Indemnification and Limitation of Liability paragraphs herein shall survive any termination or expiration of this Agreement.  In the event of the termination hereof by a Party because of a breach by the other Party, the terminating Party, subject to the provisions of this Agreement, shall retain all its legal remedies for the breach of this Agreement or any unperformed portion thereof.  No right or remedy conferred upon or reserved to any Party under this Agreement is intended to be, nor shall it be deemed, exclusive of any other right or remedy provided in this Agreement or by law or equity, but each shall be cumulative of every other right or remedy.  All such rights and remedies may be exercised concurrently or separately.

16.    **Waiver.**

The failure of either Party to insist in any one or more instances upon strict performance of any of the provisions of this Agreement, or to take advantage of any of its rights, shall not operate as a continuing waiver of such provisions or rights and shall not prevent such Party from insisting upon such provisions and taking advantage of such rights in the future.

17.    **Assignment; Transfer.**

17.1.1  In the event that either Party engages in a merger with another, commences the sale of substantially all of its assets, or is the target of an acquisition (each a "Sale Event"), neither this Agreement nor any interest in it may be sold, assigned, pledged, or otherwise transferred or encumbered by either Party without the prior express written consent of the other Party, whose consent shall not be unreasonably withheld.

17.1.2  Except for a Sale Event, neither this Agreement nor any interest in it may be sold, assigned, pledged, or otherwise transferred or encumbered ("Transfer") by either Party without the prior express written consent of the other Party, whose consent shall be given or withheld in its sole and absolute discretion.

17.1.3  As a condition precedent to Sections 17.1.1 and 17.1.2, the Party who is the subject of a Sale Event or intends a Transfer shall promptly provide full and accurate disclosure of information reasonably calculated to permit the other Party to make an informed decision to grant or withhold consent.

17.1.4  Any Transfer in violation of the provisions of this Section 17 shall be void, and of no force or effect.  Any permitted Transfer shall be invalid and of no force or effect and, accordingly, shall constitute a material breach of this Agreement and, in addition to any other rights and remedies which may otherwise be available, whether at law, in equity or otherwise, unless each transferee expressly agrees to be bound by each of the terms and conditions of this Agreement.  No permitted Transfer shall operate to relieve the transferor of its obligations or duties under this Agreement.  This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted transferees.

18.   **Governing Law; Forum.**

This Agreement shall be governed by and construed in accordance with the internal laws and not the conflicts of laws rules of the State of California without presumption or construction against the Party preparing it.  The Parties irrevocably submit to the exclusive jurisdiction of the federal and state courts of California on any matters whatsoever arising out of or related to this Agreement and irrevocably waive any objection to venue or inconvenient forum.

19.   **Entire Agreement.**

This Agreement, including the exhibits, is the final and exclusive expression of the Parties' agreement on the matters contained herein and all prior and contemporaneous negotiations and agreements between the Parties on such matters are expressly merged into and superseded by this Agreement.  No modification, amendment or waiver of any of the terms, conditions or provisions of this Agreement shall be valid unless agreed to in writing by the Parties.  Orders issued by CLI shall be subject to the terms and conditions hereof, and this Agreement shall prevail over any and all terms, conditions and provisions contained in CLI's Orders, Allan's quotes or acknowledgments, or other document of either Party, except dates and places of deliveries and means of transportation are to be fixed by CLI's Orders and Allan's acknowledgments.

20.     **Interpretation; Severability.**

The language in all parts of this Agreement shall be construed as a whole in accordance with its fair meaning and any rule of construction having the effect of resolving ambiguities against the drafting Party shall not apply in interpreting this Agreement. Handwritten or typed words shall have no greater weight than printed words in the interpretation or construction of this Agreement. Section, paragraph, and other headings used in this Agreement are included for convenience only and shall neither affect the construction or interpretation of any provision in this Agreement nor affect any of the rights or obligations of the Parties to this Agreement. In the event that any provision of this Agreement is held illegal or invalid for any reason, such illegality or invalidity shall at the option of the Party against whom the same is asserted not affect the remaining parts of this Agreement, but this Agreement shall be construed and enforced as if the illegal or invalid provision had never been inserted herein.

21.     **Independent Contractors.**

The relationship between CLI and Allan is that of independent contractors. Nothing contained in this Agreement shall be construed to create a principal-agent, employer-employee or co-venturer relationship between the Parties.

22.     **No Third Party Rights.**

This Agreement is intended to be solely for the benefit of the Parties hereto and is not intended to confer any benefits upon, or create any rights in favor of, any entity other than the Parties hereto, except as expressly provided to the contrary elsewhere in this Agreement.

23.     **Counterparts.**

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and all of which shall constitute one and the same Agreement. This Agreement may be executed and delivered by facsimile.

24.     **Negotiation Between Executives.**

24.1     The Parties shall attempt in good faith to resolve any dispute arising out of or relating to this Agreement, or the breach, termination or validity of the Agreement, by negotiations between executives who have authority to settle the controversy. Any Party

may give the other Party written notice of any dispute not resolved in the normal course of business. Within 30 days after delivery of the notice, executives of both Parties shall meet at a mutually acceptable time and place, and thereafter as often as they reasonably deem necessary, to exchange relevant information and to attempt to resolve the dispute. If the matter has not been resolved within 60 calendar days of the disputing Party's notice, or if the Parties fail to meet within 30 days after delivery of the notice, either Party may initiate the other remedies available under this Agreement or under applicable law. All negotiations pursuant to this clause are confidential and shall be treated as compromise and settlement negotiations for purposes of the Federal Rules of Evidence and state rules of evidence.

25. **<u>WAIVER OF RIGHT TO TRIAL BY JURY.</u>**

EACH PARTY HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT TO ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, ANY OTHER AGREEMENT CONTEMPLATED TO BE EXECUTED IN CONNECTION HEREWITH, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF EITHER PARTY.  EACH PARTY HEREBY AGREES THAT THIS AGREEMENT CONSTITUTES A WRITTEN CONSENT TO WAIVER OF TRIAL BY JURY PURSUANT TO THE PROVISIONS OF ANY APPLICABLE LAW, INCLUDING, WITHOUT LIMITATION, ANY APPLICABLE PROVISIONS OF CALIFORNIA CODE OF CIVIL PROCEDURE SECTION 631, AS SUCH PROVISIONS MAY BE APPLIED TO THIS AGREEMENT. THE PARTIES HEREBY ACKNOWLEDGE THAT THE TRANSACTION OF WHICH THIS AGREEMENT IS A PART IS A COMMERCIAL TRANSACTION.

{signature page follows}

**IN WITNESS WHEREOF**, CLI and Allan have executed this Agreement as of the day first above written.

CarbonLITE Industries LLC, a Delaware limited liability company

By: _____
Name: _LeoN FARAHNIK____
Its: ___CEO_____

Cedarwood-Young Company, a California corporation doing business as Allan Company

By: _Stephen A. Young_____
Name: _SAY_____
Its: _CEO_____

Address

10250 Constellation Boulevard
Suite 2820
Los Angeles, California 90067

Attn: _Rich Zirkler_____
Telephone: _310 473-7005_____
Facsimile: _310 473-8592_____
Email: _RZirkler@HPC.Com_____

Address

14620 Joanbridge Street
Baldwin Park, California 91706

Attn: _Jason Young_____
Telephone: _626-9624047_____
Facsimile: _626 9600422_____
Email: _JYoung@AllanCompany.Com_

**Exhibit A**

## PRODUCT SPECIFICATIONS

| | |
|---|---|
| <u>Resin:</u> | PET Mixed Color |
| <u>Product:</u> | Post-Consumer PET Bottles, including lids, caps and labels |
| <u>Category:</u> | Mixture of containers including but not limited to the following, soft drink, water, sports drink, juice, liquor, and custom bottles. |

<u>Bale Properties:</u>

| | |
|---|---|
| Bulk Density: | 10 lbs/cu ft. Min. - 25 lbs/cu ft. Max |
| Approximate Dimensions: | 30" x 54" x 65" |
| Strapping: | Non-rusting material |
| Integrity: | Must be maintained through shipping. |

| | |
|---|---|
| <u>Moisture Content:</u> | Moisture content up to and including 10% by weight is deemed to be air dry and acceptable. Where moisture content is shown to exceed 10% in a bale, CLI shall have the right to request a pro-rata adjustment. |

<u>Out-throws:</u>

1. Total allowable contamination:     4%

2. No more than 2% by weight of the following individual materials:

   • HDPE containers

   • LDPE Containers

- Polypropylene Containers

- Aluminum

- Tin cans

- Paper

3. No more than 1% by weight of the following individual materials:

- Thermoform containers

- Film

- Glass

- PVC

- Other

Disclaimer:   Total out-throws percentage is a baseline measurement that has been determined based upon current incoming PET stream characteristics. Changes to consumer packaging (e.g. bottle composition) may occur that renders the aforementioned characteristics obsolete or inaccurate. In this event, the parties will meet and confer in accordance with Section 2.1 to modify these specifications.

<u>Exhibit B</u>

1.    **PRICING FORMULA**

Total price per gross pound of Product (the "Contract Price") shall be computed as follows:

> **Contract Price = PET Bottle Price *plus* Per Pound Premium *plus or minus* Freight Differential (as the case may be).**

**Where**

> **PET Bottle Price** will be determined as follows:
>
> > Two times each calendar month, Allan will market like quality baled Product to qualified purchasers using a bid process. The prices in this bid process represent the delivered price to the Long Beach dock. For purposes of this Agreement, the PET Bottle Price shall be set on the same date that the bidding closes and shall be equal to the weighted average price per gross pound of the two highest bidders of the bid process. In the event that only one successful bid is received, then the PET Bottle Price shall be the same price per gross pound as such successful bid.
>
> **Per Pound Premium** means a $0.02 per gross pound surcharge over the highest of the following:
>
> > a. **PET Bottle Price**; or
> >
> > b. the highest price paid by CLI to others for Product of like or lower grade from anyone other than Allan during the same time period, subject to the audit rights set forth in Section 3.3.
>
> **Freight Differential** will be computed as the difference in freight costs and other miscellaneous transportation expenses, on a load-by-load basis for delivery of Products to the Long Beach dock versus delivery of Products to Riverside. There may be a zero Freight Differential, or a negative Freight Differential, or a positive Freight Differential, depending on the origin of the bales.

In the event that Allan gives notices that the PET Bottle Price can no longer be determined in the manner described above, the Parties shall meet and confer in good faith to discuss other means of determining the market price for the Product.

2.   **MOST FAVORED NATION PRICING GUARANTEE**

Notwithstanding anything to the contrary in this Agreement, if at any time during the Term of this Agreement CLI buys Product of like or lower grade from anyone other than Allan at a price higher than the PET Bottle Price, the PET Bottle Price will be immediately increased to the highest price paid by CLI for that the period of time during which the PET Bottle Price is less than the highest price paid by CLI.  In the event CLI does so buy, CLI will immediately advise Allan of that activity.

# FIRST AMENDMENT TO
# POST-CONSUMER PET SUPPLY AGREEMENT

This First Amendment ("**Amendment**") to the Post-Consumer PET Supply Agreement (the "**Agreement**") is entered into as of August 31, 2016, by and between Cedarwood-Young Company, a California corporation doing business as Allan Company ("**Allan**"), and CarbonLITE Industries LLC, a Delaware limited liability company ("**CLI**"). Allan and CLI are sometimes referred to in this Agreement individually as the "Party" or "PARTY" and collectively as the "Parties" or "PARTIES". Capitalized terms not otherwise defined herein shall have the meanings ascribed thereto in the **Agreement**.

## RECITALS

A.     The Parties desire to set the Contract Date and the Start Date and replace placeholders in the Agreement with such dates; and

B.     The Parties further desire to amend the Agreement in order to provide certain differing or specified terms and conditions.

## AGREEMENT

NOW THEREFORE, in consideration of the mutual covenants set forth herein and of the recitals set forth above which the parties acknowledge are true and correct, the parties hereby amend the Agreement and agree as follows:

1.     The Parties agree to set the Contract Date as April 28, 2010, and set the Start Date as June 1, 2011, such that the introductory paragraph of the Agreement is amended to read as follows:

> This POST-CONSUMER PET SUPPLY AGREEMENT ("Agreement") is made as of April 28, 2010 (the "Contract Date") for initial supplies to commence delivery on June 1, 2011 (the "Start Date") by and between Cedarwood-Young Company, a California corporation doing business as Allan Company ("Allan" or "ALLAN"), having a principal place of business at 14620 Joanbridge Street, Baldwin Park, California 91706, and CarbonLITE Industries LLC, a Delaware limited liability company ("CLI"), having a principal place of business at 10250 Constellation Boulevard, Suite 2820, Los Angeles, California 90067.  Allan and CLI are sometimes referred to in this Agreement

1

individually as the "Party" or "PARTY" and collectively as the "Parties" or "PARTIES".

2. The Parties agree to amend Section 1 (Term) of the Agreement by replacing Section 1 in its entirety with the following:

1. **Term.**

1.1 This Agreement shall be operative as of the Contract Date set forth above and continue in force for five (5) successive years from the Start Date (the "Term") unless earlier terminated as set forth in this Agreement or pursuant to applicable law (the "Initial Term").

1.2 The parties agree to extend the Term of the Agreement for five (5) successive years beyond the Initial Term (the "First Extension Period"), such that the First Extension Period shall start on June 1, 2016 and shall expire on May 31, 2021, unless earlier terminated as provided in the Agreement or pursuant to applicable law.

1.3 The parties agree to meet and confer regarding the this Agreement in the 25th month of the First Extension Period to review, discuss, and develop economically feasible solutions to ameliorate reasonably unforeseeable and uncontrollable events and/or issues arising during the First Extension Period of the Agreement.

3. The Parties agree to amend Section 5.1 of the Agreement relating to Anticipated Volumes and Delivery by adding the following to the end of Section 5.1:

From and after the start of the First Extension Period, CLI shall purchase from Allan, and Allan shall sell to CLI, two million one hundred thousand (2,100,000) pounds of Products per month (the "New Monthly Quantity") instead of previously agreed amounts. The New Monthly Quantities may vary by up to five percent (5%) over the New Monthly Quantity each month, but in no event shall CLI purchase less than the New Monthly Quantity.

5.1.1   Within 30 days after the end of each calendar year during the First Extension Period, Allan shall determine whether CLI has met its obligation to purchase the New Monthly Quantity of Products. If the CLI's purchases during any month are less than the New Monthly Quantity ("Quantity Shortage"), Allan shall provide CLI with notice of the Quantity Shortage (the "Shortage Notice"). CLI shall have 10 days after the Shortage Notice to review the Shortage Notice ("Review Period") and either accept or dispute all or part of the Quantity Shortage claimed by Allan. If CLI has not notified Allan that it disputes the Quantity Shortage, then the amount of the Quantity Shortage shall be final and binding upon the Parties, absent manifest error, and CLI shall be liable for payment to Allan at a rate of $0.02 per gross pound for all Quantity Shortages ("Shortfall Payment"). The Shortfall Payment shall be due and payable within 20 days of the end of the Review Period. Otherwise, if CLI timely and properly provides notice that it disputes the Quantity Shortage (which notice shall contain a statement of the basis of such dispute), CLI shall pay the undisputed portion of the Quantity Shortage within 20 days of the end of the Review Period and the parties shall promptly and in good faith discuss resolution of the disputed portion of the Quantity Shortage.

4.   The Parties agree to amend Section 5.2 of the Agreement relating to Anticipated Volumes and Delivery by replacing that section in its entirety with the following:

5.2 Delivery of Products shall be made FOB point of origin or destination, as agreed by the Parties on a load by load basis.

5.2.1   Title, possession and risk of loss of all Products sold hereunder shall pass to CLI upon delivery of Products.

5.2.2   It is the intention of the Parties that the freight and miscellaneous transportation charges reimburse Allan for such costs. Therefore, during the First Extension Period, and within 30 days after the end of each calendar quarter, the parties shall review, in good faith, the freight and other miscellaneous transportation costs to determine whether

3

equitable adjustments should be made.  If the parties agree that adjustments would be just and proper, the parties shall promptly implement such equitable adjustments on new Orders of Products under this Agreement.

5.    The Parties agree to amend Section 5.4 of the Agreement by adding the following to the end of Section 5.4:

In the event that CLI does not have a sufficient number of empty trailers available for Allan Company to successfully swap a loaded trailer with an empty trailer in one truck trip, CLI shall arrange to deliver to Allan a suitable empty trailer as soon as possible and at CLI's sole cost and expense.  In the event that CLI fails to promptly make an empty trailer available five times in any calendar month, then Allan shall have the right, but not the obligation, without notice to or demand on CLI and without releasing CLI from any obligation under this Agreement, to obtain a suitable empty trailer and, in exercising this right, incur any liability and expend whatever amounts Allan may deem reasonably necessary.  All expenses so incurred by Allan will be immediately due and payable by CLI on demand and will bear interest at the rate of ten percent (10%), or the maximum interest rate permitted by law, whichever is less, per annum until paid.

6.    The Parties agree to amend Section 12 (Permits, Laws and Regulations) of the Agreement by replacing Section 12 in its entirety with the following:

12.    **Permits, Laws and Regulations.**

Each Party covenants that it shall obtain and pay for all necessary permits and shall comply with applicable laws, rules and regulations. Without limiting the generality of the foregoing, the Parties expressly agree to comply with the California Beverage Container Recycling and Litter Reduction Act (found at Pub. Resources Code, § 14500 et seq.) (the "Act") and regulations promulgated under the Act.  The parties further agree to prepare, sign, and maintain documents that are necessary or beneficial for such compliance, including, but not limited to, preparing and maintaining required transaction documents and verifications and/or other records of cancellation.

4

7.   The Parties agree to amend Exhibit B of the Agreement by deleting the last sentence of Section 1 of Exhibit B, which reads as follows:

> In the event that Allan gives notices that the PET Bottle Price can no longer be determined in the manner described above, the Parties shall meet and confer in good faith to discuss other means of determining the market price for the Product.

8.   The Parties agree to amend Exhibit B of the Agreement by adding the following as Section 3:

> If, during certain periods of time, Allan gives notice that the PET Bottle Price cannot, in good faith, be determined in the manner described in Section 1 (Pricing Formula), above, the parties agree to use the then "Current Average" pricing published from time to time on recyclingmarkets.net for "PET (Baled, ¢/lb, picked up)" in the "LOS ANGELES (Southwest USA)" market region as the PET Bottle Price for purposes of computing the Contract Price. In the event that recyclingmarkets.net fails to consistently and timely publish accurate market prices, the Parties shall meet and confer in good faith to discuss other means of determining the market price for the Product.

9.   To the extent that any provisions of this Amendment are inconsistent with any provisions of the Agreement, the provisions of this Amendment shall supersede and control. Except as modified in this Amendment, the terms and conditions of the Agreement shall remain in full force and effect. The Parties hereby acknowledge and agree that the Agreement is in full force and effect.

10.  This Amendment may be executed and delivered in one or more counterparts, each of which when so executed and delivered shall be the original, but such counterparts together shall constitute one and the same instrument.

{signatures follow}

5

IN WITNESS WHEREOF, the parties have executed this Amendment to be effective as of June 1, 2016.

**CarbonLITE Industries LLC, a Delaware limited liability company**

By: _____
Name: _____Rick Ziplier_____
Its: _____CUP_____

**Cedarwood-Young Company, a California corporation doing business as Allan Company**

By: _____
Name: _____JASON A. YOUNG_____
Its: _____CEO_____