**EXHIBIT A**

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

```
---------------------------------------------------------- x
In re:                                   :   Chapter 11
                                         :
CARBONLITE HOLDINGS LLC, et al., 1       :   Case No. 21-10527 (JTD)
                                         :
            Debtors.                     :   (Jointly Administered)
                                         :
                                         :   Re: Docket Nos. 11, 112, 180, 205
---------------------------------------------------------- x
```

**REPLY OF UMB BANK, N.A. IN SUPPORT OF (1) TX/PA DEBTORS' MOTION
PURSUANT TO SECTIONS 105, 361, 362, 363, 364, 503 AND 507 OF THE
BANKRUPTCY CODE SEEKING ENTRY OF INTERIM AND FINAL ORDERS
(I) AUTHORIZING THE TX/PA DEBTORS TO OBTAIN SENIOR SECURED
SUPERPRIORITY POSTPETITION FINANCING; (II) GRANTING (A) LIENS AND
SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, AND (B) ADEQUATE
PROTECTION TO THE PREPETITION SECURED PARTIES; (III) AUTHORIZING
THE USE OF CASH COLLATERAL; (IV) MODIFYING THE AUTOMATIC STAY; (V)
SCHEDULING A FINAL HEARING; AND (VI) GRANTING RELATED RELIEF; AND
(2) DEBTORS' MOTION FOR (I) AN ORDER (A) APPROVING BID PROCEDURES
FOR THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS; (B)
APPROVING PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF
EXECUTORY CONTRACTS AND UNEXPIRED LEASES; (C) APPROVING CERTAIN
BID PROTECTIONS IN CONNECTION WITH THE DEBTORS' ENTRY INTO ANY
POTENTIAL STALKING HORSE AGREEMENTS; (D) SCHEDULING THE AUCTION
AND SALE HEARING; (E) APPROVING THE FORM AND MANNER OF NOTICE
THEREOF; AND (F) GRANTING RELATED RELIEF; AND (II) AN ORDER OR
ORDERS (A) APPROVING THE SALE OF THE DEBTORS' ASSETS FREE AND
CLEAR OF ALL CLAIMS, LIENS, AND ENCUMBRANCES; AND (B) APPROVING
THE ASSUMPTION AND ASSIGNMENT OR REJECTION OF EXECUTORY
CONTRACTS AND UNEXPIRED LEASES**

UMB Bank, N.A., in its separate capacities as TX DIP Agent,[2] PA DIP Agent, TX

Prepetition Trustee, and PA Prepetition Trustee (collectively, the "***TX/PA Agent***"), hereby submits

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: CarbonLite Holdings LLC (8957); CarbonLite Industries LLC (3596); CarbonLite P Holdings LLC (8957); CarbonLite P LLC (5453); CarbonLite PI Holdings LLC (8957); CarbonLite Pinnpack LLC (8957); CarbonLite Recycling Holdings LLC (8957); CarbonLite Sub-Holdings, LLC (8957); Pinnpack P, LLC (8322); CarbonLite Recycling LLC (3727); and Pinnpack Packaging LLC (9948). The address of the Debtors' corporate headquarters is 10250 Constellation Blvd., Los Angeles, CA 90067.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the DIP Motion or the Bid Procedures Motion (as defined herein), as applicable.

this reply (this "***Reply***") in support of the *TX/PA Debtors' Motion Pursuant to Sections 105, 361, 362, 363, 364, 503 and 507 of the Bankruptcy Code Seeking Entry of Interim and Final Orders (I) Authorizing the TX/PA Debtors to Obtain Senior Secured Superpriority Postpetition Financing; (II) Granting (A) Liens and Superpriority Administrative Expense Claims, and (B) Adequate Protection to the Prepetition Secured Parties; (III) Authorizing the Use of Cash Collateral; (IV) Modifying The Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief* [D.I. 11] (the "***DIP Motion***") and the *Debtors' Motion for (I) An Order (A) Approving Bid Procedures for the Sale of Substantially All of the Debtors' Assets; (B) Approving Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases; (C) Approving Certain Bid Protections in Connection With the Debtors' Entry Into Any Potential Stalking Horse Agreements; (D) Scheduling the Auction and Sale Hearing; (E) Approving the Form and Manner of Notice Thereof; and (F) Granting Related Relief; and (II) An Order or Orders (A) Approving the Sale of the Debtors' Assets Free and Clear of All Claims, Liens, and Encumbrances; and (B) Approving the Assumption and Assignment or Rejection of Executory Contracts and Unexpired Leases* [D.I. 112] (the "***Bid Procedures Motion***") and in response to the objection thereto [D.I. 180] (the "***Objection***") filed by the Official Committee of Unsecured Creditors (the "***Committee***"). In support of this Reply and in further support of the DIP Motion and the Bidding Procedures Motion, the TX/PA Agent respectfully states as follows:

## **PRELIMINARY STATEMENT**

1.      The Objection should be overruled.  The Committee does not dispute that the TX/PA Debtors have an urgent need for postpetition financing.  Nor could it.  The record in these Chapter 11 Cases is clear—without the financing package proposed by the TX/PA Agent and the bondholders it represents—institutional holders of tax-exempt bonds, not distressed investors—

2

the TX/PA Debtors' businesses would cease to operate as going concerns. Rather, the Committee challenges select components of these financing packages, notwithstanding the fact that such components are integral to the DIP Lenders' decision to put additional funds at risk and are resoundingly customary in debtor-in-possession financings. Moreover, the Committee, quite incredibly, argues that the DIP Lenders should be compelled to inject additional funds—in addition to the *$40 million* in new money that the DIP Lenders are providing under the DIP Facilities, to support the TX/PA Debtors' sale processes. Such challenges ignore the Bankruptcy Code and constitute a proposed usurpation of the TX/PA Debtors' properly exercised business judgment.

2.      The Committee further insists that the DIP Lenders and the Prepetition Secured Parties seek a "value grab" of the TX/PA Debtors' assets and "complete control" of the sale process. Nothing could be further from the truth. The terms of the DIP Facilities reflect the commercial reality of these Chapter 11 Cases and the unique and significant challenges facing the TX/PA Debtors: a Pennsylvania recycling plant which is not operational and requires substantial capital expenditures, raw goods, and immediate employee hires (all to be funded by the PA DIP Facility) in order to commence business and a Texas facility that has historically failed to reliably satisfy customer demand and operate profitably (or even break-even). All of these challenges are set against the backdrop of a properly run but inherently uncertain sale process in which the DIP Secured Parties and the Prepetition Secured Parties lack any visibility into likely sale proceeds or the ultimate secured creditor recovery. What is more, despite soliciting financing proposals from multiple potential sources, the TX DIP Facility and the PA DIP Facility are the only postpetition financing options available to the TX Debtors and the PA Debtors, respectively. *See* Morgner Declaration ¶¶ 12–16 [D.I. 17]. Indeed, the Committee has not identified any potential sources

3

of alternative financing to the TX/PA Debtors and completely abandoned negotiations with the DIP Lenders.[3]

3.      Further, in seeking an extension of the milestones under the DIP Facilities and Bid Procedures in these Chapter 11 Cases, the Committee conveniently overlooks the fact that the marketing process for the TX/PA Debtors has been ongoing since *January 2021*, when the TX/PA Debtors hired their investment banker, Jefferies L.L.C. ("*Jefferies*"). The TX/PA Debtors, along with Jefferies and their other advisors, evaluated the terms of the DIP Facilities and determined that the milestones were reasonable and achievable. Extending the milestones in these Chapter 11 Cases just unnecessarily prolongs a process that was already well underway before these cases were filed and adds tremendous additional expense without additional benefit to the TX/PA Debtors' estates.

4.      The DIP Facilities provide vital liquidity to the TX/PA Debtors notwithstanding the limited sale visibility and challenges faced by all stakeholders. The DIP Lenders and the other Prepetition Secured Parties would not have consented to the use of their Cash Collateral, nor provided the DIP Facilities, without the assurances and protections provided in the proposed Final Orders. The Committee should not be permitted to cherry-pick the provisions of the DIP Facilities and Bid Procedures which it finds objectionable yet receive the benefit of the financial package provided by the DIP Lenders and the Prepetition Secured Parties. The DIP Facilities, when viewed as a whole, as well as the Bid Procedures, are more than reasonable and provide the

---

[3]    Counsel to the TX/PA Agent and the Committee had been engaged in good-faith negotiations regarding a resolution of the issues set forth in the Objection and the Debtors, with the consent of the TX/PA Agent, granted an extension of the Committee's objection deadline to facilitate further negotiations. Following the exchange of an issues list and a discussion amongst the parties, which counsel to the TX/PA DIP Agent believed narrowed the issues and provided a path toward potential resolution, the Committee inexplicably went radio silent and then filed its approximately fifty-page Objection, raising numerous issues which the TX/PA Agent believe could have been easily resolved if the Committee had engaged in minimal further discussions.

greatest opportunity for the Debtors to maximize the value of their estates for the benefit of all creditors.  Thus, they should be approved in their entirety, and the Objection should be overruled.

## **REPLY**

**I.     The DIP Motion Should Be Approved on a Final Basis.**

5.     The TX/PA Debtors have determined, in their respective business judgment, that the DIP Facilities provide the best means of financing these Chapter 11 Cases and maintaining their businesses as going concerns.  When determining whether to approve a debtor's request to obtain postpetition financing, bankruptcy courts defer to a debtor's business judgment.  *See, e.g.*, *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender. . . .  Under the [Business Judgment Rule], courts will not second-guess a business decision, so long as corporate management exercised a minimum level of care in arriving at the decision."); *In re U.S. Mineral Prods. Co.,* No. 01-2471 (JKF), 2005 WL 5887218, at *2 (Bankr. D. Del. Nov. 29, 2005) (approving financing based on debtor's and trustee's exercise of "prudent business judgment"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (holding that a court should defer to debtor's "reasonable business judgment").

6.     The business judgment rule governs unless one of four elements can be shown: (a) the directors did not in fact make a decision; (b) the directors' decision was uninformed; (c) the directors were not disinterested or independent; or (d) the directors were grossly negligent. *Id.*  The Committee has not demonstrated that any of these exceptions apply to the facts at hand. Rather, for the reasons set forth in the DIP Motion, and as further described in this Reply, the DIP

Facilities are clearly the best (and only) option available to preserve value for these estates, creditors, employees and other parties in interest, and the Objection should therefore be overruled.

7.     Allowing the Committee to substitute its own judgement for that of the TX/PA Debtors would undermine the business judgment rule.  *See, e.g.*, *In re The Wet Seal Inc.*, No. 15-10081, D.I. 335, p. 52–53 (Bankr. D. Del. Feb. 5, 2015) (finding, over objection, that the debtor "acted in accordance with reasonable business judgment in deciding how to proceed. . . ."); *In re Exide Techs.*, No. 13-11482, D.I. 2568, p. 115 (Bankr. D. Del. Oct. 31, 2014) (approving a DIP amendment and extension over committee objections and noting that "[c]ourts generally will not second guess, nor should they, a business decision so long as corporate management has exercised a minimum level of care in arriving at the decision.").

    **(A)**    **The Process Timeline Is Adequate and Reasonable Under the Circumstances of These Chapter 11 Cases.**

8.     The Court should reject the Committee's contention that the proposed milestones are too truncated and prevent a thorough process that will maximize value for the TX/PA Debtors' estates and all parties in interest.  *See, e.g.*, Objection ¶¶ 1–2.  Rather, particularly when viewed from the perspective of prepetition activities, the process timeline is adequate and reasonable under the circumstances of these Chapter 11 Cases, does not preclude alternatives to a sale, and is designed to maximize the value of the TX/PA Debtors' estates for the benefit of all of the TX/PA Debtors' creditors.  The TX/PA Debtors have been engaged in a robust marketing process, led by Jefferies, for one or more sale transactions of substantially all or a portion of their assets ***or, for an alternative reorganization transaction, since January 2021***.  Jefferies has identified and contacted 152 potential interested parties, including industry and financial players.  Bidding Procedures Motion ¶ 14.  As of the date of the Bid Procedures Motion, 83 of those parties had signed non-disclosure agreements and had begun conducting due diligence.  *Id.*  Of those, eight

(8) potential bidders have provided non-binding indications of interest and nine (9) have expressed interest in serving as a Stalking Horse Bidder. *Id.* Thus, market interest to date is substantial. Interested parties have had more than three months already to assess the Debtors' assets and business operations and continue to do so under the timeline currently in place. This is a far cry from the Committee's "fire sale" or "stifle[d]" characterization of the process. *See* Objection ¶¶ 2, 12. And to the TX/PA Agent's knowledge, no prospective bidder has raised concerns about the proposed sale timeline.

9. Furthermore, the milestones set forth in the DIP Credit Agreements and in the Bidding Procedures Motion were reached through arms'-length, good faith negotiation with the TX/PA Debtors and reflect the exercise of the TX/PA Debtors' reasonable business judgment. Slowing the process does not maximize value; rather, it increases the cost of the process to the estates and delays the efficient resolution of these Chapter 11 Cases—to the benefit of no party in interest, especially general unsecured creditors. Every day that the Debtors remain in chapter 11 is costing their estates considerable administrative expenses. As the Committee explicitly acknowledges in the *Declaration of Edward Kim in Support of Combined Objection of the Official Committee of Unsecured Creditors to the TX/PA DIP Motion, the CA DIP Motion, and the Bid Procedures Motion* [D.I. 205] (the "***Kim Declaration***"), ███████████████████████ ███████—yet, the Committee, seemingly at odds with several of its own arguments, asks for additional time. *See, e.g.*, Kim Declaration ¶ 14. Nevertheless, as set forth in the revised proposed Bidding Procedures Order, concurrently filed by the Debtors, the DIP Lenders have agreed to reasonable extensions to the timeline to address certain concerns raised by the Committee with respect thereto.

**(B)** **The Sizing of the DIP Facilities Is Adequate to Meet the TX/PA Debtors' Operating Needs and to Fund These Chapter 11 Cases.**

10.    What seems lost on the Committee in its incredible ask for an upsizing of the DIP Facilities is twofold: (a) the DIP Lenders agreed to provide postpetition financing solely in accordance with the agreed Budgets and cannot be compelled to lend additional funds, and (b) the Budgets were prepared by the TX/PA Debtors' management and their financial advisors, who are the most knowledgeable about the needs of the TX/PA Debtors' business. The DIP Lenders relied on the TX/PA Debtors' representations and assurances that the Budgets contain applicable expenses for the period covered by such Budgets, including all necessary costs and expenses of operating the TX/PA Debtors' businesses and administering these Chapter 11 Cases and represent an exercise of the TX/PA Debtors' reasonable business judgment.

11.    The Committee now would have the Court substitute its judgment as to the Budgets and sizing of the DIP Facilities for that of the TX/PA Debtors themselves, who are involved in the day-to-day operations of the business and intimately know and understand the requirements of operating their business. The Committee maintains that the current size of the DIP Facilities is "to the detriment of unsecured creditors" and advocates for more DIP funding and a longer chapter 11 process, but it fails to acknowledge that any additional new money will only be provided on a senior secured superpriority basis, pushing unsecured creditors even deeper out of the money.

12.    The motive behind the Committee's request for additional funds is confusing at best as it will place additional senior secured superpriority financing ahead of general unsecured creditors, effectively reducing their recovery, and is self-serving at worst as it appears additional funding would largely be diverted to increasing the budgets for Committee professionals' fees.

8

**(C)    The Terms of the DIP Facilities Are Reasonable and Reflect the Commercial Realities of These Chapter 11 Cases.**

13.    Although the Committee is eager to pick and choose provisions of the DIP Facilities that it may find objectionable in isolation, the DIP Facilities must be viewed comprehensively with respect to the particular circumstances of these Chapter 11 Cases.  In short, each of the DIP Facilities's terms objected to by the Committee was required, after vigorous negotiation, between the TX/PA Debtors and the DIP Lenders.  The terms of the DIP Facilities, and the protections afforded to the DIP Lenders thereunder, are standard terms in postpetition financing agreements.  The fees, expenses, interest rates, Milestones, waivers and other provisions were negotiated at arms'-length to provide the TX/PA Debtors with the necessary liquidity to operate their businesses and effectuate a restructuring, while simultaneously providing the DIP Lenders with market-based terms and protections.  Without these provisions, the TX/PA Debtors would have been unable to access the liquidity necessary to fund these Chapter 11 Cases and maintain the businesses as a going concern.  The Committee would like to cherry-pick the provisions it likes while rejecting those that largely serve to protect the DIP Lenders.  However, each of the TX DIP Facility and the PA DIP Facility is a package, and each reflects concessions from both the applicable TX/PA Debtors and applicable DIP Lenders.  Regardless of whether considered properly as a package or considered in isolation, the purportedly objectionable terms are entirely reasonable and appropriate in these Chapter 11 Cases and should be approved

**(i)    The Roll-Up Is Necessary and Appropriate Under the Circumstances.**

14.    The Court should overrule the Committee's request not to approve the roll-up on a 2:1 basis under the PA DIP Facility.  The PA Roll-Up Loans are a material component of the structure of the PA DIP Facility, which was required by the PA DIP Lenders as a condition to their commitment to provide $25 million in new money postpetition financing and consent to the

PA Debtors' use of their cash collateral.  The PA Facility is unique in the context of these Chapter 11 Cases.  Unlike the Debtors' other facilities, the PA Facility is not yet fully operational and still needs to have certain of its equipment installed and certified.  Conversely, the other three facilities have been operating for some time.  While the PA DIP Lenders are hopeful that the PA Facility will be successful once it is fully operational, there is a significant risk to ramp up and operations, and there is no guarantee of success.  Relatedly, the PA DIP Lenders have concerns that some of the issues that have plagued the other facilities may also affect the PA Facility.  Accordingly, the PA DIP Facility is an inherently riskier loan.  Even with the 2:1 roll-up, the PA DIP Lenders were unable to convince all of the PA Prepetition Bondholders to participate given the perceived risks of this financing.  The PA Roll-Up Loans are intended to provide further economics in exchange for taking on that credit risk and are an essential element of the total consideration the PA DIP Lenders will receive in exchange for providing the PA DIP Facility.  Removing the roll-up would impair, or indeed destroy, the fundamental bargain reflected by the terms of the PA DIP Facility.

15.     Courts in this jurisdiction have recognized that roll-ups are a common element of debtor-in-possession financings in recent years and have approved such provisions.  *See, e.g.*, *In re Golfsmith Int'l Holdings, Inc.*, No. 16-12033 (LSS) (Bankr. D. Del. Oct. 17, 2016) [D.I. 314]; *In re Draw Another Circle, LLC*, No. 16-11452 (KJC) (Bankr. D. Del. July 22, 2016) [D.I. 448]; *In re Pac. Sunwear of Cal., Inc.*, No. 16-10882 (LSS) (Bankr. D. Del. May 24, 2016) [D.I. 388]; *In re Haggen Holdings Liquidation, LLC*, No. 15-11874 (KG) (Bankr. D. Del. Oct. 15, 2015) [D.I. 449]; *In re EveryWare Global, Inc.*, No. 15-10743 (LSS) (Bankr. D. Del. Apr. 28, 2015) [D.I. 130].

16.     Additionally, courts have held that approval of a roll-up is permissible in circumstances where: (a) the debtor's business operations will not survive absent the proposed

financing; (b) the debtor is unable to obtain alternative financing on acceptable terms; (c) the proposed lender will not accede to less preferential terms; and (d) the proposed financing is in the best interests of the general creditor body. *See, e.g.*, *In re Vanguard Diversified, Inc.*, 31 B.R. 364, 366 (Bankr. E.D.N.Y. 1983); *see also In re Ellingsen MacLean Oil Co.*, 834 F.2d 599, 601–02 (6th Cir. 1987); *In re Beker Indus. Corp.*, 58 B.R. 725, 741–43 (Bankr. S.D.N.Y. 1986); *In re FCX, Inc.*, 54 B.R. 833, 837, 840 (Bankr. E.D.N.C. 1985); *In re Gen. Oil Distribs., Inc.*, 20 B.R. 873, 876–77 (Bankr. E.D.N.Y. 1982). The PA Roll-Up Loans satisfy each of the criteria noted above as follows: (i) without the liquidity provided by the PA DIP Facility, the PA Debtors would be unable to fund necessary expenditures to ensure the PA Facility becomes fully operational and maintain the business as a going concern; (ii) as underscored by the evidence the PA Debtors proffered in support of the PA DIP Facility, the PA Debtors are unable to obtain alternative financing on acceptable terms, *see, e.g.*, Morgner Decl. ¶¶ 15–16; (iii) the PA Prepetition Bondholders' agreement to provide financing to the PA Debtors and consent to the use of their Cash Collateral was premised on inclusion of the roll-up in the PA DIP Facility, *see* Morgner Decl. ¶ 19; and (iv) the PA DIP Facility is in the best interest of the PA Debtors' creditors because it provides the PA Debtors with the necessary cash to fund the completion of the PA Facility and its operations once fully-functioning, as well as providing the best economic terms possible given the circumstances. Accordingly, the PA Roll-Up Loans meet the necessary criteria for approval.

17.    Furthermore, contrary to the Committee's assertions otherwise, *see* Objection ¶ 25, the PA Roll-Up Loans are subject to the Challenge Period. *See, e.g.*, proposed Final Order ¶ 13(b)(ii) (delineating the Roll-Up Loans as one of the matters with respect to which a Challenge Proceeding may be filed). This fully "protect[s] the rights and interests of unsecured creditors and other parties-in-interest." Objection ¶ 25.

>   **(ii)**      **The DIP Liens and the Proposed Adequate Protection Package Are Appropriate and Warranted.**

18.      The Committee contends that the DIP Facilities improperly grant the DIP Lenders liens on unencumbered assets and that the proposed adequate protection provisions violate the Bankruptcy Code.  *See* Objection ¶¶ 26–33.  The DIP Liens and the adequate protection package provided to the DIP Secured Parties and the Prepetition Secured Parties, respectively, are a part of the complete package that was negotiated by the TX/PA Debtors, the DIP Secured Parties, and the Prepetition Secured Parties.  The types of unencumbered assets identified by the Committee are routinely made available as collateral to postpetition lenders in exchange for new money loans and to prepetition lenders in exchange for the use of cash collateral and their consent to priming.  *See, e.g.*, *In re Windsor Petroleum Transp. Corp.*, No. 14-11708 (PJW) (Bankr D. Del. Aug. 12, 2014) [D.I. 52] (permitting liens on avoidance actions for use of cash collateral).  As a representative of unsecured creditors, neither the Committee nor its constituents are entitled to any adequate protection, nor are they entitled to restrict the TX/PA Debtors' ability to grant unencumbered property as collateral in exchange for the infusion of new capital.  *See, e.g.*, *In re Dairy Mart Convenience Stores, Inc.*, 351 F.3d 86, 90 (2d Cir. 2003).

19.      Proceeds of avoidance actions are property of a debtor's estate under section 541(a)(3) of the Bankruptcy Code, which provides that "any interest in property that a trustee recovers" under section 550 of the Bankruptcy Code is property of the estate.  11 U.S.C. § 541(a)(3).  Therefore, a debtor may pledge proceeds of avoidance actions as collateral for the claims of secured creditors.  *See, e.g.*, *In re AppliedTheory Corp.*, No. 02-11868 (REG), 2008 WL 1869770, at *1 (Bankr. S.D.N.Y. Apr. 24, 2008) ("Of course those assets started out unencumbered.  But those assets can thereafter be encumbered (or made available to satisfy superpriority claims), if necessary to provide adequate protection.  That's expressly authorized

under section 361(2).").  Unsecured creditors do not hold an exclusive right to the proceeds of avoidance actions.  Such causes of action are property of a debtor's estate that may be utilized in accordance with the debtor's business judgment.  *See* 11 U.S.C. §§ 541(a)(3), 541(a)(4), 550(a). Indeed, the right to encumber avoidance actions is a valuable tool available to debtors when seeking to obtain postpetition financing in circumstances where they otherwise would not be able to do so.

20.     Further, there is no requirement under section 550(a) that the value from such avoidance actions flows to unsecured creditors.  Section 550(a) refers to benefit of the estate— not specifically to general unsecured creditors or any other particular class of creditors.  *See, e.g.*, *Mellon Bank, N.A. v. Dick Corp.*, 351 F.3d 290, 293 (7th Cir. 2003); *see also In re Calpine Corp.*, 377 B.R. 808, 813 (Bankr. S.D.N.Y. 2007) (citing *Mellon Bank* with approval); *In re Fleming Packaging Corp.*, No. 03-82408, 2007 WL 4556985, at *6 (Bankr. C.D. Ill. Dec. 20, 2007) ("This Court does not consider Section 550(a)'s 'for the benefit of the estate' phraseology as a statutory requirement that the unsecured creditors benefit directly from the recovery of an avoided transfer, i.e., that the recovered funds end up in the pockets of the unsecured creditors.").

21.     Courts in this District routinely approve debtor-in-possession facilities that encumber avoidance action proceeds.  *See, e.g.*, *In re Craftworks Parent, LLC*, No. 2010475 (BLS) (Bankr. D. Del. May 21, 2020) [D.I. 535]; *In re PES Holdings, LLC*, No. 19-11626 (KG) (Bankr. D. Del. Nov. 14, 2019) [D.I. 580]; *In re One Aviation Corp.*, No. 18-12309 (CSS) (Bankr. D. Del. Nov. 27, 2018) [D.I. 208]; *In re Basic Energy Servs., Inc.*, No. 16-12320 (KJC) (Bankr. D. Del. Nov. 17, 2016) [D.I. 171].  Thus, the practice of granting liens on avoidance actions

13

proceeds is one permitted by the Bankruptcy Code and one that is routinely authorized by courts to secure the financing needed to achieve a debtor's restructuring goals.

22.     The DIP Lenders have conditioned the extension of credit on obtaining liens on unencumbered property and the proceeds of avoidance actions.  The TX/PA Debtors have concluded, in the exercise of their business judgment, that the benefits of the DIP Facilities are well worth that exchange.  However, to address the Committee's concern that the DIP Liens and Adequate Protection Liens extend to the proceeds of avoidance actions against the Prepetition Secured Parties, the DIP Secured Parties and Prepetition Secured Parties have agreed to carve-out such proceeds from the DIP Liens and the Adequate Protection Liens.  *See* proposed Final Orders ¶ 6(a)(i).  Accordingly, the liens on unencumbered property and the proceeds of avoidance actions should be approved as provided for in the proposed Final Orders.

23.     As mentioned above, the Committee also challenges the breadth of the definition of diminution in value.  To address the Committee's concerns, the Prepetition Secured Parties have agreed to revise the language to make it clear that the Diminution in Value is only "to the fullest extent set forth in the Bankruptcy Code or other applicable law."  Proposed Final Orders ¶ (vii).

24.     Finally, the Prepetition Secured Parties have added language to the proposed Final Orders to address the concerns raised by the Committee with respect to recharacterization of payments of postpetition interest, fees, costs, and charges as principal in the event that the Prepetition Secured Parties are determined to be undersecured.  *See* proposed Final Orders ¶ 9(d).

### (iii)    The DIP Economics Reflect the Risk Born by the DIP Lenders.

25.     As discussed above, the terms of the DIP Facilities reflect the commercial reality of these Chapter 11 Cases, particularly given the unique challenges facing the TX/PA Debtors,

including at the PA Facility which is in the process of becoming fully operational.  Additionally,

all the terms of the DIP Facilities reflect a hard fought, arms'-length negotiation by the TX/PA

Debtors and the DIP Lenders with concessions on both sides.  As no other financing is available

to the TX/PA Debtors, the economics of the DIP Facilities reflect the best option available to the

TX/PA Debtors and are "customary and usual and reasonable under the circumstances."  Morgner

Declaration ¶ 20.  To the extent the Committee can find replacement financing with better terms,

there is nothing in the DIP Facilities that prevents such facilities from being taken out by another

financing source.

**(iv)    The Section 506(c) and Section 552(b) and Marshalling Waivers Are Appropriate.**

26.    The Committee's objection to a waiver of the Debtors' rights under section 506(c)

should be overruled.  Such waivers are standard with respect to postpetition financings between

sophisticated parties, such as is the case here.  Courts have consistently found that a debtor is

vested with the discretion to waive section 506(c) of the Bankruptcy Code.  As the Supreme Court

made clear in *Hartford Underwriters*, section 506(c) claims are available to, and are an asset of,

a debtor, and not any other creditor or party in interest.  *Hartford Underwriters Ins. Co. v. Union

Planters Bank, N.A.*, 530 U.S. 1, 6 (2000) ("the trustee is the only party empowered to invoke"

section 506(c) of the Bankruptcy Code); *see also In re Smart World Techs., LLC*, 423 F.3d 166,

181–82 (2d Cir. 2005) ("Section 506(c) . . . allows only the 'trustee,' or debtor-in-possession, to

take advantage of this exception. . . . We read *Hartford Underwriters* to stand for the proposition

that § 1109(b) does not entitle parties in interest, such as Smart World's creditors, to usurp the

debtor-in-possession's role as legal representative of the estate.").  Here, the TX/PA Debtors have

reasonably exercised their business judgment and determined that the section 506(c) waiver is

necessary to obtain the DIP Facilities on the best possible terms.  *See, e.g.*, *In re Trans World*

15

*Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"). The section 506(c) waiver is a core component of the DIP Facilities, absent which the TX/PA Debtors would not have had access to the liquidity necessary to continue operating their businesses.

27.     Similarly, the TX/PA Debtors' reasonable business judgment in agreeing to waive the "equities of the case" exception under section 552(b) of the Bankruptcy Code outweighs the Committee's arguments that the waiver should not be granted. Like the section 506(c) waiver, the section 552(b) waiver is part of the consideration that the TX/PA Debtors decided to provide in exchange for the DIP Facilities. The record in these Chapter 11 Cases shows that the Debtors' decision is based on market conditions and resulted from extensive arm's-length negotiations. The DIP Lenders have provided crucial liquidity that made these Chapter 11 Cases possible and would not have advanced such financing without the section 552(b) waiver. Courts in this District routinely approve section 552(b) waivers. *See, e.g.*, *In re Hospital Acquisition LLC*, No. 19-10998 (BLS) (Bankr. D. Del. June 21, 2019) [D.I. 278] ¶ 46 (approving waiver of any "equities of the case" exception under section 552(b) as to a DIP lender); *In re Cent. Grocers, Inc.*, No. 17-10993 (LSS) (Bankr. D. Del. June 8, 2017) [D.I. 368] ¶ 32 (same); *In re Garden Fresh Rest. Intermediate Holdings, LLC*, No. 16-12174 (CSS) (Bankr. D. Del. Nov. 15, 2016) [D.I. 355] ¶ 19 (approving waiver of the "equities of the case" exception under section 552(b) as to the prepetition secured parties); *In re Verengo, Inc.*, No. 16-12098 (BLS) (Bankr. D. Del. Oct. 13, 2016) [D.I. 78] ¶ 12 (same).

28.     The Committee also argues that the marshaling waiver is inappropriate. The marshaling doctrine provides that a court may require a senior secured creditor to first satisfy its claim from property of the debtor in which a junior creditor lacks an interest—thus protecting the

16

junior creditors' interest in property subject to both a senior and junior claim. *See In re Tampa Chain Co.*, 53 B.R. 772, 777 (Bankr. S.D.N.Y. 1985). However, "unsecured creditors cannot invoke the equitable doctrine of marshaling," because marshaling is a protection for junior secured creditors. *In re Advanced Mktg. Servs., Inc.*, 360 B.R. 421, 427 (Bankr. D. Del. 2007). Moreover, the granting of such a waiver is reasonable and is a customary component in DIP financings as evidenced by Courts in this District granting such relief in numerous other cases. *See, e.g.*, *In re Craftworks Parent, LLC*, No. 20-10475 (BLS) (Bankr. D. Del. May 21, 2020) [D.I. 535]; *In re Fred's, Inc.*, No. 19-11984 (CSS) (Bankr. D. Del. Oct. 17, 2019) [D.I. 338]; *In re Exide Techs.*, No. 13-11482 (KJC) (Bankr. D. Del. July 25, 2013) [D.I. 427]; *In re Visteon Corp.*, No. 09-11786 (CSS) (Bankr. D. Del. Nov. 12, 2009) [D.I. 1311]; *In re Linens Holding Co.*, No. 08-10832 (CSS) (Bankr. D. Del. May 28, 2008) [D.I. 476]. Thus, only a secured creditor can invoke the doctrine of marshaling. *In re Arlco, Inc.*, 239 B.R. 261, 274 (Bankr. S.D.N.Y. 1999) (holding that unsecured creditors have no right to invoke the doctrine of marshaling) (*citing In re Prichard*, 170 B.R. 41, 45 (Bankr. N.D.N.Y. 1994)). No secured party has objected to the marshaling waiver here.

29.     The Committee's contention that the DIP Lenders should provide $40 million in new money financing without protection from section 506(c), section 552(b), and marshalling attacks is patently unreasonably and should be rejected.

## C.     The Committee Budgets Are Reasonable.

30.     The Committee objects that its investigation budget is too restrictive, that the amounts budgeted for Committee professionals is inadequate, and that the Carve-Outs are insufficient. Specifically, the Committee asserts the investigation budget should be increased from $50,000 to $100,000 for each of the TX DIP Facility and the PA DIP Facility. The DIP

Lenders submit that in light of the nature of these Chapter 11 Cases and the siloed nature of the collateral and claims of the Prepetition Secured Parties, the investigation budget of $50,000 per silo is appropriate. The TX/PA Debtors possess a straightforward capital structure—they do not have a complex, multi-tiered capital structure that might justify a further increase in the investigation budget. Additionally, █████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████

31.    The Committee also requests an increase in the aggregate budgeted amount for its professionals from $1.2 million to $3.5 million and a doubling of the post-default Carve-Outs to $500,000 for each of the PA DIP Facility and the TX DIP Facility. These requests from the Committee are unreasonable given the uncomplicated, straightforward capital structures of the TX/PA Debtors and the timeline for these Chapter 11 Cases. With respect to the split of fees between the TX Debtors and the PA Debtors, as applicable, and the Committee, the DIP Lenders are agnostic. Such parties can divide the post-default Carve-Out amount amongst themselves however they can agree.

**D.      The Challenge Period Is Reasonable.**

32.      As the Committee acknowledges in the Objection, the 75-day challenge period from the date of entry of the Interim Order is consistent with the Local Rules and has become standard in this Court.  They have provided no rationale for why an extended time period is appropriate here.  Furthermore, the DIP Secured Parties and the Prepetition Secured Parties have agreed to include language substantially similar to that proposed by the Committee with respect to standing of the Committee.  *See* proposed Final Orders ¶ 13(b)(i).

**II.      The Bidding Procedures Are Reasonable and Designed to Maximize the Value of the Estates.**

33.      As detailed further above, the sale process timeline is adequate and reasonable under the circumstances of these Chapter 11 Cases and is designed to maximize the value of the TX/PA Debtors' estates for the benefit of all of the TX/PA Debtors' creditors.  Furthermore, as a concession to the Committee, the DIP Lenders have agreed to the extension of certain milestones as set forth in the proposed revised Bidding Procedures Order.

34.      Based on its statements in the Objection, the Committee seems to be confused as to which parties have consent and/or consultation rights with respect to which facilities.  As clearly delineated in the Bid Procedures, the TX Secured Parties only have consent or consultation rights, as applicable, with respect to the assets of the TX Debtors (whether in a sale of only that facility or combined with one or more other facilities), and the PA Secured Parties only have consent or consultation rights, as applicable, with respect to the assets of the PA Debtors (whether in a sale of only that facility or combined with one or more other facilities).

35.      Additionally, with respect to the Committee's comments on the rights of the DIP Secured Parties and the Prepetition Secured Parties to credit bid, such parties have full rights to credit bid to the extent provided for under section 363(k) of the Bankruptcy Code.  The proposed

19

Final Orders clearly provide for such.  *See* proposed Final Orders ¶ 34.  The Bankruptcy Code clearly provides those rights and the parameters under which they can be exercised, and the Bid Procedures should not restrict such rights any further.

**III.    Joinder.**

36.    The remainder of the Committee's objections are addressed in the Debtors' reply, filed concurrently herewith, in which the TX/PA Agent joins to the extent not inconsistent herewith.  The TX/PA Agent respectfully requests that the Court overrule the Objection.

*[Remainder of page intentionally left blank]*

## **CONCLUSION**

For the foregoing reasons, the TX/PA Agent respectfully requests that the Court: (i) approve the DIP Motion on a final basis; (ii) approve the Bidding Procedures Motion; and (iii) overrule the Committee's Objection.

Dated: April 7, 2021
   Wilmington, Delaware

Respectfully submitted,

*/s/ David B. Stratton*
TROUTMAN PEPPER HAMILTON SANDERS LLP
David B. Stratton (DE Bar No. 960)
Evelyn J. Meltzer (DE Bar No. 4581)
Kenneth A. Listwak (DE Bar No. 6300)
Hercules Plaza, Suite 5100
1313 N. Market Street, P.O. Box 1709
Wilmington, DE 19899-1709
Telephone: (302) 777-6500
Facsimile: (302) 421-8390
david.stratton@troutman.com
evelyn.meltzer@troutman.com
ken.listwak@troutman.com

-and-

ARNOLD & PORTER KAYE SCHOLER LLP
Michael D. Messersmith (admitted *pro hac vice*)
Sarah Gryll (admitted *pro hac vice*)
Ginger Clements (admitted *pro hac vice*)
70 West Madison Street, Suite 4200
Chicago, Illinois 60602-4231
Telephone: (312) 583-2300
Facsimile: (312) 583-2360
michael.messersmith@arnoldporter.com
sarah.gryll@arnoldporter.com
ginger.clements@arnoldporter.com

*Co-Counsel to UMB Bank, N.A., in its separate capacities as TX DIP Agent, PA DIP Agent, TX Prepetition Trustee, and PA Prepetition Trustee*