# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ------------------------------------------------------- X | |
| In re: | : Chapter 11 |
| | : |
| CARBONLITE HOLDINGS LLC., *et al.*,[1] | : Case No. 21-10527 (JTD) |
| | : |
| | : (Jointly Administered) |
| Debtors. | : |
| | : **Re: Docket No. 180** |
| ------------------------------------------------------- X | |

**REPLY OF BANK LEUMI USA, AS PREPETITION ABL LENDER AND DIP ABL LENDER, TO THE COMBINED OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO THE TX/PA DIP MOTION, THE CA DIP MOTION AND THE BID PROCEDURES MOTION**

1.  Bank Leumi USA, as lender ("Leumi"), by its undersigned counsel, respectfully submits this Reply to the Objection (the "Objection") filed by the Official Committee of Unsecured Creditors (the "Committee") to (i) *the TX/PA Debtors' Motion Pursuant to Sections 105, 361, 362, 363, 364, 503 and 507 of the Bankruptcy Code Seeking Entry of Interim and Final Orders (I) Authorizing the TX/PA Debtors to Obtain Senior Secured Superpriority Postpetition Financing; (II) Granting (A) Liens and Superpriority Administrative Expense Claims, (B) Adequate Protection to the Prepetition Secured Parties; (III) Authorizing the Use of Cash Collateral; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief* [D.I. 11] (the "TX/PA DIP Motion"), (ii) the *CA Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the CA Debtors to Obtain Postpetition Secured Financing Pursuant to Section 364 of the Bankruptcy Code; (II)*

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number are: CarbonLite Holdings LLC (8957); CarbonLite Industries LLC (3596); CarbonLite P Holdings LLC (8957); CarbonLite P LLC (5453); CarbonLite PI Holdings LLC (8957); CarbonLite Pinnpack LLC (8957); CarbonLite Recycling Holdings LLC (8957); CarbonLite Sub-Holdings, LLC (8957); Pinnpack P, LLC (8322); CarbonLite Recycling LLC (3727); and Pinnpack Packaging LLC (9948). The address of the Debtors' corporate headquarters is 10250 Constellation Blvd., Los Angeles, CA 90067.

RLF1 25076292v.1

*Authorizing the CA Debtors to Use Cash Collateral; (III) Granting Liens and Superpriority Administrative Expense Claims; (IV) Granting Adequate Protection to the Prepetition Lenders; (V) Modifying the Automatic Stay; (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [D.I. 16] (the "<u>CA DIP Motion</u>," and together with the TX/PA DIP Motion, the "<u>DIP Motions</u>")[2] and (iii) the *Debtors' Motion for (I) An Order (A) Approving Bid Procedures for the Sale of Substantially All of the Debtors' Assets; (B) Approving Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases; (C) Approving Certain Bid Protections in Connection With the Debtors' Entry Into Any Potential Stalking Horse Agreements; (D) Scheduling the Auction and Sale Hearing; (E) Approving the Form and Manner of Notice Thereof; and (F) Granting Related Relief* [D.I. 112] (the "<u>Bid Procedures Motion</u>"), and respectfully states as follows:

## **<u>PRELIMINARY STATEMENT</u>**

2.  The Committee's Objection to the entry of a final order (the "<u>Final Order</u>") approving the debtor-in-possession financing facility set forth in the CA DIP Motion (the "<u>CA DIP Facility</u>") seeks to have this Court disregard the proper exercise of the Debtors' business judgment by, *inter alia*, calling into question the Debtors' decision to obtain post-petition financing in the first instance, and deleting or modifying numerous key provisions, which were heavily negotiated in good faith and at arm's length. The unfortunate reality of these cases is that each of the business units that comprise the Debtors are highly leveraged, are burning millions of dollars of cash post-petition, a fact which the Committee acknowledges, and needs to be sold on a quick timeline in order to stop the hemorrhaging. The DIP ABL Lender and the DIP Term Lenders (collectively, the "<u>CA DIP Lenders</u>") have agreed to support the CA Debtors, by

---

[2] Capitalized terms used but not defined herein shall have the same meanings ascribed to such terms in the CA DIP Motion.

2

providing the CA Debtors with substantial new money DIP Loans, which are intended to provide the CA Debtors with sufficient liquidity to fund the administrative costs of the cases through the closing of a sale designed to maximize the value of the Debtors' assets. Accordingly, the Objections lack merit and should be denied.

3. The Committee's assertion that "the Debtors have permitted the DIP Lenders and Prepetition Lenders to put in place an underfunded and artificially truncated sale process that weaponizes the DIP Facilities to allow them to take control of these chapter 11 cases and capture for themselves all of the Debtors' value" is not only reckless, but is plain wrong. To the contrary, the CA DIP Facility and the millions of dollars of liquidity that the CA DIP Lenders have made, and have agreed to make, available to the CA Debtors, have enabled the CA Debtors to continue to operate and avoid being forced to terminate their businesses as going concerns. In exchange, the CA DIP Lenders were granted claims, rights, liens and protections, without which neither the DIP ABL Lender nor the DIP Term Lenders would be willing to continue financing the CA Debtors' post-petition activities. Denial of the DIP Motion on a final basis (or any adverse modification of the terms under which the DIP ABL Lender has been financing the CA Debtors in these bankruptcy cases) would disrupt the delicate balance struck by the CA Debtors and CA DIP Lenders, and force the CA Debtors to terminate their business as going concerns to the detriment of the CA Debtors, their estates and all stakeholders.

4. Leumi respectfully requests that the Court overrule the Objection and enter the proposed Final Order in the form and with the terms agreed to between the CA Debtors and the CA DIP Lenders.

## BACKGROUND

5. On March 8, 2021 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware. The cases are jointly administered. The Debtors continue to operate their businesses and manage their properties as debtors-in-possession. No trustee or examiner has been appointed in these cases. The Committee was appointed on March 23, 2021.

6. Prepetition, certain of the Debtors, as borrowers and/or guarantors, and Leumi (the "Prepetition ABL Lender") were parties to that certain Credit Agreement, dated as of September 16, 2019 (as further amended, restated, supplemented, or otherwise modified from time to time), pursuant to which the Prepetition ABL Lender provided revolving loans based on a borrowing base to the Prepetition ABL Borrowers on a secured basis. As of the Petition Date, the Prepetition ABL Obligors were indebted to the ABL Lender under the Prepetition ABL Loan Documents, in respect of outstanding Revolving Loans (as defined in the Prepetition Credit Agreement) in the aggregate principal amount of not less than $7,784,755.94 (the "Prepetition ABL Loans").

7. On the Petition Date, and following weeks of arms-length negotiations, the Debtors filed the CA DIP Motion [D.I. 16]. The DIP Motion seeks, *inter alia*, authorization to enter into the DIP ABL Facility, together with the DIP Term Facility, on the terms set forth in the CA DIP Motion.

8.  In support of the DIP Motions, the Debtors submitted the Declaration of Richard W. Morgner, the Managing Director and Joint Global Head of the Debt Advisory & Restructuring Group at Jefferies LLC, which has served as the Debtors' investment banker since January 2021 (the "Morgner Decl.") [D.I. 17]. In his Declaration, among other things, Morgner attested to the fact that: (i) "Debtors lack sufficient liquidity and do not generate sufficient cash from operations to fund their businesses. Accordingly, without the DIP Facilities and the ability to use Cash Collateral, the Debtors will not have the liquidity needed to operate their businesses, fund their ordinary course expenditures (including paying employees), or pay the expenses necessary to administer these chapter 11 cases" (¶ 10), (ii) "the Debtors sought financing from numerous third-party sources" however, "none of those parties was prepared to provide DIP financing on an unsecured or junior basis, and, further, all would have required priming liens on existing collateral of the Prepetition Secured Parties" and accordingly, "the Debtors focused their efforts on obtaining postpetition financing from the Prepetition Secured Parties and engaged in good faith, arm's-length negotiations concerning the economics, milestones, covenants, and other provisions typical in debtor in possession financings with each of the existing constituencies comprising the Prepetition Secured Parties" (¶¶ 12, 15, 16), (iii) "the DIP Facilities represent the best available postpetition financing under the circumstances" (¶ 20), and (iv) the Debtors and the DIP Lenders "agreed to terms that will provide the Debtors with access to adequate and necessary liquidity during the pendency of these chapter 11 cases." (¶ 20).

9.  On January 18, 2019, the Court entered the *Interim Order (I) Authorizing Debtors to (A) Obtain Postpetition Financing, (B) Grant Senior Secured Liens and Superpriority Administrative Expense Claims, and (C) Utilize Cash Collateral; (II) Granting Adequate Protection to the Prepetition Secured Parties; (III) Modifying the Automatic Stay; (IV)*

*Scheduling a Final Hearing, and (V) Granting Related Relief* [D.I. 74] (the "CA Interim DIP Order"). Pursuant to the CA Interim DIP Order, the CA Debtors were authorized, *inter alia*, to obtain postpetition loans, advances and other financial accommodations from the CA DIP Lenders on a superpriority basis, secured by first priority liens on and security interests in substantially all of CA Debtors' assets and properties pursuant to the terms of the CA Interim DIP Order. The CA Interim DIP Order also provided for a "creeping" roll-up of the Prepetition ABL Obligations, whereby upon entry of the Final Order, all Prepetition ABL Obligations shall be deemed to be DIP ABL Obligations.

10. The final hearing on the CA DIP Motion is set for April 8, 2021.

## ARGUMENT

I. **The Terms of the CA DIP Facility Are Fair, Reasonable, and Customary, and Entering Into the DIP Facility is a Proper Exercise of the CA Debtors' Business Judgment**

11. The CA Debtors' decision to enter into the CA DIP Facility is a sound exercise of their business judgment and should not be disturbed. Bankruptcy courts routinely and properly defer to a debtor's business judgment on the decision to enter into a post-petition financing arrangement. *See In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving an interim loan, receivables facility and asset-based facility because they "reflect[ed] sound and prudent business judgment … [were] reasonable under the circumstances and in the best interest of [the debtor] and its creditors"); *see also In re Ames Dept. Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[A] court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."). Business judgments

"should be left to the board room and not to [the] court." *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (D. Colo. 1985).

12. The CA Debtors have determined, in the reasonable and independent exercise of their business judgment, that the DIP ABL Facility, together with the DIP Term Facility, offers the best opportunity to maximize the value of the CA Debtors' estates. The DIP ABL Facility enables the CA Debtors to gain access to needed financing and thereby maximize value through an orderly sale process. Under the circumstances, this Court should not second-guess that determination, but should instead grant the relief requested by the CA Debtors in the CA DIP Motion on a final basis.

  **A. Deference Should Be Accorded to the CA Debtors' Decision to Obtain Post-Petition Financing**

13. For all of its rhetoric concerning the Lenders' purported motives in connection with entering into the CA DIP Facility, the Committee's Objection glosses over one critical fact: the decision to obtain post-petition debtor-in-possession financing was one made *solely* by the CA Debtors (with the assistance of their preeminent financial and legal advisors), in the sound exercise of their business judgment. In their business judgment, the CA Debtors have determined to seek, and the CA DIP Lenders have agreed to provide, financing that allows the Debtors to maximize value through an orderly sale process.

14. In support of their conclusion, the CA Debtors have explained that they "lack sufficient liquidity and do not generate sufficient cash from operations to fund their businesses," "have an urgent and immediate need for access to funds available under the DIP Facilities and the use of Cash Collateral" and, "without the DIP Facilities and the ability to use Cash Collateral, the CA Debtors will not have the liquidity needed to operate their businesses, fund their ordinary course expenditures (including paying employees), or pay the expenses necessary to administer

7

these chapter 11 cases" and would suffer "immediate and irreparable harm." (CA DIP Motion, ¶ 37). In addition, the Debtors' investment banker attested in support of the DIP Motions that"[a]bsent increased funding in the form of the DIP Facilities, the Debtors could be forced to terminate their businesses as going concerns to the detriment of the Debtors, their estates, and all stakeholders." (Morgner Decl., ¶ 10)  The Debtors' evidence and the record before this Court will show that the applicable standards for obtaining post-petition financing has been satisfied, and that entry into the CA DIP Facility on a final basis is in the best interests of the Debtors, their creditors, and their estates.

15.    In short, the Debtors' decision to seek and obtain post-petition financing should not be second-guessed, and the Committee has not shown otherwise.

### B.    The Roll-Up Is Justified

16.    In their Objection, the Committee complains about the CA DIP Facility's use of a roll-up provision, and claims that such provisions are "disfavored" and should not be approved. Although the Committee does not appear to challenge the roll-up of Prepetition ABL Loans into DIP ABL Loans, the roll-up provisions of the DIP ABL Facility are customary and are routinely granted by bankruptcy courts in circumstances similar to those presented here.  In this case, it is acknowledged and agreed by the CA Debtors and the DIP Term Lender that the ABL Lender was fully secured on the Petition Date.  Further, in order to provide the CA Debtors with full post-petition access to the ABL borrowing base availability, roll-ups are routinely granted.

17.    Roll-ups are a common feature in DIP financing arrangements. *See In re Capmark Fin. Grp. Inc.*, 438 B.R. 471, 511 and n. 15 (Bankr. D. Del. 2010); *In re Energy Future Holding Corp.*, 527 B.R. 157, 167 (D. Del. 2015).  The Supreme Court of the United States has recognized that roll-ups may serve significant Bankruptcy Code objectives. *See Czyzewski v.*

*Jevic Holding Corp.*, 137 S. Ct. 973, 985, 197 L. Ed.2d 398 (2017). Courts in this jurisdiction have approved similar financing features in postpetition loans. *See, e.g.*, *In re Blackhawk Mining LLC*, No. 19-11595 (LSS) (Bankr. D. Del. Aug. 13, 2019) (authorizing roll-up of $70 million in prepetition term loans and up to $82 million of prepetition ABL in interim order); *In re ATD Corporation*, No. 18-12221 (KJC) (Bankr. D. Del. Oct. 26, 2018) (authorizing a full roll-up of the prepetition ABL outstanding principal of $639 million pursuant to interim order); *In re Remington Outdoor Co., Inc.*, No. 18-10684 (BLS) (Bankr. D. Del. Mar. 28, 2018) (authorizing a roll-up of approximately $150 million which included a full ABL roll-up of $114 million pursuant to interim order); *In re Forever 21, Inc.*, No. 19-12122 (KG) (approving the repayment in full of all outstanding amounts under the prepetition revolving credit agreement); *In re Charming Charlie LLC*, No. 19-11534 (CSS) (Bankr. D. Del. July 12, 2019) (authorizing a "creeping" roll-up of prepetition ABL facility of $9.5 million pursuant to interim order); *In re Bon-Ton Stores, Inc.*, No. 18-10248 (MFW) (Bankr. D. Del. Feb. 6, 2018) (authorizing full rollup of all $489 million outstanding prepetition revolving obligations pursuant to interim order); *In re American Apparel, Inc.*, No. 15-12055 (BLS) (Bankr. D. Del. Oct. 6, 2015) (approving on an interim basis the repayment in full of all outstanding amounts under the prepetition revolving credit agreement).

18. In this case, the roll-up is appropriate in exchange for the DIP ABL Lender, among other things, agreeing to provide new-money liquidity and permit access to Cash Collateral. (CA DIP Motion, ¶ 56) Accordingly, as other courts in this Circuit and others have regularly done when necessary to obtain DIP financing, the Court should approve the roll-up provision. *See, e.g.*, *In re Payless Holdings LLC*, Case No. 1742267 (Bankr. E.D. Mo. May 17, 2017) (authorizing a $385 million DIP facility and a roll-up of approximately $187 million,

pursuant to a final order); *In re Tuscany Int'l Holdings (U.S.A.) Ltd.*, 2014 WL 1419488 (Bankr. D. Del. Mar. 21, 2014) (authorizing roll-up of certain prepetition obligations); *In re True Temper Sports, Inc.*, 2009 WL 7226692 (Bankr. D. Del. Oct. 30, 2009) (authorizing an $80 million roll-up); *In re Lyondell Chem. Co.*, No. 09-10023 (REG) (Bankr. S.D.N.Y. Mar. 1, 2009) (authorizing a $3,250,000,000 roll-up); *In re Tronox Inc.*, No. 09-10156 (ALG) (Bankr. S.D.N.Y. Feb. 9, 2009) (authorizing a $79,500,000 roll-up); *In re WCI Cmtys., Inc.*, No. 08-11643 (KJC) (Bankr. D. Del. Sept. 23, 2008) (authorizing the debtors to use a portion of the DIP proceeds to repay the prepetition credit agreement).

      **C.**      **Liens on Avoidance Actions and Other Assets Are Appropriate**

19.     The Committee objects to the issuance of DIP liens and adequate protection liens on previously unencumbered assets, including the proceeds of avoidance actions. The Committee's argument is misplaced. Given the amount of additional liquidity provided in the CA DIP Facility, it is clearly appropriate for the CA Debtors to grant liens on previously unencumbered assets to secure the DIP ABL Loans.

20.     In fact, the challenged relief is expressly authorized under the Bankruptcy Code. Under section 364 of the Bankruptcy Code, a debtor may grant a post-petition lender a lien on property of the estate in exchange for provision of credit, including on unencumbered assets. *See* 11 U.S.C. 364(c). In relevant part, Section 364 provides that the Court may authorize the debtor to obtain credit "(1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title; (2) secured by a lien on property of the estate that is not otherwise subject to a lien; (3) or secured by a junior lien on property of the estate that is subject to a lien." *Id*.

21. In enacting Section 364, Congress recognized the natural reluctance of lenders to extend credit to a company in bankruptcy and designed Section 364 to provide "incentives to the creditor to extend post-petition credit" so that the debtor may be able to reorganize. *In re Ellingsen MacClean Oil, Inc.*, 834 F.2d 599, 603 (6th Cir. 1987), *cert. denied*, 488 U.S. 817, 109 S.Ct. 55, 102 L.Ed.2d 33 (1988). The granting of liens on the proceeds of avoidance actions is one of those incentives. As courts have recognized, limiting the protections offered by Section 364, as the Committee's Objection attempts to do, undercuts the reorganizational goals of bankruptcy and would cause a chilling effect on DIP financing. *In re Florida West Gateway, Inc.*, 147 B.R. 817 (Bankr. S.D. Fla. 1992).

22. Whether or not the grant of liens is necessary or appropriate is a matter to be decided by the CA DIP Lenders and the CA Debtors in the context of their good faith negotiations, and the CA Debtors have discretion to offer more than one of the protections described in section 364(c). *See* 3 *Collier on Bankruptcy*, 364.04[1], at p. 364-11 (16th Ed. 2012); *In re Sobiech*, 125 B.R. 110, 115 (Bankr. S.D.N.Y. 1991) (stating that, "[a]lthough the subdivisions contained in Code § 364(c) appear in the alternative, creditors often seek the 'super-priority' of Code § 364(c)(1) in conjunction with the lien protection of Code § 364(c)(2)).

23. In assessing requests under Section 364(c), courts generally apply a three-part test requiring a showing that: (1) the debtor cannot obtain unsecured credit without granting superpriority status; (2) the proposed financing is necessary to preserve assets of the estate; and (3) the terms of the proposed financing are fair, reasonable and adequate. *In re Crouse Group*, 71 B.R. 544 (Bankr. E.D. Pa. 1987). The Committee does not dispute that the CA Debtors have satisfied this test. Rather, it summarily contends that the CA DIP Lenders should not be granted

11

a lien on the proceeds of avoidance actions, and seeks to have this Court rewrite the bargained-for deal.

24. In fact, priority in payment on proceeds from avoidance actions and liens on such proceeds are routinely authorized in connection with post-petition financing, including by courts in this Circuit. *See, e.g., In re Bicent Holdings LLC*, Case No. 12-11304 (KG) (May 16, 2012); *In re Delta Petroleum Corp.*, Case No. 11-14006 (KLC) (Jan. 11, 2012); *In re Townsends, Inc.*, Case No. 10-14092 (CSS) (Jan. 28, 2011); *In re Xerium Technologies, Inc.*, Case No. 10-11031 (KJC) (Bankr. Del. Apr. 28, 2010); *In re Source Interlink*, Case No. 09-11424) (KG) (Bankr. D. Del. May 28, 2009); *In re Silver Cinemas International, Inc.*, Case No. 00-1978 (Bankr. D. Del. August 11, 2000). Accordingly, the Committee's suggestion that the granting of such liens is improper lacks any basis in law or fact, particularly in light of the significant "new money" provided by the CA DIP Facility.

**D.     The 506(c) / Marshaling / Section 552 Waivers Are Enforceable**

25. The objections to the Section 506(c) waiver are without merit under the facts of this case. In fact, such a waiver is entirely appropriate in this case – and should be authorized on consent. The Debtors, together with their sophisticated financial and legal advisors, prepared a Budget which specifies the post-petition costs and expenses the Debtors intend to incur and pay. The DIP ABL Lender understands that the Budget factors in the landscape of potentially surchargeable claims. The DIP ABL Lender has relied in good faith on the accuracy of the Budget and has agreed to provide the CA Debtors with the funding necessary to cover the expenses set forth in the Budget. If the Debtors determine to use the proceeds of their loans to pay other expenses, the DIP ABL Lender should not be surcharged for such expenses.

26.     In all events, the CA Debtors are well within their business judgment to agree to waive Section 506(c) claims in order to obtain DIP Financing and the use of Cash Collateral, and there are numerous examples where courts have entered orders approving a debtor's exercise of its business judgment to grant Section 506(c) waivers. *See e.g., In re Forever21, Inc.*, No. 19-12122 (KG) (Bankr. D. Del. Nov. 5, 2019) (approving a section 506(c) waiver that was subject to the carve out); *In re Blackhawk Mining LLC*, No. l9-11595 (LSS) (Bankr. D. Del. Aug. 13, 2019) (same); *In re Z Gallerie, LLC*, No. 19-10488 (LSS) (Bankr. D. Del. Apr. 9, 2019) (same); *In re Things Remembered, Inc.*, No. 19-10234 (KG) (Bankr. D. Del. Mar. 29, 2019) (same); *In re PES Holdings, LLC*, No. 18-10122 (KG) (Bankr. D. Del. Feb. 27, 2018) (same).

27.     The DIP ABL Lender is entitled to a waiver of any "equities of the case" exception under Section 552(b) of the Bankruptcy Code and a waiver of the provisions of section 506(c) of the Bankruptcy Code in light of (i) the DIP ABL Lender's agreement to extend the CA DIP Facility to the CA Debtors, (ii) the DIP ABL Lender's agreement to permit the use of Cash Collateral, and (iii) the DIP ABL Lender's agreement to the payment of certain expenses of administration of the Chapter 11 Cases, including, without limitation, the funding of a Professional Fee Carve-Out with the proceeds of its advances. (CA Interim DIP Order, ¶ L).

28.     The aforementioned waivers were part and parcel of a heavily negotiated DIP Facility that has enabled the CA Debtors to, *inter alia*, obtain immediate access to liquidity, avoid a costly and distracting fight over priming and other execution risk associated with a new lender transaction, and send a positive signal to the market, and accordingly, should not be disturbed.

### E. The Lien Priorities in the DIP ABL Facility are Reasonable

29. The Committee argues that the lien priorities in the DIP ABL Facility should be modified to provide that the Carve-Out ranks ahead of the DIP ABL Liens, the Prepetition ABL Liens and the Prepetition Adequate Protection Liens. However, the lien priorities were heavily negotiated among the CA Debtors, the DIP ABL Lender, and DIP Term Agent. According to the agreement that was reached, the DIP ABL Lender has no obligation to fund the carve-out, although the proceeds of its advances are being used to fund the weekly deposits into the Escrow Account. The DIP Term Lender has agreed to back-stop obligations benefitting from the Carve-Out Cap, in order that the Debtors' professionals and the Committee's professionals can rely on the Carve-Out Cap in the event it is triggered. This structure enabled the CA Debtors to access borrowing availability under the DIP ABL Facility, without the concern of it being restricted by reserves created to fund the Carve-Out. The lien priorities in the DIP ABL Facility are therefore reasonable, and should be approved on a final basis.

### F. The Budget Properly Accounts for Administrative Expenses

30. The Committee's claim that the DIP budgets do not contemplate a budget for the payment of all administrative expenses is belied by the Budget that the Court approved. In support of the CA DIP Motion, among other first day filings, the Debtors submitted the Declaration of Brian Weiss, the Chief Restructuring Officer of the Debtors, (the "Weiss Decl.") [D.I. 13]. In his Declaration, Weiss states that each of the Budgets will be adequate to pay the administrative expenses that may become due or accrued during the period covered by the particular Budget. (Weiss Decl., ¶ 100).

### G. The Proposed ABL DIP Loan Fee is Reasonable

31. Pursuant to the terms of the DIP ABL Credit Agreement, the DIP ABL Borrowers agreed to pay to the DIP ABL Lender a debtor-in-possession financing facility fee in the amount of 2% of the Maximum Credit, which amount is reasonable and market. Further, the Debtors' investment banker worked with the Debtors and the Debtors' Chief Restructuring Officer to evaluate the fees and expenses associated with the proposed DIP Financings as part of the Debtors' preparations for the chapter 11 cases (Morgner Decl., ¶ 9) and determined that the DIP ABL Fee is fair and reasonable.

### I. The Balance of the Committee's Objections Lacks Merit

32. The Committee's other objections can be addressed as follows:

33. <u>The CA DIP Lenders Should be Consent Parties Under the Bidding Procedures</u>. The Committee argues that the Lenders should not be Consent Parties under the proposed Bid Procedures. However, the CA Interim DIP Order entered by this Court and the DIP ABL Credit Agreement expressly requires, as does the Prepetition ABL Credit Agreement, that the CA Debtors obtain the prior written consent of the DIP ABL Lender and Prepetition ABL Secured Parties prior to any disposition of any portion of the DIP ABL Collateral. (CA Interim DIP Order, ¶ 24). The designation of the DIP ABL Lender as a Consent Party is therefore consistent with the CA Interim DIP Order and the DIP ABL Credit Agreement. Furthermore, it is usual and customary to require the consent of a lender prior to the sale of collateral, which is subject to such lender's liens.

34. <u>The Timeline of the Process is Reasonable</u>. The Committee argues that the timeline of the proposed sale is too short, as memorialized in the Sale Milestones set forth in the DIP ABL Credit Agreement. However, the case timeline was agreed-upon following extensive,

arms-length negotiations between the Debtors and the DIP Lenders to balance the Debtors' need to undertake a robust marketing process for the sale of all or a portion of their businesses on an expedited basis, in light of the massive cash-burn being incurred by the Debtors. (*See* Weiss Decl., ¶ 54). The granting of additional time would merely increase the costs of these bankruptcy cases, without enhancing the value of the assets.

## CONCLUSION

35. In conclusion, for all of the reasons set forth above, the Objection should be overruled and the Court should enter the proposed Final Order in the form and with the terms agreed to between the CA Debtors and the CA DIP Lenders.

Dated: April 7, 2021
      Wilmington, Delaware

*/s/ David T. Queroli*
John H. Knight (No. 3848)
David T. Queroli (No. 6318)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701
Email: knight@rlf.com
       queroli@rlf.com

-and-

Andrew M. Kramer (admitted *pro hac vice*)
OTTERBOURG P.C.
230 Park Avenue
New York, New York 10169-0075
Telephone: (212) 661-9100
Facsimile: (212) 682-6104
Email: akramer@otterbourg.com

*Counsel for Bank Leumi USA as DIP Lender, Prepetition Secured Creditor and Interested Party*