IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | ) | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CARBONLITE HOLDINGS LLC, *et al.*,[1] | ) | Case No. 21-10527 (JTD) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**DECLARATION OF RICHARD W. MORGNER IN SUPPORT OF PROPOSED
STALKING HORSE BID PROTECTIONS FOR READING STALKING HORSE**

I, Richard W. Morgner, hereby declare under penalty of perjury as follows:

1. In accordance with the Bid Procedures Order (as defined below), I submit this declaration (this "Declaration") in support of the proposed Bid Protections for the Stalking Horse Bidder as identified in the *Notice of Designation of Stalking Horse Bidder for Reading Facility* [Docket No. 396] (the "Reading Stalking Horse Notice"), which supplements the *Order (A) Approving Bid Procedures for the Sale of Substantially All of the Debtors' Assets; (B) Approving Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases; (C) Approving Certain Bid Protections in Connection With the Debtors' Entry Into Any Potential Stalking Horse Agreements; (D) Scheduling the Auction and Sale Hearing; (E) Approving the Form and Manner of Notice Thereof; and (F) Granting Related Relief* [Docket No. 266] (as amended from time to time) (the "Bid Procedures Order").[2]

2. Unless otherwise indicated, the statements set forth in this Declaration are based on (a) my personal knowledge or views based on my experience; (b) information I have received

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: CarbonLite Holdings LLC (8957); CarbonLite Industries LLC (3596); CarbonLite P Holdings, LLC (8957); CarbonLite P, LLC (5453); CarbonLite PI Holdings, LLC (8957); CarbonLite Pinnpack, LLC (8957); CarbonLite Recycling Holdings LLC (8957); CarbonLite Recycling LLC (3727); CarbonLite Sub-Holdings, LLC (8957); Pinnpack P, LLC (8322); and Pinnpack Packaging, LLC (9948). The address of the Debtors' corporate headquarters is 10250 Constellation Blvd., Los Angeles, CA 90067.

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Bid Procedures Order, or as applicable, the Bid Procedures attached thereto as Exhibit A.

from the Debtors, my colleagues at Jefferies, LLC ("Jefferies") working directly with me or under my supervision, direction or control, or other advisors of the Debtors; and/or (c) my review of relevant documents.

3. I am over the age of 18 and authorized to submit this Declaration on behalf of the Debtors. I am not being specifically compensated for this testimony other than through payments received by Jefferies, as engaged by the Debtors; none of those payments are specifically payable on account of this testimony. If I were called upon to testify, I would testify competently to the facts and views set forth herein.

## Professional Background and Qualifications

4. I am a Managing Director and Joint Global Head of the Debt Advisory & Restructuring Group at Jefferies, a global investment banking firm founded over 50 years ago, with its principal office located at 520 Madison Avenue, New York, New York 10022. Jefferies is a registered broker-dealer with the United States Securities and Exchange Commission and is a member of the Financial Industry Regulatory Authority and the Securities Investor Protection Corporation. Jefferies, together with its investment banking advisory affiliates, has approximately 3,900 employees located in more than 30 offices around the world. Jefferies and its senior professionals have extensive expertise providing investment banking services to financially distressed companies, creditors, committees, equity holders, asset purchasers, and other constituencies in reorganization proceedings and complex financial restructurings, both in and out of court.

5. I have more than 28 years of investment banking and restructuring experience. Since joining Jefferies in 2009, I have provided investment banking expertise, and distressed mergers and acquisition and financing advice to companies, lenders, and investors in both in- and

out-of-court restructurings. Prior to joining Jefferies, I was a Managing Director and Co-Head of the mergers and acquisitions group at Miller Buckfire, where my primary responsibilities included advising companies and investors in restructuring, distressed mergers and acquisitions, distressed financing, and special situations. I have participated in dozens of major bankruptcy cases in numerous capacities, including providing testimony on valuation, debtor in possession financing, and plan confirmation, and providing consulting and M&A services in regard to the development and confirmation of plans of reorganization, and organizing and running a marketing process for both debtor in possession financing and a section 363 sale process for substantially all the assets of a debtor.

6. I have personally led or had material involvement in the execution of the sales of well over 100 companies during my career, many of which had been experiencing financial distress. In addition, I have personally led or had material involvement in approximately 30 chapter 11 cases over the past 19 years. Examples of some these cases where I was involved in a sale process include: Dura Automotive (Bankr. D. Del); Hanjin Shipping Co. (Bankr. D. N.J.); Black Diamond Mining Co. (Bankr. E.D. Ky.); Dana Corporation (Bankr. S.D. N.Y.); Sundevil Power Holdings (Bankr. D. Del); BMC Holdings (Bankr. D. Minn.); and Magnatrax (Bankr. D. Del.).

## General Background

7. A detailed description of the Debtors' business and facts precipitating the filing of the Debtors' chapter 11 proceedings are set forth in the First Day Declaration,[3] which is incorporated herein by reference.

---

[3] *Declaration of Brian Weiss in Support of Debtors' Chapter 11 Petitions and First Day Relief* (the "First Day Declaration") [Docket No. 13].

8.     As more fully set forth in the First Day Declaration, the Debtors are on the forefront of processing post-consumer recycled polyethylene terephthalate ("rPET") plastic products and producing high-quality rPET and polyethylene terephthalate ("PET") beverage and food packaging products.  As of the Petition Date, the Debtors operate three facilities (the "Recycling Facilities") at which they process PET bottles and flake into rPET pellets, which are later incorporated into other products and packaging.  The Debtors also operate PinnPack, which processes rPET and PET into high-quality thermoformed tubs, bowls, domes, and clamshell packaging for food applications.

9.     The Debtors principally operate through four facilities located in California, Texas, and Pennsylvania.  The Debtors' three Recycling Facilities—the Riverside Facility, the Dallas Facility, and the Reading Facility—recycle rPET bottles (procured by the Company in the form of 1,000 pound bales) into food-grade rPET resin pellets.  These rPET resin pellets, in turn, are combined with virgin resin and used by beverage makers to manufacture new bottles.  I understand the Debtors have invested over $200 million over the past decade into the Recycling Facilities, and, when the Reading Facility is fully operational next month, will have the capability to process over 4 *billion* bottles per year.

10.    In addition to its core Recycling Business, the Debtors own PinnPack, a leading producer of high-quality, food-grade thermoformed PET and rPET packaging products with the capacity to produce over 300 SKUs.  PinnPack operates out of a facility in Oxnard, California (the "PinnPack Facility" and, together with the Recycling Facilities, the "Facilities").  PinnPack distinguishes itself from its competitors with its broad portfolio of products with a range of size and applications as well as an industry leading speed-to-market to adapt to the continually evolving design preferences and requirements, particularly for foods in the supermarket.

DOCS_NY:43048.2 13044/003

## The Marketing Process

A.     Pre-Petition Marketing Process

11.     Beginning in January 2021, Jefferies commenced a robust marketing process (the "Marketing Process") for a sale of all or a portion of the Debtors' assets (each, a "Potential Transaction"). To that end, prior to the Petition Date, Jefferies worked closely with the Debtors' management to analyze the Debtors' financial position, prepared marketing and diligence materials, and populated a digital data room (the "Data Room"). The Data Room is updated on a regular basis and includes thousands of documents regarding all aspects of the Debtors' business operations for prospective bidders to review in connection with a Potential Transaction.

12.     In addition to me, the Jefferies marketing team (the "Marketing Team") includes senior members David Bradley, Vice-Chair and Co-Head of Industrials, with over 30 years of M&A experience and Matthew Bowersox, Managing Director and U.S. Head of Packaging, with over 18 years of M&A experience. The Marketing Team also includes several junior members with M&A experience ranging from 2-12 years. Collectively, these individuals have over 75 years of distressed M&A experience and have closed on dozens of transactions valued at billions of dollars. The Marketing Team is multi-disciplinary, taking into account the nature of the Debtors' Assets and business operations, and the universe of potential buyers, both in the United States and globally.

13.     As of the Petition Date, Jefferies had contacted approximately 135 potential acquirers to alert such parties of the Debtors' interest in pursuing a Potential Transaction. Jefferies sent teasers and non-disclosure agreements ("NDAs") to each of the parties. As of the Petition Date, 73 parties had executed NDAs and received access to the Data Room.

14. As of the Petition Date, the Debtors had received eight indications of interest ("IOIs") from parties interested in pursuing a Potential Transaction and expressions of interest from nine parties, some of whom had submitted IOIs in serving as a stalking horse bidder for a Potential Transaction.

B. Post-Petition Marketing Process

15. Since the filing of the Petitions, the Jefferies Marketing Team and the Debtors have continued to both market the Assets and investigate the potential for a plan-based sale or restructuring. Jefferies and the Debtors are running a robust sale process and will consider all appropriate Bids for the Assets, which could include any possible combination of the Facilities, or the sale of each Facility separately, in accordance with the Bid Procedures and Bid Procedures Order. Jefferies and the Debtors are running an open process that is intended to protect the best interests of the Debtors' estates and creditors and preserve the Debtors' ability to exercise their fiduciary duties throughout the process (the "Sale Process"). The Sale Process has been designed to maximize value for all constituencies.

16. To date, Jefferies has reached out to 178 parties (the "Interested Parties") to explore a sale of part or all of the Debtors, about one-third of which have been strategic parties. In regard to the PinnPack Facility and the related Debtors, 19 parties have been contacted, 15 of whom have executed Confidentiality Agreements and accessed the Data Room, and 6 of which made site visits. The Jefferies and Debtors teams have held numerous diligence meetings with potential bidders and continue to answer questions as they arise. One party has submitted a Stalking Horse Bid for the PinnPack Facility; seven have declined to do so date.

17. In regard to the Recycling Facilities and related Debtors, 159 parties have been contacted, 95 of whom have executed Confidentiality Agreements and accessed the Data Room,

and 12 of which made site visits. Four parties have submitted potential stalking horse bids to date. Jefferies and the Debtors have held numerous diligence calls with potential bidders and continue to answer questions as they arise.

18. While Jefferies and the Debtors were marketing the Assets, they continued to explore a consensual restructuring path with their various lenders in regard to each Facility, and to explore all potential proposals from entities contacted through the Marketing Process, from insiders of the Debtors and from other third parties. To date, Jefferies has only been contacted by two parties who claimed they wanted to acquire the Debtors through a plan process. Neither of those proposals was viable as to structure, timing, or consideration. Any plan proposals received in the future will be fully evaluated and considered, in accordance with the applicable DIP Orders.

19. In accordance with the Bid Procedures, the deadline for the Debtors to designate one of more Stalking Horse Bidders for the Facilities was April 19, 2021. The designation of a Stalking Horse Bidder requires the Debtors to file a Stalking Horse Bidder Notice, including (i) a draft sale approval order, (ii) a complete asset purchase agreement ("APA") with applicable schedules, and (iii) a Bid Protections Declaration identifying the Bid Protections proposed to be granted the Stalking Horse Bidder.

20. On April 19, 2021, the Debtors, the Jefferies Marketing Team, and the applicable Consent Parties were actively engaged in negotiations with several Interested Parties who had expressed interest in being designated a Stalking Horse Bidder for one or more of the Facilities, but were not in a position in terms of pricing, structure and documentation to designate one or

7

more Stalking Horse Bidders. Therefore, the milestone for designation of a Stalking Horse Bidder was ultimately extended to May 1, 2021.[4]

21. During the twelve day extension, the Debtors, their counsel and the Jefferies Marketing Team, along with the applicable Consent Parties, have been working diligently to negotiate with the Interested Parties to (i) increase the proposed cash and other consideration being paid for the applicable Facilities, (ii) structure the proposed Sales Transactions to maximize value for the estates, (iii) prepare the necessary documentation to effectuate the proposed Sale Transactions, including the APA, the applicable schedules to the APA and, as applicable, any debt or other necessary and related documentation. In my view, the twelve days of negotiations has resulted in added value to the estates, as set forth in the Reading Stalking Horse Notice.

22. I believe that the process was an appropriate process under the facts and circumstances of these cases and served as an effective market test for the Debtors' assets. The process was designed to permit a fair, efficient and competitive process to investigate available strategic alternatives to maximize the value of the Debtors' assets. The resulting PA Stalking Horse Bid, as set forth below, is the result of diligent and extensive marketing and negotiating efforts by the Debtors and Jefferies to obtain serious and credible Stalking Horse Bidders for the Debtors' assets.

### The PA Stalking Horse Bid and Proposed PA Bid Protections[5]

---

[4] *See* (i) *Order Approving Stipulation Among Debtors, the Official Committee of Unsecured Creditors and the DIP Lenders, Extending Certain Deadlines Under the Bid Procedures Order* [Docket No. 312]; (ii) *Order Approving Second Stipulation Among Debtors and the DIP Lenders Extending Certain Deadlines Under the Bid Procedures Order* [Docket No. 357]; and the (iii) *Amended Third Stipulation Among Debtors and the DIP Lenders Extending Certain Deadlines Under the (I) TX Debtors' Final DIP Order; (II) PA Debtors' Final DIP Order; (III) CA Debtors' Final DIP Order; (IV) and Bid Procedures Order* [Docket No. 378-1].

[55] Any summary of the PA Stalking Horse Agreement discussed herein is qualified in its entirety by the actual terms and conditions of the PA Stalking Horse Agreement. To the extent there is any conflict between the summary and the actual terms and conditions of the PA Stalking Horse Agreement, the actual terms and conditions shall control. A copy of the PA Stalking Horse Agreement referenced herein is attached as Exhibit B to the applicable Reading

**DAK Americas LLC/Reading Facility**

23. Debtor CLP Holdings LLC ("CLP"), has entered into an agreement with DAK Americas LLC as Stalking Horse Bidder (the "PA Stalking Horse Bidder") for the Reading Facility and related assets (the "Purchased Assets"), as set forth in more detail in the Reading Stalking Horse Notice and the PA Stalking Horse Agreement attached thereto.[6] The PA Stalking Horse Bidder seeks to acquire the Purchased Assets for an aggregate Purchase Price of (i) cash in the amount of $96,000,000.00, plus (A) the aggregate amount of all Cash or Cash Equivalents backing or securing the Acquired L/Cs as of the Closing Date in the amount set forth on Schedule 2.1(m) to the PA Stalking Horse Agreement, which in no event shall exceed $2,100,000.00 (the "L/C Consideration"), minus (B) any amounts drawn under any Acquired L/C as of the Closing Date, plus or minus (as applicable), (C) the amount, if any, by which the Net Working Capital as of the Closing Date is greater or less than, as applicable, the Target Closing Net Working Capital minus (D) the Tax Prorations, plus or minus (as applicable) (E) the Non-Tax Prorations, plus (ii) without duplication of any item described in clause (i) of this definition and solely for purposes of the Purchase Price allocation in Section 2.6(h) of the PA Stalking Horse Agreement, the Assumed Liabilities. The consideration described in clause (i) of the foregoing definition is referred to as the "Cash Consideration," which is subject to adjustment pursuant to Section 2.6 of the PA Stalking Horse Agreement.

24. In accordance with the Bid Procedures Order, CLP, with the consent of the applicable Consent Parties and after consultation with the Committee, has agreed to provide the PA Stalking Horse Bidder with the following Bid Protections: (i) a Break-Up Fee in the amount

---

Stalking Horse Notice.

[6] A copy of the PA Stalking Horse Agreement is attached to the Reading Stalking Horse Notice as Exhibit B. All defined terms used in paragraphs 23-27, herein, not otherwise defined shall have the meanings ascribed to them in the PA Stalking Horse Agreement.

DOCS_NY:43048.2 13044/003

of $2,880,000.00 in cash (3% of the cash portion of the Purchase Price) and (ii) Expense Reimbursement of the actual and documented expenses of the PA Stalking Horse Bidder in connection with its PA Stalking Horse Bid, in an amount up to $350,000.00 (collectively, the "PA Bid Protections").

25. To the extent the PA Bid Protections are earned by and payable to the PA Stalking Horse Bidder, the PA Bid Protections shall be paid in cash at Closing of an Alternative Transaction from the proceeds of the cash portion of the Purchase Price of the Successful Bid. In the event that the Alternative Transaction is a credit bid with no cash proceeds or cash proceeds insufficient to pay the PA Bid Protections in full, the PA Bid Protections shall be paid in cash at Closing by CLP from cash in its estate or from any cash component of such credit bid. The applicable DIP Lenders shall be deemed to have consented to payment of the PA Bid Protections as set forth in the Bid Protections Order in accordance with the applicable DIP Orders.

26. The PA Bid Protections will only be earned and payable to the PA Stalking Horse Bidder upon the Closing of a Sale Transaction with a Successful Bidder that has overbid the PA Facility Stalking Horse Bidder on the Reading Facility included in the PA Stalking Horse Agreement in accordance with the Bid Procedures.

27. The PA Bid Protections shall be *not* earned by the PA Stalking Horse Bidder in the event the PA Stalking Horse Agreement is terminated by CLP if (i) the conditions set forth in Section 6.6 and Section 7.5 of the PA Stalking Horse Agreement shall not have been satisfied on and as of the date of the Auction, and (ii) CLP determines that, as of the Auction, the PA Stalking Horse Bidder is not a "qualified bidder" for the Auction and as a result of such determination, the PA Stalking Horse Bidder is not permitted to participate in and bid at, the Auction in accordance with Section 8.1 of the PA Stalking Horse Agreement.

10

**The Bid Protections**

28. Based on my experience with sale transactions as well as my involvement in the negotiation of various stalking horse agreements, I believe the PA Bid Protections being provided to the PA Stalking Horse Bidder are reasonable, necessary and consistent with market terms for these types of transactions. In accordance with the Bid Procedures, the PA Bid Protections will only be earned by the PA Stalking Horse Bidder upon the Closing of a Sale Transaction with a Successful Bidder that has Overbid the Stalking Horse Bidder on the same Facilities included in the applicable Stalking Horse Bid (the "Alternative Transaction"). The PA Bid Protections were the subject of significant arms' length negotiation between the Debtors, the PA Stalking Horse Bidder and the applicable Consent Parties.

29. I understand that the PA Stalking Horse Bidder has spent considerable time and expended significant resources in furtherance of the PA Stalking Horse Agreement, and will be required to spend additional time and resources between now and the Auction and the ultimate Sale Approval Hearing to finalize any necessary government and regulatory approvals and documentation. Therefore, unless it is assured that the PA Bid Protections will be available upon consummation of an Alternative Transaction in accordance with the Bid Protections Order, the PA Stalking Horse Bidder has indicated that it is not willing to remain obligated to consummate the PA Stalking Horse Agreement or otherwise be bound under the PA Stalking Horse Agreement, including, the obligations to maintain a committed Stalking Horse Bid while such bid is subject to higher and better bids as contemplated by the Bid Procedures. Additionally, based on my experience, the time and money spent by credible potential purchasers in conducting due diligence incentivizes other potential purchasers to consider submitting bids on the same assets.

30. The PA Bid Protections also immediately benefit the estates in that the existence of the PA Stalking Horse Agreement allows the Debtors to continue as a going concern, protects the interests of employees, vendors and creditors, and establishes the existence of a robust market for the Debtors' assets, while the Debtors continue to determine if there are higher and better offers for the Debtors' assets. As a result, the Bid Protections benefit the estates in a material manner. In my view, the value associated with locking in the Stalking Horse Bid that will set the floor for other Qualified Bidders to submit higher and better bids outweighs the potential costs associated with the Break-Up Fee and Expense Reimbursement applicable to the PA Stalking Horse Bidder.

31. Additionally, I do not believe that providing the PA Bid Protections will chill bidding. In fact, I believe it will foster bidding because the PA Stalking Horse Bidder will set a floor for bids on the Reading Facility while the Debtors continue to negotiate in good faith with parties that have already submitted bids and several other parties that have been working with Jefferies and expressed interest in the Debtors' assets, but are still conducting due diligence or have indicated they will bid at the Auction but do not want to serve as a stalking horse.

32. The Debtors have determined that the selection of the PA Stalking Horse Bidder was important, if not essential, to help support the foundation for the final phase of the Sale Process, including to give other Interested Parties necessary information to proceed quickly and efficiently, and the Debtors' estates a minimum bid on which to rely, all to promote more competitive bidding. In my view, moreover, the execution of the PA Stalking Horse Agreement has put the Debtors in a position to solicit competing bids that may be materially higher or otherwise better than the PA Stalking Horse Bid.

33. Accordingly, for the reasons set forth above, I believe the PA Bid Protections (i) are commensurate to the benefits conferred upon the Debtors' estates by the PA Stalking Horse Bidder; (ii) will promote competitive bidding on the Debtors' assets, (iii) are fair, reasonable, and appropriate in light of the circumstances and the size and nature of the proposed Sale Transactions and the efforts that have been and will be expended by the PA Stalking Horse Bidder while the bids are subject to higher and better offers, and (iv) are reasonable, necessary and consistent with market terms for these types of transactions.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: May 2, 2021  /s/ Richard W. Morgner
New York, New York  Richard W. Morgner

Managing Director and Joint Global Head of
the Recapitalization & Restructuring Group
Jefferies LLC