SCHEDULES AND EXHIBITS

[See attached]

Exhibit "A"

Form of Note Purchase Agreement

[See attached]

NOTE PURCHASE AGREEMENT

dated as of [_____], 2021

among

TSG SHELF II ACQUISITION PARENT, LLC,
as Holdings,

TSG SHELF II ACQUISITION, LLC
as Issuer,

THE SUBSIDIARY GUARANTORS PARTY HERETO

THE NOTEHOLDERS PARTY HERETO,

and

UMB BANK, N.A.
as Agent

$21,000,000 Senior Secured Fixed Rate Notes

## TABLE OF CONTENTS

ARTICLE I DEFINITIONS ...............................................................................................1
    Section 1.01   Certain Defined Terms...........................................................................1
    Section 1.02   Terms Generally...................................................................................27
    Section 1.03   Accounting Terms................................................................................28

ARTICLE II THE NOTES .................................................................................................28
    Section 2.01   Sale and Purchase of Notes.................................................................28
    Section 2.02   Issuance of the Notes...........................................................................28
    Section 2.03   Termination and Reduction of the Commitments.................................28
    Section 2.04   Repayment of Notes; Evidence of Debt...............................................29
    Section 2.05   Prepayment of the Notes......................................................................29
    Section 2.06   Agent Fees. ..........................................................................................31
    Section 2.07   Interest.................................................................................................31
    Section 2.08   [Reserved]............................................................................................32
    Section 2.09   Taxes....................................................................................................32
    Section 2.10   Payments Generally; Pro Rata Treatment; Sharing of Setoffs.................35
    Section 2.11   Mitigation Obligations.........................................................................36
    Section 2.12   Acknowledgement and Consent to Bail-In of EEA Financial
                        Institutions..........................................................................................36
    Section 2.13   Additional Notes. .................................................................................37

ARTICLE III REPRESENTATIONS AND WARRANTIES .............................................38
    Section 3.01   Due Organization, Etc.........................................................................38
    Section 3.02   Authorization, Etc................................................................................38
    Section 3.03   No Conflict...........................................................................................39
    Section 3.04   Approvals, Etc......................................................................................39
    Section 3.05   Use of Proceeds....................................................................................39
    Section 3.06   Litigation.............................................................................................39
    Section 3.07   Environmental Matters.........................................................................40
    Section 3.08   Compliance with Laws and Obligations. .............................................41
    Section 3.09   No Material Adverse Effect..................................................................41
    Section 3.10   Intellectual Property; Licenses.............................................................41
    Section 3.11   Taxes....................................................................................................41
    Section 3.12   [Reserved]............................................................................................42
    Section 3.13   Solvency...............................................................................................42
    Section 3.14   Regulatory Restrictions on the Notes. .................................................42
    Section 3.15   Title; Security Documents. ..................................................................42
    Section 3.16   ERISA..................................................................................................42
    Section 3.17   Insurance.............................................................................................43
    Section 3.18   [Reserved]............................................................................................43
    Section 3.19   Capital Stock and Related Matters.......................................................43
    Section 3.20   [Reserved]............................................................................................43
    Section 3.21   [Reserved]............................................................................................43

Section 3.22    No Bank Accounts. ......................................................................43
Section 3.23    No Default or Event of Default. ....................................................43
Section 3.24    Foreign Assets Control Regulations. .............................................44
Section 3.25    Commercial Activity; Absence of Immunity...................................44

ARTICLE IV CONDITIONS ..........................................................................................44
Section 4.01    Conditions to the Closing Date. ....................................................44
Section 4.02    [Reserved]. ..................................................................................48

ARTICLE V AFFIRMATIVE COVENANTS...................................................................48
Section 5.01    Corporate Existence; Etc..............................................................48
Section 5.02    Conduct of Business. ...................................................................48
Section 5.03    Compliance with Laws and Obligations. .......................................48
Section 5.04    [Reserved]. ..................................................................................48
Section 5.05    Maintenance of Title.....................................................................49
Section 5.06    [Reserved]. ..................................................................................49
Section 5.07    Keeping of Books. ........................................................................49
Section 5.08    [Reserved]. ..................................................................................49
Section 5.09    Taxes. ..........................................................................................49
Section 5.10    Financial Statements; Other Reporting Requirements...................49
Section 5.11    Notices. ........................................................................................50
Section 5.12    Noteholder Calls. .........................................................................51
Section 5.13    [Reserved]. ..................................................................................51
Section 5.14    Security. .......................................................................................51
Section 5.15    Further Assurances.......................................................................51
Section 5.16    Additional Collateral; Additional Guarantors.................................51
Section 5.17    [Reserved]. ..................................................................................53
Section 5.18    Intellectual Property. ....................................................................53
Section 5.19    Certain Post-Closing Obligations. .................................................54
Section 5.20    Additional Covenants. ..................................................................54

ARTICLE VI NEGATIVE COVENANTS .......................................................................54
Section 6.01    [Reserved]. ..................................................................................54
Section 6.02    Indebtedness.................................................................................54
Section 6.03    Liens, Etc. ....................................................................................55
Section 6.04    Investments. .................................................................................57
Section 6.05    Change of Jurisdiction, Corporate Name or Location; Change of
                Fiscal Year; Business Activities. ..................................................58
Section 6.06    Restricted Payments......................................................................59
Section 6.07    Fundamental Changes; Asset Dispositions.....................................59
Section 6.08    [Reserved]. ..................................................................................60
Section 6.09    Transactions with Affiliates............................................................61
Section 6.10    Passive Holding Company.............................................................61
Section 6.11    No Further Negative Pledge...........................................................61
Section 6.12    Limitations on Restricted Actions. .................................................62

Section 6.13   [Reserved]. ................................................................................62
Section 6.14   No Hedging or Speculative Transactions. ..................................62

ARTICLE VII EVENTS OF DEFAULT..........................................................62
Section 7.01   Events of Default. ......................................................................62
Section 7.02   Application of Proceeds. .............................................................66

ARTICLE VIII THE AGENT.........................................................................66
Section 8.01   Appointment and Authorization of the Agent. ...........................66
Section 8.02   Rights as a Noteholder. ..............................................................67
Section 8.03   Duties of Agent; Exculpatory Provisions. ..................................67
Section 8.04   Reliance by Agent. ......................................................................68
Section 8.05   Delegation of Duties. ..................................................................69
Section 8.06   [Reserved]. ..................................................................................69
Section 8.07   Resignation of Agent. .................................................................69
Section 8.08   Non-Reliance on Agent or Other Noteholders............................70
Section 8.09   No Other Duties; Etc. ..................................................................70
Section 8.10   Agent May File Proofs of Claim; Credit Bidding.......................70
Section 8.11   Collateral and Guaranty Matters .................................................71
Section 8.12   Withholding Taxes ......................................................................73

ARTICLE IX GUARANTY .............................................................................74
Section 9.01   Guaranty. .....................................................................................74
Section 9.02   Guaranty Unconditional...............................................................74
Section 9.03   Discharge Only Upon Payment in Full; Reinstatement in Certain
               Circumstances. ............................................................................75
Section 9.04   Waiver by the Guarantors. ..........................................................75
Section 9.05   Subrogation. .................................................................................76
Section 9.06   Acceleration. ...............................................................................76
Section 9.07   Subordination. ............................................................................76
Section 9.08   Contribution with Respect to Guaranty Obligations....................76

ARTICLE X MISCELLANEOUS.....................................................................77
Section 10.01 Notices. ......................................................................................77
Section 10.02 Waivers; Amendments.................................................................78
Section 10.03 Expenses; Indemnity; Etc. ..........................................................79
Section 10.04 Successors and Assigns.................................................................81
Section 10.05 Survival........................................................................................84
Section 10.06 Counterparts; Integration; Effectiveness.....................................84
Section 10.07 Severability. .................................................................................85
Section 10.08 Right of Setoff.............................................................................85
Section 10.09 Governing Law; Jurisdiction; Etc. ..............................................85
Section 10.10 Headings. .....................................................................................86
Section 10.11 Confidentiality. ...........................................................................86
Section 10.12 No Third Party Beneficiaries. .....................................................88

Section 10.13 Reinstatement........................................................................................88
Section 10.14 USA PATRIOT Act..............................................................................88

| | |
|---|---|
| Annex I | Commitments |
| Schedule 3.01(b) | Equity Shareholders |
| Schedule 3.07 | Environmental Matters |
| Schedule 3.11 | Taxes |
| Schedule 3.17 | Insurance |
| Schedule 3.19(b) | Subsidiaries |
| Schedule 5.04 | Governmental Authorizations |
| Schedule 5.20 | Certain Post-Closing Obligations |
| Schedule 6.02 | Permitted Indebtedness |
| Schedule 6.03 | Permitted Liens |
| Schedule 6.04 | Permitted Investments |
| Schedule 6.11 | Permitted Negative Pledges |
| Schedule 6.12 | Permitted Restrictive Actions |
| | |
| Exhibit A | Form of Assignment and Assumption |
| Exhibits B-1 through B-4 | Tax Certificates |
| Exhibit C | Form of Note |
| Exhibit D | Additional Covenants |

This NOTE PURCHASE AGREEMENT is dated as of [_____], 2021, among TSG SHELF II ACQUISITION, LLC, a Delaware limited liability company (the "Issuer"), TSG SHELF II ACQUISITION PARENT, LLC, a Delaware limited liability company ("Holdings"), CERTAIN SUBSIDIARIES OF THE ISSUER, as Subsidiary Guarantors, the noteholders from time to time party hereto (collectively, the "Noteholders" and individually, a "Noteholder") and UMB Bank, N.A., as Agent.

WHEREAS, pursuant that certain Asset Purchase Agreement, dated as of [_____], 2021 (the "Purchase Agreement"), by and among CarbonLite Recycling, LLC, a Delaware limited liability company, CarbonLite Industries, LLC, a Delaware limited liability company (collectively, the "Sellers") and the Issuer, the Issuer has agreed to purchase from the Sellers, and the Sellers have agreed to sell to the Noteholder, pursuant to, among other provisions thereof, Section 363 of Chapter 11 of Title 11 of the Bankruptcy Code, the Purchased Assets;

WHEREAS, the Issuer desires to issue the Notes in an aggregate amount equal to $21,000,000 to the Noteholders as the Note Consideration contemplated under the Purchase Agreement on the terms and conditions set forth herein;

WHEREAS, each of the Note Parties has agreed to secure all of its Obligations by granting to Agent, for the benefit of Secured Parties, a Lien on substantially all of its assets, including a pledge of all of the equity interests of certain of its Subsidiaries on the terms and conditions set forth herein and the Security Documents;

WHEREAS, the Guarantors have agreed to guarantee the obligations of the Issuer hereunder pursuant to Article IX hereof, and to secure their respective Obligations by granting to Agent, for the benefit of Secured Parties, a Lien on substantially all of their respective assets, including a pledge of all of the equity interests of certain of their respective Subsidiaries on the terms and conditions set forth herein and the Security Documents; and

WHEREAS, the Noteholders are willing to accept the Notes issued by the Issuer on the Closing Date as the Note Consideration on the terms and subject to the conditions set forth herein.

NOW, THEREFORE, in consideration of the premises and the agreements, provisions and covenants herein contained, the parties hereto agree as follows:

ARTICLE I

DEFINITIONS

Section 1.01   Certain Defined Terms. As used in this Agreement, the following terms shall have the following meanings:

"ABL Priority Collateral" means any Note Party's (i) accounts or proceeds arising from the sale of inventory or the provision of services, (ii) segregated proceeds of the foregoing (including any deposit accounts, securities accounts or commodities accounts holding solely such

proceeds), (iii) books and records relating to the foregoing, (iv) other assets related to the foregoing that would customarily secure any asset-based facility with priority over the Liens securing a secured term loan or note purchase facility in a split collateral structure, (v) supporting obligations in respect of any of the property described in the foregoing <u>clauses (i)</u> through <u>(iv)</u> and (vi) substitutions, replacements, accessions, products or proceeds of any of the property described in the foregoing <u>clauses (i)</u> through <u>(v)</u>.

"<u>Acquisition</u>" means the acquisition by the Issuer of the Purchased Assets pursuant to the Purchase Agreement.

"<u>Additional Agreement</u>" has the meaning assigned to such term in <u>Section 8.01(c)</u>.

"<u>Additional Covenants</u>" means the covenants of the Issuer and the other Note Parties as set forth in <u>Exhibit D</u> hereto.

"<u>Additional Notes</u>" has the meaning assigned to such term in <u>Section 2.13</u>.

"<u>Additional Notes Amendment</u>" has the meaning assigned to such term in <u>Section 2.13</u>.

"<u>Affected Property</u>" means any property of any Note Party that suffers an Event of Loss.

"<u>Affiliate</u>" means, with respect to a specified Person, another Person that at such time directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified. Each Guarantor and Non-Guarantor Subsidiary shall be considered an "Affiliate" of the Issuer.

"<u>Agent</u>" means UMB Bank, N.A., in its capacity as administrative agent and collateral agent for the Secured Parties under the Note Documents, and any successor thereto pursuant to <u>Article VIII</u>.

"<u>Agent Fee Letter</u>" means the fee letter, dated as of the Closing Date, between the Issuer and the Agent.

"<u>Agreement</u>" means this Note Purchase Agreement, as amended, restated, replaced, supplemented or otherwise modified from time to time.

"<u>Allocable Amount</u>" has the meaning assigned to such term in <u>Section 9.08(a)</u>.

"<u>Anti-Corruption Laws</u>" means any law, rule or regulation of any jurisdiction relating to bribery or corruption in which any Note Party performs business or any jurisdiction otherwise applicable to Holdings and its Subsidiaries, including without limitation, the FCPA and where applicable, legislation relating to bribery or corruption enacted by member states and signatories implementing the OECD Convention Combating Bribery of Foreign Officials.

"<u>Anti-Corruption Prohibited Activity</u>" means the offering, payment, promise to pay, authorization of the payment of any money or the offer, promise to give, giving, or authorizing the giving of anything of value, to any Government Official or to any person under the circumstances

where the Person, such Person's Affiliate's or such Person's representative knew or had reason to know that all or a portion of such money or thing of value would be offered, given or promised, directly or indirectly, to any Government Official, for the purpose of (a) influencing any act or decision of such Government Official in his or her official capacity, (b) inducing such Government Official to do or omit to do any act in relation to his or her lawful duty, (c) securing any improper advantage, or (d) inducing such Government Official to influence or affect any act or decision of any Governmental Authority, in each case, in order to assist such Person in obtaining or retaining business for or with, or in directing business to, any Person.

"Anti-Money Laundering Laws" means the U.S. Currency and Foreign Transaction Reporting Act of 1970, as amended, and all money laundering-related laws of the United States and other jurisdictions where such Person conducts business or owns assets, and any related or similar law issued, administered or enforced by any Governmental Authority.

"Applicable Law" means with respect to any Person, property or matter, any of the following applicable thereto: any constitution, writ, injunction, statute, law, regulation, ordinance, rule, judgment, principle of common law, order, decree, court decision, Authorization, approval, concession, grant, franchise, license, agreement, directive, guideline, policy, requirement, or other governmental restriction or any similar form of decision of, or determination by, or any interpretation or administration of any of the foregoing, by any Governmental Authority, whether in effect as of the date hereof or thereafter and in each case as amended, including Environmental Laws.

"Assignment and Assumption" means an assignment and assumption entered into by a Noteholder and an assignee (with the consent of any party whose consent is required by Section 10.04), in the form of Exhibit A or any other form approved by the Required Noteholders.

"Authorization" means any consent, waiver, variance, registration, filing, declaration, agreement, notarization, certificate, license, tariff, approval, permit (including water and environmental permits), order, authorization, exception or exemption from, by or with any Governmental Authority, whether given by express action or deemed given by failure to act within any specified period, and all corporate, creditors', shareholders' and partners' approvals or consents.

"Authorized Representative" means, with respect to any Person, the chief executive officer, the chief financial officer, president, secretary, assistant secretary or any other officer or authorized representative of such Person as may be designated from time to time by such Person in writing by a notice delivered to the Agent and the Noteholders. Any document or certificate delivered under the Note Documents that is signed by an Authorized Representative may be conclusively presumed by the Agent and Noteholders to have been authorized by all necessary corporate, limited liability company or other action on the part of the relevant Person.

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"Bail-In Legislation" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European

Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"Bankruptcy Code" means Title 11, United States Code.

"Board" means the Board of Governors of the Federal Reserve System of the United States of America.

"Business" means, collectively, (A) the recycling and/or conversion of PET materials into products for resale directly or through one or more Subsidiaries, including (i) the acquisition of plastic waste or any derivative products thereof, (ii) the recycling of plastic waste or any derivative products thereof, including all aspects of the recycling process, (iii) the sale to other converters of PET or any derivative products thereof and (iv) the conversion of PET into finished products, including but not limited to rPET Resins; and (B) activities reasonably related or incidental thereto or representing a reasonable expansion thereof.

"Business Day" means a day other than a Saturday, Sunday or other day on which commercial banks in New York City, New York are authorized or required by law to close.

"Capital Expenditures" means with respect to any Person, the aggregate of all expenditures and costs (whether paid in cash or accrued as liabilities and including that portion of payments under Capital Lease Obligations that are capitalized on the balance sheet of such Person) by such Person and its Subsidiaries which are required to be capitalized under GAAP on a balance sheet of such Person.

"Capital Lease Obligations" means, with respect to any Person, the obligations of such Person to pay rent or any other amounts under any lease of (or other arrangements conveying the right to use) real or personal property, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person in accordance with GAAP.

"Capital Stock" means, with respect to any Person, any and all shares, interests, participations and/or rights in or other equivalents (however designated, whether voting or nonvoting, ordinary or preferred) in capital stock of such Person (if such Person is a corporation), any and all equivalent ownership interests in such Person (if other than a corporation), including partnership interests and membership interests, now or hereafter outstanding, and any and all rights, warrants or options exchangeable for or convertible into any of the foregoing.

"Cash Equivalent Investments" means:

(a)    direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the United States of America), in each case maturing within one year from the date of acquisition thereof;

(b)    investments in commercial paper maturing within one year from the date of acquisition thereof and having, at such date of acquisition, the highest credit rating obtainable from S&P or from Moody's;

(c)      investments in certificates of deposit, banker's acceptances and time deposits maturing within one year from the date of acquisition thereof issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, any domestic office of any commercial bank organized under the laws of the United States of America or any State thereof that has a combined capital and surplus and undivided profits of not less than $100,000,000;

(d)      fully collateralized repurchase agreements with a term of not more than thirty (30) days for securities described in clause (a) above and entered into with a financial institution satisfying the criteria described in clause (c) above; and

(e)      money market funds that (x)(i) comply with the criteria set forth in SEC Rule 2a-7 under the Investment Company Act of 1940, (ii) are rated AAA by S&P and Aaa by Moody's and (iii) have portfolio assets of at least $5,000,000,000 or (y) invest exclusively in Investments described in clauses (a) through (d) above.

"Change of Control" means:

(a)      the Sponsor ceases to own, directly or indirectly, a majority of the economic and voting Capital Stock of the Issuer;

(b)      Holdings ceases to own, directly, 100% of the issued and outstanding Capital Stock of the Issuer;

(c)      the Issuer ceases to own, directly or indirectly, any of the Facilities (or all of the Capital Stock of any Subsidiary that owns a Facility); or

(d)      an IPO of Holdings, the Issuer or any parent entity of any of the foregoing.

"CFC" means any Subsidiary that is a "controlled foreign corporation" for United States federal income tax purposes within the meaning of Section 957 of the Code and any direct or indirect subsidiary of a CFC.

"Change of Control Prepayment Offer" has the meaning assigned to such term in Section 2.05(b)(i).

"Closing Date" means the date on which all conditions precedent specified in Section 4.01 are satisfied (or waived by the Agent and the Noteholders in their sole and absolute discretion in accordance with Section 10.02).

"Code" means the U.S. Internal Revenue Code of 1986, as amended.

"Collateral" means all Property of the Note Parties (including all Capital Stock of the Issuer and the Subsidiaries of the Issuer) now owned or hereafter acquired, which is intended to be subject to the security interests or Liens granted pursuant to any of the Security Documents.

"Collateral Accounts" means (a) the Issuer Account, and (b) any other any securities account, deposit account or commodities account established by a Note Party with the prior written consent of the Required Noteholders, such consent not to be unreasonably withheld, delayed or conditioned, and, in each case, subject to a Control Agreement, other than any Excluded Account.

"Commitment" means, with respect to each Noteholder, the commitment of such Noteholder to accept Notes from the Issuer pursuant to Section 2.01 as Note Consideration, in an aggregate principal amount not to exceed the amount set forth opposite such Noteholder's name on Annex I under the heading "Commitment".

"Compliance Certificate" has the meaning assigned to such term in Section 5.10(d).

"Compliance Period" has the meaning assigned to that term in the definitions of "Pro Forma Basis" and "Pro Forma Effect".

"Condemnation" means any taking, seizure, confiscation, requisition, exercise of rights of eminent domain, public improvement, inverse condemnation, condemnation, expropriation, nationalization or similar action of or proceeding by any Governmental Authority affecting the Business.

"Consolidated EBITDA" means, for any period, the sum, without duplication, of the amounts for such period of (i) Consolidated Net Income, (ii) Consolidated Interest Expense, (iii) provision for U.S. federal, state, local and non-U.S. income taxes, franchise taxes and other taxes in lieu of income taxes payable, (iv) total depreciation expense, (v) total amortization expense, (vi) transaction expenses incurred by the Issuer or any of its Subsidiaries in such period in connection with Permitted Acquisitions, (vii) Transaction Costs, (viii) out-of-pocket financial advisory fees, accounting fees, legal fees and any other similar third party out-of-pocket fees and expenses incurred in connection with the pursuit of any acquisition, offering of Capital Stock, Investment, disposition, Restricted Payment, recapitalization or the incurrence, issuance, repayment, amendment or modification of Indebtedness (in each case, regardless of whether such transaction is consummated); provided that the aggregate amount added to Consolidated EBITDA pursuant to this clause (viii) for such four Fiscal Quarter period shall not exceed $10,000,000, (ix) management and other fees and reimbursement of expenses permitted pursuant to Section 6.09(e), (x) impairment of goodwill and other non-cash items (other than any such non-cash item to the extent it represents an accrual of or reserve for cash expenditures in any future period) including, without limitation, the write up of inventory to its estimated fair market value pursuant to Financial Accounting Standards Board Accounting Standards Codification No. 805 in excess of its manufacturing cost, (xi) to the extent actually reimbursed, expenses incurred to the extent covered by indemnification provisions in any agreement in connection with a Permitted Acquisition, (xii) all business optimization expenses and other restructuring and integration charges (including, without limitation, the costs associated with business optimization programs, including costs of consultants, relocation and recruiting expenses, back office closures, retention costs, severance costs, system establishment and integration of information technology and information systems costs) and expenses and charges incurred in connection with the implementation of cost savings initiatives, business optimization charges and restructuring charges; provided that the aggregate amount added to Consolidated EBITDA pursuant to this clause (xii) and clause (xiii) below in the

aggregate in any four Fiscal Quarter period shall not exceed 20.0% of Consolidated EBITDA for such four Fiscal Quarter period (calculated before giving effect to such amounts added to Consolidated EBITDA), (xiii) the amount of pro forma "run rate" cost savings, operating expense reductions, operating improvements and synergies (in each case, net of amounts actually realized) related to the Transactions, Permitted Acquisitions and other Investments, Dispositions, other similar transactions, and cost savings, business optimization or restructuring initiatives, in each case, that are reasonably identifiable, factually supportable and projected by the Issuer in good faith to result from actions that have been taken or with respect to which substantial steps have been taken or are expected to be taken (in the good faith determination of the Issuer) within twelve (12) months after the Transactions, such Permitted Acquisition or other Investment, Disposition, other similar transaction, or cost savings, business optimization or restructuring initiative; provided that the aggregate amount added to Consolidated EBITDA pursuant to this clause (xiii) and clause (xii) above in the aggregate in any four Fiscal Quarter period shall not exceed 20.0% of Consolidated EBITDA for such four Fiscal Quarter period (calculated before giving effect to such amounts added to Consolidated EBITDA), (xiv) [reserved], (xv) non-cash expenses recognized due to purchase accounting, (xvi) any non-cash equity-based compensation expense, (xvii) to the extent covered by insurance and actually reimbursed, or, so long as the Issuer has made a determination that there exists reasonable evidence that such amount will in fact be reimbursed by the insurer and only to the extent that such amount is (A) not denied by the applicable carrier in writing and (B) in fact reimbursed within 365 days of the date of the determination by the Issuer that there exists such evidence (with a deduction for any amount so added back to the extent not so reimbursed within such 365 days), expenses with respect to liability or casualty events or business interruption, in each case under this clause (xvii) to the extent not included in Consolidated Net Income, (xviii) [reserved], (xix) to the extent not included in determining Consolidated Net Income, proceeds of business interruption insurance actually received in cash by the Issuer and its Subsidiaries during such period, and (xx) fees, expenses, and indemnities paid or accrued in such period to directors (not to exceed $500,000 in the aggregate for any four Fiscal Quarter period), but only, in the case of each of the foregoing clauses (ii) through (xx), to the extent deducted in the calculation of Consolidated Net Income, less the sum of (i)  non-cash items added in the calculation of Consolidated Net Income (other than any such non-cash item to the extent it will result in the receipt of cash payments in any future period), (ii) gains from the purchase of Notes pursuant to Section 2.01, (iii) the amount added back to Consolidated EBITDA pursuant to clause (xvii) above to the extent such reimbursement amounts were not received within the time period required by such clause, all of the foregoing as determined on a consolidated basis for Issuer and its Subsidiaries in conformity with GAAP other than with respect to the use of the Equity Investment Calculation Period for Joint Ventures.

"Consolidated Interest Expense" means, for any period, total interest expense (including that portion attributable to Capital Lease Obligations in accordance with GAAP and capitalized interest) of the Issuer and its Subsidiaries on a consolidated basis with respect to all outstanding Indebtedness of the Issuer and its Subsidiaries, including all commissions, discounts and other fees and charges owed with respect to letters of credit and bankers' acceptance financing, net costs under Hedging Agreements and fees payable to the Agent and Noteholders and the holders of other Indebtedness that are considered interest expense in accordance with GAAP; provided that Consolidated Interest Expense shall exclude unrealized gains and losses with respect to Hedging Agreements.

"<u>Consolidated Net Income</u>" means, for any period, the net income (or loss) of Holdings and its Subsidiaries on a consolidated basis for such period taken as a single accounting period determined in conformity with GAAP, which shall be calculated (x) less (or plus) net income (or loss) attributable to non-controlling interests and (y) inclusive of net income (or loss) from equity investments; <u>provided</u>, that there shall be excluded (i) except as provided in the definition of "Pro Forma Basis", the income (or loss) of any Person accrued prior to the date it becomes a Subsidiary of the Issuer or is merged into or consolidated with Issuer or any of its Subsidiaries or that Person's assets are acquired by the Issuer or any of its Subsidiaries, (ii) any after-tax gains or losses attributable to asset sales or returned surplus assets of any Pension Plan, (iii) (to the extent not included in clauses (i) through (ii) above) any net non-recurring or extraordinary gains or net non-recurring or extraordinary losses, (iv) the impact of currency translation gains and losses and mark to market gains and losses on any Hedging Agreement, (v) the cumulative effect of a change in accounting principles during such period, and (vi) gains and losses from the early extinguishment of Indebtedness (including any cancellation of debt income as a result of any purchases of Notes by the Issuer pursuant to <u>Section 2.01</u>), hedging obligations or other derivative instruments.

"<u>Control</u>" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "<u>Controlling</u>" and "<u>Controlled</u>" have meanings correlative thereto.

"<u>Control Agreement</u>" means an account control agreement in respect of one or more deposit accounts or securities accounts of the Note Parties, in form and substance reasonably satisfactory to the Agent, executed by the financial institution at which an account is maintained, pursuant to which such financial institution agrees that such financial institution will comply with instructions or entitlement orders originated by the Agent as to disposition of funds in such account, without further consent by any other Person.

"<u>Controlled Investment Affiliate</u>" shall mean, with respect to The Sterling Group, L.P., any fund, investment vehicle or other Person (other than a natural Person) that (i) is organized by The Sterling Group, L.P. or by any Person that directly or indirectly controls The Sterling Group, L.P., for the purpose of making investments in one or more companies and (ii) is controlled by or is under common control with The Sterling Group, L.P. For purposes of this definition "control" means the power to direct or cause the direction of management and policies of a Person, whether by contract or otherwise.

"<u>Copyrights</u>" means all works of authorship, United States and foreign copyrights (whether or not the underlying works of authorship have been published), designs, whether registered or unregistered, registrations and applications for registration of the foregoing and all extensions, renewals, and restorations thereof.

"<u>Debtor Relief Laws</u>" means the Bankruptcy Code and all other liquidation, conservatorship, bankruptcy, general assignment for the benefit of creditors, moratorium, arrangement, rearrangement, scheme of arrangement, receivership, insolvency, reorganization, winding up or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Debt Service Coverage Ratio" means for any given period of time, the ratio of (a) Consolidated EBITDA to (b) the total of all principal, interest, premium (if any), fees and other amounts due and payable during such period in connection with the Notes, all as determined in accordance with GAAP.

"Debt Service Coverage Ratio Covenant" means the Debt Service Coverage Ratio covenant set forth in Section 1.18(b) of the Additional Covenants.

"Debt Prepayment Offer" has the meaning assigned to such term in Section 2.05(b)(iv).

"Default" means any event, condition or circumstance that, with notice or lapse of time or both, would (unless cured or waived) become an Event of Default.

"Disposition" means any sale, transfer or other disposition (in one transaction or in a series of transactions and whether effected pursuant to a division of a limited liability company or an allocation of assets to a series of a limited liability company) of any assets or property by any Note Party or Subsidiary thereof (including any issuance of Capital Stock by a Subsidiary of such Person (other than (a) any issuance of directors' qualifying shares, (b) nominal shares issued to foreign nationals to the extent required by Applicable Laws and (c) other than issuing shares of Capital Stock of Holdings in compliance with Section 6.04(a)), other than any Event of Loss.

"Disqualified Investor" means any entity (a) engaged in the business of virgin PET production or (b) engaged in the business of PET recycling in competition with the Issuer Group Members and, in the case of clause (a) or (b), identified by name in writing by the Issuer to the Noteholders from time to time; provided that any such notice shall not apply to retroactively disqualify such persons that have previously acquired an assignment of any Noteholder's rights and obligations under this Agreement or to retroactively require the consent of the Issuer to such assignment.

"Disqualified Stock" means, with respect to any Person, any Capital Stock of such Person which, by its terms, or by the terms of any security into which it is convertible or for which it is putable or exchangeable, or upon the happening of any event, matures or is mandatorily redeemable (other than (i) as a result of a change of control or asset sale, provided that such change of control or asset sale results in the payment in full of the Obligations (ii) solely for Capital Stock in such Person that does not constitute Disqualified Stock and cash in lieu of fractional shares of such Capital Stock) pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof (other than (i) solely as a result of a change of control or asset sale or (ii) solely for Capital Stock in such Person that does not constitute Disqualified Stock and cash in lieu of fractional shares of such Capital Stock), in whole or in part, in each case prior to the date that is 91 days after the Maturity Date; provided however that (i) if such Capital Stock are issued to any employee or to any plan for the benefit of employees of Holdings or its Subsidiaries or by any such plan to such employees, such Capital Stock will not constitute Disqualified Stock solely because they may be required to be repurchased by Holdings or any of its Subsidiaries in order to satisfy applicable statutory or regulatory obligations or a result of such employee's termination, death or disability.

"Dollars" or "$" refers to the lawful currency of the United States of America.

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clause (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Environmental Claim" means any administrative or judicial action, suit, proceeding, notice, claim or demand (including any request for information pursuant to Section 104(e) of the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. ss. 9601 et seq.) by any Person seeking to enforce any obligation or responsibility arising under or relating to Environmental Law or alleging or asserting liability for investigatory costs, cleanup or other remedial costs, legal costs, environmental consulting costs, governmental response costs, damages to natural resources or other property, personal injuries, fines or penalties related to (a) the presence, or Release into the environment, of any Hazardous Material at any location, whether or not owned by the Person against whom such claim is made, or (b) any noncompliance with, or alleged noncompliance with, or liability arising under any Environmental Law. The term "Environmental Claim" shall include, without limitation any claim by any Person for damages, contribution, indemnification, cost recovery, compensation or injunctive relief or costs associated with any remediation plan, in each case, under any Environmental Law.

"Environmental Laws" means any Applicable Laws regulating or imposing liability or standards of conduct concerning or relating to pollution or the protection of human health, safety the environment, natural resources or special status species and their habitat, including all Applicable Laws concerning the presence, use, manufacture, generation, transportation, Release, threatened Release, disposal, arrangement for disposal, dumping, discharge, treatment, storage, handling, control or cleanup of Hazardous Materials.

"Equity Investment Calculation Period" has the meaning assigned to that term in the definition of "Consolidated Net Income".

"Equity Shareholders" means the equity owners of Holdings set forth on Schedule 3.01(b) as of the Closing Date.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that, together with the Issuer, is treated as a single employer under Sections 414(b), (c), (m) or (o) of the Code.

"ERISA Event" means (a) a Reportable Event with respect to any Pension Plan, (b) the failure by any Pension Plan to satisfy the minimum funding standard (within the meaning of Section 412 of the Code or Section 302 of ERISA) applicable to such plan, whether or not waived, (c) the filing of a notice of intent to terminate a Pension Plan in a distress termination (as described in Section 4041(c) of ERISA), (d) a complete or partial withdrawal by the Issuer or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization or insolvent (within the meaning of Title IV of ERISA), (e) the imposition or incurrence of any liability under Title IV of ERISA, other than PBGC premiums due but not delinquent under Section 4007 of ERISA, upon the Issuer or any ERISA Affiliate, (f) the institution by the PBGC of proceedings to terminate a Pension Plan or Multiemployer Plan, (g) the appointment of a trustee to administer any Pension Plan under Section 4042 of ERISA, or (h) the imposition of a Lien upon the Issuer pursuant to Section 430(k) of the Code or Section 303(k) of ERISA.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Event of Default" has the meaning assigned to such term in Section 7.01.

"Event of Loss" means any loss of, destruction of or damage to, or any Condemnation or other taking of any property of any Issuer Group Member.

"Event of Loss/Disposition Prepayment Offer" has the meaning assigned to such term in Section 2.05(b)(ii).

"Excluded Account" means (a) any deposit account that is used solely as a payroll account for the employees of Issuer or its Subsidiaries or the funds in which consist solely of funds held by the owner of such deposit account in trust for any director, officer or employee of any Note Party or any employee benefit plan maintained by any Note Party or funds representing deferred compensation for the directors and employees of any Note Party, (b) escrow accounts and trust accounts, in each case holding assets that are pledged or otherwise encumbered pursuant to Permitted Liens, (c) accounts containing no (zero) balance at any time, and accounts that by their terms are swept to a zero balance on a daily basis to a deposit account that is subject to a control agreement in favor of Agent and (d) other deposit accounts, securities accounts and commodities accounts, except to the extent the value of all such accounts in this clause (d) shall exceed at any time $250,000 in the aggregate shall not be "Excluded Accounts"; provided that the aggregate daily maximum balance for all accounts described in clauses (a) through (d) on any day shall not exceed $500,000.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to the Agent, any Noteholder or any other recipient of any payment to be made by or on account of any obligation of any Note Party hereunder, (a) Taxes imposed on or measured by net income, franchise Taxes (imposed in lieu of net income tax) or branch profits Taxes, in each case, (i) imposed by the jurisdiction under the laws of which such recipient is organized, in which its principal office (or other fixed place of business) is located or, in which its applicable lending office is located, in each case, as a result of such recipient's being organized under the laws of the jurisdiction imposing such Taxes or having its principal office or lending office located therein, or

(ii) that are Other Connection Taxes, (b) any Taxes attributable to the failure of the Agent, Noteholder or any such other applicable recipient to comply with <u>Section 2.09(e)</u>, (c) in the case of the Agent or a Noteholder (other than an assignee pursuant to a request by the Issuer under <u>Section 2.11</u>) any U.S. federal withholding Tax that is imposed on amounts payable to such Agent or Noteholder under the laws effective at the time the Agent or Noteholder becomes a party hereto (or designates a new lending office) (other than pursuant to an assignment request by the Issuer under Section 2.11), except, in each case, to the extent that the Agent or Noteholder (or its assignor, if any) was entitled immediately before becoming a party hereto or immediately before designation of a new lending office (or assignment), to receive amounts with respect to such Tax pursuant to Section 2.09, and (d) any United States federal withholding Taxes imposed under FATCA.

"<u>Evergreen Facility</u>" means the Issuer's rPET processing facility located in Clyde, Ohio (other than the Strapping Assets).

"<u>Existing Indebtedness</u>" means Indebtedness of the Sellers contemplated to be extinguished in connection with the issuance of the Notes on the Closing Date.

"<u>Facilities</u>" means, individually and collectively, the Evergreen Facility and the Riverside Facility.

"<u>FATCA</u>" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with) and any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Code.

"<u>FCPA</u>" means the United States Foreign Corrupt Practices Act of 1977, as amended.

"<u>Fiscal Quarter</u>" means a fiscal quarter of any Fiscal Year.

"<u>Fiscal Year</u>" means the Fiscal Year of the Issuer and its Subsidiaries ending on December 31 of each calendar year.  For purposes of this Agreement, any particular Fiscal Year may be designated by reference to the calendar year in which such Fiscal Year ends.

"<u>Foreign Plan</u>" means any employee pension benefit plan, program, policy, arrangement or agreement maintained or contributed to by any Note Party or with respect to which any Note Party would have any liability, in each case with respect to employees employed outside the United States (as such term is defined in Section 3(10) of ERISA) (other than any arrangement with the applicable Governmental Authority).

"<u>GAAP</u>" means generally accepted accounting principles in effect from time to time in the United States of America, applied on a consistent basis.

"<u>Governmental Authority</u>" means any federal, regional, state or local government of the United States of America or any other nation, or political subdivision thereof, and any authority,

regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government, including all agencies and instrumentalities of such governments and political subdivisions.

"Government Official" means any official of any Governmental Authority, including, without limitation, all officers or employees of a government department, agency, instrumentality or permitting agency.

"Guarantee" means as to any Person (the "*guaranteeing person*"), any obligation of (a) the guaranteeing person or (b) another Person (including any bank under any letter of credit), if to induce the creation of such obligation of such other Person, the guaranteeing person has issued a reimbursement, counterindemnity or similar obligation, in either case guaranteeing or in effect guaranteeing any Indebtedness, leases, dividends or other obligations (the "*primary obligations*") of any other third Person (the "*primary obligor*") in any manner, whether directly or indirectly, including any obligation of the guaranteeing person, whether or not contingent, (w) to purchase any such primary obligation or any Property constituting direct or indirect security therefor, (x) to advance or supply funds (i) for the purchase or payment of any such primary obligation or (ii) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (y) to purchase Property, securities or services, in each case, primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (z) otherwise to assure or hold harmless the owner of any such primary obligation against loss in respect thereof; provided that the term Guarantee shall not include endorsements of instruments for deposit or collection in the ordinary course of business. The amount of any Guarantee of any guaranteeing person shall be deemed to be the lower of (A) an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee is made and (B) the maximum amount for which such guaranteeing person may be liable pursuant to the terms of the instrument embodying such Guarantee, unless such primary obligation and the maximum amount for which such guaranteeing person may be liable are not stated or determinable, in which case the amount of such Guarantee shall be such guaranteeing person's maximum reasonably anticipated liability in respect thereof as determined by the Issuer in good faith.

"Guaranteed Obligations" means, with respect to any Guarantor, the Obligations whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest, reimbursements and fees that accrue after the commencement by or against any Note Party or any Affiliate thereof of any proceeding under any debtor relief law naming such Person as the debtor in such proceeding, regardless of whether such interest, reimbursements and fees are allowed claims in such proceeding.

"Guarantor Payment" has the meaning assigned to such term in Section 9.08(a).

"Guarantors" means Holdings and each Subsidiary Guarantor.

"Hazardous Material" means any hazardous, toxic or dangerous substances, materials and wastes, including, without limitation, hydrocarbons (including naturally occurring or man-made

petroleum and hydrocarbons), flammable explosives, asbestos, urea formaldehyde insulation, radioactive materials, biological substances, polychlorinated biphenyls, pesticides, herbicides and any other kind and/or type of pollutants or contaminants (including, without limitation, materials which include hazardous constituents), sewage, sludge, industrial slag, solvents and/or any other similar substances, materials, or wastes and including any other substances, materials or wastes that are or become regulated under any Environmental Laws (including, without limitation, any that are or become classified as hazardous or toxic under any Environmental Laws).

"Hedging Agreement" means any agreement with respect to any swap, cap, collar, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions entered into in connection with the operation of a Facility.

"Indebtedness" of any Person means, without duplication, all (a) indebtedness for borrowed money and every reimbursement obligation with respect to letters of credit, bankers' acceptances or similar facilities, (b) obligations evidenced by bonds, debentures, notes or other similar instruments, (c) obligations to pay the deferred purchase price of property or services, except accounts payable and accrued expenses arising in the ordinary course of business and payable within ninety (90) days after the due date therefor as specified in, or determined from, the applicable contract or purchase order, (d) the Net Hedging Obligations under interest rate or currency Hedging Agreements and all other agreements or arrangements designed to protect against fluctuations in interest rates, commodity prices and currency exchange rates, (e) the capitalized amount (determined in accordance with GAAP) of all payments due or to become due under all leases and agreements to enter into leases required to be classified and accounted for as a capital lease in accordance with GAAP, (f) reimbursement obligations (contingent or otherwise) pursuant to any performance bonds or collateral security, (g) Indebtedness of others described in clauses (a) through (f) above secured by (or for which the holder thereof has an existing right, contingent or otherwise, to be secured by) a Lien on the property of such Person, whether or not the respective Indebtedness so secured has been assumed by such Person, (h) Guarantees by such Person of Indebtedness of others described in clauses (a) through (g) above and (i) all Disqualified Stock. The Indebtedness of any Person shall include the Indebtedness of any partnership in which such Person is a general partner to the extent such Person is liable therefor as a result of such Person's general partner interest in such partnership, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor.

"Indemnified Party" has the meaning assigned to such term in Section 10.03(b).

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Note Parties under any Note Document and (b) to the extent not otherwise described in (a), Other Taxes.

"Independent Auditor" means (i) any "big four" accounting firm selected by the Issuer and notified to the Noteholders and (ii) any other firm of independent public accountants of recognized

- 14 -

national standing in the United States selected by the Issuer and reasonably acceptable to the Required Noteholders

"Insurance Covenant" means Section 1.4 of the Additional Covenants.

"Intellectual Property" means (a) the collective reference to all rights, priorities and privileges relating to intellectual property, whether arising under United States, multinational or foreign laws or otherwise, including, without limitation, all Copyrights, Patents, Trademarks and trade secrets, (b) all rights to sue or otherwise recover for any past, present and future infringement, dilution, misappropriation, or other violation or impairment thereof, (c) all proceeds of any of the foregoing, including without limitation license fees, royalties, income payments, claims, damages and proceeds of suit, now or hereafter due and/or payable with respect thereto, (d) all written agreements, licenses and covenants providing for the grant to or from any Person any rights in any such intellectual property that is owned by another Person.

"Interest Rate" means 5.00% per annum.

"Investment" means for any Person (a) the acquisition (whether for cash, Property of such Person, services or securities or otherwise) of Capital Stock, bonds, notes, debentures, debt securities, partnership or other ownership interests or other securities of, or any Property constituting an ongoing business, line of business, division or business unit of or constituting all or substantially all the assets of, or the making of any capital contribution to, any other Person, (b) the making of any advance, loan or other extension of credit to, any other Person (including the purchase of Property from another Person subject to an understanding or agreement, contingent or otherwise, to resell such Property to such Person, but excluding any such advance, loan or extension of credit having a term not exceeding ninety (90) days representing the purchase price of inventory or supplies sold in the ordinary course of business), (c) the entering into of any Guarantee with respect to Indebtedness or other liability of any other Person, and (d) any other investment that would be classified as such on a balance sheet of such Person in accordance with GAAP. For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment but giving effect to any returns or distributions of capital or repayment of principal actually received in case by such Person with respect thereto.

"IPO" means the initial public offering (other than a public offering pursuant to a registration statement on Form S-8) of the Capital Stock of the Issuer, Holdings or a direct or indirect parent entity of Holdings, including the merger, acquisition or other consolidation of the Issuer, Holdings, or any direct or indirect parent of Holdings with a SPAC.

"Issuer" has the meaning assigned to such term in the introductory paragraph.

"Issuer Account" means the account of the Issuer maintained at [_____] with the account number [_____].

"Issuer Group Members" means, collectively, (a) the Issuer, (b) the Guarantors and (c) the Non-Guarantor Subsidiaries.

"Joint Venture" means a joint venture, partnership or other similar arrangement, whether in corporate, partnership or other legal form.

"Lien" means any mortgage, charge, pledge, lien (statutory or other), privilege, security interest, hypothecation, collateral assignment or preference, priority or other security agreement, mandatory deposit arrangement, preferential arrangement or other encumbrance upon or with respect to any property of any kind, real or personal, movable or immovable, now owned or hereafter acquired (including, without limitation, any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing).

"Loss Proceeds" means insurance proceeds, condemnation awards or other similar compensation, awards, damages and payments or relief (exclusive, in each case, of proceeds of business interruption, workers' compensation, employee theft or embezzlement, employment practices, environmental or product liability, automobile liability, builders' all risk liability, directors and officers insurance and general liability insurance) with respect to any Event of Loss.

"Material Adverse Effect" means a material adverse effect on: (a) the business, assets, properties, operations or financial condition of the Issuer Group Members, taken as a whole; (b) the ability of any Note Party to perform its material obligations under the Note Documents; (c) the validity of, enforceability of the material rights or remedies of, or benefits available to the Secured Parties under, the Note Documents or (d) all of the Collateral (or any material portion thereof) or the Liens in favor of the Secured Parties on the Collateral or the validity, enforceability, perfection or priority of such Liens.

"Material Real Property" means any parcel of real property (other than a parcel with a fair market value (as reasonably estimated by the Issuer) of more than $1,000,000) owned in fee by a Note Party.

"Maturity Date" means December 31, 2027.

"Mortgage" means, collectively, the deeds of trust, trust deeds, mortgages in respect of Mortgaged Properties made by the Note Parties in favor or for the benefit of the Agent on behalf of the Secured Parties in form and substance reasonably satisfactory to the Agent.

"Mortgaged Properties" means the Evergreen Facility and any other Material Real Property.

"Multiemployer Plan" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA that is subject to Title IV of ERISA to which any Note Party contributes or is obligated to contribute, or with respect to which any Note Party has or could reasonably be expected to have any liability.

"Net Available Amount" means:

(a)    in the case of any Event of Loss, the aggregate amount of Loss Proceeds received by the Issuer Group Members or any of their respective Affiliates in respect of

such Event of Loss, net of reasonable costs and expenses incurred by the Note Parties (including, as a distribution from a Non-Guarantor Subsidiary) in connection with the collection of such Loss Proceeds; and

(b)    in the case of any Disposition, the aggregate amount received by the Note Parties (including, as a distribution from a Non-Guarantor Subsidiary) or any of their respective Affiliates in respect of such Disposition, net of reasonable costs and expenses incurred by the Issuer Group Members in connection with such Disposition.

"Net Hedging Obligations" means, as of any date, the Termination Value of any Hedging Agreement on such date.

"Non-Guarantor Subsidiaries" means (i) any Subsidiary of the Issuer approved in writing by, subject to Section 10.02(b)(vii), the Required Noteholders as a Non-Guarantor Subsidiary and (ii) each CFC and U.S. Foreign HoldCo, to the extent that making such CFC or U.S. Foreign HoldCo a Guarantor could reasonably be expected to give rise to material adverse tax consequences to Holdings (or any direct or indirect parent entity thereof), the Issuer and/or any of its Subsidiaries (as reasonably determined by the Issuer).

"Note Consideration" has the meaning given to such term in the Purchase Agreement.

"Note Documents" means (a) this Agreement, (b) any Additional Notes Amendment, (c) each Note, (d) the Agent Fee Letter, (e) the Security Documents and (f) each certificate, agreement, instrument, amendment, waiver, consent or document executed by a Note Party and delivered to the Agent or any Noteholder in connection with or pursuant to any of the foregoing and designated as a "Note Document".

"Note Parties" means, collectively, the Issuer and the Guarantors.

"Noteholders" has the meaning assigned to such term in the preamble. For the avoidance of doubt, the term "Noteholders" includes any Additional Noteholders.

"Notes" means (a) the notes purchased by the Noteholders from (and issued by) the Issuer pursuant to Section 2.01, substantially in the form of Exhibit C hereto and (b) any Additional Notes purchased by the Additional Noteholders from (and issued by) the Issuer pursuant to Section 2.13, substantially in the form of Exhibit C hereto.

"Obligations" means all debts (including accrued interest, interest accruing after the maturity of the Notes and interest and fees that accrue after the commencement by or against any Note Party or any Subsidiary thereof of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding), liabilities, obligations, covenants and duties of, any Note Party arising under any Note Document, in each case whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest, reimbursements and fees that accrue after the commencement by or against Holdings, the Issuer or any of its Subsidiaries of any proceeding under any debtor relief law

- 17 -

naming such Person as the debtor in such proceeding, regardless of whether such interest, reimbursements and fees are allowed claims in such proceeding.

"Officer's Certificate" means, with respect to any Note Party, a certificate signed by an Authorized Representative of such Note Party.

"Operating Budget" means an annual operating plan and budget of the Issuer and each of the Facilities, prepared by the Issuer, of anticipated Operating Expenses and Capital Expenditures limited to direct wages, other manufacturing overhead, general and administrative expense, maintenance capital expense and growth capital expense, in each case, detailed for the following calendar year.

"Operating Expenses" means any and all of the expenses paid or payable by or on behalf of any Note Party in relation to the operation and maintenance (except as set forth below) of the Business, including consumables, payments under any operating lease, taxes (including franchise taxes, property taxes, sales taxes and excluding income taxes), insurance (including the costs of premiums and deductibles and brokers' expenses), costs and fees attendant to obtaining and maintaining in effect the Authorizations relating to the Business payable during such period, payments made to security, police services, and legal, accounting and other professional fees attendant to any of the foregoing items payable during such period, but exclusive of Capital Expenditures and payments in respect of payments of principal and interest in respect of the Obligations or any other Indebtedness. Operating Expenses do not include non-cash charges, including, without limitation, depreciation, amortization, income taxes, non-cash taxes or other bookkeeping entries of a similar nature.

"Organizational Documents" means, with respect to any Person, (i) in the case of any corporation, the certificate of incorporation and by-laws (or similar documents) of such Person, (ii) in the case of any limited liability company, the certificate of formation and operating agreement (or similar documents) of such Person, (iii) in the case of any limited partnership, the certificate of formation and limited partnership agreement (or similar documents) of such Person, (iv) in the case of any general partnership, the partnership agreement (or similar document) of such Person and (v) in any other case, the functional equivalent of the foregoing.

"Other Connection Taxes" means, with respect to the Agent or any Noteholder, Taxes imposed as a result of a present or former connection between the Agent or Noteholder and the jurisdiction imposing such Tax (other than connections arising from the Agent or Noteholder having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Note Document, or sold or assigned an interest in any Note or Note Document).

"Other Taxes" means any and all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes arising from any payment made under any Note Document or from the execution, delivery, performance, registration or enforcement of, from the receipt or perfection of a security interest under or otherwise with respect to, any Note Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 2.11).

"Participant" has the meaning assigned to such term in Section 10.04(f).

"Participant Register" has the meaning assigned to such term in Section 10.04(f).

"Patents" means all patentable inventions and designs, United States, foreign, and multinational patents, certificates of invention, and similar industrial property rights, and applications for any of the foregoing, including, without limitation, all reissues, substitutes, divisions, continuations, continuations-in-part, extensions, renewals, and reexaminations thereof.

"PBGC" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

"Pennsylvania Facility" means the Sellers' rPET processing facility located in Reading, Pennsylvania.

"Pennsylvania Facility Acquisition" means the purchase by the Issuer of the Sellers' right, title and interest in and to all of the assets of the Sellers used or held for use with respect to the rPET business conducted at the Pennsylvania Facility pursuant to, among other provisions thereof, Section 363 of Chapter 11 of Title 11 of the Bankruptcy Code.

"Pension Plan" means any employee pension benefit plan as defined in Section 3(2) of ERISA (other than a Multiemployer Plan) that is subject to the provisions of Title IV or Section 302 of ERISA, or Section 412 of the Code, and in respect of which any Note Party is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA or with respect to which any Note Party has or would have any liability.

"Permitted ABL Facility" means any secured or unsecured asset-based revolving credit facility satisfying the following conditions: (i) such Indebtedness is incurred by a Note Party (other than Holdings) and is not secured by any asset or property that is not Collateral; (ii) the aggregate principal amount of such Indebtedness does not at any time exceed the greater of (x) $30,000,000 and (y) the "borrowing base" (or such equivalent term) as defined therein; (iii) to the extent secured, shall only be secured by Liens on the ABL Priority Collateral; (iv) the Lien and/or payment priorities thereunder are, as among the holders of such Indebtedness, *pari passu* (e.g., there are no "first-out" or "last-out" tranches); and (v) the providers of such Indebtedness (or an agent on their behalf) shall have executed an intercreditor agreement in favor of the Agent, in form and substance satisfactory to the Agent and Required Noteholders (for the avoidance of doubt, such intercreditor agreement shall provide that the Agent, for the benefit of the Noteholders, a second-ranking Lien on the ABL Priority Collateral).

"Permitted Acquisition" means (a) the Texas Facility Acquisition, (b) the Pennsylvania Facility Acquisition and (c) any other purchase or other acquisition, by merger, consolidation or otherwise, by the any Issuer Group Member (other than Holdings) of not less than 100% of the Capital Stock in, or all or substantially all the assets of (or all or substantially all the assets constituting a business unit, division, product line or line of business of), any Person (referred to herein as the "Target"); provided that,

(i)      the aggregate consideration, no matter how composed, does not exceed $10,000,000, unless such acquisition shall have been approved by a resolution adopted by the majority of the governing body of the Issuer (and a copy thereof attached to the certification referred to clause (ix) below);

(ii)     all transactions in connection therewith shall be consummated, in all material respects, in accordance with all Applicable Laws and in conformity in all material respects with all applicable permits, licenses, authorizations, plans, directives, consent orders or consent decrees of or from any Governmental Authority;

(iii)    in the case of an acquisition of a publicly-held Person, such acquisition shall have been approved by the board of directors of the Target (or similar governing body if such Target is not a corporation) which is the subject of such acquisition and such Target shall not have publicly announced that it will oppose such acquisition or shall not have commenced any action which alleges that such acquisition will violate Applicable Law (unless such announcement or action shall have been withdrawn, dismissed or terminated);

(iv)     the Target shall be in the same business or similar line of business as that of the Issuer Group Members are engaged as of the Closing Date;

(v)      the Issuer or a Subsidiary Guarantor shall be the surviving entity in the case of any such acquisition consummated pursuant to a merger or other combination;

(vii)    immediately prior to, and after giving effect thereto, no Default or Event of Default shall have occurred and be continuing or would result therefrom;

(viii)   after giving Pro Forma Effect to such transaction, and to any other event occurring after such period as to which giving Pro Forma Effect thereto is appropriate, the Issuer shall be in compliance with the Debt Service Coverage Ratio as of such date;

(ix)     the Issuer shall have delivered to the Noteholders at least five (5) Business Days prior to any such acquisition, (A) notice of the Issuer Group Members' intent to consummate such acquisition, along with a certificate of an Authorized Representative of the Issuer, certifying as to compliance with the foregoing clauses (i) (to the extent applicable), (vii) and (viii) and containing reasonably detailed calculations in support thereof, in form and substance satisfactory to the Required Noteholders, (B) all other relevant financial information with respect to such acquired assets and any other information of the Target, (C) a copy of the most recent draft of the purchase agreement related to the proposed acquisition and (D) if aggregate consideration payable for such acquisition exceeds $10,000,000, (i) to the extent available, quarterly and annual financial statements of the Target whose Capital Stock or assets are being acquired for the twelve month (12) period immediately prior to such proposed acquisition, including any audited financial statements that are available and (ii) copies of any material due diligence reports or other results of any material due diligence investigation with respect to such acquisition or the applicable Target (in each case, in this clause (D)(ii), to the extent prepared by or otherwise reasonably available to the Issuer) and (iii) all such other

information and data relating to such transaction or the Target or business or assets to be acquired as may be reasonably requested by the Required Noteholders;

(x)     in the case of an acquisition of Capital Stock of a Person, all of the Capital Stock acquired or otherwise issued by such Person or any newly formed Subsidiary of the Issuer in connection with such acquisition shall be owned 100% by the Issuer or a Subsidiary Guarantor free and clear of all Liens (other than Liens under the Note Documents); and

(xi)     upon consummation of such transaction, the Note Parties shall comply with the requirements of <u>Section 5.16</u> and cause the property, assets and businesses acquired in such purchase or other acquisition shall become Collateral.

"<u>Permitted Contest Conditions</u>" means, with respect to any Note Party, a contest, pursued in good faith, challenging the enforceability, validity, interpretation, amount or application of any law, tax or other matter (legal, contractual or other) by appropriate proceedings timely instituted if (a) such Note Party diligently pursues such contest in good faith, (b) such Note Party establishes and maintains adequate reserves with respect to the contested claim in accordance with GAAP and (c) such contest (i) would not reasonably be expected to have a Material Adverse Effect, (ii) does not involve any material risk or danger of any criminal or unindemnified civil liability being incurred by the Agent or the Noteholders and (iii) effectively stays the enforcement of any remedies against the Collateral.

"<u>Permitted Indebtedness</u>" has the meaning assigned to such term in <u>Section 6.02</u>.

"<u>Permitted Lien</u>" has the meaning assigned to such term in <u>Section 6.03</u>.

"<u>Permitted Tax Distributions</u>" means, for so long as the Issuer and Holdings are each considered a partnership or a "disregarded entity" for U.S. federal income tax purposes, distributions to any direct or indirect parent entity of Holdings to discharge such parent entity's respective U.S. federal (and to the extent applicable, state or local) income tax liabilities attributable to its allocable share of the net taxable income of the Issuer and Holdings and their flow-through subsidiaries; provided that the amount of such distributions shall (i) take into account all losses realized in prior years or any other available reductions to net taxable income or tax liability and (ii) be determined assuming each direct or indirect parent entity of Issuer is subject to tax at the highest effective federal, state and local tax rate imposed on the income of the Issuer (taking into account the character of such income and the deductibility of any state and local taxes, to the extent deductible) that applies to any direct or indirect member of the Issuer. Permitted Tax Distributions shall also be modified to take into account any adjustments to income, gain, loss, deduction and credit made pursuant to a tax audit; and be made on a quarterly basis in order to permit each direct or indirect parent entity of Issuer to pay any estimated tax payments in respect of the net taxable income of the Issuer and Holdings and their Subsidiaries.

"<u>Person</u>" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"<u>PET</u>" means polyethylene terephthalate.

"Post-Default Rate" means 7.00% per annum.

"Pro Forma Basis" and "Pro Forma Effect" mean, as of any date of determination, the calculation of the compliance of the Issuer with the Debt Service Coverage Ratio Covenant, after giving effect on a pro forma basis to any Permitted Acquisition made during the four Fiscal Quarter period most recently ended on or prior to such date of determination (a "Compliance Period") (or made after the end of such Compliance Period but on or before the date of determination), and any disposition made during such Compliance Period (or made after the end of such Compliance Period but on or before the date of determination), on the following basis:

(i)       any Indebtedness incurred or assumed by the Issuer or any of its Subsidiaries in connection with such Permitted Acquisitions and any Indebtedness repaid in connection with such Permitted Acquisitions or dispositions shall be deemed to have been incurred or repaid, respectively, as of the first day of such Compliance Period;

(ii)      if such Indebtedness incurred or assumed by the Issuer or any of its Subsidiaries in connection with any such Permitted Acquisition has a floating or formula rate, then the rate of interest for such Indebtedness for the applicable period shall be computed as if the rate in effect for such Indebtedness on the relevant measurement date had been the applicable rate for the entire applicable period; and

(iii)     income statement items (whether positive or negative) attributable to the property or business acquired or disposed of in such Permitted Acquisitions or dispositions shall be included or excluded, as the case may be, as if such Permitted Acquisitions or dispositions took place on the first day of such Compliance Period on a pro forma basis.

With respect to any such Permitted Acquisitions, such pro forma calculations shall be based on the consolidated balance sheet of such acquired Person or business and its consolidated Subsidiaries as at the end of its most recent Fiscal Year or the most recent fiscal period preceding such Permitted Acquisition and the related consolidated statements of income and of cash flows for such period, which shall have been previously provided to the Noteholders and shall either (1) have been reported on without a qualification arising out of the scope of the audit by independent certified public accountants of nationally recognized standing or (2) have been found reasonably acceptable by the Required Noteholders.

"Property" means any right or interest in or to property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible.

"Purchase Agreement" has the meaning assigned to such term in the preamble.

"Purchased Assets" has the meaning given to such term in the Purchase Agreement.

"Register" has the meaning assigned to such term in Section 10.04(c).

"Regulation D" means Regulation D of the Board.

"Regulation U" means Regulation U of the Board.

"Related Fund" means with respect to any Noteholder, any fund that invests in notes and is managed or advised by the same investment advisor as such Noteholder, by such Noteholder or an Affiliate of such Noteholder.

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, employees, agents and advisors of such Person and such Person's Affiliates.

"Release" means any release, spill, emission, emanation, leaking, pumping, injection, deposit, disposal, discharge, dispersal, leaching or migration into or through the indoor or outdoor environment, including, the movement through ambient air, soil, surface water, ground water, wetlands, land or subsurface strata.

"Reportable Event" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the 30-day notice period has been waived.

"Required Noteholders" means, at any time, Noteholders holding more than 50% of the sum of the aggregate unpaid principal amount of the Notes then outstanding.

"Restoration" means, with respect to any Affected Property, the rebuilding, repair, restoration or replacement of such Affected Property.

"Restricted Payment" means:

(a)    all dividends paid by any Note Party (in cash, Property or obligations) on, or other payments or distributions on account of, or the setting apart of money for a sinking or other analogous fund for, or the purchase, redemption, retirement or other acquisition by any Note Party of, any portion of any class of Capital Stock in any Note Party or any warrants, rights or options to acquire any such class of Capital Stock;

(b)    any payment of development, management or other fees, or of any other amounts, by any Note Party to any Affiliate thereof;

(c)    any other payment in cash, Property or obligations to a parent company of the Note Parties or Affiliate of the Note Parties; and/or

(d)    any other payment in cash, Property or obligations to a parent company of the Note Parties or Affiliate of the Note Parties in respect of any Indebtedness subordinated to the Obligations hereunder.

"Riverside Facility" means the Issuer's rPET processing facility located in Riverside, California.

"rPET Resins" means recycled polyethylene terephthalate resins.

"S&P" means Standard & Poor's Ratings Services, or any successor to the rating agency business thereof.

"<u>Sanctioned Country</u>" means, at any time, a country or territory that is subject to comprehensive Sanctions. For the avoidance of doubt, as of the Closing Date, Sanctioned Countries are the Crimea region of Ukraine, Cuba, Iran, North Korea and Syria.

"<u>Sanctioned Person</u>" means, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, or by the United Nations Security Council, the European Union or any EU member state, (b) any Person operating, organized or resident in a Sanctioned Country, or (c) any Person owned or controlled by any such Person.

"<u>Sanctions</u>" means economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, or (b) the United Nations Security Council, the European Union or Her Majesty's Treasury of the United Kingdom.

"<u>Secured Obligations</u>" has the meaning assigned to such term in the Security Agreement.

"<u>Secured Parties</u>" means (a) the Agent and (b) the Noteholders.

"<u>Security Agreement</u>" means the Security Agreement, dated as of the Closing Date, by and among the Note Parties and the Agent.

"<u>Security Documents</u>" means the Security Agreement, any Control Agreement, all Uniform Commercial Code financing statements required by any Security Document, all Mortgages and any other security agreement, or other similar agreements or instrument to be executed and delivered to the Agent (on behalf of the Noteholders) pursuant hereto or any Security Document.

"<u>Sellers</u>" has the meaning assigned to such term in the preamble.

"<u>Semi-Annual Payment Date</u>" means the last Business Day of June and December in each Fiscal Year.

"<u>Solvent</u>" means, with respect to any Person on a particular date that on such date (a) the fair value of the property of such Person is greater than the total amount of liabilities, including contingent liabilities of such Person, (b) the present fair saleable value of the assets of such Person is not less than the amount that will be required to pay the probable liability of such Person on its debts as they become absolute and matured, (c) such Person does not intend to, and does not believe that it will, incur debts or liabilities beyond such Person's ability to pay such debts and liabilities as they mature, (d) such Person is not engaged in business or a transaction, and is not about to engage in business or a transaction, for which such Person's property would constitute an unreasonably small capital and (e) such Person is not insolvent as defined under applicable Debtor Relief Laws; <u>provided</u> that unless otherwise provided under Applicable Law, the amount of contingent liabilities at any time shall be computed as the amount that, in light of all the facts and circumstances existing at such date, represents the amount that can reasonably be expected to become an actual or matured liability.

"SPAC" means any special purpose acquisition entity which has completed an initial public offering initial public offering (other than a public offering pursuant to a registration statement on Form S-8) of its Capital Stock.

"Sponsor" means, collectively, The Sterling Group, L.P. and its Controlled Investment Affiliates.

"Strapping Assets" means the strapping assets used in the business of the Evergreen Facility on or prior to the Closing Date (it being understood and agreed that such assets shall be transferred from the Evergreen Facility to a strapping extrusion facility operated by Polychem LLC).

"Subsidiary" means, with respect to any Person (the "parent"), any other corporation, limited liability company, partnership, association or other entity (a) of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date, owned, controlled or held, or (b) that is, as of such date, otherwise controlled, by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.

"Subsidiary Guarantor" means each Subsidiary of the Issuer other than the Non-Guarantor Subsidiaries.

"Super-Majority Noteholders" means, at any time, Noteholders holding more than 66 2/3% of the sum of the aggregate unpaid principal amount of the Notes then outstanding.

"Target" has the meaning assigned to such term in the definition of "Permitted Acquisition".

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Termination Value" means, in respect of any one or more Hedging Agreement, after taking into account the effect of any legally enforceable netting agreement relating to such Hedging Agreements, (a) for any date on or after the date such Hedging Agreements have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) or any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Hedging Agreements, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Hedging Agreements (which may include a Noteholder or any Affiliate of a Noteholder).

"Texas Facility" means the Sellers' rPET processing facility located in Dallas, Texas.

"Texas Facility Acquisition" means the purchase by the Issuer of the Sellers' right, title and interest in and to all of the assets of the Sellers used or held for use with respect to the rPET

business conducted at the Texas Facility pursuant to, among other provisions thereof, Section 363 of Chapter 11 of Title 11 of the Bankruptcy Code.

"Trademarks" means all domestic, foreign and multinational trademarks, service marks, trade names, corporate names, company names, business names, fictitious business names, trade dress, trade styles, logos, Internet domain names, other indicia of origin or source identification, and general intangibles of a like nature, whether registered or unregistered, and, with respect to the foregoing, all registrations and applications for registration thereof, all extensions and renewals thereof, and all of the goodwill of the business connected with the use of and symbolized by any of the foregoing.

"Transaction Costs" means the fees, costs and expenses, regardless of when paid, incurred by the Issuer on or before the Closing Date in connection with the Transactions.

"Transactions" means (i) the execution and delivery of this Agreement and the other Note Documents, the issuance of the Notes and the incurrence of Indebtedness thereunder, (ii) the extinguishment of the Indebtedness outstanding under the Existing Indebtedness, (iii) the consummation of the Acquisition pursuant to the Purchase Agreement and the transactions contemplated thereby, and (iv) the payment of Transaction Costs incurred in connection therewith.

"U.S. Foreign HoldCo" means (i) any U.S. Subsidiary that is treated as a corporation for U.S. federal income tax purposes substantially all the assets of which consist (directly or indirectly) of stock or securities of one or more CFCs and (ii) any U.S. Subsidiary that is treated as either a partnership or disregarded entity for U.S. federal income tax purposes substantially all of the assets of which consist (directly or indirectly) of stock or securities of one or more CFCs.

"UCC" means the Uniform Commercial Code as in effect from time to time in the State of New York; provided that if, with respect to any filing statement or by reason of any mandatory provisions of law, the perfection or the effect of perfection or non-perfection of the security interests granted to the Agent pursuant to the applicable Security Document is governed by the Uniform Commercial Code as in effect in a jurisdiction of the United States other than New York, UCC means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions of each applicable Note Document and any filing statement relating to such perfection or effect of perfection or non-perfection.

"Uniform Commercial Code" means the Uniform Commercial Code as in effect from time to time in the applicable jurisdiction.

"US Person" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"USA PATRIOT Act" has the meaning assigned to such term in Section 10.14.

"Vehicle" means any vehicle covered by a certificate of title law of any jurisdiction of the United States.

"Voting Stock" means, with respect to any Person, Capital Stock the holders of which are ordinarily, in the absence of contingencies, entitled to vote for the election of directors (or persons performing similar functions) of such Person, even if the right so to vote has been suspended by the happening of a contingency.

"Write-Down and Conversion Powers" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

Section 1.02    Terms Generally. Except as otherwise expressly provided, the following rules of interpretation shall apply to this Agreement and the other Note Documents:

(a)    the definitions of terms herein shall apply equally to the singular and plural forms of the terms defined;

(b)    whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms;

(c)    the words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation";

(d)    the word "will" shall be construed to have the same meaning and effect as the word "shall";

(e)    unless the context requires otherwise, any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or therein) and shall include any appendices, schedules, exhibits, clarification letters, side letters and disclosure letters executed in connection therewith;

(f)    any reference herein to any Person shall be construed to include such Person's successors and assigns to the extent permitted under the Note Documents and, in the case of any Governmental Authority, any Person succeeding to its functions and capacities;

(g)    the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision;

(h)    all references herein to Articles, Sections, Appendices, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Appendices, Exhibits and Schedules to, this Agreement;

(i)    the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights; and

(j)      any reference herein to a merger, transfer, consolidation, amalgamation, consolidation, assignment, sale, disposition or transfer, or similar term, shall be deemed to apply to a division of or by a limited liability company, or an allocation of assets to a series of a limited liability company (or the unwinding of such a division or allocation), as if it were a merger, transfer, consolidation, amalgamation, consolidation, assignment, sale or transfer, or similar term, as applicable, to, of or with a separate Person. Any division of a limited liability company shall constitute a separate Person hereunder (and each division of any limited liability company that is a Subsidiary, joint venture or any other like term shall also constitute such a Person or entity).

Section 1.03   Accounting Terms. Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP. If the Issuer notifies the Agent and the Noteholders that the Issuer wishes to amend any provision hereof to eliminate the effect of any change occurring after the date hereof in GAAP or in the application thereof on the operation of such provision, regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then the Required Noteholders and the Issuer shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP; provided that, until so amended, ( such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein; provided that Capital Lease Obligations shall be construed in accordance with GAAP as in effect on the Closing Date, notwithstanding any changes to GAAP occurring after the Closing Date. Notwithstanding any provision contained herein or in any other Note Document, any lease (or similar arrangement) that would have been characterized, classified or reclassified as an operating lease in accordance with GAAP prior to the date of the Issuer's adoption of ASC 842 (or any other ASC having a similar result or effect) (and related interpretations) (whether or not such lease was in effect on such date) shall not constitute a Capital Lease Obligation, and any such lease shall be, for all purposes of this Agreement and the other Note Documents, treated as though it were reflected on the Issuer's consolidated financial statements in the same manner as an operating lease would have been reflected prior to the Issuer's adoption of ASC 842.

ARTICLE II

THE NOTES

Section 2.01   Sale and Purchase of Notes. Subject to the terms and conditions set forth herein (including, without limitation, the conditions set forth in Section 4.01), each Issuer agrees to issue Notes to the Noteholders on the Closing Date, in an aggregate principal amount equal to its Commitment for the consideration set forth opposite such Noteholder's name on Annex I hereto.

Section 2.02   Issuance of the Notes. On the Closing Date, each Noteholder shall receive a Note as Note Consideration in the original principal amount set forth opposite such Noteholder's name on Annex I hereto

Section 2.03   Termination and Reduction of the Commitments. Each Noteholder's Commitment shall automatically terminate without further action upon the issuance of the Notes on the Closing Date.

Section 2.04    Repayment of Notes; Evidence of Debt.

(a)    Promise to Repay at Maturity.  The Issuer hereby unconditionally promises to pay to the Noteholders, the unpaid principal amount of the Notes then outstanding and all accrued and unpaid interest on the Notes on the Maturity Date.  Issuer hereby further agrees to pay interest on the unpaid principal amount of each Note from time to time outstanding from the Closing Date until payment in full in cash thereof at the rates per annum, and on the dates, set forth in Section 2.07.

(b)    Evidence of Debt.  Each Noteholder may maintain in accordance with its usual practice an account or accounts evidencing the Indebtedness of the Issuer to such Noteholder resulting from the Notes purchased by such Noteholder, including the amounts of principal and interest payable and paid to such Noteholder from time to time hereunder. In the case of a Noteholder that does not request. Such account or accounts shall be conclusive and binding on the Issuer absent manifest error; provided that the failure of any Noteholder to maintain such account or accounts or any error in any such account shall not limit or otherwise affect any obligations of the Issuer.

(c)    Amortization.  The Notes shall be repaid by the Issuer on each date set forth in the table below in the aggregate principal amount of Notes set forth opposite such date.

| Date | Amount |
|---|---|
| [_____][1] | $210,000 |
| [_____][2] | $210,000 |
| [_____][3] | $420,000 |
| [_____][4] | $630,000 |
| [_____][5] | $630,000 |

Section 2.05    Prepayment of the Notes.

(a)    Optional Prepayments. The Issuer shall have the right at any time and from time to time, upon at least ten (10) days and not more than sixty (60) days' prior written notice to the Noteholders stating the prepayment date and aggregate principal amount of the prepayment, to

---

[1] NTD: Second Anniversary of the Closing Date.

[2] NTD: Third Anniversary of the Closing Date.

[3] NTD: Fourth Anniversary of the Closing Date.

[4] NTD: Fifth Anniversary of the Closing Date.

[5] NTD: Sixth Anniversary of the Closing Date.

- 29 -

prepay the Notes in whole or in part, in each case, subject to the requirements of this <u>Section 2.05(a)</u>. Each partial prepayment of Notes under this <u>Section 2.05(a)</u> shall be in an aggregate amount for the Notes of all Noteholders of at least $5,000,000 or an integral multiple of $500,000 in excess thereof (or such lesser amount as may be necessary to prepay the aggregate principal amount then outstanding with respect to all Notes of all Noteholders).

      (b)      <u>Mandatory Prepayments and Offers to Prepay</u>.

      (i)      <u>Change of Control Prepayment Offer</u>. If a Change of Control occurs, the Issuer shall, within five (5) Business Days after the occurrence thereof, offer to prepay the Notes in an amount equal to 100% of the outstanding principal amount thereof, pursuant to a written notice sent to the Noteholders describing in reasonable detail the event giving rise to the obligation under this <u>Section 2.05(b)(i)</u> to make such offer (each such offer to prepay referred to in this <u>Section 2.05(b)(i)</u>, a "<u>Change of Control Prepayment Offer</u>").

      (ii)      <u>Event of Loss/Disposition Prepayment Offer</u>. If the Net Available Amount received by the Note Parties (including without limitation, as a distribution from any Non-Guarantor Subsidiary) in respect of any Event of Loss or any Disposition by the Issuer Group Members (other than any Disposition by the Issuer Group Members in the ordinary course of business) shall be in excess of (x) $250,000 per item of equipment subject to such Disposition or Event of Loss, as the case may be, or (y) $1,000,000 in the aggregate per calendar year across all Events of Loss and Dispositions, then the Issuer shall, subject to the immediately succeeding sentence, promptly (and in any event not later than ten (10) Business Days after such Event of Loss or Disposition, as applicable) offer to prepay the Notes with an amount equal to 100% of the Net Available Amount with respect to such Event of Loss or such Disposition, as applicable, pursuant to a written notice sent to the Agent and the Noteholders describing in reasonable detail the event giving rise to the obligation under this Section <u>2.05(b)(ii)</u> to make such offer (each such offer to prepay referred to in this Section <u>2.05(c)(ii)</u>, an "<u>Event of Loss/Disposition Prepayment Offer</u>"). Notwithstanding the foregoing, the Issuer shall have the option (to be exercised by the Issuer notifying the Agent and the Noteholders of its intention to reinvest prior to the date any such prepayment is required to be made) to not prepay the Notes pursuant to this <u>Section 2.05(b)(ii)</u> to the extent that (A) the Issuer reinvests the Net Available Amount (or any portion thereof) of any such Event of Loss or Disposition in assets that are necessary or useful for the Business pursuant to a transaction not prohibited hereunder (including without limitation, in the case of any Event of Loss, Restoration of the related Affected Property) and such Net Available Amount is so reinvested within three hundred sixty-five (365) days after receipt thereof (or, if committed to be so reinvested pursuant to a written agreement on or prior to the expiration of such three hundred sixty-five (365) day period, within five hundred forty-five (545) days after receipt thereof) and (B) such assets shall become Collateral subject to and in accordance with this Agreement.

      (iii)      [Reserved].

      (iv)      <u>Incurrence of Debt</u>. If any Issuer Group Member issues or incurs any Indebtedness (other than Permitted Indebtedness), Issuer shall, within one (1) Business Day of the receipt of the net cash proceeds therefrom, offer to prepay the Notes with an amount equal to 100% of the cash proceeds of such Indebtedness, pursuant to a written notice sent to the Agent and the

- 30 -

Noteholders describing in reasonable detail the event giving rise to the obligation under this Section 2.05(b)(iv) to make such offer (each such offer to prepay referred to in this Section 2.05(b)(iv), a "Debt Prepayment Offer").

Notwithstanding the foregoing Sections 2.05(b)(i) through (iv), Issuer shall be permitted to request a waiver of the requirement to deliver a Change of Control Prepayment Offer, an Event of Loss/Disposition Prepayment Offer or a Debt Prepayment Offer, which waiver may be accepted or rejected by the Required Noteholders.

(c)     Terms of All Prepayments.

(i)     All partial prepayments of the Notes shall be applied, on a *pro rata* basis to the Notes of each Noteholder.

(ii)     Each prepayment of Notes shall be accompanied by payment of all accrued interest on the amount prepaid, any additional amounts required pursuant to Section 2.09 and without any make-whole amount or premium.

(iii)     No later than ten (10) Business Days after receiving a Change of Control Prepayment Offer, an Event of Loss/Disposition Prepayment Offer or a Debt Prepayment Offer, each Noteholder shall advise the Issuer in writing whether it has elected to accept such prepayment offer, which it shall determine in its sole and absolute discretion. Each of the Noteholders shall have the right, but not the obligation, to accept or reject such prepayment offer by the Issuer. In connection with any prepayment pursuant to Section 2.05(b)(i) or (ii), the amount of the Notes prepaid shall be calculated so that the total amount of Notes prepaid, the accrued but unpaid interest on such Notes shall be no more than the Net Available Amount.  If a Noteholder fails to deliver a notice of election declining receipt of its ratable share of any prepayment offer to the Issuer within the time frame specified above, any such failure will be deemed to constitute an acceptance of such Noteholder's share of the total amount of such prepayment offer.

Section 2.06     Agent Fees. The Issuer agrees to pay to the Agent, for its own account, amounts payable in the amounts and at the times expressly set forth in the Agent Fee Letter.

Section 2.07     Interest.

(a)     Notes. With respect to each Note, for each day on and after the Closing Date until the date on which such Note has been fully repaid in cash (including the first day but excluding the last), the outstanding principal amount of such Note shall bear interest at a rate per annum equal to the Interest Rate.

(b)     Default Interest. If all or a portion of the principal amount of any Note, interest in respect thereof or any other amount due under the Note Documents shall not be paid when due (whether at the stated maturity, by acceleration or otherwise and after giving effect to any applicable grace periods), then the outstanding principal amount of the Notes (whether or not overdue) (to the extent legally permitted) shall bear interest at a rate per annum equal to the Post-Default Rate, from the date of such nonpayment (after giving effect to any applicable grace periods) until such amount is paid in full (after as well as before judgment), and, in each case, such

default interest shall be payable on demand.  To the greatest extent permitted by law, interest shall continue to accrue after the filing by or against the Issuer of any petition seeking any relief under any Debtor Relief Law.

(c)     Payment of Interest. Accrued interest on each Note shall be payable in arrears in cash on each Semi-Annual Payment Date; provided that (i) interest accrued pursuant to paragraph (b) of this Section shall be payable on demand and (ii) in the event of any repayment or prepayment of any Note, accrued interest on the principal amount repaid or prepaid shall be payable in cash on the date of such repayment or prepayment.  Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law.

(d)     Computation. All interest hereunder shall be computed on the basis of a year of 360 days, and, in each case, shall be payable for the actual number of days elapsed (including the first day but excluding the last). The computation by any Noteholder of any interest payable to it shall be determined by such Noteholder, as the case may be, and such determination shall be conclusive absent manifest error.

Section 2.08    [Reserved].

Section 2.09    Taxes.

(a)     Payments Free of Taxes. Any and all payments by or on account of any obligation of any Note Party hereunder or under any other Note Document shall be made without withholding or deduction for any Taxes except as required by Applicable Law; provided that if the applicable withholding agent shall be required by Applicable Law (as determined in the good faith discretion of the applicable withholding agent) to withhold or deduct any Taxes from such payments, then (i) to the extent such Taxes are Indemnified Taxes, the sum payable shall be increased as necessary so that after making all required withholdings and deductions (including withholdings and deductions applicable to additional sums payable under this Section), the Noteholder receives an amount equal to the sum it would have received had no such withholdings or deductions been made, (ii) such Note Party shall make or shall cause to be made such withholdings and deductions and (iii) such Note Party shall timely pay or shall cause to be timely paid the full amount withheld and deducted to the relevant Governmental Authority in accordance with Applicable Law.

(b)     Payment of Other Taxes by the Issuer. In addition, the Note Parties shall timely pay or cause to be paid any Other Taxes to the relevant Governmental Authority in accordance with Applicable Law.

(c)     Indemnification by the Issuer. The Note Parties shall jointly and severally indemnify, or cause to be indemnified, the Agent and each Noteholder, within fifteen (15) days after written demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) paid or payable by (or required to be withheld or deducted from a payment to) the Agent or such Noteholder, as the case may be, and any reasonable expenses arising therefrom or with respect thereto whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant

Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Issuer by the Agent or a Noteholder, shall be conclusive absent manifest error.

(d)    Evidence of Payments. As soon as practicable after any payment of Indemnified Taxes or Other Taxes by any Note Party to a Governmental Authority, the relevant Note Party shall deliver or cause to be delivered to the Noteholders  the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment satisfactory to the Noteholders.

(e)    Forms. (i) The Agent or any Noteholder (including any assignee Noteholder) that is legally entitled to an exemption from or reduction of withholding tax under the law of the jurisdiction in which any Note Party is located with respect to payments under any Note Document shall deliver to the Issuer, at the time or times reasonably requested by the Issuer, such properly completed and executed documentation prescribed by Applicable Law as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Noteholder, if reasonably requested by the Issuer, shall deliver such other documentation prescribed by Applicable Law or reasonably requested by the Issuer as will enable the Issuer to determine whether or not such Noteholder is subject to information reporting requirements. Upon the reasonable written request of the Issuer, or if any form or certification previously delivered expires or becomes obsolete or inaccurate, a Noteholder shall update any such form or certification previously delivered  pursuant  to  this  Section 2.09(e). Notwithstanding anything to the contrary in the preceding three sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 2.09(e)(ii)(A), (B) and Section 2.09(g)) shall not be required if in the Noteholder's reasonable judgment such completion, execution or submission would subject such Noteholder to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Noteholder.

(ii)    Without limiting the generality of the foregoing, in the event that the Issuer is a US Person,

(A)    any Noteholder that is a US Person shall deliver to the Issuer and the Agent on or about the date on which such Noteholder becomes a party to this Agreement (and from time to time thereafter upon the reasonable request of the Issuer or the Agent), executed copies of IRS Form W-9 certifying that such Noteholder is exempt from U.S. federal backup withholding tax;

(B)    any Noteholder who is not a US Person shall, to the extent it is legally entitled to do so, deliver to the Issuer and the Agent (in such number of copies as shall be requested by the recipient) on or about the date on which such Noteholder becomes a party to this Agreement (and from time to time thereafter upon the reasonable request of the Issuer or the Agent), whichever of the following is applicable:

(I)    in the case of a Noteholder who is not a US Person claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under this Agreement or any Note Document, executed copies of IRS Form W- 8BEN or W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding

Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under this Agreement or any Note Document, IRS Form W-8BEN or W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(II)    executed copies of IRS Form W-8ECI;

(III)    in the case of a Noteholder who is not a US Person claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit B-1 to the effect that such Noteholder is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Issuer within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code and (y) executed copies of IRS Form W-8BEN or W-8BEN-E; or

(IV)    to the extent a Noteholder who is not a US Person is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN or W-8BEN-E, a U.S. Tax compliance certificate substantially in the form of Exhibit B-2 or Exhibit B-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if such Noteholder is a partnership and one or more direct or indirect partners of such Noteholder are claiming the portfolio interest exemption, such Noteholder may provide a U.S. Tax compliance certificate substantially in the form of Exhibit B-4 on behalf of each such direct and indirect partner.

(f)    If the Agent or any Noteholder (each, a "Recipient") determines, in its sole discretion exercised in good faith, that it has received a refund of any Indemnified Taxes or Other Taxes as to which it has been indemnified pursuant to this Section by a Note Party or with respect to which a Note Party has paid additional amounts pursuant to this Section 2.09, such Recipient shall pay an amount equal to such refund (but only to the extent of indemnity payments made under this Section 2.09 with respect to the Taxes giving rise to such refund) to the Issuer, net of out-of-pocket expenses (including Taxes of such Recipient) and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); provided that the Issuer, upon the request of such Recipient, shall promptly repay the amount paid over to the Issuer (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to such Recipient, in the event the Recipient, is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this paragraph (f), in no event will any Recipient be required to pay any amount to the Issuer pursuant to this paragraph (f) the payment of which would place such Recipient, in a less favorable net after-Tax position than it would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This paragraph shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(g)    If a payment made to any Recipient under this Agreement would be subject to U.S. federal withholding Tax imposed by FATCA if such Recipient were to fail to comply with the

applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Recipient shall deliver to the Issuer and (if such Recipient is a Noteholder) the Agent at the time or times prescribed by law and at such time or times reasonably requested by the Issuer or (if such Recipient is a Noteholder) the Agent, such documentation prescribed by Applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Issuer or (if such Recipient is a Noteholder) the Agent as may be necessary for the Issuer and (if such Recipient is a Noteholder) the Agent to comply with their obligations under FATCA and to determine that such Recipient has complied with such Person's obligations under FATCA or to determine the amount, if any, to deduct and withhold from such payment. Solely for purposes of this clause, "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(h)    Survival. Each party's obligations under this Section shall survive the resignation or replacement of the Agent or any assignment of rights by, or the replacement of, a Noteholder, the termination of the Commitments and the repayment, satisfaction or discharge of all Obligations under any Note Document.

Section 2.10    Payments Generally; Pro Rata Treatment; Sharing of Setoffs.

(a)    Payments by the Issuer. Unless otherwise specified, the Issuer shall make each payment required to be made by it hereunder (whether of principal, interest, reimbursements, fees, or under Section 2.09 or otherwise) or under any other Note Document (except to the extent otherwise provided therein) prior to 1:00 p.m., New York City time, on the date when due, in Dollars and immediately available funds, without setoff or counterclaim. Any amounts received after such time on any date may, in the discretion of the applicable Noteholders (or the Agent, in the case of any such payment made to the Agent) be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon. All such payments shall to except as otherwise expressly provided in the relevant Note Document, shall be made directly to the Persons entitled thereto. If any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be set to the immediately preceding Business Day and, in the case of any payment accruing interest, interest thereon shall be payable for the period up to and including such immediately preceding Business Day, with the day(s) following such immediately preceding Business Day to be included in the calculation of interest for the following quarterly period in accordance with the terms hereof. All amounts owing under this Agreement or under any other Note Document are payable in Dollars.

(b)    Application of Insufficient Payments. If at any time insufficient funds are received by and available to any Noteholder to pay fully all amounts of principal, interest, reimbursements, fees and other amounts then due hereunder to it, as the case may be, such funds shall be applied (i) first, to pay interest, reimbursements, fees and other amounts (except for the amounts required to be paid pursuant to the following clause (ii)) then due hereunder in accordance with the amounts of interest, reimbursements, fees and such other amounts then due to such Noteholder, and (ii) second, to pay principal on the Notes then due hereunder in accordance with the amounts of principal then due to such Noteholder.

(c)    <u>Pro Rata Treatment</u>. Except to the extent otherwise provided herein: (i) each payment or prepayment of principal of the Notes by the Issuer shall be made *pro rata* amongst the Noteholders in accordance with the respective unpaid principal amounts of the Notes held by them being paid or prepaid; and (ii) each payment of interest on the Notes by the Issuer shall be made *pro rata* in accordance with the amounts of interest on the Notes then due and payable to the respective Noteholders.

(d)    <u>Sharing of Payments by Noteholders</u>. If any Noteholder shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment or recover any amount in respect of any principal of or interest on any of its Note resulting in such Noteholder receiving a greater proportion of the aggregate amount of the Notes and accrued interest thereon then due than the proportion received by any other Noteholder, then, unless otherwise agreed in writing by the Noteholders, the Noteholder receiving such greater proportion shall purchase (for cash at face value) participations in the Notes of other Noteholders to the extent necessary so that the benefit of all such payments shall be shared by the Noteholders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Notes; <u>provided</u> that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this paragraph shall not be construed to apply to any payment made by the Issuer pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a Noteholder as consideration for the assignment of or sale of a participation in any of its Notes to any assignee or Participant, other than to the Issuer or any Affiliate thereof (as to which the provisions of this paragraph shall apply). Each Note Party consents to the foregoing and agrees, to the extent it may effectively do so under Applicable Law, that any Noteholder acquiring a participation pursuant to the foregoing arrangements may exercise against such Note Party rights of setoff and counterclaim with respect to such participation as fully as if such Noteholder were a direct creditor of such Note Party in the amount of such participation.

Section 2.11    <u>Mitigation Obligations</u>. If the Issuer is required to pay any Indemnified Taxes or additional amount to any Noteholder or any Governmental Authority for the account of any Noteholder pursuant to Section 2.09 then such Noteholder shall (at the reasonable request of the Issuer) (i) use commercially reasonable efforts to file any certificate or document required by law and/or (ii) use reasonable efforts to designate a different lending office for issuing its Note hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the reasonable judgment of such Noteholder, such designation or assignment (x) would eliminate or reduce amounts payable pursuant to Section 2.09 in the future and (y) would not subject such Noteholder to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Noteholder in any material respect. The Issuer hereby agrees to pay all reasonable costs and expenses incurred by any Noteholder in connection with any such designation or assignment.

Section 2.12    <u>Acknowledgement and Consent to Bail-In of EEA Financial Institutions</u>. Notwithstanding anything to the contrary in any Note Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any

liability of any EEA Financial Institution arising under any Note Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)    the effects of any Bail-In Action on any such liability, including, if applicable:

(c)    a reduction in full or in part or cancellation of any such liability;

(d)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Note Document; or

(e)    the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of any EEA Resolution Authority.

Section 2.13    Additional Notes.  The Issuer may, from time to time, in its sole discretion and without the consent of any Noteholder or Agent, but subject to the terms and conditions of this Section 2.13, issue additional Notes under this Agreement (the "Additional Notes") to additional Persons (the "Additional Noteholders") pursuant to an Additional Notes Amendment (as defined below) as consideration (in whole or in part) for the Texas Facility Acquisition and/or the Pennsylvania Facility Acquisition.  The Additional Notes issued pursuant to an Additional Notes Amendment shall be subject to the following terms and conditions:

(a)    the Additional Notes shall be dated the date of issue thereof, bear interest at such rate or rates, mature on such date or dates, be subject to such mandatory and optional prepayment on such dates and at such premiums, if any, have such additional or different conditions precedent to closing, such representations and warranties and such additional or different covenants as shall be specified in an amendment to this Agreement (an "Additional Notes Amendment") to be executed by Issuer and each Additional Noteholder (whereupon, this Agreement will be amended by such Additional Notes Amendment without further action by the then Noteholders or Agent); provided, that, any additional or different covenants, any additional rights to mandatory or optional prepayment, any increased pricing or premiums and any other term or condition of such Additional Notes that is more favorable than the terms of the Notes then outstanding hereunder shall inure to the benefit of all Noteholders;

(b)    such Additional Notes shall constitute Notes hereunder, shall rank *pari passu* with all other Notes issued hereunder and be entitled to the same rights and be subject to the same obligations of all other Notes issued hereunder;

(c)    the Additional Noteholders will become Noteholders hereunder upon execution of the applicable Additional Notes Amendment; and

(d)    such Additional Notes shall vote (including for all consents, approvals and waivers under this Agreement to be made by all Noteholders including Additional Noteholders) as a single class with all other Notes issued hereunder and therefore will not be entitled to tranche or class voting, consent, approval or waiver.

ARTICLE III
REPRESENTATIONS AND WARRANTIES

Each Note Party represents and warrants (to its knowledge, in the case of any representation or warranty related to the Riverside Facility made on the Closing Date) to the Agent and each of the Noteholders that:

Section 3.01   Due Organization, Etc.

(a)    Each Note Party (and, as of the Closing Date, each Non-Guarantor Subsidiary, if any) is duly organized or incorporated, validly existing and in good standing under the laws of the jurisdiction of its organization or incorporation. Each Note Party (and, as of the Closing Date, each Non- Guarantor Subsidiary) (i) has all requisite limited liability company, corporate or other organizational power and authority to own or lease and operate its assets and to carry on its business as now conducted and as proposed to be conducted by it and (ii) is duly qualified to do business and is in good standing in each jurisdiction where necessary in light of its business as now conducted and as proposed to be conducted, in the case of this clause (ii), where the failure to so qualify would not reasonably be expected to have a Material Adverse Effect. No filing, recording, publishing or other act by a Note Party (and, as of the Closing Date, each Non-Guarantor Subsidiary), that has not been made or done, is necessary in connection with the existence or good standing of such Issuer Group Member.

(b)    As of the Closing Date, the Equity Shareholders listed on Schedule 3.01(b) are the only members of Holdings.

(c)    The only member of the Issuer is Holdings, with Holdings owning, directly, 100% of the Issuer's Capital Stock

(d)    The only member or stockholder, as applicable, of each Subsidiary Guarantor is the Issuer or another Guarantor, with the Issuer owning, directly or indirectly, 100% of each Subsidiary Guarantor's Capital Stock. All Capital Stock in each Subsidiary Guarantor is beneficially owned and controlled by the Issuer free and clear of all Liens other than non-consensual Permitted Liens.

(e)    The only member or stockholder, as applicable, of each Non-Guarantor Subsidiary is a Subsidiary Guarantor, with a Guarantor owning 100% of each Non-Guarantor Subsidiary's Capital Stock.

Section 3.02   Authorization, Etc. Each Note Party has full limited liability company, corporate or other organizational powers, authority and legal right to enter into, deliver and perform its respective obligations under each of the Note Documents to which it is a party and to consummate each of the transactions contemplated herein and therein, and has taken all necessary limited

liability company, corporate or other organizational action to authorize the execution, delivery and performance by it of each of the Note Documents to which it is a party. Each of the Note Documents to which any Note Party is a party has been duly executed and delivered by such Note Party and is in full force and effect and constitutes a legal, valid and binding obligation of such Note Party, enforceable against such Note Party in accordance with its respective terms, except as enforcement may be limited (i) by bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance or other similar laws affecting creditors rights generally, (ii) by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law) and (iii) by implied covenants of good faith and fair dealing.

Section 3.03    No Conflict. The execution, delivery and performance by each Note Party of each of the Note Documents to which it is a party and all other documents and instruments to be executed and delivered hereunder by it, as well as the consummation of the transactions contemplated herein and therein, do not and will not (i) conflict with the Organizational Documents of such Note Party, (ii) conflict with or result in a breach of, or constitute a default under, any indenture, loan agreement, mortgage, deed of trust or other material instrument or agreement to which such Note Party is a party or by which it is bound or to which such Note Party's (and, as of the Closing Date, any Non-Guarantor Subsidiary's) property or assets are subject, (iii) conflict with or result in a breach of, or constitute a default under, in any material respect, any Applicable Law or (iv) with respect to each Note Party (and, as of the Closing Date, each Non-Guarantor Subsidiary), result in the creation or imposition of any Lien (other than a Permitted Lien) upon any of such Issuer Group Member's property or the Collateral.

Section 3.04    Approvals, Etc.

(a)    Each Note Party has obtained all material Authorizations required under any Applicable Law to be issued to, assigned to, or otherwise assumed by, such Issuer Group Member and necessary for (i) the Business or (ii) the execution, delivery and performance by each Note Party of the Note Documents to which it is a party.

(b)    As of the Closing Date, all of the material Authorizations required under any Applicable Law to be issued to, assigned to, or otherwise assumed by, any Note Party and necessary for (i) the Business or (ii) the execution, delivery and performance by any Note Party of the Note Documents to which it is a party, other than, in each case, Authorizations that are not currently necessary and are obtainable in the ordinary course of business, are set forth in Schedule 5.04 hereto.

(c)    Each Note Party is in compliance with each Authorization by a Governmental Authority currently in effect, except as would not have a Material Adverse Effect.

Section 3.05    Use of Proceeds. The Notes have been issued directly to the Noteholders as assignees of the Sellers as the Note Consideration contemplated under the Purchase Agreement.

Section 3.06    Litigation.

(a)    There is no pending or, to the knowledge of any Authorized Representative of any Note Party (and, as of the Closing Date, each Non-Guarantor Subsidiary), threatened (in writing)

litigation, investigation, action or proceeding of or before any court, arbitrator or Governmental Authority (in the case of any of the foregoing not involving the Note Parties, to the knowledge of any Authorized Representative of any Issuer Group Member) (i) seeking to restrain or prohibit the consummation of the transactions contemplated by the Note Documents or (ii) purporting to affect the legality, validity or enforceability of any of the Note Documents.

(b)    There is no pending or, to the knowledge of any Authorized Representative of any Note Party threatened (in writing) litigation, investigation, action or proceeding of or before any court, arbitrator or Governmental Authority against any Note Party that affects the Business which (either individually or in the aggregate) would have a Material Adverse Effect.

Section 3.07    Environmental Matters. (a) Except as set forth on Schedule 3.07, or as would not have a Material Adverse Effect:

(i)    each Note Party (and, as of the Closing Date, each Non-Guarantor Subsidiary) and the conduct of the Business is in compliance with all applicable Environmental Laws;

(ii)    each Note Party (and, as of the Closing Date, each Non-Guarantor Subsidiary), (A) holds or has applied for all Authorizations required under Environmental Laws (each of which is in full force and effect) required for the conduct of the Business and any of its current operations or for any property owned, leased or otherwise operated by it; and (B) is in compliance with all Authorizations required under Environmental Law;

(iii)    to the knowledge of any Authorized Representative of any Note Party (and, as of the Closing Date, each Non-Guarantor Subsidiary), (x) there are no pending Environmental Claims asserted against any Note Party (and, as of the Closing Date, each Non-Guarantor Subsidiary) or the Business and (y) no Note Party (and, as of the Closing Date, each Non-Guarantor Subsidiary) has received any written notice, claim or information regarding, or otherwise has knowledge of, a past or threatened Environmental Claim asserted against any Note Party (and, as of the Closing Date, each Non-Guarantor Subsidiary) or the Business, except for such Environmental Claims that have been fully resolved;

(iv)    there are no outstanding consent decrees, orders, settlements or other agreements concerning any Note Party (and, as of the Closing Date, each Non-Guarantor Subsidiary) or the Business relating to compliance with or liability under Environmental Law; and

(v)    no Note Party (and, as of the Closing Date, each Non-Guarantor Subsidiary) and, to the knowledge of any Authorized Representative of any Note Party, no other Person has Released Hazardous Materials at, on, in, to, from or under any real property currently or formerly owned, leased or operated by any Note Party (and, as of the Closing Date, each Non-Guarantor Subsidiary) in a manner that would reasonably be expected to result in a material liability of any Note Party (and, as of the Closing Date, each Non-Guarantor Subsidiary) pursuant to Environmental Laws.

(b)    Each Note Party (and, as of the Closing Date, each Non-Guarantor Subsidiary) has made available copies of all significant reports, correspondence and other documents in its

possession, custody or control regarding compliance by any Note Party (and, as of the Closing Date, each Non-Guarantor Subsidiary), or potential liability of any Note Party (and, as of the Closing Date, each Non-Guarantor Subsidiary) under Environmental Laws or Authorizations required under Environmental Laws.

Section 3.08    Compliance with Laws and Obligations. Subject to Section 3.07, each Note Party and the Business are in compliance with all Applicable Laws applicable to the Issuer Group Members and the Business, except where the failure to do so, individually or in the aggregate, would not result in a Material Adverse Effect.

Section 3.09    No Material Adverse Effect. Since the Closing Date there has been no development or event which has had or would reasonably be expected to have a Material Adverse Effect.

Section 3.10    Intellectual Property; Licenses.

(a)    Each Note Party owns, or is licensed to use, free and clear of all Liens except for Permitted Liens, all Intellectual Property necessary for its business and that are necessary for the performance by it of its obligations under the Note Documents to which it is a party, in each case, as to which the failure of such Issuer Group Member to so own or be licensed would have a Material Adverse Effect, and the use thereof by such Issuer Group Member does not, to the knowledge of any Note Party (and, as of the Closing Date, each Non-Guarantor Subsidiary), infringe in any material respect upon the rights of any other Person.

(b)    Each Note Party (and, as of the Closing Date, each Non-Guarantor Subsidiary) has obtained the necessary intellectual property licenses that the Issuer Group Members other than any Non-Guarantor Subsidiary (and, as of the Closing Date, each Non-Guarantor Subsidiary) reasonably believe are required for the Business, the absence of any of which would have a Material Adverse Effect.

(c)    With respect to each material license in or to Intellectual Property held by each Note Party (and, as of the Closing Date, each Non-Guarantor Subsidiary): (i) such license is valid and binding and in full force and effect and represents the entire agreement between the respective licensor and licensee with respect to the subject matter of such license; and (ii) such license will not cease to be valid and binding and in full force and effect on terms identical to those currently in effect as a result of the rights and interests granted herein, nor will the grant of such rights and interests constitute a breach or default under such license or otherwise give the licensor or sublicensor a right to terminate such license.

Section 3.11    Taxes. Except as specified on Schedule 3.11:

(a)    each Note Party and each of its Subsidiaries has timely filed or caused to be timely filed all material U.S. federal, state, non-U.S. and other tax returns and reports required to have been filed by it and has timely paid, or has caused to be timely paid, all material taxes, assessments, fees and other governmental charges levied or imposed upon them or their properties, income or assets, other than taxes that are being contested in accordance with the Permitted Contest Conditions; and

(b)      as of the Closing Date, each Note Party and each Non-Guarantor Subsidiary has been properly treated as a disregarded entity or a partnership for U.S. federal income tax purposes.

Section 3.12    [Reserved].

Section 3.13    Solvency. The Issuer Group Members, on a consolidated basis, are Solvent.

Section 3.14    Regulatory Restrictions on the Notes.  No Note Party is an "investment company", or a company "controlled" by an "investment company", within the meaning of the Investment Company Act of 1940, as amended..

Section 3.15    Title; Security Documents.

(a)      Each Note Party owns and has good, legal and defensible title, or valid leasehold interests in, all of its property material to its Business, free and clear of all Liens other than Permitted Liens.

(b)      The provisions of the Security Documents to which any Note Party is a party that have been delivered on or prior to the date this representation is made are, effective to create, in favor of the Agent for the benefit of the Secured Parties, a legal, valid and enforceable Lien on and security interest in all of the Collateral (other than any Vehicles) purported to be covered thereby, and all necessary recordings and filings have been or will concurrently be made in all necessary public offices (other than with respect to any Vehicles), and all other necessary and appropriate action has been taken, so that the security interest created by each Security Document is a first-priority perfected Lien on and security interest in all right, title and interest of such Note Party in the Collateral purported to be covered thereby (other than any Vehicles), prior and superior to all other Liens other than (i) in the case of any ABL Priority Collateral, as provided in the intercreditor agreement entered into in connection with any Permitted ABL Facility, (ii) Permitted Liens, to the extent any such Permitted Lien would have priority over the Liens in favor of the Agent (on behalf of the Noteholders) pursuant to any Applicable Law and (iii) Liens perfected only by possession (including possession of any certificate of title), to the extent that the Agent has not obtained or does not maintain possession of such Collateral.

Section 3.16    ERISA.

(a)      No ERISA Event has occurred or is reasonably expected to occur which has or would reasonably be expected to have a Material Adverse Effect. Each Pension Plan has complied in all material respects with the applicable provisions of ERISA and the Code. No termination of a Pension Plan has occurred resulting in any liability that has remained underfunded and no Lien against any Note Party or any of its ERISA Affiliates in favor of the PBGC or a Pension Plan has arisen during the five-year period prior to the date hereof.

(b)      None of the Note Party (and, as of the Closing Date, each Non-Guarantor Subsidiary) has incurred any obligation which has or would reasonably be expected to have a Material Adverse Effect on account of the termination or withdrawal from any Foreign Plan.

Section 3.17   Insurance. Except as set forth in Schedule 3.17, all insurance policies required to be obtained by the Issuer Group Members other than any Non-Guarantor Subsidiary (and, as of the Closing Date, each Non-Guarantor Subsidiary) pursuant to the Insurance Covenant have been obtained and are in full force and effect as required under Insurance Covenant and all premiums then due and payable thereon have been paid in full. No Note Party (and, as of the Closing Date, each Non-Guarantor Subsidiary) has received any notice from any insurer that any insurance policy has ceased to be in full force and effect or claiming that the insurer's liability under any such insurance policy can be reduced or avoided.

Section 3.18   [Reserved].

Section 3.19   Capital Stock and Related Matters.

(a)      [Reserved].

(b)      Other than as set forth on Schedule 3.19(b), no Note Party has any Subsidiaries and no Note Party owns any equity interest in, or otherwise Controls any Voting Stock of or has any ownership interest in, any Person.

(c)      All of the Capital Stock in the Issuer and each Guarantor have been duly authorized and validly issued in accordance with its Organizational Documents, are fully paid and non-assessable (subject to the applicable Note Parties' obligation to contribute capital to another Note Party, in accordance with the terms of such Note Party's governing documents) and free and clear of all Liens. Neither the Issuer nor any Guarantor has outstanding any securities convertible into or exchangeable for any of its Capital Stock in or any rights to subscribe for or to purchase, or any warrants or options for the purchase of, or any agreements providing for the issuance (contingent or otherwise) of, or any calls, commitments or claims of any character relating to any such Capital Stock (except as expressly provided for or permitted herein or in the Security Documents).

(d)      Other than consents that have been obtained, no consent of any Person, including any general or limited partner, any other member or manager of a limited liability company, any shareholder, any other trust beneficiary or derivative counterparty, is necessary in connection with the creation, perfection or first priority status (or the maintenance thereof) of the security interest of the Agent under the Security Documents or the exercise by the Agent or any Noteholder of the voting or other rights provided for in the Security Documents or the exercise of remedies in respect of such Capital Stock.

Section 3.20   [Reserved].

Section 3.21   [Reserved].

Section 3.22   No Bank Accounts. No Note Party maintains any accounts other than the Collateral Accounts and Excluded Accounts.

Section 3.23   No Default or Event of Default. No Default or Event of Default has occurred and is continuing.

- 43 -

Section 3.24    <u>Foreign Assets Control Regulations</u>.

(a)    None of the Issuer Group Members, and none of their respective, principals, owners, officers or directors, or, to any of the Note Parties' knowledge, their respective Affiliates or agents (i) is a Sanctioned Person; or (ii) engages in any dealings or transactions in or with a Sanctioned Country or that are otherwise prohibited by Sanctions.

(b)    Each of the Issuer Group Members maintains reasonable policies and procedures to ensure compliance with Sanctions, Anti-Corruption Laws and Anti-Money Laundering Laws (as such compliance is required under this Agreement).

(c)    Each of the Issuer Group Members and their respective officers, directors, employees and, to the Issuer Group Members' knowledge, agents are in compliance with Anti-Corruption Laws, Anti-Money Laundering Laws and Sanctions.

(d)    [Reserved].

(e)    Each of the Issuer Group Members has disclosed to the Noteholders all facts known to it regarding (a) all claims, damages, liabilities, obligations, losses, penalties, actions, judgment, and/or allegations of any kind or nature that are asserted against, paid or payable by such Person, any of its Affiliates or any of its representatives in connection with non-compliance with Anti-Corruption Laws, Sanctions or Anti-Money Laundering Laws by such Person, and (b) any investigations involving possible non-compliance with Anti-Corruption Laws, Sanctions or Anti-Money Laundering Laws by such Person or such Affiliate or such representative. No proceeding by or before any Governmental Authority involving any Issuer Group Member with respect to Anti- Corruption Laws, Sanctions or Anti-Money Laundering Laws is pending or, to the knowledge of the Issuer Group Members, threatened.

Section 3.25    <u>Commercial Activity; Absence of Immunity</u>.Each Note Party is subject to civil and commercial law with respect to its obligations under the Note Documents, and the making and performance of the Note Documents by the Note Parties constitute private and commercial acts rather than public or governmental acts. The Note Parties are not entitled to any immunity on the ground of sovereignty or the like from the jurisdiction of any court or from any action, suit, setoff or proceeding, or the service of process in connection therewith, arising under the Note Documents.

ARTICLE IV

CONDITIONS

Section 4.01    <u>Conditions to the Closing Date</u>. The occurrence of the Closing Date, the effectiveness of this Agreement and the obligations of each Noteholder hereunder (including without limitation, to purchase the Notes pursuant to <u>Section 2.01</u> on the Closing Date) hereunder are subject to the receipt by the Noteholders (except as set forth otherwise below) of each of the following documents, and the satisfaction of the conditions precedent set forth below, each of which must be satisfied to the reasonable satisfaction of the Required Noteholders (unless waived in accordance with <u>Section 10.02</u>):

(a)    <u>Execution of Certain Note Documents</u>. This Agreement, the Agent Fee Letter and the Security Agreement shall have been duly executed and delivered by each of the Note Parties, the Agent and Noteholders intended to be parties thereto.

(b)    <u>Execution of Notes</u>. Each Noteholder shall have received a Note or Notes, duly executed by the Issuer and payable to such Noteholder in a principal amount equal to the amount contemplated to be purchased by such Noteholder pursuant to <u>Section 2.01</u>.

(c)    <u>Corporate Documents</u>. The following documents, each certified as of the Closing Date as indicated below:

(i)    copies of the Organizational Documents, together with any amendments thereto, of each Note Party and a certificate of good standing or its equivalent (if any) for the applicable jurisdiction for each such party (in each case such good standing certificate or its equivalent dated no more than ten (10) days prior to the Closing Date);

(ii)    an Officer's Certificate of each Note Party dated as of the Closing Date, certifying:

(A)    that attached to such certificate is a true and complete copy of the Organizational Documents referred in <u>clause (i)</u> above for such Person;

(B)    that attached to such certificate is a true and complete copy of resolutions duly adopted by the board of directors, member(s), manager(s), partner(s) or other authorized governing body of such Person authorizing the transactions contemplated by the Note Documents, and that such resolutions or other evidence of authority have not been modified, rescinded or amended and are in full force and effect;

(C)    that the certificate of incorporation, certificate of formation, charter or other Organizational Documents (as the case may be) referred in <u>clause (i)</u> above for such Person has not been amended since the date of the certification furnished pursuant to <u>clause (i)</u> above;

(D)    as to the incumbency and specimen signature of each officer, member, manager or partner (as applicable) of such Person executing the Note Documents to which such Person is or is intended to be a party (and each Noteholder may conclusively rely on such certificate until it receives notice in writing from such Person); and

(E)    as to the qualification of such Person to do business in each jurisdiction where its operations require qualification to do business and as to the absence of any pending proceeding for the dissolution or liquidation of such Person.

(d)    <u>Authorizations</u>. All Authorizations required under any Applicable Law to be issued to, assigned to, or otherwise assumed by any Note Party and necessary for (i) conduct of the Business or (ii) the execution, delivery and performance by such Note Party of the Note Documents to which it is a party, other than, in each case, Authorizations that are not currently necessary and are obtainable in the ordinary course of business, (A) have been duly obtained and, to the knowledge of Issuer, validly issued, (B) are in full force and effect and not subject to any pending

or, to the knowledge of Issuer, threatened, appeal or legal proceeding that could reasonably be expected to result in a material adverse modification to or withdrawal, cancellation, suspension or revocation of such Authorization, (C) are issued to, assigned to, or otherwise assumed by, a Note Party (or such Note Party is entitled to the benefit thereof), (D) are free from any unsatisfied condition the failure of which to satisfy would reasonably be expected to have a Material Adverse Effect and (E) with respect to such Authorizations, all applicable statutory, judicial and administrative review periods have expired.

(e)　　Operating Budget. A copy of the current Operating Budget in substantially the form presented to the Noteholders prior to the Closing Date.

(f)　　Regulatory Information. Each Noteholder shall have received all documentation and other written information required by under applicable anti-money laundering rules and regulations, including the USA PATRIOT Act.

(g)　　Representations and Warranties. The representations and warranties of each of the Note Parties set forth in the Note Documents shall be true and correct in all material respects on and as of the Closing Date (except where already qualified by materiality or Material Adverse Effect, in which case, in all respects).

(h)　　Officer's Certificate. An Officer's Certificate of the Issuer dated as of the Closing Date certifying that each of the conditions set forth in this Section 4.01 have been satisfied.

(i)　　Payoff Letters. The Agent shall have received payoff letters or other evidence of termination of Indebtedness with respect to the Existing Indebtedness, together with such UCC termination statements as shall be requested by the Required Noteholders, in each case, in form and substance satisfactory to the Required Noteholders.

(j)　　Fees and Expenses. The Issuer has arranged for payment on the Closing Date of all reasonable and documented out-of-pocket fees, reimbursements and expenses then due and payable pursuant to the Note Documents.

(k)　　Collateral Perfection Matters.

(i)　　The security interests in and to the Collateral intended to be created under the Security Documents shall have been created in favor of the Agent for the benefit of the Secured Parties, are in full force and effect and all notices, consents, acknowledgments, filings, registrations, recordings and other actions necessary to preserve, protect and perfect the security interests in the Collateral have been made or taken immediately prior to the Closing Date such that the security interests granted in favor of the Agent for the benefit of the Secured Parties will constitute a first priority (subject to Permitted Liens, to the extent any such Permitted Lien would have priority over the Liens in favor of the Agent (on behalf of the Noteholders) pursuant to any Applicable Law), perfected security interest in the Collateral free and clear of any Liens, other than Permitted Liens, and all related recordation, registration and/or notarial fees of such Collateral have been paid to the extent required.

(ii)    Appropriately completed UCC-1 financing statements, which have been duly authorized for filing by the appropriate Person, naming the Note Parties as debtors and Agent as secured party, in form appropriate for filing under each jurisdiction as may be necessary to perfect the security interests purported to be created by the Security Documents, covering the applicable Collateral.

(iii)    Copies of UCC, judgment lien, tax lien and litigation lien search reports, which reports will be for the period between the Closing Date and a recent date acceptable to the Agent in its sole and absolute discretion, listing all effective financing statements that name any Note Party as debtor and that are filed in the jurisdictions in which the UCC-1 financing statements will be filed in respect of the Collateral, none of which shall cover the Collateral except to the extent evidencing Permitted Liens.

(iv)    Appropriately completed copies of all other recordings and filings of, or with respect to, the Security Documents as may be requested by Agent and necessary to perfect the security interests purported to be created by the Security Documents.

(v)    Subject to Section 5.20, the Agent and the Required Noteholders shall be satisfied with arrangements to receive all certificates representing the shares of Capital Stock constituting "certificated securities" under the UCC that are pledged pursuant to the Security Agreement, together with an undated stock power for each such certificate executed in blank by a duly Authorized Representative of the applicable Note Party.

(vi)    Evidence that all other actions requested by Agent and necessary to perfect and protect the security interests purported to be created by the Security Documents entered into on or prior to the Closing Date have been taken immediately prior to the Closing Date.

(l)    Insurance Deliverables. The Issuer shall have obtained the insurance required to be in effect under the Insurance Covenant and such insurance shall be in full force and effect, and the Issuer shall have furnished the Agent with certificates signed by the insurer or an agent authorized to bind the insurer, together with loss payee endorsements in favor of the Agent, evidencing such insurance, identifying underwriters, the type of insurance, the insurance limits and the policy terms, and stating that such insurance (x) is, in each case, in full force and effect and (y) complies with Insurance Covenant and that all premiums then due and payable on such insurance have been paid.

(m)    Opinions of Counsel. A written opinion (dated the Closing Date and addressed to the Noteholders and the Agent) of Willkie Farr & Gallagher LLP, special New York counsel to the Note Parties.

(n)    [Reserved].

(o)    [Reserved].

(p)    Sale.  The sale of the Purchased Assets (as defined in the Purchase Agreement) shall be consummated substantially concurrently with the issuance of the Notes on the Closing

Date in accordance with the Purchase Agreement and the Sale Order (as defined in the Purchase Agreement).

(q)    Contribution of the Evergreen Facility.  The contribution of the Evergreen Facility to the Issuer shall have occurred pursuant to _____.

Without limiting the generality of the provisions of this Section, for purposes of determining compliance with the conditions specified in this Section, each Noteholder that has signed this Agreement shall be deemed to have consented to, approved of, accepted or been satisfied with each document or other matter required thereunder to be consented to, approved by or acceptable or satisfactory to a Noteholder unless the Agent shall have received notice from such Noteholder prior to the proposed Closing Date specifying its objection thereto.

Section 4.02    [Reserved].

# ARTICLE V
# AFFIRMATIVE COVENANTS

Each Note Party hereby agrees that, from and after the Closing Date until all of the Obligations (other than contingent obligations as to which no claim exists or has been asserted) have been paid in full:

Section 5.01    Corporate Existence; Etc. Each Issuer Group Member shall at all times preserve and maintain in full force and effect (a) its existence as a corporation or a limited liability company, as applicable, (b) its good standing under the laws of the jurisdiction of its organization, and (c) its qualification to do business and its good standing in each jurisdiction in which the character of properties owned by it or in which the transaction of its business as conducted or proposed to be conducted makes such qualification necessary, except in the case of this clause (c), where the failure to do so would not reasonably be expected to have a Material Adverse Effect.

Section 5.02    Conduct of Business. Each Issuer Group Member shall operate, maintain and preserve or cause to be operated, maintained and preserved, the Business in compliance with all Applicable Laws and Authorizations by Governmental Authorities and the terms of its insurance policies, in each case, except as would not reasonably be expected to have a Material Adverse Effect.

Section 5.03    Compliance with Laws and Obligations.

(a)    Each Issuer Group Member shall (i) comply with all applicable Environmental Laws, including occupational health and safety regulations, and all other Applicable Laws and Authorizations and (ii) comply with and perform its respective contractual obligations, in each case, except as would not reasonably be expected to have a Material Adverse Effect. Each Issuer Group Member shall not violate applicable Sanctions, Anti-Money Laundering Laws, the FCPA or any other Anti-Corruption Laws and shall not undertake or cause to be undertaken any Anti-Corruption Prohibited Activity.

Section 5.04    [Reserved].

Section 5.05   <u>Maintenance of Title</u>. Each Issuer Group Member shall maintain (a) good title to the property owned by such Issuer Group Member necessary for the conduct of the Business free and clear of Liens, other than Permitted Liens, (b) legal and valid and subsisting leasehold interests to the properties leased by such Issuer Group Member necessary for the conduct of the Business, free and clear of Liens, other than Permitted Liens and (c) legal and valid possessory rights to the properties possessed and not otherwise held in fee or leased by such Issuer Group Member necessary for the conduct of the Business.

Section 5.06   [Reserved].

Section 5.07   <u>Keeping of Books</u>. Each Note Party shall maintain an accounting and control system, management information system and books of account and other records, which together adequately reflect truly and fairly the financial condition of such Note Party and the results of operations in accordance with GAAP and all Applicable Laws.

Section 5.08   [Reserved].

Section 5.09   <u>Taxes</u>. Each Note Party and its Subsidiaries shall timely and fully pay and discharge, before the same shall become delinquent, all material Taxes imposed upon it or upon its property, including to the extent required under the Note Documents to which such Note Party is a party or as required under Applicable Law; <u>provided</u> that the foregoing shall not apply for any such Tax liability that is being contested in accordance with the Permitted Contest Conditions (but only for so long as such Note Party satisfies the Permitted Contest Conditions in relation to such tax, assessment, charge or claim).

Section 5.10   <u>Financial Statements; Other Reporting Requirements</u>.Each Note Party shall, or cause the applicable Non-Guarantor Subsidiary to, furnish to the Noteholders:

(a)      as soon as available and in any event within thirty (30) days after the end of each fiscal month (other than the last fiscal month of each Fiscal Quarter), commencing with the fiscal month ending October 31, 2021, (i) the unaudited consolidated balance sheet of the Issuer Group Members as of the end of such fiscal month and the related unaudited statement of income for such fiscal month and for the portion of such Fiscal Year ending on the last day of such fiscal month, all in reasonable detail prepared in accordance with GAAP, subject to the absence of footnotes and normal year-end adjustments (it being understood that the financial statements to be delivered pursuant to this clause (a) for the fiscal months ending October 31, 2021, November 30, 2021 and January 31, 2021 shall be limited in nature) and (ii) a monthly report containing (A) information (in summary form) as to the consolidated operational and financial performance of the Issuer Group Members;

(b)      as soon as available and in any event within forty-five (45) days after the end of each Fiscal Quarter, commencing with Fiscal Quarter ending on March 31, 2022, the unaudited consolidated balance sheet of the Issuer Group Members as of the end of such Fiscal Quarter and the related statements of income and cash flows for such Fiscal Quarter and for the portion of such Fiscal Year ending on the last day of such Fiscal Quarter, all in reasonable detail and accompanied

by customary management discussion and analysis, prepared in accordance with GAAP, subject to the absence of footnotes and normal year-end adjustments;

(c)     as soon as available and in any event within one hundred twenty (120) days after the end of each Fiscal Year (or one hundred eighty (180) days after the end of the Fiscal Year ending on December 31, 2021), commencing with Fiscal Year ending on December 31, 2021, the audited consolidated financial statements of the Issuer Group Members for such Fiscal Year, including therein the consolidated balance sheet as of the end of such Fiscal Year and the related statements of income, retained earnings and cash flows for such year, all in reasonable detail and accompanied by customary management discussion and analysis and an audit opinion thereon by the Independent Auditor, which opinion shall state that said financial statements present fairly, in all material respects, the financial position of the Issuer Group Members, as the case may be, at the end of, and for, such Fiscal Year in accordance with GAAP;

(d)     at the time of the delivery of the financial statements under Section 5.10(b) or (c) above, a certificate of an the chief financial officer, chief accounting officer, treasurer or corporate controller (or other similar officer) of the Issuer (i) certifying that such financial statements fairly present in all material respects the financial condition and results of operations of the Issuer Group Members on the dates and for the periods indicated in accordance with GAAP, subject, in the case of interim financial statements, to the absence of footnotes and normally recurring year-end adjustments, (ii) certifying that no Default or Event of Default has occurred and is continuing, or if a Default or Event of Default has occurred and is continuing, a statement as to the nature thereof and (iii) certifying and providing calculations for the Debt Service Coverage Ratio as of such date (such certificate, the "Compliance Certificate"); and

(e)     not later than sixty (60) days after the commencement of each Fiscal Year, beginning with the Fiscal Year commencing on January 1, 2022, an Operating Budget for such Fiscal Year (it being understood that any failure to comply with any such Operating Budget shall not constitute a default or Event of Default, or require the consent of the Agent or any Noteholder as a result of such failure to so comply).

Section 5.11   Notices. The Note Parties shall, or cause the applicable Non-Guarantor Subsidiary to promptly (and, unless a subsection of this Section 5.11 is expressly made subject to another time period, within five (5) Business Days) upon an Authorized Representative of any Note Party obtaining actual knowledge thereof (or as otherwise provided in the case of clause (a) below), give notice to the Noteholders of:

(a)     the filing or commencement of any litigation, investigation, action or proceeding (including any Environmental Claim) of or before any court, arbitrator or Governmental Authority against or affecting any Issuer Group Member or the Business (x) in which the amount involved is in excess of $1,250,000, (y) has resulted in or, if adversely determined, would reasonably be expected to result in a Material Adverse Effect or (z) which relates to a material Authorization (including all material Authorizations required by Environmental Law) necessary for the Business;

(b)     the occurrence of a Default or an Event of Default;

(c)     the occurrence of any ERISA Event, together with a written notice setting forth the nature thereof and the action, if any, that such Note Party or ERISA Affiliate proposes to take with respect thereto; and

(d)     promptly following any request therefor, such other information regarding the operations, business affairs and financial condition of any Issuer Group Member, or compliance with the terms of any Note Document as the Agent or any Noteholder may reasonably request in writing.

Section 5.12   Noteholder Calls. At the request of the Required Noteholders (through the Agent), the Note Parties shall hold a quarterly telephonic meeting by conference call with the Agent and all Noteholders who chose to attend such meeting, at such reasonable times during normal business hours upon reasonable advance notice from the Agent (but in no event shall the timing of or reasonable delay in scheduling such calls constitute a Default or Event of Default or require the consent of any Noteholder).

Section 5.13   [Reserved].

Section 5.14   Security. The Note Parties shall preserve and maintain the  security interests granted under the Security Documents and undertake all actions which are necessary or appropriate to: (a) maintain the Agent's security interest in the Collateral in full force and effect at all times (including the priority thereof (subject to Permitted Liens)), and (b) preserve and protect the Collateral and protect and enforce the Note Parties' rights and title and the rights of the Agent and the other Secured Parties to the Collateral (subject to Permitted Liens), including the making or delivery of all filings and recordations, the payment of all reimbursements, fees and other charges and the issuance of supplemental documentation.

Section 5.15   Further Assurances.The Note Parties shall execute, acknowledge where appropriate, and deliver, and cause to be executed, acknowledged where appropriate, and delivered, from time to time promptly at the reasonable request of the Agent all such instruments and documents as are necessary or appropriate to carry out the intent and purpose of the Note Documents (including filings, recordings or registrations required to be filed in respect of any Security Document or assignment thereto) necessary to maintain, to the extent permitted by Applicable Law, the validity, enforceability, perfection and the priority of the Agent's Lien in the Collateral to the extent and in the priority required by the Note Documents.

Section 5.16   Additional Collateral; Additional Guarantors.

(a)     With respect to any Person that is or becomes a Subsidiary (other than any Non-Guarantor Subsidiary) of the Issuer after the Closing Date, promptly (and in any event within forty-five (45) days after such Person becomes a Subsidiary, unless extended by the Required Noteholders in writing in their reasonable discretion) (i) deliver to the Agent the certificates, if any, representing all of the Capital Stock of such Subsidiary, together with undated stock powers or other appropriate instruments of transfer executed and delivered in blank by a duly authorized officer of the holder(s) of such Capital Stock, and, to the extent required under the Security Agreement, all intercompany notes owing from such Subsidiary to any Note Party together with instruments of transfer executed and delivered in blank by a duly authorized officer of such Note

Party and (ii) cause such new Subsidiary (A) to become a Subsidiary Guarantor and execute and deliver to the Agent a joinder agreement to this Agreement in form and substance satisfactory to the Required Noteholders, (B) to become a [grantor] under the Security Agreement and execute and deliver to the Agent a joinder to the Security Agreement in form and substance satisfactory to the Required Noteholders, (C) deliver customary opinions of counsel to the Issuer in form and substance, and from counsel, reasonably satisfactory to the Required Noteholders, and (D) to take all actions necessary or advisable in the opinion of the Agent or the Required Noteholders to cause the Lien created by the applicable Security Document to be duly perfected to the extent required by such Security Document in accordance with all Applicable Laws, including the filing of financing statements (or equivalent registrations) in such jurisdictions as may be reasonably requested by the Agent or the Required Noteholders. Notwithstanding any other provisions of this Agreement or any other Note Document to the contrary, (i) no Non-Guarantor Subsidiary shall be required to execute and deliver the Guarantee or the Security Agreement, (ii) in no event shall more than 65% of the total combined voting power of all classes of capital stock entitled to vote of any "first tier" CFC or any U.S. Foreign HoldCo be pledged pursuant to the provisions of the Security Agreement or any other Note Document (to the extent that such pledge in excess of 65% could reasonably be expected to give rise to material adverse tax consequences to Holdings (or any direct or indirect parent entity thereof), the Issuer and/or any of its Subsidiaries (as reasonably determined by the Issuer), and (iii) in no event shall any of the stock of a Subsidiary that is owned by a CFC be pledged pursuant to the provisions of the Security Agreement or any other Note Document (to the extent that such pledge could reasonably be expected to give rise to material adverse tax consequences to Holdings (or any direct or indirect parent entity thereof), the Issuer and/or any of its Subsidiaries (as reasonably determined by the Issuer).

        (b)     The Note Parties shall deliver to the Agent within 120 days after the Closing Date (with respect to Evergreen Facility) or 120 days after the acquisition thereof (in the case of Material Real Properties acquired by the Note Parties after the Closing Date) (i) counterparts of a Mortgage with respect to such Material Real Property duly executed and delivered by the record owner of such Material Real Property, (ii) a policy or policies of title insurance, naming the Agent as the insured for the benefit of the Secured Parties, issued by a nationally recognized title insurance company reasonably acceptable to the Agent insuring the Lien of each such Mortgage as a valid and enforceable Lien on the Material Real Property described therein, free of any other Liens except Permitted Liens, together with such endorsements, coinsurance and reinsurance as the Agent may reasonably request, (iii) prior to the execution and delivery of each Mortgage, a completed "Life-of-Loan" Federal Emergency Management Agency standard flood hazard determination with respect to the Material Real Property encumbered by such Mortgage (together with a notice about special flood hazard area status and flood disaster assistance duly executed by the Issuer), and if any Material Real Property is located in an area determined by the Federal Emergency Management Agency to have special flood hazards, a copy of, or a certificate as to coverage under, and a declaration page relating to, the flood insurance policies required by Section 1.4 of Exhibit D and the applicable provisions of the Security Documents, each of which shall (v) be endorsed or otherwise amended to include a "standard" or "New York" lender's loss payable or mortgagee endorsement (as applicable), (w) identify the addresses of each property located in a special flood hazard area, (x) indicate the applicable flood zone designation, the flood insurance coverage and the deductible relating thereto, (y) provide that the insurer will give the Agent 45 days written notice of cancellation or non-renewal and (z) shall be otherwise in form and substance

satisfactory to the Agent and (iv) such surveys, abstracts, appraisals, legal opinions and other documents as the Agent may reasonably request with respect to any such Mortgage or Material Real Property.

Section 5.17    [Reserved].

Section 5.18    Intellectual Property.

(a)    Each Note Party shall own, or be licensed to use, all Intellectual Property that such Note Party reasonably believes is necessary for its conduct of the Business, except where failure of such Note Party to so own or be licensed would have a Material Adverse Effect.

(b)    If a Note Party licenses any Intellectual Property from another Person and such Intellectual Property is material to the conduct of the business of any Note Party, and the license is rejected in an insolvency proceeding, such Note Party shall use commercially reasonable efforts to maintain its rights under the license, which efforts shall include making an election under Section 365(n) of the Bankruptcy Code, if an election is available to such Note Party.

(c)    Each Note Party agrees that, should it hereafter (i) obtain an ownership interest in any issued Copyrights, Trademarks, or Patents, (ii) obtain an exclusive license to any Copyrights, (iii) either by itself or through any agent, employee, licensee, or designee, file any application for the registration or issuance of any Copyrights, Trademarks or Patents with the United States Patent and Trademark Office or the United States Copyright Office, or (iv) should it file a statement of use or an amendment to allege use with respect to any "intent-to-use" Trademark application (the items in clauses (i), (ii), (iii) and (iv), collectively, the "After-Acquired Intellectual Property"), then, unless it constitutes Excluded Assets under the Pledge and Security Agreement, any such After-Acquired Intellectual Property shall automatically become part of the Collateral, and such Note Party shall give written notice thereof within 60 days of the registration or issuance thereof to the Agent in accordance herewith.

(d)    Each Note Party agrees to use commercially reasonable efforts so as not to permit the inclusion in any contract to which it hereafter becomes a party of any provision that would materially impair or prevent the creation of a security interest in such Note Party's rights and interests in any property described in Section 5.19(c) that is material to the business of any Note Party, other than the Note Documents and any loan documentation relating to the Permitted ABL Facility.

(e)    Each Note Party shall promptly notify the Agent if it knows or has reason to know that any registered or issued Copyrights, Trademarks or Patents that it owns or licenses becomes (i) abandoned or dedicated to the public or placed in the public domain, (ii) invalid or unenforceable, (iii) subject to any adverse determination or development regarding such Note Party's ownership, registration or use or the validity or enforceability of such item of Intellectual Property (including the institution of, or any adverse development with respect to, any action or proceeding in the United States Patent and Trademark Office, the United States Copyright Office, any state registry, any foreign counterpart of the foregoing, or any court) or (iv) the subject of any reversion or termination rights.

(f)     Each Note Party shall not intentionally infringe, misappropriate, dilute, or otherwise violate the Intellectual Property rights of any other Person in any manner which would reasonably be expected to have a Material Adverse Effect. In the event that any Person initiates, or threatens in writing to initiate, any action or proceeding alleging that such Note Party, or the conduct of such Note Party's business, infringes, misappropriates, dilutes, or otherwise violates the Intellectual Property of any other Person, and such action or proceeding would reasonably be expected to have a Material Adverse Effect, such Note Party shall promptly notify the Agent after it learns thereof.

Section 5.19   Certain Post-Closing Obligations. Each Note Party shall deliver the documents or take the actions specified on Schedule 5.20 in accordance with the provisions thereunder.

Section 5.20   Additional Covenants. Each Note Party shall comply with the Additional Covenants in accordance with the provisions thereunder.

## ARTICLE VI

## NEGATIVE COVENANTS

Each Note Party agrees that from and after the Closing Date until all of the Obligations (other than contingent obligations as to which no claim exists or has been asserted) have been paid in full:

Section 6.01   [Reserved].

Section 6.02   Indebtedness. No Issuer Group Member shall create, incur, assume or suffer to exist any Indebtedness, other than (each of the following, "Permitted Indebtedness"):

(a)     Indebtedness incurred under the Note Documents (including without limitation, any Indebtedness incurred under any Additional Notes);

(b)     Capital Lease Obligations or purchase money obligations (i) to the extent incurred to finance the acquisition or licensing of intellectual property or discrete items of equipment (and Indebtedness incurred to finance any such obligations); provided that the aggregate principal amount of Indebtedness that is outstanding in reliance on this clause (b)(i) does not exceed $5,000,000 and (ii) to the extent incurred to finance the expansion of capital expenditures of any Issuer Group Member (including without limitation, any debottlenecking and other efficiency undertakings in respect of the Business); provided that the aggregate principal amount of Indebtedness that is outstanding in reliance on this clause (b)(ii) does not exceed $15,000,000

(c)     current accounts payable not more than ninety (90) days past due or which are that are being contested in accordance with the Permitted Contest Conditions, interest thereon, regulatory bonds, surety obligations and accrued expenses incurred, in the ordinary course of business;

(d)     [Reserved];

(e)     Indebtedness incurred under any Permitted ABL Facility;

(f)     Indebtedness existing on the Closing Date and set forth in Schedule 6.02 and extensions, renewals and replacements of any such Indebtedness that do not increase the outstanding principal amount thereof except by an amount equal to a reasonable premium or other amount paid, and reasonable fees and expenses incurred, in connection with such extension, renewal or replacement or change any direct or contingent obligor with respect thereto or shorten the average life to maturity thereof;

(g)     (i) Guarantees by any Note Party of Indebtedness otherwise permitted hereunder of any other Note Party and (ii) performance guarantees provided by a Note Party to support the obligations of any Note Party in the ordinary course of business;

(h)     unsecured Indebtedness of Holdings, provided that such Indebtedness (i) does not mature prior to the date is 91 days following the Maturity Date and (ii) is subordinated to the Obligations pursuant to a subordination agreement in form and substance reasonably acceptable to the Agent and the Required Noteholders;

(i)     unsecured intercompany Indebtedness among the Note Parties (other than Holdings);

(j)     Indebtedness in respect of any sale and leaseback transaction consummated by any Issuer Group Member with any Person that is not an Affiliate of any Issuer Group Member for cash consideration for fair market value (as reasonably determined in good faith by the Issuer); provided that the Issuer shall offer to prepay the Notes with the Net Available Amount of any such sale and leaseback transaction;

(k)     Indebtedness in respect of any letter of credit issued in favor of the landlord under any real property leases in an aggregate face amount not to exceed $2,000,000 at any one time outstanding;

(l)     [reserved]; and

(m)     other unsecured Indebtedness in an aggregate principal amount not exceeding $2,500,000 at any time outstanding (as such amount may be increased with the consent of the Required Noteholders in their sole and absolute discretion).

Section 6.03   Liens, Etc. No Issuer Group Member shall create, incur, assume or suffer to exist any Lien upon or with respect to any of its properties of any character (including accounts receivables) whether now owned or hereafter acquired, or assign any accounts or other right to receive income, other than (each of the following, a "Permitted Lien"):

(a)     Liens arising by reason of:

(i)     Taxes which are not yet due or which are being contested pursuant to the Permitted Contest Conditions;

(ii)    security, pledges or deposits in the ordinary course of business for payment of workmen's compensation or unemployment insurance or other types of social security benefits; and

(iii)    good faith deposits or pledges incurred or created in connection with or to secure the performance of bids, tenders, contracts (other than contracts for the payment of money), leases, statutory obligations, surety bonds or appeal bonds entered into in the ordinary course of business or under Applicable Law;

(b)    Liens of mechanics, carriers, landlords, warehousemen, materialmen, laborers, repairmen's, employees or suppliers or any similar Liens arising by operation of law, incurred in the ordinary course of business with respect to obligations which are not overdue by more than forty-five (45) days, or which are adequately bonded and which are being contested pursuant to the Permitted Contest Conditions;

(c)    Liens arising out of judgments, orders or awards not constituting an Event of Default that have been adequately bonded, are fully covered by insurance (subject to applicable deductibles) or with respect to which a stay of execution has been obtained pending an appeal or proceeding for review pursuant to the Permitted Contest Conditions;

(d)    Liens arising with respect to zoning restrictions, easements, licenses, reservations, covenants, rights-of-way, utility easements, building restrictions and other similar charges or encumbrances on the use of real property which, individually or in the aggregate, do not materially detract from the value of the affected property and do not materially interfere with the ordinary conduct of the business of such Issuer Group Member;

(e)    Liens or the interests of lessors to secure purchase money obligations permitted under Section 6.02(b); provided that such Lien encumbers only the specific goods, equipment or software so financed, any accessions thereto, proceeds thereof and related books and records;

(f)    [reserved];

(g)    to the extent constituting Liens, leases, licenses, subleases or sublicenses granted to others in the ordinary course of business that do not (i) interfere in any material respect with the ordinary conduct of the Business of the Issuer Group Members, (ii) secure any Indebtedness or (iii) individually or in the aggregate detract from the expected value of the property of the Issuer Group Members in any material respect;

(h)    (i) Liens arising solely by virtue of any statutory or common law provision relating to banker's liens, rights of set-off or similar rights and remedies and burdening only deposit accounts or other funds maintained with a creditor depository institution, in each case, granted in the ordinary course of business in favor of such creditor depositary institution, provided that no such deposit account is a dedicated cash collateral account or is subject to restrictions against access by the depositor in excess of those set forth by regulations promulgated by the Board and no such deposit account is intended by the Issuer to provide collateral to the depository institution and (ii) Liens in favor of a banking or other financial institution arising as a matter of law or in the ordinary course of business under customary general terms and conditions encumbering deposits

or other funds maintained with a financial institution (including the right of setoff) and that are within the general parameters customary in the banking industry or arising pursuant to such banking institution's general terms and conditions;

(i) any Lien on any property or asset of the Issuer or any of its Subsidiaries existing on the Closing Date and set forth in Schedule 6.03; provided that such Lien shall not apply to any other property or asset of the Issuer or any Subsidiary;

(j) Liens arising under the Note Documents;

(k) Liens, securing obligations under any Permitted ABL Facility on the applicable ABL Priority Collateral, so long as such Liens are at all times subject to the intercreditor agreement referred to in the definition of Permitted ABL Facility;

(l) [reserved];

(m) cash collateral arrangements with respect to letters of credit issued in accordance with Section 6.02(k) securing not greater than 105% of the principal amount of such letters of credit in the aggregate;

(n) Liens on the assets of the Issuer or any Subsidiary that are sold pursuant to any sale and leaseback transaction permitted under Section 6.02(j);

(o) Liens consisting of Investments permitted in reliance on Section 6.04(j); and

(p) Liens that extend, renew or replace in whole or in part a Lien referred to above.

Section 6.04    Investments. No Issuer Group Member shall make any Investment, except:

(a) cash equity investments and/or contributions made by a Note Party to a Non-Guarantor Subsidiary solely to the extent such investment or contribution is made using the direct or indirect cash proceeds of the issuance of additional shares of Capital Stock of Holdings in exchange for cash after the Closing Date (to the extent not constituting a Change of Control); provided that, at the time of such issuance, no Event of Default is continuing;

(b) (i) intercompany loans by any Note Party to any Subsidiary of the Issuer that is not a Note Party, to the extent unsecured and pledged to the Agent, for the benefit of the Secured Parties, under the Security Agreement, in an aggregate amount not to exceed $1,000,000 at any time and (ii) Investments between Note Parties (other than to Holdings);

(c) (i) Cash Equivalent Investments and (ii) bank deposits in the ordinary course of business;

(d) deposits described in Section 6.03(a)(ii);

(e) Investments consisting of extensions of credit in the nature of deposits, accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of

business, and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors to the extent reasonably necessary in order to prevent or limit loss;

(f)    non-cash consideration received, to the extent permitted by the Note Documents, in connection with the Disposition of property permitted by this Agreement;

(g)    Investments listed on Schedule 6.04 as of the Closing Date;

(h)    discounts given to customers of any Note Party in the ordinary course of business and in the good faith business judgment of the Issuer;

(i)    Investments by any Non-Guarantor Subsidiary in any other Non-Guarantor Subsidiary;

(j)    Investments consisting of security deposits with utilities, landlords and other like Persons made in the ordinary course of business;

(k)    Permitted Acquisitions;

(l)    Investments consisting of loans or advances to employees, officers, members and directors of any Issuer Group Member for reasonable and customary business-related travel, entertainment, relocation and analogous ordinary business purposes;

(m)    other Investments not otherwise permitted pursuant to this Agreement in an aggregate amount not to exceed $2,500,000 at any time.

Section 6.05  Change of Jurisdiction, Corporate Name or Location; Change of Fiscal Year; Business Activities.

(a)    No Note Party shall, and no Note Party shall permit any of its Subsidiaries to, (a) change its jurisdiction of organization and/or organizational identification number (if any), unless the Agent has been provided with no less than five (5) days' prior notice of same, (b) change its name unless Agent has been provided no less than five (5) days' prior written notice of same or (c) change its chief executive office or principal place of business or (d) change the locations at which Collateral is held or stored (other than Collateral in transit in the ordinary course of business, items out for repair in the ordinary course of business, equipment in the possession of an employee in the ordinary course of business and Collateral with a fair market value (as determined in good faith by the Issuer), not to exceed $1,000,000 in the aggregate for all such locations), or the location of its records concerning the Collateral, in any case without at least five (5) days' prior written notice to Agent.  Without limiting the foregoing, no Note Party shall, and no Note Party shall permit any of its Subsidiaries to, change its location, name, identity or organizational structure in any manner which might make any financing or continuation statement filed in connection herewith seriously misleading within the meaning of Section 9-506 of the UCC or any other then applicable provision of the UCC except upon prior written notice to Agent and after Agent's written acknowledgment that any reasonable action requested by Agent in connection therewith, including to continue the perfection of any Liens in favor of Agent, on behalf of itself and the other Secured Parties, in any Collateral, has been completed or taken.  No Note Party shall, and no Note

Party shall permit any of its Subsidiaries to, change its fiscal year or method of determining fiscal quarters or fiscal months.  No Issuer Group Member shall at any time to any material extent conduct any activities other than those related to the Business.

Section 6.06    Restricted Payments.No Issuer Group Member shall declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment other than:

(a)    Dividends, distributions or other payments in respect of Investments by any Issuer Group Member to any Note Party;

(b)    any Note Party may declare and pay dividends with respect to its equity interests payable solely in additional shares of its common stock;

(c)    so long as no Default or Event of Default has occurred and is continuing or would result therefrom, any Note Party may make Restricted Payments to redeem, acquire, retire, repurchase or settle equity interests of any nature from current and former officers, directors, employees and consultants of any Issuer Group Member that are not an Affiliate of the Sponsor; provided that the aggregate amount thereof does not exceed $2,000,000 during any Fiscal Year;

(d)    [reserved];

(e)    [reserved];

(f)    Permitted Tax Distributions; and

(g)    Restricted Payments made by any Non-Guarantor Subsidiary to any Note Party.

Section 6.07    Fundamental Changes; Asset Dispositions.No Issuer Group Member shall:

(a)    in one transaction or a series of transactions, merge into or consolidate with, or acquire all or any substantial part of the assets or any class of stock or other ownership interests of, any other Person or sell, transfer or otherwise Dispose of all or substantially all of its assets to any other Person; provided that (i) any Subsidiary may participate in a merger or consolidation with the Issuer (provided that the Issuer shall be the continuing or surviving corporation) or any other Subsidiary Guarantor and (ii) any Non-Guarantor Subsidiary may participate in a merger or consolidation with another Non-Guarantor;

(b)    change its legal form, liquidate or dissolve (provided that any Non-Guarantor Subsidiary may do any of the foregoing so long as any such liquidation or dissolution is to a Note Party (other than Holdings);

(c)    make or agree to make any amendment to its Organizational Documents to the extent that such amendment could reasonably be expected to be materially adverse to the interests of the Agent or the Noteholders;

(d)    [reserved];

(e)    Dispose of, in one transaction or a series of transactions, all or any part of Holdings, the Issuer's or any other Issuer Group Members' businesses, assets or properties of any kind, whether real, personal or mixed and whether tangible or intangible, whether now owned or hereafter acquired, leased or licensed, including the Capital Stock of the Issuer or any of its Subsidiaries, except:

(i)    (x) sales or other Dispositions of equipment that is worn out or defective, or no longer used or useful, for fair market value to the extent that the Issuer reinvests the Net Available Amount (or any portion thereof) of any such Disposition in substantially similar assets that are necessary or useful for the Business pursuant to a transaction not prohibited hereunder and such Net Available Amount is so reinvested within three hundred sixty-five (365) days after receipt thereof (or, if committed to be so reinvested pursuant to a written agreement on or prior to the expiration of such three hundred sixty-five (365) day period, within five hundred forty-five (545) days after receipt thereof) and (y) Dispositions of equipment to the extent that such property is exchanged for credit against the purchase price of similar replacement property; provided that, in the case of clauses (x) and (y), to the extent the property being transferred or Disposed of constitutes Collateral such replacement property shall constitute Collateral,

(ii)    Dispositions of assets, including equity interests, from any Note Party (other than Holdings) to any other Note Party (other than Holdings),

(iii)    Dispositions of cash and Cash Equivalent Investments in the ordinary course of business and for fair market value,

(iv)    licensing of Intellectual Property in the ordinary course of business, so long as it does not interfere in any material respect with the ordinary conduct of the Business of the Issuer Group Members,

(v)    the sale of inventory (if any) in ordinary course of business,

(vi)    [reserved], and

(vii)    Dispositions (or group of related Dispositions); provided, (x) at the time of such Disposition, no Default or Event of Default shall have occurred and be continuing or would result therefrom, and (x) such consideration shall be (A) in an amount at least equal to the fair market value of the asset(s) subject to such Disposition (as determined in good faith by the Issuer), (B) at least 75% of the consideration for such Disposition consists of cash or Cash Equivalent Investments, and (C) to the extent required by Section 2.05(b)(ii), the Issuer shall make an Event of Loss/Disposition Prepayment Offer with the Net Available Amount from any such Disposition or reinvest such Net Available Amount, in each case, in accordance with Section 2.05(b)(ii).

For the avoidance of doubt, maintenance capital expenditures treated as a disposition for accounting purposes shall not be subject to this clause (e) solely by virtue of such accounting treatment.

Section 6.08    [Reserved].

Section 6.09  <u>Transactions with Affiliates</u>. No Issuer Group Member shall directly or indirectly enter into any transaction or series of related transactions with an Affiliate of such Issuer Group Member, except for (a) transactions set forth on <u>Schedule 3.21</u> hereto, (b) transactions in the ordinary course of such Issuer Group Member's (and such Affiliate's) business and upon fair and reasonable terms no less favorable to such Issuer Group Member than it would obtain in comparable arm's-length transactions with a Person acting in good faith which is not an Affiliate, (c) transactions between or among the Issuer Group Members not involving any other Affiliate, (d) any transaction permitted by <u>Section 6.02 (h)</u>, <u>6.03</u>, <u>6.04</u> and <u>6.06</u>, in each case, which are implemented in a manner consistent with the Sponsor's historical agreements and practices (as in effect as of the Closing Date) and (e) so long as no Default or Event of Default has occurred and is continuing or would result therefrom, transactions of any Issuer Group Member with any of its Affiliates under and in accordance with any management or advisory agreement between the Sponsor and one or more Issuer Group Members as in effect on the Closing Date (including without limitation, the payment of (i) management, advisory, consulting or other fees of and (ii) reasonable costs and expenses of, and indemnities provided on behalf of, in each case, the Sponsor pursuant to the terms and conditions thereunder).

Section 6.10  <u>Passive Holding Company</u>. Holdings shall not engage in any material business activities or own any material property other than (i) ownership of the Capital Stock of the Issuer, (ii) activities and contractual rights incidental to maintenance of its corporate existence, (iii) performance of its obligations under this Agreement or any of the other Note Documents to which it is a party, (iv) the performance of its rights and obligations, if any, under its Organization Documents, (v) the execution, delivery and performance of its rights and obligation sunder any employment agreements to which it is a party, (vii) guarantees of obligations in connection with the making or entering into of leases or subleases with respect to any leasehold interests of any of the Issuer Group Members and (viii) if applicable, performance of obligations under any management or advisory agreement between the Sponsor and one or more Issuer Group Members as in effect on the Closing Date.

Section 6.11  <u>No Further Negative Pledge</u>. No Issuer Group Member shall into any agreement, instrument, deed or lease which prohibits or limits the ability of any Note Party to create, incur, assume or suffer to exist any Lien upon any of its properties or assets, whether now owned or hereafter acquired, or which requires the grant of any security for an obligation if security is granted for another obligation, except the following:  (a) this Agreement and the other Note Documents; (b) any prohibition or limitation in existence on the Closing Date and set forth on <u>Schedule 6.11</u> hereto, (c) covenants in documents creating Liens permitted by <u>Section 6.03</u> prohibiting further Liens (other than Liens permitted under <u>Section 6.03(j)</u>) on the properties encumbered thereby; (d) any prohibition or limitation that consists of customary restrictions and conditions contained in any agreement relating to the sale of any property pending the consummation of such sale; <u>provided</u> that (1) such restrictions apply only to the property to be sold and such sale is permitted hereunder, and (2) such sale is permitted hereunder, or (iii) restricts subletting or assignment of any lease governing a leasehold interest of the Issuer or one of its Subsidiaries; (e) prohibitions and limitations contained in any agreement to which a Subsidiary is a party that was in effect at the time such Subsidiary became a Subsidiary of the Issuer, so long as such agreement was not entered into in anticipation or contemplation of such Person becoming a Subsidiary and such prohibitions and limitations only relate to such Subsidiary; (f) customary non-

assignment provisions in customer contracts and licenses of (or any other grants of rights to use) Intellectual Property, in each case entered into in the ordinary course of business; and (g) is imposed by any amendments that are otherwise permitted by the Note Documents of the contracts, instruments or obligations referred to in this <u>Section 6.11</u>; <u>provided</u> that such amendments are no more restrictive with respect to the prohibitions and limitations in such contracts, instruments or obligations as in effect prior to any such amendment.

Section 6.12   <u>Limitations on Restricted Actions</u>. No Issuer Group Member shall, directly or indirectly, create or otherwise cause or suffer to exist or become effective any encumbrance or restriction on the ability of any such Person to (a) pay dividends or make any other distributions to any Note Party on its Capital Stock, (b) pay any Indebtedness or other obligation owed to any Note Party, (c) make loans or advances to any Note Party, (d) sell, lease or transfer any of its properties or assets to any Note Party, or (e) act as a Guarantor and pledge its assets pursuant to the Note Documents, except (in respect of any of the matters referred to in clauses (a)-(d) above) for such encumbrances or restrictions existing under or by reason of (i) this Agreement and the other Note Documents, (ii) applicable law, (iii) restrictions or conditions in existence on the Closing Date and set forth on <u>Schedule 6.12</u> hereto, (iii) restrictions or conditions imposed by any agreement relating to purchase money Indebtedness, capital leases and other secured Indebtedness permitted by this Agreement if such restrictions or conditions apply only to the property or assets securing such Indebtedness, (iv) any Permitted Lien or any document or instrument governing any Permitted Lien; <u>provided</u> that any such restriction contained therein relates only to the asset or assets subject to such Permitted Lien, (v) customary restrictions and conditions contained in agreements relating to the sale of Capital Stock or assets of any Subsidiary pending such sale, provided such restrictions and conditions apply only to the Subsidiary to be sold and such sale is permitted hereunder, (vi) customary provisions in leases, licenses and other contracts restricting the assignment thereof, (vii) customary provisions in joint venture agreements restricting the assignment thereof or upon the assets of such joint venture and (viii) any agreement in effect at the time any Person becomes a Subsidiary of the Issuer; <u>provided</u> that such agreement was not entered into in contemplation of such Person becoming a Subsidiary of the Issuer.

Section 6.13   <u>[Reserved]</u>.

Section 6.14   <u>No Hedging or Speculative Transactions</u>. No Note Party shall enter into, or suffer to exist, any Hedging Agreement for speculative purposes or any other speculative transaction.

ARTICLE VII

EVENTS OF DEFAULT

Section 7.01   <u>Events of Default</u>. If any of the following events ("<u>Events of Default</u>") shall occur:

     (a)      any Note Party shall fail to pay (i) any principal of any Note when and as the same shall become due and payable, whether at the due date thereof or, in the case of payments of principal due pursuant to <u>Section 2.04(c)</u> or <u>2.05(b)</u>, at a date fixed for repayment or prepayment thereof, or otherwise; or (ii)(x) any interest or (y) any fee or any other amount (other than an amount referred to in <u>clause (i)</u> of this <u>Section 7.01(a)</u>), in each case, payable under this Agreement

- 62 -

or any other Note Document, when and as the same shall become due and payable where such failure shall continue unremedied for (I) in the case of <u>clause (ii)(x)</u>, a period of three (3) Business Days after the occurrence thereof or (II) in the case of clause (ii)(y), a period of five (5) Business Days after the occurrence thereof.

(b)     any representation or warranty made by or deemed made by any Note Party in this Agreement or any other Note Document, or in any certificate furnished to any Secured Party by or on behalf of such Note Party in accordance with the terms hereof or thereof, shall prove to have been incorrect in any material respect (to the extent not already qualified by materiality) as of the time made or deemed made, confirmed or furnished; unless (i) the fact, event or circumstance resulting in such incorrect representation or warranty is capable of being changed such that such representation or warranty would be correct in all material respects, (ii) such fact, event or circumstance shall have been changed within five (5) days from the earlier of (x) the date an Authorized Representative of any Note Party obtains knowledge thereof and (y) the date notice is given to any Note Party by the Agent or the Required Noteholders, such that such representation or warranty is correct in all material respects by such deadline, and (iii) such fact, event or circumstance (as so changed) would not reasonably be expected to result in a Material Adverse Effect; or

(c)     any Note Party shall fail, or fail to cause any Non-Guarantor Subsidiary, to observe or perform any covenant, condition or agreement contained in (i) <u>Sections 5.01</u>, <u>5.11(b)</u>, <u>Section 1.18(b)</u> of the Additional Covenants or in <u>Article VI</u>, or (ii) this Agreement or any other Note Document to which it is a party (other than those specified in <u>Sections 7.01(a)</u>, <u>(b)</u>, <u>(c)(i)</u>), and such failure shall continue unremedied for a period of thirty (30) days after the earlier of (x) written notice thereof to such Note Party and (y) knowledge of such default by an Authorized Representative of any Note Party; or

(d)     [reserved]; or

(e)     (i) any Issuer Group Member becomes unable or admits in writing its inability or fails generally to pay its debts as they become due, or (ii) any writ or warrant of attachment or execution or similar process is issued or levied against all or any material part of the property of the Note Parties, taken as a whole, and is not released, vacated or fully bonded within sixty (60) days after its issue or levy; or

(f)     any Issuer Group Member institutes or consents to the institution of any proceeding under any Debtor Relief Law, or makes an assignment for the benefit of creditors; or applies for or consents to the appointment of any receiver, trustee, custodian, conservator, liquidator, rehabilitator, administrator, administrative receiver or similar officer for it or for all or any material part of its property; or any receiver, trustee, custodian, conservator, liquidator, rehabilitator, administrator, administrative receiver or similar officer is appointed without the application or consent of such Person and the appointment continues undischarged or unstayed for sixty (60) calendar days; or any proceeding under any Debtor Relief Law relating to any such Person or to all or any material part of its property is instituted without the consent of such Person and continues undismissed or unstayed for sixty (60) calendar days, or an order for relief is entered in any such proceeding; or

(g)      a final non-appealable judgment or order for the payment of money is entered against any Issuer Group Member in an amount exceeding $2,500,000 (exclusive of judgment amounts covered by insurance or bond where the insurer or bonding party has admitted liability in respect of such judgment), and such judgment remains unsatisfied without any procurement of a stay of execution for a period of sixty (60) days or more after the date of entry of judgment; or

(h)      (i) any Security Document (A) is revoked, terminated or otherwise ceases to be in full force and effect (except in connection with its expiration in accordance with its terms in the ordinary course (and not related to any default thereunder)), or the validity or enforceability thereof shall be challenged in writing by any Issuer Group Member or any Issuer Group Member contests in writing the validity or priority of a Lien as required by the Security Documents on a material portion of the Collateral, (B) ceases to provide (to the extent permitted by law and to the extent required by the Note Documents) a first priority perfected Lien on the assets purported to be covered thereby in favor of the Agent (other than any Vehicles), free and clear of all other Liens (other than Permitted Liens), except, in the case of each clauses (A) and (B) above, to the extent that such cessation (x) is expressly permitted under any Note Document or (y) is caused solely and directly by any act or omission by the Agent or the Noteholders, or (C) becomes unlawful or is declared void, (ii) any Note Document (A) is revoked, terminated or otherwise ceases to be in full force and effect (except in connection with its expiration in accordance with its terms in the ordinary course (and not related to any default thereunder) and except to the extent such revocation, termination or cessation (x) is expressly permitted under any Note Document or (y) is caused by any act or omission by the Agent or the Noteholders), or the validity or enforceability thereof shall be challenged in writing by any Issuer Group Member, or (B) becomes unlawful or is declared void, or (iii) any Note Party denies in writing that it has any or further liability or obligations under any Note Document (other than as a result of repayment in full in cash of the Obligations), or purports in writing to revoke or rescind any Note Document; or

(i)      [reserved]; or

(j)      a Change of Control has occurred; or

(k)      (i) an ERISA Event occurs which has resulted or could reasonably be expected to result in liability of an Issuer Group Member in an aggregate amount which could reasonably be expected to result in a Material Adverse Effect, or (ii) an Issuer Group Member or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan and a Material Adverse Effect could reasonably be expected to result.

(l)      [reserved]; or

(m)      [reserved]; or

(n)      [reserved]; or

(o)      [reserved]; or

(p)        any Issuer Group Member shall (i) default in making any payment of any principal, interest or premium of any Indebtedness (excluding the Obligations) the outstanding principal amount of which exceeds at such time $2,500,000 ("Material Indebtedness") on the scheduled or original due date with respect thereto, in each case, beyond any grace periods applicable thereto; or (ii) default in the observance or performance of any other agreement or condition relating to any such Indebtedness (excluding the Obligations) or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist, in each case, beyond any grace periods applicable thereto, the effect of which default or other event or condition is to cause, or to permit the holder or beneficiary of Material Indebtedness (or a trustee or agent on behalf of such holder or beneficiary) to cause, with or without the giving of notice, the lapse of time or both, such Material Indebtedness to become due prior to its stated maturity or to become subject to a mandatory offer to purchase by the obligor thereunder or (in the case of any such Indebtedness constituting a Guarantee) to become payable;

then, and in every such event (other than an event with respect to any Issuer Group Member described in Section 7.01(f)), and at any time thereafter during the continuance of such event, the Required Noteholders (or the Agent at the direction of the Required Noteholders) shall by notice to the Issuer, take any or all of the following actions, at the same or different times: declare the Notes and all other amounts due under the Note Documents then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Notes so declared to be due and payable, together with accrued interest thereon and all reimbursements, fees and other obligations of the Issuer accrued hereunder or under the Note Documents shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Note Parties; and in case of any event with respect to any Issuer Group Member described in Section 7.01(f), the principal of the Notes then outstanding, together with accrued interest thereon and all reimbursements, fees and other obligations of the Issuer accrued hereunder and under the Note Documents, shall automatically become due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Note Parties. Upon the occurrence and during the continuance of any Event of Default, in addition to the exercise of remedies set forth above in this paragraph, each Secured Party shall be, subject to the terms of the Security Agreement, entitled to exercise the rights and remedies available to such Secured Party under and in accordance with the provisions of the other Note Documents to which it is a party or any Applicable Law. For the purpose of enabling the Agent to exercise the rights and remedies under this Section 7.01 (including in order to take possession of, collect, receive, assemble, process, appropriate, remove, realize upon, sell, assign, license out, convey, transfer or grant options to purchase any Collateral) at such time as the Agent shall be lawfully entitled to exercise such rights and remedies, each Note Party hereby grants to the Agent, for the benefit of the Agent and each other Secured Party, a nonexclusive and assignable license (exercisable without payment of royalty or other compensation to such Note Party), subject, in the case of Intellectual Property licenses, to the terms of the applicable license, and subject, in the case of Trademarks, to sufficient rights to quality control and inspection in favor of such Note Party to avoid the risk of invalidation of such Trademarks, to use, practice, license, sublicense, and otherwise exploit any and all Intellectual Property now owned or held or hereafter acquired or held by such Note Party.

Section 7.02    <u>Application of Proceeds</u>. The proceeds of any collection, sale or other realization of all or any part of the Collateral shall be applied in the following order of priority:

(a)    <u>first</u>, to any fees, costs, charges, expenses and indemnities then due and payable to the Agent under any Note Document;

(b)    <u>second</u>, to the respective outstanding fees, costs, charges, expenses and indemnities then due and payable to the other Secured Parties under any Note Document *pro rata* based on such respective amounts then due to such Persons;

(c)    <u>third</u>, to any accrued but unpaid interest on the Obligations owed to the Secured Parties *pro rata* based on such respective amounts then due to the Secured Parties;

(d)    <u>fourth</u>, to any principal amount of the Obligations owed to the Secured Parties *pro rata* based on such respective amounts then due to the Secured Parties;

(e)    <u>fifth</u>, to any other unpaid Obligations then due and payable to Secured Parties *pro rata* based on such respective amounts then due to the Secured Parties; and

(f)    <u>sixth</u>, after final payment in full of the amounts described in clauses *first* through *fifth* above and the payment in full of all of the Obligations (other than contingent obligations as to which no claim exists or has been asserted), to the Issuer or as otherwise required by Applicable Law.

It is understood that the Note Parties shall remain liable to the extent of any deficiency between the amount of the proceeds of the Collateral and the aggregate of the sums referred to in clauses *first* through *fifth* above.

ARTICLE VIII

THE AGENT

Section 8.01    <u>Appointment and Authorization of the Agent</u>.

(a)    Each of the Noteholders hereby irrevocably appoints the Agent to act on its behalf as its agent hereunder and under the other Note Documents and authorizes the Agent in such capacity, to take such actions on its behalf and to exercise such powers as are delegated to it by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto. The Agent, by executing this Agreement, hereby accepts such appointment.

(b)    The Agent is hereby authorized to execute, deliver and perform each of the Note Documents to which the Agent is intended to be a party. The Agent hereby agrees, and each Noteholder hereby authorizes the Agent, to enter into the amendments and other modifications of the Security Documents (subject to <u>Section 10.02(b)</u>).

(c)    The Agent is authorized to enter into any intercreditor agreement permitted under this Agreement (on terms reasonably satisfactory to the Required Noteholders with respect to

Indebtedness permitted hereby that is (i) required or permitted to be subordinated hereunder and/or (ii) secured by Liens permitted hereunder and which Indebtedness contemplates an intercreditor, subordination or collateral trust agreement (any such intercreditor agreement, an "Additional Agreement"), and the parties hereto acknowledge that this Agreement and any Additional Agreement is binding upon them. Each Noteholder (a) hereby consents to the subordination of the Liens on the Collateral securing the Obligations on the terms set forth in any Additional Agreement, to the extent such subordination is contemplated by this Agreement, (b) hereby agrees that it will be bound by and will take no actions contrary to the provisions of any Additional Agreement and (c) hereby authorizes and instructs the Agent to enter into any Additional Agreement and to subject the Liens on the Collateral securing the Obligations to the provisions thereof.

Section 8.02   Rights as a Noteholder. The Agent shall, if applicable, have the same rights and powers in its capacity as a Noteholder as any other Noteholder and may exercise the same as though it were not the Agent, and such Person and its Affiliates may accept deposits from, lend money to and generally engage in any kind of business with the Issuer or any of Subsidiary or other Affiliate thereof as if it were not the Agent hereunder.

Section 8.03   Duties of Agent; Exculpatory Provisions. The Agent shall not have any duties or obligations except those expressly set forth herein and in the other Note Documents. Without limiting the generality of the foregoing, the Agent shall not (a) be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred and is continuing, (b) have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Note Documents that the Agent is required to exercise as directed in writing by the Required Noteholder (or such other number or percentage of the Noteholders as shall be necessary, or as the Agent shall believe in good faith to be necessary, under the circumstances as provided in the Note Documents), as applicable, provided that the Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, could expose the Agent to liability or be contrary to any Note Document or applicable law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any bankruptcy or similar law, and (c) except as expressly set forth herein and in the other Note Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Issuer or any of its Subsidiaries that is communicated to or obtained by the financial institution serving as the Agent or any of its Affiliates in any capacity. The Agent shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Noteholders (or such other number or percentage of the Noteholders as shall be necessary, or as the Agent shall believe in good faith shall be necessary, under the circumstances provided herein) or (ii) in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction in a final, non-appealable decision. The Agent shall not be deemed to have knowledge of any Default or Event of Default unless and until written notice thereof is given to the Agent by the Issuer or a Noteholder, and no Agent shall be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Note Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein, (iv) the validity,

enforceability, effectiveness or genuineness of this Agreement, any other Note Document or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in Article IV or elsewhere herein or therein, other than to confirm receipt of items expressly required to be delivered to the Agent.  The Agent shall not be responsible or have any liability for, or have any duty to ascertain, inquire into, monitor or enforce, compliance with the provisions hereof relating to Disqualified Investors. Without limiting the generality of the foregoing, the Agent shall not (a) be obligated to ascertain, monitor or inquire as to whether any Noteholder or Participant or prospective Lender or Participant is a Disqualified Investor or (b) have any liability with respect to or arising out of any assignment or participation of Notes, or disclosure of confidential information, to any Disqualified Investor.  The Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any recital, statement, warranty or representation made in or in connection with this Agreement or any other Note Document, (ii) the contents of any certificate, report, statement or agreement or other document delivered hereunder or thereunder or in connection herewith or therewith or referred to or provided for in, or received by the Agent under or in connection with this Agreement or any other Note Document, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Note Document or any other agreement, instrument or document, or the creation, perfection or priority of any Lien purported to be created by the Security Documents, (v) the value or the sufficiency of any Collateral, or (vi) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Agent, or to inspect the properties, books or records of any Note Party or any Affiliate thereof.

Section 8.04   Reliance by Agent. The Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing believed by it to be genuine and to have been signed or sent by the proper Person. The Agent also may rely upon any statement made to it orally or by telephone and believed by it to be made by the proper Person, and shall not incur any liability for relying thereon. The Agent may consult with legal counsel (who may be counsel for the Issuer), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.  The Agent shall be fully justified in failing or refusing to take any action that is not required or explicitly approved by the Noteholders under any Note Document unless it shall first receive such advice or concurrence of the Required Noteholders as it deems appropriate and, if it so requests, it shall first be indemnified to its satisfaction by the Noteholders against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action. The Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement or any other Note Document in accordance with a request or consent of the Required Noteholder (or such greater number of Noteholders as may be expressly required hereby in any instance) and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Noteholders; provided that the Agent shall not be required to take any action that, in its opinion or in the opinion of its counsel, may expose the Agent to liability or that is contrary to any Note Document or Applicable Law. The Agent may, without incurring any liability hereunder, rely on the latest version of the Register received by the Agent in accordance with Section 10.04(c) in performing its obligations under the Note Documents.

Section 8.05   <u>Delegation of Duties</u>. The Agent may perform any and all its duties and exercise its rights and powers by or through any one or more sub-agents appointed by the Agent. The Agent and any such sub-agent may perform any and all its duties and exercise its rights and powers through their respective Related Parties. The exculpatory provisions of the preceding paragraphs shall apply to any such sub-agent and to the Related Parties of The Agent and any such sub-agent, and shall apply to their respective activities as well as activities as The Agent. The Agent shall not be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and non-appealable judgment that the Agent acted with gross negligence or willful misconduct in the selection of such sub agents

Section 8.06   [Reserved].

Section 8.07   <u>Resignation of Agent</u>. The Agent may resign at any time upon thirty (30) days' notice by notifying the Noteholders and the Issuer, and the Agent may be removed at any time by the Required Noteholders with the consent of the Issuer (such consent not to be unreasonably withheld or delayed) unless an Event of Default shall have occurred and be continuing (in which case, prior written notice to the Issuer of the proposed appointment shall only be required). Upon any such resignation or removal, the Agent shall have the right, with the consent of the Issuer (such consent not to be unreasonably withheld and such consent not to be required if an Event of Default has occurred and is continuing), to appoint a successor. If no successor shall have been so appointed by the Agent and approved by the Issuer and shall have accepted such appointment within thirty (30) days after the retiring Agent gives notice of its resignation of the retiring Agent or after the  notice of removal is provided to the removed Agent, then the retiring Agent may, on behalf of the Noteholders, appoint a successor Agent, which shall be a Noteholder with an office in New York, New York, an Affiliate of a Noteholder or a financial institution with  an office in New York, New York having a combined capital and surplus that is not less than $250,000,000. If no qualifying Person has accepted appointment as the Agent by the date which is thirty (30) days following the Agent's notice of resignation or removal, the retiring or removed Agent's resignation or removal shall nonetheless become effective in accordance with such notice and (a) the retiring or removed Agent shall be discharged from its duties and obligations hereunder and under the other Note Documents (except that in the case of any collateral security held by the Agent on behalf of the Noteholders under any of the Note Documents, the retiring or removed Agent shall continue to hold such collateral security until such time as a successor of the Agent is appointed) and (b) except for any indemnity payments or other amounts owed to the retiring or retired Agent, all payments, communications and determinations provided to be made by, to or through the Agent shall instead be made by or to each Noteholders directly, until such time as the Required Noteholders appoint a successor Agent as provided for above in this Section. Upon the acceptance of its appointment as Agent hereunder by a successor, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring (or retired) Agent and the retiring Agent shall be discharged from its duties and obligations hereunder (if not already discharged therefrom as provided above in this paragraph). The reimbursements and fees payable by the Issuer to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Issuer and such successor. After the Agent's resignation or removal hereunder, the provisions of this Article and <u>Section 10.03</u>  shall continue in effect for its benefit in respect of any actions taken or omitted to be taken by it while it was acting as Agent.

Section 8.08   Non-Reliance on Agent or Other Noteholders.  Each Noteholder acknowledges that it has, independently and without reliance upon the Agent, the Affiliates of the Agent or any other Noteholder and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Noteholder also acknowledges that it will, independently and without reliance upon the Agent, the Affiliates of the Agent or any other Noteholder and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Note Document or any related agreement or any document furnished hereunder or thereunder.

Section 8.09   No Other Duties; Etc.  The parties agree that neither the Agent nor the Agent shall have any obligations, liability or responsibility under or in connection with this Agreement and the other Note Documents and that none of the Agent shall have any obligations, liabilities or responsibilities except for those expressly set forth herein and in the other Note Documents. The Agent shall have all of the rights (including indemnification rights), powers, benefits, privileges, exculpations, protections and immunities granted to the Agent under the other Note Documents, all of which are incorporated herein *mutatis mutandis*.

Section 8.10   Agent May File Proofs of Claim; Credit Bidding. In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Note Party, the Agent (irrespective of whether the principal of any Note shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Required Noteholders shall have made any demand on the Issuer) shall be entitled and empowered (but not obligated), by intervention in such proceeding or otherwise:

(a)     to file a verified statement pursuant to rule 2019 of the Federal Rules of Bankruptcy Procedure that, in its sole opinion, complies with such rule's disclosure requirements for entities representing more than one creditor;

(b)     to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Notes and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Noteholders and the Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Noteholders or the Agent and their respective agents and counsel and all other amounts due the Noteholders and the Agent) allowed in such judicial proceeding; and

(c)     to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Noteholder to make such payments to the Agent and, in the event that the Agent shall consent to the making of such payments directly to the Noteholders, to pay to the Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Agent and its agents and counsel, and any other amounts due the Agent under this Agreement.

Nothing contained herein shall be deemed to authorize the Agent to authorize or consent to or accept or adopt on behalf of any Noteholder any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Noteholder or to authorize the Agent to vote in respect of the claim of any Noteholder in any such proceeding.

The Secured Parties hereby irrevocably authorize the Agent, at the direction of the Required Noteholders, to credit bid all or any portion of the Obligations (including accepting some or all of the Collateral in satisfaction of some or all of the Secured Obligations pursuant to a deed in lieu of foreclosure or otherwise) and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral (i) at any sale thereof conducted under the provisions of the Bankruptcy Code of the United States, including under Sections 363, 1123 or 1129 of the Bankruptcy Code of the United States, or any similar Laws in any other jurisdictions to which a Note Party is subject, (ii) at any other sale or foreclosure or acceptance of collateral in lieu of debt conducted by (or with the consent or at the direction of) the Agent (whether by judicial action or otherwise) in accordance with any applicable law. In connection with any such credit bid and purchase, the Obligations owed to the Secured Parties shall be entitled to be, and shall be, credit bid on a ratable basis (with Obligations with respect to contingent or unliquidated claims receiving contingent interests in the acquired assets on a ratable basis that would vest upon the liquidation of such claims in an amount proportional to the liquidated portion of the contingent claim amount used in allocating the contingent interests) in the asset or assets so purchased (or in the Capital Stock or debt instruments of the acquisition vehicle or vehicles that are used to consummate such purchase). In connection with any such bid (A) the Agent (or any designee thereof) shall be authorized to form one or more acquisition vehicles to make a bid, (B) the Agent (or any designee thereof) shall be authorized to adopt documents providing for the governance of the acquisition vehicle or vehicles (provided that any actions by the Agent (or designee thereof) with respect to such acquisition vehicle or vehicles, including any disposition of the assets or Capital Stock thereof shall be governed, directly or indirectly, by the vote of the Required Noteholders, irrespective of the termination of this Agreement and without giving effect to the limitations on actions by the Required Noteholders contained in <u>Section 10.02</u> of this Agreement), (C) the Agent shall be authorized to assign the relevant Obligations to any such acquisition vehicle pro rata by the Noteholders, as a result of which each of the Noteholders shall be deemed to have received a pro rata portion of any Capital Stock and/or debt instruments issued by such an acquisition vehicle on account of the assignment of the Obligations to be credit bid, all without the need for any Secured Party or acquisition vehicle to take any further action and (D) to the extent that Obligations that are assigned to an acquisition vehicle are not used to acquire Collateral for any reason (as a result of another bid being higher or better, because the amount of Obligations assigned to the acquisition vehicle exceeds the amount of debt credit bid by the acquisition vehicle or otherwise), such Obligations shall automatically be reassigned to the Noteholders pro rata and the Capital Stock and/or debt instruments issued by any acquisition vehicle on account of the Obligations that had been assigned to the acquisition vehicle shall automatically be cancelled, without the need for any Secured Party or any acquisition vehicle to take any further action.

Section 8.11   <u>Collateral and Guaranty Matters</u>.

(a)     Each of the Noteholders irrevocably authorizes the Agent to be the agent for and representative of the Noteholders with respect to the guaranty of the Obligations of the Guarantors contained herein, the Collateral and the Security Documents; provided that the Agent shall not owe any fiduciary duty, duty of loyalty, duty of care, duty of disclosure or any other obligation whatsoever to any holder of Obligations.

(b)     The Agent, each Noteholder and each other Secured Party agrees that:

(i)     Liens on any property granted to or held by the Agent or in favor of any Secured Party under any Note Document will be automatically released and directs the Agent to enter into the necessary or advisable documents associated therewith,

(A)     upon payment in full in cash of all Obligations (other than contingent indemnification obligations for which claims has been made);

(B)     at the time the property subject to such Lien is transferred (or to be transferred) as part of, or in connection with, any transfer permitted under the Note Documents to any Person that is not a Note Party pursuant to a transaction permitted under this Agreement; and

(D)     subject to Section 10.02 (in respect of releases of all or substantially all of the Collateral), if the release of such Lien is approved, authorized or ratified in writing by the Required Noteholders;

(ii)     it will release or subordinate any Lien on any property granted to or held by the Agent under any Note Document to the holder of any Lien on such property that is permitted by Section 6.03(e).

The Agent, each Noteholder and each other Secured Party agrees that it will take such action and execute any such documents as may be reasonably requested by the Issuer, at the Issuer's sole cost and expense, in connection with any of the foregoing releases or any such subordination. The Agent shall be entitled to (and the Noteholders and other Secured Parties hereby authorize and direct the Agent to) rely exclusively and conclusively on an officer's certificate of the Issuer certifying that the applicable transaction giving rise to such release or subordination is permitted under Note Documents in performing its obligations under this Section 8.11. Each Noteholder and each Secured Party irrevocably authorizes the Agent to take such action and execute any such document and consents to such reliance. The Agent shall not be responsible for or have a duty to ascertain or inquire into any representation or warranty regarding the existence, value or collectability of the Collateral, the existence, priority or perfection of the Agent's Lien thereon, or contained in any certificate prepared or delivered by the Issuer or any Note Party in connection with the Collateral or compliance with the terms set forth above or in a Note Document, nor shall the Agent be responsible or liable to the Noteholders for any failure to monitor or maintain any portion of the Collateral.

(c)     Anything contained in any of the Note Documents to the contrary notwithstanding, the Agent and each Noteholder hereby agree that:

(i)     no Noteholder shall have any right individually to realize upon any of the Collateral or to enforce the Guaranty or any other Note Document, it being understood and agreed that all powers, rights and remedies hereunder and under any of the Note Documents may be exercised solely by the Agent for the benefit of the Noteholders in accordance with the terms hereof and thereof, and all powers, rights and remedies under the Collateral Documents may be exercised solely by the Agent for the benefit of the Noteholders in accordance with the terms thereof; and

(ii)     in the event of a foreclosure or similar enforcement action by the Agent on any of the Collateral pursuant to a public or private sale or other disposition (including, without limitation, pursuant to Section 363(k), Section 1129(b)(2)(a)(ii) or otherwise of the U.S. Bankruptcy Code), the Agent (or any Noteholder, except with respect to a "credit bid" pursuant to Section 363(k), Section 1129(b)(2)(a)(ii) or otherwise of the U.S. Bankruptcy Code) may be the Noteholder or licensor of any or all of such Collateral at any such sale or other disposition, and the Agent, as agent for and representative of Noteholders (but not any Noteholder or Noteholders in its or their respective individual capacities), shall be entitled, upon instructions from the Required Noteholders, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such sale or disposition, to use and apply any of the Obligations as a credit on account of the purchase price for any collateral payable by the Agent at such sale or other disposition.

Section 8.12    <u>Withholding Taxes</u>. To the extent required by any applicable law, the Agent may withhold from any payment to any Noteholder an amount equivalent to any applicable withholding Tax.  If the IRS or any other Governmental Authority asserts a claim that the Agent did not properly withhold Tax from amounts paid to or for the account of any Noteholder because the appropriate form was not delivered or was not properly executed or because such Noteholder failed to notify the Agent of a change in circumstance which rendered the exemption from, or reduction of, withholding Tax ineffective or for any other reason, or if the Agent reasonably determines that a payment was made to a Noteholder pursuant to this Agreement without deduction of applicable withholding Tax from such payment, such Noteholder shall indemnify the Agent fully, within 10 days after written demand therefor, for all amounts paid, directly or indirectly, by the Agent as Tax or otherwise, including any penalties or interest and together with all expenses (including legal expenses, allocated internal costs and out-of-pocket expenses) incurred.  A certificate as to the amount of such payment or liability delivered to any Noteholder by the Agent shall be conclusive absent manifest error.  Each Noteholder hereby authorizes the Agent to set off and apply any amounts at any time owing to such Noteholder under this Agreement or any other Note Document against any amounts due the Agent under this <u>Section 8.12</u>.  The agreements in this <u>Section 8.12</u> shall survive the resignation and/or replacement of the Agent, any assignment of rights by, or the replacement of, a Noteholder, the termination of the Commitments and the repayment, satisfaction or discharge of all other Obligations.

ARTICLE IX

GUARANTY

Section 9.01    <u>Guaranty</u>.

(a)    For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Guarantor hereby unconditionally and irrevocably, jointly and severally, Guarantees the full and punctual payment and performance (whether at stated maturity, upon acceleration or otherwise) of all Guaranteed Obligations, in each case as primary obligor and not merely as surety and with respect to all such Guaranteed Obligations howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, now or hereafter existing, or due or to become due. This is a guaranty of payment and not merely of collection.

(b)    All payments made by any Guarantor under this <u>Article IX</u> shall be payable in the manner required for payments by the Issuer hereunder, including: (i) the obligation to make all such payments in Dollars, free and clear of, and without deduction for, any Taxes, and subject to the gross-up and indemnity as provided under <u>Section 2.09</u>, (ii) the obligation to pay interest at the Post-Default Rate and (iii) the obligation to pay all amounts due under the Notes in Dollars.

(c)    Any term or provision of this guaranty to the contrary notwithstanding the aggregate maximum amount of the Guaranteed Obligations for which such Guarantor shall be liable under this guaranty shall not exceed the maximum amount for which such Guarantor can be liable without rendering this guaranty or any other Note Document, as it relates to such Guarantor, void or voidable under Applicable Law relating to fraudulent conveyance or fraudulent transfer.

Section 9.02    <u>Guaranty Unconditional</u>.  The Guaranteed Obligations shall be unconditional and absolute and, without limiting the generality of the foregoing, shall not be released, discharged or otherwise affected by:

(a)    any extension, renewal, settlement, compromise, waiver or release in respect of any obligations of any Note Party under the Note Documents, by operation of law or otherwise (other than with respect to any such extension, renewal, settlement, compromise, waiver or release agreed in accordance with the terms hereunder as expressly applying to the Guaranteed Obligations),

(b)    any modification or amendment of or supplement to this Agreement or any other Note Document (other than with respect to any modification, amendment or supplement agreed in accordance with the terms hereunder as expressly applying to the Guaranteed Obligations),

(c)    any release, impairment, non-perfection or invalidity of any Collateral,

(d)    any change in the corporate existence, structure or ownership of any Note Party or any other Person, or any event of the type described in <u>Sections 5.01</u> or <u>6.07</u> with respect to any Person,

(e)　　the existence of any claim, set-off or other rights that any Guarantor may have at any time against any Note Party, any Secured Party or any other Person, whether in connection herewith or with any unrelated transactions,

(f)　　any invalidity or unenforceability relating to or against any Note Party for any reason of any Note Document, or any provision of Applicable Law purporting to prohibit the performance by any Note Party of any of its obligations under the Note Documents (other than any such invalidity or unenforceability with respect solely to the Guaranteed Obligations),

(g)　　any change in the time, manner or place of payment of, or in any other term of, all or any of the Obligations, or

(h)　　any other act or omission to act or delay of any kind by any Note Party, any Secured Party or any other Person or any other circumstance whatsoever that might, but for the provisions of this Section 9.02, constitute a defense available to, or legal or equitable discharge of the obligations of, any Note Party under the Note Documents.

Section 9.03　　Discharge Only Upon Payment in Full; Reinstatement in Certain Circumstances. The Guaranteed Obligations shall remain in full force and effect until all of the Issuer's obligations under the Note Documents shall have been paid or otherwise performed in full. If at any time any payment made under this Agreement or any other Note Document is rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy, reorganization or similar event of any Note Party or any other Person or otherwise, then the Guaranteed Obligations with respect to such payment shall be reinstated at such time as though such payment had been due but not made at such time.

Section 9.04　　Waiver by the Guarantors.

(a)　　Each Guarantor hereby irrevocably and unconditionally waives, to the fullest extent permitted by Applicable Law: (i) notice of acceptance of the guaranty provided in this Article IX and notice of any liability to which this guaranty may apply, (ii) all notices that may be required by Applicable Law or otherwise to preserve intact any rights of any Secured Party against any Note Party, including any demand, presentment, protest, proof of notice of non-payment, notice of any failure on the part of any Note Party to perform and comply with any covenant, agreement, term, condition or provision of any agreement and any other notice to any other party that may be liable in respect of the Guaranteed Obligations (including any Note Party) except any of the foregoing as may be expressly required hereunder, (iii) any right to the enforcement, assertion or exercise by any Secured Party of any right, power, privilege or remedy conferred upon such Person under the Note Documents or otherwise and (iv) any requirement that any Secured Party exhaust any right, power, privilege or remedy, or mitigate any damages resulting from any Default or Event of Default under any Note Document, or proceed to take any action against any Collateral or against any Note Party or any other Person under or in respect of any Note Document or otherwise, or protect, secure, perfect or ensure any Lien on any Collateral.

(b)　　Each Guarantor agrees and acknowledges that the each Noteholder and each holder of any Guaranteed Obligations may demand payment of, enforce and recover from any Guarantor or any other Person obligated for any or all of such Guaranteed Obligations in any order and in

any manner whatsoever, without any requirement that such Noteholder or such holder seek to recover from any particular Guarantor or other Person first or from any Guarantors or other Persons *pro rata* or on any other basis.

Section 9.05  <u>Subrogation</u>.  Upon any Guarantor making any payment under this <u>Article IX</u>, such Guarantor shall be subrogated to the rights of the payee against the Issuer with respect to such obligation; <u>provided</u> that no Guarantor shall enforce any payment by way of subrogation, indemnity, contribution or otherwise, or exercise any other right, against any Note Party (or otherwise benefit from any payment or other transfer arising from any such right) so long as any obligations under the Note Documents (other than on-going but not yet incurred indemnity obligations) remain unpaid and/or unsatisfied.

Section 9.06  <u>Acceleration</u>.  All amounts then subject to acceleration under <u>Section 7.01</u> of this Agreement shall be payable by the Guarantors hereunder immediately upon demand by the Agent.

Section 9.07  <u>Subordination</u>.  Each Guarantor hereby agrees that all Indebtedness owed by it to any Subsidiary shall be fully subordinated to the indefeasible payment in full in cash of the Obligations.

Section 9.08  <u>Contribution with Respect to Guaranty Obligations</u>.

(a)    To the extent that any Note Party shall make a payment under this <u>Article IX </u>of all or any of the Obligations (a "<u>Guarantor Payment</u>") which, taking into account all other Guarantor Payments then previously or concurrently made by any other Note Party, exceeds the amount which such Note Party would otherwise have paid if each Note Party had paid the aggregate Obligations satisfied by such Guarantor Payment in the same proportion that such Note Party's "<u>Allocable Amount</u>" (as defined below) (as determined immediately prior to such Guarantor Payment) bore to the aggregate Allocable Amounts of each of the Note Parties as determined immediately prior to the making of such Guarantor Payment, <u>then</u>, following the occurrence of the payment in full in cash of all Obligations, such Note Party shall be entitled to receive contribution and indemnification payments from, and be reimbursed by, each other Note Party for the amount of such excess, <u>pro rata</u> based upon their respective Allocable Amounts in effect immediately prior to such Guarantor Payment.

(b)    As of any date of determination, the "<u>Allocable Amount</u>" of any Note Parties shall be equal to the maximum amount of the claim which could then be recovered from such Note Parties under this <u>Article IX</u> without rendering such claim voidable or avoidable under Section 548 of Chapter 11 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law.

(c)    This <u>Section 9.08</u> is intended only to define the relative rights of Notes Parties and nothing set forth in this <u>Section 9.08</u> is intended to or shall impair the obligations of Note Parties, jointly and severally, to pay any amounts as and when the same shall become due and payable in accordance with the terms of this Agreement.  Nothing contained in this <u>Section 9.08</u> shall limit the liability of any Note Party to pay the Loans made directly or indirectly to that Note Party and accrued interest, fees and expenses with respect thereto for which such Note Party shall be primarily liable.

(d)     The parties hereto acknowledge that the rights of contribution and indemnification hereunder shall constitute assets of the Note Party to which such contribution and indemnification is owing.

(e)     The rights of the indemnifying Note Parties against other Note Parties under this Section 9.08 shall be exercisable upon and after the payment in full in cash of all Obligations.

ARTICLE X

MISCELLANEOUS

Section 10.01 Notices.  Except  as otherwise expressly provided herein or in any Note Document, all notices and other communications provided for hereunder or thereunder shall be (i) in writing and (ii) sent by overnight courier (if for inland delivery) or international courier (if for overseas delivery); provided, that such notice or communication may be sent by email so long as (x) such email or electronic transmission is promptly followed by a communication or notice in sent in accordance with (i) and (ii) above, (y) any Note Party is delivering documents and information required to be provided under Article IV, Article V or Article VI, or (z) the express terms of any Note Document permit electronic transmissions, in each case, to a party hereto at its address and contact number specified below, or at such other address and contact number as is designated by such party in a written notice to the other parties hereto:

(a)     Issuer or Guarantors:

[_____]
[_____]
[_____]
Attention:      [_____]
Email:          [_____]


With a copy to:

[_____]
[_____]
[_____]
Attention:      [_____]
Email:          [_____]


(b)     Agent:

[_____]
[_____]
[_____]
Attention:      [_____]

Email:          [_____]

(c)     If to a Noteholder, to it at its address (mail or email) set forth on its signature page hereto.

All notices and communications shall be effective when received by the addressee thereof during business hours on a Business Day in such Person's location as indicated by such Person's address in paragraphs (a) to (c) above, or at such other address as is designated by such Person in a written notice to the other parties hereto.

Section 10.02 Waivers; Amendments.

(a)     No Deemed Waivers; Remedies Cumulative. No failure or delay on the part of the Agent or any Noteholder in exercising any right, power or privilege hereunder or under any other Note Document and no course of dealing between any Note Party, or any of the Issuer's Affiliates, on the one hand, and the Agent or Noteholder on the other hand, shall impair any such right, power or privilege or operate as a waiver thereof; nor shall any single or partial exercise of any right, power or privilege hereunder or under any other Note Document preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder or thereunder. The rights, powers and remedies herein or in any other Note Document expressly provided are cumulative and not exclusive of any rights, powers or remedies which any party thereto would otherwise have. No notice to or demand on the Issuer in any case shall entitle the Issuer to any other or further notice or demand in similar or other circumstances or constitute a waiver of the rights of the Agent or any Noteholder to any other or further action in any circumstances without notice or demand.

(b)     Amendments. No amendment or waiver of any provision of this Agreement or any other Note Document (other than any Security Document, each of which may only be waived, amended or modified in accordance with such Security Document), and no consent to any departure by the Issuer shall be effective unless in writing signed by Required Noteholders and the Issuer; provided that (x) no such amendment, waiver or consent shall (i) increase the Commitment of any Noteholder, change any ratable sharing or payment provision or modify Section 7.02 (it being understood that a waiver of any condition precedent set forth in Section 4.01 or the waiver of any Default, Event of Default or mandatory prepayment or redemption hereunder shall not constitute an extension or increase of any Commitment of any Noteholder), (ii) reduce the principal amount of any Note (it being understood that a waiver of any Default, Event of Default or mandatory prepayment or redemption hereunder shall not constitute a reduction or forgiveness of principal) or reduce the rate of interest thereon, or reduce any fees payable hereunder; provided that only the consent of the Required Noteholders shall be necessary to waive any obligation of the Noteholder to pay interest at the Post-Default Rate pursuant to Section 2.07(b), (iii) postpone the maturity of any Note, or the date of any scheduled amortization payment of the principal amount of any Note under Section 2.04(c), or any date for the payment of any interest or fees payable hereunder (it being understood that a waiver of any Default, Event of Default or mandatory prepayment or redemption hereunder shall not constitute an extension of any maturity date, any scheduled amortization payment or the date for payment of any interest or fees), (iv) change any

of the provisions of this Section 10.02(b) or any provision in any other Note Document which sets forth the rights of the parties thereunder to waive, amend or modify any of the parties' rights thereunder, (v) change the definition of "Required Noteholders", (vi) release all or substantially all the Collateral from the Liens of the Security Documents, or (vii) permit any Subsidiary of the Issuer to become a Non-Guarantor Subsidiary to the extent such designation or permission would disproportionately and adversely affect any Noteholder as compared to the other Noteholders, in each case of the foregoing clauses (i) through (vii), without the prior written consent of each Noteholder directly and adversely affected thereby; provided further that (A) no amendment, waiver or consent shall, (i) change the definition of "Change of Control" (or the waiver of any Change of Control), or (ii) amend, waive or modify any provision of Section 6.06, in each case of foregoing clauses (i) and (ii), without the prior written consent of the Super-Majority Noteholders, (B) no amendment, waiver or consent shall, without the written consent of the Agent, affect the rights or duties of the Agent under this Agreement or any other Note Document and (C) any separate reimbursement or fee agreement between the Issuer and the Agent in its capacity as such (including without limitation the Agent Fee Letter as such may be amended or modified by such parties. Notwithstanding anything herein to the contrary, (x) the Note Parties and the Agent may (but shall not be obligated to) amend or supplement any Security Document without the consent of the Noteholders to cure any ambiguity, defect or inconsistency which is not material, or to make any change that would provide any additional rights or benefits to the Noteholders and (y) any Note Party may amend, modify or supplement any annexes or schedules to the Security Documents as expressly provided therein (without the consent of the Agent, Noteholder or other secured party).

Section 10.03 Expenses; Indemnity; Etc.

(a)    Costs and Expenses. The Issuer agrees to pay or reimburse each of the Agent and the Noteholders for: (i) all reasonable and documented out-of-pocket costs and expenses of the Agent and the Noteholders (including the reasonable fees and expenses of, (w) a single firm of New York counsel to the Agent, (x) a single firm of New York counsel to various funds and Affiliates of Orion Energy Partners and (y) a single firm of New York counsel to the other Noteholders and (z) experts engaged by the Agent and/or the Noteholders from time to time) in connection with any amendment, modification or waiver of any of the terms of this Agreement or any other Note Documents, (ii) all reasonable and documented out-of-pocket costs and expenses of the Noteholders (including payment of the fees and reimbursements provided for herein) and the Agent (including reasonable and documented outside counsels' fees and expenses and reasonable and documented outside experts' fees and expenses) in connection with (A) any Default or Event of Default and any enforcement or collection proceedings resulting from such Default or Event of Default or in connection with the negotiation of any restructuring or "work-out" (whether or not consummated) of the obligations of the Issuer under this Agreement and (B) the enforcement of this Section 10.03 or the preservation of their respective rights (provided that such counsel fees Noteholders shall limited to one counsel for all Noteholders) and (iii) all costs, expenses, Taxes, assessments and other charges incurred in connection with any filing, registration, recording or perfection of any security interest contemplated by any Security Document or any other document referred to therein.

(b)    <u>Indemnification by the Issuer</u>. Each Note Party agrees to indemnify and hold harmless each of the Noteholders and the Agent and each of their respective Related Parties (each, an "<u>Indemnified Party</u>") from and against any and all losses, claims, damages, liabilities obligations, penalties, demands, actions, judgments, suits, costs, expenses and disbursements, joint or several, to which such Indemnified Party may become subject related to or arising out of any transaction contemplated by the Note Documents or the execution, delivery and performance of the Note Documents or any other document in any way relating to the Note Documents and the transactions contemplated by the Note Documents (including, for avoidance of doubt, any liabilities arising under or in connection with Environmental Law) and will reimburse any Indemnified Party for all expenses (including reasonable and documented outside counsel fees and expenses) as they are incurred in connection therewith. No Note Party shall be liable under the foregoing indemnification provision to an Indemnified Party to the extent that any l losses, claims, damages, liabilities obligations, penalties, demands, actions, judgments, suits, costs, expenses and disbursements is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct. Each Note Party also agrees that no Indemnified Party shall have any liability (whether direct or indirect, in contract or tort or otherwise) to it, or any of its security holders or creditors related to or arising out of the execution, delivery and performance of any Note Document or any other document in any way relating to the Note Documents or the other transactions contemplated by the Note Documents, except to the extent that any loss, claim, damage or liability is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct as determined by a court of competent jurisdiction. To the extent permitted by Applicable Law, no party hereto shall assert and each party hereto hereby waives, any claim against any Indemnified Party or any other party hereto, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any Note Document or any agreement or instrument contemplated hereby, any Note or the use of the proceeds thereof. Paragraph (b) of this Section shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

(c)    <u>Indemnification by Noteholders</u>. To the extent that the Issuer fails to pay any amount required to be paid to the Agent or its Related Parties under <u>Section 10.03(a)</u> or <u>(b)</u>, each Noteholder severally agrees to pay ratably in accordance with the aggregate principal amount of the Notes held by the Noteholder to the Agent, affiliate or agent such unpaid amount; <u>provided</u> that the unreimbursed expense or indemnified losses, claims, damages, liabilities obligations, penalties, demands, actions, judgments, suits, costs, expenses and disbursements, as the case may be, was incurred by or asserted against the Agent, affiliate or agent in its capacity as such.

(d)    <u>Settlements; Appearances in Actions</u>. The Issuer agrees that, without each Indemnified Party's prior written consent, it will not settle, compromise or consent to the entry of any judgment in any pending or threatened claim, action or proceeding in respect of which indemnification could be sought by or on behalf of such Indemnified Party under this Section (whether or not any Indemnified Party is an actual or potential party to such claim, action or proceeding), unless such settlement, compromise or consent includes an unconditional release of such Indemnified Party from all liability arising out of such claim, action or proceeding. In the event that an Indemnified Party is requested or required to appear as a witness in any action brought

by or on behalf of or against the Issuer or any Affiliate thereof in which such Indemnified Party is not named as a defendant, the Issuer agrees to reimburse such Indemnified Party for all reasonable expenses incurred by it in connection with such Indemnified Party's appearing and preparing to appear as such a witness, including the reasonable and documented fees and disbursements of its legal counsel. In the case of any claim brought against an Indemnified Party for which the Issuer may be responsible under this Section 10.03, the Agent agrees (at the expense of the Issuer) to execute such instruments and documents and cooperate as reasonably requested by the Issuer in connection with the Issuer's defense, settlement or compromise of such claim, action or proceeding.

Section 10.04 Successors and Assigns.

(a)    Assignments Generally. The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) the Note Parties may not assign or otherwise transfer any of their rights or obligations hereunder without the prior written consent of the Agent and the Noteholders (and any attempted assignment or transfer by such Note Party without such consent shall be null and void) and (ii) no Noteholder may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section 10.04. Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants (to the extent provided in paragraph (f) of this Section) and, to the extent expressly contemplated hereby, the Indemnified Parties referred to in Section 10.03(b) and the Related Parties of each of the Agent and the Noteholders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    Assignments by Noteholders. Any Noteholder may assign to one or more Persons all or a portion of its rights and obligations under this Agreement (including all or a portion of its Note at the time owing to it); provided that:

(i)    except in the case of an assignment to a Noteholder or an Affiliate or Related Fund of a Noteholder, the amount of the Notes of the assigning Noteholder subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Issuer) shall not be less than $500,000 (or such lesser amount as shall be the then outstanding principal balance thereof) unless the Issuer otherwise consents;

(ii)    no consent shall be required for any such assignment, except (i) to the extent required under clause (b)(i) above and (ii) the consent of the Issuer shall be required for any assignment to any Disqualified Investor;

(iii)    each partial assignment shall be made as an assignment of a proportionate part of all the assigning Noteholder's rights and obligations under this Agreement; and

(iv)    except in the case of an assignment to an Affiliate, the parties to each assignment shall execute and deliver to the Issuer an Assignment and Assumption.

Upon acceptance and recording pursuant to paragraph (d) of this Section, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be

a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Noteholder under this Agreement, and the assigning Noteholder thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Noteholder's rights and obligations under this Agreement, such Noteholder shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.09, 2.10 and 10.03). Any assignment or transfer by a Noteholder of rights or obligations under this Agreement that does not comply with this paragraph shall be treated for purposes of this Agreement as a sale by such Noteholder of a participation in such rights and obligations in accordance with paragraph (f) of this Section.

(c)        Maintenance of Register by the Issuer. The Issuer shall maintain at one of its offices in the United States a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Noteholders, and the Commitments of, and principal amounts (and stated interest) of the Notes owing to each Noteholder pursuant to the terms hereof from time to time and the amount of any accrued interest owing from time to time (the "Register"). The entries in the Register shall be conclusive absent manifest error, and the Issuer, the Agent and the Noteholders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Noteholder hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Agent and any Noteholder, at any reasonable time and from time to time upon reasonable prior notice.

(d)        Effectiveness of Assignments. Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Noteholder and an assignee, the Issuer shall accept such Assignment and Assumption and record the information contained therein in the Register. No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

(e)        Limitations on Rights of Assignees. An assignee Noteholder shall not be entitled to receive any greater payment under Sections 2.09 or 2.10 than the assigning Noteholder would have been entitled to receive with respect to the interest assigned to such assignee (based on the circumstances existing at the time of the assignment), unless the Issuer's prior written consent has been obtained therefor.

(f)        Participations. Any Noteholder may, without the consent of the Issuer or the Agent, sell participations to one or more banks or other entities (a "Participant") in all or a portion of such Noteholder's rights and obligations under this Agreement and the other Note Documents (including all or a portion of the Notes owing to it); provided that (i) such Noteholder's obligations under this Agreement and the other Note Documents shall remain unchanged, (ii) such Noteholder shall remain solely responsible to the other parties hereto for the performance of such obligations, (iii) the Note Parties, the Agent and the other Noteholders shall continue to deal solely and directly with such Noteholder in connection with such Noteholder's rights and obligations under this Agreement and the other Note Documents. Any agreement or instrument pursuant to which a Noteholder sells such a participation shall provide that such Noteholder shall retain the sole right to enforce this Agreement and the other Note Documents and to approve any amendment, modification or waiver of any provision of this Agreement or any other Note Document; provided

that, such agreement or instrument may provide that such Noteholder will not, without the consent of the Participant, agree to any amendment, modification or waiver described in the first proviso to Section 10.02(b) that affects such Participant. Subject to paragraph (g) of this Section, the Issuer agrees that each Participant shall be entitled to the benefits of Sections 2.09 and 2.10 (subject to the requirements and limitations therein, including the requirements under Section 2.09(e) (it being understood that the documentation required under Section 2.09(e) shall be delivered to the participating Noteholder)) to the same extent as if it were a Noteholder and had acquired its interest by assignment pursuant to paragraph (b) of this Section. Each Noteholder that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Issuer, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Notes or other obligations under the Note Documents held by it (the "Participant Register"); provided that no Noteholder shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any Commitments, Note or its other obligations under any Note Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan or other obligation is in registered form under Section 5f.103-1(c) of the regulations promulgated under the Code by the U.S. Department of the Treasury. The entries in the Participant Register shall be conclusive absent manifest error, and such Noteholder shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Agent (in its capacity as Agent) shall have no responsibility for maintaining a Participant Register.

(g)     Limitations on Rights of Participants. A Participant shall not be entitled to receive any greater payment under Sections 2.09 or 2.10 than the applicable Noteholder would have been entitled to receive with respect to the participation sold to such Participant. A Participant shall not be entitled to the benefits of Section 2.09 unless the Participant agrees, for the benefit of the Issuer, to comply with Section 2.09(e) as though it were a Noteholder (it being understood that the documentation required under Section 2.09(e) shall be delivered to the participating Noteholder).

(h)     Certain Pledges.

(i)     Any Noteholder may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Noteholder, including any such pledge or assignment to a Federal Reserve Bank, the European Central Bank or any other central bank or similar monetary authority in the jurisdiction of such Noteholder, and this Section shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release a Noteholder from any of its obligations hereunder or substitute any such pledgee or assignee for such Noteholder as a party hereto; and provided further that any payment in respect of such pledge or assignment made by any Note Party to or for the account of the pledging or assigning Noteholder in accordance with the terms of this Agreement shall satisfy such Note Party's obligations hereunder in respect of such pledged or assigned Note to the extent of such payment.

(ii)     Notwithstanding any other provision of this Agreement, any Noteholder may, without informing, consulting with or obtaining the consent of any other Party to the Note

Documents and without formality under any Note Document, assign by way of security, mortgage, charge or otherwise create security by any means over, its rights under any Note Document to secure the obligations of that Noteholder to any Person that would be a permitted assignee (without the consent of the Issuer or the Agent) pursuant to <u>Section 10.04(b)</u> including (A) to the benefit of any of its Affiliates and/or (B) within the framework of its, or its Affiliates, direct or indirect funding operations.

(i)    <u>No Assignments to the Issuer or Affiliates</u>. Anything in this Section to the contrary notwithstanding, no Noteholder may assign or participate any interest in any Note held by it hereunder to any Note Party or any Affiliate of the Issuer without the prior written consent of each other Noteholder.

Section 10.05 <u>Survival</u>.All covenants, agreements, representations and warranties made by the Note Parties herein and in the certificates or other instruments delivered in connection with or pursuant to this Agreement shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement and the issuance of any Note, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Agent or any Noteholder may have had notice or knowledge of any Default or Event of Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Note or any reimbursement, fee or any other amount payable under this Agreement (other than any contingent indemnification or reimbursement amount not then due and payable) is outstanding and unpaid. The provisions of <u>Sections 2.09</u>, <u>2.10</u>, <u>10.03</u>, <u>10.12</u>, <u>10.13</u> and <u>Article VIII</u> shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the payment in full of the Obligations, the expiration or termination of the Commitments or the termination of this Agreement or any provision hereof.

Section 10.06 <u>Counterparts; Integration; Effectiveness</u>.    This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement and the other Note Documents to which a Note Party is party constitute the entire contract between and among the parties relating to the subject matter hereof and thereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Delivery of an executed counterpart of a signature page to this Agreement by electronic transmission shall be effective as delivery of a manually executed counterpart of this Agreement.  The words "execution," "execute", "signed," "signature," and words of like import in or related to any document to be signed in connection with this Agreement and the transactions contemplated hereby (including without limitation Assignment and Assumptions, amendments, waivers and consents) shall be deemed to include electronic signatures, the electronic matching of assignment terms and contract formations on electronic platforms approved by the Agent, or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

Section 10.07 <u>Severability</u>.    Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

Section 10.08 <u>Right of Setoff</u>. If an Event of Default shall have occurred and be continuing, each Noteholder and any of its Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held, and any other indebtedness at any time owing, by such Noteholder or any such Affiliate to or for the credit or the account of the Issuer against any of and all the obligations of the Issuer now or hereafter existing under this Agreement held by such Noteholder, irrespective of whether or not such Noteholder shall have made any demand under this Agreement and although such obligations may be unmatured or denominated in a currency other than Dollars. The rights of each Noteholder or any such Affiliate under this Section are in addition to other rights and remedies (including other rights of setoff) which such Noteholder may have.

Section 10.09 <u>Governing Law; Jurisdiction; Etc.</u>

(a)    <u>Governing Law</u>. This Agreement shall be construed in accordance with and governed by the law of the State of New York.

(b)    <u>Submission to Jurisdiction</u>. Any legal action or proceeding with respect to this Agreement or any other Note Document to which a Note Party is a party shall, except as provided in clause (d) below, be brought in the courts of the State of New York, or of the United States District Court for the Southern District of New York, in each case, seated in the County of New York and, by execution and delivery of this Agreement, each party hereto hereby irrevocably accepts for itself and in respect of its property, generally and unconditionally, the exclusive jurisdiction of the aforesaid courts. Each party hereto agrees that a judgment, after exhaustion of all available appeals, in any such action or proceeding shall be conclusive and binding upon it, and may be enforced in any other jurisdiction, including by a suit upon such judgment, a certified copy of which shall be conclusive evidence of the judgment.

(c)    <u>Waiver of Venue</u>. Each party hereto hereby irrevocably waives any objection that it may now have or hereafter have to the laying of the venue of any suit, action or proceeding arising out of or relating to this Agreement or any other Note Document to which it is a party brought in the Supreme Court of the State of New York or in the United States District Court for the Southern District of New York, in each case, seated in the County of New York and hereby further irrevocably waives any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

(d)    <u>Rights of the Secured Parties</u>. Nothing in this <u>Section 10.09</u> shall limit the right of the Secured Parties to refer any claim against a Note Party to any court of competent jurisdiction anywhere else outside of the State of New York, nor shall the taking of proceedings by any Secured

- 85 -

Party before the courts in one or more jurisdictions preclude the taking of proceedings in any other jurisdiction whether concurrently or not.

(e)      WAIVER OF JURY TRIAL. EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING UNDER ANY FINANCING DOCUMENT OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO ANY NOTE DOCUMENT, OR THE TRANSACTIONS RELATED THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER FOUNDED IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE SIGNATORIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

(f)      Service of Process. Each party hereto irrevocably consents to the service of process in the manner provided for notices in Section 10.01.

(g)      Waiver of Immunity. To the extent that a Note Party has or hereafter may acquire any immunity from jurisdiction of any court or from any legal process (whether through service of notice, attachment prior to judgment, attachment in aid of execution, execution, sovereign immunity or otherwise) with respect to itself or its property, it hereby irrevocably waives such immunity, to the fullest extent permitted by law, in respect of its obligations under this Agreement and the other Note Documents.

Section 10.10 Headings.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

Section 10.11 Confidentiality.

(a)      Each of the Agent and the Noteholders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (i) to its and its Affiliates' directors, officers, employees, board members (and members of committees thereof), current or prospective limited partners, agents, consultants, Persons providing administration and settlement services and other professional advisors, including accountants, auditors, legal counsel and other advisors with a need to know (for purposes of this Section 10.11, the "Representatives") (it being understood that the Representatives will be informed of the confidential nature of such Information and instructed to keep such Information confidential, and that the Agent or Noteholder responsible for such disclosure shall be responsible for any non-compliance with the foregoing by any such Representatives that do not have a separate confidentiality obligation to the Agent or Noteholder), (ii) to the extent requested by any applicable regulatory or supervisory body or authority, by applicable laws or regulations or by any subpoena, oral question posed at any deposition, interrogatory or similar legal process (including, for the avoidance of doubt, to the

extent requested in connection with any pledge or assignment pursuant to Section 10.04(h)); provided that the party from whom disclosure is being required shall give notice thereof to the Issuer as soon as practicable (unless restricted from doing so and except where disclosure is to be made to a regulatory or supervisory body or authority during the ordinary course of its supervisory or regulatory function), (iii) to any other party to this Agreement, (iv) subject to an agreement containing provisions substantially the same as those of this paragraph, to any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement, (v) with the written consent of the Issuer, (vi) to the extent such Information (A) becomes publicly available other than as a result of a breach of this paragraph or (B) becomes available to the Agent or any Noteholder on a nonconfidential basis from a source other than the Issuer and such source is not, to the knowledge of the Agent or Noteholder, subject to subject to a confidentiality agreement with any Note Party or (vii) to any other party to this Agreement or any Person with whom any Note Party, the Agent or a Noteholder has entered into (or potentially may enter into), whether directly or indirectly, any transaction under which payments are to be made or may be made by reference to one or more Note Documents and/or the Note Parties or to any of such Person's Affiliates and Representatives. For the purposes of this paragraph, "Information" means all information received from any Note Party or relating to any Issuer Group Member, or its respective business (including, for the avoidance of doubt, any information with respect to which any Note Party owes any duty or obligation of confidentiality to any third-party), other than any such information that is available to the Agent or any Noteholder on a nonconfidential basis prior to disclosure by a Note Party. Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

(b)       Upon written request after a discharge contemplated by Section 9.03, but no later than ten (10) Business Days thereafter, by any Note Party, The Agent and Noteholder agrees to promptly return or destroy all copies of confidential Information and all notes, correspondence, documents or other records based thereon or which contain confidential Information ("Derivate Documents") which are then in the Agent's or Noteholder's possession. Notwithstanding the foregoing, the Agent and Noteholders and their Representatives shall be entitled to (i) retain copies of all Information provided to the Agent or Noteholder for legal, regulatory, and compliance purposes, in a manner consistent with the Agent's or Noteholder's document archiving procedures, and which information shall remain confidential for the term of this Agreement so long as such Information is retained in a manner consistent with the Agent's or Noteholder's internal confidentiality policies, or (ii) to the extent that the Agent or Noteholder and its Representatives have copies of computer records and files containing Information, which have been created as a result of automatic archiving or backup procedures, may retain such number of copies of the Information for legal, regulatory, and compliance purposes, in a manner consistent with the Agent's or Noteholder's and its Representatives' document archiving procedure, and which information shall remain confidential so long as such Information is retained in a manner consistent with the Agent's or Noteholder's and its Representatives' internal confidentiality policies. The Note Party remains the owner of all its Information contained in all Derivate Documents. In addition, the Agent and Noteholders shall not be obligated to return or destroy any Information contained in any documents or packages prepared for its board of directors or like

body, but may retain such documents or packages in a manner consistent with the Agent's or Noteholder's internal confidentiality policies.

(c)     Notwithstanding anything to the contrary contained herein, the parties hereto acknowledge that the Agent and its respective affiliates and advisors and investors in funds managed by the foregoing Persons (collectively, the "Related Persons") are subject to compliance obligations mandated by various regulators, governmental agencies and taxation authorities; and in satisfaction of those compliance obligations, the Related Persons may disclose confidential Information in response to a broad information request not specifically targeted at any Note Party, as required by such regulators, governmental agencies, and taxation authorities without notice to any Note Party and without obtaining assurances that information will be treated confidentially; and such disclosure shall not be a violation of this agreement; provided that if such regulators, governmental agencies and taxation authorities make information requests specifically targeted at or regarding the Issuer or any of its affiliates, the Related Persons will promptly notify the Note Parties of such information request.

Section 10.12 No Third Party Beneficiaries. The agreement of the Noteholders to purchase the Notes from the Issuer on the terms and conditions set forth in this Agreement, is solely for the benefit of the Note Parties, the Agent and the Noteholders, and no other Person (including any contractor, subcontractor, supplier, workman, carrier, warehouseman or materialman furnishing labor, supplies, goods or services to or for the benefit of the Business) shall have any rights under this Agreement or under any other Note Document as against the Agent or any Noteholder or with respect to any extension of credit contemplated by this Agreement.

Section 10.13 Reinstatement. The obligations of each Note Party under this Agreement shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of any Note Party in respect of the Secured Obligations is rescinded or must be otherwise restored by any holder of any of the Secured Obligations, whether as a result of any proceedings under any Debtor Relief Law or reorganization or otherwise, and the Issuer agrees that it will indemnify each Secured Party on demand for all reasonable costs and expenses (including fees of counsel) incurred by such Secured Party in connection with such rescission or restoration, including any such costs and expenses incurred in defending against any claim alleging that such payment constituted a preference, fraudulent transfer or similar payment under any Debtor Relief Law.

Section 10.14 USA PATRIOT Act. Each Noteholder hereby notifies the Note Parties that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "USA PATRIOT Act"), it is required to obtain, verify and record information that identifies such Note Party, which information includes the name and address of such Note Party and other information that will allow such Noteholder to identify such Note Party in accordance with the USA PATRIOT Act.

[Remainder of page intentionally left blank]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their duly authorized officers as of the day and year first above written.

HOLDINGS:


TSG SHELF II ACQUISITION HOLDINGS, LLC


By: _____
　　　Name:
　　　Title:


ISSUER:


TSG SHELF II ACQUISITION, LLC


By: _____
　　　Name:
　　　Title:


SUBSIDIARY NOTE PARTIES:


[_____]


By: _____
　　　Name:
　　　Title:

**UMB BANK, NA.**, as Agent

By: _____
      Name:
      Title:

[_____], as a Noteholder

By: _____
      Name:
      Title:

Address for Notices:

[_____]
[_____]
[_____]
Attention:     [_____]
Email: [_____]

**ANNEX I**
**TO**
**NOTE PURCHASE AGREEMENT**

**Commitments**

| NOTEHOLDER | COMMITMENTS |
|---|---|
| [Orion][6] | $21,000,000 |
| **TOTAL** | $21,000,000 |

---

[6] NTD: Orion entities TBC.

**EXHIBIT D**
**TO**
**NOTE PURCHASE AGREEMENT**

**ADDITIONAL COVENANTS[1]**

SECTION 1.1.    <u>Right of Access to Facilities/Records</u>.  Each Note Party agrees that during the term of the Agreement, the Noteholders, the Collateral Agent and the duly authorized agents of either of them shall have the right (i) at all commercially reasonable times during normal business hours to enter upon each Facility and to examine and inspect such Facility and examine and make copies of the books of record and accounts of such Facility; <u>provided</u> that twenty-four hours' notice shall be given to the Issuer prior to such examination or inspection.

SECTION 1.2.    [Reserved].

SECTION 1.3.    [Reserved].

SECTION 1.4.    <u>Insurance</u>. (a) Beginning on the date of execution hereof and thereafter throughout the term of the Agreement, each Note Party shall provide, maintain and keep in force or cause to be provided, maintained and kept in force, the following insurance coverages relating to the Facilities, paying as the same become due and payable all premiums with respect thereto:

        (i)    A title insurance policy or policies, to the extent required by the Agreement.

        (ii)    Insurance against loss or damage to the Facilities and all improvements therein (including, during any period of time when any Note Party is making alterations, repairs or improvements to the Facilities, improvements and betterments coverage), all subject to standard form exclusions, with uniform standard extended coverage endorsement limited only as may be provided in the standard form of extended coverage endorsement at the time in use in the jurisdiction where such Facility is located.

        (iii)    Commercial comprehensive general liability, property and automobile liability insurance against claims arising in, on or about the Facilities and its Business, including in, on or about the sidewalks or premises adjacent to the Facilities.

        (iv)    Business interruption or rent loss insurance (or a combination of the two).With respect to each Mortgaged Property that is located in an area identified by the Federal Emergency Management Agency (or any successor agency) as a special flood hazard area with respect to which flood insurance has been made available under Flood Insurance Laws (it being understood and agreed that as of the Closing Date, the Evergreen Property is not so classified, and as such, the following requirements of this clause (iv) shall not apply with respect to the Evergreen Facility), then, the applicable Note Party (x)

---

[1] NTD: to be included in body of final form NPA.

43006417.2

shall maintain, or cause to be maintained, with financially sound and reputable insurance companies (as reasonably determined in good faith by the Issuer), such flood insurance in an amount and otherwise sufficient to comply with all applicable rules and regulations promulgated pursuant to the Flood Insurance Laws and (y) deliver to the Collateral Agent upon reasonable written request, evidence of such compliance in form and substance reasonably acceptable to the Collateral Agent, including, without limitation, evidence of annual renewals of such insurance.

(v)    Without limiting the foregoing, the Issuer shall maintain with insurance companies that are financially sound and reputable at the time the relevant coverage is placed or renewed or with a property insurance, casualty insurance and general liability insurance policies with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business, of such types and in such amounts as are customarily carried under similar circumstances by such other Persons, and furnish to the Noteholders, upon reasonable written request from the Required Noteholders, information presented in reasonable detail as to the insurance so carried.

(vi)    Such other forms of insurance as are customary in the industry or as such Note Party is required by law or written agreement to provide with respect to the Facilities, including, without limitation, any legally required worker's compensation insurance and disability benefits insurance.

(b)    All the insurance coverage required by this Section 1.4 of this Exhibit D shall be in such amounts, and may be subject to deductible clauses in such amounts, as are customary for facilities of similar size, type and character within the jurisdictions where the Facilities are located.

(c)    [Reserved].

(d)    All policies maintained (or caused to be maintained) by each Note Party pursuant to this Section 1.4 of this Exhibit D shall be taken out and maintained with generally recognized, responsible insurance companies rated not less than "A" by A.M. Best (or any successor), authorized to write insurance in the jurisdictions where the Facilities are located, which may include "captive" insurance companies or governmental insurance pools, selected by the Issuer. The insurance policies required by subsections (a)(i), (a)(ii) and (a)(iv) and (a)(v) of this Section 1.4 of this Exhibit D shall name the Collateral Agent and such Note Party as insureds or lenders' loss payee, as applicable, as their respective interests may appear (provided that with respect to insurance maintained pursuant to subsection (a)(i) of this Section 1.4 of this Exhibit D, the Collateral Agent shall also be named as a mortgagee, and the Collateral Agent shall also be named as an additional insured on the policies required by subsections (a)(iii) and (a)(iv) of this Section 1.4 of this Exhibit D). Such policies or certificates of insurance shall provide that the insurer will endeavor to mail not less than thirty (30) nor more than sixty (60) days' written notice to the Collateral Agent of any amendment or cancellation prior to expiration of such policy.

43006417.2

(e)     The Note Parties shall deliver to the Collateral Agent (i) upon the Closing Date, the certificate(s) of insurance which the Note Parties are then required to maintain pursuant to this Section 1.4 of this Exhibit D, together with evidence as to the payment of all premiums then due thereon, (ii) at least 15 days prior to the expiration of any such policies evidence as to the renewal thereof, if then required by this Section 1.4 of this Exhibit D, and the payment of all premiums then due with respect thereto, and (iii) promptly upon request by the Collateral Agent, but in any case within 90 days after the end of each fiscal year, a certificate of an Authorized Representative of the Issuer setting forth the particulars as to all insurance policies maintained by the Note Parties pursuant to this Section 1.4 of this Exhibit D and certifying that such insurance policies are in full force and effect, that such policies comply with the provisions of this Section 1.4 of this Exhibit D and that all premiums then due thereon have been paid.

SECTION 1.5.          Maintenance and Repair; Taxes; Utility and Other Charges.

(a)     Each Note Party agrees to (i) maintain each Facility, or cause each Facility to be maintained, during the term of the Agreement in as reasonably safe condition as its operations shall permit and (ii) do or cause to be maintained in good repair and in good operating condition, ordinary wear and tear excepted, all properties material to the conduct of the Business making from time to time all necessary repairs thereto and renewals and replacements thereof necessary in order that the business carried on in connection therewith may be properly conducted at all times, except, in each case, where the failure to do so would not have a Material Adverse Effect.

(b)     Each Note Party agrees to timely and fully pay when due, or cause to be timely and fully paid when due during the term of the Agreement all material taxes, governmental charges of any kind assessed or levied upon the Facilities or any part thereof, including any material taxes levied against any portion of the Facilities which, if not paid, will become a charge on the revenues or other receipts from the Facilities prior to or on a parity with the charge thereon and the pledge or assignment thereof to be created therefrom or under the Agreement, all utility and other charges incurred in the operation, maintenance, use, occupancy and upkeep of any portion of the Facilities and all assessments and charges lawfully made by any governmental body for public improvements that may be secured by a lien on the Facilities; provided that with respect to special assessments or other governmental charges that may lawfully be paid in installments over a period of years, such Note Party shall be obligated to pay only such installments as are required to be paid during the term of the Agreement. Any Note Party may, at such Note Party's expense and in such Note Party's name, in good faith and in accordance with the Permitted Contest Conditions, contest any such taxes, assessments and other charges and, in the event of any such contest, may permit the taxes, assessments or other charges so contested to remain unpaid during that period of such contest and any appeal therefrom (provided the requirements of the Permitted Contest Conditions at all times continue to be satisfied) unless by such nonpayment any Facility or any part thereof will be subject to seizure, tax sale, loss, forfeiture or similar taking.

SECTION 1.6.          [Reserved]

SECTION 1.7.          [Reserved].

43006417.2

SECTION 1.8.        Payment of Obligations; Compliance with Liens.  Each Note Party agrees to promptly pay or otherwise satisfy and discharge all obligations, indebtedness, demands and claims as and when the same become due and payable, other than any thereof whose validity, amount or collectability is being contested in accordance with the Permitted Contest Conditions and shall at all times comply with all terms, covenants and provisions contained in any mortgages, deeds of trust, security agreements or instruments evidencing any Liens at any time existing upon its properties or any part thereof securing any indebtedness incurred or assumed by it and pay or cause to be paid, or to be renewed, refunded or extended or to be taken up, by it, all bonds, notes or other evidences of indebtedness secured by any such mortgage or other Lien, as and when the same shall become due and payable, in each case except as would not result in a Material Adverse Effect. For the avoidance of doubt, in the event of any conflict between this Section 1.8 of this Exhibit D and Section 5.09 of the Agreement, the provisions of Section 5.09 shall control.

SECTION 1.9.        [Reserved].

SECTION 1.10.        [Reserved].

SECTION 1.11.        [Reserved].

SECTION 1.12.        [Reserved].

SECTION 1.13.        [Reserved].

SECTION 1.14.        [Reserved].

SECTION 1.15.        [Reserved].

SECTION 1.16.        [Reserved].

SECTION 1.17.        [Reserved].

SECTION 1.18.        Financial Covenants.

(a)        [Reserved].

(b)        Debt Service Coverage.

For each period of four consecutive Fiscal Quarters, commencing with the period of four consecutive Fiscal Quarters ending on March 31, 2023, the Note Parties shall maintain a Debt Service Coverage Ratio equal to at least 1.25 to 1.00, calculated as of the last day of each such period of four consecutive Fiscal Quarters, based upon the financial statements of the Issuer Group Members delivered in respect of such date.

SECTION 1.19.        [Reserved].

SECTION 1.20.        ERISA.

43006417.2

(a)        Each of the Note Parties will not, with respect to any Pension Plan: (1) incur any "accumulated funding deficiency," as such term is defined in Section 412 of the Code, whether or not waived, if the amount of such accumulated funding deficiency, plus any accumulated funding deficiencies previously incurred with respect to such Pension Plan and not eliminated, would aggregate more than $100,000; provided that the incurring of such an accumulated funding deficiency will not be an Event of Default under Section 7.01(c) of the Agreement if it is reduced below $100,000 or eliminated within 90 days after the date upon which any Note Party becomes aware of such accumulated funding deficiency; or (2) terminate any such Pension Plan in a manner which could result in the imposition of a material lien on the property of such Note Party pursuant to Section 4068 of ERISA and which could materially adversely affect the business, earnings, properties or financial condition of the Note Parties, taken as a whole; or (3) withdraw from a Multiemployer Plan in a "complete withdrawal" or a "partial withdrawal" as defined in Sections 4203(a) and 4205(a), respectively, of ERISA, if such withdrawal could materially adversely affect the ability of any Note Parties, taken as a whole, to comply at any time with any of the provisions of the Agreement.

(b)        Each of the Note Parties will: (1) fund all current and past service pension liabilities under the provisions of all Pension Plans such that if all such Pension Plans were terminated at the same time by such Note Party any liens imposed on such Note Party under Section 4068 of ERISA would not be in an amount in the aggregate which would materially affect the such Note Party's ability to comply at any time with any of the provisions of the Agreement; and (2) otherwise comply in all material respects with the provisions applicable to its Pension Plans contained in ERISA, the Code and the regulations published thereunder; and (3) notify the Noteholders promptly after any Note Party knows or has reason to know (i) of the happening of any material ERISA Event with respect to any Pension Plan and, in any event, at least five days prior to any notification of such material ERISA Event given to the PBGC pursuant to the terms of Section 4043 of ERISA or (ii) of an assessment against any Note Party or any Common Control Entity of any withdrawal liability to a Multiemployer Plan. Notwithstanding anything herein to the contrary, the Note Parties need not notify the Noteholders of such material ERISA Event or withdrawal liability unless it would materially adversely affect the business, prospects, earnings, properties or condition (financial or otherwise) of any Note Party.

For purposes of subsections (a) and (b) of this Section 1.20 of this Exhibit D, the term "Common Control Entity" means any entity which is a member of a "controlled group of corporations" with, or is under "common control" with, any Note Party as defined in Section 414(b) or (c) of the Code.

Exhibit "B-1"

Equity Consideration Term Sheet and Form of Amended and Restated Limited Liability Company Agreement of TSG Shelf II Investments, LLC

[See attached]

## SUMMARY OF MATERIAL TERMS OF
## EQUITY CONSIDERATION AND EQUITY INVESTMENT OPPORTUNITY

This Equity Consideration and Equity Investment Opportunity Term Sheet (this "Term Sheet") is attached as Exhibit B-1 to and made a part of the Asset Purchase Agreement, dated as of May [•], 2021 (the "TSG Shelf II Purchase Agreement"), by and between CarbonLITE Industries, LLC and TSG Shelf II Acquisition, LLC, and is intended as an outline of certain of the material terms of the equity consideration and equity investment opportunity that would be made available to Orion Energy Partners ("Orion") under certain circumstances described in the TSG Shelf II Purchase Agreement and herein.  This term sheet does not constitute and will not give rise to any legally binding obligation on the part of any party to these discussions or any other person other than as expressly set forth in the TSG Shelf II Purchase Agreement.  Capitalized terms used but not defined herein shall have the meanings ascribed to them in the TSG Shelf II Purchase Agreement.

| EQUITY CONSIDERATION | |
|---|---|
| **Equity Consideration**<br><br>**Profits Interests** | At Closing TSG Shelf II Investments, LLC ("Investments") will issue to Orion profits interests in the form of Class C-1 Units in Investments.  The number of Class C-1 Units issued to Orion will equal 1.5% of all units outstanding 180 days after Closing (the "Class C-1 Units").  The Class C-1 Units will be structured to participate in distributions made by Investments once The Sterling Group, L.P. and its Affiliates ("Sterling") and Investments' other investors receive distributions (other than tax distributions attributable to allocations of operating income) equal to 200% of the capital invested by such investors as of 180 days after the Closing. The Class C-1 Units will be non-voting securities and will be subject to the limited liability company agreement of Investments substantially in the form attached hereto, as amended from time to time (the "Investments LLC Agreement"), the material terms of which are described below. Investments hereby represents and warrants that it owns, or prior to Closing shall own all right, title and interest to the Evergreen facility located in Clyde, OH and all assets and rights primarily used in connection with such business. |

| INVESTMENT OPPORTUNITY OVERVIEW | |
|---|---|
| Investment Opportunity | During the 90-day period following the Closing Date, Orion will have the right, but not the obligation, to purchase, without duplication: (a) up to $[5] million of Class A Units in Investments if Sterling, or its affiliates acquires Sellers' facility located in Riverside, CA but no other facility, (b) up to $10 million of Class A Units in Investments if Sterling or its affiliates acquire Sellers' facility located in Riverside, CA and either Sellers' facility located in Dallas, Texas or Reading, Pennsylvania, or (c) up to $12.5 million of Class A Units in Investments if Sterling or its affiliates acquire Sellers' facilities located in Dallas, Texas, Riverside, California, and Reading, Pennsylvania (the "Equity Investment Option"), at the same issue price as paid by Sterling to purchase its Class A Units at the Closing.  The Class A Units will be voting securities and will be subject to the Investments LLC Agreement, the material terms of which are described below. The parties acknowledge and agree that Orion and its permitted transferees that beneficially own Units shall be deemed an "Institutional Holder", "Eligible Purchaser" (solely with respect to its Class A Units)", "VCOC Member" and "Lender Member" for purposes of the Investments LLC Agreement.<br><br>During such 90-day period, Investments will provide Orion with (i) monthly operating reports (only if any such reports are produced by Investments and without any representation of accuracy) and general information on the turnaround plan for the Business and (ii) a meeting with management and a tour of the Business property located in Clyde, Ohio, so Orion may evaluate such investment opportunity. |
| Governing Documents | The documentation governing Orion's investment in Investments, should it be entitled to make such investment and elect to do so, will consist of a subscription agreement between Orion and Investments in the form attached as Annex I to this term sheet (the "Subscription Agreement") and the Investments LLC Agreement.  Any amendment to the Investments LLC Agreement that is disproportionately adverse to Orion- specific rights shall require Orion's prior written consent. |
| MATERIAL INVESTMENTS LLC AGREEMENT TERMS | |
| GOVERNANCE PROVISIONS | |
| Board of Directors | Investments is managed by a board of directors (the "Board") controlled by Sterling. |
| Director Protection | The Investments LLC Agreement contains customary exculpation, indemnification, expense advancement and insurance provisions for the benefit of directors. |

| Fiduciary Duties | The Investments LLC Agreement eliminates fiduciary duties but includes restrictions on related party transactions. |
|---|---|
| **TRANSFER RELATED PROVISIONS** | |
| Permitted Transfers | Members have the ability to transfer their Class A Units and Class C Units to affiliates and certain other related parties without Board consent and without triggering the tag-along and ROFR provisions described below. |
| Right of First Refusal | Transfers of Class A Units and Class C Units will trigger a right of first refusal ("ROFR") in favor of holders of Class A Units unless the transfer involves total consideration less than $2 million in which case only the Company will have a ROFR. |
| Tag-Along | The Investments LLC Agreement contains customary tag-along rights with respect to transfers of Class A Units, subject to customary minority protections. |
| Drag-Along | If the Board or holders of a majority of the Class A Units approve a sale transaction, the approving parties will have the right to require each Member to participate in such transaction on the same terms as the approving parties, subject to customary minority protections.    Sale proceeds from any drag- along sale shall be distributed as if such sale was distributed through the distribution waterfall set forth in the Investments LLC Agreement. |
| Blocker Sales | Any Member that identifies itself as a blocker entity (or as having a blocker entity in its investment structure) is permitted to sell all (but not less than all) of the equity of its blocker in a sale transaction so long as such Member provides a creditworthy indemnity covering all liabilities of its Blocker. |
| **ADDITIONAL RIGHTS** | |
| Preemptive Rights | Subject to customary exceptions (including employee issuances and securities issued as consideration in an acquisition), each holder of Class A Units will have the right to purchase its pro rata percentage of any units or other equity securities issued by the Company or any subsidiary.  If any such Member elects to purchase less than its pro rata portion, Sterling will have the first right to purchase such unpurchased securities. |
| Information Rights | The Investments LLC Agreement provides Holders of Class A Units or Class C Units with audited financial statements following the end of each fiscal year, unaudited financial statements following the end of each fiscal quarter and K-1s. |

| | |
|---|---|
| **Inspection Rights** | The Investments LLC Agreement grants holders of Class A Units or Class C Units customary inspection rights. |
| **VCOC** | Each Member that is required to qualify as a venture capital operating company has been granted such management or inspection rights as are needed for its investment in the Company to qualify as qualifying investment. |
| **Registration Rights** | Each Member will have piggyback registration rights in connection with IPOs and other public offerings. |
| **MISCELLANEOUS TERMS** | |
| **Governing Law; Exclusive Forum** | The Investments LLC Agreement is governed by Delaware law and all disputes thereunder must be submitted for resolution in Delaware courts. |
| **Sterling Advisory Agreement** | Investments and Sterling are parties to a customary advisory agreement pursuant to which Sterling is compensated for providing customary services to its portfolio companies, provided that any amendment thereto shall require the same approval as is required for any related-party transaction or agreement. |

42992629.4

**Annex I**

SUBSCRIPTION AGREEMENT

This Subscription Agreement (this "<u>Agreement</u>"), dated as of [●], 2021, is made by and between TSG Shelf II Investments, LLC, a Delaware limited liability company (the "<u>Company</u>"), and [_____] (the "<u>Subscriber</u>").

RECITALS

**WHEREAS**, the Subscriber desires to purchase [●] Class A Units (the "<u>Purchased Units</u>") for an aggregate cash purchase price of $[●] and the Company desires to issue and sell the Purchased Units to the Subscriber, in each case, on the terms and conditions set forth in this Agreement.

**NOW**, **THEREFORE**, in consideration of the foregoing and of the mutual covenants and agreements contained herein, the parties hereto agree as follows:

AGREEMENTS

**ARTICLE 1**
SUBSCRIPTION FOR CLASS A UNITS

1.1.    <u>Defined Terms</u>.  Capitalized terms used in this Agreement that are not otherwise defined herein will have the respective meanings ascribed to such terms in the Amended and Restated Limited Liability Company Agreement of the Company, dated as of [●], 2021 (as further amended or restated in accordance with its terms, the "<u>LLC Agreement</u>").

1.2.    <u>Purchase and Sale</u>.  The Subscriber agrees to purchase and pay for on the date hereof, and the Company agrees to issue and sell to the Subscriber on the date hereof, the Purchased Units for a cash purchase price of $[●] per Unit or $[●] in the aggregate.  Payment will be made on the date hereof by wire transfer in immediately available funds to an account designated by the Company to the Subscriber.

1.3.    <u>Limited Liability Company Agreement</u>.  Upon receipt of the purchase price specified in <u>Section 1.2</u>, the Company will immediately admit the Subscriber as a Member and designate the Subscriber as an "Institutional Holder" as such term is used in the LLC Agreement. The Subscriber hereby adopts, accepts and agrees to be bound by the terms and conditions of the LLC Agreement and agrees that the Purchased Units issued to the Subscriber will be bound by and subject to the terms of the LLC Agreement.  The Subscriber will execute and deliver a counterpart to the LLC Agreement to evidence its agreement to the foregoing.

**ARTICLE 2**
REPRESENTATIONS, WARRANTIES AND COVENANTS OF THE SUBSCRIBER

2.1.    <u>Representations, Warranties and Covenants</u>.  The Subscriber hereby represents and warrants to, and agrees with, the Company as follows as of the date hereof:

(a)    <u>Power and Authority</u>.  The Subscriber has all requisite power and authority (i) to enter into this Agreement, the LLC Agreement and such other documents, instruments, certificates and agreements that are executed and delivered by the Subscriber hereunder and thereunder (collectively, the "<u>Investment Documents</u>"), (ii) to perform its obligations under each of the Investment Documents and (iii) to consummate the transactions that are the respective subjects of each such Investment Document.  This Agreement has been duly authorized, executed and delivered by the Subscriber and constitutes the valid and legally binding agreement of the Subscriber enforceable in accordance with its terms against the Subscriber, except as such enforceability may be limited by (A) bankruptcy, insolvency, reorganization, fraudulent conveyance, moratorium or other laws of general application relating to or affecting the enforcement of creditors' rights and remedies, as from time to time may be in effect, (B) application of equitable principles (regardless of whether such enforceability is considered in a proceeding in equity or at law) and (C) considerations of public policy.

(b)    <u>No Violation of Laws or Other Instruments</u>.  The execution and delivery of the Investment Documents by the Subscriber and the consummation by the Subscriber of the transactions contemplated by the Investment Documents do not (with or without the giving of notice or the lapse of time or both) conflict with or result in any violation of or default under any provision of any applicable Law or any charter, bylaws, trust agreement, partnership agreement, or other organizational document, as the case may be, of the Subscriber or any material agreement, certificate or other instrument to which the Subscriber is a party or by which the Subscriber is bound.

(c)    <u>Accredited Investor</u>.  The Subscriber is an "accredited investor" as defined in Rule 501(a) of Regulation D promulgated under the Securities Act.

(d)    <u>Investment Intent</u>.  The Subscriber is acquiring the Purchased Units for its own account for investment, and not with a view to any distribution, resale, subdivision or fractionalization thereof in violation of the Securities Act or any other applicable securities laws, and the Subscriber has no present plans to enter into any contract, undertaking, agreement or arrangement for any such distribution, resale, subdivision or fractionalization.

(e)    <u>Access</u>.  The Subscriber has carefully reviewed and is familiar with the terms of this Agreement and the LLC Agreement.  The Subscriber has had the opportunity to ask questions of and receive answers from the Company concerning the terms and conditions of this investment.

(f)    <u>Illiquidity</u>.  The Subscriber understands that substantial restrictions exist on transferability of the Class A Units, that no market for resale of any such Class A Units exists or is expected to develop, and that the Subscriber may not be able to liquidate its investment in the Company. The Subscriber represents and warrants further that it has no contract, understanding, agreement or arrangement with any Person to sell or transfer or pledge to such Person or anyone else any of the Purchased Units for which the Subscriber hereby subscribes (in whole or in part); and the Subscriber represents and warrants that it has no present plans to enter into any such contract, undertaking, agreement or arrangement.  The Subscriber understands that the Purchased Units may not be sold except in accordance with the terms of the LLC Agreement and this

3

Agreement.  The Subscriber understands that any certificate representing the Class A Units will bear legends restricting the transfer thereof.  The Subscriber undertakes and agrees that it will not offer for sale, resell, assign, pledge or otherwise dispose of the Purchased Units at any time, except in accordance with the provisions of Regulation D under the Securities Act, pursuant to registration under the Securities Act, or pursuant to an available exemption from registration under the Securities Act.  The Subscriber agrees not to engage in any hedging transactions with regard to the Purchased Units unless in compliance with the Securities Act.

(g)    <u>Awareness of Risks; Taxes</u>.  The Subscriber understands that investment in the Company entails a high degree of risk and understands the risks associated with the operation of the Company and the Subscriber's investment in the Company.  The Subscriber is aware that ownership of the Class A Units involves a substantial degree of risk of loss of the Subscriber's entire investment and that there is no assurance of any return on such investment.  The Subscriber further represents that it is relying solely on its own conclusions or the advice of its own counsel or investment representative with respect to tax aspects of any investment in the Company.

(h)    <u>Economic Loss, Suitability and Sophistication</u>.  The Subscriber (i) is able to bear the economic risk of losing its entire investment in the Company and (ii) is able to bear such risk for an indefinite period of time.  The Subscriber has evaluated the risks involved in investing in the Class A Units and has determined that the Class A Units are a suitable investment for the Subscriber.  The Subscriber has such knowledge and experience in financial and business matters that it is capable of evaluating the risks and merits of this investment.

(i)    <u>No Advice</u>.  The Subscriber acknowledges and agrees that the Board has the exclusive power and discretion to make all investment decisions on behalf of the Company, subject to the terms of the LLC Agreement.  Accordingly, the Subscriber acknowledges that neither the Board nor the Company, nor any Affiliate of the Company, has rendered or will render any financial or tax advice or securities valuation advice to the Subscriber, and that the Subscriber is neither subscribing for nor acquiring any Class A Units in reliance upon, or with the expectation of, any such advice.

(j)    <u>No Fiduciary Duties</u>.  The Subscriber understands and acknowledges that applicable Delaware law permits the members of a Delaware limited liability company to modify and even eliminate fiduciary duties of members and managers (i.e., directors).  By executing the LLC Agreement, the Subscriber agrees that the terms of the LLC Agreement modify and eliminate fiduciary duties of the members and managers as otherwise may be imposed by applicable law or in equity.  The Subscriber hereby releases, discharges and acquits the members and the managers of the Company from any claims based on fiduciary duties imposed by applicable law or equity that are not set forth in the LLC Agreement.

(k)    <u>Disclosure; No Reliance</u>.  The Subscriber understands and agrees that, other than the representations and warranties of the Company set forth in <u>Article 3</u> herein, neither the Company nor any other Person makes any representation or warranty, express or implied, as to the accuracy or completeness of the information provided or to be provided to the Subscriber by or on behalf of the Company or related to the transactions contemplated hereby, and nothing contained in any other documents provided or statements made by or on behalf of the Company to the

4

Subscriber is, or will be relied upon as, a promise or representation by the Company or any other Person that any such information is accurate or complete.

(l)     Disclaimer of Other Representations and Warranties. NOTWITHSTANDING ANY PROVISION OF THIS AGREEMENT TO THE CONTRARY, THE SUBSCRIBER MAKES NO REPRESENTATIONS OR WARRANTIES TO THE COMPANY OR ANY OTHER PERSON IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, EXCEPT AS SPECIFICALLY SET FORTH IN THIS SECTION 2.1 AND THE OTHER INVESTMENT DOCUMENTS.  ALL OTHER REPRESENTATIONS AND WARRANTIES, WHETHER EXPRESS OR IMPLIED, ARE HEREBY DISCLAIMED BY THE SUBSCRIBER.

2.2.    Survival.  The Subscriber acknowledges that the Company has relied and will rely upon the representations and warranties of, and information furnished by, the Subscriber set forth in this Agreement and that all such representations and warranties, and furnished information, will survive the closing of the issuance of the Class A Units pursuant to this Agreement.

**ARTICLE 3**
REPRESENTATIONS, WARRANTIES AND COVENANTS OF THE COMPANY

3.1.    Representations, Warranties and Covenants.  The Company hereby represents and warrants to, and agrees with, the Subscriber as of the date hereof as follows:

(a)     Organization.  The Company is a limited liability company duly formed, validly existing and in good standing under the laws of the State of Delaware.  The Company has the full limited liability company power and authority to own its property, carry on its business as now being conducted, and to carry out the transactions contemplated by the Investment Documents.  The Company has provided or made available to the Subscriber true and correct copies of the LLC Agreement and certificate of formation of the Company (or other applicable organizational documents), including all amendments thereto.

(b)     Power and Authority.  The Company has all requisite power, authority and legal capacity to enter into each Investment Document to which it is a party, to perform its respective obligations under each such Investment Document, and to consummate the transactions that are the respective subjects of each such Investment Document.  The signature of the respective individual signing any Investment Document on behalf of the Company is binding upon the Company.  All actions required hereunder to be taken by the Company as a condition to the issuance and sale of the Class A Units purchased by the Subscriber have been taken.  This Agreement has been duly authorized, executed and delivered by the Company and, upon due authorization, execution and delivery by the Subscriber, will constitute the valid and legally binding agreement of the Company, enforceable in accordance with its terms against the Company, except as such enforceability may be limited by (i) bankruptcy, insolvency, reorganization, fraudulent conveyance, moratorium or other laws of general application relating to or affecting the enforcement of creditors' rights and remedies, as from time to time may be in effect, (ii) application of equitable principles (regardless of whether such enforceability is considered in a proceeding in equity or at law) and (iii) considerations of public policy.

5

(c)     Offer of Class A Units.  Assuming the investment representations set forth in Section 2.1 are true, the offer, sale and issuance by the Company of the Purchased Units are exempt from the registration requirements of the Securities Act, and neither the Company nor anyone acting on its behalf has taken or will take any action that would subject the issuance or sale of the Purchased Units acquired by the Subscriber to the registration and prospectus delivery provisions of the Securities Act.

(d)     Capitalization.  As of immediately prior to giving effect to the Company's issuance of the Purchased Units on the date hereof, Schedule 1 to the LLC Agreement is true and correct.  After giving effect to the Company's issuance of the Purchased Units on the date hereof, the Company's outstanding equity capitalization will consist [solely of [●] Class A Units and [●] Class C Units].  Other than the foregoing, there are no equity interests (including any profits interests, options, warrants or other rights, convertible securities or exchangeable securities) of the Company issued, reserved for issuance or otherwise outstanding.  All of the issued and outstanding Units and other equity interests in the Company issued by the Company on or before the date hereof, including the Purchased Units issued to the Subscriber hereunder, have been duly authorized and validly issued and will be fully paid and non-assessable, free and clear of all liens and encumbrances, and have been issued free of any pre-emptive rights.  Except for the LLC Agreement, this Agreement and the other Investment Documents, the Company has not entered into any agreement with respect to voting rights, preemptive or similar rights, registration rights or transfer restrictions with respect to any Units or other equity interests in the Company.

(e)     Investment Company Act.  Neither the Company nor any of its Subsidiaries is an "investment company" or a company "controlled" by an "investment company" within the meaning of the Investment Company Act.

(f)     No Conflict.  The execution and delivery of this Agreement and the other Investment Documents by the Company does not, and the consummation of the transactions contemplated hereby and thereby will not (with or without the giving of notice or the lapse of time or both), (i) violate or conflict with or result in any default under any provision of the organizational documents of the Company or any of its Subsidiaries including the LLC Agreement, (ii) violate any provision of any Law, or any order, judgment or decree of any court or other governmental authority applicable to the Company or any of its Subsidiaries or any of their respective assets or properties, (iii) violate or result in the cancellation, modification, revocation or suspension of any material license, franchise or permit held by the Company or any of its Subsidiaries, or (iv) violate or result in a breach of or default under any material contract to which the Company is a party or by which any of the Company's assets are bound.

(g)     Proceedings.  There is no pending or, to the knowledge of the Company, threatened action, arbitration, audit, litigation or suit (whether civil, criminal, administrative or investigative) commenced, brought, conducted or heard by or before, or otherwise involving, any governmental authority, against or otherwise relating to or involving the Company or its equityholders or any of their respective assets, at law or in equity, that challenges, or would reasonably be expected to have the effect of preventing, delaying, making illegal or otherwise interfering with, the ability of the Company to enter into and perform its obligations under the Investment Documents.  The Company is not subject to any outstanding order, judgment or decree

6

that prohibits or otherwise restricts the ability of the Company to consummate fully the transactions contemplated by the Investment Documents.

(h)    Disclaimer of Other Representations and Warranties. NOTWITHSTANDING ANY PROVISION OF THIS AGREEMENT TO THE CONTRARY, THE COMPANY MAKES NO REPRESENTATIONS OR WARRANTIES TO THE SUBSCRIBER OR ANY OTHER PERSON IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, EXCEPT AS SPECIFICALLY SET FORTH IN THIS SECTION 3.1 AND THE OTHER INVESTMENT DOCUMENTS.   ALL OTHER REPRESENTATIONS AND WARRANTIES, WHETHER EXPRESS OR IMPLIED, ARE HEREBY DISCLAIMED BY THE COMPANY.

3.2.    Survival.  The Company acknowledges that the Subscriber has relied and will rely upon the representations and agreements of the Company set forth in this Agreement, and that all such representations and agreements will survive the closing of the issuance of the Class A Units pursuant to this Agreement.

## ARTICLE 4
## MISCELLANEOUS

4.1.    Amendments and Modifications; Waivers.  This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each of the Company and the Subscriber.  No waiver by either the Company or the Subscriber of any of the provisions hereof will be effective unless explicitly set forth in writing and signed by the party so waiving.  No waiver by any party hereto will operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver.  No failure to exercise, or delay in exercising, any rights, remedy, power or privilege arising from this Agreement will operate or be construed as a waiver thereof; nor will any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

4.2.    Notices.  Except as expressly set forth to the contrary in this Agreement, all notices, requests or consents provided for or permitted to be given under this Agreement must be in writing and must be delivered to the recipient in person, by courier or mail (including electronic mail) or by facsimile, or similar transmission; and a notice, request or consent given under this Agreement is effective on receipt by the Person to receive it.  Notices given by facsimile will be deemed to have been received (a) on the day on which the sender receives answer back confirmation if such confirmation is received before or during normal business hours of any Business Day or (b) on the next Business Day after the sender receives answer back confirmation if such confirmation is received (i) after normal business hours on any Business Day or (ii) on any day other than a Business Day.  All notices, requests and consents to be sent to the Subscriber must be sent to or made at the addresses given for the Subscriber in the LLC Agreement or such other address as the Subscriber may specify by notice to the Company.  Whenever any notice is required to be given by Law, the Certificate or this Agreement, a written waiver thereof, signed by the Person entitled

to notice, whether before or after the time stated therein, will be deemed equivalent to the giving of such notice.

4.3.    <u>Governing Law; Jurisdiction; Venue</u>.  This Agreement will be enforced, governed and construed in all respects in accordance with the Laws of the State of Delaware, without giving effect to any conflict-of-laws rule or principle that might refer the construction or interpretation of this Agreement to the Laws of another State or jurisdiction.  Any action or proceeding against any party hereto relating in any way to this Agreement may be brought and enforced in the courts of the State of Delaware located in New Castle County and, to the extent subject matter jurisdiction exists therefor, in the courts of the United States for the District of Delaware, and the parties hereto hereby irrevocably submit to the exclusive jurisdiction of the foregoing courts in respect of any such action or proceeding.  The parties hereby irrevocably waive, to the fullest extent permitted by Law, any objection that they may now or hereafter have to the laying of venue of any such action or proceeding in the courts of the State of Delaware located in New Castle County or the United States District Court for the District of Delaware, and any claim that any such action or proceeding brought in any such court has been brought in an inconvenient forum.

4.4.    <u>Assignment; Binding Effect</u>.  This Agreement and the other Investment Documents and the rights and obligations set forth herein and therein will be binding upon, and will inure to the benefit of, the Subscriber, the Company and their respective successors and permitted assigns. Each provision of this Agreement will be considered severable and if for any reason any provision that is not essential to the effectuation of the basic purposes of this Agreement is determined by a court of competent jurisdiction to be invalid or unenforceable under Law, such invalidity will not impair the operation of or affect any other provisions of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.  In that case, this Agreement will be construed so as to limit any term or provision so as to make it enforceable or valid within the requirements of any applicable Law, and in the event such term or provision cannot be so limited, this Agreement will be construed to omit such invalid or unenforceable term or provision.  No party hereto may assign any of its rights or obligations under this Agreement without the prior written consent of the other party hereto, except that the Subscriber may, without the consent of the Company, assign its rights and obligations hereunder to any Person to whom the Subscriber transfers all or any portion of its Purchased Units in compliance with the LLC Agreement.

4.5.    <u>Entire Agreement</u>.

(a)    This Agreement, including the exhibits hereto, and the other Investment Documents between the Company and the Subscriber, constitute the entire agreement directly relating to the Subscriber's purchase of the Purchased Units, and supersede all prior agreements or understandings between the parties hereto directly relating to the Subscriber's purchase of the Purchased Units.  Notwithstanding the foregoing, this Agreement does not supersede or otherwise affect or have any impact upon the LLC Agreement (unless explicitly stated otherwise therein), any other definitive agreement entered into by and between the Subscriber and the Company after the date hereof, or any of the Other Agreements (as defined below), or the rights and obligations thereunder.

8

(b)    [For clarification, the parties hereto acknowledge and agree that Subscriber, on the one hand, and the Company, on the other hand, have certain rights and obligations under the following agreements (collectively, the "Other Agreements"): (i) that certain [●] Agreement, dated as of [DATE], by and among [●], the Subscriber and the other parties thereto, (ii) that certain [●] Agreement, dated as of [DATE], by and between the Subscriber and [●], and (iii) other agreements and documents that do not expressly govern the Subscriber's purchase of the Purchased Units, all of which other agreements remain in full force and effect in accordance with their terms.][1]

4.6.    Counterparts; Facsimile.    This Agreement may be executed in one or more counterparts, all of which will constitute one and the same instrument.  Any counterparts of this Agreement or any signatures thereon delivered by facsimile transmission or other electronic method (including by email in portable document format (pdf)) will be deemed an original executed document for all purposes hereof.

4.7.    No Vicarious Liability.    Notwithstanding anything in this Agreement to the contrary, the liabilities of the parties to this Agreement will be limited to such parties, and no Person that is not a party to this Agreement will have any liability hereunder or with respect to the matters contemplated hereby.

4.8.    Waiver of Damages.    Notwithstanding anything to the contrary in this Agreement, no party to this Agreement will be liable to or otherwise responsible to any other party hereto for the punitive damages that arise out of or relate to this Agreement or the performance or breach hereof or any liability retained or assumed hereunder other than damages paid to an unaffiliated third party claimant.

*[Signature pages follow.]*

---

[1] **Note to Draft**: Definition of Other Agreements should be customized for the parties to the Subscription Agreement.

IN WITNESS WHEREOF, the undersigned has executed this Agreement as of the date first written above.

**<u>THE SUBSCRIBER</u>**:

[_____]

By: _____

Name: _____

Title: _____

IN WITNESS WHEREOF, the undersigned has executed and accepted this Agreement as of the date first written above.

**THE COMPANY**:
**TSG SHELF II INVESTMENTS, LLC**


By: _____
Name: Scott MacLaren
Title:   Vice President

TSG SHELF II INVESTMENTS, LLC

AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT

[•], 2021

THE UNITS REFERENCED HEREIN HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS.  ACCORDINGLY, SUCH UNITS MAY NOT BE SOLD, ASSIGNED, PLEDGED OR OTHERWISE DISPOSED OF AT ANY TIME WITHOUT EFFECTIVE REGISTRATION UNDER SUCH ACT AND LAWS OR EXEMPTION THEREFROM, AND COMPLIANCE WITH THE OTHER RESTRICTIONS ON TRANSFERABILITY SET FORTH OR REFERRED TO IN THIS AGREEMENT.

## TABLE OF CONTENTS

**Page**

### ARTICLE 1
### DEFINITIONS AND CONSTRUCTION

| | | |
|---|---|---|
| 1.1 | Definitions | 1 |
| 1.2 | Construction | 2 |
| 1.3 | Applicability of the Act | 2 |

### ARTICLE 2
### ORGANIZATIONAL MATTERS

| | | |
|---|---|---|
| 2.1 | Formation | 2 |
| 2.2 | Name | 2 |
| 2.3 | Offices | 2 |
| 2.4 | Purposes; Power | 3 |
| 2.5 | Foreign Qualification | 3 |
| 2.6 | Term | 3 |
| 2.7 | No State Law Partnership | 3 |
| 2.8 | Title to Company Assets | 3 |
| 2.9 | Waiver of Dissenters' and Appraisal Rights | 4 |

### ARTICLE 3
### REPRESENTATIONS AND WARRANTIES

| | | |
|---|---|---|
| 3.1 | Representations and Warranties of Each Member | 4 |
| 3.2 | Representations and Warranties of the Company | 6 |

### ARTICLE 4
### MEMBERS; UNITS

| | | |
|---|---|---|
| 4.1 | Members | 6 |
| 4.2 | Units | 7 |
| 4.3 | Preemptive Rights | 10 |
| 4.4 | Transfer Related Provisions | 12 |
| 4.5 | Registration Rights | 28 |
| 4.6 | Additional Terms Relating to Members | 32 |

### ARTICLE 5
### CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS

| | | |
|---|---|---|
| 5.1 | Capital Contributions | 32 |
| 5.2 | Return of Capital Contributions | 32 |
| 5.3 | Advances by Members | 32 |
| 5.4 | Capital Accounts | 32 |

i

**ARTICLE 6**
**DISTRIBUTIONS; ALLOCATIONS**

6.1    Distributions ................................................................................................33
6.2    Other Distribution Provisions ......................................................................33
6.3    Allocations of Net Profits and Net Losses ...................................................34
6.4    Income Tax Allocations ...............................................................................34
6.5    Regulatory Allocations ................................................................................35
6.6    Curative Allocations ....................................................................................36
6.7    Other Allocation Rules ................................................................................36

**ARTICLE 7**
**GOVERNANCE**

7.1    Manager (Director) Managed Company .......................................................36
7.2    Board of Directors ........................................................................................37
7.3    Board Observers ...........................................................................................39
7.4    Meetings of the Members .............................................................................40
7.5    Provisions Applicable to All Meetings ........................................................41
7.6    Officers .........................................................................................................41

**ARTICLE 8**
**ADDITIONAL COVENANTS**

8.1    Information; Confidentiality ........................................................................42
8.2    Insider Members' Time Commitment; Company Opportunities ...................42
8.3    Reports .........................................................................................................43
8.4    Related Party Transactions ..........................................................................43
8.5    Inspection Rights .........................................................................................44
8.6    Power of Attorney ........................................................................................44
8.7    VCOC Related Rights ..................................................................................45
8.8    Internal Restructure ......................................................................................45
8.9    Blocker Member Covenant ..........................................................................46

**ARTICLE 9**
**LIABILITY STANDARDS; EXCULPATION AND INDEMNIFICATION**

9.1    Elimination of Fiduciary Duties ..................................................................46
9.2    Actions at Direction of Members .................................................................47
9.3    Burden of Proof ...........................................................................................47
9.4    Corporate Opportunities ..............................................................................47
9.5    Exculpation ..................................................................................................48
9.6    Indemnification of Members, Directors and Officers ..................................49
9.7    Advance Payment .........................................................................................49
9.8    Indemnification of Employees and Agents ..................................................50
9.9    Appearance as a Witness ..............................................................................50
9.10   Nonexclusivity of Rights .............................................................................50

9.11   Insurance .................................................................................................................50

## ARTICLE 10
## TAX, ACCOUNTING, BOOKKEEPING AND RELATED PROVISIONS

10.1   Tax Returns .............................................................................................................50
10.2   Tax Partnership .......................................................................................................51
10.3   Tax Elections ..........................................................................................................51
10.4   Bank Accounts ........................................................................................................51
10.5   Fiscal Year ..............................................................................................................51
10.6   Bipartisan Budget Act of 2015 ..............................................................................51
10.7   Cooperation and Assistance ...................................................................................52

## ARTICLE 11
## DISSOLUTION, WINDING-UP AND TERMINATION

11.1   Dissolution .............................................................................................................52
11.2   Winding-Up and Termination .................................................................................53
11.3   Deficit Capital Accounts ........................................................................................54
11.4   Certificate of Cancellation .....................................................................................54

## ARTICLE 12
## GENERAL PROVISIONS

12.1   Books ......................................................................................................................54
12.2   Offset ......................................................................................................................54
12.3   Notices ....................................................................................................................55
12.4   Entire Agreement; Supersedure .............................................................................55
12.5   Effect of Waiver or Consent ..................................................................................55
12.6   Amendment or Restatement ...................................................................................55
12.7   Binding Effect ........................................................................................................57
12.8   Governing Law; Venue ...........................................................................................57
12.9   Severability .............................................................................................................58
12.10  Independent Legal Advice ......................................................................................58
12.11  Further Assurances .................................................................................................58
12.12  Waiver of Certain Rights ........................................................................................58
12.13  Directly or Indirectly .............................................................................................58
12.14  Counterparts ...........................................................................................................58
12.15  Equitable Relief .....................................................................................................58
12.16  Lender Rights .........................................................................................................59
12.17  No Vicarious Liability ............................................................................................59

## SCHEDULES:

Schedule 1     Members, Units and Information Related Thereto

42992628.2

**<u>EXHIBITS:</u>**

Exhibit A        Defined Terms

**AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT**
**OF**
**TSG SHELF II INVESTMENTS, LLC**

This **AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT** of **TSG SHELF II INVESTMENTS, LLC**, a Delaware limited liability company (the "Company"), dated as of [•], 2021 (the "First A&R Date"), is adopted, executed and agreed to, for good and valuable consideration, by and among the Company, the other signatories hereto and each other Person who becomes bound by this Agreement whether as a signatory to this Agreement, pursuant to a Joinder Agreement, as a holder of any Unit or otherwise, including the Members (as defined below) (each, a "Party").

## RECITALS

**WHEREAS**, the Company was formed as a Delaware limited liability company by filing a Certificate of Formation on March 5, 2021 (the "Formation Date") under and pursuant to the Act (such Certificate of Formation as amended or restated from time to time in accordance with this Agreement, is referred to herein as the "Certificate");

**WHEREAS**, TSG Shelf II Investments Holdings, L.P., a Delaware limited partnership, as the sole and managing member of the Company, entered into a limited liability company agreement of the Company (the "Original Agreement") on March 5, 2021;

**WHEREAS**, in connection with the consummation of the transactions contemplated by that certain Asset Purchase Agreement, dated as of May [•], 2021, by and among TSG Shelf II Acquisition, LLC, a Delaware limited liability company, and the other parties signatory thereto (the "CarbonLite Purchase Agreement"), the signatories to this Agreement desire to amend and restate the Original Agreement in its entirety; and

**WHEREAS**, this Agreement sets forth, among other things, terms applicable to capitalization of the Company, the Persons that will be admitted as Members in connection therewith, the Units to be issued to such Members and the manner by which the business and affairs of the Company will be managed and certain rights and obligations in respect of Units issued on or after the First A&R Date;

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Members (whether admitted on or prior to the First A&R Date or admitted hereafter in accordance with the terms of this Agreement) and the Company hereby agree that the Original Agreement is hereby amended and restated in its entirety as follows:

## AGREEMENTS

## ARTICLE 1
## DEFINITIONS AND CONSTRUCTION

**1.1** <u>Definitions</u>. In addition to terms defined in the body of this Agreement, capitalized terms used herein will have the meanings given to them in Exhibit A.

**1.2**     Construction.  Unless the context requires otherwise:  (a) the gender (or lack of gender) of all words used in this Agreement includes the masculine, feminine and neuter; (b) references to Articles and Sections refer to articles and sections of this Agreement; (c) references to Exhibits and Schedules are to exhibits and schedules attached to this Agreement, each of which is made a part of this Agreement for all purposes; (d) references to money refer to legal currency of the United States of America unless specifically stated otherwise; (e) the word "including" means "including without limitation;" (f) words in the singular or plural form include the plural and singular form, respectively; and (g) references to Laws, as well as to contracts, agreements and other instruments, mean such Laws, contracts, agreements and instruments as in effect at the time of determination (taking into account any amendments thereto effective at such time without regard to whether such amendments were enacted or adopted after the First A&R Date) and will include all successor Laws, contracts, agreements and instruments. In the event an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the Parties and no presumption or burden of proof will arise favoring or disfavoring any party hereto by virtue of the authorship of any of the provisions of this Agreement.

**1.3**     Applicability of the Act.  The rights and obligations of the Members and the other Parties with respect to the Company and the Units will be determined in accordance with the terms and conditions of this Agreement and, to the extent not inconsistent with this Agreement or to the extent non-waivable, the Act.  On any matter upon which this Agreement is silent, the Act will control.  No provision of this Agreement will be in violation of the Act and to the extent any provision of this Agreement is in violation of the Act, such provision will be void and of no effect and will not affect the validity of the other provisions of this Agreement; provided, where the Act provides that a provision of the Act will apply "unless otherwise provided in a limited liability company agreement" or words of similar effect, the provisions of this Agreement will in each instance control.

## ARTICLE 2
## ORGANIZATIONAL MATTERS

**2.1**     Formation.  The Company was organized as a limited liability company under the Act by the filing of the Certificate with the Secretary of State of the State of Delaware.  All actions by any Member or authorized person of the Company in making such filing are hereby ratified, adopted and approved.

**2.2**     Name.  The name of the Company is TSG Shelf II Investments, LLC and all Company business must be conducted in that name or such other names that comply with Law and as the Board may select from time to time.

**2.3**     Offices.  The registered office of the Company required by the Act to be maintained in the State of Delaware will be the office of the initial registered agent named in the Certificate or such other office (which need not be a place of business of the Company) as the Board may designate in the manner provided by Law.  The registered agent of the Company in the State of Delaware will be the initial registered agent named in the Certificate or such other Person or Persons as the Board may designate in the manner provided by Law.  The principal office of the Company in the United States will be at such place as the Board may designate, which need not

2

be in the State of Delaware.  The Company may have such other offices as the Board may designate.

    **2.4**    <u>Purposes; Power</u>.  The purposes of the Company are to serve as a holding company to acquire, own, exercise rights with respect to and dispose of equity interests in Subsidiaries that directly or indirectly own assets and properties and operate businesses and to engage in any and all activities necessary, convenient, desirable or incidental to the foregoing that are not forbidden by the Law of the jurisdiction in which the Company engages in that business.  However, notwithstanding such limited purpose, the Company has the power to engage in any lawful act or activity for which limited liability companies may be organized under the Act and to engage in any business not forbidden by the Law of the jurisdiction in which the Company engages in that business.

    **2.5**    <u>Foreign Qualification</u>.  To the extent that the nature of the business conducted by the Company requires the Company to qualify as a foreign limited liability company under the Laws of a jurisdiction other than the State of Delaware, the Company will satisfy all requirements necessary to so qualify.  At the request of the Company, each Member will execute, acknowledge, swear to and deliver all certificates and other instruments conforming with this Agreement that are necessary or appropriate to qualify, continue and terminate the Company as a foreign limited liability company in all such jurisdictions in which the Company may conduct business.

    **2.6**    <u>Term</u>.  The existence of the Company commenced upon the filing of the Certificate, and the Company will have a perpetual existence unless and until dissolved and terminated in accordance with <u>Article 11</u>.

    **2.7**    <u>No State Law Partnership</u>.  The Members do not intend for the Company to be a partnership (including a limited partnership) or joint venture, and no Member will be a partner or joint venturer of any other Member by reason of this Agreement for any purpose other than federal and, if applicable, state income tax purposes, and this Agreement will not be interpreted to provide otherwise.  The Members intend that the Company will be treated as a partnership for United States federal and, if applicable, state income tax purposes, and each Member and the Company will file all tax returns and will otherwise take all tax and financial reporting positions in a manner consistent with such treatment.  The Company will not, nor will it cause or allow any of its Subsidiaries that are not treated as corporations for tax purposes on the First A&R Date, to make any election to be treated as a corporation for federal and, if applicable, state income tax purposes, except with the approval of the Board and then only following at least 10 days' prior notice to the Institutional Holders.

    **2.8**    <u>Title to Company Assets</u>.  Title to the Company's assets, whether real, personal or mixed and whether tangible or intangible, will be vested in the Company as an entity, and no Member, Director, Officer or employee will have any ownership interest in the Company's assets or any portion thereof.  Each Member hereby waives any right such Member may at any time have to cause the Company's assets to be partitioned among the Members or to file any complaint or to institute any Proceeding at Law or in equity seeking to have any one or all of the Company's assets partitioned.

3

**2.9**    Waiver of Dissenters' and Appraisal Rights.    Notwithstanding anything to the contrary herein or in the Act, no Member will have dissenters' or appraisal rights under any circumstances including in connection with an Approved Transaction, and each Member hereby waives and releases, and will execute such further instruments as the Company or the Board reasonably requests to further evidence the waiver and release of, such rights.

## ARTICLE 3
## REPRESENTATIONS AND WARRANTIES

**3.1**    Representations and Warranties of Each Member.    Each Member (as to itself only) represents and warrants to the Company and to the other Members (including other Members admitted after the First A&R Date) as follows as of the date such Member is first admitted as a "Member":

(a)    Organization; Existence; Good Standing.    Such Member, if such Member is an Entity, is duly organized, validly existing and in good standing under the Laws of the jurisdiction of its formation.

(b)    Power; Qualification.    Such Member, if such Member is an Entity, has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder, and the execution and delivery by such Member of this Agreement and the performance of all obligations hereunder have been duly authorized by all necessary action.

(c)    Authority; Enforceability.    This Agreement has been duly and validly executed and delivered by such Member and, assuming due execution and delivery of this Agreement by the Company or one or more other Parties, constitutes the binding obligation of such Member enforceable against such Member in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization or similar Laws affecting creditors' rights generally, and by principles of equity.

(d)    No Conflicts.    The execution, delivery and performance by such Member of this Agreement will not, with or without the giving of notice or the lapse of time, or both, (i) violate any provision of Law to which such Member is subject, (ii) violate any order, judgment or decree applicable to such Member or (iii) conflict with, or result in a breach or default under, any term or condition of its certificate of incorporation or by-laws, certificate of limited partnership or partnership agreement, certificate of formation or limited liability company agreement, or trust agreement, as applicable, or any employment, non-compete, non-solicit or any other material agreement or instrument to which such Member is a party.    No consent, approval, authorization or order of any court or governmental agency or authority or of any third party which has not been obtained is required in connection with the execution, delivery and performance by such Member of this Agreement.

(e)    Investment Matters.    Such Member is acquiring Units for its own account, for investment purposes, and not with a view to or in connection with the resale or other distribution of such Units in violation of applicable securities Laws.    Such Member is an "accredited investor" as defined in Rule 501(a) of Regulation D under the Securities Act; provided, the representation and warranty in this sentence will be deemed not to have been made by any

4

Member whose sole Membership Interest consists of Class C Units granted for no monetary consideration or issued in a Company offering pursuant to Rule 701 under the Securities Act. Such Member understands and agrees that the Units have not been registered under the Securities Act and are "restricted securities." Such Member has sufficient knowledge of finance, securities and investments generally, has experience and skill in investments based on actual participation, and has the ability to bear the economic risks of such Member's investment in the Company for an indefinite period of time.

(f)     <u>LLC Agreement</u>.  Such Member understands that the Units acquired by it will, upon issuance by the Company, without any further action on the part of the Company or such Member, be subject to the terms, conditions and restrictions contained in this Agreement including all amendments, modifications and restatements thereof made in accordance with this Agreement from time to time.

(g)     <u>No Brokers</u>.  Neither such Member nor any of its Affiliates has employed or retained any broker, agent or finder in connection with this Agreement or the transactions contemplated herein, or paid or agreed to pay any brokerage fee, finder's fee, commission or similar payment to any Person on account of this Agreement or the transactions provided for herein which fee, commission or payment will constitute an obligation payable by the Company, any subsidiary thereof, or any other Member.

(h)     <u>Marital Status</u>.  If such Member is a natural person, such Member is not married unless otherwise indicated on such Member's signature page hereto or other instrument by which such individual becomes bound by this Agreement.

(i)     <u>SPV Member or BDC Member Status</u>.  Such Member is not (i) an SPV Member unless noted as an "SPV Member" on <u>Schedule 1</u> or (ii) a BDC Member unless noted as a "BDC Member" on Schedule 1.

(j)     <u>Competitive Activities</u>.  Such Member is not engaged in Competitive Activities and is not a direct Competitor or a potential Competitor of the Company or any Subsidiary.

(k)     <u>Blocker Entity</u>.  If such Member is designated as a "Blocker Member" on <u>Schedule 1</u>, such <u>Blocker</u> Member is either a Blocker Entity or such Member's Related Blocker Entity is correctly identified on <u>Schedule 1</u>. Such Member (and its Related Blocker Entity, if applicable) was formed for the sole purpose of directly or indirectly investing in the Company, holds no assets other than a direct or indirect interest in such Blocker Member, Units, cash and other immaterial assets relating to its formation, existence, good standing and ongoing administrative matters and has incurred no liabilities other than those arising from its direct or indirect interest in such Blocker Member or being a Member or owning Units and immaterial liabilities relating to its formation, existence, good standing and ongoing administrative matters and liabilities arising under applicable Laws.

(l)     <u>Survival of Representations and Warranties</u>.  All representations and warranties made by each Member in this Agreement will be considered to have been relied upon

by the Company and the other Parties regardless of any investigation made by or on behalf of the Company or any such Party and will survive the execution and delivery of this Agreement.

      **3.2**    <u>Representations and Warranties of the Company</u>.  The Company represents and warrants to the Members as of the First A&R Date as follows:

      (a)    <u>Formation</u>.  The Company was formed in the State of Delaware on the Formation Date.

      (b)    <u>Organization; Existence; Good Standing</u>.  The Company is duly organized, validly existing and in good standing under the Laws of the State of Delaware and has all requisite power and authority to enter into this Agreement.

      (c)    <u>Authority; Enforceability</u>.  This Agreement has been duly and validly executed and delivered by the Company and constitutes the binding obligation of the Company enforceable against it in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization or similar Laws affecting creditors' rights generally, and by principles of equity.

      (d)    <u>No Conflicts</u>.  The execution, delivery and performance by the Company of this Agreement will not, with or without the giving of notice or the lapse of time, or both, (i) violate any provision of Law to which the Company is subject, (ii) violate any order, judgment or decree applicable to the Company or (iii) conflict with, or result in a breach or default under, any term or condition of its certificate of formation or limited liability company agreement, as applicable, or any other material agreement or instrument to which the Company is a party.  No consent, approval, authorization or order of any court or governmental agency or authority or of any third party which has not been obtained is required in connection with the execution, delivery and performance by the Company of this Agreement.

      (e)    <u>Exempt Issuance</u>.  The Units issued on or before the First A&R Date have been duly authorized and validly issued.  Assuming the accuracy of the representations and warranties of the Members in this Agreement and in any other agreement entered into in connection with the issuance of Units to which any Member is a party, the issuance of such Units does not require registration under applicable federal or state securities Laws.

**ARTICLE 4**
**MEMBERS; UNITS**

      **4.1**    <u>Members</u>.

      (a)    <u>Existing Members</u>. Sterling Group Partners V, L.P. was admitted as a Member on the Formation Date. Each other Person listed on <u>Schedule 1</u> hereto is hereby admitted as a Member as of the "Admission Date" specified opposite its name on <u>Schedule 1</u>.

      (b)    <u>Additional Members</u>.  All Members will be listed on <u>Schedule 1</u>.  <u>Schedule 1</u> will be maintained by the Company and from time to time will be amended and supplemented in accordance with this Agreement. The following Persons will be deemed to be Members and will

6

be admitted as Members without any further action by the Company or any Member: (i) any Person (other than the Company) to whom Units are Transferred by a Member after the First A&R Date so long as such Transfer is made in accordance with this Agreement and (ii) any Person to whom the Company issues Units after the First A&R Date in accordance with this Agreement. TSG Shelf II Holdings, LLC, a Delaware limited liability company ("Holdings"), is a Subsidiary and is the entity (A) in which certain Persons including employees of, and service providers to, the Company or one or more Subsidiaries have been or may be given the opportunity to invest and (B) that may grant options to purchase equity interests in Holdings to such employees and service providers. Pursuant to the limited liability company agreement of Holdings, as amended from time to time, the Company, in its capacity as the sole managing member of Holdings, may require each Holdings member (other than the Company) to exchange its equity interests in Holdings for newly issued Units. To effect such contribution and exchange, the Board may approve the creation of a new class or series of Units and the Company may issue such Units in exchange for the equity interests in Holdings. Members of Holdings will be admitted as Members in the Company upon receipt of Units.

(c)     Cessation of Members.   Any Person admitted or deemed admitted as a Member pursuant to Section 4.1(a) or Section 4.1(b) will cease to have the rights of a Member under this Agreement at such time that such Person is no longer a record owner of any Units (except as provided under Article 9, which rights will not cease), but such Person will continue to be bound by and obligated with respect to all of the provisions of this Agreement other than those that relate solely to a Person that holds Units.

4.2     Units.

(a)     Units; Class and Series.     From and after the First A&R Date, the Membership Interests will be reflected solely as "units" (each, a "Unit"), and the Company may issue whole or fractional Units, in each case, to the extent approved by the Board. The Unit designations as of the First A&R Date are set forth in Section 4.2(c). From time to time, the Company may designate and, subject to Section 4.3, issue additional Units having such rights, preferences and designations as the Board approves (including (i) assigning a designation to such Units as "Preferred Units," "Common Units," "Incentive Units" or any other designation, (ii) subject to compliance with any restrictions applicable to any class or series of Units then outstanding, specifying such Units as senior or junior to, or *pari passu* with, any Units then outstanding or to be issued thereafter and (iii) specifying the voting rights (if any) of such Units). Subject to 4.3, the Board may increase the number of authorized Units in any then-existing class or series. Upon due authorization of any Unit issuance by the Board, the Company is hereby authorized to take all actions that it deems reasonably necessary or appropriate in connection with the authorization (including the increase in number of authorized Units of any class or series), designation, creation and issuance of the Units to be issued and the fixing of the designations, preferences and rights applicable thereto and such action may include an amendment to this Agreement adopted solely by the Company, subject to Board approval (each, a "New Terms Amendment") and without the approval of any Member, except for any Member approval expressly required under Section 12.6.

(b)     Unit Certificates. Ownership of Units may, but need not, be evidenced by certificates similar to customary stock certificates. As of the First A&R Date, Units are

7

uncertificated, but the Board may determine to certificate all or any Units at any time by resolution thereof. In such event, the Board will prescribe the forms of certificates to be issued by the Company, including the forms of legends to be affixed thereto. Any such certificate will be delivered by the Company to the applicable record owner of the Units represented by such certificate. Certificates evidencing Units will provide that they are governed by Article 8 of the Uniform Commercial Code. Certificates need not bear a seal of the Company but will be signed by the Chief Executive Officer, President, any Vice President or any other Person authorized by the Board to sign such certificates who will certify the Units represented by such certificate. In the event any Officer who has signed, or whose facsimile signature or signatures will have been placed upon, any such certificate or certificates ceases to be such an Officer before such certificate is issued by the Company, such certificate may nevertheless be issued by the Company with the same effect as if such person were such an Officer at the date of issue. The Board may determine the conditions upon which a new certificate may be issued in place of a certificate which is alleged to have been lost, stolen or destroyed and may, in its discretion, require the owner of such certificate or its legal representative to give bond, with sufficient surety, to indemnify the Company against any and all losses or claims that may arise by reason of the issuance of a new certificate in the place of the one so lost, stolen or destroyed.

(c) <u>Initial Unit Designations; Authorized Units</u>.

(i) A class of Units is hereby designated as "<u>Class A Units</u>." The Company is authorized to issue as many Class A Units as the Board approves from time to time, and any Class A Unit issued in accordance with this Agreement will be deemed to have been duly authorized and validly issued.

(ii) A class of Units is hereby designated as "<u>Class B Units</u>." The Company is authorized to issue as many Class B Units as the Board approves from time to time, and any Class B Unit issued in accordance with this Agreement will be deemed to have been duly authorized and validly issued. A holder of Class B Units may elect at any time to exchange all or some of its Class B Units for a like number of Class A Units. The Class A Units and the Class B Units will be identical in all respects except as specifically set forth in this Agreement.

(iii) A class of Units is hereby designated as "<u>Class C Units</u>." Each Class C Unit will also bear a numeric sub-classification. Initially, there will be two sub-classifications of the Class C Units: "<u>Class C-1 Units</u>" and "<u>Class C-2 Units</u>." All Class C Units (regardless of the numeric sub-classifications thereof) will be identical in all respects except as expressly set forth in this Agreement. The Company hereby confirms that the Board has authorized the issuance of a number of Class C-1 Units equal to 1.5% of the total number of Class A Units, Class B Units and Class C-1 Units outstanding as of the 180th day after the First A&R Date and no more other than increases to effect a proportionate unit split or similar proportionate reclassification. The Company is authorized to issue as many Class C Units as the Board approves from time to time, other than Class C-1 Units which are covered by the preceding sentence. Any Class C Unit issued in accordance with this Agreement and with approval of the Board will be deemed to have been duly authorized and validly issued. The Class C-2 Units and other Class C Unit sub-classifications (other than the Class C-1 Units) are sometimes referred to herein

8

as the "Incentive Units." For clarification, the Class C-1 Units are not Incentive Units. Incentive Units may only be issued by the Company to Eligible Incentive Participants from time to time for no consideration or *de minimis* consideration as such interests are intended to constitute "profits interests" within the meaning of Revenue Procedures 93-27 and 2001-43. The Company will assign a Participation Level to each Incentive Unit upon its issuance in such amount that the Company determines is needed in order for each Incentive Unit to qualify as a profits interest for U.S. federal income tax purposes. Incentive Units will be granted and issued pursuant to separate Restricted Unit Agreements between the Company and each grantee thereof, and the Participation Level assigned to any Class C Unit will be specified in the Restricted Unit Agreement entered into upon the issuance of such Unit. Incentive Units will be further subject to restrictions on transfer, vesting and forfeiture and other terms set forth in a Restricted Unit Agreement. The terms of each Restricted Unit Agreement must be approved by the Board and may differ from other Restricted Unit Agreements. The Company expressly disclaims any obligation, and each holder of Class C Units hereby releases the Company from any obligation, to grant Class C Units to any Person on the same terms as to any other Person.

(d)     Options; Warrants. Subject to Board approval and the provisions of Section 4.3, the Company may grant, award, issue or sell options or warrants to acquire Units, and the Company will issue Units upon exercise of such options or warrants in accordance with the terms of documentation related to such options or warrants approved by the Board.

(e)     Issued and Outstanding Units; Unit Ledger. The Company will maintain a ledger (the "Unit Ledger") listing all of the record holders of Units and the number, class or series of Units held thereby; provided, notwithstanding the foregoing, to maintain the confidentiality of individual Incentive Unit grants, the Unit Ledger may list only certain information about Incentive Unit grants (such as the aggregate number and weighted average Participation Level of Incentive Units outstanding from time to time). Until the Board determines otherwise, Schedule 1 will serve as the Unit Ledger. A separate Incentive Unit ledger (the "Incentive Unit Ledger") will be maintained by the Company that lists the holders of Incentive Units, the number of Incentive Units outstanding and the Participation Level applicable to each outstanding Incentive Unit. The Incentive Unit Ledger will be kept in confidence from Persons other than members of the Board and other Persons authorized by the Board. The Company will update the Unit Ledger and Incentive Unit Ledger as Units are issued, forfeited, repurchased or Transferred from time to time in accordance with this Agreement. Modifications to the Unit Ledger and Incentive Unit Ledger for the foregoing purposes will not require consent or approval from any of the Members and will not be considered amendments to this Agreement.

(f)     Safe Harbor Election. Without any further action by the Board or any Member, the Company may make an election to value any Incentive Units at liquidation value (the "Safe Harbor Election") as the same may be permitted pursuant to or in accordance with the finally promulgated successor rules to Proposed Treasury Regulations Section 1.83-3(1) and IRS Notice 2005-43. The Board will cause the Company to make any allocations of items of income, gain, deduction, loss or credit (including forfeiture allocations under Proposed Treasury Regulations Section 1.704-1(b)(4)(xii)(c) and elections as to allocation periods) necessary or appropriate to effectuate and maintain the Safe Harbor Election.

(g) <u>Voting Rights</u>.

(i) *Voting Units*. The Class A Units will be Voting Units and will vote on all matters submitted for approval of the Members. Each Class A Unit will entitle the holder thereof to one vote for each such Unit. Whenever action is to be taken by the Sterling Holders under this Agreement, the decision, act or vote of the holders of a majority of the Class A Units held by all of the Sterling Holders at the time will be the decision, act or vote of all of the Sterling Holders. Notwithstanding the foregoing, the Board is authorized to eliminate the voting rights of any Voting Unit held by a Member who is not in Good Standing.

(ii) *Non-Voting Units*. The Class B Units and the Class C Units will be non-voting except with respect to such matters, if any, on which such Units are entitled to vote as a matter of mandatory, non-waivable Law and, in such cases, such votes will be cast on a combined basis (and not as a separate class) with all Voting Units.

**4.3** <u>Preemptive Rights</u>.

(a) At any time the Company or any Subsidiary proposes to issue Units, Unit Equivalents or other Equity Interests, in each case, other than Exempted Units (each such issuance, an "<u>Offering</u>," and the Units, Unit Equivalents or other Equity Interests of any Subsidiary offered in each Offering are referred to as the "<u>Offered Units</u>"), each Eligible Purchaser will have the right to purchase a portion of the Offered Units on the terms set forth in <u>Section 4.3(b)</u>. Any Eligible Purchaser that is a Blocker Member may assign its preemptive rights under this <u>Section 4.3</u> to a Permitted Transferee of such Blocker Member.

(b) Except under the circumstances described in <u>Section 4.3(e)</u>, the Company will give each Eligible Purchaser at least 15 days' prior notice before issuing any Offered Units (the "<u>First Notice</u>"), which notice will set forth in reasonable detail the proposed terms and conditions of such issuance (including a range of terms and conditions if the terms and conditions of the issuance have not been finalized) and will offer to each Eligible Purchaser the opportunity to purchase its Preemptive Right Percentage of the Offered Units at the same price, on the same economic and other material terms and conditions (including, if more than one type of security is issued, each type of security in the same proportion offered) and at the same time as the Offered Units are proposed to be issued by the Company or any Subsidiary to the other Persons participating in the Offering. If, following the giving of the First Notice, the terms of the proposed issuance materially change, the Company will furnish a supplemental notice (a "<u>Supplemental Notice</u>") describing the revised terms; provided, the Supplemental Notice will not restart the foregoing 15-day period, but the Company will give each Eligible Purchaser a reasonable period of time (which may be as few as five Business Days after the initial 15-day period) (such 15-day period, as and if so extended, being referred to as the "<u>Election Period</u>") to consider the revised terms. If any Eligible Purchaser wishes to exercise its preemptive rights, it must do so by delivering notice (which will constitute such Eligible Purchaser's acceptance of the offer contained in the First Notice, as modified by a Supplemental Notice, if applicable) to the Company within the Election Period specifying the maximum dollar amount of Offered Units such Eligible Purchaser (each a "<u>Requesting Investor</u>") would like to purchase (as to each Requesting Investor, its "<u>Maximum Dollar Amount</u>"), which may be equal to or be more or less than its Preemptive

10

Right Percentage of the Offered Units (the "Participation Commitment Notice"). The acceptance of each Requesting Investor will be irrevocable, and each Requesting Investor will be bound and obligated to purchase up to the number of Offered Units that have an aggregate purchase price equal to such Requesting Investor's Maximum Dollar Amount on the terms and conditions set forth in the First Notice, as modified by a Supplemental Notice, if applicable. If one or more Eligible Purchasers does not elect to purchase its full Preemptive Right Percentage of the Offered Units, except as provided in the last sentence of this Section 4.3(b), the Company will allocate the right to purchase the unsubscribed portion (the "Unsubscribed Portion") to each Requesting Investor whose Maximum Dollar Amount exceeds the dollar amount represented by its Preemptive Right Percentage of the Offered Units (with the rights being allocated to such Requesting Investors based on their relative Preemptive Right Percentages). Any Eligible Purchaser that fails to deliver its Participation Commitment Notice to the Company before the termination of the Election Period will be deemed to have waived its preemptive rights with respect to such Offering. Notwithstanding the foregoing, each Sterling Holder that specifies a Maximum Dollar Amount in excess of the purchase price of its Preemptive Right Percentage of the Offered Units (each, an "Oversubscribing Sterling Holder") will have the first right to purchase all or a portion of the Unsubscribed Portion, and the Sterling Holders will specify the manner in which the Unsubscribed Portion will be allocated among the Oversubscribing Sterling Holders.

(c)    If fewer than all of the Offered Units are subscribed for by the Eligible Purchasers pursuant to Section 4.3(b), the Company or the applicable Subsidiary will have the right to issue and sell the unsubscribed-for portion of the Offered Units to any Person at any time during the 90 days following the termination of the Election Period only on terms and conditions that are not materially more favorable to the offeree than those set forth in the First Notice, as modified by a Supplemental Notice, if applicable, without any further notice to such Eligible Purchasers.

(d)    In connection with the issuance and sale of Offered Units subscribed for by the Members pursuant to the preemptive rights provisions of this Section 4.3, the Board may, in its sole and reasonable discretion, impose such other reasonable and customary terms and procedures such as setting a closing date and rounding the number of the Units to be issued to any subscriber to the nearest whole number. Each Member in its capacity as a Requesting Investor will take or cause to be taken all such reasonable actions as may be necessary or desirable in order to expeditiously consummate each Offering pursuant to this Section 4.3 and any related transactions, including executing, acknowledging and delivering customary closing deliveries such as accredited investor certificates, representations of due authority and otherwise cooperating with the Company, the other Requesting Investors and each other Person to whom the Offered Units are proposed to be issued, if any. Without limiting the generality of the foregoing, each Member in its capacity as a Requesting Investor agrees to execute and deliver such subscription and other agreements specified by the Company. If any Eligible Purchaser defaults on the purchase of Offered Units which it had agreed to purchase pursuant to the exercise of preemptive rights granted under this Section 4.3, in addition to any other rights the Company has available to it at Law or in equity, such Member will not be considered an Eligible Purchaser for any future rights granted under Section 4.3(a) unless the Board expressly designates such Person as an Eligible Purchaser (which the Board, in its sole discretion, may do on an offer-by-offer basis or not at all). Notwithstanding anything to the contrary in this Section 4.3, the Company or the applicable

11

Subsidiary may terminate an Offering of Offered Units at any time prior to the closing of such Offering whereupon the Company or the applicable Subsidiary will have no obligation or liability to an Eligible Purchaser even if such Eligible Purchaser had elected to participate in such Offering.

(e)       The Parties acknowledge that, under certain circumstances, the Company or a Subsidiary may require capital on an expedited basis such that the full preemptive rights process described above cannot be completed in a timely manner.  In such case, notwithstanding anything to the contrary in this Section 4.3, (i) the Company or a Subsidiary may issue Offered Units to one or more of the Eligible Purchasers to raise the required funds in the required timeframe so long as, within 60 days after the completion of the initial sale, the Company or the applicable Subsidiary makes the same investment opportunity available to all Eligible Purchasers that were not offered the opportunity in connection with the closing of the initial Offering, to the same extent as would have been required under Section 4.3(a) through Section 4.3(d) and (ii) until all Eligible Purchasers have so acquired such Offered Units (or the applicable period during which Eligible Purchasers have the option to acquire a portion of such Offered Units pursuant to the foregoing provisions of this Section 4.3 has lapsed), the Company or the applicable Subsidiary will not make any distribution in respect of any class of Units that is the same as the Offered Units or consummate any Strategic Transaction.  The Company or the applicable Subsidiary may elect to make such same investment opportunity available to such other Eligible Purchasers either by requiring the initial subscribers to sell down a portion of their investment, by issuing additional Offered Units or a combination of the foregoing or by taking any other action which effectively provides such other Eligible Purchasers with the same investment opportunity as would have been required under Section 4.3(a) through Section 4.3(d).  If the Company elects to fulfill its obligation under the preceding sentence by issuing additional Offered Units to those Eligible Purchasers that were not given the opportunity to participate in the initial Offering, the Offered Units issued by the Company or the applicable Subsidiary will constitute "Exempted Units" so as not to trigger preemptive rights with respect to the issuance thereof so long as the issuance is in satisfaction of the obligations under this Section 4.3(e).

(f)       The rights granted in this Section 4.3, other than the catch-up rights set forth in Section 4.3(e) in respect of issuances subject to this Section 4.3, will terminate immediately prior to, but conditioned on the consummation of, an Initial Public Offering.

**4.4**    Transfer Related Provisions.

(a)       General Rules.

(i)       *Required Compliance*.  No Transfer of Units will be valid unless it is made in accordance with the terms of this Section 4.4 and, in the case of Incentive Units, in accordance with any Transfer restrictions set forth in the Restricted Unit Agreement applicable thereto.  Any attempted Transfer that is not in accordance with this Section 4.4 and, in the case of Incentive Units, in accordance with any Transfer restrictions set forth in the Restricted Unit Agreement applicable thereto will be, and is hereby declared, null and void *ab initio*.

(ii)       *Prohibited Transfers*.  Unless expressly approved by the Board through a prior written consent on a case by case basis, no Member will Transfer all or any

12

of its Units (including any of its Incentive Units) (A) if such Transfer would subject the Company to the reporting requirements of the Exchange Act, (B) if such Transfer would cause the Company to lose its status as a partnership for United States federal income tax purposes or cause the Company to be classified as a "publicly traded partnership" within the meaning of Code Section 7704, (C) if the Board determines such Transfer would damage the Company or any Subsidiary because such Transfer would violate, give rise to a default under or cause any material payment to become due under any credit agreement, guaranty or similar credit document or any other material contract to which the Company or any Subsidiary is bound, or (D) to an Adverse Person.  Transfers prohibited by this Section 4.4(a)(ii) are referred to herein as "Prohibited Transfers."

(iii)    *Involuntary Transfers*.  An Involuntary Transfer of Units (including an Involuntary Transfer that is a Permitted Transfer) will be deemed to have been made in accordance with this Agreement if (A) such Transfer is not a Prohibited Transfer and (B) each transferee (other than the Company) in such Involuntary Transfer joins in and agrees to be bound by this Agreement (and therefore agrees to become a Member) with respect to the Units acquired thereby, in accordance with Section 4.4(a)(xi).

(iv)    *Permitted Transfers*.  A Member may make a Voluntary Transfer to a Permitted Transferee subject to compliance with Section 4.4(a)(xi) and, in the case of Incentive Units, subject to compliance with any Transfer restrictions set forth in the Restricted Unit Agreement applicable thereto.

(v)    *Transfers by Sterling Holders*.  In addition to Transfers permitted under Section 4.4(a)(iii) or Section 4.4(a)(iv), a Sterling Holder may make a Voluntary Transfer of Units (other than a Prohibited Transfer) at any time and in its sole discretion, subject to compliance with Section 4.4(a)(xi) and Section 4.4(c) to the extent such sections apply to the Transfer at hand.

(vi)    *Other Institutional Holder Transfers*.  In addition to Transfers permitted under Section 4.4(a)(iii) or Section 4.4(a)(iv), an Institutional Holder (other than the Sterling Holders, who are covered under Section 4.4(a)(v) rather than this Section 4.4(a)(vi)) may make a Voluntary Transfer of Units (other than a Prohibited Transfer) at any time and in its sole discretion, subject to compliance with Section 4.4(a)(xi), Section 4.4(b) and Section 4.4(c) to the extent such sections apply to the Transfer at hand.

(vii)    *Transfers by Other Holders*.  In addition to the Transfers permitted under Section 4.4(a)(iii) or Section 4.4(a)(iv), any Member (other than the Sterling Holders, who are covered under Section 4.4(a)(v), and the other Institutional Holders, who are covered under Section 4.4(a)(vi)) may make a Voluntary Transfer of Units (other than a Prohibited Transfer) only if the Board consents to such Transfer in its sole discretion and such Transfer is made subject to compliance with Section 4.4(a)(xi), Section 4.4(b) and Section 4.4(c) to the extent such sections apply to the Transfer at hand.

(viii)    *Indirect Transfers*. Any Member that is an Entity will be deemed to have Transferred any Unit held thereby if (A) such Entity, or any Entity that has a direct or indirect ownership interest in such Entity, issues equity or equity-linked securities

13

therein or any equity or equity-linked security therein is Transferred, in each case, other than to a Permitted Transferee of such Entity, (B) the fair market value of the Entity's Units at the time of the issuance or Transfer described in clause (A) exceeds 30% of the fair market value of all of the assets of the Entity as a whole (a "Deemed Indirect Transfer") and (C) assets are contributed to, or otherwise obtained by, such Entity in order to avoid the application of clause (B) preceding. If a Deemed Indirect Transfer occurs without the approval of the Board, the Entity that makes such Deemed Indirect Transfer will be deemed to have violated this Section 4.4, and, in addition to such rights and remedies as the Company and other Members have against such defaulting Member as set forth in this Agreement, such defaulting Member will take all action required to void such Deemed Indirect Transfer.

(ix)    *SPV Members.*

(A)    The Company will identify on Schedule 1 which of the Members is known to the Company as an SPV Member (based on its representations and warranties set forth in this Agreement, any Joinder Agreement or any Individual Insider Member Agreement or based on other information that becomes known to the Company); provided, the Company is not obligated to determine whether a Member is an SPV Member and therefore will have no liability for failing to identify any Member as such.

(B)    Direct and indirect changes in the ownership of an SPV Member have the effect of indirectly shifting some or all of the economic benefits and burdens of Unit ownership similar to shifts that result from direct Transfers of Units, which are regulated by this Section 4.4. Accordingly, each SPV Member (other than any Sterling Holder that is an SPV Member, which is covered by Section 4.4(a)(ix)(C)) will not permit direct or indirect changes in the ownership thereof (other than those that result from Involuntary Transfers) without the prior consent of the Board or the Majority Holders.

(C)    Voluntary Transfers of equity interests in the Sterling Holders to any particular transferee are permitted without restriction so long as (1) the other Members that would have co-sale rights under Section 4.4(c) (assuming such Sterling Holder Transferred Units to such transferee (rather than equity interests in such Sterling Holder)) are given economically equivalent (and the same other material) co-sale rights to sell Units to such transferee alongside the Transfer of equity interests in any Sterling Holder and (2) any Member described in clause (1) preceding that is a Blocker Member is given the opportunity to allow its owners (or the owners of its Related Blocker Entity, if applicable) to sell equity interests in such Blocker Member or, if applicable, Related Blocker Entity on the same economic and other material terms that the owners of such Sterling Holder agree to in connection with their sale of equity interests in such Sterling Holder (subject to the co-sale related limitations contained in the Customary Transaction Terms).

14

(x)     *Blocker Entities.*

(A)     The Company will indicate on Schedule 1 each Member who has requested to be treated as a Blocker Member prior to its admission as a Member and each Related Blocker Entity of such Blocker Member identified as such by such Blocker Member.

(B)     The Members and the Company acknowledge that, for tax reasons, Blocker Members may prefer to effect sales and other Transfers of Units indirectly by selling or otherwise Transferring ownership in the Blocker Entity itself (or ownership in a Related Blocker Entity, if applicable) rather than the Blocker Member directly selling or otherwise Transferring any of its Units. The terms of this Section 4.4 regulate Transfers of Units and, to the extent set forth in this Section 4.4, Transfers of equity and other ownership changes in Blocker Members themselves and in their Related Blocker Entities. However, the principles set forth in this Section 4.4 that apply to Transfers of Units also will apply to Transfers of equity and other ownership changes in the Blocker Members themselves and in their Related Blocker Entities. Accordingly, each Blocker Member (other than any Sterling Holder that is a Blocker Member, which is covered by Section 4.4(a)(v)) agrees that it will not permit direct or indirect changes in the ownership thereof or in the ownership of its Related Blocker Entity unless such change is approved by the Board or the Majority Holders in their sole discretion; provided, Transfers of ownership in any Blocker Member or in any Related Blocker Entity to Permitted Transferees of such Blocker Member will be permitted to the same and extent, and subject to the same conditions, as Transfers of Units by such Blocker Member to its Permitted Transferees.

(C)     In connection with any Approved Transaction (other than an Initial Public Offering which is covered by Section 4.4(a)(x)(E)) in which any Blocker Member is required or permitted to participate, if requested by such Blocker Member, the Company will ensure that such Blocker Member is permitted to participate in such transaction by allowing all or a portion of the equityholders (as designated by such Blocker Member) of such Blocker Member or its Related Blocker Entity to Transfer their equity interests in such Blocker Member or in its Related Blocker Entity, subject to the same limitations contained in the Customary Transaction Terms. Notwithstanding the fact that an acquiror of equity interests of a Blocker Member or a Related Blocker Entity may ascribe a different value to such equity interests than the Units held thereby, the aggregate consideration in any Approved Transaction will be disbursed in the manner described in Section 4.4(d)(iv).

(D)     In connection with any Proposed Co-Sale Transfer by a Co-Sale Seller that is not a Blocker Member, such Co-Sale Seller will give each Blocker Member that would have co-sale rights under Section 4.4(c) the opportunity to have all or a portion of the equityholders (as designated by such Blocker Member) of such Blocker Member or its Related Blocker Entity sell equity interests in such Blocker Member or its Related Blocker Entity (rather than the

15

Units held by such Blocker Member) alongside the Co-Sale Seller's Transfer of Units on economically equivalent (and the same other material) terms to those set forth in Section 4.4(c) (subject to the co-sale related limitations contained in the Customary Transaction Terms) but with such changes to such terms (but subject to such limitations) as the Board or the Majority Holders establish to reflect the differences between the direct Transfer of Units and the sale of equity in a Blocker Member or its Related Blocker Entity including the governance terms that will apply among the co-owners of such Blocker Member or Related Blocker Entity after such Transfer; provided, notwithstanding the fact that an acquiror of equity interests of a Blocker Member or Related Blocker Entity may ascribe a different value to such equity interests than the Units acquired directly thereby in a Proposed Co-Sale Transfer, the aggregate consideration in any Proposed Co-Sale Transfer will be disbursed as if the transferors of equity in any Blocker Member or Related Blocker Entity had directly transferred a corresponding percentage of the Class A Units and Class B Units held by the applicable Blocker Member (but such proceeds will be payable to the sellers of equity in such Blocker Member or its Related Blocker Entity equity rather than the Blocker Member itself).

(E)     In connection with an Initial Public Offering, the Company will use commercially reasonable efforts to allow the Blocker Members or their Related Blocker Entities to merge into the IPO Issuer, to allow the owners of each such Blocker Member or Related Blocker Entity to contribute their equity interests in such Blocker Member or its Related Blocker Entity to the IPO Issuer in exchange for equity therein or to utilize another structure deemed acceptable by the Board or the Majority Holders to address the United States Federal income tax inefficiencies that would arise if a Blocker Member or its Related Blocker Entity itself (rather than its equityholders) owned securities in the IPO Issuer.

(xi)     *Transfer Conditions*.

(A)     *Joinder*.  As a condition to any Transfer permitted under this Section 4.4 (other than an Approved Transaction that is structured as an asset sale or a sale of all of the outstanding Units), unless waived by the Board or the Majority Holders, a transferee of Units will be required to become a party to this Agreement by executing (together with such Person's spouse, if applicable) a Joinder Agreement.  If any Person acquires Units from a Member in a Transfer, notwithstanding such Person's failure to execute a Joinder Agreement in accordance with the preceding sentence (including an Involuntary Transfer), such Person and such Units will be bound by and subject to this Agreement.

(B)     *Securities Laws Compliance*.  No Units may be Transferred by a Person unless the transferor first delivers to the Company, at the transferring Member's sole cost and expense, evidence reasonably satisfactory to the Company (such as an opinion of counsel) to the effect that such Transfer is not required to be registered under the Securities Act; provided, the Board or the Majority Holders may waive the foregoing opinion requirement.

16

(C)     *Prohibited Transfers*.  Notwithstanding anything to the contrary in this Agreement, no Transfer will be effective unless and until the Company provides notice to the proposed transferor that the proposed Transfer will not, if effected, constitute a Prohibited Transfer.  The Company will indicate whether a proposed Transfer will or will not be a Prohibited Transfer within 15 days after receipt of any request for such determination from any proposed transferor.

(D)     *Expense Reimbursement*.  Unless waived by the Board or the Majority Holders, no Transfer of Units will be effective unless the transferor reimburses, or causes the transferee to reimburse, the Company for any out of pocket expenses incurred by it that would not have been incurred but for such Transfer.

(E)     *Related Individual*.  No Transfer of Units by an Insider Member that is an Entity will be effective unless and until Schedule 1 specifies a Related Individual for the transferee thereof.

(b)     Right of First Refusal.

(i)     The remaining provisions of this Section 4.4(b) will not apply to the following (each, an "Exempt ROFR Transfer"): (A) a Voluntary Transfer made by a Sterling Holder in accordance with Section 4.4(a)(v), (B) an Involuntary Transfer made in accordance with Section 4.4(a)(iii), (C) a Permitted Transfer made in accordance with Section 4.4(a)(iv), (D) a Voluntary Transfer that is made at the request of the Board or the Majority Holders as part of an Approved Transaction, (E) a Voluntary Transfer that results from the exercise of co-sale (tag-along) rights under Section 4.4(c), (F) a Voluntary Transfer that results from the exercise of demand or piggyback registration rights granted by the Company or any Subsidiary or (G) any other specific Transfer that the Board exempts from the remaining provisions of this Section 4.4(b), which the Board may do in its sole discretion.

(ii)     Except for any Exempt ROFR Transfer, before any Member Transfers any Units to any Person (including to another Member), such Member (the "Disposing Holder") must give notice (a "Disposition Notice") of the proposed Transfer (the "Proposed Transfer") to the Company setting forth: (A) the name and address of the prospective acquiror (the "Proposed Transferee") and the number and type of Units proposed to be Transferred (the "Sale Units"), (B) the per Unit purchase price offered by such Proposed Transferee and the Disposing Holder's calculation of the fair market value of any non-cash portion of the proposed consideration, if any, along with reasonable detail concerning such non-cash consideration, to allow the Board to evaluate the proposed fair market value of such non-cash consideration, (C) the contemplated timetable for consummating such Proposed Transfer, (D) material conditions to closing of the Proposed Transfer, (E) details of financing of the Proposed Transfer and (F) all other material terms and conditions of the Proposed Transfer that are then known to the Disposing Holder and a copy of any written offer, letter of intent or term sheet with respect to such Proposed Transfer (whether binding or non-binding).  Based on the information set forth in the

17

Disposition Notice, the Board will determine if the Proposed Transfer is a Prohibited Transfer and, if not, whether Board consent is required under Section 4.4(a)(vii). If the Board determines that the Proposed Transfer is not a Prohibited Transfer and if the Proposed Transfer either does not require Board consent or if the Board consents thereto, then the Board will determine the fair market value of any non-cash consideration described in the Disposition Notice. If the consideration is all cash or if the fair market value of any such non-cash consideration as determined by the Board is equal to or greater than the fair market value of such consideration as specified by the Disposing Holder in the Disposition Notice, then the provisions of Section 4.4(b)(iv) will next apply, otherwise the provisions of Section 4.4(b)(iii) will next apply.

(iii)    If the fair market value of any non-cash consideration included in a Disposition Notice as determined by the Board is less than the fair market value specified by the Disposing Holder in the Disposition Notice, and if the Board and the Disposing Holder are unable to mutually agree upon the fair market value of such non-cash consideration within five Business Days after the Board notifies the Disposing Holder of its determination thereof, then the Company will promptly engage and instruct a qualified investment bank or other qualified appraiser (the "Firm") to determine the fair market value of such non-cash consideration. The Firm will be instructed to return its decision within 30 days after all material information is submitted thereto, which decision will be Final, and notice of such decision will be given by the Company to the Disposing Holder no later than the third Business Day following such decision. All costs of the Firm will be equitably apportioned by the Firm between the Disposing Holder and the Company in the manner the Firm determines reflects the relative merits of each of their valuation determinations with the party having the greater relative merit bearing a lesser relative share of such costs. The Firm will be instructed to provide a written statement and analysis in reasonable detail in support of its determination of the fair market value of the non-cash consideration. If the Firm's determination of the value of any non-cash consideration is equal to or greater than the fair market value of such consideration as determined by the Disposing Holder in the Disposition Notice, then the provisions of Section 4.4(b)(iv) will next apply. If the Firm's determination of the value of any non-cash consideration is less than the fair market value of such consideration as determined by the Disposing Holder in the Disposition Notice, then the Disposing Holder may decide whether to abandon the Proposed Transfer or continue with the procedures in this Section 4.4(b). If the Disposing Holder decides to proceed with the Proposed Transfer, then the Company and the Disposing Holder will amend the Disposition Notice to substitute the Firm's determination of fair market value of the non-cash consideration for the Disposing Holder's determination thereof and the Disposition Notice will be deemed to have been given to the Company on the date such amended Disposition Notice is delivered to the Company. Thereupon, the provisions of Section 4.4(b)(iv) will next apply.

(iv)    If the total value of the Sale Units is less than or equal to $2,000,000, the Company may elect to purchase all, but not less than all, of the Sale Units for the ROFR Unit Purchase Price so long as the Company notifies the Disposing Holder of its election no later than the 10th day after the later of the date on which the Disposition Notice is given or deemed to have been given (the "Company Acceptance Deadline"), after which the

18

provisions of Section 4.4(b)(v) will next apply.  If the total value of the Sale Units as described in the Disposition Notice is greater than $2,000,000 or if the Company does not timely elect to purchase the Sale Units pursuant to the foregoing sentence, then the remainder of this Section 4.4(b)(iv) will next apply.  The following provisions of this Section 4.4(b)(iv) will apply at any time any of the preceding provisions in this Section 4.4(b) direct for the provisions of this Section 4.4(b)(iv) to apply. The Company will furnish a copy of the Disposition Notice (as amended in accordance with the above provisions, if applicable) to the ROFR Offerees within 30 days after the later of the date on which such Disposition Notice is given or deemed to have been given to the Company. The giving of such Disposition Notice will constitute an offer by the Disposing Holder to sell all of the Sale Units to the Company and/or the ROFR Offerees. Each of the ROFR Offerees will have the option, but not the obligation, exercisable by giving notice at any time prior to the 15th day (the "ROFR Acceptance Deadline") after the later of the date on which the Disposition Notice is given or deemed to have been given to the ROFR Offerees (which deadline will be specified by the Company in the Disposition Notice or cover letter transmitting same), to acquire a portion of the Sale Units for the ROFR Unit Purchase Price.  To exercise the right of first refusal offer granted hereby, a ROFR Offeree must notify the Company before the ROFR Acceptance Deadline, and such exercise notice (which will constitute such ROFR Offeree's irrevocable acceptance of the offer contained in the Disposition Notice) must set forth the number of Sale Units such ROFR Offeree elects to purchase, which may be more or less than, or equal to, its ROFR Percentage Interest of the Sale Units.  If any ROFR Offeree elects not to purchase any Sale Units or elects to purchase a fewer number of Sale Units than its ROFR Percentage Interest, the Company will allocate the residual Sale Units to the ROFR Offerees that elect to purchase more than their ROFR Percentage Interest of the Sale Units, and such allocation will be made in proportion to the ROFR Percentage Interests of the oversubscribing ROFR Offerees or in such other proportion upon which the oversubscribing ROFR Offerees unanimously agree.  A ROFR Offeree that fails to make its purchase election before the ROFR Acceptance Deadline will be deemed to have waived its right of first refusal rights with respect to such Proposed Transfer. The Company will have the right to purchase any or all of the Sale Units not purchased by the ROFR Offerees on the same terms offered to the ROFR Offerees so long as the Company notifies the Disposing Holder of its election no later than the 10th day after the ROFR Acceptance Deadline.

(v)     The closing of the purchase and sale of the Sale Units to the electing ROFR Offerees and, if applicable, the Company (each, an "Accepting Investor") pursuant to this Section 4.4(b) will take place on the 20th Business Day following the later of the Company Acceptance Deadline or, if applicable, the ROFR Acceptance Deadline.  At the closing, each Accepting Investor's purchase consideration will be delivered by such Accepting Investor to the Disposing Holder, the Disposing Holder will represent and warrant in writing to each Accepting Investor that the Sale Units are free and clear of all liens, encumbrances and adverse claims (other than the terms of this Agreement), and the Disposing Holder will deliver to each Accepting Investor such unit certificates representing the Sale Units (if the Units are then certificated) so purchased, accompanied by duly executed transfer instruments and such other matters as are deemed reasonably necessary by the Company for the proper transfer of such Sale Units on the books of the Company.

The Company, the Disposing Holder, and each Accepting Investor will cooperate in good faith in obtaining all necessary governmental and other third party approvals, waivers and consents required for the closing of such purchase and sale.  Any such closing will be delayed, to the extent required, until the third Business Day following the expiration of any required waiting periods under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended; provided, such delay will not exceed more than 60 days and, if governmental approvals and waiting periods are not obtained or have not expired, as the case may be, by such 60th day, then the Accepting Investors affected by such delay will be deemed to have waived the right of first refusal with respect to the Sale Units to be purchased by them.

(vi)    If, in connection with any Transfer under this Section 4.4(b), any record date for any distribution by the Company (other than tax distributions in accordance with Section 6.1(b)) or any record date for the issuance of any Units or Equity Interests of any other Person in respect of Units in connection with any exchange, merger, recapitalization, consolidation, reorganization or other transaction involving the Company occurs on or after the date of the Disposition Notice and prior to the closing of the purchase of any Sale Units pursuant to Section 4.4(b)(v), then the Accepting Investors will be entitled to receive any such distributions or issuances of Units or Equity Interests, as the case may be, in respect of the Units they acquire pursuant to the exercise of their preferential purchase rights, and appropriate documentation will be delivered at the closing by the Disposing Holder to evidence the Accepting Investors' rights to receive such distributions or issuances of Units or Equity Interests.

(vii)    If any Sale Units are not purchased pursuant to the procedures above in this Section 4.4(b) (the "Remaining Sale Units"), then the Disposing Holder will be permitted to Transfer the Remaining Sale Units to the Proposed Transferee (so long as it is not a Prohibited Transfer) on the terms set forth in the original Disposition Notice, subject first to the co-sale (tag-along) provisions of Section 4.4(c), prior to the later of (A) 90 days after the later of the ROFR Acceptance Deadline or the Company Acceptance Deadline, and (B) 10 days after the satisfaction of all governmental approval or filing requirements. Any Transfer to which this Section 4.4(b) applies that is not made before such deadline will require the reapplication of the provisions of this Section 4.4(b).

(viii)    Blocker Members whose Transfers of Units are subject to the terms of this Section 4.4(b) (i.e. Blocker Members other than the Sterling Holders) will not permit direct or indirect changes in the ownership thereof (including in its Related Blocker Entities, if any) without entering into arrangements, which must be approved by the Board or the Majority Holders, that provide the Members with rights comparable to those in this Section 4.4(b).

(ix)    The rights granted in this Section 4.4(b) will terminate immediately prior to, but conditioned on the consummation of, an Initial Public Offering.

(c)    Co-Sale (Tag-Along) Rights.

(i)    The remaining provisions of this Section 4.4(c) will not apply to the following (each, an "Exempt Tag Transfer"): (A) an Involuntary Transfer made in

20

accordance with Section 4.4(a)(iii), (B) a Permitted Transfer made in accordance with Section 4.4(a)(iv), (C) a Transfer that results from the exercise of the right of first refusal provisions under Section 4.4(b), (D) a Transfer that results from the exercise of demand or piggyback registration rights granted by the Company or any Subsidiary, (E) a Transfer that is made at the request of the Board or the Majority Holders as part of an Approved Transaction so long as each Member that holds Class A Units or Class B Units (or, in the case of Blocker Members, the equityholders of such Blocker Member or the equityholders of its Related Blocker Entity) has the opportunity (whether by choice or by requirement) to participate in such Approved Transaction at least to the same extent such Blocker Member (or the equityholders of such Blocker Member or the equityholders of its Related Blocker Entity) would be entitled to participate in any Transfer under this Section 4.4(c) if the exception in this clause (E) were disregarded and (F) any other specific Transfer by a Person (other than a Sterling Holder) so long as the Board exempts such Transfer from this Section 4.4(c), which the Board may determine in its sole discretion.

(ii)    If (A) any Member, including a Sterling Holder, proposes to Transfer any of its Class A Units or Class B Units (each such Member, a "Co-Sale Seller," and each such proposed Transfer, a "Proposed Co-Sale Transfer"), (B) such Transfer is neither a Prohibited Transfer nor an Exempt Tag Transfer and (C) either the right of first refusal provisions of Section 4.4(b) do not apply to such Proposed Co-Sale Transfer or Remaining Sale Units exist after application of Section 4.4(b) to such Transfer, then such Co-Sale Seller will offer (the "Co-Sale Offer") to include in such Transfer a number of Class A Units and Class B Units owned by each Eligible Co-Sale Participant in accordance with the remaining terms of this Section 4.4(c).

(iii)    The Co-Sale Seller will notify the Company (the "Co-Sale Notice") at least 20 calendar days prior to the scheduled closing of the Proposed Co-Sale Transfer. The Co-Sale Notice will include the name and address of the prospective acquiror (the "Proposed Co-Sale Transferee"), the number of Class A Units or Class B Units proposed to be Transferred (the "Co-Sale Units"), the per Unit purchase price offered by such Proposed Co-Sale Transferee (which must be the same for each Class A Unit and each Class B Unit because Class B Units can be exchanged for Class A Units at any time), reasonable detail concerning any non-cash portion of the proposed consideration, the contemplated timetable for consummating such transaction, material conditions to closing, details of financing and all other material terms and conditions of the Proposed Co-Sale Transfer that are then known to the Co-Sale Seller and a copy of any written offer, letter of intent, term sheet or agreement with respect to such Proposed Co-Sale Transfer (whether or not binding or non-binding). The Company will promptly provide each Eligible Co-Sale Participant with a copy of the Co-Sale Notice. If any Eligible Co-Sale Participant wishes to accept the Co-Sale Offer and participate in the Proposed Co-Sale Transfer, such Eligible Co-Sale Participant must notify the Company within 15 days after the Co-Sale Notice is given. If an Eligible Co-Sale Participant elects to participate in such Proposed Co-Sale Transfer (each, an "Electing Co-Sale Member"), then such Person will have the right to include Units in such Transfer as provided in the remaining terms of this Section 4.4(c), but only if such Person executes and delivers the Customary Transaction Documents evidencing such Person's agreement to the Customary Transaction Terms.

(iv)     Unless otherwise unanimously agreed to by all of the Electing Co-Sale Members and the Co-Sale Seller, each Electing Co-Sale Member may elect, by notice delivered to the Company within 15 days after the Co-Sale Notice is given, to include in such Transfer up to its Co-Sale Percentage of the Co-Sale Units.  The number of Units each Electing Co-Sale Member elects to sell in accordance with the foregoing is referred to as such Electing Co-Sale Member's "Co-Sale Elected Units."  If requested by the Proposed Co-Sale Transferee, any Co-Sale Units or Co-Sale Elected Units that are Class B Units will be exchanged for a like number of Class A Units immediately upon the consummation of the Proposed Co-Sale Transfer or acquisition by the Co-Sale Seller, as applicable.  The Co-Sale Seller will reduce the number of Units it includes in the Proposed Co-Sale Transfer by the Co-Sale Elected Units or, if the Proposed Co-Sale Transferee refuses to purchase Units from any Electing Co-Sale Member, the Co-Sale Seller will purchase the Co-Sale Elected Units from the Electing Co-Sale Member on the same economic terms as those described in the Co-Sale Notice.

(v)     Except as provided below in this Section 4.4(c)(v) with respect to participants who are not accredited investors, all consideration payable as a result of the consummation of a Proposed Co-Sale Transfer will be aggregated, handled, adjusted and disbursed in the manner described in Section 4.4(d)(iv).  If the Proposed Co-Sale Transferee refuses to allocate the consideration in the manner described in Section 4.4(d)(iv) or requires transaction terms that are more onerous than the Customary Transaction Terms, none of the Members (including the Co-Sale Seller) will be permitted to consummate such Proposed Co-Sale Transfer (and none of the Members who are Blocker Members will permit their direct or indirect equity owners to consummate such Proposed Co-Sale Transfers).  Notwithstanding the foregoing rule that requires allocation of the net consideration payable in a Proposed Co-Sale Transfer in the manner described in Section 4.4(d)(iv), if such consideration includes Equity Interests in a transaction not involving a Public Offering and any Person who would otherwise receive a portion of such Equity Interests is not an accredited investor (as defined under Rule 501 of Regulation D under the Securities Act) or is a former employee of the Company or any of its Subsidiaries, then the Company may require each such Person (A) to receive solely cash in such transaction, (B) to otherwise be cashed out (by redemption, retirement or otherwise) by the Company, any Member or any other Person approved by the Majority Holders prior to the consummation of such transaction or (C) to appoint a purchaser representative (as contemplated by Rule 506 of Regulation D under the Securities Act) selected by the Company, with the intent being that such Person receive cash equal to the Fair Market Value of the Equity Interests it would have received in the absence of this sentence.

(vi)     The date on which the Proposed Co-Sale Transfer will be consummated will be the date specified in the Co-Sale Notice unless such longer period of time is required to obtain, make or satisfy governmental approval or filing requirements, if any, required to consummate the Proposed Co-Sale Transfer.

(vii)     Blocker Members whose Transfers of Units are subject to the terms of this Section 4.4(c) will not permit direct or indirect changes in the ownership thereof (including in its Related Blocker Entities, if any) without entering into arrangements, which

22

must be approved by the Board or the Majority Holders, that provide the Members with rights comparable to those in this Section 4.4(c).

(viii)    The rights granted in this Section 4.4(c) will terminate immediately prior to, but conditioned on the consummation of, an Initial Public Offering.

(d)    _Strategic Transactions_.

(i)    _Processes_.  At any time, the Board or the Majority Holders may request the Company to initiate an auction or other process with a view to consummating a Strategic Transaction.  Following such request, the Company will initiate the process as requested including, if requested, engaging an investment banker and counsel selected by the Board (a "Transaction Process").

(ii)    _Required Participation_.

(A)    If, whether or not as a result of a Transaction Process, the Board or the Majority Holders approve a Strategic Transaction and such Strategic Transaction does not require consent under Section 8.4(b) or consent is obtained for such transaction under Section 8.4(b) (each, an "Approved Transaction"), then the Company and each Member will comply with the remaining terms of this Section 4.4(d) and will take all other actions (in their capacities as Members) reasonably requested by the Majority Holders or the Board that do not conflict with the remaining terms of this Section 4.4(d) to effect such Approved Transaction.

(B)    If the Approved Transaction is structured as the sale, exchange, redemption or other Transfer of Units, each Member (other than any Blocker Member that, pursuant to Section 4.4(a)(x)(C), elects for its direct or indirect equityholders to sell equity interests in such Blocker Member or its Related Blocker Entity in such Approved Transaction and takes all actions reasonably requested by the Board or the Majority Holders in connection with participating in such manner) will sell, exchange, deliver, surrender and Transfer its Units in the manner and in the amount requested by the Board or the Majority Holders.

(C)    If the Approved Transaction is structured as a merger in which the Company is a constituent entity (whether or not the surviving entity) or a sale of the Company's assets (including a sale of all or substantially all of its assets), each Member (in its capacity as a Member) agrees (1) that, to the maximum extent permitted by Law (including the Act), no Member vote will be required and, as provided in Section 2.9, no Member will have dissenters' or appraisal rights with respect to such transaction and (2) to support and, if applicable Law does not permit the elimination of a Member's vote with respect to such transaction, to vote in favor of such transaction and to waive all dissenters' and appraisal rights with respect thereto.

(iii)    _Transaction Documentation_.  If requested by the Board or the Majority Holders, in connection with an Approved Transaction, a Member will be required

23

to execute and deliver the Customary Transaction Documents applicable to such transaction evidencing such Member's agreement to the Customary Transaction Terms applicable to such transaction.  For purposes of clarification, without the consent of a particular Member, such Member will not be required to agree to terms that are more onerous than the Customary Transaction Terms (disregarding deviations from the Customary Transaction Terms that are not, in the aggregate, materially adverse to such Member).  The Members acknowledge and agree that, subject to the express requirements contained in the definition of Customary Transaction Documents, the Board or the Majority Holders may not require all of the Members to enter into the same documentation as one another.  In particular, as the lead investors, the Sterling Holders (or their direct or indirect equityholders) may rollover a portion of their investment in the Company (directly or by rolling over an indirect interest in the Company through a rollover of ownership in a Blocker Member itself or its Related Blocker Entity) as part of an Approved Transaction and nothing in this Agreement will entitle the other Members (or their direct or indirect equityholders) to rollover any of their investment in the Company or in a Blocker Member (or Related Blocker Entity, if applicable) as part of such Approved Transaction so long as the rollover amount invested by the Sterling Holders does not exceed 30% of the pre-tax proceeds that would have been payable to all Sterling Holders in such transaction (the "Sterling Rollover Exception").

      (iv)    *Expenses; Disbursement of Consideration.*

      (A)    Regardless of the manner in which an Approved Transaction is structured, all of the consideration payable to the Company, the Members the Blocker Members' direct or indirect owners, or any other transaction beneficiary of such Approved Transaction (collectively, the "Transaction Beneficiaries") by reason of such Approved Transaction will be handled by or at the direction of the Deal Representative whom the Members hereby appoint as the sole representative of the Transaction Beneficiaries to carry out the matters described in this Section 4.4(d)(iv).  The Deal Representative is authorized (1) to reduce the aggregate consideration payable to the Transaction Beneficiaries by all fees and expenses approved by the Board or the Majority Holders that are incurred in connection with the Approved Transaction (including those payable to investment banks, legal counsel, diligence consultants, financing and accounting consultants, tax advisors and other customary transaction advisors) by the Company, any Subsidiary thereof, the Sterling Holders (including the owners of the Sterling Holders) or any other Person whose expense reimbursement is approved by the Deal Representative and (2) to make such arrangements as the Board or the Majority Holders approve to provide for the payment of such fees and expenses.  The Deal Representative may also withhold, escrow or otherwise reserve from the consideration payable to the Transaction Beneficiaries other amounts deemed advisable by the Deal Representative to cover post-closing fees and expenses, purchase price adjustment obligations and indemnification obligations.

      (B)    After making the holdbacks, transaction expense and other payments, withholdings and reserves to the aggregate consideration payable to the Transaction Beneficiaries as contemplated by Section 4.4(d)(iv)(A), the Deal

24

42992628.2

Representative will make such arrangements as it deems necessary or advisable, including (if the Deal Representative chooses) engaging a third-party paying agent, to disburse the net consideration to the Transaction Beneficiaries in the same amounts such consideration would have been distributed had such distribution been made under Section 6.1 (including by taking into account each Member's Advance Amount). For purposes of such disbursement, the Blocker Members or, if applicable, their Related Blocker Entities will be deemed to have sold Units directly and proceeds otherwise distributable to a Blocker Member or its Related Blocker Entity in respect of such Blocker Member's or Related Blocker Entity's Units will be distributed to direct or indirect equityholders of such Blocker Member or its Related Blocker Entity that sold equity interests in such transaction. For purposes of clarification, no transaction proceeds from an Approved Transaction will be distributed under Section 6.2(b). Notwithstanding the foregoing in this Section 4.4(d)(iv)(B), if the Approved Transaction involves the issuance of any stock or other equity consideration in a transaction not involving a Public Offering and any Member or other selling equityholder otherwise entitled to receive consideration in such transaction is not an accredited investor (as defined under Rule 501 of Regulation D under the Securities Act) or is a former employee of the Company or any of its Affiliates, then the Company may require each such Person (1) to receive solely cash in such transaction, (2) to otherwise be cashed out (by redemption or otherwise) by the Company or any other Person prior to the consummation of such transaction and/or (3) to appoint a purchaser representative (as contemplated by Rule 506 of Regulation D under the Securities Act) selected by the Company, with the intent being that such Person receive cash equal to the Fair Market Value of the Equity Interests it would have received in the absence of this sentence.

(v)     *Power of Attorney*. Each Member (other than the Institutional Holders) hereby makes, constitutes and appoints the Company and the Deal Representative as its true and lawful attorney-in-fact for it and in its name, place, and stead and for its use and benefit, to sign, execute, certify, acknowledge, swear to, file and record any instrument or other documentation deemed necessary by the Company or the Deal Representative in its reasonable discretion to carry out fully the provisions of this Section 4.4(d) including to execute and deliver all definitive documentation that such Member is required to execute and deliver in accordance with this Section 4.4(d) if such Member does not execute and deliver such documentation within seven days after request by the Company or the Deal Representative. The power of attorney granted pursuant to this paragraph is a special power of attorney, coupled with an interest, and is irrevocable, and will survive the bankruptcy, insolvency, dissolution or cessation of existence of the applicable Member.

(vi)     *Termination*. The rights granted in this Section 4.4(d) will terminate immediately prior to, but conditioned on the consummation of, an Initial Public Offering.

(e)     Insider Members.

(i)     *Additional Transfer Restrictions*. Insider Members may be subject to additional Transfer restrictions and repurchase obligations set forth in an individual Restricted Unit Agreement or other subscription, contribution, employment, incentive

25

compensation or option grant or other agreements between each such Member and the Company (each, an "Individual Insider Member Agreement"). Such additional Transfer restrictions are also binding on any Person (other than the Company) that is the direct or indirect transferee of Units from an Insider Member. If a conflict exists between repurchase provisions in this Agreement and repurchase provisions in an Individual Insider Member Agreement, the repurchase provisions in the Individual Insider Member Agreement will control. Insider Members that are Entities will not permit any change to occur in the ownership of such Entity (other than by reason of Involuntary Transfers) without the prior consent of the Board or the Majority Holders.

(ii)    *Repurchase Provisions*.    With respect to any Units (including Eligible Class C Units) held by an Insider Member (each, a "Specified Unit"), the following repurchase provisions will apply whether such Specified Units are held by such Insider Member or any Person taking by, through or under such Insider Member, directly or indirectly. At any time (A) following the termination of any Insider Member's employment (or, if such Insider Member is an Entity, termination of the employment of such Insider Member's Related Individual) with the Company or its Subsidiary for any reason or no reason or (B) following the date on which any Insider Member (or such Insider Member's Related Individual) becomes employed by any Competitor or otherwise becomes involved in Competitive Activities, then the Company will have the right, but not the obligation, to purchase all or any portion of the Specified Units held thereby from such Insider Member (whether such Units are then owned by such Insider Member) or any other Person for the Fair Market Value per Unit (the "Repurchase Price"). If the Company does not elect to purchase all such Specified Units, the Majority Holders may repurchase all or some of the remaining Specified Units, may designate another Person to repurchase all or some of the remaining Specified Units or may allow the Insider Member to retain all or some of the remaining Specified Units. In order to exercise the repurchase rights granted in this Section 4.4(e)(ii), the Company and any other Person granted repurchase rights hereunder, as applicable, must deliver an election notice (each, a "Repurchase Notice") to the Company (and the Company in turn will deliver such Repurchase Notice to the record holder of the Specified Units) within 90 days of (x) such Insider Member's termination of employment (or, if such Insider Member is an Entity, termination of the employment of such Insider Member's Related Individual) or (y) the date on which all of the Directors become actually aware of such Insider Member's (or, if such Insider Member is an Entity, such Insider Member's Related Individual's) employment by any Competitor or involvement in Competitive Activities, which notice must contain a statement of the Repurchase Price and the number and type of Specified Units that the Company or any such other Person, as applicable, elects to purchase. Such purchase and sale will be consummated at a closing at the Company's principal office (unless otherwise agreed) within 30 days from the delivery of the Repurchase Notice. At such closing, the Repurchase Price (in the form of a cashier's check or such other mutually acceptable form) multiplied by the number of Specified Units to be purchased (as specified in the Repurchase Notice) will be delivered to the Insider Member (or its transferee, as applicable), and the Insider Member (or its transferee, as applicable) will deliver to the Company or other Person purchasing such Specified Units the certificates representing all of the Specified Units to be purchased as specified in the Repurchase Notice (if Specified

26

Units are then certificated by the Company), duly endorsed for transfer, and duly executed Unit transfer instruments which will be deemed to include representations as to such Insider Member's good title to such Specified Units and the absence of liens, encumbrances and adverse claims with respect thereto (other than those created by the terms of this Agreement) and such other matters as are necessary for the proper transfer of such Specified Units to the Company or other purchasing Person, as applicable, on the books and records of the Company.

(f)    <u>Divorce; Death of Spouse</u>.

(i)    *Divorce*.  If the marital relationship of a Member (the "<u>Divorced Member</u>") is terminated by divorce, and pursuant to such divorce or any property settlement in connection with such divorce, Units previously issued in the name of the Divorced Member or any community property interest, similar marital property interest or other interest therein is transferred to, retained by or vested in the former spouse of such Divorced Member (the "<u>Divorced Spouse</u>") (such Units or interest therein so transferred to, retained by or vested in the Divorced Spouse being referred as the "<u>Divorced Spouse Units</u>"), the Divorced Member will promptly give notice to the Company of such event containing the name and address for purposes of notice of the Divorced Spouse (the "<u>Divorce Notice</u>").  Within 60 days after receipt of the Divorce Notice by the Company, the Board will determine or cause to be determined the Fair Market Value of the Divorced Spouse Units for purposes of determining the purchase price per Unit and deliver notice thereof to the Divorced Member and the Divorced Spouse (the "<u>Divorce FMV Notice</u>"). The Divorced Member will have the option to purchase all or any portion of the Divorced Spouse Units for the purchase price per Unit set forth in the Divorce FMV Notice, and the Divorced Spouse will be obligated to sell such Divorced Spouse Units to the Divorced Member for the purchase price per Unit set forth in the Divorce FMV Notice.  Such option must be exercised, and the purchase consummated, within 30 days after the later of (A) the entry by a court of a final order, judgment or decree not subject to appeal awarding the ownership of the Divorced Spouse Units to the Divorced Spouse and divesting the Divorced Member of all right, title and claim thereto and (B) the delivery of the Divorce FMV Notice to the Divorced Member and the Divorced Spouse.  The option will be exercised by the giving of notice of exercise to the Divorced Spouse.  The Divorced Member will, within five days after the expiration of such option period, deliver notice to the Company as to whether the Divorced Member has purchased any of the Divorced Spouse Units.  The Company will have the right, but not the obligation, to purchase all or any portion of the Divorced Spouse Units from the Divorced Spouse on the same terms as the Divorced Member, and will have 45 days to exercise such right after the Divorced Member notifies the Company that it has elected to purchase less than all of the Divorced Spouse Units. The foregoing provisions of this <u>Section 4.4(f)(i)</u> will apply *mutatis mutandis* to the divorce of any Related Individual of an Insider Member that is an Entity so that if any ownership interest in the Insider Member passes to the ex-spouse of such Related Individual, a portion of the Insider Member's Units that corresponds to such passing interest will be subject to the repurchase provisions herein.

(ii)    *Death of Spouse*.  If the spouse of a Member dies (such spouse, the "<u>Deceased Spouse</u>"), and all or any portion of the Units issued in the name of such Member

27

(the "Surviving Member") or any interest therein vests in or is transferable to any heir or legatee of the Deceased Spouse other than the Surviving Member (such Units or interest therein vesting in or transferable to any heir or legatee of the Deceased Spouse other than the Surviving Member being referred to herein as the "Deceased Spouse Units"), the Surviving Member will promptly give notice to the Company of such event, containing the name(s) and address(es) for purposes of notice of the estate of the Deceased Spouse and each heir or legatee in or to which any portion of the Deceased Spouse Units has vested or is transferable (the "Passing Interest Notice"). Within 60 days after receipt of the Passing Interest Notice by the Company, the Board will determine or cause to be determined the Fair Market Value of the Deceased Spouse Units for purposes of determining the purchase price per Unit and will deliver notice thereof to the Surviving Member, the estate of the Deceased Spouse and the heirs and legatees identified in the Passing Interest Notice (the "Deceased FMV Notice"). The Surviving Member will have the option to purchase all or any portion of the Deceased Spouse Units for the purchase price per Unit set forth in the Deceased FMV Notice, and the estate of the Deceased Spouse will be obligated to sell the Deceased Spouse Units to the Surviving Member for the purchase price per Unit set forth in the Deceased FMV Notice. Such option must be exercised by the Surviving Member, and the purchase consummated, within 30 days after the last to occur of (A) the entry of an order of a probate or similar court having jurisdiction over the estate of the Deceased Spouse (1) admitting to probate the will of the Deceased Spouse and (2) determining the heirs of the Deceased Spouse if the Deceased Spouse is determined to have died intestate, (B) the appointment of the executor, administrator or legal representative of the estate of the Deceased Spouse and (C) the delivery of the Deceased FMV Notice to the Surviving Member and the estate of the Deceased Spouse. The option will be exercised by the giving of notice of exercise to the executor, administrator or legal representative of the Deceased Spouse's estate. The Surviving Member will, within five days after the expiration of such 30-day period, deliver notice to the Company as to whether the Surviving Member has purchased any of the Deceased Spouse Units. The Company will have the right, but not the obligation, to purchase all or any portion of the Deceased Spouse Units from the Deceased Spouse on the same terms as the Surviving Member, and will have 45 days to exercise such right after the Surviving Member notifies the Company that it has elected to purchase less than all of the Deceased Spouse Units. The foregoing provisions of this Section 4.4(f)(ii) will apply *mutatis mutandis* to the death of any Related Individual of an Insider Member that is an Entity so that if any ownership interest in the Insider Member passes to the surviving spouse or other legatees or heirs of such deceased Related Individual, a portion of the Insider Member's Units that corresponds to such passing interest will be subject to the repurchase provisions herein.

  **4.5**    Registration Rights. Each Member understands and agrees that the Units have not been registered under the Securities Act and are restricted securities within the meaning of the Securities Act. However, as a material condition to the Members acquiring the Units, the Company has agreed to grant each Member certain demand and piggy-back registration rights with respect to all Registrable Securities held thereby. The Company currently has no plans to engage in a Public Offering, but if it does it is unknown in which jurisdictions such offering will take place and on which exchanges or markets the equity securities of the Company will be listed and/or traded. Furthermore, in connection with an Initial Public Offering, it may be advisable to

restructure the Company into a corporation pursuant to the Internal Restructure provisions in Section 8.8. Accordingly, in light of these unknown factors, it would be impracticable to specify the detailed registration rights that are being granted at this time. Nevertheless, because the granting of registration rights is a material condition to the Members' acquisition of the Units, the parties hereto desire to indicate, in general terms that will need to be refined when the details of any Public Offering become known, the registration rights that each Member will have, and that are hereby granted. Prior to an Initial Public Offering, the terms of this Section 4.5 will be further developed into a customary registration rights agreement the terms of which will be consistent with this Agreement. The form of such registration rights agreement will be subject to Board, but not Member, approval. Such registration rights will consist of the following:

(a)     Public Offering; Piggyback Registration Rights. In connection with a Public Offering, including an Initial Public Offering, initiated by the Company, the Company will adopt reasonable and customary procedures to allow each Member to participate in such offering on a "piggyback" basis with the Company with respect to such Member's Registrable Securities; provided, the Company's right to sell securities in such offering will be senior to each Member's so that, if the managing underwriter determines that a cut-back in includable securities is required, the Members will be cut-back entirely (on a proportionate basis) before the Company's securities are cut-back at all. Such reasonable and customary procedures will also include (i) deadlines by which each Member must indicate the number of Registrable Securities it desires to sell in the offering, which number of Registrable Securities may be limited by the Company to such Member's pro rata number of Registrable Securities (based on the number of Registrable Securities held of record by each Member that elects to participate in the offering), (ii) requirements to provide customary selling Member information for inclusion in the prospectus or other offering materials together with customary indemnification and contribution obligations to protect the underwriters, the Company and its directors, officers, employees and agents, and the other Members from losses in the event the information furnished by any such Member is incorrect, (iii) requirements that any participating Member enter into customary agreements governing the sale of its Registrable Securities in the offering (including the underwriting agreement, custody agreement, standstill agreement and power of attorney) and (iv) the Company's agreement to pay for all Registration Expenses incurred by a Member in connection with participating in such offering pursuant to the exercise of its piggyback registration rights.

(b)     Demand and Piggyback Registration Rights. At any time after 180 days after the consummation of the Company's Initial Public Offering, the Members will have the following registration rights:

(i)     *Demand Rights*. The Sterling Holders, as a group, will have three demand rights to require the Company to sell, pursuant to a Public Offering, the number of Registrable Securities indicated by them upon exercise of any of their three demand rights; provided, (A) the Company will not be required to honor any demand rights during customary trading blackout periods, during any other offering of securities being conducted by the Company or whenever the Company, as determined in good faith by the Board, believes the Company is likely to suffer a material adverse effect from engaging in a Public Offering at such time, (B) the Company will not be required to honor any demand unless the number of the Registrable Securities the Members exercising such demand rights elect to sell in such offering is reasonably likely to result in gross sale proceeds of at least

29

$10,000,000, (C) the Company will not be required to honor more than one demand right exercise in any 270-day period from the Members exercising such demand rights; provided, any such 270-day period may be shortened by the Board if the Board determines, in its sole discretion, that shortening such period would not materially and adversely affect the Company or any holder of Equity Interests of the Company, (D) the Company will pay for all Registration Expenses incurred by a Member in connection with participating in such offering pursuant to the exercise of its demand registration rights and (E) any participating Member will be required (1) to provide customary selling Member information for inclusion in the prospectus or other offering materials together with customary indemnification and contribution obligations to protect the underwriters, the Company and its directors, officers, employees and agents, and the other Members from losses in the event the information furnished by any such Member is incorrect and (2) to enter into customary agreements governing the sale of its Registrable Securities in the offering (including the underwriting agreement, custody agreement, standstill agreement and power of attorney). If, as a result of the piggyback registration rights granted in <u>Section 4.5(b)(ii)</u>, market conditions or otherwise, the Members that make demand under this <u>Section 4.5(b)(i)</u> do not sell at least 80% of the Registrable Securities requested to be registered within 180 days after the applicable registration statement becomes effective, such demand will not count against their three demand rights hereunder.

(ii)     *Piggyback Registration Rights*. The Company will adopt reasonable and customary procedures to allow each Member to participate in each Public Offering initiated by a Member's valid exercise of its demand registration rights. Such procedures will be similar to those described above that apply to a Public Offering initiated by the Company except that in connection with any Public Offering initiated by a Member's valid exercise of its demand registration rights, any cut-back required in an underwritten offering would be applied on a pro rata and *pari passu* basis to all Members electing to participate in such registration process whether such participating right arises because of the demand rights granted in <u>Section 4.5(b)(i)</u> or the piggyback rights granted in this <u>Section 4.5(b)(ii)</u>.

(c)     <u>Indemnification for Vicarious Liability</u>.

(i)     In connection with each Public Offering, the Company will defend, indemnify and hold each Member, its Affiliates and their respective direct and indirect partners (including partners of partners and stockholders and members of partners), members, stockholders, directors, officers, employees and agents and each person who controls any of them within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act (the "<u>Covered Persons</u>") harmless from and against any and all damages, liabilities, losses, taxes, fines, penalties, diminution in value, reasonable costs and expenses (including reasonable fees of a single counsel representing all the Covered Persons or, if the representation of all the Covered Persons by the same counsel would be inappropriate under applicable standards of professional conduct, then as many counsel as may be needed under such standards of professional conduct to represent all of the Covered Persons) of any kind or nature whatsoever (including all amounts paid in investigation, defense or settlement of the foregoing and consequential damages) ("<u>Covered Losses</u>") sustained or suffered by any such Covered Person based upon, relating to, arising out of, or by reason of any third party or governmental claims against such Covered Person based

30

upon such Covered Person's status as a Covered Person (including any and all Covered Losses under the Securities Act, the Exchange Act or other federal or state statutory law or regulation, at common law or otherwise, which relate directly or indirectly to the registration, purchase, sale or ownership of any securities of the Company); provided, the Company will not be liable to any Covered Person to the extent that such Covered Losses arise from and are based on (A) an untrue statement or omission or alleged untrue statement or omission in a registration statement or prospectus which is made in reliance on and in conformity with written information furnished to the Company by or on behalf of such Covered Person or (B) conduct by such Covered Person which is found to constitute fraud or willful misconduct in a non-appealable, final judgment.

        (ii)      If the indemnification provided for in this <u>Section 4.5(c)</u> for any reason is held by a court of competent jurisdiction to be unavailable to a Covered Person in respect of any Covered Losses referred to herein, then the Company, in lieu of indemnifying such Covered Person hereunder, will contribute to the amount paid or payable by such Covered Person as a result of such Covered Losses (A) in such proportion as is appropriate to reflect the relative benefits received by the Company and the Members, or (B) if the allocation provided by clause (A) above is not permitted by applicable law, in such proportion as is appropriate to reflect not only the relative benefits referred to in clause (A) above but also the relative fault of the Company and the Covered Person in connection with the action or inaction which resulted in such Covered Losses, as well as any other relevant equitable considerations.  The relative fault of the Company and the Covered Person will be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by the Company and the Covered Person and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission.  Each of the Company and the Members agrees that it would not be just and equitable if contribution pursuant to this <u>Section 4.5(c)</u> were determined by pro rata or per capita allocation or by any other method of allocation which does not take account of the foregoing equitable considerations.

        (d)      <u>Standstill Agreement</u>.  At any time that the Company is engaged in a Public Offering (on its own behalf, on behalf of selling Members or both), no Member will make any Transfer on any securities exchange or in the over-the-counter or any other public trading market for whatever period of time the Company (upon the recommendation of its underwriters) requests by notice to each Member; provided, (i) such request will not be for a period extending longer than 180 days after the later of (A) the effective date of the registration statement relating to such Public Offering and (B) the date of the underwriting agreement relating to such Public Offering, (ii) this <u>Section 4.5(d)</u> will not limit any Member's right to include equity securities in any such underwritten public offering pursuant to any demand or piggyback registration rights that such Member may have pursuant to this <u>Section 4.5</u> or any registration rights or similar agreement binding upon the Company and (iii) all Members are subject to the same restrictions on Transfer. The obligations in this <u>Section 4.5(d)</u> will survive the termination of this Agreement for any standstill period in effect as of the date of such termination, after which time the obligations in this <u>Section 4.5(d)</u> will terminate.

**4.6**    <u>Additional Terms Relating to Members</u>.  No Member has the right or power to Resign, and no Member may be Expelled from the Company.  No Member will be liable for the debts, obligations or liabilities of the Company, nor will any Member be obligated to guaranty any debt, obligation or liability of the Company.

**ARTICLE 5**
**CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS**

**5.1**    <u>Capital Contributions</u>.  No Member will have any obligation to make any Capital Contribution after its admission as a "Member" unless it elects to do so pursuant to <u>Section 4.3</u>.

**5.2**    <u>Return of Capital Contributions</u>.  A Member is not entitled to the return of any part of its Capital Contributions or to be paid interest in respect of either its Capital Account or its Capital Contributions.  An unpaid Capital Contribution is not a liability of the Company or of any Member.  A Member is not required to contribute or to lend any cash or property to the Company to enable the Company to return any Member's Capital Contributions.

**5.3**    <u>Advances by Members</u>.  Advances of monies by any Member to the Company are not void or voidable but must be approved by the Board and may be subject to <u>Section 8.4(b)</u>.

**5.4**    <u>Capital Accounts</u>.

(a)    A separate capital account (a "<u>Capital Account</u>") will be maintained for each Member.  Each Member's Capital Account will be increased by:  (i) such Member's Capital Contributions; and (ii) allocations to such Member of Profits and other items of income and gain in accordance with the allocation provisions of this Agreement.  Each Member's Capital Account will be decreased by:  (A) the amount of money distributed to such Member by the Company; (B) the fair market value of property distributed to such Member by the Company (net of liabilities secured by such distributed property that such Member is considered to assume or take subject to as described in Section 1.704-1(b)(2)(iv)(c) of the Treasury Regulations); and (C) allocations to such Member of Losses and other items of deduction and credit in accordance with the allocation provisions of this Agreement.

(b)    In the event of a Transfer of Units, the Capital Account of the transferor will become the Capital Account of the transferee to the extent it relates to the Transferred Units in accordance with Section 1.704-1(b)(2)(iv)(l) of the Treasury Regulations.

(c)    The manner in which Capital Accounts are to be maintained pursuant to this <u>Section 5.4</u> is intended to comply with the requirements of Code Section 704(b) and the Treasury Regulations promulgated thereunder.  If the Board determines that the manner in which Capital Accounts are to be maintained pursuant to the preceding provisions of this <u>Section 5.4</u> should be modified in order to comply with Code Section 704(b) and the Treasury Regulations, then notwithstanding anything to the contrary contained in the preceding provisions of this <u>Section 5.4</u>, the method in which Capital Accounts are maintained will be so modified.

32

## ARTICLE 6
## DISTRIBUTIONS; ALLOCATIONS

6.1    Distributions.

(a)    Regular Distributions.  Subject to Section 6.2, Available Cash and other property will be distributed in respect of outstanding Units solely at such times and in such amounts as the Board determines and approves (such amount, the "Distributable Amount").  Subject to the remaining provisions of this Article 6, the Distributable Amount will be distributed pro rata in proportion to the number of Class A Units, the Class B Units and the Eligible Class C Units outstanding immediately before such distribution is made.  If any Distributable Amount consists of both cash and other property, proportions of cash and other property distributed in respect of a class of Units will be consistent to the extent possible.

(b)    Tax Distributions.  Notwithstanding anything to the contrary in Section 6.1(a), at least two Business Days before each estimated individual quarterly United States Federal income tax payment is due in each Fiscal Year, the Company will distribute from Available Cash, if any, to each Member such Member's quarterly Estimated Maximum Tax Liability, if any.  Neither the Company nor the Directors will have any liability to any Member for penalties arising from non-payment or incorrect estimates of such Member's estimated tax payments or incorrect estimates of the portion of allocable income attributable to capital assets sales rather than operations.  If sufficient Available Cash is not available, as determined by the Board, to distribute to each Member the full amount of such Member's quarterly Estimated Maximum Tax Liability for any estimated individual quarterly federal income tax payment date, the amount available for distribution under this Section 6.1(b) will be distributed to the Members in proportion to each Member's full quarterly Estimated Maximum Tax Liability.  The Company will maintain in its books and records an accounting of the aggregate amount distributed pursuant to this Section 6.1(b) in respect of each Unit.  The amount of distributions made under this Section 6.1(b) in respect of any Unit (including, for the avoidance of doubt, a Class C Unit) that exceeds the amount that would have been distributed in respect of such Unit had all distributions been made under Section 6.1(a) and none under this Section 6.1(b) is referred to as such Unit's "Advance Amount".  Amounts distributable in respect of each Unit under Section 6.1(a) will first be used to reduce such Unit's Advance Amount to $0, and therefore the Company will retain such distributable amounts as "repayment" of the Advance Amount until the Advance Amount is reduced to $0.  In connection with any Transfer of a Unit in accordance with this Agreement, at the request of the transferor and transferee, the Company will indicate the balance of the Advance Amount that remains as a credit to future distributions under Section 6.1(a) in respect of such Unit, and such balance will continue to apply to such Unit following such Transfer.

6.2    Other Distribution Provisions.  Notwithstanding anything to the contrary in Section 6.1:

(a)    No distribution will be declared and paid unless, (i) after the distribution is made, the fair value of the Company's assets is at least equal to all of the Company's liabilities and (ii) the distribution or payment would not cause the Company or any Subsidiary to be in violation of any material agreement binding on the Company or any Subsidiary.

33

(b)     The Company is hereby authorized to withhold from any distribution to any Member and to pay over to any federal, state, local or foreign government any amounts required to be so withheld pursuant to federal, state, local or foreign Law.  All amounts required to be withheld pursuant to federal, state, local or foreign tax laws will be treated as amounts actually distributed to the affected Members under Section 6.1 for all purposes under this Agreement.

(c)     The Board may impose conditions on the receipt of any distribution under Section 6.1 relating to the proceeds received by the Company or any Subsidiary from an Approved Transaction similar to the Customary Transaction Terms that would apply to an Approved Transaction.  If the Board imposes such conditions, distributions will be made only to those Members that agree to the conditions imposed by the Board.

**6.3**     Allocations of Net Profits and Net Losses.  Net Profits and Net Losses for each Fiscal Year or other period will be allocated among the Members, after giving effect to the allocations pursuant to Section 6.4 for such Fiscal Year or other period, in such a manner as will cause the Capital Accounts of the Members (as adjusted through the end of such Fiscal Year or other period) to equal, as nearly as possible, in the same proportionate amounts as (a) the amount such Members would receive if all assets of the Company on hand at the end of such Fiscal Year or other period were sold for cash equal to their Book Values, all liabilities of the Company were satisfied in cash in accordance with their terms (limited in the case of non-recourse liabilities to the Book Value of the property securing such liabilities), all outstanding Incentive Units vested as a result of such sale and all remaining or resulting cash were distributed to the Members under Section 6.1, minus (b) such Member's share of Minimum Gain and Member Nonrecourse Debt Minimum Gain, computed immediately prior to the hypothetical sale of assets.

**6.4**     Income Tax Allocations.

(a)     All items of income, gain, loss and deduction for United States federal income tax purposes will be allocated in the same manner as the corresponding item of Profits or Losses is allocated, except as otherwise provided in this Section 6.4.

(b)     In accordance with Code Section 704(c) and the applicable Treasury Regulations thereunder, income, gain, loss, and deduction with respect to any property contributed to the Company will, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its initial Book Value using any permissible method chosen by the Board. In the event the Book Value of any property is adjusted pursuant to clause (b) or (d) of the definition of Book Value, subsequent allocations of income, gain, loss, and deduction with respect to such property will take account of any variation between the adjusted basis of such property for United States federal income tax purposes and its Book Value using any permissible method chosen by the Board under Code Section 704(c) and the applicable regulations thereunder.

(c)     If, as a result of an exercise of a noncompensatory option to acquire an interest in the Company, a Capital Account reallocation is required under Treasury Regulations Section 1.704-1(b)(2)(iv)(s)(3), the Company will make corrective allocations pursuant to Treasury Regulations Section 1.704-1(b)(4)(x).

(d)     Allocations pursuant to this <u>Section 6.4</u> are solely for purposes of United States federal, state, and local taxes and will not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Profits, Losses, other items or distributions pursuant to any provision of this Agreement.

**6.5**     <u>Regulatory Allocations</u>.  The following allocations will be made in the following order.

(a)     Nonrecourse Deductions will be allocated to the Members pro rata in accordance with the number of Units held thereby.

(b)     Member Nonrecourse Deductions attributable to Member Nonrecourse Debt will be allocated to the Members bearing the Economic Risk of Loss for such Member Nonrecourse Debt as determined under Treasury Regulations Section 1.704-2(b)(4). If more than one (1) Member bears the Economic Risk of Loss for such Member Nonrecourse Debt, the Member Nonrecourse Deductions attributable to such Member Nonrecourse Debt will be allocated among the Members according to the ratio in which they bear the Economic Risk of Loss.  This <u>Section 6.5(b)</u> is intended to comply with the provisions of Treasury Regulations Section 1.704-2(i) and will be interpreted consistently therewith.

(c)     Notwithstanding any other provision hereof to the contrary, if there is a net decrease in Minimum Gain for a Fiscal Year (or if there was a net decrease in Minimum Gain for a prior Fiscal Year and the Company did not have sufficient amounts of income and gain during prior years to allocate among the Members under this <u>Section 6.5(c)</u>), items of income and gain will be allocated to each Member in an amount equal to such Member's share of the net decrease in such Minimum Gain (as determined pursuant to Treasury Regulations Section 1.704-2(g)(2)). This <u>Section 6.5(c)</u> is intended to constitute a minimum gain chargeback under Treasury Regulations Section 1.704-2(f) and will be interpreted consistently therewith.

(d)     Notwithstanding any provision hereof to the contrary except <u>Section 6.5(c)</u> (dealing with Minimum Gain), if there is a net decrease in Member Nonrecourse Debt Minimum Gain for a Fiscal Year (or if there was a net decrease in Member Nonrecourse Debt Minimum Gain for a prior Fiscal Year and the Company did not have sufficient amounts of income and gain during prior years to allocate among the Members under this <u>Section 6.5(d)</u>), items of income and gain will be allocated to each Member in an amount equal to such Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain (as determined pursuant to Treasury Regulations Section 1.704-2(i)(4)). This <u>Section 6.5(d)</u> is intended to constitute a partner nonrecourse debt minimum gain chargeback under Treasury Regulations Section 1.704-2(i)(4) and will be interpreted consistently therewith.

(e)     Notwithstanding any provision hereof to the contrary except <u>Section 6.5(c)</u> and <u>Section 6.5(d)</u> (dealing with Minimum Gain and Member Nonrecourse Debt Minimum Gain), a Member who unexpectedly receives an adjustment, allocation or distribution described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6) will be allocated items of income and gain (consisting of a pro rata portion of each item of income, including gross income, and gain for the Fiscal Year) in an amount and manner sufficient to eliminate any deficit balance in such Member's Adjusted Capital Account as quickly as possible. This <u>Section 6.5(e)</u> is intended to

35

constitute a qualified income offset under Treasury Regulations Section 1.704- 1(b)(2)(ii)(d) and will be interpreted consistently therewith.

(f)      In the event that any Member has a negative Adjusted Capital Account at the end of any Fiscal Year, such Member will be allocated items of Company income and gain in the amount of such deficit as quickly as possible; provided an allocation pursuant to this Section 6.5(f) will be made only if and to the extent that such Member would have a negative Adjusted Capital Account after all other allocations provided for in this Section 6.5 have been tentatively made as if this Section 6.5(f) were not in this Agreement.

(g)      To the extent an adjustment to the adjusted tax basis of any Company properties pursuant to Code Section 734(b) or Code Section 743(b) is required pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(2) or 1.704-1(b)(2)(iv)(m)(4) to be taken into account in determining Capital Accounts as the result of a distribution to any Member in complete liquidation of such Member's Membership Interest, the amount of such adjustment to Capital Accounts will be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss will be allocated to the Members in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(2) if such Section applies, or to the Member to whom such distribution was made if Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(4) applies.

**6.6**      Curative Allocations.  The Regulatory Allocations are intended to comply with certain requirements of Treasury Regulations Sections 1.704-1(b) and 1.704-2. The Regulatory Allocations may be inconsistent with the manner in which the Members intend to divide Company distributions. Accordingly, the Board is authorized to divide other allocations of Profits, Losses and other items among the Members, to the extent that they exist, so that the net amount of the Regulatory Allocations and the Curative Allocations to each Member is zero. The Board will have discretion to accomplish this result in any reasonable manner that is consistent with Code Section 704 and the related Treasury Regulations.

**6.7**      Other Allocation Rules.

(a)      All items of income, gain, loss, deduction and credit allocable to a Unit that is transferred may be allocated between the transferor and the transferee using any permissible method, as determined by the Board.

(b)      Members' proportionate share of the "excess nonrecourse liabilities" of the Company, within the meaning of Treasury Regulations Section 1.752-3(a)(3), will be in proportion to the number of Units held thereby.

## ARTICLE 7
## GOVERNANCE

**7.1**      Manager (Director) Managed Company.   The Company will be managed by "managers" (as such term is used in the Act) according to the remaining provisions of this Article 7.  Except with respect to certain consent or approval requirements expressly delegated to the Members in this Agreement, no Member by virtue of having the status of a Member will have any

36

management power over the business and affairs of the Company or actual or apparent authority to enter into contracts on behalf of, or to otherwise bind, the Company. The "managers" are referred to at times as "Directors" in this Agreement. The business and affairs of the Company will be managed through a committee of Directors to be known as the "Board of Directors" of the Company (the "Board") in accordance with this Agreement. Under the direction of the Board, the day-to-day activities of the Company will be conducted on the Company's behalf by the Officers, who will be agents of the Company, subject to the scope of authority delegated to the Officers by the Board. In addition to the powers that now or hereafter can be granted under the Act and to all other powers granted under any other provision of this Agreement, subject to any consent of the Members expressly required by this Agreement, if any, the Board will have full power and authority to do all things on such terms as it may deem necessary or appropriate to conduct, or cause to be conducted, the business and affairs of the Company. Without limiting the foregoing, the Parties acknowledge that the Board will have the power, without any Member consent or approval, (a) to approve and effect any Strategic Transaction (subject to compliance with Section 8.4 if applicable to such transaction) or an Internal Restructure, (b) to vote, pledge or otherwise dispose of any Equity Interests held by the Company including Equity Interests issued by any Subsidiary and (c) to initiate and conduct any Offering, including an Initial Public Offering.

**7.2**    Board of Directors.

(a)    Size; Designation Rights; Composition; Initial Directors. Each Member will vote its Units and take such other action in its capacity as a Member, including executing and delivering written consents, to cause the Board to be sized and composed in the manner set forth in this Section 7.2(a).

(i)    *Size*. The Board is composed of [•] Directors. The size of the Board may be increased or decreased from time to time by resolution adopted by the Board in accordance with remaining terms of this Section 7.2 or by the written consent of the Majority Holders; provided, the Board will be deemed to have no fewer seats than necessary to provide a seat for each individual designated in accordance with the remaining provisions of this Section 7.2 to serve on the Board.

(ii)    *Designees; Initial Directors*. Each Director will be elected by the vote of the Majority Holders.

(iii)    *Chairperson*. The chairperson of the Board, if any, will be designated by, and may be replaced by, the Majority Holders or by a majority of the then serving Directors.

(b)    Removal. The Majority Holders may remove any Director at any time with or without cause.

(c)    Vacancies. Any vacancy created by the death, disability, retirement, resignation or removal of any Director may be filled solely by the Majority Holders. Actions taken at a duly convened Board meeting or by consent when a vacancy exists will not affect the validity of such action.

(d)    <u>Quorum; Required Vote for Board Action</u>.  A quorum for the transaction of business at a meeting of the Board will exist when a majority of the Directors then serving on the Board are present in person, by proxy or by telephone.  All decisions of the Board will require the affirmative vote of a majority of the Directors who are present in person, by proxy or by telephone at any meeting of the Board at which a quorum is present.

(e)    <u>Location; Order of Business</u>.  The Board may hold its meetings and may have an office and keep the books of the Company, in such place or places, within or without the State of Delaware, as the Board may from time to time determine by resolution.  At all meetings of the Board, business will be transacted in such order as will from time to time be determined by resolution of the Board.

(f)    <u>Meetings of the Board; Notices</u>.  The Board will meet at least quarterly.  Regular meetings of the Board will be held at such places as will be designated from time to time by resolution of the Board.  Special meetings of the Board may be called by any two or more Directors on at least 48 hours' notice to each Director, with such notice containing a statement of the purposes for such special meeting.

(g)    <u>Reimbursement; Compensation</u>.  The Company will reimburse all Directors for their respective reasonable out-of-pocket costs and expenses incurred in the course of their services as such, including travel expenses in accordance with the Company's travel reimbursement policies.  Independent Directors may be compensated by the Company and any Subsidiary on such terms as the Board approves.

(h)    <u>Committees of the Board</u>.

(i)    The Board may, by resolution, designate one or more committees, including an audit, compensation, disclosure, governance, executive and nomination committee, with each such committee consisting of such number of committee members as the Board specifies.  Any such designated committee will have and may exercise such of the powers and authority of the Board in the management of the business and affairs of the Company as may be provided in such resolution.

(ii)    Any committee designated in accordance with this <u>Section 7.2(h)</u> will have a chairman either appointed by the Board or chosen by the committee, will keep regular minutes of its proceedings and report the same to the Board when requested, will fix its own rules or procedures, and will meet at such times and at such place or places as may be provided by such rules or procedures, or by resolution of such committee or Board.  At every meeting of any such committee, the presence of a majority of all the members thereof will constitute a quorum, and the affirmative vote of a majority of the members present at any meeting at which a quorum is present will be necessary for the adoption of any resolution.

(iii)    The Board may designate one or more Directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of such committee.  In the absence or disqualification of a member of a committee, the member or members present at any meeting and not disqualified from voting, whether

or not constituting a quorum, may unanimously appoint another member of the Board to act at the meeting in the place of the absent or disqualified member.

(iv)    Each of the Members agrees to take such action, or refrain from taking such action, as is within its reasonable control to effect the provisions of this Section 7.2(h), including causing any Director nominated thereby to take or refrain from taking action for the foregoing purpose.

(i)    <u>Subsidiary Governance</u>.  The Company and each Member acknowledge that the Company may from time to time form or acquire Subsidiaries.  The governance arrangements and rules pertaining to such Subsidiaries, including the composition, quorum and voting provisions of the governing body (and each committee thereof) of each such Subsidiary, will be determined from time to time by the Board. Notwithstanding the foregoing, to the extent permitted by Law, the powers of any Subsidiary that is a limited liability company will be exercised by or under the authority of, and the business and affairs of such Subsidiary will be managed under the direction of, the Board.

**7.3**    <u>Board Observers</u>.

(a)    <u>Observer Rights</u>.  The Company will permit each Observer to attend each meeting of the Board as a non-voting observer; provided, (i) such rights will not extend to meetings of any committee of the Board and (ii) the Company reserves the right to withhold any information and exclude any Observer from any such meeting or portion thereof to the extent that such information or such meeting: (A) is reasonably likely to adversely affect the attorney-client privilege between the Company or any Subsidiary and its counsel, (B) is reasonably likely to result in a conflict of interest between the Company or any Subsidiary and such Observer or any Affiliate of such Observer or (C) involves personnel decisions (e.g. selecting, hiring, compensating, promoting or terminating) or discussions regarding the capital structure of the Company and any Subsidiary that may, directly or indirectly, impact the lender-borrower relationship between the Company or any Subsidiary, on the one hand, and the Observers or their respective Affiliates, on the other hand (the matters referenced in clauses (i) and (ii) above are referred to herein as "<u>Excluded Matters</u>").  Notice of the time and place of any such meeting will be given to each Observer in the same manner and at the same time as notice is given to the Directors, which notice will, to the extent practicable, be given at least two Business Days prior to such meeting.  Each Observer will be given copies of all notices, reports, minutes, consents and other documents and materials related to such meetings at the time and in the manner as are provided to the Board, other than, (1) if the Company chooses, to the extent covering any Excluded Matter and (2) any written consent of the Board relating to grants of equity interest to employees of the Company or any of its Subsidiaries or other ministerial matters and upon written request by such Observer to the Company (which written request must contain a specific description of the written consent being so requested and not by reference to all such written consents or categories of written consents), the Company will provide a copy thereof to the requesting Observer.  Each Observer will be entitled to participate in discussions and consult with, and make proposals and furnish advice to, the Board, in each case, other than with respect to the Excluded Matters; provided, the Board will not be under any obligation to take any action with respect to any proposals made or advice furnished by any Observer.

(b)    Reimbursement.  The Company will reimburse the Member entitled to designate an Observer for the reasonable and documented out-of-pocket costs and expenses incurred in connection with such Observer's attendance of Board meetings including travel expenses.

**7.4**    Meetings of the Members.

(a)    Meetings.  All meetings of the Members for the transaction of such business as may be properly considered at a meeting may be held at the principal office of the Company, or at such other place within or without the State of Delaware on such date, and at such time as the Board may fix and set forth in the notice of such meeting.  The Board will provide at least 72 hours' prior notice of any meeting of the Members.  Annual meetings are not required for any purpose and are not envisioned to occur.

(b)    Quorum; Required Vote for Member Action; Adjournment of Meetings. The Majority Holders will constitute a quorum at any meeting of Members, and the affirmative vote of the Members of a majority of the Voting Units so present or represented at such meeting, voting together as a single class, will constitute the act of the Members.  No matter will require the approval of any separate class of Units except to the extent required by mandatory, non-waivable provisions of the Act.  The Members present at a duly organized meeting may continue to transact business until adjournment, notwithstanding the withdrawal of sufficient Members to destroy the quorum.

(c)    Record Date.

(i)    For the purpose of determining Members entitled to notice of or to vote at any meeting of Members, or any adjournment thereof, or entitled to consent to any matter, or entitled to exercise any rights in connection with any change, conversion or exchange of Units, or for the purpose of any other lawful action, the Board may fix a record date, which record date will not precede the date upon which the resolution fixing such record date is adopted by the Board, and which record date will not be more than 60 days prior to the date of such meeting.  If no record date is fixed by the Board, the record date for determining Members entitled to notice of or to vote at a meeting of Members will be the close of business on the day next preceding the day on which notice of such meeting is given, or, if notice is waived in accordance with this Agreement, the close of business on the day next preceding the day on which the meeting of Members is held.  Persons who only hold Incentive Units will not be entitled to notice of or to vote at any meeting of the Members, except as required by Law.

(ii)    If action without a meeting is to be taken, the Board may fix a record date for determining Members entitled to consent to such action, which record date will not precede the date upon which the resolution fixing the record date is adopted by the Board, and which record date will not be more than 10 days subsequent to the date upon which the resolution fixing the record date is adopted by the Board.  If no record date has been fixed by the Board, the record date for determining Members entitled to consent to action without a meeting will be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Company by delivery to

40

its registered office, to its principal place of business, or to an Officer having custody of the book in which proceedings of meetings of Members are recorded.

   (iii) A determination of Members of record entitled to notice of or to vote at a meeting of Members will apply to any adjournment of the meeting; provided, that the Board may fix a new record date for the adjourned meeting.

  **7.5** <u>Provisions Applicable to All Meetings</u>.  In connection with any meeting of the Board or any committee thereof or any meeting of the Members, the following provisions will apply:

   (a) <u>Waiver of Notice Through Attendance</u>.  Attendance of a Person at such meeting (including attendance by telephone pursuant to <u>Section 7.5(d)</u>) will constitute a waiver of notice of such meeting, except where such Person attends the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

   (b) <u>Proxies</u>.  A Director or committee member may vote at a Board or committee meeting by a written proxy executed by that Person and delivered to another Director or committee member.  A Member entitled to vote at a meeting of Members may vote at a meeting of Members by a written proxy executed by that Person and delivered to the secretary of the Company.  A proxy will be revocable unless it is stated to be irrevocable.

   (c) <u>Action by Written Consent</u>.  Any action required or permitted to be taken at such a meeting may be taken without a meeting and without a vote if a consent or consents in writing, setting forth the action or actions so taken, is signed by such Directors or members of a committee of the Board or the Members, as applicable, required to constitute a quorum and carry the vote at any duly convened meeting thereof.  Written consent signed by fewer than all of the Directors or members of a committee of the Board, as applicable, will promptly be furnished to the other Directors or the other members of such committee of the Board, as applicable, and entered into the Company's corporate minute book.  Written consent signed by fewer than all of the Members holding Voting Units will promptly be furnished to the other Members holding Voting Units and the Institutional Holders and entered into the Company's corporate minute book.

   (d) <u>Meetings by Telephone</u>.  Directors, members of any committee of the Board, or the Members, as applicable, may participate in and hold any meeting by means of conference telephone, video conference or similar communications equipment by means of which all Persons participating in the meeting can hear each other, and the votes of any Directors, members of any committee of the Board, or the Members, as applicable, participating by conference telephone, video conference or similar communications equipment will be given full effect.

  **7.6** <u>Officers</u>.  The Board may appoint certain agents of the Company to be referred to as "officers" of the Company ("<u>Officers</u>") and designate such titles (such as Chief Executive Officer, President, Vice-President, Secretary and Treasurer) as are customary for corporations under the Laws of the State of Delaware, and such Officers will have the power, authority and duties described by resolution of the Board or as is customary for each such position.  In addition

41

to or in lieu of Officers, the Board may authorize any Person to take any action or perform any duties on behalf of the Company (including any action or duty reserved to any particular Officer) and any such Person may be referred to as an "authorized person." An employee or other agent of the Company will not be an authorized person unless specifically appointed as such by the Board. Duly elected and designated Officers will have primary responsibility for the day-to-day operations of the Company, subject to oversight by the Board.

## ARTICLE 8
## ADDITIONAL COVENANTS

8.1    <u>Information; Confidentiality</u>.  No Member will be entitled to obtain or access any information relating to the Company or any Subsidiary or any information described in Section 18-305 of the Act except as expressly provided in this Agreement.  Each Member will keep confidential and will not disclose or use any Confidential Information (other than for the business of the Company and any Subsidiary or for any Institutional Holder's or its Affiliates' marketing or fund raising efforts, compliance requirements, investor relations, portfolio company management and oversight responsibilities, in each case (other than with respect to compliance requirements), so long as the recipient of such Confidential Information is subject to customary confidentiality obligations), except for disclosures (a) compelled by Law or required or requested by subpoena or request from a court or a stock exchange (but the Member will (provided such is legally permitted) notify the Company promptly of any request for that information before disclosing it if practicable), (b) to Representatives of the Member (provided each Representative is informed of the confidential nature of such information, and that the disclosing Member remains liable for any breach of this provision by its Representatives) who need to know such information to provide advice or services to such Member, (c) of information that a Member has received from a source or otherwise developed independent of the Company and any Subsidiary, (d) to any Person to whom such Member Transfers or offers to Transfer any of its Units in compliance with this Agreement so long as the Transferring party first obtains a confidentiality agreement from the proposed transferee, in form reasonably acceptable to the Company, (e) of information in connection with litigation against the Company or any Member to which the disclosing Member is a party (provided the Member notifies the Company or the Member affected by such disclosure, as applicable, as promptly as practicable prior to making such disclosure, if practicable, and discloses only that portion of such information required to be disclosed), (f) permitted by the Company or (g) to any bank, insurance or other regulatory authority having jurisdiction over such Member (including the National Association of Insurance Commissioners and similar state agencies), or to any ratings agencies.

8.2    Insider <u>Members' Time Commitment; Company Opportunities</u>.  While an Insider Member who is an individual is employed on a full-time basis by the Company or any Subsidiary, such Insider Member agrees (a) to dedicate his or her full business time to the business and affairs of the Company and the Subsidiaries unless the Board determines otherwise and to refer all Company Opportunities to the Company and (b) not to pursue any Company Opportunity for his or her account even if the Company and its Subsidiaries do not pursue it for their own account. The preceding sentence will continue to apply in accordance with its terms to any individual who ceases to be an Insider Member by reason of a Permitted Transfer so long as such individual is employed on a full-time basis by the Company or any Subsidiary.  While an individual who is a Related Individual of an Insider Member (but not an Insider Member itself) is employed on a full-

42

time basis by the Company or any Subsidiary, such related Insider Member will cause such individual to dedicate his or her full business time to the business and affairs of the Company and the Subsidiaries unless the Board determines otherwise and will cause such individual to refer all Company Opportunities to the Company and not to pursue any Company Opportunity for his or her account even if the Company and the Subsidiaries do not pursue it for their own account.

      **8.3**   <u>Reports</u>.  The Company will deliver the following reports and information to each Institutional Holder and to each other Member that the Majority Holders or the Board selects to receive some or all of the following reports or information; provided, the Company may suspend providing any of the following reports to any Member who is not in Good Standing:

      (a)   As promptly as reasonably practicable and in any event within 120 days after the end of each Fiscal Year, (i) a consolidated audited balance sheet of the Reporting Entity as of the end of such Fiscal Year, (ii) the related consolidated audited statements of operations, owners' equity and cash flows for such fiscal year, and (iii) a general description of the Reporting Entity's activities during such Fiscal Year.

      (b)   As promptly as reasonably practicable and in any event within 60 days after the end of each of the first three fiscal quarters of each Fiscal Year, (i) an unaudited consolidated balance sheet of the Reporting Entity as of the end of such fiscal quarter, (ii) the related unaudited consolidated statements of operations, owners' equity and cash flows for such fiscal quarter (in each case, which will be subject to revision at the end of the applicable Fiscal Year), and (iii) a general description of the Reporting Entity's activities during such fiscal quarter.

      (c)   As promptly as reasonably practicable, a copy of all tax information required to be provided to the Members, including IRS Schedule K-1.  The Company will use reasonable efforts to provide IRS Schedule K-1s within 90 days after the end of each Fiscal Year. Upon the request of any Member, the Company will provide tax estimates to such Member within 75 days after the end of each year.

      **8.4**   <u>Related Party Transactions</u>.

      (a)   Any transaction or agreement between the Company or any Subsidiary, on the one hand, and any Member or Affiliate thereof, on the other hand, (i) approved (or deemed approved) in accordance with <u>Section 8.4(b)</u> or (ii) that does not require the approval set forth in <u>Section 8.4(b)</u> but is approved by the Board, is not subject to being enjoined and is neither void nor voidable.  No Director or Member (including any Controlling Member) will have any liability for having approved any transaction or agreement described in the preceding sentence so long as such transaction or agreement is approved (or deemed approved) in accordance with <u>Section 8.4(b)</u> or does not require the approval set forth in <u>Section 8.4(b)</u> but is otherwise approved by the Board.

      (b)   At any time (i) individuals who are employed by, or who devote substantially all of their business time to providing services to, Sterling, constitute a majority of all Directors then serving on the Board or (ii) the Sterling Holders have the right to designate a majority of the Directors to serve on the Board, neither the Company nor any Subsidiary, on the one hand, will enter into, renew or amend any agreement or engage in any transaction, in each case, with the Sterling Holders or any Affiliate thereof (the term "Affiliate" as used immediately

preceding does not include the Company or any Subsidiary) or any director, officer, full-time employee or immediate family member of such Sterling Holder or any such Affiliate, on the other hand (each, a "Sterling Related Party Transaction") unless (A) the Sterling Related Party Transaction is approved by the affirmative vote or consent of the holders of a majority of the Voting Units then outstanding held of record by Persons other than the Sterling Holders, (B) the Sterling Related Party Transaction is approved by a majority of the Independent Directors, (C) the Company or the Board receives a fairness opinion from a qualified investment bank to the effect that the terms of the Sterling Related Party Transaction are, from a financial point of view, fair to the Company and its Subsidiaries or the Members, as applicable, in which case such transaction will be deemed to have been approved under this Section 8.4(b) or (D) the terms of the Sterling Related Party Transaction are not materially less favorable to the Company, any of its Subsidiaries or the Members than those available from an unrelated third party in an arms-length transaction, in which case such transaction will be deemed to have been approved under this Section 8.4(b); provided, notwithstanding the foregoing, the following matters are deemed to have received the approval required by this Section 8.4(b): (x) the execution and delivery by the Company and its Subsidiaries (and the joinder of any such Subsidiary), and the performance of their obligations under, the Sterling Advisory Agreement and any of the transactions covered by the Sterling Advisory Agreement in the form furnished to the Members on or before the First A&R Date (which, for clarification, will not be amended unless such amendment is approved in the manner described in this Section 8.4(b) as if this proviso were not part of this Section 8.4(b)) and (y) the issuance of any Units or Unit Equivalents in accordance with Section 4.3.

**8.5** **Inspection Rights**. The Company will, and will cause each Subsidiary to, permit (a) the Institutional Holders, (b) any VCOC Member and (c) any other Member approved by the Majority Holders on a case-by-case basis to visit and inspect any of the properties of the Company or of any Subsidiary, to inspect, copy and take extracts from its and their financial and accounting records, and to discuss its and their affairs, finances and accounts with its and their officers and independent public accountants (provided the Company may, if it so chooses, be present at or participate in any such discussion), all upon reasonable notice and at such reasonable times during normal business hours and as often as may reasonably be requested. No Member other than (i) an Institutional Holder, (ii) a VCOC Member and (iii) a Member approved by the Majority Holders on a case-by-case basis will have inspection rights.

**8.6** **Power of Attorney**. Each Member (other than the Institutional Holders) hereby makes, constitutes and appoints the secretary of the Company as its true and lawful attorney-in-fact for it and in its name, place and stead and for its use and benefit, to sign, execute, certify, acknowledge, swear to, file and record this Agreement and any amendment or restatement hereof that is adopted in accordance with Section 12.6, and any other instrument that is now or may hereafter be deemed necessary by the Company in its reasonable discretion to carry out fully the provisions and the agreements, obligations and covenants of such Member. Each Member (other than the Institutional Holders) hereby gives such attorney-in-fact full power and authority to do and perform each and every act or thing whatsoever requisite or advisable to be done in connection with such Member's obligations and agreements as fully as such Member might or could do personally, and hereby ratifies and confirms all that any such attorney-in-fact will lawfully do or cause to be done by virtue of the power of attorney granted hereby. The power of attorney granted pursuant to this Section 8.6 is a special power of attorney, coupled with an interest, and is

44

irrevocable, and will survive the bankruptcy, insolvency, dissolution or cessation of existence of the applicable Member.

**8.7**    <u>VCOC Related Rights</u>.  At the request of any Institutional Holder, the Company will enter into one or more letter agreements in such form as is approved by the Board with such Institutional Holder or any direct or indirect owner thereof, in each case, that intends to qualify as a "venture capital operating company" within the meaning of United States Department of Labor Regulation § 2510.3-101(d)(1) ("<u>VCOC Member</u>") for the purpose of providing such Institutional Holders with "management rights" within the meaning of United States Department of Labor Regulation § 2510.3-101(d)(3)(ii) (including the right to consult with and advise the management of the Company and any Subsidiary on matters relating to the business and financial affairs of the Company and any Subsidiary).  Any "management rights" provided directly to a VCOC Member under this Agreement or in any such letter agreement may be assigned by such VCOC Member to another VCOC Member, and thereupon the assigning party will not exercise any "management rights" provided to it hereunder or thereunder.  Notwithstanding anything to the contrary contained in this <u>Section 8.7</u>, or in any letter agreement contemplated hereby, the Board will have full and exclusive power and authority on behalf of the Company and any member-managed Subsidiary to acquire, manage, control, administer and operate the property, business and affairs of the Company and such Subsidiaries in accordance with <u>Article 7</u> and the other applicable provisions of this Agreement.

**8.8**    <u>Internal Restructure</u>.

(a)    In connection with an Initial Public Offering or an acquisition of another business or Entity, the Board may determine that the Company should undergo an Internal Restructure.  Accordingly, if the Board makes such determination, the Company and the Members will take commercially reasonable steps to effect an Internal Restructure on such terms as the Board in good faith deems advisable.  Each Member hereby agrees that it will execute and deliver, at the Company's expense, all agreements, instruments and documents as are required, in the reasonable judgment of the Board (and not in conflict with this <u>Section 8.8</u>), to be executed by such Member in order to consummate the Internal Restructure.  Each Member agrees that it will consent to and raise no objections to any such Internal Restructure.

(b)    Subject to <u>Section 4.4(a)(x)(E)</u> with respect to Blocker Members, in connection with an Initial Public Offering, the Board may require each outstanding Unit to be converted into or exchanged for equity securities of the IPO Issuer ("<u>IPO Securities</u>") having a value, based on the price in the Initial Public Offering to the public, equal to value that would be distributed in respect of such Unit if (i) the Pre-IPO Value were distributed by the Company under <u>Section 6.1</u> in complete liquidation and (ii) all Unvested Class C Units were Vested Class C Units; provided, the IPO Securities issued with respect to Unvested Class C Units will remain subject to any applicable time vesting in accordance with, and to the extent provided in, the applicable Restricted Unit Agreement.  Each Member will sell any fractional IPO Securities owned by such Member (after taking into account all IPO Securities held by such Member) to the IPO Issuer, upon the request of the Company in connection with or in anticipation of the consummation of an Initial Public Offering, for cash consideration equal to the fair market value of such fractional IPO Securities, as determined by the Board.  If the foregoing provisions would result in a Class C Unit receiving no IPO Securities, then the Board may determine to have such Class C Unit canceled for

45

no consideration.  The Board may elect, in connection with a proposed Initial Public Offering where a Subsidiary or another Entity that is not the Company or its successor is the IPO Issuer, not to effect an Internal Restructure and, in such case, this Agreement may continue in effect after an Initial Public Offering in accordance with its terms.

(c)    Notwithstanding anything to the contrary in this <u>Section 8.8</u>, if the Internal Restructure involves the issuance of any stock or other security in a transaction not involving a Public Offering and any Member otherwise entitled to receive securities in such Internal Restructure in exchange for the Units held thereby is not an "accredited investor" (as defined under Rule 501 of Regulation D of the Securities Act (disregarding Rule 501(a)(4))), then the Company may require each Member that is not an accredited investor (i) to receive solely cash in such transaction, (ii) to otherwise be cashed out (by redemption, retirement or otherwise) by the Company or any other Member prior to the consummation of such restructure and/or (iii) to appoint a "Purchaser Representative" (as contemplated by Rule 506 of Regulation D of the Securities Act) selected by the Company with the intent being that such Member that is not an accredited investor receive substantially the same value in cash that such Member would have otherwise received in securities had such Member been an accredited investor.

**8.9**    <u>Blocker Member Covenant</u>.  Each Blocker Member agrees that it will not acquire, and it will not permit its Related Blocker Entity to acquire, assets other than the Units, a direct or indirect interest in such Blocker Member, assets distributed or otherwise obtained, directly or indirectly, by reason of the Units and immaterial assets related to such entity's formation, existence, good standing or ongoing administrative matters nor will it incur any liabilities other than those associated with holding the Units, a direct or indirect interest in such Blocker Member, immaterial liabilities related to such entity's formation, existence, good standing or ongoing administrative matters and liabilities arising under applicable Laws.


# ARTICLE 9
# LIABILITY STANDARDS; EXCULPATION AND INDEMNIFICATION

**9.1**    <u>Elimination of Fiduciary Duties</u>.  The Members agree that this Agreement and the Certificate, and no other agreement, document, instrument or Law, contain the entire agreement among the Company, the Members and the Directors with respect to the governance of the Company and the responsibilities that Directors and Members (including Controlling Members) owe to the Company and the Members. **ACCORDINGLY, WITH THE INTENT THAT THIS AGREEMENT AND THE CONTRACTUAL OBLIGATIONS SET FORTH HEREIN SERVE AS THE SOLE BASIS OF ESTABLISHING THE GOVERNANCE OBLIGATIONS OF THE DIRECTORS AND THE MEMBERS (INCLUDING CONTROLLING MEMBERS), THE MEMBERS AND THE COMPANY AGREE THAT, TO THE FULLEST EXTENT PERMITTED BY THE ACT, FIDUCIARY DUTIES OF DIRECTORS AND MEMBERS (INCLUDING CONTROLLING MEMBERS) (SUCH AS THE DUTIES OF CARE, LOYALTY AND CANDOR) ARE HEREBY ELIMINATED, AND IMPLIED COVENANTS AND OTHER STANDARDS OF CONDUCT THAT ARE NOT EXPRESSLY PROVIDED IN THIS AGREEMENT WILL NOT APPLY AND ARE HEREBY WAIVED AND THAT DEFAULT FIDUCIARY DUTIES WILL NOT BE READ**

46

**INTO THIS AGREEMENT OR OTHERWISE APPLY**. Each Member waives to the fullest extent permitted by the Act, any duty or other obligation, if any, that a Director or Member (including a Controlling Member) may have to the Company or another Member, pursuant to the Act or any other applicable Law, to the extent such waiver is necessary to give effect to the terms of this Section 9.1. The Members acknowledge, affirm and agree that (a) the Members would not be willing to make any investment in the Company, and no person designated by the Members to serve on the Board would be willing to so serve, in the absence of this Section 9.1 and (b) they have reviewed and understand the provisions of §§18-1101(b) and (c) of the Act.

**9.2**    Actions at Direction of Members. Without limiting the foregoing, to the fullest extent permitted by the Act, a Director, in performing his duties and obligations in such capacity, will be entitled to act or omit to act at the direction of the Members that designated such person to serve as a Director, considering only such factors, including the separate interests of the Members that have designated such Director, as such Director or such Members choose to consider so long as such acts or omissions (a) impact each Unit of a particular class or series in the same manner as each other Unit in such class or series and (b) do not violate any express provision contained in this Agreement. A Director will not have any liability for acting in a manner consistent with this Section 9.2.

**9.3**    Burden of Proof. The burden of proof to establish that any provision of this Agreement has been breached will be borne by the Person alleging such breach, and such burden of proof will not be shifted even in the context of a Sterling Related Party Transaction. This Section 9.3 does not alter, amend, restrict or limit any rights or obligations of (a) any Member (including any Insider Member) or Director arising under any other agreement with the Company or any Subsidiary (such as employment agreements, non-compete agreements or confidentiality agreements) to which such Person is a party or by which such Person is bound or (b) any Member (including any Insider Member but excluding any Institutional Holder) or Director arising under any policy, plan, program or procedure applicable to the employees of the Company or any Subsidiary.

**9.4**    Corporate Opportunities.

(a)    Each Director and each Member including Controlling Members (other than any Insider Member or Person who is an Affiliate of an Insider Member unless the Board determines otherwise) will have the right to have financial interests in, govern, control, provide services to, engage in and possess interests in other business ventures of every type and description, including those engaged in the same or similar business activities or lines of business as the Company and any Subsidiary, or deemed to be competing with the Company or any Subsidiary, on its own account, or in partnership with, or as an employee, manager, officer, director, member, Controlling Person, equity holder, general or limited partner or shareholder of any other Person, with no obligation to offer to the Company or any Subsidiary or any other Member the right to participate therein; provided, such Director or Member will promptly provide the Board with written notice of any of the foregoing. In the event that any Director or Member (other than any Insider Member or Affiliate of an Insider Member unless the Board determines otherwise) acquires knowledge of a potential transaction or matter that may be a corporate or other business opportunity for the Company, no such Director and no such Member will have any duty (fiduciary, contractual or otherwise) to communicate or present such opportunity to the Company or any

47

Subsidiary or any other Member, as the case may be, and, notwithstanding any provision of this Agreement to the contrary, will not be liable to the Company or any Subsidiary or any other Member (or their respective Affiliates) under any theory by reason of the fact that such Director or any such Member, directly or indirectly, pursues or acquires such opportunity for itself, directs such opportunity to another Person or does not present such opportunity to the Company or any of its Subsidiaries or any other Member. The Company hereby renounces any interest or expectancy in any business opportunity, transaction or other matter in which any Member (other than any Insider Member or Person who is an Affiliate of an Insider Member unless the Board determines otherwise) participates or desires to participate (each such business opportunity is referred to as a "Renounced Business Opportunity"). The Company acknowledges that such Renounced Business Opportunities may involve transactions or ventures that compete directly with the Company's business.

(b)     Notwithstanding anything to the contrary in Section 9.4(a), a Director or Member may be restricted from pursuing corporate opportunities for its own account pursuant to a separate agreement (such as an employment agreement, non-compete agreement, confidentiality agreement or other agreement), and neither this Section 9.4 nor any other provision of this Agreement will override or otherwise affect any restriction in any other agreement.

(c)     Each Member hereby agrees that (i) the terms of this Section 9.4, to the extent that they eliminate or modify a duty or other obligation that a Director may have to the Company or any other Member under the Act or other applicable Law, are reasonable in form, scope and content; and (ii) the terms of this Section 9.4 will control to the fullest extent possible if it is in conflict with a duty, if any, that a Director may have to the Company or another Member, under the Act or any other applicable Law. Each Member waives to the fullest extent permitted by the Act, any duty or other obligation, if any, that a Director or Member (including a Controlling Member) may have to the Company or another Member, pursuant to the Act or any other applicable Law, to the extent such waiver is necessary to give effect to the terms of this Section 9.4. The Members acknowledge, affirm and agree that (A) the Members would not be willing to make any investment in the Company, and no person designated by the Members to serve on the Board would be willing to so serve, in the absence of this Section 9.4 and (B) they have reviewed and understand the provisions of §§18-1101(b) and (c) of the Act.

**9.5**     Exculpation.

(a)     No Director, Observer or Sterling Officer in his capacity as such and no Director, Observer or Sterling Officer who is or was serving at the request of the Company as a member, manager, director, officer, partner, venturer, proprietor, trustee, employee, authorized person, agent, or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise will be liable to the Company or any Member for monetary damages arising from any actions taken, or actions failed to be taken, in his or her capacity as such except for (i) liability for acts that involve fraud, willful misconduct or bad faith, (ii) liability with respect to any transaction from which such Person derived a personal benefit unless such transaction is permitted by or approved or deemed approved in accordance with this Agreement or (iii) liability arising from a breach of this Agreement.

48

(b)    No Member (including a Controlling Member) will be liable to the Company or any other Member for monetary damages arising from any actions taken, or actions failed to be taken, in its capacity as such except for liability arising from a breach of this Agreement.

**9.6**    <u>Indemnification of Members, Directors and Officers</u>.  Subject to the limitations set forth in this <u>Section 9.6</u>, each Person who was or is made a party or is threatened to be made a party to or is involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, arbitrative or investigative (hereinafter a "<u>Proceeding</u>"), or any appeal in such a Proceeding or any inquiry or investigation that could lead to such a Proceeding, by reason of the fact that it, or a Person of whom it is the legal representative, is or was a Member, Director or Officer or while a Director or Officer is or was serving at the request of the Company as a member, manager, director, officer, partner, venturer, proprietor, trustee, employee, authorized person, agent, or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise will be indemnified by the Company to the fullest extent permitted by the Act, as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Company to provide broader indemnification rights than said Law permitted the Company to provide prior to such amendment), against judgments, penalties (including excise and similar taxes and punitive damages), fines, settlements and reasonable expenses (including reasonable attorneys' fees) actually incurred by such Person in connection with such Proceeding, and indemnification under this <u>Section 9.6</u> will continue as to a Person who has ceased to serve in the capacity which initially entitled such Person to indemnity hereunder.  Notwithstanding anything to the contrary in this <u>Section 9.6</u>, a Person will not be entitled to indemnification hereunder if it is determined by a non-appealable order of a court of competent jurisdiction or arbitrator that, with respect to the matter for which such Person seeks indemnification, (a) such Person did not act in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the Company, (b) that such Person's actions constituted fraud, willful misconduct or bad faith or, with respect to any criminal action or proceeding, had reasonable cause to believe that his conduct was unlawful, (c) the matter for which such Person seeks indemnification is a Proceeding that primarily relates to a breach of this Agreement or any other agreement between such Person and the Company or any Subsidiary or (d) the matter for which such Person seeks indemnification would not have arisen but for such Person's or such Person's Affiliates' acting in a capacity other than in its capacity as a Member, Director or Officer.  The termination of any action, suit or Proceeding by judgment, order, settlement, conviction, or upon a plea of *nolo contendere* or its equivalent, will not, of itself, create a presumption that the Person did not act in good faith and in a manner which he reasonably believed to be in or not opposed to the best interests of the Company and, with respect to any criminal action or Proceeding, had reasonable cause to believe that his conduct was unlawful.

**9.7**    <u>Advance Payment</u>.  The right to indemnification conferred on the Members, Directors and Officers referenced under <u>Section 9.6</u> will include the right to be paid or reimbursed by the Company the reasonable expenses incurred by a Person entitled to be indemnified under <u>Section 9.6</u> who was, is or is threatened to be made a named defendant or respondent in a Proceeding (other than Proceedings for matters described in clauses (a) through (d) of <u>Section 9.6</u>) in advance of the final disposition of the Proceeding and without any determination as to the

49

Person's ultimate entitlement to indemnification; provided, payment of such expenses incurred by any such Person in advance of the final disposition of a Proceeding will be made only upon delivery to the Company of a written affirmation by such Person of its good faith belief that it has met the standard of conduct necessary for indemnification under <u>Section 9.6</u> and a written undertaking by such Person to repay all amounts so advanced if it is ultimately determined by a court of competent jurisdiction that such Protected Person is not entitled to be indemnified under <u>Section 9.6</u> or otherwise.

**9.8**    <u>Indemnification of Employees and Agents</u>.    The Company, by adoption of a resolution of the Board, may, but will not be obligated to, indemnify and advance expenses to an employee or agent of the Company or any Subsidiary to the same extent and subject to the same conditions under which it may indemnify and advance expenses to the Members, Directors and Officers under <u>Section 9.6</u> and <u>Section 9.7</u>.

**9.9**    <u>Appearance as a Witness</u>.    The Company may, by adoption of a resolution of the Board, pay or reimburse expenses incurred by a Member, Director, Officer, employee or other agent of the Company or representative of a Member (such as employees and partners of Sterling) in connection with its appearance as a witness or other participation in a Proceeding at a time when the Company is not a named defendant or respondent in the Proceeding.

**9.10**    <u>Nonexclusivity of Rights</u>.    The right to indemnification and the advancement and payment of expenses conferred in this <u>Article 9</u> will not be exclusive of any other right that any such Person indemnified pursuant to this <u>Article 9</u> (each, a "<u>Protected Person</u>") may have or hereafter acquire by vote of the Board or otherwise.  If a Protected Person is indemnified by a Third-Party Indemnitor for a loss covered by <u>Section 9.6</u> or receives from a Third-Party Indemnitor expense reimbursement or advancement of an expense covered by <u>Section 9.7</u>, such Third-Party Indemnitor will be subrogated to the rights of the Protected Person under this <u>Article 9</u> to recover such amount from the Company on the terms of this <u>Article 9</u>.  The Company will not be subrogated to the rights a Protected Person may have against a Third-Party Indemnitor.  A Protected Person is not required to assert any claim for indemnification protection or expense reimbursement or advance against any Third-Party Indemnitor prior to asserting a claim against, or receiving an indemnification or expense reimbursement payment from, the Company.

**9.11**    <u>Insurance</u>.    Without limiting the Company's other obligations under this <u>Article 9</u>, if approved by the Board, the Company will procure and at all times maintain directors and officers liability insurance coverage, unless otherwise determined by the Board.

## ARTICLE 10
## TAX, ACCOUNTING, BOOKKEEPING AND RELATED PROVISIONS

**10.1**    <u>Tax Returns</u>.    The Company will prepare, or cause to be prepared, and timely file all tax returns and reports required to be filed by the Company.  The Company will deliver to each Member with respect to each Fiscal Year an IRS Schedule K-1 as contemplated in <u>Section 8.3(c)</u>. Each Member will furnish to the Company all pertinent information in its possession relating to the Company's operations that is necessary to enable the Company's tax returns to be timely prepared and filed.  The Company will bear the costs of the preparation and filing of its tax returns and reports.

**10.2** <u>Tax Partnership</u>.  The Members acknowledge that, subject to <u>Section 8.8</u> and the impact of an Internal Restructure, the Company will be treated as a partnership for federal income tax purposes and the Members will not otherwise characterize the Company for purposes of any federal tax returns, statements or reports filed by them or their Affiliates.

**10.3** <u>Tax Elections</u>.  The Company will make the following elections on the appropriate tax returns:

(a)     to adopt, as the Company's Fiscal Year, the calendar year or such other Fiscal Year as the Partnership Representative designates;

(b)     to adopt the accrual method of accounting unless the cash method of accounting is available and the Partnership Representative designates the cash method of accounting for use by the Company;

(c)     if a distribution of the Company's property as described in Code Section 734 occurs or a Transfer of Units as described in Code Section 743 occurs, the Company may elect, at the discretion of the Board, pursuant to Code Section 754, to adjust the basis of the Company's properties;

(d)     any election that would ensure that the Company will be treated as a partnership for federal income tax purposes; and

(e)     any other election the Board may deem appropriate and in the best interests of the Members.

Neither the Company nor any Member may make an election for the Company to be excluded from the application of the provisions of subchapter K of chapter 1 of subtitle A of the Code or any similar provisions of applicable state Law and no provision of this Agreement will be construed to sanction or approve such an election.

**10.4** <u>Bank Accounts</u>.  The Company may establish one or more separate bank and investment accounts and arrangements, which will be maintained in the Company's name with financial institutions and firms that the Board may determine.  The Company will not commingle the Company's funds with the funds of any Member or any Affiliate of a Member.

**10.5** <u>Fiscal Year</u>.  The fiscal year of the Company (the "<u>Fiscal Year</u>") will end on December 31 of each calendar year unless, for United States federal income tax purposes, another fiscal year is required. The Company will have the same fiscal year for United States federal income tax purposes and for accounting purposes.

**10.6** <u>Bipartisan Budget Act of 2015</u>.  Sterling Group Partners V, L.P., or such other Member designated by the Board from time to time, will be designated, and will be specifically authorized to act as, the "partnership representative" (the "<u>Partnership Representative</u>") under Section 6223 of the Code (or any successor thereto), as amended by the Bipartisan Budget Act of 2015 (the "<u>2015 Act</u>"), and, if required by the 2015 Act, the Board will also appoint a Designated Individual.  Both the Partnership Representative and the Designated Individual are subject to

51

replacement from time to time by the Board.  The Partnership Representative will apply the provisions of subchapter C of Chapter 63 of the Code, as amended by the 2015 Act (or any successor rules thereto) with respect to any audit, imputed underpayment, other adjustment, or any such decision or action by the Internal Revenue Service with respect to the Company or the Members for such taxable years, in the manner determined by the Partnership Representative, as approved by the Board.  For the avoidance of doubt, the Partnership Representative may make, as approved by the Board, an election to apply Section 6221(b) or Section 6226 of the Code or an election to file an administrative adjustment pursuant to Section 6227 of the Code, in each case as amended by the 2015 Act and in the manner determined by Partnership Representative and approved by the Board.  The Partnership Representative will promptly inform the Members of any tax deficiencies assessed by any taxing authority against the Company or the Members.  Each Member does hereby agree to indemnify and hold harmless the Company from and against any liability with respect to its share of any tax deficiency paid or payable by the Company that is allocable to the Member (as reasonably determined by the Board) with respect to an audited or reviewed taxable year for which such Member was a Member (for the avoidance of doubt, including any applicable interest and penalties); such obligation will survive such Member's ceasing to be a Member and/or the termination, dissolution, liquidation and winding up of the Company.  For the avoidance of doubt, the Partnership Representative will not make any election under this Section 10.6, unless required by Law, without the approval of the Board.

      **10.7**    <u>Cooperation and Assistance</u>.  Each Member will provide such cooperation and assistance, including but not limited to executing and filing forms or other statements and providing information about the Member, as is reasonably requested by Partnership Representative, to enable the Company to satisfy any applicable tax reporting or compliance requirements, to make any tax election or to qualify for an exception from or reduced rate of tax or other tax benefit or be relieved of liability for any tax regardless of whether such requirement, tax benefit or tax liability existed on the date such Member was admitted to the Company.  If a Member fails to provide any such forms, statements, or other information requested by the Partnership Representative, such Member will be required to indemnify the Company for the share of any tax deficiency paid or payable by the Company that is due to such failure (as reasonably determined by the Board).  The obligations set forth in this <u>Section 10.7</u> will survive such Member's ceasing to be a member of the Company and/or the termination, dissolution, liquidation and winding up of the Company.

## ARTICLE 11
## DISSOLUTION, WINDING-UP AND TERMINATION

      **11.1**    <u>Dissolution</u>.

      (a)    <u>General</u>.  Subject to <u>Section 11.1(b)</u>, the Company will dissolve and its affairs will be wound up on the first to occur of the following events (each a "<u>Dissolution Event</u>"), and no other event will cause the Company's dissolution:

      (i)    the approval of the Board; and

      (ii)    the entry of a decree of judicial dissolution of the Company under Section 18-802 of the Act.

(b)    <u>Continuance of the Company</u>.  To the maximum extent permitted by the Act, the death, retirement, resignation, expulsion, bankruptcy or dissolution of a Member will not constitute a Dissolution Event and, notwithstanding the occurrence of any such event or circumstance, the business of the Company will be continued without dissolution.

**11.2**    <u>Winding-Up and Termination</u>.  On the occurrence of a Dissolution Event, the Board may select one or more Persons to act as liquidator or may itself act as liquidator.  The liquidator will proceed diligently to wind up the affairs of the Company and make final distributions as provided herein and in the Act.  The costs of winding up will be borne as a Company expense, including reasonable compensation to the liquidator if approved by the Board.  Until final distribution, the liquidator will continue to operate the Company properties with all of the power and authority of the Board.  The steps to be accomplished by the liquidator are as follows:

(a)    <u>Accounting</u>.  As promptly as possible after dissolution and again after final winding up, the liquidator will cause a proper accounting to be made by the Accounting Firm of the Company's assets, liabilities, and operations through the last calendar day of the month in which the dissolution occurs or the final winding up is completed, as applicable.

(b)    <u>Satisfaction of Obligations</u>.  The liquidator will pay, satisfy or discharge from Company funds all of the debts, liabilities and obligations of the Company (including all expenses incurred in winding up and any advances described in <u>Section 5.3</u>); provided, the liquidator may establish one or more cash escrow funds (in such amounts and for such terms as the liquidator may reasonably determine) for the payment of contingent liabilities.

(c)    <u>Distribution of Assets</u>.  All remaining assets of the Company will be distributed to the Members as follows:

(i)    the liquidator may sell any or all Company property, including to the Members, and any resulting gain or loss from each sale will be computed and allocated to the Capital Accounts of Members in accordance with the allocation provisions in this Agreement;

(ii)    with respect to all Company property that has not been sold, the fair market value of that property will be determined and the Capital Accounts of Members will be adjusted to reflect the manner in which the unrealized income, gain, loss, and deduction inherent in property that has not been reflected in the Capital Accounts previously would be allocated among Members if there were a taxable disposition of that property for the fair market value of that property on the date of distribution; and

(iii)    the property of the Company will be distributed in accordance with <u>Section 6.1</u> and <u>Section 6.2</u>.

All distributions in kind to the Members will be made subject to the liability of each distributee for costs, expenses and liabilities theretofore incurred or for which the Company has committed prior to the date of termination and those costs, expenses and liabilities will be allocated to the distributee pursuant to this <u>Section 11.2</u>; provided no Member will be liable for any such Company cost, expense or liability in excess of the fair market value of the property so distributed

53

in kind to such Member.  The distribution of cash and/or property to a Member in accordance with the provisions of this Section 11.2 constitutes a complete return to the Member of its Capital Contributions and constitutes a compromise to which all Members have consented within the meaning of Section 18-502(b) of the Act; provided no Member will be deemed, under this Section 11.2(c), to have agreed to be liable for any such Company cost, expense or liability in excess of the fair market value of the property so distributed in kind to such Member.  To the extent that a Member returns funds to the Company, it has no claim against any other Member for those funds.

(d)     Final Capital Account Balances.  The Members intend that the allocations provided under Section 6.3, Section 6.4, and Section 6.5 will produce final Capital Account balances for the Members that equal the amount of permit liquidating distributions pursuant to Section 11.2(c)(iii) to be made under Section 6.1 (after taking into account all previous distributions made to the Members pursuant to Section 6.1).  If the allocations otherwise made under Section 6.3, Section 6.4, and Section 6.5 would fail to produce such final Capital Account balances, the Board will cause the allocations of Profit or Loss (including items therein) and, to the extent necessary, guaranteed payments to be made in the final Fiscal Year of the Company in a manner that achieves the foregoing intent as closely as possible.

**11.3**    Deficit Capital Accounts.  No Member will be required to pay to the Company, to any other Member or to any third party any deficit balance which may exist from time to time in the Member's Capital Account.

**11.4**    Certificate of Cancellation.  On completion of the distribution of Company assets as provided herein, the Board (or any Person or Persons as the Act may require or permit) will file a certificate of cancellation with the Secretary of State of Delaware, cancel any other filings made pursuant to Section 2.5 and take such other actions as may be necessary to terminate the existence of the Company.  Upon the effectiveness of the certificate of cancellation, the existence of the Company will cease, except as may be otherwise provided by the Act or other applicable Law.

# ARTICLE 12
# GENERAL PROVISIONS

**12.1**    Books.  To the extent required by the Act, the Company will maintain or cause to be maintained complete and accurate records and books of account of the Company's affairs at the principal office of the Company.

**12.2**    Offset.

(a)     Whenever the Company is to pay any sum to any Member, any amounts that such Member owes the Company or any Subsidiary may be deducted from that sum before payment, after notice to the Member describing the nature of the offset and the amount to be offset.

(b)     In general, Rollover Units are issued in connection the Company's or its Subsidiaries' business acquisitions. In some cases, the definitive acquisition agreements or rollover, contribution or subscription agreements contain provisions that call for the forfeiture or cancellation of Rollover Units or that entitle the Company to withhold or offset distributions in respect of Rollover Units, in each case, if obligations owing to the Company or a Subsidiary remain

unsatisfied. Such forfeiture, cancellation, withholding and offset provisions can continue to burden Rollover Units even following Transfers thereof. Accordingly, the Company may enforce its forfeiture, cancellation, withholding and offset rights granted thereto under any such definitive acquisition agreement or rollover, contribution or subscription agreement against a holder of Rollover Units if such Rollover Units are burdened by such provisions, and the provisions in this Agreement will be applied to allow for Transfers to the Company to effect any forfeiture or cancellation remedy and to allow the Company to modify the distribution provisions set forth herein to effect any distribution withholding or offset remedy.

      **12.3**   <u>Notices</u>. Except as expressly set forth to the contrary in this Agreement, all notices, requests or consents provided for or permitted to be given under this Agreement must be in writing and must be delivered to the recipient in person, by courier or mail, by email or similar transmission; and a notice, request or consent given under this Agreement is effective on receipt by the Person to receive it. Any notice given in accordance herewith will be deemed to have been received upon actual receipt when delivered in person, including delivery by the United States Postal Service; on the Business Day that receipt is confirmed by a reputable courier; or on the Business Day following the date the party giving notice receives electronic confirmation of delivery, in the case of an email or similar transmission. If the date specified in this Agreement for giving notice or taking any action is not a Business Day (or if the period during which any notice is required to be given or any action taken expires on a date which is not a Business Day), then the date for giving such notice or taking such action (and the expiration date of such period during which notice is required to be given or action taken) will be the next day which is a Business Day. All notices, requests and consents to be sent to a Member must be sent to or made at the addresses given for that Member on <u>Schedule 1</u> or such other address as that Member may specify by notice to the Company and the other Members. Whenever any notice is required to be given by Law, the Certificate or this Agreement, a written waiver thereof, signed by the Person entitled to notice, whether before or after the time stated therein, will be deemed equivalent to the giving of such notice.

      **12.4**   <u>Entire Agreement; Supersedure</u>. This Agreement and any other agreements expressly mentioned herein constitute the entire agreement of the Members and their respective Affiliates relating to the matters covered hereby and supersede all prior contracts or agreements with respect to the Company, whether oral or written.

      **12.5**   <u>Effect of Waiver or Consent</u>. A waiver or consent, express or implied, to or of any breach or default by any Person in the performance by that Person of its obligations with respect to the Company is not a consent or waiver to or of any other breach or default in the performance by that Person of the same or any other obligations of that Person with respect to the Company. Failure on the part of a Person to complain of any act of any Person or to declare any Person in default with respect to the Company, irrespective of how long that failure continues, does not constitute a waiver by that Person of its rights with respect to that default until the applicable statute-of-limitations period has run.

      **12.6**   <u>Amendment or Restatement</u>. This Agreement (including the Exhibits and Schedules) may only be amended or restated by, and the rights of the Company or any other Party under this Agreement only may be waived by, a written instrument adopted, executed and agreed to by the Company and the Majority Holders; provided, in addition to the foregoing approvals:

(a)    in no event will any amendment, modification, waiver or restatement of this Agreement that would disproportionately and adversely impair the rights of any Member (including the rights, designations or preferences of any class or series of Units held by any such Member) (each, an "Adversely Affected Member") be effective against any such Member unless such amendment, modification, waiver or restatement is approved by Adversely Affected Members who hold at least two-thirds of the Voting Units held by all of the Adversely Affected Members; provided, pro rata dilution of all Units will be deemed not to disproportionately or adversely impair the rights of any Member;

(b)    in no event will any amendment, modification, waiver or restatement impose any obligation to make additional capital contributions upon any Member, and no existing monetary obligation of a Member will be increased, in each case, without such Member's consent;

(c)    in no event will any amendment, modification, waiver or restatement adversely affect the rights of an Observer under Section 7.3 without the prior consent of the Member designating such Observer;

(d)    in no event will any amendment, modification, waiver or restatement (i) reclassify an Institutional Holder as a Member that is not an Institutional Holder without the prior consent of such Member, (ii) reclassify a Lender Member as a Member that is not a Lender Member without the prior consent of such Member, or (iii) reclassify an Exempt Institutional Holder as a Member that is not an Exempt Institutional Holder without the prior consent of such Member;

(e)    in no event will any amendment, modification, waiver, or restatement reclassify a Blocker Member as a Member that is not a Blocker Member without the prior consent of such Blocker Member.

(f)    in no event will any amendment, modification, waiver or restatement to the references to, use of, or definitions of, "Customary Transaction Terms" or "Customary Transaction Documents" be effective against any Member without the prior consent of the Members that hold at least 90% of the outstanding Class A Units, the Class B Units and the Class C-1 Units, voting as a single, combined class; provided, notwithstanding the foregoing, no amendment, modification, waiver or restatement to the following Customary Transaction Terms will be effective against any Member without such Member's consent: (i) any amendment, modification, waiver or restatement that would require any Member, other than the Insider Members, to enter into a non-compete agreement; (ii) any amendment, modification, waiver or restatement that would require any Member to make representations and warranties about the Company or any Subsidiary in connection with an Approved Transaction and (iii) any amendment, modification, waiver or restatement that would require a Member to be liable for more than the proceeds received thereby in an Approved Transaction;

(g)    in no event will any amendment, modification, waiver or restatement be made to Section 4.3, Section 4.4(a), Section 4.4(c) or this Section 12.6 without the prior consent of the Members that hold at least 90% of the outstanding Class A Units, the Class B Units and the Class C-1 Units, voting as a single, combined class, which Members must include the Institutional Holders who hold at least 75% of the outstanding Class A Units, the Class B Units and the Class

C-1 Units, as a single, combined class, held by all Institutional Holders other than the Sterling Holders; provided, (i) this clause (g) will not apply to a New Terms Amendment so long as the co-sale rights granted to holders of the Units created by the New Terms Amendment are no more favorable to such holders than the rights granted in <u>Section 4.4(c)</u> as in effect immediately prior to the New Terms Amendment and (ii) no amendment or modification to the proviso in <u>Section 12.6(f)</u> will be effective against any Member without such Member's consent;

(h)    in no event will any amendment, modification, waiver or restatement to <u>Section 12.16</u> be effective against a Lender Member without such Lender Member's consent; and

(i)    no amendment, modification, waiver or restatement to this <u>Section 12.6(i)</u>, or any of the foregoing clauses (a) through (h) of this <u>Section 12.6</u> that adversely affects the rights or obligations of any Institutional Holder will be effective against such Institutional Holder without either (i) such Institutional Holder's prior consent or (ii) in the case of amendments, modifications, waivers or restatements to clauses (a) through (h) above, without first obtaining the consent expressly referenced in the clause being amended or modified;

(j)    in no event will any amendment, modification, waiver or restatement to the distribution rights of the Class C-1 Units be effective without the consent of the holders of a majority of the Class C-1 Units then outstanding if any such amendment, modification, waiver or restatement would alter the relative distribution rights of the Class C-1 Units compared to the distribution rights of the Class A Units or Class B Units (it being understood that proportionate dilution caused by the issuance of additional Units would not require consent hereunder);

provided, notwithstanding the foregoing provisions of this <u>Section 12.6</u>, at the request of any Member who experiences a Regulatory Problem and provides the Company with a written request detailing such Regulatory Problem and requesting that this Agreement be amended or particular provisions hereof waived to address any time limitations imposed on such Member to effect a Transfer due to such Regulatory Problem, the Company may adopt any such amendment or waiver without the consent or approval of any Member so long as such amendment, modification, waiver or restatement is approved by the Board.

The Company will provide notice to any Member that does not vote in favor of an amendment that is approved in accordance with this <u>Section 12.6</u> within 10 days after the effective date of such amendment.

**12.7    <u>Binding Effect</u>.** This Agreement is binding on and inures to the benefit of the Members and their respective heirs, legal representatives, successors and permitted assigns.

**12.8    <u>Governing Law; Venue</u>.** This Agreement is governed by and will be construed in accordance with the Laws of the State of Delaware. The Members covenant and agree that the state courts located in the State of Delaware, or in a case involving diversity of citizenship or a federal question, the federal courts located in the State of Delaware will have exclusive jurisdiction of any action or Proceeding under this Agreement or related to the matters contemplated by this Agreement or any agreement entered into in connection therewith.

**12.9**    Severability.  If a direct conflict exists between the provisions of this Agreement and (a) any provision of the Certificate or (b) any mandatory, non-waivable provision of the Act, such provision of the Certificate or the Act will control.  If any provision of the Act provides that it may be varied or superseded in the agreement of a limited liability company (or otherwise by agreement of the members or managers of a limited liability company), such provision will be deemed superseded and waived in its entirety if this Agreement contains a provision addressing the same issue or subject matter.  If any provision of this Agreement or the application thereof to any Person or circumstance is held invalid or unenforceable to any extent, the remainder of this Agreement and the application of that provision to other Persons or circumstances will be enforced to the greatest extent permitted by Law.

**12.10**    Independent Legal Advice.  Each of the Members and their spouses, as applicable, acknowledge that he, she or it has read and understands this Agreement, has consulted with legal counsel with respect to the terms and conditions hereof, is fully aware of its legal effect, has not acted in reliance upon any representations or promises made by the Company other than those contained in writing herein, and has entered into this Agreement freely based on his, her or its own judgment with the advice of legal counsel and other advisers as he, she or it has deemed necessary or advisable.

**12.11**    Further Assurances.   In connection with this Agreement and the transactions contemplated hereby, each Member will execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and those transactions.

**12.12**    Waiver of Certain Rights.

(a)    Each Member irrevocably waives any right it may have to maintain any action for dissolution of the Company or for partition of the property of the Company.

(b)    Each Member irrevocably waives any contractual appraisal right in connection with any merger or consolidation of the Company with or into any other Entity, unless expressly set forth in an agreement of merger or consolidation or a plan of merger approved by the Board.

**12.13**    Directly or Indirectly.  Where any provision of this Agreement refers to action to be taken by any Person, or which such Person is prohibited from taking, such provision will be applicable whether such action is taken directly or indirectly by such Person, including actions taken by or on behalf of any Affiliate of such Person.

**12.14**    Counterparts.  This Agreement may be executed in any number of counterparts, including facsimile counterparts or electronic PDF transmission (including via e-mail delivery) of counterparts, with the same effect as if all signing Parties had signed the same document.  All counterparts will be construed together and constitute the same instrument.

**12.15**    Equitable Relief.  Each Member acknowledges and agrees that any breach of this Agreement by such Member or any transferee or any legal representative thereof may cause irreparable injury to the Company or the other Members for which monetary damages (or other

remedy at law) are inadequate in view of (a) the complexities and uncertainties in measuring the actual damages that would be sustained by reason of the failure of a Member to comply with such provisions and (b) the uniqueness of the Company's and each other Member's business. Accordingly, each Member consents to the issuance of an injunction or the enforcement of other equitable remedies against such Member at the suit of an aggrieved party without the posting of any bond or other security, to compel specific performance of all of the terms of this Agreement, and waives any defenses thereto, including the defenses of: (i) failure of consideration, (ii) breach of any other provision of this Agreement and (iii) availability of relief in damages.

      **12.16** <u>Lender Rights</u>.  Notwithstanding anything in this Agreement to the contrary, nothing contained in this Agreement will affect, limit or impair the rights or remedies of any Lender Member or any other lender in their capacity as lender (or as agent for lenders) to or with respect to the Company or any Subsidiary pursuant to any agreement (including the Applicable Credit Documents) under which the Company or such Subsidiary has borrowed money.  Without limiting the generality of the foregoing, no Lender Member, in exercising its rights as a lender (or as an agent for lenders) to the Company or any Subsidiary including making its decision on whether to foreclose on any collateral security will have any duty by reason of this Agreement or as a direct or indirect holder of Units to consider (a) its status as a direct or indirect holder of Units or other equity securities of the Company, (b) the interests of the Company or any Subsidiary or (c) any duty it may have to any other direct or indirect holder of Units other than equity securities of the Company, except to the extent arising under the Applicable Credit Documents.

      **12.17** <u>No Vicarious Liability</u>.  Notwithstanding anything in this Agreement to the contrary, this Agreement may only be enforced against the Parties and their respective successors and permitted assigns. All claims or causes of action (whether in contract, tort or otherwise) that may be based upon, arise out of, or relate to this Agreement, or the negotiation, execution or performance of this Agreement (including any representation or warranty made in or in connection with this Agreement or as an inducement to enter into this Agreement), may be made only against the Parties and their respective successors and permitted assigns, and no officer, director, partner, manager, equityholder, employee or Affiliate of any Party (including any Person negotiating or executing this Agreement on behalf of such Party) will have any liability or obligation with respect to this Agreement or with respect to any claim or cause of action (whether in contract, tort or otherwise) that may arise out of or relate to this Agreement or the negotiation, execution or performance of this Agreement (including a representation or warranty made in connection with this Agreement or as an inducement to enter into this Agreement). Each Party hereby agrees not to bring any action or claim arising under or relating to this Agreement against any Person that is not a Party.

**[Signature Pages Follow]**

42992628.2

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the First A&R Date.

**COMPANY**:

**TSG SHELF II INVESTMENTS, LLC**

By: _____
Name: Max Klupchak
Title: Secretary

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the First A&R Date.

<u>**MEMBER**</u>:

**TSG SHELF II INVESTMENTS HOLDINGS, L.P.**

By: Sterling Group Partners V GP, L.P.,
its General Partner
By: Sterling Group Partners V UGP, Ltd.,
its General Partner

By: _____
Name: Max Klupchak
Title: Secretary

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the First A&R Date.

<u>**MEMBER**</u>:

**TSG SHELF II CREDIT BLOCKER CORP.**


By: _____
Name: Max Klupchak
Title: Secretary

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the First A&R Date.

<u>**MEMBER**</u>:

**STERLING GROUP CREDIT FUND, L.P.**

By: Sterling Group Credit GP, L.P.,
its General Partner
By: Sterling Group Credit UGP, LLC
its General Partner


By:_____
Name: Sean Davenport
Title: Authorized Investment Officer

## Spousal Consent and Marital Statement

I, _____, am the spouse of the above signed Member, a holder of Units of TSG Shelf II Investments, LLC, a Delaware limited liability company (the "Company").  I understand that my spouse is a party to this Agreement, and that this Agreement contains certain provisions regarding my acquiring or retaining any Units, or rights to receive Units.  I agree that I may not acquire any such Units (whether by gift, purchase, will, intestate succession, operation of law or decree, order or injunction of any court, division of community or marital property, or otherwise), except in compliance with the terms of this Agreement.  I acknowledge and understand that if I ever propose to acquire any such Units in compliance with this Agreement, I must first agree to become a party to this Agreement.  I further acknowledge and agree that any interest I may have in Units (whether as a result of community property rights or otherwise) as of the date hereof are subject to the provisions of this Agreement.

Executed as of the _____ day of _____, 20_____

Name: _____

Address: _____

_____

If this signature page is delivered without the above Spousal Consent and Marital Statement executed by the spouse of the Member executing above, then such Member hereby represents and warrants to the Company and the other Members that he or she is not married and does not have a common law spouse as of the date hereof.

The above signed Member will promptly notify the Company whenever there is a change in such Member's marital status.  If the above signed Member marries or remarries after the date hereof such Member will promptly provide the Company with the name and address of his or her spouse.  The above signed Member will use his or her best efforts to cause his or her current or future spouse to execute and deliver to the Company the above Spousal Consent and Marital Statement or an instrument substantially in the form of the above Spousal Consent and Marital Statement.

## SCHEDULE 1
## MEMBERS, UNITS AND INFORMATION RELATED THERETO
## AS OF THE FIRST A&R DATE

(See Attached)

| Members | Numbers and Classes of Units | Admission Date | Eligible Co-Sale Participant (Y/N) | Eligible Purchaser (Y/N) | Exempt Institutional Holder (Y/N) | Institutional Holder (Y/N) | VCOC Member (Y/N) | Insider Member (Y/N) | Related Individual | Lender Member (Y/N) | BDC Member (Y/N) | SPV Member (Y/N) | Blocker Member (Y/N) | Related Blocker Entity |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **TSG Shelf II Investments Holdings, L.P.**<br><br>Notice Information:<br><br>c/o The Sterling Group, L.P.<br>9 Greenway Plaza, Suite 2400<br>Houston, TX 77046<br><br>Attention: [_] | [_]<br><br>Class A Units | May [_], 2021 | Yes | Yes | No | Yes | Yes | No | N/A | No | No | No | Yes | TSG Shelf II Blocker Corp. |
| **TSG Shelf II Credit Blocker Corp.**<br><br>[_]<br><br>Attention: [_] | [_]<br><br>Class A Units | May [_], 2021 | Yes | Yes | Yes | Yes | Yes | No | N/A | Yes | No | No | Yes | N/A |
| **Sterling Group Credit Fund, L.P.**<br><br>[_]<br><br>Attention: [_] | [_]<br><br>Class A Units | May [_], 2021 | Yes | Yes | Yes | Yes | Yes | No | N/A | Yes | No | No | No | N/A |

Schedule 1-1

## EXHIBIT A

### DEFINED TERMS

"<u>2015 Act</u>" has the meaning specified in <u>Section 10.6</u>.

"<u>Accepting Investor</u>" has the meaning specified in <u>Section 4.4(b)(v)</u>.

"<u>Accounting Firm</u>" means such accounting firm of nationally recognized standing as the Board will from time to time determine.

"<u>Act</u>" means the Delaware Limited Liability Company Act and any successor statute, as amended from time to time.

"<u>Adversely Affected Member</u>" has the meaning specified in <u>Section 12.6(a)</u>.

"<u>Adjusted Capital Account</u>" means the Capital Account maintained for each Member, (a) increased by any amounts that such Member is obligated to restore (or is treated as obligated to restore under Treasury Regulations Sections 1.704-1(b)(2)(ii)(c), 1.704-2(g)(1) and 1.704-2(i)(5)), and (b) decreased by any amounts described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6) with respect to such Member.

"<u>Advance Amount</u>" has the meaning specified in <u>Section 6.1(b)</u>.

"<u>Adverse Person</u>" means any Person whom the Board reasonably determines is engaged in Competitive Activities or is a direct Competitor or a potential Competitor; provided, no BDC Member will be deemed a Competitor, a potential Competitor or engaged in any Competitive Activity solely due to such BDC Member's loan to, or investment in, a Person that is a Competitor, a potential Competitor or that is engaged in any Competitive Activity.

"<u>Affiliate</u>" of a Person means any Person Controlling, Controlled by, or under common Control with such Person.  Whether the Person is an Affiliate of another Person (other than the Company or any of its Subsidiaries) will be determined without regard to ownership in or control of the Company and any of its Subsidiaries.

"<u>Agreement</u>" means this Amended and Restated Limited Liability Company Agreement of the Company, as amended and restated from time to time, including the Exhibits and Schedules hereto.

["<u>Applicable Credit Documents</u>" means that certain Credit Agreement, dated as of [•], by and among [•], LLC, a Delaware limited liability company, as borrower, the lenders party thereto from time to time, [•], as term loan administrative agent and [•], as administrative agent, and each of the other "Loan Documents" (as such term is defined therein), in each case as amended, restated, supplemented or otherwise modified from time to time.]

"<u>Approved Transaction</u>" has the meaning specified in <u>Section 4.4(d)(ii)(A)</u>.

"Available Cash" means all cash held by the Company less such reserves as the Board deems reasonably necessary for the proper operation of the Company's business and satisfaction of the Company's debts and obligations.

"BDC Member" means a Business Development Company (as defined in Section 2(a)(48) of the Investment Company Act of 1940) or any Subsidiary thereof that is designated as a "BDC Member" on Schedule 1.

"Blocker Entity" means an Entity that is treated as a corporation for United States federal income tax purposes.

"Blocker Member" means a Member that is designated as a "Blocker Member" on Schedule 1.

"Board" has the meaning specified in Section 7.1.

"Book Value" means, with respect to any property of the Company, such property's adjusted basis for federal income tax purposes, except as follows:

(a)    The initial Book Value of any property contributed by a Member to the Company will be the fair market value of such property as of the date of such contribution as reasonably determined by the Board;

(b)    The Book Values of all properties will be adjusted to equal their respective fair market values as reasonably determined by the Board in connection with (i) the acquisition of an additional interest in the Company by any new or existing Member; (ii) the distribution by the Company to a Member of more than a *de minimis* amount of property (other than a distribution made in accordance with Section 6.1 as consideration for an interest in the Company), (iii) the liquidation of the Company within the meaning of Treasury Regulation Section 1.704-1(b)(2)(ii)(g)(*1*) (other than pursuant to Section 708(b)(1)(B) of the Code); (iv) the acquisition of an interest in the Company by any new or existing Member upon the exercise of a noncompensatory option in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv)(*s*) or (v) any other event to the extent determined by the Board to be permitted and necessary to properly reflect Book Values in accordance with the standards set forth in Treasury Regulation Section 1.704(v)(2)(iv)(*q*); provided, adjustments pursuant to clauses (i), (ii) and (iv) above will be made only if the Board reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company, and provided, further, if any noncompensatory options are outstanding upon the occurrence of an event described in clauses (i) through (v) in this paragraph, the Company will adjust the Book Values of its properties in accordance with Treasury Regulation Sections 1.704-1(b)(2)(iv)(*l*) and 1.704-1(b)(2)(iv)(*h*)(2);

(c)    The Book Value of property distributed to a Member will be the fair market value of such property as of the date of such distribution as reasonably determined by the Board; and

(d)    The Book Value of all property will be increased (or decreased) to reflect any adjustments to the adjusted basis of such property pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining

Capital Accounts pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(m) and clause (e) of the definition of Profits or Losses.

"<u>Business</u>" means, as of any date of determination, all lines of business conducted by the Company or its Subsidiaries at such date or any time during the 24-month period prior to such date, including, without limitation, the business of processing post-consumer and post-industrial recycled polyethylene terephthalate plastic products.

"<u>Business Day</u>" means any day other than a Saturday, a Sunday, or a holiday on which national banking associations in New York City are authorized by Law to close.

"<u>Capital Account</u>" has the meaning specified in <u>Section 5.4(a)</u>.

"<u>Capital Contribution</u>" means, with respect to any Member, the amount of money and the initial Book Value of any property, other than money (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to as described in Section 1.704-1(b)(2)(iv)(c) of the Treasury Regulations), contributed to the Company by such Member (provided, that the Company may direct that any such Capital Contribution be made directly to a Subsidiary).  Any reference in this Agreement to the Capital Contribution of a Member with respect to a Unit held thereby will include Capital Contributions made in respect of such Unit by any predecessor-in-interest of such Unit.

"<u>Certificate</u>" has the meaning specified in the recitals to this Agreement.

"<u>Class A Units</u>" has the meaning specified in <u>Section 4.2(c)(i)</u>.

"<u>Class B Units</u>" has the meaning specified in <u>Section 4.2(c)(ii)</u>.

"<u>Class C Units</u>" has the meaning specified in <u>Section 4.2(c)(iii)</u>.

"<u>Class C-1 Units</u>" has the meaning specified in <u>Section 4.2(c)(iii)</u>.

"<u>Code</u>" means the United States Internal Revenue Code of 1986, as amended from time to time.  All references herein to Sections of the Code will include any corresponding provision or provisions of succeeding Law.

"<u>Company</u>" has the meaning specified in the preamble to this Agreement.

"<u>Company Acceptance Deadline</u>" has the meaning specified in <u>Section 4.4(b)(iv)</u>.

"<u>Company Opportunity</u>" means any business opportunity related to the business, operations and purposes of the Company or any Subsidiary (whether in the past or from time to time).

"<u>Competitive Activities</u>" means, as of any date of determination, any business activity that is competitive with the then-current or demonstrably planned business activities of the Company or any Subsidiary.

42992628.2

"Competitor" means any Person that (a) is engaged in any business or activity that is, or could reasonably be considered, competitive with the Business or the Company's or any Subsidiary's actual business or demonstrable, planned business as of the date of such termination, (b) was engaged in any business or activity described in clause (a) preceding at any time during the 12-month period before the date of such termination or (c) has articulated plans to engage in any business or activity described in clause (a) preceding beginning in the 12-month period following such termination date.

"Confidential Information" means any information which is currently held by the Company or any Subsidiary or is hereafter acquired, developed or used by the Company or any Subsidiary relating to business opportunities or other operational, economic, financial, management or other aspects of the business, operations, properties or prospects of the Company or any Subsidiary, whether oral or in written form; but does not include (a) information which is or becomes generally available to the public other than as a result of a disclosure that is known to be in violation of this Agreement or (b) information made available to a Member on a non-confidential basis from a Person other than the Company, any Subsidiary, another Member or any of their representatives.

"Control," including the correlative terms "Controlling," "Controlled by" and "under common Control with" means possession, directly or indirectly, of the power to direct or cause the direction of management or policies (whether through ownership of securities or any partnership or other ownership interest, by contract or otherwise) of a Person.  For the purposes of the preceding sentence, control will be deemed to exist when a Person possesses, directly or indirectly, through one or more intermediaries (a) in the case of a corporation, more than 50% of the outstanding voting securities thereof; (b) in the case of a limited liability company, partnership, limited partnership or venture, the right to more than 50% of the distributions therefrom (including liquidating distributions); or (c) in the case of any other Person, more than 50% of the economic or beneficial interest therein.

"Co-Sale Elected Units" has the meaning specified in Section  4.4(c)(iv).

"Co-Sale Notice" has the meaning specified in Section 4.4(c)(iii).

"Co-Sale Offer" has the meaning specified in Section 4.4(c)(ii).

"Co-Sale Percentage" means, as to any Electing Co-Sale Member, a fraction (expressed as a percentage), the numerator of which equals the number of Class A Units and Class B Units held of record by such Electing Co-Sale Member and the denominator of which equals the aggregate number of Class A Units and Class B Units held by the Co-Sale Seller and all Electing Co-Sale Members.

"Co-Sale Seller" has the meaning specified in Section 4.4(c)(ii).

"Co-Sale Units" has the meaning specified in Section 4.4(c)(iii).

"Covered Losses" has the meaning specified in Section 4.5(c)(i).

"Covered Persons" has the meaning specified in Section 4.5(c)(i).

Exhibit A-4

"Curative Allocations" means the allocations pursuant to Section 6.6.

"Customary Transaction Documents" means, with respect to a Proposed Co-Sale Transfer or an Approved Transaction, such definitive documentation that governs the Proposed Co-Sale Transfer or Approved Transaction and is approved by the Board or the Majority Holders and that is customarily entered into in connection with such type of transaction including purchase and sale agreements, merger agreements, restrictive covenant agreements that include, among other terms, confidentiality provisions and provisions restricting competition, soliciting and hiring any of the Company's or any Subsidiary's employees or soliciting any of the Company's or any of its Subsidiary's customers, Unit transfer instruments, incumbency certificates, certificates of existence and good standing, FIRPTA certificates and joinder or support agreements. The definitive documentation will designate the Deal Representative to serve as the representative of all of the Members and the Blocker Member owners to take all action under such documentation (such as, but not limited to, agreeing to amendments or waivers, waiving closing conditions, prosecuting, defending, settling and authorizing payments with respect to indemnification claims, managing and making all decisions with respect to post-closing purchase price adjustment procedures, settlements and payments, engaging counsel and other advisors and receiving and disbursing transaction consideration, net of expenses, and incurring expenses in connection with any of the foregoing).

"Customary Transaction Terms" means, with respect to a Member and with respect to a Proposed Co-Sale Transfer or Approved Transaction:

(a)     representations and warranties from such Member about itself and its Units (but not representations or warranties about any other Member, the Company or any Subsidiary or their respective businesses) covering such Member's corporate or other entity power, due authorization, execution and delivery, enforceability, receipt of necessary approvals, absence of conflicts and ownership of unencumbered title to its Units;

(b)     if such Member is a Blocker Member Transferring Equity Interests therein rather than Units, in addition to the representations and warranties in clause (a) above, representations and warranties from such Member's equity holders (i) confirming that such Blocker Member has never owned assets other than Units, tax assets related to the Company (such as net operating losses), cash and cash equivalents and immaterial assets related to such entity's formation, existence, good standing, or ongoing administrative matters and that such Blocker Member's only liabilities are those arising under this Agreement including tax liabilities arising from allocations of income or gain from the Company, immaterial liabilities relating to its formation, existence, good standing and ongoing administrative matters and liabilities arising under applicable Laws and (ii) with respect to the capitalization and ownership of such Blocker Member;

(c)     (i) such Member's agreement to bear (i) up to 100% of the losses arising from a breach of any of such Member's representations and warranties described in clause (a) and any covenants that are personal to such Member (such as restrictive covenants, confidentiality provisions and releases (in such Member's capacity as a Member)), (ii) if such Member is a Blocker Member, such Blocker Member's owners' agreement to bear up to 100% of the losses arising from a breach of any of such Member's or such Blocker Member's owners' representations

and warranties described in clause (b) and to indemnify against up to 100% the liabilities of the Blocker Member other than those that a buyer of Units directly from such Blocker Member would have been exposed to and (iii) such Member's agreement or, if such Member is a Blocker Member, such Blocker Member's owners' agreement to bear up to such Member's pro rata share (but not more than its pro rata share) of any escrow amount, holdback, purchase price adjustment and post-closing indemnity obligation (other than losses arising from representations and warranties about another Member and other than covenants of another Member that are personal to such Member); provided, in no event will the Customary Transaction Terms require a Member or, in the case of a Blocker Member, such Blocker Member's owners, to agree to bear more than 100% of the aggregate proceeds received by such Member or Blocker Member owners from the Approved Transaction or Proposed Co-Sale Transfer, as applicable, except in the case of fraud.  For clarification, the post-closing indemnity obligations described in clause (iii) preceding may arise from a breach of the Company's representations or warranties, a violation of the Company's covenants or other indemnity items (including tax indemnities, indemnities for indebtedness or transaction expenses, purchase price adjustment items and fundamental representation losses) that are not personal to a particular Member.  For purposes of clause (ii) preceding, a Member's pro rata share of any such loss will be the reduced amount such Member would have received if the amount of such loss had first reduced the aggregate transaction consideration distributable to the Members and such reduced amount (rather than the unreduced amount) had been distributed as required by Section 4.4(d)(iv);

(d)     a release of such Member's claims (in its capacity as a Member and not in any other capacity such as a director, officer or employee) other than rights under the Customary Transaction Documents governing the Approved Transaction or Proposed Co-Sale Transfer, rights under Article 9 of this Agreement, if any, and rights of such Member under any third-party directors and officers (or similar) insurance policy maintained by the Company or any of its Subsidiaries;

(e)     solely in the context of a Sale Transaction (and otherwise not in any Proposed Co-Sale Transfer or other Approved Transaction), an agreement not to solicit or hire employees of the Company or any Subsidiary (provided, this non-solicitation requirement will not apply to any Exempt Institutional Holder) and an agreement not to solicit any customers of the Company or any Subsidiary (provided, this non-solicitation requirement will also not apply to any Exempt Institutional Holder) and, solely with respect to Insider Members, the Insider Members' agreement not to compete, and to cause its Affiliates not to compete, with the Company or its Subsidiaries for up to five years after the closing of an Approved Transaction;

(f)     if any Member is given an option as to the form of financial consideration to be received, each other Member holding the same class of Units will be given the same option with respect to the same class of Units, except with respect to the Sterling Rollover Exception or as otherwise provided in the third sentence of Section 4.4(c)(v) or the last sentence of Section 4.4(d)(iv)(B);

(g)     if the consideration to be paid in the Proposed Co-Sale Transfer or Approved Transaction consists of any securities or other property other than cash and/or Freely Marketable Securities, (i) each Member participating in such transaction (or in the case of a Blocker Member, the owners of such Blocker Member) will have been offered the right to enter

into an agreement with the Majority Holders providing such Member (or owners of such Blocker Member) with substantially the same co-sale rights with respect to any Transfer by the Majority Holders of such securities or other property as the rights, if any, such Member has under <u>Section 4.4(c)</u>; and

        (h)      in any Approved Transaction, each Member that is forced to participate in such Approved Transaction will be required to sell the same percentage of each class of Units or other Equity Interests held by such Member as each other Member (i.e., if the Sterling Holders sell 90% of their respective Class A Units (counting rollover investments as being sold for these purposes), each other Member will sell 90% of the Class A Units held by each other Member).

For clarification, Customary Transaction Terms will not include a requirement for any Institutional Holder to enter into a non-compete agreement.

"<u>Deal Representative</u>" means Sterling or any Affiliate of Sterling that is designated by Sterling.

"<u>Deceased FMV Notice</u>" has the meaning specified in <u>Section 4.4(f)(ii)</u>.

"<u>Deceased Spouse</u>" has the meaning specified in <u>Section 4.4(f)(ii)</u>.

"<u>Deceased Spouse Units</u>" has the meaning specified in <u>Section 4.4(f)(ii)</u>.

"<u>Deemed Indirect Transfer</u>" has the meaning specified in <u>Section 4.4(a)(viii)</u>.

"<u>Designated Individual</u>" means an individual meeting the requirements of proposed Treasury Regulations Section 301.6223-1(b)(2) and (4) that is appointed as the sole individual through whom the Partnership Representative will act for purposes of subchapter C of chapter 63 of the Code, as provided in the proposed Treasury Regulations.

"<u>Directors</u>" has the meaning specified in <u>Section 7.1</u>.

"<u>Disposing Holder</u>" has the meaning specified in <u>Section 4.4(b)(ii)</u>.

"<u>Disposition Notice</u>" has the meaning specified in <u>Section 4.4(b)(ii)</u>.

"<u>Dissolution Event</u>" has the meaning specified in <u>Section 11.1(a)</u>.

"<u>Distributable Amount</u>" has the meaning specified in <u>Section 6.1(a)</u>.

"<u>Divorce FMV Notice</u>" has the meaning specified in <u>Section 4.4(f)(i)</u>.

"<u>Divorce Notice</u>" has the meaning specified in <u>Section 4.4(f)(i)</u>.

"<u>Divorced Member</u>" has the meaning specified in <u>Section 4.4(f)(i)</u>.

"<u>Divorced Spouse</u>" has the meaning specified in <u>Section 4.4(f)(i)</u>.

"<u>Divorced Spouse Units</u>" has the meaning specified in <u>Section 4.4(f)(i)</u>.

"Electing Co-Sale Member" has the meaning specified in Section 4.4(c)(iii).

"Election Period" has the meaning specified in Section 4.3(b).

"Eligible Class C Unit" means, as of any time of determination, (a) each Vested Class C-1 Unit but only from and after the date each Class A Unit and each Class B Unit that is outstanding as of the 180 day after the First A&R Date has received cumulative distributions from the Company (disregarding distributions under Section 6.1(b)) of cash or other property in an amount equal to [2x pre-money per unit value] and (b) each other Vested Class C Unit but only from and after the date each Class A Unit and each Class B Unit that is outstanding has received cumulative distributions from the Company (disregarding distributions under Section 6.1(b)) of cash or other property in an amount equal to Participation Level of such Class C Units; provided, for purposes of this clause (b) only distributions made after the issuance of the Class C Unit will be counted in determining whether the Participation Level of any Class C Unit has been achieved.

"Eligible Co-Sale Participant" means, in connection with any Transfer that triggers the co-sale (tag-along) rights under Section 4.4(c), (a) each Member designated as an "Eligible Co-Sale Participant" on Schedule 1 and its respective Permitted Transferees and (b) any other Member designated by the Majority Holders or the Board as an Eligible Co-Sale Participant for purposes of such Transfer; provided, notwithstanding the foregoing, a Member will not be an Eligible Co-Sale Participant unless it is in Good Standing or unless the Board expressly waives the Good Standing requirement for such Member in connection with such Transfer.

"Eligible Incentive Participant" means a Person acting as an officer, manager, director or employee of, or providing services to, the Company or any Subsidiary, or an Affiliate of such Person (or an Entity in which such Person owns equity interests) but only if such Affiliate is designated as an "Eligible Incentive Participant" by the Board.

"Eligible Purchaser" means, in connection with any offering that triggers the preemptive rights set forth in Section 4.3, (a) each Member designated as an "Eligible Purchaser" on Schedule 1 and its respective Permitted Transferees and (b) any other Member designated by the Majority Holders or the Board as an Eligible Purchaser for purposes of such offering.

"Entity" means any Person other than a natural person.

"Equity Interest" means any and all shares, interests, participations, or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation) such as membership or partnership interest (whether undivided, unitized or otherwise denominated) and any and all warrants, options, or other rights to purchase or acquire any of the foregoing.

"Estimated Maximum Tax Liability" means, for each Member, the product of (a) an amount determined by the Board (on an actual or estimated basis) for such Member for a completed fiscal quarter equal to the sum of the portion of the Company's net income allocated or to be allocated and guaranteed payments made or to be made to such Member for federal, state or local income tax purposes for such fiscal quarter (provided, unless otherwise determined by the Board, Net Profit arising from a Sale Transaction or from transactions undertaken in connection with the winding-up or liquidation of the Company will be disregarded for purposes of this clause (a) so

that tax distributions under Section 6.1(b) are not made in respect of such Net Profit) multiplied by (b) the Tax Rate. In determining the Estimated Maximum Tax Liability for any such Member, the Board will take into account rate differences that may apply to the character of the income so allocated. In addition, in determining the Estimated Maximum Tax Liability for any Member, Net Losses allocated to such Member for a Fiscal Year that are allowed to be carried forward under applicable tax Laws to a later Fiscal Year will be deducted from Net Profit in that later year.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated by the SEC thereunder, together with any successor Law.

"Excluded Matters" has the meaning specified in Section 7.3(a).

"Exempt Institutional Holder" means each Member designated as an "Exempt Institutional Holder" on Schedule 1 and its respective Permitted Transferees.

"Exempt ROFR Transfer" has the meaning specified in Section 4.4(b)(i).

"Exempt Tag Transfer" has the meaning specified in Section 4.4(c)(i).

"Exempted Units" means any (a) Units issued, sold or otherwise Transferred in connection with a Public Offering or an Internal Restructure, (b) Units, Unit Equivalents or Equity Interests of any Subsidiary distributed or set aside ratably to all Members pro rata based on their respective Class A Units, Class B Units and Class C Units, including any distribution to effect any split of Units or class of Units or similar reclassification or an Internal Restructure, (c) Units, Unit Equivalents or Equity Interests of any Subsidiary issued, sold or otherwise Transferred to any Person that is not a Sterling Holder or an Affiliate of a Sterling Holder as consideration in a business acquisition (with a Person or Persons that are not Affiliates of a Sterling Holder) whether structured as a merger, consolidation, equity purchase, asset purchase, recapitalization, or otherwise, including customary "rollover" equity arrangements with such Persons including the Class C-1 Units, (d) Unit Equivalents issued to any Eligible Incentive Participant (or to any Entity whose owners of economic interests consist solely of Eligible Incentive Participants so long as such Entity is approved by the Board), (e) Units, Unit Equivalents or Equity Interests of any Subsidiary issued to any Person that is not a Member or an Affiliate of any Member so long as (i) the Board determines that there are strategic reasons to exempt such issuance from the preemptive rights terms of Section 4.3 and (ii) none of the Members or any of their Affiliates participates in such issuance or otherwise co-invests in any related issuance or related transaction, (f) any Units, Unit Equivalents or Equity Interests of any Subsidiary issued, sold or otherwise Transferred to any lender (including the Members and their Affiliates, but excluding the Sterling Holder and its Affiliates, unless approved or deemed approved under Section 8.4) in connection with any loan or commitment to lend made by such lender to the Company or any Subsidiary, (g) the Units designated as "Exempted Units" in Section 4.3(e), (h) Units issued in exchange for equity interests in Holdings contributed to the Company by Persons other than the Sterling Holders or their Affiliates at the request of the Company to facilitate a Strategic Transaction, (i) Units issued, sold or otherwise Transferred to fulltime employees of Sterling or its affiliated management company so long as (A) the per Unit issue price paid by any such employee upon the issuance of any such Unit is no less than the issue price paid most recently by an Institutional Holder to acquire its then most recently acquired Unit and (B) the aggregate issue price of all Units issued pursuant to the

42992628.2

exemption in this clause (i) does not exceed $1,000,000 in the aggregate, (j) Units issued, sold or otherwise Transferred by any Subsidiary to the Company or another Subsidiary and (k) up to _____ Class A Units issued to Orion if and to the extent Orion elects to purchase Class A Units pursuant to the Equity Term Sheet attached to the CarbonLite Purchase Agreement.

"Expelled" means the expulsion or removal of a Member from the Company as a member.

"Fair Market Value" means the Board's or the Majority Holders' determination in its sole discretion of the fair market value of any equity or Entity, which determination will be Final. The Board or the Majority Holders may use the most recent carrying value of the equity or Entity reported by Sterling to its fund investors as the basis for the Board's or Majority Holders' determination of Fair Market Value, and none of the Board, the Majority Holders, their limited partners, or other investors, or any of their respective Affiliates will have any liability to any Person for such determination or the Board's or Majority Holders' reliance thereon.

"Final" means final, conclusive and binding on the Company and all Members without opportunity for judicial review, challenge or appeal of any kind.

"FINRA" means the Financial Industry Regulatory Authority.

"Firm" has the meaning specified in Section 4.4(b)(iii).

"FIRPTA" means the Foreign Investment in Real Property Act.

"First A&R Date" has the meaning specified in the preamble to this Agreement.

"First Notice" has the meaning specified in Section 4.3(b).

"Fiscal Year" has the meaning specified in Section 10.5.

"Formation Date" has the meaning specified in the recitals to this Agreement.

"Freely Marketable Securities" means securities listed on a national securities exchange or quoted on the NASDAQ Global Market and which are not subject to a contractual prohibition on the sale of such securities for a period of time.

"Good Standing" means, with respect to any Member, (a) that neither such Member, nor any of such Member's direct or indirect Permitted Transferees from whom such Member received, directly or indirectly, any Unit in a Permitted Transfer is in material breach of this Agreement or any non-compete, non-solicit, no-hire or confidentiality obligation that inures to the benefit of the Company or any Subsidiary or (b) that such Member is deemed to be in Good Standing by the Board in connection with any particular matter set forth in this Agreement.

"Holdings" has the meaning specified in Section 4.1(b).

"Incentive Unit" has the meaning specified in Section 4.2(c)(iii).

"Incentive Unit Ledger" has the meaning specified in Section 4.2(e).

"Independent Director" means, as of any date of determination, any individual other than (a) an individual who is employed on a full-time basis by, or who otherwise dedicates substantially all of his business time to, Sterling or (b) an individual that has received cash remuneration from Sterling for services rendered in excess of $250,000 in any of the three calendar years preceding such date of determination.

"Individual Insider Member Agreement" has the meaning specified in Section 4.4(e)(i).

"Initial Public Offering" means the initial sale of any class of shares or equity securities of the Company or any Subsidiary or any successor thereto or an IPO Issuer pursuant to an effective registration statement under the Securities Act (other than a registration statement on Form S-8, Form S-4 or any successor forms) or other applicable legislation, regulation or rules in any applicable jurisdiction that results in the initial public sale of the equity securities and the listing or admission to trading of the equity securities on a Recognized Stock Exchange.

"Insider Member" means, as of any date of determination, (a) any individual who is an employee of the Company or any Subsidiary at the time such individual is admitted as a Member, (b) any Member who, when first admitted as a Member, is Majority-Owned by one or more individuals described in clause (a) preceding, (c) any Member that is designated as an "Insider Member" on Schedule 1 when first admitted as a Member and (d) any Permitted Transferee of any of the foregoing; provided, an Institutional Holder will not be an Insider Member unless specifically designated as such by the Majority Holders or the Board upon first being admitted as a Member.

"Institutional Holder" means (a) each Sterling Holder and each other Member designated as an "Institutional Holder" on Schedule 1 to this Agreement and (b) each Member that is a private equity fund, investment fund, governmental pension plan, managed account or similar investment vehicle that is an Affiliate of, and receives Units from, a Member described in clause (a) or this clause (b) in a Permitted Transfer made in accordance with this Agreement.  Notwithstanding anything to the contrary herein, including the amendment provisions in Section 12.6, no Member that is an Institutional Holder will cease to be an Institutional Holder unless such Member ceases to be a Member or consents to such change in designation.

"Internal Restructure" means, with respect to the Company, any re-formation, conversion, transfer of assets, Transfer by Members of their Units, merger, incorporation, liquidation or other similar transaction undertaken for the primary purpose of changing the Company's corporate structure for a legitimate business purpose, such as effecting a Strategic Transaction.

"Involuntary Transfer" means (a) a Transfer resulting from the death or permanent incapacity of a Member and (b) a Transfer pursuant to a judgment, decree or order made pursuant to applicable domestic relations Law.

"IPO Issuer" means the Company, a successor to the Company that is an Affiliate of the Company or any Affiliate of the Company, in each case, which will be the issuer in an Initial Public Offering.

"IPO Securities" has the meaning specified in Section 8.8(b).

"Joinder Agreement" means an agreement in form approved by the Board and pursuant to which a Person (a) agrees to be bound by the terms of this Agreement, (b) agrees that any Units held thereby will be bound by the terms of this Agreement and (c) makes representations and warranties about itself including whether or not such Person is an SPV Member confirming that such Person is not an Adverse Person.

"Law" means any applicable federal, state, provincial, municipal, local or foreign statute, law, treaty, ordinance, regulation, rule, code, order or rule of common law.

"Lender Member" means any Member designated as a "Lender Member" on Schedule 1 and any Permitted Transferee thereof.

"Majority Holders" means, as of any date of determination, the Members who, among them, hold a majority of the Voting Units of all Members, as of such date.

"Majority-Owned" means, when used to associate a Person or Persons with a particular Entity, that such Person or Persons have both (a) the right to more than 50% of distributions on liquidation of such Entity and (b) the right to elect directors, managers or similar governing persons of such Entity who, among them, hold a majority of the voting power of all such directors, managers or similar governing persons of such Entity.

"Maximum Dollar Amount" has the meaning specified in Section 4.3(a).

"Member" means any Person other than the Company (a) that executes this Agreement as of the First A&R Date or (b) who is hereafter admitted to the Company as a Member as provided in Section 4.1(b), but such term does not include any Person who has ceased to be a Member in the Company as provided in Section 4.1(c).

"Member Nonrecourse Debt" has the meaning assigned to the term "partner nonrecourse debt" in Treasury Regulations Section 1.704-2(b)(4).

"Member Nonrecourse Debt Minimum Gain" has the meaning assigned to the term "partner nonrecourse debt minimum gain" set forth in Treasury Regulations Section 1.704-2(i)(2).

"Member Nonrecourse Deduction" has the meaning assigned to the term "partner nonrecourse deduction" in Treasury Regulations Section 1.704-2(i)(1).

"Membership Interest" means the interest of a Member, in its capacity as such, in the Company, including rights to distributions (liquidating or otherwise), allocations, information, vote, and all other rights, benefits and privileges enjoyed by that Member (under the Act, the Certificate, this Agreement or otherwise) in its capacity as a Member; and all obligations, duties and liabilities imposed on that Member (under the Act, the Certificate, this Agreement, or otherwise) in its capacity as a Member.

"Minimum Gain" has the meaning assigned to that term in Treasury Regulations Section 1.704-2(d).

"Net Loss" means, for each Fiscal Year or other period, the excess of the Company's Loss over Profit.

"Net Profit" means, for each Fiscal Year or other period, the excess of the Company's Profit for such Fiscal Year or other period over the Company's Loss for such Fiscal Year or other period.

"New Terms Amendment" has the meaning specified in Section 4.2(a).

"Nonrecourse Deduction" has the meaning assigned to that term in Treasury Regulations Section 1.704-2(b)(1).

"Observer" means one representative designated by _____ to attend meetings of the Board and have other rights as further provided in 7.3.

"Offered Units" has the meaning specified in Section 4.3(a).

"Offering" has the meaning specified in Section 4.3(a).

"Officers" has the meaning specified in Section 7.6.

"Original Agreement" has the meaning specified in the recitals to this Agreement.

"Orion" means Orion Energy Partners.

"Oversubscribing Sterling Holder" has the meaning specified in Section 4.3(c).

"Participation Commitment Notice" has the meaning specified in Section 4.3(a).

"Participation Level" means with respect to any Incentive Unit the dollar amount determined by the Board, which at a minimum will be the amount necessary to qualify such Unit as a "profits interests" within the meaning of Revenue Procedures 93-27 and 2001-43.

"Partnership Representative" has the meaning specified in Section 10.6.

"Party" has the meaning specified in the preamble to this Agreement.

"Passing Interest Notice" has the meaning specified in Section 4.4(f)(ii).

"Permitted Transfer" means:

(a)     with respect to any Member other than the Sterling Holder, (i) any Transfer expressly approved as a "Permitted Transfer" by a majority of Directors who do not have a direct and meaningful interest in such Transfer and (ii) any Transfer to the Company pursuant to repurchase provisions in this Agreement or in any Individual Insider Member Agreement;

(b)     with respect to any Member that is a natural person, (i) an Involuntary Transfer and (ii) a Transfer to any trust, limited liability company, limited partnership or other entity having as its sole beneficiaries or owners such Member or any spouse, parent, sibling, child

or grandchild of such Member, or any combination of the foregoing, so long as such trust, limited liability company, limited partnership or other entity is Controlled by such transferring Member or, in the case of a trust, by an independent trustee who is not a beneficiary of such trust;

(c)    with respect to any Sterling Holder, (i) a Transfer to any full-time employee of Sterling or its affiliated management company so long as (A) the per Unit price paid by any such employee in any such Transfer is no less than the issue price paid most recently by a Sterling Holder to acquire such Unit from the Company and (B) the aggregate price of all Units purchased by all such employees in all Transfers covered by this clause (c) does not exceed $1,000,000 in the aggregate, and (ii) Transfers by the Sterling Holders to their respective limited partners so long as the aggregate number does not exceed 20% of the number of Class A Units held by the Sterling Holders as of the First A&R Date;

(d)    with respect to any Institutional Holder, a Transfer to (i) any of its Affiliates, (ii) the beneficiaries, partners, security holders or members of such Institutional Holder as a pro rata distribution in respect of the equity held by such beneficiaries, partners, security holders or members in such Institutional Holder or (iii) any managed account, investment fund or other vehicle for which such Institutional Holder or Affiliate thereof is the controlling investment advisor or portfolio manager; and

(e)    any forfeiture or cancellation of Rollover Units, or withholding or offset of distributions in respect of Rollover Units, by the Company pursuant to any definitive acquisition agreements or rollover, contribution or subscription agreements entered into by the Company or its Subsidiaries in connection with their business acquisitions as contemplated in Section 12.2(b).

"Permitted Transferee" means, with respect to any Member, any Person that receives, directly or indirectly, Units from such Member pursuant to a Permitted Transfer.

"Person" means any natural person, limited liability company, corporation, limited partnership, general partnership, joint stock company, joint venture, association, company, trust, bank trust company, land trust, business trust, or other organization, whether or not a legal entity, and any government or agency or political subdivision thereof.

"Preemptive Right Percentage" means, as to any Requesting Investor, a fraction (expressed as a percentage), the numerator of which equals the number of Class A Units and Class B Units held of record thereby and the denominator of which equals the total number of Class A Units and Class B Units then outstanding.

"Pre-IPO Value" means (a) the quotient obtained by dividing (i) the net proceeds to the IPO Issuer (or if the IPO Issuer will not receive proceeds in connection with such Initial Public Offering, then the net proceeds to the sellers of publicly offered securities in the Initial Public Offering) (in each case, less the reasonably estimated expenses of such Initial Public Offering incurred by the IPO Issuer) by (ii) a fraction (expressed as a percentage), the numerator of which is the number of publicly offered IPO Securities to be sold to the public in the Initial Public Offering and the denominator of which is the total number of securities of the same class or series as the publicly offered IPO Securities (including the publicly offered securities) that will be

outstanding immediately after the Initial Public Offering less (b) the proceeds to the IPO Issuer net of the reasonably estimated expenses of such Initial Public Offering incurred by the IPO Issuer.

"Proceeding" has the meaning specified in Section 9.6.

"Profits" or "Losses" means, for each Fiscal Year or other period, an amount equal to the Company's taxable income or loss for such Fiscal Year or other period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) will be included in taxable income or loss), with the following adjustments (without duplication):

(a) any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits and Losses pursuant to this definition of "Profits" or "Losses" will be added to such taxable income or loss;

(b) any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(*i*), and not otherwise taken into account in computing Profits or Losses pursuant to this definition of "Profits" or "Losses" will be subtracted from such taxable income or loss;

(c) in the event the Book Value of any asset is adjusted pursuant to clause (b) or clause (c) of the definition of Book Value, the amount of such adjustment will be treated as an item of gain (if the adjustment increases the Book Value of the asset) or an item of loss (if the adjustment decreases the Book Value of the asset) from the disposition of such asset and will be taken into account for purposes of computing Profits or Losses;

(d) gain or loss resulting from any disposition of property with respect to which gain or loss is recognized for federal income tax purposes will be computed by reference to the Book Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Book Value; and

(e) to the extent an adjustment to the adjusted tax basis of any asset pursuant to Code Section 734(b) is required, pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(*m*)(4), to be taken into account in determining Capital Account balances as a result of a distribution other than in liquidation of a Member's interest in the Company, the amount of such adjustment will be treated as an item of gain (if the adjustment increases the basis of the asset) or an item of loss (if the adjustment decreases such basis) from the disposition of such asset and will be taken into account for purposes of computing Profits or Losses.

"Prohibited Transfers" has the meaning specified in Section 4.4(c)(ii).

"Proposed Co-Sale Transfer" has the meaning specified in Section 4.4(c)(ii).

"Proposed Co-Sale Transferee" has the meaning specified in Section 4.4(c)(iii).

"Proposed Transfer" has the meaning specified in Section 4.4(b)(ii).

"Proposed Transferee" has the meaning specified in Section 4.4(b)(ii).

"Protected Person" has the meaning specified in Section 9.10.

"Public Offering" means any primary or secondary public offering of equity securities of the Company or any Subsidiary pursuant to an effective registration statement under the Securities Act other than pursuant to a registration statement filed in connection with a transaction of the type described in Rule 145 under the Securities Act or for the purpose of issuing securities pursuant to an employee benefit plan.

"Recognized Stock Exchange" means the New York Stock Exchange, The NASDAQ Stock Market or any comparable stock exchange acceptable to the Board.

"Registrable Securities" means, at any time, with respect to any Member, any Units, or any securities into which Units are converted or for which Units are exchanged in connection with an Internal Restructure, which are held of record by such Member until (a) a registration statement covering such Units has been declared effective by the SEC and such Units have been disposed of pursuant to such effective registration statement, (b) such Units have been sold under circumstances in which all of the applicable conditions of Rule 144 (or any similar provisions then in force) under the Securities Act are met or such Units become eligible to be sold to the public through a broker, dealer, or market maker pursuant to Rule 144 (or any similar provision then in force) during a single 90-day period, or (c) such Units have been otherwise Transferred and in connection therewith the Company has delivered a new certificate or other evidence of ownership for such Units not bearing the legend required pursuant to this Agreement and such Units may be resold without subsequent registration under the Securities Act.

"Registration Expenses" means (a) all registration and filing fees, (b) fees and expenses of compliance with securities or blue sky laws (including reasonable fees and disbursements of counsel in connection with blue sky qualifications of the securities registered), (c) printing expenses, (d) internal expenses of the Company (including all salaries and expenses of its officers and employees performing legal or accounting duties), (e) reasonable fees and disbursements of counsel for the Company and customary fees and expenses for independent certified public accountants retained by the Company, (f) the reasonable fees and expenses of any special experts retained by the Company in connection with such registration, (g) reasonable fees and expenses of up to one counsel for the Members participating in the offering chosen by the participating Members holding a majority of the Registrable Securities to be included in the offering, (h) fees and expenses in connection with any review of underwriting arrangements by FINRA including fees and expenses of any "qualified independent underwriter" and (i) fees and disbursements of underwriters customarily paid by issuers or sellers of Registrable Securities, but will not include any underwriting discounts attributable to the sale of any Member's Registrable Securities, or any out-of-pocket expenses (except as set forth in clause (g) above) of the applicable selling Members.

"Regulated Holder" means any Member that (a) is subject to the provisions of Regulation Y (directly or indirectly due to its ownership by an entity subject to Regulation Y); (b) is affiliated with any entity subject to the provisions of Regulation Y (if such Affiliate holds securities of the Company); or (c) otherwise is subject to federal or state regulation as (i) a bank, (ii) an insurance company, (iii) an investment or other fund or (iv) an entity described in Rule 144A(a)(i)(A)-(I) under the Securities Act.  A Member will be deemed not to be a Regulated Holder unless designated as such by the Board or Majority Holders at the time of its admission.

42992628.2

"Regulation Y" means 12 C.F.R. Part 225 (or any successor to such regulation) promulgated under the federal Bank Holding Company Act of 1956, as amended.

"Regulatory Allocations" means the allocations pursuant to Section 6.5.

"Regulatory Problem" means, with respect to any Regulated Holder, any set of facts, events or circumstances the existence of which would cause such Regulated Holder to (a) be in violation of any Law or other requirement of any governmental authority (including Regulation Y) or (b) reasonably believe that it is not entitled to hold or exercise any significant right with respect to the Units, including, pursuant to the relevant provisions of the Bank Holding Company Act of 1956, as amended, and including any regulations, orders and rules promulgated or issued thereunder and the International Bank Act of 1978, as amended, and the "Volcker Rule" under the United States Dodd-Frank Wall Street Reform and Consumer Protection Act.

"Related Blocker Entity" means, with respect to any Blocker Member that is not a Blocker Entity, any Blocker Entity that is a direct or indirect equity owner of such Blocker Member and that such Blocker Member identifies as such to the Company at the time such Blocker Member is admitted as a Member.

"Related Individual" means, with respect to an Insider Member and any Member who acquires Units through one or more Permitted Transfers of Units first issued by the Company to an Insider Member, the individual listed under the column labeled "Related Individual" opposite such Insider Member's name on Schedule 1.

"Remaining Sale Units" has the meaning specified in Section 4.4(b)(vii).

"Renounced Business Opportunity" has the meaning specified in Section 9.4(a).

"Reporting Entity" means [TSG Shelf II Acquisition, LLC], a Delaware limited liability company.

"Representative" means (a) with respect to any Member, such Member's attorneys, accountants, tax advisors, consultants, financial advisors and other professionals but only to the extent necessary to provide services to such Member for purposes that are not competitive with the Company's business and (b) with respect to a Sterling Holder, or any Sterling Fund, their respective investors, limited partners, general partners, management companies, rating agencies, financial institutions, placement agents and investment banking firms.

"Repurchase Notice" has the meaning specified in Section 4.4(e)(ii).

"Repurchase Price" has the meaning specified in Section 4.4(e)(ii).

"Requesting Investor" has the meaning specified in Section 4.3(a).

"Resign" means the resignation, withdrawal or retirement of a Member from the Company. Such terms will not include any Transfer of Units, even though the Member making a Transfer may cease to be a Member as a result of such Transfer.

"Restricted Unit Agreement" means, with respect to each Member holding Incentive Units, that certain agreement dated as of the date of issuance of such Member's Incentive Units between the Company and such Member.

"ROFR Acceptance Deadline" has the meaning specified in Section 4.4(b)(iv).

"ROFR Offerees" means, with respect to any Transfer to which Section 4.4(b) applies, (a) any Member that, at the time such Transfer is proposed, is either an Institutional Holder or a Permitted Transferee thereof and (b) any other Person designated by the Majority Holders or the Board as a "ROFR Offeree" with respect to such Transfer, which designation may be made by the Board or the Majority Holders in their sole discretion on a transfer-by-transfer basis; provided, notwithstanding the foregoing, a Person will not be a ROFR Offeree unless it is in Good Standing or unless the Board or the Majority Holders waive such Good Standing requirement.

"ROFR Percentage Interest" means, as to any ROFR Offeree determined as of the date of the Disposition Notice, a fraction (expressed as a percentage), the numerator of which equals the number of Units held of record thereby as of such date and the denominator of which equals the number of Units held of record by all of the ROFR Offerees as of such date.

"ROFR Unit Purchase Price" means the per Unit purchase price set forth in the Disposition Notice except that the cash equivalent value (determined pursuant to the provisions of Section 4.4(b)) of any non-cash consideration will replace any non-cash consideration included in the Disposition Notice.

"Rollover Units" means any Class A Units issued to any Person that is a seller in connection with the Company's or its Subsidiaries' business acquisitions pursuant to any definitive acquisition agreement or rollover, contribution or subscription agreement.

"Safe Harbor Election" has the meaning specified in Section 4.2(f).

"Sale Transaction" means any transaction or series of related transactions (whether such transaction occurs by a sale or exchange of assets, sale or exchange of Units, merger, conversion, recapitalization, other business combination or indirect sale of Unit Equivalents) that results in (a) all or substantially all of the consolidated assets of the Company and any Subsidiary being transferred to or owned by a Person or Persons that are not directly or indirectly Majority-Owned by the record holders of the Units immediately prior to such transaction or series of related transactions or their Affiliates or (b) the Company no longer being Majority-Owned, directly or indirectly, by the record holders of the Units immediately prior to such transaction or series of related transactions or their Affiliates. Because of the existence of Blocker Members in the Company's ownership structure and the likelihood that the equity of some or all of the Blocker Members may be transferred, sold, exchanged, converted or cancelled in lieu of the Units held thereby in sale transactions, the Board or the Majority Holders may designate any transaction or series of related transactions as a "Sale Transaction" so long as either of them determines in good faith that such transaction or series of related transactions has a substantially similar economic objective as a transaction described in the preceding sentence.

"Sale Units" has the meaning specified in Section 4.4(b)(ii).

42992628.2

"SEC" means the United States Securities and Exchange Commission.

"Securities Act" means the Securities Act of 1933, as amended from time to time, and the rules and regulations promulgated by the SEC thereunder, together with any successor statute.

"Specified Unit" has the meaning specified in Section 4.4(e)(ii).

"SPV Member" means (a) any Member denoted as an "SPV Member" on Schedule 1 and (b) any other Member whose Units comprise more than 30% of the fair market value of all of the assets of such Member (disregarding assets that the Board determines in good faith have been contributed to, or otherwise acquired by, such Member in order to avoid the 30% test set forth in this definition).

"Sterling" means The Sterling Group, L.P. and its Affiliates; provided, "Affiliates" as used in this definition does not include the Company or any Subsidiary.

"Sterling Advisory Agreement" means that certain letter agreement, dated as of [•], and as amended from time to time, by Sterling Group Management V, L.P. governing certain advisory services to be performed for the benefit of the [•] (as defined therein).

"Sterling Credit Holders" means, collectively, the Sterling Group Credit Fund, L.P., a Delaware limited partnership, TSG Shelf II Blocker Corp., a Delaware corporation, and their direct or indirect Permitted Transferees.

"Sterling Fund" means any pooled investment entity that is an Affiliate of Sterling.

"Sterling Holder" means, collectively, Sterling Group Partners V, L.P., a Cayman Islands exempted limited partnership, Sterling Group Partners V (Parallel), L.P., a Cayman Islands exempted limited partnership, TSG Shelf II Investments Holdings, LP, a Delaware limited partnership, and their direct or indirect Permitted Transferees.

"Sterling Officer" means any Officer that is a partner or full-time employee of Sterling or who otherwise dedicates substantially all of his or her business time to the management of Sterling and its portfolio companies.

"Sterling Related Party Transaction" has the meaning specified in Section 8.4(b).

"Sterling Rollover Exception" has the meaning set forth in Section 4.4(d)(iii).

"Strategic Transaction" means a Sale Transaction, a Public Offering including an Initial Public Offering and any other transaction expressly designated by the Board or the Majority Holders as a "Strategic Transaction."

"Subsidiary" means (a) any corporation or other Entity (including a limited liability company) a majority of the Equity Interests of which having ordinary voting power to elect a majority of the board of directors or other Persons performing similar functions is at the time owned, directly or indirectly, with power to vote, by the Company or any direct or indirect

subsidiary of the Company or (b) a partnership in which the Company or any Person described in the foregoing clause(a) is a general partner.

"Supplemental Notice" has the meaning specified in Section 4.3(a).

"Surviving Member" has the meaning specified in Section 4.4(f)(ii).

"Tax Rate" means the highest combined federal, state and local tax rates imposed on the income of the Company that apply to an individual residing in New York County, New York, or such other applicable tax rate selected by the Board, which Tax Rate will be the same for all Members of the Company, regardless of such Member's actual rate of taxation.

"Third-Party Indemnitor" means, with respect to each Protected Person, any Person (other than the Company or a Subsidiary thereof or any of their respective insurers) that indemnifies or provides expense advancement or reimbursement to such Protected Person with respect to a loss for which such Protected Person also has indemnification and/or expense reimbursement and/or advancement rights under Article 9.

"Transaction Beneficiaries" has the meaning specified in Section 4.4(d)(iv)(A).

"Transaction Process" has the meaning specified in Section 4.4(d)(i).

"Transfer," including the correlative terms "Transferring" or "Transferred," means any transfer, assignment, sale, gift, pledge, hypothecation or other encumbrance, or any other disposition (whether voluntary or involuntary or by operation of Law), of Units (or any interest (pecuniary or otherwise) therein or right thereto), including derivative or similar transactions or arrangements whereby a portion or all of the economic interest in, or risk of loss or opportunity for gain with respect to, Units are transferred or shifted to another Person; provided none of the following will be deemed a Transfer for purposes hereof: (a) an exchange, merger, recapitalization, consolidation or reorganization involving an Internal Restructure, (b) a transfer of securities in any Person that directly or indirectly owns equity interests in a Member to the extent such securities are (i) traded on an established United States national securities exchange or (ii) quoted on an established United States national over-the-counter trading system or (c) a transfer of limited partnership interests (or equivalent equity interests) in a conventional private equity fund or a conventional institutional debt fund.

"Treasury Regulations" means the regulations promulgated by the United States Department of the Treasury pursuant to and in respect of provisions of the Code. All references herein to Sections of the Treasury Regulations will include any corresponding provision or provisions of succeeding, similar, substitute, proposed or final Treasury Regulations.

"Unit" has the meaning specified in Section 4.2(a).

"Unit Equivalent" means any Unit or any other Membership Interest and any right, warrant, option, convertible security or exchangeable security, in each case, exercisable for or convertible or exchangeable into, directly or indirectly, any Unit or any other Membership Interest, whether at the time of issuance or upon the passage of time or the occurrence of some future event.

"Unit Ledger" has the meaning specified in Section 4.2(e).

"Unsubscribed Portion" has the meaning set forth in Section 4.3(a).

"Unvested Class C Unit" means, as of any date of determination, each Class C Unit that has been granted and issued by the Company to an Eligible Incentive Participant pursuant to a Restricted Unit Agreement and which, as of such date, has not "vested" or become non-forfeitable (except for cause) under the terms of such Restricted Unit Agreement.

"VCOC Member" has the meaning specified in Section 8.7.

"Vested Class C Unit" means, as of any date of determination, (a) each Class C-1 Unit and (b) each other Class C Unit (other than a Class C-1 Unit) that has been granted and issued by the Company to an Eligible Incentive Participant pursuant to a Restricted Unit Agreement and which (i) has not been forfeited to the Company pursuant to the terms of such Restricted Unit Agreement and is, as of such date, "vested" under the terms of such Restricted Unit Agreement or (ii) is specified as being a Vested Class C Unit by the Board as of such date of determination.

"Voluntary Transfer" means a Transfer that is not an Involuntary Transfer or a Prohibited Transfer.

"Voting Units" means the Class A Units and any other class or series of Units that is designated by the Board as voting.

EXHIBIT "B-2"

FORM OF SUBSCRIPTION AGREEMENT

[See attached]

## SUBSCRIPTION AGREEMENT

This Subscription Agreement (this "Agreement"), dated as of [●], 2021, is made by and between TSG Shelf II Investments, LLC, a Delaware limited liability company (the "Company"), and [_____] (the "Subscriber").

## RECITALS

**WHEREAS**, the Subscriber desires to purchase [●] Class A Units (the "Purchased Units") for an aggregate cash purchase price of $[●] and the Company desires to issue and sell the Purchased Units to the Subscriber, in each case, on the terms and conditions set forth in this Agreement.

**NOW**, **THEREFORE**, in consideration of the foregoing and of the mutual covenants and agreements contained herein, the parties hereto agree as follows:

## AGREEMENTS

## ARTICLE 1
## SUBSCRIPTION FOR CLASS A UNITS

1.1.    Defined Terms.  Capitalized terms used in this Agreement that are not otherwise defined herein will have the respective meanings ascribed to such terms in the Amended and Restated Limited Liability Company Agreement of the Company, dated as of [●], 2021 (as further amended or restated in accordance with its terms, the "LLC Agreement").

1.2.    Purchase and Sale.  The Subscriber agrees to purchase and pay for on the date hereof, and the Company agrees to issue and sell to the Subscriber on the date hereof, the Purchased Units for a cash purchase price of $[●] per Unit or $[●] in the aggregate.  Payment will be made on the date hereof by wire transfer in immediately available funds to an account designated by the Company to the Subscriber.

1.3.    Limited Liability Company Agreement.  Upon receipt of the purchase price specified in Section 1.2, the Company will immediately admit the Subscriber as a Member and designate the Subscriber as an "Institutional Holder" as such term is used in the LLC Agreement. The Subscriber hereby adopts, accepts and agrees to be bound by the terms and conditions of the LLC Agreement and agrees that the Purchased Units issued to the Subscriber will be bound by and subject to the terms of the LLC Agreement.  The Subscriber will execute and deliver a counterpart to the LLC Agreement to evidence its agreement to the foregoing.

## ARTICLE 2
## REPRESENTATIONS, WARRANTIES AND COVENANTS OF THE SUBSCRIBER

2.1.    Representations, Warranties and Covenants.  The Subscriber hereby represents and warrants to, and agrees with, the Company as follows as of the date hereof:

(a) <u>Power and Authority</u>. The Subscriber has all requisite power and authority (i) to enter into this Agreement, the LLC Agreement and such other documents, instruments, certificates and agreements that are executed and delivered by the Subscriber hereunder and thereunder (collectively, the "<u>Investment Documents</u>"), (ii) to perform its obligations under each of the Investment Documents and (iii) to consummate the transactions that are the respective subjects of each such Investment Document. This Agreement has been duly authorized, executed and delivered by the Subscriber and constitutes the valid and legally binding agreement of the Subscriber enforceable in accordance with its terms against the Subscriber, except as such enforceability may be limited by (A) bankruptcy, insolvency, reorganization, fraudulent conveyance, moratorium or other laws of general application relating to or affecting the enforcement of creditors' rights and remedies, as from time to time may be in effect, (B) application of equitable principles (regardless of whether such enforceability is considered in a proceeding in equity or at law) and (C) considerations of public policy.

(b) <u>No Violation of Laws or Other Instruments</u>. The execution and delivery of the Investment Documents by the Subscriber and the consummation by the Subscriber of the transactions contemplated by the Investment Documents do not (with or without the giving of notice or the lapse of time or both) conflict with or result in any violation of or default under any provision of any applicable Law or any charter, bylaws, trust agreement, partnership agreement, or other organizational document, as the case may be, of the Subscriber or any material agreement, certificate or other instrument to which the Subscriber is a party or by which the Subscriber is bound.

(c) <u>Accredited Investor</u>. The Subscriber is an "accredited investor" as defined in Rule 501(a) of Regulation D promulgated under the Securities Act.

(d) <u>Investment Intent</u>. The Subscriber is acquiring the Purchased Units for its own account for investment, and not with a view to any distribution, resale, subdivision or fractionalization thereof in violation of the Securities Act or any other applicable securities laws, and the Subscriber has no present plans to enter into any contract, undertaking, agreement or arrangement for any such distribution, resale, subdivision or fractionalization.

(e) <u>Access</u>. The Subscriber has carefully reviewed and is familiar with the terms of this Agreement and the LLC Agreement. The Subscriber has had the opportunity to ask questions of and receive answers from the Company concerning the terms and conditions of this investment.

(f) <u>Illiquidity</u>. The Subscriber understands that substantial restrictions exist on transferability of the Class A Units, that no market for resale of any such Class A Units exists or is expected to develop, and that the Subscriber may not be able to liquidate its investment in the Company. The Subscriber represents and warrants further that it has no contract, understanding, agreement or arrangement with any Person to sell or transfer or pledge to such Person or anyone else any of the Purchased Units for which the Subscriber hereby subscribes (in whole or in part); and the Subscriber represents and warrants that it has no present plans to enter into any such contract, undertaking, agreement or arrangement. The Subscriber understands that the Purchased Units may not be sold except in accordance with the terms of the LLC Agreement and this

3

Agreement.  The Subscriber understands that any certificate representing the Class A Units will bear legends restricting the transfer thereof.  The Subscriber undertakes and agrees that it will not offer for sale, resell, assign, pledge or otherwise dispose of the Purchased Units at any time, except in accordance with the provisions of Regulation D under the Securities Act, pursuant to registration under the Securities Act, or pursuant to an available exemption from registration under the Securities Act.  The Subscriber agrees not to engage in any hedging transactions with regard to the Purchased Units unless in compliance with the Securities Act.

(g)    Awareness of Risks; Taxes.  The Subscriber understands that investment in the Company entails a high degree of risk and understands the risks associated with the operation of the Company and the Subscriber's investment in the Company.  The Subscriber is aware that ownership of the Class A Units involves a substantial degree of risk of loss of the Subscriber's entire investment and that there is no assurance of any return on such investment.  The Subscriber further represents that it is relying solely on its own conclusions or the advice of its own counsel or investment representative with respect to tax aspects of any investment in the Company.

(h)    Economic Loss, Suitability and Sophistication.  The Subscriber (i) is able to bear the economic risk of losing its entire investment in the Company and (ii) is able to bear such risk for an indefinite period of time.  The Subscriber has evaluated the risks involved in investing in the Class A Units and has determined that the Class A Units are a suitable investment for the Subscriber.  The Subscriber has such knowledge and experience in financial and business matters that it is capable of evaluating the risks and merits of this investment.

(i)    No Advice.  The Subscriber acknowledges and agrees that the Board has the exclusive power and discretion to make all investment decisions on behalf of the Company, subject to the terms of the LLC Agreement.  Accordingly, the Subscriber acknowledges that neither the Board nor the Company, nor any Affiliate of the Company, has rendered or will render any financial or tax advice or securities valuation advice to the Subscriber, and that the Subscriber is neither subscribing for nor acquiring any Class A Units in reliance upon, or with the expectation of, any such advice.

(j)    No Fiduciary Duties.  The Subscriber understands and acknowledges that applicable Delaware law permits the members of a Delaware limited liability company to modify and even eliminate fiduciary duties of members and managers (i.e., directors).  By executing the LLC Agreement, the Subscriber agrees that the terms of the LLC Agreement modify and eliminate fiduciary duties of the members and managers as otherwise may be imposed by applicable law or in equity.  The Subscriber hereby releases, discharges and acquits the members and the managers of the Company from any claims based on fiduciary duties imposed by applicable law or equity that are not set forth in the LLC Agreement.

(k)    Disclosure; No Reliance.  The Subscriber understands and agrees that, other than the representations and warranties of the Company set forth in Article 3 herein, neither the Company nor any other Person makes any representation or warranty, express or implied, as to the accuracy or completeness of the information provided or to be provided to the Subscriber by or on behalf of the Company or related to the transactions contemplated hereby, and nothing contained in any other documents provided or statements made by or on behalf of the Company to the

4

Subscriber is, or will be relied upon as, a promise or representation by the Company or any other Person that any such information is accurate or complete.

(l)     Disclaimer of Other Representations and Warranties. NOTWITHSTANDING ANY PROVISION OF THIS AGREEMENT TO THE CONTRARY, THE SUBSCRIBER MAKES NO REPRESENTATIONS OR WARRANTIES TO THE COMPANY OR ANY OTHER PERSON IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, EXCEPT AS SPECIFICALLY SET FORTH IN THIS SECTION 2.1 AND THE OTHER INVESTMENT DOCUMENTS.  ALL OTHER REPRESENTATIONS AND WARRANTIES, WHETHER EXPRESS OR IMPLIED, ARE HEREBY DISCLAIMED BY THE SUBSCRIBER.

2.2.     Survival.  The Subscriber acknowledges that the Company has relied and will rely upon the representations and warranties of, and information furnished by, the Subscriber set forth in this Agreement and that all such representations and warranties, and furnished information, will survive the closing of the issuance of the Class A Units pursuant to this Agreement.

# ARTICLE 3
# REPRESENTATIONS, WARRANTIES AND COVENANTS OF THE COMPANY

3.1.     Representations, Warranties and Covenants.  The Company hereby represents and warrants to, and agrees with, the Subscriber as of the date hereof as follows:

(a)     Organization.  The Company is a limited liability company duly formed, validly existing and in good standing under the laws of the State of Delaware.  The Company has the full limited liability company power and authority to own its property, carry on its business as now being conducted, and to carry out the transactions contemplated by the Investment Documents.  The Company has provided or made available to the Subscriber true and correct copies of the LLC Agreement and certificate of formation of the Company (or other applicable organizational documents), including all amendments thereto.

(b)     Power and Authority.  The Company has all requisite power, authority and legal capacity to enter into each Investment Document to which it is a party, to perform its respective obligations under each such Investment Document, and to consummate the transactions that are the respective subjects of each such Investment Document.  The signature of the respective individual signing any Investment Document on behalf of the Company is binding upon the Company.  All actions required hereunder to be taken by the Company as a condition to the issuance and sale of the Class A Units purchased by the Subscriber have been taken.  This Agreement has been duly authorized, executed and delivered by the Company and, upon due authorization, execution and delivery by the Subscriber, will constitute the valid and legally binding agreement of the Company, enforceable in accordance with its terms against the Company, except as such enforceability may be limited by (i) bankruptcy, insolvency, reorganization, fraudulent conveyance, moratorium or other laws of general application relating to or affecting the enforcement of creditors' rights and remedies, as from time to time may be in effect, (ii) application of equitable principles (regardless of whether such enforceability is considered in a proceeding in equity or at law) and (iii) considerations of public policy.

5

(c)    <u>Offer of Class A Units</u>.  Assuming the investment representations set forth in <u>Section 2.1</u> are true, the offer, sale and issuance by the Company of the Purchased Units are exempt from the registration requirements of the Securities Act, and neither the Company nor anyone acting on its behalf has taken or will take any action that would subject the issuance or sale of the Purchased Units acquired by the Subscriber to the registration and prospectus delivery provisions of the Securities Act.

(d)    <u>Capitalization</u>.  As of immediately prior to giving effect to the Company's issuance of the Purchased Units on the date hereof, <u>Schedule 1</u> to the LLC Agreement is true and correct.  After giving effect to the Company's issuance of the Purchased Units on the date hereof, the Company's outstanding equity capitalization will consist [solely of [●] Class A Units and [●] Class C Units].  Other than the foregoing, there are no equity interests (including any profits interests, options, warrants or other rights, convertible securities or exchangeable securities) of the Company issued, reserved for issuance or otherwise outstanding.  All of the issued and outstanding Units and other equity interests in the Company issued by the Company on or before the date hereof, including the Purchased Units issued to the Subscriber hereunder, have been duly authorized and validly issued and will be fully paid and non-assessable, free and clear of all liens and encumbrances, and have been issued free of any pre-emptive rights.  Except for the LLC Agreement, this Agreement and the other Investment Documents, the Company has not entered into any agreement with respect to voting rights, preemptive or similar rights, registration rights or transfer restrictions with respect to any Units or other equity interests in the Company.

(e)    <u>Investment Company Act</u>.  Neither the Company nor any of its Subsidiaries is an "investment company" or a company "controlled" by an "investment company" within the meaning of the Investment Company Act.

(f)    <u>No Conflict</u>.  The execution and delivery of this Agreement and the other Investment Documents by the Company does not, and the consummation of the transactions contemplated hereby and thereby will not (with or without the giving of notice or the lapse of time or both), (i) violate or conflict with or result in any default under any provision of the organizational documents of the Company or any of its Subsidiaries including the LLC Agreement, (ii) violate any provision of any Law, or any order, judgment or decree of any court or other governmental authority applicable to the Company or any of its Subsidiaries or any of their respective assets or properties, (iii) violate or result in the cancellation, modification, revocation or suspension of any material license, franchise or permit held by the Company or any of its Subsidiaries, or (iv) violate or result in a breach of or default under any material contract to which the Company is a party or by which any of the Company's assets are bound.

(g)    <u>Proceedings</u>.  There is no pending or, to the knowledge of the Company, threatened action, arbitration, audit, litigation or suit (whether civil, criminal, administrative or investigative) commenced, brought, conducted or heard by or before, or otherwise involving, any governmental authority, against or otherwise relating to or involving the Company or its equityholders or any of their respective assets, at law or in equity, that challenges, or would reasonably be expected to have the effect of preventing, delaying, making illegal or otherwise interfering with, the ability of the Company to enter into and perform its obligations under the Investment Documents.  The Company is not subject to any outstanding order, judgment or decree

6

that prohibits or otherwise restricts the ability of the Company to consummate fully the transactions contemplated by the Investment Documents.

(h)     Disclaimer of Other Representations and Warranties. NOTWITHSTANDING ANY PROVISION OF THIS AGREEMENT TO THE CONTRARY, THE COMPANY MAKES NO REPRESENTATIONS OR WARRANTIES TO THE SUBSCRIBER OR ANY OTHER PERSON IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, EXCEPT AS SPECIFICALLY SET FORTH IN THIS SECTION 3.1 AND THE OTHER INVESTMENT DOCUMENTS. ALL OTHER REPRESENTATIONS AND WARRANTIES, WHETHER EXPRESS OR IMPLIED, ARE HEREBY DISCLAIMED BY THE COMPANY.

3.2.    Survival. The Company acknowledges that the Subscriber has relied and will rely upon the representations and agreements of the Company set forth in this Agreement, and that all such representations and agreements will survive the closing of the issuance of the Class A Units pursuant to this Agreement.

# ARTICLE 4
# MISCELLANEOUS

4.1.    Amendments and Modifications; Waivers. This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each of the Company and the Subscriber. No waiver by either the Company or the Subscriber of any of the provisions hereof will be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party hereto will operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any rights, remedy, power or privilege arising from this Agreement will operate or be construed as a waiver thereof; nor will any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

4.2.    Notices. Except as expressly set forth to the contrary in this Agreement, all notices, requests or consents provided for or permitted to be given under this Agreement must be in writing and must be delivered to the recipient in person, by courier or mail (including electronic mail) or by facsimile, or similar transmission; and a notice, request or consent given under this Agreement is effective on receipt by the Person to receive it. Notices given by facsimile will be deemed to have been received (a) on the day on which the sender receives answer back confirmation if such confirmation is received before or during normal business hours of any Business Day or (b) on the next Business Day after the sender receives answer back confirmation if such confirmation is received (i) after normal business hours on any Business Day or (ii) on any day other than a Business Day. All notices, requests and consents to be sent to the Subscriber must be sent to or made at the addresses given for the Subscriber in the LLC Agreement or such other address as the Subscriber may specify by notice to the Company. Whenever any notice is required to be given by Law, the Certificate or this Agreement, a written waiver thereof, signed by the Person entitled

7

to notice, whether before or after the time stated therein, will be deemed equivalent to the giving of such notice.

4.3.    Governing Law; Jurisdiction; Venue.  This Agreement will be enforced, governed and construed in all respects in accordance with the Laws of the State of Delaware, without giving effect to any conflict-of-laws rule or principle that might refer the construction or interpretation of this Agreement to the Laws of another State or jurisdiction.  Any action or proceeding against any party hereto relating in any way to this Agreement may be brought and enforced in the courts of the State of Delaware located in New Castle County and, to the extent subject matter jurisdiction exists therefor, in the courts of the United States for the District of Delaware, and the parties hereto hereby irrevocably submit to the exclusive jurisdiction of the foregoing courts in respect of any such action or proceeding.  The parties hereby irrevocably waive, to the fullest extent permitted by Law, any objection that they may now or hereafter have to the laying of venue of any such action or proceeding in the courts of the State of Delaware located in New Castle County or the United States District Court for the District of Delaware, and any claim that any such action or proceeding brought in any such court has been brought in an inconvenient forum.

4.4.    Assignment; Binding Effect.  This Agreement and the other Investment Documents and the rights and obligations set forth herein and therein will be binding upon, and will inure to the benefit of, the Subscriber, the Company and their respective successors and permitted assigns. Each provision of this Agreement will be considered severable and if for any reason any provision that is not essential to the effectuation of the basic purposes of this Agreement is determined by a court of competent jurisdiction to be invalid or unenforceable under Law, such invalidity will not impair the operation of or affect any other provisions of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.  In that case, this Agreement will be construed so as to limit any term or provision so as to make it enforceable or valid within the requirements of any applicable Law, and in the event such term or provision cannot be so limited, this Agreement will be construed to omit such invalid or unenforceable term or provision.  No party hereto may assign any of its rights or obligations under this Agreement without the prior written consent of the other party hereto, except that the Subscriber may, without the consent of the Company, assign its rights and obligations hereunder to any Person to whom the Subscriber transfers all or any portion of its Purchased Units in compliance with the LLC Agreement.

4.5.    Entire Agreement.

(a)    This Agreement, including the exhibits hereto, and the other Investment Documents between the Company and the Subscriber, constitute the entire agreement directly relating to the Subscriber's purchase of the Purchased Units, and supersede all prior agreements or understandings between the parties hereto directly relating to the Subscriber's purchase of the Purchased Units.  Notwithstanding the foregoing, this Agreement does not supersede or otherwise affect or have any impact upon the LLC Agreement (unless explicitly stated otherwise therein), any other definitive agreement entered into by and between the Subscriber and the Company after the date hereof, or any of the Other Agreements (as defined below), or the rights and obligations thereunder.

8

(b)    [For clarification, the parties hereto acknowledge and agree that Subscriber, on the one hand, and the Company, on the other hand, have certain rights and obligations under the following agreements (collectively, the "Other Agreements"): (i) that certain [●] Agreement, dated as of [DATE], by and among [●], the Subscriber and the other parties thereto, (ii) that certain [●] Agreement, dated as of [DATE], by and between the Subscriber and [●], and (iii) other agreements and documents that do not expressly govern the Subscriber's purchase of the Purchased Units, all of which other agreements remain in full force and effect in accordance with their terms.][1]

4.6.    Counterparts; Facsimile.    This Agreement may be executed in one or more counterparts, all of which will constitute one and the same instrument.  Any counterparts of this Agreement or any signatures thereon delivered by facsimile transmission or other electronic method (including by email in portable document format (pdf)) will be deemed an original executed document for all purposes hereof.

4.7.    No Vicarious Liability.    Notwithstanding anything in this Agreement to the contrary, the liabilities of the parties to this Agreement will be limited to such parties, and no Person that is not a party to this Agreement will have any liability hereunder or with respect to the matters contemplated hereby.

4.8.    Waiver of Damages.    Notwithstanding anything to the contrary in this Agreement, no party to this Agreement will be liable to or otherwise responsible to any other party hereto for the punitive damages that arise out of or relate to this Agreement or the performance or breach hereof or any liability retained or assumed hereunder other than damages paid to an unaffiliated third party claimant.

*[Signature pages follow.]*

---

[1] **Note to Draft**: Definition of Other Agreements should be customized for the parties to the Subscription Agreement.

9

IN WITNESS WHEREOF, the undersigned has executed this Agreement as of the date first written above.

**THE SUBSCRIBER**:

[_____]

By:  _____
Name:  _____
Title:  _____

IN WITNESS WHEREOF, the undersigned has executed and accepted this Agreement as of the date first written above.

**THE COMPANY**:

**TSG SHELF II INVESTMENTS, LLC**

By: _____
Name: Scott MacLaren
Title:   Vice President

EXHIBIT 1.1

FORM OF SALE ORDER

[See attached]

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CARBONLITE HOLDINGS LLC, *et al.*,[1] | ) | Case No. 21-10527 (JTD) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## ORDER (A) APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS RELATING TO THE RIVERSIDE FACILITY FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS; (B) APPROVING ASSUMPTION AND ASSIGNMENT OF CERTAIN UNEXPIRED LEASES AND EXECUTORY CONTRACTS; AND (C) GRANTING RELATED RELIEF

Upon the motion [Docket No. 112] (the "Motion") of the above-captioned debtors and debtors in possession (the "Debtors") pursuant to sections 105(a), 363, 365, 503, 507, 1107, and 1108 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1 and 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") for (a) approval of a sale of substantially all of the assets of the Debtors relating to the Riverside Facility[2] free and clear of all liens, claims, encumbrances, and other interests; (b) approval of assumption and assignment of certain unexpired leases and executory contracts; and (c) approval of related relief, all as contemplated in the *Order (A) Approving Bid Procedures for the Sale of Substantially All of the Debtors' Assets; (B) Approving Procedures for the Assumption and Assignment of*

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: CarbonLite Holdings LLC (8957); CarbonLite Industries LLC (3596); CarbonLite P Holdings LLC (8957); CarbonLite P LLC (5453); CarbonLite PI Holdings LLC (8957); CarbonLite Pinnpack LLC (8957); CarbonLite Recycling Holdings LLC (8957); CarbonLite Sub-Holdings, LLC (8957); Pinnpack P, LLC (8322); CarbonLite Recycling LLC (3727); and Pinnpack Packaging LLC (9948). The address of the Debtors' corporate headquarters is 10250 Constellation Blvd., Los Angeles, CA 90067.

[2] The Riverside Facility is a recycling facility operated by Debtor CarbonLite Industries, LLC ("Industries") located in Riverside, California.

*Executory Contracts and Unexpired Leases; (C) Approving Certain Bid Protections in Connection With the Debtors' Entry Into Any Potential Stalking Horse Agreements; (D) Scheduling the Auction and Sale Hearing; (E) Approving the Form and Manner of Notice Thereof; and (F) Granting Related Relief* [Docket No. 266] (as may be amended, supplemented or modified)[3] (the "Bid Procedures Order")[4] entered by this Court on April 9, 2021; and [the Auction having taken place on May [ • ], 2021, in accordance with the Bid Procedures Order]; and **TSG Shelf II Acquisition, LLC** having been chosen as the Successful Bidder (the "Successful Bidder" or the "Buyer") for the Riverside Facility; and the Debtor party to the APA (as defined below) (the "Seller")[5] having agreed to enter into and consummate the Asset Purchase Agreement attached hereto as Exhibit A with the Buyer (the "APA"); and the hearing to approve the sale (the "Sale" or "Sale Transaction") of the Purchased Assets (as defined in the APA) and the APA (the "Sale Hearing") having been held on May [ • ], 2021 in accordance with the Bid Procedures Order; and this Court having found that proper and adequate notice of the Motion and the relief requested therein has been provided in accordance with the Bid Procedures Order, Bankruptcy Rules and Local Rules, and that, except as otherwise ordered herein, no other further notice is necessary; and upon the record at the Sale Hearing and all of the proceedings before this Court; and this Court having

---

[3] *See Order Approving Stipulation Among Debtors, the Official Committee of Unsecured Creditors and the DIP Lenders, Extending Certain Deadlines Under the Bid Procedures Order* [Docket No. 312], entered by this Court on April 20, 2021; *Order Approving Second Stipulation Among Debtors and the DIP Lenders, Extending Certain Deadlines Under the Bid Procedures Order* [Docket No. 357], entered by this Court on April 27, 2021; and *Order Approving Amended Third Stipulation Among Debtors and the DIP Lenders Extending Certain Deadlines Under (I) TX Debtors' Final DIP Order; (II) PA Debtors' Final DIP Order; (III) CA Debtors' Final DIP Order; and (IV) Bid Procedures Order* [Docket No. 401], entered on May 4, 2021.

[4] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Bid Procedures Order and, as applicable, the Bid Procedures (as defined in and attached to the Bid Procedures Order).

[5] Debtor CarbonLite Holdings LLC ("Holdings") is also party to the APA for the sole and exclusive purposes of (a) agreeing to transfer to Buyer at the Closing, all of Holdings' right, title and interest in and to any Acquired Intellectual Property Rights (as defined in the APA) and any Wayward Assets (as defined in the APA) and (b) Section 5.15 of APA, and for purposes of this Order is a Seller hereunder to that extent.

reviewed any objections asserted at the Sale Hearing and having found and determined that the relief sought at the Sale Hearing, and entry of this Order, is in the best interests of the Seller, the Seller's estate, its creditors, and all other parties in interest; and after due deliberation thereon and sufficient cause appearing therefore, the Court makes the following Findings of Fact and Conclusions of Law:

**<u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>**

A.     **Findings and Conclusions:** The findings and conclusions set forth herein and in the record of the Sale Hearing constitute the Court's findings of fact and  conclusions of law under Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Bankruptcy Rules 7052 and 9014.  To the extent any of the following conclusions of law constitute findings of fact, or *vice versa*, they are adopted as such.

B.     **Jurisdiction, Venue and Core Proceeding:** This Court has jurisdiction over these chapter 11 cases pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as  of February 29, 2012.  The matters covered by this Order are core proceedings under 28 U.S.C. § 157(b)(2).  Venue is proper in this district and before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  Venue in this district and before this Court was proper as of the Petition Date and continues to be proper.  The Court may enter a final order with respect to the Motion, the Sale, the Sale Transaction, and all related relief, in each case, consistent with Article III of the United States Constitution.

C.     **Statutory Predicates.**  The statutory predicates for the relief sought in the Motion are sections 105(a), 363, 365, 503, 507, 1107 and 1108 of the Bankruptcy Code, Rules 2002, 6004, 6006, 9008, and 9014 of the Bankruptcy Rules and Rules 2002-1 and 6004-1 of the Local

3

Rules.  The consummation of the Sale Transaction contemplated by the Motion, the APA, and this Order, and the assumption and assignment of the Acquired Contracts, the Assumed Real Property Leases, the Assumed Personal Property Leases and the Licenses and Permits (as defined in the APA) (the "Acquired Contracts"), are legal, valid, and properly authorized under the cited provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and all of the applicable requirements of such sections and rules have  been complied with in respect of such transactions.

D.    **Sufficiency of Notice.**  As evidenced by the affidavits of service filed with the Court, proper, timely, adequate, and sufficient notice of the Motion, the Bid Procedures Hearing, the Bid Procedures, the Assumption and Assignment Procedures, the proposed assumption and assignment of the Acquired Contracts, the Auction, the Sale Hearing, the Sale, the Sale Transaction, and all transactions contemplated therein or in connection therewith, and all deadlines related thereto, was given under the particular circumstances and no further notice need be provided.

E.    **Actual Notice.**  Actual written notice of the Motion, the Bid Procedures Hearing, the Bid Procedures, the Assumption and Assignment Procedures, the proposed assumption and assignment of Acquired Contracts, the Auction, the Sale Hearing, the Sale, the Sale Transaction and all transactions contemplated therein or in connection therewith, and all deadlines related thereto has been given to  all interested persons and entities, including, without limitation: (i) the DIP Term Agent, DIP Term Lenders, and Prepetition Term Secured Parties, and each of their counsel; (ii) the DIP ABL Lender and Prepetition ABL Secured Parties, and each of their counsel (iii) the TX/PA Dip Agents and Prepetition Trustees, and each of their counsel; (iv) counsel to the Official Committee of Unsecured Creditors (the "Committee"); (v) the Office of The United

States Trustee; (vi) the counterparty to each unexpired lease and executory contract to be assumed and assigned pursuant to this Order, and each of their counsel (if known) (vii) all persons known or reasonably believed to have asserted an interest in the Purchased Assets; (viii) the Attorneys General in the States where the Assets are located; (ix) all federal, state, and local taxing authorities in the States where the Assets are located; (x) all parties who have asserted liens against the Purchased Assets; (xi) all parties included on the Debtors' consolidated creditor matrix; and (xii) any other party that has filed a request for notices with the Court (collectively, the "Notice Parties").

F.    **Extensive Efforts by Debtors.**    The Seller has worked with its counsel, its investment banker Jefferies, LLC ("Jefferies"), and other advisors, as well as, as applicable, the Consultation Parties and the Consent Parties, to implement a viable Sale Transaction that would allow it to maximize the value of its Assets.  The Sale Transaction for the Purchased Assets that is the subject of this Order is the result of the Seller's extensive efforts in seeking to maximize recoveries to the Debtors' estates, for the benefit of all of the Debtors' creditors.

G.    **Business Justification.**   The Seller has demonstrated good, sufficient, and sound business purposes and justifications for, and compelling circumstances to promptly consummate, the Sale Transaction contemplated by the APA and related documents, including, without limitation, the assumption, assignment, and/or transfer of the Acquired Contracts pursuant to sections 105, 363, and 365 of the Bankruptcy Code, prior to and outside of a plan of reorganization, and such action is an appropriate exercise of the Seller's business judgment and in the best interests of the Seller, its estates, and its creditors.  Such business reasons include, but are not limited to, the fact that: (i) there is substantial risk of depreciation of the value of the Purchased Assets (as defined in the APA) if the Sale is not consummated promptly; (ii) the Sale

5

Transaction contemplated by the APA presents the best opportunity to maximize the value of the Seller's estate; (iii) at Closing, in accordance with the CA DIP Order, the cash proceeds of the Sale Transaction will be used to indefeasibly pay the DIP Obligations (as defined in the CA DIP Order); and (iv) unless the Sale is concluded expeditiously as provided for in this Order and pursuant to the APA, potential creditor recoveries may be substantially diminished.

H.    **Bid Procedures Order.** On April 9, 2021, this Court entered the Bid Procedures Order approving, among other things, Bid Procedures for the sale of substantially all of the Debtors' Assets and Assumption and Assignment Procedures for the related assumption and assignment of any unexpired leases and executory contracts relating to any sale. The Bid Procedures provided a full, fair, and reasonable opportunity for any entity to make an offer to purchase the Debtors' Assets. The Assumption and Assignment Procedures provided a full, fair, and reasonable opportunity for any counterparty to any unexpired lease or executory contract to object to any proposed Cure Amount, assumption and assignment of its applicable unexpired lease or executory contract, or the Buyer's adequate assurance of future performance. The Debtors, the Buyer, and their respective counsel and other advisors have complied with the Bid Procedures Order, the Bid Procedures, and the Assumption and Assignment Procedures in all respects.

I.    **Adequate Marketing; Highest or Best Offer.** As demonstrated by (i) the testimony and other evidence proffered or adduced at the Sale Hearing, and (ii) the representations of counsel made on the record at the Sale Hearing, (a) the Seller has adequately marketed the Purchased Assets and conducted the Sale process in compliance with the Bid Procedures Order in good faith and in a fair and open manner; (b) the Sale Process and the Bid Procedures were non-collusive, duly noticed, and provided a full, fair, reasonable and adequate

opportunity for any interested party to conduct due diligence and make an offer to purchase the Debtors' Assets, and submit higher and better offers for the Purchased Assets than the Buyer's Successful Bid; (c) the consideration provided by the Buyer in the APA constitutes the highest and best offer for the Purchased Assets; (d) the consideration is fair and reasonable consideration for the Purchased Assets and constitutes reasonably equivalent value under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia; (e) the Sale will provide a greater recovery to the Seller's creditors with respect to the Purchased Assets than would be provided by any other available alternative; (f) taking into consideration all relevant factors and circumstances, no other entity has offered to purchase the Purchased Assets for greater economic value to the Seller or its estate than the Buyer; and (g) the Seller's determination that the APA constitutes the highest or best offer for the Purchased Assets, maximizes value for the Debtors' estates, and constitutes a valid and sound exercise of the Seller's business judgment.  There is no legal or equitable reason to delay Closing of the Sale Transaction contemplated by the APA.

J.    **Opportunity to Object.**  A reasonable opportunity to object or be heard with respect to the Motion, and all relief requested therein has been afforded to all interested parties.

K.    **Property of the Estate.**  The Purchased Assets are property of the Seller's estate and title thereto is vested in the Seller's estate.

L.    **Sale in Best Interests.**  The actions to be taken by the Seller and the Buyer are appropriate under the circumstances of these chapter 11 cases and are in the best interests of the Seller, its estate, its creditors, and other parties in interest.  Approval of the APA and the Sale Transaction set forth therein, and all related transactions at this time is in the best interests of the Seller, its creditors, its estate, and all other parties in interest.

M.     **Arm's-Length Sale.**   The APA, the Sale, the Sale Transaction, and any transactions contemplated therein and associated therewith were negotiated, proposed, and entered into by the Seller and the Buyer without collusion, in good faith, and from arm's-length bargaining positions.  Neither the Seller, its insiders and affiliates, the CA DIP Lenders, and the CA Prepetition Secured Parties nor the Buyer have engaged in any conduct that would cause or permit the APA, the Sale, or any part of the Sale Transaction to be avoided under section 363(n) of the Bankruptcy Code.

N.     **Good Faith Buyer.**   The Buyer has proceeded in good faith in all respects, is a good faith buyer under section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby, including in the event this Order or any portion hereof is reversed or modified on appeal.  In particular, (i) Buyer recognized that the Seller was free to deal with any other party interested in purchasing the Purchased Assets; (ii) Buyer in no way induced or caused the chapter 11 filings by the Seller or other Debtors; (iii) Buyer has not violated section 363(n) of the Bankruptcy Code by any action or inaction; (iv) no common identity of directors, managers, officers or controlling stockholders exist between Buyer, on the one hand, and any of the Seller or other Debtors, on the other hand; (v) Buyer complied with the Bid Procedures and all provisions of the Bid Procedures Order; and (vi) all payments to be made, and all other material agreements or arrangements entered into or to be entered into by Buyer in connection with the Sale Transaction have been disclosed.

O.     **Corporate Authority.** The Seller (i) has full corporate power and authority to execute the APA and all other documents contemplated thereby, and the Sale Transaction and Sale of the Purchased Assets has been duly and validly authorized by all necessary corporate action of the Seller, (ii) has all of the corporate power and authority necessary to consummate

the transactions contemplated by the APA, (iii) has taken all corporate action necessary to authorize and approve the APA and the consummation by the Seller of the transactions contemplated thereby, and (iv) needs no consents or approvals, other than those expressly provided for in the APA, subject to the waiver of such consents or approvals to the extent provided in the APA and as may be permitted under applicable law.

P.     **Free and Clear Findings Required by the Buyer.**  The Buyer would not have entered into the APA and would not consummate the Sale if the Sale of the Purchased Assets to the Buyer were not, pursuant to section 363(f) of the Bankruptcy Code, free and clear of (i) all liens, claims, pledges, options, charges, hypothecations, easements, security interests, rights-of-way, encroachments, mortgages and deeds of trusts or other encumbrances, other than Permitted Post-Closing Encumbrances (as defined in the APA) (collectively, the "Liens"), (ii) all claims as defined in section 101(5) of the Bankruptcy Code, including all rights or causes of action (whether in law or in equity), warranties, guarantees, indemnities, rights of recovery, setoff, recoupment, indemnity or contribution, obligations, demands, restrictions, indemnification claims or liabilities relating to any act or omission of the Debtors or any other person prior to the Closing, consent rights, options, contract rights, covenants and interests of any kind or nature whatsoever (known or unknown, matured or unmatured, accrued or contingent and regardless of whether currently exercisable), whether arising prior to or subsequent to the commencement of the above-captioned case, and whether imposed by agreement, understanding, law, equity or otherwise (collectively the "Claims"), and (iii) all debts, liabilities, obligations, contractual rights and claims and labor, employment and pension claims, in each case, whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-

contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, whether arising prior to or subsequent to the commencement of these chapter 11 cases, and whether imposed by agreement, understanding, law, equity or otherwise (collectively the "Interests").  Upon entry of this Order, the Seller is authorized to transfer all its right, title and interest in and to the Purchased Assets free and clear of, and the Buyer shall not be responsible for, any Liens, Claims, or Interests, including, without limitation, in respect of the following: (i) any rights or Claims based on any successor or transferee liability, (ii) any Liens, Claims or Interests that purport to give to any party a right or option to effect any forfeiture, modification, right of first refusal, or termination of the Seller's or the Buyer's interest in the Assets, or any similar rights; (iii) any labor or employment agreements; (iv) any pension, multiemployer plan (as such term is defined in Section 3(37) or Section 4001(a)(3) of ERISA), health or welfare, compensation or other Benefit Plans, agreements, practices and programs, including, without limitation, any pension plans of the Debtors or any multiemployer plan to which the Debtors have at any time contributed to or had any liability or potential liability; (v) any other employee, worker's compensation, occupational disease or unemployment or temporary disability related claim, including, without limitation, claims that might otherwise arise under or pursuant to (a) ERISA, (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Age Discrimination and Employment Act of 1967 and Age Discrimination in Employment Act, as amended, (g) the Americans with Disabilities Act of 1990, (h) Section 4980B of the Internal Revenue Code of 1986 and Part 6 of Title I of ERISA, together in each case, with applicable regulations, in each case, as amended and in effect from time to time (collectively, "COBRA"), (i) state discrimination laws, (j) state unemployment compensation

laws or any other similar state laws, or (k) any other state or federal benefits or claims relating to any employment with the Debtor or any of its predecessors; (vi) any bulk sales or similar law; (vii) any tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder, and any taxes arising under or out of, in connection with, or in any way relating to the operation of the Assets prior to the Closing; or (viii) any unexpired and executory contract or unexpired lease to which any Debtor is a party that is not a contract or lease that will be assumed and assigned pursuant to this Order and the APA (the "<u>Successor or Other Liabilities</u>").   A sale of the Purchased Assets other than one free and clear of all Liens, Claims, and Interests would yield substantially less value for the Seller's estate, with less certainty, than the Sale as contemplated.   Therefore, the Sale contemplated by the APA free and clear of all Liens, Claims, and Interests is in the best interests of the Seller, its estate, its creditors, and all other parties in interest.

Q.    **Environmental Protection Agency.**  Notwithstanding the foregoing, nothing in this Order or the APA releases, nullifies, precludes or enjoins the enforcement of any police or regulatory liability to a governmental unit that any entity would be subject to as the post-sale owner or operator of property after the date of entry of this Order. Nothing in this Order or the APA authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization, or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police or regulatory law. Nothing in this Order divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Order or to adjudicate any defense asserted under this Order.

R.     **Assumption and Assignment of Unexpired Leases and Executory Contracts.**

Pursuant to section 365 of the Bankruptcy Code, the Debtors are authorized to assume all Acquired Contracts[6] and assign such Acquired Contracts to the Buyer.  To the extent a Cure Amount is owed to the counterparty of any Assumed/Assigned Contract (the "Contract Counterparty"), the applicable Cure Amount will be paid in accordance with this Order and the APA.  The Buyer has, in accordance with the Assumption and Assignment Procedures, provided adequate assurance of future performance to any Contract Counterparty as required by section 365(b)(1)(C).  In accordance with the Assumption and Assignment Procedures and the terms of this Order, following the Closing, Buyer shall be fully and irrevocably vested with all of the Seller's right, title and interest in and under the Acquired Contracts in connection with the Purchased Assets, free and clear of any Liens, Claims and Interests, and each Acquired Contract shall be fully enforceable by Buyer in accordance with its respective terms and conditions, except as limited by this Order.  Following assignment of the Acquired Contracts to Buyer, the Seller shall be relieved from any further liability with respect to such Acquired Contracts.

S.     The Acquired Contracts being assigned to Buyer are an integral part of the Sale Transaction and, accordingly, their assumption and assignment is reasonable and an enhancement to the value of the Debtors' estates.  To the extent any Acquired Contract is not an executory contract within the meaning of section 365 of the Bankruptcy Code, it shall be transferred to Buyer in accordance with the terms of the APA and, other than with respect to Permitted Post-Closing Encumbrances and Assumed Liabilities, Buyer shall have no liability or obligation for any (i) defaults or breaches under such agreement that relate to acts or omissions that occurred in the period, or otherwise arose, prior to the Closing Date and (ii) claims,

---

[6] Notwithstanding the name of the Debtors listed on any Acquired Contract, the Acquired Contracts identified in the APA are deemed assumed and assigned by the applicable Debtors party to the APA.

counterclaims, offsets, or defenses (whether contractual or otherwise, including, any right of recoupment) with respect to such Acquired Contract, that relate to any acts or omissions that arose or occurred prior to the Closing Date.

T.      **Binding and Valid Transfer.**  The transfer of the Purchased Assets to the Buyer will be a legal, valid, and effective sale and transfer of the Purchased Assets and will vest the Buyer with all right, title, and interest of the Seller to the Purchased Assets free and clear of all Liens, Claims, and Interests and any liabilities of the Seller, except as otherwise expressly set forth in the APA or in this Order.

U.      **Satisfaction of Standards of Section 363(f).**  The Seller may sell the Purchased Assets free and clear of all Liens, Claims, and Interests of any kind or nature whatsoever, because, in each case, one or more of the standards set forth in section 363(f)(1) - (5) of the Bankruptcy Code have been satisfied.  Those holders of Liens, Claims, and Interests who did not object,  or  who withdrew their objections, to the Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code.  Holders of Liens, Claims, or Interests are adequately protected by having their Liens, Claims, or Interests attach to the proceeds received by the Seller (if any) that are ultimately attributable to the property against or in which such Liens, Claims, or Interests are asserted, subject to the terms of such Liens, Claims, or Interests, with the same validity, force, and effect, and in the same order of priority, which such Liens, Claims, or Interests now have against the Purchased Assets or their proceeds, if any.  In all cases, each such person with Liens, Claims, or Interests in the Purchased Assets is enjoined from taking any action against the Buyer, the Buyer's affiliates, or any agent of the foregoing to recover any such Lien, Claim, or Interest.

V.     **Consideration for Transfer of Purchased Assets Free and Clear**.  Buyer would not have entered into the APA if the transfer of the Purchased Assets were not free and clear of all Liens, Claims and Interests as set forth in the APA and this Order, or if in the future Buyer would or could be liable for any such Liens, Claims or Interests.  The total consideration to be provided under the APA reflects Buyer's reliance on this Order to provide, pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, that, upon the Closing, Buyer has title to, interest in and possession of the Purchased Assets free and clear of all Liens, Claims and Interests.

W.     **Repayment of DIP Obligations.**  Pursuant to the CA DIP Order, the Purchased Assets constitute DIP Collateral (as defined in the CA DIP Order) and are subject to the DIP Liens (as defined in the CA DIP Order).  At Closing, the Seller is authorized and directed to distribute the proceeds of the Sale Transaction in accordance with the CA DIP Order and applicable DIP Documents (as defined in the CA DIP Order).

X.     **No *Sub Rosa* Plan**.  The Sale, Sale Transaction, the APA, and the other transactions contemplated thereby do not constitute a *sub rosa* chapter 11 plan.  The Sale Transaction neither impermissibly restructures the rights of the Seller's creditors nor impermissibly dictates a liquidating chapter 11 plan for the Seller.

Y.     **Assets Assignable**.  To the maximum extent possible under the Bankruptcy Code, each and every provision of the documents governing the Purchased Assets or applicable non-bankruptcy law that purports to prohibit, restrict, or condition, or could be construed as prohibiting, restricting, or conditioning assignment of any of the Purchased Assets, if any, has been or will be satisfied or is otherwise unenforceable under section 365 of the Bankruptcy Code.

Z.    **Necessity of Order.**  The Buyer would not have entered into the APA and would not consummate the Sale Transaction contemplated therein without all of the relief provided for in this  Order (including, but not limited to, that the sale and transfer of the Assets to Buyer be free and clear  of all Liens, Claims, and Interests).  The consummation of the Sale Transaction pursuant to this Order and the APA is necessary for the Seller to (i) comply with the terms of the CA DIP Order and DIP Documents, including the milestones and repayment provisions set forth therein, and (ii) maximize the value of its estate for the benefit of all creditors.

AA.    **Final Order.** This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), the Court expressly finds that there is no just reason for delay in the implementation of this Order and expressly directs entry of judgment as set forth herein.

BB.    **Best Interests.** Entry of this Order is in the best interests of the Seller, the Seller's estate, its creditors, and all other parties in interest.

## ORDER

Based on the foregoing Findings of Fact and Conclusions of Law, it is hereby **ORDERED, ADJUDGED, AND DECREED** as follows:

1.    **Findings of Fact and Conclusions of Law.**    The above-referenced findings of fact and conclusions of law are hereby incorporated by reference as though fully set forth herein and shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable herein by Bankruptcy Rule 9014.  To the extent that any finding of fact shall be determined to be a conclusion of law, it shall be deemed so, and *vice versa*.

2.      **Motion Granted.**  The Motion is granted with respect to the Sale Transaction contemplated by the APA, and the relief requested therein with respect to the Sale is granted and approved in its entirety, as set forth herein.

3.      **Objections are Overruled.**  Except for any objections to adequate assurance of future performance by any Contract Counterparty that are contemplated to be heard post-Sale Hearing in accordance with the Assumption and Assignment Procedures, all objections, reservations of rights regarding, or other responses to the Motion or the relief requested therein, the APA, all other ancillary agreements, the Sale Transaction, the entry of this Order or to the relief granted herein that have not been withdrawn, waived, settled, or not otherwise resolved pursuant to the terms hereof, if any, hereby are denied and overruled on the merits with prejudice.  All persons and entities that failed to timely object to the Motion are deemed to have consented to the relief granted herein for all purposes.

4.      **Approval.**  The APA, and all the terms and conditions thereof, is approved. Pursuant to sections 105, 363, and 365 of the Bankruptcy Code, the Seller is authorized to perform its obligations under, and comply with the terms of, the APA and consummate the Sale and the related transactions pursuant to, and in accordance with, the terms and conditions of the APA and this Order.  The Seller is authorized to execute and deliver, and empowered to perform under, consummate, and implement, the APA and the Sale Transaction contemplated therein, together with all additional instruments and documents that the Seller or the Buyer deem necessary or appropriate to implement the APA and effectuate the Sale Transaction contemplated therein, and to take all further actions as may reasonably be required by the Buyer for the purpose of assigning, transferring, granting, conveying, and conferring to the Buyer the Purchased Assets as may be necessary or appropriate to the performance of their obligations

under the APA. The Buyer and the Seller shall have no obligation to consummate the Sale Transaction except as contemplated by and provided for in the APA and the Bid Procedures. The Buyer shall not be required to seek or obtain relief from the stay under section 362 of the Bankruptcy Code to enforce any of its remedies under the APA or related documents. The automatic stay imposed by section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the provisions of this Order.

5. **Notice**. Notice of the Motion, the Bid Procedures Hearing, the Bid Procedures, the Assumption and Assignment Procedures, the assumption and assignment of the Acquired Contracts to Buyer, the Auction, the Sale Hearing, the Sale, all transactions contemplated therein or in connection therewith, including the Sale Transaction, all deadlines related thereto, and the relief granted in this Order was fair, sufficient, proper, and equitable under the circumstances and complied in all respects with sections 102(1) and 363 of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Bid Procedures Order, the Bid Procedures, the Assumption and Assignment Procedures, and the procedural due process requirements of the United States Constitution.

6. **Assumption and Assignment of Unexpired Leases and Executory Contracts.** Pursuant to section 365 of the Bankruptcy Code, the Seller is authorized to assume the Acquired Contracts and assign such Acquired Contracts to the Buyer. To the extent a Cure Amount is owed to a Contract Counterparty, the applicable Cure Amount will be paid (or if disputed, escrowed) on or before Closing of the Sale subject to and in accordance with the APA. Any objection of any Contract Counterparty to the assumption or assignment of any Acquired Contracts, any Cure Amount, or seeking further adequate assurance of future performance than that provided in the APA, to the extent not otherwise resolved by agreement, contemplated to be

heard after the Sale Hearing in accordance with the Assumption and Assignment Procedures, or by separate order of this Court, is hereby overruled.  There shall be no accelerations, assignment fees, increases, or any other fees charged to Buyer or Seller as a result of the assignment of the Purchased Assets or the assumption and assignment of the Acquired Contracts.  Disputed Cure Amounts escrowed pursuant to the APA and this Order shall be held in escrow and disbursed to satisfy the payment of Cure Amounts only upon agreement of the Seller, the Buyer and the applicable Contract Counterparty, or upon further order of the Court.  Upon payment of the Cure Amount, the Seller shall be released by the applicable Contract Counterparty from any and all claims and causes of action of any nature whatsoever based on, arising from or relating to the Acquired Contracts.

7. **Transfer of Security and Other Deposits**.  To the extent provided for in the APA, any and all of the Seller's security deposits, or other security held by landlords, lessors, and other Contract Counterparties to the Acquired Contracts are being transferred and assigned to, and shall be the property of, the Buyer from and after the Closing, which transfer and assignment of security deposits, other deposits, or security shall satisfy in full the requirements of section 365(l) of the Bankruptcy Code for all Acquired Contracts assumed and assigned pursuant to this Order or the APA.[7]  Except as expressly set forth in the APA, the Buyer shall have no responsibility for the payment of any Cure Amounts.

8. **Binding Effect of Order.**  This Order shall be binding  in  all respects upon (i) all known and unknown creditors of, and holders of equity security interests in, the Debtors, including any holders of Liens, Claims, and Interests; (ii) the Buyer; (iii) the Debtors; (iv) the Purchased Assets; (v) any trustee(s) appointed in the Debtors' chapter 11 cases or upon a

---

[7] The deposits referenced herein and being transferred pursuant to the APA do not include any Good Faith Deposits made by other potential bidders for the Assets of the Debtors pursuant to the Bid Procedures.

conversion to cases under chapter 7 of the Bankruptcy Code; and (vi) all successors and assigns of each of the foregoing, and this Order shall not be subject to amendment or modification and the APA shall not be subject to rejection.

9.      [**Release of Back-Up Bidder.**   The Back-Up Bidder will be released at Closing and any Good Faith Deposit of any Back-Up Bidder will be refunded within three (3) days of Closing.]

10.      **Injunction.**   All persons and entities are prohibited and enjoined from taking any action to adversely affect or interfere with the ability of the Seller to transfer the Purchased Assets to the Buyer in accordance with the APA and this Order. Following the Closing, all persons (including, but not limited to, the Seller and the other Debtors, creditors, investors, current and former employees and shareholders, administrative agencies, governmental units, secretaries of state, federal, state, and local officials, including those maintaining any authority relating to any environmental, health and safety laws, and the successors and assigns of each of the foregoing) holding Liens, Claims, or Interests in the Purchased Assets or against the Seller and the other Debtors in respect of the Purchased Assets of any kind or nature whatsoever shall be, and hereby are, forever barred, estopped, and permanently enjoined from asserting, prosecuting, or otherwise pursuing any Liens, Claims, or Interests of any kind or nature whatsoever against the Buyer or any affiliate of the Buyer or any of its respective property, successors and assigns, or the Purchased Assets, as an alleged successor or on any other grounds.  No person shall assert, and the Buyer and the Purchased Assets shall not be subject to, any defaults, breaches, counterclaims, offsets, defenses (whether contractual or otherwise, including, without limitation, any right of recoupment), liabilities, claims and interests, or basis of any kind or nature whatsoever to delay, defer, or impair any right of the Buyer under, or with

respect to, any Purchased Assets, with respect to any act or omission that occurred prior to the Closing or with respect to any other agreement or any obligation of the Seller or the other Debtors that  is not an assumed liability under the APA.

11.    **General Assignment.**  Upon the Closing, this Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of the Seller's interests in the Purchased Assets and a bill of sale transferring good and marketable title in the Purchased Assets to the Buyer free and clear of all Liens, Claims and Interests.  Each and every federal, state, and local governmental agency, quasi-agency, or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the Sale Transaction contemplated under the APA.

12.    **Transfer Free and Clear.** Upon the Closing, pursuant to sections 105(a), 363(b), 363(f), 365(b) and 365(f) of the Bankruptcy Code, the Purchased Assets, including the Acquired Contracts, shall be transferred to the Buyer in accordance with the APA, and such transfer shall be free and clear of all Liens, Claims, and Interests of any person, including, without limitation, all such Liens, Claims, and Interests specifically enumerated in paragraph P of this Order, whether arising by agreement, by statute, or otherwise and whether occurring or arising before, on, or after the Petition Date, whether known or unknown, occurring or arising prior to such transfer, with all such Liens, Claims, and Interests attaching to the proceeds of the Sale ultimately attributable to the property against or in which the holder of a Lien, Claim, or Interest claims or may claim a Lien, Claim, or Interest, in the order of its priority, with the same validity, force, and effect which they now have and had against the Purchased Assets immediately prior to Closing, subject to any claims and defenses the Debtors may possess with respect thereto (other

than with respect to any Lien, Claim, or Interest of any of the DIP ABL Lender, the DIP Term Agent, the DIP Term Lender, or the CA Prepetition Secured Parties).

13.    **Licenses and Permits**.  To the greatest extent available under applicable law, the Buyer shall be authorized, as of the Closing Date, to operate under any license, permit, registration, and governmental authorization or approval of the Seller with respect to the Purchased Assets, and all such licenses, permits, registrations, and governmental authorizations and approvals are deemed to have been, and hereby are, deemed to be transferred to the Buyer as of the Closing Date. To the extent provided by section 525 of the Bankruptcy Code, no Governmental Entity may revoke or suspend any grant, permit, or license relating to the operation of the Purchased Assets sold, transferred, assigned, or conveyed to the Buyer on account of the filing or pendency of these chapter 11 cases or the consummation of the Sale Transaction.

14.    **Environmental Protection Agency**.  Notwithstanding the foregoing, nothing in this Order or the APA releases, nullifies, precludes or enjoins the enforcement of any police or regulatory liability to a governmental unit that any entity would be subject to as the post-sale owner or operator of property after the date of entry of this Order. Nothing in this Order or the APA authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization, or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police or regulatory law. Nothing in this Order divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Order or to adjudicate any defense asserted under this Order.

15. **Valid Transfer.**  The transfer of the Purchased Assets to the Buyer pursuant to the APA constitutes a legal, valid, and effective transfer of the Purchased Assets and shall vest the Buyer with all right, title, and interest of the Seller in and to the Purchased Assets free and clear of all Liens, Claims, and Interests of any kind or nature whatsoever.

16. **Exculpation and Release.**  Neither the Buyer nor any of its affiliates, successors, and assigns, nor any of its professionals, shall have, or incur any liability to, or be subject to any action by, the Debtors or any of their predecessors, successors, or assigns, arising out of the negotiation, investigation, preparation, execution, or delivery of the APA and the entry into and consummation of the Sale Transaction, except as expressly provided in the APA and this Order. Neither the Debtors nor any of their affiliates, successors, and assigns, nor any of their professionals, shall have, or incur any liability to, or be subject to any action by, the Buyer or any of its predecessors, successors, or assigns, arising out of the negotiation, investigation, preparation, execution, or delivery of the APA and the entry into and consummation of the Sale Transaction, except as expressly provided in the APA and this Order.

17. **Direction to Release Interests.**  Upon the Closing, each of the Debtors' creditors and any other holder of a Lien, Claim, or Interest is authorized and directed to execute such documents and take all other actions as may be reasonably necessary to release its Lien, Claim, or Interest in the Purchased Assets, if any, as such Lien, Claim, or Interest may have been recorded or may otherwise exist.  If any person or entity that has filed financing statements, mortgages, mechanic's liens, *lis pendens*, or other documents or agreements evidencing a Lien, Claim, or Interest in all or any portion of the Purchased Assets being sold pursuant to the Sale Transaction and the APA shall not have delivered to the Debtors prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of

satisfaction, releases of all Liens, Claims, and Interests, which such person or entity has with respect to all or any portion of the Purchased Assets being sold pursuant to the Sale Transaction and the APA , then (i) the Seller is authorized to execute and file such statements, instruments, releases, and other documents on behalf of such person or entity with respect to all or any portion of the Purchased Assets being sold pursuant to the Sale Transaction and the APA, and (ii) the Buyer is authorized to file, register, or otherwise record a certified copy of this Order, which shall constitute conclusive evidence of the release of all Liens, Claims, and Interests of any kind or nature whatsoever in the Purchased Assets being sold pursuant to the Sale Transaction and the APA. Each and every federal, state, and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the APA, including, without limitation, recordation of this Order. This Order shall be binding upon and shall govern the acts of all persons including without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons who  may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to  any of such assets or other property interests.

18.    **No Interference.**  Following the Closing, no holder of any Lien, Claim or Interest in the Purchased Assets shall interfere with the Buyer's title to, or use and enjoyment of, the Purchased Assets being sold pursuant to the Sale Transaction and the APA based on, or related

to, any such Lien, Claim, or Interest, or based on any actions the Debtors may take in these chapter 11 cases.

19.    **Surrender of Possession.**  All persons or entities that are currently, or as of the Closing, may be, in possession of some or all of the Purchased Assets are hereby directed to surrender possession of the Purchased Assets to the Buyer at the Closing, unless the Buyer otherwise agrees.

20.    **Standing to Object to Claims**.  The Buyer shall have standing  to object to the allowance of claims (as such term is defined in section 101(5) of the Bankruptcy Code) asserted against the Seller *solely* in regard to any unresolved or disputed Assumed Liabilities (as defined in the APA), that constitute obligations assumed by the Buyer pursuant to the terms of the APA.

21.    **Standing**. The APA shall be in full force and effect, regardless of the Seller's lack of good standing in any jurisdiction in which Seller is formed or authorized to transact business.

22.    **Post-Closing Actions and Transactions.**  The Seller and the Buyer, and each of their respective officers, employees, and agents, will be authorized and empowered to take all actions and execute and deliver any and all documents and instruments that either the Seller or the Buyer deem necessary or appropriate to implement and effectuate the terms of the APA, the Sale Transaction contemplated therein and this Order.

23.    **Sale is Self-Executing**.  The Sale is self-executing, and neither the Seller nor the Buyer shall be required to execute or file releases, termination statements, assignments, consents, or other instruments to effectuate, consummate, and implement the provisions of this Order.

24.    **No Discriminatory Treatment.**  To the extent provided by section 525 of the Bankruptcy Code, no governmental unit may deny, revoke, suspend, or refuse to renew any permit, license, or similar grant relating to the operation of the Purchased Assets  sold,

transferred, or conveyed to the Buyer on account of the filing or pendency of these chapter 11 cases or the consummation of the transactions contemplated by the APA.

25. **No Successor Liability.** Neither the Buyer, nor any of its successors or assigns, or any of their respective affiliates shall have any liability for any Lien, Claim, or Interest that arose or occurred prior to the Closing, or otherwise may be asserted against the Seller or other Debtors or is related to the Purchased Assets prior to the Closing. The Buyer is not and shall not be deemed a "successor" to the Seller or other Debtors or their estates; the Buyer has not, *de facto* or otherwise, merged with or into the Seller or other Debtors; the Buyer does not have any common law or successor liability in relation to any employment plans; the Buyer is not liable for any liability or Lien (other than Assumed Liabilities) against the Seller or other Debtors or any of the Seller's or other Debtors' predecessors or Affiliates (other than those transferred to the Buyer pursuant to the Sale); and the Buyer is not an alter ego or mere continuation or substantial continuation of the Seller or other Debtors or the enterprise of the Seller or other Debtors under any theory of law or equity as a result of any action taken in connection with the APA, the Sale Transaction or any transactions or documents ancillary thereto or contemplated thereby or in connection with the acquisition of the Purchased Assets.

26. **Limitations on Liability.** Without limiting the foregoing, and except as otherwise set forth in the APA, the Buyer shall not have any successor, transferee, derivative, or vicarious liabilities of any kind or character for any Liens, Claims, or Interests, including under any theory of successor or transferee liability, *de facto* merger or continuity, whether known or unknown as of the Closing, now existing or hereafter arising, whether fixed or contingent, asserted or unasserted, liquidated or unliquidated, with respect to the Successor or Other Liabilities.

27.    **Fair Consideration.**  The consideration provided by the Buyer for the Purchased Assets under the APA shall be deemed to constitute reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia.  The Sale may not be avoided under section 363(n) of the Bankruptcy Code.  The APA was not entered into, and the Sale is not being consummated, for the purpose of hindering, delaying, or defrauding creditors of the Seller or other Debtors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof, or the District of Columbia, or any other applicable law.  Neither the Seller nor the Buyer have entered into the APA or any agreement contemplated thereby or are consummating the Sale with any fraudulent or otherwise improper purpose, including, without limitation, to evade any pension liabilities.  No other person or entity or group of persons or entities has offered to purchase the Purchased Assets for an amount that would provide greater value to the Seller and its estate than the value provided by the Buyer.  The Court's approval of the Motion and the APA are in the best interests of the Debtors, their estates, their creditors, and all other parties in interest.

28.    **No Modification by Subsequent Orders or Plan Provisions**.    Nothing contained in any chapter 11  plan confirmed in the Debtors' chapter 11 cases, any order confirming any such plan, or in any other order entered in these chapter 11 cases (including any order entered after any conversion of any of these chapter 11 cases to a case under chapter 7 of the Bankruptcy Code) or any related proceeding subsequent to entry of this Order shall modify, alter, conflict with, or derogate from, the provisions of the APA or this Order.

29.    **Retention of Jurisdiction.** This Court retains jurisdiction, pursuant to  its statutory powers under 28 U.S.C. § 157(b)(2), to, among other things, interpret, implement, and

enforce the terms and provisions of this Order and the APA, all amendments thereto, and any waivers and consents thereunder, and each of the agreements executed in connection therewith in all respects, including, but not limited to, retaining jurisdiction to (i) compel delivery of the Purchased Assets to the Buyer; (ii) interpret, implement, and enforce the provisions of this Order and the APA; (iii) protect the Buyer, any of the Buyer's affiliates, or any agent of the foregoing, against any Liens, Claims, or Interests against the Seller or other Debtors or the Purchased Assets of any kind or nature whatsoever; and (iv) enter any order under sections 363 and 365 of the Bankruptcy Code.

30.    **Good Faith Buyer.**  The transactions contemplated by the APA are undertaken by the Buyer without collusion and in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and, accordingly, the reversal or modification on appeal of the authorization provided in this Order to consummate the transactions shall not affect the validity of the transactions (including the assumption and assignment of the Acquired Contracts) nor the transfer of the Purchased Assets owned by the Seller to the Buyer fee and clear of all Liens pursuant to the APA.  The Buyer is a buyer in good faith of the Purchased Assets and is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.  In particular, (i) Buyer recognized that the Seller was free to deal with any other party interested in purchasing the Purchased Assets; (ii) Buyer in no way induced or caused the chapter 11 filings by the Seller or the other Debtors; (iii) Buyer has not violated section 363(n) of the Bankruptcy Code by any action or inaction; (iv) no common identity of directors, managers, officers or controlling stockholders exist between Buyer, on the one hand, and the Seller or the other Debtors, on the other hand; (v) Buyer complied with the Bid Procedures and all provisions of the Bid Procedures Order; and (vi) all payments to be made, and all other material agreements or arrangements

entered into or to be entered into by Buyer in connection with the Sale Transaction have been disclosed. The Seller and the Buyer will be acting in good faith if they proceed to consummate the Sale at any time after entry of this Order.

31. **Approval of Repayment of DIP Obligations**. At Closing, the Seller is authorized and directed to distribute the proceeds of the Sale Transaction with respect to the applicable Purchased Assets to the CA DIP Lenders in accordance with the CA DIP Order and the applicable DIP Documents (as defined in the CA DIP Order).

32. **Repayment of Prepetition Obligations and Adequate Protection Obligations/Remaining Prepetition Obligations and Adequate Protection Obligations.** To the extent the proceeds of the Sale Transaction are sufficient to pay the DIP Obligations (as defined in the CA DIP Order) owed the CA DIP Lenders in full at Closing and any other costs and expenses that are required to be paid at Closing, the remaining proceeds of the Purchase Price will be distributed in accordance with the APA and this Order.

33. **Release of Secured Parties.** In consideration of the consent by each of the DIP ABL Lender, the DIP Term Agent, the DIP Term Lender, and the CA Prepetition Secured Parties to the Sale Transaction, each of the Debtors, on behalf of themselves, anyone who may bring a claim on their behalf (including derivative claims), and their successors and assigns, and each of their respective officers, directors, employees, agents, sub-agents, attorneys, consultants, advisors and affiliates (collectively, the "Releasors"), hereby, forever release, discharge and acquit each of the DIP ABL Lender, the DIP Term Agent, the DIP Term Lender, and the CA Prepetition Secured Parties, and their respective successors and assigns, and their present and former shareholders, affiliates, subsidiaries, divisions, predecessors, directors, officers, partners, members, managers, attorneys, employees, consultants, advisors and other representatives in

their respective capacities as such (collectively, the "Released Secured Parties") of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, of every kind, nature and description, including, without limitation, any so-called "lender liability" claims or defenses, that Releasors had, have or hereafter can or may have against any Released Secured Party as of the date hereof, in respect of events that occurred on or prior to the date hereof with respect to any Debtor or any subsidiary thereof, the DIP Documents (as defined in the CA DIP Order), the Prepetition Documents (as defined in the CA DIP Order), and any other financial accommodations made by any of the Released Secured Parties to the Debtors, including any action or omission of a Released Secured Party in such person's capacity as an officer, director, employee, consultant, or agent of, or advisor to, any Debtor or any subsidiary thereof (the "Secured Party Release").  In addition, upon the Closing, Released Secured Parties are hereby released from any and all obligations, liabilities, actions, duties, responsibilities and causes of action arising or occurring in connection with or related to the DIP Documents (as defined in the CA DIP Order), the CA DIP Order, these chapter 11 cases, or this Order, and the Debtors are authorized to execute and deliver a termination and release agreement, in form and substance satisfactory to each of the Released Secured Parties. *Notwithstanding the foregoing*, the effectiveness of the Secured Party Releases set forth herein are expressly subject to the Challenge Deadline (as defined in the CA DIP Order) as may be extended in accordance with the terms of the applicable DIP Order.

34.    **No Bulk Law Application.**  No bulk sales law or similar law shall apply in any way to the transactions contemplated by the Sale, the APA, the Motion, and this Order.

35.    **Inconsistencies with Prior Orders, Pleadings or Agreements**.  To the extent this Order is inconsistent with any prior order or filing with respect to the Motion in these

chapter 11 cases, the terms of this Order shall govern and any prior orders shall be deemed amended or otherwise modified to the extent required to permit consummation of the Sale Transaction.  To the extent there is any inconsistency between the terms of this Order and the terms of the  APA (including all ancillary documents executed in connection therewith), the terms of this Order shall govern.  Nothing in the APA or this Order shall be deemed to amend, modify, or limit the rights and claims of each of the Prepetition Secured Parties (each as defined in the CA DIP Order), until the Closing of the Sale Transaction and only to the extent contemplated by this Order, the APA and the Sale Transaction contemplated therein, unless expressly agreed to in writing by the foregoing as applicable.

36.    **Failure to Specify Provisions.**  The failure to specifically include any particular provision of the APA in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the APA be authorized and approved in its entirety.

37.    **Non-Material Modifications.**  The APA and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment, or supplement does not have any adverse effect on the Seller's estate. Notwithstanding anything to the contrary set forth in this Order, the APA, any ancillary agreement or related agreement, document, or other instrument, any amendments, modifications, supplements to or waivers of any obligations or rights of the parties thereto that could reasonably adversely impact or affect the rights of the CA Secured Parties or the Prepetition Secured Parties (each as defined in the CA DIP Order) shall require the prior written consent of the applicable Required  Lenders (as defined in the DIP Credit Agreement or Prepetition Documents (as defined in the CA DIP Order)).

38.    **No Stay of Order.**  Notwithstanding the provisions of Bankruptcy Rules 6004(h) and 6006(d), this Order shall not be stayed for fourteen (14) days after its entry and shall be effective immediately upon entry, and the Seller and the Buyer are authorized to close the Sale Transaction immediately upon entry of this Order.  Time is of the essence in closing the Sale Transaction referenced herein, and the Seller and the Buyer intend to close the Sale Transaction as soon as practicable.  This Order is a final order and the period in which an appeal must be filed shall commence upon the entry of this Order.   Any party objecting to this Order must exercise due diligence in filing an appeal and pursuing a stay, or risk its appeal being foreclosed as moot.

39.    **Headings.**  Headings utilized in this Order are for convenience of reference only, and do not constitute a part of this Order for any other purpose.

40.    **Time Periods.** All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

41.    **Non-severability.**  The provisions of this order are non-severable and mutually dependent.

## __EXHIBIT A__

Asset  Purchase  Agreement

EXHIBIT 1.3

CERTAIN NON-TRANSFERRED EMPLOYEES

[See attached]

1. Farahnik, Leon

2. Maroofian, Ira

3. Delnik, Alex

4. Farahnik, Jason

5. Cruz, Aniceta

6. Milhaupt, Gregg

7. Xia, Daniel

8. Smith, Kimball

9. Diaz, Michele

10. Franco, Jose

11. Costa, Rich

12. Siddhi, Vijendra

EXHIBIT 2.6(A)

FORM OF ESCROW AGREEMENT

[See attached]

## ESCROW AGREEMENT

**THIS ESCROW AGREEMENT** (this "Agreement") is made and entered into as of May__, 2021, by and among TSG Shelf II Acquisition, LLC, a Delaware limited liability company ("Purchaser"), and CarbonLite Industries, LLC, a Delaware limited liability company ( "Seller") (Purchaser and Seller, sometimes referred to individually as a "Party" and collectively as the "Parties"), and Citibank, N.A., as escrow agent (the "Escrow Agent").  Capitalized terms used but not defined herein shall have the meanings assigned to them in that certain Asset Purchase Agreement, dated as of May __, 2021 (as amended from time to time, the "Purchase Agreement"), by and between Purchaser and Seller, Seller being a chapter 11 debtor and debtor in possession in Case No. 21-10527(JTD) (jointly administered) (the "Bankruptcy Case") pending in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") and, solely for the purposes specified therein, CarbonLite Holdings LLC.

## RECITALS

**WHEREAS**, the Purchase Agreement contemplates the execution and delivery of this Agreement and (a) the deposit by Seller's bankruptcy counsel with the Escrow Agent concurrently with the execution and delivery of this Agreement of $4,250,000 (such amount having been previously deposited by Purchaser with the Seller's bankruptcy counsel) (the "Deposit Amount") and (b) the deposit by Purchaser of $1,000,000 on the Closing Date (the "Adjustment Fund Amount" and, together with the Deposit Amount, the "Escrow Funds"), in each case to provide sources of funding solely for the purposes set forth in the Purchase Agreement; and

**WHEREAS**, the Parties wish for such deposits to be subject to the terms and conditions set forth herein and in the Purchase Agreement.

**NOW THEREFORE**, in consideration of the foregoing recitals and of the mutual covenants hereinafter set forth, and other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the parties hereto agree as follows:

1.      Appointment.  The Parties hereby appoint the Escrow Agent as their escrow agent for the purposes set forth herein, and the Escrow Agent hereby accepts such appointment and agrees to act as escrow agent in accordance with the terms and conditions set forth herein.

2.      Escrow Funds.  Concurrently with the execution and delivery of this Agreement, Seller will cause its bankruptcy counsel to deposit with the Escrow Agent the Deposit Amount in immediately available funds into a separate and distinct sub-account (the "Deposit Escrow Account") and, on the Closing Date, Purchaser will deposit with the Escrow Agent the Adjustment Fund Amount in immediately available funds into a separate and distinct sub-account (the "Adjustment Escrow Account" and together with the Deposit Escrow Account, the "Escrow Accounts").  The Escrow Agent hereby acknowledges receipt of the Deposit Amount.

3.      Investment of Escrow Funds.

(a)      Unless otherwise instructed in a joint written notice signed by an Authorized Representative of each of the Parties, the Escrow Agent shall hold the Escrow Funds

in "noninterest-bearing deposit accounts" insured by the Federal Deposit Insurance Corporation ("FDIC") to the applicable limits. The Escrow Funds shall at all times remain available for distribution to the Parties in accordance with Section 4 below.

        (b)      The Escrow Agent shall send an account statement or statements to each of the Parties on a monthly basis reflecting activity in each Escrow Account for the preceding month.

        4.      Disposition of the Escrow Funds and Termination of the Escrow Accounts.

        (a)      Escrow Funds. The Parties shall act in accordance with, and the Escrow Agent shall hold and release the Escrow Funds solely as provided in, this Section 4(a) as follows:

        (i)      Upon receipt of a Joint Release Instruction (as defined herein) with respect to the Escrow Funds (whether held in the Deposit Escrow Account or in the Adjustment Escrow Account), the Escrow Agent shall promptly, but in any event within two Business Days after receipt of such Joint Release Instruction, disburse all or part of the applicable Escrow Funds from the applicable Escrow Account(s) in accordance with such Joint Release Instruction.

        (ii)      Upon distribution of the entire Deposit Amount or Adjustment Fund Amount, Escrow Agent shall close the applicable Escrow Account.

        (iii)      If at any time any of the Parties receives a Final Determination (as defined herein), then upon receipt by the Escrow Agent of a copy of such Final Determination from any Party, the Escrow Agent shall (A) promptly deliver a courtesy copy of such Final Determination to the other Parties and (B) on the fifth Business Day following receipt by the Escrow Agent of the Final Determination, disburse to Purchaser and/or Seller, as applicable, part or all, as the case may be, of the applicable Escrow Funds from the applicable Escrow Account(s) (but only to the extent funds are available in the applicable Escrow Account(s)) in accordance with such Final Determination. Subject to the terms of this Section 4(a), the Escrow Agent will be entitled to act on such Final Determination without further inquiry.

        (iv)      All payments of any part of the Escrow Funds to Purchaser or Seller, as the case may be, shall be made by wire transfer of immediately available funds as set forth in the Joint Release Instruction or Final Determination, as applicable. The Parties shall prepare and deliver to the Escrow Agent any Joint Release Instruction or Final Determination, as applicable, that is required for disbursement (A) in accordance with Section 2.6 of the Purchase Agreement with respect to the Escrow Funds from the Adjustment Escrow Account and (B) in accordance with Section 2.6 and Section 8.3 of the Purchase Agreement with respect to the Escrow Funds from the Deposit Escrow Account.

        (v)      Any instructions setting forth, claiming, containing, objecting to, or in any way related to the transfer or distribution of any funds on deposit in any Escrow Account under the terms of this Agreement must be in writing, executed by the appropriate Party or Parties as evidenced by the signatures of the person or persons set forth on Exhibit A-1 and Exhibit A-2 (an "Authorized Representative") and delivered to the Escrow Agent attached to an e-mail received in accordance with Section 11 below. In the event a Joint Release Instruction or Final Determination is delivered to the Escrow Agent, whether in writing, by e-mail or

otherwise, the Escrow Agent is authorized to seek confirmation of such instruction by telephone call back to the person or persons designated on <u>Exhibit A-1</u> or <u>Exhibit A-2</u> annexed hereto (the "<u>Call Back Authorized Individuals</u>"), and the Escrow Agent may rely upon the confirmations of anyone purporting to be a Call Back Authorized Individual.  To assure the accuracy of the instructions it receives, the Escrow Agent may record such call backs.  If the Escrow Agent is unable to verify the instructions, or is not satisfied with the verification it receives, it will not execute the instruction until all such issues have been resolved; it being understood that the Escrow Agent shall use its commercially reasonable efforts to resolve all such issues.  The persons and telephone numbers for call backs may be changed only in writing, executed by an Authorized Representative of the applicable Party actually received and acknowledged by the Escrow Agent.

(b)      <u>Certain Definitions</u>.

(i)      "<u>Business Day</u>" means any day, other than a Saturday, Sunday or any other day on which banks located in New York, New York are required or authorized by law to be closed.

(ii)      "<u>Final Determination</u>" means (A) a final non-appealable order of any court of competent jurisdiction which may be issued, together with a certificate executed by an Authorized Representative of the prevailing Party to the effect that such order is final and non-appealable and from a court of competent jurisdiction having proper authority, or (B) with respect to the Adjustment Escrow Account, a final determination made by the Independent Auditor as set forth in the Purchase Agreement, and in the case of each of clauses (A) and (B), together with the written payment instructions executed by an Authorized Representative of each Party to whom funds are to be disbursed to effectuate such order.

(iii)      "<u>Joint Release Instruction</u>" means the joint written instruction of Purchaser and Seller which is executed by an Authorized Representative of each of Purchaser and each Seller and delivered to the Escrow Agent directing the Escrow Agent to disburse all or a portion of the Escrow Funds from the Deposit Escrow Account and/or the Adjustment Escrow Account, as applicable.

(iv)      "<u>Person</u>" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization or a governmental entity or any department, agency or political subdivision thereof.

5.      <u>Escrow Agent</u>.  The Escrow Agent undertakes to perform only such duties as are expressly set forth herein, which shall be deemed purely ministerial in nature, and no other duties, including but not limited to any fiduciary duty, shall be implied (other than the implied covenant of good faith and fair dealing).  The Escrow Agent shall neither be responsible for, nor chargeable with, knowledge of, nor have any requirements to comply with, the terms and conditions of any other agreement, instrument or document between the Parties, in connection herewith, if any, including without limitation the Purchase Agreement, nor shall the Escrow Agent be required to determine if any Person has complied with any such agreements, nor shall any additional obligations of the Escrow Agent be inferred from the terms of such agreements,

even though reference thereto may be made in this Agreement.  Notwithstanding the terms of any other agreement between the Parties, the terms and conditions of this Agreement will control the action of the Escrow Agent.  The Escrow Agent may rely upon and shall not be liable for acting or refraining from acting upon any Joint Release Instruction or Final Determination furnished to it hereunder and reasonably believed by it to be genuine and to have been signed by an Authorized Representative of the proper Party or Parties.  Concurrent with the execution of this Agreement, the Parties shall deliver to the Escrow Agent authorized signers' forms in the form of Exhibit A-1 and Exhibit A-2 attached hereto.  The Escrow Agent shall be under no duty to inquire into or investigate the validity, accuracy or content of any such document, notice, instruction or request.  The Escrow Agent shall have no duty to solicit any payments which may be due it or the Escrow Funds.  In the event that the Escrow Agent, acting reasonably, shall be uncertain as to its duties or rights hereunder or shall receive instructions, claims or demands from any Party hereto which, in its opinion, conflict with any of the provisions of this Agreement, it shall be entitled to refrain from taking any action and its sole obligation shall be to keep safely all property held in escrow until it shall be directed otherwise in a Joint Release Instruction or Final Determination.  The Escrow Agent may interplead all of the assets held hereunder into a court of competent jurisdiction or may seek a declaratory judgment with respect to certain circumstances, and thereafter be fully relieved from any and all liability or obligation with respect to such interpleaded assets or any action or nonaction based on such declaratory judgment.  The Escrow Agent may consult with legal counsel of its selection in the event of any dispute or question as to the meaning or construction of any of the provisions hereof or its duties hereunder.  The Escrow Agent will not be liable for any action taken, suffered or omitted to be taken by it in good faith pursuant to this Agreement except to the extent that the Escrow Agent's fraud, gross negligence or willful misconduct was the cause of any direct losses or damages to any Party or the Escrow Funds.  To the extent practicable, the Parties agree to pursue any redress or recourse in connection with any dispute (other than with respect to a dispute involving the Escrow Agent) without making the Escrow Agent a party to the same.  Anything in this Agreement to the contrary notwithstanding, in no event shall the Escrow Agent be liable for any special, indirect, punitive, incidental or consequential losses or damages of any kind whatsoever (including but not limited to lost profits), even if the Escrow Agent has been advised of the likelihood of such losses or damages and regardless of the form of action.  Notwithstanding anything to the contrary herein, in no event shall the Parties' remedies against the Escrow Agent, the Escrow Agent's liabilities hereunder, or any limitations or protections in favor of the Escrow Agent set forth in this Section 5 (including, without limitation, any limitations on losses or damages or the knowledge of the Escrow Agent), be limited, prohibited or restricted in the event of the Escrow Agent's fraud or willful misconduct.

6.    Resignation and Removal of Escrow Agent.  The Escrow Agent (a) may resign and be discharged from its duties or obligations hereunder by giving 30 calendar days' advance notice in writing of such resignation to the Parties specifying a date when such resignation shall take effect or (b) may be removed, with or without cause, by Purchaser and Seller acting jointly at any time by providing a joint written notice to the Escrow Agent.  Any corporation or association into which the Escrow Agent may be merged or converted or with which it may be consolidated, or any corporation or association to which all or substantially all of the escrow business of the Escrow Agent's line of business may be transferred, shall be the Escrow Agent under this Agreement without further act.  The Escrow Agent's sole responsibility after such 30-day notice period expires or after receipt of written notice of removal shall be to hold and

safeguard the Escrow Funds (without any obligation to reinvest the same) and to deliver the same (i) to a substitute or successor escrow agent pursuant to a joint written designation from the Parties, (ii) as set forth in a Joint Release Instruction or (iii) in accordance with the directions of a Final Determination, and, at the time of such delivery, the Escrow Agent's obligations hereunder shall cease and terminate. In the event the Escrow Agent resigns, if the Parties have failed to appoint a successor escrow agent prior to the expiration of 30 calendar days following receipt of the notice of resignation, the Escrow Agent may petition any court of competent jurisdiction for the appointment of such a successor escrow agent or for other appropriate relief, and any such resulting appointment shall be binding upon all of the parties hereto.

       7.    <u>Fees and Expenses</u>. All fees and expenses of the Escrow Agent are waived as described in <u>Schedule 1</u> attached hereto.

       8.    <u>Indemnity</u>. Each of the Parties shall jointly and severally indemnify, defend and hold harmless the Escrow Agent and its affiliates and their respective successors, assigns, directors, officers, agents and employees (the "<u>Indemnitees</u>") from and against any and all losses, damages, claims, liabilities, penalties, judgments, settlements, actions, suits, proceedings, litigation, investigations, costs or expenses (including the reasonable and documented fees and expenses of one outside counsel and experts and their staffs and all expense of document location, duplication and shipment) (collectively "<u>Escrow Agent Losses</u>") arising out of or in connection with (a) the Escrow Agent's execution and performance of this Agreement, tax reporting or withholding, the enforcement of any rights or remedies under or in connection with this Agreement, or as may arise by reason of any act, omission or error of the Indemnitee, or (b) its compliance with any instructions or other directions from Purchaser or Seller. Notwithstanding anything to the contrary herein, Purchaser and Seller agree, solely as between themselves, that any obligation for indemnification under this <u>Section 8</u> (or for reasonable and documented fees and expenses of the Escrow Agent described in <u>Section 7</u>) shall be borne by the Party or Parties determined by a court of competent jurisdiction to be responsible for causing the loss, damage, liability, cost or expense against which the Escrow Agent is entitled to indemnification or, if no such determination is made, then 50% by Purchaser and 50% by Seller. The Parties hereto acknowledge that the foregoing indemnities shall survive the resignation or removal of the Escrow Agent or the termination of this Agreement. In connection with clause (a) above, in no event shall any Indemnitee be indemnified, defended or held harmless in respect of any Escrow Agent Losses in the event of any fraud, gross negligence or willful misconduct of such Indemnitee (as adjudicated by a court of competent jurisdiction).

       9.    <u>Tax Matters</u>.

       (a)    Prior to the date hereof, the Parties shall provide (or shall cause to be provided) the Escrow Agent with certified tax identification numbers by furnishing appropriate forms W-9 or W-8 as applicable and such other forms and documents that the Escrow Agent may reasonably request.

       (b)    The Escrow Agent shall be responsible only for income reporting, if any, to the Internal Revenue Service with respect to income earned on the Escrow Funds. The Escrow Agent shall withhold any taxes required to be withheld by applicable law, including but

not limited to required withholding in the absence of proper tax documentation, and shall remit such taxes to the appropriate authorities.

(c)    The Escrow Agent, its affiliates, and its employees are not in the business of providing tax or legal advice to any taxpayer outside of Citigroup, Inc. and its affiliates.  This Agreement and any amendments or attachments hereto are not intended or written to be used, and may not be used or relied upon, by any such taxpayer or for the purpose of avoiding tax penalties.    Any such taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor.

10.    Covenant of Escrow Agent.  The Escrow Agent hereby agrees and covenants with Purchaser and Seller that it shall perform all of its obligations under this Agreement and shall not deliver custody or possession of any of the Escrow Funds to anyone except pursuant to the express terms of this Agreement or as otherwise required by law.

11.    Notices.  All notices, requests, demands and other communications required under this Agreement shall be in writing, in English, and shall be deemed to have been duly given if delivered (i) personally, (ii) on the day of transmission if sent by electronic mail ("e-mail") with a PDF attachment executed by an authorized signer of the Party/Parties to the e-mail address given below, provided, no "bounce-back", system error message or other notification of non-delivery is received by the sender, (iii) by overnight delivery with a reputable national overnight delivery service, or (iv) by mail or by certified mail, return receipt requested, and postage prepaid.  If any notice is sent pursuant to clause (iv) of the immediately preceding sentence, it shall be deemed given upon the earlier to occur of (A) the date that is five Business Days after the date such notice is deposited with the United States Postal Service and (B) the actual receipt of such notice by the intended recipient thereof.  If notice is given to a Party, it shall be given at the address for such Party set forth below. It shall be the responsibility of the Parties to notify the Escrow Agent and the other Party in writing of any name or address changes.

if to Purchaser, then to:

TSG Shelf II Acquisition, LLC
c/o The Sterling Group, L.P.
9 Greenway Plaza, Suite 2400
Houston, Texas 77046
Attention:  Scott Maclaren; Max Klupchak
Email: smaclaren@sterling-group.com; mklupchak@sterling-group.com

with a copy (which shall not constitute notice) to:

Willkie Farr & Gallagher LLP
600 Travis Street, Suite 2100
Houston, TX  77002
Attention: Bruce C. Herzog and Paul Shalhoub
Email:  bherzog@willkie.com and pshalhoub@willkie.com

if to Seller, then to:

        CarbonLite Industries, LLC
        c/o Force 10 Partners
        5271 California Avenue, Suite 270
        Irvine, CA  92617
        Attn:  Mr. Brian Weiss
        Email:  bweiss@force10partners.com


        with a copy (which shall not constitute notice) to:

        Pachulski Stang Ziehl & Jones LLP
        10100 Santa Monica Blvd., 13th Floor
        Los Angeles, CA  90067
        Attention: Gabriel I Glazer, Esq. and Steven W. Golden, Esq.
        Email:  gglazer@pszjlaw.com and sgolden@pszjlaw.com


or, if to the Escrow Agent, then to:

        Citibank, N.A.
        c/o Citi Private Bank
        388 Greenwich St., 29th Fl
        New York, NY  10013
        Attention:    Rola Tseng-Pappalardo
        E-mail:        rola.tsengpappalardo@citi.com

Notwithstanding the above, in the case of notices, requests, demands or other communications delivered to the Escrow Agent pursuant to the foregoing clause (i) through (iii) of this Section 11, such communications shall be deemed to have been given on the date received by the Escrow Agent.  In the event that the Escrow Agent, in its sole discretion, shall determine that an emergency exists, the Escrow Agent may use such other means of communication as the Escrow Agent deems appropriate.

      12.    Termination.    This Agreement shall terminate on the first to occur of (a) the distribution of all of the amounts in the Escrow Funds in accordance with this Agreement or (b) delivery to the Escrow Agent of a written notice of termination executed jointly by Purchaser and Seller after which this Agreement shall be of no further force and effect except that the provisions of Section 8 hereof shall survive termination.

      13.    Miscellaneous.    The provisions of this Agreement may be waived, altered, amended or supplemented, in whole or in part, only by a writing signed by all of the parties hereto.  Neither this Agreement nor any right or interest hereunder may be assigned in whole or in part by any party, except as provided in Sections 6 and 16, without the prior consent of the other parties.  This Agreement shall be governed by and construed under the laws of the State of Delaware without regard to any conflicts of law, rules or principles that would result in the

application of the laws of any other jurisdiction. Notwithstanding anything to the contrary in this Agreement, each Party to this Agreement hereby irrevocably (i) waives any objection on the grounds of venue, forum non-conveniens or any similar grounds, (ii) consents to service of process by mail or in any other manner permitted by applicable law, and (iii) consents to the exclusive jurisdiction of the Bankruptcy Court over all disputes, matters and issues arising under or relating to the interpretation or enforcement of this Agreement (including, without limitation, any interpleader Escrow Agent may hereafter bring or file in connection with this Agreement). The parties hereto hereby waive any right to a trial by jury with respect to any lawsuit or judicial proceeding arising from or relating to this Agreement. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. All signatures of the parties to this Agreement may be transmitted by electronic transmission in portable document format (.pdf), and such .pdf will, for all purposes, be deemed to be the original signature of such party whose signature it reproduces, and will be binding upon such party. If any provision of this Agreement is determined to be prohibited or unenforceable by reason of any applicable law of a jurisdiction, then such provision shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions thereof, and any such prohibition or unenforceability in such jurisdiction shall not invalidate or render unenforceable such provisions in any other jurisdiction. Each Party represents, warrants and covenants to the Escrow Agent, solely with respect to such Party, that each document, notice, instruction or request provided by such Party to the Escrow Agent shall comply with applicable laws and regulations and the applicable provisions of the Purchase Agreement. Where, however, the conflicting provisions of any such applicable law may be waived, they are hereby irrevocably waived by the parties hereto to the fullest extent permitted by law, to the end that this Agreement shall be enforced as written. Except as expressly provided in <u>Sections 7</u> and <u>8</u>, nothing in this Agreement, whether express or implied, shall be construed to give to any person or entity other than the Escrow Agent and the Parties (and their successors and any permitted assignees) any legal or equitable right, remedy, interest or claim under or in respect of this Agreement or any funds escrowed hereunder.

14.    <u>Compliance with Court Orders</u>. In the event that any escrow property shall be attached, garnished or levied upon by any court order, or the delivery thereof shall be stayed or enjoined by an order of a court, or any order, judgment or decree shall be made or entered by any court order affecting the property deposited under this Agreement, the Escrow Agent is hereby expressly authorized, in its sole discretion, to obey and comply with all writs, orders or decrees so entered or issued, which it is advised by legal counsel of its own choosing is binding upon it, whether with or without jurisdiction, and in the event that the Escrow Agent obeys or complies with any such writ, order or decree it shall not be liable to any of the Parties or to any other Person, by reason of such compliance notwithstanding such writ, order or decree be subsequently reversed, modified, annulled, set aside or vacated.

15.    <u>Further Assurances</u>. Following the date hereof, each party hereto shall deliver to the other parties hereto such further information and documents and shall execute and deliver to the other parties hereto such further instruments and agreements as any other party hereto shall reasonably request to consummate or confirm the transactions provided for herein, to accomplish the purpose hereof or to assure to any other party hereto the benefits hereof; provided, however, as between Purchaser and Seller, nothing herein shall be deemed to require them to execute or

deliver any of the foregoing to the extent they would not be required to provide the same pursuant to Section 10.9 of the Purchase Agreement.

16.    <u>Assignment</u>.  No assignment of the interest of any of the Parties hereto shall be binding upon the Escrow Agent unless and until written notice of such assignment shall be filed with and consented to by the Escrow Agent (such consent not to be unreasonably withheld, conditioned or delayed).  Any transfer or assignment of the rights, interests or obligations hereunder in violation of the terms hereof shall be void and of no force or effect.

17.    <u>Force Majeure</u>.  The Escrow Agent shall not incur any liability for not performing any act or fulfilling any obligation hereunder by reason of any occurrence beyond its control (including, but not limited to, any provision of any present or future law or regulation or any act of any governmental authority, any act of God or war or terrorism, or the unavailability of the Federal Reserve Bank wire services or any electronic communication facility), it being understood that the Escrow Agent shall use commercially reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as reasonably practicable under the circumstances.

18.    <u>Compliance with Federal Law</u>. To help the U.S. Government fight the funding of terrorism and money laundering activities and to comply with Federal law requiring financial institutions to obtain, verify and record information on the source of funds deposited to an account, the Parties agree to provide the Escrow Agent with the name, address, taxpayer identification number, and remitting bank for all Parties depositing funds at Citibank pursuant to the terms and conditions of this Agreement.  For a non-individual Person such as a business entity, a charity, a trust or other legal entity, the Escrow Agent will ask for documentation to verify its formation and existence as a legal entity.  The Escrow Agent may also ask to see financial statements, licenses, an identification and authorization documents from individuals claiming authority to represent the entity or other relevant documentation.

19.    <u>Use of Citibank Name</u>.  Except as requested or required by applicable law, rule or regulation, by any governmental authority, self-regulatory authority or regulatory auditor, or by any order, subpoena or legal, regulatory or self-regulatory procedure, proceeding or process, no publicly distributed printed or other material in any language, including prospectuses, notices, reports, and promotional material which mentions "Citibank" by name or the rights, powers, or duties of the Escrow Agent under this Agreement shall be issued by any other parties hereto, or on such party's behalf, without the prior written consent of the Escrow Agent.

20.    <u>Publication; Disclosure</u>.  By executing this Agreement, the Parties and the Escrow Agent acknowledge that this Agreement (including all related attachments) contains certain information that is sensitive and confidential in nature and agree that such information needs to be protected from improper disclosure, including the publication or dissemination of this Agreement and related information to Persons that are not a party to this Agreement.  The Parties and the Escrow Agent each further agree to take commercially reasonable measures to mitigate any risks associated with the publication or disclosure of this Agreement and/or any of the information contained herein (including all related attachments).  If any Party or the Escrow Agent becomes aware of any threatened or actual unauthorized disclosure, publication or use of this Agreement and/or any of the information contained herein (including all related

attachments), such Person shall promptly notify each other Party and the Escrow Agent in writing thereof.  Further, the Parties and the Escrow Agent agree that (i) any Party's or the Escrow Agent's disclosure of information as may be requested or required by applicable law, rule or regulation, by any governmental authority, self-regulatory authority or regulatory auditor, or by any order, subpoena or legal, regulatory or self-regulatory procedure, proceeding or process, and/or (ii) Seller's disclosure of this Agreement or any information contained herein pursuant to any filing Seller may be required to make (or which may be appropriate to make) in the Bankruptcy Case, shall not be considered an unauthorized release or disclosure.

\*   \*   \*   \*   \*

42992706.2
DOCS_LA:337525.3 13044/001

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date set forth above.

PURCHASER:

**TSG SHELF II ACQUISITION, LLC**

By: _____
Name: Scott MacLaren
Title:  Authorized Person

SELLER:

**CARBONLITE INDUSTRIES, LLC**

By: _____
Name: Brian Weiss
Title:  Chief Restructuring Officer

ESCROW AGENT:

**CITIBANK, N.A.**

By: _____
Name: _____
Title: _____

*Signature Page To Escrow Agreement*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date set forth above.

<u>PURCHASER</u>:

**TSG SHELF II ACQUISITION, LLC**

By: _____
Name: _____
Title: _____

<u>SELLER</u>:

**CARBONLITE INDUSTRIES, LLC**

By: _____
Name: <u>Brian Weiss</u>
Title: <u>Chief Restructuring Officer</u>

<u>ESCROW AGENT</u>:

**CITIBANK, N.A.**

By: _____
Name: _____
Title: _____

*Signature Page to Escrow Agreement*

## Schedule 1

**ESCROW AGENT FEE SCHEDULE**
**Citibank, N.A., Escrow Agent**

**Acceptance Fee**

To cover the acceptance of the Escrow Agency appointment, the study of this Agreement, and supporting documents submitted in connection with the execution and delivery thereof, and communication with other members of the working group:

**Fee: Waived**

**Administration Fee**

The annual administration fee covers maintenance of the Escrow Accounts including safekeeping of assets in the Escrow Accounts, normal administrative functions of the Escrow Agent, including maintenance of the Escrow Agent's records, follow-up of this Agreement's provisions, and any other safekeeping duties required by the Escrow Agent under the terms of this Agreement. Fee is based on the Escrow Funds being deposited in a non-interest bearing deposit account, FDIC insured to the applicable limits.

**Fee: Waived**

**Tax Preparation Fee**

To cover preparation and mailing of Forms 1099-INT, if applicable for the Parties for each calendar year:

**Fee: Waived**

**Transaction Fees**

To oversee all required disbursements or release of property from the Escrow Accounts to any Party, including cash disbursements made via check and/or wire transfer, fees associated with postage and overnight delivery charges incurred by the Escrow Agent as required under the terms and conditions of this Agreement:

**Fee: Waived**

**Other Fees**

Material amendments to this Agreement: additional fee(s), if any, to be discussed at time of amendment.

<u>EXHIBIT A-1</u>

<u>Certificate as to Purchaser's Authorized Signatures</u>

The specimen signatures shown below are the specimen signatures of the individuals who have been designated as authorized representatives of Purchaser and are authorized to initiate and approve transactions of all types for the Escrow Accounts on behalf of Purchaser. The below listed persons (must list at least two individuals) have also been designated Call Back Authorized Individuals and will be notified by Citibank N.A. upon the release of any Escrow Funds from the Escrow Account(s) unless an original "Standing or Predefined Instruction" letter is on file with the Escrow Agent.

<u>Name / Title / Telephone</u>                  <u>Specimen Signature</u>

Scott Maclaren
Name                                          Signature

Authorized Person
Title

214-202-7129                                  713-341-5758
Phone                                         Mobile Phone


Gary Rosenthal
Name                                          Signature

Authorized Person
Title

713-341-5741
Phone                                         Mobile Phone


Max Klupchak
Name                                          Signature

Authorized Person
Title

713-341-5740                                  608-345-2338
Telephone                                     Mobile Phone


NOTE: Actual signatures are required above. Execution by DocuSign, initiated by Citibank, is available upon request. Please contact your Citi Private Bank representative for further details and instructions. During COVID-19 crisis, if possible, please include alternative number, preferably mobile.

*Signature Page to Escrow Agreement*

EXHIBIT A-1

Certificate as to Purchaser's Authorized Signatures

The specimen signatures shown below are the specimen signatures of the individuals who have been designated as authorized representatives of Purchaser and are authorized to initiate and approve transactions of all types for the Escrow Accounts on behalf of Purchaser. The below listed persons (must list at least two individuals) have also been designated Call Back Authorized Individuals and will be notified by Citibank N.A. upon the release of any Escrow Funds from the Escrow Account(s) unless an original "Standing or Predefined Instruction" letter is on file with the Escrow Agent.

| Name / Title / Telephone | Specimen Signature |
|---|---|
| Scott Maclaren | |
| Name | Signature |
| | |
| Authorized Person | |
| Title | |
| | |
| 214-202-7129 | 713-341-5758 |
| Phone | Mobile Phone |
| | |
| Gary Rosenthal | |
| Name | Signature |
| | |
| Authorized Person | |
| Title | |
| | |
| 713-341-5741 | |
| Phone | Mobile Phone |
| | |
| Max Klupchak | |
| Name | Signature |
| | |
| Authorized Person | |
| Title | |
| | |
| 713-341-5740 | 608-345-2338 |
| Telephone | Mobile Phone |

NOTE: Actual signatures are required above. Execution by DocuSign, initiated by Citibank, is available upon request. Please contact your Citi Private Bank representative for further details and instructions. During COVID-19 crisis, if possible, please include alternative number, preferably mobile.

*Signature Page to Escrow Agreement*

EXHIBIT A-1

Certificate as to Purchaser's Authorized Signatures

The specimen signatures shown below are the specimen signatures of the individuals who have been designated as authorized representatives of Purchaser and are authorized to initiate and approve transactions of all types for the Escrow Accounts on behalf of Purchaser.  The below listed persons (must list at least two individuals) have also been designated Call Back Authorized Individuals and will be notified by Citibank N.A. upon the release of any Escrow Funds from the Escrow Account(s) unless an original "Standing or Predefined Instruction" letter is on file with the Escrow Agent.

Name / Title / Telephone            Specimen Signature

Scott Maclaren
Name                                         Signature

Authorized Person
Title

214-202-7129                       713-341-5758
Phone                                    Mobile Phone

Gary Rosenthal
Name                                         Signature

Authorized Person
Title

713-341-5741
Phone                                    Mobile Phone

Max Klupchak
Name                                         Signature

Authorized Person
Title

713-341-5740                       608-345-2338
Telephone                               Mobile Phone

NOTE: Actual signatures are required above. Execution by DocuSign, initiated by Citibank, is available upon request.  Please contact your Citi Private Bank representative for further details and instructions. During COVID-19 crisis, if possible, please include alternative number, preferably mobile.

*Signature Page to Escrow Agreement*

## EXHIBIT A-2

### Certificate as to Seller's Authorized Signatures

The specimen signatures shown below are the specimen signatures of the individuals who have been designated as authorized representatives of Seller and are authorized to initiate and approve transactions of all types for the Escrow Accounts on behalf of Seller.  The below listed persons (must list at least two individuals) have also been designated Call Back Authorized Individuals and will be notified by Citibank N.A. upon the release of any Escrow Funds from the Escrow Account(s) unless an original "Standing or Predefined Instruction" letter is on file with the Escrow Agent.

<u>Name / Title / Telephone</u>                                 <u>Specimen Signature</u>

Brian Weiss
_____          _____
Name                                               Signature

Chief Restructuring Officer
_____
Title

949-357-2368                                      949-933-7011
_____          _____
Phone                                              Mobile Phone


_____          _____
Name                                               Signature


_____
Title


_____          _____
Phone                                              Mobile Phone


NOTE: Actual signatures are required above. Execution by DocuSign, initiated by Citibank, is available upon request.  Please contact your Citi Private Bank representative for further details and instructions. During COVID-19 crisis, if possible, please include alternative number, preferably mobile.

EXHIBIT 2.6(C)

APPLICABLE METHODOLOGY

[See attached]

**Schedule 2.6(c): Estimated Closing Statement Methodology**
Riverside Facility

*Cash Consideration*

| | | | Methodology 3/31/21 | Closing Estimate | |
|---|---|---|---|---|---|
| | | | | | Notes: |
| | | (i) the amount of: | $22,500,000 | | (A) Aggregate amount of all Cash or Cash Equivalents backing or securing the Acquired L/Cs as of the |
| A | plus | Cash or Cash Equivalent backed L/Cs | $500,000 | | Closing Date in the amount set forth on Schedule 2.1(m) (the "L/C Consideration") |
| B | minus | L/C draw amount | $0 | | (B) any amounts drawn under any Acquired L/C as of the Closing Date |
| C | minus | Cure Costs Escrowed by Purchaser | $0 | | (C) the amount of any Cure Costs paid or escrowed by Purchaser in accordance with Section 5.1: |
| D | plus/minus | NWC vs Target | $ 10,696,861 | | (D) the amount, if any, by which the Net Working Capital as of the Closing Date is greater or less than, |
| | | | | | as applicable, the Target Closing net Working Capital  (CALCULATION BELOW) |
| E | plus/minus | Non-Tax Prorations | $0 | | (E) the Non-Tax Prorations |
| F | minus | Transfer Taxes | $0 | | (F) Transfer taxes to the extent not paid by Seller at closing |
| | | **Estimated Cash Consideration:** | **$33,696,861** | | |

*Net Working Capital*

| | | | 3/31/2021 Balance | Closing Estimate | |
|---|---|---|---|---|---|
| Total Current Assets | | | | | Closing Estimate and Final calculation shall include ONLY Accounts Receivable that have been |
| | *Acquired Receivables* | | | | outstanding for less than 120 days; other than those certain Accounts Receivable related to the |
| A | | Accounts Receivable | $ 6,040,308 | | customer 'Cal Recycle'.  Also shall not include any AR for Niagara, Everrank, Bantam Materials, Banyan |
| | | | | | Plastics, Worldwide of New York, GP Harmon Recycling, Reterra, Indorama, or Encina Renewables. |
| | *plus Acquired Inventories* | | | | |
| B | | Inventory | $ 4,887,470 | | Closing Estimate and Final calculation shall include ONLY Inventory aged less than 90 days |
| | plus Prepaid Assets | | | | |
| C | | Lease Security Deposits (minus 1 month rent) | $ - | | Closing Estimate and Final calculation shall include cash deposits (excluding L/C Consideration cash |
| D | | Prepaid Contracts | $ - | | amounts, and 1 month's fixed rent in eash lease security deposit), advance payments and other prepaid |
| E | | Vendor Deposits - pre and post petition | $ 958,251 | | items as listed on Schedule 3.6(g) Prepaid Assets. |
| F | | Current Assets: F = A+B+C+D+E | $ 11,886,029 | | |
| *minus* | | | | | |
| Total Current Liabilities | | | | | |
| | Trade Payables | | | | |
| G | | Trade Payables | $ 476,866 | | |
| | plus Accrued Expenses | | | | |
| H | | Accrued Tax Prorations | $ 134,596 | | Closing Estimate and Final Calculation shall include Employees on Schedule 3.9( |
| I | | Accrued Payroll | $ 375,926 | | Closing Estiamte and Final calculation shall include Employees on Schedule 3.9( |
| J | | Accrued Paid Time Off | $ 336,375 | | Closing Estiamte and Final calculation shall include Employees on Schedule 3.9( |
| K | | Current Liabilities: K = G+H+I+J | $ 1,189,168 | | |
| L | | NWC:  L = F - K | $ 10,696,861 | | |
| | | Target Net Working Capital | 0 | | |
| | | **NWC vs Target** | **$ 10,696,861** | **$ -** | Result used in Cash Consideration Calculation |

Notes:
All definitions referenced relate to Asset Purchase Agreement
Amounts above reflect 3/31/21 balance sheet data included in file 'Working Capital Statement (04.21.21)' provided in Datasite data room
CA or Riverside refers to legal entity CarbonLITE Industries LLC

EXHIBIT 2.7(B)(I)

FORM OF BILL OF SALE, ASSIGNMENT AND ASSUMPTION

[See attached]

## BILL OF SALE, ASSIGNMENT AND ASSUMPTION

This Bill of Sale, Assignment and Assumption (this **"Bill of Sale"**) is entered into as of this ___th day of [_____], 2021, between CarbonLITE Industries, LLC, a Delaware limited liability company (**"Seller"**), Seller being a chapter 11 debtor and debtor in possession in Case No. 21-10527(JTD) (jointly administered) (the **"Bankruptcy Case"**) pending in the United States Bankruptcy Court for the, on the one hand, and TSG Shelf II Acquisition, LLC, a Delaware limited liability company (the **"Purchaser"**), on the other hand, with respect to the following facts and circumstances:

A.     Seller and Purchaser, have heretofore entered into that certain Asset Purchase Agreement dated May __, 2021 (the **"Purchase Agreement"**).  Except for terms specifically defined herein, the capitalized terms used in this Bill of Sale shall have the same meanings as capitalized terms used in the Purchase Agreement.

B.     Concurrently with the mutual execution and delivery of this Bill of Sale, Seller and Purchaser are consummating the transactions contemplated by the Purchase Agreement. Seller and Purchaser are executing and delivering this Bill of Sale in satisfaction of their respective obligations pursuant to Section 2.7(b)(i) and Section 2.7(c)(iv) of the Purchase Agreement.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and adequacy of which Seller and Purchaser hereby acknowledge, Seller and Purchaser hereby agree as follows:

1.     Transfer.  Effective as of the Closing Date, Seller hereby sells, conveys, transfers, assigns and delivers to Purchaser, and Purchaser purchases and accepts from Seller, good title in and to the Purchased Assets free and clear of all Liens to the extent provided in the Sale Order except for Permitted Post-Closing Encumbrances (other than the Acquired Intellectual Property Rights, which are being transferred to Purchaser concurrently herewith pursuant to a separate assignment document).  Notwithstanding anything in this Bill of Sale to the contrary, nothing in this Bill of Sale will be construed as conveying any right, title or interest in or to any of the Excluded Assets.

2.     Assumption.  Effective as of the Closing Date, Purchaser hereby accepts the foregoing assignment and assumes and agrees to be bound by the terms and provisions of the Assumed Liabilities.  Notwithstanding anything in this Bill of Sale to the contrary, nothing in this Bill of Sale will be construed as conveying any right, title or intent in or to any of the Excluded Liabilities.

3.     Amendments.   This Bill of Sale may only be amended by a writing signed by both Seller and Purchaser.

4.     Execution in Counterparts.  This Bill of Sale may be executed in counterparts and delivered by the delivery of facsimile or electronic mail signatures; provided, however, that if the

42992757.2

parties exchange signatures by facsimile or electronic mail, each of them agrees to provide the other with a copy of this Bill of Sale bearing their original signature promptly following any request therefor from another party hereto.

5. <u>Delivery Pursuant to Purchase Agreement</u>.  Notwithstanding anything to the contrary herein, Seller and Purchaser are executing and delivering this Bill of Sale in accordance with and subject to all of the terms and provisions of the Purchase Agreement.  To the extent that any provision of this instrument conflicts or is inconsistent with the terms or provisions of the Purchase Agreement, the Purchase Agreement will govern and control and the superseded term or provision hereof shall be of no force or effect whatsoever.

6. <u>Governing Law</u>.  This Bill of Sale shall be governed by and construed and enforced in accordance with the laws of the State of Delaware.

7. <u>Subsequent Action</u>.  Pursuant to Section 10.9 of the Purchase Agreement, Seller will execute and deliver to Purchaser, its successors and assigns, all such other and further instruments of sale, assignment, transfer, conveyance, delivery, and all such notices, releases and other documents that would more fully and specifically sell, assign, transfer, convey and deliver to and vest in Purchaser, its successors and assigns, the title of such Seller in and to all and any of the Purchased Assets sold, assigned, transferred, conveyed or delivered or intended to be sold, assigned, transferred, conveyed and delivered (without imposing any material monetary obligations or other obligations beyond those specifically imposed on the cooperating party(ies) by the  provisions of the Purchase Agreement). To the extent that, with respect to any of the Purchased Assets, no assignment document other than this Bill of Sale is executed, the parties intend for this Bill of Sale to constitute the sale, assignment, transfer, conveyance and delivery of such Purchased Assets.

*[Balance of Page Intentionally Left Blank]*

42992757.2

**IN WITNESS WHEREOF**, Seller and Purchaser have executed this Bill of Sale, Assignment and Assumption as of the day and year first set forth above.

**SELLER**:

**Carbon LITE Industries, LLC, a Delaware
limited liability company
and Debtor and Debtor in Possession**


By:_____
Name: _____
Its:  _____


**PURCHASER**:

**TSG Shelf II Acquisition, LLC, a Delaware
limited liability company**


By:_____
Name: _____
Its:  _____

- 3 -

EXHIBIT 2.7(B)(II)

FORM OF IP ASSIGNMENT

[See attached]

## <u>ASSIGNMENT OF INTELLECTUAL PROPERTY RIGHTS</u>

This Assignment of Intellectual Property Rights (this **"Assignment"**) is entered into as of this ___th day of [_____], 2021,  between, CarbonLITE Industries, LLC, a Delaware limited liability company (**"Seller"**), Seller being a chapter 11 debtor and debtor in possession in Case No. 21-10527(JTD) (jointly administered) (the "Bankruptcy Case") pending in the United States Bankruptcy Court for the, on the one hand, and TSG Shelf II Acquisition, LLC, a Delaware limited liability company (the **"Purchaser"**), on the other hand, with respect to the following facts and circumstances:

(A)    Seller and Purchaser have heretofore entered into that certain Asset Purchase Agreement dated May _____, 2021 (the **"Agreement"**).  Except for terms specifically defined in this Assignment, the capitalized terms used in this Assignment shall have the same meanings as such terms when used in the Agreement.

(B)    Concurrently with the execution and delivery of this Assignment, Seller and Purchaser are consummating the transactions contemplated by the Agreement.  Pursuant to Section 2.7(b)(ii) of the Agreement, Seller is required to execute and deliver this Assignment at the Closing.

**NOW, THEREFORE, FOR GOOD AND VALUABLE CONSIDERATION**, the receipt and sufficiency of which Seller hereby expressly acknowledges, Seller, as to itself, hereby assigns, conveys, transfers and sets over unto Purchaser, all of its right, title and interest, if any, in and to all Acquired Intellectual Property Rights, including, but not limited to, the Acquired Intellectual Property listed in Schedule A to this Assignment, and including all claims, causes of action and rights of recovery arising from or relating to the Acquired Intellectual Property Rights. This Assignment shall inure to the benefit of, and be binding upon, the successors, executors, administrators, legal representatives and assigns of Seller and Purchaser.

This Assignment may only be amended by a writing signed by both Seller and Purchaser.

This Assignment may be executed in counterparts and delivered by the delivery of facsimile or electronic mail signatures; provided, however, that if the parties exchange signatures by facsimile or electronic mail, each of them agrees to provide the other with a copy of this Assignment bearing their original signature promptly following any request therefor from another party hereto.

Pursuant to Section 10.9 of the Agreement, upon the reasonable request of Purchaser or Seller, each party shall do and perform, or cause to be done and performed, all such further acts and things, and shall execute and deliver all such other agreements, certificates, instruments and documents, as the other party may reasonably request in order to carry out the intent and accomplish the purposes of this Assignment and the consummation of the transactions contemplated hereby (without imposing any material monetary obligations or other obligations beyond those specifically imposed on the cooperating party(ies) by the provisions of the Agreement).  The Parties acknowledge that this Agreement may be filed with the U.S. Patent and Trademark Office.

Notwithstanding anything to the contrary herein, Seller is executing and delivering this Assignment in accordance with and subject to all of the terms and provisions of the Agreement (including, without limitation, the acknowledgements and disclaimer set forth in Sections 3.22 and 4.5 thereof).

This Assignment shall be governed by and construed and enforced in accordance with the laws of the State of Delaware.

42992760.2

**IN WITNESS WHEREOF**, Seller and Purchaser have executed this Assignment of Intellectual Property Rights as of the ___ day of  [_____], 2021.

**SELLER:**

**Carbon LITE Industries, LLC, a Delaware limited liability company and Debtor and Debtor in Possession**

By:_____

Name: _____

Its:

**PURCHASER:**

**TSG Shelf II Acquisition, LLC, a Delaware limited liability company**

By:_____

Name: _____

Its:

42992760.2

**<u>Schedule A</u>**

**Registered Trademarks**

| Trademark Text | Registration Number | Country |
|---|---|---|
| CARBONLITE | 4242388 | United States |
| CARBONLITE | 4492569 | United States |

**Patents, Copyrights, Trademarks**

The name "CarbonLITE" and any similar names indicating affiliation with any Affiliates of the Sellers, the Business, or the Purchased Assets.

**Domain Names**

http://www.carbonliterecycling.com/

42992760.2

EXHIBIT 2.7(B)(VI)

FORM OF REAL PROPERTY ASSIGNMENT AND ASSUMPTION AGREEMENT

[See attached]

## REAL PROPERTY LEASE ASSIGNMENT AND ASSUMPTION AGREEMENT

**THIS REAL PROPERTY LEASE ASSIGNMENT AND ASSUMPTION AGREEMENT** (this "Assignment"), dated as of May_____, 2021 (the "Effective Date"), is entered into by and between CarbonLITE Industries, LLC, a Delaware limited liability company ("Assignor"), Assignor being a chapter 11 debtor and debtor in possession in Case No. Case No. 21-10527(JTD) (jointly administered) (the "Bankruptcy Case") pending in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), on the one hand, and TSG Shelf II Acquisition, LLC, a Delaware limited liability company (the "Assignee"), on the other hand, with respect to the following facts and circumstances:

A.    Assignor (and Affiliates of Assignor), on the one hand, and Assignee, on the other, have heretofore entered into that certain Asset Purchase Agreement dated May_____, 2021 (the "Purchase Agreement"). Except for terms specifically defined herein, the capitalized terms used in this Assignment shall have the same meanings as such capitalized terms have when used in the Purchase Agreement.

B.    Assignor, as tenant and lessee, and _____, as landlord (the "Landlord"), are parties to that certain _____ dated as of _____, as amended by _____[1] (collectively, the "Lease").

C.    Pursuant to that certain [Order Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases] approved by the Bankruptcy Court on _____, 2021, attached hereto and made a part hereof as Exhibit A (the "Order"), Assignor is authorized by the Bankruptcy Court to assign the Lease to Assignee.

D.    Concurrently with the mutual execution and delivery of this Assignment, Assignor and Assignee are consummating the transactions contemplated by the Purchase Agreement. Assignor and Assignee are executing and delivering this Assignment in satisfaction of their respective obligations pursuant to Sections 2.7(b)(vi) and 2.7(c)(viii) of the Purchase Agreement.

**NOW, THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

### AGREEMENT:

1.    **Assignment and Assumption.** As of the Effective Date, Assignor hereby assigns, transfers and conveys to Assignee all of Assignor's right, title and interest in, to and under the Lease (including, without limitation, Assignor's right, title and interest in and to any security deposit, instrument or other security held by the Landlord to secure the performance of tenant's obligations thereunder), to the extent arising or accruing under the Lease from and after the Effective Date. As of the Effective Date, Assignee hereby accepts, assumes and agrees to perform all of the terms, covenants, agreements and obligations contained in the Lease on

---

[1] Note:  Describe amendments or modifications, if applicable.

42992765.2

Assignor's part to be kept, performed and observed, to the extent arising or accruing under the Lease from and after the Effective Date.

2.    **Governing Law.**  This Assignment shall be governed by, and shall be construed in accordance with the domestic laws of the State of Delaware (the "<u>State</u>"), without giving effect to any choice of law or conflict of law provision (whether of the State or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the laws of such State.

3.    **Binding Effect.**  This Assignment shall inure to the benefit of, and shall be binding upon, the parties hereto and their respective successors and permitted assigns.

4.    **Severability.**  If any provision of this Assignment or the application of any such provision to any person or circumstance shall be held invalid, illegal or unenforceable in any respect by a court of competent jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision of this Assignment.

5.    **Counterparts, Etc.**    This Assignment may be executed in one or more counterparts, all of which shall be considered one and the same agreement, and shall become effective when one or more such counterparts have been signed by each of the parties and delivered to the other party.  This Assignment, to the extent signed and delivered by means of a facsimile machine or electronic mail, shall be treated in all manner and respects as an original contract and shall be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person.  At the request of either party hereto, the other party shall re-execute original forms thereof and deliver them to the other party.  No party hereto shall raise the use of a facsimile machine or electronic mail to deliver a signature or the fact that any signature or contract was transmitted or communicated through the use of facsimile machine or electronic mail as a defense to the formation of a contract and each such party forever waives any such defense.

6.    **Purchase Agreement Controls.**    Nothing in this Assignment, express or implied, is intended to or shall be construed to modify, expand, limit or otherwise affect in any way the terms or provisions of the Purchase Agreement or to constitute a waiver or release by Assignor or Assignee of, or to otherwise affect, any liabilities, duties, limitations, acknowledgments or obligations imposed upon either of them by the terms of the Purchase Agreement, including, without limitation, the representations and warranties, limitations, acknowledgments and other provisions that the Purchase Agreement provides shall survive the date hereof.  To the extent that any provision of this instrument conflicts or is inconsistent with the terms or provisions of the Purchase Agreement, the Purchase Agreement will govern and control and the superseded term or provision hereof shall be of no force or effect whatsoever.

7.    **No Third Party Beneficiaries.**  This Assignment shall not confer any rights or remedies upon any person other than the parties hereto and their respective successors and assigns.

8.    **Amendments.**  This Assignment sets forth the entire agreement of the parties hereto with respect to the subject matter hereof and may not be altered, amended, changed,

42992765.2

waived, terminated or modified in any respect or particular unless the same shall be in writing and signed by each of the parties hereto.

[*signature pages follow*]

**IN WITNESS WHEREOF,** the parties have executed this Assignment on the date first above written.

**ASSIGNOR:**

Carbon LITE Industries, LLC, a Delaware limited liability company and Debtor and Debtor in Possession

By:_____
Name:
Title:


**ASSIGNEE:**

TSG Shelf II Acquisition, LLC, a Delaware limited liability company

By:
Name:
Title:

42992765.2

## **Exhibit A**

[Order Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases]

(Attached)