# **Exhibit 2**

*Reading Asset Purchase Agreement*

DOCS_DE:234547.2 13044/001

ASSET PURCHASE AGREEMENT

BY AND AMONG

CARBONLITE P, LLC, as Seller,

CARBONLITE HOLDINGS LLC
(solely for purposes of <u>Section 5.16</u>),

AND

DAK AMERICAS LLC, as Purchaser

Dated as of May 2, 2021

# TABLE OF CONTENTS

ARTICLE I DEFINITIONS ................................................................................................. 1

    1.1    Definitions.................................................................................................. 1

ARTICLE II PURCHASE AND SALE; CLOSING ................................................................ 13

    2.1    Purchase and Sale. .................................................................................... 13
    2.2    Excluded Assets. ....................................................................................... 15
    2.3    Assumed Liabilities. ................................................................................. 17
    2.4    Excluded Liabilities. ................................................................................. 18
    2.5    Non-Transferable Contracts and Permits.................................................. 18
    2.6    Calculation and Payment of Cash Consideration...................................... 19
    2.7    Closing. ..................................................................................................... 22
    2.8    Addition/Removal of Acquired Contracts, Acquired Real Property Leases, Acquired Personal Property Leases and Permits and Licenses. ......................... 23

ARTICLE III REPRESENTATIONS AND WARRANTIES OF SELLER ............................... 23

    3.1    Due Incorporation. .................................................................................... 23
    3.2    Due Authorization. .................................................................................... 24
    3.3    Consents and Approvals; Governmental Authority Relative to This Agreement. ....................................................................................................... 24
    3.4    Compliance With Laws.............................................................................. 24
    3.5    Litigation................................................................................................... 24
    3.6    Certain Financial Information. .................................................................. 25
    3.7    Real Property. ........................................................................................... 25
    3.8    Material Contracts..................................................................................... 26
    3.9    Employees and Labor Matters. ................................................................. 28
    3.10    Benefit Plans. ........................................................................................... 29
    3.11    Permits. ..................................................................................................... 29
    3.12    Intellectual Property ................................................................................. 29
    3.13    Environmental Matters.............................................................................. 31
    3.14    Title to Assets; Sufficiency of Assets; Condition of Assets. .................... 32
    3.15    Taxes. ....................................................................................................... 32
    3.16    Key Business Relationships. ..................................................................... 32
    3.17    Insurance. .................................................................................................. 33
    3.18    Brokers and Finders. ................................................................................. 33
    3.19    Product Quality. ........................................................................................ 33
    3.20    Intercompany Agreements. ....................................................................... 33
    3.21    Data Privacy.............................................................................................. 34
    3.22    Disclaimer of Additional Representations and Warranties........................ 34

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF PURCHASER ...................... 35

    4.1    Due Organization. ..................................................................................... 35
    4.2    Due Authorization. .................................................................................... 35
    4.3    Consents and Approvals; No Violations................................................... 35

| | 4.4 | Purchaser's Examination. | 35 |
| | 4.5 | Investigation; Limitation on Warranties. | 35 |
| | 4.6 | Available Funds. | 36 |
| | 4.7 | Brokers and Finders. | 36 |

ARTICLE V COVENANTS ... 37

| | 5.1 | Access to Information and Applicable Locations. | 37 |
| | 5.2 | Preservation of Business. | 37 |
| | 5.3 | Efforts. | 38 |
| | 5.4 | Preservation of Records; Post-Closing Access and Cooperation. | 39 |
| | 5.5 | Employees and Benefits. | 40 |
| | 5.6 | Public Announcements. | 40 |
| | 5.7 | Transfer Taxes. | 41 |
| | 5.8 | Tax Proration. | 41 |
| | 5.9 | Hart-Scott Rodino Act. | 41 |
| | 5.10 | Filing With CFIUS | 42 |
| | 5.11 | Use of Names and Marks. | 43 |
| | 5.12 | No Successor Liability. | 43 |
| | 5.13 | Assumption and Assignment of Contracts. | 43 |
| | 5.14 | Transfer of 401(k) Plan. | 44 |

ARTICLE VI CONDITIONS PRECEDENT TO OBLIGATIONS OF PURCHASER ... 44

| | 6.1 | Warranties True as of Present Date. | 44 |
| | 6.2 | Compliance with Agreements and Covenants. | 45 |
| | 6.3 | No Prohibition. | 45 |
| | 6.4 | Entry of Sale Order. | 45 |
| | 6.5 | No Material Adverse Effect. | 45 |
| | 6.6 | HSR Clearance. | 45 |

ARTICLE VII CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLER ... 45

| | 7.1 | Warranties True as of Present Date. | 45 |
| | 7.2 | Compliance with Agreements and Covenants. | 46 |
| | 7.3 | No Prohibition. | 46 |
| | 7.4 | Entry of Sale Order. | 46 |
| | 7.5 | HSR Clearance. | 46 |

ARTICLE VIII TERMINATION ... 46

| | 8.1 | Termination. | 46 |
| | 8.2 | Expenses. | 48 |
| | 8.3 | Effect of Termination. | 48 |

ARTICLE IX BANKRUPTCY COURT MATTERS ... 49

| | 9.1 | Motion for Approvals. | 49 |
| | 9.2 | Bidding Procedures and Bid Protections. | 50 |

ARTICLE X MISCELLANEOUS ... 50

| | 10.1 | Amendment. | 50 |

10.2    Notices. ................................................................................................................ 50
10.3    Waivers. ............................................................................................................... 51
10.4    Counterparts. ........................................................................................................ 51
10.5    Interpretation. ....................................................................................................... 51
10.6    Applicable Law. .................................................................................................... 52
10.7    Binding Agreement; Assignment. ......................................................................... 52
10.8    Third Party Beneficiaries. ..................................................................................... 52
10.9    Further Assurances. .............................................................................................. 52
10.10  Entire Understanding. ........................................................................................... 52
10.11  EXCLUSIVE JURISDICTION OF BANKRUPTCY COURT. ......................... 53
10.12  WAIVER OF JURY TRIAL. ............................................................................... 53
10.13  Disclosure Schedule. ............................................................................................ 53
10.14  Severability. ......................................................................................................... 54
10.15  Attorneys' Fees. ................................................................................................... 54
10.16  Construction. ........................................................................................................ 54
10.17  [Reserved]. ........................................................................................................... 54
10.18  Survival. ............................................................................................................... 54
10.19  No Vicarious Liability. ......................................................................................... 55

DOCS_SF:105462.9 13044/003

## SCHEDULES

1.      Permitted Liens

2.      Section 2.1(a): Purchased Equipment

3.      Section 2.1(c): Acquired Contracts

4.      Section 2.1(e): Acquired Real Property Lease

5.      Section 2.1(f): Acquired Personal Property Leases

6.      Section 2.1(g): Permits and Licenses

7.      Section 2.1 (i): Open Customer Orders

8.      Section 2.1 (j): Open Supplier Orders

9.      Section 2.1(l): Acquired Intellectual Property Rights

10.     Section 2.1(m): Acquired L/Cs

11.     Section 2.1(o): Prepaid Assets

12.     Section 2.2(h): Excluded Assets

13.     Section 3.3:  Consents and Approvals; Governmental Authority

14.     Section 3.4: Compliance with Laws

15.     Section 3.5: Litigation

16.     Section 3.6(a): Balance Sheets

17.     Section 3.6(c): Accounts Receivable

18.     Section 3.6(e): Amounts Drawn Under Acquired L/Cs

19.     Section 3.6(f): Capital Expenditures

20.     Section 3.6(g): Capital Leases

21.     Section 3.7(a): Real Property Lease Matters

22.     Section 3.7(b): Contracts Regarding Material Repairs, Work, and Capital
        Improvements

DOCS_SF:105462.9 13044/003

23.     Section 3.8(a): Material Contracts

24.     Section 3.8(b): Defaults Under Material Contracts

25.     Section 3.9(a): Employees

26.     Section 3.10(a): Employee Benefit Plans

27.     Section 3.11: Permits

28.     Section 3.12(a): Intellectual Property

29.     Section 3.12(c): Intellectual Property Matters

30.     Section 3.12(f): Computer Systems Matters

31.     Section 3.13(c): Environmental Matters

32.     Section 3.15: Tax Matters

33.     Section 3.16(a)(i): Key Customer and Vendor Lists

34.     Section 3.16(a)(ii): Key Customer/Vendor Matters

35.     Section 3.16(b): Discounts and Rebates

36.     Section 3.17: Insurance

37.     Section 3.18: Brokers and Finders

38.     Section 3.20: Affiliate Intercompany Agreements

39.     Section 5.5(a): Employees

DOCS_SF:105462.9 13044/003

## <u>EXHIBITS</u>

Exhibit 1.1 (Sale Order) – Form of Sale Order

Exhibit 2.6(c) – Estimated Closing Statement Methodology

Exhibit 2.7(b)(i) – Form of Bill of Sale, Assignment and Assumption

Exhibit 2.7(b)(ii) – Form of IP Assignment

<u>ASSET PURCHASE AGREEMENT</u>

THIS ASSET PURCHASE AGREEMENT (this "<u>Agreement</u>") is made as of May 2, 2021, by and among DAK Americas LLC, a Delaware limited liability company (the "<u>Purchaser</u>"), CarbonLITE P, LLC, a Delaware limited liability company (the "<u>Seller</u>"), and solely for purposes of <u>Section 5.16</u>, CarbonLITE Holdings LLC, a Delaware limited liability company (the "<u>Parent</u>"), each of Seller and Parent being a chapter 11 debtor and debtor in possession in Case No. 21-10527(JTD) (jointly administered) (the "<u>Bankruptcy Case</u>") pending in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>"). Certain capitalized terms used herein are defined in <u>ARTICLE I</u>.

W I T N E S S E T H:

WHEREAS, Seller is engaged in the conduct of the Business (as defined below) at the Reading Facility (as defined below); and

WHEREAS, Purchaser desires to purchase from Seller, and Seller desire to sell to Purchaser, pursuant to, among other provisions thereof, Section 363 of Chapter 11 of Title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), the Purchased Assets (as defined below), for the consideration and upon the terms and conditions contained in this Agreement;

NOW, THEREFORE, in consideration of the mutual covenants, agreements, representations and warranties contained herein, and for their mutual reliance, the parties hereto agree as follows:

ARTICLE I

DEFINITIONS

1.1 <u>Definitions</u>. The following terms shall have the following meanings for the purposes of this Agreement:

"<u>Accounts Receivable</u>" means accounts and notes receivable (whether current or non-current) and all causes of action specifically pertaining to the collection of the foregoing, in each case to the extent arising out of the operation of the Business. For the avoidance of all doubt, in no event shall "Accounts Receivable" include (x) rights or claims to proceeds under Insurance Policies held by Seller or (y) accounts and notes receivable from related parties of Seller.

"<u>Accrued Expenses</u>" is defined in the definition of "Net Working Capital" below.

"<u>Acquired Contracts</u>" shall have the meaning set forth in <u>Section 2.1(c)</u>.

"<u>Acquired Intellectual Property Rights</u>" shall have the meaning set forth in <u>Section 2.1(l)</u>.

"<u>Acquired Inventories</u>" shall have the meaning set forth in <u>Section 2.1(d)</u>.

"<u>Acquired L/Cs</u>" is defined in <u>Section 2.1(m)</u> hereof.

"Acquired Personal Property Leases" shall have the meaning set forth in <u>Section 2.1(f).</u>

"Acquired Real Property Leases" shall have the meaning set forth in <u>Section 2.1(e).</u>

"Acquired Receivables" is defined in <u>Section 2.1(k)</u> hereof.

"Adjustment Escrow Account" has the meaning set forth in <u>Section 2.6(b).</u>

"Adjustment Escrow Amount" means an amount equal to $250,000.

"Affiliate" shall mean, with respect to any specified Person, any other Person which, directly or indirectly, controls, is under common control with, or is controlled by, such specified Person.

"Agreement" shall mean this Agreement, including the Disclosure Schedule and all other exhibits and schedules hereto, as it and they may be amended from time to time.

"Alternative Transaction" shall have the meaning set forth in the Bid Protections Order.

"Applicable Laws" shall mean all laws, statutes, orders, rules, and regulations of Governmental Authorities, and judgments, decisions or orders entered by any Governmental Authority applicable to Seller or the Business.

"Assumed Accounts Payable" is defined in the definition of "Net Working Capital" below.

"Assumed Liabilities" shall have the meaning set forth in <u>Section 2.3</u>.

"Auction" shall have the meaning set forth in the Bid Procedures Order.

"Avoidance Action" shall mean any avoidance claims, rights, recoveries, subordinations or causes of action or remedies under Chapter 5 of the Bankruptcy Code, including any proceeds thereof, and any analogous state law claims, in each case, of the Seller and its estate, that relate to the Purchased Assets or the Business, other than Excluded Avoidance Actions.

"Bankruptcy Case" has the meaning ascribed to such term in the preamble.

"Bankruptcy Code" has the meaning ascribed to such term in the recitals of this Agreement.

"Bankruptcy Court" has the meaning ascribed to such term in the preamble.

"Benefit Plans" shall mean (i) any "employee welfare benefit plan" or "employee pension benefit plan" (as those terms are respectively defined in Sections 3(1) and 3(2) of ERISA), other than a Multiemployer Plan,; and (ii) any retirement or deferred compensation plan, incentive compensation, employment, change-in-control, collective bargaining, retention, compensation, employee loan, consulting, severance, stock, share appreciation right, unemployment compensation, vacation pay, severance pay, bonus arrangement, health benefit, profit-sharing, death or disability plan, agreement, commitment, program, policy, practice or arrangement or

any other welfare or fringe benefit arrangements in each case in which any Employees participate or with respect to which Seller has or may have any liability.

"<u>Bidding Procedures</u>" shall mean and refer to the process and procedures established in the Bid Procedures Order with respect to the conduct of the transactions contemplated herein and Seller's disposition of the Purchased Assets.

"<u>Bid Procedures Order</u>" shall mean and refer to that certain Order (A) Approving Bid Procedures For The Sale Of Certain Assets, (B) Approving Procedures For The Assumption And Assignment Of Executory Contracts Or Unexpired Leases In Connection With The Sale, (C) Approving Certain Bidder Incentives In Connection With The Debtors' Entry Into Any Potential Stalking Horse Agreement, (D) Scheduling A Sale Hearing, And (E) Granting Certain Related Relief, issued by the Bankruptcy Court and entered in the Bankruptcy Case on April 9, 2021 Docket No. 266.

"<u>Bid Protections</u>" shall mean (a) the Break-Up Fee plus (b) the Expense Reimbursement, all matters relating to both of which (including Purchaser's entitlement thereto and the timing of payment thereof) shall be addressed in and governed by the Bid Procedures Order and/or, as applicable, the Bid Protections Order (as defined below).

"<u>Bid Protections Order</u>" shall mean an order granting the Bid Protections, in form and substance acceptable to the Seller and the Purchaser (in their respective sole discretion) and to be filed by the Seller in accordance with the Bid Procedures Order.

"<u>Bill of Sale, Assignment and Assumption</u>" shall have the meaning set forth in <u>Section 2.7(b)(i)</u>.

"<u>Break-Up Fee</u>" shall mean an amount equal to $2,880,000.00 in cash.

"<u>Business</u>" shall mean the business of processing post-consumer polyethylene terephthalate ("PET") plastic products in order to produce food grade recycled polyethylene terephthalate flake and food grade recycled polyethylene pellets ("rPET"), conducted by Seller at the Reading Facility.

"<u>Business Day</u>" shall mean any day other than a Saturday, Sunday or other day on which banking institutions in the States of California or New York are authorized or required by law or other action of a Governmental Authority to close.

"<u>Capital Lease Obligations</u>" shall have the meaning set forth in <u>Section 3.6(g)</u>.

"<u>Cash and Cash Equivalents</u>" means, collectively, all of the Seller's cash (including petty cash and checks received prior to the close of business on the Closing Date), checking account balances, marketable securities, certificates of deposits, time deposits, bankers' acceptances, commercial paper, government securities and other cash equivalents, net of uncleared checks issued by Seller that are not yet reflected in the applicable bank account of Seller.

"<u>Cash Consideration</u>" has the meaning given to it in the definition of Purchase Price.

"CERCLA" shall mean the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended.

"CFIUS" shall mean the Committee on Foreign Investment in the United States.

"Claim" shall mean any action, cause of action, suit, debt, lien, liability, claim, counterclaim, cross-claim, demand, damage, loss, attorneys' or consultants' fees, costs or expenses, of any nature whatsoever, in law or in equity.

"Closing" shall mean the consummation of the transaction contemplated herein.

"Closing Cash Consideration" shall have the meaning set forth in Section 2.6(d).

"Closing Date" shall have the meaning set forth in Section 2.7(a).

"COBRA" shall mean and refer to the applicable requirements of Part 6 of Subtitle B of Title I of ERISA and Section 4980B of the Code (and predecessors thereof).

"Code" shall mean the Internal Revenue Code of 1986, as amended.

"Confidentiality Agreement" means and refers to that certain Confidentiality Agreement executed by Purchaser in favor of Seller.

"Consent" shall mean any approval, consent, ratification, waiver or other authorization.

"Construction Work" is defined in Section 5.2 hereof.

"Contract" means any contract, agreement, grant, sub-grant, arrangement, understanding, commitment, ground lease, lease, sublease, license, mortgage, bond, note or other instrument (including any instrument evidencing indebtedness), or other legally binding obligation, and all amendments thereof (whether written or oral and whether express or implied).

"Contamination" or "Contaminated" shall mean the presence of Hazardous Material in, on or under the soil, groundwater, surface water or other environmental media to an extent that any Response Action is legally required by any Governmental Authority under any Environmental Law with respect to such presence of Hazardous Material.

"Cost to Complete" is defined in Section 5.2 hereof.

"Cure Costs" means the monetary amounts that must be paid under Sections 365(b)(1)(A) and (B) of the Bankruptcy Code in connection with the assumption and/or assignment of any Acquired Contract, Acquired Real Property Lease, Acquired Personal Property Lease, or Permits and Licenses, as agreed upon by the Seller and Purchaser or determined by the Bankruptcy Court pursuant to the Bid Procedures Order.

"Defense Production Act" means the provisions of 50 U.S.C. Sections 4501, et seq., as amended.

"Deficiency Amount" shall have the meaning set forth in Section 2.6(g).

"Deposit" means a cash amount equal to $9,600,000.00.

"Designated Contacts" shall have the meaning set forth in Section 5.1(a).

"Disclosure Schedule" shall mean the Disclosure Schedule delivered by Seller to Purchaser on the date of this Agreement, as amended, modified or supplemented in accordance with this Agreement.

"DIP Budgeted Capital Expenditures" shall have the meaning set forth in Section 3.6(f).

"Dispute Notice" shall have the meaning set forth in Section 2.6(e).

"DOJ" is defined in Section 5.9(a) hereof.

"Employees" shall mean all full-time and part-time employees employed by Seller at the Reading Facility.

"Environmental Claim" shall mean any Claim by any Person alleging liability (including liability for Response Action, investigatory costs, governmental response costs, remediation or clean-up costs, natural resources damages, property damages, personal injuries, attorneys' fees, fines or penalties) arising out of, based on, resulting from or relating to (a) the presence, Release or threatened Release of, or exposure to any Hazardous Materials; (b) circumstances forming the basis of any violation, or alleged violation, of any Environmental Law; or (c) any other matters for which liability is imposed under Environmental Laws.

"Environmental Law" shall mean any federal, state or local statute, order, regulation or ordinance relating to (a) the protection of the natural environment, including natural resources, (b) the protection of human health and safety as it pertains to exposure to Hazardous Materials, (c) the manufacture, registration, distribution, formulation, packaging or labeling of Hazardous Materials or products containing Hazardous Materials, or (d) the handling, use, presence, generation, treatment, storage, disposal, Release or threatened Release of or exposure to any Hazardous Materials.

"Environmental Liabilities" means any indebtedness, liability, Claim, loss, damage, fine, penalty, cost, expense, deficiency or responsibility, whether known or unknown, arising under, based on or relating to any Environmental Law, whether based on negligence, strict liability or otherwise, including liability or responsibility for the costs of enforcement proceedings, investigations, Response Action, governmental response, removal, remediation, cleanup, restoration, abatement, monitoring, personal injury, property damage, medical monitoring, penalties, contribution, indemnification, injunctive relief, natural resource damages, court costs and reasonable attorneys' fees.

"Environmental Permit" means any Permits and Licenses required or issued by any Governmental Authority under or in connection with any Environmental Law, including any and all orders, consent orders or binding agreements issued by or entered into with a Governmental Authority under any applicable Environmental Law.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended.

"Escrow" is defined in Section 2.6(a) hereof.

"Escrow Holder" is defined in Section 2.6(a) hereof.

"Estimated Cash Consideration" shall have the meaning set forth in Section 2.6(c).

"Estimated Closing Statement" shall have the meaning set forth in Section 2.6(c).

"Excess Amount" shall have the meaning set forth in Section 2.6(g).

"Excluded Assets" shall have the meaning set forth in Section 2.2.

"Excluded Avoidance Action" shall mean any avoidance claims, rights, recoveries, subordinations or causes of action or remedies under Chapter 5 of the Bankruptcy Code, including any proceeds thereof, and any state law commercial tort or breach of fiduciary duty claims, including any  proceeds thereof, in each case, (i) between or among the Seller or any of its affiliated debtors in the Bankruptcy Case, or (ii) against any current or former officer, director, employee, advisor, consultant, representative or insider of the Seller or any of its affiliated debtors in the Bankruptcy Case that is not a Transferred Employee.

"Excluded Liabilities" shall have the meaning set forth in Section 2.4.

"Expense Reimbursement" shall mean a reimbursement of the actual and documented expenses of Purchaser in connection with its consideration, diligence, negotiation, execution and pursuit of implementation and consummation of this Agreement and the Related Agreements, in an amount up to $350,000.00.

"Expenses" shall have the meaning set forth in Section 8.2.

"Facility" shall mean the Reading Facility.

"Final Cash Consideration" shall have the meaning set forth in Section 2.6(g).

"Final Net Working Capital" shall have the meaning set forth in Section 2.6(d).

"Financial Statements" shall have the meaning set forth in Section 3.6(a).

"FTC" is defined in Section 5.9(a) hereof.

"Fully Operational" with respect to the Reading Facility shall mean (i) all three (3) extrusion and solid stating lines, one (1) Bottle Processing/Prewash System and two (2) wash lines have been fully installed and are operating in the manner intended at each OEM guaranteed capacity and each OEM quality specifications with all appropriate licenses and permits having been obtained, (ii) each OEM has issued an OEM Performance Guaranty for each extrusion line and each wash line and (iii) all ancillary production equipment and utilities systems have been fully installed.

6

"GAAP" shall mean U.S. generally accepted accounting principles, as in effect from time to time, consistently applied.

"Good Funds" is defined in Section 2.6(a) hereof.

"Governmental Authority" shall mean any U.S., state, local or foreign governmental, regulatory or administrative body, agency or authority, any court or judicial authority or arbitration tribunal, whether national, Federal, state or local or otherwise, or any Person lawfully empowered by any of the foregoing to enforce or seek compliance with any applicable law, statute, regulation, order or decree.

"Hazardous Material" shall mean any chemicals, materials, or substances defined as or included in the definition of "hazardous substances," "hazardous wastes," "hazardous materials," "hazardous constituents," "restricted hazardous materials," "extremely hazardous substances," "toxic substances," "contaminants," "pollutants," "toxic pollutants," under any Environmental Law or for which liability or standards of conduct may be imposed pursuant to Environmental Law, including petroleum and petroleum products, by-products, derivatives or wastes, radioactive materials, asbestos or asbestos-containing materials or products, per- and polyfluoroalkyl substances, polychlorinated biphenyls (PCBs) or materials containing same, lead or lead-based paints or materials, radon, fungus, mold in quantities or concentrations that may adversely affect human health or materially affect the value or utility of the building(s) in which it is present, or other substances that may have an adverse effect on human health or the environment.

"HSR Act" shall have the meaning ascribed to such term in Section 5.9(a) hereof.

"Income Tax" means any United States or foreign, federal, state, provincial, municipal or county Tax that, in whole or in part, is based on, measured by or calculated by reference to net income, profits or gains, including any state or local franchise Tax, and including any interest, penalty or addition thereto, whether disputed or not.

"Income Tax Returns" means any Tax Return with respect to Income Taxes.

"Independent Auditor" shall have the meaning set forth in Section 2.6(f).

"Insurance Policies" shall have the meaning set forth in Section 3.17.

"Intellectual Property Rights" shall mean all of the following in any jurisdiction throughout the world: (a) patents, patent applications, patent disclosures and statutory invention registrations, including reissues, divisions, continuations, continuations in part, extensions and reexaminations thereof, all rights therein provided by international treaties or conventions ("Patents"); (b) trademarks, service marks, trade dress, trade names, logos (and all translations, adaptations, derivations and combinations of the foregoing) and Internet domain names, together with all goodwill associated with each of the foregoing, any and all common law rights, and registrations and applications for registration thereof, all rights therein provided by international treaties or conventions, and all reissues, extensions and renewals of any of the foregoing; (c) copyrightable works (including computer software source code, executable code, databases and related documentation and maskworks), copyrights, whether or not registered, and registrations

and applications for registration thereof, and all rights therein provided by international treaties or conventions; and (d) confidential and proprietary information, including trade secrets, unpatented inventions, data and know-how.

"IP Assignment" shall have the meaning set forth in Section 2.7(b)(ii).

"Item of Dispute" shall have the meaning set forth in Section 2.6(e).

"Key Customers" shall have the meaning set forth in Section 3.16(a).

"Key Vendors" shall have the meaning set forth in Section 3.16(a).

"Knowledge" shall mean, with respect to Seller, the actual knowledge as of the date hereof and the Closing, of Leon Farahnik, Brian Weiss, Alex Delnik and Gregg Milhaupt and, solely with respect to the representations and warranties set forth in Section 3.7(b), Vijendra Siddhi and Jeff Walsh.

"L/C Consideration" is defined in the definition of Purchase Price.

"Lien" shall mean all liens, encumbrances, mortgages, charges, claims, restrictions, pledges, security interests, title defects, easements, rights of way, covenants and encroachments.

"Look-Back Period" means the period beginning on January 1, 2021.

"Material Adverse Effect" shall mean any change, event, occurrence, condition, development, fact, or state of facts occurring that has had or would reasonably be expected to have a material adverse effect on (i) the condition (financial or otherwise) or results of operations of the Business, the Purchased Assets or the Assumed Liabilities, taken as a whole, or (ii) Seller's ability to consummate the transactions contemplated by this Agreement; provided, however, the following shall be disregarded in determining whether there has been a Material Adverse Effect or whether a Material Adverse Effect could or would reasonably be expected to occur: (i) general economic, business, industry or credit, financial or capital market conditions (whether in the United States or internationally), including conditions affecting generally all companies engaged in the Business or a segment thereof, or the industries served by the Business; (ii) the announcement of this Agreement or pendency of the transactions contemplated hereby, (iii) the breach of this Agreement or any Related Agreement by Purchaser, (iv) pandemics (including, without limitation, the COVID-19 pandemic existing and continuing as of the date of this Agreement), earthquakes, tornados, hurricanes, floods and acts of God, (v) acts of war (whether declared or not declared), sabotage, terrorism, military actions or the escalation thereof; (vi) any changes or prospective changes in applicable laws, regulations or accounting rules, including GAAP or interpretations thereof, or any changes or prospective changes in the interpretation or enforcement of any of the foregoing, or any changes in general legal, regulatory or political conditions; (vii) any existing event, occurrence or circumstance set forth in the Disclosure Schedule, and (viii) any change to the Business or the Purchased Assets that results from the filing or pendency of the Bankruptcy Case, except, in the case of the foregoing clauses (i), (iv), (v), and (vii), to the extent that the Business or the Purchased Assets, are disproportionately adversely affected thereby relative to other similarly situated Persons operating in the industries in which the Business operates.

DOCS_SF:105462.9 13044/003

"Material Contract" shall have the meaning set forth in Section 3.8(a).

"Multiemployer Plan" shall have the meaning set forth in Section 3(37) of the Code.

"Net Working Capital" shall mean the total of (a) the sum of (i) Acquired Receivables that are current assets, (ii) Acquired Inventories, and (iii) Prepaid Assets of the Business as of the Closing Date, less (b) the sum of (i) trade payables incurred with respect to the Business during the period between initiation of the Bankruptcy Case and the Closing Date (the "Relevant Period") (collectively, the amounts described in this clause (i) are referred to herein as the "Assumed Accounts Payable") and (ii) accrued expenses of Seller incurred or accrued with respect to the Business during the Relevant Period (collectively, the amounts described in this clause (ii) are referred to herein as the "Accrued Expenses"). All of the foregoing shall be determined in accordance with the Applicable Methodology.

"Non-Tax Prorations" shall mean closing adjustments to be included in the calculation of (a) Estimated Cash Consideration at Closing in accordance with Section 2.6(c) and (b) Final Cash Consideration in accordance with Section 2.6(d) or, if there is a dispute, Section 2.6(e) and (f), based on the proration of utilities and rents but not Property Taxes.

"Notice of Successful Bidder" shall have the meaning set forth in the Bid Procedures Order.

"Open Customer Orders" shall have the meaning set forth in Section 2.1(i).

"Open Supplier Orders" shall have the meaning set forth in Section 2.1(j).

"Order" means any award, decision, injunction, order, ruling, subpoena, or verdict entered, issued, made, or rendered by any court, administrative agency, or other Governmental Authority or by any arbitrator.

"Ordinary Course of Business" means, with respect to any Person, actions that are taken in the ordinary course of business and consistent with the past practices of such Person and, in the case of the Seller, only taking into account past practice of such Person since the commencement of the Bankruptcy Case and the fact that the Reading Facility is not Fully Operational.

"Owned Intellectual Property" shall have the meaning set forth in Section 3.12(a).

"Patents" has the meaning set forth in the definition of Intellectual Property Rights.

"Permits and Licenses" shall have the meaning set forth in Section 2.1(g).

"Permitted Access Parties" is defined in Section 5.4 hereof.

"Permitted Liens" shall mean, as of the Closing Date, all (a) Liens for Taxes, assessments and governmental charges or levies not yet delinquent or for which adequate reserves are maintained on the financial statements of Seller and set forth as a current liability on the Estimated Closing Statement; (b) Liens imposed by law, such as materialmen's, mechanics',

carriers', workmen's and repairmen's liens and other similar liens arising in the ordinary course of business securing obligations that are not overdue for a period of more than 60 days or which are being contested in good faith by appropriate proceedings and set forth as a current liability on the Estimated Closing Statement; (c) pledges or deposits to secure obligations under workers' compensation laws or similar legislation or to secure public or statutory obligations that are not otherwise due or delinquent; (d) deposits to secure the performance of bids, trade contracts, leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business consistent with past practice and set forth as a current liability on the Estimated Closing Statement; (e) all matters of record, including survey exceptions, reciprocal easement agreements and other encumbrances on title to real property; (f) all applicable zoning, entitlement, conservation restrictions and other land use and environmental regulations; (g) all exceptions, restrictions, easements, charges, rights-of-way and other Liens set forth in any permits, any deed restrictions, groundwater or land use limitations or other institutional controls utilized in connection with any required environmental remedial actions, or other state, local or municipal franchise applicable to Seller or any of its respective properties; and (h) Liens referred to in the Disclosure Schedule.

"Permitted Post-Closing Encumbrance" shall mean the following non-monetary encumbrances: (a) licenses and similar rights granted with respect to Intellectual Property Rights, (b) with respect to any real property interest, zoning restrictions, building codes and other land use laws regulating the use or occupancy of real property and imperfections in title, charges, and easements, in each case that do not materially interfere with the operation of the assets or property to which they relate, and (c) with respect to any real property interest, Liens on the interest of any third party landlord or sublandlord or underlying fee interest of any Acquired Real Property Lease, but only those not extinguished by the Sale Order.

"Person" shall mean an individual, corporation, partnership, joint venture, trust, association, estate, joint stock company, limited liability company, Governmental Authority or any other organization of any kind.

"Personal Information" means, in addition to any definition for "personal information" or any similar term (e.g., "personal data" or "personally identifiable information") provided by Applicable Law, or by the Seller in any of its privacy policies, notices or contracts applicable to the Business or the Purchased Assets, all information that identifies, could be used to identify or is otherwise associated with an individual person.

"Prepaid Assets" means all cash deposits (including, without limitation (but without duplication of any amounts included in the L/C Consideration), the amount of any security deposit held by a landlord under an Acquired Real Property Lease(s) that exceeds the equivalent of one (1) month's fixed rent under the applicable Acquired Real Property Lease), advance payments and other prepaid items (except for advances for capital projects) relating to or arising in connection with the operation of the Business to the extent made in the regular course of business and are related to agreements that will survive the Closing.

"Privacy Laws" means any and all Applicable Laws, legal requirements and selfregulatory guidelines relating to the receipt, collection, compilation, use, storage, processing, sharing, safeguarding, security (both technical and physical), disposal, destruction, disclosure or

transfer (including cross-border) of Personal Information, including the Federal Trade Commission Act, California Consumer Privacy Act, Gramm-Leach-Bliley Act, Payment Card Industry Data Security Standard, EU General Data Protection Regulation, and any and all applicable Laws relating to breach notification or marketing in connection with Personal Information.

"Proceeding" means any judicial, administrative or arbitral actions, arbitrations, suits, hearings, disputes, audits, administrative proceedings, condemnation or eminent domain proceedings.

"Property Taxes" shall mean ad valorem, property, excise or similar Taxes (including any interest, fine, penalty or additions to tax imposed by any Governmental Authority in connection with such Taxes) based upon the acquisition, operation or ownership of the Purchased Assets but excluding, for the avoidance of doubt, Income Taxes and Transfer Taxes.

"Purchase Price" shall mean the sum of the following: (i) cash in the amount of $96,000,000.00, plus (A) the aggregate amount of all Cash or Cash Equivalents backing or securing the Acquired L/Cs as of the Closing Date in the amount set forth on Schedule 2.1(m), which in no event shall exceed $2,100,000.00 (the "L/C Consideration"), minus (B) any amounts drawn under any Acquired L/C as of the Closing Date, plus or minus (as applicable), (C) the amount, if any, by which the Net Working Capital as of the Closing Date is greater or less than, as applicable, the Target Closing Net Working Capital minus (D) the Tax Prorations, plus or minus (as applicable) (E) the Non-Tax Prorations, plus (ii) without duplication of any item described in clause (i) of this definition and solely for purposes of the Purchase Price allocation in Section 2.6(h), the Assumed Liabilities. The consideration described in clause (i) of this definition is referred to as the "Cash Consideration," which is subject to adjustment pursuant to Section 2.6.

"Purchased Assets" shall have the meaning set forth in Section 2.1.

"Purchased Equipment" shall have the meaning set forth in Section 2.1(a).

"Purchaser" shall have the meaning set forth in the preamble.

"R&W Policy" is defined in Section 5.3 of this Agreement.

"Reading Facility" shall mean and refer to the Reading Facility operated at and from the Reading Leased Property.

"Reading Leased Property" shall mean and refer to that certain real property commonly known as 4030 Pottsville Pike, Reading, Pennsylvania 19605, together with all buildings, structures, fixtures and improvements erected thereon, and any and all rights, privileges, easements, licenses, hereditaments and other appurtenances relating thereto, and used, or held for use, in connection with the operation of the Business.

"Related Agreements" shall mean the Bill of Sale, Assignment and Assumption, and the IP Assignment.

"**Release**" means any release, spill, emission, discharge, leaking, pumping, injection, deposit, placing, disposal, dispersal, leaching or migration into the environment (including, without limitation, ambient air, surface water, groundwater and surface or subsurface strata) or into or out of any property, including the movement of any Hazardous Material through or in the air, vapor, soil, surface water, groundwater or property.

"Relevant Period" is defined in the definition of "Net Working Capital" above.

"Response Action" shall mean any action taken to investigate, abate, treat, remediate, clean up, remove or mitigate any violation of Environmental Law, any Contamination of any property owned, leased or used by the Business or any release or threatened release of Hazardous Materials.  Without limitation, Response Action shall include any action that would be a response as defined by the Comprehensive Environmental Response, Compensation and Liability Act, as amended at the date of Closing, 42 U.S.C. § 9601 (25).

"Sale Hearing" shall have the meaning set forth in the Bid Procedures Order.

"Sale Motion" is defined in Section 9.1 hereof.

"Sale Order" shall mean an order of the Bankruptcy Court entered in the Bankruptcy Case approving and authorizing this Agreement and the transaction contemplated herein (including, without limitation, approving and authorizing Seller's assumption and assignment pursuant to Section 365 of the Bankruptcy Code of the Acquired Contracts, Acquired Personal Property Leases and Acquired Real Property Leases), which Sale Order shall be substantially in the form attached as Exhibit 1.1 (Sale Order) to this Agreement, but as to any material changes affecting a party hereto, only those that are acceptable to Seller and Purchaser in their respective sole discretion, as applicable.

"Schedules and Statements" shall mean Parent's and its subsidiaries' Schedules of Assets and Liabilities and Statements of Financial Affairs filed in the Bankruptcy Case on April 5, 2021.

"Selected Employees" shall have the meaning set forth in Section 5.5(a).

"Seller" shall have the meaning set forth in the preamble.

"Seller Intellectual Property" shall mean Owned Intellectual Property, together with all other Intellectual Property Rights licensed to Seller or which Seller otherwise has the right to use.

"Subject Employees" shall have the meaning set forth in Section 5.5(a).

"Target Closing Net Working Capital" shall mean $0.

"Target Completion" means substantial progress toward completion of the Construction Work, but not including (i) the commissioning of Extrusion Line #3, (ii) completion of testing of all individual components of Washline #1 (7 t/hr), (iii) acceptance testing for Sorema Line #1

(continuous full-cycle operation at full capacity and guaranteed product quality), and (iv) completion of the Bluerock and Anchor scopes.

"Tax" (and, with correlative meaning, "Taxes," "Taxable" and "Taxing") shall mean (i) any net income, capital gains, gross income, gross receipts, sales, use, transfer, ad valorem, franchise, profits, license, capital, withholding, payroll, estimated, employment, excise, goods and services, severance, stamp, occupation, premium, property, social security, environmental (including Code section 59A), alternative or add-on, value added, registration, windfall profits or other taxes, duties, charges, fees, levies or other assessments imposed by any Governmental Authority, or any interest, penalties, or additions to tax incurred under Applicable Laws with respect to taxes and (ii) any liability in respect of any item described in clause (i) above that arises by reason of a contract, assumption, transferee or successor liability, operation of law (including by reason of participation in a consolidated, combined or unitary Tax Return) or otherwise.

"Tax Prorations" shall mean the Property Taxes allocable to Seller pursuant to the procedures set forth in Section 5.8 to the extent unpaid at the Closing.

"Tax Returns" shall mean any report, return (including any information return), declaration or other filing required or permitted to be supplied to any taxing authority or jurisdiction with respect to Taxes, including any amendments or attachments to such reports, returns, declarations or other filings.

"Termination Date" shall have the meaning set forth in Section 8.1(b).

"Trade Secrets" has the meaning set forth in the definition of Intellectual Property Rights.

"Transfer Taxes" shall have the meaning set forth in Section 5.7.

"Transferred Employees" shall have the meaning set forth in Section 5.5(a).

"WARN Act" shall mean the Worker Adjustment and Retraining Notification Act of 1988, as amended.

"Wayward Assets" is defined in Section 5.16 below.

ARTICLE II

PURCHASE AND SALE; CLOSING

2.1     Purchase and Sale.  Upon the terms and subject to the conditions set forth in this Agreement (including, without limitation, entry of the Sale Order), at the Closing, Seller shall sell, convey, transfer, assign and deliver to Purchaser, and Purchaser shall purchase and accept from Seller, all of Seller's right, title and interest in and to all of the assets of Seller, wherever located, whether at the Reading Facility or in transit thereto which are used or are held for use primarily in the Business, including, without limitation, the following assets (the "Purchased Assets"), in each case free and clear of all Liens to the extent provided in the Sale Order (other than Permitted Post-Closing Encumbrances):

(a)    All owned machinery, equipment, furniture, fixtures, office furnishings, tools and dies, molds and parts, spares, vehicles, computer hardware and software, and other tangible personal property owned by Seller, for use primarily in connection with the Business, including those located at, on or affixed to the Reading Facility, including, without limitation, the tangible personal property identified on Section 2.1(a) of the Disclosure Schedule (collectively, the "Purchased Equipment");

(b)    to the extent assignable, all rights in all warranties of any manufacturer or vendor in connection with the Purchased Equipment;

(c)    all contracts and agreements, licenses, purchase orders, customer orders, utility supply arrangements, and other contracts and agreements, whether written or oral, which are related primarily to the Business at the Reading Facility and identified on Section 2.1(c) of the Disclosure Schedule (collectively, the "Acquired Contracts").  For the avoidance of doubt, references herein to Acquired Contracts shall not be deemed to include Acquired Real Property Leases, Acquired Personal Property Leases or Permits and Licenses;

(d)    all inventories of raw materials, works in process, finished goods, parts, office supplies, packing materials, janitorial supplies and other supplies owned by Seller and used or held for use in connection with the Business (collectively, the "Acquired Inventories");

(e)    Seller's leasehold interest in the Reading Facility arising under the leases identified in Section 2.1(e) of the Disclosure Schedule (the "Acquired Real Property Leases");

(f)    all leasehold rights in personal property leased by Seller and used or held for use primarily in connection with the Business at the Reading Facility, as set forth in the leases identified in Section 2.1(f) of the Disclosure Schedule (the "Acquired Personal Property Leases");

(g)    all the permits, including environmental permits, licenses, approvals, franchises and registrations and other governmental licenses, permits or approvals issued to Seller or any Affiliate thereof primarily with respect to the ownership or operation of any of the Reading Facility or Purchased Assets or the conduct of the Business at the Reading Facility, as identified in Section 2.1(g) of the Disclosure Schedule (collectively, the "Permits and Licenses");

(h)    other than the books and records contemplated by Section 2.2(a) and (b) below, all books and records maintained by Seller or its Affiliates to the extent related to the Business or the Purchased Assets, including without limitation, engineering drawings of machinery and equipment currently used or held for use primarily in connection with the Business; blueprints and other technical papers; user manuals; inventory, maintenance, and asset history records; construction plans and specifications; administrative libraries; environmental records required by law or regulation; and systems documentation and other data processing information and records, except, in each instance, to the extent they relate primarily to the other Purchased Assets;

(i)    to the extent not fulfilled prior to Closing, all open purchase orders for goods and services with customers of the Business at the Reading Facility outstanding as of the Closing Date (collectively, the "Open Customer Orders"), which, as of the date set forth with

respect thereto on the Disclosure Schedule, are as set forth on <u>Schedule 2.1(i)</u> of the Disclosure Schedule;

(j)     the right to receive all goods or services to be provided to Seller in connection with the Business at the Reading Facility pursuant to open orders for goods and services with suppliers that remain unfulfilled as of the Closing Date (the "<u>Open Supplier Orders</u>"), which, as of the date set forth with respect thereto on the Disclosure Schedule, are as set forth on <u>Schedule 2.1(j)</u> of the Disclosure Schedule;

(k)     all Accounts Receivable of Seller which are both (i) specifically related to products produced at the Reading Facility on or before the Closing Date, and (ii) owing by customers who have placed orders with or purchased goods from Seller on or prior to the Closing (collectively, the foregoing are referred to as the "<u>Acquired Receivables</u>");

(l)     all Intellectual Property Rights, wherever located, owned by Seller and used or held for use in the Business at the Reading Facility, including any enterprise resource planning system relating to the Business or the Purchased Assets and those Intellectual Property Rights set forth on <u>Section 2.1(l)</u> of the Disclosure Schedule (the "<u>Acquired Intellectual Property Rights</u>");

(m)     those letters of credit or similar financial accommodations issued to third party(ies) for the account of the Seller(s) (and any collateral therefor) which are described on <u>Section 2.1(m)</u> of the Disclosure Schedule (collectively, the "<u>Acquired L/Cs</u>");

(n)     all claims and causes of action owned by or available to Seller, including Avoidance Actions (other than Excluded Avoidance Actions), (i) relating to the Purchased Assets, the Assumed Liabilities or the acquisition, ownership, management, operation, use, function or value of the Business or any Purchased Asset or (ii) against any counterparty to an Acquired Contract, Acquired Real Property Lease, Acquired Personal Property Lease, or Permits and Licenses or any Affiliate of such counterparty; provided that any Avoidance Actions acquired by Purchaser shall be deemed waived for all purposes;

(o)     all Prepaid Assets listed on <u>Section 2.1(o)</u> of the Disclosure Schedule;

(p)     all employee-related files and records, including occupational health and safety records, assessments and audits; industrial hygiene files; workers compensation records; workers compensation claims files; and personnel employment and medical records (in each case, to the extent the transfer thereof is not prohibited by law) for Transferred Employees; and

(q)     the cash collateral securing any of the Acquired L/Cs (the amounts for which are set forth on <u>Section 2.1(m)</u> of the Disclosure Schedule).

2.2     <u>Excluded Assets</u>.     Notwithstanding anything to the contrary contained in <u>Section 2.1</u> above or any other provision of this Agreement or any Related Agreement, the following assets are not being sold, assigned, transferred or conveyed to Purchaser by Seller hereunder (collectively, the "<u>Excluded Assets</u>"):

DOCS_SF:105462.9 13044/003

(a)     the corporate seals, organizational documents, minute books, stock books, Income Tax Returns, books of account and other records having to do with the corporate organization of Seller;

(b)     the basic books and records of account and all supporting vouchers, invoices and other records and materials primarily relating to any or all Income Taxes of Seller;

(c)     all claims for refunds due to Seller for Taxes of any nature paid by Seller with respect to any period ending on or prior to the Closing Date;

(d)     all Insurance Policies and performance bonds of Seller covering the Purchased Assets and any rights, proceeds and claims of and from such bonds or policies;

(e)     all Benefit Plans and Benefit Plan assets;

(f)     data files, archive files, systems documentation and other data processing information and records relating solely to any of the foregoing Excluded Assets;

(g)     all contracts, agreements, licenses, purchase orders, customer orders, utility supply arrangements, and other contracts, whether written or oral, other than those explicitly identified as Acquired Contracts on Section 2.1(c) of the Disclosure Schedule, Acquired Real Property Leases on Section 2.1(e) of the Disclosure Schedule, Acquired Personal Property Leases on Section 2.1(f) of the Disclosure Schedule, or the Permits and Licenses;

(h)     any assets, properties and rights specifically described or set forth on Section 2.2(h) of the Disclosure Schedule;

(i)     the rights which accrue or will accrue to Seller under this Agreement and the Related Agreements;

(j)     any rights, claims or causes of action to the extent related to (i) Excluded Assets described herein and (ii) intercompany obligations between Seller or any of its Affiliates;

(k)     any tangible or intangible asset held by Seller pursuant to a lease, license, contract, or other agreement where such lease, license, contract or other agreement is not among the Acquired Contracts, Acquired Personal Property Leases, Acquired Real Property Leases, and/or Permits and Licenses assumed by Seller and assigned to Purchaser at the Closing in accordance with the Bankruptcy Code;

(l)     other than the Acquired L/Cs, any letters of credit or similar financial accommodations issued to any third party(ies) for the account of Seller or any of its Affiliates and any collateral therefor;

(m)     all securities, whether capital stock or debt, of Seller or any other entity;

(n)     all Accounts Receivable, other than the Acquired Accounts Receivable;

(o)     all Cash and Cash Equivalents, other than cash collateral securing the Acquired L/Cs, whether on hand, in transit or in banks or other financial institutions, security entitlements, securities accounts, commodity contracts and commodity accounts and including any cash collateral that is collateralizing any letters of credit (other than cash collateral securing the Acquired L/Cs) or Insurance Policies, or any obligations with respect thereto;

(p)     all Personal Information that Seller is prohibited by Applicable Law, including applicable Privacy Laws, or by any of Seller's public-facing policies, notices or other disclosures from delivering or transferring to Purchaser;

(q)     all bank accounts of Seller; and

(r)     all Excluded Avoidance Actions.

2.3     <u>Assumed Liabilities</u>.  Upon the terms and conditions contained in this Agreement, Purchaser shall upon, from and after the Closing Date, assume and be solely liable and responsible for paying and satisfying, solely and only the following liabilities and obligations, all items not specifically set forth below in this <u>Section 2.3</u> being excluded (all liabilities and obligations so assumed, the "<u>Assumed Liabilities</u>"):

(a)     all liabilities arising in connection with or from the use of the Purchased Assets or operation of the Business at the Reading Facility, including, without limitation, claims by employees of any of the foregoing, or other persons, in each case, solely attributable to the use of the Purchased Assets or the operation of the Business at the Reading Facility on or after the Closing Date, including, without limitation, claims resulting from injuries alleged to occur as a result of the condition of any of the Purchased Assets first existing from and after the Closing Date;

(b)     all obligations arising from any actions taken by Purchaser after the Closing Date with respect to Transferred Employees or operation of the Business conducted at the Reading Facility;

(c)     all post-Closing obligations of Seller to deliver products or services pursuant to Open Customer Orders outstanding as of Closing Date;

(d)     all Assumed Accounts Payable and Accrued Expenses of Seller, in each case, to the extent taken into account in the calculation of the Final Cash Consideration;

(e)     the Tax Prorations and the Non-Tax Prorations, in each case, to the extent taken into account in the calculation of the Final Cash Consideration;

(f)     any and all obligations arising under the WARN Act or similar state statutes as a result of the consummation of the transaction contemplated by this Agreement, it being agreed that (i) in no event shall any such liability be deemed to be an Accrued Expense or otherwise taken into account in the calculation of Seller's Net Working Capital as of the Closing Date, and (ii) any such obligations or liabilities relating to Employees to whom Purchaser does not extend employment offers shall in any event be deemed Assumed Liabilities;

17

(g)     all accrued and unpaid vacation, holidays, sick pay and other paid time-off (whether accrued prior to or during the Bankruptcy Case) to which the Transferred Employees are entitled with respect to all periods of service up to and including the Closing Date under the policies and practices of Seller or their Affiliates, but only to the extent included as a reduction in Net Working Capital;

(h)     any and all liabilities arising under or relating to any Environmental Laws with respect to the environmental condition of the Reading Facility, including, without limitation, any Response Actions that may at any time, or from time to time, be required with respect to any Reading Facility under Environmental Law arising out of facts, events or conditions first existing or first occurring from and after the Closing;

(i)     all obligations and liability with respect to any product liability or warranty claims relating to the Business and arising out of facts, events, or conditions first existing or first occurring from and after the Closing;

(j)     without duplication of any other item described in this <u>Section 2.3</u>, the Capital Lease Obligations; and

(k)     all other obligations expressly assumed by Purchaser under the other terms and provisions of this Agreement or any of the Related Agreements or other documents and agreements executed in connection with the Closing.

2.4     <u>Excluded Liabilities</u>.  Except for the Assumed Liabilities expressly set forth in <u>Section 2.3</u>, Purchaser shall not assume or become responsible for Seller's or any of its Affiliates' obligations or liabilities other than those expressly set forth in <u>Section 2.3</u> (such excluded liabilities are collectively referred to herein as the "<u>Excluded Liabilities</u>") and Seller and its Affiliates shall remain fully and solely responsible for all Excluded Liabilities.

2.5     <u>Non-Transferable Contracts and Permits</u>.  Anything in this Agreement to the contrary notwithstanding, this Agreement shall not constitute an agreement to assign or transfer any Acquired Contract, Acquired Personal Property Lease, Acquired Real Property Lease or any of the Permits and Licenses, or any claim or right or any benefit or obligation thereunder or resulting therefrom if, an assignment or transfer thereof is prohibited or, without the consent of a third party thereto, would, notwithstanding the provisions of section 365(f) of the Bankruptcy Code and the effect of the Sale Order, be prohibited and such consent has not been obtained.  If such consent is required and has not been obtained or if an attempted assignment or transfer is ineffective or prohibited, Seller shall, and shall cause its Affiliates to, use commercially reasonable efforts to cooperate with Purchaser in any reasonable arrangement requested and approved by Purchaser to provide for Purchaser all of the benefits under any such Acquired Contract, Acquired Personal Property Lease, Acquired Real Property Lease, or Permit or License.  In connection with any such arrangement, (i) Purchaser shall bear the expense of structuring and implementing the arrangement and (ii) Purchaser shall honor Seller's commitments set forth in any such Acquired Contract, Acquired Personal Property Lease, Acquired Real Property Lease, or Permit or License to the extent arising following the close of business on the Closing Date in connection with Purchaser's use of any such Acquired Contract,

18

Acquired Personal Property Lease, Acquired Real Property Lease, or Permit or License that is the subject of such arrangement (or assets or rights relating thereto).

2.6     Calculation and Payment of Cash Consideration.

(a)     Deposit; Liquidated Damages.

(i)     Concurrently with the execution and delivery of this Agreement by all parties hereto, Purchaser shall deposit into a non-interest bearing trust account (the "Escrow") with Seller's bankruptcy counsel (the "Escrow Holder") an amount equal to the Deposit in immediately available, good funds of the United States of America (funds delivered in this manner are referred to herein as "Good Funds"). The Deposit shall be credited and applied toward payment of the Cash Consideration at the Closing.

(ii)     PURCHASER AND SELLER HEREBY ACKNOWLEDGE THAT, IN THE EVENT PURCHASER FAILS TO CLOSE THE PURCHASE OF THE PURCHASED ASSETS WHEN REQUIRED TO DO SO UNDER THE TERMS OF THIS AGREEMENT WITHIN THREE BUSINESS DAYS AFTER THE LATER OF (A) THE CLOSING DATE AND (B) RECEIPT OF NOTICE FROM SELLER THAT IT IS READY, WILLING AND ABLE TO PROCEED WITH AND CONSUMMATE THE CLOSING (A "DEFAULT"), IT WOULD BE IMPRACTICABLE AND EXTREMELY DIFFICULT TO ESTIMATE THE DAMAGES SELLER MAY SUFFER OR INCUR IN THE EVENT THAT THE TRANSACTION CONTEMPLATED HEREIN FAILS TO CLOSE BY REASON OF SUCH DEFAULT.     ACCORDINGLY, NOTWITHSTANDING ANYTHING TO THE CONTRARY HEREIN, PURCHASER AND SELLER HEREBY AGREE THAT CONSIDERING ALL OF THE CIRCUMSTANCES EXISTING AT THE EXECUTION OF THIS AGREEMENT, THE DEPOSIT AMOUNT CONSTITUTES A REASONABLE ESTIMATE OF THE TOTAL DETRIMENT THAT SELLER WOULD SUFFER IN THE EVENT THAT THE TRANSACTIONS CONTEMPLATED HEREIN ARE TERMINATED PURSUANT TO SECTION 8.1(c) OR (e) HEREOF. EXCEPT AS OTHERWISE PROVIDED IN CLAUSES (i), (ii) AND (iii) BELOW, SAID AMOUNT SHALL REPRESENT THE AGREED AND LIQUIDATED DAMAGES TO WHICH SELLER IS ENTITLED BY REASON OF PURCHASER'S DEFAULT. THE PAYMENT OF SUCH AMOUNT AS LIQUIDATED DAMAGES IS NOT INTENDED AS A FORFEITURE OR PENALTY, BUT RATHER IS INTENDED TO CONSTITUTE LIQUIDATED DAMAGES TO SELLER.     UPON PURCHASER'S DEFAULT AND SELLER'S ELECTION TO TERMINATE THIS AGREEMENT BY REASON THEREOF PURSUANT TO SECTION 8.1(c) OR 8.1(e), THIS AGREEMENT SHALL TERMINATE AND, EXCEPT FOR (i) SELLER'S RIGHT TO COLLECT THE AMOUNT OF SUCH LIQUIDATED DAMAGES, (ii) SELLER'S RIGHTS UNDER SECTION 11.2 HEREOF TO THE EXTENT RELATING TO THE COLLECTION OF THE DEPOSIT PURSUANT TO THIS SECTION 2.6(a)(ii), AND (iii) ANY PROVISIONS AND OBLIGATIONS OF THIS AGREEMENT WHICH BY THEIR TERMS SURVIVE ANY TERMINATION OF THIS AGREEMENT, THE PARTIES HERETO SHALL BE RELIEVED OF ANY FURTHER LIABILITY OR OBLIGATION UNDER THIS AGREEMENT.  BY EXECUTING AND DELIVERING THIS AGREEMENT, EACH

PARTY SPECIFICALLY ACKNOWLEDGES AND CONFIRMS THE ACCURACY OF THE STATEMENTS SET FORTH ABOVE AND THAT IT WAS REPRESENTED BY COUNSEL OF ITS CHOICE WHO FULLY EXPLAINED THE CONSEQUENCES OF THIS LIQUIDATED DAMAGES PROVISION AT THE TIME OF EXECUTION OF THIS AGREEMENT.

(b)     Payment at Closing.  On the Closing Date, subject to the satisfaction of the conditions set forth herein, Purchaser shall (i) (A) cause the Escrow Holder to deliver the Deposit to Seller, (B) pay and deliver to Seller, in Good Funds, the Estimated Cash Consideration (as defined below) less the Deposit and less the Adjustment Escrow Amount, in each case, by wire transfer in accordance with written wire instructions provided by Seller to Purchaser not later than two (2) Business Days prior to Closing and (ii) deposit, in Good Funds, the Adjustment Escrow Amount into an account (the "Adjustment Escrow Account") designated at least three (3) Business Days prior to the Closing Date by the Escrow Holder.   The Adjustment Escrow Amount will not be used for any purpose except as expressly provided in this Agreement.

(c)     Estimated Cash Consideration.  Not less than five (5) Business Days prior to the Closing Date, Seller shall in good faith and in consultation with Purchaser prepare and deliver to Purchaser a good faith estimated calculation of the Cash Consideration (the "Estimated Cash Consideration") and all components thereof, including the Net Working Capital as of the Closing Date. Seller's calculation of the Estimated Cash Consideration shall be made in accordance with the methodology (the "Applicable Methodology") set forth in Exhibit 2.6(c) hereto (the "Estimated Closing Statement").

(d)     Closing Cash Consideration.  Within sixty (60) days after the Closing Date, Purchaser shall prepare (again, utilizing the Applicable Methodology) and deliver to Seller a good faith estimated calculation of the Cash Consideration (the "Closing Cash Consideration") and all components thereof, including the Net Working Capital as of the Closing Date (the "Final Net Working Capital"). Seller will have reasonable access to all work papers and books and records of the Business used by Purchaser in its calculation of the Closing Cash Consideration.

(e)     Dispute Notice.   Purchaser's determination of the Closing Cash Consideration will be final, conclusive and binding on Purchaser and Seller unless Seller provide a written notice (a "Dispute Notice") to Purchaser no later than the fifteenth (15th) Business Day after delivery of Purchaser's calculation of the Closing Cash Consideration setting forth in reasonable detail (i) any item of Purchaser's calculation of the Closing Cash Consideration which Seller believes has not been prepared in accordance with this Agreement (an "Item of Dispute") and (ii) the correct amount of such Item of Dispute in accordance with this Agreement. Any item or amount to which no dispute is raised in a timely fashion under the Dispute Notice will be final, conclusive and binding on Purchaser and Seller.

(f)     Resolution of Disputes.  If any Item of Dispute remains unresolved for a period of thirty (30) days after Purchaser's receipt of the Dispute Notice, either Purchaser or Seller may submit the remaining Items of Dispute to BDO USA, LLC, or other mutually agreeable accounting firm (the "Independent Auditor").  Purchaser and Seller shall request that the Independent Auditor render a determination (which determination shall be solely based on whether the Item of Dispute was prepared in accordance with the terms of this Section 2.6 or

whether a mathematical error was made) as to each unresolved Item of Dispute within fifteen (15) Business Days after its retention, and Purchaser and Seller shall cooperate in all reasonable respects with the Independent Auditor so as to enable it to make such determination as quickly and as accurately as practicable. The Independent Auditor's determination as to each Item of Dispute shall be (i) based solely on presentations by Purchaser and Seller which are in accordance with the guidelines and procedures set forth in this Agreement (i.e., not on the basis of an independent review), (ii) in writing and (iii) conclusive and binding upon Purchaser and Seller, and the Closing Cash Consideration shall be modified to the extent necessary to reflect such determination. The Independent Auditor shall consider only the remaining Items of Dispute and the Independent Auditor may not assign a value to any Item of Dispute greater than the greatest value assigned by Purchaser, on the one hand, or Seller, on the other hand, or less than the smallest value for such item assigned by Purchaser, on the one hand, or Seller, on the other hand. The costs and expenses of the Independent Auditor shall be borne by the non-prevailing party as determined by the Independent Auditor. The Independent Auditor will act as an expert and not as an arbitrator.

(g)     <u>Final Cash Consideration</u>. The Closing Cash Consideration as finally determined pursuant to <u>Section 2.6(d)</u>, if there is no dispute, or Section 2.6(e) and (f), if there is a dispute, is referred to as the "<u>Final Cash Consideration</u>." If the Final Cash Consideration exceeds the Estimated Cash Consideration (such excess amount, the "<u>Excess Amount</u>"), then Purchaser shall within five (5) Business Days of the determination of the Final Cash Consideration (i) pay to Seller the Excess Amount and (ii) instruct the Escrow Holder to make a payment in an amount equal to the Adjustment Escrow Amount to Seller. If the Final Cash Consideration is less than the Estimated Cash Consideration (such shortfall amount, the "<u>Deficiency Amount</u>"), then, within five (5) Business Days of the determination of the Final Cash Consideration, (i) Purchaser shall be entitled to receive a payment in cash out of the Adjustment Escrow Amount in an amount equal to the lesser of the Deficiency Amount and the Adjustment Escrow Amount, and Purchaser and Seller shall jointly instruct the Escrow Holder to make a payment to Purchaser out of the Adjustment Escrow Account in an amount equal to such lesser amount, (ii) if the Deficiency Amount is greater than the Adjustment Escrow Amount, Seller shall pay such excess to Purchaser, and (iii) if the Deficiency Amount is less than the Adjustment Escrow Amount, Purchaser and Seller shall jointly instruct the Escrow Holder to make a payment to Seller out of the Adjustment Escrow Account in an amount equal to the balance of such Adjustment Escrow Amount (after giving effect to the payment in clause (i) of this sentence).

(h)     <u>Purchase Price Allocation</u>. Within thirty (30) days after the determination of the Final Cash Consideration, Purchaser will prepare or cause to be prepared and delivered to Seller an allocation of the Purchase Price for applicable Tax purposes among the Purchased Assets in accordance with Section 1060 of the Code and the Treasury Regulations thereunder. Seller and Purchaser shall cooperate in good faith to finalize a mutually agreeable Form 8594 allocation within thirty (30) Business Days after the delivery of the allocation by Purchaser to Seller. If the Parties reach agreement on the allocation, Seller and Purchaser covenant (i) to revise the allocation in accordance with this <u>Section 2.6(h)</u> to reflect any adjustments to the Purchase Price, (ii) to report gain or loss or cost basis, as the case may be, in a manner consistent with such allocation, (iii) to prepare and file, and cause their respective Affiliates to prepare and file, their Tax Returns, including Internal Revenue Service Form 8594, on a basis consistent with

the allocation, (iv) not to voluntarily take any position inconsistent therewith in any proceeding relating to Taxes, and (v) to use commercially reasonable efforts to sustain such allocation in any subsequent Tax audit or Tax dispute.

2.7     Closing.

(a)     The Closing shall take place on the date that is three (3) Business Days after the satisfaction or waiver of the conditions precedent set forth in ARTICLES VI and VII or on such other date, and at such time and place, as may be agreed by Purchaser and Seller.  The date on which the Closing occurs in accordance with the preceding sentence is referred to in this Agreement as the "Closing Date."

(b)     At the Closing, Seller shall deliver counterparts of the following to Purchaser:

(i)     a bill of sale and assignment and assumption agreement in the form attached hereto as Exhibit 2.7(b)(i) (the "Bill of Sale, Assignment and Assumption") duly executed by Seller;

(ii)     an assignment of the Acquired Intellectual Property Rights in the form attached hereto as Exhibit 2.7(b)(ii) (the "IP Assignment");

(iii)     a certificate of Seller, dated as of the Closing Date, as to the satisfaction of the conditions set forth in Sections 6.1, 6.2, and 6.5 hereof;

(iv)     a certified copy of the Sale Order as entered by the Bankruptcy Court, vesting the Purchased Assets in Purchaser free and clear of any Liens (except for Permitted Post-Closing Encumbrances), and a certified copy of the docket for the period following entry of the Sale Order and through the date immediately prior to the date of the Closing;

(v)     a certificate of non-foreign status of Seller (or, if Seller is disregarded for U.S. federal income tax purposes, its regarded owner) meeting the requirements of Treasury Regulations Section 1.1445-2(b)(2); and

(vi)     [Reserved];

(vii)     [Reserved]

(viii)     [Reserved]

(ix)     a certificate of the Secretary or an Assistant Secretary of Seller certifying as to the incumbency and signatures of the executing officers of Seller;

(x)     [Reserved]; and

22

(xi) such other instruments and documents as may be reasonably requested by Purchaser at least five (5) Business Days prior to Closing in order to consummate the transactions contemplated under this Agreement.

(c) At the Closing, Purchaser shall deliver the following to Seller:

(i) the amount described in Section 2.6(b) pursuant to the payment procedures described in Section 2.6(b);

(ii) [Reserved]

(iii) duly executed counterparts of each of the Related Agreements referred to in Section 2.7(b);

(iv) a certificate of Purchaser, dated as of the Closing Date, as to the satisfaction of the conditions set forth in Sections 7.1 and 7.2; and

(v) a counterpart of each Real Property Lease Assignment and Assumption Agreement, executed by Purchaser and dated as of the Closing Date; and

(vi) such other instruments and documents as may be reasonably requested by Seller at least five (5) Business Days prior to Closing in order to consummate the transactions contemplated under this Agreement.

2.8 <u>Addition/Removal of Acquired Contracts, Acquired Real Property Leases, Acquired Personal Property Leases and Permits and Licenses</u>. Purchaser may, in its sole discretion, add any Contract or Permits and Licenses to (or remove any Contract or Permits and Licenses from) the Acquired Contracts on Section 2.1(c) of the Disclosure Schedule, the Acquired Real Property Leases on Section 2.1(e) of the Disclosure Schedule, the Acquired Personal Property Leases on Section 2.1(f) of the Disclosure Schedule or the Permits and Licenses on Section 2.1(g) of the Disclosure Schedule up to the date that is three (3) days prior to the date of the Closing. The Seller shall comply with the terms of the Bid Procedures Order and the Notice of Proposed Assumption and Assignment of Designated Executory Contracts and Unexpired Leases Docket No. 269 with respect to all such Contracts and Permits and Licenses added to (or removed from) the relevant sections of the Disclosure Schedule. Any removal or addition of Contracts or Permits and Licenses pursuant to this Section 2.8 shall have no effect upon the Purchase Price payable to Seller hereunder.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to Purchaser, as of the date hereof and as of the Closing Date, as follows:

3.1 <u>Due Incorporation</u>. Seller is duly organized, validly existing and in good standing under the law of the State of Delaware.

3.2     Due Authorization.  Subject to entry of the Sale Order, Seller has full power and authority to (a) enter into this Agreement and its Related Agreements and to consummate the transactions contemplated hereby and thereby and (b) own, lease, hold and operate the assets and properties owned, leased, held or operated by it and to carry on its business as it is currently conducted.  Seller is duly qualified or licensed and in good standing to do business in each jurisdiction in which the property owned, leased, held or operated by it or the nature of its business makes such qualification or licensing necessary, except where the failure to be so qualified, licensed or in good standing has not been, and would not reasonably be expected to be, material to the Business or the Purchased Assets.  Subject to entry of the Sale Order, the execution, delivery and performance by Seller of this Agreement and the Related Agreements have been duly and validly approved on behalf of the Board of Directors of Parent and the managing member of Seller and no other corporate or entity actions or proceedings on the part of Seller is necessary to authorize this Agreement, Seller's Related Agreements and the transactions contemplated hereby and thereby.  Seller has duly and validly executed and delivered this Agreement and have duly and validly executed and delivered (or prior to or at the Closing will duly and validly execute and deliver) their Related Agreements.  Subject to entry of the Sale Order, (i) this Agreement constitutes the legal, valid and binding obligation of Seller and (ii) Seller's Related Agreements, upon execution and delivery by Seller, will constitute legal, valid and binding obligations of Seller, in each case, enforceable in accordance with their respective terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, moratorium, reorganization or similar laws in effect which affect the enforcement of creditors' rights generally and by equitable principles.

3.3     Consents and Approvals; Governmental Authority Relative to This Agreement. Except as set forth in Section 3.3 of the Disclosure Schedule, the execution, delivery and performance by Seller of this Agreement and the Related Agreements will not, subject to entry of the Sale Order, (a) result in the creation of any Lien upon any of the Purchased Assets that is not extinguished pursuant to the Sale Order or (b) violate, conflict with or result in a breach of (with or without notice or lapse of time, or both), require a Consent, result in the loss of any material benefit under, require payment pursuant to, or give rise to a right of acceleration, termination, modification or loss of benefits under (i) any provision of any of the Certificate of Formation or Operating Agreement of Seller, (ii)  any Permits and Licenses, order, writ, injunction, decree, statute, treaty, rule or regulation applicable to the Business, the Purchased Assets, Seller or any of its assets or (iii) any Contract included in the Purchased Assets other than, in the case of clause (ii) and (iii) above, as would not reasonably be expected to result in a Material Adverse Effect.

3.4     Compliance With Laws.  Except as otherwise set forth on Section 3.4 of the Disclosure Schedule, Seller is and has been during the Look-Back Period operating the Business in compliance in all material respects with all Applicable Laws.

3.5     Litigation.  Except (i) for the general pendency of the Bankruptcy Case and related Proceedings that would not reasonably be expected to be, individually or in the aggregate, material to the Business or the Purchased Assets and (ii) for the Proceedings described in Section 3.5 of the Disclosure Schedule: (a) during the Look-Back Period, there have not been, and there are no, Proceedings pending or threatened against Seller or the Purchased Assets and (b) Seller is not subject to any outstanding Order that prohibits or otherwise restricts the ability of Seller or

24

any of its Affiliates to consummate fully the transactions contemplated by this Agreement or any other Related Agreements.

3.6    Certain Financial Information.

(a)    Attached to Section 3.6(a) of the Disclosure Schedule are true and complete copies of the unaudited, consolidated balance sheets of Parent and its subsidiaries as of December 31, 2019 and December 31, 2020 and the related unaudited consolidated statement of operations, members' equity, and cash flows for the 12 months then ended (the "Financial Statements"). The Financial Statements have been prepared from, and are consistent with, the books and records of Parent and its subsidiaries.

(b)    Except for liabilities reflected or reserved against on the Schedules and Statements, Seller does not have any material liabilities, other than (i) liabilities that have been incurred in the Ordinary Course of Business since the Petition Date and which are included in the Final Cash Consideration, or (ii) contractual liabilities incurred in the Ordinary Course of Business that are not material and, in the case of clauses (i) and (ii), none of which is a liability for breach of Contract, breach of representation or warranty, violation of Applicable Law, tort or infringement by Seller.

(c)    All Acquired Receivables resulted from bona fide sales in the Ordinary Course of Business and represent the genuine, valid and legally enforceable indebtedness of the account debtor.  Section 3.6(c) of the Disclosure Schedule sets forth a true and complete list of all Accounts Receivable that are more than thirty (30) days past due as of the date hereof.

(d)    All Acquired Inventories consist of a quality and quantity usable and salable in the Ordinary Course of Business.  No Acquired Inventory is held on a consignment basis.  All Acquired Inventories are located at the Reading Facility or are in transit thereto.

(e)    Each Acquired L/C is a validly issued and outstanding standby letter of credit that is in full force and effect. Each Acquired L/C has been cash collateralized in a manner satisfactory to the issuer of such Acquired L/C. Section 2.1(m) of the Disclosure Schedule accurately lists the amounts of cash collateral posted for each Acquired L/C.  Except as set forth on Section 3.6(e) of the Disclosure Schedule, no amounts are currently drawn under any Acquired L/C, and Seller has not received a draw request from any L/C beneficiary.

(f)    Section 3.6(f) of the Disclosure Schedule sets forth a true and complete list of all of the capital expenditures budgeted, at any time, to be paid by Seller under their debtor in possession financing facilities during the Relevant Period (collectively, the "DIP Budgeted Capital Expenditures").

(g)    Section 3.6(g) of the Disclosure Schedule sets forth a true and complete list of all capital leases secured by any of the Purchased Assets (the "Capital Lease Obligations").

3.7    Real Property.

(a)     Seller does not hold fee title to any real property used or held for use in the Business.  Section 2.1(e) of the Disclosure Schedule sets forth a complete and correct list of all of the real property leased by Seller.  Seller has not granted any options with respect to the purchase of the Reading Facility or any portion thereof or any other unexpired rights in favor of third Persons to purchase or otherwise acquire a leasehold interest in the Reading Facility or any portion thereof.  Except as set forth on Section 3.7(a) of the Disclosure Schedule or as a result of the pendency of the Bankruptcy Case, (i) Seller is not in material default under the Acquired Real Property Leases,  (ii) no written notice of any material default under the Acquired Real Property Leases, which default remains uncured, has been sent or received by Seller, and (iii) no conditions or circumstances exist which, with the lapse of time or the giving of notice, or both, would constitute a material default or breach under the Acquired Real Property Leases. Seller has not leased, subleased, assigned, licensed or otherwise granted to any Person the right to use or occupy any portion of the Reading Facility.  Seller has not collaterally assigned or granted any other security interest in any Acquired Real Property Lease.

(b)     Seller has valid leasehold interests in and exclusive possession of each parcel of the Reading Facility free and clear of all Liens, other than (x) as of the date hereof, Permitted Liens and (y) as of the Closing Date, Permitted Post-Closing Encumbrances.  Section 3.7(b) of the Disclosure Schedules, lists each executory Contract providing for any material repairs, work, and/or capital improvements at the Reading Facility.  To the Seller's Knowledge, there are no material structural defects (whether latent or patent) relating to the Reading Facility, and there is no material physical damage to the Reading Facility for which there is no insurance in effect.  For the avoidance of all doubt, the fact that the Construction Work is ongoing shall not be deemed to breach or violate the representation made in the immediately preceding sentence.

3.8     Material Contracts.

(a)     Section 3.8(a) of the Disclosure Schedule contains a true and complete list of all of the following types of Contracts, including Contracts to which the Seller is a party or bound, in each case (i) relating to the Business or (ii) by which any of the Purchased Assets are bound or affected (each Contract listed, and each Contract that should be listed, on Section 3.8(a) of the Disclosure Schedule being referred to as a "Material Contract"), a complete and correct copy of which (as in effect on the date hereof), and including all amendments, supplements, restatements, waivers, side letters, addenda, exhibits, schedules and modifications thereto, and summaries of any oral versions of same, has been furnished to Purchaser by Seller:

(i)     any Contract pursuant to which Seller leases any real property, including the Acquired Real Property Leases;

(ii)     any Contract (other than a purchase order) with a Key Customer or Key Vendor;

(iii)     any outstanding purchase order or related series of purchase orders included in the Purchased Assets in excess of $250,000;

(iv)     any Contract for the distribution of products of the Business, including any dealer, representative, agency or similar Contract;

(v)     any Contract with any Governmental Authority or any instrumentality of any such Governmental Authority;

(vi)     any (A) employment and similar Contract with an officer or other member of management and (B) Contract with a consultant pursuant to which the Business is or could become obligated to make payments exceeding $100,000 per annum;

(vii)     any Contract involving a change of control or retention bonus, "stay bonus" or similar arrangement or providing for the grant or acceleration of any benefit payable to any Employee;

(viii)     any Contract between any current or former employee of Seller or its Affiliates or current or former consultant of Seller or its Affiliates, on the one hand, and Seller or its Affiliates, on the other hand, that restricts any such Person (A) from competing, directly or indirectly, with the Seller, the Business or any other Person or (B) from soliciting or hiring current or former employees or customers of the Seller, the Business or any other Person;

(ix)     any Acquired Contract that includes a "most favored nation," "meet or release" or similar pricing and delivery arrangement or that includes a minimum volume commitment or any other similar performance or financial goal, or involves the payment by the Business of amounts that include "take or pay" requirements or output terms or similar pricing or delivery arrangements;

(x)     any Acquired Contract that restricts the ability of Seller or the Business to compete with any Person, engage in any business or operate in any geographical area;

(xi)     any Acquired Contract by which any material Intellectual Property Rights are (A) licensed by Seller or its Affiliates to a third party or (B) licensed to the Seller (other than Contracts that are shrinkwrap, clickwrap or other similar non-negotiable terms granted to the Seller for third-party software that are available to the general public as of the Closing Date);

(xii)     any performance bond or surety Contract;

(xiii)     any Contract that settled any Proceeding (A) during the Look-Back Period for monetary payments to or by Seller or any of its Affiliates in excess of $250,000 or (B) that involves any equitable or other non-monetary relief and that is binding on the Seller or the Business;

(xiv)     any collective bargaining, works council, shop, enterprise or recognition Contract;

(xv)     the Acquired Real Property Leases; and

(xvi)     the Acquired Personal Property Leases.

(b)     With respect to each Material Contract: (i) such Material Contract is the legal and valid obligation of the applicable Seller and each other party thereto, and constitutes the binding and enforceable obligation of the Seller and each other party thereto, in accordance with its terms; (ii) the Seller is not, nor is any other Person, in breach or default thereunder and, except as otherwise set forth in Section 3.8(b) of the Disclosure Schedule or as a result of the pendency of the Bankruptcy Case, no condition exists or event has occurred (including any condition or event that with notice or lapse of time, or both) that would constitute a breach or default, or permit termination, modification in any manner adverse to the Business or the Purchased Assets or acceleration thereunder; (iii) no party has asserted nor has (except by operation of law) any right to offset, discount or otherwise abate any amount owing under such Material Contract; and (iv) no amendment or modification has been made thereto except those, if any, reflected in the copies previously furnished to Purchaser.  There are no material disputes under any Material Contract.

3.9     <u>Employees and Labor Matters</u>.

(a)     <u>Section 3.9(a)</u> of the Disclosure Schedule sets forth the following information for each current Employee (including each current Employee on leave of absence): employer; name; date of hire; job title or position; current compensation paid or payable; status as exempt or non-exempt under the Fair Labor Standards Act of 1938, as amended; current base salary or rate of pay; bonus compensation (if any) paid or payable for calendar year 2020; accrued and unused vacation and other paid time-off; and leave status (including nature and duration of any leave).

(b)     To the Seller's Knowledge, no Employee is a party to, or is otherwise bound by, any agreement, including any confidentiality, noncompetition, or proprietary rights agreement, between such Employee and any other Person that in any way (i) adversely affects the performance of his or her duties as an Employee; (ii) adversely affects the ability of Seller, or could reasonably be expected to adversely affect the ability of Purchaser after the Closing Date, to conduct the Business; or (iii) is being violated by virtue of the Employee's provision of services to Seller or any of its Affiliates.

(c)     Neither Seller nor any of its Affiliates is a party to any collective bargaining agreement or other labor union Contract applicable to the Employees and there are not any activities or Proceedings of any labor union to organize any of the Employees.

(d)     The employment or other engagement of all Employees is terminable at will without any penalty or severance obligation of any kind on the part of the employer.  All sums due for employee compensation and benefits and all vacation time or paid time off owing to any Employees have been duly and adequately accrued on the accounting records of Seller.

(e)     Any individual who performs or performed services for Seller or any of its Affiliates and who is not treated as an employee for federal income tax purposes by the Seller or an Affiliate, as applicable, is not an employee under Applicable Laws or for any purpose, including, without limitation, for Tax withholding purposes or Benefit Plan purposes.

(f)     Seller has not effectuated (i) a "plant closing" (as defined in the WARN Act) in connection with the Business; or (ii) a "mass layoff" (as defined in the WARN Act) of individuals employed at or who primarily provided service to the Business.  Seller has heretofore made available to Purchaser a true and complete list of layoffs, by location, implemented by Seller since January 1, 2021.

3.10    Benefit Plans.

(a)     Section 3.10(a) of the Disclosure Schedule sets forth an accurate and complete list of all Benefit Plans.  Seller has made available to Purchaser or its counsel a true and complete copy of all plan documents (including related trust agreements, funding arrangements, Form 5500s and insurance contracts and all amendments thereto) with respect to each Benefit Plan in which any Employees participate or are eligible to participate.

(b)     Each Benefit Plan has been established, funded, maintained and administered in all material respects in accordance with its terms, and in compliance with the applicable provisions of ERISA, the Code and other Applicable Law.  With respect to each Benefit Plan that is intended to qualify under Section 401(a) of the Code, Seller has received a favorable determination, opinion or advisory letter with respect to such Benefit Plan and its related trust that has not been revoked and no circumstances exist and no events have occurred that could adversely affect the qualified status of such Benefit Plan or the related trust.  No Benefit Plan provides retiree health or life insurance benefits except as may be required by Section 4980B of the Code and Section 601 of ERISA, any other Applicable Law or at the sole expense of the participant or the participant's beneficiary.  No Benefit Plan that provides health insurance or medical coverage is self-funded or self-insured and all premiums that have become due have been paid in full.

(c)     No Benefit Plan is (i) a "defined benefit plan" (as defined in Section 3(35) of ERISA), (ii) an "employee pension benefit plan" (as defined in Section 3(2) of ERISA) that is subject to Title IV of ERISA or Sections 412 or 430 of the Internal Revenue Code, (iii) a "multiemployer plan" (as defined in Section 3(37) or 4001(a)(3) of ERISA), or (iv) a "multiple employer plan" within the meaning of Section 413(c) of the Code.

3.11    Permits.  Seller has made all filings and paid all fees and duties, in each case, necessary to maintain the Permits and Licenses, each of which is valid and in full force and effect.  Except as otherwise set forth in Section 3.11 of the Disclosure Schedule or as a result of the pendency of the Bankruptcy Case, (i) Seller is in compliance in all material respects with all of the Permits and Licenses included in the Purchased Assets, and no condition exists that with notice or passage of time or both would reasonably be expected to constitute a default under any such Permits and Licenses and (ii)  Seller has not received any notice of any violation of any Permits and Licenses included in the Purchased Assets or notice of any proposal to revoke, cancel, rescind, modify or refuse to renew any of such Permits and Licenses.

3.12    Intellectual Property

(a)     Section 3.12(a) of the Disclosure Schedule is a true and complete list of all (i) Patents; (ii) registered trademarks, service marks and trade names and those for which an

application is pending; (iii) registered or applied for copyrights; and (iv) Internet domain names and social media accounts, in each case, owned or purported to be owned by Seller (items (i) through (iii), the "Registered Intellectual Property," together with all other Intellectual Property Rights owned or purported to be owned by each of the Seller, collectively the "Owned Intellectual Property"). Other than pending applications included in the Registered Intellectual Property, the Registered Intellectual Property is subsisting, valid and enforceable. Seller is not subject to any Order that restricts or impairs its use of any Owned Intellectual Property. No Person has alleged, in a Proceeding to which Seller is a party or otherwise, that any Owned Intellectual Property is not owned by Seller or that rights thereto are invalid or unenforceable.

(b)     Seller exclusively owns all right, title and interest in and to all Registered Intellectual Property and material Owned Intellectual Property, free and clear of all Liens. Seller has valid, subsisting and enforceable licenses to use all Seller Intellectual Property owned by any third party, including sufficient quantities of seat, server core, or other license units. Seller is in compliance in all material respects with all licenses, and all license fees, renewal fees and maintenance fees that have become due have been timely paid by Seller, including with respect to seat, server core or other unit license restrictions. The consummation of the transactions contemplated by this Agreement will not alter or impair any rights of Seller to Seller Intellectual Property.

(c)     Except as set forth in Section 3.12(c) of the Disclosure Schedule, (i) the operation of the Business as conducted as of the date hereof does not, and the services provided by Seller do not, infringe, misappropriate, or otherwise violate in any material respect, and have not during the Look-Back Period infringed, misappropriated or otherwise violated in any material respect, the Intellectual Property Rights of any third party, and no third party is infringing, misappropriating, or otherwise violating the Owned Intellectual Property, (ii) during the Look-Back Period, neither Seller nor any of its Affiliates has received any communication regarding any actual, alleged or suspected material infringement, misappropriation or other material violation of Intellectual Property Rights of a third party by Seller, and (iii) during the Look-Back Period, neither Seller nor any of its Affiliates has sent any written notice, charge, complaint, claim or other written assertion asserting or threatening to assert in any Proceedings against any Person regarding the material infringement, misappropriation, dilution or other material violation of any Owned Intellectual Property.

(d)     No current or former employee or officer of Seller and no current or former consultant or contractor of Seller has any right, title or interest in or to any material Seller Intellectual Property. No funding, facilities or personnel of any Governmental Authority or academic or research institution were used to develop or create, in whole or in part, any Owned Intellectual Property.

(e)     Seller has taken commercially reasonable actions to safeguard and maintain the secrecy and the confidentiality of, and their respective proprietary rights in and to, all non-public Owned Intellectual Property.

(f)     The computer software, computer hardware, firmware, networks, interfaces and related systems included in the Purchased Assets (collectively, "Computer Systems") are sufficient in all material respects for the Seller's operation of the Business and the

Purchased Assets as conducted as of the date hereof and as contemplated to be conducted as of the date hereof and, except as set forth on Section 3.12(f) of the Disclosure Schedule, there have been no material failures, crashes, ransomware attacks, security breaches or similar adverse events affecting the Computer Systems. Seller provides for the backup and recovery of material data and has implemented and maintains commercially reasonable disaster recovery plans, procedures and facilities. Seller has taken commercially reasonable steps, as necessary and appropriate, to protect the integrity and security of the Computer Systems and the information stored therein, processed thereon or transmitted therefrom from misuse or unauthorized use, access, disclosure or modification by third parties, and there has been no such misuse or unauthorized use, access, disclosure or modification thereof. None of the Computer Systems are used in any business other than the Business.

3.13    Environmental Matters.

(a)    There is no Environmental Claim pending or threatened against the Seller or with respect to the Business or the Purchased Assets, and all past Environmental Claims have been finally and fully resolved. There are no past or present actions, activities, circumstances, conditions, events or incidents, including the Release, presence, handling, management, use, generation, or disposal of any Hazardous Materials at any location that could form the basis of any material Environmental Claim or otherwise result in any material costs or liabilities under Environmental Law with respect to the Business or the Purchased Assets.

(b)    No Release or threatened Release of Hazardous Material has occurred or is currently occurring at or from any property owned, operated, leased or used or any other property formerly owned, operated, leased or used by the Seller or any of its predecessors or the Business for which Environmental Law requires (i) notice to any Person or (ii) any form of Response Action and the Seller has not received any notice that the operation of the Business has caused the contamination of any other property with Hazardous Material, which has resulted or would reasonably be expected to result in a material Environmental Claim against the Business or the Purchased Assets.

(c)    Except as otherwise set forth in Section 3.13(c) of the Disclosure Schedule, Seller has not, either expressly or by operation of law, assumed responsibility for or agreed to indemnify or hold harmless any Person for any Environmental liability with respect to the Business or the Purchased Assets.

(d)    Seller has identified and made available to Purchaser complete and correct copies of all material studies, audits, assessments, reports, data, memoranda and investigations, and other material information relating to Hazardous Materials, Environmental Claims, Environmental Liabilities or other environmental matters that are in its possession or control pertaining to, or the environmental condition of, the Business and the Purchased Assets or the compliance (or noncompliance) by the Seller or any of its predecessors with Environmental Laws.

(e)    Seller is not required by any Environmental Law or by virtue of the transactions set forth herein and contemplated hereby, or as a condition to the effectiveness of any transactions contemplated hereby, (i) to remove or remediate Hazardous Materials, (ii) to

31

give notice to or receive approval from any Governmental Authority or other Person, or to record any disclosure document or statement pertaining to environmental matters, or (iii) except as set forth in <u>Section 3.11</u> of the Disclosure Schedule, to alter, modify, renew, change or update any Environmental Permit, in each case with respect to the Business or the Purchased Assets.

3.14    <u>Title to Assets; Sufficiency of Assets; Condition of Assets</u>.  Seller has good and valid legal and beneficial title to, or a valid, binding and enforceable leasehold interest in, as applicable, all of the Purchased Assets, and such Purchased Assets are not subject to any Liens (other than (x) as of the date hereof, Permitted Liens and (y) as of the Closing Date, Permitted Post-Closing Encumbrances).  The Purchased Assets constitute (a) all of the tangible and intangible assets, rights and properties that are used or held for use by Seller or any of its Affiliates in connection with the Business, and (b) all of the assets, rights and properties necessary for the conduct of the Business in the Ordinary Course of Business following the Closing. The Purchased Assets are in good working condition and are suitable for the purposes for which they are used (subject to normal wear and tear) including for Purchaser to conduct and operate the Business in the Ordinary Course of Business, subject to the ongoing Construction Work.

3.15    <u>Taxes</u>.  Except to the extent an inaccuracy of the following would neither result in a Lien on any of the Purchased Assets nor a Tax liability to the Purchaser or its Affiliates or except as set forth on <u>Section 3.15</u> of the Disclosure Schedule:

(a)    All Tax Returns required to be filed by Seller or otherwise related to the Purchased Assets or the Business have been duly and timely filed and each such Tax Return is true, correct and complete in all material respects.  All Taxes owed by Seller or otherwise related to the Purchased Assets or the Business for which Purchaser may be liable that are or have become due have been paid in full and all other Taxes attributable to pre-Closing periods have been fully accrued through Closing on the financials statements of Seller.

(b)    Seller does not have in force any waiver of any statute of limitations in respect of Taxes or any extension of time related to a Tax assessment or deficiency with respect to the Purchased Assets or the Business.  No extension of time within which to file any Tax Return with respect to the Purchased Assets or the Business is currently in effect.  There is no audit, litigation or other Proceeding, Claim, assessment, deficiency, or adjustment pending, asserted, proposed or threatened with respect to Taxes of Seller or otherwise with respect to the Purchased Assets or the Business.  All of the Purchased Assets have been properly listed and described on the property tax rolls for all periods prior to and including the Closing Date and no portion of the Purchased Assets constitutes omitted property for property tax purposes.  Purchaser will not be held liable for any unpaid Taxes that are or have become due on or prior to the Closing Date as a successor or transferee, by statute, contract or otherwise, as a result of the transfer of the Purchased Assets pursuant to this Agreement.

3.16    <u>Key Business Relationships</u>.

(a)    <u>Section 3.16(a)(i)</u> of the Disclosure Schedules sets forth a true and complete list of (i) the top 10 customers of the Business based on revenue generated for the fiscal year period ended December 31, 2020 (each, a "<u>Key Customer</u>", and together, the "<u>Key</u>

<u>Customers</u>") and the amount of such revenue generated with respect to each Key Customer, and (ii) the top 15 vendors or suppliers of the Business based on purchases for the fiscal year period ended December 31, 2020 (each, a "<u>Key Vendor</u>", and together, the "<u>Key Vendors</u>") and the amount of such expenses incurred with respect to each Key Vendor. Except as set forth on <u>Section 3.16(a)(ii)</u> of the Disclosure Schedules, during the Look-Back Period, (i) no Key Customer has (A) materially decreased or notified Seller or any Affiliate of Seller of the foregoing of its intention to materially decrease its aggregate level of purchases of services from Seller relative to such Key Customer's purchasing history during the twelve (12) months prior to such change or (B) requested reduced pricing (whether through increased credits or otherwise) from that in effect under an existing Contract, in each case, other than with respect to commercial negotiations in the Ordinary Course of Business with respect to such Key Customer and not as a result of a deterioration in the business relationship with such Key Customer and (ii) no Key Vendor has adversely altered or notified Seller or its Affiliates of the foregoing of its intention to adversely alter in any material respect the terms (including price) on which it sells goods or services to the Business.

(b)     <u>Section 3.16(b)</u> of the Disclosure Schedule sets forth a true and complete list of all discounts, allowances, free goods or services, rebates, programs or other promotions that had a value, individually or in the aggregate, to any one customer of Seller in excess of $250,000 in the calendar year ended December 31, 2020. Seller has not changed its policies, procedures or guidelines in respect of any discounts, allowances, free goods or services, rebates, programs or other promotions offered to any customer other than in the Ordinary Course of Business.

3.17    <u>Insurance</u>. <u>Section 3.17</u> of the Disclosure Schedule sets forth a true and complete list of all insurance policies maintained by Seller or its Affiliates with respect to the Business, the Employees or the Purchased Assets (collectively, the "<u>Insurance Policies</u>"). Each Insurance Policy is in full force and effect and, except as otherwise set forth on <u>Section 3.17</u> of the Disclosure Schedule, all premiums due to date thereunder have been paid in full and neither Seller nor any of its Affiliates is in material default thereunder. Neither Seller nor any of its Affiliates, has received notice of cancellation or nonrenewal, in whole or in part, in respect of any Insurance Policy.

3.18    <u>Brokers and Finders</u>. Other than as set forth on <u>Section 3.18</u> of the Disclosure Schedule, no agent, broker, investment banker, financial advisor or other firm or person is entitled to any brokerage, finder's, financial advisor's or other similar fee or commission for which Purchaser or any of its Affiliates could become liable in connection with the transactions contemplated by this Agreement as a result of any action taken by or on behalf of Seller or any of its Affiliates.

3.19    <u>Product Quality</u>. All products manufactured, fabricated, sold or distributed by prior to the Closing Date comply with applicable customer specifications and Applicable Laws for the intended use of such products.

3.20    <u>Intercompany Agreements</u>. Other than as set forth on <u>Section 3.20</u> of the Disclosure Schedule, there are no Contracts between the Seller, on the one hand, and any

Affiliate of Seller, on the other hand, relating to the ownership, management or operation of the Business or the Purchased Assets.

3.21    Data Privacy.

(a)    With respect to the Business and the Purchased Assets, the Seller and, to the Knowledge of Seller, any Person acting for or on Seller's behalf have for the past three (3) years, as applicable, materially complied with (i) all applicable Privacy Laws, (ii) all of the Seller's policies and notices regarding Personal Information, and (iii) all of the Seller's contractual obligations with respect to Personal Information. The Seller has not received any written notice of any claims of or investigations or regulatory inquiries related to, or been charged with, the violation of any Privacy Laws, applicable privacy policies, or contractual commitments with respect to Personal Information in connection with the Business or the Purchased Assets. To the Knowledge of Seller, there are no facts or circumstances that could reasonably form the basis of any such notice or claim.

(b)    With respect to the Business and the Purchased Assets, the Seller has (i) implemented and for the past three (3) years, as applicable, maintained reasonable and appropriate technical and organizational safeguards, at least consistent with practices in the industry in which the Seller operates, to protect Personal Information and other confidential data in its possession or under its control against loss, theft, misuse or unauthorized access, use, modification, alteration, destruction or disclosure, and (ii) taken reasonable steps to ensure that any third party with access to Personal Information collected by or on behalf of the Seller has implemented and maintained the same. To the Knowledge of Seller, any third party who has provided Personal Information to Seller in connection with the Business or the Purchased Assets has done so in material compliance with applicable Privacy Laws. Except as would not reasonably be expected to be material to the Business or the Purchased Assets, there have been no breaches, security incidents, misuse of or unauthorized access to or disclosure of any Personal Information in the possession or control of the Seller or collected, used or processed by or on behalf of the Seller. The Seller has not provided or been legally required to provide any notices to any Person in connection with a disclosure of Personal Information in connection with the Business or the Purchased Assets. The transfer of Personal Information in connection with the transactions contemplated by this Agreement will not violate in any material respect any applicable Privacy Laws or the Seller's privacy policies as they currently exist or as they existed at any time during which any of the Personal Information was collected or obtained.

3.22    Disclaimer of Additional Representations and Warranties. EXCEPT AS SPECIFICALLY SET FORTH IN THIS AGREEMENT, NEITHER SELLER NOR ANY OF ITS AFFILIATES OR ANY OF THEIR RESPECTIVE AFFILIATES' DIRECTORS, OFFICERS, EMPLOYEES, CONTROLLING PERSONS, AGENTS OR REPRESENTATIVES MAKES OR HAS MADE ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, INCLUDING IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR THE ACCURACY OR COMPLETENESS OF ANY PROJECTIONS, ESTIMATES OR OTHER FORWARD LOOKING INFORMATION PROVIDED OR OTHERWISE MADE AVAILABLE TO PURCHASER OR ANY OF ITS DIRECTORS, OFFICERS, EMPLOYEES, AFFILIATES, CONTROLLING PERSONS, AGENTS OR REPRESENTATIVES.

# ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Seller as of the date hereof and as of the Closing, as follows:

4.1     Due Organization.   Purchaser is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware with all requisite power and authority to own and operate its assets and properties as they are now being owned and operated.

4.2     Due Authorization.   Purchaser has full power and authority to enter into this Agreement and its Related Agreements and to consummate the transactions contemplated hereby and thereby.  The execution, delivery and performance by Purchaser of this Agreement and its Related Agreements have been duly authorized by all necessary entity action of Purchaser. Purchaser has duly and validly executed and delivered this Agreement and has duly and validly executed and delivered (or prior to or at the Closing will duly and validly execute and deliver) its Related Agreements.  This Agreement constitutes the legal, valid and binding obligation of Purchaser and its Related Agreements, upon execution and delivery by Purchaser, will constitute legal, valid and binding obligations of Purchaser enforceable in accordance with their respective terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, moratorium, reorganization or similar laws in effect which affect the enforcement of creditors' rights generally and by equitable principles.

4.3     Consents and Approvals; No Violations.   The execution, delivery and performance by Purchaser of this Agreement and its Related Agreements will not (i) violate any law, regulation or order of any Governmental Authority applicable to Purchaser; (ii) except for filings that may be required pursuant to ARTICLE IX, require any filing or registration by Purchaser with, or consent or approval with respect to Purchaser of, any Governmental Authority; (iii) violate or conflict with or result in a breach or default under any Contract to which Purchaser is a party or by which Purchaser or any of its assets or properties are bound; or (iv) violate or conflict with the certificate of formation or limited liability company agreement of Purchaser, except where any such filing, registration, consent or approval, if not made or obtained, or any such violation, conflict, breach or default, would not have a material adverse effect on Purchaser's ability to consummate the transactions contemplated hereby.

4.4     Purchaser's Examination.   Purchaser and its representatives have been afforded the opportunity to meet with, ask questions of and receive answers from the management of Seller in connection with the determination by Purchaser to enter into this Agreement and the Related Agreements and consummate the transactions contemplated hereby and thereby, and all such questions have been answered to the reasonable satisfaction of Purchaser.

4.5     Investigation; Limitation on Warranties.

(a)     Purchaser acknowledges and agrees that neither Seller, nor any other Person acting on behalf of Seller or any of its Affiliates or representatives has made any

representation or warranty, express or implied, as to the accuracy or completeness of any information regarding Seller, the Business or the Purchased Assets, except as expressly set forth in this Agreement or the Related Agreements or as and to the extent required by this Agreement to be set forth in the Disclosure Schedule. Purchaser further agrees that, except only as expressly provided in this Agreement or the Related Agreements, Seller will not have or be subject to any liability to Purchaser or any other Person resulting from the distribution or use by Purchaser, any of its Affiliates or any of their respective directors, officers, employees, agents, consultants, accountants, counsel or other representatives of any such information, and any legal opinions, memoranda, summaries or any other information, document or material made available to Purchaser or its Affiliates or representatives in certain "data rooms," management presentations or any other form otherwise provided in expectation of the transactions contemplated by this Agreement.

(b)     Purchaser acknowledges and agrees that except for the representations and warranties of Seller expressly set forth in <u>ARTICLE III</u> hereof and the Related Agreements, the Purchased Assets are being acquired AS IS WITHOUT ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR INTENDED USE OR OTHER EXPRESSED OR IMPLIED WARRANTY.  Purchaser acknowledges and agrees that it is consummating the transactions contemplated hereby without any representation or warranty, express or implied, by any Person, except for the representations and warranties of Seller expressly set forth in <u>ARTICLE III</u> hereof.  Following the Closing, Seller will have no liability for a breach of representation or warranty except in the case of actual, intentional fraud.

(c)     In connection with Purchaser's investigation of Seller and the Business, Purchaser has received from or on behalf of Seller certain projections, including projected statements of operating revenues and income from operations of the Business and certain business plan information of Seller.  Purchaser acknowledges that there are uncertainties inherent in attempting to make such estimates, projections and other forecasts and plans, that Purchaser is familiar with such uncertainties, that Purchaser is taking full responsibility for making its own evaluation of the adequacy and accuracy of all estimates, projections and other forecasts and plans so furnished to it (including the reasonableness of the assumptions underlying such estimates, projections and forecasts), and that Purchaser shall have no claim against Seller or any other Person with respect thereto.  Accordingly, Seller make no representations or warranties whatsoever with respect to such estimates, projections and other forecasts and plans (including the reasonableness of the assumptions underlying such estimates, projections and forecasts) except as set forth in <u>ARTICLE III</u>.  Purchaser is relying on the representations and warranties of Seller regardless of the knowledge obtained through its own investigation, diligence or otherwise.

4.6     <u>Available Funds</u>.  Purchaser has sufficient cash resources on hand or available to it in an aggregate amount sufficient to pay in cash any and all amounts required to be paid by it pursuant to this Agreement, including the Cash Consideration and all fees and expenses related to the transactions contemplated by this Agreement to be paid by Purchaser.

4.7     <u>Brokers and Finders</u>.  No agent, broker, investment banker, financial advisor or other firm or person is entitled to any brokerage, finder's, financial advisor's or other similar fee or commission for which Seller or any of its Affiliates could become liable in connection with

36

the transactions contemplated by this Agreement as a result of any action taken by or on behalf of Purchaser or any of its Subsidiaries.

## ARTICLE V

## COVENANTS

5.1     <u>Access to Information and Applicable Locations</u>.

(a)     From the date of this Agreement to the earlier of the Closing Date or the date this Agreement is terminated, subject to the Confidentiality Agreement, Seller and its Affiliates shall give Purchaser and Purchaser's representatives, upon reasonable notice, reasonable access during normal business hours to the offices, Facility, employees, and books and records relating to the Business, and shall make the officers and employees of Seller and its Affiliates available to Purchaser and its representatives as Purchaser and its representatives shall from time to time reasonably request, in each case to the extent that such access and disclosure would not obligate Seller to take any actions that would unreasonably disrupt the normal course of their businesses or violate the terms of any contract to which Seller is bound or any Applicable Law; <u>provided</u>, that all requests for access shall be directed to Gregg Milhaupt and/or Alex Delnik (collectively, the "<u>Designated Contacts</u>").  Notwithstanding the foregoing, other than the Designated Contacts, Purchaser is not authorized to and shall not (and shall cause its employees, agents, representatives and Affiliates to not) contact any officer, director, employee, franchisee, customer, supplier, distributor, lender or other material business relation of Seller prior to the Closing without the prior written consent of a Designated Contact (it being agreed that if the Designated Contact elects to give any such consent, the consent may be conditioned upon, among other things, Seller being able to monitor or participate in any such contacts and any discussions or dialogue resulting therefrom).

(b)     Purchaser and their representatives shall treat and hold strictly confidential any confidential information (in whatever form) provided by or on behalf of Seller to the extent required by the Confidentiality Agreement.

5.2     <u>Preservation of Business</u>.  From the date of this Agreement until the Closing Date, other than as specifically contemplated by this Agreement or with the prior consent of Purchaser, Seller shall (a) operate the Reading Facility and the Business in the ordinary course of business and (b) use commercially reasonable efforts to preserve intact the Purchased Assets and the Business, retain the present officers and employees and consultants of the Business at their current compensation and benefits levels, and preserve the Business's goodwill and relationships with customers, suppliers, distributors and others having material business dealings with the Seller or the Business, and (c) not enter into any Contract (excluding ordinary course purchases of feed stock) which (x) involves the payment or receipt by the Seller of amounts in excess of $250,000 (in the aggregate) or (y) has a duration of longer than six (6) months.  Notwithstanding anything to the contrary in this Agreement, Purchaser and Seller hereby acknowledge and agree that (i) as of the execution date of this Agreement, there is construction, installation, and commissioning work ongoing at the Reading Facility (the "<u>Construction Work</u>") and the Reading Facility is not currently, and by the Closing Date may not be, Fully Operational, (ii) from execution of this Agreement through the Closing, Seller's obligation with respect to the

Construction Work shall be to use commercially reasonable efforts to achieve Target Completion of such Construction Work prior to the Closing, subject in all events to delays beyond Seller's reasonable control (including delays in receiving equipment or materials and issuance of permits or other third party approvals required in connection with the Construction Work), (iii) so long as Seller has complied with its obligation pursuant to clause (ii) of this sentence, neither completion of the Construction Work nor the achievement of Target Completion shall be deemed a condition to Purchaser's obligations to consummate the transaction contemplated herein, and (iv) to the extent the Construction Work is not completed prior to the Closing, Seller shall pay in full at the Closing the remaining costs to complete such work to the point where the Reading Facility will be Fully Operational, excluding the allocation of internal costs (such as existing employee costs being allocated to the Construction Work (the "Cost to Complete"), such Cost to Complete to be reasonably determined by the Parties based upon the amount of Construction Work remaining as of the Closing and the anticipated amount of the DIP Budgeted Capital Expenditures for the items of the Construction Work then remaining incomplete.

5.3     Efforts. Subject to the terms and conditions hereof, each party hereto shall use its commercially reasonable efforts to consummate the transactions contemplated hereby as promptly as practicable. The "commercially reasonable efforts" of Seller shall not require Seller, their Affiliates or representatives to incur or expend any material sums of money to remedy any breach of any representation or warranty hereunder or to provide financing to Purchaser for consummation of the transactions contemplated hereby; provided that if Seller, their Affiliates or representatives elect to remedy any such breach, Seller shall not be deemed to be in breach of such representation or warranty, or in violation of any covenant pursuant to Section 5.2, for purposes of determining Purchaser's obligations to consummate the transactions contemplated hereby pursuant to Section 6.1. Without limiting the foregoing, Seller will reasonably cooperate (as more particularly addressed below) with Purchaser, at Purchaser's expense, in Purchaser's efforts to obtain customary buyer-side representation and warranty insurance (the "R&W Policy") (payable solely by Purchaser) in connection with the transactions contemplated by this Agreement. Any R&W Policy so obtained shall specify that there is no right of, and that the insurer under the R&W Policy expressly waives any claims of, subrogation, contribution, or otherwise against the Seller or any of its Affiliates, employees, or direct or indirect shareholders, members, directors, officers, or partners, except in the case of actual, intentional fraud by the Seller in connection with the negotiation, execution, or performance of this Agreement. The cost of the R&W Policy (including the premium, underwriting fee, surplus lines taxes, and other fees (including the brokerage fees)) shall be paid by Purchaser. From and after the binding of the R&W Policy (which shall include the waivers described above), Purchaser shall provide Seller with a true and complete copy thereof and shall not amend, modify, or cancel the R&W Policy if such amendment, modification, or cancellation could reasonably be expected to adversely affect the rights of Seller thereunder without the prior written consent of the Seller (which consent may be granted or withheld in the Seller's sole discretion). As set forth above, the Seller shall reasonably cooperate with Purchaser in connection with obtaining the R&W Policy, including by making its officers and senior management available to Purchaser at reasonable times and for reasonable periods of time; provided that, in no event, shall (i) the issuance of an R&W Policy be a condition to or otherwise affect Purchaser's obligation to consummate the transactions set forth herein, or (ii) Seller or any employee, officer, director, agent or other representative of Seller be required to provide any affidavit, certificate, application, agreement or other covenant or assurance to Purchaser, the insurer under the R&W Policy or any other person in connection with

the underwriting or issuance thereof.  The "commercially reasonable efforts" of Seller shall not require Seller, their Affiliates or representatives to incur or expend any material sums of money to remedy any breach of any representation or warranty hereunder or to provide financing to Purchaser for consummation of the transactions contemplated hereby; provided that if Seller, their Affiliates or representatives elect to remedy any such breach, Seller shall not be deemed to be in breach of such representation or warranty, or in violation of any covenant pursuant to Section 5.2, for purposes of determining Purchaser's obligations to consummate the transactions contemplated hereby pursuant to Section 6.1.

      5.4    <u>Preservation of Records; Post-Closing Access and Cooperation</u>.  For a period of six (6) years after the Closing Date or such other period (if longer) required by Applicable Law, Purchaser shall preserve and retain, all corporate, accounting, legal, auditing, human resources and other books and records included in the Purchased Assets that are in its possession relating to the Business and the Purchased Assets prior to the Closing Date.  Purchaser shall, after the Closing Date, (a) permit Seller's counsel and other professionals and counsel for any successor to Seller and its professionals (collectively, "<u>Permitted Access Parties</u>") reasonable access, for the purpose of Seller's tax reporting requirements, financial accounting and compliance with Applicable Law, to the material financial and other books and records included in the Purchased Assets that are in its possession, during regular business hours and upon reasonable advance notice, which access shall include (i) the right of such Permitted Access Parties to copy, at such Permitted Access Parties' expense, such documents and records as they may reasonably request in furtherance of the purposes described above, and (ii) Purchaser's copying and delivering to the relevant Permitted Access Parties such documents or records as they may reasonably request in furtherance of the purposes described above, but only to the extent such Permitted Access Parties furnish Purchaser with reasonably detailed written descriptions of the materials to be so copied and the applicable Permitted Access Party reimburses the Purchaser for the reasonable costs and expenses thereof, and (b) Purchaser shall provide the Permitted Access Parties (at no cost to the Permitted Access Parties) with reasonable access to a representative during regular business hours and upon reasonable advance notice so that Seller and the other Permitted Access Parties have information necessary for the preparation of tax returns, collection of those Accounts Receivable that are Excluded Assets, determination of the amount of any adjustment to the Cash Consideration pursuant to Section 2.6 hereof, and other activities in connection with the administration and wind-down of the Bankruptcy Case; provided that such access does not unreasonably interfere with the Purchaser's operation of the Business and Purchaser shall not be required to provide access for requests unrelated to the Business or the Purchased Assets. Nothing in this Section 5.4 shall require Purchaser to take any such action if (a) such action (i) could result in a waiver or breach of any attorney-client, attorney work product or other legally recognized privileges or immunity from disclosure or (ii) would result in the disclosure of any trade secrets of third parties or violate any Applicable Laws related to the exchange of information or any obligation of Purchaser with respect to confidentiality, or (b) such access or information is requested in relation to disputes involving Purchaser, its equity holders or any of their respective Affiliates or the Business or Purchased Assets, including disputes arising under this Agreement or any other Related Agreement.

5.5    <u>Employees and Benefits</u>.

(a)    As of the Closing, Seller shall terminate the employment of all of those Employees identified on <u>Section 5.5(a)</u> of the Disclosure Schedule (the "<u>Subject Employees</u>"). <u>Section 5.5(a)</u> of the Disclosure Schedule hereto shall be amended from time to time prior to the Closing (i) to delete any individuals who are no longer employed by Seller or (ii) upon written notice from Purchaser to Seller, to add or remove any other individuals.  Purchaser, in cooperation with Seller, shall, at least five (5) Business Days prior to the Closing Date and effective as of the Closing Date, extend a written offer of employment to those employees selected by Purchaser, in its sole and absolute discretion (the "<u>Selected Employees</u>"), (A) at a level and with responsibilities that are substantially commensurate with their employment with Seller and at a wage or salary and bonus opportunity not less than the respective wage or salary and bonus opportunity specified for such Selected Employees on <u>Section 5.5(a)</u> of the Disclosure Schedule and with other benefits substantially comparable to those provided to similarly situated employees of the Purchaser.  Those Selected Employees who accept offers of employment with Purchaser and who become employees of Purchaser as of the Closing Date are referred to as "<u>Transferred Employees</u>."

(b)    It is understood and agreed between the parties that all provisions contained in this Agreement with respect to Benefit Plans or employee compensation are included for the sole benefit of the respective parties hereto and do not and shall not create any right in any other person, including, but not limited to, any Employee, any participant in any benefit or compensation plan or any beneficiary thereof.

(c)    In any termination or layoff of any Transferred Employee by Purchaser on or after the Closing, Purchaser will comply fully, if applicable, with the WARN Act and all other applicable foreign, Federal, state and local laws, including those prohibiting discrimination and requiring notice to employees.  Purchaser shall not at any time prior to sixty (60) days after the Closing Date, effectuate a "plant closing" or "mass layoff" as those terms are defined in the WARN Act affecting in whole or in part any facility, site of employment, operating unit or employee of the Business without complying fully with the requirements of the WARN Act. Purchaser shall be solely responsible for, and will bear the entire cost of, compliance with (or failure to comply with) any such laws following the Closing Date.

(d)    To the extent permissible under the Benefit Plans of Purchaser as of the Closing Date, Purchaser shall administer COBRA continuation coverage (other than with respect to flexible spending accounts) for M&A Qualified Beneficiaries (as defined in COBRA) that both (x) are Subject Employees (and not probationary or inactive employees as of the Closing Date) and (y) were not made offers of employment by Purchaser in accordance with <u>Section 5.5(a)</u>.

5.6    <u>Public Announcements</u>.  Purchaser and Seller will consult with each other before issuing any press release or otherwise making any public statements or disclosures with respect to the transactions contemplated by this Agreement, including the terms hereof, and no party shall, without the prior written consent of the other party, issue any such press release or make any such public statement, except as may be required by Applicable Law; provided, however, that Seller may make public statements or disclosures with respect to this Agreement and the

40

transactions contemplated herein as may be necessary or advisable in connection with the Bankruptcy Case, including, without limitation, to comply with the Bidding Procedures Order, Bid Protections Order and/or in seeking issuance of the Sale Order.

5.7     Transfer Taxes.     To the extent that any sales, purchase, transfer, stamp, documentary stamp, registration, use or similar taxes ("Transfer Taxes") are payable by reason of the sale of the Purchased Assets under this Agreement, such Transfer Taxes shall be borne and timely paid by Purchaser.  Purchaser and Seller shall reasonably cooperate in good faith to minimize, to the extent permissible under Applicable Law, the amount of any Transfer Taxes that might otherwise be imposed in connection with the transactions contemplated by this Agreement.

5.8     Tax Proration.     All Property Taxes levied with respect to the Purchased Assets for any taxable period falling entirely within the period ending on or before the Closing Date shall be the responsibility of Seller.  All Property Taxes levied with respect to the Purchased Assets for any taxable period that includes the Closing Date and ends after the Closing Date, whether imposed or assessed before or after the Closing Date will be prorated based on the number of days in such period that occur before the Closing Date, on the one hand, and the number of days in such period that occur on or after the Closing Date, on the other hand, the amount of such Property Taxes allocable to the portion of the period ending before the Closing Date being the responsibility of Seller and the remainder being the responsibility of Purchaser. If the exact amount of any Property Taxes is not known on the Closing Date, such taxes shall be estimated based upon the best available information at the time of Closing (i.e., the taxable value currently assigned to the real property).  There shall be no re-proration of Property Taxes after Closing.  The amount of such Property Taxes allocable to Seller pursuant to this Section 5.8 that have not been paid prior to Closing, if any, shall be paid to the appropriate Governmental Authority by Purchaser, but shall result in a reduction of the Cash Consideration in like amount.

5.9     Hart-Scott Rodino Act.

(a)     Purchaser and Seller agree, promptly after execution of this Agreement, to the extent any such filings have not been made prior to such date, to file Notification and Report Forms with the Federal Trade Commission ("FTC") and Antitrust Division of the United States Department of Justice ("DOJ") as required by the Hart-Scott Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act"), and to give, submit, make and deliver, as applicable, all notices, filings, petitions, statements, registrations, submissions of information, applications and submissions of other documents in connection with the same. Each of Purchaser and Seller shall cause all documents that it is responsible for filing with any governmental authority under this Section 5.9 to comply in all material respects with all applicable legal requirements, and Purchaser shall bear and pay any and all filing fees and the like for applications or filings necessary under the HSR Act.

(b)     Purchaser agrees to, and will cause its affiliates to, use reasonable best efforts to take any and all actions necessary to avoid, eliminate and resolve any and all impediments under any Antitrust Law or trade regulation law that may be asserted by any Governmental Authority or any other Person with respect to the Transaction contemplated by this Agreement and to obtain all consents, approvals and waivers under any Antitrust Law that may be required by any

41

Governmental Authority to enable the parties to close the Transaction as promptly as practicable. In addition, if any action or proceeding is instituted (or threatened) challenging the Transaction as violating any Antitrust Law or if any decree, order, judgment or injunction (whether temporary, preliminary or permanent) is entered, enforced or attempted to be entered or enforced by any Governmental Authority that would make the Transaction illegal or otherwise delay or prohibit the consummation of the Transaction, Purchaser and its affiliates and subsidiaries shall take any and all actions to contest and defend any such claim, cause of action or proceeding to avoid entry of, or to have vacated, lifted, reversed, repealed, rescinded or terminated, any decree, order, judgment or injunction (whether temporary, preliminary or permanent) that prohibits, prevents or restricts consummation of the Transaction.

(c)     Except where prohibited by applicable legal requirements, Seller and Purchaser shall each consult with the other prior to taking a position with respect to any such filing, shall permit the other to review and discuss in advance, and consider in good faith the views of the other in connection with any analyses, appearances, presentations, memoranda, briefs, white papers, other materials, arguments, opinions and proposals before making or submitting any of the foregoing to any governmental authority in connection with any investigations or proceedings in connection with this Agreement or the transactions contemplated hereby, coordinate with the other in preparing and providing such information and promptly provide the other (and its counsel) copies of all filings, presentations and submissions (and a summary of oral presentations) made by such party to or with any governmental authority in connection with this Agreement and the transactions contemplated hereby.

(d)     Purchaser and Seller shall each notify the other promptly upon the receipt of (i) any comments from any officials of any governmental authority in connection with any filings made pursuant hereto, and (ii) any request by any officials of any governmental authority for amendments or supplements to any filings made pursuant to, or information provided to comply in all materials respect with, applicable legal requirements. Whenever any event occurs that is required to be set forth in an amendment or supplement to any filing made pursuant to this Section 5.9, Purchaser or Seller, as the case may be, will promptly inform the other of such occurrence and cooperate in filing with the applicable governmental authority such amendment or supplement.

(e)     Notwithstanding the foregoing provisions of this Section 5.9, neither Purchaser nor Seller shall be required to litigate with any governmental authority.

5.10   Filing With CFIUS.   If the transaction contemplated by this Agreement is a "covered transaction" that requires submission of a filing to the CFIUS pursuant to 31 C.F.R. § 800.401 ("mandatory declarations"), Purchaser and Seller shall, and shall cause their affiliates to, use reasonable best efforts to obtain CFIUS approval. Such reasonable best efforts shall include (a) engaging in pre-filing discussions with CFIUS or its member agencies, as appropriate, (b) promptly making any draft and final filings required in connection with the CFIUS approval in accordance with the Defense Production Act, (c) providing any information reasonably requested by CFIUS or its member agencies in connection with the CFIUS review or investigation of the transactions contemplated by this Agreement, (d) consulting with each other in advance of any planned communication with CFIUS or its member agencies and promptly informing each other of any material communication with CFIUS or its member agencies, and (e) ensuring that both

42

Purchaser and Seller or their counsel review and approve in advance any material written communication with CFIUS or its member agencies; provided, however, that nothing in this Section 5.10 shall be construed as requiring Purchaser or Seller to disclose to the other(s) any communication or materials that the disclosing party(ies) considers to be proprietary or confidential. If the transactions contemplated by this Agreement do not require the filing of a "mandatory declaration" for CFIUS purposes, but CFIUS requests or requires a filing with respect to the transactions contemplated by this Agreement, then Purchaser and Seller shall, and shall cause their Affiliates to, use reasonable best efforts to obtain the CFIUS approval.  In the event that the transaction contemplated by this Agreement is a "covered transaction" or if CFIUS requests or requires a filing in respect thereof, then CFIUS approval shall automatically (and without amendment hereto) be deemed to be a condition to the Closing hereunder.

5.11    Use of Names and Marks.  As soon as reasonably practicable after the Closing, but in no event more than thirty (30) Business Days after the Closing, Seller shall cause an amendment to the certificate or articles of incorporation or formation (or any equivalent organizational documents) of Seller to be filed with the appropriate Governmental Authority and shall take all other action necessary to change Seller's legal, registered, assumed, trade and "doing business as" name, as applicable, to a name or names not containing any Acquired Intellectual Property Rights, *excluding* "CarbonLITE" or any name confusingly similar to the foregoing, and will cause to be filed as soon as practicable after the Closing, in all jurisdictions in which Seller is qualified to do business, any documents necessary to reflect such change in its legal, registered, assumed, trade and "doing business as" name, as applicable, or to terminate its qualification therein.  Seller further agrees that from and after the Closing, Seller and its Affiliates will cease to make any use of all Acquired Intellectual Property Rights.  Nothing contained in this Agreement or otherwise shall prohibit, restrict or prevent the Purchaser from using the "CarbonLITE" name following the Closing for a commercially reasonable period to allow for the orderly transition to a name, trademark or logo (as applicable) of the Purchaser or its Affiliates.

5.12    No Successor Liability.  The parties hereto agree that the Sale Order shall provide that to the fullest extent permitted by Applicable Law (including under Section 363(f) of the Bankruptcy Code), (a) Purchaser shall not be liable for any liability or Lien (other than Assumed Liabilities) against the Seller or any of its predecessors or Affiliates and (b) Purchaser shall have no successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the Business, the Purchased Assets or any liabilities of Seller arising prior to the Closing Date.

5.13    Assumption and Assignment of Contracts. At or prior to the Closing, Seller shall assume and assign to Purchaser the Acquired Contracts, Acquired Real Property Leases, Acquired Personal Property Leases and Permits and Licenses, and Purchaser shall pay in full the Cure Costs (as a deduct against the Cash Consideration), in each case pursuant to Section 365 of the Bankruptcy Code, the Sale Order and Section 2.1, subject to Purchaser's provision of adequate assurance as may be required under Section 365 of the Bankruptcy Code. Notwithstanding anything to the contrary in this Agreement, Purchaser expressly acknowledges that Seller's inability to assume and assign any Acquired Contracts, Acquired Real Property Leases, Acquired Personal Property Leases and/or Permits and Licenses by reason of Purchaser's

43

failure to provide adequate assurance of future performance with respect thereto to the Bankruptcy Court's satisfaction shall have no effect on Purchaser's obligation to consummate the transactions set forth herein and any such Acquired Contracts, Acquired Real Property Leases, Acquired Personal Property Leases and/or Permits and Licenses Seller fail to so assume and assign at the Closing shall for all purposes thereafter be deemed Excluded Assets.

5.14    Transfer of 401(k) Plan.  From and after the date of the Auction (if Purchaser is the Successful Bidder), Seller and Purchaser shall cooperate and use reasonable best efforts to determine the advisability of transferring the assets and liabilities of the Seller's 401(k) plan relating to the Transferred Employees to the Purchaser's 401(k) plan (excluding those employees who retired effective on or prior to the date of transfer) in accordance with applicable requirements of Seller's 401(k) plan, Purchaser's 401(k) plan and the Code.  In order to implement this Section 5.14 (as applicable), Purchaser and Seller shall cooperate in the exchange of information, the notification of Transferred Employees, and the preparation of any documentation required to implement any such transfer. Without limiting the generality of the foregoing, Seller shall promptly provide Purchaser with such documents and other information as Purchaser shall reasonably request in connection with the foregoing, and in connection with any such transfers agreed by the Seller and the Purchaser.

5.15    Air Quality Permit Renewal.  Seller shall use reasonable best efforts to renew the Department Plan Approval Permit No. 06-05159A, issued by the Pennsylvania Department of Environmental Protection - Air Quality Program, for the period from and after May 31, 2021.

5.16    Purchased Assets held by Affiliates.  Without limiting Seller's obligations under Section 10.9 hereof, in the event that an Affiliate of Seller owns or holds any assets rights or properties that, if owned or held by the Seller at the Closing, would constitute Purchased Assets ("Wayward Assets"), Parent shall cause each such Affiliate to transfer and assign, for no additional consideration, such Wayward Assets to Purchaser by transfer documents in form and content not inconsistent with the terms and provisions hereof and otherwise in form and content reasonably requested by Purchaser.

ARTICLE VI

CONDITIONS PRECEDENT TO OBLIGATIONS
OF PURCHASER

The obligations of Purchaser at Closing under this Agreement are subject to the satisfaction (or waiver by Purchaser) of the following conditions precedent on or before the Closing Date:

6.1    Warranties True as of Present Date.  Each of the representations and warranties of Seller contained in ARTICLE III (a) that are qualified as to Material Adverse Effect shall be true and correct in all respects as of the Closing Date as if made anew as of such date (except to the extent such representations and warranties expressly relate to an earlier date (in which case, as of such earlier date)), except to the extent of changes or developments contemplated by the terms of this Agreement or caused by the transactions contemplated hereby; and (b) that are not so qualified shall be true and correct (without giving effect to any qualifications as to "materiality,"

"Material Adverse Effect" or similar qualifications as to materiality) as of the Closing Date as if made anew as of such date (except to the extent such representations and warranties expressly relate to an earlier date (in which case, as of such earlier date)), except to the extent of changes or developments contemplated by the terms of this Agreement or caused by the transactions contemplated hereby and except for failures of such representations and warranties to be true and correct as do not and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

6.2     <u>Compliance with Agreements and Covenants</u>.   Seller shall have performed and complied with all of the covenants, obligations and agreements contained in this Agreement to be performed and complied with by them on or prior to the Closing Date (including <u>Section 5.15</u>), including delivery of the documents referred to in <u>Section 2.7(b)</u>.

6.3     <u>No Prohibition</u>.   No law or injunction shall have been adopted, promulgated or entered by any Governmental Authority which prohibits, and no lawsuit, proceeding or investigation shall be pending, which would be reasonably expected to prohibit, the consummation of the transactions contemplated hereby.

6.4     <u>Entry of Sale Order</u>.   The Sale Order shall have been entered by the Bankruptcy Court, shall be in full force and effect, and shall not have been vacated, reversed, stayed, modified or amended in any manner not approved by Purchaser, and the stay imposed by Rule 6004(h) of the Federal Rules of Bankruptcy Procedure has expired or the Bankruptcy Court has ordered otherwise.

6.5     <u>No Material Adverse Effect</u>.   Since the date of this Agreement, no Material Adverse Effect shall have occurred and be continuing.

6.6     <u>HSR Clearance</u>.   All applicable waiting periods (and any extensions thereof) under the HSR Act shall have expired or been terminated or clearance has been obtained, as applicable.

Any waiver of a condition by Purchaser shall be effective only if such waiver is stated in writing and signed by Purchaser; provided, however, that the consent of Purchaser to the Closing shall constitute a waiver by Purchaser of any conditions to Closing as to Purchaser not satisfied as of the Closing Date.

ARTICLE VII

CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLER

The obligations of Seller at Closing under this Agreement are subject to the satisfaction (or waiver in writing by Seller) of the following conditions precedent on or before the Closing Date:

7.1     <u>Warranties True as of Present Date</u>.   Each of the representations and warranties of Purchaser contained in <u>ARTICLE IV</u> (a) that are qualified as to "material adverse effect" shall be true and correct as of the Closing Date as if made anew as of such date (except to the extent such representations and warranties expressly relate to an earlier date (in which case, as of such earlier

date)), except to the extent of changes or developments contemplated by the terms of this Agreement or caused by the transactions contemplated hereby, and (b) that are not so qualified shall be true and correct as of the Closing Date as if made anew as of such date (except to the extent such representations and warranties expressly relate to an earlier date (in which case, as of such earlier date)), except to the extent of changes or developments contemplated by the terms of this Agreement or caused by the transactions contemplated hereby and except for failures of the representations and warranties referred to in this <u>clause (b)</u> to be true and correct as do not and would not reasonably be expected to have, in the aggregate, a material adverse effect on Purchaser's ability to consummate the transactions contemplated hereby.

7.2    <u>Compliance with Agreements and Covenants</u>.  Purchaser shall have performed and complied with all of its covenants, obligations and agreements contained in this Agreement to be performed and complied with by it on or prior to the Closing Date, in all material respects, including delivery of the documents referred to in <u>Section 2.7(b)</u> hereof.

7.3    <u>No Prohibition</u>.  No law or injunction shall have been adopted, promulgated or entered by any Governmental Authority which prohibits and no lawsuit, proceeding or investigation shall be pending, which would be reasonably expected to prohibit the consummation of the transactions contemplated hereby.

7.4    <u>Entry of Sale Order</u>.  The Sale Order shall have been entered by the Bankruptcy Court, shall be in full force and effect, and shall not have been vacated, reversed, stayed, modified or amended in any manner not approved by Seller, and the stay imposed by Rule 6004(h) of the Federal Rules of Bankruptcy Procedure has expired or the Bankruptcy Court has ordered otherwise.

7.5    <u>HSR Clearance</u>.  All applicable waiting periods (and any extensions thereof) under the HSR Act shall have expired or been terminated or clearance has been obtained, as applicable.

Any waiver of a condition by Seller shall be effective only if such waiver is stated in writing and signed by the Seller; provided, however, that the consent of Seller to the Closing shall constitute a waiver by the Seller of any conditions as to the Seller to Closing not satisfied as of the Closing Date.

## ARTICLE VIII

## TERMINATION

8.1    <u>Termination</u>.  This Agreement may be terminated at any time on or prior to the Closing Date:

(a)    With the mutual written consent of Purchaser and Seller;

(b)    By either Purchaser or Seller, if the Closing shall not have occurred on or before June 3, 2021 (the "<u>Termination Date</u>"); <u>provided</u>, that the right to terminate this Agreement under this <u>Section 8.1(b)</u> shall not be available to any party whose failure to fulfill

any obligation under this Agreement has been the primary cause of, or primarily resulted in, the failure of the Closing to occur on or before the Termination Date;

(c)  By Seller, if Purchaser shall have breached or failed to perform any of its representations, warranties, covenants or other agreements contained in this Agreement, which breach or failure to perform (A) would give rise to the failure of a condition set forth in <u>Section 7.1</u> or <u>Section 7.2</u> and (B) has not been or is incapable of being cured by Purchaser within ten (10) Business Days after its receipt of written notice thereof from Seller;

(d)  By Purchaser, if Seller shall have breached or failed to perform any of its representations, warranties, covenants or other agreements contained in this Agreement, which breach or failure to perform (A) would give rise to the failure of a condition set forth in <u>Section 6.1</u> or <u>Section 6.2</u> and (B) has not been or is incapable of being cured by Seller within ten (10) Business Days after their receipt of written notice thereof from Purchaser;

(e)  By Seller, if (i) all of the conditions set forth in <u>ARTICLE VI</u> have been satisfied or waived (other than those conditions that by their terms are to be satisfied at the Closing) and (ii) Purchaser fails to proceed with and consummate the Closing within three (3) Business Days after receipt of written notice from Seller that Seller is ready, willing and able to proceed with and consummate the Closing;

(f)  By Purchaser, if (i) all of the conditions set forth in <u>Article VII</u> have been satisfied or waived (other than those conditions that by their terms are to be satisfied at the Closing) and (ii) Seller fail to proceed with and consummate the Closing within three (3) Business Days after receipt of written notice from Purchaser that Purchaser is ready, willing and able to proceed with and consummate the Closing;

(g)  By Purchaser, if (i) prior to the Auction, other than as contemplated by the Bid Procedures Order or this Agreement, Seller enters into a definitive agreement with respect to any Alternative Transaction or seeks to have the Bankruptcy Court enter an Order dismissing, or converting into a case under Chapter 7 of the Bankruptcy Code, the case commenced by Seller under Chapter 11 of the Bankruptcy Code and comprising part of the Bankruptcy Case, or appointing a trustee in the Bankruptcy Case or appointing a responsible officer or an examiner with enlarged powers (other than a fee examiner) relating to the operation of Seller's business pursuant to Section 1104 of the Bankruptcy Code, or such an order of dismissal, conversion or appointment is entered for any reason and is not reversed or vacated within five (5) days after the entry thereof or (ii) after the conclusion of the Auction, if Purchaser is the Successful Bidder, Seller enters into any Alternative Transaction or seeks to have the Bankruptcy Court enter an Order dismissing, or converting into a case under Chapter 7 of the Bankruptcy Code, the case commenced by Seller under Chapter 11 of the Bankruptcy Code and comprising part of the Bankruptcy Case, or appointing a trustee in the Bankruptcy Case or appointing a responsible officer or an examiner with enlarged powers (other than a fee examiner) relating to the operation of Seller's business pursuant to Section 1104 of the Bankruptcy Code, or such an order of dismissal, conversion or appointment is entered for any reason and is not reversed or vacated within five (5) days after the entry thereof;

DOCS_SF:105462.9 13044/003

(h)     By either Purchaser or Seller, if any Governmental Authority shall have issued an order, decree or ruling or taken any other action permanently restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement, and such order, decree, ruling or other action shall have become final and nonappealable;

(i)     Automatically if Seller consummates any Alternative Transaction with someone other than Purchaser involving the Purchased Assets;

(j)     By Seller, if (i) the conditions set forth in <u>Section 6.6</u> and <u>Section 7.5</u> shall not have been satisfied on and as of the date of the Auction, and (ii) Seller determines that, as of the Auction, Purchaser is not a "qualified bidder" for the Auction and as a result of such determination, Purchaser is not permitted to participate in and bid at, the Auction; or

(k)     By Purchaser, if: (i) Purchaser is not selected and designated as the Successful Bidder in the Notice of Successful Bidder to be filed by Seller in accordance with the Bid Procedures Order; or (ii) the Sale Order shall not have been entered on or before June 3, 2021.

Notwithstanding anything else contained in this Agreement, the right to terminate this Agreement under this <u>Section 8.1</u> shall not be available to any party (a) that is in material breach of its obligations hereunder or (b) whose failure to fulfill its obligations or to comply with its covenants under this Agreement has been the primary cause of, or primarily resulted in, the failure to satisfy any condition to the obligations of either party hereunder.

For the avoidance of doubt, Seller agrees (on behalf of itself and its Affiliates) that any rules, criteria or factors used in connection with any determination that Purchaser is not a "qualified bidder" for the Auction, and that Purchaser may not participate in or bid at the Auction, shall be applied by Seller, in its reasonable discretion, consistently across all other prospective bidders in the Auction; it being agreed that Seller's disqualification of Purchaser from participation in the Auction solely or primarily to eliminate the Bid Protections shall not constitute reasonable cause for determining Purchaser is not a "qualified bidder."

8.2     <u>Expenses</u>.  Except with regard to the Expense Reimbursement or as otherwise provided in <u>Section 10.15</u>, below, whether or not the Closing occurs, all Expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such Expenses.  As used in this Agreement, "<u>Expenses</u>" means the out-of-pocket fees and expenses of the party's independent advisor, counsel and accountants, incurred or paid by the party or on its behalf in connection with this Agreement and the transactions contemplated hereby.

8.3     <u>Effect of Termination</u>.  In the event of termination of this Agreement by either Purchaser or Seller as provided in <u>Section 8.1</u>, this Agreement will forthwith become void and have no further force or effect, without any liability (other than as set forth in <u>Section 8.2</u>, this <u>Section 8.3</u>, or <u>Section 9.2</u>) on the part of Purchaser or Seller; <u>provided</u>, <u>however</u>, that the provisions of <u>Section 8.2</u>, this <u>Section 8.3</u>, <u>Section 2.6(a)(ii)</u>, <u>Section 9.2</u> and <u>Sections 10.11</u> and <u>10.12</u> will survive any termination hereof; <u>provided</u>, <u>further</u>, <u>however</u>, that subject to the terms of this <u>Section 8.3</u>, nothing in this <u>Section 8.3</u> shall relieve any party of any liability for any breach

by such party of this Agreement prior to the date of any such termination. For the avoidance of all doubt, upon any termination of this Agreement pursuant to <u>Section 8.1(c)</u> or <u>(e)</u> above, Seller shall have the right to collect the Deposit from the Escrow Holder as liquidated damages in accordance with <u>Section 2.6(a)(ii)</u> above. In connection with any termination pursuant to this Agreement (other than pursuant to <u>Section 8.1(c)</u> or <u>Section 8.1(e)</u>), Purchaser shall be entitled to the prompt return of the Deposit, less an amount equal to Purchaser's share of the Escrow Holder's actual expenses. In the event of termination of this Agreement as provided in <u>Section 8.1(g)</u> or <u>Section 8.1(i)</u>, Purchaser shall be entitled to the Bid Protections subject to entry of the Bid Protections Order and Seller shall pay the Bid Protections to Purchaser solely from the proceeds of such Alternative Transaction consistent with the terms of the Bid Protections Order.

ARTICLE IX

BANKRUPTCY COURT MATTERS

9.1 <u>Motion for Approvals</u>.

(a) No later than the times set forth in the Bid Procedures Order, Seller will make all filings and give all notices relating to this Agreement as Seller is required to make and give pursuant to the Bid Procedures Order. Seller shall take all actions as may be reasonably necessary to obtain entry of the Sale Order, including furnishing affidavits, declarations or other documents or information for filing with the Bankruptcy Court. Purchaser agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining entry of the Sale Order and a finding of adequate assurance of future performance by Purchaser, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" Purchaser under Section 363(m) of the Bankruptcy Code. Except for Seller's obligations under <u>Section 9.2(b)</u> hereof, both Purchaser's and Seller's obligations to consummate the transactions contemplated in this Agreement shall be conditioned upon the Bankruptcy Court's entry of the Sale Order. If the Bankruptcy Court refuses to issue the Sale Order or to approve a sale of the Purchased Assets to Purchaser at the hearing on the Sale Motion, then this transaction shall automatically terminate and Seller and the Purchaser shall be relieved of any further liability or obligation hereunder, except for Seller's obligations under <u>Section 9.2(b)</u> hereof. Upon entry of the Sale Order in accordance with the provisions of this <u>Section 9.1(a)</u>, the condition set forth in this <u>Section 9.1(a)</u> shall conclusively be deemed satisfied.

(b) If the Sale Order, or any other orders of the Bankruptcy Court relating to this Agreement or the transactions contemplated hereby are appealed by any Person (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacatur, stay, rehearing or re-argument shall be filed with respect to the Bid Procedures Order and the Sale Order, or other such order) subject to the rights otherwise arising from this Agreement, Seller shall take all actions as may be reasonably necessary to prosecute such appeal, petition or motion and obtain an expedited resolution of any such appeal, petition or motion; provided, however, nothing herein shall be deemed to require Seller to so pursue any such appeal or other actions beyond the Termination Date.

49

(c)     Purchaser and Seller shall consult with each other regarding pleadings that any of them intends to file with the Bankruptcy Court in connection with, or which might reasonably be expected to adversely affect the Bankruptcy Court's approval of the Sale Order, including, sharing in advance any drafts for the other's review and comment, it being agreed that each party shall give reasonable consideration to any comments the other(s) may provide within a reasonable time prior to the filing of any of such pleading.  No party hereto shall seek any modification to the Sale Order by the Bankruptcy Court or any other Governmental Authority of competent jurisdiction to which a decision relating to the Bankruptcy Case has been appealed, in each case, without prior written consent of the other(s) in its/their sole discretion.

9.2     Bidding Procedures and Bid Protections.

(a)     Purchaser and Seller acknowledge entry of the Bid Procedures Order. Seller shall take all actions as may be reasonably necessary to carry out the process contemplated in the Bidding Procedures, including obtaining entry of the Sale Order on or before June 3, 2021.

(b)     Subject to entry of the Bid Protections Order, Purchaser shall be entitled to payment of the Bid Protections if, as and when provided the Bid Protections Order.  To the extent of any inconsistency between this Agreement and the Bid Protections Order as to any matter covered or addressed in the Bid Protections Order, the terms and provisions of the Bid Protections Order shall govern and control.

(c)     Seller and Purchaser shall take all actions as may be reasonably necessary to obtain entry of the Bid Protections Order, including furnishing customary affidavits, declarations or other documents or information for filing with the Bankruptcy Court.

ARTICLE X

MISCELLANEOUS

10.1     Amendment.  This Agreement may be amended, modified or supplemented only in a writing signed by Purchaser and Seller.

10.2     Notices.  Any notice, request, instruction or other document to be given hereunder by a party hereto shall be in writing and shall be deemed to have been given, (i) when received if given in person or by courier or a courier service, (ii) on the date of transmission if sent by confirmed electronic mail, (iii) on the next Business Day if sent by an overnight delivery service, or (iv) five Business Days after being deposited in the U.S. mail, certified or registered mail, postage prepaid:

(a)     If to Seller, addressed as follows:

CarbonLite P, LLC
c/o Force 10 Partners
5271 California Avenue, Suite 270
Irvine, CA  92617
Attn:  Brian Weiss
Email:  bweiss@force10partners.com

DOCS_SF:105462.9 13044/003

With a copy (which shall not constitute notice) to:

> Pachulski Stang Ziehl & Jones LLP
> 10100 Santa Monica Blvd., 13th Floor
> Los Angeles, CA  90067
> Attention: Maxim B. Litvak, Esq. and Steven W. Golden, Esq.
> Email:  mlitvak@pszjlaw.com and sgolden@pszjlaw.com

(b)       If to Purchaser, addressed as follows:

> DAK Americas LLC
> 7621 Little Ave., Suite 500
> Charlotte, NC 28226
> Attention:  Jorge P. Young, Carlos M. Garcia and Verónica Ramírez Briones
> Email:  jyoung@AlpekPolyester.com,  cgarcia@AlpekPolyester.com,  and vramirez@AlpekPolyester.com

with a copy (which shall not constitute notice) to:

> Weil, Gotshal & Manges LLP
> 767 Fifth Avenue
> New York, New York 10153
> Attention:  Jon-Paul Bernard and Alfredo Perez
> Email: jon-paul.bernard@weil.com and alfredo.perez@weil.com

or to such other individual or address as a party hereto may designate for itself by notice given as herein provided.

10.3     _Waivers_.  The failure of a party hereto at any time or times to require performance of any provision hereof shall in no manner affect its right at a later time to enforce the same.  No waiver by a party of any condition or of any breach of any term, covenant, representation or warranty contained in this Agreement shall be effective unless in writing, and no waiver in any one or more instances shall be deemed to be a further or continuing waiver of any such condition or breach in other instances or a waiver of any other condition or breach of any other term, covenant, representation or warranty.

10.4     _Counterparts_.   This Agreement may be executed in counterparts and such counterparts may be delivered in electronic format (including by email).  Such delivery of counterparts shall be conclusive evidence of the intent to be bound hereby and each such counterpart and copies produced therefrom shall have the same effect as an original.  To the extent applicable, the foregoing constitutes the election of the parties to invoke any law authorizing electronic signatures.

10.5     _Interpretation_.  The headings preceding the text of Articles and Sections included in this Agreement and the headings to Sections of the Disclosure Schedule are for convenience

only and shall not be deemed part of this Agreement or the Disclosure Schedule or be given any effect in interpreting this Agreement or the Disclosure Schedule. The use of the masculine, feminine or neuter gender herein shall not limit any provision of this Agreement. The use of the terms "including" or "include" shall in all cases herein mean "including, without limitation" or "include, without limitation," respectively. The term "made available to Purchaser" means made available in the Data Room at least two (2) Business Days prior to the date hereof. Underscored references to Articles, Sections, Exhibits or Schedules shall refer to those portions of this Agreement. Time is of the essence of each and every covenant, agreement and obligation in this Agreement. Neither Purchaser nor Seller shall be deemed to be in breach of any covenant contained in this Agreement if such party's deemed breach is the result of any action or inaction on the part of the other.

10.6     Applicable Law.   THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF DELAWARE WITHOUT GIVING EFFECT TO THE PRINCIPLES OF CONFLICTS OF LAW THEREOF.

10.7     Binding Agreement; Assignment.   This Agreement and the Related Agreements shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns; provided that neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned (including by operation of law) by any party without the prior written consent of the other party(ies). For all purposes hereof, a transfer, sale or disposition of a majority of the capital stock or other voting interest of a party (whether by contract or otherwise) shall be deemed an assignment requiring consent hereunder. Any purported assignment in contravention of this Section 10.7 shall be null and void. Notwithstanding the foregoing or anything else in this Agreement to the contrary, Purchaser may (a) transfer or assign its rights, interests or obligations under this Agreement, in whole or from time to time in part, to one or more of its Affiliates, provided that Purchaser will remain liable for the performance of its obligations and will provide notice to Seller of such assignment and (b) collaterally assign its rights hereunder to any lender of Purchaser.

10.8     Third Party Beneficiaries.   This Agreement is solely for the benefit of the parties hereto and no provision of this Agreement shall be deemed to confer upon third parties, either express or implied, any remedy, claim, liability, reimbursement, cause of action or other right.

10.9     Further Assurances.   Upon the reasonable request of Purchaser or Seller, each party will on and after the Closing Date execute and deliver to the other parties such other documents, assignments and other instruments as may be reasonably required (without imposing any material monetary obligations or other obligations beyond those specifically imposed on the cooperating party(ies) by the other provisions of this Agreement or the Related Agreements) to effectuate completely the transactions contemplated hereby, and to effect and evidence the provisions of this Agreement and the Related Agreements and the transactions contemplated hereby. For the avoidance of doubt, as to Seller, the obligations set forth in this Section 10.9 shall lapse and cease to be of any further force or effect upon the closing of the Bankruptcy Case.

10.10     Entire Understanding.   The Exhibits, Schedules and Disclosure Schedules identified in this Agreement are incorporated herein by reference and made a part hereof. This

Agreement and the Related Agreements set forth the entire agreement and understanding of the parties hereto and supersedes any and all prior agreements, arrangements and understandings among the parties.

10.11   EXCLUSIVE JURISDICTION OF BANKRUPTCY COURT.  IN THE EVENT ANY PARTY TO THIS AGREEMENT COMMENCES ANY LITIGATION, PROCEEDING OR OTHER LEGAL ACTION IN CONNECTION WITH OR RELATING TO THIS AGREEMENT, ANY RELATED AGREEMENT OR ANY MATTERS DESCRIBED OR CONTEMPLATED HEREIN OR THEREIN, THE PARTIES TO THIS AGREEMENT HEREBY (A) AGREE ANY LITIGATION, PROCEEDING OR OTHER LEGAL ACTION SHALL BE INSTITUTED ONLY IN THE BANKRUPTCY COURT, WHICH SHALL HAVE SOLE AND EXCLUSIVE JURISDICTION OVER ANY SUCH MATTERS; (B) CONSENT AND SUBMIT TO PERSONAL JURISDICTION OF THE BANKRUPTCY COURT AND TO SERVICE OF PROCESS UPON THEM IN ACCORDANCE WITH THE RULES AND STATUTES GOVERNING SERVICE OF PROCESS; AND (C) AGREE TO WAIVE TO THE FULL EXTENT PERMITTED BY LAW ANY OBJECTION THAT THEY MAY NOW OR HEREAFTER HAVE TO THE VENUE OF ANY SUCH LITIGATION, PROCEEDING OR ACTION IN ANY SUCH COURT OR THAT ANY SUCH LITIGATION, PROCEEDING OR ACTION WAS BROUGHT IN AN INCONVENIENT FORUM.

10.12   WAIVER OF JURY TRIAL.   EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH SUCH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (i) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (ii) EACH PARTY UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (iii) EACH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (iv) EACH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.12.

10.13   Disclosure Schedule.  The inclusion of information in the Disclosure Schedule shall not be construed as an admission that such information is material to Seller or the Business. In addition, matters reflected in the Disclosure Schedule are not necessarily limited to matters required by this Agreement to be reflected in the Disclosure Schedule.  Such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature.  Neither the specifications of any dollar amount in any provision of this Agreement nor the inclusion of any specific item in the Disclosure Schedule is intended to imply that such amount, or higher or lower amounts, or the item so included or other items, are or are not material, and no party shall use the fact of the setting forth of any such amount or the inclusion of any such item in any dispute or controversy between the parties as to whether any obligation, item or matter not described herein or included in the Disclosure Schedule is or is not

material for purposes of this Agreement.  Further, neither the specification of any item or matter in any representation, warranty or covenant contained in this Agreement nor the inclusion of any specific item in the Disclosure Schedule is intended to imply that such item or matter, or other items or matters, are or are not in the ordinary course of business, and no party shall use the fact of setting forth or the inclusion of any such items or matter in any dispute or controversy between the parties as to whether any obligation, item or matter not described herein or included in the Disclosure Schedule is or is not in the ordinary course of business for purposes of this Agreement. Provided that any such amended disclosure does not materially affect the value of the Purchased Assets or result in additional liability to Purchaser, Purchaser and Seller may mutually agree at any time prior to Closing to amend all schedules to correct errors and to add omitted items, or new items that first arise or occur after the date hereof.

10.14    Severability.    Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other situation or in any other jurisdiction.  If the final judgment of a court of competent jurisdiction declares that any term or provision hereof is invalid or unenforceable, the parties agree that the court making the determination of invalidity or unenforceability shall have the power to reduce the scope, duration, or area of the term or provision, to delete specific words or phrases, or to replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and this Agreement shall be enforceable as so modified after the expiration of the time within which the judgment may be appealed.

10.15    Attorneys' Fees.    In the event that Seller or Purchaser bring an action or other proceeding to enforce or interpret the terms and provisions of this Agreement, the prevailing party(ies) in that action or proceeding shall be entitled to have and recover from the non-prevailing party(ies) all such reasonable, out of pocket fees, costs and expenses (including, without limitation, all court costs and reasonable attorneys' fees) as the prevailing party(ies) may suffer or incur in the pursuit or defense of such action or proceeding.

10.16    Construction.  The parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, the language shall be construed as mutually chosen by the parties to express their mutual intent, and no rule of strict construction shall be applied against any party.  Any reference to any federal, state, local, or foreign statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise.

10.17    [Reserved].

10.18    Survival. Except for Purchaser's representations and acknowledgments set forth in Sections 4.5 and 4.7 hereof and Seller's representations set forth in Sections 3.1, 3.2 and 3.18 of this Agreement (all of which shall survive and continue in force following the Closing) and without in any way affecting Seller's disclaimer set forth in Section 3.22 hereof, the respective representations and warranties of Purchaser and Seller under this Agreement shall lapse and cease to be of any further force or effect effective immediately following the Closing.  Except as

54

provided in the immediately preceding sentence, the covenants and agreements of Seller and Purchaser herein, or in any certificates or other documents delivered prior to or at the Closing, shall not be deemed waived or otherwise affected by the Closing.

10.19  <u>No Vicarious Liability</u>.  This Agreement may only be enforced against the parties hereto and their respective successors and permitted assigns.  Any Claims or Proceedings that may be based upon, arise out of, or relate to this Agreement or the negotiation, execution or performance of this Agreement (including any representation or warranty made in or in connection with this Agreement or as an inducement to enter into this Agreement) may be made only against the Persons that are signatories to this Agreement, and their respective successors and permitted assigns, and no agent, Affiliate or representative of any such Person (including any Person negotiating or executing this Agreement on behalf of such Person), will have any liability with respect to this Agreement or with respect to any Claim that may arise out of or relate to this Agreement, or the negotiation, execution, or performance of this Agreement (including a representation or warranty made in connection with this Agreement or as an inducement to enter into this Agreement).  Nothing in this <u>Section 10.19</u> will impair or adversely affect the rights of Purchaser or any other Person set forth in any other Contract executed and delivered in connection with the consummation of the transactions contemplated under this Agreement and the Related Agreements.

*[Signature page follows]*

DOCS_SF:105462.9 13044/003

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered as of the date first above written.

**SELLER:**

**CarbonLite P, LLC**, a Delaware limited liability company and Debtor and Debtor in Possession

By: _____
    Name:  Brian Weiss
    Title:  Chief Restructuring Officer

**PARENT (**solely for purposes of <u>Section 5.16</u>**):**

**CarbonLite Holdings LLC**, a Delaware limited liability company and Debtor and Debtor in Possession

By: _____
    Name:  Brian Weiss
    Title:  Chief Restructuring Officer

**PURCHASER:**

DAK Americas LLC, a Delaware limited liability company

By: _____
    Name:  Jorge P. Young
    Title:  President and CEO

By: _____
    Name:  Carlos M. Garcia
    Title:  Global VP, Planning, M&A and IT

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered as of the date first above written.

**SELLER:**

**CarbonLite P, LLC**, a Delaware limited liability company and Debtor and Debtor in Possession

By:_____
    Name:  Brian Weiss
    Title:  Chief Restructuring Officer

**PARENT (**solely for purposes of <u>Section 5.16</u>**):**

**CarbonLite Holdings LLC**, a Delaware limited liability company and Debtor and Debtor in Possession

By:_____
    Name:  Brian Weiss
    Title:  Chief Restructuring Officer

**PURCHASER:**

DAK Americas LLC, a Delaware limited liability company

By:_____
    Name:  Jorge P. Young
    Title:  President and CEO

By:_____
    Name:  Carlos M. Garcia
    Title:  Global VP, Planning, M&A and IT

# SCHEDULES AND EXHIBITS

**Section 2.1(a): Purchased Equipment**

[To Be Provided][1]

---

[1] Seller is in process of having a third party perform a comprehensive inventory of all manufacturing equipment (excluding computers and office furniture and fixtures) at the Reading Facility.  Seller will update this Section when complete.

## Section 2.1(c): Acquired Contracts

| Contract Counterparty/Address | Contract / Lease Debtor Party | Contract/Lease Title | Date of Contract / Lease |
|---|---|---|---|
| A1 Restoration, Inc. d/b/a A1 Energy 2730 Shenck Road Manheim, PA 17545 | CarbonLite P, LLC | Standard Abbreviated Form of Agreement Between Owner and Contractor | 5/24/2019 |
| A1 Restoration, Inc. d/b/a A1 Energy 2730 Shenck Road Manheim, PA 17545 | CarbonLite P, LLC | Change Order 1 | 6/21/2019 |
| A1 Restoration, Inc. d/b/a A1 Energy 2730 Shenck Road Manheim, PA 17545 | CarbonLite P, LLC | Change Order 2 | 7/1/2019 |
| A1 Restoration, Inc. d/b/a A1 Energy 2730 Shenck Road Manheim, PA 17545 | CarbonLite P, LLC | Change Order 3 | 12/18/2019 |
| A1 Restoration, Inc. d/b/a A1 Energy 2730 Shenck Road Manheim, PA 17545 | CarbonLite P, LLC | Change Order 4 | 5/21/2020 |
| A1 Restoration, Inc. d/b/a A1 Energy 2730 Shenck Road Manheim, PA 17545 | CarbonLite P, LLC | Energy Services Agreement | Undated |
| Anchor Fire Protection Co., Inc. 270 Renninger Road Perkiomenville, PdA 18074 | CarbonLite P, LLC | Standard Short Form Agreement Between Owner and Contractor | 11/4/2020 |
| Berks61 Owner, LLC c/o Endurance Real Estate Group 4 Radnor Corporate Center, Suite 105 Radnor, PA 19087 | CarbonLite P, LLC | Industrial Lease | 5/13/2019 |

| Contract Counterparty/Address | Contract / Lease Debtor Party | Contract/Lease Title | Date of Contract / Lease |
|---|---|---|---|
| Berks61 Owner, LLC<br>c/o Endurance Real Estate Group<br>4 Radnor Corporate Center, Suite 105<br>Radnor, PA 19087 | CarbonLite P, LLC | First Amendment to Industrial Lease | 10/20/2019 |
| Berks61 Owner, LLC<br>c/o Endurance Real Estate Group<br>4 Radnor Corporate Center, Suite 105<br>Radnor, PA 19087 | CarbonLite P, LLC | Second Amendment to Industrial Lease | 2/21/2021 |
| Blue Rock Construction, Inc.<br>1275 Glenlivet Drive, Suite 330<br>Allentown, PA 18106 | CarbonLite P, LLC | Standard Form of Agreement Between Owner and Design-Builder | 8/27/2019 |
| Blue Rock Construction, Inc.<br>1275 Glenlivet Drive, Suite 330<br>Allentown, PA 18106 | CarbonLite P, LLC | Design-Build Amendment | 8/27/2019 |
| Blue Rock Construction, Inc.<br>1275 Glenlivet Drive, Suite 330<br>Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 1 | 10/22/2019 |
| Blue Rock Construction, Inc.<br>1275 Glenlivet Drive, Suite 330<br>Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 6 | 11/14/2019 |
| Blue Rock Construction, Inc.<br>1275 Glenlivet Drive, Suite 330<br>Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 7 | 11/14/2019 |
| Blue Rock Construction, Inc.<br>1275 Glenlivet Drive, Suite 330<br>Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 8 | 11/14/2019 |

| Contract Counterparty/Address | Contract / Lease Debtor Party | Contract/Lease Title | Date of Contract / Lease |
|---|---|---|---|
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 9 | 11/14/2019 |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 10 | 1/15/2020 |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 11 | 1/15/2020 |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 13 | 1/21/2020 |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 14 | 1/28/2020 |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 15 | 2/25/2020 |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 16 | 3/30/2020 |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 17 | 3/30/2020 |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 18 | 4/10/2020 |

| Contract Counterparty/Address | Contract / Lease Debtor Party | Contract/Lease Title | Date of Contract / Lease |
|---|---|---|---|
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 19 | 4/20/2020 |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 20 | 5/11/2020 |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 21 | 5/18/2020 |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 22 | 5/18/2020 |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 23 | 6/10/2020 |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 24 | 6/18/2020 |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 25 | 6/25/2020 |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 26 | 6/25/2020 |

| Contract Counterparty/Address | Contract / Lease Debtor Party | Contract/Lease Title | Date of Contract / Lease |
|---|---|---|---|
| Blue Rock Construction, Inc.<br>1275 Glenlivet Drive, Suite 330<br>Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 27 | 10/16/2020 |
| Blue Rock Construction, Inc.<br>1275 Glenlivet Drive, Suite 330<br>Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 28 | 11/20/2020 |
| Blue Rock Construction, Inc.<br>1275 Glenlivet Drive, Suite 330<br>Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 29 | 12/10/2020 |
| ClearFreight, Inc.<br>Building 75, North Hangar Road, Suite 210<br>JFK International Airport<br>Jamaica, NY 11430 | CarbonLite P, LLC | Customs Power of Attorney and Acknowledgement of Terms and Conditions Service; Credit Agreement and Application; Continuing Guaranty | 10/25/2019 |
| Comcast Cable Communications Management, LLC<br>c/o Market Development, Comcast Business<br>1701 JFK Blvd., Flr. 39 - Attn ROE Team<br>Philadelphia, PA 19103 | CarbonLite P, LLC | Comcast Enterprise Services Master Services Agreement (MSA) | 3/23/2020 |
| Data Technology Solutions, LLC<br>9 North College Street<br>Myerstown, PA 19605 | CarbonLite P, LLC | Data Cabling Services Contract (Letter price quotation with acceptance) | 7/29/2020 |
| Emerging Acquisitions LLC d/b/a Bulk Handling Solutions<br>3592 W. 5th Avenue<br>Eugene, OR 97402 | CarbonLite P, LLC | Secondary Plastics Processing System | 1/22/2019 |

| Contract Counterparty/Address | Contract / Lease Debtor Party | Contract/Lease Title | Date of Contract / Lease |
|---|---|---|---|
| Emerging Acquisitions LLC d/b/a Bulk Handling Solutions 3592 W. 5th Avenue Eugene, OR 97402 | CarbonLite P, LLC | Change Order #01 | 5/17/2019 |
| Emerging Acquisitions LLC d/b/a Bulk Handling Solutions 3592 W. 5th Avenue Eugene, OR 97402 | CarbonLite P, LLC | Change Order #02 | 6/7/2019 |
| Emerging Acquisitions LLC d/b/a Bulk Handling Solutions 3592 W. 5th Avenue Eugene, OR 97402 | CarbonLite P, LLC | Change Order #03 | 6/7/2019 |
| Emerging Acquisitions LLC d/b/a Bulk Handling Solutions 3592 W. 5th Avenue Eugene, OR 97402 | CarbonLite P, LLC | Change Order #04 | 6/13/2019 |
| Emerging Acquisitions LLC d/b/a Bulk Handling Solutions 3592 W. 5th Avenue Eugene, OR 97402 | CarbonLite P, LLC | Change Order #05 | 2/7/2020 |
| Emerging Acquisitions LLC d/b/a Bulk Handling Solutions 3592 W. 5th Avenue Eugene, OR 97402 | CarbonLite P, LLC | Consignment Agreement | 2/25/2021 |
| Evoqua Water Technologies LLC 725 Wooten Road Colorado Springs, CO 80915 | CarbonLite P, LLC | Firm Proposal #2019-328049 | 8/5/2019 |

| Contract Counterparty/Address | Contract / Lease Debtor Party | Contract/Lease Title | Date of Contract / Lease |
|---|---|---|---|
| Granite Telecommunications, LLC<br>100 Newport Avenue Extension<br>Quincy, MA 02171 | CarbonLite P, LLC | Commercial Account Form and Letter of Agency - Mobility Services | 3/2/2020 |
| Ingersoll Rand Company<br>800 East Beaty Street<br>Davidson, NC 28036 | CarbonLite P, LLC | Purchase Orders; Standard Terms and Conditions of Sale | 6/27/2019 |
| Ingersoll Rand Company<br>800 East Beaty Street<br>Davidson, NC 28036 | CarbonLite P, LLC | PackageCARE Agreement | 9/30/2019 |
| Ingersoll-Rand Company<br>800-B Beaty Street<br>Davidson, NC 28036 | CarbonLite P, LLC | PackageCARE Agreement | 7/1/2019 |
| Ingersoll-Rand Company<br>Compression Technologies &<br>Services<br>6291 Burnham Avenue<br>Buena Park, CA 90621 | CarbonLite P, LLC | PackageCARE Addendum | 7/20/2020 |
| J.P Mascaro & Sons<br>2650 Audubon Road<br>Audubon, PA 19403 | CarbonLite P, LLC | Contract for Required Services | 7/23/2020 |
| KRE Security, LLC<br>11 South 3rd Street<br>Hamburg, PA 19526 | CarbonLite P, LLC | Security Services Agreement | 11/8/2019 |
| KRE Security, LLC<br>11 South 3rd Street<br>Hamburg, PA 19526 | CarbonLite P, LLC | Mutual Non-Disclosure and Confidentiality Agreement | 11/15/2019 |

| Contract Counterparty/Address | Contract / Lease Debtor Party | Contract/Lease Title | Date of Contract / Lease |
|---|---|---|---|
| Kupper Engineering, Inc.<br>300 Brookside Avenue, Building 14<br>Ambler, PA 19002 | CarbonLite P, LLC | Proposal to Provide System Integration Services for the Direct Transfer Trip System | 12/3/2019 |
| Lift Inc. (Corporate Office)<br>3745 Hempland Rd.<br>Mountville, PA 17554 | CarbonLite P, LLC | Planned Maintenance Agreement (Lift Trucks) | 7/24/2020 |
| Lubo USA LLC d/b/a Van Dyk<br>Recycling Solutions<br>78 Halloween Boulevard<br>Stamford, CT 06902 | CarbonLite P, LLC | Order Confirmation OC#LUTI2019245 | 6/12/2019 |
| Metropolitan Edison Company<br>2800 Pottsville Pike<br>Reading, PA 19605 | CarbonLite P, LLC | FirstEnergy Interconnection Agreement | 10/7/2020 |
| Miura America Co., Ltd.<br>2200 Steven B. Smith Boulevard<br>Rockmart, GA 30153 | CarbonLite P, LLC | Miura Maintenance Agreement | 6/4/2019 |
| Nitel Inc.<br>350 N. Orleans Street, #1300N<br>Chicago IL 60654 | CarbonLite P, LLC | Services Agreement | 12/30/2019 |
| Orkin<br>3330 Keller Springs Road #250<br>Carrollton, TX 75006 | CarbonLite P, LLC | Service Agreement | 7/20/2020 |
| Pelletron Corporation<br>1866 Colonial Village Lane<br>Lancaster, PA 17601 | CarbonLite P, LLC | Order Confirmation | 6/17/2019 |
| Pelletron Corporation<br>1866 Colonial Village Lane<br>Lancaster, PA 17601 | CarbonLite P, LLC;<br>CarbonLite Recycling LLC | Pelletron Order Confirmation for PET Flake and Pellet Handling System for PA and Dallas | 9/9/2020 |

| Contract Counterparty/Address | Contract / Lease Debtor Party | Contract/Lease Title | Date of Contract / Lease |
|---|---|---|---|
| PerkinElmer Health Sciences Inc.<br>710 Bridgeport Avenue<br>Shelton, CT 06484 | CarbonLite P, LLC | Quotation | 12/5/2019 |
| R.A.T.T., Inc. d/b/a Orkin<br>800 Shoemaker Avenue<br>Shoemakersville, PA 19555 | CarbonLite P, LLC | Special Service Agreement | 7/1/2020 |
| R.A.T.T., Inc. d/b/a Orkin<br>800 Shoemaker Avenue<br>Shoemakersville, PA 19555 | CarbonLite P, LLC | Special Service Agreement | 10/21/2020 |
| Security Signal Devices, Inc.<br>900 Six Flags<br>Arlington, TX 76011 | CarbonLite P, LLC | Letter Agreement | 11/26/2020 |
| Security Signal Devices, Inc.<br>900 Six Flags<br>Arlington, TX 76011 | CarbonLite P, LLC | SSD Alarm Agreement | 4/21/2020 |
| Sorema Division of Previero N. srl<br>Via Per Cavolto,<br>17- 22040 Anzano del Parco, Italy | CarbonLite P, LLC | Order Confirmation V1450 | 1/28/2019 |
| Sorema Division of Previero N. srl<br>Via Per Cavolto,<br>17- 22040 Anzano del Parco, Italy | CarbonLite P, LLC | Order Confirmation V1451 | 1/28/2019 |
| Starlinger & Co. Gesellschaft m.b.H.<br>Sonneuhrgasse 4<br>1060 Vienna, Austria | CarbonLite P, LLC | Order Confirmation No. MA295440 | 11/27/2018 |
| Trimax Systems Inc.<br>565 Explorer Street<br>Brea, CA 92821 | CarbonLite P, LLC | Proposal (E-12155 Rev 2) | 7/29/2019 |

| Contract Counterparty/Address | Contract / Lease Debtor Party | Contract/Lease Title | Date of Contract / Lease |
|---|---|---|---|
| UniSensor Sensorststeme GmbH<br>Am Sandfeld 11<br>D-76149 Karlsruhe<br>Germany | CarbonLite P. LLC | Offer No. A016804 | 3/15/2019 |
| UniVoIP, Inc.<br>830 Parkview Drive N.<br>El Segundo, CA 90245 | CarbonLite P, LLC | Agreement to Subscribe to Hosted Voice Over IP (VOIP) Telephone System and Internet Access Service | 11/4/2019 |

## Section 2.1(e): Acquired Real Property Leases

| Debtor / Lessee | Location | Lessor |
|---|---|---|
| CarbonLite P LLC | 4030 Pottsville Pike<br>Reading, PA 19605 | Berks 61 Owner, LLC<br>c/o Endurance Real Estate Group<br>4 Radnor Corporate Center<br>Suite 105<br>Radnor, PA 19087 |

## Section 2.1(f): Acquired Personal Property Leases

| Contract Counterparty/Address | Contract / Lease Debtor Party | Contract/Lease Title | Date of Contract / Lease |
|---|---|---|---|
| Toyota Motor Credit Corporation P.O. Box 2431 Carol Stream, IL 60132 | CarbonLite P, LLC | Equipment Schedule 22 to Master Lease Agreement | 2/7/2020 |
| Toyota Motor Credit Corporation P.O. Box 2431 Carol Stream, IL 60132 | CarbonLite P, LLC | Equipment Schedule 23 to Master Lease Agreement | 2/7/2020 |
| Toyota Motor Credit Corporation P.O. Box 2431 Carol Stream, IL 60132 | CarbonLite P, LLC | Equipment Schedule 24 to Master Lease Agreement | 2/7/2020 |
| Toyota Motor Credit Corporation P.O. Box 2431 Carol Stream, IL 60132 | CarbonLite P, LLC | Equipment Schedule 25 to Master Lease Agreement | 2/7/2020 |
| Toyota Motor Credit Corporation P.O. Box 2431 Carol Stream, IL 60132 | CarbonLite P, LLC | Equipment Schedule 26 to Master Lease Agreement | 2/7/2020 |

# Section 2.1(g): Permits and Licenses

| Permit Type | Issuing Entity | Permit Number | Expiration Date |
|---|---|---|---|
| Department Plan Approval | Pennsylvania Department of Environmental Protection- Air Quality Program | Plan Approval No. 06-05159A | 5/31/2021 |
| Industrial Waste Discharge Permit | City of Reading | #92 | 9/30/2023 |
| Temporary Certificate of Occupancy | Muhlenberg Township | n/a | |
| Temporary Fire License | Muhlenberg Fire Marshal | FL-0190 | 10/1/2021 |
| NPDES Stormwater Discharge Permit | Pennsylvania Department of Environmental Protection – Bureau of Clean Water | PAG03368 | 9/23/2021 |
| RCRA Small Quantity Generator of Hazardous Waste | U.S. Environmental Protection Agency | Generator ID No. PAD000731224 | N/A |

## Section 2.1(i): Open Customer Orders[2]

| Shipment Date | Type | No. | Description | Quantity | Outstanding Quantity | Quantity on Back Order |
|---|---|---|---|---|---|---|
| **1005** | **Amcor Group GmbH** | | | | | |
| | | **Order No.** | **SO-005993   1/6/2021** | | | |
| 01/27/21 | Item | CL-LNO-01-02 | Starlinger Clear Pellet | 50,000 | 50,000 | 50,000 |
| 01/27/21 | G/L Account | 5020004 | T&S - Reimbursable: Other | 1 | 1 | 1 |

---

[2] Schedule as of 4/19/2021.  Per unit pricing to be consistent with existing pricing formula.

| Document No. | Buy-from Vendor No. | Expected Date | Quantity | Quantity Received | Outstanding Quantity | Direct Unit Cost Excl. Tax | Outstanding Amount |
|---|---|---|---|---|---|---|---|
| **80016** | **Dewatering Bag - Reusable** | | | | | | |
| PO-001654 | 2172 | 04/13/21 | 100 | | 100 | $65.00 | $6,500.00 |
| PO-001654 | 2172 | 04/13/21 | 1 | | 1 | $260.00 | $260.00 |
| PO-001654 | 2172 | 04/13/21 | 1 | | 1 | $405.60 | $405.60 |
| **80016** | **Item Total** | | **102** | **0** | **102** | | **$7,165.60** |
| | | | | | | | |
| **80022** | **Flake Bag, 36x44x96, White, Duffle Top** | | | | | | |
| PO-001637 | 2502 | 04/07/21 | 6,600.00 | 3,300.00 | 3,300.00 | $11.85 | $39,105.00 |
| **80022** | **Item Total** | | **6,600.00** | **3,300.00** | **3,300.00** | | **$39,105.00** |
| | | | | | | | |
| **90058** | **Polymac 4-4619** | | | | | | |
| PO-001625 | 2195 | 04/01/21 | 45,000.00 | | 45,000.00 | $0.36 | $16,200.00 |
| **90058** | **Item Total** | | **45,000.00** | **0** | **45,000.00** | | **$16,200.00** |
| | | | | | | | |
| **RM-BALES-01A** | **Purchased Bale** | | | | | | |
| PO-001568-12 | 3755 | 03/25/21 | 42,000.00 | | 42,000.00 | $0.15 | $6,300.00 |
| PO-001568-13 | 3755 | 03/25/21 | 42,000.00 | | 42,000.00 | $0.15 | $6,300.00 |
| PO-001568-14 | 3755 | 03/25/21 | 42,000.00 | | 42,000.00 | $0.15 | $6,300.00 |
| PO-001568-15 | 3755 | 03/25/21 | 42,000.00 | | 42,000.00 | $0.15 | $6,300.00 |
| PO-001583-10 | 2469 | 03/26/21 | 40,000.00 | | 40,000.00 | $0.16 | $6,200.00 |
| PO-001583-8 | 2469 | 03/26/21 | 40,000.00 | | 40,000.00 | $0.16 | $6,200.00 |
| PO-001583-9 | 2469 | 03/26/21 | 40,000.00 | | 40,000.00 | $0.16 | $6,200.00 |
| PO-001611-10 | 2469 | 04/06/21 | 40,000.00 | | 40,000.00 | $0.18 | $7,000.00 |
| PO-001611-13 | 2469 | 04/06/21 | 40,000.00 | | 40,000.00 | $0.18 | $7,000.00 |
| PO-001611-14 | 2469 | 04/06/21 | 40,000.00 | | 40,000.00 | $0.18 | $7,000.00 |
| PO-001611-15 | 2469 | 04/06/21 | 40,000.00 | | 40,000.00 | $0.18 | $7,000.00 |
| PO-001611-17 | 2469 | 04/06/21 | 40,000.00 | | 40,000.00 | $0.18 | $7,000.00 |
| PO-001611-18 | 2469 | 04/06/21 | 40,000.00 | | 40,000.00 | $0.18 | $7,000.00 |
| PO-001611-19 | 2469 | 04/06/21 | 40,000.00 | | 40,000.00 | $0.18 | $7,000.00 |
| PO-001611-20 | 2469 | 04/06/21 | 40,000.00 | | 40,000.00 | $0.18 | $7,000.00 |
| PO-001611-22 | 2469 | 04/06/21 | 40,000.00 | | 40,000.00 | $0.18 | $7,000.00 |
| PO-001611-23 | 2469 | 04/06/21 | 40,000.00 | | 40,000.00 | $0.18 | $7,000.00 |
| PO-001611-24 | 2469 | 04/06/21 | 40,000.00 | | 40,000.00 | $0.18 | $7,000.00 |
| PO-001611-25 | 2469 | 04/06/21 | 40,000.00 | | 40,000.00 | $0.18 | $7,000.00 |
| PO-001611-26 | 2469 | 04/06/21 | 40,000.00 | | 40,000.00 | $0.18 | $7,000.00 |
| PO-001611-27 | 2469 | 04/06/21 | 40,000.00 | | 40,000.00 | $0.18 | $7,000.00 |
| PO-001611-28 | 2469 | 04/06/21 | 40,000.00 | | 40,000.00 | $0.18 | $7,000.00 |
| PO-001611-29 | 2469 | 04/06/21 | 40,000.00 | | 40,000.00 | $0.18 | $7,000.00 |
| PO-001611-3 | 2469 | 04/06/21 | 40,000.00 | | 40,000.00 | $0.18 | $7,000.00 |
| PO-001611-30 | 2469 | 04/06/21 | 40,000.00 | | 40,000.00 | $0.18 | $7,000.00 |
| PO-001611-7 | 2469 | 04/06/21 | 40,000.00 | | 40,000.00 | $0.18 | $7,000.00 |
| PO-001611-8 | 2469 | 04/06/21 | 40,000.00 | | 40,000.00 | $0.18 | $7,000.00 |

---

[3] Schedule as of 4/19/2021

| Document No. | Buy-from Vendor No. | Expected Date | Quantity | Quantity Received | Outstanding Quantity | Direct Unit Cost Excl. Tax | Outstanding Amount |
|---|---|---|---|---|---|---|---|
| PO-001541-10 | 2812 | 04/08/21 | 40,000.00 | | 40,000.00 | $0.12 | $4,800.00 |
| PO-001541-6 | 2812 | 04/08/21 | 40,000.00 | | 40,000.00 | $0.12 | $4,800.00 |
| PO-001541-7 | 2812 | 04/08/21 | 40,000.00 | | 40,000.00 | $0.12 | $4,800.00 |
| PO-001541-8 | 2812 | 04/08/21 | 40,000.00 | | 40,000.00 | $0.12 | $4,800.00 |
| PO-001541-9 | 2812 | 04/08/21 | 40,000.00 | | 40,000.00 | $0.12 | $4,800.00 |
| PO-001626-13 | 2272 | 04/08/21 | 40,000.00 | | 40,000.00 | $0.18 | $7,200.00 |
| PO-001626-14 | 2272 | 04/08/21 | 40,000.00 | | 40,000.00 | $0.18 | $7,200.00 |
| PO-001626-15 | 2272 | 04/08/21 | 40,000.00 | | 40,000.00 | $0.18 | $7,200.00 |
| PO-001626-16 | 2272 | 04/08/21 | 40,000.00 | | 40,000.00 | $0.18 | $7,200.00 |
| PO-001626-20 | 2272 | 04/08/21 | 40,000.00 | | 40,000.00 | $0.18 | $7,200.00 |
| PO-001626-7 | 2272 | 04/08/21 | 40,000.00 | | 40,000.00 | $0.18 | $7,200.00 |
| PO-001626-8 | 2272 | 04/08/21 | 40,000.00 | | 40,000.00 | $0.18 | $7,200.00 |
| PO-001648 | 2847 | 04/09/21 | 33,000.00 | | 33,000.00 | $0.18 | $5,940.00 |
| PO-001646-3 | 2214 | 04/15/21 | 40,000.00 | | 40,000.00 | $0.19 | $7,400.00 |
| PO-001674 | 2847 | 04/15/21 | 42,000.00 | | 42,000.00 | $0.19 | $7,770.00 |
| **RM-BALES-01A** | | **Item Total** | **1,723,000.00** | **0** | **1,723,000.00** | | **$286,310.00** |
| | | | | | | | |
| **ZCIP 2019-12** | | **COGZ Software** | | | | | |
| PO-001678 | 2310 | 04/17/21 | 1 | | 1 | $1,802.00 | $1,802.00 |
| **ZCIP 2019-12** | | **Item Total** | **1** | **0** | **1** | | **$1,802.00** |
| | | | | | | | |
| **ZCOMPEXP** | | **Computer and Internet Expense** | | | | | |
| PO-001632 | 2160 | 04/03/21 | 1 | | 1 | $10.54 | $10.54 |
| PO-001632 | 2160 | 04/03/21 | 1 | | 1 | $9.99 | $9.99 |
| PO-001632 | 2160 | 04/03/21 | 1 | | 1 | $164.99 | $164.99 |
| PO-001632 | 2160 | 04/03/21 | 1 | | 1 | $1,099.00 | $1,099.00 |
| PO-001632 | 2160 | 04/03/21 | 1 | | 1 | $1,097.00 | $1,097.00 |
| PO-001632 | 2160 | 04/03/21 | 1 | | 1 | $142.89 | $142.89 |
| PO-001633 | 2160 | 04/03/21 | 2 | | 2 | $11.04 | $22.08 |
| PO-001633 | 2160 | 04/03/21 | 2 | | 2 | $9.58 | $19.16 |
| PO-001633 | 2160 | 04/03/21 | 1 | | 1 | $32.80 | $32.80 |
| PO-001633 | 2160 | 04/03/21 | 1 | | 1 | $12.83 | $12.83 |
| PO-001633 | 2160 | 04/03/21 | 1 | | 1 | $2.98 | $2.98 |
| PO-001634 | 2160 | 04/03/21 | 3 | | 3 | $64.00 | $192.00 |
| PO-001634 | 2160 | 04/03/21 | 1 | | 1 | $11.52 | $11.52 |
| PO-001660 | 2160 | 04/13/21 | 1 | | 1 | $159.99 | $159.99 |
| PO-001660 | 2160 | 04/13/21 | 1 | | 1 | $9.60 | $9.60 |
| PO-001665 | 2160 | 04/14/21 | 1 | | 1 | $162.95 | $162.95 |
| PO-001665 | 2160 | 04/14/21 | 1 | | 1 | $24.99 | $24.99 |
| PO-001665 | 2160 | 04/14/21 | 1 | | 1 | $189.99 | $189.99 |
| PO-001665 | 2160 | 04/14/21 | 1 | | 1 | $162.95 | $162.95 |
| PO-001665 | 2160 | 04/14/21 | 1 | | 1 | $162.95 | $162.95 |
| PO-001665 | 2160 | 04/14/21 | 1 | | 1 | $239.99 | $239.99 |
| PO-001665 | 2160 | 04/14/21 | 1 | | 1 | $162.95 | $162.95 |
| PO-001665 | 2160 | 04/14/21 | 10 | | 10 | $10.73 | $107.30 |
| PO-001665 | 2160 | 04/14/21 | 10 | | 10 | $10.37 | $103.70 |
| PO-001665 | 2160 | 04/14/21 | 1 | | 1 | $79.02 | $79.02 |
| **ZCOMPEXP** | | **Item Total** | **47** | **0** | **47** | | **$4,384.16** |

| Document No. | Buy-from Vendor No. | Expected Date | Quantity | Quantity Received | Outstanding Quantity | Direct Unit Cost Excl. Tax | Outstanding Amount |
|---|---|---|---|---|---|---|---|
| **ZLAB SUPPLIES** | **QA Lab Supplies** | | | | | | |
| PO-001605 | 2470 | 03/25/21 | 1 | | 1 | $154.22 | $154.22 |
| PO-001605 | 2470 | 03/25/21 | 1 | | 1 | $9.25 | $9.25 |
| PO-001627 | 2800 | 04/02/21 | 1 | | 1 | $42.71 | $42.71 |
| PO-001627 | 2800 | 04/02/21 | 1 | | 1 | $133.00 | $133.00 |
| PO-001627 | 2800 | 04/02/21 | 2 | | 2 | $130.10 | $260.20 |
| PO-001627 | 2800 | 04/02/21 | 1 | | 1 | $183.50 | $183.50 |
| PO-001627 | 2800 | 04/02/21 | 2 | | 2 | $23.58 | $47.16 |
| PO-001647 | 2390 | 04/08/21 | 1 | | 1 | $960.00 | $960.00 |
| PO-001647 | 2390 | 04/08/21 | 1 | | 1 | $325.00 | $325.00 |
| **ZLAB SUPPLIES** | **Item Total** | | **11** | **0** | **11** | | **$2,115.04** |
| | | | | | | | |
| **ZMAINT SUPPLIES** | **Maintenance Supplies** | | | | | | |
| PO-001521 | 2415 | 02/19/21 | 1 | | 1 | $90.68 | $90.68 |
| PO-001521 | 2415 | 02/19/21 | 8 | 7 | 1 | $8.09 | $8.09 |
| PO-001521 | 2415 | 02/19/21 | 8 | 4 | 4 | $7.46 | $29.86 |
| PO-001599 | 2691 | 03/24/21 | 1 | | 1 | $87.70 | $87.70 |
| PO-001599 | 2691 | 03/24/21 | 1 | | 1 | $98.65 | $98.65 |
| PO-001599 | 2691 | 03/24/21 | 1 | | 1 | $148.62 | $148.62 |
| PO-001599 | 2691 | 03/24/21 | 1 | | 1 | $133.85 | $133.85 |
| PO-001599 | 2691 | 03/24/21 | 1 | | 1 | $28.31 | $28.31 |
| PO-001599 | 2691 | 03/24/21 | 1 | | 1 | $3.00 | $3.00 |
| PO-001642 | 2432 | 04/07/21 | 4 | | 4 | $275.00 | $1,100.00 |
| PO-001642 | 2432 | 04/07/21 | 1 | | 1 | $66.00 | $66.00 |
| PO-001661 | 2560 | 04/13/21 | 1 | | 1 | $9.62 | $9.62 |
| PO-001661 | 2560 | 04/13/21 | 1 | | 1 | $7.47 | $7.47 |
| PO-001662 | 2636 | 04/13/21 | 1 | | 1 | $579.70 | $579.70 |
| PO-001662 | 2636 | 04/13/21 | 1 | | 1 | $64.99 | $64.99 |
| PO-001662 | 2636 | 04/13/21 | 4 | | 4 | $18.99 | $75.96 |
| PO-001662 | 2636 | 04/13/21 | 2 | | 2 | $37.99 | $75.98 |
| PO-001662 | 2636 | 04/13/21 | 2 | | 2 | $27.99 | $55.98 |
| PO-001662 | 2636 | 04/13/21 | 2 | | 2 | $27.99 | $55.98 |
| PO-001662 | 2636 | 04/13/21 | 4 | | 4 | $21.99 | $87.96 |
| PO-001662 | 2636 | 04/13/21 | 2 | | 2 | $27.99 | $55.98 |
| PO-001662 | 2636 | 04/13/21 | 1 | | 1 | $409.99 | $409.99 |
| PO-001662 | 2636 | 04/13/21 | 2 | | 2 | $249.00 | $498.00 |
| PO-001662 | 2636 | 04/13/21 | 1 | | 1 | $117.63 | $117.63 |
| PO-001662 | 2636 | 04/13/21 | 1 | | 1 | $108.06 | $108.06 |
| PO-001663 | 2415 | 04/14/21 | 4 | | 4 | $9.71 | $38.84 |
| PO-001663 | 2415 | 04/14/21 | 1 | | 1 | $2.33 | $2.33 |
| PO-001664 | 2905 | 04/14/21 | 6 | | 6 | $52.99 | $317.94 |
| PO-001664 | 2905 | 04/14/21 | 1 | | 1 | $19.08 | $19.08 |
| **ZMAINT SUPPLIES** | **Item Total** | | **65** | **11** | **54** | | **$4,376.25** |
| | | | | | | | |
| **ZOFFICE SUPPLIES** | **Office Supplies** | | | | | | |
| PO-001655 | 2905 | 04/13/21 | 1 | | 1 | $93.75 | $93.75 |
| PO-001655 | 2905 | 04/13/21 | 1 | | 1 | $5.63 | $5.63 |

| Document No. | Buy-from Vendor No. | Expected Date | Quantity | Quantity Received | Outstanding Quantity | Direct Unit Cost Excl. Tax | Outstanding Amount |
|---|---|---|---|---|---|---|---|
| PO-001670 | 2718 | 04/15/21 | 6 | | 6 | $39.98 | $239.88 |
| PO-001670 | 2718 | 04/15/21 | 1 | | 1 | $17.75 | $17.75 |
| PO-001670 | 2718 | 04/15/21 | 1 | | 1 | $55.98 | $55.98 |
| PO-001671 | 2880 | 04/15/21 | 3 | | 3 | $1.99 | $5.97 |
| PO-001671 | 2880 | 04/15/21 | 1 | | 1 | $7.62 | $7.62 |
| PO-001672 | 2718 | 04/15/21 | 1 | | 1 | $159.98 | $159.98 |
| PO-001672 | 2718 | 04/15/21 | 1 | | 1 | $449.00 | $449.00 |
| PO-001672 | 2718 | 04/15/21 | 1 | | 1 | $37.32 | $37.32 |
| PO-001672 | 2718 | 04/15/21 | 1 | | 1 | $13.00 | $13.00 |
| PO-001675 | 2880 | 04/16/21 | 1 | | 1 | $3.17 | $3.17 |
| PO-001677 | 2765 | 04/16/21 | 1 | | 1 | $109.89 | $109.89 |
| PO-001677 | 2765 | 04/16/21 | 1 | | 1 | $84.89 | $84.89 |
| PO-001677 | 2765 | 04/16/21 | 1 | | 1 | $11.69 | $11.69 |
| **ZOFFICE SUPPLIES** | **Item Total** | | **22** | **0** | **22** | | **$1,295.52** |
| | | | | | | | |
| **ZRM BECKART** | **R&M Beckart** | | | | | | |
| PO-001460 | 2895 | 01/06/21 | 3 | | 3 | $54.40 | $163.20 |
| PO-001559 | 2895 | 03/17/21 | 6 | | 6 | $14.65 | $87.90 |
| PO-001644 | 2166 | 04/08/21 | 1 | | 1 | $275.00 | $275.00 |
| PO-001644 | 2166 | 04/08/21 | 1 | | 1 | $26.18 | $26.18 |
| **ZRM BECKART** | **Item Total** | | **11** | **0** | **11** | | **$552.28** |
| | | | | | | | |
| **ZRM STARLINGER** | **R&M Starlinger** | | | | | | |
| PO-001589 | 2770 | 03/24/21 | 2 | | 2 | $75.74 | $151.48 |
| PO-001589 | 2770 | 03/24/21 | 2 | | 2 | $100.11 | $200.22 |
| PO-001589 | 2770 | 03/24/21 | 8 | | 8 | $2.32 | $18.56 |
| PO-001589 | 2770 | 03/24/21 | 1 | | 1 | $22.22 | $22.22 |
| **ZRM STARLINGER** | **Item Total** | | **13** | **0** | **13** | | **$392.48** |
| | | | | | | | |
| **ZSAFETY** | **Safety and Compliance** | | | | | | |
| PO-001573 | 2470 | 03/20/21 | 36 | 9 | 27 | $15.70 | $423.90 |
| PO-001573 | 2470 | 03/20/21 | 20 | 9 | 11 | $12.00 | $132.00 |
| PO-001581 | 2593 | 03/20/21 | 1 | | 1 | $1,695.00 | $1,695.00 |
| PO-001581 | 2593 | 03/20/21 | 1 | | 1 | $149.00 | $149.00 |
| PO-001581 | 2593 | 03/20/21 | 1 | | 1 | $179.95 | $179.95 |
| PO-001581 | 2593 | 03/20/21 | 1 | | 1 | $159.95 | $159.95 |
| PO-001581 | 2593 | 03/20/21 | 1 | | 1 | $149.95 | $149.95 |
| PO-001581 | 2593 | 03/20/21 | 1 | | 1 | $129.95 | $129.95 |
| PO-001581 | 2593 | 03/20/21 | 2 | | 2 | $399.95 | $799.90 |
| PO-001606 | 2470 | 03/25/21 | 2 | | 2 | $22.53 | $45.06 |
| PO-001606 | 2470 | 03/25/21 | 2 | | 2 | $22.53 | $45.06 |
| PO-001606 | 2470 | 03/25/21 | 1 | | 1 | $5.40 | $5.40 |
| PO-001623 | 2412 | 03/31/21 | 3 | | 3 | $750.00 | $2,250.00 |
| PO-001623 | 2412 | 03/31/21 | 3 | | 3 | $299.99 | $899.97 |
| PO-001623 | 2412 | 03/31/21 | 2 | | 2 | $189.99 | $379.98 |
| PO-001623 | 2412 | 03/31/21 | 2 | | 2 | $35.99 | $71.98 |
| PO-001623 | 2412 | 03/31/21 | 2 | | 2 | $25.99 | $51.98 |
| PO-001623 | 2412 | 03/31/21 | 2 | | 2 | $19.99 | $39.98 |

| Document No. | Buy-from Vendor No. | Expected Date | Quantity | Quantity Received | Outstanding Quantity | Direct Unit Cost Excl. Tax | Outstanding Amount |
|---|---|---|---|---|---|---|---|
| PO-001623 | 2412 | 03/31/21 | 1 | | 1 | $309.99 | $309.99 |
| PO-001623 | 2412 | 03/31/21 | 2 | | 2 | $75.99 | $151.98 |
| PO-001623 | 2412 | 03/31/21 | 1 | | 1 | $750.00 | $750.00 |
| PO-001623 | 2412 | 03/31/21 | 1 | | 1 | $299.99 | $299.99 |
| PO-001623 | 2412 | 03/31/21 | 1 | | 1 | $312.35 | $312.35 |
| PO-001656 | 2470 | 04/13/21 | 10 | 3 | 7 | $18.77 | $131.39 |
| **ZSAFETY** | **Item Total** | | **99** | **21** | **78** | | **$9,564.71** |
| | | | | | | | |
| **ZSPARE PARTS** | **Spare Parts - Inventory Asset Other** | | | | | | |
| PO-001629 | 2445 | 04/02/21 | 6 | | 6 | $17.10 | $102.60 |
| PO-001629 | 2445 | 04/02/21 | 6 | | 6 | $18.02 | $108.12 |
| PO-001629 | 2445 | 04/02/21 | 6 | | 6 | $18.75 | $112.50 |
| PO-001629 | 2445 | 04/02/21 | 6 | | 6 | $18.02 | $108.12 |
| PO-001629 | 2445 | 04/02/21 | 6 | | 6 | $17.48 | $104.88 |
| PO-001629 | 2445 | 04/02/21 | 6 | | 6 | $17.48 | $104.88 |
| PO-001629 | 2445 | 04/02/21 | 6 | | 6 | $17.48 | $104.88 |
| PO-001629 | 2445 | 04/02/21 | 6 | | 6 | $17.48 | $104.88 |
| PO-001629 | 2445 | 04/02/21 | 6 | | 6 | $17.48 | $104.88 |
| PO-001629 | 2445 | 04/02/21 | 6 | | 6 | $17.48 | $104.88 |
| PO-001629 | 2445 | 04/02/21 | 6 | | 6 | $17.48 | $104.88 |
| PO-001629 | 2445 | 04/02/21 | 6 | | 6 | $10.82 | $64.92 |
| PO-001629 | 2445 | 04/02/21 | 6 | | 6 | $10.82 | $64.92 |
| PO-001629 | 2445 | 04/02/21 | 6 | | 6 | $10.82 | $64.92 |
| PO-001629 | 2445 | 04/02/21 | 6 | | 6 | $11.51 | $69.06 |
| PO-001629 | 2445 | 04/02/21 | 6 | | 6 | $31.65 | $189.90 |
| PO-001629 | 2445 | 04/02/21 | 6 | | 6 | $29.49 | $176.94 |
| PO-001629 | 2445 | 04/02/21 | 6 | | 6 | $29.49 | $176.94 |
| PO-001629 | 2445 | 04/02/21 | 6 | | 6 | $27.76 | $166.56 |
| PO-001629 | 2445 | 04/02/21 | 6 | | 6 | $50.09 | $300.54 |
| PO-001629 | 2445 | 04/02/21 | 6 | | 6 | $50.09 | $300.54 |
| PO-001629 | 2445 | 04/02/21 | 6 | | 6 | $88.60 | $531.60 |
| PO-001629 | 2445 | 04/02/21 | 6 | | 6 | $25.91 | $155.46 |
| PO-001629 | 2445 | 04/02/21 | 6 | | 6 | $25.91 | $155.46 |
| PO-001629 | 2445 | 04/02/21 | 6 | | 6 | $25.91 | $155.46 |
| PO-001629 | 2445 | 04/02/21 | 6 | | 6 | $56.10 | $336.60 |
| PO-001629 | 2445 | 04/02/21 | 1 | | 1 | $244.52 | $244.52 |
| **ZSPARE PARTS** | **Item Total** | | **157** | **0** | **157** | | **$4,319.84** |
| | | | | | | | |
| **ZWAREHOUSE SUPPLIES** | **Warehouse Supplies** | | | | | | |
| PO-001515 | 2905 | 02/16/21 | 1 | | 1 | $34.05 | $34.05 |
| PO-001590 | 2787 | 03/24/21 | 5 | | 5 | $275.00 | $1,375.00 |
| PO-001590 | 2787 | 03/24/21 | 1 | | 1 | $3.57 | $3.57 |
| PO-001590 | 2787 | 03/24/21 | 1 | | 1 | $3.57 | $3.57 |
| PO-001600 | 2213 | 03/24/21 | 2 | | 2 | $6,250.00 | $12,500.00 |
| PO-001600 | 2213 | 03/24/21 | 1 | | 1 | $601.56 | $601.56 |
| PO-001607 | 2490 | 03/25/21 | 2 | | 2 | $549.00 | $1,098.00 |
| PO-001607 | 2490 | 03/25/21 | 1 | | 1 | $65.88 | $65.88 |
| PO-001640 | 2465 | 04/07/21 | 1 | | 1 | $304.95 | $304.95 |

| Document No. | Buy-from Vendor No. | Expected Date | Quantity | Quantity Received | Outstanding Quantity | Direct Unit Cost Excl. Tax | Outstanding Amount |
|---|---|---|---|---|---|---|---|
| PO-001640 | 2465 | 04/07/21 | 1 | | 1 | $326.95 | $326.95 |
| PO-001640 | 2465 | 04/07/21 | 1 | | 1 | $26.95 | $26.95 |
| PO-001640 | 2465 | 04/07/21 | 1 | | 1 | $59.33 | $59.33 |
| PO-001640 | 2465 | 04/07/21 | 1 | | 1 | $329.99 | $329.99 |
| PO-001669 | 2835 | 04/15/21 | 3 | | 3 | $1,150.00 | $3,450.00 |
| PO-001669 | 2835 | 04/15/21 | 1 | | 1 | $737.65 | $737.65 |
| PO-001669 | 2835 | 04/15/21 | 1 | | 1 | $251.26 | $251.26 |
| PO-001673 | 2835 | 04/15/21 | 4 | | 4 | $1,044.00 | $4,176.00 |
| PO-001673 | 2835 | 04/15/21 | 1 | | 1 | $319.82 | $319.82 |
| PO-001673 | 2835 | 04/15/21 | 1 | | 1 | $269.75 | $269.75 |
| PO-001676 | 2470 | 04/16/21 | 6 | | 6 | $15.46 | $92.76 |
| PO-001676 | 2470 | 04/16/21 | 1 | | 1 | $5.57 | $5.57 |
| **ZWAREHOUSE SUPPLIES** | **Item Total** | | **37** | **0** | **37** | | **$26,032.61** |

**Report Total** **$403,615.49**

**Section 2.1(l): Acquired Intellectual Property Rights**

None.

**Section 2.1(m): Acquired L/Cs**

| Bank Account | Type of Account | LC # | Amount |
|---|---|---|---|
| East West Bank | Letter of Credit | 19OSL04417 | $2,053,304.27 |

**Section 2.1(o): Prepaid Assets**

| Depositee | Purpose | Date of Deposit | Amount |
|---|---|---|---|
| J.P Mascaro & Sons | Bale deposit | 4/1/2021 | $30,000 |
| J.P Mascaro & Sons | Utility deposit | 4/1/2021 | $20,000 |
| Muhlenberg Township Authority | Utility deposit | 4/19/2021 | $16,000 |
| The Metropolitan Edison Company | Utility deposit | 4/5/2021 | $14,906 |

# Section 2.2(h): Excluded Assets

## *Open Customer Orders*

| Shipment Date | Type | No. | Description | Quantity | Outstanding Quantity | Quantity on Back Order |
|---|---|---|---|---|---|---|
| **1050** | **Nestle Waters North America** | | | | | |
| | | **Order No.** | **SO-006014   3/19/2021** | | | |
| 03/30/21 | Item | CL-LNO-01-02 | Starlinger Clear Pellet | 45,000 | 45,000 | 45,000 |
| | | **Order No.** | **SO-006015   3/19/2021** | | | |
| 03/31/21 | Item | CL-LNO-01-02 | Starlinger Clear Pellet | 45,000 | 45,000 | 45,000 |
| | | **Order No.** | **SO-006016   4/8/2021** | | | |
| | Item | CL-LNO-01-02 | Starlinger Clear Pellet | 45,000 | 45,000 | 45,000 |
| | | **Order No.** | **SO-006017   4/8/2021** | | | |
| 04/22/21 | Item | CL-LNO-01-02 | Starlinger Clear Pellet | 45,000 | 45,000 | 0 |
| | | **Order No.** | **SO-006018   4/8/2021** | | | |
| 04/23/21 | Item | CL-LNO-01-02 | Starlinger Clear Pellet | 45,000 | 45,000 | 0 |
| | | **Order No.** | **SO-006019   4/8/2021** | | | |
| 04/27/21 | Item | CL-LNO-01-02 | Starlinger Clear Pellet | 45,000 | 45,000 | 0 |
| | | **Order No.** | **SO-006020   4/8/2021** | | | |
| 04/27/21 | Item | CL-LNO-01-02 | Starlinger Clear Pellet | 45,000 | 45,000 | 0 |
| | | **Order No.** | **SO-006021   4/8/2021** | | | |
| 04/29/21 | Item | CL-LNO-01-02 | Starlinger Clear Pellet | 45,000 | 45,000 | 0 |
| | | **Order No.** | **SO-006022   4/8/2021** | | | |
| 04/30/21 | Item | CL-LNO-01-02 | Starlinger Clear Pellet | 45,000 | 45,000 | 0 |
| | | **Order No.** | **SO-006023   4/8/2021** | | | |
| 04/26/21 | Item | CL-LNO-01-02 | Starlinger Clear Pellet | 45,000 | 45,000 | 0 |
| | | **Order No.** | **SO-006024   4/8/2021** | | | |
| 05/03/21 | Item | CL-LNO-01-02 | Starlinger Clear Pellet | 45,000 | 45,000 | 0 |
| | | **Order No.** | **SO-006025   4/8/2021** | | | |
| 05/05/21 | Item | CL-LNO-01-02 | Starlinger Clear Pellet | 45,000 | 45,000 | 0 |
| | | **Order No.** | **SO-006026   4/8/2021** | | | |
| 05/10/21 | Item | CL-LNO-01-02 | Starlinger Clear Pellet | 45,000 | 45,000 | 0 |
| | | **Order No.** | **SO-006027   4/8/2021** | | | |
| 05/12/21 | Item | CL-LNO-01-02 | Starlinger Clear Pellet | 45,000 | 45,000 | 0 |
| | | **Order No.** | **SO-006028   4/8/2021** | | | |
| 05/17/21 | Item | CL-LNO-01-02 | Starlinger Clear Pellet | 45,000 | 45,000 | 0 |
| | | **Order No.** | **SO-006029   4/8/2021** | | | |
| 05/19/21 | Item | CL-LNO-01-02 | Starlinger Clear Pellet | 45,000 | 45,000 | 0 |
| | | **Order No.** | **SO-006030   4/8/2021** | | | |
| 05/24/21 | Item | CL-LNO-01-02 | Starlinger Clear Pellet | 45,000 | 45,000 | 0 |
| | | **Order No.** | **SO-006031   4/8/2021** | | | |
| 05/26/21 | Item | CL-LNO-01-02 | Starlinger Clear Pellet | 45,000 | 45,000 | 0 |
| | | **Order No.** | **SO-006032   4/8/2021** | | | |
| 06/01/21 | Item | CL-LNO-01-02 | Starlinger Clear Pellet | 45,000 | 45,000 | 0 |
| | | **Order No.** | **SO-006033   4/8/2021** | | | |
| 06/03/21 | Item | CL-LNO-01-02 | Starlinger Clear Pellet | 45,000 | 45,000 | 0 |
| | | **Order No.** | **SO-006034   4/8/2021** | | | |
| 06/07/21 | Item | CL-LNO-01-02 | Starlinger Clear Pellet | 45,000 | 45,000 | 0 |
| | | **Order No.** | **SO-006035   4/8/2021** | | | |
| 06/09/21 | Item | CL-LNO-01-02 | Starlinger Clear Pellet | 45,000 | 45,000 | 0 |

| Shipment Date | Type | No. | Description | Quantity | Outstanding Quantity | Quantity on Back Order |
|---|---|---|---|---|---|---|
| | | **Order No.** | **SO-006036  4/8/2021** | | | |
| 06/14/21 | Item | CL-LNO-01-02 | Starlinger Clear Pellet | 45,000 | 45,000 | 0 |
| | | **Order No.** | **SO-006037  4/8/2021** | | | |
| 06/16/21 | Item | CL-LNO-01-02 | Starlinger Clear Pellet | 45,000 | 45,000 | 0 |
| | | **Order No.** | **SO-006038  4/8/2021** | | | |
| 06/21/21 | Item | CL-LNO-01-02 | Starlinger Clear Pellet | 45,000 | 45,000 | 0 |
| | | **Order No.** | **SO-006039  4/8/2021** | | | |
| 06/23/21 | Item | CL-LNO-01-02 | Starlinger Clear Pellet | 45,000 | 45,000 | 0 |
| | | **Order No.** | **SO-006040  4/8/2021** | | | |
| 06/28/21 | Item | CL-LNO-01-02 | Starlinger Clear Pellet | 45,000 | 45,000 | 0 |
| | | **Order No.** | **SO-006041  4/8/2021** | | | |
| 06/30/21 | Item | CL-LNO-01-02 | Starlinger Clear Pellet | 45,000 | 45,000 | 0 |
| | **Nestle Waters North America** | | | | | |

*Affiliate/Intercompany Agreements*

- CarbonLite Holdings LLC ("Holdings") is party to that certain Commission Agreement dated April 4, 2019 (the "Loaned Earth Agreement") with Jason Farahnik d/b/a Loaned Earth Recycling.  Under the Loaned Earth Agreement, Mr. Farahnik serves as Holdings' Director of Resin Sales and Brand Partnerships and is entitled to certain commission payments related to his work for Holdings and its subsidiaries, including Seller.

- Holdings is party to that certain Management Agreement dated April 1, 2010 (the "HPC/CarbonLite Management Agreement") with HPC Industries LLC ("HPC"), pursuant to which HPC provides certain services to Holdings and certain of its subsidiaries, including Seller.  The HPC/CarbonLite Management Agreement was amended on January 1, 2011; on or about July 1, 2011; May 1, 2012; March 15, 2013; and October 28, 2015, and was extended on or about December 30, 2020.

**Section 3.3: Consents and Approvals; Governmental Authority**

- Certain of the Permits may not be transferable from the Sellers to the Buyer and Buyer may be required to apply to a Governmental Authority for such Permits.

## Section 3.4:  Compliance with Laws

- In the ordinary course of business, Seller may be subject to periodic inspections by governmental authorities, during which inspections, Seller may be informed of alleged concerns or violations to be remediated.  Except as otherwise set forth herein, Seller is not aware of any material alleged violations that are unremediated as of the date hereof.

- There is ongoing construction at Seller's premises, for which Seller presently has all required Permits.  In the future, Seller may be required to obtain additional Permits as circumstances warrant.

**Section 3.5:  Litigation**

- PQ Recycling LLC (no suit filed; entered into out-of-court settlement)

## Section 3.6(a):  Balance Sheets

See attached.

**CarbonLITE Holdings, LLC and Subsidiaries**

**Consolidated Balance Sheets**
**December 31, 2019 and 2018**

| | | **2019** | | 2018 |
|---|---|---|---|---|
| **Assets** | | | | |
| | | | | |
| Current assets: | | | | |
| Cash and cash equivalents | $ | **27,764,000** | $ | 17,224,000 |
| Accounts receivable, net of allowance for doubtful accounts of $5,000 and $17,000 for 2019 and | | | | |
| 2018, respectively | | **11,621,000** | | 9,021,000 |
| Inventories | | **34,591,000** | | 47,854,000 |
| Prepaid expenses and other current assets | | **2,202,000** | | 3,563,000 |
| **Total current assets** | | **76,178,000** | | 77,662,000 |
| | | | | |
| Restricted cash | | **2,734,000** | | 878,000 |
| Property and equipment, net | | **98,052,000** | | 101,107,000 |
| Goodwill, net | | **1,886,000** | | 2,178,000 |
| Deposits and other assets | | **43,638,000** | | 4,399,000 |
| | | | | |
| **Total assets** | $ | **222,488,000** | $ | 186,224,000 |

See notes to consolidated financial statements.

|  | 2019 | 2018 |
|---|---|---|
| **Liabilities and Members' Deficit** | | |
| | | |
| Current liabilities: | | |
| Accounts payable and other accrued liabilities | $ 41,667,000 | $ 32,667,000 |
| Customer deposits | 41,519,000 | 33,241,000 |
| Current portion of long-term debt | 2,405,000 | 4,918,000 |
| Current portion of capital lease obligation | 1,626,000 | 1,633,000 |
| Current portion of deferred rent | 2,634,000 | 285,000 |
| Unsecured notes payable | 2,250,000 | 4,000,000 |
| Revolving line of credit, net of deferred financing costs of $48,000 | 4,694,000 | - |
| **Total current liabilities** | 96,795,000 | 76,744,000 |
| | | |
| Revolving line of credit, net of deferred financing costs of $426,000 | - | 14,276,000 |
| Senior term loan, net of debt discount and deferred financing costs | 74,376,000 | - |
| Bonds payable, net of current portion and deferred financing costs | 103,878,000 | 45,532,000 |
| Equipment loan, net of current portion and deferred financing costs | - | 32,732,000 |
| Subordinated members' loan | 14,400,000 | 14,400,000 |
| Secured note payable, net of current portion | 1,540,000 | 1,720,000 |
| Obligations under capital lease, net of current portion | 4,341,000 | 5,705,000 |
| Deferred rent, net of current portion | 1,311,000 | 1,660,000 |
| Warrants liability | 1,475,000 | - |
| **Total liabilities** | 298,116,000 | 192,769,000 |
| | | |
| Commitments and contingencies (Notes 6 and 8) | | |
| | | |
| Members' deficit: | | |
| Common units, no par value per unit; 35,000 units | 3,000,000 | 3,000,000 |
| Convertible Class A Preferred Units, par value $1,000 per unit; 5,500 units issued and outstanding | 5,500,000 | 5,500,000 |
| Convertible Class B Preferred Units, par value $1,000 per unit; 6,000 units issued and outstanding | 6,000,000 | 6,000,000 |
| Convertible Class C Preferred Units, par value $1,000 per unit; 5,500 units issued and outstanding | 5,500,000 | 5,500,000 |
| Convertible Class D Preferred Units, par value $1,000 per unit; 5,000 units issued and outstanding | 5,000,000 | 5,000,000 |
| Convertible Class E Preferred Units, par value $1,000 per unit; 8,000 units issued and outstanding | 8,000,000 | 8,000,000 |
| Convertible Class F Preferred Units, par value $1,000 per unit; 2,600 units issued and outstanding | 2,600,000 | 2,600,000 |
| Convertible Class G Preferred Units, par value $1,000 per unit; 14,365 units issued and outstanding | 14,365,000 | 14,365,000 |
| Convertible Class H Preferred Units, par value $1,000 per unit; 13,956 units issued and outstanding | 13,956,000 | 13,956,000 |
| Convertible Class T Preferred Units, par value $1,000 per unit; 12,560 units issued and outstanding | 11,800,000 | 11,800,000 |
| Convertible Class P Preferred Units, par value $1,000 per unit; 3,125 units issued and outstanding in 2019 and 2,365 units issued and outstanding in 2018 | 3,125,000 | 2,365,000 |
| | 78,846,000 | 78,086,000 |
| Subscriptions receivable | - | (450,000) |
| Accumulated deficit | (155,305,000) | (85,275,000) |
| **Total members' deficit attributed to CarbonLITE Holdings, LLC** | (76,459,000) | (7,639,000) |
| | | |
| Noncontrolling interest | 831,000 | 1,094,000 |
| **Total members' deficit** | (75,628,000) | (6,545,000) |
| | | |
| **Total liabilities and members' deficit** | $ 222,488,000 | $ 186,224,000 |

**CarbonLITE Holdings, LLC and Subsidiaries**

**Consolidated Statements of Operations and Noncontrolling Interest**
**Years Ended December 31, 2019 and 2018**

|  | 2019 | 2018 |
|---|---|---|
| Net sales | $ 101,998,000 | $ 91,614,000 |
| Cost of sales | 137,694,000 | 81,414,000 |
| **Gross (loss) margin** | **(35,696,000)** | 10,200,000 |
| General and administrative expenses | 19,170,000 | 16,807,000 |
| **Operating loss** | **(54,866,000)** | (6,607,000) |
| Other (expense) income: |  |  |
| Interest expense | **(18,527,000)** | (12,051,000) |
| Other income, net | **2,963,000** | 1,424,000 |
| **Net loss** | **(70,430,000)** | (17,234,000) |
| Net loss attributable to noncontrolling interest | **263,000** | 287,000 |
| **Net loss attributable to CarbonLITE Holdings, LLC** | **$ (70,167,000)** | $ (16,947,000) |

See notes to consolidated financial statements.

**CarbonLITE Holdings, LLC and Subsidiaries**

**Consolidated Statements of Members' Deficit**
**Years Ended December 31, 2019 and 2018**

| | Common Units | | Preferred Units | | Subscriptions | Accumulated | Noncontrolling | |
| | Units | Amounts | Units | Amounts | Receivable | Deficit | Interest | Total |
|---|---|---|---|---|---|---|---|---|
| Balance, December 31, 2017 | 35,000 | $ 3,000,000 | 72,721 | $ 72,721,000 | $ - | $ (68,456,000) | $ 1,381,000 | $ 8,646,000 |
| Issuance of Class P Convertible | | | | | | | | |
| Preferred Units | - | - | 2,365 | 2,365,000 | (450,000) | - | - | 1,915,000 |
| Member unit-based compensation | - | - | - | - | - | 128,000 | - | 128,000 |
| Net loss | - | - | - | - | - | (16,947,000) | (287,000) | (17,234,000) |
| Balance, December 31, 2018 | 35,000 | 3,000,000 | 75,086 | 75,086,000 | (450,000) | (85,275,000) | 1,094,000 | (6,545,000) |
| Collections of subscriptions receivable | - | - | - | - | 450,000 | - | - | 450,000 |
| Issuance of Class P Convertible | | | | | | | | |
| Preferred Units | - | - | 760 | 760,000 | - | - | - | 760,000 |
| Member unit-based compensation | - | - | - | - | - | 137,000 | - | 137,000 |
| Net loss | - | - | - | - | - | (70,167,000) | (263,000) | (70,430,000) |
| Balance, December 31, 2019 | 35,000 | $ 3,000,000 | 75,846 | $ 75,846,000 | $ - | $ (155,305,000) | $ 831,000 | $ (75,628,000) |

See notes to consolidated financial statements.

**CarbonLITE Holdings, LLC and Subsidiaries**

**Consolidated Statements of Cash Flows**
**Years Ended December 31, 2019 and 2018**

| | 2019 | 2018 |
|---|---|---|
| Cash flows from operating activities: | | |
| Net loss | $ (70,430,000) | $ (17,234,000) |
| Adjustments to reconcile net loss to net cash (used in) provided by operating activities: | | |
| Depreciation and amortization | 15,518,000 | 14,019,000 |
| Write off deferred financing costs on extinguished debt | 1,415,000 | - |
| Amortization of deferred financing costs | 1,027,000 | 463,000 |
| Member unit-based compensation | 137,000 | 128,000 |
| (Recoveries from) provisions for doubtful accounts | (12,000) | 15,000 |
| Loss on disposals of property and equipment | - | 42,000 |
| Changes in operating assets and liabilities: | | |
| Accounts receivable | (2,588,000) | 381,000 |
| Inventories | 13,263,000 | (18,910,000) |
| Prepaid expenses and other current assets | 1,361,000 | (1,833,000) |
| Deposits and other assets | (2,030,000) | (1,203,000) |
| Accounts payable and other accrued liabilities | 9,000,000 | 13,243,000 |
| Customer deposits | 8,278,000 | 23,241,000 |
| Deferred rent | 2,000,000 | (221,000) |
| Net cash (used in) provided by operating activities | (23,061,000) | 12,131,000 |
| | | |
| Cash flows from investing activities: | | |
| Purchases of property and equipment | (12,171,000) | (6,746,000) |
| Deposits on machinery and equipment | (37,229,000) | (1,978,000) |
| Restricted cash | (1,856,000) | 72,000 |
| Net cash used in investing activities | (51,256,000) | (8,652,000) |
| | | |
| Cash flows from financing activities: | | |
| Net repayment of revolving line of credit | (9,960,000) | 5,526,000 |
| Borrowings from long-term debt | 141,800,000 | 3,000,000 |
| Repayments of long-term debt | (40,530,000) | (1,143,000) |
| Proceeds from issuance of preferred units | 1,210,000 | 1,915,000 |
| Payments on capital leases obligation | (1,371,000) | (675,000) |
| Financing costs, loan fees paid | (6,292,000) | (91,000) |
| Net cash provided by financing activities | 84,857,000 | 8,532,000 |
| | | |
| Net increase in cash, cash equivalents and restricted cash | 10,540,000 | 12,011,000 |
| | | |
| Cash, cash equivalents and restricted cash, beginning of year | 17,224,000 | 5,213,000 |
| | | |
| Cash, cash equivalents and restricted cash, end of year | $ 27,764,000 | $ 17,224,000 |
| | | |
| Supplemental disclosure of cash flow information: | | |
| Interest paid | $ 9,173,000 | $ 9,429,000 |
| | | |
| Supplemental disclosure of noncash investing and financing activities: | | |
| Equipment purchases under capital lease obligations | $ - | $ 7,150,000 |
| | | |
| Supplemental disclosures of noncash financing activities: | | |
| Fair value of warrants liability | $ 1,475,000 | $ - |
| | | |
| Subscriptions receivable | $ - | $ 450,000 |

See notes to consolidated financial statements.

The accompanying financial information is preliminary, unaudited and subject to material revision.  This financial information has not been adjusted to reflect the outcome of any sale or reorganization. The financial statements do not include impairment of assets, the resolution any pre-petition obligations including setoff or recoupment claims.



**Unaudited**

| Balance Sheet | Month Ending 12/31/2020 CarbonLITE Holdings, LLC | Month Ending 12/31/2020 CarbonLITE Industries, LLC | Month Ending 12/31/2020 CarbonLITE Recycling, LLC | Month Ending 12/31/2020 CarbonLITE P, LLC | Month Ending 12/31/2020 CarbonLITE PinnPack, LLC | Month Ending 12/31/2020 Consolidated CarbonLITE Holdings, LLC |
|---|---|---|---|---|---|---|
| Cash and ST Investments | $1 | ($0) | $95 | $166 | $555 | $816 |
| Accounts Receivable, Net | $0 | $10,170 | $1,478 | $418 | $5,528 | $17,595 |
| Inventory | $0 | $4,949 | $395 | $402 | $6,543 | $12,289 |
| Intercompany Receivable | $3,881 | ($639) | $90 | $29,582 | $2,835 | $0 |
| Other Current Assets | $0 | $282 | $104 | $80 | $362 | $828 |
| Total Current Assets | 3,882 | 14,762 | 2,163 | 30,648 | 15,823 | 31,528 |
| | | | | | | |
| Net Fixed Assets | $0 | $17,579 | $43,683 | $63,812 | $27,329 | $152,403 |
| Machinery Deposits & Progress Payments | $0 | $3,189 | $0 | $0 | $592 | $3,781 |
| Restricted Cash | $0 | $0 | $5,068 | $9,928 | $0 | $14,996 |
| Security Deposits & Other L/T Assets | $0 | $1,297 | $1,231 | $145 | $57 | $2,730 |
| Net Goodwill | $0 | $0 | $0 | $0 | $1,596 | $1,596 |
| Total Long-Term Assets | - | 22,065 | 49,981 | 73,885 | 29,574 | 175,504 |
| | | | | | | |
| Total Assets | 3,882 | 36,826 | 52,144 | 104,533 | 45,397 | 207,032 |
| | | | | | | |
| Senior Revolver | $0 | $7,260 | $0 | $0 | $4,763 | $12,023 |
| Accounts Payable | $849 | $19,205 | $15,163 | $3,346 | $11,145 | $48,831 |
| Intercompany Payable | $29,622 | ($10,071) | $14,481 | $625 | $215 | $0 |
| Unsecured Loan | $8,250 | $0 | $0 | $0 | $0 | $8,250 |
| Accrued Liabilities | $0 | $1,646 | $1,175 | $72 | $620 | $3,513 |
| Customer Deposits | $5,411 | $4,725 | $21,507 | $14,589 | $0 | $46,232 |
| M&E Vendor Payables | $0 | ($1) | $0 | $0 | $299 | $298 |
| Current Portion of Other LT Debt | $96,381 | $2,668 | $48,587 | $72,569 | $207 | $220,412 |
| Total Current Liabilities | 140,513 | 25,432 | 100,914 | 91,202 | 17,248 | 339,560 |
| | | | | | | |
| Long-Term Debt - Funded-Institutional | $91,381 | $1,892 | $50,379 | $72,855 | $1,680 | $218,188 |
| Long-Term Debt - Non Institutional | $5,000 | $2,707 | $26 | $0 | $4,243 | $11,976 |
| Long-Term Subordinated Debt | $0 | $23,209 | $0 | $0 | $0 | $23,209 |
| Deferred Rent | $0 | $67 | $1,217 | $2,880 | ($5) | $4,159 |
| Note Payable - Parent | $0 | $0 | $0 | $0 | $0 | $0 |
| Less Current Portion of LT Debt | ($96,381) | ($2,668) | ($48,587) | ($72,569) | $0 | ($220,205) |
| Total Long-Term Debt | - | 25,207 | 3,036 | 3,166 | 5,918 | 37,327 |
| | | | | | | |
| | | | | | | |
| Series B Preferred Stock | $6,000 | $0 | $0 | $0 | $0 | $6,000 |
| Series A Preferred Stock | $5,500 | $0 | $0 | $0 | $0 | $5,500 |
| Series C Preferred Stock | $5,500 | $0 | $0 | $0 | $0 | $5,500 |
| Series D Preferred Stock | $5,000 | $0 | $0 | $0 | $0 | $5,000 |
| Series E Preferred Stock | $8,000 | $0 | $0 | $0 | $0 | $8,000 |
| Series F Preferred Stock | $2,600 | $0 | $0 | $0 | $0 | $2,600 |
| Series G Preferred Stock | $14,365 | $0 | $0 | $0 | $0 | $14,365 |
| Series H Preferred Stock | $13,956 | $0 | $0 | $0 | $0 | $13,956 |
| Series T Preferred Stock | $11,800 | $0 | $0 | $0 | $0 | $11,800 |
| Series P Preferred Stock | $3,125 | $0 | $0 | $0 | $0 | $3,125 |
| Common Stock | $3,000 | $0 | $0 | $0 | $0 | $3,000 |
| Additional Paid In Capital | ($191,005) | $87,296 | $29,830 | $25,000 | $48,666 | ($212) |
| Non-Controlling Interest | $0 | $0 | $0 | $0 | $831 | $831 |
| Retained Earnings | ($24,473) | ($100,382) | ($81,636) | ($14,835) | ($27,267) | ($248,593) |
| Total Equity | (136,631) | (13,085) | (51,806) | 10,165 | 22,230 | (169,128) |
| | | | | | | |
| Total Liabilities + Equity | 3,882 | 37,554 | 52,140 | 104,533 | 45,397 | 207,756 |



**Unaudited**

12/31/2020
Year-To-Date

### Statement Of Operations

| Statement Of Operations | CarbonLITE Holdings, LLC | CarbonLITE Industries, LLC | CarbonLITE Recycling, LLC | CarbonLITE LLC | P, LLC | CarbonLITE PinnPack, LLC | Consolidated CarbonLITE Holdings, LLC |
|---|---|---|---|---|---|---|---|
| **Total Net Revenue** | $0 | $45,286,543 | $29,941,031 | $2,199,466 | | $35,451,066 | $107,979,594 |
| | | | | | | | |
| **Cost Of Goods Sold:** | | | | | | | |
| Direct Materials, Freight, Broker & Pac | 0 | 18,518,252 | 17,989,921 | 2,465,303 | | 12,642,874 | 46,717,836 |
| Depreciation | 0 | 7,251,888 | 5,544,749 | 0 | | 2,956,203 | 15,752,840 |
| Direct Wages | 0 | 7,541,275 | 7,117,518 | 1,475,064 | | 8,678,137 | 24,811,995 |
| Other MO | 0 | 15,541,941 | 9,533,429 | 1,326,893 | | 7,828,219 | 34,230,482 |
| Change In Inventory | 0 | (1,811,764) | 6,405,911 | (402,211) | | (729,972) | 3,461,964 |
| Total | $0 | $47,041,592 | $46,591,528 | $4,865,049 | | $31,375,460 | $124,975,117 |
| | | | | | | | |
| **Gross Profit (Loss)** | $0 | ($1,755,049) | ($16,650,498) | ($2,665,583) | | $4,075,606 | ($16,995,523) |
| | | | | | | | |
| **Operating Expenses:** | | | | | | | |
| Freight Out | 0 | 1,463,893 | 1,504,685 | 21,481 | | 3,101,308 | 6,091,368 |
| General & Administrative | 305,422 | 2,680,550 | 4,393,695 | 2,524,990 | | 4,204,351 | 13,937,956 |
| Depreciation & Amort | 0 | 39,876 | 87,632 | 0 | | 660,929 | 788,437 |
| **Total Operating Expenses** | $305,422 | $4,184,319 | $5,986,012 | $2,546,471 | | $7,966,588 | $20,817,760 |
| | | | | | | | |
| **Operating Income** | ($305,422) | ($5,939,368) | ($22,636,510) | ($5,212,055) | | ($3,890,981) | ($37,813,283) |
| | | | | | | | |
| **Interest Income (Expense) - NET** | (12,292,582) | (1,749,407) | (5,378,889) | (6,575,577) | | (66,603) | (23,901,145) |
| | | | | | | | |
| Other Income (Expense) | 12,926 | (936,418) | (273,126) | 28,162 | | 22,150 | (1,146,304) |
| **Total Other Income (Expense)** | ($12,279,655) | ($2,685,825) | ($5,652,015) | ($6,547,415) | | ($44,453) | ($25,047,449) |
| | | | | | | | |
| **Net (Pre-Tax) Income** | ($12,585,078) | ($8,625,193) | ($28,288,524) | ($11,759,469) | | ($3,935,434) | ($62,860,733) |
| **Income Tax Expense** | 1,308 | 15,106 | 46,015 | 1,015 | | 0 | 63,443 |
| Net Income | ($12,586,385) | ($8,640,299) | ($28,334,539) | ($11,760,484) | | ($3,935,434) | ($62,924,176) |
| | | | | | | | |
| **EBITDA:** | | | | | | | |
| Net Income (Loss) | ($12,586,385) | ($8,640,299) | ($28,334,539) | ($11,760,484) | | ($3,935,434) | ($62,924,176) |
| Interest | $12,292,582 | $1,749,407 | $5,378,889 | $6,575,577 | | $66,603 | $23,901,145 |
| Taxes | $1,308 | $15,106 | $46,015 | $1,015 | | $0 | $63,443 |
| Depreciation & Amortization | $0 | $7,291,764 | $5,632,381 | $0 | | $3,617,131 | $16,541,277 |
| Management Adjustments | 0 | 1,826,291 | 8,242,016 | 0 | | 274,352 | 10,342,659 |
| Sonoco Add-Back | 0 | 0 | 0 | 0 | | 0 | 0 |
| **Total Adjusted EBITDA** | ($292,496) | $2,242,269 | ($9,035,238) | ($5,183,892) | | $22,653 | ($12,075,652) |

## Section 3.6(c): Accounts Receivable

| Customer Name | Document Date | Due Date | Description | Document Type | Document No. | Balance Due |
|---|---|---|---|---|---|---|
| Western Container Corporation | 03/01/21 | 03/31/21 | Order SO-006001 | Invoice | PSINV000000764 | $27,192.00 |
| Nestle Waters North America | 03/31/21 | 04/30/21 | Invoice SINV000000400 | Invoice | PSINV000000765 | $277,996.16 |
| Easypak, LLC | 04/01/21 | 05/01/21 | Order SO-006010 | Invoice | PSINV000000763 | $19,393.60 |
| Easypak, LLC | 04/26/21 | 05/26/21 | Order SO-006043 | Invoice | PSINV000000766 | $23,274.24 |
| Easypak, LLC | 04/28/21 | 05/28/21 | Order SO-006044 | Invoice | PSINV000000767 | $23,647.76 |

## Section 3.6(e): Amounts Drawn Under Acquired L/Cs

- In March 2021, after the Petition Date, Seller's landlord drew down $374,798.52 from the letter of credit posted for its benefit, as discussed in further detail in Section 3.7(a) of the Disclosure Schedules.

**Section 3.6(f): Capital Expenditures**

**CarbonLite P LLC**
**Capital Project Forecast**

| | Total Cost Remaining | Week 1 03/14/21 | Week 2 03/21/21 | Week 3 03/28/21 | Week 4 04/04/21 | Week 5 04/11/21 | Week 6 04/18/21 | Week 7 04/25/21 | Week 8 05/02/21 | Week 9 05/09/21 | Week 10 05/16/21 | Week 11 05/23/21 | Paid w/i DIP Budget | SALE Cure at Closing |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Actual Payments | | | | | | | | | | SALE |
| **Pre Petition Spend** | | | | | | | | | | | | | | |
| Anchor Fire Protection | 138,780 | | | | | | | 76,824 | | 61,956 | | | 138,780 | 0 |
| BlueRock | 804,974 | | | | | | 426,631 | | | | | | 426,631 | 378,342 |
| Muira | 30,716 | | | | | | | | | | | | 0 | 30,716 |
| Muhlenberg Township Auth | 176,000 | | | | | | | | | | | | 0 | 176,000 |
| Pelletron | 1,410,000 | | | | | | | 705,000 | | | | 295,000 | 1,000,000 | 410,000 |
| Sorema | 1,452,000 | | | | | | | | | | | | 0 | 1,452,000 |
| Starlinger | 3,036,768 | | | | | | | | | | | | 0 | 3,036,768 |
| Bulk Handling Systems | 1,438,975 | | | | | | 719,488 | | | | | | 719,488 | 719,488 |
| | | | | | | | | | | | | | | |
| **Post Petition Spend** | | | | | | | | | | | | | | |
| A1 / Cleveland Brothers | 543,736 | | | | | 100,000 | | 100,000 | | 100,000 | | 100,000 | 400,000 | 143,736 |
| Anchor Fire Protection | 0 | | | | | | | | | | | | 0 | 0 |
| BlueRock | 157,053 | | | | | 34,541 | | | | 50,000 | | | 84,541 | 72,512 |
| Bulk Handling Systems | 0 | | | | | | | | | | | | 0 | 0 |
| Muhlenberg Township Auth | 30,000 | | | | | | | 15,000 | | | | 15,000 | 30,000 | 0 |
| Perkin Elmer | 114,686 | | | | 114,686 | | | | | | | | 114,686 | 0 |
| Pelletron | 0 | | | | | | | | | | | | 0 | 0 |
| Sorema | 3,782,000 | | | | 1,500,000 | | | | | | | | 1,500,000 | 2,282,000 |
| Starlinger | 470,545 | | | | | | | | | | | | 0 | 470,545 |
| Trimax | 47,885 | | | | 47,885 | | | | | | | | 47,885 | 0 |
| Unisensor | 138,722 | | | | | | 138,722 | | | | | | 138,722 | 0 |
| VanDyk / Lubo | 87,600 | | | | 87,600 | | | | | | | | 87,600 | 0 |
| | | | | | | | | | | | | | | |
| **Total Project Spend** | 13,860,439 | 0 | 0 | 0 | 1,750,170 | 134,541 | 138,722 | 2,042,943 | 0 | 211,956 | 0 | 410,000 | 4,688,332 | 9,172,107 |
| | | | | | | | | | | | | | | |
| **Legal & Fees** | | | | | | | | | | | | | | |
| Blue Rock | | | | | | | | | | | | | | |
|   Legal | 15,000 | | | | | | | | | | | | | 15,000 |
|   Remobilization Costs | 18,000 | | | | | | | | | | | | | 18,000 |
|   Extended General Condition Costs | 63,648 | | | | | | | | | | | | | 63,648 |
| Bulk Handling Systems | | | | | | | | | | | | | | |
|   Legal | 20,000 | | | | | | | | | | | | | 20,000 |
| Anchor Fire Protection | | | | | | | | | | | | | | |
|   Legal | 8,868 | | | | | | | | | | | | | 8,868 |
|   Delay Damages | 31,000 | | | | | | | | | 14,868 | | | 14,868 | 16,132 |
| | | | | | | | | | | | | | | |
| **Total Spend Incl Legal** | 14,016,955 | | | | | | | | | | | | 4,703,200 | 9,313,755 |

## Section 3.6(g):  Capital Leases

None.

*(i) and (ii)*

- On March 9, 2021, immediately following the Petition Date, Berks61 Owner, LLC ("Landlord") sent a letter to Seller alleging that the filing of the Bankruptcy Cases constituted a default under the lease between Seller and Landlord dated May 13, 2019 (as amended, the "Lease") and further alleged that Landlord was entitled to accelerate the Lease and demand Seller pay Deferred Rent (as such term is defined in the Lease) in full.  On March 16, 2021, Landlord sent a second letter to Seller, stating that it had drawn down $374,798.52 of the Letter of Credit posted with East West Bank referenced in Section 2.1(m) of the Disclosure Schedules (the "L/C") and demanding that Seller replenish such draw.  On March 19, 2021, CLP, through counsel, sent a letter to Landlord, informing it that the actions it took subsequent to the Petition Date constituted a violation of 11 U.S.C. § 362.  By email dated March 23, 2021, the asserted violations of the Bankruptcy Code were resolved as between counsel to the Debtors and the Landlord, and the Landlord withdrew its demand to replenish the L/C.

- Blue Rock Construction, Inc. filed a mechanics' lien affecting the leased real property of Seller on March 8, 2021.

*Security Interests*

- Pursuant to that certain Open-End Leasehold Mortgage, Security Agreement, Assignment of Rents and Leases, and Fixture Filing (the "PA Leasehold Mortgage") dated June 1, 2019, Seller granted a leasehold mortgage in favor of UMB Bank, N.A.  The PA Leasehold Mortgage was amended pursuant to that certain First Amendment to Open-End Leasehold Mortgage, Security Agreement, Assignment of Rents and Leases, and Fixture Filing dated September 1, 2020.

## Section 3.7(b):  Contracts Regarding Material Repairs, Work, and Capital Improvements

| Contract Counterparty/Address | Contract / Lease Debtor Party | Contract/Lease Title | Date of Contract / Lease |
|---|---|---|---|
| A1 Restoration, Inc. d/b/a A1 Energy 2730 Shenck Road Manheim, PA 17545 | CarbonLite P, LLC | Standard Abbreviated Form of Agreement Between Owner and Contractor | 5/24/2019 |
| A1 Restoration, Inc. d/b/a A1 Energy 2730 Shenck Road Manheim, PA 17545 | CarbonLite P, LLC | Change Order 1 | 6/21/2019 |
| A1 Restoration, Inc. d/b/a A1 Energy 2730 Shenck Road Manheim, PA 17545 | CarbonLite P, LLC | Change Order 2 | 7/1/2019 |
| A1 Restoration, Inc. d/b/a A1 Energy 2730 Shenck Road Manheim, PA 17545 | CarbonLite P, LLC | Change Order 3 | 12/18/2019 |
| A1 Restoration, Inc. d/b/a A1 Energy 2730 Shenck Road Manheim, PA 17545 | CarbonLite P, LLC | Change Order 4 | 5/21/2020 |
| A1 Restoration, Inc. d/b/a A1 Energy 2730 Shenck Road Manheim, PA 17545 | CarbonLite P, LLC | Energy Services Agreement | Undated |
| Anchor Fire Protection Co., Inc. 270 Renninger Road Perkiomenville, PdA 18074 | CarbonLite P, LLC | Standard Short Form Agreement Between Owner and Contractor | 11/4/2020 |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Standard Form of Agreement Between Owner and Design-Builder | 8/27/2019 |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Design-Build Amendment | 8/27/2019 |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 1 | 10/22/2019 |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 6 | 11/14/2019 |

| Contract Counterparty/Address | Contract / Lease Debtor Party | Contract/Lease Title | Date of Contract / Lease |
|---|---|---|---|
| Blue Rock Construction, Inc.<br>1275 Glenlivet Drive, Suite 330<br>Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 7 | 11/14/2019 |
| Blue Rock Construction, Inc.<br>1275 Glenlivet Drive, Suite 330<br>Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 8 | 11/14/2019 |
| Blue Rock Construction, Inc.<br>1275 Glenlivet Drive, Suite 330<br>Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 9 | 11/14/2019 |
| Blue Rock Construction, Inc.<br>1275 Glenlivet Drive, Suite 330<br>Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 10 | 1/15/2020 |
| Blue Rock Construction, Inc.<br>1275 Glenlivet Drive, Suite 330<br>Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 11 | 1/15/2020 |
| Blue Rock Construction, Inc.<br>1275 Glenlivet Drive, Suite 330<br>Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 13 | 1/21/2020 |
| Blue Rock Construction, Inc.<br>1275 Glenlivet Drive, Suite 330<br>Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 14 | 1/28/2020 |
| Blue Rock Construction, Inc.<br>1275 Glenlivet Drive, Suite 330<br>Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 15 | 2/25/2020 |
| Blue Rock Construction, Inc.<br>1275 Glenlivet Drive, Suite 330<br>Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 16 | 3/30/2020 |
| Blue Rock Construction, Inc.<br>1275 Glenlivet Drive, Suite 330<br>Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 17 | 3/30/2020 |
| Blue Rock Construction, Inc.<br>1275 Glenlivet Drive, Suite 330<br>Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 18 | 4/10/2020 |
| Blue Rock Construction, Inc.<br>1275 Glenlivet Drive, Suite 330<br>Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 19 | 4/20/2020 |

| Contract Counterparty/Address | Contract / Lease Debtor Party | Contract/Lease Title | Date of Contract / Lease |
|---|---|---|---|
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 20 | 5/11/2020 |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 21 | 5/18/2020 |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 22 | 5/18/2020 |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 23 | 6/10/2020 |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 24 | 6/18/2020 |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 25 | 6/25/2020 |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 26 | 6/25/2020 |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 27 | 10/16/2020 |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 28 | 11/20/2020 |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 29 | 12/10/2020 |
| Emerging Acquisitions LLC d/b/a Bulk Handling Solutions 3592 W. 5th Avenue Eugene, OR 97402 | CarbonLite P, LLC | Secondary Plastics Processing System | 1/22/2019 |
| Emerging Acquisitions LLC d/b/a Bulk Handling Solutions 3592 W. 5th Avenue Eugene, OR 97402 | CarbonLite P, LLC | Change Order #01 | 5/17/2019 |

| Contract Counterparty/Address | Contract / Lease Debtor Party | Contract/Lease Title | Date of Contract / Lease |
|---|---|---|---|
| Emerging Acquisitions LLC d/b/a Bulk Handling Solutions 3592 W. 5th Avenue Eugene, OR 97402 | CarbonLite P, LLC | Change Order #02 | 6/7/2019 |
| Emerging Acquisitions LLC d/b/a Bulk Handling Solutions 3592 W. 5th Avenue Eugene, OR 97402 | CarbonLite P, LLC | Change Order #03 | 6/7/2019 |
| Emerging Acquisitions LLC d/b/a Bulk Handling Solutions 3592 W. 5th Avenue Eugene, OR 97402 | CarbonLite P, LLC | Change Order #04 | 6/13/2019 |
| Emerging Acquisitions LLC d/b/a Bulk Handling Solutions 3592 W. 5th Avenue Eugene, OR 97402 | CarbonLite P, LLC | Change Order #05 | 2/7/2020 |
| Emerging Acquisitions LLC d/b/a Bulk Handling Solutions 3592 W. 5th Avenue Eugene, OR 97402 | CarbonLite P, LLC | Consignment Agreement | 2/25/2021 |
| Evoqua Water Technologies LLC 725 Wooten Road Colorado Springs, CO 80915 | CarbonLite P, LLC | Firm Proposal #2019-328049 | 8/5/2019 |
| Ingersoll Rand Company 800 East Beaty Street Davidson, NC 28036 | CarbonLite P, LLC | Purchase Orders; Standard Terms and Conditions of Sale | 6/27/2019 |
| Ingersoll Rand Company 800 East Beaty Street Davidson, NC 28036 | CarbonLite P, LLC | PackageCARE Agreement | 9/30/2019 |
| Ingersoll-Rand Company 800-B Beaty Street Davidson, NC 28036 | CarbonLite P, LLC | PackageCARE Agreement | 7/1/2019 |
| Ingersoll-Rand Company Compression Technologies & Services 6291 Burnham Avenue Buena Park, CA 90621 | CarbonLite P, LLC | PackageCARE Addendum | 7/20/2020 |
| Lubo USA LLC d/b/a Van Dyk Recycling Solutions 78 Halloween Boulevard Stamford, CT 06902 | CarbonLite P, LLC | Order Confirmation OC#LUTI2019245 | 6/12/2019 |
| Miura America Co., Ltd. 2200 Steven B. Smith Boulevard Rockmart, GA 30153 | CarbonLite P, LLC | Miura Maintenance Agreement | 6/4/2019 |

| Contract Counterparty/Address | Contract / Lease Debtor Party | Contract/Lease Title | Date of Contract / Lease |
|---|---|---|---|
| Pelletron Corporation<br>1866 Colonial Village Lane<br>Lancaster, PA 17601 | CarbonLite P, LLC | Order Confirmation | 6/17/2019 |
| Pelletron Corporation<br>1866 Colonial Village Lane<br>Lancaster, PA 17601 | CarbonLite P, LLC;<br>CarbonLite Recycling LLC | Pelletron Order Confirmation for PET Flake and Pellet Handling System for PA and Dallas | 9/9/2020 |
| Sorema Division of Previero N. srl<br>Via Per Cavolto,<br>17- 22040 Anzano del Parco, Italy | CarbonLite P, LLC | Order Confirmation V1450 | 1/28/2019 |
| Sorema Division of Previero N. srl<br>Via Per Cavolto,<br>17- 22040 Anzano del Parco, Italy | CarbonLite P, LLC | Order Confirmation V1451 | 1/28/2019 |
| Starlinger & Co. Gesellschaft m.b.H.<br>Sonneuhrgasse 4<br>1060 Vienna, Austria | CarbonLite P, LLC | Order Confirmation No. MA295440 | 11/27/2018 |
| Trimax Systems Inc.<br>565 Explorer Street<br>Brea, CA 92821 | CarbonLite P, LLC | Proposal (E-12155 Rev 2) | 7/29/2019 |
| UniSensor Sensorststeme GmbH<br>Am Sandfeld 11<br>D-76149 Karlsruhe<br>Germany | CarbonLite P. LLC | Offer No. A016804 | 3/15/2019 |

## Section 3.8(a): Material Contracts

| Contract Counterparty/Address | Contract / Lease Debtor Party | Contract/Lease Title | Date of Contract / Lease | Section 3.8(b) Disclosures |
|---|---|---|---|---|
| A1 Restoration, Inc. d/b/a A1 Energy 2730 Shenck Road Manheim, PA 17545 | CarbonLite P, LLC | Standard Abbreviated Form of Agreement Between Owner and Contractor | 5/24/2019 | As set forth in the Debtors' cure schedules, Seller is in default under its contracts with A1 on account of unpaid prepetition amounts due thereunder. |
| A1 Restoration, Inc. d/b/a A1 Energy 2730 Shenck Road Manheim, PA 17545 | CarbonLite P, LLC | Change Order 1 | 6/21/2019 | Please see above. |
| A1 Restoration, Inc. d/b/a A1 Energy 2730 Shenck Road Manheim, PA 17545 | CarbonLite P, LLC | Change Order 2 | 7/1/2019 | Please see above. |
| A1 Restoration, Inc. d/b/a A1 Energy 2730 Shenck Road Manheim, PA 17545 | CarbonLite P, LLC | Change Order 3 | 12/18/2019 | Please see above. |
| A1 Restoration, Inc. d/b/a A1 Energy 2730 Shenck Road Manheim, PA 17545 | CarbonLite P, LLC | Change Order 4 | 5/21/2020 | Please see above. |
| A1 Restoration, Inc. d/b/a A1 Energy 2730 Shenck Road Manheim, PA 17545 | CarbonLite P, LLC | Energy Services Agreement | Undated | Please see above. |
| Anchor Fire Protection Co., Inc. 270 Renninger Road Perkiomenville, PdA 18074 | CarbonLite P, LLC | Standard Short Form Agreement Between Owner and Contractor | 11/4/2020 | All disputes with Anchor Fire were resolved by stipulation and order [Docket No. 311]. |

| Contract Counterparty/Address | Contract / Lease Debtor Party | Contract/Lease Title | Date of Contract / Lease | Section 3.8(b) Disclosures |
|---|---|---|---|---|
| Berks61 Owner, LLC<br>c/o Endurance Real Estate Group<br>4 Radnor Corporate Center, Suite 105<br>Radnor, PA 19087 | CarbonLite P, LLC | Industrial Lease | 5/13/2019 | Please see disclosure in Section 3.7(a) of the Disclosure Schedules. Berks61 Owner has also filed an objection to the proposed Cure Amount associated with its lease [Docket No. 365]. |
| Berks61 Owner, LLC<br>c/o Endurance Real Estate Group<br>4 Radnor Corporate Center, Suite 105<br>Radnor, PA 19087 | CarbonLite P, LLC | First Amendment to Industrial Lease | 10/20/2019 | Please see above. |
| Berks61 Owner, LLC<br>c/o Endurance Real Estate Group<br>4 Radnor Corporate Center, Suite 105<br>Radnor, PA 19087 | CarbonLite P, LLC | Second Amendment to Industrial Lease | 2/21/2021 | Please see above. |
| Blue Rock Construction, Inc.<br>1275 Glenlivet Drive, Suite 330<br>Allentown, PA 18106 | CarbonLite P, LLC | Standard Form of Agreement Between Owner and Design-Builder | 8/27/2019 | All disputes with Blue Rock were resolved by agreed order [Docket No. 340]. |
| Blue Rock Construction, Inc.<br>1275 Glenlivet Drive, Suite 330<br>Allentown, PA 18106 | CarbonLite P, LLC | Design-Build Amendment | 8/27/2019 | Please see above. |
| Blue Rock Construction, Inc.<br>1275 Glenlivet Drive, Suite 330<br>Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 1 | 10/22/2019 | Please see above. |
| Blue Rock Construction, Inc.<br>1275 Glenlivet Drive, Suite 330<br>Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 6 | 11/14/2019 | Please see above. |
| Blue Rock Construction, Inc.<br>1275 Glenlivet Drive, Suite 330<br>Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 7 | 11/14/2019 | Please see above. |

| Contract Counterparty/Address | Contract / Lease Debtor Party | Contract/Lease Title | Date of Contract / Lease | Section 3.8(b) Disclosures |
|---|---|---|---|---|
| Blue Rock Construction, Inc.<br>1275 Glenlivet Drive, Suite 330<br>Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 8 | 11/14/2019 | Please see above. |
| Blue Rock Construction, Inc.<br>1275 Glenlivet Drive, Suite 330<br>Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 9 | 11/14/2019 | Please see above. |
| Blue Rock Construction, Inc.<br>1275 Glenlivet Drive, Suite 330<br>Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 10 | 1/15/2020 | Please see above. |
| Blue Rock Construction, Inc.<br>1275 Glenlivet Drive, Suite 330<br>Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 11 | 1/15/2020 | Please see above. |
| Blue Rock Construction, Inc.<br>1275 Glenlivet Drive, Suite 330<br>Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 13 | 1/21/2020 | Please see above. |
| Blue Rock Construction, Inc.<br>1275 Glenlivet Drive, Suite 330<br>Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 14 | 1/28/2020 | Please see above. |
| Blue Rock Construction, Inc.<br>1275 Glenlivet Drive, Suite 330<br>Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 15 | 2/25/2020 | Please see above. |
| Blue Rock Construction, Inc.<br>1275 Glenlivet Drive, Suite 330<br>Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 16 | 3/30/2020 | Please see above. |

| Contract Counterparty/Address | Contract / Lease Debtor Party | Contract/Lease Title | Date of Contract / Lease | Section 3.8(b) Disclosures |
|---|---|---|---|---|
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 17 | 3/30/2020 | Please see above. |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 18 | 4/10/2020 | Please see above. |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 19 | 4/20/2020 | Please see above. |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 20 | 5/11/2020 | Please see above. |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 21 | 5/18/2020 | Please see above. |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 22 | 5/18/2020 | Please see above. |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 23 | 6/10/2020 | Please see above. |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 24 | 6/18/2020 | Please see above. |

| Contract Counterparty/Address | Contract / Lease Debtor Party | Contract/Lease Title | Date of Contract / Lease | Section 3.8(b) Disclosures |
|---|---|---|---|---|
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 25 | 6/25/2020 | Please see above. |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 26 | 6/25/2020 | Please see above. |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 27 | 10/16/2020 | Please see above. |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 28 | 11/20/2020 | Please see above. |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 29 | 12/10/2020 | Please see above. |
| CellMark Incorporated 80 Washington Street Norwalk, CT 06854 | CarbonLite P, LLC | Letter of Intent to Supply Raw Materials | Undated | |

| Contract Counterparty/Address | Contract / Lease Debtor Party | Contract/Lease Title | Date of Contract / Lease | Section 3.8(b) Disclosures |
|---|---|---|---|---|
| Coca-Cola Cross Enterprise Procurement Group c/o The Coca-Cola Company One Coca-Cola Plaza Atlanta, GA 30313 | CarbonLite Holdings LLC | The Master Terms and Conditions | 5/1/2019 | The Debtor counterparty under all of the Debtors' contracts with Coca-Cola is Holdings. However, Seller (along with Recycling and Industries) performs the Debtors' obligations thereunder, and is compensated for the sale of product it produces under such contracts by Western Container on behalf of Coca-Cola.<br><br>Prior to the Petition Date, Holdings unilaterally changed the pricing charged to Coca-Cola under its contracts, which pricing changes Coca-Cola accepted, and continued to purchase under such terms. Coca-Cola paused its purchasing from Seller in March pending the ongoing sale process. |
| Coca-Cola Cross Enterprise Procurement Group c/o The Coca-Cola Company One Coca-Cola Plaza Atlanta, GA 30313 ATTN: Lars-Peter Ludwig | CarbonLite Holdings LLC | Letter of Understanding | 8/3/2020 | Please see above. |
| Coca-Cola Cross Enterprise Procurement Group c/o The Coca-Cola Company One Coca-Cola Plaza Atlanta, GA 30313 | CarbonLite Holdings LLC | Non-Binding Letter of Understanding | 8/3/2020 | Please see above. |
| Emerging Acquisitions LLC d/b/a Bulk Handling Solutions 3592 W. 5th Avenue Eugene, OR 97402 | CarbonLite P, LLC | Secondary Plastics Processing System | 1/22/2019 | All disputes as between Seller and BHS were resolved by agreed order [Docket No. 339]. |
| Emerging Acquisitions LLC d/b/a Bulk Handling Solutions 3592 W. 5th Avenue Eugene, OR 97402 | CarbonLite P, LLC | Change Order #01 | 5/17/2019 | Please see above. |

| Contract Counterparty/Address | Contract / Lease Debtor Party | Contract/Lease Title | Date of Contract / Lease | Section 3.8(b) Disclosures |
|---|---|---|---|---|
| Emerging Acquisitions LLC d/b/a Bulk Handling Solutions 3592 W. 5th Avenue Eugene, OR 97402 | CarbonLite P, LLC | Change Order #02 | 6/7/2019 | Please see above. |
| Emerging Acquisitions LLC d/b/a Bulk Handling Solutions 3592 W. 5th Avenue Eugene, OR 97402 | CarbonLite P, LLC | Change Order #03 | 6/7/2019 | Please see above. |
| Emerging Acquisitions LLC d/b/a Bulk Handling Solutions 3592 W. 5th Avenue Eugene, OR 97402 | CarbonLite P, LLC | Change Order #04 | 6/13/2019 | Please see above. |
| Emerging Acquisitions LLC d/b/a Bulk Handling Solutions 3592 W. 5th Avenue Eugene, OR 97402 | CarbonLite P, LLC | Change Order #05 | 2/7/2020 | Please see above. |
| Evoqua Water Technologies LLC 725 Wooten Road Colorado Springs, CO 80915 | CarbonLite P, LLC | Firm Proposal #2019-328049 | 8/5/2019 | As set forth in the Debtors' cure schedules, Seller is in default under its contracts with Evoqua on account of unpaid prepetition amounts due thereunder. |
| Ingersoll Rand Company 800 East Beaty Street Davidson, NC 28036 | CarbonLite P, LLC | Purchase Orders; Standard Terms and Conditions of Sale | 6/27/2019 | As set forth in the Debtors' cure schedules, Seller is in default under its contracts with Ingersoll Rand on account of unpaid prepetition amounts due thereunder. |
| Ingersoll Rand Company 800 East Beaty Street Davidson, NC 28036 | CarbonLite P, LLC | PackageCARE Agreement | 9/30/2019 | Please see above. |
| Ingersoll-Rand Company 800-B Beaty Street Davidson, NC 28036 | CarbonLite P, LLC | PackageCARE Agreement | 7/1/2019 | Please see above. |

| Contract Counterparty/Address | Contract / Lease Debtor Party | Contract/Lease Title | Date of Contract / Lease | Section 3.8(b) Disclosures |
|---|---|---|---|---|
| Ingersoll-Rand Company Compression Technologies & Services 6291 Burnham Avenue Buena Park, CA 90621 | CarbonLite P, LLC | PackageCARE Addendum | 7/20/2020 | Please see above. |
| KRE Security, LLC 11 South 3rd Street Hamburg, PA 19526 | CarbonLite P, LLC | Security Services Agreement | 11/8/2019 | As set forth in the Debtors' cure schedules, Seller is in default under its contracts with KRE on account of unpaid prepetition amounts due thereunder. |
| KRE Security, LLC 11 South 3rd Street Hamburg, PA 19526 | CarbonLite P, LLC | Mutual Non-Disclosure and Confidentiality Agreement | 11/15/2019 | Please see above. |
| Lubo USA LLC d/b/a Van Dyk Recycling Solutions 78 Halloween Boulevard Stamford, CT 06902 | CarbonLite P, LLC | Order Confirmation OC#LUTI2019245 | 6/12/2019 | |
| Miura America Co., Ltd. 2200 Steven B. Smith Boulevard Rockmart, GA 30153 | CarbonLite P, LLC | Miura Maintenance Agreement | 6/4/2019 | As set forth in the Debtors' cure schedules, Seller is in default under its contracts with Miura on account of unpaid prepetition amounts due thereunder. |
| Nestle Waters North America, Inc. 900 Long Ridge Road, Stamford, CT 06902 Attn: Schon Rindani | CarbonLite P, LLC | First Amendment to Contract | 1/1/2020 | Prior to the Petition Date, Seller unilaterally changed the pricing charged to Nestle under its contracts, which pricing changes Nestle accepted, and continued to purchase under such terms. |
| Nestle Waters North America, Inc. 900 Long Ridge Road, Building 2 Stamford, CT 06902 Attn: Schon Rindani Attn: General Counsel | CarbonLite P, LLC | Supply Agreement | 5/10/2018 | Please see above. |

| Contract Counterparty/Address | Contract / Lease Debtor Party | Contract/Lease Title | Date of Contract / Lease | Section 3.8(b) Disclosures |
|---|---|---|---|---|
| Niagara Bottling, LLC<br>1440 Bridgegate Drive<br>Diamond Bar, CA 91765 | CarbonLite Recycling LLC,<br>CarbonLite Industries, LLC,<br>CarbonLite P, LLC | PET Bale Purchase Agreement | 1/21/2021 | On April 9, 2021, Niagara filed a *Notice of Reclamation Demand* [Docket No. 261] against Industries and Recycling, but not Seller, with respect to goods provided to Industries under the PET Bale Purchase Agreement, as set forth in further detail therein. |
| Niagara Bottling, LLC<br>2560 E. Philadelphia Street<br>Ontario, CA 91761 | CarbonLite Recycling LLC,<br>CarbonLite Industries, LLC,<br>CarbonLite P, LLC | Supply Agreement | 11/1/2017 | Seller, along with Recycling and Industries, are party to all of the Debtors' agreements with Niagara. Seller is compensated for the sale of product it produces under such contracts by Niagara.<br><br>Prior to the Petition Date, Seller unilaterally changed the pricing charged to Niagara under its contracts, which pricing changes Niagara did not accept. Accordingly, since March 2021, Seller has not had a business relationship with Niagara. |
| Niagara Bottling, LLC<br>2560 E. Philadelphia Street<br>Ontario, CA 91761 | CarbonLite Recycling LLC,<br>CarbonLite Industries, LLC,<br>CarbonLite P, LLC | Amendment 1 to Supply Agreement | 3/1/2018 | Please see above. |
| Niagara Bottling, LLC<br>2560 E. Philadelphia Street<br>Ontario, CA 91761 | CarbonLite Recycling LLC,<br>CarbonLite Industries, LLC,<br>CarbonLite P, LLC | Amendment 2 to Supply Agreement | 4/17/2018 | Please see above. |
| Niagara Bottling, LLC<br>2560 E. Philadelphia Street<br>Ontario, CA 91761 | CarbonLite Recycling LLC,<br>CarbonLite Industries, LLC,<br>CarbonLite P, LLC | Amendment 3 to Supply Agreement | 11/1/2018 | Please see above. |

| Contract Counterparty/Address | Contract / Lease Debtor Party | Contract/Lease Title | Date of Contract / Lease | Section 3.8(b) Disclosures |
|---|---|---|---|---|
| Niagara Bottling, LLC<br>2560 E. Philadelphia Street<br>Ontario, CA 91761 | CarbonLite Recycling LLC,<br>CarbonLite Industries, LLC,<br>CarbonLite P, LLC | Amendment 4 to Supply Agreement | 12/30/2019 | Please see above. |
| Niagara Bottling, LLC<br>2560 E. Philadelphia Street<br>Ontario, CA 91761 | CarbonLite Recycling LLC,<br>CarbonLite Industries, LLC,<br>CarbonLite P, LLC | Amendment 5 to Supply Agreement | 4/1/2020 | Please see above. |
| Niagara Bottling, LLC<br>2560 E. Philadelphia Street<br>Ontario, CA 91761 | CarbonLite Recycling LLC,<br>CarbonLite Industries, LLC,<br>CarbonLite P, LLC | Amendment 6 to Supply Agreement | 9/2/2020 | Please see above. |
| Pelletron Corporation<br>1866 Colonial Village Lane<br>Lancaster, PA 17601 | CarbonLite P, LLC | Order Confirmation | 6/17/2019 | All disputes as between Seller and Pelletron were resolved by agreed order [Docket No. 342]. |
| Pelletron Corporation<br>1866 Colonial Village Lane<br>Lancaster, PA 17601 | CarbonLite P, LLC;<br>CarbonLite Recycling LLC | Pelletron Order Confirmation for PET Flake and Pellet Handling System for PA and Dallas | 9/9/2020 | Please see above. |
| PerkinElmer Health Sciences Inc.<br>710 Bridgeport Avenue<br>Shelton, CT 06484 | CarbonLite P, LLC | Quotation | 12/5/2019 | |
| Sorema Division of Previero N. srl<br>Via Per Cavolto,<br>17- 22040 Anzano del Parco, Italy | CarbonLite P, LLC | Order Confirmation V1450 | 1/28/2019 | All disputes as between Seller and Sorema were resolved by agreed order [Docket No. 341]. |
| Sorema Division of Previero N. srl<br>Via Per Cavolto,<br>17- 22040 Anzano del Parco, Italy | CarbonLite P, LLC | Order Confirmation V1451 | 1/28/2019 | Please see above. |

| Contract Counterparty/Address | Contract / Lease Debtor Party | Contract/Lease Title | Date of Contract / Lease | Section 3.8(b) Disclosures |
|---|---|---|---|---|
| Starlinger & Co. Gesellschaft m.b.H.<br>Sonneuhrgasse 4<br>1060 Vienna, Austria | CarbonLite P, LLC | Order Confirmation No. MA295440 | 11/27/2018 | As set forth in the Debtors' cure schedules, Seller is in default under its contracts with Starlinger on account of unpaid prepetition amounts due thereunder. |
| The Metropolitan Edison Company<br>2800 Pottsville Pike<br>Reading, PA 19605 | CarbonLite P, LLC | FirstEnergy Interconnection Agreement | 10/7/2020 | As set forth in the Debtors' cure schedules, Seller is in default under its contracts with MetEd on account of unpaid prepetition amounts due thereunder. |
| Toyota Industries Commercial Finance<br>P.O. Box 660926<br>Dallas, TX 75266 | CarbonLite P, LLC | Equipment Schedule 22 to Master Lease Agreement | 2/7/2020 | As set forth in the Debtors' cure schedules, Seller is in default under certain of its contracts with TICF on account of unpaid prepetition amounts due thereunder<br><br>In addition, this contract is associated with a Master Lease Agreement between TCIF and Industries, and lists Industries as the Debtor counterparty to the contract.  However, the contract indicates that the leased equipment is located at the Reading Facility and Seller has performed under this contract at all relevant times. |
| Toyota Industries Commercial Finance<br>P.O. Box 660926<br>Dallas, TX 75266 | CarbonLite P, LLC | Equipment Schedule 23 to Master Lease Agreement | 2/7/2020 | Please see above. |
| Toyota Industries Commercial Finance<br>P.O. Box 660926<br>Dallas, TX 75266 | CarbonLite P, LLC | Equipment Schedule 24 to Master Lease Agreement | 2/7/2020 | Please see above. |

| Contract Counterparty/Address | Contract / Lease Debtor Party | Contract/Lease Title | Date of Contract / Lease | Section 3.8(b) Disclosures |
|---|---|---|---|---|
| Toyota Industries Commercial Finance<br>P.O. Box 660926<br>Dallas, TX 75266 | CarbonLite P, LLC | Equipment Schedule 25 to Master Lease Agreement | 2/7/2020 | Please see above. |
| Trimax Systems Inc.<br>565 Explorer Street<br>Brea, CA 92821 | CarbonLite P, LLC | Proposal (E-12155 Rev 2) | 7/29/2019 | Please see above. |
| UniSensor Sensorststeme GmbH<br>Am Sandfeld 11<br>D-76149 Karlsruhe<br>Germany | CarbonLite P. LLC | Offer No. A016804 | 3/15/2019 | UniSensor filed an objection to Seller's listed Cure Amount [Docket No. 361]. |

**Section 3.8(b):  Defaults Under Material Contracts**

Please see Section 3.8(a) of the Disclosure Schedules.

**Section 3.9(a):  Employees**

Redacted for Privacy.

## Section 3.10(a):  Employee Benefit Plans[4]

- Pursuant to that certain *Administrative Services Contract (Level Funding)* between CarbonLite Industries LLC ("Industries") and Cigna Health and Life Insurance Company and other associated documents, effective June 1, 2020, Seller offers its eligible full-time Employees and their family members medical and prescription drug coverage.

- Pursuant to that certain *Group Contract* between Industries and Cigna Dental Health of Pennsylvania, Inc. and other associated documents, effective June 1, 2020, Seller offers its eligible full-time Employees and their family members dental insurance coverage.

- Pursuant to that certain *Group Vision Care Plan* between Industries and Vision Service Plan and other associated documents, effective June 1, 2020, Seller offers its eligible full-time Employees and their family members vision coverage.

- Seller offers eligible Employees the opportunity to participate in the 401(k) Plan administered by the Company, utilizing a platform provided by ADP 401k, Inc.  Seller historically matches Employees' 401(k) contributions in a discretionary amount of up to 50% of the first 10% of salary contributed.

- Seller's Employees are entitled to paid holiday time, vacation time, and other paid time off as provided in that certain document in the Jefferies Data Room entitled "8.3.3.4.6 - Benefits - Reading.pdf."

- To the extent not otherwise specifically described herein, Seller's Employees are entitled to all Employee Benefits Programs, as such term is defined and described in the Wage and Benefit Motion.

---

[4] Capitalized terms not otherwise defined in this Section shall have the meanings ascribed to them in the *Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to (I) Pay and/or Honor Prepetition Employee Obligations and Pay Third Party and Contract Workers; (II) Remit Withholding Obligations and Deductions; (III) Maintain Employee Compensation and Benefits Programs and Pay Related Administrative Obligations; and (IV) Have Applicable Banks and Other Financial Institutions Receive, Process, Honor, and Pay Certain Checks Presented for Payment and Honor Certain Fund Transfer Requests* [Docket No. 5] (the "Wage and Benefit Motion").)

**Section 3.11: Permits**

- There is ongoing construction at Seller's premises, for which Seller presently has all required Permits. In the future, Seller may be required to obtain additional Permits as circumstances warrant.

**Section 3.12(a):  Intellectual Property**

None.

## Section 3.12(c):  Intellectual Property Matters

None.

## Section 3.12(f):  Computer Systems Matters

None.

**Section 3.13(c):  Environmental Matters**

None to Seller's Knowledge.

**Section 3.15:  Tax Matters**

- Holdings and its subsidiaries, including Industries, have a statutory extension to file their 2020 federal Tax Returns until September 15, 2021.

**Section 3.16(a)(i):  Key Customer and Vendor Lists**

*Key Customers*

| Customer Name | 2020 Billing | Section 3.16(a)(ii) Disclosures |
|---|---|---|
| Amcor Group GmbH | $1,724,140 | In March 2021, Amcor and Pepsi paused purchasing from Seller during the pendency of the Debtors' bankruptcy cases. |
| Indorama Ventures Sustainable Solutions | $92,540 | |
| Niagara Bottling, LLC | $44,370 | Niagara Bottling has ceased purchasing from Seller as of March 2021. |
| Gary Plastic Packaging Corp | $29,449 | |
| Nestle Waters North America | $17,824 | Nestle Water has decreased purchasing from Industries in 2021 as compared to 2020. |
| PinnPACK Packaging, LLC | $9,000 | |
| Southeastern Container | $7,476 | |
| Karl W. Richter Ltd. | $3,789 | |
| Absolute Polymers Inc. | $2,691 | |

*Key Vendors*

| Vendor Name | 2020 Payables | Section 3.16(a)(ii) Disclosures |
|---|---|---|
| BBSI Payroll | $1,942,557 | |
| PQ Recycling, A Polyquest Company | $1,808,696 | |
| HPC Industries, LLC | $485,675 | |
| Bantam Materials International | $466,852 | |
| ClearFreight Inc. | $312,306 | |
| Berks61 Owner LLC | $277,726 | Please see disclosure in Section 3.7(a) of the Disclosure Schedules. |
| Muhlenberg Township Authority | $232,691 | |
| Nahai Insurance Services | $208,091 | |
| Met Ed | $135,552 | |
| KRE Security LLC | $117,026 | |

**Section 3.16(a)(ii):  Key Customer/Vendor Matters**

Please see Section 3.16(a)(i) of the Disclosure Schedules.

**Section 3.16(b):  Discounts and Rebates**

None.

## Section 3.17:  Insurance

| Type of Coverage | Insurer | Policy No. | Policy Period |
|---|---|---|---|
| Crime | Federal Insurance Company | 8260-1946 | 9/19/2020 - 9/19/2021 |
| Terrorism; Excess Liability | Travelers Property Casualty Company of America | ZUP-51N34853-20-NF | 9/19/2020 - 9/19/2021 |
| General Liability; Business Auto; Certified Terrorism | Allianz - Fireman's Fund Insurance Company | USC021595200 | 9/19/2020 - 9/19/2021 |
| Umbrella Liability; Certified Terrorism | Allianz - Fireman's Fund Insurance Company | USC01771220U | 9/19/2020 - 9/19/2021 |
| Property (Storage Trailers) | Endurance Risk Solutions Assurance Co. | IMU30001985400 | 9/19/2020 - 9/19/2021 |
| Commercial Property | The Travelers Insurance Companies | KTJ-CMB-3L24100-8-20 | 9/19/2020 - 9/19/2021 |
| D&O and Private Company Coverage; Employment Practices Coverage | U.S. Specialty Insurance Company | 14-MGU-20-A50339 | 10/1/2020 - 10/1/2021 |
| Marine Open Cargo Policy | The Continental Insurance Company | OC 246248 | 2/23/2020 - 2/23/2022 |

**Section 3.18: Brokers and Finders**

None.

- CarbonLite Holdings LLC ("Holdings") is party to that certain Commission Agreement dated April 4, 2019 (the "Loaned Earth Agreement") with Jason Farahnik d/b/a Loaned Earth Recycling. Under the Loaned Earth Agreement, Mr. Farahnik serves as Holdings' Director of Resin Sales and Brand Partnerships and is entitled to certain commission payments related to his work for Holdings and its subsidiaries, including Seller.

- Holdings is party to that certain Management Agreement dated April 1, 2010 (the "HPC/CarbonLite Management Agreement") with HPC Industries LLC ("HPC"), pursuant to which HPC provides certain services to Holdings and certain of its subsidiaries, including Seller. The HPC/CarbonLite Management Agreement was amended on January 1, 2011; on or about July 1, 2011; May 1, 2012; March 15, 2013; and October 28, 2015, and was extended on or about December 30, 2020.

## Section 5.5(a): Employees

***Subject Employees***

None.

***Selected Employees***

Redacted for Privacy

EXHIBIT 1.1

Form of Sale Order

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CARBONLITE HOLDINGS LLC, *et al.*,[1] | ) | Case No. 21-10527 (JTD) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

*[PROPOSED]* **ORDER (A) APPROVING THE SALE OF SUBSTANTIALLY
ALL ASSETS OF CARBONLITE P, LLC FREE AND CLEAR OF LIENS, CLAIMS,
ENCUMBRANCES, AND OTHER INTERESTS; (B) APPROVING ASSUMPTION
AND ASSIGNMENT OF CERTAIN UNEXPIRED LEASES AND EXECUTORY
CONTRACTS; AND (C) GRANTING RELATED RELIEF**

Upon the motion [Docket No. 112] (the "Motion") of the above-captioned debtors and

debtors in possession (the "Debtors") pursuant to sections 105(a), 363, 365, 503, 507, 1107,

and 1108 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002 and 6004

of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1

and 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States

Bankruptcy Court for the District of Delaware (the "Local Rules") for (a) approval of a sale of

substantially all assets (the "Assets") of CarbonLite P, LLC, as set forth in the APA (as

defined herein), free and clear of all liens, claims, encumbrances, and other interests; (b)

approval of assumption and assignment of certain unexpired leases and executory contracts;

and (c) approval of related relief, all as contemplated in the *Order (A) Approving Bid*

*Procedures for the Sale of Substantially All of the Debtors' Assets; (B) Approving Procedures*

*for the Assumption and Assignment of Executory Contracts and Unexpired Leases; (C)*

---

[1]  The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: CarbonLite Holdings LLC (8957); CarbonLite Industries LLC (3596); CarbonLite P Holdings LLC (8957); CarbonLite P, LLC (5453); CarbonLite PI Holdings LLC (8957); CarbonLite Pinnpack LLC (8957); CarbonLite Recycling Holdings LLC (8957); CarbonLite Sub-Holdings, LLC (8957); Pinnpack P, LLC (8322); CarbonLite Recycling LLC (3727); and Pinnpack Packaging LLC (9948). The address of the Debtors' corporate headquarters is 10250 Constellation Blvd., Los Angeles, CA 90067.

*Approving Certain Bid Protections in Connection With the Debtors' Entry Into Any Potential Stalking Horse Agreements; (D) Scheduling the Auction and Sale Hearing; (E) Approving the Form and Manner of Notice Thereof; and (F) Granting Related Relief* [Docket No. 266] (as may be amended, supplemented, or modified)[2] (the "<u>Bid Procedures Order</u>")[3] entered by this Court on April 9, 2021; and [the Auction having taken place on May [ • ], 2021, in accordance with the Bid Procedures Order], [_____] having been chosen as the Successful Bidder (the "<u>Successful Bidder</u>" or the "<u>Buyer</u>") for the Assets; and the applicable Debtors having agreed to enter into and consummate the Asset Purchase Agreement attached hereto as **<u>Exhibit A</u>** with the Buyer (the "<u>APA</u>"); and the hearing to approve the sale (the "<u>Sale</u>" or "<u>Sale Transaction</u>") of the Assets and the APA (the "<u>Sale Approval Hearing</u>") having been held on May [ • ], 2021 in accordance with the Bid Procedures Order; and this Court having found that proper and adequate notice of the Motion and the relief requested therein has been provided in accordance with the Bid Procedures Order, Bankruptcy Rules and Local Rules, and that, except as otherwise ordered herein, no other further notice is necessary; and upon the record at the Sale Approval Hearing and all of the proceedings before this Court; and this Court having reviewed any objections asserted at the Sale Approval Hearing and having found and determined that the relief sought at the Sale Approval Hearing, and entry of this Order, is in the best interests of the applicable Debtors, the Debtors' estates, their creditors, and all other parties in interest; and after due deliberation thereon and sufficient

---

[2] *See Order Approving Order Approving Stipulation Among Debtors, the Official Committee of Unsecured Creditors and the DIP Lenders, Extending Certain Deadlines Under the Bid Procedures Order* [Docket No. 312], entered by this Court on April 20, 2021; *Order Approving Second Stipulation Among Debtors and the DIP Lenders, Extending Certain Deadlines Under the Bid Procedures Order* [Docket No. 357], entered by this Court on April 27, 2021; and *Order Approving Amended Third Stipulation Among Debtors and the DIP Lenders Extending Certain Deadlines Under (I) TX Debtors' Final DIP Order; (II) PA Debtors' Final DIP Order; (III) CA Debtors' Final DIP Order; and (IV) Bid Procedures Order* [Docket No. __], entered on May __, 2021.

[3] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Bid Procedures Order, the Bid Procedures (as defined in and attached to the Bid Procedures Order), and the APA, as applicable.

cause appearing therefore, the Court makes the following Findings of Fact and Conclusions of Law:

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

A.      **Findings and Conclusions:** The findings and conclusions set forth herein and in the record of the Sale Approval Hearing constitute the Court's findings of fact and conclusions of law under Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Bankruptcy Rules 7052 and 9014. To the extent any of the following conclusions of law constitute findings of fact, or *vice versa*, they are adopted as such.

B.      **Jurisdiction, Venue and Core Proceeding:** This Court has jurisdiction over these chapter 11 cases pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012. The matters covered by this Order are core proceedings under 28 U.S.C. § 157(b)(2). Venue is proper in this district and before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. Venue in this district and before this Court was proper as of the Petition Date and continues to be proper. The Court may enter a final order with respect to the Motion, the Sale, the Sale Transaction, and all related relief, in each case, consistent with Article III of the United States Constitution.

C.      **Statutory Predicates.** The statutory predicates for the relief sought in the Motion are sections 105(a), 363, 365, 503, 507, 1107, and 1108 of the Bankruptcy Code, Rules 2002, 6004, 6006, 9008, and 9014 of the Bankruptcy Rules and Rules 2002-1 and 6004-1 of the Local Rules. The consummation of the Sale Transaction contemplated by the Motion, the APA, and this Order, and the assumption and assignment of the Transferred Contracts (as defined below), are legal, valid, and properly authorized under the cited provisions of the Bankruptcy Code, the

Bankruptcy Rules, and the Local Rules, and all of the applicable requirements of such sections and rules have been complied with in respect of such transactions.

D. **Actual Notice.** Actual written notice of the Motion, the Bid Procedures Hearing, the Bid Procedures, the Assumption and Assignment Procedures, the proposed assumption and assignment of the Transferred Contracts, the Auction, the Sale Approval Hearing, the Sale, the Sale Transaction and all transactions contemplated therein or in connection therewith, and all deadlines related thereto, has been given to all interested persons and entities, including, without limitation: (i) the DIP Agent, DIP Lenders, and Prepetition Secured Parties (each as defined in the DIP Order, as defined below), and each of their counsel; (ii) counsel to the Official Committee of Unsecured Creditors; (iii) the Office of the United States Trustee; (iv) the counterparty to each unexpired lease and executory contract to be assumed and assigned pursuant to this Order, and each of their counsel (if known); (v) all persons known or reasonably believed to have asserted an interest in the Assets; (vi) the Attorneys General in the State(s) where the Assets are located; (vii) all federal, state, and local taxing authorities in the State(s) where the Assets are located; (viii) all parties who have asserted liens against the Assets; (ix) all parties included on the Debtors' consolidated creditor matrix; and (x) any other party that has filed a request for notices with the Court (collectively, the "Notice Parties").

E. **Sufficiency of Notice.** As evidenced by the affidavits of service filed with the Court, proper, timely, adequate, and sufficient notice of the Motion, the Bid Procedures Hearing, the Bid Procedures, the Assumption and Assignment Procedures, the Auction, the Sale Approval Hearing, the Sale, the Sale Transaction, and all transactions contemplated therein or in connection therewith, and all deadlines related thereto, was served in accordance with the Bid Procedures Order on the Notice Parties and any other party entitled to receive such notice under

the Bid Procedures Order and applicable rules. Such notice was appropriate and reasonably calculated under the circumstances to provide all interested parties with timely and proper notice. Accordingly, no further notice need be provided.

F. **Extensive Efforts by Debtors.** The Debtors have worked with their counsel, their investment banker Jefferies, LLC ("Jefferies"), and other advisors, as well as, as applicable, the Consultation Parties and the Consent Parties, to implement a viable Sale Transaction that would allow them to maximize the value of the Assets. The Sale Transaction for the Assets that is the subject of this Order is the result of the Debtors' extensive efforts in seeking to maximize recoveries to the applicable Debtors' estates, for the benefit of all of the Debtors' creditors.

G. **Business Justification.** The Debtors have demonstrated good, sufficient, and sound business purposes and justifications for, and compelling circumstances to promptly consummate, the Sale Transaction contemplated by the APA and related documents, including, without limitation, the assumption, assignment, and/or transfer of the Transferred Contracts pursuant to sections 105, 363, and 365 of the Bankruptcy Code, prior to and outside of a plan of reorganization, and such action is an appropriate exercise of the Debtors' business judgment and in the best interests of the applicable Debtors, their estates, and their creditors. Such business reasons include, but are not limited to, the fact that: (i) the total consideration provided by the Buyer for the Assets as reflected in the APA is the highest or otherwise best offer for the Assets; (ii) there is substantial risk of depreciation of the value of the Assets if the Sale is not consummated promptly; (iii) the Sale Transaction contemplated by the APA presents the best opportunity to maximize the value of the Debtors' estates; (iv) at Closing, in accordance with the *Final Order Pursuant to Sections 105, 361, 362, 363, 364, 503 and 507 of the Bankruptcy Code (I) Authorizing CarbonLite P, LLC and CarbonLite P Holdings LLC to Obtain Senior Secured*

*Superpriority Postpetition Financing; (II) Granting (A) Liens and Superpriority Administrative Expense Claims, and (B) Adequate Protection to the Prepetition Secured Parties; (III) Authorizing the Use of Cash Collateral; (IV) Modifying the Automatic Stay; and (V) Granting Related Relief* [Docket No. 276] (the "<u>DIP Order</u>"), the cash proceeds of the Sale Transaction will be used to indefeasibly pay the DIP Obligations (as defined in the DIP Order) and, if applicable, the Bid Protections as approved by the Court; and (v) unless the Sale is concluded expeditiously as provided for in this Order and pursuant to the APA, potential creditor recoveries may be substantially diminished.

H.    **Bid Procedures Order.** On April 9, 2021, this Court entered the Bid Procedures Order approving, among other things, Bid Procedures for the sale of substantially all of the Debtors' Assets and Assumption and Assignment Procedures for the related assumption and assignment of any unexpired leases and executory contracts relating to any sale. The Bid Procedures provided a full, fair, and reasonable opportunity for any entity to make an offer to purchase the Debtors' Assets. The Assumption and Assignment Procedures provided a full, fair, and reasonable opportunity for any counterparty to any unexpired lease or executory contract to object to any proposed Cure Amount, assumption and assignment of its applicable unexpired lease or executory contract, or the Buyer's adequate assurance of future performance. The Debtors, the Buyer, and their respective counsel and other advisors have complied with the Bid Procedures Order, the Bid Procedures, and the Assumption and Assignment Procedures in all respects.

I.    **Adequate Marketing; Highest or Best Offer.** As demonstrated by (i) the testimony and other evidence proffered or adduced at the Sale Approval Hearing and (ii) the representations of counsel made on the record at the Sale Approval Hearing, (a) the Debtors and

their professionals adequately marketed the Assets and conducted the Sale process in compliance with the Bid Procedures Order in good faith and in a fair and open manner; (b) the Sale process and the Bid Procedures were non-collusive, duly noticed, and provided a full, fair, reasonable and adequate opportunity for any interested party to conduct due diligence and make an offer to purchase the Debtors' Assets, and submit higher and better offers for the Assets than the Buyer's Successful Bid; (c) the consideration provided by the Buyer in the APA constitutes the highest or otherwise best offer for the Assets; (d) the consideration provided by the Buyer is fair and reasonable consideration for the Assets and constitutes reasonably equivalent value under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, the Uniform Voidable Transactions Act, and any other applicable laws of the United States, any state, territory, possession, or the District of Columbia; (e) the Sale will provide a greater recovery to the Debtors' creditors with respect to the Assets than would be provided by any other available alternative; (f) taking into consideration all relevant factors and circumstances, no other entity has offered to purchase the Assets for greater economic value to the Debtors or their estates than the Buyer; and (g) the Debtors' determination that the APA constitutes the highest or best offer  for the Assets, maximizes value for the Debtors' estates, and constitutes a valid and sound exercise of the Debtors' business judgment.  There is no legal or equitable reason to delay Closing of the Sale Transaction contemplated by the APA.

J. **Opportunity to Object.**  A reasonable opportunity to object or be heard with respect to the Motion, and all relief requested therein, has been afforded to all interested parties.

K. **Property of the Estate.**  The Assets are property of the applicable Debtors' estates and title thereto is vested in the applicable Debtors' estates.

L.      **Sale in Best Interests.**  The actions to be taken by the Debtors and the Buyer are appropriate under the circumstances of these chapter 11 cases and are in the best interests of the Debtors, their estates, their creditors, and other parties in interest.  Approval of the APA and the Sale Transaction set forth therein, and all related transactions at this time is in the best interests of the Debtors, their creditors, their estates, and all other parties in interest.

M.      **Arm's-Length Sale.**  The APA, the Sale, the Sale Transaction, and any transactions contemplated therein and associated therewith were negotiated, proposed, and entered into by the Debtors and the Buyer without collusion, in good faith, and from arm's-length bargaining positions.  The Buyer (i) recognizes that the Debtors were free to deal with any other party interested in acquiring the Assets, (ii) complied with the Bid Procedures Order in all respects, and (iii) willingly subjected its bid to the competitive Bid Procedures.  All payments to be made by the Buyer and other agreements or arrangements entered into by the Buyer in connection with the Sale have been disclosed.  Accordingly, none of the Debtors, their insiders and affiliates, the DIP Agent, DIP Lenders, and Prepetition Secured Parties (each as defined in the DIP Order) or the Buyer have engaged in any conduct that would cause or permit the APA, the Sale, or any part of the Sale Transaction to be avoided under section 363(n) of the Bankruptcy Code.

N.      **Good Faith Buyer.**  The Buyer is a good faith buyer under section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby, including in the event this Order or any portion thereof is reversed or modified on appeal, and the Buyer has proceeded in good faith in all respects in connection with the Sale Transaction specifically and these chapter 11 cases generally.

O. **Corporate Authority.** The applicable Debtors (i) have full corporate power and authority to execute the APA and all other documents contemplated thereby, and the Sale Transaction and Sale of the Assets have been duly and validly authorized by all necessary corporate action of the applicable Debtors, (ii) have all of the corporate power and authority necessary to consummate the transactions contemplated by the APA, (iii) have taken all corporate action necessary to authorize and approve the APA and the consummation by the applicable Debtors of the transactions contemplated thereby, and (iv) need no consents or approvals, other than those expressly provided for in the APA, which may be waived in accordance with the terms therewith and applicable law.

P. **Free and Clear Findings Required by the Buyer.** The Buyer would not have entered into the APA and would not consummate the Sale if the Sale of the Assets to the Buyer were not, pursuant to section 363(f) of the Bankruptcy Code and except for the Permitted Liens or as otherwise set forth in the APA, free and clear of (i) all liens, whether consensual or statutory, replacement liens, adequate protection liens or other liens granted under sections 361, 363, or 364 of the Bankruptcy Code, mortgages, deeds of trust, hypothecations, pledges, security interests, charges, options and transfer restrictions, including rights of first refusal or first offer, defect or objection liens, easements, encroachments or servitudes, in each case, that constitutes an "interest" for purposes of section 363(f) of the Bankruptcy Code (collectively, the "Liens"), (ii) any and all "claims," as defined in section 101(5) of the Bankruptcy Code and jurisprudence interpreting the Bankruptcy Code, including (a) any and all claims or causes of action based on or arising under any labor, employment or pension laws, labor or employment agreements, including any employee claims related to worker's compensation, occupational disease, or unemployment or temporary disability, including, without limitation, claims that might otherwise

arise under or pursuant to (1) ERISA (as defined below), (2) the Fair Labor Standards Act, (3) Title VII of the Civil Rights Act of 1964, (4) the Federal Rehabilitation Act of 1973, (5) the National Labor Relations Act, (6) the Age Discrimination and Employment Act of 1967 and Age Discrimination in Employment Act, as amended, (7) the Americans with Disabilities Act of 1990, (8) the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, including the requirements of Part 6 of Subtitle B of Title I of ERISA and Section 4980B of the Internal Revenue Code and of any similar state law, (9) state discrimination laws, (10) state unemployment compensation laws or any other similar state laws, (11) any other state or federal benefits or claims relating to any employment with the Debtors or any of their predecessors, or (12) the WARN Act (29 U.S.C. §§ 2101 et seq.), (b) any rights under any pension or multiemployer plan (as such term is defined in Section 3(37) or Section 4001(a)(3) of the Employee Retirement Income Security Act of 1974 (as amended, "ERISA"), health or welfare, compensation or other employee benefit plans, agreements, practices, and programs, including any pension plans of the Debtors or any multiemployer plan to which the Debtors have at any time contributed to or had any liability or potential liability, (c) any and all claims or causes of action based upon or relating to any putative successor or transferee liability, (d) any and all claims or causes of action based upon or relating to any bulk sales or similar law, (e) any and all claims or causes of action based upon or relating to any tax statutes or ordinances, including the Internal Revenue Code of 1986, as amended, and any taxes arising under or out of, in connection with, or in any way relating to the operation of the Assets prior to the Closing, including any ad valorem taxes assessed by any applicable taxing authority, and (f) any other rights or causes of action (whether in law or in equity), warranties, guarantees, indemnities, rights of recovery, setoff, recoupment, indemnity or contribution, obligations, demands, restrictions,

indemnification claims or liabilities relating to any act or omission of the Debtors or any other person prior to the Closing, consent rights, options, contract rights, covenants and interests of any kind or nature whatsoever (known or unknown, matured or unmatured, accrued or contingent and regardless of whether currently exercisable), whether arising prior to or subsequent to the commencement of the above-captioned case, and whether imposed by agreement, understanding, law, equity or otherwise (collectively the "Claims"), and (iii) any and all claims, causes of actions, payments, charges, judgments, assessments, losses, monetary damages, penalties, fines, fees, interest obligations, deficiencies, debts, obligations, costs and expenses and other liabilities (whether absolute, accrued, contingent, fixed or otherwise, or whether known or unknown, or due or to become due or otherwise), including any amounts paid in settlement, interest, court costs, costs of investigators, attorneys' fees, legal or other expenses incurred in connection therewith (collectively the "Interests").  A sale of the Assets other than one free and clear of all Liens, Claims, and Interests would have yielded substantially less value for the Debtors' estates, with less certainty, than the Sale as contemplated.  Therefore, the Sale contemplated by the APA free and clear of all Liens, Claims, and Interests is in the best interests of the Debtors, their estates, their creditors, and all other parties in interest.

Q.     Upon entry of this Order, subject to the terms of the APA, the applicable Debtors are authorized to transfer all their right, title and interest in and to the Assets free and clear of, and the Buyer shall not be responsible for, any Liens, Claims, or Interests (other than Permitted Liens and Assumed Liabilities).

R.     **[Environmental Protection Agency.**  Notwithstanding the foregoing, nothing in this Order or the APA releases, nullifies, precludes or enjoins the enforcement of any police or regulatory liability to a governmental unit that any entity would be subject to as the post-sale

owner or operator of property after the date of entry of this Order. Nothing in this Order or the APA authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization, or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police or regulatory law. Nothing in this Order divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Order or to adjudicate any defense asserted under this Order.]

S.     **Assumption and Assignment of Unexpired Leases and Executory Contracts.** Pursuant to section 365 of the Bankruptcy Code, the Debtors are authorized to assume all unexpired leases and executory contracts identified in the APA (the "<u>Transferred Contracts</u>")[4] and assign such Transferred Contracts to the Buyer. To the extent a Cure Amount is owed to the counterparty of any Transferred Contract, the applicable Cure Amount will be paid on or before Closing of the Sale approved pursuant to this Order in accordance with the APA. The Buyer has, in accordance with the Assumption and Assignment Procedures, provided adequate assurance of future performance to any Contract Counterparty as required by section 365(b)(1)(C).

T.     The Transferred Contracts being assigned to the Buyer are an integral part of the Sale Transaction and, accordingly, their assumption and assignment is reasonable and an enhancement to the value of the Debtors' estates. To the extent any Transferred Contract is not an executory contract within the meaning of section 365 of the Bankruptcy Code, it shall be transferred to the Buyer in accordance with the terms of the APA and, other than with respect to Permitted Liens and Assumed Liabilities, the Buyer shall have no liability or obligation for any (i) defaults or breaches under such agreement that relate to acts or omissions that occurred in the

---

[4] Notwithstanding the name of the Debtors listed on any Transferred Contract, the Transferred Contracts identified in the APA are deemed assumed and assigned by the applicable Debtors party to the APA.

period, or otherwise arose, prior to the Closing Date and (ii) claims, counterclaims, offsets, or defenses (whether contractual or otherwise, including, any right of recoupment) with respect to such Transferred Contract, that relate to any acts or omissions that arose or occurred prior to the Closing Date.

U.      **Release of Debtors.**  The Sale of the Assets, the Sale Transaction and any other transactions contemplated by the APA are (i) on an "as is, where is" basis; (ii) have been negotiated by the Buyer and the Debtors after extensive due diligence by the Buyer; and (iii) are not subject to any representations and warranties, except as expressly set forth in the APA. Based on this finding, except as otherwise expressly set forth in the APA, effective as of the Closing, the Debtors are unconditionally and irrevocably, released from any and all liabilities, obligations, claims, demands, losses, damages, suits, causes or rights of action whatsoever, known or unknown, anticipated or unanticipated, direct or contingent, whether now existing or hereafter arising, which Buyer has or may have, including those in any way resulting from, arising out of, or in any way connected with the Sale, the Debtors' Assets subject to the Sale, and the Sale Transaction.

V.      **Binding and Valid Transfer.**  The transfer of the Assets to the Buyer will be a legal, valid, effective, and enforceable sale and transfer of the Assets and will vest the Buyer with all right, title, and interest of the applicable Debtors to the Assets free and clear of all Liens, Claims, and Interests, other than the Permitted Liens and Assumed Liabilities, to the extent expressly set forth in the APA or in this Order.

W.      **Satisfaction of Standards of Section 363(f).**  The applicable Debtors are authorized to sell the Assets free and clear of all Liens, Claims, and Interests of any kind or nature whatsoever, other than the Permitted Liens and Assumed Liabilities, because, with respect

to each creditor or other person or entity asserting a Lien, Claim, or Interest, one or more of the standards set forth in section 363(f)(1) - (5) of the Bankruptcy Code have been satisfied. Each holder of a Lien, Claim, or Interest (i) has, subject to the terms and conditions of this Order, consented to the Sale or is deemed to have consented to the Sale pursuant to section 363(f)(2) of the Bankruptcy Code, (ii) is adequately protected by having its Lien, Claim, or Interest attach to the proceeds received by the applicable Debtors (if any) that are ultimately attributable to the property against or in which such Lien, Claim, or Interest is asserted, subject to the terms of such Lien, Claim, or Interest, with the same validity, force, and effect, and in the same order of priority that such Lien, Claim, or Interest now has against the Assets or their proceeds, if any, (iii) could be compelled in a legal or equitable proceeding to accept money satisfaction of such Lien, Claim, or Interest, or (iv) otherwise falls within the provisions of section 363(f) of the Bankruptcy Code. In all cases, each such person with Liens, Claims, or Interests in the Assets (other than Permitted Liens or Assumed Liabilities) is enjoined from taking any action against the Buyer, the Buyer's affiliates, or any agent of the foregoing to recover any such Lien, Claim, or Interest.

X. **Repayment of DIP Obligations.** Pursuant to the DIP Order, Assets of the applicable Debtors constitute DIP Collateral (as defined in the DIP Order) and are subject to the DIP Liens (as defined in the DIP Order). At Closing, the applicable Debtors are authorized and directed to distribute the proceeds of the Sale Transaction in accordance with the DIP Order and DIP Documents (as defined in the DIP Order). Notwithstanding the foregoing, if applicable, the Bid Protections, as approved by prior order of the Court, will be paid in accordance with the Bid Protections Order.

Y.     **No *Sub Rosa* Plan**.    The Sale, Sale Transaction, the APA, and the other transactions contemplated thereby do not constitute a *sub rosa* chapter 11 plan.    The Sale Transaction neither impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates a liquidating chapter 11 plan for the Debtors.

Z.     **Assets Assignable.**    To the maximum extent possible under the Bankruptcy Code, each and every provision of the documents governing the Assets or applicable non-bankruptcy law that purports to prohibit, restrict, or condition, or could be construed as prohibiting, restricting, or conditioning assignment of any of the Assets, if any, has been or will be satisfied or is otherwise unenforceable under section 365 of the Bankruptcy Code.

AA.     **Necessity of Order.**    The Buyer would not have entered into the APA and would not consummate the Sale Transaction contemplated therein without all of the relief provided for in this  Order (including, but not limited to, that the sale and transfer of the Assets to Buyer be free and clear  of all Liens, Claims, and Interests).    The consummation of the Sale Transaction pursuant to this Order and the APA is necessary for the applicable Debtors to (i) comply with the terms of the DIP Order and DIP Documents, including the milestones and repayment provisions set forth therein, and (ii) maximize the value of their estates for the benefit of all creditors.

BB.     **Final Order.** This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).    Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), the Court expressly finds that there is no just reason for delay in the implementation of this Order and expressly directs entry of judgment as set forth herein.

CC.     **Best Interests.** Entry of this Order is in the best interests of the applicable Debtors, the Debtors' estates, their creditors, and all other parties in interest.

# ORDER

Based on the foregoing Findings of Fact and Conclusions of Law, it is hereby

**ORDERED, ADJUDGED, AND DECREED** as follows:

1.      **Findings of Fact and Conclusions of Law.**    The above-referenced findings of fact and conclusions of law are hereby incorporated by reference as though fully set forth herein and shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable herein by Bankruptcy Rule 9014.  To the extent that any finding of fact shall be determined to be a conclusion of law, it shall be deemed so, and *vice versa*.

2.      **Motion Granted.**  The Motion is granted with respect to the Sale Transaction contemplated by the APA and the relief requested therein with respect to the Sale is granted and approved in its entirety, as set forth herein.

3.      **Objections are Overruled.**  Except for any objections to adequate assurance of future performance by any Contract Counterparty that are contemplated to be heard post-Sale Approval Hearing in accordance with the Assumption and Assignment Procedures, all objections, reservations of rights regarding, or other responses to the Motion or the relief requested therein, the APA, all other ancillary agreements, the Sale Transaction, the entry of this Order or to the relief granted herein that have not been withdrawn, waived, settled, or not otherwise resolved pursuant to the terms hereof, if any, hereby are denied and overruled on the merits with prejudice.  All persons and entities that failed to timely object to the Motion are deemed to have consented to the relief granted herein for all purposes.

4.      **Approval.**  The APA, and all the terms and conditions thereof, is approved. Pursuant to sections 105, 363, and 365 of the Bankruptcy Code, the applicable Debtors are authorized to perform their obligations under, and comply with the terms of, the APA and

consummate the Sale and the related transactions pursuant to, and in accordance with, the terms and conditions of the APA and this Order. The applicable Debtors are authorized to execute and deliver, and empowered to perform under, consummate, and implement, the APA and the Sale Transaction contemplated therein, together with all additional instruments and documents that the applicable Debtors or the Buyer deem necessary or appropriate to implement the APA and effectuate the Sale Transaction contemplated therein, and to take all further actions as may reasonably be required by the Buyer for the purpose of assigning, transferring, granting, conveying, and conferring to the Buyer the Assets free and clear of any and all Liens, Claims, and Interests (other than Permitted Liens and Assumed Liabilities) as may be necessary or appropriate to their performance of their obligations under the APA. The Buyer and the Debtors shall have no obligation to consummate the Sale Transaction except as contemplated by and provided for in the APA and the Bid Procedures. The Buyer shall not be required to seek or obtain relief from the stay under section 362 of the Bankruptcy Code to enforce any of its remedies under the APA or related documents. The automatic stay imposed by section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the provisions of this Order.

5. **Notice**. Notice of the Motion, the Bid Procedures Hearing, the Bid Procedures, the Assumption and Assignment Procedures, the Auction, the Sale Approval Hearing, the Sale, all transactions contemplated therein or in connection therewith, including the Sale Transaction, all deadlines related thereto, and the relief granted in this Order was fair, sufficient, proper, and equitable under the circumstances and complied in all respects with sections 102(1) and 363 of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Bid Procedures

Order, the Bid Procedures, the Assumption and Assignment Procedures, and the procedural due process requirements of the United States Constitution.

6.      **Authorization to Assign**. Notwithstanding any provision of any contract governing the Assets, including any Transferred Contract to be assumed and assigned to the Buyer as of the Closing, pursuant to section 365(f) of the Bankruptcy Code or applicable non-bankruptcy law that prohibits, restricts, or conditions the assignment of the Assets, including any Transferred Contract, the applicable Debtors are authorized to (i) assign the Assets to the Buyer and (ii) assume and assign the Transferred Contracts to the Buyer as of the Closing, in each case, which assignments shall take place on and be effective as of the Closing or such other date after the Closing Date, in each case, as provided in the APA or as otherwise provided by a separate order of this Court.

     a.   There shall be no accelerations, assignment fees, increases, or any other fees charged to the Buyer or the Debtors as a result of the assignment of the Assets or the assumption and assignment of the Transferred Contracts.

     b.   The Debtors have met all of the requirements of section 365(b) of the Bankruptcy Code for each of the Transferred Contracts that are to be assumed and assigned to the Buyer as of Closing. Notwithstanding the foregoing, unless required by the Buyer under the APA for the Debtors to assume and assign any Transferred Contract, no Debtor shall be required by the Court to assume and assign any Transferred Contract, and, if no such assumption and assignment occurs, no Cure Amounts shall be due and no adequate assurance of future performance shall be required with respect to any such contract.

     c.   The Debtors' assumption and assignment of the Transferred Contracts is subject to the consummation of the Sale Transaction with the Buyer. Any objection of any Contract Counterparty to the assumption and assignment of any Transferred Contracts, any Cure Amount, or seeking further adequate assurance of future performance than that provided in the APA, to the extent not otherwise resolved by agreement, contemplated to be heard after the Sale Approval Hearing in accordance with the Assumption and Assignment Procedures, or by separate order of this Court, is hereby overruled; *provided*, *however*, that the Debtors, the Buyer, and the relevant Contract Counterparty under each Transferred Contract subject to a dispute contemplated to be heard after the Sale Approval Hearing shall have authority to compromise, settle, or otherwise resolve any such objections without

further order of, or notice to, this Court. Upon payment of the Cure Amount, the Debtors shall be released by the Buyer and the applicable Contract Counterparty from any and all claims and causes of action of any nature whatsoever based on, arising from or relating to such Transferred Contracts.

7. **Transferred Contracts**. As of the Closing, subject to the provisions of this Order and in accordance with the APA, the Buyer shall succeed to the entirety of the applicable Debtors' rights and obligations in the Transferred Contracts to be assumed and assigned to the Buyer, and shall have all rights thereunder subject to the terms of the APA.

a. Upon Closing, (i) all defaults (monetary and non-monetary) under the Transferred Contracts shall be deemed cured and satisfied in full through the payment of the Cure Amounts, (ii) no other amounts will be owed by the Debtors, their estates, or the Buyer with respect to the Transferred Contracts, and (iii) any and all persons or entities shall be forever barred and estopped from asserting a Claim against the Debtors, their estates, the Buyer, or the Assets that any additional amounts are due or defaults exist under the Transferred Contracts. The Buyer's promise pursuant to the terms of the APA to pay the Cure Amounts and the Buyer's promise to perform the Debtors' obligations under the Transferred Contracts for the period on or after the Closing Date shall constitute adequate assurance of Buyer's future performance under the Transferred Contracts being assigned to it as of the Closing within the meaning of sections 365(b)(l)(C) and (f)(2)(A)-(B) of the Bankruptcy Code.

b. Upon assumption of the Transferred Contracts to be assumed by the applicable Debtors and assigned to the Buyer as of the Closing, such Transferred Contracts shall be deemed valid and binding, in full force and effect in accordance with their terms, subject to the provisions of this Order, and shall be assigned and transferred to the Buyer, notwithstanding any provision in such Transferred Contract or other restrictions prohibiting assignment or transfer. To the extent any Transferred Contract is assumed and assigned to the Buyer under this Order, such assumption and assignment will not take effect until the Closing. Furthermore, other than the Transferred Contracts, no other contract shall be deemed assumed by the Debtors and assigned to the Buyer pursuant to section 365 of the Bankruptcy Code. The failure of the Debtors or the Buyer to enforce at any time one or more terms or conditions of any Transferred Contract shall not be a waiver of such terms or conditions, or of the Debtors' and the Buyer's rights to enforce every term and condition of such Transferred Contract.

Notwithstanding the foregoing, the Debtors may, at the Buyer's direction, amend the list of Transferred Contracts to add or remove any executory contract or unexpired list to or from such list prior to Closing of the Sale Transaction in accordance with the terms of the APA.

8.      **Binding Effect of Order.**   This Order and the APA shall be binding  in  all respects upon (i) all known and unknown creditors of, and holders of equity security interests in, the Debtors, including any holders of Liens, Claims, and Interests; (ii) the Buyer, and all successors and assigns of the Buyer; (iii) the Debtors and their estates; (iv) the Assets; (v) any trustee(s) appointed in the Debtors' chapter 11 cases or upon a conversion to cases under chapter 7 of the Bankruptcy Code; and (vi) all successors and assigns of each of the foregoing. The APA, this Order, and the Debtors' obligations therein and herein shall not be altered, impaired, amended, rejected, discharged, or otherwise affected by any chapter 11 plan proposed or confirmed in these bankruptcy cases, without the prior written consent of the Buyer.  To the extent of any conflict between this Order and the APA, the terms of this Order shall control.

9.      **[Reserved].**

10.     **[Release of Back-Up Bidder.**   The Back-Up Bidder will be released at Closing and any Good Faith Deposit of any Back-Up Bidder will be refunded within three (3) days of Closing.]

11.     **Injunction.**   Effective upon the Closing, with the  sole  exception  of  any enforcement of rights related to the Assumed Liabilities, all persons (including, but not limited to, the Debtors, creditors, investors, current and former employees and shareholders, administrative agencies, governmental units, secretaries of state, federal, state, and local officials, including those maintaining any authority relating to any environmental, health and safety laws, and the successors and assigns of each of the foregoing) shall be, and hereby are, forever barred, estopped, and permanently enjoined from (i) taking any action that would adversely affect or interfere with the ability of the applicable Debtors to transfer the Assets to the Buyer in accordance with the APA and this Order and (ii) asserting, prosecuting, or otherwise

pursuing any Liens, Claims, or Interests (other than Permitted Liens and Assumed Liabilities) of any kind or nature whatsoever against the Buyer or any affiliate of the Buyer or any of its respective property, successors and assigns, or the Assets, on any other grounds. No person shall assert, and the Buyer and the Assets shall not be subject to, any defaults, breaches, counterclaims, offsets, defenses (whether contractual or otherwise, including, without limitation, any right of recoupment), liabilities, claims and interests, or basis of any kind or nature whatsoever to delay, defer, or impair any right of the Buyer under, or with respect to, any Assets, with respect to any act or omission that occurred prior to the Closing or with respect to any other agreement or any obligation of the Debtors that is not an assumed liability under the APA.

12. **General Assignment.** Upon the Closing, this Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of the applicable Debtors' interests, right, and title in the Assets and a bill of sale transferring good and marketable title in the Assets to the Buyer at Closing, pursuant to the terms of the APA, free and clear of all Liens, Claims and Interests (other than Permitted Liens and Assumed Liabilities).

13. **Governmental Authorization to Effectuate Sale.** Each and every federal, state, and local governmental agency, quasi-agency, or department is hereby directed and authorized to accept any and all documents and instruments in connection with or necessary and appropriate to consummate the Sale Transaction contemplated under the APA. Except as otherwise provided in this Order, to the greatest extent available under applicable law upon the Closing, the Buyer shall be authorized, as of the Closing Date, to operate under any license, permit, registration, and governmental authorization or approval of the Debtors with respect to the Assets, and all such

licenses, permits, registrations, and governmental authorizations and approvals are deemed to have been, and hereby are, deemed to be transferred to the Buyer as of the Closing. No governmental unit may deny, revoke, suspend, or refuse to renew any permit, license, or similar grant relating to the operation of the Assets sold, transferred, or conveyed to the Buyer on account of the filing or pendency of these chapter 11 cases or the consummation of the transactions contemplated by the APA.

14. **Transfer Free and Clear.** Upon the Closing, pursuant to sections 105(a), 363(b), 363(f), 365(b) and 365(f) of the Bankruptcy Code, the Assets, including the Transferred Contracts, shall be transferred to the Buyer in accordance with the APA, and such transfer shall be free and clear of all Liens, Claims, and Interests (other than Permitted Liens and Assumed Liabilities), in each case to the maximum extent permitted by section 363(f) of the Bankruptcy Code, whether in law or in equity, known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, direct or indirect, and whether arising by agreement, understanding, law, equity or otherwise, and whether occurring or arising before, on or after the Petition Date, or occurring or arising prior to the Closing. Any and all such Liens, Claims, and Interests (other than Permitted Liens and Assumed Liabilities) shall attach to the proceeds of the Sale ultimately attributable to the property against or in which the holder of a Lien, Claim, or Interest claims or may claim a Lien, Claim, or Interest, in the order of its priority, with the same validity, force, and effect which they now have and had against such Assets immediately prior to Closing.

15.     **[Environmental Protection Agency.**  Notwithstanding the foregoing, nothing in this Order or the APA releases, nullifies, precludes or enjoins the enforcement of any police or regulatory liability to a governmental unit that any entity would be subject to as the post-sale owner or operator of property after the date of entry of this Order. Nothing in this Order or the APA authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization, or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police or regulatory law. Nothing in this Order divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Order or to adjudicate any defense asserted under this Order.]

16.     **Valid Transfer.**  Effective upon the Closing, the transfer of the Assets to the Buyer pursuant to the APA constitutes a legal, valid, and effective transfer of the Assets and shall vest the Buyer with all right, title, and interest of the applicable Debtors in and to the Assets, free and clear of all Liens, Claims, and Interests of any kind or nature whatsoever (other than Permitted Liens and Assumed Liabilities).

17.     **Exculpation.**  Neither the Buyer nor any of its affiliates, successors, and assigns, nor any of its professionals, shall have, or incur any liability to, or be subject to any action by, the Debtors or any of their predecessors, successors, or assigns, arising out of the negotiation, investigation, preparation, execution, or delivery of the APA and the entry into and consummation of the Sale Transaction, except as expressly provided in the APA and this Order. Neither the Debtors nor any of their affiliates, successors, and assigns, nor any of its professionals, shall have, or incur any liability to, or be subject to any action by, the Buyer or any of its predecessors, successors, or assigns, arising out of the negotiation, investigation,

preparation, execution, or delivery of the APA and the entry into and consummation of the Sale Transaction, except as expressly provided in the APA and this Order.

18.     **Release of Interests.** Effective upon the Closing, this Order (i) is and shall be effective as a determination that all Liens, Claims, and Interests of any kind or nature whatsoever (other than Permitted Liens and Assumed Liabilities) existing as to the Assets prior to the Closing have been unconditionally released, discharged, and terminated (with such Liens, Claims, and Interests attaching to the proceeds of the sale with the same nature, validity, priority, extent, perfection, and force and effect that such Liens, Claims, and Interests encumbered the Assets immediately prior to the entry of this Order) and that the conveyances described herein have been effected, (ii) is and shall be binding upon and shall govern the acts of all entities, including all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies or units, governmental departments or units, secretaries of state, federal, state and local officials and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to the Assets conveyed to the Buyer, and (iii) all recorded Liens, Claims, and Interests (other than Permitted Liens and Assumed Liabilities) against the Assets shall be deemed stricken from such entities records, official and otherwise.

19.     **Direction to Release Interests.**  If any person or entity that has filed financing statements, mortgages, mechanic's liens, *lis pendens*, or other documents or agreements evidencing a Lien, Claim, or Interest in all or any portion of the Assets being sold pursuant to the Sale Transaction and the APA shall not have delivered to the applicable Debtors prior to the

Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all Liens, Claims, and Interests (other than Permitted Liens and Assumed Liabilities), which such person or entity has with respect to all or any portion of the Assets being sold pursuant to the Sale Transaction and the APA , then (i) the applicable Debtors are authorized to execute and file such statements, instruments, releases, and other documents on behalf of such person or entity with respect to all or any portion of the Assets being sold pursuant to the Sale Transaction and the APA, and (ii) the Buyer is authorized to file, register, or otherwise record a certified copy of this Order, which shall constitute conclusive evidence of the release of all Liens, Claims, and Interests (other than Permitted Liens and Assumed Liabilities) of any kind or nature whatsoever in the Assets being sold pursuant to the Sale Transaction and the APA.  Each and every federal, state, and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the APA, including, without  limitation, recordation of this Order.

20.     **No Interference.**  Following the Closing, no holder of any Lien, Claim or Interest in the Assets shall interfere with the Buyer's title to, or use and enjoyment of, the Assets being sold pursuant to the Sale Transaction and the APA based on, or related to, any such Lien, Claim, or Interest, or based on any actions the Debtors may take in these chapter 11 cases.

21.     **Surrender of Possession.**  All persons or entities that are currently, or as of the Closing, may be, in possession of some or all of the Assets are hereby directed to surrender possession of the Assets to the Buyer at the Closing, unless the Buyer otherwise agrees.

22.     **Post-Closing Actions and Transactions.**  The applicable Debtors and the Buyer, and each of their respective officers, employees, and agents, will be authorized and empowered

to take all actions and execute and deliver any and all documents and instruments that either the applicable Debtors or the Buyer deem necessary or appropriate to implement and effectuate the terms of the APA, the Sale Transaction contemplated therein and this Order.

23. **Sale is Self-Executing**.  The Sale is self-executing, and neither the Debtors nor the Buyer shall be required to execute or file releases, termination statements, assignments, consents, or other instruments to effectuate, consummate, and implement the provisions of this Order.

24. **No Successor Liability.**   Neither the Buyer, nor any of its successors or assigns, or any of their respective affiliates shall have any liability for any Lien, Claim, or Interest that arose or occurred prior to the Closing, or otherwise may be asserted against the Debtors or is related to the Assets prior to the Closing.  Neither the Buyer nor any of its affiliates are or shall be deemed, as a result of the consummation of the Sale Transaction, to (i) be legal successors to the Debtors or their estates by reason of any theory of law or equity, (ii) have, *de facto* or otherwise, merged with or into the Debtors, or (iii) be an alter ego or a mere continuation or substantial continuation or successor of the Debtors in any respect. Neither the Buyer nor any of its affiliates shall assume or in any way be responsible for any liability or obligation of any of the Debtors or their estates, other than the Permitted Liens and Assumed Liabilities, to the extent provided in the APA.

25. **Limitations on Liability.**  Without limiting the foregoing, and except as otherwise set forth in the APA, the Buyer and its affiliates shall not have any successor, transferee, derivative, or vicarious liabilities of any kind or character, including under any theory of successor  or transferee liability, *de facto* merger or continuity, product liability, warranty, labor law, or ERISA, whether known or unknown as of the Closing, now existing or hereafter

arising, whether fixed or contingent, asserted or unasserted, liquidated or unliquidated, with respect to the Debtors or any obligations of the Debtors.

26.   **Fair Consideration.**   The consideration provided by the Buyer for the Assets under the APA shall be deemed to constitute reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, the Uniform Voidable Transactions Act, and any other applicable laws of the United States, any state, territory, possession, or the District of Columbia.  The Sale may not be avoided under section 363(n) of the Bankruptcy Code or any other applicable law.  The APA was not entered into, and the Sale is not being consummated, for the purpose of hindering, delaying, or defrauding creditors of the Debtors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof, or the District of Columbia, or any other applicable law.  Neither the applicable Debtors nor the Buyer have entered into the APA or any agreement contemplated thereby or are consummating the Sale with any fraudulent or otherwise improper purpose, including, without limitation, to evade any pension liabilities.  No other person or entity or group of persons or entities has offered to purchase the Assets for an amount that would provide greater value to the applicable Debtors and their estates than the value provided by the Buyer.  The Court's approval of the Motion and the APA are in the best interests of the applicable Debtors, their estates, their creditors, and all other parties in interest.

27.   **Retention of Jurisdiction.**   This Court retains exclusive jurisdiction, pursuant to its statutory powers under 28 U.S.C. § 157(b)(2), to, on and after closing of the Sale, among other things, interpret, implement, and enforce the terms and provisions of this Order and the APA, all amendments thereto, and any waivers and consents thereunder, and each of the agreements executed in connection therewith in all respects, including, but not limited to,

retaining jurisdiction to (i) compel delivery of the Assets to the Buyer; (ii) resolve any disputes arising under or related to this Order and the APA; (iii) protect the Buyer, any of the Buyer's affiliates, or any agent of the foregoing, against any Liens, Claims, or Interests against the Debtors or the Assets of any kind or nature whatsoever; and (iv) enter any order under sections 363 and 365 of the Bankruptcy Code.

28.     **Good Faith Buyer.**  The transactions contemplated by the APA are undertaken by the Buyer without collusion and in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and, accordingly, the reversal or modification on appeal of the authorization provided in this Order to consummate the transactions shall not affect the validity of the Sale of the Assets to the Buyer, including the assumption and assignment by the applicable Debtors of any Transferred Contract.  The Buyer is a buyer in good faith of the Assets and is entitled to all the protections afforded by section 363(m) of the Bankruptcy Code.

29.     **Approval of Repayment of DIP Obligations**.  At Closing, the applicable Debtors are authorized and directed to distribute the proceeds of the Sale Transaction with respect to the applicable Assets to the DIP Secured Parties (as defined in the DIP Order) in accordance with the DIP Order and the DIP Documents, subject to the payment of the Bid Protections, if applicable.

30.     **Repayment of Prepetition Obligations and Adequate Protection Obligations/Remaining Prepetition Obligations and Adequate Protection Obligations.**  To the extent the proceeds of the Sale Transaction are sufficient to pay the DIP Obligations (as defined in the DIP Order) owed to the DIP Secured Parties (as defined in the DIP Order) in full at Closing and any other costs and expenses that are required to be paid at Closing, the remaining

proceeds of the Purchase Price shall be distributed to the trustee for the Prepetition Secured Parties (as defined in the DIP Order).

31.     **Release of Secured Parties.**  In consideration of the consent by each of the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties (each as defined in the DIP Order) to the Sale Transaction, upon the Closing, each of the Debtors, on behalf of themselves, anyone who may bring a claim on their behalf (including derivative claims), and their successors and assigns, and each of their respective officers, directors, employees, agents, sub-agents, attorneys, consultants, advisors and affiliates (collectively, the "Releasors"), hereby, forever release, discharge and acquit each of the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties (each as defined in the DIP Order), and their respective successors and assigns, and their present and former shareholders, affiliates, subsidiaries, divisions, predecessors, directors, officers, partners, members, managers, attorneys, employees, consultants, advisors and other representatives in their respective capacities as such (collectively, the "Released Secured Parties") of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, of every kind, nature and description, including, without limitation, any so-called "lender liability" claims or defenses, that Releasors had, have or hereafter can or may have against any Released Secured Party as of the date hereof, in respect of events that occurred on or prior to the date hereof with respect to any Debtor or any subsidiary thereof, the DIP Documents (as defined in the DIP Order), the Prepetition Documents (as defined in the DIP Order), and any other financial accommodations made by any of the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties (each as defined in the DIP Order), and/or any other Released Secured Party to any Debtor, including any action or omission of a Released Secured Party in such person's capacity as an officer, director, employee, consultant, or agent of,

or advisor to, any Debtor or any subsidiary thereof (the "Secured Party Release"). In addition, upon the Closing, the Released Secured Parties are hereby released from any and all obligations, liabilities, actions, duties, responsibilities and causes of action arising or occurring in connection with or related to the DIP Documents (as defined in the DIP Order), the DIP Order, these chapter 11 cases, or this Order, and the Debtors are authorized to execute and deliver a termination and release agreement, in form and substance satisfactory to each of the Released Secured Parties. Notwithstanding the foregoing, the effectiveness of the Releases set forth herein are expressly subject to expiration of the Challenge Period (as defined in the DIP Order); *provided*, *however*, that the effectiveness of the Releases as to the PA Debtors (as defined in the DIP Order) were effective immediately upon entry of the Interim Order (as defined in the DIP Order).

32. **No Bulk Law Application.** No bulk sales law or similar law of any state or other jurisdiction shall apply in any way to the transactions contemplated by the Sale, the APA, the Motion, and this Order.

33. **Inconsistencies**. To the extent this Order is inconsistent with any prior filing with respect to the Motion in these chapter 11 cases, the terms of this Order shall govern and any prior filings shall be deemed amended or otherwise modified to the extent required to permit consummation of the Sale Transaction. To the extent there is any inconsistency between the terms of this Order and the terms of the APA (including all ancillary documents executed in connection therewith), the terms of this Order shall govern. Nothing in the APA or this Order shall be deemed to amend, modify, or limit the rights and claims of each of the DIP Secured Parties or each of the Prepetition Secured Parties (each as defined in the DIP Order) unless expressly agreed to in writing by the foregoing as applicable.

34.     **Failure to Specify Provisions.**  The failure to specifically include any particular provision of the APA or other related document in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the APA and other related documents be authorized and approved in their entirety.

35.     **Non-Material Modifications.**  The APA and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment, or supplement does not have any adverse effect on the applicable Debtors' estates.  Notwithstanding anything to the contrary set forth in this Order, the APA, any ancillary agreement or related agreement, document, or other instrument, any amendments, modifications, supplements to or waivers of any obligations or rights of the parties thereto that could reasonably adversely impact or affect the rights of the DIP Secured Parties or the Prepetition Secured Parties (each as defined in the DIP Order) shall require the prior written consent of the applicable Required Lenders (as defined in the DIP Order, the DIP Documents, or the Prepetition Documents).

36.     **No Stay of Order.**  Notwithstanding the provisions of Bankruptcy Rules 6004(h) and 6006(d), this Order shall not be stayed for fourteen (14) days after its entry and shall be effective immediately upon entry, and the applicable Debtors and the Buyer are authorized to close the Sale Transaction immediately upon entry of this Order.  Time is of the essence in closing the Sale Transaction referenced herein, and the applicable Debtors and the Buyer intend to close the Sale Transaction as soon as practicable.  This Order is a Final Order and the period in which an appeal must be filed shall commence upon the entry of this Order.   Any party

objecting to this Order must exercise due diligence in filing an appeal and pursuing a stay, or risk its appeal being foreclosed as moot.

37.     **Headings.**   Headings utilized in this Order are for convenience of reference only, and do not constitute a part of this Order for any other purpose.

38.     **Time Periods.** All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

39.     **Non-severability.**   The provisions of this Order are non-severable and mutually dependent.

# **EXHIBIT A**

Asset  Purchase  Agreement with CarbonLite P, LLC, as Seller

*[Filed Separately]*

# SCHEDULES AND EXHIBITS

*Provided separately*

## EXHIBIT 2.6(c)

Each of the components of Net Working Capital shall be determined in accordance with GAAP, subject only to such exceptions thereto as may be agreed to in writing by Purchaser and Seller.

**Accounts and notes receivable** shall be calculated net of any rebates, discounts, returns and other sales promotion incentives on an accrual or vesting basis (but for the avoidance of doubt, shall not be netted against any customer deposits). Such accounts and notes receivable are those that will be converted to cash upon collection, within the reasonable amounts of time that are normally granted to each customer. Account receivable shall be calculated net of the reserve for doubtful accounts and shall not include: (i) any account under dispute, (ii) accounts in litigation, (iii) accounts that are in other legal processes. Further, for the avoidance of all doubt, in no event shall accounts receivable include (x) rights or claims to proceeds under Insurance Policies held by Seller or (y) accounts and notes receivable from related parties of Seller.

**Inventories** shall be calculated net of the reserve for obsolete inventory and shall not include any amount that is obsolete, inventory that cannot be sold, inventory corresponding to discontinue products and non-operating inventory. Inventory of finished products shall be net of any accruals or reserves to account for differences in product quality/grades.

Inventories shall be stated at the lower of cost or net realizable value. Cost is determined using the average cost method and net realizable value is the estimated selling price in the ordinary course of business, less applicable variable selling expenses.

For the purpose of calculating the Net Working Capital as of the Closing Date, a physical inventory shall be performed at the Closing Date. Purchaser and its representatives shall participate. The physical inventory shall include all onsite finished goods inventory, raw material inventory, packaging and other production materials, and a sample of representative / material spare parts inventory sufficient to validate its physical existence and its condition as useful and recurring spare parts inventory. For stocks in transit, an alternative procedure shall be performed to reasonably serve the purpose of the physical inventory.

**Trade payables** are those accounts corresponding to commercial accounts payable due to third party suppliers which do not exceed the period of credit granted by each supplier during the normal course of operations. The definition of accounts payable shall apply to payables due to suppliers and/or creditors for services that are operating in nature. Any obligation for purchase orders, materials or services that has been accrued but not recorded / provisioned in the accounts of the Business will be taken into account for purposes of the calculation of Net Working Capital provided that such balances correspond to the purchase of materials or to services for the production of commercial goods or to routine operations under normal business conditions. Such trade payable balances shall also be net of any rebates, discounts, returns and other sales promotion incentives on an accrual or vesting basis, provided that Seller or the Business holds a contractual and legal right to such benefits. For the avoidance of all doubt, in no event shall trade payables include accounts payable owing to related parties of Seller.

**Exhibit 2.7(b)(i)**

**Form of Bill of Sale, Assignment and Assumption**

# BILL OF SALE, ASSIGNMENT AND ASSUMPTION

This Bill of Sale, Assignment and Assumption (this **"Bill of Sale"**) is entered into as of this ___ day of [_____], 2021, between, CarbonLite P, LLC  (**"Seller"**), a chapter 11 debtor and debtor in possession in Case No. 21-10527 (JTD) (jointly administered) (the **"Bankruptcy Case"**) pending in the United States Bankruptcy Court for the District of Delaware, on the one hand, and DAK Americas LLC (**"Purchaser"**), on the other hand, with respect to the following facts and circumstances:

A.      Seller and Purchaser, have heretofore entered into that certain Asset Purchase Agreement dated May 2, 2021 (the **"Purchase Agreement"**).  Except for terms specifically defined herein, the capitalized terms used in this Bill of Sale shall have the same meanings as capitalized terms used in the Purchase Agreement.

B.      Concurrently with the mutual execution and delivery of this Bill of Sale, Seller and Purchaser are consummating the transactions contemplated by the Purchase Agreement. Seller and Purchaser are executing and delivering this Bill of Sale in satisfaction of their respective obligations pursuant to Sections 2.7(b)(i) and 2.7(c)(iii) of the Purchase Agreement.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and adequacy of which Seller and Purchaser hereby acknowledge, Seller and Purchaser hereby agree as follows:

1.      Transfer.  Effective as of the Closing, Seller hereby sells, conveys, transfers, assigns and delivers to Purchaser, all of its right, title and interest in and to the Purchased Assets (other than the Acquired Intellectual Property Rights, which are being transferred to Purchaser concurrently herewith pursuant to a separate assignment document), wherever located, whether at the Reading Facility or in transit thereto, in each case free and clear of all Liens to the extent provided in the Sale Order (other than Permitted Post-Closing Encumbrances).

2.      Assumption.  Effective as of the Closing, Purchaser hereby accepts the foregoing assignment and assumes and shall be solely liable and responsible for paying and satisfying the Assumed Liabilities.

3.      Amendments.   This Bill of Sale may only be amended by a writing signed by both Seller and Purchaser.

4.      Execution in Counterparts.  This Bill of Sale may be executed in counterparts and delivered by the delivery of facsimile or electronic mail signatures; provided, however, that if the parties exchange signatures by facsimile or electronic mail, each of them agrees to provide the other with a copy of this Bill of Sale bearing their original signature promptly following any request therefor from another party hereto.

5.      Delivery Pursuant to Purchase Agreement.  Notwithstanding anything to the contrary herein, Seller and Purchaser are executing and delivering this Bill of Sale in accordance with and

subject to all of the terms and provisions of the Purchase Agreement (including, without limitation, the acknowledgements and disclaimers set forth in Sections 3.22 and 4.5 thereof).

6. <u>Governing Law</u>. This Bill of Sale shall be governed by and construed and enforced in accordance with the laws of the State of Delaware.

[*Balance of Page Intentionally Left Blank*]

**IN WITNESS WHEREOF**, Seller and Purchaser have executed this Bill of Sale, Assignment and Assumption as of the day and year first set forth above.

**SELLER:**

**CARBONLITE P, LLC, a Delaware limited liability company and Debtor and Debtor in Possession**

By:_____
Name: Brian Weiss
Its:  Chief Restructuring Officer

**PURCHASER:**

**DAK Americas LLC, a Delaware limited liability company**

By:_____
Name: _____
Its:  _____

By:_____
Name: _____
Its:  _____

**Exhibit 2.7(b)(ii)**

**Form of IP Assignment**

## <u>ASSIGNMENT OF INTELLECTUAL PROPERTY RIGHTS</u>

This Assignment of Intellectual Property Rights (this **"Assignment"**) is entered into as of this ___ day of [_____], 2021, between, between, CarbonLite P, LLC (**"Seller"**), a chapter 11 debtor and debtor in possession in Case No. 21-10527 (JTD) (jointly administered) (the **"Bankruptcy Case"**) pending in the United States Bankruptcy Court for the District of Delaware, on the one hand, and DAK Americas LLC (**"Purchaser"**), on the other hand, with respect to the following facts and circumstances:

(A) Seller and Purchaser have heretofore entered into that certain Asset Purchase Agreement dated May 2, 2021 (the **"Agreement"**). Except for terms specifically defined in this Assignment, the capitalized terms used in this Assignment shall have the same meanings as such terms when used in the Agreement.

(B) Concurrently with the execution and delivery of this Assignment, Seller and Purchaser are consummating the transactions contemplated by the Agreement. Pursuant to Section 2.7(b)(ii) of the Agreement, Seller is required to execute and deliver this Assignment at the Closing.

**NOW, THEREFORE, FOR GOOD AND VALUABLE CONSIDERATION**, the receipt and sufficiency of which Seller hereby expressly acknowledges, Seller hereby sells, conveys, transfers, assigns and delivers to Purchaser, all of its right, title and interest in and to all Acquired Intellectual Property Rights, free and clear of all Liens to the extent provided in the Sale Order (other than Permitted Post-Closing Encumbrances), together with any and all goodwill connected with and symbolized by the Acquired Intellectual Property Rights, the same to be held and enjoyed by Purchaser for its own use and enjoyment and the use and enjoyment of its successors, assigns and other legal representatives as fully and entirely as the same would have been held and enjoyed by Seller if this assignment and sale had not been made, as Purchaser of its respective entire right, title and interest therein, including, without limitation, all rights in and to all income, royalties, damages and payments now or hereafter due or payable with respect thereto, all causes of action (whether in law or in equity) with respect thereto, and the right to sue, counterclaim, and recover for past, present and future infringement, misappropriation, dilution or other violation of the rights assigned or to be assigned under this Assignment. This Assignment shall inure to the benefit of, and be binding upon, the successors, executors, administrators, legal representatives and assigns of Seller and Purchaser.Upon reasonable request by Purchaser, Seller will execute additional documents and take other actions as may be necessary or desirable to record or memorialize the assignments of the Acquired Intellectual Property Rights set forth herein, and to vest in Purchaser such right, title, and interest in and to the Acquired Intellectual Property Rights as sold, assigned and transferred to Purchaser hereunder.

Seller hereby authorizes and requests the officials of the United States Copyright Office and the United States Patent and Trademark Office, and the corresponding entities or agencies in any applicable foreign jurisdiction, to record Purchaser as assignee and owner of the entire right, title and interest in, to and under the Acquired Intellectual Property Rights.

This Assignment may only be amended by a writing signed by both Seller and Purchaser.

This Assignment may be executed in counterparts and delivered by the delivery of facsimile or electronic mail signatures; provided, however, that if the parties exchange signatures by facsimile or electronic mail, each of them agrees to provide the other with a copy of this Assignment bearing their original signature promptly following any request therefor from another party hereto.

Notwithstanding anything to the contrary herein, Seller is executing and delivering this Assignment in accordance with and subject to all of the terms and provisions of the Agreement. It is understood that any finding of invalidity of one assignment as effected hereby shall not affect the assignment of other Acquired Intellectual Property Rights.

This Assignment shall be governed by and construed and enforced in accordance with the laws of the State of Delaware.

**IN WITNESS WHEREOF**, Seller and Purchaser have executed this Assignment of Intellectual Property Rights as of the ___ day of [_____], 2021.

<u>**SELLER:**</u>

**CARBONLITE P, LLC, a Delaware limited liability company and Debtor and Debtor in Possession**

By:_____
Name: Brian Weiss
Its:  Chief Restructuring Officer

<u>**PURCHASER:**</u>

**DAK Americas LLC, a Delaware limited liability company**

By:_____
Name: _____
Its:  _____

By:_____
Name: _____
Its:  _____

## AMENDMENT NO. 1 TO ASSET PURCHASE AGREEMENT

This AMENDMENT NO. 1 TO THE ASSET PURCHASE AGREEMENT, made May 25, 2021 (this "*Amendment*"), is by and among DAK AMERICAS LLC, a Delaware limited liability company ("*Purchaser*"), CARBONLITE HOLDINGS LLC, a Delaware limited liability company (the "*Parent*"), and CARBONLITE P, LLC, a Delaware limited liability company ("*Seller*"), with each of Seller and Parent being a chapter 11 debtor and debtor in possession in Case No. 21-10527(JTD) (jointly administered) pending in the United States Bankruptcy Court for the District of Delaware. Each of Purchaser, Parent and Seller are referred to herein as individually as a "*Party*" and collectively as the "*Parties*".

## WITNESSETH:

WHEREAS, the Parties have entered into that Asset Purchase Agreement, dated as of May 2, 2021 (as amended, the "*Purchase Agreement*"; and capitalized terms used herein without definition shall have the meanings assigned to such terms in the Purchase Agreement); and

WHEREAS, in accordance with Section 10.1 of the Purchase Agreement, the Parties desire to enter into this Amendment to amend the Purchase Agreement as set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth, the Parties hereby agree as follows:

1.      Amendment to Section 8.1(b).  Section 8.1(b) of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

"(b) By either Purchaser or Seller, if the Closing shall not have occurred on or before June 11, 2021 (the "Termination Date"); provided, that the right to terminate this Agreement under this Section 8.1(b) shall not be available to any party whose failure to fulfill any obligation under this Agreement has been the primary cause of, or primarily resulted in, the failure of the Closing to occur on or before the Termination Date;"

2.      Amendment to Section 8.1(k).  Section 8.1(k) of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

"(k) By Purchaser, if: (i) Purchaser is not selected and designated as the Successful Bidder in the Notice of Successful Bidder to be filed by Seller in accordance with the Bid Procedures Order; or (ii) the Sale Order shall not have been entered on or before June 7, 2021."

3.      Amendment to Section 9.2(a).  Section 9.2(a) of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

"(a) Purchaser and Seller acknowledge entry of the Bid Procedures Order.  Seller shall take all actions as may be reasonably necessary to carry out the process contemplated in the Bidding Procedures, including obtaining entry of the Sale Order on or before June 7, 2021."

4.      No Other Amendments.  Except as otherwise expressly amended or modified hereby, all of the terms and conditions of the Purchase Agreement shall continue in full force and effect.  Each reference to "hereof", "hereunder", "herein" and "hereby" and each similar reference contained in the Purchase Agreement shall refer to the Purchase Agreement as amended hereby.

5. .Entire Understanding. This Amendment, the Purchase Agreement and the Related Agreements set forth the entire agreement and understanding of the parties hereto and supersedes any and all prior agreements, arrangements and understandings among the parties.

6. Applicable Law. THIS AMENDMENT SHALL BE GOVERNED BY AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF DELAWARE WITHOUT GIVING EFFECT TO THE PRINCIPLES OF CONFLICTS OF LAW THEREOF.

7. Counterparts. This Amendment may be executed in counterparts and such counterparts may be delivered in electronic format (including by email). Such delivery of counterparts shall be conclusive evidence of the intent to be bound hereby and each such counterpart and copies produced therefrom shall have the same effect as an original. To the extent applicable, the foregoing constitutes the election of the parties to invoke any law authorizing electronic signatures.

8. Incorporation of Other Miscellaneous Provisions. This Amendment shall be subject to the miscellaneous provisions contained in Article 10 of the Purchase Agreement, which are hereby incorporated by reference herein, *mutatis mutandis.*

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be executed and delivered as of the date first above written.

**SELLER:**

**CarbonLite P, LLC**, a Delaware limited liability company and Debtor and Debtor in Possession

By: _____
    Name:  Brian Weiss
    Title:  Chief Restructuring Officer

**PARENT (**solely for purposes of <u>Section 5.16</u> of the Purchase Agreement**):**

**CarbonLite Parent LLC**, a Delaware limited liability company and Debtor and Debtor in Possession

By: _____
    Name:  Brian Weiss
    Title:  Chief Restructuring Officer

**PURCHASER:**

**DAK Americas LLC**, a Delaware limited liability company

By: _____
    Name:  Jorge P. Young
    Title:  President and CEO

By: _____
    Name:  Carlos M. Garcia
    Title:  Global VP, Planning, M&A and IT

*[Signature Page to APA Amendment]*