## **Exhibit 4**

*Reading Backup Asset Purchase Agreement*

DOCS_DE:234547.2 13044/001

ASSET PURCHASE AGREEMENT

BY AND AMONG

CARBONLITE P, LLC, as Seller,

CARBONLITE HOLDINGS LLC
(solely for purposes of <u>Section 5.16</u>),

AND

TSG SHELF II ACQUISITION, LLC, as Purchaser

Dated as of May 25, 2021

# TABLE OF CONTENTS

ARTICLE I  DEFINITIONS ...............................................................................................1

    1.1    Definitions .................................................................................................1

ARTICLE II  PURCHASE AND SALE; CLOSING ..............................................................13

    2.1    Purchase and Sale ....................................................................................13
    2.2    Excluded Assets........................................................................................16
    2.3    Assumed Liabilities ..................................................................................18
    2.4    Excluded Liabilities ..................................................................................19
    2.5    Non-Transferable Contracts and Permits..................................................19
    2.6    Calculation and Payment of Cash Consideration ....................................19
    2.7    Closing......................................................................................................23
    2.8    Addition/Removal of Acquired Contracts, Acquired Real Property Leases, Acquired Personal Property Leases and Permits and Licenses ....................................24

ARTICLE III  REPRESENTATIONS AND WARRANTIES OF SELLER ...............................25

    3.1    Due Incorporation ....................................................................................25
    3.2    Due Authorization.....................................................................................25
    3.3    Consents and Approvals; Governmental Authority Relative to This Agreement .........25
    3.4    Compliance With Laws ............................................................................26
    3.5    Litigation..................................................................................................26
    3.6    Certain Financial Information...................................................................26
    3.7    Real Property ............................................................................................27
    3.8    Material Contracts.....................................................................................27
    3.9    Employees and Labor Matters ..................................................................29
    3.10   Benefit Plans ............................................................................................30
    3.11   Permits .....................................................................................................30
    3.12   Intellectual Property.................................................................................31
    3.13   Environmental Matters .............................................................................32
    3.14   Title to Assets; Sufficiency of Assets; Condition of Assets .........................33
    3.15   Taxes ........................................................................................................33
    3.16   Key Business Relationships......................................................................34
    3.17   Insurance ..................................................................................................34
    3.18   Brokers and Finders .................................................................................34
    3.19   Product Quality ........................................................................................35
    3.20   Intercompany Agreements........................................................................35
    3.21   Data Privacy.............................................................................................35
    3.22   Disclaimer of Additional Representations and Warranties........................35

ARTICLE IV  REPRESENTATIONS AND WARRANTIES OF PURCHASER......................36

    4.1    Due Organization .....................................................................................36
    4.2    Due Authorization.....................................................................................36
    4.3    Consents and Approvals; No Violations....................................................36

| | | |
|---|---|---|
| 4.4 | Purchaser's Examination | 37 |
| 4.5 | Investigation; Limitation on Warranties | 37 |
| 4.6 | Available Funds | 38 |
| 4.7 | Brokers and Finders | 38 |

ARTICLE V  COVENANTS .......................................................................................38

| | | |
|---|---|---|
| 5.1 | Access to Information and Applicable Locations | 38 |
| 5.2 | Preservation of Business | 38 |
| 5.3 | Efforts | 39 |
| 5.4 | Preservation of Records; Post-Closing Access and Cooperation | 40 |
| 5.5 | Employees and Benefits | 41 |
| 5.6 | Public Announcements | 42 |
| 5.7 | Transfer Taxes | 42 |
| 5.8 | Tax Proration | 42 |
| 5.9 | [Reserved] | 42 |
| 5.10 | [Reserved] | 42 |
| 5.11 | Use of Names and Marks | 42 |
| 5.12 | No Successor Liability | 43 |
| 5.13 | Assumption and Assignment of Contracts | 43 |
| 5.14 | Transfer of 401(k) Plan | 43 |
| 5.15 | Air Quality Permit Renewal | 44 |
| 5.16 | Purchased Assets held by Affiliates | 44 |
| 5.17 | Benefit Plan Cooperation | 44 |
| 5.18 | ERP/IT Cooperation and Access | 44 |

ARTICLE VI  CONDITIONS PRECEDENT TO OBLIGATIONS OF PURCHASER .............45

| | | |
|---|---|---|
| 6.1 | Warranties True as of Present Date | 45 |
| 6.2 | Compliance with Agreements and Covenants | 45 |
| 6.3 | No Prohibition | 45 |
| 6.4 | Entry of Sale Order | 45 |
| 6.5 | No Material Adverse Effect | 46 |

ARTICLE VII  CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLER ...................46

| | | |
|---|---|---|
| 7.1 | Warranties True as of Present Date | 46 |
| 7.2 | Compliance with Agreements and Covenants | 46 |
| 7.3 | No Prohibition | 46 |
| 7.4 | Entry of Sale Order | 46 |

ARTICLE VIII  TERMINATION ...............................................................................47

| | | |
|---|---|---|
| 8.1 | Termination | 47 |
| 8.2 | Expenses | 49 |
| 8.3 | Effect of Termination | 49 |

ARTICLE IX  BANKRUPTCY COURT MATTERS ................................................49

9.1     Motion for Approvals ........................................................................................49

9.2     Bidding Procedures .........................................................................................51

ARTICLE X  MISCELLANEOUS ...........................................................................51

10.1    Amendment.......................................................................................................51

10.2    Notices .............................................................................................................51

10.3    Waivers ............................................................................................................52

10.4    Counterparts ....................................................................................................52

10.5    Interpretation ...................................................................................................52

10.6    Applicable Law ...............................................................................................52

10.7    Binding Agreement; Assignment....................................................................53

10.8    Third Party Beneficiaries ................................................................................53

10.9    Further Assurances ..........................................................................................53

10.10  Entire Understanding .......................................................................................53

10.11  EXCLUSIVE JURISDICTION OF BANKRUPTCY COURT ......................53

10.12  WAIVER OF JURY TRIAL.............................................................................54

10.13  Disclosure Schedule ........................................................................................54

10.14  Severability......................................................................................................55

10.15  Attorneys' Fees ...............................................................................................55

10.16  Construction ....................................................................................................55

10.17  [Reserved] .......................................................................................................55

10.18  Survival ...........................................................................................................55

10.19  No Vicarious Liability .....................................................................................55

10.20  Specific Performance.......................................................................................56

**<u>SCHEDULES</u>**

1.      Section 1.1: Permitted Liens

2.      Section 2.1(a): Purchased Equipment

3.      Section 2.1(c): Acquired Contracts

4.      Section 2.1(e): Acquired Real Property Lease

5.      Section 2.1(f): Acquired Personal Property Leases

6.      Section 2.1(g): Permits and Licenses

7.      Section 2.1(i): Open Customer Orders

8.      Section 2.1(j): Open Supplier Orders

9.      Section 2.1(k):  Acquired Receivables

10.     Section 2.1(l): Acquired Intellectual Property Rights

11.     Section 2.1(m): Acquired L/Cs

12.     Section 2.2(h): Excluded Assets

13.     Section 3.3: Consents and Approvals; Governmental Authority

14.     Section 3.4: Compliance with Laws

15.     Section 3.5: Litigation

16.     Section 3.6(a): Balance Sheets

17.     Section 3.6(c): Accounts Receivable

18.     Section 3.6(e): Amounts Drawn Under Acquired L/Cs

19.     Section 3.6(f): Capital Expenditures

20.     Section 3.6(g): Prepaid Assets, Cure Costs and Tax Prorations

21.     Section 3.6(h): Capital Leases

22.     Section 3.7(a): Real Property Lease Matters

23.     Section 3.7(b): Contracts Regarding Material Repairs, Work, and Capital Improvements

24.     Section 3.8(a): Material Contracts

25.     Section 3.8(b): Defaults Under Material Contracts

26.     Section 3.9(a): Employees

27.     Section 3.10(a): Employee Benefit Plans

28.     Section 3.11: Permits

29.     Section 3.12(a): Intellectual Property

30.     Section 3.12(c): Intellectual Property Matters

31.     Section 3.12(f): Computer Systems Matters

32.     Section 3.13(c): Environmental Matters

33.     Section 3.15: Tax Matters

34.     Section 3.16(a)(i): Key Customer and Vendor Lists

35.     Section 3.16(a)(ii): Key Customer/Vendor Matters

36.     Section 3.16(b): Discounts and Rebates

37.     Section 3.17: Insurance

38.     Section 3.18: Brokers and Finders

39.     Section 3.20: Affiliate Intercompany Agreements

40.     Section 5.5(a): Employees

## <u>EXHIBITS</u>

Exhibit A – Form of Note Purchase Agreement

Exhibit 1.1 (Sale Order) – Form of Sale Order

Exhibit 1.3 – Certain Non-Transferred Employees

Exhibit 2.6(a) – Form of Escrow Agreement

Exhibit 2.6(c) – Estimated Closing Statement Methodology

Exhibit 2.7(b)(i) – Form of Bill of Sale, Assignment and Assumption

Exhibit 2.7(b)(ii) – Form of IP Assignment

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "<u>Agreement</u>") is made as of May 25, 2021, by and among TSG Shelf II Acquisition, LLC, a Delaware limited liability company (the "<u>Purchaser</u>"), CarbonLITE P, LLC, a Delaware limited liability company (the "<u>Seller</u>"), and solely for purposes of <u>Section 5.16,</u> CarbonLITE Holdings LLC, a Delaware limited liability company (the "<u>Parent</u>"), each of Seller and Parent being a chapter 11 debtor and debtor in possession in Case No. 21-10527(JTD) (jointly administered) (the "<u>Bankruptcy Case</u>") pending in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>"). Certain capitalized terms used herein are defined in <u>Article I</u>.

W I T N E S S E T H:

WHEREAS, Seller is engaged in the conduct of the Business (as defined below) at the Reading Facility (as defined below); and

WHEREAS, Purchaser desires to purchase from Seller, and Seller desires to sell to Purchaser, pursuant to, among other provisions thereof, Section 363 of Chapter 11 of Title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), the Purchased Assets (as defined below), for the consideration and upon the terms and conditions contained in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants, agreements, representations and warranties contained herein, and for their mutual reliance, the parties hereto agree as follows:

ARTICLE I<br/>DEFINITIONS

1.1 <u>Definitions</u>. The following terms shall have the following meanings for the purposes of this Agreement:

"<u>Accounts Receivable</u>" means accounts and notes receivable (whether current or non-current) and all causes of action specifically pertaining to the collection of the foregoing, in each case to the extent arising out of the operation of the Business. For the avoidance of all doubt, in no event shall "Accounts Receivable" include (x) rights or claims to proceeds under Insurance Policies held by Seller or (y) accounts and notes receivable from related parties of Seller.

"<u>Accrued Expenses</u>" is defined in the definition of "Net Working Capital" below.

"<u>Acquired Contracts</u>" shall have the meaning set forth in <u>Section 2.1(c)</u>.

"<u>Acquired Intellectual Property Rights</u>" shall have the meaning set forth in <u>Section 2.1(l)</u>.

"<u>Acquired Inventories</u>" shall have the meaning set forth in <u>Section 2.1(d)</u>.

"<u>Acquired L/Cs</u>" is defined in <u>Section 2.1(m)</u> hereof.

"<u>Acquired Personal Property Leases</u>" shall have the meaning set forth in <u>Section 2.1(f)</u>.

"Acquired Real Property Leases" shall have the meaning set forth in Section 2.1(e)

"Acquired Receivables" is defined in Section 2.1(k) hereof.

"Adjustment Escrow Account" has the meaning set forth in Section 2.6(b).

"Adjustment Escrow Amount" means an amount equal to $250,000.

"Affiliate" shall mean, with respect to any specified Person, any other Person which, directly or indirectly, controls, is under common control with, or is controlled by, such specified Person.

"Agreement" shall mean this Agreement, including the Disclosure Schedule and all other exhibits and schedules hereto, as it and they may be amended from time to time.

"Alternative Transaction" means any transaction or series of transactions (whether pursuant to section 363 or 1129 of the Bankruptcy Code or pursuant to any applicable non-bankruptcy law) involving the direct or indirect sale, transfer, or other disposition of all, or a material portion of, the Purchased Assets to a purchaser or purchasers other than Purchaser or effecting any other transaction the consummation of which would be substantially inconsistent with the transactions contemplated by this Agreement.

"Applicable Laws" shall mean all laws, statutes, orders, rules, and regulations of Governmental Authorities, and judgments, decisions or orders entered by any Governmental Authority applicable to Seller or the Business.

"Applicable Methodology" shall have the meaning set forth in Section 2.6(c).

"Assumed Accounts Payable" is defined in the definition of "Net Working Capital" below.

"Assumed Liabilities" shall have the meaning set forth in Section 2.3.

"Auction" shall have the meaning set forth in the Bid Procedures Order.

"Avoidance Action" shall mean any avoidance claims, rights, recoveries, subordinations or causes of action or remedies under Chapter 5 of the Bankruptcy Code, including any proceeds thereof, and any analogous state law claims, in each case, of the Seller and its estate, that relate to the Purchased Assets or the Business, other than Excluded Avoidance Actions.

"Back-Up Bidder" shall have the meaning set forth in the Bid Procedures Order.

"Bankruptcy Case" has the meaning ascribed to such term in the preamble.

"Bankruptcy Code" has the meaning ascribed to such term in the recitals of this Agreement.

"Bankruptcy Court" has the meaning ascribed to such term in the preamble.

"Benefit Plans" shall mean (i) any "employee welfare benefit plan" or "employee pension benefit plan" (as those terms are respectively defined in Sections 3(1) and 3(2) of ERISA), other

than a Multiemployer Plan,; and (ii) any retirement or deferred compensation plan, incentive compensation, employment, change-in-control, collective bargaining, retention, compensation, employee loan, consulting, severance, stock, share appreciation right, unemployment compensation, vacation pay, severance pay, bonus arrangement, health benefit, profit-sharing, death or disability plan, agreement, commitment, program, policy, practice or arrangement or any other welfare or fringe benefit arrangements in each case in which any Employees participate or with respect to which Seller has or may have any liability.

"Bidding Procedures" shall mean and refer to the process and procedures established in the Bid Procedures Order with respect to the conduct of the transactions contemplated herein and Seller's disposition of the Purchased Assets.

"Bid Procedures Order" shall mean and refer to that certain Order (A) Approving Bid Procedures For The Sale Of Certain Assets, (B) Approving Procedures For The Assumption And Assignment Of Executory Contracts Or Unexpired Leases In Connection With The Sale, (C) Approving Certain Bidder Incentives In Connection With The Debtors' Entry Into Any Potential Stalking Horse Agreement, (D) Scheduling A Sale Hearing, and (E) Granting Certain Related Relief, issued by the Bankruptcy Court and entered in the Bankruptcy Case on April 9, 2021 Docket No. 266.

"Bill of Sale, Assignment and Assumption" shall have the meaning set forth in Section 2.7(b)(i).

"Business" shall mean the business of processing post-consumer polyethylene terephthalate ("PET") plastic products in order to produce food grade recycled polyethylene terephthalate flake and food grade recycled polyethylene pellets ("rPET"), conducted by Seller at the Reading Facility in the Ordinary Course of Business during the Look-Back Period.

"Business Day" shall mean any day other than a Saturday, Sunday or other day on which banking institutions in the States of Pennsylvania or Texas are authorized or required by law or other action of a Governmental Authority to close.

"Capital Lease Obligations" shall have the meaning set forth in Section 3.6(h).

"Cash and Cash Equivalents" means, collectively, all of the Seller's cash (including petty cash and checks received prior to the close of business on the Closing Date), checking account balances, marketable securities, certificates of deposits, time deposits, bankers' acceptances, commercial paper, government securities and other cash equivalents, net of uncleared checks issued by Seller that are not yet reflected in the applicable bank account of Seller.

"Cash Consideration" has the meaning given to it in the definition of Purchase Price.

"Claim" shall mean any action, cause of action, suit, debt, lien, liability, claim, counterclaim, cross-claim, demand, damage, loss, attorneys' or consultants' fees, costs or expenses, of any nature whatsoever, in law or in equity.

"Closing" shall mean the consummation of the transaction contemplated herein.

"Closing Cash Consideration" shall have the meaning set forth in Section 2.6(d).

"Closing Date" shall have the meaning set forth in Section 2.7(a).

"COBRA" shall mean and refer to the applicable requirements of Part 6 of Subtitle B of Title I of ERISA and Section 4980B of the Code (and predecessors thereof).

"Code" shall mean the Internal Revenue Code of 1986, as amended.

"Computer Systems" shall have the meaning set forth in Section3.12(f).

"Confidentiality Agreement" means and refers to that certain Confidentiality Agreement dated January 13, 2021, by Purchaser in favor of Seller.

"Consent" shall mean any approval, consent, ratification, waiver or other authorization.

"Construction Work" is defined in Section 5.2 hereof.

"Contamination" or "Contaminated" shall mean the presence of Hazardous Material in, on or under the soil, groundwater, surface water or other environmental media to an extent that any Response Action is legally required by any Governmental Authority under any Environmental Law with respect to such presence of Hazardous Material.

"Contract" means any contract, agreement, grant, sub-grant, arrangement, understanding, commitment, ground lease, lease, sublease, license, mortgage, bond, note or other instrument (including any instrument evidencing indebtedness), or other legally binding obligation, and all amendments thereof (whether written or oral and whether express or implied).

"Cost to Complete" is defined in Section 5.2 hereof.

"Cure Costs" means the monetary amounts that must be paid under Sections 365(b)(1)(A) and (B) of the Bankruptcy Code in connection with the assumption and/or assignment of any Acquired Contract, Acquired Real Property Lease, Acquired Personal Property Lease, or Permits and Licenses, as agreed upon by the Seller and Purchaser or determined by the Bankruptcy Court pursuant to the Bid Procedures Order.

"Data Room" shall mean that certain virtual data room entitled Project Celtic established by Seller and certain of its Affiliates on Datasite Diligence.

"Deficiency Amount" shall have the meaning set forth in Section 2.6(g).

"Deposit" means a cash amount equal to $8,000,000.

"Designated Contacts" shall have the meaning set forth in Section 5.1(a).

"DIP Budgeted Capital Expenditures" shall have the meaning set forth in Section 3.6(f).

"Disclosure Schedule" shall mean the Disclosure Schedule delivered by Seller to Purchaser on the date of this Agreement, as amended, modified or supplemented in accordance with this Agreement.

"Dispute Notice" shall have the meaning set forth in Section 2.6(e).

"Employees" shall mean all full-time and part-time employees employed by Seller at the Reading Facility.

"Environmental Claim" shall mean any Claim by any Person alleging liability (including liability for Response Action, investigatory costs, governmental response costs, remediation or clean-up costs, natural resources damages, property damages, personal injuries, attorneys' fees, fines or penalties) arising out of, based on, resulting from or relating to (a) the presence, Release or threatened Release of, or exposure to any Hazardous Materials; (b) circumstances forming the basis of any violation, or alleged violation, of any Environmental Law; or (c) any other matters for which liability is imposed under Environmental Laws.

"Environmental Law" shall mean any federal, state or local statute, order, regulation or ordinance relating to (a) the protection of the natural environment, including natural resources, (b) the protection of human health and safety as it pertains to exposure to Hazardous Materials, (c) the manufacture, registration, distribution, formulation, packaging or labeling of Hazardous Materials or products containing Hazardous Materials, or (d) the handling, use, presence, generation, treatment, storage, disposal, Release or threatened Release of or exposure to any Hazardous Materials.

"Environmental Liabilities" means any indebtedness, liability, Claim, loss, damage, fine, penalty, cost, expense, deficiency or responsibility, whether known or unknown, arising under, based on or relating to any Environmental Law, whether based on negligence, strict liability or otherwise, including liability or responsibility for the costs of enforcement proceedings, investigations, Response Action, governmental response, removal, remediation, cleanup, restoration, abatement, monitoring, personal injury, property damage, medical monitoring, penalties, contribution, indemnification, injunctive relief, natural resource damages, court costs and reasonable attorneys' fees.

"Environmental Permit" means any Permits and Licenses required or issued by any Governmental Authority under or in connection with any Environmental Law, including any and all orders, consent orders or binding agreements issued by or entered into with a Governmental Authority under any applicable Environmental Law.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended.

"Escrow Agreement" shall mean the Escrow Agreement, substantially in the form attached hereto as Exhibit 2.6(a), to be entered into among Purchaser, Seller and Escrow Holder concurrently with the execution of this Agreement by all parties hereto.

"Escrow Holder" is defined in Section 2.6(a) hereof.

"Estimated Cash Consideration" shall have the meaning set forth in Section 2.6(c).

"Estimated Closing Statement" shall have the meaning set forth in Section 2.6(c).

"Excess Amount" shall have the meaning set forth in Section 2.6(g).

"Excluded Assets" shall have the meaning set forth in Section 2.2.

"Excluded Avoidance Action" shall mean any avoidance claims, rights, recoveries, subordinations or causes of action or remedies under Chapter 5 of the Bankruptcy Code, including any proceeds thereof, and any analogous state law claims, and any commercial tort or breach of fiduciary duty claims, including any proceeds thereof, in each case, (i) between or among the Seller or any of its affiliated debtors in the Bankruptcy Case, or (ii) against any current or former officer, director, employee, advisor, consultant, representative, or insider of the Seller or any of its affiliated debtors in the Bankruptcy Case that is not a Transferred Employee (provided that, for purposes of this definition, Transferred Employees shall not include any person set forth on Exhibit 1.3).

"Excluded Liabilities" shall have the meaning set forth in Section 2.4.

"Expenses" shall have the meaning set forth in Section 8.2.

"Facility" shall mean the Reading Facility.

"Final Cash Consideration" shall have the meaning set forth in Section 2.6(g).

"Financial Statements" shall have the meaning set forth in Section 3.6(a).

"Fully Operational" with respect to the Reading Facility shall mean (i) all three (3) extrusion and solid stating lines, one (1) Bottle Processing/Prewash System and two (2) wash lines have been fully installed and are operating in the manner intended at each OEM guaranteed capacity and each OEM quality specifications with all appropriate licenses and permits having been obtained, (ii) each OEM has issued an OEM Performance Guaranty for each extrusion line and each wash line and (iii) all ancillary production equipment and utilities systems have been fully installed.

"GAAP" shall mean U.S. generally accepted accounting principles, as in effect from time to time, consistently applied.

"Good Faith Objection" shall have the meaning set forth in Section 6.4.

"Good Funds" is defined in Section 2.6(a)(i) hereof.

"Governmental Authority" shall mean any U.S., state, local or foreign governmental, regulatory or administrative body, agency or authority, any court or judicial authority or arbitration tribunal, whether national, Federal, state or local or otherwise, or any Person lawfully empowered by any of the foregoing to enforce or seek compliance with any applicable law, statute, regulation, order or decree.

"Hazardous Material" shall mean any chemicals, materials, or substances defined as or included in the definition of "hazardous substances," "hazardous wastes," "hazardous materials," "hazardous constituents," "restricted hazardous materials," "extremely hazardous substances," "toxic substances," "contaminants," "pollutants," "toxic pollutants," under any Environmental Law or for which liability or standards of conduct may be imposed pursuant to Environmental Law, including petroleum and petroleum products, by-products, derivatives or wastes, radioactive materials, asbestos or asbestos-containing materials or products, per- and polyfluoroalkyl substances, polychlorinated biphenyls (PCBs) or materials containing same, lead or lead-based paints or materials, radon, fungus, mold in quantities or concentrations that may adversely affect human health or materially affect the value or utility of the building(s) in which it is present, or other substances that may have an adverse effect on human health or the environment.

"Income Tax" means any United States or foreign, federal, state, provincial, municipal or county Tax that, in whole or in part, is based on, measured by or calculated by reference to net income, profits or gains, including any state or local franchise Tax, and including any interest, penalty or addition thereto, whether disputed or not.

"Income Tax Returns" means any Tax Return with respect to Income Taxes.

"Independent Auditor" shall have the meaning set forth in Section 2.6(f).

"Insurance Policies" shall have the meaning set forth in Section 3.17.

"Intellectual Property Rights" shall mean all of the following in any jurisdiction throughout the world: (a) patents, patent applications, patent disclosures and statutory invention registrations, including reissues, divisions, continuations, continuations in part, extensions and reexaminations thereof, all rights therein provided by international treaties or conventions ("Patents"); (b) trademarks, service marks, trade dress, trade names, logos (and all translations, adaptations, derivations and combinations of the foregoing) and Internet domain names, together with all goodwill associated with each of the foregoing, any and all common law rights, and registrations and applications for registration thereof, all rights therein provided by international treaties or conventions, and all reissues, extensions and renewals of any of the foregoing; (c) copyrightable works (including computer software source code, executable code, databases and related documentation and maskworks), copyrights, whether or not registered, and registrations and applications for registration thereof, and all rights therein provided by international treaties or conventions; and (d) confidential and proprietary information, including trade secrets, unpatented inventions, data and know-how ("Trade Secrets").

"IP Assignment" shall have the meaning set forth in Section 2.7(b)(ii).

"Item of Dispute" shall have the meaning set forth in Section 2.6(e).

"Key Customers" shall have the meaning set forth in Section 3.16(a).

"Key Vendors" shall have the meaning set forth in Section 3.16(a).

"Knowledge" shall mean, with respect to Seller, the actual knowledge as of the date hereof and the Closing, of Leon Farahnik, Brian Weiss, Alex Delnik and Gregg Milhaupt and, solely with

respect to the representations and warranties set forth in <u>Section 3.7(b)</u>, Vijendra Siddhi and Jeff Walsh.

"<u>L/C Consideration</u>" is defined in the definition of Purchase Price.

"<u>Lien</u>" shall mean all liens, encumbrances, mortgages, charges, claims, restrictions, pledges, security interests, title defects, easements, rights of way, covenants and encroachments.

"<u>Look-Back Period</u>" means the period beginning on January 1, 2021.

"<u>Material Adverse Effect</u>" shall mean any change, event, occurrence, condition, development, fact, or state of facts occurring that has had or would reasonably be expected to have a material adverse effect on (i) the condition (financial or otherwise) or results of operations of the Business, the Purchased Assets or the Assumed Liabilities, taken as a whole, or (ii) Seller's ability to consummate the transactions contemplated by this Agreement; <u>provided, however</u>, the following shall be disregarded in determining whether there has been a Material Adverse Effect or whether a Material Adverse Effect could or would reasonably be expected to occur: (i) general economic, business, industry or credit, financial or capital market conditions (whether in the United States or internationally), including conditions affecting generally all companies engaged in the Business or a segment thereof, or the industries served by the Business; (ii) the announcement of this Agreement or pendency of the transactions contemplated hereby, (iii) the breach of this Agreement or any Related Agreement by Purchaser, (iv) pandemics (including, without limitation, the COVID-19 pandemic existing and continuing as of the date of this Agreement), earthquakes, tornados, hurricanes, floods and acts of God, (v) acts of war (whether declared or not declared), sabotage, terrorism, military actions or the escalation thereof; (vi) any changes or prospective changes in applicable laws, regulations or accounting rules, including GAAP or interpretations thereof, or any changes or prospective changes in the interpretation or enforcement of any of the foregoing, or any changes in general legal, regulatory or political conditions; (vii) solely for purposes of the condition set forth in <u>Section 6.</u>5, any existing event, occurrence or circumstance set forth in the Disclosure Schedule, (viii) adverse changes or effects on the Business or the Purchased Assets that directly result from the filing or pendency of the Bankruptcy Case, and (ix) the taking of any action by Seller expressly required or permitted to be taken by this Agreement or the Related Agreements, except, in the case of the foregoing clauses (i), (iv), (v), and (vi), to the extent that the Business or the Purchased Assets are disproportionately adversely affected thereby relative to other similarly situated Persons operating in the industries in which the Business operates.

"<u>Material Contract</u>" shall have the meaning set forth in <u>Section 3.8(a)</u>.

"<u>Multiemployer Plan</u>" shall have the meaning set forth in Section 3(37) of the Code.

"<u>Net Working Capital</u>" shall mean the total of (a) the sum of (i) Acquired Receivables, (ii) Acquired Inventories, and (iii) Prepaid Assets as of the Closing Date, <u>less</u> (b) the sum of (i) trade payables incurred with respect to the Business during the period between initiation of the Bankruptcy Case and the Closing Date (the "Relevant Period") (collectively, the amounts described in this clause (i) are referred to herein as the "<u>Assumed Accounts Payable</u>") and (ii) accrued expenses of Seller incurred or accrued with respect to the Business during the Relevant

Period (collectively, the amounts described in this clause (ii) are referred to herein as the "Accrued Expenses"). All of the foregoing shall be determined in accordance with the Applicable Methodology.

"Non-Tax Prorations" shall mean closing adjustments to be included in the calculation of (a) Estimated Cash Consideration at Closing in accordance with Section 2.6(c) and (b) Final Cash Consideration in accordance with Section 2.6(d) or, if there is a dispute, Section 2.6(e) and (f), based on the proration of utilities and rents but not Property Taxes.

"Note Consideration" shall have the meaning set forth in the definition of Purchase Price.

"Note Purchase Agreement" shall mean the Note Purchase Agreement among Purchaser, as Issuer, the subsidiary guarantors party thereto and the noteholders party thereto, substantially in the form attached hereto as Exhibit A (with such changes, if any, that are reasonably acceptable to Purchaser and the majority of the PA Secured Parties).

"Notice of Successful Bidder" shall have the meaning set forth in the Bid Procedures Order.

"Open Customer Orders" shall have the meaning set forth in Section 2.1(i).

"Open Supplier Orders" shall have the meaning set forth in Section 2.1(j).

"Order" means any award, decision, injunction, order, ruling, subpoena, or verdict entered, issued, made, or rendered by any court, administrative agency, or other Governmental Authority or by any arbitrator.

"Ordinary Course of Business" means, with respect to any Person, actions that are taken in the ordinary course of business and consistent with the past practices of such Person and, in the case of the Seller, only taking into account past practice of such Person since the commencement of the Bankruptcy Case and the fact that the Reading Facility is not Fully Operational.

"Owned Intellectual Property" shall have the meaning set forth in Section 3.12(a).

"PA Secured Parties" shall have the meaning set forth in the Bid Procedures Order.

"Patents" has the meaning set forth in the definition of Intellectual Property Rights.

"Pending Good Faith Review" shall have the meaning set forth in Section 6.4.

"Permits and Licenses" shall have the meaning set forth in Section 2.1(g).

"Permitted Access Parties" is defined in Section 5.4 hereof.

"Permitted Liens" shall mean, as of the Closing Date, all (a) Liens for Taxes, assessments and governmental charges or levies not yet delinquent or for which adequate reserves are maintained on the financial statements of Seller and set forth as a current liability on the Estimated Closing Statement; (b) Liens imposed by law, such as materialmen's, mechanics', carriers', workmen's and repairmen's liens and other similar liens arising in the ordinary course of business

securing obligations that are not overdue for a period of more than 60 days or which are being contested in good faith by appropriate proceedings and set forth as a current liability on the Estimated Closing Statement; (c) pledges or deposits to secure obligations under workers' compensation laws or similar legislation or to secure public or statutory obligations that are not otherwise due or delinquent; (d) deposits to secure the performance of bids, trade contracts, leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business consistent with past practice and set forth as a current liability on the Estimated Closing Statement; (e) all matters of record, including survey exceptions, reciprocal easement agreements and other encumbrances on title to real property; (f) all applicable zoning, entitlement, conservation restrictions and other land use and environmental regulations; (g) all exceptions, restrictions, easements, charges, rights-of-way and other Liens set forth in any permits, any deed restrictions, groundwater or land use limitations or other institutional controls utilized in connection with any required environmental remedial actions, or other state, local or municipal franchise applicable to Seller or any of its respective properties; and (h) Liens referred to in <u>Section 1.1</u> of the Disclosure Schedule.

"<u>Permitted Post-Closing Encumbrance</u>" shall mean (i) the following non-monetary encumbrances: (a) licenses and similar rights granted with respect to Intellectual Property Rights, (b) with respect to any real property interest, zoning restrictions, building codes and other land use laws regulating the use or occupancy of real property and imperfections in title, charges, and easements, in each case that do not materially interfere with the operation of the assets or property to which they relate, and (c) with respect to any real property interest, Liens on the interest of any third party landlord or sublandlord or underlying fee interest of any Acquired Real Property Lease, but only those not extinguished by the Sale Order, and (ii) all Liens relating to or arising in connection with the Note Consideration.

"<u>Person</u>" shall mean an individual, corporation, partnership, joint venture, trust, association, estate, joint stock company, limited liability company, Governmental Authority or any other organization of any kind.

"<u>Personal Information</u>" means, in addition to any definition for "personal information" or any similar term (e.g., "personal data" or "personally identifiable information") provided by Applicable Law, or by the Seller in any of its privacy policies, notices or contracts applicable to the Business or the Purchased Assets, all information that identifies, could be used to identify or is otherwise associated with an individual person.

"<u>Post-Petition Costs</u>" shall have the meaning set forth in <u>Section 2.7(b)(vi)</u>.

"<u>Prepaid Assets</u>" means (a) the items listed on <u>Section 3.6(g)</u> of the Disclosure Schedule delivered as of the date hereof and (b) all cash deposits (including, without limitation (but without duplication of any amounts included in the L/C Consideration), the amount of any security deposit held by a landlord under an Acquired Real Property Lease(s) that exceeds the equivalent of one (1) month's fixed rent under the applicable Acquired Real Property Lease), advance payments and other prepaid items (except for advances for capital projects), in each case, (i) relating to or arising in connection with the operation of the Business, (ii) that are made after the date hereof and (iii) that are added to <u>Section 3.6(g)</u> of the Disclosure Schedule in accordance with <u>Section 2.1(o)</u>; provided, that Prepaid Assets will not include items relating to any Excluded Asset.

"Privacy Laws" means any and all Applicable Laws, legal requirements and self-regulatory guidelines relating to the receipt, collection, compilation, use, storage, processing, sharing, safeguarding, security (both technical and physical), disposal, destruction, disclosure or transfer (including cross-border) of Personal Information, including the Federal Trade Commission Act, California Consumer Privacy Act, Gramm-Leach-Bliley Act, Payment Card Industry Data Security Standard, EU General Data Protection Regulation, and any and all Applicable Laws relating to breach notification or marketing in connection with Personal Information.

"Proceeding" means any judicial, administrative or arbitral actions, arbitrations, suits, hearings, disputes, audits, administrative proceedings, condemnation or eminent domain proceedings.

"Property Taxes" shall mean ad valorem, property, excise or similar Taxes (including any interest, fine, penalty or additions to tax imposed by any Governmental Authority in connection with such Taxes) based upon the acquisition, operation or ownership of the Purchased Assets but excluding, for the avoidance of doubt, Income Taxes and Transfer Taxes.

"Purchase Price" shall mean $80,000,000 consisting of: (i) cash in the amount of $20,000,000, plus (A) the aggregate amount of all Cash or Cash Equivalents backing or securing the Acquired L/Cs as of the Closing Date in the amount set forth on Schedule 2.1(m), which in no event shall exceed $3,000,000 (the "L/C Consideration"), minus (B) any amounts drawn under any Acquired L/C as of the Closing Date, minus (C) the amount of any Cure Costs paid or escrowed by Purchaser in accordance with Section 5.13, plus or minus (as applicable), (D) the amount, if any, by which the Net Working Capital as of the Closing Date is greater or less than, as applicable, the Target Closing Net Working Capital minus (E) the Tax Prorations (without duplication of any amount taken into account in calculating the Net Working Capital or the Purchase Price), plus or minus (as applicable) (F) the Non-Tax Prorations, plus (ii) senior secured notes in the aggregate principal amount of $60,000,000 and having the terms set forth in the Note Purchase Agreement, plus (iii) without duplication of any item described in clause (i) of this definition and solely for purposes of the Purchase Price allocation in Section 2.6(h), the Assumed Liabilities. The consideration described in clause (i) of this definition is referred to as the "Cash Consideration," which is subject to adjustment pursuant to Section 2.6. The consideration described in clause (ii) of this definition is referred to as the "Note Consideration."

"Purchased Assets" shall have the meaning set forth in Section 2.1.

"Purchased Equipment" shall have the meaning set forth in Section 2.1(a).

"Purchaser" shall have the meaning set forth in the preamble.

"R&W Policy" is defined in Section 5.3 of this Agreement.

"Reading Facility" shall mean and refer to the Reading Facility operated at and from the Reading Leased Property.

"Reading Leased Property" shall mean and refer to that certain real property commonly known as 4030 Pottsville Pike, Reading, Pennsylvania 19605, together with all buildings, structures, fixtures and improvements erected thereon, and any and all rights, privileges,

easements, licenses, hereditaments and other appurtenances relating thereto, and used, or held for use, in connection with the operation of the Business.

"<u>Related Agreements</u>" shall mean the Bill of Sale, Assignment and Assumption, the IP Assignment and the Escrow Agreement.

"<u>Release</u>" means any release, spill, emission, discharge, leaking, pumping, injection, deposit, placing, disposal, dispersal, leaching or migration into the environment (including, without limitation, ambient air, surface water, groundwater and surface or subsurface strata) or into or out of any property, including the movement of any Hazardous Material through or in the air, vapor, soil, surface water, groundwater or property.

"<u>Relevant Period</u>" is defined in the definition of "Net Working Capital" above.

"<u>Response Action</u>" shall mean any action taken to investigate, abate, treat, remediate, clean up, remove or mitigate any violation of Environmental Law, any Contamination of any property owned, leased or used by the Business or any release or threatened release of Hazardous Materials. Without limitation, Response Action shall include any action that would be a response as defined by the Comprehensive Environmental Response, Compensation and Liability Act, as amended at the date of Closing, 42 U.S.C. § 9601 (25).

"<u>Sale Hearing</u>" shall have the meaning set forth in the Bid Procedures Order.

"<u>Sale Order</u>" shall mean an order of the Bankruptcy Court entered in the Bankruptcy Case approving and authorizing this Agreement and the transaction contemplated herein (including, without limitation, approving and authorizing Seller's assumption and assignment pursuant to Section 365 of the Bankruptcy Code of the Acquired Contracts, Acquired Personal Property Leases and Acquired Real Property Leases), which Sale Order shall be in the form attached as <u>Exhibit 1.1 (Sale Order)</u> to this Agreement, with such changes that are acceptable to Seller and Purchaser in their respective sole discretion (provided that changes to the Sale Order that do not adversely affect Purchaser or Seller need only be reasonably acceptable to Purchaser or Seller, as applicable).

"<u>Schedules and Statements</u>" shall mean Parent's and its subsidiaries' Schedules of Assets and Liabilities and Statements of Financial Affairs filed in the Bankruptcy Case on April 5, 2021.

"<u>Selected Employees</u>" shall have the meaning set forth in <u>Section 5.5(a)</u>.

"<u>Seller</u>" shall have the meaning set forth in the preamble.

"<u>Seller Intellectual Property</u>" shall mean Owned Intellectual Property, together with all other Intellectual Property Rights licensed to Seller or which Seller otherwise has the right to use.

"<u>Subject Employees</u>" shall have the meaning set forth in <u>Section 5.5(a)</u>.

"<u>Successful Bidder</u>" shall have the meaning set forth in the Bid Procedures Order.

"<u>Target Closing Net Working Capital</u>" shall mean $0.

"Target Completion" means substantial progress toward completion of the Construction Work, but not including (i) the commissioning of Extrusion Line #3, (ii) completion of testing of all individual components of Washline #1 (7 t/hr), (iii) acceptance testing for Sorema Line #1 (continuous full-cycle operation at full capacity and guaranteed product quality), and (iv) completion of the Bluerock and Anchor scopes.

"Tax" (and, with correlative meaning, "Taxes," "Taxable" and "Taxing") shall mean (i) any net income, capital gains, gross income, gross receipts, sales, use, transfer, ad valorem, franchise, profits, license, capital, withholding, payroll, estimated, employment, excise, goods and services, severance, stamp, occupation, premium, property, social security, environmental (including Code section 59A), alternative or add-on, value added, registration, windfall profits or other taxes, duties, charges, fees, levies or other assessments imposed by any Governmental Authority, or any interest, penalties, or additions to tax incurred under Applicable Laws with respect to taxes and (ii) any liability in respect of any item described in clause (i) above that arises by reason of a contract, assumption, transferee or successor liability, operation of law (including by reason of participation in a consolidated, combined or unitary Tax Return) or otherwise.

"Tax Prorations" shall mean the Property Taxes allocable to Seller pursuant to the procedures set forth in Section 5.8 to the extent unpaid at the Closing.

"Tax Returns" shall mean any report, return (including any information return), declaration or other filing required or permitted to be supplied to any taxing authority or jurisdiction with respect to Taxes, including any amendments or attachments to such reports, returns, declarations or other filings.

"Termination Date" shall have the meaning set forth in Section 8.1(b).

"Trade Secrets" has the meaning set forth in the definition of Intellectual Property Rights.

"Transfer Taxes" shall have the meaning set forth in Section 5.7.

"Transferred Employees" shall have the meaning set forth in Section 5.5(a).

"Upset Agreement" is defined in Section 9.1(a).

"Upset Purchaser" is defined in Section 9.1(a).

"WARN Act" shall mean the Worker Adjustment and Retraining Notification Act of 1988, as amended.

"Wayward Assets" is defined in Section 5.16 below.

ARTICLE II
PURCHASE AND SALE; CLOSING

2.1    Purchase and Sale. Upon the terms and subject to the conditions set forth in this Agreement (including, without limitation, entry of the Sale Order), at the Closing, Seller shall sell, convey, transfer, assign and deliver to Purchaser, and Purchaser shall purchase and accept from

Seller, good title in and to all of the assets of Seller, wherever located, whether at the Reading Facility or in transit thereto which are used or are held for use primarily in the Business, including, without limitation, the following assets (the "Purchased Assets"), in each case free and clear of all Liens to the extent provided in the Sale Order (other than Permitted Post-Closing Encumbrances):

(a)     All owned machinery, equipment, furniture, fixtures, structures, improvements, office furnishings, tools and dies, molds and parts, spares, vehicles, computer hardware and software, and other tangible personal property owned by Seller, for use primarily in connection with the Business, including those located at, on or affixed to the Reading Facility, including, without limitation, the tangible personal property identified on Section 2.1(a) of the Disclosure Schedule (collectively, the "Purchased Equipment");

(b)     to the extent assignable, all rights in all warranties of any manufacturer or vendor in connection with the Purchased Equipment;

(c)     all contracts and agreements, licenses, utility supply arrangements, and other contracts and agreements, whether written or oral, which are related primarily to the Business at the Reading Facility and identified on Section 2.1(c) of the Disclosure Schedule (collectively, the "Acquired Contracts"). For the avoidance of doubt, references herein to Acquired Contracts shall not be deemed to include Acquired Real Property Leases, Acquired Personal Property Leases or Permits and Licenses;

(d)     all inventories of raw materials, works in process, finished goods, parts, office supplies, packing materials, janitorial supplies and other supplies owned by Seller and used or held for use in connection with the Business (collectively, the "Acquired Inventories");

(e)     Seller's leasehold interest in the Reading Facility arising under the leases identified in Section 2.1(e) of the Disclosure Schedule (the "Acquired Real Property Leases");

(f)     all leasehold rights in personal property leased by Seller and used or held for use primarily in connection with the Business at the Reading Facility, as set forth in the leases identified in Section 2.1(f) of the Disclosure Schedule (the "Acquired Personal Property Leases");

(g)     all the permits, including environmental permits, licenses, approvals, franchises and registrations and other governmental licenses, permits or approvals issued to Seller or any Affiliate thereof primarily with respect to the ownership or operation of any of the Reading Facility or Purchased Assets or the conduct of the Business at the Reading Facility, as identified in Section 2.1(g) of the Disclosure Schedule (collectively, the "Permits and Licenses");

(h)     other than the books and records contemplated by Section 2.2(a) and (b) below, all books and records maintained by Seller or its Affiliates to the extent related to the Business or the Purchased Assets, including without limitation, engineering drawings of machinery and equipment currently used or held for use primarily in connection with the Business; blueprints and other technical papers; user manuals; inventory, maintenance, and asset history records; construction plans and specifications; administrative libraries; environmental records required by law or regulation; and systems documentation and other data processing information and records, except, in each instance, to the extent they relate to the Excluded Assets;

(i)        to the extent not fulfilled prior to Closing, all open purchase orders that are set forth on Section 2.1(i) of the Disclosure Schedule for goods and services with customers of the Business at the Reading Facility outstanding as of the Closing Date (collectively, the "Open Customer Orders"); provided, that Section 2.1(i) of the Disclosure Schedule shall be updated prior to the Closing to reflect additional open purchase orders arising after the date hereof which Seller may hereafter enter into so long as such orders include terms reasonably comparable to the generally prevailing terms of the Open Customer Orders set forth on Section 2.1(i) of the Disclosure Schedule as of the date hereof;

(j)        the right to receive all goods or services to be provided to Seller in connection with the Business at the Reading Facility pursuant to the open orders set forth on Section 2.1(j) of the Disclosure Schedule (the "Open Supplier Orders") for goods and services with suppliers that remain unfulfilled as of the Closing Date; provided, that Section 2.1(j) of the Disclosure Schedule shall be updated prior to the Closing to reflect additional open orders arising after the date hereof which Seller may hereafter enter into so long as such orders include terms reasonably comparable to the generally prevailing terms of the Open Supplier Orders set forth on Section 2.1(j) of the Disclosure Schedule as of the date hereof;

(k)        all Accounts Receivable of Seller listed in Section 2.1(k) of the Disclosure Schedule, as well as any Accounts Receivable which arise out of transactions (on terms consistent with Seller's ordinary course activities since the commencement of the Bankruptcy Case) occurring after the mutual execution and delivery of this Agreement which are (i) specifically related to products produced at the Reading Facility on or before the Closing Date, and (ii) owing to Seller by customers who have placed orders with or purchased goods from Seller prior to the Closing (collectively, the foregoing are referred to as the "Acquired Receivables"), it being agreed that Section 2.1(k) of the Disclosure Schedule shall be updated at or prior to the Closing to include additional Accounts Receivable meeting the requirements for inclusion set forth in this Section 2.1(k);

(l)        all Intellectual Property Rights, wherever located, owned by Seller and/or its Affiliates and used or held for use in the Business at the Reading Facility, including any enterprise resource planning system relating to the Business or the Purchased Assets and those Intellectual Property Rights set forth on Section 2.1(l) of the Disclosure Schedule (the "Acquired Intellectual Property Rights");

(m)        those letters of credit or similar financial accommodations issued to third party(ies) for the account of the Seller (and any collateral therefor) which are described on Section 2.1(m) of the Disclosure Schedule (collectively, the "Acquired L/Cs"); provided, that Section 2.1(m) of the Disclosure Schedule shall be updated prior to the Closing to reflect additional letters of credit or similar financial accommodation issued to third party(ies) for the account of Seller and relating to or arising in connection with the operation of the Business, solely to the extent such letters of credit or similar financial accommodation is fully cash collateralized;

(n)        all claims and causes of action owned by or available to Seller, including Avoidance Actions (other than Excluded Avoidance Actions), (i) relating to the Purchased Assets, the Assumed Liabilities or the acquisition, ownership, management, operation, use, function or value of the Business or any Purchased Asset or (ii) against any counterparty to an Acquired

Contract, Acquired Real Property Lease, Acquired Personal Property Lease, or Permits and Licenses or any Affiliate of such counterparty; provided that any Avoidance Actions acquired by Purchaser shall be deemed waived for all purposes;

(o)    all Prepaid Assets; provided that Section 3.6(g) of the Disclosure Schedule shall be updated prior to the Closing to reflect additional cash deposits, advance payments and other prepaid items (except for advances for capital projects) of the types specified in the definition of Prepaid Assets and arising after the date hereof that are (i) of a type consistent with the Prepaid Assets set forth on Section 3.6(g) of the Disclosure Schedule as of the date hereof and (ii) incurred on commercially reasonable terms and included (either initially or by way of modification as additional items to be included arise pursuant to this Section 2.1(o)) on Schedule 3.6(g) of the Disclosure Schedule in good faith;

(p)    all employee-related files and records, including occupational health and safety records, assessments and audits; industrial hygiene files; workers compensation records; workers compensation claims files; and personnel employment and medical records (in each case, to the extent the transfer thereof is not prohibited by law) for Transferred Employees; and

(q)    the cash collateral securing any of the Acquired L/Cs (the amounts for which are set forth on Section 2.1(m) of the Disclosure Schedule); provided, that Section 2.1(m) of the Disclosure Schedule shall be updated prior to the Closing to reflect the amount of cash collateral securing any of the Acquired L/Cs as of the Closing Date.

2.2    Excluded Assets. Notwithstanding anything to the contrary contained in Section 2.1 above or any other provision of this Agreement or any Related Agreement, the following assets are not being sold, assigned, transferred or conveyed to Purchaser by Seller hereunder (collectively, the "Excluded Assets"):

(a)    the corporate seals, organizational documents, minute books, stock books, Income Tax Returns, books of account and other records having to do with the corporate organization of Seller;

(b)    the basic books and records of account and all supporting vouchers, invoices and other records and materials primarily relating to any or all Income Taxes of Seller;

(c)    all claims for refunds due to Seller for Taxes of any nature paid by Seller with respect to any period ending on or prior to the Closing Date;

(d)    all Insurance Policies and performance bonds of Seller covering the Purchased Assets and any rights, proceeds and claims of and from such bonds or policies;

(e)    all Benefit Plans and Benefit Plan assets;

(f)    data files, archive files, systems documentation and other data processing information and records relating solely to any of the foregoing Excluded Assets;

(g)    all contracts, agreements, licenses, utility supply arrangements, and other contracts, whether written or oral, other than those explicitly identified as Acquired Contracts on

Section 2.1(c) of the Disclosure Schedule, Acquired Real Property Leases on Section 2.1(e) of the Disclosure Schedule, Acquired Personal Property Leases on Section 2.1(f) of the Disclosure Schedule, or the Permits and Licenses on Section 2.1(g) of the Disclosure Schedule;

(h)　　　any assets, properties and rights specifically described or set forth on Section 2.2(h) of the Disclosure Schedule;

(i)　　　the rights which accrue or will accrue to Seller under this Agreement and the Related Agreements;

(j)　　　any rights, claims or causes of action to the extent related to (i) Excluded Assets described herein and (ii) intercompany obligations between Seller or any of its Affiliates;

(k)　　　any tangible or intangible asset held by Seller pursuant to a lease, license, contract, or other agreement where such lease, license, contract or other agreement is not among the Acquired Contracts, Acquired Personal Property Leases, Acquired Real Property Leases, and/or Permits and Licenses assumed by Seller and assigned to Purchaser at the Closing in accordance with the Bankruptcy Code;

(l)　　　other than the Acquired L/Cs, any letters of credit or similar financial accommodations issued to any third party(ies) for the account of Seller or any of its Affiliates and any collateral therefor;

(m)　　　all securities, whether capital stock or debt, of Seller or any other entity;

(n)　　　all Accounts Receivable, other than the Acquired Receivables;

(o)　　　all Cash and Cash Equivalents, other than cash collateral securing the Acquired L/Cs, whether on hand, in transit or in banks or other financial institutions, security entitlements, securities accounts, commodity contracts and commodity accounts and including any cash collateral that is collateralizing any letters of credit (other than cash collateral securing the Acquired L/Cs) or Insurance Policies, or any obligations with respect thereto;

(p)　　　all Personal Information that Seller is prohibited by Applicable Law, including applicable Privacy Laws, or by any of Seller's public-facing policies, notices or other disclosures from delivering or transferring to Purchaser;

(q)　　　all bank accounts of Seller;

(r)　　　all open purchase orders for goods and services with customers of the Business outstanding as of the Closing Date, other than the Open Customer Orders;

(s)　　　all open orders for goods and services with suppliers of the Business that remain unfulfilled as of the Closing Date, other than the Open Supplier Orders; and

(t)　　　all Excluded Avoidance Actions.

2.3    <u>Assumed Liabilities</u>. Upon the terms and conditions contained in this Agreement, Purchaser shall upon, from and after the Closing Date, assume and be solely liable and responsible for paying and satisfying, solely and only the following liabilities and obligations, all items not specifically set forth below in this <u>Section 2.3</u> being excluded (all liabilities and obligations so assumed, the "<u>Assumed Liabilities</u>"):

(a)    all liabilities arising in connection with or from the use of the Purchased Assets or operation of the Business at the Reading Facility, including, without limitation, claims by employees of any of the foregoing, or other persons, in each case, solely attributable to the use of the Purchased Assets or the operation of the Business at the Reading Facility on or after the Closing Date, including, without limitation, claims resulting from injuries alleged to occur as a result of the condition of any of the Purchased Assets first existing from and after the Closing Date;

(b)    all obligations arising from any actions taken by Purchaser after the Closing Date with respect to Transferred Employees or operation of the Business conducted at the Reading Facility;

(c)    all post-Closing obligations of Seller to deliver products or services pursuant to Open Customer Orders outstanding as of the Closing Date;

(d)    all Assumed Accounts Payable and Accrued Expenses of Seller, in each case, to the extent taken into account in the calculation of the Final Cash Consideration;

(e)    the Tax Prorations and the Non-Tax Prorations, in each case, to the extent taken into account in the calculation of the Final Cash Consideration;

(f)    subject to the accuracy of the representations and warranties in <u>Section 3.9(f)</u>, any and all obligations arising under the WARN Act or similar state statutes as a result of the consummation of the transaction contemplated by this Agreement, it being agreed that (i) in no event shall any such obligation be deemed to be an Accrued Expense or otherwise taken into account in the calculation of Seller's Net Working Capital as of the Closing Date, and (ii) any such obligation relating to Employees to whom Purchaser does not extend employment offers shall in any event be deemed Assumed Liabilities;

(g)    all accrued and unpaid vacation, holidays, sick pay and other paid time-off (whether accrued prior to or during the Bankruptcy Case) to which the Transferred Employees are entitled with respect to all periods of service up to and including the Closing Date under the policies and practices of Seller or its Affiliates, but only to the extent included as a reduction in Net Working Capital;

(h)    any and all liabilities arising under or relating to any Environmental Laws with respect to the environmental condition of the Reading Facility, including, without limitation, any Response Actions that may at any time, or from time to time, be required with respect to the Reading Facility under Environmental Law arising out of facts, events or conditions first existing or first occurring from and after the Closing;

(i)     all obligations and liability with respect to any product liability or warranty claims relating to the Business and arising out of facts, events, or conditions first existing or first occurring from and after the Closing;

(j)     without duplication of any other item described in this Section 2.3, the Capital Lease Obligations; and

(k)     all other obligations expressly assumed by Purchaser under the other terms and provisions of this Agreement or any of the Related Agreements or other documents and agreements executed in connection with the Closing.

2.4     Excluded Liabilities. Except for the Assumed Liabilities expressly set forth in Section 2.3, Purchaser shall not assume or become responsible for Seller's or any of its Affiliates' obligations or liabilities other than those expressly set forth in Section 2.3 (such excluded liabilities are collectively referred to herein as the "Excluded Liabilities") and Seller and its Affiliates shall remain fully and solely responsible for all Excluded Liabilities. For the avoidance of doubt, any liability or obligation arising out of or relating to any breach of Contract or non-compliance with law occurring at any time prior to the Closing shall be an Excluded Liability.

2.5     Non-Transferable Contracts and Permits. Anything in this Agreement to the contrary notwithstanding, this Agreement shall not constitute an agreement to assign or transfer any Acquired Contract, Acquired Personal Property Lease, Acquired Real Property Lease or any of the Permits and Licenses, or any claim or right or any benefit or obligation thereunder or resulting therefrom if, an assignment or transfer thereof is prohibited or, without the consent of a third party thereto, would, notwithstanding the provisions of section 365(f) of the Bankruptcy Code and the effect of the Sale Order, be prohibited and such consent has not been obtained. If such consent is required and has not been obtained or if an attempted assignment or transfer is ineffective or prohibited, Seller shall, and shall cause its Affiliates to, use commercially reasonable efforts to cooperate with Purchaser in any reasonable arrangement requested and approved by Purchaser to provide for Purchaser all of the benefits under any such Acquired Contract, Acquired Personal Property Lease, Acquired Real Property Lease, or Permit and License. In connection with any such arrangement, (i) Purchaser shall bear the expense of structuring and implementing the arrangement and (ii) Purchaser shall honor Seller's commitments set forth in any such Acquired Contract, Acquired Personal Property Lease, Acquired Real Property Lease, or Permit and License to the extent arising following the close of business on the Closing Date in connection with Purchaser's use of any such Acquired Contract, Acquired Personal Property Lease, Acquired Real Property Lease, or Permit and License that is the subject of such arrangement (or assets or rights relating thereto).

2.6     Calculation and Payment of Cash Consideration.

(a)     Deposit; Liquidated Damages.

(i)     The parties acknowledge and agree that Purchaser has previously deposited with Seller's bankruptcy counsel an amount equal to the Deposit in immediately available, good funds of the United States of America (funds delivered in this manner are referred to herein as "Good Funds"). Concurrently with the

execution and delivery of this Agreement by all parties hereto, Seller shall cause its bankruptcy counsel to transfer into an escrow account with Citibank, N.A. (the "Escrow Holder") an amount equal to the Deposit in Good Funds. The Deposit (and any interest accrued thereon) shall be credited and applied toward payment of the Cash Consideration at the Closing.

(ii) PURCHASER AND SELLER HEREBY ACKNOWLEDGE THAT, IN THE EVENT PURCHASER FAILS TO CLOSE THE PURCHASE OF THE PURCHASED ASSETS WHEN REQUIRED TO DO SO UNDER THE TERMS OF THIS AGREEMENT WITHIN THREE BUSINESS DAYS AFTER THE LATER OF (A) THE CLOSING DATE AND (B) RECEIPT OF NOTICE FROM SELLER THAT IT IS READY, WILLING AND ABLE TO PROCEED WITH AND CONSUMMATE THE CLOSING (A "DEFAULT"), IT WOULD BE IMPRACTICABLE AND EXTREMELY DIFFICULT TO ESTIMATE THE DAMAGES SELLER MAY SUFFER OR INCUR IN THE EVENT THAT THE TRANSACTION CONTEMPLATED HEREIN FAILS TO CLOSE BY REASON OF SUCH DEFAULT. ACCORDINGLY, NOTWITHSTANDING ANYTHING TO THE CONTRARY HEREIN, PURCHASER AND SELLER HEREBY AGREE THAT CONSIDERING ALL OF THE CIRCUMSTANCES EXISTING AT THE EXECUTION OF THIS AGREEMENT, THE DEPOSIT AMOUNT CONSTITUTES A REASONABLE ESTIMATE OF THE TOTAL DETRIMENT THAT SELLER WOULD SUFFER IN THE EVENT THAT THE TRANSACTIONS CONTEMPLATED HEREIN ARE TERMINATED PURSUANT TO SECTION 8.1(c) OR (e) HEREOF. EXCEPT AS OTHERWISE PROVIDED IN CLAUSES (i), (ii) AND (iii) BELOW, SAID AMOUNT SHALL REPRESENT THE AGREED AND LIQUIDATED DAMAGES TO WHICH SELLER IS ENTITLED BY REASON OF PURCHASER'S DEFAULT. THE PAYMENT OF SUCH AMOUNT AS LIQUIDATED DAMAGES IS NOT INTENDED AS A FORFEITURE OR PENALTY, BUT RATHER IS INTENDED TO CONSTITUTE LIQUIDATED DAMAGES TO SELLER. UPON PURCHASER'S DEFAULT AS DESCRIBED ABOVE AND SELLER'S ELECTION TO TERMINATE THIS AGREEMENT BY REASON THEREOF PURSUANT TO SECTION 8.1(c) OR 8.1(e), THIS AGREEMENT SHALL TERMINATE AND, EXCEPT FOR (i) SELLER'S RIGHT TO COLLECT THE AMOUNT OF SUCH LIQUIDATED DAMAGES, (ii) SELLER'S RIGHTS UNDER SECTION 10.15 HEREOF TO THE EXTENT RELATING TO THE COLLECTION OF THE DEPOSIT PURSUANT TO THIS SECTION 2.6(a)(ii), AND (iii) ANY PROVISIONS AND OBLIGATIONS OF THIS AGREEMENT WHICH BY THEIR TERMS SURVIVE ANY TERMINATION OF THIS AGREEMENT, THE PARTIES HERETO SHALL BE RELIEVED OF ANY FURTHER LIABILITY OR OBLIGATION UNDER THIS AGREEMENT. BY EXECUTING AND DELIVERING THIS AGREEMENT, EACH PARTY SPECIFICALLY ACKNOWLEDGES AND CONFIRMS THE ACCURACY OF THE STATEMENTS SET FORTH ABOVE AND THAT IT WAS REPRESENTED BY COUNSEL OF ITS CHOICE WHO FULLY EXPLAINED THE CONSEQUENCES OF THIS LIQUIDATED DAMAGES PROVISION AT THE TIME OF EXECUTION OF THIS AGREEMENT.

(b)     Payment at Closing. On the Closing Date, subject to the satisfaction of the conditions set forth herein, Purchaser shall (i) (A) cause the Escrow Holder to deliver the Deposit to Seller, and (B) pay and deliver to Seller, in Good Funds, the Estimated Cash Consideration (as defined below) less the Deposit and less the Adjustment Escrow Amount, in each case, by wire transfer in accordance with written wire instructions provided by Seller to Purchaser not later than two (2) Business Days prior to Closing and (ii) deposit, in Good Funds, the Adjustment Escrow Amount into an account (the "Adjustment Escrow Account") designated at least three (3) Business Days prior to the Closing Date by the Escrow Holder. The Adjustment Escrow Amount will not be used for any purpose except as expressly provided in this Agreement.

(c)     Estimated Cash Consideration. Not less than five (5) Business Days prior to the Closing Date, Seller shall in good faith and in consultation with Purchaser prepare and deliver to Purchaser a good faith estimated calculation of the Cash Consideration (the "Estimated Cash Consideration") and all components thereof, including the Net Working Capital as of the Closing Date. Seller's calculation of the Estimated Cash Consideration shall be made in accordance with the methodology (the "Applicable Methodology") set forth in Exhibit 2.6(c) hereto (the "Estimated Closing Statement").  In connection with such consultation between Seller and Purchaser, the Estimated Cash Consideration will be revised before the Closing to the extent necessary to take into account Purchaser's reasonable comments.

(d)     Closing Cash Consideration. Within sixty (60) days after the Closing Date, Purchaser shall prepare (again, utilizing the Applicable Methodology) and deliver to Seller a good faith estimated calculation of the Cash Consideration (the "Closing Cash Consideration") and all components thereof, including the Net Working Capital as of the Closing Date. Seller will have reasonable access to all work papers and books and records of the Business used by Purchaser in its calculation of the Closing Cash Consideration.

(e)     Dispute Notice. Purchaser's determination of the Closing Cash Consideration will be final, conclusive and binding on Purchaser and Seller unless Seller provides a written notice (a "Dispute Notice") to Purchaser no later than the fifteenth (15th) Business Day after delivery of Purchaser's calculation of the Closing Cash Consideration setting forth in reasonable detail (i) any item of Purchaser's calculation of the Closing Cash Consideration which Seller believes has not been prepared in accordance with this Agreement (an "Item of Dispute") and (ii) the correct amount of such Item of Dispute in accordance with this Agreement. Any item or amount to which no dispute is raised in a timely fashion under the Dispute Notice will be final, conclusive and binding on Purchaser and Seller.

(f)     Resolution of Disputes. If any Item of Dispute remains unresolved for a period of thirty (30) days after Purchaser's receipt of the Dispute Notice, either Purchaser or Seller may submit the remaining Items of Dispute to a nationally recognized certified public accounting firm which is "independent" as to Purchaser, Seller and, in each case, their respective Affiliates, or other mutually agreeable accounting firm (the "Independent Auditor"). Purchaser and Seller shall request that the Independent Auditor render a determination (which determination shall be solely based on whether the Item of Dispute was prepared in accordance with the terms of this Section 2.6 or whether a mathematical error was made) as to each unresolved Item of Dispute within fifteen (15) Business Days after its retention, and Purchaser and Seller shall cooperate in all reasonable respects with the Independent Auditor so as to enable it to make such determination

as quickly and as accurately as practicable. The Independent Auditor's determination as to each Item of Dispute shall be (i) based solely on presentations by Purchaser and Seller which are in accordance with the guidelines and procedures set forth in this Agreement (i.e., not on the basis of an independent review), (ii) in writing and (iii) conclusive and binding upon Purchaser and Seller, and the Closing Cash Consideration shall be modified to the extent necessary to reflect such determination. The Independent Auditor shall consider only the remaining Items of Dispute and the Independent Auditor may not assign a value to any Item of Dispute greater than the greatest value assigned by Purchaser, on the one hand, or Seller, on the other hand, or less than the smallest value for such item assigned by Purchaser, on the one hand, or Seller, on the other hand. The costs and expenses of the Independent Auditor shall be borne by the non-prevailing party as determined by the Independent Auditor. The Independent Auditor will act as an expert and not as an arbitrator.

(g) <u>Final Cash Consideration</u>. The Closing Cash Consideration as finally determined pursuant to Section 2.6(d) if there is no dispute, or Section 2.6(e) and (f) if there is a dispute, is referred to as the "Final Cash Consideration." If the Final Cash Consideration exceeds the Estimated Cash Consideration (such excess amount, the "Excess Amount"), then within five (5) Business Days of the determination of the Final Cash Consideration (i) Purchaser shall pay to Seller the Excess Amount and (ii) Purchaser and Seller will deliver a joint written instruction, in accordance with the Escrow Agreement, to the Escrow Holder instructing the Escrow Holder to make a payment in an amount equal to the Adjustment Escrow Amount to Seller. If the Final Cash Consideration is less than the Estimated Cash Consideration (such shortfall amount, the "Deficiency Amount"), then, within five (5) Business Days of the determination of the Final Cash Consideration, (i) Purchaser shall be entitled to receive a payment in cash out of the Adjustment Escrow Account in an amount equal to the lesser of the Deficiency Amount and the Adjustment Escrow Amount, and Purchaser and Seller will deliver a joint written instruction, in accordance with the Escrow Agreement, to the Escrow Holder instructing the Escrow Holder to make a payment to Purchaser out of the Adjustment Escrow Account in an amount equal to such lesser amount, (ii) if the Deficiency Amount is greater than the Adjustment Escrow Amount, Seller shall pay such excess to Purchaser, and (iii) if the Deficiency Amount is less than the Adjustment Escrow Amount, Purchaser and Seller will deliver a joint written instruction, in accordance with the Escrow Agreement, to the Escrow Holder instructing the Escrow Holder to make a payment to Seller out of the Adjustment Escrow Account in an amount equal to the balance of such Adjustment Escrow Amount (after giving effect to the payment in clause (i) of this sentence).

(h) <u>Purchase Price Allocation</u>. Within thirty (30) days after the determination of the Final Cash Consideration, Purchaser will prepare or cause to be prepared and delivered to Seller an allocation of the Purchase Price (and any other items constituting consideration for Tax purposes) among the Purchased Assets in accordance with Section 1060 of the Code and the Treasury Regulations thereunder. Seller and Purchaser shall cooperate in good faith to finalize a mutually agreeable Form 8594 allocation within thirty (30) Business Days after the delivery of the allocation by Purchaser to Seller. If the parties reach agreement on the allocation, Seller and Purchaser covenant (i) to revise the allocation in accordance with this <u>Section 2.6(h)</u> to reflect any adjustments to the Purchase Price, (ii) to report gain or loss or cost basis, as the case may be, in a manner consistent with such allocation, (iii) to prepare and file, and cause their respective Affiliates to prepare and file, their Tax Returns, including Internal Revenue Service Form 8594, on a basis consistent with the allocation, (iv) not to voluntarily take any position inconsistent

therewith in any proceeding relating to Taxes, and (v) to use commercially reasonable efforts to sustain such allocation in any subsequent Tax audit or Tax dispute.

2.7    Closing.

(a)    The Closing shall take place on the date that is three (3) Business Days after the satisfaction or waiver of the conditions precedent set forth in Articles VI and VII or on such other date, and at such time and place, as may be agreed by Purchaser and Seller. The date on which the Closing occurs in accordance with the preceding sentence is referred to in this Agreement as the "Closing Date."

(b)    At the Closing, Seller shall deliver counterparts of the following to Purchaser:

(i)    a bill of sale and assignment and assumption agreement in the form attached hereto as Exhibit 2.7(b)(i) (the "Bill of Sale, Assignment and Assumption") duly executed by Seller;

(ii)    an assignment of the Acquired Intellectual Property Rights in the form attached hereto as Exhibit 2.7(b)(ii) (the "IP Assignment");

(iii)    a certificate of Seller, dated as of the Closing Date, as to the satisfaction of the conditions set forth in Sections 6.1, 6.2, and 6.56.5 hereof;

(iv)    a certified copy of the Sale Order as entered by the Bankruptcy Court, vesting the Purchased Assets in Purchaser free and clear of any Liens (except for Permitted Post-Closing Encumbrances), and a certified copy of the docket for the period following entry of the Sale Order and through the date immediately prior to the date of the Closing;

(v)    a certificate of non-foreign status of Seller (or, if Seller is disregarded for U.S. federal income tax purposes, its regarded owner) meeting the requirements of Treasury Regulations Section 1.1445-2(b)(2); and

(vi)    evidence reasonably satisfactory to Purchaser that all undisputed amounts due and payable pursuant to the Acquired Contracts and arising during the Relevant Period (the "Post-Petition Costs") have been, or will concurrently with the Closing, be paid in full.  With respect to Post-Petition Costs for which an objection has been filed that has not been consensually resolved by the parties or determined by the Bankruptcy Court at or prior to the Sale Hearing, Seller shall deliver evidence reasonably satisfactory to Purchaser that Seller has deposited the full amount of the disputed Post-Petition Costs in an escrow in accordance with the Sale Order pending final resolution thereof.  If Seller does not provide such evidence at or prior to the Closing of payment in full of all undisputed Post-Petition Costs and escrows required above, Purchaser may pay all or a portion of such undisputed Post-Petition Costs that remain unpaid as of the Closing and may itself escrow any amount that Seller is required to escrow, and any amounts so paid or escrowed by Purchaser shall reduce the Cash Consideration payable to Seller on a

dollar-for-dollar basis, with it being agreed that Seller will be entitled to any amount remaining in escrow after the final resolution of all disputed Post-Petition Costs and the payment from escrow of all amounts finally determined to be owed;

        (vii)    [Reserved];

        (viii)    a certificate of the Secretary or an Assistant Secretary of Seller certifying as to the incumbency and signatures of the executing officers of Seller;

        (ix)    [Reserved]; and

        (x)    such other instruments and documents as may be reasonably requested by Purchaser at least five (5) Business Days prior to Closing in order to consummate the transactions contemplated under this Agreement.

        (c)    At the Closing, Purchaser shall deliver the following to Seller (or, in the case of clauses (ii) and (v) below, directly to the counterparties thereto specified in such clauses):

        (i)    the amount described in Section 2.6(b)(i)(B) pursuant to the payment procedures described in Section 2.6(b);

        (ii)    the Note Consideration to be issued to the Persons and in the amounts set forth in the Note Purchase Agreement;

        (iii)    duly executed counterparts of each of the Related Agreements referred to in Section 2.7(b);

        (iv)    a certificate of Purchaser, dated as of the Closing Date, as to the satisfaction of the conditions set forth in Sections 7.1 and 7.2;

        (v)    a duly executed counterpart of the Note Purchase Agreement, signed by Purchaser and dated as of the Closing Date; and

        (vi)    such other instruments and documents as may be reasonably requested by Seller at least five (5) Business Days prior to Closing in order to consummate the transactions contemplated under this Agreement.

        2.8    Addition/Removal of Acquired Contracts, Acquired Real Property Leases, Acquired Personal Property Leases and Permits and Licenses. Purchaser may, in its sole discretion, add any Contract, permit or license to (or remove any Contract, permit, or license from) the Acquired Contracts on Section 2.1(c) of the Disclosure Schedule, the Acquired Real Property Leases on Section 2.1(e) of the Disclosure Schedule, the Acquired Personal Property Leases on Section 2.1(f) of the Disclosure Schedule or the Permits and Licenses on Section 2.1(g) of the Disclosure Schedule up to the date that is three (3) days prior to the date of the Closing. The Seller shall comply with the terms of the Bid Procedures Order and the Notice of Proposed Assumption and Assignment of Designated Executory Contracts and Unexpired Leases Docket No. 269 with respect to all such Contracts, permits, and licenses added to (or removed from) the relevant sections

of the Disclosure Schedule. Any removal or addition of Contracts, permits, or licenses pursuant to this Section 2.8 shall have no effect upon the Purchase Price payable to Seller hereunder.

ARTICLE III
REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to Purchaser, as of the date hereof and as of the Closing Date, as follows:

3.1     Due Incorporation. Seller is duly organized, validly existing and in good standing under the law of the State of Delaware.

3.2     Due Authorization. Subject to entry of the Sale Order, Seller has full power and authority to (a) enter into this Agreement and its Related Agreements and to consummate the transactions contemplated hereby and thereby and (b) own, lease, hold and operate the assets and properties owned, leased, held or operated by it and to carry on its business as it is currently conducted. Seller is duly qualified or licensed and in good standing to do business in each jurisdiction in which the property owned, leased, held or operated by it or the nature of its business makes such qualification or licensing necessary, except where the failure to be so qualified, licensed or in good standing has not been, and would not reasonably be expected to be, material to the Business or the Purchased Assets. Subject to entry of the Sale Order, the execution, delivery and performance by Seller of this Agreement and the Related Agreements have been duly and validly approved on behalf of the Board of Directors of Parent and the managing member of Seller and no other corporate or entity actions or proceedings on the part of Seller are necessary to authorize this Agreement, Seller's Related Agreements and the transactions contemplated hereby and thereby. Seller has duly and validly executed and delivered this Agreement and has duly and validly executed and delivered (or prior to or at the Closing will duly and validly execute and deliver) its Related Agreements. Subject to entry of the Sale Order, (i) this Agreement constitutes the legal, valid and binding obligation of Seller and (ii) Seller's Related Agreements, upon execution and delivery by Seller, will constitute legal, valid and binding obligations of Seller, in each case, enforceable in accordance with their respective terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, moratorium, reorganization or similar laws in effect which affect the enforcement of creditors' rights generally and by equitable principles.

3.3     Consents and Approvals; Governmental Authority Relative to This Agreement. Except as set forth in Section 3.3 of the Disclosure Schedule, the execution, delivery and performance by Seller of this Agreement and the Related Agreements will not, subject to entry of the Sale Order, (a) result in the creation of any Lien upon any of the Purchased Assets that is not extinguished pursuant to the Sale Order or (b) violate, conflict with or result in a breach of (with or without notice or lapse of time, or both), require a Consent, result in the loss of any material benefit under, require payment pursuant to, or give rise to a right of acceleration, termination, modification or loss of benefits under (i) any provision of any of the Certificate of Formation or Operating Agreement of Seller, (ii) any Permits and Licenses, order, writ, injunction, decree, statute, treaty, rule or regulation applicable to the Business, the Purchased Assets, Seller or any of its assets or (iii) any Contract included in the Purchased Assets other than, in the case of clause (ii) and (iii) above, as would not reasonably be expected to result in a Material Adverse Effect.

3.4    Compliance With Laws. Except as otherwise set forth on Section 3.4 of the Disclosure Schedule, Seller is and has been during the Look-Back Period operating the Business in compliance in all material respects with all Applicable Laws.

3.5    Litigation. Except (i) for the general pendency of the Bankruptcy Case and related Proceedings that would not reasonably be expected to be, individually or in the aggregate, material to the Business or the Purchased Assets and (ii) for the Proceedings described in Section 3.5 of the Disclosure Schedule: (a) during the Look-Back Period, there have not been, and there are no, Proceedings pending or threatened against Seller or the Purchased Assets and (b) Seller is not subject to any outstanding Order that prohibits or otherwise restricts the ability of Seller or any of its Affiliates to consummate fully the transactions contemplated by this Agreement or any other Related Agreements.

3.6    Certain Financial Information.

(a)    Attached to Section 3.6(a) of the Disclosure Schedule are true and complete copies of the unaudited, consolidated balance sheets of Parent and its subsidiaries as of December 31, 2019 and December 31, 2020 and the related unaudited consolidated statement of operations, members' equity, and cash flows for the 12 months then ended (the "Financial Statements"). The Financial Statements have been prepared from, and are consistent with, the books and records of Parent and its subsidiaries.

(b)    Except for liabilities reflected or reserved against on the Schedules and Statements, Seller does not have any material liabilities, other than (i) liabilities that have been incurred in the Ordinary Course of Business since the commencement of the Bankruptcy Case and which are included in the Final Cash Consideration, or (ii) contractual liabilities incurred in the Ordinary Course of Business that are not material and, in the case of clauses (i) and (ii), none of which is a liability for breach of Contract, breach of representation or warranty, violation of Applicable Law, tort or infringement by Seller.

(c)    All Acquired Receivables resulted from bona fide sales in the Ordinary Course of Business and represent the genuine, valid and legally enforceable indebtedness of the account debtor. Section 3.6(c) of the Disclosure Schedule sets forth a true and complete list of all Accounts Receivable that are more than thirty (30) days past due as of the date hereof.

(d)    All Acquired Inventories consist of a quality and quantity usable and salable in the Ordinary Course of Business. No Acquired Inventory is held on a consignment basis. All Acquired Inventories are located at the Reading Facility or are in transit thereto.

(e)    Each Acquired L/C is a validly issued and outstanding standby letter of credit that is in full force and effect. Each Acquired L/C has been cash collateralized in a manner satisfactory to the issuer of such Acquired L/C. Section 2.1(m) of the Disclosure Schedule accurately lists the amounts of cash collateral posted for each Acquired L/C. Except as set forth on Section 3.6(e) of the Disclosure Schedule, no amounts are currently drawn under any Acquired L/C, and Seller has not received a draw request from any Acquired L/C beneficiary.

(f)    Section 3.6(f) of the Disclosure Schedule sets forth a true and complete list of all of the capital expenditures budgeted, at any time, to be paid by Seller under its debtor in

possession financing facilities during the Relevant Period (collectively, the "DIP Budgeted Capital Expenditures").

(g)     Section 3.6(g) of the Disclosure Schedule accurately lists the amounts of the Prepaid Assets as of the execution of this Agreement and Seller's reasonable good faith estimate of the items and amounts of the Cure Costs and Tax Prorations.

(h)     Section 3.6(h) of the Disclosure Schedule sets forth a true and complete list of all capital leases secured by any of the Purchased Assets (the "Capital Lease Obligations").

3.7     Real Property.

(a)     Seller does not hold fee title to any real property used or held for use in the Business. Section 2.1(e) of the Disclosure Schedule sets forth a complete and correct list of all of the real property leased by Seller. Seller has not granted any options with respect to the purchase of the Reading Facility or any portion thereof or any other unexpired rights in favor of third Persons to purchase or otherwise acquire a leasehold interest in the Reading Facility or any portion thereof. Except as set forth on Section 3.7(a) of the Disclosure Schedule or as a result of the pendency of the Bankruptcy Case, (i) Seller is not in material default under the Acquired Real Property Leases, (ii) no written notice of any material default under the Acquired Real Property Leases, which default remains uncured, has been sent or received by Seller, and (iii) no conditions or circumstances exist which, with the lapse of time or the giving of notice, or both, would constitute a material default or breach under the Acquired Real Property Leases. Seller has not leased, subleased, assigned, licensed or otherwise granted to any Person the right to use or occupy any portion of the Reading Facility. Seller has not collaterally assigned or granted any other security interest in any Acquired Real Property Lease.

(b)     Seller has valid leasehold interests in and exclusive possession of each parcel of the Reading Facility free and clear of all Liens, other than (x) as of the date hereof, Permitted Liens and (y) as of the Closing Date, Permitted Post-Closing Encumbrances. Section 3.7(b) of the Disclosure Schedule lists each executory Contract providing for any material repairs, work, and/or capital improvements at the Reading Facility. To the Seller's Knowledge, there are no material structural defects (whether latent or patent) relating to the Reading Facility, and there is no material physical damage to the Reading Facility for which there is no insurance in effect. For the avoidance of all doubt, the fact that the Construction Work is ongoing shall not be deemed to breach or violate the representation made in the immediately preceding sentence.

3.8     Material Contracts.

(a)     Section 3.8(a) of the Disclosure Schedule contains a true and complete list of all of the following types of Contracts, including Contracts to which the Seller or any of its Affiliates is a party or bound, in each case (i) relating to the Business or (ii) by which any of the Purchased Assets are bound or affected (each Contract listed, and each Contract that should be listed, on Section 3.8(a) of the Disclosure Schedule being referred to as a "Material Contract"), a complete and correct copy of which (as in effect on the date hereof), and including all amendments, supplements, restatements, waivers, side letters, addenda, exhibits, schedules and modifications thereto, and summaries of any oral versions of same, has been furnished to Purchaser by Seller:

(i)     any Contract pursuant to which Seller leases any real property, including the Acquired Real Property Leases;

(ii)    any Contract (other than a purchase order) with a Key Customer or Key Vendor;

(iii)   any outstanding purchase order or related series of purchase orders included in the Purchased Assets in excess of $250,000;

(iv)    any Contract for the distribution of products of the Business, including any dealer, representative, agency or similar Contract;

(v)     any Contract with any Governmental Authority or any instrumentality of any such Governmental Authority;

(vi)    any (A) employment and similar Contract with an officer or other member of management and (B) Contract with a consultant pursuant to which the Business is or could become obligated to make payments exceeding $100,000 per annum;

(vii)   any Contract involving a change of control or retention bonus, "stay bonus" or similar arrangement or providing for the grant or acceleration of any benefit payable to any Employee;

(viii)  any Contract between any current or former employee of Seller or its Affiliates or current or former consultant of Seller or its Affiliates, on the one hand, and Seller or its Affiliates, on the other hand, that restricts any such Person (A) from competing, directly or indirectly, with the Seller, the Business or any other Person or (B) from soliciting or hiring current or former employees or customers of the Seller, the Business or any other Person;

(ix)    any Acquired Contract that includes a "most favored nation," "meet or release" or similar pricing and delivery arrangement or that includes a minimum volume commitment or any other similar performance or financial goal, or involves the payment by the Business of amounts that include "take or pay" requirements or output terms or similar pricing or delivery arrangements;

(x)     any Acquired Contract that restricts the ability of Seller or the Business to compete with any Person, engage in any business or operate in any geographical area;

(xi)    any Acquired Contract by which any material Intellectual Property Rights are (A) licensed by Seller or its Affiliates to a third party or (B) licensed to the Seller (other than Contracts that are shrinkwrap, clickwrap or other similar non-negotiable terms granted to the Seller for third-party software that are available to the general public as of the Closing Date);

(xii)   any performance bond or surety Contract;

(xiii)   any Contract that settled any Proceeding (A) during the Look-Back Period for monetary payments to or by Seller or any of its Affiliates in excess of $250,000 or (B) that involves any equitable or other non-monetary relief and that is binding on the Seller or the Business;

(xiv)   any collective bargaining, works council, shop, enterprise or recognition Contract;

(xv)   the Acquired Real Property Leases; and

(xvi)   the Acquired Personal Property Leases.

(b)   With respect to each Material Contract: (i) such Material Contract is the legal and valid obligation of Seller and each other party thereto, and constitutes the binding and enforceable obligation of the Seller and each other party thereto, in accordance with its terms; (ii) the Seller is not, nor is any other Person, in breach or default thereunder and, except as otherwise set forth in Section 3.8(b) of the Disclosure Schedule or as a result of the pendency of the Bankruptcy Case, no condition exists or event has occurred (including any condition or event that with notice or lapse of time, or both) that would constitute a breach or default, or permit termination, modification in any manner adverse to the Business or the Purchased Assets or acceleration thereunder; (iii) no party has asserted nor has (except by operation of law) any right to offset, discount or otherwise abate any amount owing under such Material Contract; and (iv) no amendment or modification has been made thereto except those, if any, reflected in the copies previously furnished to Purchaser. There are no material disputes under any Material Contract.

3.9   Employees and Labor Matters.

(a)   Section 3.9(a) of the Disclosure Schedule sets forth the following information for each current Employee (including each current Employee on leave of absence): employer; name; date of hire; job title or position; current compensation paid or payable; status as exempt or non-exempt under the Fair Labor Standards Act of 1938, as amended; current base salary or rate of pay; bonus compensation (if any) paid or payable for calendar year 2020; accrued and unused vacation and other paid time-off; and leave status (including nature and duration of any leave).

(b)   To the Seller's Knowledge, no Employee is a party to, or is otherwise bound by, any agreement, including any confidentiality, noncompetition, or proprietary rights agreement, between such Employee and any other Person that in any way (i) adversely affects the performance of his or her duties as an Employee; (ii) adversely affects the ability of Seller, or could reasonably be expected to adversely affect the ability of Purchaser after the Closing Date, to conduct the Business; or (iii) is being violated by virtue of the Employee's provision of services to Seller or any of its Affiliates.

(c)   Neither Seller nor any of its Affiliates is a party to any collective bargaining agreement or other labor union Contract applicable to the Employees and there are not any activities or Proceedings of any labor union to organize any of the Employees.

(d)     The employment or other engagement of all Employees is terminable at will without any penalty or severance obligation of any kind on the part of the employer. All sums due for employee compensation and benefits and all vacation time or paid time off owing to any Employees have been duly and adequately accrued on the accounting records of Seller.

(e)     Any individual who performs or performed services for Seller or any of its Affiliates and who is not treated as an employee for federal income tax purposes by the Seller or an Affiliate, as applicable, is not an employee under Applicable Laws or for any purpose, including, without limitation, for Tax withholding purposes or Benefit Plan purposes.

(f)     Seller has not effectuated (i) a "plant closing" (as defined in the WARN Act) in connection with the Business; or (ii) a "mass layoff" (as defined in the WARN Act) of individuals employed at or who primarily provided service to the Business. Seller has heretofore made available to Purchaser a true and complete list of layoffs, by location, implemented by Seller since January 1, 2021.

3.10    Benefit Plans.

(a)     Section 3.10(a) of the Disclosure Schedule sets forth an accurate and complete list of all Benefit Plans. Seller has made available to Purchaser or its counsel a true and complete copy of all plan documents (including related trust agreements, funding arrangements, Form 5500s and insurance contracts and all amendments thereto) with respect to each Benefit Plan in which any Employees participate or are eligible to participate.

(b)     Each Benefit Plan has been established, funded, maintained and administered in all material respects in accordance with its terms, and in compliance with the applicable provisions of ERISA, the Code and other Applicable Law. With respect to each Benefit Plan that is intended to qualify under Section 401(a) of the Code, Seller has received a favorable determination, opinion or advisory letter with respect to such Benefit Plan and its related trust that has not been revoked and no circumstances exist and no events have occurred that could adversely affect the qualified status of such Benefit Plan or the related trust. No Benefit Plan provides retiree health or life insurance benefits except as may be required by Section 4980B of the Code and Section 601 of ERISA, any other Applicable Law or at the sole expense of the participant or the participant's beneficiary. No Benefit Plan that provides health insurance or medical coverage is self-funded or self-insured and all premiums that have become due have been paid in full.

(c)     No Benefit Plan is (i) a "defined benefit plan" (as defined in Section 3(35) of ERISA), (ii) an "employee pension benefit plan" (as defined in Section 3(2) of ERISA) that is subject to Title IV of ERISA or Sections 412 or 430 of the Internal Revenue Code, (iii) a "multiemployer plan" (as defined in Section 3(37) or 4001(a)(3) of ERISA), or (iv) a "multiple employer plan" within the meaning of Section 413(c) of the Code.

3.11    Permits. Seller has made all filings and paid all fees and duties, in each case, necessary to maintain the Permits and Licenses, each of which is valid and in full force and effect. Except as otherwise set forth in Section 3.11 of the Disclosure Schedule or as a result of the pendency of the Bankruptcy Case, (i) Seller is in compliance in all material respects with all of the Permits and Licenses included in the Purchased Assets, and no condition exists that with notice or

passage of time or both would reasonably be expected to constitute a default under any such Permits and Licenses and (ii) Seller has not received any notice of any violation of any Permits and Licenses included in the Purchased Assets or notice of any proposal to revoke, cancel, rescind, modify or refuse to renew any of such Permits and Licenses.

3.12    Intellectual Property.

(a)    Section 3.12(a) of the Disclosure Schedule is a true and complete list of all (i) Patents; (ii) registered trademarks, service marks and trade names and those for which an application is pending; (iii) registered or applied for copyrights; and (iv) Internet domain names and social media accounts, in each case, owned or purported to be owned by Seller (items (i) through (iii), the "Registered Intellectual Property," together with all other Intellectual Property Rights owned or purported to be owned by Seller, collectively the "Owned Intellectual Property"). Other than pending applications included in the Registered Intellectual Property, the Registered Intellectual Property is subsisting, valid and enforceable. Seller is not subject to any Order that restricts or impairs its use of any Owned Intellectual Property. No Person has alleged, in a Proceeding to which Seller is a party or otherwise, that any Owned Intellectual Property is not owned by Seller or that rights thereto are invalid or unenforceable.

(b)    Seller exclusively owns all right, title and interest in and to all Registered Intellectual Property and material Owned Intellectual Property, free and clear of all Liens. Seller has valid, subsisting and enforceable licenses to use all Seller Intellectual Property owned by any third party, including sufficient quantities of seat, server core, or other license units. Seller is in compliance in all material respects with all licenses, and all license fees, renewal fees and maintenance fees that have become due have been timely paid by Seller, including with respect to seat, server core or other unit license restrictions. The consummation of the transactions contemplated by this Agreement will not alter or impair any rights of Seller to Seller Intellectual Property.

(c)    Except as set forth in Section 3.12(c) of the Disclosure Schedule, (i) the operation of the Business as conducted as of the date hereof does not, and the services provided by Seller do not, infringe, misappropriate, or otherwise violate in any material respect, and have not during the Look-Back Period infringed, misappropriated or otherwise violated in any material respect, the Intellectual Property Rights of any third party, and no third party is infringing, misappropriating, or otherwise violating the Owned Intellectual Property, (ii) during the Look-Back Period, neither Seller nor any of its Affiliates has received any communication regarding any actual, alleged or suspected material infringement, misappropriation or other material violation of Intellectual Property Rights of a third party by Seller, and (iii) during the Look-Back Period, neither Seller nor any of its Affiliates has sent any written notice, charge, complaint, claim or other written assertion asserting or threatening to assert in any Proceedings against any Person regarding the material infringement, misappropriation, dilution or other material violation of any Owned Intellectual Property.

(d)    No current or former employee or officer of Seller and no current or former consultant or contractor of Seller has any right, title or interest in or to any material Seller Intellectual Property. No funding, facilities or personnel of any Governmental Authority or

academic or research institution were used to develop or create, in whole or in part, any Owned Intellectual Property.

(e)     Seller has taken commercially reasonable actions to safeguard and maintain the secrecy and the confidentiality of, and its proprietary rights in and to, all non-public Owned Intellectual Property.

(f)     The computer software, computer hardware, firmware, networks, interfaces and related systems included in the Purchased Assets (collectively, "Computer Systems") are sufficient in all material respects for the Seller's operation of the Business and the Purchased Assets as conducted as of the date hereof and as contemplated to be conducted as of the date hereof and, except as set forth on Section 3.12(f) of the Disclosure Schedule, there have been no material failures, crashes, ransomware attacks, security breaches or similar adverse events affecting the Computer Systems. Seller provides for the backup and recovery of material data and has implemented and maintains commercially reasonable disaster recovery plans, procedures and facilities. Seller has taken commercially reasonable steps, as necessary and appropriate, to protect the integrity and security of the Computer Systems and the information stored therein, processed thereon or transmitted therefrom from misuse or unauthorized use, access, disclosure or modification by third parties, and there has been no such misuse or unauthorized use, access, disclosure or modification thereof. None of the Computer Systems are used in any business other than the Business.

3.13    Environmental Matters.

(a)     There is no Environmental Claim pending or threatened against the Seller or with respect to the Business or the Purchased Assets, and all past Environmental Claims have been finally and fully resolved. There are no past or present actions, activities, circumstances, conditions, events or incidents, including the Release, presence, handling, management, use, generation, or disposal of any Hazardous Materials at any location that could form the basis of any material Environmental Claim or otherwise result in any material costs or liabilities under Environmental Law with respect to the Business or the Purchased Assets.

(b)     No Release or threatened Release of Hazardous Material has occurred or is currently occurring at or from any property owned, operated, leased or used or any other property formerly owned, operated, leased or used by the Seller or any of its predecessors or the Business for which Environmental Law requires (i) notice to any Person or (ii) any form of Response Action and the Seller has not received any notice that the operation of the Business has caused the contamination of any other property with Hazardous Material, which has resulted or would reasonably be expected to result in a material Environmental Claim against the Business or the Purchased Assets.

(c)     Except as otherwise set forth in Section 3.13(c) of the Disclosure Schedule, Seller has not, either expressly or by operation of law, assumed responsibility for or agreed to indemnify or hold harmless any Person for any Environmental Liability with respect to the Business or the Purchased Assets.

(d) Seller has identified and made available to Purchaser complete and correct copies of all material studies, audits, assessments, reports, data, memoranda and investigations, and other material information relating to Hazardous Materials, Environmental Claims, Environmental Liabilities or other environmental matters that are in its possession or control pertaining to, or the environmental condition of, the Business and the Purchased Assets or the compliance (or noncompliance) by the Seller or any of its predecessors with Environmental Laws.

(e) Seller is not required by any Environmental Law or by virtue of the transactions set forth herein and contemplated hereby, or as a condition to the effectiveness of any transactions contemplated hereby, (i) to remove or remediate Hazardous Materials, (ii) to give notice to or receive approval from any Governmental Authority or other Person, or to record any disclosure document or statement pertaining to environmental matters, or (iii) except as set forth in Section 3.11 of the Disclosure Schedule, to alter, modify, renew, change or update any Environmental Permit, in each case with respect to the Business or the Purchased Assets.

3.14 Title to Assets; Sufficiency of Assets; Condition of Assets. Seller has good and valid legal and beneficial title to, or a valid, binding and enforceable leasehold interest in, as applicable, all of the Purchased Assets, and such Purchased Assets are not subject to any Liens (other than (x) as of the date hereof, Permitted Liens and (y) as of the Closing Date, Permitted Post-Closing Encumbrances). The Purchased Assets constitute (a) all of the tangible and intangible assets, rights and properties that are used or held for use by Seller or any of its Affiliates in connection with the Business, and (b) all of the assets, rights and properties necessary for the conduct of the Business in the Ordinary Course of Business following the Closing. The Purchased Assets are in good working condition and are suitable for the purposes for which they are used (subject to normal wear and tear) including for Purchaser to conduct and operate the Business in the Ordinary Course of Business, subject to the ongoing Construction Work.

3.15 Taxes. Except to the extent an inaccuracy of the following would neither result in a Lien on any of the Purchased Assets nor a Tax liability to the Purchaser or its Affiliates or except as set forth on Section 3.15 of the Disclosure Schedule:

(a) All Tax Returns required to be filed by Seller or otherwise related to the Purchased Assets or the Business have been duly and timely filed and each such Tax Return is true, correct and complete in all material respects. All Taxes owed by Seller or otherwise related to the Purchased Assets or the Business for which Purchaser may be liable that are or have become due have been paid in full and all other Taxes attributable to pre-Closing periods have been fully accrued through Closing on the financials statements of Seller.

(b) Seller does not have in force any waiver of any statute of limitations in respect of Taxes or any extension of time related to a Tax assessment or deficiency with respect to the Purchased Assets or the Business. No extension of time within which to file any Tax Return with respect to the Purchased Assets or the Business is currently in effect. There is no audit, litigation or other Proceeding, Claim, assessment, deficiency, or adjustment pending, asserted, proposed or threatened with respect to Taxes of Seller or otherwise with respect to the Purchased Assets or the Business. All of the Purchased Assets have been properly listed and described on the property tax rolls for all periods prior to and including the Closing Date and no portion of the Purchased Assets constitutes omitted property for property tax purposes. Purchaser will not be

held liable for any unpaid Taxes that are or have become due on or prior to the Closing Date as a successor or transferee, by statute, contract or otherwise, as a result of the transfer of the Purchased Assets pursuant to this Agreement.

(c)     Other than assets held for resale in the ordinary course of business and motor vehicles, the sale of the Purchased Assets qualifies as an occasional sale pursuant to Pa. Stat. Ann. 72 §7204(1), Pa. Code 61 §32.4(a)(1); and Pa. Code 61 §32.4(a)(2).

3.16     Key Business Relationships.

(a)     Section 3.16(a)(i) of the Disclosure Schedule sets forth a true and complete list of (i) the top 10 customers of the Business based on revenue generated for the fiscal year period ended December 31, 2020 (each, a "Key Customers", and together, the "Key Customers") and the amount of such revenue generated with respect to each Key Customer, and (ii) the top 15 vendors or suppliers of the Business based on purchases for the fiscal year period ended December 31, 2020 (each, a "Key Vendor", and together, the "Key Vendors") and the amount of such expenses incurred with respect to each Key Vendor. Except as set forth on Section 3.16(a)(ii) of the Disclosure Schedule, during the Look-Back Period, (i) no Key Customer has (A) materially decreased or notified Seller or any Affiliate of Seller of the foregoing of its intention to materially decrease its aggregate level of purchases of services from Seller relative to such Key Customer's purchasing history during the twelve (12) months prior to such change or (B) requested reduced pricing (whether through increased credits or otherwise) from that in effect under an existing Contract, in each case, other than with respect to commercial negotiations in the Ordinary Course of Business with respect to such Key Customer and not as a result of a deterioration in the business relationship with such Key Customer and (ii) no Key Vendor has adversely altered or notified Seller or its Affiliates of the foregoing of its intention to adversely alter in any material respect the terms (including price) on which it sells goods or services to the Business.

(b)     Section 3.16(b) of the Disclosure Schedule sets forth a true and complete list of all discounts, allowances, free goods or services, rebates, programs or other promotions that had a value, individually or in the aggregate, to any one customer of Seller in excess of $250,000 in the calendar year ended December 31, 2020. Seller has not changed its policies, procedures or guidelines in respect of any discounts, allowances, free goods or services, rebates, programs or other promotions offered to any customer other than in the Ordinary Course of Business.

3.17     Insurance. Section 3.17 of the Disclosure Schedule sets forth a true and complete list of all insurance policies maintained by Seller or its Affiliates with respect to the Business, the Employees or the Purchased Assets (collectively, the "Insurance Policies"). Each Insurance Policy is in full force and effect and, except as otherwise set forth on Section 3.17 of the Disclosure Schedule, all premiums due to date thereunder have been paid in full and neither Seller nor any of its Affiliates is in material default thereunder. Neither Seller nor any of its Affiliates, has received notice of cancellation or nonrenewal, in whole or in part, in respect of any Insurance Policy.

3.18     Brokers and Finders. Other than as set forth on Section 3.18 of the Disclosure Schedule, no agent, broker, investment banker, financial advisor or other firm or person is entitled to any brokerage, finder's, financial advisor's or other similar fee or commission for which Purchaser or any of its Affiliates could become liable in connection with the transactions

contemplated by this Agreement as a result of any action taken by or on behalf of Seller or any of its Affiliates.

3.19    Product Quality. All products manufactured, fabricated, sold or distributed by the Business prior to the Closing Date comply with applicable customer specifications and Applicable Laws for the intended use of such products.

3.20    Intercompany Agreements. Other than as set forth on Section 3.20 of the Disclosure Schedule, there are no Contracts between the Seller, on the one hand, and any Affiliate of Seller, on the other hand, relating to the ownership, management or operation of the Business or the Purchased Assets.

3.21    Data Privacy.

(a)    With respect to the Business and the Purchased Assets, the Seller and, to the Knowledge of Seller, any Person acting for or on Seller's behalf have for the past three (3) years, as applicable, materially complied with (i) all applicable Privacy Laws, (ii) all of the Seller's policies and notices regarding Personal Information, and (iii) all of the Seller's contractual obligations with respect to Personal Information. The Seller has not received any written notice of any claims of or investigations or regulatory inquiries related to, or been charged with, the violation of any Privacy Laws, applicable privacy policies, or contractual commitments with respect to Personal Information in connection with the Business or the Purchased Assets. To the Knowledge of Seller, there are no facts or circumstances that could reasonably form the basis of any such notice or claim.

(b)    With respect to the Business and the Purchased Assets, the Seller has (i) implemented and for the past three (3) years, as applicable, maintained reasonable and appropriate technical and organizational safeguards, at least consistent with practices in the industry in which the Seller operates, to protect Personal Information and other confidential data in its possession or under its control against loss, theft, misuse or unauthorized access, use, modification, alteration, destruction or disclosure, and (ii) taken reasonable steps to ensure that any third party with access to Personal Information collected by or on behalf of the Seller has implemented and maintained the same. To the Knowledge of Seller, any third party who has provided Personal Information to Seller in connection with the Business or the Purchased Assets has done so in material compliance with applicable Privacy Laws. Except as would not reasonably be expected to be material to the Business or the Purchased Assets, there have been no breaches, security incidents, misuse of or unauthorized access to or disclosure of any Personal Information in the possession or control of the Seller or collected, used or processed by or on behalf of the Seller. The Seller has not provided or been legally required to provide any notices to any Person in connection with a disclosure of Personal Information in connection with the Business or the Purchased Assets. The transfer of Personal Information in connection with the transactions contemplated by this Agreement will not violate in any material respect any applicable Privacy Laws or the Seller's privacy policies as they currently exist or as they existed at any time during which any of the Personal Information was collected or obtained.

3.22    Disclaimer of Additional Representations and Warranties. EXCEPT AS SPECIFICALLY SET FORTH IN THIS AGREEMENT, NEITHER SELLER NOR ANY OF ITS

AFFILIATES OR ANY OF THEIR RESPECTIVE AFFILIATES' DIRECTORS, OFFICERS, EMPLOYEES, CONTROLLING PERSONS, AGENTS OR REPRESENTATIVES MAKES OR HAS MADE ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, INCLUDING IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR THE ACCURACY OR COMPLETENESS OF ANY PROJECTIONS, ESTIMATES OR OTHER FORWARD LOOKING INFORMATION PROVIDED OR OTHERWISE MADE AVAILABLE TO PURCHASER OR ANY OF ITS DIRECTORS, OFFICERS, EMPLOYEES, AFFILIATES, CONTROLLING PERSONS, AGENTS OR REPRESENTATIVES.

Purchaser hereby expressly acknowledges and agrees none of the provisions of this ARTICLE III (including, without limitation, anything in Section 3.6) shall be deemed to affect or influence in any manner the provisions of this Agreement relating to the calculation of the Purchase Price or any elements, components, or methodology thereof or applicable thereto (including, without limitation, the Applicable Methodology); provided, that the foregoing will not affect the last sentence of Section 4.5(b).

ARTICLE IV
REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Seller as of the date hereof and as of the Closing, as follows:

4.1     Due Organization. Purchaser is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware with all requisite power and authority to own and operate its assets and properties as they are now being owned and operated.

4.2     Due Authorization. Purchaser has full power and authority to enter into this Agreement and its Related Agreements and to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance by Purchaser of this Agreement and its Related Agreements have been duly authorized by all necessary entity action of Purchaser. Purchaser has duly and validly executed and delivered this Agreement and has duly and validly executed and delivered (or prior to or at the Closing will duly and validly execute and deliver) its Related Agreements. This Agreement constitutes the legal, valid and binding obligation of Purchaser and its Related Agreements, upon execution and delivery by Purchaser, will constitute legal, valid and binding obligations of Purchaser enforceable in accordance with their respective terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, moratorium, reorganization or similar laws in effect which affect the enforcement of creditors' rights generally and by equitable principles.

4.3     Consents and Approvals; No Violations. The execution, delivery and performance by Purchaser of this Agreement and its Related Agreements will not (i) violate any law, regulation or order of any Governmental Authority applicable to Purchaser; (ii) except for filings that may be required pursuant to Article IX, require any filing or registration by Purchaser with, or consent or approval with respect to Purchaser of, any Governmental Authority; (iii) violate or conflict with or result in a breach or default under any Contract to which Purchaser is a party or by which Purchaser or any of its assets or properties are bound; or (iv) violate or conflict with the certificate

of formation or limited liability company agreement of Purchaser, except where any such filing, registration, consent or approval, if not made or obtained, or any such violation, conflict, breach or default, would not have a material adverse effect on Purchaser's ability to consummate the transactions contemplated hereby.

4.4    Purchaser's Examination. Purchaser and its representatives have been afforded the opportunity to meet with, ask questions of and receive answers from the management of Seller in connection with the determination by Purchaser to enter into this Agreement and the Related Agreements and consummate the transactions contemplated hereby and thereby, and all such questions have been answered to the reasonable satisfaction of Purchaser.

4.5    Investigation; Limitation on Warranties.

(a)    Purchaser acknowledges and agrees that neither Seller, nor any other Person acting on behalf of Seller or any of its Affiliates or representatives has made any representation or warranty, express or implied, as to the accuracy or completeness of any information regarding Seller, the Business or the Purchased Assets, except as expressly set forth in this Agreement or the Related Agreements or as and to the extent required by this Agreement to be set forth in the Disclosure Schedule. Purchaser further agrees that, except only as expressly provided in this Agreement or the Related Agreements, Seller will not have or be subject to any liability to Purchaser or any other Person resulting from the distribution or use by Purchaser, any of its Affiliates or any of their respective directors, officers, employees, agents, consultants, accountants, counsel or other representatives of any such information, and any legal opinions, memoranda, summaries or any other information, document or material made available to Purchaser or its Affiliates or representatives in certain "data rooms," management presentations or any other form otherwise provided in expectation of the transactions contemplated by this Agreement.

(b)    Purchaser acknowledges and agrees that except for the representations and warranties of Seller expressly set forth in Article III hereof and the Related Agreements, the Purchased Assets are being acquired AS IS WITHOUT ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR INTENDED USE OR OTHER EXPRESSED OR IMPLIED WARRANTY. Purchaser acknowledges and agrees that it is consummating the transactions contemplated hereby without any representation or warranty, express or implied, by any Person, except for the representations and warranties of Seller expressly set forth in Article III hereof. Following the Closing, Seller will have no liability for a breach of representation or warranty (and no breach of representation or warranty will require Seller to return any portion of the Purchase Price to Purchaser) except in the case of actual, intentional fraud.

(c)    In connection with Purchaser's investigation of Seller and the Business, Purchaser has received from or on behalf of Seller certain projections, including projected statements of operating revenues and income from operations of the Business and certain business plan information of Seller. Purchaser acknowledges that there are uncertainties inherent in attempting to make such estimates, projections and other forecasts and plans, that Purchaser is familiar with such uncertainties, that Purchaser is taking full responsibility for making its own evaluation of the adequacy and accuracy of all estimates, projections and other forecasts and plans so furnished to it (including the reasonableness of the assumptions underlying such estimates, projections and forecasts), and that Purchaser shall have no claim against Seller or any other Person

with respect thereto. Accordingly, Seller makes no representations or warranties whatsoever with respect to such estimates, projections and other forecasts and plans (including the reasonableness of the assumptions underlying such estimates, projections and forecasts) except as set forth in <u>Article III</u> Purchaser is relying on the representations and warranties of Seller regardless of the knowledge obtained through its own investigation, diligence or otherwise.

4.6     <u>Available Funds</u>. Purchaser has sufficient cash resources on hand or available to it in an aggregate amount sufficient to pay in cash any and all amounts required to be paid by it pursuant to this Agreement, including the Cash Consideration and all fees and expenses related to the transactions contemplated by this Agreement to be paid by Purchaser.

4.7     <u>Brokers and Finders</u>. No agent, broker, investment banker, financial advisor or other firm or person is entitled to any brokerage, finder's, financial advisor's or other similar fee or commission for which Seller or any of its Affiliates could become liable in connection with the transactions contemplated by this Agreement as a result of any action taken by or on behalf of Purchaser or any of its subsidiaries.

ARTICLE V
COVENANTS

5.1     <u>Access to Information and Applicable Locations</u>.

(a)     From the date of this Agreement to the earlier of the Closing Date or the date this Agreement is terminated, subject to the Confidentiality Agreement, Seller and its Affiliates shall give Purchaser and Purchaser's representatives, upon reasonable notice, reasonable access during normal business hours to the offices, Facility, employees, and books and records relating to the Business, and shall make the officers and employees of Seller and its Affiliates available to Purchaser and its representatives as Purchaser and its representatives shall from time to time reasonably request, in each case to the extent that such access and disclosure would not obligate Seller to take any actions that would unreasonably disrupt the normal course of its business or violate the terms of any contract to which Seller is bound or any Applicable Law; <u>provided</u>, that all requests for access shall be directed to Gregg Milhaupt and/or Alex Delnik (collectively, the "<u>Designated Contacts</u>"). Notwithstanding the foregoing, other than the Designated Contacts, Purchaser is not authorized to and shall not (and shall cause its employees, agents, representatives and Affiliates to not) contact any officer, director, employee, franchisee, customer, supplier, distributor, lender or other material business relation of Seller prior to the Closing without the prior written consent of a Designated Contact (it being agreed that if the Designated Contact elects to give any such consent, the consent may be conditioned upon, among other things, Seller being able to monitor or participate in any such contacts and any discussions or dialogue resulting therefrom).

(b)     Purchaser and their representatives shall treat and hold strictly confidential any confidential information (in whatever form) provided by or on behalf of Seller to the extent required by the Confidentiality Agreement.

5.2     <u>Preservation of Business</u>. From the date of this Agreement until the earlier of the Closing Date or the date this Agreement is terminated, other than as specifically contemplated by

this Agreement or with the prior consent of Purchaser, Seller shall (a) operate the Reading Facility and the Business in the ordinary course of business, (b) use commercially reasonable efforts to preserve intact the Purchased Assets and the Business, retain the present officers and employees and consultants of the Business at their current compensation and benefits levels, and preserve the Business's goodwill and relationships with customers, suppliers, distributors and others having material business dealings with the Seller or the Business, (c) not sell or otherwise dispose of any of the Purchased Assets other than inventories of finished goods at arm's length in the ordinary course of business, and (d) not enter into any Contract (excluding ordinary course purchases of feed stock) which (x) involves the payment or receipt by Seller of amounts in excess of $250,000 (in the aggregate) or (y) has a duration of longer than six (6) months. Notwithstanding anything to the contrary in this Agreement, Purchaser and Seller hereby acknowledge and agree that (i) as of the execution date of this Agreement, there is construction, installation, and commissioning work ongoing at the Reading Facility (the "Construction Work") and the Reading Facility is not currently, and by the Closing Date may not be, Fully Operational, (ii) from execution of this Agreement through the Closing, Seller's obligation with respect to the Construction Work shall be to use commercially reasonable efforts to achieve Target Completion of such Construction Work prior to the Closing, subject in all events to delays beyond Seller's reasonable control (including delays in receiving equipment or materials and issuance of permits or other third party approvals required in connection with the Construction Work), (iii) so long as Seller has complied with its obligation pursuant to clause (ii) of this sentence, neither completion of the Construction Work nor the achievement of Target Completion shall be deemed a condition to Purchaser's obligations to consummate the transaction contemplated herein, and (iv) to the extent the Construction Work is not completed prior to the Closing, Seller shall pay in full at the Closing the remaining costs to complete such work to the point where the Reading Facility will be Fully Operational, excluding the allocation of internal costs (such as existing employee costs being allocated to the Construction Work) (the "Cost to Complete"), such Cost to Complete to be reasonably determined by the parties hereto based upon the amount of Construction Work remaining as of the Closing and the anticipated amount of the DIP Budgeted Capital Expenditures for the items of the Construction Work then remaining incomplete.

5.3     Efforts. Subject to the terms and conditions hereof, each party hereto shall use its commercially reasonable efforts to consummate the transactions contemplated hereby as promptly as practicable. The "commercially reasonable efforts" of any party hereto shall not require such party, its Affiliates or representatives to divest or encumber any of the Purchased Assets or any of the assets of the Purchaser or any of its Affiliates or to incur or expend any material sums of money to remedy any breach of any representation or warranty hereunder or to provide financing to any other party hereto for consummation of the transactions contemplated hereby; provided that if such party, its Affiliates or representatives remedy any such breach, such party shall not be deemed to be in breach of such representation or warranty for purposes of determining the other parties' obligations to consummate the transactions contemplated hereby pursuant to Section 6.1, in the case of Purchaser, or Section 7.1, in the case of Seller. Without limiting the foregoing, Seller will reasonably cooperate (as more particularly addressed below) with Purchaser, at Purchaser's expense, in Purchaser's efforts to obtain customary buyer-side representation and warranty insurance (the "R&W Policy") (payable solely by Purchaser) in connection with the transactions contemplated by this Agreement. Any R&W Policy so obtained shall specify that there is no right of, and that the insurer under the R&W Policy expressly waives any claims of, subrogation, contribution, or otherwise against the Seller or any of its Affiliates, employees, or direct or indirect

shareholders, members, directors, officers, or partners, except in the case of actual, intentional fraud by the Seller in connection with the negotiation, execution, or performance of this Agreement. The cost of the R&W Policy (including the premium, underwriting fee, surplus lines taxes, and other fees (including the brokerage fees)) shall be paid by Purchaser. From and after the binding of the R&W Policy (which shall include the waivers described above), Purchaser shall provide Seller with a true and complete copy thereof and shall not amend, modify, or cancel the R&W Policy if such amendment, modification, or cancellation could reasonably be expected to adversely affect the rights of Seller thereunder without the prior written consent of the Seller (which consent may be granted or withheld in the Seller's sole discretion). As set forth above, the Seller shall reasonably cooperate with Purchaser in connection with obtaining the R&W Policy, including by making its officers and senior management available to Purchaser at reasonable times and for reasonable periods of time; provided that, in no event, shall (i) the issuance of an R&W Policy be a condition to or otherwise affect Purchaser's obligation to consummate the transactions set forth herein, or (ii) Seller or any employee, officer, director, agent or other representative of Seller be required to provide any affidavit, certificate, application, agreement or other covenant or assurance to Purchaser, the insurer under the R&W Policy or any other person in connection with the underwriting or issuance thereof.

5.4     Preservation of Records; Post-Closing Access and Cooperation. For a period of six (6) years after the Closing Date or such other period (if longer) required by Applicable Law, Purchaser shall preserve and retain, all corporate, accounting, legal, auditing, human resources and other books and records included in the Purchased Assets that are in its possession relating to the Business and the Purchased Assets prior to the Closing Date. Purchaser shall, after the Closing Date, (a) permit Seller's counsel and other professionals and counsel for any successor to Seller and its professionals (collectively, "Permitted Access Parties") reasonable access, for the purpose of Seller's tax reporting requirements, financial accounting and compliance with Applicable Law, to the material financial and other books and records included in the Purchased Assets that are in its possession, during regular business hours and upon reasonable advance notice, which access shall include (i) the right of such Permitted Access Parties to copy, at such Permitted Access Parties' expense, such documents and records as they may reasonably request in furtherance of the purposes described above, and (ii) Purchaser's copying and delivering to the relevant Permitted Access Parties such documents or records as they may reasonably request in furtherance of the purposes described above, but only to the extent such Permitted Access Parties furnish Purchaser with reasonably detailed written descriptions of the materials to be so copied and the applicable Permitted Access Party reimburses the Purchaser for the reasonable costs and expenses thereof, and (b) Purchaser shall provide the Permitted Access Parties (at no cost to the Permitted Access Parties) with reasonable access to a representative during regular business hours and upon reasonable advance notice so that Seller and the other Permitted Access Parties have information necessary for the preparation of tax returns, collection of those Accounts Receivable that are Excluded Assets, determination of the amount of any adjustment to the Cash Consideration pursuant to Section 2.6 hereof, and other activities in connection with the administration and wind-down of the Bankruptcy Case; provided that such access does not unreasonably interfere with the Purchaser's operation of the Business and Purchaser shall not be required to provide access for requests unrelated to the Business or the Purchased Assets.

Nothing in this Section 5.4 shall require Purchaser to take any such action if (a) such action (i) could result in a waiver or breach of any attorney-client, attorney work product or other legally

recognized privileges or immunity from disclosure or (ii) would result in the disclosure of any Trade Secrets of third parties or violate any Applicable Laws related to the exchange of information or any obligation of Purchaser with respect to confidentiality, or (b) such access or information is requested in relation to disputes involving Purchaser, its equity holders or any of their respective Affiliates or the Business or Purchased Assets, including disputes arising under this Agreement or any other Related Agreement.

5.5     Employees and Benefits.

(a)     As of the Closing, Seller shall terminate the employment of all of those Employees identified on Section 5.5(a) of the Disclosure Schedule (the "Subject Employees"). Section 5.5(a) of the Disclosure Schedule hereto shall be amended from time to time prior to the Closing (i) to delete any individuals who are no longer employed by Seller or (ii) upon written notice from Purchaser to Seller, to add or remove any other individuals. Purchaser, in cooperation with Seller, shall, at least five (5) Business Days prior to the Closing Date and effective as of the Closing Date, extend a written offer of employment to those employees selected by Purchaser, in its sole and absolute discretion (the "Selected Employees"), (A) at a level and with responsibilities that are substantially commensurate with their employment with Seller and at a wage or salary and bonus opportunity not less than the respective wage or salary and bonus opportunity specified for such Selected Employees on Section 5.5(a) of the Disclosure Schedule and with other benefits substantially comparable to those provided to similarly situated employees of the Purchaser. Those Selected Employees who accept offers of employment with Purchaser and who become employees of Purchaser as of the Closing Date are referred to as "Transferred Employees."

(b)     It is understood and agreed between the parties that all provisions contained in this Agreement with respect to Benefit Plans or employee compensation are included for the sole benefit of the respective parties hereto and do not and shall not create any right in any other person, including, but not limited to, any Employee, any participant in any benefit or compensation plan or any beneficiary thereof.

(c)     In any termination or layoff of any Transferred Employee by Purchaser on or after the Closing, Purchaser will comply fully, if applicable, with the WARN Act and all other applicable foreign, Federal, state and local laws, including those prohibiting discrimination and requiring notice to employees. Purchaser shall not at any time prior to sixty (60) days after the Closing Date, effectuate a "plant closing" or "mass layoff" as those terms are defined in the WARN Act affecting in whole or in part any facility, site of employment, operating unit or employee of the Business without complying fully with the requirements of the WARN Act. Purchaser shall be solely responsible for, and will bear the entire cost of, compliance with (or failure to comply with) any such laws following the Closing Date.

(d)     To the extent permissible under the Benefit Plans of Purchaser as of the Closing Date, Purchaser shall administer COBRA continuation coverage (other than with respect to flexible spending accounts) for M&A Qualified Beneficiaries (as defined in COBRA) that both (x) are Subject Employees (and not probationary or inactive employees as of the Closing Date) and (y) were not made offers of employment by Purchaser in accordance with Section 5.5(a).

5.6     Public Announcements. Purchaser and Seller will consult with each other before issuing any press release or otherwise making any public statements or disclosures with respect to the transactions contemplated by this Agreement, including the terms hereof, and no party shall, without the prior written consent of the other party, issue any such press release or make any such public statement, except as may be required by Applicable Law; provided, however, that Seller may make public statements or disclosures with respect to this Agreement and the transactions contemplated herein as may be necessary or advisable in connection with the Bankruptcy Case, including, without limitation, to comply with the Bid Procedures Order and/or in seeking issuance of the Sale Order.

5.7     Transfer Taxes. To the extent that any sales, purchase, transfer, stamp, documentary stamp, registration, use or similar taxes ("Transfer Taxes") are payable by reason of the sale of the Purchased Assets under this Agreement, such Transfer Taxes shall be borne and timely paid by Purchaser. Purchaser and Seller shall reasonably cooperate in good faith to minimize, to the extent permissible under Applicable Law, the amount of any Transfer Taxes that might otherwise be imposed in connection with the transactions contemplated by this Agreement.

5.8     Tax Proration. All Property Taxes levied with respect to the Purchased Assets for any taxable period falling entirely within the period ending on or before the Closing Date shall be the responsibility of Seller. All Property Taxes levied with respect to the Purchased Assets for any taxable period that includes the Closing Date and ends after the Closing Date, whether imposed or assessed before or after the Closing Date will be prorated based on the number of days in such period that occur before the Closing Date, on the one hand, and the number of days in such period that occur on or after the Closing Date, on the other hand, the amount of such Property Taxes allocable to the portion of the period ending before the Closing Date being the responsibility of Seller and the remainder being the responsibility of Purchaser. If the exact amount of any Property Taxes is not known on the Closing Date, such taxes shall be estimated based upon the best available information at the time of Closing (i.e., the taxable value currently assigned to the real property). There shall be no re-proration of Property Taxes after Closing. The amount of such Property Taxes allocable to Seller pursuant to this Section 5.8 that have not been paid prior to Closing, if any, shall be paid to the appropriate Governmental Authority by Purchaser, but shall result in a reduction of the Cash Consideration in like amount.

5.9     [Reserved].

5.10     [Reserved].

5.11     Use of Names and Marks. As soon as reasonably practicable after the Closing, but in no event more than thirty (30) Business Days after the Closing, Seller shall cause an amendment to the certificate or articles of incorporation or formation (or any equivalent organizational documents) of Seller to be filed with the appropriate Governmental Authority and shall take all other action necessary to change Seller's legal, registered, assumed, trade and "doing business as" name, as applicable, to a name or names not containing any Acquired Intellectual Property Rights, including "CarbonLITE" or any name confusingly similar to the foregoing, and will cause to be filed as soon as practicable after the Closing, in all jurisdictions in which Seller is qualified to do business, any documents necessary to reflect such change in its legal, registered, assumed, trade and "doing business as" name, as applicable, or to terminate its qualification therein. Seller further

agrees that from and after the Closing, Seller and its Affiliates will cease to make any use of all Acquired Intellectual Property Rights, the name "CarbonLite," and any similar names indicating affiliation with Purchaser, any of its Affiliates, the Business, the Purchased Assets or the business or activities engaged in by Purchaser or any of its Affiliates.

5.12    No Successor Liability. The parties hereto agree that the Sale Order shall provide that to the fullest extent permitted by Applicable Law (including under Section 363(f) of the Bankruptcy Code), (a) Purchaser shall not be liable for any liability or Lien (other than Assumed Liabilities) against the Seller or any of its predecessors or Affiliates and (b) Purchaser shall have no successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the Business, the Purchased Assets or any liabilities of Seller arising prior to the Closing Date.

5.13    Assumption and Assignment of Contracts. At or prior to the Closing, Seller shall assume and assign to Purchaser the Acquired Contracts, Acquired Real Property Leases, Acquired Personal Property Leases and Permits and Licenses, and Purchaser shall pay in full the Cure Costs (as a deduct against the Cash Consideration), in each case pursuant to Section 365 of the Bankruptcy Code, the Sale Order and Section 2.1, subject to Purchaser's provision of adequate assurance as may be required under Section 365 of the Bankruptcy Code; provided, however, that with respect to Cure Costs for which an objection has been filed that has not been consensually resolved by the parties or determined by the Bankruptcy Court at or prior to the Sale Hearing, Purchaser shall pay such disputed Cure Cost amount into an escrow in accordance with the Sale Order pending final resolution of such dispute, and any amounts so paid by Purchaser into escrow shall reduce the Cash Consideration payable to Seller on a dollar-for-dollar basis, with it being agreed that Seller will be entitled to any amount remaining in escrow after the final resolution of all disputed Cure Costs and the payment from escrow of all amounts finally determined to be owed.

Notwithstanding anything to the contrary in this Agreement, Purchaser expressly acknowledges that Seller's inability to assume and assign any Acquired Contracts, Acquired Real Property Leases, Acquired Personal Property Leases and/or Permits and Licenses by reason of Purchaser's failure to provide adequate assurance of future performance with respect thereto to the Bankruptcy Court's satisfaction shall have no effect on Purchaser's obligation to consummate the transactions set forth herein and any such Acquired Contracts, Acquired Real Property Leases, Acquired Personal Property Leases and/or Permits and Licenses Seller fails to so assume and assign at the Closing shall for all purposes thereafter be deemed Excluded Assets.

5.14    Transfer of 401(k) Plan. From and after the date of the Auction (if Purchaser is the Successful Bidder), Seller and Purchaser shall cooperate and use reasonable best efforts to determine the advisability of transferring the assets and liabilities of the Seller's 401(k) plan relating to the Transferred Employees to the Purchaser's 401(k) plan (excluding those employees who retired effective on or prior to the date of transfer) in accordance with applicable requirements of Seller's 401(k) plan, Purchaser's 401(k) plan and the Code. In order to implement this Section 5.14 (as applicable), Purchaser and Seller shall cooperate in the exchange of information, the notification of Transferred Employees, and the preparation of any documentation required to implement any such transfer. Without limiting the generality of the foregoing, Seller shall promptly provide Purchaser with such documents and other information as Purchaser shall

reasonably request in connection with the foregoing, and in connection with any such transfers agreed by the Seller and the Purchaser.

5.15    Air Quality Permit Renewal. Seller shall use reasonable best efforts to renew the Department Plan Approval Permit No. 06-05159A, issued by the Pennsylvania Department of Environmental Protection - Air Quality Program, for the period from and after May 31, 2021.

5.16    Purchased Assets held by Affiliates. Without limiting Seller's obligations under Section 10.9 hereof, in the event that an Affiliate of Seller owns or holds any assets rights or properties that, if owned or held by the Seller at the Closing, would constitute Purchased Assets ("Wayward Assets"), Parent shall cause each such Affiliate to transfer and assign, for no additional consideration, such Wayward Assets to Purchaser by transfer documents in form and content not inconsistent with the terms and provisions hereof and otherwise in form and content reasonably requested by Purchaser.

5.17    Benefit Plan Cooperation. Prior to the Closing, Seller shall cooperate in good faith with and provide reasonable assistance to Purchaser in connection with and to facilitate Purchaser and/or its Affiliates' establishment of new health, welfare and retirement plans for the Transferred Employees (including, without limitation, Seller's prompt execution and delivery of broker access and change of broker forms in respect of Benefit Plans in form and content reasonably satisfactory to Seller and the delivery of claims and other participant information, in each case, as reasonably requested by Purchaser and not prohibited or restricted by applicable law).

5.18    ERP/IT Cooperation and Access. Without limiting the generality of Section 2.1(l) or Section 5.1, from the date of this Agreement to the earlier of the Closing or the date this Agreement is terminated, Seller shall, and shall cause its Affiliates to, cooperate in good faith (but at no material cost or expense to Seller) with and provide reasonable access and assistance to Purchaser and its Affiliates during normal business hours in connection with and to facilitate Purchaser's and/or its Affiliates' transitioning of any enterprise resource planning system or information technology system relating to the Business or the Purchased Assets to the enterprise resource planning systems or information technology systems of Purchaser and/or its Affiliates so that such transitioning can be effectuated at Closing or as soon thereafter as possible.

5.19    Designation as Successful Bidder and Related Matters. If Purchaser is designated as the Back-Up Bidder at the Auction, then Seller will designate Purchaser as the Successful Bidder prior to 5:00 pm, Eastern Time, on June 11, 2021 if the transactions contemplated by the Stalking Horse Agreement (as defined below) have not been consummated prior to such time.  Furthermore, if the transactions contemplated by the Stalking Horse Agreement have not been consummated prior to  5:00 pm, Eastern Time, on June 11, 2021, subject to the satisfaction of the conditions set forth in Article VII, Seller will consummate the transactions contemplated by this Agreement on or before the Termination Date.  Seller will notify Purchaser prior to 5:00 pm, Eastern Time, on June 3, 2021 as to whether or not clearance under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, has been obtained under the Stalking Horse Agreement and which, if any, closing conditions under the Stalking Horse Agreement remain unsatisfied as of such time. Seller will provide prompt notice and a reasonably detailed description of major developments that occur between the Auction Date and the Termination Date under the Stalking Horse Agreement.

ARTICLE VI
CONDITIONS PRECEDENT TO OBLIGATIONS OF PURCHASER

The obligations of Purchaser at Closing under this Agreement are subject to the satisfaction (or waiver by Purchaser) of the following conditions precedent on or before the Closing Date:

6.1     <u>Warranties True as of Present Date</u>. Each of the representations and warranties of Seller contained in <u>Sections 3.1</u>, <u>3.2</u>, <u>3.3</u>, <u>3.4</u> and <u>3.18</u> (a) that are qualified as to Material Adverse Effect shall be true and correct in all respects as of the Closing Date as if made anew as of such date (except to the extent such representations and warranties expressly relate to an earlier date (in which case, as of such earlier date)), except to the extent of changes or developments contemplated by the terms of this Agreement or caused by the transactions contemplated hereby; and (b) that are not so qualified shall be true and correct (without giving effect to any qualifications as to "materiality," "Material Adverse Effect" or similar qualifications as to materiality) as of the Closing Date as if made anew as of such date (except to the extent such representations and warranties expressly relate to an earlier date (in which case, as of such earlier date)), except to the extent of changes or developments contemplated by the terms of this Agreement or caused by the transactions contemplated hereby and except for failures of such representations and warranties to be true and correct as do not and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

6.2     <u>Compliance with Agreements and Covenants</u>. Seller shall have performed and complied with all of the covenants, obligations and agreements contained in this Agreement to be performed and complied with by it on or prior to the Closing Date, in all material respects, (including <u>Section 5.15</u>), including delivery of the documents referred to in <u>Section 2.7(b)</u>.

6.3     <u>No Prohibition</u>. No law or injunction shall have been adopted, promulgated or entered by any Governmental Authority which prohibits, and no lawsuit or proceeding shall be pending, which would be reasonably expected to prohibit, the consummation of the transactions contemplated hereby.

6.4     <u>Entry of Sale Order</u>. The Sale Order shall have been entered by the Bankruptcy Court, shall be in full force and effect, shall not have been vacated, reversed, stayed, modified or amended in any manner not approved by Purchaser, shall have become final and no longer be subject to (or subject to a pending) appeal, vacatur, reversal or motion for reconsideration, and shall not be subject to a stay; provided, however, that if no person, entity or governmental unit has specifically questioned, challenged or objected to the good faith (as such term is used within the meaning of section 363 of the Bankruptcy Code) of Purchaser at or before the Sale Hearing (any such question, challenge or objection, a "<u>Good Faith Objection</u>"), and the Sale Order is not subject to a pending appeal, vacatur, reversal or motion for reconsideration based on a Good Faith Objection or the Bankruptcy Court's determination that Purchaser is a good faith purchaser within the meaning of section 363 of the Bankruptcy Code (a "<u>Pending Good Faith Review</u>"), and is not subject to a stay, as of the Closing, then the Sale Order need only have been entered by the Bankruptcy Court and be in full force and effect and not subject to a stay as of the Closing.

6.5    No Material Adverse Effect. Since the date of this Agreement, no Material Adverse Effect shall have occurred.

Any waiver of a condition by Purchaser shall be effective only if such waiver is stated in writing and signed by Purchaser; provided, however, that the consent of Purchaser to the Closing shall constitute a waiver by Purchaser of any conditions to Closing as to Purchaser not satisfied as of the Closing Date.

ARTICLE VII
CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLER

The obligations of Seller at Closing under this Agreement are subject to the satisfaction (or waiver in writing by Seller) of the following conditions precedent on or before the Closing Date:

7.1    Warranties True as of Present Date. Each of the representations and warranties of Purchaser contained in Article IV (a) that are qualified as to "material adverse effect" shall be true and correct as of the Closing Date as if made anew as of such date (except to the extent such representations and warranties expressly relate to an earlier date (in which case, as of such earlier date)), except to the extent of changes or developments contemplated by the terms of this Agreement or caused by the transactions contemplated hereby, and (b) that are not so qualified shall be true and correct as of the Closing Date as if made anew as of such date (except to the extent such representations and warranties expressly relate to an earlier date (in which case, as of such earlier date)), except to the extent of changes or developments contemplated by the terms of this Agreement or caused by the transactions contemplated hereby and except for failures of the representations and warranties referred to in this clause (b) to be true and correct as do not and would not reasonably be expected to have, in the aggregate, a material adverse effect on Purchaser's ability to consummate the transactions contemplated hereby.

7.2    Compliance with Agreements and Covenants. Purchaser shall have performed and complied with all of its covenants, obligations and agreements contained in this Agreement to be performed and complied with by it on or prior to the Closing Date, in all material respects, including delivery of the documents referred to in Section 2.7(c) hereof.

7.3    No Prohibition. No law or injunction shall have been adopted, promulgated or entered by any Governmental Authority which prohibits and no lawsuit or proceeding shall be pending, which would be reasonably expected to prohibit the consummation of the transactions contemplated hereby.

7.4    Entry of Sale Order. The Sale Order shall have been entered by the Bankruptcy Court, shall be in full force and effect, shall not have been vacated, reversed, stayed, modified or amended in any manner not approved by Seller, shall have become final and no longer be subject to (or subject to a pending) appeal, vacatur, reversal or motion for reconsideration, and shall not be subject to a stay; provided, however, that if no person, entity or governmental unit has made a Good Faith Objection at or before the Sale Hearing, and the Sale Order is not subject to a Pending Good Faith Review, and is not subject to a stay, as of the Closing, then the Sale Order need only have been entered by the Bankruptcy Court and be in full force and effect and not subject to a stay as of the Closing.

Any waiver of a condition by Seller shall be effective only if such waiver is stated in writing and signed by the Seller; provided, however, that the consent of Seller to the Closing shall constitute a waiver by the Seller of any conditions as to the Seller to Closing not satisfied as of the Closing Date.

## ARTICLE VIII
## TERMINATION

8.1     <u>Termination</u>. This Agreement may be terminated at any time on or prior to the Closing Date:

(a)     With the mutual written consent of Purchaser and Seller;

(b)     By either Purchaser or Seller, if the Closing shall not have occurred on or before June 18, 2021 (as may be extended pursuant to <u>Section 8.1(k)</u>) (the "<u>Termination Date</u>"); <u>provided</u>, that the right to terminate this Agreement under this <u>Section 8.1(b)</u> shall not be available to any party whose failure to fulfill any obligation under this Agreement has been the primary cause of, or primarily resulted in, the failure of the Closing to occur on or before the Termination Date;

(c)     By Seller, if Purchaser shall have breached or failed to perform any of its representations, warranties, covenants or other agreements contained in this Agreement, which breach or failure to perform (A) would give rise to the failure of a condition set forth in <u>Section 7.1</u> or <u>Section 7.2</u> and (B) has not been or is incapable of being cured by Purchaser within ten (10) Business Days after its receipt of written notice thereof from Seller;

(d)     By Purchaser, if Seller shall have breached or failed to perform any of its representations, warranties, covenants or other agreements contained in this Agreement, which breach or failure to perform (A) would give rise to the failure of a condition set forth in <u>Section 6.1</u> or <u>Section 6.2</u> and (B) has not been or is incapable of being cured by Seller within ten (10) Business Days after their receipt of written notice thereof from Purchaser;

(e)     By Seller, if (i) all of the conditions set forth in <u>Article VI</u> have been satisfied or waived (other than those conditions that by their terms are to be satisfied at the Closing) and (ii) Purchaser fails to proceed with and consummate the Closing within three (3) Business Days after receipt of written notice from Seller that Seller is ready, willing and able to proceed with and consummate the Closing;

(f)     By Purchaser, if (i) all of the conditions set forth in <u>Article VII</u> have been satisfied or waived (other than those conditions that by their terms are to be satisfied at the Closing) and (ii) Seller fails to proceed with and consummate the Closing within three (3) Business Days after receipt of written notice from Purchaser that Purchaser is ready, willing and able to proceed with and consummate the Closing;

(g)     By Purchaser, if (i) after the conclusion of the Auction, if Purchaser is the Successful Bidder, Seller or any of its Affiliates take steps in furtherance of any Alternative Transaction or seek to have the Bankruptcy Court enter an Order dismissing, or converting into a case under Chapter 7 of the Bankruptcy Code, the case commenced by Seller under Chapter 11 of

the Bankruptcy Code and comprising part of the Bankruptcy Case, or appointing a trustee in the Bankruptcy Case or appointing a responsible officer or an examiner with enlarged powers (other than a fee examiner) relating to the operation of Seller's business pursuant to Section 1104 of the Bankruptcy Code, or such an order of dismissal, conversion or appointment is entered for any reason and is not reversed or vacated within five (5) days after the entry thereof or (ii) after the conclusion of the Auction if Purchaser is the Back-Up Bidder, Seller or any of its Affiliates take steps in furtherance of any Alternative Transaction other than that of the Successful Bidder or seeks to have the Bankruptcy Court enter an Order dismissing, or converting into a case under Chapter 7 of the Bankruptcy Code, the case commenced by Seller under Chapter 11 of the Bankruptcy Code and comprising part of the Bankruptcy Case, or appointing a trustee in the Bankruptcy Case or appointing a responsible officer or an examiner with enlarged powers (other than a fee examiner) relating to the operation of Seller's business pursuant to Section 1104 of the Bankruptcy Code, or such an order of dismissal, conversion or appointment is entered for any reason and is not reversed or vacated within five (5) days after the entry thereof;

(h)     By either Purchaser or Seller, if any Governmental Authority shall have issued an order, decree or ruling or taken any other action permanently restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement, and such order, decree, ruling or other action shall have become final and nonappealable;

(i)     Automatically if Seller consummates any Alternative Transaction with someone other than Purchaser involving the Purchased Assets;

(j)     [Reserved];

(k)     By Purchaser if: (i) the Auction for the Reading Facility shall not have been held, conducted and concluded on or before May 24, 2021; (ii) Purchaser is not selected and designated as the Successful Bidder or Back-Up Bidder in the Notice of Successful Bidder to be filed by Seller on or before May 26, 2021; (iii) the Sale Hearing shall not have been held and concluded on or before June 8, 2021; (iv) the Sale Order shall not have been entered on or before June 9, 2021; or (v) the Closing of the transactions contemplated by this Agreement shall not have occurred on or before June 18, 2021; provided that Seller and Purchaser may mutually agree in writing to extend such milestones. For the avoidance of doubt, Purchaser shall not have the right to terminate this Agreement pursuant to this <u>Section 8.1(k)</u> with respect to any of the milestone dates set forth in clauses (iii), (iv) and (v) of this Section 8.1(k) (but no others) in the event that Seller has obtained agreement from the existing secured lenders having the right to approve the transaction timeline for the transaction contemplated herein an extension of the applicable date; provided, that no such date may be extended (A) by more than five Business Days or (B) more than once, in each case, without first obtaining Purchaser's written consent, which consent Purchaser may grant or withhold in its sole discretion; and, provided further, that in the event the milestone dates set forth in clauses (iii), (iv) or (v) of this <u>Section 8.1(k)</u> are extended as provided herein, the Termination Date shall automatically be extended by the same amount of time;

(l)     By Purchaser at any time after 5:00 p.m. Eastern Time on June 11, 2021, unless (i) prior to such time Purchaser has been designated the Successful Bidder and (ii) Seller is not bound by the Asset Purchase Agreement, dated as of May 2, 2021, by and among DAK Americas LLC, Seller and solely for purposes of Section 5.16 thereof, Parent (the "<u>Stalking Horse</u>

Agreement"), or any other agreement providing for the purchase and sale of the Purchased Assets or any material portion thereof; or

(m)     By Purchaser at any time after 5:00 p.m. Eastern Time on June 3, 2021 if prior to such time clearance has not been obtained under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, to consummate the transactions contemplated by the Stalking Horse Agreement; provided, Purchaser will not have the right to terminate this Agreement pursuant to this Section 8.1(m) if Purchaser has been designated the Successful Bidder prior to 5:00 p.m. Eastern Time on June 3, 2021.

Notwithstanding anything else contained in this Agreement, the right to terminate this Agreement under this Section 8.1 shall not be available to any party (a) that is in material breach of its obligations hereunder or (b) whose failure to fulfill its obligations or to comply with its covenants under this Agreement has been the primary cause of, or primarily resulted in, the failure to satisfy any condition to the obligations of either party hereunder.

8.2     Expenses. Except as otherwise provided in Section 10.15 below, whether or not the Closing occurs, all Expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such Expenses. As used in this Agreement, "Expenses" means the out-of-pocket fees and expenses of the party's independent advisor, counsel and accountants, incurred or paid by the party or on its behalf in connection with this Agreement and the transactions contemplated hereby.

8.3     Effect of Termination. In the event of termination of this Agreement by either Purchaser or Seller as provided in Section 8.1, this Agreement will forthwith become void and have no further force or effect, without any liability (other than as set forth in Section 8.2, this Section 8.3, or Section 9.2) on the part of Purchaser or Seller; provided, however, that the provisions of Section 8.2, this Section 8.3, Section 2.6(a)(ii), Section 9.2 and Sections 10.11, 10.12 and 10.15 will survive any termination hereof; provided, further, however, that subject to the terms of this Section 8.3, nothing in this Section 8.3 shall relieve any party of any liability for any breach by such party of this Agreement prior to the date of any such termination. For the avoidance of all doubt, upon any termination of this Agreement pursuant to Section 8.1(c) or (e) above, (a) Seller shall have the right to collect the Deposit from the Escrow Holder as liquidated damages in accordance with Section 2.6(a)(ii) above and (b) Purchaser and Seller shall deliver a joint written instruction, in accordance with the Escrow Agreement, to the Escrow Holder instructing the Escrow Holder to disburse the Deposit, less an amount equal to Seller's share of the Escrow Holder's fees and charges, to Seller. In connection with any termination pursuant to this Agreement (other than pursuant to Section 8.1(c) or Section 8.1(e)), including pursuant to Section 9.1(a), (i) Purchaser shall be entitled to the prompt return of the Deposit, and (ii) Purchaser and Seller shall deliver a joint written instruction, in accordance with the Escrow Agreement, to the Escrow Holder instructing the Escrow Holder to disburse the Deposit, less an amount equal to Purchaser's share of the Escrow Holder's fees and charges, to Purchaser.

ARTICLE IX
BANKRUPTCY COURT MATTERS

9.1     Motion for Approvals.

(a)     No later than the times set forth in the Bid Procedures Order (as may be modified pursuant to the terms thereof with the prior written consent of Purchaser to the extent such modifications relate to this Agreement and adversely affect Purchaser, such consent not to be unreasonably withheld), Seller will (subject to Purchaser's and Seller's rights and obligations set forth in Section 9.1(c) below) make all filings and give all notices relating to this Agreement as Seller is required to make and give pursuant to the Bid Procedures Order. Seller shall take all actions as may be reasonably necessary to obtain entry of the Sale Order, including furnishing affidavits, declarations or other documents or information for filing with the Bankruptcy Court. Purchaser agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining entry of the Sale Order and a finding of adequate assurance of future performance by Purchaser, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" Purchaser under Section 363(m) of the Bankruptcy Code. Both Purchaser's and Seller's obligations to consummate the transactions contemplated in this Agreement shall be conditioned upon the Bankruptcy Court's entry of the Sale Order. If the Bankruptcy Court refuses to issue the Sale Order or to approve a sale of the Purchased Assets to Purchaser at the Sale Hearing, then this transaction shall automatically terminate and Seller and the Purchaser shall be relieved of any further liability or obligation hereunder. In the event that a third party (an "Upset Purchaser" and the underlying purchase agreement between the Upset Purchaser and Seller, the "Upset Agreement") is approved by the Bankruptcy Court as the purchaser of the Purchased Assets at the Sale Hearing, and Purchaser's bid as reflected in this Agreement is the next highest bid at the Auction, then notwithstanding anything to the contrary in this Agreement, this Agreement shall not terminate, but rather shall become a "back-up bid" which shall (subject to Purchaser's other rights of termination hereunder) remain open for acceptance by Seller until the closing of the sale transaction with the Upset Purchaser, but subject and subordinate in all respects to the rights of the Upset Purchaser under the Upset Agreement.  Upon entry of the Sale Order in accordance with the provisions of this Section 9.1(a), the condition set forth in this Section 9.1(a) shall conclusively be deemed satisfied.

(b)     If the Sale Order, or any other orders of the Bankruptcy Court relating to this Agreement or the transactions contemplated hereby are appealed by any Person (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacatur, stay, rehearing or re-argument shall be filed with respect to the Bid Procedures Order and the Sale Order, or other such order) subject to the rights otherwise arising from this Agreement, Seller shall take all actions as may be reasonably necessary to prosecute such appeal, petition or motion and obtain an expedited resolution of any such appeal, petition or motion; provided, however, nothing herein shall be deemed to require Seller to so pursue any such appeal or other actions beyond the Termination Date if this Agreement is terminated in accordance with its terms after the Termination Date.

(c)     Purchaser and Seller shall consult with each other regarding pleadings, notices and filings that either of them intends to file with the Bankruptcy Court in connection with, or which might reasonably be expected to adversely affect the Bankruptcy Court's approval of the Sale Order, including, sharing in advance any drafts for the other's review and comment, it being agreed that each party shall give reasonable consideration to, and incorporate into the relevant pleading, notice or filing, any reasonable comments the other(s) may provide within a reasonable

time prior to the filing of any of such pleading, notice or filing. No party hereto shall seek any modification to the Sale Order by the Bankruptcy Court or any other Governmental Authority of competent jurisdiction to which a decision relating to the Bankruptcy Case has been appealed, in each case, without prior written consent of the other(s) in its/their sole discretion.

9.2     <u>Bidding Procedures</u>. Purchaser and Seller acknowledge entry of the Bid Procedures Order and related stipulations. Seller shall take all actions as may be reasonably necessary to carry out the process contemplated in the Bidding Procedures, including  (i) holding the Auction for the Reading Facility on or before May 24, 2021, and (ii) filing and having entered the Sale Order on or before June 9, 2021.

ARTICLE X
MISCELLANEOUS

10.1     <u>Amendment</u>. This Agreement may be amended, modified or supplemented only in a writing signed by Purchaser and Seller.

10.2     <u>Notices</u>. Any notice, request, instruction or other document to be given hereunder by a party hereto shall be in writing and shall be deemed to have been given, (i) when received if given in person or by courier or a courier service, (ii) on the date of transmission if sent by confirmed electronic mail, (iii) on the next Business Day if sent by an overnight delivery service, or (iv) five Business Days after being deposited in the U.S. mail, certified or registered mail, postage prepaid:

> (a)     If to Seller, addressed as follows:
>
> > CarbonLite P, LLC
> > c/o Force 10 Partners
> > 5271 California Avenue, Suite 270
> > Irvine, CA 92617
> > Attn: Brian Weiss
> > Email: bweiss@force10partners.com
>
> > With a copy (which shall not constitute notice) to:
>
> > Pachulski Stang Ziehl & Jones LLP
> > 10100 Santa Monica Blvd., 13th Floor
> > Los Angeles, CA 90067
> > Attention: Maxim B. Litvak, Esq. and Steven W. Golden, Esq.
> > Email: mlitvak@pszjlaw.com and sgolden@pszjlaw.com
>
> (b)     If to Purchaser, addressed as follows:
>
> > TSG Shelf II Acquisition, LLC
> > c/o The Sterling Group, L.P.
> > 9 Greenway Plaza, Suite 2400
> > Houston, Texas 77046
> > Attention:     Scott Maclaren; Max Klupchak

Email: smaclaren@sterling-group.com; mklupchak@sterling-group.com

with a copy (which shall not constitute notice) to:

Willkie Farr & Gallagher LLP
600 Travis Street, Suite 2100
Houston, Texas 77002
Attention: Bruce C. Herzog and Paul Shalhoub
Email: bherzog@willkie.com and pshalhoub@willkie.com

or to such other individual or address as a party hereto may designate for itself by notice given as herein provided.

 10.3 <u>Waivers</u>. The failure of a party hereto at any time or times to require performance of any provision hereof shall in no manner affect its right at a later time to enforce the same. No waiver by a party of any condition or of any breach of any term, covenant, representation or warranty contained in this Agreement shall be effective unless in writing, and no waiver in any one or more instances shall be deemed to be a further or continuing waiver of any such condition or breach in other instances or a waiver of any other condition or breach of any other term, covenant, representation or warranty.

 10.4 <u>Counterparts</u>. This Agreement may be executed in counterparts and such counterparts may be delivered in electronic format (including by email). Such delivery of counterparts shall be conclusive evidence of the intent to be bound hereby and each such counterpart and copies produced therefrom shall have the same effect as an original. To the extent applicable, the foregoing constitutes the election of the parties to invoke any law authorizing electronic signatures.

 10.5 <u>Interpretation</u>. The headings preceding the text of Articles and Sections included in this Agreement and the headings to Sections of the Disclosure Schedule are for convenience only and shall not be deemed part of this Agreement or the Disclosure Schedule or be given any effect in interpreting this Agreement or the Disclosure Schedule. The use of the masculine, feminine or neuter gender herein shall not limit any provision of this Agreement. The use of the terms "including" or "include" shall in all cases herein mean "including, without limitation" or "include, without limitation," respectively. The term "made available to Purchaser" means made available in the Data Room at least two (2) Business Days prior to the date hereof. Underscored references to Articles, Sections, Exhibits or Schedules shall refer to those portions of this Agreement. Time is of the essence of each and every covenant, agreement and obligation in this Agreement. Neither Purchaser nor Seller shall be deemed to be in breach of any covenant contained in this Agreement if such party's deemed breach is the result of any action or inaction on the part of the other.

 10.6 <u>Applicable Law</u>. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF DELAWARE WITHOUT GIVING EFFECT TO THE PRINCIPLES OF CONFLICTS OF LAW THEREOF.

10.7    Binding Agreement; Assignment. This Agreement and the Related Agreements shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns; provided that neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned (including by operation of law) by any party without the prior written consent of the other party(ies). For all purposes hereof, a transfer, sale or disposition of a majority of the capital stock or other voting interest of a party (whether by contract or otherwise) shall be deemed an assignment requiring consent hereunder. Any purported assignment in contravention of this Section 10.7 shall be null and void. Notwithstanding the foregoing or anything else in this Agreement to the contrary, Purchaser may

(a)    transfer or assign its rights, interests or obligations under this Agreement, in whole or from time to time in part, to one or more of its Affiliates, provided that Purchaser will remain liable for the performance of its obligations and will provide notice to Seller of such assignment and

(b)    collaterally assign its rights hereunder to any lender of Purchaser.

10.8    Third Party Beneficiaries. This Agreement is solely for the benefit of the parties hereto and no provision of this Agreement shall be deemed to confer upon third parties, either express or implied, any remedy, claim, liability, reimbursement, cause of action or other right.

10.9    Further Assurances. Upon the reasonable request of Purchaser or Seller, each party will on and after the Closing Date execute and deliver to the other parties such other documents, assignments and other instruments as may be reasonably required (without imposing any material monetary obligations or other obligations beyond those specifically imposed on the cooperating party(ies) by the other provisions of this Agreement or the Related Agreements) to effectuate completely the transactions contemplated hereby, and to effect and evidence the provisions of this Agreement and the Related Agreements and the transactions contemplated hereby. For the avoidance of doubt, as to Seller, the obligations set forth in this Section 10.9 shall lapse and cease to be of any further force or effect upon the closing of the Bankruptcy Case.

10.10    Entire Understanding. The Exhibits, Schedules and Disclosure Schedules identified in this Agreement are incorporated herein by reference and made a part hereof. This Agreement and the Related Agreements set forth the entire agreement and understanding of the parties hereto and supersedes any and all prior agreements, arrangements and understandings among the parties.

10.11    EXCLUSIVE JURISDICTION OF BANKRUPTCY COURT. IN THE EVENT ANY PARTY TO THIS AGREEMENT COMMENCES ANY LITIGATION, PROCEEDING OR OTHER LEGAL ACTION IN CONNECTION WITH OR RELATING TO THIS AGREEMENT, ANY RELATED AGREEMENT OR ANY MATTERS DESCRIBED OR CONTEMPLATED HEREIN OR THEREIN, THE PARTIES TO THIS AGREEMENT HEREBY (A) AGREE ANY LITIGATION, PROCEEDING OR OTHER LEGAL ACTION SHALL BE INSTITUTED ONLY IN THE BANKRUPTCY COURT, WHICH SHALL HAVE SOLE AND EXCLUSIVE JURISDICTION OVER ANY SUCH MATTERS; (B) CONSENT AND SUBMIT TO PERSONAL JURISDICTION OF THE BANKRUPTCY COURT AND TO SERVICE OF PROCESS UPON THEM IN ACCORDANCE WITH THE RULES AND STATUTES GOVERNING SERVICE OF PROCESS; AND (C) AGREE TO WAIVE TO THE

FULL EXTENT PERMITTED BY LAW ANY OBJECTION THAT THEY MAY NOW OR HEREAFTER HAVE TO THE VENUE OF ANY SUCH LITIGATION, PROCEEDING OR ACTION IN ANY SUCH COURT OR THAT ANY SUCH LITIGATION, PROCEEDING OR ACTION WAS BROUGHT IN AN INCONVENIENT FORUM.

10.12 <u>WAIVER OF JURY TRIAL</u>. EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH SUCH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (i) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (ii) EACH PARTY UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (iii) EACH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (iv) EACH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 10.12</u>.

10.13 <u>Disclosure Schedule</u>. The inclusion of information in the Disclosure Schedule shall not be construed as an admission that such information is material to Seller or the Business. In addition, matters reflected in the Disclosure Schedule are not necessarily limited to matters required by this Agreement to be reflected in the Disclosure Schedule. Such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature. Neither the specifications of any dollar amount in any provision of this Agreement nor the inclusion of any specific item in the Disclosure Schedule is intended to imply that such amount, or higher or lower amounts, or the item so included or other items, are or are not material, and no party shall use the fact of the setting forth of any such amount or the inclusion of any such item in any dispute or controversy between the parties as to whether any obligation, item or matter not described herein or included in the Disclosure Schedule is or is not material for purposes of this Agreement. Further, neither the specification of any item or matter in any representation, warranty or covenant contained in this Agreement nor the inclusion of any specific item in the Disclosure Schedule is intended to imply that such item or matter, or other items or matters, are or are not in the ordinary course of business, and no party shall use the fact of setting forth or the inclusion of any such items or matter in any dispute or controversy between the parties as to whether any obligation, item or matter not described herein or included in the Disclosure Schedule is or is not in the ordinary course of business for purposes of this Agreement. Provided that any such amended disclosure does not materially affect the value of the Purchased Assets or result in additional liability to Purchaser, Purchaser and Seller may mutually agree at any time prior to Closing to amend all schedules to correct errors and to add omitted items, or new items that first arise or occur after the date hereof. The sections of the Disclosure Schedule described in <u>Section 2.1(i)</u>, <u>Section 2.1(j)</u>, <u>Section 2.1(k)</u>, <u>Section 2.1(m)</u>, <u>Section 2.1(q)</u>, <u>Section 2.8</u> and <u>Section 5.5(a)</u> shall be amended at the times, and subject to the terms and conditions, specified therein. Seller shall update <u>Section 3.6(g)</u> of the Disclosure Schedule (i) at least five Business Days prior to the Closing to

reflect an accurate list of the final Cure Costs and (ii) at the times, and subject to the terms and conditions specified in Section 2.1(o).

10.14    Severability. Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other situation or in any other jurisdiction. If the final judgment of a court of competent jurisdiction declares that any term or provision hereof is invalid or unenforceable, the parties agree that the court making the determination of invalidity or unenforceability shall have the power to reduce the scope, duration, or area of the term or provision, to delete specific words or phrases, or to replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and this Agreement shall be enforceable as so modified after the expiration of the time within which the judgment may be appealed.

10.15    Attorneys' Fees. In the event that Seller or Purchaser bring an action or other proceeding to enforce or interpret the terms and provisions of this Agreement, the prevailing party(ies) in that action or proceeding shall be entitled to have and recover from the non-prevailing party(ies) all such reasonable, out of pocket fees, costs and expenses (including, without limitation, all court costs and reasonable attorneys' fees) as the prevailing party(ies) may suffer or incur in the pursuit or defense of such action or proceeding.

10.16    Construction. The parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, the language shall be construed as mutually chosen by the parties to express their mutual intent, and no rule of strict construction shall be applied against any party. Any reference to any federal, state, local, or foreign statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise.

10.17    [Reserved].

10.18    Survival. Except for Purchaser's representations and acknowledgments set forth in Sections 4.5 and 4.7 hereof and Seller's representations set forth in Sections 3.1, 3.2 and 3.18 of this Agreement (all of which shall survive and continue in force following the Closing) and without in any way affecting Seller's disclaimer set forth in Section 3.22 hereof, the respective representations and warranties of Purchaser and Seller under this Agreement shall lapse and cease to be of any further force or effect effective immediately following the Closing. Except as provided in the immediately preceding sentence, the covenants and agreements of Seller and Purchaser herein, or in any certificates or other documents delivered prior to or at the Closing, shall not be deemed waived or otherwise affected by the Closing.

10.19    No Vicarious Liability. This Agreement may only be enforced against the parties hereto and their respective successors and permitted assigns. Any Claims or Proceedings that may be based upon, arise out of, or relate to this Agreement or the negotiation, execution or performance of this Agreement (including any representation or warranty made in or in connection with this Agreement or as an inducement to enter into this Agreement) may be made only against

the Persons that are signatories to this Agreement, and their respective successors and permitted assigns, and no agent, Affiliate or representative of any such Person (including any Person negotiating or executing this Agreement on behalf of such Person), will have any liability with respect to this Agreement or with respect to any Claim that may arise out of or relate to this Agreement, or the negotiation, execution, or performance of this Agreement (including a representation or warranty made in connection with this Agreement or as an inducement to enter into this Agreement). Nothing in this <u>Section 10.19</u> will impair or adversely affect the rights of Purchaser or any other Person set forth in any other Contract executed and delivered in connection with the consummation of the transactions contemplated under this Agreement and the Related Agreements.

      10.20  <u>Specific Performance</u>.  The parties agree that irreparable damage would occur if any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached.  Accordingly, from and after the entry of the Sale Order, Seller, on the one hand, and Purchaser on the other hand, will be entitled to obtain an injunction or injunctions to prevent breach of the provisions of this Agreement and to enforce specifically this Agreement and its terms and provisions, without the necessity of proving the inadequacy of money damages as a remedy, in addition to any other remedy to which they may be entitled, at law or in equity.

[<i>Signature page follows</i>]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered as of the date first above written.

**SELLER:**

**CarbonLite P, LLC**, a Delaware limited liability company and Debtor and Debtor in Possession

By:_____
      Name: Brian Weiss
      Title:  Chief Restructuring Officer

**PURCHASER:**

**TSG Shelf II Acquisition, LLC**, a Delaware limited liability company

By:_____
      Name: Scott MacLaren
      Title:  Vice President

THE UNDERSIGNED HEREBY JOINS IN THIS AGREEMENT FOR THE LIMITED PURPOSE EXPRESSLY SET FORTH IN THE PREAMBLE TO THIS AGREEMENT:

CarbonLite Holdings LLC, a Delaware limited liability company

By:_____
Name: Brian Weiss
Title:  Chief Restructuring Officer

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered as of the date first above written.

SELLER:

**CarbonLite P, LLC**, a Delaware limited liability company and Debtor and Debtor in Possession

By: _____

Name: Brian Weiss
Title: Chief Restructuring Officer

PURCHASER:

**TSG Shelf II Acquisition, LLC**, a Delaware limited liability company

By: _____

Name: Scott MacLaren
Title: Vice President

THE UNDERSIGNED HEREBY JOINS IN THIS AGREEMENT FOR THE LIMITED PURPOSE EXPRESSLY SET FORTH IN THE PREAMBLE TO THIS AGREEMENT:

CarbonLite Holdings LLC, a Delaware limited liability company

By: _____          _____

Name: Brian Weiss
Title: Chief Restructuring Officer

# **SCHEDULES AND EXHIBITS**

EXHIBIT "A"

FORM OF NOTE PURCHASE AGREEMENT

[To Be Filed]

EXHIBIT 1.1

FORM OF SALE ORDER

[See attached]

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CARBONLITE HOLDINGS LLC, *et al.*,[1] | ) | Case No. 21-10527 (JTD) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## ORDER (A) APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS RELATING TO THE READING FACILITY FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS; (B) APPROVING ASSUMPTION AND ASSIGNMENT OF CERTAIN UNEXPIRED LEASES AND EXECUTORY CONTRACTS; AND (C) GRANTING RELATED RELIEF

Upon the motion [Docket No. 112] (the "Motion") of the above-captioned debtors and debtors in possession (the "Debtors") pursuant to sections 105(a), 363, 365, 503, 507, 1107, and 1108 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1 and 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") for (a) approval of a sale of substantially all of the assets of the Debtors relating to the Reading Facility[2] free and clear of all liens, claims, encumbrances, and other interests; (b) approval of assumption and assignment of certain unexpired leases and executory contracts; and (c) approval of related relief, all as contemplated in the *Order (A) Approving Bid Procedures for the Sale of Substantially All of the Debtors'*

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: CarbonLite Holdings LLC (8957); CarbonLite Industries LLC (3596); CarbonLite P Holdings LLC (8957); CarbonLite P LLC (5453); CarbonLite PI Holdings LLC (8957); CarbonLite Pinnpack LLC (8957); CarbonLite Recycling Holdings LLC (8957); CarbonLite Sub-Holdings, LLC (8957); Pinnpack P, LLC (8322); CarbonLite Recycling LLC (3727); and Pinnpack Packaging LLC (9948). The address of the Debtors' corporate headquarters is 10250 Constellation Blvd., Los Angeles, CA 90067.

[2] The Reading Facility is a recycling facility operated by Debtor CarbonLite P, LLC ("CarbonLite P") located in Reading, Pennsylvania.

*Assets; (B) Approving Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases; (C) Approving Certain Bid Protections in Connection With the Debtors' Entry Into Any Potential Stalking Horse Agreements; (D) Scheduling the Auction and Sale Hearing; (E) Approving the Form and Manner of Notice Thereof; and (F) Granting Related Relief* [Docket No. 266] (as may be amended, supplemented or modified)[3] (the "Bid Procedures Order")[4] entered by this Court on April 9, 2021; and the Auction having taken place on May 24, 2021, in accordance with the Bid Procedures Order; and **TSG Shelf II Acquisition, LLC** having been chosen as the Successful Bidder (the "Successful Bidder" or the "Buyer") for the Purchased Assets;[5] and the Debtors party to the APA (as defined below) (the "Sellers")[6] having agreed to enter into and consummate the Asset Purchase Agreement attached hereto as Exhibit A with the Buyer (the "APA"); and the hearing to approve the sale (the "Sale" or "Sale Transaction") of the Purchased Assets and the APA (the "Sale Approval Hearing") having been held on May [ • ], 2021 in accordance with the Bid Procedures Order; and this Court having found that proper and adequate notice of the Motion and the relief requested therein has been provided in accordance with the Bid Procedures Order, Bankruptcy Rules and Local Rules, and that, except as otherwise ordered herein, no other further notice is

---

[3] *See Order Approving Stipulation Among Debtors, the Official Committee of Unsecured Creditors and the DIP Lenders, Extending Certain Deadlines Under the Bid Procedures Order* [Docket No. 312], entered by this Court on April 20, 2021; *Order Approving Second Stipulation Among Debtors and the DIP Lenders, Extending Certain Deadlines Under the Bid Procedures Order* [Docket No. 357], entered by this Court on April 27, 2021; *Order Approving Amended Third Stipulation Among Debtors and the DIP Lenders Extending Certain Deadlines Under (I) TX Debtors' Final DIP Order; (II) PA Debtors' Final DIP Order; (III) CA Debtors' Final DIP Order; and (IV) Bid Procedures Order* [Docket No. 401], entered on May 4, 2021; and *Order Authorizing Debtors to Extend, as Necessary, Certain Deadlines Under the (I) Bid Procedures Order; (II) TX Debtors' Final DIP Order; (III) PA Debtors' Final DIP Order; and (IV) CA Debtors' Final DIP Order* [Docket No. 449], entered by this Court on May 13, 2021.

[4] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Bid Procedures Order and, as applicable, the Bid Procedures (as defined in and attached to the Bid Procedures Order).

[5] As used herein, "Purchased Assets" shall have the meaning ascribed to it in the APA.

[6] Debtor CarbonLite Holdings LLC ("Holdings") is party to the APA for the sole and exclusive purpose of Section 5.15 of the APA, and for purposes of this Order is a Seller hereunder solely to that extent.

necessary; and upon the record at the Sale Approval Hearing and all of the proceedings before

this Court; and this Court having reviewed any objections asserted at the Sale Approval Hearing

and having found and determined that the relief sought at the Sale Approval Hearing, and entry

of this Order, is in the best interests of the Sellers, the Sellers' estates, their creditors, and all

other parties in interest; and after due deliberation thereon and sufficient cause appearing

therefore, the Court makes the following Findings of Fact and Conclusions of Law:

<u>**FINDINGS OF FACT AND CONCLUSIONS OF LAW**</u>

A.      **Findings and Conclusions:** The findings and conclusions set forth herein and in

the record of the Sale Approval Hearing constitute the Court's findings of fact and  conclusions of

law under Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by

Bankruptcy Rules 7052 and 9014.  To the extent any of the following conclusions of law constitute

findings of fact, or *vice versa*, they are adopted as such.

B.      **Jurisdiction, Venue and Core Proceeding:** This Court has jurisdiction over these

chapter 11 cases pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of

Reference* from the United States District Court for the District of Delaware, dated as  of February

29, 2012.  The matters covered by this Order are core proceedings under 28 U.S.C. § 157(b)(2).

Venue is proper in this district and before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

Venue in this district and before this Court was proper as of the Petition Date and continues to be

proper.   The Court may enter a final order with respect to the Motion, the Sale, the Sale

Transaction, and all related relief, in each case, consistent with Article III of the United States

Constitution.

C.      **Statutory Predicates.**  The statutory predicates for the relief sought in the Motion

are sections 105(a), 363, 365, 503, 507, 1107 and 1108 of the Bankruptcy Code, Rules 2002, 6004,

6006, 9008, and 9014 of the Bankruptcy Rules and Rules 2002-1 and 6004-1 of the Local Rules. The consummation of the Sale Transaction contemplated by the Motion, the APA, and this Order, and the assumption and assignment of the Acquired Contracts, the Acquired Real Property Leases, the Acquired Personal Property Leases and the Licenses and Permits (as defined in the APA) (the "Acquired Contracts"), are legal, valid, and properly authorized under the cited provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and all of the applicable requirements of such sections and rules have been complied with in respect of such transactions.

D. **Sufficiency of Notice.** As evidenced by the affidavits of service filed with the Court, proper, timely, adequate, and sufficient notice of the Motion, the Bid Procedures Hearing, the Bid Procedures, the Assumption and Assignment Procedures, the proposed assumption and assignment of the Acquired Contracts, the Auction, the Sale Approval Hearing, the Sale, the Sale Transaction, and all transactions contemplated therein or in connection therewith, and all deadlines related thereto, was given under the particular circumstances and no further notice need be provided.

E. **Actual Notice.** Actual written notice of the Motion, the Bid Procedures Hearing, the Bid Procedures, the Assumption and Assignment Procedures, the proposed assumption and assignment of Acquired Contracts, the Auction, the Sale Approval Hearing, the Sale, the Sale Transaction and all transactions contemplated therein or in connection therewith, and all deadlines related thereto has been given to all interested persons and entities, including, without limitation: (i) the DIP Term Agent, DIP Term Lenders, and Prepetition Term Secured Parties, and each of their counsel; (ii) the DIP ABL Lender and Prepetition ABL Secured Parties, and each of their counsel (iii) the TX/PA DIP Agents and Prepetition Trustees (each as defined in the applicable DIP Order), and each of their counsel; (iv) counsel to the Official Committee of Unsecured

Creditors (the "Committee"); (v) the Office of The United States Trustee; (vi) the counterparty to each unexpired lease and executory contract to be assumed and assigned pursuant to this Order, and each of their counsel (if known) (vii) all persons known or reasonably believed to have asserted an interest in the Purchased Assets; (viii) the Attorneys General in the States where the Assets are located; (ix) all federal, state, and local taxing authorities in the States where the Assets are located; (x) all parties who have asserted liens against the Purchased Assets; (xi) all parties included on the Debtors' consolidated creditor matrix; and (xii) any other party that has filed a request for notices with the Court (collectively, the "Notice Parties").

F.     **Extensive Efforts by Debtors.**  The Sellers have worked with their counsel, their investment banker Jefferies, LLC ("Jefferies"), and other advisors, as well as, as applicable, the Consultation Parties and the Consent Parties, to implement a viable Sale Transaction that would allow them to maximize the value of their Assets.  The Sale Transaction for the Purchased Assets that is the subject of this Order is the result of the Sellers' extensive efforts in seeking to maximize recoveries to the Debtors' estates, for the benefit of all of the Debtors' creditors.

G.     **Business Justification.**  The Sellers have demonstrated good, sufficient, and sound business purposes and justifications for, and compelling circumstances to promptly consummate, the Sale Transaction contemplated by the APA and related documents, including, without limitation, the assumption, assignment, and/or transfer of the Acquired Contracts pursuant to sections 105, 363, and 365 of the Bankruptcy Code, prior to and outside of a plan of reorganization, and such action is an appropriate exercise of the Sellers' business judgment and in the best interests of the Sellers, their estates, and their creditors.  Such business reasons include, but are not limited to, the fact that: (i) there is substantial risk of depreciation of the value of the Purchased Assets if the Sale is not consummated promptly; (ii) the Sale Transaction contemplated by the APA presents

the best opportunity to maximize the value of the Sellers' estates; (iii) at Closing, in accordance with the *Final Order Pursuant to Sections 105, 361, 362, 363, 364, 503 and 507 of the Bankruptcy Code (I) Authorizing CarbonLite P, LLC and CarbonLite P Holdings LLC to Obtain Senior Secured Superpriority Postpetition Financing; (II) Granting (A) Liens and Superpriority Administrative Expense Claims, and (B) Adequate Protection to the Prepetition Secured Parties; (III) Authorizing the Use of Cash Collateral; (IV) Modifying the Automatic Stay; and (V) Granting Related Relief* [Docket No. 276] (the "PA DIP Order"), the cash proceeds of the Sale Transaction will be used to indefeasibly pay the DIP Obligations (as defined in the PA DIP Order); and (iv) unless the Sale is concluded expeditiously as provided for in this Order and pursuant to the APA, potential creditor recoveries may be substantially diminished.

H. **Bid Procedures Order.** On April 9, 2021, this Court entered the Bid Procedures Order approving, among other things, Bid Procedures for the sale of substantially all of the Debtors' Assets and Assumption and Assignment Procedures for the related assumption and assignment of any unexpired leases and executory contracts relating to any sale. The Bid Procedures provided a full, fair, and reasonable opportunity for any entity to make an offer to purchase the Debtors' Assets. The Assumption and Assignment Procedures provided a full, fair, and reasonable opportunity for any counterparty to any unexpired lease or executory contract to object to any proposed Cure Amount, assumption and assignment of its applicable unexpired lease or executory contract, or the Buyer's adequate assurance of future performance. The Debtors, the Buyer, and their respective counsel and other advisors have complied with the Bid Procedures Order, the Bid Procedures, and the Assumption and Assignment Procedures in all respects.

I. **Adequate Marketing; Highest or Best Offer.** As demonstrated by (i) the testimony and other evidence proffered or adduced at the Sale Approval Hearing, and (ii) the

representations of counsel made on the record at the Sale Approval Hearing, (a) the Sellers have adequately marketed the Purchased Assets and conducted the Sale process in compliance with the Bid Procedures Order in good faith and in a fair and open manner; (b) the Sale Process and the Bid Procedures were non-collusive, duly noticed, and provided a full, fair, reasonable and adequate opportunity for any interested party to conduct due diligence and make an offer to purchase the Debtors' Assets, and submit higher and better offers for the Purchased Assets than the Buyer's Successful Bid; (c) the consideration provided by the Buyer in the APA constitutes the highest and best offer for the Purchased Assets; (d) the consideration is fair and reasonable consideration for the Purchased Assets and constitutes reasonably equivalent value under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia; (e) the Sale will provide a greater recovery to the Sellers' creditors with respect to the Purchased Assets than would be provided by any other available alternative; (f) taking into consideration all relevant factors and circumstances, no other entity has offered to purchase the Purchased Assets for greater economic value to the Sellers or their estates than the Buyer; and (g) the Sellers' determination that the APA constitutes the highest or best offer for the Purchased Assets, maximizes value for the Debtors' estates, and constitutes a valid and sound exercise of the Sellers' business judgment. There is no legal or equitable reason to delay Closing of the Sale Transaction contemplated by the APA.

J.       **Opportunity to Object.**  A reasonable opportunity to object or be heard with respect to the Motion, and all relief requested therein has been afforded to all interested parties.

K.       **Property of the Estates.**  The Purchased Assets are property of the Sellers' estates and title thereto is vested in the Sellers' estates.

L.     **Sale in Best Interests.**  The actions to be taken by the Sellers and the Buyer are appropriate under the circumstances of these chapter 11 cases and are in the best interests of the Sellers, their estates, their creditors, and other parties in interest.  Approval of the APA and the Sale Transaction set forth therein, and all related transactions at this time is in the best interests of the Sellers, their creditors, their estates, and all other parties in interest.

M.     **Arm's-Length Sale.**  The APA, the Sale, the Sale Transaction, and any transactions contemplated therein and associated therewith were negotiated, proposed, and entered into by the Sellers and the Buyer without collusion, in good faith, and from arm's-length bargaining positions.  Neither the Sellers, their insiders and affiliates, the DIP Secured Parties (as defined in the PA DIP Order), and the Prepetition Secured Parties (as defined in the PA DIP Order) nor the Buyer have engaged in any conduct that would cause or permit the APA, the Sale, or any part of the Sale Transaction to be avoided under section 363(n) of the Bankruptcy Code.

N.     **Good Faith Buyer.**  The Buyer has proceeded in good faith in all respects, is a good faith buyer under section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby, including in the event this Order or any portion hereof is reversed or modified on appeal.  In particular, (i) Buyer recognized that the Sellers were free to deal with any other party interested in purchasing the Purchased Assets; (ii) Buyer in no way induced or caused the chapter 11 filings by the Sellers or other Debtors; (iii) Buyer has not violated section 363(n) of the Bankruptcy Code by any action or inaction; (iv) no common identity of directors, managers, officers or controlling stockholders exist between Buyer, on the one hand, and any of the Sellers or other Debtors, on the other hand; (v) Buyer complied with the Bid Procedures and all provisions of the Bid Procedures Order; and (vi) all payments to be made, and all other material

agreements or arrangements entered into or to be entered into by Buyer in connection with the Sale Transaction have been disclosed.

O. **Corporate Authority.** The Sellers (i) have full corporate power and authority to execute the APA and all other documents contemplated thereby, and the Sale Transaction and Sale of the Purchased Assets have been duly and validly authorized by all necessary corporate action of the Sellers, (ii) have all of the corporate power and authority necessary to consummate the transactions contemplated by the APA, (iii) have taken all corporate action necessary to authorize and approve the APA and the consummation by the Sellers of the transactions contemplated thereby, and (iv) need no consents or approvals, other than those expressly provided for in the APA, subject to the waiver of such consents or approvals to the extent provided in the APA and as may be permitted under applicable law.

P. **Free and Clear Findings Required by the Buyer.** The Buyer would not have entered into the APA and would not consummate the Sale if the Sale of the Purchased Assets to the Buyer were not, pursuant to section 363(f) of the Bankruptcy Code, free and clear of (i) all liens, claims, pledges, options, charges, hypothecations, easements, security interests, rights-of-way, encroachments, mortgages and deeds of trusts or other encumbrances, other than Permitted Post-Closing Encumbrances (as defined in the APA) (collectively, the "Liens"), (ii) all claims as defined in section 101(5) of the Bankruptcy Code, including all rights or causes of action (whether in law or in equity), warranties, guarantees, indemnities, rights of recovery, setoff, recoupment, indemnity or contribution, obligations, demands, restrictions, indemnification claims or liabilities relating to any act or omission of the Debtors or any other person prior to the Closing, consent rights, options, contract rights, covenants and interests of any kind or nature whatsoever (known or unknown, matured or unmatured, accrued or contingent and regardless of whether currently

exercisable), whether arising prior to or subsequent to the commencement of the above-captioned

cases, and whether imposed by agreement, understanding, law, equity or otherwise (collectively,

the "Claims"), and (iii) all debts, liabilities, obligations, contractual rights and claims and labor,

employment and pension claims, in each case, whether known or unknown, choate or inchoate,

filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected

or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated,

matured or unmatured, material or non-material, disputed or undisputed, whether arising prior to

or subsequent to the commencement of these chapter 11 cases, and whether imposed by agreement,

understanding, law, equity or otherwise (collectively, the "Interests").   Upon entry of this Order,

the Sellers are authorized to transfer all their right, title and interest in and to the Purchased Assets

free and clear of, and the Buyer shall not be responsible for, any Liens, Claims, or Interests,

including, without limitation, in respect of the following: (i) any rights or Claims basedon any

successor or transferee liability, (ii) any Liens, Claims or Interests that purport to give to any party

a right or option to effect any forfeiture, modification, right of first refusal, or termination of the

Sellers' or the Buyer's interest in the Assets, or any similar rights; (iii) any labor or employment

agreements; (iv) any pension, multiemployer plan (as such term is defined in Section 3(37) or

Section 4001(a)(3) of ERISA), health or welfare, compensation or other Benefit Plans, agreements,

practices and programs, including, without limitation, any pension plans of the Debtors or any

multiemployer plan to which the Debtors have at any time contributed to or had any liability or

potential liability; (v) any other employee, worker's compensation, occupational disease or

unemployment or temporary disability related claim, including, without limitation, claims that

might otherwise arise under or pursuant to (a) ERISA, (b) the Fair Labor Standards Act, (c) Title

VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National

Labor Relations Act, (f) the Age Discrimination and Employment Act of 1967 and Age Discrimination in Employment Act, as amended, (g) the Americans with Disabilities Act of 1990, (h) Section 4980B of the Internal Revenue Code of 1986 and Part 6 of Title I of ERISA, together in each case, with applicable regulations, in each case, as amended and in effect from time to time (collectively, "<u>COBRA</u>"), (i) state discrimination laws, (j) state unemployment compensation laws or any other similar state laws, or (k) any other state or federal benefits or claims relating to any employment with the Sellers or any of their predecessors; (vi) any bulk sales or similar law; (vii) any tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder, and any taxes arising under or out of, in connection with, or in any way relating to the operation of the Assets prior to the Closing; or (viii) any unexpired and executory contract or unexpired lease to which any Debtor is a party that is not a contract or lease that will be assumed and assigned pursuant to this Order and the APA (the "<u>Successor or Other Liabilities</u>"). A sale of the Purchased Assets other than one free and clear of all Liens, Claims, and Interests would yield substantially less value for the Sellers' estates, with less certainty, than the Sale as contemplated. Therefore, the Sale contemplated by the APA free and clear of all Liens, Claims, and Interests is in the best interests of the Sellers, their estates, their creditors, and all other parties in interest.

Q. **Environmental Protection Agency.** Notwithstanding the foregoing, nothing in this Order or the APA releases, nullifies, precludes or enjoins the enforcement of any police or regulatory liability to a governmental unit that any entity would be subject to as the post-sale owner or operator of property after the date of entry of this Order. Nothing in this Order or the APA authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization, or (e) approval, or the discontinuation of any obligation thereunder,

without compliance with all applicable legal requirements and approvals under police or regulatory law. Nothing in this Order divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Order or to adjudicate any defense asserted under this Order.

R. **Assumption and Assignment of Unexpired Leases and Executory Contracts.** Pursuant to section 365 of the Bankruptcy Code, the Debtors are authorized to assume all Acquired Contracts[7] and assign such Acquired Contracts to the Buyer. To the extent a Cure Amount is owed to the counterparty of any Acquired Contract (the "Contract Counterparty"), the applicable Cure Amount will be paid by the Buyer in accordance with this Order and the APA. The Buyer has, in accordance with the Assumption and Assignment Procedures, provided adequate assurance of future performance to any Contract Counterparty as required by section 365(b)(1)(C). In accordance with the Assumption and Assignment Procedures and the terms of this Order, following the Closing, Buyer shall be fully and irrevocably vested with all of the Sellers' right, title and interest in and under the Acquired Contracts in connection with the Purchased Assets, free and clear of any Liens, Claims and Interests, and each Acquired Contract shall be fully enforceable by Buyer in accordance with its respective terms and conditions, except as limited by this Order. Following assignment of the Acquired Contracts to Buyer, the Sellers shall be relieved from any further liability with respect to such Acquired Contracts.

S. **Transfer of Acquired Contracts**. The Acquired Contracts being assigned to Buyer are an integral part of the Sale Transaction and, accordingly, their assumption and assignment is reasonable and an enhancement to the value of the Debtors' estates. To the extent

---

[7] Notwithstanding the name of the Debtor listed on any Acquired Contract, the Acquired Contracts identified in the APA are deemed assumed and assigned by the applicable Debtors party to the APA.

any Acquired Contract is not an executory contract within the meaning of section 365 of the Bankruptcy Code, it shall be transferred to Buyer in accordance with the terms of the APA and, other than with respect to Permitted Post-Closing Encumbrances and Assumed Liabilities, Buyer shall have no liability or obligation for any (i) defaults or breaches under such agreement that relate to acts or omissions that occurred in the period, or otherwise arose, prior to the Closing Date and (ii) claims, counterclaims, offsets, or defenses (whether contractual or otherwise, including, any right of recoupment) with respect to such Acquired Contract, that relate to any acts or omissions that arose or occurred prior to the Closing Date.

T.     **Binding and Valid Transfer.**  The transfer of the Purchased Assets to the Buyer will be a legal, valid, and effective sale and transfer of the Purchased Assets and will vest the Buyer with all right, title, and interest of the Sellers to the Purchased Assets free and clear of all Liens, Claims, and Interests (other than Permitted Post-Closing Encumbrances and Assumed Liabilities), and any liabilities of the Sellers, except as otherwise expressly set forth in the APA or in this Order.

U.     **Satisfaction of Standards of Section 363(f).**  The Sellers may sell the Purchased Assets freeand clear of all Liens, Claims, and Interests of any kind or nature whatsoever, other than Permitted Post-Closing Encumbrances and Assumed Liabilities, because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code have been satisfied.  Those holders of Liens, Claims, and Interests who did not object,  or  who withdrew their objections, to the Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code.  Holders of Liens, Claims, or Interests are adequately protected by having their Liens, Claims, or Interests attach to the proceeds received by the Sellers (if any) that are ultimately attributable to the property against or in which such Liens, Claims, or Interests are asserted, subject to the terms of such Liens, Claims, or Interests, with the same validity, force, and effect, and in the

same order of priority, which such Liens, Claims, or Interests now have against the Purchased Assets or their proceeds, if any. In all cases, each such person with Liens, Claims, or Interests in the Purchased Assets (other than Permitted Post-Closing Encumbrances and Assumed Liabilities) is enjoined from taking any action against the Buyer, the Buyer's affiliates, or any agent of the foregoing to recover any such Lien, Claim, or Interest.

V.      **Consideration for Transfer of Purchased Assets Free and Clear**. Buyer would not have entered into the APA if the transfer of the Purchased Assets were not free and clear of all Liens, Claims and Interests as set forth in the APA and this Order, or if in the future Buyer would or could be liable for any such Liens, Claims or Interests. The total consideration to be provided under the APA reflects Buyer's reliance on this Order to provide, pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, that, upon the Closing, Buyer has title to, interest in and possession of the Purchased Assets free and clear of all Liens, Claims and Interests.

W.      **Repayment of DIP Obligations.** Pursuant to the PA DIP Order, the Purchased Assets constitute DIP Collateral (as defined in the PA DIP Order) and are subject to the DIP Liens (as defined in the PA DIP Order). At Closing, the Sellers are authorized and directed to distribute the proceeds of the Sale Transaction in accordance with the PA DIP Order and the DIP Documents (as defined in the PA DIP Order).

X.      **No *Sub Rosa* Plan**. The Sale, Sale Transaction, the APA, and the other transactions contemplated thereby do not constitute a *sub rosa* chapter 11 plan. The Sale Transaction neither impermissibly restructures the rights of the Sellers' creditors nor impermissibly dictates a liquidating chapter 11 plan for the Sellers.

Y.      **Assets Assignable**. To the maximum extent possible under the Bankruptcy Code, each and every provision of the documents governing the Purchased Assets or applicable non-

bankruptcy law that purports to prohibit, restrict, or condition, or could be construed as prohibiting, restricting, or conditioning assignment of any of the Purchased Assets, if any, has been or will be satisfied or is otherwise unenforceable under section 365 of the Bankruptcy Code.

Z.      **Necessity of Order.**  The Buyer would not have entered into the APA and would not consummate the Sale Transaction contemplated therein without all of the relief provided for in this  Order (including, but not limited to, that the sale and transfer of the Purchased Assets to Buyer be free and clear  of all Liens, Claims, and Interests).   The consummation of the Sale Transaction pursuant to this Order and the APA is necessary for the Sellers to (i) comply with the terms of the PA DIP Order and the DIP Documents (as defined in the PA DIP Order), including the milestones and repayment provisions set forth therein, and (ii) maximize the value of their estates for the benefit of all creditors.

AA.      **Final Order.** This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), the Court expressly finds that there is no just reason for delay in the implementation of this Order and expressly directs entry of judgment as set forth herein.

BB.      **Best Interests.** Entry of this Order is in the best interests of the Sellers, the Sellers' estates, their creditors, and all other parties in interest.

## ORDER

Based on the foregoing Findings of Fact and Conclusions of Law, it is hereby **ORDERED, ADJUDGED, AND DECREED** as follows:

1.      **Findings of Fact and Conclusions of Law.**      The above-referenced findings of fact and conclusions of law are hereby incorporated by reference as though fully set forth herein and shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052,

made applicable herein by Bankruptcy Rule 9014. To the extent that any finding of fact shall be determined to be a conclusion of law, it shall be deemed so, and *vice versa*.

2. **Motion Granted.** The Motion is granted with respect to the Sale Transaction contemplated by the APA, and the relief requested therein with respect to the Sale is granted and approved in its entirety, as set forth herein.

3. **Objections are Overruled.** Except for any objections to adequate assurance of future performance by any Contract Counterparty that are contemplated to be heard post-Sale Approval Hearing in accordance with the Assumption and Assignment Procedures, all objections, reservations of rights regarding, or other responses to the Motion or the relief requested therein, the APA, all other ancillary agreements, the Sale Transaction, the entry of this Order or to the relief granted herein that have not been withdrawn, waived, settled, or not otherwise resolved pursuant to the terms hereof, if any, hereby are denied and overruled on the merits with prejudice. All persons and entities that failed to timely object to the Motion are deemed to have consented to the relief granted herein for all purposes.

4. **Approval.** The APA, and all the terms and conditions thereof, is approved. Pursuant to sections 105, 363, and 365 of the Bankruptcy Code, the Sellers are authorized to perform their obligations under, and comply with the terms of, the APA and consummate the Sale and the related transactions pursuant to, and in accordance with, the terms and conditions of the APA and this Order. The Sellers are authorized to execute and deliver, and empowered to perform under, consummate, and implement, the APA and the Sale Transaction contemplated therein, together with all additional instruments and documents that the Sellers or the Buyer deem necessary or appropriate to implement the APA and effectuate the Sale Transaction contemplated therein, and to take all further actions as may reasonably be required by the Buyer for the purpose

of assigning, transferring, granting, conveying, and conferring to the Buyer the Purchased Assets free and clear of any and all Liens, Claims, and Interests (other than Permitted Post-Closing Encumbrances and Assumed Liabilities) as may be necessary or appropriate to the performance of their obligations under the APA. The Buyer and the Sellers shall have no obligation to consummate the Sale Transaction except as contemplated by and provided for in the APA and the Bid Procedures. The Buyer shall not be required to seek or obtain relief from the stay under section 362 of the Bankruptcy Code to enforce any of its remedies under the APA or related documents. The automatic stay imposed by section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the provisions of this Order.

5. **Notice**. Notice of the Motion, the Bid Procedures Hearing, the Bid Procedures, the Assumption and Assignment Procedures, the assumption and assignment of the Acquired Contracts to Buyer, the Auction, the Sale Approval Hearing, the Sale, all transactions contemplated therein or in connection therewith, including the Sale Transaction, all deadlines related thereto, and the relief granted in this Order was fair, sufficient, proper, and equitable under the circumstances and complied in all respects with sections 102(1) and 363 of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Bid Procedures Order, the Bid Procedures, the Assumption and Assignment Procedures, and the procedural due process requirements of the United States Constitution.

6. **Assumption and Assignment of Unexpired Leases and Executory Contracts.** Pursuant to section 365 of the Bankruptcy Code, the Sellers are authorized to assume the Acquired Contracts and assign such Acquired Contracts to the Buyer. To the extent a Cure Amount is owed to a Contract Counterparty, the applicable Cure Amount will be paid by the Buyer (or if disputed, escrowed) on or before Closing of the Sale subject to and in accordance with the APA. Any

objection of any Contract Counterparty to the assumption or assignment of any Acquired Contracts, any Cure Amount, or seeking further adequate assurance of future performance than that provided in the APA, to the extent not otherwise resolved by agreement, contemplated to be heard after the Sale Approval Hearing in accordance with the Assumption and Assignment Procedures, or by separate order of this Court, is hereby overruled. There shall be no accelerations, assignment fees, increases, or any other fees charged to Buyer or Sellers as a result of the assignment of the Purchased Assets or the assumption and assignment of the Acquired Contracts. Disputed Cure Amounts escrowed pursuant to the APA and this Order shall be held in escrow and disbursed to satisfy the payment of Cure Amounts only upon agreement of the Sellers, the Buyer and the applicable Contract Counterparty, or upon further order of the Court. Upon payment of the Cure Amount, the Sellers shall be released by the applicable Contract Counterparty from any and all claims and causes of action of any nature whatsoever based on, arising from or relating to the Acquired Contracts.

7.      **Transfer of Security and Other Deposits**. To the extent provided for in the APA, any and all of the Sellers' security deposits, or other security held by landlords, lessors, and other Contract Counterparties to the Acquired Contracts are being transferred and assigned to, and shall be the property of, the Buyer from and after the Closing, which transfer and assignment of security deposits, other deposits, or security shall satisfy in full the requirements of section 365(l) of the Bankruptcy Code for all Acquired Contracts assumed and assigned pursuant to this Order or the APA.[8] Except as expressly set forth in the APA, the Buyer shall have no responsibility for the payment of any Cure Amounts.

---

[8] The deposits referenced herein and being transferred pursuant to the APA do not include any Good Faith Deposits made by other potential bidders for the Assets of the Debtors pursuant to the Bid Procedures.

8.     **Binding Effect of Order.**  This Order shall be binding  in  all respects upon (i) all known and unknown creditors of, and holders of equity security interests in, the Debtors, including any holders of Liens, Claims, and Interests; (ii) the Buyer; (iii) the Debtors; (iv) the Purchased Assets; (v) any trustee(s) appointed in the Debtors' chapter 11 cases or upon a conversion to cases under chapter 7 of the Bankruptcy Code; and (vi) all successors and assigns of each of the foregoing, and this Order shall not be subject to amendment or modification and the APA shall not be subject to rejection.

9.     **[Release of Back-Up Bidder.**   The Back-Up Bidder will be released at Closing and any Good Faith Deposit of any Back-Up Bidder will be refunded within three (3) days of Closing.]

10.     **Injunction.**  All persons and entities are prohibited and enjoined from taking any action to adversely affect or interfere with the ability of the Sellers to transfer the Purchased Assets to the Buyer in accordance with the APA and this Order. Following the Closing, all persons (including, but not limited to, the Sellers and the other Debtors, creditors, investors, current and former employees and shareholders, administrative agencies, governmental units, secretaries of state, federal, state, and local officials, including those maintaining any authority relating to any environmental, health and safety laws, and the successors and assigns of each of the foregoing) holding Liens, Claims, or Interests in the Purchased Assets or against the Sellers and the other Debtors in respect of the Purchased Assets of any kind or nature whatsoever shall be, and hereby are, forever barred, estopped, and permanently enjoined from asserting, prosecuting, or otherwise pursuing  any Liens, Claims, or Interests (other than Permitted Post-Closing Encumbrances and Assumed Liabilities) of any kind or nature whatsoever against the Buyer or any affiliate of the Buyer or any of its respective property, successors and assigns, or the Purchased Assets, as an

alleged successor or on any other grounds. No person shall assert, and the Buyer and the Purchased Assets shall not be subject to, any defaults, breaches, counterclaims, offsets, defenses (whether contractual or otherwise, including, without limitation, any right of recoupment), liabilities, claims and interests, or basis of any kind or nature whatsoever to delay, defer, or impair any right of the Buyer under, or with respect to, any Purchased Assets, with respect to any act or omission that occurred prior to the Closing or with respect to any other agreement or any obligation of the Sellers or the other Debtors that is not an assumed liability under the APA.

11. **General Assignment.** Upon the Closing, this Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of the Sellers' interests in the Purchased Assets and a bill of sale transferring good and marketable title in the Purchased Assets to the Buyer free and clear of all Liens, Claims and Interests (other than the Permitted Post-Closing Encumbrances and Assumed Liabilities). Each and every federal, state, and local governmental agency, quasi-agency, or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the Sale Transaction contemplated under the APA.

12. **Transfer Free and Clear.** Upon the Closing, pursuant to sections 105(a), 363(b), 363(f), 365(b) and 365(f) of the Bankruptcy Code, the Purchased Assets, including the Acquired Contracts, shall be transferred to the Buyer in accordance with the APA, and such transfer shall be free and clear of all Liens, Claims, and Interests (other than the Permitted Post-Closing Encumbrances and Assumed Liabilities) of any person, including, without limitation, all such Liens, Claims, and Interests specifically enumerated in paragraph P of this Order, whether arising by agreement, by statute, or otherwise and whether occurring or arising before, on, or after the Petition Date, whether known or unknown, occurring or arising prior to such transfer, with all such

Liens, Claims, and Interests (other than the Permitted Post-Closing Encumbrances and Assumed Liabilities) attaching to the proceeds of the Sale ultimately attributable to the property against or in which the holder of a Lien, Claim, or Interest claims or may claim a Lien, Claim, or Interest, in the order of its priority, with the same validity, force, and effect which they now have and had against the Purchased Assets immediately prior to Closing, subject to any claims and defenses the Debtors may possess with respect thereto (other than with respect to any Lien, Claim, or Interest of any of the DIP Secured Parties (as defined in the PA DIP Order) and Prepetition Secured Parties (as defined in the PA DIP Order).

13.     **Licenses and Permits**.  To the greatest extent available under applicable law, the Buyer shall be authorized, as of the Closing Date, to operate under any license, permit, registration, and governmental authorization or approval of the Sellers with respect to the Purchased Assets, and all such licenses, permits, registrations, and governmental authorizations and approvals are deemed to have been, and hereby are, deemed to be transferred to the Buyer as of the Closing Date. To the extent provided by section 525 of the Bankruptcy Code, no Governmental Entity may revoke or suspend any grant, permit, or license relating to the operation of the Purchased Assets sold, transferred, assigned, or conveyed to the Buyer on account of the filing or pendency of these chapter 11 cases or the consummation of the Sale Transaction.

14.     **Environmental Protection Agency**.  Notwithstanding the foregoing, nothing in this Order or the APA releases, nullifies, precludes or enjoins the enforcement of any police or regulatory liability to a governmental unit that any entity would be subject to as the post-sale owner or operator of property after the date of entry of this Order. Nothing in this Order or the APA authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization, or (e) approval, or the discontinuation of any obligation thereunder,

without compliance with all applicable legal requirements and approvals under police or regulatory law. Nothing in this Order divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Order or to adjudicate any defense asserted under this Order.

15.     **Valid Transfer.**  The transfer of the Purchased Assets to the Buyer pursuant to the APA constitutes a legal, valid, and effective transfer of the Purchased Assets and shall vest the Buyer with all right, title, and interest of the Sellers in and to the Purchased Assets free and clear of all Liens, Claims, and Interests of any kind or nature whatsoever (other than the Permitted Post-Closing Encumbrances and Assumed Liabilities).

16.     **Exculpation and Release.**  Neither the Buyer nor any of its affiliates, successors, and assigns, nor any of its professionals, shall have, or incur any liability to, or be subject to any action by, the Debtors or any of their predecessors, successors, or assigns, arising out of the negotiation, investigation, preparation, execution, or delivery of the APA and the entry into and consummation of the Sale Transaction, except as expressly provided in the APA and this Order. Neither the Debtors nor any of their affiliates, successors, and assigns, nor any of their professionals, shall have, or incur any liability to, or be subject to any action by, the Buyer or any of its predecessors, successors, or assigns, arising out of the negotiation, investigation, preparation, execution, or delivery of the APA and the entry into and consummation of the Sale Transaction, except as expressly provided in the APA and this Order.

17.     **Direction to Release Interests.**  Upon the Closing, each of the Debtors' creditors and any other holder of a Lien, Claim, or Interest is authorized and directed to execute such documents and take all other actions as may be reasonably necessary to release its Lien, Claim, or Interest in the Purchased Assets, if any, as such Lien, Claim, or Interest may have been recorded

or may otherwise exist.  If any person or entity that has filed financing statements, mortgages, mechanic's liens, *lis pendens*, or other documents or agreements evidencing a Lien, Claim, or Interest in all or any portion of the Purchased Assets being sold pursuant to the Sale Transaction and the APA shall not have delivered to the Debtors prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all Liens, Claims, and Interests (other than the Permitted Post-Closing Encumbrances and Assumed Liabilities), which such person or entity has with respect to all or any portion of the Purchased Assets being sold pursuant to the Sale Transaction and the APA , then (i) the Sellers are authorized to execute and file such statements, instruments, releases, and other documents on behalf of such person or entity with respect to all or any portion of the Purchased Assets being sold pursuant to the Sale Transaction and the APA, and (ii) the Buyer is authorized to file, register, or otherwise record a certified copy of this Order, which shall constitute conclusive evidence of the release of all Liens, Claims, and Interests (other than the Permitted Post-Closing Encumbrances and Assumed Liabilities) of any kind or nature whatsoever in the Purchased Assets being sold pursuant to the Sale Transaction and the APA.  Each and every federal, state, and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the APA, including, without  limitation, recordation of this Order.  This Order shall be binding upon and shall govern the acts of all persons including without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons who  may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments,

or who maybe required to report or insure any title or state of title in or to any of such assets or other property interests.

18. **No Interference.** Following the Closing, no holder of any Lien, Claim or Interest in the Purchased Assets shall interfere with the Buyer's title to, or use and enjoyment of, the Purchased Assets being sold pursuant to the Sale Transaction and the APA based on, or related to, any such Lien, Claim, or Interest, or based on any actions the Debtors may take in these chapter 11 cases.

19. **Surrender of Possession.** All persons or entities that are currently, or as of the Closing, may be, in possession of some or all of the Purchased Assets are hereby directed to surrender possession of the Purchased Assets to the Buyer at the Closing, unless the Buyer otherwise agrees.

20. **Standing to Object to Claims**. The Buyer shall have standing to object to the allowance of claims (as such term is defined in section 101(5) of the Bankruptcy Code) asserted against the Sellers *solely* in regard to any unresolved or disputed Assumed Liabilities (as defined in the APA), that constitute obligations assumed by the Buyer pursuant to the terms of the APA.

21. **Standing**. The APA shall be in full force and effect, regardless of any Seller's lack of good standing in any jurisdiction in which such Seller is formed or authorized to transact business.

22. **Post-Closing Actions and Transactions.** The Sellers and the Buyer, and each of their respective officers, employees, and agents, will be authorized and empowered to take all actions and execute and deliver any and all documents and instruments that either the Sellers or the Buyer deem necessary or appropriate to implement and effectuate the terms of the APA, the Sale Transaction contemplated therein and this Order.

23. **Sale is Self-Executing**. The Sale is self-executing, and neither the Sellers nor the Buyer shall be required to execute or file releases, termination statements, assignments, consents, or other instruments to effectuate, consummate, and implement the provisions of this Order.

24. **No Discriminatory Treatment.** To the extent provided by section 525 of the Bankruptcy Code, no governmental unit may deny, revoke, suspend, or refuse to renew any permit, license, or similar grant relating to the operation of the Purchased Assets sold, transferred, or conveyed to the Buyer on account of the filing or pendency of these chapter 11 cases or the consummation of the transactions contemplated by the APA.

25. **No Successor Liability.** Neither the Buyer, nor any of its successors or assigns, or any of their respective affiliates shall have any liability for any Lien, Claim, or Interest that arose or occurred prior to the Closing, or otherwise may be asserted against the Sellers or other Debtors or is related to the Purchased Assets prior to the Closing. The Buyer is not and shall not be deemed a "successor" to the Sellers or other Debtors or their estates; the Buyer has not, *de facto* or otherwise, merged with or into the Sellers or other Debtors; the Buyer does not have any common law or successor liability in relation to any employment plans; the Buyer is not liable for any liability or Lien (other than Assumed Liabilities) against the Sellers or other Debtors or any of the Sellers' or other Debtors' predecessors or Affiliates (other than those transferred to the Buyer pursuant to the Sale); and the Buyer is not an alter ego or mere continuation or substantial continuation of the Sellers or other Debtors or the enterprise of the Sellers or other Debtors under any theory of law or equity as a result of any action taken in connection with the APA, the Sale Transaction or any transactions or documents ancillary thereto or contemplated thereby or in connection with the acquisition of the Purchased Assets.

26.     **Limitations on Liability.**  Without limiting the foregoing, and except as otherwise set forth in the APA, the Buyer shall not have any successor, transferee, derivative, or vicarious liabilities of any kind or character for any Liens, Claims, or Interests, including under any theory of successor  or transferee liability, *de facto* merger or continuity, whether known or unknown as of the Closing, now existing or hereafter arising, whether fixed or contingent, asserted or unasserted, liquidated or unliquidated, with respect to the Successor or Other Liabilities.

27.     **Fair Consideration.**  The consideration provided by the Buyer for the Purchased Assets under the APA shall be deemed to constitute reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia.  The Sale may not be avoided under section 363(n) of the Bankruptcy Code.  The APA was not entered into, and the Sale is not being consummated, for the purpose of hindering, delaying, or defrauding creditors of the Sellers or other Debtors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof, or the District of Columbia, or any other applicable law.  Neither the Sellers nor the Buyer have entered into the APA or any agreement contemplated thereby or are consummating the Sale with any fraudulent or otherwise improper purpose, including, without limitation, to evade any pension liabilities.  No other person or entity or group of persons or entities has offered to purchase the Purchased Assets for an amount that would provide greater value to the Sellers and their estates than the value provided by the Buyer.  The Court's approval of the Motion and the APA is in the best interests of the Debtors, their estates, their creditors, and all other parties in interest.

28.     **No Modification by Subsequent Orders or Plan Provisions**.  Nothing contained in any chapter 11  plan confirmed in the Debtors' chapter 11 cases, any order confirming any such

plan, or in any other order entered in these chapter 11 cases (including any order entered after any conversion of any of these chapter 11 cases to a case under chapter 7 of the Bankruptcy Code) or any related proceeding subsequent to entry of this Order shall modify, alter, conflict with, or derogate from, the provisions of the APA or this Order.

29. **Retention of Jurisdiction.** This Court retains jurisdiction, pursuant to its statutory powers under 28 U.S.C. § 157(b)(2), to, among other things, interpret, implement, and enforce the terms and provisions of this Order and the APA, all amendments thereto, and any waivers and consents thereunder, including, but not limited to, retaining jurisdiction to (i) compel delivery of the Purchased Assets to the Buyer; (ii) interpret, implement, and enforce the provisions of this Order and the APA; (iii) protect the Buyer, any of the Buyer's affiliates, or any agent of the foregoing, against any Liens, Claims, or Interests against the Sellers or other Debtors or the Purchased Assets of any kind or nature whatsoever; and (iv) enter any order under sections 363 and 365 of the Bankruptcy Code.

30. **Good Faith Buyer.** The transactions contemplated by the APA are undertaken by the Buyer without collusion and in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and, accordingly, the reversal or modification on appeal of the authorization provided in this Order to consummate the transactions shall not affect the validity of the transactions (including the assumption and assignment of the Acquired Contracts) nor the transfer of the Purchased Assets owned by the Sellers to the Buyer fee and clear of all Liens pursuant to the APA. The Buyer is a buyer in good faith of the Purchased Assets and is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code. In particular, (i) Buyer recognized that the Sellers were free to deal with any other party interested in purchasing the Purchased Assets; (ii) Buyer in no way induced or caused the chapter 11 filings by the Sellers or the other Debtors;

(iii) Buyer has not violated section 363(n) of the Bankruptcy Code by any action or inaction; (iv) no common identity of directors, managers, officers or controlling stockholders exist between Buyer, on the one hand, and the Sellers or the other Debtors, on the other hand; (v) Buyer complied with the Bid Procedures and all provisions of the Bid Procedures Order; and (vi) all payments to be made, and all other material agreements or arrangements entered into or to be entered into by Buyer in connection with the Sale Transaction have been disclosed. The Sellers and the Buyer will be acting in good faith if they proceed to consummate the Sale at any time after entry of this Order.

31. **Approval of Repayment of DIP Obligations**. At Closing, the Sellers are authorized and directed to distribute the proceeds of the Sale Transaction with respect to the Purchased Assets to the DIP Secured Parties (as defined in the PA DIP Order) in accordance with the PA DIP Order and the DIP Documents (as defined in the PA DIP Order).

32. **Repayment of Prepetition Obligations and Adequate Protection Obligations/Remaining Prepetition Obligations and Adequate Protection Obligations.** To the extent the proceeds of the Sale Transaction are sufficient to pay the DIP Obligations (as defined in the PA DIP Order) owed to the DIP Secured Parties (as defined in the PA DIP Order) in full at Closing and any other costs and expenses that are required to be paid at Closing, the remaining proceeds of the Purchase Price shall be distributed (i) in respect of cash, to the trustee for the Prepetition Secured Parties (as defined in the PA DIP Order), and (ii) in respect of the Note Consideration (as defined in the APA), in accordance with the APA.

33. **Release of Secured Parties.** In consideration of the consent by each of the DIP Secured Parties (as defined in the PA DIP Order) and Prepetition Secured Parties (as defined in the PA DIP Order) to the Sale Transaction, each of the Debtors, on behalf of themselves, anyone

who may bring a claim on their behalf (including derivative claims), and their successors and assigns, and each of their respective officers, directors, employees, agents, sub-agents, attorneys, consultants, advisors and affiliates (collectively, the "Releasors"), hereby, forever release, discharge and acquit each of the DIP Secured Parties (as defined in the PA DIP Order) and the Prepetition Secured Parties (as defined in the PA DIP Order), and their respective successors and assigns, and their present and former shareholders, affiliates, subsidiaries, divisions, predecessors, directors, officers, partners, members, managers, attorneys, employees, consultants, advisors and other representatives in their respective capacities as such (collectively, the "Released Secured Parties") of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, of every kind, nature and description, including, without limitation, any so-called "lender liability" claims or defenses, that Releasors had, have or hereafter can or may have against any Released Secured Party as of the date hereof, in respect of events that occurred on or prior to the date hereof with respect to any Debtors or any subsidiary thereof, the DIP Documents (as defined in the PA DIP Order), the Prepetition Documents (as defined in the PA DIP Order), and any other financial accommodations made by any of the Released Secured Parties to the Debtors, including any action or omission of a Released Secured Party in such person's capacity as an officer, director, employee, consultant, or agent of, or advisor to, any Debtors or any subsidiary thereof (the "Secured Party Release"). In addition, upon the Closing, the Released Secured Parties are hereby released from any and all obligations, liabilities, actions, duties, responsibilities and causes of action arising or occurring in connection with or related to the DIP Documents (as defined in the PA DIP Order), the PA DIP Order, these chapter 11 cases, or this Order, and the Debtors are authorized to execute and deliver a termination and release agreement, in form and substance satisfactory to each of the Released Secured Parties.

*Notwithstanding the foregoing*, the effectiveness of the Secured Party Releases set forth herein are expressly subject to the Challenge Period (as defined in the PA DIP Order) as may be extended in accordance with the terms of the PA DIP Order, *provided however,* that the effectiveness of the Secured Party Releases by the PA Debtors (as defined in the PA DIP Order) to the DIP Secured Parties (as defined in the PA DIP Order) and the Prepetition Secured Parties (as defined in the PA DIP Order) were effective immediately upon entry of the Interim Order (as defined in the PA DIP Order).

34. **No Bulk Law Application.** No bulk sales law or similar law shall apply in any way to the transactions contemplated by the Sale, the APA, the Motion, and this Order.

35. **Inconsistencies with Prior Orders, Pleadings or Agreements**. To the extent this Order is inconsistent with any prior order or filing with respect to the Motion in these chapter 11 cases, the terms of this Order shall govern and any prior orders shall be deemed amended or otherwise modified to the extent required to permit consummation of the Sale Transaction. To the extent there is any inconsistency between the terms of this Order and the terms of the APA (including all ancillary documents executed in connection therewith), the terms of this Order shall govern. Except as otherwise expressly provided by this Order, nothing in the APA or this Order shall be deemed to amend, modify, or limit the rights and claims of any of the DIP Secured Parties (as defined in the PA DIP Order) or any of the Prepetition Secured Parties (as defined in the PA DIP Order), unless expressly agreed to in writing by the foregoing as applicable.

36. **Failure to Specify Provisions.** The failure to specifically include any particular provision of the APA or other documents relating to the Sale Transaction in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the APA

and all other documents related to the Sale Transaction be authorized and approved in their entirety pursuant to this Order.

37.    **Non-Material Modifications.**  The APA and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment, or supplement does not have any adverse effect on the Sellers' estates. Notwithstanding anything to the contrary set forth in this Order, the APA, any ancillary agreement or related agreement, document, or other instrument, any amendments, modifications, supplements to or waivers of any obligations or rights of the parties thereto that could reasonably adversely impact or affect the rights of the DIP Secured Parties (as defined in the PA DIP Order) or the Prepetition Secured Parties (as defined in the PA DIP Order) shall require the prior written consent of the applicable Required Lenders (as defined in the DIP Credit Agreement or Prepetition Documents (each as defined in the PA DIP Order)).

38.    **No Stay of Order.**  Notwithstanding the provisions of Bankruptcy Rules 6004(h) and 6006(d), this Order shall not be stayed for fourteen (14) days after its entry and shall be effective immediately upon entry, and the Sellers and the Buyer are authorized to close the Sale Transaction immediately upon entry of this Order.  Time is of the essence in closing the Sale Transaction referenced herein, and the Sellers and the Buyer intend to close the Sale Transaction as soon as practicable.  This Order is a final order and the period in which an appeal must be filed shall commence upon the entry of this Order.  Any party objecting to this Order must exercise due diligence in filing an appeal and pursuing a stay, or risk its appeal being foreclosed as moot.

39.    **Headings.**  Headings utilized in this Order are for convenience of reference only, and do not constitute a part of this Order for any other purpose.

40. **Time Periods.** All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

41. **Non-severability.** The provisions of this order are non-severable and mutually dependent.

## **EXHIBIT A**

Asset Purchase Agreement

EXHIBIT 1.3

CERTAIN NON-TRANSFERRED EMPLOYEES

[See attached]

1. Farahnik, Leon

2. Maroofian, Ira

3. Delnik, Alex

4. Farahnik, Jason

5. Cruz, Aniceta

6. Milhaupt, Gregg

7. Xia, Daniel

8. Smith, Kimball

9. Diaz, Michele

10. Franco, Jose

11. Costa, Rich

12. Siddhi, Vijendra

EXHIBIT 2.6(A)

FORM OF ESCROW AGREEMENT

[See attached]

# ESCROW AGREEMENT

**THIS ESCROW AGREEMENT** (this "<u>Agreement</u>") is made and entered into as of May 25, 2021, by and among TSG Shelf II Acquisition, LLC, a Delaware limited liability company ("<u>Purchaser</u>"), and CarbonLite P, LLC, a Delaware limited liability company ( "<u>Seller</u>") (Purchaser and Seller, sometimes referred to individually as a "<u>Party</u>" and collectively as the "<u>Parties</u>"), and Citibank, N.A., as escrow agent (the "<u>Escrow Agent</u>"). Capitalized terms used but not defined herein shall have the meanings assigned to them in that certain Asset Purchase Agreement, dated as of May 25, 2021 (as amended from time to time, the "<u>Purchase Agreement</u>"), by and between Purchaser and Seller, Seller being a chapter 11 debtor and debtor in possession in Case No. 21-10527(JTD) (jointly administered) (the "<u>Bankruptcy Case</u>") pending in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>") and, solely for the purposes specified therein, CarbonLite Holdings LLC.

## RECITALS

**WHEREAS**, the Purchase Agreement contemplates the execution and delivery of this Agreement and (a) the deposit by Seller's bankruptcy counsel with the Escrow Agent concurrently with the execution and delivery of this Agreement of $8,000,000 (such amount having been previously deposited by Purchaser with the Seller's bankruptcy counsel) (the "<u>Deposit Amount</u>") and (b) the deposit by Purchaser of $250,000 on the Closing Date (the "<u>Adjustment Escrow Amount</u>" and, together with the Deposit Amount, the "<u>Escrow Funds</u>"), in each case to provide sources of funding solely for the purposes set forth in the Purchase Agreement; and

**WHEREAS**, the Parties wish for such deposits to be subject to the terms and conditions set forth herein and in the Purchase Agreement.

**NOW THEREFORE**, in consideration of the foregoing recitals and of the mutual covenants hereinafter set forth, and other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the parties hereto agree as follows:

1.      <u>Appointment</u>.  The Parties hereby appoint the Escrow Agent as their escrow agent for the purposes set forth herein, and the Escrow Agent hereby accepts such appointment and agrees to act as escrow agent in accordance with the terms and conditions set forth herein.

2.      <u>Escrow Funds</u>.  Concurrently with the execution and delivery of this Agreement, Seller will cause its bankruptcy counsel to deposit with the Escrow Agent the Deposit Amount in immediately available funds into a separate and distinct sub-account (the "<u>Deposit Escrow Account</u>") and, on the Closing Date, Purchaser will deposit with the Escrow Agent the Adjustment Escrow Amount in immediately available funds into a separate and distinct sub-account (the "<u>Adjustment Escrow Account</u>" and together with the Deposit Escrow Account, the "<u>Escrow Accounts</u>").  The Escrow Agent hereby acknowledges receipt of the Deposit Amount.

3.      <u>Investment of Escrow Funds</u>.

(a)      Unless otherwise instructed in a joint written notice signed by an Authorized Representative of each of the Parties, the Escrow Agent shall hold the Escrow Funds

in "noninterest-bearing deposit accounts" insured by the Federal Deposit Insurance Corporation ("FDIC") to the applicable limits. The Escrow Funds shall at all times remain available for distribution to the Parties in accordance with Section 4 below.

(b)     The Escrow Agent shall send an account statement or statements to each of the Parties on a monthly basis reflecting activity in each Escrow Account for the preceding month.

4.     Disposition of the Escrow Funds and Termination of the Escrow Accounts.

(a)     Escrow Funds.  The Parties shall act in accordance with, and the Escrow Agent shall hold and release the Escrow Funds solely as provided in, this Section 4(a) as follows:

(i)     Upon receipt of a Joint Release Instruction (as defined herein) with respect to the Escrow Funds (whether held in the Deposit Escrow Account or in the Adjustment Escrow Account), the Escrow Agent shall promptly, but in any event within two Business Days after receipt of such Joint Release Instruction, disburse all or part of the applicable Escrow Funds from the applicable Escrow Account(s) in accordance with such Joint Release Instruction.

(ii)     Upon distribution of the entire Deposit Amount or Adjustment Escrow Amount, Escrow Agent shall close the applicable Escrow Account.

(iii)     If at any time any of the Parties receives a Final Determination (as defined herein), then upon receipt by the Escrow Agent of a copy of such Final Determination from any Party, the Escrow Agent shall (A) promptly deliver a courtesy copy of such Final Determination to the other Parties and (B) on the fifth Business Day following receipt by the Escrow Agent of the Final Determination, disburse to Purchaser and/or Seller, as applicable, part or all, as the case may be, of the applicable Escrow Funds from the applicable Escrow Account(s) (but only to the extent funds are available in the applicable Escrow Account(s)) in accordance with such Final Determination.  Subject to the terms of this Section 4(a), the Escrow Agent will be entitled to act on such Final Determination without further inquiry.

(iv)     All payments of any part of the Escrow Funds to Purchaser or Seller, as the case may be, shall be made by wire transfer of immediately available funds as set forth in the Joint Release Instruction or Final Determination, as applicable.  The Parties shall prepare and deliver to the Escrow Agent any Joint Release Instruction or Final Determination, as applicable, that is required for disbursement (A) in accordance with Section 2.6 of the Purchase Agreement with respect to the Escrow Funds from the Adjustment Escrow Account and (B) in accordance with Section 2.6 and Section 8.3 of the Purchase Agreement with respect to the Escrow Funds from the Deposit Escrow Account.

(v)     Any instructions setting forth, claiming, containing, objecting to, or in any way related to the transfer or distribution of any funds on deposit in any Escrow Account under the terms of this Agreement must be in writing, executed by the appropriate Party or Parties as evidenced by the signatures of the person or persons set forth on Exhibit A-1 and Exhibit A-2 (an "Authorized Representative") and delivered to the Escrow Agent attached to an e-mail received in accordance with Section 11 below.  In the event a Joint Release Instruction or Final Determination is delivered to the Escrow Agent, whether in writing, by e-mail or

otherwise, the Escrow Agent is authorized to seek confirmation of such instruction by telephone call back to the person or persons designated on Exhibit A-1 or Exhibit A-2 annexed hereto (the "Call Back Authorized Individuals"), and the Escrow Agent may rely upon the confirmations of anyone purporting to be a Call Back Authorized Individual. To assure the accuracy of the instructions it receives, the Escrow Agent may record such call backs. If the Escrow Agent is unable to verify the instructions, or is not satisfied with the verification it receives, it will not execute the instruction until all such issues have been resolved; it being understood that the Escrow Agent shall use its commercially reasonable efforts to resolve all such issues. The persons and telephone numbers for call backs may be changed only in writing, executed by an Authorized Representative of the applicable Party actually received and acknowledged by the Escrow Agent.

(b)     Certain Definitions.

(i)     "Business Day" means any day, other than a Saturday, Sunday or any other day on which banks located in New York, New York are required or authorized by law to be closed.

(ii)     "Final Determination" means (A) a final non-appealable order of any court of competent jurisdiction which may be issued, together with a certificate executed by an Authorized Representative of the prevailing Party to the effect that such order is final and non-appealable and from a court of competent jurisdiction having proper authority, or (B) with respect to the Adjustment Escrow Account, a final determination made by the Independent Auditor as set forth in the Purchase Agreement, and in the case of each of clauses (A) and (B), together with the written payment instructions executed by an Authorized Representative of each Party to whom funds are to be disbursed to effectuate such order.

(iii)     "Joint Release Instruction" means the joint written instruction of Purchaser and Seller which is executed by an Authorized Representative of each of Purchaser and each Seller and delivered to the Escrow Agent directing the Escrow Agent to disburse all or a portion of the Escrow Funds from the Deposit Escrow Account and/or the Adjustment Escrow Account, as applicable.

(iv)     "Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization or a governmental entity or any department, agency or political subdivision thereof.

5.     Escrow Agent. The Escrow Agent undertakes to perform only such duties as are expressly set forth herein, which shall be deemed purely ministerial in nature, and no other duties, including but not limited to any fiduciary duty, shall be implied (other than the implied covenant of good faith and fair dealing). The Escrow Agent shall neither be responsible for, nor chargeable with, knowledge of, nor have any requirements to comply with, the terms and conditions of any other agreement, instrument or document between the Parties, in connection herewith, if any, including without limitation the Purchase Agreement, nor shall the Escrow Agent be required to determine if any Person has complied with any such agreements, nor shall any additional obligations of the Escrow Agent be inferred from the terms of such agreements,

even though reference thereto may be made in this Agreement. Notwithstanding the terms of any other agreement between the Parties, the terms and conditions of this Agreement will control the action of the Escrow Agent. The Escrow Agent may rely upon and shall not be liable for acting or refraining from acting upon any Joint Release Instruction or Final Determination furnished to it hereunder and reasonably believed by it to be genuine and to have been signed by an Authorized Representative of the proper Party or Parties. Concurrent with the execution of this Agreement, the Parties shall deliver to the Escrow Agent authorized signers' forms in the form of Exhibit A-1 and Exhibit A-2 attached hereto. The Escrow Agent shall be under no duty to inquire into or investigate the validity, accuracy or content of any such document, notice, instruction or request. The Escrow Agent shall have no duty to solicit any payments which may be due it or the Escrow Funds. In the event that the Escrow Agent, acting reasonably, shall be uncertain as to its duties or rights hereunder or shall receive instructions, claims or demands from any Party hereto which, in its opinion, conflict with any of the provisions of this Agreement, it shall be entitled to refrain from taking any action and its sole obligation shall be to keep safely all property held in escrow until it shall be directed otherwise in a Joint Release Instruction or Final Determination. The Escrow Agent may interplead all of the assets held hereunder into a court of competent jurisdiction or may seek a declaratory judgment with respect to certain circumstances, and thereafter be fully relieved from any and all liability or obligation with respect to such interpleaded assets or any action or nonaction based on such declaratory judgment. The Escrow Agent may consult with legal counsel of its selection in the event of any dispute or question as to the meaning or construction of any of the provisions hereof or its duties hereunder. The Escrow Agent will not be liable for any action taken, suffered or omitted to be taken by it in good faith pursuant to this Agreement except to the extent that the Escrow Agent's fraud, gross negligence or willful misconduct was the cause of any direct losses or damages to any Party or the Escrow Funds. To the extent practicable, the Parties agree to pursue any redress or recourse in connection with any dispute (other than with respect to a dispute involving the Escrow Agent) without making the Escrow Agent a party to the same. Anything in this Agreement to the contrary notwithstanding, in no event shall the Escrow Agent be liable for any special, indirect, punitive, incidental or consequential losses or damages of any kind whatsoever (including but not limited to lost profits), even if the Escrow Agent has been advised of the likelihood of such losses or damages and regardless of the form of action. Notwithstanding anything to the contrary herein, in no event shall the Parties' remedies against the Escrow Agent, the Escrow Agent's liabilities hereunder, or any limitations or protections in favor of the Escrow Agent set forth in this Section 5 (including, without limitation, any limitations on losses or damages or the knowledge of the Escrow Agent), be limited, prohibited or restricted in the event of the Escrow Agent's fraud or willful misconduct.

6.  Resignation and Removal of Escrow Agent. The Escrow Agent (a) may resign and be discharged from its duties or obligations hereunder by giving 30 calendar days' advance notice in writing of such resignation to the Parties specifying a date when such resignation shall take effect or (b) may be removed, with or without cause, by Purchaser and Seller acting jointly at any time by providing a joint written notice to the Escrow Agent. Any corporation or association into which the Escrow Agent may be merged or converted or with which it may be consolidated, or any corporation or association to which all or substantially all of the escrow business of the Escrow Agent's line of business may be transferred, shall be the Escrow Agent under this Agreement without further act. The Escrow Agent's sole responsibility after such 30-day notice period expires or after receipt of written notice of removal shall be to hold and

safeguard the Escrow Funds (without any obligation to reinvest the same) and to deliver the same (i) to a substitute or successor escrow agent pursuant to a joint written designation from the Parties, (ii) as set forth in a Joint Release Instruction or (iii) in accordance with the directions of a Final Determination, and, at the time of such delivery, the Escrow Agent's obligations hereunder shall cease and terminate. In the event the Escrow Agent resigns, if the Parties have failed to appoint a successor escrow agent prior to the expiration of 30 calendar days following receipt of the notice of resignation, the Escrow Agent may petition any court of competent jurisdiction for the appointment of such a successor escrow agent or for other appropriate relief, and any such resulting appointment shall be binding upon all of the parties hereto.

7. <u>Fees and Expenses</u>. All fees and expenses of the Escrow Agent are waived as described in <u>Schedule 1</u> attached hereto.

8. <u>Indemnity</u>. Each of the Parties shall jointly and severally indemnify, defend and hold harmless the Escrow Agent and its affiliates and their respective successors, assigns, directors, officers, agents and employees (the "<u>Indemnitees</u>") from and against any and all losses, damages, claims, liabilities, penalties, judgments, settlements, actions, suits, proceedings, litigation, investigations, costs or expenses (including the reasonable and documented fees and expenses of one outside counsel and experts and their staffs and all expense of document location, duplication and shipment) (collectively "<u>Escrow Agent Losses</u>") arising out of or in connection with (a) the Escrow Agent's execution and performance of this Agreement, tax reporting or withholding, the enforcement of any rights or remedies under or in connection with this Agreement, or as may arise by reason of any act, omission or error of the Indemnitee, or (b) its compliance with any instructions or other directions from Purchaser or Seller. Notwithstanding anything to the contrary herein, Purchaser and Seller agree, solely as between themselves, that any obligation for indemnification under this <u>Section 8</u> (or for reasonable and documented fees and expenses of the Escrow Agent described in <u>Section 7</u>) shall be borne by the Party or Parties determined by a court of competent jurisdiction to be responsible for causing the loss, damage, liability, cost or expense against which the Escrow Agent is entitled to indemnification or, if no such determination is made, then 50% by Purchaser and 50% by Seller. The Parties hereto acknowledge that the foregoing indemnities shall survive the resignation or removal of the Escrow Agent or the termination of this Agreement. In connection with clause (a) above, in no event shall any Indemnitee be indemnified, defended or held harmless in respect of any Escrow Agent Losses in the event of any fraud, gross negligence or willful misconduct of such Indemnitee (as adjudicated by a court of competent jurisdiction).

9. <u>Tax Matters</u>.

(a) Prior to the date hereof, the Parties shall provide (or shall cause to be provided) the Escrow Agent with certified tax identification numbers by furnishing appropriate forms W-9 or W-8 as applicable and such other forms and documents that the Escrow Agent may reasonably request.

(b) The Escrow Agent shall be responsible only for income reporting, if any, to the Internal Revenue Service with respect to income earned on the Escrow Funds. The Escrow Agent shall withhold any taxes required to be withheld by applicable law, including but

not limited to required withholding in the absence of proper tax documentation, and shall remit such taxes to the appropriate authorities.

(c)     The Escrow Agent, its affiliates, and its employees are not in the business of providing tax or legal advice to any taxpayer outside of Citigroup, Inc. and its affiliates.  This Agreement and any amendments or attachments hereto are not intended or written to be used, and may not be used or relied upon, by any such taxpayer or for the purpose of avoiding tax penalties.    Any such taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor.

10.     Covenant of Escrow Agent.  The Escrow Agent hereby agrees and covenants with Purchaser and Seller that it shall perform all of its obligations under this Agreement and shall not deliver custody or possession of any of the Escrow Funds to anyone except pursuant to the express terms of this Agreement or as otherwise required by law.

11.     Notices.  All notices, requests, demands and other communications required under this Agreement shall be in writing, in English, and shall be deemed to have been duly given if delivered (i) personally, (ii) on the day of transmission if sent by electronic mail ("e-mail") with a PDF attachment executed by an authorized signer of the Party/Parties to the e-mail address given below, provided, no "bounce-back", system error message or other notification of non-delivery is received by the sender, (iii) by overnight delivery with a reputable national overnight delivery service, or (iv) by mail or by certified mail, return receipt requested, and postage prepaid.  If any notice is sent pursuant to clause (iv) of the immediately preceding sentence, it shall be deemed given upon the earlier to occur of (A) the date that is five Business Days after the date such notice is deposited with the United States Postal Service and (B) the actual receipt of such notice by the intended recipient thereof.  If notice is given to a Party, it shall be given at the address for such Party set forth below. It shall be the responsibility of the Parties to notify the Escrow Agent and the other Party in writing of any name or address changes.

if to Purchaser, then to:

TSG Shelf II Acquisition, LLC
c/o The Sterling Group, L.P.
9 Greenway Plaza, Suite 2400
Houston, Texas 77046
Attention:  Scott Maclaren; Max Klupchak
Email: smaclaren@sterling-group.com; mklupchak@sterling-group.com

with a copy (which shall not constitute notice) to:

Willkie Farr & Gallagher LLP
600 Travis Street, Suite 2100
Houston, TX  77002
Attention: Bruce C. Herzog and Paul Shalhoub
Email:  bherzog@willkie.com and pshalhoub@willkie.com

> CarbonLite P, LLC
> c/o Force 10 Partners
> 5271 California Avenue, Suite 270
> Irvine, CA  92617
> Attn:  Mr. Brian Weiss
> Email:  bweiss@force10partners.com

with a copy (which shall not constitute notice) to:

> Pachulski Stang Ziehl & Jones LLP
> 10100 Santa Monica Blvd., 13th Floor
> Los Angeles, CA  90067
> Attention: Maxim B. Litvak, Esq. and Steven W. Golden, Esq.
> Email: mlitvak@pszjlaw.com and sgolden@pszjlaw.com

or, if to the Escrow Agent, then to:

> Citibank, N.A.
> c/o Citi Private Bank
> 388 Greenwich St., 29th Fl
> New York, NY  10013
> Attention:     Rola Tseng-Pappalardo
> E-mail:        rola.tsengpappalardo@citi.com

Notwithstanding the above, in the case of notices, requests, demands or other communications delivered to the Escrow Agent pursuant to the foregoing clause (i) through (iii) of this Section 11, such communications shall be deemed to have been given on the date received by the Escrow Agent.  In the event that the Escrow Agent, in its sole discretion, shall determine that an emergency exists, the Escrow Agent may use such other means of communication as the Escrow Agent deems appropriate.

12.    Termination.  This Agreement shall terminate on the first to occur of (a) the distribution of all of the amounts in the Escrow Funds in accordance with this Agreement or (b) delivery to the Escrow Agent of a written notice of termination executed jointly by Purchaser and Seller after which this Agreement shall be of no further force and effect except that the provisions of Section 8 hereof shall survive termination.

13.    Miscellaneous.    The provisions of this Agreement may be waived, altered, amended or supplemented, in whole or in part, only by a writing signed by all of the parties hereto.  Neither this Agreement nor any right or interest hereunder may be assigned in whole or in part by any party, except as provided in Sections 6 and 16, without the prior consent of the other parties.  This Agreement shall be governed by and construed under the laws of the State of Delaware without regard to any conflicts of law, rules or principles that would result in the

application of the laws of any other jurisdiction. Notwithstanding anything to the contrary in this Agreement, each Party to this Agreement hereby irrevocably (i) waives any objection on the grounds of venue, forum non-conveniens or any similar grounds, (ii) consents to service of process by mail or in any other manner permitted by applicable law, and (iii) consents to the exclusive jurisdiction of the Bankruptcy Court over all disputes, matters and issues arising under or relating to the interpretation or enforcement of this Agreement (including, without limitation, any interpleader Escrow Agent may hereafter bring or file in connection with this Agreement). The parties hereto hereby waive any right to a trial by jury with respect to any lawsuit or judicial proceeding arising from or relating to this Agreement. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. All signatures of the parties to this Agreement may be transmitted by electronic transmission in portable document format (.pdf), and such .pdf will, for all purposes, be deemed to be the original signature of such party whose signature it reproduces, and will be binding upon such party. If any provision of this Agreement is determined to be prohibited or unenforceable by reason of any applicable law of a jurisdiction, then such provision shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions thereof, and any such prohibition or unenforceability in such jurisdiction shall not invalidate or render unenforceable such provisions in any other jurisdiction. Each Party represents, warrants and covenants to the Escrow Agent, solely with respect to such Party, that each document, notice, instruction or request provided by such Party to the Escrow Agent shall comply with applicable laws and regulations and the applicable provisions of the Purchase Agreement. Where, however, the conflicting provisions of any such applicable law may be waived, they are hereby irrevocably waived by the parties hereto to the fullest extent permitted by law, to the end that this Agreement shall be enforced as written. Except as expressly provided in Sections 7 and 8, nothing in this Agreement, whether express or implied, shall be construed to give to any person or entity other than the Escrow Agent and the Parties (and their successors and any permitted assignees) any legal or equitable right, remedy, interest or claim under or in respect of this Agreement or any funds escrowed hereunder.

14.    Compliance with Court Orders.  In the event that any escrow property shall be attached, garnished or levied upon by any court order, or the delivery thereof shall be stayed or enjoined by an order of a court, or any order, judgment or decree shall be made or entered by any court order affecting the property deposited under this Agreement, the Escrow Agent is hereby expressly authorized, in its sole discretion, to obey and comply with all writs, orders or decrees so entered or issued, which it is advised by legal counsel of its own choosing is binding upon it, whether with or without jurisdiction, and in the event that the Escrow Agent obeys or complies with any such writ, order or decree it shall not be liable to any of the Parties or to any other Person, by reason of such compliance notwithstanding such writ, order or decree be subsequently reversed, modified, annulled, set aside or vacated.

15.    Further Assurances.  Following the date hereof, each party hereto shall deliver to the other parties hereto such further information and documents and shall execute and deliver to the other parties hereto such further instruments and agreements as any other party hereto shall reasonably request to consummate or confirm the transactions provided for herein, to accomplish the purpose hereof or to assure to any other party hereto the benefits hereof; provided, however, as between Purchaser and Seller, nothing herein shall be deemed to require them to execute or

deliver any of the foregoing to the extent they would not be required to provide the same pursuant to Section 10.9 of the Purchase Agreement.

16.     Assignment.  No assignment of the interest of any of the Parties hereto shall be binding upon the Escrow Agent unless and until written notice of such assignment shall be filed with and consented to by the Escrow Agent (such consent not to be unreasonably withheld, conditioned or delayed).  Any transfer or assignment of the rights, interests or obligations hereunder in violation of the terms hereof shall be void and of no force or effect.

17.     Force Majeure.  The Escrow Agent shall not incur any liability for not performing any act or fulfilling any obligation hereunder by reason of any occurrence beyond its control (including, but not limited to, any provision of any present or future law or regulation or any act of any governmental authority, any act of God or war or terrorism, or the unavailability of the Federal Reserve Bank wire services or any electronic communication facility), it being understood that the Escrow Agent shall use commercially reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as reasonably practicable under the circumstances.

18.     Compliance with Federal Law.  To help the U.S. Government fight the funding of terrorism and money laundering activities and to comply with Federal law requiring financial institutions to obtain, verify and record information on the source of funds deposited to an account, the Parties agree to provide the Escrow Agent with the name, address, taxpayer identification number, and remitting bank for all Parties depositing funds at Citibank pursuant to the terms and conditions of this Agreement.  For a non-individual Person such as a business entity, a charity, a trust or other legal entity, the Escrow Agent will ask for documentation to verify its formation and existence as a legal entity.  The Escrow Agent may also ask to see financial statements, licenses, an identification and authorization documents from individuals claiming authority to represent the entity or other relevant documentation.

19.     Use of Citibank Name.  Except as requested or required by applicable law, rule or regulation, by any governmental authority, self-regulatory authority or regulatory auditor, or by any order, subpoena or legal, regulatory or self-regulatory procedure, proceeding or process, no publicly distributed printed or other material in any language, including prospectuses, notices, reports, and promotional material which mentions "Citibank" by name or the rights, powers, or duties of the Escrow Agent under this Agreement shall be issued by any other parties hereto, or on such party's behalf, without the prior written consent of the Escrow Agent.

20.     Publication; Disclosure.  By executing this Agreement, the Parties and the Escrow Agent acknowledge that this Agreement (including all related attachments) contains certain information that is sensitive and confidential in nature and agree that such information needs to be protected from improper disclosure, including the publication or dissemination of this Agreement and related information to Persons that are not a party to this Agreement.  The Parties and the Escrow Agent each further agree to take commercially reasonable measures to mitigate any risks associated with the publication or disclosure of this Agreement and/or any of the information contained herein (including all related attachments).  If any Party or the Escrow Agent becomes aware of any threatened or actual unauthorized disclosure, publication or use of this Agreement and/or any of the information contained herein (including all related

attachments), such Person shall promptly notify each other Party and the Escrow Agent in writing thereof. Further, the Parties and the Escrow Agent agree that (i) any Party's or the Escrow Agent's disclosure of information as may be requested or required by applicable law, rule or regulation, by any governmental authority, self-regulatory authority or regulatory auditor, or by any order, subpoena or legal, regulatory or self-regulatory procedure, proceeding or process, and/or (ii) Seller's disclosure of this Agreement or any information contained herein pursuant to any filing Seller may be required to make (or which may be appropriate to make) in the Bankruptcy Case, shall not be considered an unauthorized release or disclosure.

*   *   *   *   *

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date set forth above.

PURCHASER:

**TSG SHELF II ACQUISITION, LLC**

By: _____

Name: Scott MacLaren

Title: Authorized Person

SELLER:

**CARBONLITE P, LLC**

By: _____

Name: _____

Title: _____

ESCROW AGENT:

**CITIBANK, N.A.**

By: _____

Name: _____

Title: _____

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date set forth above.

PURCHASER:

**TSG SHELF II ACQUISITION, LLC**

By: _____
Name: Scott MacLaren
Title:   Authorized Person

SELLER:

**CARBONLITE P, LLC**

By: _____
Name: Brian Weiss
Title:   Chief Restructuring Officer

ESCROW AGENT:

**CITIBANK, N.A.**

By: _____
Name: _____
Title: _____

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date set forth above.

PURCHASER:

**TSG SHELF II ACQUISITION, LLC**

By: _____
Name: Scott MacLaren
Title:  Authorized Person

SELLER:

**CARBONLITE P, LLC**

By: _____
Name: Brian Weiss
Title:  Chief Restructuring Officer

ESCROW AGENT:

**CITIBANK, N.A.**

By: _____
Name: Rola Tseng-Pappalardo
Title:  Sr. Vice President

# Schedule 1

## ESCROW AGENT FEE SCHEDULE
### Citibank, N.A., Escrow Agent

**Acceptance Fee**

To cover the acceptance of the Escrow Agency appointment, the study of this Agreement, and supporting documents submitted in connection with the execution and delivery thereof, and communication with other members of the working group:

      **Fee: Waived**

**Administration Fee**

The annual administration fee covers maintenance of the Escrow Accounts including safekeeping of assets in the Escrow Accounts, normal administrative functions of the Escrow Agent, including maintenance of the Escrow Agent's records, follow-up of this Agreement's provisions, and any other safekeeping duties required by the Escrow Agent under the terms of this Agreement. Fee is based on the Escrow Funds being deposited in a non-interest bearing deposit account, FDIC insured to the applicable limits.

      **Fee: Waived**

**Tax Preparation Fee**

To cover preparation and mailing of Forms 1099-INT, if applicable for the Parties for each calendar year:

      **Fee: Waived**

**Transaction Fees**

To oversee all required disbursements or release of property from the Escrow Accounts to any Party, including cash disbursements made via check and/or wire transfer, fees associated with postage and overnight delivery charges incurred by the Escrow Agent as required under the terms and conditions of this Agreement:

      **Fee: Waived**

**Other Fees**

Material amendments to this Agreement: additional fee(s), if any, to be discussed at time of amendment.

## EXHIBIT A-1

### Certificate as to Purchaser's Authorized Signatures

The specimen signatures shown below are the specimen signatures of the individuals who have been designated as authorized representatives of Purchaser and are authorized to initiate and approve transactions of all types for the Escrow Accounts on behalf of Purchaser. The below listed persons (must list at least two individuals) have also been designated Call Back Authorized Individuals and will be notified by Citibank N.A. upon the release of any Escrow Funds from the Escrow Account(s) unless an original "Standing or Predefined Instruction" letter is on file with the Escrow Agent.

| Name / Title / Telephone | Specimen Signature |
|---|---|
| Scott Maclaren | |
| Name | Signature |
| Authorized Person | |
| Title | |
| 214-202-7129 | 713-341-5758 |
| Phone | Mobile Phone |
| Gary Rosenthal | |
| Name | Signature |
| Authorized Person | |
| Title | |
| 713-341-5741 | |
| Phone | Mobile Phone |
| Max Klupchak | |
| Name | Signature |
| Authorized Person | |
| Title | |
| 713-341-5740 | 608-345-2338 |
| Telephone | Mobile Phone |

NOTE: Actual signatures are required above. Execution by DocuSign, initiated by Citibank, is available upon request. Please contact your Citi Private Bank representative for further details and instructions. During COVID-19 crisis, if possible, please include alternative number, preferably mobile.

*Signature Page to Escrow Agreement*

EXHIBIT A-1

Certificate as to Purchaser's Authorized Signatures

The specimen signatures shown below are the specimen signatures of the individuals who have been designated as authorized representatives of Purchaser and are authorized to initiate and approve transactions of all types for the Escrow Accounts on behalf of Purchaser. The below listed persons (must list at least two individuals) have also been designated Call Back Authorized Individuals and will be notified by Citibank N.A. upon the release of any Escrow Funds from the Escrow Account(s) unless an original "Standing or Predefined Instruction" letter is on file with the Escrow Agent.

Name / Title / Telephone                    Specimen Signature

Scott Maclaren
Name                                         Signature

Authorized Person
Title

214-202-7129                                 713-341-5758
Phone                                        Mobile Phone

Gary Rosenthal
Name                                         Signature

Authorized Person
Title

713-341-5741
Phone                                        Mobile Phone

Max Klupchak
Name                                         Signature

Authorized Person
Title

713-341-5740                                 608-345-2338
Telephone                                    Mobile Phone

NOTE: Actual signatures are required above. Execution by DocuSign, initiated by Citibank, is available upon request. Please contact your Citi Private Bank representative for further details and instructions. During COVID-19 crisis, if possible, please include alternative number, preferably mobile.

*Signature Page to Escrow Agreement*

EXHIBIT A-1

Certificate as to Purchaser's Authorized Signatures

The specimen signatures shown below are the specimen signatures of the individuals who have been designated as authorized representatives of Purchaser and are authorized to initiate and approve transactions of all types for the Escrow Accounts on behalf of Purchaser. The below listed persons (must list at least two individuals) have also been designated Call Back Authorized Individuals and will be notified by Citibank N.A. upon the release of any Escrow Funds from the Escrow Account(s) unless an original "Standing or Predefined Instruction" letter is on file with the Escrow Agent.

Name / Title / Telephone                    Specimen Signature

Scott Maclaren
_____          _____
Name                                        Signature

Authorized Person
_____
Title

214-202-7129                                713-341-5758
_____          _____
Phone                                        Mobile Phone

Gary Rosenthal
_____          _____
Name                                        Signature

Authorized Person
_____
Title

713-341-5741
_____          _____
Phone                                        Mobile Phone

Max Klupchak
_____          _____
Name                                        Signature

Authorized Person
_____
Title

713-341-5740                                608-345-2338
_____          _____
Telephone                                    Mobile Phone

NOTE: Actual signatures are required above. Execution by DocuSign, initiated by Citibank, is available upon request. Please contact your Citi Private Bank representative for further details and instructions. During COVID-19 crisis, if possible, please include alternative number, preferably mobile.

*Signature Page to Escrow Agreement*

# EXHIBIT A-2

## Certificate as to Seller's Authorized Signatures

The specimen signatures shown below are the specimen signatures of the individuals who have been designated as authorized representatives of Seller and are authorized to initiate and approve transactions of all types for the Escrow Accounts on behalf of Seller. The below listed persons (must list at least two individuals) have also been designated Call Back Authorized Individuals and will be notified by Citibank N.A. upon the release of any Escrow Funds from the Escrow Account(s) unless an original "Standing or Predefined Instruction" letter is on file with the Escrow Agent.

| Name / Title / Telephone | Specimen Signature |
|---|---|

Brian Weiss
Name

Chief Restructuring Officer
Title

949-357-2368
Phone

Signature

949-933-7011
Mobile Phone

Name

Signature

Title

Phone

Mobile Phone

NOTE: Actual signatures are required above. Execution by DocuSign, initiated by Citibank, is available upon request. Please contact your Citi Private Bank representative for further details and instructions. During COVID-19 crisis, if possible, please include alternative number, preferably mobile.

EXHIBIT 2.6(C)

APPLICABLE METHODOLOGY

[See attached]

EXHIBIT 2.6(c)

Each of the components of Net Working Capital shall be determined in accordance with GAAP, subject only to such exceptions thereto as may be agreed to in writing by Purchaser and Seller.

**Accounts and notes receivable** shall be calculated net of any rebates, discounts, returns and other sales promotion incentives on an accrual or vesting basis (but for the avoidance of doubt, shall not be netted against any customer deposits). Such accounts and notes receivable are those that will be converted to cash upon collection, within the reasonable amounts of time that are normally granted to each customer. Account receivable shall be calculated net of the reserve for doubtful accounts and shall not include: (i) any account under dispute, (ii) accounts in litigation, (iii) accounts that are in other legal processes. Further, for the avoidance of all doubt, in no event shall accounts receivable include (x) rights or claims to proceeds under Insurance Policies held by Seller or (y) accounts and notes receivable from related parties of Seller. Acquired Receivables shall include only Accounts Receivable of Seller that are listed on Section 2.1(k) of the Disclosure Schedule as an "Acquired Receivable," as well as any Accounts Receiveable which arise out of transactions (on terms consistent with Seller's ordinary course activities since the commencement of the Bankruptcy Case) occurring after the mutual execution and delivery of the Agreement which are (i) specifically related to products produced at the Reading Facility on or before the Closing Date and (ii) owing to Seller by customers who have placed orders with or purchased goods from Seller prior to the Closing.

**Inventories** shall be calculated net of the reserve for obsolete inventory and shall not include any amount that is obsolete, inventory that cannot be sold, inventory corresponding to discontinue products and non-operating inventory. Inventory of finished products shall be net of any accruals or reserves to account for differences in product quality/grades.

Inventories shall be stated at the lower of cost or net realizable value. Cost is determined using the average cost method and net realizable value is the estimated selling price in the ordinary course of business, less applicable variable selling expenses.

For the purpose of calculating the Net Working Capital as of the Closing Date, a physical inventory shall be performed at the Closing Date. Purchaser and its representatives shall participate. The physical inventory shall include all onsite finished goods inventory, raw material inventory, packaging and other production materials, and a sample of representative / material spare parts inventory sufficient to validate its physical existence and its condition as useful and recurring spare parts inventory. For stocks in transit, an alternative procedure shall be performed to reasonably serve the purpose of the physical inventory.

**Trade payables** are those accounts corresponding to commercial accounts payable due to third party suppliers which do not exceed the period of credit granted by each supplier during the normal course of operations. The definition of accounts payable shall apply to payables due to suppliers and/or creditors for services that are operating in nature. Any obligation for purchase orders, materials or services that has been accrued but not recorded/provisioned in the accounts of the Business will be taken into account for purposes of the calculation of Net Working Capital provided that such balances correspond to the purchase of materials or to services for the production of commercial goods or to routine operations under normal business conditions. Such

trade payable balances shall also be net of any rebates, discounts, returns and other sales promotion incentives on an accrual or vesting basis, provided that Seller or the Business holds a contractual and legal right to such benefits. For the avoidance of all doubt, in no event shall trade payables include accounts payable owing to related parties of Seller.

EXHIBIT 2.7(B)(I)

FORM OF BILL OF SALE, ASSIGNMENT AND ASSUMPTION

[See attached]

## BILL OF SALE, ASSIGNMENT AND ASSUMPTION

This Bill of Sale, Assignment and Assumption (this **"Bill of Sale"**) is entered into as of this ___ day of [_____], 2021, between, CarbonLite P, LLC, a Delaware limited liability company ( **"Seller"**), a chapter 11 debtor and debtor in possession in Case No. 21-10527(JTD) (jointly administered) (the **"Bankruptcy Case"**) pending in the United States Bankruptcy Court for the District of Delaware, on the one hand, and TSG Shelf II Acquisition, LLC, a Delaware limited liability company (**"Purchaser"**), on the other hand, with respect to the following facts and circumstances:

A.    Seller and Purchaser, have heretofore entered into that certain Asset Purchase Agreement dated May __, 2021 (the **"Purchase Agreement"**).  Except for terms specifically defined herein, the capitalized terms used in this Bill of Sale shall have the same meanings as capitalized terms used in the Purchase Agreement.

B.    Concurrently with the mutual execution and delivery of this Bill of Sale, Seller and Purchaser are consummating the transactions contemplated by the Purchase Agreement. Seller and Purchaser are executing and delivering this Bill of Sale in satisfaction of their respective obligations pursuant to Sections 2.7(b)(i) and 2.7(c)(iii) of the Purchase Agreement.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and adequacy of which Seller and Purchaser hereby acknowledge, Seller and Purchaser hereby agree as follows:

1.    Transfer.  Effective as of the Closing Date, Seller hereby sells, conveys, transfers, assigns and delivers to Purchaser, and Purchaser purchases and accepts from Seller, good title in and to the Purchased Assets free and clear of all Liens to the extent provided in the Sale Order except for Permitted Post-Closing Encumbrances (other than the Acquired Intellectual Property Rights, which are being transferred to Purchaser concurrently herewith pursuant to a separate assignment document).  Notwithstanding anything in this Bill of Sale to the contrary, nothing in this Bill of Sale will be construed as conveying any right, title or interest in or to any of the Excluded Assets.

2.    Assumption.  Effective as of the Closing Date, Purchaser hereby accepts the foregoing assignment and assumes and agrees to be bound by the terms and provisions of the Assumed Liabilities.  Notwithstanding anything in this Bill of Sale to the contrary, nothing in this Bill of Sale will be construed as conveying any right, title or interest in or to any of the Excluded Liabilities.

3.    Amendments.   This Bill of Sale may only be amended by a writing signed by both Seller and Purchaser.

4.    Execution in Counterparts.  This Bill of Sale may be executed in counterparts and delivered by the delivery of facsimile or electronic mail signatures; provided, however, that if the parties exchange signatures by facsimile or electronic mail, each of them agrees to provide the

other with a copy of this Bill of Sale bearing their original signature promptly following any request therefor from another party hereto.

      5.   <u>Delivery Pursuant to Purchase Agreement</u>.  Notwithstanding anything to the contrary herein, Seller and Purchaser are executing and delivering this Bill of Sale in accordance with and subject to all of the terms and provisions of the Purchase Agreement.  To the extent that any provision of this instrument conflicts or is inconsistent with the terms or provisions of the Purchase Agreement, the Purchase Agreement will govern and control and the superseded term or provision hereof shall be of no force or effect whatsoever.

      6.   <u>Governing Law</u>.  This Bill of Sale shall be governed by and construed and enforced in accordance with the laws of the State of Delaware.

      7.   <u>Subsequent Action</u>.  Pursuant to Section 10.9 of the Purchase Agreement, Seller will execute and deliver to Purchaser, its successors and assigns, all such other and further instruments of sale, assignment, transfer, conveyance, delivery, and all such notices, releases and other documents that would more fully and specifically sell, assign, transfer, convey and deliver to and vest in Purchaser, its successors and assigns, the title of Seller in and to all and any of the Purchased Assets sold, assigned, transferred, conveyed or delivered or intended to be sold, assigned, transferred, conveyed and delivered (without imposing any material monetary obligations or other obligations beyond those specifically imposed on the cooperating party(ies) by the  provisions of the Purchase Agreement). To the extent that, with respect to any of the Purchased Assets, no assignment document other than this Bill of Sale is executed, the parties intend for this Bill of Sale to constitute the sale, assignment, transfer, conveyance and delivery of such Purchased Assets.

*[Balance of Page Intentionally Left Blank]*

**IN WITNESS WHEREOF**, Seller and Purchaser have executed this Bill of Sale, Assignment and Assumption as of the day and year first set forth above.

<u>**SELLER**</u>**:**

**CarbonLITE P, LLC, a Delaware**
**limited liability company**
**and Debtor and Debtor in Possession**

**By:**_____

**Name:** _____

**Its:** _____

<u>**PURCHASER**</u>**:**

**TSG Shelf II Acquisition, LLC, a Delaware**
**limited liability company**

**By:**_____

**Name:** _____

**Its:** _____

EXHIBIT 2.7(B)(II)

FORM OF IP ASSIGNMENT

[See attached]

# ASSIGNMENT OF INTELLECTUAL PROPERTY RIGHTS

This Assignment of Intellectual Property Rights (this "**Assignment**") is entered into as of this __ day of [_____], 2021, between, between, CarbonLite P, LLC ("**Seller**"), a chapter 11 debtor and debtor in possession in Case No. 21-10527 (JTD) (jointly administered) (the "**Bankruptcy Case**") pending in the United States Bankruptcy Court for the District of Delaware, on the one hand, and TSG Shelf II Acquisition, LLC ("**Purchaser**"), on the other hand, with respect to the following facts and circumstances:

        A.      Seller and Purchaser have heretofore entered into that certain Asset Purchase Agreement dated May 2, 2021 (the "**Agreement**"). Except for terms specifically defined in this Assignment, the capitalized terms used in this Assignment shall have the same meanings as such terms when used in the Agreement.

        B.      Concurrently with the execution and delivery of this Assignment, Seller and Purchaser are consummating the transactions contemplated by the Agreement. Pursuant to Section 2.7(b)(ii) of the Agreement, Seller is required to execute and deliver this Assignment at the Closing.

**NOW, THEREFORE, FOR GOOD AND VALUABLE CONSIDERATION**, the receipt and sufficiency of which Seller hereby expressly acknowledges, Seller hereby sells, conveys, transfers, assigns and delivers to Purchaser, all of its right, title and interest in and to all Acquired Intellectual Property Rights, free and clear of all Liens to the extent provided in the Sale Order (other than Permitted Post-Closing Encumbrances), together with any and all goodwill connected with and symbolized by the Acquired Intellectual Property Rights, the same to be held and enjoyed by Purchaser for its own use and enjoyment and the use and enjoyment of its successors, assigns and other legal representatives as fully and entirely as the same would have been held and enjoyed by Seller if this assignment and sale had not been made, as Purchaser of its respective entire right, title and interest therein, including, without limitation, all rights in and to all income, royalties, damages and payments now or hereafter due or payable with respect thereto, all causes of action (whether in law or in equity) with respect thereto, and the right to sue, counterclaim, and recover for past, present and future infringement, misappropriation, dilution or other violation of the rights assigned or to be assigned under this Assignment. This Assignment shall inure to the benefit of, and be binding upon, the successors, executors, administrators, legal representatives and assigns of Seller and Purchaser. Upon reasonable request by Purchaser, Seller will execute additional documents and take other actions as may be necessary or desirable to record or memorialize the assignments of the Acquired Intellectual Property Rights set forth herein, and to vest in Purchaser such right, title, and interest in and to the Acquired Intellectual Property Rights as sold, assigned and transferred to Purchaser hereunder.

Seller hereby authorizes and requests the officials of the United States Copyright Office and the United States Patent and Trademark Office, and the corresponding entities or agencies in any applicable foreign jurisdiction, to record Purchaser as assignee and owner of the entire right, title and interest in, to and under the Acquired Intellectual Property Rights.

This Assignment may only be amended by a writing signed by both Seller and Purchaser.

This Assignment may be executed in counterparts and delivered by the delivery of facsimile or electronic mail signatures; provided, however, that if the parties exchange signatures by facsimile or electronic mail, each of them agrees to provide the other with a copy of this Assignment bearing their original signature promptly following any request therefor from another party hereto.

Notwithstanding anything to the contrary herein, Seller is executing and delivering this Assignment in accordance with and subject to all of the terms and provisions of the Agreement. It is understood that any finding of invalidity of one assignment as effected hereby shall not affect the assignment of other Acquired Intellectual Property Rights.

This Assignment shall be governed by and construed and enforced in accordance with the laws of the State of Delaware.

Disclosure Schedule

[See attached]

**Section 1.1: Permitted Liens**

None.

## Section 2.1(a): Purchased Equipment

All of the machinery and equipment listed in that certain Inspection Report for CarbonLITE P, LLC prepared by Gordon Brothers on May 3, 2021 in relation to the Reading Facility attached hereto.



# CarbonLITE, P LLC

## Inspection Report

INVENTORY | **MACHINERY & EQUIPMENT** | BUSINESS VALUATIONS |
BRANDS & INTELLECTUAL PROPERTY | REAL ESTATE

**EFFECTIVE DATE:** April 28, 2021
**REPORT DATE:** May 3, 2021

# TABLE OF CONTENTS

**Inspection Report performed for:**
Force Ten Partners LLC
Mr. Brian Weiss
Co-Founder
20341 SW Birch Street, Suite 220
Newport Beach, CA 92660

**Report Contacts:**
Gordon Brothers Asset Advisors, LLC
Prudential Tower
800 Boylston St., 27th Floor
Boston, MA 02199

**President, Valuations**
Chris Carmosino

**Senior Managing Director,**
**North American Sales**
Frank Grimaldi

**Managing Director**
Jerome (Jerry) Galaszewski

**Project Manager**
James A. Brodie, ASA, CEA

**For inquiries, please contact**
Aaron Walton
Relationship Manager
+1.512.673.7835
awalton@gordonbrothers.com

MACHINERY & EQUIPMENT LISTING ..............................................................3
   Reading, Pennsylvania..........................................................................................4
MACHINERY & EQUIPMENT PHOTO REPORT.................................................18
APPENDIX
   Project Manager Qualifications





May 3, 2021


Mr. Brian Weiss
Co-Founder
Force Ten Partners LLC
5271 California Avenue, Suite 270
Irvine, CA 92617


**Re: Inspection Report – CarbonLITE P, LLC**
**4030 Pottsville Pike**
**Reading, Pennsylvania**
**Machinery & Equipment**

Dear Mr. Weiss:

Gordon Brothers Asset Advisors, LLC ("Gordon Brothers"), an affiliate of Gordon Brothers Group, LLC ("Gordon Brothers Group") is pleased to submit to you the following Inspection Report.

On April 28, 2021, Gordon Brothers personnel inspected the machinery and equipment of CarbonLITE P, LLC, located at:

- 4030 Pottsville Pike, Reading, Pennsylvania

The inspection was conducted to gather data relative to the assets and provide an asset listing to be used as documentation for business planning purposes.

The Effective Date of the asset listing is **April 28, 2021**.


GENERAL CONDITION OF THE ASSETS

The general condition of the assets was considered to be fair to new. During the inspection, Gordon Brothers interviewed Company personnel familiar with the overall age and condition of the assets and internal maintenance practices. In some instances, machinery was not in operation at the time of inspection. The inspection report has assumed that all equipment is in working order, unless otherwise specifically indicated in the asset descriptions included in this report.

It should be noted that some equipment was still in crates during our inspection. As such, Gordon Brothers has relied on the information the Company provided, and has assumed it to be an accurate representation of the assets.

Any condition statements that appear in the listing of the assets are based only on general observations made during visual inspection. It is impossible to judge the actual mechanical condition of the assets without relying on the accuracy of the representations made by Company management. This inspection report is not a technical or engineering survey.

The following are Gordon Brothers' guidelines for each condition classification. If no classification is noted in the machinery listing, the asset(s) are considered to be in average condition for their age.

| Classification | Description |
| --- | --- |
| New | New, unused, installed, or uninstalled property in excellent condition |
| Very Good | Like new condition, only slightly used, capable of full capacity per design specifications without modifications or requiring repairs or abnormal maintenance |
| Good | Used property, capable of operating at or near full specified capacity, that has undergone repairs as part of regular maintenance |
| Average | Used property, requiring some repairs or ordinary replacement of wear parts, with the condition of the item being consistent with its actual age, assuming normal usage |
| Fair | Used property, operating below fully specified capacity due to age and/or application, requiring general maintenance and/or replacement of components and/or wear parts in the foreseeable future |
| Poor | Used property, operating below fully specified capacity due to age and/or application, requiring major rebuild and/or maintenance in the near future of its major components and/or wear parts |
| Scrap | Used property, salvage value only, no longer serviceable, not economically feasible to repair and/or modify, salable only for the recovery of the property's basic material content or reusable component parts |

## STATEMENT OF OWNERSHIP

Gordon Brothers is providing an asset listing of owned and leased assets. Gordon Brothers has assumed that the Company has accurately represented the ownership interest in all of the personal property and has not conducted Uniform Commercial Code ("UCC") searches to determine the ownership. A search of this type is outside the scope of this assignment. It is recommended that any parties with or considering an interest in the assets independently confirm the ownership and determine what potential impact any encumbrances may have on the asset.

The inspection report that follows provides an identification of the machinery and equipment inspected.

It has been a pleasure being of service to you.

Very truly yours,

**Gordon Brothers Asset Advisors, LLC**

James A. Brodie, ASA, CEA
Senior Manager, Valuations





# Machinery & Equipment Listing

**Department Evaluation Summary**

Effective Date: April 28, 2021

| Departments: |
| --- |
| Support Equipment |
| QC Laboratory |
| Scrap Bottle Processing |
| Throughout Plant |
| Rolling Stock |
| Leased Assets |



## Description

### Support Equipment

**Item #1**
Qty:(3) GNB Model 18000-48VUS Industrial Battery Chargers, S/N 1926001736; S/N 1926001732; and S/N 1926001696; Mounted On Steel Pedestals, 30 Amp Maximum Input

**Item #2**
Qty:(1) Vestil Model FL4000 4,000-Lb. Fork Lift Bucket Attachment, S/N F2033604

**Item #3**
Qty:(1) Husqvarna Model ST224P Snow Blower

**Item #4**
Qty:(2) GNB Model 18000-48VUS Electric Battery Chargers, S/N 1926001742; and S/N 1926001713; 30 Amp Maximum Input; Each with Steel Pedestal

### QC Laboratory

**Item #5**
Qty:(1) Mettler Toledo Model HE53 Moisture Analyzer, S/N B946609147

**Item #6**
Qty:(1) Mettler Toledo Model XS40002S 4,100-g x .01-g Digital Balance, S/N D739725466

**Item #7**
Qty:(1) Mettler Toledo Model XSR204 220-g x .0001-g Digital Balance, S/N C0080281135

**Item #8**
Qty:(1) Dynisco Model LMI5500 Sample Melt Flow Indexer, S/N 206FBI6996

**Item #9**
Qty:(1) Hunter Model Agera Color Spectrum Analyzer

**Item #10**
Qty:(1) Binder Model FD115-UL Drying and Heating Oven, S/N 2019000001734, (2019)

**Item #11**
Qty:(1) Hach Model DRB200 Digital Reactor Block; with Hach Model DR900 Colorimeter

**Item #12**
Qty:(1) Kewaunee Scientific Corp. Model Supreme Air Laboratory Fume Hood

**Item #13**
Qty:(1) Mettler Toledo Model SevenCompact pH/Ion Meter

**Item #14**
Qty:(1) Thermo Scientific Model Cimarec+ Stirring Hot Plate

COMPANY NAME CarbonLITE P. LLC
EFFECTIVE DATE April 28, 2021
REPORT DATE May 3, 2021
JOB NUMBER 3056749


Gordon Brothers

## Description

**Item #15**

Qty:(1) VWR Scientific Vibratory Stirrer

**Item #16**

Qty:(2) Cobra Systems Model VnM4 Pro Label Printers; Each with Keyboard Control

**Item #17**

Qty:(1) Binder Model ED56-UL Drying and Heating Oven, S/N 2019000001160

**Item #18**

Qty:(1) W.S. Tyler Model Ro-Tap RX-29 Sieve Shaker, S/N 15200; with Sound Enclosure

## Scrap Bottle Processing

**Item #19**

Qty:(1) Sorema Scrap Bottle Dust Collection System; **(Construction In Progress; To Be Installed)**
(Asset Documentation In Photograph Section)

**Item #20**

Qty:(1) Outside Silo Storage System. To Include:
- (3) CST Storage 18'D x 82'H, 15,217-Cubic Feet PET Flake Silos, S/N 19-6932; S/N 19-6931; and S/N Unknown, (2019)
- (2) CST Storage 11'11"D x 75'H, 6,740-Cubic Feet Plastic Pellet Silos, (2019)
- (1) Imperial Systems Model CMAXX CM-04 PET Flake Vacuum System, S/N 4555, (2019)
- (1) Aerzen Model Delta Blower GM30L Positive Displacement Blower, S/N 021-000303, (2019), 50 hp
- (2) Aerzen Model Delta Blower GM25S Positive Displacement Blowers, S/N 021-000306; and S/N 021-000307, (2019), 30 hp
- (1) Imperial Systems Model CMAXX CM-04 PET Flake Vacuum System, S/N 4556, (2019)
(Asset Documentation In Photograph Section)

**Item #21**

Qty:(1) BHS Scrap Bottle Decontamination and Sorting System, (2020); Approximately 10 Ton/Hour Capacity. To Include:
- (1) Bulk Handling Systems Model Cross Wrap Wire Removal System; with Bale Infeed Conveyor, Approximately 60"W x 20'L; Controls; and Accessories
- (1) Bulk Handling Systems Approximately 60"W x 40'L x 15'H Inclined Belt Conveyor
- (1) SSI Model Pri-Max Scrap Shredder, S/N S0296, (2020); with 200 hp Hydraulic Pump; Dual Shredding Wheels; Controls; and Accessories
- (1) Bulk Handling Systems Approximately 60"W x 80'L x 20'H Inclined Belt Conveyor
- (1) Bulk Handling Systems Scrap Bottle Storage Bunker; with Integrated Inclined Belt Conveyor, Approximately 60'L x 25'H; and Integrated Debris Removal Conveyor
- (1) Bulk Handling Systems Approximately 60"W x 80'L Inclined Power Belt Conveyor
- (1) Stadler Model Modul 1010 Unten 6,000-kg Ballistic Separator, S/N BS-2150-11-19-1953, (2019)
- (1) Stadler Model Modul 1010 Unten 6,000-kg Ballistic Separator, S/N BS-2150-11-19-955, (2019)
- (1) Steel Support Mezzanine; Multi-Level Operator Platform; with Operator Stairs; and Platform Support Structure
- (2) Bulk Handling Systems Approximately 48"W x 60'L x 20'H Inclined Belt Conveyors; (For A and B Side)

COMPANY NAME CarbonLITE P. LLC
EFFECTIVE DATE April 28, 2021
REPORT DATE May 3, 2021
JOB NUMBER 3096749


Gordon Brothers



## Description

*Item #21 (continued)*

| | |
|---|---|
| (2) | Para-Mount Model 7655.0 Approximately 5W x 7.6L Shaker Tables, S/N C11364-018; and S/N C11364-01A; (For A and B Side) |
| (2) | Steinert Model ALK 2000 120 Eddy Current Separators, S/N 19055004001; and S/N 19050002001, (2019); with Infeed Conveyor; (For A and B Side) |
| (2) | Bulk Handling Systems Model B15-48 Power Belt Picking Conveyors, S/N Unknown; and S/N 2156-C0024-1019, (2019); with Inclined Section, Approximately 36"W x 80'L; (For A and B Side) |
| (2) | General Kinematics Approximately 7'W x 15'L Shaker Tables; Model and S/N Unknown; (For A and B Side) |
| (2) | Bulk Handling Systems Model ACL120 Approximately 120"W x 15'L Optical Sorting Infeed Power Belt Conveyors, S/N Unknown; and S/N 2156-C0020-1019; (For A and B Side) |
| (2) | NRT Model SpydIR-T-120 Optical Sorters, S/N 5PY-T-355; and S/N 5PY-T-358, (2019); (For A and B Side) |
| (1) | Approximately 36"W x 80'L Power Belt Conveyor; with Triple Discharge Chutes; (For Take-Off From Separators) |
| (1) | Bulk Handling Systems Approximately 60"W x 50'L Inclined Power Belt Conveyor |
| (1) | Bulk Handling Systems 24"W x Approximately 20'L x 25'H Inclined Power Belt Conveyor; (For Waste Removal) |
| (1) | Bulk Handling Systems Approximately 24"W x 100'L Power Belt Conveyor; (For Waste Removal) |
| (1) | Bulk Handling Systems Approximately 60"W x 80'L x 25'H Inclined Power Belt Conveyor |
| (1) | Bulk Handling Systems Approximately 36"W x 150'L Inclined Power Belt Conveyor |
| (1) | Bulk Handling Systems Approximately 36"W x 200'L Inclined Power Belt Conveyor |
| (1) | Bulk Handling Systems Approximately 24"W x 80'L Inclined Power Belt Conveyor; (To Waste Compactors) |
| (1) | Bulk Handling Systems Approximately 60"W x 40'L Inclined Power Belt Conveyor; (To Waste Compactors) |
| (1) | Bulk Handling Systems Wash Toil Bottle Mix PET Storage Bunker; with Walking Floor Type Conveyor; and Integrated Inclined Power Belt Conveyor |
| (1) | Bulk Handling Systems 30"W x Approximately150-Linear Feet Long x 15'H Inclined Power Belt Conveyor; (For Clear PET) |
| (1) | Bulk Handling Systems Approximately 36"W x 30'L Inclined Power Belt Conveyor; (Mounted Above PET Bunker) |
| (1) | NRT Model SpydIR-T/ColorPlus R 96/W/IMD Optical Sorter, S/N 5PY-T-353, (2019); (For PET Recovery Loop) |
| (1) | Bulk Handling Systems Model ACL-96 Approximately 96"W x 15'L Optical Sorting Infeed Power Belt Conveyor, S/N 2156-C0046-1019 |
| (1) | NRT Model ColorPlus R-108 Optical Sorter, S/N COLOR+ 075, (2019); (For PET Recovery Loop) |
| (1) | Bulk Handling Systems Model ACL-96 Approximately 96"W x 15'L Optical Sorting Infeed Power Belt Conveyor, S/N Unknown |
| (1) | NRT Model SpydIR-R-120 W/IMD Optical Sorter, S/N 5PY-R-357, (2019); (For PET Recovery Loop) |
| (1) | Bulk Handling Systems Model ACL-120 Approximately 120"W x 15'L Optical Sorting Infeed Power Belt Conveyor, S/N 2156-C0042-1019 |
| (1) | General Kinematics Approximately 10'W x 20'L Vibratory Conveyor; Model and S/N Unknown |
| (1) | Bulk Handling Systems Approximately 30'W x 150'L x 20'H Inclined Power Belt Conveyor |
| (1) | Bulk Handling Systems Model ACL-60 60"W x 15'L Optical Sorting Infeed Power Belt Conveyor, S/N 2156-C0072-1019 |
| (1) | NRT Model ColorPlus R 60 Optical Sorter, S/N COLOR+ 076, (2019) |
| (1) | Bulk Handling Systems Approximately 36"W x 150-Linear Feet Power Belt Conveyor; with Inclined Section |
| (1) | Bulk Handling Systems Approximately 24"W x 20'L x 50'H Inclined Power Belt Conveyor |
| (1) | General Kinematics Approximately 10'W x 20'L Vibratory Conveyor; Model and S/N Unknown |
| (1) | Bulk Handling Systems Approximately 30' x 120-Linear Feet x 25'H Inclined Power Belt Conveyor |
| (1) | Bulk Handling Systems Model ACL-96 Approximately 96"W x 20'L Power Belt Conveyor, S/N 2156-C0037-1019; (For Optical Sorting Feed) |

COMPANY NAME CarbonLITE P, LLC
EFFECTIVE DATE April 28, 2021
REPORT DATE May 3, 2021
JOB NUMBER 3096749



## Description

### Item #21 (continued)

(1) NRT Model MAX AI HS VIS-120 Computerized Visual Identification System, S/N 011, (2020)
(1) NRT Model SpydIR-R-96 W/MD Optical Sorter, S/N 5PY-R-356, (2022)
(1) Bulk Handling Systems Approximately 24"W x 150-Linear Feet Length Power Belt Conveyor; with Inclined Section; (For Compactor Discharge)
(1) Bulk Handling Systems Approximately 24"W x 150-Linear Feet Length Power Belt Conveyor
(1) Bulk Handling Systems Inclined Power Belt Conveyor; Dual Belt, Each Belt Approximately 24" x 100'L x Approximately 25'H
(1) Bulk Handling Systems Approximately 36"W x 150'L Inclined Power Belt Conveyor
(1) Bulk Handling Systems Approximately 36"W x 120'L Inclined Power Belt Conveyor
(1) Bulk Handling Systems Approximately 24"W x 35'L x 12'H Inclined Power Belt Conveyor; with Hopper; and Pipe Feed Section
(1) Bulk Handling Systems Approximately 18"W x 100'L Power Belt Conveyor
(1) Motor Control Room; with All Associated Motor Controls; and Computer Controls
(2) General Kinematics Approximately 40'W x 50'L Shaker Vibratory Conveyors; (For A & B Side)
(2) Bulk Handling Systems Model C15-60 60"W x 30'L Power Belt Conveyors, S/N 2156-C0056-1019; and S/N 2156-C0058-1019, (2019); (For A & B Side)
(2) NRT Model Max AI AQC-2 Robotic Picker Systems, S/N 019; and S/N 013, (2019); with (2) ABB Picking Robots; All Computer Controls; and Accessories; (For A & B Side)
(1) Bulk Handling Systems Approximately 36"W x 30'L x 25'H Inclined Power Belt Conveyor
(1) Bulk Handling Systems Approximately 24"W x 60'L Power Belt Conveyor
(1) Clear PET Storage Bunker; with Top Mounted Auger Screw, Hydraulically Operated; Walking Floor Type Conveyor; and Integrated Inclined Power Belt Conveyor
(1) Colored PET Storage Bunker; with Top Mounted Auger Screw, Hydraulically Operated; Walking Floor Type Conveyor; and Integrated Inclined Power Belt Conveyor
(1) PAAL Model Pacomat III D Horizontal Hydraulic Baler, S/N 31.371, (2019); with Wire Feed System
(Asset Documentation In Photograph Section)

### Item #22

Qty.(1) Sorema Bottle Delabeling System, (2020); Approximately 10 Ton/Hour Capacity, To Include:
(1) Sorema Approximately 48"W x 25' Inclined Power Belt Conveyor
(1) Sorema Model WCE 9000 L Prewash Centrifuge, S/N WCE9000L-100, (2019)
(1) Sorema Approximately 15 hp Centrifuge Blower
(1) Sorema Approximately 6'W Vibratory Screen
(1) Sorema Approximately 12" Screw x 20'L Auger Screw Conveyor
(1) Sorema Approximately 6'W Vibratory Screen
(1) Sorema Approximately 18" Screw x 20'L Auger Screw Conveyor
(1) Sorema Approximately 12" Screw x 20'L Auger Screw Conveyor
(1) Sorema Approximately 12"W x 30'L Inclined Disk Type Separator Conveyor
(1) Sorema Approximately 24"W x 12'L Auger Screw Conveyor
(1) Sorema 36"W x 20'L Inclined Auger Screw Conveyor

COMPANY NAME CarbonLITE P. LLC
EFFECTIVE DATE April 28, 2021
REPORT DATE May 3, 2021
JOB NUMBER 3096749



## Description

### Item #22 (continued)

(1) Sorema Approximately 48"W x 125'L Power Belt Conveyor; 15'H, B-Shaped; (For Return To BHS Bottle Sorting System)
(1) Sorema Decanter; Bolted Steel Construction, Cone Bottom
(2) Aqua Filter Model AISI 304 Micro Filters; Each with Auger Mixer, and Controls
(Asset Documentation In Photograph Section)

### Item #23

Qty (1) Sorema Wash Line #1, (2020); 2 Ton/Hour Capacity, To Include:
(1) Bulk Handling Systems Approximately 60"W x 180'L x 30'H Inclined Power Belt Conveyor; Steel Support Mounted
(1) Bulk Handling Systems Approximately 24"W x 40'L Power Belt Conveyor
(1) Sorema Scrap Wet Grinder, 200 hp; with Vibratory Infeed Conveyor
(1) Sorema Scrap Wet Grinder, 200 hp; with Vibratory Infeed Conveyor
(2) Sorema Fines Separators; Each with 12-1/2 hp Motor
(2) Sorema Model WCE 2000 C Washing Centrifuges, S/N WCE200C-133; and S/N WCE200C-132, (2019)
(2) Sorema Model SCW200 Approximately 12" x 30'L Inclined Auger Screw Conveyors, S/N Unknown
(1) Sorema Tote Discharge Rack
(1) Sorema Electrical Control Cabinet and Mezzanine
(1) Sorema Dirty Flake Tote Unloading System; Dual Station; with Bottom Mounted Screw Conveyor On Hopper, Approximately 12"W x 15'
(1) Sorema Model WCE 1500 W Washing Centrifuge, S/N WCE1500W-273, (2019)
(1) Sorema Model WCE 1500 W Washing Centrifuge, S/N WCE1500W-274, (2019)
(1) Sorema Centrifugal Dryer
(1) Sorema Float/Sink Tank; with Top Mounted Agitators
(1) Sorema Model STR 16/20 Approximately 300-Gallon Washing Reactor, S/N STR 16/20-305, (2005); with Top Mounted Agitation
(2) Sorema Approximately 200-Gallon Rinse Tanks
(1) Sorema Centrifugal Dryer
(1) Sorema Approximately 60"W Vibratory Screen
(1) Sorema Approximately 150-Gallon Dosing Tank; with Volumetric Metering Controls; and Accessories
(1) Sorema Approximately 350-Gallon Dosing Tank; with Volumetric Metering Controls; and Accessories
(1) Sorema Approximately 60" Vibratory Screen
(2) Sorema Approximately 450-Gallon Batch Washers; with All Associated Pumps; Heaters; and Controls
(1) Sorema Approximately 10'W x 30'H Dirty Flake Silo; Cone Bottom; with Auger Screw Conveyor Outfeed; and Associated Controls
(6) Bulk Handling Systems Approximately 12" x 20' Inclined Auger Screw Conveyors; (Inline to Form One Multi-Section Transport Conveyor, Mezzanine Mounted, For Dirty Flake Silo Infeed)
(1) Sorema Blower Centrifuge; with Hopper; and Approximately 10 hp Motor
(1) Sorema Approximately 36" x 6'L Fluid Bed Dryer
(1) Sorema Centrifugal Dryer; with Associated Motor; and Controls
(1) Sorema Approximately 350-Gallon Water Collecting Tank; with Associated Pumps; and Volumetric Metering

COMPANY NAME  CarbonLITE P. LLC
EFFECTIVE DATE  April 28, 2021
REPORT DATE  May 3, 2021
JOB NUMBER  3096749

**Gordon Brothers**

## Description

### Item #23 (continued)

| | |
|---|---|
| (1) | Sorema Approximately 6'W Vibratory Screen |
| (3) | Steinert Model MOR 145 165 MT 40 U Eddy Current Separators, S/N 1906081100I; S/N T8001082700I; and S/N T19060080100I, (2019) |
| (3) | Steinert Model NES 150 Eddy Current Separators, S/N MD-EC-124; S/N MD-EC-123; and S/N MD-EC-122, (2019); Each with Feed Hopper; Controls; Electricals; and Accessories |
| (1) | Sorema Approximately 12" x 20' Transfer Auger |
| (1) | Sorema Model VE/E 80/430 Fluid Bed Dryer, S/N DRY840-114, (2019) |
| (1) | Sorema Model VE/E 80/430 Fluid Bed Dryer, S/N DRY840-115, (2019) |
| (1) | Bulk Handling Systems 12" x Approximately 20' Auger Screw Conveyor; (For Outfeed From Dryers) |
| (1) | Bulk Handling Systems 12" x 30' Inclined Auger Screw Conveyor; (Infeed to Eddy Current Separators) |
| (3) | Sorema Model R/C 35/20 Vacuum Feed Rotary Valves, S/N VS355-155-1; S/N Unknown; and S/N VS355-156-1, (2019) |
| (3) | Sorema Model MT1802BF00016 Vibratory Screens, S/N 23533; S/N 23596; and S/N 23532, (2019); Each with Stainless Steel Feed Hoppers |
| (2) | Bulk Handling Systems 12" x 20'H x 20'L Inclined Dry Grinder Auger Screw Feeders |
| (2) | Sorema Dry Grinders; Each with Approximately 125 hp Motor |
| (2) | Bulk Handling Systems 12" x 50'L Outfeed Inclined Screw Conveyors; Each with Integrated Vacuum Valve System; (For Outfeed From Dry Grinders) |
| (1) | Robuschi Model Robox Lobe S85-3P-RVP125 Packaged Positive Displacement Blower, S/N CMM37-108-1, (2019) |
| (1) | TOMRA Model Autosort Flake (NIR1-CRG8) Optical Sorter, S/N N-F-430221-20-02976; with 4-Lane Hopper Feed System |
| (1) | Sorema Elutriator |
| (1) | Sorema Approximately 6'D Vibratory Screen |
| (1) | Sorema Clean Station 1 Tote Filler; with Single Ancillary Tote Discharge System |
| (1) | Sorema Clean Station 2 Tote Filler |
| (4) | Zorzini 5'D x 30'H Mixer Silos; Dished Bottom, Stainless Steel Welded Construction; Each with Vacuum Feed Motors; Valves; and Accessories |
| (1) | Aerzen Model Delta Blower GM30L Positive Displacement Blower, S/N 021-000302, (2019), 40 hp |
| (1) | Robuschi Model S85/3P RVP125 Packaged Positive Displacement Blower, S/N CMM37-107-1, (2019) |
| (1) | Lot of Miscellaneous and Assorted Line Equipment, To Include: Blowers; Mezzanines; Electrical Panels; and All Related Accessories |

(Asset Documentation In Photograph Section)

### Item #24

| | |
|---|---|
| QTY (1) | Sorema Wash Line #2, (2020/2021); 7 Tons/Hour Capacity; (Not In Use Yet; Currently Being Installed and Tested); To Include: |
| (1) | Sorema Approximately 300 hp Scrap Grinder; with Associated Controls; Mezzanine; and Accessories |
| (1) | Sorema Approximately 300 hp Scrap Grinder; with Associated Controls; Mezzanine; and Accessories |
| (1) | Sorema Approximately 300 hp Scrap Grinder; with Associated Controls; Mezzanine; and Accessories |
| (1) | Sorema Approximately 300 hp Scrap Grinder; with Associated Controls; Mezzanine; and Accessories |
| (4) | Sorema Centrifugal Separators |
| (2) | Sorema Scrap Grinder Auger Screw Feed Systems; Dual Outfeed; with Approximately 24" x 20' Dual Inclined Screw Conveyors; and 2-Tiered Multi Hopper Feed Vibratory Table Feed System |
| (4) | Sorema 12" x 30' Inclined Auger Screw Conveyors |

COMPANY NAME CarbonLITE P, LLC
EFFECTIVE DATE April 28, 2021
REPORT DATE May 3, 2021
JOB NUMBER 3096749


Gordon Brothers



## Description

*Item #24 (continued)*

(7) Sorema Approximately 12"W x 20'L Inclined Auger Screw Conveyors; (Runs In Parallel For Wet Grinding to Dirty Flake Silo Infeed System)

(1) Sorema Approximately 15'W x 30'H Dirty Flake Silo; Bolted Steel Construction; with (4) Approximately 18" x 20' Bottom Mounted Auger Screw Discharge Conveyors; Support Mezzanine; and Accessories

(1) Sorema Stainless Steel Decanter; Dished Bottom, Cone Bottom; with Associated Pumps; Volumetric Metering; and Control

(1) Sorema Stainless Steel Decanter; Dished Bottom, Cone Bottom; with Associated Pumps; Volumetric Metering; and Control

(1) Sorema Approximately 12" x 25' Screw Conveyor; (For Waste Discharge)

(1) Sorema Approximately 8"W Screw Conveyor; (For Waste Discharge)

(1) Sorema Approximately 6'D Vibratory Screen

(1) Sorema Model VB 1800 1R Vibratory Screen, S/N VB1800-453, (2019)

(1) Sorema Model VRC-3 150-Gallon Collection Tank, S/N VRC-1451, (2019)

(1) Sorema Model VRC-1 Approximately 150-Gallon Collection Tank, S/N VRC-1449, (2019)

(1) Sorema Model VST 17/90 Separation Tank, S/N VST 17/90-102, (2019)

(3) Sorema Model VRC-3 Approximately 300-Gallon Stainless Steel Chemical Mixing Tanks; Each with Volumetric Metering; Pumps; and Controls

(3) Sorema Model VRC-3 Approximately 500-Gallon Stainless Steel Chemical Mixing Tanks; Each with Volumetric Metering; Pumps; and Controls

(1) Sorema Approximately 200-Gallon Stainless Steel Process Tank; Cone Bottom

(1) Sorema Model STC 1/15/20 Washing Reactor, S/N STC1/15/20-102, (2019)

(1) Sorema Horizontal Centrifuge, (2019)

(1) Sorema 12" x Approximately 15' Inclined Auger Screw Conveyor

(1) Sorema Approximately 2,000-Gallon Rinse Tank; with Top Mounted Agitator

(4) Sorema Approximately 1,500-Gallon Rinse Tanks; Each with Top Mounted Agitator

(1) Sorema Approximately 18"W x 25'L Inclined Auger Screw Conveyor

(5) Sorema Approximately 18"W x 15'L Auger Screw Conveyors

(1) Sorema Model WCE 2000 C Washing Centrifuge, S/N WCE2000C-141, (2019)

(1) Sorema Model STC 3/15/20 Washing Reactor, S/N STC 3/15/20-121, (2019); with (3) Approximately 100 hp Motors; Controls; and Accessories

(1) Sorema Model WCE 2000 C Washing Centrifuge, S/N WCE2000C-14, (2019)

(1) Sorema Approximately 100-Gallon Stainless Steel Additive Tank; with Associated Pump

(1) Sorema Model DCE 10/20 Centrifugal Separator, S/N DCE 10/20-182, (2019); with Approximately 200 hp Main Motor; All Associated Motors; Vacuum Blowers; and Accessories

(1) Sorema Model DCE 10/20 Centrifugal Separator, S/N DCE 10/20-183, (2019); with Approximately 200 hp Main Motor; All Associated Motors; Vacuum Blowers; and Accessories

(2) Sorema Approximately 12" x 20' Inclined Auger Screw Conveyors

(1) Sorema Model VRC-1 Approximately 150-Gallon Collection Tank, S/N VRC-1456, (2019)

(2) Sorema Model VB 1800 1RC Approximately 6'D Vibratory Screens, S/N Unknown; and S/N VB1800-1-455, (2019)

(1) Tote Bagging Station; with (2) Dual Discharge Stations; and (4) Tote Feeds; (Currently Shares Optical Sorter with Line #1)

COMPANY NAME CarbonLITE P. LLC
EFFECTIVE DATE April 28, 2021
REPORT DATE May 3, 2021
JOB NUMBER 3096749



## Description

### Item #24 (continued)

(6) Approximately 6'W x 30'H Storage Silos; Stainless Steel, Welded Construction, Coned Bottom; Each with Auger Screw Outfeed; and Common Feed Screw Conveyor Discharge

(1) Aerzen Model Delta Blower GM10S Positive Displacement Blower, S/N 021-000305, (2019), 20 hp

(1) Aerzen Model Delta Blower GM30L Positive Displacement Blower, S/N 021-000304, (2019), 20 hp

(1) Lot of Miscellaneous Line Components, To Include: All Associated Electricals; Mezzanines; Pumps; Motors; Controls; Metering; etc.; (Line Still Under Construction and Testing)

(Asset Documentation In Photograph Section)

### Item #25
**QTY (1)**

Line #2 Flaking System, (2020); (Not Currently In Use; Being Installed and Tested); To Include:

(1) TOMRA Model Autosort Flake (NIR1-CRGB) Optical Sorter, S/N N-F-410221-19-00084, (2019); 4-Bin; with Computers Controls; Infeed Hopper; and Accessories

(1) TOMRA Model Autosort Flake (NIR1-CRGB) Optical Sorter, S/N N-F-410221-19-00086, (2019); 4-Bin; with Computers Controls; Infeed Hopper; and Accessories

(1) TOMRA Model Autosort Flake (NIR1-CRGB) Optical Sorter, S/N N-F-410221-19-00087, (2019); 4-Bin; with Computers Controls; Infeed Hopper; and Accessories

(1) Unisensor Model PowerSort 200 V16 Laser Sorting System, S/N 052P2119V16, (2019)

(1) Unisensor Model PowerSort 200 V16 Laser Sorting System, S/N 055P2119V16, (2019)

(4) Sorema Elutriators

(2) Sorema Model VB 1000 2R Approximately 6'D Vibratory Screens, S/N Unknown; and S/N VB 1000-459

(4) Approximately 12" x 15' Auger Screw Conveyors

(3) Dual Outfeed Discharge Stations; **(Not Complete; Under Construction)**

(1) Lot of Miscellaneous and Assorted Equipment Located On Line # 2 Flaking Line, To Include: Assorted Gravity Feed Conveyors; Platform Mezzanine; Air Locks; Controls; Stainless Steel Hoppers; and Accessories

(Asset Documentation In Photograph Section)

### Item #26
**QTY (1)**

Wash Line #1 and #2 Waste Discharge Tote Loading System, To Include: (3) Discharge Hoppers, with Dual Tote Feed, and (1) Ancillary Hopper Gaylord Feeder For Total of (6) Tote Feeders and (1) Hopper Or Gaylord Feed; **(Not Complete, Under Construction)**

(Asset Documentation In Photograph Section)

### Item #27
**QTY (1)**

Pelletron Feed System, (2021); (Not In Use; Currently Being Installed and Tested); To Include:

(6) Approximately 40'H X 12'D Feed Storage Bins; Welded Steel Construction, Cone Bottom; Each with Support Steel Legs

(6) Pelletron Computer Controlled Rotary Valves

(3) Pelletron Tote Loading Stations; with Ensign Bag Support; Stainless Steel Vacuum Feed Hoppers; Valving; Piping; and Accessories

(2) Bagging Stations; Steel Construction, 1,100 kg Maximum Load

COMPANY NAME  CarbonLITE P. LLC
EFFECTIVE DATE  April 28, 2021
REPORT DATE  May 3, 2021
JOB NUMBER  3096749

## Description

**Item #27** (continued)

QTY:(1)
(1) Lot of Miscellaneous and Assorted Equipment Located On Pelletron Feed System. To Include: All Controls; Valves; Computer Controls; and Accessories;
**(System Not Complete; Currently Under Construction)**
(Asset Documentation In Photograph Section)

**Item #28**

QTY:(1)
(1) Pelletizing Line #1; 1.8 Tons/Hour, To Include:
(1) Plovan Approximately 6'W x 30'H Mixing Silo; with Approximately 12" x 35' Auger Screw Outfeed Conveyor; Top Mounted Mixer, with Motor; Steel Feed Hopper; Controls; and Accessories
(1) Flake Hopper; with Approximately 12" x 35' Auger Screw Outfeed Conveyor
(1) Plovan Dryer, (2019); Model and S/N Unknown; with Approximately 12" x 40'L PDU Inclined Feed Screw
(1) Plovan Model DPS180 Chiller, S/N 02219DP01, (2019)
(3) Plovan Model CDF6000 PDU Condensate Separators, S/N (2) Unknown; and S/N EQ.02219FL01, (2019)
(1) Plovan PDU Air Heater
(1) Starlinger Model recoSTAR PET 165 HC IV+ Pelletizing Extruder, S/N 19-00025-00135, (2019); with All Associated Accessories Including Die Injector, Motors, Controls, Pumps, etc.; Model MPB2910P Melt Filter; and Automatic Cut-Off System
(1) Maag Model Sphero 100 Underwater Pelletizer, S/N SH-0327, (2019); with All Associated Accessories
(1) Starlinger Centrifuge; with Vibratory Pellet Classifier; Feed Screw, Approximately 12" x 15'; and Buffer Tank
(Asset Documentation In Photograph Section)

**Item #29**

QTY:(1)
(1) Pelletizing Line #2; 1.8 Tons/Hour, To Include:
(1) Plovan Approximately 6'W x 30'H Mixing Silo; with Approximately 12" x 35' Auger Screw Outfeed Conveyor; Top Mounted Mixer, with Motor; Steel Feed Hopper; Controls; and Accessories
(1) Flake Hopper; with Approximately 12" x 35' Auger Screw Outfeed Conveyor
(1) Rittal Model SK 3364100 Dryer, S/N 2019K00006 1580, (2019)
(1) Plovan Model DPS180 Chiller, S/N EQ.02519DP01, (2019)
(1) Plovan Model CDF6000 PDU Condensate Separator, S/N Unknown, (2019)
(1) Plovan PDU Air Heater
(1) Starlinger Model recoSTAR PET 165 HC IV+ Pelletizing Extruder, S/N 19-00026-00135, (2019); with All Associated Accessories Including Die Injector, Motors, Controls, Pumps, etc.; Model MPB2910P Melt Filter; and Nordson Automatic Cut-Off System
(1) Maag Model Sphero 100 Underwater Pelletizer, S/N SH-0328, (2019); with All Associated Accessories
(1) Starlinger Centrifuge; with Vibratory Pellet Classifier; Feed Screw, Approximately 12" x 15'; and Buffer Tank
(Asset Documentation In Photograph Section)

**Item #30**

QTY:(1)
(1) Pelletizing Line #3; 1.8 Tons/Hour, To Include:
(1) Plovan Approximately 6'W x 30'H Mixing Silo; with Approximately 12" x 35' Auger Screw Outfeed Conveyor; Top Mounted Mixer, with Motor; Steel Feed Hopper; Controls; and Accessories

COMPANY NAME CarbonLITE P, LLC
EFFECTIVE DATE April 28, 2021
REPORT DATE May 3, 2021
JOB NUMBER 3096749


Gordon Brothers



## Description

### Item #20 *(continued)*

| | |
|---|---|
| (1) | Flake Hopper; with Approximately 12' x 35' Auger Screw Outfeed Conveyor |
| (1) | Piovan Dryer, (2019); Model and S/N Unknown; with Approximately 12' x 40L PDU Inclined Feed Screw |
| (1) | Piovan Model DPS180 Chiller, S/N EQ.04619DP01, (2019) |
| (1) | Piovan Model CDF6000 PDU Condensate Separator, S/N EQ.04169FC02, (2019) |
| (1) | Piovan PDU Air Heater |
| (1) | Starlinger Model recoSTAR PET 165 HC IV+ Pelletizing Extruder, S/N 20-00027-00135, (2020); with All Associated Accessories Including Die Injector, Motors, Controls, Pumps, etc.; Model MPB2910P Melt Filter; and Nordson Automatic Cut-Off System |
| (1) | Maag Model Sphero 100 Underwater Pelletizer, S/N SH-0329, (2019); with All Associated Accessories |
| (1) | Starlinger Centrifuge; with Vibratory Pellet Classifier; Feed Screw, Approximately 12' x 15'; and Buffer Tank |
| | (Asset Documentation In Photograph Section) |

### Item #31

**QTY (1)** Starlinger Viscotec SSP System; 5.4 Tons/Hour, To Include:

| | |
|---|---|
| (1) | Starlinger Model viscoSTAR 180 SSP Dryer, S/N 19-00003-V180, (2019); with Associated Hoppers; Mezzanine Support Structure; Volumetric Metering; Blowers; and Controls |
| (1) | Starlinger Model viscoSTAR 180 SSP Dryer, S/N 19-00002-V1180, (2019); with Associated Hoppers; Mezzanine Support Structure; Volumetric Metering; Blowers; and Controls |
| (1) | Starlinger Model viscoSTAR 180 SSP Dryer, S/N 19-00001-V180, (2019); with Associated Hoppers; Mezzanine Support Structure; Volumetric Metering; Blowers; and Controls |
| (2) | Kaeser Model SX7.5 Rotary Screw Air Compressors, S/N 10318-7126366; and S/N 10317-7126358; Each with Inmatec Gas Technology Nitrogen N2 Feed System |
| (3) | Piovan Drying Hoppers; Each with Air Filtration Units; Controls; and Accessories |
| (3) | Flakt Model CAIRplus 096.064IVBV Blower Filtration Units, S/N (2) Unknown; and S/N 648296.0020, (2019) |
| (5) | Approximately 10 hp Rack Mounted Blowers |
| (5) | Piovan Model F416/2 Ancillary Feed Hopper/Filter Dryer/Blowers, S/N (2) Unknown; S/N 01919V007; S/N 119193; and S/N 119153, (2019) |
| (3) | Tote Loaders; Each with Feed Hopper; Stainless Steel Top Mounted Vacuum Feed Hopper; and Surge Hopper |
| (9) | Kaeser Model Omega DB 236C Packaged Positive Displacement Blowers, S/N 7299; S/N 7300; S/N 7172; S/N 7103; S/N 7188; S/N 7168; S/N 7104; and S/N 7170 |
| (3) | Vacuum Pump Racks; Each with (4) Busch Model R5-RA 0305 D4 Vacuum Pumps; Associated Piping; Rack; and Controls |
| (3) | Tote Loading Systems; with (3) Surge Hoppers, with Pivovan Stainless Steel Feed Hoppers, 3-Station; Pivovan Vacuum Blower Dryer Type System; Controls; Valving; and Accessories |
| | (Asset Documentation In Photograph Section) |

COMPANY NAME CarbonLITE P, LLC
EFFECTIVE DATE April 28, 2021
REPORT DATE May 3, 2021
JOB NUMBER 3096749



## Description

### Throughout Plant

**Item #32**

Qty(1) Compressed Air System, To Include:

(1) Ingersoll-Rand Model IRN2008-OF Packaged Rotary Screw Air Compressor, S/N MOX1000170U19152, 200 hp; (Air Compressor #1)
(1) Ingersoll-Rand Model Sierra H200A Packaged Rotary Screw Air Compressor, S/N MOX1000527U19203, (2019), 200 hp; (Air Compressor #2)
(1) Ingersoll-Rand Model Sierra H200A Packaged Rotary Screw Air Compressor, S/N MOX1001408, 200 hp; (Air Compressor #3)
(1) Ingersoll-Rand Model Sierra H200A Packaged Rotary Screw Air Compressor, S/N MOX1001407, 200 hp; (Air Compressor #4)
(1) Ingersoll-Rand Model Sierra H200A Packaged Rotary Screw Air Compressor, S/N MOX1001409, 200 hp; (Air Compressor #5)
(1) Ingersoll-Rand Approximately 5,000-Gallon Vertical Air Receiving Tank; with Air Filter
(1) Ingersoll-Rand Model NVC4000A400 Refrigerated Air Dryer, S/N WCH1037734, (2019), 13 hp; (Air Dryer #1)
(1) Ingersoll-Rand Model NVC4000A400 Refrigerated Air Dryer, S/N WCH1037735, (2019), 13.5 hp; (Air Dryer #2)
(1) Manchester Tank Model RT-4 200-Gallon Steel Vertical Air Receiving Tank
    (Asset Documentation In Photograph Section)

**Item #33**

Qty(1) CHP Room, To Include:

(1) Caterpillar Model G35128 Diesel Generator, S/N CATG3512BGF401136, (2019); Part of ISO 8528 Generator Set, S/N CF401136; To Include: Xylem Heat Exchange System; Air Cooling System; Associated Piping; and Accessories
(1) Caterpillar Model G35128 Diesel Generator, S/N CATG3512BGF401134, (2019); Part of ISO 8528 Generator Set, S/N CF401136; To Include: Xylem Heat Exchange System; Air Cooling System; Associated Piping; and Accessories
(1) Caterpillar Model G35128 Diesel Generator, S/N CATG3512BGF401133, (2019); Part of ISO 8528 Generator Set, S/N CF401136; To Include: Xylem Heat Exchange System; Air Cooling System; Associated Piping; and Accessories
(1) Xylem Compressed Air Heat Exchanger System; with (2) Vertical Air Receiving Tanks; (2) WEG Model W40 25 hp Motors; (2) WEG Model T00718OT3E213KM-F 7.5 hp Motors; Piping; and Accessories
(1) Miura Model LX200SG-07 6,900-Lb./Hour Gas Fired Steam Boiler, S/N 47S483904, Asset #BOILER 2, (2019); Maximum 400°F Temperature, 170 psi, Maximum Input 7,877,000 Btus/Hour
(1) Miura Model LX200SG-07 6,900-Lb./Hour Gas Fired Steam Boiler, S/N 47S483903, Asset #BOILER 1, (2019); Maximum 400°F Temperature, 170 psi, Maximum Input 7,877,000 Btus/Hour
(1) Miura Model CPI-MI Deaerator; with (3) Grundfos Motors; Controls; (2) Iwaki E Class Metering Pumps; Associated Piping; and Accessories
(1) Miura Model MW-150U 1,300-GPH Water Softening System, S/N US12030118; with (2) Polyethylene Pressure Tanks, (1) Plastic Holding Tank; Control; Associated Piping; and Accessories
(3) Hot Water Storage Tanks: Each with Johnson Matthey Model MQW80S-H-CS-SIEO-18/18-2 Outfeed System
(1) Powertherm Silencer; with (8) Powertherm-Maxim Model GTS150-P6-S2-H-150-143-8A22315A Ancillary Silencers; Steel Mezzanine; Associated Piping; and Accessories
    (Asset Documentation In Photograph Section)

COMPANY NAME  CarbonLITE P, LLC
EFFECTIVE DATE  April 28, 2021
REPORT DATE  May 3, 2021
JOB NUMBER  3096749

## Description

**Item #34**

Qty (1)  Guardian Booth Approximately 8 x 6 Guard Booth; with Barrier Controls; and (4) FAAC Weight Lift Barriers

**Item #35**

Qty (1)  Fairbanks Model PLT-602090-A10-070 Truck Scale, S/N 13424, (2020); 240,000 Lb. Nominal Capacity; with Concrete On Load and Off Load Ramps

(Asset Documentation In Photograph Section)

**Item #36**

Qty (1)  Beckart Waste Treatment System; 190 Gallons/Minute, To Include: Filter Press, with Allen-Bradley PLC Control; (2) Gorman-Rupp Centrifugal Pumps; Model C-ODV-10-7815 7,815-Gallon Sludge Holding Tanks; Model C-DFE-9-6608 6,608-Gallon Bulk Tank Coagulant; Approximately 500-Gallon Filtrate Pre-Coat Tank; Approximately 500-Gallon Rotary Screen Collection Tank; (2) R&M 1,329-Gallon Tanks, Each with Isophthalic Polyester Lining; Approximately 500-Gallon Polymer Aging Tank; Double Rotary Screener; Clarifier; Approximately 300-Gallon Clarifier Collection Tank; Vincent Corporation Model KLP-10 Screw Press, S/N 18149-A; (3) WEG Motor Powered Pumps; (2) P&L Specialties Rotary Screeners; Approximately 750-Gallon Rotary Screen Collection Tank; Model C-ODV-11-13128 13,128-Gallon Clean Water Tank; Model C-LFD-11-17766 17,766-Gallon Equalization Tank; 275-Gallon Sulfuric Acid Collection Tank; and All Associated Piping, Pump, Motors, Metering, and Accessories

(Asset Documentation In Photograph Section)

**Item #37**

Qty (1)  Evoqua Reverse Osmosis Water Treatment System; 30 Gallons/Minute Capacity, To Include: (1) Soft Tank; (2) 345-Gallon Resin Tanks; (1) 187-Gallon Activated Carbon Tank, S/N 19319622; Shelco Model 4FOS3-C304-2F-P-DB-ML-V Filtration System, S/N 222981; Baldor 15 hp Motor; Allen-Bradley PLC Control; 1,000-Gallon Reservoir Tank; (2) Baldor 3 hp Motors; Aquafine Model Opti/venn Ultraviolet Disinfection Unit, S/N 10026011-30-01; Aquafine UV Monitoring Station; Mettler Toledo Model M300 Water Transmitter; (2) Protec Arisawa Model PRO-8-300 300-psi Pressure Vessels; and All Associated Piping, Pumps, and Accessories

(Asset Documentation In Photograph Section)

**Item #38**

Qty (1)  Plant Chilled Water System, To Include:

(1)  Modine Model LFS8824-3M9-4B Chiller, S/N 1947045004; with Piping; and Accessories
(1)  Modine Model LFS8824-3M9-4B Chiller, S/N 1947045005; with Piping; and Accessories
(1)  Modine Model LFS8824-3M9-4B Chiller, S/N 1947045003; with Piping; and Accessories
(1)  Frigel Model MRM404ECBPCC460/60UL 480-Volt Chiller, S/N 21089, (2019); with Piping; and Accessories
(1)  Frigel Model MRM404ECBPCC460/60UL 177.5 hp Evaporative Chiller, S/N 21051, (2019); with Associated Piping; Motors; and Accessories

(Asset Documentation In Photograph Section)

## Rolling Stock

**Item #39**

Qty (1)  Yale Model GLC050VXNVAE083 5,000-Lb. LP Gas Lift Truck, S/N G910V10047X, Asset #RF7999; 2,368 Hours Indicated, 3-Stage Mast; *(Rental)*

**Item #40**

Qty (1)  Yamaha Model DR2E20 Golf Cart, (2019)

COMPANY NAME  CarbonLITE P, LLC
EFFECTIVE DATE  April 28, 2021
REPORT DATE  May 3, 2021
JOB NUMBER  3096749



## Description

**Item #41**
Qty (1)  Yale Model GLC050VXNVAE083 5,000-Lb. LP Gas Lift Truck, S/N C910V100553S, Asset #RF7994; 521 Hours Indicated, 3-Stage Mast; *(Rental)*

**Item #42**
Qty (1)  Hyster Model S50FT LP Gas Lift Truck, S/N 8187B138277, Asset #RF8543; 2,152 Hours Indicated, 3-Stage Mast; *(Rental)*

## Leased Assets

**Item #43**
Qty (1)  Toyota Model 8FBCU25 5,000-Lb. Electric Lift Truck, S/N 81711, Asset #FT-02; 870 Hours Indicated, 3-Stage Mast; with Side Shift; *(Leased)*

**Item #44**
Qty (1)  Toyota Model 8FG45U 10,000-Lb. LP Gas Lift Truck, S/N 20015, Asset #FT-00; 3-Stage Mast; *(Leased)*

**Item #45**
Qty (1)  Toyota Model 8FBCU25 5,000-Lb. Electric Lift Truck, S/N 81707, Asset #FT-05; 705 Hours Indicated, 3-Stage Mast; with Side Shift; *(Leased)*

**Item #46**
Qty (1)  Toyota Model 8FBCU25 5,000-Lb. Electric Lift Truck, S/N 81699, Asset #FT-01; 667 Hours Indicated, 3-Stage Mast; *(Leased)*

**Item #47**
Qty (1)  Toyota Model 8FBCU25 5,000-Lb. Electric Lift Truck, S/N 81691, Asset #FT-04; 3-Stage Mast; *(Leased)*

**Item #48**
Qty (1)  Toyota Model 8FBCU25 5,000-Lb. Electric Lift Truck, S/N 81698, Asset #CT-02; 303 Hours Indicated, 3-Stage Mast; with Cascade Model 35D-CCS-35Q Clamp Attachment; *(Leased)*

**Item #49**
Qty (1)  Toyota Model 8FBCU25 5,000-Lb. Electric Lift Truck, S/N 81688, Asset #FT-03; 736 Hours Indicated, 3-Stage Mast; with Side Shift; *(Leased)*

**Item #50**
Qty (1)  Toyota Model 8FBCU25 5,000-Lb. Electric Lift Truck, S/N 81695, Asset #CT-04; 357 Hours Indicated, 3-Stage Mast; with Cascade Model 35D-CCS-35Q Clamp Attachment; *(Leased)*

**Item #51**
Qty (1)  Toyota Model 8FBCU25 5,000-Lb. Electric Lift Truck, S/N 81701, Asset #CT-01; 3-Stage Mast; with Cascade Model 35D-CCS-35Q Clamp Attachment; *(Leased)*

**Item #52**
Qty (1)  Toyota Model 8FBCU25 5,000-Lb. Electric Lift Truck, S/N 81704, Asset #CT-03; 223 Hours Indicated, 3-Stage Mast; with Cascade Model 35D-CCS-35Q Clamp Attachment; *(Leased)*

COMPANY NAME  CarbonLITE P, LLC
EFFECTIVE DATE  April 28, 2021
REPORT DATE  May 3, 2021
JOB NUMBER  3096749





# Machinery & Equipment Photo Report





Item #19 - 1 Sorema Scrap Bottle Dust Collection System



Item #19 - 2 Sorema Scrap Bottle Dust Collection System



Item #20 - 1 CST Storage 18'D x 82'H, 15,217-Cubic Feet PET Flake Silos



Item #20 - 2 Imperial Systems Model CMAXX CM-04 PET Flake Vacuum System



Item #20 - 3 Aerzen Model Delta Blower GM30L Positive Displacement Blower



Item #21 - 1 Bulk Handling Systems Model Cross Wrap Wire Removal System



Item #21 - 2 Bulk Handling Systems Approximately 60"W x 40'L x 15'H Inclined Belt Conveyor



Item #21 - 3 SSI Model Pri-Max Scrap Shredder



Gordon Brothers

CARBONLITE P, LLC
JOB NUMBER: 3096749





*Item #21 - 5* Bulk Handling Systems Scrap Bottle Storage Bunker





*Item #21 - 4* Bulk Handling Systems Approximately 60"W x 80'L x 20'H Inclined Belt Conveyor

*Item #21 - 7* Stadler Model Modul 1010 Unten 6,000-kg Ballistic Separator

*Item #21 - 6* Stadler Model Modul 1010 Unten 6,000-kg Ballistic Separator



**Gordon Brothers**

CARBONLITE P, LLC
JOB NUMBER: 3096749




*Item #21 - 8 Para-Mount Model 7655.0 Approximately 5'W x 7.6'L Shaker Tables*



*Item #21 - 9 Steinert Model ALK 2000 120 Eddy Current Separators*



*Item #21 - 10 Steinert Model ALK 2000 120 Eddy Current Separators*



*Item #21 - 11 General Kinematics Approximately 7'W x 15'L Shaker Tables*



**Gordon Brothers**



Item #21 - 12 NRT Model SpydIR-T-120 Optical Sorters



Item #21 - 13 NRT Model SpydIR-T-120 Optical Sorters



Item #21 - 14 Bulk Handling Systems Approximately 60"W x 50'L Inclined Power Belt Conveyor



Item #21 - 15 Bulk Handling Systems Approximately 24"W x 80'L Inclined Power Belt Conveyor



Gordon Brothers



Item #21 - 16 Bulk Handling Systems Wash Toll Bottle Mix PET Storage Bunker



Item #21 - 17 Bulk Handling Systems 30"W x Approximately150-Linear Feet Long x 15'H Inclined Power Belt Conveyor



Item #21 - 18 NRT Model SpydIR-T/ColorPlus R 96/W/MD Optical Sorter



Item #21 - 19 NRT Model ColorPlus R-108 Optical Sorter



Gordon
Brothers

CARBONLITE P, LLC
JOB NUMBER: 3096749





Item #21 - 21 General Kinematics Approximately 10'W x 20'L Vibratory Conveyor



Item #21 - 23 General Kinematics Approximately 10'W x 20'L Vibratory Conveyor



Item #21 - 20 NRT Model SpydIR-R-120 W/MD Optical Sorter



Item #21 - 22 NRT Model ColorPlus R 60 Optical Sorter

CARBONLITE P, LLC
JOB NUMBER: 3096749





Item #21 - 24 NRT Model MAX AI HS VIS-120 Computerized Visual Identification System



Item #21 - 25 NRT Model SpydIR-R-96 W/MD Optical Sorter



Item #21 - 26 Bulk Handling Systems Inclined Power Belt Conveyor



Item #21 - 27 Motor Control Room

Gordon Brothers





Item #21 - 29 Motor Control Room



Item #21 - 28 Motor Control Room



Item #21 - 31 NRT Model Max AI AQC-2 Robotic Picker Systems

Item #21 - 30 General Kinematics Approximately 40W x 50'L Shaker Vibratory
Conveyors



Gordon
Brothers



Item #21 - 32 NRT Model Max AI AQC-2 Robotic Picker Systems



Item #21 - 33 Clear PET Storage Bunker



Item #21 - 34 Colored PET Storage Bunker



Item #21 - 35 PAAL Model Pacomat III D Horizontal Hydraulic Baler



Gordon Brothers



Item #22 - 1 Sorema Model WCE 9000 L Prewash Centrifuge



Item #22 - 2 Sorema Approximately 6'W Vibratory Screen



Item #22 - 3 Sorema Approximately 6'W Vibratory Screen



Item #22 - 4 Sorema Approximately 12" Screw x 20'L Auger Screw Conveyor



Gordon
Brothers





Item #22 - 5 Sorema Approximately 12'W x 30'L Inclined Disk Type Separator Conveyor



Item #22 - 6 Sorema Approximately 48"W x 125'L Power Belt Conveyor



Item #22 - 7 Sorema Decanter



Item #22 - 8 Aqua Filter Model AISI 304 Micro Filters



Item #23 - 1 Sorema Scrap Wet Grinder



Item #23 - 2 Sorema Scrap Wet Grinder



Item #23 - 3 Sorema Fines Separators



Item #23 - 4 Sorema Model WCE 2000 C Washing Centrifuges



Gordon
Brothers

CARBONLITE P, LLC
JOB NUMBER: 3096749



Item #23 - 6 Sorema Model SCW200 Approximately 12" x 30'L Inclined Auger Screw Conveyors



Item #23 - 8 Sorema Model WCE 1500 W Washing Centrifuge



Item #23 - 5 Sorema Model WCE 2000 C Washing Centrifuges



Item #23 - 7 Sorema Electrical Control Cabinet and Mezzanine



**Gordon Brothers**



Item #23 - 9 Sorema Model WCE 1500 W Washing Centrifuge



Item #23 - 10 Sorema Centrifugal Dryer



Item #23 - 11 Sorema Float/Sink Tank



Item #23 - 12 Sorema Model STR 16/20 Approximately 300-Gallon Washing Reactor



Gordon Brothers





Item #23 - 14 Sorema Centrifugal Dryer



Item #23 - 16 Sorema Approximately 150-Gallon Dosing Tank



Item #23 - 13 Sorema Approximately 200-Gallon Rinse Tanks



Item #23 - 15 Sorema Approximately 60"W Vibratory Screen



*Item #23 - 17 Sorema Approximately 350-Gallon Dosing Tank*



*Item #23 - 18 Sorema Approximately 60" Vibratory Screen*



*Item #23 - 19 Sorema Approximately 450-Gallon Batch Washers*



*Item #23 - 20 Sorema Approximately 10W x 30H Dirty Flake Silo*



**Gordon Brothers**



Item #23 - 21 Sorema Approximately 36" x 6'L Fluid Bed Dryer



Item #23 - 22 Sorema Centrifugal Dryer



Item #23 - 23 Sorema Approximately 350-Gallon Water Collecting Tank



Item #23 - 24 Sorema Approximately 6'W Vibratory Screen



Gordon Brothers





Item #23 - 25 Steinert Model MOR 145 165 MT 40 U Eddy Current Separators

Item #23 - 26 Steinert Model NES 150 Eddy Current Separators





Item #23 - 27 Sorema Approximately 12" x 20' Transfer Auger

Item #23 - 28 Sorema Model VE/E 80/430 Fluid Bed Dryer



Gordon
Brothers
1903



*Item #23 - 30* Sorema Model MT1802BF00016 Vibratory Screens



*Item #23 - 32* Sorema Dry Grinders



*Item #23 - 29* Sorema Model VE/E 80/430 Fluid Bed Dryer



*Item #23 - 31* Sorema Dry Grinders



Gordon Brothers



Item #23 - 33 Robuschi Model Robox Lobe S85-3P-RVP125 Packaged
Positive Displacement Blower



Item #23 - 34 TOMRA Model Autosort Flake (NIR1-CRG8) Optical Sorter



Item #23 - 35 Sorema Elutriator



Item #23 - 36 Sorema Approximately 6'D Vibratory Screen



Gordon
Brothers





Item #23 - 37 Zorzini 5'D x 30'H Mixer Silos



Item #23 - 38 Robuschi Model S85/3P RVP125 Packaged Positive
Displacement Blower



Item #24 - 1 Sorema Approximately 300 hp Scrap Grinder



Item #24 - 2 Sorema Approximately 300 hp Scrap Grinder



*Item #24 - 3 Sorema Approximately 300 hp Scrap Grinder*



*Item #24 - 4 Sorema Approximately 300 hp Scrap Grinder*



*Item #24 - 5 Sorema Centrifugal Separators*



*Item #24 - 6 Sorema Scrap Grinder Auger Screw Feed Systems*



Gordon
Brothers

CARBONLITE P, LLC
JOB NUMBER: 3096749



*Item #24 - 7 Sorema Approximately 15W x 30'H Dirty Flake Silo*



*Item #24 - 8 Sorema Stainless Steel Decanter*



*Item #24 - 9 Sorema Stainless Steel Decanter*



*Item #24 - 10 Sorema Approximately 6'D Vibratory Screen*



Gordon
Brothers



Item #24 - 11 Sorema Model VB 1800 1R Vibratory Screen



Item #24 - 12 Sorema Model VRC-3 150-Gallon Collection Tank



Item #24 - 13 Sorema Model VRC-1 Approximately 150-Gallon Collection Tank



Item #24 - 14 Sorema Model VST 17/90 Separation Tank



Gordon Brothers

CARBONLITE P, LLC
JOB NUMBER: 3096749



*Item #24 - 15* Sorema Model VRC-3 Approximately 300-Gallon Stainless Steel
Chemical Mixing Tanks



*Item #24 - 16* Sorema Model VRC-3 Approximately 300-Gallon Stainless Steel
Chemical Mixing Tanks



*Item #24 - 17* Sorema Model VRC-3 Approximately 300-Gallon Stainless Steel
Chemical Mixing Tanks



*Item #24 - 18* Sorema Model VRC-3 Approximately 500-Gallon Stainless Steel
Chemical Mixing Tanks



Gordon
Brothers

CARBONLITE P, LLC
JOB NUMBER: 3096749



Item #24 - 19 Sorema Approximately 200-Gallon Stainless Steel Process Tank



Item #24 - 20 Sorema Model STC 1/15/20 Washing Reactor



Item #24 - 21 Sorema Horizontal Centrifuge



Item #24 - 22 Sorema Approximately 2,000-Gallon Rinse Tank



Gordon Brothers



*Item #24 - 23* Sorema Approximately 1,500-Gallon Rinse Tanks



*Item #24 - 24* Sorema Model WCE 2000 C Washing Centrifuge



*Item #24 - 25* Sorema Model STC 3/15/20 Washing Reactor



*Item #24 - 26* Sorema Model WCE 2000 C Washing Centrifuge



Gordon Brothers

Item #24 - 27 Sorema Approximately 100-Gallon Stainless Steel Additive Tank



Item #24 - 28 Sorema Model DCE 10/20 Centrifugal Separator



Item #24 - 29 Sorema Model DCE 10/20 Centrifugal Separator



Item #24 - 30 Sorema Model VB 1800 1RC Approximately 6'D Vibratory Screens







*Item #25 - 1* TOMRA Model Autosort Flake (NIR1-CRGB) Optical Sorter



*Item #25 - 3* TOMRA Model Autosort Flake (NIR1-CRGB) Optical Sorter



*Item #24 - 31* Aerzen Model Delta Blower GM30L Positive Displacement Blower



*Item #25 - 2* TOMRA Model Autosort Flake (NIR1-CRGB) Optical Sorter

CARBONLITE P, LLC
JOB NUMBER: 3096749



Item #25 - 4 Unisensor Model PowerSort 200 V16 Laser Sorting System



Item #25 - 6 Sorema Elutriators



Item #25 - 5 Unisensor Model PowerSort 200 V16 Laser Sorting System



Item #25 - 7 Sorema Model VB 1000 2R Approximately 6'D Vibratory Screens



Gordon
Brothers



Item #25 - 8 Dual Outfeed Discharge Stations



Item #26 Wash Line #1 and #2 Waste Discharge Tote Loading System



Item #27 - 1 Pelletron Feed System



Item #28 - 1 Piovan Dryer



Gordon
Brothers



Gordon
Brothers



Item #28 - 3 Piovan Model CDF6000 PDU Condensate Separators



Item #28 - 5 Starlinger Model recoSTAR PET 165 HC IV+ Pelletizing Extruder



Item #28 - 2 Piovan Model DPS180 Chiller



Item #28 - 4 Piovan PDU Air Heater



Item #28 - 6 Maag Model Sphero 100 Underwater Pelletizer



Item #28 - 7 Starlinger Centrifuge



Item #29 - 1 Piovan Approximately 6'W x 30'H Mixing Silo



Item #29 - 2 Flake Hopper



Gordon
Brothers

CARBONLITE P, LLC
JOB NUMBER: 3096749



Item #29 - 3 Rittal Model SK 3364100 Dryer



Item #29 - 5 Piovan Model CDF6000 PDU Condensate Separator



Item #29 - 4 Piovan Model DPS180 Chiller



Item #29 - 6 Piovan PDU Air Heater



Gordon
Brothers





*Item #29 - 7 Starlinger Model recoSTAR PET 165 HC IV+ Pelletizing Extruder*



*Item #29 - 8 Maag Model Sphero 100 Underwater Pelletizer*



*Item #29 - 9 Starlinger Centrifuge*



*Item #30 - 1 Piovan Approximately 6'W x 30'H Mixing Silo*

CARBONLITE P, LLC
JOB NUMBER: 3096749



*Item #30 - 3 Piovan Model DPS180 Chiller*



*Item #30 - 5 Piovan PDU Air Heater*



*Item #30 - 2 Piovan Dryer*



*Item #30 - 4 Piovan Model CDF6000 PDU Condensate Separator*



Gordon
Brothers





Item #30 - 6 Starlinger Model recoSTAR PET 165 HC IV+ Pelletizing Extruder



Item #30 - 7 Maag Model Sphero 100 Underwater Pelletizer



Item #30 - 8 Starlinger Centrifuge



Item #31 - 1 Starlinger Model viscoSTAR 180 SSP Dryer



Item #31 - 2 Starlinger Model viscoSTAR 180 SSP Dryer



Item #31 - 3 Starlinger Model viscoSTAR 180 SSP Dryer



Item #31 - 4 Kaeser Model SX7.5 Rotary Screw Air Compressors



Item #31 - 5 Piovan Drying Hoppers



Gordon Brothers





Item #31 - 6 Piovan Model F416/2 Ancillary Feed Hopper/Filter Dryer/Blowers



Item #31 - 7 Tote Loaders



Item #31 - 8 Kaeser Model Omega DB 236C Packaged Positive Displacement Blowers



Item #31 - 9 Vacuum Pump Racks

Gordon Brothers





*Item #32 - 1* Ingersoll-Rand Model IRN2008-OF Packaged Rotary Screw Air Compressor



*Item #32 - 3* Ingersoll-Rand Model NVC4000A400 Refrigerated Air Dryer



*Item #31 - 10* Vacuum Pump Racks



*Item #32 - 2* Ingersoll-Rand Model Sierra H200A Packaged Rotary Screw Air Compressor



*Item #33 - 1 Caterpillar Model G35128 Diesel Generator*



*Item #33 - 2 Caterpillar Model G35128 Diesel Generator*



*Item #33 - 3 Xylem Compressed Air Heat Exchanger System*



*Item #33 - 4 Miura Model LX200SG-07 6,900-Lb./Hour Gas Fired Steam Boiler*



**Gordon Brothers**





Item #33 - 5 Miura Model LX200SG-07 6,900-Lb./Hour Gas Fired Steam Boiler



Item #33 - 6 Powertherm Silencer



Item #35 Fairbanks Model PLT-6020090-A10-070 Truck Scale



Item #36 - 1 Beckart Waste Treatment System

Gordon Brothers



Item #36 - 2 Beckart Waste Treatment System



Item #36 - 3 Beckart Waste Treatment System



Item #37 - 1 Evoqua Reverse Osmosis Water Treatment System



Item #37 - 2 Evoqua Reverse Osmosis Water Treatment System



Gordon Brothers



Item #38 - 1 Modine Model LFS8824-3M9-4B Chiller



Item #38 - 2 Frigel Model MRM404ECBPCC460/60UL 480-Volt Chiller



Item #38 - 3 Frigel Model MRM404ECBPCC460/60UL 177.5 hp Evaporative Chiller

Gordon Brothers



# Appendix

Project Manager Qualifications

# PROJECT MANAGER QUALIFICATIONS

JAMES A. BRODIE, ASA, CEA

**Senior Manager, Valuations**
Gordon Brothers
Detroit, MI  USA

Office: 810.534.7076
Mobile: 248.514.4079
jbrodie@gordonbrothers.com

## Experience

Jim Brodie is a senior manager in Gordon Brothers' Machinery & Equipment Valuation practice.  He has directed hundreds of machinery and equipment valuation projects across a wide range of industries during his career, which began in 1983. Jim also has liquidation experience.

## Industry Specialties (partial listing)

- Aerospace
- Automotive
- Construction & Building Products
- Electronics and High-Tech
- Fabricated Metal Products
- Food & Beverage

- Furniture
- Laboratories
- Machinery Manufacturing
- Mobile and Modular Units
- Packaging
- Plastics and Rubber

- Primary Metals
- Printing and Publishing
- Trucking and Transportation
- Warehousing and Storage
- Wood Products

## Licenses, Accreditation, and Certifications

- Accredited Senior Appraiser, American Society of Appraisers, Machinery & Technical Specialties
- Certified Equipment Appraiser, Association of Machinery & Equipment Appraisers

## Professional Development

- Introduction to Machinery & Equipment Valuation (Course ME201, American Society of Appraisers)
- Machinery & Equipment Valuation (Course ME 202, American Society of Appraisers)
- Machinery and Equipment Valuation – Advanced Topics and Case Studies (Course ME203, American Society of Appraisers)
- Machinery and Equipment Valuation – Advanced Topics and Report Writing (Course ME204, American Society of Appraisers)
- Appraisal Review and Management (Course AR204, American Society of Appraisers)
- Uniform Standards of Professional Appraisal Practice

## Association Memberships

- American Society of Appraisers
- Association of Machinery & Equipment Appraisers

## Education

SCHOOLCRAFT COLLEGE
Undergraduate Studies – Business Administration



# Section 2.1(c):  Acquired Contracts

| Contract Counterparty/Address | Contract / Lease Debtor Party | Contract/Lease Title | Date of Contract / Lease |
|---|---|---|---|
| A1 Restoration, Inc. d/b/a A1 Energy 2730 Shenck Road Manheim, PA 17545 | CarbonLite P, LLC | Standard Abbreviated Form of Agreement Between Owner and Contractor | 5/24/2019 |
| A1 Restoration, Inc. d/b/a A1 Energy 2730 Shenck Road Manheim, PA 17545 | CarbonLite P, LLC | Change Order 1 | 6/21/2019 |
| A1 Restoration, Inc. d/b/a A1 Energy 2730 Shenck Road Manheim, PA 17545 | CarbonLite P, LLC | Change Order 2 | 7/1/2019 |
| A1 Restoration, Inc. d/b/a A1 Energy 2730 Shenck Road Manheim, PA 17545 | CarbonLite P, LLC | Change Order 3 | 12/18/2019 |
| A1 Restoration, Inc. d/b/a A1 Energy 2730 Shenck Road Manheim, PA 17545 | CarbonLite P, LLC | Change Order 4 | 5/21/2020 |
| A1 Restoration, Inc. d/b/a A1 Energy 2730 Shenck Road Manheim, PA 17545 | CarbonLite P, LLC | Energy Services Agreement | Undated |
| Anchor Fire Protection Co., Inc. 270 Renninger Road Perkiomenville, PA 18074 | CarbonLite P, LLC | Standard Short Form Agreement Between Owner and Contractor | 11/4/2020 |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Standard Form of Agreement Between Owner and Design-Builder | 8/27/2019 |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Design-Build Amendment | 8/27/2019 |

DOCS_DE:234533.2 13044/001

| Contract Counterparty/Address | Contract / Lease Debtor Party | Contract/Lease Title | Date of Contract / Lease |
|---|---|---|---|
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 1 | 10/22/2019 |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 6 | 11/14/2019 |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 7 | 11/14/2019 |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 8 | 11/14/2019 |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 9 | 11/14/2019 |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 10 | 1/15/2020 |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 11 | 1/15/2020 |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 13 | 1/21/2020 |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 14 | 1/28/2020 |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 15 | 2/25/2020 |

DOCS_DE:234533.2 13044/001

| Contract Counterparty/Address | Contract / Lease Debtor Party | Contract/Lease Title | Date of Contract / Lease |
|---|---|---|---|
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 16 | 3/30/2020 |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 17 | 3/30/2020 |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 18 | 4/10/2020 |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 19 | 4/20/2020 |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 20 | 5/11/2020 |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 21 | 5/18/2020 |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 22 | 5/18/2020 |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 23 | 6/10/2020 |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 24 | 6/18/2020 |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 25 | 6/25/2020 |

DOCS_DE:234533.2 13044/001

| Contract Counterparty/Address | Contract / Lease Debtor Party | Contract/Lease Title | Date of Contract / Lease |
|---|---|---|---|
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 26 | 6/25/2020 |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 27 | 10/16/2020 |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 28 | 11/20/2020 |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 29 | 12/10/2020 |
| ClearFreight, Inc. Building 75 North Hangar Road, Suite 210 JFK International Airport Jamaica, NY 11430 | CarbonLite P, LLC | Customs Power of Attorney and Acknowledgement of Terms and Conditions Service; Credit Agreement and Application; Continuing Guaranty | 10/25/2019 |
| Comcast Cable Communications Management, LLC c/o Market Development, Comcast Business 1701 JFK Blvd., Flr. 39 - Attn ROE Team Philadelphia, PA 19103 | CarbonLite P, LLC | Comcast Enterprise Services Master Services Agreement (MSA) | 3/23/2020 |
| Data Technology Solutions, LLC 9 North College Street Myerstown, PA 19605 | CarbonLite P, LLC | Data Cabling Services Contract (Letter price quotation with acceptance) | 7/29/2020 |
| Emerging Acquisitions LLC d/b/a Bulk Handling Solutions 3592 W. 5th Avenue Eugene, OR 97402 | CarbonLite P, LLC | Secondary Plastics Processing System | 1/22/2019 |
| Emerging Acquisitions LLC d/b/a Bulk Handling Solutions 3592 W. 5th Avenue Eugene, OR 97402 | CarbonLite P, LLC | Change Order #01 | 5/17/2019 |

7

| Contract Counterparty/Address | Contract / Lease Debtor Party | Contract/Lease Title | Date of Contract / Lease |
|---|---|---|---|
| Emerging Acquisitions LLC d/b/a Bulk Handling Solutions 3592 W. 5th Avenue Eugene, OR 97402 | CarbonLite P, LLC | Change Order #02 | 6/7/2019 |
| Emerging Acquisitions LLC d/b/a Bulk Handling Solutions 3592 W. 5th Avenue Eugene, OR 97402 | CarbonLite P, LLC | Change Order #03 | 6/7/2019 |
| Emerging Acquisitions LLC d/b/a Bulk Handling Solutions 3592 W. 5th Avenue Eugene, OR 97402 | CarbonLite P, LLC | Change Order #04 | 6/13/2019 |
| Emerging Acquisitions LLC d/b/a Bulk Handling Solutions 3592 W. 5th Avenue Eugene, OR 97402 | CarbonLite P, LLC | Change Order #05 | 2/7/2020 |
| Emerging Acquisitions LLC d/b/a Bulk Handling Solutions 3592 W. 5th Avenue Eugene, OR 97402 | CarbonLite P, LLC | Consignment Agreement | 2/25/2021 |
| Evoqua Water Technologies LLC 725 Wooten Road Colorado Springs, CO 80915 | CarbonLite P, LLC | Firm Proposal #2019-328049 | 8/5/2019 |
| Granite Telecommunications, LLC 100 Newport Avenue Extension Quincy, MA 02171 | CarbonLite P, LLC | Commercial Account Form and Letter of Agency - Mobility Services | 3/2/2020 |
| Ingersoll Rand Company 800 East Beaty Street Davidson, NC 28036 | CarbonLite P, LLC | Purchase Orders; Standard Terms and Conditions of Sale | 6/27/2019 |
| Ingersoll Rand Company 800 East Beaty Street Davidson, NC 28036 | CarbonLite P, LLC | PackageCARE Agreement | 9/30/2019 |
| Ingersoll-Rand Company 800-B Beaty Street Davidson, NC 28036 | CarbonLite P, LLC | PackageCARE Agreement | 7/1/2019 |

| Contract Counterparty/Address | Contract / Lease Debtor Party | Contract/Lease Title | Date of Contract / Lease |
|---|---|---|---|
| Ingersoll-Rand Company Compression Technologies & Services 6291 Burnham Avenue Buena Park, CA 90621 | CarbonLite P, LLC | PackageCARE Addendum | 7/20/2020 |
| J.P Mascaro & Sons 2650 Audubon Road Audubon, PA 19403 | CarbonLite P, LLC | Contract for Required Services | 7/23/2020 |
| KRE Security, LLC 11 South 3rd Street Hamburg, PA 19526 | CarbonLite P, LLC | Security Services Agreement | 11/8/2019 |
| KRE Security, LLC 11 South 3rd Street Hamburg, PA 19526 | CarbonLite P, LLC | Mutual Non-Disclosure and Confidentiality Agreement | 11/15/2019 |
| Kupper Engineering, Inc. 300 Brookside Avenue, Building 14 Ambler, PA 19002 | CarbonLite P, LLC | Proposal to Provide System Integration Services for the Direct Transfer Trip System | 12/3/2019 |
| Lift Inc. (Corporate Office) 3745 Hempland Rd. Mountville, PA 17554 | CarbonLite P, LLC | Planned Maintenance Agreement (Lift Trucks) | 7/24/2020 |
| Lubo USA LLC d/b/a Van Dyk Recycling Solutions 78 Halloween Boulevard Stamford, CT 06902 | CarbonLite P, LLC | Order Confirmation OC#LUTI2019245 | 6/12/2019 |
| Metropolitan Edison Company 2800 Pottsville Pike Reading, PA 19605 | CarbonLite P, LLC | FirstEnergy Interconnection Agreement | 10/7/2020 |
| Miura America Co., Ltd. 2200 Steven B. Smith Boulevard Rockmart, GA 30153 | CarbonLite P, LLC | Miura Maintenance Agreement | 6/4/2019 |
| Nitel Inc. 350 N. Orleans Street, #1300N Chicago IL 60654 | CarbonLite P, LLC | Services Agreement | 12/30/2019 |
| Orkin 3330 Keller Springs Road #250 Carrollton, TX 75006 | CarbonLite P, LLC | Service Agreement | 7/20/2020 |

| Contract Counterparty/Address | Contract / Lease Debtor Party | Contract/Lease Title | Date of Contract / Lease |
|---|---|---|---|
| Pelletron Corporation 1866 Colonial Village Lane Lancaster, PA 17601 | CarbonLite P, LLC | Order Confirmation | 6/17/2019 |
| Pelletron Corporation 1866 Colonial Village Lane Lancaster, PA 17601 | CarbonLite P, LLC; CarbonLite Recycling LLC | Pelletron Order Confirmation for PET Flake and Pellet Handling System for PA and Dallas | 9/9/2020 |
| PerkinElmer Health Sciences Inc. 710 Bridgeport Avenue Shelton, CT 06484 | CarbonLite P, LLC | Quotation | 12/5/2019 |
| R.A.T.T., Inc. d/b/a Orkin 800 Shoemaker Avenue Shoemakersville, PA 19555 | CarbonLite P, LLC | Special Service Agreement | 7/1/2020 |
| R.A.T.T., Inc. d/b/a Orkin 800 Shoemaker Avenue Shoemakersville, PA 19555 | CarbonLite P, LLC | Special Service Agreement | 10/21/2020 |
| Security Signal Devices, Inc. 900 Six Flags Arlington, TX 76011 | CarbonLite P, LLC | Letter Agreement | 11/26/2020 |
| Security Signal Devices, Inc. 900 Six Flags Arlington, TX 76011 | CarbonLite P, LLC | SSD Alarm Agreement | 4/21/2020 |
| Sorema Division of Previero N. srl Via Per Cavolto 17-22040 Anzano del Parco Italy | CarbonLite P, LLC | Order Confirmation V1450 | 1/28/2019 |
| Sorema Division of Previero N. srl Via Per Cavolto 17-22040 Anzano del Parco Italy | CarbonLite P, LLC | Order Confirmation V1451 | 1/28/2019 |
| Starlinger & Co. Gesellschaft m.b.H. Sonneuhrgasse 4 1060 Vienna Austria | CarbonLite P, LLC | Order Confirmation No. MA295440 | 11/27/2018 |
| Trimax Systems Inc. 565 Explorer Street Brea, CA 92821 | CarbonLite P, LLC | Proposal (E-12155 Rev 2) | 7/29/2019 |

10

| Contract Counterparty/Address | Contract / Lease Debtor Party | Contract/Lease Title | Date of Contract / Lease |
|---|---|---|---|
| UniSensor Sensorststeme GmbH Am Sandfeld 11 D-76149 Karlsruhe Germany | CarbonLite P. LLC | Offer No. A016804 | 3/15/2019 |
| UniVoIP, Inc. 830 Parkview Drive N. El Segundo, CA 90245 | CarbonLite P, LLC | Agreement to Subscribe to Hosted Voice Over IP (VOIP) Telephone System and Internet Access Service | 11/4/2019 |

DOCS_DE:234533.2 13044/001

**Section 2.1(e): Acquired Real Property Leases**

| Debtor / Lessee | Location | Lessor | Lease Title | Date of Contract / Lease |
|---|---|---|---|---|
| CarbonLite P, LLC | 4030 Pottsville Pike Reading, PA 19605 | Berks 61 Owner, LLC c/o Endurance Real Estate Group 4 Radnor Corporate Center Suite 105 Radnor, PA 19087 | Industrial Lease | 5/13/2019 |
| CarbonLite P, LLC | 4030 Pottsville Pike Reading, PA 19605 | Berks61 Owner, LLC c/o Endurance Real Estate Group 4 Radnor Corporate Center, Suite 105 Radnor, PA 19087 | First Amendment to Industrial Lease | 10/20/2019 |
| CarbonLite P, LLC | 4030 Pottsville Pike Reading, PA 19605 | Berks61 Owner, LLC c/o Endurance Real Estate Group 4 Radnor Corporate Center, Suite 105 Radnor, PA 19087 | Second Amendment to Industrial Lease | 2/21/2021 |

12

**Section 2.1(f): Acquired Personal Property Leases**

None.

DOCS_DE:234533.2 13044/001

## Section 2.1(g): Permits and Licenses

| Permit Type | Issuing Entity | Permit Number | Expiration Date |
|---|---|---|---|
| Department Plan Approval | Pennsylvania Department of Environmental Protection- Air Quality Program | Plan Approval No. 06-05159A | 5/31/2021 |
| Industrial Waste Discharge Permit | City of Reading | #92 | 9/30/2023 |
| Temporary Certificate of Occupancy | Muhlenberg Township | n/a | |
| Temporary Fire License | Muhlenberg Fire Marshal | FL-0190 | 10/1/2021 |
| NPDES Stormwater Discharge Permit | Pennsylvania Department of Environmental Protection – Bureau of Clean Water | PAG03368 | 9/23/2021 |
| RCRA Small Quantity Generator of Hazardous Waste | U.S. Environmental Protection Agency | Generator ID No. PAD000731224 | N/A |

DOCS_DE:234533.2 13044/001

**Section 2.1(i): Open Customer Orders**

| Customer | Order # | SKU | Description | Order Date | Qty | O/S Qty | Back-Ordered Qty |
|---|---|---|---|---|---|---|---|
| Easypak, LLC | SO-006077 | CL-LNO-01-02 | Starlinger Clear Pellet | 05/19/21 | 42,000 | 42,000 | 0 |
| Easypak, LLC | SO-006078 | CL-LNO-01-02 | Starlinger Clear Pellet | 05/19/21 | 42,000 | 42,000 | 0 |
| Nestle Waters North America | SO-006028 | CL-LNO-01-02 | Starlinger Clear Pellet | 04/08/21 | 45,000 | 45,000 | 0 |
| Nestle Waters North America | SO-006029 | CL-LNO-01-02 | Starlinger Clear Pellet | 04/08/21 | 45,000 | 45,000 | 0 |
| Nestle Waters North America | SO-006030 | CL-LNO-01-02 | Starlinger Clear Pellet | 04/08/21 | 45,000 | 45,000 | 0 |
| Nestle Waters North America | SO-006031 | CL-LNO-01-02 | Starlinger Clear Pellet | 04/08/21 | 45,000 | 45,000 | 45,000 |
| Nestle Waters North America | SO-006032 | CL-LNO-01-02 | Starlinger Clear Pellet | 04/08/21 | 45,000 | 45,000 | 0 |
| Nestle Waters North America | SO-006033 | CL-LNO-01-02 | Starlinger Clear Pellet | 04/08/21 | 45,000 | 45,000 | 0 |
| Nestle Waters North America | SO-006034 | CL-LNO-01-02 | Starlinger Clear Pellet | 04/08/21 | 45,000 | 45,000 | 0 |
| Nestle Waters North America | SO-006035 | CL-LNO-01-02 | Starlinger Clear Pellet | 04/08/21 | 45,000 | 45,000 | 0 |
| Nestle Waters North America | SO-006036 | CL-LNO-01-02 | Starlinger Clear Pellet | 04/08/21 | 45,000 | 45,000 | 0 |
| Nestle Waters North America | SO-006037 | CL-LNO-01-02 | Starlinger Clear Pellet | 04/08/21 | 45,000 | 45,000 | 0 |
| Nestle Waters North America | SO-006038 | CL-LNO-01-02 | Starlinger Clear Pellet | 04/08/21 | 45,000 | 45,000 | 0 |
| Nestle Waters North America | SO-006039 | CL-LNO-01-02 | Starlinger Clear Pellet | 04/08/21 | 45,000 | 45,000 | 0 |
| Nestle Waters North America | SO-006040 | CL-LNO-01-02 | Starlinger Clear Pellet | 04/08/21 | 45,000 | 45,000 | 0 |
| Nestle Waters North America | SO-006041 | CL-LNO-01-02 | Starlinger Clear Pellet | 04/08/21 | 40,126 | 40,126 | 0 |
| Nestle Waters North America | SO-006050 | CL-LNO-01-02 | Starlinger Clear Pellet | 04/23/21 | 49,000 | 49,000 | 0 |
| Nestle Waters North America | SO-006053 | CL-LNO-01-02 | Starlinger Clear Pellet | 04/23/21 | 49,000 | 49,000 | 0 |
| Nestle Waters North America | SO-006054 | CL-LNO-01-02 | Starlinger Clear Pellet | 04/23/21 | 49,000 | 49,000 | 0 |
| Nestle Waters North America | SO-006055 | CL-LNO-01-02 | Starlinger Clear Pellet | 04/23/21 | 45,040 | 45,040 | 0 |
| Nestle Waters North America | SO-006079 | CL-LNO-01-02 | Starlinger Clear Pellet | 05/19/21 | 49,000 | 49,000 | 0 |
| Nestle Waters North America | SO-006080 | CL-LNO-01-02 | Starlinger Clear Pellet | 05/19/21 | 49,000 | 49,000 | 0 |
| Nestle Waters North America | SO-006081 | CL-LNO-01-02 | Starlinger Clear Pellet | 05/19/21 | 49,000 | 49,000 | 0 |
| Nestle Waters North America | SO-006082 | CL-LNO-01-02 | Starlinger Clear Pellet | 05/19/21 | 49,000 | 49,000 | 0 |

DOCS_DE:234533.2 13044/001

# Section 2.1(j): Open Supplier Orders

| Document Number | Item Description | Vendor | Expected Date | Qty | Recv'd | O/S Qty | Direct Unit Cost | Open Balance |
|---|---|---|---|---|---|---|---|---|
| PO-001712 | Packaging Supplies: Pallets | Noll Pallet & Lumber Co. | 05/04/21 | 500 | 460 | 40 | $5.25 | $210 |
| PO-001637 | Flake Bag, 36x44x96, White, Duffle Top | IMBB USA, LLC | 04/07/21 | 6,600 | 3,300 | 3,300 | $11.85 | $39,105 |
| PO-001727 | REPI 00090 Anti-Yellow (NO OB) | REPI LLC | 05/12/21 | 140 | 0 | 140 | $22.26 | $3,116 |
| PO-001568-12 | Purchased Bale | JMD Recycling Services Inc. | 03/25/21 | 42,000 | 0 | 42,000 | $0.15 | $6,300 |
| PO-001568-13 | Purchased Bale | JMD Recycling Services Inc. | 03/25/21 | 42,000 | 0 | 42,000 | $0.15 | $6,300 |
| PO-001568-14 | Purchased Bale | JMD Recycling Services Inc. | 03/25/21 | 42,000 | 0 | 42,000 | $0.15 | $6,300 |
| PO-001568-15 | Purchased Bale | JMD Recycling Services Inc. | 03/25/21 | 42,000 | 0 | 42,000 | $0.15 | $6,300 |
| PO-001583-10 | Purchased Bale | GP Harmon Recycling, LLC | 03/26/21 | 40,000 | 0 | 40,000 | $0.16 | $6,200 |
| PO-001583-8 | Purchased Bale | GP Harmon Recycling, LLC | 03/26/21 | 40,000 | 0 | 40,000 | $0.16 | $6,200 |
| PO-001583-9 | Purchased Bale | GP Harmon Recycling, LLC | 03/26/21 | 40,000 | 0 | 40,000 | $0.16 | $6,200 |
| PO-001611-27 | Purchased Bale | GP Harmon Recycling, LLC | 04/06/21 | 40,000 | 0 | 40,000 | $0.18 | $7,000 |
| PO-001611-28 | Purchased Bale | GP Harmon Recycling, LLC | 04/06/21 | 40,000 | 0 | 40,000 | $0.18 | $7,000 |
| PO-001611-30 | Purchased Bale | GP Harmon Recycling, LLC | 04/06/21 | 40,000 | 0 | 40,000 | $0.18 | $7,000 |
| PO-001541-10 | Purchased Bale | Total Recycle, Inc. | 04/08/21 | 40,000 | 0 | 40,000 | $0.12 | $4,800 |
| PO-001541-6 | Purchased Bale | Total Recycle, Inc. | 04/08/21 | 40,000 | 0 | 40,000 | $0.12 | $4,800 |
| PO-001541-7 | Purchased Bale | Total Recycle, Inc. | 04/08/21 | 40,000 | 0 | 40,000 | $0.12 | $4,800 |
| PO-001541-8 | Purchased Bale | Total Recycle, Inc. | 04/08/21 | 40,000 | 0 | 40,000 | $0.12 | $4,800 |
| PO-001541-9 | Purchased Bale | Total Recycle, Inc. | 04/08/21 | 40,000 | 0 | 40,000 | $0.12 | $4,800 |
| PO-001240 | Intercom/Access Control | Security Signal Devices, Inc. (SSD, Inc.) | 05/21/21 | 1 | 0 | 1 | $13,522.34 | $13,522 |
| PO-001240 | Intercom/Access Control | Security Signal Devices, Inc. (SSD, Inc.) | 05/21/21 | 1 | 0 | 1 | $22,880.04 | $22,880 |
| PO-001748 | Build out of Facility | C.M. High Inc. | 05/21/21 | 1 | 0 | 1 | $18,157.00 | $18,157 |
| PO-001740 | Computer and Internet Expense | Prodeal | 05/19/21 | 2 | 0 | 2 | $99.00 | $198 |
| PO-001740 | Computer and Internet Expense | Prodeal | 05/19/21 | 1 | 0 | 1 | $11.88 | $12 |
| PO-001719 | QA Lab Supplies | Mettler-Toledo, LLC | 05/12/21 | 1 | 0 | 1 | $1,022.00 | $1,022 |
| PO-001739 | QA Lab Supplies | Praxair Distribution Inc. | 05/19/21 | 2 | 0 | 2 | $75.87 | $152 |
| PO-001739 | QA Lab Supplies | Praxair Distribution Inc. | 05/19/21 | 2 | 0 | 2 | $386.43 | $773 |
| PO-001739 | QA Lab Supplies | Praxair Distribution Inc. | 05/19/21 | 1 | 0 | 1 | $4.95 | $5 |
| PO-001739 | QA Lab Supplies | Praxair Distribution Inc. | 05/19/21 | 1 | 0 | 1 | $5.00 | $5 |
| PO-001739 | QA Lab Supplies | Praxair Distribution Inc. | 05/19/21 | 1 | 0 | 1 | $34.78 | $35 |
| PO-001739 | QA Lab Supplies | Praxair Distribution Inc. | 05/19/21 | 1 | 0 | 1 | $25.00 | $25 |
| PO-001739 | QA Lab Supplies | Praxair Distribution Inc. | 05/19/21 | 1 | 0 | 1 | $59.66 | $60 |

16

| Document Number | Item Description | Vendor | Expected Date | Qty | Recv'd | O/S Qty | Direct Unit Cost | Open Balance |
|---|---|---|---|---|---|---|---|---|
| PO-001743 | QA Lab Supplies | Amazon | 05/19/21 | 5 | 0 | 5 | $19.50 | $98 |
| PO-001743 | QA Lab Supplies | Amazon | 05/19/21 | 1 | 0 | 1 | $16.95 | $17 |
| PO-001743 | QA Lab Supplies | Amazon | 05/19/21 | 1 | 0 | 1 | $144.67 | $145 |
| PO-001743 | QA Lab Supplies | Amazon | 05/19/21 | 1 | 0 | 1 | $17.99 | $18 |
| PO-001743 | QA Lab Supplies | Amazon | 05/19/21 | 1 | 0 | 1 | $79.99 | $80 |
| PO-001743 | QA Lab Supplies | Amazon | 05/19/21 | 1 | 0 | 1 | $31.90 | $32 |
| PO-001743 | QA Lab Supplies | Amazon | 05/19/21 | 2 | 0 | 2 | $18.99 | $38 |
| PO-001743 | QA Lab Supplies | Amazon | 05/19/21 | 1 | 0 | 1 | $107.99 | $108 |
| PO-001743 | QA Lab Supplies | Amazon | 05/19/21 | 1 | 0 | 1 | $32.01 | $32 |
| PO-001599 | Maintenance Supplies | Reading Bearing & Drive Solutions, Inc. | 03/24/21 | 1 | 0 | 1 | $87.70 | $88 |
| PO-001599 | Maintenance Supplies | Reading Bearing & Drive Solutions, Inc. | 03/24/21 | 1 | 0 | 1 | $98.65 | $99 |
| PO-001599 | Maintenance Supplies | Reading Bearing & Drive Solutions, Inc. | 03/24/21 | 1 | 0 | 1 | $148.62 | $149 |
| PO-001599 | Maintenance Supplies | Reading Bearing & Drive Solutions, Inc. | 03/24/21 | 1 | 0 | 1 | $133.85 | $134 |
| PO-001599 | Maintenance Supplies | Reading Bearing & Drive Solutions, Inc. | 03/24/21 | 1 | 0 | 1 | $28.31 | $28 |
| PO-001599 | Maintenance Supplies | Reading Bearing & Drive Solutions, Inc. | 03/24/21 | 1 | 0 | 1 | $3.00 | $3 |
| PO-001662 | Maintenance Supplies | Northern Tool & Equipment | 04/13/21 | 1 | 0 | 1 | $64.75 | $65 |
| PO-001662 | Maintenance Supplies | Northern Tool & Equipment | 04/13/21 | 1 | 0 | 1 | $108.06 | $108 |
| PO-001697 | Maintenance Supplies | Northern Tool & Equipment | 04/27/21 | 1 | 0 | 1 | $659.99 | $660 |
| PO-001697 | Maintenance Supplies | Northern Tool & Equipment | 04/27/21 | 1 | 0 | 1 | $39.60 | $40 |
| PO-001698 | Maintenance Supplies | Zoro | 04/27/21 | 3 | 0 | 3 | $84.99 | $255 |
| PO-001698 | Maintenance Supplies | Zoro | 04/27/21 | 6 | 0 | 6 | $71.99 | $432 |
| PO-001706 | Maintenance Supplies | Zoro | 04/29/21 | 1 | 0 | 1 | $353.90 | $354 |
| PO-001713 | Maintenance Supplies | FROMM Electric Supply Corp | 05/04/21 | 90 | 26 | 64 | $5.66 | $362 |
| PO-001741 | Maintenance Supplies | Amazon | 05/19/21 | 2 | 0 | 2 | $84.99 | $170 |
| PO-001741 | Maintenance Supplies | Amazon | 05/19/21 | 1 | 0 | 1 | $10.20 | $10 |
| PO-001701 | Office Supplies | Amazon | 04/29/21 | 1 | 0 | 1 | $138.05 | $138 |
| PO-001721 | Office Supplies | Amazon | 05/12/21 | 1 | 0 | 1 | $342.41 | $342 |
| PO-001721 | Office Supplies | Amazon | 05/12/21 | 1 | 0 | 1 | $30.43 | $30 |
| PO-001722 | Office Supplies | Amazon | 05/12/21 | 3 | 2 | 1 | $43.66 | $44 |
| PO-001726 | Office Supplies | Office Service Company | 05/12/21 | 2 | 0 | 2 | $1,332.77 | $2,666 |
| PO-001726 | Office Supplies | Office Service Company | 05/12/21 | 5 | 0 | 5 | $1,606.15 | $8,031 |

17

| Document Number | Item Description | Vendor | Expected Date | Qty | Recv'd | O/S Qty | Direct Unit Cost | Open Balance |
|---|---|---|---|---|---|---|---|---|
| PO-001726 | Office Supplies | Office Service Company | 05/12/21 | 1 | 0 | 1 | $437.40 | $437 |
| PO-001730 | Office Supplies | Zoro | 05/13/21 | 1 | 0 | 1 | $240.95 | $241 |
| PO-001730 | Office Supplies | Zoro | 05/13/21 | 1 | 0 | 1 | $14.46 | $14 |
| PO-001738 | Office Supplies | W B Mason Co Inc | 05/19/21 | 12 | 0 | 12 | $2.48 | $30 |
| PO-001738 | Office Supplies | W B Mason Co Inc | 05/19/21 | 2 | 0 | 2 | $9.27 | $19 |
| PO-001738 | Office Supplies | W B Mason Co Inc | 05/19/21 | 1 | 0 | 1 | $73.98 | $74 |
| PO-001738 | Office Supplies | W B Mason Co Inc | 05/19/21 | 1 | 0 | 1 | $7.34 | $7 |
| PO-001744 | Office Supplies | W B Mason Co Inc | 05/19/21 | 1 | 0 | 1 | $117.88 | $118 |
| PO-001744 | Office Supplies | W B Mason Co Inc | 05/19/21 | 2 | 0 | 2 | $72.99 | $146 |
| PO-001744 | Office Supplies | W B Mason Co Inc | 05/19/21 | 2 | 0 | 2 | $92.99 | $186 |
| PO-001744 | Office Supplies | W B Mason Co Inc | 05/19/21 | 2 | 0 | 2 | $92.99 | $186 |
| PO-001744 | Office Supplies | W B Mason Co Inc | 05/19/21 | 2 | 0 | 2 | $92.99 | $186 |
| PO-001744 | Office Supplies | W B Mason Co Inc | 05/19/21 | 2 | 0 | 2 | $39.99 | $80 |
| PO-001744 | Office Supplies | W B Mason Co Inc | 05/19/21 | 1 | 0 | 1 | $37.48 | $37 |
| PO-001744 | Office Supplies | W B Mason Co Inc | 05/19/21 | 1 | 0 | 1 | $56.36 | $56 |
| PO-001736 | R&M Boiler | Home Depot | 05/19/21 | 12 | 0 | 12 | $3.03 | $36 |
| PO-001736 | R&M Boiler | Home Depot | 05/19/21 | 1 | 0 | 1 | $2.18 | $2 |
| PO-001747 | R&M Sorena | Sorena Div of Previero | 05/21/21 | 4 | 0 | 4 | $336.00 | $1,344 |
| PO-001747 | R&M Sorena | Sorena Div of Previero | 05/21/21 | 10 | 0 | 10 | $312.00 | $3,120 |
| PO-001716 | R&M Starlinger | Starlinger - American | 05/12/21 | 10 | 7 | 3 | $69.54 | $209 |
| PO-001716 | R&M Starlinger | Starlinger - American | 05/12/21 | 4 | 0 | 4 | $69.53 | $278 |
| PO-001716 | R&M Starlinger | Starlinger - American | 05/12/21 | 1 | 0 | 1 | $71.10 | $71 |
| PO-001731 | R&M Starlinger | Jacob Tubing LP | 05/14/21 | 12 | 0 | 12 | $4.19 | $50 |
| PO-001731 | R&M Starlinger | Jacob Tubing LP | 05/14/21 | 1 | 0 | 1 | $3.02 | $3 |
| PO-001732 | R&M Starlinger | Starlinger - American | 05/14/21 | 6 | 0 | 6 | $5.45 | $33 |
| PO-001732 | R&M Starlinger | Starlinger - American | 05/14/21 | 1 | 0 | 1 | $1.96 | $2 |
| PO-001746 | R&M Starlinger | Starlinger - American | 05/20/21 | 3 | 0 | 3 | $1,296.71 | $3,890 |
| PO-001746 | R&M Starlinger | Starlinger - American | 05/20/21 | 4 | 0 | 4 | $86.67 | $347 |
| PO-001746 | R&M Starlinger | Starlinger - American | 05/20/21 | 1 | 0 | 1 | $254.21 | $254 |
| PO-001606 | Safety and Compliance | Grainger | 03/25/21 | 2 | 0 | 2 | $22.53 | $45 |
| PO-001724 | Safety and Compliance | Liberty Environmental, Inc. | 05/12/21 | 1 | 0 | 1 | $1,700.00 | $1,700 |
| PO-001724 | Safety and Compliance | Liberty Environmental, Inc. | 05/12/21 | 1 | 0 | 1 | $2,400.00 | $2,400 |
| PO-001724 | Safety and Compliance | Liberty Environmental, Inc. | 05/12/21 | 1 | 0 | 1 | $2,000.00 | $2,000 |
| PO-001724 | Safety and Compliance | Liberty Environmental, Inc. | 05/12/21 | 1 | 0 | 1 | $3,600.00 | $3,600 |
| PO-001724 | Safety and Compliance | Liberty Environmental, Inc. | 05/12/21 | 1 | 0 | 1 | $2,000.00 | $2,000 |

| Document Number | Item Description | Vendor | Expected Date | Qty | Recv'd | O/S Qty | Direct Unit Cost | Open Balance |
|---|---|---|---|---|---|---|---|---|
| PO-001737 | Safety and Compliance | Grainger | 05/19/21 | 25 | 0 | 25 | $14.66 | $367 |
| PO-001737 | Safety and Compliance | Grainger | 05/19/21 | 5 | 0 | 5 | $20.00 | $100 |
| PO-001737 | Safety and Compliance | Grainger | 05/19/21 | 1 | 0 | 1 | $27.99 | $28 |
| PO-001737 | Safety and Compliance | Grainger | 05/19/21 | 24 | 0 | 24 | $1.98 | $48 |
| PO-001737 | Safety and Compliance | Grainger | 05/19/21 | 1 | 0 | 1 | $2.85 | $3 |
| PO-001629 | Spare Parts - Inventory Asset Other | FROMM Electric Supply Corp | 04/02/21 | 6 | 0 | 6 | $17.10 | $103 |
| PO-001629 | Spare Parts - Inventory Asset Other | FROMM Electric Supply Corp | 04/02/21 | 6 | 0 | 6 | $18.02 | $108 |
| PO-001629 | Spare Parts - Inventory Asset Other | FROMM Electric Supply Corp | 04/02/21 | 6 | 0 | 6 | $18.75 | $113 |
| PO-001629 | Spare Parts - Inventory Asset Other | FROMM Electric Supply Corp | 04/02/21 | 6 | 0 | 6 | $18.02 | $108 |
| PO-001629 | Spare Parts - Inventory Asset Other | FROMM Electric Supply Corp | 04/02/21 | 6 | 0 | 6 | $17.48 | $105 |
| PO-001629 | Spare Parts - Inventory Asset Other | FROMM Electric Supply Corp | 04/02/21 | 6 | 0 | 6 | $17.48 | $105 |
| PO-001629 | Spare Parts - Inventory Asset Other | FROMM Electric Supply Corp | 04/02/21 | 6 | 0 | 6 | $17.48 | $105 |
| PO-001629 | Spare Parts - Inventory Asset Other | FROMM Electric Supply Corp | 04/02/21 | 6 | 0 | 6 | $17.48 | $105 |
| PO-001629 | Spare Parts - Inventory Asset Other | FROMM Electric Supply Corp | 04/02/21 | 6 | 0 | 6 | $17.48 | $105 |
| PO-001629 | Spare Parts - Inventory Asset Other | FROMM Electric Supply Corp | 04/02/21 | 6 | 0 | 6 | $17.48 | $105 |
| PO-001629 | Spare Parts - Inventory Asset Other | FROMM Electric Supply Corp | 04/02/21 | 6 | 0 | 6 | $17.48 | $105 |
| PO-001629 | Spare Parts - Inventory Asset Other | FROMM Electric Supply Corp | 04/02/21 | 6 | 0 | 6 | $10.82 | $65 |
| PO-001629 | Spare Parts - Inventory Asset Other | FROMM Electric Supply Corp | 04/02/21 | 6 | 0 | 6 | $10.82 | $65 |
| PO-001629 | Spare Parts - Inventory Asset Other | FROMM Electric Supply Corp | 04/02/21 | 6 | 0 | 6 | $11.51 | $69 |
| PO-001629 | Spare Parts - Inventory Asset Other | FROMM Electric Supply Corp | 04/02/21 | 6 | 0 | 6 | $31.65 | $190 |
| PO-001629 | Spare Parts - Inventory Asset Other | FROMM Electric Supply Corp | 04/02/21 | 6 | 0 | 6 | $29.49 | $177 |
| PO-001629 | Spare Parts - Inventory Asset Other | FROMM Electric Supply Corp | 04/02/21 | 6 | 0 | 6 | $29.49 | $177 |
| PO-001629 | Spare Parts - Inventory Asset Other | FROMM Electric Supply Corp | 04/02/21 | 6 | 0 | 6 | $27.76 | $167 |
| PO-001629 | Spare Parts - Inventory Asset Other | FROMM Electric Supply Corp | 04/02/21 | 6 | 0 | 6 | $50.09 | $301 |
| PO-001629 | Spare Parts - Inventory Asset Other | FROMM Electric Supply Corp | 04/02/21 | 6 | 0 | 6 | $50.09 | $301 |
| PO-001629 | Spare Parts - Inventory Asset Other | FROMM Electric Supply Corp | 04/02/21 | 6 | 0 | 6 | $88.60 | $532 |
| PO-001629 | Spare Parts - Inventory Asset Other | FROMM Electric Supply Corp | 04/02/21 | 6 | 0 | 6 | $25.91 | $155 |
| PO-001629 | Spare Parts - Inventory Asset Other | FROMM Electric Supply Corp | 04/02/21 | 6 | 0 | 6 | $25.91 | $155 |
| PO-001629 | Spare Parts - Inventory Asset Other | FROMM Electric Supply Corp | 04/02/21 | 6 | 0 | 6 | $25.91 | $155 |
| PO-001629 | Spare Parts - Inventory Asset Other | FROMM Electric Supply Corp | 04/02/21 | 6 | 0 | 6 | $56.10 | $337 |
| PO-001629 | Spare Parts - Inventory Asset Other | FROMM Electric Supply Corp | 04/02/21 | 1 | 0 | 1 | $244.52 | $245 |
| PO-001600 | Warehouse Supplies | BK Customs Inc. | 03/24/21 | 2 | 0 | 2 | $6,250.00 | $12,500 |
| PO-001600 | Warehouse Supplies | BK Customs Inc. | 03/24/21 | 1 | 0 | 1 | $601.56 | $602 |
| PO-001607 | Warehouse Supplies | Hogentogler & Co., Inc | 03/25/21 | 2 | 0 | 2 | $549.00 | $1,098 |

19

| Document Number | Item Description | Vendor | Expected Date | Qty | Recv'd | O/S Qty | Direct Unit Cost | Open Balance |
|---|---|---|---|---|---|---|---|---|
| PO-001607 | Warehouse Supplies | Hogentogler & Co., Inc | 03/25/21 | 1 | 0 | 1 | $65.88 | $66 |
| PO-001640 | Warehouse Supplies | Global Equipment Company Inc. | 04/07/21 | 1 | 0 | 1 | $304.95 | $305 |
| PO-001640 | Warehouse Supplies | Global Equipment Company Inc. | 04/07/21 | 1 | 0 | 1 | $326.95 | $327 |
| PO-001640 | Warehouse Supplies | Global Equipment Company Inc. | 04/07/21 | 1 | 0 | 1 | $59.33 | $59 |
| PO-001640 | Warehouse Supplies | Global Equipment Company Inc. | 04/07/21 | 1 | 0 | 1 | $329.99 | $330 |
| PO-001718 | Warehouse Supplies | Global Equipment Company Inc. | 05/12/21 | 2 | 0 | 2 | $152.95 | $306 |
| PO-001718 | Warehouse Supplies | Global Equipment Company Inc. | 05/12/21 | 1 | 0 | 1 | $18.35 | $18 |
| PO-001733 | Warehouse Supplies | Eastern Lift Truck Co., Inc. | 05/14/21 | 30 | 0 | 30 | $800.00 | $24,000 |
| PO-001733 | Warehouse Supplies | Eastern Lift Truck Co., Inc. | 05/14/21 | 1 | 0 | 1 | $5,278.00 | $5,278 |

**Section 2.1(k): Acquired Receivables**

| Cust # | Name | Aging Date (Doc Date) | Aging Date (Due Date) | Description | Document Type | Document No. | Balance Due | Acquired Value | Acquired Receivable | Acquired Receivable Greater Than 30 Days Past Due | Outstanding Greater Than 120 Days |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1006 | Banyan Plastics | 10/02/20 | 10/02/20 | Order SO-005811 | Invoice | PSINV000000735 | $2,521.40 | $0.00 | N | | |
| 1008 | BlackBridge Investment | 05/03/21 | 05/13/21 | Invoice SINV000000410 | Invoice | PSINV000000776 | $3,816.00 | $3,816.00 | Y | | |
| 1025 | Easypak, LLC | 04/01/21 | 04/01/21 | Order SO-006010 | Invoice | PSINV000000763 | $19,393.60 | $0.00 | N | | |
| 1025 | Easypak, LLC | 04/26/21 | 04/26/21 | Order SO-006043 | Invoice | PSINV000000766 | $23,274.24 | $23,274.24 | Y | | |
| 1025 | Easypak, LLC | 04/28/21 | 04/28/21 | Order SO-006044 | Invoice | PSINV000000767 | $23,647.76 | $23,647.76 | Y | | |
| 1025 | Easypak, LLC | 05/03/21 | 05/03/21 | Order SO-006056 | Invoice | PSINV000000770 | $23,230.16 | $23,230.16 | Y | | |
| 1025 | Easypak, LLC | 05/05/21 | 05/05/21 | Order SO-006057 | Invoice | PSINV000000771 | $23,661.68 | $23,661.68 | Y | | |
| 1040 | Indorama Ventures Sustainable Solutions Fontana, I | 11/19/20 | 11/19/20 | Order SO-005863-6 | Invoice | PSINV000000741 | $18,594.35 | $0.00 | N | | |
| 1040 | Indorama Ventures Sustainable Solutions Fontana, I | 11/19/20 | 11/19/20 | Order SO-005863-2 | Invoice | PSINV000000743 | $18,375.85 | $0.00 | N | | |
| 1040 | Indorama Ventures Sustainable Solutions Fontana, I | 11/19/20 | 11/19/20 | Order SO-005863-5 | Invoice | PSINV000000744 | $18,695.73 | $0.00 | N | | |
| 1040 | Indorama Ventures Sustainable Solutions Fontana, I | 11/19/20 | 11/19/20 | Order SO-005863-4 | Invoice | PSINV000000745 | $18,559.39 | $0.00 | N | | |
| 1040 | Indorama Ventures Sustainable Solutions Fontana, I | 11/24/20 | 11/24/20 | Order SO-005863-3 | Invoice | PSINV000000742 | $18,314.67 | $0.00 | N | | |
| 1050 | Nestle Waters North America | 04/30/21 | 05/17/21 | Invoice SINV000000408 | Invoice | PSINV000000773 | $291,712.91 | $291,712.91 | Y | | |
| 1050 | Nestle Waters North America | 05/17/21 | 05/30/21 | Nestle Waters North America - INV 765 | Payment | EWB DEP AR 05.17.21 | -$4,436.99 | -$4,436.99 | Y | | |
| 1098 | Reterra Corporation | 04/19/21 | 05/06/21 | Invoice SINV000000404 | Invoice | PSINV000000768 | $1,984.46 | $1,984.46 | Y | | |
| 1098 | Reterra Corporation | 05/06/21 | 05/18/21 | Invoice SINV000000407 | Invoice | PSINV000000772 | $3,677.46 | $3,677.46 | Y | | |
| 1125 | Western Container Corporation | 05/14/21 | 05/14/21 | Western Container Corporation INV 764 | Payment | EWB DEP AR 05.14.21 | -$3,067.49 | -$3,067.49 | Y | | |

**Section 2.1(l): Acquired Intellectual Property Rights**

None.

DOCS_DE:234533.2 13044/001

**Section 2.1(m): Acquired L/Cs**

| Bank Account | Type of Account | LC # | Amount |
|---|---|---|---|
| East West Bank | Letter of Credit | 19OSL04417 | $2,053,304.27 |

DOCS_DE:234533.2 13044/001

## Section 2.2(h): Additional Excluded Assets

*Open Customer Orders*

| Shipment Date | Type | No. | Description | Quantity | Outstanding Quantity | Quantity on Back Order |
|---|---|---|---|---|---|---|
| 1050 | **Nestle Waters North America** | | | | | |
| | | Order No. | SO-006014  3/19/2021 | | | |
| 03/30/21 | Item | CL-LNO-01-02 | Starlinger Clear Pellet | 45,000 | 45,000 | 45,000 |
| | | Order No. | SO-006015  3/19/2021 | | | |
| 03/31/21 | Item | CL-LNO-01-02 | Starlinger Clear Pellet | 45,000 | 45,000 | 45,000 |
| | | Order No. | SO-006016  4/8/2021 | | | |
| | Item | CL-LNO-01-02 | Starlinger Clear Pellet | 45,000 | 45,000 | 45,000 |
| | | Order No. | SO-006017  4/8/2021 | | | |
| 04/22/21 | Item | CL-LNO-01-02 | Starlinger Clear Pellet | 45,000 | 45,000 | 0 |
| | | Order No. | SO-006018  4/8/2021 | | | |
| 04/23/21 | Item | CL-LNO-01-02 | Starlinger Clear Pellet | 45,000 | 45,000 | 0 |
| | | Order No. | SO-006019  4/8/2021 | | | |
| 04/27/21 | Item | CL-LNO-01-02 | Starlinger Clear Pellet | 45,000 | 45,000 | 0 |
| | | Order No. | SO-006020  4/8/2021 | | | |
| 04/27/21 | Item | CL-LNO-01-02 | Starlinger Clear Pellet | 45,000 | 45,000 | 0 |
| | | Order No. | SO-006021  4/8/2021 | | | |
| 04/29/21 | Item | CL-LNO-01-02 | Starlinger Clear Pellet | 45,000 | 45,000 | 0 |
| | | Order No. | SO-006022  4/8/2021 | | | |
| 04/30/21 | Item | CL-LNO-01-02 | Starlinger Clear Pellet | 45,000 | 45,000 | 0 |
| | | Order No. | SO-006023  4/8/2021 | | | |
| 04/26/21 | Item | CL-LNO-01-02 | Starlinger Clear Pellet | 45,000 | 45,000 | 0 |
| | | Order No. | SO-006024  4/8/2021 | | | |
| 05/03/21 | Item | CL-LNO-01-02 | Starlinger Clear Pellet | 45,000 | 45,000 | 0 |
| | | Order No. | SO-006025  4/8/2021 | | | |
| 05/05/21 | Item | CL-LNO-01-02 | Starlinger Clear Pellet | 45,000 | 45,000 | 0 |
| | | Order No. | SO-006026  4/8/2021 | | | |
| 05/10/21 | Item | CL-LNO-01-02 | Starlinger Clear Pellet | 45,000 | 45,000 | 0 |
| | | Order No. | SO-006027  4/8/2021 | | | |
| 05/12/21 | Item | CL-LNO-01-02 | Starlinger Clear Pellet | 45,000 | 45,000 | 0 |
| | | Order No. | SO-006028  4/8/2021 | | | |
| 05/17/21 | Item | CL-LNO-01-02 | Starlinger Clear Pellet | 45,000 | 45,000 | 0 |
| | | Order No. | SO-006029  4/8/2021 | | | |
| 05/19/21 | Item | CL-LNO-01-02 | Starlinger Clear Pellet | 45,000 | 45,000 | 0 |
| | | Order No. | SO-006030  4/8/2021 | | | |
| 05/24/21 | Item | CL-LNO-01-02 | Starlinger Clear Pellet | 45,000 | 45,000 | 0 |
| | | Order No. | SO-006031  4/8/2021 | | | |
| 05/26/21 | Item | CL-LNO-01-02 | Starlinger Clear Pellet | 45,000 | 45,000 | 0 |
| | | Order No. | SO-006032  4/8/2021 | | | |
| 06/01/21 | Item | CL-LNO-01-02 | Starlinger Clear Pellet | 45,000 | 45,000 | 0 |
| | | Order No. | SO-006033  4/8/2021 | | | |
| 06/03/21 | Item | CL-LNO-01-02 | Starlinger Clear Pellet | 45,000 | 45,000 | 0 |
| | | Order No. | SO-006034  4/8/2021 | | | |
| 06/07/21 | Item | CL-LNO-01-02 | Starlinger Clear Pellet | 45,000 | 45,000 | 0 |
| | | Order No. | SO-006035  4/8/2021 | | | |
| 06/09/21 | Item | CL-LNO-01-02 | Starlinger Clear Pellet | 45,000 | 45,000 | 0 |

24

| Shipment Date | Type | No. | Description | Quantity | Outstanding Quantity | Quantity on Back Order |
|---|---|---|---|---|---|---|
| | | Order No. | SO-006036  4/8/2021 | | | |
| 06/14/21 | Item | CL-LNO-01-02 | Starlinger Clear Pellet | 45,000 | 45,000 | 0 |
| | | Order No. | SO-006037  4/8/2021 | | | |
| 06/16/21 | Item | CL-LNO-01-02 | Starlinger Clear Pellet | 45,000 | 45,000 | 0 |
| | | Order No. | SO-006038  4/8/2021 | | | |
| 06/21/21 | Item | CL-LNO-01-02 | Starlinger Clear Pellet | 45,000 | 45,000 | 0 |
| | | Order No. | SO-006039  4/8/2021 | | | |
| 06/23/21 | Item | CL-LNO-01-02 | Starlinger Clear Pellet | 45,000 | 45,000 | 0 |
| | | Order No. | SO-006040  4/8/2021 | | | |
| 06/28/21 | Item | CL-LNO-01-02 | Starlinger Clear Pellet | 45,000 | 45,000 | 0 |
| | | Order No. | SO-006041  4/8/2021 | | | |
| 06/30/21 | Item | CL-LNO-01-02 | Starlinger Clear Pellet | 45,000 | 45,000 | 0 |
| Nestle Waters North America | | | | | | |

*Personal Property Leases*

| Contract Counterparty/Address | Contract / Lease Debtor Party | Contract/Lease Title | Date of Contract / Lease |
|---|---|---|---|
| Toyota Motor Credit Corporation<br>P.O. Box 2431<br>Carol Stream, IL 60132 | CarbonLite P, LLC | Equipment Schedule 22 to Master Lease Agreement | 2/7/2020 |
| Toyota Motor Credit Corporation<br>P.O. Box 2431<br>Carol Stream, IL 60132 | CarbonLite P, LLC | Equipment Schedule 23 to Master Lease Agreement | 2/7/2020 |
| Toyota Motor Credit Corporation<br>P.O. Box 2431<br>Carol Stream, IL 60132 | CarbonLite P, LLC | Equipment Schedule 24 to Master Lease Agreement | 2/7/2020 |
| Toyota Motor Credit Corporation<br>P.O. Box 2431<br>Carol Stream, IL 60132 | CarbonLite P, LLC | Equipment Schedule 25 to Master Lease Agreement | 2/7/2020 |
| Toyota Motor Credit Corporation<br>P.O. Box 2431<br>Carol Stream, IL 60132 | CarbonLite P, LLC | Equipment Schedule 26 to Master Lease Agreement | 2/7/2020 |

*Affiliate/Intercompany Agreements*

- CarbonLite Holdings LLC ("Holdings") is party to that certain Commission Agreement dated April 4, 2019 (the "Loaned Earth Agreement") with Jason Farahnik d/b/a Loaned Earth Recycling. Under the Loaned Earth Agreement, Mr. Farahnik serves as Holdings' Director of Resin Sales and Brand Partnerships and is entitled to certain commission payments related to his work for Holdings and its subsidiaries, including Seller.

- Holdings is party to that certain Management Agreement dated April 1, 2010 (the "HPC/CarbonLite Management Agreement") with HPC Industries LLC ("HPC"), pursuant to which HPC provides certain services to Holdings and certain of its subsidiaries, including Seller. The HPC/CarbonLite Management Agreement was amended on January 1, 2011; on or about July 1, 2011; May 1, 2012; March 15, 2013; and October 28, 2015, and was extended on or about December 30, 2020.

DOCS_DE:234533.2 13044/001

**Section 3.3: Consents and Approvals; Governmental Authority**

- Certain of the Permits may not be transferable from the Sellers to the Buyer and Buyer may be required to apply to a Governmental Authority for such Permits.

DOCS_DE:234533.2 13044/001

## Section 3.4: Compliance with Laws

- In the ordinary course of business, Seller may be subject to periodic inspections by governmental authorities, during which inspections, Seller may be informed of alleged concerns or violations to be remediated. There are no material alleged violations that are unremediated as of the date hereof.

- There is ongoing construction at Seller's premises, for which Seller presently has all required Permits. In the future, Seller may be required to obtain additional Permits as circumstances warrant.

DOCS_DE:234533.2 13044/001

**Section 3.5: Litigation**

- PQ Recycling LLC (no suit filed; entered into out-of-court settlement)

DOCS_DE:234533.2 13044/001

**Section 3.6(a):  Balance Sheets**

See attached.

DOCS_DE:234533.2 13044/001

**Section 3.6(c): Accounts Receivable**

| Cust # | Name | Aging Date (Doc Date) | Aging Date (Due Date) | Description | Document Type | Document No. | Balance Due |
|--------|------|------|------|-------------|---------------|--------------|-------------|
| 1006 | Banyan Plastics | 10/02/20 | 10/02/20 | Order SO-005811 | Invoice | PSINV000000735 | $2,521.40 |
| 1025 | Easypak. LLC | 04/01/21 | 04/01/21 | Order SO-006010 | Invoice | PSINV000000763 | $19,393.60 |
| 1040 | Indorama Ventures Sustainable Solutions Fontana. I | 11/19/20 | 11/19/20 | Order SO-005863-6 | Invoice | PSINV000000741 | $18,594.35 |
| 1040 | Indorama Ventures Sustainable Solutions Fontana. I | 11/19/20 | 11/19/20 | Order SO-005863-2 | Invoice | PSINV000000743 | $18,375.85 |
| 1040 | Indorama Ventures Sustainable Solutions Fontana. I | 11/19/20 | 11/19/20 | Order SO-005863-5 | Invoice | PSINV000000744 | $18,695.73 |
| 1040 | Indorama Ventures Sustainable Solutions Fontana. I | 11/19/20 | 11/19/20 | Order SO-005863-4 | Invoice | PSINV000000745 | $18,559.39 |
| 1040 | Indorama Ventures Sustainable Solutions Fontana. I | 11/24/20 | 11/24/20 | Order SO-005863-3 | Invoice | PSINV000000742 | $18,314.67 |

**Section 3.6(e): Amounts Drawn Under Acquired L/Cs**

- In March 2021, after the Petition Date, Seller's landlord drew down $374,798.52 from the letter of credit posted for its benefit, as discussed in further detail in Section 3.7(a) of the Disclosure Schedules.

# Section 3.6(f): Capital Expenditures

**CarbonLite P LLC**
**Capital Project Forecast**

| | Total Cost Remaining | Week 1 03/14/21 | Week 2 03/21/21 | Week 3 03/28/21 | Week 4 04/04/21 | Week 5 04/11/21 | Week 6 04/18/21 | Week 7 04/25/21 | Week 8 05/02/21 | Week 9 05/09/21 | Week 10 05/16/21 | Week 11 05/23/21 | Paid w/i DIP Budget | SALE Cure at Closing |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Pre Petition Spend** | | | | | | | | | | | | | | |
| Anchor Fire Protection | 138,780 | | | | | | | 76,824 | | 61,956 | | | 138,780 | 0 |
| BlueRock | 804,974 | | | | | | | 426,631 | | | | | 426,631 | 378,342 |
| Miura | 30,716 | | | | | | | | | | | | 0 | 30,716 |
| Muhlenberg Township Auth | 176,000 | | | | | | | | | | | | 0 | 176,000 |
| Pelletron | 1,410,000 | | | | | | | 705,000 | | | | 295,000 | 1,000,000 | 410,000 |
| Sorema | 1,452,000 | | | | | | | | | | | | 0 | 1,452,000 |
| Starlinger | 3,036,768 | | | | | | | | | | | | 0 | 3,036,768 |
| Bulk Handling Systems | 1,438,975 | | | | | | | 719,488 | | | | | 719,488 | 719,488 |
| | | | | | | | | | | | | | | |
| **Post Petition Spend** | | | | | | | | | | | | | | |
| A1 / Cleveland Brothers | 543,736 | | | | | 100,000 | | 100,000 | | 100,000 | | 100,000 | 400,000 | 143,736 |
| Anchor Fire Protection | 0 | | | | | | | | | | | | 0 | 0 |
| BlueRock | 157,053 | | | | | 34,541 | | | | 50,000 | | | 84,541 | 72,512 |
| Bulk Handling Systems | 0 | | | | | | | | | | | | 0 | 0 |
| Muhlenberg Township Auth | 30,000 | | | | | | | 15,000 | | | | 15,000 | 30,000 | 0 |
| Perkin Elmer | 114,686 | | | | 114,686 | | | | | | | | 114,686 | 0 |
| Pelletron | 0 | | | | | | | | | | | | 0 | 0 |
| Sorema | 3,782,000 | | | | 1,500,000 | | | | | | | | 1,500,000 | 2,282,000 |
| Starlinger | 470,545 | | | | | | | | | | | | 0 | 470,545 |
| Trimax | 47,885 | | | | 47,885 | | | | | | | | 47,885 | 0 |
| Unisensor | 138,722 | | | | | | 138,722 | | | | | | 138,722 | 0 |
| VanDyk / Lubo | 87,600 | | | | 87,600 | | | | | | | | 87,600 | 0 |
| | | | | | | | | | | | | | | |
| **Total Project Spend** | 13,860,439 | 0 | 0 | 0 | 1,750,170 | 134,541 | 138,722 | 2,042,943 | 0 | 211,956 | 0 | 410,000 | 4,688,332 | 9,172,107 |
| | | | | | | | | | | | | | | |
| **Legal & Fees** | | | | | | | | | | | | | | |
| Blue Rock | | | | | | | | | | | | | | |
|   Legal | 15,000 | | | | | | | | | | | | | 15,000 |
|   Remobilization Costs | 18,000 | | | | | | | | | | | | | 18,000 |
|   Extended General Condition Costs | 63,648 | | | | | | | | | | | | | 63,648 |
| Bulk Handling Systems | | | | | | | | | | | | | | |
|   Legal | 20,000 | | | | | | | | | | | | | 20,000 |
| Anchor Fire Protection | | | | | | | | | | | | | | |
|   Legal | 8,868 | | | | | | | | | | | | | 8,868 |
|   Delay Damages | 31,000 | | | | | | | | | 14,868 | | | 14,868 | 16,132 |
| | | | | | | | | | | | | | | |
| **Total Spend Incl Legal** | 14,016,955 | | | | | | | | | | | | 4,703,200 | 9,313,755 |

## Section 3.6(g): Prepaid Assets, Cure Costs and Tax Prorations

*Estimated Cure Costs*

| Contract Counterparty/Address | Contract / Lease Debtor Party | Contract/Lease Title | Date of Contract / Lease | Cure Amount |
|---|---|---|---|---|
| A1 Restoration, Inc. d/b/a A1 Energy 2730 Shenck Road Manheim, PA 17545 | CarbonLite P, LLC | Standard Abbreviated Form of Agreement Between Owner and Contractor | 5/24/2019 | $12,000.00 |
| A1 Restoration, Inc. d/b/a A1 Energy 2730 Shenck Road Manheim, PA 17545 | CarbonLite P, LLC | Change Order 1 | 6/21/2019 | See above |
| A1 Restoration, Inc. d/b/a A1 Energy 2730 Shenck Road Manheim, PA 17545 | CarbonLite P, LLC | Change Order 2 | 7/1/2019 | See above |
| A1 Restoration, Inc. d/b/a A1 Energy 2730 Shenck Road Manheim, PA 17545 | CarbonLite P, LLC | Change Order 3 | 12/18/2019 | See above |
| A1 Restoration, Inc. d/b/a A1 Energy 2730 Shenck Road Manheim, PA 17545 | CarbonLite P, LLC | Change Order 4 | 5/21/2020 | See above |
| A1 Restoration, Inc. d/b/a A1 Energy 2730 Shenck Road Manheim, PA 17545 | CarbonLite P, LLC | Energy Services Agreement | Undated | See above |
| Anchor Fire Protection Co., Inc. 270 Renninger Road Perkiomenville, PdA 18074 | CarbonLite P, LLC | Standard Short Form Agreement Between Owner and Contractor | 11/4/2020 | See footnote[1] |
| Berks61 Owner, LLC c/o Endurance Real Estate Group 4 Radnor Corporate Center, Suite 105 Radnor, PA 19087 | CarbonLite P, LLC | Industrial Lease | 5/13/2019 | $374,798.52 |

---

[1] Pursuant to Docket No. 311, this agreement has been assumed by Seller, subject to the terms and conditions contained therein. This agreement remains subject to assignment pursuant to section 365 of the Bankruptcy Code.

42

| Contract Counterparty/Address | Contract / Lease Debtor Party | Contract/Lease Title | Date of Contract / Lease | Cure Amount |
|---|---|---|---|---|
| Berks61 Owner, LLC c/o Endurance Real Estate Group 4 Radnor Corporate Center, Suite 105 Radnor, PA 19087 | CarbonLite P, LLC | First Amendment to Industrial Lease | 10/20/2019 | See above |
| Berks61 Owner, LLC c/o Endurance Real Estate Group 4 Radnor Corporate Center, Suite 105 Radnor, PA 19087 | CarbonLite P, LLC | Second Amendment to Industrial Lease | 2/21/2021 | See above |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Standard Form of Agreement Between Owner and Design-Builder | 8/27/2019 | See footnote.[2] |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Design-Build Amendment | 8/27/2019 | See above |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 1 | 10/22/2019 | See above |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 6 | 11/14/2019 | See above |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 7 | 11/14/2019 | See above |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 8 | 11/14/2019 | See above |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 9 | 11/14/2019 | See above |

---

[2] Pursuant to Docket No. 340, this agreement has been assumed by Seller, subject to the terms and conditions contained therein. This agreement remains subject to assignment pursuant to section 365 of the Bankruptcy Code.

| Contract Counterparty/Address | Contract / Lease Debtor Party | Contract/Lease Title | Date of Contract / Lease | Cure Amount |
|---|---|---|---|---|
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 10 | 1/15/2020 | See above |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 11 | 1/15/2020 | See above |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 13 | 1/21/2020 | See above |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 14 | 1/28/2020 | See above |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 15 | 2/25/2020 | See above |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 16 | 3/30/2020 | See above |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 17 | 3/30/2020 | See above |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 18 | 4/10/2020 | See above |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 19 | 4/20/2020 | See above |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 20 | 5/11/2020 | See above |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 21 | 5/18/2020 | See above |

| Contract Counterparty/Address | Contract / Lease Debtor Party | Contract/Lease Title | Date of Contract / Lease | Cure Amount |
|---|---|---|---|---|
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 22 | 5/18/2020 | See above |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 23 | 6/10/2020 | See above |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 24 | 6/18/2020 | See above |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 25 | 6/25/2020 | See above |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 26 | 6/25/2020 | See above |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 27 | 10/16/2020 | See above |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 28 | 11/20/2020 | See above |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 29 | 12/10/2020 | See above |
| ClearFreight, Inc. Building 75, North Hangar Road, Suite 210 JFK International Airport Jamaica, NY 11430 | CarbonLite P, LLC | Customs Power of Attorney and Acknowledgement of Terms and Conditions Service; Credit Agreement and Application; Continuing Guaranty | 10/25/2019 | $35,076.92 |

| Contract Counterparty/Address | Contract / Lease Debtor Party | Contract/Lease Title | Date of Contract / Lease | Cure Amount |
|---|---|---|---|---|
| Comcast Cable Communications Management, LLC c/o Market Development, Comcast Business 1701 JFK Blvd., Flr. 39 - Attn ROE Team Philadelphia, PA 19103 | CarbonLite P, LLC | Comcast Enterprise Services Master Services Agreement (MSA) | 3/23/2020 | $103.67 |
| Data Technology Solutions, LLC 9 North College Street Myerstown, PA 19605 | CarbonLite P, LLC | Data Cabling Services Contract (Letter price quotation with acceptance) | 7/29/2020 | $4,975.22 |
| Emerging Acquisitions LLC d/b/a Bulk Handling Solutions 3592 W. 5th Avenue Eugene, OR 97402 | CarbonLite P, LLC | Secondary Plastics Processing System | 1/22/2019 | See footnote.[3] |
| Emerging Acquisitions LLC d/b/a Bulk Handling Solutions 3592 W. 5th Avenue Eugene, OR 97402 | CarbonLite P, LLC | Change Order #01 | 5/17/2019 | See above |
| Emerging Acquisitions LLC d/b/a Bulk Handling Solutions 3592 W. 5th Avenue Eugene, OR 97402 | CarbonLite P, LLC | Change Order #02 | 6/7/2019 | See above |
| Emerging Acquisitions LLC d/b/a Bulk Handling Solutions 3592 W. 5th Avenue Eugene, OR 97402 | CarbonLite P, LLC | Change Order #03 | 6/7/2019 | See above |
| Emerging Acquisitions LLC d/b/a Bulk Handling Solutions 3592 W. 5th Avenue Eugene, OR 97402 | CarbonLite P, LLC | Change Order #04 | 6/13/2019 | See above |
| Emerging Acquisitions LLC d/b/a Bulk Handling Solutions 3592 W. 5th Avenue Eugene, OR 97402 | CarbonLite P, LLC | Change Order #05 | 2/7/2020 | See above |

---

[3] Pursuant to Docket No. 339, this agreement has been assumed by Seller, subject to the terms and conditions contained therein. This agreement remains subject to assignment pursuant to section 365 of the Bankruptcy Code.

| Contract Counterparty/Address | Contract / Lease Debtor Party | Contract/Lease Title | Date of Contract / Lease | Cure Amount |
|---|---|---|---|---|
| Evoqua Water Technologies LLC 725 Wooten Road Colorado Springs, CO 80915 | CarbonLite P, LLC | Firm Proposal #2019-328049 | 8/5/2019 | $10,263.03 |
| Ingersoll Rand Company 800 East Beaty Street Davidson, NC 28036 | CarbonLite P, LLC | Purchase Orders; Standard Terms and Conditions of Sale | 6/27/2019 | See below |
| Ingersoll Rand Company 800 East Beaty Street Davidson, NC 28036 | CarbonLite P, LLC | PackageCARE Agreement | 9/30/2019 | See below |
| Ingersoll-Rand Company 800-B Beaty Street Davidson, NC 28036 | CarbonLite P, LLC | PackageCARE Agreement | 7/1/2019 | $9,528.34 |
| Ingersoll-Rand Company Compression Technologies & Services 6291 Burnham Avenue Buena Park, CA 90621 | CarbonLite P, LLC | PackageCARE Addendum | 7/20/2020 | See above |
| J.P Mascaro & Sons 2650 Audubon Road Audubon, PA 19403 | CarbonLite P, LLC | Contract for Required Services | 7/23/2020 | $24,276.88 |
| Lift Inc. (Corporate Office) 3745 Hempland Rd. Mountville, PA 17554 | CarbonLite P, LLC | Planned Maintenance Agreement (Lift Trucks) | 7/24/2020 | $12,051.02 |
| Lubo USA LLC d/b/a Van Dyk Recycling Solutions 78 Halloween Boulevard Stamford, CT 06902 | CarbonLite P, LLC | Order Confirmation OC#LUTI2019245 | 6/12/2019 | $0.00 |
| Miura America Co., Ltd. 2200 Steven B. Smith Boulevard Rockmart, GA 30153 | CarbonLite P, LLC | Miura Maintenance Agreement | 6/4/2019 | $30,715.57 |
| Nitel Inc. 350 N. Orleans Street, #1300N Chicago IL 60654 | CarbonLite P, LLC | Services Agreement | 12/30/2019 | $0.00 |
| R.A.T.T., Inc. d/b/a Orkin Pest Control 4450 Paxton Street Harrisburg, PA 17111 | CarbonLite P, LLC | Service Agreement | 7/20/2020 | $1,351.50 |

DOCS_DE:234533.2 13044/001

| Contract Counterparty/Address | Contract / Lease Debtor Party | Contract/Lease Title | Date of Contract / Lease | Cure Amount |
|---|---|---|---|---|
| Pelletron Corporation 1866 Colonial Village Lane Lancaster, PA 17601 | CarbonLite P, LLC | Order Confirmation | 6/17/2019 | See footnote.[4] |
| PerkinElmer Health Sciences Inc. 710 Bridgeport Avenue Shelton, CT 06484 | CarbonLite P, LLC | Quotation | 12/5/2019 | $0.00 |
| Sorema Division of Previero N. srl Via Per Cavolto, 17- 22040 Anzano del Parco, Italy | CarbonLite P, LLC | Order Confirmation V1450 | 1/28/2019 | See footnote.[5] |
| Sorema Division of Previero N. srl Via Per Cavolto, 17- 22040 Anzano del Parco, Italy | CarbonLite P, LLC | Order Confirmation V1451 | 1/28/2019 | See above |
| Starlinger & Co. Gesellschaft m.b.H. Sonneuhrgasse 4 1060 Vienna, Austria | CarbonLite P, LLC | Order Confirmation No. MA295440 | 11/27/2018 | $3,029,684.79 |
| Trimax Systems Inc. 565 Explorer Street Brea, CA 92821 | CarbonLite P, LLC | Proposal (E-12155 Rev 2) | 7/29/2019 | $0.00 |
| UniSensor Sensorststeme GmbH Am Sandfeld 11 D-76149 Karlsruhe Germany | CarbonLite P. LLC | Offer No. A016804 | 3/15/2019 | $0.00 |
| UniVoIP, Inc. 830 Parkview Drive N. El Segundo, CA 90245 | CarbonLite P, LLC | Agreement to Subscribe to Hosted Voice Over IP (VOIP) Telephone System and Internet Access Service | 11/4/2019 | $0.00 |
| KRE Security, LLC 11 South 3rd Street Hamburg, PA 19526 | CarbonLite P, LLC | Security Services Agreement | 11/8/2019 | $79,619.26 |

---

[4] Pursuant to Docket No. 342, this agreement has been assumed by Seller, subject to the terms and conditions contained therein. This agreement remains subject to assignment pursuant to section 365 of the Bankruptcy Code.
[5] Pursuant to Docket No. 341, this agreement has been assumed by Seller, subject to the terms and conditions contained therein. This agreement remains subject to assignment pursuant to section 365 of the Bankruptcy Code.

| Contract Counterparty/Address | Contract / Lease Debtor Party | Contract/Lease Title | Date of Contract / Lease | Cure Amount |
|---|---|---|---|---|
| KRE Security, LLC 11 South 3rd Street Hamburg, PA 19526 | CarbonLite P, LLC | Mutual Non-Disclosure and Confidentiality Agreement | 11/15/2019 | See above |
| Kupper Engineering, Inc. 300 Brookside Avenue, Building 14 Ambler, PA 19002 | CarbonLite P, LLC | Proposal to Provide System Integration Services for the Direct Transfer Trip System | 12/3/2019 | $0.00 |
| Pelletron Corporation 1866 Colonial Village Lane Lancaster, PA 17601 | CarbonLite P, LLC; CarbonLite Recycling LLC | Pelletron Order Confirmation for PET Flake and Pellet Handling System for PA and Dallas | 9/9/2020 | See footnote.[6] |
| Security Signal Devices, Inc. 900 Six Flags Arlington, TX 76011 | CarbonLite P, LLC | Letter Agreement | 11/26/2020 | $0.00 |
| Security Signal Devices, Inc. 900 Six Flags Arlington, TX 76011 | CarbonLite P, LLC | SSD Alarm Agreement (150293C-041620) | 4/23/2020 | $0.00 |
| Security Signal Devices, Inc. 900 Six Flags Arlington, TX 76011 | CarbonLite P, LLC | SSD Alarm Agreement (150293J-041620) | 4/23/2020 | $0.00 |
| Security Signal Devices, Inc. 900 Six Flags Arlington, TX 76011 | CarbonLite P, LLC | SSD Alarm Agreement (150293K-041620) | 4/23/2020 | $0.00 |
| The Metropolitan Edison Company 2800 Pottsville Pike Reading, PA 19605 | CarbonLite P, LLC | FirstEnergy Interconnection Agreement | 10/7/2020 | $38,640.00 |
| CellMark Incorporated 80 Washington Street Norwalk, CT 06854 | CarbonLite P, LLC | Letter of Intent to Supply Raw Materials | Undated | $0.00 |
| Direct Energy Business Marketing, LLC 194 Wood Avenue South, Second Floor Iselin, NJ 08830 | CarbonLite P, LLC | Natural Gas Transaction Confirmation | 5/19/2020 | $20,191.08 |

---

[6] Pursuant to Docket No. 342, this agreement has been assumed by Seller and CarbonLite Recycling LLC, subject to the terms and conditions contained therein. This agreement remains subject to assignment pursuant to section 365 of the Bankruptcy Code

**Prepaid Assets**

| Depositee | Purpose | Date of Deposit | Amount |
|---|---|---|---|
| J.P Mascaro & Sons | Bale deposit | 4/1/2021 | $30,000 |
| J.P Mascaro & Sons | Utility deposit | 4/1/2021 | $20,000 |
| Muhlenberg Township Authority | Utility deposit | 4/19/2021 | $16,000 |
| The Metropolitan Edison Company | Utility deposit | 4/5/2021 | $14,906 |

**Section 3.6(h): Capital Leases**

None.

**Section 3.7(a): Real Property Lease Matters**

*(i) and (ii)*

- On March 9, 2021, immediately following the Petition Date, Berks61 Owner, LLC ("Landlord") sent a letter to Seller alleging that the filing of the Bankruptcy Cases constituted a default under the lease between Seller and Landlord dated May 13, 2019 (as amended, the "Lease") and further alleged that Landlord was entitled to accelerate the Lease and demand Seller pay Deferred Rent (as such term is defined in the Lease) in full. On March 16, 2021, Landlord sent a second letter to Seller, stating that it had drawn down $374,798.52 of the Letter of Credit posted with East West Bank referenced in Section 2.1(m) of the Disclosure Schedules (the "L/C") and demanding that Seller replenish such draw. On March 19, 2021, CLP, through counsel, sent a letter to Landlord, informing it that the actions it took subsequent to the Petition Date constituted a violation of 11 U.S.C. § 362. By email dated March 23, 2021, the asserted violations of the Bankruptcy Code were resolved as between counsel to the Debtors and the Landlord, and the Landlord withdrew its demand to replenish the L/C.

- Blue Rock Construction, Inc. filed a mechanics' lien affecting the leased real property of Seller on March 8, 2021.

*Security Interests*

- Pursuant to that certain Open-End Leasehold Mortgage, Security Agreement, Assignment of Rents and Leases, and Fixture Filing (the "PA Leasehold Mortgage") dated June 1, 2019, Seller granted a leasehold mortgage in favor of UMB Bank, N.A. The PA Leasehold Mortgage was amended pursuant to that certain First Amendment to Open-End Leasehold Mortgage, Security Agreement, Assignment of Rents and Leases, and Fixture Filing dated September 1, 2020.

DOCS_DE:234533.2 13044/001

**Section 3.7(b): Contracts Regarding Material Repairs, Work, and Capital Improvements**

| Contract Counterparty/Address | Contract / Lease Debtor Party | Contract/Lease Title | Date of Contract / Lease |
|---|---|---|---|
| A1 Restoration, Inc. d/b/a A1 Energy<br>2730 Shenck Road<br>Manheim, PA 17545 | CarbonLite P, LLC | Standard Abbreviated Form of Agreement Between Owner and Contractor | 5/24/2019 |
| A1 Restoration, Inc. d/b/a A1 Energy<br>2730 Shenck Road<br>Manheim, PA 17545 | CarbonLite P, LLC | Change Order 1 | 6/21/2019 |
| A1 Restoration, Inc. d/b/a A1 Energy<br>2730 Shenck Road<br>Manheim, PA 17545 | CarbonLite P, LLC | Change Order 2 | 7/1/2019 |
| A1 Restoration, Inc. d/b/a A1 Energy<br>2730 Shenck Road<br>Manheim, PA 17545 | CarbonLite P, LLC | Change Order 3 | 12/18/2019 |
| A1 Restoration, Inc. d/b/a A1 Energy<br>2730 Shenck Road<br>Manheim, PA 17545 | CarbonLite P, LLC | Change Order 4 | 5/21/2020 |
| A1 Restoration, Inc. d/b/a A1 Energy<br>2730 Shenck Road<br>Manheim, PA 17545 | CarbonLite P, LLC | Energy Services Agreement | Undated |
| Anchor Fire Protection Co., Inc.<br>270 Renninger Road<br>Perkiomenville, PdA 18074 | CarbonLite P, LLC | Standard Short Form Agreement Between Owner and Contractor | 11/4/2020 |
| Blue Rock Construction, Inc.<br>1275 Glenlivet Drive, Suite 330<br>Allentown, PA 18106 | CarbonLite P, LLC | Standard Form of Agreement Between Owner and Design-Builder | 8/27/2019 |
| Blue Rock Construction, Inc.<br>1275 Glenlivet Drive, Suite 330<br>Allentown, PA 18106 | CarbonLite P, LLC | Design-Build Amendment | 8/27/2019 |
| Blue Rock Construction, Inc.<br>1275 Glenlivet Drive, Suite 330<br>Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 1 | 10/22/2019 |
| Blue Rock Construction, Inc.<br>1275 Glenlivet Drive, Suite 330<br>Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 6 | 11/14/2019 |
| Blue Rock Construction, Inc.<br>1275 Glenlivet Drive, Suite 330<br>Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 7 | 11/14/2019 |
| Blue Rock Construction, Inc.<br>1275 Glenlivet Drive, Suite 330<br>Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 8 | 11/14/2019 |
| Blue Rock Construction, Inc.<br>1275 Glenlivet Drive, Suite 330<br>Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 9 | 11/14/2019 |
| Blue Rock Construction, Inc.<br>1275 Glenlivet Drive, Suite 330<br>Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 10 | 1/15/2020 |

| Contract Counterparty/Address | Contract / Lease Debtor Party | Contract/Lease Title | Date of Contract / Lease |
|---|---|---|---|
| Blue Rock Construction, Inc.<br>1275 Glenlivet Drive, Suite 330<br>Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 11 | 1/15/2020 |
| Blue Rock Construction, Inc.<br>1275 Glenlivet Drive, Suite 330<br>Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 13 | 1/21/2020 |
| Blue Rock Construction, Inc.<br>1275 Glenlivet Drive, Suite 330<br>Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 14 | 1/28/2020 |
| Blue Rock Construction, Inc.<br>1275 Glenlivet Drive, Suite 330<br>Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 15 | 2/25/2020 |
| Blue Rock Construction, Inc.<br>1275 Glenlivet Drive, Suite 330<br>Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 16 | 3/30/2020 |
| Blue Rock Construction, Inc.<br>1275 Glenlivet Drive, Suite 330<br>Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 17 | 3/30/2020 |
| Blue Rock Construction, Inc.<br>1275 Glenlivet Drive, Suite 330<br>Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 18 | 4/10/2020 |
| Blue Rock Construction, Inc.<br>1275 Glenlivet Drive, Suite 330<br>Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 19 | 4/20/2020 |
| Blue Rock Construction, Inc.<br>1275 Glenlivet Drive, Suite 330<br>Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 20 | 5/11/2020 |
| Blue Rock Construction, Inc.<br>1275 Glenlivet Drive, Suite 330<br>Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 21 | 5/18/2020 |
| Blue Rock Construction, Inc.<br>1275 Glenlivet Drive, Suite 330<br>Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 22 | 5/18/2020 |
| Blue Rock Construction, Inc.<br>1275 Glenlivet Drive, Suite 330<br>Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 23 | 6/10/2020 |
| Blue Rock Construction, Inc.<br>1275 Glenlivet Drive, Suite 330<br>Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 24 | 6/18/2020 |
| Blue Rock Construction, Inc.<br>1275 Glenlivet Drive, Suite 330<br>Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 25 | 6/25/2020 |
| Blue Rock Construction, Inc.<br>1275 Glenlivet Drive, Suite 330<br>Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 26 | 6/25/2020 |
| Blue Rock Construction, Inc.<br>1275 Glenlivet Drive, Suite 330<br>Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 27 | 10/16/2020 |

| Contract Counterparty/Address | Contract / Lease Debtor Party | Contract/Lease Title | Date of Contract / Lease |
|---|---|---|---|
| Blue Rock Construction, Inc.<br>1275 Glenlivet Drive, Suite 330<br>Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 28 | 11/20/2020 |
| Blue Rock Construction, Inc.<br>1275 Glenlivet Drive, Suite 330<br>Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 29 | 12/10/2020 |
| Emerging Acquisitions LLC d/b/a Bulk Handling Solutions<br>3592 W. 5th Avenue<br>Eugene, OR 97402 | CarbonLite P, LLC | Secondary Plastics Processing System | 1/22/2019 |
| Emerging Acquisitions LLC d/b/a Bulk Handling Solutions<br>3592 W. 5th Avenue<br>Eugene, OR 97402 | CarbonLite P, LLC | Change Order #01 | 5/17/2019 |
| Emerging Acquisitions LLC d/b/a Bulk Handling Solutions<br>3592 W. 5th Avenue<br>Eugene, OR 97402 | CarbonLite P, LLC | Change Order #02 | 6/7/2019 |
| Emerging Acquisitions LLC d/b/a Bulk Handling Solutions<br>3592 W. 5th Avenue<br>Eugene, OR 97402 | CarbonLite P, LLC | Change Order #03 | 6/7/2019 |
| Emerging Acquisitions LLC d/b/a Bulk Handling Solutions<br>3592 W. 5th Avenue<br>Eugene, OR 97402 | CarbonLite P, LLC | Change Order #04 | 6/13/2019 |
| Emerging Acquisitions LLC d/b/a Bulk Handling Solutions<br>3592 W. 5th Avenue<br>Eugene, OR 97402 | CarbonLite P, LLC | Change Order #05 | 2/7/2020 |
| Emerging Acquisitions LLC d/b/a Bulk Handling Solutions<br>3592 W. 5th Avenue<br>Eugene, OR 97402 | CarbonLite P, LLC | Consignment Agreement | 2/25/2021 |
| Evoqua Water Technologies LLC<br>725 Wooten Road<br>Colorado Springs, CO 80915 | CarbonLite P, LLC | Firm Proposal #2019-328049 | 8/5/2019 |
| Ingersoll Rand Company<br>800 East Beaty Street<br>Davidson, NC 28036 | CarbonLite P, LLC | Purchase Orders; Standard Terms and Conditions of Sale | 6/27/2019 |
| Ingersoll Rand Company<br>800 East Beaty Street<br>Davidson, NC 28036 | CarbonLite P, LLC | PackageCARE Agreement | 9/30/2019 |
| Ingersoll-Rand Company<br>800-B Beaty Street<br>Davidson, NC 28036 | CarbonLite P, LLC | PackageCARE Agreement | 7/1/2019 |
| Ingersoll-Rand Company<br>Compression Technologies & Services<br>6291 Burnham Avenue<br>Buena Park, CA 90621 | CarbonLite P, LLC | PackageCARE Addendum | 7/20/2020 |

| Contract Counterparty/Address | Contract / Lease Debtor Party | Contract/Lease Title | Date of Contract / Lease |
|---|---|---|---|
| Lubo USA LLC d/b/a Van Dyk Recycling Solutions<br>78 Halloween Boulevard<br>Stamford, CT 06902 | CarbonLite P, LLC | Order Confirmation OC#LUTI2019245 | 6/12/2019 |
| Miura America Co., Ltd.<br>2200 Steven B. Smith Boulevard<br>Rockmart, GA 30153 | CarbonLite P, LLC | Miura Maintenance Agreement | 6/4/2019 |
| Pelletron Corporation<br>1866 Colonial Village Lane<br>Lancaster, PA 17601 | CarbonLite P, LLC | Order Confirmation | 6/17/2019 |
| Pelletron Corporation<br>1866 Colonial Village Lane<br>Lancaster, PA 17601 | CarbonLite P, LLC; CarbonLite Recycling LLC | Pelletron Order Confirmation for PET Flake and Pellet Handling System for PA and Dallas | 9/9/2020 |
| Sorema Division of Previero N. srl<br>Via Per Cavolto,<br>17- 22040 Anzano del Parco, Italy | CarbonLite P, LLC | Order Confirmation V1450 | 1/28/2019 |
| Sorema Division of Previero N. srl<br>Via Per Cavolto,<br>17- 22040 Anzano del Parco, Italy | CarbonLite P, LLC | Order Confirmation V1451 | 1/28/2019 |
| Starlinger & Co. Gesellschaft m.b.H.<br>Sonneuhrgasse 4<br>1060 Vienna, Austria | CarbonLite P, LLC | Order Confirmation No. MA295440 | 11/27/2018 |
| Trimax Systems Inc.<br>565 Explorer Street<br>Brea, CA 92821 | CarbonLite P, LLC | Proposal (E-12155 Rev 2) | 7/29/2019 |
| UniSensor Sensorststeme GmbH<br>Am Sandfeld 11<br>D-76149 Karlsruhe<br>Germany | CarbonLite P. LLC | Offer No. A016804 | 3/15/2019 |

| Contract Counterparty/Address | Contract / Lease Debtor Party | Contract/Lease Title | Date of Contract / Lease | Section 3.8(b) Disclosures |
|---|---|---|---|---|
| A1 Restoration, Inc. d/b/a A1 Energy 2730 Shenck Road Manheim, PA 17545 | CarbonLite P, LLC | Standard Abbreviated Form of Agreement Between Owner and Contractor | 5/24/2019 | As set forth in the Debtors' cure schedules, Seller is in default under its contracts with A1 on account of unpaid prepetition amounts due thereunder. |
| A1 Restoration, Inc. d/b/a A1 Energy 2730 Shenck Road Manheim, PA 17545 | CarbonLite P, LLC | Change Order 1 | 6/21/2019 | Please see above. |
| A1 Restoration, Inc. d/b/a A1 Energy 2730 Shenck Road Manheim, PA 17545 | CarbonLite P, LLC | Change Order 2 | 7/1/2019 | Please see above. |
| A1 Restoration, Inc. d/b/a A1 Energy 2730 Shenck Road Manheim, PA 17545 | CarbonLite P, LLC | Change Order 3 | 12/18/2019 | Please see above. |
| A1 Restoration, Inc. d/b/a A1 Energy 2730 Shenck Road Manheim, PA 17545 | CarbonLite P, LLC | Change Order 4 | 5/21/2020 | Please see above. |
| A1 Restoration, Inc. d/b/a A1 Energy 2730 Shenck Road Manheim, PA 17545 | CarbonLite P, LLC | Energy Services Agreement | Undated | Please see above. |
| Anchor Fire Protection Co., Inc. 270 Renninger Road Perkionenville, PdA 18074 | CarbonLite P, LLC | Standard Short Form Agreement Between Owner and Contractor | 11/4/2020 | All disputes with Anchor Fire were resolved by stipulation and order [Docket No. 311]. |
| Berks61 Owner, LLC c/o Endurance Real Estate Group 4 Radnor Corporate Center, Suite 105 Radnor, PA 19087 | CarbonLite P, LLC | Industrial Lease | 5/13/2019 | Please see disclosure in Section 3.7(a) of the Disclosure Schedules. Berks61 Owner has also filed an objection to the proposed Cure Amount associatedwith its lease [Docket No. 365]. |
| Berks61 Owner, LLC c/o Endurance Real Estate Group 4 Radnor Corporate Center, Suite 105 Radnor, PA 19087 | CarbonLite P, LLC | First Amendment to Industrial Lease | 10/20/2019 | Please see above. |
| Berks61 Owner, LLC c/o Endurance Real Estate Group | CarbonLite P, LLC | Second Amendment to Industrial Lease | 2/21/2021 | Please see above. |

| Contract Counterparty/Address | Contract / Lease Debtor Party | Contract/Lease Title | Date of Contract / Lease | Section 3.8(b) Disclosures |
|---|---|---|---|---|
| 4 Radnor Corporate Center, Suite 105 Radnor, PA 19087 | | | | |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Standard Form of Agreement Between Owner and Design-Builder | 8/27/2019 | All disputes with Blue Rock were resolved by agreed order [Docket No. 340]. |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Design-Build Amendment | 8/27/2019 | Please see above. |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 1 | 10/22/2019 | Please see above. |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 6 | 11/14/2019 | Please see above. |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 7 | 11/14/2019 | Please see above. |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 8 | 11/14/2019 | Please see above. |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 9 | 11/14/2019 | Please see above. |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 10 | 1/15/2020 | Please see above. |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 11 | 1/15/2020 | Please see above. |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 13 | 1/21/2020 | Please see above. |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 14 | 1/28/2020 | Please see above. |

58

| Contract Counterparty/Address | Contract / Lease Debtor Party | Contract/Lease Title | Date of Contract / Lease | Section 3.8(b) Disclosures |
|---|---|---|---|---|
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 15 | 2/25/2020 | Please see above. |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 16 | 3/30/2020 | Please see above. |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 17 | 3/30/2020 | Please see above. |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 18 | 4/10/2020 | Please see above. |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 19 | 4/20/2020 | Please see above. |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 20 | 5/11/2020 | Please see above. |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 21 | 5/18/2020 | Please see above. |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 22 | 5/18/2020 | Please see above. |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 23 | 6/10/2020 | Please see above. |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 24 | 6/18/2020 | Please see above. |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 25 | 6/25/2020 | Please see above. |

| Contract Counterparty/Address | Contract / Lease Debtor Party | Contract/Lease Title | Date of Contract / Lease | Section 3.8(b) Disclosures |
|---|---|---|---|---|
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 26 | 6/25/2020 | Please see above. |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 27 | 10/16/2020 | Please see above. |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 28 | 11/20/2020 | Please see above. |
| Blue Rock Construction, Inc. 1275 Glenlivet Drive, Suite 330 Allentown, PA 18106 | CarbonLite P, LLC | Owner Change Order 29 | 12/10/2020 | Please see above. |
| CellMark Incorporated 80 Washington Street Norwalk, CT 06854 | CarbonLite P, LLC | Letter of Intent to Supply Raw Materials | Undated | |
| Coca-Cola Cross Enterprise Procurement Group c/o The Coca-Cola Company One Coca-Cola Plaza Atlanta, GA 30313 | CarbonLite Holdings LLC | The Master Terms and Conditions | 5/1/2019 | The Debtor counterparty under all ofthe Debtors' contracts with Coca-Cola is Holdings. However, Seller (along with Recycling and Industries)performs the Debtors' obligations thereunder, and is compensated for the sale of product it produces under such contracts by Western Container on behalf of Coca-Cola.<br><br>Prior to the Petition Date, Holdings unilaterally changed the pricing charged to Coca-Cola under its contracts, which pricing changes Coca-Cola accepted, and continued topurchase under such terms. Coca-Cola paused its purchasing from Seller inMarch pending the ongoing sale process. |
| Coca-Cola Cross Enterprise Procurement Group c/o The Coca-Cola Company One Coca-Cola Plaza Atlanta, GA 30313 ATTN: Lars-Peter Ludwig | CarbonLite Holdings LLC | Letter of Understanding | 8/3/2020 | Please see above. |

DOCS_DE:234533.2 13044/001

| Contract Counterparty/Address | Contract / Lease Debtor Party | Contract/Lease Title | Date of Contract / Lease | Section 3.8(b) Disclosures |
|---|---|---|---|---|
| Coca-Cola Cross Enterprise Procurement Group c/o The Coca-Cola Company One Coca-Cola Plaza Atlanta, GA 30313 | CarbonLite Holdings LLC | Non-Binding Letter of Understanding | 8/3/2020 | Please see above. |
| Emerging Acquisitions LLC d/b/a Bulk Handling Solutions3592 W. 5th Avenue Eugene, OR 97402 | CarbonLite P, LLC | Secondary Plastics Processing System | 1/22/2019 | All disputes as between Seller and BHS were resolved by agreed order [Docket No. 339]. |
| Emerging Acquisitions LLC d/b/a Bulk Handling Solutions 3592 W. 5th Avenue Eugene, OR 97402 | CarbonLite P, LLC | Change Order #01 | 5/17/2019 | Please see above. |
| Emerging Acquisitions LLC d/b/a Bulk Handling Solutions 3592 W. 5th Avenue Eugene, OR 97402 | CarbonLite P, LLC | Change Order #02 | 6/7/2019 | Please see above. |
| Emerging Acquisitions LLC d/b/a Bulk Handling Solutions 3592 W. 5th Avenue Eugene, OR 97402 | CarbonLite P, LLC | Change Order #03 | 6/7/2019 | Please see above. |
| Emerging Acquisitions LLC d/b/a Bulk Handling Solutions 3592 W. 5th Avenue Eugene, OR 97402 | CarbonLite P, LLC | Change Order #04 | 6/13/2019 | Please see above. |
| Emerging Acquisitions LLC d/b/a Bulk Handling Solutions 3592 W. 5th Avenue Eugene, OR 97402 | CarbonLite P, LLC | Change Order #05 | 2/7/2020 | Please see above. |
| Evoqua Water Technologies LLC 725 Wooten Road Colorado Springs, CO 80915 | CarbonLite P, LLC | Firm Proposal #2019-328049 | 8/5/2019 | As set forth in the Debtors' cure schedules, Seller is in default under its contracts with Evoqua on account of unpaid prepetition amounts due thereunder. |
| Ingersoll Rand Company 800 East Beaty Street Davidson, NC 28036 | CarbonLite P, LLC | Purchase Orders; Standard Terms and Conditions of Sale | 6/27/2019 | As set forth in the Debtors' cure schedules, Seller is in default under its contracts with Ingersoll Rand on account of unpaid prepetition amounts due thereunder. |

61

| Contract Counterparty/Address | Contract / Lease Debtor Party | Contract/Lease Title | Date of Contract / Lease | Section 3.8(b) Disclosures |
|---|---|---|---|---|
| Ingersoll Rand Company 800 East Beaty Street Davidson, NC 28036 | CarbonLite P, LLC | PackageCARE Agreement | 9/30/2019 | Please see above. |
| Ingersoll-Rand Company 800-B Beaty Street Davidson, NC 28036 | CarbonLite P, LLC | PackageCARE Agreement | 7/1/2019 | Please see above. |
| Ingersoll-Rand Company Compression Technologies & Services 6291 Burnham Avenue Buena Park, CA 90621 | CarbonLite P, LLC | PackageCARE Addendum | 7/20/2020 | Please see above. |
| KRE Security, LLC 11 South 3rd Street Hamburg, PA 19526 | CarbonLite P, LLC | Security Services Agreement | 11/8/2019 | As set forth in the Debtors' cure schedules, Seller is in default under its contracts with KRE on account of unpaid prepetition amounts duet hereunder. |
| KRE Security, LLC 11 South 3rd Street Hamburg, PA 19526 | CarbonLite P, LLC | Mutual Non-Disclosure and Confidentiality Agreement | 11/15/2019 | Please see above. |
| Lubo USA LLC d/b/a Van Dyk Recycling Solutions 78 Halloween Boulevard Stamford, CT 06902 | CarbonLite P, LLC | Order Confirmation OC#LUTI2019245 | 6/12/2019 | |
| Miura America Co., Ltd. 2200 Steven B. Smith Boulevard Rockmart, GA 30153 | CarbonLite P, LLC | Miura Maintenance Agreement | 6/4/2019 | As set forth in the Debtors' cure schedules, Seller is in default under its contracts with Miura on account of unpaid prepetition amounts due thereunder. |
| Nestle Waters North America, Inc. 900 Long Ridge Road, Stamford, CT 06902 Attn: Schon Rindani | CarbonLite P, LLC | First Amendment to Contract | 1/1/2020 | Prior to the Petition Date, Seller unilaterally changed the pricing charged to Nestle under its contracts, which pricing changes Nestle accepted, and continued to purchase under such terms. |
| Nestle Waters North America, Inc. 900 Long Ridge Road, Building 2 Stamford, CT 06902 Attn: Schon Rindani Attn: General Counsel | CarbonLite P, LLC | Supply Agreement | 5/10/2018 | Please see above. |

62

| Contract Counterparty/Address | Contract / Lease Debtor Party | Contract/Lease Title | Date of Contract / Lease | Section 3.8(b) Disclosures |
|---|---|---|---|---|
| Niagara Bottling, LLC<br>1440 Bridegate Drive<br>Diamond Bar, CA 91765 | CarbonLite Recycling LLC,<br>CarbonLite Industries, LLC,<br>CarbonLite P, LLC | PET Bale Purchase Agreement | 1/21/2021 | On April 9, 2021, Niagara filed a *Notice of Reclamation Demand* [Docket No. 261] against Industries and Recycling, but not Seller, with respect to goods provided to Industries under the PET Bale Purchase Agreement, as set forth in further detail therein. |
| Niagara Bottling, LLC<br>2560 E. Philadelphia Street<br>Ontario, CA 91761 | CarbonLite Recycling LLC,<br>CarbonLite Industries, LLC,<br>CarbonLite P, LLC | Supply Agreement | 11/1/2017 | Seller, along with Recycling and Industries, are party to all of the Debtors' agreements with Niagara. Seller is compensated for the sale of product it produces under such contracts by Niagara.<br><br>Prior to the Petition Date, Seller unilaterally changed the pricing charged to Niagara under its contracts, which pricing changes Niagara did not accept. Accordingly, since March 2021, Seller has not had a business relationship with Niagara. |
| Niagara Bottling, LLC,<br>2560 E. Philadelphia Street<br>Ontario, CA 91761 | CarbonLite Recycling LLC,<br>CarbonLite Industries, LLC,<br>CarbonLite P, LLC | Amendment 1 to Supply Agreement | 3/1/2018 | Please see above. |
| Niagara Bottling, LLC,<br>2560 E. Philadelphia Street<br>Ontario, CA 91761 | CarbonLite Recycling LLC,<br>CarbonLite Industries, LLC,<br>CarbonLite P, LLC | Amendment 2 to Supply Agreement | 4/17/2018 | Please see above. |
| Niagara Bottling, LLC,<br>2560 E. Philadelphia Street<br>Ontario, CA 91761 | CarbonLite Recycling LLC,<br>CarbonLite Industries, LLC,<br>CarbonLite P, LLC | Amendment 3 to Supply Agreement | 11/1/2018 | Please see above. |
| Niagara Bottling, LLC,<br>2560 E. Philadelphia Street Ontario, CA 91761 | CarbonLite Recycling LLC,<br>CarbonLite Industries, | Amendment 4 to Supply Agreement | 12/30/2019 | Please see above. |

63

| Contract Counterparty/Address | Contract / Lease Debtor Party | Contract/Lease Title | Date of Contract / Lease | Section 3.8(b) Disclosures |
|---|---|---|---|---|
| | LLC;<br>CarbonLite P, LLC | | | |
| Niagara Bottling, LLC,<br>2560 E. Philadelphia Street<br>Ontario, CA 91761 | CarbonLite Recycling LLC,<br>CarbonLite Industries, LLC,<br>CarbonLite P, LLC | Amendment 5 to Supply Agreement | 4/1/2020 | Please see above. |
| Niagara Bottling, LLC,<br>2560 E. Philadelphia Street<br>Ontario, CA 91761 | CarbonLite Recycling LLC,<br>CarbonLite Industries, LLC,<br>CarbonLite P, LLC | Amendment 6 to Supply Agreement | 9/2/2020 | Please see above. |
| Pelletron Corporation<br>1866 Colonial Village Lane<br>Lancaster, PA 17601 | CarbonLite P, LLC | Order Confirmation | 6/17/2019 | All disputes as between Seller and Pelletron were resolved by agreed order [Docket No. 342]. |
| Pelletron Corporation<br>1866 Colonial Village Lane<br>Lancaster, PA 17601 | CarbonLite P, LLC;<br>CarbonLite Recycling LLC | Pelletron Order Confirmation for PET Flake and Pellet Handling System for PA and Dallas | 9/9/2020 | Please see above. |
| PerkinElmer Health Sciences Inc.<br>710 Bridgeport Avenue<br>Shelton, CT 06484 | CarbonLite P, LLC | Quotation | 12/5/2019 | |
| Sorena Division of Previero N. srl<br>Via Per Cavolto,<br>17- 22040 Anzano del Parco, Italy | CarbonLite P, LLC | Order Confirmation V1450 | 1/28/2019 | All disputes as between Seller and Sorena were resolved by agreed order [Docket No. 341]. |
| Sorena Division of Previero N. srl<br>Via Per Cavolto,<br>17- 22040 Anzano del Parco, Italy | CarbonLite P, LLC | Order Confirmation V1451 | 1/28/2019 | Please see above. |
| Starlinger & Co. Gesellschaft m.b.H.<br>Sonnenlirgasse 4<br>1060 Vienna, Austria | CarbonLite P, LLC | Order Confirmation No. MA295440 | 11/27/2018 | As set forth in the Debtors' cure schedules, Seller is in default under its contracts with Starlinger on account of unpaid prepetition amounts due thereunder. |
| The Metropolitan Edison Company<br>2800 Pottsville Pike<br>Reading, PA 19605 | CarbonLite P, LLC | FirstEnergy Interconnection Agreement | 10/7/2020 | As set forth in the Debtors' cure schedules, Seller is in default under its contracts with MetEd on account of unpaid prepetition amounts due thereunder. |

64

| Contract Counterparty/Address | Contract / Lease Debtor Party | Contract/Lease Title | Date of Contract / Lease | Section 3.8(b) Disclosures |
|---|---|---|---|---|
| Toyota Industries Commercial Finance P.O. Box 660926 Dallas, TX 75266 | CarbonLite P, LLC | Equipment Schedule 22 to Master Lease Agreement | 2/7/2020 | As set forth in the Debtors' cure schedules, Seller is in default under certain of its contracts with TICF on account of unpaid prepetition amounts due thereunder In addition, this contract is associated with a Master Lease Agreement between TCIF and Industries, and lists Industries as the Debtor counterparty to the contract. However, the contract indicates that the leased equipment is located at the Reading Facility and Seller has performed under this contract at all relevant times. |
| Toyota Industries Commercial Finance P.O. Box 660926 Dallas, TX 75266 | CarbonLite P, LLC | Equipment Schedule 23 to Master Lease Agreement | 2/7/2020 | Please see above. |
| Toyota Industries Commercial Finance P.O. Box 660926 Dallas, TX 75266 | CarbonLite P, LLC | Equipment Schedule 24 to Master Lease Agreement | 2/7/2020 | Please see above. |
| Toyota Industries Commercial Finance P.O. Box 660926 Dallas, TX 75266 | CarbonLite P, LLC | Equipment Schedule 25 to Master Lease Agreement | 2/7/2020 | Please see above. |
| Trimax Systems Inc. 565 Explorer Street Brea, CA 92821 | CarbonLite P, LLC | Proposal (E-12155 Rev 2) | 7/29/2019 | |
| UniSensor Sensorsteme GmbH Am Sandfeld 11 D-76149 Karlsruhe Germany | CarbonLite P, LLC | Offer No. A016804 | 3/15/2019 | UniSensor filed an objection to Seller's listed Cure Amount [Docket No. 361]. |

65

**Section 3.8(b): Defaults Under Material Contracts**

Please see Section 3.8(a) of the Disclosure Schedules.

1

Redacted- Personal Information

DOCS_DE:234533.2 13044/001

Redacted- Personal Information

5

# Section 3.10(a): Employee Benefit Plans[1]

- Pursuant to that certain *Administrative Services Contract (Level Funding)* between CarbonLite Industries LLC ("Industries") and Cigna Health and Life Insurance Company and other associated documents, effective June 1, 2020, Seller offers its eligible full-time Employees and their family members medical and prescription drug coverage.

- Pursuant to that certain *Group Contract* between Industries and Cigna Dental Health of Pennsylvania, Inc. and other associated documents, effective June 1, 2020, Seller offers its eligible full-time Employees and their family members dental insurance coverage.

- Pursuant to that certain *Group Vision Care Plan* between Industries and Vision Service Plan and other associated documents, effective June 1, 2020, Seller offers its eligible full-time Employees and their family members vision coverage.

- Seller offers eligible Employees the opportunity to participate in the 401(k) Plan administered by the Company, utilizing a platform provided by ADP 401k, Inc. Seller historically matches Employees' 401(k) contributions in a discretionary amount of up to 50% of the first 10% of salary contributed.

- Seller's Employees are entitled to paid holiday time, vacation time, and other paid time off as provided in that certain document in the Jefferies Data Room entitled "8.3.3.4.6 - Benefits - Reading.pdf."

- To the extent not otherwise specifically described herein, Seller's Employees are entitled to all Employee Benefits Programs, as such term is defined and described in the Wage and Benefit Motion.

---

[1] Capitalized terms not otherwise defined in this Section shall have the meanings ascribed to them in the *Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to (I) Pay and/or Honor Prepetition Employee Obligations and Pay Third Party and Contract Workers; (II) Remit Withholding Obligations and Deductions; (III) Maintain Employee Compensation and Benefits Programs and Pay Related Administrative Obligations; and (IV) Have Applicable Banks and Other Financial Institutions Receive, Process, Honor, and Pay Certain Checks Presented for Payment and Honor Certain Fund Transfer Requests* [Docket No. 5] (the "Wage and Benefit Motion").)

DOCS_DE:234533.2 13044/001

**Section 3.11: Permits**

- There is ongoing construction at Seller's premises, for which Seller presently has all required Permits. In the future, Seller may be required to obtain additional Permits as circumstances warrant.

DOCS_DE:234533.2 13044/001

**Section 3.12(a): Intellectual Property**

None.

DOCS_DE:234533.2 13044/001

**Section 3.12(c): Intellectual Property Matters**

None.

**Section 3.12(f): Computer Systems Matters**

None.

DOCS_DE:234533.2 13044/001

**Section 3.13(c): Environmental Matters**

None.

DOCS_DE:234533.2 13044/001

**Section 3.15: Tax Matters**

- Holdings and its subsidiaries, including Industries, have a statutory extension to file their 2020 federal Tax Returns until September 15, 2021.

## Section 3.16(a)(i): Key Customer and Vendor Lists

### *Key Customers*

| Customer Name | 2020 Billing | Section 3.16(a)(ii) Disclosures |
|---|---|---|
| Amcor Group GmbH | $1,724,140 | In March 2021, Amcor and Pepsi paused purchasing from Seller during the pendency of the Debtors' bankruptcy cases. |
| Indorama Ventures Sustainable Solutions | $92,540 | |
| Niagara Bottling, LLC | $44,370 | Niagara Bottling has ceased purchasing from Seller as of March 2021. |
| Gary Plastic Packaging Corp | $29,449 | |
| Nestle Waters North America | $17,824 | Nestle Water has decreased purchasing from Industries in 2021 as compared to 2020. |
| PinnPACK Packaging, LLC | $9,000 | |
| Southeastern Container | $7,476 | |
| Karl W. Richter Ltd. | $3,789 | |
| Absolute Polymers Inc. | $2,691 | |

### *Key Vendors*

| Vendor Name | 2020 Payables | Section 3.16(a)(ii) Disclosures |
|---|---|---|
| BBSI Payroll | $1,942,557 | |
| PQ Recycling, A Polyquest Company | $1,808,696 | |
| HPC Industries, LLC | $485,675 | |
| Bantam Materials International | $466,852 | |
| ClearFreight Inc. | $312,306 | |
| Berks61 Owner LLC | $277,726 | Please see disclosure in Section 3.7(a) of the Disclosure Schedules. |
| Muhlenberg Township Authority | $232,691 | |
| Nahai Insurance Services | $208,091 | |
| Met Ed | $135,552 | |
| KRE Security LLC | $117,026 | |

**Section 3.16(a)(ii): Key Customer/Vendor Matters**

Please see Section 3.16(a)(i) of the Disclosure Schedules.

DOCS_DE:234533.2 13044/001

## Section 3.16(b): Discounts and Rebates

None.

DOCS_DE:234533.2 13044/001

## Section 3.17: Insurance

| Type of Coverage | Insurer | Policy No. | Policy Period |
|---|---|---|---|
| Crime | Federal Insurance Company | 8260-1946 | 9/19/2020 - 9/19/2021 |
| Terrorism; Excess Liability | Travelers Property Casualty Company of America | ZUP-51N34853-20-NF | 9/19/2020 - 9/19/2021 |
| General Liability; Business Auto; Certified Terrorism | Allianz - Fireman's Fund Insurance Company | USC021595200 | 9/19/2020 - 9/19/2021 |
| Umbrella Liability; Certified Terrorism | Allianz - Fireman's Fund Insurance Company | USC01771220U | 9/19/2020 - 9/19/2021 |
| Property (Storage Trailers) | Endurance Risk Solutions Assurance Co. | IMU30001985400 | 9/19/2020 - 9/19/2021 |
| Commercial Property | The Travelers Insurance Company | KTJ-CMB-3L24100-8-20 | 9/19/2020 - 9/19/2021 |
| D&O and Private Company Coverage; Employment Practices Coverage | U.S. Specialty Insurance Company | 14-MGU-20-A50339 | 10/1/2020 - 10/1/2021 |
| Marine Open Cargo Policy | The Continental Insurance Company | OC 246248 | 2/23/2020 - 2/23/2022 |

DOCS_DE:234533.2 13044/001

**Section 3.18: Brokers and Finders**

None.

DOCS_DE:234533.2 13044/001

**Section 3.20: Affiliate/Intercompany Agreements**

- CarbonLite Holdings LLC ("Holdings") is party to that certain Commission Agreement dated April 4, 2019 (the "Loaned Earth Agreement") with Jason Farahnik d/b/a Loaned Earth Recycling. Under the Loaned Earth Agreement, Mr. Farahnik serves as Holdings' Director of Resin Sales and Brand Partnerships and is entitled to certain commission payments related to his work for Holdings and its subsidiaries, including Seller.

- Holdings is party to that certain Management Agreement dated April 1, 2010 (the "HPC/CarbonLite Management Agreement") with HPC Industries LLC ("HPC"), pursuant to which HPC provides certain services to Holdings and certain of its subsidiaries, including Seller. The HPC/CarbonLite Management Agreement was amended on January 1, 2011; on or about July 1, 2011; May 1, 2012; March 15, 2013; and October 28, 2015, and was extended on or about December 30, 2020.

DOCS_DE:234533.2 13044/001

**Section 5.5(a): Employees**

Redacted- Personal Information

1

Redacted- Personal Information

DOCS_DE:234533.2 13044/001

Redacted- Personal Information

4

DOCS_DE:234533.2 13044/001