EXHIBIT 1

*Execution Version*

CREDIT AGREEMENT

dated as of

August 2, 2019

among

CARBONLITE HOLDINGS, LLC,
as Borrower,

CERTAIN SUBSIDIARIES OF CARBONLITE HOLDINGS, LLC,
as Guarantors,

THE LENDERS PARTY HERETO,

and

ORION ENERGY PARTNERS INVESTMENT AGENT, LLC,
as Administrative Agent and Collateral Agent

$100,000,000 Senior Secured Term Loan Facility

# TABLE OF CONTENTS

**ARTICLE I DEFINITIONS** ................................................................1
    Section 1.01  Certain Defined Terms .....................................................1
    Section 1.02  Terms Generally ...........................................................28
    Section 1.03  Accounting Terms .........................................................29

**ARTICLE II THE CREDITS** ...........................................................**30**
    Section 2.01  Loans ...........................................................................30
    Section 2.02  Funding of the Loans ....................................................31
    Section 2.03  Termination and Reduction of the Commitments ..........31
    Section 2.04  Repayment of Loan; Evidence of Debt .........................31
    Section 2.05  Prepayment of the Loan.................................................32
    Section 2.06  Reimbursements ...........................................................35
    Section 2.07  Interest .........................................................................36
    Section 2.08  [Reserved].....................................................................37
    Section 2.09  Taxes............................................................................37
    Section 2.10  Payments Generally; Pro Rata Treatment; Sharing of Setoffs .................40
    Section 2.11  Mitigation Obligations; Replacement of Lenders ......42
    Section 2.12  Acknowledgement and Consent to Bail-In of EEA Financial Institutions ................................................42
    Section 2.13  Incremental Facility.....................................................42

**ARTICLE III REPRESENTATIONS AND WARRANTIES** ..............**43**
    Section 3.01  Due Organization, Etc. .................................................43
    Section 3.02  Authorization, Etc........................................................44
    Section 3.03  No Conflict ...................................................................44
    Section 3.04  Approvals, Etc. .............................................................45
    Section 3.05  Financial Statements ....................................................45
    Section 3.06  Litigation .....................................................................45
    Section 3.07  Environmental Matters .................................................46
    Section 3.08  Compliance with Laws and Obligations........................47
    Section 3.09  Material Agreements; Bond Documents ........................47
    Section 3.10  Intellectual Property; Licenses .....................................47
    Section 3.11  Taxes............................................................................48
    Section 3.12  Disclosure ....................................................................48
    Section 3.13  Solvency ......................................................................49
    Section 3.14  Regulatory Restrictions on the Loan .............................49
    Section 3.15  Title; Security Documents ............................................49
    Section 3.16  ERISA..........................................................................49
    Section 3.17  Insurance......................................................................49
    Section 3.18  Use of Proceeds ...........................................................50
    Section 3.19  Membership Interests and Related Matters ...................50
    Section 3.20  [Reserved].....................................................................50
    Section 3.21  No Agreements with Affiliates......................................50

Section 3.22   No Bank Accounts ...................................................................50
Section 3.23   No Default or Event of Default ..............................................50
Section 3.24   Foreign Assets Control Regulations .......................................50
Section 3.25   Commercial Activity; Absence of Immunity ..........................51

**ARTICLE IV CONDITIONS** ................................................................................**51**
Section 4.01   Conditions to the Closing Date...............................................51
Section 4.02   Conditions to the Initial Funding Date ...................................53
Section 4.03   Conditions to Each Funding Date............................................55
Section 4.04   Satisfaction of Conditions ......................................................56

**ARTICLE V AFFIRMATIVE COVENANTS** ......................................................**57**
Section 5.01   Corporate Existence; Etc. .......................................................57
Section 5.02   Conduct of Business ...............................................................57
Section 5.03   Compliance with Laws and Obligations..................................57
Section 5.04   Governmental Authorizations .................................................57
Section 5.05   Maintenance of Title...............................................................57
Section 5.06   Insurance.................................................................................57
Section 5.07   Keeping of Books ...................................................................58
Section 5.08   Access to Property/Records....................................................58
Section 5.09   Taxes.......................................................................................59
Section 5.10   Financial Statements; Other Reporting Requirements ............59
Section 5.11   Notices ....................................................................................60
Section 5.12   [Reserved]...............................................................................62
Section 5.13   Use of Proceeds ......................................................................62
Section 5.14   Security...................................................................................62
Section 5.15   Further Assurances..................................................................62
Section 5.16   Security in Newly Acquired Property and Revenues ...............62
Section 5.17   Material Agreements ...............................................................63
Section 5.18   Collateral Accounts ................................................................63
Section 5.19   Intellectual Property ...............................................................65
Section 5.20   Budget and Updated Model; Non-Guarantor Subsidiaries.........66
Section 5.21   Post-Closing Covenants..........................................................67

**ARTICLE VI NEGATIVE COVENANTS** .............................................................**68**
Section 6.01   Subsidiaries; Equity Issuances ...............................................68
Section 6.02   Indebtedness ...........................................................................68
Section 6.03   Liens, Etc................................................................................70
Section 6.04   Investments .............................................................................71
Section 6.05   Chief Executive Office; Business Activities ...........................72
Section 6.06   Restricted Payments ...............................................................72
Section 6.07   Fundamental Changes; Asset Dispositions ..............................73
Section 6.08   Accounting Changes................................................................74
Section 6.09   Material Agreements, Bond Documents and Permitted Revolving
              Facilities ................................................................................74
Section 6.10   Transactions with Affiliates ...................................................75
Section 6.11   Collateral Accounts ................................................................75

iii

Section 6.12    [Reserved]..................................................................................76
Section 6.13    Hazardous Materials......................................................................76
Section 6.14    No Hedging or Speculative Transactions ...............................76
Section 6.15    Change of Auditors.......................................................................76
Section 6.16    Purchase of Capital Stock............................................................76
Section 6.17    [Reserved]..................................................................................76
Section 6.18    Capital Expenditures....................................................................76

**ARTICLE VII EVENTS OF DEFAULT**................................................................**77**
Section 7.01    Events of Default..........................................................................77
Section 7.02    Application of Proceeds ...............................................................81

**ARTICLE VIII THE AGENTS**..........................................................................**81**
Section 8.01    Appointment and Authorization of the Agents ..........................81
Section 8.02    Rights as a Lender........................................................................82
Section 8.03    Duties of Agent; Exculpatory Provisions ...................................82
Section 8.04    Reliance by Agent ........................................................................82
Section 8.05    Delegation of Duties.....................................................................82
Section 8.06    Withholding of Taxes by the Administrative Agent; Indemnification
                ......................................................................................................83
Section 8.07    Resignation of Agent....................................................................83
Section 8.08    Non-Reliance on Agent or Other Lenders....................................84
Section 8.09    No Other Duties; Etc. ...................................................................84

**ARTICLE IX GUARANTY**................................................................................**84**
Section 9.01    Guaranty .......................................................................................84
Section 9.02    Guaranty Unconditional...............................................................85
Section 9.03    Discharge Only Upon Payment in Full; Reinstatement in Certain
                Circumstances..............................................................................85
Section 9.04    Waiver by the Guarantors.............................................................86
Section 9.05    Subrogation...................................................................................86
Section 9.06    Acceleration..................................................................................86

**ARTICLE X MISCELLANEOUS** ......................................................................**86**
Section 10.01 Notices...........................................................................................86
Section 10.02 Waivers; Amendments...................................................................88
Section 10.03 Expenses; Indemnity; Etc. ...........................................................88
Section 10.04 Successors and Assigns .................................................................90
Section 10.05 Survival..........................................................................................93
Section 10.06 Counterparts; Integration; Effectiveness .....................................94
Section 10.07 Severability....................................................................................94
Section 10.08 Right of Setoff...............................................................................94
Section 10.09 Governing Law; Jurisdiction; Etc.................................................94
Section 10.10 Headings.........................................................................................96
Section 10.11 Confidentiality...............................................................................96
Section 10.12 No Third Party Beneficiaries.........................................................97
Section 10.13 Reinstatement ................................................................................98

iv

Section 10.14 USA PATRIOT Act ...................................................................................98

| | | |
|---|---|---|
| Exhibit A | – | Form of Assignment and Assumption |
| Exhibit B | – | Form of Note |
| Exhibits B-1 through B-4 | | Tax Certificates |
| Exhibit C | – | Form of Borrowing Request |
| Exhibit D | – | [Reserved] |
| Exhibit E | – | Form of Operating Budget |
| Exhibit F | – | Form of Operational Report |
| Exhibit G | – | Form of Shareholder Note Subordination Agreement |
| Exhibit H | – | Form of Observer Rights Agreement |
| Exhibit I | – | Form of Security Agreement |
| Exhibit J | – | Form of Environmental, Social and Governance Report |
| Exhibit K | – | Form of Lender Warrants |

| | | |
|---|---|---|
| Annex I | – | Loans; Commitments |
| Annex II | – | Orion Energy Equity Holders |
| Schedule 1.01(a) | – | Non-Guarantor Subsidiaries |
| Schedule 1.01(b) | – | Prepayment Premium |
| Schedule 1.01(c) | – | Shareholder Notes |
| Schedule 3.01(b) | – | Equity Shareholders |
| Schedule 3.07 | – | Environmental Matters |
| Schedule 3.09 | – | Material Agreements |
| Schedule 3.11 | – | Taxes |
| Schedule 3.17 | – | Insurance |
| Schedule 3.19(b) | – | Subsidiaries |
| Schedule 3.21 | – | Transactions with Affiliates |
| Schedule 5.04 | – | Governmental Authorizations |
| Schedule 5.13(a) | – | Use of Proceeds |
| Schedule 6.02 | – | Permitted Indebtedness |
| Schedule 6.03 | – | Permitted Liens |
| Schedule 6.04 | – | Permitted Investments |

v

This CREDIT AGREEMENT is dated as of August 2, 2019, among CARBONLITE HOLDINGS, LLC, a Delaware limited liability company (the "Borrower"), CERTAIN SUBSIDIARIES OF BORROWER, as Guarantors, each LENDER designated as a "Lender" on Annex I from time to time party hereto (collectively, the "Lenders" and individually, a "Lender") and ORION ENERGY PARTNERS INVESTMENT AGENT, LLC, as the Administrative Agent and the Collateral Agent.

WHEREAS, the Borrower (i) indirectly owns 99.3% of PinnPack and (ii) directly or indirectly owns 100% of each other Guarantor;

WHEREAS, the Borrower is engaged in the business of recycling plastic into food-grade post-consumer recycled polyethylene terephthalate resins and other activities ancillary to or in support of the foregoing;

WHEREAS, the Borrower has requested that the Lenders (i) extend term loans (a) on the Initial Funding Date in an aggregate amount not in excess of $71,800,000 and (b) on the Second Funding Date, in an aggregate amount not in excess of $8,200,000, which, in each case, will be used in accordance with Section 5.13 and (ii) provide certain other commitments to fund additional projects of the Loan Parties, in each case, on the terms and conditions set forth herein;

WHEREAS, the Borrower has agreed to secure all of its Obligations by granting to Collateral Agent, for the benefit of Secured Parties, a Lien on substantially all of its assets, including a pledge of all of the equity interests of certain of the Guarantors; and

WHEREAS, the Guarantors have agreed to guarantee the obligations of the Borrower hereunder and to secure their respective Obligations by granting to Collateral Agent, for the benefit of Secured Parties, a Lien on substantially all of their respective assets, including a pledge of all of the equity interests of certain of their respective Subsidiaries.

WHEREAS, in consideration for the extensions of credit provided hereunder, the Guarantors have jointly and severally agreed to provide a guarantee pursuant to Article IX hereof for the performance of the Borrower's obligations under this Agreement; and

WHEREAS, the Lenders are willing to provide such financing to the Borrower on the terms and subject to the conditions set forth herein.

NOW, THEREFORE, in consideration of the premises and the agreements, provisions and covenants herein contained, the parties hereto agree as follows:

ARTICLE I

DEFINITIONS

Section 1.01   Certain Defined Terms.  As used in this Agreement, the following terms shall have the following meanings:

"7% Notes" means those certain Subordinated Promissory Notes in an original aggregate principal amount of $4,400,000, issued by CL Industries between November 27, 2012 and May 1,

2013, as disclosed on Schedule 1.01(c) and as in effect on the date hereof and as further amended with the consent of Administrative Agent.

"7% Shareholder Note Subordination Agreement" means that certain Subordination Agreement, dated as of the Initial Funding Date, by and among the Administrative Agent, the Collateral Agent, Ebi Simhaee, as "Subordinated Indebtedness Agent" (as defined therein), the Borrower and CL Industries, which agreement shall be substantially in the form of Exhibit G.

"10% Notes" means those certain Senior Subordinated Promissory Notes in an original aggregate principal amount of $10,000,000, issued by CL Industries in connection with that certain Amended and Restated Note Purchase Agreement dated as of September 26, 2011, as disclosed on Schedule 1.01(c) and as in effect on the date hereof and as further amended with the consent of Administrative Agent.

"10% Shareholder Note Subordination Agreement" means that certain Subordination Agreement, dated as of the Initial Funding Date, by and among the Administrative Agent, the Collateral Agent, CLI Mason, LLC, a Delaware limited liability company, as "Subordinated Indebtedness Agent" (as defined therein), the Borrower and CL Industries, which agreement shall be substantially in the form of Exhibit G.

"ABL Credit Agreement" means that certain Revolving Loan and Security Agreement, dated as of November 13, 2017, among CL Industries, CL Pinnpack, CL PI Holdings, PinnPack, the other loan parties from time to time party thereto and Texas Capital Bank, National Association, as the revolving lender.

"Accrued Interest" means the payment-in-kind of interest in respect of the Loans by increasing the outstanding principal amount of the Loans.

"Additional Agreements" means any contracts or agreements related to the acquisition of and/or the sale to other converters of post-consumer plastic waste ("Post-Consumer Materials") or any derivative products thereof, the recycling and/or conversion of Post-Consumer Materials into food-grade post-consumer recycled polyethylene terephthalate resins ("pcrPET Resins") and other finished products, the acquisition, construction, servicing (including ancillary services), maintenance, repair or operation of recycling facilities and any associated equipment, entered into by any Borrower Group Member and any other Person, or assigned to any Borrower Group Member, subsequent to the Closing Date.

"Additional Equity Raise Amount" means the net cash proceeds received by the Loan Parties in connection with the issuance of additional shares of Capital Stock in the Borrower, less any amounts thereof used to make payments on the Shareholder Notes.

"Administrative Agent" means Orion Energy Partners Investment Agent, LLC, in its capacity as administrative agent for the Lenders hereunder, and any successor thereto pursuant to Article VIII.

"Administrative Questionnaire" means a questionnaire, in a form supplied by the Administrative Agent, completed by a Lender.

2

"<u>Affected Property</u>" means any property of any Loan Party that suffers an Event of Loss.

"<u>Affiliate</u>" means, with respect to a specified Person, another Person that at such time directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.  Each Guarantor and Non-Guarantor Subsidiary shall be considered an "Affiliate" of the Borrower.

"<u>Agent Reimbursement Letter</u>" means the reimbursement letter, dated as of the Closing Date, among Borrower, the Administrative Agent and the Collateral Agent.

"<u>Agents</u>" means, collectively, the Administrative Agent and the Collateral Agent.

"<u>Agreement</u>" means this Credit Agreement, as amended, restated, replaced, supplemented or otherwise modified from time to time.

"<u>Anti-Corruption Laws</u>" means any law of any jurisdiction relating to corruption in which any Loan Party performs business, including without limitation, the FCPA and where applicable, legislation relating to corruption enacted by member states and signatories implementing the OECD Convention Combating Bribery of Foreign Officials.

"<u>Anti-Corruption Prohibited Activity</u>" means the offering, payment, promise to pay, authorization of the payment of any money or the offer, promise to give, giving, or authorizing the giving of anything of value, to any Government Official or to any person under the circumstances where the Person, such Person's Affiliate's or such Person's representative knew or had reason to know that all or a portion of such money or thing of value would be offered, given or promised, directly or indirectly, to any Government Official, for the purpose of (a) influencing any act or decision of such Government Official in his or her official capacity, (b) inducing such Government Official to do or omit to do any act in relation to his or her lawful duty, (c) securing any improper advantage, or (d) inducing such Government Official to influence or affect any act or decision of any Governmental Authority, in each case, in order to assist such Person in obtaining or retaining business for or with, or in directing business to, any person.

"<u>Anti-Money Laundering Laws</u>" means the U.S. Currency and Foreign Transaction Reporting Act of 1970, as amended, and all money laundering-related laws of the United States and other jurisdictions where such Person conducts business or owns assets, and any related or similar law issued, administered or enforced by any Governmental Authority.

"<u>Applicable ECF Percentage</u>" means, with respect of the Net Cash Flow for any quarterly period ending on any Quarterly Payment Date, (a) 100% if the Leverage Ratio as of the last day of the Measurement Period ended on such Quarterly Payment Date is greater than or equal to 4.00:1.00, (b) 75% if the Leverage Ratio as of the last day of the Measurement Period ended on such Quarterly Payment Date is less than 4.00:1.00 but greater than or equal to 3.00:1.00, and (c) 50% if the Leverage Ratio as of the last day of the Measurement Period ended on such Quarterly Payment Date is less than 3.00:1.00, in each case, as determined for such Measurement Period by reference to the applicable Compliance Certificate delivered pursuant to <u>Section 5.10(e)</u>; <u>provided</u> that if no Compliance Certificate is delivered within thirty (30) days after any Quarterly Payment Date, the Applicable ECF Percentage shall be 100%.

"<u>Applicable Law</u>" means with respect to any Person, property or matter, any of the following applicable thereto: any constitution, writ, injunction, statute, law, regulation, ordinance, rule, judgment, principle of common law, order, decree, court decision, Authorization, approval, concession, grant, franchise, license, agreement, directive, guideline, policy, requirement, or other governmental restriction or any similar form of decision of, or determination by, or any interpretation or administration of any of the foregoing, by any Governmental Authority, whether in effect as of the date hereof or thereafter and in each case as amended, including Environmental Laws.

"<u>Approved Fund</u>" means any Person (other than a natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course.

"<u>Assignment and Assumption</u>" means an assignment and assumption entered into by a Lender and an assignee (with the consent of any party whose consent is required by <u>Section 10.04</u>), in the form of <u>Exhibit A</u> or any other form approved by the Administrative Agent.

"<u>Authorization</u>" means any consent, waiver, variance, registration, filing, declaration, agreement, notarization, certificate, license, tariff, approval, permit (including water and environmental permits), orders, authorization, exception or exemption from, by or with any Governmental Authority, whether given by express action or deemed given by failure to act within any specified period, and all corporate, creditors', shareholders' and partners' approvals or consents.

"<u>Authorized Representative</u>" means, with respect to any Person, the chief executive officer, the chief financial officer, president, secretary, assistant secretary or any other officer or authorized representative of such Person as may be designated from time to time by such Person in writing by a notice delivered to the Administrative Agent.  Any document or certificate delivered under the Financing Documents that is signed by an Authorized Representative may be conclusively presumed by the Administrative Agent and Lenders to have been authorized by all necessary corporate, limited liability company or other action on the part of the relevant Person.

"<u>Bail-In Action</u>" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"<u>Bail-In Legislation</u>" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"<u>Bankruptcy</u>" means with respect to any Person (i) commencement by such Person of any case or other proceeding (x) under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization or relief of debtors, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it or its debts, or (y) seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or any substantial part of its assets; or

4

(ii) commencement against such Person of any case or other proceeding of a nature referred to in clause (x) or (y) above which (a) results in the entry of an order for relief or any such adjudication or appointment or (b) remains undismissed, undischarged or unbonded for a period of sixty (60) days; or (iii) commencement against such Person of any case or other proceeding seeking issuance of a warrant of attachment, execution or similar process against all or any substantial part of its assets which results in the entry of an order for any such relief which shall not have been vacated, discharged, or stayed or bonded pending appeal within sixty (60) days from the entry thereof; or (iv) such Person shall take any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in clause (i), (ii) or (iii) above; or (v) such Person shall admit in writing its inability to pay its debts as they become due or shall make a general assignment for the benefit of its creditors.

"Board" means the Board of Governors of the Federal Reserve System of the United States of America.

"Bond Documents" means, individually and collectively, (A)(i) the Indenture of Trust, dated as of June 1, 2019, by and between The Pennsylvania Economic Development Financing Authority, as issuer and UMB Bank, N.A., as trustee and (ii) the Loan Agreement, dated as of June 1, 2019, by and between The Pennsylvania Economic Development Financing Authority and CL P and (B)(i) the Indenture, dated as of October 1, 2016, by and between The Mission Economic Development Corporation, as issuer and UMB Bank, N.A., as trustee and (ii) the Loan Agreement, dated as of October 1, 2016, by and between The Mission Economic Development Corporation and CL Recycling, in each case, as amended, restated, supplemented or otherwise modified.

"Borrower" has the meaning assigned to such term in the introductory paragraph.

"Borrower Account" means the account of the Borrower maintained at the Depositary Bank named "Operating Account" with the account number 1000702405.

"Borrower Group Members" means, collectively, (a) the Borrower, (b) the Guarantors, and (c) the Non-Guarantor Subsidiaries.

"Borrower Operating Agreement" means that certain Fourth Amended and Restated Operating Agreement of Borrower, dated as of December 20, 2018, by the members of the Borrower.

"Borrowing Request" means a request by the Borrower for Loans in accordance with Section 2.01.

"Business" means, collectively, (A) the recycling and/or conversion of PET materials into products for resale directly or through one or more Subsidiaries, including (i) the acquisition of Post-Consumer Materials or any derivative products thereof, (ii) the recycling of Post-Consumer Materials including all aspects of the recycling process, (iii) the sale to other converters of PET or any derivative products thereof, (iv) the conversion of PET into finished products, including but not limited to pcrPET Resins; and  (B) activities reasonably related or incidental thereto or representing a reasonable expansion thereof.

"Business Day" means a day other than a Saturday, Sunday or other day on which commercial banks in New York City, New York are authorized or required by law to close.

"Business Revenues" means, for any period (without duplication), all revenue received by or on behalf of the Loan Parties during such period, interest paid in respect of any Collateral Accounts, proceeds from any business interruption insurance and any other receipts otherwise arising or derived from or paid or payable to the Loan Parties under the Material Agreements or otherwise in respect of the Business (including any extraordinary receipts).

"Capital Expenditures" means with respect to any Person, the aggregate of all expenditures and costs (whether paid in cash or accrued as liabilities and including that portion of payments under Capital Lease Obligations that are capitalized on the balance sheet of such Person) by such Person and its Subsidiaries which are required to be capitalized under GAAP on a balance sheet of such Person.

"Capital Lease Obligations" means, with respect to any Person, the obligations of such Person to pay rent or any other amounts under any lease of (or other arrangements conveying the right to use) real or personal property, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person in accordance with GAAP.

"Capital Stock" means, with respect to any Person, any and all shares, interests, participations and/or rights in or other equivalents (however designated, whether voting or nonvoting, ordinary or preferred) in the equity or capital of such Person, now or hereafter outstanding, and any and all rights, warrants or options exchangeable for or convertible into any of the foregoing.

"Cash Equivalent Investments" means:

(a)     direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the United States of America), in each case maturing within one year from the date of acquisition thereof;

(b)     investments in commercial paper maturing within one year from the date of acquisition thereof and having, at such date of acquisition, the highest credit rating obtainable from S&P or from Moody's;

(c)     investments in certificates of deposit, banker's acceptances and time deposits maturing within one year from the date of acquisition thereof issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, any domestic office of any

6

commercial bank organized under the laws of the United States of America or any State thereof that has a combined capital and surplus and undivided profits of not less than $100,000,000;

(d)        fully collateralized repurchase agreements with a term of not more than thirty (30) days for securities described in clause (a) above and entered into with a financial institution satisfying the criteria described in clause (c) above; and

(e)        money market funds that (x)(i) comply with the criteria set forth in SEC Rule 2a-7 under the Investment Company Act of 1940, (ii) are rated AAA by S&P and Aaa by Moody's and (iii) have portfolio assets of at least $5,000,000,000 or (y) invest exclusively in Investments described in clauses (a) through (d) above.

"Change of Control" means:

(a)        The Equity Shareholders shall cease to own, directly or indirectly, beneficially or of record (1) at least 51% of the aggregate voting interests in the Capital Stock of the Borrower or (2) the right to at least 51% of the profits of the Borrower, or (3) the right to at least 51% of the assets of the Borrower upon its dissolution (excluding the Obligations and any Permitted Indebtedness that is *pari passu* with or prior to the Obligations), in each case, on a fully diluted basis;

(b)        the Equity Shareholders collectively shall otherwise fail to have the right to elect a majority of the Board of Directors of the Borrower;

(c)        prior to the conversion of any Preferred Units into Common Units (as each such term is defined in the Borrower Operating Agreement) in accordance with the Borrower Operating Agreement, the failure of Leon Farahnik (including his spouse, parents, siblings or members of his or her immediate family (including adopted children and step children) and/or direct lineal descendants) or the HPC Member to hold at least 66-2/3% of the Common Class Membership Units (as such term is defined in the Borrower Operating Agreement) in the Borrower;

(d)        the majority of the seats (other than vacant seats) on the Board of Directors of Borrower shall cease to be occupied by (i) the directors of Borrower on the Closing Date and (ii) other directors of Borrower whose nomination for election to the Board of Directors of Borrower is recommended by at least 66-2/3% of the votes of directors then qualifying under clause (i) or this clause (ii), or such other director receives the vote of the Equity Shareholders in his or her election by the shareholders of Borrower;

(e)        the Borrower shall fail to directly or indirectly own at least 100% on a fully diluted basis of the aggregate voting and economic interests in the Capital Stock of each of the Guarantors (other than PinnPack);

(f)        the Borrower shall fail to directly or indirectly own at least 99.3% on a fully diluted basis of the aggregate voting and economic interests in the Capital Stock of PinnPack; or

(g)        the Borrower shall fail to directly or indirectly own at least 100% on a fully diluted basis of the aggregate voting and economic interests in the Capital Stock of the Non-Guarantor Subsidiaries.

"<u>CL Industries</u>" means CarbonLite Industries LLC, a Delaware limited liability company.

"<u>CL Intermediate Holdco</u>" means CarbonLite Sub-Holdings, LLC, a Delaware limited liability company.

"<u>CL P</u>" means CarbonLite P LLC, a Delaware limited liability company.

"<u>CL P Holdings</u>" means CarbonLite P Holdings LLC, a Delaware limited liability company.

"<u>CL PI Holdings</u>" means CarbonLITE PI Holdings, LLC, a Delaware limited liability company.

"<u>CL Pinnpack</u>" means CarbonLite Pinnpack, LLC, a Delaware limited liability company.

"<u>CL Recycling</u>" means CarbonLite Recycling LLC, a Delaware limited liability company.

"<u>CL Recycling Holdings</u>" means CarbonLite Recycling Holdings LLC, a Delaware limited liability company.

"<u>Closing Date</u>" means the date on which all conditions precedent specified in <u>Section 4.01</u> are satisfied (or waived by the Administrative Agent and the Lenders in their sole and absolute discretion in accordance with <u>Section 10.02</u>).

"<u>Code</u>" means the Internal Revenue Code of 1986, as amended from time to time (unless as indicated otherwise), the regulations thereunder and publicly available interpretations thereof.

"<u>Collateral</u>" means all Property of the Loan Parties (including all Capital Stock of the Subsidiaries of the Borrower) now owned or hereafter acquired, which is intended to be subject to the security interests or Liens granted pursuant to any of the Security Documents.

"<u>Collateral Accounts</u>" means (a) the Borrower Account, (b) the Rejected Proceeds Account, (c) the Debt Service Reserve Account and (d) any other any securities account, deposit account or commodities account established by a Loan Party with the prior written consent of the Collateral Agent, such consent not to be unreasonably withheld, delayed or conditioned, and, in each case, subject to a Control Agreement, other than any Excluded Account.

"<u>Collateral Agent</u>" means Orion Energy Partners Investment Agent, LLC, in its capacity as collateral agent for the Secured Parties under the Security Documents, and any successor thereto pursuant <u>Article VIII</u>.

"<u>Commitment</u>" means, with respect to each Lender, the commitment of such Lender to make Loans to the Borrower pursuant to <u>Section 2.01(a)</u>, in an aggregate principal amount not to exceed the amount set forth opposite such Lender's name on <u>Annex I</u> under the heading "Commitment", as such <u>Annex I</u> may be modified by the Administrative Agent in its sole discretion and noticed to Borrower, but in compliance with assignment provisions in <u>Section 10.04</u>. As of the date hereof, the aggregate Commitments of all Lenders is equal to the sum of the Initial Funding Commitment and the Second Funding Commitment.

8

"Compliance Certificate" has the meaning assigned to such term in Section 5.10(e).

"Condemnation" means any taking, seizure, confiscation, requisition, exercise of rights of eminent domain, public improvement, inverse condemnation, condemnation, expropriation, nationalization or similar action of or proceeding by any Governmental Authority affecting the Business.

"Consolidated CFADS" means, with respect to the Loan Parties for any period, the Consolidated Net Income of the Loan Parties for such period,

(a) increased by the sum of the following, without duplication, to the extent deducted in determining Consolidated Net Income, in each case, for such period: (i) income tax expense, operating leases for equipment, tangible personal property and motor vehicles; (ii) interest expense; (iii) amortization, depreciation, unrealized losses with respect to Hedging Agreements and other non-cash charges (including, if applicable, non-cash compensation expense), (iv) after-tax losses attributable to any Dispositions and (v) to the extent not already included in the Consolidated Net Income of the Loan Parties for such period, any distributions or payments from the Non-Guarantor Subsidiaries; and

(b) decreased by the sum of the following, without duplication and solely to the extent not deducted when calculating Consolidated Net Income, in each case, for such period: (i) after tax gains attributable to any Dispositions to the extent included in the calculation of Consolidated Net Income, (ii) non-cash gains (including unrealized gains with respect to Hedging Agreements) and non-cash revenues increasing Consolidated Net Income, in each case of clauses (i) and (ii), determined on a consolidated and accrual basis in accordance with GAAP, (iii) any prepayment credits and/or deferred revenues from PET offtake of the Borrower Group Members for such period and (iv) Investments made during such period by the Guarantors in the Non-Guarantor Subsidiaries (which for the avoidance of doubt shall not include any Investments made prior to the Closing Date); and

(c) solely for purposes of any calculation of the Leverage Ratio, decreased by the sum of the following, without duplication and solely to the extent not deducted when calculating Consolidated Net Income, in each case, for such period: (i) Capital Expenditures of the Loan Parties, and (ii) any Permitted Tax Distribution.

For purposes of clarification only, except for any cash distribution or payment from any Non-Guarantor Subsidiary to a Loan Party, any calculation of Consolidated CFADS shall exclude all of the foregoing of any Non-Guarantor Subsidiary.

"Consolidated Net Income" means, with respect to any Person for any period, the net income (or loss) of such Person and its Subsidiaries (other than Non-Guarantor Subsidiaries) determined on a consolidated and accrual basis in accordance with GAAP.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.  "Controlling" and "Controlled" have meanings correlative thereto.

9

"Control Agreement" means a springing account control agreement in respect of one or more deposit accounts or securities accounts of the Loan Parties, in form and substance reasonably satisfactory to the Collateral Agent and the Administrative Agent, executed by the financial institution at which an account is maintained, pursuant to which such financial institution agrees that such financial institution will comply with instructions or entitlement orders originated by the Collateral Agent as to disposition of funds in such account, without further consent by any other Person.

"Copyrights" means all works of authorship, United States and foreign copyrights (whether or not the underlying works of authorship have been published), designs, whether registered or unregistered, registrations and applications for registration of the foregoing and all extensions, renewals, and restorations thereof.

"Debt Prepayment Offer" has the meaning assigned to such term in Section 2.05(b)(iv).

"Debt Service Reserve Account" means an account in the name of Borrower and established with the Depositary Bank is designated by Borrower to be the "Debt Service Reserve Account."

"Default" means any event, condition or circumstance that, with notice or lapse of time or both, would (unless cured or waived) become an Event of Default.

"Depositary Bank" means Pacific Western Bank, a California state-charted bank, and any successor thereto selected by the applicable Loan Party and reasonably acceptable to the Administrative Agent.

"Discharge Date" has the meaning assigned to such term in the Security Agreement.

"Disposition" means any sale, transfer or other disposition of any assets or property by any Loan Party, other than any Event of Loss.

"Disposition Proceeds Prepayment Offer" has the meaning assigned to such term in Section 2.05(b)(iii).

"Dollars" or "$" refers to the lawful currency of the United States of America.

"DSRA CFADS" means the Consolidated CFADS relating to the PinnPack Facility and the Riverside Facility in the aggregate, decreased for Capital Expenditures paid with cash on hand (as opposed to capitalized leases), and adjusted for any net changes in working capital (for the avoidance of doubt, which (i) includes the negative cash flow / positive cash flow associated with the increase / decrease of inventory, respectively and (ii) excludes any Investments made by the Loan Parties); provided that such calculation shall exclude any distributions made from the Non-Guarantor Subsidiaries.

"DSR Released Funds" has the meaning assigned to such term in Section 5.18(c)(ii)(C)(I).

"ECF Amount" has the meaning assigned to such term in Section 2.05(b)(v).

10

"ECF Prepayment Offer" has the meaning assigned to such term in Section 2.05(b)(v).

"ECF Reinvestment Request" means any written request by the Borrower to reinvest the ECF Amount in respect of the quarterly period specified in such request and in accordance with a proposed reinvestment plan, which has demonstrated to the reasonable satisfaction of the Administrative Agent that such proposed reinvestment plan would be accretive to each Lender's credit profile (provided that any reinvestment shall be deemed accretive if it has a three year or less cash on cash payback on the capital investment contemplated, as demonstrated by the Borrower to the reasonable satisfaction of the Administrative Agent).

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clause (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Environmental Claim" means any administrative or judicial action, suit, proceeding, notice, claim or demand by any Person seeking to enforce any obligation or responsibility arising under or relating to Environmental Law or alleging or asserting liability for investigatory costs, cleanup or other remedial costs, legal costs, environmental consulting costs, governmental response costs, damages to natural resources or other property, personal injuries, fines or penalties related to (a) the presence, or Release into the environment, of any Hazardous Material at any location, whether or not owned by the Person against whom such claim is made, or (b) any noncompliance with, or alleged noncompliance with, or liability arising under any Environmental Law. The term "Environmental Claim" shall include, without limitation any claim by any Person for damages, contribution, indemnification, cost recovery, compensation or injunctive relief or costs associated with any remediation plan, in each case, under any Environmental Law.

"Environmental Laws" means any Applicable Laws regulating or imposing liability or standards of conduct concerning or relating to pollution or the protection of human health, safety the environment, natural resources or special status species and their habitat, including all Applicable Laws concerning the presence, use, manufacture, generation, transportation, Release, threatened Release, disposal, arrangement for disposal, dumping, discharge, treatment, storage, handling, control or cleanup of Hazardous Materials.

"Equity Shareholders" means the equity owners of the Borrower set forth on Schedule 3.01(b) as of the Closing Date.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

US-DOCS\109334811.27

"ERISA Affiliate" means any trade or business (whether or not incorporated) that, together with the Borrower, is treated as a single employer under Sections 414(b), (c), (m) or (o) of the US Code.

"ERISA Event" means (a) a Reportable Event with respect to any Pension Plan, (b) the failure by any Pension Plan to satisfy the minimum funding standard (within the meaning of Section 412 of the US Code or Section 302 of ERISA) applicable to such plan, whether or not waived, (c) the filing of a notice of intent to terminate a Pension Plan in a distress termination (as described in Section 4041(c) of ERISA), (d) a complete or partial withdrawal by the Borrower or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization or insolvent (within the meaning of Title IV of ERISA), (e) the imposition or incurrence of any liability under Title IV of ERISA, other than PBGC premiums due but not delinquent under Section 4007 of ERISA, upon the Borrower or any ERISA Affiliate, (f) the institution by the PBGC of proceedings to terminate a Pension Plan or Multiemployer Plan, (g) the appointment of a trustee to administer any Pension Plan under Section 4042 of ERISA, or (h) the imposition of a Lien upon the Borrower pursuant to Section 430(k) of the US Code or Section 303(k) of ERISA.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Event of Default" has the meaning assigned to such term in Section 7.01.

"Event of Loss" means any loss of, destruction of or damage to, or any Condemnation or other taking of any property of any Borrower Group Member.

"Event of Loss Prepayment Offer" has the meaning assigned to such term in Section 2.05(b)(ii).

"Excess Cash Flow Payment Date" means, in the case of a payment required to be made pursuant to Section 2.05(b)(v) with respect to the Net Cash Flow of any quarterly period ending on a Quarterly Payment Date (commencing with the quarterly period ending December 31, 2019), the first date on which financial statements for the Measurement Period ending on such Quarterly Payment Date have been delivered pursuant to Section 5.10(b) and the related Compliance Certificate has been delivered pursuant to Section 5.10(e), or, if earlier, the date that is forty-five (45) days after the end of such Quarterly Payment Date (or, if such date is not a Business Day, the immediately preceding Business Day).

"Excluded Account" means (a) any deposit account that is used solely as a payroll account for the employees of Borrower or its Subsidiaries or the funds in which consist solely of funds held by the owner of such deposit account in trust for any director, officer or employee of any Loan Party or any employee benefit plan maintained by any Loan Party or funds representing deferred compensation for the directors and employees of any Loan Party, (b) escrow accounts, deposit accounts and trust accounts, in each case holding assets that are pledged or otherwise encumbered pursuant to Permitted Liens, (c) accounts containing no (zero) balance at any time, and accounts that by their terms are swept to a zero balance on a daily basis to a deposit account that is subject to a control agreement in favor of Collateral Agent, (d) accounts described in Section

6.03(k)(ii), and (e) other deposit accounts, securities accounts and commodities accounts, except to the extent the value of all such accounts in this clause (e) shall exceed at any time $250,000 in the aggregate shall not be "Excluded Accounts"; provided that the aggregate daily maximum balance for all accounts described in clauses (a) through (d) on any day shall not exceed $500,000.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to any Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of any Loan Party hereunder, (a) Taxes imposed on or measured by net income and franchise Taxes (imposed in lieu of net income tax), in each case, (i) imposed by the jurisdiction under the laws of which such recipient is organized, in which its principal office (or other fixed place of business) is located or, in which its applicable lending office is located, in each case, as a result of such recipient's connection to the jurisdiction imposing such Taxes or (ii) that are Other Connection Taxes, (b) any branch profits Taxes imposed by the jurisdictions listed in clause (a) of this definition, (c) any Taxes attributable to the failure of the applicable Agent, Lender or any such other applicable recipient to comply with Section 2.09(e), (d) in the case of an Agent or a Lender (other than an assignee pursuant to a request by Borrower under Section 2.11), any United States federal withholding Tax that is imposed on amounts payable to such Agent or Lender under the laws effective at the time such Agent or Lender becomes a party hereto (or designates a new lending office), except to the extent that such Agent or Lender (or its assignor, if any) was entitled, at the time of designation of a new lending office (or assignment), to receive additional amounts from a Loan Party with respect to such withholding Tax pursuant to Section 2.09(a), and (e) any United States federal withholding Taxes imposed under FATCA.

"Facilities" means, individually and collectively, the Pennsylvania Facility, the PinnPack Facility, the Riverside Facility and the Texas Facility.

"FATCA" means Sections 1471 through 1474 of the US Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with) and any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Code.

"FCPA" means the United States Foreign Corrupt Practices Act of 1977, as amended.

"Federal Funds Effective Rate" means, for any day, the weighted average (rounded upwards, if necessary, to the next 1/100 of 1%) of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average (rounded upwards, if necessary, to the next 1/100 of 1%) of the quotations for such day for such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it.

"Financing Documents" means (a) this Agreement, (b) each Note (if requested by a Lender), (c) the Loan Discount Letter, (d) the Agent Reimbursement Letter, (e) the Security Documents, (f) the Subordination Agreements and (g) each certificate, agreement, instrument,

waiver, consent or document executed by a Loan Party and delivered to Agent or any Lender in connection with or pursuant to any of the foregoing and designated as a "Financing Document".

"Foreign Plan" means any employee pension benefit plan, program, policy, arrangement or agreement maintained or contributed to by any Loan Party or with respect to which any Loan Party could reasonably be expected to have any liability, in each case with respect to employees employed outside the United States (as such term is defined in Section 3(10) of ERISA) (other than any arrangement with the applicable Governmental Authority).

"Funding Date" has the meaning assigned to such term in Section 2.01(c).

"Funding Office" means the office specified from time to time by the Administrative Agent as its funding office by notice to Borrower and the Lenders.

"GAAP" means generally accepted accounting principles in effect from time to time in the United States of America, applied on a consistent basis.

"Governmental Authority" means any federal, regional, state or local government, or political subdivision thereof or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government and having jurisdiction over the Person or matters in question, including all agencies and instrumentalities of such governments and political subdivisions.

"Government Official" means any official of any Governmental Authority, including, without limitation, all officers or employees of a government department, agency, instrumentality or permitting agency.

"Guarantee" means as to any Person (the "*guaranteeing person*"), any obligation of (a) the guaranteeing person or (b) another Person (including any bank under any letter of credit), if to induce the creation of such obligation of such other Person, the guaranteeing person has issued a reimbursement, counterindemnity or similar obligation, in either case guaranteeing or in effect guaranteeing any Indebtedness, leases, dividends or other obligations (the "*primary obligations*") of any other third Person (the "*primary obligor*") in any manner, whether directly or indirectly, including any obligation of the guaranteeing person, whether or not contingent, (w) to purchase any such primary obligation or any Property constituting direct or indirect security therefor, (x) to advance or supply funds (i) for the purchase or payment of any such primary obligation or (ii) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (y) to purchase Property, securities or services, in each case, primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (z) otherwise to assure or hold harmless the owner of any such primary obligation against loss in respect thereof; provided that the term Guarantee shall not include endorsements of instruments for deposit or collection in the ordinary course of business. The amount of any Guarantee of any guaranteeing person shall be deemed to be the lower of (A) an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee is made and (B) the maximum amount for which such guaranteeing person may be liable pursuant to the terms of the instrument embodying such Guarantee, unless such primary obligation and the maximum amount for which such

14

guaranteeing person may be liable are not stated or determinable, in which case the amount of such Guarantee shall be such guaranteeing person's maximum reasonably anticipated liability in respect thereof as determined by Borrower in good faith.

"Guaranteed Obligations" means, with respect to any Guarantor, the Obligations whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest, reimbursements and fees that accrue after the commencement by or against any Loan Party or any Affiliate thereof of any proceeding under any debtor relief law naming such Person as the debtor in such proceeding, regardless of whether such interest, reimbursements and fees are allowed claims in such proceeding.

"Guarantors" means each Subsidiary of the Borrower (including, for the avoidance of doubt, CL Intermediate Holdco), other than the Non-Guarantor Subsidiaries.

"Hazardous Material" means any hazardous, toxic or dangerous substances, materials and wastes, including, without limitation, hydrocarbons (including naturally occurring or man-made petroleum and hydrocarbons), flammable explosives, asbestos, urea formaldehyde insulation, radioactive materials, biological substances, polychlorinated biphenyls, pesticides, herbicides and any other kind and/or type of pollutants or contaminants (including, without limitation, materials which include hazardous constituents), sewage, sludge, industrial slag, solvents and/or any other similar substances, materials, or wastes and including any other substances, materials or wastes that are or become regulated under any Environmental Laws (including, without limitation, any that are or become classified as hazardous or toxic under any Environmental Laws).

"Hedging Agreement" means any agreement with respect to any swap, cap, collar, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions.

"HPC Member" means HPC Industries LLC, a Delaware limited liability company.

"Incremental Availability Period" means the period commencing on the Initial Funding Date and ending on the earlier of (a) the 18-month anniversary of the Closing Date and (b) the date on which all Incremental Loans are made to the Borrower.

"Incremental Loans" has the meaning assigned to such term in Section 2.13(a).

"Incremental Request" means any request by the Borrower for Incremental Loans pursuant to Section 2.13(a).

"Indebtedness" of any Person means, without duplication, all (a) indebtedness for borrowed money and every reimbursement obligation with respect to letters of credit, bankers' acceptances or similar facilities, (b) obligations evidenced by bonds, debentures, notes or other similar instruments, (c) obligations to pay the deferred purchase price of property or services, except accounts payable and accrued expenses arising in the ordinary course of business and payable within ninety (90) days after the due date therefor as specified in, or determined from, the

15

applicable contract or purchase order, (d) the Net Hedging Obligations under interest rate or currency Hedging Agreements and all other agreements or arrangements designed to protect against fluctuations in interest rates, commodity prices and currency exchange rates, (e) the capitalized amount (determined in accordance with GAAP) of all payments due or to become due under all leases and agreements to enter into leases required to be classified and accounted for as a capital lease in accordance with GAAP, (f) reimbursement obligations (contingent or otherwise) pursuant to any performance bonds or collateral security, (g) Indebtedness of others described in clauses (a) through (f) above secured by (or for which the holder thereof has an existing right, contingent or otherwise, to be secured by) a Lien on the property of such Person, whether or not the respective Indebtedness so secured has been assumed by such Person and (h) Guarantees by such Person of Indebtedness of others described in clauses (a) through (g) above. The Indebtedness of any Person shall include the Indebtedness of any partnership in which such Person is a general partner to the extent such Person is liable therefor as a result of such Person's general partner interest in such partnership, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor.

"Indemnified Party" has the meaning assigned to such term in Section 10.03(b).

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Loan Parties under any Financing Document and (b) to the extent not otherwise described in (a), Other Taxes.

"Independent Auditor" means (i) RSM US LLP, (ii) any "big four" accounting firm selected by the Borrower and notified to the Administrative Agent or (iii) any other firm of independent public accountants of recognized national standing in the United States selected by the Borrower and reasonably acceptable to the Administrative Agent.

"Initial Funding Commitments" means, with respect to each Lender, the commitment of such Lender to make Loans to the Borrower pursuant to Section 2.01(a), in an aggregate principal amount not to exceed the amount set forth opposite such Lender's name on Annex I under the heading "Initial Funding Commitments".

"Initial Funding Date" means the Funding Date following the Closing Date on which all conditions precedent specified in Section 4.02 and 4.03 are satisfied (or waived by the Administrative Agent and the Lenders in their sole and absolute discretion in accordance with Section 10.02), or such other date as may be requested by Borrower and approved by the Administrative Agent in its sole and absolute discretion.

"Intellectual Property" means (a) the collective reference to all rights, priorities and privileges relating to intellectual property, whether arising under United States, multinational or foreign laws or otherwise, including, without limitation, all Copyrights, Patents, Trademarks and trade secrets, (b) all rights to sue or otherwise recover for any past, present and future infringement, dilution, misappropriation, or other violation or impairment thereof, (c) all proceeds of any of the foregoing, including without limitation license fees, royalties, income payments, claims, damages and proceeds of suit, now or hereafter due and/or payable with respect thereto, (d) all written agreements, licenses and covenants providing for the grant to or from any Person any rights in any such intellectual property that is owned by another Person.

16

"Interest Rate" means 14.85% per annum.

"Interest Payment Deficiency" has the meaning assigned to such term in Section 5.18(c)(ii)(B).

"Investment" means for any Person (a) the acquisition (whether for cash, Property of such Person, services or securities or otherwise) of Capital Stock, bonds, notes, debentures, debt securities, partnership or other ownership interests or other securities of, or any Property constituting an ongoing business, line of business, division or business unit of or constituting all or substantially all the assets of, or the making of any capital contribution to, any other Person, (b) the making of any advance, loan or other extension of credit to, any other Person (including the purchase of Property from another Person subject to an understanding or agreement, contingent or otherwise, to resell such Property to such Person, but excluding any such advance, loan or extension of credit having a term not exceeding ninety (90) days representing the purchase price of inventory or supplies sold in the ordinary course of business), (c) the entering into of any Guarantee with respect to Indebtedness or other liability of any other Person, and (d) any other investment that would be classified as such on a balance sheet of such Person in accordance with GAAP.  For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment but giving effect to any returns or distributions of capital or repayment of principal actually received in case by such Person with respect thereto.

"Investment Committee" means, as of any date, the committee of Orion Energy Partners, L.P., the members of which have a right or duty to vote on whether the general partner of the Lenders shall cause the Lenders to make an investment in the form of a loan.

"Lender Warrant" means the warrant to be granted by Borrower to the Orion Energy Equity Holders in connection herewith on the Initial Funding Date, substantially in the form of Exhibit K.

"Lenders" has the meaning assigned to such term in the preamble.

"Leverage Ratio" means, as of any date of determination, the ratio of (a) Net Debt of the Loan Parties as of such date divided by (b) the Consolidated CFADS of the Loan Parties for the most recently completed Measurement Period.

"Lien" means any mortgage, charge, pledge, lien (statutory or other), privilege, security interest, hypothecation, collateral assignment or preference, priority or other security agreement, mandatory deposit arrangement, preferential arrangement or other encumbrance upon or with respect to any property of any kind, real or personal, movable or immovable, now owned or hereafter acquired (including, without limitation, any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing).

"Life Insurance Policy" has the meaning assigned to such term in Section 5.21(d).

"Loan Discount Letter" means that certain loan discount letter, dated as of the Closing Date, among the Borrower and the Lenders.

17

"<u>Loan Parties</u>" means, collectively, the Borrower and the Guarantors.

"<u>Loans</u>" means the term loans made by the Lenders to the Borrower pursuant to <u>Section 2.01(a)</u> and, if applicable, <u>Section 2.13</u>.

"<u>Loss Proceeds</u>" means (i) insurance proceeds, condemnation awards or other similar compensation, awards, damages and payments or relief (exclusive, in each case, of proceeds of business interruption, workers' compensation, employee theft or embezzlement, employment practices, environmental or product liability, automobile liability, builders' all risk liability, directors and officers insurance and general liability insurance) with respect to any Event of Loss and (ii) any insurance proceeds with respect to the Life Insurance Policy.

"<u>Material Additional Agreements</u>" means each Additional Agreement (or series of related Additional Agreements) entered into by, or assigned to any Borrower Group Member subsequent to the Closing Date that (i) provides for the payment by any Borrower Group Member, or the provision to any Borrower Group Member, of goods, inventory or services equal to or in excess of $5,000,000 in the aggregate thereunder, (ii) provides revenue or income to any Borrower Group Member equal to or in excess of $10,000,000 in the aggregate thereunder or (iii) provides for a deposit or prepayment of revenue equal to or in excess of $5,000,000 in the aggregate thereunder.

"<u>Material Adverse Effect</u>" means a material adverse effect on: (a) the business, assets, properties, operations or financial condition of the Borrower Group Members, taken as a whole; (b) the ability of any Loan Party to perform its material obligations under the Financing Documents; (c) the validity of, enforceability of the material rights or remedies of, or benefits available to the Secured Parties under, the Financing Documents or (d) the validity and perfection of the Secured Parties' Liens in a material portion of the Collateral.

"<u>Material Agreements</u>" means, individually and collectively, (1)(a) Material Agreements Riverside, (b) Material Agreements PinnPack, (c) Material Agreements Texas, (d) Material Agreements Pennsylvania, (2) any Material Additional Agreement and (3) any Additional Agreement entered into by a Loan Party in replacement of any of the foregoing.

"<u>Material Agreements Pennsylvania</u>" means those agreements listed under the header "Material Agreements Pennsylvania" in <u>Schedule 3.09</u>.

"<u>Material Agreements PinnPack</u>" means those agreements listed under the header "Material Agreements PinnPack" in <u>Schedule 3.09</u>.

"<u>Material Agreements Prepayment Offer</u>" has the meaning assigned to such term in <u>Section 2.05(b)(i)</u>.

"<u>Material Agreements Riverside</u>" means those agreements listed under the header "Material Agreements Riverside" in <u>Schedule 3.09</u>.

"<u>Material Agreements Texas</u>" means those agreements listed under the header "Material Agreements Texas" in <u>Schedule 3.09</u>.

US-DOCS\109334811.27

"Material Counterparty" means each Person (other than any Agent, Lender, or Borrower Group Member) from time to time party to any Material Agreement.

"Maturity Date" means the sixth (6th) anniversary of the Initial Funding Date.

"Measurement Period" means each period of four consecutive fiscal quarters of the Borrower.

"Multiemployer Plan" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA that is subject to Title IV of ERISA to which any Loan Party contributes or is obligated to contribute, or with respect to which any Loan Party has or could reasonably be expected to have any liability.

"Net Available Amount" means:

(a)      in the case of any receipt of termination payments, liquidated damages, indemnity payments or other extraordinary payments under the Material Agreements or any real property lease for the Facilities, the aggregate amount of payments received by the Loan Parties (including, as a distribution from a Non-Guarantor Subsidiary) or any of their respective Affiliates in respect of such event, net of (i) reasonable costs and expenses incurred by the Borrower Group Members or any of their respective Affiliates in connection with the collection of such proceeds and (ii) in the case of the Non-Guarantor Subsidiaries, mandatory redemption payments to be made under the Bond Documents;

(b)      in the case of any Event of Loss, the aggregate amount of Loss Proceeds received by the Borrower Group Members or any of their respective Affiliates in respect of such Event of Loss, net of (i) reasonable costs and expenses incurred by the Loan Parties (including, as a distribution from a Non-Guarantor Subsidiary) in connection with the collection of such Loss Proceeds and (ii) in the case of the Non-Guarantor Subsidiaries, mandatory redemption payments to be made under the Bond Documents; and

(c)      in the case of any Disposition, the aggregate amount received by the Loan Parties (including, as a distribution from a Non-Guarantor Subsidiary) or any of their respective Affiliates in respect of such Disposition, net of (i) reasonable costs and expenses incurred by the Borrower Group Members in connection with such Disposition and (ii) in the case of the Non-Guarantor Subsidiaries, mandatory redemption payments to be made under the Bond Documents.

"Net Cash Flow" means, for any period, the Consolidated CFADS of the Loan Parties for such period,

(a) increased (without duplication) by proceeds in respect of Events of Loss (including Loss Proceeds) and Dispositions (but in each case without duplication of amounts used to prepay, or that are exempt from prepayment, under Section 2.05(b)(ii) or (iii)), termination payments and other extraordinary payments under project contracts, including the Material Agreements (but in each case without duplication of amounts used to prepay, or that are exempt from prepayment, under Section 2.05(b)(i)), damages and other proceeds received by the Loan Parties not in the ordinary course of business during such period (calculated on a cash basis); and

(b) decreased (without duplication) by (i) Permitted Tax Distributions made by the Loan Parties during such period (if any), and (ii) interest and principal payments on the Loans, and any payments on or servicing of Permitted Indebtedness by any Loan Party permitted to be made hereunder (other than Indebtedness solely among the Loan Parties), during such period to the extent not already reflected in the calculation of Consolidated CFADS (but, in each case, excluding interest paid or to be paid in kind) (calculated on an accrual basis); and

(c) with respect to the first quarter of any fiscal year, as increased or decreased (as applicable and without duplication), on a dollar for dollar basis, for any changes to the calculation of Net Cash Flow for the immediately preceding fiscal quarter as a result of year-end adjustments in connection with the preparation and delivery of the audited consolidated financial statements of the Loan Parties for the immediately preceding fiscal year.

"Net Debt" means, on any date of determination, the outstanding principal amount of the Loans (including, for the avoidance of doubt, Accrued Interest that has been added to principal) plus the principal amount of all other outstanding Indebtedness of the Loan Parties for borrowed money (including, for the avoidance of doubt, any Permitted Revolving Facility), unreimbursed letter of credit obligations, purchase money debt, capital lease obligations and Guarantees of the foregoing minus any cash of the Loan Parties that is on deposit in the Collateral Accounts.

"Net Hedging Obligations" means, as of any date, the Termination Value of any Hedging Agreement on such date.

"Non-Guarantor Subsidiaries" means, collectively, (i) the Pennsylvania Facility Group, (ii) the Texas Facility Group, and (iii) any other Person approved in writing by Administrative Agent as a Non-Guarantor Subsidiary (not to be unreasonably withheld in the case of Subsidiaries to be subject to Indebtedness permitted in reliance on Section 6.02(m)).

"Note" has the meaning assigned to such term in Section 2.04(b)(ii).

"Obligations" means all advances to, and debts (including Accrued Interest, interest accruing after the maturity of the Loans and interest accruing after the filing of any Bankruptcy, but excluding obligations in respect of the Lender Warrants), liabilities, obligations, Prepayment Premium, covenants and duties of, any Loan Party arising under any Financing Document, or otherwise with respect to any Loan, in each case whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest, reimbursements and fees that accrue after the commencement by or against the Borrower or any of its Subsidiaries of any proceeding under any debtor relief law naming such Person as the debtor in such proceeding, regardless of whether such interest, reimbursements and fees are allowed claims in such proceeding.

"Observer Rights Agreement" has the meaning assigned to such term in Section 4.02(a).

"Officer's Certificate" means, with respect to any Loan Party, a certificate signed by an Authorized Representative of such Loan Party.

"Operating Budget" means an annual operating plan and budget of (i) the Loan Parties and the PinnPack Facility and the Riverside Facility, taken as a whole, (ii) the calendar year after distributions are permitted under the Bond Documents in respect of the Texas Facility (which is expected to be 2021), the Texas Facility Group and the Texas Facility and (iii) the calendar year after distributions are permitted under the Bond Documents in respect of the Pennsylvania Facility (which is expected to be 2023), the Pennsylvania Facility Group and the Pennsylvania Facility, in each case, prepared by the Borrower in accordance with Section 5.20(a) and approved by Lenders in accordance with Section 5.20(b), as may be modified from time to time in accordance with Section 5.20, of anticipated Operating Expenses and Capital Expenditures limited to direct wages, other manufacturing overhead, general and administrative expense, maintenance capital expense and growth capital expense, in each case, detailed monthly for the following calendar year, which annual operating plan and budget shall be substantially in the form of Exhibit E.

"Operating Expenses" means any and all of the expenses paid or payable by or on behalf of any Loan Party in relation to the operation and maintenance (except as set forth below) of the Business, including consumables, payments under any operating lease, taxes (including franchise taxes, property taxes, sales taxes and excluding income taxes), insurance (including the costs of premiums and deductibles and brokers' expenses), costs and fees attendant to obtaining and maintaining in effect the Authorizations relating to the Business payable during such period, payments made to security, police services, and legal, accounting and other professional fees attendant to any of the foregoing items payable during such period, but exclusive of Capital Expenditures and payments in respect of payments of principal and interest in respect of the Obligations or any other Indebtedness.  Operating Expenses do not include non-cash charges, including, without limitation, depreciation, amortization, income taxes, non-cash taxes or other bookkeeping entries of a similar nature.

"Organizational Documents" means, with respect to any Person, (i) in the case of any corporation, the certificate of incorporation and by-laws (or similar documents) of such Person, (ii) in the case of any limited liability company, the certificate of formation and operating agreement (or similar documents) of such Person, (iii) in the case of any limited partnership, the certificate of formation and limited partnership agreement (or similar documents) of such Person, (iv) in the case of any general partnership, the partnership agreement (or similar document) of such Person and (v) in any other case, the functional equivalent of the foregoing.

"Orion Energy Equity Holders" means each of the Lenders (or their designees) listed on Annex II.

"Other Connection Taxes" means, with respect to any Agent or any Lender, Taxes imposed as a result of a present or former connection between such Agent or Lender and the jurisdiction imposing such Tax (other than connections arising from such Agent or Lender having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Financing Document, or sold or assigned an interest in any Loan or Financing Document).

"Other Taxes" means any and all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes arising from any payment made under any Financing Document or from the execution, delivery, performance, registration or enforcement of, from the receipt or

21

perfection of a security interest under or otherwise with respect to, any Financing Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to <u>Section 2.11</u>).  For the avoidance of doubt, "Other Taxes" shall not include any Excluded Taxes.

"<u>Participant</u>" has the meaning assigned to such term in <u>Section 10.04(f)</u>.

"<u>Participant Register</u>" has the meaning assigned to such term in <u>Section 10.04(f)</u>.

"<u>Patents</u>" means all patentable inventions and designs, United States, foreign, and multinational patents, certificates of invention, and similar industrial property rights, and applications for any of the foregoing, including, without limitation, all reissues, substitutes, divisions, continuations, continuations-in-part, extensions, renewals, and reexaminations thereof.

"<u>PBGC</u>" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

"<u>Pennsylvania Facility</u>" means the pcrPET processing facility under construction in Reading, Pennsylvania, to be owned and operated by CL P.

"<u>Pennsylvania Facility Group</u>" means CL P and CL P Holdings.

"<u>Pennsylvania Intercompany Indebtedness</u>" means any intercompany Indebtedness between the Borrower, as borrower and CL P, a Lender.

"<u>Pension Plan</u>" means any employee pension benefit plan as defined in Section 3(2) of ERISA (other than a Multiemployer Plan) that is subject to the provisions of Title IV or Section 302 of ERISA, or Section 412 of the US Code, and in respect of which any Loan Party is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA or with respect to which any Loan Party has or could reasonably be expected to have any liability.

"<u>Permitted Contest Conditions</u>" means, with respect to any Loan Party, a contest, pursued in good faith, challenging the enforceability, validity, interpretation, amount or application of any law, tax or other matter (legal, contractual or other) by appropriate proceedings timely instituted if (a) such Loan Party diligently pursues such contest, (b) such Loan Party establishes adequate reserves with respect to the contested claim if and to the extent required by GAAP and (c) such contest (i) could not reasonably be expected to result in a Material Adverse Effect and (ii) does not involve any material risk or danger of any criminal or unindemnified civil liability being incurred by the Administrative Agent or the Lenders.

"<u>Permitted Indebtedness</u>" has the meaning assigned to such term in <u>Section 6.02</u>.

"<u>Permitted Lien</u>" has the meaning assigned to such term in <u>Section 6.03</u>.

"<u>Permitted Revolving Facility</u>" means one or more secured or unsecured revolving credit facilities satisfying the following conditions: (i) such Indebtedness is incurred to finance the working capital requirements of one or more of the Borrower Group Members; (ii) the aggregate

principal amount of such Indebtedness incurred by (A) CL PI Holdings does not exceed $10,000,000, (B) CL Recycling Holdings does not exceed $5,000,000 and (C) CL P Holdings does not exceed $6,000,000; (iii) such Indebtedness has no make-whole or similar prepayment premium; (iv) the lien and/or payment priorities thereunder are, as among the holders of such Indebtedness, pari passu (e.g., there are no "first-out" or "last-out" tranches); and (v) the providers of such Indebtedness (or an agent on their behalf) shall have executed an intercreditor agreement in favor of the Collateral Agent, in form and substance satisfactory to the Administrative Agent in its sole discretion.

"Permitted Tax Distributions" means, for each taxable year in which the Borrower is considered a partnership or a "disregarded entity" for U.S. federal income tax purposes, distributions made by the Borrower to its Equity Shareholders to discharge their respective federal (and, if the Borrower is also treated as a partnership or disregarded entity for the relevant state or local income tax purposes, such state or local) income tax liabilities attributable to their allocable share of the net taxable income of the Borrower and its flow-through subsidiaries for such taxable year in an amount not to exceed the amounts specified in Section 5.1(a) of the Borrower Operating Agreement (in effect as of the date hereof).

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"PET" means polyethylene terephthalate.

"PinnPack" means PinnPack Packaging, LLC, a Delaware limited liability company.

"PinnPack Facility" means the PET thermoforming and processing facility located in Oxnard, California, directly owned by PinnPack.

"Post-Default Rate" means a rate per annum which is equal to the greater of (a) the sum of the Interest Rate plus 2.00% and (b) with respect to each Lender, the maximum nonusurious interest rate, if any, that may be contracted for, taken, reserved, charged or received on the Loans under laws applicable to such Lender which are in effect at the relevant time.

"Prepayment Premium" means, with respect to any prepayment on any date of Loans (except as contemplated in Section 2.05(c)(ii)), an amount equal to (i) all accrued and unpaid interest on the aggregate principal amount of the Loans subject to such prepayment as of such date plus (ii) an aggregate amount equal to all interest payments that would have been payable to the Lenders on the principal amount of the Loans subject to such prepayment from the date of such prepayment through the third anniversary of the Funding Date on which such Loans had been made had such prepayment not occurred, which amount shall be calculated assuming there has been no repayment of the principal amount of the Loans; provided that if the Borrower elects to prepay the Loans in accordance with Section 2.05(b)(v) after the Lenders have declined the Borrower's request to reinvest such amounts in accordance with an ECF Reinvestment Request, the reference to the third anniversary of the Closing Date in clause (ii) above shall be deemed to be the 18-month anniversary of the Funding Date on which such Loans had been made. Schedule 1.01(b) sets forth an example calculation of the Prepayment Premium.

23

"Prepayment Premium Event" has the meaning assigned to such term in Section 2.05(c)(iv).

"Projection" has the meaning assigned to such term in Section 3.12(b).

"Property" means any right or interest in or to property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible.

"Quarterly Payment Date" means the last Business Day of March, June, September and December in each fiscal year (or, when used in Section 2.05(b)(v), the definition of "Applicable ECF Percentage" and the definition of "Excess Cash Flow Payment Date", the last day of March, June, September and December in each fiscal year).

"Register" has the meaning assigned to such term in Section 10.04(c).

"Regulation D" means Regulation D of the Board.

"Regulation U" means Regulation U of the Board.

"Reinvestment Notice" means a written notice executed by an Authorized Representative of Borrower stating that no Default or Event of Default has occurred and is continuing, and that the applicable Loan Party intends and expects to use all or a specified portion of the Loss Proceeds in respect of such Event of Loss to repair or restore the Business.

"Rejected Proceeds" has the meaning assigned to such term in Section 2.05(c)(iii).

"Rejected Proceeds Account" means an account of the Borrower to be established and maintained at the Depositary Bank for the deposit of Rejected Proceeds as provided herein.

"Related Fund" means with respect to any Lender, any fund that invests in loans and is managed or advised by the same investment advisor as such Lender, by such Lender or an Affiliate of such Lender.

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, employees, agents and advisors of such Person and such Person's Affiliates.

"Release" means any release, spill, emission, emanation, leaking, pumping, injection, deposit, disposal, discharge, dispersal, leaching or migration into or through the indoor or outdoor environment, including, the movement through ambient air, soil, surface water, ground water, wetlands, land or subsurface strata.

"Replacement Agreement" means any Additional Agreement that is (i) entered into by a Loan Party in replacement of any Material Agreement, (ii) in form and substance reasonably satisfactory to the Administrative Agent and (iii) in the case of any real property lease, is with one or more Replacement Obligors.

24

"Replacement Obligor" means a Person (or guarantor of such Person's obligations) that is approved by the Administrative Agent, such approval to be in the Administrative Agent's reasonable discretion.

"Reportable Event" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the 30-day notice period has been waived.

"Restoration" means, with respect to any Affected Property, the rebuilding, repair, restoration or replacement of such Affected Property.

"Restricted Payment" means:

(a)    all dividends paid by any Loan Party (in cash, Property or obligations) on, or other payments or distributions on account of, or the setting apart of money for a sinking or other analogous fund for, or the purchase, redemption, retirement or other acquisition by any Loan Party of, any portion of any membership interests in any Loan Party or any warrants, rights or options to acquire any such membership interests;

(b)    any payment of development, management or other fees, or of any other amounts, by any Loan Party to any Affiliate thereof;

(c)    any other payment in cash, Property or obligations to a parent company of the Loan Parties or Affiliate of the Loan Parties;

(d)    any other payment in cash, Property or obligations in respect of the Shareholder Notes; and/or

(e)    any other payment in cash, Property or obligations to a parent company of the Loan Parties or Affiliate of the Loan Parties in respect of any Indebtedness subordinated to the Obligations hereunder.

"Riverside Facility" means the pcrPET processing facility located in Riverside, California, directly owned by CL Industries.

"S&P" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., or any successor to the rating agency business thereof.

"Sanctioned Country" means, at any time, a country or territory that is subject to comprehensive Sanctions.  For the avoidance of doubt, as of the Closing Date, Sanctioned Countries are the Crimea region of Ukraine, Cuba, Iran, North Korea and Syria.

"Sanctioned Person" means, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, or by the United Nations Security Council, the European Union or any EU member state, (b) any Person operating, organized or resident in a Sanctioned Country, or (c) any Person owned or controlled by any such Person.

25

"Sanctions" means economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, or (b) the United Nations Security Council, the European Union or Her Majesty's Treasury of the United Kingdom.

"Second Funding Commitments" means, with respect to each Lender, the commitment of such Lender to make Loans to the Borrower pursuant to Section 2.01(a), in an aggregate principal amount not to exceed the amount set forth opposite such Lender's name on Annex I under the heading "Second Funding Commitments".

"Second Funding Date" means August 15, 2019 (or such earlier date as may be agreed to by the Administrative Agent in its sole and absolute discretion), subject to all conditions precedent specified in Section 4.03 being satisfied (or waived by the Administrative Agent and the Lenders in their sole and absolute discretion in accordance with Section 10.02), or such other date as may be requested by Borrower and approved by the Administrative Agent in its sole and absolute discretion.

"Secured Obligations" has the meaning assigned to such term in the Security Agreement.

"Secured Parties" means (a) the Agents and (b) the Lenders.

"Security Agreement" means the Pledge and Security Agreement, entered into on the Initial Funding Date, among the Loan Parties and the Collateral Agent, a copy of which is attached hereto as Exhibit I.

"Security Documents" means the Security Agreement, the Subordination Agreements, the Control Agreements, all Uniform Commercial Code financing statements required by any Security Document and any other security agreement or instrument to be executed pursuant hereto or any Security Document.

"Shareholder Notes" means, collectively, the 7% Notes and the 10% Notes.

"Solvent" means, with respect to any Person on a particular date that on such date (a) the fair value of the property of such Person is greater than the total amount of liabilities, including contingent liabilities of such Person, (b) the present fair saleable value of the assets of such Person is not less than the amount that will be required to pay the probable liability of such Person on its debts as they become absolute and matured, (c) such Person does not intend to, and does not believe that it will, incur debts or liabilities beyond such Person's ability to pay such debts and liabilities as they mature, (d) such Person is not engaged in business or a transaction, and is not about to engage in business or a transaction, for which such Person's property would constitute an unreasonably small capital and (e) such Person is not insolvent as defined under applicable Bankruptcy or insolvency laws; provided that unless otherwise provided under Applicable Law, the amount of contingent liabilities at any time shall be computed as the amount that, in light of all the facts and circumstances existing at such date, represents the amount that can reasonably be expected to become an actual or matured liability.

"Subordination Agreements" means, individually and collectively, (i) the 7% Shareholder Note Subordination Agreement and (ii) the 10% Shareholder Note Subordination Agreement.

"Subsidiary" means, with respect to any Person (the "parent"), any other corporation, limited liability company, partnership, association or other entity (a) of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date, owned, controlled or held, or (b) that is, as of such date, otherwise controlled, by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Termination Value" means, in respect of any one or more Hedging Agreement, after taking into account the effect of any legally enforceable netting agreement relating to such Hedging Agreements, (a) for any date on or after the date such Hedging Agreements have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) or any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Hedging Agreements, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Hedging Agreements (which may include a Lender or any Affiliate of a Lender).

"Term Loan Credit Agreement" means that certain Revolving Loan and Security Agreement, dated as of November 13, 2017, among Northport TRS, LLC, a Delaware limited liability company, as administrative agent, the lenders from time to time party thereto, CarbonLITE Industries, CL Pinnpack, CL PI Holdings, PinnPack and the other credit parties from time to time party thereto.

"Texas Facility" means the pcrPET processing facility located in Dallas, Texas, directly owned by CL Recycling.

"Texas Facility Group" means CL Recycling and CL Recycling Holdings.

"Texas Intercompany Indebtedness" means any intercompany Indebtedness between CL Industries, as borrower and CL Recycling, a Lender.

"Trademarks" means all domestic, foreign and multinational trademarks, service marks, trade names, corporate names, company names, business names, fictitious business names, trade dress, trade styles, logos, Internet domain names, other indicia of origin or source identification, and general intangibles of a like nature, whether registered or unregistered, and, with respect to the foregoing, all registrations and applications for registration thereof, all extensions and renewals thereof, and all of the goodwill of the business connected with the use of and symbolized by any of the foregoing.

"Transaction Documents" means each of the Financing Documents, the Lender Warrants and the Observer Rights Agreement.

27

"UCC" means the Uniform Commercial Code as in effect from time to time in the State of New York; provided that if, with respect to any filing statement or by reason of any mandatory provisions of law, the perfection or the effect of perfection or non-perfection of the security interests granted to the Collateral Agent pursuant to the applicable Security Document is governed by the Uniform Commercial Code as in effect in a jurisdiction of the United States other than New York, UCC means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions of each applicable Financing Document and any filing statement relating to such perfection or effect of perfection or non-perfection.

"Uniform Commercial Code" means the Uniform Commercial Code as in effect from time to time in the applicable jurisdiction.

"US Code" means the U.S. Internal Revenue Code of 1986, as amended.

"US Person" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"USA PATRIOT Act" has the meaning assigned to such term in Section 10.14.

"Voting Stock" means, with respect to any Person, Capital Stock the holders of which are ordinarily, in the absence of contingencies, entitled to vote for the election of directors (or persons performing similar functions) of such Person, even if the right so to vote has been suspended by the happening of a contingency.

"Vehicles" has the meaning assigned to such term in the Security Agreement.

"Write-Down and Conversion Powers" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

Section 1.02   Terms Generally.  Except as otherwise expressly provided, the following rules of interpretation shall apply to this Agreement and the other Financing Documents:

(a)     the definitions of terms herein shall apply equally to the singular and plural forms of the terms defined;

(b)     whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms;

(c)     the words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation";

(d)     the word "will" shall be construed to have the same meaning and effect as the word "shall";

(e)     unless the context requires otherwise, any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement,

28

instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or therein) and shall include any appendices, schedules, exhibits, clarification letters, side letters and disclosure letters executed in connection therewith;

(f)     any reference herein to any Person shall be construed to include such Person's successors and assigns to the extent permitted under the Financing Documents and, in the case of any Governmental Authority, any Person succeeding to its functions and capacities;

(g)     the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision;

(h)     all references herein to Articles, Sections, Appendices, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Appendices, Exhibits and Schedules to, this Agreement;

(i)     the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights; and

(j)     any reference herein to a merger, transfer, consolidation, amalgamation, consolidation, assignment, sale, disposition or transfer, or similar term, shall be deemed to apply to a division of or by a limited liability company, or an allocation of assets to a series of a limited liability company (or the unwinding of such a division or allocation), as if it were a merger, transfer, consolidation, amalgamation, consolidation, assignment, sale or transfer, or similar term, as applicable, to, of or with a separate Person.  Any division of a limited liability company shall constitute a separate Person hereunder (and each division of any limited liability company that is a Subsidiary, joint venture or any other like term shall also constitute such a Person or entity).

Section 1.03    <u>Accounting Terms</u>.  Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP.  If the Borrower notifies the Administrative Agent that the Borrower wishes to amend any provision hereof to eliminate the effect of any change occurring after the date hereof in GAAP or in the application thereof on the operation of such provision, regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then the Borrower's compliance with such provision shall be determined on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in a manner satisfactory to the Borrower and the Administrative Agent; <u>provided</u> that Capital Lease Obligations shall be construed in accordance with GAAP as in effect on the Closing Date, notwithstanding any changes to GAAP occurring after the Closing Date. Notwithstanding any provision contained herein or in any other Financing Document, any lease (or similar arrangement) that would have been characterized, classified or reclassified as an operating lease in accordance with GAAP prior to the date of the Borrower's adoption of ASC 842 (or any other ASC having a similar result or effect) (and related interpretations) (whether or not such lease was in effect on such date) shall not constitute a Capital Lease Obligation, and any such lease shall be, for all purposes of this Agreement and the other Financing Documents, treated as

US-DOCS\109334811.27

though it were reflected on the Borrower's consolidated financial statements in the same manner as an operating lease would have been reflected prior to the Borrower's adoption of ASC 842.

## ARTICLE II

## THE CREDITS

Section 2.01    Loans.

(a)    Subject to the terms and conditions set forth herein (including, without limitation, the conditions set forth in Sections 4.01 through 4.03), each Lender agrees to make Loans to Borrower (i) on the Initial Funding Date, as requested by Borrower pursuant to Section 2.01(c), in an aggregate principal amount not to exceed the Initial Funding Commitments and (ii) on the Second Funding Date, as requested by Borrower pursuant to Section 2.01(c), in an aggregate principal amount not to exceed the Second Funding Commitments, or as otherwise requested by Borrower and approved by the Administrative Agent in its sole and absolute discretion.

(b)    No Reborrowing.  Amounts prepaid or repaid in respect of any Loan may not be reborrowed.

(c)    Procedures for Borrower.

(i)    Subject to Sections 4.01 through 4.03, as applicable, and except as otherwise provided herein, the Borrower may request the Lenders to make Loans to the Borrower by delivery to the Administrative Agent, on any Business Day, of a Borrowing Request.  The date of the proposed borrowing (each such date, a "Funding Date") specified in a Borrowing Request shall be no earlier than ten (10) days (or, in the case of the Initial Funding Date, as mutually agreed between the Borrower and the Administrative Agent) after the delivery of such Borrowing Request.  Unless otherwise provided herein, each Borrowing Request shall be irrevocable and shall specify (i) the aggregate principal amount of the borrowing requested (it being acknowledged and agreed that no more than $50,000,000 may be borrowed on the Initial Funding Date), (ii) the proposed Funding Date (which shall be a Business Day) and (iii) the Collateral Account(s) into which the proceeds of the borrowing are to be deposited and the amounts to be deposited into each Collateral Account if more than one Collateral Account is designated.

(ii)    Borrower shall not deliver a Borrowing Request for Loans, and, subject to Sections 2.07(e) and 2.13, the Lenders shall be under no obligation to make available any funds for any Loans, on the Initial Funding Date, in an aggregate amount for all Lenders exceeding the Initial Funding Commitments, and on the Second Funding Date, in an aggregate amount for all Lenders exceeding the Second Funding Commitments.

(d)    Notice by the Administrative Agent to the Lenders.  Promptly following receipt of a Borrowing Request in accordance with this Section 2.01, the Administrative Agent shall advise each Lender of the details thereof and of the amount of such Lender's Loan to be made as part of the requested borrowing.

(e)    Tax Considerations.  For U.S. federal income tax purposes, each of the Borrower, the Guarantors and the Lenders agrees: (i) that the Loan advanced pursuant to Section 2.01(a)

30

hereof, together with the Lender Warrant, shall be treated as an investment unit, and the purchase price of such investment unit shall equal the total purchase price paid by the Lenders for the Loan on the Closing Date, and $80,000 of the purchase price of the investment unit shall, for U.S. federal income tax purposes, be allocated to the purchase of the Lender Warrant; and (ii) to treat the Loans as a debt instrument, and not as a "contingent payment debt instrument," for U.S. federal and state income tax purposes. The Borrower will provide any information reasonably requested from time to time by any Lender regarding the original issue discount associated with the Loans for U.S. federal income tax purposes. Each of Borrower and the Lenders agrees to file tax returns consistent with the allocation set forth in this paragraph. Notwithstanding the foregoing, for all purposes (except for the purpose of this <u>Section 2.01(e)</u>), each Lender shall be treated as having lent the full amount of its pro rata portion of the principal amount of the Loans.

Section 2.02    <u>Funding of the Loans</u>.  If the Borrower has satisfied the conditions set forth in <u>Section 4.01</u> through <u>4.03</u>, as applicable, not later than 12:00 Noon, New York City time, on the applicable Funding Date, each Lender shall make available to the Administrative Agent at the Funding Office an amount in Dollars and in immediately available funds equal to the Loans to be made by such Lender.  Administrative Agent shall deposit the aggregate of the amounts made available to Administrative Agent by the Lenders, in like funds as received by Administrative Agent, into the Borrower Account in accordance with the Borrowing Request or as otherwise agreed between the Administrative Agent and the Borrower pursuant to any funds flow memorandum delivered in connection therewith.  With respect to the Loans made on the Initial Funding Date, the Administrative Agent shall distribute the funds in accordance with the Funds Flow Memorandum.

Section 2.03    <u>Termination and Reduction of the Commitments</u>.  Any Initial Funding Commitment not funded on the Initial Funding Date and any Second Funding Commitment not funded on the Second Funding Date shall, in each case, automatically and without notice be reduced to zero and terminated upon the close of business on the Initial Funding Date or the Second Funding Date, as applicable.  Amounts prepaid or repaid in respect of any Loans may not be reborrowed.

Section 2.04    <u>Repayment of Loan; Evidence of Debt</u>.

(a)    <u>Promise to Repay at Maturity</u>.  Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of the Lenders, the unpaid principal amount of the Loans then outstanding (including all amounts added to principal as Accrued Interest pursuant to <u>Section 2.07(e)</u>) on the Maturity Date.  Borrower hereby further agrees to pay interest on the unpaid principal amount of each Loan from time to time outstanding from the applicable Funding Date until payment in full in cash thereof at the rates per annum, and on the dates, set forth in <u>Section 2.07</u>.

(b)    <u>Evidence of Debt</u>.

(i)    Each Lender may maintain in accordance with its usual practice an account or accounts evidencing the Indebtedness of the Borrower to such Lender resulting from the Loans made by such Lender from time to time, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.  In the case of a Lender that does not request

31

execution and delivery of a Note evidencing the Loans made by such Lender to the Borrower, such account or accounts shall, to the extent not inconsistent with the notations made by the Administrative Agent in the Register, be conclusive and binding on the Borrower absent manifest error; provided that the failure of any Lender to maintain such account or accounts or any error in any such account shall not limit or otherwise affect any obligations of the Borrower.

(ii)     The Borrower agrees that, upon the request by the Administrative Agent to Borrower from any Lender, the Borrower will promptly execute in favor of such Lender and deliver to Administrative Agent a promissory note (a "Note") substantially in the form of Exhibit B payable to such Lender in an amount equal to such Lender's Loan evidencing the Loans made by such Lender. The Borrower hereby irrevocably authorizes each Lender to make (or cause to be made) appropriate notations on the grid attached to such Lender's Notes (or on any continuation of such grid) with respect to each payment or prepayment of, and each addition of Accrued Interest to, the principal of the Loans evidenced thereby, which notations, if made, shall evidence, inter alia, the date of, the outstanding principal amount of, and the interest rate applicable to the Loans evidenced thereby; provided that (i) notwithstanding any such notation or the absence thereof, as set forth in Section 2.07(f), the Agent's determination of the principal amount of the Loans outstanding at any time shall be conclusive and binding on all parties absent manifest error; and (ii) the failure of any Lender to make any such notations or any error in any such notations shall not limit or otherwise affect any obligations of the Borrower. A Note and the obligation evidenced thereby may be assigned or otherwise transferred in whole or in part only in accordance with Section 10.04(b).

Section 2.05   Prepayment of the Loan.

(a)     Optional Prepayments. The Borrower shall have the right at any time and from time to time, upon at least ten (10) Business Days' prior written notice to the Administrative Agent stating the prepayment date and aggregate principal amount of the prepayment, to prepay any Loan in whole or in part, and subject to the requirements of this Section 2.05(a). Each prepayment pursuant to this Section 2.05(a) during the period from the Funding Date on which such Loans were made through the third anniversary thereof, shall be accompanied by the Prepayment Premium with respect to the principal amount of the Loans being prepaid. Each partial prepayment of any Loans under this Section 2.05(a) shall be in an aggregate amount for the Loans of all Lenders at least equal to $1,000,000 or an integral multiple of $500,000 in excess thereof (or such lesser amount as may be necessary to prepay the aggregate principal amount then outstanding with respect to all of the Loans of all Lenders).

(b)     Mandatory Prepayments and Offers to Prepay.

(i)     Material Agreement. If any Loan Party receives any termination payments, damages (including liquidated damages), indemnity payments (other than indemnity payments received by any Loan Party as reimbursement for costs, expenses or other amounts expended by such Loan Party in connection with defending, settling or satisfying any third-party claim against such Loan Party) or other extraordinary payments under or in respect of any Material Agreement that is a real property lease, in excess of $2,500,000 individually or $5,000,000 in the aggregate per calendar year, the Loan Parties shall, or shall cause their Affiliates to, within five (5) Business Days of the receipt of such termination or other payment, offer to prepay the Loans with an amount

32

equal to 100% of the Net Available Amount of such payments, pursuant to a written notice sent to the Administrative Agent and the Lenders describing in reasonable detail the event giving rise to the obligation under this Section 2.05(b)(i) to make such offer (each such offer to prepay referred to in this clause (b)(i) a "<u>Material Agreements Prepayment Offer</u>").

        (ii)    <u>Event of Loss</u>. If the proceeds received by the Loan Parties (including, as a distribution from a Non-Guarantor Subsidiary) in respect of Events of Loss shall be in excess of $2,500,000 per item of equipment subject to an Event of Loss or $5,000,000 in the aggregate per calendar year across all Events of Loss, and, in any such case, are not applied to the Restoration of the related Affected Property as permitted by the immediately succeeding sentence, then the Loan Parties shall, or shall cause their Affiliates to, offer to prepay the Loans with an amount equal to 100% of the Net Available Amount with respect to such Event of Loss, pursuant to a written notice sent to the Administrative Agent and the Lenders describing in reasonable detail the event giving rise to the obligation under this Section 2.05(b)(ii) to make such offer (each such offer to prepay referred to in this Section 2.05(b)(ii) a "<u>Event of Loss Prepayment Offer</u>"). Notwithstanding the foregoing, any Loan Party may use Loss Proceeds received in respect of any Event of Loss for the reinvestment of such funds in the Restoration of the Affected Property if, (i) in the case of Loss Proceeds less than $5,000,000 in the aggregate in any calendar year, the Borrower's Board of Directors shall have authorized the reinvestment of such Loss Proceeds and (ii) in the case of Loss Proceeds exceeding $5,000,000 in the aggregate per calendar year, the Borrower's Board of Directors shall have authorized the reinvestment of such Loss Proceeds and the Borrower shall have delivered to the Administrative Agent a Reinvestment Notice and a restoration plan reasonably acceptable to the Administrative Agent and such reinvestment is applied in accordance with such approved restoration plan.

        (iii)    <u>Disposition of Assets</u>.  Without limiting the obligation of the Borrower to obtain the consent of the Administrative Agent to any Disposition not otherwise permitted hereunder, in the event that the Net Available Amount of any such Disposition by the Borrower Group Members shall exceed $1,500,000 per individual event or $3,500,000 in the aggregate per calendar year for all such Dispositions (in the case of the Non-Guarantor Subsidiaries, solely to the extent the proceeds thereof have been distributed to the Loan Parties), then the Borrower shall offer to prepay the Loans ratably in an amount equal to 100% of the Net Available Amount of the Disposition on the Quarterly Payment Date immediately following receipt by the Borrower of the relevant proceeds.  Notwithstanding the foregoing, the Borrower shall not be required to prepay the Loans pursuant to this <u>Section 2.05(b)(iii)</u> to the extent that the Borrower reinvests the Net Available Amount (or any portion thereof) of any such Disposition in substantially similar assets that are necessary or useful for the Business pursuant to a transaction not prohibited hereunder and such Net Available Amount is so reinvested within one hundred eighty (180) days (or been made the subject of a firm purchase order placed within such time period) of such Disposition, and any uninvested portion of such Net Available Amount shall promptly thereafter be applied to prepayments as contemplated by this <u>Section 2.05(b)(iii)</u>.  Any such offer to prepay shall be made pursuant to a written notice sent to the Administrative Agent and the Lenders describing in reasonable detail the event giving rise to the obligation under this Section 2.05(b)(iii) to make such offer (each such offer to prepay referred to in this <u>Section 2.05(b)(iii)</u> a "<u>Disposition Proceeds Prepayment Offer</u>").

(iv)    Incurrence of Debt. If any Borrower Group Member issues or incurs any Indebtedness (other than Permitted Indebtedness), Borrower shall, within one (1) Business Day of the receipt of the net cash proceeds therefrom, offer to prepay the Loans with an amount equal to 100% of the cash proceeds of such Indebtedness, pursuant to a written notice sent to the Administrative Agent and the Lenders describing in reasonable detail the event giving rise to the obligation under this Section 2.05(b)(iv) to make such offer (each such offer to prepay referred to in this Section 2.05(b)(iv) a "Debt Prepayment Offer").

(v)    Excess Cash Flow Sweep.  On each Excess Cash Flow Payment Date, Borrower shall offer to prepay the Loans of each Lender in an amount equal to such Lender's *pro rata* share of the Applicable ECF Percentage of Net Cash Flow for the quarterly period ending on the Quarterly Payment Date related to such Excess Cash Flow Payment Date, pursuant to a written notice sent to the Administrative Agent and the Lenders with detailed calculations of the Net Cash Flow amount (such Net Cash Flow amount, the "ECF Amount" and each such offer to prepay referred to in this Section 2.05(b)(v) an "ECF Prepayment Offer").  Notwithstanding the foregoing, any Loan Party may reinvest funds equal to all or a portion of the ECF Amount for such quarterly period if the Administrative Agent has approved an ECF Reinvestment Request submitted by the Borrower and such reinvestment is applied in accordance with such approved reinvestment plan or the Operating Budget.

Notwithstanding the foregoing Sections 2.05(b)(i) through (v), Borrower shall be permitted to request a waiver of the requirement to deliver a Material Agreements Prepayment Offer, an Event of Loss Prepayment Offer, a Disposition Proceeds Prepayment Offer, a Debt Prepayment Offer, or an ECF Prepayment Offer, which waiver may be accepted or rejected by the Administrative Agent in its sole and absolute discretion.

(c)    Terms of All Prepayments.

(i)    All partial prepayments of the Loans shall be applied, on a *pro rata* basis to the Loans of each Lender.

(ii)    Each prepayment of Loans shall be accompanied by payment of all accrued interest on the amount prepaid, any additional amounts required pursuant to Section 2.09 and the Prepayment Premium in the case of any prepayment of Loans from the Closing Date through the third anniversary thereof pursuant to (x) Sections 2.05(a), 2.05(b)(i), (ii) and (iv) or (y) Section 2.05(b)(iii) (if the applicable unpermitted Dispositions yield a Net Available Amount to the Borrower shall exceed $1,000,000 per individual event or $2,000,000 in the aggregate per calendar year for all such Dispositions); provided that no Prepayment Premium shall be due in respect of any prepayment under Section 2.05(b)(iii) in respect of any Disposition that was not permitted hereunder and was subsequently consented to by the Administrative Agent.

(iii)    No later than ten (10) Business Days after receiving a Material Agreements Prepayment Offer, an Event of Loss Prepayment Offer, a Disposition Proceeds Prepayment Offer, a Debt Prepayment Offer or an ECF Prepayment Offer, each Lender shall advise the Borrower in writing whether it has elected to accept such prepayment offer, which it shall determine in its sole and absolute discretion.  Each of the Lenders shall have the right, but not the obligation, to accept or reject such prepayment offer by the Borrower.  In connection with any prepayment pursuant to

34

Section 2.05(b)(i), (ii) and/or (iii), the amount of the Loans prepaid shall be calculated so that the total amount of Loans prepaid, the accrued but unpaid interest on such Loans and any Prepayment Premium applicable to such prepayment of Loans shall be no more than the Net Available Amount. Any amount rejected by any Lender after receiving a Material Agreements Prepayment Offer, an Event of Loss Prepayment Offer, a Disposition Proceeds Prepayment Offer, a Debt Prepayment Offer or an ECF Prepayment Offer (any such amounts, "Rejected Proceeds") shall be deposited into the Rejected Proceeds Account of the Borrower.

(iv)    It is understood and agreed that if the Obligations are accelerated or otherwise become due prior to their maturity date, in each case, in respect of any Event of Default (including, but not limited to, upon the occurrence of a bankruptcy or insolvency event (including the acceleration of claims by operation of law)), the Prepayment Premium that would have applied if, at the time of such acceleration, Borrower had prepaid, refinanced, substituted or replaced any or all of the Loans as contemplated in Section 2.05(a) (any such event, a "Prepayment Premium Event"), will also be due and payable without any further action (including, without limitation, any notice requirements otherwise applicable to Prepayment Premium Events, if any) as though a Prepayment Premium Event had occurred and such Prepayment Premium shall constitute part of the Obligations, in view of the impracticability and extreme difficulty of ascertaining actual damages and by mutual agreement of the parties as to a reasonable calculation of each Lender's lost profits as a result thereof.  Any Prepayment Premium payable above shall be presumed to be the liquidated damages sustained by each Lender as the result of the early termination and Borrower agrees that it is reasonable under the circumstances currently existing.  The Prepayment Premium shall also be payable in the event the Obligations (and/or this Agreement) are satisfied or released by foreclosure (whether by power of judicial proceeding), deed in lieu of foreclosure or by any other means.  EACH LOAN PARTY EXPRESSLY WAIVES (TO THE FULLEST EXTENT IT MAY LAWFULLY DO SO), ON BEHALF OF ITSELF AND THE OTHER LOAN PARTIES, THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE OR LAW THAT PROHIBITS OR MAY PROHIBIT THE COLLECTION OF THE FOREGOING PREPAYMENT PREMIUM IN CONNECTION WITH ANY SUCH ACCELERATION.  Each Loan Party expressly agrees (to the fullest extent that each may lawfully do so) that: (A) the Prepayment Premium is reasonable and is the product of an arm's length transaction between sophisticated business people, ably represented by counsel; (B) the Prepayment Premium shall be payable notwithstanding the then prevailing market rates at the time payment is made; (C) there has been a course of conduct between Lenders and the Loan Parties giving specific consideration in this transaction for such agreement to pay the Prepayment Premium; and (D) the Loan Parties shall be estopped hereafter from claiming differently than as agreed to in this paragraph.  Each Loan Party expressly acknowledges that its agreement to pay the Prepayment Premium to Lenders as herein described is a material inducement to Lenders to provide the Commitments and make the Loan.

Section 2.06    Reimbursements.

(a)    Agent Reimbursements.  The Borrower agrees to pay to each of the Administrative Agent and the Collateral Agent, for its own account, amounts payable in the amounts and at the times separately agreed upon in the Agent Reimbursement Letter.

US-DOCS\109334811.27

(b)    <u>Payment of Reimbursements</u>.  All reimbursements payable hereunder shall be paid on the dates due, in Dollars and immediately available funds, to the Administrative Agent for distribution to the Lenders entitled thereto.  Reimbursements paid shall not be refundable under any circumstances absent manifest error.

Section 2.07    <u>Interest</u>.

(a)    <u>Loans</u>.  With respect to any Loan, for each day on and after the Funding Date of such Loan until the date on which such Loan has been fully repaid (including the first day but excluding the last), the outstanding principal amount of such Loan (including any Accrued Interest previously added to the principal on a prior Quarterly Payment Date) shall bear interest at a rate per annum equal to the Interest Rate.

(b)    <u>Default Interest</u>.  If all or a portion of the principal amount of any Loan, interest in respect thereof or any other amount due under the Financing Documents shall not be paid when due (whether at the stated maturity, by acceleration or otherwise) or there shall occur and be continuing any other Event of Default, then, to the extent so elected by the Administrative Agent, the outstanding principal amount of the Loans (whether or not overdue) (to the extent legally permitted) shall bear interest at a rate per annum equal to the Post-Default Rate, from the date of such nonpayment or occurrence of such Event of Default, respectively, until such amount is paid in full (after as well as before judgment) or until such Event of Default is no longer continuing, respectively.

(c)    <u>Payment of Interest</u>.  Subject to <u>Section 2.07(e)</u>, accrued interest on each Loan shall be payable in arrears in cash on each Quarterly Payment Date; <u>provided</u> that (i) interest accrued pursuant to paragraph (b) of this Section shall be payable on demand and (ii) in the event of any repayment or prepayment of any Loan, accrued interest on the principal amount repaid or prepaid shall be payable in cash on the date of such repayment or prepayment.

(d)    <u>Computation</u>.  All interest hereunder shall be computed on the basis of a year of 360 days, and, in each case, shall be payable for the actual number of days elapsed (including the first day but excluding the last).  The computation of interest shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error.

(e)    <u>Payment in Kind</u>.  On each Quarterly Payment Date, the Borrower shall pay all of the accrued interest on each Loan at the Interest Rate in full in cash; <u>provided</u> that the Borrower may, in its sole discretion by sending written notice to the Administrative Agent no later than the applicable Quarterly Payment Date, without penalty, pay a portion of the accrued interest due and payable on each Loan equal to up to 4.85% per annum of the outstanding principal amount of such Loan (including any Accrued Interest previously added to principal on a prior Quarterly Payment Date) in kind; <u>provided</u> <u>further</u>, that the Borrower shall pay all of the accrued interest on each Loan at the Interest Rate in cash for the first six (6) months following the Initial Funding, pro-rated for any partial quarterly period for the applicable Quarterly Payment Date based on the number of day in such period, without the option of making any such payment of interest in kind.  The aggregate outstanding principal amount of the Loans shall be automatically increased on each such Quarterly Payment Date by the amount of such interest paid in kind (and such increased principal shall bear interest at a rate per annum equal to the Interest Rate).

US-DOCS\109334811.27

(f)    <u>Miscellaneous</u>. For the avoidance of doubt, (i) on each Quarterly Payment Date prior to the Maturity Date, any interest on the Loans then due and payable shall be paid, either in cash or in kind, in accordance with this Agreement and (ii) on the Maturity Date, any interest on the Loans then due and payable shall be paid entirely in cash in accordance with this Agreement. All amounts of interest added to the principal of the Loans pursuant to <u>Section 2.07(e)</u> shall bear interest as provided herein, be payable as provided in <u>Section 2.04</u> and shall be due and payable on the Maturity Date. The Agent's determination of the principal amount of the Loans outstanding at any time shall be conclusive and binding, absent manifest error.

Section 2.08    [Reserved].

Section 2.09    <u>Taxes</u>.

(a)    <u>Payments Free of Taxes</u>. Any and all payments by or on account of any obligation of any Loan Party hereunder or under any other Financing Document shall be made without withholding or deduction for any Taxes except as required by Applicable Law; <u>provided</u> that if such Loan Party or Agent shall be required by Applicable Law (as determined in the good faith discretion of the applicable withholding agent) to withhold or deduct any Taxes from such payments, then (i) to the extent such Taxes are Indemnified Taxes, the sum payable shall be increased as necessary so that after making all required withholdings and deductions (including withholdings and deductions applicable to additional sums payable under this Section) the Administrative Agent, the Collateral Agent or the Lender (as the case may be) receives an amount equal to the sum it would have received had no such withholdings or deductions been made, (ii) such Loan Party or Agent shall make or shall cause to be made such withholdings and deductions and (iii) such Loan Party or Agent shall pay or shall cause to be paid the full amount withheld and deducted to the relevant Governmental Authority in accordance with Applicable Law.

(b)    <u>Payment of Other Taxes by the Borrower</u>.  In addition, the Loan Parties shall pay or cause to be paid any Other Taxes to the relevant Governmental Authority in accordance with Applicable Law.

(c)    <u>Indemnification by Borrower</u>.  Loan Parties shall jointly and severally indemnify, or cause to be indemnified, the Administrative Agent, the Collateral Agent and each Lender, within thirty (30) days after written demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) paid or payable by the Administrative Agent, the Collateral Agent or such Lender, as the case may be, and any reasonable expenses arising therefrom or with respect thereto whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrower by the Collateral Agent or a Lender, or by the Administrative Agent on its own behalf or on behalf of the Collateral Agent or a Lender, shall be conclusive absent manifest error.

(d)    <u>Evidence of Payments</u>.  As soon as practicable after any payment of Indemnified Taxes or Other Taxes by any Loan Party to a Governmental Authority, the relevant Loan Party shall deliver or cause to be delivered to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return

37

reporting such payment or other evidence of such payment satisfactory to the Administrative Agent.

(e)    Forms. (i) Any of the Administrative Agent, the Collateral Agent or any Lender (including any assignee Lender) that is legally entitled to an exemption from or reduction of withholding tax under the law of the jurisdiction in which any Loan Party is located with respect to payments under any Transaction Document shall deliver to the Borrower (with a copy to the Administrative Agent), at the time or times reasonably requested by the Borrower or Administrative Agent, such properly completed and executed documentation prescribed by Applicable Law as will permit such payments to be made without or at a reduced rate of withholding. In addition, any of the Administrative Agent, the Collateral Agent or any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by Applicable Law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to any withholding tax or information reporting requirements. Upon the reasonable written request of the Borrower or the Administrative Agent, or if any form or certification previously delivered expires or becomes obsolete or inaccurate, any Lender shall update any such form or certification previously delivered pursuant to this Section 2.09(e). Notwithstanding anything to the contrary in the preceding three sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 2.09(e)(ii)(A), (B) and Section 2.09(g)) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)    Without limiting the generality of the foregoing, in the event that the Borrower is a US Person,

(A)    any Lender that is a US Person shall deliver to the Borrower and the Administrative Agent on or about the date on which such Lender becomes a party to this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)    any Lender who is not a US Person shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or about the date on which such Lender becomes a party to this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(I)    in the case of a Lender who is not a US Person claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under this Agreement or any Transaction Document, executed copies of IRS Form W-8BEN or W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under this Agreement or any Transaction Document, IRS Form W-8BEN or W-8BEN-

38

E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(II)    executed copies of IRS Form W-8ECI;

(III)    in the case of a Lender who is not a US Person claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit B-1 to the effect that such Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code and (y) executed copies of IRS Form W-8BEN or W-8BEN-E; or

(IV)    to the extent a Lender who is not a US Person is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN or W-8BEN-E, a U.S. Tax compliance certificate substantially in the form of Exhibit B-2 or Exhibit B-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if such Lender is a partnership and one or more direct or indirect partners of such Lender are claiming the portfolio interest exemption, such Lender may provide a U.S. Tax compliance certificate substantially in the form of Exhibit B-4 on behalf of each such direct and indirect partner.

(f)    If the Administrative Agent, the Collateral Agent or any Lender determines, in its sole discretion exercised in good faith, that it has received a refund of any Indemnified Taxes or Other Taxes as to which it has been indemnified by a Loan Party or with respect to which a Loan Party has paid additional amounts pursuant to this Section 2.09, it shall pay over such refund (but only to the extent of indemnity payments made under this Section 2.09 with respect to the Taxes giving rise to such refund), to the Borrower, net of all of its out-of-pocket expenses (including Taxes with respect to such refund) and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); provided that the Borrower, upon the request of the Administrative Agent, the Collateral Agent or any Lender, as the case may be, agrees to repay as soon as reasonably practicable the amount paid over to the Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent, the Collateral Agent or any Lender, as the case may be, in the event the Administrative Agent, the Collateral Agent or any Lender, as the case may be, is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this paragraph (f), in no event will the Administrative Agent, the Collateral Agent or any Lender be required to pay any amount to the Borrower pursuant to this paragraph (f) the payment of which would place the Administrative Agent, the Collateral Agent or the Lender, as the case may be, in a less favorable net after-Tax position than it would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This paragraph shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(g)     If a payment made to the Administrative Agent, the Collateral Agent or any Lender under this Agreement would be subject to U.S. federal withholding Tax imposed by FATCA if such Administrative Agent, Collateral Agent or Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Administrative Agent, Collateral Agent or Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by Applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Person's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause, "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(h)     Survival. Each party's obligations under this Section shall survive the resignation and replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender.

Section 2.10    Payments Generally; Pro Rata Treatment; Sharing of Setoffs.

(a)     Payments by Borrower. Unless otherwise specified, the Borrower shall make each payment required to be made by it hereunder (whether of principal, interest, reimbursements, fees, or under Section 2.09 or otherwise) or under any other Financing Document (except to the extent otherwise provided therein) prior to 1:00 p.m., New York City time, on the date when due, in immediately available funds, without setoff or counterclaim. Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon. All such payments shall be made to the Administrative Agent at its offices at Orion Energy Partners Investment Agent, LLC (payment instructions: Bank Name: JPMorgan Chase Bank, N.A., Bank Address: 270 Park Avenue, New York, New York 10017, ABA/Routing No.: 021000021, Account Name: ORION ENERGY PARTNERS INVESTMENT AGENT, LLC, Account No.: 700846822, Swift No.: CHASUS33, Reference: "CarbonLITE" + [purpose of the payment]) except as otherwise expressly provided in the relevant Financing Document and payments pursuant to Sections 2.09 and 10.03, which shall be made directly to the Persons entitled thereto. The Administrative Agent shall distribute any such payments received by it for account of any other Person to the appropriate recipient promptly following receipt thereof. If any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be set to the immediately preceding Business Day and, in the case of any payment accruing interest, interest thereon shall be payable for the period up to and including such immediately preceding Business Day, with the day(s) following such immediately preceding Business Day to be included in the calculation of interest for the following quarterly period in accordance with the terms hereof. All amounts owing under this Agreement or under any other Financing Document are payable in Dollars.

(b)     Application of Insufficient Payments. If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, interest,

reimbursements, fees and other amounts then due hereunder, such funds shall be applied (i) first, to pay interest, reimbursements, fees and other amounts (except for the amounts required to be paid pursuant to the following clause (ii)) then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest, reimbursements, fees and such other amounts then due to such parties, and (ii) second, to pay principal then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal then due to such parties.

(c)     Pro Rata Treatment.  Except to the extent otherwise provided herein:  (i) the Loans shall be made from the Lenders, and each termination or reduction of the amount of the Commitments under Section 2.03 shall be applied to the respective Commitments of the Lenders, *pro rata* according to the amounts of their respective applicable Commitments; (ii) each payment or prepayment of principal of the Loans by the Borrower shall be made for account of the Lenders *pro rata* in accordance with the respective unpaid principal amounts of the Loans held by them being paid or prepaid; and (iii) each payment of interest on the Loans by the Borrower shall be made for account of the Lenders *pro rata* in accordance with the amounts of interest on the Loans then due and payable to the respective Lenders.

(d)     Sharing of Payments by Lenders.  If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment or recover any amount in respect of any principal of or interest on any of its Loan resulting in such Lender receiving a greater proportion of the aggregate amount of the Loans and accrued interest thereon then due than the proportion received by any other Lender, then, unless otherwise agreed in writing by the Lenders, the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Loans of other Lenders to the extent necessary so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans; provided that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this paragraph shall not be construed to apply to any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or Participant, other than to the Borrower or any Affiliate thereof (as to which the provisions of this paragraph shall apply).  Each Loan Party consents to the foregoing and agrees, to the extent it may effectively do so under Applicable Law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against such Loan Party rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of such Loan Party in the amount of such participation.

(e)     Presumptions of Payment.  Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for account of the Lenders hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due.  In such event, if the Borrower has not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the

41

greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

(f)    Certain Deductions by the Administrative Agent.  If any Lender shall fail to make any payment required to be made by it pursuant to Section 2.02, 2.10(e) or 10.03(c), then the Administrative Agent may, in its discretion (notwithstanding any contrary provision hereof), apply any amounts thereafter received by the Administrative Agent for account of such Lender to satisfy such Lender's obligations under such Sections until all such unsatisfied obligations are fully paid.

Section 2.11    Mitigation Obligations; Replacement of Lenders.  If the Borrower is required to pay any Indemnified Taxes or additional amount to any Lender or any Governmental Authority for account of any Lender pursuant to Section 2.09 then such Lender shall (i) file any certificate or document reasonably requested in writing by the Borrower and/or (ii) use reasonable efforts to designate a different lending office for funding or booking its Loan hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the sole judgment of such Lender exercised in good faith, such designation or assignment (x) would eliminate or reduce amounts payable pursuant to Section 2.09 in the future and (y) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender in any material respect.  The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

Section 2.12    Acknowledgement and Consent to Bail-In of EEA Financial Institutions. Notwithstanding anything to the contrary in any Financing Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Financing Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)    the effects of any Bail-In Action on any such liability, including, if applicable:

(c)    a reduction in full or in part or cancellation of any such liability;

(d)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Financing Document; or

(e)    the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of any EEA Resolution Authority.

Section 2.13    Incremental Facility.  The Borrower may, pursuant to an Incremental Request delivered to the Administrative Agent from time to time during the Incremental Availability

42

Period, request the establishment of an incremental term loan facility in an aggregate principal amount to be agreed between the Borrower and the Administrative Agent (the "Incremental Loans"), to be documented as an increase in the total amount of the Loans under this Agreement; provided that, the aggregate amount of the Incremental Loans shall not exceed $20,000,000. Each Lender shall participate in such Incremental Loans if each of the following conditions have been satisfied:

(a)    no Default or Event of Default exists as of the effective date of such Incremental Loans or would exist after giving effect thereto;

(b)    no development, event or circumstance that has had or could reasonably be expected to have a Material Adverse Effect shall have occurred and be continuing, or shall occur as a result thereof as of the effective date of such Incremental Loans;

(c)    the representations and warranties of each of the Loan Parties set forth in the Financing Documents shall be true and correct in all material respects on and as of the effective date of such Incremental Loans (except where already qualified by materiality or Material Adverse Effect, in which case, in all respects);

(d)    Investment Committee approval for such Incremental Loans shall have been obtained;

(e)    the other applicable conditions set forth in Section 4.03 shall have been satisfied as of the effective date of such Incremental Loans; and

(f)    the terms of any such Incremental Loans shall be identical to those of the existing Loans, unless otherwise agreed by the Administrative Agent and the Borrower; provided that, (x) the Borrower may request multiple borrowings (the timing of which shall be mutually agreed between the Borrower and the Lenders) and each borrowing of Incremental Loans shall be in an aggregate amount of $5,000,000 or a larger multiple of $1,000,000; provided that the final borrowing of such Incremental Loan may be in an amount equal to the then current amount of the unfunded commitments with respect to the applicable Incremental Loan.

In connection therewith, this Agreement and the other Financing Documents shall be amended as necessary to effectuate such increase, such amendments to be acceptable to the Administrative Agent in its reasonable discretion.


# ARTICLE III

## REPRESENTATIONS AND WARRANTIES

Each Loan Party represents and warrants to each Agent and the Lenders that:

Section 3.01    Due Organization, Etc.

(a)    Each Loan Party (and, as of the Closing Date, each Non-Guarantor Subsidiary) is a limited liability company, duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization.  Each Loan Party (and, as of the Closing Date, each Non-Guarantor Subsidiary) (i) has all requisite limited liability company or other organizational power and authority to own or lease and operate its assets and to carry on its business as now conducted and as proposed to be conducted by it and (ii) is duly qualified to do business and is in good standing in each jurisdiction where necessary in light of its business as now conducted and as proposed to be conducted (including performance of each Material Agreement to which it is party) except, in the case of this clause (ii), where the failure to so qualify could not reasonably be expected to have a Material Adverse Effect.  No filing, recording, publishing or other act by a Loan Party (and, as of the Closing Date, each Non-Guarantor Subsidiary), that has not been made or done, is necessary in connection with the existence or good standing of such Borrower Group Member.

(b)    As of the Closing Date, the Equity Shareholders listed on Schedule 3.01(b) are the only members of the Borrower.

(c)    The only member of each Guarantor is the Borrower or another Guarantor, with the Borrower owning, directly or indirectly, 100% of each Guarantor's (other than PinnPack's) Capital Stock.  All Capital Stock in each Guarantor (other than PinnPack) is beneficially owned and controlled by the Borrower free and clear of all Liens other than Permitted Liens.

(d)    The only member of each Non-Guarantor Subsidiary is a Guarantor, with a Guarantor owning 100% of each Non-Guarantor Subsidiary's Capital Stock.

Section 3.02    Authorization, Etc. Each Loan Party has full corporate, limited liability company or other organizational powers, authority and legal right to enter into, deliver and perform its respective obligations under each of the Transaction Documents to which it is a party and to consummate each of the transactions contemplated herein and therein, and has taken all necessary corporate, limited liability company or other organizational action to authorize the execution, delivery and performance by it of each of the Transaction Documents to which it is a party. Each of the Transaction Documents to which any Loan Party is a party has been duly executed and delivered by such Loan Party and is in full force and effect and constitutes a legal, valid and binding obligation of such Loan Party, enforceable against such Loan Party in accordance with its respective terms, except as enforcement may be limited (i) by Bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance or other similar laws affecting creditors' rights generally, (ii) by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law) and (iii) by implied covenants of good faith and fair dealing.

Section 3.03    No Conflict.  The execution, delivery and performance by each Loan Party of each of the Transaction Documents to which it is a party and all other documents and instruments to be executed and delivered hereunder by it, as well as the consummation of the transactions contemplated herein and therein, do not and will not (i) conflict with the Organizational Documents of such Loan Party, (ii) conflict with or result in a breach of, or constitute a default under, any indenture, loan agreement, mortgage, deed of trust or other material instrument or agreement to which such Loan Party (and, as of the Closing Date, any Non-Guarantor Subsidiary)

44

is a party or by which it is bound or to which such Loan Party's (and, as of the Closing Date, any Non-Guarantor Subsidiary's) property or assets are subject, (iii) conflict with or result in a breach of, or constitute a default under, in any material respect, any Applicable Law or (iv) with respect to each Loan Party (and, as of the Closing Date, each Non-Guarantor Subsidiary), result in the creation or imposition of any Lien (other than a Permitted Lien) upon any of such Borrower Group Member's property or the Collateral.

Section 3.04    Approvals, Etc.

(a)    Each Loan Party (and, as of the Closing Date, each Non-Guarantor Subsidiary) has obtained all material Authorizations required under any Applicable Law to be issued to, assigned to, or otherwise assumed by, such Borrower Group Member and necessary for (i) the Business or (ii) the execution, delivery and performance by each Loan Party of the Transaction Documents to which it is a party other than, in each case, Authorizations that are not currently necessary and are obtainable in the ordinary course of business.

(b)    As of the Closing Date, all of the material Authorizations required under any Applicable Law to be issued to, assigned to, or otherwise assumed by, any Loan Party (and, as of the Closing Date, each Non-Guarantor Subsidiary) and necessary for (i) the Business or (ii) the execution, delivery and performance by any Loan Party of the Transaction Documents to which it is a party, other than, in each case, Authorizations that are not currently necessary and are obtainable in the ordinary course of business, are set forth in Schedule 5.04 hereto.

(c)    Each Loan Party (and, as of the Closing Date, each Non-Guarantor Subsidiary) is in material compliance with each Authorization by a Governmental Authority currently in effect.

Section 3.05    Financial Statements.

(a)    As of the date of delivery thereof, (x) the financial statements delivered to the Lenders pursuant to this Agreement will present fairly in all material respects the financial condition, results of operations and cash flows of such Borrower Group Member as of the dates set forth therein, (y) such balance sheets and the notes thereto will disclose all material liabilities (contingent or otherwise) of such Borrower Group Member as of the dates thereof to the extent required to be disclosed by GAAP and (z) such financial statements were prepared in accordance with GAAP.

(b)    As of the Closing Date and each Funding Date, no event, change or condition has occurred that has caused, or could be reasonably expected to cause, a Material Adverse Effect.

Section 3.06    Litigation.

(a)    There is no pending or, to the knowledge of any Authorized Representative of any Loan Party (and, as of the Closing Date, each Non-Guarantor Subsidiary), threatened (in writing) litigation, investigation, action or proceeding of or before any court, arbitrator or Governmental Authority (in the case of any of the foregoing not involving the Loan Parties, to the knowledge of any Authorized Representative of any Borrower Group Member) (i) seeking to restrain or prohibit the consummation of the transactions contemplated by the Transaction Documents or (ii) purporting to affect the legality, validity or enforceability of any of the Transaction Documents.

(b)    There is no pending or, to the knowledge of any Authorized Representative of any Loan Party (and, as of the Closing Date, each Non-Guarantor Subsidiary), threatened (in writing) litigation, investigation, action or proceeding of or before any court, arbitrator or Governmental Authority against any Loan Party (and, as of the Closing Date, each Non-Guarantor Subsidiary) that affects the Business which (either individually or in the aggregate) could reasonably be expected to have a Material Adverse Effect.

Section 3.07    <u>Environmental Matters</u>.  Except as set forth on <u>Schedule 3.07</u>:

(a)    each Loan Party (and, as of the Closing Date, each Non-Guarantor Subsidiary) and the conduct of the Business is in compliance in all material respects with all applicable Environmental Laws;

(b)    each Loan Party (and, as of the Closing Date, each Non-Guarantor Subsidiary), (i) holds or has applied for all material Authorizations required under Environmental Laws (each of which is in full force and effect) required for the conduct of the Business and any of its current operations or for any property owned, leased or otherwise operated by it; and (ii) is in compliance in all material respects with all Authorizations required under Environmental Law;

(c)    to the knowledge of any Authorized Representative of any Loan Party (and, as of the Closing Date, each Non-Guarantor Subsidiary), (x) there are no material pending Environmental Claims asserted against any Loan Party (and, as of the Closing Date, each Non-Guarantor Subsidiary) or the Business and (y) no Loan Party (and, as of the Closing Date, each Non-Guarantor Subsidiary) has received any written notice, claim or information regarding, or otherwise has knowledge of, a past or threatened material Environmental Claim asserted against any Loan Party (and, as of the Closing Date, each Non-Guarantor Subsidiary) or the Business, except for such Environmental Claims that have been fully resolved;

(d)    there are no outstanding consent decrees, orders, settlements or other material agreements concerning any Loan Party (and, as of the Closing Date, each Non-Guarantor Subsidiary)  or the Business relating to compliance with or liability under Environmental Law;

(e)    no Loan Party (and, as of the Closing Date, each Non-Guarantor Subsidiary) and, to the knowledge of any Authorized Representative of any Loan Party, no other Person has Released Hazardous Materials at, on, from or under any real property currently or formerly owned, leased or operated by any Loan Party (and, as of the Closing Date, each Non-Guarantor Subsidiary) in a manner that would reasonably be expected to result in a material liability of any Loan Party (and, as of the Closing Date, each Non-Guarantor Subsidiary) pursuant to Environmental Laws; and

(f)    each Loan Party (and, as of the Closing Date, each Non-Guarantor Subsidiary) has made available copies of all significant reports, correspondence and other documents in its possession, custody or control regarding compliance by any of the Loan Party (and, as of the Closing Date, each Non-Guarantor Subsidiary), or potential liability of any of the Loan Party (and, as of the Closing Date, each Non-Guarantor Subsidiary) under Environmental Laws or Authorizations required under Environmental Laws.

US-DOCS\109334811.27

Section 3.08    Compliance with Laws and Obligations.  Subject to Section 3.07, each Loan Party (and, as of the Closing Date, each Non-Guarantor Subsidiary) and the Business are in compliance with all Applicable Laws applicable to the Borrower Group Members and the Business, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

Section 3.09    Material Agreements; Bond Documents.

(a)    As of the Closing Date, each Material Agreement is listed on Schedule 3.09.  The copies of each of the Material Agreements, and any amendments thereto provided or to be provided by any Loan Party (and, as of the Closing Date, each Non-Guarantor Subsidiary) to the Administrative Agent are, or when delivered will be, true and complete copies of such agreements and documents.  Except as permitted under Section 6.09 or disclosed in accordance with Section 5.11, no termination event has occurred under any Material Agreement, each Material Agreement is in full force and effect, and no Loan Party (and, as of the Closing Date, each Non-Guarantor Subsidiary) has received any written notice of a material default, expiration, breach or termination pursuant to any Material Agreement.  Each Loan Party (and, as of the Closing Date, each Non-Guarantor Subsidiary) is in compliance in all material respects with the terms of the Material Agreements to which it is a party.  To the knowledge of any Authorized Representative of any Loan Party (and, as of the Closing Date, each Non-Guarantor Subsidiary), no Material Counterparty is in default of any of its obligations under any Material Agreement other than defaults which, individually or in the aggregate, could not reasonably be expected to be materially adverse to the Borrower Group Members and/or the Lenders.

(b)    The copies of each of the Bond Documents, and any amendments thereto provided or to be provided by any Borrower Group Member to the Administrative Agent are, or when delivered will be, true and complete copies of such agreements and documents.  As of the Closing Date and the Funding Date, no "Default," "Event of Default" or similar term under any Bond Document has occurred and is continuing.

Section 3.10    Intellectual Property; Licenses.

(a)    Each Loan Party (and, as of the Closing Date, each Non-Guarantor Subsidiary) owns, or is licensed to use, free and clear of all Liens except for Permitted Liens, all Intellectual Property necessary for its business and that are necessary for the performance by it of its obligations under the Transaction Documents to which it is a party, in each case, as to which the failure of such Borrower Group Member to so own or be licensed could reasonably be expected to have a Material Adverse Effect, and the use thereof by such Borrower Group Member does not, to the knowledge of any Loan Party (and, as of the Closing Date, each Non-Guarantor Subsidiary), infringe in any material respect upon the rights of any other Person.

(b)    Each Loan Party (and, as of the Closing Date, each Non-Guarantor Subsidiary) has obtained the necessary intellectual property licenses that the Borrower Group Members other than any Non-Guarantor Subsidiary (and, as of the Closing Date, each Non-Guarantor Subsidiary) reasonably believe are required for the Business, the absence of any of which could reasonably be expected to have a Material Adverse Effect.

(c)    With respect to each material license in or to Intellectual Property held by each Loan Party (and, as of the Closing Date, each Non-Guarantor Subsidiary): (i) such license is valid and binding and in full force and effect and represents the entire agreement between the respective licensor and licensee with respect to the subject matter of such license; and (ii) such license will not cease to be valid and binding and in full force and effect on terms identical to those currently in effect as a result of the rights and interests granted herein, nor will the grant of such rights and interests constitute a breach or default under such license or otherwise give the licensor or sublicensor a right to terminate such license.

Section 3.11    Taxes.  Except as specified on Schedule 3.11:

(a)    each Loan Party (and, as of the Closing Date, each Non-Guarantor Subsidiary) has timely filed or caused to be filed all material tax returns and reports required to have been filed by it and has paid, or has caused to be paid, all material taxes required to have been paid by it, other than taxes that are being contested in accordance with the Permitted Contest Conditions; and

(b)    property owned by any Borrower Group Member is not the subject of any temporary tax abatement or any other temporary tax reduction; and

(c)    each Loan Party (and, as of the Closing Date, each Non-Guarantor Subsidiary) has been properly treated as a disregarded entity or a partnership for U.S. federal income tax purposes.

Section 3.12    Disclosure.

(a)    None of the written reports, financial statements, certificates or other written information (other than Projections and information of a general economic or industry nature) furnished by or on behalf of any Borrower Group Member to the Administrative Agent or any Lender in connection with the negotiation of this Agreement or delivered hereunder (as modified or supplemented by other written information so furnished), taken as a whole, contains any material misstatement of fact or omits to state any material fact necessary to make such statements therein (when taken as a whole), in the light of the circumstances under which they were made, not materially misleading.

(b)    Statements, estimates, forecasts and projections regarding the Borrower Group Members and the future performance of the Business or other expressions of view as to future circumstances (including the initial Operating Budget) that have been made available to any Secured Party by or on behalf of any Borrower Group Member or any of its representatives or Affiliates (collectively, "Projections") have been prepared in good faith based upon assumptions believed to be reasonable at the time of preparation thereof; provided that it is understood and acknowledged that such Projections are based upon a number of estimates and assumptions and are subject to business, economic and competitive uncertainties and contingencies, that actual results during the period or periods covered by any such Projections may differ from the projected results and such differences may be material and that, accordingly, no assurances are given and no representations, warranties or covenants are made that any of the assumptions are correct, that such Projections will be achieved or that the forward-looking statements expressed in such Projections will correspond to actual results.

Section 3.13    Solvency.  (a) The Borrower Group Members, on a consolidated basis, are, and (b) each Loan Party individually is, in each case, Solvent.

Section 3.14    Regulatory Restrictions on the Loan.  Each Loan Party is not required to be registered as an "investment company" within the meaning of the Investment Company Act of 1940 of the United States (including the rules and regulations thereunder), as amended.

Section 3.15    Title; Security Documents.

(a)    Each Loan Party owns and has good, legal and defensible title to the property purported to be covered by the Security Documents to which it is party, free and clear of all Liens other than Permitted Liens.

(b)    The provisions of the Security Documents to which any Loan Party is a party that have been delivered on or prior to the date this representation is made are, effective to create, in favor of the Collateral Agent for the benefit of the Secured Parties, a legal, valid and enforceable first-priority (subject only to Permitted Liens) Lien on and security interest in all of the Collateral (other than any Vehicles) purported to be covered thereby, and all necessary recordings and filings have been or will concurrently be made in all necessary public offices (other than with respect to any Vehicles), and all other necessary and appropriate action has been taken, so that the security interest created by each Security Document is a first-priority (subject only to Permitted Liens) perfected Lien on and security interest in all right, title and interest of such Loan Party in the Collateral purported to be covered thereby (other than any Vehicles), prior and superior to all other Liens other than Permitted Liens.

Section 3.16    ERISA.

(a)    No ERISA Event has occurred or is reasonably expected to occur which has or could reasonably be expected to have a Material Adverse Effect.  Each Pension Plan has complied in all material respects with the applicable provisions of ERISA and the Code.  No termination of a Pension Plan has occurred resulting in any liability that has remained underfunded and no Lien against any Loan Party or any of its ERISA Affiliates in favor of the PBGC or a Pension Plan has arisen during the five-year period prior to the date hereof.

(b)    None of the Loan Party (and, as of the Closing Date, each Non-Guarantor Subsidiary) has incurred any obligation which has or could reasonably be expected to have a Material Adverse Effect on account of the termination or withdrawal from any Foreign Plan.

Section 3.17    Insurance.  Except as set forth in Schedule 3.17, all insurance policies required to be obtained by the Borrower Group Members other than any Non-Guarantor Subsidiary (and, as of the Closing Date, each Non-Guarantor Subsidiary) pursuant to Section 5.06 and under any Material Agreement, if any, have been obtained and are in full force and effect as required under Section 5.06 and all premiums then due and payable thereon have been paid in full.  No Loan Party (and, as of the Closing Date, each Non-Guarantor Subsidiary) has received any notice from any insurer that any insurance policy has ceased to be in full force and effect or claiming that the insurer's liability under any such insurance policy can be reduced or avoided.

49

Section 3.18    Use of Proceeds.  The proceeds the Loans on the Initial Funding Date will be used solely in accordance with, and solely for the purposes contemplated by, Section 5.13.  No part of the proceeds of any Loan and other extensions of credit hereunder will be used, either directly or indirectly, by any Borrower Group Member to purchase or carry any Margin Stock (as defined in Regulation U) or to extend credit to others for the purpose of purchasing or carrying any Margin Stock or for any purpose that entails a violation of any of the regulations of the Board.

Section 3.19    Membership Interests and Related Matters.

(a)    The only member of CL Intermediate Holdco is the Borrower.

(b)    Other than as set forth on Schedule 3.19(b), no Loan Party has any Subsidiaries and no Loan Party owns any equity interest in, or otherwise Controls any Voting Stock of or has any ownership interest in, any Person.

(c)    All of the membership interests in the Borrower and each Guarantor have been duly authorized and validly issued in accordance with its operating agreement and any other constitutive documents, are fully paid and non-assessable (subject to the applicable Loan Parties' obligation to contribute capital to another Loan Party, in accordance with the terms of such Loan Party's governing documents) and free and clear of all Liens.  Other than as contemplated herein in connection with the Lender Warrant, neither the Borrower nor any Guarantor has outstanding any securities convertible into or exchangeable for any of its membership interests in or any rights to subscribe for or to purchase, or any warrants or options for the purchase of, or any agreements providing for the issuance (contingent or otherwise) of, or any calls, commitments or claims of any character relating to any such membership interests (except as expressly provided for or permitted herein or in the Security Documents).

Section 3.20    [Reserved].

Section 3.21    No Agreements with Affiliates.  Schedule 3.21 sets forth any and all agreements, transactions or series of related transactions among, on one hand, one or more Loan Parties, and on the other hand, one or more Affiliates of a Loan Party (other than the Loan Parties), in each case, that involve payment of more than $50,000.

Section 3.22    No Bank Accounts.  No Loan Party maintains any accounts other than the Collateral Accounts and Excluded Accounts.

Section 3.23    No Default or Event of Default.  No Default or Event of Default has occurred and is continuing.

Section 3.24    Foreign Assets Control Regulations.

(a)    None of the Borrower Group Members, and none of their respective, principals, owners, officers or directors, or, to any of the Loan Parties' knowledge, their respective Affiliates or agents (i) is a Sanctioned Person; or (ii) engages in any dealings or transactions in or with a Sanctioned Country or that are otherwise prohibited by Sanctions.

US-DOCS\109334811.27

(b)      Each of the Borrower Group Members maintains reasonable policies and procedures to ensure compliance with Sanctions, Anti-Corruption Laws and Anti-Money Laundering Laws (as such compliance is required under this Agreement).

(c)      Each of the Borrower Group Members and their respective officers, directors, employees and, to the Borrower Group Members' knowledge, agents are in compliance with Anti-Corruption Laws, Anti-Money Laundering Laws and Sanctions.

(d)      No part of the proceeds of the Loans will be used, directly or indirectly (i) in violation of the FCPA, Anti-Money Laundering Laws or Sanctions or (ii) to offer or make payments or to take any other action that would constitute a violation, or implicate any Lender, Administrative Agent, Collateral Agent or their respective Affiliates in a violation, of Anti-Corruption Laws.

(e)      Each of the Borrower Group Members has disclosed all facts known to it regarding (a) all claims, damages, liabilities, obligations, losses, penalties, actions, judgment, and/or allegations of any kind or nature that are asserted against, paid or payable by such Person, any of its Affiliates or any of its representatives in connection with non-compliance with Anti-Corruption Laws, Sanctions or Anti-Money Laundering Laws by such Person, and (b) any investigations involving possible non-compliance with Anti-Corruption Laws, Sanctions or Anti-Money Laundering Laws by such Person or such Affiliate or such representative.  No proceeding by or before any Governmental Authority involving any Borrower Group Member with respect to Anti-Corruption Laws, Sanctions or Anti-Money Laundering Laws is pending or, to the knowledge of the Borrower Group Members, threatened.

Section 3.25    Commercial Activity; Absence of Immunity.  Each Loan Party is subject to civil and commercial law with respect to its obligations under the Transaction Documents, and the making and performance of the Transaction Documents by the Loan Parties constitute private and commercial acts rather than public or governmental acts.  The Loan Parties are not entitled to any immunity on the ground of sovereignty or the like from the jurisdiction of any court or from any action, suit, setoff or proceeding, or the service of process in connection therewith, arising under the Financing Documents.

ARTICLE IV

CONDITIONS

Section 4.01    Conditions to the Closing Date.    The occurrence of the Closing Date, the effectiveness of this Agreement and the obligations of each Agent and each Lender hereunder are subject to the receipt by the Administrative Agent (except as set forth otherwise below) of each of the following documents, and the satisfaction of the conditions precedent set forth below, each of which must be satisfied to the reasonable satisfaction of the Administrative Agent (unless waived in accordance with Section 10.02):

(a)      Execution of Certain Financing Documents.  This Agreement, the Loan Discount Letter and the Agent Reimbursement Letter shall have been duly executed and delivered by each

51

of the Loan Parties, Agent and Lenders intended to be parties thereto and shall be in full force and effect.

(b)     Corporate Documents.  The following documents, each certified as of the Closing Date as indicated below:

(i)     copies of the Organizational Documents, together with any amendments thereto, of each Loan Party and a certificate of good standing or its equivalent (if any) for the applicable jurisdiction for each such party (in each case such good standing certificate or its equivalent dated no more than ten (10) days prior to the Closing Date);

(ii)    an Officer's Certificate of each Loan Party dated as of the Closing Date, certifying:

(A)     that attached to such certificate is a true and complete copy of the Organizational Documents referred in clause (i) above for such Person;

(B)     that attached to such certificate is a true and complete copy of resolutions duly adopted by the board of directors, member(s), partner(s) or other authorized governing body of such Person authorizing the transactions contemplated by the Financing Documents, and that such resolutions or other evidence of authority have not been modified, rescinded or amended and are in full force and effect;

(C)     that the certificate of incorporation, certificate of formation, charter or other Organizational Documents (as the case may be) referred in clause (i) above for such Person has not been amended since the date of the certification furnished pursuant to clause (i) above;

(D)     as to the incumbency and specimen signature of each officer, member or partner (as applicable) of such Person executing the Financing Documents to which such Person is or is intended to be a party (and each Lender may conclusively rely on such certificate until it receives notice in writing from such Person); and

(E)     as to the qualification of such Person to do business in each jurisdiction where its operations require qualification to do business and as to the absence of any pending proceeding for the dissolution or liquidation of such Person.

(c)     Material Agreements and Bond Documents.  A copy of each of the Material Agreements and the Bond Documents executed as of the Closing Date and any amendments thereto shall have been made available to the Administrative Agent and the Lenders for their review.

(d)     Authorizations.  All material Authorizations required under any Applicable Law to be issued to, assigned to, or otherwise assumed by any Loan Party and necessary for (i) conduct of the Business or (ii) the execution, delivery and performance by such Loan Party of the Transaction Documents to which it is a party, other than, in each case, Authorizations that are not currently necessary and are obtainable in the ordinary course of business, (A) have been duly obtained and, to the knowledge of Borrower, validly issued, (B) are in full force and effect and not subject to any pending or, to the knowledge of Borrower, threatened, appeal or legal proceeding

that could reasonably be expected to result in a material adverse modification to or withdrawal, cancellation, suspension or revocation of such Authorization, (C) are issued to, assigned to, or otherwise assumed by, a Loan Party (or such Loan Party is entitled to the benefit thereof), (D) are free from any unsatisfied condition the failure of which to satisfy could reasonably be expected to have a Material Adverse Effect and (E) with respect to such Authorizations, all applicable statutory, judicial and administrative review periods have expired.

(e)     Operating Budget.  A copy of the current Operating Budget in substantially the form presented prior to the Closing Date.

(f)     Regulatory Information.  Each Lender shall have received all documentation and other written information required by under applicable anti-money laundering rules and regulations, including the USA PATRIOT Act.

(g)     Representations and Warranties.  The representations and warranties of each of the Loan Parties set forth in the Financing Documents shall be true and correct in all material respects on and as of the Closing Date (except where already qualified by materiality or Material Adverse Effect, in which case, in all respects).

(h)     No Default or Event of Default; No Material Adverse Effect.  No Default or Event of Default shall have occurred and be continuing on, or shall result as a result of the transactions contemplated to occur on, the Closing Date. As of the Closing Date, no development, event or circumstance that has had or could reasonably be expected to have a Material Adverse Effect shall have occurred and be continuing, or shall result as a result of the transactions contemplated to occur on the Closing Date.

(i)     Officer's Certificate.  An Officer's Certificate of the Borrower dated as of the Closing Date certifying that each of the conditions set forth in this Section 4.01 have been satisfied.

Section 4.02   Conditions to the Initial Funding Date.  The occurrence of the Initial Funding Date and each Lender's obligations to make the Loans pursuant to Section 2.01 on such date are subject to the receipt by the Administrative Agent (except as set forth otherwise below) of each of the following documents, and the satisfaction of the conditions precedent set forth below, each of which must be satisfied to the reasonable satisfaction of the Administrative Agent (unless waived in accordance with Section 10.02):

(a)     Financing Documents; VCOC Matters; Warrants; Bond Documents.

(i)     Each of the Security Agreement, a Control Agreement relating to each Collateral Account, the Subordination Agreements and each other Financing Document shall have been duly executed and delivered by each of the Loan Parties, Agent and Lenders intended to be parties thereto and shall be in full force and effect.

(ii)     A strategic committee observer rights agreement containing such terms as will permit each of the Lenders to qualify as a "venture capital operating company" within the meaning of Department of Labor Regulation 29 C.F.R. Section 2510.3-101, dated as of the Initial Funding Date, substantially in the form attached hereto as Exhibit H (the "Observer Rights Agreement").

53

(iii)    The Lender Warrants shall have been duly executed and delivered by each of the parties thereto.

(b)    <u>Payoff Letters</u>. The Administrative Agent shall have received payoff letters with respect to the ABL Credit Agreement and the Term Loan Credit Agreement, together with such UCC termination statements as shall be requested by the Administrative Agent, in each case, in form and substance satisfactory to the Administrative Agent.

(c)    <u>Fees and Expenses</u>.  The Borrower has arranged for payment on such Funding Date (including arrangement for payment out of the proceeds of Loan to be made on such Funding Date in accordance with <u>Section 5.13</u>) of all reasonable and documented out-of-pocket fees, reimbursements and expenses then due and payable pursuant to the Financing Documents.

(d)    <u>Funds Flow Memorandum</u>.  The Funds Flow Memorandum, which shall be in form and substance satisfactory to the Administrative Agent in its sole and absolute discretion.

(e)    <u>Establishment of Accounts</u>. Evidence that each of the Collateral Accounts described in <u>clauses (a)</u> through <u>(c)</u> of the definition thereof has been established.

(f)    <u>Security Documents and Collateral Perfection Matters</u>.

(i)    The Security Documents shall have been duly executed and delivered by the Persons intended to be parties thereto and shall be in full force and effect.

(ii)    The security interests in and to the Collateral intended to be created under the Security Documents shall have been created in favor of the Collateral Agent for the benefit of the Secured Parties, are in full force and effect and the necessary notices, consents, acknowledgments, filings, registrations and recordings to preserve, protect and perfect the security interests in the Collateral have been made immediately prior to the Initial Funding Date such that the security interests granted in favor of the Collateral Agent for the benefit of the Secured Parties are filed, registered and recorded and will constitute a first priority (subject to Permitted Liens), perfected security interest in the Collateral free and clear of any Liens, other than Permitted Liens, and all related recordation, registration and/or notarial fees of such Collateral have been paid to the extent required.

(iii)    Appropriately completed UCC financing statements (Form UCC-1) or UCC financing statement amendments (Form UCC-3), which have been duly authorized for filing by the appropriate Person, naming the Loan Parties as debtors and Collateral Agent as secured party, in form appropriate for filing under each jurisdiction as may be necessary to perfect the security interests purported to be created by the Security Documents, covering the applicable Collateral.

(iv)    Copies of UCC, judgment lien, tax lien and litigation lien search reports, which reports will be for the period between the Closing Date and a recent date acceptable to the Administrative Agent in its sole and absolute discretion, listing all effective financing statements that name any Loan Party as debtor and that are filed in the jurisdictions in which the UCC-1 financing statements will be filed in respect of the Collateral, none of which shall cover the Collateral except to the extent evidencing Permitted Liens.

US-DOCS\109334811.27

(v)    Appropriately completed copies of all other recordings and filings of, or with respect to, the Security Documents as may be requested by Collateral Agent and necessary to perfect the security interests purported to be created by the Security Documents.

(vi)    Subject to <u>Section 5.21(b)</u>, the Collateral Agent shall be satisfied with arrangements to receive all certificates representing the shares of Capital Stock constituting "certificated securities" under the UCC that are pledged pursuant to the Security Agreement, together with an undated stock power for each such certificate executed in blank by a duly Authorized Representative of the Borrower.

(vii)    Evidence that all other actions requested by Collateral Agent and necessary to perfect and protect the security interests purported to be created by the Security Documents entered into on or prior to the Initial Funding Date have been taken immediately prior to the Initial Funding Date.

(g)    <u>Insurance Deliverables</u>.

(i)    The Borrower shall have obtained the insurance required to be in effect under <u>Section 5.06</u> and such insurance shall be in full force and effect, and the Borrower shall have furnished the Administrative Agent with certificates signed by the insurer or an agent authorized to bind the insurer, together with loss payee endorsements in favor of the Collateral Agent, evidencing such insurance, identifying underwriters, the type of insurance, the insurance limits and the policy terms, and stating that such insurance (x) is, in each case, in full force and effect and (y) complies with <u>Section 5.06</u> and that all premiums then due and payable on such insurance have been paid.

(ii)    Reasonably satisfactory evidence that the Borrower has in place insurance required to be in effect under <u>Section 5.06</u>.

(h)    <u>Opinions of Counsel</u>.  Written opinions (dated the Initial Funding Date and addressed to the Administrative Agent, the Lenders and the Collateral Agent) of Reed Smith LLP, special New York counsel to the Loan Parties.

Section 4.03    <u>Conditions to Each Funding Date</u>.  The occurrence of each Funding Date (including the Initial Funding Date and the Second Funding Date) and each Lender's obligations to make the Loans pursuant to <u>Section 2.01</u> on such date are subject to the satisfaction of the conditions precedent set forth below, each of which must be satisfied to the reasonable satisfaction of the Administrative Agent (unless waived in accordance with <u>Section 10.02</u>):

(a)    <u>Documents</u>.  Administrative Agent shall have received:

(i)    To the extent not previously delivered, a copy of each Bond Document, including all schedules, exhibits, attachments, supplements and amendments thereto shall have been delivered to the Administrative Agent.

(ii)    Any amendment to any Material Agreement or any Material Agreement executed after the Closing Date shall have been delivered to the Administrative Agent.

55

(iii)    A Borrowing Request in accordance with <u>Section 2.01(c)</u>, executed and delivered by an Authorized Representative of the Borrower.

(iv)    To the extent requested by any Lender prior to such Funding Date pursuant to <u>Section 2.04(b)</u>, a duly executed Note or Notes, as applicable, dated such Funding Date, payable to such Lender in a principal amount equal to such Lender's Loan.

(v)    An Officer's Certificate of the Borrower, dated as of such Funding Date, certifying that each of the conditions set forth in this <u>Section 4.03</u> (and, in the case of the Initial Funding Date, <u>Section 4.02</u>) has been satisfied.

(b)    <u>Fees and Expenses</u>.  The Borrower has arranged for payment on such Funding Date (including arrangement for payment out of the proceeds of Loan to be made on such Funding Date in accordance with <u>Section 5.13</u>) of all reasonable and documented out-of-pocket fees, reimbursements and expenses then due and payable pursuant to the Financing Documents.

(c)    <u>Representations and Warranties</u>.  The representations and warranties of each Loan Party set forth in the Financing Documents shall be true and correct in all material respects on and as of such Funding Date (except where already qualified by materiality or Material Adverse Effect or in the case of any representation and warranty in <u>Section 3.13</u>, in all respects).

(d)    <u>No Default or Event of Default; No Material Adverse Effect</u>.  No Default or Event of Default shall have occurred and be continuing on, or shall result as a result of the transactions contemplated to occur on, such Funding Date. As of such Funding Date, no development, event or circumstance that has had or would reasonably be expected to have a Material Adverse Effect shall have occurred and be continuing, or shall result from the transactions contemplated to occur on such Funding Date.

(e)    <u>Use of Proceeds</u>. The Administrative Agent and the Borrower shall have mutually agreed on the use of proceeds of the Loans made on such Funding Date.

Section 4.04    <u>Satisfaction of Conditions</u>.  Except to the extent that Borrower has disclosed in the Borrowing Request that an applicable condition specified in <u>Section 4.01</u> <u>4.02</u>, or <u>4.03</u> will not be satisfied as of the Closing Date or applicable Funding Date, as applicable, Borrower shall be deemed to have made a representation and warranty as of such time that the conditions specified in such Section have been satisfied.  No such disclosure by Borrower that a condition specified in <u>Section 4.01</u> <u>4.02</u>, or <u>4.03</u>, as applicable, will not be satisfied as of Closing Date or the applicable Funding Date, as applicable, shall affect the right of each Lender not to make the Loans requested to be made by it if such condition has not been satisfied at such time.

US-DOCS\109334811.27

ARTICLE V

AFFIRMATIVE COVENANTS

Each Loan Party hereby agrees that, from and after the Closing Date until the Discharge Date:

Section 5.01    Corporate Existence; Etc.Each Borrower Group Member shall at all times preserve and maintain in full force and effect (a) its existence as a corporation or a limited liability company, as applicable, (b) its good standing under the laws of the jurisdiction of its organization, and (c) its qualification to do business and its good standing in each jurisdiction in which the character of properties owned by it or in which the transaction of its business as conducted or proposed to be conducted makes such qualification necessary.

Section 5.02    Conduct of Business.  Each Borrower Group Member shall operate, maintain and preserve or cause to be operated, maintained and preserved, the Business in accordance in all material respects with the requirements of the Material Agreements to which it is a party and in compliance, in all material respects, with Applicable Laws and Authorizations by Governmental Authorities and the terms of its insurance policies.

Section 5.03    Compliance with Laws and Obligations.

(a)    Each Borrower Group Member shall comply in all material respects with applicable Environmental Laws, including occupational health and safety regulations, and all other Applicable Laws and Authorizations. Each Borrower Group Member shall comply with and perform its respective contractual obligations in all material respects, and enforce against Material Counterparties their respective material contractual obligations in all material respects, under each Material Agreement to which it is a party.  Each Borrower Group Member shall not violate applicable Sanctions, Anti-Money Laundering Laws, the FCPA or any other Anti-Corruption Laws and shall not undertake or cause to be undertaken any Anti-Corruption Prohibited Activity.

Section 5.04    Governmental Authorizations.    Each Borrower Group Member shall obtain, preserve and maintain in full force and effect (or where appropriate, renew in a timely manner), or cause to be obtained and maintained in full force and effect all material Authorizations (including all material Authorizations required by Environmental Law) required under any Applicable Law for (i) conduct of the Business or (ii) the execution, delivery and performance by such Loan Party of the Transaction Documents to which it is a party, in each case, at or before the time the relevant Authorization becomes necessary for such purposes.

Section 5.05    Maintenance of Title.  Each Borrower Group Member shall maintain (a) good title to the property owned by such Borrower Group Member necessary for the conduct of the Business free and clear of Liens, other than Permitted Liens; (b) legal and valid and subsisting leasehold interests to the properties leased by such Borrower Group Member necessary for the conduct of the Business, free and clear of Liens, other than Permitted Liens and (c) legal and valid possessory rights to the properties possessed and not otherwise held in fee or leased by such Borrower Group Member necessary for the conduct of the Business.

Section 5.06    Insurance.

57

(a)    Each Loan Party shall maintain insurance with insurance companies rated A- (or the then equivalent grade) or better, with a minimum size rating of VII (or the then equivalent grade) by A.M. Best Company (or an equivalent rating by another nationally recognized insurance rating agency of similar standing if A.M. Best Company shall no longer publish its Best's Credit Ratings or if S&P shall no longer publish its ratings for insurance companies, as the case may be) or other insurance companies of recognized responsibility satisfactory to the Administrative Agent against at least such risks and in at least such amounts as are customarily maintained by prudent similar businesses and as may be required by Applicable Law and as are required by the Material Agreements and/or Security Documents.  All such insurance shall, (a) provide that no cancellation or material modification thereof shall be effective until at least thirty (30) days (or, in the case of cancellation for non-payment of premiums, ten (10) days) after receipt by the Administrative Agent of written notice thereof, (b) in the case of any liability insurance and property insurance, name the Collateral Agent and the Secured Parties as an additional insured party thereunder and (c) in respect of any such policy relating to the Property of the Loan Parties, in the case of each casualty insurance policy, name the Collateral Agent as lender's loss payee. On the Closing Date and from time to time thereafter deliver to the Administrative Agent upon its reasonable request information in reasonable detail as to the insurance then in effect, stating the names of the insurance companies, the amounts and rates of the insurance, the dates of the expiration thereof and the properties and risks covered thereby.

(b)    Each Loan Party shall maintain (or cause to be maintained) the insurance required to be maintained pursuant to the Material Agreements in accordance with the terms of the same.

(c)    The applicable Loan Party shall instruct the relevant insurers to pay Loss Proceeds of the insurance policies provided or obtained by or on behalf of the Loan Parties directly to the Borrower Account.  If any Loss Proceeds that are required under the preceding sentence to be paid to the Borrower Account are received by any other Loan Party, such Loss Proceeds shall be received in trust for the Collateral Agent, shall be segregated from other funds of the recipient, and shall be forthwith paid into the Borrower Account in the same form as received (with any necessary endorsement).

Section 5.07    Keeping of Books.  Each Loan Party shall maintain an accounting and control system, management information system and books of account and other records, which together adequately reflect truly and fairly the financial condition of such Loan Party and the results of operations in accordance with GAAP and all Applicable Laws.

Section 5.08    Access to Property/Records.  Each Loan Party shall permit (i) officers and designated representatives of the Administrative Agent to visit and inspect any of its properties accompanied by officers or designated representatives of such Loan Party and (ii) officers and designated representatives of the Administrative Agent to examine and make copies of the books of record and accounts of such Loan Party (provided that such Loan Party shall have the right to be present) and discuss the affairs, finances and accounts of such Loan Party with the chief financial officer, the chief operating officer and the chief executive officer of such Loan Party (subject to reasonable requirements of safety and confidentiality, including requirements imposed by Applicable Law or by contract), in each case, with at least three (3) Business Days advance notice to such Loan Party and during normal business hours of such Loan Party; provided that,

58

such Loan Party shall not be required to reimburse the Administrative Agent for more than one inspection per calendar year as long as no Event of Default has occurred.

Section 5.09    <u>Taxes</u>.

(a)    Each Loan Party shall pay and discharge, before the same shall become delinquent, all material Taxes imposed upon it or upon its property to the extent required under the Transaction Documents to which such Loan Party is a party or under Applicable Law that, if unpaid, might become a Lien (other than a Permitted Lien of the type referenced in <u>clause (a)(i)</u> of the definition of Permitted Lien) upon its property; <u>provided</u> that such Loan Party shall not be required to pay or discharge any such Tax for so long as such Loan Party satisfies the Permitted Contest Conditions in relation to such tax, assessment, charge or claim.

(b)    No Loan Party shall make an election pursuant to Treasury Regulations Section 301.7701-3(c) to be treated as an association taxable as a corporation for U.S. federal income tax purposes or take any other action inconsistent with such Loan Party's status as an entity treated as a partnership or disregarded for U.S. federal income tax purposes.

Section 5.10    <u>Financial Statements; Other Reporting Requirements</u>.  Each Loan Party shall, or cause the applicable Non-Guarantor Subsidiary to, furnish to the Administrative Agent:

(a)    as soon as available and in any event within thirty (30) days after the end of each calendar month, a monthly report containing (i) such detailed information as Borrower customarily relies upon to monitor the operational performance (including commercial updates) of the Borrower Group Members, (ii) information on the financial performance of the Borrower Group Members and (iii) other key business performance indicators, in the form attached hereto as <u>Exhibit F</u>; <u>provided</u> that, for the report delivered under this <u>clause (a)</u> related to the end of each fiscal quarter, the Borrower shall delivery such report within forty-five (45) days after the end of such fiscal quarter;

(b)    as soon as available and in any event within thirty (30) days after the end of each calendar month, commencing with the partial calendar month during which the Closing Date occurs, monthly unaudited consolidated financial statements of the Borrower Group Members, including the unaudited consolidated balance sheet as of the end of such calendar month and the related unaudited statements of income, retained earnings and cash flows for such calendar month and for the portion of such fiscal year ending on the last day of such calendar month, all in reasonable detail; <u>provided</u> that, for the financial statements delivered under this <u>clause (b)</u> related to the end of each fiscal quarter, the Borrower shall delivery such financial statements within this forty-five (45) days after the end of such fiscal quarter;

(c)    as soon as available and in any event within one hundred fifty (150) days after the end of each fiscal year, commencing with fiscal year ending on December 31, 2019, audited consolidated financial statements for such fiscal year for the Borrower Group Members, including therein the consolidated balance sheet as of the end of such fiscal year and the related statements of income, retained earnings and cash flows for such year, and the respective directors' and auditors' reports, all in reasonable detail and accompanied by customary management discussion and analysis and an audit opinion thereon by the Independent Auditor, which opinion shall state

59

that said financial statements present fairly, in all material respects, the financial position of the Borrower Group Members, as the case may be, at the end of, and for, such fiscal year in accordance with GAAP;

(d)     at the time of the delivery of the financial statements under <u>Section 5.10(b)</u> or <u>(c)</u> above, a certificate of an Authorized Representative of Borrower (i) certifying that such financial statements fairly present in all material respects the financial condition and results of operations of the Borrower Group Members on the dates and for the periods indicated in accordance with GAAP, subject, in the case of interim financial statements, to the absence of footnotes and normally recurring year-end adjustments, (ii) certifying that no Default or Event of Default has occurred and is continuing, or if a Default or Event of Default has occurred and is continuing, a statement as to the nature thereof and (iii) certifying and providing calculations for the Leverage Ratio as of such date (such certificate, the "<u>Compliance Certificate</u>");

(e)     within thirty (30) days after each annual policy renewal date, a certificate of an Authorized Representative of the Borrower certifying that the insurance requirements of <u>Section 5.06</u> have been implemented and are being complied with by the Loan Parties and on or prior to the expiration of each policy required to be maintained pursuant to <u>Section 5.06</u>, certificates of insurance with respect to each renewal policy and each other insurance policy required to be in effect under this Agreement that has not previously been furnished to the Administrative Agent under this Agreement. If at any time requested by the Administrative Agent, the Borrower shall deliver to the Administrative Agent a duplicate of any policy of insurance required to be in effect under this Agreement;

(f)     within forty-five (45) days following the end of each fiscal quarter, an environmental, social and governance report in respect of the applicable fiscal year in the form attached hereto as <u>Exhibit J</u>;

(g)     within three (3) Business Days following delivery of any financial statements, operating or construction reports and/or any other material notices or reporting information as required under the Bond Documents or any Permitted Revolving Facility, a copy of such document, notice or information delivered in connection with the Bond Documents, any Permitted Revolving Facility, as applicable;

(h)     within five (5) Business Days of the end of each calendar month, in electronic format, an itemized summary of all withdrawals from the Collateral Accounts made during such calendar month.

Section 5.11    <u>Notices</u>. The Loan Parties shall, or cause the applicable Non-Guarantor Subsidiary to promptly (and, unless a subsection of this <u>Section 5.11</u> is expressly made subject to another time period, within five (5) Business Days) upon an Authorized Representative of any Loan Party obtaining knowledge thereof (or as otherwise provided in the case of clauses (a) and (h) below), give notice to the Administrative Agent of:

(a)      within five (5) Business Days after the earlier of (i) an Authorized Representative of any Borrower Group Member obtaining knowledge thereof and (ii) receipt of any notice thereof, the occurrence of any material default under any Material Agreements;

(b)      within ten (10) Business Days of any documents becoming available, any agreement or transaction (or series of related transactions) entered into with an Affiliate of a Loan Party (that is not a Loan Party) with a value in excess of $500,000 over the term of such agreement or transaction (or series of related transactions);

(c)      [Reserved];

(d)      [Reserved];

(e)      within ten (10) Business Days of any documents becoming available, true and complete copies of any amendment of any Material Agreement and of any Material Agreements executed after the Closing Date;

(f)      any Investments made by any Loan Party in a Non-Guarantor Subsidiary, to the extent not permitted by this Agreement; and

(g)      (x) the sale, lease, transfer or other Disposition of, in one transaction or a series of transactions, all or any part of the property of the Borrower Group Members in excess of $500,000 in the aggregate per calendar year and (y) the entry of any contract contemplated by, and any Disposition pursuant to, Section 6.07(e)(iii) (including the fair market value of any such Disposition).

(h)      notice received by it with respect to the cancellation of, adverse change in, or default under, any insurance policy required to be maintained in accordance with Section 5.06;

(i)      the filing or commencement of any litigation, investigation, action or proceeding (including any Environmental Claim) of or before any court, arbitrator or Governmental Authority against or affecting any Borrower Group Member or the Business (x) in which the amount involved is in excess of $1,250,000, (y) has resulted in or, if adversely determined, could reasonably be expected to result in a Material Adverse Effect or (z) which relates to a material Authorization (including all material Authorizations required by Environmental Law) necessary for the Business;

(j)      the occurrence of a Default or an Event of Default;

(k)      the occurrence of any ERISA Event, together with a written notice setting forth the nature thereof and the action, if any, that such Loan Party or ERISA Affiliate proposes to take with respect thereto;

(l)      no later than five (5) Business Days prior to the execution and delivery thereof (which period may be shortened in any instance at Administrative Agent's discretion), any amendment thereof, notice of any amendment to any Material Agreement that is an offtake agreement;

61

(m)    within five (5) days of delivery, copies of all statements, reports and notices (including board kits) made available to Borrower's Board of Directors; provided that any such material may be redacted by Borrower to exclude information relating to the Lenders (including Borrower's strategy regarding the Loans) or any material that Borrower determines in good faith, upon advice of counsel, the exclusion of which is reasonably necessary to preserve attorney-client privilege or to protect highly confidential proprietary information of any Borrower Group Member.

Section 5.12    [Reserved]

Section 5.13    Use of Proceeds.

(a)    The proceeds of the Loans funded on the Initial Funding Date shall be used as specified on Schedule 5.13(a).  The proceeds of the Loans funded on the Second Funding Date shall be used as specified on Schedule 5.13(b).

(b)    For the avoidance of doubt, (i) Borrower is permitted to lend or contribute the proceeds of the Loans to one or more of the Guarantors and (ii) except as set forth in Section 6.04, no Loan Party is permitted to lend or contribute the proceeds of the Loans to any of the Non-Guarantor Subsidiaries.

(c)    The proceeds of the Loans will not be used in violation of Anti-Corruption Laws or applicable Sanctions.

Section 5.14    Security.  The Loan Parties shall preserve and maintain the security interests granted under the Security Documents and undertake all actions which are necessary or appropriate to:  (a) maintain the Collateral Agent's security interest in the Collateral in full force and effect at all times (including the priority thereof (subject to Permitted Liens)), and (b) preserve and protect the Collateral and protect and enforce the Loan Parties' rights and title and the rights of the Collateral Agent and the other Secured Parties to the Collateral (subject to Permitted Liens), including the making or delivery of all filings and recordations, the payment of all reimbursements, fees and other charges and the issuance of supplemental documentation.

Section 5.15    Further Assurances.  The Loan Parties shall execute, acknowledge where appropriate, and deliver, and cause to be executed, acknowledged where appropriate, and delivered, from time to time promptly at the reasonable request of any Agent all such instruments and documents as are necessary or appropriate to carry out the intent and purpose of the Financing Documents (including filings, recordings or registrations required to be filed in respect of any Security Document or assignment thereto) necessary to maintain, to the extent permitted by Applicable Law, the Collateral Agent's perfected security interest in the Collateral to the extent and in the priority required by the Financing Documents.

Section 5.16    Security in Newly Acquired Property and Revenues.  Without limiting any other provision of any Financing Document, if any Loan Party shall at any time acquire interests in property in a single transaction or series of transactions, as applicable, not otherwise subject to the Lien created by the Security Documents having a value of at least $1,000,000 individually, promptly upon such acquisition, such Loan Party shall execute, deliver and record a supplement to the Security Documents or other documents, subjecting such interest to the Lien created by the Security Documents.

Section 5.17    <u>Material Agreements</u>.    Each Loan Party shall, or cause the applicable Non-Guarantor Subsidiary to (a) duly and punctually perform and observe all of its material covenants and obligations contained in each Material Agreement to which it is a party and (b) enforce against the relevant Material Counterparty each material covenant or obligation of such Material Agreement, as applicable, in accordance with its terms.

Section 5.18    <u>Collateral Accounts</u>.

(a)    The Loan Parties shall at all times maintain the Collateral Accounts in accordance with the Financing Documents and cause such Collateral Accounts to be subject to a Control Agreement at all times.

(b)    [Reserved]

(c)    At all times each Loan Party shall deposit and maintain, or cause to be deposited and maintained, all Business Revenues, insurance proceeds and other amounts received into the Collateral Accounts in accordance with the provisions below and request or make only such payments and transfers out of the Collateral Accounts as permitted by the provisions below (except as otherwise consented to in writing by the Collateral Agent).

(i)    <u>Borrower Account</u>.

(A)    The Loan Parties shall deposit into the Borrower Account: (i) proceeds of the Loans which are intended to be deposited into such account(s) pursuant to the Funds Flow Memorandum delivered on the Initial Funding Date or any funds flow memorandum agreed with the Administrative Agent and delivered in connection with any other Funding Date, (ii) any Business Revenues paid to any Loan Party and (iii) all other amounts received by any Loan Party and not required or permitted to be deposited into another Collateral Account pursuant to this Agreement (including proceeds in respect of Events of Loss (including Loss Proceeds) and Dispositions, proceeds from the incurrence of Indebtedness, termination payments and other extraordinary payments under project contracts (including the Material Agreements), damages and other proceeds received by the Loan Parties).

(B)    The Loan Parties may make withdrawals, transfers and payments from the Borrower Account as permitted by this Agreement and the other Financing Documents.

(ii)    <u>Debt Service Reserve Account</u>.

(A)    On the Second Funding Date, the Debt Service Reserve Account shall be funded in cash, from the proceeds of the Loans advanced on such date, in an amount equal to $7,730,000.

(B)    Subject to <u>clause (C)</u> below, if the Borrower has insufficient cash to pay interest on the Loans in accordance with <u>Section 2.07</u> (taking into account the right of the Borrower to pay interest in kind pursuant to <u>Section 2.07(e)</u>) on any Quarterly Payment Date (such insufficiency, the "***Interest Payment Deficiency***"), Borrower shall promptly transfer an aggregate amount equal to the Interest Payment Deficiency (or, if less, the aggregate amount of cash then on

deposit in the Debt Service Reserve Account) from the Debt Service Reserve Account to the Administrative Agent to pay, on behalf of Borrower, the Interest Payment Deficiency.

(C)

(I)       In addition to transfers made in accordance with clause (B) above, the amounts remaining on deposit in the Debt Service Reserve Account may be withdrawn by the Borrower to make payment on the Shareholder Notes on or after December 31, 2019 in accordance with Section 6.06(e) if (i) for the period between June 1, 2019 and December 31, 2019, the Borrower has demonstrated to the reasonable satisfaction of the Administrative Agent that the DSRA CFADS of the Loan Parties relating to the PinnPack Facility and the Riverside Facility in the aggregate is greater than or equal to $6,000,000 (excluding any distributions made from the Non-Guarantor Subsidiaries), in an amount equal to 100% of the amounts then-remaining on deposit in the Debt Service Reserve Account or (ii) for the period between June 1, 2019 and December 31, 2019, the Borrower has demonstrated to the reasonable satisfaction of the Administrative Agent that the DSRA CFADS of the Loan Parties relating to the PinnPack Facility and the Riverside Facility in the aggregate is greater than $4,000,000 but less than $6,000,000 (excluding any distributions made from the Non-Guarantor Subsidiaries), in an amount equal to 50% of the amounts then-remaining on deposit in the Debt Service Reserve Account (any such funds released pursuant to this clause (C)(I) or clause (C)(II) below, the "DSR Released Funds"); provided, that, for the avoidance of doubt, (1) if no amounts were withdrawn from the Debt Service Reserve Account pursuant to this clause (C)(I), the cash on deposit would continue to be utilized as a reserve subject to clause (B) above and (2) the foregoing shall not restrict the Loan Parties from making payments on Shareholder Notes using the cash proceeds of Additional Equity Raise Amounts permitted by Section 6.06(e).

(II)      In addition to transfers made in accordance with clause (B) and clause (C)(I) above, the amounts remaining on deposit in the Debt Service Reserve Account may be withdrawn by the Borrower to make payment on the Shareholder Notes on or after June 30, 2020 in accordance with Section 6.06(e) if (i) for the period between January 1, 2020 and June 30, 2020, the Borrower has demonstrated to the reasonable satisfaction of the Administrative Agent that the DSRA CFADS of the Loan Parties relating to the PinnPack Facility and the Riverside Facility in the aggregate is greater than or equal to $6,000,000 (excluding any distributions made from the Non-Guarantor Subsidiaries), in an amount equal to 100% of the amounts then-remaining on deposit in the Debt Service Reserve Account or (ii) for the period between January 1, 2020 and June 30, 2020, the Borrower has demonstrated to the reasonable satisfaction of the Administrative Agent that the DSRA CFADS of the Loan Parties relating to the PinnPack Facility and the Riverside Facility in the aggregate is greater than $4,000,000 but less than $6,000,000 (excluding any distributions made from the Non-Guarantor Subsidiaries), in an amount equal to 50% of the amounts then-remaining on deposit in the Debt Service Reserve Account; provided, that, for the avoidance of doubt, (1) if no amounts were withdrawn from the Debt Service Reserve Account pursuant to this clause (C)(II), the cash on deposit would continue to be utilized as a reserve subject to clause (B) above and (2) the foregoing shall not restrict the Loan Parties from making payments on Shareholder Notes using the cash proceeds of Additional Equity Raise Amounts permitted by Section 6.06(e).

64

(d)      The Loan Parties shall cause the Non-Guarantor Subsidiaries to distribute cash to the Loan Parties to the extent permitted under the applicable Bond Documents of such Non-Guarantor Subsidiaries.

(e)      Nothing set forth in this Agreement shall prohibit the Borrower Group Members from depositing or holding in the Excluded Accounts the amounts described in the definition thereof.

Section 5.19   <u>Intellectual Property</u>.

(a)      Each Loan Party shall own, or be licensed to use, all Intellectual Property that such Loan Party reasonably believes is necessary for its conduct of the Business, in each case, as to which the failure of such Loan Party to so own or be licensed could reasonably be expected to have a Material Adverse Effect.

(b)      If a Loan Party licenses any Intellectual Property from another Person and such Intellectual Property is material to the conduct of the business of any Loan Party, and the license is rejected in an insolvency proceeding, such Loan Party shall use commercially reasonable efforts to maintain its rights under the license, which efforts shall include making an election under Section 365(n) of the Bankruptcy Code, if an election is available to such Loan Party.

(c)      Each Loan Party agrees that, should it hereafter (i) obtain an ownership interest in any issued Copyrights, Trademarks, or Patents, (ii) obtain an exclusive license to any Copyrights, (iii) either by itself or through any agent, employee, licensee, or designee, file any application for the registration or issuance of any Copyrights, Trademarks or Patents with the United States Patent and Trademark Office or the United States Copyright Office, or (iv) should it file a statement of use or an amendment to allege use with respect to any "intent-to-use" Trademark application (the items in clauses (i), (ii) (iii) and (iv), collectively, the "<u>After-Acquired Intellectual Property</u>"), then, unless it constitutes Excluded Assets under the Pledge and Security Agreement, any such After-Acquired Intellectual Property shall automatically become part of the Collateral, and such Loan Party shall give written notice thereof within 60 days of the registration or issuance thereof to the Collateral Agent in accordance herewith.

(d)      Each Loan Party agrees to use commercially reasonable efforts so as not to permit the inclusion in any contract to which it hereafter becomes a party of any provision that would materially impair or prevent the creation of a security interest in such Loan Party's rights and interests in any property described in <u>Section 5.19(c)</u> that is material to the business of any Loan Party, other than the Financing Documents and any loan documentation relating to the Permitted Revolving Facility.

(e)      Each Loan Party shall promptly notify the Collateral Agent if it knows or has reason to know that any registered or issued Copyrights, Trademarks or Patents that it owns or licenses becomes (i) abandoned or dedicated to the public or placed in the public domain, (ii) invalid or unenforceable, (iii) subject to any adverse determination or development regarding such Loan Party's ownership, registration or use or the validity or enforceability of such item of Intellectual Property (including the institution of, or any adverse development with respect to, any action or proceeding in the United States Patent and Trademark Office, the United States Copyright Office,

any state registry, any foreign counterpart of the foregoing, or any court) or (iv) the subject of any reversion or termination rights.

(f)    Each Loan Party shall not intentionally infringe, misappropriate, dilute, or otherwise violate the Intellectual Property rights of any other Person in any manner which could reasonably be expected to have a Material Adverse Effect.  In the event that any Person initiates, or threatens in writing to initiate, any action or proceeding alleging that such Loan Party, or the conduct of such Loan Party's business, infringes, misappropriates, dilutes, or otherwise violates the Intellectual Property of any other Person, and such action or proceeding could reasonably be expected to have a Material Adverse Effect, such Loan Party shall promptly notify the Collateral Agent after it learns thereof.

Section 5.20    <u>Budget and Updated Model; Non-Guarantor Subsidiaries</u>.

(a)    <u>Submission of Operating Budget</u>.  (x) (1) With respect to the Loan Parties, on the Closing Date (with respect to the remainder of fiscal year 2019 and full fiscal year 2020) and (2) not later than thirty (30) days after the beginning of each fiscal year following the Closing Date beginning with the calendar year ending December 31, 2021, (y) with respect to the Texas Facility Group, no later than thirty (30) days prior to the beginning of the calendar year after distributions are permitted under the Bond Documents in respect of the Texas Facility (which is expected to be 2021), and (z) with respect to the Pennsylvania Facility Group, no later than thirty (30) days prior to the beginning of the calendar year after distributions are permitted under the Bond Documents in respect of the Pennsylvania Facility (which is expected to be 2023), in each case, the Borrower shall submit to the Lenders a copy of its proposed operating budget for such fiscal year with respect to the applicable Borrower Group Members covered thereby.  In addition, Borrower may from time to time propose an amended operating budget for the remainder of any fiscal year to which an existing Operating Budget applies.  The effectiveness of any proposed operating budget so submitted, for purposes of the Financing Documents, is subject to <u>Sections 5.20(b)</u>.

(b)    <u>Approval of Operating Budget</u>.  Except with respect to the agreed Operating Budget delivered on the Closing Date, each proposed operating budget delivered pursuant to <u>Section 5.20(a)</u> shall not be effective for purposes of the Financing Documents until approved by the Administrative Agent (such approval not to be unreasonably withheld, conditioned or delayed).  In the event that, pursuant to the immediately preceding sentence, such a proposed operating budget is not approved by the Administrative Agent, or the Borrower has not submitted a proposed operating budget for a fiscal year, the Operating Budget for the immediately preceding fiscal year shall apply until a proposed operating budget for the then current fiscal year is approved.

(c)    <u>Compliance with Operating Budget; Intra-year Adjustments</u>.  Commencing on the Closing Date, direct wages, other manufacturing overhead, general and administrative expenses, maintenance capital expenses and growth capital expenses shall be paid by the Borrower Group Members in compliance with the Operating Budget, except as set forth in this <u>Section 5.20(c)</u>.

(i)    Without necessitating any amendment to the Operating Budget, the Borrower Group Members may exceed any line item in the Operating Budget for the applicable fiscal year, so long as the net excess of all line items for such fiscal year does not exceed zero

(after giving effect to any Additional Equity Raise Amounts applied pursuant to <u>Section 5.20(c)(iii)</u>).

(ii)    While performance against the Operating Budget will be reported periodically pursuant to <u>Section 5.10(d)</u>, compliance with the Operating Budget will be determined only on an annual basis (after giving effect to any equity cures pursuant to <u>Section 5.20(c)(iii)</u> or <u>6.01(b)</u>), and Loan Parties shall not be in breach of this <u>Section 5.20(c)</u> (and no Default or Event of Default may occur) by virtue of any reported deviation from the Operating Budget on a period shorter than an annual basis.

(iii)    The Borrower may, in its discretion, use any Additional Equity Raise Amounts to cure any default in respect of this Section by paying direct wages, other manufacturing overhead, general and administrative expense, maintenance capital expense and growth capital expense made during the fiscal year in which such cash was received by Borrower for purposes of determining compliance with this <u>Section 5.20(c)</u>.

(d)    <u>Non-Guarantor Subsidiaries</u>.  Non-Guarantor Subsidiaries shall utilize such Non-Guarantor Subsidiary's Business Revenues to pay operating expenses, debt service, Capital Expenditures and other amounts generally in accordance with the applicable Operating Budget, and shall distribute, to the extent permitted by the Bond Documents, and the terms of any applicable working capital financing arrangements entered into as permitted by this Agreement, and net of reasonable reserves and working capital, all remaining cash and Cash Equivalent Investments to the Loan Parties once per calendar quarter.

Section 5.21    <u>Post-Closing Covenants</u>.

(a)    The Loan Parties shall cause the property insurance policies to be increased to an amount of not less than $60,000,000 per occurrence during the current policies' next policy period.

(b)    Each Loan Party shall cause all certificates representing the shares of Capital Stock constituting "certificated securities" under the UCC that are pledged pursuant to the Security Agreement, together with an undated stock power for each such certificate executed in blank by a duly Authorized Representative of the applicable Loan Party, each in form and substance reasonably satisfactory to the Collateral Agent, to be delivered to the Collateral Agent within fifteen (15) days of the Initial Funding Date.

(c)    The Loan Parties shall obtain key person life insurance insuring the life of Leon Farahnik in an amount of not less than $7,500,000 (the "<u>Life Insurance Policy</u>") within ninety (90) days of the Initial Funding Date and until the Discharge Date, maintain such Life Insurance Policy in such amount at all times.  The Life Insurance Policy shall name the Borrower as owner and beneficiary with respect to such insurance and shall designate the Borrower Account as the account in which proceeds under the Life Insurance Policy shall be paid.

(d)    Following the Closing Date, each Loan Party agrees to use commercially reasonable efforts to cause CL Industries to be released from its joint and several obligations tied to the Texas Facility and the Pennsylvania Facility prepayments, in Amendment 3, dated November 1, 2018, to the Niagara Bottling, LLC and CarbonLite Recycling LLC Supply

Agreement, dated November 1, 2017, as amended by Amendment 1 dated March 1, 2018 and Amendment No 2, dated April 17, 2018.

(e)     Borrower shall use commercially reasonable efforts to raise Additional Equity Raise Amounts in an amount equal to at least $10,000,000 which shall be applied to repay and retire a portion of the Pennsylvania Intercompany Indebtedness within twelve (12) months following the Initial Funding Date.

(f)     The Loan Parties shall, within 30 days following the Closing Date, provide to the Administrative Agent a certificate of good standing from the Secretary of State of the State of California with respect to PinnPack.

ARTICLE VI

NEGATIVE COVENANTS

Each Loan Party agrees that from and after the Closing Date until the Discharge Date:

Section 6.01    Subsidiaries; Equity Issuances.

(a)     No Loan Party shall (i) form or have any subsidiary other than another wholly-owned U.S. domestic subsidiary whose equity interests become subject to the Security Documents as contemplated by the Security Documents (other than the Non-Guarantor Subsidiaries and any Subsidiaries that are not wholly-owned on the Closing Date) or (i) subject to Section 6.04 hereof, own, or otherwise Control any Capital Stock in, any other Person.

(b)     Borrower shall not issue any additional shares of Capital Stock while any breach of Section 5.20(c) is continuing, subject to the following.  Notwithstanding anything to the contrary contained in Article VII, in the event that Borrower fails to comply with Section 5.20(c) for any fiscal year, Borrower may, within ninety (90) days of the end of such fiscal year, issue additional shares of Capital Stock of Borrower in exchange for cash (the amount thereof, the "Cure Amount").  Upon the receipt by Borrower of the cash Cure Amount pursuant to the exercise of such cure right, such Cure Amount shall be deemed to reduce the aggregate amount of direct wages, other manufacturing overhead, general and administrative expense, maintenance capital expense and growth capital expense made during the fiscal year for which such breach occurred, and compliance with the Operating Budget for such fiscal year shall be recalculated for all purposes under the Loan Documents. If, after giving effect to the foregoing recalculation, Borrower shall then be in compliance with the Operating Budget, Borrower shall be deemed to have satisfied the requirements of Section 5.20(c) for such fiscal year, with the same effect as though there had been no failure to comply therewith, and the applicable breach of Section 5.20(c) that had occurred, and any related Default or Event of Default, shall be deemed cured without any further action of Borrower, Administrative Agent or any Lender for all purposes under the Loan Documents.

Section 6.02    Indebtedness.  No Borrower Group Member shall create, incur, assume or suffer to exist any Indebtedness, other than (each of the following, "Permitted Indebtedness"):

(a)     Indebtedness incurred under the Financing Documents;

68

(b)    Capital Lease Obligations or purchase money obligations to the extent incurred in the ordinary course of business to finance the acquisition or licensing of intellectual property or discrete items of equipment (and Indebtedness incurred to finance any such obligations); <u>provided</u> that the annual debt service payments in respect of all such Indebtedness (inclusive of interest, principal and fees) does not exceed $350,000 per calendar year;

(c)    current accounts payable not more than ninety (90) days past due or which are that are being contested in accordance with the Permitted Contest Conditions, interest thereon, regulatory bonds, surety obligations and accrued expenses incurred, in the ordinary course of business;

(d)    [Reserved];

(e)    Indebtedness incurred under any Permitted Revolving Facility;

(f)    Indebtedness existing on the Closing Date and set forth in <u>Schedule 6.02</u> and extensions, renewals and replacements of any such Indebtedness that do not increase the outstanding principal amount thereof except by an amount equal to a reasonable premium or other amount paid, and reasonable fees and expenses incurred, in connection with such extension, renewal or replacement or change any direct or contingent obligor with respect thereto or shorten the average life to maturity thereof;

(g)    (i) Guarantees by any Borrower Group Member of Indebtedness otherwise permitted hereunder of any other Borrower Group Member, and (i) performance guarantees provided by a Loan Party to support the obligations of any Loan Party in the ordinary course of business under the Material Agreements;

(h)    Indebtedness under the Shareholder Notes and subject to the applicable Subordination Agreement or another subordination agreement in form and substance reasonably acceptable to the Administrative Agent;

(i)    unsecured intercompany Indebtedness among the Borrower Group Members;

(j)    other Indebtedness of the Non-Guarantor Subsidiaries in an amount not exceeding $4,000,000 in the aggregate at any time outstanding across the Non-Guarantor Subsidiaries (for which the Loan Parties shall not be obligated);

(k)    Indebtedness with respect to letters of credit in favor of the landlord under any real property leases, in each case, issued in accordance with the applicable real property lease and in an aggregate stated amount not exceeding $5,000,000 at any time outstanding;

(l)    (i) in the case of the Non-Guarantor Subsidiaries, Indebtedness of a Non-Guarantor Subsidiary under the Bond Documents to which it is a party as of the date hereof and (ii) additional industrial revenue bond transactions of a nature similar to those subject to the Bond Documents not involving any of the Borrower Group Members in existence as of the Closing Date; and

(m)     other unsecured Indebtedness in an aggregate principal amount not exceeding $2,000,000 at any time outstanding (as such amount may be increased with the consent of the Administrative Agent in its sole and absolute discretion).

Section 6.03    Liens, Etc. No Borrower Group Member shall create, incur, assume or suffer to exist any Lien upon or with respect to any of its properties of any character (including accounts receivables) whether now owned or hereafter acquired, or assign any accounts or other right to receive income, other than (each of the following, a "Permitted Lien"):

(a)     Liens arising by reason of:

(i)     Taxes either secured by a bond or which are not yet due or which are being contested pursuant to the Permitted Contest Conditions;

(ii)     security, pledges or deposits in the ordinary course of business for payment of workmen's compensation or unemployment insurance or other types of social security benefits; and

(iii)     good faith deposits or pledges incurred or created in connection with or to secure the performance of bids, tenders, contracts (other than contracts for the payment of money), leases, statutory obligations, surety bonds or appeal bonds entered into in the ordinary course of business or under Applicable Law;

(b)     Liens of mechanics, carriers, landlords, warehousemen, materialmen, laborers, repairmen's, employees or suppliers or any similar Liens arising by operation of law, incurred in the ordinary course of business with respect to obligations which are not overdue by more than forty-five (45) days, or which are adequately bonded and which are being contested pursuant to the Permitted Contest Conditions;

(c)     Liens arising out of judgments, orders or awards that have been adequately bonded, are fully covered by insurance (subject to applicable deductibles) or with respect to which a stay of execution has been obtained pending an appeal or proceeding for review pursuant to the Permitted Contest Conditions;

(d)     Liens arising with respect to zoning restrictions, easements, licenses, reservations, covenants, rights-of-way, utility easements, building restrictions and other similar charges or encumbrances on the use of real property which, individually or in the aggregate, do not materially detract from the value of the affected property and do not materially interfere with the ordinary conduct of the business of such Borrower Group Member;

(e)     Liens or the interests of lessors to secure purchase money obligations permitted under Section 6.02(b); provided that such Lien encumbers only the specific goods, equipment or software so financed, any accessions thereto, proceeds thereof and related books and records;

(f)     Liens arising under ERISA and Liens arising under the US Code with respect to an employee benefit plan (as defined in Section 3(2) of ERISA) that do not constitute an Event of Default under Section 7.01(i);

(g)      to the extent constituting Liens, leases, licenses, subleases or sublicenses granted to others in the ordinary course of business that do not (i) interfere in any material respect with the ordinary conduct of the Business of the Borrower Group Members, (ii) secure any Indebtedness or (iii) individually or in the aggregate detract from the expected value of the property of the Borrower Group Members in any material respect;

(h)      (i) Liens arising solely by virtue of any statutory or common law provision relating to banker's liens, rights of set-off or similar rights and remedies and burdening only deposit accounts or other funds maintained with a creditor depository institution, in each case, granted in the ordinary course of business in favor of such creditor depositary institution, provided that no such deposit account is a dedicated cash collateral account or is subject to restrictions against access by the depositor in excess of those set forth by regulations promulgated by the Board and no such deposit account is intended by Borrower to provide collateral to the depository institution and (ii) Liens in favor of a banking or other financial institution arising as a matter of law or in the ordinary course of business under customary general terms and conditions encumbering deposits or other funds maintained with a financial institution (including the right of setoff) and that are within the general parameters customary in the banking industry or arising pursuant to such banking institution's general terms and conditions;

(i)      any Lien on any property or asset of the Borrower or any of its Subsidiaries existing on the Closing Date and set forth in Schedule 6.03; provided that such Lien shall not apply to any other property or asset of the Borrower or any Subsidiary;

(j)      Liens arising under the Financing Documents;

(k)      Liens, securing obligations under any Permitted Revolving Facility, on the applicable Borrower Group Members' (i) accounts or proceeds arising from the sale of inventory or the provision of services, (ii) segregated proceeds of the foregoing (including any deposit accounts, securities accounts or commodities accounts holding solely such proceeds), and (iii) books and records relating to the foregoing;

(l)      Liens on the assets and properties of the Non-Guarantor Subsidiaries incurred pursuant to the Bond Documents;

(m)      cash collateral arrangements with respect to letters of credit issued in accordance with Section 6.02(k);

(n)      Liens on the assets and properties of the Non-Guarantor Subsidiaries securing Indebtedness permitted in reliance on Section 6.02(j);

(o)      Liens consisting of Investments permitted in reliance on Section 6.04(j);

(p)      Liens that extend, renew or replace in whole or in part a Lien referred to above.

Section 6.04    Investments.  No Borrower Group Member shall make any Investment, except:

(a)      cash equity investments and/or contributions made by a Loan Party to a Non-Guarantor Subsidiary solely to the extent such investment or contribution is made using the direct

or indirect cash proceeds of the issuance of additional shares of Capital Stock of Borrower in exchange for cash after the Closing Date; <u>provided</u> that, at the time of such issuance, no Event of Default is continuing;

(b)   (i) intercompany loans among the Borrower Group Members, to the extent unsecured and pledged to the Collateral Agent, for the benefit of the Secured Parties, under the Security Agreement, and (ii) Investments between Loan Parties;

(c)   (i) Cash Equivalent Investments and (ii) bank deposits in the ordinary course of business;

(d)   deposits described in <u>Section 6.03(a)(ii)</u>;

(e)   Investments consisting of extensions of credit in the nature of deposits, accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business, and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors to the extent reasonably necessary in order to prevent or limit loss;

(f)   non-cash consideration received, to the extent permitted by the Financing Documents, in connection with the Disposition of property permitted by this Agreement;

(g)   Investments listed on <u>Schedule 6.04</u> as of the Closing Date;

(h)   discounts given to customers of any Loan Party in the ordinary course of business;

(i)   Investments by any Non-Guarantor Subsidiary in accordance with the Bond Documents; and

(j)   Investments consisting of security deposits with utilities, landlords and other like Persons made in the ordinary course of business.

Section 6.05   <u>Chief Executive Office; Business Activities</u>.

(a)   Each Loan Party shall maintain its chief executive office at the address specified in <u>Section 10.01</u>, and no such Person shall change such chief executive office unless it has given at least ten (10) days' prior notice thereof to the Administrative Agent and the Collateral Agent, and each Loan Party has taken all steps then required pursuant to the Security Agreements to ensure the maintenance and perfection of the security interests created or purported to be created thereby.

(b)   No Borrower Group Member shall at any time to any material extent conduct any activities other than (i) those related to the Business and the other Material Agreements and any activities incidental to the foregoing and (ii) in the case of any Non-Guarantor Subsidiary, those not prohibited by the Bond Documents.

Section 6.06   <u>Restricted Payments</u>.  No Borrower Group Member shall declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment other than:

(a)       Dividends, distributions or other payments in respect of Investments by any Borrower Group Member to any Loan Party;

(b)       any Loan Party may declare and pay dividends with respect to its equity interests payable solely in additional shares of its common stock;

(c)       any Loan Party may make Restricted Payments pursuant to and in accordance with stock option plans or other benefit plans for management or employees of the Borrower, including repurchases of equity interests of any nature from employees of any Borrower Group Member or from officers and/or directors of Borrower, provided that the aggregate amount thereof does not exceed $100,000 during any fiscal year;

(d)       any Loan Party may make any payment pursuant to Section 6.10 so long as any such payments are in compliance with the Operating Budget (subject to any variance permitted pursuant to Section 5.20), it being understood that any amounts that are not contemplated by, or included in, the Operating Budget are not permitted to be made;

(e)       the Loan Parties may make payments on (i) the Shareholder Notes, so long as (A) the amount of such payments (other than any DSR Released Funds and any Additional Equity Raise Amounts) do not exceed $200,000 per year, (B) except in the case of any DSR Released Funds or any Additional Equity Raise Amounts, such amounts are paid quarterly, (C) except in the case of any DSR Released Funds or any Additional Equity Raise Amounts, such payment amounts do not exceed 25% of the annual interest outstanding on such Indebtedness, (D) except in the case of any DSR Released Funds or any Additional Equity Raise Amounts, the full amount of the Interest Rate payable hereunder that is payable in cash (subject to the Borrower's rights to pay in kind in Section 2.07) has been paid in cash through the date of such payment and (E) no Default, Event of Default or Material Adverse Effect has occurred and is continuing or would result from such Restricted Payment (for avoidance of doubt, any such Shareholder Note may be exchanged by the holder thereof for equity interests in Borrower), and (ii) the Loan Parties may make payments on the Pennsylvania Intercompany Indebtedness and the Texas Intercompany Indebtedness from Additional Equity Raise Amounts, so long as no Default, Event of Default or Material Adverse Effect has occurred and is continuing or would result from such Restricted Payment;

(f)       Permitted Tax Distributions so long as (x) no Default, Event of Default or Material Adverse Effect has occurred and is continuing or would result from such Restricted Payment and (y) the Administrative Agent shall have received reasonably detailed calculations of the amount of any such Permitted Tax Distribution proposed to be made (which calculations shall be in form and substance reasonably satisfactory to the Administrative Agent); and

(g)       Restricted Payments made by any Non-Guarantor Subsidiary to any Loan Party that are not prohibited by the Bond Documents; and

(h)       Restricted Payments among Loan Parties.

Section 6.07   Fundamental Changes; Asset Dispositions.  No Borrower Group Member shall:

73

(a)    in one transaction or a series of transactions, merge into or consolidate with, or acquire all or any substantial part of the assets or any class of stock or other ownership interests of, any other Person or sell, transfer or otherwise Dispose of all or substantially all of its assets to any other Person; provided that (i) the Borrower may participate in a merger or consolidation with any Person if (w) no Default is continuing, (x) any such merger or consolidation would not cause a Default hereunder, (y) if the Borrower merges or consolidates with any Person, the Borrower shall be the surviving Person and (z) such merger is approved by the Administrative Agent in its reasonable discretion; (ii) any Subsidiary may participate in a merger or consolidation with the Borrower (provided that the Borrower shall be the continuing or surviving corporation); and (iii) any Non-Guarantor Subsidiary may do any of the foregoing to the extent not prohibited by the Bond Documents;

(b)    change its legal form, liquidate or dissolve (provided that any Non-Guarantor Subsidiary may do any of the foregoing to the extent not prohibited by the Bond Documents);

(c)    make or agree to make any amendment to its Organizational Documents to the extent that such amendment could reasonably be expected to be materially adverse to the interests of the Agents or the Lenders;

(d)    [Reserved];

(e)    Dispose of, in one transaction or a series of transactions, all or any part of the property owned by the Borrower Group Members in excess of $1,000,000 per year in the aggregate other than: (i) sales or other Dispositions of equipment (either worn out or defective, or no longer used or useful, or to be replaced with improved equipment) for fair market value to the extent that the Borrower reinvests the Net Available Amount (or any portion thereof) of any such Disposition in substantially similar assets that are necessary or useful for the Business pursuant to a transaction not prohibited hereunder and such Net Available Amount is so reinvested within one hundred eighty (180) days (or been made the subject of a firm purchase order placed within such time period) of such Disposition; (ii) Dispositions of assets, including equity interests, from any Loan Party to any other Loan Party, (iii) Dispositions of cash and Cash Equivalent Investments in the ordinary course of business and for fair market value, (iv) licensing of Intellectual Property in the ordinary course of business, so long as it does not interfere in any material respect with the ordinary conduct of the Business of the Borrower Group Members, (v) the sale of inventory (if any) in ordinary course of business and (vi) dispositions of direct or indirect proceeds of the issuance of additional shares of Capital Stock of Borrower in exchange for cash after the Closing Date (provided that, at the time of such issuance, no Event of Default is continuing). For the avoidance of doubt, maintenance capital expenditures treated as a disposition for accounting purposes shall not be subject to this clause (e) solely by virtue of such accounting treatment.

Section 6.08    Accounting Changes. No Loan Party shall change its fiscal year.

Section 6.09    Material Agreements, Bond Documents and Permitted Revolving Facilities. No Borrower Group Member shall, directly or indirectly:

(a)    amend, modify, supplement or grant a consent, approval or waiver under, or permit or consent to the amendment, modification, supplement, consent, approval or waiver of

74

(collectively, an "Amendment"), (i) any real property lease of any Facility, without the prior written consent of the Administrative Agent (which shall not to be unreasonably withheld, conditioned or delayed), (ii) any Material Agreement that is an offtake agreement, without the prior written consent of the Administrative Agent (which shall not be unreasonably withheld, conditioned or delayed), if such Amendment would (x) be reasonably expected to adversely affect Lenders, or (y) adversely modify any of the repayment terms related to the deposits, (iii) any Bond Document, to the extent that such Amendment would limit the rights of the Non-Guarantor Subsidiaries to make distributions, add indebtedness or liens or take an action that is currently prohibited thereunder, (iv) any Permitted Revolving Facility in violation of any intercreditor agreement between Agent and the holders of the Indebtedness thereunder;

    (b)    [Reserved];

    (c)    subject to the right of each Borrower Group Member to enter into a Replacement Agreement as set forth in Section 7.01(k), directly or indirectly transfer, terminate, cancel or permit or consent to the transfer, termination or cancellation (including by exercising any contractual option to terminate, or failing to exercise any contractual option to extend) of any Material Agreement without the written consent of the Administrative Agent, such consent not to be unreasonably withheld, conditioned or delayed; or

    (d)    enter into an Material Additional Agreement without the prior written consent of the Administrative Agent not to be unreasonably withheld, conditioned or delayed; provided that the entry into any Material Additional Agreement relating to any item contemplated by, and in compliance with, the Operating Budget (subject to any variance permitted pursuant to Section 5.20) shall not require the consent of the Administrative Agent.

Section 6.10   Transactions with Affiliates.  No Borrower Group Member shall directly or indirectly enter into any transaction or series of related transactions with an Affiliate of such Borrower Group Member, except for (a) transactions set forth on Schedule 3.21 hereto and reasonable modifications, renewals or extensions thereto as contemplated by Borrower's Operating Budget (provided that no Loan Party may make any payments with respect to the Pennsylvania Intercompany Indebtedness or the Texas Intercompany Indebtedness except (i) with the consent of the Administrative Agent in its sole and absolute discretion or (ii) in compliance with Section 6.06(e)), (b) transactions in the ordinary course of such Borrower Group Member's (and such Affiliate's) business and upon fair and reasonable terms no less favorable to such Borrower Group Member than it would obtain in comparable arm's-length transactions with a Person acting in good faith which is not an Affiliate, (c) transactions between or among the Borrower Group Members not involving any other Affiliate and (d) any transaction permitted by Section 6.01, 6.02, 6.03, 6.04, 6.06, 6.07 or 6.16.  No Borrower Group Member shall cause a business opportunity of the Loan Parties to be diverted, assigned or allocated to the Non-Guarantor Subsidiaries.

Section 6.11   Collateral Accounts.  No Borrower Group Member shall open or maintain, or instruct any Person to open or maintain, any securities accounts, deposit accounts or other bank accounts other than (i) the Collateral Accounts (each of which shall be subject to a Control Agreement at all times), (ii) Excluded Accounts and (iii) in the case of any Non-Guarantor Subsidiary, any such accounts that are not prohibited by the Bond Documents. Prior to the

US-DOCS\109334811.27

Discharge Date, no Borrower Group Member shall change (or permit any other Person to change) the name or account number of any Collateral Account without prior written notice to the Collateral Agent.  No amounts may be transferred or withdrawn from any Collateral Account other than in accordance with and as permitted by <u>Section 5.18</u>.

Section 6.12    [Reserved]

Section 6.13    <u>Hazardous Materials</u>.  No Loan Party shall cause any Releases of Hazardous Materials at, on, from or under any real property currently or formerly owned, leased or operated by such Borrower Group Member, except to the extent such Release is otherwise in compliance in all material respects with all Applicable Laws, including Environmental Laws, and applicable insurance policies.

Section 6.14    <u>No Hedging or Speculative Transactions</u>.  No Loan Party shall enter into, or suffer to exist, any Hedging Agreement for speculative purposes or any other speculative transaction.

Section 6.15    <u>Change of Auditors</u>.  No Borrower Group Member shall change its Independent Auditor, except (i) with the prior written consent of the Administrative Agent, such consent not to be unreasonably withheld, conditioned or delayed, and (ii) in the case of any Non-Guarantor Subsidiary, to the extent not prohibited by the Bond Documents.

Section 6.16    <u>Purchase of Capital Stock</u>.  No Borrower Group Member shall purchase, redeem or otherwise acquire any of such Borrower Group Member's issued Capital Stock or otherwise reduce its Capital Stock, except (i) as permitted under <u>Section 6.07</u>, and (ii) in the case of any Non-Guarantor Subsidiary, to the extent not prohibited by the Bond Documents; <u>provided</u> that the foregoing shall in no way be construed to limit such Borrower Group Member's ability to make Restricted Payments.

Section 6.17    [Reserved].

Section 6.18    <u>Capital Expenditures</u>.  No Borrower Group Member will make any Capital Expenditures other than (a) the purchase or lease of assets reasonably required for the Business in accordance with the Operating Budget; (b) the purchase or lease of assets reasonably required in connection with the Restoration of the Business to the extent permitted under <u>Section 2.05(b)(ii)</u>; (c) any Capital Expenditures or other investments in assets necessary or useful for the business of the Business from the proceeds of any Disposition not prohibited by <u>Section 6.07(e)</u>; (d) the purchase or lease of assets otherwise required or permitted by the Material Agreements to which it is a party that do not in the aggregate exceed the amount budgeted for such purchases or leases in the Operating Budget (subject to any variance permitted pursuant to <u>Section 5.20</u>), (e) Capital Expenditures with amounts on deposit in the Rejected Proceeds Account; (f) Capital Expenditures in accordance with the Operating Budget (subject to any variance permitted pursuant to <u>Section 5.20</u>); (g) with direct or indirect proceeds of the issuance of additional shares of Capital Stock of Borrower in exchange for cash after the Closing Date; and (h) in the case of any Non-Guarantor Subsidiary, to the extent not prohibited by the Bond Documents.

US-DOCS\109334811.27

## ARTICLE VII

## EVENTS OF DEFAULT

Section 7.01   <u>Events of Default</u>.  If any of the following events ("<u>Events of Default</u>") shall occur:

(a)     the Borrower shall fail to pay any principal of any Loan (including any Accrued Interest that has been added to principal) when and as the same shall become due and payable, whether at the due date thereof or, in the case of payments of principal due pursuant to <u>Section 2.05(b)</u>, at a date fixed for prepayment thereof, or otherwise; or

(b)     the Borrower shall fail to pay any other amount (other than an amount referred to in <u>Section 7.01(a)</u>) payable under this Agreement or under any other Financing Document when and as the same shall become due and payable, and such failure shall continue unremedied for a period of five (5) Business Days after the occurrence thereof; or

(c)     any representation or warranty made by or deemed made by any Loan Party in this Agreement or any other Financing Document, or in any certificate furnished to any Secured Party by or on behalf of such Loan Party in accordance with the terms hereof or thereof, shall prove to have been incorrect in any material respect (to the extent not already qualified by materiality) as of the time made or deemed made, confirmed or furnished; unless (i) such incorrect representation or warranty is not that set forth in <u>Section 3.05(b)</u>, (ii) the fact, event or circumstance resulting in such incorrect representation or warranty is capable of being changed such that such representation or warranty would be correct in all material respects, (iii) such fact, event or circumstance shall have been changed, within thirty (30) days (or sixty (60) days, if at the end of thirty (30) days the Loan Parties are proceeding with diligence and in good faith to change such fact, event or circumstance) from the earlier of (x) the date an Authorized Representative of any Loan Party obtains knowledge thereof and (y) the date notice is given to any Loan Party, such that such representation or warranty is correct in all material respects by such deadline, and (iv) such fact, event or circumstance (as so changed) would not reasonably be expected to result in a Material Adverse Effect; or

(d)     any Loan Party shall fail to observe or perform any covenant or agreement, as applicable, contained in the following Sections:

(i)     <u>Section 2.05(b)(v)</u> (as to delivery of detailed calculations of the Net Cash Flow amount), <u>Sections 5.01</u> (as to existence), <u>5.11(h)</u>, <u>5.13</u> or <u>Article VI</u>; or

(ii)     <u>Sections 5.06(a)</u>, <u>5.10(b)</u>, <u>5.10(c)</u>, <u>5.10(h)</u> or <u>5.20(c)</u> and such failure has continued unremedied for a period of twenty (20) Business Days after the occurrence thereof; or

(iii)     <u>Sections 5.10(e)</u> or <u>5.10(h)</u> and such failure has continued unremedied for thirty (30) days after the occurrence thereof; or

(e)     any Loan Party shall fail, or fail to cause any Non-Guarantor Subsidiary, to observe or perform any covenant, condition or agreement contained in this Agreement or any other Financing Document to which it is a party (other than those specified in <u>Section 7.01(a)</u>, <u>(b)</u>, <u>(c)</u>,

77

(d) or (l)), and such failure shall continue unremedied for a period of thirty (30) days after the earlier of (i) written notice thereof to such Loan Party and (ii) knowledge of such default by an Authorized Representative of any Loan Party; provided that, if (A) such default cannot be cured within such 30-day period, (B) such default is susceptible of cure and (C) the applicable Loan Party is proceeding with diligence and in good faith to cure such default, then such thirty (30) day cure period shall be extended to such date, not to exceed a total of sixty (60) days, as shall be necessary for such Loan Party to diligently cure such default; or

(f)     a Bankruptcy occurs with respect to any Borrower Group Member; or

(g)     a final non-appealable judgment or order for the payment of money is entered against any Borrower Group Member in an amount exceeding $2,500,000 (exclusive of judgment amounts covered by insurance or bond where the insurer or bonding party has admitted liability in respect of such judgment), and such judgment remains unsatisfied without any procurement of a stay of execution for a period of ninety (90) days or more after the date of entry of judgment; or

(h)     (i) any Security Document (A) is revoked, terminated or otherwise ceases to be in full force and effect (except in connection with its expiration in accordance with its terms in the ordinary course (and not related to any default thereunder) and except to the extent such revocation, termination or cessation is caused by any act or omission of the Agent or the Lenders), or the enforceability thereof shall be challenged in writing by any Borrower Group Member, (B) ceases to provide (to the extent permitted by law and to the extent required by the Financing Documents) a first priority perfected Lien on the assets purported to be covered thereby in favor of the Collateral Agent (other than any Vehicles), free and clear of all other Liens (other than Permitted Liens), except to the extent that such cessation is caused solely and directly by any act or omission by the Agent or the Lenders, or (C) becomes unlawful or is declared void or (ii) any Financing Document (A) is revoked, terminated or otherwise ceases to be in full force and effect (except in connection with its expiration in accordance with its terms in the ordinary course (and not related to any default thereunder) and except to the extent such revocation, termination or cessation is caused any act or omission by the Agent or the Lenders), or (B) becomes unlawful or is declared void; or

(i)     an ERISA Event has occurred which, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect; or

(j)     a Change of Control has occurred; or

(k)

(i)     any Material Agreement relating to material real property rights of any Facility shall at any time for any reason cease to be valid and binding and in full force and effect (in each case, except in connection with its expiration in accordance with its terms in the ordinary course (and not related to any default thereunder)) on the applicable Material Counterparty; provided that any such event with respect to such Material Agreement shall not be an Event of Default if the applicable Person has, within thirty (30) days after the occurrence of such relevant circumstance, entered into a Replacement Agreement or has received a termination payment that

has been offered to prepay the Loans in accordance with Section 2.05(b)(i) in an amount acceptable to the Administrative Agent (in its reasonable discretion); or

(ii)    any Material Agreement which contains a deposit or prepayment to a Borrower Group Member from a customer shall at any time for any reason cease to be valid and binding and in full force and effect (in each case, except in connection with its expiration in accordance with its terms in the ordinary course (and not related to any default thereunder)) on the applicable Material Counterparty; provided that any such event with respect to such Material Agreement shall not be an Event of Default if the applicable Person during the sixty (60) day period following the date that such deposit is required to be paid in full uses commercially reasonable efforts to extend the maturity of the deposit or prepayment liability with respect to such Material Agreement, such that the deposit or prepayment liability shall be amortized over a period of twelve (12) calendar months or longer, or causes the repayment of such deposit with either an Additional Equity Raise Amount, or a deposit provided by an Additional Agreement which replaces the Material Agreement so terminated; or

(l)    any Authorization by a Governmental Authority necessary for the execution, delivery and performance of any obligation under the Transaction Documents is terminated or ceases to be in full force or is not obtained, maintained, or complied with, unless such failure (i) could not reasonably be expected to result in a Material Adverse Effect during the cure period (or the additional cure period) under the following clause (ii) and (ii) is remedied within ninety (90) days after the occurrence thereof or such longer period as is necessary, if not fully remedied within such period, as is reasonably required so long as such remediation is diligently pursued in good faith and such default remains susceptible of cure; or

(m)    an uninsured Event of Loss or a Condemnation, in each case with respect to a portion of the property of the Borrower Group Members in excess of $7,500,000 in value shall occur; or

(n)    (i) the abandonment by any Loan Party of all or a material portion of its activities to operate or maintain the Business, which abandonment shall be deemed to have occurred if any Loan Party fails to operate any material part of the Business for a period of thirty (30) or more consecutive days; provided that any such failure to operate the Business caused by an Event of Loss or other force majeure event shall not constitute a Material Adverse Effect so long as, to the extent feasible during such Event of Loss or other force majeure event, the Borrower is diligently attempting to restart operation of the Business, or (ii) the written announcement by any Loan Party of its intention to do any of the foregoing in clause (i); or

(o)    any Loan Party shall default in any material respect in the observance or performance of any Material Agreement or material condition contained in the Observer Rights Agreement and such material default shall continue after the expiration of any cure period therefor;

(p)    any Borrower Group Member shall (i) default in making any payment of any principal, interest or premium of any Indebtedness (excluding the Obligations) the outstanding principal amount of which exceeds at such time $3,500,000 ("Material Indebtedness") on the scheduled or original due date with respect thereto, in each case, beyond any grace periods applicable thereto; or (ii) default in the observance or performance of any other agreement or

79

condition relating to any such Indebtedness (excluding the Obligations) or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist, in each case, beyond any grace periods applicable thereto, the effect of which default or other event or condition is to cause, or to permit the holder or beneficiary of Material Indebtedness (or a trustee or agent on behalf of such holder or beneficiary) to cause, with or without the giving of notice, the lapse of time or both, such Material Indebtedness to become due prior to its stated maturity or to become subject to a mandatory offer to purchase by the obligor thereunder or (in the case of any such Indebtedness constituting a Guarantee) to become payable; or

(q)     any party to any Subordination Agreement (other than any Agent) shall default in the observance or performance of any agreement or condition contained therein, and such default has continued unremedied for the greater of (x) ten (10) days after the occurrence thereof or (y) any grace period therefor specified therein;

then, and in every such event (other than an event with respect to a Borrower Group Member described in Section 7.01(f)), and at any time thereafter during the continuance of such event, the Administrative Agent shall by notice to the Borrower, take any or all of the following actions, at the same or different times:  (i) terminate the Commitments, and thereupon the Commitments shall terminate immediately; and (ii) declare the Loans and all other amounts due under the Financing Documents (including the Prepayment Premium, if applicable) then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all reimbursements, fees and other obligations of the Borrower accrued hereunder or under the Financing Documents (including the Prepayment Premium, if applicable), shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Loan Parties; and in case of any event with respect to a Borrower Group Member described in Section 7.01(f), the Commitments shall automatically terminate and the principal of the Loans then outstanding, together with accrued interest thereon and all reimbursements, fees and other obligations of the Borrower accrued hereunder and under the Financing Documents (including the Prepayment Premium, if applicable), shall automatically become due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Loan Parties.  Upon the occurrence and during the continuance of any Event of Default, in addition to the exercise of remedies set forth above in this paragraph, each Secured Party shall be, subject to the terms of the Security Agreement, entitled to exercise the rights and remedies available to such Secured Party under and in accordance with the provisions of the other Financing Documents to which it is a party or any Applicable Law. For the purpose of enabling the Collateral Agent to exercise the rights and remedies under this Section 7.01 (including in order to take possession of, collect, receive, assemble, process, appropriate, remove, realize upon, sell, assign, license out, convey, transfer or grant options to purchase any Collateral) at such time as the Collateral Agent shall be lawfully entitled to exercise such rights and remedies, each Loan Party hereby grants to the Collateral Agent, for the benefit of the Collateral Agent and each other Secured Party, a nonexclusive and assignable license (exercisable without payment of royalty or other compensation to such Loan Party), subject, in the case of Intellectual Property licenses, to the terms of the applicable license, and subject, in the case of Trademarks, to sufficient rights to quality control and inspection in favor of such Loan Party to avoid the risk of invalidation

80

of such Trademarks, to use, practice, license, sublicense, and otherwise exploit any and all Intellectual Property now owned or held or hereafter acquired or held by such Loan Party.

Section 7.02    <u>Application of Proceeds</u>. The proceeds of any collection, sale or other realization of all or any part of the Collateral (including any amount in the Collateral Accounts) shall be applied in the following order of priority:

(a)    <u>first</u>, to any fees, costs, charges, expenses and indemnities then due and payable to Administrative Agent and Collateral Agent under any Financing Document *pro rata* based on such respective amounts then due to such Persons;

(b)    <u>second</u>, to the respective outstanding fees, costs, charges, expenses and indemnities then due and payable to the other Secured Parties under any Financing Document *pro rata* based on such respective amounts then due to such Persons;

(c)    <u>third</u>, to any accrued but unpaid interest on the Obligations owed to the Secured Parties pro rata based on such respective amounts then due to the Secured Parties;

(d)    <u>fourth</u>, to any principal amount of the Obligations owed to the Secured Parties pro rata based on such respective amounts then due to the Secured Parties;

(e)    <u>fifth</u>, to any other unpaid Obligations then due and payable to Secured Parties, *pro rata* based on such respective amounts then due to the Secured Parties; and

(f)    <u>sixth</u>, after final payment in full of the amounts described in clauses *first* through *fifth* above and the Discharge Date shall have occurred, to the Borrower or as otherwise required by Applicable Law.

It is understood that the Loan Parties shall remain liable to the extent of any deficiency between the amount of the proceeds of the Collateral and the aggregate of the sums referred to in clauses *first* through *fifth* above.

ARTICLE VIII

THE AGENTS

Section 8.01    <u>Appointment and Authorization of the Agents</u>.

(a)    Each of the Lenders hereby irrevocably appoints each Agent to act on its behalf as its agent hereunder and under the other Financing Documents and authorizes each Agent in such capacity, to take such actions on its behalf and to exercise such powers as are delegated to it by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto. Each Agent, by executing this Agreement, hereby accepts such appointment.

(b)    Each Agent is hereby authorized to execute, deliver and perform each of the Transaction Documents to which such Agent is intended to be a party. Each Agent hereby agrees, and each Lender hereby authorizes such Agent, to enter into the amendments and other modifications of the Security Documents (subject to <u>Section 10.02(b)</u>).

81

Section 8.02    Rights as a Lender.  Each Agent shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not an Agent, and such Person and its Affiliates may accept deposits from, lend money to and generally engage in any kind of business with the Borrower or any of Subsidiary or other Affiliate thereof as if it were not an Agent hereunder.

Section 8.03    Duties of Agent; Exculpatory Provisions.  No Agent shall have any duties or obligations except those expressly set forth herein and in the other Financing Documents.  Without limiting the generality of the foregoing, no Agent (a) shall be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred and is continuing, (b) shall have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Financing Documents that such Agent is required to exercise, and (c) shall, except as expressly set forth herein and in the other Financing Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Subsidiaries that is communicated to or obtained by the financial institution serving as an Agent or any of its Affiliates in any capacity.  No Agent shall be liable for any action taken or not taken by it with the consent or at the request of the Lenders or in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction in a final, non-appealable decision.  No Agent shall be deemed to have knowledge of any Default or Event of Default unless and until written notice thereof is given to such Agent by the Borrower or a Lender, and no Agent shall be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Financing Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Financing Document or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in Article IV or elsewhere herein or therein, other than to confirm receipt of items expressly required to be delivered to such Agent.

Section 8.04    Reliance by Agent.  Each Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing believed by it to be genuine and to have been signed or sent by the proper Person.  Each Agent also may rely upon any statement made to it orally or by telephone and believed by it to be made by the proper Person, and shall not incur any liability for relying thereon.  Each Agent may consult with legal counsel, independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

Section 8.05    Delegation of Duties.  Each Agent may perform any and all its duties and exercise its rights and powers by or through any one or more sub-agents appointed by such Agent.  Each Agent and any such sub-agent may perform any and all its duties and exercise its rights and powers through their respective Related Parties.  The exculpatory provisions of the preceding paragraphs shall apply to any such sub-agent and to the Related Parties of each Agent and any such sub-agent, and shall apply to their respective activities as well as activities as each Agent.

82

Section 8.06    <u>Withholding of Taxes by the Administrative Agent; Indemnification</u>.  To the extent required by any Applicable Law, the Administrative Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding Taxes.  If any Governmental Authority asserts a claim that the Administrative Agent did not properly withhold Taxes from amounts paid to or for the account of any Lender because the appropriate form was not delivered or was not properly executed or because such Lender failed to notify the Administrative Agent of a change in circumstance which rendered the exemption from, or reduction of, withholding Taxes ineffective or for any other reason, or if the Administrative Agent reasonably determines that a payment was made to a Lender pursuant to this Agreement without deduction of applicable withholding tax from such payment, such Lender shall promptly indemnify the Administrative Agent fully for all amounts paid, directly or indirectly, by Administrative Agent as Taxes or otherwise, including any penalties or interest and together with all expenses (including legal expenses, allocated internal costs and out-of-pocket expenses) incurred.  Each Lender shall severally indemnify the Administrative Agent, within ten (10) days after demand therefor, for (i) any Indemnified Taxes attributable to such Person (but only to the extent that the Borrower has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Borrower to do so), (ii) any Taxes attributable to such Person's failure to comply with the provisions of <u>Section 10.04(f)</u> relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Person, in each case, that are payable or paid by the Administrative Agent in connection with any Financing Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Financing Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this <u>Section 8.06</u>.

Section 8.07    <u>Resignation of Agent</u>.  Each Agent may resign at any time upon thirty (30) days' notice by notifying the Lenders and the Borrower, and the Collateral Agent may be removed at any time by the Administrative Agent (with a prior written notice to the Borrower).  Upon any such resignation or removal, the Administrative Agent shall have the right, with the consent of the Borrower (such consent not to be unreasonably withheld), to appoint a successor.  If no successor shall have been so appointed by the Administrative Agent and approved by the Borrower and shall have accepted such appointment within thirty (30) days after the retiring Agent gives notice of its resignation or after the Administrative Agent's removal of the retiring Collateral Agent, then the retiring Agent may, on behalf of the Lenders, appoint a successor Agent, which shall be a Lender with an office in New York, New York, an Affiliate of a Lender or a financial institution with an office in New York, New York having a combined capital and surplus that is not less than $250,000,000.  Upon the acceptance of its appointment as Agent hereunder by a successor, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring (or retired) Agent and the retiring Agent shall be discharged from its duties and obligations hereunder (if not already discharged therefrom as provided above in this paragraph). The reimbursements and fees payable by the Borrower to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After the Agent's resignation or removal hereunder, the provisions of this Article and <u>Section</u>

10.03 shall continue in effect for its benefit in respect of any actions taken or omitted to be taken by it while it was acting as Agent.

Section 8.08   Non-Reliance on Agent or Other Lenders.  Each Lender acknowledges that it has, independently and without reliance upon any Agent, the Affiliates of any Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender also acknowledges that it will, independently and without reliance upon any Agent, the Affiliates of any Agent or any other Lender and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Financing Document or any related agreement or any document furnished hereunder or thereunder.

Section 8.09   No Other Duties; Etc.The parties agree that neither the Administrative Agent nor the Collateral Agent shall have any obligations, liability or responsibility under or in connection with this Agreement and the other Financing Documents and that none of the Agents shall have any obligations, liabilities or responsibilities except for those expressly set forth herein and in the other Financing Documents.  The Collateral Agent shall have all of the rights (including indemnification rights), powers, benefits, privileges, exculpations, protections and immunities granted to the Collateral Agent under the other Financing Documents, all of which are incorporated herein *mutatis mutandis*.

ARTICLE IX

GUARANTY

Section 9.01   Guaranty.

(a)   For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Guarantor hereby unconditionally and irrevocably, jointly and severally, Guarantees the full and punctual payment and performance (whether at stated maturity, upon acceleration or otherwise) of all Guaranteed Obligations, in each case as primary obligor and not merely as surety and with respect to all such Guaranteed Obligations howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, now or hereafter existing, or due or to become due. This is a guaranty of payment and not merely of collection.

(b)   All payments made by any Guarantor under this Article IX shall be payable in the manner required for payments by the Borrower hereunder, including: (i) the obligation to make all such payments in Dollars, free and clear of, and without deduction for, any Taxes, and subject to the gross-up and indemnity as provided under Section 2.09, (ii) the obligation to pay interest at the Post-Default Rate and (iii) the obligation to pay all amounts due under the Loans in Dollars.

(c)   Any term or provision of this guaranty to the contrary notwithstanding the aggregate maximum amount of the Guaranteed Obligations for which such Guarantor shall be liable under this guaranty shall not exceed the maximum amount for which such Guarantor can be liable without rendering this guaranty or any other Financing Document, as it relates to such

84

Guarantor, void or voidable under Applicable Law relating to fraudulent conveyance or fraudulent transfer.

Section 9.02   <u>Guaranty Unconditional</u>. The Guaranteed Obligations shall be unconditional and absolute and, without limiting the generality of the foregoing, shall not be released, discharged or otherwise affected by:

(a)     any extension, renewal, settlement, compromise, waiver or release in respect of any obligations of any Loan Party under the Financing Documents and/or any Commitments under the Financing Documents, by operation of law or otherwise (other than with respect to any such extension, renewal, settlement, compromise, waiver or release agreed in accordance with the terms hereunder as expressly applying to the Guaranteed Obligations),

(b)     any modification or amendment of or supplement to this Agreement or any other Financing Document (other than with respect to any modification, amendment or supplement agreed in accordance with the terms hereunder as expressly applying to the Guaranteed Obligations),

(c)     any release, impairment, non-perfection or invalidity of any Collateral,

(d)     any change in the corporate existence, structure or ownership of any Loan Party or any other Person, or any event of the type described in <u>Sections 5.01</u>, <u>6.01</u> or <u>6.07</u> with respect to any Person,

(e)     the existence of any claim, set-off or other rights that any Guarantor may have at any time against any Loan Party, any Secured Party or any other Person, whether in connection herewith or with any unrelated transactions,

(f)     any invalidity or unenforceability relating to or against any Loan Party for any reason of any Financing Document, or any provision of Applicable Law purporting to prohibit the performance by any Loan Party of any of its obligations under the Financing Documents (other than any such invalidity or unenforceability with respect solely to the Guaranteed Obligations),

(g)     the failure of any Material Counterparty to make payments owed to any Loan Party, or

(h)     any other act or omission to act or delay of any kind by any Loan Party, any Secured Party or any other Person or any other circumstance whatsoever that might, but for the provisions of this <u>Section 9.02</u>, constitute a legal or equitable discharge of the obligations of any Loan Party under the Financing Documents.

Section 9.03   <u>Discharge Only Upon Payment in Full; Reinstatement in Certain Circumstances</u>. The Guaranteed Obligations shall remain in full force and effect until all of the Borrower's obligations under the Financing Documents shall have been paid or otherwise performed in full and all of the Commitments shall have terminated. If at any time any payment made under this Agreement or any other Financing Document is rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy, reorganization or similar event of any Loan Party or

any other Person or otherwise, then the Guaranteed Obligations with respect to such payment shall be reinstated at such time as though such payment had been due but not made at such time.

Section 9.04    <u>Waiver by the Guarantors</u>.

(a)    Each Guarantor hereby irrevocably and unconditionally waives, to the fullest extent permitted by Applicable Law: (i) notice of acceptance of the guaranty provided in this <u>Article IX</u> and notice of any liability to which this guaranty may apply, (ii) all notices that may be required by Applicable Law or otherwise to preserve intact any rights of any Secured Party against any Loan Party, including any demand, presentment, protest, proof of notice of non-payment, notice of any failure on the part of any Loan Party to perform and comply with any covenant, agreement, term, condition or provision of any agreement and any other notice to any other party that may be liable in respect of the Guaranteed Obligations (including any Loan Party) except any of the foregoing as may be expressly required hereunder, (iii) any right to the enforcement, assertion or exercise by any Secured Party of any right, power, privilege or remedy conferred upon such Person under the Financing Documents or otherwise and (iv) any requirement that any Secured Party exhaust any right, power, privilege or remedy, or mitigate any damages resulting from any Default or Event of Default under any Financing Document, or proceed to take any action against any Collateral or against any Loan Party or any other Person under or in respect of any Financing Document or otherwise, or protect, secure, perfect or ensure any Lien on any Collateral.

(b)    Each Guarantor agrees and acknowledges that the Administrative Agent and each holder of any Guaranteed Obligations may demand payment of, enforce and recover from any Guarantor or any other Person obligated for any or all of such Guaranteed Obligations in any order and in any manner whatsoever, without any requirement that the Administrative Agent or such holder seek to recover from any particular Guarantor or other Person first or from any Guarantors or other Persons *pro rata* or on any other basis.

Section 9.05    <u>Subrogation</u>.  Upon any Guarantor making any payment under this <u>Article IX</u>, such Guarantor shall be subrogated to the rights of the payee against the Borrower with respect to such obligation; <u>provided</u> that no Guarantor shall enforce any payment by way of subrogation, indemnity, contribution or otherwise, or exercise any other right, against any Loan Party (or otherwise benefit from any payment or other transfer arising from any such right) so long as any obligations under the Financing Documents (other than on-going but not yet incurred indemnity obligations) remain unpaid and/or unsatisfied.

Section 9.06    <u>Acceleration</u>.  All amounts then subject to acceleration under <u>Section 7.01</u> of this Agreement shall be payable by the Guarantors hereunder immediately upon demand by the Administrative Agent.

ARTICLE X

MISCELLANEOUS

Section 10.01  <u>Notices</u>.  Except as otherwise expressly provided herein or in any Financing Document, all notices and other communications provided for hereunder or thereunder shall be (i) in writing and (ii) sent by overnight courier (if for inland delivery) or international courier (if

for overseas delivery); <u>provided</u>, that such notice or communication may be sent by email so long as (x) such email or electronic transmission is promptly followed by a communication or notice in sent in accordance with (i) and (ii) above, (y) any Loan Party is delivering documents and information required to be provided under <u>Article IV</u>, <u>Article V</u> or <u>Article VI</u>, or (z) the express terms of any Financing Document permit electronic transmissions, in each case, to a party hereto at its address and contact number specified below, or at such other address and contact number as is designated by such party in a written notice to the other parties hereto:

(a)      Borrower or Guarantors:

> CarbonLite Holdings, LLC
> 10250 Constellation Boulevard, Suite 2820
> Los Angeles, CA 90067
> Attention:      both Leon Farahnik, Chief Executive Officer; and Gregg Milhaupt
> Email:          both lfarahnik@hpcindustries.com; and gregg@carbonliterecycling.com
>
> With a copy to:
>
> Reed Smith LLP
> 1901 Avenue of Stars
> Suite 700
> Los Angeles, CA 90067-6078
> Attention:      Moshe Kupietzky
> Email:          MKupietzky@reedsmith.com

(b)      Administrative Agent and Collateral Agent:

> Orion Energy Partners Investment Agent, LLC
> 350 Fifth Avenue #6740
> New York, NY 10118
> Attention: Gerrit Nicholas, Chris Leary and Mark Friedland
> Email:          Gerrit@OrionEnergyPartners.com;
>                 Chris@OrionEnergyPartners.com;
>                 Mark@OrionEnergyPartners.com

(c)      If to a Lender, to it at its address (mail or email) set forth in its Administrative Questionnaire.

All notices and communications shall be effective when received by the addressee thereof during business hours on a Business Day in such Person's location as indicated by such Person's address in paragraphs (a) to (c) above, or at such other address as is designated by such Person in a written notice to the other parties hereto.

US-DOCS\109334811.27

Section 10.02  Waivers; Amendments.

(a)      No Deemed Waivers; Remedies Cumulative.  No failure or delay on the part of any Agent or any Lender in exercising any right, power or privilege hereunder or under any other Financing Document and no course of dealing between any Loan Party, or any of the Borrower's Affiliates, on the one hand, and any Agent or Lender on the other hand, shall impair any such right, power or privilege or operate as a waiver thereof; nor shall any single or partial exercise of any right, power or privilege hereunder or under any other Financing Document preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder or thereunder.  The rights, powers and remedies herein or in any other Financing Document expressly provided are cumulative and not exclusive of any rights, powers or remedies which any party thereto would otherwise have.  No notice to or demand on the Borrower in any case shall entitle the Borrower to any other or further notice or demand in similar or other circumstances or constitute a waiver of the rights of any Agent or any Lender to any other or further action in any circumstances without notice or demand.

(b)      Amendments.  No amendment or waiver of any provision of this Agreement or any other Financing Document (other than any Security Document, each of which may only be waived, amended or modified in accordance with such Security Document), and no consent to any departure by the Borrower shall be effective unless in writing signed by the Administrative Agent and the Borrower; provided that no such amendment, waiver or consent shall change the *pro rata* agreements in Section 7.02 without the consent of each Lender affected thereby, and provided further that (A) no amendment, waiver or consent shall, without the written consent of the relevant Agent, affect the rights or duties of such Agent under this Agreement or any other Financing Document and (B) any separate reimbursement or fee agreement between the Borrower and the Administrative Agent in its capacity as such or between the Borrower and the Collateral Agent in its capacity as such may be amended or modified by such parties.  Notwithstanding anything herein to the contrary, (x) the Loan Parties and the Collateral Agent may (but shall not be obligated to) amend or supplement any Security Document without the consent of the Administrative Agent to cure any ambiguity, defect or inconsistency which is not material, or to make any change that would provide any additional rights or benefits to the Lenders and (y) any Loan Party may amend, modify or supplement any annexes or schedules to the Security Documents as expressly provided therein (without the consent of any Agent, Lender or other secured party).

Section 10.03  Expenses; Indemnity; Etc.

(a)      Costs and Expenses.  The Borrower agrees to pay or reimburse each of the Agents and the Lenders for:  (i) all reasonable and documented out-of-pocket costs and expenses of the Agents and the Lenders (including the reasonable fees and expenses of Latham & Watkins LLP, New York counsel to the Administrative Agent and the Collateral Agent, and experts engaged by the Agents and the Lenders from time to time) in connection with (A) the negotiation, preparation, execution, delivery and performance of this Agreement and the other Financing Documents and the extension of credit under this Agreement (whether or not the transaction contemplated hereby and thereby shall be consummated) or (B) any amendment, modification or waiver of any of the terms of this Agreement or any other Financing Documents, (ii) all reasonable and documented out-of-pocket costs and expenses of the Lenders (including payment of the fees and reimbursements provided for herein) and the Agents (including reasonable and documented

88

outside counsels' fees and expenses and reasonable and documented outside experts' fees and expenses) in connection with (A) any Default or Event of Default and any enforcement or collection proceedings resulting from such Default or Event of Default or in connection with the negotiation of any restructuring or "work-out" (whether or not consummated) of the obligations of the Borrower under this Agreement or the obligations of any Material Counterparty under any other Financing Document or Material Agreement and (B) the enforcement of this <u>Section 10.03</u> or the preservation of their respective rights (provided that such counsel fees Lenders shall limited to one counsel for all Lenders), (iii) all costs, expenses, Taxes, assessments and other charges incurred in connection with any filing, registration, recording or perfection of any security interest contemplated by any Security Document or any other document referred to therein, and (iv) all reasonable and documented out-of-pocket costs and expenses of the Agents and the Lenders (including the reasonable and documented fees and expenses of the experts and consultants engaged by the Agents or the Lenders) in connection with the Lenders' due diligence review prior to the Second Funding Date.

(b)    <u>Indemnification by the Borrower</u>.  Each Loan Party agrees to indemnify and hold harmless each of the Agents and the Lenders and their affiliates and their respective directors, officers, employees, administrative agents, attorneys-in-fact and controlling persons (each, an "<u>Indemnified Party</u>") from and against any and all losses, claims, damages and liabilities, joint or several, to which such Indemnified Party may become subject related to or arising out of any transaction contemplated by the Financing Documents or the execution, delivery and performance of the Financing Documents or any other document in any way relating to the Financing Documents and the transactions contemplated by the Financing Documents (including, for avoidance of doubt, any liabilities arising under or in connection with Environmental Law) and will reimburse any Indemnified Party for all expenses (including reasonable and documented outside counsel fees and expenses) as they are incurred in connection therewith.  No Loan Party shall be liable under the foregoing indemnification provision to an Indemnified Party to the extent that any loss, claim, damage, liability or expense is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct.  Each Loan Party also agrees that no Indemnified Party shall have any liability (whether direct or indirect, in contract or tort or otherwise) to it, or any of its security holders or creditors related to or arising out of the execution, delivery and performance of any Financing Document or any other document in any way relating to the Financing Documents or the other transactions contemplated by the Financing Documents, except to the extent that any loss, claim, damage or liability is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct as determined by a court of competent jurisdiction.  To the extent permitted by Applicable Law, no party hereto shall assert and each party hereto hereby waives, any claim against any Indemnified Party or any other party hereto, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any Financing Document or any agreement or instrument contemplated hereby, any Loan or the use of the proceeds thereof.  Paragraph (b) of this Section shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

(c)    <u>Indemnification by Lenders</u>.  To the extent that the Borrower fails to pay any amount required to be paid to any Agent, their affiliates or agents under <u>Section 10.03(a)</u> or <u>(b)</u>,

each Lender severally agrees to pay ratably in accordance with the aggregate principal amount of the Loans held by the Lender to such Agent, affiliate or agent such unpaid amount; provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against such Agent, affiliate or agent in its capacity as such.

(d)    Settlements; Appearances in Actions.    The Borrower agrees that, without each Indemnified Party's prior written consent, it will not settle, compromise or consent to the entry of any judgment in any pending or threatened claim, action or proceeding in respect of which indemnification could be sought by or on behalf of such Indemnified Party under this Section (whether or not any Indemnified Party is an actual or potential party to such claim, action or proceeding), unless such settlement, compromise or consent includes an unconditional release of such Indemnified Party from all liability arising out of such claim, action or proceeding.  In the event that an Indemnified Party is requested or required to appear as a witness in any action brought by or on behalf of or against the Borrower or any Affiliate thereof in which such Indemnified Party is not named as a defendant, the Borrower agrees to reimburse such Indemnified Party for all reasonable expenses incurred by it in connection with such Indemnified Party's appearing and preparing to appear as such a witness, including the reasonable and documented fees and disbursements of its legal counsel.  In the case of any claim brought against an Indemnified Party for which the Borrower may be responsible under this Section 10.03, the Agents and the Lenders agree (at the expense of the Borrower) to execute such instruments and documents and cooperate as reasonably requested by the Borrower in connection with the Borrower's defense, settlement or compromise of such claim, action or proceeding.

Section 10.04  Successors and Assigns.

(a)    Assignments Generally.    The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) the Loan Parties may not assign or otherwise transfer any of their rights or obligations hereunder without the prior written consent of the Administrative Agent (and any attempted assignment or transfer by such Loan Party without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section 10.04.  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants (to the extent provided in paragraph (f) of this Section) and, to the extent expressly contemplated hereby, the Indemnified Parties referred to in Section 10.03(b) and the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    Assignments by Lenders.    Any Lender may assign to one or more Persons all or a portion of its rights and obligations under this Agreement (including all or a portion of its Loan at the time owing to it); provided that:

(i)    except in the case of an assignment to a Lender or an Affiliate or Related Fund of a Lender, the amount of the Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is

delivered to the Administrative Agent) shall not be less than $500,000 unless the Borrower and the Administrative Agent otherwise consent;

(ii)    except in the case of an assignment to a Lender or an Affiliate or Related Fund of a Lender, the Borrower and the Administrative Agent must each give its prior written consent to such assignment; provided that (x) in the case of the Administrative Agent, such consent shall not be unreasonably withheld, conditioned or delayed and (y) in the case of the Borrower, such consent shall not be unreasonably withheld, conditioned or delayed if such assignment is to an Approved Fund and such consent shall be given in the Borrower's sole discretion if the assignment is to any other Person (other than a Lender, an Affiliate or Related Fund of a Lender or an Approved Fund) (and provided further that, in the case of the Borrower, such consent shall be deemed to be given if the Borrower has not responded within five (5) Business Days of any request for consent);

(iii)    each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement;

(iv)    except in the case of an assignment to an Affiliate, the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500; and

(v)    the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire;

provided further that any consent of the Borrower otherwise required under this clause (b) shall not be required if any Event of Default has occurred and is continuing and shall be deemed given if the Borrower has not responded to a request for such consent within five (5) Business Days of the request.  Upon acceptance and recording pursuant to paragraph (d) of this Section, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.09, 2.10 and 10.03).  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this paragraph shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (f) of this Section.

(c)    Maintenance of Register by the Administrative Agent.  The Administrative Agent, acting for this purpose as an agent of the Borrower, shall maintain at one of its offices in New York City a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, principal amount of the Loans owing to each Lender pursuant to the terms hereof from time to time and the amount of any Accrued Interest owing from time to time (the "Register").  The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Administrative Agent and the Lenders may treat each Person

91

whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(d)    <u>Effectiveness of Assignments</u>.  Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in paragraph (b) of this Section and any written consent to such assignment required by paragraph (b) of this Section, the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register.  No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

(e)    <u>Limitations on Rights of Assignees</u>.  An assignee Lender shall not be entitled to receive any greater payment under <u>Sections 2.09</u> or <u>2.10</u> than the assigning Lender would have been entitled to receive with respect to the interest assigned to such assignee (based on the circumstances existing at the time of the assignment), unless the Borrower's prior written consent has been obtained therefor.

(f)    <u>Participations</u>.  Any Lender may, without the consent of the Borrower or the Administrative Agent, sell participations to one or more banks or other entities (a "<u>Participant</u>") in all or a portion of such Lender's rights and obligations under this Agreement and the other Financing Documents (including all or a portion of the Loans owing to it); <u>provided</u> that (i) such Lender's obligations under this Agreement and the other Financing Documents shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (iii) the Loan Parties, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement and the other Financing Documents.  Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and the other Financing Documents and to approve any amendment, modification or waiver of any provision of this Agreement or any other Financing Document; <u>provided</u> that, such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in the first proviso in <u>Section 10.02(b)</u> that affects such Participant.  Subject to paragraph (g) of this Section, the Borrower agrees that each Participant shall be entitled to the benefits of <u>Sections 2.09</u> and <u>2.10</u> (subject to the requirements and limitations therein, including the requirements under <u>Section 2.09(e)</u> (it being understood that the documentation required under <u>Section 2.09(e)</u> shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section.  Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Financing Documents held by it (the "<u>Participant Register</u>"); <u>provided</u> that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any Commitments, Loan or its other obligations under any

Financing Document) to any Person except to the extent that such disclosure is necessary to establish that such participation complies with Section 10.14 and that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the Treasury Regulations and Section 1.163-5(b) of the Proposed Treasury Regulations (or any amended or successor version).  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(g)    Limitations on Rights of Participants.  A Participant shall not be entitled to receive any greater payment under Sections 2.09 or 2.10 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant.  A Participant shall not be entitled to the benefits of Section 2.09 unless the Participant agrees, for the benefit of the Borrower, to comply with Section 2.09(e) as though it were a Lender (it being understood that the documentation required under Section 2.09(e) shall be delivered to the participating Lender).

(h)    Certain Pledges.

(i)    Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any such pledge or assignment to a Federal Reserve Bank, the European Central Bank or any other central bank or similar monetary authority in the jurisdiction of such Lender, and this Section shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto; and provided further that any payment in respect of such pledge or assignment made by any Loan Party to or for the account of the pledging or assigning Lender in accordance with the terms of this Agreement shall satisfy such Loan Party's obligations hereunder in respect of such pledged or assigned Loan to the extent of such payment.

(ii)    Notwithstanding any other provision of this Agreement, any Lender may, without informing, consulting with or obtaining the consent of any other Party to the Financing Documents and without formality under any Financing Document, assign by way of security, mortgage, charge or otherwise create security by any means over, its rights under any Financing Document to secure the obligations of that Lender to any Person that would be a permitted assignee (without the consent of the Borrower or any Agent) pursuant to Section 10.04(b) including (A) to the benefit of any of its Affiliates and/or (B) within the framework of its, or its Affiliates, direct or indirect funding operations.

(i)    No Assignments to the Borrower or Affiliates.  Anything in this Section to the contrary notwithstanding, no Lender may assign or participate any interest in any Loan held by it hereunder to any Loan Party or any Affiliate of the Borrower without the prior written consent of each other Lender.

Section 10.05  Survival.  All covenants, agreements, representations and warranties made by the Loan Parties herein and in the certificates or other instruments delivered in connection with or

93

pursuant to this Agreement shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement and the making of any Loan, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default or Event of Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any reimbursement, fee or any other amount payable under this Agreement (other than any contingent indemnification or reimbursement amount not then due and payable) is outstanding and unpaid.   The provisions of Sections 2.09, 2.10, 10.03, 10.12, 10.13 and Article VIII shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loan, the expiration or termination of the Commitments or the termination of this Agreement or any provision hereof.

Section 10.06  Counterparts; Integration; Effectiveness.   This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement and the other Financing Documents to which a Loan Party is party constitute the entire contract between and among the parties relating to the subject matter hereof and thereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  This Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.  Delivery of an executed counterpart of a signature page to this Agreement by electronic transmission shall be effective as delivery of a manually executed counterpart of this Agreement.

Section 10.07  Severability.   Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

Section 10.08  Right of Setoff.   If an Event of Default shall have occurred and be continuing, each Lender and any of its Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held, and any other indebtedness at any time owing, by such Lender or any such Affiliate to or for the credit or the account of the Borrower against any of and all the obligations of the Borrower now or hereafter existing under this Agreement held by such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement and although such obligations may be unmatured or denominated in a currency other than Dollars.  The rights of each Lender or any such Affiliate under this Section are in addition to other rights and remedies (including other rights of setoff) which such Lender may have.

Section 10.09  Governing Law; Jurisdiction; Etc.

94

(a)     <u>Governing Law</u>.  This Agreement shall be construed in accordance with and governed by the law of the State of New York.

(b)     <u>Submission to Jurisdiction</u>.  Any legal action or proceeding with respect to this Agreement or any other Financing Document to which a Loan Party is a party shall, except as provided in clause (d) below, be brought in the courts of the State of New York, or of the United States District Court for the Southern District of New York, in each case, seated in the County of New York and, by execution and delivery of this Agreement, each party hereto hereby irrevocably accepts for itself and in respect of its property, generally and unconditionally, the jurisdiction of the aforesaid courts.  Each party hereto agrees that a judgment, after exhaustion of all available appeals, in any such action or proceeding shall be conclusive and binding upon it, and may be enforced in any other jurisdiction, including by a suit upon such judgment, a certified copy of which shall be conclusive evidence of the judgment.

(c)     <u>Waiver of Venue</u>.  Each party hereto hereby irrevocably waives any objection that it may now have or hereafter have to the laying of the venue of any suit, action or proceeding arising out of or relating to this Agreement or any other Financing Document to which it is a party brought in the Supreme Court of the State of New York or in the United States District Court for the Southern District of New York, in each case, seated in the County of New York and hereby further irrevocably waives any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

(d)     <u>Rights of the Secured Parties</u>.  Nothing in this <u>Section 10.09</u> shall limit the right of the Secured Parties to refer any claim against a Loan Party to any court of competent jurisdiction anywhere else outside of the State of New York, nor shall the taking of proceedings by any Secured Party before the courts in one or more jurisdictions preclude the taking of proceedings in any other jurisdiction whether concurrently or not.

(e)     <u>WAIVER OF JURY TRIAL</u>.  EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING UNDER ANY FINANCING DOCUMENT OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO ANY FINANCING DOCUMENT, OR THE TRANSACTIONS RELATED THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER FOUNDED IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE SIGNATORIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

(f)     <u>Service of Process</u>.  Each party hereto irrevocably consents to the service of process in the manner provided for notices in <u>Section 10.01</u>.

(g)     <u>Waiver of Immunity</u>.  To the extent that a Loan Party has or hereafter may acquire any immunity from jurisdiction of any court or from any legal process (whether through service

95

of notice, attachment prior to judgment, attachment in aid of execution, execution, sovereign immunity or otherwise) with respect to itself or its property, it hereby irrevocably waives such immunity, to the fullest extent permitted by law, in respect of its obligations under this Agreement and the other Financing Documents.

Section 10.10  Headings.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

Section 10.11  Confidentiality.

(a)       Each of the Agents and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (i) to its and its Affiliates' directors, officers, employees, board members (and members of committees thereof), current or prospective limited partners, agents, consultants, Persons providing administration and settlement services and other professional advisors, including accountants, auditors, legal counsel and other advisors with a need to know (for purposes of this Section 10.11, the "Representatives") (it being understood that the Representatives will be informed of the confidential nature of such Information and instructed to keep such Information confidential, and that the applicable Agent or Lender responsible for such disclosure shall be responsible for any non-compliance with the foregoing by any such Representatives that do not have a separate confidentiality obligation to such Agent or Lender), (ii) to the extent requested by any applicable regulatory or supervisory body or authority, by applicable laws or regulations or by any subpoena, oral question posed at any deposition, interrogatory or similar legal process (including, for the avoidance of doubt, to the extent requested in connection with any pledge or assignment pursuant to Section 10.04(h)); provided that the party from whom disclosure is being required shall give notice thereof to the Borrower as soon as practicable (unless restricted from doing so and except where disclosure is to be made to a regulatory or supervisory body or authority during the ordinary course of its supervisory or regulatory function), (iii) to any other party to this Agreement, (iv) subject to an agreement containing provisions substantially the same as those of this paragraph, to any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement, (v) with the written consent of the Borrower, (vi) to the extent such Information (A) becomes publicly available other than as a result of a breach of this paragraph or (B) becomes available to any Agent or any Lender on a nonconfidential basis from a source other than the Borrower and such source is not, to the knowledge of such Agent or Lender, subject to subject to a confidentiality agreement with any Loan Party or (vii) to any Person with whom any Loan Party, an Agent or a Lender has entered into (or potentially may enter into), whether directly or indirectly, any transaction under which payments are to be made or may be made by reference to one or more Financing Documents and/or the Loan Parties or to any of such Person's Affiliates and Representatives.  For the purposes of this paragraph, "Information" means all information received from any Loan Party or relating to any Borrower Group Member, or its respective business (including, for the avoidance of doubt, any information with respect to which any Loan Party owes any duty or obligation of confidentiality to any third-party), other than any such information that is available to the Agents or any Lender on a nonconfidential basis prior to disclosure by a Loan Party.  Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such

Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

(b)      Upon written request after a discharge contemplated by Section 9.03, but no later than ten (10) Business Days thereafter, by any Loan Party, each Agent and Lender agrees to promptly return or destroy all copies of confidential Information and all notes, correspondence, documents or other records based thereon or which contain confidential Information ("Derivate Documents") which are then in the such Agent's or Lender's possession. Notwithstanding the foregoing, the Agents and Lenders and their Representatives shall be entitled to (i) retain copies of all Information provided to such Agent or Lender for legal, regulatory, and compliance purposes, in a manner consistent with the such Agent's or Lender's document archiving procedures, and which information shall remain confidential for the term of this Agreement so long as such Information is retained in a manner consistent with such Agent's or Lender's internal confidentiality policies, or (ii) to the extent that such Agent or Lender and its Representatives have copies of computer records and files containing Information, which have been created as a result of automatic archiving or backup procedures, may retain such number of copies of the Information for legal, regulatory, and compliance purposes, in a manner consistent with such Agent's or Lender's and its Representatives' document archiving procedure, and which information shall remain confidential so long as such Information is retained in a manner consistent with such Agent's or Lender's and its Representatives' internal confidentiality policies. The Loan Party remains the owner of all its Information contained in all Derivate Documents. In addition, the Agents and Lenders shall not be obligated to return or destroy any Information contained in any documents or packages prepared for its board of directors or like body, but may retain such documents or packages in a manner consistent with such Agent's or Lender's internal confidentiality policies.

(c)      Notwithstanding anything to the contrary contained herein, the parties hereto acknowledge that the Administrative Agent and its respective affiliates and advisors and investors in funds managed by the foregoing Persons (collectively, the "Orion Energy Persons") are subject to compliance obligations mandated by various regulators, governmental agencies and taxation authorities; and in satisfaction of those compliance obligations, the Orion Energy Persons may disclose confidential Information in response to a broad information request not specifically targeted at Borrower, as required by such regulators, governmental agencies, and taxation authorities without notice to the Borrower and without obtaining assurances that information will be treated confidentially; and such disclosure shall not be a violation of this agreement; provided that if such regulators, governmental agencies and taxation authorities make information requests specifically targeted at or regarding the Borrower or any of its affiliates, the Orion Energy Persons will promptly notify the Borrower of such information request.

Section 10.12  No Third Party Beneficiaries.  The agreement of the Lenders to make the Loans to the Borrower on the terms and conditions set forth in this Agreement, is solely for the benefit of the Loan Parties, the Agents and the Lenders, and no other Person (including any Material Counterparty, contractor, subcontractor, supplier, workman, carrier, warehouseman or materialman furnishing labor, supplies, goods or services to or for the benefit of the Business) shall have any rights under this Agreement or under any other Financing Document or Material Agreement as against the Agent or any Lender or with respect to any extension of credit contemplated by this Agreement.

Section 10.13 <u>Reinstatement</u>.  The obligations of the Borrower under this Agreement shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of the Borrower in respect of the Secured Obligations is rescinded or must be otherwise restored by any holder of any of the Secured Obligations, whether as a result of any proceedings in Bankruptcy or reorganization or otherwise, and the Borrower agrees that it will indemnify each Secured Party on demand for all reasonable costs and expenses (including fees of counsel) incurred by such Secured Party in connection with such rescission or restoration, including any such costs and expenses incurred in defending against any claim alleging that such payment constituted a preference, fraudulent transfer or similar payment under any Bankruptcy, insolvency or similar law.

Section 10.14 <u>USA PATRIOT Act</u>.  Each Lender hereby notifies the Loan Parties that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "<u>USA PATRIOT Act</u>"), it is required to obtain, verify and record information that identifies such Loan Party, which information includes the name and address of such Loan Party and other information that will allow such Lender to identify such Loan Party in accordance with the USA PATRIOT Act.

[Remainder of page intentionally left blank]

US-DOCS\109334811.27

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

CARBONLITE HOLDINGS, LLC

By _____
Leon Farahnik
Chief Executive Officer

CARBONLITE SUB-HOLDINGS, LLC
By CarbonLite Holdings, LLC, its sole member

By _____
Leon Farahnik
Chief Executive Officer

CARBONLITE PI HOLDINGS LLC
By CarbonLite Sub-Holdings, LLC, its sole Member
By CarbonLite Holdings, LLC, its sole member

By _____
Leon Farahnik
Chief Executive Officer

CARBONLITE INDUSTRIES LLC
By CarbonLITE PI Holdings LLC, its sole Member
By CarbonLite Sub-Holdings, LLC, its sole Member
By CarbonLite Holdings, LLC, its sole member

By _____
Leon Farahnik
Chief Executive Officer

CARBONLITE PINNPACK, LLC
By CarbonLITE PI Holdings LLC, its sole Member
By CarbonLite Sub-Holdings, LLC, its sole Member
By CarbonLite Holdings, LLC, its sole member

By _____
Leon Farahnik
Chief Executive Officer


PINNPACK PACKAGING, LLC
By CarbonLITE Pinnpack, LLC, its Managing Member
By CarbonLITE PI Holdings LLC, its sole Member
By CarbonLite Sub-Holdings, LLC, its sole Member
By CarbonLite Holdings, LLC, its sole member

By _____
Leon Farahnik
Chief Executive Officer

ORION ENERGY PARTNERS INVESTMENT AGENT, LLC,
as Administrative Agent and Collateral Agent

By: _____
    Name: Nazar Massouh
    Title: CEO and Managing Partner

ORION ENERGY CREDIT OPPORTUNITIES
FUND II, L.P.,
as a Lender

By: Orion Energy Credit Opportunities Fund II GP,
L.P.
Its: General Partner

By: Orion Energy Credit Opportunities Fund II
Holdings, LLC
Its: General Partner

By: _____

      Name: Nazar Massouh
      Title: CEO and Managing Partner

ORION ENERGY CREDIT OPPORTUNITIES
FUND II PV, L.P.,
as a Lender

By: Orion Energy Credit Opportunities Fund II GP,
L.P.
Its: General Partner

By: Orion Energy Credit Opportunities Fund II
Holdings, LLC
Its: General Partner

By: _____

      Name: Nazar Massouh
      Title: CEO and Managing Partner

ORION ENERGY CREDIT OPPORTUNITIES
FUND II GPFA, L.P.,
as a Lender

By: Orion Energy Credit Opportunities Fund II GP,
L.P.
Its: General Partner

By: Orion Energy Credit Opportunities Fund II
Holdings, LLC
Its: General Partner

By:_____
      Name: Nazar Massouh
      Title: CEO and Managing Partner


ORION ENERGY CREDIT OPPORTUNITIES
CARBONLITE CO-INVEST, L.P.,
as a Lender

By: Orion Energy Credit Opportunities Fund II GP,
L.P.
Its: General Partner

By: Orion Energy Credit Opportunities Fund II
Holdings, LLC
Its: General Partner

By:_____
      Name: Nazar Massouh
      Title: CEO and Managing Partner

**ANNEX I**
**TO**
**CREDIT AGREEMENT**

**Loans; Commitments**

| LENDER | INITIAL FUNDING COMMITMENTS | SECOND FUNDING COMMITMENTS |
|---|---|---|
| **ORION ENERGY CREDIT OPPORTUNITIES FUND II, L.P.** | $26,538,898.13 | $0 |
| **ORION ENERGY CREDIT OPPORTUNITIES FUND II PV, L.P.** | $42,646,575.88 | $0 |
| **ORION ENERGY CREDIT OPPORTUNITIES FUND II GPFA, L.P.** | $2,614,526.00 | $0 |
| **ORION ENERGY CREDIT OPPORTUNITIES CARBONLITE CO-INVEST, L.P.** | $0 | $8,200,000.00 |
| **TOTAL** | $71,800,000.00 | $8,200,000.00 |

**ANNEX II**
**TO**
**CREDIT AGREEMENT**

<u>**Orion Energy Equity Holders**</u>

Orion Energy Credit Opportunities Fund II, L.P.
Orion II PV CarbonLITE Splitter, L.P.
Orion Energy Credit Opportunities Fund II GPFA, L.P.
ORION II CO-INVEST CarbonLITE BLOCKER, LLC

**EXHIBIT A**
**TO**
**CREDIT AGREEMENT**

**Form of Assignment and Assumption**

 This Assignment and Assumption (the "<u>Assignment and Assumption</u>") is dated as of the Effective Date set forth in <u>item 9</u> below and is entered into by and between [the][each][1] Assignor identified in <u>item 1</u> below ([the][each, an] "<u>Assignor</u>") and [the][each][2] Assignee identified in <u>item 2</u> below ([the][each, an] "<u>Assignee</u>"). [It is understood and agreed that the rights and obligations of [the Assignors][the Assignees][3] hereunder are several and not joint.][4] Capitalized terms used but not defined herein shall have the meanings given to them in the Credit Agreement identified in <u>item 7</u> below (as amended, restated, supplemented or otherwise modified and in effect from time to time, the "<u>Credit Agreement</u>"), receipt of a copy of which is hereby acknowledged by [the][each] Assignee. The Standard Terms and Conditions set forth in <u>Annex 1</u> (the "<u>Standard Terms and Conditions</u>") attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment and Assumption as if set forth herein in full.

 For an agreed consideration, [the][each] Assignor hereby irrevocably sells and assigns to [the Assignee][the respective Assignees], and [the][each] Assignee hereby irrevocably purchases and assumes from [the Assignor][the respective Assignors], subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date inserted by the Administrative Agent as contemplated in <u>item 9</u> below (the "<u>Effective Date</u>") (i) all of [the Assignor's][the respective Assignors'] rights and obligations in [its capacity as a Lender] [their respective capacities as Lenders] under the Credit Agreement and any other Financing Document or other documents or instruments delivered pursuant thereto to the extent related to the amount and percentage interest identified in <u>item 8</u> below of all of such outstanding rights and obligations of [the Assignor][the respective Assignors] related to the tranche identified below and (ii) to the extent permitted to be assigned under Applicable Law, all claims, suits, causes of action and any other right of [the Assignor (in its capacity as a Lender)][the respective Assignors (in their respective capacities as Lenders)] against any Person, whether known or unknown, arising under or in connection with the Credit Agreement or other Financing Document, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including, but not limited to, contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned by [the] [any] Assignor to [the] [any] Assignee pursuant to clauses (i) and (ii) above being referred to herein collectively as [the][an] "<u>Assigned</u>

---

[1] *Note to Form*:  For bracketed language here and elsewhere in this form relating to the Assignor(s), if the assignment is from a single Assignor, choose the first bracketed language.  If the assignment is from multiple Assignors, choose the second bracketed language.

[2] *Note to Form*:  For bracketed language here and elsewhere in this form relating to the Assignee(s), if the assignment is to a single Assignee, choose the first bracketed language.  If the assignment is to multiple Assignees, choose the second bracketed language.

[3] *Note to Form*:  Select as appropriate.

[4] *Note to Form*:  Include and adjust as appropriate if there are either multiple Assignors or multiple Assignees.

US-DOCS\109436811.3

Interest"). Each such sale and assignment is without recourse to [the][any] Assignor and, except as expressly provided in this Assignment and Assumption, without representation or warranty by [the][any] Assignor.

1.      Assignor[s]:

2.      Assignee[s]: _____

        [if applicable, for each Assignee, indicate [Affiliate][Related Fund] of [identify Lender]]

3.      Borrower: CarbonLite Holdings, LLC

4.      Guarantors: CarbonLite Sub-Holdings, LLC, CarbonLite PI Holdings, LLC, CarbonLite Industries LLC, CarbonLite Pinnpack, LLC and PinnPack Packaging, LLC

5.      Administrative Agent: Orion Energy Partners Investment Agent, LLC

6.      Collateral Agent: Orion Energy Partners Investment Agent, LLC

7.      Credit Agreement: The Credit Agreement, dated as of August 2, 2019 among the Borrower, the Guarantors, the Lenders from time to time party thereto, the Administrative Agent and the Collateral Agent.

8.      Assigned Interest[s]:

| Assignor[s] | Assignee[s] | Aggregate Amount of Commitment/Loans of Assignor[s] | Amount of Commitment/ Loans Assigned[5] | Percentage Assigned of Commitment/ Loans[6] |
| --- | --- | --- | --- | --- |
| | | $ | $ | % |
| | | $ | $ | % |
| | | $ | $ | % |

9.      Effective Date: _____ _____, 20____[7]

10.     [[Each][The] Assignor attaches the Note[s] held by it [and requests that the Administrative Agent exchange such Note[s] for new Note[s] payable to the [respective] Assignee in [an amount/amounts] equal to the [Commitment][and] [Loan[s]] assumed by the [respective] Assignee pursuant hereto [and to the

---

[5] *Note to Form*: Include if the Assignee holds a Note, adjusting language as appropriate if the Assignee also elects to hold Notes.

[6] *Note to Form*: Set forth, to at least 9 decimals, as a percentage of the Commitment/Loans of all Lenders thereunder.

[7] *Note to Form*: To be inserted by Administrative Agent and to be the effective date of recordation of transfer in the register therefor (following receipt of Borrower's consent, if applicable).

[respective] Assignor in [an amount/amounts] equal to the [Commitment][and][Loan[s]] retained by the [respective] Assignor].[8]

The terms set forth in this Assignment and Assumption are hereby agreed to as of the Effective Date:[9]

ASSIGNOR[S]

**[NAME OF ASSIGNOR]**

By: _____
      Name:
      Title:

**[NAME OF ASSIGNOR]**

By: _____
      Name:
      Title:

ASSIGNEE[S]

**[NAME OF ASSIGNEE]**

By: _____
      Name:
      Title:

**[NAME OF ASSIGNEE]**

By: _____
      Name:
      Title:

---

[8] *Note to Form*: Include if the Assignee holds a Note, adjusting language as appropriate if the Assignee also elects to hold Notes.

[9] *Note to Form*: Add signature blocks as necessary.

Exhibit A-6

Accepted by:

**ORION ENERGY PARTNERS INVESTMENT AGENT, LLC**, as Administrative Agent

By: _____
    Name:
    Title:

[Consented to:]
[**CARBONLITE HOLDINGS, LLC**, as Borrower][10]

By: _____
    Name:
    Title:

---

[10] *Note to Form*: To be included when the Borrower's consent is required pursuant to Section 10.04(b).

Exhibit A-4

ANNEX 1<br>to Assignment and Assumption

## STANDARD TERMS AND CONDITIONS FOR
## ASSIGNMENT AND ASSUMPTION

1.  <u>Representations and Warranties</u>.

1.1  <u>Assignor[s]</u>. [The][Each] Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of [the][the relevant] Assigned Interest, (ii) [the][such] Assigned Interest is free and clear of any lien, encumbrance or other adverse claim and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Credit Agreement or any other Financing Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Financing Documents or any collateral thereunder, (iii) the financial condition of the Borrower, any of its Affiliates or any other Person obligated in respect of any Financing Document or (iv) the performance or observance by the Borrower, any of its Affiliates or any other Person of any of their respective obligations under any Financing Document.

1.2  <u>Assignee[s]</u>. [The][Each] Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement, (ii) it meets all the requirements to be an assignee under Section 10.04(b) of the Credit Agreement (subject to such consents, if any, as may be required under Section 10.04(b) of the Credit Agreement), (iii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement as a Lender thereunder and, to the extent of [the][the relevant] Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it is sophisticated with respect to decisions to acquire assets of the type represented by the Assigned Interest and either it, or the person exercising discretion in making its decision to acquire the Assigned Interest, is experienced in acquiring assets of such type, (v) it has received a copy of the Credit Agreement and the other Financing Documents to which the Assignor[s] [was][were] party, and has received or has been accorded the opportunity to receive copies of the most recent financial statements delivered pursuant to Section 5.10 of the Credit Agreement, as applicable, and such other documents and information as it deems appropriate to make its own credit analysis and decision to enter into this Assignment and Assumption and to purchase [the][such] Assigned Interest, (vi) [it has duly executed and delivered to the Administrative Agent an Administrative Questionnaire,][11] (vii) it has, independently and without reliance upon the Administrative Agent or any other Lender and based on such

---

[11] *Note to Form*: Delete if there is an assignment to a Lender pursuant to Section 10.04(b)(v) of the Credit Agreement.

Exhibit A-5

documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Assignment and Assumption and to purchase [the][such] Assigned Interest, and (ix) if it is entitled to an exemption from or reduction of withholding tax under the law of the jurisdiction in which the Borrower is organized (or any treaty to which such jurisdiction is a party), attached to the Assignment and Assumption is any documentation required to be delivered by it pursuant to the terms of the Credit Agreement, duly completed and executed by [the][such] Assignee; and (b) agrees that (i) [it will pay to the Administrative Agent, on or before the Effective Date, a processing and recordation fee in an amount of US $3,500.00,][12] (ii) it will, independently and without reliance on the Administrative Agent, [the] [any] Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Financing Documents, and [(ii)] [(iii)] it will perform in accordance with their terms all of the obligations which by the terms of the Financing Documents are required to be performed by it as a Lender.

2.     <u>Payments</u>. From and after the Effective Date, the Administrative Agent shall make all payments in respect of [the][each] Assigned Interest (including payments of principal, interest, fees and other amounts) to [the][the relevant] Assignor for amounts which have accrued to but excluding the Effective Date and to [the][the relevant] Assignee for amounts which have accrued from and after the Effective Date. Each party hereto agrees that it will hold any interest, fees or other amounts that it may receive to which the other party hereto shall be entitled pursuant to the preceding sentence for account of such other party and pay, in like money and funds, any such amounts that it may receive to such other party promptly upon receipt.

3.     <u>General Provisions</u>. This Assignment and Assumption shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns. This Assignment and Assumption may be executed in any number of counterparts, which together shall constitute one instrument. Delivery of an executed counterpart of a signature page of this Assignment and Assumption by telecopy shall be effective as delivery of a manually executed counterpart of this Assignment and Assumption. This Assignment and Assumption shall be governed by, and construed in accordance with, the law of the State of New York.

---

[12] *Note to Form*: Delete with respect to Affiliate Assignees in accordance with Section 10.04(b)(iv) of the Credit Agreement.

Exhibit A-6

**EXHIBIT B**
**TO**
**CREDIT AGREEMENT**

**Form of Note**

$[ ● ]                                                                                    [ ● ], 20[ ● ]

New York, New York

FOR VALUE RECEIVED, the undersigned (the "<u>Borrower</u>"), hereby promises to pay to [ ● ] (the "<u>Lender</u>"), at the office of the Administrative Agent as provided for by the Credit Agreement referred to below, for the account of the Lender, the principal sum of $[ ● ] (or such lesser amount as shall equal the aggregate unpaid principal amount of the Loans made by the Lender to the Borrower under the Credit Agreement), in lawful money of the United States of America and in immediately available funds, on the dates and in the principal amounts provided in the Credit Agreement, and to pay interest on the unpaid principal amount of each such Loan, at such office, in like money and funds, for the period commencing on the date of such Loan until such Loan shall be paid in full, at the rate per annum and on the dates provided in the Credit Agreement.

The date, amount and interest rate of each Loan made by the Lender to the Borrower, and each payment made on account of the principal thereof, shall be recorded by the Lender on its books and, prior to any transfer of this Note, endorsed by the Lender on the schedule attached hereto or any continuation thereof, provided that the failure of the Lender to make any such recordation or endorsement shall not affect the obligations of the Borrower to make a payment when due of any amount owing under the Credit Agreement or hereunder in respect of the Loans made by the Lender.

This Note evidences Loans made by the Lender under the Credit Agreement dated as of August 2, 2019 (as amended, restated, supplemented or otherwise modified and in effect from time to time, the "<u>Credit Agreement</u>") among, the Borrower, the Guarantors, the Lenders from time to time party thereto, the Administrative Agent and the Collateral Agent. Terms used but not defined in this Note have the respective meanings assigned to them in the Credit Agreement.

The Credit Agreement provides for the acceleration of the maturity of this Note upon the occurrence of certain events and for prepayments of the Loans upon the terms and conditions specified therein.

Except as permitted by Section 10.04(b) of the Credit Agreement, this Note may not be assigned by the Lender to any other Person.

This Note shall be governed by, and construed in accordance with, the law of the State of New York.

**CARBONLITE HOLDINGS, LLC,**
as Borrower

By: _____
     Name:
     Title:

Exhibit B – 2

**Schedule of Loans**

This Note evidences Loans made under the within described Credit Agreement to the Borrower, on the dates, in the principal amounts and bearing interest at the rates set forth below, subject to the payments and prepayments of principal set forth below:

| Date | Principal Amount of Loan | Interest Rate | Amount Paid or Prepaid | Notation made by |
|------|--------------------------|---------------|------------------------|------------------|
|      |                          |               |                        |                  |
|      |                          |               |                        |                  |
|      |                          |               |                        |                  |
|      |                          |               |                        |                  |
|      |                          |               |                        |                  |
|      |                          |               |                        |                  |
|      |                          |               |                        |                  |
|      |                          |               |                        |                  |

Exhibit B – 3

**EXHIBIT B-1**
**TO**
**CREDIT AGREEMENT**

FORM OF

U.S. TAX COMPLIANCE CERTIFICATE

(For Foreign Lenders That Are Not Partnerships For U.S. Federal Income Tax Purposes)

       Reference is hereby made to the Credit Agreement, dated as of August 2, 2019 (as amended, restated, supplemented or otherwise modified and in effect from time to time, the "Credit Agreement"), among CarbonLite Holdings, LLC (the "Borrower"), the Guarantors, the Lenders from time to time party thereto and Orion Energy Partners Investment Agent, LLC (the "Administrative Agent").

       Pursuant to the provisions of Section 2.09 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) it is not a bank within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (iv) it is not a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

       The undersigned has furnished the Administrative Agent and the Borrower with a certificate of its non-U.S. Person status on IRS Form W-8BEN or IRS Form W-8BEN-E.  By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrower and the Administrative Agent, and (2) the undersigned shall have at all times furnished the Borrower and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

       Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

[NAME OF LENDER]

By:_____

     Name:
     Title:
Date: _____ __, 20[  ]

Exhibit B-1– 1

**EXHIBIT B-2**
**TO**
**CREDIT AGREEMENT**

FORM OF

U.S. TAX COMPLIANCE CERTIFICATE
(For Foreign Participants That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Credit Agreement, dated as of August 2 2019 (as amended, restated, supplemented or otherwise modified and in effect from time to time, the "Credit Agreement"), among CarbonLite Holdings, LLC (the "Borrower"), the Guarantors, the Lenders from time to time party thereto and Orion Energy Partners Investment Agent, LLC (the "Administrative Agent").

Pursuant to the provisions of Section 2.09 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the participation in respect of which it is providing this certificate, (ii) it is not a bank within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code, and (iv) it is not a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with a certificate of its non-U.S. Person status on IRS Form W-8BEN or IRS Form W-8BEN-E. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender in writing, and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

[NAME OF PARTICIPANT]

By:_____
    Name:
    Title:
Date: _____ __, 20[  ]

Exhibit B-2 – 1

**EXHIBIT B-3**
**TO**
**CREDIT AGREEMENT**

FORM OF

U.S. TAX COMPLIANCE CERTIFICATE
(For Foreign Participants That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Credit Agreement dated as of August 2, 2019 (as amended, restated, supplemented or otherwise modified and in effect from time to time, the "Credit Agreement"), among CarbonLite Holdings, LLC (the "Borrower"), the Guarantors, the Lenders from time to time party thereto and Orion Energy Partners Investment Agent, LLC (the "Administrative Agent").

Pursuant to the provisions of Section 2.09 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the participation in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such participation, (iii) with respect such participation, neither the undersigned nor any of its direct or indirect partners/members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or IRS Form W-8BEN-E or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN or IRS Form W-8BEN-E from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption.  By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

[NAME OF PARTICIPANT]

By:_____

    Name:
    Title:
Date: _____ __, 20[  ]

US-DOCS\109436811.3

**EXHIBIT B-4**
**TO**
**CREDIT AGREEMENT**

FORM OF

U.S. TAX COMPLIANCE CERTIFICATE
(For Foreign Lenders That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Credit Agreement dated as of August 2, 2019 (as amended, restated, supplemented or otherwise modified and in effect from time to time, the "Credit Agreement"), among CarbonLite Holdings, LLC (the "Borrower"), the Guarantors, the Lenders from time to time party thereto and Orion Energy Partners Investment Agent, LLC (the "Administrative Agent").

Pursuant to the provisions of Section 2.09 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such Loan(s) (as well as any Note(s) evidencing such Loan(s)), (iii) with respect to the extension of credit pursuant to this Credit Agreement or any other Financing Document, neither the undersigned nor any of its direct or indirect partners/members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Administrative Agent and the Borrower with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or IRS Form W-8BEN-E or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN or IRS Form W-8BEN-E from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption.  By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrower and the Administrative Agent, and (2) the undersigned shall have at all times furnished the Borrower and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

[NAME OF LENDER]

By:_____

     Name:
     Title:
Date: _____ __, 20[  ]

US-DOCS\109436811.3

**EXHIBIT C**
**TO**
**CREDIT AGREEMENT**

**Form of Borrowing Request**

[INSERT DATE]

Orion Energy Partners Investment Agent, LLC, as Administrative Agent and Collateral Agent
350 5th Ave #6740
New York, NY 10118
Attention: Gerrit Nicholas, Chris Leary and Mark Friedland
Email: Gerrit@OrionEnergyPartners.Com;
　　　　Chris@OrionEnergyPartners.Com;
　　　　Mark@OrionEnergyPartners.com

RE:　　CarbonLite Holdings, LLC

Ladies and Gentlemen:

　　　　The undersigned refers to that certain Credit Agreement, dated as of August 2, 2019 (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), among CarbonLite Holdings, LLC, a Delaware limited liability company (the "Borrower"), the Guarantors, the Lenders from time to time party thereto, the Administrative Agent and the Collateral Agent. All capitalized terms used herein shall have the respective meanings specified in the Credit Agreement unless otherwise defined herein.

　　　　The undersigned hereby requests a borrowing of Loans under the Credit Agreement (the "Proposed Borrowing"), as follows:

　　　　(1)　　The aggregate amount of the Proposed Borrowing by the Borrower is $[_____].[1]

　　　　(2)　　The date of the Proposed Borrowing is [ ● ][2], 201[ ● ], which is a Business Day and the [Initial][Second] Funding Date (the "Drawdown Date").

　　　　The undersigned Authorized Representative of the Borrower hereby certifies that, as of the date of this Borrowing Request and the Drawdown Date:

　　　　i.　　　the representations and warranties of each of the Loan Parties set forth in the Credit Agreement and the other Financing Documents are true and correct in all material respects (except where already qualified by materiality or Material

---

[1] *Note to Form*: The aggregate amount of the Borrowing on any Funding Date shall not exceed the aggregate Commitment applicable to such Funding Date.

[2] *Note to Form*: In accordance with Section 2.01(c) of the Credit Agreement, each Funding Date shall be no earlier than 10 days after delivery of this Borrowing Request, unless consented to by the Administrative Agent (other than the Initial Funding Date, which shall be mutually agreed between the Administrative Agent and the Borrower).

Exhibit C – 1

Adverse Effect or in the case of any representation and warranty in Section 3.13 of the Credit Agreement, in each such case, in all respects);

ii.    no Default or Event of Default has occurred and is continuing on, or will result as a result of the transactions contemplated to occur on the date hereof or the Drawdown Date; and

iii.    no development, event or circumstance that has had or could reasonably be expected to have a Material Adverse Effect has occurred and is continuing, or will result from the transactions contemplated to occur on the date hereof or the Drawdown Date.

[*signature page follows*]

Exhibit C – 3

**CARBONLITE HOLDINGS, LLC,**
as Borrower

By:  _____
     Name:
     Title:

Exhibit C – 3

**EXHIBIT D**
**TO**
**CREDIT AGREEMENT**

[Reserved]

**EXHIBIT E**
**TO**
**CREDIT AGREEMENT**

**<u>Form of Operating Budget</u>**

[*Please see attached*]

**CarbonLITE PI Holdings**

## Income Statement

### CarbonLITE Industries

| | Budget Jul-19 | Budget Aug-19 | Budget Sep-19 | Budget Oct-19 | Budget Nov-19 | Budget Dec-19 | Total 2H 2019 |
|---|---|---|---|---|---|---|---|
| Direct Wages | 565,000 | 565,000 | 565,000 | 565,000 | 565,000 | 565,000 | 3,390,000 |
| Other MO | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 6,000,000 |
| General & Administrative | 300,000 | 300,000 | 300,000 | 300,000 | 300,000 | 300,000 | 1,800,000 |
| | 1,865,000 | 1,865,000 | 1,865,000 | 1,865,000 | 1,865,000 | 1,865,000 | 11,190,000 |
| | | | | | | | |
| Maintenance CapEx | 83,333 | 83,333 | 83,333 | 83,333 | 83,333 | 83,333 | 500,000 |
| Growth CapEx | - | 1,200,000 | - | - | 300,000 | - | 1,500,000 |

### CarbonLITE PinnPack

| | Budget Jul-19 | Budget Aug-19 | Budget Sep-19 | Budget Oct-19 | Budget Nov-19 | Budget Dec-19 | Total 2H 2019 |
|---|---|---|---|---|---|---|---|
| Direct Wages | 600,000 | 600,000 | 600,000 | 600,000 | 600,000 | 600,000 | 3,600,000 |
| Other MO | 700,000 | 700,000 | 700,000 | 700,000 | 700,000 | 700,000 | 4,200,000 |
| General & Administrative | 350,000 | 350,000 | 350,000 | 350,000 | 350,000 | 350,000 | 2,100,000 |
| | 1,650,000 | 1,650,000 | 1,650,000 | 1,650,000 | 1,650,000 | 1,650,000 | 9,900,000 |
| | | | | | | | |
| Maintenance CapEx | 83,333 | 83,333 | 83,333 | 83,333 | 83,333 | 83,333 | 500,000 |
| Growth CapEx | 563,900 | 263,900 | 863,900 | 263,900 | 263,900 | 263,900 | 2,483,400 |

CarbonLITE PI Holdings

## Income Statement

### CarbonLITE Industries

| | Projection Jan-20 | Projection Feb-20 | Projection Mar-20 | Projection Apr-20 | Projection May-20 | Projection Jun-20 | Projection Jul-20 | Projection Aug-20 | Projection Sep-20 | Projection Oct-20 | Projection Nov-20 | Projection Dec-20 | Projection Year 2020 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Direct Wages | 576,300 | 576,300 | 576,300 | 576,300 | 576,300 | 576,300 | 576,300 | 576,300 | 576,300 | 576,300 | 576,300 | 576,300 | 6,915,600 |
| Other MO | 1,050,000 | 1,050,000 | 1,050,000 | 1,050,000 | 1,050,000 | 1,050,000 | 1,050,000 | 1,050,000 | 1,050,000 | 1,050,000 | 1,050,000 | 1,050,000 | 12,600,000 |
| General & Administrative | 315,000 | 315,000 | 315,000 | 315,000 | 315,000 | 315,000 | 315,000 | 315,000 | 315,000 | 315,000 | 315,000 | 315,000 | 3,780,000 |
| | 1,941,300 | 1,941,300 | 1,941,300 | 1,941,300 | 1,941,300 | 1,941,300 | 1,941,300 | 1,941,300 | 1,941,300 | 1,941,300 | 1,941,300 | 1,941,300 | 23,295,600 |
| Maintenance CapEx | 83,333 | 83,333 | 83,333 | 83,333 | 83,333 | 83,333 | 83,333 | 83,333 | 83,333 | 83,333 | 83,333 | 83,333 | 1,000,000 |
| Growth CapEx | - | - | - | - | - | - | - | - | - | - | - | - | |

### CarbonLITE PinnPack

| | Projection Jan-20 | Projection Feb-20 | Projection Mar-20 | Projection Apr-20 | Projection May-20 | Projection Jun-20 | Projection Jul-20 | Projection Aug-20 | Projection Sep-20 | Projection Oct-20 | Projection Nov-20 | Projection Dec-20 | Projection Year 2020 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Direct Wages | 612,000 | 612,000 | 612,000 | 612,000 | 612,000 | 612,000 | 612,000 | 612,000 | 612,000 | 612,000 | 612,000 | 612,000 | 7,344,000 |
| Other MO | 800,000 | 800,000 | 800,000 | 800,000 | 800,000 | 800,000 | 800,000 | 800,000 | 800,000 | 800,000 | 800,000 | 800,000 | 9,600,000 |
| General & Administrative | 357,000 | 357,000 | 357,000 | 357,000 | 357,000 | 357,000 | 357,000 | 357,000 | 357,000 | 357,000 | 357,000 | 357,000 | 4,284,000 |
| | 1,769,000 | 1,769,000 | 1,769,000 | 1,769,000 | 1,769,000 | 1,769,000 | 1,769,000 | 1,769,000 | 1,769,000 | 1,769,000 | 1,769,000 | 1,769,000 | 21,228,000 |
| Maintenance CapEx | 83,333 | 83,333 | 83,333 | 83,333 | 83,333 | 83,333 | 83,333 | 83,333 | 83,333 | 83,333 | 83,333 | 83,333 | 1,000,000 |
| Growth CapEx | 41,667 | 41,667 | 41,667 | 41,667 | 41,667 | 41,667 | 41,667 | 41,667 | 41,667 | 41,667 | 41,667 | 41,667 | 500,000 |

**EXHIBIT F**
**TO**
**CREDIT AGREEMENT**

## **Form of Operational Report**

[*Please see attached*]



**carbonLITE.**
INDUSTRIES LLC • AN HPC COMPANY
**Monthly Financial Review**

| Month: | May-19 |
|---|---|

## KPI Dashboard

| | Current Month | | | Year-to-Date | | | Notes |
|---|---|---|---|---|---|---|---|
| | Budget | Actual | Variance | Budget | Actual | Variance | |
| **Production Volume (in LBS):** | | | | | | | |
| De-Baled | 8,304,480 | 7,778,670 | (525,810) | 38,554,400 | 37,469,807 | (1,084,593) | |
| Clear Flake | 5,730,091 | 4,980,259 | (749,832) | 26,602,536 | 22,151,904 | (4,450,632) | |
| Green Flake | 498,269 | 471,571 | (26,698) | 2,313,264 | 2,875,982 | 562,718 | |
| Total Flake | 6,228,360 | 5,451,830 | (776,530) | 28,915,800 | 25,027,886 | (3,887,914) | |
| Flake Yield | 75.00% | 70.09% | -4.91% | 75.00% | 66.79% | -8.21% | |
| PET Pellet | 6,362,314 | 5,293,682 | (1,068,632) | 28,332,831 | 24,495,029 | (3,837,802) | |
| PO Pellet | 478,961 | 313,969 | (164,992) | 2,287,958 | 1,549,548 | (738,411) | |
| **Total MFG Cost per Pound** | $ 0.3506 | $ 0.3758 | $ (0.0251) | $ 0.3714 | $ 0.3996 | $ (0.0282) | |
| **Sales Volume (in LBS):** | | | | | | | |
| B2B Clear Pellet | 6,988,400 | 4,207,460 | (2,780,940) | 28,603,600 | 22,926,066 | (5,677,534) | |
| Non-B2B Clear Pellet | 350,000 | 942,777 | 592,777 | 1,750,000 | 3,855,939 | 2,105,939 | |
| Green Pellet | 250,000 | 0 | (250,000) | 1,250,000 | 124,145 | (1,125,855) | |
| Green Flake | 1,000,000 | 0 | (1,000,000) | 5,000,000 | 0 | (5,000,000) | |
| PO Pellet | 478,961 | 298,100 | (180,861) | 2,287,958 | 1,418,109 | (869,849) | |
| Total Sales Volume (in LBS) | 9,067,361 | 5,448,337 | (3,619,024) | 38,891,558 | 28,324,259 | (10,567,299) | |
| **Net Revenue** | $ 5,432,450 | $ 3,416,648 | $ (2,015,802) | $ 22,478,280 | $ 17,085,806 | $ (5,392,473) | |
| **Net Revenue per Pound** | $ 0.5991 | $ 0.6271 | $ 0.0280 | $ 0.5780 | $ 0.6032 | $ 0.0252 | |
| **Adj. EBITDA** | $ 699,992 | $ 421,815 | $ (278,177) | $ 2,414,463 | $ 1,926,855 | $ (487,608) | |

**TO BE UPDATED FOLLOWING CLOSING DATE FOR:**

o $/lb cost of the bales
o Revenue broken out by product type and the equivalent average sales price ($/lb)
o Volume or revenue broken out by major customer (Nestle, Niagara, Pepsi, Coca-Cola)
o Adjusted EBITDA / lb of PET Pellet

CONFIDENTIAL

**Monthly Financial Review**

## Manufacturing Cost Detail

| Manufacturing Costs: | Current Month Budget | Actual | Variance | Year-to-Date Budget | Actual | Variance | Notes |
|---|---|---|---|---|---|---|---|
| Packaging | $ 25,000 | $ 6,578 | $ 18,422 | $ 125,000 | $ 32,461 | $ 92,539 | |
| Chemicals | $ 123,668 | $ - | $ 123,668 | $ 574,142 | $ 44,523 | $ 529,620 | |
| Purchase Price Variance | $ - | $ (251) | $ 251 | $ - | $ (1,381) | $ 1,381 | |
| Payroll Expense MFG | $ 482,839 | $ 517,490 | $ (34,651) | $ 2,414,195 | $ 2,610,643 | $ (196,447) | |
| Temp Payroll MFG | $ 25,000 | $ 50,274 | $ (25,274) | $ 125,000 | $ 133,656 | $ (8,656) | |
| Employee Benefits MFG | $ 81,425 | $ (5,684) | $ 87,109 | $ 407,125 | $ 219,951 | $ 187,174 | |
| Training & Development | $ - | $ - | $ - | $ - | $ 325 | $ (325) | |
| Rent Expense MFG | $ 85,000 | $ 85,142 | $ (142) | $ 425,000 | $ 432,838 | $ (7,838) | |
| Rent Expense - Outside Warehouse | $ 48,000 | $ 57,026 | $ (9,026) | $ 240,000 | $ 294,527 | $ (54,527) | |
| Utilities | $ 403,251 | $ 372,139 | $ 31,112 | $ 1,881,783 | $ 1,741,924 | $ 139,859 | |
| Personal Property Tax | $ 48,000 | $ 45,000 | $ 3,000 | $ 240,000 | $ 225,000 | $ 15,000 | |
| Insurance Expense MFG | $ 19,000 | $ 19,357 | $ (357) | $ 95,000 | $ 96,784 | $ (1,784) | |
| Workers Comp MFG | $ 41,707 | $ 36,713 | $ 4,994 | $ 208,534 | $ 188,180 | $ 20,353 | |
| Depreciation Expense MFG | $ 538,000 | $ 535,821 | $ 2,179 | $ 2,690,000 | $ 2,680,367 | $ 9,633 | |
| Repairs and Maintenance | $ 115,000 | $ 124,379 | $ (9,379) | $ 575,000 | $ 610,629 | $ (35,629) | |
| Equipment Rental | $ 29,000 | $ 31,921 | $ (2,921) | $ 145,000 | $ 139,180 | $ 5,820 | |
| Manufacturing Supplies | $ 6,700 | $ 7,630 | $ (930) | $ 33,500 | $ 30,230 | $ 3,270 | |
| Maintenance Supplies | $ 12,000 | $ 8,181 | $ 3,819 | $ 60,000 | $ 64,310 | $ (4,310) | |
| Lubricants | $ 500 | $ (1,613) | $ 2,113 | $ 2,500 | $ (1,613) | $ 4,113 | |
| QA Lab Supplies | $ 8,000 | $ 14,475 | $ (6,475) | $ 40,000 | $ 65,683 | $ (25,683) | |
| Warehouse Supplies | $ 9,000 | $ 6,582 | $ 2,418 | $ 45,000 | $ 23,783 | $ 21,217 | |
| Janitorial Supplies | $ 3,000 | $ 228 | $ 2,772 | $ 15,000 | $ 15,288 | $ (288) | |
| Safety & Compliance | $ 8,500 | $ 3,005 | $ 5,495 | $ 42,500 | $ 28,177 | $ 14,323 | |
| Uniforms | $ 500 | $ 190 | $ 310 | $ 2,500 | $ 190 | $ 2,310 | |
| Alarm Service | $ 100 | $ 128 | $ (28) | $ 500 | $ 596 | $ (96) | |
| Automobile Expense | $ 700 | $ 1,204 | $ (504) | $ 3,500 | $ 2,150 | $ 1,350 | |
| Outside Services (Waste Hauling) | $ 65,000 | $ 122,914 | $ (57,914) | $ 325,000 | $ 294,667 | $ 30,333 | Timing of waste hauling bills |
| Environmental | $ 1,000 | $ - | $ 1,000 | $ 5,000 | $ - | $ 5,000 | |
| Personnel Recruitment | $ - | $ 111 | $ (111) | $ - | $ 845 | $ (845) | |
| Dues & Subscriptions | $ 3,300 | $ - | $ 3,300 | $ 16,500 | $ 10,945 | $ 5,555 | |
| Permit Fees | $ 600 | $ 9,687 | $ (9,087) | $ 3,000 | $ 16,446 | $ (13,446) | |
| **Total Cost of Manufacturing** | **$ 2,183,790** | **$ 2,048,626** | **$ 135,164** | **$ 10,740,280** | **$ 10,001,302** | **$ 738,978** | |
| | | | | | | | |
| General Sales Freight | $ 135,910 | $ 126,247 | $ 9,663 | $ 639,493 | $ 696,600 | $ (57,107) | |



carbonLITE
INDUSTRIES LLC · AN HPC COMPANY

CONFIDENTIAL

# carbonLITE
INDUSTRIES LLC • AN HPC COMPANY

**Monthly Financial Review**

## G&A Cost Detail

| G&A Cost Accounts | Current Month | | | Year-to-Date | | | Notes |
|---|---|---|---|---|---|---|---|
| | Budget | Actual | Variance | Budget | Actual | Variance | |
| Sales Travel Expense | $ 100 | $ - | $ 100 | $ 500 | $ - | $ 500 | |
| Meals & Entertainment | $ 650 | $ 9 | $ 641 | $ 3,250 | $ (2,098) | $ 5,348 | |
| Trade Show Expense | $ - | $ - | $ - | $ - | $ 685 | $ (685) | |
| Payroll Expense G&A | $ 97,362 | $ 79,587 | $ 17,775 | $ 486,810 | $ 740,879 | $ (254,070) | |
| Temp Payroll G&A | $ 350 | $ 2,845 | $ (2,495) | $ 1,750 | $ 10,490 | $ (8,740) | |
| Employee Benefits G&A | $ 28,674 | $ 1,839 | $ 26,835 | $ 143,369 | $ 77,865 | $ 65,504 | |
| Personnel Recruitment G&A | $ - | $ - | $ - | $ - | $ 5,000 | $ (5,000) | |
| Insurance Expense G&A | $ 6,000 | $ 6,663 | $ (663) | $ 30,000 | $ 30,917 | $ (917) | |
| Workers Comp G&A | $ 2,892 | $ 4,154 | $ (1,263) | $ 14,459 | $ 22,087 | $ (7,628) | |
| Telephone Expense | $ 3,700 | $ 3,118 | $ 582 | $ 18,500 | $ 14,199 | $ 4,301 | |
| Postage & Delivery | $ 960 | $ 615 | $ 346 | $ 4,800 | $ 1,800 | $ 3,000 | |
| Office Supplies | $ 710 | $ 1,597 | $ (887) | $ 3,550 | $ 7,521 | $ (3,971) | |
| Office Equipment Lease | $ 860 | $ 672 | $ 188 | $ 4,300 | $ 3,443 | $ 857 | |
| Computer & Internet Expense | $ 5,700 | $ 18,078 | $ (12,378) | $ 28,500 | $ 53,826 | $ (25,326) | |
| Depreciation Expense G&A | $ 7,700 | $ 6,985 | $ 715 | $ 38,500 | $ 35,094 | $ 3,406 | |
| Outside Services G&A | $ 270 | $ 216 | $ 54 | $ 1,350 | $ 8,453 | $ (7,103) | |
| Professional Fees | $ 52,000 | $ 15,719 | $ 36,281 | $ 260,000 | $ 85,199 | $ 174,801 | W&H issue budgeted |
| Travel Expense | $ 2,100 | $ 2,712 | $ (612) | $ 10,500 | $ 10,394 | $ 106 | |
| Employee Welfare | $ 3,200 | $ 2,032 | $ 1,168 | $ 16,000 | $ 10,334 | $ 5,666 | |
| Business Tax, License & Fees | $ 480 | $ - | $ 480 | $ 2,400 | $ 1,146 | $ 1,254 | |
| Bank Service Charges | $ 320 | $ 1,626 | $ (1,306) | $ 1,600 | $ 9,281 | $ (7,681) | |
| Management Fee | $ 66,000 | $ 67,501 | $ (1,501) | $ 330,000 | $ 337,505 | $ (7,505) | |
| HPC Reimbursable Expenses | $ 5,500 | $ 1,182 | $ 4,318 | $ 27,500 | $ 19,055 | $ 8,445 | |
| **Total G&A Cost** | $ 285,528 | $ 217,150 | $ 68,377 | $ 1,427,638 | $ 1,483,077 | $ (55,439) | |
| | | | | | | | |
| **Total Cost (MFG, FRT & G&A)** | $ 2,469,317 | $ 2,265,776 | $ 203,541 | $ 12,167,918 | $ 11,484,378 | $ 683,539 | |
| | | | | | | | |
| Total CapEx | $ 72,917 | $ - | $ 72,917 | $ 364,583 | $ 50,667 | $ 313,916 | |

TO BE UPDATED FOLLOWING CLOSING DATE FOR:

o Capex split between growth vs. maintenance
o Inventory volume + $ value by type (raw materials, WIP, finished goods)

CONFIDENTIAL

**EXHIBIT G**
**TO**
**CREDIT AGREEMENT**

**Form of Shareholder Note Subordination Agreement**

[*Please see attached*]

US-DOCS\109436811.3

*Execution Version*

## SHAREHOLDER NOTE SUBORDINATION AGREEMENT

**THIS SUBORDINATION AGREEMENT** (as the same may be amended, restated, supplemented or otherwise modified from time to time, this "***Agreement***"), dated as of August 2, 2019 is among CarbonLite Industries LLC, a Delaware limited liability company ("***CL Industries***"), CarbonLite Pinnpack, LLC, a Delaware limited liability company ("***CL Pinnpack***"), CarbonLite PI Holdings, LLC, a Delaware limited liability company ("***CL PI Holdings***"), Pinnpack Packaging, LLC, a Delaware limited liability company ("***Pinnpack Packaging***"), CarbonLite Sub-Holdings, LLC, a Delaware limited liability company ("***CL Intermediate Holdco***"), CarbonLite Holdings LLC, a Delaware limited liability company (the "***CL Holdings***" and together with CL Industries, CL Pinnpack, CL PI Holdings, Pinnpack Packaging and CL Intermediate Holdco and each other Person (as hereinafter defined) who guarantees, or grants a lien on its assets to secure, "Senior Indebtedness" (as hereinafter defined), is referred to individually as an "***Obligor***" and collectively as the "***Obligors***"), [CLI Mason, LLC, a Delaware limited liability company ("***CLI Mason***")][1][Ebrahim Simhaee, an individual ("***Simhaee***")][2], as authorized representative of the Subordinated Noteholders described below (together with its successors and assigns in such capacity, the "***Subordinated Indebtedness Agent***") and Orion Energy Partners Investment Agent, LLC, in its capacities as administrative agent and collateral agent (together with its successors and assigns in such capacity, the "***Senior Agent***") for the Senior Lenders (as hereinafter defined).

## R E C I T A L S

A.    CL Holdings, as borrower (in such capacity, the "***Borrower***"), the other Obligors, as guarantors, the Senior Agent and the Senior Lenders are party to that certain Credit Agreement, dated as of August 2, 2019 (as the same may be amended, supplemented, restated or otherwise modified from time to time as permitted hereunder, the "***Senior Loan Agreement***") pursuant to which, among other things, Senior Lenders have agreed, subject to the terms and conditions set forth in the Senior Loan Agreement, to make certain loans and financial accommodations to Borrower.

B.    Pursuant to (i) the Senior Loan Agreement and (ii) certain of the other Financing Documents, the Obligors have guaranteed the obligations of the Borrower under the Senior Loan Agreement.

C.    [CL Industries issued certain Senior Subordinated Promissory Notes in an aggregate principal amount of $10,000,000 (as the same have been amended prior to the date hereof, including by those certain Consents of Holders of Subordinated Shareholder Notes dated on or about the date hereof (the "***Noteholder Consents***"), and may otherwise be amended, supplemented, restated or otherwise modified from time to time solely to the extent permitted hereunder and including any notes issued in exchange or substitution therefor, the "***Subordinated***

---

[1] Insert if this subordination agreement is in respect of the 10% Notes.

[2] Insert if this subordination agreement is in respect of the 7% Notes.

***Notes***") to the Subordinated Noteholders (as hereinafter defined) pursuant to that certain Amended and Restated Note Purchase Agreement dated as of September 26, 2011 (as the same has been amended prior to the date hereof, including by that certain Amendment No. 1 to Note Purchase Agreement dated August 21, 2014 and the Noteholder Consents and as may otherwise be amended, supplemented, restated or otherwise modified from time to time solely to the extent permitted hereunder, the "***Note Agreement***"), by and among CL Industries, the Subordinated Indebtedness Agent and the "Holders" (as defined therein, herein referred to collectively as, together with each other holder of Subordinated Indebtedness (as hereinafter defined), and their successors and assigns, the "***Subordinated Noteholders***"; the Subordinated Noteholders and the Subordinated Indebtedness Agent herein referred to collectively as the "***Subordinated Creditors***"), pursuant to which, among other things, Subordinated Noteholders have extended credit to CL Industries as evidenced by the Subordinated Notes, and pursuant to which CL Industries has incurred and may hereafter incur other obligations and liabilities to the Subordinated Creditors solely to the extent permitted hereunder.][3] [CL Industries issued certain Senior Subordinated Promissory Notes in an aggregate principal amount of $4,400,000 between November 27, 2012 and May 1, 2013 (as the same have been amended on or prior to the date hereof, including by those certain Consents of Holders of Subordinated Shareholder Notes dated on or about the date hereof (the "***Noteholder Consents***"), and may otherwise be amended, supplemented, restated or otherwise modified from time to time solely to the extent permitted hereunder and including any notes issued in exchange or substitution therefor, the "***Subordinated Notes***") to each "Lender" (as defined in each of the separate Subordinated Notes, with each such "Lender" and their successors and assigns being referred to herein as a "***Subordinated Noteholder***" and all of such "Lenders" and their successors and assigns) and each other holder of Subordinated Indebtedness (as hereinafter defined), being referred to herein collectively as the "***Subordinated Noteholders***"; the Subordinated Noteholders and the Subordinated Indebtedness Agent herein referred to collectively as the "***Subordinated Creditors***"), pursuant to which, among other things, Subordinated Noteholders have extended credit to CL Industries as evidenced by the Subordinated Notes, and pursuant to which CL Industries has incurred and may hereafter incur other obligations and liabilities to the Subordinated Creditors solely to the extent permitted hereunder.][4]

D.      As an inducement to and as one of the conditions precedent to the agreement of Senior Creditors to enter into the Senior Loan Agreement and to consummate the transactions contemplated thereby, Senior Creditors required the execution and delivery of this Agreement by (i) the Subordinated Indebtedness Agent on behalf of all Subordinated Creditors and (ii) the Obligors.

E.      Pursuant to [[the Note Agreement and][5] the Noteholder Consents], Subordinated Indebtedness Agent has been authorized, and has agreed, to act on behalf of each Subordinated Noteholder in its capacity as such, and therefore, for the avoidance of doubt, each agreement,

---

[3] Insert if this subordination agreement is in respect of the 10% Notes.

[4] Insert if this subordination agreement is in respect of the 7% Notes.

[5] Insert if this subordination agreement is in respect of the 10% Notes.

2

consent, covenant or obligation of, or other provision applicable to, each Subordinated Creditor shall be deemed to mean each such Subordinated Creditor via Subordinated Indebtedness Agent on its behalf.

NOW, THEREFORE, in order to induce Senior Creditors to consummate the transactions contemplated by the Senior Loan Agreement, and for other good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, the parties hereto hereby agree as follows:

1.     **Definitions**.  Any capitalized term used but not defined herein shall have the meaning ascribed to such term in the Senior Loan Agreement.  The following terms shall have the following meanings in this Agreement:

"***Business Day***" shall mean any day other than a Saturday, a Sunday or any day that banks in New York City, New York are required or permitted to close.

"***Capital Securities***" shall mean, with respect to any Person, all shares, interests, participations or other equivalents of such Person's equity capital, including common shares, preferred shares, membership interests in a limited liability company, limited or general partnership interests in a partnership, interests in a trust, interests in other unincorporated organizations or any other equivalent of such ownership interest.

"***Enforcement Action***" shall mean (a) to take from or for the account of any Obligor (other than Permitted Subordinated Indebtedness Payments otherwise permitted to be made hereunder) or any other Person (other than in connection with the sale, assignment, disposal or transfer of all or any portion of the Subordinated Indebtedness to a Person (other than an Obligor) to the extent permitted under Section 2.5), by set-off or in any other manner, the whole or any part of any moneys which may now or hereafter be owing by any Obligor with respect to the Subordinated Indebtedness, (b) to sue for payment of, or to initiate or participate with others in any suit, action or proceeding against any Obligor or any other Person to (i) enforce payment or performance of or to collect the whole or any part of the Subordinated Indebtedness or (ii) commence judicial enforcement of any of the rights and remedies under the Subordinated Indebtedness Documents or applicable law with respect to the Subordinated Indebtedness, including, without limitation, the commencement of a Proceeding, (c) to accelerate the Subordinated Indebtedness, (d) to exercise any put option or to cause any Obligor to honor any redemption or mandatory prepayment obligation under any Subordinated Indebtedness Document, (e) to notify account debtors or directly collect accounts receivable or other payment rights of any Obligor, (f) to take any action under the provisions of any state or federal law, including, without limitation, the Uniform Commercial Code, or under any contract or agreement, to, with respect to the Subordinated Indebtedness, enforce, foreclose upon, take possession of or sell any property or assets of any Obligor or any other Person, or (g) to exercise in any other manner any remedies with respect to the Subordinated Indebtedness set forth in any Subordinated Indebtedness Document or that otherwise might be available to any Subordinated Creditor at law, in equity, pursuant to judicial proceeding or otherwise; provided, however, that the term Enforcement Action shall not include (i) any suit or action initiated or maintained by a Subordinated Creditor within thirty (30) days of the expiration of, and solely to the extent

3

such suit or action is necessary to prevent the expiration of, any applicable statute of limitations or similar permanent restriction on claims (<u>provided</u>, that no payment on the Subordinated Indebtedness or money damages are received or retained in connection therewith), (ii) upon the occurrence and during the continuation of a Subordinated Default, the delivery to the Senior Agent of a Subordinated Default Notice, (iii) the filing of any notice in a Proceeding involving any Subordinated Indebtedness not in violation of this Agreement, or (iv) upon the occurrence and during the continuance of a Subordinated Default, the delivery to Obligors from the Subordinated Creditors of a notice of acceleration; <u>provided</u>, such acceleration is not effective until the date specified in <u>subsection 2.7B</u>.

"***Lien***" shall mean any mortgage, deed of trust, pledge, hypothecation, assignment, charge or deposit arrangement, encumbrance, lien (statutory or otherwise) or preference, priority or other security interest or preferential arrangement of any kind or nature whatsoever (including those created by, arising under or evidenced by any conditional sale or other title retention agreement, the interest of a lessor under a capital lease, any financing lease having substantially the same economic effect as any of the foregoing, or the filing of any financing statement naming the owner of the asset to which such lien relates as debtor, under the Uniform Commercial Code or any comparable law) and any contingent or other agreement to provide any of the foregoing, but not including the interest of a lessor under a lease which is not a capital lease.

"***Paid in Full***" or "***Payment in Full***" shall mean the indefeasible payment in full in cash of all Senior Indebtedness and termination of all commitments to lend under the Financing Documents and Permitted Refinancing Financing Documents. Senior Indebtedness shall be considered to be outstanding whenever any loan commitment under the Senior Loan Agreement or Permitted Refinancing Financing Documents is outstanding.

"***Permitted Disposition***" shall have the meaning assigned to such term in subsection 2.7D.

"***Permitted Refinancing***" shall mean any refinancing of the Senior Indebtedness under the Financing Documents; <u>provided</u> that the financing documentation entered into by Obligors in connection with such Permitted Refinancing constitutes Permitted Refinancing Financing Documents.

"***Permitted Refinancing Financing Documents***" shall mean any financing documentation which replaces the Financing Documents and pursuant to which the Senior Indebtedness under the Financing Documents is refinanced, as such financing documentation may be amended, supplemented, restated or otherwise modified from time to time as permitted hereunder.

"***Permitted Subordinated Indebtedness Payments***" means:

(a)      cash payments so long as such payments are (i) in an amount not to exceed $200,000 per any rolling 12-month period, (ii) made quarterly, (iii) such payments do not exceed 25% of the annual interest outstanding on such Subordinated Indebtedness, (iv) the

US-DOCS\109502861.7

Senior Indebtedness is being paid in cash (to the extent required thereby) and (v) no Senior Default has occurred and is continuing; and

    (b)        Reorganization Subordinated Securities;

in each instance, due and payable in accordance with the terms of the Subordinated Indebtedness Documents as in effect on the date hereof or as modified in accordance with the terms of this Agreement.

"***Person***" shall mean an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association or joint venture.

"***Proceeding***" shall mean any insolvency, bankruptcy, receivership, custodianship, liquidation, dissolution, reorganization, assignment for the benefit of creditors or other proceeding for the liquidation, dissolution or other winding up of any Obligor or any of its subsidiaries or any of their respective properties.

"***Reorganization Subordinated Securities***" shall mean any (a) notes or other debt securities issued pursuant to a Proceeding in substitution of all or any portion of the Subordinated Indebtedness that are subordinated, including in right of payment, to the Senior Indebtedness (or any notes or other securities issued in substitution of all or any portion of the Senior Indebtedness) at least to the same extent that the Subordinated Indebtedness is subordinated to the Senior Indebtedness pursuant to the terms of this Agreement, and (b) Restructure Securities issued pursuant to a Proceeding and which securities have, in each case of (a) and (b) above, maturities and other terms no less advantageous to Obligors and the Senior Lenders than the terms contained in the Subordinated Indebtedness Documents and which could be included in the Subordinated Indebtedness Documents by an amendment or other modification that would not be prohibited by the terms of this Agreement; provided, in either case, that such securities are authorized by an order or decree made by a court of competent jurisdiction in such Proceeding.

"***Restructure Securities***" shall mean (a) any Capital Securities of CL Industries, and (b) any Capital Securities of any other Person consented to by the Senior Agent (including consent by approving any plan of reorganization, composition, arrangement or similar plan providing for such issuance), in each instance in (a) and (b), which do not contain mandatory redemption cash payment obligations or require cash dividend payments, distributions or any other securities or consideration to the holder until Payment in Full of the Senior Indebtedness (or any notes or other securities issued in substitution of all or any portion of Senior Indebtedness).

"***Senior Agent***" shall have the meaning ascribed to such term in the preamble of this Agreement; <u>provided</u> that, after the consummation of any Permitted Refinancing, the term " Senior Agent" shall refer to any Person appointed by the holders of the Senior Indebtedness as agent for themselves for the purposes of this Agreement.

"***Senior Creditors***" means the Senior Agent and the Senior Lenders, collectively.

"***Senior Default***" shall mean any "Default" or "Event of Default" under the Senior Loan Agreement or any corresponding provision in the Permitted Refinancing Financing Documents, including, without limitation, any such Event of Default resulting from the failure of any Obligor to pay, on a timely basis, any principal, interest, fees or other obligations under the Senior Loan Agreement, any other Financing Document or any Permitted Refinancing Financing Document, including, without limitation, in each case, any default in payment of Senior Indebtedness after acceleration thereof.

"***Senior Indebtedness***" shall mean the "Obligations", as such term is defined in the Senior Loan Agreement, including, without limitation, all principal, premiums, interest, fees, expenses, indemnities, reimbursement obligations and all other obligations and liabilities under the Senior Loan Agreement and all other Financing Documents, whether now due or to become due, whether primary, secondary, direct, indirect, absolute, contingent or otherwise, in each instance, whether before or after the commencement of a Proceeding and without regard to whether or not an allowed claim, and all obligations and liabilities incurred with respect to Permitted Refinancing, together with any amendments, restatements, modifications, renewals or extensions of any thereof permitted hereunder.

"***Senior Lenders***" shall mean any holder or all of the holders of Senior Indebtedness including, without limitation, any "Lender" or the "Lenders," respectively, as such terms are defined in the Senior Loan Agreement or after the consummation of any Permitted Refinancing, the Permitted Refinancing Financing Documents.

"***Subordinated Creditor***" shall mean each Subordinated Creditor which is signatory to this Agreement and any other holder of a Subordinated Note or any other Subordinated Indebtedness from time to time.

"***Subordinated Default***" shall mean a default in the payment of the Subordinated Indebtedness, or performance of any term, covenant or condition contained in the Subordinated Indebtedness Documents or the occurrence of any other event or condition constituting a default or event of default under the Subordinated Indebtedness Documents.

"***Subordinated Default Notice***" shall mean a written notice to the Senior Agent pursuant to which the Senior Agent is notified of the existence of a Subordinated Default, which notice incorporates a reasonably detailed description of such Subordinated Default.

"***Subordinated Indebtedness***" shall mean all of the obligations and liabilities of CL Industries to the Subordinated Creditors evidenced by the Subordinated Notes and all other amounts and other obligations and liabilities now or hereafter owed by any Obligor to the Subordinated Creditors pursuant to the Subordinated Indebtedness Documents.

"***Subordinated Indebtedness Documents***" shall mean the Subordinated Notes, any guaranty with respect to the Subordinated Indebtedness and all other documents and instruments evidencing, securing or pertaining to any portion of the Subordinated Indebtedness, as amended, supplemented, restated or otherwise modified from time to time as permitted hereunder.

2.    **<u>Subordination of Subordinated Indebtedness to Senior Indebtedness</u>**.

6

2.1 **Subordination**.  The payment and performance of any and all of the Subordinated Indebtedness is hereby expressly subordinated, to the extent and in the manner set forth herein, to the Payment in Full of the Senior Indebtedness.  Each holder of Senior Indebtedness, whether now outstanding or hereafter arising, shall be deemed to have acquired Senior Indebtedness in reliance upon the provisions contained herein.  The parties hereto intend that this Agreement be enforceable in any Proceeding.

2.2 **Restriction on Payments**.  Notwithstanding any provision of the Subordinated Indebtedness Documents to the contrary and in addition to any other limitations set forth herein or therein, no payment (whether made in cash, securities or other property or by setoff) of principal, interest or any other amount due with respect to the Subordinated Indebtedness (other than Reorganization Subordinated Securities) shall be made or received, and no Subordinated Creditor shall exercise any right of set-off or recoupment with respect to any Subordinated Indebtedness, until all of the Senior Indebtedness is Paid in Full; provided, however, except as provided in the immediately succeeding sentence or in subsection 2.3, Obligors may make, and the Subordinated Creditors may accept, Permitted Subordinated Indebtedness Payments. Notwithstanding the foregoing, no Obligor may make, and no Subordinated Creditor may receive, any payment of principal, interest or any other amount (including any Permitted Subordinated Indebtedness Payments) with respect to the Subordinated Indebtedness (other than Reorganization Subordinated Securities) if, at the time of such payment or immediately after giving effect thereto, a Senior Default exists.  Obligors may resume Permitted Subordinated Indebtedness Payments (and may make any Permitted Subordinated Indebtedness Payments missed due to the application of this subsection 2.2) in respect of the Subordinated Indebtedness, upon the earlier to occur of (x) the waiver (as evidenced by a written waiver from the Senior Agent to Borrower) of the Senior Default giving rise to such payment restriction in accordance with the terms of the Senior Loan Agreement or Permitted Refinancing Financing Documents or such Senior Default ceases to exist or (y) Payment in Full of the Senior Indebtedness.  The provisions of this subsection 2.2 shall not apply to any payment with respect to which Section 2.3 would be applicable.

If any Subordinated Creditor receives any Reorganization Subordinated Securities and such securities have any call, put or other conversion features that would obligate any Obligor to declare or pay dividends, make distributions, or otherwise pay any money or deliver any other securities or consideration to the holder, such Subordinated Creditor hereby agrees that none of the Obligors may declare, pay or make such dividends, distributions or other payments to such Subordinated Creditor, and the Subordinated Creditors shall not accept any such dividends, distributions or other payments, except as may be expressly permitted in the Financing Documents.

2.3 **Proceedings**.  Each of the following shall apply in the event of any Proceeding:

A.    All Senior Indebtedness first shall be Paid in Full before any payment (whether made in cash, securities or other property) of or with respect to the Subordinated Indebtedness shall be made (other than a distribution of Reorganization Subordinated Securities).

B.    Any payment which, but for the terms hereof, otherwise would be payable or deliverable in respect of the Subordinated Indebtedness (other than a distribution of Reorganization Subordinated Securities), shall be paid or delivered directly to the Senior Agent

7

(to be held and/or applied by the Senior Agent to the repayment of any and all then outstanding Senior Indebtedness in accordance with the terms of the Senior Loan Agreement or the Permitted Refinancing Financing Documents) until all Senior Indebtedness is Paid in Full, and each Subordinated Creditor irrevocably authorizes, empowers and directs all receivers, trustees, liquidators, custodians, conservators and others having authority in the premises to effect all such payments and deliveries, and each Subordinated Creditor also irrevocably authorizes, empowers and directs the Senior Agent to demand, sue for, collect and receive every such payment or distribution.

C.    Each Subordinated Creditor agrees to execute and deliver to the Senior Agent or its representative all such further instruments confirming the authorization referred to in the foregoing subsection 2.3B.

D.    Each Subordinated Creditor agrees to execute, verify, deliver and file any proofs of claim in respect of the Subordinated Indebtedness requested by the Senior Agent in connection with any such Proceeding and hereby irrevocably authorizes, empowers and appoints the Senior Agent its agent and attorney-in-fact to (i) execute, verify, deliver and file such proofs of claim upon the failure of such Subordinated Creditor promptly to do so (and in any event prior to fifteen (15) days before the expiration of the time to file any such proof) and (ii) vote such claim in any such Proceeding upon the failure of such Subordinated Creditor to do so prior to fifteen (15) days before the expiration of time to vote any such claim; provided, the Senior Agent shall have no obligation to execute, verify, deliver, and/or file any such proof of claim and/or vote any such claim. In the event that the Senior Agent votes any claim in accordance with the authority granted hereby, no Subordinated Creditor shall be entitled to change or withdraw such vote.

E.    The Senior Indebtedness shall continue to be treated as Senior Indebtedness and the provisions of this Agreement shall continue to govern the relative rights and priorities of the Senior Agent, the Senior Lenders and the Subordinated Creditors even if all or part of the Senior Indebtedness or the Liens securing the Senior Indebtedness are subordinated, set aside, avoided or disallowed in connection with any such Proceeding.

F.    Each Subordinated Creditor agrees that prior to the Payment in Full of the Senior Indebtedness, the Senior Agent and the Senior Lenders may consent to the use of cash collateral or provide financing to the Obligors on such terms and conditions and in such amounts as the Senior Agent and the Senior Lenders in their sole discretion, may decide and, in connection therewith, prior to the Payment in Full of the Senior Indebtedness, the Obligors may grant to the Senior Agent and the Senior Lenders liens and security interests upon all of the property of the Obligors, which liens and security interests shall secure payment of all Senior Indebtedness (whether such Senior Indebtedness arose prior to the commencement of any Proceeding or at any time thereafter) and all other financing provided by the Senior Agent and the Senior Lenders during the Proceeding. Each Subordinated Creditor agrees that it will not object to or oppose a sale or other disposition of any property securing all of any part of the Senior Indebtedness free and clear of security interests, liens or other claims of such Subordinated Creditor under Section 363 of the Bankruptcy Code (or any foreign equivalent) or any other provision of the Bankruptcy Code (or any foreign equivalent) if the Senior Agent and the Senior Lenders have consented to such sale or disposition. No Subordinated Creditor shall assert any objection (or support any other Person's objection) to any request by the Senior Agent and the Senior Lenders for "adequate protection" or

8

assert any right it may have to "adequate protection" of such Person's interest in any Collateral in any Proceeding and each Subordinated Creditor agrees that it will not seek to have the automatic stay lifted with respect to any Collateral without the prior written consent of the Senior Agent. Each Subordinated Creditor waives any claim it may now or hereafter have arising out of the Senior Agent or any Senior Lender's election, in any Proceeding instituted under the Bankruptcy Code, of the application of Section 1111(b)(2) of the Bankruptcy Code, and/or any borrowing or grant of a security interest under Section 364 of the Bankruptcy Code by any Obligor, as debtor in possession. The Subordinated Creditors shall not vote in a manner or take any other action which may impair or adversely affect the Senior Agent's or the Senior Lenders' interests, rights and remedies under the Senior Loan Agreement or this Agreement.

G.    Notwithstanding anything to the contrary in this <u>Section 2.3</u> or <u>subsection 2.7B</u> in any Proceeding commenced against any Obligor (other than by a Subordinated Creditor) or by any Obligor, the Subordinated Creditors may (i) file a proof of claim or statement of interest with respect to the Subordinated Indebtedness and (ii) take any other action, including (A) filing any necessary responsive or defensive pleadings in opposition to any motion or other pleading made by any Person objecting to or otherwise seeking the disallowance of any claims of the Subordinated Indebtedness (other than any affirmative defense or counterclaim in respect of a claim that would not otherwise be permitted to be made under the terms hereof) and (B) voting on any plan of reorganization that is not, in the sole and absolute opinion of the Senior Agent, inconsistent with the terms of this Agreement, in each case under this clause (ii) that is not adverse in any respect to the Senior Creditors, the payment priority of the Senior Indebtedness or the rights of the Senior Creditors to exercise remedies in respect thereof or otherwise in violation of this Agreement.

2.4    **Incorrect Payments**.  If any payment (whether made in cash, securities or other property) not permitted under this Agreement is received by any Subordinated Creditor on account of the Subordinated Indebtedness before all Senior Indebtedness is Paid in Full, such payment shall be held in trust by such Subordinated Creditor for the benefit of Senior Creditors and shall immediately be paid over to the Senior Agent, or its designated representative, for application (in accordance with the Senior Loan Agreement or the Permitted Refinancing Financing Documents) to the payment of the Senior Indebtedness then remaining unpaid, until all of the Senior Indebtedness is Paid in Full.  Without limiting any other term or condition of this Agreement, in the event that (i) a payment of any portion of the Senior Indebtedness is due on the same day as a payment with respect to any Subordinated Indebtedness is due, (ii) any Obligor or any other Person obligated to make such payment defaults in the payment of such Senior Indebtedness and (iii) payment is made to any Subordinated Creditor in respect of such Subordinated Indebtedness, the Subordinated Creditors shall not be entitled to retain any such payment on account of the Subordinated Indebtedness and the provisions of the immediately preceding sentence shall govern.

2.5    **Sale, Transfer**.  No Subordinated Creditor shall sell, assign, dispose of or otherwise transfer all or any portion of the Subordinated Indebtedness without the prior written consent of the Senior Agent and (upon the receipt of such consent) unless prior to the consummation of any such action, the transferor and transferee thereof shall execute and deliver to the Senior Agent (i) a joinder to this Agreement or (ii) an acknowledgement of this agreement and authorization of Subordinated Indebtedness Agent to act on such Subordinated Creditor's

behalf hereunder, in each case in form and substance reasonably acceptable to the Senior Agent and providing for the continued subordination of the assigned Subordinated Indebtedness to the Senior Indebtedness as provided herein and for the continued effectiveness of all of the rights of the Senior Agent and Senior Lenders arising under this Agreement with respect to such Subordinated Indebtedness. Notwithstanding the failure to satisfy the foregoing conditions, the subordination effected hereby shall survive any sale, assignment, disposition or other transfer of all or any portion of the Subordinated Indebtedness, and the terms of this Agreement shall be binding upon the successors and assigns of each Subordinated Creditor, as provided in <u>Section 10</u> below.

2.6    **Legends**. Until the Senior Indebtedness is Paid in Full, to the extent any additional Subordinated Indebtedness Documents are issued, they shall at all times contain in a conspicuous manner a legend substantially in the following form:

"This [Note][other Subordinated Indebtedness Document] and the indebtedness evidenced hereby are subordinate in the manner and to the extent set forth in that certain Subordination Agreement (the "***Subordination Agreement***") dated as of [_____], 2019 among CarbonLite Industries LLC, a Delaware limited liability company, CarbonLite Pinnpack, LLC, a Delaware limited liability company, CarbonLite PI Holdings, LLC, a Delaware limited liability company, Pinnpack Packaging, LLC, a Delaware limited liability company, CarbonLite Sub-Holdings LLC, a Delaware limited liability company, CarbonLite Holdings LLC, [CLI Mason, LLC][6] [Ebrahim Simhaee][7], as Subordinated Indebtedness Agent and Orion Energy Partners Investment Agent, LLC, a Delaware limited liability company, as the Senior Agent for the holders of the Senior Indebtedness (as defined in the Subordination Agreement); and each holder of this [Note][other Subordinated Indebtedness Document], by its acceptance hereof, shall be bound by the provisions of the Subordination Agreement."

2.7    <u>**Restriction on Action by Subordinated Creditors**</u>.

A.    Until the Senior Indebtedness is Paid in Full and notwithstanding anything contained in the Subordinated Indebtedness Documents, the Senior Loan Agreement, the other Financing Documents or the Permitted Refinancing Financing Documents to the contrary, no Subordinated Creditor shall, without the prior written consent of the Senior Agent, (i) take any Lien to secure the Subordinated Indebtedness, (ii) obtain any guaranties of the Subordinated Indebtedness or any other credit support for the Subordinated Indebtedness from any Person or (iii) agree to any amendment, modification or supplement to the Subordinated Indebtedness Documents.

---

[6] Insert if this subordination agreement is in respect of the 10% Notes.

[7] Insert if this subordination agreement is in respect of the 7% Notes.

B.      Until the Senior Indebtedness is Paid in Full and notwithstanding anything contained in the Subordinated Indebtedness Documents, the Senior Loan Agreement, the other Financing Documents or the Permitted Refinancing Financing Documents to the contrary, no Subordinated Creditor shall, without the prior written consent of the Senior Agent, take any Enforcement Action; provided, that upon the acceleration of all Senior Indebtedness, the Subordinated Creditors may accelerate the Subordinated Indebtedness (provided, however, that if, following any such acceleration of the Senior Indebtedness, such acceleration in respect of the Senior Indebtedness is rescinded, then all Enforcement Actions taken by the Subordinated Creditors (or any of them) to accelerate the Subordinated Indebtedness shall likewise be rescinded and no Subordinated Creditor shall have any right under this subsection 2.7B to accelerate the Subordinated Indebtedness).

C.      Until the Senior Indebtedness is Paid in Full, to the extent any Subordinated Creditor at any time has a Lien in the Collateral (notwithstanding that such Lien would be in violation of this Agreement), (i) any such Lien shall be and hereby is subordinated for all purposes and in all respects to the Liens of the Senior Agent and Senior Lenders in the Collateral, regardless of the time, manner or order of perfection of any such Liens, (ii) such Subordinated Creditor, or the Subordinated Indebtedness on behalf of any other such Subordinated Creditor (A) shall promptly execute and/or deliver to the Senior Agent such termination statements and releases as the Senior Agent shall request to effect the release of such Liens and (B) shall be deemed to have authorized the Senior Agent to file any and all termination statements required by the Senior Agent in respect of such Liens.  In furtherance of the foregoing, each Subordinated Creditor hereby irrevocably appoints the Senior Agent its attorney-in-fact, with full authority in the place and stead of such Subordinated Creditor and in the name of such Subordinated Creditor or otherwise, to execute and deliver any document or instrument which such Subordinated Creditor may be required to deliver pursuant to this subsection 2.7C.

D.      Until Payment in Full of the Senior Indebtedness, and notwithstanding any contrary provisions contained in any of the Subordinated Indebtedness Documents, each of the Subordinated Creditors (in their capacity as such) hereby agrees that it shall not at any time or for any reason whatsoever, so long as any Senior Default shall be continuing, in connection with the exercise of rights and remedies by, or at the request of, the Senior Agent or the Senior Lenders, take any action of any kind to enjoin or otherwise prevent the completion of any sale, transfer or other disposition (including, without limitation, any such disposition by means of a merger or consolidation of any of the Obligors or their Subsidiaries with or into another Person) of any Property of any of the Obligors or any of their Subsidiaries, if each of the following conditions shall be satisfied with respect thereto (each such disposition that shall have satisfied each of such conditions shall be deemed a "***Permitted Disposition***"): (i) such disposition is made by any of the Obligors upon the written request, or with the prior written consent or approval of, the Senior Agent during the continuation of a Senior Default; (ii) the Senior Agent shall have given the Subordinated Indebtedness Agent not less than ten (10) Business Days' prior written notice of the intention of the Senior Agent to request or to grant its consent or approval for any such sale, transfer or other disposition not otherwise permitted by the Subordinated Indebtedness Documents; and (iii) substantially all net cash proceeds from any such disposition are paid or remitted to the Senior Agent for immediate application towards payment of the Senior Indebtedness.  For the avoidance of doubt, notwithstanding any contrary provisions in any of the Subordinated Indebtedness Documents, no Obligor shall be obligated or otherwise required to obtain any consent

11

or approval of any of the Subordinated Creditors for any Permitted Disposition, and the completion of any Permitted Disposition shall not contravene, or be deemed to conflict with, any of the provisions of any of the Subordinated Indebtedness Documents.

E.    In the case of a Permitted Disposition consisting of the sale, transfer or other disposition of all of the equity interests of any Obligor or Subsidiary of an Obligor that has guaranteed the Subordinated Indebtedness or has any other obligations or liabilities under the Subordinated Indebtedness Documents (notwithstanding that such guarantee or obligations may be in violation of this Agreement), the Subordinated Creditors shall release such Person from all obligations under the Subordinated Indebtedness Documents, if any.  Each of the Subordinated Creditors hereby irrevocably constitutes and appoints the Senior Agent and any officer of the Senior Agent, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of such Subordinated Creditor and in the name of such Subordinated Creditor or in the Senior Agent's own name, from time to time in the Senior Agent's reasonable discretion, for the purpose of carrying out the foregoing terms of this subsection 2.7E, to execute and deliver any and all documents and instruments which the Senior Agent may reasonably determine to be necessary or desirable to accomplish the purposes of the foregoing provisions of this subsection 2.7E, including executing and delivering any instruments of termination and release required by the Senior Agent.  Such power of attorney being coupled with an interest shall be irrevocable until the Payment in Full of all Senior Indebtedness. Subordinated Indebtedness Agent, on behalf of each of the Subordinated Creditors hereby ratifies all that said attorneys shall lawfully do or cause to be done pursuant to the power of attorney granted in this subsection 2.7E.

3.    **Continued Effectiveness of this Agreement; Modifications to Senior Indebtedness**.

(a)    The terms of this Agreement, the subordination effected hereby, and the rights and the obligations of Subordinated Indebtedness Agent, Subordinated Noteholders, the Senior Agent and Senior Lenders arising hereunder, shall not be affected, modified or impaired in any manner or to any extent by: (i) any amendment or modification of or supplement to the Senior Loan Agreement, any other Financing Document or any Permitted Refinancing Financing Document or any Subordinated Indebtedness Document; (ii) the validity or enforceability of any of such documents; or (iii) any exercise or non-exercise of any right, power or remedy under or in respect of the Senior Indebtedness or the Subordinated Indebtedness or any of the instruments or documents referred to in clause (i) above.

(b)    Without limiting the generality of the foregoing, the Senior Agent and/or Senior Lenders (as applicable under the Financing Documents) may at any time and from time to time without the consent of or notice to any Subordinated Creditor, without incurring liability to any Subordinated Creditor and without impairing or releasing the obligations of any Subordinated Creditor under this Agreement, change the manner or place of payment or extend the time of payment of or renew or alter any Senior Indebtedness, or amend, supplement, restate or otherwise modify in any manner any Financing Document or Permitted Refinancing Financing Document.

4.   **Representations and Warranties**.  Subordinated Indebtedness Agent, hereby represents and warrants to the Senior Agent and Senior Lenders as follows:

4.1   **Existence and Power**.  It is duly organized, validly existing and in good standing under the laws of the state of its incorporation, organization or formation, as applicable.

4.2   **Authority**.  It has the power and authority to execute, deliver and perform its obligations under this Agreement, all of which have been duly authorized by all proper and necessary action and are not prohibited by its organizational documents.

4.3   **Binding Agreements**.  This Agreement constitutes its legal valid and binding obligation, enforceable against it in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, or similar laws affecting the enforcement of creditors' rights generally and by equitable principles.

4.4   **Conflicting Agreements**.  The execution, delivery and performance of this Agreement by it does not (a) contravene the terms of its organization documents, (b) conflict with or result in any material breach or contravention of, or result in the creation of any lien under, any material contract or agreement to which it is a party or to which its property is subject or any order, injunction, writ or decree of any governmental authority to which it or its property is subject or (c) violate any law, rule or regulation binding upon it or its property.

4.5   **Default under Subordinated Indebtedness Documents**.  On the date hereof, no default or event of default exists under or with respect to the Subordinated Notes or any of the other Subordinated Indebtedness Documents.

5.   **Cumulative Rights, No Waivers**.  Each and every right, remedy and power granted to the Senior Agent or Senior Lenders hereunder shall be cumulative and in addition to any other right, remedy or power specifically granted herein, in the Senior Loan Agreement, the other Financing Documents or Permitted Refinancing Financing Documents or now or hereafter existing in equity, at law, by virtue of statute or otherwise, and may be exercised by the Senior Agent or Senior Lenders, from time to time, concurrently or independently and as often and in such order as the Senior Agent or Senior Lenders may deem expedient.  Any failure or delay on the part of the Senior Agent or Senior Lenders in exercising any such right, remedy or power, or abandonment or discontinuance of steps to enforce the same, shall not operate as a waiver thereof or affect the Senior Agent's or Senior Lenders' right thereafter to exercise the same, and any single or partial exercise of any such right, remedy or power shall not preclude any other or further exercise thereof or the exercise of any other right, remedy or power, and no such failure, delay, abandonment or single or partial exercise of the Senior Agent's or Senior Lenders' rights hereunder shall be deemed to establish a custom or course of dealing or performance among the parties hereto.

6.   **Modification**.  Any modification or waiver of any provision of this Agreement, or any consent to any departure by the Senior Agent or any Subordinated Creditor therefrom, shall not be effective in any event unless the same is in writing and signed by the Senior Agent and the Subordinated Indebtedness Agent, and then such modification, waiver or consent shall be effective only in the specific instance and for the specific instance and for the specific purpose given.  Any

13

notice to or demand on any Subordinated Creditor in any event not specifically required of the Senior Agent hereunder shall not entitle any Subordinated Creditor to any other or further notice or demand in the same, similar or other circumstances unless specifically required hereunder.

7.    **Additional Documents and Actions**.  Each Subordinated Creditor at any time, and from time to time, after the execution and delivery of this Agreement, upon the request of the Senior Agent and at the joint and several expense of Obligors, promptly will execute and deliver such further documents and do such further acts and things as the Senior Agent may reasonably request in order to effect fully the purposes of this Agreement.

8.    **Notices**.  All notices and communications under this Agreement shall be in writing and shall be (i) delivered in person, (ii) mailed, postage prepaid, either by registered or certified mail, return receipt requested, (iii) delivered by overnight express courier, or (iv) sent by email, addressed in each case as follows:

| | |
|---|---|
| If to Subordinated Indebtedness Agent or any Subordinated Creditor: | [Benjamin Shapiro c/o CLI Mason, LLC 400 N. Michigan Avenue Suite 250 Chicago, Illinois Email: bshapiro@masonave.com][8] |
| | [Ebrahim Simhaee 5700 Bickett Street Huntington Park, CA 90255 Phone: (323) 585-5522 Ext. 304 Email: e_simhaee@crownpoly.com][9] |
| If to any Obligor: | CarbonLITE Industries 10250 Constellation Boulevard Suite 2820 Los Angeles, CA 90067 Phone:    310-473-7005 Fax:    310-473-9592 |
| with a copy (which shall not constitute notice) to: | Reed Smith LLP 1901 Avenue of the Stars Suite 700 |

---

[8] Insert if this subordination agreement is in respect of the 10% Notes.

[9] Insert if this subordination agreement is in respect of the 10% Notes.

|  | Los Angeles, CA 90067-6078<br>Attention: Moshe Kupietzky<br>Email: MKupietzky@reedsmith.com |
|---|---|
| If to the Senior Agent or any Senior Lender: | Orion Energy Partners Investment Agent, LLC<br>350 Fifth Avenue #6740<br>New York, NY 10118<br>Attention: Gerrit Nicholas, Chris Leary and Mark Friedland<br>Email: Gerrit@OrionEnergyPartners.com;<br>Chris@OrionEnergyPartners.Com;<br>Mark@OrionEnergyPartners.com |
| with a copy (which shall not constitute notice) to: | Lathan & Watkins LLP<br>Latham & Watkins LLP<br>885 Third Avenue<br>New York, NY 10022-4834<br>Attention: Chirag K. Dedania and Jeffrey Greenberg<br>Email: Jeffrey.Greenberg@lw.com;<br>Chirag.Dedania@lw.com |

or to any other address, as to any of the parties hereto, as such party shall designate in a written notice to the other parties hereto. All written notices and other written communications with respect to this Agreement shall be sent by ordinary, certified or overnight mail, by electronic mail or delivered in person. All notices shall be deemed received upon actual receipt thereof or refusal of delivery.

9.      **Severability**.  The illegality or unenforceability of any provision of this Agreement or any instrument or agreement required hereunder shall not in any way affect or impair the legality or enforceability of the remaining provisions of this Agreement.

10.      **Successors and Assigns**.  This Agreement shall inure to the benefit of the successors and assigns of the Senior Agent and Senior Lenders and shall be binding upon the successors and assigns of the Subordinated Creditors and the Obligors.

11.      **Counterparts**.  This Agreement may be executed in any number of counterparts and by different parties in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement. Signature pages may be detached from multiple separate counterparts and attached to a single counterpart.  Delivery of an executed signature page of this Agreement (or any notice or agreement delivered pursuant to the terms hereof) by facsimile transmission or electronic transmission shall be as effective as delivery of a manually executed counterpart hereof.

12.      **Defines Rights of Creditors; Subrogation**.

A.    The provisions of this Agreement are solely for the purpose of defining the relative rights of the Subordinated Creditors, the Senior Agent and Senior Lenders and shall not be deemed to create any rights or priorities in favor of any other Person, including, without limitation, any Obligor.  As between the Obligors and the Subordinated Creditors, nothing contained herein shall impair the unconditional and absolute obligation of the Obligors to the Subordinated Creditors to pay the Subordinated Indebtedness as such Subordinated Indebtedness shall become due and payable in accordance with the Subordinated Indebtedness Documents.  The failure of any Obligor to make any payment to any Subordinated Creditor due to the operation of this Agreement shall not be construed as prohibiting the occurrence of a Subordinated Default.

B.    Subject to the Payment in Full of the Senior Indebtedness, in the event and to the extent cash, property or securities otherwise payable or deliverable to the holders of the Subordinated Indebtedness shall have been applied pursuant to this Agreement to the payment of Senior Indebtedness, then and in each such event, the holders of the Subordinated Indebtedness shall be subrogated to the rights of each holder of Senior Indebtedness to receive any further payment or distribution in respect of or applicable to the Senior Indebtedness; and, for the purposes of such subrogation, no payment or distribution to the holders of Senior Indebtedness of any cash, property or securities to which any holder of Subordinated Indebtedness would be entitled except for the provisions of this Agreement shall, and no payment over pursuant to the provisions of this Agreement to the holders of Senior Indebtedness by the holders of the Subordinated Indebtedness shall, as between any Obligor, its creditors other than the holders of Senior Indebtedness and the holders of Subordinated Indebtedness, be deemed to be a payment by such Obligor to or on account of Senior Indebtedness.

13.    **Conflict**.  In the event of any conflict between any term, covenant or condition of this Agreement and any term, covenant or condition of any of the Subordinated Indebtedness Documents, the provisions of this Agreement shall control and govern.

14.    **Statement of Indebtedness to the Subordinated Creditors**.  Borrower will furnish to the Senior Agent upon demand, a statement of the indebtedness owing from the Obligors to the Subordinated Creditors, and will give the Senior Agent access to the books of Obligors in accordance with the Senior Loan Agreement so that the Senior Agent can make a full examination of the status of such indebtedness.

15.    **Headings**.  The captions and headings of this Agreement are for convenience of reference only and shall not affect the interpretation of this Agreement.

16.    **Termination**.  This Agreement shall terminate upon the indefeasible Payment in Full of the Senior Indebtedness; provided, however, this Agreement shall be reinstated if at any time any payment of any of the Senior Indebtedness is rescinded or must otherwise be returned by any holder of the Senior Indebtedness or any representative of such holder and the Senior Indebtedness, or portion thereof, intended to have been satisfied shall be deemed to be reinstated and outstanding as if such payment had not occurred.

17.    **Subordinated Default Notice**.  Subordinated Indebtedness Agent and Borrower each shall provide the Senior Agent with a Subordinated Default Notice upon the occurrence of

each Subordinated Default, and Subordinated Indebtedness Agent and Borrower each shall notify the Senior Agent in the event such Subordinated Default is cured or waived.

18. **No Contest of Senior Indebtedness or Liens; No Security for Subordinated Indebtedness**. Each Subordinated Creditor agrees that it will not, and will not encourage any other Person to, at any time, contest the validity, perfection, priority or enforceability of the Senior Indebtedness or Liens in the Collateral granted to the Senior Agent pursuant to the Senior Loan Agreement, the other Financing Documents or the Permitted Refinancing Financing Documents, accept or take any collateral security for the Subordinated Indebtedness.

19. **Governing Law**. The laws of the State of New York shall govern all matters arising out of, in connection with or relating to this Agreement, including, without limitation, its validity, interpretation, construction, performance and enforcement.

20. **Submission to Jurisdiction**. Any legal action or proceeding with respect to this Agreement may be brought in the courts of the State of New York located in the City of New York, Borough of Manhattan, or of the United States of America sitting for the Southern District of New York and, by execution and delivery of this Agreement, each Subordinated Creditor hereby accepts for itself and in respect of its property, generally and unconditionally, the jurisdiction of the aforesaid courts. The parties hereto hereby irrevocably waive any objection, including any objection to the laying of venue or based on the grounds of forum non conveniens, that any of them may now or hereafter have to the bringing of any such action or proceeding in such jurisdictions.

21. **WAIVER OF JURY TRIAL. THE PARTIES HERETO, TO THE EXTENT PERMITTED BY LAW, WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING ARISING OUT OF, IN CONNECTION WITH OR RELATING TO, THIS AGREEMENT AND ANY OTHER TRANSACTION CONTEMPLATED HEREBY AND THEREBY. THIS WAIVER APPLIES TO ANY ACTION, SUIT OR PROCEEDING WHETHER SOUNDING IN TORT, CONTRACT OR OTHERWISE.**

22. **Waiver of Consolidation**. [[CLI Mason][10][Simhaee][11]], in both its individual capacity as a Subordinated Noteholder and its capacity as Subordinated Indebtedness Agent, acknowledges and agrees that (i) Obligors are each separate and distinct entities; and (ii) it will not at any time insist upon, plead or seek advantage of any substantive consolidation, piercing the corporate veil or any other order or judgment that causes an effective combination of the assets and liabilities of Obligors in any case or proceeding under Title 11 of the United States Code or other similar proceeding.

23. **Subordinated Indebtedness Agent**. Subordinated Indebtedness Agent by its signature below hereby represents, warrants and confirms, for the benefit of the Senior Agent and

---

US-DOCS\109502861.7

Senior Lenders, that each Subordinated Noteholder irrevocably designated and appointed the Subordinated Indebtedness Agent as its exclusive representative to act under this Agreement to deliver and receive all notices and written notices on behalf of such Subordinated Creditor and to receive all items on behalf of such Subordinated Creditor and distribute all distributions of such Subordinated Creditor in accordance with the respective interests of such Subordinated Creditor and to take such other actions as are set forth in this Agreement.

[**remainder of page intentionally left blank; signature page(s) follow**]

18

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their duly authorized officers as of the day and year first above written.

**[CLI MASON, LLC**, as Subordinated Indebtedness Agent and a Subordinated Creditor

By: _____
Name:
Title:]¹²

**[EBRAHIM SIMHAEE**, as Subordinated Indebtedness Agent and a Subordinated Creditor

By: _____
Name:
Title:]¹³

---

¹² Insert if this subordination agreement is in respect of the 10% Notes.

¹³ Insert if this subordination agreement is in respect of the 7% Notes.

**CARBONLITE HOLDINGS LLC**, as an Obligor

By: _____
Name:
Title:

**CARBONLITE SUB-HOLDINGS, LLC**, as an Obligor

By: _____
Name:
Title:

**CARBONLITE PI HOLDINGS LLC**, as an Obligor

By: _____
Name:
Title:

**CARBONLITE INDUSTRIES LLC**, as an Obligor

By: _____
Name:
Title:

**CARBONLITE PINNPACK, LLC**, as an Obligor

By: _____
Name:
Title:

**PINNPACK PACKAGING, LLC**, as an Obligor

By: _____
Name:
Title:

**ORION ENERGY PARTNERS INVESTMENT AGENT, LLC**, as the Senior Agent

By: _____
Name:
Title:

**EXHIBIT H**
**TO**
**CREDIT AGREEMENT**

**<u>Form of Observer Rights Agreement</u>**

[*Please see attached*]

US-DOCS\109436811.3

*Execution Version*

August 2, 2019

Orion Energy Credit Opportunities Fund II, L.P.
Orion Energy Credit Opportunities Fund II PV, L.P.
Orion Energy Credit Opportunities Fund II GPFA, L.P.
350 5th Ave #6740
New York, NY 20118
Attention:  Chris Leary, Mark Friedland,
                 Lauren Key, Karen Vejseli, and
                 Gerrit Nicholas
Email:  Chris@OrionEnergyPartners.com;
           Mark@OrionEnergyPartners.com;
           Lauren@OrionEnergyPartners.com;
           Karen@OrionEnergyPartners.com;
           Gerrit@OrionEnergyPartners.com

           Re: Observer Right Agreement


Ladies and Gentlemen:

       CarbonLITE Holdings, LLC, a Delaware limited liability company ("Borrower"), CarbonLITE PI Holdings LLC, CarbonLITE Industries LLC, CarbonLITE PinnPack LLC, PinnPack Packaging LLC, CarbonLITE Recycling Holdings LLC, CarbonLITE P Holdings LLC, CarbonLITE FL Holdings LLC and CarbonLite Sub-Holdings LLC (each, a "Guarantor" and collectively, the "Guarantors"), Orion Energy Credit Opportunities Fund II, L.P., a Delaware limited partnership ("Main Fund"), Orion Energy Credit Opportunities Fund II PV, L.P., a Delaware limited partnership ("ECI Parallel Fund") and Orion Energy Credit Opportunities Fund II GPFA, L.P., a Delaware limited partnership ("Family & Associates Fund," and, together with Main Fund, ECI Parallel Fund, and their respective Affiliates, collectively, "Orion") are entering into this letter agreement (this "Agreement"), in connection with (i) the Credit Agreement dated of even date herewith (the "Credit Agreement"), among the Borrower, the Guarantors, the lenders party thereto from time to time (collectively, the "Lenders") and Orion Energy Partners Investment Agent, LLC, as administrative agent and collateral agent and (ii) the Warrant Agreement dated as of even date herewith between the Borrower and Orion. The purpose of this Agreement is to permit Main Fund, ECI Parallel Fund and Family & Associates Fund to qualify the investment in the Borrower and the Guarantors as a "venture capital investment" for purposes of the United States Department of Labor Regulation published at 29 C.F.R. Section 2510.3-101(c) under the Employee Retirement Income Security Act of 1974, as amended (the "Plan Asset Regulation"). Capitalized terms used in this Agreement and not otherwise defined shall have the respective meanings set forth in the Credit Agreement.  In connection therewith, the parties hereby agree as follows:

       1.        Observer Right.

(a)      The Borrower hereby grants to each of Main Fund and Family & Associates Fund the right to have a representative (who shall initially be Chris Leary in the case of Main Fund and Gerrit Nicholas in the case of Family & Associates Fund) (each, a "Representative" and, together, the "Representatives"), to attend all formal meetings of the Board of Directors of the Borrower (the "Board") relating to the Borrower or Guarantors and committees thereof, including executive sessions, in a nonvoting observer capacity and, in this respect, the Borrower shall give such Representatives copies of all notices, minutes, consents, and other materials that it provides to members of the Board or committees thereof at the same time and in the same manner as provided to such members; provided, however, that (i)  such Representatives shall agree to hold in confidence and trust all information so provided; and (ii) the Borrower may withhold any information and exclude such Representative from any meeting or portion thereof if (A) access to such information or attendance at such meeting would (i) adversely affect the attorney-client privilege between the Borrower and its counsel, (ii) result in a conflict of interest (including, in the case of any threatened, pending or completed action, suit or proceeding involving Orion or the Lenders or any proposed or pending transaction involving the Guarantors, Borrower, or their respective subsidiaries, on the one hand, and Orion or the Lenders, on the other hand), or (iii) result in the disclosure of trade secrets to such Representative or (B) such information or discussion relates to Orion or Lenders (including Loan Parties' strategy regarding the Loans); information described in clauses (i) and (ii), "Protected Information").

(b)      The Borrower shall not remove or replace the Representative of Main Fund or the Representative of Family & Associates Fund at any time without the prior written consent of Main Fund or Family & Associates Fund, respectively.  Each Representative shall have the right to resign at any time by giving prior written notice thereof to the Borrower. Upon any such notice of resignation or any such removal, (i) Main Fund shall have the right to appoint a successor representative of Main Fund, and (ii) Family & Associates Fund shall have the right to appoint a successor representative of Family & Associates Fund.  Any such successor representative shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring or removed representative and the retiring or removed representative shall promptly take such actions, as may be necessary or appropriate in connection with the assignment to such successor representative of the rights hereunder, whereupon such retiring or removed representative shall be discharged from his or her duties and obligations hereunder. After any retiring or removed representative's resignation or removal hereunder, the provisions of Section 5 of this Agreement shall inure to such representative's benefit as to any actions taken or omitted to be taken by such representative while he or she was a representative hereunder.

(c)      In the event that Guarantors may at any time in the future be governed, directly or indirectly, by a board of directors, board of managers or similar governing body of a person (other than or in addition to the Board), the rights set forth in clauses (a) and (b) above shall apply *mutatis mutandis* to such other board of directors, board of managers or similar governing body and committees thereof.

(d)      The parties hereto acknowledge and agree that the Representatives shall not be entitled to reimbursement or compensation from the Company Group Members (as such term is defined below) in connection with the activities performed by the Representatives under this Agreement.

2.    <u>Books and Records; Financial Information</u>. Each of the Borrower and the Guarantors (the "<u>Company Group Members</u>") hereby agree, subject to the right of the Company Group Members to withhold Protected Information and Orion's reimbursement of the Company Group Members for any out-of-pocket expenses incurred in connection with activities set forth in clause (a) below, that they shall provide each of the Representatives, with:

(a)    the right to (i) visit and inspect the properties of the Company Group Member and its subsidiaries; (ii) examine the books of account and records of the Company Group Member and its subsidiaries; and (iii) discuss the operational performance of the facilities, affairs, finances, and accounts of the Company Group Member and its subsidiaries with its officers, during normal business hours of the Borrower and its subsidiaries, in each case, as may be reasonably requested by Main Fund, ECI Parallel Fund or Family & Associates Fund; and

(b)    as soon as practicable, but in any event within one hundred fifty (150) days after the end of each fiscal year of the Borrower and its subsidiaries, (i) a consolidated balance sheet as of the end of such year, (ii) consolidated statements of income and of cash flows for such year, and (iii) a consolidated statement of members' equity as of the end of such year, all such financial statements audited and certified by independent public accountants of recognized standing selected by the Borrower.

3.    <u>Consultation with Management</u>. The Company Group Members hereby agree that they and their subsidiaries shall make their appropriate executive officers available periodically, but at least quarterly, and at such other times as reasonably requested (in any event, with at least five (5) business days' written notice unless waived by all relevant parties) by any of Main Fund, ECI Parallel Fund or Family & Associates Fund, for reasonable consultation with the Representatives, with respect to matters relating to the business, operational performance and affairs of the Company Group Members. The parties acknowledge and agree that such consultations need not be in person and may be carried out by telephone or videoconference. At the request of any or all of Main Fund, ECI Parallel Fund and Family & Associates Fund, the Company Group Members will provide such additional rights of consultation as Main Fund, ECI Parallel Fund or Family & Associates Fund may reasonably request in the event changes in applicable law require such changes in order for the investment in the Company Group Members to qualify as a "venture capital investment" for purposes of the Plan Asset Regulation.

4.    <u>VCOC Transferees</u>.

(a)    In the event that Main Fund, ECI Parallel Fund or Family & Associates Fund transfers all or any portion of its investment in the Borrower or the Guarantors to any other entity that is intended to qualify as a "venture capital operating company" under the Plan Asset Regulation (a "<u>VCOC Transferee</u>"), the Company Group Members shall (if so requested by such VCOC Tranfereee) enter into an observer rights letter agreement with such VCOC Transferee on or prior to the date of such transfer that is substantially identical to this observer rights letter agreement.

(b)    It is the intention of Orion and the Company Group Members that all rights herein constitute direct contractual rights between Main Fund, ECI Parallel Fund and Family & Associates Fund, on the one hand, and each of the Company Group Members, on the other hand,

3

and that such rights shall be independently enforceable by each of Main Fund, ECI Parallel Fund and Family & Associates Fund, consistent with each fund's status as a "venture capital operating company" as defined in the Plan Asset Regulation. The Company Group Members hereby acknowledge and agree that each of Main Fund, ECI Parallel Fund and Family & Associates Fund shall have the right, in its sole discretion, to designate one or more individuals or other persons to exercise the management rights granted to Main Fund, ECI Parallel Fund and Family & Associates Fund hereunder.

5.    Term.  The observer right set forth in Section 1 of this Agreement, the right to review books and records set forth in Section 2 of this Agreement, the right to consult with management set forth in Section 3 above and this Agreement as a whole shall automatically terminate on such date as all of the Obligations have been indefeasibly paid in full and neither Orion nor any of its Affiliates owns any interest in any Company Group Member (including any Lender Warrant or any equity interest acquired upon the exercise of the Lender Warrants); provided that Sections 6 and 7 of this Agreement shall survive such termination.  Upon such termination, Orion shall return or destroy, and cause each Representative to return or destroy, to the Company Group Members all documentation, materials and other information received in connection with the activities set forth in this Agreement, or materials prepared by Orion or the Representatives with the help of such documentation, materials and information (collectively, "Information"); provided that if Orion shall opt to destroy such Information, it shall provide certification in writing of such destruction to the Company Group Members.  For any such documentation, materials or information stored in electronic format, such documentation, materials and information shall be destroyed, and upon request from the Company Group Members, a senior executive of Orion shall certify in writing to the Company Group Members that such documentation, materials and information have been so destroyed. Notwithstanding the foregoing, Orion shall be entitled to retain Information in electronic or written format to the extent that such Information is retained in order to comply with any law, rule, regulation, professional standard or internal record retention policy, in which case Orion shall take the appropriate measures to preserve such Information confidentially.

6.    Indemnity.  To the extent the provisions of Section 1 of this Agreement apply, the Borrower hereby agrees to provide indemnification and advancement to the Representatives in accordance with the terms of the form of Indemnification Agreement attached hereto as Exhibit A.  For purposes of clarity, the parties agree and acknowledge that (i) each of the Representatives shall have no fiduciary duties or obligations to the Company Group Members and, under no circumstances, shall any indemnity and/or advancement contemplated by this Agreement be negated or otherwise impacted by any claim which alleges a breach of any such duties and (ii) subject to the obligations of non-use and confidentiality set forth in Sections 1(a) and 7 of this Agreement, nothing contained herein will restrict the ability of Orion or any of its Affiliates from time to time to engage in any business or investment activity or to acquire, develop or otherwise pursue business or investment opportunities for its own account, independently and without notice to, or regard for the interests of, the Company Group Members, including, without limitation, business or investment activities or opportunities that compete with or are otherwise contrary to the interests of the Company Group Members or their Affiliates or that the Company Group Members or their Affiliates might find advantageous or desirable to engage in, acquire, develop or otherwise pursue. The provisions of Article 9 of the operating agreement of the Borrower are expressly incorporated herein and made applicable to the Representatives.

4

7.    Confidentiality.  Orion agrees that it will, and will cause each Representative to, keep confidential, not disclose and not use for any other purpose than to monitor its investment in the Borrower and the Guarantors any confidential information obtained from the Borrower pursuant to the terms of this Agreement, unless such confidential information (a) is known or becomes known to the public in general other than as a result of direct or indirect disclosure by Orion in violation of this Agreement, (b) is or has been independently developed or conceived by Orion without the aid, application or use of any confidential information obtained from the Company Group Members, (c) is or has been made known or disclosed to Orion by a third party who, to Orion's knowledge, had not received such information on a confidential basis or (d) is in the possession or knowledge of Orion prior to its disclosure by the Company Group Members or any of their Affiliates; provided, however, that Orion may disclose confidential information: (i) to its attorneys, accountants, tax advisors, officers, directors, employees, partners, and persons receiving information to become partners in Orion, provided that Orion informs such Person that such information is confidential and directs such Person to maintain the confidentiality of, and comply with the non-use restrictions with respect to, such information as set forth herein; or (ii) as may otherwise be required by law or judicial process.

8.    Miscellaneous.

(a)    This Agreement shall be governed in accordance with the laws of the State of New York, without regard to principles of conflicts of laws, and all provisions of this Agreement pertaining to the qualification of any investment in the Borrower as a "venture capital investment" for purposes of the Plan Asset Regulation shall be construed to provide the maximum protection under the Employee Retirement Income Security Act of 1974, as amended.

(b)    This Agreement embodies the entire agreement and understanding of the parties as to the subject matter contained herein. This Agreement supersedes all prior agreements and understandings with respect to the subject matter hereof.

(c)    This Agreement may be executed in one or more counterparts, and by the parties hereto in separate counterparts, each of which when executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.  Delivery by telecopier or electronic means in portable document format of an executed counterpart of a signature page of this Agreement (or of an executed counterpart of any amendment or waiver of this Agreement or any Exhibit hereto to be executed and delivered hereunder) shall be as effective as delivery of a manually executed counterpart hereof.

(d)    This Agreement may only be amended or modified by an instrument in writing signed by each of the parties hereto.

(e)    The parties hereto hereby knowingly, voluntarily, and intentionally waive any rights they may have to a trial by jury in respect of any litigation based hereon, or arising out of, under, or in connection with this Agreement. This provision is a material inducement for Orion to enter into this Agreement.

(f)    The parties agree that any legal action or proceeding with respect to or arising out of this Agreement, may be brought in or removed to the courts of the State of New

5

York, in and for the County of New York, or, to the extent permitted by applicable law, of the United States of America for the Southern District of New York.  By execution and delivery of this Agreement, each of the parties hereto accepts, for itself and in respect of its property, generally and unconditionally, the jurisdiction of the aforesaid courts. The parties hereto irrevocably consent to the service of process out of any of the aforementioned courts by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, or in any other manner permitted by applicable law. Nothing herein shall affect the right of the parties hereto to bring legal action or proceedings in any other competent jurisdiction. The parties hereto hereby waive, to the extent permitted by applicable law, any right to stay or dismiss any action or proceeding under or in connection with this Agreement brought before the foregoing courts on the basis of *forum non-conveniens*.

(g)    The parties hereto agree that a breach of any of the covenants contained in this Agreement may cause irreparable injury to the other parties hereto, that such other parties may not have an adequate remedy at law in respect of such breach and, as a consequence, that each and every covenant contained in this Agreement shall be specifically enforceable against the breaching party, and the parties hereto hereby waive and agree not to assert any defenses based on the adequacy for a remedy for damages against an action for specific performance of such covenants.

[REMAINDER OF PAGE INTENTIONALLY BLANK]

6

**IN WITNESS WHEREOF**, the undersigned have executed this Agreement as of the date first written above.

CARBONLITE HOLDINGS LLC

By: _____
      Name:
      Title

CARBONLITE SUB-HOLDINGS LLC,
By its Sole Member
CarbonLITE Holdings LLC

By: _____
      Name:
      Title:

CARBONLITE PI HOLDINGS LLC
By its Sole Member
CarbonLITE Holdings LLC

By: _____
      Name:
      Title:

CARBONLITE INDUSTRIES LLC
By its Sole Member
CarbonLITE Holdings LLC

By: _____
      Name:
      Title:

*[Signature Page to Observer Right Agreement]*

CARBONLITE PINNPACK LLC
By its Sole Member
CarbonLITE Holdings LLC


By: _____
       Name:
       Title:


PINNPACK PACKAGING LLC
By its Sole Member
CarbonLITE Holdings LLC


By: _____
       Name:
       Title:


CARBONLITE RECYCLING HOLDINGS LLC
By its Sole Member
CarbonLITE Holdings LLC


By: _____
       Name:
       Title:


CARBONLITE P HOLDINGS LLC
By its Sole Member
CarbonLITE Holdings LLC


By: _____
       Name:
       Title:

*[Signature Page to Observer Right Agreement]*

CARBONLITE FL HOLDINGS LLC
By its Sole Member
CarbonLITE Holdings LLC


By:    _____
            Name:
            Title:

**ACCEPTED AND AGREED TO:**

ORION ENERGY CREDIT OPPORTUNITIES FUND II, L.P.,
a Delaware limited partnership


By: _____
      Name:
      Title:


ORION ENERGY CREDIT OPPORTUNITIES FUND II PV, L.P.,
a Delaware limited partnership


By: _____
      Name:
      Title:

ORION ENERGY CREDIT OPPORTUNITIES FUND II GPFA, L.P.,
a Delaware limited partnership


By: _____
      Name:
      Title:

*[Signature Page to Observer Right Agreement]*

## EXHIBIT A

## INDEMNIFICATION AGREEMENT

THIS INDEMNIFICATION AGREEMENT (the "Agreement") is made and entered into as of [_____], 2019 between CarbonLITE Holdings LLC, a Delaware limited liability company (the "Company"), Orion Energy Credit Opportunities Fund II, L.P., a Delaware limited partnership ("Main Fund"), Orion Energy Credit Opportunities Fund II PV, L.P., a Delaware limited partnership ("ECI Parallel Fund"), Orion Energy Credit Opportunities Fund II GPFA, L.P., a Delaware limited partnership ("Family & Associates Fund" and, together with Main Fund and ECI Parallel Fund, "Orion"), Orion Energy Credit Opportunities Fund II GP, L.P., a Delaware limited partnership ("GP"), Orion Energy Partners, L.P., a Delaware limited partnership ("Main Fund Management"), [_____], an individual, in his capacity as a representative of Main Fund as an observer to the Company's Board of Directors (the "Board"), and [_____], an individual, in his capacity as a representative of Family & Associates Fund as an observer to the Board (together, in such capacity, the "Representatives," and collectively with Main Fund, ECI Parallel Fund, Family & Associates Fund, GP, Main Fund Management, any replacement Representatives and their respective Affiliates, the "Indemnitees").

## WITNESSETH:

WHEREAS, highly competent persons have become more reluctant to serve companies as directors, managers, officers or in other capacities unless they are provided with adequate protection through insurance or adequate indemnification against risks of claims and actions against them arising out of their service to and activities on behalf of the corporation;

WHEREAS, the Board has determined that, in order to attract and retain qualified individuals, the Company will attempt to maintain on an ongoing basis, at its sole expense, liability insurance to protect persons serving the Company and its subsidiaries from certain liabilities. Although the furnishing of such insurance has been a customary and widespread practice among United States-based companies and other business enterprises, the Company believes that, given current market conditions and trends, such insurance may be available to it in the future only at higher premiums and with more exclusions.  At the same time, directors, managers, officers, and other persons in service to companies and other business enterprises are being increasingly subjected to expensive and time-consuming litigation relating to, among other things, matters that traditionally would have been brought only against the Company or business enterprise itself.

WHEREAS, the uncertainties relating to such insurance and to indemnification have increased the difficulty of attracting and retaining such persons;

WHEREAS, the Board has determined that the increased difficulty in attracting and retaining such persons is detrimental to the best interests of the Company and its equityholders and that the Company should act to assure such persons that there will be increased certainty of such protection in the future;

WHEREAS, it is reasonable, prudent and necessary for the Company contractually to obligate itself to indemnify, and to advance expenses on behalf of, such persons to the fullest extent permitted by applicable law so that they will serve or continue to serve the Company free from

undue concern that they will not be so indemnified;

WHEREAS, this Agreement is a supplement to and is in furtherance of the certificate of formation and operating agreement of the Company (as the same may be amended from time to time in accordance with their terms, the "Charter Documents"), and shall not be deemed a substitute therefor, nor shall anything in this Agreement diminish or abrogate any rights of any Indemnitee thereunder; and

WHEREAS, the Indemnitees do not regard the protection available under the Charter Documents and insurance as adequate in the present circumstances, and may not be willing to enter into the transactions contemplated by (i) the Credit Agreement dated as of August 2, 2019 (the "Credit Agreement"), among the Borrower, the Guarantors, the lenders party thereto from time to time (collectively, the "Lenders") and Orion Energy Partners Investment Agent, LLC, as administrative agent and collateral agent and (ii) the Participation Agreement dated as of [ _ ], 2019 between Borrower and Orion (collectively, the "Transactions"), or to permit the Representatives to serve in such capacity, in each case without adequate protection, and the Company desires the Indemnitees to enter into the Transactions and to cause the Representatives to serve in such capacity. The Representatives are willing to serve in such capacity on the condition that they be so indemnified.

NOW, THEREFORE, in consideration of the Indemnitees' agreement to enter into the Transactions and the Representatives' agreement to serve in such capacity, the parties hereto agree as follows:

1.    Indemnity of Indemnitees.  Subject to the terms and conditions hereof, the Company hereby agrees to hold harmless and indemnify each Indemnitee to the fullest extent permitted by law, as such may be amended from time to time. In furtherance of the foregoing indemnification, and without limiting the generality thereof:

(a)    Generally.  Each Indemnitee shall be indemnified to the maximum extent permitted by law, as such may be amended from time to time, against all Expenses (as hereinafter defined) actually and reasonably incurred by it or on its behalf if, by reason of a Representative's status as such or service in such capacity, such Indemnitee is, or is threatened to be made, a party to or otherwise involved in any Proceeding (as hereinafter defined), REGARDLESS OF WHETHER ARISING FROM ANY ACT OR OMISSION WHICH CONSTITUTED THE SOLE, PARTIAL OR CONCURRENT NEGLIGENCE (WHETHER ACTIVE OR PASSIVE) OF SUCH INDEMNIFIED PERSON; provided that the conduct of such Indemnitee in respect of the matters at issue did not constitute gross negligence or willful misconduct, and in the case of any criminal proceeding, such Indemnitee did not have reasonable cause to believe that the act or omission was unlawful.

(b)    Certain Presumptions.  The termination of any Proceeding by judgment, order or settlement does not create a presumption that the Indemnitee did not meet the requisite standard of conduct set forth in this Section 1. The termination of any Proceeding by conviction or upon a plea of *nolo contendere* or its equivalent, or an entry of an order of probation prior to judgment, creates a rebuttable presumption that an Indemnitee acted in a manner contrary to that specified in this Section 1.

2

2.      Additional Indemnity.  In addition to, and without regard to any limitations on, the indemnification provided for in Section 1 of this Agreement, the Company shall and hereby does indemnify and hold harmless each Indemnitee against all Expenses, judgments, penalties, fines and amounts paid in settlement actually and reasonably incurred by it or on its behalf if, by reason of a Representative's status as such or service in such capacity, it is, or is threatened to be made, a party to or participant in any Proceeding, including, without limitation, all liability arising out of the negligence or active or passive wrongdoing of such Indemnitee.  The only limitation that shall exist upon the Company's obligations pursuant to this Agreement shall be that the Company shall not be obligated to make any payment to an Indemnitee that is finally determined (under the procedures, and subject to the presumptions, set forth in Sections 6 and 7 hereof of this Agreement) to be unlawful.

3.      Contribution.

(a)      Whether or not the indemnification provided in Sections 1 and 2 of this Agreement is available, in respect of any threatened, pending or completed action, suit or proceeding in which the Company is jointly liable with an Indemnitee (or would be if joined in such action, suit or proceeding), the Company shall pay, in the first instance, the entire amount of any judgment or settlement of such action, suit or proceeding without requiring any Indemnitee to contribute to such payment and the Company hereby waives and relinquishes any right of contribution it may have against the Indemnitees.  The Company shall not enter into any settlement of any action, suit or proceeding in which the Company is jointly liable with any Indemnitee (or would be if joined in such action, suit or proceeding) unless such settlement provides for a full and final release of all claims asserted against each Indemnitee.

(b)      Without diminishing or impairing the obligations of the Company set forth in the preceding subparagraph, if, for any reason, an Indemnitee shall elect or be required to pay all or any portion of any judgment or settlement in any threatened, pending or completed action, suit or proceeding in which the Company is jointly liable with such Indemnitee (or would be if joined in such action, suit or proceeding), the Company shall contribute to the amount of Expenses, judgments, fines and amounts paid in settlement actually and reasonably incurred and paid or payable by such Indemnitee in proportion to the relative benefits received by the Company and all officers, directors, managers or employees of the Company who are jointly liable with such Indemnitee (or would be if joined in such action, suit or proceeding), on the one hand, and such Indemnitee, on the other hand, from the transaction from which such action, suit or proceeding arose; provided, however, that the proportion determined on the basis of relative benefit may, to the extent necessary to conform to law, be further adjusted by reference to the relative fault of the Company and all officers, directors, managers or employees of the Company who are jointly liable with such Indemnitee (or would be if joined in such action, suit or proceeding), on the one hand, and such Indemnitee, on the other hand, in connection with the events that resulted in such expenses, judgments, fines or settlement amounts, as well as any other equitable considerations which the law may require to be considered.  The relative fault of the Company and all officers, directors, managers or employees of the Company who are jointly liable with such Indemnitee (or would be if joined in such action, suit or proceeding), on the one hand, and such Indemnitee, on the other hand, shall be determined by reference to, among other things, the degree to which their actions were motivated by intent to gain personal profit or advantage, the degree to which their liability is primary or secondary and the degree to which their conduct is active or passive.

3

(c)    The Company hereby agrees to fully indemnify and hold each Indemnitee harmless from any claims of contribution which may be brought by officers, directors, managers or employees of the Company who may be jointly liable with such Indemnitee.

(d)    To the fullest extent permissible under applicable law, if the indemnification provided for in this Agreement is unavailable to an Indemnitee for any reason whatsoever, the Company, in lieu of indemnifying such Indemnitee, shall contribute to the amount incurred by such Indemnitee, whether for judgments, fines, penalties, excise taxes, amounts paid or to be paid in settlement and/or for Expenses, in connection with any claim relating to an indemnifiable event under this Agreement, in such proportion as is deemed fair and reasonable in light of all of the circumstances of such Proceeding in order to reflect (i) the relative benefits received by the Company and such Indemnitee as a result of the event(s) and/or transaction(s) giving cause to such Proceeding; and/or (ii) the relative fault of the Company (and its directors, officers, managers, employees and agents) and such Indemnitee in connection with such event(s) and/or transaction(s).

4.    <u>Indemnification for Expenses of a Witness</u>.  Notwithstanding any other provision of this Agreement, to the extent that any Indemnitee is, by reason of a Representative's status as such or service in such capacity, a witness, or is made (or asked to) respond to discovery requests, in any Proceeding to which such Indemnitee is not a party, such Indemnitee shall be indemnified against all Expenses actually and reasonably incurred by it or on its behalf in connection therewith.

5.    <u>Advancement of Expenses</u>.  Notwithstanding any other provision of this Agreement, the Company shall advance all Expenses incurred by or on behalf of any Indemnitee in connection with the matters under this Agreement within thirty (30) days after the receipt by the Company of a statement or statements from such Indemnitee requesting such advance or advances from time to time, whether prior to or after final disposition of such Proceeding.  Such statement or statements shall reasonably evidence the Expenses incurred by such Indemnitee and shall include or be preceded or accompanied by a written undertaking by or on behalf of such Indemnitee to repay any Expenses advanced if it shall ultimately be determined that such Indemnitee is not entitled to be indemnified against such Expenses.  Any advances and undertakings to repay pursuant to this <u>Section 5</u> shall be unsecured and interest free.

6.    <u>Presumption of Entitlement to Indemnification</u>.  It is the intent of this Agreement to secure for each Indemnitee rights of indemnity that are as favorable as may be permitted under applicable law.  Accordingly, the parties agree that the following procedure and presumption shall apply in the event of any question as to whether an Indemnitee is entitled to indemnification under this Agreement:

(a)    To obtain indemnification under this Agreement, an Indemnitee shall submit to the Company a written request, including therein or therewith such documentation and information as is reasonably available to such Indemnitee and is reasonably necessary to determine whether and to what extent such Indemnitee is entitled to indemnification. Notwithstanding the foregoing, any delay or failure by an Indemnitee to notify the Company hereunder will not relieve the Company from any liability which it may have to such Indemnitee

4

hereunder or otherwise than under this Agreement, and any delay or failure in so notifying the Company shall not constitute a waiver by any Indemnitee of any rights under this Agreement.

(b)     Upon written request by an Indemnitee for indemnification pursuant to the first sentence of Section 6(a) hereof, such Indemnitee shall be presumed to be entitled to indemnification under this Agreement, and such Indemnitee shall be fairly and reasonably entitled to indemnification, unless and only to the extent that a court of competent jurisdiction has determined to the contrary, by a final and non-appealable judgment.

7.     Remedies of Indemnitee.

(a)     In the event that (i) a determination is made pursuant to Section 6 of this Agreement that an Indemnitee is not entitled to indemnification under this Agreement, (ii) advancement of Expenses is not timely made pursuant to Section 5 of this Agreement, (iii) no determination of entitlement to indemnification is made pursuant to Section 6(b) of this Agreement within ninety (90) days after receipt by the Company of the request for indemnification, (iv) payment of indemnification is not made pursuant to this Agreement within ten (10) days after receipt by the Company of a written request therefor or (v) payment of indemnification is not made within ten (10) days after a determination has been made that such Indemnitee is entitled to indemnification or such determination is deemed to have been made pursuant to Section 6 of this Agreement, such Indemnitee shall be entitled to an adjudication in any court of competent jurisdiction, of such Indemnitee's entitlement to such indemnification.  The Company shall not oppose any Indemnitee's right to seek any adjudication thereof.

(b)     In the event that a determination shall have been made pursuant to Section 6(b) of this Agreement that an Indemnitee is not entitled to indemnification, any judicial proceeding commenced pursuant to this Section 7 shall be conducted in all respects as a *de novo* trial on the merits, and such Indemnitee shall not be prejudiced by reason of the adverse determination under Section 6(b).

(c)     If a determination shall have been made pursuant to Section 6(b) of this Agreement that an Indemnitee is entitled to indemnification, the Company shall be bound by such determination in any judicial proceeding commenced pursuant to this Section 7.

(d)     In the event that an Indemnitee, pursuant to this Section 7, seeks a judicial adjudication of its rights under, or to recover damages for breach of, this Agreement, or to recover under any directors' and officers' liability insurance policies maintained by the Company, the Company shall pay on such Indemnitee's behalf, in advance, any and all expenses (of the types described in the definition of Expenses in Section 12 of this Agreement) actually and reasonably incurred by such Indemnitee in such judicial adjudication, regardless of whether such Indemnitee ultimately is determined to be entitled to such indemnification, advancement of expenses or insurance recovery.

(e)     The Company shall be precluded from asserting in any judicial proceeding commenced pursuant to this Section 7 that the procedures and presumptions of this Agreement are not valid, binding and enforceable and shall stipulate in any such court that the Company is bound by all the provisions of this Agreement.  The Company shall indemnify each

5

Indemnitee against any and all Expenses and, if requested by any Indemnitee, shall (within ten (10) days after receipt by the Company of a written request therefor) advance, to the extent not prohibited by law, such expenses to the applicable Indemnitee, which are incurred by such Indemnitee in connection with any action brought by any Indemnitee for indemnification or advance of Expenses from the Company under this Agreement or under any directors' and officers' liability insurance policies maintained by the Company, regardless of whether the Indemnitee ultimately is determined to be entitled to such indemnification, advancement of Expenses or insurance recovery, as the case may be.

(f)     Notwithstanding anything in this Agreement to the contrary, no determination as to entitlement to indemnification under this Agreement shall be required to be made prior to the final disposition of the Proceeding.

8.     Non-Exclusivity; Survival of Rights; Insurance; Primacy of Indemnification; Subrogation.

(a)     The rights of indemnification as provided by this Agreement shall not be deemed exclusive of any other rights to which any Indemnitee may at any time be entitled, without duplication, under applicable law, Charter Documents, any other agreement, a vote of equityholders, a resolution of managers or otherwise, of the Company.  No amendment, alteration or repeal of this Agreement or of any provision hereof shall limit or restrict any right of any Indemnitee under this Agreement in respect of any action taken or omitted by such Indemnitee prior to such amendment, alteration or repeal.  To the extent that a change in law, whether by statute or judicial decision, permits greater indemnification than would be afforded currently under the Charter Documents and this Agreement, it is the intent of the parties hereto that each Indemnitee shall enjoy by this Agreement the greater benefits, without duplication, so afforded by such change.  No right or remedy herein conferred is intended to be exclusive of any other right or remedy, and every other right and remedy shall be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing at law or in equity or otherwise, but without duplication of payment or reimbursement.  The assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other right or remedy.

(b)     To the extent that the Company maintains an insurance policy or policies providing liability insurance for directors, officers, managers, employees, or agents or fiduciaries of the Company or of any other corporation, partnership, joint venture, trust, employee benefit plan or other enterprise that such person serves at the request of the Company, each Indemnitee shall be covered by such policy or policies in accordance with its or their terms to the maximum extent of the coverage available for any director, officer, manager, employee, agent or fiduciary under such policy or policies.  If, at the time of the receipt of a notice of a claim pursuant to the terms hereof, the Company has director and officer liability insurance in effect, the Company shall give prompt notice of the commencement of such proceeding to the insurers in accordance with the procedures set forth in the respective policies.  The Company shall thereafter take all necessary or desirable action to cause such insurers to pay, on behalf of the Indemnitee, all amounts payable as a result of such proceeding in accordance with the terms of such policies.

6

(c)      In the event of any payment under this Agreement, the Company shall be subrogated to the extent of such payment to all of the rights of recovery of the Indemnitee, who shall execute all papers required and take all action necessary to secure such rights, including execution of such documents as are necessary to enable the Company to bring suit to enforce such rights. Notwithstanding the foregoing, in no event shall the Company be subrogated to any right of recovery an Indemnitee may have from any Orion Energy Partners entity or any insurer thereof.

(d)      The Company hereby acknowledges that the Indemnitees may have certain rights to indemnification, advancement of expenses and/or insurance provided by or on behalf of one or more Orion Energy Partners entities, including Main Fund, ECI Parallel Fund, Family & Associates Fund, Main Fund Management, or their respective affiliates (collectively, the "Fund Indemnitors").  Notwithstanding anything to the contrary herein or otherwise, the Company hereby agrees:

(i)      that the Company is the indemnitor of first resort (*i.e.*, that the Company's obligations to each Indemnitee are primary and that any obligation of the Fund Indemnitors to advance expenses or to provide indemnification for the same expenses or liabilities incurred by Indemnitee are secondary),

(ii)      that the Company will be required to advance the full amount of any reasonable expenses incurred by Indemnitee and will be liable for the full amount of all liabilities, expenses, judgments, penalties, fines and amounts paid in settlement to the extent legally permitted and as required by the terms of this Agreement or any other agreement between the Company and such Indemnitee, without regard to any rights such Indemnitee may have against the Fund Indemnitors, and,

(iii)      that the Company irrevocably waives, relinquishes and releases the Fund Indemnitors from any and all claims for contribution, subrogation or any other recovery of any kind in respect thereof.

(e)      Notwithstanding anything to the contrary herein or otherwise, the Company further agrees that no advancement or payment by the Fund Indemnitors on behalf of any Indemnitee with respect to any claim for which an Indemnitee has sought indemnification from the Company will affect the foregoing and the Fund Indemnitors will have a right of contribution and/or be subrogated to the extent of such advancement or payment to all of the rights of recovery of each Indemnitee against the Company.  The Company and each Indemnitee agree that the Fund Indemnitors are express third party beneficiaries of the terms of this Agreement.

9.      Duration of Agreement.  All agreements and obligations of the Company contained herein shall continue for so long as there is any Representative or any replacement thereof serving in such capacity and for a period of six years thereafter, and shall continue thereafter so long as any Indemnitee shall be subject to any Proceeding contemplated to be covered by this Agreement, whether or not any Representative is acting or serving in any such capacity at the time any liability or expense is incurred for which indemnification can be provided under this Agreement.  This Agreement shall be binding upon and inure to the benefit of and be enforceable by the parties hereto and their respective successors (including any direct or indirect successor by purchase, merger, consolidation or otherwise to all or substantially all of the business or assets of

7

the Company, and including any transferee of an interest of any Orion Energy Partners entity), assigns, spouses, heirs, executors and personal and legal representatives.

10.   <u>Security</u>.  To the extent requested by an Indemnitee and approved by the Company, the Company may at any time and from time to time provide security to an Indemnitee for the Company's obligations hereunder through an irrevocable bank line of credit, funded trust or other collateral.  Any such security, once provided to an Indemnitee, may not be revoked or released without the prior written consent of the Indemnitee.

11.   <u>Enforcement</u>.

(a)   The Company expressly confirms and agrees that it has entered into this Agreement and assumes the obligations imposed on it hereby in order to induce the Indemnitees to enter into the Transactions and to induce the Representatives to serve in such capacity in connection with the Transactions, and the Company acknowledges that each Indemnitee is relying upon this Agreement in entering into the Transactions and permitting the Representatives to serve as such.

(b)   This Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings, oral, written and implied, between the parties hereto with respect to the subject matter hereof.

12.   <u>Definitions</u>.  For purposes of this Agreement:

(a)   "<u>Expenses</u>" shall include all losses, claims, damages, liabilities, joint or several, reasonable and documented attorneys' fees and legal expenses, judgments, fines, settlements, retainers, court costs, transcript costs, fees of experts, witness fees, travel expenses, duplicating costs, printing and binding costs, telephone charges, postage, delivery service fees and all other disbursements or expenses of the types customarily incurred in connection with prosecuting, defending, preparing to prosecute or defend, investigating, participating, or being or preparing to be a witness in a Proceeding, or responding to, or objecting to, a request to provide discovery in any Proceeding.  Expenses also shall include Expenses incurred in connection with any appeal resulting from any Proceeding and all federal, state, local or foreign taxes imposed on any Indemnitee as a result of the actual or deemed receipt of any payments under this Agreement, including without limitation the premium, security for, and other costs relating to any cost bond, supersede as bond, or other appeal bond or its equivalent.

(b)   "<u>Proceeding</u>" includes any threatened, pending or completed action, suit, arbitration, alternate dispute resolution mechanism, investigation, inquiry, administrative hearing or any other actual, threatened or completed proceeding, whether brought by or in the right of the Company or otherwise and whether civil, criminal, administrative or investigative, in which an Indemnitee was, is or will be involved as a party or otherwise.

13.   <u>Severability</u>.  The invalidity or unenforceability of any provision hereof shall in no way affect the validity or enforceability of any other provision.  Without limiting the generality of the foregoing, this Agreement is intended to confer upon each Indemnitee indemnification rights to the fullest extent permitted by applicable laws.  In the event any provision

8

hereof conflicts with any applicable law, such provision shall be deemed modified, consistent with the aforementioned intent, to the extent necessary to resolve such conflict.

14.    <u>Modification and Waiver</u>.    No supplement, modification, termination or amendment of this Agreement shall be binding unless executed in writing by each of the Company and GP.  No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provisions hereof (whether or not similar) nor shall such waiver constitute a continuing waiver.

15.    <u>Notices</u>.    All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given: (a) upon personal delivery to the party to be notified, (b) when sent by confirmed electronic mail or facsimile if sent during normal business hours of the recipient, and if not so confirmed, then on the next business day, (c) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt.  All communications shall be sent:

(a)    To any Indemnitee at the following address:

[Orion Energy Credit Opportunities Fund II, L.P.
Orion Energy Credit Opportunities Fund II PV, L.P.
Orion Energy Credit Opportunities Fund II GPFA, L.P.]
350 5th Ave #6740
New York, NY 20118
Attention:  Chris Leary, Mark Friedland, Lauren Key,
            Karen Vejseli, and Gerrit Nicholas
Email:  Chris@OrionEnergyPartners.com;
        Mark@OrionEnergyPartners.com;
        Lauren@OrionEnergyPartners.com;
        Karen@OrionEnergyPartners.com;
        Gerrit@OrionEnergyPartners.com

with a copy to:

Latham & Watkins LLP
355 South Grand Avenue
Los Angeles, CA 90071-1560
Attention:  Jeff Greenberg
Phone:  1-213-485-1234
Email: jeffrey.greenberg@lw.com

(b)    To the Company at:

CarbonLITE Holdings LLC
[_____]

with a copy to:

9

[_____]

or to such other address as may have been furnished to Indemnitee by the Company or to the Company by Indemnitee, as the case may be.

16.    Counterparts.    This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same Agreement.  This Agreement may also be executed and delivered by facsimile or electronic signature and in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

17.    Headings.  The headings of the paragraphs of this Agreement are inserted for convenience only and shall not be deemed to constitute part of this Agreement or to affect the construction thereof.

18.    Governing Law and Consent to Jurisdiction.  This Agreement and the legal relations among the parties shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without regard to otherwise governing choice of law or conflict of laws rules.

**[SIGNATURE PAGE TO FOLLOW]**

10

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement on and as of the day and year first above written.

**COMPANY:**

CARBONLITE HOLDINGS LLC

By: _____
     Name:
     Title:

**INDEMNITEE:**

_____
[_____]

_____
[_____]

[ORION ENERGY CREDIT OPPORTUNITIES FUND II, L.P.,
a Delaware limited partnership]

By: _____
     Name:  [_____]
     Title:  [_____]

11

[ORION ENERGY CREDIT OPPORTUNITIES
FUND II PV, L.P.,
a Delaware limited partnership]


By: _____
      Name: [                  ]
      Title: [                  ]


[ORION ENERGY CREDIT OPPORTUNITIES
FUND II GPFA, L.P.,
a Delaware limited partnership]


By: _____
      Name: [                  ]
      Title: [                  ]


[ORION ENERGY CREDIT OPPORTUNITIES
FUND II GP, L.P.,
a Delaware limited partnership]


By: _____
      Name: [                  ]
      Title: [                  ]


[ORION ENERGY PARTNERS, L.P.,
a Delaware limited partnership]


By: _____
      Name: [                  ]
      Title: [                  ]

12

**EXHIBIT I**
**TO**
**CREDIT AGREEMENT**

**<u>Form of Security Agreement</u>**

[*Please see attached*]

Exhibit I – 1

*Execution Version*

# PLEDGE AND SECURITY AGREEMENT

This PLEDGE AND SECURITY AGREEMENT (this "<u>Agreement</u>") is made as of August 2, 2019, by and between CARBONLITE HOLDINGS LLC, a Delaware limited liability company (the "<u>Borrower</u>"), CERTAIN SUBSIDIARIES OF BORROWER, as Guarantors, (the "Guarantors" and together with the Borrower, the "<u>Grantors</u>" and each a "<u>Grantor</u>"), and ORION ENERGY PARTNERS INVESTMENT AGENT, LLC, in its capacity as collateral agent for the benefit of the Secured Parties, as hereinafter defined (in such capacity, together with its successors in such capacity, the "<u>Collateral Agent</u>").

WHEREAS, pursuant to that certain Credit Agreement, dated August 2, 2019 (as amended, supplemented, restated or otherwise modified from time to time, the "<u>Credit Agreement</u>"), by and among the Grantors, certain lenders party thereto (the "<u>Lenders</u>"), Orion Energy Partners Investment Agent, LLC, as the administrative agent and the Collateral Agent, the Lenders, on terms and subject to the conditions set forth in the Credit Agreement, will provide loans to the Borrower for the purposes specified therein.

WHEREAS, it is a condition precedent to the Initial Funding Date under the Credit Agreement that the Grantors shall have executed and delivered this Agreement.

NOW, THEREFORE, in consideration of the mutual agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

Section 1.      <u>Definitions.</u>

1.01      <u>Certain Uniform Commercial Code Terms</u>. As used herein, the terms "<u>Accession</u>", "<u>Account</u>", "<u>Chattel Paper</u>", "<u>Commercial Tort Claims</u>", "<u>Commodity Account</u>", "<u>Deposit Account</u>", "<u>Document</u>", "<u>Electronic Chattel Paper</u>", "<u>Equipment</u>", "<u>Fixture</u>", "<u>General Intangible</u>", "<u>Goods</u>", "<u>Instrument</u>", "<u>Inventory</u>", "<u>Letter-of-Credit Rights</u>", "<u>Payment Intangible</u>", "<u>Proceeds</u>", "<u>Promissory Note</u>", "<u>Software</u>" and "<u>Tangible Chattel Paper</u>" have the respective meanings set forth in Article 9 of the NYUCC, and the terms "<u>Certificated Security</u>", "<u>Entitlement Holder</u>", "<u>Financial Asset</u>", "<u>Securities Account</u>", "<u>Security</u>", "<u>Security Entitlement</u>", and "<u>Supporting Obligations</u>" have the respective meanings set forth in Article 8 or 9, as the case may be, of the NYUCC.

1.02      <u>Defined Terms</u>. All capitalized terms used but not otherwise defined herein (including the introductory paragraph and recitals) shall have the respective meanings given to such terms in Section 1.01 of the Credit Agreement. The rules of interpretation set forth in Section 1.02 of the Credit Agreement shall apply to this Agreement. In addition to the terms defined in the Credit Agreement, the following terms shall have the meanings specified below:

"<u>Account Collateral</u>" has the meaning assigned to such term in <u>Section 3.01(i)</u> hereof.

"<u>Assigned Agreements</u>" has the meaning assigned to such term in <u>Section 3.01(g)</u> hereof.

"<u>Borrower</u>" has the meaning assigned to such term in the introductory paragraph hereto.

"Collateral" has the meaning assigned to such term in Section 3.01 hereof.

"Collateral Agent" has the meaning assigned to such term in the introductory paragraph hereto.

"Credit Agreement" has the meaning assigned to such term in the recitals hereto.

"Discharge Date" means the date on which the Loan Parties' Obligations (other than (i) inchoate indemnity obligations for which no claim has been made, (ii) contingent indemnity obligations which by the terms of the Credit Agreement expressly survive the termination thereof and (iii) those in respect of Lender Warrants) are paid in full in cash and the Commitments thereunder shall have been terminated.

"Excluded Assets" means:

(a)    any property or other asset (including any agreement or contract, but other than any Material Agreement), (i) that is subject to terms that prohibit the creation by any Grantor of a security interest therein to secure the Secured Obligations (solely to the extent that such restriction is not prohibited by the Credit Agreement), (ii) to the extent that any Applicable Law prohibits the creation of a security interest therein, or (iii) that would be rendered invalid, abandoned, void or unenforceable by reason of its being included as part of the Collateral (in each case, other than to the extent that any such term or restriction would be rendered ineffective pursuant to Section 9-406, 9-407, 9-408 or 9-409 of the NYUCC);

(b)    any permit or other approval by a Governmental Authority that by its terms or by operation of law would become void, voidable, terminable or revocable if mortgaged, pledged or assigned hereunder or if a security interest therein were granted hereunder;

(c)    any United States intent-to-use trademark applications to the extent that, and solely during the period in which, the grant, attachment or enforcement of a security interest therein would, under applicable federal law, impair the registrability of such applications or the validity or enforceability of registrations issuing from such applications;

(d)    Excluded Accounts; and

(e)    those assets as to which the Collateral Agent and the Borrower shall reasonably determine, in writing, that the cost or other consequence of obtaining a Lien thereon or perfection thereof are excessive in relation to the benefit to the Secured Parties of the security to be afforded thereby;

provided that (I) any such permit, approval, trademark application or other property or asset described in clauses (a) through (c) above shall constitute Excluded Assets only to the extent and for so long as the consequences specified above shall exist and shall cease to be Excluded Assets and shall become subject to the Lien of this Agreement, and constitute Collateral immediately and automatically, at such time as such consequence shall no longer exist and to the extent severable, shall attach immediately to any portion of such permit, approval, trademark application or other property or asset not subject to the prohibitions specified in clauses (a) through (c) above and (II) this definition shall not apply to, and the

2

Collateral shall include, any proceeds of any such permit, approval, trademark application or other property or asset (unless such proceeds would constitute Excluded Assets).

"Excluded Interest" means, with respect to any Grantor, such Grantor's interest in the Capital Stock of any Non-Guarantor Subsidiary.

"Excluded Swap Obligation" means, with respect to any Grantor, any Swap Obligation if, and to the extent that, all or a portion of the Guarantee of such Grantor of, or the grant by such Grantor of a security interest to secure, such Swap Obligation (or any Guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Grantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder at the time the Guarantee of such Grantor or the grant of such security interest becomes effective with respect to such Swap Obligation. If a Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such Guarantee or security interest is or becomes illegal.

"Grantor" has the meaning assigned to such term in the introductory paragraph hereto.

"Investment Property" means the collective reference to (i) all "investment property" as such term is defined in Section 9-102(a)(49) of the NYUCC including, without limitation, all Certificated Securities and Uncertificated Securities, all Security Entitlements, all Securities Accounts and Financial Assets carried therein, (ii) all security entitlements, in the case of any United States Treasury book-entry securities, as defined in 31 C.F.R. section 357.2, or, in the case of any United States federal agency book-entry securities, as defined in the corresponding United States federal regulations governing such book-entry securities, and (iii) whether or not constituting "investment property" as so defined, all Pledged Debt and Pledged Equity Interests.

"Lenders" has the meaning assigned to such term in the recitals hereto.

"NYUCC" means the Uniform Commercial Code as in effect from time to time in the State of New York; provided, however, that if by reason of mandatory provisions of law, any or all of the perfection or priority of the Collateral Agent's and the Secured Parties' security interest in any item or portion of the Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, the term "NYUCC" means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions hereof relating to such perfection or priority and for purposes of definitions relating to such provisions.

"Operating Agreement" means, collectively, the agreements set forth on Annex 6

"Pledged Debt" means, with respect to any Grantor, all indebtedness for borrowed money owed to such Grantor (including indebtedness owed to such Grantor by any other Grantor), whether or not evidenced by any Instrument, issued by the obligors named therein, the instruments, if any, evidencing any of the foregoing, and all interest, cash, instruments and other property or proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of the foregoing.

3

"<u>Pledged Equity Interests</u>" means all Pledged LLC Interests, Pledged Stock and Pledged Partnership Interests, including, without limitation, all limited liability company interests listed on <u>Annex 2</u> hereto under the heading "Pledged Equity Interests", and any other participation or interests in any equity or profits of any business entity including, without limitation, any trust and all management rights relating to any entity whose equity interests are included as Pledged Equity Interests. Notwithstanding the foregoing, in no case shall the Pledged Equity Interest of any Grantor include the Excluded Interests.

"<u>Pledged LLC Interests</u>" means all membership interests and other interests now owned or hereafter acquired by any Grantor in any limited liability company, and the certificates representing such limited liability company interests and any interest of such Grantor on the books and records of such limited liability company and any securities entitlements relating thereto and all dividends, distributions, cash, warrants, rights, options, instruments, securities and other property or proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such limited liability company interests and any other warrant, right or option or other agreement to acquire any of the foregoing, all management rights, all voting rights, any interest in any capital account of a member in such limited liability company, all rights as and to become a member of the limited liability company, all rights of the Grantor under any shareholder or voting trust agreement or similar agreement in respect of such limited liability company, all of the Grantor's right, title and interest as a member to any and all assets or properties of such limited liability company, and all other rights, powers, privileges, interests, claims and other property in any manner arising out of or relating to any of the foregoing.

"<u>Pledged Partnership Interests</u>" means all interests in any general partnership, limited partnership, limited liability partnership, limited liability limited partnership or other partnership interests owned by any Grantor, and the certificates, if any, representing such partnership interests and any interest of such Grantor on the books and records of such partnership and any securities entitlements relating thereto and all dividends, distributions, cash, warrants, rights, options, instruments, securities and other property or proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such partnership interests and any other warrant, right or option or other agreement to acquire any of the foregoing, all management rights, all voting rights, any interest in any capital account of a partner in such partnership, all rights as and to become a partner of the partnership, all rights of the Grantor under any shareholder or voting trust agreement or similar agreement in respect of such partnership, all of the Grantor's right, title and interest as a partner to any and all assets or properties of such partnership, and all other rights, powers, privileges, interests, claims and other property in any manner arising out of or relating to any of the foregoing.

"<u>Pledged Stock</u>" means all shares of capital stock owned by any Grantor, and the certificates, if any, representing such shares and any interest of such Grantor in the entries on the books of the issuer of such shares or on the books of any securities intermediary pertaining to such shares, and all dividends, distributions, cash, warrants, rights, options, instruments, securities and other property or Proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such shares and any other warrant, right or option or other agreement to acquire any of the foregoing, all management rights, all voting rights, any interest in any capital account of a shareholder of such entity, all rights as and to become a shareholder in such entity, all rights of the Grantor under any shareholder or voting trust agreement

4

or similar agreement in respect of such entity, all of the Grantor's right, title and interest as a shareholder to any and all assets or properties of such entity, and all other rights, powers, privileges, interests, claims and other property in any manner arising out of or relating to any of the foregoing.

"Receivables" has the meaning assigned to such term in Section 3.01(k) hereof.

"Related Contracts" has the meaning assigned to such term in Section 3.01(k) hereof.

"Secured Obligations" means, collectively, without duplication: (a) the Obligations (other than in respect of Lender Warrants); (b) any and all sums advanced by the Collateral Agent in order to preserve the Collateral or preserve the security interest in the Collateral; and (c) in the event of any proceeding for the collection or enforcement of the obligations described in clauses (a) and (b) above, after an Event of Default has occurred and is continuing and unwaived, the expenses of retaking, holding, preparing for sale or lease, selling or otherwise disposing of or realizing on the Collateral, or of any exercise by the Collateral Agent of its rights under the Security Documents. For the avoidance of doubt, no amounts (x) now or hereafter owing in connection with the Participation Agreement or (y) constituting Excluded Swap Obligations, shall in either case constitute Secured Obligations hereunder.

"Swap Obligation" means, with respect to any Grantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act.

"Vehicles" means all cars, trucks, trailers, construction and earth moving equipment and other Equipment of any nature covered by a certificate of title law of any jurisdiction.

Section 2.     Representations and Warranties. Each Grantor represents and warrants to the Collateral Agent and to each Secured Party that:

2.01    Title. The Grantors are the sole beneficial owners of the Collateral, free and clear of all Liens or other exceptions to title other than, in the case of Collateral other than the Pledged Equity Interests, the Permitted Liens, and in the case of Pledged Equity Interests, Permitted Liens arising pursuant to Applicable Law. This Agreement is effective to create, in favor of the Collateral Agent, legally valid and enforceable Liens on the Collateral. The Liens created by this Agreement constitute first priority (subject to (i) Permitted Liens, in the case of Collateral other than the Pledged Equity Interests, and (ii) Permitted Liens arising pursuant to Applicable Law, in the case of Pledged Equity Interests) perfected Liens on the Collateral, subject, for the following Collateral, to the occurrence of the following: (i) in the case of all Collateral in which a security interest may be perfected by filing a financing statement under the UCC, the filing of a UCC financing statement in the office of the Secretary of State of the State of the applicable Grantor's incorporation or formation, (ii) in the case of deposit accounts, the execution and delivery of Control Agreements, (iii) in the case of copyrights, the filing of a signed short-form copyright security agreement with the United States Copyright Office, (iv) in the case of Letter-Of-Credit Rights that are not Supporting Obligations of Collateral, the execution of an agreement granting to Collateral Agent control over such Letter-Of-Credit Rights, and (v) in the case of electronic

chattel paper, the completion of all steps necessary to grant to Collateral Agent control over such electronic chattel paper.

2.02    <u>Names, Etc</u>. The full and correct legal name, type of organization, jurisdiction of organization, organizational ID number (if applicable) and mailing address of each Grantor as of the date hereof are correctly set forth in <u>Annex 1</u>. Said <u>Annex 1</u> correctly specifies (a) the place of business of each Grantor or, if such Grantor has more than one place of business, the location of the chief executive office of such Grantor, and (b) each location where Goods (including Equipment) of any Grantor are located (other than Vehicles).

2.03    <u>Changes in Circumstances</u>. No Grantor has (a) within the period of four months prior to the date this representation is made, changed its jurisdiction of incorporation or formation, as the case may be, (b) except as specified in <u>Annex 1</u>, heretofore changed its name, or (c) except as specified in <u>Annex 3</u>, heretofore become a "new debtor" (as defined in Section 9-102(a)(56) of the NYUCC) with respect to a currently effective security agreement previously entered into by any other Person.

2.04    <u>Pledged Equity Interests</u>.

(a)    All of the Securities that are pledged by such Grantor hereunder constitute a "security" under Section 8-103 of the NYUCC and a Certificated Security. Subject to Section 5.21(b) of the Credit Agreement, Grantor has made arrangements to deliver all Certificated Securities constituting Collateral held by such Grantor to the Collateral Agent, together with duly executed undated blank stock powers, or other equivalent instruments of transfer acceptable to the Collateral Agent.

(b)    The Pledged Equity Interests pledged by such Grantor hereunder constitute all of the issued and outstanding shares of all classes of Capital Stock of each relevant issuer owned by such Grantor.

(c)    Each Grantor has the full power and authority to pledge all of the Pledged Equity Interests pledged by it pursuant to this Agreement.

(d)    All the shares of the Pledged Equity Interests have been duly and validly issued and are fully paid and nonassessable. There are no outstanding warrants, options or other rights or agreements to purchase or that require the issuance or sale of, or property that is now or hereafter convertible into, any of the Pledged Equity Interests.

(e)    Each Operating Agreement contains the entire agreement between the parties thereto with respect to the subject matter thereof and is in full force and effect in accordance with its terms. There exists no material violation or default by any Grantor under any Operating Agreement to which it is a party. None of the Grantors has knowingly waived or released any of its material rights under or otherwise consented to a material departure from the terms and provisions of any Operating Agreement to which it is a party.

2.05    <u>Commercial Tort Claims</u>. <u>Annex 4</u> sets forth a complete and correct list of all known Commercial Tort Claims, the value of which is in excess of $500,000, of the Grantors.

6

Section 3.    <u>Collateral.</u>

3.01    To secure the prompt payment in full when due (whether at stated maturity, by acceleration or otherwise) in cash and performance in full of the Secured Obligations, each Grantor does hereby collaterally assign, grant and pledge to the Collateral Agent, for the ratable benefit of the Collateral Agent and each other Secured Party, a security interest in all of such Grantor's right, title and interest in, to and under all assets of such Grantor, whether now owned or hereafter existing or acquired, including a security interest in all the right, title and interest of such Grantor in, to and under the following (all of the property described in this Section 3.01, subject to the last sentence of this Section 3.01, being collectively referred to herein as "<u>Collateral</u>"):

(a)    all Documents;

(b)    all Equipment;

(c)    all Fixtures;

(d)    all Goods not covered by the other clauses of this <u>Section 3</u>;

(e)    all Intellectual Property;

(f)    all Inventory;

(g)    all Commercial Tort Claims arising out of the events described in <u>Annex 4</u>;

(h)    all agreements, contracts and documents, including each Material Agreement to which such Grantor is a party, as each such agreement may be amended, amended and restated, supplemented or otherwise modified from time to time (collectively, the "<u>Assigned Agreements</u>"), including (i) all rights of such Grantor to receive moneys due and to become due under or pursuant to the Assigned Agreements, (ii) all rights of such Grantor to receive proceeds of any insurance, indemnity, warranty or guaranty with respect to the Assigned Agreements, (iii) claims of such Grantor for damages arising out of or for breach of or default under the Assigned Agreements and (iv) the right of such Grantor to terminate the Assigned Agreements, to perform thereunder and to compel performance and otherwise exercise all remedies thereunder;

(i)    all Pledged Equity Interests;

(j)    the following (collectively, the "<u>Account Collateral</u>"):

(i)    the Deposit Accounts and other Collateral Accounts and all funds and financial assets from time to time credited thereto (including all cash equivalent investments), and all certificates and instruments, if any, from time to time representing or evidencing the Collateral Accounts;

(ii)    all promissory notes, certificates of deposit, checks and other instruments from time to time delivered to or otherwise possessed by the Collateral Agent for or on behalf of such Grantor in substitution for or in addition to any or all of the then existing Account Collateral; and

(iii)    all interest, dividends, distributions, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of the then existing Account Collateral;

(k)    all Accounts, Chattel Paper (including Tangible Chattel Paper and Electronic Chattel Paper), Instruments, Letter-of-Credit Rights, General Intangibles (including Payment Intangibles) and other obligations of any kind, whether or not arising out of or in connection with the sale or lease of goods or the rendering of services and whether or not earned by performance, and all rights now or hereafter existing in and to all supporting obligations and in and to all security agreements, mortgages, Liens, leases, letters of credit and other contracts securing or otherwise relating to the foregoing property (any and all of such accounts, chattel paper, instruments, letter-of-credit rights, general intangibles and other obligations being the "Receivables", and any and all such supporting obligations, security agreements, mortgages, Liens, leases, letters of credit and other contracts being the "Related Contracts");

(l)    all Investment Property in which the Grantors have now, or acquire from time to time hereafter, any right, title or interest in any manner, and the certificates or instruments, if any, representing or evidencing such Investment Property, and all dividends, distributions, return of capital, interest, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such investment property and all warrants, rights or options issued thereon or with respect thereto;

(m)    all Vehicles;

(n)    all other tangible and intangible personal property whatsoever of such Grantor; and

(o)    all Proceeds of the foregoing, all Accessions to and substitutions and replacements for, any of the foregoing, and all offspring, rents, profits and products of any of the foregoing, and, to the extent related to any of the foregoing, all books, correspondence, credit files, records, invoices and other papers (including all tapes, cards, computer runs and other papers and documents in the possession or under the control of such Grantor or any computer bureau or service company from time to time acting for such Grantor).

Notwithstanding any of the other provisions set forth in this Section 3 or any other Financing Document to the contrary, this Agreement shall not, at any time, constitute a grant of a Lien on any property or other asset of the Grantors that is an Excluded Asset, and no property or other asset of the Grantors that is an Excluded Asset shall be deemed to be Collateral for any purpose hereunder or under any other Financing Document.

Section 4.    Letter-of-Credit Rights.

4.01    Each Grantor by granting a security interest in its Letter-of-Credit Rights to the Collateral Agent, intends to (and hereby does) assign to the Collateral Agent its rights (including its contingent rights) to the proceeds of all Related Contracts consisting of letters of credit of which it is or hereafter becomes a beneficiary or assignee.

8

4.02    During the period that an Event of Default shall have occurred and be continuing, each Grantor will, promptly upon written request by the Collateral Agent (a) notify (and such Grantor hereby authorizes the Collateral Agent to notify) the issuer and each nominated person with respect to each of the Related Contracts consisting of letters of credit the proceeds of which have been assigned to the Collateral Agent hereunder and any payments due or to become due in respect thereof are to be made directly to the Collateral Agent or its designee and (b) arrange for the Collateral Agent to become the transferee beneficiary of such letter of credit.

Section 5.    [Reserved]

Section 6.    [Reserved]

Section 7.    Further Assurances; Voting Rights; Remedies. In furtherance of the grant of the security interest pursuant to Section 3, the Grantors hereby agree with the Collateral Agent as follows:

7.01    Delivery and Other Perfection. Each Grantor shall promptly from time to time give, execute, deliver, file, record, authorize or obtain all such financing statements, continuation statements, notices, instruments, documents, agreements or consents or other papers as may be necessary or appropriate in the reasonable judgment of the Collateral Agent to create, preserve, perfect, maintain the perfection of or validate the security interest in the Collateral (other than Vehicles) granted pursuant hereto or to enable the Collateral Agent to exercise and enforce its rights hereunder with respect to such security interest, and without limiting the foregoing, shall:

(a)    if any of the Investment Property or Financial Assets constituting part of the Collateral is or shall become evidenced or represented by any certificates or instruments, forthwith (x) deliver to the Collateral Agent the certificates or instruments representing or evidencing the same, duly endorsed in blank or accompanied by such instruments of assignment and transfer in such form and substance as the Collateral Agent may reasonably request, all of which thereafter shall be held by the Collateral Agent, pursuant to the terms of this Agreement, as part of the Collateral and (y) take such other action as the Collateral Agent may reasonably deem necessary or appropriate to duly record or otherwise perfect the security interest created hereunder in such Collateral;

(b)    promptly from time to time, deliver to the Collateral Agent any and all Instruments having a face amount in excess of $500,000 constituting part of the Collateral, endorsed and/or accompanied by such instruments of assignment and transfer in such form and substance as the Collateral Agent may reasonably request; provided, that unless an Event of Default shall have occurred and be continuing, each Grantor may retain for collection in the ordinary course any Instruments received by such Grantor in the ordinary course of business and the Collateral Agent shall, promptly upon written request of such Grantor, make appropriate arrangements for making any Instrument delivered to Collateral Agent available to such Grantor for purposes of presentation, collection or renewal (any such arrangement to be effected, to the extent requested by the Collateral Agent, against trust receipt or like document);

(c)    other than with respect to the Pledged Equity Interests, promptly from time to time, enter into such control agreements, each in form and substance reasonably acceptable to

the Collateral Agent, as may be required to perfect the security interest created hereby in any and all Deposit Accounts, Securities Accounts, Investment Property, Electronic Chattel Paper and Letter-of-Credit Rights, and will promptly furnish to the Collateral Agent true copies thereof;

(d)    upon the request of the Collateral Agent, execute and deliver such short-form security agreements properly reflecting evidencing this Agreement as the Collateral Agent may reasonably deem necessary or appropriate to protect the interests of the Collateral Agent in respect of that portion of the Collateral consisting of Intellectual Property;

(e)    with respect to any Commercial Tort Claim, the value of which is in excess of $500,000, that any Grantor may hereafter hold, such Grantor shall promptly provide the Collateral Agent with a supplement to <u>Annex 4</u> to reflect such additional Commercial Tort Claim);

(f)    subject to Section 5.21(b) of the Credit Agreement, at all times cause the Pledged Equity Interests owned by each Grantor to be Certificated Securities;

(g)    upon obtaining any additional Pledged Equity Interests, including, without limitation, any additional equity interest in any Grantor issued in respect of any new equity investment or other consideration of any kind from any Grantor, or any additional or substitute certificates or any other equity interests, whether as an addition to, in substitution for or exchange for any Pledged Equity Interests, hold such Pledged Equity Interests in trust for the Collateral Agent, segregate the certificates or instruments evidencing such additional Pledged Equity Interests from other property or funds of such Grantor, and promptly (and in any event, within five (5) Business Days) deliver to the Collateral Agent the certificates or instruments evidencing such additional Pledged Equity Interests, which shall be in suitable form for transfer by delivery, or shall be accompanied by duly executed instruments of transfer or assignment, where applicable, in blank, all in form and substance reasonably satisfactory to the Collateral Agent;

(h)    keep full and accurate books and records relating to the Collateral as required by the Financing Documents; and

(i)    permit representatives of the Collateral Agent, as may be directed by the Secured Parties, to inspect its books and records pertaining to the Collateral, in accordance with Section 5.08 of the Credit Agreement.

7.02    <u>Control</u>. Without the prior written consent of the Collateral Agent, the Grantors shall not cause or permit any Person other than the Grantors or the Collateral Agent to have "<u>Control</u>" (as defined in Section 9-104, 9-105, 9-106 or 9-107 of the NYUCC) of any Deposit Account, Electronic Chattel Paper, Investment Property or Letter-of-Credit Right constituting part of the Collateral (except to the extent of Permitted Liens).

7.03    <u>Preservation of Rights</u>. The Collateral Agent shall not be required to take steps necessary to preserve any rights against prior parties to any of the Collateral.

7.04    <u>Chattel Paper</u>. Each Grantor will (i) deliver to the Collateral Agent each original of each item of Chattel Paper having a face amount in excess of $500,000 at any time constituting part of the Collateral, and (ii) cause each such original and each copy thereof to bear a conspicuous legend, in form and substance reasonably satisfactory to the Collateral Agent, indicating that such

10

Chattel Paper is subject to the security interest granted hereby and that purchase of such Chattel Paper by a Person other than the Collateral Agent without the consent of the Collateral Agent would violate the rights of the Collateral Agent.

7.05    <u>Adverse Claims</u>. Each Grantor shall use commercially reasonable efforts to defend, at its own cost and expense, such Grantor's title and the existence, perfection and required priority of the Collateral Agent's (for the benefit of the Secured Parties) security interests in the Collateral against all adverse claims (other than any Permitted Liens).

7.06    <u>Distributions, Voting Rights, Etc.</u>

(a)    <u>Distributions and Voting Rights Prior to Event of Default.</u> Unless an Event of Default shall have occurred and be continuing and the Collateral Agent shall have provided notice as provided in <u>Section 7.06(b)</u>, each Grantor shall be entitled to (i) receive and retain, and to utilize free and clear of the Lien of this Agreement, any and all cash and other distributions paid in respect of its Pledged Equity Interests; <u>provided</u>, that such distributions are permitted by, and are made in accordance with, the terms of the Financing Documents, and (ii) exercise any and all voting and other consensual rights pertaining to its Pledged Equity Interests or any part thereof for any purpose not inconsistent with the terms of this Agreement.

(b)    <u>Distributions and Voting Rights After Event of Default</u>.

(i)    During the period that an Event of Default shall have occurred and be continuing, the Collateral Agent may provide any Grantor with written notice prohibiting such Grantor from exercising the rights and powers of a holder of the Pledged Equity Interests, at which time (and until such time that such Event of Default has been cured or waived) all such rights and powers of such Grantor shall cease immediately, and the Collateral Agent shall thereupon have the right to exercise any and all rights and powers, including voting rights, and enforce any and all remedies available to the Collateral Agent, on behalf of the Secured Parties related to the Pledged Equity Interests, including foreclosure thereof, pursuant to this Agreement, all without liability except to account for property actually received by it or any loss resulting from its fraud, gross negligence or willful misconduct.

(ii)    In order to permit the Collateral Agent to exercise the voting and other consensual rights which it may be entitled to exercise pursuant hereto and to receive all distributions which it may be entitled to receive hereunder, (A) each Grantor shall promptly execute and deliver (or cause to be executed and delivered) to the Collateral Agent all such proxies and other instruments the Collateral Agent may from time to time reasonably request in writing, and (B) without limiting the effect of clause (A) above, each Grantor grants to the Collateral Agent an irrevocable proxy to vote its Pledged Equity Interests and to exercise all other rights, powers, privileges and remedies to which a holder of such Pledged Equity Interests would be entitled (including giving or withholding written consents of members or other holders of equity interests, calling special meetings of members or other holders of equity interests and voting at such meetings), which proxy shall be effective, automatically and without the necessity of any action (including any transfer of any such Pledged Equity Interests on the record books of the applicable Grantor) by any other Person (including the Loan Parties or any officer or agent thereof), during

11

the period that an Event of Default has occurred and is continuing and which proxy shall terminate only at such time as such Event of Default is cured or waived.

       7.07   <u>Remedies</u>.

       (a)   <u>Rights and Remedies Generally upon Event of Default</u>. If an Event of Default shall have occurred and be continuing, the Collateral Agent for the benefit of the Secured Parties shall have all of the rights and remedies with respect to the Collateral of a secured party under the NYUCC and such additional rights and remedies to which a secured party is entitled under the laws in effect in any jurisdiction where any rights and remedies hereunder may be asserted, including the right, to the fullest extent permitted by law, to exercise all voting, consensual and other powers of ownership pertaining to the Collateral as if the Collateral Agent were the sole and absolute owner thereof (and the Grantors agree to take all such action as may be appropriate to give effect to such right); and without limiting the foregoing:

       (i)   the Collateral Agent in its discretion may, in its name or in the name of any Grantor or otherwise, demand, sue for, collect or receive any money or other property at any time payable or receivable on account of or in exchange for any of the Collateral, but shall be under no obligation to do so;

       (ii)   the Collateral Agent may make any reasonable compromise or settlement deemed desirable with respect to any of the Collateral and may extend the time of payment, arrange for payment in installments, or otherwise modify the terms of, any of the Collateral;

       (iii)   the Collateral Agent may require any Grantor to notify (and each Grantor hereby authorizes the Collateral Agent so to notify) each account debtor in respect of any Account, Chattel Paper or General Intangible, and each obligor on any Instrument, constituting part of the Collateral that such Collateral has been assigned to the Collateral Agent hereunder, and to instruct that any payments due or to become due in respect of such Collateral shall be made directly to the Collateral Agent or as it may direct (and if any such payments, or any other Proceeds of Collateral, are received by any Grantor they shall be held in trust by such Grantor for the benefit of the Collateral Agent and as promptly as possible remitted or delivered to the Collateral Agent for application as provided herein);

       (iv)   the Collateral Agent may require the Grantors to assemble the Collateral (not otherwise in the possession of the Collateral Agent) at such place or places, reasonably convenient to the Collateral Agent and the Grantors, as the Collateral Agent may direct;

       (v)   the Collateral Agent may apply the Collateral Accounts and any money or other property therein to payment of the Secured Obligations; and

       (vi)   the Collateral Agent may sell, lease, assign or otherwise dispose of all or any part of the Collateral, at such place or places as the Collateral Agent deems best, and for cash or for credit or for future delivery (without thereby assuming any credit risk), at public or private sale, without demand of performance or notice of intention to effect any such disposition or of the time or place thereof (except such notice as is required by applicable statute and cannot be waived), and the Collateral Agent or anyone else may be the purchaser, lessee, assignee or

recipient of any or all of the Collateral so disposed of at any public sale (or, to the extent permitted by law, at any private sale) and thereafter hold the same absolutely, free from any claim or right of whatsoever kind, including any right or equity of redemption (statutory or otherwise), of the Grantors, any such demand, notice and right or equity being hereby expressly waived and released. The Collateral Agent may, without notice or publication, adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for the sale, and such sale may be made at any time or place to which the sale may be so adjourned; and

(vii)    the Collateral Agent in its discretion may, in its name or in the name of any Grantor or otherwise, cure any default or event of default under any Assigned Agreement, but shall be under no obligation to do so.

The Proceeds of each collection, sale or other disposition under this <u>Section 7.07</u> shall be applied in accordance with <u>Section 7.11</u>.

(b)    [Reserved]

(c)    <u>Notice</u>. The Grantors agree that to the extent the Collateral Agent is required by Applicable Law to give reasonable prior notice of any sale or other disposition of any Collateral, ten (10) Business Days' notice shall be deemed to constitute reasonable prior notice.

7.08    <u>Deficiency</u>. If the proceeds of sale, collection or other realization of or upon the Collateral pursuant to <u>Section 7.07</u> are insufficient to cover the costs and expenses of such realization and the payment in full of the Secured Obligations, the Grantors shall remain liable for any deficiency.

7.09    <u>Locations; Names, Etc.</u> Without at least thirty (30) days' prior written notice to the Collateral Agent, no Grantor shall (i) change its jurisdiction of incorporation or formation, as the case may be, (ii) change its name from the name shown as its current legal name on <u>Annex 1</u>, (iii) permit any of the Goods (including Equipment) of such Grantor to be kept at a location other than those listed on <u>Annex 1</u> (other than to the extent in the possession of a third party for purposes of maintenance or repair) or (iv) agree to or authorize any modification of the terms of any item of Collateral if the effect thereof would be to result in a loss of perfection of, or diminution of priority for, the security interests created hereunder in such item of Collateral, or the loss of control (within the meaning of Section 9-104, 9-105, 9-106 or 9-107 of the NYUCC) over such item of Collateral.

7.10    <u>Private Sale</u>.

(a)    The Collateral Agent shall incur no liability as a result of the sale of the Collateral, or any part thereof, at any private sale pursuant to <u>Section 7.07</u> conducted in a commercially reasonable manner. The Grantors hereby waive, to the maximum extent permitted under Applicable Law, any claims against the Collateral Agent arising by reason of the fact that the price at which the Collateral may have been sold at such a private sale was less than the price that might have been obtained at a public sale or was less than the aggregate amount of the Secured Obligations, even if the Collateral Agent accepts the first offer received and does not offer the Collateral to more than one offeree.

US-DOCS\109438275.10

(b)     Each Grantor recognizes that, by reason of certain prohibitions contained in the Securities Act of 1933, and applicable state securities laws, the Collateral Agent may be compelled, with respect to any sale of all or any part of the Pledged Equity Interests, to limit purchasers to those who will agree, among other things, to acquire the Pledged Equity Interests for their own account, for investment and not with a view to the distribution or resale thereof. Each Grantor acknowledges that any such private sales may be at prices and on terms less favorable to the Collateral Agent than those obtainable through a public sale without such restrictions, and, and, notwithstanding such circumstances, agrees that such private sales shall not solely by reason thereof be deemed not to have been made in a commercially reasonable manner and that the Collateral Agent shall have no obligation to engage in public sales and no obligation to delay the sale of any Pledged Equity Interests for the period of time necessary to permit the issuer thereof to register it for public sale.

7.11    <u>Application of Proceeds</u>. Except as otherwise herein expressly provided, the Proceeds of any collection, sale or other realization of all or any part of the Collateral pursuant hereto, and any cash at the time held by the Collateral Agent under <u>Section 3</u> or this <u>Section 7</u>, shall be applied by the Collateral Agent in accordance with Section 7.02 of the Credit Agreement.

7.12    <u>Attorney-in-Fact</u>. During the period that an Event of Default shall have occurred and be continuing, the Collateral Agent is hereby appointed the attorney-in-fact of the Grantors for the purpose of carrying out the provisions of this <u>Section 7</u> and taking any action and executing any instruments that the Secured Parties may deem necessary or advisable to accomplish the purposes hereof, which appointment as attorney-in-fact is irrevocable and coupled with an interest. Without limiting the generality of the foregoing, so long as the Collateral Agent shall be entitled under this <u>Section 7</u> to make collections in respect of the Collateral, the Collateral Agent shall have the right and power to receive, endorse and collect all checks made payable to the order of the Grantors representing any dividend, payment or other distribution in respect of the Collateral or any part thereof and to give full discharge for the same.

7.13    <u>Perfection and Recordation</u>.  Each Grantor authorizes the Collateral Agent to file Uniform Commercial Code financing statements describing the Collateral as "all assets" or "all personal property and fixtures" of such Grantor (provided that no such description shall be deemed to modify the description of Collateral set forth in <u>Section 3</u>).

7.14    <u>Termination</u>. On the Discharge Date, this Agreement automatically shall terminate without further action of any Person, and the Collateral Agent shall forthwith cause to be assigned, transferred and delivered, against receipt but without any recourse, warranty or representation whatsoever, any remaining Collateral and money received in respect thereof, to or on the order of the Grantors. The Collateral Agent shall also, at the expense of the Grantors, execute and deliver to the Grantors upon such termination, such Uniform Commercial Code termination statements and such other documentation as shall be reasonably requested by the Grantors to effect the termination and release of the Liens on the Collateral as required by this <u>Section 7.14</u>. In the event that a Grantor disposes of any asset in accordance with a disposition expressly permitted by the provisions of the Credit Agreement, the Lien of the Collateral Agent created by this Agreement in such asset shall be automatically released without execution and delivery of any such documents or other instruments and the Collateral Agent hereby agrees to execute and deliver documents and other instruments as reasonably requested by such Grantor to effect such release.

7.15    Further Assurances. The Grantors agree that, from time to time upon the written request of the Collateral Agent, the Grantors will execute and deliver such further documents and do such other acts and things as the Collateral Agent may reasonably request in order to fully effect the purposes of this Agreement.

Section 8.    Miscellaneous.

8.01    Notices. All notices, requests and demands to or upon the respective parties hereto to be effective shall be in writing (including by facsimile), and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when delivered by hand or, in the case of notice given by certified or registered mail, private courier, overnight delivery service or facsimile, when received, addressed as follows, or to such other address as may be hereafter notified in accordance with this Section 8.01 by the respective parties hereto:

if to the Grantors:

CarbonLite Holdings, LLC
10250 Constellation Boulevard, Suite 2820
Los Angeles, CA 90067
Attention: both Leon Farahnik, Chief Executive Officer; and Gregg Milhaupt
Email: both lfarahnik@hpcindustries.com; and gregg@carbonliterecycling.com

if to the Collateral Agent:

Orion Energy Partners Investment Agent, LLC
350 5th Ave #6740
New York, NY 10118
Attention: Chris Leary, Mark Friedland and Tim Mister
Email: Chris@OrionEnergyPartners.com;
Mark@OrionEnergyPartners.com
Tim@OrionEnergyPartners.com

Notwithstanding anything to the contrary contained herein, each such notice, instruction, direction, request or other communication so given shall be effective only upon actual receipt.

8.02    No Waiver. No failure or delay on the part of Collateral Agent in exercising any right, power or privilege hereunder or under any other Financing Document and no course of dealing between any Grantor, on the one hand, and Collateral Agent on the other hand, shall impair any such right, power or privilege or operate as a waiver thereof; nor shall any single or partial exercise of any right, power or privilege hereunder or under any other Financing Document preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder or thereunder.  The rights, powers and remedies herein or in any other Financing Document expressly provided are cumulative and not exclusive of any rights, powers or remedies which any party thereto would otherwise have.  No notice to or demand on any Grantor in any case shall entitle such Grantor to any other or further notice or demand in similar or other circumstances or constitute a waiver of the rights of Collateral Agent to any other or further action in any circumstances without notice or demand.

15

8.03    Expenses. The Grantors agree to pay or to reimburse the Collateral Agent for all reasonable documented out-of-pocket costs and expenses (including reasonable attorney's fees and expenses) that may be incurred by the Collateral Agent in accordance with this Agreement in any effort to enforce any of the obligations of the Grantors in respect of the Collateral or in connection with (a) the preservation of the Liens on, or the rights of the Collateral Agent to the Collateral pursuant to this Agreement, (b) performance by the Collateral Agent of any obligations of the Grantors in respect of the Collateral that the Grantors have failed or refused to perform, or (c) any actual or attempted sale, lease, disposition, exchange, collection, compromise, settlement or other realization in respect of, or care of, the Collateral, including all such reasonable out-of-pocket costs and expenses (and reasonable attorney's fees and expenses) incurred in any bankruptcy, reorganization, workout or other similar proceeding, and, until paid all such costs, shall be Secured Obligations entitled to the benefit of the collateral security provided by this Agreement.

8.04    Amendments, Etc. No waiver of any provision of this Agreement, or consent to any departure therefrom, shall be effective unless in writing signed by the party against which such waiver is sought.  No amendment of any provision of this Agreement shall be effective unless in writing signed by the Collateral Agent and the Grantors.

8.05    Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of the respective successors and permitted assigns of any of the Grantors and the Collateral Agent; provided that no Grantor shall assign or transfer its respective rights or obligations hereunder without the prior written consent of the Collateral Agent.

8.06    Counterparts. This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.

8.07    Governing Law; Submission to Jurisdiction; Etc.

(a)    Governing Law. This Agreement shall be governed by and construed in accordance with the law of the State of New York.

(b)    Submission to Jurisdiction. Each Grantor hereby irrevocably and unconditionally submits, for itself and its properties, to the exclusive jurisdiction of the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement shall affect any right that the Collateral Agent may otherwise have to bring any action or proceeding relating to this Agreement against the Grantors or their respective properties in the courts of any jurisdiction.

16

(c)    <u>Waiver of Venue</u>. Each Grantor hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement in any court referred to in paragraph (b) of this <u>Section 8.07</u>. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)    <u>Service of Process</u>. Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in <u>Section 8.01</u>. Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

8.08    <u>WAIVER OF JURY TRIAL</u>. EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT IT MAY HAVE TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTION CONTEMPLATED HEREBY OR THEREBY (WHETHER FOUNDED IN CONTRACT OR TORT OR OTHERWISE). EACH PARTY HERETO ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

8.09    <u>Agents and Attorneys-in-Fact</u>. The Collateral Agent may employ agents and attorneys-in-fact in connection herewith.

8.10    <u>Headings</u>. The headings of Sections and Annexes have been included herein for convenience of reference only, are not part of this Agreement, and shall not be taken into consideration in interpreting this Agreement.

8.11    <u>Severability</u>. If any provision of this Agreement is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions. The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

8.12    <u>Entire Agreement</u>. This Agreement and the other Financing Documents to which any Grantor is party constitute the entire contract between and among the parties relating to the subject matter hereof and thereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered as of the day and year first above written.

**CARBONLITE HOLDINGS LLC**,
as Grantor

By:_____
     Name:
     Title:

**CARBONLITE SUB-HOLDINGS LLC**,
as Grantor

By:_____
     Name:
     Title:

**CARBONLITE PI HOLDINGS LLC**,
as Grantor

By:_____
     Name:
     Title:

**CARBONLITE INDUSTRIES LLC**,
as Grantor

By:_____
     Name:
     Title:

**CARBONLITE PINNPACK LLC**,
as Grantor

By:_____
     Name:
     Title:

**PINNPACK PACKAGING LLC**,
as Grantor

By:_____
     Name:

*[CarbonLITE - Signature Page to Pledge and Security Agreement]*

Title:

**ORION ENERGY PARTNERS INVESTMENT AGENT, LLC,**
as Collateral Agent

By: _____
      Name:
      Title:

ANNEX 1

FILING DETAILS

1.　　Name: CarbonLITE Holdings LLC
　　1.1.　　Type:　　　　　　　　　　　Limited Liability Company
　　1.2.　　Jurisdiction:　　　　　　　　Delaware
　　1.3.　　Organizational ID:　　　　　5408341
　　1.4.　　Mailing Address:　　　　　　10250 Constellation Boulevard, Suite 2820, Los Angeles, CA 90067
　　1.5.　　Chief Executive Office:　　　10250 Constellation Boulevard, Suite 2820, Los Angeles, CA 90067
　　1.6.　　Location of Goods:　　　　　None.
　　1.7.　　Former Names:　　　　　　　None.

2.　　Name: CarbonLITE Sub-Holdings LLC
　　2.1.　　Type:　　　　　　　　　　　Limited Liability Company
　　2.2.　　Jurisdiction:　　　　　　　　Delaware
　　2.3.　　Organizational ID:　　　　　7489395
　　2.4.　　Mailing Address:　　　　　　10250 Constellation Boulevard, Suite 2820, Los Angeles, CA 90067
　　2.5.　　Chief Executive Office:　　　10250 Constellation Boulevard, Suite 2820, Los Angeles, CA 90067
　　2.6.　　Location of Goods:　　　　　None.
　　2.7.　　Former Names:　　　　　　　None.

3.　　Name: CarbonLITE PI Holdings LLC
　　3.1.　　Type:　　　　　　　　　　　Limited Liability Company
　　3.2.　　Jurisdiction:　　　　　　　　Delaware
　　3.3.　　Organizational ID:　　　　　6575904
　　3.4.　　Mailing Address:　　　　　　10250 Constellation Boulevard, Suite 2820, Los Angeles, CA 90067
　　3.5.　　Chief Executive Office:　　　10250 Constellation Boulevard, Suite 2820, Los Angeles, CA 90067
　　3.6.　　Location of Goods:　　　　　None.
　　3.7.　　Former Names:　　　　　　　None.

4.　　Name: CarbonLite Industries LLC
　　4.1.　　Type:　　　　　　　　　　　Limited Liability Company
　　4.2.　　Jurisdiction:　　　　　　　　Delaware
　　4.3.　　Organizational ID:　　　　　4796003
　　4.4.　　Mailing Address:　　　　　　10250 Constellation Boulevard, Suite 2820, Los Angeles, CA 90067
　　4.5.　　Chief Executive Office:　　　10250 Constellation Boulevard, Suite 2820, Los Angeles, CA 90067

US-DOCS\109438275.10

| | | |
|---|---|---|
| 4.6. | Location of Goods: | 875 Michigan Ave, Riverside, CA 90257; 2245 West Valley Blvd., Colton, CA 92324; 301 South Rose Ave. Oxnard, CA 93030 |
| 4.7. | Former Names: | None. |

5. Name: CarbonLite PinnPack LLC

| | | |
|---|---|---|
| 5.1. | Type: | Limited Liability Company |
| 5.2. | Jurisdiction: | Delaware |
| 5.3. | Organizational ID: | 6038721 |
| 5.4. | Mailing Address: | 10250 Constellation Boulevard, Suite 2820, Los Angeles, CA 90067 |
| 5.5. | Chief Executive Office: | 10250 Constellation Boulevard, Suite 2820, Los Angeles, CA 90067 |
| 5.6. | Location of Goods: | None. |
| 5.7. | Former Names: | None. |

6. Name: PinnPack Packaging LLC

| | | |
|---|---|---|
| 6.1. | Type: | Limited Liability Company |
| 6.2. | Jurisdiction: | Delaware |
| 6.3. | Organizational ID: | 5968507 |
| 6.4. | Mailing Address: | 10250 Constellation Boulevard, Suite 2820, Los Angeles, CA 90067 |
| 6.5. | Chief Executive Office: | 10250 Constellation Boulevard, Suite 2820, Los Angeles, CA 90067 |
| 6.6. | Location of Goods: | 1151 and 1351 Pacific Ave. Oxnard, CA 93033; 301 South Rose Ave. Oxnard, CA 93030 |
| 6.7. | Former Names: | None. |

US-DOCS\109438275.10

ANNEX 2

PLEDGED EQUITY INTERESTS

| Issuer | Holder | Type of Interest | Percentage Held | Certificate Number |
|---|---|---|---|---|
| CarbonLite Sub-Holdings LLC, a Delaware limited liability company | CarbonLite Holdings LLC, a Delaware limited liability company | Pledged LLC Interests | 100% | 1 |
| CarbonLite PI Holdings, LLC, a Delaware limited liability company | CarbonLite Sub-Holdings LLC, a Delaware limited liability company | Pledged LLC Interests | 100% | N/A |
| CarbonLite Industries LLC, a Delaware limited liability company | CarbonLite PI Holdings, LLC, a Delaware limited liability company | Pledged LLC Interests | 100% | N/A |
| CarbonLite Pinnpack, LLC, a Delaware limited liability company | CarbonLite PI Holdings, LLC, a Delaware limited liability company | Pledged LLC Interests | 100% | N/A |
| PinnPack Packaging LLC, a Delaware limited liability company | CarbonLite PinnPack LLC, a Delaware limited liability company | Pledged LLC Interests | 99.295% | 1 and 3 |

US-DOCS\109438275.10

## ANNEX 3

### NEW DEBTOR EVENTS

None.

US-DOCS\109438275.10

## ANNEX 4

### LIST OF COMMERCIAL TORT CLAIMS

None.

US-DOCS\109438275.10

ANNEX 5

[Reserved]

ANNEX 6

Operating Agreements

1.  The Fourth Amended and Restated Operating Agreement of CarbonLite Holdings LLC, dated as of December 20, 2018.

2.  The Limited Liability Company Agreement of CarbonLite Sub-Holdings, LLC, dated as of July 29, 2019.

3.  The Limited Liability Company Agreement of CarbonLite PI Holdings LLC, dated as of November 13, 2017.

4.  The Amended and Restated Limited Liability Company Agreement of CarbonLITE Pinnpack, LLC, dated as of November 13, 2017.

5.  The Eighth Amended and Restated Limited Liability Company Agreement of CarbonLite Industries LLC, dated as of November 13, 2017.

6.  The Amended and Restated Operating Agreement of Pinnpack Packaging LLC, dated as of June 1, 2016, as amended by the First Amendment to the Amended and Restated Operating Agreement, dated as of November 13, 2017 and the Second Amendment to the Amended and Restated Operating Agreement, dated as of March 31, 2019.

US-DOCS\109438275.10

**EXHIBIT J**
**TO**
**CREDIT AGREEMENT**

**Form of Environmental, Social and Governance Report**

[*Please see attached*]

US-DOCS\109436811.3

Environmental, Social, Governance Report

ESG Matrix:

| Health & Safety | # of Incidents | Comments |
|---|---|---|
| OSHA Recordable Injuries | | Provide summary list of all OSHA recordable injuries to employees or contractors |
| Notable "Near Miss" Incidents | | Provide summary list of all "near miss" incidents and steps to avoid repeating |
| Overall TRIR: | | |
| Recycling TRIR: | | |
| Thermoforming TRIR: | | |

| Environmental | # of Incidents | Comments |
|---|---|---|
| Notable Environmental Regulatory Interactions | | Provide summary of all material interactions (including visits, inspections, concerns noted) |
| Reportable Environmental Incidents | | Provide summary of any reportable environmental incidents |

| NOVs / Permitting | # of Incidents | Comments |
|---|---|---|
| NOVs / Plan to Address | | Provide summary list of all active NOVs and plan to address |

| Labor | # of Incidents | Comments |
|---|---|---|
| Employee Turnover | | |
| Terminated: | | Provide any material reasons for departure |
| Resigned: | | Provide any material reasons for departure |
| Salary or Benefits Issues | | Provide summary list of any salary or benefits-related disputes or issues. |

| Governance / Conflicts | # of Incidents | Comments |
|---|---|---|
| Shareholder / Board Member Potential Conflicts | | Summarize performance of suppliers or customers who also own equity in Borrower or its affiliates; discuss transparency issues, if any |

Health & Safety | Management Commentary:

Environmental | Management Commentary:

NOVs / Permitting | Management Commentary:

Labor | Management Commentary:

Governance | Management Commentary:

**EXHIBIT K**
**TO**
**CREDIT AGREEMENT**

**Form of Lender Warrants**

[*Please see attached*]

# WARRANT

Warrant Certificate No.: [ ● ]

Issue Date: [ ● ], 2019

THIS WARRANT AND THE SECURITIES ISSUABLE UPON EXERCISE OF THIS WARRANT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), OR QUALIFIED UNDER ANY STATE OR FOREIGN SECURITIES LAWS AND MAY NOT BE TRANSFERRED, OFFERED FOR SALE, SOLD, ASSIGNED, PLEDGED, HYPOTHECATED OR OTHERWISE DISPOSED OF UNLESS (I) A REGISTRATION STATEMENT COVERING SUCH SECURITIES IS EFFECTIVE UNDER THE SECURITIES ACT AND IS QUALIFIED UNDER APPLICABLE STATE AND FOREIGN SECURITIES LAWS OR (II) THE TRANSACTION IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS UNDER THE SECURITIES ACT AND THE QUALIFICATION REQUIREMENTS UNDER APPLICABLE STATE AND FOREIGN SECURITIES LAWS.

THE SECURITIES ISSUABLE UPON EXERCISE OF THIS WARRANT ARE SUBJECT TO A FOURTH AMENDED AND RESTATED OPERATING AGREEMENT, DATED AS OF DECEMBER 20, 2018, BY AND AMONG THE MEMBERS OF CARBONLITE HOLDINGS, LLC, A DELAWARE LIMITED LIABILITY COMPANY (AS MAY BE AMENDED FROM TIME TO TIME, THE "**LLC AGREEMENT**"). NO TRANSFER, OFFER FOR SALE, SALE, ASSIGNMENT, PLEDGE, HYPOTHECATION OR OTHER DISPOSITION OF THE SECURITIES ISSUABLE UPON THE EXERCISE OF THIS WARRANT MAY BE MADE EXCEPT IN ACCORDANCE WITH THE PROVISIONS OF SUCH LLC AGREEMENT AND APPLICABLE LAW. A COPY OF THE LLC AGREEMENT WILL BE FURNISHED WITHOUT CHARGE BY THE COMPANY TO THE REGISTERED HOLDER HEREOF UPON REQUEST.

FOR VALUE RECEIVED, CarbonLITE Holdings, LLC, a Delaware limited liability company (the "**Company**"), hereby certifies that [Orion Energy][1] (together with its successors and permitted assigns, the "**Holder**"), is entitled to purchase from the Company a number of Common Class Membership Units equal to [five and one-half percent (5.5 %)][2] of the issued and outstanding Common Class Membership Units, on a Fully Diluted Basis at the time of any exercise of this Warrant, at a purchase price of $0.01 per Common Class Membership Unit (the "**Exercise Price**"), all subject to the terms and conditions set forth below in this Warrant.

1.    <u>Definitions</u>. As used in this Warrant, the following capitalized terms have the respective meanings set forth below:

---

[1] Note to Draft:  Holders to be confirmed.
[2] Note to Draft:  5.5% to be allocated among Holders.

"**Affiliate**" means, with respect to (a) any Person that is a natural Person, (i) any other Person that is a family member of such Person (or a family limited partnership, or trustee of any trust created during the lifetime or at death for the benefit of such Person or such family member), (ii) any guardian or conservator of such Person of such family member who is under legal disability, (iii) any attorney in fact acting under a valid power of attorney for such Person or such family member, or (iv) upon death of such Person, any executor, administrator, trustee or personal representative such Person, (b) any Person that is a trust, any beneficiary of such trust pursuant to its terms, and (c) any Person that is not a natural Person or a trust, any Person that directly or indirectly Controls or is Controlled by or is under common Control with such Person.

"**Aggregate Exercise Price**" means an amount equal to the product of (a) the number of Common Class Membership Units in respect of which this Warrant is then being exercised pursuant to Section 3, *multiplied by* (b) the Exercise Price.

"**Bond Documents**" has the meaning set forth in the Credit Agreement.

"**Business Day**" has the meaning set forth in the LLC Agreement.

"**Call Dispute Period**" has the meaning set forth in Section 5(b)(iii).

"**Call Exercise Notice**" has the meaning set forth in Section 5(b)(ii).

"**Call Purchase Price**" means a dollar amount equal to the amount that would be received by the holder of the Common Class Membership Units issuable in respect of the Warrant Interest in connection with a sale of the issued and outstanding Common Class Membership Units for Fair Market Value.

"**Call Right**" has the meaning set forth in Section 5(b)(i).

"**Call Right Closing Day**" has the meaning set forth in Section 5(b)(v).

"**Common Class Membership Units**" has the meaning set forth in the LLC Agreement.

"**Company**" has the meaning set forth in the preamble.

"**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise.

"**Conversion Ratio**" has the meaning set forth in the LLC Agreement.

"**Credit Agreement**" means that certain Credit Agreement, dated as of [ ● ], 2019, by and among the Company, the guarantors party thereto from time to time, the lenders party thereto from time to time, and Orion Energy Partners Investment Agent, LLC, as administrative agent and collateral agent, as amended, amended and restated, supplemented or otherwise modified from time to time.

"**Exercise Period**" has the meaning set forth in Section 2.

2

"**Exercise Price**" has the meaning set forth in the preamble.

"**Expiration Time**" means the earliest to occur of: (a) 5:00 p.m., New York City time, on the six (6) year anniversary of the Original Issue Date; (b) the full exercise of this Warrant pursuant to Section 3; (c) the Holder's full exercise of the Put Right pursuant to Section 5(a); and (d) the Company's full exercise of the Call Right pursuant to Section 5(b).

"**Fair Market Value**" means, with respect to the issued and outstanding Common Class Membership Units, the price that would be paid for such Common Class Membership Units in an arm's length transaction between an informed and willing buyer and an informed and willing seller, neither being under any compulsion to buy or sell, (a) taking into account (i) any Indebtedness of the Company then outstanding and (ii) the Liquidation Preferences of any issued and outstanding Preferred Membership Units that would exceed the amount that would be paid in such transaction in respect of the Common Class Membership Units issuable upon the conversion of such Preferred Membership Units at their then existing respective Conversion Ratios, and (b) assuming the conversion in full of any issued and outstanding Preferred Membership Units, the Liquidation Preferences of which would not exceed the amount that would be paid in such transaction in respect of the Common Class membership Units issuable upon the conversion of such Preferred Membership Units at their then existing respective Conversion Ratios.

"**Fully Diluted Basis**" means, as of the time of any determination, with respect to the Common Class Membership Units, all issued and outstanding Common Class Membership Units and all Common Class Membership Units issuable upon the exercise or conversion of any outstanding Unit Equivalents (whether or not such Unit Equivalents are then exercisable or convertible); provided, however, that the determination of "Fully Diluted Basis":

(a)     shall include Common Class Membership Units or any Common Class Membership Units issuable upon the exercise or conversion of any Unit Equivalents, in each case, issued after the Original Issue Date, until the aggregate amount of consideration received by the Company in respect thereof equals $10,000,000, and shall exclude any additional Common Class Membership Units or any Common Class Membership Units issuable upon the exercise or conversion of any Unit Equivalents, in each case, issued thereafter;

(b)     shall include any Common Class Membership Units issued in exchange for, or in redemption of, any Common Class Membership Units or any Unit Equivalents that would have otherwise been included in the determination of "Fully Diluted Basis", regardless of when issued; and

(c)     shall exclude any Preferred Membership Units issued and outstanding as of the Original Issue Date, the Liquidation Preferences of which would exceed the amount that would be paid in conjunction with a Sale Transaction in respect of the Common Class Membership Units issuable upon the conversion of such Preferred Membership Units at their then existing respective Conversion Ratios.

"**Holder**" has the meaning set forth in the preamble.

US-DOCS\109470051.13

"**Holder's Percentage Interest**" means a percentage equal to the total number of Common Class Membership Units that the Holder would own upon full exercise of this Warrant, divided by the total number of Common Class Membership Units on a Fully Diluted Basis.

"**Independent Appraiser**" has the meaning set forth in <u>Section 5(a)(iii)</u>.

"**Indebtedness**" has the meaning set forth in the Credit Agreement.

"**Initial Loans**" means the Loans made on the Initial Funding Date (as defined in the Credit Agreement) pursuant to the Credit Agreement.

"**Internal Reorganization**" has the meaning set forth in <u>Section 4(a)</u>.

"**Joinder Agreement**" has the meaning set forth in <u>Section 3(a)(i)</u>.

"**Law**" means any applicable law, statute, constitution, rule, regulation, directive, ordinance, ruling, judgment, decree, order or other requirement of any governmental entity.

"**Lender**" has the meaning set forth in the Credit Agreement.

"**Liens**" means any liens, charges, taxes, mortgages, pledges, security interests, options, rights of first offer, encumbrances or other restrictions or limitations of any nature whatsoever.

"**Limited Liability Company Act**" shall mean the Delaware Limited Liability Company Act, 6 Del.C. § 18-101, et seq., as amended from time to time, and any applicable successor statutes thereto.

"**Liquidation Preference**" has the meaning set forth in the LLC Agreement.

"**LLC Agreement**" has the meaning set forth in the preamble.

"**Loans**" has the meaning set forth in the Credit Agreement.

"**Member**" has the meaning set forth in the LLC Agreement.

"**New Securities"** has the meaning set forth in the LLC Agreement.

"**Non-Guarantor Subsidiaries**" has the meaning set forth in the Credit Agreement.

"**Original Issue Date**" means [ ● ], 2019.

"**Other Warrant Holders**" means the holders of the Other Warrants.

"**Other Warrants**" means the other warrants issued to Affiliates of the Holder on the Original Issue Date, together with any warrants issued in replacement or exchange for such warrants (including in connection with a transfer thereof in accordance with the terms thereof).

"**Per Unit Sale Price**" has the meaning set forth in <u>Section 5(b)(viii)</u>.

4

"**Person**" means any natural person, corporation, business trust, estate, trust, partnership, limited liability company, association, joint venture or any other entity (including any governmental entity).

"**Preferred Membership Units**" has the meaning set forth in the LLC Agreement.

"**Put Dispute Period**" has the meaning set forth in <u>Section 5(a)(iii)</u>.

"**Put Exercise Notice**" has the meaning set forth in <u>Section 5(a)(ii)</u>.

"**Put/Call Exercise Period**" means the period beginning at 9:00 a.m., New York City time, on the date that is the fourth (4th) anniversary of the Original Issue Date, and ending on the Expiration Time.

"**Put Purchase Price**" means a dollar amount equal to the amount that would be received by the holder of the Common Class Membership Units issuable in respect of the Warrant Interest in connection with a sale of the issued and outstanding Common Class Membership Units for Fair Market Value.

"**Put Right**" has the meaning set forth in <u>Section 5(a)(i)</u>.

"**Put Right Closing Date**" has the meaning set forth in <u>Section 5(a)(v)</u>.

"**Sale Notice**" means a notice of a Sale Transaction delivered pursuant to <u>Section 12(b)</u>.

"**Sale Transaction**" means any of the following events (a) a direct or indirect sale, transfer or other disposition in any single transaction or series of related transactions (including by way of an equity sale or issuance, recapitalization, reclassification, reorganization, merger, consolidation or other business combination) of any Membership Interests; or (b) the sale, lease, transfer, license or other disposition, in a single transaction or series of related transactions, by the Company or any of its subsidiaries of assets of the Company or its subsidiaries, in each case, pursuant to which or as a result of which, holders of Common Class Membership Interests receives any consideration or distributions in respect thereof, except (x) where such sale, transfer, lease, license or other disposition is to a wholly-owned direct or indirect subsidiary of the Company or (y) for any Internal Reorganization implemented in compliance with <u>Section 4(a)</u>.

"**Securities Act**" has the meaning set forth in <u>the preamble</u>.

"**Transfer**" means, with respect to this Warrant or any of the rights or obligations set forth herein, any transfer, pledge, assignment or otherwise disposition thereof. Whenever any other word derived from "Transfer" is used in this Agreement, such derived word shall have the meaning correlative thereto.

"**Unit Equivalent**" means any security issued by the Company that is by its terms, directly or indirectly, convertible into, exchangeable or exercisable for Common Class Membership Units, and any option, warrant or other right to subscribe for, purchase or acquire

Common Class Membership Units, including, for the avoidance of doubt, this Warrant and any Preferred Membership Units.

"**Warrant**" means this Warrant and all warrants issued upon division of, in substitution for, or in replacement of this Warrant.

"**Warrant Interest**" means the Holder's Percentage Interest then purchasable upon exercise of this Warrant in accordance with the terms of this Warrant.

2.    <u>Term of Warrant</u>. Subject to the terms and conditions hereof, at any time beginning at 9:00 a.m., New York City time, on the Original Issue Date until the Expiration Time (the "**Exercise Period**"), the Holder of this Warrant may exercise this Warrant for all (but not less than all) of the Warrant Interest purchasable hereunder. At the Expiration Time, this Warrant shall expire and be of no further force and effect, and the parties shall have no further rights or obligations with respect to this Warrant.

3.    <u>Exercise of Warrant</u>.

(a)    <u>Exercise Procedure</u>. This Warrant may be exercised at any time during the Exercise Period after (x) receipt by the Holder of written notice pursuant to <u>Section 12(b)</u>, <u>Section 12(d)</u> or <u>Section 12(e)</u> or (y) the date that is that is thirty (30) days prior to the six (6) year anniversary of the Original Issue Date.  This Warrant may be exercised for all (but not less than all) of the Warrant Interest, upon:

(i)    the substantially simultaneous exercise of the Other Warrants by the Other Warrant Holders in accordance with the terms thereof;

(ii)    the Holder surrendering this Warrant to the Company, together with delivery of (A) a notice of exercise and, (B) unless the Holder is already a Member at the time of exercise, a joinder agreement to the LLC Agreement in the form attached hereto as <u>Exhibit A</u> (the "**Joinder Agreement**"), duly executed by the Holder, pursuant to which the Holder acknowledges and agrees to be bound as a Member by the terms and provisions of the LLC Agreement; and

(iii)    the Holder paying to the Company the Aggregate Exercise Price in accordance with <u>Section 3(c)</u>.

(b)    <u>Exercise in Connection with Sale Transaction</u>.  The Holder may condition its exercise of this Warrant upon the substantially simultaneous closing of a Sale Transaction, in which case the issuance of Common Class Membership Units pursuant to this Warrant shall occur on the date of the closing of such Sale Transaction and shall be deemed to have been effected immediately prior to the closing of such Sale Transaction (but following the conversion of any Unit Equivalents in contemplation of such Sale Transaction).  If a Sale Transaction occurs at any time prior to the Expiration Time pursuant to which 100% of the Common Class Membership Interests are being sold, then the Holder shall be deemed to have exercised this Warrant immediately prior to the closing of such Sale Transaction (but following the conversion of any Unit Equivalents in contemplation of such Sale Transaction).

US-DOCS\109470051.13

(c)    Obligation to Issue Units.  Subject to the valid exercise of this Warrant by the Holder pursuant to Section 3(a) or deemed exercise of this Warrant pursuant to Section 3(b), the Company's obligations to issue and deliver Common Class Membership Units in accordance with the terms hereof are absolute and unconditional, irrespective of any action or inaction by the Holder to enforce the same, the recovery of any judgment against any Person or any action to enforce the same, or any setoff, counterclaim, recoupment or limitation, or any breach or alleged breach by the Holder or any other Person of any obligation to the Company (other than any breach by the Holder of any of its obligations under this Warrant).

(d)    Payment of the Aggregate Exercise Price. Payment of the Aggregate Exercise Price shall be made by delivery to the Company of a certified or official bank check payable to the order of the Company or by wire transfer of immediately available funds to an account previously designated in writing by the Company, in the amount of such Aggregate Exercise Price.

(e)    Amendment of LLC Agreement. The Company shall, as promptly as practicable following the satisfaction by the Holder of the exercise procedures set forth in Section 3(a), (i) cause the LLC Agreement to be amended in accordance with the terms of the LLC Agreement to reflect (A) the Holder as a Member (unless the Holder is already a Member at the time of exercise), and (B) the Common Class Membership Units held by such Holder, (ii) update its records to reflect the Warrant Interest, and (iii) enter into an agreement with the Holder providing that, upon written election by either the Holder, or the Company, at any time following the issuance of Common Class Membership Units upon exercise of this Warrant through and including February 28, 2027, the Holder shall sell to the Company (and the Company will purchase from the Holder), all, but not less than all, of the Common Class Membership Units issued to the Holder upon exercise of this Warrant, on the terms set forth in Section 5, *mutatis mutandis*.

(f)    Representations, Warranties, Covenants and Agreements of the Company. The Company hereby represents, warrants, covenants and agrees:

(i)    The Company is an entity duly formed, validly existing and in good standing under the Laws of the jurisdiction of its formation. The Company has full power and authority to execute and deliver this Warrant and to perform its obligations hereunder, and the execution, delivery and performance by the Company of this Warrant have been duly authorized by all necessary limited liability company action.

(ii)    This Warrant has been duly and validly executed and delivered by the Company and constitutes the binding obligations of the Company enforceable against the Company in accordance with its terms, subject to applicable bankruptcy, insolvency or other similar Laws relating to or affecting the enforcement of creditors' rights generally and to general principles of equity.

(iii)    The execution, delivery and performance by the Company of this Warrant and the transactions contemplated hereby do not and will not, with or without the giving of notice or the lapse of time, or both, (A) violate any provision of Law to which the Company is subject, (B) conflict with, or result in a breach or default under, any

provision of its organizational documents or (C) to the extent applicable, conflict with, or result in a breach or default under, any provision of any agreement or other instrument to which the Company is a party or by which the Company's assets are bound, except, in the case of each of clauses (A) and (C), as would not reasonably be expected, individually or in the aggregate, to have a material adverse effect on the Company's ability to perform its obligations hereunder. Assuming the accuracy of the representations made by the Holder in Section 11(b), no consent or approval of any other Person is required in connection with the execution, delivery and performance of this Warrant by the Company.

(iv)     This Warrant is, and any Warrant issued upon division of, in substitution for or in replacement of this Warrant shall be, upon issuance, duly authorized and validly issued.

(v)     All Common Class Membership Units issuable upon the exercise of this Warrant pursuant to the terms hereof shall be, upon issuance, and the Company shall take all such actions as may be necessary or appropriate to ensure that such Common Class Membership Units are, validly issued and fully paid and non-assessable, issued without violation of any preemptive or similar rights of any Person and free and clear of all Liens other than Liens arising as a result of or under the terms of the LLC Agreement and applicable state and federal securities Laws.

(vi)     The Company shall take all such actions as may be reasonably necessary or appropriate to ensure that all such Common Class Membership Units are issued without violation by the Company of any applicable Laws.

(vii)     The Company shall pay all its expenses in connection with the issuance or delivery of the Common Class Membership Units upon exercise of this Warrant, together with any applicable withholding payable upon the issuance or delivery of the Common Class Membership Units to the Holder or any other Person.

4.     Effect of Certain Events on Warrant Interest.

(a)     Adjustment to Warrant Interest Upon Internal Reorganization. Prior to the Expiration Time, in the event of any (i) capital reorganization of the Company, (ii) reclassification of the Common Class Membership Units, (iii) consolidation or merger of the Company with or into another Affiliate or (iv) other similar internal reorganization transaction, in each case, which entitles the holders of Common Class Membership Units to receive (either directly or upon subsequent liquidation) another type of security, interest or assets in exchange for the Common Class Membership Units (an "**Internal Reorganization**"), this Warrant shall, immediately after an Internal Reorganization, remain outstanding and shall thereafter, in lieu of the Warrant Interest then exercisable under this Warrant, be exercisable for the kind and number of equity interests or other securities or assets of the Company or of the successor Person of the Company in connection with such Internal Reorganization to which the Holder would have been entitled upon such Internal Reorganization if the Holder had exercised this Warrant in full immediately prior to the time of such Internal Reorganization; and, in such case, appropriate adjustment (in form and substance reasonably satisfactory to the Holder) shall be made with respect to the Holder's rights under this Warrant to ensure that the provisions of this Warrant

8

shall thereafter be applicable, as nearly as possible, to any equity interests, securities or assets thereafter acquirable upon exercise of this Warrant. The provisions of this Section 4(a) shall similarly apply to any successive Internal Reorganizations. The Company shall not effect any such Internal Reorganization unless, in connection with the consummation thereof, the successor Person of the Company (if applicable) in connection with such Internal Reorganization, shall assume, by written instrument substantially similar in form and substance to this Warrant and reasonably satisfactory to the Holder, the obligation to deliver to the Holder such equity interests, securities or assets which, in accordance with the foregoing provisions, such Holder shall be entitled to receive upon exercise of this Warrant.

(b)    Certificate as to Adjustment. As promptly as reasonably practicable following any adjustment of the kind of the Warrant Interest pursuant to the provisions of Section 4(a), but in any event not later than fifteen (15) days thereafter, the Company shall furnish to the Holder a certificate of an executive officer setting forth in reasonable detail such adjustment and the facts upon which it is based and certifying the calculation thereof.

5.    Put Right and Call Right.

(a)    Put Right.

(i)    Subject to the terms and conditions of this Section 5(a), at any time during the Put/Call Exercise Period, the Holder shall have the right (the "**Put Right**"), but not the obligation, to sell to the Company (and the Company shall have the obligation to purchase) all (but not less than all) of the Warrant Interest at the Put Purchase Price; provided, that the Holder shall not exercise the Put Right unless each of the Other Holders shall substantially concurrently exercise the equivalent put rights under the Other Warrants.

(ii)    If the Holder desires to exercise the Put Right pursuant to this Section 5(a), then the Holder shall deliver to the Company, a written, unconditional and irrevocable notice of exercise of the Put Right (the "**Put Exercise Notice**"), which shall include (x) the Holder's good faith determination of the Put Purchase Price and (y) the proposed closing date with respect to the exercise of such Put Right (which shall not be less than ninety (90) days after the date of the Put Exercise Notice).

(iii)    If the Company does not object in writing to the Put Purchase Price set forth in the Put Exercise Notice as not reflective of the Fair Market Value within thirty (30) days after the date of the Put Exercise Notice (the "**Put Dispute Period**"), the Put Purchase Price set forth in the Put Exercise Notice shall be final and binding on the Holder and the Company. If the Company objects in writing to the Put Purchase Price as not reflective of the Fair Market Value prior to the termination of the Dispute Period, the Holder and the Company shall negotiate in good faith to mutually agree on the Put Purchase Price. If during such negotiation, the Holder and the Company agree on the Put Purchase Price, then such Put Purchase Price shall be final and binding on Holder and the Company. If the Holder and the Company are unable to agree on the Put Purchase Price prior to the date that is fifteen (15) days after the expiration of the Dispute Period, the Holder and the Company shall jointly agree on a nationally recognized accounting firm to

act as an independent appraiser (the "**Independent Appraiser**"), and instruct the Independent Appraiser to render within thirty (30) days a determination of the Fair Market Value and the Put Purchase Price, which determination shall be final and binding on the Company and the Holder; provided, that, the Holder shall be entitled to withdraw its exercise of the Put Right following the determination of the Independent Appraiser pursuant to this Section 5(a)(iii).  Each of the Holder and the Company shall bear fifty percent (50%) of the fees of the Independent Appraiser in connection therewith.  Each of the Holder and the Company shall use commercially reasonable efforts to cooperate with the Independent Appraiser and provide all information reasonably requested by the Independent Appraiser in order to assist the Independent Appraiser in rendering its determination of the Fair Market Value and the Put Purchase Price pursuant to this Section 5(a)(iii).  Notwithstanding anything to the contrary in this Warrant, any final and binding determination of "Fair Market Value" (as defined in any Other Warrant) in connection with a put right exercised pursuant to the terms of any Other Warrant substantially concurrently with an exercise of the Put Right, shall be final and binding on the Company and the Holder for purposes of determining the Put Purchase Price for such exercise of the Put Right.

(iv)    On the Put Right Closing Date, the Holder shall deliver a certificate to the Company dated as of such date, duly executed by an authorized signatory of the Holder, which shall contain representations and warranties of the Holder as of the closing of the exercise of the Put Right as to the Holder's (A) full and complete right, title and interest in and to the Warrant, free and clear of any and all Liens other than Liens arising as a result of or under the terms of this Warrant, the LLC Agreement and applicable state and federal securities Laws, and (B) full power and authority, and necessary organizational action, to sell the Warrant to the Company as contemplated by this Section 5(a).

(v)    The closing of the exercise of the Put Right pursuant to this Section 5 shall take place on the sixtieth (60th) day after the date on which the Put Purchase Price becomes final and binding on the Holder and the Company pursuant to Section 5(a)(iii) or on such other date as is agreed between the Holder and the Company (the "**Put Right Closing Date**"), at the executive offices of the Company or at such other place (including remotely via teleconference or electronic communication).  For the avoidance of doubt, the contemplated closing date of the exercise of the Put Right may be a date that follows the expiration of the Put/Call Exercise Period so long as the Put Exercise Notice is delivered prior to the expiration of the Put/Call Exercise Period.  Notwithstanding anything to the contrary in this Section 5(a), the closing of the exercise of the Put Right shall be conditioned upon the substantially simultaneous closing of the equivalent put rights under the Other Warrants at the same Put Purchase Price (as adjusted to reflect the varying number of Common Class Membership Units issuable pursuant to such Other Warrants).

(vi)    On the Put Right Closing Date, in exchange for the Holder's surrender and delivery of the Warrant to the Company, the Company shall pay to the Holder the Put Purchase Price by certified or official bank check or by wire transfer of immediately available funds to an account set forth in the Put Exercise Notice or otherwise designated in writing by the Holder at least three (3) days prior to the Put Right Closing Date.

(vii)    Upon the closing of the exercise of the Put Right for the Warrant Interest in full on the Put Right Closing Date, the Holder shall have no further rights or obligations under the Warrant.  Each of the Company and the Holder shall take all actions as may be reasonably necessary or appropriate to consummate the closing of the exercise of the Put Right as contemplated by this Section 5(a), including entering into agreements and delivering certificates, consents and other instruments as may be deemed necessary or appropriate.

(b)    Call Right.

(i)    Subject to the terms and conditions of this Section 5(b), at any time during the Put/Call Exercise Period, the Company shall have the right (the "**Call Right**"), but not the obligation, to purchase from the Holder (and the Holder shall have the obligation to sell) all (but not less than all) of the Warrant Interest at the Call Purchase Price; provided, that the Company shall not exercise the Call Right unless the Company shall substantially concurrently exercise the equivalent call rights under the Other Warrants.

(ii)    If the Company desires to exercise the Call Right pursuant to this Section 5(b), then the Company shall deliver to the Holder, a written, unconditional and irrevocable notice of exercise of the Call Right (the "**Call Exercise Notice**"), which shall include (x) the Company's good faith determination of the Call Purchase Price and (y) the proposed closing date with respect to the exercise of such Call Right (which shall not be less than ninety (90) days after the date of the Call Exercise Notice).

(iii)    If the Holder does not object in writing to the Call Purchase Price set forth in the Call Exercise Notice as not reflective of the Fair Market Value within thirty (30) days after the date of the Call Exercise Notice (the "**Call Dispute Period**"), the Call Purchase Price set forth in the Call Exercise Notice shall be final and binding on the Holder and the Company.  If the Holder objects in writing to the Call Purchase Price as not reflective of the Fair Market Value prior to the termination of the Call Dispute Period, the Holder and the Company shall negotiate in good faith to mutually agree on the Call Purchase Price.  If during such negotiation, the Holder and the Company agree on the Call Purchase Price, then such Call Purchase Price shall be final and binding on Holder and the Company.  If the Holder and the Company are unable to agree on the Call Purchase Price prior to the date that is fifteen (15) days after the expiration of the Call Dispute Period, the Holder and the Company shall jointly agree on an Independent Appraiser, and instruct the Independent Appraiser to render within thirty (30) days a determination of the Fair Market Value and the Call Purchase Price, which determination shall be final and binding on the Company and the Holder; provided, that, the Company shall be entitled to withdraw its exercise of the Call Right following the determination of the Independent Appraiser pursuant to this Section 5(b)(iii).  Each of the Holder and the Company shall bear fifty percent (50%) of the fees of the Independent Appraiser in connection therewith.  Each of the Holder and the Company shall use commercially reasonable efforts to cooperate with the Independent Appraiser and provide all information reasonably requested by the Independent Appraiser in order to assist the Independent Appraiser in rendering its determination of the Fair Market Value and the Call Purchase Price pursuant to this Section 5(b)(iii).  Notwithstanding anything to the

11

contrary in this Warrant, any final and binding determination of "Fair Market Value" (as defined in any Other Warrant) in connection with a call right exercised pursuant to the terms of any Other Warrant substantially concurrently with an exercise of the Call Right, shall be final and binding on the Company and the Holder for purposes of determining the Call Purchase Price for such exercise of the Call Right.

(iv)    On the Call Right Closing Date, the Holder shall deliver a certificate to the Company dated as of such date, duly executed by an authorized signatory of the Holder, which shall contain representations and warranties of the Holder as of the closing of the exercise of the Call Right as to the Holder's (A) full and complete right, title and interest in and to the Warrant, free and clear of any and all Liens other than Liens arising as a result of or under the terms of this Warrant, the LLC Agreement and applicable state and federal securities Laws, and (B) full power and authority, and necessary organizational action, to sell the Warrant to the Company as contemplated by this Section 5(b).

(v)    The closing of the exercise of the Call Right pursuant to this Section 5(b) shall take place on the sixtieth (60th) day after the date on which the Call Purchase Price becomes final and binding on the Holder and the Company pursuant to Section 5(b)(iii) or on such other date as is agreed between the Holder and the Company (the "**Call Right Closing Date**"), at the executive offices of the Company or at such other place (including remotely via teleconference or electronic communication).  For the avoidance of doubt, the contemplated closing date of the exercise of the Call Right may be a date that follows the expiration of the Put/Call Exercise Period so long as the Call Exercise Notice is delivered prior to the expiration of the Put/Call Exercise Period. Notwithstanding anything to the contrary in this Section 5(b), the closing of the exercise of the Call Right shall be conditioned upon the substantially simultaneous closing of the equivalent call rights under the Other Warrants at the same Call Purchase Price (as adjusted to reflect the varying number of Common Class Membership Units issuable pursuant to such Other Warrants).

(vi)    On the Call Right Closing Date, in exchange for the Holder's surrender and delivery of the Warrant to the Company, the Company shall pay to the Holder the Call Purchase Price by certified or official bank check or by wire transfer of immediately available funds to an account set forth in the Call Exercise Notice or otherwise designated in writing by the Holder at least three (3) days prior to the Call Right Closing Date.

(vii)    Subject to Section 5(b)(viii) below, upon the closing of the exercise of the Call Right for the Warrant Interest in full on the Call Right Closing Date, the Holder shall have no further rights or obligations under the Warrant.  Each of the Company and the Holder shall take all actions as may be reasonably necessary or appropriate to consummate the closing of the exercise of the Call Right as contemplated by this Section 5(b), including entering into agreements and delivering certificates, consents and other instruments as may be deemed necessary or appropriate.

(viii)    Notwithstanding anything to the contrary in this Warrant, if the Company consummates any Sale Transaction within six (6) months after the Call Right Closing Date, pursuant to which any Member receives aggregate consideration per Common

12

Class Membership Unit (the "Per Unit Sale Price") that is greater than the consideration per Common Class Membership Unit represented by the Call Purchase Price paid to the Holder pursuant to Section 5.6(vi), then the Company shall pay to the Holder, by certified or official bank check or by wire transfer of immediately available funds to an account designated in writing by the Holder, within ten (10) days after the consummation of such Sale Transaction, an amount equal to the difference between (x) the amount the Holder would have received if it had exercised this Warrant and sold the Common Class Membership Units issued in respect thereof at the Per Unit Sale Price and (y) the amount the Holder received pursuant to Section 5.6(vi).

6.    Participation Right.

(a)    If at any time prior to the Expiration Time, the Company issues New Securities (other than (x) Exempt Securities (as defined in the LLC Agreement) and (y) New Securities that would be included in the determination of "Fully Diluted Basis" pursuant to the definition thereof), then the Holder shall have the right to purchase its Holder's Percentage Interest of such New Securities (the "**Offered Securities**").

(b)    The Company shall give the Holder written notice of the Company's intention to issue or sell Offered Securities (the "**Issuance Notice**"), describing the type of Offered Securities, the price at which such Offered Securities will be issued or sold and the general terms upon which the Company proposes to issue or sell the Offered Securities, including the anticipated date of such issuance, sale or distribution and the general use of proceeds thereof. The Holder shall have fifteen (15) days from the date the Issuance Notice is sent to agree to purchase all or any portion of its Holder's Percentage Interest of the Offered Securities (the "**Response Notice**") and stating therein the quantity of Offered Securities to be purchased. Such Response Notice shall constitute the irrevocable agreement of the Holder to purchase the quantity of Offered Securities indicated in the Response Notice at the price and upon the terms stated in the Issuance Notice. Any purchase of Offered Securities by the Holder pursuant to this Section 6 shall be consummated on or prior to the later of (i) the date on which all other Offered Securities described in the applicable Issuance Notice are issued, sold or distributed and (ii) the tenth (10th) business day following delivery of the Response Notice by the Holder. Each of the Company and the Holder shall take all actions as may be reasonably necessary or appropriate to consummate the purchase of the Offered Securities by the Holder pursuant to this Section 6, including execution of a Joinder Agreement, entering into agreements and delivering certificates, consents and other instruments as may be deemed necessary or appropriate.

7.    LLC Agreement; No Impairment. Subject to an Internal Reorganization pursuant to Section 4(a), all Common Class Membership Units issuable upon exercise of this Warrant shall become subject to, and have the benefit of, the LLC Agreement, and the Holder shall be required, for so long as the Holder holds any Common Class Membership Units or Unit Equivalents, to become and remain a party to the LLC Agreement, and the Company shall not, by any action including by amendment of the LLC Agreement or its certificate of formation or through any equity sale or issuance, recapitalization, reclassification, reorganization, merger, consolidation or other business combination, dissolution, liquidation or winding-up or any other action, avoid or seek to avoid the observance or performance of any of the terms to be observed or performed by it hereunder or under the LLC Agreement, but shall at all times in good faith

13

assist in the carrying out of all the provisions of this Warrant and the LLC Agreement and in the taking of all such actions as may be necessary or appropriate to protect the rights of the Holder of this Warrant against impairment thereof. Without limiting the generality of the foregoing, without the consent of the Holder, the Company shall not amend any provision of the LLC Agreement or its certificate of formation in any manner that would reasonably be expected to adversely affect any of the rights or obligations of the Holder, in its capacity as a Member upon exercise of this Warrant, set forth in the LLC Agreement.

8.      Transfer of Warrant. Subject to the applicable conditions referred to in the legend endorsed hereon, this Warrant may be Transferred, in whole or in part, by the Holder to (a) any Affiliate of the Holder or Approved Fund (as defined in the Credit Agreement) thereof, (b) any lender (or any of its Affiliates) in connection with a transfer of the Loans from the initial Lender to such other lender in accordance with the terms and conditions of the Credit Agreement; provided that, for the avoidance of doubt, the Holder shall not be obligated to Transfer the Warrant, in whole or in part, to any such lender (or any of its Affiliates) in connection with a transfer of the Loans, and (c) any other Person with the prior written consent of the Company (not to be unreasonably withheld, conditioned or delayed).  Any Transfer pursuant to this Section 8 shall be implemented by surrendering this Warrant to the Company at its executive offices with a duly executed and delivered instruments of Transfer in customary form and substance for such Transfer (including an agreement by the Transferee to be bound by the terms of this Warrant with respect to the Transferred Warrant).  Upon such surrender of the Warrant, the Company shall execute and deliver any new Warrants in the names of the Transferor and permitted Transferees, as applicable, and in accordance with the denominations specified in such instrument of Transfer, and this Warrant shall automatically be cancelled, and the Company shall register the permitted Transferees, and the permitted Transferees shall be deemed to have become, and shall be treated for all purposes as, the holder of record of the new Warrants immediately upon issuance of the new Warrants to such permitted Transferees. Any Transfer of this Warrant not made in compliance with this Section 8 or otherwise pursuant to this Warrant shall be deemed void *ab initio* and without force and effect.

9.      Holder Not Deemed a Member; Limitations on Liability. Prior to the issuance to the Holder of the Common Class Membership Units to which the Holder is then entitled to receive upon the due exercise of this Warrant, except as otherwise expressly set forth in the LLC Agreement or herein or as may otherwise be agreed to by the Holder and the Company, the Holder shall not be entitled to vote or receive distributions or be deemed the holder of any Common Class Membership Units or Unit Equivalents (other than this Warrant) in the Company for any purpose, nor shall anything contained in this Warrant be construed to confer upon the Holder, as such, any of the rights of a Member or any right to vote, give or withhold consent to any Company action, receive notice of meetings, receive distributions or subscription rights, or otherwise, and no income, gain, losses or deductions shall be allocated to the Holder for federal income tax purposes. In addition, except as expressly set forth herein, nothing contained in this Warrant shall be construed as imposing any liabilities on the Holder with respect to the purchase of any Common Class Membership Units or Unit Equivalents (upon exercise of this Warrant or otherwise) or as a Member, whether such liabilities are asserted by the Company or by creditors of the Company.

10.     Replacement on Loss. In the event that the Holder notifies the Company of the loss, theft,

destruction or mutilation of this Warrant, then upon delivery of an indemnity bond or lost warrant affidavit sufficient in the reasonable determination of the Company to protect the Company from any loss that it may suffer if the lost, stolen or destroyed Warrant is replaced and, in case of mutilation, upon surrender of such Warrant for cancellation to the Company, the Company shall execute and deliver to the Holder, in lieu hereof, a new Warrant of like tenor and exercisable for a Warrant Interest equivalent to the Warrant so lost, stolen, destroyed or mutilated and the replaced or surrendered and cancelled Warrant shall automatically be cancelled; provided, that, in the case of mutilation, no indemnity bond or lost warrant affidavit shall be required if the mutilated Warrant in identifiable form is surrendered to the Company for cancellation.

11.    Compliance with the Securities Act.

(a)    Warrant to Comply with the Securities Act. The Holder, by acceptance of this Warrant, agrees to comply in all respects with the provisions of this Section 11 and the restrictive legend requirements set forth on the face of this Warrant (which shall be included in any new Warrant issued upon division of, in substitution for, or in replacement of this Warrant) and further agrees that such Holder shall not offer, sell or otherwise dispose of this Warrant or any Common Class Membership Units to be issued upon exercise hereof except under circumstances that will not result in a violation of the Securities Act.

(b)    Representations and Warranties of the Holder. The Holder represents and warrants, as of the Original Issue Date, and as of each successive issue date, to the Company by acceptance of this Warrant as follows:

(i)    The Holder is an "accredited investor" as defined in Rule 501 of Regulation D promulgated under the Securities Act. The Holder is acquiring this Warrant, and the Common Class Membership Units to be issued upon exercise hereof, for investment for its own account and not with a view towards, or for resale in connection with, the public sale or distribution of this Warrant or the Common Class Membership Units in violation of applicable state or federal securities Laws.

(ii)    The Holder understands that this Warrant, and the Common Class Membership Units to be issued upon exercise hereof, have not been registered under the Act in reliance upon a specific exemption therefrom, which exemption depends upon, among other things, the bona fide nature of the Holder's investment intent as expressed herein. The Holder accepts and acknowledges that this Warrant and the Common Class Membership Units to be issued upon exercise hereof may not be resold except in compliance with the registration requirements or exemption provisions under the Securities Act and other applicable securities Laws.

(iii)    The Holder accepts and acknowledges that it can bear the economic and financial risk of its investment in this Warrant and the Common Class Membership Units for an indefinite period, and has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks of the investment in this Warrant and the Common Class Membership Units.

US-DOCS\109470051.13

12.    <u>Company Notices</u>. The Company shall provide no less than thirty (30) days' prior written notice to the Holder in the event of:

(a)    any Internal Reorganization;

(b)    any Sale Transaction;

(c)    any material refinancing;

(d)    any dividend or distribution on Common Class Membership Units;

(e)    any voluntary or involuntary dissolution, liquidation or winding-up of the Company; and

(f)    any default under the Bond Documents by the Non-Guarantor Subsidiaries.

Such notice shall set forth the material terms and conditions of such reorganization, refinancing, transaction or dissolution, dividend or distribution, liquidation or winding-up, as applicable, and the contemplated date of the closing or other consummation thereof.

13.    <u>Warrant Register</u>. The Company shall keep and properly maintain at its executive offices records of the registration of the Warrant and any Transfers or exercises thereof effected in accordance with the applicable provisions of this Warrant. The Company may deem and treat the Person in whose name the Warrant is registered in such register as the Holder thereof for all purposes, and the Company shall not be affected by any notice to the contrary, except in connection with any Transfers or exercises of the Warrant effected in accordance with the applicable provisions of this Warrant.

14.    <u>Notices</u>. All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given: (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (with all fees prepaid and receipt requested); (c) on the date sent by e-mail of a PDF document (with confirmation of transmission) if sent prior to 5:00 p.m., New York City time, and on the next day if sent after 5:00 p.m., New York City time; or (d) on the third (3rd) day after the date mailed, by certified or registered mail (with return receipt requested and postage prepaid). Such communications must be sent to the respective parties hereto at the addresses indicated below (or at such other address for any party hereto as shall be specified in a notice given in accordance with this <u>Section 14</u>).

If to the Company:                    CarbonLITE Holdings, LLC
                                      10250 Constellation Boulevard
                                      Ste. 2820
                                      Los Angeles CA 90067
                                      Attention:  Leon Farahnik
                                      Email:  lfarahnik@hpcindustries.com

with a copy to:                       Reed Smith LLP
                                      1901 Avenue of the Stars #700

Los Angeles, CA 90067
Attention: Moshe Kupietzky
E-mail: mkupietzky@reedsmith.com

If to the Holder:                     to the address for the Holder set forth on <u>Schedule I</u> hereto

with a copy to:                       Latham & Watkins LLP
                                      885 Third Avenue
                                      New York, NY 10022
                                      Attention: David E. Owen
                                      E-mail: david.owen@lw.com

15.    <u>Cumulative Remedies</u>. The rights and remedies provided in this Warrant are cumulative and are not exclusive of, and are in addition to and not in substitution for, any other rights or remedies available at Law, in equity or otherwise.

16.    <u>Equitable Relief</u>. Each party hereto acknowledges and agrees that a breach or threatened breach by such party of any of its obligations under this Warrant would give rise to irreparable harm to the other party hereto for which monetary damages would not be an adequate remedy and hereby agrees that in the event of a breach or a threatened breach by such party of any such obligations, such other party shall, in addition to any and all other rights and remedies that may be available to it in respect of such breach, be entitled to equitable relief, without the need to post a bond, including a restraining order, an injunction, specific performance and any other relief that may be available from a court of competent jurisdiction.

17.    <u>Entire Agreement</u>. This Warrant (including all Exhibits hereto) constitutes the sole and entire agreement of the parties to this Warrant with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter. Upon execution of a Joinder Agreement in accordance with <u>Section 3(a)(i)</u>, this Warrant (including all Exhibits hereto), together with the LLC Agreement and the Joinder Agreement, will constitute the sole and entire agreement of the parties to this Warrant with respect to the subject matter contained herein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter. In the event of any inconsistency between the statements in the body of this Warrant and the LLC Agreement or the Joinder Agreement upon execution of a Joinder Agreement in accordance with <u>Section 3(a)(i)</u>, the statements in the body of this Warrant shall control.

18.    <u>Successor and Assigns</u>. This Warrant and the rights and obligations evidenced hereby shall be binding upon and shall inure to the benefit of the parties hereto and the successors of the Company and the successors and permitted Transferees of the Holder. Such successor or permitted Transferees of the Holder shall be deemed to be a Holder for all purposes hereunder.

19.    <u>No Third-Party Beneficiaries</u>. This Warrant is for the sole benefit of the Company and the Holder and their respective successors and, in the case of the Holder, permitted Transferees, and nothing herein, express or implied, is intended to or shall confer upon any other Person any

17

legal or equitable right, benefit or remedy of any nature whatsoever, under or by reason of this Warrant.

20.     Interpretation. For purposes of this Warrant, (a) definitions shall apply equally to the singular and plural forms of the terms defined; (b) words of any gender shall be deemed to include each other gender and neuter forms; (c) Section headings are for convenience only and shall not limit or otherwise affect the meaning hereof; (d) the word "including" and words of similar import shall be deemed to be followed by the phrase "without limitation"; (e) the words "this Warrant," "herein," "hereof," "hereby," "hereunder," and words of similar import shall refer to this Warrant as a whole, and not to any particular subdivision hereof unless expressly so limited; (f) "or" is not exclusive; (g) unless otherwise specified or the context otherwise requires, (i) any reference to an agreement or other document means such agreement or other document as amended, restated or otherwise modified from time to time in accordance with its terms, (ii) any reference to a Person shall be deemed to include such Person's successors and permitted assigns, (iii) any reference to a Section, a clause or an Exhibit means a Section or a clause of, or an Exhibit to, this Agreement;  (h) any reference to any statute or other Law shall be deemed to include all rules, regulations and exemptions promulgated thereunder and all provisions consolidating, amending, replacing, supplementing or interpreting such statute or other Law (including any successor provisions); and (i) if any action is required to be taken under this Warrant on a day that is not a Business Day, such action shall instead be taken on the next succeeding Business Day. The terms "dollars" and "$" means U.S. dollars, the lawful currency of the United States of America.

21.     Amendment and Modification; Waiver. Except as otherwise provided herein, this Warrant may only be amended, modified or supplemented by an agreement in writing signed by each party hereto. No waiver by the Company or the Holder of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party hereto shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any rights, remedy, power or privilege arising from this Warrant shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

22.     Severability. If any term or provision of this Warrant is finally determined by a court of competent jurisdiction to be invalid, illegal or incapable of being enforced by any rule of Law or public policy, all other conditions and provisions of this Warrant shall nevertheless remain in full force and effect so long as the economic substance of the transactions contemplated hereby is not affected in any material manner adverse to any party hereto.  Upon such determination, the parties hereto shall negotiate in good faith to modify this Warrant so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the extent possible.

23.     Governing Law. This Warrant shall be governed by and construed in accordance with the internal Laws of the State of Delaware without giving effect to any choice or conflict of law

provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of Laws of any jurisdiction other than those of the State of Delaware.

24.    <u>Submission to Jurisdiction</u>. Any legal suit, action or proceeding arising out of or based upon this Warrant or the transactions contemplated hereby may be instituted in the federal courts of the United States of America or the courts of the State of New York in each case located in New York City and New York County, and each party hereto irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action or proceeding. Service of process, summons, notice or other document by certified or registered mail to such party's address set forth herein shall be effective service of process for any suit, action or other proceeding brought in any such court. The parties hereto irrevocably and unconditionally waive any objection to the laying of venue of any suit, action or any proceeding in such courts and irrevocably waive and agree not to plead or claim in any such court that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

25.    <u>Waiver of Jury Trial</u>. Each party hereto acknowledges and agrees that any controversy which may arise under this Warrant is likely to involve complicated and difficult issues and, therefore, each such party hereto irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any legal action arising out of or relating to this Warrant or the transactions contemplated hereby.

26.    <u>Counterparts</u>. This Warrant may be executed in one or more counterparts, each of which when executed shall be deemed to be an original, but both of which when together shall constitute one and the same agreement. A signed copy of this Warrant delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Warrant.

27.    <u>No Strict Construction</u>. This Warrant shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted.

28.    <u>Tax Treatment of the Warrant</u>. For U.S. federal income tax purposes, (a) the Initial Funding Commitments, together with the Warrant, shall be treated as an investment unit, and (b) $[___] of the purchase price of the investment unit shall be allocated to the purchase of the Warrant and treated as paid by the Holders to the Company as consideration for the Warrant. Each of the Holders and the Company agrees to file tax returns consistent with such treatment.

[<em>Signature pages follow.</em>]

19

IN WITNESS WHEREOF, the parties hereto have duly executed this Warrant on the date first written above.

CARBONLITE HOLDINGS, LLC

By:_____
Name:
Title:

[ORION]

By:
Its:

By:
Its:

By:_____
Name:
Title:

## Exhibit A

## Form of Joinder Agreement

JOINDER AGREEMENT

This JOINDER AGREEMENT dated as of [_____] (the "**Joinder Agreement**") is made and entered into by [Orion] (the "**New Member**"), pursuant to that certain Fourth Amended and Restated Operating Agreement of CarbonLite Holdings LLC ("**Company**"), dated as of December 20, 2018 (as such agreement may be amended, supplemented or otherwise modified, renewed or replaced from time to time, the "**LLC Agreement**"). Capitalized terms used but not defined herein shall have the meanings given to such terms in the LLC Agreement.

WITNESSETH

The New Member desires to purchase [____] Common Class Membership Units (the "**Units**") and to be admitted as a Member of Company, as of the date first set forth above.

NOW, THEREFORE , in consideration of the premises and other good and valuable consideration, the receipt of which is hereby acknowledged, the New Member hereby agrees as follows:

1. Joinder and Assumption.

(a) The New Member hereby confirms that the New Member hereby assumes, and agrees to perform and observe, each and every one of the covenants, rights, promises, agreements, terms, conditions, obligations, appointments, duties and liabilities applicable to a Member of the Company under the LLC Agreement. By virtue of the foregoing, the New Member hereby accepts and assumes any liability of a Member of the Company related to each covenant or obligation of a Member of the Company in the LLC Agreement.

(b) As of the date hereof, all references to the term "**Member**" in the LLC Agreement or in any document or instrument executed and delivered or furnished, or to be executed and delivered or furnished, in connection therewith shall be deemed to be references to, and shall include, the New Member.

2. Further Assurances.  At any time and from time to time, upon the Company's request and at the sole expense of the New Member, the New Member will promptly and duly execute and deliver any and all further instruments and documents and take such further action as the Company reasonably deems necessary to effect the purposes of this Joinder Agreement.

3. Binding Effect.  The Joinder Agreement shall be binding upon the new Member and shall inure to the benefit of the Company and its Members and their respective successors and assigns.

4. GOVERNING LAW.  **THIS JOINDER AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH, AND GOVERNED BY, THE LAWS OF THE STATE OF**

DELAWARE APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED WHOLLY WITHIN THE STATE OF DELAWARE.

IN WITNESS WHEREOF, the undersigned has caused this Joinder Agreement to be duly executed and delivered by its duly authorized officer as of the date first above written.

[ORION]

By:
Its:

By:
Its:

By:_____
Name:
Title:

## **SCHEDULE I**

### **HOLDER**

[Orion]
350 5th Ave #6740
New York, NY 10118
Attention: Gerrit Nicholas, Chris Leary and Mark Friedland
Email: Gerrit@OrionEnergyPartners.com;
Chris@OrionEnergyPartners.Com;
Mark@OrionEnergyPartners.com

**SCHEDULE 1.01(a)**
**TO**
**CREDIT AGREEMENT**

<u>**Non-Guarantor Subsidiaries**</u>

1.      CarbonLite P LLC

2.      CarbonLite P Holdings LLC

3.      CarbonLite Recycling LLC

4.      CarbonLite Recycling Holdings LLC

**SCHEDULE 1.01(b)**
**TO**
**CREDIT AGREEMENT**

**<u>Prepayment Premium</u>**

[*Please see attached*]

**Schedule 1.01(b)**

| Assumptions | Units | Variable | Notes |
|---|---|---|---|
| "Accrued Interest" | % | 10.00% | |
| "Interest Rate" | % | 4.85% | |
| | | 14.85% | (a) |
| Days in year for computation of interest, Z/D(d) | # | 360.0 | (b) |
| Third Anniversary of "Initial Funding Date" | Date | 6/30/2022 | (c) |

**Notes:**
Assumes zero amortization of Loans during holding periods as per definition of "Prepayment Premium"
Assumes interest Rate of 14.85% is paid fully in cash and no portion of the coupon becomes Accrued Interest
For purposes of this Schedule only, T = 0 assumes "Initial Funding Date" on June 30, 2019
For purposes of this Schedule only, assumes Initial Funding Date and Second Funding Date occur on same day
for the purposes of this Schedule, assumes Lenders have not declined a Borrower request to reinvest in accordance with a "TCF Reinvestment Request"

* **Refinancing / Prepayment at T ≤ 366 days (12 months)**

| Loan Balance | Notes | Units | 6/30/19 | 9/30/19 | 12/31/19 | 3/31/20 | 6/30/20 | 9/30/20 | 12/31/20 |
|---|---|---|---|---|---|---|---|---|---|
| Days in Period | | | | 92.0 | 92.0 | 91.0 | 91.0 | 92.0 | 92.0 |
| Cumulative Days Elapsed since "Initial Funding Date" | | | | 92.0 | 184.0 | 275.0 | 366.0 | 458.0 | 550.0 |
| Days Between Refinancing and Third Anniversary | | | 1,096.0 | 1,004.0 | 912.0 | 821.0 | 730.0 | 638.0 | 546.0 | <<< (f) |

(d)
v
v
v
(f)

| Loan Balance | Notes | Units | 6/30/19 | 9/30/19 | 12/31/19 | 3/31/20 | 6/30/20 | 9/30/20 | 12/31/20 |
|---|---|---|---|---|---|---|---|---|---|
| Beginning Balance | | $MM | | 77.3 | 77.3 | 77.3 | 77.3 | 77.3 | 77.3 |
| (+) Loan Draw #1 | | $MM | 50.0 | - | - | - | - | - | - |
| (+) Loan Draw #2 | | $MM | 27.3 | - | - | - | - | - | - |
| (-) Principal Repayment | | $MM | - | - | - | - | - | - | - |
| Ending Balance | | $MM | 77.3 | 77.3 | 77.3 | 77.3 | 77.3 | 77.3 | 77.3 |
| (+) Principal Repayment | (d) | $MM | - | - | - | - | 77.3 | 77.3 | 77.3 |
| (+) "Prepayment Premium" | | $MM | - | - | - | - | 23.3 | 17.4 | 11.6 |
| Payments to Orion Energy | | $MM | - | - | - | - | 100.6 | 94.7 | 88.9 |

Note: If (d) ≤ (c), the "Prepayment Premium" calculated as follows: (e) x (a) x (f) / (b). Otherwise, the "Prepayment Premium" is 0

* **Refinancing / Prepayment at T ≤ 546 days (18 months)**

| Loan Balance | Notes | Units | 6/30/19 | 9/30/19 | 12/31/19 | 3/31/20 | 6/30/20 | 9/30/20 | 12/31/20 |
|---|---|---|---|---|---|---|---|---|---|
| Days in Period | | | | 92.0 | 92.0 | 91.0 | 91.0 | 92.0 | 92.0 |
| Cumulative Days Elapsed since "Initial Funding Date" | | | | 92.0 | 184.0 | 275.0 | 366.0 | 458.0 | 550.0 |
| Days Between Refinancing and Third Anniversary | | | 1,096.0 | 1,004.0 | 912.0 | 821.0 | 730.0 | 638.0 | 546.0 | <<< (f) |

(d)
v
v
v

| Loan Balance | Notes | Units | 6/30/19 | 9/30/19 | 12/31/19 | 3/31/20 | 6/30/20 | 9/30/20 | 12/31/20 |
|---|---|---|---|---|---|---|---|---|---|
| Beginning Balance | | $MM | | 77.3 | 77.3 | 77.3 | 77.3 | 77.3 | 77.3 |
| (+) Loan Draw #1 | | $MM | 50.0 | - | - | - | - | - | - |
| (+) Loan Draw #2 | | $MM | 27.3 | - | - | - | - | - | - |
| (-) Principal Repayment | | $MM | - | - | - | - | - | - | - |
| Ending Balance | | $MM | 77.3 | 77.3 | 77.3 | 77.3 | 77.3 | 77.3 | 77.3 |
| (+) Principal Repayment | (d) | $MM | - | - | - | - | - | - | 77.3 |
| (+) "Prepayment Premium" | | $MM | - | - | - | - | - | - | 17.4 |
| Payments to Orion Energy | | $MM | - | - | - | - | - | - | 94.7 |

Note: If (d) ≤ (c), the "Prepayment Premium" calculated as follows: (e) x (a) x (f) / (b). Otherwise, the "Prepayment Premium" is 0

* **Refinancing / Prepayment at T ≤ 1,461 days (48 months)**

| Loan Balance | Notes | Units | 6/30/19 | 9/30/19 | 12/31/19 | 3/31/20 | 6/30/20 | 9/30/20 | 12/31/20 | 3/31/21 | 6/30/21 | 9/30/21 | 12/31/21 | 3/31/22 | 6/30/22 | 9/30/22 | 12/31/22 | 3/31/23 | 6/30/23 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Days in Period | | | | 92.0 | 92.0 | 91.0 | 91.0 | 92.0 | 92.0 | 92.0 | 90.0 | 91.0 | 92.0 | 92.0 | 90.0 | 91.0 | 92.0 | 92.0 | 90.0 | 91.0 |
| Cumulative Days Elapsed since "Initial Funding Date" | | | | 92.0 | 184.0 | 275.0 | 366.0 | 458.0 | 550.0 | 640.0 | 731.0 | 823.0 | 915.0 | 1,005.0 | 1,096.0 | 1,188.0 | 1,280.0 | 1,370.0 | 1,461.0 |
| Days Between Refinancing and Third Anniversary | | | 1,096.0 | 1,004.0 | 912.0 | 821.0 | 730.0 | 638.0 | 546.0 | 456.0 | 365.0 | 273.0 | 181.0 | 91.0 | - | - | - | - | - |

(d)
v
v
v

| Loan Balance | Notes | Units | 6/30/19 | 9/30/19 | 12/31/19 | 3/31/20 | 6/30/20 | 9/30/20 | 12/31/20 | 3/31/21 | 6/30/21 | 9/30/21 | 12/31/21 | 3/31/22 | 6/30/22 | 9/30/22 | 12/31/22 | 3/31/23 | 6/30/23 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning Balance | | $MM | | 77.3 | 77.3 | 77.3 | 77.3 | 77.3 | 77.3 | 77.3 | 77.3 | 77.3 | 77.3 | 77.3 | 77.3 | 77.3 | 77.3 | 77.3 | 77.3 | 77.3 |
| (+) Loan Draw #1 | | $MM | 50.0 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| (+) Loan Draw #2 | | $MM | 27.3 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| (-) Principal Repayment | | $MM | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Ending Balance | | $MM | 77.3 | 77.3 | 77.3 | 77.3 | 77.3 | 77.3 | 77.3 | 77.3 | 77.3 | 77.3 | 77.3 | 77.3 | 77.3 | 77.3 | 77.3 | 77.3 | 77.3 | 77.3 |
| (+) Principal Repayment | (e) | $MM | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 77.3 | 77.3 |
| (+) "Prepayment Premium" | | $MM | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Payments to Orion Energy | | $MM | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 77.3 | 77.3 |

Note: If (d) ≤ (c), the "Prepayment Premium" calculated as follows: (e) x (a) x (f) / (b). Otherwise, the "Prepayment Premium" is 0

**Schedule 1.01(b)**

| Assumptions | Units | Variable | Notes |
|---|---|---|---|
| Cash Interest | % | 10.00% | |
| "Accrued Interest" | % | 4.85% | (a) |
| "Interest Rate" | % | 14.85% | |
| Days in year for computation of interest, 2.01(d) | # | 360.0 | (b) |
| Third Anniversary of "Initial Funding Date" | Date | 6/30/2022 | (c) |

**Notes:**
- Assumes zero amortization of Loans during holding periods as per definition of "Prepayment Premium"
- Assumes Interest Rate of 14.85% is paid fully in cash and no portion of the coupon becomes Accrued Interest
- For purposes of this Schedule only, T=0 assumes "Initial Funding Date" on June 30, 2019
- For purposes of this Schedule only, assumes Initial Funding Date and Second Funding Date occur on same day
- for the purposes of this Schedule, assumes Lenders have not declined a Borrower request to reinvest in accordance with a "TCF Reinvestment Request"

---

**\* Refinancing / Prepayment at T ≤ 366 days (12 months)**

| | Units | 6/30/19 | 9/30/19 | 12/31/19 | 3/31/20 | 6/30/20 | 9/30/20 | 12/31/20 |
|---|---|---|---|---|---|---|---|---|
| Days in Period | | | 92.0 | 92.0 | 91.0 | 91.0 | 92.0 | 92.0 |
| Cumulative Days Elapsed since "Initial Funding Date" | | | 92.0 | 184.0 | 275.0 | 366.0 | 458.0 | 550.0 |
| Days Between Refinancing and Third Anniversary | | 1,096.0 | 1,004.0 | 912.0 | 821.0 | 730.0 | 638.0 | 546.0 |

| Loan Balance | Notes | 6/30/19 | 9/30/19 | 12/31/19 | 3/31/20 | 6/30/20 | 9/30/20 | 12/31/20 |
|---|---|---|---|---|---|---|---|---|
| Beginning Balance | $MM | - | 77.3 | 77.3 | 77.3 | 77.3 | 77.3 | 77.3 |
| (+) Loan Draw #1 | $MM | 50.0 | - | - | - | - | | |
| (+) Loan Draw #2 | $MM | 27.3 | - | - | - | - | | |
| (-) Principal Repayment | $MM | - | - | - | - | (77.3) | | |
| Ending Balance | $MM | 77.3 | 77.3 | 77.3 | 77.3 | - | | |
| (+) Principal Repayment | $MM | - | - | - | - | 77.3 | | |
| (+) "Prepayment Premium" | $MM (d) | - | - | - | - | 23.3 | | |
| Payments to Orion Energy | $MM | - | - | - | - | 100.6 | | |

*Note: If (d) < (c), the "Prepayment Premium" calculated as follows: (e) x (a) x (f) / (b). Otherwise, the "Prepayment Premium" is 0*

---

**\* Refinancing / Prepayment at T ≤ 546 days (18 months)**

| | Units | 6/30/19 | 9/30/19 | 12/31/19 | 3/31/20 | 6/30/20 | 9/30/20 | 12/31/20 |
|---|---|---|---|---|---|---|---|---|
| Days in Period | | | 92.0 | 92.0 | 91.0 | 91.0 | 92.0 | 92.0 |
| Cumulative Days Elapsed since "Initial Funding Date" | | | 92.0 | 184.0 | 275.0 | 366.0 | 458.0 | 550.0 |
| Days Between Refinancing and Third Anniversary | | 1,096.0 | 1,004.0 | 912.0 | 821.0 | 730.0 | 638.0 | 546.0 |

| Loan Balance | Notes | 6/30/19 | 9/30/19 | 12/31/19 | 3/31/20 | 6/30/20 | 9/30/20 | 12/31/20 |
|---|---|---|---|---|---|---|---|---|
| Beginning Balance | $MM | - | 77.3 | 77.3 | 77.3 | 77.3 | 77.3 | 77.3 |
| (+) Loan Draw #1 | $MM | 50.0 | - | - | - | - | - | |
| (+) Loan Draw #2 | $MM | 27.3 | - | - | - | - | - | |
| (-) Principal Repayment | $MM | - | - | - | - | - | (77.3) | |
| Ending Balance | $MM | 77.3 | 77.3 | 77.3 | 77.3 | 77.3 | - | |
| (+) Principal Repayment | $MM (e) | - | - | - | - | - | 77.3 | |
| (+) "Prepayment Premium" | $MM | - | - | - | - | - | 17.4 | |
| Payments to Orion Energy | $MM | - | - | - | - | - | 94.7 | |

*Note: If (d) < (c), the "Prepayment Premium" calculated as follows: (e) x (a) x (f) / (b). Otherwise, the "Prepayment Premium" is 0*

---

**\* Refinancing / Prepayment at T ≤ 1,461 days (48 months)**

| | Units | 6/30/19 | 9/30/19 | 12/31/19 | 3/31/20 | 6/30/20 | 9/30/20 | 12/31/20 | 3/31/21 | 6/30/21 | 9/30/21 | 12/31/21 | 3/31/22 | 6/30/22 | 9/30/22 | 12/31/22 | 3/31/23 | 6/30/23 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Days in Period | | | 92.0 | 92.0 | 91.0 | 91.0 | 92.0 | 92.0 | 90.0 | 91.0 | 92.0 | 92.0 | 90.0 | 91.0 | 92.0 | 92.0 | 90.0 | 91.0 |
| Cumulative Days Elapsed since "Initial Funding Date" | | | 92.0 | 184.0 | 275.0 | 366.0 | 458.0 | 550.0 | 640.0 | 731.0 | 823.0 | 915.0 | 1,005.0 | 1,096.0 | 1,188.0 | 1,280.0 | 1,370.0 | 1,461.0 |
| Days Between Refinancing and Third Anniversary | | 1,096.0 | 1,004.0 | 912.0 | 821.0 | 730.0 | 638.0 | 546.0 | 456.0 | 365.0 | 273.0 | 181.0 | 91.0 | - | | | | | |

| Loan Balance | Notes | 6/30/19 | 9/30/19 | 12/31/19 | 3/31/20 | 6/30/20 | 9/30/20 | 12/31/20 | 3/31/21 | 6/30/21 | 9/30/21 | 12/31/21 | 3/31/22 | 6/30/22 | 9/30/22 | 12/31/22 | 3/31/23 | 6/30/23 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning Balance | $MM | - | 77.3 | 77.3 | 77.3 | 77.3 | 77.3 | 77.3 | 77.3 | 77.3 | 77.3 | 77.3 | 77.3 | 77.3 | 77.3 | 77.3 | 77.3 | 77.3 |
| (+) Loan Draw #1 | $MM | 50.0 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| (+) Loan Draw #2 | $MM | 27.3 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| (-) Principal Repayment | $MM | - | - | - | - | - | - | - | - | - | - | - | - | - | (77.3) | | | |
| Ending Balance | $MM | 77.3 | 77.3 | 77.3 | 77.3 | 77.3 | 77.3 | 77.3 | 77.3 | 77.3 | 77.3 | 77.3 | 77.3 | 77.3 | - | | | |
| (+) Principal Repayment | $MM | - | - | - | - | - | - | - | - | - | - | - | - | - | 77.3 | | | |
| (+) "Prepayment Premium" | $MM | - | - | - | - | - | - | - | - | - | - | - | - | - | - | | | |
| Payments to Orion Energy | $MM | - | - | - | - | - | - | - | - | - | - | - | - | - | 77.3 | | | |

*Note: If (d) < (c), the "Prepayment Premium" calculated as follows: (e) x (a) x (f) / (b). Otherwise, the "Prepayment Premium" is 0*

**Schedule 1.01(b)**

| Assumptions | Units | Variable | Notes |
|---|---|---|---|
| Cash Interest | % | 10.00% | |
| "Accrued Interest" | % | 4.85% | (a) |
| "Interest Rate" | % | 14.85% | |
| Days in year for computation of interest, 2.07(d) | # | 360.0 | (b) |
| Third Anniversary of "Initial Funding Date" | Date | 6/30/2022 | (c) |

**Notes:**
- Assumes zero amortization of Loans during holding periods as per definition of "Prepayment Premium"
- Assumes interest rate of 14.85% is paid fully in cash and no portion of the coupon becomes Accrued Interest
- For purposes of this Schedule only, T = 0 assumes "Initial Funding Date" on June 30, 2019
- For purposes of this Schedule only, assumes Initial Funding Date and Second Funding Date occur on same day
- For the purposes of this Schedule, assumes Lenders have not declined a Borrower request to reinvest in accordance with a "TCE Reinvestment Request"

---

**Refinancing / Prepayment at T = 366 days (12 months)**

| Loan Balance | Notes | Units | 6/30/19 | 9/30/19 | 12/31/19 | 3/31/20 | 6/30/20 |
|---|---|---|---|---|---|---|---|
| Beginning Balance | | $MM | - | | | | |
| (+) Loan Draw #1 | | $MM | 50.0 | | | | |
| (+) Loan Draw #2 | | $MM | 27.3 | | | | |
| (-) Principal Repayment | | $MM | | | | | |
| Ending Balance | | $MM | 1,096.0 | 77.3 | 77.3 | 77.3 | 77.3 |

| | | | 6/30/19 | 9/30/19 | 12/31/19 | 3/31/20 | 6/30/20 |
|---|---|---|---|---|---|---|---|
| Days in Period | | | - | 92.0 | 92.0 | 91.0 | 91.0 |
| Cumulative Days Elapsed since "Initial Funding Date" | | | 50.0 | 92.0 | 184.0 | 275.0 | 366.0 |
| Days Between Refinancing and Third Anniversary | | | 27.3 | 1,004.0 | 912.0 | 821.0 | 730.0 |

| | Notes | | 6/30/19 | 9/30/19 | 12/31/19 | 3/31/20 | 6/30/20 |
|---|---|---|---|---|---|---|---|
| (+) Principal Repayment | (d) | $MM | | | | | 77.3 |
| (+) "Prepayment Premium" | | $MM | | | | | 23.3 |
| Payments to Orion Energy | | $MM | | | | | 100.6 |

*Note: If (d) < (c), the "Prepayment Premium" calculated as follows: (e) x (a) x (f) / (b). Otherwise, the "Prepayment Premium" is 0*

---

**Refinancing / Prepayment at T = 546 days (18 months)**

| Loan Balance | Notes | Units | 6/30/19 | 9/30/19 | 12/31/19 | 3/31/20 | 6/30/20 | 9/30/20 | 12/31/20 |
|---|---|---|---|---|---|---|---|---|---|
| Beginning Balance | | $MM | - | | | | | | |
| (+) Loan Draw #1 | | $MM | 50.0 | | | | | | |
| (+) Loan Draw #2 | | $MM | 27.3 | | | | | | |
| (-) Principal Repayment | | $MM | | | | | | | |
| Ending Balance | | $MM | 1,096.0 | 77.3 | 77.3 | 77.3 | 77.3 | 77.3 | 77.3 |

| | | | 6/30/19 | 9/30/19 | 12/31/19 | 3/31/20 | 6/30/20 | 9/30/20 | 12/31/20 |
|---|---|---|---|---|---|---|---|---|---|
| Days in Period | | | - | 92.0 | 92.0 | 91.0 | 91.0 | 92.0 | 92.0 |
| Cumulative Days Elapsed since "Initial Funding Date" | | | 50.0 | 92.0 | 184.0 | 275.0 | 366.0 | 458.0 | 550.0 |
| Days Between Refinancing and Third Anniversary | | | 27.3 | 1,004.0 | 912.0 | 821.0 | 730.0 | 638.0 | 546.0 |

| | Notes | | 6/30/19 | 9/30/19 | 12/31/19 | 3/31/20 | 6/30/20 | 9/30/20 | 12/31/20 |
|---|---|---|---|---|---|---|---|---|---|
| (+) Principal Repayment | (d) | $MM | | | | | | | 77.3 |
| (+) "Prepayment Premium" | | $MM | | | | | | | 17.4 |
| Payments to Orion Energy | | $MM | | | | | | | 94.7 |

*Note: If (d) < (c), the "Prepayment Premium" calculated as follows: (e) x (a) x (f) / (b). Otherwise, the "Prepayment Premium" is 0*

---

**Refinancing / Prepayment at T = 1,461 days (48 months)**

| Loan Balance | Notes | Units | 6/30/19 | 9/30/19 | 12/31/19 | 3/31/20 | 6/30/20 | 9/30/20 | 12/31/20 | 3/31/21 | 6/30/21 | 9/30/21 | 12/31/21 | 3/31/22 | 6/30/22 | 9/30/22 | 12/31/22 | 3/31/23 | 6/30/23 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning Balance | | $MM | - | | | | | | | | | | | | | | | | |
| (+) Loan Draw #1 | | $MM | 50.0 | | | | | | | | | | | | | | | | |
| (+) Loan Draw #2 | | $MM | 27.3 | | | | | | | | | | | | | | | | |
| (-) Principal Repayment | | $MM | | | | | | | | | | | | | | | | | |
| Ending Balance | | $MM | 1,096.0 | 77.3 | 77.3 | 77.3 | 77.3 | 77.3 | 77.3 | 77.3 | 77.3 | 77.3 | 77.3 | 77.3 | 77.3 | 77.3 | 77.3 | 77.3 | 77.3 |

| | | | 6/30/19 | 9/30/19 | 12/31/19 | 3/31/20 | 6/30/20 | 9/30/20 | 12/31/20 | 3/31/21 | 6/30/21 | 9/30/21 | 12/31/21 | 3/31/22 | 6/30/22 | 9/30/22 | 12/31/22 | 3/31/23 | 6/30/23 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Days in Period | | | - | 92.0 | 92.0 | 91.0 | 91.0 | 92.0 | 92.0 | 90.0 | 91.0 | 92.0 | 92.0 | 90.0 | 91.0 | 92.0 | 92.0 | 90.0 | 92.0 |
| Cumulative Days Elapsed since "Initial Funding Date" | | | 50.0 | 92.0 | 184.0 | 275.0 | 366.0 | 458.0 | 550.0 | 640.0 | 731.0 | 823.0 | 915.0 | 1,005.0 | 1,096.0 | 1,188.0 | 1,280.0 | 1,370.0 | 1,461.0 |
| Days Between Refinancing and Third Anniversary | | | 27.3 | 1,004.0 | 912.0 | 821.0 | 730.0 | 638.0 | 546.0 | 456.0 | 365.0 | 273.0 | 181.0 | 91.0 | - | | | | |

| | Notes | | ... | | | | | | | | | | | | | | | 3/31/23 | 6/30/23 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| (+) Principal Repayment | (e) | $MM | | | | | | | | | | | | | | | | 77.3 | 77.3 |
| (+) "Prepayment Premium" | | $MM | | | | | | | | | | | | | | | | | |
| Payments to Orion Energy | | $MM | | | | | | | | | | | | | | | | 77.3 | 77.3 |

*Note: If (d) < (c), the "Prepayment Premium" calculated as follows: (e) x (a) x (f) / (b). Otherwise, the "Prepayment Premium" is 0*

**SCHEDULE 1.01(c)
TO
CREDIT AGREEMENT**

**Shareholder Notes**

1.  7% Notes

| Date | Name | Loan Amount |
|---|---|---|
| **FIRST BATCH:** | | |
| 11/27/2012 | Ebrahim Simhaee | $500,000 |
| 12/14/2012 | Behrooz Broukhim, MD, Inc. Defined Pension Plan & Trust | $250,000 |
| 12/17/2012 | RAM 2 GP, A General Partnership | $350,000 |
| 1/2/2013 | Morad M. Hariri Family Trust | $1,000,000 |
| 1/4/2013 | George & Soheila Daneshgar Family Living Trust Dtd. 3/14/2003 | $500,000 |
| 1/11/2013 | Ebrahim Simhaee | $100,000 |
| 1/14/2013 | Kambiz Hakim | $500,000 |
| | **SUBTOTAL:** | **$3,200,000** |
| **SECOND BATCH:** | | |
| 5/1/2013 | Morad M. Hariri Family Trust | $300,000 |
| 5/1/2013 | Kamran H. Broukhim MD DBPP | $150,000 |
| 5/1/2013 | Hariri Family 2012 Irrevocable Trust | $120,000 |
| 5/1/2013 | Max-California Associates | $100,000 |
| 5/21/2013 | Benjamin Broukhim, MD, Inc. | $120,000 |
| 5/1/2013 | Bijan Daneshgar | $100,000 |
| 5/1/2013 | Bijan Nahai | $60,000 |
| 5/1/2013 | Farhad (David) Hekmat | $60,000 |
| 5/1/2013 | Farshid Hekmat | $60,000 |
| 5/1/2013 | KRT Trust | $70,000 |
| 5/1/2013 | The Brian G. Trust, Sassan Ohebsion Trustee | $30,000 |
| 5/1/2013 | The Theodore G. Trust, Sassan Ohebsion Trustee | $30,000 |
| | **SUBTOTAL:** | **$1,200,000** |
| | **GRAND TOTAL:** | **$4,400,000** |

2.  10% Notes

| Date | Name | Loan Amount |
|---|---|---|
| **FIRST BATCH:** | | |
| 9/30/2011 | HPC Industries, LLC | $1,435,551 |
| 9/30/2011 | CLI Mason, LLC | $1,233,198 |
| 9/30/2011 | George Daneshgar, Trustee of The George & Soheila Daneshgar Family Living Trust dtd 3/14/2003 | $424,516 |

US-DOCS\109859713.4

| 9/30/2011 | Joseph and Shiva Daneshgar, Trustees of the Joseph and Shiva Daneshgar Family Living Trust | $424,949 |
|---|---|---|
| 9/30/2011 | Bahman Farahnik, Trustee of the 1996 Bahman Farahnik & Raheleh Farahnik Revocable Trust | $38,532 |
| 9/30/2011 | Sassan Ohebsion, Trustee of The Brian G. Trust | $48,592 |
| 9/30/2011 | Sassan Ohebsion, Trustee of The Theodore G. Trust | $48,592 |
| 9/30/2011 | Kambiz Hakim | $188,718 |
| 9/30/2011 | Halimi Capital LLC | $242,808 |
| 9/30/2011 | Morad Hariri, Trustee of the MoradM. Hariri Family Trust | $151,148 |
| 9/30/2011 | ANMH Investments LLC | $64,832 |
| 9/30/2011 | Marvin Liebman & Simone Liebman as trustees of the Liebman Family Trust dated 10-20-10 | $19,420 |
| 9/30/2011 | Iraj Maroofian, Trustee of the Iraj and Shirin Maroofian 2008 Trust | $27,262 |
| 9/30/2011 | David Pourbaba | $53,963 |
| 9/30/2011 | Max-California Associates, a California General Partnership | $259,202 |
| 9/30/2011 | Kamiar Torbati, Trustee of the KRT Trust Dated 5/21/07 | $80,791 |
| 9/30/2011 | Gita Torbati, Trustee of the GED Trust Dated May 11, 2010 | $53,963 |
| 9/30/2011 | AAEE Ldd. Partnership | $53,963 |
| 9/30/2011 | Richard Zirkler | $150,000 |
| | **SUBTOTAL:** | **$5,000,000** |
| **SECOND BATCH:** | | |
| 1/15/2012 | HPC Industries, LLC | $1,435,550 |
| 1/15/2012 | CLI Mason, LLC | $1,233,198 |
| 1/15/2012 | George Daneshgar, Trustee of The George & Soheila Daneshgar Family Living Trust dtd 3/14/2003 | $94,000 |
| 1/15/2012 | Joseph and Shiva Daneshgar, Trustees of the Joseph and Shiva Daneshgar Family Living Trust | $94,000 |
| 1/15/2012 | Sassan Ohebsion, Trustee of The Brian G. Trust | $94,840 |
| 1/15/2012 | Sassan Ohebsion, Trustee of The Theodore G. Trust | $94,840 |
| 1/15/2012 | Kambiz Hakim | $188,718 |
| 1/15/2012 | Halimi Capital LLC | $242,808 |
| 1/15/2012 | Morad Hariri | $151,148 |
| 1/15/2012 | ANMH Investments LLC | $64,832 |
| 1/15/2012 | Marvin Liebman & Simone Liebman as trustees of the Liebman Family Trust dated 10-20-10 | $19,420 |
| 1/15/2012 | Iraj Maroofian | $27,262 |
| 1/15/2012 | Max-California Associates, CA General Partnership | $920,667 |
| 1/15/2012 | Kamiar Torbati, Trustee of the KRT Trust Dated 5/21/07 | $80,791 |

| 1/15/2012 | Gita Torbati, Trustee of the GED Trust Dated May 11, 2010 | $107,926 |
|---|---|---|
| 1/15/2012 | Rick Zirkler | $150,000 |
|  | **SUBTOTAL:** | **$5,000,000** |
|  | **GRAND TOTAL:** | **$10,000,000** |

Schedule 1.01(c)-3

**SCHEDULE 3.01(b)**
**TO**
**CREDIT AGREEMENT**

**<u>Shareholder Notes</u>**

HPC Industries
CLI Mason
The George & Soheila Daneshgar Family Living Trust
Joseph and Shiva Daneshgar Family Living Trust
1996 Bahman Farahnik & Raheleh Farahnik Revocable Trust
Sassan Ohebsion, Trustee of the Brian G. Trust
Sassan Ohebsion, Trustee of the Theodore G. Trust
Kambiz Hakim
Halimi Capital LLC
Morad Hariri
Hariri family 2012 Irrevocable Trust
ANMH Investments LLC
Behzad Kianmahd
Daniel Nazarian
Larian Living Trust
Marvin Liebman and Simone Liebman, as trustees of the Liebman Family Trust
Iraj Maroofian
RAM2 GP, A General Partnership
Bijan Nahai
Shayesteh and Kamran Living Trust
David Pourbaba
Crown Poly, Inc.
Max-California Associates, CA General Partnership
KRT Trust Dated 5/12/07
GED Trust Dated May 11, 2010
AAE Limited Partnership
Rick Zirkler
David Simhaee
Shahram Afshani
Shahram Afshani as Trustee of the S&S Irrevocable Trust
Behrooz Broukhim, M.D, Inc. Pension Trust
Broukhim Family Trust  L.P.
Benjamin Broukhim, M.D. Inc. Defined Benefit Pension Plan
Broukhim Family Trust
Kamran H. Broukhim, M.D., D.B.P.P.
Bijan and Minoo Daneshgar Family Trust
Philip Elghanian
James Elist
The Farhad & Soheila Hekmat Family Trust dated January 12, 2010
Elliot Hekmat
Giacomo Mattioli Sole and Separate Property

Schedule 3.01(b)-1

Javaheri Family Trust
Family Fund Ventures, LLC, a California Limited Liability Company
George & Beth Hassid Family Trust
The Leon S. Kaplan Revocable Trust of Sept 04, 2008
Yoel & Monia Neman Family Trust
GS 2012 Trust
DS 2012 Trust
Elm Tree Investments, LP
Shaw Shahery 2012 Irrevocable Trust
Starson Beach, LLC
Ghadir Family Trust
Sean Daneshgar
Yashari LLC
Anne V. Waldie
Marilyn L. Hanna Trust
Kim Eaton Jeffery
Windmill Equity Fund II, LLC
Salim Investment Fund, LLC
713 Capital LP
Hope & Co. Real Estate, LLC
FPY Family Trust Farhad Yousefzadeh
Binafard Capital Partners, L.P.
Susan Azizzadeh
Iraj & Shirin Maroofian Trust Dated August 2008
AFY Nevada Trust
Sterling Capital
Lance & Linda Collins
KSLB Holding Company, LLC

**SCHEDULE 3.07**
**TO**
**CREDIT AGREEMENT**

<u>**Environmental Matters**</u>

On March 14, 2012 sodium hydroxide was released from CarbonLite Industries, Riverside California and allegedly contaminated soil near the facility.  In October 2013, the California Department of Fish and Wildlife entered into a Settlement Agreement with CarbonLite Industries for a total payment of $42,424.00 to be paid $4,243.20 semiannually through August 1, 2018.  All payments have been made and no further monies are owed. All cleanup required by the Department of Fish and Wildlife has been completed.

**SCHEDULE 3.09**
**TO**
**CREDIT AGREEMENT**

**Material Agreements**

1.  Material Agreements Pennsylvania

    a.  Customer Contracts:

        i.   Supply Agreement, dated as of May 10, 2018, by and between CarbonLite P LLC and Nestle Waters North America Inc.

        ii.  Supply Agreement, dated as of September 13, 2018, by and between CarbonLite P LLC and Nestle Waters North America Inc.

        iii. Non-Binding Letter of Understanding Following Price Negotiations for rPET Supply to the NA Market, dated as of January 24, 2019, by and between CarbonLite P LLC and Coca-Cola Cross Enterprise Procurement Group.

        iv.  Amendment 3 to Supply Agreement, dated as of November 1, 2018, by and among CarbonLite P LLC, CarbonLite Industries LLC, CarbonLite Recycling LLC, and Niagara Bottling, LLC (the "***Amendment 3 to Niagara Agreement***").

    b.  Leases:

        i.   Industrial Lease, dated as of May 31, 2019, by and between CarbonLite P LLC and BERKS61 Owner, LLC.

2.  Material Agreements PinnPack

    a.  Leases:

        i.   Standard Industrial Single-Tenant Lease – Net, dated as of June 1, 2016, by and between PinnPack Packaging LLC and Duris Corporation.

        ii.  Master Lease Agreement, dated as of March 15, 2017, by and between PinnPack Packaging LLC and Jules and Associates, Inc.

3.  Material Agreements Riverside

    a.  Customer Contracts:

        i.   Contract, dated as of September 1, 2011, by and between CarbonLite Industries LLC and Nestle Waters North America Inc.

ii.   Amendment to Contract, dated as of September 1, 2013, by and between CarbonLite Industries LLC and Nestle Waters North America Inc.

iii.  Second Amendment to Contract, dated as of May 1, 2014, by and between CarbonLite Industries LLC and Nestle Waters North America Inc.

iv.  Third Amendment to Contract, dated as of December 19, 2014, by and between CarbonLite Industries LLC and Nestle Waters North America Inc.

v.   Fourth Amendment to Contract, dated as of December 21, 2015, by and between CarbonLite Industries LLC and Nestle Waters North America Inc.

vi.  Fifth Amendment to Contract, dated as of December 14, 2016, by and between CarbonLite Industries LLC and Nestle Waters North America Inc.

vii. Sixth Amendment to Contract, dated as of March 10, 2017, by and between CarbonLite Industries LLC and Nestle Waters North America Inc.

viii. Seventh Amendment to Contract, dated as of November 6, 2017, by and between CarbonLite Industries LLC and Nestle Waters North America Inc.

ix.  Eighth Amendment to Contract, dated as of May 1, 2018, by and between CarbonLite Industries LLC and Nestle Waters North America Inc.

x.   Ninth Amendment to Contract, dated as of October 18, 2018, by and between CarbonLite Industries LLC and Nestle Waters North America Inc.

xi.  Tenth Amendment to Contract, dated as of January 1, 2019, by and between CarbonLite Industries LLC and Nestle Waters North America Inc.

xii. PCR Resin Agreement, dated as of February 22, 2018, by and between CarbonLite Industries LLC and Pepsi-Cola Advertising and Marketing, Inc.

xiii. Agreement, dated as of July 29, 2010, by and between CarbonLite Industries LLC and Pepsi-Cola Advertising and Marketing, Inc.

xiv. Agreement, dated as of April 29, 2016, by and between CarbonLite Industries LLC and Pepsi-Cola Advertising and Marketing, Inc.

xv.  Amendment #1 to Agreement to Purchase PCR Resin, dated as of June 22, 2016, by and between CarbonLite Industries LLC and Pepsi-Cola Advertising and Marketing, Inc.

xvi. PCR Resin Agreement, dated as of June 28, 2018, by and between CarbonLite Industries LLC and Pepsi-Cola Advertising and Marketing, Inc.

xvii. Reference is made to Amendment 3 to Niagara Agreement.

b.  Leases:

    i. Standard Multi-Tenant Office Lease – Gross, dated as of February 12, 2016, by and between CarbonLite Industries LLC and 2245 Valley Blvd, LLC.

    ii. Addendum to Lease, dated as of March 25, 2016, by and between CarbonLite Industries LLC and 2245 Valley Blvd, LLC.

    iii. Second Amendment to Lease, dated as of July 25, 2017, by and between CarbonLite Industries LLC and 2245 Valley Blvd, LLC.

    iv. Third Amendment to Lease, dated as of August 14, 2018, by and between CarbonLite Industries LLC and 2245 Valley Blvd, LLC.

    v. Standard Industrial/Commercial Multi-Tenant Lease – Gross, dated as of June 23, 2016, by and between CarbonLite Industries LLC and One Miracle Property.

    vi. First Amendment to Lease, dated as of March 17, 2017, by and between CarbonLite Industries LLC and One Miracle Property.

    vii. Second Amendment to Lease, dated as of January 10, 2018, by and between CarbonLite Industries LLC and One Miracle Property.

    viii. Columbia Business Center Building Lease, dated as of October 1, 2010, by and between CarbonLite Industries LLC and Columbia Business Center, LLC.

4. Material Agreements Texas

  a. Customer Contracts:

    i. Supply Agreement, dated as of October 28, 2013, by and between CarbonLite Recycling LLC and Nestle Waters North America Inc.

    ii. Amendment to Contract, dated as of April 13, 2016, by and between CarbonLite Recycling LLC and Nestle Waters North America Inc.

    iii. Second Amendment to Contract, dated as of December 14, 2016, by and between CarbonLite Recycling LLC and Nestle Waters North America Inc.

    iv. Third Amendment to Contract, dated as of December 14, 2016, by and between CarbonLite Recycling LLC and Nestle Waters North America Inc.

    v. Fourth Amendment to Contract, dated as of November 6, 2017, by and between CarbonLite Recycling LLC and Nestle Waters North America Inc.

    vi. Fifth Amendment to Contract, dated as of April 10, 2018, by and between CarbonLite Recycling LLC and Nestle Waters North America Inc.

    vii.  Sixth Amendment to Contract, dated as of October 18, 2018, by and between CarbonLite Recycling LLC and Nestle Waters North America Inc.

   viii.  Seventh Amendment to Contract, dated as of February 7, 2019, by and between CarbonLite Recycling LLC and Nestle Waters North America Inc.

    ix.  Supply Agreement, dated as of November 1, 2017, by and between CarbonLite Recycling LLC and Niagara Bottling, LLC.

    x.  Amendment 1 to Supply Agreement, dated as of March 8, 2018, by and between CarbonLite Recycling LLC and Niagara Bottling, LLC.

    xi.  Amendment 2 to Supply Agreement, dated as of April 17, 2018, by and between CarbonLite Recycling LLC and Niagara Bottling, LLC.

    xii.  Reference is made to Amendment 3 to Niagara Agreement.

b.  Leases:

    i.  Lease Agreement, dated as of October 17, 2016, by and between CarbonLite Recycling LLC and PIHV Mountain Creek, LLC.

US-DOCS\109859713.4

**SCHEDULE 3.11**
**TO**
**CREDIT AGREEMENT**

**<u>Taxes</u>**

None.

**SCHEDULE 3.17**
**TO**
**CREDIT AGREEMENT**

**<u>Insurance</u>**

None.

**SCHEDULE 3.19(b)**
**TO**
**CREDIT AGREEMENT**

**Subsidiaries**

| Loan Party | Subsidiary |
|---|---|
| CarbonLite Holdings, LLC | CarbonLite Sub-Holdings, LLC |
| CarbonLite Sub-Holdings, LLC | CarbonLITE PI Holdings, LLC |
| | CarbonLite Recycling Holdings LLC |
| | CarbonLite P Holdings LLC |
| CarbonLITE PI Holdings, LLC | CarbonLite Industries LLC |
| | CarbonLite Pinnpack, LLC |
| CarbonLite Recycling Holdings LLC | CarbonLite Recycling LLC |
| CarbonLite P Holdings LLC | CarbonLite P LLC |
| CarbonLite Industries LLC | None |
| CarbonLite Pinnpack, LLC | PinnPack Packaging LLC |
| PinnPack Packaging LLC | None |
| CarbonLite Recycling LLC | None |
| CarbonLite P LLC | None |

**SCHEDULE 3.21**
**TO**
**CREDIT AGREEMENT**

**Transactions with Affiliates**

1.  The 7% Notes and the 10% Notes held by Affiliates.

2.  Emil Halimi Notes as follows (collectively, the "***Emil Halimi Note***"):

    a.  $1,000,000 promissory note, issued October 12, 2017, by Borrower in favor of Emil Halimi.

    b.  $1,000,000 promissory note, issued April 24, 2018, by Borrower in favor of Emil Halimi.

    c.  $1,000,000 promissory note, issued May 21, 2018, by Borrower in favor of Emil Halimi.

    d.  $1,000,000 promissory note, issued June 7, 2018, by Borrower in favor of Emil Halimi.

    e.  $2,000,000 promissory note, issued July 8, 2019, by Borrower in favor of Emil Halimi.

3.  The following management fees paid to HPC:

| Entity | Monthly Management Fee | Annual Management Fee |
|---|---|---|
| CL Industries | $67,501.00 | $810,012.00 |
| CL Recycling | $64,047.00 | $768,564.00 |
| CL Pinnpack | $32,024.00 | $384,288.00 |
| **Total** | $163,572.00 | $1,962,864.00 |

4.  $12,478,481 loan from CarbonLite P, LLC to Borrower.

**SCHEDULE 5.04**
**TO**
**CREDIT AGREEMENT**

**<u>Governmental Authorizations</u>**

None.

**SCHEDULE 5.13(a)**
**TO**
**CREDIT AGREEMENT**

**Use of Proceeds**

[*Please see attached*]

**CarbonLITE Holdings, LLC**
*Sources and Uses for Funds Flow*

*Strictly Confidential*
*as of 8/01/19*

### Initial Funding | Schedule 5.13(a)

| Sources | ($) |
|---|---|
| *Orion Energy Debt Funding - Initial Funding* | |
| Orion Energy Loan Proceeds | $71,800,000.00 |
| | |
| **Total Sources (Initial Funding)** | **$71,800,000.00** |

| Uses | ($) | Notes: |
|---|---|---|
| *Loan and Shareholder Note Repayment* | | |
| Refinance CVC/Comvest | $33,113,253.03 | |
| CVC/Comvest Release Legal Fees | $10,000.00 | |
| Refinance Texas Capital Bank | $14,576,113.79 | |
| Hong Note Principal | $1,750,000.00 | |
| Other Shareholder Notes Principal/Interest | $3,000,000.00 | See footnotes (1) and (2) below |
| Halimi Notes | $4,000,000.00 | See "Loan Paydown Detail" tab for detail |
| PA Facility Bridge Loan Repayment | $10,000,000.00 | See "Loan Paydown Detail" tab for detail |
| | | |
| *Cash to CarbonLITE Collateral Accounts* | | |
| Funds to Borrower Account | $924,926.58 | To be utilized for liquidity at CarbonLITE PI |
| | | |
| *CarbonLITE Transaction Expenses* | | |
| FocalPoint Securities, LLC | $2,010,000.00 | |
| Reed Smith, LLP | $250,000.00 | |
| | | |
| *Orion Energy Transaction Expenses* | | |
| Orion Energy Loan Discount | $1,795,000.00 | |
| Orion Energy Agent Reimbursement | $50,000.00 | |
| Latham & Watkins, LLP | $313,632.50 | See "Orion Energy Expense Detail" tab for detail |
| Other Due Diligence Expenses in Excess of Deposit | $7,074.10 | See "Orion Energy Expense Detail" tab for detail |
| | | |
| **Total Uses (Initial Funding)** | **$71,800,000.00** | |

### Second Funding | Schedule 5.13(b)

| Sources | ($) |
|---|---|
| *Orion Energy Debt Funding - Second Funding* | |
| Orion Energy Loan Proceeds | $8,200,000.00 |
| | |
| **Total Sources (Second Funding)** | **$8,200,000.00** |

| Uses | ($) |
|---|---|
| *Cash to CarbonLITE Collateral Accounts* | |
| Funds to Debt Service Reserve Account | $7,730,000.00 |
| Funds to Borrower Account | $255,000.00 |
| | |
| *Orion Energy Transaction Expenses* | |
| Orion Energy Loan Discount | $205,000.00 |
| Latham & Watkins, LLP | $10,000.00 |
| | |
| **Total Uses (Second Funding)** | **$8,200,000.00** |

| | ($) |
|---|---|
| **Total Sources** | **$80,000,000.00** |
| **Total Uses** | **$80,000,000.00** |
| | |
| **Gross Amount of Orion Energy Funding** | **$80,000,000.00** |
| **Total Cash to Balance Sheet/Available for Shareholders** | **$4,179,926.58** |

**Footnotes:**
(1) For the avoidance of doubt, does not include any paydown of the HPC Notes
(2) A portion of the cash allocated for the paydown of the SH Loans is expected to remain as cash on the balance sheet initially, and used to paydown SH Loans 30-60 days post-closing

**SCHEDULE 6.02**
**TO**
**CREDIT AGREEMENT**

**Permitted Indebtedness**

1.    Until the application of proceeds of the Loans on the Initial Funding Date in accordance with Section 5.13:

    a.    ABL Credit Agreement.

    b.    Term Loan Credit Agreement.

    c.    Emil Halimi Notes (as defined on Schedule 3.21).

    d.    $2,000,000 promissory note, issued July 8, 2019, by Borrower in favor of Kelton Associates, LP.

    e.    $2,000,000 promissory note, issued July 8, 2019, by Borrower in favor of KRT Trust.

    f.    $4,000,000 promissory note, issued July 8, 2019, by Borrower in favor of Torbati Brothers LP.

    g.    $1,750,000 promissory note, issued November 13, 2017, by Pinnpack Packaging LLC in favor of Leading Industry, Inc.

2.    Indebtedness incurred in connection with that certain Business Loan Agreement (Loan #2016-431), dated December 11, 2017, between PinnPack, as borrower, and State of California, Department of Resources Recycling and Recovery, as lender.

    a.    Guarantees thereof by Borrower, CL Pinnpack and CL PI Holdings.

    b.    $2,000,000 promissory note issued thereunder on December 11, 2017 by PinnPack.

3.    $12,478,481 loan from CarbonLite P, LLC to Borrower.

US-DOCS\109859713.4

**SCHEDULE 6.03**
**TO**
**CREDIT AGREEMENT**

**Permitted Liens**

1.      Until the application of proceeds of the Loans on the Initial Funding Date in accordance with Section 5.13, liens securing the Indebtedness described in Paragraphs 1 of Schedule 6.02.

2.      Liens, securing the Indebtedness described in Paragraph 2 of Schedule 6.02, on the equipment thereby financed and related change orders, accessions, additions, replacements, substitutions, records, and proceeds.

**SCHEDULE 6.04**
**TO**
**CREDIT AGREEMENT**

**Permitted Investments**

1.      $12,478,481 loan from CarbonLite P, LLC to Borrower.