EXHIBIT 3

*Execution Version*

# AMENDMENT NO. 2 TO
# CREDIT AGREEMENT

THIS AMENDMENT NO. 2 TO CREDIT AGREEMENT (this "<u>Amendment</u>"), effective as of September 9, 2020 (this "<u>Amendment</u>"), is among CarbonLite Holdings, LLC (the "<u>Borrower</u>"), certain Subsidiaries of the Borrower as guarantors (the "<u>Guarantors</u>" and, with the Borrower, the "<u>Loan Parties</u>"), the existing lenders party hereto (the "<u>Tranche A Lenders</u>"), the financial institutions party hereto as "Tranche B Lenders" as identified on the signature pages hereto (the "<u>Tranche B Lenders</u>" and, collectively with the Tranche A Lenders, the "<u>Lenders</u>"), Orion Energy Partners Investment Agent, LLC, as Administrative Agent ("<u>Administrative Agent</u>") and Orion Energy Partners Investment Agent, LLC, as Collateral Agent ("<u>Collateral Agent</u>") and relates to that certain Credit Agreement, dated as of August 2, 2019, (the "<u>Original Credit Agreement</u>", and as amended by that Amendment No. 1 to Credit Agreement and Waiver, dated March 30, 2020 ("<u>Amendment No. 1</u>"), and as further amended, restated, amended and restated, supplemented or otherwise modified prior to the date hereof, the "<u>Existing Credit Agreement</u>") among the Borrower, the Guarantors, the Existing Lenders, Administrative Agent, Collateral Agent and the other persons party thereto.

## W I T N E S S E T H

WHEREAS, pursuant to this Amendment, the Borrower has requested, and the Administrative Agent and Lenders have agreed, subject to the terms and conditions of this Amendment, to amend the Existing Credit Agreement on the Amendment No. 2 Effective Date (as defined below), as specified in <u>Section 3</u> below;

WHEREAS, pursuant to this Amendment, the Borrower is requesting the commitment and funding of a new tranche of loans in an aggregate principal amount of $5,250,000 (the "<u>Tranche B Facility</u>") by one or more of the Lenders;

WHEREAS, certain of the Lenders party hereto as Tranche B Lenders are willing to provide the Tranche B Facility subject to the terms and conditions herein and in the Amended Credit Agreement (as defined below);

NOW, THEREFORE, in consideration of the premises contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound hereby, agree as follows:

Section 1.    ***Definitions***.  Unless otherwise defined in this Amendment, each capitalized term used in this Amendment has the meaning assigned to such term in the Amended Credit Agreement.

Section 2.    ***Tranche B Commitments.***

(a)    Subject to the satisfaction of all of the conditions precedent set forth in <u>Section 4</u> hereof, as of the Amendment No. 2 Effective Date, each Tranche B Lender hereby:

(i)    severally commits to make one or more Tranche B Loans to the Borrower pursuant to the provisions of, and subject to the conditions contained in, the Amended Credit Agreement in an amount up to the commitment amount set forth next to such Tranche B Lender's name on Exhibit A attached hereto under the caption "Tranche B Commitments" (the "Tranche B Commitments"); and

(ii)    agrees, subject to the satisfaction of the conditions set forth in Section 4 hereto, to make Tranche B Loans to the Borrower pursuant to the Amended Credit Agreement on September 9, 2020, funded in accordance with the Tranche B Funds Flow Memorandum (as defined in the Amended Credit Agreement), in an amount equal to the commitment amount set forth next to such Tranche B Lender's name on Exhibit A attached hereto under the caption "Tranche B Commitments."

(b)    Subject to the satisfaction of all the conditions precedent set forth in Section 4 hereof, as of the Amendment No. 2 Effective Date, each Lender (including the Tranche B Lenders) hereby:

(i)    consents to the incurrence by Borrower of the Tranche B Commitments (including any Tranche B Loans incurred in respect thereof); and

(ii)    agrees that the Tranche B Commitments, and any Tranche B Loans incurred in respect thereof, shall be Commitments and Loans for all purposes under the Amended Credit Agreement.

Section 3.    ***Amendments to the Existing Credit Agreement***.    Effective as of the Amendment No. 2 Effective Date, each of the Administrative Agent, the Lenders and the Borrower hereby consents to the following amendments, to be effective on and as of the Amendment No. 2 Effective Date:

(a)    the amendment of the Existing Credit Agreement to delete the stricken text (indicated textually in the same manner as the following example: ~~stricken text~~) and to add the double-underlined text (indicated textually in the same manner as the following example: **double-underlined text**) as set forth in Exhibit A hereto;

(b)    the amendment and restatement of Annex I to the Existing Credit Agreement, as set forth in Exhibit B hereto;

(c)    the deletion of the documents attached as Exhibit L to the Existing Credit Agreement pursuant to Amendment No. 1 and the replacement thereof with the documents attached as Exhibit C hereto; and

(d)    the amendment and restatement of Schedule 3.09 to the Existing Credit Agreement, as set forth in Exhibit D hereto;

(the Existing Credit Agreement as so amended, the "Amended Credit Agreement").

Section 4.    ***Effectiveness of Amendment***.  This Amendment shall become effective on the date (the "Amendment No. 2 Effective Date") on which each of the following conditions is satisfied:

(a)    This Amendment shall have been executed by each of (i) the Administrative Agent, (ii) the Lenders and (iii) the Borrower, and the Administrative Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto.

(b)    No Default or Event of Default shall have occurred and be continuing as of the Amendment No. 2 Effective Date.

(c)    The representations and warranties of the Loan Parties contained in the Amended Credit Agreement and the representations and warranties of the Loan Parties contained in Section 6 hereof shall be true and correct in all material respects (except where already qualified by materiality or Material Adverse Effect, in which case, in all respects) on and as of the Amendment No. 2 Effective Date (unless stated to relate solely to an earlier date, in which case such representations and warranties were true and correct as of such earlier date).

(d)    The Administrative Agent shall have received the Unconditional Guaranty (as defined in the Amended Credit Agreement) in respect of the Tranche B Loans, duly executed by the Leon Faranik and the Collateral Agent.

(e)    The Tranche B Lenders shall have received a loan discount letter reasonably acceptable to the Tranche B Lenders, duly executed by each Tranche B Lender and the Borrower.

(f)    The Administrative Agent shall have received the Tranche B Funds Flow Memorandum (as defined in the Amended Credit Agreement), in form and substance satisfactory to the Administrative Agent.

(g)    The Administrative Agent, the Lenders and their counsel shall have been paid or reimbursed by the Borrower for all reasonable and documented out-of-pocket expenses associated with the preparation, negotiation and execution of this Amendment, Amendment No. 1 and the review of the documentation attached to the Amended Credit Agreement as Exhibit L (including, without limitation, the fees and expenses of Latham & Watkins pursuant to invoices dated March 19, 2020 and September 8, 2020).

(h)    The Administrative Agent shall have received (i) an executed copy of a $5,000,000 Promissory Note, dated on or prior to the date hereof, between the Borrower and Niagara Bottling, LLC, which shall be substantially in the form previously presented to and approved by the Administrative Agent and (ii) evidence reasonably satisfactory to it that Niagara Bottling, LLC has funded $5,000,000 under the foregoing promissory note.

(i)    The Administrative Agent shall have received a joinder to the Security Agreement, dated as of the date hereof, by and between the Collateral Agent and Pinnpack P.

3

Section 5.    ***Ratification of Obligations***.    Each of the Borrower and Guarantors each hereby (a) ratifies and confirms all of their respective Obligations under the Amended Credit Agreement and the other Financing Documents related thereto, (b) affirms that, after giving effect to this Amendment, all of its pledges, grants of security interests and Liens and other obligations under the Security Documents are reaffirmed and remain in full force and effect on a continuous basis, (c) reaffirms each Lien granted by it to the Collateral Agent and (d) acknowledges and agrees that the grants of security interests and Liens by it contained in the Security Documents are, and shall remain, in full force and effect on and after the Amendment No. 2 Effective Date.

Section 6.    ***Representations and Warranties.***    In order to induce each other party hereto to enter into this Amendment, each Loan Party represents and warrants to each other party hereto as follows:

(a)    Each Loan Party has full corporate, limited liability company or other organizational powers, authority and legal right to enter into, deliver and perform its respective obligations under the Amendment to consummate each of the transactions contemplated herein and therein, and has taken all necessary corporate, limited liability company or other organizational action to authorize the execution, delivery and performance by it of the Amendment. The Amendment has been duly executed and delivered by such Loan Party and is in full force and effect and constitutes a legal, valid and binding obligation of such Loan Party, enforceable against such Loan Party in accordance with its respective terms, except as enforcement may be limited (i) by Bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance or other similar laws affecting creditors' rights generally, (ii) by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law) and (iii) by implied covenants of good faith and fair dealing.

(b)    The execution, delivery and performance by each Loan Party of this Amendment and all other documents and instruments to be executed and delivered hereunder by it, as well as the consummation of the transactions contemplated herein and therein, do not and will not (i) conflict with the Organizational Documents of such Loan Party, (ii) conflict with or result in a breach of, or constitute a default under, any indenture, loan agreement, mortgage, deed of trust or other material instrument or agreement to which such Loan Party (and, as of the Amendment No. 2 Effective Date, any Non-Guarantor Subsidiary) is a party or by which it is bound or to which such Loan Party's (and, as of the Amendment No. 2 Effective Date, any Non-Guarantor Subsidiary's) property or assets are subject, (iii) conflict with or result in a breach of, or constitute a default under, in any material respect, any Applicable Law or (iv) with respect to each Loan Party (and, as of the Amendment No. 2 Effective Date, each Non-Guarantor Subsidiary), result in the creation or imposition of any Lien (other than a Permitted Lien) upon any of such Borrower Group Member's property or the Collateral.

(c)    Each Loan Party (and, as of the Amendment No. 2 Effective Date, each Non-Guarantor Subsidiary) has obtained all material Authorizations required under any Applicable Law to be issued to, assigned to, or otherwise assumed by, such Borrower Group Member and necessary for (i) the Business or (ii) the execution, delivery and performance by each Loan Party of this Amendment other than, in each case,

4

Authorizations that are not currently necessary and are obtainable in the ordinary course of business.

(d)     Each Loan Party (and, as of the Amendment No. 2 Effective Date, each Non-Guarantor Subsidiary) is in material compliance with each Authorization by a Governmental Authority currently in effect.

(e)     As of the Amendment No. 2 Effective Date, the conditions precedent set forth in <u>Section 4</u> above have been satisfied.

Section 7.     *Joinder of PinnPack P*.  In connection with this Amendment No. 2, PinnPack P and each other party party hereto hereby agrees as follows:

(a)     PinnPack P hereby agrees to be bound as a party to the Amended Credit Agreement as a "Guarantor" and a "Loan Party" thereunder pursuant to the terms and conditions set forth therein to the same extent that it would have been bound if it had been a signatory to the Original Credit Agreement; and

(b)     PinnPack P represents and warrants that the representations and warranties made by it as a Loan Party under Article III of the Amended Credit Agreement are true and correct in all material respects on and as of the date hereof, provided that, to the extent that such representations and warranties specifically refer to an earlier date, they shall be deemed to refer to the date hereof.

Section 8.     *Governing Law*.  THIS AMENDMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AMENDMENT (INCLUDING ANY CLAIM OR CONTROVERSY ARISING OUT OF OR RELATING TO THIS AMENDMENT WHETHER SOUNDING IN CONTRACT LAW, TORT LAW OR OTHERWISE) SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAW PRINCIPLES THAT WOULD RESULT IN THE APPLICATION OF ANY LAW OTHER THAN THE LAW OF THE STATE OF NEW YORK.

Section 9.     *Miscellaneous*.

(a)     On and after the Amendment No. 2 Effective Date, each reference in the Amended Credit Agreement to "this Agreement", "hereunder", "hereof" or words of like import, referring to the Amended Credit Agreement, and each reference in each other Financing Document to "the Credit Agreement", "thereunder", "thereof" or words of like import referring to the Amended Credit Agreement, shall mean and be a reference to the Amended Credit Agreement as amended or otherwise modified by this Amendment.  This Amendment shall constitute a Financing Document for purposes of the Amended Credit Agreement.

(b)     The execution, delivery and effectiveness of this Amendment shall not operate as a waiver of any default of the Borrower or any right, power or remedy of the Administrative Agent or the Lenders under any of the Financing Documents, nor constitute a waiver of any provision of any of the Financing Documents.

Section 10. ***Severability***. Any provisions of this Amendment held by a court of competent jurisdiction to be invalid or unenforceable shall not impair or invalidate the remainder of this Amendment and the effect thereof shall be confined to the provisions so held to be invalid.

Section 11. ***Successors and Assigns***. This Amendment is binding upon and shall inure to the benefit of the Administrative Agent, the Lenders and the Borrower and their respective successors and permitted assigns.

Section 12. ***Counterparts***. This Amendment may be executed by one or more of the parties to this Amendment on any number of separate counterparts (including by facsimile or other electronic transmission, *i.e.* a "pdf" or a "tif"), and all of said counterparts taken together shall be deemed to constitute one and the same instrument. A set of the copies of this Amendment signed by all parties shall be lodged with the Borrower and the Administrative Agent. The words "execution," "execute", "signed," "signature," and words of like import in or related to any document to be signed in connection with this Amendment shall be deemed to include electronic signatures, deliveries or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

Section 13. ***Headings***. The headings, captions and arrangements used in this Amendment are for convenience only and shall not affect the interpretation of this Amendment or any other Financing Document.

Section 14. ***Integration***. This Amendment represents the agreement of the Borrower, the Administrative Agent and the Lenders with respect to the subject matter hereof, and there are no promises, undertakings, representations or warranties by the Borrower, any Agent nor any Lender relative to subject matter hereof not expressly set forth or referred to herein.

[*Signature Pages Follow*]

IN WITNESS WHEREOF, each of the parties hereto has caused this Amendment to be executed by its officer(s) thereunto duly authorized as of the date first above written.

CarbonLite Holdings, LLC

By _____
Leon Farahnik
Chief Executive Officer

CarbonLite Sub-Holdings, LLC
By CarbonLite Holdings, LLC, its sole member

By _____
Leon Farahnik
Chief Executive Officer

CarbonLITE PI Holdings, LLC
By CarbonLite Sub-Holdings, LLC, its sole Member
By CarbonLite Holdings, LLC, its sole member

By _____
Leon Farahnik
Chief Executive Officer

CarbonLite Industries LLC
By CarbonLITE PI Holdings LLC, its sole Member
By CarbonLite Sub-Holdings, LLC, its sole Member
By CarbonLite Holdings, LLC, its sole member

By _____
Leon Farahnik
Chief Executive Officer

CarbonLite Pinnpack, LLC
   By CarbonLITE PI Holdings, LLC, its sole Member
      By CarbonLite Sub-Holdings, LLC, its sole Member
         By CarbonLite Holdings, LLC, its sole member

By _____
    Leon Farahnik
    Chief Executive Officer


PinnPack Packaging, LLC
   By CarbonLITE Pinnpack, LLC, its Managing Member
      By CarbonLITE PI Holdings, LLC, its sole Member
         By CarbonLite Sub-Holdings, LLC, its sole Member
            By CarbonLite Holdings, LLC, its sole member

By _____
    Leon Farahnik
    Chief Executive Officer

PinnPack P, LLC

By _____
    Leon Farahnik
    Chief Executive Officer

ORION ENERGY PARTNERS INVESTMENT AGENT, LLC,
as Administrative Agent and Collateral Agent

By: _____
     Name:  Gerrit Nicholas
     Title:  Managing Partner


ORION ENERGY CREDIT OPPORTUNITIES FUND II, L.P.,
as a Lender

By: Orion Energy Credit Opportunities Fund II GP, L.P.
Its: General Partner

By: Orion Energy Credit Opportunities Fund II Holdings, LLC
Its: General Partner

By: _____
     Name:  Gerrit Nicholas
     Title:  Managing Partner


ORION ENERGY CREDIT OPPORTUNITIES FUND II PV, L.P.,
as a Lender

By: Orion Energy Credit Opportunities Fund II GP, L.P.
Its: General Partner

By: Orion Energy Credit Opportunities Fund II Holdings, LLC
Its: General Partner

By: _____
     Name:  Gerrit Nicholas
     Title:  Managing Partner

ORION ENERGY CREDIT OPPORTUNITIES
FUND II GPFA, L.P.,
as a Lender

By: Orion Energy Credit Opportunities Fund II GP,
L.P.
Its: General Partner

By: Orion Energy Credit Opportunities Fund II
Holdings, LLC
Its: General Partner

By: _____
     Name:  Gerrit Nicholas
     Title:  Managing Partner


ORION ENERGY CREDIT OPPORTUNITIES
CARBONLITE CO-INVEST, L.P.,
as a Lender

By: Orion Energy Credit Opportunities Fund II GP,
L.P.
Its: General Partner

By: Orion Energy Credit Opportunities Fund II
Holdings, LLC
Its: General Partner

By: _____
     Name:  Gerrit Nicholas
     Title:  Managing Partner

## **EXHIBIT A**
CREDIT AGREEMENT


[Attached.]

*Execution Version*

CREDIT AGREEMENT

dated as of

August 2, 2019

**As amended by Amendment No. 1 to the Credit Agreement and Waiver, dated March 30, 2020 and Amendment No. 2 to the Credit Agreement, dated September 9, 2020**

among

CARBONLITE HOLDINGS, LLC,
as Borrower,

CERTAIN SUBSIDIARIES OF CARBONLITE HOLDINGS, LLC,
as Guarantors,

THE LENDERS PARTY HERETO,

and

ORION ENERGY PARTNERS INVESTMENT AGENT, LLC,
as Administrative Agent and Collateral Agent

$100,000,000 Senior Secured Term Loan Facility

**TABLE OF CONTENTS**

**ARTICLE I DEFINITIONS** ................................................................................................ 1
    Section 1.01__Certain Defined Terms ........................................................................... 1
    Section 1.02__Terms Generally ............................................................................... **2832**
    Section 1.03__Accounting Terms ............................................................................ **2933**

**ARTICLE II THE CREDITS** ...................................................................................... **3033**
    Section 2.01__Loans ................................................................................................ **3033**
    Section 2.02__Funding of the Loans ...................................................................... **3135**
    Section 2.03__Termination and Reduction of the Commitments ............................ **3135**
    Section 2.04__Repayment of Loan; Evidence of Debt .......................................... **3135**
    Section 2.05__Prepayment of the Loan .................................................................. **3236**
    Section 2.06__Reimbursements ............................................................................... **3541**
    Section 2.07__Interest ............................................................... **36; Minimum Return**     **42**
    Section 2.08__[Reserved] ........................................................................................ **3743**
    Section 2.09__Taxes ................................................................................................ **3743**
    Section 2.10__Payments Generally; Pro Rata Treatment; Sharing of Setoffs ........ **4046**
    Section 2.11__Mitigation Obligations; Replacement of Lenders ........................... **4248**
    Section 2.12__Acknowledgement and Consent to Bail-In of EEA Financial
        Institutions ...................................................................................... **4248**
    Section 2.13__Incremental Facility ........................................................................ **4349**

**ARTICLE III REPRESENTATIONS AND WARRANTIES** ...................................... **4350**
    Section 3.01__Due Organization, Etc. ................................................................... **4350**
    Section 3.02__Authorization, Etc. .......................................................................... **4450**
    Section 3.03__No Conflict ...................................................................................... **4451**
    Section 3.04__Approvals, Etc. ................................................................................ **4551**
    Section 3.05__Financial Statements ....................................................................... **4551**
    Section 3.06__Litigation ......................................................................................... **4552**
    Section 3.07__Environmental Matters .................................................................... **4652**
    Section 3.08__Compliance with Laws and Obligations ......................................... **4753**
    Section 3.09__Material Agreements; Bond Documents .......................................... **4753**
    Section 3.10__Intellectual Property; Licenses ....................................................... **4753**
    Section 3.11__Taxes ............................................................................................... **4854**
    Section 3.12__Disclosure ........................................................................................ **4854**
    Section 3.13__Solvency .......................................................................................... **4955**
    Section 3.14__Regulatory Restrictions on the Loan .............................................. **4955**
    Section 3.15__Title; Security Documents .............................................................. **4955**
    Section 3.16__ERISA ............................................................................................. **4955**
    Section 3.17__Insurance .......................................................................................... **4955**
    Section 3.18__Use of Proceeds .............................................................................. **5056**
    Section 3.19__Membership Interests and Related Matters ..................................... **5056**
    Section 3.20__[Reserved] ........................................................................................ **5056**
    Section 3.21__No Agreements with Affiliates ....................................................... **5056**

Section 3.22__No Bank Accounts ................................................................... 5056
Section 3.23__No Default or Event of Default ............................................... 5056
Section 3.24__Foreign Assets Control Regulations ........................................ 5056
Section 3.25__Commercial Activity; Absence of Immunity ........................... 5157

**ARTICLE IV CONDITIONS** ................................................................... 5157
Section 4.01__Conditions to the Closing Date .............................................. 5157
Section 4.02__Conditions to the Initial Funding Date ................................... 5359
Section 4.03__Conditions to Each Funding Date ........................................... 5561
Section 4.04__Satisfaction of Conditions ...................................................... 5662

**ARTICLE V AFFIRMATIVE COVENANTS** .......................................... 5763
Section 5.01__Corporate Existence; Etc. ...................................................... 5763
Section 5.02__Conduct of Business ............................................................... 5763
Section 5.03__Compliance with Laws and Obligations ................................. 5763
Section 5.04__Governmental Authorizations ................................................ 5763
Section 5.05__Maintenance of Title .............................................................. 5763
Section 5.06__Insurance ............................................................................... 5764
Section 5.07__Keeping of Books ................................................................... 5864
Section 5.08__Access to Property/Records .................................................... 5864
Section 5.09__Taxes ..................................................................................... 5965
Section 5.10__Financial Statements; Other Reporting Requirements ............ 5965
Section 5.11__Notices ................................................................................... 6066
Section 5.12__[Reserved] ............................................................................. 6268
Section 5.13__Use of Proceeds ..................................................................... 6268
Section 5.14__Security .................................................................................. 6268
Section 5.15__Further Assurances ................................................................ 6268
Section 5.16__Security in Newly Acquired Property and Revenues .............. 6269
Section 5.17__Material Agreements .............................................................. 6369
Section 5.18__Collateral Accounts ............................................................... 6369
Section 5.19__Intellectual Property .............................................................. 6570
Section 5.20__Budget and Updated Model; Non-Guarantor Subsidiaries ...... 6671
Section 5.21__Post-Closing Covenants ......................................................... 6772

**ARTICLE VI NEGATIVE COVENANTS** ............................................... 6874
Section 6.01__Subsidiaries; Equity Issuances .............................................. 6874
Section 6.02__Indebtedness .......................................................................... 6875
Section 6.03__Liens, Etc. ............................................................................. 7076
Section 6.04__Investments ........................................................................... 7178
Section 6.05__Chief Executive Office; Business Activities ........................... 7279
Section 6.06__Restricted Payments .............................................................. 7279
Section 6.07__Fundamental Changes; Asset Dispositions ............................ 7380
Section 6.08__Accounting Changes .............................................................. 7481
Section 6.09__Material Agreements, Bond Documents and Permitted Revolving
        Facilities .......................................................................................... 7481
Section 6.10__Transactions with Affiliates ................................................... 7582
Section 6.11__Collateral Accounts ............................................................... 7682

Section 6.12 [Reserved]................................................................................ ~~76~~83
Section 6.13 Hazardous Materials................................................................. ~~76~~83
Section 6.14 No Hedging or Speculative Transactions................................. ~~76~~83
Section 6.15 Change of Auditors.................................................................. ~~76~~83
Section 6.16 Purchase of Capital Stock........................................................ ~~76~~83
Section 6.17 [Reserved]................................................................................ ~~76~~83
Section 6.18 Capital Expenditures................................................................ ~~76~~83

**ARTICLE VII EVENTS OF DEFAULT**................................................... ~~77~~83
Section 7.01 Events of Default..................................................................... ~~77~~83
Section 7.02 Application of Proceeds........................................................... ~~81~~88

**ARTICLE VIII THE AGENTS**................................................................... ~~81~~89
Section 8.01 Appointment and Authorization of the Agents........................ ~~81~~89
Section 8.02 Rights as a Lender.................................................................... ~~81~~89
Section 8.03 Duties of Agent; Exculpatory Provisions................................ ~~82~~89
Section 8.04 Reliance by Agent.................................................................... ~~82~~90
Section 8.05 Delegation of Duties................................................................ ~~82~~90
Section 8.06 Withholding of Taxes by the Administrative Agent;
           Indemnification.................................................................... ~~82~~90
Section 8.07 Resignation of Agent................................................................ ~~83~~91
Section 8.08 Non-Reliance on Agent or Other Lenders................................ ~~84~~91
Section 8.09 No Other Duties; Etc. ............................................................. ~~84~~91

**ARTICLE IX GUARANTY**.......................................................................... ~~84~~92
Section 9.01 Guaranty.................................................................................. ~~84~~92
Section 9.02 Guaranty Unconditional.......................................................... ~~85~~92
Section 9.03 Discharge Only Upon Payment in Full; Reinstatement in Certain
           Circumstances....................................................................... ~~85~~93
Section 9.04 Waiver by the Guarantors........................................................ ~~85~~93
Section 9.05 Subrogation.............................................................................. ~~86~~94
Section 9.06 Acceleration.............................................................................. ~~86~~94

**ARTICLE X MISCELLANEOUS**............................................................... ~~86~~94
Section 10.01 Notices.................................................................................. ~~86~~94
Section 10.02 Waivers; Amendments.......................................................... ~~87~~95
Section 10.03 Expenses; Indemnity; Etc. ................................................... ~~88~~96
Section 10.04 Successors and Assigns......................................................... ~~90~~98
Section 10.05 Survival................................................................................. ~~93~~101
Section 10.06 Counterparts; Integration; Effectiveness.............................. ~~94~~101
Section 10.07 Severability........................................................................... ~~94~~102
Section 10.08 Right of Setoff...................................................................... ~~94~~102
Section 10.09 Governing Law; Jurisdiction; Etc. ...................................... ~~94~~102
Section 10.10 Headings............................................................................... ~~95~~103
Section 10.11 Confidentiality...................................................................... ~~96~~103
Section 10.12 No Third Party Beneficiaries................................................ ~~97~~105
Section 10.13 Reinstatement....................................................................... ~~97~~105

Section 10.14_USA PATRIOT Act ........................................................... ~~98~~105

**ANNEX III** ............................................................................................... **1**


Exhibit A_____     –      Form of Assignment and Assumption
Exhibit B_____     –      Form of Note
Exhibits B-1 through B-4      Tax Certificates
Exhibit C_____     –      Form of Borrowing Request
Exhibit D_____     –      [Reserved]
Exhibit E_____     –      Form of Operating Budget
Exhibit F_____     –      Form of Operational Report
Exhibit G_____     –      Form of Shareholder Note Subordination Agreement
Exhibit H_____     –      Form of Observer Rights Agreement
Exhibit I_____      –      Form of Security Agreement
Exhibit J_____     –      Form of Environmental, Social and Governance Report
Exhibit K_____     –      Form of Lender Warrants
Exhibit L_____     –      Form of Approved Bond Documents


Annex I_____      –      Loans; Commitments
Annex II_____      –      Orion Energy Equity Holders
**Annex III**_____      **–**      **Tranche B Minimum Return**
Schedule 1.01(a)_    –      Non-Guarantor Subsidiaries
Schedule 1.01(b)_    –      **Tranche A** Prepayment Premium
Schedule 1.01(c)_    –      Shareholder Notes
Schedule 3.01(b)_    –      Equity Shareholders
Schedule 3.07____    –      Environmental Matters
Schedule 3.09____    –      Material Agreements
Schedule 3.11____    –      Taxes
Schedule 3.17____    –      Insurance
Schedule 3.19(b)_    –      Subsidiaries
Schedule 3.21____    –      Transactions with Affiliates
Schedule 5.04____    –      Governmental Authorizations
Schedule 5.13(a)_    –      Use of Proceeds
Schedule 6.02____    –      Permitted Indebtedness
Schedule 6.03____    –      Permitted Liens
Schedule 6.04____    –      Permitted Investments

US-DOCS\~~109334811.27~~117632562.13

This CREDIT AGREEMENT is dated as of August 2, 2019, **as amended by Amendment No. 1 and Waiver, dated March 20, 2020 and Amendment No. 2 dated September 9, 2020,** among CARBONLITE HOLDINGS, LLC, a Delaware limited liability company (the "Borrower"), CERTAIN SUBSIDIARIES OF BORROWER, as Guarantors, each LENDER designated as a "Lender" on Annex I from time to time party hereto  (**including as updated pursuant to Amendment No. 2) (**collectively, the "Lenders" and individually, a "Lender") and ORION ENERGY PARTNERS INVESTMENT AGENT, LLC, as the Administrative Agent and the Collateral Agent.

WHEREAS, the Borrower (i) indirectly owns 99.3% of PinnPack and (ii) directly or indirectly owns 100% of each other Guarantor;

WHEREAS, the Borrower is engaged in the business of recycling plastic into food-grade post-consumer recycled polyethylene terephthalate resins and other activities ancillary to or in support of the foregoing;

WHEREAS, the Borrower ~~has~~**have** requested that the Lenders (i) ~~extend term loans (a) on the Initial Funding Date in an aggregate amount not in excess of $71,800,000 and (b) on the Second Funding Date, in an aggregate amount not in excess of $8,200,000, which, in each case,~~**establish a credit facility that** will be used in accordance with Section 5.13 and (ii) provide certain other commitments to fund additional projects of the Loan Parties, in each case, on the terms and conditions set forth herein;

WHEREAS, the Borrower has agreed to secure all of its Obligations by granting to Collateral Agent, for the benefit of Secured Parties, a Lien on substantially all of its assets, including a pledge of all of the equity interests of certain of the Guarantors; and

WHEREAS, the Guarantors have agreed to guarantee the obligations of the Borrower hereunder and to secure their respective Obligations by granting to Collateral Agent, for the benefit of Secured Parties, a Lien on substantially all of their respective assets, including a pledge of all of the equity interests of certain of their respective Subsidiaries.

WHEREAS, in consideration for the extensions of credit provided hereunder, the Guarantors have jointly and severally agreed to provide a guarantee pursuant to Article IX hereof for the performance of the Borrower's obligations under this Agreement; and

WHEREAS, the Lenders are willing to provide such financing to the Borrower on the terms and subject to the conditions set forth herein.

NOW, THEREFORE, in consideration of the premises and the agreements, provisions and covenants herein contained, the parties hereto agree as follows:

ARTICLE I

DEFINITIONS

Section 1.01    <u>Certain Defined Terms</u>.  As used in this Agreement, the following terms shall have the following meanings:

"<u>7% Notes</u>" means those certain Subordinated Promissory Notes in an original aggregate principal amount of $4,400,000, issued by CL Industries between November 27, 2012 and May 1, 2013, as disclosed on <u>Schedule 1.01(c)</u> and as in effect on the date hereof and as further amended with the consent of Administrative Agent.

"<u>7% Shareholder Note Subordination Agreement</u>" means that certain Subordination Agreement, dated as of the Initial Funding Date, by and among the Administrative Agent, the Collateral Agent, Ebi Simhaee, as "Subordinated Indebtedness Agent" (as defined therein), the Borrower and CL Industries, which agreement shall be substantially in the form of <u>Exhibit G</u>.

"<u>10% Notes</u>" means those certain Senior Subordinated Promissory Notes in an original aggregate principal amount of $10,000,000, issued by CL Industries in connection with that certain Amended and Restated Note Purchase Agreement dated as of September 26, 2011, as disclosed on <u>Schedule 1.01(c)</u> and as in effect on the date hereof and as further amended with the consent of Administrative Agent.

"<u>10% Shareholder Note Subordination Agreement</u>" means that certain Subordination Agreement, dated as of the Initial Funding Date, by and among the Administrative Agent, the Collateral Agent, CLI Mason, LLC, a Delaware limited liability company, as "Subordinated Indebtedness Agent" (as defined therein), the Borrower and CL Industries, which agreement shall be substantially in the form of <u>Exhibit G</u>.

"<u>ABL Credit Agreement</u>" means that certain Revolving Loan and Security Agreement, dated as of November 13, 2017, among CL Industries, CL Pinnpack, CL PI Holdings, PinnPack, the other loan parties from time to time party thereto and Texas Capital Bank, National Association, as the revolving lender.

"<u>Accrued Interest</u>" means the payment-in-kind of interest in respect of the Loans by increasing the outstanding principal amount of the Loans.

"<u>Additional Agreements</u>" means any contracts or agreements related to the acquisition of and/or the sale to other converters of post-consumer plastic waste ("<u>Post-Consumer Materials</u>") or any derivative products thereof, the recycling and/or conversion of Post-Consumer Materials into food-grade post-consumer recycled polyethylene terephthalate resins ("<u>pcrPET Resins</u>") and other finished products, the acquisition, construction, servicing (including ancillary services), maintenance, repair or operation of recycling facilities and any associated equipment, entered into by any Borrower Group Member and any other Person, or assigned to any Borrower Group Member, subsequent to the Closing Date.

"<u>Additional Equity Raise Amount</u>" means the net cash proceeds received by the Loan Parties in connection with (~~a~~i) the issuance of additional shares of Capital Stock in the Borrower

2

~~and/or~~, (~~b~~ii) subordinated notes of the Loan Parties permitted to be incurred under this Agreement and which are subordinated pursuant to agreements reasonably satisfactory to the Administrative Agent (provided that any subordination agreement having terms similar to the Additional Subordinated Note Subordination Agreement is satisfactory to the Administrative Agent) **and/or (iii) any Indebtedness incurred under a Qualified Junior Facility**.

"Additional Subordinated Notes" means those certain Subordinated Notes in an original aggregate principal amount of $6,000,000, issued by the Borrower in connection with (i) that Promissory Note, dated February 6, 2020, by and between the Borrower and Windmill Realty Advisors, Inc., in an aggregate principal amount of $1,000,000 as disclosed on Schedule 1.01(c) (ii) Promissory Note, dated February 6, 2020, by and between the Borrower and KRT Trust, in an aggregate principal amount of $2,000,000 as disclosed on Schedule 1.01(c), (iii) Promissory Note, dated February 6, 2020, by and between the Borrower and Emil Halimi, in an aggregate principal amount of $3,000,000 as disclosed on Schedule 1.01(c) and (iv) any other subordinated notes issued by the Borrower on or following the First Amendment Effective Date; provided that such notes (1) are subordinated to the Obligations on terms reasonably satisfactory to the Administrative Agent (provided that any subordination agreement having terms similar to the Additional Subordinated Note Subordination Agreement is satisfactory to the Administrative Agent), (2) do not exceed an aggregate principal amount of $6,000,000 and (3) the proceeds for such other subordinated notes are used solely to repay in their entirety the notes in clause (iii) of this definition.

"Additional Subordinated Note Subordination Agreement" means that certain Subordination Agreement, dated March 30, 2020, by and among the Administrative Agent, the Collateral Agent, the Subordinated Creditors (as defined therein), the Obligors (as defined therein) and the Borrower, which agreement shall be substantially in the form of Exhibit G.

"Administrative Agent" means Orion Energy Partners Investment Agent, LLC, in its capacity as administrative agent for the Lenders hereunder, and any successor thereto pursuant to Article VIII.

"Administrative Questionnaire" means a questionnaire, in a form supplied by the Administrative Agent, completed by a Lender.

"Affected Property" means any property of any Loan Party that suffers an Event of Loss.

"Affiliate" means, with respect to a specified Person, another Person that at such time directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified. Each Guarantor and Non-Guarantor Subsidiary shall be considered an "Affiliate" of the Borrower.

"Agent Reimbursement Letter" means the reimbursement letter, dated as of the Closing Date, among Borrower, the Administrative Agent and the Collateral Agent.

"Agents" means, collectively, the Administrative Agent and the Collateral Agent.

"Agreement" means this Credit Agreement, as amended, restated, replaced, supplemented or otherwise modified from time to time.

**"Amendment No. 2" means Amendment No. 2 to the Credit Agreement, dated as of September 9, 2020, by and among the Borrower, the Guarantors, the Administrative Agent, the Collateral Agent and the Lenders.**

**"Amendment No. 2 Effective Date" has the meaning assigned to such term in Amendment No. 2.**

"Anti-Corruption Laws" means any law of any jurisdiction relating to corruption in which any Loan Party performs business, including without limitation, the FCPA and where applicable, legislation relating to corruption enacted by member states and signatories implementing the OECD Convention Combating Bribery of Foreign Officials.

"Anti-Corruption Prohibited Activity" means the offering, payment, promise to pay, authorization of the payment of any money or the offer, promise to give, giving, or authorizing the giving of anything of value, to any Government Official or to any person under the circumstances where the Person, such Person's Affiliate's or such Person's representative knew or had reason to know that all or a portion of such money or thing of value would be offered, given or promised, directly or indirectly, to any Government Official, for the purpose of (a) influencing any act or decision of such Government Official in his or her official capacity, (b) inducing such Government Official to do or omit to do any act in relation to his or her lawful duty, (c) securing any improper advantage, or (d) inducing such Government Official to influence or affect any act or decision of any Governmental Authority, in each case, in order to assist such Person in obtaining or retaining business for or with, or in directing business to, any person.

"Anti-Money Laundering Laws" means the U.S. Currency and Foreign Transaction Reporting Act of 1970, as amended, and all money laundering-related laws of the United States and other jurisdictions where such Person conducts business or owns assets, and any related or similar law issued, administered or enforced by any Governmental Authority.

"Applicable ECF Percentage" means, with respect of the Net Cash Flow for any quarterly period ending on any Quarterly Payment Date, (a) 100% if the Leverage Ratio as of the last day of the Measurement Period ended on such Quarterly Payment Date is greater than or equal to 4.00:1.00, (b) 75% if the Leverage Ratio as of the last day of the Measurement Period ended on such Quarterly Payment Date is less than 4.00:1.00 but greater than or equal to 3.00:1.00, and (c) 50% if the Leverage Ratio as of the last day of the Measurement Period ended on such Quarterly Payment Date is less than 3.00:1.00, in each case, as determined for such Measurement Period by reference to the applicable Compliance Certificate delivered pursuant to Section 5.10(e); provided that if no Compliance Certificate is delivered within thirty (30) days after any Quarterly Payment Date, the Applicable ECF Percentage shall be 100%.

"Applicable Law" means with respect to any Person, property or matter, any of the following applicable thereto:   any constitution, writ, injunction, statute, law, regulation, ordinance, rule, judgment, principle of common law, order, decree, court decision,

Authorization, approval, concession, grant, franchise, license, agreement, directive, guideline, policy, requirement, or other governmental restriction or any similar form of decision of, or determination by, or any interpretation or administration of any of the foregoing, by any Governmental Authority, whether in effect as of the date hereof or thereafter and in each case as amended, including Environmental Laws.

"Approved Fund" means any Person (other than a natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an assignee (with the consent of any party whose consent is required by Section 10.04), in the form of Exhibit A or any other form approved by the Administrative Agent.

"Authorization" means any consent, waiver, variance, registration, filing, declaration, agreement, notarization, certificate, license, tariff, approval, permit (including water and environmental permits), orders, authorization, exception or exemption from, by or with any Governmental Authority, whether given by express action or deemed given by failure to act within any specified period, and all corporate, creditors', shareholders' and partners' approvals or consents.

"Authorized Representative" means, with respect to any Person, the chief executive officer, the chief financial officer, president, secretary, assistant secretary or any other officer or authorized representative of such Person as may be designated from time to time by such Person in writing by a notice delivered to the Administrative Agent.  Any document or certificate delivered under the Financing Documents that is signed by an Authorized Representative may be conclusively presumed by the Administrative Agent and Lenders to have been authorized by all necessary corporate, limited liability company or other action on the part of the relevant Person.

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"Bail-In Legislation" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"Bankruptcy" means with respect to any Person (i) commencement by such Person of any case or other proceeding (x) under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization or relief of debtors, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it or its debts, or (y) seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or any substantial part of its assets; or (ii) commencement against such Person of any case or other proceeding of a nature referred to in clause (x) or (y) above which (a) results in the entry of an order for relief or any

such adjudication or appointment or (b) remains undismissed, undischarged or unbonded for a period of sixty (60) days; or (iii) commencement against such Person of any case or other proceeding seeking issuance of a warrant of attachment, execution or similar process against all or any substantial part of its assets which results in the entry of an order for any such relief which shall not have been vacated, discharged, or stayed or bonded pending appeal within sixty (60) days from the entry thereof; or (iv) such Person shall take any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in clause (i), (ii) or (iii) above; or (v) such Person shall admit in writing its inability to pay its debts as they become due or shall make a general assignment for the benefit of its creditors.

"Board" means the Board of Governors of the Federal Reserve System of the United States of America.

"Bond Documents" means, individually and collectively, **(A)***(i) the Indenture of Trust, dated as of June 1, 2019, by and between The Pennsylvania Economic Development Financing Authority, as issuer and UMB Bank, N.A., as trustee* **and (ii) the Loan Agreement, dated as of June 1, 2019, by and between The Pennsylvania Economic Development Financing Authority and CL P and (B)***(i) the Indenture, dated as of October 1, 2016, by and between The Mission Economic Development Corporation, as issuer and UMB Bank, N.A., as trustee* **and (***ii***) the Loan Agreement, dated as of October 1, 2016, by and between The Mission Economic Development Corporation and CL Recycling**, **in each case, as amended, restated, supplemented or otherwise modified.the Pennsylvania Bond Documents and the Texas Bond Documents.**

"Borrower" has the meaning assigned to such term in the introductory paragraph.

"Borrower Account" means the account of the Borrower maintained at the Depositary Bank named "Operating Account" with the account number 1000702405.

"Borrower Group Members" means, collectively, (a) the Borrower, (b) the Guarantors, and (c) the Non-Guarantor Subsidiaries.

"Borrower Operating Agreement" means that certain Fourth Amended and Restated Operating Agreement of Borrower, dated as of December 20, 2018, by the members of the Borrower.

"Borrowing Request" means a request by the Borrower for Loans in accordance with Section 2.01.

6

"Business" means, collectively, (A) the recycling and/or conversion of PET materials into products for resale directly or through one or more Subsidiaries, including (i) the acquisition of Post-Consumer Materials or any derivative products thereof, (ii) the recycling of Post-Consumer Materials including all aspects of the recycling process, (iii) the sale to other converters of PET or any derivative products thereof, (iv) the conversion of PET into finished products, including but not limited to pcrPET Resins; and  (B) activities reasonably related or incidental thereto or representing a reasonable expansion thereof.

"Business Day" means a day other than a Saturday, Sunday or other day on which commercial banks in New York City, New York are authorized or required by law to close.

"Business Revenues" means, for any period (without duplication), all revenue received by or on behalf of the Loan Parties during such period, interest paid in respect of any Collateral Accounts, proceeds from any business interruption insurance and any other receipts otherwise arising or derived from or paid or payable to the Loan Parties under the Material Agreements or otherwise in respect of the Business (including any extraordinary receipts).

"Capital Expenditures" means with respect to any Person, the aggregate of all expenditures and costs (whether paid in cash or accrued as liabilities and including that portion of payments under Capital Lease Obligations that are capitalized on the balance sheet of such Person) by such Person and its Subsidiaries which are required to be capitalized under GAAP on a balance sheet of such Person.

"Capital Lease Obligations" means, with respect to any Person, the obligations of such Person to pay rent or any other amounts under any lease of (or other arrangements conveying the right to use) real or personal property, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person in accordance with GAAP.

"Capital Stock" means, with respect to any Person, any and all shares, interests, participations and/or rights in or other equivalents (however designated, whether voting or nonvoting, ordinary or preferred) in the equity or capital of such Person, now or hereafter outstanding, and any and all rights, warrants or options exchangeable for or convertible into any of the foregoing.

"Cash Equivalent Investments" means:

(a)    direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the United States of America), in each case maturing within one year from the date of acquisition thereof;

(b)    investments in commercial paper maturing within one year from the date of acquisition thereof and having, at such date of acquisition, the highest credit rating obtainable from S&P or from Moody's;

(c)    investments in certificates of deposit, banker's acceptances and time deposits maturing within one year from the date of acquisition thereof issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, any domestic office of any

commercial bank organized under the laws of the United States of America or any State thereof that has a combined capital and surplus and undivided profits of not less than $100,000,000;

(d)    fully collateralized repurchase agreements with a term of not more than thirty (30) days for securities described in clause (a) above and entered into with a financial institution satisfying the criteria described in clause (c) above; and

(e)    money market funds that (x)(i) comply with the criteria set forth in SEC Rule 2a-7 under the Investment Company Act of 1940, (ii) are rated AAA by S&P and Aaa by Moody's and (iii) have portfolio assets of at least $5,000,000,000 or (y) invest exclusively in Investments described in clauses (a) through (d) above.

"Change of Control" means:

(a)    The Equity Shareholders **at the time of the Closing Date** shall cease to own, directly or indirectly, beneficially or of record (1) at least 51% of the aggregate voting interests in the Capital Stock of the Borrower or (2) the right to at least 51% of the profits of the Borrower, or (3) the right to at least 51% of the assets of the Borrower upon its dissolution (excluding the Obligations and any Permitted Indebtedness that is *pari passu* with or prior to the Obligations), in each case, on a fully diluted basis;

(b)    the Equity Shareholders **at the time of the Closing Date** collectively shall otherwise fail to have the right to elect a majority of the Board of Directors of the Borrower;

(c)    prior to the conversion of any Preferred Units into Common Units (as each such term is defined in the Borrower Operating Agreement) in accordance with the Borrower Operating Agreement, the failure of Leon Farahnik (including his spouse, parents, siblings or members of his or her immediate family (including adopted children and step children) and/or direct lineal descendants) or the HPC Member to hold at least 66-2/3% of the Common Class Membership Units (as such term is defined in the Borrower Operating Agreement) in the Borrower;

(d)    the majority of the seats (other than vacant seats) on the Board of Directors of Borrower shall cease to be occupied by (i) the directors of Borrower on the Closing Date and (ii) other directors of Borrower whose nomination for election to the Board of Directors of Borrower is recommended by at least 66-2/3% of the votes of directors then qualifying under clause (i) or this clause (ii), or such other director receives the vote of the Equity Shareholders **at the time of the Closing Date** in his or her election by the shareholders of Borrower;

(e)    the Borrower shall fail to directly or indirectly own at least 100% on a fully diluted basis of the aggregate voting and economic interests in the Capital Stock of each of the Guarantors (other than PinnPack);

(f)    the Borrower shall fail to directly or indirectly own at least 99.3% on a fully diluted basis of the aggregate voting and economic interests in the Capital Stock of PinnPack; or

8

(g)    the Borrower shall fail to directly or indirectly own at least 100% on a fully diluted basis of the aggregate voting and economic interests in the Capital Stock of the Non-Guarantor Subsidiaries.

"CL Industries" means CarbonLite Industries LLC, a Delaware limited liability company.

"CL Intermediate Holdco" means CarbonLite Sub-Holdings, LLC, a Delaware limited liability company.

"CL P" means CarbonLite P LLC, a Delaware limited liability company.

"CL P Holdings" means CarbonLite P Holdings LLC, a Delaware limited liability company.

"CL PI Holdings" means CarbonLITE PI Holdings, LLC, a Delaware limited liability company.

"CL Pinnpack" means CarbonLite Pinnpack, LLC, a Delaware limited liability company.

"CL Recycling" means CarbonLite Recycling LLC, a Delaware limited liability company.

"CL Recycling Holdings" means CarbonLite Recycling Holdings LLC, a Delaware limited liability company.

"Closing Date" means the date on which all conditions precedent specified in Section 4.01 are satisfied (or waived by the Administrative Agent and the Lenders in their sole and absolute discretion in accordance with Section 10.02).

"Code" means the Internal Revenue Code of 1986, as amended from time to time (unless as indicated otherwise), the regulations thereunder and publicly available interpretations thereof.

"Collateral" means all Property of the Loan Parties (including all Capital Stock of the Subsidiaries of the Borrower) now owned or hereafter acquired, which is intended to be subject to the security interests or Liens granted pursuant to any of the Security Documents.

"Collateral Accounts" means (a) the Borrower Account, (b) the Rejected Proceeds Account, (c) the Debt Service Reserve Account and (d) any other any securities account, deposit account or commodities account established by a Loan Party with the prior written consent of the Collateral Agent, such consent not to be unreasonably withheld, delayed or conditioned, and, in each case, subject to a Control Agreement, other than any Excluded Account.

"Collateral Agent" means Orion Energy Partners Investment Agent, LLC, in its capacity as collateral agent for the Secured Parties under the Security Documents, and any successor thereto pursuant Article VIII.

"Commitment" means, ~~with respect to each Lender, the commitment of such Lender to make Loans to the Borrower pursuant to~~ ~~Section 2.01(a~~*, in an aggregate principal amount not to exceed the amount set forth opposite such Lender's name on* *Annex I under the heading "*~~Commitment~~*", as such* *Annex I may be modified by the Administrative Agent in its sole discretion and noticed to Borrower, but in compliance with assignment provisions in* *Section 10.04.  As of the date hereof, the aggregate* ~~Commitments of all Lenders is equal to the sum of the Initial Funding~~**individually or collectively, as the context requires, the Tranche A** Commitment and the ~~Second Funding~~**Tranche B** Commitment.

"Compliance Certificate" has the meaning assigned to such term in Section 5.10(e).

"Condemnation" means any taking, seizure, confiscation, requisition, exercise of rights of eminent domain, public improvement, inverse condemnation, condemnation, expropriation, nationalization or similar action of or proceeding by any Governmental Authority affecting the Business.

"Consolidated CFADS" means, with respect to the Loan Parties for any period, the Consolidated Net Income of the Loan Parties for such period,

(a) increased by the sum of the following, without duplication, to the extent deducted in determining Consolidated Net Income, in each case, for such period: (i) income tax expense, operating leases for equipment, tangible personal property and motor vehicles; (ii) interest expense; (iii) amortization, depreciation, unrealized losses with respect to Hedging Agreements and other non-cash charges (including, if applicable, non-cash compensation expense), (iv) after-tax losses attributable to any Dispositions and (v) to the extent not already included in the Consolidated Net Income of the Loan Parties for such period, any distributions or payments from the Non-Guarantor Subsidiaries; and

(b) decreased by the sum of the following, without duplication and solely to the extent not deducted when calculating Consolidated Net Income, in each case, for such period: (i) after tax gains attributable to any Dispositions to the extent included in the calculation of Consolidated Net Income, (ii) non-cash gains (including unrealized gains with respect to Hedging Agreements) and non-cash revenues increasing Consolidated Net Income, in each case of clauses (i) and (ii), determined on a consolidated and accrual basis in accordance with GAAP, (iii) any prepayment credits and/or deferred revenues from PET offtake of the Borrower Group Members for such period and (iv) Investments made during such period by the Guarantors in the Non-Guarantor Subsidiaries (which for the avoidance of doubt shall not include any Investments made prior to the Closing Date); and

(c) solely for purposes of any calculation of the Leverage Ratio, decreased by the sum of the following, without duplication and solely to the extent not deducted when calculating Consolidated Net Income, in each case, for such period: (i) Capital Expenditures of the Loan Parties, and (ii) any Permitted Tax Distribution.

For purposes of clarification only, except for any cash distribution or payment from any Non-Guarantor Subsidiary to a Loan Party, any calculation of Consolidated CFADS shall exclude all of the foregoing of any Non-Guarantor Subsidiary.

"Consolidated Net Income" means, with respect to any Person for any period, the net income (or loss) of such Person and its Subsidiaries (other than Non-Guarantor Subsidiaries) determined on a consolidated and accrual basis in accordance with GAAP.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.   "Controlling" and "Controlled" have meanings correlative thereto.

"Control Agreement" means a springing account control agreement in respect of one or more deposit accounts or securities accounts of the Loan Parties, in form and substance reasonably satisfactory to the Collateral Agent and the Administrative Agent, executed by the financial institution at which an account is maintained, pursuant to which such financial institution agrees that such financial institution will comply with instructions or entitlement orders originated by the Collateral Agent as to disposition of funds in such account, without further consent by any other Person.

"Copyrights" means all works of authorship, United States and foreign copyrights (whether or not the underlying works of authorship have been published), designs, whether registered or unregistered, registrations and applications for registration of the foregoing and all extensions, renewals, and restorations thereof.

"Debt Prepayment Offer" has the meaning assigned to such term in Section 2.05(b)(iv).

"Debt Service Reserve Account" means an account in the name of Borrower and established with the Depositary Bank is designated by Borrower to be the "Debt Service Reserve Account."

"Default" means any event, condition or circumstance that, with notice or lapse of time or both, would (unless cured or waived) become an Event of Default.

"Depositary Bank" means Pacific Western Bank, a California state-charted bank, and any successor thereto selected by the applicable Loan Party and reasonably acceptable to the Administrative Agent.

"Discharge Date" has the meaning assigned to such term in the Security Agreement.

"Disposition" means any sale, transfer or other disposition of any assets or property by any Loan Party, other than any Event of Loss.

"Disposition Proceeds Prepayment Offer" has the meaning assigned to such term in Section 2.05(b)(iii).

"Dollars" or "$" refers to the lawful currency of the United States of America.

"DSRA CFADS" means the Consolidated CFADS relating to the PinnPack Facility and the Riverside Facility in the aggregate, decreased for Capital Expenditures paid with cash on hand (as opposed to capitalized leases), and adjusted for any net changes in working capital (for the avoidance of doubt, which (i) includes the negative cash flow / positive cash flow associated with the increase / decrease of inventory, respectively and (ii) excludes any Investments made by the Loan Parties); provided that such calculation shall exclude any distributions made from the Non-Guarantor Subsidiaries.

"DSR Released Funds" has the meaning assigned to such term in Section 5.18(c)(ii)(C)(I).

"ECF Amount" has the meaning assigned to such term in Section 2.05(b)(v).

"ECF Prepayment Offer" has the meaning assigned to such term in Section 2.05(b)(v).

"ECF Reinvestment Request" means any written request by the Borrower to reinvest the ECF Amount in respect of the quarterly period specified in such request and in accordance with a proposed reinvestment plan, which has demonstrated to the reasonable satisfaction of the Administrative Agent that such proposed reinvestment plan would be accretive to each Lender's credit profile (provided that any reinvestment shall be deemed accretive if it has a three year or less cash on cash payback on the capital investment contemplated, as demonstrated by the Borrower to the reasonable satisfaction of the Administrative Agent).

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clause (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Environmental Claim" means any administrative or judicial action, suit, proceeding, notice, claim or demand by any Person seeking to enforce any obligation or responsibility arising under or relating to Environmental Law or alleging or asserting liability for investigatory costs, cleanup or other remedial costs, legal costs, environmental consulting costs, governmental response costs, damages to natural resources or other property, personal injuries, fines or penalties related to (a) the presence, or Release into the environment, of any Hazardous Material at any location, whether or not owned by the Person against whom such claim is made, or (b) any noncompliance with, or alleged noncompliance with, or liability arising under any Environmental Law.  The term "Environmental Claim" shall include, without limitation any

12

claim by any Person for damages, contribution, indemnification, cost recovery, compensation or injunctive relief or costs associated with any remediation plan, in each case, under any Environmental Law.

"Environmental Laws" means any Applicable Laws regulating or imposing liability or standards of conduct concerning or relating to pollution or the protection of human health, safety the environment, natural resources or special status species and their habitat, including all Applicable Laws concerning the presence, use, manufacture, generation, transportation, Release, threatened Release, disposal, arrangement for disposal, dumping, discharge, treatment, storage, handling, control or cleanup of Hazardous Materials.

"Equity Shareholders" means the equity owners of the Borrower ~~set forth~~from time to time.  The Equity Shareholders as at the time of the Closing are listed on Schedule 3.01(b) ~~as of the Closing Date~~to the as Agreement.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that, together with the Borrower, is treated as a single employer under Sections 414(b), (c), (m) or (o) of the US Code.

"ERISA Event" means (a) a Reportable Event with respect to any Pension Plan, (b) the failure by any Pension Plan to satisfy the minimum funding standard (within the meaning of Section 412 of the US Code or Section 302 of ERISA) applicable to such plan, whether or not waived, (c) the filing of a notice of intent to terminate a Pension Plan in a distress termination (as described in Section 4041(c) of ERISA), (d) a complete or partial withdrawal by the Borrower or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization or insolvent (within the meaning of Title IV of ERISA), (e) the imposition or incurrence of any liability under Title IV of ERISA, other than PBGC premiums due but not delinquent under Section 4007 of ERISA, upon the Borrower or any ERISA Affiliate, (f) the institution by the PBGC of proceedings to terminate a Pension Plan or Multiemployer Plan, (g) the appointment of a trustee to administer any Pension Plan under Section 4042 of ERISA, or (h) the imposition of a Lien upon the Borrower pursuant to Section 430(k) of the US Code or Section 303(k) of ERISA.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Event of Default" has the meaning assigned to such term in Section 7.01.

"Event of Loss" means any loss of, destruction of or damage to, or any Condemnation or other taking of any property of any Borrower Group Member.

"Event of Loss Prepayment Offer" has the meaning assigned to such term in Section 2.05(b)(ii).

13

"Excess Cash Flow Payment Date" means, in the case of a payment required to be made pursuant to Section 2.05(b)(v) with respect to the Net Cash Flow of any quarterly period ending on a Quarterly Payment Date (commencing with the quarterly period ending December 31, 2019), the first date on which financial statements for the Measurement Period ending on such Quarterly Payment Date have been delivered pursuant to Section 5.10(b) and the related Compliance Certificate has been delivered pursuant to Section 5.10(e), or, if earlier, the date that is forty-five (45) days after the end of such Quarterly Payment Date (or, if such date is not a Business Day, the immediately preceding Business Day).

"Excluded Account" means (a) any deposit account that is used solely as a payroll account for the employees of Borrower or its Subsidiaries or the funds in which consist solely of funds held by the owner of such deposit account in trust for any director, officer or employee of any Loan Party or any employee benefit plan maintained by any Loan Party or funds representing deferred compensation for the directors and employees of any Loan Party, (b) escrow accounts, deposit accounts and trust accounts, in each case holding assets that are pledged or otherwise encumbered pursuant to Permitted Liens, (c) accounts containing no (zero) balance at any time, and accounts that by their terms are swept to a zero balance on a daily basis to a deposit account that is subject to a control agreement in favor of Collateral Agent, (d) accounts described in Section 6.03(k)(ii), and (e) other deposit accounts, securities accounts and commodities accounts, except to the extent the value of all such accounts in this clause (e) shall exceed at any time $250,000 in the aggregate shall not be "Excluded Accounts"; provided that the aggregate daily maximum balance for all accounts described in clauses (a) through (d) on any day shall not exceed $500,000.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to any Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of any Loan Party hereunder, (a) Taxes imposed on or measured by net income and franchise Taxes (imposed in lieu of net income tax), in each case, (i) imposed by the jurisdiction under the laws of which such recipient is organized, in which its principal office (or other fixed place of business) is located or, in which its applicable lending office is located, in each case, as a result of such recipient's connection to the jurisdiction imposing such Taxes or (ii) that are Other Connection Taxes, (b) any branch profits Taxes imposed by the jurisdictions listed in clause (a) of this definition, (c) any Taxes attributable to the failure of the applicable Agent, Lender or any such other applicable recipient to comply with Section 2.09(e), (d) in the case of an Agent or a Lender (other than an assignee pursuant to a request by Borrower under Section 2.11), any United States federal withholding Tax that is imposed on amounts payable to such Agent or Lender under the laws effective at the time such Agent or Lender becomes a party hereto (or designates a new lending office), except to the extent that such Agent or Lender (or its assignor, if any) was entitled, at the time of designation of a new lending office (or assignment), to receive additional amounts from a Loan Party with respect to such withholding Tax pursuant to Section 2.09(a), and (e) any United States federal withholding Taxes imposed under FATCA.

"Facilities" means, individually and collectively, the Pennsylvania Facility, the PinnPack Facility, the **PinnPack P Facility, the** Riverside Facility and the Texas Facility.

"FATCA" means Sections 1471 through 1474 of the US Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not

materially more onerous to comply with) and any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Code.

"FCPA" means the United States Foreign Corrupt Practices Act of 1977, as amended.

"Federal Funds Effective Rate" means, for any day, the weighted average (rounded upwards, if necessary, to the next 1/100 of 1%) of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average (rounded upwards, if necessary, to the next 1/100 of 1%) of the quotations for such day for such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it.

"Financing Documents" means (a) this Agreement, (b) each Note (if requested by a Lender), (c) the Loan Discount ~~Letter~~**Letters**, (d) the Agent Reimbursement Letter, (e) the Security Documents, (f) the Subordination Agreements, (g) the Side Letter**, (h) the Unconditional Guaranty** and (~~e~~**i**) each certificate, agreement, instrument, waiver, consent or document executed by a Loan Party and delivered to Agent or any Lender in connection with or pursuant to any of the foregoing and designated as a "Financing Document".

"First Amendment Effective Date" means March 30, 2020.

"Foreign Plan" means any employee pension benefit plan, program, policy, arrangement or agreement maintained or contributed to by any Loan Party or with respect to which any Loan Party could reasonably be expected to have any liability, in each case with respect to employees employed outside the United States (as such term is defined in Section 3(10) of ERISA) (other than any arrangement with the applicable Governmental Authority).

"Funding Date" has the meaning assigned to such term in Section 2.01(c).

"Funding Office" means the office specified from time to time by the Administrative Agent as its funding office by notice to Borrower and the Lenders.

"GAAP" means generally accepted accounting principles in effect from time to time in the United States of America, applied on a consistent basis.

"Governmental Authority" means any federal, regional, state or local government, or political subdivision thereof or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government and having jurisdiction over the Person or matters in question, including all agencies and instrumentalities of such governments and political subdivisions.

"Government Official" means any official of any Governmental Authority, including, without limitation, all officers or employees of a government department, agency, instrumentality or permitting agency.

"Guarantee" means as to any Person (the "*guaranteeing person*"), any obligation of (a) the guaranteeing person or (b) another Person (including any bank under any letter of credit), if to induce the creation of such obligation of such other Person, the guaranteeing person has issued a reimbursement, counterindemnity or similar obligation, in either case guaranteeing or in effect guaranteeing any Indebtedness, leases, dividends or other obligations (the "*primary obligations*") of any other third Person (the "*primary obligor*") in any manner, whether directly or indirectly, including any obligation of the guaranteeing person, whether or not contingent, (w) to purchase any such primary obligation or any Property constituting direct or indirect security therefor, (x) to advance or supply funds (i) for the purchase or payment of any such primary obligation or (ii) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (y) to purchase Property, securities or services, in each case, primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (z) otherwise to assure or hold harmless the owner of any such primary obligation against loss in respect thereof; provided that the term Guarantee shall not include endorsements of instruments for deposit or collection in the ordinary course of business.  The amount of any Guarantee of any guaranteeing person shall be deemed to be the lower of (A) an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee is made and (B) the maximum amount for which such guaranteeing person may be liable pursuant to the terms of the instrument embodying such Guarantee, unless such primary obligation and the maximum amount for which such guaranteeing person may be liable are not stated or determinable, in which case the amount of such Guarantee shall be such guaranteeing person's maximum reasonably anticipated liability in respect thereof as determined by Borrower in good faith.

"Guaranteed Obligations" means, with respect to any Guarantor, the Obligations whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest, reimbursements and fees that accrue after the commencement by or against any Loan Party or any Affiliate thereof of any proceeding under any debtor relief law naming such Person as the debtor in such proceeding, regardless of whether such interest, reimbursements and fees are allowed claims in such proceeding.

"Guarantors" means each Subsidiary of the Borrower (including, for the avoidance of doubt, CL Intermediate Holdco), other than the Non-Guarantor Subsidiaries.

"Hazardous Material" means any hazardous, toxic or dangerous substances, materials and wastes, including, without limitation, hydrocarbons (including naturally occurring or man-made petroleum and hydrocarbons), flammable explosives, asbestos, urea formaldehyde insulation, radioactive materials, biological substances, polychlorinated biphenyls, pesticides, herbicides and any other kind and/or type of pollutants or contaminants (including, without limitation, materials which include hazardous constituents), sewage, sludge, industrial slag, solvents and/or any other similar substances, materials, or wastes and including any other

US-DOCS\~~109334811.27~~117632562.13

substances, materials or wastes that are or become regulated under any Environmental Laws (including, without limitation, any that are or become classified as hazardous or toxic under any Environmental Laws).

"Hedging Agreement" means any agreement with respect to any swap, cap, collar, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions.

"HPC Member" means HPC Industries LLC, a Delaware limited liability company.

"Incremental Availability Period" means the period commencing on the Initial Funding Date and ending on the earlier of (a) the 18-month anniversary of the Closing Date and (b) the date on which all Incremental Loans are made to the Borrower.

"Incremental Loans" has the meaning assigned to such term in Section 2.13(a).

"Incremental Request" means any request by the Borrower for Incremental Loans pursuant to Section 2.13(a).

"Indebtedness" of any Person means, without duplication, all (a) indebtedness for borrowed money and every reimbursement obligation with respect to letters of credit, bankers' acceptances or similar facilities, (b) obligations evidenced by bonds, debentures, notes or other similar instruments, (c) obligations to pay the deferred purchase price of property or services, except accounts payable and accrued expenses arising in the ordinary course of business and payable within ninety (90) days after the due date therefor as specified in, or determined from, the applicable contract or purchase order, (d) the Net Hedging Obligations under interest rate or currency Hedging Agreements and all other agreements or arrangements designed to protect against fluctuations in interest rates, commodity prices and currency exchange rates, (e) the capitalized amount (determined in accordance with GAAP) of all payments due or to become due under all leases and agreements to enter into leases required to be classified and accounted for as a capital lease in accordance with GAAP, (f) reimbursement obligations (contingent or otherwise) pursuant to any performance bonds or collateral security, (g) Indebtedness of others described in clauses (a) through (f) above secured by (or for which the holder thereof has an existing right, contingent or otherwise, to be secured by) a Lien on the property of such Person, whether or not the respective Indebtedness so secured has been assumed by such Person and (h) Guarantees by such Person of Indebtedness of others described in clauses (a) through (g) above. The Indebtedness of any Person shall include the Indebtedness of any partnership in which such Person is a general partner to the extent such Person is liable therefor as a result of such Person's general partner interest in such partnership, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor.

"Indemnified Party" has the meaning assigned to such term in Section 10.03(b).

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Loan Parties under any Financing Document and (b) to the extent not otherwise described in (a), Other Taxes.

"Independent Auditor" means (i) RSM US LLP, (ii) any "big four" accounting firm selected by the Borrower and notified to the Administrative Agent or (iii) any other firm of independent public accountants of recognized national standing in the United States selected by the Borrower and reasonably acceptable to the Administrative Agent.

"Initial Funding Commitments" means, with respect to each Lender, the commitment of such Lender to make Loans to the Borrower pursuant to Section 2.01(a), in an aggregate principal amount not to exceed the amount set forth opposite such Lender's name on Annex I under the heading "Initial Funding Commitments".

~~"Initial Funding Date" means the Funding Date following the Closing Date on which all conditions precedent specified in Section 4.02 and 4.03 are satisfied (or waived by the Administrative Agent and the Lenders in their sole and absolute discretion in accordance with Section 10.02), or such other date as may be requested by Borrower and approved by the Administrative Agent in its sole and absolute discretion.~~

**"Initial Funding Date" means August 2, 2019.**

**"Initial Loan"  has the meaning assigned to such term in Section 2.01(a).**

"Intellectual Property" means (a) the collective reference to all rights, priorities and privileges relating to intellectual property, whether arising under United States, multinational or foreign laws or otherwise, including, without limitation, all Copyrights, Patents, Trademarks and trade secrets, (b)  all rights to sue or otherwise recover for any past, present and future infringement, dilution, misappropriation, or other violation or impairment thereof, (c) all proceeds of any of the foregoing, including without limitation license fees, royalties, income payments, claims, damages and proceeds of suit, now or hereafter due and/or payable with respect thereto, (d) all written agreements, licenses and covenants providing for the grant to or from any Person any rights in any such intellectual property that is owned by another Person.

"Interest Rate" means 14.85% per annum.

"Interest Payment Deficiency" has the meaning assigned to such term in Section 5.18(c)(ii)(B).

"Investment" means for any Person (a) the acquisition (whether for cash, Property of such Person, services or securities or otherwise) of Capital Stock, bonds, notes, debentures, debt securities, partnership or other ownership interests or other securities of, or any Property constituting an ongoing business, line of business, division or business unit of or constituting all or substantially all the assets of, or the making of any capital contribution to, any other Person, (b) the making of any advance, loan or other extension of credit to, any other Person (including the purchase of Property from another Person subject to an understanding or agreement, contingent or otherwise, to resell such Property to such Person, but excluding any such advance, loan or extension of credit having a term not exceeding ninety (90) days representing the

purchase price of inventory or supplies sold in the ordinary course of business), (c) the entering into of any Guarantee with respect to Indebtedness or other liability of any other Person, and (d) any other investment that would be classified as such on a balance sheet of such Person in accordance with GAAP.  For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment but giving effect to any returns or distributions of capital or repayment of principal actually received in case by such Person with respect thereto.

"Investment Committee" means, as of any date, the committee of Orion Energy Partners, L.P., the members of which have a right or duty to vote on whether the general partner of the Lenders shall cause the Lenders to make an investment in the form of a loan.

"Lender Warrant" means the warrant to be granted by Borrower to the Orion Energy Equity Holders in connection herewith on the Initial Funding Date, substantially in the form of Exhibit K.

"Lenders" has the meaning assigned to such term in the preamble.

"Leverage Ratio" means, as of any date of determination, the ratio of (a) Net Debt of the Loan Parties as of such date divided by (b) the Consolidated CFADS of the Loan Parties for the most recently completed Measurement Period.

"Lien" means any mortgage, charge, pledge, lien (statutory or other), privilege, security interest, hypothecation, collateral assignment or preference, priority or other security agreement, mandatory deposit arrangement, preferential arrangement or other encumbrance upon or with respect to any property of any kind, real or personal, movable or immovable, now owned or hereafter acquired (including, without limitation, any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing).

"Life Insurance Policy" has the meaning assigned to such term in Section 5.21(d).

"Loan Discount ~~Letter~~**Letters**" means **(a)** that certain loan discount letter, dated as of the Closing Date, among the Borrower and the Lenders **and (b) that certain loan discount letter, dated the Amendment No. 2 Effective Date, among the Borrower and the Tranche B Lenders**.

"Loan Parties" means, collectively, the Borrower and the Guarantors.

"Loans" means the ~~term loans made by the Lenders to the Borrower pursuant to Section 2.01(a)~~**Tranche A Loans, the Tranche B Loans** and, if applicable, **any loans made pursuant to** Section 2.13.

"Loss Proceeds" means (i) insurance proceeds, condemnation awards or other similar compensation, awards, damages and payments or relief (exclusive, in each case, of proceeds of business interruption, workers' compensation, employee theft or embezzlement, employment practices, environmental or product liability, automobile liability, builders' all risk liability,

directors and officers insurance and general liability insurance) with respect to any Event of Loss and (ii) any insurance proceeds with respect to the Life Insurance Policy.

"<u>Material Additional Agreements</u>" means each Additional Agreement (or series of related Additional Agreements) entered into by, or assigned to any Borrower Group Member subsequent to the Closing Date that (i) provides for the payment by any Borrower Group Member, or the provision to any Borrower Group Member, of goods, inventory or services equal to or in excess of $5,000,000 in the aggregate thereunder, (ii) provides revenue or income to any Borrower Group Member equal to or in excess of $10,000,000 in the aggregate thereunder or (iii) provides for a deposit or prepayment of revenue equal to or in excess of $5,000,000 in the aggregate thereunder.

"<u>Material Adverse Effect</u>" means a material adverse effect on: (a) the business, assets, properties, operations or financial condition of the Borrower Group Members, taken as a whole; (b) the ability of any Loan Party to perform its material obligations under the Financing Documents; (c) the validity of, enforceability of the material rights or remedies of, or benefits available to the Secured Parties under, the Financing Documents or (d) the validity and perfection of the Secured Parties' Liens in a material portion of the Collateral.

"<u>Material Agreements</u>" means, individually and collectively, (1)(a) Material Agreements Riverside, (b) Material Agreements PinnPack, (c) Material Agreements Texas, (d) Material Agreements Pennsylvania, (2) any Material Additional Agreement and (3) any Additional Agreement entered into by a Loan Party in replacement of any of the foregoing.

"<u>Material Agreements Pennsylvania</u>" means those agreements listed under the header "Material Agreements Pennsylvania" in <u>Schedule 3.09</u>.

"<u>Material Agreements PinnPack</u>" means those agreements listed under the header "Material Agreements PinnPack" in <u>Schedule 3.09</u>.

"<u>Material Agreements Prepayment Offer</u>" has the meaning assigned to such term in <u>Section 2.05(b)(i)</u>.

"<u>Material Agreements Riverside</u>" means those agreements listed under the header "Material Agreements Riverside" in <u>Schedule 3.09</u>.

"<u>Material Agreements Texas</u>" means those agreements listed under the header "Material Agreements Texas" in <u>Schedule 3.09</u>.

"<u>Material Counterparty</u>" means each Person (other than any Agent, Lender, or Borrower Group Member) from time to time party to any Material Agreement.

"<u>Maturity Date</u>" means the sixth (6th) anniversary of the Initial Funding Date.

"<u>Measurement Period</u>" means each period of four consecutive fiscal quarters of the Borrower.

"Multiemployer Plan" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA that is subject to Title IV of ERISA to which any Loan Party contributes or is obligated to contribute, or with respect to which any Loan Party has or could reasonably be expected to have any liability.

**"Net Additional Equity Raise Amount" means, as of any date of determination, (a) the Additional Equity Raise Amounts raised by the Loan Parties on or after the Amendment No. 2 Effective Date minus (b) any amounts thereof used to make payments on the Shareholder Notes, the Loans (including the Tranche B Loans) or for any other purpose on or after the Amendment No. 2 Effective Date.**

"Net Available Amount" means:

(a)     in the case of any receipt of termination payments, liquidated damages, indemnity payments or other extraordinary payments under the Material Agreements or any real property lease for the Facilities, the aggregate amount of payments received by the Loan Parties (including, as a distribution from a Non-Guarantor Subsidiary) or any of their respective Affiliates in respect of such event, net of (i) reasonable costs and expenses incurred by the Borrower Group Members or any of their respective Affiliates in connection with the collection of such proceeds and (ii) in the case of the Non-Guarantor Subsidiaries, mandatory redemption payments to be made under the Bond Documents;

(b)     in the case of any Event of Loss, the aggregate amount of Loss Proceeds received by the Borrower Group Members or any of their respective Affiliates in respect of such Event of Loss, net of (i) reasonable costs and expenses incurred by the Loan Parties (including, as a distribution from a Non-Guarantor Subsidiary) in connection with the collection of such Loss Proceeds and (ii) in the case of the Non-Guarantor Subsidiaries, mandatory redemption payments to be made under the Bond Documents; and

(c)     in the case of any Disposition, the aggregate amount received by the Loan Parties (including, as a distribution from a Non-Guarantor Subsidiary) or any of their respective Affiliates in respect of such Disposition, net of (i) reasonable costs and expenses incurred by the Borrower Group Members in connection with such Disposition and (ii) in the case of the Non-Guarantor Subsidiaries, mandatory redemption payments to be made under the Bond Documents.

"Net Cash Flow" means, for any period, the Consolidated CFADS of the Loan Parties for such period,

(a) increased (without duplication) by proceeds in respect of Events of Loss (including Loss Proceeds) and Dispositions (but in each case without duplication of amounts used to prepay, or that are exempt from prepayment, under Section 2.05(b)(ii) or (iii)), termination payments and other extraordinary payments under project contracts, including the Material Agreements (but in each case without duplication of amounts used to prepay, or that are exempt from prepayment, under Section 2.05(b)(i)), damages and

other proceeds received by the Loan Parties not in the ordinary course of business during such period (calculated on a cash basis); and

(b) decreased (without duplication) by (i) Permitted Tax Distributions made by the Loan Parties during such period (if any), and (ii) interest and principal payments on the Loans, and any payments on or servicing of Permitted Indebtedness by any Loan Party permitted to be made hereunder (other than Indebtedness solely among the Loan Parties), during such period to the extent not already reflected in the calculation of Consolidated CFADS (but, in each case, excluding interest paid or to be paid in kind) (calculated on an accrual basis); and

(c) with respect to the first quarter of any fiscal year, as increased or decreased (as applicable and without duplication), on a dollar for dollar basis, for any changes to the calculation of Net Cash Flow for the immediately preceding fiscal quarter as a result of year-end adjustments in connection with the preparation and delivery of the audited consolidated financial statements of the Loan Parties for the immediately preceding fiscal year.

"Net Debt" means, on any date of determination, the outstanding principal amount of the Loans (including, for the avoidance of doubt, Accrued Interest that has been added to principal) plus the principal amount of all other outstanding Indebtedness of the Loan Parties for borrowed money (including, for the avoidance of doubt, any Permitted Revolving Facility), unreimbursed letter of credit obligations, purchase money debt, capital lease obligations and Guarantees of the foregoing minus any cash of the Loan Parties that is on deposit in the Collateral Accounts.

"Net Hedging Obligations" means, as of any date, the Termination Value of any Hedging Agreement on such date.

**"Niagara Promissory Note" means that certain promissory note, dated September 2, 2020, by and between the Borrower and Niagara Bottling, LLC, pursuant to which Niagara Bottling, LLC has loaned $5,000,000 to the Borrower.  The final version of the Niagara Promissory Note was delivered by the Borrower to the Administrative Agent at 3:28 pm New York Time on Friday, September 4, 2020.**

"Non-Guarantor Subsidiaries" means, collectively, (i) the Pennsylvania Facility Group, (ii) the Texas Facility Group**, and** (iii~~) Pinnpack P, and (iv~~) any other Person approved in writing by Administrative Agent as a Non-Guarantor Subsidiary (not to be unreasonably withheld, conditioned or delayed in the case of Subsidiaries to be subject to Indebtedness permitted in reliance on Section 6.02(~~m~~**j**)).

"Note" has the meaning assigned to such term in Section 2.04(b)(ii).

~~**"**Obligations" means all advances to, and debts (including Accrued Interest, interest accruing after the maturity of the Loans and interest accruing after the filing of any Bankruptcy, but excluding obligations in respect of the Lender Warrants), liabilities, obligations, Prepayment Premium, covenants and duties of, any Loan Party arising under any Financing Document, or otherwise with respect to any Loan, in each case whether direct or indirect (including those~~

*acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest, reimbursements and fees that accrue after the commencement by or against the Borrower or any of its Subsidiaries of any proceeding under any debtor relief law naming such Person as the debtor in such proceeding, regardless of whether such interest, reimbursements and fees are allowed claims in such proceeding.*

"**Obligations**" **means collectively, the Tranche A Obligations and the Tranche B Obligations.**

"Observer Rights Agreement" has the meaning assigned to such term in Section 4.02(a).

"Officer's Certificate" means, with respect to any Loan Party, a certificate signed by an Authorized Representative of such Loan Party.

"Operating Budget" means an annual operating plan and budget of (i) the Loan Parties and the PinnPack Facility and the Riverside Facility, taken as a whole, (ii) the ~~calendar year after distributions are permitted under the Bond Documents in respect of the~~ Texas Facility ~~(which is expected to be 2021), the Texas Facility~~ Group and the Texas Facility and (iii) ~~the calendar year after distributions are permitted under the Bond Documents in respect of the Pennsylvania Facility (which is expected to be 2023),~~ the Pennsylvania Facility Group and the Pennsylvania Facility, in each case, prepared by the Borrower in accordance with Section 5.20(a) and approved by Lenders in accordance with Section 5.20(b), as may be modified from time to time in accordance with Section 5.20, of anticipated Operating Expenses and Capital Expenditures limited to direct wages, other manufacturing overhead, general and administrative expense, maintenance capital expense and growth capital expense, in each case, detailed monthly for the following calendar year, which annual operating plan and budget shall be substantially in the form of Exhibit E.

"Operating Expenses" means any and all of the expenses paid or payable by or on behalf of any Loan Party in relation to the operation and maintenance (except as set forth below) of the Business, including consumables, payments under any operating lease, taxes (including franchise taxes, property taxes, sales taxes and excluding income taxes), insurance (including the costs of premiums and deductibles and brokers' expenses), costs and fees attendant to obtaining and maintaining in effect the Authorizations relating to the Business payable during such period, payments made to security, police services, and legal, accounting and other professional fees attendant to any of the foregoing items payable during such period, but exclusive of Capital Expenditures and payments in respect of payments of principal and interest in respect of the Obligations or any other Indebtedness.  Operating Expenses do not include non-cash charges, including, without limitation, depreciation, amortization, income taxes, non-cash taxes or other bookkeeping entries of a similar nature.

"Organizational Documents" means, with respect to any Person, (i) in the case of any corporation, the certificate of incorporation and by-laws (or similar documents) of such Person, (ii) in the case of any limited liability company, the certificate of formation and operating agreement (or similar documents) of such Person, (iii) in the case of any limited partnership, the certificate of formation and limited partnership agreement (or similar documents) of such

Person, (iv) in the case of any general partnership, the partnership agreement (or similar document) of such Person and (v) in any other case, the functional equivalent of the foregoing.

"Orion Energy Equity Holders" means each of the Lenders (or their designees) listed on Annex II.

"Other Connection Taxes" means, with respect to any Agent or any Lender, Taxes imposed as a result of a present or former connection between such Agent or Lender and the jurisdiction imposing such Tax (other than connections arising from such Agent or Lender having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Financing Document, or sold or assigned an interest in any Loan or Financing Document).

"Other Taxes" means any and all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes arising from any payment made under any Financing Document or from the execution, delivery, performance, registration or enforcement of, from the receipt or perfection of a security interest under or otherwise with respect to, any Financing Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 2.11).  For the avoidance of doubt, "Other Taxes" shall not include any Excluded Taxes.

"Participant" has the meaning assigned to such term in Section 10.04(f).

"Participant Register" has the meaning assigned to such term in Section 10.04(f).

"Patents" means all patentable inventions and designs, United States, foreign, and multinational patents, certificates of invention, and similar industrial property rights, and applications for any of the foregoing, including, without limitation, all reissues, substitutes, divisions, continuations, continuations-in-part, extensions, renewals, and reexaminations thereof.

"PBGC" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

"Pennsylvania Facility" means the pcrPET processing facility under construction in Reading, Pennsylvania, to be owned and operated by CL P.

"Pennsylvania Facility Group" means CL P and CL P Holdings.

"Pennsylvania Intercompany Indebtedness" means any intercompany Indebtedness between the Borrower, as borrower and CL P, a Lender.

"Pension Plan" means any employee pension benefit plan as defined in Section 3(2) of ERISA (other than a Multiemployer Plan) that is subject to the provisions of Title IV or Section 302 of ERISA, or Section 412 of the US Code, and in respect of which any Loan Party is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an

"employer" as defined in Section 3(5) of ERISA or with respect to which any Loan Party has or could reasonably be expected to have any liability.

**"Pennsylvania Bond Documents" means** *(i) the Indenture of Trust, dated as of June 1, 2019, by and between The Pennsylvania Economic Development Financing Authority, as issuer and UMB Bank, N.A., as trustee***, (ii) supplemented by the First Supplemental Indenture, effective as of September 1, 2020, by and between The Pennsylvania Economic Development Financing Authority, as issuer and UMB Bank, N.A., as trustee, (iii) the Loan Agreement, dated as of June 1, 2019 (as amended by the First Amendment to Loan Agreement, effective as of September 1, 2020), by and between The Pennsylvania Economic Development Financing Authority and CL P and (iv) the documents entered into in connection therewith.**

"Permitted Contest Conditions" means, with respect to any Loan Party, a contest, pursued in good faith, challenging the enforceability, validity, interpretation, amount or application of any law, tax or other matter (legal, contractual or other) by appropriate proceedings timely instituted if (a) such Loan Party diligently pursues such contest, (b) such Loan Party establishes adequate reserves with respect to the contested claim if and to the extent required by GAAP and (c) such contest (i) could not reasonably be expected to result in a Material Adverse Effect and (ii) does not involve any material risk or danger of any criminal or unindemnified civil liability being incurred by the Administrative Agent or the Lenders.

"Permitted Indebtedness" has the meaning assigned to such term in Section 6.02.

"Permitted Lien" has the meaning assigned to such term in Section 6.03.

"Permitted Revolving Facility" means one or more secured or unsecured revolving credit facilities satisfying the following conditions: (i) such Indebtedness is incurred to finance the working capital requirements of one or more of the Borrower Group Members; (ii) the aggregate principal amount of such Indebtedness incurred by (A) CL PI Holdings does not exceed $10,000,000, **provided that such amount may be increased to up to $25,000,000 subject to documentation reasonably satisfactory to the Administrative Agent (but which shall include adding "inventory" to the definition of "RCF Priority Collateral")** (B) CL Recycling Holdings does not exceed $5,000,000 and (C) CL P Holdings does not exceed $6,000,000; (iii) such Indebtedness has no make-whole or similar prepayment premium; (iv) the lien and/or payment priorities thereunder are, as among the holders of such Indebtedness, pari passu (e.g., there are no "first-out" or "last-out" tranches); and (v) the providers of such Indebtedness (or an agent on their behalf) shall have executed an intercreditor agreement in favor of the Collateral Agent, in form and substance satisfactory to the Administrative Agent in its sole discretion.

"Permitted Tax Distributions" means, for each taxable year in which the Borrower is considered a partnership or a "disregarded entity" for U.S. federal income tax purposes, distributions made by the Borrower to its Equity Shareholders to discharge their respective federal (and, if the Borrower is also treated as a partnership or disregarded entity for the relevant state or local income tax purposes, such state or local) income tax liabilities attributable to their allocable share of the net taxable income of the Borrower and its flow-through subsidiaries for

such taxable year in an amount not to exceed the amounts specified in Section 5.1(a) of the Borrower Operating Agreement (in effect as of the date hereof).

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"PET" means polyethylene terephthalate.

"PinnPack" means PinnPack Packaging, LLC, a Delaware limited liability company.

**"Pinnpack P" means Pinnpack P, LLC, a Delaware limited liability company.**

"PinnPack Facility" means the PET thermoforming and processing facility located in Oxnard, California, directly owned by PinnPack **P**.

"Pinnpack P **Facility**" means ~~Pinnpack P, LLC, a Delaware limited liability company~~**the PET thermoforming and processing facility contemplated in Eastern Pennsylvania, directly owned by PinnPack P**.

"Post-Default Rate" means a rate per annum which is equal to the greater of (a) the sum of the Interest Rate *plus* 2.00% and (b) with respect to each Lender, the maximum nonusurious interest rate, if any, that may be contracted for, taken, reserved, charged or received on the Loans under laws applicable to such Lender which are in effect at the relevant time.

~~"*Prepayment Premium*" means, with respect to any prepayment on any date of Loans (except as contemplated in Section 2.05(c)(ii)), an amount equal to (i) all accrued and unpaid interest on the aggregate principal amount of the Loans subject to such prepayment as of such date plus (ii) an aggregate amount equal to all interest payments that would have been payable to the **Lenders on the principal amount of the** Loans subject to such prepayment from the date of such prepayment through the third anniversary of the Funding Date on which such Loans had been made had such prepayment not occurred, which amount shall be calculated assuming there has been no repayment of the principal amount of the **Loans; provided** that if the Borrower **elects to prepay the Loans in accordance with Section 2.05(b)(v) after the** Lenders have declined the Borrower's request to reinvest such amounts in accordance with an ECF Reinvestment Request, the reference to the third anniversary of the Closing Date in clause (ii) above shall be deemed to be the 18-month anniversary of the Funding Date on which such Loans had been made. Schedule 1.01(b) sets forth an example calculation of the **Prepayment Premium.**~~

~~"*Prepayment Premium Event*" has the meaning assigned to such term in Section 2.05(c)(iv).~~

"Projection" has the meaning assigned to such term in Section 3.12(b).

"Property" means any right or interest in or to property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible.

"**Qualified Additional Collateral Conditions**" means the satisfaction by the Borrower of the following conditions:

(a)     the Borrower shall have induced a Person to form a new Delaware limited liability company (or other special purpose company reasonably acceptable to the Administrative Agent), the sole purpose of which is to satisfy the conditions set forth in this definition ("**Accommodation Collateral Provider**") ;

(b)     either (i) 100% of the Capital Stock in the special purpose company listed in clause (a) shall have been pledged to the Collateral Agent, solely for the benefit of the Tranche B Lenders, by the Accommodation Collateral Provider or (ii) the special purpose company listed in clause (a) shall have signed a guaranty and provided a perfected security interest over its assets in favor of the Collateral Agent, in either case, pursuant to documentation in form and substance reasonable satisfactory to the Administrative Agent; provided that so long as no default occurs  under any such guarantee, all dividends, distributions and gains on the Capital Stock of such special purpose company shall remain the property of the special purpose company;

(c)     The Accommodation Collateral Provider  shall have funded to the special purpose vehicle at least $5,250,000 in (i) cash, (ii) Cash Equivalent Investments or (iii) other marketable publicly-traded securities (which, in the case of this clause (iii), shall be "Fortune 500" entities and subject to the reasonable approval of the Administrative Agent);

(d)     the Administrative Agent shall have received evidence of each of the foregoing; and

(e)     so long as any Tranche B Obligations remain outstanding, all assets in the special purpose company described in clause (a) above shall remain in accounts within the United States of America and shall not be sold, pledged or assigned except as permitted under this Agreement.

"**Qualified Additional Equity Raise Threshold**" means Additional Equity Raise Amounts received by the Borrower on or after the Amendment No. 2 Effective Date in an amount equal to or greater than $20,000,000.

"**Qualified Junior Facility**" means a junior lien secured or unsecured credit facility satisfying the following conditions: (i) the purpose of such Indebtedness is to (A) first, repay all of the Tranche B Obligations and (B) thereafter, to provide working capital for the Loan Parties; (ii) the aggregate principal amount of such Indebtedness does not exceed the Tranche B Obligations (plus any additional amounts approved by the Administrative Agent, in its reasonable discretion); (iii) such Indebtedness does not benefit from a guaranty or security in respect of any Borrower Group Member (other than the Loan Parties); and (iv) the provider of such Indebtedness shall have executed an intercreditor agreement in favor of the Collateral Agent, in form and substance satisfactory to the Administrative Agent in its sole discretion.

"Quarterly Payment Date" means the last Business Day of March, June, September and December in each fiscal year (or, when used in Section 2.05(b)(v), the definition of "Applicable ECF Percentage" and the definition of "Excess Cash Flow Payment Date", the last day of March, June, September and December in each fiscal year).

"Register" has the meaning assigned to such term in Section 10.04(c).

"Regulation D" means Regulation D of the Board.

"Regulation U" means Regulation U of the Board.

"Reinvestment Notice" means a written notice executed by an Authorized Representative of Borrower stating that no Default or Event of Default has occurred and is continuing, and that the applicable Loan Party intends and expects to use all or a specified portion of the Loss Proceeds in respect of such Event of Loss to repair or restore the Business.

"Rejected Proceeds" has the meaning assigned to such term in Section 2.05(c)(iii).

"Rejected Proceeds Account" means an account of the Borrower to be established and maintained at the Depositary Bank for the deposit of Rejected Proceeds as provided herein.

"Related Fund" means with respect to any Lender, any fund that invests in loans and is managed or advised by the same investment advisor as such Lender, by such Lender or an Affiliate of such Lender.

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, employees, agents and advisors of such Person and such Person's Affiliates.

"Release" means any release, spill, emission, emanation, leaking, pumping, injection, deposit, disposal, discharge, dispersal, leaching or migration into or through the indoor or outdoor environment, including, the movement through ambient air, soil, surface water, ground water, wetlands, land or subsurface strata.

"Replacement Agreement" means any Additional Agreement that is (i) entered into by a Loan Party in replacement of any Material Agreement, (ii) in form and substance reasonably satisfactory to the Administrative Agent and (iii) in the case of any real property lease, is with one or more Replacement Obligors.

"Replacement Obligor" means a Person (or guarantor of such Person's obligations) that is approved by the Administrative Agent, such approval to be in the Administrative Agent's reasonable discretion.

"Reportable Event" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the 30-day notice period has been waived.

"Restoration" means, with respect to any Affected Property, the rebuilding, repair, restoration or replacement of such Affected Property.

"Restricted Payment" means:

(a)    all dividends paid by any Loan Party (in cash, Property or obligations) on, or other payments or distributions on account of, or the setting apart of money for a sinking or other analogous fund for, or the purchase, redemption, retirement or other acquisition by any Loan Party of, any portion of any membership interests in any Loan Party or any warrants, rights or options to acquire any such membership interests;

(b)    any payment of development, management or other fees, or of any other amounts, by any Loan Party to any Affiliate thereof;

(c)    any other payment in cash, Property or obligations to a parent company of the Loan Parties or Affiliate of the Loan Parties;

(d)    any other payment in cash, Property or obligations in respect of the Shareholder Notes; and/or

(e)    any other payment in cash, Property or obligations to a parent company of the Loan Parties or Affiliate of the Loan Parties in respect of any Indebtedness subordinated to the Obligations hereunder.

"Riverside Facility" means the pcrPET processing facility located in Riverside, California, directly owned by CL Industries.

"S&P" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., or any successor to the rating agency business thereof.

"Sanctioned Country" means, at any time, a country or territory that is subject to comprehensive Sanctions.  For the avoidance of doubt, as of the Closing Date, Sanctioned Countries are the Crimea region of Ukraine, Cuba, Iran, North Korea and Syria.

"Sanctioned Person" means, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, or by the United Nations Security Council, the European Union or any EU member state, (b) any Person operating, organized or resident in a Sanctioned Country, or (c) any Person owned or controlled by any such Person.

"Sanctions" means economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, or (b) the United Nations Security Council, the European Union or Her Majesty's Treasury of the United Kingdom.

"Second Funding Commitments" means, with respect to each Lender, the commitment of such Lender to make Loans to the Borrower pursuant to Section 2.01(a), in an aggregate

29

principal amount not to exceed the amount set forth opposite such Lender's name on Annex I under the heading "Second Funding Commitments".

"Second Funding Date" means August 15, 2019 ~~(or such earlier date as may be agreed to by the Administrative Agent in its sole and absolute discretion), subject to all conditions precedent specified in Section 4.03 being satisfied (or waived by the Administrative Agent and the Lenders in their sole and absolute discretion in accordance with Section 10.02), or such other date as may be requested by Borrower and approved by the Administrative Agent in its sole and absolute discretion.~~.

"Secured Obligations" has the meaning assigned to such term in the Security Agreement.

"Secured Parties" means (a) the Agents and (b) the Lenders.

"Security Agreement" means the Pledge and Security Agreement, entered into on the Initial Funding Date, among the Loan Parties and the Collateral Agent, a copy of which is attached hereto as Exhibit I.

"Security Documents" means the Security Agreement, the Subordination Agreements, the Control Agreements, all Uniform Commercial Code financing statements required by any Security Document and any other security agreement or instrument to be executed pursuant hereto or any Security Document.

"Shareholder Notes" means, collectively, the 7% Notes, the 10% Notes, the Additional Subordinated Notes.

"Side Letter" means that certain Side Letter, dated March 30, 2020, by and between Mr. Leon Farahnik and Agent.

"Solvent" means, with respect to any Person on a particular date that on such date (a) the fair value of the property of such Person is greater than the total amount of liabilities, including contingent liabilities of such Person, (b) the present fair saleable value of the assets of such Person is not less than the amount that will be required to pay the probable liability of such Person on its debts as they become absolute and matured, (c) such Person does not intend to, and does not believe that it will, incur debts or liabilities beyond such Person's ability to pay such debts and liabilities as they mature, (d) such Person is not engaged in business or a transaction, and is not about to engage in business or a transaction, for which such Person's property would constitute an unreasonably small capital and (e) such Person is not insolvent as defined under applicable Bankruptcy or insolvency laws; provided that unless otherwise provided under Applicable Law, the amount of contingent liabilities at any time shall be computed as the amount that, in light of all the facts and circumstances existing at such date, represents the amount that can reasonably be expected to become an actual or matured liability.

"Subordination Agreements" means, individually and collectively, (i) the 7% Shareholder Note Subordination Agreement, (ii) the 10% Shareholder Note Subordination Agreement, (iii) the Additional Subordinated Note Subordination Agreement and (iv) any other

subordination agreements under which Additional Subordinated Notes are subordinated with respect to the Obligations.

"Subsidiary" means, with respect to any Person (the "parent"), any other corporation, limited liability company, partnership, association or other entity (a) of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date, owned, controlled or held, or (b) that is, as of such date, otherwise controlled, by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Termination Value" means, in respect of any one or more Hedging Agreement, after taking into account the effect of any legally enforceable netting agreement relating to such Hedging Agreements, (a) for any date on or after the date such Hedging Agreements have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) or any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Hedging Agreements, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Hedging Agreements (which may include a Lender or any Affiliate of a Lender).

"Term Loan Credit Agreement" means that certain Revolving Loan and Security Agreement, dated as of November 13, 2017, among Northport TRS, LLC, a Delaware limited liability company, as administrative agent, the lenders from time to time party thereto, CarbonLITE Industries, CL Pinnpack, CL PI Holdings, PinnPack and the other credit parties from time to time party thereto.

*"Texas Bond Documents" means (i) the Indenture, dated as of October 1, 2016, by and between The Mission Economic Development Corporation, as issuer and UMB Bank, N.A., as trustee, (ii) the Loan Agreement, dated as of October 1, 2016, by and between The Mission Economic Development Corporation and CL Recycling* **and (iii) the documents entered into in connection therewith.**

"Texas Facility" means the pcrPET processing facility located in Dallas, Texas, directly owned by CL Recycling.

"Texas Facility Group" means CL Recycling and CL Recycling Holdings.

"Texas Intercompany Indebtedness" means any intercompany Indebtedness between CL Industries, as borrower and CL Recycling, a Lender.

"Trademarks" means all domestic, foreign and multinational trademarks, service marks, trade names, corporate names, company names, business names, fictitious business names, trade dress, trade styles, logos, Internet domain names, other indicia of origin or source identification, and general intangibles of a like nature, whether registered or unregistered, and, with respect to

31

the foregoing, all registrations and applications for registration thereof, all extensions and renewals thereof, and all of the goodwill of the business connected with the use of and symbolized by any of the foregoing.

**"Tranche A Commitments" means, individually or collectively as the context requires, the Initial Funding Commitment and Second Funding Commitments.**

**"Tranche A Loans"  has the meaning assigned to such term in Section 2.01(b).**

**"Tranche A** *Prepayment Premium" means, with respect to any prepayment on any date of* **Tranche A** *Loans (except as contemplated in Section 2.05(c)(ii)), an amount equal to (i) all accrued and unpaid interest on the aggregate principal amount of the* **Tranche A** *Loans subject to such prepayment as of such date plus (ii) an aggregate amount equal to all interest payments that would have been payable to the* **Tranche A Lenders on the principal amount of the Tranche A** *Loans subject to such prepayment from the date of such prepayment through the third anniversary of the Funding Date on which such* **Tranche A** *Loans had been made had such prepayment not occurred, which amount shall be calculated assuming there has been no repayment of the principal amount of the* **Tranche A Loans; provided that if the Borrower elects to prepay the Tranche A Loans in accordance with Section 2.05(b)(v) after the Tranche A** *Lenders have declined the Borrower's request to reinvest such amounts in accordance with an ECF Reinvestment Request, the reference to the third anniversary of the Closing Date in clause (ii) above shall be deemed to be the 18-month anniversary of the Funding Date on which such* **Tranche A** *Loans had been made.  Schedule 1.01(b) sets forth an example calculation of the* **Tranche A Prepayment Premium.**

**"Tranche A** *Prepayment Premium Event" has the meaning assigned to such term in Section 2.05(c)(iv).*

**"Tranche A** *Obligations"  means all advances to, and debts (including Accrued Interest, interest accruing after the maturity of the* **Tranche A** *Loans and interest accruing after the filing of any Bankruptcy, but excluding obligations in respect of the Lender Warrants), liabilities, obligations,* **Tranche A** *Prepayment Premium, covenants and duties of, any Loan Party arising under any Financing Document, or otherwise with respect to any* **Tranche A** *Loan, in each case whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest, reimbursements and fees that accrue after the commencement by or against the Borrower or any of its Subsidiaries of any proceeding under any debtor relief law naming such Person as the debtor in such proceeding, regardless of whether such interest, reimbursements and fees are allowed claims in such proceeding.*

**"Tranche B Funding Date" means September 9, 2020.**

**"Tranche B Loans" has the meaning assigned to such term in Section 2.01(c).**

**"Tranche B Funding Commitments" means, with respect to each Tranche B Lender, the commitment of such Lender to make Tranche B Loans to the Borrower pursuant to Section 2.01(c**), *in an aggregate principal amount not to exceed the amount set*

32

*forth opposite such Lender's name on Annex I under the heading "**Tranche B Commitments***", as such Annex I may be modified by the Administrative Agent in its sole discretion and noticed to Borrower, but in compliance with assignment provisions in Section 10.04.  As of the date hereof, the aggregate* **Tranche B Funding Commitments of all Lenders is equal to $5,250,000.**

**"Tranche B Funds Flow Memorandum" means a funds flow memorandum in respect of the Tranche B Loans advanced on the Tranche B Funding Date, in form and substance satisfactory to the Administrative Agent.**

**"Tranche B Lender" means a Lender that provides any Tranche B Commitment in accordance with Section 2.01(c) or holds Tranche B Loans and each Person that shall become a Tranche B Lender hereunder pursuant to an Assignment and Assumption for so long as such Person shall be a party to this Agreement.**

**"Tranche B Maturity Date" means June 30, 2021.**

**"Tranche B Minimum Return" means, with respect to any Tranche B Loans, a minimum return on such Tranche B Loans calculated in accordance with the methodology set forth in Annex III.**

**"Tranche B Obligations"  means all advances to, and debts (including Accrued Interest, interest accruing after the maturity of the Tranche B Loans and interest accruing after the filing of any Bankruptcy), liabilities, obligations, Tranche B Minimum Return, covenants and duties of, any Loan Party arising under any Financing Document, or otherwise with respect to any Tranche B Loan, in each case whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest, reimbursements and fees that accrue after the commencement by or against the Borrower or any of its Subsidiaries of any proceeding under any debtor relief law naming such Person as the debtor in such proceeding, regardless of whether such interest, reimbursements and fees are allowed claims in such proceeding.**

**"Tranche B Optional Warrants" means one or more warrants granted ratably to each of the Tranche B Lenders (or its Affiliate) for 2% of the common equity of the Borrower (taken as a whole across all Tranche B Lenders (or its applicable Affiliates)), which warrants shall (a) have a purchase price equal to $0.01 and (b) be documented pursuant to documentation in the same form as the Lender Warrants.**

"Transaction Documents" means each of the Financing Documents, the Lender Warrants and the Observer Rights Agreement.

"UCC" means the Uniform Commercial Code as in effect from time to time in the State of New York; provided that if, with respect to any filing statement or by reason of any mandatory provisions of law, the perfection or the effect of perfection or non-perfection of the security interests granted to the Collateral Agent pursuant to the applicable Security Document is governed by the Uniform Commercial Code as in effect in a jurisdiction of the United States other than New York, UCC means the Uniform Commercial Code as in effect from time to time

in such other jurisdiction for purposes of the provisions of each applicable Financing Document and any filing statement relating to such perfection or effect of perfection or non-perfection.

**"Unconditional Guaranty" means that certain Unconditional Continuing Guaranty of all Tranche B Obligations, made and entered into as of the Amendment No. 2 Effective Date, by Leon Faranik in favor of the Collateral Agent for the benefit of the Tranche B Lenders.**

"Uniform Commercial Code" means the Uniform Commercial Code as in effect from time to time in the applicable jurisdiction.

"US Code" means the U.S. Internal Revenue Code of 1986, as amended.

"US Person" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"USA PATRIOT Act" has the meaning assigned to such term in Section 10.14.

"Voting Stock" means, with respect to any Person, Capital Stock the holders of which are ordinarily, in the absence of contingencies, entitled to vote for the election of directors (or persons performing similar functions) of such Person, even if the right so to vote has been suspended by the happening of a contingency.

"Vehicles" has the meaning assigned to such term in the Security Agreement.

"Write-Down and Conversion Powers" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

Section 1.02    Terms Generally.  Except as otherwise expressly provided, the following rules of interpretation shall apply to this Agreement and the other Financing Documents:

(a)    the definitions of terms herein shall apply equally to the singular and plural forms of the terms defined;

(b)    whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms;

(c)    the words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation";

(d)    the word "will" shall be construed to have the same meaning and effect as the word "shall";

(e)    unless the context requires otherwise, any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or

otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or therein) and shall include any appendices, schedules, exhibits, clarification letters, side letters and disclosure letters executed in connection therewith;

(f)    any reference herein to any Person shall be construed to include such Person's successors and assigns to the extent permitted under the Financing Documents and, in the case of any Governmental Authority, any Person succeeding to its functions and capacities;

(g)    the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision;

(h)    all references herein to Articles, Sections, Appendices, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Appendices, Exhibits and Schedules to, this Agreement;

(i)    the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights; and

(j)    any reference herein to a merger, transfer, consolidation, amalgamation, consolidation, assignment, sale, disposition or transfer, or similar term, shall be deemed to apply to a division of or by a limited liability company, or an allocation of assets to a series of a limited liability company (or the unwinding of such a division or allocation), as if it were a merger, transfer, consolidation, amalgamation, consolidation, assignment, sale or transfer, or similar term, as applicable, to, of or with a separate Person.  Any division of a limited liability company shall constitute a separate Person hereunder (and each division of any limited liability company that is a Subsidiary, joint venture or any other like term shall also constitute such a Person or entity).

Section 1.03    Accounting Terms.  Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP.  If the Borrower notifies the Administrative Agent that the Borrower wishes to amend any provision hereof to eliminate the effect of any change occurring after the date hereof in GAAP or in the application thereof on the operation of such provision, regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then the Borrower's compliance with such provision shall be determined on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in a manner satisfactory to the Borrower and the Administrative Agent; provided that Capital Lease Obligations shall be construed in accordance with GAAP as in effect on the Closing Date, notwithstanding any changes to GAAP occurring after the Closing Date. Notwithstanding any provision contained herein or in any other Financing Document, any lease (or similar arrangement) that would have been characterized, classified or reclassified as an operating lease in accordance with GAAP prior to the date of the Borrower's adoption of ASC 842 (or any other ASC having a similar result or effect) (and related interpretations) (whether or not such lease was in effect on such date) shall not constitute a Capital Lease Obligation, and any such lease shall be, for all purposes of this Agreement and the other Financing Documents, treated as though it were reflected on the Borrower's consolidated financial statements in the

same manner as an operating lease would have been reflected prior to the Borrower's adoption of ASC 842.

## ARTICLE II

## THE CREDITS

Section 2.01   Loans.

(a)   **Each Lender made a single advance of Loans on the Initial Funding Date (the "Initial Loan") in an amount equal to its ratable share (based upon the respective amounts of such Lender's Initial Funding Commitments at such time) of the aggregate amount requested by Borrower pursuant to Section 2.01(e).**

(b)   **Each Lender made a single advance of Loans on the Second Funding Date (the "Second Funding Date Loan" and together with the Initial Loans, the "Tranche A Loans") in an amount equal to its ratable share (based upon the respective amounts of such Lender's Second Funding Commitments at such time) of the aggregate amount requested by Borrower pursuant to Section 2.01(e).**

(c)   ~~(a)~~ Subject to the terms and conditions set forth herein **and in Amendment No. 2** (including, without limitation, the conditions set forth in ~~Sections 4.01 through~~**Section 4 of Amendment No. 2 and Section** 4.03 **hereof**), each **Tranche B** Lender agrees to make Loans to Borrower ~~(i)~~ on the ~~Initial~~**Tranche B** Funding Date **(such Loans the "Tranche B Loans")**, as requested by Borrower pursuant to Section 2.01(**ee**), in an aggregate principal amount not to exceed the ~~Initial~~**Tranche B** Funding Commitments ~~and (ii) on the Second Funding Date, as requested by Borrower pursuant to Section 2.01(c), in an aggregate principal amount not to exceed the Second Funding Commitments, or as otherwise requested by Borrower and approved by the Administrative Agent in its sole and absolute discretion.~~ **.**

(d)   ~~(b)~~ No Reborrowing.  Amounts prepaid or repaid in respect of any Loan may not be reborrowed.

(e)   ~~(c)~~ Procedures for Borrower.

(i)   Subject to Sections 4.01 through 4.03, as applicable, and except as otherwise provided herein, the Borrower may request the Lenders to make Loans to the Borrower by delivery to the Administrative Agent, on any Business Day, of a Borrowing Request.  The date of the proposed borrowing (each such date, a "Funding Date") specified in a Borrowing Request shall be no earlier than ten (10) days **after the delivery of such Borrowing Request** (or, in the case of the ~~Initial~~**Tranche B Loans, the Tranche B** Funding Date~~, as mutually agreed between the Borrower and the Administrative Agent) after the delivery of such Borrowing Request~~).  Unless otherwise provided herein, each Borrowing Request shall be irrevocable and shall specify (i) the aggregate principal amount of the borrowing requested ~~(it being acknowledged and agreed that no more than $50,000,000 may be borrowed on the Initial Funding Date)~~, (ii) the proposed Funding Date (which shall be a Business Day) and (iii) the Collateral Account(s) into which the proceeds of the borrowing are to be deposited and the

amounts to be deposited into each Collateral Account if more than one Collateral Account is designated.

(ii)    Borrower shall not deliver a Borrowing Request for Loans, and, subject to Sections 2.07(e) and 2.13, the Lenders shall be under no obligation to make available any funds for any Loans, on the Initial Funding Date, in an aggregate amount for all Lenders exceeding the Initial Funding Commitments, **and** on the Second Funding Date, in an aggregate amount for all Lenders exceeding the Second Funding Commitments **and on the Tranche B Funding Date, in an aggregate amount for all Lenders exceeding the Tranche B Funding Commitments**.

**(f)**    ~~(d)~~ Notice by the Administrative Agent to the Lenders.    Promptly following receipt of a Borrowing Request in accordance with this Section 2.01, the Administrative Agent shall advise each Lender of the details thereof and of the amount of such Lender's Loan to be made as part of the requested borrowing.

**(g)**    Tax Considerations.

**(i)**    ~~(e)~~ For U.S. federal income tax purposes, each of the Borrower, the Guarantors and the **Tranche A** Lenders agrees: (i) that the ~~Loan~~**Tranche A Loans** advanced pursuant to Section 2.01(a) **and (b)** hereof, together with the Lender Warrant, shall be treated as an investment unit, and the purchase price of such investment unit shall equal the total purchase price paid by the **Tranche A** Lenders for the **Tranche A** Loan on the Closing Date, and $80,000 of the purchase price of the investment unit shall, for U.S. federal income tax purposes, be allocated to the purchase of the Lender Warrant; and (ii) to treat the **Tranche A** Loans as a debt instrument, and not as a "contingent payment debt instrument," for U.S. federal and state income tax purposes.  The Borrower will provide any information reasonably requested from time to time by any **Tranche A** Lender regarding the original issue discount associated with the **Tranche A** Loans for U.S. federal income tax purposes.  Each of Borrower and the **Tranche A** Lenders agrees to file tax returns consistent with the allocation set forth in this paragraph.  Notwithstanding the foregoing, for all purposes (except for the purpose of this Section 2.01(e)), each **Tranche A** Lender shall be treated as having lent the full amount of its pro rata portion of the principal amount of the **Tranche A** Loans.

**(ii)    For U.S. federal income tax purposes, each of the Borrower, the Guarantors and the Tranche B Lenders agrees: (i) that the Tranche B Loans advanced pursuant to Section 2.01(c) hereof, together with the Tranche B Optional Warrants, if any, shall be treated as an investment unit, and the purchase price of such investment unit shall equal the total purchase price paid by the Tranche B Lenders for the Tranche B Loan on the Tranche B Effective Date, and $4,900 of the purchase price of the investment unit shall, for U.S. federal income tax purposes, be allocated to the purchase of the Tranche B Optional Warrants; and (ii) to treat the Tranche B Loans as a debt instrument, and not as a "contingent payment debt instrument," for U.S. federal and state income tax purposes. The Borrower will provide any information reasonably requested from time to time by any Tranche B Lender regarding the original issue discount associated with the Tranche B Loans for U.S. federal income tax purposes.  Each of Borrower and the Tranche B Lenders agrees to file tax returns consistent with the allocation set forth in this paragraph. Notwithstanding the foregoing, for all purposes (except for the purpose of this Section**

**2.01(e)), each Tranche B Lender shall be treated as having lent the full amount of its pro rata portion of the principal amount of the Tranche B Loans.**

Section 2.02   Funding of the Loans.  If the Borrower has satisfied the conditions set forth in Section ~~4.01 through~~**4 of Amendment No. 2 and Section** 4.03~~, as applicable~~ **hereof**, not later than 12:00 Noon, New York City time, on the **applicableTranche B** Funding Date, each **Tranche B** Lender shall make available to the Administrative Agent at the Funding Office an amount in Dollars and in immediately available funds equal to the **Tranche B** Loans to be made by such Lender.  Administrative Agent shall deposit the aggregate of the amounts made available to Administrative Agent by the Lenders, in like funds as received by Administrative Agent, ~~into the Borrower Account~~ in accordance with the ~~Borrowing Request or as otherwise agreed between the Administrative Agent and the Borrower pursuant to any funds flow memorandum delivered in connection therewith.  With respect to the Loans made on the Initial Funding Date, the Administrative Agent shall distribute the funds in accordance with the~~**Tranche B** Funds Flow Memorandum.

Section 2.03   Termination and Reduction of the Commitments.   **(i)** Any Initial Funding Commitment not funded on the Initial Funding Date ~~and,~~ **(ii)** any Second Funding Commitment not funded on the Second Funding **Date and (iii) any Tranche B Commitments not funded on the Tranche B Funding** Date shall, in each case, automatically and without notice be reduced to zero and terminated upon the close of business on the Initial Funding Date ~~or,~~ the Second **Funding Date or the Tranche B** Funding Date, as applicable.  Amounts prepaid or repaid in respect of any Loans may not be reborrowed.

Section 2.04   Repayment of Loan; Evidence of Debt.

**(a)**   Promise to Repay at Maturity.

**(i)**   ~~(a)~~ Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of the Lenders, the unpaid principal amount of the **Tranche A** Loans then outstanding (including all amounts added to principal as Accrued Interest pursuant to Section 2.07(e)) on the Maturity Date.  Borrower hereby further agrees to pay interest on the unpaid principal amount of each **Tranche A** Loan from time to time outstanding from the applicable Funding Date until payment in full in cash thereof at the rates per annum, and on the dates, set forth in Section 2.07.

**(ii)   Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of the Tranche B Lenders, the unpaid principal amount of the Tranche B Loans then outstanding (including all amounts added to principal as Accrued Interest pursuant to Section 2.07(e)) on the Tranche B Maturity Date. Borrower hereby further agrees to pay interest on the unpaid principal amount of each Tranche B Loan from time to time outstanding from the Tranche B Funding Date until payment in full in cash thereof at the rates per annum, and on the dates, set forth in Section 2.07.  Finally, the Borrower further agrees to pay, in connection with any repayment or prepayment of Tranche B Loans, the Tranche B Minimum Return in respect of the Tranche B Loans repaid or prepaid.**

38

(b)      Evidence of Debt.

(i)      Each Lender may maintain in accordance with its usual practice an account or accounts evidencing the Indebtedness of the Borrower to such Lender resulting from the Loans made by such Lender from time to time, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.  In the case of a Lender that does not request execution and delivery of a Note evidencing the Loans made by such Lender to the Borrower, such account or accounts shall, to the extent not inconsistent with the notations made by the Administrative Agent in the Register, be conclusive and binding on the Borrower absent manifest error; provided that the failure of any Lender to maintain such account or accounts or any error in any such account shall not limit or otherwise affect any obligations of the Borrower.

(ii)      The Borrower agrees that, upon the request by the Administrative Agent to Borrower from any Lender, the Borrower will promptly execute in favor of such Lender and deliver to Administrative Agent a promissory note (a "Note") substantially in the form of Exhibit B payable to such Lender in an amount equal to such Lender's Loan evidencing the Loans made by such Lender.  The Borrower hereby irrevocably authorizes each Lender to make (or cause to be made) appropriate notations on the grid attached to such Lender's Notes (or on any continuation of such grid) with respect to each payment or prepayment of, and each addition of Accrued Interest to, the principal of the Loans evidenced thereby, which notations, if made, shall evidence, inter alia, the date of, the outstanding principal amount of, and the interest rate applicable to the Loans evidenced thereby; provided that (i) notwithstanding any such notation or the absence thereof, as set forth in Section 2.07(f), the Agent's determination of the principal amount of the Loans outstanding at any time shall be conclusive and binding on all parties absent manifest error; and (ii) the failure of any Lender to make any such notations or any error in any such notations shall not limit or otherwise affect any obligations of the Borrower.  A Note and the obligation evidenced thereby may be assigned or otherwise transferred in whole or in part only in accordance with Section 10.04(b).

Section 2.05    Prepayment of the Loan.

**(a)**      Optional Prepayments.

**(i)**      The Borrower shall have the right at any time and from time to time, upon at least ten (10) Business Days' prior written notice to the Administrative Agent stating the prepayment date and aggregate principal amount of the prepayment, to prepay any **Tranche A** Loan in whole or in part, and subject to the requirements of this Section 2.05(a)**(i)**.   Each prepayment pursuant to this Section 2.05(a)**(i)** during the period from the Funding Date on which such **Tranche A** Loans were made through the third anniversary thereof, shall be accompanied by the **Tranche A** Prepayment Premium with respect to the principal amount of the **Tranche A** Loans being prepaid.

**(ii)      The Borrower shall have the right, upon at least ten (10) Business Days' prior written notice to the Administrative Agent stating the prepayment date and aggregate principal amount of the prepayment, to prepay any Tranche B Loan in whole (but not in part), and subject to the requirements of this Section 2.05(a)(ii).   Each**

39

**prepayment pursuant to this Section 2.05(a)(ii) shall be accompanied by the Tranche B Minimum Return (if any) with respect to the principal amount of the Tranche B Loans being prepaid. For the avoidance of doubt, (i) no Minimum Return will be required if the Tranche B Loans are repaid in full in cash prior to the date that is 45 days after the Amendment No. 2 Effective Date and (ii) no Tranche B Lender shall have the right to reject any prepayment of the Tranche B Loans by the Borrower with Additional Equity Raise Amounts in accordance with this Section 2.05(a)(ii).**

(iii)    (a) Each partial prepayment of any Loans under this Section 2.05(a) shall be in an aggregate amount for the Loans of all Lenders at least equal to $1,000,000 or an integral multiple of $500,000 in excess thereof (or such lesser amount as may be necessary to prepay the aggregate principal amount then outstanding with respect to all of the Loans of all Lenders).

(b)    <u>Mandatory Prepayments and Offers to Prepay</u>.

(i)    <u>Material Agreement</u>.  If any Loan Party receives any termination payments, damages (including liquidated damages), indemnity payments (other than indemnity payments received by any Loan Party as reimbursement for costs, expenses or other amounts expended by such Loan Party in connection with defending, settling or satisfying any third-party claim against such Loan Party) or other extraordinary payments under or in respect of any Material Agreement that is a real property lease, in excess of $2,500,000 individually or $5,000,000 in the aggregate per calendar year, the Loan Parties shall, or shall cause their Affiliates to, within five (5) Business Days of the receipt of such termination or other payment, offer to prepay the Loans with an amount equal to 100% of the Net Available Amount of such payments, pursuant to a written notice sent to the Administrative Agent and the Lenders describing in reasonable detail the event giving rise to the obligation under this Section 2.05(b)(i) to make such offer (each such offer to prepay referred to in this clause (b)(i) a "<u>Material Agreements Prepayment Offer</u>").

(ii)    <u>Event of Loss</u>. If the proceeds received by the Loan Parties (including, as a distribution from a Non-Guarantor Subsidiary) in respect of Events of Loss shall be in excess of $2,500,000 per item of equipment subject to an Event of Loss or $5,000,000 in the aggregate per calendar year across all Events of Loss, and, in any such case, are not applied to the Restoration of the related Affected Property as permitted by the immediately succeeding sentence, then the Loan Parties shall, or shall cause their Affiliates to, offer to prepay the Loans with an amount equal to 100% of the Net Available Amount with respect to such Event of Loss, pursuant to a written notice sent to the Administrative Agent and the Lenders describing in reasonable detail the event giving rise to the obligation under this Section 2.05(b)(ii) to make such offer (each such offer to prepay referred to in this Section 2.05(b)(ii) a "<u>Event of Loss Prepayment Offer</u>").  Notwithstanding the foregoing, any Loan Party may use Loss Proceeds received in respect of any Event of Loss for the reinvestment of such funds in the Restoration of the Affected Property if, (i) in the case of Loss Proceeds less than $5,000,000 in the aggregate in any calendar year, the Borrower's Board of Directors shall have authorized the reinvestment of such Loss Proceeds and (ii) in the case of Loss Proceeds exceeding $5,000,000 in the aggregate per calendar year, the Borrower's Board of Directors shall have authorized the reinvestment of such Loss Proceeds and the Borrower shall have delivered to the Administrative Agent a

Reinvestment Notice and a restoration plan reasonably acceptable to the Administrative Agent and such reinvestment is applied in accordance with such approved restoration plan.

(iii)     <u>Disposition of Assets</u>.  Without limiting the obligation of the Borrower to obtain the consent of the Administrative Agent to any Disposition not otherwise permitted hereunder, in the event that the Net Available Amount of any such Disposition by the Borrower Group Members shall exceed $1,500,000 per individual event or $3,500,000 in the aggregate per calendar year for all such Dispositions (in the case of the Non-Guarantor Subsidiaries, solely to the extent the proceeds thereof have been distributed to the Loan Parties), then the Borrower shall offer to prepay the Loans ratably in an amount equal to 100% of the Net Available Amount of the Disposition on the Quarterly Payment Date immediately following receipt by the Borrower of the relevant proceeds.  Notwithstanding the foregoing, the Borrower shall not be required to prepay the Loans pursuant to this <u>Section 2.05(b)(iii)</u> to the extent that the Borrower reinvests the Net Available Amount (or any portion thereof) of any such Disposition in substantially similar assets that are necessary or useful for the Business pursuant to a transaction not prohibited hereunder and such Net Available Amount is so reinvested within one hundred eighty (180) days (or been made the subject of a firm purchase order placed within such time period) of such Disposition, and any uninvested portion of such Net Available Amount shall promptly thereafter be applied to prepayments as contemplated by this <u>Section 2.05(b)(iii)</u>.  Any such offer to prepay shall be made pursuant to a written notice sent to the Administrative Agent and the Lenders describing in reasonable detail the event giving rise to the obligation under this Section 2.05(b)(iii) to make such offer (each such offer to prepay referred to in this <u>Section 2.05(b)(iii)</u> a "<u>Disposition Proceeds Prepayment Offer</u>").

(iv)     <u>Incurrence of Debt</u>.  If any Borrower Group Member issues or incurs any Indebtedness (other than Permitted Indebtedness), Borrower shall, within one (1) Business Day of the receipt of the net cash proceeds therefrom, offer to prepay the Loans with an amount equal to 100% of the cash proceeds of such Indebtedness, pursuant to a written notice sent to the Administrative Agent and the Lenders describing in reasonable detail the event giving rise to the obligation under this <u>Section 2.05(b)(iv)</u> to make such offer (each such offer to prepay referred to in this <u>Section 2.05(b)(iv)</u> a "<u>Debt Prepayment Offer</u>").

(v)     <u>Excess Cash Flow Sweep</u>.  On each Excess Cash Flow Payment Date, Borrower shall offer to prepay the Loans of each Lender in an amount equal to such Lender's *pro rata* share of the Applicable ECF Percentage of Net Cash Flow for the quarterly period ending on the Quarterly Payment Date related to such Excess Cash Flow Payment Date, pursuant to a written notice sent to the Administrative Agent and the Lenders with detailed calculations of the Net Cash Flow amount (such Net Cash Flow amount, the "<u>ECF Amount</u>" and each such offer to prepay referred to in this Section 2.05(b)(v) an "<u>ECF Prepayment Offer</u>").  Notwithstanding the foregoing, any Loan Party may reinvest funds equal to all or a portion of the ECF Amount for such quarterly period if the Administrative Agent has approved an ECF Reinvestment Request submitted by the Borrower and such reinvestment is applied in accordance with such approved reinvestment plan or the Operating Budget.

**(vi)     <u>Incurrence of Equity</u>.  If any Borrower Group Member receives any Additional Equity Raise Amounts, then the Borrower shall, within one (1) Business Day of the receipt of the net cash proceeds therefrom, prepay the Tranche B Obligations with an**

41

amount equal to the amount of Tranche B Obligations due and outstanding as of such date, pursuant to a written notice sent to the Administrative Agent and the Tranche B Lenders describing in reasonable detail the event giving rise to the obligation under this Section 2.05(b)(vi) to make such prepayment.  In furtherance of the foregoing, the Loan Parties, the Administrative Agent and the Lenders acknowledge and agree that any Additional Equity Raise Amount shall be used to first pay any Tranche B Obligations then outstanding (including any Tranche B Minimum Return) and thereafter, may be used for any other purpose permitted by this Agreement. Once the Tranche B Obligations are satisfied in full (A) any collateral and/or guaranty provided by the Accommodation Collateral Provider shall be released and (B) any portion of the Loan that was designated as Short Term Indebtedness pursuant to Section 5.21(i) hereof shall cease to be so denominated and all liens granted to secure such portion of the Loan shall be released.

(vii)    Failure to Close Bond Deal.  If, pursuant to the Pennsylvania Bond Documents, the Pennsylvania Facility Group does not receive the net cash proceeds of $10,000,000 of additional bond proceeds within three (3) Business Days after the Amendment No. 2 Effective Date, Borrower shall, on the third Business Day after the Amendment No. 2 Effective Date, prepay the Loans with an amount equal to $5,000,000.

Notwithstanding the foregoing Sections 2.05(b)(i) through (vvii), Borrower shall be permitted to request a waiver of the requirement to deliver a Material Agreements Prepayment Offer, an Event of Loss Prepayment Offer, a Disposition Proceeds Prepayment Offer, a Debt Prepayment Offer, or an ECF Prepayment Offer, which waiver may be accepted or rejected by the Administrative Agent in its sole and absolute discretion.

(c)    Terms of All Prepayments.

(i)

(A)    Any partial prepayments of the Loans pursuant to Section 2.05(b)(vi) or Section 2.05(b)(vii) shall be applied (1) first, on a *pro rata* basis to the Tranche B Obligations of each Tranche B Lender and (2) *second*, on a *pro rata* basis to the Tranche A Obligations of each Lender.

(B)    (i) AllAny partial prepayments of the Loans pursuant to any other provision of this Agreement shall be applied (1) first, on a *pro rata* basis to the LoansTranche A Obligations of each Lender and (2) *second*, on a *pro rata* basis to the Tranche B Obligations of each Tranche B Lender.

(ii)    Each prepayment of Loans shall be accompanied by payment of all accrued interest on the amount prepaid, any additional amounts required pursuant to Section 2.09 and the(A) in the case of the Tranche A Loans, the Tranche A Prepayment Premium in the case of any prepayment of Tranche A Loans from the Closing Date through the third anniversary thereof pursuant to (x) Sections 2.05(a), 2.05(b)(i), (ii) and (iv) or (y) Section 2.05(b)(iii) (if the applicable unpermitted Dispositions yield a Net Available Amount to the Borrower shall exceed $1,000,000 per individual event or $2,000,000 in the aggregate per calendar year for all such Dispositions) and (B) in the case of any Tranche B Loans, the

**Tranche B Minimum Return in the case of any repayment or prepayment of Tranche B Loans on or after the date that is forty five (45) days after the Amendment No. 2 Effective Date pursuant to (x) Sections 2.05(a), 2.05(b)(i), (ii), (iv) and (vi) or (y) Section 2.05(b)(iii) (if the applicable unpermitted Dispositions yield a Net Available Amount to the Borrower shall exceed $1,000,000 per individual event or $2,000,000 in the aggregate per calendar year for all such Dispositions)**; provided that no **Tranche A** Prepayment Premium shall be due in respect of any prepayment under Section 2.05(b)(iii) in respect of any Disposition that was not permitted hereunder and was subsequently consented to by the Administrative Agent.

(iii)     No later than ten (10) Business Days after receiving a Material Agreements Prepayment Offer, an Event of Loss Prepayment Offer, a Disposition Proceeds Prepayment Offer, a Debt Prepayment Offer or an ECF Prepayment Offer, each Lender shall advise the Borrower in writing whether it has elected to accept such prepayment offer, which it shall determine in its sole and absolute discretion. Each of the Lenders shall have the right, but not the obligation, to accept or reject such prepayment offer by the Borrower. In connection with any prepayment pursuant to Section 2.05(b)(i), (ii)**, (iii), (iv)** and/or (**iiivi**), the amount of the Loans prepaid shall be calculated so that the total amount of Loans prepaid, the accrued but unpaid interest on such Loans and any **Tranche A** Prepayment Premium **or Tranche B Minimum Return, as applicable,** applicable to such prepayment of Loans shall be no more than the Net Available Amount. Any amount rejected by any Lender after receiving a Material Agreements Prepayment Offer, an Event of Loss Prepayment Offer, a Disposition Proceeds Prepayment Offer, a Debt Prepayment Offer or an ECF Prepayment Offer (any such amounts, "Rejected Proceeds") shall be deposited into the Rejected Proceeds Account of the Borrower.

(iv)     It is understood and agreed that if the Obligations are accelerated or otherwise become due prior to their maturity date, in each case, in respect of any Event of Default (including, but not limited to, upon the occurrence of a bankruptcy or insolvency event (including the acceleration of claims by operation of law)), the **Tranche A** Prepayment Premium that would have applied if, at the time of such acceleration, Borrower had prepaid, refinanced, substituted or replaced any or all of the Loans as contemplated in Section 2.05(a) (any such event, a "**Tranche A** Prepayment Premium Event"), will also be due and payable without any further action (including, without limitation, any notice requirements otherwise applicable to **Tranche A** Prepayment Premium Events, if any) as though a **Tranche A** Prepayment Premium Event had occurred and such **Tranche A** Prepayment Premium shall constitute part of the **Tranche A** Obligations, in view of the impracticability and extreme difficulty of ascertaining actual damages and by mutual agreement of the parties as to a reasonable calculation of each Lender's lost profits as a result thereof. Any **Tranche A** Prepayment Premium payable above shall be presumed to be the liquidated damages sustained by each Lender as the result of the early termination and Borrower agrees that it is reasonable under the circumstances currently existing. The **Tranche A** Prepayment Premium shall also be payable in the event the Obligations (and/or this Agreement) are satisfied or released by foreclosure (whether by power of judicial proceeding), deed in lieu of foreclosure or by any other means. EACH LOAN PARTY EXPRESSLY WAIVES (TO THE FULLEST EXTENT IT MAY LAWFULLY DO SO), ON BEHALF OF ITSELF AND THE OTHER LOAN PARTIES, THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE OR LAW THAT PROHIBITS OR MAY PROHIBIT THE COLLECTION OF THE FOREGOING PREPAYMENT PREMIUM IN CONNECTION WITH ANY SUCH ACCELERATION. Each Loan Party expressly agrees (to the fullest extent

that each may lawfully do so) that: (A) the **Tranche A** Prepayment Premium is reasonable and is the product of an arm's length transaction between sophisticated business people, ably represented by counsel; (B) the **Tranche A** Prepayment Premium shall be payable notwithstanding the then prevailing market rates at the time payment is made; (C) there has been a course of conduct between Lenders and the Loan Parties giving specific consideration in this transaction for such agreement to pay the **Tranche A** Prepayment Premium; and (D) the Loan Parties shall be estopped hereafter from claiming differently than as agreed to in this paragraph. Each Loan Party expressly acknowledges that its agreement to pay the **Tranche A** Prepayment Premium to Lenders as herein described is a material inducement to Lenders to provide the **Tranche A** Commitments and make the **Tranche A** Loan.

(v)     It is understood and agreed that if the Tranche B Obligations are accelerated or otherwise become due prior to their maturity date or otherwise, in each case, in respect of any Event of Default (including, but not limited to, upon the occurrence of a bankruptcy or insolvency event (including the acceleration of claims by operation of law)), the Tranche B Minimum Return that is payable pursuant to Section 2.07(g) (any such event, a "Tranche B Minimum Return Event"), will also be due and payable without any further action (including, without limitation, any notice requirements otherwise applicable to Tranche B Minimum Return Events, if any) as though a Tranche B Minimum Return Event had occurred and such Tranche B Minimum Return shall constitute part of the Tranche B Obligations, in view of the impracticability and extreme difficulty of ascertaining actual damages and by mutual agreement of the parties as to a reasonable calculation of each Tranche B Lender's lost profits as a result thereof. Any Tranche B Minimum Return payable above shall be presumed to be the liquidated damages sustained by each Tranche B Lender as the result of the early termination and Borrower agrees that it is reasonable under the circumstances currently existing. The Tranche B Minimum Return shall also be payable in the event the Tranche B Obligations (and/or this Agreement) are satisfied or released by foreclosure (whether by power of judicial proceeding), deed in lieu of foreclosure or by any other means. EACH LOAN PARTY EXPRESSLY WAIVES (TO THE FULLEST EXTENT IT MAY LAWFULLY DO SO), ON BEHALF OF ITSELF AND THE OTHER LOAN PARTIES, THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE OR LAW THAT PROHIBITS OR MAY PROHIBIT THE COLLECTION OF THE FOREGOING TRANCHE B MINIMUM RETURN IN CONNECTION WITH ANY SUCH ACCELERATION. Each Loan Party expressly agrees (to the fullest extent that each may lawfully do so) that: (A) the Tranche B Minimum Return is reasonable and is the product of an arm's length transaction between sophisticated business people, ably represented by counsel; (B) the Tranche B Minimum Return shall be payable notwithstanding the then prevailing market rates at the time payment is made; (C) there has been a course of conduct between the Tranche B Lenders and the Loan Parties giving specific consideration in this transaction for such agreement to pay the Tranche B Minimum Return; and (D) the Loan Parties shall be estopped hereafter from claiming differently than as agreed to in this paragraph. Each Loan Party expressly acknowledges that its agreement to pay the Tranche B Minimum Return to the Tranche B Lenders as herein described is a material inducement to the Tranche B Lenders to provide the Tranche B Commitments and make the Tranche B Loans.

Section 2.06    Reimbursements.

(a)    Agent Reimbursements.    The Borrower agrees to pay to each of the Administrative Agent and the Collateral Agent, for its own account, amounts payable in the amounts and at the times separately agreed upon in the Agent Reimbursement Letter.

(b)    Payment of Reimbursements.    All reimbursements payable hereunder shall be paid on the dates due, in Dollars and immediately available funds, to the Administrative Agent for distribution to the Lenders entitled thereto.    Reimbursements paid shall not be refundable under any circumstances absent manifest error.

Section 2.07    Interest**; Minimum Return**.

(a)    Loans.    With respect to any Loan, for each day on and after the Funding Date of such Loan until the date on which such Loan has been fully repaid (including the first day but excluding the last), the outstanding principal amount of such Loan (including any Accrued Interest previously added to the principal on a prior Quarterly Payment Date) shall bear interest at a rate per annum equal to the Interest Rate.

(b)    Default Interest.    If all or a portion of the principal amount of any Loan, interest in respect thereof or any other amount due under the Financing Documents shall not be paid when due (whether at the stated maturity, by acceleration or otherwise) or there shall occur and be continuing any other Event of Default, then, to the extent so elected by the Administrative Agent, the outstanding principal amount of the Loans (whether or not overdue) (to the extent legally permitted) shall bear interest at a rate per annum equal to the Post-Default Rate, from the date of such nonpayment or occurrence of such Event of Default, respectively, until such amount is paid in full (after as well as before judgment) or until such Event of Default is no longer continuing, respectively.

(c)    Payment of Interest.    Subject to Section 2.07(e), accrued interest on each Loan shall be payable in arrears in cash on each Quarterly Payment Date; provided that (i) interest accrued pursuant to paragraph (b) of this Section shall be payable on demand and (ii) in the event of any repayment or prepayment of any Loan, accrued interest on the principal amount repaid or prepaid shall be payable in cash on the date of such repayment or prepayment.

(d)    Computation.    All interest hereunder shall be computed on the basis of a year of 360 days, and, in each case, shall be payable for the actual number of days elapsed (including the first day but excluding the last).    The computation of interest shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error.

(e)    Payment in Kind.    On each Quarterly Payment Date, the Borrower shall pay all of the accrued interest on each Loan at the Interest Rate in full in cash; provided that the Borrower may, in its sole discretion by sending written notice to the Administrative Agent no later than the applicable Quarterly Payment Date, without penalty, pay a portion of the accrued interest due and payable on each Loan equal to up to ~~(i)~~ 4.85% per annum ~~or (ii) in the case of the fiscal quarter ending March 31, 2020, 14.85% per annum, in each case,~~ of the outstanding principal amount of such Loan (including any Accrued Interest previously added to principal on

45

a prior Quarterly Payment Date) ~~in kind; provided further, that the Borrower shall pay all of the accrued interest on each Loan at the Interest Rate in cash following the Initial Funding and through the end of the fiscal quarter ending December 31, 2019, pro-rated for any partial quarterly period for the applicable Quarterly Payment Date based on the number of days in such period, without the option of making any such payment of interest~~ in kind. The aggregate outstanding principal amount of the Loans shall be automatically increased on each such Quarterly Payment Date by the amount of such interest paid in kind (and such increased principal shall bear interest at a rate per annum equal to the Interest Rate).

(f)     Miscellaneous. For the avoidance of doubt, (i) on each Quarterly Payment Date prior to ~~the~~**(1) with respect to the Tranche A Loans, the Maturity Date and (2) with respect to the Tranche B Loans, the Tranche B** Maturity Date, any interest on the Loans then due and payable shall be paid, either in cash or in kind, in accordance with this Agreement and (ii) on ~~the~~**(1) with respect to the Tranche A Loans, the Maturity Date and (2) with respect to the Tranche B Loans, the Tranche B** Maturity Date, any interest on the Loans then due and payable shall be paid entirely in cash in accordance with this Agreement.  All amounts of interest added to the principal of the Loans pursuant to Section 2.07(e) shall bear interest as provided herein, be payable as provided in Section 2.04 and shall be due and payable on ~~the~~**(1) with respect to the Tranche A Loans, the Maturity Date and (ii) with respect to the Tranche B Loans, the Tranche B** Maturity Date.  The Agent's determination of the principal amount of the Loans outstanding at any time shall be conclusive and binding, absent manifest error.

**(g)     Tranche B Minimum Return.  On the earliest to occur of (i) repayment of Tranche B Obligations pursuant to Section 2.04, (ii) repayment of Tranche B Obligations pursuant to Section 2.05 or (iii) application of any proceeds of Collateral, the Unconditional Guaranty or any other repayment or prepayment, the Borrower shall pay the Tranche B Lenders a fee equal to the Tranche B Minimum Return.  The Borrower and the Tranche B Lenders acknowledge and agree that if any Tranche B Minimum Return is payable in accordance with this section (as calculated in accordance with Annex III), such amount shall be payable regardless of whether the Tranche B Loans (and any accrued interest in respect thereof) have been repaid in full in cash.**

Section 2.08    [Reserved].

Section 2.09    Taxes.

(a)     Payments Free of Taxes. Any and all payments by or on account of any obligation of any Loan Party hereunder or under any other Financing Document shall be made without withholding or deduction for any Taxes except as required by Applicable Law; provided that if such Loan Party or Agent shall be required by Applicable Law (as determined in the good faith discretion of the applicable withholding agent) to withhold or deduct any Taxes from such payments, then (i) to the extent such Taxes are Indemnified Taxes, the sum payable shall be increased as necessary so that after making all required withholdings and deductions (including withholdings and deductions applicable to additional sums payable under this Section) the Administrative Agent, the Collateral Agent or the Lender (as the case may be) receives an amount equal to the sum it would have received had no such withholdings or deductions been made, (ii) such Loan Party or Agent shall make or shall cause to be made such withholdings and

deductions and (iii) such Loan Party or Agent shall pay or shall cause to be paid the full amount withheld and deducted to the relevant Governmental Authority in accordance with Applicable Law.

(b)      Payment of Other Taxes by the Borrower.  In addition, the Loan Parties shall pay or cause to be paid any Other Taxes to the relevant Governmental Authority in accordance with Applicable Law.

(c)      Indemnification by Borrower.  Loan Parties shall jointly and severally indemnify, or cause to be indemnified, the Administrative Agent, the Collateral Agent and each Lender, within thirty (30) days after written demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) paid or payable by the Administrative Agent, the Collateral Agent or such Lender, as the case may be, and any reasonable expenses arising therefrom or with respect thereto whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrower by the Collateral Agent or a Lender, or by the Administrative Agent on its own behalf or on behalf of the Collateral Agent or a Lender, shall be conclusive absent manifest error.

(d)      Evidence of Payments.  As soon as practicable after any payment of Indemnified Taxes or Other Taxes by any Loan Party to a Governmental Authority, the relevant Loan Party shall deliver or cause to be delivered to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment satisfactory to the Administrative Agent.

(e)      Forms. (i) Any of the Administrative Agent, the Collateral Agent or any Lender (including any assignee Lender) that is legally entitled to an exemption from or reduction of withholding tax under the law of the jurisdiction in which any Loan Party is located with respect to payments under any Transaction Document shall deliver to the Borrower (with a copy to the Administrative Agent), at the time or times reasonably requested by the Borrower or Administrative Agent, such properly completed and executed documentation prescribed by Applicable Law as will permit such payments to be made without or at a reduced rate of withholding.  In addition, any of the Administrative Agent, the Collateral Agent or any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by Applicable Law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to any withholding tax or information reporting requirements.  Upon the reasonable written request of the Borrower or the Administrative Agent, or if any form or certification previously delivered expires or becomes obsolete or inaccurate, any Lender shall update any such form or certification previously delivered pursuant to this Section 2.09(e).  Notwithstanding anything to the contrary in the preceding three sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 2.09(e)(ii)(A), (B) and Section 2.09(g)) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to

any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)    Without limiting the generality of the foregoing, in the event that the Borrower is a US Person,

(A)    any Lender that is a US Person shall deliver to the Borrower and the Administrative Agent on or about the date on which such Lender becomes a party to this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)    any Lender who is not a US Person shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or about the date on which such Lender becomes a party to this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(I)    in the case of a Lender who is not a US Person claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under this Agreement or any Transaction Document, executed copies of IRS Form W-8BEN or W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under this Agreement or any Transaction Document, IRS Form W-8BEN or W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(II)    executed copies of IRS Form W-8ECI;

(III)    in the case of a Lender who is not a US Person claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit B-1 to the effect that such Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code and (y) executed copies of IRS Form W-8BEN or W-8BEN-E; or

(IV)    to the extent a Lender who is not a US Person is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN or W-8BEN-E, a U.S. Tax compliance certificate substantially in the form of Exhibit B-2 or Exhibit B-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if such Lender is a partnership and one or more direct or indirect partners of such Lender are claiming the portfolio interest exemption, such Lender may provide a U.S. Tax compliance certificate substantially in the form of Exhibit B-4 on behalf of each such direct and indirect partner.

US-DOCS\109334811.27117632562.13

(f)     If the Administrative Agent, the Collateral Agent or any Lender determines, in its sole discretion exercised in good faith, that it has received a refund of any Indemnified Taxes or Other Taxes as to which it has been indemnified by a Loan Party or with respect to which a Loan Party has paid additional amounts pursuant to this Section 2.09, it shall pay over such refund (but only to the extent of indemnity payments made under this Section 2.09 with respect to the Taxes giving rise to such refund), to the Borrower, net of all of its out-of-pocket expenses (including Taxes with respect to such refund) and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); provided that the Borrower, upon the request of the Administrative Agent, the Collateral Agent or any Lender, as the case may be, agrees to repay as soon as reasonably practicable the amount paid over to the Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent, the Collateral Agent or any Lender, as the case may be, in the event the Administrative Agent, the Collateral Agent or any Lender, as the case may be, is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this paragraph (f), in no event will the Administrative Agent, the Collateral Agent or any Lender be required to pay any amount to the Borrower pursuant to this paragraph (f) the payment of which would place the Administrative Agent, the Collateral Agent or the Lender, as the case may be, in a less favorable net after-Tax position than it would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This paragraph shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(g)     If a payment made to the Administrative Agent, the Collateral Agent or any Lender under this Agreement would be subject to U.S. federal withholding Tax imposed by FATCA if such Administrative Agent, Collateral Agent or Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Administrative Agent, Collateral Agent or Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by Applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Person's obligations under FATCA or to determine the amount to deduct and withhold from such payment.  Solely for purposes of this clause, "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(h)     Survival. Each party's obligations under this Section shall survive the resignation and replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender.

Section 2.10    Payments Generally; Pro Rata Treatment; Sharing of Setoffs.

(a)     Payments by Borrower.  Unless otherwise specified, the Borrower shall make each payment required to be made by it hereunder (whether of principal, interest,

reimbursements, fees, or under Section 2.09 or otherwise) or under any other Financing Document (except to the extent otherwise provided therein) prior to 1:00 p.m., New York City time, on the date when due, in immediately available funds, without setoff or counterclaim. Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon. All such payments shall be made to the Administrative Agent at its offices at Orion Energy Partners Investment Agent, LLC (payment instructions: Bank Name: JPMorgan Chase Bank, N.A., Bank Address: 270 Park Avenue, New York, New York 10017, ABA/Routing No.: 021000021, Account Name: ORION ENERGY PARTNERS INVESTMENT AGENT, LLC, Account No.: 700846822, Swift No.: CHASUS33, Reference: "CarbonLITE" + [purpose of the payment]) except as otherwise expressly provided in the relevant Financing Document and payments pursuant to Sections 2.09 and 10.03, which shall be made directly to the Persons entitled thereto. The Administrative Agent shall distribute any such payments received by it for account of any other Person to the appropriate recipient promptly following receipt thereof. If any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be set to the immediately preceding Business Day and, in the case of any payment accruing interest, interest thereon shall be payable for the period up to and including such immediately preceding Business Day, with the day(s) following such immediately preceding Business Day to be included in the calculation of interest for the following quarterly period in accordance with the terms hereof. All amounts owing under this Agreement or under any other Financing Document are payable in Dollars.

(b)    Application of Insufficient Payments. If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, interest, reimbursements, fees and other amounts then due hereunder, such funds shall be applied (i) first, to pay interest, reimbursements, fees and other amounts (except for the amounts required to be paid pursuant to the following clause (ii)) then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest, reimbursements, fees and such other amounts then due to such parties, and (ii) second, to pay principal then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal then due to such parties.

(c)    Pro Rata Treatment. Except to the extent otherwise provided herein **(including, without limitation, the waterfall provisions set forth in Secton 2.05(c)(i) and Section 7.02)**: (i) the Loans shall be made from the Lenders, and each termination or reduction of the amount of the Commitments under Section 2.03 shall be applied to the respective Commitments of the Lenders, *pro rata* according to the amounts of their respective applicable Commitments; (ii) each payment or prepayment of principal of the Loans by the Borrower shall be made for account of the Lenders *pro rata* in accordance with the respective unpaid principal amounts of the Loans held by them being paid or prepaid; and (iii) each payment of interest on the Loans by the Borrower shall be made for account of the Lenders *pro rata* in accordance with the amounts of interest on the Loans then due and payable to the respective Lenders.

(d)    Sharing of Payments by Lenders. If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment or recover any amount in respect of any principal of or interest on any of its Loan resulting in such Lender receiving a greater proportion of the aggregate amount of the Loans and accrued interest thereon then due than the proportion

received by any other Lender, then, unless otherwise agreed in writing by the Lenders, the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Loans of other Lenders to the extent necessary so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans; provided that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this paragraph shall not be construed to apply to any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a Lender as consideration for the assignment or sale of a participation in any of its Loans to any assignee or Participant, other than to the Borrower or any Affiliate thereof (as to which the provisions of this paragraph shall apply). Each Loan Party consents to the foregoing and agrees, to the extent it may effectively do so under Applicable Law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against such Loan Party rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of such Loan Party in the amount of such participation.

(e)      Presumptions of Payment.  Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for account of the Lenders hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due.  In such event, if the Borrower has not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

(f)      Certain Deductions by the Administrative Agent.  If any Lender shall fail to make any payment required to be made by it pursuant to Section 2.02, 2.10(e) or 10.03(c), then the Administrative Agent may, in its discretion (notwithstanding any contrary provision hereof), apply any amounts thereafter received by the Administrative Agent for account of such Lender to satisfy such Lender's obligations under such Sections until all such unsatisfied obligations are fully paid.

Section 2.11   Mitigation Obligations; Replacement of Lenders.  If the Borrower is required to pay any Indemnified Taxes or additional amount to any Lender or any Governmental Authority for account of any Lender pursuant to Section 2.09 then such Lender shall (i) file any certificate or document reasonably requested in writing by the Borrower and/or (ii) use reasonable efforts to designate a different lending office for funding or booking its Loan hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the sole judgment of such Lender exercised in good faith, such designation or assignment (x) would eliminate or reduce amounts payable pursuant to Section 2.09 in the future and (y) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender in any material respect.  The Borrower hereby agrees to pay all

reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

Section 2.12   Acknowledgement and Consent to Bail-In of EEA Financial Institutions. Notwithstanding anything to the contrary in any Financing Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Financing Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)   the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)   the effects of any Bail-In Action on any such liability, including, if applicable:

(c)   a reduction in full or in part or cancellation of any such liability;

(d)   a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Financing Document; or

(e)   the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of any EEA Resolution Authority.

Section 2.13   Incremental Facility.   The Borrower may, pursuant to an Incremental Request delivered to the Administrative Agent from time to time during the Incremental Availability Period, request the establishment of an incremental term loan facility in an aggregate principal amount to be agreed between the Borrower and the Administrative Agent (the "Incremental Loans"), to be documented as an increase in the total amount of the Loans under this Agreement; provided that, the aggregate amount of the Incremental Loans shall not exceed $20,000,000. Each Lender shall participate in such Incremental Loans if each of the following conditions have been satisfied:

(a)   no Default or Event of Default exists as of the effective date of such Incremental Loans or would exist after giving effect thereto;

(b)   no development, event or circumstance that has had or could reasonably be expected to have a Material Adverse Effect shall have occurred and be continuing, or shall occur as a result thereof as of the effective date of such Incremental Loans;

(c)   the representations and warranties of each of the Loan Parties set forth in the Financing Documents shall be true and correct in all material respects on and as of the

effective date of such Incremental Loans (except where already qualified by materiality or Material Adverse Effect, in which case, in all respects);

(d)    Investment Committee approval for such Incremental Loans shall have been obtained;

(e)    the other applicable conditions set forth in Section 4.03 shall have been satisfied as of the effective date of such Incremental Loans; and

(f)    the terms of any such Incremental Loans shall be identical to those of the existing Loans, unless otherwise agreed by the Administrative Agent and the Borrower; provided that, (x) the Borrower may request multiple borrowings (the timing of which shall be mutually agreed between the Borrower and the Lenders) and each borrowing of Incremental Loans shall be in an aggregate amount of $5,000,000 or a larger multiple of $1,000,000; provided that the final borrowing of such Incremental Loan may be in an amount equal to the then current amount of the unfunded commitments with respect to the applicable Incremental Loan.

In connection therewith, this Agreement and the other Financing Documents shall be amended as necessary to effectuate such increase, such amendments to be acceptable to the Administrative Agent in its reasonable discretion.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES

Each Loan Party represents and warrants to each Agent and the Lenders that:

Section 3.01    Due Organization, Etc.

(a)    Each Loan Party (and, as of the Closing Date, each Non-Guarantor Subsidiary) is a limited liability company, duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization.  Each Loan Party (and, as of the Closing Date, each Non-Guarantor Subsidiary) (i) has all requisite limited liability company or other organizational power and authority to own or lease and operate its assets and to carry on its business as now conducted and as proposed to be conducted by it and (ii) is duly qualified to do business and is in good standing in each jurisdiction where necessary in light of its business as now conducted and as proposed to be conducted (including performance of each Material Agreement to which it is party) except, in the case of this clause (ii), where the failure to so qualify could not reasonably be expected to have a Material Adverse Effect.  No filing, recording, publishing or other act by a Loan Party (and, as of the Closing Date, each Non-Guarantor Subsidiary), that has not been made or done, is necessary in connection with the existence or good standing of such Borrower Group Member.

(b)     As of the Closing Date, the Equity Shareholders listed on Schedule 3.01(b) are the only members of the Borrower.  **As of the Tranche B Funding Date, there has been no Change of Control.**

(c)     The only member of each Guarantor is the Borrower or another Guarantor, with the Borrower owning, directly or indirectly, 100% of each Guarantor's (other than PinnPack's) Capital Stock.  All Capital Stock in each Guarantor (other than PinnPack) is beneficially owned and controlled by the Borrower free and clear of all Liens other than Permitted Liens.

(d)     The only member of each Non-Guarantor Subsidiary is a Guarantor, with a Guarantor owning 100% of each Non-Guarantor Subsidiary's Capital Stock.

Section 3.02   Authorization, Etc.  Each Loan Party has full corporate, limited liability company or other organizational powers, authority and legal right to enter into, deliver and perform its respective obligations under each of the Transaction Documents to which it is a party and to consummate each of the transactions contemplated herein and therein, and has taken all necessary corporate, limited liability company or other organizational action to authorize the execution, delivery and performance by it of each of the Transaction Documents to which it is a party. Each of the Transaction Documents to which any Loan Party is a party has been duly executed and delivered by such Loan Party and is in full force and effect and constitutes a legal, valid and binding obligation of such Loan Party, enforceable against such Loan Party in accordance with its respective terms, except as enforcement may be limited (i) by Bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance or other similar laws affecting creditors' rights generally, (ii) by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law) and (iii) by implied covenants of good faith and fair dealing.

Section 3.03   No Conflict.  The execution, delivery and performance by each Loan Party of each of the Transaction Documents to which it is a party and all other documents and instruments to be executed and delivered hereunder by it, as well as the consummation of the transactions contemplated herein and therein, do not and will not (i) conflict with the Organizational Documents of such Loan Party, (ii) conflict with or result in a breach of, or constitute a default under, any indenture, loan agreement, mortgage, deed of trust or other material instrument or agreement to which such Loan Party (and, as of the Closing Date, any Non-Guarantor Subsidiary) is a party or by which it is bound or to which such Loan Party's (and, as of the Closing Date, any Non-Guarantor Subsidiary's) property or assets are subject, (iii) conflict with or result in a breach of, or constitute a default under, in any material respect, any Applicable Law or (iv) with respect to each Loan Party (and~~, as of the Closing Date,~~ each Non-Guarantor Subsidiary), result in the creation or imposition of any Lien (other than a Permitted Lien) upon any of such Borrower Group Member's property or the Collateral.

Section 3.04   Approvals, Etc.

(a)     Each Loan Party (and~~, as of the Closing Date,~~ each Non-Guarantor Subsidiary) has obtained all material Authorizations required under any Applicable Law to be issued to, assigned to, or otherwise assumed by, such Borrower Group Member and necessary for (i) the Business or (ii) the execution, delivery and performance by each Loan Party of the Transaction

Documents to which it is a party other than, in each case, Authorizations that are not currently necessary and are obtainable in the ordinary course of business.

(b)     As of the Closing Date, all of the material Authorizations required under any Applicable Law to be issued to, assigned to, or otherwise assumed by, any Loan Party (and~~, as of the Closing Date,~~ each Non-Guarantor Subsidiary) and necessary for (i) the Business or (ii) the execution, delivery and performance by any Loan Party of the Transaction Documents to which it is a party, other than, in each case, Authorizations that are not currently necessary and are obtainable in the ordinary course of business, are set forth in <u>Schedule 5.04</u> hereto.

(c)     Each Loan Party (and~~, as of the Closing Date,~~ each Non-Guarantor Subsidiary) is in material compliance with each Authorization by a Governmental Authority currently in effect.

Section 3.05     <u>Financial Statements</u>.

(a)     As of the date of delivery thereof, (x) the financial statements delivered to the Lenders pursuant to this Agreement will present fairly in all material respects the financial condition, results of operations and cash flows of such Borrower Group Member as of the dates set forth therein, (y) such balance sheets and the notes thereto will disclose all material liabilities (contingent or otherwise) of such Borrower Group Member as of the dates thereof to the extent required to be disclosed by GAAP and (z) such financial statements were prepared in accordance with GAAP.

(b)     As of the Closing Date and each Funding Date, no event, change or condition has occurred that has caused, or could be reasonably expected to cause, a Material Adverse Effect.

Section 3.06     <u>Litigation</u>.

(a)     There is no pending or, to the knowledge of any Authorized Representative of any Loan Party (and~~, as of the Closing Date,~~ each Non-Guarantor Subsidiary), threatened (in writing) litigation, investigation, action or proceeding of or before any court, arbitrator or Governmental Authority (in the case of any of the foregoing not involving the Loan Parties, to the knowledge of any Authorized Representative of any Borrower Group Member) (i) seeking to restrain or prohibit the consummation of the transactions contemplated by the Transaction Documents or (ii) purporting to affect the legality, validity or enforceability of any of the Transaction Documents.

(b)     There is no pending or, to the knowledge of any Authorized Representative of any Loan Party (and~~, as of the Closing Date,~~ each Non-Guarantor Subsidiary), threatened (in writing) litigation, investigation, action or proceeding of or before any court, arbitrator or Governmental Authority against any Loan Party (and~~, as of the Closing Date,~~ each Non-Guarantor Subsidiary)  that affects the Business which (either individually or in the aggregate) could reasonably be expected to have a Material Adverse Effect.

Section 3.07     <u>Environmental Matters</u>.  Except as set forth on <u>Schedule 3.07</u>:

(a)      each Loan Party (and~~, as of the Closing Date,~~ each Non-Guarantor Subsidiary) and the conduct of the Business is in compliance in all material respects with all applicable Environmental Laws;

(b)      each Loan Party (and~~, as of the Closing Date,~~ each Non-Guarantor Subsidiary), (i) holds or has applied for all material Authorizations required under Environmental Laws (each of which is in full force and effect) required for the conduct of the Business and any of its current operations or for any property owned, leased or otherwise operated by it; and (ii) is in compliance in all material respects with all Authorizations required under Environmental Law;

(c)      to the knowledge of any Authorized Representative of any Loan Party (and~~, as of the Closing Date,~~ each Non-Guarantor Subsidiary), (x) there are no material pending Environmental Claims asserted against any Loan Party (and~~, as of the Closing Date,~~ each Non-Guarantor Subsidiary) or the Business and (y) no Loan Party (and~~, as of the Closing Date,~~ each Non-Guarantor Subsidiary) has received any written notice, claim or information regarding, or otherwise has knowledge of, a past or threatened material Environmental Claim asserted against any Loan Party (and~~, as of the Closing Date,~~ each Non-Guarantor Subsidiary) or the Business, except for such Environmental Claims that have been fully resolved;

(d)      there are no outstanding consent decrees, orders, settlements or other material agreements concerning any Loan Party (and~~, as of the Closing Date,~~ each Non-Guarantor Subsidiary) or the Business relating to compliance with or liability under Environmental Law;

(e)      no Loan Party (and~~, as of the Closing Date,~~ each Non-Guarantor Subsidiary) and, to the knowledge of any Authorized Representative of any Loan Party, no other Person has Released Hazardous Materials at, on, from or under any real property currently or formerly owned, leased or operated by any Loan Party (and~~, as of the Closing Date,~~ each Non-Guarantor Subsidiary) in a manner that would reasonably be expected to result in a material liability of any Loan Party (and~~, as of the Closing Date,~~ each Non-Guarantor Subsidiary) pursuant to Environmental Laws; and

(f)      each Loan Party (and~~, as of the Closing Date,~~ each Non-Guarantor Subsidiary) has made available copies of all significant reports, correspondence and other documents in its possession, custody or control regarding compliance by any of the Loan Party (and~~, as of the Closing Date,~~ each Non-Guarantor Subsidiary), or potential liability of any of the Loan Party (and~~, as of the Closing Date,~~ each Non-Guarantor Subsidiary) under Environmental Laws or Authorizations required under Environmental Laws.

Section 3.08    Compliance with Laws and Obligations.  Subject to Section 3.07, each Loan Party (and~~, as of the Closing Date,~~ each Non-Guarantor Subsidiary) and the Business are in compliance with all Applicable Laws applicable to the Borrower Group Members and the Business, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

Section 3.09    Material Agreements; Bond Documents.

(a)    As of the ~~Closing~~**Tranche B Funding** Date, each Material Agreement is listed on **amended** Schedule 3.09 **attached to Amendment No. 2**.  The copies of each of the Material Agreements, and any amendments thereto provided or to be provided by any Loan Party (and~~, as of the Closing Date,~~ each Non-Guarantor Subsidiary) to the Administrative Agent are, or when delivered will be, true and complete copies of such agreements and documents.  Except as permitted under Section 6.09 or disclosed in accordance with Section 5.11, no termination event has occurred under any Material Agreement, each Material Agreement is in full force and effect, and no Loan Party (and~~, as of the Closing Date,~~ each Non-Guarantor Subsidiary) has received any written notice of a material default, expiration, breach or termination pursuant to any Material Agreement.  Each Loan Party (and~~, as of the Closing Date,~~ each Non-Guarantor Subsidiary) is in compliance in all material respects with the terms of the Material Agreements to which it is a party.  To the knowledge of any Authorized Representative of any Loan Party (and~~, as of the Closing Date,~~ each Non-Guarantor Subsidiary), no Material Counterparty is in default of any of its obligations under any Material Agreement other than defaults which, individually or in the aggregate, could not reasonably be expected to be materially adverse to the Borrower Group Members and/or the Lenders.

(b)    The copies of each of the Bond Documents, and any amendments thereto provided or to be provided by any Borrower Group Member to the Administrative Agent are, or when delivered will be, true and complete copies of such agreements and documents.  As of the Closing Date and the Funding Date, no "Default," "Event of Default" or similar term under any Bond Document has occurred and is continuing.

Section 3.10    Intellectual Property; Licenses.

(a)    Each Loan Party (and~~, as of the Closing Date,~~ each Non-Guarantor Subsidiary) owns, or is licensed to use, free and clear of all Liens except for Permitted Liens, all Intellectual Property necessary for its business and that are necessary for the performance by it of its obligations under the Transaction Documents to which it is a party, in each case, as to which the failure of such Borrower Group Member to so own or be licensed could reasonably be expected to have a Material Adverse Effect, and the use thereof by such Borrower Group Member does not, to the knowledge of any Loan Party (and~~, as of the Closing Date,~~ each Non-Guarantor Subsidiary), infringe in any material respect upon the rights of any other Person.

(b)    Each Loan Party (and~~, as of the Closing Date,~~ each Non-Guarantor Subsidiary) has obtained the necessary intellectual property licenses that the Borrower Group Members other than any Non-Guarantor Subsidiary (and~~, as of the Closing Date,~~ each Non-Guarantor Subsidiary) reasonably believe are required for the Business, the absence of any of which could reasonably be expected to have a Material Adverse Effect.

(c)    With respect to each material license in or to Intellectual Property held by each Loan Party (and~~, as of the Closing Date,~~ each Non-Guarantor Subsidiary): (i) such license is valid and binding and in full force and effect and represents the entire agreement between the respective licensor and licensee with respect to the subject matter of such license; and (ii) such license will not cease to be valid and binding and in full force and effect on terms identical to those currently in effect as a result of the rights and interests granted herein, nor will the grant of

such rights and interests constitute a breach or default under such license or otherwise give the licensor or sublicensor a right to terminate such license.

Section 3.11    <u>Taxes</u>.  Except as specified on <u>Schedule 3.11</u>:

(a)    each Loan Party (and~~, as of the Closing Date,~~ each Non-Guarantor Subsidiary) has timely filed or caused to be filed all material tax returns and reports required to have been filed by it and has paid, or has caused to be paid, all material taxes required to have been paid by it, other than taxes that are being contested in accordance with the Permitted Contest Conditions; and

(b)    property owned by any Borrower Group Member is not the subject of any temporary tax abatement or any other temporary tax reduction; and

(c)    each Loan Party (and~~, as of the Closing Date,~~ each Non-Guarantor Subsidiary) has been properly treated as a disregarded entity or a partnership for U.S. federal income tax purposes.

Section 3.12    <u>Disclosure</u>.

(a)    None of the written reports, financial statements, certificates or other written information (other than Projections and information of a general economic or industry nature) furnished by or on behalf of any Borrower Group Member to the Administrative Agent or any Lender in connection with the negotiation of this Agreement or delivered hereunder (as modified or supplemented by other written information so furnished), taken as a whole, contains any material misstatement of fact or omits to state any material fact necessary to make such statements therein (when taken as a whole), in the light of the circumstances under which they were made, not materially misleading.

(b)    Statements, estimates, forecasts and projections regarding the Borrower Group Members and the future performance of the Business or other expressions of view as to future circumstances (including the initial Operating Budget) that have been made available to any Secured Party by or on behalf of any Borrower Group Member or any of its representatives or Affiliates (collectively, "<u>Projections</u>") have been prepared in good faith based upon assumptions believed to be reasonable at the time of preparation thereof; <u>provided</u> that it is understood and acknowledged that such Projections are based upon a number of estimates and assumptions and are subject to business, economic and competitive uncertainties and contingencies, that actual results during the period or periods covered by any such Projections may differ from the projected results and such differences may be material and that, accordingly, no assurances are given and no representations, warranties or covenants are made that any of the assumptions are correct, that such Projections will be achieved or that the forward-looking statements expressed in such Projections will correspond to actual results.

Section 3.13    <u>Solvency</u>.  (a) The Borrower Group Members, on a consolidated basis, are, and (b) each Loan Party individually is, in each case, Solvent.

Section 3.14    <u>Regulatory Restrictions on the Loan</u>.  Each Loan Party is not required to be registered as an "investment company" within the meaning of the Investment Company Act of 1940 of the United States (including the rules and regulations thereunder), as amended.

Section 3.15    <u>Title; Security Documents</u>.

(a)    Each Loan Party owns and has good, legal and defensible title to the property purported to be covered by the Security Documents to which it is party, free and clear of all Liens other than Permitted Liens.

(b)    The provisions of the Security Documents to which any Loan Party is a party that have been delivered on or prior to the date this representation is made are, effective to create, in favor of the Collateral Agent for the benefit of the Secured Parties, a legal, valid and enforceable first-priority (subject only to Permitted Liens) Lien on and security interest in all of the Collateral (other than any Vehicles) purported to be covered thereby, and all necessary recordings and filings have been or will concurrently be made in all necessary public offices (other than with respect to any Vehicles), and all other necessary and appropriate action has been taken, so that the security interest created by each Security Document is a first-priority (subject only to Permitted Liens) perfected Lien on and security interest in all right, title and interest of such Loan Party in the Collateral purported to be covered thereby (other than any Vehicles), prior and superior to all other Liens other than Permitted Liens.

Section 3.16    <u>ERISA</u>.

(a)    No ERISA Event has occurred or is reasonably expected to occur which has or could reasonably be expected to have a Material Adverse Effect.  Each Pension Plan has complied in all material respects with the applicable provisions of ERISA and the Code.  No termination of a Pension Plan has occurred resulting in any liability that has remained underfunded and no Lien against any Loan Party or any of its ERISA Affiliates in favor of the PBGC or a Pension Plan has arisen during the five-year period prior to the date hereof.

(b)    None of the Loan Party (and~~, as of the Closing Date,~~ each Non-Guarantor Subsidiary) has incurred any obligation which has or could reasonably be expected to have a Material Adverse Effect on account of the termination or withdrawal from any Foreign Plan.

Section 3.17    <u>Insurance</u>.  Except as set forth in <u>Schedule 3.17</u>, all insurance policies required to be obtained by the Borrower Group Members other than any Non-Guarantor Subsidiary (and~~, as of the Closing Date,~~ each Non-Guarantor Subsidiary) pursuant to <u>Section 5.06</u> and under any Material Agreement, if any, have been obtained and are in full force and effect as required under <u>Section 5.06</u> and all premiums then due and payable thereon have been paid in full.  No Loan Party (and~~, as of the Closing Date,~~ each Non-Guarantor Subsidiary) has received any notice from any insurer that any insurance policy has ceased to be in full force and effect or claiming that the insurer's liability under any such insurance policy can be reduced or avoided.

Section 3.18    <u>Use of Proceeds</u>.  The proceeds the Loans on the Initial Funding Date will be used solely in accordance with, and solely for the purposes contemplated by, <u>Section 5.13</u>.  No part of the proceeds of any Loan and other extensions of credit hereunder will be used, either directly or

indirectly, by any Borrower Group Member to purchase or carry any Margin Stock (as defined in Regulation U) or to extend credit to others for the purpose of purchasing or carrying any Margin Stock or for any purpose that entails a violation of any of the regulations of the Board.

Section 3.19    Membership Interests and Related Matters.

(a)    The only member of CL Intermediate Holdco is the Borrower.

(b)    Other than as set forth on Schedule 3.19(b), no Loan Party has any Subsidiaries and no Loan Party owns any equity interest in, or otherwise Controls any Voting Stock of or has any ownership interest in, any Person.

(c)    All of the membership interests in the Borrower and each Guarantor have been duly authorized and validly issued in accordance with its operating agreement and any other constitutive documents, are fully paid and non-assessable (subject to the applicable Loan Parties' obligation to contribute capital to another Loan Party, in accordance with the terms of such Loan Party's governing documents) and free and clear of all Liens.  Other than as contemplated herein in connection with the Lender Warrant, neither the Borrower nor any Guarantor has outstanding any securities convertible into or exchangeable for any of its membership interests in or any rights to subscribe for or to purchase, or any warrants or options for the purchase of, or any agreements providing for the issuance (contingent or otherwise) of, or any calls, commitments or claims of any character relating to any such membership interests (except as expressly provided for or permitted herein or in the Security Documents).

Section 3.20    [Reserved].

Section 3.21    No Agreements with Affiliates.  Schedule 3.21 sets forth any and all agreements, transactions or series of related transactions among, on one hand, one or more Loan Parties, and on the other hand, one or more Affiliates of a Loan Party (other than the Loan Parties), in each case, that involve payment of more than $50,000.

Section 3.22    No Bank Accounts.  No Loan Party maintains any accounts other than the Collateral Accounts and Excluded Accounts.

Section 3.23    No Default or Event of Default.  No Default or Event of Default has occurred and is continuing.

Section 3.24    Foreign Assets Control Regulations.

(a)    None of the Borrower Group Members, and none of their respective, principals, owners, officers or directors, or, to any of the Loan Parties' knowledge, their respective Affiliates or agents (i) is a Sanctioned Person; or (ii) engages in any dealings or transactions in or with a Sanctioned Country or that are otherwise prohibited by Sanctions.

(b)    Each of the Borrower Group Members maintains reasonable policies and procedures to ensure compliance with Sanctions, Anti-Corruption Laws and Anti-Money Laundering Laws (as such compliance is required under this Agreement).

US-DOCS\109334811.27117632562.13

(c)    Each of the Borrower Group Members and their respective officers, directors, employees and, to the Borrower Group Members' knowledge, agents are in compliance with Anti-Corruption Laws, Anti-Money Laundering Laws and Sanctions.

(d)    No part of the proceeds of the Loans will be used, directly or indirectly (i) in violation of the FCPA, Anti-Money Laundering Laws or Sanctions or (ii) to offer or make payments or to take any other action that would constitute a violation, or implicate any Lender, Administrative Agent, Collateral Agent or their respective Affiliates in a violation, of Anti-Corruption Laws.

(e)    Each of the Borrower Group Members has disclosed all facts known to it regarding (a) all claims, damages, liabilities, obligations, losses, penalties, actions, judgment, and/or allegations of any kind or nature that are asserted against, paid or payable by such Person, any of its Affiliates or any of its representatives in connection with non-compliance with Anti-Corruption Laws, Sanctions or Anti-Money Laundering Laws by such Person, and (b) any investigations involving possible non-compliance with Anti-Corruption Laws, Sanctions or Anti-Money Laundering Laws by such Person or such Affiliate or such representative. No proceeding by or before any Governmental Authority involving any Borrower Group Member with respect to Anti-Corruption Laws, Sanctions or Anti-Money Laundering Laws is pending or, to the knowledge of the Borrower Group Members, threatened.

Section 3.25    Commercial Activity; Absence of Immunity.  Each Loan Party is subject to civil and commercial law with respect to its obligations under the Transaction Documents, and the making and performance of the Transaction Documents by the Loan Parties constitute private and commercial acts rather than public or governmental acts.  The Loan Parties are not entitled to any immunity on the ground of sovereignty or the like from the jurisdiction of any court or from any action, suit, setoff or proceeding, or the service of process in connection therewith, arising under the Financing Documents.

## ARTICLE IV

## CONDITIONS

Section 4.01    Conditions to the Closing Date.  The occurrence of the Closing Date, the effectiveness of this Agreement and the obligations of each Agent and each Lender hereunder are subject to the receipt by the Administrative Agent (except as set forth otherwise below) of each of the following documents, and the satisfaction of the conditions precedent set forth below, each of which must be satisfied to the reasonable satisfaction of the Administrative Agent (unless waived in accordance with Section 10.02):

(a)    Execution of Certain Financing Documents.  This Agreement, the Loan Discount ~~Letter~~**Letters** and the Agent Reimbursement Letter shall have been duly executed and delivered by each of the Loan Parties, Agent and Lenders intended to be parties thereto and shall be in full force and effect.

(b)     Corporate Documents.  The following documents, each certified as of the Closing Date as indicated below:

(i)     copies of the Organizational Documents, together with any amendments thereto, of each Loan Party and a certificate of good standing or its equivalent (if any) for the applicable jurisdiction for each such party (in each case such good standing certificate or its equivalent dated no more than ten (10) days prior to the Closing Date);

(ii)     an Officer's Certificate of each Loan Party dated as of the Closing Date, certifying:

(A)     that attached to such certificate is a true and complete copy of the Organizational Documents referred in clause (i) above for such Person;

(B)     that attached to such certificate is a true and complete copy of resolutions duly adopted by the board of directors, member(s), partner(s) or other authorized governing body of such Person authorizing the transactions contemplated by the Financing Documents, and that such resolutions or other evidence of authority have not been modified, rescinded or amended and are in full force and effect;

(C)     that the certificate of incorporation, certificate of formation, charter or other Organizational Documents (as the case may be) referred in clause (i) above for such Person has not been amended since the date of the certification furnished pursuant to clause (i) above;

(D)     as to the incumbency and specimen signature of each officer, member or partner (as applicable) of such Person executing the Financing Documents to which such Person is or is intended to be a party (and each Lender may conclusively rely on such certificate until it receives notice in writing from such Person); and

(E)     as to the qualification of such Person to do business in each jurisdiction where its operations require qualification to do business and as to the absence of any pending proceeding for the dissolution or liquidation of such Person.

(c)     Material Agreements and Bond Documents.  A copy of each of the Material Agreements and the Bond Documents executed as of the Closing Date and any amendments thereto shall have been made available to the Administrative Agent and the Lenders for their review.

(d)     Authorizations.  All material Authorizations required under any Applicable Law to be issued to, assigned to, or otherwise assumed by any Loan Party and necessary for (i) conduct of the Business or (ii) the execution, delivery and performance by such Loan Party of the Transaction Documents to which it is a party, other than, in each case, Authorizations that are not currently necessary and are obtainable in the ordinary course of business, (A) have been duly obtained and, to the knowledge of Borrower, validly issued, (B) are in full force and effect and not subject to any pending or, to the knowledge of Borrower, threatened, appeal or legal proceeding that could reasonably be expected to result in a material adverse modification to or withdrawal, cancellation, suspension or revocation of such Authorization, (C) are issued to,

assigned to, or otherwise assumed by, a Loan Party (or such Loan Party is entitled to the benefit thereof), (D) are free from any unsatisfied condition the failure of which to satisfy could reasonably be expected to have a Material Adverse Effect and (E) with respect to such Authorizations, all applicable statutory, judicial and administrative review periods have expired.

(e)     Operating Budget.  A copy of the current Operating Budget in substantially the form presented prior to the Closing Date.

(f)     Regulatory Information.  Each Lender shall have received all documentation and other written information required by under applicable anti-money laundering rules and regulations, including the USA PATRIOT Act.

(g)     Representations and Warranties.  The representations and warranties of each of the Loan Parties set forth in the Financing Documents shall be true and correct in all material respects on and as of the Closing Date (except where already qualified by materiality or Material Adverse Effect, in which case, in all respects).

(h)     No Default or Event of Default; No Material Adverse Effect.  No Default or Event of Default shall have occurred and be continuing on, or shall result as a result of the transactions contemplated to occur on, the Closing Date. As of the Closing Date, no development, event or circumstance that has had or could reasonably be expected to have a Material Adverse Effect shall have occurred and be continuing, or shall result as a result of the transactions contemplated to occur on the Closing Date.

(i)     Officer's Certificate.  An Officer's Certificate of the Borrower dated as of the Closing Date certifying that each of the conditions set forth in this Section 4.01 have been satisfied.

**The Parties hereto acknowledge and agree that the Closing Date occurred on August 2, 2019.**

Section 4.02   Conditions to the Initial Funding Date.  The occurrence of the Initial Funding Date and each Lender's obligations to make the Loans pursuant to Section 2.01 on such date are subject to the receipt by the Administrative Agent (except as set forth otherwise below) of each of the following documents, and the satisfaction of the conditions precedent set forth below, each of which must be satisfied to the reasonable satisfaction of the Administrative Agent (unless waived in accordance with Section 10.02):

(a)     Financing Documents; VCOC Matters; Warrants; Bond Documents.

(i)     Each of the Security Agreement, a Control Agreement relating to each Collateral Account, the Subordination Agreements and each other Financing Document shall have been duly executed and delivered by each of the Loan Parties, Agent and Lenders intended to be parties thereto and shall be in full force and effect.

(ii)     A strategic committee observer rights agreement containing such terms as will permit each of the Lenders to qualify as a "venture capital operating company" within the meaning of Department of Labor Regulation 29 C.F.R. Section 2510.3-101, dated as of the

Initial Funding Date, substantially in the form attached hereto as <u>Exhibit H</u> (the "<u>Observer Rights Agreement</u>").

(iii)    The Lender Warrants shall have been duly executed and delivered by each of the parties thereto.

(b)    <u>Payoff Letters</u>. The Administrative Agent shall have received payoff letters with respect to the ABL Credit Agreement and the Term Loan Credit Agreement, together with such UCC termination statements as shall be requested by the Administrative Agent, in each case, in form and substance satisfactory to the Administrative Agent.

(c)    <u>Fees and Expenses</u>.  The Borrower has arranged for payment on such Funding Date (including arrangement for payment out of the proceeds of Loan to be made on such Funding Date in accordance with <u>Section 5.13</u>) of all reasonable and documented out-of-pocket fees, reimbursements and expenses then due and payable pursuant to the Financing Documents.

(d)    <u>Funds Flow Memorandum</u>.  The Funds Flow Memorandum, which shall be in form and substance satisfactory to the Administrative Agent in its sole and absolute discretion.

(e)    <u>Establishment of Accounts</u>. Evidence that each of the Collateral Accounts described in <u>clauses (a)</u> through <u>(c)</u> of the definition thereof has been established.

(f)    <u>Security Documents and Collateral Perfection Matters</u>.

(i)    The Security Documents shall have been duly executed and delivered by the Persons intended to be parties thereto and shall be in full force and effect.

(ii)    The security interests in and to the Collateral intended to be created under the Security Documents shall have been created in favor of the Collateral Agent for the benefit of the Secured Parties, are in full force and effect and the necessary notices, consents, acknowledgments, filings, registrations and recordings to preserve, protect and perfect the security interests in the Collateral have been made immediately prior to the Initial Funding Date such that the security interests granted in favor of the Collateral Agent for the benefit of the Secured Parties are filed, registered and recorded and will constitute a first priority (subject to Permitted Liens), perfected security interest in the Collateral free and clear of any Liens, other than Permitted Liens, and all related recordation, registration and/or notarial fees of such Collateral have been paid to the extent required.

(iii)    Appropriately completed UCC financing statements (Form UCC-1) or UCC financing statement amendments (Form UCC-3), which have been duly authorized for filing by the appropriate Person, naming the Loan Parties as debtors and Collateral Agent as secured party, in form appropriate for filing under each jurisdiction as may be necessary to perfect the security interests purported to be created by the Security Documents, covering the applicable Collateral.

(iv)    Copies of UCC, judgment lien, tax lien and litigation lien search reports, which reports will be for the period between the Closing Date and a recent date acceptable to the Administrative Agent in its sole and absolute discretion, listing all effective financing statements

that name any Loan Party as debtor and that are filed in the jurisdictions in which the UCC-1 financing statements will be filed in respect of the Collateral, none of which shall cover the Collateral except to the extent evidencing Permitted Liens.

(v)     Appropriately completed copies of all other recordings and filings of, or with respect to, the Security Documents as may be requested by Collateral Agent and necessary to perfect the security interests purported to be created by the Security Documents.

(vi)     Subject to Section 5.21(b), the Collateral Agent shall be satisfied with arrangements to receive all certificates representing the shares of Capital Stock constituting "certificated securities" under the UCC that are pledged pursuant to the Security Agreement, together with an undated stock power for each such certificate executed in blank by a duly Authorized Representative of the Borrower.

(vii)     Evidence that all other actions requested by Collateral Agent and necessary to perfect and protect the security interests purported to be created by the Security Documents entered into on or prior to the Initial Funding Date have been taken immediately prior to the Initial Funding Date.

(g)     Insurance Deliverables.

(i)     The Borrower shall have obtained the insurance required to be in effect under Section 5.06 and such insurance shall be in full force and effect, and the Borrower shall have furnished the Administrative Agent with certificates signed by the insurer or an agent authorized to bind the insurer, together with loss payee endorsements in favor of the Collateral Agent, evidencing such insurance, identifying underwriters, the type of insurance, the insurance limits and the policy terms, and stating that such insurance (x) is, in each case, in full force and effect and (y) complies with Section 5.06 and that all premiums then due and payable on such insurance have been paid.

(ii)     Reasonably satisfactory evidence that the Borrower has in place insurance required to be in effect under Section 5.06.

(h)     Opinions of Counsel.  Written opinions (dated the Initial Funding Date and addressed to the Administrative Agent, the Lenders and the Collateral Agent) of Reed Smith LLP, special New York counsel to the Loan Parties.

**The Parties hereto acknowledge and agree that the Initial Funding Date occurred on August 2, 2019, and that all conditions precedent thereto were either satisfied or permanently waived.**

Section 4.03     Conditions to Each Funding Date.  The occurrence of each Funding Date (including the Initial Funding Date and the Second Funding Date) and each Lender's obligations to make the Loans pursuant to Section 2.01 on such date are subject to the satisfaction of the conditions precedent set forth below, each of which must be satisfied to the reasonable satisfaction of the Administrative Agent (unless waived in accordance with Section 10.02):

(a)    Documents.  Administrative Agent shall have received:

(i)    To the extent not previously delivered, a copy of each Bond Document, including all schedules, exhibits, attachments, supplements and amendments thereto shall have been delivered to the Administrative Agent.

(ii)    Any amendment to any Material Agreement or any Material Agreement executed after the Closing Date shall have been delivered to the Administrative Agent.

(iii)    A Borrowing Request in accordance with Section 2.01(c), executed and delivered by an Authorized Representative of the Borrower.

(iv)    To the extent requested by any Lender prior to such Funding Date pursuant to Section 2.04(b), a duly executed Note or Notes, as applicable, dated such Funding Date, payable to such Lender in a principal amount equal to such Lender's Loan.

(v)    An Officer's Certificate of the Borrower, dated as of such Funding Date, certifying that each of the conditions set forth in this Section 4.03 (and, in the case of the Initial Funding Date, Section 4.02) has been satisfied.

(b)    Fees and Expenses.  The Borrower has arranged for payment on such Funding Date (including arrangement for payment out of the proceeds of Loan to be made on such Funding Date in accordance with Section 5.13) of all reasonable and documented out-of-pocket fees, reimbursements and expenses then due and payable pursuant to the Financing Documents.

(c)    Representations and Warranties.  The representations and warranties of each Loan Party set forth in the Financing Documents shall be true and correct in all material respects on and as of such Funding Date (except where already qualified by materiality or Material Adverse Effect or in the case of any representation and warranty in Section 3.13, in all respects).

(d)    No Default or Event of Default; No Material Adverse Effect.  No Default or Event of Default shall have occurred and be continuing on, or shall result as a result of the transactions contemplated to occur on, such Funding Date. As of such Funding Date, no development, event or circumstance that has had or would reasonably be expected to have a Material Adverse Effect shall have occurred and be continuing, or shall result from the transactions contemplated to occur on such Funding Date.

(e)    Use of Proceeds. The Administrative Agent and the Borrower shall have mutually agreed on the use of proceeds of the Loans made on such Funding Date.

Section 4.04    Satisfaction of Conditions.  Except to the extent that Borrower has disclosed in the Borrowing Request that an applicable condition specified in Section 4.01 4.02, or 4.03 will not be satisfied as of the Closing Date or applicable Funding Date, as applicable, Borrower shall be deemed to have made a representation and warranty as of such time that the conditions specified in such Section have been satisfied.  No such disclosure by Borrower that a condition specified in Section 4.01 4.02, or 4.03, as applicable, will not be satisfied as of Closing Date or

66

the applicable Funding Date, as applicable, shall affect the right of each Lender not to make the Loans requested to be made by it if such condition has not been satisfied at such time.

## ARTICLE V

## AFFIRMATIVE COVENANTS

Each Loan Party hereby agrees that, from and after the Closing Date until the Discharge Date:

Section 5.01   <u>Corporate Existence; Etc.</u> Each Borrower Group Member shall at all times preserve and maintain in full force and effect (a) its existence as a corporation or a limited liability company, as applicable, (b) its good standing under the laws of the jurisdiction of its organization, and (c) its qualification to do business and its good standing in each jurisdiction in which the character of properties owned by it or in which the transaction of its business as conducted or proposed to be conducted makes such qualification necessary.

Section 5.02   <u>Conduct of Business</u>.  Each Borrower Group Member shall operate, maintain and preserve or cause to be operated, maintained and preserved, the Business in accordance in all material respects with the requirements of the Material Agreements to which it is a party and in compliance, in all material respects, with Applicable Laws and Authorizations by Governmental Authorities and the terms of its insurance policies.

Section 5.03   <u>Compliance with Laws and Obligations</u>.

(a)   Each Borrower Group Member shall comply in all material respects with applicable Environmental Laws, including occupational health and safety regulations, and all other Applicable Laws and Authorizations. Each Borrower Group Member shall comply with and perform its respective contractual obligations in all material respects, and enforce against Material Counterparties their respective material contractual obligations in all material respects, under each Material Agreement to which it is a party.  Each Borrower Group Member shall not violate applicable Sanctions, Anti-Money Laundering Laws, the FCPA or any other Anti-Corruption Laws and shall not undertake or cause to be undertaken any Anti-Corruption Prohibited Activity.

Section 5.04   <u>Governmental Authorizations</u>.   Each Borrower Group Member shall obtain, preserve and maintain in full force and effect (or where appropriate, renew in a timely manner), or cause to be obtained and maintained in full force and effect all material Authorizations (including all material Authorizations required by Environmental Law) required under any Applicable Law for (i) conduct of the Business or (ii) the execution, delivery and performance by such Loan Party of the Transaction Documents to which it is a party, in each case, at or before the time the relevant Authorization becomes necessary for such purposes.

Section 5.05   <u>Maintenance of Title</u>. Each Borrower Group Member shall maintain (a) good title to the property owned by such Borrower Group Member necessary for the conduct of the Business free and clear of Liens, other than Permitted Liens; (b) legal and valid and subsisting leasehold interests to the properties leased by such Borrower Group Member necessary for the

67

conduct of the Business, free and clear of Liens, other than Permitted Liens and (c) legal and valid possessory rights to the properties possessed and not otherwise held in fee or leased by such Borrower Group Member necessary for the conduct of the Business.

Section 5.06    Insurance.

(a)      Each Loan Party shall maintain insurance with insurance companies rated A- (or the then equivalent grade) or better, with a minimum size rating of VII (or the then equivalent grade) by A.M. Best Company (or an equivalent rating by another nationally recognized insurance rating agency of similar standing if A.M. Best Company shall no longer publish its Best's Credit Ratings or if S&P shall no longer publish its ratings for insurance companies, as the case may be) or other insurance companies of recognized responsibility satisfactory to the Administrative Agent against at least such risks and in at least such amounts as are customarily maintained by prudent similar businesses and as may be required by Applicable Law and as are required by the Material Agreements and/or Security Documents.  All such insurance shall, (a) provide that no cancellation or material modification thereof shall be effective until at least thirty (30) days (or, in the case of cancellation for non-payment of premiums, ten (10) days) after receipt by the Administrative Agent of written notice thereof, (b) in the case of any liability insurance and property insurance, name the Collateral Agent and the Secured Parties as an additional insured party thereunder and (c) in respect of any such policy relating to the Property of the Loan Parties, in the case of each casualty insurance policy, name the Collateral Agent as lender's loss payee. On the Closing Date and from time to time thereafter deliver to the Administrative Agent upon its reasonable request information in reasonable detail as to the insurance then in effect, stating the names of the insurance companies, the amounts and rates of the insurance, the dates of the expiration thereof and the properties and risks covered thereby.

(b)      Each Loan Party shall maintain (or cause to be maintained) the insurance required to be maintained pursuant to the Material Agreements in accordance with the terms of the same.

(c)      The applicable Loan Party shall instruct the relevant insurers to pay Loss Proceeds of the insurance policies provided or obtained by or on behalf of the Loan Parties directly to the Borrower Account.  If any Loss Proceeds that are required under the preceding sentence to be paid to the Borrower Account are received by any other Loan Party, such Loss Proceeds shall be received in trust for the Collateral Agent, shall be segregated from other funds of the recipient, and shall be forthwith paid into the Borrower Account in the same form as received (with any necessary endorsement).

Section 5.07    Keeping of Books.  Each Loan Party shall maintain an accounting and control system, management information system and books of account and other records, which together adequately reflect truly and fairly the financial condition of such Loan Party and the results of operations in accordance with GAAP and all Applicable Laws.

Section 5.08    Access to Property/Records.  Each Loan Party shall permit (i) officers and designated representatives of the Administrative Agent to visit and inspect any of its properties accompanied by officers or designated representatives of such Loan Party and (ii) officers and designated representatives of the Administrative Agent to examine and make copies of the books of record and accounts of such Loan Party (provided that such Loan Party shall have the right to

be present) and discuss the affairs, finances and accounts of such Loan Party with the chief financial officer, the chief operating officer and the chief executive officer of such Loan Party (subject to reasonable requirements of safety and confidentiality, including requirements imposed by Applicable Law or by contract), in each case, with at least three (3) Business Days advance notice to such Loan Party and during normal business hours of such Loan Party; provided that, such Loan Party shall not be required to reimburse the Administrative Agent for more than one inspection per calendar year as long as no Event of Default has occurred.

Section 5.09    Taxes.

(a)    Each Loan Party shall pay and discharge, before the same shall become delinquent, all material Taxes imposed upon it or upon its property to the extent required under the Transaction Documents to which such Loan Party is a party or under Applicable Law that, if unpaid, might become a Lien (other than a Permitted Lien of the type referenced in clause (a)(i) of the definition of Permitted Lien) upon its property; provided that such Loan Party shall not be required to pay or discharge any such Tax for so long as such Loan Party satisfies the Permitted Contest Conditions in relation to such tax, assessment, charge or claim.

(b)    No Loan Party shall make an election pursuant to Treasury Regulations Section 301.7701-3(c) to be treated as an association taxable as a corporation for U.S. federal income tax purposes or take any other action inconsistent with such Loan Party's status as an entity treated as a partnership or disregarded for U.S. federal income tax purposes.

Section 5.10    Financial Statements; Other Reporting Requirements.  Each Loan Party shall, or cause the applicable Non-Guarantor Subsidiary to, furnish to the Administrative Agent:

(a)    as soon as available and in any event within thirty (30) days after the end of each calendar month, a monthly report containing (i) such detailed information as Borrower customarily relies upon to monitor the operational performance (including commercial updates) of the Borrower Group Members, (ii) information on the financial performance of the Borrower Group Members and (iii) other key business performance indicators, in the form attached hereto as Exhibit F; provided that, for the report delivered under this clause (a) related to the end of each fiscal quarter, the Borrower shall delivery such report within forty-five (45) days after the end of such fiscal quarter;

(b)    as soon as available and in any event within thirty (30) days after the end of each calendar month, commencing with the partial calendar month during which the Closing Date occurs, monthly unaudited consolidated financial statements of the Borrower Group Members, including the unaudited consolidated balance sheet as of the end of such calendar month and the related unaudited statements of income, retained earnings and cash flows for such calendar month and for the portion of such fiscal year ending on the last day of such calendar month, all in reasonable detail; provided that, for the financial statements delivered under this clause (b) related to the end of each fiscal quarter, the Borrower shall delivery such financial statements within this forty-five (45) days after the end of such fiscal quarter;

(c)    as soon as available and in any event within one hundred fifty (150) days after the end of each fiscal year **(or, in the case of the fiscal year ending December 31, 2019, on or**

**prior to September 8, 2020**), commencing with fiscal year ending on December 31, 2019, audited consolidated financial statements for such fiscal year for the Borrower Group Members, including therein the consolidated balance sheet as of the end of such fiscal year and the related statements of income, retained earnings and cash flows for such year, and the respective directors' and auditors' reports, all in reasonable detail and accompanied by customary management discussion and analysis and an audit opinion thereon by the Independent Auditor, which opinion shall state that said financial statements present fairly, in all material respects, the financial position of the Borrower Group Members, as the case may be, at the end of, and for, such fiscal year in accordance with GAAP;

(d)       at the time of the delivery of the financial statements under Section 5.10(b) or (c) above, a certificate of an Authorized Representative of Borrower (i) certifying that such financial statements fairly present in all material respects the financial condition and results of operations of the Borrower Group Members on the dates and for the periods indicated in accordance with GAAP, subject, in the case of interim financial statements, to the absence of footnotes and normally recurring year-end adjustments, (ii) certifying that no Default or Event of Default has occurred and is continuing, or if a Default or Event of Default has occurred and is continuing, a statement as to the nature thereof and (iii) certifying and providing calculations for the Leverage Ratio as of such date (such certificate, the "Compliance Certificate");

(e)       within thirty (30) days after each annual policy renewal date, a certificate of an Authorized Representative of the Borrower certifying that the insurance requirements of Section 5.06 have been implemented and are being complied with by the Loan Parties and on or prior to the expiration of each policy required to be maintained pursuant to Section 5.06, certificates of insurance with respect to each renewal policy and each other insurance policy required to be in effect under this Agreement that has not previously been furnished to the Administrative Agent under this Agreement.  If at any time requested by the Administrative Agent, the Borrower shall deliver to the Administrative Agent a duplicate of any policy of insurance required to be in effect under this Agreement;

(f)       within forty-five (45) days following the end of each fiscal quarter, an environmental, social and governance report in respect of the applicable fiscal year in the form attached hereto as Exhibit J;

(g)       within three (3) Business Days following delivery of any financial statements, operating or construction reports and/or any other material notices or reporting information as required under the Bond Documents or any Permitted Revolving Facility, a copy of such document, notice or information delivered in connection with the Bond Documents, any Permitted Revolving Facility, as applicable;

(h)       within five (5) Business Days of the end of each calendar month, in electronic format, an itemized summary of all withdrawals from the Collateral Accounts made during such calendar month.

Section 5.11    Notices.    The Loan Parties shall, or cause the applicable Non-Guarantor Subsidiary to promptly (and, unless a subsection of this Section 5.11 is expressly made subject to another time period, within five (5) Business Days) upon an Authorized Representative of any

Loan Party obtaining knowledge thereof (or as otherwise provided in the case of clauses (a) and (h) below), give notice to the Administrative Agent of:

(a)     within five (5) Business Days after the earlier of (i) an Authorized Representative of any Borrower Group Member obtaining knowledge thereof and (ii) receipt of any notice thereof, the occurrence of any material default under any Material Agreements;

(b)     within ten (10) Business Days of any documents becoming available, any agreement or transaction (or series of related transactions) entered into with an Affiliate of a Loan Party (that is not a Loan Party) with a value in excess of $500,000 over the term of such agreement or transaction (or series of related transactions);

(c)     [Reserved];

(d)     [Reserved];

(e)     within ten (10) Business Days of any documents becoming available, true and complete copies of any amendment of any Material Agreement and of any Material Agreements executed after the Closing Date;

(f)     any Investments made by any Loan Party in a Non-Guarantor Subsidiary, to the extent not permitted by this Agreement; and

(g)     (x) the sale, lease, transfer or other Disposition of, in one transaction or a series of transactions, all or any part of the property of the Borrower Group Members in excess of $500,000 in the aggregate per calendar year and (y) the entry of any contract contemplated by, and any Disposition pursuant to, Section 6.07(e)(iii) (including the fair market value of any such Disposition).

(h)     notice received by it with respect to the cancellation of, adverse change in, or default under, any insurance policy required to be maintained in accordance with Section 5.06;

(i)     the filing or commencement of any litigation, investigation, action or proceeding (including any Environmental Claim) of or before any court, arbitrator or Governmental Authority against or affecting any Borrower Group Member or the Business (x) in which the amount involved is in excess of $1,250,000, (y) has resulted in or, if adversely determined, could reasonably be expected to result in a Material Adverse Effect or (z) which relates to a material Authorization (including all material Authorizations required by Environmental Law) necessary for the Business;

(j)     the occurrence of a Default or an Event of Default;

(k)     the occurrence of any ERISA Event, together with a written notice setting forth the nature thereof and the action, if any, that such Loan Party or ERISA Affiliate proposes to take with respect thereto;

(l)     no later than five (5) Business Days prior to the execution and delivery thereof (which period may be shortened in any instance at Administrative Agent's discretion), any

amendment thereof, notice of any amendment to any Material Agreement that is an offtake agreement;

(m)    within five (5) days of delivery, copies of all statements, reports and notices (including board kits) made available to Borrower's Board of Directors; provided that any such material may be redacted by Borrower to exclude information relating to the Lenders (including Borrower's strategy regarding the Loans) or any material that Borrower determines in good faith, upon advice of counsel, the exclusion of which is reasonably necessary to preserve attorney-client privilege or to protect highly confidential proprietary information of any Borrower Group Member.**; and**

**(n)    within five (5) days of delivery or receipt, copies of all material notices delivered or received in connection with the Niagara Promissory Note.**

Section 5.12    [Reserved]

Section 5.13    Use of Proceeds.

(a)    The proceeds of the Loans funded on the Initial Funding Date shall be used as specified on Schedule 5.13(a).  The proceeds of the Loans funded on the Second Funding Date shall be used as specified on Schedule 5.13(b).

**(b)    The proceeds of the Tranche B Loans shall be used to satisfy a portion of CL P's $10,000,000 equity funding obligations under the Pennsylvania Bond Documents in accordance with the Tranche B Funds Flow Memorandum.**

**(c)**    ~~(b)~~ For the avoidance of doubt, (i) Borrower is permitted to lend or contribute the proceeds of the Loans to one or more of the Guarantors and (ii) except as set forth in Section 6.04, no Loan Party is permitted to lend or contribute the proceeds of the Loans to any of the Non-Guarantor Subsidiaries.

**(d)**    ~~(c)~~ The proceeds of the Loans will not be used in violation of Anti-Corruption Laws or applicable Sanctions.

Section 5.14    Security.  The Loan Parties shall preserve and maintain the security interests granted under the Security Documents and undertake all actions which are necessary or appropriate to:  (a) maintain the Collateral Agent's security interest in the Collateral in full force and effect at all times (including the priority thereof (subject to Permitted Liens)), and (b) preserve and protect the Collateral and protect and enforce the Loan Parties' rights and title and the rights of the Collateral Agent and the other Secured Parties to the Collateral (subject to Permitted Liens), including the making or delivery of all filings and recordations, the payment of all reimbursements, fees and other charges and the issuance of supplemental documentation.

Section 5.15    Further Assurances.  The Loan Parties shall execute, acknowledge where appropriate, and deliver, and cause to be executed, acknowledged where appropriate, and delivered, from time to time promptly at the reasonable request of any Agent all such instruments and documents as are necessary or appropriate to carry out the intent and purpose of the Financing Documents (including filings, recordings or registrations required to be filed in

respect of any Security Document or assignment thereto) necessary to maintain, to the extent permitted by Applicable Law, the Collateral Agent's perfected security interest in the Collateral to the extent and in the priority required by the Financing Documents.

Section 5.16    Security in Newly Acquired Property and Revenues.  Without limiting any other provision of any Financing Document, if any Loan Party shall at any time acquire interests in property in a single transaction or series of transactions, as applicable, not otherwise subject to the Lien created by the Security Documents having a value of at least $1,000,000 individually, promptly upon such acquisition, such Loan Party shall execute, deliver and record a supplement to the Security Documents or other documents, subjecting such interest to the Lien created by the Security Documents.

Section 5.17    Material Agreements.    Each Loan Party shall, or cause the applicable Non-Guarantor Subsidiary to (a) duly and punctually perform and observe all of its material covenants and obligations contained in each Material Agreement to which it is a party and (b) enforce against the relevant Material Counterparty each material covenant or obligation of such Material Agreement, as applicable, in accordance with its terms.

Section 5.18    Collateral Accounts.

(a)    The Loan Parties shall at all times maintain the Collateral Accounts in accordance with the Financing Documents and cause such Collateral Accounts to be subject to a Control Agreement at all times.

(b)    [Reserved]

(c)    At all times each Loan Party shall deposit and maintain, or cause to be deposited and maintained, all Business Revenues, insurance proceeds and other amounts received into the Collateral Accounts in accordance with the provisions below and request or make only such payments and transfers out of the Collateral Accounts as permitted by the provisions below (except as otherwise consented to in writing by the Collateral Agent).

(i)    Borrower Account.

(A)    The Loan Parties shall deposit into the Borrower Account: (i) proceeds of the Loans which are intended to be deposited into such account(s) pursuant to the Funds Flow Memorandum delivered on the Initial Funding Date or any funds flow memorandum agreed with the Administrative Agent and delivered in connection with any other Funding Date, (ii) any Business Revenues paid to any Loan Party and (iii) all other amounts received by any Loan Party and not required or permitted to be deposited into another Collateral Account pursuant to this Agreement (including proceeds in respect of Events of Loss (including Loss Proceeds) and Dispositions, proceeds from the incurrence of Indebtedness, termination payments and other extraordinary payments under project contracts (including the Material Agreements), damages and other proceeds received by the Loan Parties).

(B)    The Loan Parties may make withdrawals, transfers and payments from the Borrower Account as permitted by this Agreement and the other Financing Documents.

(ii)    Debt Service Reserve Account.

(A)    On the Second Funding Date, **if any,** the Debt Service Reserve Account shall be funded in cash, from the proceeds of the Loans advanced on such date, in an amount equal to $7,730,000.

(B)    Subject to clause (C) below, if the Borrower has insufficient cash to pay interest on the Loans in accordance with Section 2.07 (taking into account the right of the Borrower to pay interest in kind pursuant to Section 2.07(e)) on any Quarterly Payment Date (such insufficiency, the "*Interest Payment Deficiency*"), Borrower shall promptly transfer an aggregate amount equal to the Interest Payment Deficiency (or, if less, the aggregate amount of cash then on deposit in the Debt Service Reserve Account) from the Debt Service Reserve Account to the Administrative Agent to pay, on behalf of Borrower, the Interest Payment Deficiency.

(C)    [Reserved].

(d)    The Loan Parties shall cause the Non-Guarantor Subsidiaries to distribute cash to the Loan Parties to the extent permitted under the applicable Bond Documents of such Non-Guarantor Subsidiaries.

(e)    Nothing set forth in this Agreement shall prohibit the Borrower Group Members from depositing or holding in the Excluded Accounts the amounts described in the definition thereof.

Section 5.19    Intellectual Property.

(a)    Each Loan Party shall own, or be licensed to use, all Intellectual Property that such Loan Party reasonably believes is necessary for its conduct of the Business, in each case, as to which the failure of such Loan Party to so own or be licensed could reasonably be expected to have a Material Adverse Effect.

(b)    If a Loan Party licenses any Intellectual Property from another Person and such Intellectual Property is material to the conduct of the business of any Loan Party, and the license is rejected in an insolvency proceeding, such Loan Party shall use commercially reasonable efforts to maintain its rights under the license, which efforts shall include making an election under Section 365(n) of the Bankruptcy Code, if an election is available to such Loan Party.

(c)    Each Loan Party agrees that, should it hereafter (i) obtain an ownership interest in any issued Copyrights, Trademarks, or Patents, (ii) obtain an exclusive license to any Copyrights, (iii) either by itself or through any agent, employee, licensee, or designee, file any application for the registration or issuance of any Copyrights, Trademarks or Patents with the United States Patent and Trademark Office or the United States Copyright Office, or (iv) should it file a statement of use or an amendment to allege use with respect to any "intent-to-use" Trademark application (the items in clauses (i), (ii) (iii) and (iv), collectively, the "After-Acquired Intellectual Property"), then, unless it constitutes Excluded Assets under the Pledge and Security Agreement, any such After-Acquired Intellectual Property shall automatically become part of the Collateral, and such Loan Party shall give written notice

thereof within 60 days of the registration or issuance thereof to the Collateral Agent in accordance herewith.

(d)     Each Loan Party agrees to use commercially reasonable efforts so as not to permit the inclusion in any contract to which it hereafter becomes a party of any provision that would materially impair or prevent the creation of a security interest in such Loan Party's rights and interests in any property described in Section 5.19(c) that is material to the business of any Loan Party, other than the Financing Documents and any loan documentation relating to the Permitted Revolving Facility.

(e)     Each Loan Party shall promptly notify the Collateral Agent if it knows or has reason to know that any registered or issued Copyrights, Trademarks or Patents that it owns or licenses becomes (i) abandoned or dedicated to the public or placed in the public domain, (ii) invalid or unenforceable, (iii) subject to any adverse determination or development regarding such Loan Party's ownership, registration or use or the validity or enforceability of such item of Intellectual Property (including the institution of, or any adverse development with respect to, any action or proceeding in the United States Patent and Trademark Office, the United States Copyright Office, any state registry, any foreign counterpart of the foregoing, or any court) or (iv) the subject of any reversion or termination rights.

(f)     Each Loan Party shall not intentionally infringe, misappropriate, dilute, or otherwise violate the Intellectual Property rights of any other Person in any manner which could reasonably be expected to have a Material Adverse Effect.  In the event that any Person initiates, or threatens in writing to initiate, any action or proceeding alleging that such Loan Party, or the conduct of such Loan Party's business, infringes, misappropriates, dilutes, or otherwise violates the Intellectual Property of any other Person, and such action or proceeding could reasonably be expected to have a Material Adverse Effect, such Loan Party shall promptly notify the Collateral Agent after it learns thereof.

Section 5.20    Budget and Updated Model; Non-Guarantor Subsidiaries.

(a)     Submission of Operating Budget.  (x) ~~(1)~~ With respect to the Loan Parties, ~~on the Closing Date (with respect to the remainder of fiscal year 2019 and full fiscal year 2020) and (2)~~ not later than thirty (30) days after the beginning of each fiscal year following the Closing Date beginning with the calendar year ending December 31, 2021, (y) with respect to the Texas Facility Group, no later than thirty (30) days ~~prior to~~**after** the beginning of the calendar year ~~after distributions are permitted under the Bond Documents in respect of the Texas Facility (which is expected to be~~**ending December 31,** 2021~~)~~, and (z) with respect to the Pennsylvania Facility Group, no later than thirty (30) days ~~prior to~~**after** the beginning of the calendar year ~~after distributions are permitted under the Bond Documents in respect of the Pennsylvania Facility (which is expected to be 2023)~~**ending December 31, 2021**, in each case, the Borrower shall submit to the Lenders a copy of its proposed operating budget for such fiscal year with respect to the applicable Borrower Group Members covered thereby.  In addition, Borrower may from time to time propose an amended operating budget for the remainder of any fiscal year to which an existing Operating Budget applies.  The effectiveness of any proposed

operating budget so submitted, for purposes of the Financing Documents, is subject to Sections 5.20(b).

(b)    Approval of Operating Budget.  Except with respect to the agreed Operating Budget delivered on the Closing Date, each proposed operating budget delivered pursuant to Section 5.20(a) **(which shall include, for the avoidance of doubt, approval of operating budgets in respect of the Texas Facility Group and the Pennsylvania Facility Group)** shall not be effective for purposes of the Financing Documents until approved by the Administrative Agent (such approval not to be unreasonably withheld, conditioned or delayed).  In the event that, pursuant to the immediately preceding sentence, such a proposed operating budget is not approved by the Administrative Agent, or the Borrower has not submitted a proposed operating budget for a fiscal year, the Operating Budget for the immediately preceding fiscal year shall apply until a proposed operating budget for the then current fiscal year is approved.

(c)    Compliance with Operating Budget; Intra-year Adjustments.  Commencing on the Closing Date, direct wages, other manufacturing overhead, general and administrative expenses, maintenance capital expenses and growth capital expenses shall be paid by the ~~Borrower Group Members~~**Loan Parties** in compliance with the Operating Budget **for such companies**, except as set forth in this Section 5.20(c).

(i)    Without necessitating any amendment to the Operating Budget, the ~~Borrower Group Members~~**Loan Parties** may exceed any line item in the Operating Budget for the applicable fiscal year, so long as the net excess of all line items for such fiscal year does not exceed zero (after giving effect to any **Net** Additional Equity Raise Amounts applied pursuant to Section 5.20(c)(iii)).

(ii)    While performance against the Operating Budget will be reported periodically pursuant to Section 5.10(d), compliance with the Operating Budget will be determined only on an annual basis (after giving effect to any equity cures pursuant to Section 5.20(c)(iii) or 6.01(b)), and Loan Parties shall not be in breach of this Section 5.20(c) (and no Default or Event of Default may occur) by virtue of any reported deviation from the Operating Budget **for any Loan Party** on a period shorter than an annual basis.

(iii)    ~~The~~**So long as no Tranche B Obligations are outstanding, the** Borrower may, in its discretion, use any **Net** Additional Equity Raise Amounts to cure any default in respect of this Section by paying direct wages, other manufacturing overhead, general and administrative expense, maintenance capital expense and growth capital expense made during the fiscal year in which such cash was received by Borrower for purposes of determining compliance with this Section 5.20(c).

(d)    Non-Guarantor Subsidiaries.  Non-Guarantor Subsidiaries shall utilize such Non-Guarantor Subsidiary's Business Revenues to pay operating expenses, debt service, Capital Expenditures and other amounts generally in accordance with the applicable Operating Budget, and shall distribute, to the extent permitted by the Bond Documents, and the terms of any applicable working capital financing arrangements entered into as permitted by this Agreement,

76

and net of reasonable reserves and working capital, all remaining cash and Cash Equivalent Investments to the Loan Parties once per calendar quarter.

Section 5.21    Post-Closing Covenants.

(a)    The Loan Parties shall cause the property insurance policies to be increased to an amount of not less than $60,000,000 per occurrence during the current policies' next policy period.

(b)    Each Loan Party shall cause all certificates representing the shares of Capital Stock constituting "certificated securities" under the UCC that are pledged pursuant to the Security Agreement, together with an undated stock power for each such certificate executed in blank by a duly Authorized Representative of the applicable Loan Party, each in form and substance reasonably satisfactory to the Collateral Agent, to be delivered to the Collateral Agent within fifteen (15) days of the Initial Funding Date.

(c)    The Loan Parties shall obtain key person life insurance insuring the life of Leon Farahnik in an amount of not less than $7,500,000 (the "Life Insurance Policy") within ninety (90) days of the Initial Funding Date and until the Discharge Date, maintain such Life Insurance Policy in such amount at all times.  The Life Insurance Policy shall name the Borrower as owner and beneficiary with respect to such insurance and shall designate the Borrower Account as the account in which proceeds under the Life Insurance Policy shall be paid.

(d)    [Reserved].

~~(d) Following the Closing Date, each Loan Party agrees to use commercially reasonable efforts to cause CL Industries to be released from its joint and several obligations tied to the Texas Facility and the Pennsylvania Facility prepayments, in Amendment 3, dated November 1, 2018, to the Niagara Bottling, LLC and CarbonLite Recycling LLC Supply Agreement, dated November 1, 2017, as amended by Amendment 1 dated March 1, 2018 and Amendment No 2, dated April 17, 2018.~~

~~(e) *Borrower shall use commercially reasonable efforts to raise Additional Equity Raise Amounts in an amount equal to at least* $10,000,000 which shall be applied to repay and retire a portion of the Pennsylvania Intercompany Indebtedness within twelve (12) months following the Initial Funding Date.~~

(e)    ~~(f)~~ The Loan Parties shall, within 30 days following the Closing Date, provide to the Administrative Agent a certificate of good standing from the Secretary of State of the State of California with respect to PinnPack.

(f)    If the Tranche B Loans are not repaid in full in cash on or prior to March 31, 2021, then the Borrower shall, to the extent directed by the Administrative Agent (in its sole and absolute discretion), immediately proceed in good faith with a direct or indirect sale of the Pinnpack Facility in accordance with terms that have been approved by the Administrative Agent (in its sole and absolute discretion) and with a closing and funding of such sale to occur on or prior to June 30, 2021.  In connection therewith, the Borrower shall (i) engage a sell-side advisor on or prior to April 15, 2021, who shall be reasonably

acceptable to the Administrative Agent and (ii) promptly (and in any event, within one (1) Business Day) advise the Administrative Agent of any material events, milestones or dates relating thereto.

(g)    On and after the Amendment No. 2 Effective Date, *Borrower shall use commercially reasonable efforts to raise Additional Equity Raise Amounts in an amount equal to at least $*20,000,000 on or prior to the Tranche B Maturity Date.

(h)    The Loan Parties shall:

(i)

(A)    Use commercially reasonable effort to satisfy the Qualified Additional Collateral Conditions  within ten (10) Business Days after the Amendment No. 2 Effective Date; and

(B)    If  the Accommodation Collateral Provider satisfies the Qualified Additional Collateral Conditions, and at any time thereafter, the value of any security provided under clause (c)(i) through (iii) of the definition of "Qualified Additional Collateral Conditions" falls below $5,250,000, then within ten (10) Business Days, the Loan Parties shall cause the Accommodation Collateral Provider to fund additional amounts such that the value of such security is equal to at least $5,250,000 (it being acknowledged that the failure to provide such additional amounts shall be an Event of Default on the tenth Business Day after such deficiency occurs); and

(ii)    If the Loan Parties fail to satisfy the Qualified Additional Collateral Conditions within ten (10) Business Days after the Amendment No. 2 Effective Date, then, within forty-five days after the Amendment No. 2 Effective Date, (1) the Loan Parties shall designate $5,000,000 of the Tranche B Obligations as "Short-Term Indebtedness" (as defined in the Texas Bond Documents) and (2) take all steps reasonably requested by the Administrative Agent to cause the Collateral Agent to become a  secured party on the accounts receivable and inventory in respect of the Texas Facility (it being acknowledged and agreed that the Administrative Agent and Collateral Agent have approved the form of intercreditor agreement attached to the Texas Bond Documents).  To the extent that the Loan Parties take the steps set forth in the foregoing clause (i)(ii), the Administrative Agent and Lenders shall, in good faith, consider the release of any such collateral contemplated by the foregoing clause (i)(ii) to facilitate a permanent working capital solution for the Texas Facility. Once the Tranche B Obligations have been repaid in full in cash, the Obligations shall cease to be "Short-Term Indebtedness" under the Texas Bond Documents, the Texas Facility Group shall have no further obligations to the Administrative Agent, Collateral Agent or the Lenders, and the Administrative Agent, the Collateral Agent and the Lenders shall, at the expense of the Borrower, take all actions, provide confirmations that the Texas Facility Group owes no further obligations to the Administrative Agent, Collateral Agent or the Lenders and execute all release documents reasonably requested by the Borrower to release Liens on inventory, accounts receivable and all other collateral afforded to the Collateral Agent in respect of the Texas Facility.

**(i)        Unless either (i) the Tranche B Obligations have been repaid in full in cash prior to the date that is forty five (45) days after the Amendment No. 2 Effective Date or (ii) the Borrower has satisfied the Qualified Additional Collateral Conditions prior to the date that is ten (10) Business Days after the Amendment No. 2 Effective Date, the Borrower shall give each Tranche B Lender (or its Affiliate or designee) its ratable share of Tranche B Optional Warrants, as contemplated by Annex III hereto.**

## ARTICLE VI

## NEGATIVE COVENANTS

Each Loan Party agrees that from and after the Closing Date until the Discharge Date:

Section 6.01    Subsidiaries; Equity Issuances.

(a)        No Loan Party shall (i) form or have any subsidiary other than another wholly-owned U.S. domestic subsidiary whose equity interests become subject to the Security Documents as contemplated by the Security Documents (other than the Non-Guarantor Subsidiaries and any Subsidiaries that are not wholly-owned on the Closing Date) or (i) subject to Section 6.04 hereof, own, or otherwise Control any Capital Stock in, any other Person.

(b)        Borrower shall not issue any additional shares of Capital Stock while any breach of Section 5.20(c) is continuing, subject to the following.  Notwithstanding anything to the contrary contained in Article VII, in the event that Borrower fails to comply with Section 5.20(c) for any fiscal year, Borrower may, within ninety (90) days of the end of such fiscal year, issue additional shares of Capital Stock of Borrower in exchange for cash (the amount thereof, the "Cure Amount").  Upon the receipt by Borrower of the cash Cure Amount pursuant to the exercise of such cure right, such Cure Amount shall be deemed to reduce the aggregate amount of direct wages, other manufacturing overhead, general and administrative expense, maintenance capital expense and growth capital expense made during the fiscal year for which such breach occurred, and compliance with the Operating Budget for such fiscal year shall be recalculated for all purposes under the Loan Documents. If, after giving effect to the foregoing recalculation, Borrower shall then be in compliance with the Operating Budget, Borrower shall be deemed to have satisfied the requirements of Section 5.20(c) for such fiscal year, with the same effect as though there had been no failure to comply therewith, and the applicable breach of Section 5.20(c) that had occurred, and any related Default or Event of Default, shall be deemed cured without any further action of Borrower, Administrative Agent or any Lender for all purposes under the Loan Documents.

Section 6.02    Indebtedness.  No Borrower Group Member shall create, incur, assume or suffer to exist any Indebtedness, other than (each of the following, "Permitted Indebtedness"):

(a)        Indebtedness incurred under the Financing Documents;

(b)        Capital Lease Obligations or purchase money obligations to the extent incurred in the ordinary course of business to finance the acquisition or licensing of intellectual property or discrete items of equipment (and Indebtedness incurred to finance any such obligations);

provided that the annual debt service payments in respect of all such Indebtedness (inclusive of interest, principal and fees) does not exceed $350,000 per calendar year;

(c)    current accounts payable not more than ninety (90) days past due or which are that are being contested in accordance with the Permitted Contest Conditions, interest thereon, regulatory bonds, surety obligations and accrued expenses incurred, in the ordinary course of business;

(d)    [Reserved];

(e)    Indebtedness incurred under any Permitted Revolving Facility;

(f)    Indebtedness existing on the Closing Date and set forth in Schedule 6.02 and extensions, renewals and replacements of any such Indebtedness that do not increase the outstanding principal amount thereof except by an amount equal to a reasonable premium or other amount paid, and reasonable fees and expenses incurred, in connection with such extension, renewal or replacement or change any direct or contingent obligor with respect thereto or shorten the average life to maturity thereof;

(g)    (i) Guarantees by any Borrower Group Member of Indebtedness otherwise permitted hereunder of any other Borrower Group Member, and (i) performance guarantees provided by a Loan Party to support the obligations of any Loan Party in the ordinary course of business under the Material Agreements;

(h)    Indebtedness under the Shareholder Notes and subject to the applicable Subordination Agreement or another subordination agreement in form and substance reasonably acceptable to the Administrative Agent;

(i)    unsecured intercompany Indebtedness among the Borrower Group Members**;, to the extent unsecured and, if in favor of any Loan Party, pledged to the Collateral Agent, for the benefit of the Secured Parties, under the Security Agreement; provided, that any intercompany loans from the Loan Parties to any Non-Guarantor Subsidiary on or after the Amendment No. 2 Effective Date shall be subject to the approval of the Administrative Agent (not to be unreasonably withheld, conditioned or delayed);**

(j)    other Indebtedness of the Non-Guarantor Subsidiaries in an amount not exceeding $4,000,000 **(exclusive of all Indebtedness referenced in clause (l) below)** in the aggregate at any time outstanding across the Non-Guarantor Subsidiaries (for which the Loan Parties shall not be obligated);

(k)    Indebtedness with respect to letters of credit in favor of the landlord under any real property leases, in each case, issued in accordance with the applicable real property lease and in an aggregate stated amount not exceeding $~~5,000,000~~**6,000,000** at any time outstanding;

(l)    (i) in the case of the Non-Guarantor Subsidiaries, Indebtedness of a Non-Guarantor Subsidiary under the Bond Documents to which it is a party as of the date hereof, (ii) in the case of the Non-Guarantor Subsidiaries, additional industrial revenue bond transactions of a nature similar to those subject to the Bond Documents following the date hereof

US-DOCS\~~109334811.27~~117632562.13

so long as (1) the aggregate outstanding principal amount of the Indebtedness under the foregoing clauses (i) and (ii) does not exceed $140,000,000, (2) neither Borrower nor any Guarantor has any direct liability therefor and (3) the Administrative Agent has approved (in its sole discretion) the documentation related thereto in writing (it being acknowledged that the forms attached hereto as Exhibit L shall be pre-approved) and (iii) additional industrial revenue bond transactions of a nature similar to those subject to the Bond Documents not involving any of the Borrower Group Members in existence as of the Closing Date; **and**

(m)     **(i) Indebtedness of the Borrower in respect of the Niagara Promissory Note (as in effect as of the Amendment No. 2 Effective Date, without giving effect to any modifications that are not consented to by the Administrative Agent, in its reasonable discretion) and (ii)** other unsecured Indebtedness in an aggregate principal amount not exceeding $~~2,000,000~~**1,000,000** at any time outstanding (as such amount may be increased with the consent of the Administrative Agent in its sole and absolute discretion)~~.~~**;**

**(n)     Unsecured Indebtedness incurred under the "paycheck protection program" under Section 1102 of the CARES Act (as in effect on the Amendment No. 2 Effective Date) in an aggregate principal amount not exceeding $5,850,000; and**

**(o)     Indebtedness incurred under a Qualified Junior Facility, so long as the proceeds of such Indebtedness are used to repay all of the outstanding Tranche B Obligations.**

Section 6.03     Liens, Etc. No Borrower Group Member shall create, incur, assume or suffer to exist any Lien upon or with respect to any of its properties of any character (including accounts receivables) whether now owned or hereafter acquired, or assign any accounts or other right to receive income, other than (each of the following, a "Permitted Lien"):

(a)     Liens arising by reason of:

(i)     Taxes either secured by a bond or which are not yet due or which are being contested pursuant to the Permitted Contest Conditions;

(ii)     security, pledges or deposits in the ordinary course of business for payment of workmen's compensation or unemployment insurance or other types of social security benefits; and

(iii)     good faith deposits or pledges incurred or created in connection with or to secure the performance of bids, tenders, contracts (other than contracts for the payment of money), leases, statutory obligations, surety bonds or appeal bonds entered into in the ordinary course of business or under Applicable Law;

(b)     Liens of mechanics, carriers, landlords, warehousemen, materialmen, laborers, repairmen's, employees or suppliers or any similar Liens arising by operation of law, incurred in the ordinary course of business with respect to obligations which are not overdue by more than forty-five (45) days, or which are adequately bonded and which are being contested pursuant to the Permitted Contest Conditions;

(c)     Liens arising out of judgments, orders or awards that have been adequately bonded, are fully covered by insurance (subject to applicable deductibles) or with respect to which a stay of execution has been obtained pending an appeal or proceeding for review pursuant to the Permitted Contest Conditions;

(d)     Liens arising with respect to zoning restrictions, easements, licenses, reservations, covenants, rights-of-way, utility easements, building restrictions and other similar charges or encumbrances on the use of real property which, individually or in the aggregate, do not materially detract from the value of the affected property and do not materially interfere with the ordinary conduct of the business of such Borrower Group Member;

(e)     Liens or the interests of lessors to secure purchase money obligations permitted under Section 6.02(b); provided that such Lien encumbers only the specific goods, equipment or software so financed, any accessions thereto, proceeds thereof and related books and records;

(f)     Liens arising under ERISA and Liens arising under the US Code with respect to an employee benefit plan (as defined in Section 3(2) of ERISA) that do not constitute an Event of Default under Section 7.01(i);

(g)     to the extent constituting Liens, leases, licenses, subleases or sublicenses granted to others in the ordinary course of business that do not (i) interfere in any material respect with the ordinary conduct of the Business of the Borrower Group Members, (ii) secure any Indebtedness or (iii) individually or in the aggregate detract from the expected value of the property of the Borrower Group Members in any material respect;

(h)     (i) Liens arising solely by virtue of any statutory or common law provision relating to banker's liens, rights of set-off or similar rights and remedies and burdening only deposit accounts or other funds maintained with a creditor depository institution, in each case, granted in the ordinary course of business in favor of such creditor depositary institution, provided that no such deposit account is a dedicated cash collateral account or is subject to restrictions against access by the depositor in excess of those set forth by regulations promulgated by the Board and no such deposit account is intended by Borrower to provide collateral to the depository institution and (ii) Liens in favor of a banking or other financial institution arising as a matter of law or in the ordinary course of business under customary general terms and conditions encumbering deposits or other funds maintained with a financial institution (including the right of setoff) and that are within the general parameters customary in the banking industry or arising pursuant to such banking institution's general terms and conditions;

(i)     any Lien on any property or asset of the Borrower or any of its Subsidiaries existing on the Closing Date and set forth in Schedule 6.03; provided that such Lien shall not apply to any other property or asset of the Borrower or any Subsidiary;

(j)     Liens arising under the Financing Documents;

(k)     Liens, securing obligations under any Permitted Revolving Facility, on the applicable Borrower Group Members' (i) accounts or proceeds arising from the sale of inventory

82

or the provision of services, (ii) segregated proceeds of the foregoing (including any deposit accounts, securities accounts or commodities accounts holding solely such proceeds), and (iii) books and records relating to the foregoing;

(l)    Liens on the assets and properties of the Non-Guarantor Subsidiaries incurred pursuant to the Bond Documents;

(m)    cash collateral arrangements with respect to letters of credit issued in accordance with Section 6.02(k);

(n)    Liens on the assets and properties of the Non-Guarantor Subsidiaries securing Indebtedness permitted in reliance on Section 6.02(j);

(o)    Liens consisting of Investments permitted in reliance on Section 6.04(j);

(p)    Liens that extend, renew or replace in whole or in part a Lien referred to above.**; and**

**(q)    to the extent the conditions set forth in the definition of "Qualified Junior Facility" are satisfied, junior Liens in favor of the holder of any Indebtedness incurred under such Qualified Junior Facility.**

Section 6.04    Investments.  No Borrower Group Member shall make any Investment, except:

(a)    cash equity investments and/or **equity** contributions made by a Loan Party to a Non-Guarantor Subsidiary ~~solely~~ **either (i)** to the extent such investment or contribution is made using the direct or indirect cash proceeds of the issuance of additional shares of Capital Stock of Borrower in exchange for cash after the Closing Date; provided that, at the time of such issuance, no Event of Default is continuing**; and so long as no Tranche B Obligations are outstanding; and (ii) $10,000,000 from proceeds of the Niagara Promissory Note and the Tranche B  Loans, which shall be contributed within three (3) Business Days of the Amendment No. 2 Effective Date to CL P;**

(b)    (i) intercompany loans among the Borrower Group Members, to the extent unsecured and pledged to the Collateral Agent, for the benefit of the Secured Parties, under the Security Agreement **(provided, that any intercompany loans from the Loan Parties to any Non-Guarantor Subsidiary on or after the Amendment No. 2 Effective Date shall be subject to the approval of the Administrative Agent (not to be unreasonably withheld, conditioned or delayed))**, and (ii) Investments between Loan Parties;

(c)    (i) Cash Equivalent Investments and (ii) bank deposits in the ordinary course of business;

(d)    deposits described in Section 6.03(a)(ii);

(e)    Investments consisting of extensions of credit in the nature of deposits, accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of

business, and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors to the extent reasonably necessary in order to prevent or limit loss;

(f)    non-cash consideration received, to the extent permitted by the Financing Documents, in connection with the Disposition of property permitted by this Agreement;

(g)    Investments listed on Schedule 6.04 as of the Closing Date;

(h)    discounts given to customers of any Loan Party in the ordinary course of business;

(i)    Investments by any Non-Guarantor Subsidiary in accordance with the Bond Documents; and

(j)    Investments consisting of security deposits with utilities, landlords and other like Persons made in the ordinary course of business.

Section 6.05    Chief Executive Office; Business Activities.

(a)    Each Loan Party shall maintain its chief executive office at the address specified in Section 10.01, and no such Person shall change such chief executive office unless it has given at least ten (10) days' prior notice thereof to the Administrative Agent and the Collateral Agent, and each Loan Party has taken all steps then required pursuant to the Security Agreements to ensure the maintenance and perfection of the security interests created or purported to be created thereby.

(b)    No Borrower Group Member shall at any time to any material extent conduct any activities other than (i) those related to the Business and the other Material Agreements and any activities incidental to the foregoing and (ii) in the case of any Non-Guarantor Subsidiary, those not prohibited by the Bond Documents.

**Section 6.06**    Restricted Payments.    No Borrower Group Member shall declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment other than:

(a)    Dividends, distributions or other payments in respect of Investments by any Borrower Group Member to any Loan Party;

(b)    any Loan Party may declare and pay dividends with respect to its equity interests payable solely in additional shares of its common stock;

(c)    any Loan Party may make Restricted Payments pursuant to and in accordance with stock option plans or other benefit plans for management or employees of the Borrower, including repurchases of equity interests of any nature from employees of any Borrower Group Member or from officers and/or directors of Borrower, provided that the aggregate amount thereof does not exceed $100,000 during any fiscal year;

(d)    any Loan Party may make any payment pursuant to Section 6.10 so long as any such payments are in compliance with the Operating Budget (subject to any variance permitted

pursuant to Section 5.20), it being understood that any amounts that are not contemplated by, or included in, the Operating Budget are not permitted to be made;

(e)       the Loan Parties may make payments on (i) the Shareholder Notes, so long as (A) the amount of such payments under Shareholder Notes (other than **with** any DSR Released Funds and any **Net** Additional Equity Raise Amounts) do not exceed $200,000 per year, (B) except in the case of any **payment with** DSR Released Funds or any **Net** Additional Equity Raise Amounts, such amounts are paid quarterly, (C) except in the case of any **payment with** DSR Released Funds or any **Net** Additional Equity Raise Amounts, such payment amounts do not exceed 25% of the annual interest outstanding on such Indebtedness, (D) except in the case of any **payment with** DSR Released Funds or any **Net** Additional Equity Raise Amounts, the full amount of the Interest Rate payable hereunder that is payable in cash (subject to the ~~Borrower's~~**Borrower's** rights to pay in kind in Section 2.07) has been paid in cash through the date of such payment and (E)  no Default, Event of Default or Material Adverse Effect has occurred and is continuing or would result from such Restricted Payment (provided, that the foregoing shall not restrict payment on any Shareholder Notes (including Additional Shareholder Notes) using **Net** Additional Equity Raise Amounts), and (ii) the Loan Parties may make payments on the Pennsylvania Intercompany Indebtedness and the Texas Intercompany Indebtedness from **Net** Additional Equity Raise Amounts, so long as no Default, Event of Default or Material Adverse Effect has occurred and is continuing or would result from such Restricted Payment; **provided, that notwithstanding anything to the contrary above, payments on Shareholder Notes with any Net Additional Equity Raise Amounts are permitted only after the Tranche B Obligations are satisfied in cash in full;**

(f)       Permitted Tax Distributions so long as (x) no Default, Event of Default or Material Adverse Effect has occurred and is continuing or would result from such Restricted Payment and (y) the Administrative Agent shall have received reasonably detailed calculations of the amount of any such Permitted Tax Distribution proposed to be made (which calculations shall be in form and substance reasonably satisfactory to the Administrative Agent); and

(g)       Restricted Payments made by any Non-Guarantor Subsidiary to any Loan Party that are not prohibited by the Bond Documents; and

(h)       Restricted Payments among Loan Parties.

Section 6.07    Fundamental Changes; Asset Dispositions.  No Borrower Group Member shall:

(a)       in one transaction or a series of transactions, merge into or consolidate with, or acquire all or any substantial part of the assets or any class of stock or other ownership interests of, any other Person or sell, transfer or otherwise Dispose of all or substantially all of its assets to any other Person; provided that (i) the Borrower may participate in a merger or consolidation with any Person if (w) no Default is continuing, (x) any such merger or consolidation would not cause a Default hereunder, (y) if the Borrower merges or consolidates with any Person, the Borrower shall be the surviving Person and (z) such merger is approved by the Administrative Agent in its reasonable discretion; (ii) any Subsidiary may participate in a merger or consolidation with the Borrower (provided that the Borrower shall be the continuing or surviving

corporation); and (iii) any Non-Guarantor Subsidiary may do any of the foregoing to the extent not prohibited by the Bond Documents;

(b)      change its legal form, liquidate or dissolve (provided that any Non-Guarantor Subsidiary may do any of the foregoing to the extent not prohibited by the Bond Documents);

(c)      make or agree to make any amendment to its Organizational Documents to the extent that such amendment could reasonably be expected to be materially adverse to the interests of the Agents or the Lenders;

(d)      [Reserved];

(e)      Dispose of, in one transaction or a series of transactions, all or any part of the property owned by the Borrower Group Members in excess of $1,000,000 per year in the aggregate other than: (i) sales or other Dispositions of equipment (either worn out or defective, or no longer used or useful, or to be replaced with improved equipment) for fair market value to the extent that the Borrower reinvests the Net Available Amount (or any portion thereof) of any such Disposition in substantially similar assets that are necessary or useful for the Business pursuant to a transaction not prohibited hereunder and such Net Available Amount is so reinvested within one hundred eighty (180) days (or been made the subject of a firm purchase order placed within such time period) of such Disposition; (ii) Dispositions of assets, including equity interests, from any Loan Party to any other Loan Party, (iii) Dispositions of cash and Cash Equivalent Investments in the ordinary course of business and for fair market value, (iv) licensing of Intellectual Property in the ordinary course of business, so long as it does not interfere in any material respect with the ordinary conduct of the Business of the Borrower Group Members, (v) the sale of inventory (if any) in ordinary course of business and (vi) dispositions of direct or indirect proceeds of the issuance of additional shares of Capital Stock of Borrower in exchange for cash after the Closing Date (provided that, at the time of such issuance, no Event of Default is continuing).  For the avoidance of doubt, maintenance capital expenditures treated as a disposition for accounting purposes shall not be subject to this clause (e) solely by virtue of such accounting treatment.

Section 6.08    Accounting Changes.  No Loan Party shall change its fiscal year.

Section 6.09    Material Agreements, Bond Documents and Permitted Revolving Facilities.  No Borrower Group Member shall, directly or indirectly:

(a)      amend, modify, supplement or grant a consent, approval or waiver under, or permit or consent to the amendment, modification, supplement, consent, approval or waiver of (collectively, an "Amendment"), (i) any real property lease of any Facility, without the prior written consent of the Administrative Agent (which shall not to be unreasonably withheld, conditioned or delayed), (ii) any Material Agreement that is an offtake agreement, without the prior written consent of the Administrative Agent (which shall not be unreasonably withheld, conditioned or delayed), if such Amendment would (x) be reasonably expected to adversely affect Lenders, or (y) adversely modify any of the repayment terms related to the deposits, (iii) any Bond Document, to the extent that such Amendment would limit the rights of the Non-Guarantor Subsidiaries to make distributions, add indebtedness or liens or take an action

that is currently prohibited thereunder, (iv) any Permitted Revolving Facility in violation of any intercreditor agreement between Agent and the holders of the Indebtedness thereunder;

(b)    **[Reserved];make any voluntary or optional prepayment under the Niagara Promissory Note or make any voluntary or optional prepayment or return of customer deposit inder any Material Agreements, in either case, without the prior written consent of the Administrative Agent;**

(c)    subject to the right of each Borrower Group Member to enter into a Replacement Agreement as set forth in Section 7.01(k), directly or indirectly transfer, terminate, cancel or permit or consent to the transfer, termination or cancellation (including by exercising any contractual option to terminate, or failing to exercise any contractual option to extend) of any Material Agreement without the written consent of the Administrative Agent, such consent not to be unreasonably withheld, conditioned or delayed; or

(d)    enter into an Material Additional Agreement without the prior written consent of the Administrative Agent not to be unreasonably withheld, conditioned or delayed; provided that the entry into any Material Additional Agreement relating to any item contemplated by, and in compliance with, the Operating Budget (subject to any variance permitted pursuant to Section 5.20) shall not require the consent of the Administrative Agent.

Section 6.10    Transactions with Affiliates.    No Borrower Group Member shall directly or indirectly enter into any transaction or series of related transactions with an Affiliate of such Borrower Group Member, except for (a) transactions set forth on Schedule 3.21 hereto and reasonable modifications, renewals or extensions thereto as contemplated by Borrower's Operating Budget (provided that no Loan Party may make any payments with respect to the Pennsylvania Intercompany Indebtedness or the Texas Intercompany Indebtedness except (i) with the consent of the Administrative Agent in its sole and absolute discretion or (ii) in compliance with Section 6.06(e)), (b) transactions in the ordinary course of such Borrower Group Member's (and such Affiliate's) business and upon fair and reasonable terms no less favorable to such Borrower Group Member than it would obtain in comparable arm's-length transactions with a Person acting in good faith which is not an Affiliate, (c) transactions between or among the Borrower Group Members not involving any other Affiliate and (d) any transaction permitted by Section 6.01, 6.02, 6.03, 6.04, 6.06, 6.07 or 6.16.    No Borrower Group Member shall cause a business opportunity of the Loan Parties to be diverted, assigned or allocated to the Non-Guarantor Subsidiaries.

Section 6.11    Collateral Accounts.    No Borrower Group Member shall open or maintain, or instruct any Person to open or maintain, any securities accounts, deposit accounts or other bank accounts other than (i) the Collateral Accounts (each of which shall be subject to a Control Agreement at all times), (ii) Excluded Accounts and (iii) in the case of any Non-Guarantor Subsidiary, any such accounts that are not prohibited by the Bond Documents. Prior to the Discharge Date, no Borrower Group Member shall change (or permit any other Person to change) the name or account number of any Collateral Account without prior written notice to the Collateral Agent.    No amounts may be transferred or withdrawn from any Collateral Account other than in accordance with and as permitted by Section 5.18.

***Section 6.12***    [Reserved]

Section 6.13    <u>Hazardous Materials</u>.  No Loan Party shall cause any Releases of Hazardous Materials at, on, from or under any real property currently or formerly owned, leased or operated by such Borrower Group Member, except to the extent such Release is otherwise in compliance in all material respects with all Applicable Laws, including Environmental Laws, and applicable insurance policies.

Section 6.14    <u>No Hedging or Speculative Transactions</u>.  No Loan Party shall enter into, or suffer to exist, any Hedging Agreement for speculative purposes or any other speculative transaction.

Section 6.15    <u>Change of Auditors</u>.  No Borrower Group Member shall change its Independent Auditor, except (i) with the prior written consent of the Administrative Agent, such consent not to be unreasonably withheld, conditioned or delayed, and (ii) in the case of any Non-Guarantor Subsidiary, to the extent not prohibited by the Bond Documents.

Section 6.16    <u>Purchase of Capital Stock</u>.  No Borrower Group Member shall purchase, redeem or otherwise acquire any of such Borrower Group Member's issued Capital Stock or otherwise reduce its Capital Stock, except (i) as permitted under <u>Section 6.07</u>, and (ii) in the case of any Non-Guarantor Subsidiary, to the extent not prohibited by the Bond Documents; <u>provided</u> that the foregoing shall in no way be construed to limit such Borrower Group Member's ability to make Restricted Payments.

Section 6.17    [Reserved].

Section 6.18    <u>Capital Expenditures</u>.  No Borrower Group Member will make any Capital Expenditures other than (a) the purchase or lease of assets reasonably required for the Business in accordance with the Operating Budget; (b) the purchase or lease of assets reasonably required in connection with the Restoration of the Business to the extent permitted under <u>Section 2.05(b)(ii)</u>; (c) any Capital Expenditures or other investments in assets necessary or useful for the business of the Business from the proceeds of any Disposition not prohibited by <u>Section 6.07(e)</u>; (d) the purchase or lease of assets otherwise required or permitted by the Material Agreements to which it is a party that do not in the aggregate exceed the amount budgeted for such purchases or leases in the Operating Budget (subject to any variance permitted pursuant to <u>Section 5.20</u>), (e) Capital Expenditures with amounts on deposit in the Rejected Proceeds Account; (f) Capital Expenditures in accordance with the Operating Budget (subject to any variance permitted pursuant to <u>Section 5.20</u>); (g) with direct or indirect proceeds of the issuance of additional shares of Capital Stock of Borrower in exchange for cash after the Closing Date; and (h) in the case of any Non-Guarantor Subsidiary, to the extent not prohibited by the Bond Documents.

ARTICLE VII

EVENTS OF DEFAULT

Section 7.01    Events of Default.  If any of the following events ("Events of Default") shall occur:

(a)    the Borrower shall fail to pay any principal of any Loan (including any Accrued Interest that has been added to principal) when and as the same shall become due and payable, whether at the due date thereof or, in the case of payments of principal due pursuant to Section 2.05(b), at a date fixed for prepayment thereof, or otherwise; or

(b)    the Borrower shall fail to pay any other amount (other than an amount referred to in Section 7.01(a)) payable under this Agreement or under any other Financing Document when and as the same shall become due and payable, and such failure shall continue unremedied for a period of five (5) Business Days after the occurrence thereof; or

(c)    any representation or warranty made by or deemed made by any Loan Party in this Agreement or any other Financing Document, or in any certificate furnished to any Secured Party by or on behalf of such Loan Party in accordance with the terms hereof or thereof, shall prove to have been incorrect in any material respect (to the extent not already qualified by materiality) as of the time made or deemed made, confirmed or furnished; unless (i) such incorrect representation or warranty is not that set forth in Section 3.05(b), (ii) the fact, event or circumstance resulting in such incorrect representation or warranty is capable of being changed such that such representation or warranty would be correct in all material respects, (iii) such fact, event or circumstance shall have been changed, within thirty (30) days (or sixty (60) days, if at the end of thirty (30) days the Loan Parties are proceeding with diligence and in good faith to change such fact, event or circumstance) from the earlier of (x) the date an Authorized Representative of any Loan Party obtains knowledge thereof and (y) the date notice is given to any Loan Party, such that such representation or warranty is correct in all material respects by such deadline, and (iv) such fact, event or circumstance (as so changed) would not reasonably be expected to result in a Material Adverse Effect; or

(d)    any Loan Party shall fail to observe or perform any covenant or agreement, as applicable, contained in the following Sections:

(i)    Section 2.05(b)(v) (as to delivery of detailed calculations of the Net Cash Flow amount), Sections 5.01 (as to existence), 5.11(h), 5.13, **5.21(g) through 5.21(l)** or Article VI; or

(ii)    Sections 5.06(a), 5.10(b), 5.10(c), 5.10(h) or 5.20(c) and such failure has continued unremedied for a period of twenty (20) Business Days after the occurrence thereof; or

(iii)    Sections 5.10(e) or 5.10(h) and such failure has continued unremedied for thirty (30) days after the occurrence thereof; or

89

(e)    any Loan Party shall fail, or fail to cause any Non-Guarantor Subsidiary, to observe or perform any covenant, condition or agreement contained in this Agreement or any other Financing Document to which it is a party (other than those specified in Section 7.01(a), (b), (c), (d) or (l)), and such failure shall continue unremedied for a period of thirty (30) days after the earlier of (i) written notice thereof to such Loan Party and (ii) knowledge of such default by an Authorized Representative of any Loan Party; provided that, if (A) such default cannot be cured within such 30-day period, (B) such default is susceptible of cure and (C) the applicable Loan Party is proceeding with diligence and in good faith to cure such default, then such thirty (30) day cure period shall be extended to such date, not to exceed a total of sixty (60) days, as shall be necessary for such Loan Party to diligently cure such default; or

(f)    a Bankruptcy occurs with respect to any Borrower Group Member **or Leon Faranik**; or

(g)    a final non-appealable judgment or order for the payment of money is entered against any Borrower Group Member in an amount exceeding $2,500,000 (exclusive of judgment amounts covered by insurance or bond where the insurer or bonding party has admitted liability in respect of such judgment), and such judgment remains unsatisfied without any procurement of a stay of execution for a period of ninety (90) days or more after the date of entry of judgment; or

(h)    (i) any Security Document (A) is revoked, terminated or otherwise ceases to be in full force and effect (except in connection with its expiration in accordance with its terms in the ordinary course (and not related to any default thereunder) and except to the extent such revocation, termination or cessation is caused by any act or omission of the Agent or the Lenders), or the enforceability thereof shall be challenged in writing by any Borrower Group Member, (B) ceases to provide (to the extent permitted by law and to the extent required by the Financing Documents) a first priority perfected Lien on the assets purported to be covered thereby in favor of the Collateral Agent (other than any Vehicles), free and clear of all other Liens (other than Permitted Liens), except to the extent that such cessation is caused solely and directly by any act or omission by the Agent or the Lenders, or (C) becomes unlawful or is declared void or (ii) any Financing Document (A) is revoked, terminated or otherwise ceases to be in full force and effect (except in connection with its expiration in accordance with its terms in the ordinary course (and not related to any default thereunder) and except to the extent such revocation, termination or cessation is caused any act or omission by the Agent or the Lenders), or (B) becomes unlawful or is declared void; or

(i)    an ERISA Event has occurred which, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect; or

(j)    a Change of Control has occurred; or

(k)

(i)    any Material Agreement relating to material real property rights of any Facility shall at any time for any reason cease to be valid and binding and in full force and effect (in each case, except in connection with its expiration in accordance with its terms in the

ordinary course (and not related to any default thereunder)) on the applicable Material Counterparty; provided that any such event with respect to such Material Agreement shall not be an Event of Default if the applicable Person has, within thirty (30) days after the occurrence of such relevant circumstance, entered into a Replacement Agreement or has received a termination payment that has been offered to prepay the Loans in accordance with Section 2.05(b)(i) in an amount acceptable to the Administrative Agent (in its reasonable discretion); or

(ii)    any Material Agreement which contains a deposit or prepayment to a Borrower Group Member from a customer shall at any time for any reason cease to be valid and binding and in full force and effect (in each case, except in connection with its expiration in accordance with its terms in the ordinary course (and not related to any default thereunder)) on the applicable Material Counterparty; provided that any such event with respect to such Material Agreement shall not be an Event of Default if the applicable Person during the sixty (60) day period following the date that such deposit is required to be paid in full uses commercially reasonable efforts to extend the maturity of the deposit or prepayment liability with respect to such Material Agreement, such that the deposit or prepayment liability shall be amortized over a period of twelve (12) calendar months or longer, or causes the repayment of such deposit with either an **Net** Additional Equity Raise Amount **(so long as no Tranche B Obligations are outstanding)**, or a deposit provided by an Additional Agreement which replaces the Material Agreement so terminated; or

(l)    any Authorization by a Governmental Authority necessary for the execution, delivery and performance of any obligation under the Transaction Documents is terminated or ceases to be in full force or is not obtained, maintained, or complied with, unless such failure (i) could not reasonably be expected to result in a Material Adverse Effect during the cure period (or the additional cure period) under the following clause (ii) and (ii) is remedied within ninety (90) days after the occurrence thereof or such longer period as is necessary, if not fully remedied within such period, as is reasonably required so long as such remediation is diligently pursued in good faith and such default remains susceptible of cure; or

(m)    an uninsured Event of Loss or a Condemnation, in each case with respect to a portion of the property of the Borrower Group Members in excess of $7,500,000 in value shall occur; or

(n)    (i) the abandonment by any Loan Party of all or a material portion of its activities to operate or maintain the Business, which abandonment shall be deemed to have occurred if any Loan Party fails to operate any material part of the Business for a period of thirty (30) or more consecutive days; provided that any such failure to operate the Business caused by an Event of Loss or other force majeure event shall not constitute a Material Adverse Effect so long as, to the extent feasible during such Event of Loss or other force majeure event, the Borrower is diligently attempting to restart operation of the Business, or (ii) the written announcement by any Loan Party of its intention to do any of the foregoing in clause (i); or

(o)    any Loan Party shall default in any material respect in the observance or performance of any Material Agreement or material condition contained in the Observer Rights

Agreement and such material default shall continue after the expiration of any cure period therefor; **or**

(p)    any Borrower Group Member shall (i) default in making any payment of any principal, interest or premium of **(x)** any Indebtedness (excluding the Obligations) the outstanding principal amount of which exceeds at such time $3,500,000 **or (y) the Niagara Promissory Note (such Indebtedness in clauses (x) and (y),** "Material Indebtedness") on the scheduled or original due date with respect thereto, in each case, beyond any grace periods applicable thereto; or (ii) default in the observance or performance of any other agreement or condition relating to any such Indebtedness (excluding the Obligations) or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist, in each case, beyond any grace periods applicable thereto, the effect of which default or other event or condition is to cause, or to permit the holder or beneficiary of Material Indebtedness (or a trustee or agent on behalf of such holder or beneficiary) to cause, with or without the giving of notice, the lapse of time or both, such Material Indebtedness to become due prior to its stated maturity or to become subject to a mandatory offer to purchase by the obligor thereunder or (in the case of any such Indebtedness constituting a Guarantee) to become payable; or

(q)    any party to any Subordination Agreement **or the Unconditional Guaranty** (other than any Agent) shall default in the observance or performance of any agreement or condition contained therein, and such default has continued unremedied for the greater of (x) ten (10) days after the occurrence thereof or (y) any grace period therefor specified therein; **or**

then, and in every such event (other than an event with respect to a Borrower Group Member described in Section 7.01(f)), and at any time thereafter during the continuance of such event, the Administrative Agent shall by notice to the Borrower, take any or all of the following actions, at the same or different times:   (i) terminate the Commitments, and thereupon the Commitments shall terminate immediately; and (ii) declare the Loans and all other amounts due under the Financing Documents (including the **Tranche A** Prepayment Premium **or Tranche B Minimum Return**, if applicable) then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all reimbursements, fees and other obligations of the Borrower accrued hereunder or under the Financing Documents (including the **Tranche A** Prepayment Premium **or Tranche B Minimum Return**, if applicable), shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Loan Parties; and in case of any event with respect to a Borrower Group Member described in Section 7.01(f), the Commitments shall automatically terminate and the principal of the Loans then outstanding, together with accrued interest thereon and all reimbursements, fees and other obligations of the Borrower accrued hereunder and under the Financing Documents (including the **Tranche A** Prepayment Premium **or Tranche B Minimum Return**, if applicable), shall automatically become due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Loan Parties.   Upon the occurrence and during the continuance of any Event of Default, in addition to the exercise of remedies set forth above in this paragraph, each Secured Party shall be, subject to the terms of the Security Agreement, entitled to exercise the rights and remedies

available to such Secured Party under and in accordance with the provisions of the other Financing Documents to which it is a party or any Applicable Law. For the purpose of enabling the Collateral Agent to exercise the rights and remedies under this <u>Section 7.01</u> (including in order to take possession of, collect, receive, assemble, process, appropriate, remove, realize upon, sell, assign, license out, convey, transfer or grant options to purchase any Collateral) at such time as the Collateral Agent shall be lawfully entitled to exercise such rights and remedies, each Loan Party hereby grants to the Collateral Agent, for the benefit of the Collateral Agent and each other Secured Party, a nonexclusive and assignable license (exercisable without payment of royalty or other compensation to such Loan Party), subject, in the case of Intellectual Property licenses, to the terms of the applicable license, and subject, in the case of Trademarks, to sufficient rights to quality control and inspection in favor of such Loan Party to avoid the risk of invalidation of such Trademarks, to use, practice, license, sublicense, and otherwise exploit any and all Intellectual Property now owned or held or hereafter acquired or held by such Loan Party.

Section 7.02    <u>Application of Proceeds</u>. The proceeds of any collection, sale or other realization of all or any part of the Collateral (including any amount in the Collateral Accounts**, but excluding any proceeds in respect of the Unconditional Guaranty**) shall be applied in the following order of priority:

      (a) <u>first</u>, to any fees, costs, charges, expenses and indemnities then due and payable to Administrative Agent and Collateral Agent under any Financing Document *pro rata* based on such respective amounts then due to such Persons;

      (b) <u>second</u>, to the respective outstanding fees, costs, charges, expenses and indemnities then due and payable to the other Secured Parties under any Financing Document *pro rata* based on such respective amounts then due to such Persons;

      (c) <u>third</u>, to any accrued but unpaid interest on the **Tranche A** Obligations owed to the Secured Parties pro rata based on such respective amounts then due to the Secured Parties;

      (d) <u>fourth</u>, to any principal amount of the **Tranche A** Obligations owed to the Secured Parties pro rata based on such respective amounts then due to the Secured Parties;

      (e) <u>fifth</u>, to any other unpaid **Tranche A** Obligations then due and payable to Secured Parties, *pro rata* based on such respective amounts then due to the Secured Parties; and

      **(f) sixth, to any accrued but unpaid interest on the Tranche B Obligations owed to the Secured Parties pro rata based on such respective amounts then due to the Secured Parties;**

      **(g) seventh, to any principal amount of the Tranche B Obligations owed to the Secured Parties pro rata based on such respective amounts then due to the Secured Parties;**

**(h) eighth, to any other unpaid Tranche B Obligations then due and payable to Secured Parties, *pro rata* based on such respective amounts then due to the Secured Parties; and**

**(i)** ~~(f) sixth~~**ninth**, after final payment in full of the amounts described in clauses *first* through ~~*fifth*~~*eighth* above and the Discharge Date shall have occurred, to the Borrower or as otherwise required by Applicable Law.

It is understood that the Loan Parties shall remain liable to the extent of any deficiency between the amount of the proceeds of the Collateral and the aggregate of the sums referred to in clauses *first* through ~~*fifth*~~*eighth* above.

**The proceeds of any collection, sale or other realization of all or any part of the Unconditional Guaranty shall be applied in the following order of priority:**

**(a) first, to any accrued but unpaid interest on the Tranche B Obligations owed to the Secured Parties pro rata based on such respective amounts then due to the Secured Parties;**

**(b) second, to any principal amount of the Tranche B Obligations owed to the Secured Parties pro rata based on such respective amounts then due to the Secured Parties; and**

**(c) third, to any other unpaid Tranche B Obligations then due and payable to Secured Parties, *pro rata* based on such respective amounts then due to the Secured Parties;**

**It is understood that the Loan Parties shall remain liable to the extent of any deficiency between the amount of the proceeds of the Unconditional Guaranty and the aggregate of the sums referred to in clauses *first* through *third* above.**

## ARTICLE VIII

## THE AGENTS

Section 8.01    Appointment and Authorization of the Agents.

(a)    Each of the Lenders hereby irrevocably appoints each Agent to act on its behalf as its agent hereunder and under the other Financing Documents and authorizes each Agent in such capacity, to take such actions on its behalf and to exercise such powers as are delegated to it by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto.  Each Agent, by executing this Agreement, hereby accepts such appointment.

(b)    Each Agent is hereby authorized to execute, deliver and perform each of the Transaction Documents to which such Agent is intended to be a party.  Each Agent hereby agrees, and each Lender hereby authorizes such Agent, to enter into the amendments and other modifications of the Security Documents (subject to Section 10.02(b)).

94

Section 8.02    <u>Rights as a Lender</u>.  Each Agent shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not an Agent, and such Person and its Affiliates may accept deposits from, lend money to and generally engage in any kind of business with the Borrower or any of Subsidiary or other Affiliate thereof as if it were not an Agent hereunder.

Section 8.03    <u>Duties of Agent; Exculpatory Provisions</u>.  No Agent shall have any duties or obligations except those expressly set forth herein and in the other Financing Documents. Without limiting the generality of the foregoing, no Agent (a) shall be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred and is continuing, (b) shall have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Financing Documents that such Agent is required to exercise, and (c) shall, except as expressly set forth herein and in the other Financing Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Subsidiaries that is communicated to or obtained by the financial institution serving as an Agent or any of its Affiliates in any capacity.  No Agent shall be liable for any action taken or not taken by it with the consent or at the request of the Lenders or in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction in a final, non-appealable decision.  No Agent shall be deemed to have knowledge of any Default or Event of Default unless and until written notice thereof is given to such Agent by the Borrower or a Lender, and no Agent shall be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Financing Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Financing Document or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in <u>Article IV</u> or elsewhere herein or therein, other than to confirm receipt of items expressly required to be delivered to such Agent.

Section 8.04    <u>Reliance by Agent</u>.  Each Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing believed by it to be genuine and to have been signed or sent by the proper Person.  Each Agent also may rely upon any statement made to it orally or by telephone and believed by it to be made by the proper Person, and shall not incur any liability for relying thereon.  Each Agent may consult with legal counsel, independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

Section 8.05    <u>Delegation of Duties</u>.  Each Agent may perform any and all its duties and exercise its rights and powers by or through any one or more sub-agents appointed by such Agent.  Each Agent and any such sub-agent may perform any and all its duties and exercise its rights and powers through their respective Related Parties.  The exculpatory provisions of the preceding paragraphs shall apply to any such sub-agent and to the Related Parties of each Agent and any such sub-agent, and shall apply to their respective activities as well as activities as each Agent.

Section 8.06    <u>Withholding of Taxes by the Administrative Agent; Indemnification</u>.    To the extent required by any Applicable Law, the Administrative Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding Taxes.  If any Governmental Authority asserts a claim that the Administrative Agent did not properly withhold Taxes from amounts paid to or for the account of any Lender because the appropriate form was not delivered or was not properly executed or because such Lender failed to notify the Administrative Agent of a change in circumstance which rendered the exemption from, or reduction of, withholding Taxes ineffective or for any other reason, or if the Administrative Agent reasonably determines that a payment was made to a Lender pursuant to this Agreement without deduction of applicable withholding tax from such payment, such Lender shall promptly indemnify the Administrative Agent fully for all amounts paid, directly or indirectly, by Administrative Agent as Taxes or otherwise, including any penalties or interest and together with all expenses (including legal expenses, allocated internal costs and out-of-pocket expenses) incurred. Each Lender shall severally indemnify the Administrative Agent, within ten (10) days after demand therefor, for (i) any Indemnified Taxes attributable to such Person (but only to the extent that the Borrower has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Borrower to do so), (ii) any Taxes attributable to such Person's failure to comply with the provisions of <u>Section 10.04(f)</u> relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Person, in each case, that are payable or paid by the Administrative Agent in connection with any Financing Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Financing Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this <u>Section 8.06</u>.

Section 8.07    <u>Resignation of Agent</u>.  Each Agent may resign at any time upon thirty (30) days' notice by notifying the Lenders and the Borrower, and the Collateral Agent may be removed at any time by the Administrative Agent (with a prior written notice to the Borrower).  Upon any such resignation or removal, the Administrative Agent shall have the right, with the consent of the Borrower (such consent not to be unreasonably withheld), to appoint a successor.  If no successor shall have been so appointed by the Administrative Agent and approved by the Borrower and shall have accepted such appointment within thirty (30) days after the retiring Agent gives notice of its resignation or after the Administrative Agent's removal of the retiring Collateral Agent, then the retiring Agent may, on behalf of the Lenders, appoint a successor Agent, which shall be a Lender with an office in New York, New York, an Affiliate of a Lender or a financial institution with an office in New York, New York having a combined capital and surplus that is not less than $250,000,000.  Upon the acceptance of its appointment as Agent hereunder by a successor, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring (or retired) Agent and the retiring Agent shall be discharged from its duties and obligations hereunder (if not already discharged therefrom as provided above in this paragraph).  The reimbursements and fees payable by the Borrower to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor.  After the Agent's resignation or removal hereunder,

the provisions of this Article and Section 10.03 shall continue in effect for its benefit in respect of any actions taken or omitted to be taken by it while it was acting as Agent.

Section 8.08    Non-Reliance on Agent or Other Lenders.  Each Lender acknowledges that it has, independently and without reliance upon any Agent, the Affiliates of any Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender also acknowledges that it will, independently and without reliance upon any Agent, the Affiliates of any Agent or any other Lender and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Financing Document or any related agreement or any document furnished hereunder or thereunder.

Section 8.09    No Other Duties; Etc.The parties agree that neither the Administrative Agent nor the Collateral Agent shall have any obligations, liability or responsibility under or in connection with this Agreement and the other Financing Documents and that none of the Agents shall have any obligations, liabilities or responsibilities except for those expressly set forth herein and in the other Financing Documents.  The Collateral Agent shall have all of the rights (including indemnification rights), powers, benefits, privileges, exculpations, protections and immunities granted to the Collateral Agent under the other Financing Documents, all of which are incorporated herein *mutatis mutandis*.

## ARTICLE IX

## GUARANTY

Section 9.01    Guaranty.

(a)    For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Guarantor hereby unconditionally and irrevocably, jointly and severally, Guarantees the full and punctual payment and performance (whether at stated maturity, upon acceleration or otherwise) of all Guaranteed Obligations, in each case as primary obligor and not merely as surety and with respect to all such Guaranteed Obligations howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, now or hereafter existing, or due or to become due. This is a guaranty of payment and not merely of collection.

(b)    All payments made by any Guarantor under this Article IX shall be payable in the manner required for payments by the Borrower hereunder, including: (i) the obligation to make all such payments in Dollars, free and clear of, and without deduction for, any Taxes, and subject to the gross-up and indemnity as provided under Section 2.09, (ii) the obligation to pay interest at the Post-Default Rate and (iii) the obligation to pay all amounts due under the Loans in Dollars.

(c)    Any term or provision of this guaranty to the contrary notwithstanding the aggregate maximum amount of the Guaranteed Obligations for which such Guarantor shall be liable under this guaranty shall not exceed the maximum amount for which such Guarantor can be liable without rendering this guaranty or any other Financing Document, as it relates to such

Guarantor, void or voidable under Applicable Law relating to fraudulent conveyance or fraudulent transfer.

Section 9.02    Guaranty Unconditional. The Guaranteed Obligations shall be unconditional and absolute and, without limiting the generality of the foregoing, shall not be released, discharged or otherwise affected by:

(a)    any extension, renewal, settlement, compromise, waiver or release in respect of any obligations of any Loan Party under the Financing Documents and/or any Commitments under the Financing Documents, by operation of law or otherwise (other than with respect to any such extension, renewal, settlement, compromise, waiver or release agreed in accordance with the terms hereunder as expressly applying to the Guaranteed Obligations),

(b)    any modification or amendment of or supplement to this Agreement or any other Financing Document (other than with respect to any modification, amendment or supplement agreed in accordance with the terms hereunder as expressly applying to the Guaranteed Obligations),

(c)    any release, impairment, non-perfection or invalidity of any Collateral,

(d)    any change in the corporate existence, structure or ownership of any Loan Party or any other Person, or any event of the type described in Sections 5.01, 6.01 or 6.07 with respect to any Person,

(e)    the existence of any claim, set-off or other rights that any Guarantor may have at any time against any Loan Party, any Secured Party or any other Person, whether in connection herewith or with any unrelated transactions,

(f)    any invalidity or unenforceability relating to or against any Loan Party for any reason of any Financing Document, or any provision of Applicable Law purporting to prohibit the performance by any Loan Party of any of its obligations under the Financing Documents (other than any such invalidity or unenforceability with respect solely to the Guaranteed Obligations),

(g)    the failure of any Material Counterparty to make payments owed to any Loan Party, or

(h)    any other act or omission to act or delay of any kind by any Loan Party, any Secured Party or any other Person or any other circumstance whatsoever that might, but for the provisions of this Section 9.02, constitute a legal or equitable discharge of the obligations of any Loan Party under the Financing Documents.

Section 9.03    Discharge Only Upon Payment in Full; Reinstatement in Certain Circumstances. The Guaranteed Obligations shall remain in full force and effect until all of the Borrower's obligations under the Financing Documents shall have been paid or otherwise performed in full and all of the Commitments shall have terminated. If at any time any payment made under this Agreement or any other Financing Document is rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy, reorganization or similar event of any Loan Party or

any other Person or otherwise, then the Guaranteed Obligations with respect to such payment shall be reinstated at such time as though such payment had been due but not made at such time.

Section 9.04    Waiver by the Guarantors.

(a)    Each Guarantor hereby irrevocably and unconditionally waives, to the fullest extent permitted by Applicable Law: (i) notice of acceptance of the guaranty provided in this Article IX and notice of any liability to which this guaranty may apply, (ii) all notices that may be required by Applicable Law or otherwise to preserve intact any rights of any Secured Party against any Loan Party, including any demand, presentment, protest, proof of notice of non-payment, notice of any failure on the part of any Loan Party to perform and comply with any covenant, agreement, term, condition or provision of any agreement and any other notice to any other party that may be liable in respect of the Guaranteed Obligations (including any Loan Party) except any of the foregoing as may be expressly required hereunder, (iii) any right to the enforcement, assertion or exercise by any Secured Party of any right, power, privilege or remedy conferred upon such Person under the Financing Documents or otherwise and (iv) any requirement that any Secured Party exhaust any right, power, privilege or remedy, or mitigate any damages resulting from any Default or Event of Default under any Financing Document, or proceed to take any action against any Collateral or against any Loan Party or any other Person under or in respect of any Financing Document or otherwise, or protect, secure, perfect or ensure any Lien on any Collateral.

(b)    Each Guarantor agrees and acknowledges that the Administrative Agent and each holder of any Guaranteed Obligations may demand payment of, enforce and recover from any Guarantor or any other Person obligated for any or all of such Guaranteed Obligations in any order and in any manner whatsoever, without any requirement that the Administrative Agent or such holder seek to recover from any particular Guarantor or other Person first or from any Guarantors or other Persons *pro rata* or on any other basis.

Section 9.05    Subrogation.    Upon any Guarantor making any payment under this Article IX, such Guarantor shall be subrogated to the rights of the payee against the Borrower with respect to such obligation; provided that no Guarantor shall enforce any payment by way of subrogation, indemnity, contribution or otherwise, or exercise any other right, against any Loan Party (or otherwise benefit from any payment or other transfer arising from any such right) so long as any obligations under the Financing Documents (other than on-going but not yet incurred indemnity obligations) remain unpaid and/or unsatisfied.

Section 9.06    Acceleration.    All amounts then subject to acceleration under Section 7.01 of this Agreement shall be payable by the Guarantors hereunder immediately upon demand by the Administrative Agent.

## ARTICLE X

## MISCELLANEOUS

Section 10.01 Notices.    Except as otherwise expressly provided herein or in any Financing Document, all notices and other communications provided for hereunder or thereunder shall be

(i) in writing and (ii) sent by overnight courier (if for inland delivery) or international courier (if for overseas delivery); provided, that such notice or communication may be sent by email so long as (x) such email or electronic transmission is promptly followed by a communication or notice in sent in accordance with (i) and (ii) above, (y) any Loan Party is delivering documents and information required to be provided under Article IV, Article V or Article VI, or (z) the express terms of any Financing Document permit electronic transmissions, in each case, to a party hereto at its address and contact number specified below, or at such other address and contact number as is designated by such party in a written notice to the other parties hereto:

    (a)    Borrower or Guarantors:

> CarbonLite Holdings, LLC
> 10250 Constellation Boulevard, Suite 2820
> Los Angeles, CA 90067
> Attention: both Leon Farahnik, Chief Executive Officer; and Gregg Milhaupt
> Email: both lfarahnik@hpcindustries.com; and gregg@carbonliterecycling.com

> With a copy to:

> Reed Smith LLP
> 1901 Avenue of Stars
> Suite 700
> Los Angeles, CA 90067-6078
> Attention: Moshe Kupietzky
> Email: MKupietzky@reedsmith.com

    (b)    Administrative Agent and Collateral Agent:

> Orion Energy Partners Investment Agent, LLC
> ~~350 Fifth~~**292 Madison** Avenue ~~#6740~~**, Suite 2500**
> New York, NY 10118
> Attention: Gerrit Nicholas, Chris Leary and Mark Friedland
> Email: Gerrit@OrionEnergyPartners.com;
> Chris@OrionEnergyPartners.com;
> Mark@OrionEnergyPartners.com**;**
> **CarbonLiteDealTeam@orionenergypartners.com**

    (c)    If to a Lender, to it at its address (mail or email) set forth in its Administrative Questionnaire.

All notices and communications shall be effective when received by the addressee thereof during business hours on a Business Day in such Person's location as indicated by such Person's address in paragraphs (a) to (c) above, or at such other address as is designated by such Person in a written notice to the other parties hereto.

US-DOCS\~~109334811.27~~117632562.13

Section 10.02  <u>Waivers; Amendments</u>.

(a)     <u>No Deemed Waivers; Remedies Cumulative</u>.  No failure or delay on the part of any Agent or any Lender in exercising any right, power or privilege hereunder or under any other Financing Document and no course of dealing between any Loan Party, or any of the Borrower's Affiliates, on the one hand, and any Agent or Lender on the other hand, shall impair any such right, power or privilege or operate as a waiver thereof; nor shall any single or partial exercise of any right, power or privilege hereunder or under any other Financing Document preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder or thereunder.  The rights, powers and remedies herein or in any other Financing Document expressly provided are cumulative and not exclusive of any rights, powers or remedies which any party thereto would otherwise have.  No notice to or demand on the Borrower in any case shall entitle the Borrower to any other or further notice or demand in similar or other circumstances or constitute a waiver of the rights of any Agent or any Lender to any other or further action in any circumstances without notice or demand.

(b)     <u>Amendments</u>.  No amendment or waiver of any provision of this Agreement or any other Financing Document (other than any Security Document, each of which may only be waived, amended or modified in accordance with such Security Document), and no consent to any departure by the Borrower shall be effective unless in writing signed by the Administrative Agent and the Borrower; <u>provided</u> that no such amendment, waiver or consent shall change the *pro rata* agreements in Section 7.02 without the consent of each Lender affected thereby, and <u>provided</u> <u>further</u> that (A) no amendment, waiver or consent shall, without the written consent of the relevant Agent, affect the rights or duties of such Agent under this Agreement or any other Financing Document and (B) any separate reimbursement or fee agreement between the Borrower and the Administrative Agent in its capacity as such or between the Borrower and the Collateral Agent in its capacity as such may be amended or modified by such parties.  Notwithstanding anything herein to the contrary, (x) the Loan Parties and the Collateral Agent may (but shall not be obligated to) amend or supplement any Security Document without the consent of the Administrative Agent to cure any ambiguity, defect or inconsistency which is not material, or to make any change that would provide any additional rights or benefits to the Lenders and (y) any Loan Party may amend, modify or supplement any annexes or schedules to the Security Documents as expressly provided therein (without the consent of any Agent, Lender or other secured party).

Section 10.03  <u>Expenses; Indemnity; Etc.</u>

(a)     <u>Costs and Expenses</u>.  The Borrower agrees to pay or reimburse each of the Agents and the Lenders for:  (i) all reasonable and documented out-of-pocket costs and expenses of the Agents and the Lenders (including the reasonable fees and expenses of Latham & Watkins LLP, New York counsel to the Administrative Agent and the Collateral Agent, and experts engaged by the Agents and the Lenders from time to time) in connection with (A) the negotiation, preparation, execution, delivery and performance of this Agreement and the other Financing Documents and the extension of credit under this Agreement (whether or not the transaction contemplated hereby and thereby shall be consummated) or (B) any amendment, modification or waiver of any of the terms of this Agreement or any other Financing Documents, (ii) all reasonable and documented out-of-pocket costs and expenses of the Lenders (including payment

of the fees and reimbursements provided for herein) and the Agents (including reasonable and documented outside counsels' fees and expenses and reasonable and documented outside experts' fees and expenses) in connection with (A) any Default or Event of Default and any enforcement or collection proceedings resulting from such Default or Event of Default or in connection with the negotiation of any restructuring or "work-out" (whether or not consummated) of the obligations of the Borrower under this Agreement or the obligations of any Material Counterparty under any other Financing Document or Material Agreement and (B) the enforcement of this Section 10.03 or the preservation of their respective rights (provided that such counsel fees Lenders shall limited to one counsel for all Lenders), (iii) all costs, expenses, Taxes, assessments and other charges incurred in connection with any filing, registration, recording or perfection of any security interest contemplated by any Security Document or any other document referred to therein, and (iv) all reasonable and documented out-of-pocket costs and expenses of the Agents and the Lenders (including the reasonable and documented fees and expenses of the experts and consultants engaged by the Agents or the Lenders) in connection with the Lenders' due diligence review prior to the Second Funding Date.

(b)     Indemnification by the Borrower.  Each Loan Party agrees to indemnify and hold harmless each of the Agents and the Lenders and their affiliates and their respective directors, officers, employees, administrative agents, attorneys-in-fact and controlling persons (each, an "Indemnified Party") from and against any and all losses, claims, damages and liabilities, joint or several, to which such Indemnified Party may become subject related to or arising out of any transaction contemplated by the Financing Documents or the execution, delivery and performance of the Financing Documents or any other document in any way relating to the Financing Documents and the transactions contemplated by the Financing Documents (including, for avoidance of doubt, any liabilities arising under or in connection with Environmental Law) and will reimburse any Indemnified Party for all expenses (including reasonable and documented outside counsel fees and expenses) as they are incurred in connection therewith.  No Loan Party shall be liable under the foregoing indemnification provision to an Indemnified Party to the extent that any loss, claim, damage, liability or expense is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct.  Each Loan Party also agrees that no Indemnified Party shall have any liability (whether direct or indirect, in contract or tort or otherwise) to it, or any of its security holders or creditors related to or arising out of the execution, delivery and performance of any Financing Document or any other document in any way relating to the Financing Documents or the other transactions contemplated by the Financing Documents, except to the extent that any loss, claim, damage or liability is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct as determined by a court of competent jurisdiction.  To the extent permitted by Applicable Law, no party hereto shall assert and each party hereto hereby waives, any claim against any Indemnified Party or any other party hereto, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any Financing Document or any agreement or instrument contemplated hereby, any Loan or the use of the proceeds thereof.  Paragraph (b) of this Section shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

(c)     Indemnification by Lenders.  To the extent that the Borrower fails to pay any amount required to be paid to any Agent, their affiliates or agents under Section 10.03(a) or (b), each Lender severally agrees to pay ratably in accordance with the aggregate principal amount of the Loans held by the Lender to such Agent, affiliate or agent such unpaid amount; provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against such Agent, affiliate or agent in its capacity as such.

(d)     Settlements; Appearances in Actions.  The Borrower agrees that, without each Indemnified Party's prior written consent, it will not settle, compromise or consent to the entry of any judgment in any pending or threatened claim, action or proceeding in respect of which indemnification could be sought by or on behalf of such Indemnified Party under this Section (whether or not any Indemnified Party is an actual or potential party to such claim, action or proceeding), unless such settlement, compromise or consent includes an unconditional release of such Indemnified Party from all liability arising out of such claim, action or proceeding.  In the event that an Indemnified Party is requested or required to appear as a witness in any action brought by or on behalf of or against the Borrower or any Affiliate thereof in which such Indemnified Party is not named as a defendant, the Borrower agrees to reimburse such Indemnified Party for all reasonable expenses incurred by it in connection with such Indemnified Party's appearing and preparing to appear as such a witness, including the reasonable and documented fees and disbursements of its legal counsel.  In the case of any claim brought against an Indemnified Party for which the Borrower may be responsible under this Section 10.03, the Agents and the Lenders agree (at the expense of the Borrower) to execute such instruments and documents and cooperate as reasonably requested by the Borrower in connection with the Borrower's defense, settlement or compromise of such claim, action or proceeding.

Section 10.04  Successors and Assigns.

(a)     Assignments Generally.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) the Loan Parties may not assign or otherwise transfer any of their rights or obligations hereunder without the prior written consent of the Administrative Agent (and any attempted assignment or transfer by such Loan Party without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section 10.04.  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants (to the extent provided in paragraph (f) of this Section) and, to the extent expressly contemplated hereby, the Indemnified Parties referred to in Section 10.03(b) and the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)     Assignments by Lenders.  Any Lender may assign to one or more Persons all or a portion of its rights and obligations under this Agreement (including all or a portion of its Loan at the time owing to it); provided that:

(i)      except in the case of an assignment to a Lender or an Affiliate or Related Fund of a Lender, the amount of the Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $500,000 unless the Borrower and the Administrative Agent otherwise consent;

(ii)     except in the case of an assignment to a Lender or an Affiliate or Related Fund of a Lender, the Borrower and the Administrative Agent must each give its prior written consent to such assignment; provided that (x) in the case of the Administrative Agent, such consent shall not be unreasonably withheld, conditioned or delayed and (y) in the case of the Borrower, such consent shall not be unreasonably withheld, conditioned or delayed if such assignment is to an Approved Fund and such consent shall be given in the Borrower's sole discretion if the assignment is to any other Person (other than a Lender, an Affiliate or Related Fund of a Lender or an Approved Fund) (and provided further that, in the case of the Borrower, such consent shall be deemed to be given if the Borrower has not responded within five (5) Business Days of any request for consent);

(iii)    each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement;

(iv)    except in the case of an assignment to an Affiliate, the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500; and

(v)     the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire;

provided further that any consent of the Borrower otherwise required under this clause (b) shall not be required if any Event of Default has occurred and is continuing and shall be deemed given if the Borrower has not responded to a request for such consent within five (5) Business Days of the request.  Upon acceptance and recording pursuant to paragraph (d) of this Section, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.09, 2.10 and 10.03).  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this paragraph shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (f) of this Section.

(c)      Maintenance of Register by the Administrative Agent.  The Administrative Agent, acting for this purpose as an agent of the Borrower, shall maintain at one of its offices in New York City a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, principal amount of the Loans owing to

each Lender pursuant to the terms hereof from time to time and the amount of any Accrued Interest owing from time to time (the "Register"). The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Administrative Agent and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(d)     Effectiveness of Assignments.  Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in paragraph (b) of this Section and any written consent to such assignment required by paragraph (b) of this Section, the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register. No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

(e)     Limitations on Rights of Assignees.  An assignee Lender shall not be entitled to receive any greater payment under Sections 2.09 or 2.10 than the assigning Lender would have been entitled to receive with respect to the interest assigned to such assignee (based on the circumstances existing at the time of the assignment), unless the Borrower's prior written consent has been obtained therefor.

(f)     Participations.  Any Lender may, without the consent of the Borrower or the Administrative Agent, sell participations to one or more banks or other entities (a "Participant") in all or a portion of such Lender's rights and obligations under this Agreement and the other Financing Documents (including all or a portion of the Loans owing to it); provided that (i) such Lender's obligations under this Agreement and the other Financing Documents shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (iii) the Loan Parties, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement and the other Financing Documents. Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and the other Financing Documents and to approve any amendment, modification or waiver of any provision of this Agreement or any other Financing Document; provided that, such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in the first proviso to Section 10.02(b) that affects such Participant. Subject to paragraph (g) of this Section, the Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.09 and 2.10 (subject to the requirements and limitations therein, including the requirements under Section 2.09(e) (it being understood that the documentation required under Section 2.09(e) shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section. Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Financing Documents held

by it (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any Commitments, Loan or its other obligations under any Financing Document) to any Person except to the extent that such disclosure is necessary to establish that such participation complies with Section 10.14 and that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the Treasury Regulations and Section 1.163-5(b) of the Proposed Treasury Regulations (or any amended or successor version).  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(g)    Limitations on Rights of Participants.  A Participant shall not be entitled to receive any greater payment under Sections 2.09 or 2.10 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant.  A Participant shall not be entitled to the benefits of Section 2.09 unless the Participant agrees, for the benefit of the Borrower, to comply with Section 2.09(e) as though it were a Lender (it being understood that the documentation required under Section 2.09(e) shall be delivered to the participating Lender).

(h)    Certain Pledges.

(i)    Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any such pledge or assignment to a Federal Reserve Bank, the European Central Bank or any other central bank or similar monetary authority in the jurisdiction of such Lender, and this Section shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto; and provided further that any payment in respect of such pledge or assignment made by any Loan Party to or for the account of the pledging or assigning Lender in accordance with the terms of this Agreement shall satisfy such Loan Party's obligations hereunder in respect of such pledged or assigned Loan to the extent of such payment.

(ii)    Notwithstanding any other provision of this Agreement, any Lender may, without informing, consulting with or obtaining the consent of any other Party to the Financing Documents and without formality under any Financing Document, assign by way of security, mortgage, charge or otherwise create security by any means over, its rights under any Financing Document to secure the obligations of that Lender to any Person that would be a permitted assignee (without the consent of the Borrower or any Agent) pursuant to Section 10.04(b) including (A) to the benefit of any of its Affiliates and/or (B) within the framework of its, or its Affiliates, direct or indirect funding operations.

(i)    No Assignments to the Borrower or Affiliates.  Anything in this Section to the contrary notwithstanding, no Lender may assign or participate any interest in any Loan held by it

106

hereunder to any Loan Party or any Affiliate of the Borrower without the prior written consent of each other Lender.

Section 10.05  Survival.  All covenants, agreements, representations and warranties made by the Loan Parties herein and in the certificates or other instruments delivered in connection with or pursuant to this Agreement shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement and the making of any Loan, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default or Event of Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any reimbursement, fee or any other amount payable under this Agreement (other than any contingent indemnification or reimbursement amount not then due and payable) is outstanding and unpaid.  The provisions of Sections 2.09, 2.10, 10.03, 10.12, 10.13 and Article VIII shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loan, the expiration or termination of the Commitments or the termination of this Agreement or any provision hereof.

Section 10.06  Counterparts; Integration; Effectiveness.  This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement and the other Financing Documents to which a Loan Party is party constitute the entire contract between and among the parties relating to the subject matter hereof and thereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  This Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.  Delivery of an executed counterpart of a signature page to this Agreement by electronic transmission shall be effective as delivery of a manually executed counterpart of this Agreement.

Section 10.07  Severability.  Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

Section 10.08  Right of Setoff.  If an Event of Default shall have occurred and be continuing, each Lender and any of its Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held, and any other indebtedness at any time owing, by such Lender or any such Affiliate to or for the credit or the account of the Borrower against any of and all the obligations of the Borrower now or hereafter existing under this Agreement held by such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement and although such obligations may be unmatured or denominated

in a currency other than Dollars. The rights of each Lender or any such Affiliate under this Section are in addition to other rights and remedies (including other rights of setoff) which such Lender may have.

Section 10.09  Governing Law; Jurisdiction; Etc.

(a)  Governing Law.  This Agreement shall be construed in accordance with and governed by the law of the State of New York.

(b)  Submission to Jurisdiction.  Any legal action or proceeding with respect to this Agreement or any other Financing Document to which a Loan Party is a party shall, except as provided in clause (d) below, be brought in the courts of the State of New York, or of the United States District Court for the Southern District of New York, in each case, seated in the County of New York and, by execution and delivery of this Agreement, each party hereto hereby irrevocably accepts for itself and in respect of its property, generally and unconditionally, the jurisdiction of the aforesaid courts. Each party hereto agrees that a judgment, after exhaustion of all available appeals, in any such action or proceeding shall be conclusive and binding upon it, and may be enforced in any other jurisdiction, including by a suit upon such judgment, a certified copy of which shall be conclusive evidence of the judgment.

(c)  Waiver of Venue.  Each party hereto hereby irrevocably waives any objection that it may now have or hereafter have to the laying of the venue of any suit, action or proceeding arising out of or relating to this Agreement or any other Financing Document to which it is a party brought in the Supreme Court of the State of New York or in the United States District Court for the Southern District of New York, in each case, seated in the County of New York and hereby further irrevocably waives any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

(d)  Rights of the Secured Parties.  Nothing in this Section 10.09 shall limit the right of the Secured Parties to refer any claim against a Loan Party to any court of competent jurisdiction anywhere else outside of the State of New York, nor shall the taking of proceedings by any Secured Party before the courts in one or more jurisdictions preclude the taking of proceedings in any other jurisdiction whether concurrently or not.

(e)  WAIVER OF JURY TRIAL.  EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING UNDER ANY FINANCING DOCUMENT OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO ANY FINANCING DOCUMENT, OR THE TRANSACTIONS RELATED THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER FOUNDED IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE

CONSENT OF THE SIGNATORIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

(f)     Service of Process.  Each party hereto irrevocably consents to the service of process in the manner provided for notices in Section 10.01.

(g)     Waiver of Immunity.  To the extent that a Loan Party has or hereafter may acquire any immunity from jurisdiction of any court or from any legal process (whether through service of notice, attachment prior to judgment, attachment in aid of execution, execution, sovereign immunity or otherwise) with respect to itself or its property, it hereby irrevocably waives such immunity, to the fullest extent permitted by law, in respect of its obligations under this Agreement and the other Financing Documents.

Section 10.10  Headings.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

Section 10.11  Confidentiality.

(a)     Each of the Agents and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (i) to its and its Affiliates' directors, officers, employees, board members (and members of committees thereof), current or prospective limited partners, agents, consultants, Persons providing administration and settlement services and other professional advisors, including accountants, auditors, legal counsel and other advisors with a need to know (for purposes of this Section 10.11, the "Representatives") (it being understood that the Representatives will be informed of the confidential nature of such Information and instructed to keep such Information confidential, and that the applicable Agent or Lender responsible for such disclosure shall be responsible for any non-compliance with the foregoing by any such Representatives that do not have a separate confidentiality obligation to such Agent or Lender), (ii) to the extent requested by any applicable regulatory or supervisory body or authority, by applicable laws or regulations or by any subpoena, oral question posed at any deposition, interrogatory or similar legal process (including, for the avoidance of doubt, to the extent requested in connection with any pledge or assignment pursuant to Section 10.04(h)); provided that the party from whom disclosure is being required shall give notice thereof to the Borrower as soon as practicable (unless restricted from doing so and except where disclosure is to be made to a regulatory or supervisory body or authority during the ordinary course of its supervisory or regulatory function), (iii) to any other party to this Agreement, (iv) subject to an agreement containing provisions substantially the same as those of this paragraph, to any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement, (v) with the written consent of the Borrower, (vi) to the extent such Information (A) becomes publicly available other than as a result of a breach of this paragraph or (B) becomes available to any Agent or any Lender on a nonconfidential basis from a source other than the Borrower and such source is not, to the knowledge of such Agent or Lender, subject to subject to a confidentiality agreement with any Loan Party or (vii) to any Person with whom any Loan Party, an Agent or a Lender has entered into (or potentially may enter into), whether directly or indirectly, any transaction under which payments are to be made or may be made by reference to one or more Financing

US-DOCS\109334811.27117632562.13

Documents and/or the Loan Parties or to any of such Person's Affiliates and Representatives. For the purposes of this paragraph, "Information" means all information received from any Loan Party or relating to any Borrower Group Member, or its respective business (including, for the avoidance of doubt, any information with respect to which any Loan Party owes any duty or obligation of confidentiality to any third-party), other than any such information that is available to the Agents or any Lender on a nonconfidential basis prior to disclosure by a Loan Party. Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

(b)    Upon written request after a discharge contemplated by Section 9.03, but no later than ten (10) Business Days thereafter, by any Loan Party, each Agent and Lender agrees to promptly return or destroy all copies of confidential Information and all notes, correspondence, documents or other records based thereon or which contain confidential Information ("Derivate Documents") which are then in the such Agent's or Lender's possession. Notwithstanding the foregoing, the Agents and Lenders and their Representatives shall be entitled to (i) retain copies of all Information provided to such Agent or Lender for legal, regulatory, and compliance purposes, in a manner consistent with the such Agent's or Lender's document archiving procedures, and which information shall remain confidential for the term of this Agreement so long as such Information is retained in a manner consistent with such Agent's or Lender's internal confidentiality policies, or (ii) to the extent that such Agent or Lender and its Representatives have copies of computer records and files containing Information, which have been created as a result of automatic archiving or backup procedures, may retain such number of copies of the Information for legal, regulatory, and compliance purposes, in a manner consistent with such Agent's or Lender's and its Representatives' document archiving procedure, and which information shall remain confidential so long as such Information is retained in a manner consistent with such Agent's or Lender's and its Representatives' internal confidentiality policies. The Loan Party remains the owner of all its Information contained in all Derivate Documents. In addition, the Agents and Lenders shall not be obligated to return or destroy any Information contained in any documents or packages prepared for its board of directors or like body, but may retain such documents or packages in a manner consistent with such Agent's or Lender's internal confidentiality policies.

(c)    Notwithstanding anything to the contrary contained herein, the parties hereto acknowledge that the Administrative Agent and its respective affiliates and advisors and investors in funds managed by the foregoing Persons (collectively, the "Orion Energy Persons") are subject to compliance obligations mandated by various regulators, governmental agencies and taxation authorities; and in satisfaction of those compliance obligations, the Orion Energy Persons may disclose confidential Information in response to a broad information request not specifically targeted at Borrower, as required by such regulators, governmental agencies, and taxation authorities without notice to the Borrower and without obtaining assurances that information will be treated confidentially; and such disclosure shall not be a violation of this agreement; provided that if such regulators, governmental agencies and taxation authorities make information requests specifically targeted at or regarding the Borrower or any of its

affiliates, the Orion Energy Persons will promptly notify the Borrower of such information request.

Section 10.12 <u>No Third Party Beneficiaries</u>. The agreement of the Lenders to make the Loans to the Borrower on the terms and conditions set forth in this Agreement, is solely for the benefit of the Loan Parties, the Agents and the Lenders, and no other Person (including any Material Counterparty, contractor, subcontractor, supplier, workman, carrier, warehouseman or materialman furnishing labor, supplies, goods or services to or for the benefit of the Business) shall have any rights under this Agreement or under any other Financing Document or Material Agreement as against the Agent or any Lender or with respect to any extension of credit contemplated by this Agreement.

Section 10.13 <u>Reinstatement</u>. The obligations of the Borrower under this Agreement shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of the Borrower in respect of the Secured Obligations is rescinded or must be otherwise restored by any holder of any of the Secured Obligations, whether as a result of any proceedings in Bankruptcy or reorganization or otherwise, and the Borrower agrees that it will indemnify each Secured Party on demand for all reasonable costs and expenses (including fees of counsel) incurred by such Secured Party in connection with such rescission or restoration, including any such costs and expenses incurred in defending against any claim alleging that such payment constituted a preference, fraudulent transfer or similar payment under any Bankruptcy, insolvency or similar law.

Section 10.14 <u>USA PATRIOT Act</u>. Each Lender hereby notifies the Loan Parties that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "<u>USA PATRIOT Act</u>"), it is required to obtain, verify and record information that identifies such Loan Party, which information includes the name and address of such Loan Party and other information that will allow such Lender to identify such Loan Party in accordance with the USA PATRIOT Act.

[Remainder of page intentionally left blank]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**CarbonLite Holdings, LLC**

**By** ――――――――――――――――――

   **Leon Farahnik**

   **Chief Executive Officer**

**CarbonLite Sub-Holdings, LLC**

   **By CarbonLite Holdings, LLC, its sole member**

   **By** ――――――――――――――――――

      **Leon Farahnik**

      **Chief Executive Officer**

**CarbonLITE PI Holdings, LLC**

   **By CarbonLite Sub-Holdings, LLC, its sole Member**

      **By CarbonLite Holdings, LLC, its sole member**

      **By** ――――――――――――――――――

         **Leon Farahnik**

         **Chief Executive Officer**

**CarbonLite Industries LLC**

   **By CarbonLITE PI Holdings LLC, its sole Member**

      **By CarbonLite Sub-Holdings, LLC, its sole Member**

         **By CarbonLite Holdings, LLC, its sole member**

         **By** ――――――――――――――――――

            **Leon Farahnik**

            **Chief Executive Officer**

**CarbonLite Pinnpack, LLC**

    **By CarbonLITE PI Holdings, LLC, its sole Member**

        **By CarbonLite Sub-Holdings, LLC, its sole Member**

            **By CarbonLite Holdings, LLC, its sole member**

            **By** _____

                **Leon Farahnik**

                **Chief Executive Officer**

**PinnPack Packaging, LLC**

    **By CarbonLITE Pinnpack, LLC, its Managing Member**

        **By CarbonLITE PI Holdings, LLC, its sole Member**

            **By CarbonLite Sub-Holdings, LLC, its sole Member**

                **By CarbonLite Holdings, LLC, its sole member**

                **By** _____

                    **Leon Farahnik**

                    **Chief      Executive      Officer**

**[*Signature Page to Credit Agreement*]**

ORION ENERGY PARTNERS INVESTMENT
AGENT, LLC,
as Administrative Agent and Collateral Agent
By:_____
_____Name:
_____Title:
ORION ENERGY CREDIT OPPORTUNITIES
FUND II, L.P.,
as a Lender
By: Orion Energy Credit Opportunities Fund II
GP, L.P.
Its: General Partner
By: Orion Energy Credit Opportunities Fund II
Holdings, LLC
Its: General Partner
By:_____
____Name:
____Title:
ORION ENERGY CREDIT OPPORTUNITIES
FUND II PV, L.P.,
as a Lender
By: Orion Energy Credit Opportunities Fund II
GP, L.P.
Its: General Partner
By: Orion Energy Credit Opportunities Fund II
Holdings, LLC
Its: General Partner
By:_____
____Name:
____Title:
ORION ENERGY CREDIT OPPORTUNITIES
FUND II GPFA, L.P.,
as a Lender
By: Orion Energy Credit Opportunities Fund II
GP, L.P.
Its: General Partner
By: Orion Energy Credit Opportunities Fund II
Holdings, LLC
Its: General Partner
By:_____
____Name:
____Title:
ORION ENERGY CREDIT OPPORTUNITIES
CARBONLITE CO-INVEST, L.P.,
as a Lender

[*Signature Page to Credit Agreement*]

**By: Orion Energy Credit Opportunities Fund II GP, L.P.**
**Its: General Partner**
**By: Orion Energy Credit Opportunities Fund II Holdings, LLC**
**Its: General Partner**
**By:** _____

**___Name:**
**___Title:**

US-DOCS\109334811.27

**ANNEX I**
**TO**
**CREDIT AGREEMENT**

**Loans; Commitments**

| LENDER | INITIAL FUNDING COMMITMENTS | SECOND FUNDING COMMITMENTS |
|---|---|---|
| ORION ENERGY CREDIT OPPORTUNITIES FUND II, L.P. | $26,538,898.13 | $0 |
| ORION ENERGY CREDIT OPPORTUNITIES FUND II PV, L.P. | $42,646,575.88 | $0 |
| ORION ENERGY CREDIT OPPORTUNITIES FUND II GPFA, L.P. | $2,614,526.00 | $0 |
| ORION ENERGY CREDIT OPPORTUNITIES CARBONLITE CO-INVEST, L.P. | $0 | $8,200,000.00 |
| TOTAL | $71,800,000.00 | $8,200,000.00 |

**[Signature Pages provided separately]**

ANNEX II
TO
CREDIT AGREEMENT

Orion Energy Equity Holders
**ANNEX III**

**Tranche B Minimum Return**

**As used herein and in the Credit Agreement, the "Tranche B Minimum Return" as of any date shall be the sum of the following:**

| | **Conditions and Milestones** | **Minimum Return amount in respect of Tranche B Loans** |
|---|---|---|
| **1.** | **The Tranche B Obligations are repaid in full in cash with Additional Equity Raise Amounts prior to the date that is 45 days after the Amendment No. 2 Effective Date** | **No additional payment required (it being acknowledged that the foregoing shall not limit the Borrower's obligation to pay the Tranche B Loans and any accrued and unpaid interest in respect thereof)** |
| **2.** | **Additional return under this clause 2. is payable if the Tranche B Obligations are not repaid in full in cash with Additional Equity Raise Amounts prior to the date that is 45 days after the Amendment No. 2 Effective Date** | • **20% (which equals $1,050,000 divided by the aggregate Tranche B Commitments); plus**<br><br>• **Unless the Qualified Additional Collateral Conditions are satisfied prior to the date that is ten (10) Business Days after the Amendment No. 2 Effective Date, at the option of the Tranche B Lenders (or their Affiliates), the Tranche B Optional Warrants** |
| **3.** | **Additional return under this clause 3. is payable if, on or prior to January 31, 2021, (a) the Borrower has not raised Additional Equity Raise Amounts equal to or greater than the Qualified Additional Equity Raise Threshold or (b) the Tranche B Obligations are not repaid in full in cash** | **10% (which equals $525,000 divided by the aggregate Tranche B Commitments)** |
| **4.** | **Additional return under this clause 4. is payable if, on or prior to March 31, 2021,** | **10% (which equals $525,000 divided by the aggregate Tranche B** |

| | | |
|---|---|---|
| | **(a) the Borrower has not raised Additional Equity Raise Amounts equal to or greater than the Qualified Additional Equity Raise Threshold or (b) the Tranche B Obligations are not repaid in full in cash** | **Commitments)** |
| **5.** | **Additional Return under this clause 5. is payable if, on or prior to the Tranche B Maturity Date, (a) the Borrower has not raised Additional Equity Raise Amounts equal to or greater than the Qualified Additional Equity Raise Threshold has not been achieved or (b) the Tranche B Obligations are not repaid in full in cash** | **10% (which equals $525,000 divided by the aggregate Tranche B Commitments)** |

**For the avoidance of doubt, (1) the foregoing shall not limit the Borrower's obligation to pay the Tranche B Loans and any accrued and unpaid interest in respect thereof and (2) all of the foregoing premium amounts are additive and multiple additional return amounts may apply.**

**Examples:**

- **If the Tranche B Loans are repaid in full on February 1, 2021 with Additional Equity Raise Amounts that meet the Qualified Equity Raise Threshold, then the Tranche B Minimum Return would be 30% ($1.575 million on the $5.25 million Tranche B Facility)**
- **If Tranche B Loans are not repaid in full by the Tranche B Maturity Date with Additional Equity Raise Amounts that meet the Qualified Equity Raise Threshold, then the Tranche B Minimum Return would be 50% ($2.625 million on the $5.25 million Tranche B Facility)**

~~Orion Energy Credit Opportunities Fund II, L.P.~~
~~Orion II PV CarbonLITE Splitter, L.P.~~
~~Orion Energy Credit Opportunities Fund II GPFA, L.P.~~
~~ORION II CO-INVEST CarbonLITE BLOCKER, LLC~~

**EXHIBIT B**

**ANNEX I
TO
CREDIT AGREEMENT**

**Loans; Commitments**

| LENDER | EXISTING TRANCHE A LOANS | TRANCHE B COMMITMENTS |
|---|---|---|
| Orion Energy Credit Opportunities Fund II, L.P. | $18,481,127.00 | $1,940,518.34 |
| Orion Energy Credit Opportunities Fund II PV, L.P. | $29,698,173.00 | $3,118,308.17 |
| Orion Energy Credit Opportunities Fund II GPFA, L.P. | $1,820,700.00 | $191,173.50 |
| Orion Energy Credit Opportunities CarbonLITE Co-Invest, L.P. | $27,300,000.00 | - |
| **TOTAL** | $77,300,000.00 | $5,250,000.00 |

**<u>EXHIBIT C</u>**

**EXHIBIT L**
**TO**
**CREDIT AGREEMENT**

[Attached.]

# CONTINUING DISCLOSURE AGREEMENT

Pennsylvania Economic Development Financing Authority
Subordinate Solid Waste Disposal Revenue Bonds
(CarbonLite P, LLC Project), Series 2020

September 10, 2020

This Continuing Disclosure Agreement (the "Disclosure Agreement") is executed and delivered by CarbonLite P, LLC (the "Borrower"), CarbonLite P Holdings, LLC (the "Guarantor"), and UMB Bank, N.A., as dissemination agent (the "Dissemination Agent"), in connection with the issuance of the above-named bonds (the "Bonds"). The Bonds are being issued pursuant to the Indenture of Trust, dated as of June 1, 2019 (the "Original Indenture"), as amended and supplemented by a First Supplemental Indenture of Trust, dated as of September 1, 2020 (the "First Supplemental Indenture" and, together with the Original Indenture, the "Indenture") by and between the Pennsylvania Economic Development Financing Authority (the "Authority") and UMB Bank, N.A., as Trustee. The Borrower, Guarantor and Dissemination Agent covenant and agree as follows:

SECTION 1.        Purpose of the Disclosure Agreement. This Disclosure Agreement is being executed and delivered by the Borrower, the Guarantor and the Dissemination Agent for the benefit of the Holders and Beneficial Owners of the Bonds and in order to assist the Participating Underwriter in complying with Securities and Exchange Commission's Rule 15c2-12(b)(5).

SECTION 2.        Definitions. In addition to the definitions set forth in the Indenture, which apply to any capitalized term used in this Disclosure Agreement unless otherwise defined in this Section, the following capitalized terms shall have the following meanings:

"Annual Report" shall mean any Annual Report provided by (i) the Borrower pursuant to, and as described in, Section 3(a) of this Disclosure Agreement and (ii) the Guarantor pursuant to, and as described in, Section 4(b)(1) of this Disclosure Agreement.

"Beneficial Owner" shall mean any person who has or shares the power, directly or indirectly, to make investment decisions concerning ownership of any Bonds (including persons holding Bonds through nominees, depositories or other intermediaries).

"Dissemination Agent" shall mean UMB Bank, N.A., acting in its capacity as Dissemination Agent hereunder, or such other officer or employee as the Borrower shall designate in writing to the Trustee and the Dissemination Agent from time to time.

"Financial Obligation" shall mean, for purposes of the Listed Events set out in Section 5(a)(10) and Section (5)(b)(8), a (i) debt obligation; (ii) derivative instrument entered into in connection with, or pledged as security or a source of payment for, an existing or planned debt obligation; or (iii) guarantee of (i) or (ii). The term "Financial Obligation" shall not include municipal securities (as defined in the Securities Exchange Act of 1934, as amended) as to which a final official statement (as defined in the Rule) has been provided to the MSRB consistent with the Rule.

"Holder" shall mean the person in whose name any Bond shall be registered.

"Listed Events" shall mean any of the events listed in Section 5(a) or 5(b) of this Disclosure Agreement.

"Loan Agreement" shall have the meaning given to such term in the Indenture.

"MSRB" shall mean the Municipal Securities Rulemaking Board or any other entity designated or authorized by the Securities and Exchange Commission to receive reports pursuant to the Rule. Until otherwise designated by the MSRB or the Securities and Exchange Commission, filings with the MSRB are to be made through the Electronic Municipal Market Access (EMMA) website of the MSRB, currently located at http://emma.msrb.org.

"Participating Underwriter" shall mean the original underwriter of the Bonds which, if not exempt, would be required to comply with the Rule in connection with the offering of the Bonds.

"Progress Reports" shall have the meaning ascribed thereto in Section 4(a)(5) of this Disclosure Agreement.

"Quarterly Report" shall mean any Quarterly Report provided by the Borrower pursuant to, and as described in, Section 3(b) of this Disclosure Agreement.

"Rule" shall mean Rule 15c2-12(b)(5) adopted by the Securities and Exchange Commission under the Securities Exchange Act of 1934, as the same may be amended from time to time.

SECTION 3.        Provision of Annual Reports and Quarterly Reports.

(a)        Annual Report.  The Borrower shall, or shall cause the Dissemination Agent not later than 150 days after the end of the Borrower's Fiscal Year, commencing with the report for the Fiscal Year ending December 31, 2020, to provide to the MSRB an Annual Report which is consistent with the requirements of Section 4(a)(1) of this Disclosure Agreement.  If the Borrower's Fiscal Year changes, the Borrower shall give notice of such change in a filing with the MSRB.  The Annual Report shall be submitted on a standard form in use by industry participants or other appropriate form and shall identify the Bonds by name and CUSIP number.

(1)        Not later than fifteen (15) Business Days prior to the date specified in subsection (a) for providing the Annual Report to the MSRB, the Borrower shall provide the Annual Report to the Dissemination Agent (if other than the Borrower).  If the Borrower is unable to provide to the MSRB an Annual Report by the date required in subsection (a) above, the Borrower shall, or shall cause the Dissemination Agent to, in a timely manner, send to the MSRB a notice in substantially the form attached as Exhibit A.

(2)        The Dissemination Agent shall (if the Dissemination Agent is other than the Borrower) file a report with the Borrower certifying that the Annual Report has been provided pursuant to this Disclosure Agreement, stating the date it was provided to the MSRB.

(b)        Quarterly Report.  The Borrower shall, or shall cause the Dissemination Agent not later than 45 days after the end of each fiscal quarterly period to provide to the MSRB a Quarterly Report which is consistent with the requirements of Section 4(a)(2) and 4(a)(3) of this Disclosure Agreement.

(c)        Other Borrower Reports.  The Borrower shall, or shall cause the Dissemination Agent to, provide to the MSRB a report or reports which are consistent with the requirements of Sections 4(a)(4), 4(a)(5) and 4(a)(6) of this Disclosure Agreement.

(d)        Guarantor Reports.  The Guarantor shall, or shall cause the Dissemination Agent to, provide to the MSRB a report or reports which are consistent with the requirements of Section 4(b) of this Disclosure Agreement.

SECTION 4.        Reporting Requirements.

(a)        The Borrower shall provide:

(1)        Within 150 days after the end of the Borrower's Fiscal Year, the Borrower's Audited Financial Statements, including an opinion letter and management letter from the auditor;

(2)        Within 45 days after the end of each quarterly period of each Fiscal Year, commencing with the quarterly period ended September 30, 2020, and within 45 days after the end of the Borrower's Fiscal Year, commencing with Fiscal Year ending December 31, 2021, the Borrower's unaudited financial information (presented on a stand-alone basis), such information consisting of (i) an income statement, balance sheet and statement of operations (including changes in cash position) for the preceding quarterly period and, solely with respect to the information due within 45 days after the end of the Borrower's Fiscal Year, for the preceding annual period, and (ii) calculations of the Borrower's Days Cash on Hand Requirement (as defined in the Loan Agreement) and Debt Service

2

Coverage Ratio, each presented on a basis substantially consistent with the format of the Guarantor's audited financial statements and in a form reasonably ascertainable to the Holders, provided that the Quarterly Report for the period ending on or before September 30, 2020 need not include the items required by clause (ii) above;

(3)     Within 45 days after the end of each quarterly period of each Fiscal Year, commencing with the quarterly period ending September 30, 2020, a report from the Borrower consisting of:

(a)     a report from the Borrower of the volume of pcrPET bales and pcrPET flake received, and the volume of pcrPET pellets produced and sold (by weight, including type – clear or green) during such quarterly period;

(b)     a report from the Borrower providing the identity of its feedstock suppliers, the estimated monthly pounds of pcrPET supplied by each supplier during such quarterly period, and the expiration date and renewal status of any such contracts with feedstock suppliers;

(c)     a report from the Borrower providing the identity of the parties with whom the Borrower has executed or received tentative output contracts, the volume of pcrPET to be purchased per month pursuant to such contracts, and the term of such contracts, including the expiration date and renewal status;

(d)     the Borrower's budget-to-actual report for such quarterly period;

(e)     together with a report showing aged accounts receivable as of the end of such quarterly period, on a 30/60/90 day basis.

(4)     Not later than January 15 of each Fiscal Year, the Borrower's annual budget for such Fiscal Year commencing with the budget for Fiscal Year 2021;

(5)     Prior to the Completion Date and by the 15th day of the subsequent month during which the Project is under construction commencing with the month ending September 15, 2020, Progress Reports from the Borrower with respect to the construction, equipping, installation and completion of the Project and with respect to the Lessor's construction of the building on the site subject to the Lease, which shall include the following information as of the end of the reporting period:

(i)     brief description of construction activity for applicable reporting period, including:

(A)     construction work performed on site during reporting period,

(B)     status of procurement of equipment,

(C)     material issues with vendor performance (including delivery issues, performance problems or material cost overruns);

(ii)     adherence to expected construction timeline (including estimated number of days ahead or behind);

(iii)     adherence to expected construction budget (including material work order, dollar or percentage deviation from budget); and

(iv)     if applicable, brief narrative description of the reasons behind any material delays indicated in Subsection (5)(ii) and (5)(iii) above; and

(6)     Promptly upon sending or receipt, copies of any material correspondence between the Borrower and any governmental entity regarding compliance with Environmental Regulations, potential material violations of state or local law, or other material correspondence relating to the Borrower's construction of or operations of the Facility.

The Borrower's audited financial statements, if required or permitted by GAAP, may be in the form of consolidated statements within the audited financial statements of the Guarantor.  If at any time the Borrower's

financial statements are no longer included within the consolidated audited financial statements of the Guarantor, the Borrower shall separately provide audited financial statements for the Borrower's fiscal year.

(b)      If the Guarantor has no operational cashflow, any financial information will be incorporated into the Borrower's financial data. If the Guarantor has financial operations, it shall provide:

(1)      Within 150 days of each Fiscal Year end commencing with the year ended December 31, 2020, the Guarantor's audited financial statements (presented on a stand-alone basis); and

(2)      Within 45 days after the end of each fiscal quarterly period of each Fiscal Year, commencing with the fiscal quarterly period ended September 30, 2020, unaudited financial information of the Guarantor presented on a stand-alone basis and on a basis substantially consistent with the format of the Guarantor's audited financial statements and in a form reasonably ascertainable to the Holders.

(c)      Investor Calls.  The Borrower will make, and will cause the Guarantor to make, its appropriate officers available for investor calls quarterly at a mutually agreeable time through December 31, 2020, and after such time, upon no less than 10 days' prior written request of the holders of twenty-five percent (25%) in aggregate principal amount of Bonds, which request may be delivered by the Trustee, so long as such calls are no more often than quarterly during each year; provided, however, that if a Loan Event Default (as defined in the Loan Agreement) or an event of default under the Guaranty has occurred and is continuing, the Borrower and Guarantor shall be available for monthly calls at the discretion of the Trustee or the Holders of twenty-five (25%) in aggregate principal amount of Bonds. Notice of any investor calls under this Section shall be provided to all Holders, the Trustee and the MSRB no later than five (5) days prior to such call.

SECTION 5.      Reporting of Significant Events.

(a)      The Borrower shall give, or cause to be given, notice of the occurrence of any of the following events with respect to the Bonds in a timely manner not later than ten (10) Business Days of the occurrence of the event:

(1)      Principal and interest payment delinquencies;

(2)      Unscheduled draws on debt service reserves reflecting financial difficulties;

(3)      Unscheduled draws on credit enhancements reflecting financial difficulties;

(4)      Substitution of credit or liquidity providers, or their failure to perform;

(5)      Adverse tax opinions or issuance by the Internal Revenue Service of proposed or final determination of taxability or of a Notice of Proposed Issue (IRS Form 5701 TEB);

(6)      Tender offers;

(7)      Defeasances;

(8)      Rating changes;

(9)      Bankruptcy, insolvency, receivership or similar event of the obligated person; or

(10)      Default, event of acceleration, termination event, modification of terms, or other similar events under the terms of a Financial Obligation of the obligated person, any of which reflect financial difficulties.

(11)      Any Change in Control under the Indenture.

Note: for the purposes of the event identified in subparagraph (9), the event is considered to occur when any of the following occur: the appointment of a receiver, fiscal agent or similar officer for an obligated person in a proceeding under the U.S. Bankruptcy Code or in any other proceeding under state or federal law in which a court or governmental authority has assumed jurisdiction over substantially all of the assets or business of the obligated person, or if such jurisdiction has been assumed by leaving the existing governmental body and officials or officers in possession but subject to the supervision and orders of a court or governmental authority, or the entry of an order confirming a plan of reorganization, arrangement or liquidation by a court or governmental authority having supervision or jurisdiction over substantially all of the assets or business of the obligated person.

(b)    The Borrower shall give, or cause to be given, notice of the occurrence of any of the following events with respect to the Bonds, if material, in a timely manner not later than ten (10) Business Days after the occurrence of the event:

(1)    Unless described in Section 5(a)(5), other material notices or determinations by the Internal Revenue Service with respect to the tax status of the Bonds or other material events affecting the tax status of the Bonds;

(2)    Modifications to rights of Bondholders;

(3)    Optional, unscheduled or contingent Bond calls;

(4)    Release, substitution, or sale of property securing repayment of the Bonds;

(5)    Non-payment related defaults;

(6)    The consummation of a merger, consolidation, or acquisition involving an obligated person or the sale of all or substantially all of the assets of the obligated person, other than in the ordinary course of business, the entry into a definitive agreement to undertake such an action or the termination of a definitive agreement relating to any such actions, other than pursuant to its terms;

(7)    Appointment of a successor or additional trustee or the change of name of a trustee; or

(8)    Incurrence of a Financial Obligation of the obligated person, or agreement to covenants, events of default, remedies, priority rights, or other similar terms of a Financial Obligation of the obligated person, any of which affect security holders.

(c)    Whenever the Borrower obtains knowledge of the occurrence of a Listed Event described in Section 5(b) above, the Borrower shall determine if such event would be material under applicable federal securities laws.

(d)    Upon occurrence of a Listed Event described in Section 5(a) above, or determines that knowledge of a Listed Event described in Section 5(b) above would be material under applicable federal securities laws, the Borrower shall within ten (10) Business Days of occurrence file a notice of such occurrence with the MSRB. Notwithstanding the foregoing, notice of the Listed Event described in Section 5(b)(3) above need not be given under this subsection any earlier than the notice (if any) of the underlying event is given to Holders of affected Bonds pursuant to the Indenture.

(e)    The Borrower intends to comply with the Listed Events described in Section 5(a)(10) and Section 5(b)(8), and the definition of "Financial Obligation" in Section 1, with reference to the Rule, any other applicable federal securities laws and the guidance provided by the Commission in Release No. 34-83885 dated August 20, 2018 (the "2018 Release"), and any further amendments or written guidance provided by the Commission or its staff with respect the amendments to the Rule effected by the 2018 Release.

SECTION 6.    Format for Filings with MSRB. Any report or filing with the MSRB pursuant to this Disclosure Agreement must be submitted in electronic format, accompanied by such identifying information as is prescribed by the MSRB.

5

SECTION 7.    Termination of Reporting Obligation. The Borrower's and the Guarantor's obligations under this Disclosure Agreement shall terminate upon the legal defeasance, prior redemption or payment in full of all of the Bonds. If such termination occurs prior to the final maturity of the Bonds, the Borrower shall give notice of such termination in a filing with the MSRB.

SECTION 8.    Dissemination Agent. The Borrower may, from time to time, appoint or engage a Dissemination Agent to assist it in carrying out its obligations under this Disclosure Agreement, and may discharge any such Dissemination Agent, with or without appointing a successor Dissemination Agent. The Dissemination Agent shall not be responsible in any manner for the content of any notice or report prepared by the Borrower pursuant to this Disclosure Agreement. The initial Dissemination Agent shall be the Trustee.

SECTION 9.    Amendment; Waiver. Notwithstanding any other provision of this Disclosure Agreement, the Borrower, the Guarantor and the Dissemination Agent may amend this Disclosure Agreement, and any provision of this Disclosure Agreement may be waived, provided that the following conditions are satisfied:

(a)    if the amendment or waiver relates to the above provisions of Sections 3(a), 4, or 5(a) or (b), it may only be made in connection with a change in circumstances that arises from a change in legal requirements, change in law, or change in the identity, nature or status of an obligated person with respect to the Bonds, or the type of business conducted;

(b)    the undertaking, as amended or taking into account such waiver, would, in the opinion of nationally recognized bond counsel, have complied with the requirements of the Rule at the time of the original issuance of the Bonds, after taking into account any amendments or interpretations of the Rule, as well as any change in circumstances;

(c)    The amendment or waiver does not, in the opinion of nationally recognized bond counsel, materially impair the interests of the Holders or Beneficial Owners of the Bonds; and

(d)    the amendment or waiver is permitted by the Rule.

In the event of any amendment or waiver of a provision of this Disclosure Agreement, the Borrower shall describe such amendment in the next Annual Report, and shall include, as applicable, a narrative explanation of the reason for the amendment or waiver and its impact on the type (or in the case of a change of accounting principles, on the presentation) of financial information or operating data being presented by the Borrower. In addition, if the amendment relates to the accounting principles to be followed in preparing financial statements, (i) notice of such change shall be given in a filing with the MSRB, and (ii) the Annual Report for the year in which the change is made should present a comparison (in narrative form and also, if feasible, in quantitative form) between the financial statements as prepared on the basis of the new accounting principles and those prepared on the basis of the former accounting principles.

SECTION 10.    Additional Information. Nothing in this Disclosure Agreement shall be deemed to prevent the Borrower from disseminating any other information, using the means of dissemination set forth in this Disclosure Agreement or any other means of communication, or including any other information in any Annual Report or notice required to be filed pursuant to this Disclosure Agreement, in addition to that which is required by this Disclosure Agreement. If the Borrower chooses to include any information in any Annual Report or notice in addition to that which is specifically required by this Disclosure Agreement, the Borrower shall have no obligation under this Disclosure Agreement to update such information or include it in any future Annual Report or notice of occurrence of a Listed Event or any other event required to be reported.

SECTION 11.    Default. In the event of a failure of the Borrower, the Guarantor or the Dissemination Agent to comply with any provision of this Disclosure Agreement, any Holder or Beneficial Owner of the Bonds may take such actions as may be necessary and appropriate, including seeking mandate or specific performance by court order, to cause the Borrower, the Guarantor or the Dissemination Agent to comply with its obligations under this Disclosure Agreement. The sole remedy under this Disclosure Agreement in the event of any failure of the Borrower, the

6

Guarantor or the Dissemination Agent to comply with this Disclosure Agreement shall be an action to compel performance.

SECTION 12.     Beneficiaries. This Disclosure Agreement shall inure solely to the benefit of the Borrower, the Guarantor, the Dissemination Agent, the Participating Underwriter and Holders and Beneficial Owners from time to time of the Bonds, and shall create no rights in any other person or entity.

SECTION 13.     Duties and Liabilities of Dissemination Agent. The Dissemination Agent shall have only such duties as are specifically set forth in this Disclosure Agreement, and, to the extent permitted by law, the Borrower agrees to indemnify and save the Dissemination Agent, its officers, directors, employees and agents, harmless against any loss, expense and liabilities which it may incur arising out of or in the exercise or performance of its powers and duties hereunder, including the costs and expenses (including attorneys' fees) of defending against any claim of liability, but excluding claims and liabilities due to the Dissemination Agent's negligence or willful misconduct.  The obligations of the Borrower under this Section shall survive resignation or removal of the Dissemination Agent and payment of the Bonds.  The Borrower shall pay the fees, charges and expenses of the Dissemination Agent in connection with its administration of this Disclosure Agreement.

7

Dated as of the date first set forth above.

**CARBONLITE P, LLC**

By: _____
    Name: Leon Farahnik
    Title: Chief Executive Officer

**CARBONLITE P HOLDINGS, LLC**

By: _____
    Name: Leon Farahnik
    Title: Chief Executive Officer

**UMB BANK, N.A.**, as Dissemination Agent

By: _____
       Authorized Officer

**EXHIBIT A**

FORM OF NOTICE TO THE MUNICIPAL SECURITIES RULEMAKING BOARD
OF FAILURE TO FILE ANNUAL REPORT

| | |
|---|---|
| Name of Bond Issue: | Pennsylvania Economic Development Financing Authority Subordinate Solid Waste Disposal Revenue Bonds (CarbonLite P, LLC Project), Series 2020 |
| Name of Borrower: | CarbonLite P, LLC |
| Date of Issuance: | September 10, 2020 |

NOTICE IS HEREBY GIVEN that the Borrower has not provided an Annual Report with respect to the above-named Bonds as required by the Continuing Disclosure Agreement of the Borrower, dated the Date of Issuance. [The Borrower anticipates that the Annual Report will be filed by _____.]

Dated: _____, 20____.

**CARBONLITE P, LLC**

By: _____ [to be signed only if filed] _____

A-1

4159-2050-9222.3

**$10,000,000**
**PENNSYLVANIA ECONOMIC DEVELOPMENT FINANCING AUTHORITY**
**SUBORDINATE SOLID WASTE DISPOSAL REVENUE BONDS**
**(CARBONLITE P, LLC PROJECT)**
**SERIES 2020**

**BOND PURCHASE CONTRACT**

THIS BOND PURCHASE CONTRACT, dated September 3, 2020 (this *"Bond Purchase Contract"*), is made and entered into by and among the PENNSYLVANIA ECONOMIC DEVELOPMENT FINANCING AUTHORITY (the *"Issuer"*), WESTHOFF, CONE & HOLMSTEDT, as underwriter (the *"Underwriter"*), CARBONLITE P, LLC (the *"Company"* or the *"Borrower"*) and CARBONLITE P HOLDINGS, LLC (the *"Guarantor"*).

*Section 1.    Description of Bonds.*  The Issuer proposes to issue Pennsylvania Economic Development Financing Authority Subordinate Solid Waste Disposal Revenue Bonds (CarbonLite P, LLC Project) Series 2020 in the aggregate principal amount of $10,000,000 (the *"Series 2020 Bonds"*).  The Series 2020 Bonds will mature on the date and will bear interest at the rate as set forth in *Schedule I* attached hereto and will be subject to redemption as set forth in the Indenture of Trust, dated as of June 1, 2019 (the *"Original Indenture"*), as amended and supplemented by the First Supplemental Indenture of Trust, dated as of September 1, 2020 (the "*First Supplemental Indenture*" and, together with the Original Indenture, the "*Indenture*"), each between the Issuer and UMB Bank, N.A., as trustee (the *"Trustee"*).

The Series 2020 Bonds are being issued by the Issuer for the purpose of  (i) financing a portion of the costs of the acquisition, construction, installation, improvement and/or equipping of a post-consumer polyethylene terephthalate (*"pcrPET"*) plastic beverage container processing facility (the *"Pennsylvania Facility"*) located in the City of Reading, in the Commonwealth of Pennsylvania (the *"Commonwealth"*), including the installation of equipment and the upgrade of utilities of the Pennsylvania Facility (collectively, the "*Project*"), (ii) financing additional equipment and working capital costs of the Borrower, (iii) funding a deposit to an account within a reserve fund relating to the Series 2020 Bonds, and (iv) paying a portion of the costs associated with the issuance of the Series 2020 Bonds.

The Pennsylvania Facility is located at the Project Site, which is leased to the Company pursuant to an Industrial Lease Agreement, dated as of May 13, 2019 (the "Lease"), between Berks 61 Owner, LLC (the "Landlord") and the Company.  The Pennsylvania Facility is owned by the Company and will be operated by the Company or one of its direct or indirect wholly-owned subsidiaries.

Pursuant to the Loan Agreement, dated as of June 1, 2019 (the *"Original Loan Agreement"*), as amended by the First Amendment to Loan Agreement, dated as of September 1, 2020 (the "*First Amendment to Loan Agreement*" and, together with the Original Loan Agreement, the "*Loan Agreement*"), each between the Company and the Issuer, the Company has covenanted with the Issuer to make loan repayments equal to the principal of, premium, if

any, and interest, coming due on the Series 2020 Bonds, and pursuant to the Indenture, the Issuer has pledged and assigned to the Trustee all of the Issuer's right, title and interest in and to the Loan Agreement (with certain specified exceptions) and the Note (as defined below). The Company will execute a subordinate promissory note, dated September 10, 2020 (the *"Note"*), as evidence of its obligations under the Loan Agreement with respect to the Series 2020 Bonds. The payment of the principal of, premium, if any, and interest on, the Series 2019 Bonds (as defined below) and the Series 2020 Bonds will be guaranteed pursuant to a Guaranty Agreement, dated as of June 1, 2019 (the "*Original Guaranty*"), between the Trustee and the Guarantor, as amended by the First Amendment to Guaranty Agreement, dated as of September 1, 2020 (the "*First Amendment to Guaranty*" and, together with the Original Guaranty, the *"Guaranty"*), by the Guarantor in favor of the Trustee.

As security for its obligations under the Loan Agreement and the Note, the Company will enter into a First Amendment to Open-End Leasehold Mortgage, Security Agreement and Assignment of Rents and Leases, and Fixture Filing dated as of September 1, 2020, (the "*Mortgage*"), amending that certain Open-End Leasehold Mortgage, Security Agreement and Assignment of Rents and Leases, and Fixture Filing dated as of June 1, 2019, in favor of the Trustee. The Company and the Guarantor will further execute a First Amendment to Pledge and Security Agreement, amending that certain Pledge and Security Agreement, dated as of June 1, 2019 (as amended, the *"Pledge and Security Agreement"*), as additional security for their respective obligations under the Loan Agreement, the Note and the Guaranty, pursuant to which the Company and the Guarantor will grant to the Trustee a security interest in all right, title and interest of the Company and the Guarantor, respectively, to the Collateral (as defined in the Pledge and Security Agreement), which includes but is not limited to the funds and accounts held under the Indenture.

In addition, the Company has entered into a Deposit Account Control Agreement, dated as of June 1, 2019 (the *"Account Control Agreement"*), with the Trustee and Pacific Western Bank, as depository bank, in order to perfect the security interest granted to the Trustee under the Loan Agreement.

The Company executed the Non-Disturbance and Access Agreement dated as of June 1, 2019 (as amended, the "*NDA*") with the Trustee and the Landlord pursuant to which the Landlord agreed to certain limitations on the Landlord's ability to terminate the Lease in the event of a Mortgage foreclosure or a transfer in lieu of foreclosure, and which granted to the Trustee certain cure rights in the event of a breach of the Lease by the Company.

In the event that the Landlord grants a mortgage lien on its fee ownership of the real property on which the Pennsylvania Facility will be located (the "*New Mortgage*"), the Landlord will enter into a Subordination, Non-Disturbance and Attornment Agreement (the *"SNDA"*), with the Company and the Trustee, pursuant to which Company will confirm the subordination of the Lease to the lien of the New Mortgage and the mortgagee under the New Mortgage will agree not to disturb the tenancy of the Company under the Lease and consent to the lien of the Mortgage on the terms set forth in the SNDA.

The Issuer and the Company will enter into the Tax Exemption Certificate and Agreement with respect to the Series 2020 Bonds, dated as of the hereinafter defined Closing Date (the *"Tax Agreement"*).

The Indenture, the Loan Agreement, the Series 2020 Bonds, the Note, the Guaranty, the Mortgage, the Pledge and Security Agreement, the Account Control Agreement, the NDA, and this Bond Purchase Contract are collectively referred to herein as the "*Financing Agreements*."

*Section 2.    Purchase, Sales Fees and Closing*.  (a)  Subject to the provisions of this Bond Purchase Contract and the Limited Offering Memorandum dated September 3, 2020, with respect to the Series 2020 Bonds (the *"Limited Offering Memorandum"*), the Underwriter hereby agrees to purchase from the Issuer, and the Issuer will sell to the Underwriter, all of the Series 2020 Bonds, at a purchase price of $9,800,000.00 (representing the principal amount of the Series 2020 Bonds less an underwriter's discount in the amount of $200,000.00), payable in immediately available funds to the order of the Trustee.  Simultaneously with the delivery of the Series 2020 Bonds, a fee in the aggregate amount of $100,000.00 will be paid to the Underwriter by the Company in connection with the Underwriter's offering and sale of the Series 2020 Bonds to the public. On or before September 9, 2020, the Company will have contributed or deposited an equity contribution of $10,000,000 with the Trustee (the "*Equity Contribution*").

(b)      The Company shall pay to the Underwriter all reasonable out-of-pocket costs and expenses of the Underwriter incurred in connection with the successful issuance and sale of the Series 2020 Bonds.  In addition, the Company shall also pay all other reasonable fees and expenses incurred in connection with the issuance and sale of the Series 2020 Bonds and the preparation, execution, delivery and enforcement of any document that may be delivered in connection therewith, including, but not limited to, (i) all reasonable and customary fees and out-of-pocket expenses of Co-Bond Counsel, counsel for the Trustee, special counsel to the Company, counsel for the Purchaser, counsel to the Underwriter and counsel for the Issuer, (ii) all reasonable and customary fees and out-of-pocket expenses of the Issuer and the Trustee, and (iii) the cost of printing, photocopying and delivering the Series 2020 Bonds, the Preliminary Limited Offering Memorandum (as defined herein) and the Limited Offering Memorandum. The fees and expenses described in the preceding sentence shall be paid by the Company whether or not the Series 2020 Bonds are issued or sold, unless the Underwriter is in default in its obligation to purchase the Series 2020 Bonds hereunder, in which case the Company shall have no obligation to pay the fees and expenses of the Underwriter.  All fees and expenses described in this Section, to the extent they are reasonable, identifiable and billed, shall be paid on the Closing Date (as defined below), and the remainder shall be paid promptly upon receipt of statements therefor.  The obligations of the Company under this Section survive the issuance and maturity of the Series 2020 Bonds and any termination of this Bond Purchase Contract. Whether or not the sale of the Series 2020 Bonds by the Issuer to the Underwriter is consummated, the Underwriter shall be under no obligation to pay any costs or expenses incident to the performance of the obligations of the Issuer or the Company hereunder.

The closing will be held via telephone conference at 8:00 a.m. PDT on September 10, 2020, or such other date, time or place as may be agreed upon by the parties hereto.  The hour and date of such closing are herein called the *"Closing Date."*  The Series 2020 Bonds will be in registered form as a single bond, will be registered in the name of Cede & Co., as nominee of

The Depository Trust Company (*"DTC"*) under DTC's book-entry-only system, and will be made available for inspection by DTC or the Trustee, as its agent, at least one day prior to the Closing Date. The Issuer has heretofore provided DTC with a blanket letter of representations, in form satisfactory to DTC, relating to eligibility of the Series 2020 Bonds for deposit into the DTC book-entry-only system. On the Closing Date, the Company will enter into an agreement to provide certain information on an annual basis as further set forth in the Continuing Disclosure Agreement dated the Closing Date (the *"Continuing Disclosure Agreement"*) in form set forth on Appendix D to the Limited Offering Memorandum.

In the event that for any reason (other than the Underwriter's negligence or willful misconduct), the Issuer fails to deliver the Series 2020 Bonds as provided herein by 11:00 a.m. prevailing local time on the Closing Date, the Company will pay to the Underwriter any losses resulting from the Underwriter being required to hold the Series 2020 Bonds prior to delivery to the ultimate purchasers thereof. The preceding sentence shall not be construed as a waiver of any conditions to the Underwriter's obligations under this Bond Purchase Contract or a waiver by the Company of its claims or rights against another party to this transaction if its negligence, willful misconduct or wrongful act causes the Company to make such a payment to the Underwriter.

*Section 3.    Representations and Warranties of the Company*. The Company represents and warrants to, and agrees with, the Underwriter and the Issuer that:

(a)    The Company has taken all necessary action to authorize, execute and deliver the Financing Agreements to which it is a party, the Lease, the Continuing Disclosure Agreement, the Tax Agreement and all other documents executed and delivered (or to be executed and delivered) in connection with the issuance of the Bonds and the other transactions contemplated hereby and thereby to which the Company is or is to be a party (collectively, the *"Company Documents"*), and this Bond Purchase Contract has been duly executed and delivered and, assuming the due authorization, execution and delivery by the other parties thereto, constitutes, and the other Company Documents when duly executed and delivered by the Company, assuming the due authorization, execution and delivery by the other parties thereto, will constitute, the legal, valid and binding obligations of the Company enforceable against the Company in accordance with their respective terms, except as may be limited by (i) bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium, and other similar laws or equitable principles affecting creditors' rights or remedies generally; (ii) the application of equitable principles and the exercise of judicial discretion in appropriate cases; (iii) principles of public policy concerning, affecting or limiting the enforcement of rights or remedies against governmental entities such as the Issuer; and (iv) common law and statutes affecting the enforceability of contractual obligations generally.

(b)    Other than as disclosed in the Limited Offering Memorandum and any documents incorporated by reference therein, the Company has not and will not have at the Closing Date any material litigation pending of a character which would materially and adversely affect the operation of the Project, the Company's ability to perform its obligations under the Company Documents or the tax-exempt status of interest on the Series 2020 Bonds.

(c)     The execution, delivery and performance by the Company of the Company Documents are within the powers of the Company and do not and will not conflict with or violate (i) the articles of formation or its limited liability company agreement of the Company or (ii) any order, injunction, ruling or decree by which the Company or its property is bound, and do not and will not constitute a breach of or default under any agreement, indenture, mortgage, lease, note or other obligation, instrument or material arrangement to which the Company is a party or by which the Company or any of its property is bound, or contravene or constitute a violation of any federal or state constitutional or statutory provision, rule or regulation to which the Company or any of its property is subject, the breach, default, contravention or violation of which could have a material adverse effect on the business or financial condition of the Company and its subsidiaries taken as a whole, and no approval, consent or other action by, or filing or registration with, any governmental authority or agency is required in connection therewith that has not been obtained or accomplished or will not be obtained or accomplished by the Closing Date.

(d)     The Company will not voluntarily take or omit to take any action, which action or omission would in any way result in the inclusion of interest on the Series 2020 Bonds in the gross income of the owners thereof for federal income tax purposes.

(e)     The Company agrees to make available or cause to be made available to the Underwriter, without cost, sufficient copies of any documents pertaining to the Company which are relevant to the transaction described in this Bond Purchase Contract, as the Underwriter may require from time to time for the prompt and efficient performance by the Underwriter of their obligations under this Bond Purchase Contract, *provided, however*, that nothing in this Section 3(e) shall require the Company to disclose any protected or confidential information.

(f)     The Company is a limited liability company duly organized and validly existing in good standing under the laws of the State of Delaware and qualified to do business in the Commonwealth with full power, authority and legal capacity to own and operate its properties relating to the Project and to conduct the business now being and proposed to be conducted by it under the Company Documents, and has full power, authority and legal capacity to execute, deliver, carry out and perform its obligations under the Company Documents.

(g)     Since the respective most recent dates as of which information is given in the Limited Offering Memorandum, there has not been any material adverse change in the business, properties or financial condition of the Company, other than changes reflected in or contemplated by the Limited Offering Memorandum.

(h)     As of the date of the Limited Offering Memorandum and as of the Closing Date, the information in the Limited Offering Memorandum (except with respect to the information contained under the captions "THE ISSUER," "THE SERIES 2020 BONDS," "LEGAL MATTERS," "TAX MATTERS," "UNDERWRITING," APPENDIX C – "PROPOSED FORM OF OPINION OF CO-BOND COUNSEL" and APPENDIX E – "BOOK-ENTRY SYSTEM" as to which no representation is made),

5

including information incorporated by reference in the Limited Offering Memorandum or otherwise supplied by the Company in writing for inclusion therein, including, without limitation, any appendices thereto, does not and will not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made therein, in the light of the circumstances under which they were made, not misleading. The Company has authorized the delivery of the Limited Offering Memorandum and approves of the use and distribution of the Limited Offering Memorandum by the Underwriter in connection with the initial sale and distribution of the Series 2020 Bonds. The Company approves the use and distribution of the Limited Offering Memorandum by the Underwriter in connection with the initial sale of the Series 2020 Bonds, substantially in the form of the Preliminary Limited Offering Memorandum dated August 14, 2020, as supplemented by the Supplement dated August 28, 2020 (as supplemented, the *"Preliminary Limited Offering Memorandum"*) and has ratified and approved the use and distribution of copies of such Preliminary Limited Offering Memorandum in connection with the initial sale of the Series 2020 Bonds. The Company hereby confirms that the Preliminary Limited Offering Memorandum is hereby deemed "final" (except for permitted omissions) as of its date by the Company for purposes of paragraph (b)(1) of Rule 15c2-12 (the "*Rule*") promulgated by the Commission under the Exchange Act of 1934.

(i)     Other than the Continuing Disclosure Agreement, dated as of June 1, 2019, by and among the Company, CarbonLite P Holdings, LLC and UMB Bank, N.A., as dissemination agent, in connection with the Pennsylvania Economic Development Financing Authority Subordinate Solid Waste Disposal Revenue Bonds (CarbonLite P, LLC Project) Series 2019 (the "*Series 2019 Bonds*"), the Company has not previously undertaken any continuing disclosure undertakings pursuant to the Rule.

(j)     Each officer of the Company executing the Company Documents and approving the Indenture and the Limited Offering Memorandum is duly and properly authorized to approve, execute, and deliver the same on behalf of the Company.

(k)     No consent or approval of any trustee or holder of any indebtedness of the Company, and no consent, permission, authorization, order or license of, or filing or registration with, any governmental authority (except in connection with "blue sky" laws) is required to be obtained or made by the Company in connection with (i) the execution and delivery of this Bond Purchase Contract; (ii) the execution and delivery of the Company Documents at the Closing; (iii) the approval of the Indenture and the Limited Offering Memorandum; or (iv) the consummation of any transaction contemplated in the Company Documents, except as have been obtained or made and as are in full force and effect (or, in case of the Loan Agreement, will be obtained or made and will be in full force and effect at the Closing).

(l)     The Company has obtained the necessary governmental agency approvals (including without limitation, all required air and water discharge permits), all variances from applicable zoning ordinances and all building permits and easements or licenses required to date for the completion and equipping of the Project, to the extent and as such Project is described in the Limited Offering Memorandum, and such governmental

agency approvals, variances, permits, easements and licenses constitute all approvals required to complete the Project, except as provided in the Limited Offering Memorandum and excepting certain building permits, inspections and approvals which the Company anticipates obtaining in due course. The Project should not be subject to change by any administrative or judicial body so as to materially affect such completion.

(m)     There will be on the Closing Date no persons with any rights granted by the Company or any manager or member of the Company to purchase any equity interest in or debt security of the Company. There are no direct and indirect subsidiaries of the Company.

(n)     Any certificate signed by any authorized officer of the Company on the Closing Date in connection with the Series 2020 Bond financing shall be deemed a representation and warranty by the Company to the Issuer, Co-Bond Counsel to the Issuer and the Underwriter as to the truth of the statements therein as of the Closing Date.

*Section 4.    Representations and Warranties of the Guarantor.*  The Guarantor represents and warrants to, and agrees with, the Underwriter and the Issuer that:

(a)     The Guarantor has taken all necessary action to authorize, execute and deliver the Guaranty, the Continuing Disclosure Agreement, this Bond Purchase Contract, and all other documents executed and delivered (or to be executed and delivered) in connection with the issuance of the Series 2020 Bonds and the other transactions contemplated hereby and thereby to which the Guarantor is or is to be a party (collectively, the "Guarantor Documents"), and this Bond Purchase Contract has been duly executed and delivered and, assuming the due authorization, execution and delivery by the other parties thereto, constitutes, and the other Guarantor Documents when duly executed and delivered by the Guarantor, assuming the due authorization, execution and delivery by the other parties thereto, will constitute, the legal, valid and binding obligations of the Guarantor enforceable against the Guarantor in accordance with their respective terms, except as may be limited by (i) bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium, and other similar laws or equitable principles affecting creditors' rights or remedies generally; (ii) the application of equitable principles and the exercise of judicial discretion in appropriate cases; (iii) principles of public policy concerning, affecting or limiting the enforcement of rights or remedies against governmental entities such as the Issuer; and (iv) common law and statutes affecting the enforceability of contractual obligations generally.

(b)     Other than as disclosed in the Limited Offering Memorandum and any documents incorporated by reference therein, the Guarantor has not and will not have at the Closing Date any material litigation pending of a character which would materially and adversely affect the operation of the Project, the Guarantor's ability to perform its obligations under the Guarantor Documents or the tax-exempt status of interest on the Series 2020 Bonds.

(c)     The execution, delivery and performance by the Guarantor of the Guarantor Documents are within the powers of the Guarantor and do not and will not conflict with or violate (i) the articles of formation or the limited liability company agreement of the Guarantor or (ii) any order, injunction, ruling or decree by which the Guarantor or its property is bound, and

7

do not and will not constitute a breach of or default under any agreement, indenture, mortgage, lease, note or other obligation, instrument or material arrangement to which the Guarantor is a party or by which the Guarantor or any of its property is bound, or contravene or constitute a violation of any federal or state constitutional or statutory provision, rule or regulation to which the Guarantor or any of its property is subject, the breach, default, contravention or violation of which could have a material adverse effect on the business or financial condition of the Guarantor and its subsidiaries taken as a whole, and no approval, consent or other action by, or filing or registration with, any governmental authority or agency is required in connection therewith that has not been obtained or accomplished or will not be obtained or accomplished by the Closing Date.

(d)     The Guarantor is a limited liability company duly organized and validly existing in good standing under the laws of the State of Delaware and qualified to do business in the Commonwealth with full power, authority and legal capacity to conduct the business now being and proposed to be conducted by it under the Guarantor Documents, and has full power, authority and legal capacity to execute, deliver, carry out and perform its obligations under the Guarantor Documents.

(e)     Since the respective most recent dates as of which information is given in the Limited Offering Memorandum, there has not been any material adverse change in the business, properties or financial condition of the Guarantor, other than changes reflected in or contemplated by the Limited Offering Memorandum.

(f)     Other than the Continuing Disclosure Agreement, dated as of June 1, 2019, by and among the Company, CarbonLite P Holdings, LLC and UMB Bank, N.A., as dissemination agent, in connection with the Series 2019 Bonds, the Guarantor has not previously undertaken any continuing disclosure undertakings pursuant to the Rule.

(g)     Each officer of the Guarantor executing the Guarantor Documents is duly and properly authorized to approve, execute, and deliver the same on behalf of the Guarantor.

(h)     No consent or approval of any trustee or holder of any indebtedness of the Guarantor, and no consent, permission, authorization, order or license of, or filing or registration with, any governmental authority (except in connection with "blue sky" laws) is required to be obtained or made by the Guarantor in connection with (i) the execution and delivery of this Bond Purchase Contract; (ii) the execution and delivery of the Guarantor Documents at the Closing; or (iii) the consummation of any transaction contemplated in the Guarantor Documents, except as have been obtained or made and as are in full force and effect.

(i)     There will be on the Closing Date no persons with any rights granted by the Guarantor or any manager or member of the Guarantor to purchase any equity interest in or debt security of the Guarantor.  There are no direct and indirect subsidiaries of the Guarantor other than the Company.

(j)     Any certificate signed by any authorized officer of the Guarantor on the Closing Date in connection with the Series 2020 Bond financing shall be deemed a representation and

warranty by the Guarantor to the Issuer, Co-Bond Counsel to the Issuer and the Underwriter as to the truth of the statements therein as of the Closing Date.

Section 5.    *Representations and Warranties of the Issuer*.    The Issuer represents and warrants to the Underwriter, the Guarantor and the Company that:

(a)    The Issuer has duly authorized the issuance of the Series 2020 Bonds and the execution and delivery of, and the performance of its obligations under, this Bond Purchase Contract, the Loan Agreement, the Tax Agreement and the Indenture; the Issuer has duly authorized, executed and delivered this Bond Purchase Contract which (assuming the due authorization, execution and delivery by the other parties hereto) constitutes a valid, binding and enforceable agreement of the Issuer, except as may be limited by (i) bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium, and other similar laws or equitable principles affecting creditors' rights or remedies generally; (ii) the application of equitable principles and the exercise of judicial discretion in appropriate cases; (iii) principles of public policy concerning, affecting or limiting the enforcement of rights or remedies against governmental entities such as the Issuer; and (iv) common law and statutes affecting the enforceability of contractual obligations generally. By official action of the Issuer prior to or concurrently with the acceptance hereof, the Issuer has authorized the distribution of the Preliminary Limited Offering Memorandum and the Limited Offering Memorandum and authorized and approved the execution and delivery of the Series 2020 Bonds, the Indenture, the Loan Agreement, this Bond Purchase Contract, the Tax Agreement or any other document executed and delivered (or to be executed and delivered) in connection with the issuance of the Series 2020 Bonds and the other transactions contemplated hereby and thereby, to which the Issuer is or is to be a party (collectively, the "Issuer Documents") and the consummation by the Issuer of the transactions contemplated thereby.

(b)    There is no action, suit or proceeding or, to the best knowledge of the Issuer, investigation, at law or in equity, before or by any court, board or body or other governmental authority, pending or, to the best knowledge of the Issuer, threatened against or affecting the Issuer, or any basis therefor, to restrain or enjoin the issuance or delivery of any of the Series 2020 Bonds or the collection, application or pledge of revenues pledged under the Indenture or in any way contesting or affecting the authority for the issuance of the Series 2020 Bonds or the validity or enforceability of the Issuer Documents, or the power of the Issuer to execute and deliver such documents or to consummate the transactions contemplated therein or the existence or powers of the Issuer or the titles of its officers to their respective offices, or wherein an unfavorable decision, ruling or finding would adversely affect the transactions contemplated hereby and in the Indenture or the Loan Agreement, or which would adversely affect the validity of the Series 2020 Bonds, the Indenture, the resolutions adopted in connection with the issuance of the Series 2020 Bonds, the Loan Agreement, the Tax Agreement or this Bond Purchase Contract.

(c)    To the best knowledge of the Issuer, the execution, delivery and performance by the Issuer of the Issuer Documents do not violate any order, injunction, ruling or decree by which the Issuer is bound, or contravene or constitute a material violation of the Pennsylvania Economic Development Financing Law (Act of August 23, 1967 P.L. 251, No. 102), as amended, 73 P.S. § 371 et seq. (the "Act"), and no approval, consent or other action by, or filing

or registration with, any governmental authority or agency is required in connection therewith that has not been obtained or accomplished or will not be obtained or accomplished by the Closing Date, except for post-closing filings with the Commonwealth and the Internal Revenue Service and provided no representation is made as to compliance with any federal or state securities or "Blue Sky" laws.

(d)    The Issuer will not take or omit to take any action requested by the Company, the Guarantor or the Underwriter, which action or omission might in any way result in the inclusion of the interest on the Series 2020 Bonds in the gross income of the owners thereof for federal income tax purposes, provided the Company, the Guarantor or the Underwriter, as the case may be, provides indemnification satisfactory to the Issuer against any and all liabilities, damages, costs, fees and expenses (including fees of Co-Bond Counsel and the Issuer's counsel) which may be incurred by the Issuer in connection with any action (or failure to act) requested by the Company, the Guarantor or the Underwriter, as the case may be.

(e)    The statements and information contained in the Preliminary Limited Offering Memorandum, as of its date and at the time of the Issuer's acceptance hereof, and the statements and the information contained in the Limited Offering Memorandum as of its date and at all times subsequent to its date up to and including the Closing Date, in each case under the captions "THE ISSUER" and "LITIGATION" (with respect to the Issuer) were true and correct in all material respects, and the information contained under the captions "THE ISSUER" and "LITIGATION" (with respect to the Issuer) in the Limited Offering Memorandum does not contain an untrue statement of a material fact or omit any statement or information concerning the Issuer which is necessary to make such statements and information therein, in the light of the circumstances under which they were made, not misleading. The Issuer has authorized the delivery of the Limited Offering Memorandum and approves of the use and distribution of the Limited Offering Memorandum by the Underwriter in connection with the initial sale and distribution of the Series 2020 Bonds.

(f)    The execution and delivery by the Issuer of the Issuer Documents and compliance with the provisions on the Issuer's part contained therein will not conflict with or constitute a material breach of or default under any law, administrative regulation, judgment, decree, loan agreement, indenture, bond, note, resolution, agreement or other instrument to which the Issuer is a party or is otherwise subject, nor will any such execution, delivery, adoption or compliance result in the creation or imposition of any lien, charge or other security interest or encumbrance of any nature whatsoever upon any of the properties or assets of the Issuer under the terms of any such law, administrative regulation, judgment, decree, loan agreement, indenture, bond, note, resolution, agreement or other instrument, except as provided by the Issuer Documents.

*Section 6. Underwriter's Representations.*  The Underwriter represents and warrants to and agrees with the Issuer, the Company and the Guarantor that:

(a)    The Underwriter is an entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization and is authorized to take any action under this Bond Purchase Contract required to be taken by it;

10

(b)    This Bond Purchase Contract has been duly authorized, executed and delivered by the Underwriter and, assuming the due authorization, execution and delivery by the Issuer and the Company, is the legal, valid and binding obligation of the Underwriter enforceable in accordance with its terms, except as may be limited by (i) bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium, and other similar laws or equitable principles affecting creditors' rights and remedies generally; (ii) the application of equitable principles and the exercise of judicial discretion in appropriate cases; (iii) principles of public policy concerning, affecting or limiting the enforcement of rights or remedies against governmental entities such as the Issuer; and (iv) common law and statutes affecting the enforceability of contractual obligations generally.

(c)    The Underwriter is licensed by and registered with (i) the Financial Industry Regulatory Authority as a broker-dealer and (ii) the MSRB as a municipal securities dealer.

(d)    The Underwriter also represents that all information in the Limited Offering Memorandum under the heading "UNDERWRITING" was as of its date and is as of the date hereof true, accurate and correct.

*Section 7.    Covenants of the Issuer and the Company.*  (a)  The Issuer and the Company agree to cooperate with the Underwriter, at the expense of the Company, in taking all necessary action for the qualification of the Series 2020 Bonds for offer and sale, and the determination of the eligibility of the Series 2020 Bonds for investment, under the laws of such jurisdictions as the Underwriter designates and the continuation of such qualification in effect so long as required for distribution of the Series 2020 Bonds; *provided, however*, that neither the Issuer nor the Company shall be required to register as a dealer or broker in any jurisdiction, to qualify as a foreign corporation or entity in any jurisdiction, or to file a general consent to suit or to service of process in any jurisdiction.

(b)    If, during such period (not to exceed twenty-five days after the "end of the underwriting period," as defined for purposes of paragraph (b)(4) of the Rule), as in the judgment of the Underwriter and the Issuer, delivery of the Limited Offering Memorandum as the same may be amended or supplemented as necessary or desirable in connection with sales of the Series 2020 Bonds by the Underwriter or any dealer or as otherwise may be required by applicable law or regulation, any event shall occur as a result of which, in the reasonable judgment of the Underwriter and the Issuer, it is necessary to amend or supplement the Limited Offering Memorandum in order to make the statements therein, in light of the circumstances when the Limited Offering Memorandum is delivered to the Underwriter or a "potential customer" (as defined for purposes of paragraph (b)(4) of the Rule), not misleading in any material respect, the Company will prepare and furnish, or cause to be prepared and furnished, at the Company's expense, including any and all reasonable costs of the Issuer and professionals retained by the Issuer, to the Underwriter and to any dealers to whom the Underwriter may have sold Series 2020 Bonds either amendments or supplements to the Limited Offering Memorandum so that the statements in the Limited Offering Memorandum as so amended or supplemented will not, in the light of the circumstances when the Limited Offering Memorandum as so amended or supplemented is delivered to the Underwriter or "potential customer," be misleading in any material respect.

11

*Section 8.    Conditions of Underwriter's Obligation.*  The obligation of the Underwriter to purchase and pay for the Series 2020 Bonds shall be subject to the accuracy of, and compliance with, the representations and warranties of the Issuer and the Company contained herein, to the performance by the Issuer and the Company of their obligations to be performed hereunder at and prior to the Closing Date, and to the following conditions:

(a)    On and as of the Closing Date:

(i)    The Note, the Tax Agreement, the Lease, the Financing Agreements and the Continuing Disclosure Agreement shall be in full force and effect, this Bond Purchase Contract shall not have been amended, modified or supplemented (except as may have been agreed to in writing by the Underwriter), and the Tax Agreement, the Financing Agreements, the Continuing Disclosure Agreement and the Note shall have been duly authorized, executed and delivered in the respective forms heretofore approved by the Underwriter, except as otherwise approved by the Underwriter, *provided* that the acceptance of delivery of the Series 2020 Bonds by the Underwriter on the Closing Date shall be deemed to constitute such approval.

(ii)    The Series 2020 Bonds shall have been duly authorized, executed and authenticated in accordance with the provisions of this Bond Purchase Contract, the Indenture, the Loan Agreement and the resolution of the Issuer described in clause (iv) below, and shall have been delivered through the facilities of DTC or its agent.

(iii)    Each of the representations, warranties and covenants of the Issuer and the Company contained herein and in the Financing Agreements and the Tax Agreement to which each is a party shall be true, complete and correct in all material respects as if then made.

(iv)    The Issuer shall have duly adopted, and there shall be in full force and effect, such resolutions as shall be necessary to consummate the transactions contemplated by this Bond Purchase Contract.

(v)    No order, decree or injunction of any court of competent jurisdiction shall have been issued, or proceedings therefor shall have been commenced, nor shall any order, ruling, regulation or official statement by any governmental official, body or board have been issued, nor shall any legislation have been enacted, with the purpose or effect of prohibiting or limiting the issuance, offering or sale of the Series 2020 Bonds, as contemplated herein or in the Limited Offering Memorandum, or the performance of the Financing Agreements, the Note, the Tax Agreement or the Continuing Disclosure Agreement in accordance with their respective terms.

(b)    On the Closing Date, the Underwriter shall receive executed or counterpart copies of the following documents, certificates, opinions and letters, in form and substance satisfactory to the Underwriter:

12

(i) Executed copies of the Tax Agreement, the Note, the Financing Agreements and the Continuing Disclosure Agreement; and a certified copy of the resolution pursuant to which the issuance of the Series 2020 Bonds was authorized and all proceedings of the Issuer relating thereto.

(ii) Opinions, dated the Closing Date, of: (A) Ballard Spahr LLP and Turner Law, P.C., Co-Bond Counsel, in substantially the form attached to the Limited Offering Memorandum as Appendix C thereto and in substantially the form attached hereto as *Exhibit A* (with such changes or variations between the two as permitted by the Issuer, the Trustee and the Underwriter), together with a reliance letter addressed to the Issuer; (B) Reed Smith LLP, special counsel to the Company and the Guarantor in substantially the form attached hereto as *Exhibit B* (with such changes as agreed to by the Issuer, the Trustee and the Underwriter), and (C) the Office of Chief Counsel, Pennsylvania Department of Community and Economic Development ("DCED"), counsel to the Issuer, in substantially the form attached hereto as *Exhibit C.*

(iii) A certificate of the Issuer, signed by an authorized officer of the Issuer, dated the Closing Date, to the effect that each of the representations of the Issuer set forth herein is true, accurate and complete in all material respects at and as of the Closing Date and that each of the obligations of the Issuer hereunder to be performed at or prior to the Closing Date has been performed.

(iv) A certificate, dated the Closing Date, signed by an authorized officer of the Company satisfactory to the Underwriter and the Issuer, to the effect that: (1) the representations and warranties of the Company set forth herein are true, accurate and complete in all material respects at and as of the Closing Date, (2) each of the obligations of the Company under this Bond Purchase Contract to be performed at or prior to the Closing Date has been performed, and (3) since the most recent dates as of which information is given in the Limited Offering Memorandum, as it may have been amended or supplemented (including amendments or supplements resulting from the filing of documents incorporated by reference), and up to the Closing Date, there has been no material adverse change in the business, properties or financial condition of the Company and its subsidiaries taken as a whole, except as reflected in or contemplated by the Limited Offering Memorandum, as it may have been so amended or supplemented.

(v) A certificate, dated the Closing Date, signed by an authorized officer of the Guarantor satisfactory to the Underwriter and the Issuer, to the effect that: (1) the representations and warranties of the Guarantor set forth herein are true, accurate and complete in all material respects at and as of the Closing Date, (2) each of the obligations of the Guarantor under this Bond Purchase Contract to be performed at or prior to the Closing Date has been performed, and (3) since the most recent dates as of which information is given in the Limited Offering Memorandum, as it may have been amended or supplemented (including amendments or supplements resulting from the filing of

documents incorporated by reference), and up to the Closing Date, there has been no material adverse change in the business, properties or financial condition of the Guarantor and its subsidiaries taken as a whole, except as reflected in or contemplated by the Limited Offering Memorandum, as it may have been so amended or supplemented.

(vi)    An executed copy of IRS Form 8038 with respect to the Series 2020 Bonds to be filed with the Internal Revenue Service.

(vii)    An opinion of counsel to the Trustee addressed to the Issuer and the Underwriter, dated the date of Closing, to the effect that: (i) the Trustee is a national banking association with trust powers, duly organized and validly existing and in good standing under the laws of the United States of America, having the legal authority to exercise trust powers in the Commonwealth; (ii) the Trustee has full legal power and corporate authority to accept the duties and obligations imposed on it by the Account Control Agreement, the NDA, the Continuing Disclosure Agreement, the Leasehold Mortgage, the Pledge and Security Agreement, the Guaranty, and the Indenture (collectively, the "*UMB Documents*") and to authenticate the Series 2020 Bonds and the full legal power and authority to own its properties and to carry on its business; (iii) the Series 2020 Bonds have been duly authenticated by the Trustee; (iv) no consent, approval, authorization or order of any court, regulatory authority or governmental body is required for the valid authorization, execution and delivery of the UMB Documents and the authentication of the Series 2020 Bonds by the Trustee or the consummation by the Trustee of the transactions contemplated in the Indenture except such as have been obtained and except such as may be required under the state securities or Blue Sky laws in connection with the purchase and distribution of the Series 2020 Bonds by the Underwriter; and (v) the acceptance of its duties under the UMB Documents and the authentication of the Series 2020 Bonds by the Trustee and performance by the Trustee of its obligations thereunder, will not conflict with or result in a breach of any of the terms, conditions or provisions of its Articles of Organization or any other agreement or instrument to which the Trustee is a party or by which it is bound or any other existing law, regulation, court order or consent decree to which the Trustee is subject or constitute a default thereunder.

(viii)    A certificate of the Trustee, dated the date of the Closing, to the effect that: (i) it is a national banking association existing under the laws of the United States of America, and has full power and is qualified to accept and comply with the terms of the UMB Documents, as applicable, and to perform its obligations stated therein; (ii) the Trustee has accepted the duties and obligations imposed on it by the UMB Documents; (iii) no consent, approval, authorization or other action by any governmental or regulatory authority having jurisdiction over the Trustee that has not been obtained is or will be required for the consummation by the Trustee of the transactions contemplated by the UMB Documents to be undertaken by the Trustee; (iv) compliance with the terms of the UMB Documents will not conflict with, or result in a violation or breach of, or

14

constitute a default under, any loan agreement, indenture, bond, note, resolution or any other agreement or instrument to which the Trustee is a party or by which it is bound, or, to the best knowledge of the Trustee, after reasonable investigation, any law, rule, regulation, order or decree of any court or governmental agency or body having jurisdiction over the Trustee or any of its activities or properties (except that no representation, warranty or agreement is made by the Trustee with respect to any Federal or state securities or Blue Sky laws or regulations); and (v) to the best knowledge of the Trustee, there is no action, suit, proceeding, inquiry or investigation, at law or in equity, before or by any court or governmental agency, public board or body served on or threatened against or affecting the existence of the Trustee, or contesting the powers of the Trustee or its authority to enter into and perform its obligations under the UMB Documents or the Series 2020 Bonds, wherein an unfavorable decision, ruling or finding would adversely affect the validity of the UMB Documents or the Series 2020 Bonds.

(ix)    Evidence that the Company has obtained all insurance required to be obtained by the Company Documents.

(x)    A letter executed by each purchaser, addressed to the Issuer, dated the Closing Date, in substantially the form attached hereto as Exhibit D.

(xi)    Approval of Governor of the Commonwealth of Pennsylvania.

(xii)    Approval of the Office of General Counsel.

(xiii)    Approval of the Office of Attorney General.

(xiv)    an opinion of Orrick, Herrington & Sutcliffe LLP, Underwriter's Counsel, dated the Closing Date, in form and substance satisfactory to the Underwriter.

(xv)    Evidence satisfactory to the Underwriter that the Equity Contribution has been delivered to the Trustee.

(xvi)    Such additional certifications and opinions as the Underwriter or Co-Bond Counsel may reasonably require.

In case any of the conditions specified above in this Section 8 shall not have been fulfilled, or if the obligations of the Underwriter are terminated by the Underwriter for any reason permitted by this Bond Purchase Contract, this Bond Purchase Contract may be terminated by the Underwriter upon written notice thereof to the Issuer and the Company. Any such termination shall be without liability of any party to any other party; except that the obligations of the Company and the Underwriter to pay fees and expenses as provided in Section 2 hereof shall continue in full force and effect to the extent set forth therein. The Underwriter may, in its discretion, waive any one or more of the conditions imposed by this Bond Purchase Contract and proceed with the purchase of the Series 2020 Bonds on the Closing Date.

*Section 9.    Underwriter's Right to Terminate.*  The Underwriter shall have the right to terminate its obligation to purchase and accept delivery of the Series 2020 Bonds hereunder by notifying the Issuer and the Company in writing of its election to do so between the date hereof and the Closing Date if, on or after the date hereof and on or prior to the Closing Date:

(a)    legislation shall be enacted or be actively considered for enactment by the Congress, or recommended to the Congress for passage by the President of the United States of America, or favorably reported for passage to either chamber of the Congress by a committee of such chamber to which such legislation has been referred for consideration, a decision by a court of the United States of America or the United States Tax Court shall be rendered, or a ruling, regulation or official statement (including a press release) by or on behalf of the Treasury Department of the United States of America, the Internal Revenue Service or other governmental agency shall be made or proposed to be made with respect to federal taxation upon revenues or other income of the general character to be derived by the Issuer under the Indenture and the Loan Agreement or by any similar body, or upon interest on obligations of the general character of the Series 2020 Bonds, or other action or events shall have transpired which have the purpose or effect, directly or indirectly, of changing the federal income tax consequences of any of the transactions contemplated in connection herewith, which, in the reasonable judgment of the Underwriter, materially and adversely affects the marketability of the Series 2020 Bonds or the market price generally of obligations of the general character of the Series 2020 Bonds; or

(b)    legislation or a rule or regulation shall have been enacted or favorably reported for passage by any governmental body, department or agency of the Commonwealth, or any decision shall have been rendered by any court of competent jurisdiction in the Commonwealth, which would materially and adversely affect or change the exemptions (if any) from Commonwealth taxation of the Series 2020 Bonds or the interest thereon or the exemption (if any) from taxation in or by the Commonwealth of the revenues derived or income of the character to be derived by the Issuer under the Indenture or the Loan Agreement; or

(c)    a stop order, ruling, regulation or official statement by or on behalf of the Commission shall be issued or made to the effect that the issuance, offering or sale of the Series 2020 Bonds or of obligations of the general character of the Series 2020 Bonds as contemplated hereby or the Series 2020 Bonds are subject to registration or qualification under the Securities Act, or the Indenture is required to be qualified under the Trust Indenture Act of 1939, as amended (the *"TIA"*), or either the Series 2020 Bonds or the Indenture is in violation of any applicable provision of either of such acts or other federal securities laws or applicable regulations promulgated thereunder; or

(d)    any event shall have occurred or condition shall exist which, in the reasonable judgment of the Underwriter, either (i) makes untrue or incorrect in any material respect any statement or information contained in the Limited Offering Memorandum, or (ii) is not reflected in the Limited Offering Memorandum and should be reflected therein in order to comply with any rulings or regulations of the Commission or

16

other governmental agency or to make the statements and information contained therein not misleading in any material respect; or

(e)    there shall have occurred any outbreak of hostilities or escalation thereof or other national or international calamity or crisis or a financial crisis, the effect of such outbreak, calamity or crisis on the financial markets of the United States of America being such as, in the reasonable opinion of the Underwriter, would affect materially and adversely the ability of the Underwriter to market the Series 2020 Bonds; or

(f)    trading shall be suspended, or new or additional trading or loan restrictions shall be imposed by the New York Stock Exchange or other national securities exchange or governmental authority with respect to obligations of the general character of the Series 2020 Bonds or a general banking moratorium shall be declared by federal, State or New York authorities or a material disruption in commercial banking activities or securities settlement or clearance services shall have occurred; or

(g)    any litigation shall be instituted, pending or threatened to restrain or enjoin the issuance or sale of the Series 2020 Bonds or in any way protesting or affecting any authority for or the validity of the Series 2020 Bonds, the Indenture, the Loan Agreement, the Tax Agreement, the Continuing Disclosure Agreement or this Bond Purchase Contract or the existence or powers of the Issuer and the Company; or

(h)    there shall have occurred any change in the financial condition of the Company and its subsidiaries taken as a whole from those set forth in the Limited Offering Memorandum that makes the Series 2020 Bonds, in the reasonable judgment of the Underwriter, impracticable to market on the terms and in the manner contemplated in the Limited Offering Memorandum.

Any termination of this Bond Purchase Contract pursuant to this Section 9 shall be without liability of any party to any other party, except as described in Sections 2 and 8 above.

Section 10.    Indemnification.

(a)    The Company agrees to indemnify and hold harmless the Underwriter and the Issuer and any partner, member, officer, director, employee or agent of the Underwriter or the Issuer and each person, if any, who controls the Underwriter or the Issuer within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act (collectively, the "Indemnified Party") against any and all losses, costs, claims, damages, liabilities or expenses whatsoever which any of them may incur, become subject or suffer (including all such losses, costs, claims, damages, liabilities or expenses as a result of settlement consented to by the Company or any judgment which any of them may incur, become subject or suffer), and to reimburse each of them for any reasonable and customary legal fees or other out-of-pocket expenses (including, to the extent hereinafter provided, reasonable counsel fees and other costs of investigation) reasonably incurred by them in connection with investigating any such losses, claims, damages or liabilities or in connection with defending any actions (together hereinafter referred to as a "Loss" or "Losses"), insofar as such Losses arise out of or are based upon

17

(i) the failure to register any security under the Securities Act or to qualify the Indenture under the TIA in connection with the offering of the Series 2020 Bonds; (ii) any untrue statement or alleged untrue statement of a material fact (whether or not made with scienter) contained in the Limited Offering Memorandum, including any documents incorporated therein by reference, as amended or supplemented (if any amendments or supplements thereto, including documents incorporated by reference, shall have been furnished in accordance with the provisions of this Bond Purchase Contract), or the omission or alleged omission to state therein a material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading in any material respect; provided that the indemnity agreement contained in clause (ii) above of this Section 10 shall not apply to (A) the Underwriter (or any person controlling the Underwriter) on account of any such untrue statement or alleged untrue statement, or any such omission or alleged omission, under the caption "UNDERWRITING" in the Limited Offering Memorandum or (B) the Issuer on account of any such untrue statement or alleged untrue statement, or any such omission or alleged omission, under the caption "THE ISSUER" or "LITIGATION" (with respect to the Issuer); or (iii) a breach of any of the representations, warranties or covenants of the Issuer or the Company, as applicable, included in this Bond Purchase Contract; and provided further, however, that the Company shall not be liable to the Underwriter for any such Losses (A) if the person asserting the Loss purchased Series 2020 Bonds from the Underwriter, if delivery to such person of the Limited Offering Memorandum, as then amended or supplemented, would have been a valid defense to the action from which such Loss arose, and copies of an Limited Offering Memorandum, as then so amended or supplemented, were made available to the Underwriter and a copy was not delivered to such person by or on behalf of the Underwriter or (B) to the extent caused by the gross negligence, willful misconduct or bad faith of the person seeking indemnity (other than the Issuer).

(b)    Each Indemnified Party agrees that, upon the receipt of notice of the commencement of any action against it, in respect of which indemnity may be sought hereunder, it will promptly give written notice of the commencement thereof to the Company, but the failure so to notify the Company of any such action shall not relieve the Company from any liability which it may have to the Indemnified Party under this Section 10 unless such failure restricts or limits the Company's ability to defend such action.  In case such notice of any action shall be so given, the Company shall be entitled to participate at its own expense in the defense thereof or, if it elects, with the consent of each Indemnified Party, to assume (in conjunction with any other Indemnifying Party) the defense of such action, in which event such defense shall be conducted by counsel chosen by the Company reasonably satisfactory to the Indemnified Party who shall be defendant or defendants in such action, and such defendant or defendants shall bear the fees and expense of any additional counsel retained by them; provided, that if the Company shall elect not to assume the defense of such action, the Company will reimburse such Indemnified Party for the reasonable and customary legal fees and out-of-pocket expenses of any counsel retained by such Indemnified Party; provided, further that, if the defendants in any such action include one or more of the Indemnified Party and the Company, and counsel for any Indemnified Party shall have reasonably concluded that there may be a conflict of interest involved in the representation by such

counsel of both the Company and any one or more of the Indemnified Party, the Indemnified Party shall have the right to select separate counsel, including local counsel to participate in the defense of such action on behalf of such Indemnified Party and the Company shall be liable for the reasonable and customary expenses of separate counsel representing such Indemnified Party who is a party to such action.

(c)    The obligations under this Section 10 shall remain operative and in force and effect regardless of any investigation made by or on behalf of the Issuer or the Underwriter, and shall survive the issuance and the maturity of the Series 2020 Bonds and any termination of this Bond Purchase Contract.

Section 11.    Establishment of Issue Price.

(a)    The Underwriter agrees to assist the Issuer in establishing the issue price of the Series 2020 Bonds and shall execute and deliver to the Issuer on the Closing Date an "issue price" or similar certificate, substantially in the form attached hereto as Exhibit E, together with the supporting pricing wires or equivalent communications, with such modifications as may be deemed appropriate or necessary, in the reasonable judgment of the Underwriter, the Issuer and Co-Bond Counsel, to accurately reflect, as applicable, the sales price or prices or the initial offering price or prices to the public of the Series 2020 Bonds.

(b)    The Issuer represents that it will treat the first price at which 10% of each maturity of the Series 2020 Bonds (the "10% test") is sold to the public as the issue price of that maturity (if different interest rates apply within a maturity, each separate CUSIP number within that maturity will be subject to the 10% test).

(c)    The Underwriter confirms that any selling group agreement and any retail distribution agreement relating to the initial sale of the Series 2020 Bonds to the public, together with the related pricing wires, contains or will contain language obligating each dealer who is a member of the selling group and each broker-dealer that is a party to such retail distribution agreement, as applicable, to (A) report the prices at which it sells to the public the unsold Series 2020 Bonds of each maturity allotted to it until it is notified by the Underwriter that either the 10% test has been satisfied as to the Series 2020 Bonds of that maturity or all Series 2020 Bonds of that maturity have been sold to the public and (B) comply with the hold-the-offering-price rule, if applicable, in each case if and for so long as directed by the Underwriter.  The Issuer acknowledges that, in making the representation set forth in this subsection, the Underwriter will rely on (i) in the event a selling group has been created in connection with the initial sale of the Series 2020 Bonds to the public, the agreement of each dealer who is a member of the selling group to comply with the hold-the-offering-price rule, if applicable, as set forth in a selling group agreement and the related pricing wires, and (ii) in the event that a retail distribution agreement was employed in connection with the initial sale of the Series 2020 Bonds to the public, the agreement of each broker-dealer that is a party to such agreement to comply with the hold-the-offering-price rule, if applicable, as set forth in the retail distribution agreement and the related pricing wires.  The Issuer further acknowledges that the Underwriter shall not be liable for the failure of any dealer who is a member of a

selling group, or of any broker-dealer that is a party to a retail distribution agreement, to comply with its corresponding agreement regarding the hold-the-offering-price rule as applicable to the Series 2020 Bonds.

(d)    The Underwriter acknowledges that sales of any Series 2020 Bonds to any person that is a related party to the Underwriter shall not constitute sales to the public for purposes of this section. Further, for purposes of this section:

(i)    "public" means any person other than an underwriter or a related party to an underwriter,

(ii)    "underwriter" means (A) any person that agrees pursuant to a written contract with the Issuer (or with the lead underwriter to form an underwriting syndicate) to participate in the initial sale of the Series 2020 Bonds to the public and (B) any person that agrees pursuant to a written contract directly or indirectly with a person described in clause (A) to participate in the initial sale of the Series 2020 Bonds to the public (including a member of a selling group or a party to a retail distribution agreement participating in the initial sale of the Series 2020 Bonds to the public),

(iii)    a purchaser of any of the Series 2020 Bonds is a "related party" to an underwriter if the underwriter and the purchaser are subject, directly or indirectly, to (i) at least 50% common ownership of the voting power or the total value of their stock, if both entities are corporations (including direct ownership by one corporation of another), (ii) more than 50% common ownership of their capital interests or profits interests, if both entities are partnerships (including direct ownership by one partnership of another), or (iii) more than 50% common ownership of the value of the outstanding stock of the corporation or the capital interests or profit interests of the partnership, as applicable, if one entity is a corporation and the other entity is a partnership (including direct ownership of the applicable stock or interests by one entity of the other), and

(iv)    "sale date" means the date of execution of this Bond Purchase Contract by all parties.

*Section 12. Miscellaneous*.    The validity and interpretation of this Bond Purchase Contract shall be governed by the laws of the Commonwealth of Pennsylvania, without regard to conflict of laws provisions. This Bond Purchase Contract shall inure to the benefit of the Issuer, the Underwriter, the Company, and their respective successors and assigns and to the persons described in Section 10. Except as provided in Section 10, nothing in this Bond Purchase Contract is intended or shall be construed to give to any other person, firm or corporation any legal or equitable right, remedy or claim under or in respect of this Bond Purchase Contract or any provision contained herein. The terms "successors" and "assigns" as used in this Bond Purchase Contract shall not include any purchaser, as such purchaser, of any Series 2020 Bonds from or through the Underwriter. This Bond Purchase Contract may be executed by any one or more of the parties hereto in any number of counterparts, each of which shall be deemed to be an original, but all such counterparts shall together constitute one and the same instrument. If any

4129-8071-8114.9

provision of this Bond Purchase Contract shall be determined to be unenforceable, that shall not affect any other provision of this Bond Purchase Contract. Capitalized terms used herein to the extent not otherwise defined herein, are intended to have the meaning given to them in the Indenture.

The representations and warranties of the Company, the Guarantor and the Issuer contained in Sections 3, 4 and 5 hereof, respectively, shall remain operative and in full force and effect, regardless of any investigation made by or on behalf of the Underwriter, and shall survive the delivery of the Series 2020 Bonds.

*Section 13. Notices and other Actions.*    All notices, demands and formal actions hereunder will be in writing mailed, telecopied or delivered to:

| | |
|---|---|
| The Issuer: | Pennsylvania Economic Development Financing Authority |
| | Commonwealth Keystone Building |
| | 400 North Street, 4th Floor |
| | Harrisburg, PA  17120-0225 |
| | Attn:  Executive Director |
| | Facsimile: (717) 787-0879 |
| | |
| The Company: | CarbonLite P, LLC |
| | c/o HPC Industries LLC |
| | 10250 Constellation Blvd. Suite 2820 |
| | Los Angeles, CA  90067 |
| | Attention: Leon Farahnik |
| | Facsimile Number: (310) 473-9592 |
| | |
| The Underwriter: | Westhoff, Cone & Holmstedt |
| | 1777 Botelho Drive, Suite 345 |
| | Walnut Creek, CA 94596 |
| | Attention:  Principal |

Notices given by facsimile transmission shall be followed promptly by copies sent by first class mail to the notice address.

The Issuer shall receive a copy of any notice, consent, certificate or other document or communication given by any party to any party hereunder.

*Section 14.    No Advisory or Fiduciary Role.*  Each of the Issuer and the Company acknowledges and agrees that (i) the purchase and sale of the Series 2020 Bonds pursuant to this Bond Purchase Contract is an arm's-length commercial transaction among the Issuer, the Company and the Underwriter, (ii) in connection therewith and with the discussions, undertakings and procedures leading up to the consummation of such transaction, the Underwriter is and has been acting solely as principal and is not acting as the agent or fiduciary of either the Issuer or the Company, (iii) the Underwriter has not assumed an advisory or fiduciary responsibility in favor of the either the Company or the Issuer with respect to the offering contemplated hereby or the discussions, undertakings and procedures leading thereto

(irrespective of whether the Underwriter has provided other services or is currently providing other services to the Company or the Issuer on other matters) and the Underwriter has no obligation to either the Issuer or the Company with respect to the offering contemplated hereby except the obligations expressly set forth in this Bond Purchase Contract and (iv) the Company and Issuer have consulted their own legal, financial and other advisors to the extent each has deemed appropriate.

Section 15.    *Acknowledgment by Company of Distribution Agreement between Piper Sandler and Underwriter*.  The Company acknowledges that the Underwriter and Piper Sandler ("Piper Sandler") have entered into a distribution agreement for the marketing and distribution of the Series 2020 Bonds.  The Company agrees that the representations and warranties set forth in Section 3 hereof and the indemnifications set forth in Section 10 hereof shall be deemed representations, warranties and indemnifications by the Company and the Guarantor (as applicable) to Piper Sandler, the Underwriter and the Issuer.  In addition, any certificate signed by any authorized officer of the Company or the Guarantor on the Closing Date shall be deemed a representation and warranty by the Company or the Guarantor (as applicable) to Piper Sandler as to the truth of the statements therein as of the Closing Date.

IN WITNESS WHEREOF, the parties hereto, in consideration of the mutual covenants set forth herein and intending to be legally bound, have caused this Bond Purchase Contract to be executed and delivered as of the date first written above.

**PENNSYLVANIA ECONOMIC DEVELOPMENT FINANCING AUTHORITY**

By:_____
      Name: Stephen M. Drizos
      Title:   Executive Director

**WESTHOFF, CONE & HOLMSTEDT**

By:_____
      Name:  Mark A. Holmstedt
      Title:    Principal

**CARBONLITE P, LLC**

By:_____
      Name:  Leon Farahnik
      Title:    Chief Executive Officer

**CARBONLITE P HOLDINGS, LLC**

By:_____
      Name:  Leon Farahnik
      Title:    Chief Executive Officer

4129-8071-8114

IN WITNESS WHEREOF, the parties hereto, in consideration of the mutual covenants set forth herein and intending to be legally bound, have caused this Bond Purchase Contract to be executed and delivered as of the date first written above.

PENNSYLVANIA ECONOMIC DEVELOPMENT FINANCING AUTHORITY

By:_____
     Name: Stephen M. Drizos
     Title:  Executive Director

WESTHOFF, CONE & HOLMSTEDT

By:_____
     Name:  Mark A. Holmstedt
     Title:  Principal

CARBONLITE P, LLC

By:_____
     Name:  Leon Farahnik
     Title:   Chief Executive Officer

CARBONLITE P HOLDINGS, LLC

By:_____
     Name:  Leon Farahnik
     Title:   Chief Executive Officer

4129-8071-8114

IN WITNESS WHEREOF, the parties hereto, in consideration of the mutual covenants set forth herein and intending to be legally bound, have caused this Bond Purchase Contract to be executed and delivered as of the date first written above.

PENNSYLVANIA ECONOMIC DEVELOPMENT
FINANCING AUTHORITY

By:_____

    Name: Stephen M. Drizos
    Title:  Executive Director

WESTHOFF, CONE & HOLMSTEDT

By:_____

    Name: Mark A. Holmstedt
    Title:   Principal

CARBONLITE P, LLC

By:_____

    Name: Leon Farahnik
    Title:   Chief Executive Officer

CARBONLITE P HOLDINGS, LLC

By:_____

    Name: Leon Farahnik
    Title:   Chief Executive Officer

**Schedule I**

**Maturity Schedule**

$10,000,000 8.50% Bond due December 1, 2036 - Price 100.00%

**Redemption**

So long as no Series 2019 Bonds are then Outstanding, the Series 2020 Bonds will be redeemed upon the following terms:

*Optional Redemption*.  On any date on and after June 1, 2026, the Series 2020 Bonds may be redeemed in whole or in part, at a redemption price expressed as a percentage of the principal amount of the Series 2020 Bonds to be redeemed, plus accrued interest thereon to the date of redemption, as follows:

| Redemption Date | Redemption Price |
| --- | --- |
| June 1, 2026 through May 31, 2027 | 103% |
| June 1, 2027 through May 31, 2028 | 102% |
| June 1, 2028 through May 31, 2029 | 101% |
| June 1, 2029 and thereafter | 100% |

*Mandatory Redemption Upon Invalidity*.  In the event of a prepayment pursuant to the Loan Agreement as a result of invalidity, Series 2020 Bonds Outstanding on the date of the occurrence of the invalidity will be redeemed in whole at any time within 30 days thereafter (on a redemption date selected by the Trustee), at a redemption price of 100% of the principal amount thereof, without premium, plus accrued interest to the date of redemption.

*Mandatory Redemption of Series 2020 Bonds Upon a Determination of Taxability*.  In the event of a prepayment pursuant to the Loan Agreement as a result of a Determination of Taxability (as defined in the Indenture), Series 2020 Bonds Outstanding on the date of the occurrence of the Determination of Taxability will be redeemed in whole at any time within 30 days thereafter (on a redemption date selected by the Trustee), at a redemption price of 103% of the principal amount thereof plus accrued interest to the date of redemption.

*Optional Redemption Upon Occurrence of Extraordinary Events*.  The Series 2020 Bonds may be redeemed in whole or in part on any date at a redemption price equal to the principal amount thereof, without premium, plus accrued interest to the date of redemption, upon receipt by the Trustee (with a copy to the Issuer) of a written notice from the Borrower stating that any of the following events has occurred:

(i)  all of the Project or a portion thereof is damaged or destroyed, condemned or taken by eminent domain to such extent that, in the opinion of an Independent Consultant evidenced by a certificate provided to the Issuer and the Trustee, which opinion may be conclusively relied upon by the Trustee and the Issuer, that (1) it is not

practicable or desirable to rebuild, repair or replace the Project or such portion thereof or the facility at which the Project is located within a period of six (6) consecutive months following such damage, destruction or condemnation, and the Borrower is or will be thereby prevented from carrying on its normal operations at the Project or such portion thereof or the facility at which the Project is located for a period of at least six (6) consecutive months, or (2) the cost of repair or replacement of the Project or such portion thereof or the facility at which the Project is located would substantially exceed the Net Proceeds of insurance carried thereon and the Net Proceeds of insurance together with Borrower's cash contribution, are sufficient to fully pay the principal of and interest on the Series 2020 Bonds to the redemption date; or

(ii) the continued operation of all or a portion of the Project is enjoined or prevented or is otherwise prohibited by, or conflicts with, any order, decree, rule or regulation of any court or federal, state or local regulatory body, administrative agency or other governmental body.

Anything under this subheading to the contrary notwithstanding, if any of the events described above have occurred with respect to a portion of, but not all of, the Project, the amount of Series 2020 Bonds that may be redeemed will not exceed an amount derived by multiplying the total principal amount of the Series 2020 Bonds by a fraction (a) the numerator of which is the original cost of the Project or portion thereof so affected and (b) the denominator of which is the total original cost of the Project.

*Optional Redemption from Excess Proceeds in the Project Fund*.  On any date on and after December 1, 2020, the Series 2020 Bonds may be redeemed at the direction of the Borrower from excess Series 2020 Bond proceeds on deposit in the Project Fund, in whole or in part, at a redemption price equal to 100% of the principal amount thereof to be redeemed (without premium), plus accrued interest thereon to the date of redemption.

**Exhibit A**

**[Form of Supplemental Co-Bond Counsel Opinion]**

September 10, 2020

Westhoff, Cone & Holmstedt
1777 Botelho Drive
Suite 345
Walnut Creek, CA 94596

Re:    $10,000,000 Pennsylvania Economic Development Financing Authority Subordinate Solid Waste Disposal Revenue Bonds (CarbonLite P, LLC Project) Series 2020

Ladies and Gentlemen:

We have acted as co-bond counsel to the Pennsylvania Economic Development Financing Authority (the "Issuer") in connection with the issuance by the Issuer of $10,000,000 aggregate principal amount of its Subordinate Solid Waste Disposal Revenue Bonds (CarbonLite P, LLC Project), Series 2020 (the "Bonds").  The Bonds are being issued pursuant to (i) the Pennsylvania Economic Development Financing Law, Act of August 23, 1967, P.L. 251, as amended (the "Act"), (ii) an Indenture of Trust dated as of June 1, 2019 (the "Original Indenture"), as amended and supplemented by the First Supplemental Indenture of Trust dated as of September 1, 2020 (the "First Supplemental Indenture" and, together with the Original Indenture, the "Indenture"), each between the Issuer and UMB Bank, N.A., as trustee (the "Trustee"), and (iii) a Resolution of the Issuer's Board of Directors adopted on February 19, 2020 (the "Resolution").

Proceeds of the Bonds will be loaned by the Issuer to CarbonLite P, LLC, a Delaware limited liability company (the "Borrower") pursuant to the terms of a Loan Agreement dated as of June 1, 2019 (the "Original Loan Agreement"), as amended by the First Amendment to Loan Agreement, dated as of September 1, 2020 (the "First Amendment to Loan Agreement" and, together with the Original Loan Agreement, the "Loan Agreement"), each between the Issuer and the Borrower.  Payment of the principal of and interest on the Bonds when due will be guaranteed by CarbonLite P Holdings LLC, a Delaware limited liability company and the sole member of the Borrower, as guarantor (the "Guarantor"), pursuant to the Guaranty Agreement dated as of June 1, 2019 (the "Original Guaranty"), as amended by the First Amendment to Guaranty Agreement, dated as of September 1, 2020 (the "First Amendment to Guaranty" and, together with the Original Guaranty, the "Guaranty"), each by and between the Guarantor and the Trustee.

The Bonds are being purchased on the date hereof by Westhoff, Cone & Holmstedt (the "Underwriter") pursuant to a Bond Purchase Contract dated September 3, 2020 (the "Bond Purchase Contract") among the Underwriter, the Issuer, the Borrower and the Guarantor.

A-1

In our capacity as co-bond counsel, we have examined such documents, records of the Issuer and other instruments as we deemed necessary to enable us to express the opinions set forth below, including the Preliminary Limited Offering Memorandum dated August 14, 2020, as supplemented by the Supplement dated August 28, 2020 (as so supplemented, the "Preliminary Limited Offering Memorandum") and the Limited Offering Memorandum dated September 3, 2020 (the "Limited Offering Memorandum") distributed in connection with the limited offering and sale of the Bonds, as well as originals or copies of such other agreements, documents, records, certificates and other materials, and have satisfied ourselves as to such matters, as we have considered relevant or necessary as a basis for such opinion.  In such review, we have assumed the accuracy and completeness of all agreements, documents, records, certificates and other materials submitted to us, the conformity with the originals of all such materials submitted to us as copies (whether or not certified and including facsimiles), the authenticity of the originals of such materials and all materials submitted to us as originals, the genuineness of all signatures, and the legal capacity of all natural persons.  We have also assumed (i) that each party (other than the Issuer) to each of the documents referred to above is validly existing and in good standing under the laws of its state of incorporation or formation, and (ii) the due authorization, execution and delivery of each document referred to above by each of the parties thereto (other than the Issuer), and the validity, binding nature and enforceability of each document referred to above against each of the parties thereto (other than the Issuer).  As to various questions of fact relevant to such opinion, we have relied, without independent investigation, upon certifications of public officials, certificates of officers of the Borrower and the Guarantor and representations and warranties of the Borrower and the Guarantor contained in the documents referred to above.

Based on the foregoing, we are of the opinion that:

1.   The Bond Purchase Contract constitutes the legal, valid and binding obligation of the Issuer, enforceable against it in accordance with its terms, except as enforcement thereof may be limited by (a) applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, fraudulent transfer, marshalling or similar laws affecting creditors' rights and remedies generally; (b) the rights of account debtors, claims and defenses of account debtors and the terms of agreements with account debtors; (c) general principles of equity, including without limitation, concepts of materiality, reasonableness, good faith and fair dealing (regardless of whether such enforceability is considered in a proceeding in equity or at law); and (d) limitations on enforceability of rights to indemnification or contribution by federal or state securities laws or regulations or by public policy.

2.   No registration of the Bonds under the Securities Act of 1933, as amended, or qualification of the Indenture under the Trust Indenture Act of 1939, as amended, is required in connection with the limited offering and sale of the Bonds.

3.   The statements contained in the Preliminary Limited Offering Memorandum and the Limited Offering Memorandum under the captions "THE SERIES 2020 BONDS" (but excluding the information set forth under the subheading "– the Guaranty"), "SECURITY FOR THE SERIES 2020 BONDS" (but excluding the information set forth under the subheadings "– Pledge and Security Agreement," "– Lease Agreement," "– Leasehold Mortgage," "– Non-Disturbance and Access Agreement" and "– Subordination, Non-Disturbance and Attornment

A-2

Agreement") and "FINANCIAL COVENANTS" and in Appendix B – SELECTED DEFINITIONS AND SUMMARY OF PRINICIPAL LEGAL DOCUMENTS", insofar as such statements purport to summarize certain provisions of the Bonds, the Indenture and the Loan Agreement, accurately summarize the provisions purported to be summarized therein, and the statements contained in the Preliminary Limited Offering Memorandum and the Limited Offering Memorandum under the caption "TAX MATTERS," in APPENDIX C – PROPOSED FORM OF OPINION OF CO-BOND COUNSEL," and on the covers of the Preliminary Limited Offering Memorandum and the Limited Offering Memorandum relating to tax matters accurately reflect our opinion as to the federal and Pennsylvania tax exemptions applicable to the Bonds.

Our Opinion in item (1) above is subject to the following exceptions, limitations and qualifications:

(a)    We express no opinion as to the application or requirements of federal or state securities, patent, trademark, copyright, antitrust and unfair competition, pension or employee benefit, labor, environmental, health and safety, tax, trade regulation laws, insolvency or fraudulent transfer laws, antifraud laws, margin regulations, laws and regulations relating to commodities trading, derivatives, futures and swaps, the rules of any stock exchange, clearing organization, designated contract market or other regulated entity for trading, processing, clearing or reporting transactions in securities, commodities, futures or swaps, export control, anti-money laundering or anti-terrorism laws in respect of the transactions contemplated by or referred to in the Bond Purchase Contract.

(b)    We express no opinion as to the validity or enforceability of any provision of the Bond Purchase Contract which (i) purports to be a waiver of the right to a jury trial, a waiver of any right to object to jurisdiction or venue, a waiver of any right to claim damages or to service of process, or a waiver of any other rights or benefits bestowed by operation of law or the waiver of which is limited by applicable law; (ii) purports to exculpate any party from its own negligent acts or limit any party from certain liabilities; (iii) purports to require the payment of attorneys' fees to the extent such fees exceed reasonable attorneys' fees; (iv) provides the remedy of specific performance or injunctive relief; or (v) incorporates by reference the terms of any document, instrument or agreement.

(c)    We express no opinion as to the enforceability of forum selection clauses upon the courts in the forum selected.

(d)    We express no opinion as to the law of any jurisdiction other than the Commonwealth of Pennsylvania and the federal laws of the United States of America.

This letter is furnished to you by us as co-bond counsel to the Issuer.  No attorney-client relationship has existed or exists between our firm and you in connection with the issuance of the Bonds or by virtue of this letter.  We disclaim any obligation to update this letter.  This letter is delivered to you solely for your benefit in connection with the limited offering and sale of the Bonds and may not, without our express written consent, be relied upon by any other person or for any other purpose.  This letter is not to be used, circulated, quoted or otherwise referred to or relied upon for any other purpose or by the owners of the Bonds or by any party to whom it is not addressed.

A-3

Very truly yours,

A-4

**Exhibit B**

**[Form of Opinion of Special Counsel to the Company]**

September 10, 2020

Pennsylvania Economic Development
Financing Authority
Commonwealth Keystone Building
400 North Street
Harrisburg, PA  19120-0225

UMB Bank, N.A., Trustee
Corporate Trust & Escrow Services
120 South Sixth Street, Suite 1400
Minneapolis, MN 55402
Attn:  Katie Carlson

Westhoff, Cone & Holmstedt
1777 Botelho Drive, Suite 345
Walnut Creek, CA 94596

Re:    $10,000,000 Pennsylvania Economic Development Financing Authority
       Subordinate Solid Waste Disposal Revenue Bonds (CarbonLite P, LLC Project)
       Series 2020 (the "Bonds")

Ladies and Gentlemen:

We have acted as special counsel to CarbonLite P, LLC, a Delaware limited liability
company (the "Borrower") and  to CarbonLite P Holdings, LLC, a Delaware limited liability
company (the "Guarantor"),") in connection with (i) the Loan Agreement, dated as of June 1,
2019 (the "Original Loan Agreement"), as amended by the First Amendment to Loan
Agreement, dated as of September 1, 2020 (the "First Amendment to Loan Agreement" and,
together with the Original Loan Agreement, the "Loan Agreement") by and between the
Borrower and the Pennsylvania Economic Development Financing Authority (the "Issuer"), (ii)
the Bond Purchase Contract, dated as of September 3, 2020 (the "Bond Purchase Contract"),
among the Issuer, the Borrower, the Guarantor and the underwriter therein named and (iii) the
various other Transaction Documents (as defined below). This opinion letter is being furnished
to you at the request of the Borrower pursuant to Section 8(b)(ii)(B) of the Bond Purchase
Contract. Capitalized terms used but not defined herein shall have the meanings ascribed to such
terms in the Loan Agreement.

In connection with this letter, we have examined and relied upon originals or copies,
certified or otherwise identified to our satisfaction, of the following documents:

a)       the Loan Agreement;

b)       the promissory note, dated as of the date hereof, to be issued by the Borrower to
         the Issuer (the "Note");

B-1

c)      the Pledge and Security Agreement, dated as of June 1, 2019, amended by the First Amendment to Pledge and Security Agreement, dated as of September 1, 2020, by the Borrower and the Guarantor in favor of UMB Bank, N.A., as trustee (the "<u>Trustee</u>") (as amended, the "<u>Pledge and Security Agreement</u>");

d)      Open-End Leasehold Mortgage, Security Agreement, Assignment of Rent and Leases, and Fixture Filing, dated as of June 1, 2019, but effective as of July 10, 2019, as amended by that certain First Amendment to Open-End Leasehold Mortgage, Security Agreement, Assignment of Rent and Leases, and Fixture Filing dated as of September 1, 2020 (the "<u>First Amendment to Leasehold Mortgage</u>"), by the Borrower in favor of the Trustee (as amended, the "<u>Leasehold Mortgage</u>");

e)      the Guaranty Agreement, dated as of June 1, 2019, as amended by the First Amendment to Guaranty Agreement, dated as of September 1, 2020, by the Guarantor for the benefit of the Trustee (as amended, the "<u>Guaranty</u>");

f)      the Bond Purchase Contract;

g)      the Continuing Disclosure Agreement, dated as of September 1, 2020, among the Borrower, the Guarantor and the Trustee;

h)      the Tax Exemption Certificate and Agreement, dated as of September 1, 2020, between the Issuer and the Borrower (the "<u>Tax Certificate and Agreement</u>");

i)      the Uniform Commercial Code financing statement naming the Borrower, as debtor, and the Trustee, as secured party, prepared for filing with the Secretary of State of the State of Delaware (the "<u>Filing Office</u>"), a copy of which is attached hereto as Exhibit A (the "<u>Borrower Financing Statement</u>");

j)      the Indenture of Trust, dated as of June 1, 2019, as amended and supplemented by the First Supplemental Indenture of Trust, dated as of September 1, 2020, between the Issuer and the Trustee (as amended, the "<u>Indenture</u>");

k)      the Preliminary Limited Offering Memorandum, dated as of August 14, 2020, relating to the Bonds, as supplemented dated August 28, 2020 (the "<u>Preliminary Offering Memorandum</u>");

l)      the Limited Offering Memorandum, dated as of September 3, 2020, relating to the Bonds (the "<u>Final Offering Memorandum</u>" and, together with the Preliminary Offering Memorandum, the "<u>Offering Memoranda</u>");

As used in this letter: "<u>Transaction Documents</u>" shall mean the documents listed in clauses (a) through (h) above; "<u>Transaction</u>" means the financing transaction being effectuated pursuant to the Transaction Documents; "<u>Applicable Laws</u>" shall mean the DLLCA (as defined below) and those Pennsylvania State, or United States federal laws which in our experience, without having made any investigation, are normally applicable to transactions of the type contemplated by the Transaction Documents, provided, that the term "Applicable Laws" shall

B-2

not include federal or state securities or blue sky laws (including, without limitation, the Securities Act of 1933, as amended, the Securities Exchange Act of 1934, as amended, the Trust Indenture Act of 1939, as amended or the Investment Company Act of 1940, as amended), antifraud laws, fraudulent conveyance or fraudulent transfer laws, the Dodd-Frank Wall Street Reform and Consumer Protection Act, federal, state or local laws relating to the issuance of tax exempt or otherwise government sponsored or supported bonds or indebtedness (including any laws relating to activities of an economic development authority under Pennsylvania law), federal, state or local tax laws, laws relating to zoning, construction, land use or similar matters, any other laws relating to the leasing, renovation, equipping or operation of the  Facility or the production or sale of products produced by the Facility, or labor laws, or in each case any rules or regulations thereunder; "Governmental Approval" shall mean any consent, approval, authorization or other order of any Governmental Authority. "Governmental Authority" shall mean any federal regulatory body, federal administrative agency or other federal governmental body of the United States of America or any state regulatory body, state administrative agency or other state governmental body of the Commonwealth of Pennsylvania pursuant to Applicable Laws; "DLLCA" shall mean the Limited Liability Company Act as in effect in the State of Delaware as in effect on the date hereof; "PA-UCC" shall mean the Uniform Commercial Code as in effect on the date hereof in the Commonwealth of Pennsylvania; "DE-UCC" shall mean the Uniform Commercial Code as in effect in the State of Delaware; "Article 9 Collateral" shall mean that portion of the Collateral (as defined in the Pledge and Security Agreement), which is of a type in which a security interest can be created pursuant to Article 9 of the PA-UCC; and "Opinion Parties" shall mean the Borrower and  the Guarantor.

In our examination referred to above, we have assumed the legal capacity of all natural persons, the genuineness of all signatures, the authenticity of all documents submitted to us as originals, the conformity to original documents of all documents submitted to us as certified or photostatic copies or by facsimile or other means of electronic transmission, and the authenticity of the originals of such latter documents. As to facts and certain other matters and the consequences thereof relevant to the opinions expressed herein and the other statements made herein, we have with your permission relied without independent investigation or verification upon, and assumed the accuracy and completeness of, (a) certificates, letters and written statements and representations of public officials, officers and other representatives of the Opinion Parties, and others, and (b) the representations and warranties in the Transaction Documents. We have also assumed, with your permission and without independent investigation or verification, that:

i.      each party to the Transaction Documents was duly organized or formed, as the case may be, and was at all relevant times and is validly existing and in good standing under the laws of its jurisdiction of organization or formation, as the case may be, and had at all relevant times and has full right, power and authority to conduct its business and to execute, deliver and perform its obligations under each of the Transaction Documents to which it is a party (except that no such assumptions are made with respect to the Opinion Parties to the extent matters assumed by this clause (i) are expressly addressed in Paragraph 1 below);

ii.     the execution, delivery and performance of each Transaction Document by each party thereto have been duly authorized by all necessary corporate or other

B-3

appropriate actions and proceedings on the part of each such party (except that no such assumption is made with respect to the Opinion Parties to the extent matters assumed by this clause (ii) are expressly addressed in Paragraph 2 below);

iii.    each Transaction Document has been duly executed and delivered by each party thereto (except that no such assumptions are made with respect to the Opinion Parties to the extent matters assumed by this clause (iii) are expressly addressed in Paragraph 3 below);

iv.    the Applicable Laws of the Commonwealth of Pennsylvania are the governing law of the Tax Certificate and Agreement, and (b) each Transaction Document constitutes the legal, valid and binding obligation of each party thereto, enforceable against each such party in accordance with its terms (except that no such assumptions are made with respect to the Opinion Parties to the extent matters assumed by this clause (iv) are expressly addressed in Paragraph 3 below);

v.    none of the execution, delivery or performance of any of the Transaction Documents by any party thereto does or will (a) contravene or violate any provision of any law, rule or regulation (except that no such assumption is made with respect to the Opinion Parties to the extent matters assumed by this clause (v) are expressly addressed in Paragraph 4 below), (b) contravene or violate any charter or bylaws, certificate of formation or operating agreement, or other organizational documents of any such party (except that no such assumption is made with respect to the Opinion Parties to the extent matters assumed by this clause (v) are expressly addressed in Paragraph 4 below) or (c) conflict or be inconsistent with, or result in any breach of any of the terms, covenants, conditions or provisions of, or constitute a default under or in respect of, or result in the creation or imposition of (or the obligation to create or impose) any lien or security interest (other than the liens and security interests created or required under the Transaction Documents) upon any of the property or assets of such party under or in respect of, any indenture, mortgage, deed of trust, credit agreement, loan agreement or other agreement, contract or instrument to which such party is a party or by which it or any of its properties or assets are bound or to which it or any of its properties or assets may otherwise be subject;

vi.    no consent, approval, license, authorization or order of, or filing, recording, registration or qualification of or with, any governmental authority is required for the execution, delivery or performance of any Transaction Document by any party thereto or for the granting, creation, maintenance or continuation of any lien (including, without limitation, any mortgage or other lien arising under or pursuant to the Leasehold Mortgage) or security interests under any Transaction Document (except that no such assumption is made with respect to the Opinion Parties with respect to any Governmental Approval to the extent matters assumed by this clause (vi) are expressly addressed in Paragraph 5 below);

B-4

vii.     the First Amendment to Leasehold Mortgage will be duly recorded and properly indexed in the office of the Recorder of Deeds of Berks County, Pennsylvania (the "<u>Recording Office</u>") within 6 months of the date thereof, and all applicable recording fees with respect thereto will be paid; and

viii.    none of the Opinion Parties is listed on the specially Designated Nationals and Blocked Persons List maintained by the Office of Foreign Asset Control, Department of the Treasury ("<u>OFAC</u>") pursuant to Executive Order 13224, 66 Fed. Reg. 49079 (Sept. 25, 2001) and/or on any other list of terrorists or terrorist organizations maintained pursuant to any of the rules and regulations of OFAC or pursuant to any other applicable law relating to anti-terrorism (collectively, "<u>Designated Persons Lists</u>"), or is owned or controlled by, or acts for or on behalf of, any Person on such Designated Persons Lists or any other Person who has been determined by competent authority to be subject to any prohibition contained in any such laws.

Based upon and subject to the foregoing, and subject to the other limitations, qualifications, exceptions and assumptions set forth herein, and having considered such questions of law as we have deemed necessary as a basis for the opinions expressed below, we are of the opinion that:

1.      Each Opinion Party is a limited liability company validly existing and in good standing under the laws of the State of Delaware. Each Opinion Party has the limited liability company power and authority to execute, deliver and perform its obligations under the Transaction Documents to which such Opinion Party is a party. Each Opinion Party is qualified to do business in the Commonwealth of Pennsylvania. In rendering the opinions set forth in the first and third sentence of this Paragraph 1, we have with your permission relied solely on certificates of government officials attached on <u>Schedule 1</u>.

2.      The execution and delivery by each Opinion Party of the Transaction Documents to which it is a party and the performance by such Opinion Party of its obligations thereunder have been duly authorized by all requisite limited liability company action on the part of such Opinion Party under the DLLCA.

3.      Each Transaction Document has been duly executed and delivered by each Opinion Party thereto.  Each Transaction Document constitutes the legal, valid and binding obligation of each Opinion Party thereto, enforceable against such Opinion Party in accordance with its terms.

4.      The execution and delivery by each Opinion Party of the Transaction Documents to which it is a party, and the performance by such Opinion Party of its obligations thereunder, do not (i) violate any Applicable Law of the Commonwealth of Pennsylvania, the State of Delaware or of the United States of America or (ii) violate the certificate of formation or operating agreement of such Opinion Party.

5.      Other than those filings and recordings required to give public notice of, perfect and maintain the liens and security interests created by or provided for in the Transaction

Documents, no Governmental Approval under any Applicable Law of the Commonwealth of Pennsylvania or of the United States of America, which has not been obtained or taken, is required to be obtained by any Opinion Party for the execution, delivery or performance by or the enforceability against such Opinion Party of any of the Transaction Documents to which it is a party.

6.　　The filing of the Financing Statement in the Filing Office is effective to perfect the Trustee's security in the Article 9 Collateral of the Borrower, in each case to the extent a security interest therein can be perfected by the filing of a financing statement in the Filing Office.  No  recordation or filing, other than recording Continuation Statements as and when required by applicable law, is required to preserve the validity of the  Lien in such Article 9 Collateral..

7.　　The form of the Leasehold Mortgage complies with the formal requisites necessary to constitute an open-end mortgage as defined in 42 Pa.C.S. §8143, and the First Amendment to Leasehold Mortgage is in appropriate form for recording in the Recording Office. The Leasehold Mortgage created and constitutes a valid and enforceable Lien in favor of the Trustee upon the Borrower's estate in the Mortgaged Property to the extent the Property constitutes real property or fixtures, or an interest in real property or fixtures, under Pennsylvania law.

8.　　The provisions of the Pledge and Security Agreement, and the Liens created thereby, created a valid security interest in each of Borrower's and Guarantor's rights in their respective Article 9 Collateral, as security for the Secured Obligations (as defined in the Pledge and Security Agreement).

We advise you that, to our knowledge, there are no lawsuits pending against any Opinion Party nor, to our knowledge, has any Opinion Party received any overt written threat of any lawsuits, in each case that question the validity or enforceability of any of the Transaction Documents against any Opinion Party thereto or that seek to enjoin the consummation of the transactions contemplated thereby.

We have, for purposes of making the statements set forth in clauses (1) and (2) of this paragraph, reviewed the information appearing in the Applicable Sections (as defined below) of the Offering Memoranda but, with your permission, we are not passing upon or assuming responsibility or expressing any opinion with respect to the accuracy, completeness or fairness of the information in the Applicable Sections or elsewhere in the Offering Memoranda and have made no independent check or verification or investigation thereof and we have assumed that all such information is true, complete and correct. Subject to the foregoing and on the basis of the information that we have gained in the course of providing the legal services referred to above, and based solely on our review of the Applicable Sections of the Offering Memoranda, no facts have come to our attention that have caused us to believe that:

(1)　　the statements in the Applicable Sections of the Preliminary Offering Memorandum (solely insofar as such statements describe the Opinion Parties), as of its date, included an untrue statement of a material fact or omitted to state a

material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading; or

(2)     the statements in the Applicable Sections of the Final Offering Memorandum (solely insofar as such statements describe the Opinion Parties), as of its date or as of the date hereof, included or include an untrue statement of a material fact or omitted or omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading;

except in each case that we express no belief and make no statement with respect to financial statements and schedules and other financial, operating, numerical or statistical data or projections included in or omitted from the Preliminary Offering Memorandum or the Final Limited Offering Memorandum or any information regarding the financing for the Facility. "Applicable Sections" means the information appearing in the Preliminary Offering Memorandum or Final Limited Offering Memorandum, as the case may be, under the captions "THE BORROWER,  THE GUARANTOR AND RELATED SUBSIDIARIES" and "RISK FACTORS," in the second, third and fourth paragraphs under the caption "THE PROJECT AND THE APPLICATION OF BOND PROCEEDS," and in Appendix A (other than the information in Appendix A appearing under the captions "CARBONLITE RECYCLING PROCESS," "THE PROJECT" AND "FINANCIAL SUMMARY").

Qualifications, Limitations and Exceptions

The opinions expressed herein are subject to the following qualifications, limitations and exceptions:

(A)     Enforcement of the Transaction Documents may be limited by (i) bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer or other similar laws relating to or affecting the enforcement of creditors' rights generally, and (ii) general principles of equity (regardless of whether considered in a proceeding in equity or at law), including, without limitation, the possible unavailability of specific performance, injunctive relief or any other equitable remedy, and concepts of materiality, reasonableness, good faith and fair dealing.

(B)     The enforceability of provisions in the Transaction Documents to the effect that certain terms thereof may not be waived or modified except in writing may be limited under certain circumstances.

(C)     We express no opinion as to (i) the enforceability of any rights to indemnification or contribution provided for in any of the Transaction Documents which may be deemed violative of public policy, or (ii) application of any federal or state securities, anti-trust or tax laws.

(D)     Except to the extent set forth in Paragraph 4 and 5 above, we express no opinion concerning the applicability or absence of conflict with any statute, rule, regulation, judgment, order, writ or decree of any Governmental Authority.

B-7

(E)    We express no opinion as to the enforceability of any of the Transaction Documents to the extent any party thereto fails to obtain and keep in full force and effect all governmental authorizations, approvals, consents, permits and licenses required to be obtained and maintained by it in connection with performance of its obligations or enforcement of its rights thereunder.

(F)    Certain of the remedial provisions set forth in the Leasehold Mortgage may be limited or rendered unenforceable by applicable laws and interpretations, but in our opinion such laws and interpretations do not, subject to the other qualifications, limitations and exceptions set forth in this opinion letter, make the remedies generally afforded by such instruments, when considered in their entirety, inadequate for the practical realization by the Trustee and the Issuer of the principal benefits or security intended to be provided thereby (except for the economic consequence of procedural or other delay).

(G)    With respect to the enforceability of the Guaranty, we note that it contains provisions which purport to waive certain rights and defenses which the Guarantor might otherwise have with respect to, among other things, amendments and modifications of the Transaction Documents, notice of default or the election of remedies by the Trustee following a default by the Borrower under the Loan Agreement or the other Transaction Documents to which it is a party. Although we believe that such provisions are generally enforceable, we advise you that certain waivers and other provisions in the Guaranty may be further limited or rendered unenforceable by applicable law and interpretations, but in our opinion, such laws and interpretations do not, subject to the other qualifications, limitations and exceptions set forth in this opinion letter, render the Guaranty invalid as a whole or preclude judicial enforcement of the Guaranty upon a material default by the Guarantor thereunder.

(H)    The enforceability of the Leasehold Mortgage is subject to applicable laws of the Commonwealth of Pennsylvania regarding the manner of exercising remedies.  In this connection, we call to your attention the provisions of the Pennsylvania Deficiency Judgment Act, 42 Pa.C.S. §8103, which provides that a judgment creditor who buys in real property at an execution sale must, within six months after the sale, petition the court to fix the fair market value of the property if the creditor seeks to collect a deficiency balance due.  Failure to so petition the court will fully discharge the debtor, obligor, guarantor, surety and any other person liable directly or indirectly to the judgment creditor for payment of the debt and any owner of the property affected thereby.  It is important that care be taken at the time of the foreclosure on any mortgaged property to insure that remedies against or recovery from other collateral given to secure the indebtedness secured by the Leasehold Mortgage will not be lost as a result of failure to comply with the Pennsylvania Deficiency Judgment Act.  The Pennsylvania Deficiency Judgment Act applies when any real property located in Pennsylvania is foreclosed upon, whether such property is the mortgaged property or other real property of the Borrower or Guarantor or whether such real property is only one of several parcels that constitute the mortgaged property.  Failure to comply with the Pennsylvania Deficiency Judgment Act may also affect a subsequent foreclosure or enforcement of remedies with respect to

B-8

personal property or other non-real estate collateral, or with respect to any real property collateral located outside of Pennsylvania.

(I)    Enforcement of the Transaction Documents by the Issuer or Trustee with respect to the rights of the debtor thereunder against other persons under assigned leases and contracts may be subject to the terms of agreements between such debtor and such other persons, the rights of such persons and any claims or defenses of such persons against such debtor.

(J)    We express no opinion as to the effect on the opinions expressed herein of (i) the compliance or non-compliance of the Trustee or Issuer with any state, federal or other laws applicable to it or (ii) the legal or regulatory status or nature of the business of the Issuer or any Trustee.

(K)    We express no opinion as to any document, instrument or agreement referred to in any of the Transaction Documents or incorporated therein by reference other than the Transaction Documents, nor do we express any opinion as to the effect on the matters set forth herein of any amendment, modification, supplement, extension or renewal of or to any of the Transaction Documents after the date hereof.

(L)    With respect to the opinions expressed in paragraphs 3 and 4 above, we express no opinion as to the applicability to the Transaction of Section 911(b) of the Pennsylvania Crimes Code (the "Crimes Code"), Act of December 6, 1972, P.L. 1482, No. 334, as amended, 18 Pa.C.S. §911(b), which prohibits the use or investment of income derived from a pattern of "racketeering activity" in the establishment or operation of any enterprise. "Racketeering activity," as defined in the Crimes Code, includes the collection of money or other property in full or partial satisfaction of a debt which arose as the result of the lending of money or other property at a rate of interest exceeding 25% per annum "when not otherwise authorized by law".

(M)    Except as provided in Paragraphs 6 through 8 above, we express no opinion as to the creation, validity or perfection of any lien or security interest.

(N)    Except as provided in Paragraph 6 above, the opinions expressed in paragraph 6 are subject to the following:

(i)    We express no opinion as to (a) the existence or ownership of, or legal or equitable title to, any property, (b) whether the property described in and referred to in the Leasehold Mortgage is real or personal property or whether any provision therein purporting to make such property fixtures is effective, (c) whether any provision of any Transaction Document purporting to assign or transfer any license or permit issued by any Governmental Authority is effective, (d) the effectiveness of any assignment of leases or rents under the Leasehold Mortgage as a present, absolute assignment thereof rather than as a conditional assignment thereof for security purposes, (e) the priority of the interest of any Person in any property or interest in property. We understand that with respect to the Mortgaged Property and the creation and priority of the Lien of the Leasehold

Mortgage, you will be relying upon the title insurance policy previously issued to you by First American Title Insurance Company.

(ii)    We have assumed, without investigation or inquiry, that (a) the description of the Mortgaged Property contained in the Leasehold Mortgage accurately describes the property intended to be covered thereby and (b) the Borrower holds good right, title and interest in and to the Mortgaged Property.

(O)    The opinions expressed in Paragraph 7 and 8 above are subject to the following:

(i)    We have assumed that the Article 9 Collateral does not include as-extracted collateral, farm products or timber to be cut, as such terms are used in the PA-UCC;

(ii)    We have assumed that the Borrower and Guarantor have sufficient rights in the Article 9 Collateral for the security interest of the Trustee therein to attach. We express no opinion with respect to (a) the existence of, any rights in or title to, or legal or equitable ownership of, any property, or (b) the priority of any security interest.

(iii)    Such opinions are limited to Article 9 of the PA-UCC and therefore such opinions do not address (a) laws of jurisdictions other than Pennsylvania, and laws of Pennsylvania other than Article 9 of the PA-UCC, and (b) collateral of a type not subject as original collateral to Article 9 of the PA-UCC. We note that Section 9301 of the PA-UCC provides that (I) except as otherwise provided therein in the case of a possessory interest in collateral, while a debtor is located in a jurisdiction, the local law of that jurisdiction governs perfection, the effect of perfection or nonperfection, and the priority of a security interest in collateral, and (II) while collateral is located in a jurisdiction, the local law of that jurisdiction governs (A) perfection, the effect of perfection or nonperfection, and the priority of a possessory security interest in such collateral, (B) perfection of a security interest in goods by filing a fixture filing, and (C) the effect of perfection or nonperfection and the priority of a nonpossessory security interest in such collateral.

(iv)    We call to your attention the fact that the validity and perfection of the security interests created under the Pledge and Security Agreement may be affected by various subsequent events as set forth in the PA-UCC. Without limiting the generality of the foregoing, such events may include matters of the type described in Section 9506 of the PA-UCC with respect to changes in name, structure and identity of the debtor, Sections 9301 and 9316 of the PA-UCC with respect to changes in the location of the collateral and the location of the debtor, and Section 9515 of the PA-UCC with respect to the duration of the effectiveness of filing; a purchaser of collateral may take the same free of a security interest under certain circumstances as described in Sections 9317, 9320, 9321 and 9338 of the PA-UCC; a security interest in goods which are an accession to, or

commingled or processed with, other goods, is subject to Sections 9335 and 9336 of the PA-UCC; and a security interest in proceeds is subject to Section 9315 of the PA-UCC. In addition, actions taken by a secured party (*e.g.,* releasing collateral or terminating the Financing Statements) may affect the validity or perfection of a security interest. To the extent that any Collateral is subject to agreements containing provisions that prohibit, restrict or condition assignment, such prohibitions, restrictions or conditions are subject to Sections 9-406, 9-407, 9-408 and 9-409 of the PA-UCC, and we express no opinion as to the effect thereof on any account, lease, instrument, chattel paper, payment intangible, healthcare receivable or letter of credit right.

(v)     Without limiting the generality of the preceding paragraph, we call to your attention the following. In general, under Section 9515 of the PA-UCC, a financing statement is effective for a period of five years from the date of filing. The effectiveness of a filed financing statement lapses upon the expiration of such period unless a continuation statement is filed prior to such lapse in accordance with the PA-UCC. Upon such lapse the security interest in question would, in general, become unperfected. In general, a continuation statement may be filed within six months prior to the expiration of such five year period. Upon timely filing of a continuation statement in accordance with the PA-UCC, the effectiveness of the original financing statement is continued for five years after the last date on which the filing was effective, whereupon such filing would lapse in the same manner unless another continuation is filed prior to such lapse. Succeeding continuation statements may be filed in the same way to continue the effectiveness of the financing statement.

(vi)     In the case of any after-acquired property which becomes collateral after the date hereof, Section 552 of the Federal Bankruptcy Code limits the extent to which any property acquired by a debtor after the commencement of a case under the Federal Bankruptcy Code may be subject to a security interest arising from a security agreement entered into by such debtor before the commencement of such case.

(vii)   Enforceability of the Transaction Documents may be limited by statutes or principles of law applicable to guaranties. Those statutes and provisions may, inter alia, limit the right of a creditor to alter materially the original obligation of the principal, to elect remedies on default that impair the subrogation rights of the guarantor against the principal, or to take other action that materially prejudices the guarantor. In this connection, we advise you that failure to comply with such statutes or principles on the part of the Trustee may operate to exonerate a guarantor (in its capacity as such) in whole or in part from its obligations under the Transaction Documents.

Knowledge Qualification

The phrase "*to our knowledge*" or words of similar import, as used in this opinion letter, means the conscious awareness of facts, after such inquiry of representatives of the Opinion

Parties as we have deemed appropriate in the circumstances, but otherwise without independent investigation, by any of the lawyers in this firm who have devoted substantive legal attention to representation of any of the Opinion Parties in connection with the transactions contemplated by the Transaction Documents.

The opinions in this letter are limited to matters involving the Applicable Laws of the United States of America, the DLLCA, the laws of the Commonwealth of Pennsylvania, and the DE-UCC.

The opinions in this letter are limited to the matters set forth herein, no opinion may be inferred or is implied beyond the matters expressly stated herein, and the opinions contained herein must be read in conjunction with the assumptions, qualifications, limitations and exceptions set forth in this letter. This opinion letter is delivered as of the date hereof and is based on the facts and circumstances existing as of the date hereof and upon the current state of the law. We undertake no obligation to update or supplement this opinion to advise you of any changes in facts or laws subsequent to the date hereof.

This opinion letter is provided to you by us in our capacity as special counsel to the Borrower and the Opinion Parties, and may not be relied upon by you for any purpose other than in connection with the transactions contemplated by the Loan Agreement and the Transaction Documents or by any other Person. No copies of this opinion may be delivered or furnished to any other party, provided that this opinion may be provided to purchasers (and subsequent holders) of the Bonds, and to any party to a Transaction Document. No portions of this opinion be quoted, circulated or referred to in any other document without our prior written consent, except that copies of this opinion may be provided to any regulatory agency having supervisory authority over any party to any of the Transaction Documents or any Bond purchaser or to any court or like entity in connection with the enforcement or protection of the rights or remedies of the Trustee under any of the Transaction Documents.

Very truly yours,

SCHEDULE 1

<u>Certificates of Formation, Good Standing and Registration</u>
(Attached)

**Exhibit C**

**[Form of Opinion of Issuer's Counsel]**

September 10, 2020

UMB Bank, N.A, as Trustee                    Ballard Spahr LLP, as Co-Bond Counsel
Minneapolis, Minnesota                       Philadelphia, Pennsylvania

Westhoff, Cone & Holmstedt, as Underwriter   Turner Law, P.C., as Co-Bond Counsel
Walnut Creek, California                     Philadelphia, Pennsylvania

Re:    Pennsylvania Economic Development Financing Authority Subordinate Solid Waste
       Disposal Revenue Bonds (CarbonLite P, LLC Project) Series 2020

Ladies and Gentlemen:

The Office of Chief Counsel of the Pennsylvania Department of Community and Economic Development, which agency is responsible for providing staff services to Pennsylvania Economic Development Financing Authority (the "Authority"), a public body corporate and politic and a public instrumentality of the Commonwealth of Pennsylvania, has participated in the proceedings relating to the authorization and issuance of the Authority's Subordinate Solid Waste Disposal Revenue Bonds (CarbonLite P, LLC Project) Series 2020, in the aggregate principal amount of $10,000,000 (the "Bonds").

The Bonds are being issued under and pursuant to the Pennsylvania Economic Development Financing Law (Act No. 102, approved August 23, 1967, P.L. 251, as amended, including the amendments effected by Act No. 48, approved August 10, 1987, P.L. 273, Act No. 74, approved December 17, 1993, P.L. 490, and Act No. 44, approved July 2, 2013, P.L. 251) (the "Act"), a certain Indenture of Trust, dated as of June 1, 2019 (the "Original Indenture"), as amended and supplemented by the First Supplemental Indenture of Trust, dated as of September 1, 2020 (the "First Supplemental Indenture" and, together with the Original Indenture, the "Indenture"), each between the Authority and UMB Bank, N.A., as trustee (the "Trustee") and resolution of the Authority adopted on August 14, 2020 (the "Resolution") authorizing the issuance of the Bonds.

The Bonds are being issued for the purpose of providing financing for a certain project (the "Project") as more fully described in the Loan Agreement (hereafter defined), for the benefit of CarbonLite P, LLC, a Delaware limited liability company (the "Borrower"). The Project has been authorized and approved by the Lehigh County Industrial Development Authority for financing by the Authority pursuant to the Act.

The Authority and the Borrower have entered into a Loan Agreement, dated as of June 1, 2019 (the "Original Loan Agreement"), as amended by the First Amendment to Loan Agreement, dated as of September 1, 2020 (the "First Amendment to Loan Agreement" and, together with the Original Loan Agreement, the "Loan Agreement") providing, among other

C-1

things, for a loan in the principal amount of the Bonds to pay costs of the Project and for the repayment of such loan by the Borrower in such amounts and at such times as are required to pay the interest on and the principal of the Bonds when due. Pursuant to the Indenture, the Authority has assigned to the Trustee all its rights, title and interest in, to and under the Loan Agreement (except as otherwise provided therein).

The Authority has entered into an Bond Purchase Agreement with Westhoff, Cone & Holmstedt (the "Underwriter"), the Guarantor (as defined below) and the Borrower dated September 3, 2020 (the "Bond Purchase Agreement") providing for the offering and sale of the Bonds, and pursuant thereto the Authority has authorized the use of a Preliminary Limited Offering Memorandum dated August 14, 2020, as supplemented by a Supplement dated August 28, 2020 (as supplemented, the "Preliminary Limited Offering Memorandum") and a Limited Offering Memorandum dated September 3, 2020, in connection with the offering and sale of the Bonds (the "Limited Offering Memorandum"). The Indenture, the Loan Agreement and the Bond Purchase Agreement are sometimes referred to herein collectively as the "Authority Documents".

As further security for the Bonds, CarbonLite P Holdings, LLC, a Delaware limited liability company, which wholly-owns the Borrower (the "Guarantor"), will execute a First Amendment to Guaranty Agreement, dated as of September 1, 2020 (as amended, the "Guaranty"), amending and restating the Guaranty Agreement dated as of June 1, 2019, in favor of the Trustee, whereby the Guarantor will guarantee payments on the Bonds and the payment obligations of the Borrower under the Loan Agreement.

In the course of serving as counsel to the Authority, the Office of Chief Counsel has examined the Authority Documents, and such legislation, proceedings, certificates, records, approvals, resolutions and other documents as have been deemed necessary for the purposes of this opinion.

The Office of Chief Counsel has assumed and relied upon the truth, completeness, authority and accuracy of all documents, certificates and instruments examined and the authenticity of all signatures thereon other than those of the Authority.

The Office of Chief Counsel has also assumed that each of the documents referred to herein are, where appropriate, duly authorized and executed by and valid and legally binding obligations of, and enforceable in accordance with their terms against all parties thereto other than the Authority and that the actions required to be taken or consents required to be obtained by such parties have been taken and obtained. In rendering this opinion, the Office of Chief Counsel has also assumed that such parties have acted in full compliance with the terms of all applicable laws, regulations and orders.

As to questions of fact material to this opinion, the Office of Chief Counsel has relied upon certificates and representations of officers and representatives of the Authority or of other public officials, without independent investigation.

The Office of Chief Counsel has not made any independent investigation in rendering this opinion other than the examination described above. This opinion is therefore qualified

C-2

in all respects by the scope of that examination.

The Office of Chief Counsel's opinions are specifically limited to the present internal laws of the Commonwealth of Pennsylvania ("Commonwealth") and no opinion is expressed as to the effect the laws of any other jurisdiction may have upon the subject matter of the opinions expressed herein under conflict of laws principles or otherwise.

Based upon the foregoing, and subject to the limitations, assumptions, qualifications and exceptions set forth herein, the Office of Chief Counsel is of the opinion that:

1.      The Authority is a public body corporate and politic and a public instrumentality of the Commonwealth, organized and existing under the Act. Under the Act, and by the Resolution, the Authority has full power and authority to undertake the financing of the Project, to execute, deliver and perform its obligations under the Authority Documents and to issue and deliver the Bonds.

2.      The Resolution has been duly adopted by the Authority in compliance with the Pennsylvania Sunshine Act of October 15, 1998, P.L. 729, No. 93 (65 P.S. § 701 et seq.) The Resolution complies in all respects with the procedural rules of the Authority and the requirements of Pennsylvania law, constitutes the legal, valid and binding act of the Authority and remains in full force and effect on the date hereof.

3.      The Authority has duly authorized the execution and issuance of the Bonds and the execution and delivery of the Authority Documents. The Bonds have been duly and validly executed and delivered by the Authority and the Authority Documents have each been duly and validly executed and delivered by the Authority and the Bonds and each of the Authority Documents are valid and binding agreements of the Authority, enforceable against the Authority in accordance with their respective terms.

4.      The directors and officers of the Authority identified in the Authority's General Certificate delivered at the closing for the issuance of the Bonds have been duly elected or appointed and are qualified to serve as such.  To the best of our knowledge, no director or officer of the Authority has any financial interest, direct or indirect, in the Borrower or the Project or the financing thereof.

5.      The Authority Documents and the Bonds have been duly authorized, executed and delivered by the Authority and, assuming due authorization, execution and delivery by the other parties thereto, constitute legal, valid and binding obligations of the Authority enforceable in accordance with their respective terms, except as enforcement may be limited by general principles of equity, regardless of whether applied in proceedings in equity or at law, or by bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance or other similar laws affecting the enforcement of creditors' rights generally.

6.      The execution and the issuance by the Authority of the Bonds, the execution and delivery by the Authority of the Authority Documents and performance by the Authority of the Authority's obligations under the Bonds and the Authority Documents, do not conflict with or constitute on the part of the Authority a violation of, breach of or default under any existing constitutional provision or statute of the Commonwealth applicable to the Authority, or any

C-3

indenture, mortgage, deed of trust, resolution, note agreement or other agreement or instrument to which the Authority is a party or by which the Authority is bound and which is known to the Office of Chief Counsel, or any order, rule, regulation, judgment or decree of any court, governmental agency or body of the Commonwealth having jurisdiction over the Authority or any of its activities or property. In rendering the opinion set forth in this paragraph, we have relied without independent investigation on the representations of the Borrower that the Project will be located in Pennsylvania and will not be used in whole or in part for illegal activities.

7.      There is no action, suit, proceeding, inquiry or investigation, at law or in equity, before or by any court, public board or body, pending or threatened against the Authority, challenging or contesting the powers of the Authority, the authorization of any directors or officers of the Authority to act in their respective capacities, or the issuance of the Bonds, or in which an unfavorable decision, ruling or order would affect in any way or adversely affect the validity or enforceability of the Authority Documents, the performance by the Authority of any of its obligations thereunder, or the issuance or delivery of the Bonds.

8.      Except for any approval, consent or authorization required under the securities or blue sky laws of any jurisdiction in connection with the purchase and distribution of the Bonds, as to which no opinion is expressed, no additional or further approval, consent or authorization of any governmental or public agency or authority not already obtained is required by the Authority in connection with the issuance or delivery of the Bonds or the entering into and performance of its obligation under the Authority Documents.

9.      The Authority has approved the distribution of the Preliminary Limited Offering Memorandum and the Limited Offering Memorandum by the Underwriter in connection with the offering of the Bonds.

10.      The information contained in the Preliminary Limited Offering Memorandum and the Limited Offering Memorandum under the headings "THE ISSUER" and "LITIGATION" (as it pertains to the Authority) has been reviewed and nothing has come to our attention which would lead us to believe that such information contains any untrue statement of a material fact or omits to state a material fact which is required to be stated therein or which is necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading in any material respect. Except as set forth in this paragraph, no opinion is expressed with respect to the adequacy or accuracy of the Preliminary Limited Offering Memorandum or the Limited Offering Memorandum or other information pertaining to the offering for sale of the Bonds.

The opinions expressed herein are subject in all respects to the following qualifications: (a) no opinion is rendered as to the availability of equitable remedies including, but not limited to, specific performance and injunctive relief, whether enforceability is considered in a proceeding in equity or at law; (b) no opinion is rendered as to the effect of bankruptcy, reorganization, insolvency, fraudulent conveyance, moratorium and other similar laws or legal principles affecting creditors' rights or remedies(c) no opinion is rendered as to

C-4

the creation, perfection or priority of any lien or security interest; (d) no opinion is rendered with respect to any "blue sky" or other securities laws of the Commonwealth or of other jurisdictions; and (e) no opinion is rendered with regard to any federal income tax law or regulation or any state tax law or regulation of the Commonwealth or of other jurisdictions.

No opinion is expressed as to the validity or enforceability of any provisions of the Authority Documents: (a) allowing any person or entity to institute judicial or non-judicial proceedings or to exercise any other rights, without notice to the person or entity against whom enforcement is sought; (b) waiving any right or defense of any person or entity; (c) providing or implying the availability of self-help in any particular event or circumstances; (d) relating to court costs or legal fees which may be properly chargeable or recoverable in any judicial proceedings; and (e) relating to indemnification.

We call your attention to the fact that the Bonds are special and limited obligations of the Authority, payable solely from the payments derived by the Authority under the Loan Agreement. The Bonds are not obligations or liabilities of the Commonwealth or any political subdivision thereof nor do the Bonds pledge the credit of the Commonwealth or any political subdivision thereof nor do the Bonds pledge the credit of the Authority (other than to the limited extent described above). The Authority has no taxing power.

This opinion is given as of the date hereof. No opinion is expressed as to any matter not set forth in the numbered paragraphs herein. We make no undertaking to supplement this opinion if facts or circumstances hereafter come to our attention or changes in law occur after the date hereof. This opinion is rendered solely in connection with the original delivery and payment for the Bonds on the date hereof and may not be relied upon for any other purpose. This opinion may not be relied upon by any other person, including any purchaser of the Bonds from the Underwriter or otherwise or for any other purpose, nor may this opinion be distributed, quoted or disclosed to any person, firm or entity without the Office of Chief Counsel's prior written consent in each instance.

The opinions herein expressed are issued by the Pennsylvania Department of Community and Economic Development Office of Chief Counsel, a division of the Commonwealth of Pennsylvania Office of General Counsel, each of which is an executive agency of the Commonwealth of Pennsylvania and not by any individual attorney therein either individually or as an employee of the Commonwealth of Pennsylvania.

OFFICE OF CHIEF COUNSEL, DCED

4129-8071-8114.9

**Exhibit D**

**[Form of Investor Letter]**

Pennsylvania Economic Development Financing Authority
Harrisburg, Pennsylvania

Re:    Pennsylvania Economic Development Financing Authority
       Subordinate Solid Waste Disposal Revenue Bonds
       (CarbonLite P, LLC Project) Series 2020

Ladies and Gentlemen,

The undersigned, on behalf of the purchaser (the "Purchasers" and each a "Purchaser") of the above-referenced bonds in the aggregate principal amount of $10,000,000, hereby makes the following representations upon which you may rely:

1.      The undersigned acknowledges that the Bonds were issued for the purpose of assisting in the financing of all or a portion of the cost of acquiring, constructing, rehabilitation, renovating, installing, improving and/or equipping of solid waste disposal facilities in the City of Reading, Pennsylvania (the "Project"), as more particularly described in that certain Preliminary Limited Offering Memorandum, dated August 14, 2020, as supplemented by that certain Supplement dated August 28, 2020 (as supplemented, the "Preliminary Limited Offering Memorandum") and Limited Offering Memorandum, dated September 3, 2020 (the "Limited Offering Memorandum").  The undersigned further acknowledges that the Bonds are secured by an Indenture of Trust dated as of June 1, 2019 (the "Original Indenture"), as amended and supplemented by the First Supplemental Indenture of Trust, dated as of September 1, 2020 (the "First Supplemental Indenture" and, together with the Original Indenture, the "Indenture") which creates a security interest in the trust estate under the Indenture for the benefit of the holders and owners of the Bonds, and a Loan Agreement dated as of June 1, 2019 (the "Original Loan Agreement"), as amended by the First Amendment to Loan Agreement, dated as of September 1, 2020 (the "First Amendment to Loan Agreement" and, together with the Original Loan Agreement, the "Loan Agreement"), between Pennsylvania Economic Development Financing Authority (the "Issuer") and CarbonLite P, LLC (the "Borrower"), as each document may be duly amended or supplemented from time to time in accordance with its terms.

2.      The Purchaser has authority to purchase the Bonds and to execute this letter and any other instruments and documents required to be executed by the Purchaser in connection with the purchase of the Bonds.

3.      The Purchaser is a Qualified Institutional Buyer, a financial institution or other accredited investor as defined in the Securities Act of 1933, Regulation D, 17 Code Federal Regulations Section 230.501(a).  The Purchaser has sufficient knowledge and experience in financial and business matters, including purchase and ownership of tax-exempt municipal

D-1

obligations similar to the Bonds, and is capable of evaluating the risks and merits of its purchase of the Bonds and can bear the economic risk of purchasing the Bonds.

4.      The Bonds are being acquired by the Purchaser for investment and not with a view to, or for resale in connection with, any distribution of the Bonds, and, subject to the further provisions of this paragraph 4, the Purchaser (or an affiliate) intends to hold the Bonds for its own account (subject to its rights to sell, pledge, transfer, convey, hypothecate, mortgage, or dispose of such Bonds at a future date in accordance with the Indenture and applicable law) and does not intend at this time to dispose of all or any part of the Bonds.  Although the Purchaser does not intend at this time to dispose of all or any part of the Bonds (other than to an affiliate), the Purchaser retains the right to sell and transfer the Bonds, in accordance with terms and conditions of the Indenture and applicable law.  The Purchaser understands that it may need to bear the risks of this investment for an indefinite time, since any sale prior to maturity may not be possible.

5.      Notwithstanding the foregoing, the Bonds may be transferred to a trustee, other fiduciary or custodian of a trust or other organizational entity the ownership interests in which are to be distributed through the sale of (a)(i) investment grade securities that are registered under the Securities Act and/or (ii) investment grade securities in transactions that are exempt from the registration requirements of the Securities Act and (b) non-investment grade securities in transactions that are exempt from the registration requirements of the Securities Act to Qualified Institutional Buyers in increments equal to the Authorized Denominations; provided that any prospectus relating to the investment grade securities and/or private placement memorandum or similar disclosure document relating to any non-investment grade securities will, unless approved in advance by the Issuer, disclose no more regarding the Issuer than its name and status as a public instrumentality and body corporate and politic of the Commonwealth of Pennsylvania created and existing under the laws of the Commonwealth of Pennsylvania and that the Bonds are special limited obligations of the Issuer secured solely by the Revenues as described in the Indenture.

6.      The Purchaser understands that the Bonds are not registered under the 1933 Act and that such registration is not legally required as of the date hereof; and further understands that the Bonds (a) are not being registered or otherwise qualified for sale under the "Blue Sky" laws and regulations of any state, (b) will not be listed in any stock or other securities exchange, (c) will not carry a rating from any rating service and (d) will be delivered in a form which may not be readily marketable.

7.      The Purchaser acknowledges that the Bonds, together with interest thereon, are special, limited obligations payable solely from amounts paid to the Issuer by the Borrower pursuant to the terms of the Bonds, the Loan Agreement, the Indenture and the Guaranty Agreement and any other amounts held in any fund or account established pursuant to the Indenture (other than the Rebate Fund) and that notwithstanding anything to the contrary contained in the Bonds or the Indenture, the Issuer shall not be required to use any other moneys or assets of the Issuer to pay any portion of the Project, or make any other payment or advance any other monies or be liable for any other costs or expenses in connection with the Project, or the Bonds, except from amounts paid to the Issuer by the Borrower pursuant to the Loan Agreement, the Indenture and the Guaranty Agreement.  The Purchaser further understands that

D-2

the Bonds are not secured by any pledge of any moneys received or to be received from taxation by the Issuer (which has no taxing power), the Commonwealth of Pennsylvania or any political corporation, subdivision or agency thereof; that the Bonds will never represent or constitute a general obligation, moral obligation, or a pledge of the faith and credit of the Issuer, the Commonwealth of Pennsylvania, or any political corporation, subdivision or agency thereof; and that the liability of the Issuer with respect to the Bonds is subject to further limitations set forth in the Bonds, the Loan Agreement, and the Indenture.

8.    The Purchaser acknowledges and agrees that it has not relied upon the Issuer or any of its members, employees, officers or agents for any information in connection with the Purchaser's purchase of the Bonds.

9.    The undersigned is a duly appointed, qualified, and acting representative of the Purchaser, is authorized to make the certifications, representations and warranties contained herein on behalf of the Purchaser and is authorized to execute and deliver this letter.

*[Balance of page intentionally left blank.]*

D-3

Capitalized terms used herein and not otherwise defined have the meanings given such terms in the Indenture.

[PURCHASER]
By: _____



_____
[Name]
[Title]
[Address]
[Phone Number]

D-4

**Exhibit E**

**[FORM OF CERTIFICATE OF THE UNDERWRITER]**

This Certificate is furnished by Westhoff, Cone & Holmstedt (the "Underwriter") in connection with the sale and issuance by the Pennsylvania Economic Development Financing Authority (the "Issuer") of its $10,000,000 aggregate principal amount of Pennsylvania Economic Development Financing Authority Subordinate Solid Waste Disposal Revenue Bonds (CarbonLite P, LLC Project) Series 2020 (the "2020 Bonds") issued September 10, 2020.  In connection with the sale of the 2020 Bonds, the Underwriter hereby certifies and represents the following, based upon information available to us:

As of September 3, 2020, the date on which the bond purchase agreement for the 2020 Bonds was executed (the "Sale Date"), the Underwriter offered all of the 2020 Bonds to the general public (excluding bond houses, brokers or similar persons or organizations acting in the capacity of underwriters or wholesalers) (the "Public") in a bona fide public offering at the prices listed for each maturity on the cover page of the Limited Offering Memorandum for the 2020 Bonds dated September 3, 2020 (the "Initial Offering Prices"), and based on our assessment of the then prevailing market conditions, the Underwriter reasonably expected that the first prices at which at least 10% of each maturity of the 2020 Bonds would be sold by the Underwriters to the Public were prices not higher than, or, in the case of obligations sold on a yield basis, at yields not lower than, the Initial Offering Prices.

The Underwriter had no reason to believe that any of the Initial Offering Prices of the 2020 Bonds exceeded the expected fair market value of the 2020 Bonds as of the Sale Date.

We understand that the foregoing information will be relied upon by the Issuer and the CarbonLite P, LLC (the "Borrower") with respect to certain of the representations set forth in the Tax Agreement and by Ballard Spahr LLP, in connection with rendering its opinion to the Infrastructure Bank that the interest on the 2020 Bonds is excludable from gross income of the owners thereof for federal income tax purposes. The undersigned is certifying only as to facts in existence on the date hereof. Nothing herein represents the undersigned's interpretation of any laws; in particular the regulations under the Internal Revenue Code of 1986, as amended, or the application of any laws of these facts. The certifications contained herein are not necessarily based on personal knowledge, but may instead be based on either inquiry deemed adequate by the undersigned or institutional knowledge (or both) regarding the matters set forth herein. Although certain information furnished in this Certificate has been derived from other purchasers, bond houses and brokers and cannot be independently verified by us, we have no reason to believe it to be untrue in any material respect.

Dated: _____, 2020

Westhoff, Cone & Holmstedt,

By: _____
Principal

BALLARD DRAFT 9/8/20 v2

FIRST SUPPLEMENTAL INDENTURE OF TRUST

between

PENNSYLVANIA ECONOMIC DEVELOPMENT FINANCING AUTHORITY

and

UMB BANK, N.A.,
as Trustee

Dated as of September 1, 2020

Relating to

$10,000,000
PENNSYLVANIA ECONOMIC DEVELOPMENT FINANCING AUTHORITY
SUBORDINATE SOLID WASTE DISPOSAL REVENUE BONDS
(CARBONLITE P, LLC PROJECT)
SERIES 2020

## TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS .................................................................................................3

Section 1.01.   Defined Terms .........................................................................................3
Section 1.02.   Amended Definitions ..............................................................................3

ARTICLE II AUTHORIZATION AND TERMS OF SERIES 2020 BONDS ...........................8

Section 2.01.   Authorization, Designation, and Issuance of Series 2020 Bonds ...........8
Section 2.02.   Interest Rate and Maturities of Series 2020 Bonds.................................9
Section 2.03.   Redemption of Series 2020 Bonds........................................................10
Section 2.04.   Optional Tender of Series 2020 Bonds upon Change in Control ..........10
Section 2.05.   Delivery of Series 2020 Bonds .............................................................10

ARTICLE III AMENDMENTS TO ORIGINAL INDENTURE RELATING TO BONDS .......10

Section 3.01.   Issuance of Bonds .................................................................................10
Section 3.02.   Application of Proceeds of Bonds .........................................................11
Section 3.03.   Project Fund..........................................................................................12
Section 3.04.   Costs of Issuance Fund .........................................................................15
Section 3.05.   Pledge and Assignment; Revenue Fund ................................................16
Section 3.06.   Deposits to Revenue Fund; Allocation of Revenues .............................16
Section 3.07.   Debt Service Reserve Fund...................................................................19
Section 3.08.   Amendments to Loan Agreement ..........................................................21
Section 3.09.   Application of Revenues and Other Funds After Default........................22
Section 3.10.   Bondholders' Direction of Proceedings.................................................25
Section 3.11.   Amendments to Indenture with Bondholder Consent............................25
Section 3.12.   Other Bondholder Consent Rights ........................................................27
Section 3.13.   Form of Bond; Exhibit A ......................................................................27

ARTICLE IV ADDITIONAL BONDS .............................................................................27

Section 4.01.   Incorporation of Additional Senior Bonds............................................27
Section 4.02.   Incorporation of Additional Subordinate Bonds....................................29

ARTICLE V MISCELLANEOUS ...................................................................................31

Section 5.01.   Confirmation of Original Indenture ......................................................31
Section 5.02.   Supplement Generally; Conflicts..........................................................31
Section 5.03.   Parties Interested Herein ......................................................................31
Section 5.04.   Titles, Headings, Captions, Etc.............................................................31
Section 5.05.   Severability ..........................................................................................31
Section 5.06.   Notices to Trustee ................................................................................32
Section 5.07.   Governing Law .....................................................................................32
Section 5.08.   Execution in Counterparts.....................................................................32

Exhibit A – Form of Series 2020 Bond ...................................................................................... A-1

## FIRST SUPPLEMENTAL INDENTURE OF TRUST

THIS FIRST SUPPLEMENTAL INDENTURE OF TRUST, dated as of September 1, 2020 (this "First Supplemental Indenture"), is made by and between the PENNSYLVANIA ECONOMIC DEVELOPMENT FINANCING AUTHORITY (the "Issuer"), a public instrumentality of the Commonwealth of Pennsylvania (the "Commonwealth") and a public body corporate and politic organized and existing under the Pennsylvania Economic Development Financing Law, as amended (as defined herein, the "Act"), and UMB BANK, N.A., a national banking association organized and existing under and by virtue of the laws of the United States of America, having a Corporate Trust Office in Minneapolis, Minnesota, and being qualified to accept and administer the trusts hereby created (the "Trustee").

W I T N E S S E T H:

WHEREAS, the Issuer is empowered by the provisions of the Act to enter into agreements providing for the financing of the acquisition, construction and equipping of industrial, commercial and specialized enterprises for the public for purposes of alleviating unemployment, maintaining employment at a high level and encouraging economic development in the Commonwealth within the meaning of the Act, including solid waste disposal and recycling facilities;

WHEREAS, in furtherance of its purposes under the Act, the Issuer issued, on July 10, 2019, its Solid Waste Disposal Revenue Bonds (CarbonLite P, LLC Project) Series 2019 in the aggregate principal amount of $61,800,000 (the "Series 2019 Bonds") pursuant to an Indenture of Trust dated as of June 1, 2019 (the "Original Indenture" as supplemented by this First Supplemental Indenture, together, the "Indenture") between the Issuer and the Trustee, to (i) finance all or a portion of the cost of acquiring, constructing, rehabilitating, renovating, installing, improving and/or equipping of certain solid waste disposal and recycling facilities (the "Project"), as more particularly described in Exhibit A to the Original Loan Agreement (defined below); (ii) fund capitalized interest on the Series 2019 Bonds; (iii) fund a reserve fund for the Series 2019 Bonds; and (iv) pay a portion of the costs of issuance of the Series 2019 Bonds;

WHEREAS, the Issuer loaned the proceeds of the Series 2019 Bonds to CarbonLite P, LLC (the "Borrower") pursuant to a Loan Agreement dated as of June 1, 2019 (the "Original Loan Agreement") between the Issuer and the Borrower;

WHEREAS, pursuant to the Original Loan Agreement, the Borrower delivered to the Issuer a promissory note corresponding to the Series 2019 Bonds (the "Series 2019 Note"), dated July 10, 2019, evidencing its obligation to pay all amounts due under the Original Loan Agreement;

WHEREAS, the timely payment of the principal of and premium, if any, and interest on the Series 2019 Bonds and the obligations of the Borrower under the Original Loan Agreement are guaranteed by CarbonLite P Holdings LLC (the "Guarantor") pursuant to a Guaranty Agreement dated as of June 1, 2019 (as amended from time to time, the "Original Guaranty"), in favor of the Trustee;

WHEREAS, it has been determined that provision should be made for the issuance of an additional series of revenue bonds of the Issuer ("Additional Bonds"), subordinate in priority of payment and security to the Series 2019 Bonds, upon the terms and subject to the conditions herein set forth;

WHEREAS, it has been determined that the Original Indenture should be supplemented and amended to provide for, inter alia, the issuance of Additional Bonds as set forth herein;

WHEREAS, in accordance with Article IX of the Original Indenture, the written consent of a majority of the Holders of the Series 2019 Bonds of this First Supplemental Indenture and the amendments to the Original Indenture contained herein has been obtained and delivered to the Trustee;

WHEREAS, at the request of the Borrower, the Issuer has determined to issue $10,000,000 aggregate principal amount of its Subordinate Solid Waste Disposal Revenue Bonds (CarbonLite P, LLC Project) Series 2020 (the "Series 2020 Bonds") as a series of Additional Bonds for the purposes of (i) financing a portion of the costs of the Project through the reimbursement to the Borrower of certain costs of the Project previously funded with the Borrower's equity; (ii) financing additional equipment costs of the Borrower; (iii) funding a deposit to an account within the Debt Service Reserve Fund relating to the Series 2020 Bonds; and (iv) paying a portion of the costs of issuance of the Series 2020 Bonds;

WHEREAS, the Issuer has agreed to loan the proceeds of the Series 2020 Bonds to the Borrower under the Original Loan Agreement, as amended by a First Amendment to Loan Agreement of even date herewith (the "First Amendment to Loan Agreement," and together with the Original Loan Agreement and as further amended and supplemented from time to time, the "Loan Agreement"), and the Borrower has agreed to execute and deliver its promissory note, dated the date of issuance of the Series 2020 Bonds (the "Series 2020 Note"), providing for payments at such times and in such amounts as will be required to enable the Issuer to pay the principal of, premium, if any, and interest on the Series 2020 Bonds, as and when the same become due;

WHEREAS, the timely payment of the principal of and premium, if any, and interest on the Series 2020 Bonds and the obligations of the Borrower under the Loan Agreement will be guaranteed by the Guarantor pursuant to the Original Guaranty, as amended by a First Amendment to Guaranty Agreement of even date herewith (the "First Amendment to Guaranty," and together with the Original Guaranty and as further amended and supplemented from time to time, the "Guaranty"), by the Guarantor in favor of the Trustee;

WHEREAS, in order to provide for the authentication and delivery of the Series 2020 Bonds, to establish and declare the terms and conditions upon which the Series 2020 Bonds are to be issued and secured, the Issuer has authorized the execution and delivery of this First Supplemental Indenture and the First Amendment to Loan Agreement;

WHEREAS, the Series 2020 Bonds and the authentication certificates are to be substantially in the form of Exhibit A hereto, with such necessary or appropriate variations, omissions and insertions as permitted or required by the Indenture;

WHEREAS, all acts and proceedings required by law necessary to make the Series 2020 Bonds, when executed by the Issuer, authenticated and delivered by the Trustee and duly issued, the valid, binding and legal limited obligations of the Issuer, and to constitute the Indenture a valid, binding and legal instrument for the security of the Series 2020 Bonds in accordance with its terms, have been done and performed, and the execution and delivery of the Indenture have been in all respects duly authorized;

WHEREAS, the Trustee has accepted the trusts created by the Indenture, and in evidence thereof has joined in the execution hereof; and

WHEREAS, each Owner of the Series 2020 Bonds, by its purchase thereof, will be deemed to have consented to the execution and delivery of this First Supplemental Indenture.

NOW THEREFORE, THIS FIRST SUPPLEMENTAL INDENTURE WITNESSETH:

It is declared that all Series 2020 Bonds issued hereunder are to be issued, authenticated and delivered, and that all the Revenues and other assets assigned by the Issuer hereby and by the Indenture are to be dealt with and disposed of under, upon and subject to, the terms, conditions, stipulations, covenants, agreements, obligations, trusts, uses and purposes provided in the Indenture. The Issuer has agreed and covenanted, and agrees and covenants with the Trustee and with each and all Owners, as follows:

## ARTICLE I
## DEFINITIONS

Section 1.01.    Defined Terms. All terms which are defined in the Original Indenture are incorporated by reference into this First Supplemental Indenture and shall have the same meanings respectively in this First Supplemental Indenture as such terms are given in the Original Indenture unless expressly amended under Section 1.02 below or the context hereof indicates otherwise. Those words and terms with initial capitalization, where rules of grammar do not otherwise require capitalization, not expressly defined and used herein, but which are otherwise defined terms under the Loan Agreement, shall have the meanings assigned to them in the Loan Agreement.

Section 1.02.    Amended Definitions. The meanings of the following terms defined in the Original Indenture are hereby amended and restated, or added as new defined terms, as applicable, to read as follows:

Account Control Agreement

"Account Control Agreement" means (i) from July 10, 2019 to and including September 10, 2020, that certain Deposit Account Control Agreement dated as of June 1, 2019, among the Borrower, the Trustee and Pacific Western Bank, as depository bank, (ii) from and after September 11, 2020, that certain Deposit Account Control Agreement dated as of September 4, 2020, among the Borrower, the Trustee and Pacific Western Bank, as depository bank, and (iii) any other similar agreement between a depository institution, the Borrower and the Trustee whereby the Trustee is granted the right of control over funds or bank accounts of the Borrower following the occurrence of an Event of Default.

Additional Bonds

"Additional Bonds" means, collectively and individually, any Additional Senior Bonds and Additional Subordinate Bonds.

Additional Senior Bonds

"Additional Senior Bonds" means any Bonds issued pursuant to Section 2.12 of the Indenture that are secured on a parity of lien with respect to the trust estate pledged and assigned under the Indenture with respect to the Series 2019 Bonds.

Additional Subordinate Bonds

"Additional Subordinate Bonds" means any Bonds issued pursuant to Section 2.13 of the Indenture that are secured on a parity of lien with respect to the trust estate pledged and assigned under the Indenture with respect to the Series 2020 Bonds.

Bonds

"Bonds" or "Bond" means, collectively and individually, the Series 2019 Bonds, the Series 2020 Bonds and any Additional Bonds, authorized by, and at any time Outstanding pursuant to, this Indenture.

Bond Payment Date

"Bond Payment Date" means, (i) with respect to the Series 2019 Bonds, each June 1 and December 1, beginning with December 1, 2019, (ii) with respect to the Series 2020 Bonds, each June 1 and December 1, beginning with December 1, 2020, and (iii) with respect to any other Additional Bonds, the dates specified in a Supplemental Indenture relating thereto.

Continuing Disclosure Agreement

"Continuing Disclosure Agreement" means, (i) with respect to the Series 2019 Bonds, the Continuing Disclosure Agreement dated as of June 1, 2019, by and among the Borrower, the Guarantor and the Trustee, (ii) with respect to the Series 2020 Bonds, the Continuing Disclosure Agreement dated as of September 1, 2020, by and among the Borrower, the Guarantor and the Trustee, and (iii) with respect to any other Additional Bonds, any Continuing Disclosure Agreement delivered in connection with such Additional Bonds.

Date of Delivery

"Date of Delivery" means, (i) with respect to the Series 2019 Bonds, July 10, 2019, the date of initial issuance and delivery of the Series 2019 Bonds, (ii) with respect to the Series 2020 Bonds, September 10, 2020, the date of initial issuance and delivery of the Series 2020 Bonds, and (iii) with respect to any other Additional Bonds, the date of initial issuance and delivery of such Additional Bonds as specified in a Supplemental Indenture relating thereto.

Debt Service

"Debt Service" means:

(i)     with respect to the Series 2019 Bonds:

    (a)     Scheduled sinking fund payments, to be due semi-annually on each June 1 and December 1, commencing December 1, 2021 as set forth in Section 4.01 of the Original Indenture,

    (b)     Interest due and payable on each Bond Payment Date,

    (c)     Principal due and payable thereon (whether at maturity, by redemption or otherwise), and

(ii)    with respect to the Series 2020 Bonds:

    (a)     Interest due and payable on each Bond Payment Date,

    (b)     Principal due and payable thereon (whether at maturity, by redemption or otherwise), and

(iii)   with respect to any other Additional Bonds:  the payment provisions with respect to interest, redemption (optional or mandatory) and principal specified in any Supplemental Indenture relating to such Additional Bonds.

Initial Coverage Requirement

"Initial Coverage Requirement" shall have the meaning set forth in Section 5.18(b)(i) of the Loan Agreement.

Interest Payment Date

"Interest Payment Date" means, (i) with respect to the Series 2019 Bonds, June 1 and December 1 of each year, commencing December 1, 2019, (ii) with respect to the Series 2020 Bonds, June 1 and December 1 of each year, commencing December 1, 2020, and (iii) with respect to any other Additional Bonds, the dates specified in a Supplemental Indenture relating thereto.

Leasehold Mortgage

"Leasehold Mortgage" means that certain Open-End Leasehold Mortgage, Security Agreement, Assignment of Rent and Leases, and Fixture Filing, dated as of June 1, 2019, but effective as of July 10, 2019, as amended by that certain First Amendment to Open-End Leasehold Mortgage, Security Agreement, Assignment of Rent and Leases, and Fixture Filing dated as of September 1, 2020, but effective as of September 10, 2020, by the Borrower in favor of the Trustee, as may be further amended, modified or supplemented from time to time.

Note

"Note" means, collectively and individually, the Senior Note and Subordinate Note.

Parity Debt

"Parity Debt" means any Indebtedness which is incurred by the Borrower and is secured equally and ratably with the obligations of the Borrower with respect to the Series 2019 Note under the Agreement, the Pledge and Security Agreement, the Leasehold Mortgage, the NDA and the SNDA, which satisfies the conditions set forth in Section 5.18(d) of the Agreement.

Parity Subordinate Debt

"Parity Subordinate Debt" means any Indebtedness which is incurred by the Borrower and is secured equally and ratably with the obligations of the Borrower with respect to the Series 2020 Note under the Agreement, which satisfies the conditions set forth in Section 5.18(f) of the Agreement.

Permitted Indebtedness

"Permitted Indebtedness" means Indebtedness permitted to be incurred under Section 5.18(d) of the Loan Agreement.

Pledge and Security Agreement

"Pledge and Security Agreement" means that certain Pledge and Security Agreement dated as of June 1, 2019, as amended by a First Amendment to Pledge and Security Agreement dated as of September 1, 2020, executed by the Borrower and the Guarantor in favor of the Trustee, as further amended, modified or supplemented from time to time.

Principal Payment Date

"Principal Payment Date" means, (i) with respect to the Series 2019 Bonds, June 1 and December 1 of each year, commencing December 1, 2021, (ii) with respect to the Series 2020 Bonds, December 1, 2036, which is the maturity date of the Series 2020 Bonds, and (iii) with respect to any other Additional Bonds, the dates specified in a Supplemental Indenture relating thereto.

Reserve Requirement

"Reserve Requirement" means, (i) with respect to the Series 2019 Bonds, the Series 2019 Reserve Requirement, (ii) with respect to the Series 2020 Bonds, the Series 2020 Reserve Requirement, and (iii) with respect to any Additional Bonds, the Reserve Requirement set forth in the Supplemental Indenture relating thereto.

Senior Note

"Senior Note" means the Series 2019 Note and any other promissory note issued pursuant

to the Loan Agreement with respect to any Additional Senior Bonds, from the Borrower to the Issuer and assigned to the Trustee for the benefit of the Bondholders of such Bonds.

Series

"Series" means all Bonds designated as being of the same series initially delivered as part of a simultaneous transaction evidencing a borrowing authorized by this Indenture, and any Bonds thereafter authenticated and delivered in lieu thereof or in exchange therefor.

Series 2019 Bonds

"Series 2019 Bonds" means the $61,800,000 Solid Waste Disposal Revenue Bonds (CarbonLite P, LLC Project) Series 2019.

Series 2019 Note

"Series 2019 Note" means the promissory note corresponding to the Series 2019 Bonds, dated July 10, 2019, by the Borrower in favor of the Issuer, issued pursuant to the Loan Agreement, and any amendment or supplement thereto or substitution therefor.

Series 2019 Reserve Requirement

"Series 2019 Reserve Requirement" means, an amount equal to the least of (i) Maximum Annual Debt Service with respect to the Series 2019 Bonds, (ii) one hundred twenty five percent (125%) of the average annual debt service on the Series 2019 Bonds, and (iii) ten percent (10%) of the original principal amount of the Series 2019 Bonds. Upon the issuance of the Series 2020 Bonds, the Series 2019 Reserve Requirement equals $6,056,618.75.

Series 2020 Bonds

"Series 2020 Bonds" means the $10,000,000 Subordinate Solid Waste Disposal Revenue Bonds (CarbonLite P, LLC Project) Series 2020.

Series 2020 Note

"Series 2020 Note" means the promissory note of the Borrower corresponding to the Series 2020 Bonds, substantially in the form attached to the First Amendment to Loan Agreement as Exhibit A, issued pursuant to the Loan Agreement and delivered to the Issuer by the Borrower, and any amendment or supplement thereto or substitution therefor.

Series 2020 Reserve Requirement

"Series 2020 Reserve Requirement" means, an amount equal to the least of (i) Maximum Annual Debt Service with respect to the Series 2020 Bonds, (ii) one hundred twenty five percent (125%) of the average annual debt service on the Series 2020 Bonds, and (iii) ten percent (10%) of the original principal amount of the Series 2020 Bonds. The Series 2020 Reserve Requirement equals $1,000,000.

SNDA

"SNDA" means that certain Subordination, Non-Disturbance and Access Agreement dated as of June 1, 2019, by and among the Trustee, the Borrower and the Lessor, as amended, modified or supplemented from time to time.

Subordinate Debt

"Subordinate Debt" means any Indebtedness issued or incurred by the Borrower which is either (a) payable from, but not secured by a pledge of or lien upon, the Gross Revenues and the Leasehold Mortgage, the NDA and the SNDA (whether or not otherwise secured); or (b) secured by a pledge of or lien upon the Gross Revenues or the Leasehold Mortgage, the NDA or the SNDA, which is subordinate to the pledge of and lien upon the Gross Revenues or the Leasehold Mortgage, the NDA or the SNDA under the Agreement as security for the Series 2019 Note, the Series 2020 Note and any other promissory note issued pursuant to the Loan Agreement, from the Borrower to the Issuer and assigned to the Trustee for the benefit of the Holders.

Subordinate Note

"Subordinate Note" means the Series 2020 Note and any other promissory note issued pursuant to the Loan Agreement with respect to any Additional Subordinate Bonds, from the Borrower to the Issuer and assigned to the Trustee for the benefit of the Bondholders of such Bonds.

Supplemental Indenture

"Supplemental Indenture" means any indenture hereafter duly authorized and entered into between the Issuer and the Trustee, supplementing, modifying or amending this Indenture, or authorizing the issuance of Additional Bonds hereunder; but only if and to the extent that such Supplemental Indenture is specifically authorized hereunder.

Tax Certificate

"Tax Certificate" means (i) with respect to the Series 2019 Bonds, the Tax Exemption Certificate and Agreement dated July 10, 2019, between the Borrower and the Issuer, (ii) with respect to the Series 2020 Bonds, the Tax Exemption Certificate and Agreement dated September 10, 2020, between the Borrower and the Issuer, and (iii) with respect to any other Additional Bonds, any Tax Exemption Certificate and Agreement delivered in connection with such Additional Bonds.

## ARTICLE II
## AUTHORIZATION AND TERMS OF SERIES 2020 BONDS

Section 2.01.        Authorization, Designation, and Issuance of Series 2020 Bonds.

Section 2.01 of the Original Indenture is hereby amended and restated in its entirety as follows:

SECTION 2.01        <u>Authorization of Bonds</u>.  Bonds shall be issued hereunder in order to obtain moneys to carry out the purposes of the Act for the benefit of the Issuer and the Borrower.  The Series 2019 Bonds are designated as "Pennsylvania Economic Development Financing Authority Solid Waste Disposal Revenue Bonds (CarbonLite P, LLC Project), Series 2019" and the Series 2020 Bonds are designated as "Pennsylvania Economic Development Financing Authority Subordinate Solid Waste Disposal Revenue Bonds (CarbonLite P, LLC Project), Series 2020."  Additional Bonds may further be issued as provided in Sections 2.12 or 2.13 hereof.  This Indenture constitutes a continuing agreement with the Holders from time to time of the Bonds to secure the full payment of the principal (or redemption price) of, premium if any, and interest on all such Bonds subject to the covenants, provisions and conditions herein contained.

There is hereby authorized to be issued under the Indenture and secured thereby the Series 2020 Bonds in the total aggregate principal amount of $10,000,000.  The Issuer shall issue, sell and deliver the Series 2020 Bonds for the purpose of financing costs of the Project.  The execution of this First Supplemental Indenture by the Issuer has been heretofore authorized, ratified and confirmed.

The Series 2020 Bonds shall constitute Additional Subordinate Bonds payable from the Revenues and other assets pledged hereunder and secured under the Indenture on a basis subordinate as to priority of payment and to the pledge of Revenues made hereunder for the benefit of the Holders of the Series 2019 Bonds and any Additional Senior Bonds.  All of the requirements set forth in Section 2.05 of this First Supplemental Indenture and Section 2.13 of the Indenture for the issuance of the Series 2020 Bonds as Additional Subordinate Bonds have been met.

Section 2.02.        <u>Interest Rate and Maturities of Series 2020 Bonds</u>.

Section 2.03(B) of the Original Indenture is hereby amended and restated in its entirety as follows:

(B)        (i) The Series 2019 Bonds maturing on June 1, 2026 shall bear interest at the rate per annum of 5.25% and the Series 2019 Bonds maturing on June 1, 2036 shall bear interest at the rate per annum of 5.75%; (ii) the Series 2020 Bonds shall mature on December 1, 2036 and shall bear interest at the rate per annum of 8.50%; and (iii) any Additional Bonds issued hereafter shall bear interest at the rate or rates specified in any Supplemental Indenture relating to such Additional Bonds; provided that in each case, on and after the occurrence of an Event of Default under Section 7.01, the Bonds shall bear interest at the Post-Default Rate during the continuation of such Event of Default.  Notwithstanding anything to the contrary contained herein, the interest rate on the Bonds shall not exceed the Maximum Legal Rate.

Section 2.03.        Redemption of Series 2020 Bonds.

So long as no Series 2019 Bonds are then Outstanding, the Series 2020 Bonds are subject to redemption prior to stated maturity as provided in Section 4.01 of the Original Indenture, except with respect to Section 4.01(1) (Sinking Fund Redemption), which redemption provisions shall not apply with respect to the Series 2020 Bonds.

Section 2.04.        Optional Tender of Series 2020 Bonds upon Change in Control.

The Series 2020 Bonds are subject to optional tender upon a Change of Control as set forth in Section 4.06 of the Original Indenture.

Section 2.05.        Delivery of Series 2020 Bonds.

Upon the execution and delivery of this First Supplemental Indenture and satisfaction of the conditions established in the Bond Purchase Contract for delivery of the Series 2020 Bonds, the Issuer shall execute the Series 2020 Bonds and deliver them to the Trustee.  Thereupon, the Trustee, upon order of the Borrower, shall authenticate the Series 2020 Bonds and deliver them to the Persons designated by the Purchaser.

Before the Trustee authenticates, delivers or retains, as applicable, any Series 2020 Bond, the Trustee shall have received:

(a)        original executed counterparts of this First Supplemental Indenture, the First Amendment to Loan Agreement, the Series 2020 Note, the First Amendment to Leasehold Mortgage, the First Amendment to Guaranty, the First Amendment to Pledge and Security Agreement and the Tax Certificate relating to the Series 2020 Bonds;

(b)        an opinion of Bond Counsel dated the Date of Delivery of the Series 2020 Bonds pursuant to Sections 9.02 and 9.05 of the Indenture; and

(c)        all of the items set forth in Section 2.13 of the Indenture.

### ARTICLE III
### AMENDMENTS TO ORIGINAL INDENTURE RELATING TO BONDS

Section 3.01.        Issuance of Bonds.

Section 3.01 of the Original Indenture is hereby amended and restated in its entirety as follows:

SECTION 3.01        Issuance of Bonds.

At any time after the execution and delivery of this Indenture or from time to time thereafter, upon the execution of the Bonds by the Issuer and delivery thereof to the Trustee, as hereinabove provided, and without any further action on the part of the Issuer, the Trustee shall authenticate upon Request of the Issuer, and deliver such Bonds in the aggregate principal

amount set forth in the Indenture or Supplemental Indenture related thereto.

The Trustee shall deliver the Series 2019 Bonds in an aggregate principal amount not exceeding $61,800,000 and the Series 2020 Bonds in an aggregate principal amount not exceeding $10,000,000.

Section 3.02.        Application of Proceeds of Bonds.

Section 3.02 of the Original Indenture is hereby amended and restated in its entirety as follows:

SECTION 3.02        Application of Proceeds of Series 2020 Bonds.

The purchase price of the Series 2020 Bonds ($9,800,000) (consisting of the par amount of the Series 2020 Bonds of $10,000,000, less an Underwriter's discount of $200,000), together with a Borrower equity contribution in the sum of $10,000,000 (less an Underwriter's fee in the amount of $100,000, which shall be paid by the Borrower to the Underwriter on or before the Date of Delivery with respect to the Series 2020 Bonds, and any amounts previously contributed by the Borrower or the Guarantor to pay for Costs of the Project), shall be deposited with the Trustee, who shall forthwith deposit such proceeds as follows on the Date of Delivery with respect to the Series 2020 Bonds:

(a)        The Trustee shall transfer the sum of $735,071 from the Borrower's equity contribution to the Series 2020 subaccount of the Borrower Subaccount within the Costs of Issuance Fund;

(b)        The Trustee shall transfer the sum of $8,800,000 from proceeds of the Series 2020 Bonds to the Series 2020 subaccount of the Tax-Exempt Subaccount within the Project Fund;

(c)        The Trustee shall transfer the sum of $9,264,929.41 from the Borrower's equity contribution to the Series 2020 subaccount of the Equity Subaccount within the Project Fund to be released to the Borrower upon delivery to the Trustee of a Requisition in the form of Exhibit B and in accordance with Section 3.03 of the Indenture; and

(d)        The Trustee shall transfer the sum of $1,000,000 from proceeds of the Series 2020 Bonds to the Series 2020 subaccount of the Debt Service Reserve Fund.

The proceeds of any Additional Bonds shall be deposited in trust with the Trustee in the Project Fund and, as needed, in the Debt Service Reserve Fund and Costs of Issuance Fund, in each case as set forth in the Supplemental Indenture delivered in connection with such Additional Bonds.

Section 3.03.          Project Fund.

Section 3.03 of the Original Indenture is hereby amended and restated in its entirety as follows:

SECTION 3.03          Project Fund.

The Trustee shall establish the CarbonLite P, LLC Project Fund (the "Project Fund") and, within the Project Fund, a separate account designated as the CarbonLite P, LLC Capitalized Interest Account (the "Capitalized Interest Account"), to the credit of which proceeds of the Bonds will be deposited and applied to the payment of the Costs of the Project.   Within such Capitalized Interest Account, the Trustee shall establish a separate subaccount for each Series or sub-Series of Bonds, as applicable.

The Trustee shall also create separate accounts in the Project Fund designated as the Tax-Exempt Subaccount (the "Tax-Exempt Subaccount") and the Equity Subaccount (the "Equity Subaccount") and therein, a separate subaccount for each Series or sub-Series of Bonds, as applicable. The Tax-Exempt Subaccount and the Equity Subaccount will be funded as provided in Section 3.02. The moneys in each subaccount of the Project Fund shall be held by the Trustee in trust and applied to the payment of the Costs of the Project and, with respect to the Equity Subaccount, the payment of the Operating and Working Capital Costs, including lease payments and lease deposits, in the manner set forth below.

Before each payment is made from the Project Fund (including any account established therein) by the Trustee, there shall be filed with the Trustee a sequentially numbered Requisition of the Borrower conforming with the requirements of this Section and Section 3.2 of the Agreement, and in the form attached hereto as Exhibit B, stating with respect to each payment to be made:

(i)        the requisition number;

(ii)       the name and address of the Person to whom payment is due;

(iii)      the purpose for which such payment is to be made;

(iv)      the amount to be paid;

(v)       that each obligation mentioned therein has been properly incurred and is a proper charge against the Project Fund;

(vi)    that none of the items for which payment is requested has been previously paid or reimbursed from the Project Fund;

(vii)    that each item for which payment is requested is or was necessary in connection with the acquisition, construction, installation, equipping or financing of the Project or, with respect to any payment from the Equity Subaccount, the operation of the Project;

(viii)    with respect to any payment from the Tax-Exempt Subaccount, that at least 97.0% of the amount requisitioned, together with all amounts requisitioned to date, have in the aggregate been used to pay for or to reimburse the Borrower for expenditures properly allocable to Costs of the Project pursuant to the Tax Certificate (excluding Costs of Issuance); and

(ix)    that an invoice evidencing each item for payment is attached thereto, including invoices for costs previously paid and for which reimbursement is being requested by the Borrower, of Costs of the Project or Operating and Working Capital Costs due and payable, or previously paid and for which reimbursement is being requested.

Each such Requisition of the Borrower shall be sufficient evidence of the facts stated therein, and the Trustee may conclusively rely upon and shall have no duty to confirm the accuracy of such facts.  Upon receipt of each such Requisition of the Borrower, signed by an Authorized Representative of the Borrower and accompanied by an invoice covering each item for payment of Costs of the Project or Operating and Working Capital Costs, the Trustee shall thereupon disburse moneys in the Project Fund to pay the amount set forth therein as directed by the terms thereof.  In addition, with respect to the Series 2020 subaccount of the Equity Subaccount within the Project Fund, the Trustee shall disburse funds on deposit therein to or at the direction of the Borrower, requisitioned as set forth in this Section 3.03, solely to pay Operating and Working Capital Costs of the Borrower in a maximum monthly disbursement amount equal to the lesser of (i) the Operating and Working Capital Costs of the Borrower set forth in the Borrower's then current operating expense budget for such month and (ii) $2,000,000.  Each requisition of the Borrower for payments from the Series 2020 subaccount of the Equity Subaccount of the Project Fund shall constitute a certification by the Borrower to the Trustee that the budget currently on file with the Trustee is the then current operating expense budget of the Borrower.

Upon the receipt by the Trustee of a certificate conforming with the requirements of Section 3.2 of the Agreement, and after payment of costs payable from the Project Fund or provision having been made for payment of such costs not yet due by retaining such costs in the Project Fund or otherwise as directed in such certificate, the Trustee shall transfer any

remaining balance in the relevant Series subaccount of the Tax-Exempt Subaccount within the Project Fund into the relevant Series subaccount of the Surplus Account within the Revenue Fund, which account and subaccounts the Trustee shall establish and hold in trust.  In the alternative, the Borrower may submit to the Trustee a certificate, stating that its plans for the Project have changed and that it has determined to use a portion of unspent proceeds in the Project Fund to redeem Bonds.  Upon receipt of either of the foregoing certificates, the Trustee shall arrange for the identified amount of unspent proceeds in the relevant Series subaccount of the Tax-Exempt Subaccount within the Project Fund to be returned to the Trustee for deposit in the relevant Series subaccount of the Surplus Account.  The moneys in any Surplus Account shall be used and applied (subject to Section 5.03) at the written direction of the Borrower (unless some other application of such moneys permitted by the Indenture and the Loan Agreement is requested by the Borrower and would not, in the opinion of Bond Counsel, cause interest on the Bonds to become no longer Tax-exempt) to redeem Bonds in Authorized Denominations, to the maximum degree permissible, and at the earliest possible dates at which the Bonds can be redeemed pursuant to Section 4.01 of this Indenture. Notwithstanding Section 5.05 hereof, the moneys in the Surplus Account shall be invested at the written instruction of the Borrower at a yield no higher than the yield on the Outstanding Bonds (unless in the opinion of Bond Counsel, addressed and delivered to the Issuer and the Trustee, investment at a higher yield would not cause interest on the Bonds to become no longer Tax-exempt) and all such investment income shall be deposited in the Surplus Account and expended or reinvested as provided above.

In the event of redemption of all of a Series of Bonds pursuant to Section 4.01 hereof or an Event of Default which causes acceleration of any Series of Bonds, any moneys then remaining in the relevant Series subaccount of the Tax-Exempt Subaccount within the Project Fund relating to such Series of Bonds shall be transferred to the relevant Series subaccount of the Surplus Account within the Revenue Fund, and all moneys in the Revenue Fund relating to such Series of Bonds shall be used to redeem such Series of Bonds.

Moneys in the Series 2019 subaccount of the Capitalized Interest Account shall be transferred by the Trustee on the 25th day of each month, commencing July 25, 2019, to the Series 2019 subaccount of the Interest Account within the Revenue Fund in the following amounts to pay interest due and payable on the Series 2019 Bonds on each Interest Payment Date with respect to the Series 2019 Bonds to and including June 1, 2021, in accordance with the following schedule:

| Date of Transfer from Capitalized Interest Account | Transfer Amount from Capitalized Interest Account |
|---|---|
| 7/25/2019 | $272,664.63 |
| 8/25/2019 | 272,664.63 |
| 9/25/2019 | 272,664.63 |
| 10/25/2019 | 272,664.63 |
| 11/25/2019 | 272,664.63 |
| 12/25/2019 | 290,068.75 |
| 1/25/2020 | 290,068.75 |
| 2/25/2020 | 290,068.75 |
| 3/25/2020 | 290,068.75 |
| 4/25/2020 | 290,068.75 |
| 5/25/2020 | 290,068.75 |
| 6/25/2020 | 290,068.75 |
| 7/25/2020 | 290,068.75 |
| 8/25/2020 | 290,068.75 |
| 9/25/2020 | 290,068.75 |
| 10/25/2020 | 290,068.75 |
| 11/25/2020 | 290,068.75 |
| 12/25/2020 | 290,068.75 |
| 1/25/2021 | 87,020.60 |

Section 3.04.    Costs of Issuance Fund.

Section 3.04 of the Original Indenture is hereby amended and restated in its entirety as follows:

SECTION 3.04    Costs of Issuance Fund.

The Trustee shall establish the Costs of Issuance Fund (the "Costs of Issuance Fund"). The Trustee shall also create separate accounts in the Costs of Issuance Fund designated the "Proceeds Account" and the "Borrower Subaccount" which will be funded as provided in Section 3.02. The Trustee shall further establish within the Proceeds Account and Borrower Subaccount, as applicable, a separate subaccount for each Series and sub-Series of Bonds. The moneys in each account and subaccount of the Costs of Issuance Fund shall be held by the Trustee in trust and applied to the payment of Costs of Issuance for the relevant Series of Bonds, upon a sequentially numbered Requisition of the Borrower filed with the Trustee, in the form attached hereto as Exhibit C, together with invoices required by Section 3.1 of the Agreement, signed by an Authorized Representative of the Borrower. Each Requisition of the Borrower shall be sufficient evidence to the Trustee of the facts stated therein and the Trustee may conclusively rely upon and shall have no duty to confirm the accuracy of such facts. All payments from the Costs of Issuance Fund shall be reflected in the Trustee's regular accounting statements. Any

amounts remaining in a Proceeds Account of the Costs of Issuance Fund six months following the Date of Delivery of the relevant Series of Bonds shall be transferred to relevant Series subaccount of the Tax-Exempt Subaccount within the Project Fund for such Series of Bonds.  Any amounts remaining in the Borrower Subaccount of the Costs of Issuance Fund three months following the Date of Delivery of the relevant Series of Bonds shall be transferred to the Borrower.  Upon such transfers with respect to all Series of Bonds Outstanding, the Trustee shall close the Costs of Issuance Fund.

Section 3.05.        Pledge and Assignment; Revenue Fund.

Section 5.01(A) of the Original Indenture is hereby amended and restated in its entirety as follows:

SECTION 5.01        Pledge and Assignment; Revenue Fund.

(A)    Subject only to the provisions of this Indenture permitting the application thereof for the purposes and on the terms and conditions set forth herein, all of the Revenues and any other amounts (including proceeds of the sale of Bonds) held in any fund or account established pursuant to this Indenture (except the Rebate Fund and the Borrower Subaccount of the Costs of Issuance Fund) are hereby pledged to secure the full payment of the principal of, premium, if any, and interest on the Bonds, *first*, in favor of the Series 2019 Bonds and any Additional Senior Bonds, and *second*, in favor of the Series 2020 Bonds and any Additional Subordinate Bonds, all in accordance with their terms and the provisions of this Indenture.  Said pledge shall constitute a lien on and security interest in such assets and shall attach, be perfected and be valid and binding from and after delivery by the Trustee of the Bonds, without any physical delivery thereof or further act.

Section 3.06.        Deposits to Revenue Fund; Allocation of Revenues.

Section 5.02 of the Original Indenture is hereby amended and restated in its entirety as follows:

SECTION 5.02        Deposits to Revenue Fund; Allocation of Revenues.

The Trustee shall establish, maintain and hold in trust a separate fund designated as the "Revenue Fund" and accounts therein designated the "Interest Account," "Principal Account," "Redemption Account," and the "Debt Service Reserve Fund."  The Trustee shall further establish within each such account, a separate subaccount for each Series or sub-Series of Bonds, as applicable.  On the first Business Day of every calendar month (to the extent not paid from the Capitalized Interest Account) except as noted below, the Trustee shall transfer from the Revenue Fund and deposit into the respective Series subaccount within the following respective

accounts (each of which the Trustee is hereby directed to establish and maintain within the Revenue Fund), the following amounts, in the following order of priority, the requirements of each such account (including the making up of any deficiencies in any such account resulting from lack of Revenues sufficient to make any earlier required deposit) at the time of deposit to be satisfied before any transfer is made to any account subsequent in priority:

*First*:  (i) with respect to the Series 2019 Bonds, to the Series 2019 subaccount of the Interest Account, an amount equal to one-sixth of the aggregate amount of interest becoming due and payable on the Series 2019 Bonds on the next succeeding Bond Payment Date with respect to the Series 2019 Bonds or date of redemption of all Series 2019 Bonds then Outstanding; and (ii) with respect to any Additional Senior Bonds, to the applicable Series subaccount of the Interest Account, an amount equal to one-sixth of the aggregate amount of interest becoming due and payable on such Series of Additional Senior Bonds on the next succeeding Bond Payment Date relating thereto or date of redemption of all such Series of Additional Senior Bonds then Outstanding.

*Second*:  (i) with respect to the Series 2019 Bonds, to the Series 2019 subaccount of the Principal Account, an amount equal to one-sixth of the aggregate amount of principal due on the Series 2019 Bonds on the Bond Payment Date with respect to the Series 2019 Bonds as paid by the Borrower and designated as or attributable to principal on the Series 2019 Bonds in the most recent Loan Repayment; and (ii) with respect to any Additional Senior Bonds, to the applicable Series subaccount of the Principal Account, an amount equal to one-sixth of the aggregate amount of principal due on such Series of Additional Senior Bonds on the Bond Payment Date relating thereto as paid by the Borrower and designated as or attributable to principal on such Series of Additional Senior Bonds in the most recent Loan Repayment.

*Third*:  (i) with respect to the Series 2019 Bonds, to the Series 2019 subaccount of the Redemption Account, the aggregate amount of principal and premium, if any, next coming due on the Series 2019 Bonds by acceleration or by redemption permitted or required under Article IV hereof, or any portion thereof paid by the Borrower; and (ii) with respect to any Additional Senior Bonds, to the applicable Series subaccount of the Redemption Account, the aggregate amount of principal and premium, if any, next coming due on such Series of Additional Senior Bonds by acceleration or by redemption permitted or required under Article IV hereof, or any portion thereof paid by the Borrower.

*Fourth*:  (i) with respect to the Series 2019 Bonds, to the Series 2019 subaccount of the Debt Service Reserve Fund, to restore such account or subaccount to the Series 2019 Reserve Requirement, if

required, in three equal installments; and (ii) with respect to any Additional Senior Bonds, to the applicable Series subaccount of the Debt Service Reserve Fund, to restore such account or subaccount to the Reserve Requirement relating to such Series of Additional Senior Bonds, if required, in three equal installments.

*Fifth*:  (i) with respect to the Series 2020 Bonds, to the Series 2020 subaccount of the Interest Account, an amount equal to one-third of the aggregate amount of interest becoming due and payable on the Series 2020 Bonds on December 1, 2020, and thereafter, an amount equal to one-sixth of the aggregate amount of interest becoming due and payable on the Series 2020 Bonds on the next succeeding Bond Payment Date with respect to the Series 2020 Bonds or date of redemption of all Series 2020 Bonds then Outstanding; and (ii) with respect to any Additional Subordinate Bonds, to the applicable Series subaccount of the Interest Account, an amount equal to one-sixth of the aggregate amount of interest becoming due and payable on such Series of Additional Subordinate Bonds on the next succeeding Bond Payment Date relating thereto or date of redemption of all such Series of Additional Subordinate Bonds then Outstanding.

*Sixth*:  (i) with respect to the Series 2020 Bonds, beginning on November 1, 2036, to the Series 2020 subaccount of the Principal Account, an amount equal to the aggregate amount of principal due on the Series 2020 Bonds on the Principal Payment Date with respect to the Series 2020 Bonds as paid by the Borrower and designated as or attributable to principal on the Series 2020 Bonds in the Loan Repayment immediately preceding such Principal Payment Date; and (ii) with respect to any Additional Subordinate Bonds, beginning on the first of the month immediately preceding the Principal Payment Date relating thereto, to the applicable Series subaccount of the Principal Account, an amount equal to the aggregate amount of principal due on such Series of Additional Subordinate Bonds on the Principal Payment Date relating thereto as paid by the Borrower and designated as or attributable to principal on such Series of Additional Subordinate Bonds in the Loan Repayment immediately preceding such Principal Payment Date.

*Seventh*:  (i) with respect to the Series 2020 Bonds, to the Series 2020 subaccount of the Redemption Account, the aggregate amount of principal and premium, if any, next coming due on the Series 2020 Bonds by acceleration or by redemption permitted or required under Article IV hereof, or any portion thereof paid by the Borrower; and (ii) with respect to any Additional Subordinate Bonds, to the applicable Series subaccount of the Redemption Account, the aggregate amount of principal and premium, if any, next coming due on such Series of Additional Subordinate Bonds by acceleration or by redemption permitted or required under Article IV hereof, or any portion thereof paid by the Borrower.

*Eighth*:  (i) with respect to the Series 2020 Bonds, to the Series 2020 subaccount of the Debt Service Reserve Fund, to restore such account or subaccount to the Series 2020 Reserve Requirement, if required, in three equal installments; and (ii) with respect to any Additional Subordinate Bonds, to the applicable Series subaccount of the Debt Service Reserve Fund, to restore such account or subaccount to the Reserve Requirement relating to such Series of Additional Subordinate Bonds, if required, in three equal installments.

Section 3.07.    Debt Service Reserve Fund.

Section 5.07 of the Original Indenture is hereby amended and restated in its entirety as follows:

SECTION 5.07    Debt Service Reserve Fund.

(A)    The Trustee is hereby authorized to create and establish a separate account in the Revenue Fund, which shall be known as the "Debt Service Reserve Fund" and which shall be held in trust by the Trustee until applied as directed in this Indenture.  The total amount required to be maintained in each subaccount of the Debt Service Reserve Fund shall equal the then applicable Reserve Requirement for each Series of Bonds.  On the date of initial delivery of the Series 2019 Bonds, the Debt Service Reserve Fund shall be funded, from proceeds of the Series 2019 Bonds, in the amount of the Series 2019 Reserve Requirement.  On the date of initial delivery of the Series 2020 Bonds, the Debt Service Reserve Fund shall be funded, from proceeds of the Series 2020 Bonds, in the amount of the Series 2020 Reserve Requirement.

(B)    On any Interest Payment Date immediately following the incurrence of any deficiency in the amount required to be maintained in the Debt Service Reserve Fund as a result of a withdrawal from the Debt Service Reserve Fund or a valuation pursuant to Section 5.07(D), after first having made the transfers provided for in Sections 5.01 and 5.02 (but prior to a transfer in the case of an optional redemption of the Bonds), the Trustee shall notify the Borrower that it is required to make payments pursuant to the Loan Agreement with respect to the Bonds in an aggregate amount sufficient to eliminate the deficiency, and the Trustee shall cause such deficiency to be transferred from the Revenue Fund in three monthly installments as provided in Section 5.02, regardless of whether such deficiency is the result of a draw on the Debt Service Reserve Fund by the Trustee or a valuation of investments held in the Debt Service Reserve Fund pursuant to Section 5.07(d).

(C)    Moneys on deposit in the Debt Service Reserve Fund shall be applied, after use of all available funds in the Revenue Fund, as follows:

(1)    on the date of each permitted or required payment from the Revenue Fund with respect to the Bonds, (a) moneys in the Series 2019 subaccount of the Debt Service Reserve Fund shall be applied to cure any deficiency in the Revenue Fund for the payment of the Series 2019 Bonds, (b) moneys in the Series 2020 subaccount of the Debt Service Reserve Fund shall be applied to cure any deficiency in the Revenue Fund for the payment of the Series 2020 Bonds, and (c) moneys in any subaccount of the Debt Service Reserve Fund with respect to any Additional Bonds shall be applied to cure any deficiency in the Revenue Fund for the payment of such Series of Additional Bonds;

(2)    as soon as practicable following the semi-annual valuation of amounts held in the Debt Service Reserve Fund, (a) any amount in the Series 2019 subaccount of the Debt Service Reserve Fund in excess of the Series 2019 Reserve Requirement shall be transferred to the Revenue Fund for payment of principal and interest on the Series 2019 Bonds, (b) any amount in the Series 2020 subaccount of the Debt Service Reserve Fund in excess of the Series 2020 Reserve Requirement shall be transferred to the Revenue Fund for payment of principal and interest on the Series 2020 Bonds, and (c) any amount in any subaccount of the Debt Service Reserve Fund with respect to any Additional Bonds in excess of the Reserve Requirement applicable thereto shall be transferred to the Revenue Fund for payment of principal and interest on such Series of Additional Bonds, in each case so long as no Event of Default shall have occurred and be continuing;

(3)    in each month during the twelve month period preceding the final maturity date of a Series of Bonds, moneys held in the Debt Service Reserve Fund in respect of such Series of Bonds shall be credited against payment of installment payments otherwise payable in respect of principal of and interest on such Series of Bonds and shall be transferred to the Revenue Fund for the payment of such principal and interest; except, that, with respect to the Series 2020 Bonds, on November 25, 2036, moneys held in the Series 2020 subaccount of the Debt Service Reserve Fund will be credited against the principal of and interest due on the Series 2020 Bonds at maturity, and will be transferred to the Revenue Fund for the payment of such principal and interest on the Series 2020 Bonds on the maturity date thereof; provided, however, that no such transfer shall be made pursuant to this subparagraph (3) to the extent that, immediately prior to such crediting and transfer, the amount on deposit in (a) the Series 2019 subaccount of the Debt Service Reserve Fund is not at least equal to the Series 2019 Reserve Requirement, (b) the Series 2020 subaccount of the Debt Service Reserve Fund is not at least equal to the Series 2020 Reserve Requirement, and (c) the subaccount of the Debt Service Reserve Fund with respect to any Additional Bonds is not at least equal to the Reserve Requirement applicable thereto, in each case less the amounts previously transferred to the Revenue Fund during such twelve

month period pursuant to this subparagraph (3) or otherwise; and

(4)    Notwithstanding the foregoing, upon the occurrence and during the continuation of any Event of Default hereunder, (a) moneys on deposit in the Series 2019 subaccount of the Debt Service Reserve Fund shall be applied as directed by the Holders of a majority in principal amount of the Series 2019 Bonds then Outstanding, (b) moneys in the Series 2020 subaccount of the Debt Service Reserve Fund shall be applied as directed by the Holders of a majority in principal amount of the Series 2020 Bonds then Outstanding, and (c) moneys in any subaccount of the Debt Service Reserve Fund with respect to any Additional Bonds shall be applied as directed by the Holders of a majority in principal amount of such Series of Additional Bonds then Outstanding, in each case including without limitation for payment of the Trustee's fees and expenses under Articles VII or VIII of this Indenture, which shall be withdrawn to pay such fees and expenses by the Trustee on a pro rata basis based upon the then Outstanding principal amounts of the Series 2019 Bonds, Series 2020 Bonds and any Additional Bonds.

(D)    Investments in the Debt Service Reserve Fund shall be valued by the Trustee on June 1 and December 1 of each year and at the time of any withdrawal from the Debt Service Reserve Fund, at the lesser of the face amount or the market value thereof as reflected in the Trustee's trust accounting system.  If the amount on deposit in the Debt Service Reserve Fund at any such time is less than the Reserve Requirement, the Trustee shall notify the Borrower that it is required to make payments to eliminate such deficiency pursuant to the Loan Agreement and such deficiency shall be remedied in accordance with Section 5.02 by the Trustee transferring from the Revenue Fund three equal monthly installments which in the aggregate equal such deficiency.

(E)    The Trustee shall give notice to the Issuer not later than five days after any deficiency in the amount required to be maintained in the Debt Service Reserve Fund as a result of a draw on the Debt Service Reserve Fund.

Section 3.08.    Amendments to Loan Agreement.

Section 6.07(B) of the Original Indenture is hereby amended and restated in its entirety as follows:

SECTION 6.07    Other Covenants.

(B)    The Issuer and the Borrower shall not amend, modify or terminate any of the terms of the Agreement, or consent to any such amendment, modification or termination, without the prior written consent of the Trustee.  The Trustee shall give such written consent only if (1) the

Trustee obtains an Approving Opinion, and (2) the Trustee obtains the written consent of the Holders of a majority in aggregate principal amount of the Series 2019 Bonds and any Additional Senior Bonds then Outstanding to such amendment, modification or termination, provided, however, that no such amendment, modification or termination shall reduce the amount of Loan Repayments to be made to the Issuer or the Trustee by the Borrower pursuant to the Agreement, without the written consent of Holders of at least 75% of aggregate principal amount of Series 2019 Bonds and any Additional Senior Bonds then Outstanding (provided, that, if such amendment, modification or termination shall reduce the amount of Loan Repayments to be made in favor of the Holders of the Series 2020 Bonds or any Additional Subordinate Bonds then Outstanding, then the written consent of Holders of at least 75% of aggregate principal amount of the Series 2020 Bonds and any Additional Subordinate Bonds then Outstanding shall also be required in addition to the written consent of Holders of at least 75% of aggregate principal amount of the Series 2019 Bonds and any Additional Senior Bonds then Outstanding required hereunder).  The Trustee and the Issuer shall be entitled to rely upon the Approving Opinion with respect to the effect of any amendments hereto or to the Agreement.  The Trustee may in its discretion, but shall not be obligated to, give its written consent if such amendment, modification or termination affects the Trustee's own rights, duties or immunities.

Section 3.09.        <u>Application of Revenues and Other Funds After Default</u>.

Section 7.03 of the Original Indenture is hereby amended and restated in its entirety as follows:

SECTION 7.03        <u>Application of Revenues and Other Funds After Default</u>.

If an Event of Default shall occur and be continuing, all Revenues and any other funds then held or thereafter received by the Trustee under any of the provisions of this Indenture (subject to Sections 3.04 (relative to the Borrower Subaccount of the Costs of Issuance Fund), 5.06 and 11.11 hereof) shall be promptly applied by the Trustee as follows and in the following order:

(i)        To the payment of reasonable fees and expenses of the Trustee (including reasonable fees and disbursements of its counsel) incurred in and about the performance of its powers and duties under this Indenture;

(ii)        To the payment of the principal of and interest then due on the Series 2019 Bonds and any Additional Senior Bonds (upon presentation of the Series 2019 Bonds or Additional Senior Bonds to be paid, and stamping thereon of the payment if only partially paid, or surrender

thereof if fully paid) subject to the provisions of this Indenture (including Section 6.02 hereof), as follows:

(A)    Unless the principal of all of the Series 2019 Bonds and Additional Senior Bonds shall have become or have been declared due and payable,

*First*:    To the payment of Persons entitled thereto of all installments of interest then due on the Series 2019 Bonds and Additional Senior Bonds in the order of the maturity of such installments, and, if the amount available shall not be sufficient to pay in full any installment or installments maturing on the same date, then to the payment thereof ratably, according to the amounts due thereon, to the Persons entitled thereto, without any discrimination or preference; and

*Second*:    To the payment of Persons entitled thereto of the unpaid principal of any Series 2019 Bonds and Additional Senior Bonds which shall have become due, whether at maturity or by call for redemption, with interest on the overdue principal at the rate borne by the respective Series 2019 Bonds and Additional Senior Bonds, and, if the amount available shall not be sufficient to pay in full all of the Series 2019 Bonds and Additional Senior Bonds, together with such interest, then to the payment thereof ratably, according to the amounts of principal due on such date to the Persons entitled thereto, without any discrimination or preference.

(B)    If the principal of all of the Series 2019 Bonds and Additional Senior Bonds shall have become or have been declared due and payable, to the payment of the principal and interest then due and unpaid upon the Series 2019 Bonds and Additional Senior Bonds, with interest on the overdue principal at the rate borne by the Series 2019 Bonds and Additional Senior Bonds, and, if the amount available shall not be sufficient to pay in full the whole amount so due and unpaid, then to the payment thereof ratably, without preference or priority of principal over interest, or of interest over principal, or of any installment of interest over any other installment of interest, or of any Series 2019 Bond and Additional Senior Bonds over any other Series 2019 Bond and Additional Senior Bonds, according to the amounts due respectively for principal and interest, to the Persons entitled thereto without any discrimination or preference; provided, however, that in no event shall moneys set aside to pay principal or interest on any particular Series 2019 Bonds and Additional Senior Bonds (including moneys held for non-presented Series 2019 Bonds and Additional Senior Bonds or held under Section 10.03 hereof), be used to pay any of the items listed in clause (i) of this Section.

(iii)    Only after all Series 2019 Bonds and Additional Senior Bonds have been fully paid, to the payment of the principal of and interest then due on the Series 2020 Bonds and any Additional Subordinate Bonds

(upon presentation of the Series 2020 Bonds or Additional Subordinate Bonds to be paid, and stamping thereon of the payment if only partially paid, or surrender thereof if fully paid) subject to the provisions of this Indenture (including Section 6.02 hereof), as follows:

(A)    Unless the principal of all of the Series 2020 Bonds and any Additional Subordinate Bonds shall have become or have been declared due and payable,

*First*:    To the payment of Persons entitled thereto of all installments of interest then due on the Series 2020 Bonds and any Additional Subordinate Bonds in the order of the maturity of such installments, and, if the amount available shall not be sufficient to pay in full any installment or installments maturing on the same date, then to the payment thereof ratably, according to the amounts due thereon, to the Persons entitled thereto, without any discrimination or preference; and

*Second*:    To the payment of Persons entitled thereto of the unpaid principal of any Series 2020 Bonds and any Additional Subordinate Bonds which shall have become due, whether at maturity or by call for redemption, with interest on the overdue principal at the rate borne by the respective Series 2020 Bonds and any Additional Subordinate Bonds, and, if the amount available shall not be sufficient to pay in full all of the Series 2020 Bonds and any Additional Subordinate Bonds, together with such interest, then to the payment thereof ratably, according to the amounts of principal due on such date to the Persons entitled thereto, without any discrimination or preference.

(B)    If the principal of all of the Series 2020 Bonds and any Additional Subordinate Bonds shall have become or have been declared due and payable, to the payment of the principal and interest then due and unpaid upon the Series 2020 Bonds and any Additional Subordinate Bonds, with interest on the overdue principal at the rate borne by the Series 2020 Bonds and any Additional Subordinate Bonds, and, if the amount available shall not be sufficient to pay in full the whole amount so due and unpaid, then to the payment thereof ratably, without preference or priority of principal over interest, or of interest over principal, or of any installment of interest over any other installment of interest, or of any Series 2020 Bond and any Additional Subordinate Bond over any other Series 2020 Bond and any Additional Subordinate Bond, according to the amounts due respectively for principal and interest, to the Persons entitled thereto without any discrimination or preference; provided, however, that in no event shall moneys set aside to pay principal or interest on any particular Series 2020 Bonds or any Additional Subordinate Bonds (including moneys held for non-presented Series 2020 Bonds or any Additional Subordinate Bonds or held under Section 10.03 hereof), be used to pay any of the items listed in clause (i) of this Section.

Section 3.10.    <u>Bondholders' Direction of Proceedings</u>.

Section 7.05 of the Original Indenture is hereby amended and restated in its entirety as follows:

SECTION 7.05    <u>Bondholders' Direction of Proceedings</u>.

Anything in this Indenture to the contrary notwithstanding, but subject to Section 8.03(G), the Holders of a majority in aggregate principal amount of the Series 2019 Bonds and any Additional Senior Bonds then Outstanding shall have the right, by an instrument or concurrent instruments in writing executed and delivered to the Trustee, to direct the method of conducting all remedial proceedings taken by the Trustee hereunder, provided that such direction shall not be otherwise than in accordance with law and the provisions of this Indenture. Notwithstanding any provision hereof to the contrary, so long as any Series 2019 Bonds or any Additional Senior Bonds shall remain Outstanding, all references in this Article VII to the Holders of a majority in aggregate principal amount of the Bonds then Outstanding shall solely refer to the Holders of a majority in aggregate principal amount of the Series 2019 Bonds and any Additional Senior Bonds then Outstanding, it being the agreement of the Holders of the Series 2020 Bonds and any Additional Subordinate Bonds that Holders of the Series 2020 Bonds and any Additional Subordinate Bonds shall have no rights to direct proceedings under this Indenture so long as the Series 2019 Bonds or any Additional Senior Bonds remain Outstanding. By their acceptance of the Series 2020 Bonds or any Additional Subordinate Bonds, the Holders of the Series 2020 Bonds and any Additional Subordinate Bonds shall have no right (i) to pursue or direct any remedy available to the Trustee hereunder or (ii) to be paid from the proceeds received by the Trustee through the exercise of any remedies allowed hereunder or under any other document relating to the Series 2019 Bonds or any Additional Senior Bonds while any Series 2019 Bonds or any Additional Senior Bonds are Outstanding. The Trustee shall give written notice to the Holders of the Series 2020 Bonds or any Additional Subordinate Bonds of its exercise of remedies. The Trustee has no obligation to consider whether remedies taken would have a material adverse effect on the possibility that Holders of the Series 2020 Bonds or any Additional Subordinate Bonds will be paid or to consider any effect that a remedy may have on the Holders of Subordinate Bonds, so long as the Series 2019 Bonds and any Additional Senior Bonds remain Outstanding.

Section 3.11.    <u>Amendments to Indenture with Bondholder Consent</u>.

Section 9.01(A) of the Original Indenture is hereby amended and restated in its entirety as follows:

SECTION 9.01          Amendments Permitted.

(A)     This Indenture and the rights and obligations of the Issuer and of the Holders of the Bonds and of the Trustee may be modified or amended from time to time and at any time by an indenture or indentures supplemental hereto, which the Issuer and the Trustee may enter into when the written consent of the Holders of a majority in aggregate principal amount of the Series 2019 Bonds and any Additional Senior Bonds then Outstanding shall have been filed with the Trustee.  No such modification or amendment shall (1) extend the fixed maturity of any Bond, or reduce the amount of principal thereof, or extend the time of payment, or change the method of computing the rate of interest thereon, or extend the time of payment of interest thereon, without the consent of Holders of at least 75% of aggregate principal amount of the Series 2019 Bonds and any Additional Senior Bonds then Outstanding (provided, that, if such modification or amendment shall reduce the amount of Loan Repayments to be made in favor of the Holders of the Series 2020 Bonds or any Additional Subordinate Bonds then Outstanding, then the consent of Holders of at least 75% of aggregate principal amount of the Series 2020 Bonds and any Additional Subordinate Bonds then Outstanding shall also be required in addition to the consent of Holders of at least 75% of aggregate principal amount of the Series 2019 Bonds and any Additional Senior Bonds then Outstanding required hereunder), or (2) reduce the aforesaid percentage of Bonds the consent of the Holders of which is required to effect any such modification or amendment, or permit the creation of any lien on the Revenues and other assets pledged under this Indenture prior to or on a parity with the lien created by this Indenture, or deprive the Holders of the Bonds of the lien created by this Indenture on such Revenues and other assets (except as expressly provided in this Indenture), without the consent of Holders of at least 75% of aggregate principal amount of the Series 2019 Bonds and any Additional Senior Bonds then Outstanding (provided, that, if such modification or amendment shall reduce the amount of Loan Repayments to be made in favor of the Holders of the Series 2020 Bonds or any Additional Subordinate Bonds then Outstanding, then the consent of Holders of at least 75% of aggregate principal amount of the Series 2020 Bonds and any Additional Subordinate Bonds then Outstanding shall also be required in addition to the consent of Holders of at least 75% of aggregate principal amount of the Series 2019 Bonds and any Additional Senior Bonds then Outstanding required hereunder).  It shall not be necessary for the consent of the Bondholders to approve the particular form of any Supplemental Indenture, but it shall be sufficient if such consent shall approve the substance thereof.  Promptly after the execution by the Issuer and the Trustee of any Supplemental Indenture pursuant to this subsection (A), the Trustee shall mail a notice, setting forth in general terms the substance of such Supplemental Indenture, to the Holders of the Bonds at the address shown on the registration books of the Trustee.

Furthermore, the paragraph corresponding to Section 9.01(A) of the Indenture as contained in the form of Bond attached as Exhibit A to the Original Indenture is hereby amended to reflect the same changes above.

Section 3.12.    Other Bondholder Consent Rights.

All references in Sections 7.01, 7.02, 7.04, 7.06, 8.01(C)(ii), 8.01(E), 8.01(F), 8.03(A) and 8.03(C) of the Original Indenture to "Holders of a majority in principal amount of the Bonds then Outstanding" or any similar references therein shall hereinafter mean Holders of a majority in aggregate principal amount of the Series 2019 Bonds and any Additional Senior Bonds then Outstanding, and only if such Series 2019 Bonds or Additional Senior Bonds are no longer Outstanding, Holders of a majority in aggregate principal amount of the Series 2020 Bonds and any Additional Subordinate Bonds then Outstanding.

Section 3.13.    Form of Bond; Exhibit A.

The Series 2020 Bonds shall be issued in the form of Bond attached hereto as Exhibit A. Any other Additional Bonds shall be issued in the form of Bond attached to the Supplemental Indenture relating thereto.

## ARTICLE IV
## ADDITIONAL BONDS

Section 4.01.    Incorporation of Additional Senior Bonds.

There is hereby created a new Section 2.12 under Article II of the Original Indenture, which shall read as follows:

SECTION 2.12    Additional Senior Bonds.

Conditioned upon the receipt by the Trustee of the documents and other items listed below and compliance by the Borrower with Section 5.18(d) of the Loan Agreement, the Issuer shall deliver Additional Senior Bonds from time to time to finance Costs of the Project and Costs of Issuance (to the extent permitted under this Indenture, the Loan Agreement and the Tax Certificate) to the extent the Bonds Outstanding are insufficient for the payment of same and so long as no Event of Default shall have occurred and be continuing hereunder.  Each Series of Additional Senior Bonds shall be delivered pursuant to and evidenced by a Supplemental Indenture.

Any Supplemental Indenture pursuant to which Additional Senior Bonds are issued shall specify the following:

(a)    The designation of such Series of Bonds;

(b)    The application of proceeds of such Series of Bonds, including amounts to be deposited with the Trustee in the respective Funds established pursuant to this Indenture;

(c)     The maturity date or dates, Date of Delivery and the aggregate principal amount of such Series of Bonds of each maturity;

(d)     The interest rate and Interest Payment Dates of such Series of Bonds;

(e)     The Principal Payment Dates of such Series of Bonds;

(f)     The redemption dates and premiums and any additional provisions relating to such Series of Bonds as shall be approved in writing by the Issuer and the Borrower and permitted by the Act;

(g)     Any Reserve Requirement relating to such Series of Bonds and application thereof; and

(h)     The form of such Series of Bonds.

Except as otherwise provided in a Supplemental Indenture, each Series of Additional Senior Bonds shall be (1) on a parity and equally and ratably secured under this Indenture as to Loan Repayments made by the Borrower under the Loan Agreement with the Series 2019 Bonds previously delivered, without preference, priority or distinction of any Additional Senior Bonds over any other Additional Senior Bonds, and (2) senior in priority to the payment and security of the Series 2020 Bonds and any other Additional Subordinate Bonds under this Indenture.  All such Additional Senior Bonds shall be in substantially the same form as set forth in Section 2.02 of this Indenture, provided that the principal amount referenced in such Section of the Original Indenture shall hereinafter be deemed to mean the principal amount of the Additional Senior Bonds then being issued.  The Trustee shall authenticate and deliver such Additional Senior Bonds, but only upon receipt by the Trustee of the following:

(a)     The purchase price for such Series of Bonds as set forth in the Supplemental Indenture relating thereto for the account of the Issuer;

(b)     An original executed counterpart of the Supplemental Indenture relating to such Series of Bonds;

(c)     An executed copy of the Bond Purchase Contract relating to such Series of Bonds;

(d)     A new Bond with an appropriate Series designation in an amount equal to the principal amount of such Bonds then being delivered;

(e)     A new Senior Note in an amount equal to the principal amount of such Series of Bonds then being delivered;

(f)　　An Opinion of Counsel to the Issuer to the effect that the Supplemental Indenture has been duly authorized, executed and delivered by the Issuer and is enforceable against the Issuer, subject to customary equity and bankruptcy exceptions;

(g)　　An Approving Opinion; and

(h)　　Such other items or documents as reasonably requested or required by the Issuer and Bond Counsel provided the Issuer or Bond Counsel provides the Trustee with a list of such items.

Section 4.02.　　Incorporation of Additional Subordinate Bonds.

There is hereby created a new Section 2.13, which shall be added as the last section of Article II of the Original Indenture and shall read as follows:

SECTION 2.13　　Additional Subordinate Bonds.

Conditioned upon the receipt by the Trustee of the documents and other items listed below and compliance by the Borrower with Section 5.18(d) of the Loan Agreement, the Issuer shall deliver Additional Subordinate Bonds from time to time to finance Costs of the Project and Costs of Issuance (to the extent permitted under this Indenture, the Loan Agreement and the Tax Certificate) to the extent the Bonds Outstanding are insufficient for the payment of same so long as no Event of Default shall have occurred and be continuing hereunder.　Each Series of Additional Subordinate Bonds shall be delivered pursuant to and evidenced by a Supplemental Indenture.

Any Supplemental Indenture pursuant to which Additional Subordinate Bonds are issued shall specify the following:

(a)　　The designation of such Series of Bonds;

(b)　　The application of proceeds of such Series of Bonds, including amounts to be deposited with the Trustee in the respective Funds established pursuant to this Indenture;

(c)　　The maturity date or dates, Date of Delivery and the aggregate principal amount of such Series of Bonds of each maturity;

(d)　　The interest rate and Interest Payment Dates of such Series of Bonds;

(e)　　The Principal Payment Dates of such Series of Bonds;

(f)    The redemption dates and premiums and any additional provisions relating to such Series of Bonds as shall be approved in writing by the Issuer and the Borrower and permitted by the Act; and

(g)    Any Reserve Requirement relating to such Series of Bonds and application thereof; and

(h)    The form of such Series of Bonds.

Except as otherwise provided in a Supplemental Indenture, each Series of Additional Subordinate Bonds shall be (1) on a parity and equally and ratably secured under this Indenture as to Loan Repayments made by the Borrower under the Loan Agreement with the Series 2020 Bonds previously delivered, without preference, priority or distinction of any Additional Subordinate Bonds over any other Additional Subordinate Bonds, and (2) subordinate in priority to the payment and security of the Series 2019 Bonds and any other Additional Senior Bonds under this Indenture.    All such Additional Subordinate Bonds shall be in substantially the same form as set forth in Section 2.02 of this Indenture, provided that the principal amount referenced in such Section of the Original Indenture shall hereinafter be deemed to mean the principal amount of the Additional Subordinate Bonds then being issued.    The Trustee shall authenticate and deliver such Additional Subordinate Bonds, but only upon receipt by the Trustee of the following:

(i)    The purchase price for such Series of Bonds as set forth in the Supplemental Indenture relating thereto for the account of the Issuer;

(j)    An original executed counterpart of the Supplemental Indenture relating to such Series of Bonds;

(k)    An executed copy of the Bond Purchase Contract relating to such Series of Bonds;

(l)    A new Bond with an appropriate Series designation in an amount equal to the principal amount of such Bonds then being delivered;

(m)    A new Subordinate Note in an amount equal to the principal amount of such Series of Bonds then being delivered;

(n)    An Opinion of Counsel to the Issuer to the effect that the Supplemental Indenture has been duly authorized, executed and delivered by the Issuer and is enforceable against the Issuer, subject to customary equity and bankruptcy exceptions;

(o)    An Approving Opinion; and

(p)    Such other items or documents as reasonably requested or required by the Issuer and Bond Counsel provided the Issuer or Bond Counsel provides the Trustee with a list of such items.

# ARTICLE V
# MISCELLANEOUS

Section 5.01.    <u>Confirmation of Original Indenture</u>.    Except as amended and supplemented hereby, the Original Indenture, is hereby confirmed and reaffirmed in all particulars.  The Original Indenture, as amended and supplemented, shall be read, taken and construed as one and the same instrument, notwithstanding the date and time of execution and delivery of each such instrument.  Without limiting the generality of the foregoing, all representations, covenants, agreements, obligations and rights contained in the Original Indenture, as amended and supplemented herein, and except as otherwise set forth herein, all security for the same are and shall be for the equal and ratable benefit and security of the holders of all Bonds (including Outstanding Series 2019 Bonds and Series 2020 Bonds) issued and Outstanding under the Indenture.  Anything in the Original Indenture, or herein to the contrary notwithstanding, all recitals, definitions and provisions contained in this First Supplemental Indenture shall take precedence over the recitals, definitions and provisions of the Original Indenture, to the extent of any conflict.  Terms used herein and not defined herein shall have the meanings set forth in the Original Indenture.

Section 5.02.    <u>Supplement Generally; Conflicts</u>.    Except for terms and provisions contained in the Original Indenture that are expressly amended as set forth herein, the terms and provisions contained in this First Supplemental Indenture are supplemental to the Original Indenture.  To the extent that any provision in the Original Indenture conflicts with a provision in this First Supplemental Indenture, the provision contained in this First Supplemental Indenture shall control; otherwise, all provisions contained in the Original Indenture shall apply to this First Supplemental Indenture.

Section 5.03.    <u>Parties Interested Herein</u>.    With the exception of rights conferred expressly in the Indenture, nothing expressed or mentioned in or to be implied from this First Supplemental Indenture or the Bonds is intended or shall be construed to give to any Person other than the parties hereto, the Paying Agent, the Borrower and the Owners of the Bonds any legal or equitable right, remedy, power or claim under or with respect to the Indenture or any covenants, agreements, conditions and provisions contained therein.  The Indenture and all of those covenants, agreements, conditions and provisions are intended to be, and are, for the sole and exclusive benefit of the parties hereto, the Borrower, the Paying Agent, the Owners of the Bonds, as provided therein.

Section 5.04.    <u>Titles, Headings, Captions, Etc.</u>  The titles, captions and headings of the articles, Sections and subdivisions of this First Supplemental Indenture have been inserted for convenience of reference only and will in no way modify or restrict any of the terms or provisions hereof.

Section 5.05.    <u>Severability</u>.    In case any Section or provision of this First Supplemental Indenture, or any covenant, agreement, stipulation, obligation, act or action, or part

thereof, made, assumed, entered into or taken under the Indenture, or any application thereof, is held to be illegal or invalid for any reason, or is inoperable at any time, that illegality, invalidity or inoperability shall not affect the remainder thereof or any other Section or provision of this First Supplemental Indenture or any other covenant, agreement stipulation, obligation, act or action, or part thereof, made, assumed, entered into or taken under this First Supplemental Indenture, all of which shall be construed and enforced at the time as if the illegal, invalid or inoperable portion were not contained therein.

Any illegality, invalidity or inoperability shall not affect any legal, valid or operable Section, provision, covenant, agreement, stipulation, obligation, act, action, part or application, all of which shall be deemed to be effective, operative, made, assumed, entered into or taken in the manner and to the full extent permitted by law from time to time.

Section 5.06.    <u>Notices to Trustee</u>.    All demands, notices, approvals, consents, requests and other communications for the Trustee as relating to the Series 2020 Bonds shall be in writing and shall be deemed to have been given when delivered in person or mailed by first class, registered or certified mail, postage prepaid, or when sent by telecopy, addressed to the Trustee at UMB Bank, N.A., Corporate Trust & Escrow Services, 120 South Sixth Street, Suite 1400, Minneapolis, MN 55402, Attention: Katie Carlson.

Section 5.07.    <u>Governing Law</u>.  This First Supplemental Indenture shall be construed in accordance with and governed by the Constitution and laws of the Commonwealth applicable to contracts made and performed in the Commonwealth.

Section 5.08.    <u>Execution in Counterparts</u>.  This First Supplemental Indenture may be executed in several counterparts, each of which will be an original and all of which will constitute but one and the same instrument.

[Remainder of page intentionally left blank]

IN WITNESS WHEREOF, the Pennsylvania Economic Development Financing Authority has caused this First Supplemental Indenture to be executed in its name and attested by its duly authorized officers, and UMB Bank, N.A., in token of its acceptance of the trusts created hereunder, has caused this First Supplemental Indenture to be signed in its corporate name by one of the officers thereunto duly authorized, all as of the day and year first above written.

PENNSYLVANIA ECONOMIC DEVELOPMENT
FINANCING AUTHORITY, as Issuer

By: _____
      Executive Director

ATTEST:

By: _____
    (Assistant) Secretary

UMB BANK, N.A., as Trustee

By: _____
      Authorized Officer

*(Signature Page to First Supplemental Indenture of Trust)*

The Borrower hereby consents to the foregoing First Supplemental Indenture as of the date first written above.

CARBONLITE P, LLC,
a Delaware Limited Liability Company

By _____
    Leon Farahnik
    Chief Executive Officer

## EXHIBIT A

FORM OF SERIES 2020 BOND

See attached.

(Form of Bond)

*Unless this bond is presented by an authorized representative of The Depository Trust Company, a New York corporation ("DTC"), to the Trustee or its agent for registration of transfer, exchange or payment, and any bond issued is registered in the name of Cede & Co. or in such other name as is requested by an authorized representative of DTC (and any payment is made to Cede & Co. or to such other entity as is requested by an authorized representative of DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL inasmuch as the registered owner hereof, Cede & Co., has an interest herein.*

No. R-__                                                              $10,000,000

## UNITED STATES OF AMERICA
## PENNSYLVANIA ECONOMIC DEVELOPMENT FINANCING AUTHORITY
### Subordinate Solid Waste Disposal Revenue Bond
### (CarbonLite P, LLC Project)
### Series 2020

| Maturity Date | Dated Date | Interest Rate | CUSIP |
|---|---|---|---|
| December 1, 2036 | September 10, 2020 | 8.50% | 708692 BR8 |

REGISTERED OWNER:        CEDE & CO.

PRINCIPAL AMOUNT:        TEN MILLION DOLLARS

The Pennsylvania Economic Development Financing Authority (the "Issuer"), a public instrumentality of the Commonwealth of Pennsylvania (the "Commonwealth") and a public body corporate and politic organized and existing under the Pennsylvania Economic Development Financing Law, as amended (the "Act"), for value received, hereby promises to pay (but only out of Revenues as hereinafter provided) to the registered owner identified above or registered assigns, on the maturity date set forth above, the principal sum set forth above and to pay (but only out of Revenues as hereinafter provided) interest thereon from the interest payment date to which interest has been paid or, if this Bond is authenticated on or before September 10, 2020, from the Date of Delivery specified above, until payment of such principal sum shall be discharged as provided in the Indenture hereinafter mentioned, and to pay (but only out of Revenues as hereinafter provided) interest on overdue principal at the rate borne by this Bond plus 3.00% (the "Post-Default Rate") on the date on which such principal or interest became due and payable, except as the provisions hereinafter set forth with respect to redemption prior to maturity or purchase may become applicable hereto.  Interest shall be computed at the interest rate per annum set forth above, payable on June 1 and December 1 in each year (each, an "Interest Payment Date"), commencing on December 1, 2020, based on a 360-day year of twelve

30-day months.  The principal of and premium, if any, on this Bond are payable at final maturity, acceleration or redemption in lawful money of the United States of America upon surrender hereof at the Corporate Trust Office of UMB Bank, N.A., as Trustee, or its successor in trust (the "Trustee").  Interest payments on this Bond shall be made to the Person appearing on the bond registration books of the Trustee, as bond registrar (the "Bond Registrar"), as the Bondholder thereof on the applicable Record Date, which is the date as of the close of business on the fifteenth day of the calendar month preceding any Interest Payment Date (the "Record Date"), and shall be paid (i) by check mailed on the Interest Payment Date to such Bondholder's address as it appears on the registration books or at such other address as has been furnished to the Bond Registrar as provided below, in writing by such Bondholder not later than the Record Date or (ii) upon written request, at least three Business Days prior to the applicable Record Date of the Bondholder of Series 2020 Bonds aggregating not less than $1,000,000 in principal amount, by wire transfer in immediately available funds at an account maintained in the United States at such wire address as such Bondholder shall specify in its written notice; except, in each case, that, if and to the extent that there shall be a default in the payment of the interest due on such Interest Payment Date, such defaulted interest rate shall be the Post-Default Rate and such defaulted interest shall be paid to the Bondholder in whose name any such Bonds are registered at the close of business on the fifth Business Day next preceding the date of payment of such defaulted interest.

This Bond is one of a duly authorized issue of bonds of the Issuer designated as "Pennsylvania Economic Development Financing Authority Subordinate Solid Waste Disposal Revenue Bonds (CarbonLite P, LLC Project), Series 2020" (the "Series 2020 Bonds"), issued pursuant to the Act and issued under and secured by the Indenture hereinafter mentioned.  The Series 2020 Bonds are limited obligations of the Issuer and, as and to the extent set forth in the Indenture, are payable solely from, and secured by a pledge of and lien on, the Revenues (as defined in the Indenture) on a subordinate basis to the Series 2019 Bonds and any Additional Senior Bonds.  Proceeds from the sale of the Series 2020 Bonds will be loaned by the Issuer to CarbonLite P, LLC, a Delaware limited liability company (the "Borrower"), under the terms of a Loan Agreement, dated as of June 1, 2019, between the Issuer and the Borrower, as amended by a First Amendment to Loan Agreement, dated as of September 1, 2020 (as further amended, modified or supplemented from time to time, the "Agreement").  The Borrower's obligations under the Agreement with respect to the Series 2020 Bonds will be further evidenced by the Borrower's execution and issuance of a subordinate promissory note (the "Note"), dated the Date of Delivery, in an amount equal to the aggregate principal amount of the Series 2020 Bonds.  The Series 2020 Bonds are issued under and secured on a subordinate basis by and entitled to the benefits of an Indenture of Trust, dated as of June 1, 2019, between the Issuer and the Trustee, as supplemented by a First Supplemental Indenture, dated as of September 1, 2020 (as further amended, modified or supplemented from time to time, the "Indenture"), and the Revenues pledged to the Series 2020 Bonds on a subordinate basis thereunder, and there shall be no other recourse against the Issuer or any property now or hereafter owned by it.

Reference is hereby made to the Indenture and any Supplemental Indentures for a description of the rights thereunder of the registered Bondholders of the Series 2020 Bonds, of the nature and extent of the security, of the rights, duties and immunities of the Trustee and of the rights and obligations of the Issuer thereunder, to all of the provisions of which Indenture and of the Agreement the Holder of this Bond, by acceptance hereof, assents and agrees.

All terms not herein defined shall have the meanings ascribed to them in the Indenture.

The Series 2020 Bonds are issuable as fully registered bonds without coupons in Authorized Denominations of $100,000 or any integral multiple of $5,000 in excess of thereof. Subject to the limitations and upon payment of the charges, if any, provided in the Indenture, Series 2020 Bonds may be exchanged at the Corporate Trust Office of the Trustee for a like aggregate principal amount of Bonds of other Authorized Denominations.

This Bond is transferable by the Bondholder hereof, in person, or by its duly authorized attorney, but only in the manner, subject to the limitations and upon payment of the charges provided in the Indenture, and upon surrender and cancellation of this Bond. Upon such transfer a new fully registered Series 2020 Bond or Series 2020 Bonds, in an Authorized Denomination or Denominations, for the same aggregate principal amount, will be issued to the transferee in exchange therefor. The Issuer and the Trustee may treat the Bondholder hereof as the absolute Bondholder hereof for all purposes, and the Issuer and the Trustee shall not be affected by any notice to the contrary.

**THIS BOND AND THE ISSUE OF WHICH IT IS A PART AND THE PREMIUM, IF ANY, AND INTEREST HEREON ARE LIMITED OBLIGATIONS OF THE ISSUER PAYABLE SOLELY FROM THE REVENUES AND RECEIPTS DERIVED FROM THE AGREEMENT WITH RESPECT TO THE SERIES 2020 BONDS PURSUANT TO THE AGREEMENT, INCLUDING PAYMENTS RECEIVED THEREUNDER, WHICH PAYMENTS, REVENUES AND RECEIPTS HAVE BEEN PLEDGED AND ASSIGNED TO THE TRUSTEE TO SECURE PAYMENT OF THE SERIES 2020 BONDS ON A SUBORDINATE BASIS. THE SERIES 2020 BONDS, THE PREMIUM, IF ANY, AND THE INTEREST THEREON SHALL NOT BE DEEMED TO CONSTITUTE A DEBT OR A PLEDGE OF THE FAITH AND CREDIT OF THE COMMONWEALTH OF PENNSYLVANIA OR ANY POLITICAL SUBDIVISION THEREOF, INCLUDING THE ISSUER. NEITHER THE COMMONWEALTH OF PENNSYLVANIA NOR ANY POLITICAL SUBDIVISION THEREOF, SHALL BE OBLIGATED TO PAY THE PRINCIPAL OF, PREMIUM, IF ANY, OR INTEREST ON THE SERIES 2020 BONDS OR OTHER COSTS INCIDENT THERETO. THE ISSUER SHALL NOT BE OBLIGATED TO PAY THE PRINCIPAL OF, PREMIUM, IF ANY, OR INTEREST ON THE SERIES 2020 BONDS OR OTHER COSTS INCIDENT THERETO EXCEPT FROM THE REVENUES AND RECEIPTS PLEDGED THEREFOR, AND NEITHER THE FAITH AND CREDIT NOR THE TAXING POWER OF THE COMMONWEALTH OF PENNSYLVANIA OR ANY POLITICAL SUBDIVISION OF THE COMMONWEALTH OF PENNSYLVANIA, NOR THE FAITH AND CREDIT OF THE ISSUER, IS PLEDGED TO THE PAYMENT OF THE PRINCIPAL OF, PREMIUM, IF ANY, OR INTEREST ON THE SERIES 2020 BONDS OR OTHER COSTS INCIDENT THERETO. THE ISSUER HAS NO TAXING POWER.**

No past, present or future officer, member, director, commissioner, employee or agent of the Issuer shall be personally liable on the Series 2020 Bonds; and no covenant, agreement or obligation contained therein shall be deemed to be a covenant, agreement or obligation of any present or future officer, member, director, commissioner, employee or agent of the Issuer in his individual capacity. The Issuer has no taxing power.

The Series 2020 Bonds are subject to redemption as set forth in the Indenture.

The Holder of this Bond shall have no right to institute any suit, action or proceeding at law or in equity, for the protection or enforcement of any right or remedy under the Indenture, except as provided in the Indenture.

No recourse shall be had for the payment of the principal of, premium, if any, or interest on any of the Series 2020 Bonds or for any claim based thereon or upon any obligation, covenant or agreement in the Indenture contained, against any past, present or future member, director, officer, employee or agent of the Issuer, or through the Issuer, or any successor to the Issuer, under any rule of law or equity, statute or constitution or by the enforcement of any assessment or penalty or otherwise, and all such liability of any such member, director, officer, employee or agent as such is hereby expressly waived and released as a condition of and in consideration for the execution of the Indenture and the issuance of any of the Series 2020 Bonds.

The Indenture contains provisions permitting the Issuer and the Holders of a majority in aggregate principal amount of the Series 2019 Bonds and any Additional Senior Bonds then Outstanding and the Holders of a majority in aggregate principal amount of the Series 2020 Bonds and any Additional Subordinate Bonds then Outstanding to execute Supplemental Indentures, to modify or amend the Indenture from time to time by a Supplemental Indenture; provided, however, that no such modification or amendment shall (1) extend the fixed maturity of any Bond, or reduce the amount of principal thereof, or extend the time of payment, or change the method of computing the rate of interest thereon, or extend the time of payment of interest thereon, without the consent of Holders of at least 75% of aggregate principal amount of the Series 2019 Bonds and any Additional Senior Bonds then Outstanding (provided, that, if such modification or amendment shall reduce the amount of Loan Repayments to be made in favor of the Holders of the Series 2020 Bonds or any Additional Subordinate Bonds then Outstanding, then the consent of Holders of at least 75% of aggregate principal amount of the Series 2020 Bonds and any Additional Subordinate Bonds then Outstanding shall also be required in addition to the consent of Holders of at least 75% of aggregate principal amount of the Series 2019 Bonds and any Additional Senior Bonds then Outstanding required hereunder), or (2) reduce the aforesaid percentage of Bonds the consent of the Holders of which is required to effect any such modification or amendment, or permit the creation of any lien on the Revenues and other assets pledged under the Indenture prior to or on a parity with the lien created by the Indenture, or deprive the Holders of the Bonds of the lien created by the Indenture on such Revenues and other assets (except as expressly provided in the Indenture), without the consent of Holders of at least 75% of aggregate principal amount of the Series 2019 Bonds and any Additional Senior Bonds then Outstanding (provided, that, if such modification or amendment shall reduce the amount of Loan Repayments to be made in favor of the Holders of the Series 2020 Bonds or any Additional Subordinate Bonds then Outstanding, then the consent of Holders of at least 75% of aggregate principal amount of the Series 2020 Bonds and any Additional Subordinate Bonds then Outstanding shall also be required in addition to the consent of Holders of at least 75% of aggregate principal amount of the Series 2019 Bonds and any Additional Senior Bonds then Outstanding required hereunder).  Under certain circumstances described in the Indenture, the Trustee and the Issuer may enter into a Supplemental Indenture without consent of Holders.

The Indenture prescribes the manner in which it may be discharged and after which the Series 2020 Bonds shall no longer be secured by or entitled to the benefits of the Indenture, except for the purposes of payment of the principal of and premium, if any, and interest on the Series 2020 Bonds as the same become due and payable, including a provision that under certain circumstances the Series 2020 Bonds shall be deemed to be paid if certain securities, as defined in the Indenture, maturing as to principal and interest in such amounts and at such times as to insure the availability of sufficient moneys to pay the principal of, premium, if any, and interest on such Series 2020 Bonds and all necessary and proper fees, compensation and expenses of the Trustee shall have been deposited with the Trustee.

No member or officer of the Issuer, nor any individual executing this Bond, shall in any event be subject to any personal liability or accountability by reason of the issuance of the Series 2020 Bonds.

All of the acts and proceedings required by law to have happened and to have been performed precedent to and in the issuance of this Bond do exist, have happened and have been performed in due time, form and manner as required by the Constitution and statutes of the Commonwealth.

This Bond shall not be entitled to any benefit under the Indenture, or become valid or obligatory for any purpose, until the certificate of authentication hereon endorsed shall have been manually signed by the Trustee.

In witness whereof, the Pennsylvania Economic Development Financing Authority has caused this Bond to be executed in its name and on its behalf by the manual or facsimile signature of its Executive Director, its seal to be impressed or imprinted thereon and attested by the manual or facsimile signature of its Assistant Secretary, all as of the above date.

PENNSYLVANIA ECONOMIC DEVELOPMENT FINANCING AUTHORITY, as Issuer

By: _____

Executive Director

(SEAL)

ATTEST:

By: _____

Assistant Secretary

[FORM OF TRUSTEE'S CERTIFICATE OF AUTHENTICATION]

Dated: _____

This is one of the Series 2020 Bonds described in the within mentioned Indenture.


UMB BANK, N.A., as Trustee

By _____
Authorized Signature

Unless this Bond is presented by an authorized representative of The Depository Trust Company, a New York corporation ("DTC"), to Issuer or its agent for registration of transfer, exchange, or payment, and any Bond issued upon such registration of transfer is registered in the name of Cede & Co. or in such other name as is requested by an authorized representative of DTC (and any payment is made to Cede & Co. or to such other entity as is requested by an authorized representative of DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL inasmuch as the registered owner hereof Cede & Co., has an interest herein.

[FORM OF ASSIGNMENT]

For value received the undersigned do(es) hereby sell, assign and transfer unto _____ [name, address and tax i.d. number of transferee] the within mentioned Registered Bond and do(es) hereby irrevocably constitute and appoint _____ attorney, to register the transfer of the same on the books of the Trustee with full power of substitution in the premises.

Dated: _____ , _____

Note:  The signature(s) to this Assignment must correspond with the name(s) as written on the face of the within Registered Bond in every particular, without alteration or enlargement or any change whatsoever.

Note:  Signature(s) must be guaranteed by a guarantor institution participating in the Securities Transfer Agents Medallion Program or in such other guarantee program acceptable to the Trustee.

# FIRST AMENDMENT
# TO
# PLEDGE AND SECURITY
# AGREEMENT

This First Amendment (this "*First Amendment*") to that certain PLEDGE AND SECURITY AGREEMENT dated as of  June 1, 2019 ("*Original Security Agreement*", and together with this First Amendment, the "*Security Agreement*"), is entered into by and among CARBONLITE P, LLC, a Delaware limited liability company (the "*Borrower*"), CARBONLITE P HOLDINGS, LLC, a Delaware limited liability company (the "*Guarantor*"), and UMB BANK, NA as Trustee (the "*Bank*") pursuant to that certain Indenture of Trust dated as of June 1, 2019 ("*Original Indenture*") relating to $61,800,000 Pennsylvania Economic Development Financing Authority Solid Waste Disposal Revenue Bonds (CarbonLite P, LLC Project), Series 2019 (the "*Series 2019 Bonds*"), as supplemented by that certain First Supplemental Indenture dated as of September 1, 2020 (the "*First Supplemental Indenture*" and, together with the Original Indenture, the "*Indenture*") pursuant to which $10,000,000 of Subordinate Solid Waste Disposal Revenue Bonds (CarbonLite P LLC Project), Series 2020 (the "*Series 2020 Bonds*" and, together with the Series 2019 Bonds, the "*Bonds*") were issued.  The Borrower and Guarantor are sometimes collectively referred to herein as "*Grantor*".

Capitalized terms used in this Amendment without definition shall have the meanings ascribed to such terms in the Security Agreement or Annex 1 thereto, or if not defined in the Security Agreement, shall have the meanings ascribed thereto in the Indenture.

## R E C I T A L S

A.      The Borrower and Pennsylvania Economic Development Financing Authority ("*Issuer*") are contemporaneously herewith entering into that certain First Amendment to Loan Agreement dated as of September 1, 2020 between the Issuer and the Borrower ("*Amendment No. 1*") to Loan Agreement dated as of June 1, 2019 (the "*Original Loan Agreement*") (the Original Loan Agreement, as amended by Amendment No. 1, and as it may be further amended or restated from time to time, being collectively referred to herein as the "*Loan Agreement*") pursuant to which Issuer will lend to Borrower the gross proceeds from issuance of the 2020 Bonds;

B.      In connection with execution of the Original Loan Agreement, Grantor entered into this Security Agreement and granted to the Issuer collateral security for the performance by Borrower of all of the Secured Obligations;

C.      Bank has been assigned, pursuant to the Indenture and for the benefit of the holders of the Bonds, all of the collateral security held by Issuer with respect to the Loan;

D.      Pursuant to that certain Guaranty Agreement made as of June 1, 2019 from the Guarantor to the Bank (the "*Original Guaranty Agreement*"), as amended by that certain First Amendment to Guaranty dated as of September 1  2020 (the "*First Amendment to Guaranty*" and, together with the Original Guaranty, the "*Guaranty*"), the Guarantor unconditionally agreed to guarantee the obligations of the Borrower under the Loan Agreement and executed the Security Agreement for the express benefit of Issuer and Bank, in its capacity as Bank under the Indenture.

E.    The Issuer has agreed to loan the proceeds of the Series 2020 Bonds to the Borrower under the Loan Agreement;

F.    The Borrower proposes to deliver to the Issuer a subordinate promissory note dated as of September 1, 2020 (the "Series 2020 Note"), evidencing its obligation to pay all amounts due under the Loan Agreement with respect to the Series 2020 Bonds;

G.    To induce the Issuer to issue the Series 2020 Bonds and to make the additional loan contemplated herein to the Borrower, the Grantor has agreed, inter alia, to execute this First Amendment to confirm the first-priority, perfected security interest created under the Security Agreement for the benefit of the Holders of the Series 2019 Bonds and Series 2020 Bonds (the Series 2019 Bonds, Series 2020 Bonds, together with any Additional Bonds, the "*Bonds*");

NOW, THEREFORE, in consideration of the mutual promises, covenants, conditions, representations, and warranties hereinafter set forth, and for other good and valuable consideration, the parties hereto agree as follows:

*Confirmation of Security Interest*.  Each Grantor hereby confirms the prior grant to Bank of a continuing security interest in all of its presently existing and hereafter acquired or arising Collateral in order to secure the prompt payment and performance of all of the Secured Obligations.  Each Grantor acknowledges and affirms that such security interest in the Collateral has attached to all Collateral without further act on the part of Bank or such Grantor.  By its signature hereto, each Grantor hereby consents to and reaffirms the grant of collateral security for the Secured Obligations and the increase in the amount of indebtedness secured by this Security Agreement.  Each Grantor expressly confirms that amounts payable pursuant to the Loan Agreement and Guaranty with respect to the Series 2020 Bonds constitute a part of the Secured Obligations.  Nothing contained in this First Amendment shall be construed as (a) a novation of the Secured Obligations or (b) a release or waiver of all or any portion of the grant or conveyance to the Bank of a security interest in the Collateral.

2.    *Amendments to Original Security Agreement.*  The Original Security Agreement is hereby amended as follows:

(a)    Section 3.4 and Section 10(g) of the Original Security Agreement are hereby deleted.  The definition of "Shared Collateral" contained in Annex 1 to the Original Security Agreement is hereby deleted.

(b)    Amendments to Definitions in Annex 1.  All terms used in the Original Security Agreement are hereby amended to have the following meanings:

(i)    "*Guaranty*" means, collectively, that certain Guaranty Agreement dated as of June 1, 2019 from the Guarantor to the Bank, as amended by that certain First Amendment to Guaranty Agreement dated as of September 1, 2020 from the Guarantor to the Bank.

(ii)    "*Indenture*" means, collectively, that certain Indenture of Trust, dated as of June 1, 2019, between the Issuer and the Bank, as supplemented and amended by that certain First Supplemental Indenture dated as of September 1, 2020, between the Issuer and the Bank, as further supplemented or amended.

(iii)    "*Loan Agreement*" means that certain Loan Agreement dated as of June 1, 2019 between the Issuer and the Borrower, as supplemented and amended by that certain First Amendment to Loan Agreement dated as of September 1, 2020 between the Issuer and the Borrower, as further supplemented or amended.

(iv)    "*Security Agreement*" means, collectively, that certain Security Agreement dated as of June 1, 2019 from the Grantor to the Bank, as amended by this certain First Amendment to Security Agreement dated as of September 1, 2020 from the Grantor to the Bank.

(c)    <u>Amendment of Schedules</u>.    "Schedule 1 – Section 4.6 Deposit Accounts" is hereby amended as set forth in Schedule 1 attached hereto.

3.    *Confirmations*.    Each Grantor hereby reconfirms the grants of authority and all other rights set forth in the Original Security Agreement, including the power of attorney contained in Section 2.1 of the Original Security Agreement and the irrevocable proxy contained in Section 3.3(a) of the Original Security Agreement.

4.    *Representations and Warranties*.    In order to induce Issuer to enter into this Amendment, in addition to the representations and warranties of Grantor set forth in the other documents which are incorporated herein by express reference, Grantor represents and warrants to Issuer and to the Bank that, on the date hereof:

4.1    *Confirmation of Prior Representations*. The representations and warranties contained in Section 4 of the Security Agreement are true and correct in all material respects as of the effective date of this First Amendment.

4.2    *Enforceability; Priority of Security Interest.* (i) The Original Amendment created a valid security interest and pledge in and to the Collateral, (ii) Bank has a perfected security interest (to the fullest extent perfection can be obtained by filing, notification to third persons, possession or control) and a first priority security interest in the Collateral (subject only to Permitted Liens), in each case securing the payment and performance of the Secured Obligations, ), (iii) Bank will have a perfected and first priority security interest (to the fullest extent perfection can be obtained by filing, notification to third persons, possession or control) in the Collateral in which Grantor hereafter acquires rights at the time Grantor acquires any such rights (subject only to Permitted Liens), in each case securing the payment and performance of the Secured Obligations, and (iv) the perfected, first priority security interest reaffirmed hereunder secures the additional obligations of the Borrower under the Loan Agreement and the Guarantor under the Guaranty arising contemporaneously with the execution and delivery of this First Amendment.

5.    *Covenants*.  In addition to the covenants of Grantor set forth in the Loan Agreement and  the Security Agreement, Grantor agrees that from and after the date hereof and thereafter until the payment, performance and satisfaction in full, in cash, of the Secured Obligations:

5.1    *Defense of Collateral*.  Grantor shall appear in and defend any action, suit or proceeding which may affect its title to or right or interest in, or Bank's right or interest in, any Collateral.

5.2    A new Section 3.5 is hereby added to the Original Security Agreement as follows:

3.5    *Additional Pledged Interests.*

(a)    If Borrower shall receive or become entitled to receive any additional Pledged Interests after the date hereof, it shall promptly (and in any event within 5 business days of receipt thereof) deliver to Bank a duly executed document which identify such Pledged Interests and make the same subject to this Agreement;

(b)    Borrower shall promptly deliver to Bank a copy of each material notice or other material written communication received by it in respect of any Pledged Interests;

(c)    Borrower shall not make or consent to any amendment or other modification or waiver with respect to any Pledged Interests, or enter into any agreement or permit to exist any restriction with respect to any Pledged Interests, to the extent prohibited by the Loan Agreement or the Indenture; and

(d)    Grantor agrees that it will cooperate with Bank in obtaining all necessary approvals and making all necessary filings under federal, state, local, or foreign law in connection with Bank's Lien on the Pledged Interests, or any sale or transfer thereof.

6.    *No Other Modifications*.  All of the provisions of the Security Agreement not expressly modified by this Amendment shall continue and shall remain in full force and shall be incorporated herein by this reference.

*[remainder of this page intentionally left blank]*

IN WITNESS WHEREOF, the parties have caused this Amendment to be executed by their duly authorized representatives as of the date first above written.

**CARBONLITE P HOLDINGS LLC**

By: _____

Name: Leon Farahnik

Title: Chief Executive Officer

+

**CARBONLITE P, LLC**

By: _____

Name: Leon Farahnik

Title: Chief Executive Officer

ACCEPTED:

UMB BANK, N.A.
as Trustee

By: _____

Name: _____

Title: _____

IN WITNESS WHEREOF, the parties have executed this Amendment as of the date first set forth above.

**CARBONLITE P HOLDINGS, LLC**,

By:_____
Name:_____
Title:_____

**CARBONLITE P,  LLC**,

By:_____
Name:_____
Title:_____

ACCEPTED:

**UMB BANK, NA**
As Trustee

By _____
Name:_____Katie Carlson_____
Title:_____Vice President_____

# SCHEDULE 1

## SCHEDULE OF DEPOSIT ACCOUNTS

Section 4.6 – Deposit Accounts

| Grantor | Name of Depository | Address | Account Numbers |
|---|---|---|---|
| CarbonLite P, LLC | Pacific Western Bank | 9320 Wilshire Boulevard Suite 105 Beverly Hills, CA 90212 | 1001879368 1001643525 |

# FIRST AMENDMENT

## to

# GUARANTY AGREEMENT

This FIRST AMENDMENT (this "*First Amendment*") to that certain Guaranty Agreement dated as of June 1, 2019 (the "*Original Guaranty*"), is made and entered into as of September 1, 2020, by and between **CARBONLITE P HOLDINGS LLC,** a Delaware limited liability company (the "Guarantor"), and **UMB BANK, N.A.,** as trustee (in such capacity, together with any successor or successors in such capacity, herein called the "*Trustee*"):

## WITNESSETH

WHEREAS, The Pennsylvania Economic Development Financing Authority (the "*Issuer*") issued its Solid Waste Disposal Revenue Bonds (CarbonLite P, LLC Project) Series 2019, in the aggregate principal amount of $61,800,000 (the "*Series 2019 Bonds*") under and pursuant to an Indenture of Trust, dated as of June 1, 2019 (the "*Indenture*"), between the Issuer and the Trustee. The proceeds derived from the issuance and sale of the Bonds were used to finance the acquisition, construction, rehabilitation, renovation, installation, improvement and/or equipping of solid waste facilities located in Northampton County in the Commonwealth of Pennsylvania (collectively, the "*Project*"), owned or operated by CarbonLite P, LLC, a Delaware limited liability company (the "*Borrower*").  The proceeds of the Bonds were loaned by the Issuer to the Borrower pursuant to the terms of a Loan Agreement dated as of June 1, 2019 (the "*Original Loan Agreement*"), between the Issuer and the Borrower.  Capitalized terms used without definition herein shall have the meaning ascribed in the Indenture.

WHEREAS, at the request of the Borrower, the Issuer has determined to issue $10,000,000 aggregate principal amount of its Subordinate Solid Waste Disposal Revenue Bonds (CarbonLite P, LLC Project) Series 2020 (the "*Series 2020 Bonds*") for the purposes of (i) financing a portion of the costs of the Project through the reimbursement to the Borrower of certain costs of the Project previously funded with the Borrower's equity; (ii) financing additional equipment costs of the Borrower; (iii) funding a deposit to an account within the Debt Service Reserve Fund relating to the Series 2020 Bonds; and (iv) paying a portion of the costs of issuance of the Series 2020 Bonds, such Series 2020 Bonds to be issued as "Additional Bonds" pursuant to the Original Indenture, as amended and supplemented by a First Supplemental Indenture dated as of September 1, 2020 (the "*First Supplemental Indenture*," and together with the Original Indenture and as further amended and supplemented from time to time, the "*Indenture*"), between the Issuer and the Trustee;

WHEREAS, the Issuer has agreed to loan the proceeds of the Series 2020 Bonds to the Borrower under the Original Loan Agreement, as amended by the First Amendment to Loan Agreement dated as of September 1, 2020 (the "*First Amendment to Loan Agreement*", and together with the Original Loan Agreement and as further amended and supplemented from time to time, the "*Loan Agreement*");

WHEREAS, the Borrower proposes to deliver to the Issuer a subordinate promissory note dated as of September 1, 2020 (the "*Series 2020 Note*"), evidencing its obligation to pay all amounts due under the Loan Agreement with respect to the Series 2020 Bonds;

WHEREAS, to induce the Issuer to issue the Series 2020 Bonds and to make the additional loan contemplated herein to the Borrower, the Guarantor has agreed, *inter alia*, to execute this First Amendment to additionally collateralize, for the benefit of the Holders of the Series 2019 Bonds and Series 2020 Bonds (the Series 2019 Bonds, Series 2020 Bonds, together with any Additional Bonds, the "*Bonds*"), the Guaranteed Obligations; and

NOW, THEREFORE, in consideration of the foregoing and as an inducement to the Issuer to issue the Series 2020 Bonds and in further consideration of the anticipated benefits to the Guarantor, as the owner of all of the outstanding membership interests of the Borrower, intending to be legally bound, the Guarantor agrees as follows:

**Section 1.    Amendment of Certain Defined Terms**

All terms used in the Original Guaranty are hereby amended to have the following meanings:

"**Bonds**" mean, collectively, the Series 2019 Bonds and Series 2020 Bonds outstanding under the Indenture.

"**Guaranty**" means, collectively, that certain Guaranty Agreement dated as of June 1, 2019, as amended by this First Amendment to Guaranty Agreement.

"**Indenture**" means, collectively, that certain Indenture of Trust, dated as of June 1, 2019, between the Issuer and the Trustee, as supplemented and amended by that certain First Supplemental Indenture dated as of September 1, 2020, between the Issuer and the Trustee, as further supplemented or amended.

"**Loan Agreement**" means that certain Loan Agreement dated as of June 1, 2019 between the Issuer and the Borrower, as supplemented and amended by that certain First Amendment to Loan Agreement dated as of September 1, 2020 between the Issuer and the Borrower, as further supplemented or amended.

"**Series 2019 Bonds**" means the Issuer's Solid Waste Disposal Revenue Bonds (CarbonLite P, LLC Project) Series 2020.

"**Series 2020 Bonds**" means the Issuer's Subordinate Solid Waste Disposal Revenue Bonds (CarbonLite P, LLC Project) Series 2020.

**Section 2.    Guaranteed Obligations.**  In addition to its obligations under the Original Guaranty, the Guarantor hereby unconditionally guarantees to the Trustee for the benefit of the owners and beneficial owners of the Series 2020 Bonds, the full and prompt payment of (a) the principal of and redemption premium, if any, on the Series 2020 Bonds when and as the same shall become due (whether at maturity, by acceleration, call for redemption or otherwise); (b) the interest on the Series 2020 Bonds when and as the same shall become due; and (c) all other amounts due or to become due from the Borrower under Section 4.2 of the Loan Agreement, including without limitation all amounts payable for deposit into the Debt Service Reserve Fund applicable to the Series 2020 Bonds.  In addition, the Guarantor hereby unconditionally guarantees to the Trustee (a) for the benefit of the Trustee, the full and prompt payment of all amounts due or to become due

2

from the Borrower to the Trustee under Section 4.2 of the Loan Agreement (except as specified in the previous sentence) and full and prompt payment of all amounts payable by the Borrower under the Lease; and (b) for the benefit of the Issuer, the full and prompt payment of all amounts due or to become due from the Borrower to the Issuer under Sections 4.2, 8.2 and 8.3 of the Loan Agreement.  Such guaranteed amounts, together with all obligations guaranteed by Guarantor under the Original Guaranty, are hereinafter collectively referred to as the "Guaranteed Obligations."

Section 3. Continuing Obligations. The Original Guaranty, as amended hereby, shall be a continuing, absolute and unconditional guaranty and shall remain in full force and effect until the entire principal of, redemption premium, if any, and interest on or purchase price of the Bonds shall have been paid or provided for according to the terms of the Indenture and all amounts due and owing the Trustee and the Issuer shall be fully paid, at which time this Guaranty shall automatically terminate and be of no further force and effect.  The Guarantor acknowledges and agrees, however, that its obligations hereunder shall apply to and continue with respect to any amount paid to the Trustee with respect to the Guaranteed Obligations which is subsequently recovered from the Trustee or the owners or beneficial owners of the Bonds for any reason whatsoever (including, without limitation, as a result of a bankruptcy, insolvency or fraudulent conveyance proceeding but excluding any amounts so recovered due to any willful misconduct, bad faith or gross negligence on the part of the Trustee) notwithstanding the fact that the Bonds and/or the Series 2020 Bonds may have been previously paid or performed in full or the Original Guaranty, as amended hereby , is returned, or both.

Section 4.  Covenants and Representations.  Except with respect to *Section 9(c)* and *Section 9(e)* of the Original Guaranty, the covenants and representations contained in *Section 9* of the Original Guaranty are hereby incorporated herein by reference, reaffirmed and made as of the date of this First Amendment.  In addition, the Guarantor represents, warrants and confirms as follows:

(a)    as of the effective date of this First Amendment, that Guarantor is the owner of 100% of the membership interests of the Borrower,

(b)    Except for the matters disclosed in the Limited Offering Memorandum dated September [____], 2020 relating to the Series 2020 Bonds, there are no pending or, to the best of its knowledge, threatened actions, suits, proceedings or investigations of a legal, equitable, regulatory, administrative or legislative nature, which could reasonably be expected to adversely affect in a material way its business or financial condition or its ability to perform its obligations under this Guaranty; and

(c)    The representations and warranties made by the Borrower in *Section 2.2* of the Original Loan Agreement and in *Section 1.1* of the First Amendment to Loan Agreement are true and correct in all material respects.  The Guarantor hereby adopts by reference all representations and warranties contained in Section 2.2(a)-(d) (to the extent applicable to the Guarantor), 2.2(f)-(g), 2.2(i)-(j), 2.2(o) and 2.2(t) of the Original Loan Agreement as representations and warranties of the Guarantor, as if set forth in full herein.

**Section 5.  Confession of Judgment**.  GUARANTOR HEREBY AUTHORIZES AND EMPOWERS ANY ATTORNEY OR THE PROTHONOTARY OR CLERK OF ANY COURT IN THE STATE, OR IN ANY OTHER JURISDICTION THAT PERMITS THE ENTRY OF JUDGMENT BY CONFESSION, TO APPEAR FOR GUARANTOR IN ANY ACTION BROUGHT AGAINST GUARANTOR UNDER THE ORIGINAL GUARANTY AS AMENDED BY THIS FIRST AMENDMENT BY TRUSTEE, WITH OR WITHOUT COMPLAINT OR DECLARATION FILED, WITHOUT STAY OF EXECUTION, AS OF ANY TERM OR TIME, AND THEREIN TO CONFESS OR ENTER JUDGMENT AGAINST GUARANTOR FOR ALL, OR ANY PART OF, THE UNPAID BALANCE HEREUNDER AND ACCRUED INTEREST THEREON, TOGETHER WITH ALL OTHER OBLIGATIONS AS DEFINED HEREIN AND ALL REASONABLE COSTS AND OTHER EXPENSES INCURRED BY TRUSTEE IN CONNECTION THEREWITH INCLUDING WITHOUT LIMITATION, REASONABLE ATTORNEYS FEES; AND FOR SUCH PURPOSE THE ORIGINAL OR ANY PHOTOCOPY OF THIS GUARANTY AND AN AFFIDAVIT OF TRUSTEE OR TRUSTEE'S COUNSEL SHALL BE A GOOD AND SUFFICIENT WARRANT OF ATTORNEY.  SUCH AUTHORIZATION SHALL NOT BE EXHAUSTED BY ONE EXERCISE THEREOF, BUT JUDGMENT MAY BE CONFESSED AS AFORESAID FROM TIME TO TIME.  GUARANTOR HEREBY WAIVES ALL ERRORS AND RIGHTS OF APPEAL, AS WELL AS RIGHTS TO STAY OF EXECUTION AND EXEMPTION OF PROPERTY, IN ANY ACTION TO ENFORCE ITS LIABILITY HEREON.

THE AUTHORITY GRANTED HEREIN TO CONFESS JUDGMENT SHALL NOT BE EXHAUSTED BY ANY EXERCISE THEREOF, BUT SHALL CONTINUE FROM TIME TO TIME AND AT ALL TIMES UNTIL PAYMENT IN FULL OF ALL THE AMOUNTS DUE HEREUNDER.  GUARANTOR ACKNOWLEDGES THAT IT HAS BEEN REPRESENTED BY COUNSEL IN CONNECTION WITH THE EXECUTION AND DELIVERY OF THIS GUARANTY (OR HAS MADE THE UNILATERAL DECISION NOT TO CONSULT WITH COUNSEL IN CONNECTION WITH THE EXECUTION AND DELIVERY OF THIS GUARANTY) AND THAT IT KNOWINGLY WAIVES ITS RIGHT TO BE HEARD PRIOR TO THE ENTRY OF SUCH JUDGMENT AND UNDERSTANDS THAT, UPON SUCH ENTRY, SUCH JUDGMENT SHALL BECOME A LIEN ON ALL REAL PROPERTY OF GUARANTOR IN THE COUNTY WHERE SUCH JUDGMENT IS ENTERED.

GUARANTOR HEREBY ACKNOWLEDGES AND AGREES THAT GUARANTOR'S REASONABLE EXPECTATION WITH RESPECT TO THE AUTHORIZATION GRANTED PURSUANT TO ANY WARRANT OF ATTORNEY OR POWER OF ATTORNEY HEREUNDER, IS THAT TRUSTEE OR ITS ATTORNEY MAY CONFESS JUDGMENT AS SET FORTH HEREIN, SEEK TO FORECLOSE ON COLLATERAL AND TAKE ALL OTHER ACTIONS WITH RESPECT TO THE EXERCISE OF TRUSTEE'S RIGHTS HEREUNDER. GUARANTOR HEREBY WAIVES ALL OTHER DUTIES OF TRUSTEE THAT MAY ARISE UNDER 20 PA. C.S.A. § 5601.3 OR OTHERWISE.  GUARANTOR HEREBY REMISES, RELEASES, AND FOREVER DISCHARGES, AND WAIVES ALL CLAIMS, CAUSES OF ACTION AND ANY OTHER RIGHTS AGAINST TRUSTEE AND ITS PREDECESSORS, LEGAL REPRESENTATIVES, PAST AND PRESENT PARENT COMPANIES, SUBSIDIARIES,

AGENTS, EMPLOYEES, SERVANTS, INSURERS, ATTORNEYS, OFFICERS, DIRECTORS, STOCKHOLDERS, AFFILIATES, SUCCESSORS IN INTEREST, AND ASSIGNS OF AND FROM ANY AND ALL CLAIMS, DEMANDS, DAMAGES, FEES, AND COSTS, SUMS OF MONEY, RTGHTS, CAUSES OF ACTIONS, OBLIGATIONS AND LIABILITIES OF ANY KIND OR NATURE WHATSOEVER INCLUDING ATTORNEYS' FEES, ARISING UNDER OR RELATING TO ANY DUTIES OF AN AGENT UNDER 20 PA. C.S.A. § 5601.3 OR OTHERWTSE.

GUARANTOR'S INITIALS: _____

**Section 6.** THIS FIRST AMENDMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE COMMONWEALTH OF PENNSYLVANIA.

**Section 7. Original Guaranty**. Except as amended and supplemented hereby, the Original Guaranty is hereby confirmed and reaffirmed in all particulars. The Original Guaranty and this First Amendment shall be read, taken and construed as one and the same instrument, notwithstanding the date and time of execution and delivery of each such instrument. Without limiting the generality of the foregoing, all representations, covenants, agreements, obligations and rights contained in the Original Guaranty (unless specifically modified hereby) are and shall be for the equal and ratable benefit and security of the Owners of all Bonds (including the Series 2019 Bonds and the Series 2020 Bonds) issued and Outstanding under the Indenture. Anything in the Original Guaranty or herein to the contrary notwithstanding, all recitals, definitions and provisions contained in this First Amendment shall take precedence over the recitals, definitions and provisions of the Original Guaranty to the extent of any conflict.

*[Balance of page intentionally left blank.]*

IN WITNESS WHEREOF, the parties have caused this Guaranty to be executed by their duly authorized representatives as of the date first above written.

**CARBONLITE P HOLDINGS LLC**

By: _____
Name: Leon Farahnik
Title: Chief Executive Officer

ACCEPTED:

UMB BANK, N.A.
as Trustee

By: _____

Name: _____

Title: _____

[Signature Page to Amendment No. 1  Guaranty Agreement]

S-3

IN WITNESS WHEREOF, the parties have caused this Guaranty to be executed by their duly authorized representatives as of the date first above written.

**CARBONLITE P HOLDINGS LLC**

By: _____
Name: Leon Farahnik
Title: Chief Executive Officer

ACCEPTED:

UMB BANK, N.A.
as Trustee

By: _Katie Carl_____
Name: _Katie Carlson_____
Title: _Vice President_____

[Signature Page to Amendment No. 1  Guaranty Agreement]

**Property ID Number-UPI: 66530918429407**

**Property Address: 4030 Pottsville Pike, Reading, Pennsylvania 19605-1202**

### FIRST AMENDMENT TO OPEN-END LEASEHOLD MORTGAGE, SECURITY AGREEMENT, ASSIGNMENT OF RENTS AND LEASES, AND FIXTURE FILING

THIS FIRST AMENDMENT TO OPEN-END LEASEHOLD MORTGAGE, SECURITY AGREEMENT, ASSIGNMENT OF RENTS AND LEASES, AND FIXTURE FILING (this "Mortgage Amendment") is made as of September 1, 2020, to be effective as of the date of recordation hereof (the "Effective Date") by CARBONLITE P, LLC, a Delaware limited liability company, whose address is 10250 Constellation Boulevard, Suite 2820, Los Angeles, California 90067 (the "Mortgagor"), in favor of UMB BANK, N.A. a national banking association, as trustee (the "Mortgagee"), whose address is 120 South Sixth Street, Suite 1400, Minneapolis, Minnesota 55402, under that certain Indenture dated as of June 1, 2019 (as further amended, restated, modified, or otherwise supplemented from time to time, the "Indenture"), by and between the Mortgagee and the Pennsylvania Economic Development Financing Authority (the "Issuer"). Capitalized terms used in this Mortgage Amendment shall have the same meanings as in the Original Mortgage (as defined below) unless otherwise defined in this Mortgage Amendment.

WITNESSETH:

WHEREAS, pursuant to the Indenture, the Issuer has issued its $61,800,000 Sold Waste Disposal Revenue Bonds (CarbonLite P, LLC Project), Series 2019 (the "Series 2019 Bonds") to assist in financing a portion of the cost of the acquisition, construction, improvement and installation of certain facilities for the solid waste disposal recycling facility being developed by the Mortgagor (the "Project"), and to pay certain other items relating to the Bonds;

WHEREAS, the Issuer loaned the proceeds derived from the sale of the Series 2019 Bonds to the Mortgagor pursuant to a Loan Agreement dated as of June 1, 2019 (as it may be amended, modified or supplemented from time to time, the "Original Loan Agreement") under which the Mortgagor is required to make loan payments sufficient to pay when due the principal of, premium, if any, and interest on the Bonds and related expenses; and

WHEREAS, Berks61 Owner, LLC, a Delaware limited liability company, (the "Lessor") and Mortgagor have entered into that certain Industrial Lease dated as of May 13, 2019 (together

with any renewal, replacement, amendment, extension, substitution or revision thereof is collectively referred to herein as "Lease") pursuant t which Mortgagor leased approximately 270,000 square feet of space as more particularly described in the Lease (the "Leased Premises"), which Premises are situated on a portion of the land described on Exhibit A attached hereto (the "Land"), which Lease is evidenced by a Memorandum of Lease recorded in the office of the Recorder of Deeds of Berks County, Pennsylvania at Instrument Number 2019018677, Recorded Date of June 12, 2019 (the "Memorandum of Lease");

WHEREAS, the Mortgagor's repayment obligations under the Loan Agreement is evidenced by a promissory note dated July 10, 2019 (the "Series 2019 Note") from the Mortgagor to the Issuer and assigned to the Mortgagee pursuant to the Indenture, and secured by this Mortgage;

WHEREAS, Mortgagor previously executed and delivered by Mortgagee that certain Open-End Leasehold Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Filing dated as of June 1, 2019, to be effective as of July 10, 2019 and recorded on July 11, 2019 in the Office of the Recorder of Deeds of Berk County, Pennsylvania at Instrument Number 2019022526 (the "Original Mortgage");

WHEREAS, the Mortgagor has executed and delivered a Non-Disturbance and Access Agreement dated as of June 1, 2019 (the "Non-Disturbance Agreement") among the Mortgagor, the Lessor and the Trustee.

WHEREAS, at the request of the Mortgagor, the Issuer has determined to issue $10,000,000 aggregate principal amount of its Subordinate Solid Waste Disposal Revenue Bonds (CarbonLite P, LL Project) Series 2020 (the "Series 2020 Bonds") for the purposes of (i) financing a portion of the costs of the Project through the reimbursement to the Mortgagor of certain costs of the Project previously funded with the Mortgagor's equity; (ii) financing additional equipment costs of the Mortgagor; (iii) funding a deposit to an account within the Debt Service Reserve Fund relating to the Series 2020 Bonds; and (iv) paying a portion of the costs of issuance of the Series 2020 Bonds, such Series 2020 Bonds to be issued as "Additional Bonds" pursuant to the Original Indenture, as amended and supplemented by a First Supplemental Indenture dated as of September 1, 2020 (the "First Supplemental Indenture," and together with the Original Indenture and as further amended and supplemented from time to time, the "Indenture"), between the Issuer and the Mortgagee;

WHEREAS, the Issuer has agreed to loan the proceeds of the Series 2020 Bonds to the Mortgagor under the Original Loan Agreement, as amended by the First Amendment to Loan Agreement dated as of September 1, 2020 (the "First Amendment to Loan Agreement," and together with the Original Loan Agreement and as further amended and supplemented from time to time, the "Loan Agreement");

WHEREAS, the Mortgagor proposes to deliver to the Issuer a subordinate promissory note dated as of September 1, 2020 (the "Series 2020 Note"), evidencing its obligation to pay all amounts due under the Loan Agreement with respect to the Series 2020 Bonds;

- 2 -

WHEREAS, the Issuer, as security for the Series 2020 Bonds, intends to assign to the Mortgagee the Series 2020 Note;

WHEREAS, to induce the Issuer to issue the Series 2020 Bonds and to make the additional loan contemplated herein to the Mortgagor, the Mortgagor and Mortgagee have agreed, inter alia, to execute this Mortgage Amendment to confirm and additionally collateralize, for the benefit of the Holders of the Series 2019 Bonds and Series 2020 Bonds (together with any Additional Bonds, the "Bonds"), the Secured Indebtedness; and

WHEREAS, Mortgagor and Mortgagee desire to, among other things, give notice of the First Amendment to the Loan Agreement and to confirm that the Original Mortgage remains in full force and effect, except only to the extent expressly modified by this Mortgage Amendment.

A G R E E M E N T:

NOW, THEREFORE, in consideration of the foregoing and the payment of Ten Dollars ($10.00) and other good and valuable consideration the receipt and legal sufficiency of which are hereby acknowledged, and in order to secure the full, timely and proper payment, performance of and compliance with each and every one of the Secured Indebtedness, Mortgagor, intending to be legally bound, has heretofore mortgaged, granted, bargained, sold, conveyed, assigned, transferred and warranted, and by these presents does hereby mortgage, grant, bargain sell, convey, assign, transfer and warrant, unto Mortgagee, all of Mortgagor's estate, right, title, interest, property, claim and demand, now or hereafter arising, in and to the Mortgaged Property (as more particularly described in the Existing Mortgage).

AND Mortgagor and Mortgagee do hereby agree and give notice as follows.

1.    *Amendments*.  The Original Mortgage is hereby amended as follows:

1.1.    *Definition of "Loan Agreement"*.  Whenever referred to herein or in the Original Mortgage, "Loan Agreement" shall mean the Original Loan Agreement, as amended by the First Amendment to Loan Agreement, as the Loan Agreement may be further amended, amended and restated, supplemented or otherwise modified from time to time.

1.2.    *Definitions of "Mortgage"*.  Whenever referred to herein or in the Original Mortgage, "Mortgage" shall mean the Original Mortgage, as amended by this Mortgage Amendment, as the same may be further amended, amended and restated, supplemented or otherwise modified from time to time.

1.3.    *Definitions of "Secured Indebtedness"*.  Whenever referred to herein or in the Original Mortgage, "Secured Indebtedness" shall mean the Secured Indebtedness, as amended and modified by the First Amendment to the Loan Agreement, and as may be further amended, amended and restated, waived, and otherwise modified from time to time.

2.    *Taxes*.  Mortgagor shall pay all filing fees, recording fees, and other taxes imposed, if any, or assessed upon this Mortgage Amendment, including, if any, all taxes, penalties, and interest for the foregoing.

3. *Confirmation and Ratification of Original Mortgage*. Except as modified by this Mortgage Amendment, the Original Mortgage shall continue in full force and effect. In all other respects Mortgagor and Mortgagee fully confirm and ratify the Original Mortgage, the Loan Agreement, and the other documents evidencing or securing the Secured Indebtedness, except as expressly modified pursuant to this Mortgage Amendment or the First Amendment to the Loan Agreement. Nothing in this Mortgage Amendment is intended to waive any rights or remedies of Mortgagee under the Original Mortgage. The Original Mortgage shall continue to be a valid and subsisting lien against the Mortgaged Property. Nothing contained in this Mortgage Amendment shall be construed as (a) a novation of the Secured Indebtedness or (b) a release or waiver of all or any portion of the grant or conveyance to the Mortgagee of the Mortgaged Property.

4. *Future Amendments*. The Original Mortgage, as amended by this Mortgage Amendment, cannot be altered, amended, modified, terminated, waived, released, or discharged, except in accordance with the provisions of the Original Mortgage.

5. *Effect of Amendment*. Except as, and to the extent, specifically modified or amended by this Mortgage Amendment, the Original Mortgage is and remains in full force and effect according to the terms thereof.

6. *GOVERNING LAW*. THIS MORTGAGE AMENDMENT SHALL BE CONSTRUED, INTERPRETED AND GOVERNED IN ACCORDANCE WITH THE EXISTING MORTGAGE.

7. *Counterparts*. This Mortgage Amendment may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument.

[Remainder of this page intentionally left blank.]

**IN WITNESS WHEREOF**, Mortgagor and Mortgagee have executed this Mortgage Amendment as of the Effective Date. This Mortgage Amendment may be executed in counterparts.

MORTGAGOR:

CARBONLITE P, LLC, a Delaware limited liability company

By: _Kean Jerelik_

Name: _LEON FARAHNIK_

Title: _CHAIRMAN_

ACKNOWLEDGEMENT

STATE OF CALIFORNIA      )
                         ) ss:
COUNTY OF LOS ANGELES    )

On this, the ___ day of _____, 2020, before me, _____ the undersigned officer, personally appeared _____, who acknowledged herself/himself to be the _____ of CARBONLITE P, LLC, a Delaware limited liability company, and that (s)he, as such officer, being authorized to do so, executed the foregoing instrument for the purposes therein contained, by signing the name of the limited liability company by herself/himself as such officer.

In witness whereof, I hereunto set my hand and official seal.

_See attached_
_Notary_
_8·14·20_

_____
Notary Public

[SEAL]

SIGNATURE PAGE TO MORTGAGE AMENDMENT

**CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT**                    CIVIL CODE § 1189

┌─────────────────────────────────────────────────────────────────┐
│ A notary public or other officer completing this certificate verifies only the identity of the individual who signed the │
│ document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document. │
└─────────────────────────────────────────────────────────────────┘

State of California        )
County of __Los Angeles__  )

On __August 14, 2020__ before me, __Yajaira Guzman, Notary public__,
           Date                        Here Insert Name and Title of the Officer

personally appeared __Leon D Farahnik__
                        Name(s) of Signer(s)

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

YAJAIRA GUZMAN
Notary Public - California
Los Angeles County
Commission # 2300787
My Comm. Expires Aug 9, 2023

Signature _____
              Signature of Notary Public

*Place Notary Seal Above*

───────────────────────── OPTIONAL ─────────────────────────
*Though this section is optional, completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**
Title or Type of Document: __The Amendment to open Max__ Document Date: __8/14/2020__
Number of Pages: _____ Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**

| | |
|---|---|
| Signer's Name: _____ | Signer's Name: _____ |
| ☐ Corporate Officer — Title(s): _____ | ☐ Corporate Officer — Title(s): _____ |
| ☐ Partner — ☐ Limited ☐ General | ☐ Partner — ☐ Limited ☐ General |
| ☐ Individual ☐ Attorney in Fact | ☐ Individual ☐ Attorney in Fact |
| ☐ Trustee ☐ Guardian or Conservator | ☐ Trustee ☐ Guardian or Conservator |
| ☐ Other: _____ | ☐ Other: _____ |
| Signer Is Representing: _____ | Signer Is Representing: _____ |

©2014 National Notary Association • www.NationalNotary.org • 1-800-US NOTARY (1-800-876-6827)    Item #5907

**IN WITNESS WHEREOF**, Mortgagor and Mortgagee have executed this Mortgage Amendment as of the Effective Date.  This Mortgage Amendment may be executed in counterparts.

MORTGAGEE:

UMB BANK, N.A, a national banking association

By: _____

Name: Katie Carlson

Title: Vice President


ACKNOWLEDGEMENT

STATE OF MINNESOTA    )
                      ) ss:
COUNTY OF HENNEPIN    )

On this, the 31st day of August, 2020, before me, Christin Davies the undersigned notary, personally appeared Katie Carlson, who acknowledged herself to be the Vice President of UMB BANK, N.A, a national banking association, and that she, as such officer, being authorized to do so, executed the foregoing instrument for the purposes therein contained, by signing the name of such association by herself as such officer.

In witness whereof, I hereunto set my hand and official seal.

_____
Notary Public

[SEAL]

CHRISTIN ELIZABETH DAVIES
Notary Public - Minnesota
My Comm. Exp: Jan 31, 2021

**Certificate of Residence**

The undersigned certifies that the residence of Mortgagee is 120 South Sixth Street, Suite 1400, Minneapolis, Minnesota 55402

By: _____

Name: _____Katie Carlson_____

Title: _____Vice President_____

## EXHIBIT A

### Legal Description

BALLARD DRAFT 9/8/20

FIRST AMENDMENT TO LOAN AGREEMENT

between

PENNSYLVANIA ECONOMIC DEVELOPMENT FINANCING AUTHORITY

and

CARBONLITE P, LLC

Dated as of September 1, 2020

RELATING TO

$10,000,000
PENNSYLVANIA ECONOMIC DEVELOPMENT FINANCING AUTHORITY
SUBORDINATE SOLID WASTE DISPOSAL REVENUE BONDS
(CARBONLITE P, LLC PROJECT)
SERIES 2020

# TABLE OF CONTENTS

**Page**

ARTICLE 1 CONFIRMATION OF ORIGINAL LOAN AGREEMENT; AMENDMENT
TO ORIGINAL LOAN AGREEMENT ............................................................. 2
    **Section 1.1.**    Confirmation of Original Loan Agreement ................................ 2
    **Section 1.2.**    Amendments to Original Loan Agreement ................................ 2

ARTICLE 2 SERIES 2020 LOAN AND SERIES 2020 NOTE ................................ 14
    **Section 2.1.**    Series 2020 Loan and Series 2020 Note ................................... 14
    **Section 2.2.**    Agreement to Issue the Series 2020 Bonds; Application of Proceeds
                 ................................................................................................... 14
    **Section 2.3.**    First Amendment to Leasehold Mortgage, First Amendment to
                  Guaranty, First Amendment to Pledge and Security Agreement and
                  Certificate of Borrower .......................................................... 15

ARTICLE 3 MISCELLANEOUS ........................................................................ 15
    **Section 3.1.**    Successors and Assigns............................................................. 15
    **Section 3.2.**    Severability ............................................................................. 15
    **Section 3.3.**    Applicable Law ....................................................................... 15
    **Section 3.4.**    Counterparts ............................................................................ 15

Exhibit A-1:      Form of Senior Note
Exhibit A-2:      Form of Subordinate Note
Exhibit B:         Form of First Amendment to Leasehold Mortgage
Exhibit C:         Form of First Amendment to Guaranty
Exhibit D:         Form of First Amendment to Pledge and Security Agreement

THIS FIRST AMENDMENT TO LOAN AGREEMENT, dated as of September 1, 2020, by and between PENNSYLVANIA ECONOMIC DEVELOPMENT FINANCING AUTHORITY (the "Issuer"), a public instrumentality of the Commonwealth of Pennsylvania (the "Commonwealth") and a public body corporate and politic organized and existing under the Pennsylvania Economic Development Financing Law, as amended (as defined herein, the "Act"), and CarbonLite P, LLC, a Delaware limited liability company (the "Borrower").

W I T N E S S E T H:

WHEREAS, the Issuer is empowered by the provisions of the Act to enter into agreements providing for the financing of the acquisition, construction and equipping of industrial, commercial and specialized enterprises for the public for purposes of alleviating unemployment, maintaining employment at a high level and encouraging economic development in the Commonwealth within the meaning of the Act, including solid waste disposal and recycling facilities;

WHEREAS, in furtherance of its purposes under the Act, the Issuer issued, on July 10, 2019, its Solid Waste Disposal Revenue Bonds (CarbonLite P, LLC Project) Series 2019 in the aggregate principal amount of $61,800,000 (the "Series 2019 Bonds") pursuant to an Indenture of Trust dated as of June 1, 2019 (the "Original Indenture") between the Issuer and UMB Bank, N.A. (the "Trustee"), to (i) finance all or a portion of the cost of acquiring, constructing, rehabilitating, renovating, installing, improving and/or equipping of certain solid waste disposal and recycling facilities (the "Project"), as more particularly described in Exhibit A to the Loan Agreement (defined below); (ii) fund capitalized interest on the Series 2019 Bonds; (iii) fund a reserve fund for the Series 2019 Bonds; and (iv) pay a portion of the costs of issuance of the Series 2019 Bonds;

WHEREAS, the Issuer loaned the proceeds of the Series 2019 Bonds to the Borrower pursuant to a Loan Agreement dated as of June 1, 2019 (the "Original Loan Agreement") between the Issuer and the Borrower;

WHEREAS, pursuant to the Original Loan Agreement, the Borrower delivered to the Issuer a promissory note corresponding to the Series 2019 Bonds (the "Series 2019 Note"), dated July 10, 2019, evidencing its obligation to pay all amounts due under the Original Loan Agreement;

WHEREAS, at the request of the Borrower, the Issuer has determined to issue $10,000,000 aggregate principal amount of its Subordinate Solid Waste Disposal Revenue Bonds (CarbonLite P, LLC Project) Series 2020 (the "Series 2020 Bonds") for the purposes of (i) financing a portion of the costs of the Project through the reimbursement to the Borrower of certain costs of the Project previously funded with the Borrower's equity; (ii) financing additional equipment costs of the Borrower; (iii) funding a deposit to an account within the Debt Service Reserve Fund relating to the Series 2020 Bonds; and (iv) paying a portion of the costs of issuance of the Series 2020 Bonds, such Series 2020 Bonds to be issued as "Additional Bonds" pursuant to the Original Indenture, as amended and supplemented by a First Supplemental Indenture of even date herewith (the "First Supplemental Indenture," and together with the Original Indenture and as further amended and supplemented from time to time, the "Indenture"), between the Issuer and the Trustee;

WHEREAS, the Issuer has agreed to loan the proceeds of the Series 2020 Bonds to the Borrower under the Original Loan Agreement, as amended by this First Amendment to Loan Agreement (the "First Amendment to Loan Agreement," and together with the Original Loan Agreement and as further amended and supplemented from time to time, the "Loan Agreement");

WHEREAS, in connection with the issuance of the Series 2020 Bonds, the parties hereto desire to supplement the Original Loan Agreement, by entering into this First Amendment to Loan Agreement for the purpose of providing for the issuance of Additional Bonds in accordance with the terms of the Indenture and certain other matters in connection therewith;

WHEREAS, the Borrower proposes to deliver to the Issuer a subordinate promissory note in the form of Exhibit A-2 hereto dated as of September 10, 2020 (the "Series 2020 Note"), evidencing its obligation to pay all amounts due under the Loan Agreement with respect to the Series 2020 Bonds; and

WHEREAS, the Issuer, as security for the Series 2020 Bonds, intends to assign to the Trustee the Series 2020 Note;

NOW, THEREFORE, THIS FIRST AMENDMENT TO LOAN AGREEMENT WITNESSETH:

That the parties hereto, intending to be legally bound hereby and in consideration of the mutual covenants herein contained, DO HEREBY AGREE as follows.

## ARTICLE 1
## CONFIRMATION OF ORIGINAL LOAN AGREEMENT;
## AMENDMENT TO ORIGINAL LOAN AGREEMENT

**Section 1.1.    Confirmation of Original Loan Agreement.**    Except as amended and supplemented hereby, the Original Loan Agreement are hereby confirmed and reaffirmed in all particulars.  The Original Loan Agreement and this First Amendment to Loan Agreement shall be read, taken and construed as one and the same instrument, notwithstanding the date and time of execution and delivery of each such instrument.  Without limiting the generality of the foregoing, all representations, covenants, agreements, obligations and rights contained in the Original Loan Agreement (unless modified hereby or except as otherwise provided herein or in the Indenture, all security for the same are and shall be for the equal and ratable benefit and security of the Owners of all Bonds (including the Series 2019 Bonds and the Series 2020 Bonds) issued and Outstanding under the Indenture.  Anything in the Original Loan Agreement or herein to the contrary notwithstanding, all recitals, definitions and provisions contained in this First Amendment to Loan Agreement shall take precedence over the recitals, definitions and provisions of the Original Loan Agreement to the extent of any conflict.

**Section 1.2.    Amendments to Original Loan Agreement**.

(a)    All references to the "Bonds" in the Original Loan Agreement shall hereinafter be deemed to mean, collectively and each as a separate Series of Bonds, the Series 2019 Bonds, the Series 2020 Bonds and any Additional Bonds.

(b)       All references to the "Note" in the Original Loan Agreement shall hereinafter be deemed to mean, collectively, the Series 2019 Note, the Series 2020 Note and any other Senior Note and Subordinate Note issued pursuant to the Loan Agreement in connection with any Additional Bonds.

(c)       Section 4.2(a) of the Original Loan Agreement is hereby amended and restated in its entirety as follows:

(a)       The Borrower covenants and agrees to pay to the Trustee as a repayment on the loan made to the Borrower from Bond proceeds pursuant to Section 4.1 hereof, a sum equal to the amount payable on each Bond Payment Date as principal of, and premium, if any, and interest on, the Bonds then due as provided in the Indenture.  Such Loan Repayments shall be made in federal funds or other funds immediately available at the Corporate Trust Office of the Trustee.  Without limiting the foregoing, the Borrower further covenants and agrees as follows:

(i)       subject to subsection (iii) below, the Borrower, on or before the 25th day of each month, commencing January 25, 2021 with respect to the Series 2019 Bonds and September 25, 2020 with respect to the Series 2020 Bonds (or any date prior thereto to the extent not covered by funds in the Capitalized Interest Account), in each case until the principal of, premium, if any, and interest on such Series of Bonds shall have been fully paid or provision for the payment thereof shall have been made in accordance with the Indenture, will deposit in immediately available funds in the Revenue Fund for credit to applicable Series subaccount of the Interest Account established and maintained pursuant to the Indenture, the amount necessary to make the amount on deposit therein (to the extent not covered by funds in the Capitalized Interest Account) equal to the amount of accrued and unpaid interest on the Bonds as of the first day of the immediately succeeding month;

(ii)      (1)      with respect to the Series 2019 Bonds, subject to subsection (iii) below, the Borrower, on or before the 25th day of each month, commencing June 25, 2021, until the principal of, premium, if any, and interest on the Series 2019 Bonds shall have been fully paid or provision for the payment thereof shall have been made in accordance with the Indenture, will deposit in immediately available funds in the Revenue Fund for credit to the Series 2019 subaccount of the Principal Account established and maintained pursuant to the Indenture, a sum equal to one-sixth (1/6th) of the amount of principal payable (whether at maturity or upon a sinking fund redemption date) on the next Principal Payment Date with respect to the Series 2019 Bonds;

(2)      with respect to the Series 2020 Bonds, on or before the 25th day of the month immediately preceding the maturity date for the Series 2020 Bonds, the Borrower will deposit

in immediately available funds in the Revenue Fund for credit to the Series 2020 subaccount of the Principal Account, a sum equal to the principal payable on the Series 2020 Bonds on the maturity date with respect to the Series 2020 Bonds;

(3)    with respect to any Additional Senior Bonds, the Borrower, on or before the 25th day of each month, commencing with the sixth (6th) month immediately preceding the first Principal Payment Date for such Series of Additional Senior Bonds, until the principal of, premium, if any, and interest on such Series of Additional Senior Bonds shall have been fully paid or provision for the payment thereof shall have been made in accordance with the Indenture, will deposit in immediately available funds in the Revenue Fund for credit to the applicable Series subaccount of the Principal Account, a sum equal to one-sixth (1/6th) of the amount of principal payable (whether at maturity or upon a sinking fund redemption date) on the next Principal Payment Date with respect to such Series of Additional Senior Bonds;

(4)    with respect to any Additional Subordinate Bonds, on or before the 25th day of the month immediately preceding the maturity date for such Series of Additional Subordinate Bonds, the Borrower will deposit in immediately available funds in the Revenue Fund for credit to the applicable Series subaccount of the Principal Account, a sum equal to the principal payable on such Series of Additional Subordinate Bonds on the maturity date with respect to such Series of Additional Senior Bonds.

(iii)    notwithstanding subsections (i) and (ii) above, (1) with respect to the Series 2019 Bonds, during the last Bond Year ending June 1, 2036, the Borrower shall have credit against its payments due on and after December 1, 2035 under this Section 4.2(a) from moneys available in the Series 2019 subaccount of the Debt Service Reserve Fund, in such amounts as are designated by the Borrower; and (2) with respect to the Series 2020 Bonds, during the last Bond Year ending December 1, 2036, the Borrower shall have credit against its payments due on and after June 1, 2036 under this Section 4.2(a) from moneys available in the Series 2020 subaccount of the Debt Service Reserve Fund, in such amounts as are designated by the Borrower.

Each payment made pursuant to this Section 4.2(a) shall at all times be sufficient to pay the total amount of interest and principal (whether at maturity or upon redemption or acceleration) and premium, if any, becoming due and payable on the Bonds on each Bond Payment Date; provided that any amount held by the Trustee in the Revenue Fund on any due date for a Loan Repayment hereunder shall be credited against the Loan

Repayment due on such date, to the extent available for such purpose; and provided further that, subject to the provisions of this paragraph, if at any time the amounts held by the Trustee in the Revenue Fund are sufficient to pay all of the principal of and interest and premium, if any, on the Bonds as such payments become due, the Borrower shall be relieved of any obligation to make any further payments under the provisions of this Section.  Notwithstanding the foregoing, if on any date the amount held by the Trustee in the Revenue Fund is insufficient to make any required payments of principal of (whether at maturity or upon redemption or acceleration) and interest and premium, if any, on, the Bonds as such payments become due, the Borrower shall forthwith pay such deficiency as a Loan Repayment hereunder.

(d)     Section 4.7(a) of the Original Loan Agreement is hereby amended and restated in its entirety as follows:

(a)     The Borrower agrees that, as long as any Loan Repayments remain unpaid, all of the Gross Revenues shall be deposited as soon as practicable upon receipt in a bank account or fund designated as the "Gross Revenue Account" which the Borrower shall establish and maintain subject to the provisions of Section 5.15 of this Agreement, in an account or accounts at such banking institution or institutions as the Borrower shall from time to time designate in writing to the Trustee for such purpose (herein called the "Depository Bank(s)").  The Borrower pledges and assigns to the Trustee and grants to the Trustee a security interest in all right, title and interest, whether now owned or hereafter acquired, of the Borrower in, to, and under the Gross Revenue Account, all of the Gross Revenues, all investment property, instruments, money and other property on deposit in or credited to the Gross Revenue Account, and all proceeds of the foregoing (subject to subordination pursuant to an Intercreditor Agreement) with respect to trade accounts receivable in which a lien has been granted to secure Short-Term Indebtedness), to secure the payment of the Loan Repayments and the performance by the Borrower of its other obligations under this Loan Agreement and the payment and performance of all obligations of the Borrower, *first*, under any agreement securing Parity Debt and, *second*, under any agreement securing Parity Subordinate Debt.

(e)     Section 5.2(b)(ii)(B) of the Original Loan Agreement is hereby amended and restated in its entirety as follows:

(B)     an agreement by the surviving or resulting entity to pay and perform all of the obligations of the Borrower hereunder, under the Pledge and Security Agreement, under the Lease, the Leasehold Mortgage, the NDA, the SNDA, the Tax Certificate and all other agreements entered into by the Borrower in connection with the issuance of the Bonds and any Parity Debt or Parity Subordinate Debt, and

(f)    Section 5.15 of the Original Loan Agreement is hereby amended and restated in its entirety as follows:

SECTION 5.15    Gross Revenue Account.

(a)    The Gross Revenue Account shall at all times be subject to an Account Control Agreement.

(b)    Gross Revenues and amounts in the Gross Revenue Account may be used and withdrawn by the Borrower at any time for any lawful purpose, except as hereinafter provided.  In the event that

(i)    the Borrower is delinquent for more than one Business Day in the payment or required prepayment of any Loan Repayment or any similar payment with respect to Parity Debt or Parity Subordinate Debt, or

(ii)    any other Loan Default Event occurs and is continuing;

then the Trustee may notify the Issuer, the Borrower and the Depository Bank of such event, and may cause the Depository Bank(s) to transfer control of any Gross Revenue Account to the name and credit of the Trustee in accordance with the terms of the then effective Account Control Agreement or Agreements.

(c)    Notwithstanding the transfer of control over a Gross Revenue Account to the Trustee, the Borrower shall continue to deposit all Gross Revenues into the Gross Revenue Account as provided in Sections 4.3 and 4.7(a) of this Agreement until the amounts on deposit in said fund are sufficient to pay in full (or have been used to pay in full) all Loan Repayments in default and payments required with respect to Parity Debt or Parity Subordinate Debt in default and until all other Loan Default Events or events of default with respect to Parity Debt or Parity Subordinate Debt known to the Trustee shall have been cured to the satisfaction of the Trustee or provision deemed by the Trustee to be adequate shall have been made therefor, whereupon control of the Gross Revenue Account (except for the Gross Revenues required to make such payments or cure such defaults) shall be transferred by the Trustee back to the name and credit of the Borrower within ten business days.

(d)    During any period that the Gross Revenue Account is held in the name and to the credit, and subject to the control, of the Trustee, the Trustee shall use and withdraw from time to time amounts in said fund to make Loan Repayments and the other payments required of the Borrower under this Agreement as such payments become due (whether by maturity, prepayment, acceleration or otherwise), and, if such amounts shall not be sufficient to pay in full all such payments due on any date, then *first*, to the payment of Loan Repayments and debt service on such Parity Debt, and *second*, to the payment of Loan Repayments and debt service on such Parity

Subordinate Debt, according to the amounts due under the Indenture respectively for Loan Repayments and such debt service.

(e)     During any period that the Gross Revenue Account is held in the name and to the credit, and subject to the control, of the Trustee, the Borrower shall not be entitled to use or withdraw any of the Gross Revenues unless (and then only to the extent that) the Trustee, in its sole discretion, so directs for the payment of current or past due operating expenses of the Borrower.  The Borrower shall execute and deliver all instruments as may be required to implement this Section.

(f)     The Borrower further agrees that a failure to comply with the terms of this Section shall cause irreparable harm to the holders from time to time of the Bonds and of Parity Debt or Parity Subordinate Debt, and shall entitle the Trustee, with or without notice to the Borrower, to take immediate action to compel the specific performance of the obligations of the Borrower as provided in this Section.

(g)     The Borrower further agrees to provide the Trustee with thirty (30) days' prior written notice of any change in the Depository Bank or Gross Revenue Account (including, without limitation, a change in account number) together with the execution of a new or amended Account Control Agreement (which shall be in form acceptable to the Trustee in its sole discretion) applicable to any new deposit account.

(g)     Section 5.17 of the Original Loan Agreement is hereby amended and restated in its entirety as follows:

SECTION 5.17        Restrictions on Creation of Liens; Disposition of Gross Revenues.

The Borrower covenants that it will not create, assume, incur or suffer to be created, assumed or incurred any Lien on the Facility or any of its revenues (other than Permitted Liens).  The Borrower will not pledge, encumber, sell, factor or otherwise dispose of its accounts receivable or similar contract rights constituting part of the Gross Revenues without the prior written consent of the Holders of a majority in aggregate principal amount of the Series 2019 Bonds then Outstanding.

(h)     Section 5.18 of the Original Loan Agreement is hereby amended and restated in its entirety as follows:

SECTION 5.18        Financial Covenants.

(a)     Days Cash on Hand.

(i)     For the Fiscal Year ending December 31, 2021, the Borrower shall manage its business such that Borrower's Days Cash on

Hand, as of December 31 of such Fiscal Year, will not be less than 45 Days Cash on Hand (the "Initial Days Cash on Hand Requirement"). For each Fiscal Year thereafter, commencing with Fiscal Year ending December 31, 2022, the Borrower shall manage its business such that Borrower's Days Cash on Hand, as of December 31 of such Fiscal Year, will not be less than 60 Days Cash on Hand (the "Days Cash on Hand Requirement").

(ii)     The determination of annual operating expenses for each Fiscal Year shall be made utilizing the audited financial statements of the Borrower for the Fiscal Year being tested.

(iii)     If for the Fiscal Year ending December 31, 2021, the Days Cash on Hand is less than the Initial Days Cash on Hand Requirement, or for any Fiscal Year thereafter, commencing with Fiscal Year ending December 31, 2022, the Days Cash on Hand is less than the Days Cash on Hand Requirement, the Borrower covenants to retain promptly an Independent Consultant to make recommendations to increase Days Cash on Hand in the following Fiscal Year to the Days Cash on Hand Requirement for such Fiscal Year or, if in the opinion of the Independent Consultant the attainment of such level is impracticable, to the highest level attainable for such Fiscal Year and the number of Fiscal Years required to return to the Initial Days Cash on Hand Requirement or the Days Cash on Hand Requirement, as applicable. The Borrower shall provide notice of the proposed retention of an Independent Consultant within three Business Days of such retention to the Trustee (and the Trustee shall notify the Bondholders), which notice shall specify the identity of the Independent Consultant proposed to be retained by the Borrower. If within 30 calendar days of the providing of such notice, the Holders of a majority in aggregate principal amount of the Series 2019 Bonds and any Additional Senior Bonds then Outstanding (and only if such Series 2019 Bonds or Additional Senior Bonds are no longer Outstanding, Holders of a majority in aggregate principal amount of the Series 2020 Bonds and any Additional Subordinate Bonds then Outstanding) notify the Trustee in writing that they object to the retention of such Independent Consultant, such Independent Consultant shall not be retained by the Borrower and the Borrower shall provide notice of the proposed retention of a different Independent Consultant in the same manner. The process shall continue until the Borrower has proposed retention of an Independent Consultant that is not objected to by the Holders of a majority in aggregate principal amount of the Series 2019 Bonds and any Additional Senior Bonds then Outstanding (and only if such Series 2019 Bonds or Additional Senior Bonds are no longer Outstanding, Holders of a majority in aggregate principal amount of the Series 2020 Bonds and any Additional Subordinate Bonds then Outstanding).

(iv)     The Borrower agrees to transmit a copy of the report of the Independent Consultant to the Trustee and the Bondholders within five days of the receipt of such recommendations. The Borrower shall, promptly upon

its receipt of such recommendations, take such action as shall be in substantial conformity with such recommendations.

(v)    If the Borrower retains and substantially complies with the recommendations of the Independent Consultant, the Borrower will be deemed to have complied with the covenants set forth in this Section for such Fiscal Year, notwithstanding that Days Cash on Hand is less than the Days Cash on Hand Requirement for such Fiscal Year, provided that the Borrower is in compliance with its Days Cash on Hand Requirement at the end of the next Fiscal Year. Notwithstanding the foregoing, the Borrower shall not be excused from taking any action or performing any duty required under this Agreement and no other Event of Default shall be waived by the operation of the provisions of this subsection (v).

(vi)    Notwithstanding the provisions of this Section 5.18(a), a Loan Default Event shall exist and be continuing if (i) for the Fiscal Year ending December 31, 2021, the Borrower's Days Cash on Hand is less than 30 Days Cash on Hand, and (ii) for each Fiscal Year thereafter, the Borrower's Days Cash on Hand is less than 45 Days Cash on Hand.

(b)    <u>Debt Service Coverage</u>.

(i)    For the Fiscal Year ending December 31, 2021, the Borrower shall produce sufficient annual Gross Revenues in order to provide a Debt Service Coverage Ratio equal to at least (A) 125% of the debt service on the Series 2019 Bonds and any Parity Debt for such Fiscal Year (the "Initial Parity Coverage Requirement"); and (B) 105% of all debt service obligations of the Borrower (including the Series 2019 Bonds and the Series 2020 Bonds) which are Liens or encumbrances upon or payable from the Gross Revenues (the "Initial Overall Coverage Requirement" and, together with the Initial Parity Coverage Requirement, the "Initial Coverage Requirement"), calculated at the end of such Fiscal Year, based upon the audited financial statements of the Borrower for such Fiscal Year being tested.

For each Fiscal Year thereafter, commencing with Fiscal Year ending December 31, 2022, the Borrower shall produce sufficient annual Gross Revenues in order to provide a Debt Service Coverage Ratio equal to at least 135% of all debt service on all Indebtedness of the Borrower (the "Coverage Requirement"), calculated at the end of each Fiscal Year, based upon the audited financial statements of the Borrower for the Fiscal Year being tested.

(ii)    If for the Fiscal Year ending December 31, 2021, the Borrower fails to meet the Initial Parity Coverage Requirement or the Initial Overall Coverage Requirement (or both), or for any Fiscal Year thereafter, commencing with Fiscal Year ending December 31, 2022, the Borrower

fails to meet the Coverage Requirement, then the Borrower covenants to retain promptly an Independent Consultant to make recommendations to increase EBITDA in the following Fiscal Year to the level required or, if in the opinion of the Independent Consultant the attainment of such level is impracticable, to the highest level attainable for such Fiscal Year and the number of Fiscal Years required to return the Borrower to compliance with the Initial Coverage Requirement or the Coverage Requirement, as applicable.  The Borrower shall provide notice of the proposed retention of an Independent Consultant within three Business Days of such retention to the Issuer and the Trustee, who will provide notice to the Bondholders, which notice shall specify the identity of the Independent Consultant proposed to be retained by the Borrower.  If within 30 calendar days of the providing such notice, the Holders of a majority in aggregate principal amount of the Series 2019 Bonds and any Additional Senior Bonds then Outstanding (and only if such Series 2019 Bonds or Additional Senior Bonds are no longer Outstanding, Holders of a majority in aggregate principal amount of the Series 2020 Bonds and any Additional Subordinate Bonds then Outstanding) notify the Trustee in writing that they object to the retention of such Independent Consultant, such Independent Consultant shall not be retained by the Borrower and the Borrower shall provide notice of the proposed retention of a different Independent Consultant in the same manner.  The process shall continue until the Borrower has proposed retention of an Independent Consultant that is not objected to by the Holders of a majority in aggregate principal amount of the Series 2019 Bonds and any Additional Senior Bonds then Outstanding (and only if such Series 2019 Bonds or Additional Senior Bonds are no longer Outstanding, Holders of a majority in aggregate principal amount of the Series 2020 Bonds and any Additional Subordinate Bonds then Outstanding).

(iii)    The Borrower agrees to transmit a copy of the report of the Independent Consultant to the Trustee and the Bondholders within five days of the receipt of such recommendations.  The Borrower shall, promptly upon its receipt of such recommendations, take such action as shall be in substantial conformity with such recommendations.

(iv)    If the Borrower retains and substantially complies with the recommendations of the Independent Consultant, the Borrower will be deemed to have complied with the covenants set forth in this Section for such Fiscal Year, notwithstanding that for the Fiscal Year ending December 31, 2021, either of the Initial Parity Coverage Requirement or the Initial Overall Coverage Requirement was not met, or that for any Fiscal Year thereafter, commencing with the Fiscal Year ending December 31, 2022, the Coverage Requirement was not met, provided that the Borrower is in compliance with the Coverage Requirement at the end of the next Fiscal Year.  Notwithstanding the foregoing, the Borrower shall not be excused from taking any action or performing any duty required under this Agreement or the Indenture and no other Event of Default shall be waived

by the operation of the provisions of this subsection (b)(iv).

(v)    Notwithstanding the provisions of this Section 5.18(b), a Loan Default Event shall exist if (A) for the Fiscal Year ending December 31, 2021, either the Initial Parity Coverage Requirement ratio shall be less than 110% or the Initial Overall Coverage Requirement ratio shall be less than 100%, and (B) for each Fiscal Year thereafter, commencing with the Fiscal Year ending December 31, 2022, the Coverage Requirement ratio shall be less than 110%.

(c)    Distributions.

The Borrower shall not make distributions on any of its membership interests (except for tax distributions, which may be made commencing with the Fiscal Year ending December 31, 2022 based upon audited financial statements of the Borrower), nor make any payments of any type (including intercompany loan repayments) to the Guarantor, to Guarantor's parent company or companies or to any subsidiary of any of the foregoing, until the earlier of (i) the audited financial statements of the Borrower for the Fiscal Year ending December 31, 2026 becoming available and proving eligibility, and (ii) the Series 2019 Bonds being paid or defeased in full.

Thereafter, the Borrower shall not make distributions on any of its membership interests, nor make any payments of any type (including intercompany loan repayments) to the Guarantor, to Guarantor's parent company or companies or to any subsidiary of any of the foregoing, unless all of the following are met:

(i)    A Debt Service Coverage Ratio equal to at least the Coverage Requirement is satisfied with respect to the Fiscal Year prior to the date on which distributions are to be made calculated on a consistent basis with the calculations provided for in Section 5.18 based upon the audited financial statements of the Borrower for the Fiscal Year being tested;

(ii)    no event has occurred and no condition exists which would constitute a Loan Default Event under this Agreement or which, with the passing of time or with the giving of notice or both, would become such a Loan Default Event;

(iii)    the Borrower is in compliance with Section 5.18(a) and (b) of this Agreement; and

(iv)    the Days Cash on Hand Requirement was satisfied with respect to the Fiscal Year prior to the date on which distributions are to be made and there shall remain, following any distribution, no less than 60 Days Cash on Hand.

Notwithstanding anything to the contrary herein, concurrent contributions from the Guarantor shall be excluded from any calculations made pursuant to (i) – (iv) above, unless such contributions relate to capital expenditures made or to be made by Borrower.

Notwithstanding anything to the contrary herein, the Borrower shall not invest in any subsidiary entity of the Borrower, the Guarantor, any parent company or companies or in any subsidiary of any of the foregoing, nor make any loan to any Person unless the prior written consent of the Holders of a majority in principal amount of the Series 2019 Bonds then Outstanding has been obtained.

Notwithstanding anything to the contrary contained in this Subsection 5.18(c), the Borrower shall be permitted to pay and/or reimburse any of its members and affiliates for ordinary and reasonable operation and maintenance fees, costs or expenses payable to such member or affiliate, the Borrower's share of ordinary and reasonable employee benefit expenses actually paid by such member or affiliate and/or current ordinary and reasonable operating expenses incurred by such member or affiliate on the Borrower's behalf, including, without limitation, the ordinary and reasonable (A) management and services fees to cover administrative salaries and benefits for personnel actually providing services to the Borrower, and sales, marketing, legal and accounting expenses relating to the Project, provided that (I) such payments and reimbursements are reflected in the Borrower's annual budget for the current Fiscal Year and (II) that the actual amount of such payments and/or reimbursements shall not exceed the amounts specified therefor in such budget by more than 5% in the aggregate, and (B) purchases or sales of plastics, flake or finished output of the Project or of an affiliate of the Borrower on fair market value, arm's length terms.

(d)    Additional Indebtedness.

The Borrower shall not issue or incur any additional Indebtedness unless the Borrower has obtained the prior written consent of the Holders of a majority in principal amount of the Series 2019 Bonds then Outstanding, and only if the Series 2019 Bonds are no longer Outstanding, Holders of a majority in aggregate principal amount of the Series 2020 Bonds.

(i)    Section 5.19 of the Original Loan Agreement is hereby amended and restated in its entirety as follows:

(a)    The Borrower hereby pledges and assigns to the Trustee and grants to the Trustee a security interest in all right, title and interest, whether now owned or hereafter acquired, of the Borrower in, to, and under the following: (1) all contracts relating to construction of the Project; (2) all contracts with suppliers of polyethylene terephthalate ("pcrPET") and other

feedstock necessary or desirable to recycle pcrPET into food-grade polyethylene terephthalate ("PET") pellets; (3) all contracts with customers of the Facility who purchase the Project's output; (4) all service contracts relating to the Project, licenses to operate the Project, operations manuals or other documents relating to the operation and maintenance of the Project; (5) any changes, additions or extensions to, and any revisions or modifications of and any guarantees of performance of obligations to the Borrower under any of the foregoing (collectively, the "Contract Documents"); and all proceeds of any of the foregoing to secure the payment of the Loan Repayments and the performance by the Borrower of its other obligations under this Agreement and the payment and performance of all obligations of the Borrower, *first*, under any agreement securing Parity Debt and, *second*, under any agreement securing Parity Subordinate Debt.

(b)     The Borrower agrees that so long as the Bonds, any Parity Debt or any Parity Subordinate Debt are Outstanding:

(i)     The Borrower will:  (1) fulfill, perform and observe each and every condition and covenant of the Borrower contained in the Contract Documents, the failure of which would have a material adverse effect on the Borrower; (2) give prompt notice to the Trustee of any material claim of default under the Contract Documents given to the Borrower in writing or given in writing by the Borrower, together with a complete copy of any such claim; (3) at the sole cost and expense of the Borrower, enforce the performance and observance of each and every covenant and condition of the Contract Documents to be performed and observed to the extent reasonably prudent to do so; and (4) appear in, and defend to the extent appropriate, any legal action growing out of, or in any manner materially connected with, the Contract Documents or the material obligations or liabilities of the Borrower, or any guarantor thereunder.

(ii)     The rights assigned hereunder include all of the Borrower's right and title: (1) to modify the Contract Documents; (2) to terminate the Contract Documents; and (3) to waive or release the performance or observance of any obligation or condition of the Contract Documents, all of which may be exercised exclusively by the Borrower unless and until, following the occurrence, and during the pendency, of an Event of Default, the Trustee advises the Borrower in writing that the Borrower may no longer do so.

(j)     Section 5.22 of the Original Loan Agreement is hereby amended and restated in its entirety as follows:

SECTION 5.22     Competition.

The Borrower or its management will not acquire, construct, maintain or

operate any facilities competitive with the Project in Pennsylvania, in any state bordering Pennsylvania, Virginia or in the six-state "New England" region, until such time as the Project has met the following requirements for two consecutive Fiscal Years, commencing with the Fiscal Year ending December 31, 2022 or thereafter: (i) the Debt Service Coverage Ratio and (ii) the Initial Coverage Requirement for the Fiscal Year ending December 31, 2021, and the Coverage Requirement for any Fiscal Year thereafter.

(k)    All references in Sections 3.1 and 5.2 of the Original Loan Agreement to "Holders of a majority in principal amount of the Bonds then Outstanding" or any similar references therein shall hereinafter mean Holders of a majority in aggregate principal amount of the Series 2019 Bonds and any Additional Senior Bonds then Outstanding, and only if such Series 2019 Bonds or Additional Senior Bonds are no longer Outstanding, Holders of a majority in aggregate principal amount of the Series 2020 Bonds and any Additional Subordinate Bonds then Outstanding.

(l)    The form of Note attached as <u>Exhibit B</u> to the Original Loan Agreement is hereby amended and restated and shall be replaced in its entirety with the form of Senior Note attached hereto as <u>Exhibit A-1</u>, which shall be issued in connection with any Additional Senior Bonds as set forth under Section 2.12 of the Indenture, and the form of Subordinate Note attached hereto as <u>Exhibit A-2</u>, which shall be issued in connection with any Additional Subordinate Bonds as set forth under Section 2.13 of the Indenture.  Any references in the Original Loan Agreement to such form of Note or <u>Exhibit B</u> to Loan Agreement shall mean, collectively and individually, the form of Senior Note attached hereto as Exhibit A-1 and the form of Subordinate Note attached hereto as <u>Exhibit A-2</u>, as applicable.  The Series 2020 Note shall be issued in the form of Subordinate Note attached hereto as <u>Exhibit A-2</u>.

## ARTICLE 2
## SERIES 2020 LOAN AND SERIES 2020 NOTE

Section 2.1.    **Series 2020 Loan and Series 2020 Note.**

(a)    The Issuer hereby agrees to lend to the Borrower, and the Borrower hereby agrees to borrow from the Issuer, the proceeds of the sale of the Series 2020 Bonds for the purposes first stated above.  The deposit of the proceeds of the sale of the Series 2020 Bonds as provided in Section 3.02 of the First Supplemental Indenture shall constitute the loan of such proceeds from the Issuer to the Borrower.  Such proceeds shall be applied as provided in Section 3.02 of the First Supplemental Indenture.  The Borrower hereby agrees to repay such loan as provided in the Original Loan Agreement, as amended by this First Amendment to Loan Agreement.

(b)    The Borrower's obligation to repay the loan hereunder with respect to the Series 2020 Bonds, together with premium, if any, and interest thereon, which is more fully described in Section 4.1 of the Loan Agreement shall be evidenced by the Series 2020 Note, which the Issuer will endorse to the order of the Trustee.

Section 2.2.    **Agreement to Issue the Series 2020 Bonds; Application of Proceeds.**

In order to provide funds for the purposes stated above, the Issuer agrees that it will issue under the Indenture, sell and cause to be delivered to the purchaser or purchasers thereof, the

Series 2020 Bonds.  The Issuer shall thereupon apply the proceeds of the sale of the Series 2020 Bonds in accordance with the provisions of Section 3.02 of the First Supplemental Indenture.

**Section 2.3.    First Amendment to Leasehold Mortgage, First Amendment to Guaranty, First Amendment to Pledge and Security Agreement and Certificate of Borrower.**

The Borrower shall execute and deliver, where applicable, and shall cause the Guarantor to execute and deliver, prior to disbursement to the Borrower of any portion of the Series 2020 Bond proceeds, (i) the First Amendment to Leasehold Mortgage, substantially in the form attached hereto as Exhibit B, (ii) the First Amendment to Guaranty, substantially in the form attached hereto as Exhibit C, (iii) the First Amendment to Pledge and Security Agreement, substantially in the form attached hereto as Exhibit D, and (iv) a certificate of the Borrower certifying that the budget attached thereto is the Borrower's current operating expense budget, including reasonable detail of its expected Operating and Working Capital Costs for the succeeding 12 months.

## ARTICLE 3
## MISCELLANEOUS

**Section 3.1.    Successors and Assigns**.  This First Amendment to Loan Agreement shall be binding upon, inure to the benefit of and be enforceable by the parties and their respective successors and assigns.  No assignment by the Borrower shall relieve the Borrower of its obligations hereunder.

**Section 3.2.    Severability**.  If any provision of this First Amendment to Loan Agreement shall be held invalid by any court of competent jurisdiction, such holding shall not invalidate any other provision hereof.

**Section 3.3.    Applicable Law**.  This First Amendment to Loan Agreement shall be construed in accordance with and governed by the Constitution and the laws of the Commonwealth applicable to contracts made and performed in the Commonwealth.

**Section 3.4.    Counterparts**.  This First Amendment to Loan Agreement may be simultaneously executed in several counterparts, each of which shall be an original and all of which shall constitute but one and the same instrument; provided, however, that for purposes of perfecting a security interest in this Loan Agreement by the Trustee under Uniform Commercial Code of the Commonwealth, only the counterpart delivered, pledged, and assigned to the Trustee shall be deemed the original.

[Remainder of this page intentionally left blank]

IN WITNESS WHEREOF, the Pennsylvania Economic Development Financing Authority has caused this First Amendment to Loan Agreement to be executed in its name and attested by its duly authorized representatives, and the Borrower has caused this First Amendment to Loan Agreement to be executed in its name all as of the date first above written.

PENNSYLVANIA ECONOMIC
DEVELOPMENT FINANCING AUTHORITY

By_____
     Executive Director

ATTEST:

By: _____
     (Assistant) Secretary

[Signature Page to First Amendment to Loan Agreement]

CARBONLITE P, LLC,
a Delaware Limited Liability Company

By _____
Leon Farahnik
Chief Executive Officer

The Trustee hereby consents to the foregoing First Amendment to Loan Agreement as of the date first written above.

UMB BANK, N.A., as Trustee

By: _____
        Authorized Officer

**EXHIBIT A-1**

**FORM OF SENIOR NOTE**

$[_____]                                                                    [_____, 20__]

FOR VALUE RECEIVED, CARBONLITE P, LLC, a limited liability company organized and existing under the laws of the State of Delaware (the "Borrower"), does hereby promise to pay to the order of the PENNSYLVANIA ECONOMIC DEVELOPMENT FINANCING AUTHORITY (the "Issuer") at the corporate trust office of UMB BANK, N.A. (the "Trustee"), located in Minneapolis, Minnesota, or any successor trustee acting as such under that certain Indenture, dated as of June 1, 2019, between the Issuer and the Trustee, as amended and supplemented from time to time (the "Indenture"), in lawful money of the United States of America, the principal sum of _____ DOLLARS ($[_____]), and to pay interest on the unpaid principal amount hereof, in like money, at such office on the dates, in the amounts and at the rates determined in accordance with Sections 4.1 and 4.2 of the Loan Agreement hereinafter referenced.

ALL SUMS paid hereon shall be applied first to the satisfaction of accrued interest and the balance to the unpaid principal.

THE PRINCIPAL AMOUNT of this Note is due and payable on the dates and in the amounts determined in accordance with Sections 4.1 and 4.2 of the Loan Agreement.

THIS NOTE constitutes a Senior Note referred to in that certain Loan Agreement, dated as of June 1, 2019, between the Borrower and the Issuer, as amended and supplemented from time to time (the "Loan Agreement"), and is subject to, and is executed in accordance with, all of the terms, conditions and provisions thereof, including those respecting prepayment and is further subject to all of the terms, conditions and provisions of the Indenture, all as provided in the Loan Agreement.

THIS NOTE is a contract made under and shall be construed in accordance with and governed by the laws of the United States of America and the Commonwealth.

CARBONLITE P, LLC

By: _____
Name:  Leon Farahnik
Title:    Chief Executive Officer

FORM OF ENDORSEMENT

(To be set forth on back of Note)

Pay to the order of UMB Bank, N.A., Trustee, without recourse or warranty, except warranty of good title, warranty that the Issuer has not assigned this Note to a Person other than the Trustee and warranty that the original principal amount hereof remains unpaid.

PENNSYLVANIA ECONOMIC
DEVELOPMENT FINANCING AUTHORITY


By _____
            Executive Director

**EXHIBIT A-2**

**FORM OF SUBORDINATE NOTE**

$[_____]                                                                                   [_____, 20__]

FOR VALUE RECEIVED, CARBONLITE P, LLC, a limited liability company organized and existing under the laws of the State of Delaware (the "Borrower"), does hereby promise to pay to the order of the PENNSYLVANIA ECONOMIC DEVELOPMENT FINANCING AUTHORITY (the "Issuer") at the corporate trust office of UMB BANK, N.A. (the "Trustee"), located in Minneapolis, Minnesota, or any successor trustee acting as such under that certain Indenture, dated as of June 1, 2019, between the Issuer and the Trustee, as amended and supplemented from time to time (the "Indenture"), in lawful money of the United States of America, the principal sum of _____ DOLLARS ($[_____]), and to pay interest on the unpaid principal amount hereof, in like money, at such office on the dates, in the amounts and at the rates determined in accordance with Sections 4.1 and 4.2 of the Loan Agreement hereinafter referenced.

ALL SUMS paid hereon shall be applied first to the satisfaction of accrued interest and the balance to the unpaid principal.

THE PRINCIPAL AMOUNT of this Note is due and payable on the dates and in the amounts determined in accordance with Sections 4.1 and 4.2 of the Loan Agreement.

THIS NOTE constitutes a Subordinate Note referred to in that certain Loan Agreement, dated as of June 1, 2019, between the Borrower and the Issuer, as amended and supplemented from time to time (the "Loan Agreement"), and is subject to, and is executed in accordance with, all of the terms, conditions and provisions thereof, including those respecting prepayment and is further subject to all of the terms, conditions and provisions of the Indenture, all as provided in the Loan Agreement.

The indebtedness evidenced by this Note is and shall be subordinate in right of payment and security to any Senior Note (as defined in the Indenture) all as set forth in the Indenture and Loan Agreement, and the rights and remedies of the holder of this Note shall be subject to the restrictions and limitations set forth in the Indenture and Loan Agreement.

THIS NOTE is a contract made under and shall be construed in accordance with and governed by the laws of the United States of America and the Commonwealth.

CARBONLITE P, LLC


By: _____
Name:  Leon Farahnik
Title:   Chief Executive Officer

FORM OF ENDORSEMENT

(To be set forth on back of Note)

Pay to the order of UMB Bank, N.A., Trustee, without recourse or warranty, except warranty of good title, warranty that the Issuer has not assigned this Note to a Person other than the Trustee and warranty that the original principal amount hereof remains unpaid.

PENNSYLVANIA ECONOMIC
DEVELOPMENT FINANCING AUTHORITY


By _____
            Executive Director

**EXHIBIT B**

**FORM OF FIRST AMENDMENT TO LEASEHOLD MORTGAGE**

**EXHIBIT C**

**FORM OF FIRST AMENDMENT TO GUARANTY**

**EXHIBIT D**

**FORM OF FIRST AMENDMENT TO PLEDGE AND SECURITY AGREEMENT**

# APPENDIX A

# CERTAIN INFORMATION REGARDING CARBONLITE

*All statements, other than statements of historical facts, included in the presentation regarding our strategy, future growth, operations, financial position, operating results, and performance, as well as business prospects, opportunities, and plans, are forward-looking statements. Wherever possible, words such as ''anticipate,'' ''believe,'' ''expect,'' ''intend,'' ''estimate,'' ''will,'' and similar expressions have been used to identify these forward-looking statements, although not all forward-looking statements contain these identifying words. These statements reflect our current beliefs and are based on information currently available to us.*

*Forward-looking statements involve significant risks, uncertainties, and assumptions. A number of factors could cause actual results, performance, or achievements to differ materially from the results discussed or implied in the forward-looking statements, including, but not limited to, the information set out in the tables included in this appendix. Although the forward-looking statements contained in the presentation are based upon what we believe to be reasonable assumptions, we cannot assure you that actual results will be consistent with these forward-looking statements. These forward-looking statements are made as of the date of this presentation, and we do not assume any obligation to update or revise them to reflect new events or circumstances.*

## Introduction

CarbonLite P, LLC ("CarbonLite P"), a subsidiary of CarbonLite Holdings LLC ("CarbonLite Holdings" or collectively "CarbonLITE"), completed a $61.8 million financing in July 2019 (the "2019 Bonds"). The 2019 Bonds financed the construction and equipping of a new pcrPET/PET plastic beverage container recycling processing facility located at Berks Park 61, 4030 Pottsville Pike, in the City of Reading, County of Berks, Pennsylvania (the "Pennsylvania Facility" and/or the "2019 Project").

Proceeds of the 2020 Bonds and a new equity contribution will finance additional equipment and associated tenant improvements that management determined will increase the overall efficiency of the Pennsylvania Facility (see Sources and Uses of Funds herein). At present, all equipment is installed and the plant has begun initial pellet production from flake.

## The Borrower – CarbonLite P

CarbonLite P, the Borrower, is 100% owned by CarbonLite P Holdings LLC ("CarbonLite P Holdings" or "Guarantor"), which, in turn, is 100% indirectly owned by CarbonLite Holdings LLC. CarbonLite Holdings LLC ("**CarbonLite Holdings**"), founded as a holding company in October 2013, is a Delaware limited liability company that presently owns, directly or through wholly owned subsidiaries, in addition to a polyethylene terephthalate ("**PET**") packaging business (Pinnpack, Oxnard, California), three related entities that recycle post-consumer recycled polyethylene terephthalate ("**pcrPET" or "rPET"**) bottles: (1) CarbonLite Industries LLC, a Delaware limited liability company ("**CarbonLite Industries**"), (2) CarbonLite Recycling LLC, a Delaware limited liability company ("**CarbonLite Recycling**"), and (3) CarbonLite P, a Delaware limited liability company. CarbonLite Industries was formed in March 2010 for the purpose of developing and operating the Riverside Facility (as defined herein), and CarbonLite Recycling was formed in October 2013 for the purpose of developing and operating the Dallas Facility (as defined herein). CarbonLite P was formed in 2018 for the purpose of developing and operating the Pennsylvania Facility (as defined herein). CarbonLite Holdings and its subsidiaries are sometimes collectively referred to herein as "CarbonLITE".

1

## CarbonLite Holdings LLC Organizational Chart



CarbonLITE is one of the largest producers of food grade pcrPET resin pellets in the United States. CarbonLITE has a mission to provide "cradle to cradle" recycling of PET beverage containers and works to achieve this mission by converting pcrPET bottles recovered from the waste stream into food grade pcrPET resin pellets that are subsequently used to manufacture new beverage containers. Additional information on CarbonLITE may be found on its website at www.carbonliterecycling.com.

CarbonLITE presently operates two pcrPET plastic beverage container processing facilities and its third facility is presently beginning operations. Its first facility is located in Riverside, California (the "**Riverside Facility**"). The Riverside Facility, which commenced operations in November 2011, encompasses approximately 220,000 square feet and has the capacity to process approximately 8.3 million pounds of pcrPET Bales per month, approximately 100 million pounds per year, and approximately 7.9 million pounds of pcrPET Flakes per month, approximately 95 million pounds per year (approximately 1.9 billion used bottles) per year. In the original plan, the Riverside Facility was constructed to process 75 million pounds of pcrPET Flake (from 100 million pounds of pcrPET Bales), but in 2019 capacity was increased to the current figure.

CarbonLITE's second facility is located in Dallas, Texas (the "**Dallas Facility"**). It encompasses approximately 230,000 square feet and also has the capacity to process up to 8.3 million pounds of pcrPET per month, or approximately 100 million pounds (approximately 1.9 billion used bottles) per year. The plant also has the capacity to process up to up to 7.0 million pounds of pcrPET Flake per month, or approximately 84 million pounds per year. The Dallas Facility became operational at the end of 2017. For more information regarding the Dallas Facility, see "THE DALLAS FACILITY" herein. In the original plan, Dallas was constructed to process 75 million pounds of pcrPET Flake (from 113 million pounds of pcrPET Bales), but in 2018 its capacity was increased to the current figure based on limitations on ability to process the previously projected 113 million pounds of pcrPET Bales.

In July 2019, CarbonLite P completed a financing to fund CarbonLITE's third facility located in Reading, Pennsylvania (the "**Pennsylvania Facility"**). It encompasses approximately 270,000 square feet and has the capacity to process up to 11.67 million pounds of post-consumer waste PET plastic bales and flake per month, or approximately 140 million pounds (approximately 2.27 billion used bottles) per year. The

Pennsylvania Facility is expected to produce approximately 6.6 million pounds of food-grade rPET pellets per month, approximately 80 million pounds per year, for sale pursuant to contracts with various beverage manufacturers. The Pennsylvania Facility began processing PET flake in May 2020 into food grade PET resin pellets and all of its equipment is expected to be fully operational by September 2020. For more information regarding the Pennsylvania Facility, see "THE PENNSYLVANIA FACILITY" herein.

## Management Team

*Leon Farahnik, Chairman and Chief Executive Officer*.  Mr. Farahnik has more than 40 years of experience in the plastics industry and has founded, grown and sold many successful enterprises in the field of plastics.  In 1979, Mr. Farahnik founded Hilex Poly Co., Inc. ("**Hilex Poly Co**."), a company that produced high molecular weight-high density plastic grocery bags, which was sold to Sonoco Products Co. in 1989.  In 1991, Mr. Farahnik founded Rhino-X Industries, Inc. ("**Rhino-X Industries**"), a manufacturer of HMW-HD plastic trash bags, which was later sold to its competitor, Carlisle Plastics, Inc., in 1992.  In 1993, Mr. Farahnik led a team that executed a "buy, build, and consolidate" strategy for RXI Holdings, Inc. ("**RXI**"), a plastic containers and closures business formed through the acquisition and integration of four companies with seven plants, which was later sold to Silgan Plastics in 2000.  In 2001, Mr. Farahnik founded HPC Industries, LLC, a company that makes investments in, and provides management services to, companies in the plastics industry, including the plastic recycling industry.  Mr. Farahnik also served as Chairman and Chief Executive Officer of PWP Industries ("**PWP Industries**"), a plastics thermoforming and post-consumer recycling company, from 2001 until its sale to Pactiv Corporation in 2010.  Mr. Farahnik was nominated as one of four finalists for "Entrepreneur of the Year" by Inc. Magazine in 1991, and one of 10 finalists for "Entrepreneur of the Year" by Ernst & Young in 2010.  Mr. Farahnik is also a member of CarbonLite Holdings' Board.

*Ira Maroofian, President*.  Mr. Maroofian has more than 16 years of experience in the packaging and container industry and has a track record of improving operational efficiency and optimizing profitability for companies.  Prior to joining CarbonLite Industries in 2015, Mr. Maroofian served as the Chief Executive Officer of Ecologic Brands, a sustainable packaging solutions manufacturer, where he was responsible for scaling operations and accelerating the company's growth.  Mr. Maroofian has also served as Managing Director of the USA operations of SEDA International Packaging Group, and President and Chief Operating Officer of PWP Industries.  Mr. Maroofian holds an MBA from the University of California, Los Angeles, and a Master of Engineering degree from Cornell University.  Mr. Maroofian is also a member of CarbonLite Holdings' Board.

*Gregg Milhaupt, Chief Financial Officer*.  Mr. Milhaupt has been the Chief Financial Officer of each company since 2013 and is responsible for overseeing all accounting functions and financing efforts for all CarbonLITE companies. Previously, Mr. Milhaupt has served as a controller for various manufacturing companies serving the rubber and aluminum industries. Namely, Mr. Milhaupt spent time working with ABInbev's Metal Container Corporation, an aluminum beverage can manufacturing company. Mr. Milhaupt comes from an educational background where he has obtained his MBA to go along bachelor's degrees in accounting and finance from California State University.

*Vijendra "VJ" Siddhi, Vice President of Engineering*.  Mr. Siddhi joined CarbonLite Industries in 2010 as a plant engineer and currently leads CarbonLite Industries' engineering team as Vice President of Engineering.  He was the primary contact for all original equipment manufacturers for the Riverside Facility and managed the installation, commissioning and initial operations of the Riverside Facility.  Mr. Siddhi provided oversight for the construction of the Dallas Facility.  Mr. Siddhi earned his bachelor's degree in Mechanical Engineering from a university in India and has a master's degree in Mechanical and Aerospace Engineering from the University of Missouri.  Prior to joining CarbonLITE, Mr. Siddhi developed and

3

designed a PET wash system using an organic solvent for New Earth Systems and oversaw the fabrication and installation of the wash line in Canoga Park, California.

## Board of Directors of CarbonLite Holdings

***Kim Jeffery, Former Chairman and Chief Executive Officer of Nestlé Waters North America.***  Mr. Jeffery is the retired Chairman and Chief Executive Officer of Nestlé Waters North America Inc. ("**Nestlé**"), a subsidiary of Nestlé, S.A., and the leading bottled water company in North America and the third largest non-alcoholic beverage company in the United States.  Mr. Jeffery has over 44 years of experience in various facets of the consumer products industry, including sales, marketing, mergers and acquisitions, manufacturing, logistics, sustainability and finance.

***William Pearson, Former Chief Financial Officer of Nestlé Waters North America.***  Mr. Pearson is the retired Chief Financial Officer of Nestlé Waters North America Inc. ("**Nestlé**"), a subsidiary of Nestlé, S.A., and the leading bottled water company in North America and the third largest non-alcoholic beverage company in the United States.  Mr. Pearson has over 40 years of experience in various facets of the consumer products industry, including sales, marketing, mergers and acquisitions, manufacturing, logistics, sustainability and finance.

***Benjamin Shapiro, Manager of Mason Avenue Investments LLC.***  Mr. Shapiro is a Manager of Mason Avenue Investments LLC, a private investment firm.  From 1998-2007, Mr. Shapiro served as Vice President, Strategic Planning, of Prairie Packaging, Inc. ("**Prairie Packaging**"), a manufacturer of disposable plastic dinnerware that was subsequently sold to Pactiv Corporation.  Prior to joining Prairie Packaging, Mr. Shapiro spent six years as an investment banker with Prudential Securities, Inc., Oppenheimer & Co. and Brown Brothers Harriman, Inc.  He has an M.B.A. from the University of Chicago Booth School of Business and an A.B. in Economics from Princeton University.  Mr. Shapiro serves on the board of the Academy for Urban School Leadership, as well as the corporate boards of CarbonLite Holdings and Alpha Media LLC.

***Matthew Shapiro, Manager of Mason Avenue Investments LLC.***  Mr. Shapiro is a Manager of Mason Avenue Investments LLC, a private investment firm.  From 1995-2007, Mr. Shapiro served as Vice President, Marketing, of Prairie Packaging.  He has an M.B.A. from the Kellogg School of Management at Northwestern University and a B.A. in International Relations from Brown University.  Mr. Shapiro also serves on the board of the University of Chicago Laboratory School and the Steppenwolf Theater Company.

***Thomas Schneider, Former Superior Court Judge.***  Mr. Schneider was a partner at Mazirow, Schneider, Forer & Lawrence for 18 years where he specialized in real property transactional law and business litigation.  In 1980, he was appointed to the California Superior Court and served as Supervising Judge of the North West District.  In 1984, he served as an Associate Justice pro tempore at the California Court of Appeal, Second Appellate District.  After Judge Schneider retired from the bench, he practiced as a mediator and arbitrator for 13 years, predominately in controversies involving construction, business and real property disputes.  Mr. Schneider serves on the boards of several business enterprises and charitable entities.

***Kamran Neman, President and Chief Executive Officer of Midthrust Imports, Inc.***  In 1983, Mr. Neman established Midthrust Imports, Inc. ("**Midthrust Imports**"), a textile company that specializes in the import and production of a wide variety of fabrics.  Prior to establishing Midthrust Imports, Mr. Neman served as a faculty member in the economics department at the University of Rochester and later as an assistant professor of economics.  Mr. Neman has a B.Sc. and a M.Sc. in Economics from the Queen Mary College University of London.

4

***Faramarz Yousefzadeh.*** Mr. Yousefzadeh is the Chairman of Windmill Capital, a family investment office with holdings in real estate, telecommunication, life-sciences and hospitality. He was the co-founder of Auspex Pharmaceuticals, a San Diego based drug discovery company that went public in 2013 and was acquired by Teva Pharmaceutical in 2015 with a valuation of over $3 billion. While at Auspex, Mr. Yousefzadeh served in various positions including President and Chairman of the Board.  In 2003 he co-founded STM Networks, a holding company that acquired the assets of the publicly traded STM, Inc., a global leader in providing small-dish satellite communication.  As a private company, STM Networks grew and expanded its business to provide satellite communication and related services to every continent except Australia, with local physical presence in the U.S., South America, Europe, Middle East, Asia and Africa. Some of STM's projects included connecting schools, banks and governmental offices in rural locations in Nepal, Brazil, Bolivia and Ecuador and delivering fiber communication to the African country of Chad. Sloan Capital Partners, founded by Mr. Yousefzadeh in 1997, invests in and develops real estate in western United States. From entitlement to construction, Sloan has developed over 2 million square feet of multifamily, commercial and retail estate.  Its current project, The Overture, is slated to be one of the tallest residential towers in downtown San Diego.  Mr. Yousefzadeh is active in various charitable organizations and funds various philanthropic efforts through the Yousefzadeh Family Foundation.

(Remainder of Page Intentionally Left Blank)

## The Riverside Facility

CarbonLite Industries' first pcrPET plastic beverage container processing facility is located in an approximately 220,000 square foot facility in Riverside, California. The Riverside Facility commenced operations in November 2011 and began actual production on a significant scale in March 2012. The Riverside Facility has the capacity to process approximately 8.3 million pounds of pcrPET Bales per month, or approximately 100 million pounds per year and approximately 17.9 million pounds of pcrPET Flakes per year (see Table 1 below). Over the last three years the Riverside Facility processed an average of 7.51 million pounds of pcrPET per month and sold, on average, approximately 5.54 million pounds of food grade pcrPET resin pellets each month.

CarbonLITE invested over $69 million in the development of the Riverside Facility. Neither CarbonLite Holdings nor CarbonLite Industries will have any financial responsibility for the payment of either the 2019 or the 2020 Bonds (as defined herein).

## Riverside Financial Summary

Table 1 shows historical net income and EBITDA for CarbonLite Industries and production at the Riverside Facility beginning in 2017. CarbonLite Industries has no financial obligation to provide any funds to the Borrower, nor is it a guarantor of the Borrower's indebtedness under the Loan Agreement, by and between the Pennsylvania Economic Development Financing Authority, the Issuer of the 2020 Bonds, and the Borrower. The Riverside Facility generates historical yields of approximately 75% due to its purchase of external flake and higher quality bales than what is offered in Dallas and Pennsylvania. This is expected to grow to 90% yield as the scale of external flake increases. Riverside had three major factors working against their margins in 2019, but is projected to turn them around in 2020, 2021 and thereafter: (1) Continued annual increases to the minimum wage in California caused increasing labor costs in spite of relatively flat production; (2) Outsourcing of lower quality pcrPET Bales to China ceased causing yield reduction in the Riverside Facility; and (3) Markets for vPET Resin have fallen due to the decreasing cost of oil in 2019 and 2020 which is projected to come back to normal levels in 2021 or 2022; this impacted the margin on sales of non-bottle-to-bottle grade material significantly.

### Table 1. Historical Production, Net Income and EBITDA[1]

#### Riverside Facility
#### Fiscal Year Ending December 31

|  | 2017 | 2018 | 2019 [1] | Q1 2020 [1] | Projected 2020 | Projected 2021 |
|---|---|---|---|---|---|---|
| Total Net Revenue | $ 45,522,972 | $ 44,268,230 | $ 40,025,268 | $ 11,701,433 | $ 49,375,063 | $ 59,521,444 |
| Total Operating Expenses | 47,089,741 | 44,231,522 | 44,917,866 | 12,280,065 | 50,953,964 | 58,181,630 |
| Net Operating Income | (1,536,769) | 36,707 | (4,892,598) | (578,632) | (1,578,901) | 1,339,815 |
| Add: Depreciation & Amortization | 9,854,941 | 7,719,547 | 6,499,448 | 1,622,874 | 6,491,496 | 6,807,231 |
| EBITDA [2] [3] | $ 8,318,172 | $ 7,756,254 | $ 1,606,850 | $ 1,044,242 | $ 4,912,595 | $ 8,147,046 |
| **Operating Metrics:** |  |  |  |  |  |  |
| pcrPET Received (lbs.) | 89,939,876 | 88,536,628 | 85,447,518 | 24,806,495 | 94,966,956 | 100,030,105 |
| pcrPET Flakes Rec'd (lbs.) |  | 2,148,514 | 5,344,689 | 4,817,037 | 13,137,303 | 17,935,453 |
| PET Pellets Produced (lbs.) | 62,579,847 | 62,733,062 | 64,010,334 | 19,312,897 | 78,990,114 | 90,200,000 |
| PET Pellets Sold (lbs.) | 68,663,057 | 67,383,103 | 63,050,670 | 18,560,939 | 77,893,826 | 89,612,000 |

[1] Actual, unaudited results. In 2019 margins were compressed due to lesser flake production causing purchase of higher cost external flake as well as a market condition of vPET that caused significant price reductions from a single customer.

[2] EBITDA is defined as net operating income plus depreciation and amortization.

[3] EBITDA was adversely affected by increased sales to Sonoco at lower margins to decrease inventory position.

*Source*: CarbonLite.

*Note: There can be no assurance that the operating results of the Project once completed will be similar to the results above. The operating results of the Project could be materially worse than the results above*

## The Dallas Facility – CarbonLite Recycling

In October 2016, CarbonLite Recycling LLC financed the renovation, installation, improvement and equipping of a new pcrPET plastic beverage container processing facility in Dallas, Texas (the "Dallas Facility"). The Dallas Facility, which commenced operations in late 2017, encompasses approximately 230,000 square feet and can process up to 8.3 million pounds of pcrPET per month, or approximately 100 million pounds (approximately 1.9 billion used bottles) per year. Since opening the facility in 2017, CarbonLITE has invested approximately $17 million in additional equipment to enhance its operational efficiency. This includes equipment which will help with front-end flake creation such as improved optical sorting and metal detection as well as increasing the pellet output capacity by approximately 18-20% with the installation of the Starlinger extrusion line.

## Dallas Financial Summary

Table 2. shows historical net income and EBITDA for CarbonLite Recycling and production at the Dallas Facility beginning in late 2017 through the year ended December 31, 2019.  In total, CarbonLITE has invested approximately $79.3 million to support the development of the Dallas Facility, including the net proceeds from the issuance and sale of $50 million of tax-exempt bonds by the Mission Economic Development Corporation, the proceeds of which were loan to CarbonLite Recycling. To assist in the "ramp up" of the Dallas Facility, CarbonLITE made an additional investment of $13.2 million in the 2019 fiscal year. Neither CarbonLite Holdings nor CarbonLite Recycling will have any financial responsibility for the payment of the Bonds (as defined herein). Compared to the Riverside Facility, the Dallas Facility has historically experienced a lower 65% yield because of increased contamination in curbside bales. The lower bale yield will be offset by using external flake. The flake to pellet process has a higher yield than the bale to flake, or bale to pellet process. Therefore, the use of external flake increases the yield, but is offset by being a significantly more expensive input material.

**Table 2. Historical Production, Net Income and EBITDA [1]**
**Dallas Facility**
**Historical 2017 – Historical 2019 and Projected 2020 and 2021**
**Fiscal Year Ending December 31**

|  | 2017 | 2018 | 2019 [1] | Q1 2020 [1] | Projected 2020[4] | Projected 2021 |
|---|---|---|---|---|---|---|
| Total Net Revenue | $ 3,213,547 | $ 22,351,272 | $ 30,192,506 | $ 8,039,477 | $ 40,178,448 | $ 45,154,207 |
| Total Operating Expenses | 11,134,258 | 25,587,411 | 33,748,317 | 8,905,676 | 40,218,705 | 43,143,828 |
| Net Operating Income | (7,920,711) | (3,236,169) | (3,555,811) | (866,199) | (40,257) | 2,010,380 |
| Add: Depreciation & Amortization | 1,252,004 | 4,113,253 | 5,284,086 | 1,369,145 | 5,476,579 | 5,390,423 |
| EBITDA [2] | $ (6,688,707) | $ 877,084 | $ 1,728,275 | $ 502,946 | $ 5,436,323 | $ 7,400,803 |
|  |  |  |  |  |  |  |
| **Operating Metrics:** |  |  |  |  |  |  |
| pcrPET Received (lbs.) | 13,264,360 | 61,382,613 | 78,781,610 | 24,817,195 | 102,925,537 | 100,312,500 |
| pcrPET Flakes Rec'd (lbs.) | 2194802 | 6,887,970 | 16,949,761 | 3,490,185 | 9,063,022 | 10,800,000 |
| PET Pellets Produced (lbs.) [3] | 6,880,417 | 41,200,433 | 51,245,427 | 14,593,071 | 67,294,581 | 72,000,000 |
| PET Pellets Sold (lbs.) | 6,163,139 | 38,804,750 | 54,287,179 | 17,303,243 | 75,440,932 | 72,500,000 |

[1]    Actual, unaudited results.
[2]    EBITDA is defined as net operating income plus depreciation and amortization.
[3]    Difference between production and sales reflects inventory increase to meet current orders and build supply for next year.
[4]    Impact of PPP funds received in May 2020 included in 2020 results
*Source: CarbonLite.*
*Note: Operating results could be materially worse than the results above.*

## CarbonLite P, Pennsylvania

The CarbonLite P Pennsylvania Facility at 4030 Pottsville Pike in Reading, Pennsylvania (the "**Pennsylvania Facility**") is the "next generation" facility that features enhancements based upon experience gained from both the Riverside Facility and Dallas Facility with increased capacity. As of August 1, 2020, it employed a total of 30 people and plans to employ approximately 130 people in total when fully operational. It is anticipated to process up to 11.67 million pounds of pcrPET bales per month, or approximately 140 million pounds (approximately 2.25 billion used bottles) per year. The Pennsylvania Facility is expected to initially produce approximately 6.67 million pounds of food-grade pcrPET pellets per month, 80 million pounds per year plus 15 million pounds of flake for sale pursuant to contracts with various beverage manufacturers. However, due to demand for pellets, it is expected that all pcrPET bales will ultimately be processed into approximately 90-95 million pound of pellets. This compares to the original 2019 plan to process approximately 115 million pounds of pcrPET bales per year into just 80 million pounds of pellets, overall an approximately 20% increase in production. The enhancements made in the Pennsylvania Facility can be summarized as follows:

1. Front-end processing enhancements:
    a. Crosswrap dewiring unit to automatically cut and wrap the wires for disposal from the pcrPET Bales.
    b. Metal belt for the pcrPET bale feed conveyor to withstand the impact of curbside bales.
    c. Max-AI robots to increase efficiency in both throughput and yield as well as reducing labor costs.
2. Wash line enhancements:
    a. Large dry/wet delabeler with ballistic screen to remove labels as compared to Riverside's wet only and Dallas' dry only systems.
    b. 7 ton/hour ("T/hr") primary wash line for clear and 2T/hr secondary wash line for mix use for total wash capacity of 9 T/hr output compared to Riverside and Dallas' 5.5 T/Hr output.
    c. Dual stage polymer flake sorting for the primary line and single stage polymer flake sorting for the secondary line.
3. Extrusion/SSP enhancements:
    a. Three 1.8T/hr extrusion lines for flexibility as opposed to Riverside and Dallas' two 2.2T/hr extrusion lines in original plan.
    b. Post pellet SSP system for consistent quality as opposed to pre-pellet SSP which has more variables and has been a challenge to meet the strict customer quality requirements.
4. Other enhancements:
    a. CHP system power and steam generation provides cost effective and environmentally friendly power.
    b. 270,000 sqft building (40,000 more than Dallas) to provide additional warehouse storage space.

Given the ramp up difficulties faced at the Riverside Facility and Dallas Facility, the financial projections assume the Pennsylvania facility will not maximize its full production until mid-2022 with a scaled ramp up over the rest of 2020 and 2021.

## Pennsylvania Photographs

Below are a few pictures of the Pennsylvania Facility processing flake into pellets.

**Processing flake into pellets**




**pcr Pellets**




9

**pcr Pellets**



**Venting and piping completed for the boilers**



**Process Equipment Installation**



**Venting completed for the COGEN's**



**Equipment Installation at CarbonLite P**





**Equipment Installation at CarbonLite P**





## Pennsylvania Feedstock

CarbonLite P projects that it will ultimately process approximately 11.67 million pounds of pcrPET feedstock per month at full production, or approximately 140 million pounds of pcrPET bales and flake per year at the Pennsylvania Facility. CarbonLITE has a team dedicated to filling the feedstock supply to all of its facilities. This team sources Post Consumer PET from a national market.

To date, CarbonLite has had discussions with the following providers of PET scrap in Pennsylvania and the surrounding region to be suppliers for the Pennsylvania Facility. In total, they represent the ability to supply 19.995 million pounds of pcrPET per month (as shown in Table 3) compared to a monthly requirement of 11.67 million pounds. At present, Casella Waste Management, CellMark and GP Harmon Recycling provide feedstock to the Dallas Facility.

CarbonLite P's initial operations will use approximately 19.9 million pounds of flake. This flake is presently stored on site and will be used to make food-grade pellets until all existing equipment is in operation in August 2020.

**Table 3. Estimated Monthly Supply of pcrPET by Supplier**

| Feedstock Supplier | Estimated Monthly Pounds of pcrPET |
|---|---|
| Pennsylvania Waste | 2,150,000 |
| US Recycling | 645,000 |
| Casella Waste Management | 4,300,000 |
| CellMark | 8,600,000 |
| GP Harmon Recycling | 4,300,000 |
| **TOTAL** | **19,995,000** |

*Source: CarbonLite.*

CarbonLite P intends to purchase pcrPET from suppliers for the Pennsylvania Facility based upon the same formulas as its other two facilities – a monthly average bale index price, plus a 1 cent or 2 cent premium per pound. Because CarbonLite has been willing to pay this premium to the spot market price for feedstock, it has successfully sourced all of its required feedstock for its other facilities. CarbonLite P believes that it will not have difficulty in sourcing pcrPET for substantially all of its needs, although there can be no assurance that shortages in feedstock availability will not adversely affect CarbonLite P's projected performance.

(Remainder of Page Intentionally Left Blank)

## Pennsylvania Output Contracts

CarbonLite P currently has two contracts and two agreements in principle to purchase all of its food-grade pcrPET resin pellets produced at the Pennsylvania Facility, as summarized in Table 4 below.

**Table 4. Summary of Output Contracts for Pennsylvania Facility**

| Counterparty | pcrPET Lbs. (millions) per Month | Term |
|---|---|---|
| Nestlé | 3.00 | 5 Years from production commencement |
| Niagara Waters | 1.50 | Expires September, 2024 |
| Amcor | 2.50 | Expires  December, 2022 |
| Coca Cola | 1.30 | 3 Years January, 2021- December, 2023 |
| **Total** | **8.30** | - |

CarbonLite P's expected monthly output at commercial operation is approximately 6.67 million pounds. As with CarbonLITE's other two facilities, CarbonLite P has purchase contracts for most, if not all, of its anticipated output. At present, CarbonLite P has either contracts or commitments with four major bottling companies for total output of approximately 8.30 million pounds per month. Nestlé will continue to be a major buyer of CarbonLite P's food grade PET resin pellets from the Pennsylvania Facility. The resin pellets will be used for Nestlé's Deer Park brand 100% Natural Spring Water, which is bottled in Pennsylvania. CarbonLite P and Nestlé have entered into a five-year contract, commencing when the Pennsylvania Facility is fully operational, on a "fully sustainable basis" (the "**Operating Term**"), pursuant to which Nestlé is committed to purchase 3.0 million pounds of PET pellets per month (the "**Nestlé Contract**"). "**Fully sustainable basis**" means the ability to produce the minimum quantities required by Nestlé on a steady flow, month after month. CarbonLite P has an agreement with Niagara Waters which provides for Niagara Waters to purchase 1.5 million pounds per month from the Pennsylvania Facility (the "**Niagara Contract**") during the period from the commercial startup date of the Pennsylvania Facility through September 30, 2024. CarbonLite P has reached an agreement in principle with Amcor Rigid Plastics pursuant to which Amcor Rigid Plantsics will use commercially reasonable efforts to purchase 2.5 million pounds per month from the Pennsylvania Facility through December 31, 2022. CarbonLite P has an agreement with Coca-Cola which provides for Coca-Cola to purchase up to 1.3 million pounds per month from the Pennsylvania Facility through December 31, 2023.

With the above customers, CarbonLite P has more demand for pcrPET pellets than can be produced at the present time.

## CarbonLite P – Additional Funding Requirements

Subsequent to the closing of the 2019 Bonds and based upon (1) the increasing demand for food-grade PET resin pellets; and (2) the production experience at the Riverside Facility and Dallas Facility, CarbonLite P decided to invest in additional equipment in its Pennsylvania Facility that will increase both its efficiency and output. As shown in Table 5, the cost of the investment in additional equipment and associated tenant improvements is approximitely $15.597 million. The additional equipment will enable CarbonLite P to increase its processing capacity by approximately 20% from an expected 115 million pounds of pcrPET per year in 2019 to over 140 million pounds per year, based upon funding the 2020 improvements. This will in turn maximize its capacity to produce over 90 million pounds of pellets and 15 million pounds of flake by manufacturing 100% from internal flake (after the initial ramp up phase: see Projections Table 9 herein).

Pellets manufactured from internal flake save approximately $0.10 to $0.15 per pound compared to that manufactured from external flake depending on the market.

Based upon experience with the Dallas facility, management decided to upgrade the Pelletron equipment to increase internal capacity of flake production. Additional Pelletron equipment was added to support the conveying and transporting needed for two wash lines as opposed to the one wash line that is present in Dallas. The two wash lines combine to a flake production that will surpass the needs of the extrusion department and remove the shortfall/bottleneck experienced in material flow in the Riverside Facility and the Dallas Facility.

Tomra Flake Sorters were added allowing for a better sort of flakes with a higher quality and greater efficiency and productivity. Because the additional equipment required more power, 69kv Sub Station was added to bring sufficient power to the facility for the operation. This power is provided by a new A1/CHP system. The addition of the new equipment and on site power caused an increase in tenant improvements to support the equipment.

The following Table 5 summarizes the original budget for CarbonLite P at the time of the 2019 Bond financing, shows the funds spent to date and remaining funds to be spent to complete the project. Since the date of issuance of the 2019 Bonds, there was also an increase in the CarbonLite P tenant improvement budget of $2 million to provide for support of the additional equipment deemed necessary to increase the efficiency of CarbonLite P operations.

**Table 5. Pennsylvania Equipment Cost**

| | Original Budget | Change Orders | Production Increase | Spent to Date | Remaining to Completion |
|---|---|---|---|---|---|
| BHS Equipment | $ 15,300,000 | | | $ 13,718,400 | $ 1,581,600 |
| Starlinger Equipment | $ 13,149,973 | | | $ 12,420,537 | $ 708,576 |
| Sorema Equipment | $ 18,288,000 | | | $ 16,459,200 | $ 1,572,661 |
| Unisensor Equipment | $ 1,153,802 | | | $ 650,364 | $ 503,438 |
| Pelletron | $ 1,846,198 | | $ 3,400,000 | $ 4,350,000 | $ 850,000 |
| CHP | | | $ 5,300,000 | $ 4,562,460 | $ 737,540 |
| Tomra Flake Sorter | | | $ 1,600,000 | $ 1,006,400 | $ 593,600 |
| 69kv Sub Station | | | $ 3,000,000 | $ 700,000 | $ 2,300,000 |
| Leasehold Improvements | $ 7,841,632 | $ 2,000,000 | | $ 8,634,180 | $ 1,750,000 |
| **TOTAL** | **$ 57,579,605** | **$ 2,000,000** | **$ 13,300,000** | **$ 62,501,541** | **$ 10,597,414** |

## 2020 Bond Financing Plan

*Issuance of Bonds*

The Pennsylvania Economic Development Financing Authority will issue $10,000,000 of fixed rate tax-exempt solid waste disposal subordinated revenue bonds (the "**2020 Bonds**") and loan the proceeds thereof to CarbonLite P. The Bonds, together with $10,000,000 of new equity, will finance the additional costs of CarbonLite P.  The information in the following tables are subject to a number of estimates, assumptions and other uncertainties and the actual dollar amounts may differ significantly from the estimated dollar amounts shown below, particularly if the assumed interest rate on the bonds exceeds current estimates.

Table 6 below shows the initial capital investment made by CarbonLite P at the time of the initial 2019 Bond sale and the proposed capitalization assuming the closure of the 2020 Bonds.

### Table 6. CarbonLite P Capitalization

| | 2019 Initial Capitalization | 2020 Additional Capitalization | Total Capitalization |
|---|---|---|---|
| Borrower Contribution | $        15,000,000 | $        10,000,000 | $        25,000,000 |
| Landlord Contribution | $         2,160,000 | $                     - | $         2,160,000 |
| Series 2019 Bonds | $        61,800,000 | $                     - | $        61,800,000 |
| Series 2020 Bonds | $                     - | $        10,000,000 | $        10,000,000 |
| **Total** | **$        78,960,000** | **$        20,000,000** | **$        98,960,000** |

(Remainder of Page Intentionally Left Blank)

Table 7 below shows the estimated sources and uses of funds for the Project.

## Table 7. Estimated Sources and Uses of Funds

| | 2019 Bonds | Spent to Date | Proposed 2020 Bonds | 2020 Borrower's Funds | Series 2020 Total | Combined Series 2019 & 2020 |
|---|---|---|---|---|---|---|
| **Sources of Funds** | | | | | | |
| Bond Amount | $ 61,800,000.00 | $ 61,800,000.00 | $ 10,000,000.00 | $ - | $ 10,000,000.00 | $ 71,800,000.00 |
| Landlord Contribution | 2,160,000.00 | 2,160,000.00 | - | - | | 2,160,000.00 |
| Borrower's Funds | 15,000,000.00 | 15,000,000.00 | - | 10,000,000.00 | 10,000,000.00 | 25,000,000.00 |
| **Total Sources of Funds** | **$ 78,960,000.00** | **$ 78,960,000.00** | **$ 10,000,000.00** | **$ 10,000,000.00** | **$ 20,000,000.00** | **$ 98,960,000.00** |
| | | | | | | |
| **Uses of Funds** | | | | | | |
| **CarbonLite P Equipment** | | | | | | |
| 2019 BHS Equipment | $ 15,300,000.00 | $ 13,718,400.00 | $ 1,581,600.00 | $ - | $ 1,581,600.00 | $ 15,300,000.00 |
| 2019 Starlinger Equipment | 13,149,973.00 | 12,420,537.00 | 708,575.56 | - | 708,575.56 | 13,129,112.56 |
| 2019 Sorema Equipment | 18,288,000.00 | 16,459,200.00 | 1,572,660.87 | - | 1,572,660.87 | 18,031,860.87 |
| 2019 Unisensor Equipment | 1,153,802.00 | 650,364.00 | 503,438.00 | - | 503,438.00 | 1,153,802.00 |
| Pelletron | 1,846,198.00 | 4,350,000.00 | 850,000.00 | - | 850,000.00 | 5,200,000.00 |
| 2020 A1 CHP | - | 4,562,460.00 | 737,540.00 | - | 737,540.00 | 5,300,000.00 |
| 2020 Tomra Flake Sorter | - | 1,006,400.00 | 593,600.00 | - | 593,600.00 | 1,600,000.00 |
| 2020 69kv Sub Station | - | 700,000.00 | 2,252,585.57 | 47,414.43 | 2,300,000.00 | 3,000,000.00 |
| **Total Equipment Costs** | **49,737,973.00** | **53,867,361.00** | **8,800,000.00** | **47,414.43** | **8,847,414.43** | **62,714,775.43** |
| Leasehold Improvements (1) | 7,841,632.00 | 8,634,180.00 | | 1,750,000.00 | 1,750,000.00 | 10,384,180.00 |
| **Project Subtotal** | **57,579,605.00** | **62,501,541.00** | **8,800,000.00** | **1,797,414.43** | **10,597,414.43** | **73,098,955.43** |
| Title Insurance | 145,021.38 | 112,944.07 | - | - | - | 112,944.07 |
| Contingency | 450,000.00 | - | - | - | - | 115,532.92 |
| Working Capital | 5,885,566.62 | 1,323,573.76 | - | 7,602,585.57 | 7,602,585.57 | 8,926,159.33 |
| Landlord Tenant Improvement Contribution | 2,160,000.00 | 2,160,000.00 | - | - | - | 2,160,000.00 |
| Capitalized Interest | 5,221,237.50 | 5,221,237.50 | - | - | - | 5,221,237.50 |
| Debt Service Reserve Fund (2) (3) | 6,056,618.75 | 6,056,618.75 | 1,000,000.00 | - | 1,000,000.00 | 7,056,618.75 |
| Underwriter's Discount | 772,500.00 | 772,500.00 | 200,000.00 | 100,000.00 | 300,000.00 | 1,072,500.00 |
| Estimated Costs of Issuance | 689,450.75 | 696,052.00 | - | 500,000.00 | 500,000.00 | 1,196,052.00 |
| **Total Uses of Funds** | **$ 78,960,000.00** | **$ 78,844,467.08** | **$ 10,000,000.00** | **$ 10,000,000.00** | **$ 20,000,000.00** | **$ 98,960,000.00** |
| Current Cash Held by Trustee and DACA Control Account | | 115,532.92 | | | | |
| | | **$ 78,960,000** | | | | |

18

## Table 8. Estimated Combined Debt Service Schedule

| Date | Series 2020 Principal | Series 2020 Interest | Series 2020 Debt Service | Series 2019 Total Debt Service (actual) | Total Series 2019 & 2020 Annual Debt Service |
|---|---|---|---|---|---|
| 12/1/2020 | $ - | $ 191,250 | $ 191,250 | $ - | $ 191,250 |
| 6/1/2021 | $ - | $ 425,000 | $ 425,000 | $ 1,363,323 | |
| 12/1/2021 | | $ 425,000 | $ 425,000 | $ 3,040,413 | 5,253,736 |
| 6/1/2022 | | $ 425,000 | $ 425,000 | $ 3,041,288 | |
| 12/1/2022 | | $ 425,000 | $ 425,000 | $ 3,011,244 | 6,902,531 |
| 6/1/2023 | | $ 425,000 | $ 425,000 | $ 3,041,069 | |
| 12/1/2023 | | $ 425,000 | $ 425,000 | $ 3,014,188 | 6,905,256 |
| 6/1/2024 | | $ 425,000 | $ 425,000 | $ 3,047,044 | |
| 12/1/2024 | | $ 425,000 | $ 425,000 | $ 3,008,063 | 6,905,106 |
| 6/1/2025 | | $ 425,000 | $ 425,000 | $ 3,044,081 | |
| 12/1/2025 | | $ 425,000 | $ 425,000 | $ 3,008,131 | 6,902,213 |
| 6/1/2026 | | $ 425,000 | $ 425,000 | $ 3,047,050 | |
| 12/1/2026 | | $ 425,000 | $ 425,000 | $ 3,008,869 | 6,905,919 |
| 6/1/2027 | | $ 425,000 | $ 425,000 | $ 3,051,431 | |
| 12/1/2027 | | $ 425,000 | $ 425,000 | $ 3,001,406 | 6,902,838 |
| 6/1/2028 | | $ 425,000 | $ 425,000 | $ 3,051,381 | |
| 12/1/2028 | | $ 425,000 | $ 425,000 | $ 3,003,481 | 6,904,863 |
| 6/1/2029 | | $ 425,000 | $ 425,000 | $ 3,055,438 | |
| 12/1/2029 | | $ 425,000 | $ 425,000 | $ 2,999,375 | 6,904,813 |
| 6/1/2030 | | $ 425,000 | $ 425,000 | $ 3,053,313 | |
| 12/1/2030 | | $ 425,000 | $ 425,000 | $ 2,999,088 | 6,902,400 |
| 6/1/2031 | | $ 425,000 | $ 425,000 | $ 3,059,719 | |
| 12/1/2031 | | $ 425,000 | $ 425,000 | $ 2,996,900 | 6,906,619 |
| 6/1/2032 | | $ 425,000 | $ 425,000 | $ 3,064,081 | |
| 12/1/2032 | | $ 425,000 | $ 425,000 | $ 2,992,525 | 6,906,606 |
| 6/1/2033 | | $ 425,000 | $ 425,000 | $ 3,061,113 | |
| 12/1/2033 | | $ 425,000 | $ 425,000 | $ 2,990,819 | 6,901,931 |
| 6/1/2034 | | $ 425,000 | $ 425,000 | $ 3,060,525 | |
| 12/1/2034 | | $ 425,000 | $ 425,000 | $ 2,991,206 | 6,901,731 |
| 6/1/2035 | | $ 425,000 | $ 425,000 | $ 3,066,744 | |
| 12/1/2035 | | $ 425,000 | $ 425,000 | $ 2,987,969 | 6,904,713 |
| 6/1/2036 (1) | | $ 425,000 | $ 425,000 | $ (2,425) | |
| 12/1/2036 (2) | $ 10,000,000 | $ 425,000 | $ 9,425,000 | | 9,847,575 |
| Total | $10,000,000.00 | $ 13,791,250 | $22,791,250.00 | $ 89,158,848 | $ 111,950,098 |

(1)  Includes Series 2019 Debt Service Reserve Fund payout.
(2)  Includes Series 2020 Debt Service Reserve Fund payout

## Projected Financial Statements

Table 9 shows projected revenues, expenses, net income, EBITDA and debt service coverage for CarbonLite P, and projected feedstock received and PET pellets sold by the Pennsylvania Facility, assuming completion of all improvements and installation of all equipment by the end of August 2020 (the "Projections"). ***The Projections are subject to a number of assumptions (see below), estimates and uncertainties, and there can be no assurance that these assumptions and estimates will prove to be accurate or that actual operating results of the Borrower or the two Pennsylvania Facilities will attain the levels shown in the Projections. It is possible that actual volumes of PET received and PET pellets sold and actual revenues, net income, EBITDA and Debt Service coverage will be lower, perhaps substantially, than the amounts reflected in the Projections. Any failure to attain the financial and operating performance reflected in the Projections could have a material, adverse effect on the ability of the Borrower to pay its loan repayments under the Loan Agreement, which in turn could have a material, adverse effect on the payments of debt service on the 2020 Bonds. See "Risk Factors – Reliance on Projections and Underlying Assumptions" in the forepart of this Limited Offering Memorandum.***

*Primary Assumptions*

1. 140 million pounds of baled PET inputs at steady-state capacity bought at 12 cents per pound, with overall production ramping up over a 24 month period. Current market rate is approximately 10 cents per pound.

2. 70.0% bale to flake yield for the 140 million pounds of baled PET purchased annually for approximately 100 million pounds of pcrPET Flakes at capacity

3. 95% flake to pellet yield for the 95 million pounds of pcrPET Flake extrusion capacity input annually (90 million pounds produced at capacity), consisting of 80.0 million pounds of clear pellets and 10.0 million pounds of green or colored pellets.

4. Balance of 15 million pounds of pcrPET Flakes to be sold in the market at approximately 44 cents per pound.

5. Of the clear pellets, the projections assume 60.0 million pounds sold at the Nestlé or Niagara contract price. The projections also assume the remaining 10.0 million pounds of clear pellets sold annually on the open market at a 5% discount to the Nestlé contract price.

6. The projections assume the 8.0 million pounds of green or colored pellets are sold annually on the open market at an average of $0.50 per pound, approximately a 20.0% discount to the average open market clear pellet price which is the average price prevailing in the current Pennsylvania market.

7. Ramp Up Assumptions:

   a. Production testing in June and July 2020

   b. August 2020 = 3MM pounds pcrPET Pellet produced from external pcrPET Flake; headcount increase to ~35

   c. September 2020 = 3.5MM pounds pcrPET Pellet produced from external pcrPET Flake; headcount increase to ~40

   d. Oct-Dec 2020 = 5.0MM pounds monthly pcrPET Pellet prodced from internally manufactured pcrPET Flake; headcount increase to ~80 by end of year

**Table 9. CarbonLite P Facility Projected Production, Net Income and EBITDA**
**(Series 2019 & 2020)**
**Fiscal Year Ending December 31**

| | Actual 1Q2020 | Projected 2Q2020 | Projected 3Q2020 | Projected 4Q2020 | Projected 2020 | Projected 2021 | Projected 2022 | Projected 2023 |
|---|---|---|---|---|---|---|---|---|
| pcrPET Bales Rec'd (lbs.)(1) | 0 | 0 | 506,703 | 23,357,210 | 23,863,913 | 114,110,975 | 140,000,000 | 140,000,000 |
| pcrPET Flakes Rec'd (lbs.)(2) | 0 | 364,692 | 6,135,308 | 0 | 6,500,000 | 0 | 0 | 0 |
| PET Pellets Produced (lbs.) | 0 | 0 | 6,500,000 | 15,000,000 | 21,500,000 | 69,313,243 | 80,000,000 | 90,000,000 |
| PET Pellets Sold (lbs.) | 0 | 0 | 6,500,000 | 15,000,000 | 21,500,000 | 69,313,243 | 80,000,000 | 90,000,000 |
| PET Flake Sold (lbs.) | 0 | 0 | 0 | 1,313,444 | 1,313,444 | 6,000,000 | 15,000,000 | 4,500,000 |
| *Revenues* | | | | | | | | |
| **Total Revenues** | **$0** | **$0** | **$3,095,383** | **$8,313,498** | **$11,408,881** | **$39,947,771** | **$46,939,936** | **$49,939,936** |
| *Expenses* | | | | | | | | |
| Cost of Goods Sold | $0 | $0 | $1,515,476 | $2,802,865 | $4,318,341 | $13,693,317 | $16,800,000 | $16,800,000 |
| Direct Wages | $274,843 | $324,703 | $500,000 | $900,000 | $1,999,546 | $5,659,637 | $5,772,830 | $6,006,052 |
| Repairs & Maintenance | 0 | 0 | 0 | 100,000 | 100,000 | 626,280 | 638,808 | 1,000,000 |
| Rent | 0 | 0 | 425,097 | 425,097 | 850,194 | 1,700,387 | 1,700,387 | 1,700,387 |
| Depreciation | 0 | 0 | 1,084,211 | 1,534,537 | 2,618,748 | 6,342,973 | 6,392,973 | 6,442,973 |
| General & Administrative | 0 | 566,293 | 550,000 | 550,000 | 1,666,293 | 2,228,491 | 2,322,418 | 2,368,866 |
| Amortization of Transaction Fees | 36,500 | 36,500 | 36,500 | 36,500 | 146,000 | 146,000 | 146,000 | 146,000 |
| Interest Expense (3) | 870,206 | 870,206 | 870,206 | 870,206 | 3,480,825 | 4,755,825 | 4,652,531 | 4,510,256 |
| Issuer's Fee | 6,250 | 6,250 | 6,250 | 6,250 | 25,000 | 25,000 | 25,000 | 25,000 |
| Other Expenses | 582,071 | (435,844) | 124,817 | 1,347,508 | 1,618,551 | 7,663,922 | 9,077,147 | 9,258,689 |
| **Total Expenses** | **$1,769,870** | **$1,368,108** | **$5,112,557** | **$8,572,963** | **$16,823,498** | **$42,841,833** | **$47,528,094** | **$48,258,224** |
| **Net Income** (4) | **($1,769,870)** | **($1,368,108)** | **($2,017,174)** | **($259,465)** | **($5,414,617)** | **($2,894,062)** | **($588,158)** | **$1,681,712** |
| Add Back: Depreciation | 0 | 0 | 1,084,211 | 1,534,537 | 2,618,748 | 6,342,973 | 6,392,973 | 6,442,973 |
| Add Back: Amortization | 36,500 | 36,500 | 36,500 | 36,500 | 146,000 | 146,000 | 146,000 | 146,000 |
| Add Back: Interest | 870,206 | 870,206 | 870,206 | 870,206 | 3,480,825 | 4,755,825 | 4,652,531 | 4,510,256 |
| **EBITDA** | **($863,164)** | **($461,402)** | **($26,257)** | **$2,181,778** | **$830,956** | **$8,350,736** | **$10,603,346** | **$12,780,941** |
| Add: Owner's Equity Allocated to Support Working Capital | | 7,602,586 | | | | | | |
| **Cumulative Funds Available for Bond Debt Service** | **($863,164)** | **$6,278,020** | **N/A** | **N/A** | **$8,433,542** | **$16,593,028** | **$21,942,638** | **$27,821,048** |
| Series 2019 Bond Debt Service (5) | $0 | N/A | N/A | N/A | $0 | $4,403,736 | $6,052,531 | $6,055,236 |
| Series 2020 Bond Debt Service | $0 | N/A | N/A | N/A | $191,250 | $850,000 | $850,000 | $850,000 |
| Cumulative Bond Debt Service | $0 | N/A | N/A | N/A | $191,250 | $5,253,736 | $6,902,531 | $6,905,236 |
| **Funds Available After Debt Service** | **$0** | **N/A** | **N/A** | **N/A** | **$8,242,292** | **$11,339,292** | **$15,040,107** | **$20,915,812** |
| **Series 2019 Debt Service Coverage Ratio** (6) | **N/A** | **N/A** | **N/A** | **N/A** | **N/A** | **1.90 times** | **1.75 times** | **2.11 times** |
| **Cumulative Debt Service Coverage Ratio** (6) | **N/A** | **N/A** | **N/A** | **N/A** | **4.34 times** | **1.59 times** | **1.54 times** | **1.85 times** |

(1) Carbon Lite Pennsylvania to have an increased capacity compared to the other two facilities for introduction of pcrPET bales.
(2) Purchase of flakes only req's during start up due to increased capacity of flake production
(3) 2019 Interest Expense pro rated from closing date.
(4) Shortfall paid for by Trustee-held funds.
(5) Net of capitalized interest through December 2020.
(6) Based upon Indenture definition.

*Source:    Westhoff, Cone & Holmstedt.*

21

**NEW ISSUE – BOOK-ENTRY ONLY**                                                                                          **NO RATING**

*In the opinion of Ballard Spahr LLP and Turner Law, P.C., Co-Bond Counsel to the Issuer, interest on the Series 2020 Bonds is excludable from gross income for purposes of federal income tax, assuming continuing compliance with the requirements of the federal tax laws, except for interest on any Series 2020 Bond for any period during which such Series 2020 Bond is owned by a person who is a "substantial user" of the facilities financed by the Series 2020 Bonds or a "related person." Interest on the Series 2020 Bonds is an item of tax preference for purposes of the alternative minimum tax imposed on individuals. See "TAX MATTERS" herein. Co-Bond Counsel is also of the opinion that interest on the Series 2020 Bonds is exempt from Pennsylvania personal income tax and Pennsylvania corporate net income tax, under the laws of the Commonwealth of Pennsylvania as enacted and construed on the date of initial delivery of the Series 2020 Bonds. See "TAX MATTERS" herein.*

**$10,000,000**
**PENNSYLVANIA ECONOMIC DEVELOPMENT FINANCING AUTHORITY**
**Subordinate Solid Waste Disposal Revenue Bonds**
**(CarbonLite P, LLC Project)**
**Series 2020**

**Dated: Date of Issuance**                                                                          **Due: As Shown Below**

The Pennsylvania Economic Development Financing Authority (the "**Issuer**") is issuing its Subordinate Solid Waste Disposal Revenue Bonds (CarbonLite P, LLC Project) Series 2020 (the "**Series 2020 Bonds**") pursuant to an Indenture of Trust, dated as of June 1, 2019 (the "**Original Indenture**"), as amended and supplemented by a First Supplemental Indenture of Trust, dated as of September 1, 2020 (the "**First Supplemental Indenture**" and, together with the Original Indenture, the "**Indenture**"), each by and between the Issuer and UMB Bank, N.A., as trustee (the "**Trustee**"). Ownership interests in the Series 2020 Bonds may be purchased, in denominations of $100,000 or any integral multiple of $5,000 in excess thereof, in book-entry only form, without coupons, initially registered in the name of Cede & Co., as nominee of The Depository Trust Company, New York, New York ("**DTC**"). DTC will act as securities depository for the Series 2020 Bonds. Upon receipt of payments of principal of, interest and premium, if any, on for the Series 2020 Bonds, DTC will in turn remit such principal, interest or premium, if any, to the participants in DTC for subsequent disbursement to the beneficial owners of the Series 2020 Bonds. See "APPENDIX F – BOOK-ENTRY SYSTEM."

The Series 2020 Bonds will bear interest from their date of issuance. Interest on the Series 2020 Bonds is payable semiannually on June 1 and December 1 of each year, commencing December 1, 2020. Principal of the Series 2020 Bonds is payable as follows:

$10,000,000  8.50% Bond due December 1, 2036; Price: 100.000%; CUSIP[*]: 708692 BR8

**The Series 2020 Bonds will be subject to optional and mandatory redemption prior to maturity.** See "THE SERIES 2020 BONDS – Redemption."

There is no initial or planned third party credit enhancement or liquidity facility supporting the payment of principal and interest with respect to the Series 2020 Bonds.

The Series 2020 Bonds are limited obligations of the Issuer and, except to the extent payable out of Series 2020 Bond proceeds or any income from the investment thereof, will be payable solely from, and secured solely by, a pledge of payments derived by the Issuer under a Loan Agreement, dated as of June 1, 2019 (the "**Original Loan Agreement**"), as amended by a First Amendment to Loan Agreement, dated as of September 1, 2020 (the "**First Amendment to Loan Agreement**" and, together with the Original Loan Agreement, the "**Loan Agreement**"), each by and between the Issuer and CarbonLite P, LLC, a Delaware limited liability company (the "**Borrower**"). The proceeds of the Series 2020 Bonds, together with an additional Borrower contribution, will be used to (i) finance a portion of the costs of acquiring, constructing, installing, improving and/or equipping of solid waste disposal facilities (as further described herein, the "Project"); (ii) fund working capital costs of the Borrower; (iii) fund a deposit to an account within a reserve fund relating to the Series 2020 Bonds; and (iv) pay a portion of the costs of issuance of the Series 2020 Bonds.

The payment of the principal and Purchase Price of, and premium, if any, and interest on, the Series 2020 Bonds and additional bonds issued under the Indenture, including the Pennsylvania Economic Development Financing Authority Solid Waste Disposal Revenue Bonds (CarbonLite P, LLC Project) Series 2019 (the "**Series 2019 Bonds**"), will be guaranteed pursuant to a Guaranty Agreement, dated as of June 1, 2019 (the "**Original Guaranty**"), as amended by a First Amendment to Guaranty Agreement, dated as of September 1, 2020 (the "**First Amendment to Guaranty**" and, together with the Original Guaranty, the "**Guaranty**"), by CarbonLite P Holdings, LLC, as guarantor (the "**Guarantor**"), in favor of the Trustee.

**THE SERIES 2020 BONDS ARE LIMITED OBLIGATIONS OF THE ISSUER AND ARE PAYABLE SOLELY FROM THE SOURCES REFERRED TO IN THE INDENTURE AND DESCRIBED HEREIN, AND THE SERIES 2020 BONDS WILL NOT BE OR BE DEEMED AN OBLIGATION OF THE COMMONWEALTH OF PENNSYLVANIA OR ANY POLITICAL SUBDIVISION THEREOF. NEITHER THE COMMONWEALTH OF PENNSYLVANIA NOR ANY POLITICAL SUBDIVISION THEREOF IS OR WILL BE OBLIGATED TO PAY THE PRINCIPAL OF, PREMIUM, IF ANY, OR THE INTEREST ON THE SERIES 2020 BONDS, AND NEITHER THE FAITH AND CREDIT NOR THE TAXING POWER OF THE COMMONWEALTH OF**

---

[*] CUSIP® is a registered trademark of the American Bankers Association. CUSIP Global Services (CGS) is managed on behalf of the American Bankers Association by S&P Capital IQ. Copyright© 2018 CUSIP Global Services. All rights reserved. CUSIP® data herein is provided by CUSIP Global Services. This data is not intended to create a database and does not serve in any way as a substitute for the CGS database. CUSIP® numbers are provided for convenience of reference only. Neither the Issuer, the Borrower nor the Underwriter takes any responsibility for the accuracy of such CUSIP numbers.

**PENNSYLVANIA OR ANY POLITICAL SUBDIVISION THEREOF IS PLEDGED TO SUCH PAYMENT.  THE ISSUER HAS NO TAXING POWER.**

This cover page contains certain information for general reference only.  It is <u>not</u> intended as a summary of this issue.  Investors are advised to read the entire Limited Offering Memorandum to obtain information essential to the making of an informed investment decision.

*The Series 2020 Bonds are offered when, as and if issued by the Issuer, subject to the approving opinion of Ballard Spahr LLP, Philadelphia, Pennsylvania, and Turner Law, P.C., Philadelphia, Pennsylvania, Co-Bond Counsel to the Issuer, and certain other conditions.  Certain legal matters will be passed upon for the Issuer by the Office of Chief Counsel, Pennsylvania Department of Community and Economic Development, Harrisburg, Pennsylvania, for the Guarantor and the Borrower by Reed Smith LLP, Los Angeles, California, and for the Underwriter by Orrick, Herrington & Sutcliffe LLP, San Francisco, California.  It is expected that the Series 2020 Bonds in book-entry form will be available for delivery through the facilities of DTC in New York, New York on or about September 10, 2020.*

**WESTHOFF, CONE & HOLMSTEDT**

Dated: September 3, 2020

## NOTICE TO INVESTORS

The Series 2020 Bonds are being offered hereby only to Qualified Institutional Buyers ("**QIBs**") within the meaning of Rule 144A under the Securities Act of 1933, as amended, which term includes both institutions and individuals meeting certain criteria of financial sophistication, net worth, knowledge and experience, and Accredited Investors ("**AIs**") as defined in the Securities Act of 1933, Regulation D, 17 Code Federal Regulations Section 230.501(a).  Each QIB or AI is required to execute and deliver to the Issuer and the Underwriter an Investor Letter in the form attached hereto as Appendix F.

Certain of the information set forth herein has been obtained from the Issuer, the Borrower and other sources which are believed to be reliable.  Such information is not guaranteed as to accuracy or completeness and is not to be construed as a representation by the Underwriter.  The information and expressions of opinion herein are subject to change without notice and neither delivery of this Limited Offering Memorandum nor any sale made hereunder shall, under any circumstances, create any implication that there has been no change in the affairs of the Issuer or the Borrower since the date hereof.  This Limited Offering Memorandum is submitted in connection with the sale of the Series 2020 Bonds and may not be reproduced or used, in whole or in part, for any other purpose.

The Borrower maintains a website at www.carbonliterecycling.com.  The information available on such website is not incorporated by reference into this Limited Offering Memorandum and should not be relied upon in making an investment in the Series 2020 Bonds.

No person has been authorized to give any information or to make any representations other than those contained in this Limited Offering Memorandum in connection with the offering made hereby and, if given or made, such information or representations must not be relied upon as having been authorized by the Issuer, the Borrower or the Underwriter.  This Limited Offering Memorandum does not constitute an offer or solicitation in any jurisdiction in which such offer or solicitation is not authorized, or in which the person making such offer or solicitation is not qualified to do so or to any person to whom it is unlawful to make such offer or solicitation.

The descriptions of the terms and conditions of the agreements contained in this Limited Offering Memorandum are brief summaries of certain provisions of such agreements.  They do not purport to be complete and are qualified in their entirety by reference to the complete and final text of such agreements and should be reviewed carefully before a decision is made to purchase the Series 2020 Bonds.  Copies of all such agreements are available to prospective purchasers of the Series 2020 Bonds during the period of the offering and may be obtained, upon written request, from the Representative, Westhoff, Cone & Holmstedt, 1777 Botelho Drive, Suite 345, Walnut Creek, CA 94596,  and thereafter, from UMB Bank, N.A., 120 South Sixth Street, Minneapolis, MN 55402, Attn: Corporate Trust & Escrow Services.

## FORWARD-LOOKING STATEMENTS

Certain statements included or incorporated by reference in this Limited Offering Memorandum constitute forward-looking statements.  All statements, other than statements of historical fact, in this Limited Offering Memorandum (including statements that involve expectations, plans, projections or intentions relating to the Pennsylvania Facility (as defined herein), projected financial or operating results of the Borrower (as defined herein) or the Pennsylvania Facility, planned arrangements or agreements with service providers, feedstock providers or buyers of PET resin pellets, sources and uses of funds, the projected cost of and dates on which the Pennsylvania Facility will become operational and its projected production volumes and sales, and similar matters) are forward-looking statements.  Forward-looking statements can generally be identified by terms such as "may," "will," "should," "could," "would," "expect," "plan," "anticipate," "intent," "believe," "estimate," "project," "predict," "potential" and other similar expressions.  The achievement of certain results or other expectations contained in such forward-looking statements involve known and unknown risks, uncertainties and other factors which may cause actual results, performance or achievements described to be materially different from any future results, performance or achievements expressed or implied by such forward-looking statements.  No assurance is given that actual results will meet the forecasts of the Borrower or the Guarantor in any way, regardless of the level of optimism communicated in the information.  The Borrower and the Guarantor are not obligated to and do not plan to issue any updates or revisions to the forward-looking statements if or when its expectations, or events, conditions or circumstances on which such statements are based occur.  Such forward-looking statements include, but are not

limited to, certain statements contained in the section entitled "BOND DEBT SERVICE" herein and in the projections of future operating results of the Project and the Borrower in APPENDIX A attached hereto.

THE ACHIEVEMENT OF CERTAIN RESULTS OR OTHER EXPECTATIONS CONTAINED IN SUCH FORWARD LOOKING STATEMENTS INVOLVE KNOWN AND UNKNOWN RISKS, UNCERTAINTIES AND OTHER FACTORS WHICH MAY CAUSE ACTUAL RESULTS, PERFORMANCE OR ACHIEVEMENTS DESCRIBED TO BE MATERIALLY DIFFERENT FROM ANY FUTURE RESULTS, PERFORMANCE OR ACHIEVEMENTS EXPRESSED OR IMPLIED BY SUCH FORWARD-LOOKING STATEMENTS. THE BORROWER DOES NOT PLAN TO ISSUE ANY UPDATES OR REVISIONS TO THOSE FORWARD-LOOKING STATEMENTS IF OR WHEN ANY OF ITS EXPECTATIONS, OR EVENTS, CONDITIONS OR CIRCUMSTANCES ON WHICH SUCH STATEMENTS ARE BASED OCCUR.

The Underwriter has provided the following sentence for inclusion in this Limited Offering Memorandum: "The Underwriter has reviewed the information in this Limited Offering Memorandum in accordance with, and as part of its responsibilities to investors under the federal securities laws as applied to the facts and circumstances of this transaction, but the Underwriter does not guarantee the accuracy or completeness of such information. This offering is made only by delivery of a copy of this Limited Offering Memorandum by the Underwriter to QIBs and AIs. The private offering is made only to QIBs and AIs for investment only."

The Issuer makes no representation as to the accuracy or completeness of any information in this Limited Offering Memorandum and takes no responsibility for its contents, other than the information relating to the Issuer under the headings "THE ISSUER" and "LITIGATION" (as it relates to the Issuer).

THE SERIES 2020 BONDS HAVE NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), IN RELIANCE UPON THE EXEMPTION CONTAINED IN SECTION 3(a)(2) OF THE SECURITIES ACT. THE INDENTURE HAS NOT BEEN QUALIFIED UNDER THE TRUST INDENTURE ACT OF 1939, AS AMENDED, IN RELIANCE UPON AN EXEMPTION CONTAINED IN SUCH ACT.

THE ORDER AND PLACEMENT OF MATERIALS IN THIS LIMITED OFFERING MEMORANDUM, INCLUDING THE APPENDICES, ARE NOT TO BE DEEMED TO BE A DETERMINATION OF RELEVANCE, MATERIALITY OR IMPORTANCE, AND THIS LIMITED OFFERING MEMORANDUM, INCLUDING THE APPENDICES, MUST BE CONSIDERED IN ITS ENTIRETY. THE OFFERING OF THE SERIES 2020 BONDS IS MADE ONLY BY MEANS OF THIS ENTIRE LIMITED OFFERING MEMORANDUM.

IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE ISSUER, THE BORROWER, THE PROJECTS AND THE GUARANTOR AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THE SERIES 2020 BONDS HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION, NOR HAS THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION PASSED UPON THE ACCURACY OR COMPLETENESS OF THIS LIMITED OFFERING MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY MAY BE A CRIMINAL OFFENSE.

### INDUSTRY DATA

This Limited Offering Memorandum contains information regarding, among other things, the industry in which CarbonLite (as defined herein) operates and the Borrower is expected to operate, including information and statistics regarding CarbonLite's status as a producer of food grade pcrPET (as defined herein) resin pellets, and its production quantities and its operating capacity. Although the Borrower has indicated that it believes the sources of this information are reliable, this information has been obtained from third parties and has not been independently verified and its accuracy therefore cannot be guaranteed.

**TABLE OF CONTENTS**

SUMMARY STATEMENT ................................................................................................................ 1

INTRODUCTION ......................................................................................................................... 8

    General ............................................................................................................................... 8

THE ISSUER ................................................................................................................................. 8

THE BORROWER, THE GUARANTOR AND RELATED SUBSIDIARIES ........................... 10

THE PROJECT AND THE APPLICATION OF BOND PROCEEDS ....................................... 10

THE SERIES 2020 BONDS ......................................................................................................... 12

    General ............................................................................................................................. 12

    Limited Obligations ......................................................................................................... 12

    Redemption ...................................................................................................................... 13

    Optional Tender of Series 2020 Bonds upon Change in Control ..................................... 15

    The Guaranty ................................................................................................................... 16

SECURITY FOR THE SERIES 2020 BONDS ............................................................................ 17

    General ............................................................................................................................. 17

    The Loan Agreement ....................................................................................................... 17

    Pledge and Security Agreement ....................................................................................... 20

    Lease Agreement ............................................................................................................. 20

    Leasehold Mortgage ........................................................................................................ 20

    Non-Disturbance and Access Agreement ......................................................................... 20

    Subordination, Non-Disturbance and Attornment Agreement ......................................... 21

    No Credit Enhancement ................................................................................................... 21

    Debt Service Reserve Fund .............................................................................................. 21

    Additional Bonds ............................................................................................................. 23

SOURCES AND USES OF FUNDS ........................................................................................... 24

FINANCIAL COVENANTS ....................................................................................................... 24

    Debt Service Coverage Ratio Covenant ........................................................................... 24

    Days Cash on Hand Covenant .......................................................................................... 26

    Additional Indebtedness Covenant ................................................................................... 27

    Distributions Covenant .................................................................................................... 27

PROJECTED REVENUES AND EXPENSES ............................................................................. 28

BOND DEBT SERVICE .............................................................................................................. 29

RISK FACTORS .......................................................................................................................... 30

    Limited Obligations ......................................................................................................... 30

    Lack of Operating History; Limited Recourse .................................................................. 30

    Tax-Exempt Status of the Series 2020 Bonds ................................................................... 30

    Proposed Changes to Tax Treatment of Series 2020 Bonds .............................................. 30

    Lack of Rating; Limited Marketability for the Series 2020 Bonds ..................................... 31

**TABLE OF CONTENTS**

Prepayment Risks .................................................................................................................... 31

Risk of Audit by Internal Revenue Service .......................................................................... 31

Sufficiency of Operating Cash Flow and Working Capital .................................................. 31

No Feedstock Contracts .......................................................................................................... 32

Contractual Revenue Agreements .......................................................................................... 32

Reliance on Projections and Underlying Assumptions ......................................................... 33

Equipping Risks ...................................................................................................................... 33

Operating Risk ........................................................................................................................ 33

Environmental and Regulatory Compliance; Changes in Law ............................................ 34

Competition ............................................................................................................................. 34

No Credit Enhancement Facility ............................................................................................ 34

Lack of Insurance; Damage, Destruction or Condemnation ................................................ 34

Effect of Federal Bankruptcy Laws on Security for the Series 2020 Bonds ...................... 35

Guarantor's Financial Health ................................................................................................. 35

Dependence on Availability of Key Management; Potential Conflict with Equity Owners ...................... 35

LITIGATION .............................................................................................................................. 35

NO RATING ............................................................................................................................... 36

TAX MATTERS ......................................................................................................................... 36

LEGAL MATTERS .................................................................................................................... 37

CONTINUING DISCLOSURE ................................................................................................... 37

UNDERWRITING ...................................................................................................................... 37

LIMITED OFFERING ................................................................................................................ 39


APPENDIX A    CERTAIN INFORMATION REGARDING CARBONLITE

APPENDIX B    SELECTED DEFINITIONS AND SUMMARY OF PRINCIPAL LEGAL DOCUMENTS

APPENDIX C    PROPOSED FORM OF OPINIONS OF CO-BOND COUNSEL

APPENDIX D    FORM OF CONTINUING DISCLOSURE AGREEMENT

APPENDIX E    BOOK-ENTRY SYSTEM

APPENDIX F    FORM OF INVESTOR LETTER

# LIMITED OFFERING MEMORANDUM

## $10,000,000
## PENNSYLVANIA ECONOMIC DEVELOPMENT FINANCING AUTHORITY
### Subordinate Solid Waste Disposal Revenue Bonds
### (CarbonLite P, LLC Project)
### Series 2020

### SUMMARY STATEMENT

The following Summary Statement is subject in all respects to more complete information contained in this Limited Offering Memorandum and in the appendices herein. The offering of the Series 2020 Bonds (as defined below) to potential investors is made only by means of this entire Limited Offering Memorandum, including the appendices, and no person is authorized to detach this Summary Statement from this Limited Offering Memorandum or to otherwise use it without the entire Limited Offering Memorandum, including the appendices. Capitalized terms used herein and not otherwise defined will have the meanings given to such terms as set forth in APPENDIX B herein.

| | |
|---|---|
| **The Issuer:** | Pennsylvania Economic Development Financing Authority (the "**Issuer**"), is a public instrumentality and body corporate and politic of the Commonwealth of Pennsylvania (the "**Commonwealth**"). See "THE ISSUER." |
| **The Borrower:** | CarbonLite P, LLC ("**CarbonLite P**" or the "**Borrower**") is a Delaware limited liability company formed and wholly-owned by CarbonLite P Holdings ("**CarbonLite P Holdings**" or the "**Guarantor**"). See "THE BORROWER." |
| **The Guarantor and Related Subsidiaries:** | CarbonLite P Holdings is the Borrower's parent company and an indirect subsidiary of the ultimate holding company, CarbonLite Holdings LLC ("**CarbonLite Holdings**"). CarbonLite Holdings is a Delaware limited liability company that presently owns, directly or through wholly-owned subsidiaries, in addition to a polyethylene terephthalate ("**PET**") packaging business, three related entities that recycle post-consumer polyethylene terephthalate ("**pcrPET**") bottles: (1) CarbonLite Industries LLC, a Delaware limited liability company ("**CarbonLite Industries**"), (2) CarbonLite Recycling LLC, a Delaware limited liability company ("**CarbonLite Recycling**"), and (3) CarbonLite P (together with CarbonLite Holdings, CarbonLite Industries and CarbonLite Recycling, "**CarbonLite**"). See "THE BORROWER." |
| **Series 2020 Bonds:** | The Issuer will issue its Subordinate Solid Waste Disposal Revenue Bonds (CarbonLite P, LLC Project) Series 2020 in the aggregate principal amount of $10,000,000 (the "**Series 2020 Bonds**"), pursuant to an Indenture of Trust dated as of June 1, 2019 (the "**Original Indenture**"), as amended and supplemented by a First Supplemental Indenture of Trust dated as of September 1, 2020 (the "**First Supplemental Indenture**" and, together with the Original Indenture, the "**Indenture**"), each by and between the Issuer and UMB Bank, N.A., as trustee (the "**Trustee**"). The Series 2020 Bonds will be subordinate in priority of payment and security to the Pennsylvania Economic Development Financing Authority Solid Waste Disposal Revenue Bonds (CarbonLite P, LLC Project) Series 2019 (the "**Series 2019 Bonds**"). The Series 2020 Bonds will be initially registered in the name of Cede & Co., as nominee of The Depository Trust Company, New York, New York. The Series 2020 Bonds are being issued in Book-Entry Form. See "THE SERIES 2020 BONDS." |
| **The Project:** | A portion of the proceeds of the Series 2019 Bonds were used to finance the acquisition, construction, installation, improvement and/or equipping of a new pcrPET recycling |

facility located at Berks Park 61, 4030 Pottsville Pike, in the City of Reading, County of Berks, Pennsylvania (the "**Pennsylvania Facility**"), as further described below (the "**Project**"). See "THE PROJECT AND THE APPLICATION OF BOND PROCEEDS." Subsequent to the issuance of the Series 2019 Bonds, due to the increasing demand for food-grade PET resin pellets and the Borrower's production experience at the Riverside Facility (as defined below) and Dallas Facility (as defined below), the Borrower decided to expand the scope of the Project and to acquire additional equipment to increase the efficiency and output of the Pennsylvania Facility. For more information, see "—Process" below and "APPENDIX A – CERTAIN INFORMATION REGARDING CARBONLITE – CarbonLite P – Additional Funding Requirements." A portion of the proceeds of the Series 2020 Bonds, together with a $10 million additional Borrower contribution, will be used: (i) to finance additional equipment costs of the Project, and (ii) to fund working capital costs of the Borrower. The Pennsylvania Facility began processing PET flake in May 2020 into food grade PET resin pellets and all of its equipment is expected to be fully operational by September 2020.

| | |
|---|---|
| **Existing Facilities:** | CarbonLite currently operates two pcrPET plastic beverage container processing facilities located in Riverside, California (the **"Riverside Facility"**) and in Dallas, Texas (the **"Dallas Facility"**), and its third facility, the Pennsylvania Facility, is presently beginning operations.  The Riverside Facility, which commenced operations in November 2011, encompasses approximately 220,000 square feet and has the capacity to process approximately 8.3 million pounds of pcrPET Bales per month, approximately 100 million pounds per year, and approximately 7.9 million pounds of pcrPET Flakes per month, approximately 95 million pounds per year (approximately 1.9 billion used bottles) per year. Over the 36 month period ending June 30, 2020, the Riverside Facility processed an average of 7.51 million pounds of pcrPET per month and sold, on average, approximately 5.54 million pounds of food grade pcrPET resin pellets per month. See "APPENDIX A – CERTAIN INFORMATION REGARDING CARBONLITE – THE RIVERSIDE FACILITY." |

The Dallas Facility, which commenced operations at the end of 2017, encompasses approximately 230,000 square feet and also has the capacity to process up to 8.3 million pounds of pcrPET per month, or approximately 100 million pounds (approximately 1.9 billion used bottles) per year.  The plant also has the capacity to process up to up to 7.0 million pounds of pcrPET Flake per month, or approximately 84 million pounds per year. See "APPENDIX A – CERTAIN INFORMATION REGARDING CARBONLITE – THE DALLAS FACILITY."

The Pennsylvania Facility encompasses approximately 270,000 square feet and has the capacity to process up to 11.67 million pounds of pcrPET bales and flake per month, or approximately 140 million pounds (approximately 2.27 billion used bottles) per year. The Pennsylvania Facility is expected to produce approximately 6.6 million pounds of food-grade rPET pellets per month, approximately 90 million pounds per year, for sale pursuant to contracts with various beverage manufacturers. The Pennsylvania Facility began processing PET flake in May 2020 into food grade PET resin pellets and all of its equipment is expected to be fully operational by September 2020.  See "APPENDIX A – CERTAIN INFORMATION REGARDING CARBONLITE – CarbonLite P, Pennsylvania" and "– Projected Financial Statements."

| | |
|---|---|
| **Process:** | The Project converts pcrPET bottles recovered from the waste stream into food grade recycled PET resin pellets that are then used to manufacture new beverage containers. CarbonLite P receives used plastic bottles collected by various material recovery facilities ("**MRFs**"), separates single bottles from trash and debris, manually checks such bottles for unwanted items, and segregates them into three streams: (1) clear PET, (2) green PET, and (3) non-PET. Green PET and clear PET are expected to be processed and sent to the de-labeling stage where attached labels are removed and the bottles are sent through a final check for any existing contamination. The clear and green PET streams are each ground |

into cornflake-like flakes that are intensively washed, rinsed and dried in separate wash lines.  The clean flakes are further sorted, purified, and dried, and then melted and extruded into pellets.  The food-grade pellets are transported to bottle manufacturers and other customers in bulk hopper road trucks or railcars.

The expanded Project entails the installation and upgrading of Pelletron equipment, the installation of Tomra Flake Sorters, and the installation of a 69kv Sub Station and a new A1/CHP system supplied by vendors with significant experience in the plastic industry. CarbonLite expects the additional equipment to increase its processing capacity by approximately 20% from an expected 115 million pounds of pcrPET per year to over 140 million pounds per year, which in turn, will maximize its capacity to produce over 90 million pounds of pellets. For more information, see "APPENDIX A – CERTAIN INFORMATION REGARDING CARBONLITE – Additional Funding Requirements."

| | |
|---|---|
| **Feedstock Supply Sourcing:** | CarbonLite has been an active purchaser of PET since 2011 and maintains a sales staff dedicated to acquiring PET for its facilities, sourcing post-consumer PET from a national market. To date, CarbonLite has had discussions with five providers of PET scrap in Pennsylvania and the surrounding region to be suppliers for the Pennsylvania Facility. In total, they represent the ability to supply 19.995 million pounds of pcrPET per month compared to a monthly requirement of 11.67 million pounds. See "RISK FACTORS – No Feedstock Contracts" herein and "APPENDIX A – CERTAIN INFORMATION REGARDING CARBONLITE – Pennsylvania Feedstock" for additional information. |
| **Contracted Revenue Agreements:** | The Project is expected to produce approximately 6.67 million pounds of food-grade pcrPET pellets per month at commercial operation.  As of the date of this Limited Offering Memorandum, CarbonLite P has two contracts and two agreements in principle to purchase all of its food-grade pcrPET resin pellets produced at the Pennsylvania Facility, including purchase contracts or understandings with four major bottling companies for a total output of approximately 8.3 million pounds per month. CarbonLite P has entered into contracts with Nestlé Waters North America Inc. and Niagara Waters, and has reached an agreement in principle with Amcor Rigid Plastics (**"Amcor"**), pursuant to which Amcor will use commercial reasonable efforts to purchase an average of 1.0 million pounds per month from the Pennsylvania Facility through December 31, 2022, and Coca-Cola, pursuant to which Coca-Cola will use commercially reasonable efforts to purchase 1.30 million pounds per month. CarbonLite P expects to sell any remaining output to other customers.  There can be no assurance that CarbonLite will be successful in that regard or that it will be able to do so at a price that is profitable.  See "RISK FACTORS – Contractual Revenue Agreements" herein and "APPENDIX A - CERTAIN INFORMATION REGARDING CARBONLITE – Pennsylvania Output Contracts." |
| **Borrower Funds:** | CarbonLite P will contribute $10 million for the Project. See "THE PROJECT AND THE APPLICATION OF BOND PROCEEDS" herein and "APPENDIX A - CERTAIN INFORMATION REGARDING CARBONLITE – 2020 Bond Financing Plan." |
| **Guaranty:** | Pursuant to the Guaranty Agreement, dated as of June 1, 2019 (the "**Original Guaranty**"), as amended by a First Amendment to Guaranty Agreement, dated as of September 1, 2020 (the "**First Amendment to Guaranty**" and, together with the Original Guaranty, the "**Guaranty**"), by CarbonLite P Holdings (the **"Guarantor"**) in favor of the Trustee, and subject to the termination event provisions and other limitations therein, the Guarantor will unconditionally guaranty to the Trustee for the benefit of the owners and beneficial owners of the Series 2019 Bonds and the Series 2020 Bonds, the full and prompt payment of (a) the principal of and redemption premium, if any, on the Series 2019 Bonds and the Series 2020 Bonds when and as the same become due (whether at maturity, by acceleration, call for redemption or otherwise); (b) the interest on the Series 2019 Bonds and the Series 2020 Bonds when and as the same become due; and (c) all Loan Repayments pursuant to the Loan Agreement, including without limitation all amounts |

payable for deposit into the Debt Service Reserve Fund.  In addition, the Guarantor unconditionally guarantees to the Trustee (x) for the benefit of the Trustee, the full and prompt payment of all amounts due or to become due from the Borrower to the Trustee under the Loan Agreement (except as specified in the previous sentence) and full and prompt payment of all amounts payable by the Borrower under the Lease, and (y) for the benefit of the Issuer, the full and prompt payment of all amounts due or to become due from the Borrower to the Issuer under the Loan Agreement.  See "SECURITY FOR THE SERIES 2020 BONDS – The Guaranty Agreement."

**Lease:**

In July 2019, CarbonLite P entered into a lease with a joint venture entity consisting of American Realty Advisors and Endurance Real Estates Group called "Berks 61 Owner, LLC", an unaffiliated landlord ("**Landlord**") for the site on which the Pennsylvania Facility is located (the "**Lease**"). The Lease is for an initial term of 17 years with two five-year renewal options at prevailing fair rental rates. See "SECURITY FOR THE SERIES 2020 BONDS – Lease Agreement."

**Limited Obligations:**

**THE SERIES 2020 BONDS ARE LIMITED OBLIGATIONS OF THE ISSUER AND ARE PAYABLE SOLELY FROM THE SOURCES REFERRED TO IN THE INDENTURE AND DESCRIBED HEREIN, AND THE SERIES 2020 BONDS WILL NOT BE OR BE DEEMED AN OBLIGATION OF THE COMMONWEALTH OF PENNSYLVANIA OR ANY POLITICAL SUBDIVISION THEREOF.  NEITHER THE COMMONWEALTH OF PENNSYLVANIA NOR ANY POLITICAL SUBDIVISION THEREOF IS OR WILL BE OBLIGATED TO PAY THE PRINCIPAL OF, PREMIUM, IF ANY, OR THE INTEREST ON THE SERIES 2020 BONDS, AND NEITHER THE FAITH AND CREDIT NOR THE TAXING POWER OF THE COMMONWEALTH OF PENNSYLVANIA OR ANY POLITICAL SUBDIVISION THEREOF IS PLEDGED TO SUCH PAYMENT. THE ISSUER HAS NO TAXING POWER.**

**Loan Agreement:**

Proceeds of the Series 2020 Bonds will be loaned by the Issuer to the Borrower pursuant to a Loan Agreement dated as of June 1, 2019 (the "**Original Loan Agreement**"), as amended by the First Amendment to Loan Agreement dated as of September 1, 2020 (the "**First Amendment to Loan Agreement**" and, together with the Original Loan Agreement, the "**Loan Agreement**"), each between the Issuer and the Borrower, to be used, together with other available funds provided by the Borrower, to (i) finance additional equipment costs of the Project; (ii) fund working capital costs of the Borrower; (iii) fund a deposit to an account within a reserve fund relating to the Series 2020 Bonds; and (iv) pay a portion of the costs of issuance of the Series 2020 Bonds.

**Maturity:**

The Series 2020 Bonds will mature on December 1, 2036 as set forth on the outside front cover hereof.

**Denominations:**

The Series 2020 Bonds will be sold in minimum denominations of $100,000 and integral multiples of $5,000 in excess thereof.

**Interest:**

Interest on the Series 2020 Bonds is payable at the rates shown on the front cover page hereof on June 1 and December 1 of each year, commencing on December 1, 2020.

**Principal:**

The principal of and premium, if any, on the Series 2020 Bonds are payable at final maturity, acceleration or redemption in lawful money of the United States of America upon surrender thereof at the Corporate Trust Office of the Trustee.

**Redemption*:**

*The Series 2020 Bonds are not subject to redemption, in whole or in part, until such time as all of the Series 2019 Bonds have been paid or defeased in full.  When there are no longer any Series 2019 Bonds Outstanding, the Series 2020 Bonds shall be subject to*

4

*redemption prior to maturity as follows:*

***Mandatory Redemption Upon Invalidity***.  In the event of a prepayment pursuant to the Loan Agreement as a result of invalidity, Series 2020 Bonds Outstanding on the date of the occurrence of the invalidity will be redeemed in whole at any time within 30 days thereafter (on a redemption date selected by the Trustee), at a redemption price of 100% of the principal amount thereof, without premium, plus accrued interest to the date of redemption.  See "THE SERIES 2020 BONDS – Redemption – Mandatory Redemption Upon Invalidity."

***Mandatory Redemption of Series 2020 Bonds Upon a Determination of Taxability***.  In the event of a prepayment pursuant to the Loan Agreement as a result of a Determination of Taxability, Series 2020 Bonds Outstanding on the date of the occurrence of the Determination of Taxability will be redeemed in whole at any time within 30 days thereafter (on a redemption date selected by the Trustee), at a redemption price of 103% of the principal amount thereof plus accrued interest to the date of redemption. No other redemptions of Series 2020 Bonds will be made pursuant to certain other provisions of the Indenture following a Determination of Taxability. See "THE SERIES 2020 BONDS — Redemption — Mandatory Redemption Upon a Determination of Taxability."

***Optional Redemption Upon Occurrence of Extraordinary Events.***  The Series 2020 Bonds may be redeemed in whole or in part on any date at a redemption price equal to the principal amount thereof, without premium, plus accrued interest to the date of redemption, upon receipt by the Trustee (with a copy to the Issuer) of a written notice from the Borrower stating that any of the following events has occurred:

(i)    all of the Project or a portion thereof is damaged or destroyed, condemned or taken by eminent domain to such extent that, in the opinion of an Independent Consultant evidenced by a certificate provided to the Issuer and the Trustee, which opinion may be conclusively relied upon by the Trustee and the Issuer, that (1) it is not practicable or desirable to rebuild, repair or replace the Project or such portion thereof or the facility at which the Project is located within a period of six (6) consecutive months following such damage, destruction or condemnation, and the Borrower is or will be thereby prevented from carrying on its normal operations at the Project or such portion thereof or the facility at which the Project is located for a period of at least six (6) consecutive months, or (2) the cost of repair or replacement of the Project or such portion thereof or the facility at which the Project is located would substantially exceed the Net Proceeds of insurance carried thereon and the Net Proceeds of insurance together with Borrower's cash contribution, are sufficient to fully pay the principal of and interest on the Series 2020 Bonds to the redemption date; or

(ii)    the continued operation of all or a portion of the Project is enjoined or prevented or is otherwise prohibited by, or conflicts with, any order, decree, rule or regulation of any court or federal, state or local regulatory body, administrative agency or other governmental body.

Anything under "Optional Redemption Upon Occurrence of Extraordinary Events" to the contrary notwithstanding, if any of the events described above have occurred with respect to a portion of, but not all of, the Project, the amount of Series 2020 Bonds that may be redeemed will not exceed an amount derived by multiplying the total principal amount of the Series 2020 Bonds by a fraction (a) the numerator of which is the original cost of the Project or portion thereof so affected and (b) the denominator of which is the total original cost of the Project. See "THE SERIES 2020 BONDS – Redemption – Optional Redemption Upon Occurrence of Extraordinary Events."

***Optional Redemption***. On any date on and after June 1, 2026, the Series 2020 Bonds may be redeemed in whole or in part, at a redemption price expressed as a percentage of the principal amount of the Series 2020 Bonds to be redeemed, plus accrued interest thereon to the date of redemption as shown herein. See "THE SERIES 2020 BONDS –

Redemption – Optional Redemption."

***Optional Redemption from Excess Proceeds in the Project Fund***.  On any date on and after December 1, 2020, the Series 2020 Bonds may be redeemed at the direction of the Borrower from excess Series 2020 Bond proceeds on deposit in the Project Fund, in whole or in part, at a redemption price equal to 100% of the principal amount thereof to be redeemed (without premium), plus accrued interest thereon to the date of redemption. See "THE SERIES 2020 BONDS – Redemption — Optional Redemption from Excess Proceeds in the Project Fund."

| | |
|---|---|
| **Optional Tender of Series 2020 Bonds upon Change in Control:** | So long as no Series 2019 Bonds remain Outstanding, in the event a Change in Control (as defined below) has been completed, the outstanding Series 2020 Bonds shall become subject to optional tender to the Trustee, at the election by any Beneficial Owner, for purchase by Borrower at a purchase price equal to one hundred and five percent (105%) of the aggregate principal amount of the Series 2020 Bonds tendered (the "**Tender Price**"), plus accrued interest on the Series 2020 Bonds so tendered to be paid to the Beneficial Owner on the Tender Date (as defined herein). "**Change in Control**" means (i) any sale or other disposition by the Borrower of all or substantially all of its assets; (ii) any combination or consolidation with or merger by the Borrower into another entity; (iii) any consolidation or merger into the Borrower such that the Borrower is not the resulting or surviving entity; (iv) any sale, transfer or disposition of a majority of the equity or membership interests in the Borrower, the Guarantor or CarbonLite Holdings in either a single transaction or a related series of transactions; (v) any dissolution or liquidation of the Borrower, the Guarantor or CarbonLite Holdings; and/or (vi) any combination, consolidation or merger by the Borrower, the Guarantor or CarbonLite Holdings into or with another entity, whereby a majority of the equity or membership interests in the resulting entity is not controlled by the same persons who controlled a majority of the equity or membership interests in the Borrower, the Guarantor or CarbonLite Holdings immediately before such transaction. See "THE SERIES 2020 BONDS – Optional Tender of Series 2020 Bonds upon Change in Control." |
| **Restrictions on Transfer:** | The Series 2020 Bonds may be transferred only to Qualified Institutional Buyers and Accredited Investors in Authorized Denominations. |
| **Debt Service Reserve Fund:** | So long as no event of default under the Indenture has occurred and is continuing, the Series 2019 subaccount of the Debt Service Reserve Fund will be used solely to pay the principal of and interest on the Series 2019 Bonds and the Series 2020 subaccount of the Debt Service Reserve Fund will be used solely to pay the principal of and interest on the Series 2020 Bonds, in the event of a deficiency in the amounts required to be on deposit in the Revenue Fund.  Upon the occurrence and during the continuation of an event of default under the Indenture, moneys on deposit in the Series 2019 subaccount of the Debt Service Reserve Fund shall be applied as directed by the Holders of a majority in aggregate principal amount of the Series 2019 Bonds then Outstanding, and moneys in the Series 2020 subaccount of the Debt Service Reserve Fund shall be applied as directed by the Holders of a majority in aggregate principal amount of the Series 2020 Bonds then Outstanding. The total amount required to be maintained in each subaccount of the Debt Service Reserve Fund will equal the then applicable Reserve Requirement for each Series of Bonds.  "Reserve Requirement" means, with respect to the Series 2020 Bonds, an amount equal to the least of (i) Maximum Annual Debt Service with respect to the Series 2020 Bonds, (ii) one hundred twenty five percent (125%) of the average annual debt service on the Series 2020 Bonds, and (iii) ten percent (10%) of the original principal amount of the Series 2020 Bonds (the "**Series 2020 Reserve Requirement**"). The Series 2020 Reserve Requirement equals $1,000,000. |
| **Debt Service Coverage Ratio:** | For the Fiscal Year ending December 31, 2021, the Borrower covenants to produce sufficient annual Gross Revenues in order to provide a Debt Service Coverage Ratio equal |

to at least (i) 125% of the debt service on the Series 2019 Bonds and any Parity Debt for such Fiscal Year, and (ii) 105% of all debt service obligations of the Borrower (including the Series 2019 Bonds and the Series 2020 Bonds) which are Liens or encumbrances upon or payable from the Gross Revenues, calculated at the end of such Fiscal Year, based upon the audited financial statements of the Borrower for such Fiscal Year being tested.  For each Fiscal Year thereafter, commencing with Fiscal Year ending December 31, 2022, the Borrower covenants to produce sufficient annual Gross Revenues in order to provide a Debt Service Coverage Ratio equal to at least 135% of all debt service on all Indebtedness of the Borrower, calculated at the end of each Fiscal Year, based upon the audited financial statements of the Borrower for the Fiscal Year being tested. See "FINANCIAL COVENANTS – Debt Service Coverage Ratio Covenant."

**Liquidity:**   For the Fiscal Year ending December 31, 2021, the Borrower covenants to maintain a minimum of 45 Days Cash on Hand.  For each Fiscal Year thereafter, commencing with Fiscal Year ending December 31, 2022, the Borrower covenants to maintain a minimum of 60 Days Cash on Hand. See "FINANCIAL COVENANTS – Days Cash on Hand Covenant."

**Security:**   Pursuant to the Loan Agreement, the Borrower will agree to repay amounts in installments which will be sufficient to pay, when due, the principal of, and interest on the Series 2020 Bonds, and to fill and replenish various funds established under the Indenture. To secure its obligations under the Loan Agreement, the Borrower will enter into and deliver to the Trustee various security agreements.

See "SECURITY FOR THE SERIES 2020 BONDS" for a more complete description of the security for the Series 2020 Bonds.

**Additional Bonds:**   Subject to the satisfaction of the conditions set forth in the Indenture with respect to Additional Bonds, and upon the prior written consent of the Holders of a majority in principal amount of the Series 2019 Bonds then Outstanding, the Issuer may issue Additional Senior Bonds on a parity with the Series 2019 Bonds and Additional Subordinate Bonds on a parity with the Series 2020 Bonds from time to time.  See "SECURITY FOR THE SERIES 2020 BONDS – Additional Bonds."

**Additional Debt:**   The Borrower may not incur additional Indebtedness unless the prior written consent of the Holders of a majority in principal amount of the Series 2019 Bonds then Outstanding is obtained. See "FINANCIAL COVENANTS – Additional Indebtedness Covenant."

**Risk Factors:**   Investing in the Series 2020 Bonds involves a significant degree of risk. Prospective investors in the Series 2020 Bonds are encouraged to read and consider the risk factors set forth under "RISK FACTORS" below as well as other information included in this Limited Offering Memorandum and all appendices herein.

(Remainder of Page Intentionally Left Blank)

## INTRODUCTION

**General**

      This Limited Offering Memorandum is provided to furnish information in connection with the limited offering, issuance and sale by the Pennsylvania Economic Development Financing Authority (the "**Issuer**") of $10,000,000 principal amount of its Subordinate Solid Waste Disposal Revenue Bonds (CarbonLite P, LLC Project), Series 2020 (the "**Series 2020 Bonds**"). The Series 2020 Bonds will be limited obligations of the Issuer as described under the caption "THE SERIES 2020 BONDS – Limited Obligations" herein. The Series 2020 Bonds will be issued pursuant to an Indenture of Trust, dated as of June 1, 2019 (the "**Original Indenture**"), as amended and supplemented by a First Supplemental Indenture of Trust, dated as of September 1, 2020 (the "**First Supplemental Indenture**" and, together with the Original Indenture, the "**Indenture**"), each by and between the Issuer and UMB Bank, N.A., as trustee (the "**Trustee**"). The proceeds of the Series 2020 Bonds will be loaned to CarbonLite P, LLC ("**CarbonLite P**" or the "**Borrower**"), pursuant to a Loan Agreement, dated as of June 1, 2019 (the "**Original Loan Agreement**"), as amended by a First Amendment to Loan Agreement (the "**First Amendment to Loan Agreement**" and, together with the Original Loan Agreement, the "**Loan Agreement**"), each by and between the Issuer and the Borrower. In addition, payment of the Series 2019 Bonds and the Series 2020 Bonds will be guaranteed by CarbonLite P Holdings, LLC ("**CarbonLite P Holdings**" or the "**Guarantor**") pursuant to the Guaranty Agreement, dated as of June 1, 2019 (the "**Original Guaranty**"), as amended by a First Amendment to Guaranty Agreement, dated as of September 1, 2020 (the "**First Amendment to Guaranty**" and, together with the Original Guaranty, the "**Guaranty**"), in favor of the Trustee.

      **THE SERIES 2020 BONDS ARE LIMITED OBLIGATIONS OF THE ISSUER AND ARE PAYABLE SOLELY FROM THE SOURCES REFERRED TO IN THE INDENTURE AND DESCRIBED HEREIN, AND THE SERIES 2020 BONDS WILL NOT BE OR BE DEEMED AN OBLIGATION OF THE COMMONWEALTH OF PENNSYLVANIA OR ANY POLITICAL SUBDIVISION THEREOF. NEITHER THE COMMONWEALTH OF PENNSYLVANIA NOR ANY POLITICAL SUBDIVISION THEREOF IS OR WILL BE OBLIGATED TO PAY THE PRINCIPAL OF, PREMIUM, IF ANY, INTEREST ON THE SERIES 2020 BONDS, AND NEITHER THE FAITH AND CREDIT NOR THE TAXING POWER OF THE COMMONWEALTH OF PENNSYLVANIA OR ANY POLITICAL SUBDIVISION THEREOF IS PLEDGED TO SUCH PAYMENT. THE ISSUER HAS NO TAXING POWER.**

### THE ISSUER

      The Issuer is a public instrumentality and body corporate and politic of the Commonwealth of Pennsylvania (the "**Commonwealth**") created pursuant to the Pennsylvania Economic Development Financing Law, as amended and supplemented (the "**Act**"), to provide financing for qualifying projects (including, without limitation, industrial facilities, commercial facilities, pollution control facilities and public facilities) in the Commonwealth. The Issuer provides such financing by issuing its limited obligation revenue bonds to make loans to finance qualified projects authorized and approved by local industrial and commercial development authorities, industrial development agencies and certain other governmental entities. The Issuer has approved the financing of the Project and authorized the issuance of the Series 2020 Bonds. The Issuer has full power and authority to issue the Series 2020 Bonds and to perform its obligations under the Indenture and the Loan Agreement. The Act provides that the Commonwealth will not limit or alter the rights vested in the Issuer by the Act until the Series 2020 Bonds, together with the interest thereon, are fully discharged.

      The Issuer is governed by a Board of Directors composed of the Secretary of Community and Economic Development (who serves as Chairman), the Secretaries of Labor and Industry, Agriculture and Banking and Securities and eight members appointed by the Governor, subject to the advice and consent of the Senate of the Commonwealth, and four members appointed by the Majority Leader and the Minority Leader of both the Senate and the House of Representatives of the Commonwealth.

      The current Board members and their terms of office, if applicable, are as follows:

| | |
|---|---|
| Honorable Dennis M. Davin, Chairman<br>Secretary of Community and Economic Development | Gary Masino<br>Designated Term of Office expires June 20, 2022 |
| Honorable Richard Vague<br>Acting Secretary of Banking and Securities | Elizabeth Preate Havey, Esquire<br>Designated Term of Office expired April 7, 2018* |
| Laura B. Kurtz<br>Designated Term of Office expires March 18, 2023 | Dr. Howard B. Slaughter, Jr.<br>Designated Term of Office expires October 14, 2018* |
| W. Gerard Oleksiak<br>Secretary of Labor and Industry | Michael M. Brubaker<br>Designated Term of Office expires June 18, 2022 |
| Honorable Russell C. Redding<br>Secretary of Agriculture | Honorable Ryan Mackenzie<br>Pennsylvania House of Representatives |
| Mary Soderberg | Ronald J. Brown |
| Honorable Mario Scavello<br>Senate of Pennsylvania | Steven S. Bradley<br>Designated Term of Office expired June 3, 2018* |
| Nicholas S. Haden<br>Designated Term of Office expired June 3, 2018* | Fred Rinaldi<br>Designated Term of Office expired September 24, 2017* |

_____
* Board members whose terms have expired continue to serve until new members are appointed.

The staff of the Issuer includes:

*Stephen M. Drizos, Executive Director.* Stephen M. Drizos is a veteran of the United States military. He was an officer in the Army and the Pennsylvania Army Reserve National Guard. He joined the Commonwealth on February 9, 2004 as Director of the Center for Private Financing and was appointed Executive Director of the Issuer on March 10, 2004. Mr. Drizos has also been appointed to the Pennsylvania Sustainable Energy Board, the Global Competitiveness Analysis, Strategy, and Marketing Work Plan Committee for the Commonwealth. He is a member of the Pennsylvania Sustainable Infrastructure Committee for the Commonwealth, as well as the Pennsylvania Energy Development Authority. He is also a past member of the Issuer Advisory Group of the Municipal Securities Rulemaking Board, which develops rules regulating securities firms and banks involved in underwriting, trading, and selling municipal securities - bonds and notes issued by states, cities, and counties.

Prior to his current position with the Commonwealth, Mr. Drizos gained more than 30 years of diversified business experience in various financial and operational positions, with a concentration in public finance. Some of his roles in investment banking included senior investment banker and manager of fixed income and public finance. He provided such services as investment management, cash management, trading and sales of fixed income products, public finance, underwriting of tax-exempt securities, and consulting. Mr. Drizos was successful in the structuring and underwriting of more than $20 billion in corporate and public finance activities.

*Craig Petrasic, Assistant Director, Center for Private Financing.* Craig Petrasic has been with the Department of Community and Economic Development ("DCED") since 1995. He currently serves as Assistant Director of the Center for Private Financing, in which capacity he assists with the day-to-day management, operations, policy analysis and development for the Issuer and several other programs. Prior to serving as Assistant Director, Mr. Petrasic was a Program Manager for the Issuer, an Economic Development Analyst with the Pennsylvania Industrial Development Authority and a Legal Assistant in the Office of Chief Counsel for DCED. Mr. Petrasic received his Bachelor of Arts degree from Bloomsburg University and his Master of Arts degree in History from Indiana University of Pennsylvania.

*Brian Deamer, Program Manager.* Brian Deamer has been with DCED since December 1998. He currently serves as a Program Manager for the Center for Private Financing, in which capacity he assists with the day-to-day management, operations and policy analysis and development for office programs. He previously served

as a Program Analyst in the Small Business Financing Office of DCED. Mr. Deamer received his Bachelor's degree from Millersville University.

*Gail Boppe, Program Manager.* Gail Boppe has been with DCED since 2000. She currently serves as Program Manager for the Center for Private Financing, in which capacity she assists with the day-to-day management, operations, policy analysis and development for the Industrial Development Authority program. Prior to serving as Program Manager, Ms. Boppe was an Economic Development Analyst in the Small Business Financing Office and interned in the Office of International Business Development Office. Ms. Boppe received her Bachelor of Science degree from Lock Haven University.

The Issuer has previously issued bonds for projects other than the Project and expects to issue additional series of bonds after the issuance of the Series 2020 Bonds described herein. Such prior bonds are, and such additional bonds if issued, will be, secured under pledges of security separate from and unrelated to the pledges described herein with respect to the Series 2020 Bonds. The Series 2020 Bonds are special and limited obligations of the Issuer as described herein.

The Issuer has not prepared or assisted in the preparation of this Limited Offering Memorandum except for the statements under this section captioned "THE ISSUER" and the statements under the section captioned "LITIGATION" solely as it pertains to the Issuer and, except as aforesaid, the Issuer is not responsible for any statement made herein, and will not participate in or otherwise be responsible for the offer, sale or distribution of the Series 2020 Bonds. Accordingly, except as aforesaid, the Issuer disclaims responsibility for the disclosure set forth herein in connection with the offer, sale and distribution of the Series 2020 Bonds.

THE SERIES 2020 BONDS ARE LIMITED OBLIGATIONS OF THE ISSUER, PAYABLE SOLELY FROM THE SOURCES REFERRED TO IN THE INDENTURE AND DESCRIBED HEREIN. NEITHER THE COMMONWEALTH OF PENNSYLVANIA NOR ANY POLITICAL SUBDIVISION THEREOF IS OBLIGATED TO PAY THE PRINCIPAL OR REDEMPTION PRICE OF OR THE INTEREST ON THE SERIES 2020 BONDS, AND NEITHER THE FAITH AND CREDIT NOR THE TAXING POWER OF THE COMMONWEALTH OF PENNSYLVANIA OR ANY POLITICAL SUBDIVISION THEREOF IS PLEDGED TO THE PAYMENT OF THE PRINCIPAL OR REDEMPTION PRICE OF OR INTEREST ON THE SERIES 2020 BONDS. THE ISSUER HAS NO TAXING POWER.

### THE BORROWER, THE GUARANTOR AND RELATED SUBSIDIARIES

CarbonLite Holdings LLC ("**CarbonLite Holdings**"), founded as a holding company in October 2013, is a Delaware limited liability company that presently owns, directly or through wholly-owned subsidiaries, in addition to a polyethylene terephthalate ("**PET**") packaging business, three related entities that recycle post-consumer polyethylene terephthalate ("**pcrPET**") bottles: (1) CarbonLite Industries LLC, a Delaware limited liability company ("**CarbonLite Industries**"), (2) CarbonLite Recycling LLC, a Delaware limited liability company ("**CarbonLite Recycling**"), and (3) CarbonLite P, LLC, a Delaware limited liability company ("**CarbonLite P**" or the "**Borrower**" and, together with CarbonLite Holdings, CarbonLite Industries and CarbonLite Recycling, "**CarbonLite**"). CarbonLite P is 100% owned by CarbonLite P Holdings, which, in turn, is indirectly 100% owned by CarbonLite Holdings. CarbonLite Industries was formed in March 2010 for the purpose of developing and operating the Riverside Facility (as defined herein), and CarbonLite Recycling was formed in October 2013 for the purpose of developing and operating the Dallas Facility (as defined herein). CarbonLite P was formed in May 2018 for the purpose of developing and operating the Pennsylvania Facility (as defined herein). For more information regarding the Borrower and the Guarantor, see APPENDIX A, attached hereto.

### THE PROJECT AND THE APPLICATION OF BOND PROCEEDS

The proceeds of the Series 2020 Bonds will be loaned by the Issuer to the Borrower pursuant to the terms of the Loan Agreement. Such proceeds will be used, together with other available funds provided by Borrower, to (i) finance a portion of additional costs of constructing, installing, improving and/or equipping of Borrower's existing pcrPET recycling facility located in the City of Reading, Pennsylvania (the "**Pennsylvania Facility**"), as further described below (the "**Project**"); (ii) fund working capital costs of the Borrower; (iii) fund a deposit to an

account within a reserve fund relating to the Series 2020 Bonds; and (iv) pay a portion of the costs of issuance of the Series 2020 Bonds.

CarbonLite believes that it is one of the largest producers of food grade pcrPET in the United States. CarbonLite converts pcrPET bottles recovered from the waste stream into food grade recycled PET resin pellets that are then used to manufacture new beverage containers.

CarbonLite currently operates two pcrPET plastic beverage container processing facilities located in Riverside, California (the "**Riverside Facility**") and in Dallas, Texas (the "**Dallas Facility**"), and its third facility, the Pennsylvania Facility, is presently beginning operations.  The Riverside Facility, which commenced operations in November 2011, encompasses approximately 220,000 square feet and has the capacity to process approximately 8.3 million pounds of pcrPET Bales per month, approximately 100 million pounds per year, and approximately 7.9 million pounds of pcrPET Flakes per month, approximately 95 million pounds per year (approximately 1.9 billion used bottles) per year.  Over the 36 month period ending June 30, 2020, the Riverside Facility processed an average of 7.51 million pounds of pcrPET per month and sold, on average, approximately 5.54 million pounds of food grade pcrPET resin pellets per month.  See "APPENDIX A – THE RIVERSIDE FACILITY." The Dallas Facility, which commenced operations at the end of 2017, encompasses approximately 230,000 square feet and also has the capacity to process up to 8.3 million pounds of pcrPET per month, or approximately 100 million pounds (approximately 1.9 billion used bottles) per year.  The plant also has the capacity to process up to up to 7.0 million pounds of pcrPET Flake per month, or approximately 84 million pounds per year.   See "APPENDIX A – THE DALLAS FACILITY."

The Pennsylvania Facility encompasses approximately 270,000 square feet, employed approximately 28 people as of July 6, 2020 and plans to employ approximately 130 people in total when fully operational, and has the capacity to process up to 11.67 million pounds of pcrPET bales and flake per month, approximately 140 million pounds (approximately 2.27 billion used bottles) per year. The Pennsylvania Facility is expected to produce approximately 6.6 million pounds of food-grade rPET pellets per month, approximately 90 million pounds per year, for sale pursuant to contracts with various beverage manufacturers. The Pennsylvania Facility began processing PET flake in May 2020 into food grade PET resin pellets and all of its equipment is expected to be fully operational by September 2020. See "APPENDIX A – CERTAIN INFORMATION REGARDING CARBONLITE – CarbonLite P, Pennsylvania" and "– Projected Financial Statements."  The expanded Project entails the installation and upgrading of Pelletron equipment, the installation of Tomra Flake Sorters, and the installation of a 69kv Sub Station and a new A1/CHP system supplied by vendors with significant experience in the plastic industry.  CarbonLite expects the additional equipment to increase its processing capacity by approximately 20% from an expected 115 million pounds of pcrPET per year to over 140 million pounds per year, which in turn, will maximize its capacity to produce over 90 million pounds of pellets. For more information, see "APPENDIX A – CERTAIN INFORMATION REGARDING CARBONLITE – Additional Funding Requirements."

For more information regarding the Project, see "APPENDIX A – CERTAIN INFORMATION REGARDING CARBONLITE."

NONE OF CARBONLITE HOLDINGS, CARBONLITE INDUSTRIES NOR CARBONLITE RECYCLING WILL GUARANTEE THE SERIES 2020 BONDS OR THE LOAN TO CARBONLITE P BEING MADE WITH PROCEEDS FROM THE ISSUANCE OF THE SERIES 2020 BONDS, NOR WILL ANY OF CARBONLITE HOLDINGS, CARBONLITE INDUSTRIES OR CARBONLITE RECYCLING HAVE ANY FINANCIAL RESPONSIBILITY FOR COMPLETION OF THE PROJECT.

## THE SERIES 2020 BONDS

*The following is a summary, which does not purport to be complete, of certain provisions of the Series 2020 Bonds.  Reference is made to the Indenture and the form of the Series 2020 Bonds included therein for the detailed provisions of the Series 2020 Bonds.*

**General**

The Series 2020 Bonds will be dated their Date of Delivery, will mature (subject to prior redemption) on the date set forth on the cover page hereto.  Interest on the Series 2020 Bonds is payable semiannually on June 1 and December 1 of each year (each, an "**Interest Payment Date**"), commencing December 1, 2020.  Interest on the Series 2020 Bonds will be computed upon the basis of a 360-day year, consisting of twelve 30-day months.

The Series 2020 Bonds are issuable in Authorized Denominations of $100,000 or any integral multiple of $5,000 in excess thereof.  The Series 2020 Bonds will be transferable and exchangeable as set forth in the Indenture, and will be initially registered in the name of Cede & Co., as nominee of The Depository Trust Company ("**DTC**").  DTC will act as securities depository for the Series 2020 Bonds.  Ownership interests in the Series 2020 Bonds may be purchased in book-entry form only in Authorized Denominations.  See "APPENDIX E – BOOK-ENTRY SYSTEM" herein.

Principal of and premium, if any, on the Series 2020 Bonds will be payable at final maturity, acceleration or redemption upon surrender thereof at the Corporate Trust Office of the Trustee.  Payment of the interest on any Series 2020 Bond will be made to the Person appearing on the bond registration books of the Bond Registrar as the Bondholder thereof on the Record Date, such interest to be paid by the Paying Agent to such Bondholder (i) by check mailed by first class mail on the Interest Payment Date, to such Bondholder's address as it appears on the registration books or at such other address as has been furnished to the Bond Registrar as provided in the Indenture, in writing by such Bondholder not later than the Record Date, or (ii) upon written request at least three Business Days prior to the applicable Record Date of the Bondholder of Series 2020 Bonds aggregating not less than $1,000,000 in principal amount of such Series 2020 Bonds, by wire transfer in immediately available funds at an account maintained in the United States at such wire address as such Bondholder will specify in its written notice.

"**Record Date**" means, with respect to any Interest Payment Date for the Series 2020 Bonds, the fifteenth day of the calendar month immediately preceding such Interest Payment Date, whether or not such day is a Business Day.

Pursuant to the Indenture, any payment or transfer which otherwise would become due on any day which is not a Business Day will become due or will be made on the next Business Day, with the same effect as if it had been made on the due date.

**Limited Obligations**

**The Series 2020 Bonds are limited obligations of the Issuer payable solely from, and separately secured by a pledge of and lien on, the Revenues under the Indenture.**

**THE SERIES 2020 BONDS ARE LIMITED OBLIGATIONS OF THE ISSUER, PAYABLE SOLELY FROM THE SOURCES REFERRED TO IN THE INDENTURE AND DESCRIBED HEREIN. NEITHER THE COMMONWEALTH OF PENNSYLVANIA NOR ANY POLITICAL SUBDIVISION THEREOF IS OBLIGATED TO PAY THE PRINCIPAL OR REDEMPTION PRICE OF OR THE INTEREST ON THE SERIES 2020 BONDS, AND NEITHER THE FAITH AND CREDIT NOR THE TAXING POWER OF THE COMMONWEALTH OF PENNSYLVANIA OR ANY POLITICAL SUBDIVISION THEREOF IS PLEDGED TO THE PAYMENT OF THE PRINCIPAL OR REDEMPTION PRICE OF OR INTEREST ON THE SERIES 2020 BONDS. THE ISSUER HAS NO TAXING POWER.**

## Redemption

So long as no Series 2019 Bonds are then Outstanding, the Series 2020 Bonds are subject to redemption if and to the extent the Borrower is entitled to make and makes, or is required to make, a prepayment pursuant to the Loan Agreement. All such prepayments will be deposited in the Series 2020 subaccount of the Redemption Account. The Series 2020 Bonds will not be called for optional redemption, and the Trustee will not give notice of any such redemption, unless the Borrower has so directed in writing to the Trustee with a copy to the Issuer. Subject to the foregoing and so long as no Series 2019 Bonds are then Outstanding, the Series 2020 Bonds will be redeemed upon the following terms.

*Mandatory Redemption Upon Invalidity*. In the event of a prepayment pursuant to the Loan Agreement as a result of invalidity, Series 2020 Bonds Outstanding on the date of the occurrence of the invalidity will be redeemed in whole at any time within 30 days thereafter (on a redemption date selected by the Trustee), at a redemption price of 100% of the principal amount thereof, without premium, plus accrued interest to the date of redemption.

*Mandatory Redemption of Series 2020 Bonds Upon a Determination of Taxability*. In the event of a prepayment pursuant to the Loan Agreement as a result of a Determination of Taxability (as defined herein), Series 2020 Bonds Outstanding on the date of the occurrence of the Determination of Taxability will be redeemed in whole at any time within 30 days thereafter (on a redemption date selected by the Trustee), at a redemption price of 103% of the principal amount thereof plus accrued interest to the date of redemption.

*Optional Redemption Upon Occurrence of Extraordinary Events*. The Series 2020 Bonds may be redeemed in whole or in part on any date at a redemption price equal to the principal amount thereof, without premium, plus accrued interest to the date of redemption, upon receipt by the Trustee (with a copy to the Issuer) of a written notice from the Borrower stating that any of the following events has occurred:

(i) all of the Project or a portion thereof is damaged or destroyed, condemned or taken by eminent domain to such extent that, in the opinion of an Independent Consultant evidenced by a certificate provided to the Issuer and the Trustee, which opinion may be conclusively relied upon by the Trustee and the Issuer, that (1) it is not practicable or desirable to rebuild, repair or replace the Project or such portion thereof or the facility at which the Project is located within a period of six (6) consecutive months following such damage, destruction or condemnation, and the Borrower is or will be thereby prevented from carrying on its normal operations at the Project or such portion thereof or the facility at which the Project is located for a period of at least six (6) consecutive months, or (2) the cost of repair or replacement of the Project or such portion thereof or the facility at which the Project is located would substantially exceed the Net Proceeds of insurance carried thereon and the Net Proceeds of insurance together with Borrower's cash contribution, are sufficient to fully pay the principal of and interest on the Series 2020 Bonds to the redemption date; or

(ii) the continued operation of all or a portion of the Project is enjoined or prevented or is otherwise prohibited by, or conflicts with, any order, decree, rule or regulation of any court or federal, state or local regulatory body, administrative agency or other governmental body.

Anything under this subheading to the contrary notwithstanding, if any of the events described above have occurred with respect to a portion of, but not all of, the Project, the amount of Series 2020 Bonds that may be redeemed will not exceed an amount derived by multiplying the total principal amount of the Series 2020 Bonds by a fraction (a) the numerator of which is the original cost of the Project or portion thereof so affected and (b) the denominator of which is the total original cost of the Project.

*Optional Redemption*. On any date on and after June 1, 2026, the Series 2020 Bonds may be redeemed in whole or in part, at a redemption price expressed as a percentage of the principal amount of the Series 2020 Bonds to be redeemed, plus accrued interest thereon to the date of redemption, as follows:

| Redemption Date | Redemption Price |
|---|---|
| June 1, 2026 through May 31, 2027 | 103% |
| June 1, 2027 through May 31, 2028 | 102% |
| June 1, 2028 through May 31, 2029 | 101% |
| June 1, 2029 and thereafter | 100% |

*Optional Redemption from Excess Proceeds in the Project Fund*.  On any date on and after December 1, 2020, the Series 2020 Bonds may be redeemed at the direction of the Borrower from excess Series 2020 Bond proceeds on deposit in the Project Fund, in whole or in part, at a redemption price equal to 100% of the principal amount thereof to be redeemed (without premium), plus accrued interest thereon to the date of redemption.

*Selection of Series 2020 Bonds for Redemption*.  Whenever provision is made in the Indenture for the redemption of less than all of the Series 2020 Bonds, the Trustee will select the Series 2020 Bonds to be redeemed from all Series 2020 Bonds or such given portion thereof not previously called for redemption by lot in any manner which the Trustee in its sole discretion will deem appropriate.

*Notice of Redemption*.  Notice of redemption will be mailed by the Trustee by first class mail or by electronic means if to DTC or its successors not less than 30 days nor more than 60 days before such redemption date to the respective Holders of any Series 2020 Bonds designated for redemption at their addresses on the registration books maintained by the Bond Registrar.  Each notice of redemption will state the redemption date, the place or places of redemption, if less than all of the Series 2020 Bonds are to be redeemed, the distinctive number(s) of the Series 2020 Bonds to be redeemed and, in the case of Series 2020 Bonds to be redeemed in part only, the respective portions of the principal amount thereof to be redeemed.  Each such notice will also state that on said date there will become due and payable on each of said Series 2020 Bonds the principal thereof or of said specified portion of the principal thereof in the case of a Bond to be redeemed in part only, and that from and after such redemption date interest thereon will cease to accrue, and will require that such Series 2020 Bonds be then surrendered, and, with regard to optional redemption pursuant to the provision described above under "– Optional Redemption," in the event that funds required to pay the redemption price are not on deposit under the Indenture at the time the notice of redemption is sent, a statement to the effect that the redemption is conditioned upon the receipt of the appropriate funds required to pay the redemption price by the Trustee on or prior to the redemption date.  Neither failure to receive such notice nor any defect therein will affect the sufficiency of such redemption.  With respect to any notice of optional redemption of Series 2020 Bonds, such notice may be conditional upon the fulfillment of any conditions set out within such notice.  In the event that such notice of redemption contains conditions which are not met, the redemption will not be made and the Trustee will give notice, no less than two Business Days before the redemption was to be made, in the manner in which the notice of redemption was given, that the redemption will not be made.

*Partial Redemption of Series 2020 Bonds*.  Upon surrender of any Series 2020 Bond redeemed in part only, the Issuer will execute and the Trustee will authenticate and deliver to the Owner thereof, at the expense of the Borrower, a new Series 2020 Bond or Series 2020 Bonds of Authorized Denominations and of like maturity equal in aggregate principal amount to the unredeemed portion of the Series 2020 Bond surrendered.

*Effect of Redemption*.  Notice of redemption having been duly given as described above, and moneys for payment of the redemption price (including premium, if any) of, together with interest accrued to the date fixed for redemption on, the Series 2020 Bonds (or portions thereof) so called for redemption being held by the Trustee, on the redemption date designated in such notice, the Series 2020 Bonds (or portions thereof) so called for redemption will become due and payable, interest on the Series 2020 Bonds so called for redemption will cease to accrue, said Series 2020 Bonds (or portions thereof) will cease to be entitled to any benefit or security under the Indenture, except for payment of particular Series 2020 Bonds for which moneys are being held by the Trustee which moneys will be pledged to such payment, and the Holders of said Series 2020 Bonds will have no rights in respect thereof except to receive payment of said redemption price (including premium, if any) and interest accrued to the date fixed for redemption.

**Optional Tender of Series 2020 Bonds upon Change in Control**

In the event a Change in Control (as defined below) has been completed, the Outstanding Series 2020 Bonds shall become subject to optional tender to the Trustee, at the election by any Beneficial Owner, for purchase by Borrower at a purchase price equal to one hundred and five percent (105%) of the aggregate principal amount of the Series 2020 Bonds tendered (the "**Tender Price**"), plus accrued interest on the Series 2020 Bonds so tendered to be paid to the Beneficial Owner on the Tender Date (as defined below); provided, however, that no Series 2020 Bonds may be tendered pursuant to this provision until no Series 2019 Bonds remain Outstanding. "**Change in Control**" means (i) any sale or other disposition by the Borrower of all or substantially all of its assets; (ii) any combination or consolidation with or merger by the Borrower into another entity; (iii) any consolidation or merger into the Borrower such that the Borrower is not the resulting or surviving entity; (iv) any sale, transfer or disposition of a majority of the equity or membership interests in the Borrower, the Guarantor or CarbonLite Holdings in either a single transaction or a related series of transactions; (v) any dissolution or liquidation of the Borrower, the Guarantor or CarbonLite Holdings; and/or (vi) any combination, consolidation or merger by the Borrower, the Guarantor or CarbonLite Holdings into or with another entity, whereby a majority of the equity or membership interests in the resulting entity is not controlled by the same persons who controlled a majority of the equity or membership interests in the Borrower, the Guarantor or CarbonLite Holdings immediately before such transaction.

Promptly following the effectiveness of any Change in Control (but in no event more than ten (10) days thereafter), the Borrower shall provide to the Trustee and the Issuer, and post to the Electronic Municipal Market Access (EMMA) website of the Municipal Securities Rulemaking Board (including to each CUSIP number then associated with the Series 2020 Bonds), as a material event notice, written notice of the occurrence of a Change in Control (such notice being referred to herein as a "**Change in Control Notice**"), which Change in Control Notice shall (i) state the date on which the Change in Control occurred; (ii) specify the date (which shall be no less than forty-five (45) days nor more than ninety (90) days after the date of the Change in Control Notice) by which each Beneficial Owner must elect to tender its Series 2020 Bonds to the Trustee for purchase by the Borrower by delivering irrevocable written notice of its election to tender all or a portion of its Series 2020 Bonds (a "**Tender Election Notice**" and, the period from the date the Change of Control Notice is provided until the date specified therein for election to tender Series 2020 Bonds being referred to herein as the "**Tender Period**"); (iii) state that the outstanding Series 2020 Bonds will become subject to optional tender to the Trustee (for purchase by the Borrower) thirty (30) days after expiration of the Tender Period (the date of purchase herein referred to as the "**Tender Date**") by any Beneficial Owner at the Tender Price, plus accrued interest on the Series 2020 Bonds so tendered to be paid to the Beneficial Owner on the Tender Date; (iv) specify (a) the corresponding numbered clause(s) in the definition of the term "**Change in Control**" which gave rise to a Change in Control and indicate the nature of the transaction which constituted a Change in Control; (b) the name of the entity who, as a result of the Change in Control, then owns and controls, beneficially and of record, at least fifty-one percent (51%) of the equity or membership interests of the Borrower or the Guarantor or CarbonLite Holdings; and (c) who, if applicable, is the survivor or transferee of the merger, consolidation or sale of assets as to which the Change in Control occurred, and the names of all parties to such transaction; and (v) specify the mailing address of the Trustee for submission of Tender Election Notices.

Upon receipt of a Change in Control Notice, each Beneficial Owner shall have the right, in its discretion, to elect whether or not to tender all or a portion of its Series 2020 Bonds by submitting to the Trustee a Tender Election Notice no later than the expiration of the Tender Period. Each Tender Election Notice shall include the name and mailing address of the Beneficial Owner and the aggregate principal amount of the Series 2020 Bonds such Beneficial Owner will tender on the Tender Date. The Trustee may conclusively rely on the accuracy of such information and shall promptly forward each Tender Election Notice to the Borrower and the Issuer. The Borrower shall prepay the Note not less than ten (10) days prior to the Tender Date in an aggregate amount equal to the Tender Price of all tendered Series 2020 Bonds in order to provide sufficient moneys to enable the Trustee to pay the Tender Price to each tendering Beneficial Owner on the Tender Date. Failure by a Beneficial Owner to submit a Tender Election Notice on or prior to the last date for the submission of Tender Election Notices specified by the Borrower in the Change in Control Notice shall conclusively constitute a waiver of its right to tender Series 2020 Bonds pursuant to the applicable Change in Control Notice.

The failure by the Trustee to forward any Change in Control Notice to any Beneficial Owner entitled to receive such notice, or any defect therein, shall not in any way change the rights of each such Beneficial Owner to (i) submit a Tender Election Notice prior to the deadline for submissions set forth in the Change in Control Notice

15

and (ii) elect to have all or a portion of its Series 2020 Bonds purchased on the Tender Date. Any Change in Control Notice mailed by the Trustee, in the manner provided for in the Indenture for the giving of notices generally, shall be conclusively presumed to have been given, whether or not the Beneficial Owner receives such notice.

Series 2020 Bonds tendered for purchase shall be purchased at the Tender Price on the Tender Date with funds provided therefor by the Borrower pursuant to the Loan Agreement as described above.

When a book-entry system is in effect, Series 2020 Bonds that are subject to optional tender for purchase, for which there has been irrevocably deposited in trust with the Trustee on or prior to the Tender Date an amount of money sufficient to pay the Tender Price thereof on such Tender Date, will be deemed to have been surrendered for purchase on such Tender Date. When a non-book-entry system is in effect, Series 2020 Bonds that are subject to optional tender for purchase for which there has been irrevocably deposited in trust with the Trustee on or prior to the Tender Date an amount of money sufficient to pay the Tender Price thereof on such Tender Date, will be deemed to have been surrendered for purchase on such Tender Date.

No owner of undelivered Series 2020 Bonds deemed surrendered for purchase pursuant to the previous paragraph shall be entitled to any payment (including interest to accrue subsequent to the related Tender Date) other than the Tender Price for such Series 2020 Bonds and any such Series 2020 Bonds shall not longer be entitled to the benefit and security of the Indenture, except for the purpose of the payment of the Tender Price thereof; and the Trustee will not register any further transfers of such undelivered Series 2020 Bonds.

**The Guaranty**

Pursuant to the Guaranty, the Guarantor has unconditionally guaranteed to the Trustee for the benefit of the owners and beneficial owners of the Series 2019 Bonds and the Series 2020 Bonds, the full and prompt payment of (a) the principal of and redemption premium, if any, on the Series 2019 Bonds and the Series 2020 Bonds when and as the same become due (whether at maturity, by acceleration, call for redemption or otherwise); (b) the interest on the Series 2019 Bonds and the Series 2020 Bonds when and as the same become due; and (c) all Loan Repayments pursuant to the Loan Agreement, including without limitation all amounts payable for deposit into the Debt Service Reserve Fund.  In addition, the Guarantor unconditionally guarantees to the Trustee (x) for the benefit of the Trustee, the full and prompt payment of all amounts due or to become due from the Borrower to the Trustee under the Loan Agreement (except as specified in the previous sentence) and full and prompt payment of all amounts payable by the Borrower under the Lease, and (y) for the benefit of the Issuer, the full and prompt payment of all amounts due or to become due from the Borrower to the Issuer under the Loan Agreement.

The obligations of the Guarantor under the Guaranty will be a continuing, absolute and unconditional guaranty and will remain in full force and effect until the entire principal of, redemption premium, if any, and interest on or purchase price of the Series 2019 Bonds and the Series 2020 Bonds has been paid or provided for according to the terms of the Indenture and all amounts due and owing the Trustee and the Issuer are fully paid, at which time the Guaranty will automatically terminate and be of no further force and effect. The Guarantor acknowledges and agrees, however, that its obligations thereunder will apply to and continue with respect to any amount paid to the Trustee with respect to the Guaranteed Obligations (as defined in the Guaranty) which is subsequently recovered from the Trustee or the owners or beneficial owners of the Series 2019 Bonds or the Series 2020 Bonds for any reason whatsoever (including, without limitation, as a result of a bankruptcy, insolvency or fraudulent conveyance proceeding but excluding any amounts so recovered due to any willful misconduct, bad faith or gross negligence on the part of the Trustee) notwithstanding the fact that the Series 2019 Bonds or the Series 2020 Bonds may have been previously paid or performed in full or the Guaranty returned, or both.

The obligations of the Guarantor under the Guaranty are absolute and unconditional and will not be impaired, modified, released or limited by any occurrence or condition whatsoever (other than upon the discharge of the lien of the Indenture in accordance with the terms thereof), including, without limitation,

(i)        any compromise, settlement, release, waiver, renewal, extension, indulgence, change in, amendment to or modification of any of the obligations and liabilities contained in the Series 2019 Bonds or the Series 2020 Bonds, the Indenture, the Loan Agreement, the Lease Agreement (as defined herein), the Leasehold

16

Mortgage (as defined herein), the NDA (as defined herein), the SNDA (as defined herein) or the Pledge and Security Agreement (as defined herein);

(ii)    any impairment, modification, release or limitation of the liability of the Issuer or the Borrower, or any other security for or guaranty of the Series 2019 Bonds or the Series 2020 Bonds, or any remedy for the enforcement thereof, resulting from the operation of any present or future provision of the federal bankruptcy laws or other statutes or from the decision of any court relating thereto;

(iii)    the assertion or exercise by the Issuer, its successors or assigns, or the Trustee of any rights or remedies under the Indenture, the Loan Agreement, the Leasehold Mortgage, the NDA, the SNDA, the Pledge and Security Agreement or the Guaranty or their delay in asserting or exercising, or failure to assert or exercise, any such rights or remedies;

(iv)    the assignment or mortgaging or the purported assignment or mortgaging of all or any part of the interest of the Borrower in the Project; and

(v)    the purchase or sale of any membership interests in the Borrower.

During the term of the Guaranty, the Guarantor will maintain its limited liability company existence, will not dissolve or otherwise dispose of all or substantially all of its assets and will not consolidate with or merge into another entity unless the acquirer of its assets or the entity with which it will consolidate or into which it will merge will assume in writing all of the obligations of the Guarantor under the Guaranty¸ except as permitted by the Guaranty.

A more complete description of the Guaranty is set forth in APPENDIX B attached to this Limited Offering Memorandum.

***As noted herein, the Guarantor has no meaningful assets other than its equity ownership of the Borrower and, as such, the Guaranty will not provide any meaningful amount of credit support for the payment by the Borrower of its financial obligations.***

## SECURITY FOR THE SERIES 2020 BONDS

*The following section includes brief summaries of certain provisions of the Loan Agreement, the Pledge and Security Agreement, the Lease Agreement, the Leasehold Mortgage, the NDA and the SNDA (as such terms are defined below). These summaries do not purport to be complete or definitive and are qualified in their entirety by reference to the respective documents, copies of which is on file with the Trustee.*

### General

Payment of principal of, premium, if any, and interest on the Series 2020 Bonds will be paid from certain Loan Repayments (as defined herein) received by the Issuer and the Trustee from the Borrower pursuant to the Loan Agreement. The Series 2020 Bonds are also payable from income derived from the investment of moneys held under the Indenture under the circumstances set forth in the Indenture. In addition, the full and prompt payment of amounts due from the Borrower under the Loan Agreement, including without limitation, principal of, premium, if any, and interest on the Series 2020 Bonds, is guaranteed by the Guarantor pursuant to the Guaranty.

### The Loan Agreement

Pursuant to the Loan Agreement, the Borrower covenants and agrees to pay to the Trustee as a repayment on the loan made to the Borrower from Series 2020 Bond proceeds pursuant to the Loan Agreement, a sum equal to the amount payable on each Bond Payment Date as principal of, and premium, if any, and interest on, the Series 2020 Bonds then due as provided in the Indenture (the "**Loan Repayments**"). The term "**Bond Payment Date**" means any date upon which any principal, purchase price, interest or premium payable with respect to the Series 2020 Bonds shall become due, whether upon redemption (including without limitation sinking fund redemption),

acceleration, maturity, tender for purchase or otherwise; provided however that no payment of any principal, purchase price or premium payable with respect to the Series 2020 Bonds shall become due and payable until such time as all of the Series 2019 Bonds have been paid or defeased in full.  Pursuant to the Loan Agreement, the Borrower further covenants and agrees as follows.

*Loan Repayments and Payment of Other Amounts*.  The Borrower, on or before the 25th day of each month, commencing September 25, 2020, until the principal of, premium, if any, and interest on the Series 2020 Bonds shall have been fully paid or provision for the payment thereof shall have been made in accordance with the Indenture, will deposit in immediately available funds in the Revenue Fund for credit to the Series 2020 subaccount of the Interest Account established and maintained pursuant to the Indenture, the amount necessary to make the amount on deposit therein equal to the amount of accrued and unpaid interest on the Series 2020 Bonds as of the first day of the immediately succeeding month.

The Borrower, on or before November 25, 2036, unless the principal of, premium, if any, and interest on the Series 2020 Bonds shall have been fully paid or provision for the payment thereof shall have been made in accordance with the Indenture, will deposit in immediately available funds in the Revenue Fund for credit to the Series 2020 subaccount of the Principal Account established and maintained pursuant to the Indenture, a sum equal to the amount of principal payable on the maturity date of the Series 2020 Bonds.

Notwithstanding the foregoing paragraphs, with respect to the Series 2020 Bonds, during the last Bond Year ending December 1, 2036, the Borrower shall have credit against its payments due on and after June 1, 2036 under the Loan Agreement from moneys available in the Series 2020 subaccount of the Debt Service Reserve Fund, in such amounts as are designated by the Borrower.

Each Loan Repayment will at all times be sufficient to pay the total amount of interest and principal (whether at maturity or upon redemption or acceleration) and premium, if any, becoming due and payable on the Series 2020 Bonds on each Bond Payment Date; provided that any amount held by the Trustee in the Revenue Fund on any due date for a Loan Repayment under the Loan Agreement will be credited against the Loan Repayment due on such date, to the extent available for such purpose; and provided further that, if at any time the amounts held by the Trustee in the Revenue Fund are sufficient to pay all of the principal of and interest and premium, if any, on the Series 2020 Bonds as such payments become due, the Borrower will be relieved of any obligation to make any further payments under the Loan Agreement.  Notwithstanding the foregoing, if on any date the amount held by the Trustee in the Revenue Fund is insufficient to make any required payments of principal of (whether at maturity or upon redemption or acceleration) and interest and premium, if any, on, the Series 2020 Bonds as such payments become due, the Borrower shall forthwith pay such deficiency as a Loan Repayment under the Loan Agreement.

Except for draws made therefrom pursuant to the Loan Agreement, the Borrower also agrees to immediately pay any amounts necessary to replenish a draw on the Debt Service Reserve Fund under the Indenture.

*Unconditional Obligation*.  The obligations of the Borrower to make the Loan Repayments and other payments required by the Loan Agreement and to perform and observe the other agreements on its part contained therein and in the Indenture will be absolute and unconditional, irrespective of any defense or any rights of set-off, recoupment or counterclaim it might otherwise have against the Issuer, and during the term of the Loan Agreement, the Borrower will pay all payments required to be made on account of the Loan Agreement, the Note (as described in the Loan Agreement) and all other payments required thereunder, free of any deductions and without abatement, diminution or set-off.  Until such time as the principal of, premium, if any, and interest on, the Series 2020 Bonds has been fully paid, or provision for the payment thereof have been made as required by the Indenture, the Borrower (i) will not suspend or discontinue any payments provided for in the Loan Agreement; (ii) will perform and observe all of its other covenants contained in the Loan Agreement; and (iii) except as provided in the Loan Agreement, will not terminate the Loan Agreement for any cause.

A more complete description of the Loan Agreement is set forth in APPENDIX B attached to this Limited Offering Memorandum.

*Application of Revenues.* While any Series 2020 Bonds are Outstanding, Gross Revenues received by the Borrower will be tendered immediately to the Depository Bank (as defined below) and deposited by the Depository

Bank in the Gross Revenue Account (as defined below) established under the Account Control Agreement (as defined below).

***Pledge of Gross Revenue Account; Lease, Leasehold Mortgage and Pledge and Security Agreement***. The Borrower agrees under the Loan Agreement that, as long as any Loan Repayments remain unpaid, all of the Gross Revenues will be deposited as soon as practicable upon receipt in a bank account or fund designated as the "**Gross Revenue Account**" which the Borrower will establish and maintain subject to the provisions described further below, in an account or accounts at such banking institution or institutions as the Borrower shall from time to time designate in writing to the Trustee for such purpose (herein called the "**Depository Bank(s)**"). The Borrower pledges and assigns to the Trustee and grants to the Trustee a security interest in all right, title and interest, whether now owned or thereafter acquired, of the Borrower in, to, and under the Gross Revenue Account, all of the Gross Revenues, all investment property, instruments, money and other property on deposit in or credited to the Gross Revenue Account, and all proceeds of the foregoing (subject to subordination pursuant to an Intercreditor Agreement (as defined in APPENDIX B) with respect to trade accounts receivable in which a lien has been granted to secure Short-Term Indebtedness), to secure the payment of the Loan Repayments and the performance by the Borrower of its other obligations under the Loan Agreement and the payment and performance of all obligations of the Borrower, *first*, under any agreement securing Parity Debt and, *second*, under any agreement securing Parity Subordinate Debt.

***Gross Revenue Account***. Pursuant to the Loan Agreement, the Gross Revenue Account will at all times be subject to an Account Control Agreement. "**Account Control Agreement**" means (i) that certain Deposit Account Control Agreement among the Borrower, the Trustee and Pacific Western Bank, as depository bank, and (ii) any other similar agreement between a depository institution, the Borrower and the Trustee whereby the Trustee is granted the right of control over funds or bank accounts of the Borrower following the occurrence of an Event of Default.

Gross Revenues and amounts in the Gross Revenue Account may be used and withdrawn by the Borrower at any time for any lawful purpose, except as provided in the Loan Agreement. In the event that (i) the Borrower is delinquent for more than one Business Day in the payment or required prepayment of any Loan Repayment or any similar payment with respect to Parity Debt or Parity Subordinate Debt, or (ii) any other Loan Default Event occurs and is continuing; then the Trustee may notify the Issuer, the Borrower and the Depository Bank of such event, and may cause the Depository Bank(s) to transfer control of any Gross Revenue Account to the name and credit of the Trustee in accordance with the terms of the then effective Account Control Agreement or Agreements.

Notwithstanding the transfer of control over a Gross Revenue Account to the Trustee, the Borrower will continue to deposit all Gross Revenues into the Gross Revenue Account as provided in the Loan Agreement until the amounts on deposit in said fund are sufficient to pay in full (or have been used to pay in full) all Loan Repayments in default and payments required with respect to Parity Debt or Parity Subordinate Debt in default and until all other Loan Default Events or events of default with respect to Parity Debt or Parity Subordinate Debt known to the Trustee have been cured to the satisfaction of the Trustee or provision deemed by the Trustee to be adequate have been made therefor, whereupon control of the Gross Revenue Account (except for the Gross Revenues required to make such payments or cure such defaults) will be transferred by the Trustee back to the name and credit of the Borrower within ten Business Days.

During any period that the Gross Revenue Account is held in the name and to the credit, and subject to the control, of the Trustee, the Trustee will use and withdraw from time to time amounts in said fund to make Loan Repayments and the other payments required of the Borrower under the Loan Agreement as such payments become due (whether by maturity, prepayment, acceleration or otherwise), and, if such amounts are not sufficient to pay in full all such payments due on any date, then *first*, to the payment of Loan Repayments and debt service on such Parity Debt, and *second*, to the payment of Loan Repayments and debt service on such Parity Subordinate Debt, according to the amounts due under the Indenture respectively for Loan Repayments and such debt service.

During any period that the Gross Revenue Account is held in the name and to the credit, and subject to the control, of the Trustee, the Borrower will not be entitled to use or withdraw any of the Gross Revenues unless (and then only to the extent that) the Trustee, in its sole discretion, so directs for the payment of current or past due operating expenses of the Borrower.

19

The Borrower agrees that a failure to comply with the terms of this section titled "Gross Revenue Account" will cause irreparable harm to the holders from time to time of the Bonds and of Parity Debt or Parity Subordinate Debt, and will entitle the Trustee, with or without notice to the Borrower, to take immediate action to compel the specific performance of the obligations of the Borrower as provided in the Loan Agreement.

**Pledge and Security Agreement**

The Borrower and the Guarantor will execute and deliver to the Trustee a First Amendment to Pledge and Security Agreement, amending that certain Pledge and Security Agreement dated as of June 1, 2019 (as amended, the "**Pledge and Security Agreement**"), pursuant to which the Borrower and Guarantor will confirm that the grant to the Trustee of a continuing security interest in all presently existing and thereafter acquired or arising Collateral (as defined in the Pledge and Security Agreement) will secure the prompt payment and performance of all of the Secured Obligations (as defined in the Pledge and Security Agreement) including the Series 2020 Bonds.

**Lease Agreement**

The Borrower entered into an Industrial Lease Agreement (the "**Lease Agreement**") with Berks 61 Owner, LLC, a joint venture entity (the "**Landlord**") consisting of American Realty Advisors (70% ownership) and Endurance Real Estates Group (30% ownership), pursuant to which the Borrower is leasing approximately 270,000 square feet of space for the purpose of operating the Pennsylvania Facility.  The term of the Lease Agreement commenced December 1, 2019 and continues until December 31, 2036.  Pursuant to the Lease Agreement, the Borrower will have the option to renew the Lease Agreement for up to two additional terms of five years each upon the terms and conditions set forth in the Lease Agreement, and the Borrower has covenanted in the Loan Agreement to cause the Lease Agreement to remain in effect through the maturity date of the Series 2020 Bonds.  The Borrower is responsible for payment of 100% of the operating expenses of the Pennsylvania Facility.  Pursuant to the NDA (as defined below), the Lease Agreement may not be terminated if the Borrower breaches the agreement unless the Trustee fails to cure monetary defaults within 20 days or fails to cure non-monetary defaults (or initiate steps to substantially cure the non-monetary breach) within 45 calendar days of written notice from the non-breaching party.

**Leasehold Mortgage**

The Borrower will enter into a First Amendment to Open-End Leasehold Mortgage, Security Agreement, Assignment of Rents and Leases, and Fixture Filing (the "**Leasehold Mortgage**"), amending that certain Open-End Leasehold Mortgage, Security Agreement and Assignment of Rents and Leases, and Fixture Filing dated as of June 1, 2019, but effective as of July 10, 2019, as security for its obligation to make Loan Repayments and its other obligations under the Loan Agreement.  Pursuant to the Leasehold Mortgage, the Borrower granted to the Trustee, as beneficiary under the Leasehold Mortgage, for the benefit of the Holders of the Series 2019 Bonds and the Holders of the Series 2020 Bonds, all of the Borrower's estate, right, title and interest whether now owned or hereafter acquired in and to the Premises (as defined in the Leasehold Mortgage), which includes but is not limited to the Project, the Lease Agreement, all other property or assets, any deposit accounts (including the Borrower's interest in any funds held under the Indenture), all other receivables or contract rights.

**Non-Disturbance and Access Agreement**

The Borrower entered into a Non-Disturbance and Access Agreement, dated as of June 1, 2019 (the "**NDA**") with the Trustee and the Landlord.  Pursuant to the NDA, the Lease Agreement will not be terminated (unless there is an uncured event of default under the Lease), but rather will remain in full force and effect in accordance with its terms in the event the Leasehold Mortgage is foreclosed or any foreclosure sale of the leasehold estate created by the Lease Agreement is made or any transfer therein in lieu of foreclosure is made.

Pursuant to the Leasehold Mortgage, if an event of default under the Leasehold Mortgage (the "**Leasehold Mortgage Event of Default**") has occurred, then at the option of the Trustee the Leasehold Mortgage may be foreclosed in any manner now provided by Pennsylvania law, and the trustee under the Leasehold Mortgage (the "**Leasehold Mortgage Trustee**"), or the agent or successor thereof, at the request of the Trustee, may sell the

Premises (as defined in the Leasehold Mortgage) or any part of the Premises pursuant to the provisions of the Leasehold Mortgage.

At any such public sale, the Trustee may execute and deliver to the purchaser a conveyance of the Premises or any part of the Premises. Pursuant to the NDA, the Trustee will have the right to enforce any of its remedies set forth in the Leasehold Mortgage without the approval of the Borrower or the Landlord.  In the event of any sale under the Leasehold Mortgage by virtue of the exercise of the powers therein granted, or pursuant to any order in any judicial proceedings or otherwise, the Premises may be sold as an entirety or in separate parcels and in such manner or order as the Trustee in its sole discretion may elect, and if the Trustee so elects, the Leasehold Mortgage Trustee or the Trustee may sell the personal property covered by the Leasehold Mortgage pursuant to the provisions therein, and one or more exercises of the powers therein granted will not extinguish or exhaust such powers, until the entire Premises are sold or the Secured Indebtedness is paid in full.  If the Secured Indebtedness is now or hereafter further secured by any chattel mortgages, pledges, contracts of guaranty, assignments of lease or other security instruments, the Trustee at its option may exhaust the remedies granted under any of said security instruments or the Leasehold Mortgage either concurrently or independently, and in such order as the Trustee may determine.

If a Leasehold Mortgage Event of Default has occurred, the Trustee may, in addition to and not in abrogation of the rights covered under the preceding paragraph, either with or without entry or taking possession as provided in the Leasehold Mortgage or otherwise, proceed by a suit or suits in law or in equity or by any other appropriate proceeding or remedy to pursue any other remedy available to it, all as the Trustee in its sole discretion will elect.

**Subordination, Non-Disturbance and Attornment Agreement**

In the event that the Landlord desires to execute a mortgage on the real estate ("**New Mortgage**") to secure indebtedness owing by the Landlord, the Borrower has agreed to enter into a Subordination, Non-Disturbance and Access Agreement (the "**SNDA**"), with the Landlord and the Trustee.  Pursuant to the SNDA, the Borrower agrees to confirm the subordination of the Lease Agreement to the lien of the New Mortgage and the mortgagee under the New Mortgage will agree not to disturb the tenancy of the Borrower and to consent to the Leasehold Mortgage on the terms and conditions set forth in the SNDA.  The form of SNDA is attached as an exhibit to the Lease.

**No Credit Enhancement**

**The Series 2020 Bonds will not be secured by any letter of credit or other similar form of credit enhancement or liquidity facility.**

The Issuer will not be required to advance any moneys derived from any source other than the Revenues and other assets pledged under the Indenture for any of the purposes mentioned in the Indenture, whether for the payment of the principal of or interest on the Series 2020 Bonds or for any other purpose of the Indenture. NEITHER THE COMMONWEALTH OF PENNSYLVANIA NOR ANY POLITICAL SUBDIVISION THEREOF IS OR WILL BE OBLIGATED TO PAY THE PRINCIPAL OF, PREMIUM, IF ANY, AND INTEREST ON THE SERIES 2020 BONDS.  The Issuer will not be liable for any costs, expenses, losses, damages, claims or actions, of any conceivable kind on any conceivable theory, under or by reason of or in connection with the Loan Agreement, the Guaranty, the Series 2020 Bonds or the Indenture, except only to the extent amounts are received for the payment thereof from the Borrower under the Loan Agreement.

**Debt Service Reserve Fund**

So long as no Event of Default shall have occurred and be continuing, the Series 2019 subaccount of the Debt Service Reserve Fund, established and held in trust by the Trustee pursuant to the Indenture, will be used solely to pay the principal of and interest on the Series 2019 Bonds, the Series 2020 subaccount of the Debt Service Reserve Fund will be used solely to pay the principal of and interest on the Series 2020 Bonds, and any subaccount of the Debt Service Reserve Fund with respect to any Additional Bonds will be used solely to pay the principal of and interest on such Series of Additional Bonds, in the event of a deficiency in the amounts required to be on deposit

in the Revenue Fund. The total amount required to be maintained in each subaccount of the Debt Service Reserve Fund will equal the then applicable Reserve Requirement for each Series of Bonds.

"**Reserve Requirement**" means, (a) with respect to the Series 2019 Bonds, an amount equal to the least of (i) Maximum Annual Debt Service with respect to the Series 2019 Bonds, (ii) 125% of the average annual debt service on the Series 2019 Bonds, and (iii) ten percent (10%) of the original principal amount of the Series 2019 Bonds (the "**Series 2019 Reserve Requirement**"); (b) with respect to the Series 2020 Bonds, an amount equal to the least of (i) Maximum Annual Debt Service with respect to the Series 2020 Bonds, (ii) 125% of the average annual debt service on the Series 2020 Bonds, and (iii) ten percent (10%) of the original principal amount of the Series 2020 Bonds (the "**Series 2020 Reserve Requirement**"); and (c) with respect to any Additional Bonds, the Reserve Requirement set forth in the Supplemental Indenture relating thereto.

On any Interest Payment Date immediately following the incurrence of any deficiency in the amount required to be maintained in the Debt Service Reserve Fund as a result of a withdrawal from the Debt Service Reserve Fund or a valuation pursuant to the Indenture, the Trustee will notify the Borrower that it is required to make payments pursuant to the Loan Agreement with respect to the Series 2019 Bonds, the Series 2020 Bonds and any Additional Bonds in an aggregate amount sufficient to eliminate the deficiency, and the Trustee will cause such deficiency to be transferred from the Revenue Fund in three monthly installments as provided in the Indenture, regardless of whether such deficiency is the result of a draw on the Debt Service Reserve Fund by the Trustee or a valuation of investments held in the Debt Service Reserve Fund pursuant to the Indenture.

Moneys on deposit in the Debt Service Reserve Fund will be applied, after use of all available funds in the Revenue Fund, as follows: (1) on the date of each permitted or required payment from the Revenue Fund with respect to the Bonds, (a) moneys in the Series 2019 subaccount of the Debt Service Reserve Fund will be applied to cure any deficiency in the Revenue Fund for the payment of the Series 2019 Bonds, (b) moneys in the Series 2020 subaccount of the Debt Service Reserve Fund will be applied to cure any deficiency in the Revenue Fund for the payment of the Series 2020 Bonds, and (c) moneys in any subaccount of the Debt Service Reserve Fund with respect to any Additional Bonds will be applied to cure any deficiency in the Revenue Fund for the payment of such Series of Additional Bonds; (2) as soon as practicable following the semi-annual valuation of amounts held in the Debt Service Reserve Fund, (a) any amount in the Series 2019 subaccount of the Debt Service Reserve Fund in excess of the Series 2019 Reserve Requirement will be transferred to the Revenue Fund for payment of principal of and interest on the Series 2019 Bonds, (b) any amount in the Series 2020 subaccount of the Debt Service Reserve Fund in excess of the Series 2020 Reserve Requirement will be transferred to the Revenue Fund for payment of principal of and interest on the Series 2020 Bonds, and (c) any amount in any subaccount of the Debt Service Reserve Fund with respect to any Additional Bonds in excess of the Reserve Requirement applicable thereto will be transferred to the Revenue Fund for payment of principal of and interest on such Series of Additional Bonds, in each case so long as no Event of Default shall have occurred and be continuing; (3) in each month during the twelve month period preceding the final maturity date of a Series of Bonds, moneys held in the Debt Service Reserve Fund in respect of such Series of Bonds will be credited against payment of installment payments otherwise payable in respect of principal of and interest on such Series of Bonds, and will be transferred to the Revenue Fund for the payment of such principal and interest on such Series of Bonds, except, that, with respect to the Series 2020 Bonds, on November 25, 2036, moneys held in the Series 2020 subaccount of the Debt Service Reserve Fund will be credited against the principal of and interest due on the Series 2020 Bonds at maturity, and will be transferred to the Revenue Fund for the payment of such principal and interest on the Series 2020 Bonds on the maturity date thereof; provided, however, that no transfer pursuant to subparagraph (3) will be made to the extent that, immediately prior to such crediting and transfer, (a) the amount on deposit in the Series 2019 subaccount of the Debt Service Reserve Fund is not at least equal to the Series 2019 Reserve Requirement, (b) the Series 2020 subaccount of the Debt Service Reserve Fund is not at least equal to the Series 2020 Reserve Requirement, and (c) the subaccount of the Debt Service Reserve Fund with respect to any Additional Bonds is not at least equal to the Reserve Requirement applicable thereto, in each case less the amounts previously transferred to the Revenue Fund during such twelve month period pursuant to subparagraph (3) or otherwise; and (4) notwithstanding the foregoing, upon the occurrence and during the continuation of any Event of Default under the Indenture, (a) moneys on deposit in the Series 2019 subaccount of the Debt Service Reserve Fund will be applied as directed by the Holders of a majority in principal amount of the Series 2019 Bonds then Outstanding, (b) moneys in the Series 2020 subaccount of the Debt Service Reserve Fund will be applied as directed by the Holders of a majority in principal amount of the Series 2020 Bonds then Outstanding, and (c) moneys in any subaccount of the Debt Service Reserve Fund with respect to any

Additional Bonds shall be applied as directed by the Holders of a majority in principal amount of such Series of Additional Bonds then Outstanding, in each case including without limitation for payment of the Trustee's fees and expenses under the Indenture, which shall be withdrawn to pay such fees and expenses by the Trustee on a pro rata basis based upon the then Outstanding principal amounts of the Series 2019 Bonds, Series 2020 Bonds and any Additional Bonds.

Investments in the Debt Service Reserve Fund will be valued by the Trustee on June 1 and December 1 of each year and at the time of any withdrawal from the Debt Service Reserve Fund, at the lesser of the face amount or the market value thereof as reflected in the Trustee's trust accounting system.  If the amount on deposit in the Debt Service Reserve Fund at any such time is less than the Reserve Requirement, the Trustee will notify the Borrower that it is required to make payments to eliminate such deficiency pursuant to the Loan Agreement and such deficiency will be remedied in accordance with the Indenture by the Trustee transferring from the Revenue Fund three equal monthly installments which in the aggregate equal such deficiency.

The Trustee will give notice to the Issuer not later than five days after any deficiency in the amount required to be maintained in the Debt Service Reserve Fund as a result of a draw on the Debt Service Reserve Fund.

**Additional Bonds**

Conditioned upon the receipt by the Trustee of certain documents and items set forth in the "Additional Bonds" section of the Indenture and compliance by the Borrower with all conditions set forth in the Loan Agreement, including, but not limited to, obtaining the prior written consent of the Holders of a majority in principal amount of the Series 2019 Bonds then Outstanding, the Issuer will deliver Additional Senior Bonds and Additional Subordinate Bonds from time to time to finance Costs of the Project and Costs of Issuance (to the extent permitted under the Indenture, the Loan Agreement and the Tax Certificate) to the extent the Bonds Outstanding are insufficient for the payment of same and so long as no Event of Default shall have occurred and be continuing under the Indenture.  Any Additional Senior Bonds will be secured on a parity of lien with respect to the trust estate pledged and assigned under the Indenture with respect to the Series 2019 Bonds, and any Additional Subordinate Bonds will be secured on a parity of lien with respect to the trust estate pledged and assigned under the Indenture with respect to the Series 2020 Bonds.

Each Series of Additional Senior Bonds will be delivered, upon the receipt by the Trustee of the items set forth under the "Additional Senior Bonds" section of the Indenture, pursuant to and evidenced by a Supplemental Indenture delivered in accordance with the Indenture.  Each Series of Additional Subordinate Bonds will be delivered, upon the receipt by the Trustee of the items set forth under the "Additional Subordinate Bonds" section of the Indenture, pursuant to and evidenced by a Supplemental Indenture delivered in accordance with the Indenture.

## SOURCES AND USES OF FUNDS

The estimated sources and uses of funds with respect to the Series 2020 Bonds are set forth below:

| | |
|---|---|
| **Sources of Funds** | |
| Principal Amount of Series 2020 Bonds | $10,000,000 |
| Borrower's Funds | 10,000,000 |
| Total Sources of Funds | $20,000,000 |
| | |
| **Uses of Funds** | |
| Deposit to Project Fund [1] | $18,064,929 |
| Deposit to Reserve Fund | 1,000,000 |
| Underwriter's Discount | 200,000 |
| Costs of Issuance [2] | 735,071 |
| Total Uses of Funds | $20,000,000 |

_____

[1]  Includes $10,597,414.00 Deposit to Tax-Exempt Subaccount of the Project Fund plus $7,467,515 Deposit to the Equity Subaccount of the Project Fund for working capital.

[2]  Includes fees of the Issuer, Co-Bond Counsel, Disclosure Counsel, the Trustee, Trustee's Counsel, Purchaser's Counsel, Borrower's Counsel, and other miscellaneous expenses.

## FINANCIAL COVENANTS

The Borrower will make the following financial covenants for as long as any Series 2020 Bonds are outstanding:  (i) a Debt Service Coverage Ratio covenant; (ii) a Days Cash on Hand covenant; (iii) an Additional Indebtedness covenant; and (iv) a Distributions covenant.

**Debt Service Coverage Ratio Covenant**

Pursuant to the Loan Agreement, for the Fiscal Year ending December 31, 2021, the Borrower covenants to produce sufficient annual Gross Revenues in order to provide a Debt Service Coverage Ratio equal to at least (i) 125% of the debt service on the Series 2019 Bonds and any Parity Debt for such Fiscal Year (the "**Initial Parity Coverage Requirement**"), and (ii) 105% of all debt service obligations of the Borrower (including the Series 2019 Bonds and the Series 2020 Bonds) which are Liens or encumbrances upon or payable from the Gross Revenues (the "**Initial Overall Coverage Requirement**" and, together with the Initial Parity Coverage Requirement, the "**Initial Coverage Requirement**"), calculated at the end of such Fiscal Year, based upon the audited financial statements of the Borrower for such Fiscal Year being tested.  For each Fiscal Year thereafter, commencing with Fiscal Year ending December 31, 2022, the Borrower covenants to produce sufficient annual Gross Revenues in order to provide a Debt Service Coverage Ratio equal to at least 135% of all debt service on all Indebtedness of the Borrower (the "**Coverage Requirement**"), calculated at the end of each Fiscal Year, based upon the audited financial statements of the Borrower for the Fiscal Year being tested.

"Debt Service Coverage Ratio" means for any given period of time, the ratio of (a) EBITDA to (b) the total of all principal, interest, premium (if any), fees and other amounts due and payable during such period in connection with Indebtedness of the Borrower as applied in the Loan Agreement, all as determined in accordance with GAAP.

If for the Fiscal Year ending December 31, 2021, the Borrower fails to meet the Initial Parity Coverage Requirement or the Initial Overall Coverage Requirement (or both), or for any Fiscal Year thereafter, commencing with Fiscal Year ending December 31, 2022, the Borrower fails to meet the Coverage Requirement, then the Borrower covenants to retain promptly an Independent Consultant to make recommendations to increase EBITDA in the following Fiscal Year to the level required or, if in the opinion of the Independent Consultant the attainment of such level is impracticable, to the highest level attainable for such Fiscal Year and the number of Fiscal Years required to return the Borrower to compliance with the Initial Coverage Requirement or the Coverage Requirement, as applicable.  The Borrower will provide notice of the proposed retention of an Independent Consultant within three

24

Business Days of such retention to the Issuer and the Trustee, who will provide notice to the Bondholders, which notice will specify the identity of the Independent Consultant proposed to be retained by the Borrower. If, within 30 calendar days of the providing of such notice, the Holders of a majority in aggregate principal amount of Series 2019 Bonds and any Additional Senior Bonds then Outstanding (and only if such Series 2019 Bonds or Additional Senior Bonds are no longer Outstanding, Holders of a majority in aggregate principal amount of the Series 2020 Bonds and any Additional Subordinate Bonds then Outstanding) notify the Trustee in writing that they object to the retention of such Independent Consultant, such Independent Consultant will not be retained by the Borrower and the Borrower will provide notice of the proposed retention of a different Independent Consultant in the same manner. The process will continue until the Borrower has proposed retention of an Independent Consultant that is not objected to by the Holders of a majority in aggregate principal amount of Series 2019 Bonds and any Additional Senior Bonds then Outstanding (and only if such Series 2019 Bonds or Additional Senior Bonds are no longer Outstanding, Holders of a majority in aggregate principal amount of the Series 2020 Bonds and any Additional Subordinate Bonds then Outstanding).

"**Independent Consultant**" means any professional consulting, accounting, engineering, financial advisory firm or commercial banking firm or individual selected by the Borrower having the skill and experience necessary to render the particular report required and having a favorable reputation for such skill and experience, and which firm is either licensed by, or permitted to practice in, the Commonwealth and which is reputable and has over 5 years of operating history and which firm or individual does not control the Borrower and is not controlled by or under common control with the Borrower.

"**EBITDA**" means, with respect to any period, Net Income for such period of the Borrower plus all amounts deducted in arriving at such Net Income amount in respect of (i) federal, state and local income taxes, (ii) interest expense, (iii) amortization expense and (iv) depreciation expense; provided, however, that the following items shall be excluded from the computation of "EBITDA": (A) extraordinary items of income or loss, (B) gains or losses from the extinguishment of Indebtedness, (C) unrealized gains and losses on investments or Financial Product Agreements, (D) any gain or loss from the disposition of assets not in the ordinary course of business, (E) any loss from impairment of the value of assets, (F) financing costs that are treated as a current expense, rather than amortized, (G) costs of equity based compensation not paid in cash and (H) any other item that is nonrecurring and also a non-cash item. "Net Income" means, with respect to any period, the sum of the excess of revenues over expenses of the Borrower or the Guarantor, as applicable, for such period as determined by GAAP in the United States, provided that equity contributions by or on behalf of the Guarantor to Borrower during the period measured shall be treated as Gross Revenues.

The Borrower agrees to transmit a copy of the report of the Independent Consultant to the Trustee and the Bondholders within five days of the receipt of such recommendations. The Borrower will, promptly upon its receipt of such recommendations, take such action as will be in substantial conformity with such recommendations.

If the Borrower retains and substantially complies with the recommendations of the Independent Consultant, the Borrower will be deemed to have complied with the covenants set forth in the Loan Agreement for such Fiscal Year, notwithstanding that for the Fiscal Year ending December 31, 2021, either of the Initial Parity Coverage Requirement or the Initial Overall Coverage Requirement was not met, or that for any Fiscal Year thereafter, commencing with the Fiscal Year ending December 31, 2022, the Coverage Requirement was not met, provided that the Borrower is in compliance with the Coverage Requirement at the end of the next Fiscal Year. Notwithstanding the foregoing, the Borrower will not be excused from taking any action or performing any duty required under the Loan Agreement or the Indenture and no other Event of Default will be waived by the operation of the provisions of this paragraph.

Notwithstanding certain provisions of the Loan Agreement, a Loan Default Event will exist if (i) for the Fiscal Year ending December 31, 2021, either the Initial Parity Coverage Requirement is less than 110% or the Initial Overall Coverage Requirement ratio is less than 100%, and (ii) for each Fiscal Year thereafter, commencing with the Fiscal Year ending December 31, 2022, the Coverage Requirement ratio is less than 110%.

**Days Cash on Hand Covenant**

Pursuant to the Loan Agreement, the Borrower will covenant that for the Fiscal Year ending December 31, 2021, it will manage its business such that Borrower's Days Cash on Hand, as of December 31 of such Fiscal Year will not be less than 45 Days Cash on Hand (the "**Initial Days Cash on Hand Requirement**"). For each Fiscal Year thereafter, commencing with the Fiscal Year ending December 31, 2022, the Borrower will covenant to manage its business such that Borrower's Days Cash on Hand, as of December 31 of such Fiscal Year, will not be less than 60 Days Cash on Hand (the "**Days Cash on Hand Requirement**").

"**Days Cash on Hand**" means, for the period tested, the sum of Borrower's (i) cash, (ii) cash equivalents and (iii) marketable debt and equity securities, divided by the quotient of (x) operating expenses (which shall include all scheduled debt service obligations payable during the period and shall exclude depreciation and amortization) divided by (y) 365. Notwithstanding any of the foregoing to the contrary, Days Cash on Hand shall not include cash in (A) self-insurance funds, (B) proceeds of any Indebtedness, including Short-Term Indebtedness, Subordinate Debt, Non-Recourse Indebtedness or put debt not supported by a liquidity facility with term-out features, (C) held to support outstanding letters of credit or other financial guarantees, (D) any collateral required pursuant to the terms of a Financial Product Agreement that has been posted or (E) the Debt Service Reserve Fund.

The determination of annual operating expenses for each Fiscal Year shall be made utilizing the audited financial statements of the Borrower for the Fiscal Year being tested.

If for the Fiscal Year ending December 31, 2021, the Days Cash on Hand is less than the Initial Days Cash on Hand Requirement, or for any Fiscal Year thereafter, commencing with Fiscal Year ending December 31, 2022, the Days Cash on Hand is less than the Days Cash on Hand Requirement, the Borrower covenants to retain promptly an Independent Consultant to make recommendations to increase Days Cash on Hand in the following Fiscal Year to the Days Cash on Hand Requirement for such Fiscal Year or, if in the opinion of the Independent Consultant the attainment of such level is impracticable, to the highest level attainable for such Fiscal Year and the number of Fiscal Years required to return to the Initial Days Cash on Hand Requirement or the Days Cash on Hand Requirement, as applicable. The Borrower will provide notice of the proposed retention of an Independent Consultant within three Business Days of such retention to the Trustee (and the Trustee will notify the Bondholders), which notice will specify the identity of the Independent Consultant proposed to be retained by the Borrower. If, within 30 calendar days of the providing of such notice, the Holders of a majority in aggregate principal amount of Series 2019 Bonds and any Additional Senior Bonds then Outstanding (and only if such Series 2019 Bonds or Additional Senior Bonds are no longer Outstanding, Holders of a majority in aggregate principal amount of the Series 2020 Bonds and any Additional Subordinate Bonds then Outstanding) notify the Trustee in writing that they object to the retention of such Independent Consultant, such Independent Consultant will not be retained by the Borrower and the Borrower will provide notice of the proposed retention of a different Independent Consultant in the same manner. The process will continue until the Borrower has proposed retention of an Independent Consultant that is not objected to by the Holders of a majority in aggregate principal amount of the Series 2019 Bonds and any Additional Senior Bonds then Outstanding (and only if such Series 2019 Bonds or Additional Senior Bonds are no longer Outstanding, Holders of a majority in aggregate principal amount of the Series 2020 Bonds and any Additional Subordinate Bonds then Outstanding).

The Borrower agrees to transmit a copy of the report of the Independent Consultant to the Trustee and the Bondholders within five days of the receipt of such recommendations. The Borrower will, promptly upon its receipt of such recommendations, take such action as shall be in substantial conformity with such recommendations.

If the Borrower retains and substantially complies with the recommendations of the Independent Consultant, the Borrower will be deemed to have complied with the covenants set forth in the Loan Agreement for such Fiscal Year, notwithstanding that Days Cash on Hand is less than the Days Cash on Hand Requirement for such Fiscal Year, provided that the Borrower is in compliance with its Days Cash on Hand Requirement at the end of the next Fiscal Year. Notwithstanding the foregoing, the Borrower will not be excused from taking any action or performing any duty required under the Loan Agreement and no other Event of Default will be waived by the operation of the provisions of this paragraph.

Notwithstanding certain provisions of the Loan Agreement, a Loan Default Event will exist and be continuing if (i) for the Fiscal Year ending December 31, 2021, the Borrower's Days Cash on Hand is less than 30 Days Cash on Hand, and (ii) for each Fiscal Year thereafter, the Borrower's Days Cash on Hand is less than 45 Days Cash on Hand.

**Additional Indebtedness Covenant**

Pursuant to the Loan Agreement, the Borrower will covenant that it will not issue or incur any additional Indebtedness unless the Borrower has obtained the prior written consent of the Holders of a majority in principal amount of the Series 2019 Bonds then Outstanding.

**Distributions Covenant**

The Borrower will not make distributions on any of its membership interests (except for tax distributions, which may be made commencing with the Fiscal Year ending December 31, 2022 based upon audited financial statements of the Borrower), nor make any payments of any type (including intercompany loan repayments) to the Guarantor, to Guarantor's parent company or companies or to any subsidiary of any of the foregoing, until the earlier of (i) the audited financial statements of the Borrower for the Fiscal Year ending December 31, 2026 becoming available and proving eligibility, and (ii) the Series 2019 Bonds being paid or defeased in full.

Thereafter, the Borrower will not make distributions on any of its membership interests, nor make any payments of any type (including intercompany loan repayments) to the Guarantor, to Guarantor's parent company or companies or to any subsidiary of any of the foregoing, unless all of the following are met:

(i)      the Coverage Requirement is satisfied with respect to the Fiscal Year prior to the date on which distributions are to be made calculated on a consistent basis with the calculations provided for in the Loan Agreement based upon the audited financial statements of the Borrower for the Fiscal Year being tested;

(ii)      no event has occurred and no condition exists which would constitute a Loan Default Event under the Loan Agreement or which, with the passing of time or with the giving of notice or both, would become such a Loan Default Event;

(iii)      the Borrower is in compliance with its Debt Service Coverage Ratio and Days Cash on Hand covenants set forth in the Loan Agreement and described above under "FINANCIAL COVENANTS – Debt Service Coverage Ratio Covenant" and " – Days Cash of Hand Covenant"; and

(iv)      Days Cash on Hand Requirement was satisfied with respect to the Fiscal Year prior to the date on which distributions are to be made and there shall remain, following any distribution, no less than 60 Days Cash on Hand.

Notwithstanding anything to the contrary in the Loan Agreement, concurrent contributions from the Guarantor will be excluded from any calculations made pursuant to (i) – (iv) above, unless such contributions relate to capital expenditures made or to be made by the Borrower.

Notwithstanding anything to the contrary herein, the Borrower shall not invest in any subsidiary entity of the Borrower, the Guarantor, any parent company or companies or in any subsidiary of any of the foregoing, nor make any loan to any Person unless the prior written consent of the Holders of a majority in principal amount of the Series 2019 Bonds then Outstanding has been obtained.

Notwithstanding anything to the contrary contained in this section, the Borrower shall be permitted to pay and/or reimburse any of its members and affiliates for ordinary and reasonable operation and maintenance fees, costs or expenses payable to such member or affiliate, the Borrower's share of ordinary and reasonable employee benefit expenses actually paid by such member or affiliate and/or current ordinary and reasonable operating expenses incurred by such member or affiliate on the Borrower's behalf, including, without limitation, the ordinary and reasonable (y) management and services fees to cover administrative salaries and benefits for personnel actually

providing services to the Borrower, and sales, marketing, legal and accounting expenses relating to the Project, provided that (I) such payments and reimbursements are reflected in the Borrower's annual budget for the current Fiscal Year and (II) that the actual amount of such payments and/or reimbursements shall not exceed the amounts specified therefor in such budget by more than 5% in the aggregate, and (z) purchases or sales of plastics, flake or finished output of the Project or of an affiliate of the Borrower on fair market value, arm's length terms.

## PROJECTED REVENUES AND EXPENSES

Set forth in APPENDIX A is a section entitled "Projected Financial Statements" that contains certain projected operating results of the Borrower and of the Project. The financial information in Appendix A assumes completion of all improvements and installation of all equipment at the Pennsylvania Facility by the end of September 2020, at the currently estimated costs, although no assurance can be given that this will occur. These projections are subject to a number of other assumptions, estimates and uncertainties and there can be no assurance that these assumptions and estimates will prove to be accurate or that the actual operating results of the Borrower or the Project will attain the levels shown in those projections, and it is possible that actual revenues, net income, EBITDA and debt service coverage will be lower, perhaps substantially, than the amounts reflected in these projections. Any failure to attain the financial and operating performance reflected in these projections could have a material adverse effect on the ability of the Borrower to make Loan Repayments under the Loan Agreement, and could have a materially adverse effect on the ability of the issuer to make debt service payments on the Series 2020 Bonds. See "RISK FACTORS – Reliance on Projections and Underlying Assumptions." Summarized below is the required debt service for the Series 2020 Bonds. Debt service coverage assuming annual EBITDA is more fully described in APPENDIX B. See also "FORWARD-LOOKING STATEMENTS" on page (i) hereof.

**BOND DEBT SERVICE**

| Period Ending | Principal | Interest | Semi-Annual Total | Annual Total |
|---|---|---|---|---|
| 12/1/2020 | - | $191,250 | $191,250 | $191,250 |
| 6/1/2021 | - | 425,000 | 425,000 | - |
| 12/1/2021 | - | 425,000 | 425,000 | 850,000 |
| 6/1/2022 | - | 425,000 | 425,000 | - |
| 12/1/2022 | - | 425,000 | 425,000 | 850,000 |
| 6/1/2023 | - | 425,000 | 425,000 | - |
| 12/1/2023 | - | 425,000 | 425,000 | 850,000 |
| 6/1/2024 | - | 425,000 | 425,000 | - |
| 12/1/2024 | - | 425,000 | 425,000 | 850,000 |
| 6/1/2025 | - | 425,000 | 425,000 | - |
| 12/1/2025 | - | 425,000 | 425,000 | 850,000 |
| 6/1/2026 | - | 425,000 | 425,000 | - |
| 12/1/2026 | - | 425,000 | 425,000 | 850,000 |
| 6/1/2027 | - | 425,000 | 425,000 | - |
| 12/1/2027 | - | 425,000 | 425,000 | 850,000 |
| 6/1/2028 | - | 425,000 | 425,000 | - |
| 12/1/2028 | - | 425,000 | 425,000 | 850,000 |
| 6/1/2029 | - | 425,000 | 425,000 | - |
| 12/1/2029 | - | 425,000 | 425,000 | 850,000 |
| 6/1/2030 | - | 425,000 | 425,000 | - |
| 12/1/2030 | - | 425,000 | 425,000 | 850,000 |
| 6/1/2031 | - | 425,000 | 425,000 | - |
| 12/1/2031 | - | 425,000 | 425,000 | 850,000 |
| 6/1/2032 | - | 425,000 | 425,000 | - |
| 12/1/2032 | - | 425,000 | 425,000 | 850,000 |
| 6/1/2033 | - | 425,000 | 425,000 | - |
| 12/1/2033 | - | 425,000 | 425,000 | 850,000 |
| 6/1/2034 | - | 425,000 | 425,000 | - |
| 12/1/2034 | - | 425,000 | 425,000 | 850,000 |
| 6/1/2035 | - | 425,000 | 425,000 | - |
| 12/1/2035 | - | 425,000 | 425,000 | 850,000 |
| 6/1/2036 | - | 425,000 | 425,000 | - |
| 12/1/2036[*] | $10,000,000 | 425,000 | 9,425,000 | 9,850,000 |
| Total | $10,000,000 | $13,791,250 | $22,791,250 | $22,791,250 |

[*] Includes a credit from an assumed transfer of $1,000,000 from the Series 2020 subaccount of the Debt Service Reserve Fund.

## RISK FACTORS

*The following is intended only as a summary of certain risk factors attendant to an investment in the Series 2020 Bonds. In order for potential investors to identify risk factors and make an informed decision, potential investors should be thoroughly familiar with this entire Limited Offering Memorandum (including the appendices hereto).*

**Limited Obligations**

THE SERIES 2020 BONDS ARE LIMITED OBLIGATIONS OF THE ISSUER AND ARE PAYABLE SOLELY FROM THE SOURCES REFERRED TO IN THE INDENTURE AND DESCRIBED HEREIN, AND THE SERIES 2020 BONDS WILL NOT BE OR BE DEEMED AN OBLIGATION OF THE COMMONWEALTH OF PENNSYLVANIA OR ANY POLITICAL SUBDIVISION THEREOF. NEITHER THE COMMONWEALTH OF PENNSYLVANIA NOR ANY POLITICAL SUBDIVISION THEREOF IS OR WILL BE OBLIGATED TO PAY THE PRINCIPAL OF, PREMIUM, IF ANY, AND INTEREST ON THE SERIES 2020 BONDS, AND NEITHER THE FAITH AND CREDIT NOR THE TAXING POWER OF THE COMMONWEALTH OF PENNSYLVANIA OR ANY POLITICAL SUBDIVISION THEREOF IS PLEDGED TO SUCH PAYMENT. THE ISSUER HAS NO TAXING POWER.

**Lack of Operating History; Limited Recourse**

The Borrower and CarbonLite P Holdings, LLC are each recently formed entities with limited operating history and there can be no assurance that the Project will be successful and produce sufficient cash to service the Series 2020 Bonds. The Borrower and the Guarantor have limited assets and have no assured source of financing beyond the initial capital invested by CarbonLite P Holdings, LLC's parent company and the additional equity agreed to be invested in connection with the issuance of the Series 2020 Bonds, and if the total costs of the Project exceed the amounts estimated, or if there are substantial delays in completing the Project, or if the revenues from operation of the Pennsylvania Facility are inadequate to make all required payments on the Series 2020 Bonds, the Project could be materially and adversely affected. Further, the obligations and liabilities of the Borrower under the Loan Agreement and of the Guarantor under the Guaranty, while of a recourse nature, are effectively limited to the Project and money derived from the operation of the Project, and neither the sole member of the Guarantor or any of its members or affiliates have any personal liability for payments on the Loan Agreement or with respect to the Series 2020 Bonds, and the Holders of the Series 2020 Bonds are not being granted any lien on the revenues of CarbonLite Industries or CarbonLite Holdings. Accordingly, the only source of funds to pay the principal of, premium if any, and interest on, the Series 2020 Bonds will be the Project and the revenues derived therefrom.

**Tax-Exempt Status of the Series 2020 Bonds**

The tax-exempt status of the interest on the Series 2020 Bonds is based on continued compliance by the Borrower and the Issuer with certain covenants relating generally to restrictions on use of the Facility, arbitrage limitations, rebate of certain excess investment earnings to the federal government and restrictions on the amount of issuance costs financed with proceeds of the Series 2020 Bonds. Failure by the Borrower or the Issuer to comply with such covenants could cause interest on the Series 2020 Bonds to become subject to federal income taxation retroactive to the date of issuance of the Series 2020 Bonds.

**Proposed Changes to Tax Treatment of Series 2020 Bonds**

Proposals to alter or eliminate the exclusion of interest on tax-exempt bonds from gross income for some or all taxpayers have been made in the past and may be made again in the future.

It is unclear whether any legislation will be proposed or enacted affecting the tax treatment of interest on the Series 2020 Bonds. If any such legislation is retroactive and applies to tax-exempt bonds, including the Series 2020 Bonds, the adoption of any such legislation could adversely affect the marketability of and the market value for the Series 2020 Bonds. See "TAX MATTERS" herein for further information regarding the tax status of the Series 2020 Bonds.

**Lack of Rating; Limited Marketability for the Series 2020 Bonds**

The Series 2020 Bonds are a new issue of securities which has not been rated by any national credit rating agency. The Series 2020 Bonds are believed to bear higher rates of interest than would prevail if the Series 2020 Bonds were rated investment grade in order to compensate investors for a level of risk that is higher than the risk generally associated with investment grade bonds. In addition, unrated bonds typically are less liquid in the secondary market than rated bonds. Moreover, it is doubtful that there will be a secondary market for the Series 2020 Bonds, and the absence of such a market for the Series 2020 Bonds could result in investors not being able to resell the Series 2020 Bonds should they need to or wish to do so. While the Series 2020 Bonds will be eligible for trading by QIBs (as defined herein) and AIs (as defined herein), the Series 2020 Bonds will not be registered for trading on any securities exchange.

**Prepayment Risks**

Subject to the limitations on redemption so long as any of the Series 2019 Bonds are Outstanding, all of the Series 2020 Bonds are subject to redemption in advance of their stated maturities under certain circumstances, including (a) a total or partial casualty to, or condemnation of, the Project; (b) upon a Determination of Taxability (as defined herein); (c) upon a finding of invalidity of the Loan Agreement; or (d) at Borrower's option commencing in 2026. Further, upon the occurrence of certain events of default, the payment of the principal of, and interest on, the Series 2020 Bonds may be accelerated. Thus, there can be no assurance that the Series 2020 Bonds will remain outstanding until their stated maturities. In the event that the Series 2020 Bonds are redeemed or repaid prior to their maturity, there can be no assurance that investors will be able to reinvest the amounts received at an interest rate comparable to the interest rate on the Series 2020 Bonds. Moreover, because the obligations of the Borrower under the Loan Agreement and the Guarantor under the Guaranty are nonrecourse, there can be no assurance that funds will be available to repay the Series 2020 Bonds in the event that they are accelerated prior to their maturity date. See "THE SERIES 2020 BONDS – Redemption" herein.

**Risk of Audit by Internal Revenue Service**

The Internal Revenue Service has an ongoing program of auditing tax-exempt obligations to determine whether, in the view of the Internal Revenue Service, interest on such tax-exempt obligations is includable in the gross income of the owners thereof for federal income tax purposes. No assurance can be given as to whether or not the Internal Revenue Service will commence an audit of the Series 2020 Bonds. If an audit is commenced, under current procedures, the Internal Revenue Service is likely to treat the Issuer as the taxpayer and the Bondholders may have no right to participate in such procedure. Neither the Underwriter nor Bond Counsel is obligated to defend the tax-exempt status of the Series 2020 Bonds on behalf of the Bondholders. None of the Issuer, the Borrower or the Guarantor, their counsel or Bond Counsel is responsible to pay or reimburse the cost of any Bondholder of the Series 2020 Bonds with respect to any audit or litigation relating to the Series 2020 Bonds.

**Sufficiency of Operating Cash Flow and Working Capital**

The Borrower's ability to make payments on and to refinance the indebtedness incurred pursuant to the Loan Agreement and to fund working capital needs and planned capital expenditures will depend on its ability to generate cash in the future. An inability to generate adequate, or any, operating cash flows could increase the need for additional or alternative sources of liquidity and could have a material adverse effect on its business, financial condition, results of operations, prospects and its ability to service the Borrower's debt and other obligations. There can be no assurance that revenues, if any, generated by the Pennsylvania Facility, if completed, will provide the Borrower with sufficient funds to pay amounts due under the Loan Agreement, which in turn will mean that there can be no assurance that funds will be available to make timely payments of principal of and premium, if any, and interest on the Series 2020 Bonds.

Cash flows from operations are subject to many factors, some of which are partially or fully beyond the control of the Borrower, including the following:

- successful installment of improvements and equipment by the date and for the cost currently estimated;
- the operation of the Project consistent with forecasted performance levels;
- the ability of the Project to perform at a level of output in accordance with Borrower's current expectations and to generate sufficient cash to make payments on the Series 2020 Bonds when due and to pay all repair and maintenance obligations, and to repair the Pennsylvania Facility in case of major damage or other casualty;
- the pricing environment for PET pellets produced by the Pennsylvania Facility and the availability of buyers for those pellets:
- the availability of and cost of raw materials for the Pennsylvania Facility;
- the market price of virgin resin which could negatively affect the pricing formulas under Borrower's contracts with a number of its principal customers;
- maintenance or enhancement of revenue from renewals or replacement of existing contracts upon expiration or termination;
- market conditions affecting waste disposal as well as potential competition from new recycling facilities that may be brought on line;
- operating difficulties and potential for increase in costs such as labor, utilities, transportation, data processing, governmental mandates, and similar items which will adversely affect the net revenue from the Project, given that the formula pricing with Borrower's customers does not take into account any cost increases other than cost of pcrPET feedstock;
- general economic, financial, competitive, legislative, regulatory and other factors, including the various risks and other factors outlined elsewhere in this Limited Offering Memorandum or in Appendix A.

If the Borrower is unable to generate sufficient cash flow to service the Series 2020 Bonds, the Borrower may need to refinance or restructure the Series 2020 Bonds, sell assets, reduce or delay capital investments, or seek to raise additional capital. However, there can be no assurance that the Borrower will be able to implement any of these alternatives. If the Borrower is unable to implement one or more of these alternatives, it is likely that it will not be able to meet its payment obligations under the Loan Agreement with respect to the Series 2020 Bonds, which could have a material and adverse effect on the holders of the Series 2020 Bonds.

**No Feedstock Contracts**

As of the date of this Limited Offering Memorandum, the Borrower has no feedstock supply agreements in place for sourcing its pcrPET for its Pennsylvania Facility, and does not presently intend to enter into any such agreement. CarbonLite employs personnel to source pcrPET and has contracts for a portion of its feedstock at its Riverside Facility and one long-term feedstock supply agreement in place for its Dallas Facility. The Borrower intends to fill its supply needs from PET scrap providers in Pennsylvania and the surrounding region. Based on its prior experience, the Borrower does not believe feedstock contracts are necessary. However, there can be no assurance that it will be successful in sourcing pcrPET for all of its needs. If the Borrower is unable to secure sufficient feedstock, it is likely that it will not achieve sufficient revenue to meet its obligations under the Loan Agreement, which would have a material adverse effect on the ability to pay debt service on the Series 2020 Bonds. See "APPENDIX A – THE PROJECT – Feedstock."

**Contractual Revenue Agreements**

As of the date of this Limited Offering Memorandum, there are two contracts with buyers for the purchase of pcrPET resin pellets to be produced by the Pennsylvania Facility: Nestlé Waters North America Inc. and Niagara Waters. In addition, CarbonLite P has reached an agreement in principle with Amcor Rigid Plastics (**"Amcor"**), pursuant to which Amcor will use commercial reasonable efforts to purchase an average of 1.0 million pounds per month from the Pennsylvania Facility through December 31, 2022, and Coca-Cola, pursuant to which Coca-Cola will use commercially reasonable efforts to purchase 1.30 million pounds per month. CarbonLite P expects to sell any remaining output to other customers. Taken together, there is more demand for the output than supply. There can be no assurance that CarbonLite will be successful in that regard or that it will be able to enter into alternative arrangements in the event that the expected arrangements with Amcor or other customers do not get implemented.

While the Borrower expects revenues from the aforementioned sales contracts to be sufficient to enable the Borrower to meet its obligations under the Loan Agreement, the Borrower's revenues could be detrimentally impacted in the event that any customer representing a material amount of revenue terminates, fails to extend its purchase commitment, elects to pay formula damages in lieu of purchasing the minimum contracted quantities, becomes insolvent, or breaches its purchase obligations.  Further because of transportation costs, the sale of Borrower's pcrPET pellets outside the Pennsylvania area may be limited and subject to competition from other recycling operations that may be located closer to other potential customers.  In addition, if total costs of manufacturing exceed the price at which such customers have the right to buy pcrPET pellets, and if the Borrower is unable to renegotiate either or both such contracts or enter into substitute contracts, it is likely that Borrower will not achieve sufficient revenue to meet its financial obligations.  Moreover, any unexpected loss of the Borrower's anticipated revenues under the sales contracts for any other reasons not described above, would also adversely impact the Borrower's ability to pay amounts required under the Loan Agreement, which would have a material adverse detrimental impact on the ability to pay debt service on the Series 2020 Bonds.

**Reliance on Projections and Underlying Assumptions**

The Project and the financing thereof have been structured on the basis of certain assumptions and projections made by the Borrower with respect to the cost of, and the date for, completion of, the Pennsylvania Facility, the Pennsylvania Facility's revenue generating capacity and the costs associated therewith, as well as the quantities of finished product to be sold and the prices of such products.  There is no guarantee that the actual operational and economic results will conform to the projections and any difference could materially and adversely impact the ability of the Borrower to make Loan Repayments pursuant to the Loan Agreement, or the ability of the Guarantor to pay under the Guaranty.  The Borrower projects to have negative cash flow during its first year of operations and its ability to borrow necessary funds to cover shortfalls in cash flow in excess of the amount projected could adversely affect the Borrower's ability to comply with its financial covenants and impede the Borrower's ability to cover required debt service and capital expenditure requirements.  The Borrower's ability to incur additional indebtedness to cover working capital needs or to make necessary capital expenditures to grow its business or to acquire new technology is extremely limited and, as such, the Borrower may need to depend on additional equity capital to cover its financial obligations or to grow its gross revenues.  There can be no assurance that the Borrower will be able to attract such additional capital.  The limitation on the Borrower's ability to incur additional indebtedness may also limit its ability to expand the capacity of its manufacturing facility or to pursue other business opportunities.

**Equipping Risks**

The equipping and installation of the Project is subject to the risks of cost overruns, non-completion and delays due to a variety of factors, all of which could have a material adverse effect on Borrower's financial condition and liquidity.  The Borrower is a recently-formed, single purpose limited liability company with no existing operations and with limited assets apart from the proceeds from the issuance of the Series 2020 Bonds.  Likewise, CarbonLite P Holdings, LLC is a recently-formed single purpose limited liability company with no operations or assets other than its ownership of the Borrower.  No assurance can be given that the Borrower will have funds necessary to pay any increased costs of equipping and installing the Project.  Increased costs or delays in equipping and installing the Project could also adversely affect the amount and timing of the receipt of Project revenues and the value of the Project.  See "APPENDIX A – CERTAIN INFORMATION REGARDING CARBONLITE."

**Operating Risk**

As with any industrial facility, operation of the Pennsylvania Facility could be adversely affected by many factors, including the breakdown or failure of equipment or processes, the performance of the Facility below expected levels of output or efficiency, severe weather, labor disputes and/or changes in minimum wage laws, and catastrophic events such as fires, explosions, earthquakes or similar events.  The occurrence of such events could significantly reduce or eliminate net revenues generated by the Pennsylvania Facility and/or significantly increase the expenses of the Project.  The Project is required to comply with numerous state and local regulatory standards concerning their operation and a failure to comply may result in increased compliance costs or reduce the Pennsylvania Facility's entitlement to operate.

**Environmental and Regulatory Compliance; Changes in Law**

The Pennsylvania Facility is regulated pursuant to federal, state and local environmental laws. Federal laws, such as the Clean Air Act and Clean Water Act, and their state and local counterparts, govern discharges of pollutants to air and water. Other federal, state and local laws comprehensively govern the generation, transportation, storage, treatment and disposal of solid and hazardous waste and also regulate the storage and handling of chemicals and petroleum products (such laws and regulations are referred to collectively as the Environmental Regulatory Laws).

The Environmental Regulatory Laws require that various permits be obtained for the operation of the Facility and that certain conditions be satisfied and maintained throughout the term of such permits. The Borrower presently has none of the required permits, but expects to obtain them in due course. The Environmental Regulatory Laws to which the Facility is subject are administrative in nature and not discretionary. The Borrower's failure to meet conditions of these permits or of the Environmental Regulatory Laws can subject it to regulatory enforcement actions by the appropriate governmental authority, which could include fines, penalties, damages or sanctions, such as orders requiring certain remedial actions or limiting or prohibiting operation.

Changes in environmental regulations could impose substantial additional operating costs or could require costly capital expenditures, either of which could affect Borrower's ability to meet its obligations under the Loan Agreement.

Availability of pcrPET feedstock, as well as the demand for Borrower's pcrPET pellets is dependent on various laws and regulations, such as consumer bottle deposit laws, and may be affected by future laws and regulations dealing with requirements for inclusion of recycled PET, as well as customer willingness to pay higher prices for pcrPET pellets. It is also possible that changes to municipal and state "litter" laws or ordinances could adversely affect demand for Borrower's products.

**Competition**

The Borrower's operations may face competition from other operators of similar facilities in and around the location of the Project or the area(s) from which the Borrower sources its feedstock, some of whom may have greater resources than Borrower and could offer lower prices for pcrPET pellets. The Project may face additional competition in the future if and when there is construction of any new facilities that are similar in the service area of the Project and the minimum purchase commitments by Borrower's customers' lapse. No assurances can be given that utilization levels at the Project will not be adversely affected by any such existing or future competition.

**No Credit Enhancement Facility**

There is no credit enhancement facility (letter of credit or bond insurance), securing the Series 2020 Bonds, nor any requirement for a credit enhancement facility to be provided in the future. Neither the credit of the Guarantor's parent or the Guarantor's affiliates, CarbonLite Industries or CarbonLite Recycling will be available to holders of Series 2020 Bonds in case of default in payment by the Borrower of its obligations under the Loan Agreement and by the Guarantor of its obligations under the Guaranty.

**Lack of Insurance; Damage, Destruction or Condemnation**

While the Borrower intends to maintain insurance, including business interruption insurance, to protect against many of its operational risks, and it has obtained certain limited warranties for limited periods relating to the Project and its equipment, the proceeds of such insurance and warranties, if any, may not be adequate to cover the Pennsylvania Facility's lost revenues or increased costs, or in case of a casualty an amount sufficient to complete restoration of all tenant improvements, machinery, equipment and other tangible property. The Guarantor will not maintain any insurance separate from the Borrower. There can be no assurance that the Project will not suffer losses for which insurance cannot be or has not been obtained (such as earthquakes, tornados, hurricanes or floods) or that the amount of any such loss, or the period during which the Project cannot generate revenues, will not exceed the coverage of such insurance policies.

In the event the Project is subject to a casualty permitting the landlord of the Pennsylvania Facility to terminate the Lease, or in the event of the exercise of eminent domain by any governmental authority, no assurance can be given that insurance proceeds, or any award for such taking, will be adequate (i) to allow the replacing of the Project with a new facility that will produce revenues sufficient to fund payments due on the Series 2020 Bonds or (ii) to allow funding redemption in whole of all outstanding Series 2020 Bonds.

**Effect of Federal Bankruptcy Laws on Security for the Series 2020 Bonds**

Bankruptcy proceedings involving the Borrower or the Guarantor, as debtor, and equitable principles may delay or otherwise adversely affect the enforcement of Bondholders' rights in the property granted as security for the Series 2020 Bonds. Furthermore, if the security for the Series 2020 Bonds is inadequate for payment in full of the Series 2020 Bonds, bankruptcy proceedings and equitable principles may limit any attempt by the Trustee to foreclose on the collateral and/or to seek payment from other property of the Borrower or the Guarantor, and will also not permit the accrual of interest on Borrower's loan while Borrower is in bankruptcy. Also, federal bankruptcy law permits adoption of a reorganization plan even though it has not been accepted by the Bondholders of a majority in aggregate principal amount of the Series 2020 Bonds if the Bondholders are provided with the benefit of their original lien or the "indubitable equivalent." In addition, the bankruptcy law permits the debtor to retain and use collateral, and the proceeds, products, rents or profits of the collateral, even though the debtor is in default if the court concludes that the Bondholders have "adequate protection. The bankruptcy court may also have the power to invalidate certain provisions of the Loan Agreement or Guaranty that make bankruptcy and related proceedings by the Borrower or the Guarantor, respectively, an event of default thereunder.

**Guarantor's Financial Health**

CarbonLite P Holdings, LLC is a recently formed entity and is not required to maintain any minimum net worth or otherwise comply with any material financial covenants under the terms of the Guaranty. Accordingly, the ability of the Guarantor to make payments under the Guaranty if the Borrower defaults may be limited. Because the Guarantor has no operations and no assets other than its ownership of Borrower, there is effectively no additional credit support provided for the Borrower's obligations and holders of the Series 2020 Bonds should not place undue weight on the benefit of the Guaranty. See Appendix A for more information concerning the Guarantor and the Borrower.

**Dependence on Availability of Key Management; Potential Conflict with Equity Owners; Change in Control**

Success of the Borrower may be dependent on the continued availability to the Borrower of the services of a number of key executives of CarbonLite Industries. None of these executives are under employment agreements with the Borrower and should the services of any or all of them be unavailable to the Borrower for an extended period of time, the Borrower could be materially and adversely affected. CarbonLite Holdings retains total control over all strategy and operating decisions affecting the Borrower and the Project and has the ability to replace management in its sole discretion. The interests of CarbonLite Holdings may conflict with the interests of the holders of the Series 2020 Bonds, especially if the Borrower has suffered a default under the Loan Agreement or is contemplating some transaction that could increase the risk of a default. Although a Change in Control of Borrower may occur, unless all of the Series 2019 Bonds are tendered for purchase, none of the Series 2020 Bonds may be tendered and holders of the Series 2020 Bonds may be required to hold their Series 2020 Bonds until maturity if not all of the Series 2019 Bonds are tendered and accepted for payment

## LITIGATION

There is no litigation now pending, with service of process having been accomplished against the Issuer, or to the knowledge of its officers, threatened, seeking to restrain or enjoin the issuance, sale, execution or delivery of the Series 2020 Bonds, or in any way contesting or seeking to affect the validity of the Series 2020 Bonds, any proceedings of the Issuer taken concerning the issuance or sale thereof, the pledge and application of any moneys or security provided for payment of the Series 2020 Bonds, or the existence or powers of the Issuer relating to the issuance, sale and delivery of the Series 2020 Bonds.

There is no litigation now pending, with service of process having been accomplished against the Borrower, or to the knowledge of its officers, threatened, seeking to restrain or enjoin the issuance, sale, execution or delivery of the Series 2020 Bonds, or in any way contesting or seeking to affect the validity of the Series 2020 Bonds, any proceedings of the Borrower taken concerning the issuance or sale thereof, the pledge and application of any moneys or security provided for payment of the Series 2020 Bonds, the use of proceeds of the Series 2020 Bonds or the existence or powers of the Borrower relating to the issuance, sale and delivery of the Series 2020 Bonds.

There is no litigation now pending, with service of process having been accomplished against the Guarantor, or to the knowledge of its officers, threatened, seeking to restrain or enjoin the issuance, sale, execution or delivery of the Series 2020 Bonds, or in any way contesting or seeking to affect the validity of the Series 2020 Bonds, any proceedings of the Guarantor taken concerning the issuance or sale thereof, the pledge and application of any moneys or security provided for payment of the Series 2020 Bonds, the use of proceeds of the Series 2020 Bonds or the existence or powers of the Guarantor relating to the issuance, sale and delivery of the Series 2020 Bonds.

## NO RATING

No rating has been sought by the Borrower for the Series 2020 Bonds from any national credit rating agency, or is expected to be sought in the future, with respect to the Series 2020 Bonds.  No assurance exists that any credit rating agency would be willing to issue a rating with respect to the Series 2020 Bonds.

## TAX MATTERS

### Federal Tax Exemption

In the opinion of Ballard Spahr LLP and Turner Law, P.C., Co-Bond Counsel to the Issuer, interest on the Series 2020 Bonds is excludable from gross income for purposes of federal income tax under existing laws as enacted and construed on the date of initial delivery of the Series 2020 Bonds, assuming the accuracy of the certifications of the Issuer and the Borrower and continuing compliance by the Issuer and the Borrower with the requirements of the Internal Revenue Code of 1986, as amended (the "Code"), except that interest on a Bond is not excludable while the Series 2020 Bond is held by a substantial user of the facility financed with proceeds of the Series 2020 Bonds or a related person as provided in the Code.  Interest on the Series 2020 Bonds is an item of tax preference for purposes of the federal alternative minimum tax imposed on individuals.  Co-Bond Counsel express no opinion regarding other federal tax consequences relating to ownership or disposition of, or the accrual or receipt of interest on, the Series 2020 Bonds.

### State Tax Exemption

Under the laws of the Commonwealth as presently enacted and construed, the interest on the Series 2020 Bonds is exempt from Pennsylvania personal income tax and Pennsylvania corporate net income tax.  However, under the laws of the Commonwealth as presently enacted and construed, any profits, gains or income derived from the dale, exchange or other disposition of obligations of the Issuer, such as the Series 2020 Bonds, will be subject to Pennsylvania taxes within the Commonwealth.

No opinion is expressed regarding other state or local tax consequences arising with respect to the Series 2020 Bonds, including whether interest on the Series 2020 Bonds is exempt from taxation under the laws of any jurisdiction other than the Commonwealth.

### General

The opinions expressed by Co-Bond Counsel are based upon existing legislation and regulations as interpreted by relevant judicial and regulatory authorities as of the date of issuance and delivery of the Series 2020 Bonds, and Bond Counsel will not express any opinion as of any date subsequent thereto or with respect to any proposed or pending legislation, regulatory initiatives or litigation.

The proposed form of the opinions of Co-Bond Counsel is included herein as Appendix C.

## LEGAL MATTERS

The validity of the Series 2020 Bonds and certain other legal matters are subject to the approving opinions of Ballard Spahr LLP and Turner Law, P.C., Co-Bond Counsel to the Issuer. A complete copy of the proposed form of the opinions of Co-Bond Counsel is set forth as APPENDIX C hereto. Co-Bond Counsel undertakes no responsibility for the accuracy, completeness or fairness of this Limited Offering Memorandum. Certain legal matters will be passed upon for the Issuer by the Office of Chief Counsel, Pennsylvania Department of Community and Economic Development, Harrisburg, Pennsylvania ("**Issuer's Counsel**"), for the Borrower and the Guarantor by Reed Smith LLP, Los Angeles, California, and for the Underwriter by Orrick, Herrington & Sutcliffe, LLP.

## CONTINUING DISCLOSURE

The Borrower and the Guarantor have undertaken responsibility for continuing disclosure to owners and beneficial owner of the Series 2020 Bonds. The Borrower and the Guarantor will covenant for the benefit of the owners and beneficial owners of the Series 2020 Bonds to provide certain financial information and operating data relating to the Borrower and the Guarantor pursuant to the Continuing Disclosure Agreement, dated the Delivery Date, by and among the Borrower, the Guarantor and UMB Bank, N.A., as Dissemination Agent. These covenants have been made in order to assist the Underwriter in complying with Rule 15c2-12(b)(5) of the Securities and Exchange Commission (the "**Rule**"). See "APPENDIX D – FORM OF CONTINUING DISCLOSURE AGREEMENT."

The Borrower and the Guarantor previously entered into a continuing disclosure undertaking in connection with the issuance of the Series 2019 Bonds. The Borrower and the Guarantor has been late in filing certain financial operating information required by the terms of such continuing disclosure undertaking, including but not limited to certain quarterly and annual reports. In 2018, CarbonLite Recycling LLC and CarbonLite Recycling Holdings LLC, both of which are related entities of the Borrower and Guarantor, were late in filing certain financial operating information required by the terms of their continuing disclosure undertaking relating to the Mission Economic Development Corporation Subordinate Solid Waste Disposal Revenue Bonds (CarbonLite Recycling LLC Project) Series 2016 (AMT), including but not limited to certain quarterly and annual reports.

## UNDERWRITING

The Series 2020 Bonds are being purchased by Westhoff, Cone & Holmstedt (the "**Underwriter**"). The Underwriter has agreed, subject to certain conditions, to purchase the Series 2020 Bonds at a price of $9,800,000.00 (the "**Purchase Price**"), comprising the principal amount of the Series 2020 Bonds, less an underwriter's discount in the amount of $200,000.00. Simultaneously with the delivery of the Series 2020 Bonds, a fee in the aggregate amount of $100,000.00 will be paid to the Underwriter by the Borrower in connection with the Underwriter's offering and sale of the Series 2020 Bonds to the public.

The Underwriter will be obligated to purchase all of the Series 2020 Bonds if any Series 2020 Bonds are purchased. The obligation of the Underwriter to accept delivery of the Series 2020 Bonds will be subject to various conditions contained in the Bond Purchase Contract, dated as of September 3, 2020 (the "**Bond Purchase Contract**") among the Issuer, the Underwriter, the Borrower and the Guarantor.

Pursuant to the Bond Purchase Contract, each of the Borrower and the Guarantor agrees to pay certain expenses in connection with the issuance of the Series 2020 Bonds and to indemnify the Underwriter against certain liabilities, including liabilities under certain provisions of the federal securities laws.

The Underwriter has entered into a negotiated dealer agreement with Piper Sandler ("**Piper Sandler**") for the third-party distribution of the Series 2020 Bonds at the original issue price. Pursuant to said dealer agreement, Piper Sandler will purchase Series 2020 Bonds from the Underwriter at the original issue price less a negotiated portion of the take-down applicable to any Series 2020 Bonds that Piper Sandler sells.

**LIMITED OFFERING**

The Series 2020 Bonds are being offered hereby on a limited basis only to Qualified Institutional Buyers ("**QIBs**") within the meaning of Rule 144A under the Securities Act of 1933, as amended ("**Rule 144A**"), which term includes both institutions and individuals meeting certain criteria of financial sophistication, net worth, knowledge and experience, and Accredited Investors ("**AIs**") as defined in the Securities Act of 1933, Regulation D, 17 Code Federal Regulations Section 230.501(a) ("**SEC Regulation D**").

The Underwriter, in a signed certificate delivered concurrently with the execution and delivery of the Bond Purchase Agreement, represents to the Issuer, the Borrower and the Guarantor that in connection with the proposed purchases of the Series 2020 Bonds, each of the proposed buyers to whom the Underwriter will deliver Series 2020 Bonds is a QIB as defined in SEC Rule 144A or an AI as defined in SEC Regulation D.

The execution and delivery of this Limited Offering Memorandum has been duly authorized and approved by the Guarantor and the Borrower.  The Issuer has not provided any of the information in this Limited Offering Memorandum except for the information under the caption "THE ISSUER" and the information under the caption "LITIGATION" solely as it pertains to the Issuer, and makes no representation or warranty, express or implied, as to the accuracy or completeness of any other information in this Limited Offering Memorandum.  Information contained under the caption "TAX MATTERS" and "LEGAL MATTERS" has been provided by the counsel named therein and information contained under "UNDERWRITER" has been provided by the Underwriter.

APPROVED:

**CARBONLITE P, LLC**


By: /s/ Leon Farahnik_____
     Name: Leon Farahnik
     Title: Chief Executive Officer

**APPENDIX A**

**CERTAIN INFORMATION REGARDING CARBONLITE**

## APPENDIX B

## SELECTED DEFINITIONS AND SUMMARY OF PRINCIPAL LEGAL DOCUMENTS

*The following are brief summaries of certain provisions of the Indenture, the Loan Agreement, and the Guaranty pertaining to the issuance of the Series 2020 Bonds. These summaries do not purport to be comprehensive or definitive and are qualified in their entirety by reference to the full terms of the respective documents listed below. Capitalized terms not otherwise defined herein have the meaning specified in the respective document.*

## DEFINITIONS

"Account Control Agreement" means (i) that certain Deposit Account Control Agreement, dated as of June 1, 2019, among the Borrower, the Trustee and Pacific Western Bank, as depository bank, and (ii) any other similar agreement between a depository institution, the Borrower and the Trustee whereby the Trustee is granted the right of control over funds or bank accounts of the Borrower following the occurrence of an Event of Default.

"Accredited Investor" means as to any beneficial owner of the Bonds an "accredited investor" as defined in Section 501(a) of Regulation D promulgated under the Securities Act of 1933, as amended.

"Act" means the Pennsylvania Economic Development Financing Law (Act of August 23, 1967 P.L. 251, No. 102), as amended, including the amendments made by Act of December 17, 1993, No. 74.  This Act is codified at 73 P.S. §371 et seq.

"Additional Bonds" means, collectively and individually, any Additional Senior Bonds and Additional Subordinate Bonds.

"Additional Payments" means the payments required to be made by the Borrower pursuant to the Agreement.

"Additional Senior Bonds" means any Bonds issued pursuant to the Indenture that are secured on a parity of lien with respect to the trust estate pledged and assigned under the Indenture with respect to the Series 2019 Bonds.

"Additional Subordinate Bonds" means any Bonds issued pursuant to the Indenture that are secured on a parity of lien with respect to the trust estate pledged and assigned under the Indenture with respect to the Series 2020 Bonds.

"Administrative Fees and Expenses" means the reasonable and necessary expenses incurred by the Issuer pursuant to the Agreement or the Indenture and the compensation and expenses paid to or incurred by the Trustee, any Bond Registrar, and/or any Paying Agent under the Agreement or the Indenture, which include but are not limited to printing of Bonds, accomplishing transfers or new registration of Bonds, or other charges and other disbursements including those of their respective officers, directors, members, attorneys, agents and employees incurred in and about the administration and execution of the Loan Agreement and the Indenture.

"Agreement" or "Loan Agreement" means that certain Loan Agreement by and between the Issuer and the Borrower, dated as of June 1, 2019, as amended by that certain First Amendment to Loan Agreement, dated as of September 1, 2020, and as it may further be supplemented, modified or amended from time to time in accordance with the terms thereof and of the Indenture.

"Approving Opinion" means an opinion of Bond Counsel (addressed and delivered to the Issuer and the Trustee) that an action being taken (i) is authorized by the Act and the Indenture and complies with the terms of the Agreement, if applicable, and (ii) will not, in and of itself, adversely affect the Tax-exempt status of the Bonds.

"Authorized Denomination" means, $100,000 or any integral multiple of $5,000 in excess thereof.

"Balloon Indebtedness" means Long-Term Funded Debt, 25% or more of the original principal of which matures during any consecutive 12-month period, if such maturing principal amount is not required to be amortized below such percentage by mandatory redemption or prepayment prior to such 12-month period

"Beneficial Owners" means those individuals, partnerships, corporations or other entities for whom the Direct Participants have caused DTC to hold Book-Entry Bonds.

"Bonds" or "Bond" means, collectively and individually, the Series 2019 Bonds, the Series 2020 Bonds and any Additional Bonds, authorized by, and at any time Outstanding pursuant to, the Indenture.

"Bond Counsel" or "Co-Bond Counsel" means any attorney at law or firm of attorneys of nationally recognized standing in matters pertaining to the federal tax exemption of interest on bonds issued by states and political subdivisions, duly admitted to practice law before the highest court of the Commonwealth, and acceptable to the Issuer; but will not include counsel for the Borrower.

"Bond Payment Date" means, (i) with respect to the Series 2019 Bonds, each June 1 and December 1, beginning with December 1, 2019, (ii) with respect to the Series 2020 Bonds, each June 1 and December 1, beginning with December 1, 2020, and (iii) with respect to any other Additional Bonds, the dates specified in a Supplemental Indenture relating thereto.

"Bond Registrar" or "Registrar" means the entity or entities performing the duties of the bond registrar pursuant to the Indenture.

"Bond Year" means each one-year period commencing on June 2 and ending on the following June 1, until final maturity of the Bonds.

"Book-Entry Bonds" means the Bonds registered in the name of the nominee of DTC, or any successor securities depository for such Bonds, as the registered owner thereof pursuant to the terms and provisions of the Indenture.

"Borrower" means CarbonLite P LLC, a limited liability company organized and existing under the laws of the State of Delaware, or any entity which is the surviving, resulting or transferee entity in any merger, consolidation or transfer of assets permitted under the Agreement and also means, unless the context otherwise requires, an assignee of the Agreement as permitted by the Agreement, but does not mean any affiliate of the Borrower.

"Borrower's Audited Financial Statements" means the consolidated annual financial statements of the Borrower, prepared in accordance with GAAP, consistently applied, accompanied by an audit report of an independent certified public accountant.

"Business Day" means any day other than (i) a Saturday or Sunday, (ii) a day on which commercial banks in New York, New York, or any other city or cities in which the Corporate Trust Office of the Trustee is located are closed, (iii) a day on which the New York Stock Exchange is closed, or (iv) a day on which interbank wire transfers cannot be made on the Fedwire system.

"Capitalized Interest Account" means the account by that name established within the Project Fund pursuant to the Indenture.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Commonwealth" means the Commonwealth of Pennsylvania.

"Completion Date" means the earlier of the date of completion of the Project or final disbursement from the Project Fund as that date will be certified as provided in the Agreement.

"Contingent Debt Liabilities" means all guaranties, endorsements, assumptions and other contingent liabilities in respect of, or to purchase or otherwise acquire, Indebtedness of others; provided, however, that "Contingent Debt Liabilities" will not include any other liability that does not constitute Indebtedness.

"Continuing Disclosure Agreement" means, (i) with respect to the Series 2019 Bonds, the Continuing Disclosure Agreement dated as of June 1, 2019, by and among the Borrower, the Guarantor and the Trustee, (ii) with respect to the Series 2020 Bonds, the Continuing Disclosure Agreement dated as of September 1, 2020, by and among the Borrower, the Guarantor and the Trustee, and (iii) with respect to any other Additional Bonds, any Continuing Disclosure Agreement delivered in connection with such Additional Bonds.

"Corporate Trust Office" means with respect to the Trustee, the office of the Trustee at which at any particular time its corporate trust business will be principally administered, which office at the date hereof is located in Minneapolis, Minnesota; provided, however, that with respect to presentation of Bonds for payment or for registration of transfer and exchange such term will mean the office or agency of the Trustee at which, at any particular time, its corporate trust agency business will be conducted.

"Costs of Issuance" means all items of expense directly or indirectly payable by or reimbursable to the Issuer or the Borrower and related to the authorization, issuance, sale and delivery of the Bonds, including but not limited to costs of preparation and reproduction of documents, printing expenses, filing and recording fees, initial fees and charges of the Trustee, underwriting fees, legal fees and charges, fees and disbursements of consultants and professionals, fees and charges for preparation, execution and safekeeping of the Bonds and any other cost, charge or fee incurred in connection with the original issuance of the Bonds which constitutes a "cost of issuance" within the meaning of Section 147(g) of the Code.

"Costs of Issuance Fund" means the fund by that name established pursuant to the Indenture.

"Costs of the Project" means the sum of the items, or any such item, authorized to be paid from the Project Fund pursuant to the provisions of Section 3.2 of the Agreement, but shall not include any Costs of Issuance.

"Date of Delivery" means, (i) with respect to the Series 2019 Bonds, July 10, 2019, the date of initial issuance and delivery of the Series 2019 Bonds, (ii) with respect to the Series 2020 Bonds, September 10, 2020, the date of initial issuance and delivery of the Series 2020 Bonds, and (iii) with respect to any other Additional Bonds, the date of initial issuance and delivery of such Additional Bonds as specified in a Supplemental Indenture relating thereto.

"Days Cash on Hand" means, for the period tested, the sum of Borrower's (i) cash, (ii) cash equivalents and (iii) marketable debt and equity securities, divided by the quotient of (x) operating expenses (which will include all scheduled debt service obligations payable during the period and will exclude depreciation and amortization) divided by (y) 365. Notwithstanding any of the foregoing to the contrary, Days Cash on Hand will not include cash in (A) self-insurance funds, (B) proceeds of any Indebtedness, including Short-Term Indebtedness, Subordinate Debt, Non-Recourse Indebtedness or put debt not supported by a liquidity facility with term-out features, (C) held to support outstanding letters of credit or other financial guarantees, (D) any collateral required pursuant to the terms of a Financial Product Agreement that has been posted or (E) the Debt Service Reserve Fund.

"Debt Service" means:

    (i)       with respect to the Series 2019 Bonds:

           (a)       Scheduled sinking fund payments, to be due semi-annually on each June 1 and December 1, commencing December 1, 2021 as set forth in Section 4.01 of the Original Indenture,

           (b)       Interest due and payable on each Bond Payment Date,

(c) Principal due and payable thereon (whether at maturity, by redemption or otherwise), and

(ii) with respect to the Series 2020 Bonds:

(a) Interest due and payable on each Bond Payment Date,

(b) Principal due and payable thereon (whether at maturity, by redemption or otherwise), and

(iii) with respect to any other Additional Bonds:  the payment provisions with respect to interest, redemption (optional or mandatory) and principal specified in any Supplemental Indenture relating to such Additional Bonds.

"Debt Service Coverage Ratio" means for any given period of time, the ratio of (a) EBITDA to (b) the total of all principal, interest, premium (if any), fees and other amounts due and payable during such period in connection with Indebtedness of the Borrower as applied in the Loan Agreement, all as determined in accordance with GAAP.

"Debt Service Obligation" means for any period, the aggregate of regularly scheduled interest and principal payments of all Funded Debt, made or to be made during such period.  Except as otherwise provided by subparagraph (i) of this definition with respect to Variable Interest Rate Indebtedness and by subparagraph (ii) of this definition with respect to Balloon Indebtedness, interest on any Funded Debt will be calculated based on the actual amount of interest that is payable under such Funded Debt.  In addition:

(i) Interest on Variable Interest Rate Indebtedness.  (a) For tax exempt Indebtedness, interest deemed to be payable on any Variable Interest Rate Indebtedness for periods when the actual interest rate can be determined will be the actual variable interest rates and for periods when the actual interest rate cannot yet be determined will be calculated on the assumption that the interest rate on such Variable Interest Rate indebtedness would be equal to the rate of the average SIFMA Index during the twelve (12) calendar month period immediately preceding the date in which such calculation is made (the "assumed SIFMA Index rate"); (b) for taxable Indebtedness, interest deemed payable on any Variable Interest Rate Indebtedness for periods when the actual interest rate can be determined will be the actual variable interest rates and for periods when the actual interest rate cannot yet be determined will be calculated at the average 30 day LIBOR rate during the twelve (12) calendar month period immediately preceding such date of calculation;

(ii) Balloon Indebtedness.  For purposes of calculating the annual Debt Service Obligation on any Balloon Indebtedness, it will be assumed that the principal of such Balloon Indebtedness will be amortized in equal annual installments over the remaining term to its stated maturity and the interest thereon will be calculated at the stated interest rate; provided, however, that interest payable on any variable rate Balloon Indebtedness will be calculated pursuant to subparagraph (i) above.

"Debt Service Reserve Fund" means the trust fund so designated which is created and established pursuant to the Indenture.

"Determination of Taxability" means the occurrence or existence of any of the conditions or events more fully described in the Loan Agreement.

"Direct Participants" means those broker-dealers, banks and other financial institutions from time to time for which DTC holds the Bonds as securities depository.

 "DTC" means The Depository Trust Company, New York, New York, a limited purpose trust company organized under the New York Banking Law, or any successor securities depository for the Bonds.

"EBITDA" means, with respect to any period, consolidated Net Income for such period plus all amounts deducted in arriving at such Net Income amount in respect of (i) federal, state and local income taxes, (ii) interest

expense, (iii) amortization expense and (iv) depreciation expense; provided, however, that the following items will be excluded from the computation of "EBITDA": (a) extraordinary items of income or loss, (b) gains or losses from the extinguishment of Indebtedness, (c) unrealized gains and losses on investments or Financial Product Agreements, (d) any gain or loss from the disposition of assets not in the ordinary course of business, (e) any loss from impairment of the value of assets, (f) financing costs that are treated as a current expense, rather than amortized, (g) costs of equity based compensation not paid in cash and (h) any other item that is nonrecurring and also a non-cash item.  "Net Income" means, with respect to any period, the sum of the excess of revenues over expenses of the Borrower or the Guarantor, as applicable, for such period as determined by GAAP in the United States.  Equity contributions by or on behalf of Guarantor to Borrower during the period measured will be treated as Gross Revenues.

"Equity Subaccount" means all of the subaccounts by that name established pursuant to the Indenture.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Plan" means any employee pension benefit plan under ERISA, as such plan is defined in ERISA.

"Event of Default" means any of the events specified as such in the Indenture.

"Financial Product Agreement" means any interest rate exchange agreement, hedge or similar arrangement, including, inter alia, an interest rate swap, asset swap, a constant maturity swap, a forward or futures contract, cap, collar, option, floor, forward or other hedging agreement, arrangement or security, direct funding transaction or other derivative, however denominated and whether entered into on a current or forward basis, excluding however commodity (including power and natural gas) forward purchase agreements entered into in connection with the operation of the Facility.

"Fiscal Year" means the period beginning on January 1 of each year and ending on the next succeeding December 31, or any other twelve-month, or fifty-two week, period hereafter selected and designated as the official fiscal year period of the Borrower.

"Fitch" means Fitch, Inc., a corporation organized and existing under the laws of the State of Delaware, doing business as Fitch Ratings, its successors and their assigns, or, if such entity will be dissolved or liquidated or will no longer perform the functions of a securities rating agency, "Fitch" will be deemed to refer to any other nationally recognized securities rating agency (other than S&P or Moody's).

"Funded Debt" means, as to the Borrower, on a consolidated basis at any particular time, the sum of the following in accordance with GAAP: (i) all Indebtedness (whether as a direct obligor on a promissory note, bond, debenture or other similar instrument), including Subordinate Debt; and (but without duplication) (ii) all capital leases; and (iii) Contingent Debt Liabilities.

"GAAP" means generally accepted accounting principles in the United States in effect from time to time.

"Gross Revenue Account" means collectively, all deposit accounts of the Borrower for which an Account Control Agreement is in effect.

"Gross Revenues" means all moneys, contributions, fees, rates, receipts, rentals, charges, issues and income received for, received by or derived from, the Borrower, the operation of the Borrower or the Project, the Facilities or any other source whatsoever, including without limitation equity contributions from the Guarantor or any other source, moneys received from the operation of the Borrower's business or the possession of its properties, insurance proceeds or condemnation awards, and all rights to receive the same, whether in the form of accounts, accounts receivable, contract rights or other rights, and the proceeds of the same whether now owned or held or hereafter coming into being. Notwithstanding anything herein to the contrary, Gross Revenues will not include any proceeds of insurance (other than business interruption insurance), sale proceeds or condemnation awards or any property of any kind that is subject to or financed under a separate financing arrangement with respect to Short-Term Indebtedness, Nonrecourse Indebtedness or Subordinate Debt permitted by the terms of the Agreement.

"Holder" or "Bondholder," or "Owner," whenever used with respect to a Bond, means the Person in whose name such Bond is registered.

"Indebtedness" means (i) any guaranty and (ii) any indebtedness or obligation of the Borrower (other than accounts payable and accruals), as determined in accordance with GAAP, including obligations under conditional sales contracts or other title retention contracts and rental obligations under leases which are considered capital leases under GAAP.

"Indenture" means that certain Indenture of Trust by and between the Issuer and the Trustee, dated as of June 1, 2019 (the "Original Indenture"), as supplemented and amended by that certain First Supplemental Indenture of Trust, dated as of September 1, 2020 (the "First Supplemental Indenture"), and as it may further be supplemented, modified or amended from time to time in accordance with the terms thereof.

"Independent Consultant" means any professional consulting, accounting, engineering, financial advisory firm or commercial banking firm or individual selected by the Borrower having the skill and experience necessary to render the particular report required and having a favorable reputation for such skill and experience, and which firm is either licensed by, or permitted to practice in, the Commonwealth and which is reputable and has over 5 years of operating history, and which firm or individual does not control the Borrower and is not controlled by or under common control with the Borrower.

"Intercreditor Agreement" has the meaning set forth in the Pledge and Security Agreement, and if such becomes applicable, and unless otherwise agreed by Trustee, it shall be in the form attached to the Indenture.

"Interest Account" means the account by that name in the Revenue Fund established pursuant to the Indenture.

"Interest Payment Date" means, (i) with respect to the Series 2019 Bonds, June 1 and December 1 of each year, commencing December 1, 2019, (ii) with respect to the Series 2020 Bonds, June 1 and December 1 of each year, commencing December 1, 2020, and (iii) with respect to any other Additional Bonds, the dates specified in a Supplemental Indenture relating thereto.

"Investment Securities" means any of the following securities (other than those issued by the Issuer, the Borrower or any Guarantor):

     (i)     Commercial paper issued by corporations that are organized and operating within the United States and that at the time of investment are rated by Moody's or S & P (a) "A-2" or "P-2" or higher if such commercial paper has a maturity of seven days or less, and (b) "A-1" or "P-1" if such commercial paper has a maturity of greater than seven days;

     (ii)     United States Treasury notes, bonds, bills or certificates of indebtedness or those for which the faith and credit of the United States are pledged for the full and timely payment of principal and interest, not subject to prepayment or call;

     (iii)     Negotiable certificates of deposit issued by or deposit accounts with a nationally or state-chartered bank, including the Trustee, its parent company and their affiliates, or by a state licensed branch of a foreign bank, provided that the senior debt issued by such bank and/or its holding company will be rated "A" by Moody's and S&P, respectively, and the commercial paper issued by such holding company or branch of a foreign bank will be rated "P-1" and "A-1" by Moody's and S&P, respectively;

     (iv)     Bonds, notes or other obligations of any state, municipality or political subdivision the interest on which is excluded from gross income for federal income tax purposes, which are rated "A" or higher by Moody's, S&P, or Fitch;

     (v)     Investments in or shares of any "regulated investment company" within the meaning of Section 851(a) of the Code, the assets of which are securities or investments described in (i) - (iv)

above, including funds for which the Trustee or an affiliate receives and retains a fee for services provided to the fund, whether as a custodian, transfer agent, investment advisor or otherwise;

(vi)    Repurchase agreements with any bank, trust company or national banking association insured by the Federal Deposit Insurance Corporation (including, but not limited to the Trustee or any of its affiliates), or with any government bond dealer recognized as a primary dealer by the Federal Reserve Bank of New York, which agreements are fully and continuously secured by a valid and perfected security interest in obligations described in paragraph (ii) of this definition or obligations which are rated "Aaa" by Moody's or "AA+" by S&P;

(vii)    Money market funds with a rating of at least "A" or which invest solely in securities rated at least "A", including funds for which the Trustee or an affiliate receives and retains a fee for services provided to the fund, whether as a custodian, transfer agent, investment advisor or otherwise; and

(viii)    Collateralized or uncollateralized investment agreements or other contractual arrangements with domestic or foreign corporations, financial institutions or national associations, provided that the senior long term debt or rating of such corporations, institutions or associations is rated within the highest three rating categories by S&P, Moody's or Fitch.

"Issuer" means the Pennsylvania Economic Development Financing Authority.

"Lease" means that certain Industrial Lease Agreement, dated as of May 13, 2019, by and between Lessor, as landlord, and Borrower, as tenant.

"Lessor" means Berks 61 Owner, LLC, a Delaware limited liability company.

"Leasehold Mortgage" means that certain Open-End Leasehold Mortgage, Security Agreement, Assignment of Rent and Leases, and Fixture Filing, dated as of June 1, 2019, but effective as of July 10, 2019, as amended by that certain First Amendment to Open-End Leasehold Mortgage, Security Agreement, Assignment of Rent and Leases, and Fixture Filing dated as of September 1, 2020, by the Borrower in favor of the Trustee, as may be further amended, modified or supplemented from time to time.

"Leasehold Mortgage Default" means any event of default under the Leasehold Mortgage.

"LIBOR" means the rate published each Business Day in The Wall Street Journal under the Money Rates section for the one month "London interbank offered rate, or Libor." In the event that no LIBOR shall be published, the substitute Variable Rate Provision shall be the alternative variable taxable rate index or formula set forth in the applicable Variable Interest Rate Indebtedness instrument; *provided, however* that if such instrument does not provide for a substitute Variable Rate Provision, then the Variable Rate Provision shall be a substitute taxable rate determined by the Borrower, with the consent of Holders of a majority in principal amount of the applicable Variable Interest Rate Indebtedness then Outstanding, as approximating the LIBOR such that the substitute Variable Rate Provision will provide for a taxable interest rate equivalent to the Interest Rate which would have been effective if the LIBOR were quoted.

"Loan Default Event" means any one or more of the events specified as such in the Loan Agreement.

"Loan Repayments" means the payments so designated and required to be made by the Borrower pursuant to the Loan Agreement.

"Maximum Annual Debt Service" means, as of the date of calculation, an amount equal to the maximum annual debt service due on the Bonds and any Parity Debt during the then current or any succeeding calendar year, whether at maturity or upon mandatory sinking fund redemption, provided that solely for purposes of such calculation, the amount of debt service coming due on the Bonds during calendar year 2036 shall be deemed to be an amount equal to the amount of debt service coming due on the Bonds during calendar year 2035.

"Maximum Legal Rate" shall have the meaning set forth in Section 9.16 of the Loan Agreement.

"Moody's" means Moody's Investors Service, Inc., a corporation organized and existing under the laws of the State of Delaware, its successors and their assigns, or, if such corporation will be dissolved or liquidated or will no longer perform the functions of a securities rating agency, "Moody's" will be deemed to refer to any other nationally recognized securities rating agency (other than S&P or Fitch).

"NDA" means that certain Non-Disturbance and Access Agreement, dated as of June 1, 2019, among the Trustee, the Borrower and the Lessor.

"Net Proceeds" means the proceeds from insurance or from actual or threatened condemnation or eminent domain actions with respect to all or any portion of the Project, less any costs reasonably expended by the Borrower to receive such proceeds.

"Nonrecourse Indebtedness" means any Indebtedness secured by a lien, which is not a general obligation of the Borrower and liability for which is effectively limited to any property (a "Nonrecourse Lien") subject to such lien with no recourse (except to such Nonrecourse Lien) to (other than carve outs typically imposed by lenders in commercial real estate transactions, including fraud, waste or environmental indemnity), or lien upon, directly or indirectly, the Gross Revenues, the Property or any other property then owned by the Borrower.

"Note" means, collectively and individually, the Senior Note and Subordinate Note.

"Opinion of Counsel" means a written opinion (addressed and delivered to the Issuer and the Trustee) of counsel (who, in the case of an Opinion of Counsel delivered pursuant to the Indenture, will be independent from the Borrower, but who may be counsel for the Issuer or any other person familiar with the Indenture) selected by the Borrower.

"Outstanding," when used as of any particular time with reference to Bonds, means (subject to the provisions of the Indenture regarding Disqualified Bonds) all Bonds theretofore, or thereupon being, authenticated and delivered by the Trustee under the Indenture except (1) Bonds theretofore canceled by the Trustee or surrendered to the Trustee for cancellation; (2) Bonds with respect to which liability of the Issuer will have been discharged in accordance with the provisions of the Indenture regarding Discharge of Liability on Bonds, including Bonds (or portions of Bonds) referred to in the Indenture regarding Disqualified Bonds; and (3) Bonds for the transfer or exchange of or in lieu of or in substitution for which other Bonds will have been authenticated and delivered by the Trustee pursuant to the Indenture.

"Parity Debt" means any Indebtedness which is incurred by the Borrower and is secured equally and ratably with the obligations of the Borrower with respect to the Series 2019 Note under the Agreement, the Pledge and Security Agreement, the Leasehold Mortgage, the NDA and the SNDA, which satisfies the conditions set forth in the Agreement.

"Parity Subordinate Debt" means any Indebtedness which is incurred by the Borrower and is secured equally and ratably with the obligations of the Borrower with respect to the Series 2020 Note under the Agreement, which satisfies the conditions set forth in the Agreement.

"Paying Agent" means the Paying Agent as described in the Indenture.  The Trustee is the initial Paying Agent.

"Permitted Indebtedness" means Indebtedness permitted to be incurred under the Loan Agreement with the prior written consent of the Holders of a majority in aggregate principal amount of the Series 2019 Bonds then Outstanding.

"Permitted Liens" means (i) the Liens described in Exhibit C of the Agreement, (ii) Liens securing Permitted Indebtedness, and (iii) the following: (1) undetermined or inchoate liens and charges incident to construction or maintenance, and liens and charges incident to construction or maintenance now or hereafter filed of record which are being contested in good faith by the Borrower; (2) the lien of taxes and assessments which are not delinquent; (3) easements, exceptions or reservations, whether or not of record, for the purpose of pipelines, telephone lines, cellular telephone communications facilities, power lines, roads, streets, alleys, drainage and sewerage purposes, laterals, ditches, and other like purposes, or for the joint or common use of the Project Site, Facilities and equipment; (4) rights reserved to or vested in any municipality or governmental or other public authority to control or regulate or use in any manner any portion of the Project Site; (5) any obligations or duties affecting any portion of the Project Site to any municipality or governmental or other public authority with respect to any right, power, franchise, grant, license or permit; (6) present or future valid zoning laws and ordinances; (7) liens securing Indebtedness for the payment, redemption, or satisfaction of which money (or evidences of Indebtedness) in the necessary amount to fully pay such Indebtedness shall have been deposited in trust with a trustee or other holder of such Indebtedness; (8) the rights of the Trustee under the Indenture, the Loan Agreement, the Leasehold Mortgage, the NDA, the SNDA, or the Pledge and Security Agreement; (9) statutory liens arising in the ordinary course of business which are not delinquent or are being contested in good faith by the Borrower so long as bonded or cash collateral is posted with the Trustee; (10) the Lease, (11) Liens securing any letters of credit issued on Borrower's behalf as security in favor of the Landlord under the Lease; (12) any leases, licenses or other rights to use excess portions of the Project Site not needed for operation of the Project, provided the same do not materially interfere with the operation of the Project Site; or (13) any Lien with respect to Parity Debt on a parity basis, including the Lien of the Leasehold Mortgage, the NDA and the SNDA.

"Person" means an individual, corporation, firm, association, limited liability company, partnership, trust, or other legal entity or group of entities, including a governmental entity or any agency or political subdivision thereof.

"Pledge and Security Agreement" means that certain Pledge and Security Agreement dated as of June 1, 2019, as amended by a First Amendment to Pledge and Security Agreement dated as of September 1, 2020, executed by the Borrower and the Guarantor in favor of the Trustee, as further amended, modified or supplemented from time to time.

"Post-Default Rate" means (i) when used with respect to any payment of Debt Service on any Bonds or Parity Debt, the then-applicable interest rate plus three percent (3.00%), and (ii) when used with respect to all other payments due under the Indenture, a variable rate equal to the Trustee's prime rate plus 1% (100 basis points), computed on the basis of a 365 or 366-day year, as the case may be, for actual days elapsed; but in no event shall the Post-Default Rate exceed the Maximum Legal Rate.

"Principal Account" means the account by that name in the Revenue Fund established pursuant to the Indenture.

"Principal Payment Date" means, (i) with respect to the Series 2019 Bonds, June 1 and December 1 of each year, commencing December 1, 2021, (ii) with respect to the Series 2020 Bonds, December 1, 2036, which is the maturity date of the Series 2020 Bonds, and (iii) with respect to any other Additional Bonds, the dates specified in a Supplemental Indenture relating thereto.

"Proceeds Account" means all of the accounts by that name established pursuant to the Indenture.

"Progress Reports" means the monthly Project development progress reports required by the Loan Agreement as to the status of construction of the Project and the monthly report made by the Borrower as to (i) the status of completion of the Project in accordance with any drawings and specifications as set forth in any applicable construction contracts and the requirements of such construction contracts and the Project schedule (as defined in

any construction contract), (ii) any variances from such drawings and specifications and requirements, and (iii) a "schedule recovery plan" which the Borrower will prepare or cause to be prepared on a timely basis relating to any such variances.

"Project" means the Project, as described in the Loan Agreement, as it may be amended pursuant to the terms of the Agreement.

"Project Fund" means the fund by that name established pursuant to the Indenture.

"Project Site" means the Project Site, as described in the Loan Agreement.

"Property" means the site upon which the Project is being developed, as more particularly described in the Lease.

"Qualified Institutional Buyer" has the meaning given to a "qualified institutional buyer" under Rule 144A of the Securities Act of 1933.

"Rating Agency" means Moody's, S&P, and/or Fitch, or such other nationally-recognized rating agency.

"Rebate Fund" means the fund by that name created pursuant to the Indenture.

"Redemption Account" means the account by that name established in the Revenue Fund pursuant to the Indenture.

"Required Payment" means any payment, whether at maturity, by acceleration, upon proceeding for redemption or otherwise, including without limitation, the purchase price of Bonds tendered or deemed tendered for purchase.

"Reserve Requirement" means, (i) with respect to the Series 2019 Bonds, the Series 2019 Reserve Requirement, (ii) with respect to the Series 2020 Bonds, the Series 2020 Reserve Requirement, and (iii) with respect to any Additional Bonds, the amount set forth in the applicable Supplemental Indenture.

"Retained Rights" means, with respect to the Indenture or the Loan Agreement, (i) the right of the Issuer to receive any Administrative Fees and Expenses to the extent payable to the Issuer or any amounts payable to the Issuer under the Loan Agreement, (ii) any rights of the Issuer to be indemnified, held harmless and defended and rights to inspection and to receive notices, certificates and opinions, (iii) express rights of the Issuer to give approvals, consents or waivers, and (iv) the obligations of the Borrower to make deposits pursuant to the Tax Certificate.

"Revenue Fund" means the fund by that name established pursuant to the Indenture.

"Revenues" means all amounts received by the Issuer or the Trustee for the account of the Issuer pursuant or with respect to the Agreement, the Note, or the Guaranty, including, without limiting the generality of the foregoing, Loan Repayments (including both timely and delinquent payments, any late charges, and paid from whatever source), prepayments, insurance proceeds, condemnation proceeds, and all interest, profits or other income derived from the investment of amounts in any fund or account established pursuant to the Indenture (except as provided below), but not including amounts paid or payable to the Issuer in respect of Retained Rights, Additional Payments, including without limitation any Administrative Fees and Expenses or any moneys paid for deposit into the Rebate Fund, or the Borrower Subaccount of the Costs of Issuance Fund, and any investment earnings on moneys held in such funds or subaccounts.

"S&P" means Standard & Poor's Ratings Group, a division of The McGraw-Hill Companies, Inc., its successors and their assigns, and, if such entity is dissolved or liquidated or  no longer performs the functions of a securities rating agency, "S&P" will be deemed to refer to any other nationally recognized securities rating agency (other than Moody's or Fitch).

"Senior Note" means the Series 2019 Note and any other promissory note issued pursuant to the Loan Agreement with respect to any Additional Senior Bonds, from the Borrower to the Issuer and assigned to the Trustee for the benefit of the Bondholders of such Bonds.

"Series" means all Bonds designated as being of the same series initially delivered as part of a simultaneous transaction evidencing a borrowing authorized by the Indenture, and any Bonds thereafter authenticated and delivered in lieu thereof or in exchange therefor.

"Series 2019 Bonds" means the $61,800,000 Solid Waste Disposal Revenue Bonds (CarbonLite P, LLC Project) Series 2019.

"Series 2019 Note" means the promissory note corresponding to the Series 2019 Bonds, dated July 10, 2019, by the Borrower in favor of the Issuer, issued pursuant to the Loan Agreement, and any amendment or supplement thereto or substitution therefor.

"Series 2020 Bonds" means the $10,000,000 Subordinate Solid Waste Disposal Revenue Bonds (CarbonLite P, LLC Project) Series 2020.

"Series 2020 Note" means the promissory note of the Borrower corresponding to the Series 2020 Bonds, substantially in the form attached to the First Amendment to Loan Agreement as Exhibit A, issued pursuant to the Loan Agreement and delivered to the Issuer by the Borrower, and any amendment or supplement thereto or substitution therefor.

"Series 2019 Reserve Requirement" means, an amount equal to the least of (i) Maximum Annual Debt Service with respect to the Series 2019 Bonds, (ii) one hundred twenty five percent (125%) of the average annual debt service on the Series 2019 Bonds, and (iii) ten percent (10%) of the original principal amount of the Series 2019 Bonds. Upon issuance of the Series 2020 Bonds, the Series 2019 Reserve Requirement equals $6,056,618.75.

"Series 2020 Reserve Requirement" means, an amount equal to the least of (i) Maximum Annual Debt Service with respect to the Series 2020 Bonds, (ii) one hundred twenty five percent (125%) of the average annual debt service on the Series 2020 Bonds, and (iii) ten percent (10%) of the original principal amount of the Series 2020 Bonds. The Series 2020 Reserve Requirement equals $1,000,000.

"Short-Term Indebtedness" means (i) Indebtedness having an original maturity of less than or equal to one year and not renewable at the option of the Borrower for a term greater than one year from the date of original incurrence or issuance unless, by the terms of such Indebtedness, no Indebtedness is permitted to be outstanding thereunder for a period of at least thirty (30) consecutive days during each year, or (ii) a revolving credit arrangement which permits Borrower to borrow and reborrow based on a borrowing base formula, provided that the aggregate principal amount of Short-Term Indebtedness that may be outstanding at any time will not exceed $6,000,000, and which is the subject of an Intercreditor Agreement that includes the provisions and limitations set forth in the Pledge and Security Agreement.

"SIFMA" means the Securities Industry and Financial Markets Association, its successors and assigns.

"SIFMA Index" means, with respect to any date, the "SIFMA Municipal Swap Index" (such index previously known as the "BMA Municipal Swap Index") announced by Municipal Market Data on such date and based upon the weekly interest rate resets of Tax-Exempt variable rate issues included in a database maintained by Municipal Market Data which meets specified criteria established by SIFMA. If for any reason the SIFMA Index for any date is not announced or is otherwise unavailable on the applicable date, the SIFMA Index for such date will be the SIFMA Index for the next preceding date within the preceding 180 days on which the SIFMA Index was available. If for any reason the SIFMA Index for any date is not announced or is otherwise unavailable on any date in the immediately preceding 180 days, the SIFMA Index for such date will be an index selected by the Borrower with the consent of the Holders of a majority in principal amount of the Bonds then Outstanding, which is a composite of bid-side yields of obligations (a) which (i) provide for a weekly adjustment of the interest rate, and (ii) which (A) must be purchased on demand of the owner thereof at any time upon notice of up to seven (7) days or (B)

are payable in full not later than seven (7) days after the date of evaluation and (b) the interest on which is Tax-exempt and is subject to any personal "alternative minimum tax" or similar tax under the Code unless all Tax-exempt securities are subject to such tax. If no such index is so selected by the Borrower, the SIFMA Index for the applicable date will be an index computed by the Borrower which will be equal to 95% of the yield applicable to 91-day United States Treasury bills, such yield to be computed on the basis of the coupon equivalent of the average per annum discount rate at which such Treasury bills will have been sold at the most recent Treasury auction conducted prior to the applicable date.

"SNDA" means that certain Subordination, Non-Disturbance and Access Agreement dated as of June 1, 2019, by and among the Trustee, the Borrower and the Lessor, as amended, modified or supplemented from time to time.

"Subordinate Debt" means any Indebtedness issued or incurred by the Borrower which is either (a) payable from, but not secured by a pledge of or lien upon, the Gross Revenues and the Leasehold Mortgage, the NDA and the SNDA (whether or not otherwise secured); or (b) secured by a pledge of or lien upon the Gross Revenues or the Leasehold Mortgage, the NDA or the SNDA, which is subordinate to the pledge of and lien upon the Gross Revenues or the Leasehold Mortgage, the NDA or the SNDA under the Agreement as security for the Series 2019 Note, the Series 2020 Note and any other promissory note issued pursuant to the Loan Agreement, from the Borrower to the Issuer and assigned to the Trustee for the benefit of the Holders.

"Subordinate Note" means the Series 2020 Note and any other promissory note issued pursuant to the Loan Agreement with respect to any Additional Subordinate Bonds, from the Borrower to the Issuer and assigned to the Trustee for the benefit of the Bondholders of such Bonds.

"Supplemental Indenture" means any indenture duly authorized and entered into between the Issuer and the Trustee, supplementing, modifying or amending the Indenture, or authorizing the issuance of Additional Bonds thereunder; but only if and to the extent that such Supplemental Indenture is specifically authorized under the Indenture.

"Surplus Account" means the account established within the Revenue Fund pursuant to the Indenture.

"Tax Certificate" means each Use of Proceeds Certificate and Agreement of the Borrower and the Issuer dated the Date of Delivery.

"Tax-exempt" means, with respect to interest on any obligations of a state or local government, including the Bonds, that such interest is excluded from gross income for federal income tax purposes (other than in the case of a Holder of any Bonds who is a substantial user of any component of the Project or a related Person within the meaning of Section 147(a) of the Code) whether or not such interest is includable as an item of tax preference or otherwise includable directly or indirectly for purposes of calculating tax liabilities, including any alternative minimum tax or environmental tax, under the Code.

"Tax-Exempt Subaccount" means all of the subaccounts by that name established pursuant to the Indenture."

"Tender Date" shall have the meaning set forth in Section 5.2(f) of the Loan Agreement.

"Trustee" means UMB Bank, N.A., a national banking association organized and existing under and by virtue of the laws of the United States of America, having Corporate Trust Offices in Minneapolis, Minnesota or its successor as Trustee as provided in the Indenture.

"Variable Interest Rate Indebtedness" means any indebtedness which provides for interest to be payable thereon at a rate per annum that may vary from time to time over the term thereof in accordance with a Variable Rate Provision.

"Variable Rate Provision" means a formula or provision providing for the determination and periodic adjustment of the interest rate per annum borne by Variable Interest Rate Indebtedness.

[Remainder of Page Intentionally Left Blank.]

**THE INDENTURE**

Certain provisions of the Indenture are summarized below.  Other provisions are summarized in this Limited Offering Memorandum under the caption "THE SERIES 2020 BONDS."  THIS SUMMARY DOES NOT PURPORT TO BE COMPLETE OR DEFINITIVE AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE FULL TERMS OF THE INDENTURE, A COPY OF WHICH IS ON FILE WITH THE TRUSTEE.

**Project Fund**

The Trustee will establish the CarbonLite P, LLC Project Fund (the "Project Fund") and, within the Project Fund, a separate account designated as the CarbonLite P, LLC Capitalized Interest Account (the "Capitalized Interest Account"), to the credit of which proceeds of the Bonds will be deposited and applied to the payment of the Costs of the Project.  Within such Capitalized Interest Account, the Trustee will establish a separate subaccount for each Series or sub-Series of Bonds, as applicable.  The Trustee will also create separate accounts in the Project Fund designated as the Tax-Exempt Subaccount (the "Tax-Exempt Subaccount") and the Equity Subaccount (the "Equity Subaccount") and therein, a separate subaccount for each Series or sub-Series of Bonds, as applicable.  The Tax-Exempt Subaccount and the Equity Subaccount will be funded as provided in the Indenture.  The moneys in each subaccount of the Project Fund will be held by the Trustee in trust and applied to the payment of the Costs of the Project and, with respect to the Equity Subaccount, the payment of the Operating and Working Capital Costs, including lease payments and lease deposits, in the manner set forth below.

Before each payment is made from the Project Fund (including any account established therein) by the Trustee, there will be filed with the Trustee a sequentially numbered Requisition of the Borrower conforming with the requirements of this paragraph and the Agreement, and in the form attached to the Indenture, stating with respect to each payment to be made:

(1)	the requisition number;

(2)	the name and address of the Person to whom payment is due;

(3)	the purpose for which such payment is to be made;

(4)	the amount to be paid;

(5)	that each obligation mentioned therein has been properly incurred and is a proper charge against the Project Fund;

(6)	that none of the items for which payment is requested has been previously paid or reimbursed from the Project Fund;

(7)	that each item for which payment is requested is or was necessary in connection with the acquisition, construction, installation, equipping or financing of the Project or, with respect to any payment from the Equity Subaccount, the operation of the Project;

(8)	with respect to any payment from the Tax-Exempt Subaccount, that at least 97.0% of the amount requisitioned, together with all amounts requisitioned to date, have in the aggregate been used to pay for or to reimburse the Borrower for expenditures properly allocable to Costs of the Project pursuant to the Tax Certificate (excluding Costs of Issuance); and

(9)	that an invoice evidencing each item for payment is attached thereto, including invoices for costs previously paid and for which reimbursement is being requested by the Borrower, of Costs of the Project or Operating and Working Capital Costs due and payable, or previously paid and for which reimbursement is being requested.

Each such Requisition of the Borrower will be sufficient evidence of the facts stated therein, and the Trustee may conclusively rely upon and will have no duty to confirm the accuracy of such facts. Upon receipt of each such Requisition of the Borrower, signed by an Authorized Representative of the Borrower and accompanied by an invoice covering each item for payment of Costs of the Project or Operating and Working Capital Costs, the Trustee will thereupon disburse moneys in the Project Fund to pay the amount set forth therein as directed by the terms thereof. In addition, with respect to the Series 2020 subaccount of the Equity Subaccount within the Project Fund, the Trustee will disburse funds on deposit therein to or at the direction of the Borrower, requisitioned as set forth in the Indenture, solely to pay Operating and Working Capital Costs of the Borrower in a maximum monthly disbursement amount equal to the lesser of (i) the Operating and Working Capital Costs of the Borrower set forth in the Borrower's then current operating expense budget for such month and (ii) $2,000,000. Each requisition of the Borrower for payments from the Series 2020 subaccount of the Equity Subaccount of the Project Fund shall constitute a certification by the Borrower to the Trustee that the budget currently on file with the Trustee is the then current operating expense budget of the Borrower.

Upon the receipt by the Trustee of a certificate conforming with the requirements of the Agreement, and after payment of costs payable from the Project Fund or provision having been made for payment of such costs not yet due by retaining such costs in the Project Fund or otherwise as directed in such certificate, the Trustee will transfer any remaining balance in the relevant Series subaccount of the Tax-Exempt Subaccount within the Project Fund into the relevant Series subaccount of the Surplus Account within the Revenue Fund, which account and subaccounts the Trustee will establish and hold in trust. In the alternative, the Borrower may submit to the Trustee a certificate, stating that its plans for the Project have changed and that it has determined to use a portion of unspent proceeds in the Project Fund to redeem Bonds. Upon receipt of either of the foregoing certificates, the Trustee will arrange for the identified amount of unspent proceeds in the relevant Series subaccount of the Tax-Exempt Subaccount within the Project Fund to be returned to the Trustee for deposit in the relevant Series subaccount of the Surplus Account. The moneys in any Surplus Account will be used and applied (subject to the Indenture) at the written direction of the Borrower (unless some other application of such moneys permitted by the Indenture and the Loan Agreement is requested by the Borrower and would not, in the opinion of Bond Counsel, cause interest on the Bonds to become no longer Tax-exempt) to redeem Bonds in Authorized Denominations, to the maximum degree permissible, and at the earliest possible dates at which the Bonds can be redeemed pursuant to the Indenture. Notwithstanding the provision in the Indenture regarding the investment of moneys, the moneys in the Surplus Account will be invested at the written instruction of the Borrower at a yield no higher than the yield on the Outstanding Bonds (unless in the opinion of Bond Counsel, addressed and delivered to the Issuer and the Trustee, investment at a higher yield would not cause interest on the Bonds to become no longer Tax-exempt) and all such investment income will be deposited in the Surplus Account and expended or reinvested as provided above.

In the event of redemption of all of a Series of Bonds pursuant to the redemption provisions of the Indenture or an Event of Default which causes acceleration of any Series of Bonds, any moneys then remaining in the relevant Series subaccount of the Tax-Exempt Subaccount within the Project Fund relating to such Series of Bonds will be transferred to the relevant Series subaccount of the Surplus Account within the Revenue Fund, and all moneys in the Revenue Fund relating to such Series of Bonds will be used to redeem such Series of Bonds.

Moneys in the Series 2019 subaccount of the Capitalized Interest Account will be transferred by the Trustee on the 25th of each month, commencing July 25, 2019, to the Series 2019 subaccount of the Interest Account within the Revenue Fund in the amounts set forth in the Indenture to pay interest due and payable on the Series 2019 Bonds on each Interest Payment Date with respect to the Series 2019 Bonds to and including June 1, 2021, in accordance with the Indenture.

**Costs of Issuance Fund**

Under the Indenture, the Trustee will establish the Costs of Issuance Fund. The Trustee will also create separate accounts in the Costs of Issuance Fund designated the "Proceeds Account" and the "Borrower Subaccount" which will be funded as provided in the Indenture. The Trustee will further establish within the Proceeds Account and Borrower Subaccount, as applicable, a separate subaccount for each Series and sub-Series of Bonds. The moneys in each account and subaccount of the Costs of Issuance Fund will be held by the Trustee in trust and applied to the payment of Costs of Issuance for the relevant Series of Bonds, upon a sequentially numbered Requisition of the Borrower filed with the Trustee, in the form attached to the Indenture. Each Requisition of the

Borrower will be sufficient evidence to the Trustee of the facts stated therein and the Trustee may conclusively rely upon and will have no duty to confirm the accuracy of such facts. All payments from the Costs of Issuance Fund will be reflected in the Trustee's regular accounting statements. Any amounts remaining in a Proceeds Account of the Costs of Issuance Fund six months following the Date of Delivery of the relevant Series of Bonds will be transferred to the relevant Series subaccount of the Tax-Exempt Subaccount of the Project Fund for such Series of Bonds. Any amounts remaining in the Borrower Subaccount of the Costs of Issuance Fund three months following the Date of Delivery of the relevant Series of Bonds will be transferred to the Borrower. Upon such transfers with respect to all Series of Bonds Outstanding, the Trustee will close the Costs of Issuance Fund.

**Pledge and Assignment; Revenue Fund**

Subject only to the provisions of the Indenture permitting the application thereof for the purposes and on the terms and conditions set forth therein, all of the Revenues and any other amounts (including proceeds of the sale of Bonds) held in any fund or account established pursuant to the Indenture (except the Rebate Fund, and the Borrower Subaccount of the Costs of Issuance Fund) are pledged to secure the full payment of the principal of, premium, if any, and interest on the Bonds, *first*, in favor of the Series 2019 Bonds and any Additional Senior Bonds, and *second*, in favor of the Series 2020 Bonds and any Additional Subordinate Bonds, all in accordance with their terms and the provisions of the Indenture. Said pledge will constitute a lien on and security interest in such assets and will attach, be perfected and be valid and binding from and after delivery by the Trustee of the Bonds, without any physical delivery thereof or further act.

The Issuer transfers in trust, and assigns to the Trustee, for the benefit of the Holders from time to time of the Bonds, all of the Issuer's rights, title or interest in the Revenues and other assets pledged in the foregoing subparagraph of this section and all of the right, title and interest of the Issuer in the Note and the Loan Agreement (except for the Retained Rights). Such assignment to the Trustee is solely in its capacity as Trustee under the Indenture subject to the protections, immunities and limitations from liability afforded the Trustee under the Indenture. The Trustee will be entitled to and will collect and receive all of the Revenues, the Gross Revenues pledged to the Issuer under the Agreement (except for those with respect to Retained Rights) and any Revenues or Gross Revenues collected or received by the Issuer (except for those with respect to Retained Rights) will be deemed to be held, and to have been collected or received, by the Issuer as the agent of the Trustee and subject to the provisions of the Indenture, will forthwith be paid by the Issuer to the Trustee. Notwithstanding anything to the contrary in the Indenture, the Issuer will have no obligation to and instead the Trustee may, without further direction from the Issuer, take any and all steps, actions and proceedings, to enforce any or all rights of the Issuer (other than the Retained Rights) under the Indenture, the Loan Agreement, the Guaranty, the Leasehold Mortgage, the NDA, the SNDA, the Pledge and Security Agreement or each Account Control Agreement, including, without limitation, the rights to enforce the remedies upon the occurrence and continuation of an Event of Default and the obligations of the Borrower under the Loan Agreement, the Leasehold Mortgage, the NDA, the SNDA, the Pledge and Security Agreement and each Account Control Agreement, and all of the obligations of the Guarantor under the Guaranty.

All Revenues (except investment earnings which will be deposited as provided in the provisions of the Indenture regarding Investment of Moneys) will be promptly deposited by the Trustee upon receipt thereof in a special fund designated as the Revenue Fund which the Trustee will establish, maintain and hold in trust; except as otherwise provided in the provisions of Indenture regarding Allocation of Revenues, all moneys received by the Trustee and required to be deposited in the Redemption Account, if any, will be promptly deposited in the Redemption Account, which the Trustee will establish, maintain and hold in trust as provided in the provisions of the Indenture regarding Allocation of Revenues. All Revenues deposited with the Trustee will be held, disbursed, allocated and applied by the Trustee only as provided in the Indenture.

The Issuer transfers in trust, and assigns to the Trustee, for the benefit of the Holders from time to time of the Bonds all of the Issuer's rights, title or interest (if any) in the Account Control Agreement and the Blocked Deposit Accounts (as defined in the Account Control Agreement), covered thereby, including the Issuer's security interests therein.

**Deposits to Revenue Fund; Allocation of Revenues**

The Trustee will establish, maintain and hold in trust a separate fund designated as the "Revenue Fund" and accounts therein designated the "Interest Account," "Principal Account," "Redemption Account," and the "Debt Service Reserve Fund." The Trustee will further establish within each such account, a separate subaccount for each Series or sub-Series of Bonds, as applicable. On the first Business Day of every calendar month (to the extent not paid from the Capitalized Interest Account) except as noted below, the Trustee will transfer from the Revenue Fund and deposit into the following respective Series subaccount within the following respective accounts (each of which the Trustee is directed to establish and maintain within the Revenue Fund), the following amounts, in the following order of priority, the requirements of each such account (including the making up of any deficiencies in any such account resulting from lack of Revenues sufficient to make any earlier required deposit) at the time of deposit to be satisfied before any transfer is made to any account subsequent in priority:

*First*: (i) with respect to the Series 2019 Bonds, to the Series 2019 subaccount of the Interest Account, an amount equal to one-sixth of the aggregate amount of interest becoming due and payable on the Series 2019 Bonds on the next succeeding Bond Payment Date with respect to the Series 2019 Bonds or date of redemption of all Series 2019 Bonds then Outstanding; and (ii) with respect to any Additional Senior Bonds, to the applicable Series subaccount of the Interest Account, an amount equal to one-sixth of the aggregate amount of interest becoming due and payable on such Series of Additional Senior Bonds on the next succeeding Bond Payment Date relating thereto or date of redemption of all such Series of Additional Senior Bonds then Outstanding.

*Second*: (i) with respect to the Series 2019 Bonds, to the Series 2019 subaccount of the Principal Account, an amount equal to one-sixth of the aggregate amount of principal due on the Series 2019 Bonds on the Bond Payment Date with respect to the Series 2019 Bonds as paid by the Borrower and designated as or attributable to principal on the Series 2019 Bonds in the most recent Loan Repayment; and (ii) with respect to any Additional Senior Bonds, to the applicable Series subaccount of the Principal Account, an amount equal to one-sixth of the aggregate amount of principal due on such Series of Additional Senior Bonds on the Bond Payment Date relating thereto as paid by the Borrower and designated as or attributable to principal on such Series of Additional Senior Bonds in the most recent Loan Repayment.

*Third*: (i) with respect to the Series 2019 Bonds, to the Series 2019 subaccount of the Redemption Account, the aggregate amount of principal and premium, if any, next coming due on the Series 2019 Bonds by acceleration or by redemption permitted or required under the redemption provisions of the Indenture, or any portion thereof paid by the Borrower; and (ii) with respect to any Additional Senior Bonds, to the applicable Series subaccount of the Redemption Account, the aggregate amount of principal and premium, if any, next coming due on such Series of Additional Senior Bonds by acceleration or by redemption permitted or required under the redemption provisions of the Indenture, or any portion thereof paid by the Borrower.

*Fourth*: (i) with respect to the Series 2019 Bonds, to the Series 2019 subaccount of the Debt Service Reserve Fund, to restore such account or subaccount to the Series 2019 Reserve Requirement, if required, in three equal installments; and (ii) with respect to any Additional Senior Bonds, to the applicable Series subaccount of the Debt Service Reserve Fund, to restore such account or subaccount to the Reserve Requirement relating to such Series of Additional Senior Bonds, if required, in three equal installments.

*Fifth*: (i) with respect to the Series 2020 Bonds, to the Series 2020 subaccount of the Interest Account, an amount equal to one-third of the aggregate amount of interest becoming due and payable on the Series 2020 Bonds on December 1, 2020, and thereafter, an amount equal to one-sixth of the aggregate amount of interest becoming due and payable on the Series 2020 Bonds on the next succeeding Bond Payment Date with respect to the Series 2020 Bonds or date of redemption of all Series 2020 Bonds then Outstanding; and (ii) with respect to any Additional Subordinate Bonds, to the applicable Series subaccount of the Interest Account, an amount equal to one-sixth of the aggregate amount of interest becoming due and payable on such Series of Additional Subordinate Bonds on the next succeeding Bond Payment Date relating thereto or date of redemption of all such Series of Additional Subordinate Bonds then Outstanding.

*Sixth*: (i) with respect to the Series 2020 Bonds, beginning on November 1, 2036, to the Series 2020 subaccount of the Principal Account, an amount equal to the aggregate amount of principal due on the Series 2020 Bonds on the Principal Payment Date with respect to the Series 2020 Bonds as paid by the Borrower and designated as or attributable to principal on the Series 2020 Bonds in the Loan Repayment immediately preceding such

Principal Payment Date; and (ii) with respect to any Additional Subordinate Bonds, beginning on the first of the month immediately preceding the Principal Payment Date relating thereto, to the applicable Series subaccount of the Principal Account, an amount equal to the aggregate amount of principal due on such Series of Additional Subordinate Bonds on the Principal Payment Date relating thereto as paid by the Borrower and designated as or attributable to principal on such Series of Additional Subordinate Bonds in the Loan Repayment immediately preceding such Principal Payment Date.

*Seventh*:  (i) with respect to the Series 2020 Bonds, to the Series 2020 subaccount of the Redemption Account, the aggregate amount of principal and premium, if any, next coming due on the Series 2020 Bonds by acceleration or by redemption permitted or required under the redemption provisions of the Indenture, or any portion thereof paid by the Borrower; and (ii) with respect to any Additional Subordinate Bonds, to the applicable Series subaccount of the Redemption Account, the aggregate amount of principal and premium, if any, next coming due on such Series of Additional Subordinate Bonds by acceleration or by redemption permitted or required under the redemption provisions of the Indenture, or any portion thereof paid by the Borrower.

*Eighth*:  (i) with respect to the Series 2020 Bonds, to the Series 2020 subaccount of the Debt Service Reserve Fund, to restore such account or subaccount to the Series 2020 Reserve Requirement, if required, in three equal installments; and (ii) with respect to any Additional Subordinate Bonds, to the applicable Series subaccount of the Debt Service Reserve Fund, to restore such account or subaccount to the Reserve Requirement relating to such Series of Additional Subordinate Bonds, if required, in three equal installments.

## Priority of Moneys in Revenue Fund

Funds for the payment of the principal or redemption price (including premium, if any) of and interest on the Bonds will be derived from the following sources in the order of priority indicated below from each of the accounts in the Revenue Fund:

(i)    moneys paid into the Interest Account, if any, representing accrued interest received at the initial sale of the Bonds and proceeds from the investment thereof which will be applied to the payment of interest on such Bonds;

(ii)    moneys paid into the Revenue Fund pursuant to the provisions of the Indenture regarding defeasance of the Bonds from the Deposit of Money or Securities with Trustee and proceeds from the investment thereof; and

(iii)    any other moneys paid into the Revenue Fund and deposited in the Revenue Fund and proceeds from the investment thereof.

## Investment of Moneys

All moneys in any of the funds or accounts established pursuant to the Indenture will be invested by the Trustee as directed in writing by the Borrower or its agent, solely in Investment Securities.  Notwithstanding any other provision in the Indenture, in the absence of written investment instructions directing the Trustee by noon of the second Business Day preceding the day when investments are to be made, the Trustee is directed to invest available funds in Investment Securities described in paragraph (7) of the definition thereof; provided, however, that prior to the date on which such investment is to be made, the Borrower may direct the Trustee in writing specifying a specific money market fund.  The Trustee will not be liable for any losses resulting from any investments made pursuant to the preceding two sentences.

Investment Securities may be purchased at such prices as the Trustee may in its discretion determine or as may be directed in writing by the Borrower or its agent.  All Investment Securities will be acquired subject to the limitations set forth in the Indenture regarding Account Records and Reports, the limitations as to maturities thereafter set forth in this section and such additional limitations or requirements consistent with the foregoing as may be established by Request of the Borrower.

Moneys in all funds and accounts will be invested in Investment Securities maturing not later than the date on which such moneys will be required for the purposes specified in the Indenture.  Notwithstanding anything else in the Indenture, any moneys in the Interest Account, the Principal Account or the Redemption Account held for the payment of particular Bonds will be invested at the written direction of the Borrower in direct obligations of the United States or bonds or other obligations guaranteed by the United States government or for which the full faith and credit of the United States is pledged for the full and timely payment of principal and interest thereof (or money market funds investing solely in such bonds or other obligations), rated in the highest rating category applicable to such investments which mature or are subject to redemption at the option of the holder thereof not later than the date on which it is estimated that such moneys will be required to pay such Bonds (but in any event maturing or subject to such redemption in not more than thirty days).  Moneys held for non-presented Bonds will be held uninvested.

All interest, profits and other income received or losses incurred from the investment of moneys in any fund or account established pursuant to the Indenture will be deposited or booked in the fund or account which gave rise to the investment earnings or losses.  Notwithstanding anything to the contrary contained in this paragraph, an amount of interest received with respect to any Investment Security equal to the amount of accrued interest, if any, paid as part of the purchase price of such Investment Security will be credited to the fund or account from which such accrued interest was paid.  To the extent that any Investment Securities are registrable, such Securities will be registered in the name of the Trustee or its nominee.

For the purpose of determining the amount in any fund, all Investment Securities credited to such fund will be valued at the lesser of cost or par value plus, prior to the first payment of interest following purchase, the amount of accrued interest, if any, paid as a part of the purchase price.

Subject to the provisions of the Indenture regarding Arbitrage Covenants, investments in any and all funds and accounts held by the Trustee under the Indenture (other than moneys held in the Borrower Subaccount of the Costs of Issuance Fund, or moneys held for the payment of particular Bonds (including moneys held for non-presented Bonds or held by the Trustee under the provisions of the Indenture regarding defeasance associated with the Deposit of Money or Securities with Trustee) may be commingled for purposes of making, holding and disposing of investments, notwithstanding provisions of the Indenture for transfer to or holding in particular funds and accounts, the amounts received or held by the Trustee thereunder, provided that the Trustee will at all times account for such investments strictly in accordance with the funds and accounts to which they are credited and otherwise as provided in the Indenture.  Subject to the provisions of the Indenture regarding Accounting and Records any moneys invested in accordance with this section may be invested in a pooled investment account consisting solely of funds held by the Trustee as a fiduciary.

The Trustee may act as principal or agent in the making or disposing of any investment. The Trustee may sell or present for redemption any Investment Securities whenever it will be necessary to provide moneys to meet any required payment, transfer, withdrawal or disbursement from the fund to which such Investment Security is credited, and the Trustee will not be liable or responsible for any loss resulting from such investment.  The Trustee may make any and all such investments through its own investment department or that of its affiliates or subsidiaries, and may charge its ordinary and customary fees for such trades, including cash sweep account fees. The Trustee may implement its automated cash investment system, to assure that cash on hand is invested and to charge reasonable cash management fees, which may be deducted from income earned on investments.

## Events of Default; Acceleration; Waiver of Default

Each of the following events which has occurred and is continuing will constitute an "Event of Default" under the Indenture:

(a)    default in the due and punctual payment of the principal of, premium (if any) on, or purchase price of, any Bond when and as the same will become due and payable, whether at maturity as therein expressed, by proceedings for redemption, by declaration, upon tender for purchase, or otherwise;

(b)    default in the due and punctual payment of any installment of interest on any Bond, when and as the same will become due and payable;

(c)     failure by the Issuer to perform or observe any other of the covenants, agreements or conditions on its part in the Indenture or in the Bonds contained, and the continuation of such failure for a period of thirty (30) days after written notice thereof, specifying such default and requiring the same to be remedied, will have been given to the Issuer and the Borrower by the Trustee, or to the Issuer, the Borrower and the Trustee by the Holders of a majority in aggregate principal amount of the Series 2019 Bonds and any Additional Senior Bonds then Outstanding (and only if such Series 2019 Bonds or Additional Senior Bonds are no longer Outstanding, Holders of a majority in aggregate principal amount of the Series 2020 Bonds and any Additional Subordinate Bonds then Outstanding); or

(d)     the occurrence and continuance of a Loan Default Event described in the Agreement, an Event of Default under the Lease which permits Lessor to terminate the Lease, a Leasehold Mortgage Default, or any Event of Default under the Guaranty, the NDA, the SNDA, the Pledge and Security Agreement or any Account Control Agreement.

No default specified in (c) above will constitute an Event of Default unless the Issuer or the Borrower on behalf of the Issuer will have failed to correct such default within the applicable period; provided, however, that if the default specified in (c) above shall be such that it cannot be corrected within such period, it will not constitute an Event of Default if corrective action is instituted by the Issuer or the Borrower on behalf of the Issuer within the applicable period and diligently pursued. With regard to any alleged default concerning which notice is given to the Issuer under the provisions of this section, the Borrower will have full authority to perform any covenant or obligation the non-performance of which is alleged in said notice to constitute a default with full power to do any and all things and acts to the same extent that the Issuer could do and perform any such things and acts, so long as such action does not adversely affect or impair the rights of the Issuer under the Indenture or otherwise conflict with the terms thereof.

During the continuance of an Event of Default described in (a), (b), (c) or (d) above, unless the principal of all the Bonds will have already become due and payable, the Trustee may, and upon the written request of the Holders of a majority in aggregate principal amount of the Series 2019 Bonds and any Additional Senior Bonds then Outstanding (and only if such Series 2019 Bonds or Additional Senior Bonds are no longer Outstanding, Holders of a majority in aggregate principal amount of the Series 2020 Bonds and any Additional Subordinate Bonds then Outstanding), and indemnified as provided in the Indenture, the Trustee will, promptly upon such occurrence, by notice in writing to the Issuer and the Borrower, declare the principal of all the Bonds then Outstanding, and the interest accrued thereon, to be due and payable immediately, and upon any such declaration the same will become and will be immediately due and payable, anything in the Indenture or in the Bonds contained to the contrary notwithstanding. Interest on the Bonds will continue to accrue as of the date of declaration of acceleration at the Post-Default Rate until paid. The Trustee will promptly notify the Bondholders of the date of declaration of acceleration in the same manner as for a notice of redemption.

The preceding paragraph, however, is subject to the condition that if, at any time after the principal of the Bonds will have been so declared due and payable, and before any judgment or decree for the payment of the moneys due will have been obtained or entered as provided in the Indenture, there will have been deposited with the Trustee a sum sufficient to pay all the principal of the Bonds matured prior to such declaration and all matured installments of interest (if any) upon all the Bonds, with interest on such overdue installments of principal as provided in the Agreement, and the reasonable fees and expenses of the Trustee, including reasonable fees and expenses of its attorneys, and any and all other defaults known to the Trustee (other than in the payment of principal of and interest on the Bonds due and payable solely by reason of such declaration) will have been made good or cured to the satisfaction of the Trustee or provision deemed by the Trustee to be adequate will have been made therefor, then, and in every such case, the Holders of a majority in aggregate principal amount of the Series 2019 Bonds and any Additional Senior Bonds then Outstanding (and only if such Series 2019 Bonds or Additional Senior Bonds are no longer Outstanding, Holders of a majority in aggregate principal amount of the Series 2020 Bonds and any Additional Subordinate Bonds then Outstanding), by written notice to the Issuer and to the Trustee, may, on behalf of the Holders of all the Bonds, rescind and annul such declaration and its consequences and waive such default; but no such rescission and annulment will extend to or will affect any subsequent default, or will impair or exhaust any right or power consequent thereon.

**Institution of Legal Proceedings by Trustee**

Subject to the provisions of the Indenture regarding Event of Default; Acceleration; Waiver of Default, if one or more of the Events of Default will happen and be continuing, the Trustee in its discretion may, and upon the written request of the Holders of a majority in principal amount of the Series 2019 Bonds and any Additional Senior Bonds then Outstanding (and only if such Series 2019 Bonds or Additional Senior Bonds are no longer Outstanding, Holders of a majority in aggregate principal amount of the Series 2020 Bonds and any Additional Subordinate Bonds then Outstanding),and upon being indemnified to its satisfaction pursuant to the provisions of the Indenture regarding the duties, immunities and liabilities of the Trustee will, proceed to protect or enforce its rights or the rights of the Holders of Bonds under the Act or under the Indenture or the Agreement by a suit in equity or action at law, either for the specific performance of any covenant or agreement contained in the Indenture or the Agreement, or in aid of the execution of any power in the Indenture or the Agreement granted, or for appointment of a receiver, or by mandamus or other appropriate proceeding for the enforcement of any other legal or equitable remedy as the Trustee will deem most effectual in support of any of its rights or duties under the Indenture.

**Application of Revenues and Other Funds After Default**

If an Event of Default will occur and be continuing, all Revenues and any other funds then held or thereafter received by the Trustee under any of the provisions of the Indenture (subject to certain provisions of the Indenture, including the provisions thereof regarding the Costs of Issuance Fund (relative to the Borrower Subaccount of the Costs of Issuance Fund), Rebate Fund and Money Held for Particular Bonds) will be promptly applied by the Trustee as follows and in the following order:

(i)        To the payment of reasonable fees and expenses of the Trustee (including reasonable fees and disbursements of its counsel) incurred in and about the performance of its powers and duties under the Indenture;

(ii)       To the payment of the principal of and interest then due on the Series 2019 Bonds and any Additional Senior Bonds (upon presentation of the Series 2019 Bonds or Additional Senior Bonds to be paid, and stamping thereon of the payment if only partially paid, or surrender thereof if fully paid) subject to the provisions of the Indenture, including the provisions thereof regarding Extension of Maturity of Bonds, as follows:

(a)        Unless the principal of all of the Series 2019 Bonds and Additional Senior Bondswill have become or have been declared due and payable,

First:  To the payment of Persons entitled thereto of all installments of interest then due on the Series 2019 Bonds and Additional Senior Bonds in the order of the maturity of such installments, and, if the amount available will not be sufficient to pay in full any installment or installments maturing on the same date, then to the payment thereof ratably, according to the amounts due thereon, to the Persons entitled thereto, without any discrimination or preference; and

Second:  To the payment of Persons entitled thereto of the unpaid principal of any Series 2019 Bonds and Additional Senior Bonds which will have become due, whether at maturity or by call for redemption, with interest on the overdue principal at the rate borne by the respective Series 2019 Bonds and Additional Senior Bonds, and, if the amount available will not be sufficient to pay in full all of the Series 2019 Bonds and Additional Senior Bonds, together with such interest, then to the payment thereof ratably, according to the amounts of principal due on such date to the Persons entitled thereto, without any discrimination or preference.

(b)        If the principal of all of the Series 2019 Bonds and Additional Senior Bonds will have become or have been declared due and payable, to the payment of the principal and interest then due and unpaid upon the Series 2019 Bonds and Additional Senior Bonds, with interest on the overdue principal at the rate borne by the Series 2019 Bonds and Additional Senior Bonds, and, if the amount available will not be sufficient to pay in full the whole amount so due and unpaid, then to the payment thereof ratably, without preference or priority of principal over interest, or of interest over principal, or of any installment of interest over any other installment of interest, or of any Series 2019 Bond and Additional Senior Bonds over any other Series 2019 Bond and Additional Senior Bonds, according to the amounts due respectively for principal and interest, to the Persons entitled thereto without any discrimination or preference, provided, however, that in no event will moneys set aside to pay principal or interest on any particular Series 2019 Bonds and Additional Senior Bonds (including moneys held for non-presented Series 2019 Bonds and Additional Senior Bonds or held by the Trustee under the provisions of the Indenture

regarding defeasance from Deposit of Money or Securities with Trustee), be used to pay any of the items listed in clause (i) of this section.

(iii) Only after all Series 2019 Bonds and Additional Senior Bonds have been fully paid, to the payment of the principal of and interest then due on the Series 2020 Bonds and any Additional Subordinate Bonds (upon presentation of the Series 2020 Bonds or Additional Subordinate Bonds to be paid, and stamping thereon of the payment if only partially paid, or surrender thereof if fully paid) subject to the provisions of this Indenture including the provisions thereof regarding Extension of Maturity of Bonds, as follows:

(a) Unless the principal of all of the Series 2020 Bonds and any Additional Subordinate Bonds will have become or have been declared due and payable,

*First*: To the payment of Persons entitled thereto of all installments of interest then due on the Series 2020 Bonds and any Additional Subordinate Bonds in the order of the maturity of such installments, and, if the amount available will not be sufficient to pay in full any installment or installments maturing on the same date, then to the payment thereof ratably, according to the amounts due thereon, to the Persons entitled thereto, without any discrimination or preference; and

*Second*: To the payment of Persons entitled thereto of the unpaid principal of any Series 2020 Bonds and any Additional Subordinate Bonds which will have become due, whether at maturity or by call for redemption, with interest on the overdue principal at the rate borne by the respective Series 2020 Bonds and any Additional Subordinate Bonds, and, if the amount available will not be sufficient to pay in full all of the Series 2020 Bonds and any Additional Subordinate Bonds, together with such interest, then to the payment thereof ratably, according to the amounts of principal due on such date to the Persons entitled thereto, without any discrimination or preference.

(b) If the principal of all of the Series 2020 Bonds and any Additional Subordinate Bonds will have become or have been declared due and payable, to the payment of the principal and interest then due and unpaid upon the Series 2020 Bonds and any Additional Subordinate Bonds, with interest on the overdue principal at the rate borne by the Series 2020 Bonds and any Additional Subordinate Bonds, and, if the amount available will not be sufficient to pay in full the whole amount so due and unpaid, then to the payment thereof ratably, without preference or priority of principal over interest, or of interest over principal, or of any installment of interest over any other installment of interest, or of any Series 2020 Bond and any Additional Subordinate Bond over any other Series 2020 Bond and any Additional Subordinate Bond, according to the amounts due respectively for principal and interest, to the Persons entitled thereto without any discrimination or preference; provided, however, that in no event will moneys set aside to pay principal or interest on any particular Series 2020 Bonds or any Additional Subordinate Bonds (including moneys held for non-presented Series 2020 Bonds or any Additional Subordinate Bonds or held by the Trustee under the provisions of the Indenture regarding defeasance from Deposit of Money or Securities with Trustee), be used to pay any of the items listed in clause (i) of this section.

**Trustee to Represent Bondholders**

The Trustee is irrevocably appointed (and the successive respective Holders of the Bonds, by taking and holding the same, will be conclusively deemed to have so appointed the Trustee) as trustee and true and lawful attorney-in-fact of the Holders of the Bonds for the purpose of exercising and prosecuting on their behalf such rights and remedies as may be available to such Holders under the provisions of the Bonds, the Indenture, the Agreement, the Act and applicable provisions of any other law.  Subject to the section above entitled "Events of Default; Acceleration; Waiver of Default" above, upon the occurrence and continuance of an Event of Default or other occasion giving rise to a right in the Trustee to represent the Bondholders, the Trustee in its discretion may, at upon the written request of the Holders of a majority in aggregate principal amount of the Series 2019 Bonds and any Additional Senior Bonds then Outstanding (and only if such Series 2019 Bonds or Additional Senior Bonds are no longer Outstanding, Holders of a majority in aggregate principal amount of the Series 2020 Bonds and any Additional Subordinate Bonds then Outstanding), and upon being indemnified to its satisfaction therefor, will, proceed to protect or enforce its rights or the rights of such Holders by such appropriate action, suit, mandamus or other proceedings as it will deem most effectual to protect and enforce any such right, at law or in equity, either for the specific performance of any covenant or agreement contained in the Indenture, or in aid of the execution of any

power therein granted, or for the enforcement of any other appropriate legal or equitable right or remedy vested in the Trustee or in such Holders under the Indenture, the Agreement, the Act or any other law; and upon instituting such proceeding, the Trustee will be entitled, as a matter of right, to the appointment of a receiver of the Revenues and other assets pledged under the Indenture, pending such proceedings.  All rights of action under the Indenture or the Bonds or otherwise may be prosecuted and enforced by the Trustee without the possession of any of the Bonds or the production thereof in any proceeding relating thereto, and any such suit, action or proceeding instituted by the Trustee will be brought in the name of the Trustee for the benefit and protection of all the Holders of such Bonds, subject to the provisions of the Indenture.

**Bondholders' Direction of Proceedings**

Anything in the Indenture to the contrary notwithstanding, but subject to the provisions of the Indenture regarding Liability of the Trustee, the Holders of a majority in aggregate principal amount of the Series 2019 Bonds and any Additional Senior Bonds then Outstanding will have the right, by an instrument or concurrent instruments in writing executed and delivered to the Trustee, to direct the method of conducting all remedial proceedings taken by the Trustee under the Indenture, provided that such direction will not be otherwise than in accordance with law and the provisions of the Indenture.  Notwithstanding any provision under the Indenture to the contrary, so long as any Series 2019 Bonds or any Additional Senior Bonds remain Outstanding, all references under the Article captioned "EVENTS OF DEFAULT AND REMEDIES OF BONDHOLDERS" in the Indenture to the Holders of a majority in aggregate principal amount of the Bonds then Outstanding solely refers to the Holders of a majority in aggregate principal amount of the Series 2019 Bonds and any Additional Senior Bonds then Outstanding, it being the agreement of the Holders of the Series 2020 Bonds and any Additional Subordinate Bonds that Holders of the Series 2020 Bonds and any Additional Subordinate Bonds will have no rights to direct proceedings under the Indenture so long as the Series 2019 Bonds or any Additional Senior Bonds remain Outstanding.  By their acceptance of the Series 2020 Bonds or any Additional Subordinate Bonds, the Holders of the Series 2020 Bonds and any Additional Subordinate Bonds will have no right (i) to pursue or direct any remedy available to the Trustee under the Indenture or (ii) to be paid from the proceeds received by the Trustee through the exercise of any remedies allowed thereunder or under any other document relating to the Series 2019 Bonds or any Additional Senior Bonds while any Series 2019 Bonds or any Additional Senior Bonds are Outstanding.  The Trustee will give written notice to the Holders of the Series 2020 Bonds or any Additional Subordinate Bonds of its exercise of remedies.  The Trustee has no obligation to consider whether remedies taken would have a material adverse effect on the possibility that Holders of the Series 2020 Bonds or any Additional Subordinate Bonds will be paid or to consider any effect that a remedy may have on the Holders of Subordinate Bonds, so long as the Series 2019 Bonds and any Additional Senior Bonds remain Outstanding.

**Limitation on Bondholders' Right to Sue**

Subject to provisions of the Indenture regarding Events of Default; Acceleration; Waiver of Default, no Holder of any Bond will have the right to institute any suit, action or proceeding at law or in equity, for the protection or enforcement of any right or remedy under the Indenture, the Agreement, the Leasehold Mortgage, the NDA, the SNDA, the Pledge and Security Agreement, any Account Control Agreement, the Act or any other applicable law with respect to such Bond, unless (1) such Holder will have given to the Trustee written notice of the occurrence of an Event of Default; (2) the Holders of a majority in aggregate principal amount of the Series 2019 Bonds and any Additional Senior Bonds then Outstanding (and only if such Series 2019 Bonds or Additional Senior Bonds are no longer Outstanding, Holders of a majority in aggregate principal amount of the Series 2020 Bonds and any Additional Subordinate Bonds then Outstanding) will have made written request upon the Trustee to exercise the powers therein before granted or to institute such suit, action or proceeding in its own name; (3) subject to the provisions of the Indenture regarding Liability of the Trustee, such Holder or said Holders will have tendered to the Trustee reasonable indemnity against the costs, expenses and liabilities to be incurred in compliance with such request; and (4) the Trustee will have refused or omitted to comply with such request for a period of sixty (60) days after such written request will have been received by, and said tender of indemnity will have been made to, the Trustee.

Such notification, request, tender of indemnity and refusal or omission are declared, in every case, at the option of the Trustee, to be conditions precedent to the exercise any remedy thereunder or under law, provided that no such indemnity will be required by the Trustee to exercise the remedy set forth in the provision of the Indenture

relating to the failure by the Issuer to perform or observe any of the covenants, agreements or conditions on its part in the Indenture or in the Bonds for a period of thirty (30) days after written notice thereof; it being understood and intended that no one or more Holders of Bonds will have any right in any manner whatever by such Holders' action to affect, disturb or prejudice the security of the Indenture or the rights of any other Holders of Bonds, or to enforce any right under the Indenture, the Agreement, the Act or other applicable law with respect to the Bonds, except in the manner provided in the Indenture, and that all proceedings at law or in equity to enforce any such right will be instituted, had and maintained in the manner therein provided and for the benefit and protection of all Holders of the Outstanding Bonds, subject to the provisions of the Indenture including the section regarding Extension of Payment of Bonds.

**Appointment and Duties of Bond Registrar**

The Issuer appoints the Trustee as the Bond Registrar.

**Modification with Consent of Holders**

The Indenture and the rights and obligations of the Issuer and of the Holders of the Bonds and of the Trustee may be modified or amended from time to time and at any time by an indenture or indentures supplemental thereto, which the Issuer and the Trustee may enter into when the written consent of the Holders of a majority in aggregate principal amount of the Series 2019 Bonds and any Additional Senior Bonds then Outstanding will have been filed with the Trustee. No such modification or amendment will (1) extend the fixed maturity of any Bond, or reduce the amount of principal thereof, or extend the time of payment, or change the method of computing the rate of interest thereon, or extend the time of payment of interest thereon, without the consent of Holders of at least 75% of aggregate principal amount of the Series 2019 Bonds and any Additional Senior Bonds then Outstanding (provided, that, if such modification or amendment shall reduce the amount of Loan Repayments to be made in favor of the Holders of the Series 2020 Bonds or any Additional Subordinate Bonds then Outstanding, then the consent of Holders of at least 75% of aggregate principal amount of the Series 2020 Bonds and any Additional Subordinate Bonds then Outstanding will also be required in addition to the consent of Holders of at least 75% of aggregate principal amount of the Series 2019 Bonds and any Additional Senior Bonds then Outstanding required pursuant to this provision), or (2) reduce the aforesaid percentage of Bonds the consent of the Holders of which is required to effect any such modification or amendment, or permit the creation of any lien on the Revenues and other assets pledged under the Indenture prior to or on a parity with the lien created by the Indenture, or deprive the Holders of the Bonds of the lien created by the Indenture on such Revenues and other assets (except as expressly provided in the Indenture), without the consent of Holders of at least 75% of aggregate principal amount of the Series 2019 Bonds and any Additional Senior Bonds then Outstanding (provided, that, if such modification or amendment shall reduce the amount of Loan Repayments to be made in favor of the Holders of the Series 2020 Bonds or any Additional Subordinate Bonds then Outstanding, then the consent of Holders of at least 75% of aggregate principal amount of the Series 2020 Bonds and any Additional Subordinate Bonds then Outstanding will also be required in addition to the consent of Holders of at least 75% of aggregate principal amount of the Series 2019 Bonds and any Additional Senior Bonds then Outstanding pursuant to this provision). It will not be necessary for the consent of the Bondholders to approve the particular form of any Supplemental Indenture, but it will be sufficient if such consent will approve the substance thereof. Promptly after the execution by the Issuer and the Trustee of any Supplemental Indenture pursuant to this provision, the Trustee will mail a notice, setting forth in general terms the substance of such Supplemental Indenture, to the Holders of the Bonds at the address shown on the registration books of the Trustee.

**Modification without Consent of Holders**

The Indenture and the rights and obligations of the Issuer, of the Trustee and of the Holders of the Bonds may also be modified or amended from time to time and at any time by an indenture or indentures supplemental thereto, which the Issuer and the Trustee may enter into without the consent of any Bondholders (but with 30 days' notice to the Bondholders), but with the written consent of the Borrower (so long as no Event of Default exists) and only to the extent permitted by law, including, without limitation, for any one or more of the following purposes:

(1)     to add to the covenants and agreements of the Issuer in the Indenture contained other covenants and agreements thereafter to be observed, to pledge or assign additional security for the Bonds (or any portion thereof), or to surrender any right or power therein reserved to or conferred upon the Issuer;

(2)     to make such provisions for the purpose of curing any ambiguity, inconsistency or omission, or of curing or correcting any defective provision, contained in the Indenture, or in regard to matters or questions arising under the Indenture, as the Issuer, at the direction of the Borrower, may deem necessary or desirable and not inconsistent with the provisions of the Indenture and which will not adversely affect the interests of the Holders of the Bonds;

(3)     to modify, amend or supplement the Indenture in such manner as to permit the qualification thereof under the Trust Indenture Act of 1939, as amended, or any similar federal statute thereafter in effect, and to add such other terms, conditions and provisions as may be permitted by said act or similar federal statute; or

(4)     to modify, amend or supplement the Indenture in such a manner to permit the Issuer, the Trustee, the Borrower or any other responsible party to comply with the requirements of S.E.C. Rule 15c2-12, as it may from time to time be amended and supplemented, with respect to the Bonds.

**Discharge of Indenture**

Bonds may be paid by the Issuer in any of the following ways, provided that the Issuer also pays or causes to be paid any other sums payable thereunder by the Issuer and related to the Bonds:

(a)     paying or causing to be paid the principal of, interest and premium, if any, on the Bonds Outstanding, as and when the same become due and payable;

(b)     by depositing with the Trustee, in trust, at or before maturity, money or securities in the necessary amount (as provided in the provisions of the Indenture regarding defeasance by Deposit of Money or Securities with the Trustee) to pay or redeem all Bonds then Outstanding; or

(c)     by delivering to the Trustee, for cancellation by it, the Bonds then Outstanding.

If the Issuer will also pay or cause to be paid all other sums payable under the Indenture by the Issuer, then and in that case, at the election of the Issuer (evidenced by a Certificate of the Issuer, filed with the Trustee, signifying the intention of the Issuer to discharge all such indebtedness and the Indenture), and notwithstanding that any Bonds will not have been surrendered for payment, the Indenture and the pledge of Revenues and other assets made under the Indenture and all covenants, agreements and other obligations of the Issuer under the Indenture will cease, terminate, become void and be completely discharged and satisfied except only as provided in the provisions of the Indenture regarding Discharge of Liability on Bonds,.  In such event, upon request of the Issuer, the Trustee will cause an accounting for such period or periods as may be requested by the Issuer to be prepared and filed with the Issuer and will execute and deliver to the Issuer all such instruments as may be necessary or desirable to evidence such discharge and satisfaction, and the Trustee will pay over, transfer, assign or deliver all moneys or securities or other property held by it pursuant to the Indenture (other than the Rebate Fund) which are not required for the payment or redemption of Bonds not theretofore surrendered for such payment or redemption and any amounts owed to the Trustee thereunder or to the Issuer under the Loan Agreement to the Borrower, provided, however, that the Borrower may not receive any moneys held for the payment of particular Bonds (including moneys held for non-presented Bonds).

**Discharge of Liability on Bonds**

Upon the deposit with the Trustee, in trust, at or before maturity, of money or securities in the necessary amount (as provided in the provisions of the Indenture regarding defeasance by the Deposit of Money or Securities with the Trustee) to pay or redeem any Outstanding Bond (whether upon or prior to its maturity or the redemption date of such Bond), provided that, if such Bond is to be redeemed prior to its maturity, notice of such redemption will have been given as provided in the Indenture or provision satisfactory to the Trustee will have been made for the giving of such notice, then all liability of the Issuer in respect of such Bond will cease, terminate and be completely discharged, except only that the Holder thereof will thereafter be entitled to payment of the principal of, premium, if any, and interest on such Bond by the Issuer, and the Issuer will remain liable for such payment, but only out of such money or securities deposited with the Trustee as aforesaid for their payment and such money or securities will be pledged to such payment, provided further, however, that the provisions of the Indenture regarding payment of Bonds after discharge of Indenture obligations, will apply in all events.

**Deposit of Money or Securities with Trustee**

Whenever it is provided or permitted in the Indenture that there be deposited with or held in trust by the Trustee money or securities in the necessary amount to pay or redeem any Bonds, the money or securities to be deposited or held may include money or securities held by the Trustee in the funds and accounts established pursuant to the Indenture (exclusive of the Rebate Fund and the Borrower Subaccount of the Costs of Issuance Fund) and will be:

(a) Moneys in an equal amount to the principal amount of such Bonds, and all unpaid interest thereon to maturity except that, in the case of Bonds which are to be redeemed prior to maturity and in respect of which notice of such redemption will have been given as provided in the redemption provisions of the Indenture or provision satisfactory to the Trustee will have been made for the giving of such notice, the amount to be deposited or held will be the principal amount or redemption price of such Bonds and all unpaid interest thereon to the maturity or redemption date; or

(b) Investment Securities of the type described in clause (ii) (including funds described in clause (5) rated "AAA" or its equivalent by Fitch and which consist solely of securities described in clause (2)) of the definition of Investment Securities which are purchased with moneys and which are nonredeemable and noncallable, the principal of and interest on which when due and without reinvestment will provide money sufficient to pay the principal of, premium, if any, all unpaid interest to maturity, or to the redemption date on the Bonds to be paid or redeemed, as such principal and interest become due, with maturities as may be necessary to make the required payment on the Bonds provided that, in the case of Bonds which are to be redeemed prior to the maturity thereof, notice of such redemption will have been given as provided in the Indenture or irrevocable provision satisfactory to the Trustee will have been made for the giving of such notice;

provided, in each case, that the Trustee will have been irrevocably instructed (by the terms of the Indenture or by a request of the Issuer) to apply such money or Investment Securities to the payment of such principal, premium, if any, and interest with respect to such Bonds and provided further that  the Issuer and the Trustee will have received a report of an accountant that the moneys or Investment Securities on deposit are sufficient to pay the principal or and premium, if any, and interest on the Bonds due at maturity or the redemption date.

**Liability of Issuer Limited to Revenues**

Notwithstanding anything in the Indenture or in the Bonds contained, the Issuer will not be required to advance any moneys derived from any source other than the Revenues and other assets pledged under the Indenture for any of the purposes in the Indenture mentioned, whether for the payment of the principal of or interest on the Bonds or for any other purpose of the Indenture.  No provisions in the Indenture or any obligation therein imposed upon the Issuer, or the breach thereof, will constitute or give rise to or impose upon the Issuer, the Commonwealth or any potential subdivision thereof a pecuniary liability or a charge upon its general credit or taxing power.  The Issuer has no taxing power.

**Limitation of Rights to Parties and Bondholders**

Nothing in the Indenture or in the Bonds expressed or implied is intended or will be construed to give to any person other than the Issuer, the Trustee, the Borrower, Direct Participants and the Holders of the Bonds, any legal or equitable right, remedy or claim under or in respect of the Indenture or any covenant, condition or provision in the Bonds or the Indenture contained; and all such covenants, conditions and provisions are and will be held to be for the sole and exclusive benefit of the Issuer, the Trustee, the Borrower, Direct Participants and the Holders of the Bonds.

[Remainder of Page Intentionally Left Blank.]

## THE LOAN AGREEMENT

The following is a summary of certain provisions of the Agreement.  THIS SUMMARY DOES NOT PURPORT TO BE COMPLETE OR DEFINITIVE AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE FULL TERMS OF THE AGREEMENT, A COPY OF WHICH IS ON FILE WITH THE TRUSTEE.

**Loan of Proceeds**

Under the Agreement, the Issuer agrees to make a loan to the Borrower, evidenced by the Note, equal to the gross proceeds of the Bonds for the purpose of financing the Costs of the Project and Costs of Issuance and funding the Debt Service Reserve Fund and capitalized interest on the Bonds.

**Agreement to Issue Bonds; Application of Bond Proceeds** To provide funds to finance Costs of the Project and Costs of Issuance, the Issuer agrees that it will issue under the Indenture, sell and cause to be delivered to the purchasers thereof, the Bonds.  The Issuer will thereupon apply the proceeds received from the sale of the Bonds as provided in the Loan Agreement and the Indenture. The Borrower agrees that it will acquire, construct, improve, install and equip, or complete the acquisition, construction, improvement, installation and equipping of, the Project, materially in accordance with the description of the Project prepared by the Borrower and submitted to the Issuer, including any and all supplements, amendments and additions or deletions thereto or therefrom, it being understood that the approval of the Issuer will not be required for changes in such description which do not materially alter the purpose and description of the Project as set forth in the Loan Agreement.  The Borrower further agrees to proceed with due diligence to complete the Project within one year from the Issuance Date of the Bonds.  The Borrower will not make any changes to the Project or to the operation thereof which would affect the qualification of the Project as a "project" under the Act or adversely affect the Tax-exempt status of the interest on the Bonds. In particular, the Borrower agrees to comply with all requirements set forth in the Tax Certificate.

In the event that the Borrower desires to alter or change the Project, and such alteration or change materially alters the purpose and description of the Project as described in the Loan Agreement, the Borrower will be required to deliver the following to the Issuer and the Trustee; provided, however, that so long as the Borrower operates the Project as a post-consumer polyethylene terephthalate plastic beverage container processing facility and the Bonds retain their status as Tax-exempt for federal income tax purposes, this paragraph will not be applicable:

(i)     a certificate of an Authorized Representative of the Borrower describing in detail the proposed changes and stating that they will not adversely affect the Project qualifying as facilities that may be financed pursuant to the Act or Section 142(a)(6) of the Code;

(ii)    a copy of the proposed form of amended or supplemented description of the Project;

(iii)   an Approving Opinion addressed to the Trustee with a copy to be delivered to the Issuer relating to such proposed changes; and

(iv)    the written consent of the Holders of a majority in aggregate principal amount of the Series 2019 Bonds and any Additional Senior Bonds then Outstanding (and only if such Series 2019 Bonds or Additional Senior Bonds are no longer Outstanding, Holders of a majority in aggregate principal amount of the Series 2020 Bonds and any Additional Subordinate Bonds then Outstanding).

The Holders of a majority in aggregate principal amount of the Series 2019 Bonds and any Additional Senior Bonds then Outstanding (and only if such Series 2019 Bonds or Additional Senior Bonds are no longer Outstanding, Holders of a majority in aggregate principal amount of the Series 2020 Bonds and any Additional Subordinate Bonds then Outstanding) may withhold their consent under this section in their sole and absolute discretion.

**Disbursements from the Project Fund**

The Borrower will authorize and direct the Trustee, upon compliance with the Indenture, to disburse the moneys in the Project Fund only for the following purposes (and not for Costs of Issuance), subject to the provisions of the Loan Agreement.

(i)     Payment to the Borrower of such amounts, if any, as will be necessary to reimburse the Borrower in full for all advances and payments made by it no earlier than March 10, 2018 (which is 60 days prior to May 9, 2018), in connection with the acquisition, construction, improvement, equipping and installation of the Project.

(ii)    Payment to any vendors, suppliers or contractors to construct and install the Project, as provided in the plans, specifications and work orders therefor; and payment of the miscellaneous expenses incidental thereto.

(iii)   Payment of the fees, if any, of architects, engineers, legal counsel and supervisors expended in connection with the construction and installation of the Project.

(iv)    Payment of taxes including property taxes, assessments and other charges, if any, that may become payable during the construction period with respect to the Project, or reimbursement thereof, if paid by the Borrower.

(v)     Payment of any other Costs of the Project permitted by the Tax Certificate (but not including any Costs of Issuance).

(vi)    With respect to the Equity Subaccount, payment of operating and working capital costs relating to the Project ("Operating and Working Capital Costs").

Each of the payments referred to in this section will be made upon receipt by the Trustee of a written requisition in the form prescribed by the provision in the Indenture relating to the Project Fund, signed by an Authorized Representative of the Borrower.   All disbursements from the Project Fund must comply with the requirements of the Tax Certificate.

Except with respect to subparagraph (vi) above, the Borrower acknowledges that it will not submit any requisitions to the Trustee for the payment of Project Costs from the Project Fund or any account therein, unless it attaches to such requisition invoices evidencing each item requested for payment therein.   In any instance where the requisition is for payment to the Borrower for reimbursement of costs previously paid, the Borrower will attach the original invoices and other documentation to describe the original expenditures which were paid.

**Loan Repayments and Additional Payments**

The Borrower covenants and agrees to pay to the Trustee as a repayment on the loan made to the Borrower from Bond proceeds pursuant to the provisions of the Agreement a sum equal to the amount payable on each Bond Payment Date as principal of, and premium, if any, and interest on, the Bonds then due as provided in the Indenture. Such Loan Repayments will be made in federal funds or other funds immediately available at the Corporate Trust Office of the Trustee.   Without limiting the foregoing, the Borrower further covenants and agrees as follows.

(i)     subject to subsection (iii) below, the Borrower, on or before the 25th day of each month, commencing January 25, 2021 with respect to the Series 2019 Bonds, and commencing September 25, 2020 with respect to the Series 2020 Bonds (or any date prior thereto to the extent not covered by funds in the Capitalized Interest Account), in each case until the principal of, premium, if any, and interest on such Series of Bonds shall have been fully paid or provision for the payment thereof shall have been made in accordance with the Indenture, will deposit in immediately available funds in the Revenue Fund for credit to applicable Series subaccount of the Interest Account established and maintained pursuant

to the Indenture, the amount necessary to make the amount on deposit therein (to the extent not covered by funds in the Capitalized Interest Account) equal to the amount of accrued and unpaid interest on the Bonds as of the first day of the immediately succeeding month;

(ii)　　(1)　　with respect to the Series 2019 Bonds, subject to subsection (iii) below, the Borrower, on or before the 25th day of each month, commencing June 25, 2021, until the principal of, premium, if any, and interest on the Series 2019 Bonds shall have been fully paid or provision for the payment thereof shall have been made in accordance with the Indenture, will deposit in immediately available funds in the Revenue Fund for credit to the Series 2019 subaccount of the Principal Account established and maintained pursuant to the Indenture, a sum equal to one-sixth (1/6th) of the amount of principal payable (whether at maturity or upon a sinking fund redemption date) on the next Principal Payment Date with respect to the Series 2019 Bonds;

(2)　　with respect to the Series 2020 Bonds, on or before the 25th day of the month immediately preceding the maturity date for the Series 2020 Bonds, the Borrower will deposit in immediately available funds in the Revenue Fund for credit to the Series 2020 subaccount of the Principal Account, a sum equal to the principal payable on the Series 2020 Bonds on the maturity date with respect to the Series 2020 Bonds;

(3)　　with respect to any Additional Senior Bonds, the Borrower, on or before the 25th day of each month, commencing with the sixth (6th) month immediately preceding the first Principal Payment Date for such Series of Additional Senior Bonds, until the principal of, premium, if any, and interest on such Series of Additional Senior Bonds shall have been fully paid or provision for the payment thereof shall have been made in accordance with the Indenture, will deposit in immediately available funds in the Revenue Fund for credit to the applicable Series subaccount of the Principal Account, a sum equal to one-sixth (1/6th) of the amount of principal payable (whether at maturity or upon a sinking fund redemption date) on the next Principal Payment Date with respect to such Series of Additional Senior Bonds;

(4)　　with respect to any Additional Subordinate Bonds, on or before the 25th day of the month immediately preceding the maturity date for such Series of Additional Subordinate Bonds, the Borrower will deposit in immediately available funds in the Revenue Fund for credit to the applicable Series subaccount of the Principal Account, a sum equal to the principal payable on such Series of Additional Subordinate Bonds on the maturity date with respect to such Series of Additional Senior Bonds.

(iii)　　notwithstanding subsections (i) and (ii) above, (1) with respect to the Series 2019 Bonds, during the last Bond Year ending June 1, 2036, the Borrower shall have credit against its payments due on and after December 1, 2035 under this Section 4.2(a) from moneys available in the Series 2019 subaccount of the Debt Service Reserve Fund, in such amounts as are designated by the Borrower; and (2) with respect to the Series 2020 Bonds, during the last Bond Year ending December 1, 2036, the Borrower shall have credit against its payments due on and after June 1, 2036 under this Section 4.2(a) from moneys available in the Series 2020 subaccount of the Debt Service Reserve Fund, in such amounts as are designated by the Borrower.

Each payment made pursuant to the above paragraphs under "Loan Repayments and Additional Payments" will at all times be sufficient to pay the total amount of interest and principal (whether at maturity or upon redemption or acceleration) and premium, if any, becoming due and payable on the Bonds on each Bond Payment Date; provided that any amount held by the Trustee in the Revenue Fund on any due date for a Loan Repayment under the Loan Agreement will be credited against the Loan Repayment due on such date, to the extent available for such purpose; and provided further that, subject to the provisions of this paragraph, if at any time the amounts held by the Trustee in the Revenue Fund are sufficient to pay all of the principal of and interest and premium, if any, on,

the Bonds as such payments become due, the Borrower will be relieved of any obligation to make any further payments under the provisions of this section of the Agreement. Notwithstanding the foregoing, if on any date the amount held by the Trustee in the Revenue Fund is insufficient to make any required payments of principal of (whether at maturity or upon redemption or acceleration) and interest and premium, if any, on, the Bonds as such payments become due, the Borrower will forthwith pay such deficiency as a Loan Repayment thereunder.

The obligation of the Borrower to make any payment required by the above paragraphs under "Loan Repayments and Additional Payments" will be deemed to have been satisfied to the extent of any corresponding transfer by the Trustee from the Revenue Fund pursuant to the section of the Indenture summarized above under "Deposits to Revenue Fund; Allocation of Revenues." Except for draws made therefrom pursuant to subparagraph (iii) above, the Borrower also agrees to immediately pay any amounts necessary to replenish a draw on the Debt Service Reserve Fund under the Indenture.

The Borrower also agrees to pay not later than ten (10) days prior to the Tender Date, the purchase price of all Bonds subject to tender for purchase pursuant to the provision in the Indenture described above under the heading "Optional Tender of Bonds upon Change in Control", together with all accrued interest due on such Bonds on the Tender Date.

In addition, the Borrower agrees to pay certain Trustee fees and expenses, Issuer fees and expenses, costs of issuance and other miscellaneous amounts as provided in the Agreement; provided, that the aggregate of all amounts paid to the Issuer will not equal or exceed an amount which would cause the "yield" on the Agreement or any other "acquired purpose obligation" to be "materially higher" than the "yield" on the Bonds, as such terms are used in the Code. Such fees and expenses will be paid directly to the Issuer for its own account as and when such fees and expenses become due and payable. When the Issuer incurs expense or renders services after the occurrence of a Loan Default Event specified in the Loan Agreement relating to an Act of Bankruptcy of the Borrower or Guarantor, the expenses and the compensation for the services are intended to constitute expenses of administration under any federal or state bankruptcy, insolvency, arrangement, moratorium, reorganization or other debtor relief law.

The Borrower further agrees to pay any amounts required to be deposited in the Rebate Fund to comply with the provisions of the Tax Certificate and to pay the fees, charges and expenses of any rebate analyst.

In the event that the Borrower should fail to make any Loan Repayments or additional payments required by the section of the Agreement summarized above under "Loan Repayments and Additional Payments," such payments will continue as obligations of the Borrower until such amounts will have been fully paid. The Borrower agrees to pay such amounts, together with interest thereon, following a delinquency of 30 days until such amount and all interest thereon have been paid in full, to the extent permitted by law. Interest on overdue payments required under the above paragraphs will be calculated at the Post-Default Rate.

**Unconditional Obligation**

The obligations of the Borrower to make the Loan Repayments and the other payments required by the provisions of the Agreement summarized herein under the section "Loan Repayments and Payment of Other Amounts" and to perform and observe the other agreements on its part contained therein and in the Indenture will be absolute and unconditional, irrespective of any defense or any rights of set-off, recoupment or counterclaim it might otherwise have against the Issuer, and during the term of the Agreement, the Borrower will pay all payments required to be made on account of the Agreement as prescribed in the above-referenced section of the Agreement, the Note and all other payments required under the Agreement, free of any deductions and without abatement, diminution or set-off. Until such time as the principal of, premium, if any, and interest on, the Bonds will have been fully paid, or provision for the payment thereof will have been made as required by the Indenture, the Borrower (a) will not suspend or discontinue any payments provided for in the above-referenced section of the Agreement; (b) will perform and observe all of its other covenants contained in the Agreement; and (c) except as provided in the provisions of the Agreement regarding prepayment, will not terminate the Agreement for any cause, including, without limitation, the occurrence of any act or circumstances that may constitute failure of consideration, destruction of or damage to all or a portion of those facilities or equipment comprising the Project, commercial frustration of purpose, any change in the tax or other laws of the United States of America or of the Commonwealth

or any political subdivision of either of these, or any failure of the Issuer or the Trustee to perform and observe any covenant, whether express or implied, or any duty, liability or obligation arising out of or connected with the Agreement or the Indenture, except to the extent permitted by the Agreement.

**Pledge and Assignment of Issuer's Rights**

As security for the payment of the Bonds, the Issuer pledges and assigns to the Trustee the Issuer's rights under the Agreement and the Note, including the right to receive Loan Repayments under the Agreement (except the Retained Rights). The Issuer directs the Borrower to make the Loan Repayments required under the Agreement directly to the Trustee for deposit as contemplated by the Indenture. The Borrower consents to such assignment and agrees to make payments directly to the Trustee without defense or set-off by reason of any dispute between the Borrower and the Issuer or the Trustee.

**Certain Covenants of the Borrower**

The Borrower agrees to maintain the Project, or cause the Project to be maintained, and pay all taxes, governmental charges assessed or levied against the Project, all utility and other charges incurred in the operation, maintenance, use, occupancy and upkeep of any portion of the Project and all assessments and charges made by any governmental body for public improvements that may be secured by a lien on the Project. The Borrower agrees to keep the Project insured to the extent provided in the Agreement. The Borrower may not sell or otherwise dispose, or permit the sale or disposal, (including operating arrangements) of the Project, except as otherwise permitted in the Agreement. The Borrower may not issue or incur any additional Indebtedness unless the Borrower has obtained the prior written consent of the Holders of a majority in principal amount of the Series 2019 Bonds then Outstanding. The Borrower covenants that it will not create, assume, incur or suffer to be created, assumed or incurred any Lien on the Facility or any of its revenues (other than Permitted Liens). The Borrower will not pledge, encumber, sell, factor or otherwise dispose of its accounts receivable or similar contract rights constituting part of the Gross Revenues without the prior written consent of the Holders of a majority in aggregate principal amount of the Series 2019 Bonds then Outstanding. The Borrower pledges and assigns to the Trustee and grants to the Trustee a security interest in all right, title and interest, whether now owned or hereafter acquired, of the Borrower in, to, and under the following: (a) all contracts relating to construction of the Project; (b) all contracts with suppliers of polyethylene terephthalate ("pcrPET") and other feedstock necessary or desirable to recycle pcrPET into food-grade polyethylene terephthalate ("PET") pellets; (c) all contracts with customers of the Facility who purchase the Project's output; (d) all service contracts relating to the Project, licenses to operate the Project, operations manuals or other documents relating to the operation and maintenance of the Project; (e) any changes, additions or extensions to, and any revisions or modifications of and any guarantees of performance of obligations to the Borrower under any of the foregoing (collectively, the "Contract Documents"); and all proceeds of any of the foregoing to secure the payment of the Loan Repayments and the performance by the Borrower of its other obligations under the Agreement and the payment and performance of all obligations of the Borrower, *first*, under any agreement securing Parity Debt and, *second*, under any agreement securing Parity Subordinate Debt. The Borrower also agrees so long as the Bonds, any Parity Debt or any Parity Subordinate Debt are Outstanding, the Borrower will: (i) fulfill, perform and observe each and every condition and covenant of the Borrower contained in the Contract Documents, the failure of which would have a material adverse effect on the Borrower; (ii) give prompt notice to the Trustee of any material claim of default under the Contract Documents given to the Borrower in writing or given in writing by the Borrower, together with a complete copy of any such claim; (iii) at the sole cost and expense of the Borrower, enforce the performance and observance of each and every covenant and condition of the Contract Documents to be performed and observed to the extent reasonably prudent to do so; and (iv) appear in, and defend to the extent appropriate, any legal action growing out of, or in any manner materially connected with, the Contract Documents or the material obligations or liabilities of the Borrower, or any guarantor thereunder. The rights assigned pursuant to the preceding sentence include all of the Borrower's right and title: (1) to modify the Contract Documents; (2) to terminate the Contract Documents; and (3) to waive or release the performance or observance of any obligation or condition of the Contract Documents, all of which may be exercised exclusively by the Borrower unless and until, following the occurrence, and during the pendency, of an Event of Default, the Trustee advises the Borrower in writing that the Borrower may no longer do so.

The Borrower further agrees to comply with the covenants in the Loan Agreement relating to ERISA. The Borrower represents and warrants that it will not enter into a Financial Product Agreement. The Borrower or its

management may not acquire, construct, maintain or operate any facilities competitive with the Project in Pennsylvania, in any state bordering Pennsylvania, Virginia or in the six-state "New England" region, until such time as the Project has met the following requirements for two consecutive Fiscal Years, commencing with the Fiscal Year ending December 31, 2022 or thereafter: (i) the Debt Service Coverage Ratio and (ii) the Initial Coverage Requirement for the Fiscal Year ending December 31, 2021, and the Coverage Requirement for any Fiscal Year thereafter.

**Continuing Disclosure**

Pursuant to the federal Securities and Exchange Commission (the "S.E.C.") Rule 15c2-12 promulgated under the Securities Exchange Act of 1934, as amended, the Borrower covenants and agrees to comply, or to cause the Guarantor to comply with, when and if applicable, the continuing disclosure requirements promulgated thereunder, as such rule may from time to time hereafter be amended or supplemented. The Borrower covenants and agrees to execute, deliver and comply with the Continuing Disclosure Agreement and to cause the Guarantor to comply with the Continuing Disclosure Agreement. The Borrower acknowledges and agrees that the Issuer will have no liabilities with respect to these obligations.

**Loan Default Events**

Any one of the following which occurs and continues will constitute a Loan Default Event:

(a)    failure of the Borrower to make Loan Repayments or additional payments required by the section of the Agreement summarized above under "Loan Repayments and Additional Payments" when due, unless such payment is paid by the Guarantor before payment is due; or

(b)    failure of the Borrower to comply with the covenants contained in the Agreement relating to the Borrower's obligation to complete the Project; the Borrower's obligation to tender Gross Revenues to the Depository Bank for deposit in the Gross Revenue Account; the Borrower's maintenance of its existence and assignments and permitted transfers of the Project; the Borrower's payment of its obligations and compliance with Liens; the establishment and preservation of the Lien on collateral and continuation statements; the Gross Revenue Account; restrictions on the creation of Liens and disposition of Gross Revenues; financial covenants; Financial Product Agreements; and restrictions on the Borrower's ability to acquire, construct, maintain or operate facilities competitive with the Project; or

(c)    failure of the Borrower to observe and perform any covenant, condition or agreement on its part required to be observed or performed by the Agreement other than as provided in (a) or (b), which continues for a period of 30 days after written notice delivered to the Borrower and the Guarantor by the Issuer or the Trustee and, which notice will specify such failure and request that it be remedied, unless the Issuer and the Trustee will agree in writing to an extension of such time; provided, however, that if the failure stated in the notice cannot be corrected within such period, the Issuer and the Trustee will not unreasonably withhold their consent to an extension of such time if corrective action is instituted within such period and diligently pursued until the default is corrected (up to 120 days); or

(d)    existence of an Event of Default under the provisions of the Indenture, a Leasehold Mortgage Default under the Leasehold Mortgage, or a default under the NDA, the SNDA, the Guaranty, the Pledge and Security Agreement or any Account Control Agreement; or

(e)    an Event of Default under the Lease which permits the Lessor to terminate the Lease, a Leasehold Mortgage Default under the Leasehold Mortgage, or an Event of Default of the Borrower under the NDA or the SNDA; or

(f)    any representation or warranty of the Borrower set forth in the Agreement at the time made or deemed made is false in any material respect; or

(g)    an Act of Bankruptcy of the Borrower or Guarantor; or

(h)      a default in payment of any installment of interest or principal, or any premium, on any Indebtedness will have occurred; or

(i)      the existence of any additional Event of Default specified in a Supplemental Indenture; or

(j)      any judgment, writ or warrant of attachment or of any similar process entered or filed against the Borrower or Guarantor or against any property of the Borrower or Guarantor and remains unvacated, unpaid, unbonded, unstayed or uncontested in good faith for a period of 30 days; provided, however, that none of the foregoing will constitute an Event of Default unless the amount of such judgment, writ, warrant of attachment or similar process, together with the amount of all other such judgments, writs, warrants or similar processes so unvacated, unpaid, unbonded, unstayed or uncontested, exceeds $2,000,000.

The provisions of subsection (c) of this section are subject to the limitation that the Borrower will not be deemed in default if and so long as the Borrower is unable to carry out its agreements under the Agreement by reason of strikes, lockouts or other industrial disturbances; acts of public enemies; orders of any kind of the government of the United States or of the Commonwealth or any of their departments, agencies, or officials, or any civil or military authority; insurrections, riots, epidemics, landslides; lightning; earthquake; fire; hurricanes; storms; floods; washouts; droughts; arrests; restraint of government and people; civil disturbances;  wars; acts of terrorism; explosions; breakage or accident to machinery, transmission pipes or canals; partial or entire failure of utilities; or any other cause or event not reasonably within the control of the Borrower; it being agreed that the settlement of strikes, lockouts and other industrial disturbances will be entirely within the discretion of the Borrower, and the Borrower will not be required to make settlement of strikes, lockouts and other industrial disturbances by acceding to the demands of the opposing party or parties when such course is, in the judgment of the Borrower, unfavorable to the Borrower.  This limitation will not apply to any default under subsections (a), (b) or (d) - (j) of this section.

**Remedies on Default**

Subject to (c) under the section "Loan Default Events" above (if applicable), whenever any Loan Default Event will have occurred and will be continuing,

(a)      The Trustee, by written notice to the Issuer, the Borrower and the Guarantor may declare the unpaid balance of the Loan Repayments payable under the Agreement to be due and payable immediately, provided that concurrently with or prior to such notice the unpaid principal amount of the Bonds will have been declared to be due and payable under the Indenture.  Upon any such declaration such amount will become and will be immediately due and payable as determined in accordance with the Indenture.

(b)      The Trustee may exercise any right or remedy with respect to the Project or any collateral therefor provided in the Agreement, in the Guaranty, in the Leasehold Mortgage, in the NDA in the SNDA, in the Pledge and Security Agreement or in the Account Control Agreement, including without limitation the rights and remedies provided in the Agreement, in the Indenture or the rights and remedies conferred or reserved to the Trustee by the Leasehold Mortgage, the NDA, the SNDA, the Pledge and Security Agreement, any Account Control Agreement or any other documents securing the Project Site or Facilities for the benefit of the Issuer or Trustee or subjecting the Project, the Facilities or the Gross Revenues to the Lien of the Agreement, including, without limitation, any rights granted under the Lease to the Borrower.

(c)      The Trustee may have access to and may inspect, examine and make copies of the books and records and any and all accounts, data and federal income tax and other tax returns of the Borrower; provided that the Trustee will be obligated to protect the confidentiality of such information to the extent provided by Commonwealth and federal law and prevent its disclosure to the public, except to the Issuer and Bondholders.

(d)      The Issuer or the Trustee may take whatever other action at law or in equity as may be necessary or desirable to collect the payments and other amounts then due and thereafter to become due or to enforce performance and observance of any obligation, agreement or covenant of the Borrower under the Agreement, including without limitation, appointment of a receiver of the Borrower; provided, however, that acceleration of the unpaid balance of the loan payments is not a remedy available to the Issuer in pursuit of remedies for its own behalf.

Upon the occurrence of a Loan Event Default, and upon the filing of a suit or other commencement of judicial proceedings to enforce the rights of the Issuer or Trustee under the Loan Agreement, the Issuer or the Trustee will be entitled, as a matter of right, to the appointment of a receiver or receivers of the rights and properties pledged thereunder and of the revenues, issues, payments and profits thereof, pending such proceedings, with such powers as the court making such appointment will confer. The Borrower agrees not to contest such proceedings.

In case the Trustee or the Issuer will have proceeded to enforce its rights under the Agreement and such proceedings will have been discontinued or abandoned for any reason or will have been determined adversely to the Trustee or the Issuer, then, and in every such case, the Borrower, the Trustee and the Issuer will be restored respectively to their several positions and rights under the Agreement, and all rights, remedies and powers of the Borrower, the Trustee and the Issuer will continue as though no such action had been taken.

The Borrower covenants that, in case a Loan Default Event will occur with respect to the payment of any Loan Repayment payable under the Agreement, then, upon demand of the Trustee, the Borrower will pay to the Trustee the whole amount that then will have become due and payable under the Agreement, with interest on the amount then overdue at the Post-Default Rate. Such overdue rate will be in effect following a delinquency of 30 days and will remain in effect until such overdue amount has been paid.

In case the Borrower will fail forthwith to pay such amounts upon such demand, the Trustee will be entitled and empowered to institute any action or proceeding at law or in equity for the collection of the sums so due and unpaid, and may prosecute any such action or proceeding to judgment or final decree, and may enforce any such judgment or final decree against the Borrower and collect in the manner provided by law the moneys adjudged or decreed to be payable.

In case proceedings will be pending for the bankruptcy or for the reorganization of the Borrower under the federal bankruptcy laws or any other applicable law, or in case a receiver or trustee will have been appointed for the property of the Borrower or in the case of any other similar judicial proceedings relative to the Borrower, or the creditors or property of the Borrower, then the Trustee will be entitled and empowered, by intervention in such proceedings or otherwise, to file and prove a claim or claims for the whole amount owing and unpaid pursuant to the Agreement and, in case of any judicial proceedings, to file such proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the Trustee allowed in such judicial proceedings relative to the Borrower, its creditors or its property, and to collect and receive any moneys or other property payable or deliverable on any such claims, and to distribute such amounts as provided in the Indenture after the deduction of its reasonable charges and expenses to the extent permitted by the Indenture. Any receiver, assignee or trustee in bankruptcy or reorganization is authorized to make such payments to the Trustee, and to pay to the Trustee any amount due it for reasonable compensation and expenses, including reasonable expenses and fees of counsel incurred by the Trustee up to the date of such distribution.

**Options to Prepay Installments**

Under the Agreement, the Borrower will have the option to prepay the Loan Repayments by paying to the Trustee, for deposit in the Redemption Account within the Revenue Fund, the amount set forth in the provisions of the Agreement regarding Amount of Prepayment, under the circumstances (as such circumstances may apply to any Bonds) described in the Agreement and the Indenture.

**Mandatory Prepayment**

The Borrower will have and accepts the obligation to prepay the Loan Repayments required by the Agreement, together with interest accrued, but unpaid, thereon, to be used to redeem all or a part of the Outstanding Bonds under any of the following circumstances:

(a)    in whole, if and when as a result of any changes in the Constitution of the United States of America or the Commonwealth or as a result of any legislative, judicial or administrative action, the Agreement will have become void or unenforceable or impossible to perform in accordance with the intention and purposes of the parties thereto, or will have been declared unlawful; or

(b)        in whole, if there is a Determination of Taxability with respect to the Bonds.  For purposes of this subsection, a "Determination of Taxability" includes the occurrence of any of the following:

(i)        a final decree or judgment of any federal court or any notice or action of the Internal Revenue Service determining that interest paid or payable on the Bonds is or was includable in the gross income of a Holder for federal income tax purposes under the Code.  However, no such decree or action will be considered final for this purpose unless the Borrower has been given written notice and, if it is so desired and is legally allowed, have been afforded the opportunity to contest the same, either directly or in the name of any Holder and until conclusion of any appellate review, if sought;

(ii)       the receipt by any present or former Holder or the Trustee, of a "notice of deficiency" issued by the Internal Revenue Service or any similar notice assessing a tax in respect of any interest on the Bonds on the basis that such interest was includable in gross income for federal income tax purposes (other than interest on any Bonds for a period which such Bonds are held by a "substantial user" of any facility financed with the proceeds of the Bonds or a "related person," as such terms are used in Section 147 of the Code;

(iii)      the execution of a settlement agreement between the Internal Revenue Service and any present or former Holder or the Trustee, under which a tax, penalty or interest in respect of any interest on the Bonds is to be assessed on the basis that such interest was includable in gross income for federal income tax purposes and shall remain includable after execution of such settlement agreement (other than interest on any Bonds for a period during which such Bonds are held by a "substantial user" of any facility financed with the proceeds of the Bonds or a "related person," as such terms are used in Section 147(a) of the Code; or

(iv)      the delivery to the Trustee of an opinion of Bond Counsel, delivered at the request of the Borrower, to the effect that (i) the interest paid or to be paid on the Bonds is or will be includable for federal income tax purposes in the gross income of the Holder thereof, or would be so includable but for a redemption of all or part of the Bonds, or (ii) redemption of all or part of the Bonds is required under the terms of a closing agreement of similar agreement with the Internal Revenue Service; or

(c)        in whole or in part in connection with a tender for purchase of Bonds pursuant to the Indenture.

The amount payable by the Borrower in the event of a prepayment in whole required by this section will be determined as set forth in the Agreement under the section regarding Amount of Prepayment and shall be deposited in the Revenue Fund.

**Non-Liability of Issuer**

The Issuer will not be obligated to pay the principal of, or premium, if any, or interest on the Bonds, except from Revenues.  The Borrower acknowledges that the Issuer's sole source of moneys to repay the Bonds will be provided by the payments made by the Borrower pursuant to the Agreement, together with other Revenues with respect to the Bonds, including amounts received by the Trustee under the Guaranty, investment income on certain funds and accounts held by the Trustee under the Indenture, and other Revenues with respect to the Bonds, and agrees that if the payments to be made under the Agreement and payments made by the Guarantor pursuant to the Guaranty will ever prove insufficient to pay all principal of, and premium, if any, and interest on the Bonds as the same will become due (whether by maturity, redemption, acceleration or otherwise), then upon notice from the Trustee, the Borrower will pay such amounts as are required from time to time to prevent any deficiency or default in the payment of such principal, premium or interest, including, but not limited to, any deficiency caused by acts, omissions, nonfeasance or malfeasance on the part of the Trustee, the Borrower, the Issuer or any third party.

**Amendments, Changes and Modifications**

Except as otherwise provided in the Agreement or the Indenture, subsequent to the initial issuance of Bonds and prior to their payment in full, or provision for such payment having been made as provided in the Indenture, the Agreement may not be effectively amended, changed, modified, altered or terminated without the written agreement of the Issuer and the Borrower, the written consent of the Trustee, given in accordance with the provisions of the Indenture regarding amendment of the Agreement with the consent of the Trustee.  The Trustee will give such written consent only if (1) the Trustee obtains an Approving Opinion, and (2) the Trustee obtains the written consent of the Holders of a majority in aggregate principal amount of the Series 2019 Bonds and any Additional Senior Bonds then Outstanding to such amendment, modification or termination, provided, however, that no such amendment, modification or termination shall reduce the amount of Loan Repayments to be made to the Issuer or the Trustee by the Borrower pursuant to the Agreement, without the written consent of Holders of at least 75% of aggregate principal amount of Series 2019 Bonds and any Additional Senior Bonds then Outstanding (provided, that, if such amendment, modification or termination shall reduce the amount of Loan Repayments to be made in favor of the Holders of the Series 2020 Bonds or any Additional Subordinate Bonds then Outstanding, then the written consent of Holders of at least 75% of aggregate principal amount of the Series 2020 Bonds and any Additional Subordinate Bonds then Outstanding shall also be required in addition to the written consent of Holders of at least 75% of aggregate principal amount of the Series 2019 Bonds and any Additional Senior Bonds then Outstanding required hereunder).

[Remainder of Page Intentionally Left Blank.]

## THE GUARANTY AGREEMENT

The following is a summary of certain provisions of the Guaranty.  THE SUMMARY DOES NOT PURPORT TO BE COMPLETE OR DEFINITIVE AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE GUARANTY, A COPY OF WHICH IS ON FILE WITH THE TRUSTEE.

**Guaranteed Obligations**

For the entire term of the Loan Agreement, the Guarantor unconditionally guarantees to the Trustee for the benefit of the owners and beneficial owners of the 2019 Bonds and the 2020 Bonds, of such guaranteed amounts collectively referred to as the "Guaranteed Obligations" under the Guaranty.

**Continuing Obligations**

The Guaranty will be a continuing, absolute and unconditional guaranty and will remain in full force and effect until the entire principal of, redemption premium, if any, and interest on or purchase price of the 2019 Bonds and the 2020 Bonds will have been paid or provided for according to the terms of the Indenture and all amounts due and owing the Trustee and the Issuer will have been fully paid, at which time the Guaranty will automatically terminate and be of no further force and effect.

**Guaranty of Payment**

The Guaranty is a guaranty of payment and not of collection, and the Guarantor expressly waives any right to require that any action be brought against the Issuer, the Borrower or any other person or to require that resort be had to any security. If there will occur an Event of Default (as defined in the Loan Agreement) by the Borrower under the Loan Agreement with respect to the payment of the Guaranteed Obligations when and as the same become due, and such Event of Default (as defined in the Loan Agreement) is continuing, the Guarantor, upon written demand by the Trustee as provided in the Guaranty, without notice other than such demand and without the necessity of further action by the Trustee, its successors or assigns, will promptly and fully pay such defaulted payment.  All payments by the Guarantor will be paid in lawful money of the United States of America in immediately available funds.  Each default in payment of the principal or purchase price of, or redemption premium, if any, or interest on, the 2019 Bonds and the 2020 Bonds, or with respect to payments due to the Trustee or the Issuer, will give rise to a separate cause of action under the Guaranty and separate suits may be brought thereunder as each cause of action arises.

**Absolute and Unconditional Obligations**

Under the Guaranty, the obligations of the Guarantor are absolute and unconditional, as set forth above under the caption "SECURITY FOR THE SERIES 2020 BONDS."

**No Set-Off; Limited Liability of Issuer**

No act of commission or omission of any kind or at any time upon the part of the Trustee, with respect to any matter whatsoever will in any way affect or impair the rights of the Trustee to enforce any right, power or benefit of the Trustee under the Guaranty, and no set-off, claim, reduction or diminution of any obligation or any defense of any kind or nature which the Guarantor has or may have against the Issuer, the Borrower or the Trustee or their assignees or successors will be available to the Guarantor or against any such assignee or successor in any suit or action brought by the Trustee or its successors or assigns to enforce any right, power or benefit under the Guaranty. Nothing in the Guaranty will be construed as a waiver by the Guarantor of any rights or claims it may have against the Borrower or the Trustee or the Issuer under the Guaranty or otherwise, but any recovery upon such rights and claims will be had from the Borrower or the Trustee or the Issuer separately, it being the intent of the Guaranty that the Guarantor will be unconditionally and absolutely obligated to perform fully all of its obligations, agreements and covenants thereunder for the benefit of the Trustee and the owners and beneficial owners of the 2019 Bonds and the 2020 Bonds**.**

**Books and Records; Financial Statements**

The Guarantor will maintain proper books of record and account, in which entries will be made in accordance with generally accepted accounting principles (except where noted), consistently applied, of all its business and affairs.  The Guarantor covenants and agrees to execute, deliver and comply with the Continuing Disclosure Agreement and to cause the Borrower to comply with the Continuing Disclosure Agreement.  The Guarantor agrees to provide the Issuer and the Trustee with financial information and reports as the Issuer or the Trustee may reasonably request from time to time.

In addition to any remedies which may be provided in the Guaranty for failure to comply with this section, the Trustee may, and at the written request of the Holders of at least 25% aggregate principal amount of Outstanding 2019 Bonds and Outstanding 2020 Bonds, will, but only to the extent indemnified to its satisfaction as provided in the Indenture, or any Bondholder or Beneficial Owner of the 2019 Bonds or the 2020 Bonds may, take such actions as may be necessary and appropriate, including seeking mandamus or specific performance by court order, to cause the Guarantor or the Borrower to comply with their obligations under the Continuing Disclosure Agreement.  The Guarantor acknowledges and agrees that the Issuer will have no liability with respect to these obligations.

**Events of Default; Remedies.**

The occurrence and continuation of any one of the following will constitute an Event of Default:

(a)      Failure of the Guarantor to pay any Guaranteed Obligations upon receipt of demand by the Trustee or the Issuer to the Guarantor given in accordance with the terms thereof.

(b)      Failure of the Guarantor to observe or perform any of the other covenants, conditions or agreements under the Guaranty for a period of thirty (30) days after written notice (unless the Guarantor and the Trustee and, with respect to payments due the Issuer, the Issuer will agree in writing to an extension of such time prior to its expiration), specifying such failure and requesting that it be remedied, given by the Trustee or the Issuer to the Guarantor; provided, that if said default is such that it can be corrected but cannot be corrected within the applicable period, it will not constitute an Event of Default if corrective action is instituted by the Guarantor within the applicable period and is diligently pursued until the default is corrected.

(c)      The dissolution or liquidation of the Guarantor or the filing by the Guarantor of a voluntary petition in bankruptcy, or failure by the Guarantor promptly to cause to be lifted any execution, garnishment or attachment of such consequence as will impair the Guarantor's ability to carry on its obligations under the Guaranty, or the entry of any order or decree granting relief in any involuntary case commenced against the Guarantor under any present or future federal bankruptcy act or any similar federal or state law, or a petition for such an order or decree will be filed in any court and such petition will not be discharged or denied within ninety days after the filing thereof, or if the Guarantor will admit in writing its inability to pay its debts generally as they become due, or a receiver, trustee or liquidator of the Guarantor will be appointed in any proceeding brought against the Guarantor and will not be discharged within ninety days after such appointment or if the Guarantor will consent to or acquiesce in such appointment, or assignment by the Guarantor for the benefit of its creditors, or the entry by the Guarantor into an agreement of composition with its creditors, or a bankruptcy, insolvency or similar proceeding will be otherwise initiated by or against the Guarantor under any applicable bankruptcy, reorganization or analogous law as now or thereafter in effect and if initiated against the Guarantor will remain undismissed (subject to no further appeal) for a period of ninety days; provided, the term "dissolution or liquidation of the Guarantor," as used in this subsection, will not be construed to include the cessation of the existence of the Guarantor resulting either from a merger or consolidation of the Guarantor into or with another entity or a dissolution or liquidation of the Guarantor following a transfer of all or substantially all of its assets as an entirety or under the conditions permitting such actions contained in provisions of the Guaranty regarding the Guarantor's obligation to Maintain Its Corporate Existence; Conditions Under Which Exceptions Permitted.

(d)    If any representation contained in the Guaranty or any financial statement or other information furnished to the Trustee or the Issuer in connection with the Guaranty was false or misleading in any material respect at the time it was made or delivered.

(e)    Any representation or warranty of the Guarantor set forth in the Guaranty at the time made or deemed made is false in any material respect.

(f)    An Act of Bankruptcy of the Guarantor.

(g)    Any judgment, writ or warrant of attachment or of any similar process will be entered or filed against the Guarantor or against any property of the Guarantor and remains unvacated, unpaid, unbonded, unstayed or uncontested in good faith for a period of 30 days; provided, however, that none of the foregoing will constitute an Event of Default unless the amount of such judgment, writ, warrant of attachment or similar process, together with the amount of all other such judgments, writs, warrants or similar processes so unvacated, unpaid, unbonded, unstayed or uncontested, exceeds $2,000,000.

(h)    The existence of any additional Event of Default specified in a new, amended or supplemental Guaranty delivered by the Guarantor in favor of any Indebtedness of the Borrower.

Whenever an Event of Default under the Guaranty will have happened and be continuing, (a) the Trustee in the manner provided in the Indenture may declare the entire unpaid principal of, or redemption premium, if any, and interest on the 2019 Bonds and the 2020 Bonds to be immediately due and payable, and (b) the Trustee may take whatever action at law or in equity as may appear necessary or desirable to collect payments then due or thereafter to become due under the Guaranty or to enforce observance or performance of any covenant, condition or agreement of the Guarantor under the Guaranty, including, without limitation, appointment of a receiver of the Guarantor.

Upon the occurrence of an event of default under the Guaranty, and upon the filing of a suit or other commencement of judicial proceedings to enforce the rights of the Issuer or Trustee under the Guaranty, the Issuer or the Trustee will be entitled, as a matter of right, to the appointment of a receiver or receivers of the rights and properties pledged thereunder and of the revenues, issues, payments and profits thereof, pending such proceedings, with such powers as the court making such appointment will confer. The Guarantor agrees not to contest such proceedings.

In case the Trustee will have proceeded to enforce the Guaranty and such proceedings will have been discontinued or abandoned for any reason, then and in every such case the Guarantor and the Trustee will be restored respectively to their several positions and rights thereunder, and all rights, remedies and powers of the Guarantor and the Trustee will continue as though no such proceeding had been taken.

**Successors and Assigns; Enforcement of Remedies**

The Guaranty will be binding upon the Guarantor, its successors and assigns, and all rights against the Guarantor arising under the Guaranty will be for the sole benefit of the Trustee and the Bondholders and their successors and assigns and, with respect to payments due the Issuer, the Issuer. The Trustee will be entitled to bring any suit, action or proceeding against the Guarantor for the enforcement of any provision of the Guaranty without exhausting any other remedies which it may have pursuant to the terms of the 2019 Bonds, the 2020 Bonds, the Indenture or the Loan Agreement and without resort to any other security held by or available to the Issuer or the Trustee.

**Amendment of Guaranty**

The Trustee and the Guarantor may, with notice to the Issuer, without the consent of the Holders or beneficial owners of the 2019 Bonds or the 2020 Bonds (but with 30 days' prior written notice to the Holders), enter into any amendment, change or modification of the Guaranty (i) for the purpose of curing any ambiguity or formal defect or omission to make any other changes which will not adversely affect the interests of the Holders of the 2019 Bonds or the 2020 Bonds, (ii) in connection with an amendment of the Indenture, or (iii) in connection with any

other change in the Guaranty which is not to the material prejudice of the Trustee or the owners or beneficial owners of the 2019 Bonds or the 2020 Bonds. Except for the amendments, changes or modifications described in the preceding sentence, the Trustee and the Guarantor may not enter into any other amendment, change or modification of the Guaranty without first mailing notice to, and obtaining the written approval or consent of, the Holders or beneficial owners of not less than a majority in aggregate principal amount of the 2019 Bonds and the 2020 Bonds at the time outstanding; provided, however, that the foregoing does not permit, without the written approval or consent of the Holders or beneficial owners of 75% in aggregate principal amount of the 2019 Bonds and the 2020 Bonds then outstanding, an extension of the time of payment of, or a reduction in, any of the Guaranteed Obligations.

[Remainder of Page Intentionally Left Blank.]

# APPENDIX C

## PROPOSED FORM OF OPINIONS OF CO-BOND COUNSEL

September 10, 2020

Pennsylvania Economic Development Financing Authority
Commonwealth Keystone Building
400 North Street, 4th Floor
Harrisburg, PA 17120-0225

UMB Bank, N.A.
120 South Sixth Street, Suite 1400
Minneapolis, MN 55402

Re:   $10,000,000 Pennsylvania Economic Development Financing Authority Subordinate Solid Waste Disposal
      Revenue Bonds (CarbonLite P, LLC Project) Series 2020

Ladies and Gentlemen:

We have acted as co-bond counsel to the Pennsylvania Economic Development Financing Authority (the "Authority") in connection with its issuance of $10,000,000 aggregate principal amount of its Subordinate Solid Waste Disposal Revenue Bonds (CarbonLite P, LLC Project) Series 2020 (the "Bonds"), pursuant to the provisions of the Pennsylvania Economic Development Financing Law, Act of August 23, 1967, P.L. 251, as amended (the "Act"). The Bonds are being issued to accomplish the public purposes of the Act by providing funds to be loaned by the Authority to CarbonLite P, LLC (the "Company") to finance all or a portion of the costs of the acquisition, construction, improving, installation, and/or equipping of certain solid waste disposal facilities (collectively, the "Project") located at Berks Park 61, 4030 Pottsville Pike, in the City of Reading, County of Berks in the Commonwealth of Pennsylvania (the "Commonwealth"), all as more fully described in the Loan Agreement (as defined below). The Project has been authorized and approved by the Lehigh County Industrial Development Authority for financing by the Authority pursuant to the Act.

The Bonds are being issued under and secured by an Indenture of Trust dated as of June 1, 2019 (the "Original Indenture"), as amended and supplemented by a First Supplemental Indenture of Trust, dated as of September 1, 2020 (the "First Supplemental Indenture" and, together with the Original Indenture, the "Indenture"), each between the Authority and UMB Bank, N.A. as trustee (the "Trustee"). Each of the capitalized terms used but not otherwise defined herein shall have the meaning specified in the Indenture.

The Authority and the Company have entered into a Loan Agreement dated as of June 1, 2019 (the "Original Loan Agreement"), as amended by a First Amendment to Loan Agreement dated as of September 1, 2020 (the "First Amendment to Loan Agreement" and, together with the Original Loan Agreement, the "Loan Agreement"), under which the Company is obligated to make loan payments in amounts and at times sufficient to pay, when due, the principal or redemption price of and interest on the Bonds in accordance with the terms of the Indenture. Under the Indenture, the Authority has assigned certain of its interests under the Loan Agreement, including its right to receive the payments under the Loan Agreement in respect of the Bonds, to the Trustee for the benefit of the holders of the Bonds.

Payment of principal of, premium, if any, interest and additional amounts, if any, on each Bond and due and punctual performance and payment of certain other obligations of the Company as set forth in the Loan Agreement are unconditionally guaranteed by CarbonLite P Holdings, LLC pursuant to an Guaranty Agreement, dated as of June 1, 2019 (the "Original Guaranty"), by and between the Trustee and CarbonLite P Holdings, LLC, as guarantor (the "Guarantor"), as amended and restated by the First Amendment to Guaranty Agreement, dated as of September 1, 2020 (the "First Amendment to Guaranty" and, together with the Original Guaranty, the "Guaranty"), by the Guarantor in favor of the Trustee.

In our capacity as co-bond counsel, we have examined such documents, records of the Authority and other instruments and matters of law as we deemed necessary to enable us to express the opinions set forth below, including original counterparts or certified copies of the Indenture, the Loan Agreement, the other documents listed in the Closing Index in respect of the Bonds filed with the Trustee, and an executed Bond of each maturity authenticated by the Trustee.

Based on the foregoing, we are of the opinion that:

1.      The Authority is an instrumentality of the Commonwealth and a body corporate and politic organized and existing under Commonwealth law, with full power and authority under the Act to undertake the financing of certain costs of the Project, to execute, deliver and perform its obligations under the Loan Agreement and the Indenture, and to issue and sell the Bonds.

2.      The Loan Agreement and the Indenture have been duly authorized, executed and delivered by the Authority and, assuming due authorization, execution and delivery by the other parties thereto, constitute legal, valid and binding obligations of the Authority enforceable against the Authority in accordance with their respective terms, except as such enforcement may be limited by bankruptcy, insolvency, moratorium or other laws or equitable principles affecting the enforcement of creditor's rights generally and by the exercise of judicial discretion in accordance with general principles of equity.

3.      The Indenture creates a valid pledge of the Revenues and any other amounts (including proceeds of the sale of Bonds) held in the funds and accounts established pursuant to the Indenture (except for the Rebate Fund and the Borrower Subaccount of the Costs of Issuance Fund) to secure the payment of the principal of, premium, if any, and interest on the Bonds in accordance with their terms and the provisions of the Indenture.

4.      The issuance and sale of the Bonds have been duly authorized by the Authority. The Bonds have been duly executed and delivered by the Authority and are legal, valid and binding limited obligations of the Authority entitled to the benefit and security of the Indenture, except as the rights created thereunder and enforcement thereof may be limited by bankruptcy, insolvency, moratorium or other laws or equitable principles affecting the enforcement of creditor's rights generally and by the exercise of judicial discretion an accordance with general principles of equity.

5.      Interest on the Bonds is excludable from gross income for purposes of federal income tax under existing laws as enacted and construed on the date of initial delivery of the Bonds, assuming the accuracy of the certifications of the Issuer and the Company and continuing compliance by the Issuer and the Company with the requirements of the Internal Revenue Code of 1986, as amended (the "Code"), except that interest on a Bond is not excludable while the Bond is held by a substantial user of the facility financed with proceeds of the Bonds or a related person as provided in the Code. Interest on the Bonds is an item of tax preference for purposes of the federal alternative minimum tax imposed on individuals.

6.      Interest on the Bonds is exempt from personal income tax and corporate net income tax under the laws of the Commonwealth.

We express no opinion herein as to the accuracy, completeness or sufficiency of, or any other matter related to, the Preliminary Limited Offering Memorandum dated August 14, 2020, as supplemented by the Supplement dated August 28, 2020 (as so supplemented, the "Preliminary Limited Offering Memorandum"), the Limited Offering Memorandum dated September 3, 2020 relating to the Bonds, or any other offering material relating to the Bonds.

We call your attention to the fact that the Bonds are limited obligations of the Authority payable only out of payments to be made by the Company pursuant to the Loan Agreement and certain other moneys available therefor, and that the Bonds do not pledge the credit or taxing power of the Commonwealth or any political subdivision thereof. The Authority has no taxing power.

Our engagement with respect to the Bonds has concluded with their issuance. Our opinion speaks as of this date. We have not undertaken to determine or to inform any person whether any actions taken or not taken or events

occurring or not occurring after the date of issuance of the Bonds may affect the tax status of interest on the Bonds, and we have no obligation to update this opinion as a result of changes in law or matters of fact that may be brought to our attention after the date hereof.

Very truly yours,

**APPENDIX D**

**FORM OF CONTINUING DISCLOSURE AGREEMENT**

Pennsylvania Economic Development Financing Authority
Subordinate Solid Waste Disposal Revenue Bonds
(CarbonLite P, LLC Project), Series 2020

September 10, 2020

This Continuing Disclosure Agreement (the "Disclosure Agreement") is executed and delivered by CarbonLite P, LLC (the "Borrower"), CarbonLite P Holdings, LLC (the "Guarantor"), and UMB Bank, N.A., as dissemination agent (the "Dissemination Agent"), in connection with the issuance of the above-named bonds (the "Bonds"). The Bonds are being issued pursuant to the Indenture of Trust, dated as of June 1, 2019 (the "Original Indenture"), as amended and supplemented by a First Supplemental Indenture of Trust, dated as of September 1, 2020 (the "First Supplemental Indenture" and, together with the Original Indenture, the "Indenture") by and between the Pennsylvania Economic Development Financing Authority (the "Authority") and UMB Bank, N.A., as Trustee. The Borrower, Guarantor and Dissemination Agent covenant and agree as follows:

SECTION 1.        Purpose of the Disclosure Agreement.  This Disclosure Agreement is being executed and delivered by the Borrower, the Guarantor and the Dissemination Agent for the benefit of the Holders and Beneficial Owners of the Bonds and in order to assist the Participating Underwriter in complying with Securities and Exchange Commission's Rule 15c2-12(b)(5).

SECTION 2.        Definitions.  In addition to the definitions set forth in the Indenture, which apply to any capitalized term used in this Disclosure Agreement unless otherwise defined in this Section, the following capitalized terms shall have the following meanings:

"Annual Report" shall mean any Annual Report provided by (i) the Borrower pursuant to, and as described in, Section 3(a) of this Disclosure Agreement and (ii) the Guarantor pursuant to, and as described in, Section 4(b)(1) of this Disclosure Agreement.

"Beneficial Owner" shall mean any person who has or shares the power, directly or indirectly, to make investment decisions concerning ownership of any Bonds (including persons holding Bonds through nominees, depositories or other intermediaries).

"Dissemination Agent" shall mean UMB Bank, N.A., acting in its capacity as Dissemination Agent hereunder, or such other officer or employee as the Borrower shall designate in writing to the Trustee and the Dissemination Agent from time to time.

"Financial Obligation" shall mean, for purposes of the Listed Events set out in Section 5(a)(10) and Section (5)(b)(8), a (i) debt obligation; (ii) derivative instrument entered into in connection with, or pledged as security or a source of payment for, an existing or planned debt obligation; or (iii) guarantee of (i) or (ii).  The term "Financial Obligation" shall not include municipal securities (as defined in the Securities Exchange Act of 1934, as amended) as to which a final official statement (as defined in the Rule) has been provided to the MSRB consistent with the Rule.

"Holder" shall mean the person in whose name any Bond shall be registered.

"Listed Events" shall mean any of the events listed in Section 5(a) or 5(b) of this Disclosure Agreement.

"Loan Agreement" shall have the meaning given to such term in the Indenture.

"MSRB" shall mean the Municipal Securities Rulemaking Board or any other entity designated or authorized by the Securities and Exchange Commission to receive reports pursuant to the Rule.  Until otherwise

designated by the MSRB or the Securities and Exchange Commission, filings with the MSRB are to be made through the Electronic Municipal Market Access (EMMA) website of the MSRB, currently located at http://emma.msrb.org.

"Participating Underwriter" shall mean the original underwriter of the Bonds which, if not exempt, would be required to comply with the Rule in connection with the offering of the Bonds.

"Progress Reports" shall have the meaning ascribed thereto in Section 4(a)(5) of this Disclosure Agreement.

"Quarterly Report" shall mean any Quarterly Report provided by the Borrower pursuant to, and as described in, Section 3(b) of this Disclosure Agreement.

"Rule" shall mean Rule 15c2-12(b)(5) adopted by the Securities and Exchange Commission under the Securities Exchange Act of 1934, as the same may be amended from time to time.

SECTION 3.    Provision of Annual Reports and Quarterly Reports.

(a)    Annual Report.  The Borrower shall, or shall cause the Dissemination Agent not later than 150 days after the end of the Borrower's Fiscal Year, commencing with the report for the Fiscal Year ending December 31, 2020, to provide to the MSRB an Annual Report which is consistent with the requirements of Section 4(a)(1) of this Disclosure Agreement.  If the Borrower's Fiscal Year changes, the Borrower shall give notice of such change in a filing with the MSRB.  The Annual Report shall be submitted on a standard form in use by industry participants or other appropriate form and shall identify the Bonds by name and CUSIP number.

(1)    Not later than fifteen (15) Business Days prior to the date specified in subsection (a) for providing the Annual Report to the MSRB, the Borrower shall provide the Annual Report to the Dissemination Agent (if other than the Borrower).  If the Borrower is unable to provide to the MSRB an Annual Report by the date required in subsection (a) above, the Borrower shall, or shall cause the Dissemination Agent to, in a timely manner, send to the MSRB a notice in substantially the form attached as Exhibit A.

(2)    The Dissemination Agent shall (if the Dissemination Agent is other than the Borrower) file a report with the Borrower certifying that the Annual Report has been provided pursuant to this Disclosure Agreement, stating the date it was provided to the MSRB.

(b)    Quarterly Report.  The Borrower shall, or shall cause the Dissemination Agent not later than 45 days after the end of each fiscal quarterly period to provide to the MSRB a Quarterly Report which is consistent with the requirements of Section 4(a)(2) and 4(a)(3) of this Disclosure Agreement.

(c)    Other Borrower Reports.  The Borrower shall, or shall cause the Dissemination Agent to, provide to the MSRB a report or reports which are consistent with the requirements of Sections 4(a)(4), 4(a)(5) and 4(a)(6) of this Disclosure Agreement.

(d)    Guarantor Reports.  The Guarantor shall, or shall cause the Dissemination Agent to, provide to the MSRB a report or reports which are consistent with the requirements of Section 4(b) of this Disclosure Agreement.

SECTION 4.    Reporting Requirements.

(a)    The Borrower shall provide:

(1)    Within 150 days after the end of the Borrower's Fiscal Year, the Borrower's Audited Financial Statements, including an opinion letter and management letter from the auditor;

D-2

(2)        Within 45 days after the end of each quarterly period of each Fiscal Year, commencing with the quarterly period ended September 30, 2020, and within 45 days after the end of the Borrower's Fiscal Year, commencing with Fiscal Year ending December 31, 2021, the Borrower's unaudited financial information (presented on a stand-alone basis), such information consisting of (i) an income statement, balance sheet and statement of operations (including changes in cash position) for the preceding quarterly period and, solely with respect to the information due within 45 days after the end of the Borrower's Fiscal Year, for the preceding annual period, and, (ii) calculations of the Borrower's Days Cash on Hand Requirement (as defined in the Loan Agreement) and Debt Service Coverage Ratio, each presented on a basis substantially consistent with the format of the Guarantor's audited financial statements and in a form reasonably ascertainable to the Holders, provided that the Quarterly Report for the period ending on or before September 30, 2020 need not include the items required by clause (ii) above;

(3)        Within 45 days after the end of each quarterly period of each Fiscal Year, commencing with the quarterly period ending September 30, 2020, a report from the Borrower consisting of:

(a)        a report from the Borrower of the volume of pcrPET bales and pcrPET flake received, and the volume of pcrPET pellets produced and sold (by weight, including type – clear or green) during such quarterly period;

(b)        a report from the Borrower providing the identity of its feedstock suppliers, the estimated monthly pounds of pcrPET supplied by each supplier during such quarterly period, and the expiration date and renewal status of any such contracts with feedstock suppliers;

(c)        a report from the Borrower providing the identity of the parties with whom the Borrower has executed or received tentative output contracts, the volume of pcrPET to be purchased per month pursuant to such contracts, and the term of such contracts, including the expiration date and renewal status;

(d)        the Borrower's budget-to-actual report for such quarterly period;

(e)        together with a report showing aged accounts receivable as of the end of such quarterly period, on a 30/60/90 day basis.

(4)        Not later than January 15 of each Fiscal Year, the Borrower's annual budget for such Fiscal Year commencing with the budget for Fiscal Year 2021;

(5)        Prior to the Completion Date and by the 15th day of the subsequent month during which the Project is under construction commencing with the month ending September 15, 2020, Progress Reports from the Borrower with respect to the construction, equipping, installation and completion of the Project and with respect to the Lessor's construction of the building on the site subject to the Lease, which shall include the following information as of the end of the reporting period:

(i)        brief description of construction activity for applicable reporting period, including:

(A)        construction work performed on site during reporting period,

(B)        status of procurement of equipment,

(C)        material issues with vendor performance (including delivery issues, performance problems or material cost overruns);

(ii)        adherence to expected construction timeline (including estimated number of days ahead or behind);

(iii)     adherence to expected construction budget (including material work order, dollar or percentage deviation from budget); and

(iv)     if applicable, brief narrative description of the reasons behind any material delays indicated in Subsection (5)(ii) and (5)(iii) above; and

(6)     Promptly upon sending or receipt, copies of any material correspondence between the Borrower and any governmental entity regarding compliance with Environmental Regulations, potential material violations of state or local law, or other material correspondence relating to the Borrower's construction of or operations of the Facility.

The Borrower's audited financial statements, if required or permitted by GAAP, may be in the form of consolidated statements within the audited financial statements of the Guarantor.  If at any time the Borrower's financial statements are no longer included within the consolidated audited financial statements of the Guarantor, the Borrower shall separately provide audited financial statements for the Borrower's fiscal year.

(b)     If the Guarantor has no operational cashflow, any financial information will be incorporated into the Borrower's financial data. If the Guarantor has financial operations, it shall provide:

(1)     Within 150 days of each Fiscal Year end commencing with the year ended December 31, 2020, the Guarantor's audited financial statements (presented on a stand-alone basis); and

(2)     Within 45 days after the end of each fiscal quarterly period of each Fiscal Year, commencing with the fiscal quarterly period ended September 30, 2020, unaudited financial information of the Guarantor presented on a stand-alone basis and on a basis substantially consistent with the format of the Guarantor's audited financial statements and in a form reasonably ascertainable to the Holders.

(c)     <u>Investor Calls</u>.  The Borrower will make, and will cause the Guarantor to make, its appropriate officers available for investor calls quarterly at a mutually agreeable time through December 31, 2020, and after such time, upon no less than 10 days' prior written request of the holders of twenty-five percent (25%) in aggregate principal amount of Bonds, which request may be delivered by the Trustee, so long as such calls are no more often than quarterly during each year; provided, however, that if a Loan Event Default (as defined in the Loan Agreement) or an event of default under the Guaranty has occurred and is continuing, the Borrower and Guarantor shall be available for monthly calls at the discretion of the Trustee or the Holders of twenty-five (25%) in aggregate principal amount of Bonds. Notice of any investor calls under this Section shall be provided to all Holders, the Trustee and the MSRB no later than five (5) days prior to such call.

SECTION 5.     <u>Reporting of Significant Events</u>.

(a)     The Borrower shall give, or cause to be given, notice of the occurrence of any of the following events with respect to the Bonds in a timely manner not later than ten (10) Business Days of the occurrence of the event:

(1)     Principal and interest payment delinquencies;

(2)     Unscheduled draws on debt service reserves reflecting financial difficulties;

(3)     Unscheduled draws on credit enhancements reflecting financial difficulties;

(4)     Substitution of credit or liquidity providers, or their failure to perform;

(5)     Adverse tax opinions or issuance by the Internal Revenue Service of proposed or final determination of taxability or of a Notice of Proposed Issue (IRS Form 5701 TEB);

(6)     Tender offers;

(7)    Defeasances;

(8)    Rating changes;

(9)    Bankruptcy, insolvency, receivership or similar event of the obligated person; or

(10)    Default, event of acceleration, termination event, modification of terms, or other similar events under the terms of a Financial Obligation of the obligated person, any of which reflect financial difficulties.

(11)    Any Change in Control under the Indenture.

Note: for the purposes of the event identified in subparagraph (9), the event is considered to occur when any of the following occur:  the appointment of a receiver, fiscal agent or similar officer for an obligated person in a proceeding under the U.S. Bankruptcy Code or in any other proceeding under state or federal law in which a court or governmental authority has assumed jurisdiction over substantially all of the assets or business of the obligated person, or if such jurisdiction has been assumed by leaving the existing governmental body and officials or officers in possession but subject to the supervision and orders of a court or governmental authority, or the entry of an order confirming a plan of reorganization, arrangement or liquidation by a court or governmental authority having supervision or jurisdiction over substantially all of the assets or business of the obligated person.

(b)    The Borrower shall give, or cause to be given, notice of the occurrence of any of the following events with respect to the Bonds, if material, in a timely manner not later than ten (10) Business Days after the occurrence of the event:

(1)    Unless described in Section 5(a)(5), other material notices or determinations by the Internal Revenue Service with respect to the tax status of the Bonds or other material events affecting the tax status of the Bonds;

(2)    Modifications to rights of Bondholders;

(3)    Optional, unscheduled or contingent Bond calls;

(4)    Release, substitution, or sale of property securing repayment of the Bonds;

(5)    Non-payment related defaults;

(6)    The consummation of a merger, consolidation, or acquisition involving an obligated person or the sale of all or substantially all of the assets of the obligated person, other than in the ordinary course of business, the entry into a definitive agreement to undertake such an action or the termination of a definitive agreement relating to any such actions, other than pursuant to its terms;

(7)    Appointment of a successor or additional trustee or the change of name of a trustee; or

(8)    Incurrence of a Financial Obligation of the obligated person, or agreement to covenants, events of default, remedies, priority rights, or other similar terms of a Financial Obligation of the obligated person, any of which affect security holders.

(c)    Whenever the Borrower obtains knowledge of the occurrence of a Listed Event described in Section 5(b) above, the Borrower shall determine if such event would be material under applicable federal securities laws.

(d)    Upon occurrence of a Listed Event described in Section 5(a) above, or determines that knowledge of a Listed Event described in Section 5(b) above would be material under applicable federal securities laws, the

Borrower shall within ten (10) Business Days of occurrence file a notice of such occurrence with the MSRB. Notwithstanding the foregoing, notice of the Listed Event described in Section 5(b)(3) above need not be given under this subsection any earlier than the notice (if any) of the underlying event is given to Holders of affected Bonds pursuant to the Indenture.

(e)        The Borrower intends to comply with the Listed Events described in Section 5(a)(10) and Section 5(b)(8), and the definition of "Financial Obligation" in Section 1, with reference to the Rule, any other applicable federal securities laws and the guidance provided by the Commission in Release No. 34-83885 dated August 20, 2018 (the "2018 Release"), and any further amendments or written guidance provided by the Commission or its staff with respect to the amendments to the Rule effected by the 2018 Release.

SECTION 6.        Format for Filings with MSRB. Any report or filing with the MSRB pursuant to this Disclosure Agreement must be submitted in electronic format, accompanied by such identifying information as is prescribed by the MSRB.

SECTION 7.        Termination of Reporting Obligation. The Borrower's and the Guarantor's obligations under this Disclosure Agreement shall terminate upon the legal defeasance, prior redemption or payment in full of all of the Bonds. If such termination occurs prior to the final maturity of the Bonds, the Borrower shall give notice of such termination in a filing with the MSRB.

SECTION 8.        Dissemination Agent. The Borrower may, from time to time, appoint or engage a Dissemination Agent to assist it in carrying out its obligations under this Disclosure Agreement, and may discharge any such Dissemination Agent, with or without appointing a successor Dissemination Agent. The Dissemination Agent shall not be responsible in any manner for the content of any notice or report prepared by the Borrower pursuant to this Disclosure Agreement. The initial Dissemination Agent shall be the Trustee.

SECTION 9.        Amendment; Waiver. Notwithstanding any other provision of this Disclosure Agreement, the Borrower, the Guarantor and the Dissemination Agent may amend this Disclosure Agreement, and any provision of this Disclosure Agreement may be waived, provided that the following conditions are satisfied:

(a)        if the amendment or waiver relates to the above provisions of Sections 3(a), 4, or 5(a) or (b), it may only be made in connection with a change in circumstances that arises from a change in legal requirements, change in law, or change in the identity, nature or status of an obligated person with respect to the Bonds, or the type of business conducted;

(b)        the undertaking, as amended or taking into account such waiver, would, in the opinion of nationally recognized bond counsel, have complied with the requirements of the Rule at the time of the original issuance of the Bonds, after taking into account any amendments or interpretations of the Rule, as well as any change in circumstances;

(c)        The amendment or waiver does not, in the opinion of nationally recognized bond counsel, materially impair the interests of the Holders or Beneficial Owners of the Bonds; and

(d)        the amendment or waiver is permitted by the Rule.

In the event of any amendment or waiver of a provision of this Disclosure Agreement, the Borrower shall describe such amendment in the next Annual Report, and shall include, as applicable, a narrative explanation of the reason for the amendment or waiver and its impact on the type (or in the case of a change of accounting principles, on the presentation) of financial information or operating data being presented by the Borrower. In addition, if the amendment relates to the accounting principles to be followed in preparing financial statements, (i) notice of such change shall be given in a filing with the MSRB, and (ii) the Annual Report for the year in which the change is made should present a comparison (in narrative form and also, if feasible, in quantitative form) between the financial statements as prepared on the basis of the new accounting principles and those prepared on the basis of the former accounting principles.

D-6

SECTION 10.    <u>Additional Information</u>. Nothing in this Disclosure Agreement shall be deemed to prevent the Borrower from disseminating any other information, using the means of dissemination set forth in this Disclosure Agreement or any other means of communication, or including any other information in any Annual Report or notice required to be filed pursuant to this Disclosure Agreement, in addition to that which is required by this Disclosure Agreement. If the Borrower chooses to include any information in any Annual Report or notice in addition to that which is specifically required by this Disclosure Agreement, the Borrower shall have no obligation under this Disclosure Agreement to update such information or include it in any future Annual Report or notice of occurrence of a Listed Event or any other event required to be reported.

SECTION 11.    <u>Default</u>. In the event of a failure of the Borrower, the Guarantor or the Dissemination Agent to comply with any provision of this Disclosure Agreement, any Holder or Beneficial Owner of the Bonds may take such actions as may be necessary and appropriate, including seeking mandate or specific performance by court order, to cause the Borrower, the Guarantor or the Dissemination Agent to comply with its obligations under this Disclosure Agreement. The sole remedy under this Disclosure Agreement in the event of any failure of the Borrower, the Guarantor or the Dissemination Agent to comply with this Disclosure Agreement shall be an action to compel performance.

SECTION 12.    <u>Beneficiaries</u>. This Disclosure Agreement shall inure solely to the benefit of the Borrower, the Guarantor, the Dissemination Agent, the Participating Underwriter and Holders and Beneficial Owners from time to time of the Bonds, and shall create no rights in any other person or entity.

SECTION 13.    <u>Duties and Liabilities of Dissemination Agent</u>. The Dissemination Agent shall have only such duties as are specifically set forth in this Disclosure Agreement, and, to the extent permitted by law, the Borrower agrees to indemnify and save the Dissemination Agent, its officers, directors, employees and agents, harmless against any loss, expense and liabilities which it may incur arising out of or in the exercise or performance of its powers and duties hereunder, including the costs and expenses (including attorneys' fees) of defending against any claim of liability, but excluding claims and liabilities due to the Dissemination Agent's negligence or willful misconduct.  The obligations of the Borrower under this Section shall survive resignation or removal of the Dissemination Agent and payment of the Bonds.  The Borrower shall pay the fees, charges and expenses of the Dissemination Agent in connection with its administration of this Disclosure Agreement.

Dated as of the date first set forth above.

**CARBONLITE P, LLC**

By: _____

Name: Leon Farahnik
Title: Chief Executive Officer

**CARBONLITE P HOLDINGS, LLC**

By: _____

Name: Leon Farahnik
Title: Chief Executive Officer

**UMB BANK, N.A.**, as Dissemination Agent

By: _____

Authorized Officer

**EXHIBIT A**

FORM OF NOTICE TO THE MUNICIPAL SECURITIES RULEMAKING BOARD
OF FAILURE TO FILE ANNUAL REPORT

| | |
|---|---|
| Name of Bond Issue: | Pennsylvania Economic Development Financing Authority Subordinate Solid Waste Disposal Revenue Bonds (CarbonLite P, LLC Project), Series 2020 |
| Name of Borrower: | CarbonLite P, LLC |
| Date of Issuance: | September 10, 2020 |

NOTICE IS HEREBY GIVEN that the Borrower has not provided an Annual Report with respect to the above-named Bonds as required by the Continuing Disclosure Agreement of the Borrower, dated the Date of Issuance. [The Borrower anticipates that the Annual Report will be filed by _____.]

Dated: _____, 20____.

                                               **CARBONLITE P, LLC**

                                               By: _____ [to be signed only if filed]

# APPENDIX E

## BOOK-ENTRY SYSTEM

*The information in this Appendix E has been provided by DTC for use in securities offering documents, and the Issuer takes no responsibility for the accuracy or completeness thereof. The Issuer cannot and does not give any assurances that DTC, DTC Participants or Indirect Participants will distribute to the beneficial owners either (a) payments of interest, principal or premium, if any, with respect to the Bonds or (b) certificates representing ownership interest in or other confirmation of ownership interest in the Bonds, or that they will so do on a timely basis or that DTC, DTC Participants or DTC Indirect Participants will act in the manner described in this Limited Offering Memorandum. The current "Rules" applicable to DTC are on file with the Securities and Exchange Commission and the current "Procedures" of DTC to be followed in dealing with DTC Participants are on file with DTC.*

*As used in this Appendix E, "Securities" means the Bonds, "Issuer" means the Issuer, and "Agent" means the Trustee.*

1.	The Depository Trust Company ("DTC"), New York, NY, will act as securities depository for the securities (the "Securities"). The Securities will be issued as fully-registered securities registered in the name of Cede & Co. (DTC's partnership nominee) or such other name as may be requested by an authorized representative of DTC. One fully-registered Security certificate will be issued for each issue of the Securities, each in the aggregate principal amount of such issue, and will be deposited with DTC. If, however, the aggregate principal amount of any issue exceeds $500 million, one certificate will be issued with respect to each $500 million of principal amount, and an additional certificate will be issued with respect to any remaining principal amount of such issue.

2.	DTC, the world's largest securities depository, is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934. DTC holds and provides asset servicing for over 3.5 million issues of U.S. and non-U.S. equity issues, corporate and municipal debt issues, and money market instruments (from over 100 countries) that DTC's participants ("Direct Participants") deposit with DTC. DTC also facilitates the post-trade settlement among Direct Participants of sales and other securities transactions in deposited securities, through electronic computerized book-entry transfers and pledges between Direct Participants' accounts. This eliminates the need for physical movement of securities certificates. Direct Participants include both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, clearing corporations, and certain other organizations. DTC is a wholly-owned subsidiary of The Depository Trust & Clearing Corporation ("DTCC"). DTCC is the holding company for DTC, National Securities Clearing Corporation and Fixed Income Clearing Corporation, all of which are registered clearing agencies. DTCC is owned by the users of its regulated subsidiaries. Access to the DTC system is also available to others such as both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, and clearing corporations that clear through or maintain a custodial relationship with a Direct Participant, either directly or indirectly ("Indirect Participants"). DTC has a Standard & Poor's rating of AA+. The DTC Rules applicable to its Participants are on file with the Securities and Exchange Commission. More information about DTC can be found at www.dtcc.com. The information contained on this Internet site is not incorporated herein by reference.

3.	Purchases of Securities under the DTC system must be made by or through Direct Participants, which will receive a credit for the Securities on DTC's records. The ownership interest of each actual purchaser of each Security ("Beneficial Owner") is in turn to be recorded on the Direct and Indirect Participants' records. Beneficial Owners will not receive written confirmation from DTC of their purchase. Beneficial Owners are, however, expected to receive written confirmations providing details of the transaction, as well as periodic statements of their holdings, from the Direct or Indirect Participant through which the Beneficial Owner entered into the transaction. Transfers of ownership interests in the Securities are to be accomplished by entries made on the books of Direct and Indirect Participants acting on behalf of Beneficial Owners. Beneficial Owners will not receive certificates representing their ownership interests in Securities, except in the event that use of the book-entry system for the Securities is discontinued.

E-1

4.    To facilitate subsequent transfers, all Securities deposited by Direct Participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co., or such other name as may be requested by an authorized representative of DTC.  The deposit of Securities with DTC and their registration in the name of Cede & Co. or such other DTC nominee do not effect any change in beneficial ownership.  DTC has no knowledge of the actual Beneficial Owners of the Securities; DTC's records reflect only the identity of the Direct Participants to whose accounts such Securities are credited, which may or may not be the Beneficial Owners.  The Direct and Indirect Participants will remain responsible for keeping account of their holdings on behalf of their customers.

5.    Conveyance of notices and other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants, and by Direct Participants and Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time.  Beneficial Owners of Securities may wish to take certain steps to augment the transmission to them of notices of significant events with respect to the Securities, such as redemptions, tenders, defaults, and proposed amendments to the Security documents.  For example, Beneficial Owners of Securities may wish to ascertain that the nominee holding the Securities for their benefit has agreed to obtain and transmit notices to Beneficial Owners.  In the alternative, Beneficial Owners may wish to provide their names and addresses to the registrar and request that copies of notices be provided directly to them.

6.    Redemption notices shall be sent to DTC.  If less than all of the Securities within an issue are being redeemed, DTC's practice is to determine by lot the amount of the interest of each Direct Participant in such issue to be redeemed.

7.    Neither DTC nor Cede & Co. (nor any other DTC nominee) will consent or vote with respect to Securities unless authorized by a Direct Participant in accordance with DTC's MMI Procedures.  Under its usual procedures, DTC mails an Omnibus Proxy to Issuer as soon as possible after the record date.  The Omnibus Proxy assigns Cede & Co.'s consenting or voting rights to those Direct Participants to whose accounts Securities are credited on the record date (identified in a listing attached to the Omnibus Proxy).

8.    Redemption proceeds, distributions, and dividend payments on the Securities will be made to Cede & Co., or such other nominee as may be requested by an authorized representative of DTC.  DTC's practice is to credit Direct Participants' accounts upon DTC's receipt of funds and corresponding detail information from Issuer or Agent, on payable date in accordance with their respective holdings shown on DTC's records.  Payments by Participants to Beneficial Owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name," and will be the responsibility of such Participant and not of DTC, Agent, or Issuer, subject to any statutory or regulatory requirements as may be in effect from time to time.  Payment of redemption proceeds, distributions, and dividend payments to Cede & Co. (or such other nominee as may be requested by an authorized representative of DTC) is the responsibility of Issuer or Agent, disbursement of such payments to Direct Participants will be the responsibility of DTC, and disbursement of such payments to the Beneficial Owners will be the responsibility of Direct and Indirect Participants.

9.    DTC may discontinue providing its services as depository with respect to the Securities at any time by giving reasonable notice to Issuer or Agent.  Under such circumstances, in the event that a successor depository is not obtained, Security certificates are required to be printed and delivered.

10.    Issuer may decide to discontinue use of the system of book-entry-only transfers through DTC (or a successor securities depository).  In that event, Security certificates will be printed and delivered to DTC.

11.    The information in this section concerning DTC and DTC's book-entry system has been obtained from sources that Issuer believes to be reliable, but Issuer takes no responsibility for the accuracy thereof.

## APPENDIX F

## FORM OF INVESTOR LETTER

Pennsylvania Economic Development Financing Authority
Harrisburg, Pennsylvania

Re:     Pennsylvania Economic Development Financing Authority
        Subordinate Solid Waste Disposal Revenue Bonds
        (CarbonLite P, LLC Project) Series 2020

Ladies and Gentlemen,

The undersigned, on behalf of the purchaser (the "Purchasers" and each a "Purchaser") of the above-referenced bonds in the aggregate principal amount of $10,000,000, hereby makes the following representations upon which you may rely:

1.      The undersigned acknowledges that the Bonds were issued for the purpose of assisting in the financing of all or a portion of the cost of acquiring, constructing, rehabilitation, renovating, installing, improving and/or equipping of solid waste disposal facilities in the City of Reading, Pennsylvania (the "Project"), as more particularly described in that certain Preliminary Limited Offering Memorandum, dated August 14, 2020, as supplemented by that certain Supplement dated August 28, 2020 (as supplemented, the "Preliminary Limited Offering Memorandum") and Limited Offering Memorandum, dated September 3, 2020 (the "Limited Offering Memorandum"). The undersigned further acknowledges that the Bonds are secured by an Indenture of Trust dated as of June 1, 2019 (the "Original Indenture"), as amended and supplemented by a First Supplemental Indenture of Trust dated as of September 1, 2020 (the "First Supplemental Indenture" and, together with the Original Indenture, the "Indenture") which creates a security interest in the trust estate under the Indenture for the benefit of the holders and owners of the Bonds, and a Loan Agreement dated as of June 1, 2019 (the "Original Loan Agreement"), as amended by a First Amendment to Loan Agreement dated as of September 1, 2020 (the "First Amendment to Loan Agreement" and, together with the Original Loan Agreement, the "Loan Agreement"), each between Pennsylvania Economic Development Financing Authority (the "Issuer") and CarbonLite P, LLC (the "Borrower"), as each document may be duly amended or supplemented from time to time in accordance with its terms.

2.      The Purchaser has authority to purchase the Bonds and to execute this letter and any other instruments and documents required to be executed by the Purchaser in connection with the purchase of the Bonds.

3.      The Purchaser is a Qualified Institutional Buyer, a financial institution or other accredited investor as defined in the Securities Act of 1933, Regulation D, 17 Code Federal Regulations Section 230.501(a). The Purchaser has sufficient knowledge and experience in financial and business matters, including purchase and ownership of tax-exempt municipal obligations similar to the Bonds, and is capable of evaluating the risks and merits of its purchase of the Bonds and can bear the economic risk of purchasing the Bonds.

4.      The Bonds are being acquired by the Purchaser for investment and not with a view to, or for resale in connection with, any distribution of the Bonds, and, subject to the further provisions of this paragraph 4, the Purchaser (or an affiliate) intends to hold the Bonds for its own account (subject to its rights to sell, pledge, transfer, convey, hypothecate, mortgage, or dispose of such Bonds at a future date in accordance with the Indenture and applicable law) and does not intend at this time to dispose of all or any part of the Bonds. Although the Purchaser does not intend at this time to dispose of all or any part of the Bonds (other than to an affiliate), the Purchaser retains the right to sell and transfer the Bonds, in accordance with terms and conditions of the Indenture and applicable law. The Purchaser understands that it may need to bear the risks of this investment for an indefinite time, since any sale prior to maturity may not be possible.

5.      Notwithstanding the foregoing, the Bonds may be transferred to a trustee, other fiduciary or custodian of a trust or other organizational entity the ownership interests in which are to be distributed through the sale of (a)(i) investment grade securities that are registered under the Securities Act and/or (ii) investment grade securities in transactions that are exempt from the registration requirements of the Securities Act and (b) non-

investment grade securities in transactions that are exempt from the registration requirements of the Securities Act to Qualified Institutional Buyers in increments equal to the Authorized Denominations; provided that any prospectus relating to the investment grade securities and/or private placement memorandum or similar disclosure document relating to any non-investment grade securities will, unless approved in advance by the Issuer, disclose no more regarding the Issuer than its name and status as a public instrumentality and body corporate and politic of the Commonwealth of Pennsylvania created and existing under the laws of the Commonwealth of Pennsylvania and that the Bonds are special limited obligations of the Issuer secured solely by the Revenues as described in the Indenture.

6.      The Purchaser understands that the Bonds are not registered under the 1933 Act and that such registration is not legally required as of the date hereof; and further understands that the Bonds (a) are not being registered or otherwise qualified for sale under the "Blue Sky" laws and regulations of any state, (b) will not be listed in any stock or other securities exchange, (c) will not carry a rating from any rating service and (d) will be delivered in a form which may not be readily marketable.

7.      The Purchaser acknowledges that the Bonds, together with interest thereon, are special, limited obligations payable solely from amounts paid to the Issuer by the Borrower pursuant to the terms of the Bonds, the Loan Agreement, the Indenture and the Guaranty and any other amounts held in any fund or account established pursuant to the Indenture (other than the Rebate Fund) and that notwithstanding anything to the contrary contained in the Bonds or the Indenture, the Issuer shall not be required to use any other moneys or assets of the Issuer to pay any portion of the Project, or make any other payment or advance any other monies or be liable for any other costs or expenses in connection with the Project, or the Bonds, except from amounts paid to the Issuer by the Borrower pursuant to the Loan Agreement, the Indenture and the Guaranty. The Purchaser further understands that the Bonds are not secured by any pledge of any moneys received or to be received from taxation by the Issuer (which has no taxing power), the Commonwealth of Pennsylvania or any political corporation, subdivision or agency thereof; that the Bonds will never represent or constitute a general obligation, moral obligation, or a pledge of the faith and credit of the Issuer, the Commonwealth of Pennsylvania, or any political corporation, subdivision or agency thereof; and that the liability of the Issuer with respect to the Bonds is subject to further limitations set forth in the Bonds, the Loan Agreement, and the Indenture.

8.      The Purchaser acknowledges and agrees that it has not relied upon the Issuer or any of its members, employees, officers or agents for any information in connection with the Purchaser's purchase of the Bonds.

9.      The undersigned is a duly appointed, qualified, and acting representative of the Purchaser, is authorized to make the certifications, representations and warranties contained herein on behalf of the Purchaser and is authorized to execute and deliver this letter.

Capitalized terms used herein and not otherwise defined have the meanings given such terms in the Indenture.

[PURCHASER]

By: _____

[Name]
[Title]

[Address]

[Phone Number]

**SUBORDINATE NOTE**

$10,000,000                                                      September 10, 2020

FOR VALUE RECEIVED, CARBONLITE P, LLC, a limited liability company organized and existing under the laws of the State of Delaware (the "Borrower"), does hereby promise to pay to the order of the PENNSYLVANIA ECONOMIC DEVELOPMENT FINANCING AUTHORITY (the "Issuer") at the corporate trust office of UMB BANK, N.A. (the "Trustee"), located in Minneapolis, Minnesota, or any successor trustee acting as such under that certain Indenture, dated as of June 1, 2019, between the Issuer and the Trustee, as amended and supplemented from time to time (the "Indenture"), in lawful money of the United States of America, the principal sum of TEN MILLION DOLLARS ($10,000,000), and to pay interest on the unpaid principal amount hereof, in like money, at such office on the dates, in the amounts and at the rates determined in accordance with Sections 4.1 and 4.2 of the Loan Agreement hereinafter referenced.

ALL SUMS paid hereon shall be applied first to the satisfaction of accrued interest and the balance to the unpaid principal.

THE PRINCIPAL AMOUNT of this Note is due and payable on the dates and in the amounts determined in accordance with Sections 4.1 and 4.2 of the Loan Agreement.

THIS NOTE constitutes a Subordinate Note referred to in that certain Loan Agreement, dated as of June 1, 2019, between the Borrower and the Issuer, as amended and supplemented from time to time (the "Loan Agreement"), and is subject to, and is executed in accordance with, all of the terms, conditions and provisions thereof, including those respecting prepayment and is further subject to all of the terms, conditions and provisions of the Indenture, all as provided in the Loan Agreement.

The indebtedness evidenced by this Note is and shall be subordinate in right of payment and security to any Senior Note (as defined in the Indenture) all as set forth in the Indenture and Loan Agreement, and the rights and remedies of the holder of this Note shall be subject to the restrictions and limitations set forth in the Indenture and Loan Agreement.

THIS NOTE is a contract made under and shall be construed in accordance with and governed by the laws of the United States of America and the Commonwealth.

CARBONLITE P, LLC


By: _____
Name:  Leon Farahnik
Title:    Chief Executive Officer

ENDORSEMENT

Pay to the order of UMB Bank, N.A., Trustee, without recourse or warranty, except warranty of good title, warranty that the Issuer has not assigned this Note to a Person other than the Trustee and warranty that the original principal amount hereof remains unpaid.

PENNSYLVANIA ECONOMIC
DEVELOPMENT FINANCING AUTHORITY


By _____
　　　Executive Director

**SUPPLEMENT DATED SEPTEMBER 9, 2020**

**relating to**

**$10,000,000**
**PENNSYLVANIA ECONOMIC DEVELOPMENT FINANCING AUTHORITY**
**Subordinate Solid Waste Disposal Revenue Bonds**
**(CarbonLite P, LLC Project)**
**Series 2020**

The Limited Offering Memorandum dated September 3, 2020 for the above-referenced bonds (the "Limited Offering Memorandum") is supplemented and amended by this Supplement to Limited Offering Memorandum dated September 9, 2020 (the "Supplement"). Capitalized terms used in this Supplement but not otherwise defined herein are defined in the Limited Offering Memorandum.

THIS SUPPLEMENT IS TO BE READ TOGETHER WITH, AND IS SUBJECT IN CERTAIN RESPECTS TO, MORE COMPLETE INFORMATION CONTAINED IN THE LIMITED OFFERING MEMORANDUM TO WHICH THIS SUPPLEMENT IS ATTACHED. THIS SUPPLEMENT AMENDS AND SUPERSEDES THE LIMITED OFFERING MEMORANDUM AS AND TO THE EXTENT SET FORTH IN THIS SUPPLEMENT. EXCEPT AS SET FORTH IN THIS SUPPLEMENT THE LIMITED OFFERING MEMORANDUM IS NOT AMENDED OR OTHERWISE SUPPLEMENTED. NO PERSON IS AUTHORIZED TO DETACH THIS SUPPLEMENT FROM THE LIMITED OFFERING MEMORANDUM. PROSPECTIVE INVESTORS MUST READ THE ENTIRE LIMITED OFFERING MEMORANDUM AS SUPPLEMENTED HEREBY TO OBTAIN INFORMATION ESSENTIAL TO MAKING AN INFORMED INVESTMENT DECISION.

**OPTIONAL TENDER OF SERIES 2020 BONDS UPON CHANGE IN CONTROL**

1.       The first sentence of the paragraph next to the heading "SUMMARY STATEMENT – **Optional Tender of Series 2020 Bonds upon Change in Control**" on page 6 of the Limited Offering Memorandum is supplemented as follows (additions are shown in **bold underline** and deletions are shown in ~~strikethrough~~ for convenience):

> ~~So long as no Series 2019 Bonds remain Outstanding, in~~ **In** the event a Change in Control (as defined below) has been completed, the outstanding Series 2020 Bonds shall become subject to optional tender to the Trustee, at the election by any Beneficial Owner, for purchase by Borrower at a purchase price equal to one hundred and five percent (105%) of the aggregate principal amount of the Series 2020 Bonds tendered (the "Tender Price"), plus accrued interest on the Series 2020 Bonds so tendered to be paid to the Beneficial Owner on the Tender Date (as defined herein).

2.       The first sentence of the first paragraph under the "THE SERIES 2020 BONDS – Optional Tender of Series 2020 Bonds upon Change in Control" on page 15 of the Limited Offering Memorandum is supplemented as follows (deletions are shown in ~~strikethrough~~ for convenience):

> In the event a Change in Control (as defined below) has been completed, the Outstanding Series 2020 Bonds shall become subject to optional tender to the Trustee, at the election by any Beneficial Owner, for purchase by Borrower at a purchase price equal to one hundred and five percent (105%) of the aggregate principal amount of the Series 2020 Bonds tendered (the "Tender Price"), plus accrued interest on the Series 2020 Bonds so tendered to be paid to the Beneficial Owner on the Tender Date (as defined below)~~; provided, however, that no Series 2020 Bonds may be tendered pursuant to this provision until no Series 2019 Bonds remain Outstanding~~.

3. The heading on page 35 of the Limited Offering Memorandum titled "Dependence on Availability of Key Management; Potential Conflict with Equity Owners; Change in Control" and the paragraph thereunder is supplemented as follows (deletions are shown in ~~strikethrough~~ for convenience):

**Dependence on Availability of Key Management; Potential Conflict with Equity Owners; ~~Change in Control~~**

Success of the Borrower may be dependent on the continued availability to the Borrower of the services of a number of key executives of CarbonLite Industries. None of these executives are under employment agreements with the Borrower and should the services of any or all of them be unavailable to the Borrower for an extended period of time, the Borrower could be materially and adversely affected. CarbonLite Holdings retains total control over all strategy and operating decisions affecting the Borrower and the Project and has the ability to replace management in its sole discretion. The interests of CarbonLite Holdings may conflict with the interests of the holders of the Series 2020 Bonds, especially if the Borrower has suffered a default under the Loan Agreement or is contemplating some transaction that could increase the risk of a default. ~~Although a Change in Control of Borrower may occur, unless all of the Series 2019 Bonds are tendered for purchase, none of the Series 2020 Bonds may be tendered and holders of the Series 2020 Bonds may be required to hold their Series 2020 Bonds until maturity if not all of the Series 2019 Bonds are tendered and accepted for payment.~~

**ADDITIONAL INDEBTEDNESS:**

1. The paragraph next to the heading "SUMMARY STATEMENT – Additional Debt" on page 7 of the Limited Offering Memorandum is supplemented as follows (additions are shown in **bold underline** for convenience):

The Borrower may not incur additional Indebtedness unless the prior written consent of the Holders of a majority in **aggregate** principal amount of the Series 2019 Bonds then Outstanding is obtained**, and only if the Series 2019 Bonds are no longer Outstanding, the prior written consent of the Holders of a majority in aggregate principal amount of the Series 2020 Bonds then Outstanding is obtained**. See "FINANCIAL COVENANTS – Additional Indebtedness Covenant."

2. The first paragraph under the "FINANCIAL COVENANTS – Additional Indebtedness Covenant" on page 27 of the Limited Offering Memorandum is supplemented as follows (additions are shown in **bold underline** for convenience):

Pursuant to the Loan Agreement, the Borrower will covenant that it will not issue or incur any additional Indebtedness unless the Borrower has obtained the prior written consent of the Holders of a majority in **aggregate** principal amount of the Series 2019 Bonds then Outstanding**, and only if the Series 2019 Bonds are no longer Outstanding, Holders of a majority in aggregate principal amount of the Series 2020 Bonds then Outstanding**.

3. The fourth sentence of the first paragraph under "APPENDIX B - SELECTED DEFINITIONS AND SUMMARY OF PRINCIPAL LEGAL DOCUMENTS - Certain Covenants of the Borrower" on page B-30 of the Limited Offering Memorandum is supplemented as follows (additions are shown in **bold underline** for convenience):

The Borrower may not issue or incur any additional Indebtedness unless the Borrower has obtained the prior written consent of the Holders of a majority in **aggregate** principal amount of the Series 2019 Bonds then Outstanding**, and only if the Series 2019 Bonds are no longer Outstanding, Holders of a majority in aggregate principal amount of the Series 2020 Bonds then Outstanding**.

**ACCOUNT CONTROL AGREEMENT**

1.      The definition of Account Control Agreement under the heading "SECURITY FOR THE SERIES 2020 BONDS – The Loan Agreement – *Gross Revenue Account*" on page 19 and "APPENDIX B - SELECTED DEFINITIONS AND SUMMARY OF PRINCIPAL LEGAL DOCUMENTS – Definitions" on page B-1 of the Limited Offering Memorandum and in Appendix B thereof is replaced in its entirety with the following:

"**Account Control Agreement**" means (i) from July 10, 2019 to and including September 10, 2020, that certain Deposit Account Control Agreement, dated as of June 1, 2019, among the Borrower, the Trustee and Pacific Western Bank, as depository bank, (ii) from and after September 11, 2020, that certain Deposit Account Control Agreement dated as of September 4, 2020, among the Borrower, the Trustee and Pacific Western Bank, as depository bank, and (iii) any other similar agreement between a depository institution, the Borrower and the Trustee whereby the Trustee is granted the right of control over funds or bank accounts of the Borrower following the occurrence of an Event of Default.

**SOURCES AND USES OF FUNDS**

1.      Footnote (1) of the table under the heading "SOURCES AND USES OF FUNDS" contained on page 24 of the Limited Offering Memorandum is replaced in its entirety with the following:

"[1]      Includes an estimated $8,800,000 deposit to Tax-Exempt Subaccount of the Project Fund plus an estimated $9,264,929 deposit to the Equity Subaccount of the Project Fund for working capital."

**<u>EXHIBIT D</u>**

**SCHEDULE 3.09**
**TO**
**CREDIT AGREEMENT**

[Attached.]

**SCHEDULE
3.09 TO
CREDIT AGREEMENT**

**<u>Material Agreements</u>**

1. Material Agreements Pennsylvania

   a. Customer Contracts:

      i. Supply Agreement, dated as of May 10, 2018, by and between CarbonLite P LLC and Nestle Waters North America Inc.

      ii. Supply Agreement, dated as of September 13, 2018, by and between CarbonLite P LLC and Nestle Waters North America Inc.

      iii. Non-Binding Letter of Understanding Following Price Negotiations for rPET Supply to the NA Market, dated as of January 24, 2019, by and between CarbonLite P LLC and Coca-Cola Cross Enterprise Procurement Group.

      iv. Amendment 3 to Supply Agreement, dated as of November 1, 2018, by and among CarbonLite P LLC, CarbonLite Industries LLC, CarbonLite Recycling LLC, and Niagara Bottling, LLC (the "***Amendment 3 to Niagara Agreement***").

      v. Amendment 4 to Supply Agreement, dated as of December 30, 2019, by and among CarbonLite P LLC, CarbonLite Industries LLC, CarbonLite Recycling LLC, and Niagara Bottling, LLC (the "***Amendment 4 to Niagara Agreement***").

      vi. Amendment 5 to Supply Agreement, dated April 1, 2020, by and among CarbonLite P LLC, CarbonLite Industries LLC, CarbonLite Recycling LLC, and Niagara Bottling, LLC (the "***Amendment 5 to Niagara Agreement***").

      vii. Amendment 6 to Supply Agreement, dated September 2, 2020, by and among CarbonLite P LLC, CarbonLite Industries LLC, CarbonLite Recycling LLC, and Niagara Bottling, LLC (the "***Amendment 6 to Niagara Agreement***").

   b. Leases:

      i. Industrial Lease, dated as of May 31, 2019, by and between CarbonLite P LLC and BERKS61 Owner, LLC.

2. Material Agreements PinnPack

   a. Leases:

      i. Standard Industrial Single-Tenant Lease - Net, dated as of June 1, 2016, by and between PinnPack Packaging LLC and Duris Corporation.

      ii. Master Lease Agreement, dated as of March 15, 2017, by and between PinnPack Packaging LLC and Jules and Associates, Inc.

3. Material Agreements Riverside

   a. Customer Contracts:

      i. Contract, dated as of September 1, 2011, by and between CarbonLite Industries LLC and Nestle Waters North America Inc.

      ii. Amendment to Contract, dated as of September 1, 2013, by and between CarbonLite Industries LLC and Nestle Waters North America Inc.

      iii. Second Amendment to Contract, dated as of May 1, 2014, by and between CarbonLite Industries LLC and Nestle Waters North America Inc.

      iv. Third Amendment to Contract, dated as of December 19, 2014, by and between CarbonLite Industries LLC and Nestle Waters North America Inc.

      v. Fourth Amendment to Contract, dated as of December 21, 2015, by and between CarbonLite Industries LLC and Nestle Waters North America Inc.

      vi. Fifth Amendment to Contract, dated as of December 14, 2016, by and between CarbonLite Industries LLC and Nestle Waters North America Inc.

      vii. Sixth Amendment to Contract, dated as of March 10, 2017, by and between CarbonLite Industries LLC and Nestle Waters North America Inc.

      viii. Seventh Amendment to Contract, dated as of November 6, 2017, by and between CarbonLite Industries LLC and Nestle Waters North America Inc.

      ix. Eighth Amendment to Contract, dated as of May 1, 2018, by and between CarbonLite Industries LLC and Nestle Waters North America Inc.

      x. Ninth Amendment to Contract, dated as of October 18, 2018, by and between CarbonLite Industries LLC and Nestle Waters North America Inc.

      xi. Tenth Amendment to Contract, dated as of January 1, 2019, by and between CarbonLite Industries LLC and Nestle Waters North America Inc.

      xii. PCR Resin Agreement, dated as of February 22, 2018, by and between CarbonLite Industries LLC and Pepsi-Cola Advertising and Marketing, Inc.

      xiii. Agreement, dated as of July 29, 2010, by and between CarbonLite Industries LLC and Pepsi-Cola Advertising and Marketing, Inc.

      xiv. Agreement, dated as of April 29, 2016, by and between CarbonLite

Industries LLC and Pepsi-Cola Advertising and Marketing, Inc.

  xv. Amendment #1 to Agreement to Purchase PCR Resin, dated as of June 22, 2016, by and between CarbonLite Industries LLC and Pepsi-Cola Advertising and Marketing, Inc.

  xvi. PCR Resin Agreement, dated as of June 28, 2018, by and between CarbonLite Industries LLC and Pepsi-Cola Advertising and Marketing, Inc.

  xvii. Reference is made to Amendment 3 to Niagara Agreement.

  xviii. Reference is made to Amendment 4 to Niagara Agreement.

  xix. Reference is made to Amendment 5 to Niagara Agreement.

  xx. Reference is made to Amendment 6 to Niagara Agreement.

  xxi. **PCR Resin Agreement, dated as of November 25, 2019, by and between CarbonLite Industries LLC and Pepsi-Cola Advertising and Marketing, Inc.**

b. Leases:

  i. Standard Multi-Tenant Office Lease - Gross, dated as of February 12, 2016, by and between CarbonLite Industries LLC and 2245 Valley Blvd, LLC.

  ii. Addendum to Lease, dated as of March 25, 2016, by and between CarbonLite Industries LLC and 2245 Valley Blvd, LLC.

  iii. Second Amendment to Lease, dated as of July 25, 2017, by and between CarbonLite Industries LLC and 2245 Valley Blvd, LLC.

  iv. Third Amendment to Lease, dated as of August 14, 2018, by and between CarbonLite Industries LLC and 2245 Valley Blvd, LLC.

  v. Standard Industrial/Commercial Multi-Tenant Lease - Gross, dated as of June 23, 2016, by and between CarbonLite Industries LLC and One Miracle Property.

  vi. First Amendment to Lease, dated as of March 17, 2017, by and between CarbonLite Industries LLC and One Miracle Property.

  vii. Second Amendment to Lease, dated as of January 10, 2018, by and between CarbonLite Industries LLC and One Miracle Property.

  viii. Columbia Business Center Building Lease, dated as of October 1, 2010, by and between CarbonLite Industries LLC and Columbia Business Center, LLC.

  ix. Prologis Clear Lease, dated as of January 21, 2020, by and between CarbonLite Industries LLC and Prologis Targeted U.S. Logistics Fund,

LP.

4. Material Agreements Texas

    a.   Customer Contracts:

        i.   Supply Agreement, dated as of October 28, 2013, by and between CarbonLite Recycling LLC and Nestle Waters North America Inc.

        ii.   Amendment to Contract, dated as of April 13, 2016, by and between CarbonLite Recycling LLC and Nestle Waters North America Inc.

        iii.   Second Amendment to Contract, dated as of December 14, 2016, by and between CarbonLite Recycling LLC and Nestle Waters North America Inc.

        iv.   Third Amendment to Contract, dated as of December 14, 2016, by and between CarbonLite Recycling LLC and Nestle Waters North America Inc.

        v.   Fourth Amendment to Contract, dated as of November 6, 2017, by and between CarbonLite Recycling LLC and Nestle Waters North America Inc.

        vi.   Fifth Amendment to Contract, dated as of April 10, 2018, by and between CarbonLite Recycling LLC and Nestle Waters North America Inc.

        vii.   Sixth Amendment to Contract, dated as of October 18, 2018, by and between CarbonLite Recycling LLC and Nestle Waters North America Inc.

        viii.   Seventh Amendment to Contract, dated as of February 7, 2019, by and between CarbonLite Recycling LLC and Nestle Waters North America Inc.

        ix.   Supply Agreement, dated as of November 1, 2017, by and between CarbonLite Recycling LLC and Niagara Bottling, LLC.

        x.   Amendment 1 to Supply Agreement, dated as of March 8, 2018, by and between CarbonLite Recycling LLC and Niagara Bottling, LLC.

        xi.   Amendment 2 to Supply Agreement, dated as of April 17, 2018, by and between CarbonLite Recycling LLC and Niagara Bottling, LLC.

        xii.   Reference is made to Amendment 3 to Niagara Agreement.

        xiii.   Reference is made to Amendment 4 to Niagara Agreement.

        xiv.   Reference is made to Amendment 5 to Niagara Agreement.

        xv.   Reference is made to Amendment 6 to Niagara Agreement.

        xvi.   PCR Resin Agreement, dated as of November 25, 2019, by and between CarbonLite Industries LLC and Pepsi-Cola Advertising and Marketing, Inc.

b.  Leases:

    i.  Lease Agreement, dated as of October 17, 2016, by and between CarbonLite Recycling LLC and PIHV Mountain Creek, LLC.