EXHIBIT 8

*Execution Version*

## FORBEARANCE AGREEMENT AND AMENDMENT NO. 5 TO
## CREDIT AGREEMENT

THIS FORBEARANCE AGREEMENT AND AMENDMENT NO. 5 TO CREDIT AGREEMENT (this "Agreement"), effective as of February 8, 2021, is among CarbonLite Holdings, LLC (the "Borrower"), certain Subsidiaries of the Borrower that are signatories hereto as guarantors (the "Guarantors" and, with the Borrower, the "Loan Parties"), the existing lenders party hereto (the "Existing Lenders"), the financial institutions party hereto as "Tranche C Lenders" as identified on the signature pages hereto (the "Tranche C Lenders" and, collectively with the Existing Lenders, the "Lenders"), Orion Energy Partners Investment Agent, LLC, as Administrative Agent ("Administrative Agent") and Orion Energy Partners Investment Agent, LLC, as Collateral Agent ("Collateral Agent") and relates to that certain Credit Agreement, dated as of August 2, 2019 (as amended by that certain (i) Amendment No. 1 to Credit Agreement and Waiver, dated as of March 30, 2020, (ii) Amendment No. 2 to Credit Agreement, dated as of September 9, 2020, (iii) Amendment No. 3 to Credit Agreement, dated as of October 23, 2020 and (iv) Amendment No. 4 and Waiver to Credit Agreement, dated as of December 10, 2020, and as further amended, restated, amended and restated, supplemented or otherwise modified prior to the date hereof, the "Existing Credit Agreement"; and as amended hereby, the "Amended Credit Agreement"), among the Borrower, the Guarantors, the Existing Lenders, Administrative Agent, Collateral Agent and the other persons party thereto.

W I T N E S S E T H

WHEREAS, pursuant to this Agreement, the Borrower has requested, and the Administrative Agent and Lenders have agreed, subject to the terms and conditions of this Agreement, to amend the Existing Credit Agreement on the Amendment No. 5 Effective Date (as defined below), as specified in Section 5 below;

WHEREAS, as of the date hereof, certain events have occurred and are continuing that constitute Defaults or Events of Default under the Existing Credit Agreement (all such events that exist as of the Amendment No. 5 Effective Date, the "Current Defaults");

WHEREAS, pursuant to this Agreement, Borrower has requested that (a) during the Forbearance Period, the Administrative Agent agrees to forbear from exercising certain of its default-related rights and remedies against Borrower and the other Loan Parties with respect to the Current Defaults, and (b) that one or more Lenders provide financial accommodations to Borrower and the other Loan Parties, including, without limitation, providing commitment and funding of a new tranche of loans in an aggregate principal amount of $2,800,000 (the "Tranche C Facility"), each notwithstanding the existence of the Current Defaults and subject to the terms and conditions set forth herein; and

WHEREAS, subject to the terms and conditions set forth herein, (a) the Administrative Agent, the Collateral Agent and the Lenders have agreed to (i) forbear from exercising certain of their default-related rights and remedies against Borrower and the other Loan Parties with respect to the Current Defaults, and (ii) amend the Existing Credit Agreement in certain respects as set forth in the Amended Credit Agreement (as defined below), and (b) certain of the Lenders party

hereto as Tranche C Lenders are willing to provide the Tranche C Facility subject to the terms and conditions herein and in the Amended Credit Agreement in order to permit the Loan Parties an opportunity to consummate an Acceptable Sale (as defined below) and effectuate a restructuring or refinancing of the Tranche A/C Obligations under the Amended Credit Agreement, in each case, acceptable to the Agents and Lenders.

NOW, THEREFORE, in consideration of the premises contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound hereby, agree as follows:

Section 1.    *Definitions*.

(a)    As used herein, the following terms shall have the respective meanings set forth below:

"Acceptable Definitive Purchase Agreement" means, collectively, a definitive purchase agreement and related purchase documents providing for an Acceptable Sale that can be consummated on or before the Outside Sale Closing Date, and if necessary, in the bankruptcy cases of the Loan Parties pursuant to Section 363 of the U.S. Bankruptcy Code, subject to higher or otherwise better offers constituting an Acceptable Sale, obtained pursuant to customary bid procedures and bid protections satisfactory to the Administrative Agent in its sole discretion. Any Acceptable Definitive Purchase Agreement relating to an Acceptable Sale shall be in form and substance acceptable to the Administrative Agent in its sole discretion, and may not be amended, restated or otherwise modified without the prior written consent of the Administrative Agent in is sole discretion.

"Acceptable Sale" shall mean a sale to any Person(s) of all or substantially all of the Loan Parties' businesses and assets in one or a series of transactions on terms and conditions acceptable to the Administrative Agent in its sole discretion (including, without limitation, the remittance of the Net Sale Proceeds therefrom to the Administrative Agent), pursuant to an Acceptable Definitive Purchase Agreement, which sale (i) shall be consummated no later than the Outside Sale Closing Date (as hereinafter defined) and (ii) generate sufficient Net Sale Proceeds for repayment in full in cash of all Tranche A/C Obligations (including any Tranche A/C Prepayment Premium).

"Investment Banker" shall mean Jefferies LLC.

"Investment Banker Engagement Letter" shall mean that certain Engagement Letter, dated as of January 12, 2021, between Investment Bank and Borrower.

"Net Sale Proceeds" as applied to any consummated Acceptable Sale, shall mean the cash portion of the gross proceeds received at any time in respect of such Acceptable Sale, less the aggregate amount of Specified Transaction Costs. The term Net Sale Proceeds shall exclude any (i) indebtedness or liabilities assumed by the purchaser in respect of an Acceptable Sale, and (ii) any portion of the purchase price payable in respect of an Acceptable Sale that is held back by the purchaser or is escrowed for possible payment of indemnification claims of the purchaser.

"Outside Sale Closing Date" shall mean March 1, 2021 (as may be extended by the Administrative Agent in its sole and absolute discretion).

"Prepetition Budget" shall mean (a) in respect of the Loan Parties, the California Prepetition Budget, (b) in respect of the Pennsylvania Facility Group, the Pennsylvania Prepetition Budget and/or (c) in respect of the Texas Facility Group, the Texas Prepetition Budget.

"Specified Transaction Costs" shall mean, collectively, (i) all reasonable fees and expenses incurred by legal counsel for the Loan Parties in connection with this Agreement and an Acceptable Sale, (ii) all reasonable fees and expenses owing to the Chief Restructuring Officer, (iii) all reasonable fees and expenses owing to Investment Banker pursuant to the terms of the Investment Banker Engagement Letter in connection with an Acceptable Sale; provided, however, that this clause (iii) shall not include any expenses, costs or other charges incurred by Investment Banker in connection with the enforcement of the Investment Banker Engagement Letter or that constitute indemnification, contribution or reimbursement under the Investment Banker Engagement Letter (or any schedule, exhibit or other attachment to any of the foregoing); and (iv) any other fees, costs or expenses incurred by any Loan Party in connection with the consummation of an Acceptable Sale which are acceptable to the Administrative Agent in its sole discretion.

(b)     Unless otherwise defined in this Agreement, each capitalized term used in this Agreement has the meaning assigned to such term in the Amended Credit Agreement.

Section 2.     *Forbearance.*

(a)     Effective as of the Forbearance Effective Date, each of the Administrative Agent and Collateral Agent agrees that until the expiration or termination of the Forbearance Period, it will temporarily forbear from exercising its default-related rights and remedies against Borrower or any other Loan Party solely with respect to the Current Defaults; provided, however:

(i)     prior to the occurrence of any Event of Default that first occurs after the Forbearance Effective Date, the Obligations shall continue to bear interest at the regular, non-Post-Default Rate;

(ii)     except as expressly provided in Section 4 hereof, the Lenders shall have no obligation to make any further Loans or other extensions of credit to Borrower or any other Loan Party;

(iii)     each Loan Party shall comply with all limitations, restrictions or prohibitions set forth in this Agreement, the Amended Credit Agreement or any of the other Financing Documents during the continuance of any Event of Default;

(iv)     nothing herein shall restrict, impair or otherwise affect any Lender's rights and remedies under any agreements containing subordination provisions in favor of the Administrative Agent (including, without limitation, any rights or remedies available to the Administrative Agent as a result of the occurrence or continuation of any Current Default) or amend or modify any provision thereof; and

(v)    nothing herein shall restrict, impair or otherwise affect either Agent's right to file, record, publish or deliver a notice of default or document of similar effect under any state foreclosure law.

As used herein, the term "Forbearance Period" shall mean the period beginning on the Forbearance Effective Date and ending on the earliest occurrence of a Termination Event (as defined herein). A "Termination Event" shall mean:

(1)    the occurrence of any Event of Default under Section 7.01(f) of the Amended Credit Agreement (a "Bankruptcy Default");

(2)    the date on which Administrative Agent delivers to Borrower a notice terminating the Forbearance Period, which notice may be delivered at any time upon or after the occurrence of any Forbearance Default (as hereinafter defined) other than a Bankruptcy Default; or

(3)    March 1, 2021 (as may be extended by the Administrative Agent in its sole and absolute discretion).

As used herein, the term "Forbearance Default" shall mean (A) the occurrence of any Default or Event of Default other than the Current Defaults, (B) the failure of Borrower or any other Loan Party to comply timely with any term, condition, or covenant set forth in this Agreement, (C) the failure of any representation or warranty made by Borrower or any other Loan Party under or in connection with this Agreement to be true and complete as of the date when made or any other breach of any such representation or warranty, (D) any occurrence, event or change in facts or circumstances occurring on or after the Forbearance Effective Date that would have a Material Adverse Effect, (E) the repudiation (anticipatory or otherwise) and/or assertion of any defense by any Loan Party with respect to this Agreement or any Financing Document or the pursuit of any claim by any Loan Party against the Administrative Agent, any Lender or any Released Person or (F) the termination or expiration of any other forbearance granted by another creditor of the Loan Parties.  Any Forbearance Default shall constitute an immediate Event of Default under the Amended Credit Agreement and other Financing Documents.

(b)    Upon the occurrence of a Termination Event, the agreement of the Administrative Agent to forbear from exercising their respective default-related rights and remedies shall immediately terminate without the requirement of any demand, presentment, protest, or notice of any kind, all of which Borrower and the other Loan Parties each waives. Borrower and the other Loan Parties each agrees that any or all of the Administrative Agent and the Lenders may at any time thereafter proceed to exercise any and all of their respective rights and remedies under any or all of the Amended Credit Agreement, any other Financing Document and/or applicable law, including, without limitation, their respective rights and remedies with respect to the Current Defaults.  For the avoidance of doubt, the Administrative Agent and the Lenders are not required to exercise their respective rights and remedies as Tranche B Lenders, and may instead elect to enforce only the Tranche A/C Loans.  Without limiting the generality of the foregoing, upon the occurrence of a Termination Event, the Administrative Agent or the Lenders may, in their sole discretion and without the requirement of any demand, presentment, protest, or notice of any kind, (i) suspend or terminate any commitment to provide Loans or other

extensions of credit under any or all of the Amended Credit Agreement and other Financing Documents, (ii) following such Termination Event, charge interest on any or all of the Obligations at the Post-Default Rate, (iii) commence any legal or other action to collect any or all of the Obligations from Borrower, any other Loan Party and/or any Collateral, (iv) foreclose or otherwise realize on any or all of the Collateral, and/or appropriate, setoff or apply to the payment of any or all of the Obligations, any or all of the Collateral, and (v) take any other enforcement action or otherwise exercise any or all rights and remedies provided for by any or all of the Amended Credit Agreement, any other Financing Documents and/or Applicable Law, all of which rights and remedies are fully reserved by the Administrative Agent.

(c)    Any agreement by the Administrative Agent to extend the Forbearance Period, if any, must be set forth in writing and signed by a duly authorized signatory of the Administrative Agent.

(d)    Borrower and the other Loan Parties each acknowledge that the Administrative Agent have not made any assurances concerning (i) any possibility of an extension of the Forbearance Period, (ii) the manner in which or whether the Current Defaults may be resolved or (iii) any additional forbearance, waiver, restructuring or other accommodations.

(e)    The parties hereto agree that the running of all statutes of limitation and the doctrine of laches applicable to all claims or causes of action that the Administrative Agent or any Lender may be entitled to take or bring in order to enforce its rights and remedies against Borrower or any other Loan Party are, to the fullest extent permitted by law, tolled and suspended during the Forbearance Period.

(f)    Borrower and the other Loan Parties acknowledge and agree that any Loan or other financial accommodation that any Tranche C Lender makes on or after the Forbearance Effective Date has been made by such party in reliance upon, and is consideration for, among other things, the covenants, agreements, representations and warranties of Borrower and the other Loan Parties hereunder.

Section 3.    ***Supplemental Terms, Conditions and Covenants During the Forbearance Period.***  The parties hereto hereby agree to comply with the following terms, conditions and covenants during the Forbearance Period, in each case notwithstanding any provision to the contrary set forth in this Agreement, the Amended Credit Agreement or any other Financing Document:

(a) Borrower and each Loan Party shall immediately begin the process of structuring, marketing, negotiating, documenting and consummating an Acceptable Sale, and shall comply with the following covenants in connection therewith (collectively, the "Sale Milestones") (it being understood that any failure to meet a Sale Milestone shall constitute an immediate Forbearance Default):

(i)    Within five (5) days after the Amendment No. 5 Effective Date, the Borrower shall have caused the Investment Banker to prepare and deliver to all potentially interested parties a confidential sale memorandum in customary form and substance for the sale of a private company with respect to the sale of substantially all or all of the Loan

5

Parties' businesses and assets and shall have provided such parties reasonably comprehensive diligence materials, which may be provided via data room.

(ii)    Within two (2) business days after receipt thereof, the Loan Parties and the Investment Banker shall provide the Administrative Agent with a copy of any letter of intent setting forth the proposed terms of an Acceptable Sale from a potential purchaser.

(iii)    On Thursday of every week, the Loan Parties and the Investment Banker shall have a call with the Administrative Agent to give the Administrative Agent an update as to the current marketing process, along with a follow up email on such date with any marketing materials, correspondence and other material information regarding the sales process.

(iv)    On Thursday of each week, the Borrower shall:

(A)    deliver to the Administrative Agent a report from the Investment Banker in form acceptable to the Administrative Agent (the "Investment Banker Report") which shall include: (1) updates on the process of securing potential investors and/or purchasers, (2) a list of contacted and target potential investors and/or purchasers, (3) material feedback from such potential investors and/or purchasers, (4) upcoming process and discussion in respect of Sale Milestones, (5) copies of all final marketing materials associated with a potential Acceptable Sale and (6) copies of any term sheets, bona fide proposals or other relevant information and materials relating to any debtor-in-possession financing proposals from any party for the Loan Parties;

(B)    deliver to the Administrative Agent a report of the chief restructuring officer of the Borrower in form acceptable to the Administrative Agent (each, a "CRO Report") with respect to the immediately prior week ended the last Business Day of such week, setting forth (1) the actual cash receipts and disbursements for such immediately preceding week on a line-item basis and available cash on hand as of the end of such week, (2) the variance in dollar amounts of the actual receipts and disbursements for each weekly period from those reflected for the corresponding period in the California Prepetition Budget, (3) a description of the nature of any material positive or negative variance in each line item in the California Prepetition Budget, (4) a detailed description of any other non-compliance by the Loan Parties with the California Prepetition Budget, (5) discussion of any and all communications regarding a bankruptcy filing plan with critical vendors and customers, (6) a detailed discussion regarding the milestones set forth in each of the Customer Discussion Plan and the Operational Improvement Plan, (7) any variance reports and/or non-compliance reports in relation to the Texas Prepetition Budget and/or Pennsylvania Prepetition

6

Budget prepared by the Borrower Group Members in respect of the Texas Facility and/or Pennsylvania Facility delivered to holders of Indebtedness under the Bond Documents and (8) to the extent not covered by the Investment Banker Report, copies of any draft term sheets, proposals (including a written summary if such proposal is verbal) or other relevant information and materials relating to any debtor-in-possession financing proposals from any party for the Loan Parties; and

(C)    have a call with representatives of each of the Loan Parties (including the Chief Operating Officer and the Chief Restructuring Officer), the Investment Banker and the Administrative Agent to discuss updates and progress towards the Customer Discussions Plan, the Operational Improvements Plan, and the applicable weekly CRO Report.

(v)    on Thursday of every fourth week after the Amendment No. 5 Effective Date, the Borrower shall deliver to the Administrative Agent:

(A)    an updated proposed rolling 9-week cash flow projection for the PinnPack Facility and the Riverside Facility (a "<u>Proposed California Prepetition Budget</u>").  Unless the Administrative Agent notifies the Loan Parties in writing (which may be by email) on or before the Thursday of the week following the delivery of any Proposed California Prepetition Budget that such Proposed California Prepetition Budget is not in form and substance satisfactory to the Administrative Agent, such Proposed California Prepetition Budget shall on such Thursday become the "California Prepetition Budget" for all purposes.  If the Administrative Agent delivers such notice that such Proposed California Prepetition Budget is not in form and substance satisfactory to the Administrative Agent, the California Prepetition Budget then in effect (or, if the Initial California Prepetition Budget is then in effect, the Initial California Prepetition Budget) (the "<u>California Prepetition Budget</u>") shall continue as the then-effective California Prepetition Budget;

(B)    an updated proposed rolling 9-week cash flow projection for the PinnPack P Facility and the Pennsylvania Facility (the "<u>Pennsylvania Prepetition Budget</u>"), which shall have been approved in writing by the Chief Restructuring Officer; and

(C)    an updated proposed rolling 9-week cash flow projection for the Texas Facility (the "<u>Texas Prepetition Budget</u>"), which shall have been approved in writing by the Chief Restructuring Officer.

(vi)    Prior to selecting a bid that the Loan Parties and Investment Banker believe represents the highest or otherwise best offer for an Acceptable Sale (the "Winning Bidder"), the Loan Parties and the Investment Banker shall submit copies of all such bids

to the Administrative Agent.  The Administrative Agent shall have the  absolute right in its respective sole discretion to consent to or reject such bid as providing for an Acceptable Sale.

(vii)    On or before the Outside Sale Closing Date, the Loan Parties and the Winning Bidder shall have consummated an  Acceptable Sale pursuant to an Acceptable Definitive Purchase Agreement, and the Loan Parties shall remit to the Administrative Agent at closing all of the Net Sale Proceeds from such Acceptable Sale  to be applied in accordance with the Amended Credit Agreement; provided that the Loan Parties may not consummate any such sale if it would not result in the Loan Parties receiving in cash in immediately available funds Net Sale Proceeds sufficient for the repayment in full in cash of all Tranche A/C Obligations (including any Tranche A/C Prepayment Premium) on the closing date of such sale.

(b) Borrower shall not directly or indirectly remove or replace any investment banking firm, crisis manager, chief restructuring officer, consultant, financial advisor and/or other third-party professional unless it replaces such person or firm with either (i) an advisor possessing comparable credentials and experience to the Person being removed or replaced or (ii) an advisor reasonably acceptable to the Administrative Agent (in either case, an "Acceptable Advisor").

(c) The Borrower shall (i) subject to its fiduciary obligations and requirements of applicable law, use good faith efforts to agree to a debtor-in-possession senior credit facility with the Lenders (it being acknowledged that the Borrower and the Lenders shall use good faith efforts to begin negotiation of a debtor-in-possession financing based on the term set forth in Exhibit J, it being acknowledged that neither the Borrower nor the Lenders shall be bound by the terms set forth on Exhibit J), (ii) use commercially reasonable efforts to provide the Collateral Agent with mortgages in respect of any Facility owned by the Loan Parties, in the case of this clause (ii), in form and substance reasonably satisfactory to the Administrative Agent and (iii) use good faith efforts to have all preparations completed to file the Borrower and the Loan Parties for chapter 11 bankruptcy protection on March 1, 2021 (it being acknowledged that this clause (iii) shall not require a filing on March 1, 2021).

(d) Borrower shall provide to counsel to the Administrative Agent draft copies of all "first-day" and "second-day" pleadings, motions and applications, together with any supporting exhibits and proposed orders, that the Borrower determines are necessary to file with the applicable bankruptcy court at least two (2) calendar days prior to the date when the Borrower intends to file petitions initiating the chapter 11 bankruptcy cases (the "Petition Date"), and consult in good faith with such counsel regarding the form and substance of all such documents; provided that with respect to any motion seeking approval of the Borrower's or any Loan Party's incurrence of debtor-in-possession or post-petition financing or use of the Secured Parties' cash collateral, draft copies of such motion(s) and any supporting exhibits and proposed orders shall be provided to counsel to the Administrative Agent at least three (3) Business Days prior to the Petition Date.

Section 4.    *Tranche C Commitments.*

(a)    Subject to the satisfaction of all of the conditions precedent set forth in Section 6 hereof, as of the Amendment No. 5 Effective Date, each Tranche C Lender hereby:

(i)    severally commits to make one or more Tranche C Loans to the Borrower pursuant to the provisions of, and subject to the conditions contained in, the Amended Credit Agreement in an amount up to the commitment amount set forth next to such Tranche C Lender's name on Exhibit B attached hereto under the caption "Tranche C Commitments" (the "Tranche C Commitments"); and

(ii)    agrees (A) subject to the satisfaction of the conditions set forth in Section 6 hereto, to make Tranche C Loans on the Amendment No. 5 Effective Date to the Borrower pursuant to the Amended Credit Agreement in an amount equal to $2,500,000, which amount shall be funded by the Lenders ratably (based upon the respective amounts of such Lender's Tranche C Commitments at such time) and (B) subject to the satisfaction of the conditions set forth in Section 4.03 of the Amended Credit Agreement, to make Tranche C Loans in minimum increments of $250,000 on the applicable Tranche C Funding Dates to the Borrower pursuant to the Amended Credit Agreement, which amount shall be funded by the Lenders ratably (based upon the respective amounts of such Lender's Tranche C Commitments at such time), but in any case, in an aggregate principal amount not to exceed the Tranche C Commitments. The Tranche C Loans shall be used by the Loan Parties solely as specified in Schedule 5.13(c) of the Amended Credit Agreement or as otherwise agreed by the Administrative Agent (in its sole discretion).

(b)    Subject to the satisfaction of all the conditions precedent set forth in Section 6 hereof, as of the Amendment No. 5 Effective Date, each Lender (including the Tranche C Lenders) hereby:

(i)    consents to the incurrence by Borrower of the Tranche C Commitments (including any Tranche C Loans incurred in respect thereof);

(ii)    agrees that the Tranche C Commitments, and any Tranche C Loans incurred in respect thereof, shall be Commitments and Loans for all purposes under the Amended Credit Agreement; and

(iii)    agrees to the priority of payments in favor of the Tranche C Obligations as set forth in the Amended Credit Agreement, including, without limitation, Section 7.02 of the Amended Credit Agreement.

(c)    Notwithstanding anything to the contrary contained herein, each Lender and each Loan Party acknowledges and agrees that (i) the Tranche C Lenders may, in their sole and absolute discretion, and prior to the end of the Forbearance Period, increase the aggregate Tranche C Commitments from $2,800,000 to $3,500,000, (ii) in connection therewith, the Administrative Agent may send the Loan Parties and the Lenders an updated Exhibit B to this Agreement, (iii) any increase in Tranche C Commitments shall be Tranche C Commitments for all purposes under this Agreement and the Amended Credit Agreement and (iv) any loans made in respect thereof in excess of $2,800,000 shall be Tranche C Loans for all purposes hereunder and under the Amended Credit Agreement.

Section 5.    ***Amendments to the Existing Credit Agreement***.    Effective as of the Amendment No. 5 Effective Date, each of the Administrative Agent, the Lenders and the Borrower

hereby consents to the following amendments, to be effective on and as of the Amendment No. 5 Effective Date:

(a)    the amendment of the Existing Credit Agreement to delete the stricken text (indicated textually in the same manner as the following example: ~~stricken text~~) and to add the double-underlined text (indicated textually in the same manner as the following example: **double-underlined text**) as set forth in Exhibit A hereto;

(b)    the amendment and restatement of Annex I to the Existing Credit Agreement, as set forth in Exhibit B hereto; and

(c)    the addition of Schedule 5.13(c) of the Amended Credit Agreement with the schedule set forth in Exhibit C hereto;

(the Existing Credit Agreement as so amended, the "Amended Credit Agreement").

Section 6.    ***Effectiveness of Agreement***.  This Agreement shall become effective on the date (the "Amendment No. 5 Effective Date") on which each of the following conditions is satisfied:

(a)    This Amendment shall have been executed by each of (i) the Administrative Agent, (ii) the Lenders and (iii) the Borrower, and the Administrative Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto.

(b)    The Administrative Agent shall have received:

(i) a detailed customer pricing discussions plan (the "Customer Discussions Plan"), a copy of which is attached as Exhibit G;

(ii) a detailed Operational Improvements Plan, (the "Operational Improvements Plan"), a copy of which is attached as Exhibit H; and

(iii) a detailed report from the Investment Banker, a copy of which is attached as Exhibit I.

(c)    The Borrower's Board of Directors shall have: (i) authorized  the Chief Restructuring Officer to make any transfers from any bank accounts of the Loan Parties or their subsidiaries in a manner consistent with the Amended Credit Agreement and (ii) authorized one or more external counsels (including Pachulski Stang Ziehl & Jones LLP) to prepare appropriate documentation necessary for a filing by the Borrower and the Loan Parties for chapter 11 bankruptcy protection on March 1, 2021 (it being acknowledged that this clause (ii) shall not require a filing on March 1, 2021).

(d)    The Tranche C Lenders shall have received a loan discount letter reasonably acceptable to the Tranche C Lenders, duly executed by each Tranche C Lender and the Borrower.

(e)     The Administrative Agent shall have received evidence satisfactory to it that LF Investment Holdings LLC has approved this Agreement and the Amended Credit Agreement.

(f)     The Administrative Agent shall have received the Tranche C Funds Flow Memorandum (as defined in the Amended Credit Agreement), in form and substance satisfactory to the Administrative Agent.

(g)     The Administrative Agent, the Lenders and their counsel shall have been paid directly from the proceeds of the Tranche C Loans for all documented out-of-pocket costs and expenses associated with the preparation, negotiation and execution of this Agreement and the other instruments and documents to be delivered hereunder and the transactions contemplated hereby.

(h)     The Administrative Agent shall have received an initial prepetition statement of projected receipts, disbursements, net cash flow, liquidity and loans for the immediately following consecutive 9 weeks, set forth on a weekly basis, for each of (i) the PinnPack Facility and Riverside Facility (such statement, the "Initial California Prepetition Budget"), (ii) the PinnPack P Facility and Pennsylvania Facility (such statement, the "Initial Pennsylvania Prepetition Budget") and (iii) the Texas Facility (such statement, the "Initial Texas Prepetition Budget" and, collectively with the Initial California Prepetition Budget and the Initial Texas Prepetition Budget, the "Initial Prepetition Budgets").  The Initial California Prepetition Budget is attached hereto as Exhibit D, the Initial Pennsylvania Prepetition Budget is attached hereto as Exhibit E and the Initial Texas Prepetition Budget is attached hereto as Exhibit F.

Section 7.     ***General Release***.

(a)     In consideration of, among other things, Administrative Agent  and the Lenders' execution and delivery of this Agreement, each of Borrower and the other Loan Parties, on behalf of itself and its agents, representatives, officers, directors, advisors, employees, subsidiaries, affiliates, successors and assigns (collectively, "Releasors"), hereby forever agrees and covenants not to sue or prosecute against any Releasee (as hereinafter defined) and hereby forever waives, releases and discharges, to the fullest extent permitted by law, each Releasee from any and all claims (including, without limitation, crossclaims, counterclaims, rights of set-off and recoupment), actions, causes of action, suits, debts, accounts, interests, liens, promises, warranties, damages and consequential damages, demands, agreements, bonds, bills, specialties, covenants, controversies, variances, trespasses, judgments, executions, costs, expenses or claims whatsoever, that such Releasor now has or hereafter may have, of whatsoever nature and kind, whether known or unknown, whether now existing or hereafter arising, whether arising at law or in equity (collectively, the "Claims"), against any or all of the Administrative Agent or any Lender in any capacity and their respective affiliates, subsidiaries, shareholders and "controlling persons" (within the meaning of the federal securities laws) (in each case, other than the Loan Parties or their Affiliates), and their respective successors and assigns and each and all of the officers, directors, employees, agents, attorneys, advisors and other representatives of each of the foregoing (collectively, the "Releasees"), based in whole or in part on facts, whether or not now known, existing on or before the Forbearance Effective Date, that relate to, arise out of or otherwise are in connection with: (i) any or all of the Financing Documents or transactions contemplated thereby

or any actions or omissions in connection therewith, (ii) any aspect of the dealings or relationships between or among Borrower and the other Loan Parties, on the one hand, and any or all of the Administrative Agent or any Lender, on the other hand, relating to any or all of the documents, transactions, actions or omissions referenced in clause (i) hereof, or (iii) any aspect of the dealings or relationships between or among any or all of Loan Party, on the one hand, and the Administrative Agent or any Lender, on the other hand, but only to the extent such dealings or relationships relate to any or all of the documents, transactions, actions or omissions referenced in clause (i) hereof.  The receipt by Borrower or any other Loan Party of any Loans or other financial accommodations made by any Tranche C Lender after the date hereof shall constitute a ratification, adoption, and confirmation by such party of the foregoing general release of all Claims against the Releasees that are based in whole or in part on facts, whether or not now known or unknown, existing on or prior to the date of receipt of any such Loans or other financial accommodations.  In entering into this Agreement, Borrower and each other Loan Party consulted with, and has been represented by, legal counsel and expressly disclaims any reliance on any representations, acts or omissions by any of the Releasees and hereby agrees and acknowledges that the validity and effectiveness of the releases set forth above do not depend in any way on any such representations, acts and/or omissions or the accuracy, completeness or validity thereof.  The provisions of this Section shall survive the termination of this Agreement, the Amended Credit Agreement, the other Financing Documents and payment in full of the Obligations.

(b)    Borrower and other Loan Parties each hereby agrees that it shall be, jointly and severally, obligated to indemnify and hold the Releasees harmless with respect to any and all liabilities, obligations, losses, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever incurred by the Releasees, or any of them, whether direct, indirect or consequential, as a result of or arising from or relating to any proceeding by or on behalf of any Person, including, without limitation, the respective officers, directors, agents, trustees, creditors, partners or shareholders of Borrower, any other Loan Party, or any of their respective Subsidiaries, whether threatened or initiated, in respect of any claim for legal or equitable remedy under any statue, regulation or common law principle arising from or in connection with the negotiation, preparation, execution, delivery, performance, administration and enforcement of the Amended Credit Agreement, the other Financing Documents, this Agreement or any other document executed and/or delivered in connection herewith or therewith; provided, that neither Borrower nor any other Loan Party shall have any obligation to indemnify or hold harmless any Releasee hereunder with respect to liabilities to the extent they result from the gross negligence or willful misconduct of that Releasee as finally determined by a court of competent jurisdiction.  If and to the extent that the foregoing undertaking may be unenforceable for any reason, Borrower and other Loan Parties each agrees to make the maximum contribution to the payment and satisfaction thereof that is permissible under applicable law.  The foregoing indemnity shall survive the termination of this Agreement, the Amended Credit Agreement, the other Financing Documents and the payment in full of the Obligations.

(c)    Each of Borrower and other Loan Parties, on behalf of itself and its successors, assigns, and other legal representatives, hereby absolutely, unconditionally and irrevocably, covenants and agrees with and in favor of each Releasee that it will not sue (at law, in equity, in any regulatory proceeding or otherwise) any Releasee on the basis of any Claim released, remised and discharged by Borrower or any other Loan Party pursuant to Section 7(a) hereof.  If Borrower, any other Loan Party or any of its successors, assigns or other legal representatives

violates the foregoing covenant, Borrower and other Loan Parties, each for itself and its successors, assigns and legal representatives, agrees to pay, in addition to such other damages as any Releasee may sustain as a result of such violation, all attorneys' fees and costs incurred by any Releasee as a result of such violation.

Section 8.     ***Ratification of Obligations***.   Each of the Borrower and Guarantors each hereby (a) ratifies and confirms all of their respective Obligations under the Amended Credit Agreement and the other Financing Documents related thereto, (b) affirms that, after giving effect to this Agreement, all of its pledges, grants of security interests and Liens and other obligations under the Security Documents are reaffirmed and remain in full force and effect on a continuous basis, (c) reaffirms each Lien granted by it to the Collateral Agent and (d) acknowledges and agrees that the grants of security interests and Liens by it contained in the Security Documents are, and shall remain, in full force and effect on and after the Amendment No. 5 Effective Date.

Section 9.     ***Representations and Warranties.***   In order to induce each other party hereto to enter into this Agreement, each Loan Party represents and warrants to each other party hereto as follows:

(a)     Each Loan Party has full corporate, limited liability company or other organizational powers, authority and legal right to enter into, deliver and perform its respective obligations under the Agreement to consummate each of the transactions contemplated herein and therein, and has taken all necessary corporate, limited liability company or other organizational action to authorize the execution, delivery and performance by it of the Agreement. The Agreement has been duly executed and delivered by such Loan Party and is in full force and effect and constitutes a legal, valid and binding obligation of such Loan Party, enforceable against such Loan Party in accordance with its respective terms, except as enforcement may be limited (i) by Bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance or other similar laws affecting creditors' rights generally, (ii) by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law) and (iii) by implied covenants of good faith and fair dealing.

(b)     The execution, delivery and performance by each Loan Party of this Agreement and all other documents and instruments to be executed and delivered hereunder by it, as well as the consummation of the transactions contemplated herein and therein, do not and will not (i) conflict with the Organizational Documents of such Loan Party, (ii) conflict with or result in a breach of, or constitute a default under, any indenture, loan agreement, mortgage, deed of trust or other material instrument or agreement to which such Loan Party (and, as of the Amendment No. 5 Effective Date, any Non-Guarantor Subsidiary) is a party or by which it is bound or to which such Loan Party's (and, as of the Amendment No. 5 Effective Date, any Non-Guarantor Subsidiary's) property or assets are subject, (iii) conflict with or result in a breach of, or constitute a default under, in any material respect, any Applicable Law or (iv) with respect to each Loan Party (and, as of the Amendment No. 5 Effective Date, each Non-Guarantor Subsidiary), result in the creation or imposition of any Lien (other than a Permitted Lien) upon any of such Borrower Group Member's property or the Collateral.

(c)     Each Loan Party (and, as of the Amendment No. 5 Effective Date, each Non-Guarantor Subsidiary) has obtained all material Authorizations required under any

Applicable Law to be issued to, assigned to, or otherwise assumed by, such Borrower Group Member and necessary for (i) the Business or (ii) the execution, delivery and performance by each Loan Party of this Agreement other than, in each case, Authorizations that are not currently necessary and are obtainable in the ordinary course of business.

(d)     Each Loan Party (and, as of the Amendment No. 5 Effective Date, each Non-Guarantor Subsidiary) is in material compliance with each Authorization by a Governmental Authority currently in effect.

(e)     The Borrower's Board of Directors has: (i) authorized  the Chief Restructuring Officer to make transfers from any bank accounts of the Loan Parties or their subsidiaries in a manner consistent with the Amended Credit Agreement; and (ii) authorized one or more external counsels (including Pachulski Stang Ziehl & Jones LLP) to prepare appropriate documentation necessary for a filing by the Borrower and the Loan Parties for chapter 11 bankruptcy protection on March 1, 2021 (it being acknowledged that this clause (ii) shall not require a filing on March 1, 2021).

(f)     As of the Amendment No. 5 Effective Date, the conditions precedent set forth in Section 6 above have been satisfied.

Section 10.     ***Governing Law***.   THIS AMENDMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AMENDMENT (INCLUDING ANY CLAIM OR CONTROVERSY ARISING OUT OF OR RELATING TO THIS AMENDMENT WHETHER SOUNDING IN CONTRACT LAW, TORT LAW OR OTHERWISE) SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAW PRINCIPLES THAT WOULD RESULT IN THE APPLICATION OF ANY LAW OTHER THAN THE LAW OF THE STATE OF NEW YORK.

Section 11.     ***Miscellaneous***.

(a)     On and after the Amendment No. 5 Effective Date, each reference in the Amended Credit Agreement to "this Agreement", "hereunder", "hereof" or words of like import, referring to the Amended Credit Agreement, and each reference in each other Financing Document to "the Credit Agreement", "thereunder", "thereof" or words of like import referring to the Amended Credit Agreement, shall mean and be a reference to the Amended Credit Agreement as amended or otherwise modified by this Agreement.  This Agreement shall constitute a Financing Document for purposes of the Amended Credit Agreement.

(b)     The execution, delivery and effectiveness of this Agreement shall not operate as a waiver of any default of the Borrower or any right, power or remedy of the Administrative Agent or the Lenders under any of the Financing Documents, nor constitute a waiver of any provision of any of the Financing Documents.

(c)     Within five (5) Business Days after the Fifth Amendment Effective Date, the Borrower may propose an updated Schedule 3.09 to the Amended Credit Agreement and, upon the approval of the Administrative Agent (such approval not to be unreasonably withheld, conditioned or delayed), such updated Schedule 3.09 to the Amended Credit Agreement shall

replace and supersede Schedule 3.09 to the Amended Credit Agreement for all purposes under the Amended Credit Agreement.

Section 12.    *Severability*.    Any provisions of this Agreement held by a court of competent jurisdiction to be invalid or unenforceable shall not impair or invalidate the remainder of this Agreement and the effect thereof shall be confined to the provisions so held to be invalid.

Section 13.    *Successors and Assigns*.    This Agreement is binding upon and shall inure to the benefit of the Administrative Agent, the Lenders and the Borrower and their respective successors and permitted assigns.

Section 14.    *Counterparts*.    This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts (including by facsimile or other electronic transmission, *i.e.* a "pdf" or a "tif"), and all of said counterparts taken together shall be deemed to constitute one and the same instrument.    A set of the copies of this Agreement signed by all parties shall be lodged with the Borrower and the Administrative Agent.    The words "execution," "execute", "signed," "signature," and words of like import in or related to any document to be signed in connection with this Agreement shall be deemed to include electronic signatures, deliveries or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

Section 15.    *Headings*.    The headings, captions and arrangements used in this Agreement are for convenience only and shall not affect the interpretation of this Agreement or any other Financing Document.

Section 16.    *Integration*.    This Agreement represents the agreement of the Borrower, the Administrative Agent and the Lenders with respect to the subject matter hereof, and there are no promises, undertakings, representations or warranties by the Borrower, any Agent nor any Lender relative to subject matter hereof not expressly set forth or referred to herein.

Section 17.    *Costs and Expenses*.    In addition to (to the extent not otherwise provided in the Amended Credit Agreement), and not in lieu of, the terms of the Amended Credit Agreement and other Financing Documents relating to the reimbursement of the Administrative Agent's, the Collateral Agent's and the Lenders' fees and expenses, the Loan Parties shall reimburse the Administrative Agent, the Collateral Agent and the Lenders promptly on demand for all fees, costs, charges and expenses, including the fees, costs and expenses of counsel and other expenses, incurred in connection with this Agreement and the other agreements and documents executed and/or delivered in connection herewith.

[*Signature Pages Follow*]

IN WITNESS WHEREOF, each of the parties hereto has caused this Agreement to be executed by its officer(s) thereunto duly authorized as of the date first above written.

CarbonLite Holdings, LLC

By _____
Leon Farahnik
Chief Executive Officer

CarbonLite Sub-Holdings, LLC
By CarbonLite Holdings, LLC, its sole member

By _____
Leon Farahnik
Chief Executive Officer

CarbonLITE PI Holdings, LLC
By CarbonLite Sub-Holdings, LLC, its sole Member
By CarbonLite Holdings, LLC, its sole member

By _____
Leon Farahnik
Chief Executive Officer

CarbonLite Industries LLC
By CarbonLITE PI Holdings LLC, its sole Member
By CarbonLite Sub-Holdings, LLC, its sole Member
By CarbonLite Holdings, LLC, its sole member

By _____
Leon Farahnik
Chief Executive Officer

CarbonLite Pinnpack, LLC
    By CarbonLITE PI Holdings, LLC, its sole
    Member
        By CarbonLite Sub-Holdings, LLC, its sole
        Member
            By CarbonLite Holdings, LLC, its sole
            member

            By _____
            Leon Farahnik
            Chief Executive Officer


PinnPack Packaging, LLC
    By CarbonLITE Pinnpack, LLC, its Managing
    Member
        By CarbonLITE PI Holdings, LLC, its sole
        Member
            By CarbonLite Sub-Holdings, LLC, its
            sole Member
                By CarbonLite Holdings, LLC, its
                sole member

            By _____
            Leon Farahnik
            Chief Executive Officer

PinnPack P, LLC
    By PinnPack Packaging, LLC, its sole member
        By CarbonLITE Pinnpack, LLC, its
        Managing Member
            By CarbonLITE PI Holdings, LLC, its
            sole Member
                By CarbonLite Sub-Holdings, LLC,
                its sole Member
                    By CarbonLite Holdings, LLC,
                    its sole member

            By _____
            Leon Farahnik
            Chief Executive Officer

ORION ENERGY PARTNERS INVESTMENT
AGENT, LLC,
as Administrative Agent and Collateral Agent

By:_____
        Name: Gerrit Nicholas
        Title: Managing Partner


ORION ENERGY CREDIT OPPORTUNITIES
FUND II, L.P.,
as a Lender

By: Orion Energy Credit Opportunities Fund II GP,
L.P.
Its: General Partner

By: Orion Energy Credit Opportunities Fund II
Holdings, LLC
Its: General Partner

By:_____
        Name: Gerrit Nicholas
        Title: Managing Partner


ORION ENERGY CREDIT OPPORTUNITIES
FUND II PV, L.P.,
as a Lender

By: Orion Energy Credit Opportunities Fund II GP,
L.P.
Its: General Partner

By: Orion Energy Credit Opportunities Fund II
Holdings, LLC
Its: General Partner

By:_____
        Name: Gerrit Nicholas
        Title: Managing Partner


[CarbonLite – Forbearance Agreement and Amendment No. 5 to Credit Agreement]

ORION ENERGY CREDIT OPPORTUNITIES
FUND II GPFA, L.P.,
as a Lender

By: Orion Energy Credit Opportunities Fund II GP,
L.P.
Its: General Partner

By: Orion Energy Credit Opportunities Fund II
Holdings, LLC
Its: General Partner

By: _____
    Name: Gerrit Nicholas
    Title: Managing Partner

## **EXHIBIT A**
CREDIT AGREEMENT

[Attached.]

*Internally Conformed*Execution Version

---

CREDIT AGREEMENT

dated as of

August 2, 2019

As amended by Amendment No. 1 to ~~the~~ Credit Agreement and Waiver, dated March 30, 2020,
Amendment No. 2 to ~~the~~ Credit Agreement, dated September 9, 2020,
Amendment No. 3 to ~~the~~ Credit Agreement, dated October 23, 2020 ~~and~~,
Amendment No. 4 and Waiver to ~~the~~ Credit Agreement, dated December 10, 2020 **and Forbearance Agreement and Amendment No. 5 to Credit Agreement, dated February 8, 2021**

among

CARBONLITE HOLDINGS, LLC,
as Borrower,

CERTAIN SUBSIDIARIES OF CARBONLITE HOLDINGS, LLC,
as Guarantors,

THE LENDERS PARTY HERETO,

and

ORION ENERGY PARTNERS INVESTMENT AGENT, LLC,
as Administrative Agent and Collateral Agent

$100,000,000 Senior Secured Term Loan Facility

**TABLE OF CONTENTS**

**ARTICLE I DEFINITIONS** .......................................................................... ~~1~~2

    Section 1.01  Certain Defined Terms .................................................. ~~1~~2
    Section 1.02  Terms Generally ........................................................ ~~32~~33
    Section 1.03  Accounting Terms ...................................................... ~~33~~34

**ARTICLE II THE CREDITS** ........................................................................ ~~33~~35

    Section 2.01  Loans .......................................................................... ~~33~~35
    Section 2.02  Funding of the Loans ................................................ ~~35~~37
    Section 2.03  Termination and Reduction of the Commitments ...... ~~35~~37
    Section 2.04  Repayment of Loan; Evidence of Debt ...................... ~~35~~37
    Section 2.05  Prepayment of the Loan ............................................ ~~37~~39
    Section 2.06  Reimbursements ........................................................ ~~42~~44
    Section 2.07  Interest; Minimum Return .......................................... ~~43~~44
    Section 2.08  [Reserved] .................................................................. ~~44~~45
    Section 2.09  Taxes .......................................................................... ~~44~~45
    Section 2.10  Payments Generally; Pro Rata Treatment; Sharing of Setoffs .... ~~47~~48
    Section 2.11  Mitigation Obligations; Replacement of Lenders ...... ~~49~~50
    Section 2.12  Acknowledgement  and  Consent  to  Bail-In  of  EEA  Financial
                   Institutions .................................................................. ~~49~~50
    Section 2.13  Incremental Facility .................................................... ~~50~~51

**ARTICLE III REPRESENTATIONS AND WARRANTIES** ...................... ~~51~~52

    Section 3.01  Due Organization, Etc. .............................................. ~~51~~52
    Section 3.02  Authorization, Etc. .................................................... ~~51~~53
    Section 3.03  No Conflict .................................................................. ~~52~~53
    Section 3.04  Approvals, Etc. .......................................................... ~~52~~53
    Section 3.05  Financial Statements .................................................. ~~52~~54
    Section 3.06  Litigation .................................................................... ~~53~~54
    Section 3.07  Environmental Matters ................................................ ~~53~~54
    Section 3.08  Compliance with Laws and Obligations ...................... ~~54~~55
    Section 3.09  Material Agreements; Bond Documents ...................... ~~54~~55
    Section 3.10  Intellectual Property; Licenses .................................. ~~54~~56
    Section 3.11  Taxes .......................................................................... ~~55~~56
    Section 3.12  Disclosure .................................................................. ~~55~~56
    Section 3.13  Solvency ...................................................................... ~~56~~57
    Section 3.14  Regulatory Restrictions on the Loan .......................... ~~56~~57
    Section 3.15  Title; Security Documents .......................................... ~~56~~57
    Section 3.16  ERISA .......................................................................... ~~56~~57
    Section 3.17  Insurance .................................................................... ~~56~~58
    Section 3.18  Use of Proceeds .......................................................... ~~57~~58
    Section 3.19  Membership Interests and Related Matters .............. ~~57~~58
    Section 3.20  [Reserved] .................................................................. ~~57~~58
    Section 3.21  No Agreements with Affiliates .................................. ~~57~~58

-ii-

Section 3.22    No Bank Accounts ................................................ 5759

Section 3.23    No Default or Event of Default ............................. 5759

Section 3.24    Foreign Assets Control Regulations ..................... 5759

Section 3.25    Commercial Activity; Absence of Immunity ......... 5859

**ARTICLE IV CONDITIONS** ......................................................... 5860

Section 4.01    Conditions to the Closing Date ............................. 5860

Section 4.02    Conditions to the Initial Funding Date ................. 6061

Section 4.03    Conditions to Each Funding Date .......................... 6364

Section 4.04    Satisfaction of Conditions .................................... 6365

**ARTICLE V AFFIRMATIVE COVENANTS** ............................... 6465

Section 5.01    Corporate Existence; Etc. ..................................... 6465

Section 5.02    Conduct of Business ............................................. 6465

Section 5.03    Compliance with Laws and Obligations ............... 6465

Section 5.04    Governmental Authorizations .............................. 6466

Section 5.05    Maintenance of Title ............................................ 6466

Section 5.06    Insurance .............................................................. 6566

Section 5.07    Keeping of Books ................................................. 6567

Section 5.08    Access to Property/Records ................................. 6567

Section 5.09    Taxes .................................................................... 6667

Section 5.10    Financial Statements; Other Reporting Requirements ........ 6667

Section 5.11    Notices .................................................................. 6869

Section 5.12    [Reserved] ............................................................ 6970

Section 5.13    Use of Proceeds ................................................... 6970

Section 5.14    Security ................................................................ 6971

Section 5.15    Further Assurances .............................................. 7071

Section 5.16    Security in Newly Acquired Property and Revenues ......... 7071

Section 5.17    Material Agreements ............................................ 7071

Section 5.18    Collateral Accounts .............................................. 7071

Section 5.19    Intellectual Property ............................................ 7173

Section 5.20    Budget and Updated Model; Non-Guarantor Subsidiaries ..... 7274

Section 5.21    Post-Closing Covenants ....................................... 7375

**ARTICLE VI NEGATIVE COVENANTS** ................................... 7476

Section 6.01    Subsidiaries; Equity Issuances ............................ 7476

Section 6.02    Indebtedness ........................................................ 7577

Section 6.03    Liens, Etc. ............................................................ 7779

Section 6.04    Investments .......................................................... 7981

Section 6.05    Chief Executive Office; Business Activities .......... 7982

Section 6.06    Restricted Payments ............................................ 8082

Section 6.07    Fundamental Changes; Asset Dispositions ........... 8182

Section 6.08    Accounting Changes ............................................ 8283

Section 6.09    Material Agreements, Bond Documents and Permitted Revolving
Facilities ............................................................... 8284

Section 6.10    Transactions with Affiliates ................................. 8384

Section 6.11    Collateral Accounts .............................................. 8385

US-DOCS\120330147.2120747417.14

Section 6.12    [Reserved] ............................................................. 8385
Section 6.13    Hazardous Materials .............................................. 8385
Section 6.14    No Hedging or Speculative Transactions ............... 8385
Section 6.15    Change of Auditors .............................................. 8385
Section 6.16    Purchase of Capital Stock .................................... 8385
Section 6.17    Citibank Financing Documents ............................ 8485
Section 6.18    Capital Expenditures ............................................ 8485
**Section 6.19    Customer Discussions Plan .................................. 86**

**ARTICLE VII EVENTS OF DEFAULT** ..................................... 8486
Section 7.01    Events of Default ................................................. 8486
Section 7.02    Application of Proceeds ....................................... 8890

**ARTICLE VIII THE AGENTS** .................................................. 9091
Section 8.01    Appointment and Authorization of the Agents ..... 9091
Section 8.02    Rights as a Lender ............................................... 9091
Section 8.03    Duties of Agent; Exculpatory Provisions .............. 9092
Section 8.04    Reliance by Agent ............................................... 9192
Section 8.05    Delegation of Duties ............................................ 9192
Section 8.06    Withholding   of   Taxes   by   the   Administrative   Agent;
                Indemnification ................................................... 9192
Section 8.07    Resignation of Agent ........................................... 9193
Section 8.08    Non-Reliance on Agent or Other Lenders ............ 9293
Section 8.09    No Other Duties; Etc. .......................................... 9294

**ARTICLE IX GUARANTY** ....................................................... 9294
Section 9.01    Guaranty .............................................................. 9294
Section 9.02    Guaranty Unconditional ...................................... 9394
Section 9.03    Discharge Only Upon Payment in Full; Reinstatement in Certain
                Circumstances ..................................................... 9495
Section 9.04    Waiver by the Guarantors .................................... 9495
Section 9.05    Subrogation ......................................................... 9496
Section 9.06    Acceleration ........................................................ 9596

**ARTICLE X MISCELLANEOUS** ............................................... 9596
Section 10.01 Notices .................................................................. 9596
Section 10.02 Waivers; Amendments .......................................... 9698
Section 10.03 Expenses; Indemnity; Etc. .................................... 9798
Section 10.04 Successors and Assigns ......................................... 98100
Section 10.05 Survival ................................................................ 102103
Section 10.06 Counterparts; Integration; Effectiveness .............. 102104
Section 10.07 Severability .......................................................... 102104
Section 10.08 Right of Setoff ...................................................... 102104
Section 10.09 Governing Law; Jurisdiction; Etc. ........................ 103104
Section 10.10 Headings ............................................................... 104105
Section 10.11 Confidentiality ..................................................... 104106
Section 10.12 No Third Party Beneficiaries ............................... 106107

iv

Section 10.13  Reinstatement ................................................................................... ~~106~~107

Section 10.14  USA PATRIOT Act ........................................................................... ~~106~~108

| Exhibit A | – | Form of Assignment and Assumption |
|---|---|---|
| Exhibit B | – | Form of Note |
| Exhibits B-1 through B-4 | | Tax Certificates |
| Exhibit C | – | Form of Borrowing Request |
| Exhibit D | – | [Reserved] |
| Exhibit E | – | Form of Operating Budget |
| Exhibit F | – | Form of Operational Report |
| Exhibit G | – | Form of Shareholder Note Subordination Agreement |
| Exhibit H | – | Form of Observer Rights Agreement |
| Exhibit I | – | Form of Security Agreement |
| Exhibit J | – | Form of Environmental, Social and Governance Report |
| Exhibit K | – | Form of Lender Warrants |
| Exhibit L | – | Form of Approved Bond Documents |


| Annex I | – | Loans; Commitments |
|---|---|---|
| Annex II | – | Orion Energy Equity Holders |
| Annex III | – | Tranche B Minimum Return |
| Schedule 1.01(a) | – | Non-Guarantor Subsidiaries |
| Schedule 1.01(b) | – | Tranche A Prepayment Premium |
| Schedule 1.01(c) | – | Shareholder Notes |
| Schedule 3.01(b) | – | Equity Shareholders |
| Schedule 3.07 | – | Environmental Matters |
| Schedule 3.09 | – | Material Agreements |
| Schedule 3.11 | – | Taxes |
| Schedule 3.17 | – | Insurance |
| Schedule 3.19(b) | – | Subsidiaries |
| Schedule 3.21 | – | Transactions with Affiliates |
| Schedule 5.04 | – | Governmental Authorizations |
| Schedule 5.13(a) | – | Use of Proceeds |
| **Schedule 5.13(c)** | **–** | **Tranche C Use of Proceeds** |
| Schedule 6.02 | – | Permitted Indebtedness |
| Schedule 6.03 | – | Permitted Liens |
| Schedule 6.04 | – | Permitted Investments |

This CREDIT AGREEMENT is dated as of August 2, 2019, as amended by Amendment No. 1 **to Credit Agreement** and Waiver, dated March 20, 2020 ~~and,~~ Amendment No. 2 **to Credit Agreement,** dated September 9, 2020**, Amendment No. 3 to Credit Agreement, dated October 23, 2020, Amendment No. 4 and Waiver to Credit Agreement, dated December 10, 2020 and Forbearance Agreement and Amendment No. 5 to Credit Agreement, dated February 8, 2021**, among CARBONLITE HOLDINGS, LLC, a Delaware limited liability company (the "Borrower"), CERTAIN SUBSIDIARIES OF BORROWER, as Guarantors, each LENDER designated as a "Lender" on Annex I from time to time party hereto (including as updated pursuant to Amendment No. ~~2~~**5**) (collectively, the "Lenders" and individually, a "Lender") and ORION ENERGY PARTNERS INVESTMENT AGENT, LLC, as the Administrative Agent and the Collateral Agent.

WHEREAS, the Borrower (i) indirectly owns 99.3% of PinnPack and (ii) directly or indirectly owns 100% of each other Guarantor;

WHEREAS, the Borrower is engaged in the business of recycling plastic into food-grade post-consumer recycled polyethylene terephthalate resins and other activities ancillary to or in support of the foregoing;

WHEREAS, the Borrower ~~have~~**has** requested that the Lenders (i) establish a credit facility that will be used in accordance with Section 5.13 and (ii) provide certain other commitments to fund additional projects of the Loan Parties, in each case, on the terms and conditions set forth herein;

**WHEREAS, pursuant to Amendment No. 5 (as defined below) and this Agreement, the Borrower has requested that the Tranche C Lenders (as defined below) provide for Tranche C Commitments (as defined below) in an aggregate amount of $2,800,000 (which may be subject to increase as set forth in Section 4(c) of Amendment No. 5);**

**WHEREAS, subject to the conditions and other terms set forth in Amendment No. 5 and this Agreement, on the Amendment No. 5 Effective Date (as defined below), the Tranche C Lenders will fund Tranche C Loans in an amount equal to $2,500,000;**

WHEREAS, the Borrower has agreed to secure all of its Obligations by granting to Collateral Agent, for the benefit of Secured Parties, a Lien on substantially all of its assets, including a pledge of all of the equity interests of certain of the Guarantors; and

WHEREAS, the Guarantors have agreed to guarantee the obligations of the Borrower hereunder and to secure their respective Obligations by granting to Collateral Agent, for the benefit of Secured Parties, a Lien on substantially all of their respective assets, including a pledge of all of the equity interests of certain of their respective Subsidiaries.

WHEREAS, in consideration for the extensions of credit provided hereunder, the Guarantors have jointly and severally agreed to provide a guarantee pursuant to Article IX hereof for the performance of the Borrower's obligations under this Agreement; and

WHEREAS, the Lenders are willing to provide such financing to the Borrower on the terms and subject to the conditions set forth herein.

NOW, THEREFORE, in consideration of the premises and the agreements, provisions and covenants herein contained, the parties hereto agree as follows:

ARTICLE I

DEFINITIONS

Section 1.01    Certain Defined Terms.    As used in this Agreement, the following terms shall have the following meanings:

"7% Notes" means those certain Subordinated Promissory Notes in an original aggregate principal amount of $4,400,000, issued by CL Industries between November 27, 2012 and May 1, 2013, as disclosed on Schedule 1.01(c) and as in effect on the date hereof and as further amended with the consent of Administrative Agent.

"7% Shareholder Note Subordination Agreement" means that certain Subordination Agreement, dated as of the Initial Funding Date, by and among the Administrative Agent, the Collateral Agent, Ebi Simhaee, as "Subordinated Indebtedness Agent" (as defined therein), the Borrower and CL Industries, which agreement shall be substantially in the form of Exhibit G.

"10% Notes" means those certain Senior Subordinated Promissory Notes in an original aggregate principal amount of $10,000,000, issued by CL Industries in connection with that certain Amended and Restated Note Purchase Agreement dated as of September 26, 2011, as disclosed on Schedule 1.01(c) and as in effect on the date hereof and as further amended with the consent of Administrative Agent.

"10% Shareholder Note Subordination Agreement" means that certain Subordination Agreement, dated as of the Initial Funding Date, by and among the Administrative Agent, the Collateral Agent, CLI Mason, LLC, a Delaware limited liability company, as "Subordinated Indebtedness Agent" (as defined therein), the Borrower and CL Industries, which agreement shall be substantially in the form of Exhibit G.

"ABL Credit Agreement" means that certain Revolving Loan and Security Agreement, dated as of November 13, 2017, among CL Industries, CL Pinnpack, CL PI Holdings, PinnPack, the other loan parties from time to time party thereto and Texas Capital Bank, National Association, as the revolving lender.

"Accrued Interest" means the payment-in-kind of interest in respect of the Loans by increasing the outstanding principal amount of the Loans.

"Additional Agreements" means any contracts or agreements related to the acquisition of and/or the sale to other converters of post-consumer plastic waste ("Post-Consumer Materials") or any derivative products thereof, the recycling and/or conversion of Post-Consumer Materials into food-grade post-consumer recycled polyethylene terephthalate resins ("pcrPET Resins") and other finished products, the acquisition, construction, servicing (including ancillary services),

US-DOCS\120330147.2120747417.14

maintenance, repair or operation of recycling facilities and any associated equipment, entered into by any Borrower Group Member and any other Person, or assigned to any Borrower Group Member, subsequent to the Closing Date.

"Additional Equity Raise Amount" means the net cash proceeds received by the Loan Parties in connection with (i) the issuance of additional shares of Capital Stock in the Borrower, (ii) subordinated notes of the Loan Parties permitted to be incurred under this Agreement and which are subordinated pursuant to agreements reasonably satisfactory to the Administrative Agent (provided that any subordination agreement having terms similar to the Additional Subordinated Note Subordination Agreement is satisfactory to the Administrative Agent) and/or (iii) any Indebtedness incurred under a Qualified Junior Facility.

"Additional Subordinated Notes" means those certain Subordinated Notes in an original aggregate principal amount of $6,000,000, issued by the Borrower in connection with (i) that Promissory Note, dated February 6, 2020, by and between the Borrower and Windmill Realty Advisors, Inc., in an aggregate principal amount of $1,000,000 as disclosed on Schedule 1.01(c) (ii) Promissory Note, dated February 6, 2020, by and between the Borrower and KRT Trust, in an aggregate principal amount of $2,000,000 as disclosed on Schedule 1.01(c), (iii) Promissory Note, dated February 6, 2020, by and between the Borrower and Emil Halimi, in an aggregate principal amount of $3,000,000 as disclosed on Schedule 1.01(c) and (iv) any other subordinated notes issued by the Borrower on or following the First Amendment Effective Date; provided that such notes (1) are subordinated to the Obligations on terms reasonably satisfactory to the Administrative Agent (provided that any subordination agreement having terms similar to the Additional Subordinated Note Subordination Agreement is satisfactory to the Administrative Agent), (2) do not exceed an aggregate principal amount of $6,000,000 and (3) the proceeds for such other subordinated notes are used solely to repay in their entirety the notes in clause (iii) of this definition.

"Additional Subordinated Note Subordination Agreement" means that certain Subordination Agreement, dated March 30, 2020, by and among the Administrative Agent, the Collateral Agent, the Subordinated Creditors (as defined therein), the Obligors (as defined therein) and the Borrower, which agreement shall be substantially in the form of Exhibit G.

"Administrative Agent" means Orion Energy Partners Investment Agent, LLC, in its capacity as administrative agent for the Lenders hereunder, and any successor thereto pursuant to Article VIII.

"Administrative Questionnaire" means a questionnaire, in a form supplied by the Administrative Agent, completed by a Lender.

"Affected Property" means any property of any Loan Party that suffers an Event of Loss.

"Affiliate" means, with respect to a specified Person, another Person that at such time directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.  Each Guarantor and Non-Guarantor Subsidiary shall be considered an "Affiliate" of the Borrower.

"Agent Reimbursement Letter" means the reimbursement letter, dated as of the Closing Date, among Borrower, the Administrative Agent and the Collateral Agent.

"Agents" means, collectively, the Administrative Agent and the Collateral Agent.

"Agreement" means this Credit Agreement, as amended, restated, replaced, supplemented or otherwise modified from time to time.

"Amcor Receivables" means all accounts receivable owing to the Loan Parties by Amcor Rigid Plastics USA Incorporated, Amcor Group GMBH, Amcor Canada, and/or its various subsidiaries and affiliates.

"Amendment No. 2" means Amendment No. 2 to ~~the~~ Credit Agreement, dated as of September 9, 2020, by and among the Borrower, the Guarantors, the Administrative Agent, the Collateral Agent and the Lenders.

"Amendment No. 2 Effective Date" has the meaning assigned to such term in Amendment No. 2.

"Amendment No. 4 Effective Date" has the meaning assigned to such term in Amendment No. 4 and Waiver to Credit Agreement, dated as of December 10, 2020, by and among the Administrative Agent, the Lenders, the Collateral Agent, the Borrower and the other Loan Parties.

**"Amendment No. 5" means Forbearance Agreement and Amendment No. 5 to Credit Agreement, dated as of February 8, 2021, by and among the Borrower, the Guarantors, the Administrative Agent, the Collateral Agent and the Lenders.**

**"Amendment No. 5 Effective Date" has the meaning assigned to such term in Amendment No. 5.**

"Anti-Corruption Laws" means any law of any jurisdiction relating to corruption in which any Loan Party performs business, including without limitation, the FCPA and where applicable, legislation relating to corruption enacted by member states and signatories implementing the OECD Convention Combating Bribery of Foreign Officials.

"Anti-Corruption Prohibited Activity" means the offering, payment, promise to pay, authorization of the payment of any money or the offer, promise to give, giving, or authorizing the giving of anything of value, to any Government Official or to any person under the circumstances where the Person, such Person's Affiliate's or such Person's representative knew or had reason to know that all or a portion of such money or thing of value would be offered, given or promised, directly or indirectly, to any Government Official, for the purpose of (a) influencing any act or decision of such Government Official in his or her official capacity, (b) inducing such Government Official to do or omit to do any act in relation to his or her lawful duty, (c) securing any improper advantage, or (d) inducing such Government Official to influence or affect any act or decision of any Governmental Authority, in each case, in order to

assist such Person in obtaining or retaining business for or with, or in directing business to, any person.

"Anti-Money Laundering Laws" means the U.S. Currency and Foreign Transaction Reporting Act of 1970, as amended, and all money laundering-related laws of the United States and other jurisdictions where such Person conducts business or owns assets, and any related or similar law issued, administered or enforced by any Governmental Authority.

"Applicable ECF Percentage" means, with respect of the Net Cash Flow for any quarterly period ending on any Quarterly Payment Date, (a) 100% if the Leverage Ratio as of the last day of the Measurement Period ended on such Quarterly Payment Date is greater than or equal to 4.00:1.00, (b) 75% if the Leverage Ratio as of the last day of the Measurement Period ended on such Quarterly Payment Date is less than 4.00:1.00 but greater than or equal to 3.00:1.00, and (c) 50% if the Leverage Ratio as of the last day of the Measurement Period ended on such Quarterly Payment Date is less than 3.00:1.00, in each case, as determined for such Measurement Period by reference to the applicable Compliance Certificate delivered pursuant to Section 5.10(e); provided that if no Compliance Certificate is delivered within thirty (30) days after any Quarterly Payment Date, the Applicable ECF Percentage shall be 100%.

"Applicable Law" means with respect to any Person, property or matter, any of the following applicable thereto:   any constitution, writ, injunction, statute, law, regulation, ordinance, rule, judgment, principle of common law, order, decree, court decision, Authorization, approval, concession, grant, franchise, license, agreement, directive, guideline, policy, requirement, or other governmental restriction or any similar form of decision of, or determination by, or any interpretation or administration of any of the foregoing, by any Governmental Authority, whether in effect as of the date hereof or thereafter and in each case as amended, including Environmental Laws.

"Approved Fund" means any Person (other than a natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an assignee (with the consent of any party whose consent is required by Section 10.04), in the form of Exhibit A or any other form approved by the Administrative Agent.

"Authorization" means any consent, waiver, variance, registration, filing, declaration, agreement, notarization, certificate, license, tariff, approval, permit (including water and environmental permits), orders, authorization, exception or exemption from, by or with any Governmental Authority, whether given by express action or deemed given by failure to act within any specified period, and all corporate, creditors', shareholders' and partners' approvals or consents.

"Authorized Representative" means, with respect to any Person, the chief executive officer, the chief financial officer, president, secretary, assistant secretary or any other officer or authorized representative of such Person as may be designated from time to time by such Person

US-DOCS\120330147.2120747417.14

in writing by a notice delivered to the Administrative Agent. Any document or certificate delivered under the Financing Documents that is signed by an Authorized Representative may be conclusively presumed by the Administrative Agent and Lenders to have been authorized by all necessary corporate, limited liability company or other action on the part of the relevant Person.

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"Bail-In Legislation" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"Bankruptcy" means with respect to any Person (i) commencement by such Person of any case or other proceeding (x) under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization or relief of debtors, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it or its debts, or (y) seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or any substantial part of its assets; or (ii) commencement against such Person of any case or other proceeding of a nature referred to in clause (x) or (y) above which (a) results in the entry of an order for relief or any such adjudication or appointment or (b) remains undismissed, undischarged or unbonded for a period of sixty (60) days; or (iii) commencement against such Person of any case or other proceeding seeking issuance of a warrant of attachment, execution or similar process against all or any substantial part of its assets which results in the entry of an order for any such relief which shall not have been vacated, discharged, or stayed or bonded pending appeal within sixty (60) days from the entry thereof; or (iv) such Person shall take any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in clause (i), (ii) or (iii) above; or (v) such Person shall admit in writing its inability to pay its debts as they become due or shall make a general assignment for the benefit of its creditors.

"Board" means the Board of Governors of the Federal Reserve System of the United States of America.

"Bond Documents" means, individually and collectively, the Pennsylvania Bond Documents and the Texas Bond Documents.

"Borrower" has the meaning assigned to such term in the introductory paragraph.

**"Borrower Account (Blocked)" means an account in the name of Borrower and established with the Depositary Bank as designated by Borrower to be the "Borrower Account (Blocked)"; provided, that (a) any such Borrower Account (Blocked) shall be subject to a "blocked account control agreement" in form and substance satisfactory to the Administrative Agent, (b) without limiting the foregoing clause (a), the Depositary Bank shall agree in writing not to take any instructions with respect to the Borrower Account (Blocked) from any other Person other than the Collateral Agent, (c) subject to exceptions**

**acceptable to the Administrative Agent, the Depositary Bank shall agree to waive any recoupment, setoff rights, and security interest in, or against, the funds deposited in the Borrower Account (Blocked) and (d) the Collateral Agent shall be given online access to review any balances in, and transfers from, the Borrower Account (Blocked). As of the Amendment No. 5 Effective Date, the Borrower Account (Blocked) is the account maintained with the Depositary Bank numbered 7779959301 which is covered by a Deposit Account Control Agreement (Exclusive Control) in favor of the Collateral Agent dated September 18, 2019.**

"Borrower Account (**Springing**)" means the account of the Borrower maintained at the Depositary Bank named "Operating Account" with the account number 1000702405.

"Borrower Group Members" means, collectively, (a) the Borrower, (b) the Guarantors, and (c) the Non-Guarantor Subsidiaries.

"Borrower Operating Agreement" means that certain Fourth Amended and Restated Operating Agreement of Borrower, dated as of December 20, 2018, by the members of the Borrower.

"Borrowing Request" means a request by the Borrower for Loans in accordance with Section 2.01.

"Business" means, collectively, (A) the recycling and/or conversion of PET materials into products for resale directly or through one or more Subsidiaries, including (i) the acquisition of Post-Consumer Materials or any derivative products thereof, (ii) the recycling of Post-Consumer Materials including all aspects of the recycling process, (iii) the sale to other converters of PET or any derivative products thereof, (iv) the conversion of PET into finished products, including but not limited to pcrPET Resins; and (B) activities reasonably related or incidental thereto or representing a reasonable expansion thereof.

"Business Day" means a day other than a Saturday, Sunday or other day on which commercial banks in New York City, New York are authorized or required by law to close.

"Business Revenues" means, for any period (without duplication), all revenue received by or on behalf of the Loan Parties during such period, interest paid in respect of any Collateral Accounts~~, and~~ **and** proceeds from any business interruption insurance ~~and any other receipts otherwise arising or derived from or paid or payable to the Loan Parties under the Material Agreements or otherwise in respect of the Business (including any extraordinary receipts)~~.

**"California Prepetition Budget" has the meaning assigned to such term in Amendment No. 5.**

"Capital Expenditures" means with respect to any Person, the aggregate of all expenditures and costs (whether paid in cash or accrued as liabilities and including that portion of payments under Capital Lease Obligations that are capitalized on the balance sheet of such

Person) by such Person and its Subsidiaries which are required to be capitalized under GAAP on a balance sheet of such Person.

"Capital Lease Obligations" means, with respect to any Person, the obligations of such Person to pay rent or any other amounts under any lease of (or other arrangements conveying the right to use) real or personal property, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person in accordance with GAAP.

"Capital Stock" means, with respect to any Person, any and all shares, interests, participations and/or rights in or other equivalents (however designated, whether voting or nonvoting, ordinary or preferred) in the equity or capital of such Person, now or hereafter outstanding, and any and all rights, warrants or options exchangeable for or convertible into any of the foregoing.

"Cash Equivalent Investments" means:

(a)     direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the United States of America), in each case maturing within one year from the date of acquisition thereof;

(b)     investments in commercial paper maturing within one year from the date of acquisition thereof and having, at such date of acquisition, the highest credit rating obtainable from S&P or from Moody's;

(c)     investments in certificates of deposit, banker's acceptances and time deposits maturing within one year from the date of acquisition thereof issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, any domestic office of any commercial bank organized under the laws of the United States of America or any State thereof that has a combined capital and surplus and undivided profits of not less than $100,000,000;

(d)     fully collateralized repurchase agreements with a term of not more than thirty (30) days for securities described in clause (a) above and entered into with a financial institution satisfying the criteria described in clause (c) above; and

(e)     money market funds that (x)(i) comply with the criteria set forth in SEC Rule 2a-7 under the Investment Company Act of 1940, (ii) are rated AAA by S&P and Aaa by Moody's and (iii) have portfolio assets of at least $5,000,000,000 or (y) invest exclusively in Investments described in clauses (a) through (d) above.

"Change of Control" means:

(a)     The Equity Shareholders at the time of the Closing Date shall cease to own, directly or indirectly, beneficially or of record (1) at least 51% of the aggregate voting interests in the Capital Stock of the Borrower or (2) the right to at least 51% of the profits of the Borrower, or (3) the right to at least 51% of the assets of the Borrower upon its dissolution

(excluding the Obligations and any Permitted Indebtedness that is *pari passu* with or prior to the Obligations), in each case, on a fully diluted basis;

(b)    the Equity Shareholders at the time of the Closing Date collectively shall otherwise fail to have the right to elect a majority of the Board of Directors of the Borrower;

(c)    prior to the conversion of any Preferred Units into Common Units (as each such term is defined in the Borrower Operating Agreement) in accordance with the Borrower Operating Agreement, the failure of Leon Farahnik (including his spouse, parents, siblings or members of his or her immediate family (including adopted children and step children) and/or direct lineal descendants) or the HPC Member to hold at least 66-2/3% of the Common Class Membership Units (as such term is defined in the Borrower Operating Agreement) in the Borrower;

(d)    the majority of the seats (other than vacant seats) on the Board of Directors of Borrower shall cease to be occupied by (i) the directors of Borrower on the Closing Date and (ii) other directors of Borrower whose nomination for election to the Board of Directors of Borrower is recommended by at least 66-2/3% of the votes of directors then qualifying under clause (i) or this clause (ii), or such other director receives the vote of the Equity Shareholders at the time of the Closing Date in his or her election by the shareholders of Borrower;

(e)    the Borrower shall fail to directly or indirectly own at least 100% on a fully diluted basis of the aggregate voting and economic interests in the Capital Stock of each of the Guarantors (other than PinnPack);

(f)    the Borrower shall fail to directly or indirectly own at least 99.3% on a fully diluted basis of the aggregate voting and economic interests in the Capital Stock of PinnPack; or

(g)    the Borrower shall fail to directly or indirectly own at least 100% on a fully diluted basis of the aggregate voting and economic interests in the Capital Stock of the Non-Guarantor Subsidiaries.

**"Chief Restructuring Officer" means Brian Weiss, as the chief restructuring officer of the Loan Parties.**

"Citibank" means Citibank, N.A., and its branches and subsidiaries and affiliates.

"Citibank Financing Documents" means that certain Supplier Agreement, dated as of April 30, 2020, by and between CL Industries and Citibank, pursuant to which Citibank purchases from CL Industries, and CL Industries assigns to Citibank, certain accounts receivable, and all other agreements, documents and instruments now or at any time hereafter executed and/or delivered in connection with the same, in each case, as in effect as of the Amendment No. 4 Effective Date.

"CL Industries" means CarbonLite Industries LLC, a Delaware limited liability company.

"CL Intermediate Holdco" means CarbonLite Sub-Holdings, LLC, a Delaware limited liability company.

"CL P" means CarbonLite P LLC, a Delaware limited liability company.

"CL P Holdings" means CarbonLite P Holdings LLC, a Delaware limited liability company.

"CL PI Holdings" means CarbonLITE PI Holdings, LLC, a Delaware limited liability company.

"CL Pinnpack" means CarbonLite Pinnpack, LLC, a Delaware limited liability company.

"CL Recycling" means CarbonLite Recycling LLC, a Delaware limited liability company.

"CL Recycling Holdings" means CarbonLite Recycling Holdings LLC, a Delaware limited liability company.

"Closing Date" means the date on which all conditions precedent specified in Section 4.01 are satisfied (or waived by the Administrative Agent and the Lenders in their sole and absolute discretion in accordance with Section 10.02).

"Code" means the Internal Revenue Code of 1986, as amended from time to time (unless as indicated otherwise), the regulations thereunder and publicly available interpretations thereof.

"Collateral" means all Property of the Loan Parties (including all Capital Stock of the Subsidiaries of the Borrower) now owned or hereafter acquired, which is intended to be subject to the security interests or Liens granted pursuant to any of the Security Documents.

"Collateral Accounts" means (a) the Borrower Account **(Springing)**, (b) the Rejected Proceeds Account, (c) the Debt Service Reserve Account ~~and,~~ (d) **the Borrower Account (Blocked) and (e**) any other any securities account, deposit account or commodities account established by a Loan Party with the prior written consent of the Collateral Agent, such consent not to be unreasonably withheld, delayed or conditioned, and, in each case, subject to a Control Agreement, other than any Excluded Account.

"Collateral Agent" means Orion Energy Partners Investment Agent, LLC, in its capacity as collateral agent for the Secured Parties under the Security Documents, and any successor thereto pursuant to Article VIII.

"Commitment" means, individually or collectively, as the context requires, the Tranche A Commitment ~~and,~~ the Tranche B Commitment **and the Tranche C Commitment**.

"Compliance Certificate" has the meaning assigned to such term in Section 5.10(e).

"Condemnation" means any taking, seizure, confiscation, requisition, exercise of rights of eminent domain, public improvement, inverse condemnation, condemnation, expropriation,

nationalization or similar action of or proceeding by any Governmental Authority affecting the Business.

"Consolidated CFADS" means, with respect to the Loan Parties for any period, the Consolidated Net Income of the Loan Parties for such period,

(a) increased by the sum of the following, without duplication, to the extent deducted in determining Consolidated Net Income, in each case, for such period: (i) income tax expense, operating leases for equipment, tangible personal property and motor vehicles; (ii) interest expense; (iii) amortization, depreciation, unrealized losses with respect to Hedging Agreements and other non-cash charges (including, if applicable, non-cash compensation expense), (iv) after-tax losses attributable to any Dispositions and (v) to the extent not already included in the Consolidated Net Income of the Loan Parties for such period, any distributions or payments from the Non-Guarantor Subsidiaries; and

(b) decreased by the sum of the following, without duplication and solely to the extent not deducted when calculating Consolidated Net Income, in each case, for such period: (i) after tax gains attributable to any Dispositions to the extent included in the calculation of Consolidated Net Income, (ii) non-cash gains (including unrealized gains with respect to Hedging Agreements) and non-cash revenues increasing Consolidated Net Income, in each case of clauses (i) and (ii), determined on a consolidated and accrual basis in accordance with GAAP, (iii) any prepayment credits and/or deferred revenues from PET offtake of the Borrower Group Members for such period and (iv) Investments made during such period by the Guarantors in the Non-Guarantor Subsidiaries (which for the avoidance of doubt shall not include any Investments made prior to the Closing Date); and

(c) solely for purposes of any calculation of the Leverage Ratio, decreased by the sum of the following, without duplication and solely to the extent not deducted when calculating Consolidated Net Income, in each case, for such period: (i), Capital Expenditures of the Loan Parties, and (ii) any Permitted Tax Distribution.

For purposes of clarification only, except for any cash distribution or payment from any Non-Guarantor Subsidiary to a Loan Party, any calculation of Consolidated CFADS shall exclude all of the foregoing of any Non-Guarantor Subsidiary.

"Consolidated Net Income" means, with respect to any Person for any period, the net income (or loss) of such Person and its Subsidiaries (other than Non-Guarantor Subsidiaries) determined on a consolidated and accrual basis in accordance with GAAP.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.  "Controlling" and "Controlled" have meanings correlative thereto.

"Control Agreement" means a springing account control agreement in respect of one or more deposit accounts or securities accounts of the Loan Parties, in form and substance

reasonably satisfactory to the Collateral Agent and the Administrative Agent, executed by the financial institution at which an account is maintained, pursuant to which such financial institution agrees that such financial institution will comply with instructions or entitlement orders originated by the Collateral Agent as to disposition of funds in such account, without further consent by any other Person.

"Copyrights" means all works of authorship, United States and foreign copyrights (whether or not the underlying works of authorship have been published), designs, whether registered or unregistered, registrations and applications for registration of the foregoing and all extensions, renewals, and restorations thereof.

**"Customer Discussions Plan" has the meaning assigned to such term in Amendment No. 5.**

"Debt Prepayment Offer" has the meaning assigned to such term in Section 2.05(b)(iv).

"Debt Service Reserve Account" means an account in the name of Borrower and established with the Depositary Bank is designated by Borrower to be the "Debt Service Reserve Account."

"Default" means any event, condition or circumstance that, with notice or lapse of time or both, would (unless cured or waived) become an Event of Default.

"Depositary Bank" means ~~Pacific Western~~ Bank~~, a California state-charted bank~~ **Leumi USA**, and any successor thereto selected by the applicable Loan Party and reasonably acceptable to the Administrative Agent.

"Discharge Date" has the meaning assigned to such term in the Security Agreement.

"Disposition" means any sale, transfer or other disposition of any assets or property by any Loan Party, other than any Event of Loss.

"Disposition Proceeds Prepayment Offer" has the meaning assigned to such term in Section 2.05(b)(iii).

"Dollars" or "$" refers to the lawful currency of the United States of America.

"DSRA CFADS" means the Consolidated CFADS relating to the PinnPack Facility and the Riverside Facility in the aggregate, decreased for Capital Expenditures paid with cash on hand (as opposed to capitalized leases), and adjusted for any net changes in working capital (for the avoidance of doubt, which (i) includes the negative cash flow / positive cash flow associated with the increase / decrease of inventory, respectively and (ii) excludes any Investments made by the Loan Parties); provided that such calculation shall exclude any distributions made from the Non-Guarantor Subsidiaries.

"DSR Released Funds" has the meaning assigned to such term in Section 5.18(c)(ii)(C)(I).

12

US-DOCS\~~120330147.2~~120747417.14

"ECF Amount" has the meaning assigned to such term in Section 2.05(b)(v).

"ECF Prepayment Offer" has the meaning assigned to such term in Section 2.05(b)(v).

"ECF Reinvestment Request" means any written request by the Borrower to reinvest the ECF Amount in respect of the quarterly period specified in such request and in accordance with a proposed reinvestment plan, which has demonstrated to the reasonable satisfaction of the Administrative Agent that such proposed reinvestment plan would be accretive to each Lender's credit profile (provided that any reinvestment shall be deemed accretive if it has a three year or less cash on cash payback on the capital investment contemplated, as demonstrated by the Borrower to the reasonable satisfaction of the Administrative Agent).

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clause (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Environmental Claim" means any administrative or judicial action, suit, proceeding, notice, claim or demand by any Person seeking to enforce any obligation or responsibility arising under or relating to Environmental Law or alleging or asserting liability for investigatory costs, cleanup or other remedial costs, legal costs, environmental consulting costs, governmental response costs, damages to natural resources or other property, personal injuries, fines or penalties related to (a) the presence, or Release into the environment, of any Hazardous Material at any location, whether or not owned by the Person against whom such claim is made, or (b) any noncompliance with, or alleged noncompliance with, or liability arising under any Environmental Law.  The term "Environmental Claim" shall include, without limitation any claim by any Person for damages, contribution, indemnification, cost recovery, compensation or injunctive relief or costs associated with any remediation plan, in each case, under any Environmental Law.

"Environmental Laws" means any Applicable Laws regulating or imposing liability or standards of conduct concerning or relating to pollution or the protection of human health, safety, the environment, natural resources or special status species and their habitat, including all Applicable Laws concerning the presence, use, manufacture, generation, transportation, Release, threatened Release, disposal, arrangement for disposal, dumping, discharge, treatment, storage, handling, control or cleanup of Hazardous Materials.

"Equity Shareholders" means the equity owners of the Borrower from time to time. The Equity Shareholders as at the time of the Closing are listed on Schedule 3.01(b) to the as Agreement.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that, together with the Borrower, is treated as a single employer under Sections 414(b), (c), (m) or (o) of the US Code.

"ERISA Event" means (a) a Reportable Event with respect to any Pension Plan, (b) the failure by any Pension Plan to satisfy the minimum funding standard (within the meaning of Section 412 of the US Code or Section 302 of ERISA) applicable to such plan, whether or not waived, (c) the filing of a notice of intent to terminate a Pension Plan in a distress termination (as described in Section 4041(c) of ERISA), (d) a complete or partial withdrawal by the Borrower or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization or insolvent (within the meaning of Title IV of ERISA), (e) the imposition or incurrence of any liability under Title IV of ERISA, other than PBGC premiums due but not delinquent under Section 4007 of ERISA, upon the Borrower or any ERISA Affiliate, (f) the institution by the PBGC of proceedings to terminate a Pension Plan or Multiemployer Plan, (g) the appointment of a trustee to administer any Pension Plan under Section 4042 of ERISA, or (h) the imposition of a Lien upon the Borrower pursuant to Section 430(k) of the US Code or Section 303(k) of ERISA.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Event of Default" has the meaning assigned to such term in Section 7.01.

"Event of Loss" means any loss of, destruction of or damage to, or any Condemnation or other taking of any property of any Borrower Group Member.

"Event of Loss Prepayment Offer" has the meaning assigned to such term in Section 2.05(b)(ii).

"Excess Cash Flow Payment Date" means, in the case of a payment required to be made pursuant to Section 2.05(b)(v) with respect to the Net Cash Flow of any quarterly period ending on a Quarterly Payment Date (commencing with the quarterly period ending December 31, 2019), the first date on which financial statements for the Measurement Period ending on such Quarterly Payment Date have been delivered pursuant to Section 5.10(b) and the related Compliance Certificate has been delivered pursuant to Section 5.10(e), or, if earlier, the date that is forty-five (45) days after the end of such Quarterly Payment Date (or, if such date is not a Business Day, the immediately preceding Business Day).

"Excluded Account" means (a) any deposit account that is used solely as a payroll account for the employees of Borrower or its Subsidiaries or the funds in which consist solely of funds held by the owner of such deposit account in trust for any director, officer or employee of

any Loan Party or any employee benefit plan maintained by any Loan Party or funds representing deferred compensation for the directors and employees of any Loan Party, (b) escrow accounts, deposit accounts and trust accounts, in each case holding assets that are pledged or otherwise encumbered pursuant to Permitted Liens, (c) accounts containing no (zero) balance at any time, and accounts that by their terms are swept to a zero balance on a daily basis to a deposit account that is subject to a control agreement in favor of Collateral Agent, (d) accounts described in Section 6.03(k)(ii), and (e) other deposit accounts, securities accounts and commodities accounts, except to the extent the value of all such accounts in this clause (e) shall exceed at any time $250,000 in the aggregate shall not be "Excluded Accounts"; provided that the aggregate daily maximum balance for all accounts described in clauses (a) through (d) on any day shall not exceed $500,000.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to any Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of any Loan Party hereunder, (a) Taxes imposed on or measured by net income and franchise Taxes (imposed in lieu of net income tax), in each case, (i) imposed by the jurisdiction under the laws of which such recipient is organized, in which its principal office (or other fixed place of business) is located or, in which its applicable lending office is located, in each case, as a result of such recipient's connection to the jurisdiction imposing such Taxes or (ii) that are Other Connection Taxes, (b) any branch profits Taxes imposed by the jurisdictions listed in clause (a) of this definition, (c) any Taxes attributable to the failure of the applicable Agent, Lender or any such other applicable recipient to comply with Section 2.09(e), (d) in the case of an Agent or a Lender (other than an assignee pursuant to a request by Borrower under Section 2.11), any United States federal withholding Tax that is imposed on amounts payable to such Agent or Lender under the laws effective at the time such Agent or Lender becomes a party hereto (or designates a new lending office), except to the extent that such Agent or Lender (or its assignor, if any) was entitled, at the time of designation of a new lending office (or assignment), to receive additional amounts from a Loan Party with respect to such withholding Tax pursuant to Section 2.09(a), and (e) any United States federal withholding Taxes imposed under FATCA.

"Facilities" means, individually and collectively, the Pennsylvania Facility, the PinnPack Facility, the PinnPack P Facility, the Riverside Facility and the Texas Facility.

"FATCA" means Sections 1471 through 1474 of the US Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with) and any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Code.

"FCPA" means the United States Foreign Corrupt Practices Act of 1977, as amended.

"Federal Funds Effective Rate" means, for any day, the weighted average (rounded upwards, if necessary, to the next 1/100 of 1%) of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York,

or, if such rate is not so published for any day that is a Business Day, the average (rounded upwards, if necessary, to the next 1/100 of 1%) of the quotations for such day for such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it.

"Financing Documents" means (a) this Agreement, (b) each Note (if requested by a Lender), (c) the Loan Discount Letters, (d) the Agent Reimbursement Letter, (e) the Security Documents, (f) the Subordination Agreements, (g) the Side Letter, (h) the Unconditional Guaranty and (i) each certificate, agreement, instrument, waiver, consent or document executed by a Loan Party and delivered to Agent or any Lender in connection with or pursuant to any of the foregoing and designated as a "Financing Document".

"First Amendment Effective Date" means March 30, 2020.

"Foreign Plan" means any employee pension benefit plan, program, policy, arrangement or agreement maintained or contributed to by any Loan Party or with respect to which any Loan Party could reasonably be expected to have any liability, in each case with respect to employees employed outside the United States (as such term is defined in Section 3(10) of ERISA) (other than any arrangement with the applicable Governmental Authority).

"Funding Date" has the meaning assigned to such term in Section 2.01(~~e~~**f**).

"Funding Office" means the office specified from time to time by the Administrative Agent as its funding office by notice to Borrower and the Lenders.

"GAAP" means generally accepted accounting principles in effect from time to time in the United States of America, applied on a consistent basis.

"Governmental Authority" means any federal, regional, state or local government, or political subdivision thereof or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government and having jurisdiction over the Person or matters in question, including all agencies and instrumentalities of such governments and political subdivisions.

"Government Official" means any official of any Governmental Authority, including, without limitation, all officers or employees of a government department, agency, instrumentality or permitting agency.

"Guarantee" means as to any Person (the "*guaranteeing person*"), any obligation of (a) the guaranteeing person or (b) another Person (including any bank under any letter of credit), if to induce the creation of such obligation of such other Person, the guaranteeing person has issued a reimbursement, counterindemnity or similar obligation, in either case guaranteeing or in effect guaranteeing any Indebtedness, leases, dividends or other obligations (the "*primary obligations*") of any other third Person (the "*primary obligor*") in any manner, whether directly or indirectly, including any obligation of the guaranteeing person, whether or not contingent, (w) to purchase any such primary obligation or any Property constituting direct or indirect security therefor, (x) to advance or supply funds (i) for the purchase or payment of any such primary obligation or (ii) to maintain working capital or equity capital of the primary obligor or

16

otherwise to maintain the net worth or solvency of the primary obligor, (y) to purchase Property, securities or services, in each case, primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (z) otherwise to assure or hold harmless the owner of any such primary obligation against loss in respect thereof; provided that the term Guarantee shall not include endorsements of instruments for deposit or collection in the ordinary course of business.  The amount of any Guarantee of any guaranteeing person shall be deemed to be the lower of (A) an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee is made and (B) the maximum amount for which such guaranteeing person may be liable pursuant to the terms of the instrument embodying such Guarantee, unless such primary obligation and the maximum amount for which such guaranteeing person may be liable are not stated or determinable, in which case the amount of such Guarantee shall be such guaranteeing person's maximum reasonably anticipated liability in respect thereof as determined by Borrower in good faith.

"Guaranteed Obligations" means, with respect to any Guarantor, the Obligations whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest, reimbursements and fees that accrue after the commencement by or against any Loan Party or any Affiliate thereof of any proceeding under any debtor relief law naming such Person as the debtor in such proceeding, regardless of whether such interest, reimbursements and fees are allowed claims in such proceeding.

"Guarantors" means each Subsidiary of the Borrower (including, for the avoidance of doubt, CL Intermediate Holdco), other than the Non-Guarantor Subsidiaries.

"Hazardous Material" means any hazardous, toxic or dangerous substances, materials and wastes, including, without limitation, hydrocarbons (including naturally occurring or man-made petroleum and hydrocarbons), flammable explosives, asbestos, urea formaldehyde insulation, radioactive materials, biological substances, polychlorinated biphenyls, pesticides, herbicides and any other kind and/or type of pollutants or contaminants (including, without limitation, materials which include hazardous constituents), sewage, sludge, industrial slag, solvents and/or any other similar substances, materials, or wastes and including any other substances, materials or wastes that are or become regulated under any Environmental Laws (including, without limitation, any that are or become classified as hazardous or toxic under any Environmental Laws).

"Hedging Agreement" means any agreement with respect to any swap, cap, collar, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions.

"HPC Member" means HPC Industries LLC, a Delaware limited liability company.

US-DOCS\120330147.2120747417.14

"Incremental Availability Period" means the period commencing on the Initial Funding Date and ending on the earlier of (a) the 18-month anniversary of the Closing Date and (b) the date on which all Incremental Loans are made to the Borrower.

"Incremental Loans" has the meaning assigned to such term in Section 2.13(a).

"Incremental Request" means any request by the Borrower for Incremental Loans pursuant to Section 2.13(a).

"Indebtedness" of any Person means, without duplication, all (a) indebtedness for borrowed money and every reimbursement obligation with respect to letters of credit, bankers' acceptances or similar facilities, (b) obligations evidenced by bonds, debentures, notes or other similar instruments, (c) obligations to pay the deferred purchase price of property or services, except accounts payable and accrued expenses arising in the ordinary course of business and payable within ninety (90) days after the due date therefor as specified in, or determined from, the applicable contract or purchase order, (d) the Net Hedging Obligations under interest rate or currency Hedging Agreements and all other agreements or arrangements designed to protect against fluctuations in interest rates, commodity prices and currency exchange rates, (e) the capitalized amount (determined in accordance with GAAP) of all payments due or to become due under all leases and agreements to enter into leases required to be classified and accounted for as a capital lease in accordance with GAAP, (f) reimbursement obligations (contingent or otherwise) pursuant to any performance bonds or collateral security, (g) Indebtedness of others described in clauses (a) through (f) above secured by (or for which the holder thereof has an existing right, contingent or otherwise, to be secured by) a Lien on the property of such Person, whether or not the respective Indebtedness so secured has been assumed by such Person and (h) Guarantees by such Person of Indebtedness of others described in clauses (a) through (g) above. The Indebtedness of any Person shall include the Indebtedness of any partnership in which such Person is a general partner to the extent such Person is liable therefor as a result of such Person's general partner interest in such partnership, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor.

"Indemnified Party" has the meaning assigned to such term in Section 10.03(b).

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Loan Parties under any Financing Document and (b) to the extent not otherwise described in (a), Other Taxes.

"Independent Auditor" means (i) RSM US LLP, (ii) any "big four" accounting firm selected by the Borrower and notified to the Administrative Agent or (iii) any other firm of independent public accountants of recognized national standing in the United States selected by the Borrower and reasonably acceptable to the Administrative Agent.

"Initial Funding Commitments" means, with respect to each Lender, the commitment of such Lender to make Loans to the Borrower pursuant to Section 2.01(a), in an aggregate principal amount not to exceed the amount set forth opposite such Lender's name on Annex I under the heading "Initial Funding Commitments".

"Initial Funding Date" means August 2, 2019.

"Initial Loan" has the meaning assigned to such term in Section 2.01(a).

"Intellectual Property" means (a) the collective reference to all rights, priorities and privileges relating to intellectual property, whether arising under United States, multinational or foreign laws or otherwise, including, without limitation, all Copyrights, Patents, Trademarks and trade secrets, (b) all rights to sue or otherwise recover for any past, present and future infringement, dilution, misappropriation, or other violation or impairment thereof, (c) all proceeds of any of the foregoing, including without limitation license fees, royalties, income payments, claims, damages and proceeds of suit, now or hereafter due and/or payable with respect thereto, (d) all written agreements, licenses and covenants providing for the grant to or from any Person any rights in any such intellectual property that is owned by another Person.

"Interest Rate" means individually or collectively as the context may require (i) with respect to any Tranche A Loans, 14.85% per annum and, (ii) with respect to any Tranche B Loans, 10.00% per annum **and (iii) with respect to any Tranche C Loans, 14.85% per annum**, as applicable.

"Interest Payment Deficiency" has the meaning assigned to such term in Section 5.18(c)(ii)(B).

"Investment" means for any Person (a) the acquisition (whether for cash, Property of such Person, services or securities or otherwise) of Capital Stock, bonds, notes, debentures, debt securities, partnership or other ownership interests or other securities of, or any Property constituting an ongoing business, line of business, division or business unit of or constituting all or substantially all the assets of, or the making of any capital contribution to, any other Person, (b) the making of any advance, loan or other extension of credit to, any other Person (including the purchase of Property from another Person subject to an understanding or agreement, contingent or otherwise, to resell such Property to such Person, but excluding any such advance, loan or extension of credit having a term not exceeding ninety (90) days representing the purchase price of inventory or supplies sold in the ordinary course of business), (c) the entering into of any Guarantee with respect to Indebtedness or other liability of any other Person, and (d) any other investment that would be classified as such on a balance sheet of such Person in accordance with GAAP. For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment but giving effect to any returns or distributions of capital or repayment of principal actually received in case by such Person with respect thereto.

**"Investment Banker" has the meaning assigned to such term in Amendment No. 5.**

"Investment Committee" means, as of any date, the committee of Orion Energy Partners, L.P., the members of which have a right or duty to vote on whether the general partner of the Lenders shall cause the Lenders to make an investment in the form of a loan.

"Lender Warrant" means the warrant to be granted by Borrower to the Orion Energy Equity Holders in connection herewith on the Initial Funding Date, substantially in the form of Exhibit K.

"Lenders" has the meaning assigned to such term in the preamble.

"Leverage Ratio" means, as of any date of determination, the ratio of (a) Net Debt of the Loan Parties as of such date divided by (b) the Consolidated CFADS of the Loan Parties for the most recently completed Measurement Period.

"Lien" means any mortgage, charge, pledge, lien (statutory or other), privilege, security interest, hypothecation, collateral assignment or preference, priority or other security agreement, mandatory deposit arrangement, preferential arrangement or other encumbrance upon or with respect to any property of any kind, real or personal, movable or immovable, now owned or hereafter acquired (including, without limitation, any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing).

"Life Insurance Policy" has the meaning assigned to such term in Section 5.21(d).

"Loan Discount Letters" means (a) that certain loan discount letter, dated as of the Closing Date, among the Borrower and the Lenders and, (b) that certain loan discount letter, dated **as of** the Amendment No. 2 Effective Date, among the Borrower and the Tranche B Lenders **and (c) that certain loan discount letter, dated as of the Amendment No. 5 Effective Date, among the Borrower and the Tranche C Lenders**.

"Loan Parties" means, collectively, the Borrower and the Guarantors.

"Loans" means the Tranche A Loans, the Tranche B Loans**, the Tranche C Loans** and, if applicable, any loans made pursuant to Section 2.13.

"Loss Proceeds" means (i) insurance proceeds, condemnation awards or other similar compensation, awards, damages and payments or relief (exclusive, in each case, of proceeds of business interruption, workers' compensation, employee theft or embezzlement, employment practices, environmental or product liability, automobile liability, builders' all risk liability, directors and officers insurance and general liability insurance) with respect to any Event of Loss and (ii) any insurance proceeds with respect to the Life Insurance Policy.

"Material Additional Agreements" means each Additional Agreement (or series of related Additional Agreements) entered into by, or assigned to any Borrower Group Member subsequent to the Closing Date that (i) provides for the payment by any Borrower Group Member, or the provision to any Borrower Group Member, of goods, inventory or services equal to or in excess of $5,000,000100,000 in the aggregate thereunder, (ii) provides revenue or income to any Borrower Group Member equal to or in excess of $10,000,000100,000 in the aggregate thereunder or (iii) provides for a deposit or prepayment of revenue equal to or in excess of $5,000,000100,000 in the aggregate thereunder.

20

"Material Adverse Effect" means a material adverse effect on: (a) the business, assets, properties, operations or financial condition of the Borrower Group Members, taken as a whole; (b) the ability of any Loan Party to perform its material obligations under the Financing Documents; (c) the validity of, enforceability of the material rights or remedies of, or benefits available to the Secured Parties under, the Financing Documents or (d) the validity and perfection of the Secured Parties' Liens in a material portion of the Collateral.

"Material Agreements" means, individually and collectively, (1)(a) Material Agreements Riverside, (b) Material Agreements PinnPack, (c) Material Agreements Texas, (d) Material Agreements Pennsylvania, (2) any Material Additional Agreement and (3) any Additional Agreement entered into by a Loan Party in replacement of any of the foregoing.

"Material Agreements Pennsylvania" means those agreements listed under the header "Material Agreements Pennsylvania" in Schedule 3.09.

"Material Agreements PinnPack" means those agreements listed under the header "Material Agreements PinnPack" in Schedule 3.09.

"Material Agreements Prepayment Offer" has the meaning assigned to such term in Section 2.05(b)(i).

"Material Agreements Riverside" means those agreements listed under the header "Material Agreements Riverside" in Schedule 3.09.

"Material Agreements Texas" means those agreements listed under the header "Material Agreements Texas" in Schedule 3.09.

"Material Counterparty" means each Person (other than any Agent, Lender, or Borrower Group Member) from time to time party to any Material Agreement.

"Maturity Date" means the **earlier of (a) the** sixth (6th) anniversary of the Initial Funding Date, **or (b) the date on which the Administrative Agent has declared the Loans and all other amounts due under the Financing Documents (including the Tranche A/C Prepayment Premium or Tranche B Minimum Return, if applicable) then outstanding to be due and payable in accordance with Section 7.01.**

"Measurement Period" means each period of four consecutive fiscal quarters of the Borrower.

"Multiemployer Plan" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA that is subject to Title IV of ERISA to which any Loan Party contributes or is obligated to contribute, or with respect to which any Loan Party has or could reasonably be expected to have any liability.

"Net Additional Equity Raise Amount" means, as of any date of determination, (a) the Additional Equity Raise Amounts raised by the Loan Parties on or after the Amendment No. 2 Effective Date minus (b) any amounts thereof used to make payments on the Shareholder Notes,

the Loans (including the Tranche B Loans) or for any other purpose on or after the Amendment No. 2 Effective Date.

"Net Available Amount" means:

(a)    in the case of any receipt of termination payments, liquidated damages, indemnity payments or other extraordinary payments under the Material Agreements or any real property lease for the Facilities, the aggregate amount of payments received by the Loan Parties (including, as a distribution from a Non-Guarantor Subsidiary) or any of their respective Affiliates in respect of such event, net of (i) reasonable costs and expenses incurred by the Borrower Group Members or any of their respective Affiliates in connection with the collection of such proceeds and (ii) in the case of the Non-Guarantor Subsidiaries, mandatory redemption payments to be made under the Bond Documents;

(b)    in the case of any Event of Loss, the aggregate amount of Loss Proceeds received by the Borrower Group Members or any of their respective Affiliates in respect of such Event of Loss, net of (i) reasonable costs and expenses incurred by the Loan Parties (including, as a distribution from a Non-Guarantor Subsidiary) in connection with the collection of such Loss Proceeds and (ii) in the case of the Non-Guarantor Subsidiaries, mandatory redemption payments to be made under the Bond Documents; and

(c)    in the case of any Disposition, the aggregate amount received by the Loan Parties (including, as a distribution from a Non-Guarantor Subsidiary) or any of their respective Affiliates in respect of such Disposition, net of (i) reasonable costs and expenses incurred by the Borrower Group Members in connection with such Disposition and (ii) in the case of the Non-Guarantor Subsidiaries, mandatory redemption payments to be made under the Bond Documents.

"Net Cash Flow" means, for any period, the Consolidated CFADS of the Loan Parties for such period,

(a) increased (without duplication) by proceeds in respect of Events of Loss (including Loss Proceeds) and Dispositions (but in each case without duplication of amounts used to prepay, or that are exempt from prepayment, under Section 2.05(b)(ii) or (iii)), termination payments and other extraordinary payments under project contracts, including the Material Agreements (but in each case without duplication of amounts used to prepay, or that are exempt from prepayment, under Section 2.05(b)(i)), damages and other proceeds received by the Loan Parties not in the ordinary course of business during such period (calculated on a cash basis); and

(b) decreased (without duplication) by ~~(i) Permitted Tax Distributions made by the Loan Parties during such period (if any), and (ii)~~ interest and principal payments on the Loans, and any payments on or servicing of Permitted Indebtedness by any Loan Party permitted to be made hereunder (other than Indebtedness solely among the Loan Parties), during such period to the extent not already reflected in the calculation of Consolidated CFADS (but, in each case, excluding interest paid or to be paid in kind) (calculated on an accrual basis); and

(c) with respect to the first quarter of any fiscal year, as increased or decreased (as applicable and without duplication), on a dollar for dollar basis, for any changes to the calculation of Net Cash Flow for the immediately preceding fiscal quarter as a result of year-end adjustments in connection with the preparation and delivery of the audited consolidated financial statements of the Loan Parties for the immediately preceding fiscal year.

"Net Debt" means, on any date of determination, the outstanding principal amount of the Loans (including, for the avoidance of doubt, Accrued Interest that has been added to principal) plus the principal amount of all other outstanding Indebtedness of the Loan Parties for borrowed money (including, for the avoidance of doubt, any Permitted Revolving Facility), unreimbursed letter of credit obligations, purchase money debt, capital lease obligations and Guarantees of the foregoing minus any cash of the Loan Parties that is on deposit in the Collateral Accounts.

"Net Hedging Obligations" means, as of any date, the Termination Value of any Hedging Agreement on such date.

"Niagara Promissory Note" means that certain promissory note, dated September 2, 2020, by and between the Borrower and Niagara Bottling, LLC, pursuant to which Niagara Bottling, LLC has loaned $5,000,000 to the Borrower.  The final version of the Niagara Promissory Note was delivered by the Borrower to the Administrative Agent at 3:28 pm New York Time on Friday, September 4, 2020.

"Non-Guarantor Subsidiaries" means, collectively, (i) the Pennsylvania Facility Group, (ii) the Texas Facility Group and (iii) any other Person approved in writing by Administrative Agent as a Non-Guarantor Subsidiary (not to be unreasonably withheld, conditioned or delayed in the case of Subsidiaries to be subject to Indebtedness permitted in reliance on Section 6.02(j)).

"Note" has the meaning assigned to such term in Section 2.04(b)(ii).

"Obligations" means collectively, the Tranche A Obligations ~~and~~, the Tranche B Obligations **and the Tranche C Obligations**.

"Observer Rights Agreement" has the meaning assigned to such term in Section 4.02(a).

"Officer's Certificate" means, with respect to any Loan Party, a certificate signed by an Authorized Representative of such Loan Party.

"Operating Budget" means an annual operating plan and budget of (i) the Loan Parties and the PinnPack Facility and the Riverside Facility, taken as a whole, (ii) the Texas Facility Group and the Texas Facility and (iii) the Pennsylvania Facility Group and the Pennsylvania Facility, in each case, prepared by the Borrower in accordance with Section 5.20(a) and approved by Lenders in accordance with Section 5.20(b), as may be modified from time to time in accordance with Section 5.20, of anticipated Operating Expenses and Capital Expenditures limited to direct wages, other manufacturing overhead, general and administrative expense, maintenance capital expense and growth capital expense, in each case, detailed monthly for the

23

following calendar year, which annual operating plan and budget shall be substantially in the form of Exhibit E.

"Operating Expenses" means any and all of the expenses paid or payable by or on behalf of any Loan Party in relation to the operation and maintenance (except as set forth below) of the Business, including consumables, payments under any operating lease, taxes (including franchise taxes, property taxes, sales taxes and excluding income taxes), insurance (including the costs of premiums and deductibles and brokers' expenses), costs and fees attendant to obtaining and maintaining in effect the Authorizations relating to the Business payable during such period, payments made to security, police services, and legal, accounting and other professional fees attendant to any of the foregoing items payable during such period, but exclusive of Capital Expenditures and payments in respect of payments of principal and interest in respect of the Obligations or any other Indebtedness.  Operating Expenses do not include non-cash charges, including, without limitation, depreciation, amortization, income taxes, non-cash taxes or other bookkeeping entries of a similar nature.

**"Operational Improvements Plan" has the meaning assigned to such term in Amendment No. 5.**

"Organizational Documents" means, with respect to any Person, (i) in the case of any corporation, the certificate of incorporation and by-laws (or similar documents) of such Person, (ii) in the case of any limited liability company, the certificate of formation and operating agreement (or similar documents) of such Person, (iii) in the case of any limited partnership, the certificate of formation and limited partnership agreement (or similar documents) of such Person, (iv) in the case of any general partnership, the partnership agreement (or similar document) of such Person and (v) in any other case, the functional equivalent of the foregoing.

"Orion Energy Equity Holders" means each of the Lenders (or their designees) listed on Annex II.

"Other Connection Taxes" means, with respect to any Agent or any Lender, Taxes imposed as a result of a present or former connection between such Agent or Lender and the jurisdiction imposing such Tax (other than connections arising from such Agent or Lender having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Financing Document, or sold or assigned an interest in any Loan or Financing Document).

"Other Taxes" means any and all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes arising from any payment made under any Financing Document or from the execution, delivery, performance, registration or enforcement of, from the receipt or perfection of a security interest under or otherwise with respect to, any Financing Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 2.11).  For the avoidance of doubt, "Other Taxes" shall not include any Excluded Taxes.

"Participant" has the meaning assigned to such term in Section 10.04(f).

US-DOCS\120330147.2120747417.14

"Participant Register" has the meaning assigned to such term in Section 10.04(f).

"Patents" means all patentable inventions and designs, United States, foreign, and multinational patents, certificates of invention, and similar industrial property rights, and applications for any of the foregoing, including, without limitation, all reissues, substitutes, divisions, continuations, continuations-in-part, extensions, renewals, and reexaminations thereof.

"PBGC" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

"Pennsylvania Facility" means the pcrPET processing facility under construction in Reading, Pennsylvania, to be owned and operated by CL P.

"Pennsylvania Facility Group" means CL P and CL P Holdings.

"Pennsylvania Intercompany Indebtedness" means any intercompany Indebtedness between the Borrower, as borrower and CL P, a Lender.

**"Pennsylvania Prepetition Budget" has the meaning assigned to such term in Amendment No. 5.**

"Pension Plan" means any employee pension benefit plan as defined in Section 3(2) of ERISA (other than a Multiemployer Plan) that is subject to the provisions of Title IV or Section 302 of ERISA, or Section 412 of the US Code, and in respect of which any Loan Party is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA or with respect to which any Loan Party has or could reasonably be expected to have any liability.

"Pennsylvania Bond Documents" means (i) the Indenture of Trust, dated as of June 1, 2019, by and between The Pennsylvania Economic Development Financing Authority, as issuer and UMB Bank, N.A., as trustee, (ii) supplemented by the First Supplemental Indenture, effective as of September 1, 2020, by and between The Pennsylvania Economic Development Financing Authority, as issuer and UMB Bank, N.A., as trustee, (iii) the Loan Agreement, dated as of June 1, 2019 (as amended by the First Amendment to Loan Agreement, effective as of September 1, 2020), by and between The Pennsylvania Economic Development Financing Authority and CL P and (iv) the documents entered into in connection therewith.

"Permitted Contest Conditions" means, with respect to any Loan Party, a contest, pursued in good faith, challenging the enforceability, validity, interpretation, amount or application of any law, tax or other matter (legal, contractual or other) by appropriate proceedings timely instituted if (a) such Loan Party diligently pursues such contest, (b) such Loan Party establishes adequate reserves with respect to the contested claim if and to the extent required by GAAP and (c) such contest (i) could not reasonably be expected to result in a Material Adverse Effect and (ii) does not involve any material risk or danger of any criminal or unindemnified civil liability being incurred by the Administrative Agent or the Lenders.

"Permitted Indebtedness" has the meaning assigned to such term in Section 6.02.

"Permitted Lien" has the meaning assigned to such term in Section 6.03.

"Permitted Revolving Facility" means one or more secured or unsecured revolving credit facilities satisfying the following conditions: (i) such Indebtedness is incurred to finance the working capital requirements of one or more of the Borrower Group Members; (ii) the aggregate principal amount of such Indebtedness incurred by (A) CL PI Holdings does not exceed $20,000,000, provided that such amount may be increased to $25,000,000 subject to documentation satisfactory to the Administrative Agent, (B) CL Recycling Holdings does not exceed $5,000,000 and (C) CL P Holdings does not exceed $6,000,000; (iii) such Indebtedness has no make-whole or similar prepayment premium; (iv) the lien and/or payment priorities thereunder are, as among the holders of such Indebtedness, pari passu (e.g., there are no "first-out" or "last-out" tranches); and (v) the providers of such Indebtedness (or an agent on their behalf) shall have executed an intercreditor agreement in favor of the Collateral Agent, in form and substance satisfactory to the Administrative Agent in its sole discretion.

"Permitted Tax Distributions" means, for each taxable year in which the Borrower is considered a partnership or a "disregarded entity" for U.S. federal income tax purposes, distributions made by the Borrower to its Equity Shareholders to discharge their respective federal (and, if the Borrower is also treated as a partnership or disregarded entity for the relevant state or local income tax purposes, such state or local) income tax liabilities attributable to their allocable share of the net taxable income of the Borrower and its flow-through subsidiaries for such taxable year in an amount not to exceed the amounts specified in Section 5.1(a) of the Borrower Operating Agreement (in effect as of the date hereof).

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"PET" means polyethylene terephthalate.

"PinnPack" means PinnPack Packaging, LLC, a Delaware limited liability company.

"Pinnpack P" means Pinnpack P, LLC, a Delaware limited liability company.

"PinnPack Facility" means the PET thermoforming and processing facility located in Oxnard, California, directly owned by PinnPack P.

"Pinnpack P Facility" means the PET thermoforming and processing facility contemplated in Eastern Pennsylvania, directly owned by PinnPack P.

"Post-Default Rate" means a rate per annum which is equal to the greater of (a) the sum of the Interest Rate *plus* 2.00% and (b) with respect to each Lender, the maximum nonusurious interest rate, if any, that may be contracted for, taken, reserved, charged or received on the Loans under laws applicable to such Lender which are in effect at the relevant time.

**"Prepetition Budget" has the meaning assigned to such term in Amendment No. 5.**

"Projection" has the meaning assigned to such term in Section 3.12(b).

"Property" means any right or interest in or to property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible.

~~"Qualified Additional Collateral Conditions" means the satisfaction by the Borrower of the following conditions:~~

~~(a) the Borrower shall have induced a Person to form a new Delaware limited liability company (or other special purpose company reasonably acceptable to the Administrative Agent), the sole purpose of which is to satisfy the conditions set forth in this definition ("Accommodation Collateral Provider") ;~~

~~(b) either (i) 100% of the Capital Stock in the special purpose company listed in clause (a) shall have been pledged to the Collateral Agent, solely for the benefit of the Tranche B Lenders, by the Accommodation Collateral Provider or (ii) the special purpose company listed in clause (a) shall have signed a guaranty and provided a perfected security interest over its assets in favor of the Collateral Agent, in either case, pursuant to documentation in form and substance reasonable satisfactory to the Administrative Agent; provided that so long as no default occurs  under any such guarantee, all dividends, distributions and gains on the Capital Stock of such special purpose company shall remain the property of the special purpose company;~~

~~(c) The Accommodation Collateral Provider  shall have funded  to the special purpose vehicle at least $5,250,000 in (i) cash, (ii) Cash Equivalent Investments or (iii) other marketable publicly-traded securities (which, in the case of this clause (iii), shall be "Fortune 500" entities and subject to the reasonable approval of the Administrative Agent);~~

~~(d) the Administrative Agent shall have received evidence of each of the foregoing; and~~

~~(e) so long as any Tranche B Obligations remain outstanding, all assets in the special purpose company described in clause (a) above shall remain in accounts within the United States of America and shall not be sold, pledged or assigned except as permitted under this Agreement.~~

~~"Qualified Additional Equity Raise Threshold" means Additional Equity Raise Amounts received by the Borrower on or after the Amendment No. 2 Effective Date in an amount equal to or greater than $20,000,000.~~

"Qualified Junior Facility" means a junior lien secured or unsecured credit facility satisfying the following conditions: (i) the purpose of such Indebtedness is to ~~(A) first, repay all of the Tranche B Obligations and (B) thereafter, to~~ provide working capital for the Loan Parties; (ii) ~~the aggregate principal amount of such Indebtedness does not exceed the Tranche B Obligations (plus any additional amounts approved by the Administrative Agent, in its reasonable discretion); (iii)~~ such Indebtedness does not benefit from a guaranty or security in respect of any Borrower Group Member (other than the Loan Parties); and (~~iv~~iii) the

27

provider of such Indebtedness shall have executed an intercreditor agreement in favor of the Collateral Agent, in form and substance satisfactory to the Administrative Agent in its sole discretion.

"Quarterly Payment Date" means the last Business Day of March, June, September and December in each fiscal year (or, when used in Section 2.05(b)(v), the definition of "Applicable ECF Percentage" and the definition of "Excess Cash Flow Payment Date", the last day of March, June, September and December in each fiscal year).

~~"Qualified PinnPack Sale" means a direct or indirect sale of the Pinnpack Facility in accordance with and upon terms approved in writing by the Administrative Agent (in its sole and absolute discretion), including, without limitation, as to process, valuation, amount and form of consideration and application of sale proceeds; provided that, without limiting the generality of the foregoing, the Administrative Agent shall not be required to consider or approve any proposed sale of the Pinnpack Facility that yields proceeds (net of any fees, expenses and amounts proposed to be retained by the Loan Parties) of less than $25,000,000.00.~~

"Register" has the meaning assigned to such term in Section 10.04(c).

"Regulation D" means Regulation D of the Board.

"Regulation U" means Regulation U of the Board.

"Reinvestment Notice" means a written notice executed by an Authorized Representative of Borrower stating that no Default or Event of Default has occurred and is continuing, and that the applicable Loan Party intends and expects to use all or a specified portion of the Loss Proceeds in respect of such Event of Loss to repair or restore the Business.

"Rejected Proceeds" has the meaning assigned to such term in Section 2.05(c)(iii).

"Rejected Proceeds Account" means an account of the Borrower to be established and maintained at the Depositary Bank for the deposit of Rejected Proceeds as provided herein.

"Related Fund" means with respect to any Lender, any fund that invests in loans and is managed or advised by the same investment advisor as such Lender, by such Lender or an Affiliate of such Lender.

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, employees, agents and advisors of such Person and such Person's Affiliates.

"Release" means any release, spill, emission, emanation, leaking, pumping, injection, deposit, disposal, discharge, dispersal, leaching or migration into or through the indoor or outdoor environment, including, the movement through ambient air, soil, surface water, ground water, wetlands, land or subsurface strata.

"Replacement Agreement" means any Additional Agreement that is (i) entered into by a Loan Party in replacement of any Material Agreement, (ii) in form and substance reasonably satisfactory to the Administrative Agent and (iii) in the case of any real property lease, is with one or more Replacement Obligors.

"Replacement Obligor" means a Person (or guarantor of such Person's obligations) that is approved by the Administrative Agent, such approval to be in the Administrative Agent's reasonable discretion.

"Reportable Event" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the 30-day notice period has been waived.

"Restoration" means, with respect to any Affected Property, the rebuilding, repair, restoration or replacement of such Affected Property.

"Restricted Payment" means:

(a)    all dividends paid by any Loan Party (in cash, Property or obligations) on, or other payments or distributions on account of, or the setting apart of money for a sinking or other analogous fund for, or the purchase, redemption, retirement or other acquisition by any Loan Party of, any portion of any membership interests in any Loan Party or any warrants, rights or options to acquire any such membership interests;

(b)    any payment of development, management or other fees, or of any other amounts, by any Loan Party to any Affiliate thereof;

(c)    any other payment in cash, Property or obligations to a parent company of the Loan Parties or Affiliate of the Loan Parties;

(d)    any other payment in cash, Property or obligations in respect of the Shareholder Notes; and/or

(e)    any other payment in cash, Property or obligations to a parent company of the Loan Parties or Affiliate of the Loan Parties in respect of any Indebtedness subordinated to the Obligations hereunder.

"Riverside Facility" means the pcrPET processing facility located in Riverside, California, directly owned by CL Industries.

"S&P" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., or any successor to the rating agency business thereof.

**"Sale Milestones" has the meaning assigned to such term in Amendment No. 5.**

"Sanctioned Country" means, at any time, a country or territory that is subject to comprehensive Sanctions. For the avoidance of doubt, as of the Closing Date, Sanctioned Countries are the Crimea region of Ukraine, Cuba, Iran, North Korea and Syria.

"Sanctioned Person" means, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, or by the United Nations Security Council, the European Union or any EU member state, (b) any Person operating, organized or resident in a Sanctioned Country, or (c) any Person owned or controlled by any such Person.

"Sanctions" means economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, or (b) the United Nations Security Council, the European Union or Her Majesty's Treasury of the United Kingdom.

"Second Funding Commitments" means, with respect to each Lender, the commitment of such Lender to make Loans to the Borrower pursuant to Section 2.01(a), in an aggregate principal amount not to exceed the amount set forth opposite such Lender's name on Annex I under the heading "Second Funding Commitments".

"Second Funding Date" means August 15, 2019.

"Secured Obligations" has the meaning assigned to such term in the Security Agreement.

"Secured Parties" means (a) the Agents and (b) the Lenders.

"Security Agreement" means the Pledge and Security Agreement, entered into on the Initial Funding Date, among the Loan Parties and the Collateral Agent, a copy of which is attached hereto as Exhibit I.

"Security Documents" means the Security Agreement, the Subordination Agreements, the Control Agreements, all Uniform Commercial Code financing statements required by any Security Document and any other security agreement or instrument to be executed pursuant hereto or any Security Document.

"Shareholder Notes" means, collectively, the 7% Notes, the 10% Notes, the Additional Subordinated Notes.

"Side Letter" means that certain Side Letter, dated March 30, 2020, by and between Mr. Leon Farahnik and Agent.

"Solvent" means, with respect to any Person on a particular date that on such date (a) the fair value of the property of such Person is greater than the total amount of liabilities, including contingent liabilities of such Person, (b) the present fair saleable value of the assets of such Person is not less than the amount that will be required to pay the probable liability of such Person on its debts as they become absolute and matured, (c) such Person does not intend to, and does not believe that it will, incur debts or liabilities beyond such Person's ability to pay such debts and liabilities as they mature, (d) such Person is not engaged in business or a transaction, and is not about to engage in business or a transaction, for which such Person's property would constitute an unreasonably small capital and (e) such Person is not insolvent as defined under applicable Bankruptcy or insolvency laws; provided that unless otherwise provided under

Applicable Law, the amount of contingent liabilities at any time shall be computed as the amount that, in light of all the facts and circumstances existing at such date, represents the amount that can reasonably be expected to become an actual or matured liability.

"Subordination Agreements" means, individually and collectively, (i) the 7% Shareholder Note Subordination Agreement, (ii) the 10% Shareholder Note Subordination Agreement, (iii) the Additional Subordinated Note Subordination Agreement and (iv) any other subordination agreements under which Additional Subordinated Notes are subordinated with respect to the Obligations.

"Subsidiary" means, with respect to any Person (the "parent"), any other corporation, limited liability company, partnership, association or other entity (a) of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date, owned, controlled or held, or (b) that is, as of such date, otherwise controlled, by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Termination Value" means, in respect of any one or more Hedging Agreement, after taking into account the effect of any legally enforceable netting agreement relating to such Hedging Agreements, (a) for any date on or after the date such Hedging Agreements have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) or any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Hedging Agreements, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Hedging Agreements (which may include a Lender or any Affiliate of a Lender).

"Term Loan Credit Agreement" means that certain Revolving Loan and Security Agreement, dated as of November 13, 2017, among Northport TRS, LLC, a Delaware limited liability company, as administrative agent, the lenders from time to time party thereto, CarbonLITE Industries, CL Pinnpack, CL PI Holdings, PinnPack and the other credit parties from time to time party thereto.

"Texas Bond Documents" means (i) the Indenture, dated as of October 1, 2016, by and between The Mission Economic Development Corporation, as issuer and UMB Bank, N.A., as trustee, (ii) the Loan Agreement, dated as of October 1, 2016, by and between The Mission Economic Development Corporation and CL Recycling and (iii) the documents entered into in connection therewith.

"Texas Facility" means the pcrPET processing facility located in Dallas, Texas, directly owned by CL Recycling.

"Texas Facility Group" means CL Recycling and CL Recycling Holdings.

31

"Texas Intercompany Indebtedness" means any intercompany Indebtedness between CL Industries, as borrower and CL Recycling, a Lender.

**"Texas Prepetition Budget" has the meaning assigned to such term in Amendment No. 5.**

"Trademarks" means all domestic, foreign and multinational trademarks, service marks, trade names, corporate names, company names, business names, fictitious business names, trade dress, trade styles, logos, Internet domain names, other indicia of origin or source identification, and general intangibles of a like nature, whether registered or unregistered, and, with respect to the foregoing, all registrations and applications for registration thereof, all extensions and renewals thereof, and all of the goodwill of the business connected with the use of and symbolized by any of the foregoing.

"Tranche A **Funding** Commitments" means, individually or collectively as the context requires, the Initial Funding Commitment and Second Funding Commitments.

**"Tranche A Lender" means a Lender that provides any Tranche A Funding Commitment in accordance with Sections 2.01(a) or (b) or holds Tranche A Loans and each Person that shall become a Tranche A Lender hereunder pursuant to an Assignment and Assumption for so long as such Person shall be a party to this Agreement.**

"Tranche A Loans" has the meaning assigned to such term in Section 2.01(b).

"Tranche A Prepayment Premium" means, with respect to any prepayment on any date of Tranche A Loans (except as contemplated in Section 2.05(c)(ii)), an amount equal to (i) all accrued and unpaid interest on the aggregate principal amount of the Tranche A Loans subject to such prepayment as of such date *plus* (ii) an aggregate amount equal to all interest payments that would have been payable to the Tranche A Lenders on the principal amount of the Tranche A Loans subject to such prepayment from the date of such prepayment through the third anniversary of the Funding Date on which such Tranche A Loans had been made had such prepayment not occurred, which amount shall be calculated assuming there has been no repayment of the principal amount of the Tranche A Loans; provided that if the Borrower elects to prepay the Tranche A Loans in accordance with Section 2.05(b)(v) after the Tranche A Lenders have declined the Borrower's request to reinvest such amounts in accordance with an ECF Reinvestment Request, the reference to the third anniversary of the Closing Date in clause (ii) above shall be deemed to be the 18-month anniversary of the Funding Date on which such Tranche A Loans had been made. Schedule 1.01(b) sets forth an example calculation of the Tranche A Prepayment Premium.

~~"Tranche A Prepayment Premium Event" has the meaning assigned to such term in Section 2.05(c)(iv).~~

"Tranche A Obligations" means all advances to, and debts (including Accrued Interest, interest accruing after the maturity of the Tranche A Loans and interest accruing after the filing of any Bankruptcy, but excluding obligations in respect of the Lender Warrants), liabilities **(including, without limitation, expense reimbursement pursuant to Section 10.03(a))**, obligations, Tranche A Prepayment Premium, covenants and duties of, any Loan Party arising

under any Financing Document, or otherwise with respect to any Tranche A Loan, in each case whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest, reimbursements and fees that accrue after the commencement by or against the Borrower or any of its Subsidiaries of any proceeding under any debtor relief law naming such Person as the debtor in such proceeding, regardless of whether such interest, reimbursements and fees are allowed claims in such proceeding.

"**Tranche B Funding Date**" **means September 9, 2020.**

"**Tranche A/C Loans**" **means individually or collectively as the context requires, Tranche A Loans and Tranche C Loans.**

"**Tranche A/C Obligations**" **means individually or collectively as the context requires, Tranche A Obligations and Tranche C Obligations.**

"**Tranche A/C Prepayment Premium**" **means the Tranche A Prepayment Premium and/or the Tranche C Prepayment Premium, as the context may require.**

"Tranche ~~B Loans~~**A/C Prepayment Premium Event**" has the meaning assigned to such term in Section ~~2.01~~**2.05**(c)(**iv**).

"Tranche B ~~Funding~~ Commitments" means, with respect to each Tranche B Lender, the commitment of such Lender to make Tranche B Loans to the Borrower pursuant to Section 2.01(c), in an aggregate principal amount not to exceed the amount set forth opposite such Lender's name on Annex I under the heading "Tranche B Commitments", as such Annex I may be modified by the Administrative Agent in its sole discretion and noticed to Borrower, but in compliance with assignment provisions in Section 10.04. As of the date hereof, the aggregate Tranche B ~~Funding~~ Commitments of all Lenders is equal to $5,250,000.

"**Tranche B Funding Date**" **means September 9, 2020.**

"**Tranche B Loans**" **has the meaning assigned to such term in Section 2.01(c).**

"Tranche B Funds Flow Memorandum" means a funds flow memorandum in respect of the Tranche B Loans advanced on the Tranche B Funding Date, in form and substance satisfactory to the Administrative Agent.

"Tranche B Lender" means a Lender that provides any Tranche B Commitment in accordance with Section 2.01(c) or holds Tranche B Loans and each Person that shall become a Tranche B Lender hereunder pursuant to an Assignment and Assumption for so long as such Person shall be a party to this Agreement.

"Tranche B Maturity Date" means October 30, 2021.

"Tranche B Minimum Return" means, with respect to any Tranche B Loans, a minimum return on such Tranche B Loans calculated in accordance with the methodology set forth in Annex III.

"Tranche B Obligations" means all advances to, and debts (including Accrued Interest, interest accruing after the maturity of the Tranche B Loans and interest accruing after the filing of any Bankruptcy), liabilities **(including, without limitation, expense reimbursement pursuant to Section 10.03(a)),** obligations, Tranche B Minimum Return, covenants and duties of, any Loan Party arising under any Financing Document, or otherwise with respect to any Tranche B Loan, in each case whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest, reimbursements and fees that accrue after the commencement by or against the Borrower or any of its Subsidiaries of any proceeding under any debtor relief law naming such Person as the debtor in such proceeding, regardless of whether such interest, reimbursements and fees are allowed claims in such proceeding.

"Tranche B Optional Warrants" means one or more warrants granted ratably to each of the Tranche B Lenders (or its Affiliate) for 2% of the common equity of the Borrower (taken as a whole across all Tranche B Lenders (or its applicable Affiliates)), which warrants shall (a) have a purchase price equal to $0.01 and (b) be documented pursuant to documentation in the same form as the Lender Warrants.

**"Tranche C Commitments" means, with respect to each Tranche C Lender, the commitment of such Lender to make Tranche C Loans to the Borrower pursuant to Section 2.01(d), in an aggregate principal amount not to exceed the amount set forth opposite such Lender's name on Annex I under the heading "Tranche C Commitments", as such Annex I may be modified by the Administrative Agent in its sole discretion and noticed to Borrower, but in compliance with assignment provisions in Section 10.04. As of the date hereof, the aggregate Tranche C Commitments of all Lenders is equal to $2,800,000, it being acknowledged and agreed that the aggregate Tranche C Commitments of all Lenders may be increased by the Tranche C Lenders as set forth in Section 4(c) of Amendment No. 5.**

**"Tranche C Funding Date" means the Amendment No. 5 Effective Date and each other date that Tranche C Loans are requested pursuant to Section 2.01 and funded after satisfaction of the conditions precedent set forth in Section 4.03.**

**"Tranche C Lender" means a Lender that provides any Tranche C Commitment in accordance with Section 2.01(d) or holds Tranche C Loans and each Person that shall become a Tranche C Lender hereunder pursuant to an Assignment and Assumption for so long as such Person shall be a party to this Agreement.**

**"Tranche C Loans" has the meaning assigned to such term in Section 2.01(d).**

**"Tranche C Obligations" means all advances to, and debts (including Accrued Interest, interest accruing after the maturity of the Tranche C Loans and interest accruing after the filing of any Bankruptcy), liabilities (including, without limitation, expense**

reimbursement pursuant to Section 10.03(a)), obligations, Tranche C Prepayment Premium, covenants and duties of, any Loan Party arising under any Financing Document, or otherwise with respect to any Tranche C Loan, in each case whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest, reimbursements and fees that accrue after the commencement by or against the Borrower or any of its Subsidiaries of any proceeding under any debtor relief law naming such Person as the debtor in such proceeding, regardless of whether such interest, reimbursements and fees are allowed claims in such proceeding.

"Tranche C Prepayment Premium" means, with respect to any prepayment on any date of Tranche C Loans (except as contemplated in Section 2.05(c)(ii)), an amount equal to (i) all accrued and unpaid interest on the aggregate principal amount of the Tranche C Loans subject to such prepayment as of such date *plus* (ii) an aggregate amount equal to all interest payments that would have been payable to the Tranche C Lenders on the principal amount of the Tranche C Loans subject to such prepayment from the date of such prepayment through the 18-month anniversary of the Funding Date on which such Tranche C Loans had been made had such prepayment not occurred, which amount shall be calculated assuming there has been no repayment of the principal amount of the Tranche C Loans; provided that so long as no event with respect to a Borrower Group Member described in Section 7.01(f) has occurred and is continuing, if the Tranche C Loans are prepaid in full in cash prior to March 1, 2021, then the Tranche C Prepayment Premium in respect of any such prepayment satisfying such conditions is $0.

"Transaction Documents" means each of the Financing Documents, the Lender Warrants and the Observer Rights Agreement.

"UCC" means the Uniform Commercial Code as in effect from time to time in the State of New York; provided that if, with respect to any filing statement or by reason of any mandatory provisions of law, the perfection or the effect of perfection or non-perfection of the security interests granted to the Collateral Agent pursuant to the applicable Security Document is governed by the Uniform Commercial Code as in effect in a jurisdiction of the United States other than New York, UCC means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions of each applicable Financing Document and any filing statement relating to such perfection or effect of perfection or non-perfection.

"Unconditional Guaranty" means that certain Unconditional Continuing Guaranty of all Tranche B Obligations, made and entered into as of the Amendment No. 2 Effective Date, by Leon Farahnik in favor of the Collateral Agent for the benefit of the Tranche B Lenders.

"Uniform Commercial Code" means the Uniform Commercial Code as in effect from time to time in the applicable jurisdiction.

"US Code" means the U.S. Internal Revenue Code of 1986, as amended.

"US Person" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"USA PATRIOT Act" has the meaning assigned to such term in Section 10.14.

"Voting Stock" means, with respect to any Person, Capital Stock the holders of which are ordinarily, in the absence of contingencies, entitled to vote for the election of directors (or persons performing similar functions) of such Person, even if the right so to vote has been suspended by the happening of a contingency.

"Vehicles" has the meaning assigned to such term in the Security Agreement.

"Write-Down and Conversion Powers" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

Section 1.02    Terms Generally.  Except as otherwise expressly provided, the following rules of interpretation shall apply to this Agreement and the other Financing Documents:

(a)    the definitions of terms herein shall apply equally to the singular and plural forms of the terms defined;

(b)    whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms;

(c)    the words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation";

(d)    the word "will" shall be construed to have the same meaning and effect as the word "shall";

(e)    unless the context requires otherwise, any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or therein) and shall include any appendices, schedules, exhibits, clarification letters, side letters and disclosure letters executed in connection therewith;

(f)    any reference herein to any Person shall be construed to include such Person's successors and assigns to the extent permitted under the Financing Documents and, in the case of any Governmental Authority, any Person succeeding to its functions and capacities;

(g)    the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision;

(h)    all references herein to Articles, Sections, Appendices, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Appendices, Exhibits and Schedules to, this Agreement;

(i)    the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights; and

(j)    any reference herein to a merger, transfer, consolidation, amalgamation, consolidation, assignment, sale, disposition or transfer, or similar term, shall be deemed to apply to a division of or by a limited liability company, or an allocation of assets to a series of a limited liability company (or the unwinding of such a division or allocation), as if it were a merger, transfer, consolidation, amalgamation, consolidation, assignment, sale or transfer, or similar term, as applicable, to, of or with a separate Person. Any division of a limited liability company shall constitute a separate Person hereunder (and each division of any limited liability company that is a Subsidiary, joint venture or any other like term shall also constitute such a Person or entity).

Section 1.03    <u>Accounting Terms</u>.  Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP.  If the Borrower notifies the Administrative Agent that the Borrower wishes to amend any provision hereof to eliminate the effect of any change occurring after the date hereof in GAAP or in the application thereof on the operation of such provision, regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then the Borrower's compliance with such provision shall be determined on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in a manner satisfactory to the Borrower and the Administrative Agent; <u>provided</u> that Capital Lease Obligations shall be construed in accordance with GAAP as in effect on the Closing Date, notwithstanding any changes to GAAP occurring after the Closing Date. Notwithstanding any provision contained herein or in any other Financing Document, any lease (or similar arrangement) that would have been characterized, classified or reclassified as an operating lease in accordance with GAAP prior to the date of the Borrower's adoption of ASC 842 (or any other ASC having a similar result or effect) (and related interpretations) (whether or not such lease was in effect on such date) shall not constitute a Capital Lease Obligation, and any such lease shall be, for all purposes of this Agreement and the other Financing Documents, treated as though it were reflected on the Borrower's consolidated financial statements in the same manner as an operating lease would have been reflected prior to the Borrower's adoption of ASC 842.

ARTICLE II

THE CREDITS

Section 2.01    <u>Loans</u>.

(a)    Each Lender made a single advance of Loans on the Initial Funding Date (the "<u>Initial Loan</u>") in an amount equal to its ratable share (based upon the respective amounts of such Lender's Initial Funding Commitments at such time) of the aggregate amount requested by Borrower pursuant to <u>Section 2.01(e**f**)</u>.

37

(b)    Each Lender made a single advance of Loans on the Second Funding Date (the "Second Funding Date Loan" and together with the Initial Loans, the "Tranche A Loans") in an amount equal to its ratable share (based upon the respective amounts of such Lender's Second Funding Commitments at such time) of the aggregate amount requested by Borrower pursuant to Section 2.01(~~e~~**f**).

(c)    Subject to the terms and conditions set forth herein and in Amendment No. 2 (including, without limitation, the conditions set forth in Section 4 of Amendment No. 2 and Section 4.03 hereof), each Tranche B Lender agrees to make Loans to Borrower on the Tranche B Funding Date (such Loans the "Tranche B Loans"), as requested by Borrower pursuant to Section 2.01(~~e~~**f**), in an aggregate principal amount not to exceed the Tranche B ~~**Funding**~~ Commitments.

**(d)    Subject to the terms and conditions set forth herein and in Amendment No. 5 (including, without limitation, the conditions set forth in Section 6 of Amendment No. 5 and Section 4.03 hereof), each Tranche C Lender agrees to make Loans to Borrower on each Tranche C Funding Date (such Loans the "Tranche C Loans"), as requested by Borrower pursuant to Section 2.01(f), in an amount equal to its ratable share (based upon the respective amounts of such Lender's Tranche C Commitments at such time) of the aggregate amount requested by Borrower pursuant to Section 2.01(f), but in any case, in an aggregate principal amount not to exceed the Tranche C Commitments (as such Tranche C Commitments may, in the sole and absolute discretion of the Tranche C Lenders, be increased as set forth in Section 4(c) of Amendment No. 5).**

**(e)**    ~~**(d)**~~ No Reborrowing.  Amounts prepaid or repaid in respect of any Loan may not be reborrowed.

**(f)**    ~~**(e)**~~ Procedures for Borrower.

(i)    Subject to Sections 4.01 through 4.03, as applicable, and except as otherwise provided herein, the Borrower may request the Lenders to make Loans to the Borrower by delivery to the Administrative Agent, on any Business Day, of a Borrowing Request.  The date of the proposed borrowing (each such date, a "Funding Date") specified in a Borrowing Request shall be no earlier than ~~**ten**~~**three** (~~**10**~~**3**) **business** days after the delivery of such Borrowing Request (or, in the case of the Tranche B Loans, the Tranche B Funding Date~~)~~ **and, in the case of the Tranche C Loans to be made on the Amendment No. 5 Effective Date, the Tranche C Funding Date).  The minimum borrowing amounts of Tranche C Loans occurring on or after the Amendment No. 5 Effective Date shall be $250,000**.  Unless otherwise provided herein, each Borrowing Request shall be irrevocable and shall specify (i) the aggregate principal amount of the borrowing requested, (ii) the proposed Funding Date (which shall be a Business Day) and (iii) the Collateral Account(s) into which the proceeds of the borrowing are to be deposited and the amounts to be deposited into each Collateral Account if more than one Collateral Account is designated.

(ii)    Borrower shall not deliver a Borrowing Request for Loans, and, subject to Sections 2.07(e) and 2.13, the Lenders shall be under no obligation to make available any

funds for any Loans, on the Initial Funding Date, in an aggregate amount for all Lenders exceeding the Initial Funding Commitments, on the Second Funding Date, in an aggregate amount for all Lenders exceeding the Second Funding Commitments and, on the Tranche B Funding Date, in an aggregate amount for all Lenders exceeding the Tranche B **Commitments and on any Tranche C** Funding **Date, in an aggregate amount for all Lenders exceeding the Tranche C** Commitments.

**(g)** ~~(f)~~ Notice by the Administrative Agent to the Lenders.  Promptly following receipt of a Borrowing Request in accordance with this Section 2.01, the Administrative Agent shall advise each Lender of the details thereof and of the amount of such Lender's Loan to be made as part of the requested borrowing.

**(h)** ~~(g)~~ Tax Considerations.

(i)  For U.S. federal income tax purposes, each of the Borrower, the Guarantors and the Tranche A Lenders agrees: (i) that the Tranche A Loans advanced pursuant to Section 2.01(a) and (b) hereof, together with the Lender Warrant, shall be treated as an investment unit, and the purchase price of such investment unit shall equal the total purchase price paid by the Tranche A Lenders for the Tranche A Loan on the Closing Date, and $80,000 of the purchase price of the investment unit shall, for U.S. federal income tax purposes, be allocated to the purchase of the Lender Warrant; and (ii) to treat the Tranche A Loans as a debt instrument, and not as a "contingent payment debt instrument," for U.S. federal and state income tax purposes.  The Borrower will provide any information reasonably requested from time to time by any Tranche A Lender regarding the original issue discount associated with the Tranche A Loans for U.S. federal income tax purposes.  Each of Borrower and the Tranche A Lenders agrees to file tax returns consistent with the allocation set forth in this paragraph.  Notwithstanding the foregoing, for all purposes (except for the purpose of this Section 2.01(**eh**)), each Tranche A Lender shall be treated as having lent the full amount of its pro rata portion of the principal amount of the Tranche A Loans.

(ii)  For U.S. federal income tax purposes, each of the Borrower, the Guarantors and the Tranche B Lenders agrees: (i) that the Tranche B Loans advanced pursuant to Section 2.01(c) hereof, together with the Tranche B Optional Warrants, if any, shall be treated as an investment unit, and the purchase price of such investment unit shall equal the total purchase price paid by the Tranche B Lenders for the Tranche B Loan on the Tranche B Effective Date, and $4,900 of the purchase price of the investment unit shall, for U.S. federal income tax purposes, be allocated to the purchase of the Tranche B Optional Warrants; and (ii) to treat the Tranche B Loans as a debt instrument, and not as a "contingent payment debt instrument," for U.S. federal and state income tax purposes.  The Borrower will provide any information reasonably requested from time to time by any Tranche B Lender regarding the original issue discount associated with the Tranche B Loans for U.S. federal income tax purposes.  Each of Borrower and the Tranche B Lenders agrees to file tax returns consistent with the allocation set forth in this paragraph.  Notwithstanding the foregoing, for all purposes (except for the purpose of this Section 2.01(**eh**)), each Tranche B Lender shall be treated

39

as having lent the full amount of its pro rata portion of the principal amount of the Tranche B Loans.

Section 2.02    Funding of the Loans.    ~~If the Borrower has satisfied the conditions~~ The Tranche C Loans shall be funded as set forth in Section 4 of Amendment No. ~~2 and Section 4.03 hereof, not later than 12:00 Noon, New York City time, on the Tranche B Funding Date, each Tranche B Lender shall make available to the Administrative Agent at the Funding Office an amount in Dollars and in immediately available funds equal to the Tranche B Loans to be made by such Lender. Administrative Agent shall deposit the aggregate of the amounts made available to Administrative Agent by the Lenders, in like funds as received by Administrative Agent, in accordance with the Tranche B Funds Flow Memorandum.~~ 5.

Section 2.03    Termination and Reduction of the Commitments.    (i) Any Initial Funding Commitment not funded on the Initial Funding Date, (ii) any Second Funding Commitment not funded on the Second Funding Date ~~and~~, (iii) any Tranche B Commitments not funded on the Tranche B Funding Date and (iv) any Tranche C Commitments not funded prior to the end of the Forbearance Period (as defined in Amendment No. 5), shall, in each case, automatically and without notice be reduced to zero and terminated upon the close of business on the Initial Funding Date, the Second Funding Date ~~or~~, the Tranche B Funding Date or the last day of the Forbearance Period (as defined in Amendment No. 5), as applicable. Amounts prepaid or repaid in respect of any Loans may not be reborrowed.

Section 2.04    Repayment of Loan; Evidence of Debt.

(a)    Promise to Repay at Maturity.

(i)    Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of the Lenders, the unpaid principal amount of the Tranche A Loans then outstanding (including all amounts added to principal as Accrued Interest pursuant to Section 2.07(e)) on the Maturity Date. Borrower hereby further agrees to pay interest on the unpaid principal amount of each Tranche A Loan from time to time outstanding from the applicable Funding Date until payment in full in cash thereof at the rates per annum, and on the dates, set forth in Section 2.07.

(ii)    Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of the Tranche B Lenders, the unpaid principal amount of the Tranche B Loans then outstanding (including all amounts added to principal as Accrued Interest pursuant to Section 2.07(e)) on the Tranche B Maturity Date. Borrower hereby further agrees to pay interest on the unpaid principal amount of each Tranche B Loan from time to time outstanding from the Tranche B Funding Date until payment in full in cash thereof at the rates per annum, and on the dates, set forth in Section 2.07. Finally, the Borrower further agrees to pay, in connection with any repayment or prepayment of Tranche B Loans, the Tranche B Minimum Return in respect of the Tranche B Loans repaid or prepaid.

**(iii)    Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of the Lenders, the unpaid principal amount of the Tranche C Loans then outstanding (including all amounts added to principal as Accrued Interest pursuant to Section 2.07(e)) on the Maturity Date.  Borrower hereby further agrees to pay interest on the unpaid principal amount of each Tranche C Loan from time to time outstanding from the applicable Tranche C Funding Date until payment in full in cash thereof at the rates per annum, and on the dates, set forth in Section 2.07.**

(b)    <u>Evidence of Debt</u>.

(i)    Each Lender may maintain in accordance with its usual practice an account or accounts evidencing the Indebtedness of the Borrower to such Lender resulting from the Loans made by such Lender from time to time, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.  In the case of a Lender that does not request execution and delivery of a Note evidencing the Loans made by such Lender to the Borrower, such account or accounts shall, to the extent not inconsistent with the notations made by the Administrative Agent in the Register, be conclusive and binding on the Borrower absent manifest error; <u>provided</u> that the failure of any Lender to maintain such account or accounts or any error in any such account shall not limit or otherwise affect any obligations of the Borrower.

(ii)    The Borrower agrees that, upon the request by the Administrative Agent to Borrower from any Lender, the Borrower will promptly execute in favor of such Lender and deliver to Administrative Agent a promissory note (a "<u>Note</u>") substantially in the form of <u>Exhibit B</u> payable to such Lender in an amount equal to such Lender's Loan evidencing the Loans made by such Lender.  The Borrower hereby irrevocably authorizes each Lender to make (or cause to be made) appropriate notations on the grid attached to such Lender's Notes (or on any continuation of such grid) with respect to each payment or prepayment of, and each addition of Accrued Interest to, the principal of the Loans evidenced thereby, which notations, if made, shall evidence, inter alia, the date of, the outstanding principal amount of, and the interest rate applicable to the Loans evidenced thereby; <u>provided</u> that (i) notwithstanding any such notation or the absence thereof, as set forth in <u>Section 2.07(f)</u>, the Agent's determination of the principal amount of the Loans outstanding at any time shall be conclusive and binding on all parties absent manifest error; and (ii) the failure of any Lender to make any such notations or any error in any such notations shall not limit or otherwise affect any obligations of the Borrower.  A Note and the obligation evidenced thereby may be assigned or otherwise transferred in whole or in part only in accordance with <u>Section 10.04(b)</u>.

Section 2.05    <u>Prepayment of the Loan</u>.

(a)    <u>Optional Prepayments</u>.

(i)    The Borrower shall have the right at any time and from time to time, upon at least ten (10) Business Days' prior written notice to the Administrative Agent stating the prepayment date and aggregate principal amount of the prepayment, to prepay any

Tranche A Loan **or Tranche C Loan** in whole or in part, and subject to the requirements of this Section 2.05(a)(i).  Each prepayment pursuant to this Section 2.05(a)(i) during the period from the Funding Date on which ~~such~~**(A) the applicable** Tranche A Loans were made through the third anniversary thereof, shall be accompanied by the Tranche A Prepayment Premium **(as applicable)** with respect to the principal amount of the Tranche A Loans being prepaid~~.~~**and/or (B) the applicable Tranche C Loans were made through the 18-month anniversary thereof, shall be accompanied by the Tranche C Prepayment Premium (as applicable) with respect to the principal amount of the Tranche C Loans being prepaid.**

(ii)     The Borrower shall have the right, upon at least ten (10) Business Days' prior written notice to the Administrative Agent stating the prepayment date and aggregate principal amount of the prepayment, to prepay any Tranche B Loan in whole (but not in part), and subject to the requirements of this Section 2.05(a)(ii).  Each prepayment pursuant to this Section 2.05(a)(ii) shall be accompanied by the Tranche B Minimum Return (if any) with respect to the principal amount of the Tranche B Loans being prepaid. ~~For the avoidance of doubt, (i) no Minimum Return will be required if the Tranche B Loans are repaid in full in cash prior to the date that is 45 days after the Amendment No. 2 Effective Date and (ii) no Tranche B Lender shall have the right to reject any prepayment of the Tranche B Loans by the Borrower with Additional Equity Raise Amounts in accordance with this Section 2.05(a)(ii).~~ Without limiting the requirements to make mandatory prepayments in accordance with Section 2.05(b), the Borrower shall not optionally prepay any Tranche B Loan if any Tranche A/**C** Obligations remain outstanding, and to the extent any Tranche B Lender receives an optional prepayment pursuant to this Section 2.05(a)(ii) while any Tranche A/**C** Obligation remains outstanding, such Tranche B Lender shall promptly turn over any such payment to the Administrative Agent to be applied in accordance with Section 7.02.

(iii)     Each partial prepayment of any Loans under this Section 2.05(a) shall be in an aggregate amount for the Loans of all Lenders at least equal to $1,000,000 or an integral multiple of $500,000 in excess thereof (or such lesser amount as may be necessary to prepay the aggregate principal amount then outstanding with respect to all of the Loans of all Lenders).

(b)     <u>Mandatory Prepayments and Offers to Prepay</u>.

(i)     <u>Material Agreement</u>.   If any Loan Party receives any termination payments, damages (including liquidated damages), indemnity payments ~~(other than indemnity payments received by any Loan Party as reimbursement for costs, expenses or other amounts expended by such Loan Party in connection with defending, settling or satisfying any third-party claim against such Loan Party)~~ or other extraordinary payments under or in respect of any Material Agreement ~~that is a real property lease~~, in excess of $~~2,500,000~~**50,000** individually or $~~5,000,000~~**100,000** in the aggregate per calendar year, the Loan Parties shall, or shall cause their Affiliates to, within five (5) Business Days of the receipt of such termination or other payment, offer to prepay the Loans with an amount equal to 100% of the Net Available Amount of such

payments, pursuant to a written notice sent to the Administrative Agent and the Lenders describing in reasonable detail the event giving rise to the obligation under this Section 2.05(b)(i) to make such offer (each such offer to prepay referred to in this clause (b)(i) a "Material Agreements Prepayment Offer").

(ii)     Event of Loss. If the proceeds received by the Loan Parties (including, as a distribution from a Non-Guarantor Subsidiary) in respect of Events of Loss shall be in excess of $2,500,00050,000 per item of equipment subject to an Event of Loss or $5,000,000100,000 in the aggregate per calendar year across all Events of Loss, and, in any such case, are not applied to the Restoration of the related Affected Property as permitted by the immediately succeeding sentence, then the Loan Parties shall, or shall cause their Affiliates to, offer to prepay the Loans with an amount equal to 100% of the Net Available Amount with respect to such Event of Loss, pursuant to a written notice sent to the Administrative Agent and the Lenders describing in reasonable detail the event giving rise to the obligation under this Section 2.05(b)(ii) to make such offer (each such offer to prepay referred to in this Section 2.05(b)(ii) a "Event of Loss Prepayment Offer"). Notwithstanding the foregoing, any Loan Party may use Loss Proceeds received in respect of any Event of Loss for the reinvestment of such funds in the Restoration of the Affected Property if, (i) in the case of Loss Proceeds less than $5,000,000 in the aggregate in any calendar year, the Borrower's Board of Directors shall have authorized the reinvestment of such Loss Proceeds and (ii) in the case of Loss Proceeds exceeding $5,000,000 in the aggregate per calendar year, the Borrower's Board of Directors shall have authorized the reinvestment of such Loss Proceeds and the Borrower shall have delivered to the Administrative Agent a Reinvestment Notice and a restoration plan reasonably acceptable to the Administrative Agent and such reinvestment is applied in accordance with such approved restoration plan.

(iii)     Disposition of Assets. Without limiting the obligation of the Borrower to obtain the consent of the Administrative Agent to any Disposition not otherwise permitted hereunder, in the event that the Net Available Amount of any such Disposition by the Borrower Group Members shall exceed $1,500,00050,000 per individual event or $3,500,000100,000 in the aggregate per calendar year for all such Dispositions (in the case of the Non-Guarantor Subsidiaries, solely to the extent the proceeds thereof have been distributed to the Loan Parties), then the Borrower shall offer to prepay the Loans ratably in an amount equal to 100% of the Net Available Amount of the Disposition on the Quarterly Payment Date immediately following receipt by the Borrower of the relevant proceeds (or, with respect to the proceeds of any Qualified PinnPack Sale, immediately upon the occurrence of such Qualified PinnPack Sale). Notwithstanding the foregoing, the Borrower shall not be required to prepay the Loans pursuant to this Section 2.05(b)(iii) to the extent that the Borrower reinvests the Net Available Amount (or any portion thereof) of any such Disposition in substantially similar assets that are necessary or useful for the Business pursuant to a transaction not prohibited hereunder and such Net Available Amount is so reinvested within one hundred eighty (180) days (or been made the subject of a firm purchase order placed within such time period) of such Disposition, and any uninvested portion of such Net Available Amount shall promptly thereafter be

43

~~applied to prepayments as contemplated by this Section 2.05(b)(iii); provided that, the Borrower shall not be permitted to reinvest the proceeds of any Qualified PinnPack Sale in any other Investment without the prior written consent of the Administrative Agent. Any such offer to prepay shall be made pursuant to a written notice sent to the Administrative Agent and the Lenders describing in reasonable detail the event giving rise to the obligation under this Section 2.05(b)(iii) to make such offer.~~ (each such offer to prepay referred to in this Section 2.05(b)(iii) a "Disposition Proceeds Prepayment Offer").

(iv)    Incurrence of Debt. If any Borrower Group Member issues or incurs any Indebtedness (other than Permitted Indebtedness), Borrower shall, within one (1) Business Day of the receipt of the net cash proceeds therefrom, offer to prepay the Loans with an amount equal to 100% of the cash proceeds of such Indebtedness, pursuant to a written notice sent to the Administrative Agent and the Lenders describing in reasonable detail the event giving rise to the obligation under this Section 2.05(b)(iv) to make such offer (each such offer to prepay referred to in this Section 2.05(b)(iv) a "Debt Prepayment Offer").

(v)    Excess Cash Flow Sweep. On each Excess Cash Flow Payment Date, Borrower shall offer to prepay the Loans of each Lender in an amount equal to such Lender's *pro rata* share of the Applicable ECF Percentage of Net Cash Flow for the quarterly period ending on the Quarterly Payment Date related to such Excess Cash Flow Payment Date, pursuant to a written notice sent to the Administrative Agent and the Lenders with detailed calculations of the Net Cash Flow amount (such Net Cash Flow amount, the "ECF Amount" and each such offer to prepay referred to in this Section 2.05(b)(v) an "ECF Prepayment Offer"). Notwithstanding the foregoing, any Loan Party may reinvest funds equal to all or a portion of the ECF Amount for such quarterly period if the Administrative Agent has approved an ECF Reinvestment Request submitted by the Borrower and such reinvestment is applied in accordance with such approved reinvestment plan or the Operating Budget.

(vi)    Incurrence of Equity. If any Borrower Group Member receives any Additional Equity Raise Amounts, then the Borrower shall, within one (1) Business Day of the receipt of the net cash proceeds therefrom, prepay the Tranche ~~B~~A/C Obligations with an amount equal to the amount of Tranche ~~B~~A/C Obligations due and outstanding as of such date, pursuant to a written notice sent to the Administrative Agent and the Tranche ~~B~~A/C Lenders describing in reasonable detail the event giving rise to the obligation under this Section 2.05(b)(vi) to make such prepayment. In furtherance of the foregoing, the Loan Parties, the Administrative Agent and the Lenders acknowledge and agree that any Additional Equity Raise Amount shall be used to first pay any Tranche ~~B~~A/C Obligations then outstanding ~~(including, then shall be used to pay~~ any Tranche B ~~Minimum Return)~~Obligations then outstanding and thereafter, may be used for any other purpose permitted by this Agreement. ~~Once~~For the avoidance of doubt, the Tranche B ~~Obligations are satisfied in full (A) any collateral and/or guaranty provided by the Accommodation Collateral Provider shall be released and (B) any portion of the Loan that was designated as Short Term Indebtedness pursuant to Section 5.21(i) hereof shall cease to be so denominated and all liens granted to~~

~~secure such portion of the Loan shall be released~~**Lenders hereby acknowledge and agree to the modification of priorities of payment set forth in this Agreement, including in this Section 2.05(b)(vi).**

~~(vii)  Failure to Close Bond Deal.  If, pursuant to the Pennsylvania Bond Documents, the Pennsylvania Facility Group does not receive the net cash proceeds of $10,000,000 of additional bond proceeds within three (3) Business Days after the Amendment No. 2 Effective Date, Borrower shall, on the third Business Day after the Amendment No. 2 Effective Date, prepay the Loans with an amount equal to $5,000,000.~~

Notwithstanding **anything to the contrary in** the foregoing Sections 2.05(b)(i) through (~~vii~~**vi**), **(1)** Borrower shall be permitted to request a waiver of the requirement to deliver a Material Agreements Prepayment Offer, an Event of Loss Prepayment Offer, a Disposition Proceeds Prepayment Offer, a Debt Prepayment Offer or an ECF Prepayment Offer, which waiver may be accepted or rejected by the Administrative Agent in its sole and absolute discretion~~.~~ **and (2) solely to the extent any of the following amounts are not required to be used to make a mandatory prepayment in accordance with the foregoing from and after the Amendment No. 5 Effective Date, the Borrower shall apply the following amounts received by the Loan Parties solely in accordance with the California Prepetition Budget: (i) any termination payments, damages (including liquidated damages), indemnity payments or other extraordinary payments under or in respect of any Material Agreement; (ii) proceeds received by the Loan Parties (including, as a distribution from a Non-Guarantor Subsidiary) in respect of Events of Loss; (iii) the Net Available Amount of any Disposition; (iv) the proceeds of any Indebtedness for borrowed money; and/or (v) any Additional Equity Raise Amounts.**

(c)    Terms of All Prepayments.

~~(i)~~

~~(A)  Any partial prepayments of the Loans pursuant to Section 2.05(b)(iii) (solely to the extent relating to a Qualified PinnPack Sale), Section 2.05(b)(vi) or Section 2.05(b)(vii) shall be applied (1) first, on a *pro rata* basis to the Tranche B Obligations of each Tranche B Lender and (2) *second*, on a *pro rata* basis to the Tranche A Obligations of each Lender or as otherwise directed by the Administrative Agent.~~

**(i)**    ~~(B)~~ Any partial prepayments of the Loans pursuant to any ~~other~~ provision of this Agreement shall be applied (1) first, on a *pro rata* basis to the Tranche **A**~~A~~**C Obligations of each Tranche C Lender, (2) second, on a *pro rata* basis to the Tranche A** Obligations of each Tranche A Lender and (2**3**) ~~second~~**third**, on a *pro rata* basis to the Tranche B Obligations of each Tranche B Lender.

(ii)    Each prepayment of Loans shall be accompanied by payment of all accrued interest on the amount prepaid, any additional amounts required pursuant to Section 2.09 and (A) in the case of the Tranche A/**C** Loans, the Tranche A/**C** Prepayment Premium in the case of any prepayment of Tranche A/**C** Loans from **(1) in the case of**

45

**the Tranche A Loans,** the Closing Date through the third anniversary thereof **and (2) in the case of the Tranche C Loans, from the applicable Funding Date when such Tranche C Loans were made through the 18-month anniversary thereof, in each case,** pursuant to (x) Sections 2.05(a), 2.05(b)(i), (ii) and (iv) or (y) Section 2.05(b)(iii) (in respect of ~~(1) a Qualified Pinnpack Sale, and (2)~~ in respect of any other Disposition, if the applicable unpermitted Dispositions yield a Net Available Amount to the Borrower exceeding $1,000,000 per individual event or $2,000,000 in the aggregate per calendar year for all such Dispositions) and (B) in the case of any Tranche B Loans, the Tranche B Minimum Return in the case of any repayment or prepayment of Tranche B Loans  after the date that is forty five (45) days after the Amendment No. 2 Effective Date pursuant to (x) Sections 2.05(b)(i), (ii), (iv) and (vi) or (y) Section 2.05(b)(iii) (in respect of ~~(1) a Qualified Pinnpack Sale, and (2)~~ in respect of any other Disposition, if the applicable unpermitted Dispositions yield a Net Available Amount to the Borrower exceeding $1,000,000 per individual event or $2,000,000 in the aggregate per calendar year for all such Dispositions); _provided_ that no Tranche A**/C** Prepayment Premium shall be due in respect of any prepayment under Section 2.05(b)(iii) in respect of any Disposition that was not permitted hereunder and was subsequently consented to by the Administrative Agent.

(iii)     No later than ten (10) Business Days after receiving a Material Agreements Prepayment Offer, an Event of Loss Prepayment Offer, a Disposition Proceeds Prepayment Offer, a Debt Prepayment Offer or an ECF Prepayment Offer, each Lender shall advise the Borrower in writing whether it has elected to accept such prepayment offer, which it shall determine in its sole and absolute discretion.  Each of the Lenders shall have the right, but not the obligation, to accept or reject such prepayment offer by the Borrower.   In connection with any prepayment pursuant to Section 2.05(b)(i), (ii), (iii), (iv) and/or (vi), the amount of the Loans prepaid shall be calculated so that the total amount of Loans prepaid, the accrued but unpaid interest on such Loans and any Tranche A**/C** Prepayment Premium or Tranche B Minimum Return, as applicable, applicable to such prepayment of Loans shall be no more than the Net Available Amount.  Any amount rejected by any Lender after receiving a Material Agreements Prepayment Offer, an Event of Loss Prepayment Offer, a Disposition Proceeds Prepayment Offer, a Debt Prepayment Offer or an ECF Prepayment Offer (any such amounts, "Rejected Proceeds") shall be deposited into the Rejected Proceeds Account of the Borrower.

(iv)     It is understood and agreed that if the Obligations are accelerated or otherwise become due prior to their maturity date, in each case, in respect of any Event of Default (including, but not limited to, upon the occurrence of a bankruptcy or insolvency event (including the acceleration of claims by operation of law)), the Tranche A**/C** Prepayment Premium that would have applied if, at the time of such acceleration, Borrower had prepaid, refinanced, substituted or replaced any or all of the Loans as contemplated in Section 2.05(a) (any such event, a "Tranche A**/C** Prepayment Premium Event"), will be due and payable without any further action (including, without limitation, any notice requirements otherwise applicable to Tranche A**/C** Prepayment Premium Events, if any) as though a Tranche A**/C** Prepayment Premium Event had occurred and such Tranche A**/C** Prepayment Premium shall constitute part of the Tranche

A/**C** Obligations, in view of the impracticability and extreme difficulty of ascertaining actual damages and by mutual agreement of the parties as to a reasonable calculation of each Lender's lost profits as a result thereof. Any Tranche A/**C** Prepayment Premium payable above shall be presumed to be the liquidated damages sustained by each Lender as the result of the early termination and Borrower agrees that it is reasonable under the circumstances currently existing. The Tranche A/**C** Prepayment Premium shall also be payable in the event the Obligations (and/or this Agreement) are satisfied or released by foreclosure (whether by power of judicial proceeding), deed in lieu of foreclosure or by any other means. EACH LOAN PARTY EXPRESSLY WAIVES (TO THE FULLEST EXTENT IT MAY LAWFULLY DO SO), ON BEHALF OF ITSELF AND THE OTHER LOAN PARTIES, THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE OR LAW THAT PROHIBITS OR MAY PROHIBIT THE COLLECTION OF THE FOREGOING PREPAYMENT PREMIUM IN CONNECTION WITH ANY SUCH ACCELERATION. Each Loan Party expressly agrees (to the fullest extent that each may lawfully do so) that: (A) the Tranche A/**C** Prepayment Premium is reasonable and is the product of an arm's length transaction between sophisticated business people, ably represented by counsel; (B) the Tranche A/**C** Prepayment Premium shall be payable notwithstanding the then prevailing market rates at the time payment is made; (C) there has been a course of conduct between Lenders and the Loan Parties giving specific consideration in this transaction for such agreement to pay the Tranche A/**C** Prepayment Premium; and (D) the Loan Parties shall be estopped hereafter from claiming differently than as agreed to in this paragraph. Each Loan Party expressly acknowledges that its agreement to pay the Tranche A/**C** Prepayment Premium to Lenders as herein described is a material inducement to Lenders to provide the Tranche A/**C** Commitments and make the Tranche A/**C** Loan.

(v)    It is understood and agreed that if the Tranche B Obligations are accelerated or otherwise become due prior to their maturity date or otherwise, in each case, in respect of any Event of Default (including, but not limited to, upon the occurrence of a bankruptcy or insolvency event (including the acceleration of claims by operation of law)), the Tranche B Minimum Return that is payable pursuant to Section 2.07(g) (any such event, a "Tranche B Minimum Return Event") , will also be due and payable without any further action (including, without limitation, any notice requirements otherwise applicable to Tranche B Minimum Return Events, if any) as though a Tranche B Minimum Return Event had occurred and such Tranche B Minimum Return shall constitute part of the Tranche B Obligations, in view of the impracticability and extreme difficulty of ascertaining actual damages and by mutual agreement of the parties as to a reasonable calculation of each Tranche B Lender's lost profits as a result thereof. Any Tranche B Minimum Return payable above shall be presumed to be the liquidated damages sustained by each Tranche B Lender as the result of the early termination and Borrower agrees that it is reasonable under the circumstances currently existing. The Tranche B Minimum Return shall also be payable in the event the Tranche B Obligations (and/or this Agreement) are satisfied or released by foreclosure (whether by power of judicial proceeding), deed in lieu of foreclosure or by any other means. EACH LOAN PARTY EXPRESSLY WAIVES (TO THE FULLEST EXTENT IT MAY LAWFULLY DO SO), ON BEHALF OF ITSELF AND THE OTHER LOAN PARTIES, THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE OR LAW THAT

47

PROHIBITS OR MAY PROHIBIT THE COLLECTION OF THE FOREGOING TRANCHE B MINIMUM RETURN IN CONNECTION WITH ANY SUCH ACCELERATION. Each Loan Party expressly agrees (to the fullest extent that each may lawfully do so) that: (A) the Tranche B Minimum Return is reasonable and is the product of an arm's length transaction between sophisticated business people, ably represented by counsel; (B) the Tranche B Minimum Return shall be payable notwithstanding the then prevailing market rates at the time payment is made; (C) there has been a course of conduct between the Tranche B Lenders and the Loan Parties giving specific consideration in this transaction for such agreement to pay the Tranche B Minimum Return; and (D) the Loan Parties shall be estopped hereafter from claiming differently than as agreed to in this paragraph. Each Loan Party expressly acknowledges that its agreement to pay the Tranche B Minimum Return to the Tranche B Lenders as herein described is a material inducement to the Tranche B Lenders to provide the Tranche B Commitments and make the Tranche B Loans.

Section 2.06   Reimbursements.

(a)   Agent Reimbursements.   The Borrower agrees to pay to each of the Administrative Agent and the Collateral Agent, for its own account, amounts payable in the amounts and at the times separately agreed upon in the Agent Reimbursement Letter.

(b)   Payment of Reimbursements.   All reimbursements payable hereunder shall be paid on the dates due, in Dollars and immediately available funds, to the Administrative Agent for distribution to the Lenders entitled thereto. Reimbursements paid shall not be refundable under any circumstances absent manifest error.

Section 2.07   Interest; Minimum Return.

(a)   Loans.   With respect to any Loan, for each day on and after the Funding Date of such Loan until the date on which such Loan has been fully repaid (including the first day but excluding the last), the outstanding principal amount of such Loan (including any Accrued Interest previously added to the principal on a prior Quarterly Payment Date) shall bear interest at a rate per annum equal to the Interest Rate.

(b)   Default Interest.   If all or a portion of the principal amount of any Loan, interest in respect thereof or any other amount due under the Financing Documents shall not be paid when due (whether at the stated maturity, by acceleration or otherwise) or there shall occur and be continuing any other Event of Default, then, to the extent so elected by the Administrative Agent, the outstanding principal amount of the Loans (whether or not overdue) (to the extent legally permitted) shall bear interest at a rate per annum equal to the Post-Default Rate, from the date of such nonpayment or occurrence of such Event of Default, respectively, until such amount is paid in full (after as well as before judgment) or until such Event of Default is no longer continuing, respectively.

(c)   Payment of Interest.   Subject to Section 2.07(e), accrued interest on each Loan shall be payable in arrears in cash on each Quarterly Payment Date; provided that (i) interest accrued pursuant to paragraph (b) of this Section shall be payable on demand and (ii) in the

US-DOCS\120330147.2120747417.14

event of any repayment or prepayment of any Loan, accrued interest on the principal amount repaid or prepaid shall be payable in cash on the date of such repayment or prepayment. ~~Notwithstanding the foregoing, and notwithstanding the provisions of Section 2.07(e) below, interest on the Loans that would be due on December 31, 2020 (which the parties acknowledge and agree is an amount equal to $2,223,118.95) shall instead be paid early by the Borrower to the Administrative Agent within three (3) Business days of the Amendment No. 4 Effective Date.~~

(d)    <u>Computation</u>.  All interest hereunder shall be computed on the basis of a year of 360 days, and, in each case, shall be payable for the actual number of days elapsed (including the first day but excluding the last).  The computation of interest shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error.

(e)    <u>Payment in Kind</u>.  On each Quarterly Payment Date, the Borrower shall pay all of the accrued interest on each Loan at the Interest Rate in full in cash; <u>provided</u> that the Borrower may, in its sole discretion by sending written notice to the Administrative Agent no later than the applicable Quarterly Payment Date, without penalty, pay a portion of the accrued interest due and payable on each Tranche A Loan **<u>or Tranche C Loan</u>** equal to up to 4.85% per annum of the outstanding principal amount of any such Tranche A Loans (including any Accrued Interest previously added to principal on a prior Quarterly Payment Date) in kind.  The aggregate outstanding principal amount of the Tranche A  Loans **<u>or the Tranche C Loans, as applicable</u>** shall be automatically increased on each such Quarterly Payment Date by the amount of such interest paid in kind (and such increased principal shall bear interest at a rate per annum equal to the Interest Rate).

(f)    <u>Miscellaneous</u>. For the avoidance of doubt, (i) on each Quarterly Payment Date prior to (1) with respect to the Tranche A Loans **<u>and the Tranche C Loans</u>**, the Maturity Date and (2) with respect to the Tranche B Loans, the Tranche B Maturity Date, any interest on the Loans then due and payable shall be paid, either in cash or in kind, in accordance with this Agreement and (ii) on (1) with respect to the Tranche A Loans **<u>and the Tranche C Loans</u>**, the Maturity Date and (2) with respect to the Tranche B Loans, the Tranche B Maturity Date, any interest on the Loans then due and payable shall be paid entirely in cash in accordance with this Agreement.    All amounts of interest added to the principal of the Loans pursuant to Section 2.07(e) shall bear interest as provided herein, be payable as provided in Section 2.04 and shall be due and payable on (1) with respect to the Tranche A Loans **<u>and the Tranche C Loans</u>**, the Maturity Date and (ii) with respect to the Tranche B Loans, the Tranche B Maturity Date. The Agent's determination of the principal amount of the Loans outstanding at any time shall be conclusive and binding, absent manifest error.

(g)    <u>Tranche B Minimum Return</u>. On the earliest to occur of (i) repayment of Tranche B Obligations pursuant to <u>Section 2.04</u>, (ii) repayment of Tranche B Obligations pursuant to <u>Section 2.05</u> or (iii) application of any proceeds of Collateral, the Unconditional Guaranty or any other repayment or prepayment, the Borrower shall pay the Tranche B Lenders a fee equal to the Tranche B Minimum Return.  The Borrower and the Tranche B Lenders acknowledge and agree that if any Tranche B Minimum Return is payable in accordance with this section (as calculated

in accordance with <u>Annex III</u>), such amount shall be payable regardless of whether the Tranche B Loans (and any accrued interest in respect thereof) have been repaid in full in cash.

Section 2.08    [Reserved].

Section 2.09    <u>Taxes</u>.

(a)    <u>Payments Free of Taxes</u>. Any and all payments by or on account of any obligation of any Loan Party hereunder or under any other Financing Document shall be made without withholding or deduction for any Taxes except as required by Applicable Law; <u>provided</u> that if such Loan Party or Agent shall be required by Applicable Law (as determined in the good faith discretion of the applicable withholding agent) to withhold or deduct any Taxes from such payments, then (i) to the extent such Taxes are Indemnified Taxes, the sum payable shall be increased as necessary so that after making all required withholdings and deductions (including withholdings and deductions applicable to additional sums payable under this Section) the Administrative Agent, the Collateral Agent or the Lender (as the case may be) receives an amount equal to the sum it would have received had no such withholdings or deductions been made, (ii) such Loan Party or Agent shall make or shall cause to be made such withholdings and deductions and (iii) such Loan Party or Agent shall pay or shall cause to be paid the full amount withheld and deducted to the relevant Governmental Authority in accordance with Applicable Law.

(b)    <u>Payment of Other Taxes by the Borrower</u>.  In addition, the Loan Parties shall pay or cause to be paid any Other Taxes to the relevant Governmental Authority in accordance with Applicable Law.

(c)    <u>Indemnification by Borrower</u>.  Loan Parties shall jointly and severally indemnify, or cause to be indemnified, the Administrative Agent, the Collateral Agent and each Lender, within thirty (30) days after written demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) paid or payable by the Administrative Agent, the Collateral Agent or such Lender, as the case may be, and any reasonable expenses arising therefrom or with respect thereto whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrower by the Collateral Agent or a Lender, or by the Administrative Agent on its own behalf or on behalf of the Collateral Agent or a Lender, shall be conclusive absent manifest error.

(d)    <u>Evidence of Payments</u>.  As soon as practicable after any payment of Indemnified Taxes or Other Taxes by any Loan Party to a Governmental Authority, the relevant Loan Party shall deliver or cause to be delivered to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment satisfactory to the Administrative Agent.

(e)    <u>Forms</u>. (i) Any of the Administrative Agent, the Collateral Agent or any Lender (including any assignee Lender) that is legally entitled to an exemption from or reduction of

withholding tax under the law of the jurisdiction in which any Loan Party is located with respect to payments under any Transaction Document shall deliver to the Borrower (with a copy to the Administrative Agent), at the time or times reasonably requested by the Borrower or Administrative Agent, such properly completed and executed documentation prescribed by Applicable Law as will permit such payments to be made without or at a reduced rate of withholding.  In addition, any of the Administrative Agent, the Collateral Agent or any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by Applicable Law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to any withholding tax or information reporting requirements.  Upon the reasonable written request of the Borrower or the Administrative Agent, or if any form or certification previously delivered expires or becomes obsolete or inaccurate, any Lender shall update any such form or certification previously delivered pursuant to this Section 2.09(e).  Notwithstanding anything to the contrary in the preceding three sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 2.09(e)(ii)(A), (B) and Section 2.09(g)) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

        (ii)     Without limiting the generality of the foregoing, in the event that the Borrower is a US Person,

        (A)     any Lender that is a US Person shall deliver to the Borrower and the Administrative Agent on or about the date on which such Lender becomes a party to this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

        (B)     any Lender who is not a US Person shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or about the date on which such Lender becomes a party to this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

        (I)     in the case of a Lender who is not a US Person claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under this Agreement or any Transaction Document, executed copies of IRS Form W-8BEN or W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under this Agreement or any Transaction Document, IRS Form W-8BEN or W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

        (II)     executed copies of IRS Form W-8ECI;

(III)    in the case of a Lender who is not a US Person claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit B-1 to the effect that such Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code and (y) executed copies of IRS Form W-8BEN or W-8BEN-E; or

(IV)    to the extent a Lender who is not a US Person is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN or W-8BEN-E, a U.S. Tax compliance certificate substantially in the form of Exhibit B-2 or Exhibit B-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if such Lender is a partnership and one or more direct or indirect partners of such Lender are claiming the portfolio interest exemption, such Lender may provide a U.S. Tax compliance certificate substantially in the form of Exhibit B-4 on behalf of each such direct and indirect partner.

(f)    If the Administrative Agent, the Collateral Agent or any Lender determines, in its sole discretion exercised in good faith, that it has received a refund of any Indemnified Taxes or Other Taxes as to which it has been indemnified by a Loan Party or with respect to which a Loan Party has paid additional amounts pursuant to this Section 2.09, it shall pay over such refund (but only to the extent of indemnity payments made under this Section 2.09 with respect to the Taxes giving rise to such refund), to the Borrower, net of all of its out-of-pocket expenses (including Taxes with respect to such refund) and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); provided that the Borrower, upon the request of the Administrative Agent, the Collateral Agent or any Lender, as the case may be, agrees to repay as soon as reasonably practicable the amount paid over to the Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent, the Collateral Agent or any Lender, as the case may be, in the event the Administrative Agent, the Collateral Agent or any Lender, as the case may be, is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this paragraph (f), in no event will the Administrative Agent, the Collateral Agent or any Lender be required to pay any amount to the Borrower pursuant to this paragraph (f) the payment of which would place the Administrative Agent, the Collateral Agent or the Lender, as the case may be, in a less favorable net after-Tax position than it would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This paragraph shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(g)    If a payment made to the Administrative Agent, the Collateral Agent or any Lender under this Agreement would be subject to U.S. federal withholding Tax imposed by FATCA if such Administrative Agent, Collateral Agent or Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Administrative Agent, Collateral Agent or Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by

law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by Applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Person's obligations under FATCA or to determine the amount to deduct and withhold from such payment.  Solely for purposes of this clause, "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(h)    <u>Survival</u>. Each party's obligations under this Section shall survive the resignation and replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender.

Section 2.10    <u>Payments Generally; Pro Rata Treatment; Sharing of Setoffs</u>.

(a)    <u>Payments by Borrower</u>.  Unless otherwise specified, the Borrower shall make each payment required to be made by it hereunder (whether of principal, interest, reimbursements, fees, or under <u>Section 2.09</u> or otherwise) or under any other Financing Document (except to the extent otherwise provided therein) prior to 1:00 p.m., New York City time, on the date when due, in immediately available funds, without setoff or counterclaim.  Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon.  All such payments shall be made to the Administrative Agent at its offices at Orion Energy Partners Investment Agent, LLC (payment instructions: Bank Name: JPMorgan Chase Bank, N.A., Bank Address: 270 Park Avenue, New York, New York 10017, ABA/Routing No.: 021000021, Account Name: ORION ENERGY PARTNERS INVESTMENT AGENT, LLC, Account No.: 700846822, Swift No.: CHASUS33, Reference: "CarbonLITE" + [purpose of the payment]) except as otherwise expressly provided in the relevant Financing Document and payments pursuant to <u>Sections 2.09</u> and <u>10.03</u>, which shall be made directly to the Persons entitled thereto.  The Administrative Agent shall distribute any such payments received by it for account of any other Person to the appropriate recipient promptly following receipt thereof.  If any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be set to the immediately preceding Business Day and, in the case of any payment accruing interest, interest thereon shall be payable for the period up to and including such immediately preceding Business Day, with the day(s) following such immediately preceding Business Day to be included in the calculation of interest for the following quarterly period in accordance with the terms hereof.  All amounts owing under this Agreement or under any other Financing Document are payable in Dollars.

(b)    <u>Application of Insufficient Payments</u>.  If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, interest, reimbursements, fees and other amounts then due hereunder, such funds shall be applied (i) first, to pay interest, reimbursements, fees and other amounts (except for the amounts required to be paid pursuant to the following clause (ii)) then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest, reimbursements, fees and such other amounts then due to such parties, and (ii) second, to pay principal then due hereunder, ratably

53

among the parties entitled thereto in accordance with the amounts of principal then due to such parties.

(c)    <u>Pro Rata Treatment</u>.  Except to the extent otherwise provided herein (including, without limitation, the waterfall provisions set forth in ~~Secton~~Section 2.05(c)(i) and Section 7.02):  (i) the Loans shall be made from the Lenders, and each termination or reduction of the amount of the Commitments under <u>Section 2.03</u> shall be applied to the respective Commitments of the Lenders, *pro rata* according to the amounts of their respective applicable Commitments; (ii) each payment or prepayment of principal of the Loans by the Borrower shall be made for account of the Lenders *pro rata* in accordance with the respective unpaid principal amounts of the Loans held by them being paid or prepaid; and (iii) each payment of interest on the Loans by the Borrower shall be made for account of the Lenders *pro rata* in accordance with the amounts of interest on the Loans then due and payable to the respective Lenders.

(d)    <u>Sharing of Payments by Lenders</u>.  If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment or recover any amount in respect of any principal of or interest on any of its Loan resulting in such Lender receiving a greater proportion of the aggregate amount of the Loans and accrued interest thereon then due than the proportion received by any other Lender, then, unless otherwise agreed in writing by the Lenders, the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Loans of other Lenders to the extent necessary so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans; <u>provided</u> that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this paragraph shall not be construed to apply to any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or Participant, other than to the Borrower or any Affiliate thereof (as to which the provisions of this paragraph shall apply).  Each Loan Party consents to the foregoing and agrees, to the extent it may effectively do so under Applicable Law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against such Loan Party rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of such Loan Party in the amount of such participation.

(e)    <u>Presumptions of Payment</u>.  Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for account of the Lenders hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due.  In such event, if the Borrower has not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent,

at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

(f)    Certain Deductions by the Administrative Agent.  If any Lender shall fail to make any payment required to be made by it pursuant to Section 2.02, 2.10(e) or 10.03(c), then the Administrative Agent may, in its discretion (notwithstanding any contrary provision hereof), apply any amounts thereafter received by the Administrative Agent for account of such Lender to satisfy such Lender's obligations under such Sections until all such unsatisfied obligations are fully paid.

Section 2.11    Mitigation Obligations; Replacement of Lenders.  If the Borrower is required to pay any Indemnified Taxes or additional amount to any Lender or any Governmental Authority for account of any Lender pursuant to Section 2.09 then such Lender shall (i) file any certificate or document reasonably requested in writing by the Borrower and/or (ii) use reasonable efforts to designate a different lending office for funding or booking its Loan hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the sole judgment of such Lender exercised in good faith, such designation or assignment (x) would eliminate or reduce amounts payable pursuant to Section 2.09 in the future and (y) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender in any material respect.  The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

Section 2.12    Acknowledgement and Consent to Bail-In of EEA Financial Institutions.  Notwithstanding anything to the contrary in any Financing Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Financing Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)    the effects of any Bail-In Action on any such liability, including, if applicable:

(c)    a reduction in full or in part or cancellation of any such liability;

(d)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Financing Document; or

(e)    the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of any EEA Resolution Authority.

Section 2.13    Incremental Facility.  The Borrower may, pursuant to an Incremental Request delivered to the Administrative Agent from time to time during the Incremental Availability Period, request the establishment of an incremental term loan facility in an aggregate principal amount to be agreed between the Borrower and the Administrative Agent (the "Incremental Loans"), to be documented as an increase in the total amount of the Loans under this Agreement; provided that, the aggregate amount of the Incremental Loans shall not exceed $20,000,000. Each Lender shall participate in such Incremental Loans if each of the following conditions have been satisfied:

        (a)    no Default or Event of Default exists as of the effective date of such Incremental Loans or would exist after giving effect thereto;

        (b)    no development, event or circumstance that has had or could reasonably be expected to have a Material Adverse Effect shall have occurred and be continuing, or shall occur as a result thereof as of the effective date of such Incremental Loans;

        (c)    the representations and warranties of each of the Loan Parties set forth in the Financing Documents shall be true and correct in all material respects on and as of the effective date of such Incremental Loans (except where already qualified by materiality or Material Adverse Effect, in which case, in all respects);

        (d)    Investment Committee approval for such Incremental Loans shall have been obtained;

        (e)    the other applicable conditions set forth in Section 4.03 shall have been satisfied as of the effective date of such Incremental Loans; and

        (f)    the terms of any such Incremental Loans shall be identical to those of the existing Loans, unless otherwise agreed by the Administrative Agent and the Borrower; provided that, (x) the Borrower may request multiple borrowings (the timing of which shall be mutually agreed between the Borrower and the Lenders) and each borrowing of Incremental Loans shall be in an aggregate amount of $5,000,000 or a larger multiple of $1,000,000; provided that the final borrowing of such Incremental Loan may be in an amount equal to the then current amount of the unfunded commitments with respect to the applicable Incremental Loan.

In connection therewith, this Agreement and the other Financing Documents shall be amended as necessary to effectuate such increase, such amendments to be acceptable to the Administrative Agent in its reasonable discretion.


ARTICLE III

REPRESENTATIONS AND WARRANTIES

Each Loan Party represents and warrants to each Agent and the Lenders that:

US-DOCS\120330147.2120747417.14

Section 3.01    Due Organization, Etc.

(a)    Each Loan Party (and each Non-Guarantor Subsidiary) is a limited liability company, duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization.  Each Loan Party (and each Non-Guarantor Subsidiary) (i) has all requisite limited liability company or other organizational power and authority to own or lease and operate its assets and to carry on its business as now conducted and as proposed to be conducted by it and (ii) is duly qualified to do business and is in good standing in each jurisdiction where necessary in light of its business as now conducted and as proposed to be conducted (including performance of each Material Agreement to which it is party) except, in the case of this clause (ii), where the failure to so qualify could not reasonably be expected to have a Material Adverse Effect.  No filing, recording, publishing or other act by a Loan Party (and each Non-Guarantor Subsidiary), that has not been made or done, is necessary in connection with the existence or good standing of such Borrower Group Member.

(b)    As of the Closing Date, the Equity Shareholders listed on Schedule 3.01(b) are the only members of the Borrower. As of the Tranche **BC** Funding Date, there has been no Change of Control.

(c)    The only member of each Guarantor is the Borrower or another Guarantor, with the Borrower owning, directly or indirectly, 100% of each Guarantor's (other than PinnPack's) Capital Stock.  All Capital Stock in each Guarantor (other than PinnPack) is beneficially owned and controlled by the Borrower free and clear of all Liens other than Permitted Liens.

(d)    The only member of each Non-Guarantor Subsidiary is a Guarantor, with a Guarantor owning 100% of each Non-Guarantor Subsidiary's Capital Stock.

Section 3.02    Authorization, Etc.  Each Loan Party has full corporate, limited liability company or other organizational powers, authority and legal right to enter into, deliver and perform its respective obligations under each of the Transaction Documents to which it is a party and to consummate each of the transactions contemplated herein and therein, and has taken all necessary corporate, limited liability company or other organizational action to authorize the execution, delivery and performance by it of each of the Transaction Documents to which it is a party. Each of the Transaction Documents to which any Loan Party is a party has been duly executed and delivered by such Loan Party and is in full force and effect and constitutes a legal, valid and binding obligation of such Loan Party, enforceable against such Loan Party in accordance with its respective terms, except as enforcement may be limited (i) by Bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance or other similar laws affecting creditors' rights generally, (ii) by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law) and (iii) by implied covenants of good faith and fair dealing.

Section 3.03    No Conflict.  The execution, delivery and performance by each Loan Party of each of the Transaction Documents to which it is a party and all other documents and instruments to be executed and delivered hereunder by it, as well as the consummation of the transactions contemplated herein and therein, do not and will not (i) conflict with the Organizational Documents of such Loan Party, (ii) conflict with or result in a breach of, or

57

constitute a default under, any indenture, loan agreement, mortgage, deed of trust or other material instrument or agreement to which such Loan Party (and, as of the Closing Date, any Non-Guarantor Subsidiary) is a party or by which it is bound or to which such Loan Party's (and, as of the Closing Date, any Non-Guarantor Subsidiary's) property or assets are subject, (iii) conflict with or result in a breach of, or constitute a default under, in any material respect, any Applicable Law or (iv) with respect to each Loan Party (and each Non-Guarantor Subsidiary), result in the creation or imposition of any Lien (other than a Permitted Lien) upon any of such Borrower Group Member's property or the Collateral.

Section 3.04   Approvals, Etc.

(a)     Each Loan Party (and each Non-Guarantor Subsidiary) has obtained all material Authorizations required under any Applicable Law to be issued to, assigned to, or otherwise assumed by, such Borrower Group Member and necessary for (i) the Business or (ii) the execution, delivery and performance by each Loan Party of the Transaction Documents to which it is a party other than, in each case, Authorizations that are not currently necessary and are obtainable in the ordinary course of business.

(b)     As of the Closing Date, all of the material Authorizations required under any Applicable Law to be issued to, assigned to, or otherwise assumed by, any Loan Party (and each Non-Guarantor Subsidiary) and necessary for (i) the Business or (ii) the execution, delivery and performance by any Loan Party of the Transaction Documents to which it is a party, other than, in each case, Authorizations that are not currently necessary and are obtainable in the ordinary course of business, are set forth in Schedule 5.04 hereto.

(c)     Each Loan Party (and each Non-Guarantor Subsidiary) is in material compliance with each Authorization by a Governmental Authority currently in effect.

Section 3.05   Financial Statements.

(a)     As of the date of delivery thereof, (x) the financial statements delivered to the Lenders pursuant to this Agreement will present fairly in all material respects the financial condition, results of operations and cash flows of such Borrower Group Member as of the dates set forth therein, (y) such balance sheets and the notes thereto will disclose all material liabilities (contingent or otherwise) of such Borrower Group Member as of the dates thereof to the extent required to be disclosed by GAAP and (z) such financial statements were prepared in accordance with GAAP.

(b)     As of the Closing Date and each Funding Date, no event, change or condition has occurred that has caused, or could be reasonably expected to cause, a Material Adverse Effect.

Section 3.06   Litigation.

(a)     There is no pending or, to the knowledge of any Authorized Representative of any Loan Party (and each Non-Guarantor Subsidiary), threatened (in writing) litigation, investigation, action or proceeding of or before any court, arbitrator or Governmental Authority (in the case of any of the foregoing not involving the Loan Parties, to the knowledge of any Authorized Representative of any Borrower Group Member) (i) seeking to restrain or prohibit

58

the consummation of the transactions contemplated by the Transaction Documents or (ii) purporting to affect the legality, validity or enforceability of any of the Transaction Documents.

(b)    There is no pending or, to the knowledge of any Authorized Representative of any Loan Party (and each Non-Guarantor Subsidiary), threatened (in writing) litigation, investigation, action or proceeding of or before any court, arbitrator or Governmental Authority against any Loan Party (and each Non-Guarantor Subsidiary)  that affects the Business which (either individually or in the aggregate) could reasonably be expected to have a Material Adverse Effect.

Section 3.07    <u>Environmental Matters</u>.  Except as set forth on <u>Schedule 3.07</u>:

(a)    each Loan Party (and each Non-Guarantor Subsidiary) and the conduct of the Business is in compliance in all material respects with all applicable Environmental Laws;

(b)    each Loan Party (and each Non-Guarantor Subsidiary), (i) holds or has applied for all material Authorizations required under Environmental Laws (each of which is in full force and effect) required for the conduct of the Business and any of its current operations or for any property owned, leased or otherwise operated by it; and (ii) is in compliance in all material respects with all Authorizations required under Environmental Law;

(c)    to the knowledge of any Authorized Representative of any Loan Party (and each Non-Guarantor Subsidiary), (x) there are no material pending Environmental Claims asserted against any Loan Party (and each Non-Guarantor Subsidiary) or the Business and (y) no Loan Party (and each Non-Guarantor Subsidiary) has received any written notice, claim or information regarding, or otherwise has knowledge of, a past or threatened material Environmental Claim asserted against any Loan Party (and each Non-Guarantor Subsidiary) or the Business, except for such Environmental Claims that have been fully resolved;

(d)    there are no outstanding consent decrees, orders, settlements or other material agreements concerning any Loan Party (and each Non-Guarantor Subsidiary)  or the Business relating to compliance with or liability under Environmental Law;

(e)    no Loan Party (and each Non-Guarantor Subsidiary) and, to the knowledge of any Authorized Representative of any Loan Party, no other Person has Released Hazardous Materials at, on, from or under any real property currently or formerly owned, leased or operated by any Loan Party (and each Non-Guarantor Subsidiary) in a manner that would reasonably be expected to result in a material liability of any Loan Party (and each Non-Guarantor Subsidiary) pursuant to Environmental Laws; and

(f)    each Loan Party (and each Non-Guarantor Subsidiary) has made available copies of all significant reports, correspondence and other documents in its possession, custody or control regarding compliance by any of the Loan Party (and each Non-Guarantor Subsidiary), or potential liability of any of the Loan Party (and each Non-Guarantor Subsidiary) under Environmental Laws or Authorizations required under Environmental Laws.

Section 3.08    Compliance with Laws and Obligations.  Subject to Section 3.07, each Loan Party (and each Non-Guarantor Subsidiary) and the Business are in compliance with all Applicable Laws applicable to the Borrower Group Members and the Business, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

Section 3.09    Material Agreements; Bond Documents.

(a)    ~~As of the Tranche B Funding Date, each~~Each Material Agreement ~~is listed on amended Schedule 3.09 attached to~~in existence on the Amendment No. ~~2~~5 Effective Date is listed on Schedule 3.09 (as such schedule may be updated in accordance with Section 11 of Amendment No. 5).  The copies of each of the Material Agreements so listed, and any amendments thereto provided or to be provided by any Loan Party (and each Non-Guarantor Subsidiary) to the Administrative Agent are, or when delivered will be, true and complete copies of such agreements and documents.  Except as permitted under Section 6.09 or disclosed in accordance with Section 5.11, as of the Amendment No. 5 Effective Date, no termination event has occurred under any Material Agreement, each Material Agreement is in full force and effect, and no Loan Party (and each Non-Guarantor Subsidiary) has received any written notice of a material default, expiration, breach or termination pursuant to any Material Agreement.  Each Loan Party (and each Non-Guarantor Subsidiary) is in compliance in all material respects with the terms of the Material Agreements to which it is a party.  To the knowledge of any Authorized Representative of any Loan Party (and each Non-Guarantor Subsidiary), no Material Counterparty is in default of any of its obligations under any Material Agreement other than defaults which, individually or in the aggregate, could not reasonably be expected to be materially adverse to the Borrower Group Members and/or the Lenders.

(b)    The copies of each of the Bond Documents, and any amendments thereto provided or to be provided by any Borrower Group Member to the Administrative Agent are, or when delivered will be, true and complete copies of such agreements and documents.  As of the Closing Date and the Funding Date, no "Default," "Event of Default" or similar term under any Bond Document has occurred and is continuing.

Section 3.10    Intellectual Property; Licenses.

(a)    Each Loan Party (and each Non-Guarantor Subsidiary) owns, or is licensed to use, free and clear of all Liens except for Permitted Liens, all Intellectual Property necessary for its business and that are necessary for the performance by it of its obligations under the Transaction Documents to which it is a party, in each case, as to which the failure of such Borrower Group Member to so own or be licensed could reasonably be expected to have a Material Adverse Effect, and the use thereof by such Borrower Group Member does not, to the knowledge of any Loan Party (and each Non-Guarantor Subsidiary), infringe in any material respect upon the rights of any other Person.

(b)    Each Loan Party (and each Non-Guarantor Subsidiary) has obtained the necessary intellectual property licenses that the Borrower Group Members other than any Non-Guarantor Subsidiary (and each Non-Guarantor Subsidiary) reasonably believe are required for the

Business, the absence of any of which could reasonably be expected to have a Material Adverse Effect.

(c)     With respect to each material license in or to Intellectual Property held by each Loan Party (and each Non-Guarantor Subsidiary): (i) such license is valid and binding and in full force and effect and represents the entire agreement between the respective licensor and licensee with respect to the subject matter of such license; and (ii) such license will not cease to be valid and binding and in full force and effect on terms identical to those currently in effect as a result of the rights and interests granted herein, nor will the grant of such rights and interests constitute a breach or default under such license or otherwise give the licensor or sublicensor a right to terminate such license.

Section 3.11    Taxes.  Except as specified on Schedule 3.11:

(a)     each Loan Party (and each Non-Guarantor Subsidiary) has timely filed or caused to be filed all material tax returns and reports required to have been filed by it and has paid, or has caused to be paid, all material taxes required to have been paid by it, other than taxes that are being contested in accordance with the Permitted Contest Conditions; and

(b)     property owned by any Borrower Group Member is not the subject of any temporary tax abatement or any other temporary tax reduction; and

(c)     each Loan Party (and each Non-Guarantor Subsidiary) has been properly treated as a disregarded entity or a partnership for U.S. federal income tax purposes.

Section 3.12    Disclosure.

(a)     None of the written reports, financial statements, certificates or other written information (other than Projections and information of a general economic or industry nature) furnished by or on behalf of any Borrower Group Member to the Administrative Agent or any Lender in connection with the negotiation of this Agreement or delivered hereunder (as modified or supplemented by other written information so furnished), taken as a whole, contains any material misstatement of fact or omits to state any material fact necessary to make such statements therein (when taken as a whole), in the light of the circumstances under which they were made, not materially misleading.

(b)     Statements, estimates, forecasts and projections regarding the Borrower Group Members and the future performance of the Business or other expressions of view as to future circumstances (including the initial Operating Budget) that have been made available to any Secured Party by or on behalf of any Borrower Group Member or any of its representatives or Affiliates (collectively, "Projections") have been prepared in good faith based upon assumptions believed to be reasonable at the time of preparation thereof; provided that it is understood and acknowledged that such Projections are based upon a number of estimates and assumptions and are subject to business, economic and competitive uncertainties and contingencies, that actual results during the period or periods covered by any such Projections may differ from the projected results and such differences may be material and that, accordingly, no assurances are given and no representations, warranties or covenants are made that any of the assumptions are

US-DOCS\120330147.2120747417.14

correct, that such Projections will be achieved or that the forward-looking statements expressed in such Projections will correspond to actual results.

Section 3.13    <u>Solvency</u>.  (a) The Borrower Group Members, on a consolidated basis, are, and (b) each Loan Party individually is, in each case, Solvent.

Section 3.14    <u>Regulatory Restrictions on the Loan</u>.  Each Loan Party is not required to be registered as an "investment company" within the meaning of the Investment Company Act of 1940 of the United States (including the rules and regulations thereunder), as amended.

Section 3.15    <u>Title; Security Documents</u>.

(a)    Each Loan Party owns and has good, legal and defensible title to the property purported to be covered by the Security Documents to which it is party, free and clear of all Liens other than Permitted Liens.

(b)    The provisions of the Security Documents to which any Loan Party is a party that have been delivered on or prior to the date this representation is made are, effective to create, in favor of the Collateral Agent for the benefit of the Secured Parties, a legal, valid and enforceable first-priority (subject only to Permitted Liens) Lien on and security interest in all of the Collateral (other than any Vehicles) purported to be covered thereby, and all necessary recordings and filings have been or will concurrently be made in all necessary public offices (other than with respect to any Vehicles), and all other necessary and appropriate action has been taken, so that the security interest created by each Security Document is a first-priority (subject only to Permitted Liens) perfected Lien on and security interest in all right, title and interest of such Loan Party in the Collateral purported to be covered thereby (other than any Vehicles), prior and superior to all other Liens other than Permitted Liens.

Section 3.16    <u>ERISA</u>.

(a)    No ERISA Event has occurred or is reasonably expected to occur which has or could reasonably be expected to have a Material Adverse Effect.  Each Pension Plan has complied in all material respects with the applicable provisions of ERISA and the Code. No termination of a Pension Plan has occurred resulting in any liability that has remained underfunded and no Lien against any Loan Party or any of its ERISA Affiliates in favor of the PBGC or a Pension Plan has arisen during the five-year period prior to the date hereof.

(b)    None of the Loan Party (and each Non-Guarantor Subsidiary) has incurred any obligation which has or could reasonably be expected to have a Material Adverse Effect on account of the termination or withdrawal from any Foreign Plan.

Section 3.17    <u>Insurance</u>.  Except as set forth in <u>Schedule 3.17</u>, all insurance policies required to be obtained by the Borrower Group Members other than any Non-Guarantor Subsidiary (and each Non-Guarantor Subsidiary) pursuant to <u>Section 5.06</u> and under any Material Agreement, if any, have been obtained and are in full force and effect as required under <u>Section 5.06</u> and all premiums then due and payable thereon have been paid in full.  No Loan Party (and each Non-Guarantor Subsidiary) has received any notice from any insurer that any insurance policy has

US-DOCS\~~120330147.2~~120747417.14

ceased to be in full force and effect or claiming that the insurer's liability under any such insurance policy can be reduced or avoided.

Section 3.18    Use of Proceeds.  The proceeds the Loans on the Initial Funding Date will be used solely in accordance with, and solely for the purposes contemplated by, Section 5.13.  No part of the proceeds of any Loan and other extensions of credit hereunder will be used, either directly or indirectly, by any Borrower Group Member to purchase or carry any Margin Stock (as defined in Regulation U) or to extend credit to others for the purpose of purchasing or carrying any Margin Stock or for any purpose that entails a violation of any of the regulations of the Board.

Section 3.19    Membership Interests and Related Matters.

(a)    The only member of CL Intermediate Holdco is the Borrower.

(b)    Other than as set forth on Schedule 3.19(b), no Loan Party has any Subsidiaries and no Loan Party owns any equity interest in, or otherwise Controls any Voting Stock of or has any ownership interest in, any Person.

(c)    All of the membership interests in the Borrower and each Guarantor have been duly authorized and validly issued in accordance with its operating agreement and any other constitutive documents, are fully paid and non-assessable (subject to the applicable Loan Parties' obligation to contribute capital to another Loan Party, in accordance with the terms of such Loan Party's governing documents) and free and clear of all Liens.  Other than as contemplated herein in connection with the Lender Warrant, neither the Borrower nor any Guarantor has outstanding any securities convertible into or exchangeable for any of its membership interests in or any rights to subscribe for or to purchase, or any warrants or options for the purchase of, or any agreements providing for the issuance (contingent or otherwise) of, or any calls, commitments or claims of any character relating to any such membership interests (except as expressly provided for or permitted herein or in the Security Documents).

Section 3.20    [Reserved].

Section 3.21    No Agreements with Affiliates.  Schedule 3.21 sets forth any and all agreements, transactions or series of related transactions among, on one hand, one or more Loan Parties, and on the other hand, one or more Affiliates of a Loan Party (other than the Loan Parties), in each case, that involve payment of more than $50,000.

Section 3.22    No Bank Accounts.  No Loan Party maintains any accounts other than the Collateral Accounts and Excluded Accounts.

Section 3.23    No Default or Event of Default.  No Default or Event of Default has occurred and is continuing.

Section 3.24    Foreign Assets Control Regulations.

(a)    None of the Borrower Group Members, and none of their respective, principals, owners, officers or directors, or, to any of the Loan Parties' knowledge, their respective

63

Affiliates or agents (i) is a Sanctioned Person; or (ii) engages in any dealings or transactions in or with a Sanctioned Country or that are otherwise prohibited by Sanctions.

(b)    Each of the Borrower Group Members maintains reasonable policies and procedures to ensure compliance with Sanctions, Anti-Corruption Laws and Anti-Money Laundering Laws (as such compliance is required under this Agreement).

(c)    Each of the Borrower Group Members and their respective officers, directors, employees and, to the Borrower Group Members' knowledge, agents are in compliance with Anti-Corruption Laws, Anti-Money Laundering Laws and Sanctions.

(d)    No part of the proceeds of the Loans will be used, directly or indirectly (i) in violation of the FCPA, Anti-Money Laundering Laws or Sanctions or (ii) to offer or make payments or to take any other action that would constitute a violation, or implicate any Lender, Administrative Agent, Collateral Agent or their respective Affiliates in a violation, of Anti-Corruption Laws.

(e)    Each of the Borrower Group Members has disclosed all facts known to it regarding (a) all claims, damages, liabilities, obligations, losses, penalties, actions, judgment, and/or allegations of any kind or nature that are asserted against, paid or payable by such Person, any of its Affiliates or any of its representatives in connection with non-compliance with Anti-Corruption Laws, Sanctions or Anti-Money Laundering Laws by such Person, and (b) any investigations involving possible non-compliance with Anti-Corruption Laws, Sanctions or Anti-Money Laundering Laws by such Person or such Affiliate or such representative.  No proceeding by or before any Governmental Authority involving any Borrower Group Member with respect to Anti-Corruption Laws, Sanctions or Anti-Money Laundering Laws is pending or, to the knowledge of the Borrower Group Members, threatened.

Section 3.25    Commercial Activity; Absence of Immunity.  Each Loan Party is subject to civil and commercial law with respect to its obligations under the Transaction Documents, and the making and performance of the Transaction Documents by the Loan Parties constitute private and commercial acts rather than public or governmental acts.  The Loan Parties are not entitled to any immunity on the ground of sovereignty or the like from the jurisdiction of any court or from any action, suit, setoff or proceeding, or the service of process in connection therewith, arising under the Financing Documents.

ARTICLE IV

CONDITIONS

Section 4.01    Conditions to the Closing Date.    The occurrence of the Closing Date, the effectiveness of this Agreement and the obligations of each Agent and each Lender hereunder are subject to the receipt by the Administrative Agent (except as set forth otherwise below) of each of the following documents, and the satisfaction of the conditions precedent set forth below, each of which must be satisfied to the reasonable satisfaction of the Administrative Agent (unless waived in accordance with Section 10.02):

64

(a)    <u>Execution of Certain Financing Documents</u>.  This Agreement, the Loan Discount Letters and the Agent Reimbursement Letter shall have been duly executed and delivered by each of the Loan Parties, Agent and Lenders intended to be parties thereto and shall be in full force and effect.

(b)    <u>Corporate Documents</u>.  The following documents, each certified as of the Closing Date as indicated below:

(i)    copies of the Organizational Documents, together with any amendments thereto, of each Loan Party and a certificate of good standing or its equivalent (if any) for the applicable jurisdiction for each such party (in each case such good standing certificate or its equivalent dated no more than ten (10) days prior to the Closing Date);

(ii)    an Officer's Certificate of each Loan Party dated as of the Closing Date, certifying:

(A)    that attached to such certificate is a true and complete copy of the Organizational Documents referred in clause (i) above for such Person;

(B)    that attached to such certificate is a true and complete copy of resolutions duly adopted by the board of directors, member(s), partner(s) or other authorized governing body of such Person authorizing the transactions contemplated by the Financing Documents, and that such resolutions or other evidence of authority have not been modified, rescinded or amended and are in full force and effect;

(C)    that the certificate of incorporation, certificate of formation, charter or other Organizational Documents (as the case may be) referred in clause (i) above for such Person has not been amended since the date of the certification furnished pursuant to clause (i) above;

(D)    as to the incumbency and specimen signature of each officer, member or partner (as applicable) of such Person executing the Financing Documents to which such Person is or is intended to be a party (and each Lender may conclusively rely on such certificate until it receives notice in writing from such Person); and

(E)    as to the qualification of such Person to do business in each jurisdiction where its operations require qualification to do business and as to the absence of any pending proceeding for the dissolution or liquidation of such Person.

(c)    <u>Material Agreements and Bond Documents</u>.  A copy of each of the Material Agreements and the Bond Documents executed as of the Closing Date and any amendments thereto shall have been made available to the Administrative Agent and the Lenders for their review.

(d)    <u>Authorizations</u>.  All material Authorizations required under any Applicable Law to be issued to, assigned to, or otherwise assumed by any Loan Party and necessary for (i) conduct of the Business or (ii) the execution, delivery and performance by such Loan Party of the Transaction Documents to which it is a party, other than, in each case, Authorizations that

are not currently necessary and are obtainable in the ordinary course of business, (A) have been duly obtained and, to the knowledge of Borrower, validly issued, (B) are in full force and effect and not subject to any pending or, to the knowledge of Borrower, threatened, appeal or legal proceeding that could reasonably be expected to result in a material adverse modification to or withdrawal, cancellation, suspension or revocation of such Authorization, (C) are issued to, assigned to, or otherwise assumed by, a Loan Party (or such Loan Party is entitled to the benefit thereof), (D) are free from any unsatisfied condition the failure of which to satisfy could reasonably be expected to have a Material Adverse Effect and (E) with respect to such Authorizations, all applicable statutory, judicial and administrative review periods have expired.

(e)    Operating Budget.  A copy of the current Operating Budget in substantially the form presented prior to the Closing Date.

(f)    Regulatory Information.  Each Lender shall have received all documentation and other written information required by under applicable anti-money laundering rules and regulations, including the USA PATRIOT Act.

(g)    Representations and Warranties.  The representations and warranties of each of the Loan Parties set forth in the Financing Documents shall be true and correct in all material respects on and as of the Closing Date (except where already qualified by materiality or Material Adverse Effect, in which case, in all respects).

(h)    No Default or Event of Default; No Material Adverse Effect.  No Default or Event of Default shall have occurred and be continuing on, or shall result as a result of the transactions contemplated to occur on, the Closing Date. As of the Closing Date, no development, event or circumstance that has had or could reasonably be expected to have a Material Adverse Effect shall have occurred and be continuing, or shall result as a result of the transactions contemplated to occur on the Closing Date.

(i)    Officer's Certificate.  An Officer's Certificate of the Borrower dated as of the Closing Date certifying that each of the conditions set forth in this Section 4.01 have been satisfied.

The Parties hereto acknowledge and agree that the Closing Date occurred on August 2, 2019.

Section 4.02    Conditions to the Initial Funding Date.  The occurrence of the Initial Funding Date and each Lender's obligations to make the Loans pursuant to Section 2.01 on such date are subject to the receipt by the Administrative Agent (except as set forth otherwise below) of each of the following documents, and the satisfaction of the conditions precedent set forth below, each of which must be satisfied to the reasonable satisfaction of the Administrative Agent (unless waived in accordance with Section 10.02):

(a)    Financing Documents; VCOC Matters; Warrants; Bond Documents.

(i)    Each of the Security Agreement, a Control Agreement relating to each Collateral Account, the Subordination Agreements and each other Financing Document

66

shall have been duly executed and delivered by each of the Loan Parties, Agent and Lenders intended to be parties thereto and shall be in full force and effect.

(ii)    A strategic committee observer rights agreement containing such terms as will permit each of the Lenders to qualify as a "venture capital operating company" within the meaning of Department of Labor Regulation 29 C.F.R. Section 2510.3-101, dated as of the Initial Funding Date, substantially in the form attached hereto as <u>Exhibit H</u> (the "<u>Observer Rights Agreement</u>").

(iii)    The Lender Warrants shall have been duly executed and delivered by each of the parties thereto.

(b)    <u>Payoff Letters</u>. The Administrative Agent shall have received payoff letters with respect to the ABL Credit Agreement and the Term Loan Credit Agreement, together with such UCC termination statements as shall be requested by the Administrative Agent, in each case, in form and substance satisfactory to the Administrative Agent.

(c)    <u>Fees and Expenses</u>.  The Borrower has arranged for payment on such Funding Date (including arrangement for payment out of the proceeds of Loan to be made on such Funding Date in accordance with <u>Section 5.13</u>) of all reasonable and documented out-of-pocket fees, reimbursements and expenses then due and payable pursuant to the Financing Documents.

(d)    <u>Funds Flow Memorandum</u>.  The Funds Flow Memorandum, which shall be in form and substance satisfactory to the Administrative Agent in its sole and absolute discretion.

(e)    <u>Establishment of Accounts</u>. Evidence that each of the Collateral Accounts described in <u>clauses (a)</u> through <u>(c)</u> of the definition thereof has been established.

(f)    <u>Security Documents and Collateral Perfection Matters</u>.

(i)    The Security Documents shall have been duly executed and delivered by the Persons intended to be parties thereto and shall be in full force and effect.

(ii)    The security interests in and to the Collateral intended to be created under the Security Documents shall have been created in favor of the Collateral Agent for the benefit of the Secured Parties, are in full force and effect and the necessary notices, consents, acknowledgments, filings, registrations and recordings to preserve, protect and perfect the security interests in the Collateral have been made immediately prior to the Initial Funding Date such that the security interests granted in favor of the Collateral Agent for the benefit of the Secured Parties are filed, registered and recorded and will constitute a first priority (subject to Permitted Liens), perfected security interest in the Collateral free and clear of any Liens, other than Permitted Liens, and all related recordation, registration and/or notarial fees of such Collateral have been paid to the extent required.

(iii)    Appropriately completed UCC financing statements (Form UCC-1) or UCC financing statement amendments (Form UCC-3), which have been duly authorized for filing by the appropriate Person, naming the Loan Parties as debtors and Collateral

US-DOCS\~~120330147.2~~120747417.14

Agent as secured party, in form appropriate for filing under each jurisdiction as may be necessary to perfect the security interests purported to be created by the Security Documents, covering the applicable Collateral.

(iv)     Copies of UCC, judgment lien, tax lien and litigation lien search reports, which reports will be for the period between the Closing Date and a recent date acceptable to the Administrative Agent in its sole and absolute discretion, listing all effective financing statements that name any Loan Party as debtor and that are filed in the jurisdictions in which the UCC-1 financing statements will be filed in respect of the Collateral, none of which shall cover the Collateral except to the extent evidencing Permitted Liens.

(v)     Appropriately completed copies of all other recordings and filings of, or with respect to, the Security Documents as may be requested by Collateral Agent and necessary to perfect the security interests purported to be created by the Security Documents.

(vi)     Subject to Section 5.21(b), the Collateral Agent shall be satisfied with arrangements to receive all certificates representing the shares of Capital Stock constituting "certificated securities" under the UCC that are pledged pursuant to the Security Agreement, together with an undated stock power for each such certificate executed in blank by a duly Authorized Representative of the Borrower.

(vii)     Evidence that all other actions requested by Collateral Agent and necessary to perfect and protect the security interests purported to be created by the Security Documents entered into on or prior to the Initial Funding Date have been taken immediately prior to the Initial Funding Date.

(g)     Insurance Deliverables.

(i)     The Borrower shall have obtained the insurance required to be in effect under Section 5.06 and such insurance shall be in full force and effect, and the Borrower shall have furnished the Administrative Agent with certificates signed by the insurer or an agent authorized to bind the insurer, together with loss payee endorsements in favor of the Collateral Agent, evidencing such insurance, identifying underwriters, the type of insurance, the insurance limits and the policy terms, and stating that such insurance (x) is, in each case, in full force and effect and (y) complies with Section 5.06 and that all premiums then due and payable on such insurance have been paid.

(ii)     Reasonably satisfactory evidence that the Borrower has in place insurance required to be in effect under Section 5.06.

(h)     Opinions of Counsel.  Written opinions (dated the Initial Funding Date and addressed to the Administrative Agent, the Lenders and the Collateral Agent) of Reed Smith LLP, special New York counsel to the Loan Parties.

US-DOCS\120330147.2120747417.14

The Parties hereto acknowledge and agree that the Initial Funding Date occurred on August 2, 2019, and that all conditions precedent thereto were either satisfied or permanently waived.

Section 4.03    Conditions to Each Funding Date.  The occurrence of each Funding Date (including the Initial Funding Date and the Second Funding Date) and each Lender's obligations to make the Loans pursuant to Section 2.01 on such date are subject to the satisfaction of the conditions precedent set forth below, each of which must be satisfied to the reasonable satisfaction of the Administrative Agent (unless waived in accordance with Section 10.02):

(a)    Documents.  Administrative Agent shall have received:

(i)    To the extent not previously delivered, a copy of each Bond Document, including all schedules, exhibits, attachments, supplements and amendments thereto shall have been delivered to the Administrative Agent.

(ii)    Any amendment to any Material Agreement or any Material Agreement executed after the Closing Date shall have been delivered to the Administrative Agent.

(iii)    A Borrowing Request in accordance with Section 2.01(**ef**), executed and delivered by an Authorized Representative of the Borrower.

(iv)    To the extent requested by any Lender prior to such Funding Date pursuant to Section 2.04(b), a duly executed Note or Notes, as applicable, dated such Funding Date, payable to such Lender in a principal amount equal to such Lender's Loan.

(v)    An Officer's Certificate of the Borrower, dated as of such Funding Date, certifying that each of the conditions set forth in this Section 4.03 (and, in the case of the Initial Funding Date, Section 4.02) has been satisfied.

(b)    Fees and Expenses.  The Borrower has arranged for payment on such Funding Date (including arrangement for payment out of the proceeds of Loan to be made on such Funding Date in accordance with Section 5.13) of all reasonable and documented out-of-pocket fees, reimbursements and expenses then due and payable pursuant to the Financing Documents.

(c)    Representations and Warranties.  The representations and warranties of each Loan Party set forth in the Financing Documents shall be true and correct in all material respects on and as of such Funding Date (except where already qualified by materiality or Material Adverse Effect or in the case of any representation and warranty in Section 3.13, in all respects).

(d)    No Default or Event of Default; No Material Adverse Effect.  No Default or Event of Default shall have occurred and be continuing on, or shall result as a result of the transactions contemplated to occur on, such Funding Date. As of such Funding Date, no development, event or circumstance that has had or would reasonably be expected to have a Material Adverse Effect shall have occurred and be continuing, or shall result from the transactions contemplated to occur on such Funding Date.

(e)    ~~Use of Proceeds. The Administrative Agent and the Borrower shall have mutually agreed on the use of proceeds of the Loans made on such Funding Date.~~**Tranche C Loans. Solely with respect to the Tranche C Funding Date (other than the Tranche C Funding Date occurring on the Amendment No. 5 Effective Date):**

        **(i)    The Tranche C Lenders shall have approved (in their sole discretion) the making of Tranche C Loans on the requested Tranche C Funding Date.**

        **(ii)    To the extent the use of proceeds of Tranche C Loans is not in accordance with, or not contemplated by, Schedule 5.13(c), the Tranche C Lenders shall consented to the use of proceeds of the Tranche C Loans made on the requested Tranche C Funding Date.**

Section 4.04    <u>Satisfaction of Conditions</u>.  Except to the extent that Borrower has disclosed in the Borrowing Request that an applicable condition specified in <u>Section 4.01</u> <u>4.02</u>, or <u>4.03</u> will not be satisfied as of the Closing Date or applicable Funding Date, as applicable, Borrower shall be deemed to have made a representation and warranty as of such time that the conditions specified in such Section have been satisfied.  No such disclosure by Borrower that a condition specified in <u>Section 4.01</u> <u>4.02</u>, or <u>4.03</u>, as applicable, will not be satisfied as of Closing Date or the applicable Funding Date, as applicable, shall affect the right of each Lender not to make the Loans requested to be made by it if such condition has not been satisfied at such time.

## ARTICLE V

## AFFIRMATIVE COVENANTS

Each Loan Party hereby agrees that, from and after the Closing Date until the Discharge Date:

Section 5.01    <u>Corporate Existence; Etc.</u> Each Borrower Group Member shall at all times preserve and maintain in full force and effect (a) its existence as a corporation or a limited liability company, as applicable, (b) its good standing under the laws of the jurisdiction of its organization, and (c) its qualification to do business and its good standing in each jurisdiction in which the character of properties owned by it or in which the transaction of its business as conducted or proposed to be conducted makes such qualification necessary.

Section 5.02    <u>Conduct of Business</u>.  Each Borrower Group Member shall operate, maintain and preserve or cause to be operated, maintained and preserved, the Business in accordance in all material respects with the requirements of the Material Agreements to which it is a party and in compliance, in all material respects, with Applicable Laws and Authorizations by Governmental Authorities and the terms of its insurance policies.

Section 5.03    <u>Compliance with Laws and Obligations</u>.

(a)    Each Borrower Group Member shall comply in all material respects with applicable Environmental Laws, including occupational health and safety regulations, and all other Applicable Laws and Authorizations. Each Borrower Group Member shall comply with and perform its respective contractual obligations in all material respects, and enforce against

Material Counterparties their respective material contractual obligations in all material respects, under each Material Agreement to which it is a party. Each Borrower Group Member shall not violate applicable Sanctions, Anti-Money Laundering Laws, the FCPA or any other Anti-Corruption Laws and shall not undertake or cause to be undertaken any Anti-Corruption Prohibited Activity.

Section 5.04    <u>Governmental Authorizations</u>.    Each Borrower Group Member shall obtain, preserve and maintain in full force and effect (or where appropriate, renew in a timely manner), or cause to be obtained and maintained in full force and effect all material Authorizations (including all material Authorizations required by Environmental Law) required under any Applicable Law for (i) conduct of the Business or (ii) the execution, delivery and performance by such Loan Party of the Transaction Documents to which it is a party, in each case, at or before the time the relevant Authorization becomes necessary for such purposes.

Section 5.05    <u>Maintenance of Title</u>.    Each Borrower Group Member shall maintain (a) good title to the property owned by such Borrower Group Member necessary for the conduct of the Business free and clear of Liens, other than Permitted Liens; (b) legal and valid and subsisting leasehold interests to the properties leased by such Borrower Group Member necessary for the conduct of the Business, free and clear of Liens, other than Permitted Liens and (c) legal and valid possessory rights to the properties possessed and not otherwise held in fee or leased by such Borrower Group Member necessary for the conduct of the Business.

Section 5.06    <u>Insurance</u>.

(a)    Each Loan Party shall maintain insurance with insurance companies rated A- (or the then equivalent grade) or better, with a minimum size rating of VII (or the then equivalent grade) by A.M. Best Company (or an equivalent rating by another nationally recognized insurance rating agency of similar standing if A.M. Best Company shall no longer publish its Best's Credit Ratings or if S&P shall no longer publish its ratings for insurance companies, as the case may be) or other insurance companies of recognized responsibility satisfactory to the Administrative Agent against at least such risks and in at least such amounts as are customarily maintained by prudent similar businesses and as may be required by Applicable Law and as are required by the Material Agreements and/or Security Documents. All such insurance shall, (a) provide that no cancellation or material modification thereof shall be effective until at least thirty (30) days (or, in the case of cancellation for non-payment of premiums, ten (10) days) after receipt by the Administrative Agent of written notice thereof, (b) in the case of any liability insurance and property insurance, name the Collateral Agent and the Secured Parties as an additional insured party thereunder and (c) in respect of any such policy relating to the Property of the Loan Parties, in the case of each casualty insurance policy, name the Collateral Agent as lender's loss payee. On the Closing Date and from time to time thereafter deliver to the Administrative Agent upon its reasonable request information in reasonable detail as to the insurance then in effect, stating the names of the insurance companies, the amounts and rates of the insurance, the dates of the expiration thereof and the properties and risks covered thereby.

(b)    Each Loan Party shall maintain (or cause to be maintained) the insurance required to be maintained pursuant to the Material Agreements in accordance with the terms of the same.

(c)    The applicable Loan Party shall instruct the relevant insurers to pay Loss Proceeds of the insurance policies provided or obtained by or on behalf of the Loan Parties directly to the Borrower Account **(Springing)**.  If any Loss Proceeds that are required under the preceding sentence to be paid to the Borrower Account **(Springing)** are received by any other Loan Party, such Loss Proceeds shall be received in trust for the Collateral Agent, shall be segregated from other funds of the recipient, and shall be forthwith paid into the Borrower Account **(Springing)** in the same form as received (with any necessary endorsement).

Section 5.07    Keeping of Books.  Each Loan Party shall maintain an accounting and control system, management information system and books of account and other records, which together adequately reflect truly and fairly the financial condition of such Loan Party and the results of operations in accordance with GAAP and all Applicable Laws.

Section 5.08    Access to Property/Records.  Each Loan Party shall permit (i) officers and designated representatives of the Administrative Agent to visit and inspect any of its properties accompanied by officers or designated representatives of such Loan Party and (ii) officers and designated representatives of the Administrative Agent to examine and make copies of the books of record and accounts of such Loan Party (provided that such Loan Party shall have the right to be present) and discuss the affairs, finances and accounts of such Loan Party with the chief financial officer, the chief operating officer and the chief executive officer of such Loan Party (subject to reasonable requirements of safety and confidentiality, including requirements imposed by Applicable Law or by contract), in each case, with at least three (3) Business Days advance notice to such Loan Party and during normal business hours of such Loan Party; provided that, such Loan Party shall not be required to reimburse the Administrative Agent for more than one inspection per calendar year as long as no Event of Default has occurred.

Section 5.09    Taxes.

(a)    Each Loan Party shall pay and discharge, before the same shall become delinquent, all material Taxes imposed upon it or upon its property to the extent required under the Transaction Documents to which such Loan Party is a party or under Applicable Law that, if unpaid, might become a Lien (other than a Permitted Lien of the type referenced in clause (a)(i) of the definition of Permitted Lien) upon its property; provided that such Loan Party shall not be required to pay or discharge any such Tax for so long as such Loan Party satisfies the Permitted Contest Conditions in relation to such tax, assessment, charge or claim.

(b)    No Loan Party shall make an election pursuant to Treasury Regulations Section 301.7701-3(c) to be treated as an association taxable as a corporation for U.S. federal income tax purposes or take any other action inconsistent with such Loan Party's status as an entity treated as a partnership or disregarded for U.S. federal income tax purposes.

Section 5.10    Financial Statements; Other Reporting Requirements.  Each Loan Party shall, or cause the applicable Non-Guarantor Subsidiary to, furnish to the Administrative Agent:

(a)    as soon as available and in any event within thirty (30) days after the end of each calendar month, a monthly report containing (i) such detailed information as Borrower customarily relies upon to monitor the operational performance (including commercial updates)

US-DOCS\~~120330147.2~~120747417.14

of the Borrower Group Members, (ii) information on the financial performance of the Borrower Group Members and (iii) other key business performance indicators, in the form attached hereto as Exhibit F; provided that, for the report delivered under this clause (a) related to the end of each fiscal quarter, the Borrower shall delivery such report within forty-five (45) days after the end of such fiscal quarter;

(b)        as soon as available and in any event within thirty (30) days after the end of each calendar month, commencing with the partial calendar month during which the Closing Date occurs, monthly unaudited consolidated financial statements of the Borrower Group Members, including the unaudited consolidated balance sheet as of the end of such calendar month and the related unaudited statements of income, retained earnings and cash flows for such calendar month and for the portion of such fiscal year ending on the last day of such calendar month, all in reasonable detail; provided that, for the financial statements delivered under this clause (b) related to the end of each fiscal quarter, the Borrower shall delivery such financial statements within this forty-five (45) days after the end of such fiscal quarter;

(c)        as soon as available and in any event within one hundred fifty (150) days after the end of each fiscal year (or, in the case of the fiscal year ending December 31, 2019, on or prior to September 8, 2020), commencing with fiscal year ending on December 31, 2019, audited consolidated financial statements for such fiscal year for the Borrower Group Members, including therein the consolidated balance sheet as of the end of such fiscal year and the related statements of income, retained earnings and cash flows for such year, and the respective directors' and auditors' reports, all in reasonable detail and accompanied by customary management discussion and analysis and an audit opinion thereon by the Independent Auditor, which opinion shall state that said financial statements present fairly, in all material respects, the financial position of the Borrower Group Members, as the case may be, at the end of, and for, such fiscal year in accordance with GAAP;

(d)        at the time of the delivery of the financial statements under Section 5.10(b) or (c) above, a certificate of an Authorized Representative of Borrower (i) certifying that such financial statements fairly present in all material respects the financial condition and results of operations of the Borrower Group Members on the dates and for the periods indicated in accordance with GAAP, subject, in the case of interim financial statements, to the absence of footnotes and normally recurring year-end adjustments, (ii) certifying that no Default or Event of Default has occurred and is continuing, or if a Default or Event of Default has occurred and is continuing, a statement as to the nature thereof and (iii) certifying and providing calculations for the Leverage Ratio as of such date (such certificate, the "Compliance Certificate");

(e)        within thirty (30) days after each annual policy renewal date, a certificate of an Authorized Representative of the Borrower certifying that the insurance requirements of Section 5.06 have been implemented and are being complied with by the Loan Parties and on or prior to the expiration of each policy required to be maintained pursuant to Section 5.06, certificates of insurance with respect to each renewal policy and each other insurance policy required to be in effect under this Agreement that has not previously been furnished to the Administrative Agent under this Agreement.  If at any time requested by the Administrative

Agent, the Borrower shall deliver to the Administrative Agent a duplicate of any policy of insurance required to be in effect under this Agreement;

(f)    within forty-five (45) days following the end of each fiscal quarter, an environmental, social and governance report in respect of the applicable fiscal year in the form attached hereto as Exhibit J;

(g)    within three (3) Business Days following delivery of any financial statements, operating or construction reports and/or any other material notices or reporting information as required under the Bond Documents or any Permitted Revolving Facility, a copy of such document, notice or information delivered in connection with the Bond Documents, any Permitted Revolving Facility, as applicable; **and**

(h)    within five (5) Business Days of the end of each calendar month, in electronic format, an itemized summary of all withdrawals from the Collateral Accounts made during such calendar month.

Section 5.11    Notices.    The Loan Parties shall, or cause the applicable Non-Guarantor Subsidiary to promptly (and, unless a subsection of this Section 5.11 is expressly made subject to another time period, within five (5) Business Days) upon an Authorized Representative of any Loan Party obtaining knowledge thereof (or as otherwise provided in the case of clauses (a) and (h) below), give notice to the Administrative Agent of:

(a)    within five (5) Business Days after the earlier of (i) an Authorized Representative of any Borrower Group Member obtaining knowledge thereof and (ii) receipt of any notice thereof, the occurrence of any material default under any Material Agreements;

(b)    within ten (10) Business Days of any documents becoming available, any agreement or transaction (or series of related transactions) entered into with an Affiliate of a Loan Party (that is not a Loan Party) with a value in excess of $500,000 over the term of such agreement or transaction (or series of related transactions);

(c)    as soon as available, but in any event within two (2) days of any sale or proposed sale of Amcor Receivables, reports of all sales and proposed sales of such Amcor Receivables, in each case specifying the dollar amount thereof and the account debtor with respect thereto;

(d)    [Reserved];

(e)    within ten (10) Business Days of any documents becoming available, true and complete copies of any amendment of any Material Agreement and of any Material Agreements executed after the Closing Date;

(f)    any Investments made by any Loan Party in a Non-Guarantor Subsidiary, to the extent not permitted by this Agreement; **and**

(g)    (x) the sale, lease, transfer or other Disposition of, in one transaction or a series of transactions, all or any part of the property of the Borrower Group Members in excess of $500,000 in the aggregate per calendar year and (y) the entry of any contract contemplated by,

74

and any Disposition pursuant to, Section 6.07(e)(iii) (including the fair market value of any such Disposition)~~.~~**;**

(h)    notice received by it with respect to the cancellation of, adverse change in, or default under, any insurance policy required to be maintained in accordance with Section 5.06;

(i)    the filing or commencement of any litigation, investigation, action or proceeding (including any Environmental Claim) of or before any court, arbitrator or Governmental Authority against or affecting any Borrower Group Member or the Business ~~(x) in which the amount involved is in excess of $1,250,000, (y) has resulted in or, if adversely determined, could reasonably be expected to result in a Material Adverse Effect or (z) which relates to a material Authorization (including all material Authorizations required by Environmental Law) necessary for the Business~~**;**;

(j)    the occurrence of a Default or an Event of Default;

(k)    the occurrence of any ERISA Event, together with a written notice setting forth the nature thereof and the action, if any, that such Loan Party or ERISA Affiliate proposes to take with respect thereto;

(l)    no later than five (5) Business Days prior to the execution and delivery thereof (which period may be shortened in any instance at Administrative Agent's discretion), any amendment thereof, notice of any amendment to any Material Agreement ~~that is an offtake agreement~~;

(m)    within five (5) days of delivery, copies of all statements, reports and notices (including board kits) made available to Borrower's **employees, Equity Shareholders or its** Board of Directors; provided that**, with respect to any materials made available to its Board of Directors,** any such material may be redacted by Borrower to exclude information relating to the Lenders (including Borrower's strategy regarding the Loans) or any material that Borrower determines in good faith, upon advice of counsel, the exclusion of which is reasonably necessary to preserve attorney-client privilege ~~or to protect highly confidential proprietary information of any Borrower Group Member; and~~**;**

(n)    within ~~five~~**three** (~~5~~**3**) days of delivery or receipt, copies of all material notices **(including but not limited to all formal correspondence and all correspondence relating to any defaults or potential or anticipated litigation)** delivered or received in connection with the Niagara Promissory Note~~.~~**;**

**(o)    within three (3) days of delivery or receipt, copies of all notices (including but not limited to all formal correspondence and all correspondence relating to any default or potential or anticipated litigation) delivered or received in connection with the Bond Documents; and**

**(p)    within three (3) days of delivery or receipt, copies of all notices (including but not limited to all formal correspondence and all correspondence relating to any potential or anticipated litigation) received from, or delivered to, any counterparty to a Material Agreement or any other vendor or customer agreement that could reasonably be**

75

**expected to require payments by, or to, the Loan Parties in excess of $50,000, outside the ordinary course of business.**

Section 5.12    [Reserved]

Section 5.13    Use of Proceeds.

(a)    The proceeds of the Loans funded on the Initial Funding Date shall be used as specified on Schedule 5.13(a).  The proceeds of the Loans funded on the Second Funding Date shall be used as specified on Schedule 5.13(b).

(b)    The proceeds of the Tranche B Loans shall be used to satisfy a portion of CL P's $10,000,000 equity funding obligations under the Pennsylvania Bond Documents in accordance with the Tranche B Funds Flow Memorandum.

**(c)    The Tranche C Loans shall be used as specified on Schedule 5.13(c) or as may be agreed by the Administrative Agent (in its sole discretion).**

**(d)**    ~~(c)~~ For the avoidance of doubt, (i) Borrower is permitted to lend or contribute the proceeds of the Loans to one or more of the Guarantors and (ii) except as set forth in Section 6.04, no Loan Party is permitted to lend or contribute the proceeds of the Loans to any of the Non-Guarantor Subsidiaries.

**(e)**    ~~(d)~~ The proceeds of the Loans will not be used in violation of Anti-Corruption Laws or applicable Sanctions.

Section 5.14    Security.  The Loan Parties shall preserve and maintain the security interests granted under the Security Documents and undertake all actions which are necessary or appropriate to:  (a) maintain the Collateral Agent's security interest in the Collateral in full force and effect at all times (including the priority thereof (subject to Permitted Liens)), and (b) preserve and protect the Collateral and protect and enforce the Loan Parties' rights and title and the rights of the Collateral Agent and the other Secured Parties to the Collateral (subject to Permitted Liens), including the making or delivery of all filings and recordations, the payment of all reimbursements, fees and other charges and the issuance of supplemental documentation.

Section 5.15    Further Assurances.    The Loan Parties shall execute, acknowledge where appropriate, and deliver, and cause to be executed, acknowledged where appropriate, and delivered, from time to time promptly at the reasonable request of any Agent all such instruments and documents as are necessary or appropriate to carry out the intent and purpose of the Financing Documents (including filings, recordings or registrations required to be filed in respect of any Security Document or assignment thereto) necessary to maintain, to the extent permitted by Applicable Law, the Collateral Agent's perfected security interest in the Collateral to the extent and in the priority required by the Financing Documents.

Section 5.16    Security in Newly Acquired Property and Revenues.  Without limiting any other provision of any Financing Document, if any Loan Party shall at any time acquire interests in property in a single transaction or series of transactions, as applicable, not otherwise subject to the Lien created by the Security Documents having a value of at least $1,000,000 individually,

promptly upon such acquisition, such Loan Party shall execute, deliver and record a supplement to the Security Documents or other documents, subjecting such interest to the Lien created by the Security Documents.

Section 5.17    Material Agreements.    Each Loan Party shall, or cause the applicable Non-Guarantor Subsidiary to (a) duly and punctually perform and observe all of its material covenants and obligations contained in each Material Agreement to which it is a party and (b) enforce against the relevant Material Counterparty each material covenant or obligation of such Material Agreement, as applicable, in accordance with its terms.

Section 5.18    Collateral Accounts.

(a)    The Loan Parties shall at all times maintain the Collateral Accounts in accordance with the Financing Documents and cause such Collateral Accounts to be subject to a Control Agreement at all times.

(b)    [Reserved]

(c)    At all times each Loan Party shall deposit and maintain, or cause to be deposited and maintained, all Business Revenues, insurance proceeds and other amounts received into the Collateral Accounts in accordance with the provisions below and request or make only such payments and transfers out of the Collateral Accounts as permitted by the provisions below (except as otherwise consented to in writing by the Collateral Agent).

(i)    Borrower Account **(Springing)**.

**(A) The Loan Parties shall deposit into the Borrower Account: (i) proceeds of the Loans which are intended to be deposited into such account(s) pursuant to the Funds Flow Memorandum delivered on the Initial Funding Date or any funds flow memorandum agreed with the Administrative Agent and delivered in connection with any other Funding Date, (ii) any Business Revenues paid to any Loan Party and (iii) all other amounts received by any Loan Party and not required or permitted to be deposited into another Collateral Account pursuant to this Agreement (including proceeds in respect of Events of Loss (including Loss Proceeds) and Dispositions, proceeds from the incurrence of Indebtedness, termination payments and other extraordinary payments under project contracts (including the Material Agreements), damages and other proceeds received by the Loan Parties).**

**(A)    Subject to any intercreditor agreement applicable to any Permitted Revolving Facility, the Loan Parties shall deposit into the Borrower Account (Springing) any Business Revenues paid to any Loan Party.  On and after the Amendment No. 5 Effective Date, any amounts received into the Borrower Account (Springing), other than Business Revenues, shall promptly be transferred to the Borrower Account (Blocked).**

(B)    The Loan Parties may make withdrawals, transfers and payments from the Borrower Account ~~as permitted by this Agreement and the other Financing Documents.~~**(Springing) solely (1) with the prior written consent of the Chief Restructuring**

**Officer and (2) to the extent such withdrawals, transfers and payments is in compliance with the California Prepetition Budget.**

      (ii)      <u>Debt Service Reserve Account</u>.

      (A)      On the Second Funding Date, if any, the Debt Service Reserve Account shall be funded in cash, from the proceeds of the Loans advanced on such date, in an amount equal to $7,730,000.

      (B)      ~~Subject~~**Prior to the Amendment No. 5 Effective Date, subject** to <u>clause (C)</u> below, if the Borrower has insufficient cash to pay interest on the Loans in accordance with <u>Section 2.07</u> (taking into account the right of the Borrower to pay interest in kind pursuant to <u>Section 2.07(e)</u>) on any Quarterly Payment Date (such insufficiency, the "***Interest Payment Deficiency***"), Borrower shall promptly transfer an aggregate amount equal to the Interest Payment Deficiency (or, if less, the aggregate amount of cash then on deposit in the Debt Service Reserve Account) from the Debt Service Reserve Account to the Administrative Agent to pay, on behalf of Borrower, the Interest Payment Deficiency.

      ~~(C) [Reserved]~~

      **(iii)      Borrower Account (Blocked).**

      **(A)      From and after the Amendment No. 5 Effective Date, the Loan Parties shall deposit into the Borrower Account (Blocked) (i) proceeds of the Tranche C Loans, and (ii) all other amounts received by any Loan Party and not required or permitted to be deposited into another Collateral Account pursuant to this Agreement (including proceeds in respect of Events of Loss (including Loss Proceeds) and Dispositions, proceeds from the incurrence of Indebtedness, termination payments and other extraordinary payments under project contracts (including the Material Agreements), damages and other proceeds received by the Loan Parties).**

      **(B)      The Loan Parties may make withdrawals, transfers and payments from the Borrower Account (Blocked) solely to the extent such withdrawals, transfers and payments is in compliance with the California Prepetition Budget (as confirmed in writing by (1) the Chief Restructuring Officer and (2) to the extent any such withdrawals, transfers and payments exceed $75,000, the Administrative Agent).**

      (d)      The Loan Parties shall cause the Non-Guarantor Subsidiaries to distribute cash to the Loan Parties to the extent permitted under the applicable Bond Documents of such Non-Guarantor Subsidiaries.

      (e)      Nothing set forth in this Agreement shall prohibit the Borrower Group Members from depositing or holding in the Excluded Accounts the amounts described in the definition thereof.

Section 5.19    Intellectual Property.

(a)    Each Loan Party shall own, or be licensed to use, all Intellectual Property that such Loan Party reasonably believes is necessary for its conduct of the Business, in each case, as to which the failure of such Loan Party to so own or be licensed could reasonably be expected to have a Material Adverse Effect.

(b)    If a Loan Party licenses any Intellectual Property from another Person and such Intellectual Property is material to the conduct of the business of any Loan Party, and the license is rejected in an insolvency proceeding, such Loan Party shall use commercially reasonable efforts to maintain its rights under the license, which efforts shall include making an election under Section 365(n) of the Bankruptcy Code, if an election is available to such Loan Party.

(c)    Each Loan Party agrees that, should it hereafter (i) obtain an ownership interest in any issued Copyrights, Trademarks, or Patents, (ii) obtain an exclusive license to any Copyrights, (iii) either by itself or through any agent, employee, licensee, or designee, file any application for the registration or issuance of any Copyrights, Trademarks or Patents with the United States Patent and Trademark Office or the United States Copyright Office, or (iv) should it file a statement of use or an amendment to allege use with respect to any "intent-to-use" Trademark application (the items in clauses (i), (ii) (iii) and (iv), collectively, the "After-Acquired Intellectual Property"), then, unless it constitutes Excluded Assets under the Pledge and Security Agreement, any such After-Acquired Intellectual Property shall automatically become part of the Collateral, and such Loan Party shall give written notice thereof within 60 days of the registration or issuance thereof to the Collateral Agent in accordance herewith.

(d)    Each Loan Party agrees to use commercially reasonable efforts so as not to permit the inclusion in any contract to which it hereafter becomes a party of any provision that would materially impair or prevent the creation of a security interest in such Loan Party's rights and interests in any property described in Section 5.19(c) that is material to the business of any Loan Party, other than the Financing Documents and any loan documentation relating to the Permitted Revolving Facility.

(e)    Each Loan Party shall promptly notify the Collateral Agent if it knows or has reason to know that any registered or issued Copyrights, Trademarks or Patents that it owns or licenses becomes (i) abandoned or dedicated to the public or placed in the public domain, (ii) invalid or unenforceable, (iii) subject to any adverse determination or development regarding such Loan Party's ownership, registration or use or the validity or enforceability of such item of Intellectual Property (including the institution of, or any adverse development with respect to, any action or proceeding in the United States Patent and Trademark Office, the United States Copyright Office, any state registry, any foreign counterpart of the foregoing, or any court) or (iv) the subject of any reversion or termination rights.

(f)    Each Loan Party shall not intentionally infringe, misappropriate, dilute, or otherwise violate the Intellectual Property rights of any other Person in any manner which could reasonably be expected to have a Material Adverse Effect.  In the event that any Person initiates, or threatens in writing to initiate, any action or proceeding alleging that such Loan Party, or the conduct of such Loan Party's business, infringes, misappropriates, dilutes, or otherwise violates

US-DOCS\120330147.2120747417.14

the Intellectual Property of any other Person, and such action or proceeding could reasonably be expected to have a Material Adverse Effect, such Loan Party shall promptly notify the Collateral Agent after it learns thereof.

Section 5.20    Budget and Updated Model; Non-Guarantor Subsidiaries.

(a)    Submission of Operating Budget.  (x) With respect to the Loan Parties, not later than thirty (30) days after the beginning of each fiscal year following the Closing Date beginning with the calendar year ending December 31, 2021, (y) with respect to the Texas Facility Group, no later than ~~thirty~~sixty (~~30~~60) days after the beginning of the calendar year ending December 31, 2021, and (z) with respect to the Pennsylvania Facility Group, no later than ~~thirty~~sixty (~~30~~60) days after the beginning of the calendar year ending December 31, 2021, in each case, the Borrower shall submit to the Lenders a copy of its proposed operating budget for such fiscal year with respect to the applicable Borrower Group Members covered thereby.  In addition, Borrower may from time to time propose an amended operating budget for the remainder of any fiscal year to which an existing Operating Budget applies.  The effectiveness of any proposed operating budget so submitted, for purposes of the Financing Documents, is subject to Sections 5.20(b).

(b)    Approval of Operating Budget.  Except with respect to the agreed Operating Budget delivered on the Closing Date, each proposed operating budget delivered pursuant to Section 5.20(a) (which shall include, for the avoidance of doubt, approval of operating budgets in respect of the Texas Facility Group and the Pennsylvania Facility Group) shall not be effective for purposes of the Financing Documents until approved by the Administrative Agent (such approval not to be unreasonably withheld, conditioned or delayed).  In the event that, pursuant to the immediately preceding sentence, such a proposed operating budget is not approved by the Administrative Agent, or the Borrower has not submitted a proposed operating budget for a fiscal year, the Operating Budget for the immediately preceding fiscal year shall apply until a proposed operating budget for the then current fiscal year is approved.

(c)    Compliance with Operating Budget; Intra-year Adjustments.  Commencing on the Closing Date, direct wages, other manufacturing overhead, general and administrative expenses, maintenance capital expenses and growth capital expenses shall be paid by the Loan Parties  in compliance with the Operating Budget for such companies, except as set forth in this Section 5.20(c).

(i)    Without necessitating any amendment to the Operating Budget, the Loan Parties  may exceed any line item in the Operating Budget for the applicable fiscal year, so long as the net excess of all line items for such fiscal year does not exceed zero (after giving effect to any Net Additional Equity Raise Amounts applied pursuant to Section 5.20(c)(iii)).

(ii)    While performance against the Operating Budget will be reported periodically pursuant to Section 5.10(d), compliance with the Operating Budget will be determined only on an annual basis (after giving effect to any equity cures pursuant to Section 5.20(c)(iii) or 6.01(b)), and Loan Parties shall not be in breach of this Section 5.20(c) (and no Default or Event of Default may occur) by virtue of any reported

deviation from the Operating Budget  for any Loan Party on a period shorter than an annual basis.

(iii)    So long as no Tranche B Obligations are outstanding, the Borrower may, in its discretion, use any Net Additional Equity Raise Amounts to cure any default in respect of this Section by paying direct wages, other manufacturing overhead, general and administrative expense, maintenance capital expense and growth capital expense made during the fiscal year in which such cash was received by Borrower for purposes of determining compliance with this Section 5.20(c).

(d)    Non-Guarantor Subsidiaries.  Non-Guarantor Subsidiaries shall utilize such Non-Guarantor Subsidiary's **Business Revenues**revenues and any other receipts otherwise arising or derived from or paid or payable to such Non-Guarantor Subsidiaries under agreements or otherwise in respect of the Business (including any extraordinary receipts) to pay operating expenses, debt service, Capital Expenditures and other amounts generally in accordance with the applicable Operating Budget, and shall distribute, to the extent permitted by the Bond Documents, and the terms of any applicable working capital financing arrangements entered into as permitted by this Agreement, and net of reasonable reserves and working capital, all remaining cash and Cash Equivalent Investments to the Loan Parties once per calendar quarter.

Section 5.21    Post-Closing Covenants.

(a)    The Loan Parties shall cause the property insurance policies to be increased to an amount of not less than $60,000,000 per occurrence during the current policies' next policy period.

(b)    Each Loan Party shall cause all certificates representing the shares of Capital Stock constituting "certificated securities" under the UCC that are pledged pursuant to the Security Agreement, together with an undated stock power for each such certificate executed in blank by a duly Authorized Representative of the applicable Loan Party, each in form and substance reasonably satisfactory to the Collateral Agent, to be delivered to the Collateral Agent within fifteen (15) days of the Initial Funding Date.

(c)    The Loan Parties shall obtain key person life insurance insuring the life of Leon Farahnik in an amount of not less than $7,500,000 (the "Life Insurance Policy") within ninety (90) days of the Initial Funding Date and until the Discharge Date, maintain such Life Insurance Policy in such amount at all times.  The Life Insurance Policy shall name the Borrower as owner and beneficiary with respect to such insurance and shall designate the Borrower Account **(Springing)** as the account in which proceeds under the Life Insurance Policy shall be paid.

**(d) [Reserved].**

(d)    Notwithstanding Section 5.20 or anything else herein to the contrary, all expenditures, transfers, payments and withdrawals of (i) the Loan Parties occurring on or after the Amendment No. 5 Effective Date shall be made solely (A) to the extent such amounts are in compliance with the California Prepetition Budget and (B) to repay the Tranche A/C Obligations (if elected by the Loan Parties), (ii) except as could not

81

**reasonably be expected to have a Material Adverse Effect, the Texas Facility Group occurring on or after the Amendment No. 5 Effective Date shall be made solely to the extent such amounts are in compliance with the Texas Prepetition Budget and (iii) except as could not reasonably be expected to have a Material Adverse Effect, the Pennsylvania Facility Group occurring on or after the Amendment No. 5 Effective Date shall be made solely to the extent such amounts are in compliance with the Pennsylvania Prepetition Budget.**

(e)     The Loan Parties shall, within 30 days following the Closing Date, provide to the Administrative Agent a certificate of good standing from the Secretary of State of the State of California with respect to PinnPack.

**(f)     The Loan Parties shall satisfy the milestones set forth in the Customer Discussions Plan, the Operational Improvements Plan, and the Investment Banker Report, in each case, in accordance with the requirements set forth therein.**

~~(f) Provided that the Tranche B Loan then remains outstanding, the Borrower shall, to the extent requested by the Administrative Agent (in its sole and absolute discretion), use its commercially reasonable efforts to consummate a Qualified PinnPack Sale.~~

~~(g) On and after the Amendment No. 2 Effective Date, Borrower shall use commercially reasonable efforts to raise Additional Equity Raise Amounts in an amount equal to at least $20,000,000 on or prior to the Tranche B Maturity Date.~~

~~(h) [Reserved]~~

~~(i) [Reserved]~~

ARTICLE VI

NEGATIVE COVENANTS

Each Loan Party agrees that from and after the Closing Date until the Discharge Date:

Section 6.01    Subsidiaries; Equity Issuances.

(a)     No Loan Party shall (i) form or have any subsidiary other than another wholly-owned U.S. domestic subsidiary whose equity interests become subject to the Security Documents as contemplated by the Security Documents (other than the Non-Guarantor Subsidiaries and any Subsidiaries that are not wholly-owned on the Closing Date) or (i) subject to Section 6.04 hereof, own, or otherwise Control any Capital Stock in, any other Person.

(b)     Borrower shall not issue any additional shares of Capital Stock while any breach of Section 5.20(c) is continuing, subject to the following.  Notwithstanding anything to the contrary contained in Article VII, in the event that Borrower fails to comply with Section 5.20(c) for any fiscal year, Borrower may, within ninety (90) days of the end of such fiscal year, issue additional shares of Capital Stock of Borrower in exchange for cash (the amount thereof, the "Cure Amount").  Upon the receipt by Borrower of the cash Cure Amount pursuant to the

82

exercise of such cure right, such Cure Amount shall be deemed to reduce the aggregate amount of direct wages, other manufacturing overhead, general and administrative expense, maintenance capital expense and growth capital expense made during the fiscal year for which such breach occurred, and compliance with the Operating Budget for such fiscal year shall be recalculated for all purposes under the Loan Documents. If, after giving effect to the foregoing recalculation, Borrower shall then be in compliance with the Operating Budget, Borrower shall be deemed to have satisfied the requirements of Section 5.20(c) for such fiscal year, with the same effect as though there had been no failure to comply therewith, and the applicable breach of Section 5.20(c) that had occurred, and any related Default or Event of Default, shall be deemed cured without any further action of Borrower, Administrative Agent or any Lender for all purposes under the Loan Documents.

Section 6.02    Indebtedness.  No Borrower Group Member shall create, incur, assume or suffer to exist any Indebtedness, other than (each of the following, "Permitted Indebtedness"):

(a)    Indebtedness incurred under the Financing Documents;

(b)    Capital Lease Obligations or purchase money obligations to the extent incurred in the ordinary course of business to finance the acquisition or licensing of intellectual property or discrete items of equipment (and Indebtedness incurred to finance any such obligations); provided that the annual debt service payments in respect of all such Indebtedness (inclusive of interest, principal and fees) does not exceed $350,000 per calendar year;

(c)    current accounts payable not more than ninety (90) days past due or which are that are being contested in accordance with the Permitted Contest Conditions, interest thereon, regulatory bonds, surety obligations and accrued expenses incurred, in the ordinary course of business;

(d)    [Reserved];

(e)    Indebtedness incurred under any Permitted Revolving Facility;

(f)    Indebtedness existing on the Closing Date and set forth in Schedule 6.02 and extensions, renewals and replacements of any such Indebtedness that do not increase the outstanding principal amount thereof except by an amount equal to a reasonable premium or other amount paid, and reasonable fees and expenses incurred, in connection with such extension, renewal or replacement or change any direct or contingent obligor with respect thereto or shorten the average life to maturity thereof;

(g)    (i) Guarantees by any Borrower Group Member of Indebtedness otherwise permitted hereunder of any other Borrower Group Member, and (i) performance guarantees provided by a Loan Party to support the obligations of any Loan Party in the ordinary course of business under the Material Agreements;

(h)    Indebtedness under the Shareholder Notes and subject to the applicable Subordination Agreement or another subordination agreement in form and substance reasonably acceptable to the Administrative Agent;

83

(i)      unsecured intercompany Indebtedness among the Borrower Group Members, to the extent unsecured and, if in favor of any Loan Party, pledged to the Collateral Agent, for the benefit of the Secured Parties, under the Security Agreement; provided, that any intercompany loans from the Loan Parties to any Non-Guarantor Subsidiary **created** on or after the Amendment No. 2 Effective Date shall be subject to the approval of the Administrative Agent (not to be unreasonably withheld, conditioned or delayed);

(j)      other Indebtedness of the Non-Guarantor Subsidiaries in an amount not exceeding $4,000,000 (exclusive of all Indebtedness referenced in clause (l) below) in the aggregate at any time outstanding across the Non-Guarantor Subsidiaries (for which the Loan Parties shall not be obligated);

(k)      Indebtedness with respect to letters of credit in favor of the landlord under any real property leases, in each case, issued in accordance with the applicable real property lease and in an aggregate stated amount not exceeding $6,000,000 at any time outstanding;

(l)      (i) in the case of the Non-Guarantor Subsidiaries, Indebtedness of a Non-Guarantor Subsidiary under the Bond Documents to which it is a party as of the date hereof, (ii) in the case of the Non-Guarantor Subsidiaries, additional industrial revenue bond transactions of a nature similar to those subject to the Bond Documents following the date hereof so long as (1) the aggregate outstanding principal amount of the Indebtedness under the foregoing clauses (i) and (ii) does not exceed $140,000,000, (2) neither Borrower nor any Guarantor has any direct liability therefor and (3) the Administrative Agent has approved (in its sole discretion) the documentation related thereto in writing (it being acknowledged that the forms attached hereto as <u>Exhibit L</u> shall be pre-approved) and (iii) additional industrial revenue bond transactions of a nature similar to those subject to the Bond Documents not involving any of the Borrower Group Members in existence as of the Closing Date;

(m)      (i) Indebtedness of the Borrower in respect of the Niagara Promissory Note (as in effect as of the Amendment No. 2 Effective Date, without giving effect to any modifications that are not consented to by the Administrative Agent, in its reasonable discretion) and (ii) other unsecured Indebtedness in an aggregate principal amount not exceeding $1,000,000 at any time outstanding (as such amount may be increased with the consent of the Administrative Agent in its sole and absolute discretion);

(n)      Unsecured Indebtedness incurred under the "paycheck protection program" under Section 1102 of the CARES Act (as in effect on the Amendment No. ~~2~~**5** Effective Date**, hereinafter the "PPP"**) in an aggregate principal amount not exceeding $5,850,000 **plus any additional amounts for which the applicant would be entitled to obtain forgiveness under the terms of the PPP**; and

(o)      Indebtedness incurred under a Qualified Junior Facility, so long as the proceeds of such Indebtedness are used to repay all of the outstanding Tranche ~~B~~**A/C** Obligations.

**Notwithstanding the foregoing Section 6.02 or anything in this Agreement to the contrary, on and after the Amendment No. 5 Effective Date, none of the Borrower Group Members shall incur (i) any intercompany Indebtedness or similar obligations owing to any Affiliate**

**or (ii) any Indebtedness for borrowed money, in either case, other than (A) such amounts that are in compliance with the (1) California Prepetition Budget (in respect of the Loan Parties), (2) the Texas Prepetition Budget (in respect of the Texas Facility Group) or (3) the Pennsylvania Prepetition Budget (in respect of the Pennsylvania Facility Group) or (B) Indebtedness incurred on a Permitted Revolving Facility in effect as of the Amendment No. 5 Effective Date and subject to the terms and conditions of the intercreditor agreement applicable to such Permitted Revolving Facility.**

Section 6.03   Liens, Etc. No Borrower Group Member shall create, incur, assume or suffer to exist any Lien upon or with respect to any of its properties of any character (including accounts receivables) whether now owned or hereafter acquired, or assign any accounts or other right to receive income, other than (each of the following, a "Permitted Lien"):

(a)    Liens arising by reason of:

(i)    Taxes either secured by a bond or which are not yet due or which are being contested pursuant to the Permitted Contest Conditions;

(ii)    security, pledges or deposits in the ordinary course of business for payment of workmen's compensation or unemployment insurance or other types of social security benefits; and

(iii)    good faith deposits or pledges incurred or created in connection with or to secure the performance of bids, tenders, contracts (other than contracts for the payment of money), leases, statutory obligations, surety bonds or appeal bonds entered into in the ordinary course of business or under Applicable Law;

(b)    Liens of mechanics, carriers, landlords, warehousemen, materialmen, laborers, repairmen's, employees or suppliers or any similar Liens **(including purchase money Liens)** arising by **statute or** operation of law, incurred in the ordinary course of business with respect to obligations which are not overdue by more than forty-five (45) days, or which are adequately bonded and which are being contested pursuant to the Permitted Contest Conditions;

(c)    Liens arising out of judgments, orders or awards that have been adequately bonded, are fully covered by insurance (subject to applicable deductibles) or with respect to which a stay of execution has been obtained pending an appeal or proceeding for review pursuant to the Permitted Contest Conditions;

(d)    Liens arising with respect to zoning restrictions, easements, licenses, reservations, covenants, rights-of-way, utility easements, building restrictions and other similar charges or encumbrances on the use of real property which, individually or in the aggregate, do not materially detract from the value of the affected property and do not materially interfere with the ordinary conduct of the business of such Borrower Group Member;

(e)    Liens or the interests of lessors to secure purchase money obligations permitted under Section 6.02(b); provided that such Lien encumbers only the specific goods, equipment or software so financed, any accessions thereto, proceeds thereof and related books and records;

85

(f)      Liens arising under ERISA and Liens arising under the US Code with respect to an employee benefit plan (as defined in Section 3(2) of ERISA) that do not constitute an Event of Default under Section 7.01(i);

(g)      to the extent constituting Liens, leases, licenses, subleases or sublicenses granted to others in the ordinary course of business that do not (i) interfere in any material respect with the ordinary conduct of the Business of the Borrower Group Members, (ii) secure any Indebtedness or (iii) individually or in the aggregate detract from the expected value of the property of the Borrower Group Members in any material respect;

(h)      (i) Liens arising solely by virtue of any statutory or common law provision relating to banker's liens, rights of set-off or similar rights and remedies and burdening only deposit accounts or other funds maintained with a creditor depository institution, in each case, granted in the ordinary course of business in favor of such creditor depositary institution, provided that no such deposit account is a dedicated cash collateral account or is subject to restrictions against access by the depositor in excess of those set forth by regulations promulgated by the Board and no such deposit account is intended by Borrower to provide collateral to the depository institution and (ii) Liens in favor of a banking or other financial institution arising as a matter of law or in the ordinary course of business under customary general terms and conditions encumbering deposits or other funds maintained with a financial institution (including the right of setoff) and that are within the general parameters customary in the banking industry or arising pursuant to such banking institution's general terms and conditions;

(i)      any Lien on any property or asset of the Borrower or any of its Subsidiaries existing on the Closing Date and set forth in Schedule 6.03; provided that such Lien shall not apply to any other property or asset of the Borrower or any Subsidiary;

(j)      Liens arising under the Financing Documents;

(k)      (i) Liens securing obligations under any Permitted Revolving Facility, on the applicable Borrower Group Members' (A) accounts or proceeds arising from the sale of inventory or the provision of services, (B) all Inventory (as defined in the UCC), (C) any equipment which the Collateral Agent shall agree, in its sole discretion, can be subject to a prior Lien in favor of the Permitted Revolving Facility, (D) segregated proceeds of the foregoing (including any deposit accounts, securities accounts or commodities accounts holding solely such proceeds) and (E) books and records relating to the foregoing and (ii) solely for the six (6) month period occurring after the Amendment No. 4 Effective Date, a precautionary security interest and Lien of Citibank in and to the Amcor Receivables sold or assigned to it from time to time pursuant to and in accordance with the terms of the Citibank Financing Documents, to the extent any such sale or assignment is not deemed to constitute a true sale thereof, as collateral security for the payment of the obligations of the Loan Parties to Citibank thereunder;

(l)      Liens on the assets and properties of the Non-Guarantor Subsidiaries incurred pursuant to the Bond Documents;

US-DOCS\120330147.2120747417.14

(m)    cash collateral arrangements with respect to letters of credit issued in accordance with Section 6.02(k);

(n)    Liens on the assets and properties of the Non-Guarantor Subsidiaries securing Indebtedness permitted in reliance on Section 6.02(j);

(o)    Liens consisting of Investments permitted in reliance on Section 6.04(j);

(p)    Liens that extend, renew or replace in whole or in part a Lien referred to above; and

(q)    to the extent the conditions set forth in the definition of "Qualified Junior Facility" are satisfied, junior Liens in favor of the holder of any Indebtedness incurred under such Qualified Junior Facility.

**Notwithstanding the foregoing Section 6.03 or anything in this Agreement to the contrary, on and after the Amendment No. 5 Effective Date, no Loan Party shall create, incur or assume any Lien in favor of (i) providers of Indebtedness for borrowed money or (ii) counterparties to Material Agreements, in either case, upon or with respect to any of its properties of any character (including accounts receivables) whether now owned or hereafter acquired, or assign any accounts or other right to receive income.**

Section 6.04    Investments.  No Borrower Group Member shall make any Investment, except:

(a)    cash equity investments and/or equity contributions made by a Loan Party to a Non-Guarantor Subsidiary either (i) to the extent such investment or contribution is made using the direct or indirect cash proceeds of the issuance of additional shares of Capital Stock of Borrower in exchange for cash after the Closing Date; provided that, at the time of such issuance, no Event of Default is continuing and so long as no Tranche B Obligations are outstanding; and (ii) $10,000,000 from proceeds of the Niagara Promissory Note and the Tranche B Loans, which shall be contributed within three (3) Business Days of the Amendment No. 2 Effective Date to CL P;

(b)    (i) intercompany loans among the Borrower Group Members, to the extent unsecured and pledged to the Collateral Agent, for the benefit of the Secured Parties, under the Security Agreement (provided, that any intercompany loans from the Loan Parties to any Non-Guarantor Subsidiary on or after the Amendment No. 2 Effective Date shall be subject to the approval of the Administrative Agent (not to be unreasonably withheld, conditioned or delayed)), and (ii) Investments between Loan Parties;

(c)    (i) Cash Equivalent Investments and (ii) bank deposits in the ordinary course of business;

(d)    deposits described in Section 6.03(a)(ii);

(e)    **solely to the extent any such Investments were made prior to the Amendment No. 5 Effective Date,** Investments consisting of extensions of credit in the nature of deposits, accounts receivable or notes receivable arising from the grant of trade credit in the ordinary

US-DOCS\120330147.2120747417.14

course of business, and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors to the extent reasonably necessary in order to prevent or limit loss;

(f)    non-cash consideration received, to the extent permitted by the Financing Documents, in connection with the Disposition of property permitted by this Agreement;

(g)    Investments listed on Schedule 6.04 as of the ~~Closing~~**Amendment No. 5 Effective** Date;

~~(h) discounts given to customers of any Loan Party in the ordinary course of business;~~

**(h)**    ~~(i)~~ Investments by any Non-Guarantor Subsidiary in accordance with the Bond Documents; and

**(i)**    ~~(j)~~ Investments consisting of security deposits with utilities, landlords and other like Persons made in the ordinary course of business.

**Notwithstanding the foregoing Section 6.04 or anything else contained in this Agreement to the contrary, on and after the Amendment No. 5 Effective Date, (A) no Loan Party shall make any Investments except in compliance with the California Prepetition Budget and (B) to the extent the Loan Parties are entering into agreements, transactions or otherwise conducting business with the Texas Facility Group and/or the Pennsylvania Facility Group, (i) each of the Texas Facility Group and/or the Pennsylvania Facility Group, as applicable, must pre-pay in full in cash for any services, products, goods or other value provided by the Loan Parties to the Texas Facility Group and/or the Pennsylvania Facility Group, as applicable and (ii) such agreements, transactions or other conduct of business shall have been approved in writing by the Chief Restructuring Officer and the Administrative Agent or shall be in accordance with the California Prepetition Budget.**

Section 6.05    Chief Executive Office; Business Activities**; Personnel Changes**.

(a)    Each Loan Party shall maintain its chief executive office at the address specified in Section 10.01, and no such Person shall change such chief executive office unless it has given at least ten (10) days' prior notice thereof to the Administrative Agent and the Collateral Agent, and each Loan Party has taken all steps then required pursuant to the Security Agreements to ensure the maintenance and perfection of the security interests created or purported to be created thereby.

(b)    No Borrower Group Member shall at any time to any material extent conduct any activities other than (i) those related to the Business and the other Material Agreements and any activities incidental to the foregoing and (ii) in the case of any Non-Guarantor Subsidiary, those not prohibited by the Bond Documents.

**(c)    No Borrower Group Member shall make any changes to its respective key employees and other executive personnel, except with the prior written consent of the**

88

**Administrative Agent, such consent not to be unreasonably withheld, conditioned or delayed.**

Section 6.06    Restricted Payments.  No Borrower Group Member shall declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment other than:

(a)  **(i) dividends**~~Dividends~~, distributions or other payments in respect of Investments by any Borrower Group Member to any Loan Party;

~~(b)~~ **, (ii) Restricted Payments among Loan Parties (iii)** ~~any Loan Party may declare and pay dividends with respect to its equity interests payable solely in additional shares of its common stock;~~

~~(c) any Loan Party may make Restricted Payments pursuant to and in accordance with stock option plans or other benefit plans for management or employees of the Borrower, including repurchases of equity interests of any nature from employees of any Borrower Group Member or from officers and/or directors of Borrower, provided that the aggregate amount thereof does not exceed $100,000 during any fiscal year;~~

~~(d) any Loan Party may make any payment pursuant to Section 6.10 so long as any such payments are in compliance with the Operating Budget (subject to any variance permitted pursuant to Section 5.20), it being understood that any amounts that are not contemplated by, or included in, the Operating Budget are not permitted to be made;~~

~~(e) the Loan Parties may make payments on (i) the Shareholder Notes, so long as (A) the amount of such payments under Shareholder Notes (other than with any DSR Released Funds and any Net Additional Equity Raise Amounts) do not exceed $200,000 per year, (B) except in the case of any payment with DSR Released Funds or any Net Additional Equity Raise Amounts, such amounts are paid quarterly, (C) except in the case of any payment with DSR Released Funds or any Net Additional Equity Raise Amounts, such payment amounts do not exceed 25% of the annual interest outstanding on such Indebtedness, (D) except in the case of any payment with DSR Released Funds or any Net Additional Equity Raise Amounts, the full amount of the Interest Rate payable hereunder that is payable in cash (subject to the Borrower's rights to pay in kind in Section 2.07) has been paid in cash through the date of such payment and (E) no Default, Event of Default or Material Adverse Effect has occurred and is continuing or would result from such Restricted Payment (provided, that the foregoing shall not restrict payment on any Shareholder Notes (including Additional Shareholder Notes) using Net Additional Equity Raise Amounts), and (ii) the Loan Parties may make payments on the Pennsylvania Intercompany Indebtedness and the Texas Intercompany Indebtedness from Net Additional Equity Raise Amounts, so long as no Default, Event of Default or Material Adverse Effect has occurred and is continuing or would result from such Restricted Payment; provided, that notwithstanding anything to the contrary above, payments on Shareholder Notes with any Net Additional Equity Raise Amounts are permitted only after the Tranche B Obligations are satisfied in cash in full;~~

89

~~(f) Permitted Tax Distributions so long as (x) no Default, Event of Default or Material Adverse Effect has occurred and is continuing or would result from such Restricted Payment and (y) the Administrative Agent shall have received reasonably detailed calculations of the amount of any such Permitted Tax Distribution proposed to be made (which calculations shall be in form and substance reasonably satisfactory to the Administrative Agent); and~~

~~(g)~~ Restricted Payments made by any Non-Guarantor Subsidiary to any Loan Party that are not prohibited by the Bond Documents~~; and~~.

~~(h) Restricted Payments among Loan Parties.~~

Section 6.07    <u>Fundamental Changes; Asset Dispositions</u>.  No Borrower Group Member shall:

(a)    in one transaction or a series of transactions, merge into or consolidate with, or acquire all or any substantial part of the assets or any class of stock or other ownership interests of, any other Person or sell, transfer or otherwise Dispose of all or substantially all of its assets to any other Person; <u>provided</u> that (i) the Borrower may participate in a merger or consolidation with any Person if (w) no Default is continuing, (x) any such merger or consolidation would not cause a Default hereunder, (y) if the Borrower merges or consolidates with any Person, the Borrower shall be the surviving Person and (z) such merger is approved by the Administrative Agent in its ~~reasonable~~sole discretion; (ii) any Subsidiary may participate in a merger or consolidation with the Borrower (provided that the Borrower shall be the continuing or surviving corporation); and (iii) any Non-Guarantor Subsidiary may do any of the foregoing to the extent not prohibited by the Bond Documents;

(b)    change its legal form, liquidate or dissolve (provided that any Non-Guarantor Subsidiary may do any of the foregoing to the extent not prohibited by the Bond Documents);

(c)    make or agree to make any amendment to its Organizational Documents to the extent that such amendment could reasonably be expected to be ~~materially~~ adverse to the interests of the Agents or the Lenders;

(d)    [Reserved]; **and**

(e)    Dispose of, in one transaction or a series of transactions, all or any part of the property owned by the Borrower Group Members in excess of $~~1,000,000~~25,000 per year in the aggregate other than: (i) sales or other Dispositions of equipment (either worn out or defective, or no longer used or useful, or to be replaced with improved equipment) for fair market value to the extent that the Borrower reinvests the Net Available Amount (or any portion thereof) of any such Disposition in substantially similar assets that are necessary or useful for the Business pursuant to a transaction not prohibited hereunder and such Net Available Amount is so reinvested within one hundred eighty (180) days (or been made the subject of a firm purchase order placed within such time period) of such Disposition; (ii) Dispositions of assets, including equity interests, from any Loan Party to any other Loan Party, (iii) Dispositions of cash and Cash Equivalent Investments in the ordinary course of business and for fair market value, (iv) licensing of Intellectual Property in the ordinary course of business, so long as it does not interfere in any material respect with the ordinary conduct of the Business of the Borrower

Group Members, (v) the sale of (A) inventory (if any) in ordinary course of business and (B) solely for the six (6) month period occurring after the Amendment No. 4 Effective Date, the sale or assignment of Amcor Receivables pursuant to and in accordance with the terms of the Citibank Financing Documents as in effect on the Amendment No. 4 Effective Date; provided, that, Lender shall at all times retain its junior Lien in and to all proceeds of each such sale or assignment; and (vi) dispositions of direct or indirect proceeds of the issuance of additional shares of Capital Stock of Borrower in exchange for cash after the Closing Date (provided that, at the time of such issuance, no Event of Default is continuing).  For the avoidance of doubt, maintenance capital expenditures treated as a disposition for accounting purposes shall not be subject to this clause (e) solely by virtue of such accounting treatment.

**Notwithstanding the foregoing Section 6.07 or anything else contained in this Agreement to the contrary, on and after the Amendment No. 5 Effective Date, no Borrower Group Member shall (i) acquire any property or dispose of all or any part of the property owned by the Borrower Group Members or (ii) reinvest the Net Available Amount of any such disposition, in each case, except in compliance with the (1) California Prepetition Budget (in respect of the Loan Parties), (2) the Texas Prepetition Budget (in respect of the Texas Facility Group) or (3) the Pennsylvania Prepetition Budget (in respect of the Pennsylvania Facility Group), and, in each case, expressly approved in writing by the Chief Restructuring Officer and the Administrative Agent; provided, that the foregoing shall not limit or restrict an Acceptable Sale (as defined in Amendment No. 5).**

Section 6.08    Accounting Changes.  No Loan Party shall change its fiscal year.

Section 6.09    Material Agreements, Bond Documents and Permitted Revolving Facilities.  No Borrower Group Member shall, directly or indirectly:

(a)    amend, modify, supplement or grant a consent, approval or waiver under, or permit or consent to the amendment, modification, supplement, consent, approval or waiver of (collectively, an "Amendment"), (i) any real property lease of any Facility, without the prior written consent of the Administrative Agent (which shall not to be unreasonably withheld, conditioned or delayed), (ii) any Material Agreement ~~that is an offtake agreement~~, without the prior written consent of the Administrative Agent ~~(which shall not be unreasonably withheld, conditioned or delayed), if such Amendment would (x) be reasonably expected to adversely affect Lenders, or (y) adversely modify any of the repayment terms related to the deposits~~, (iii) any Bond Document, ~~to the extent that such Amendment would limit the rights of the Non-Guarantor Subsidiaries to make distributions, add indebtedness or liens or take an action that is currently prohibited thereunder, (iv) any~~**unless, in the case of this clause (iii), such Amendment could not reasonably be expected to have a Material Adverse Effect, (iv) the** Permitted Revolving Facility in violation of any intercreditor agreement between Agent and the holders of the Indebtedness thereunder**;, except in any such case, to the extent such Amendment is expressly contemplated by the Customer Discussion Plan and the Operational Improvement Plan (in either case, solely to the extent such contemplation has been confirmed in writing by the Administrative Agent);**

(b)    make any voluntary or optional prepayment under the Niagara Promissory Note or make any voluntary or optional prepayment or return of customer deposit ~~inder~~**under** any

91

Material Agreements, in either case, without the prior written consent of the Administrative Agent;

(c)    ~~subject to the right of each Borrower Group Member to enter into a Replacement Agreement as set forth in~~ ~~Section 7.01(k),~~ directly or indirectly transfer, terminate, cancel or permit or consent to the transfer, termination or cancellation (including by exercising any contractual option to terminate, or failing to exercise any contractual option to extend) of any Material Agreement without the written consent of the Administrative Agent, such consent not to be unreasonably withheld, conditioned or delayed; or

(d)    enter into ~~an~~any Material Additional Agreement without the prior written consent of the Administrative Agent not to be unreasonably withheld, conditioned or delayed~~; provided that the entry into any Material Additional Agreement relating to any item contemplated by, and in compliance with, the Operating Budget (subject to any variance permitted pursuant to~~ ~~Section 5.20) shall not require the consent of the Administrative Agent.~~.

Section 6.10    Transactions with Affiliates.  No Borrower Group Member shall directly or indirectly enter into any transaction or series of related transactions with an Affiliate of such Borrower Group Member, except for (a) transactions set forth on Schedule 3.21 hereto and reasonable modifications, renewals or extensions thereto as contemplated by Borrower's Operating Budget (provided that no Loan Party may make any payments with respect to the Pennsylvania Intercompany Indebtedness or the Texas Intercompany Indebtedness except (i) with the consent of the Administrative Agent in its sole and absolute discretion or (ii) in compliance with Section 6.06(e)), (b) transactions in the ordinary course of such Borrower Group Member's (and such Affiliate's) business and upon fair and reasonable terms no less favorable to such Borrower Group Member than it would obtain in comparable arm's-length transactions with a Person acting in good faith which is not an Affiliate, (c) transactions between or among the Borrower Group Members not involving any other Affiliate and (d) any transaction permitted by Section 6.01, 6.02, 6.03, 6.04, 6.06, 6.07 or 6.16.  No Borrower Group Member shall cause a business opportunity of the Loan Parties to be diverted, assigned or allocated to the Non-Guarantor Subsidiaries.

**Notwithstanding the foregoing Section 6.10 or anything else contained in this Agreement to the contrary, on and after the Amendment No. 5 Effective Date, no Borrower Group Member directly or indirectly enter into any transaction or series of related transactions with an Affiliate of such Borrower Group Member without the prior written consent of the Administrative Agent, other than (i) sales of inventory or assets between Borrower Group Members (A) in the ordinary course of such Borrower Group Member's (and such Affiliate's) business and upon fair and reasonable terms no less favorable to such Borrower Group Member than it would obtain in comparable arm's-length transactions with a Person acting in good faith which is not an Affiliate and (B) for which the party making payment actually makes full payment in cash upon delivery and (ii) transactions among the Loan Parties in the ordinary course of business.**

Section 6.11    Collateral Accounts.  No Borrower Group Member shall open or maintain, or instruct any Person to open or maintain, any securities accounts, deposit accounts or other bank accounts other than (i) the Collateral Accounts (each of which shall be subject to a Control

Agreement at all times), (ii) Excluded Accounts and (iii) in the case of any Non-Guarantor Subsidiary, any such accounts that are not prohibited by the Bond Documents. Prior to the Discharge Date, no Borrower Group Member shall change (or permit any other Person to change) the name or account number of any Collateral Account without prior written notice to the Collateral Agent. No amounts may be transferred or withdrawn from any Collateral Account other than in accordance with and as permitted by Section 5.18.

Section 6.12    [Reserved].

Section 6.13    Hazardous Materials.  No Loan Party shall cause any Releases of Hazardous Materials at, on, from or under any real property currently or formerly owned, leased or operated by such Borrower Group Member, except to the extent such Release is otherwise in compliance in all material respects with all Applicable Laws, including Environmental Laws, and applicable insurance policies.

Section 6.14    No Hedging or Speculative Transactions.  No Loan Party shall enter into, or suffer to exist, any Hedging Agreement for speculative purposes or any other speculative transaction.

Section 6.15    Change of Auditors.  No Borrower Group Member shall change its Independent Auditor, except (i) with the prior written consent of the Administrative Agent, such consent not to be unreasonably withheld, conditioned or delayed, and (ii) in the case of any Non-Guarantor Subsidiary, to the extent not prohibited by the Bond Documents.

Section 6.16    Purchase of Capital Stock.  No Borrower Group Member shall purchase, redeem or otherwise acquire any of such Borrower Group Member's issued Capital Stock or otherwise reduce its Capital Stock, except (i) as permitted under Section 6.07, and (ii) in the case of any Non-Guarantor Subsidiary, to the extent not prohibited by the Bond Documents; provided that the foregoing shall in no way be construed to limit such Borrower Group Member's ability to make Restricted Payments.

Section 6.17    Citibank Financing Documents.  Prior to the borrowing or application any funds under the Citibank Financing Documents, the Borrower shall obtain the prior written consent of the Administrative Agent (in its sole discretion) as to the application of funds.

Section 6.18    Capital Expenditures.  No ~~Borrower Group Member~~Loan Party will make any Capital Expenditures other than (a) the purchase or lease of assets reasonably required for the Business in accordance with the Operating Budget; (b) the purchase or lease of assets reasonably required in connection with the Restoration of the Business to the extent permitted under Section 2.05(b)(ii); (c) any Capital Expenditures or other investments in assets necessary or useful for the business of the Business from the proceeds of any Disposition not prohibited by Section 6.07(e); (d) the purchase or lease of assets otherwise required or permitted by the Material Agreements to which it is a party that do not in the aggregate exceed the amount budgeted for such purchases or leases in the Operating Budget (subject to any variance permitted pursuant to Section 5.20), (e) Capital Expenditures with amounts on deposit in the Rejected Proceeds Account; (f) Capital Expenditures in accordance with the Operating Budget (subject to any

variance permitted pursuant to Section 5.20); **and** (g) with direct or indirect proceeds of the issuance of additional shares of Capital Stock of Borrower in exchange for cash after the Closing Date; ~~and (h) in the case of any Non-Guarantor Subsidiary, to the extent not prohibited by the Bond Documents.~~**provided, however, that on and after the Amendment No. 5 Effective Date, no Loan Party will make any Capital Expenditures other than Capital Expenditures in compliance with the California Prepetition Budget (in respect of the Loan Parties).**

**Section 6.19   Customer Discussions Plan.  The Borrower Group Members shall use good faith efforts not to engage in any customer pricing discussions in contravention of the Customer Discussions Plan.**

ARTICLE VII

EVENTS OF DEFAULT

Section 7.01   Events of Default.  If any of the following events ("Events of Default") shall occur:

(a)    the Borrower shall fail to pay any principal of any Loan (including any Accrued Interest that has been added to principal) when and as the same shall become due and payable, whether at the due date thereof or, in the case of payments of principal due pursuant to Section 2.05(b), at a date fixed for prepayment thereof, or otherwise; or

(b)    the Borrower shall fail to pay any other amount (other than an amount referred to in Section 7.01(a)) payable under this Agreement or under any other Financing Document when and as the same shall become due and payable~~, and such failure shall continue unremedied for a period of five (5) Business Days after the occurrence thereof~~; or

(c)    any representation or warranty made by or deemed made by any Loan Party in this Agreement or any other Financing Document, or in any certificate furnished to any Secured Party by or on behalf of such Loan Party in accordance with the terms hereof or thereof, shall prove to have been incorrect in any material respect (to the extent not already qualified by materiality) as of the time made or deemed made, confirmed or furnished~~;~~**,** unless (i) such incorrect representation or warranty is not that set forth in Section 3.05(b), (ii) the fact, event or circumstance resulting in such incorrect representation or warranty is capable of being changed such that such representation or warranty would be correct in all material respects, (iii) such fact, event or circumstance shall have been changed, within thirty (30) days (or sixty (60) days, if at the end of thirty (30) days the Loan Parties are proceeding with diligence and in good faith to change such fact, event or circumstance) from the earlier of (x) the date an Authorized Representative of any Loan Party obtains knowledge thereof and (y) the date notice is given to any Loan Party, such that such representation or warranty is correct in all material respects by such deadline, and (iv) such fact, event or circumstance (as so changed) would not reasonably be expected to result in a Material Adverse Effect; or

(d)    any Loan Party shall fail to observe or perform any covenant or agreement, as applicable, contained in the following Sections:

94

(i)    Section 2.05(b)(v) (as to delivery of detailed calculations of the Net Cash Flow amount), the last sentence of Section 2.07(c), Sections 5.01 (as to existence), **5.10,** 5.11~~(h)~~, 5.13, 5.21~~(g) through 5.21(l) or,~~ Article VI **or Sections 1, 2, 3 , 7 or 9 of Amendment No. 5**; or

(ii)    Sections 5.06(a), 5.10(b), 5.10(c), 5.10(h) or 5.20(c) and such failure has continued unremedied for a period of ~~twenty~~**five** (~~20~~5) Business Days after the occurrence thereof; or

(iii)    Sections 5.10(e) or 5.10(h) and such failure has continued unremedied for thirty (30) days after the occurrence thereof; or

(e)    any Loan Party shall fail, or fail to cause any Non-Guarantor Subsidiary, to observe or perform any covenant, condition or agreement contained in this Agreement or any other Financing Document to which it is a party  (other than those specified in Section 7.01(a), (b), (c), (d) or (l)), and such failure shall continue unremedied for a period of ~~thirty~~**five** (~~30~~5) days after the earlier of (i) written notice thereof to such Loan Party and (ii) knowledge of such default by an Authorized Representative of any Loan Party; provided that, if (A) such default cannot be cured within such ~~30~~5-day period, (B) such default is susceptible of cure and (C) the applicable Loan Party is proceeding with diligence and in good faith to cure such default, then such ~~thirty~~**five** (~~30~~5) day cure period shall be extended to such date, not to exceed a total of ~~sixty~~**ten** (~~60~~10) days, as shall be necessary for such Loan Party to diligently cure such default; or

(f)    a Bankruptcy occurs with respect to any Borrower Group Member or Leon Faranik; or

(g)    **either (i)** a final non-appealable judgment or order for the payment of money is entered against any Borrower Group Member in an amount exceeding $~~2,500,000~~**250,000** (exclusive of judgment amounts covered by insurance or bond where the insurer or bonding party has admitted liability in respect of such judgment), and such judgment remains unsatisfied without any procurement of a stay of execution for a period of ninety (90) days or more after the date of entry of judgment~~; or~~ **or (ii) on and after the Amendment No. 5 Effective Date, any litigation which could reasonably be expected to involve an amount exceeding $250,000 is commenced by (A) any counterparty to a Material Agreement, (B) any creditor of any Borrower Group Member, (C) any equityholder of any Borrower Group Member, (D) the holders of any Indebtedness under the Bond Documents or (E) the holders of any Permitted Revolving Facility, in any case, against one or more of the Borrower Group Members; or**

(h)    (i) any Security Document (A) is revoked, terminated or otherwise ceases to be in full force and effect (except in connection with its expiration in accordance with its terms in the ordinary course (and not related to any default thereunder) ~~and except to the extent such revocation, termination or cessation is caused by any act or omission of the Agent or the Lenders~~), or the enforceability thereof shall be challenged in writing by any Borrower Group Member, (B) ceases to provide (to the extent permitted by law and to the extent required by the Financing Documents) a first priority perfected Lien on the ~~assets purported to be covered thereby~~**Collateral** in favor of the Collateral Agent (other than any Vehicles), free and clear of

95

all other Liens (other than Permitted Liens), ~~except to the extent that such cessation is caused solely and directly by any act or omission by the Agent or the Lenders,~~ or (C) becomes unlawful or is declared void or (ii) any Financing Document (A) is revoked, terminated or otherwise ceases to be in full force and effect (except in connection with its expiration in accordance with its terms in the ordinary course (and not related to any default thereunder) ~~and except to the extent such revocation, termination or cessation is caused any act or omission by the Agent or the Lenders~~), or (B) becomes unlawful or is declared void; or

(i)    an ERISA Event has occurred which, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect; or

(j)    a Change of Control has occurred; or

~~(k)~~

**(k)**    ~~(i)~~ any Material Agreement ~~relating to material real property rights of any Facility~~ shall at any time for any reason cease to be valid and binding and in full force and effect (in each case, except in connection with its expiration in accordance with its terms in the ordinary course (and not related to any default thereunder)) on the applicable Material Counterparty~~; provided that any such event with respect to such Material Agreement shall not be an Event of Default if the applicable Person has, within thirty (30) days after the occurrence of such relevant circumstance, entered into a Replacement Agreement or has received a termination payment that has been offered to prepay the Loans in accordance with Section 2.05(b)(i) in an amount acceptable to the Administrative Agent (in its reasonable discretion); or~~ **or on the applicable Borrower Group Member; or**

~~(ii) any Material Agreement which contains a deposit or prepayment to a Borrower Group Member from a customer shall at any time for any reason cease to be valid and binding and in full force and effect (in each case, except in connection with its expiration in accordance with its terms in the ordinary course (and not related to any default thereunder)) on the applicable Material Counterparty; provided that any such event with respect to such Material Agreement shall not be an Event of Default if the applicable Person during the sixty (60) day period following the date that such deposit is required to be paid in full uses commercially reasonable efforts to extend the maturity of the deposit or prepayment liability with respect to such Material Agreement, such that the deposit or prepayment liability shall be amortized over a period of twelve (12) calendar months or longer, or causes the repayment of such deposit with either an Net Additional Equity Raise Amount (so long as no Tranche B Obligations are outstanding), or a deposit provided by an Additional Agreement which replaces the Material Agreement so terminated; or~~

(l)    any Authorization by a Governmental Authority necessary for the execution, delivery and performance of any obligation under the Transaction Documents is terminated or ceases to be in full force or is not obtained, maintained, or complied with~~, unless such failure (i) could not reasonably be expected to result in a Material Adverse Effect during the cure period (or the additional cure period) under the following clause (ii) and (ii) is remedied within ninety (90) days after the occurrence thereof or such longer period as is necessary, if~~

~~not fully remedied within such period, as is reasonably required so long as such remediation is diligently pursued in good faith and such default remains susceptible of cure; or~~; or

(m)    an uninsured Event of Loss or a Condemnation, in each case with respect to a portion of the property of the Borrower Group Members in excess of $~~7,500,000~~750,000 in value shall occur;

(n)    (i) the abandonment by any Loan Party of all or a material portion of its activities to operate or maintain the Business, which abandonment shall be deemed to have occurred if any Loan Party fails to operate any material part of the Business for a period of thirty (30) or more consecutive days; provided that any such failure to operate the Business caused by an Event of Loss or other force majeure event shall not constitute a Material Adverse Effect so long as, to the extent feasible during such Event of Loss or other force majeure event, the Borrower is diligently attempting to restart operation of the Business, or (ii) the written announcement by any Loan Party of its intention to do any of the foregoing in clause (i); or

(o)    any Loan Party shall default in any material respect in the observance or performance of any Material Agreement or material condition contained in the Observer Rights Agreement and such material default shall continue after the expiration of any cure period therefor; or

(p)    any Borrower Group Member shall (i) default in making any payment of any principal, interest or premium of (x) any Indebtedness (excluding the Obligations) the outstanding principal amount of which exceeds at such time $~~3,500,000~~350,000 or (y) the Niagara Promissory Note (such Indebtedness in clauses (x) and (y), "Material Indebtedness") on the scheduled or original due date with respect thereto~~, in each case, beyond any grace periods applicable thereto~~; or (ii) default in the observance or performance of any other agreement or condition relating to any such Indebtedness (excluding the Obligations) or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist, in each case, beyond any grace periods applicable thereto, the effect of which default or other event or condition is to cause, or to permit the holder or beneficiary of Material Indebtedness (or a trustee or agent on behalf of such holder or beneficiary) to cause, with or without the giving of notice, the lapse of time or both, such Material Indebtedness to become due prior to its stated maturity or to become subject to a mandatory offer to purchase by the obligor thereunder or (in the case of any such Indebtedness constituting a Guarantee) to become payable; or

(q)    any party to any Subordination Agreement or the Unconditional Guaranty (other than any Agent) shall default in the observance or performance of any agreement or condition contained therein~~, and such default has continued unremedied for the greater of (x) ten (10) days after the occurrence thereof or (y) any grace period therefor specified therein~~; or

**(r)    any Post-Consumer Materials or any other materials located at the Riverside Facility or the Pinnpack Facility or Collateral of the Loan Parties shall be moved or**

97

**otherwise relocated to the Texas Facility or the Pennsylvania Facility or otherwise Invested in Borrower Group Members that are not Loan Parties;**

<u>then</u>, and in every such event (other than an event with respect to a Borrower Group Member described in <u>Section 7.01(f)</u>), and at any time thereafter during the continuance of such event, the Administrative Agent may, at its sole discretion, following written  notice to the Borrower, take any or all of the following actions, at the same or different times:  (i) terminate the Commitments, and thereupon the Commitments shall terminate immediately; and (ii) declare the Loans and all other amounts due under the Financing Documents (including the Tranche A**/C** Prepayment Premium or Tranche B Minimum Return, if applicable) then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all reimbursements, fees and other obligations of the Borrower accrued hereunder or under the Financing Documents (including the Tranche A**/C** Prepayment Premium or Tranche B Minimum Return, if applicable), shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Loan Parties; and in case of any event with respect to a Borrower Group Member described in <u>Section 7.01(f)</u>, the Commitments shall automatically terminate and the principal of the Loans then outstanding, together with accrued interest thereon and all reimbursements, fees and other obligations of the Borrower accrued hereunder and under the Financing Documents (including the Tranche A**/C** Prepayment Premium or Tranche B Minimum Return, if applicable), shall automatically become due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Loan Parties.  Upon the occurrence and during the continuance of any Event of Default, in addition to the exercise of remedies set forth above in this paragraph, each Secured Party shall be, subject to the terms of the Security Agreement, entitled to exercise the rights and remedies available to such Secured Party under and in accordance with the provisions of the other Financing Documents to which it is a party or any Applicable Law. For the purpose of enabling the Collateral Agent to exercise the rights and remedies under this <u>Section 7.01</u> (including in order to take possession of, collect, receive, assemble, process, appropriate, remove, realize upon, sell, assign, license out, convey, transfer or grant options to purchase any Collateral) at such time as the Collateral Agent shall be lawfully entitled to exercise such rights and remedies, each Loan Party hereby grants to the Collateral Agent, for the benefit of the Collateral Agent and each other Secured Party, a nonexclusive and assignable license (exercisable without payment of royalty or other compensation to such Loan Party), subject, in the case of Intellectual Property licenses, to the terms of the applicable license, and subject, in the case of Trademarks, to sufficient rights to quality control and inspection in favor of such Loan Party to avoid the risk of invalidation of such Trademarks, to use, practice, license, sublicense, and otherwise exploit any and all Intellectual Property now owned or held or hereafter acquired or held by such Loan Party.

Section 7.02   <u>Application of Proceeds</u>. The proceeds of any collection, sale or other realization of all or any part of the Collateral (including any amount in the Collateral Accounts, but excluding any proceeds in respect of the Unconditional Guaranty) shall be applied in the following order of priority:

(a)    first, to any fees, costs, charges, expenses and indemnities then due and payable to Administrative Agent and Collateral Agent under any Financing Document *pro rata* based on such respective amounts then due to such Persons;

(b)    second, to the respective outstanding fees, costs, charges, expenses and indemnities then due and payable to the other Secured Parties under any Financing Document *pro rata* based on such respective amounts then due to such Persons;

(c)    third, to any accrued but unpaid interest on the Tranche **A**C Obligations owed to the Secured Parties pro rata based on such respective amounts then due to the Secured Parties;

(d)    fourth, to any principal amount of the Tranche **A**C Obligations owed to the Secured Parties pro rata based on such respective amounts then due to the Secured Parties;

(e)    fifth, to any other unpaid Tranche **A**C Obligations then due and payable to Secured Parties, *pro rata* based on such respective amounts then due to the Secured Parties; **and**

(f)    sixth, to any accrued but unpaid interest on the Tranche **B**A Obligations owed to the Secured Parties pro rata based on such respective amounts then due to the Secured Parties;

(g)    seventh, to any principal amount of the Tranche **B**A Obligations owed to the Secured Parties pro rata based on such respective amounts then due to the Secured Parties;

(h)    eighth, to any other unpaid Tranche **B**A Obligations then due and payable to Secured Parties, *pro rata* based on such respective amounts then due to the Secured Parties; **and**

**(i)    ninth, to any accrued but unpaid interest on the Tranche B Obligations owed to the Secured Parties pro rata based on such respective amounts then due to the Secured Parties;**

**(j)    tenth, to any principal amount of the Tranche B Obligations owed to the Secured Parties pro rata based on such respective amounts then due to the Secured Parties;**

**(k)    eleventh, to any other unpaid Tranche B Obligations then due and payable to Secured Parties, *pro rata* based on such respective amounts then due to the Secured Parties; and**

**(l)**    (i)  ninthtwelfth, after final payment in full of the amounts described in clauses *first* through *eighth* above and the Discharge Date shall have occurred, to the Borrower or as otherwise required by Applicable Law.

99

It is understood that the Loan Parties shall remain liable to the extent of any deficiency between the amount of the proceeds of the Collateral and the aggregate of the sums referred to in clauses *first* through *eighth* above.

The proceeds of any collection, sale or other realization of all or any part of the Unconditional Guaranty shall be applied in the following order of priority:

      (a)    <u>first</u>, to any accrued but unpaid interest on the Tranche B Obligations owed to the Secured Parties pro rata based on such respective amounts then due to the Secured Parties;

      (b)    <u>second</u>, to any principal amount of the Tranche B Obligations owed to the Secured Parties pro rata based on such respective amounts then due to the Secured Parties; and

      (c)    <u>third</u>, to any other unpaid Tranche B Obligations then due and payable to Secured Parties, *pro rata* based on such respective amounts then due to the Secured Parties;

It is understood that the Loan Parties shall remain liable to the extent of any deficiency between the amount of the proceeds of the Unconditional Guaranty and the aggregate of the sums referred to in clauses *first* through *third* above.

## ARTICLE VIII

## THE AGENTS

**Section 8.01** <u>Appointment and Authorization of the Agents</u>.

      (a)    Each of the Lenders hereby irrevocably appoints each Agent to act on its behalf as its agent hereunder and under the other Financing Documents and authorizes each Agent in such capacity, to take such actions on its behalf and to exercise such powers as are delegated to it by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto. Each Agent, by executing this Agreement, hereby accepts such appointment.

      (b)    Each Agent is hereby authorized to execute, deliver and perform each of the Transaction Documents to which such Agent is intended to be a party. Each Agent hereby agrees, and each Lender hereby authorizes such Agent, to enter into the amendments and other modifications of the Security Documents (subject to <u>Section 10.02(b)</u>).

**Section 8.02** <u>Rights as a Lender</u>. Each Agent shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not an Agent, and such Person and its Affiliates may accept deposits from, lend money to and generally engage in any kind of business with the Borrower or any of Subsidiary or other Affiliate thereof as if it were not an Agent hereunder.

**Section 8.03** <u>Duties of Agent; Exculpatory Provisions</u>. No Agent shall have any duties or obligations except those expressly set forth herein and in the other Financing Documents.

Without limiting the generality of the foregoing, no Agent (a) shall be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred and is continuing, (b) shall have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Financing Documents that such Agent is required to exercise, and (c) shall, except as expressly set forth herein and in the other Financing Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Subsidiaries that is communicated to or obtained by the financial institution serving as an Agent or any of its Affiliates in any capacity.  No Agent shall be liable for any action taken or not taken by it with the consent or at the request of the Lenders or in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction in a final, non-appealable decision.  No Agent shall be deemed to have knowledge of any Default or Event of Default unless and until written notice thereof is given to such Agent by the Borrower or a Lender, and no Agent shall be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Financing Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Financing Document or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in Article IV or elsewhere herein or therein, other than to confirm receipt of items expressly required to be delivered to such Agent.

Section 8.04    Reliance by Agent.  Each Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing believed by it to be genuine and to have been signed or sent by the proper Person.  Each Agent also may rely upon any statement made to it orally or by telephone and believed by it to be made by the proper Person, and shall not incur any liability for relying thereon.  Each Agent may consult with legal counsel, independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

Section 8.05    Delegation of Duties.  Each Agent may perform any and all its duties and exercise its rights and powers by or through any one or more sub-agents appointed by such Agent.  Each Agent and any such sub-agent may perform any and all its duties and exercise its rights and powers through their respective Related Parties.  The exculpatory provisions of the preceding paragraphs shall apply to any such sub-agent and to the Related Parties of each Agent and any such sub-agent, and shall apply to their respective activities as well as activities as each Agent.

Section 8.06    Withholding of Taxes by the Administrative Agent; Indemnification.  To the extent required by any Applicable Law, the Administrative Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding Taxes.  If any Governmental Authority asserts a claim that the Administrative Agent did not properly withhold Taxes from amounts paid to or for the account of any Lender because the appropriate form was not delivered or was not properly executed or because such Lender failed to notify the Administrative Agent of a change in circumstance which rendered the exemption from, or reduction of, withholding Taxes ineffective or for any other reason, or if the Administrative

Agent reasonably determines that a payment was made to a Lender pursuant to this Agreement without deduction of applicable withholding tax from such payment, such Lender shall promptly indemnify the Administrative Agent fully for all amounts paid, directly or indirectly, by Administrative Agent as Taxes or otherwise, including any penalties or interest and together with all expenses (including legal expenses, allocated internal costs and out-of-pocket expenses) incurred. Each Lender shall severally indemnify the Administrative Agent, within ten (10) days after demand therefor, for (i) any Indemnified Taxes attributable to such Person (but only to the extent that the Borrower has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Borrower to do so), (ii) any Taxes attributable to such Person's failure to comply with the provisions of <u>Section 10.04(f)</u> relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Person, in each case, that are payable or paid by the Administrative Agent in connection with any Financing Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Financing Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this <u>Section 8.06</u>.

Section 8.07    <u>Resignation of Agent</u>.  Each Agent may resign at any time upon thirty (30) days' notice by notifying the Lenders and the Borrower, and the Collateral Agent may be removed at any time by the Administrative Agent (with a prior written notice to the Borrower). Upon any such resignation or removal, the Administrative Agent shall have the right, with the consent of the Borrower (such consent not to be unreasonably withheld), to appoint a successor. If no successor shall have been so appointed by the Administrative Agent and approved by the Borrower and shall have accepted such appointment within thirty (30) days after the retiring Agent gives notice of its resignation or after the Administrative Agent's removal of the retiring Collateral Agent, then the retiring Agent may, on behalf of the Lenders, appoint a successor Agent, which shall be a Lender with an office in New York, New York, an Affiliate of a Lender or a financial institution with an office in New York, New York having a combined capital and surplus that is not less than $250,000,000. Upon the acceptance of its appointment as Agent hereunder by a successor, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring (or retired) Agent and the retiring Agent shall be discharged from its duties and obligations hereunder (if not already discharged therefrom as provided above in this paragraph). The reimbursements and fees payable by the Borrower to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After the Agent's resignation or removal hereunder, the provisions of this Article and <u>Section 10.03</u> shall continue in effect for its benefit in respect of any actions taken or omitted to be taken by it while it was acting as Agent.

Section 8.08    <u>Non-Reliance on Agent or Other Lenders</u>.  Each Lender acknowledges that it has, independently and without reliance upon any Agent, the Affiliates of any Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon any Agent, the Affiliates of any Agent or

any other Lender and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Financing Document or any related agreement or any document furnished hereunder or thereunder.

Section 8.09    No Other Duties; Etc. The parties agree that neither the Administrative Agent nor the Collateral Agent shall have any obligations, liability or responsibility under or in connection with this Agreement and the other Financing Documents and that none of the Agents shall have any obligations, liabilities or responsibilities except for those expressly set forth herein and in the other Financing Documents.  The Collateral Agent shall have all of the rights (including indemnification rights), powers, benefits, privileges, exculpations, protections and immunities granted to the Collateral Agent under the other Financing Documents, all of which are incorporated herein *mutatis mutandis*.

ARTICLE IX

GUARANTY

Section 9.01    Guaranty.

(a)    For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Guarantor hereby unconditionally and irrevocably, jointly and severally, Guarantees the full and punctual payment and performance (whether at stated maturity, upon acceleration or otherwise) of all Guaranteed Obligations, in each case as primary obligor and not merely as surety and with respect to all such Guaranteed Obligations howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, now or hereafter existing, or due or to become due. This is a guaranty of payment and not merely of collection.

(b)    All payments made by any Guarantor under this Article IX shall be payable in the manner required for payments by the Borrower hereunder, including: (i) the obligation to make all such payments in Dollars, free and clear of, and without deduction for, any Taxes, and subject to the gross-up and indemnity as provided under Section 2.09, (ii) the obligation to pay interest at the Post-Default Rate and (iii) the obligation to pay all amounts due under the Loans in Dollars.

(c)    Any term or provision of this guaranty to the contrary notwithstanding the aggregate maximum amount of the Guaranteed Obligations for which such Guarantor shall be liable under this guaranty shall not exceed the maximum amount for which such Guarantor can be liable without rendering this guaranty or any other Financing Document, as it relates to such Guarantor, void or voidable under Applicable Law relating to fraudulent conveyance or fraudulent transfer.

Section 9.02    Guaranty Unconditional. The Guaranteed Obligations shall be unconditional and absolute and, without limiting the generality of the foregoing, shall not be released, discharged or otherwise affected by:

(a)    any extension, renewal, settlement, compromise, waiver or release in respect of any obligations of any Loan Party under the Financing Documents and/or any Commitments

under the Financing Documents, by operation of law or otherwise (other than with respect to any such extension, renewal, settlement, compromise, waiver or release agreed in accordance with the terms hereunder as expressly applying to the Guaranteed Obligations),

(b)    any modification or amendment of or supplement to this Agreement or any other Financing Document (other than with respect to any modification, amendment or supplement agreed in accordance with the terms hereunder as expressly applying to the Guaranteed Obligations),

(c)    any release, impairment, non-perfection or invalidity of any Collateral,

(d)    any change in the corporate existence, structure or ownership of any Loan Party or any other Person, or any event of the type described in Sections 5.01, 6.01 or 6.07 with respect to any Person,

(e)    the existence of any claim, set-off or other rights that any Guarantor may have at any time against any Loan Party, any Secured Party or any other Person, whether in connection herewith or with any unrelated transactions,

(f)    any invalidity or unenforceability relating to or against any Loan Party for any reason of any Financing Document, or any provision of Applicable Law purporting to prohibit the performance by any Loan Party of any of its obligations under the Financing Documents (other than any such invalidity or unenforceability with respect solely to the Guaranteed Obligations),

(g)    the failure of any Material Counterparty to make payments owed to any Loan Party, or

(h)    any other act or omission to act or delay of any kind by any Loan Party, any Secured Party or any other Person or any other circumstance whatsoever that might, but for the provisions of this Section 9.02, constitute a legal or equitable discharge of the obligations of any Loan Party under the Financing Documents.

Section 9.03    Discharge Only Upon Payment in Full; Reinstatement in Certain Circumstances. The Guaranteed Obligations shall remain in full force and effect until all of the Borrower's obligations under the Financing Documents shall have been paid or otherwise performed in full and all of the Commitments shall have terminated. If at any time any payment made under this Agreement or any other Financing Document is rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy, reorganization or similar event of any Loan Party or any other Person or otherwise, then the Guaranteed Obligations with respect to such payment shall be reinstated at such time as though such payment had been due but not made at such time.

Section 9.04    Waiver by the Guarantors.

(a)    Each Guarantor hereby irrevocably and unconditionally waives, to the fullest extent permitted by Applicable Law: (i) notice of acceptance of the guaranty provided in this Article IX and notice of any liability to which this guaranty may apply, (ii) all notices that may be required by Applicable Law or otherwise to preserve intact any rights of any Secured Party

against any Loan Party, including any demand, presentment, protest, proof of notice of non-payment, notice of any failure on the part of any Loan Party to perform and comply with any covenant, agreement, term, condition or provision of any agreement and any other notice to any other party that may be liable in respect of the Guaranteed Obligations (including any Loan Party) except any of the foregoing as may be expressly required hereunder, (iii) any right to the enforcement, assertion or exercise by any Secured Party of any right, power, privilege or remedy conferred upon such Person under the Financing Documents or otherwise and (iv) any requirement that any Secured Party exhaust any right, power, privilege or remedy, or mitigate any damages resulting from any Default or Event of Default under any Financing Document, or proceed to take any action against any Collateral or against any Loan Party or any other Person under or in respect of any Financing Document or otherwise, or protect, secure, perfect or ensure any Lien on any Collateral.

(b)    Each Guarantor agrees and acknowledges that the Administrative Agent and each holder of any Guaranteed Obligations may demand payment of, enforce and recover from any Guarantor or any other Person obligated for any or all of such Guaranteed Obligations in any order and in any manner whatsoever, without any requirement that the Administrative Agent or such holder seek to recover from any particular Guarantor or other Person first or from any Guarantors or other Persons *pro rata* or on any other basis.

Section 9.05    <u>Subrogation</u>.  Upon any Guarantor making any payment under this <u>Article IX</u>, such Guarantor shall be subrogated to the rights of the payee against the Borrower with respect to such obligation; <u>provided</u> that no Guarantor shall enforce any payment by way of subrogation, indemnity, contribution or otherwise, or exercise any other right, against any Loan Party (or otherwise benefit from any payment or other transfer arising from any such right) so long as any obligations under the Financing Documents (other than on-going but not yet incurred indemnity obligations) remain unpaid and/or unsatisfied.

Section 9.06    <u>Acceleration</u>.  All amounts then subject to acceleration under <u>Section 7.01</u> of this Agreement shall be payable by the Guarantors hereunder immediately upon demand by the Administrative Agent.

ARTICLE X

MISCELLANEOUS

Section 10.01 <u>Notices</u>.  Except as otherwise expressly provided herein or in any Financing Document, all notices and other communications provided for hereunder or thereunder shall be (i) in writing and (ii) sent by overnight courier (if for inland delivery) or international courier (if for overseas delivery); <u>provided</u>, that such notice or communication may be sent by email so long as (x) such email or electronic transmission is promptly followed by a communication or notice in sent in accordance with (i) and (ii) above, (y) any Loan Party is delivering documents and information required to be provided under <u>Article IV</u>, <u>Article V</u> or <u>Article VI</u>, or (z) the express terms of any Financing Document permit electronic transmissions, in each case, to a party hereto at its address and contact number specified below, or at such other address and contact number as is designated by such party in a written notice to the other parties hereto:

105

(a)    Borrower or Guarantors:

>   CarbonLite Holdings, LLC
>   10250 Constellation Boulevard, Suite 2820
>   Los Angeles, CA 90067
>   Attention:    both Leon Farahnik, Chief Executive Officer; and Gregg
>   Milhaupt
>   Email:    both lfarahnik@hpcindustries.com; and
>   gregg@carbonliterecycling.com
>
>   With a copy to:
>
>   Reed Smith LLP
>   1901 Avenue of Stars
>   Suite 700
>   Los Angeles, CA 90067-6078
>   Attention:    Moshe Kupietzky
>   Email:    MKupietzky@reedsmith.com
>
>   **And a copy to:**
>
>   **Force 10 Partners**
>   **20341 SW Birch Street, Suite 220**
>   **Newport Beach, CA 92660**
>   **Attention:    Brian Weiss**
>   **Email:    bweiss@force10partners.com**

(b)    Administrative Agent and Collateral Agent:

>   Orion Energy Partners Investment Agent, LLC
>   292 Madison Avenue, Suite 2500
>   New York, NY 10118
>   Attention:  Gerrit Nicholas, Chris Leary and Mark Friedland
>   Email:    Gerrit@OrionEnergyPartners.com;
>   Chris@OrionEnergyPartners.com;
>   Mark@OrionEnergyPartners.com;
>   CarbonLiteDealTeam@orionenergypartners.com

(c)    If to a Lender, to it at its address (mail or email) set forth in its Administrative Questionnaire.

All notices and communications shall be effective when received by the addressee thereof during business hours on a Business Day in such Person's location as indicated by such Person's address in paragraphs (a) to (c) above, or at such other address as is designated by such Person in a written notice to the other parties hereto.

Section 10.02  <u>Waivers; Amendments</u>.

(a)    <u>No Deemed Waivers; Remedies Cumulative</u>.  No failure or delay on the part of any Agent or any Lender in exercising any right, power or privilege hereunder or under any other Financing Document and no course of dealing between any Loan Party, or any of the Borrower's Affiliates, on the one hand, and any Agent or Lender on the other hand, shall impair any such right, power or privilege or operate as a waiver thereof; nor shall any single or partial exercise of any right, power or privilege hereunder or under any other Financing Document preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder or thereunder.  The rights, powers and remedies herein or in any other Financing Document expressly provided are cumulative and not exclusive of any rights, powers or remedies which any party thereto would otherwise have.  No notice to or demand on the Borrower in any case shall entitle the Borrower to any other or further notice or demand in similar or other circumstances or constitute a waiver of the rights of any Agent or any Lender to any other or further action in any circumstances without notice or demand.

(b)    <u>Amendments</u>.  No amendment or waiver of any provision of this Agreement or any other Financing Document (other than any Security Document, each of which may only be waived, amended or modified in accordance with such Security Document), and no consent to any departure by the Borrower shall be effective unless in writing signed by the Administrative Agent and the Borrower; <u>provided</u> that no such amendment, waiver or consent shall change the *pro rata* agreements in Section 7.02 without the consent of each Lender affected thereby, and <u>provided</u> <u>further</u> that (A) no amendment, waiver or consent shall, without the written consent of the relevant Agent, affect the rights or duties of such Agent under this Agreement or any other Financing Document and (B) any separate reimbursement or fee agreement between the Borrower and the Administrative Agent in its capacity as such or between the Borrower and the Collateral Agent in its capacity as such may be amended or modified by such parties. Notwithstanding anything herein to the contrary, (x) the Loan Parties and the Collateral Agent may (but shall not be obligated to) amend or supplement any Security Document without the consent of the Administrative Agent to cure any ambiguity, defect or inconsistency which is not material, or to make any change that would provide any additional rights or benefits to the Lenders and (y) any Loan Party may amend, modify or supplement any annexes or schedules to the Security Documents as expressly provided therein (without the consent of any Agent, Lender or other secured party).

Section 10.03  <u>Expenses; Indemnity; Etc.</u>

(a)    <u>Costs and Expenses</u>.  The Borrower agrees to pay or reimburse each of the Agents and the Lenders for:  (i) all reasonable and documented out-of-pocket costs and expenses of the Agents and the Lenders (including the reasonable fees and expenses of Latham & Watkins LLP, New York counsel to the Administrative Agent and the Collateral Agent, **financial advisors** and experts engaged by the Agents and the Lenders from time to time) in connection with (A) the negotiation, preparation, execution, delivery and performance of this Agreement and the other Financing Documents and the extension of credit under this Agreement (whether or not the transaction contemplated hereby and thereby shall be consummated) or (B) any amendment, modification or waiver of any of the terms of this Agreement or any other Financing Documents, (ii) all reasonable and documented out-of-pocket costs and expenses of the Lenders (including

payment of the fees and reimbursements provided for herein) and the Agents (including reasonable and documented outside counsels' fees and expenses and reasonable and documented outside **financial advisors and** experts' fees and expenses) in connection with (A) any Default or Event of Default and any enforcement or collection proceedings resulting from such Default or Event of Default or in connection with the negotiation of any restructuring or "work-out" (whether or not consummated) of the obligations of the Borrower under this Agreement or the obligations of any Material Counterparty under any other Financing Document or Material Agreement and (B) the enforcement of this Section 10.03 or the preservation of their respective rights (provided that such counsel fees Lenders shall limited to one counsel for all Lenders), (iii) all costs, expenses, Taxes, assessments and other charges incurred in connection with any filing, registration, recording or perfection of any security interest contemplated by any Security Document or any other document referred to therein, and (iv) all reasonable and documented out-of-pocket costs and expenses of the Agents and the Lenders (including the reasonable and documented fees and expenses of the experts and consultants engaged by the Agents or the Lenders) in connection with the Lenders' due diligence review prior to the Second Funding Date.

(b)    <u>Indemnification by the Borrower</u>.  Each Loan Party agrees to indemnify and hold harmless each of the Agents and the Lenders and their affiliates and their respective directors, officers, employees, administrative agents, attorneys-in-fact and controlling persons (each, an "<u>Indemnified Party</u>") from and against any and all losses, claims, damages and liabilities, joint or several, to which such Indemnified Party may become subject related to or arising out of any transaction contemplated by the Financing Documents or the execution, delivery and performance of the Financing Documents or any other document in any way relating to the Financing Documents and the transactions contemplated by the Financing Documents (including, for avoidance of doubt, any liabilities arising under or in connection with Environmental Law) and will reimburse any Indemnified Party for all expenses (including reasonable and documented outside counsel fees and expenses) as they are incurred in connection therewith.  No Loan Party shall be liable under the foregoing indemnification provision to an Indemnified Party to the extent that any loss, claim, damage, liability or expense is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct.  Each Loan Party also agrees that no Indemnified Party shall have any liability (whether direct or indirect, in contract or tort or otherwise) to it, or any of its security holders or creditors related to or arising out of the execution, delivery and performance of any Financing Document or any other document in any way relating to the Financing Documents or the other transactions contemplated by the Financing Documents, except to the extent that any loss, claim, damage or liability is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct as determined by a court of competent jurisdiction.  To the extent permitted by Applicable Law, no party hereto shall assert and each party hereto hereby waives, any claim against any Indemnified Party or any other party hereto, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any Financing Document or any agreement or instrument contemplated hereby, any Loan or the use of the proceeds thereof.  Paragraph (b) of this Section shall not apply with

respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

(c)    <u>Indemnification by Lenders</u>.  To the extent that the Borrower fails to pay any amount required to be paid to any Agent, their affiliates or agents under <u>Section 10.03(a)</u> or <u>(b)</u>, each Lender severally agrees to pay ratably in accordance with the aggregate principal amount of the Loans held by the Lender to such Agent, affiliate or agent such unpaid amount; <u>provided</u> that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against such Agent, affiliate or agent in its capacity as such.

(d)    <u>Settlements; Appearances in Actions</u>.  The Borrower agrees that, without each Indemnified Party's prior written consent, it will not settle, compromise or consent to the entry of any judgment in any pending or threatened claim, action or proceeding in respect of which indemnification could be sought by or on behalf of such Indemnified Party under this Section (whether or not any Indemnified Party is an actual or potential party to such claim, action or proceeding), unless such settlement, compromise or consent includes an unconditional release of such Indemnified Party from all liability arising out of such claim, action or proceeding.  In the event that an Indemnified Party is requested or required to appear as a witness in any action brought by or on behalf of or against the Borrower or any Affiliate thereof in which such Indemnified Party is not named as a defendant, the Borrower agrees to reimburse such Indemnified Party for all reasonable expenses incurred by it in connection with such Indemnified Party's appearing and preparing to appear as such a witness, including the reasonable and documented fees and disbursements of its legal counsel.  In the case of any claim brought against an Indemnified Party for which the Borrower may be responsible under this <u>Section 10.03</u>, the Agents and the Lenders agree (at the expense of the Borrower) to execute such instruments and documents and cooperate as reasonably requested by the Borrower in connection with the Borrower's defense, settlement or compromise of such claim, action or proceeding.

Section 10.04  <u>Successors and Assigns</u>.

(a)    <u>Assignments Generally</u>.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) the Loan Parties may not assign or otherwise transfer any of their rights or obligations hereunder without the prior written consent of the Administrative Agent (and any attempted assignment or transfer by such Loan Party without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this <u>Section 10.04</u>.  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants (to the extent provided in paragraph (f) of this Section) and, to the extent expressly contemplated hereby, the Indemnified Parties referred to in <u>Section 10.03(b)</u> and the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    Assignments by Lenders.  Any Lender may assign to one or more Persons all or a portion of its rights and obligations under this Agreement (including all or a portion of its Loan at the time owing to it); provided that:

(i)    except in the case of an assignment to a Lender or an Affiliate or Related Fund of a Lender, the amount of the Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $500,000 unless the ~~Borrower and the~~ Administrative Agent otherwise consent;

(ii)    except in the case of an assignment to a Lender or an Affiliate or Related Fund of a Lender, the ~~Borrower and the~~ Administrative Agent must ~~each~~ give its prior written consent to such assignment; provided that ~~(x)~~ in the case of the Administrative Agent, such consent shall not be unreasonably withheld, conditioned or delayed ~~and (y) in the case of the Borrower, such consent shall not be unreasonably withheld, conditioned or delayed if such assignment is to an Approved Fund and such consent shall be given in the Borrower's sole discretion if the assignment is to any other Person (other than a Lender, an Affiliate or Related Fund of a Lender or an Approved Fund) (and provided further that, in the case of the Borrower, such consent shall be deemed to be given if the Borrower has not responded within five (5) Business Days of any request for consent);~~;

(iii)    each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement;

(iv)    except in the case of an assignment to an Affiliate, the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500; and

(v)    the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire~~;~~.

~~provided further that any consent of the Borrower otherwise required under this clause (b) shall not be required if any Event of Default has occurred and is continuing and shall be deemed given if the Borrower has not responded to a request for such consent within five (5) Business Days of the request.~~  Upon acceptance and recording pursuant to paragraph (d) of this Section, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.09, 2.10 and 10.03).  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this

paragraph shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (f) of this Section.

(c)    <u>Maintenance of Register by the Administrative Agent</u>.  The Administrative Agent, acting for this purpose as an agent of the Borrower, shall maintain at one of its offices in New York City a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, principal amount of the Loans owing to each Lender pursuant to the terms hereof from time to time and the amount of any Accrued Interest owing from time to time (the "<u>Register</u>").  The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Administrative Agent and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(d)    <u>Effectiveness of Assignments</u>.  Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in paragraph (b) of this Section and any written consent to such assignment required by paragraph (b) of this Section, the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register.  No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

(e)    <u>Limitations on Rights of Assignees</u>.  An assignee Lender shall not be entitled to receive any greater payment under <u>Sections 2.09</u> or <u>2.10</u> than the assigning Lender would have been entitled to receive with respect to the interest assigned to such assignee (based on the circumstances existing at the time of the assignment), unless the Borrower's prior written consent has been obtained therefor.

(f)    <u>Participations</u>.  Any Lender may, without the consent of the Borrower or the Administrative Agent, sell participations to one or more banks or other entities (a "<u>Participant</u>") in all or a portion of such Lender's rights and obligations under this Agreement and the other Financing Documents (including all or a portion of the Loans owing to it); <u>provided</u> that (i) such Lender's obligations under this Agreement and the other Financing Documents shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (iii) the Loan Parties, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement and the other Financing Documents.  Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and the other Financing Documents and to approve any amendment, modification or waiver of any provision of this Agreement or any other Financing Document; <u>provided</u> that, such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in the first proviso to <u>Section 10.02(b)</u> that affects such Participant.  Subject to paragraph (g) of this Section, the Borrower agrees that each Participant shall be entitled to the benefits of <u>Sections 2.09</u> and <u>2.10</u> (subject to the requirements

US-DOCS\~~120330147.2~~120747417.14

and limitations therein, including the requirements under Section 2.09(e) (it being understood that the documentation required under Section 2.09(e) shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section.  Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Financing Documents held by it (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any Commitments, Loan or its other obligations under any Financing Document) to any Person except to the extent that such disclosure is necessary to establish that such participation complies with Section 10.14 and that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the Treasury Regulations and Section 1.163-5(b) of the Proposed Treasury Regulations (or any amended or successor version).  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(g)    Limitations on Rights of Participants.  A Participant shall not be entitled to receive any greater payment under Sections 2.09 or 2.10 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant.  A Participant shall not be entitled to the benefits of Section 2.09 unless the Participant agrees, for the benefit of the Borrower, to comply with Section 2.09(e) as though it were a Lender (it being understood that the documentation required under Section 2.09(e) shall be delivered to the participating Lender).

(h)    Certain Pledges.

(i)    Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any such pledge or assignment to a Federal Reserve Bank, the European Central Bank or any other central bank or similar monetary authority in the jurisdiction of such Lender, and this Section shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto; and provided further that any payment in respect of such pledge or assignment made by any Loan Party to or for the account of the pledging or assigning Lender in accordance with the terms of this Agreement shall satisfy such Loan Party's obligations hereunder in respect of such pledged or assigned Loan to the extent of such payment.

(ii)    Notwithstanding any other provision of this Agreement, any Lender may, without informing, consulting with or obtaining the consent of any other Party to the Financing Documents and without formality under any Financing Document, assign by

112

way of security, mortgage, charge or otherwise create security by any means over, its rights under any Financing Document to secure the obligations of that Lender to any Person that would be a permitted assignee (without the consent of the Borrower or any Agent) pursuant to Section 10.04(b) including (A) to the benefit of any of its Affiliates and/or (B) within the framework of its, or its Affiliates, direct or indirect funding operations.

(i)    No Assignments to the Borrower or Affiliates.  Anything in this Section to the contrary notwithstanding, no Lender may assign or participate any interest in any Loan held by it hereunder to any Loan Party or any Affiliate of the Borrower without the prior written consent of each other Lender.

Section 10.05  Survival.  All covenants, agreements, representations and warranties made by the Loan Parties herein and in the certificates or other instruments delivered in connection with or pursuant to this Agreement shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement and the making of any Loan, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default or Event of Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any reimbursement, fee or any other amount payable under this Agreement (other than any contingent indemnification or reimbursement amount not then due and payable) is outstanding and unpaid.  The provisions of Sections 2.09, 2.10, 10.03, 10.12, 10.13 and Article VIII shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loan, the expiration or termination of the Commitments or the termination of this Agreement or any provision hereof.

Section 10.06  Counterparts; Integration; Effectiveness.  This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement and the other Financing Documents to which a Loan Party is party constitute the entire contract between and among the parties relating to the subject matter hereof and thereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  This Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.  Delivery of an executed counterpart of a signature page to this Agreement by electronic transmission shall be effective as delivery of a manually executed counterpart of this Agreement.

Section 10.07  Severability.  Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and

US-DOCS\120330147.2120747417.14

enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

Section 10.08  Right of Setoff.  If an Event of Default shall have occurred and be continuing, each Lender and any of its Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held, and any other indebtedness at any time owing, by such Lender or any such Affiliate to or for the credit or the account of the Borrower against any of and all the obligations of the Borrower now or hereafter existing under this Agreement held by such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement and although such obligations may be unmatured or denominated in a currency other than Dollars.  The rights of each Lender or any such Affiliate under this Section are in addition to other rights and remedies (including other rights of setoff) which such Lender may have.

Section 10.09  Governing Law; Jurisdiction; Etc.

(a)     Governing Law.  This Agreement shall be construed in accordance with and governed by the law of the State of New York.

(b)     Submission to Jurisdiction.  Any legal action or proceeding with respect to this Agreement or any other Financing Document to which a Loan Party is a party shall, except as provided in clause (d) below, be brought in the courts of the State of New York, or of the United States District Court for the Southern District of New York, in each case, seated in the County of New York and, by execution and delivery of this Agreement, each party hereto hereby irrevocably accepts for itself and in respect of its property, generally and unconditionally, the jurisdiction of the aforesaid courts.  Each party hereto agrees that a judgment, after exhaustion of all available appeals, in any such action or proceeding shall be conclusive and binding upon it, and may be enforced in any other jurisdiction, including by a suit upon such judgment, a certified copy of which shall be conclusive evidence of the judgment.

(c)     Waiver of Venue.  Each party hereto hereby irrevocably waives any objection that it may now have or hereafter have to the laying of the venue of any suit, action or proceeding arising out of or relating to this Agreement or any other Financing Document to which it is a party brought in the Supreme Court of the State of New York or in the United States District Court for the Southern District of New York, in each case, seated in the County of New York and hereby further irrevocably waives any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

(d)     Rights of the Secured Parties.  Nothing in this Section 10.09 shall limit the right of the Secured Parties to refer any claim against a Loan Party to any court of competent jurisdiction anywhere else outside of the State of New York, nor shall the taking of proceedings by any Secured Party before the courts in one or more jurisdictions preclude the taking of proceedings in any other jurisdiction whether concurrently or not.

(e)     WAIVER OF JURY TRIAL.  EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM,

114

DEMAND, ACTION OR CAUSE OF ACTION ARISING UNDER ANY FINANCING DOCUMENT OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO ANY FINANCING DOCUMENT, OR THE TRANSACTIONS RELATED THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER FOUNDED IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE SIGNATORIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

(f)    <u>Service of Process</u>.  Each party hereto irrevocably consents to the service of process in the manner provided for notices in <u>Section 10.01</u>.

(g)    <u>Waiver of Immunity</u>.  To the extent that a Loan Party has or hereafter may acquire any immunity from jurisdiction of any court or from any legal process (whether through service of notice, attachment prior to judgment, attachment in aid of execution, execution, sovereign immunity or otherwise) with respect to itself or its property, it hereby irrevocably waives such immunity, to the fullest extent permitted by law, in respect of its obligations under this Agreement and the other Financing Documents.

Section 10.10  <u>Headings</u>.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

Section 10.11  <u>Confidentiality</u>.

(a)    Each of the Agents and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (i) to its and its Affiliates' directors, officers, employees, board members (and members of committees thereof), current or prospective limited partners, agents, consultants, Persons providing administration and settlement services and other professional advisors, including accountants, auditors, legal counsel and other advisors with a need to know (for purposes of this <u>Section 10.11</u>, the "<u>Representatives</u>") (it being understood that the Representatives will be informed of the confidential nature of such Information and instructed to keep such Information confidential, and that the applicable Agent or Lender responsible for such disclosure shall be responsible for any non-compliance with the foregoing by any such Representatives that do not have a separate confidentiality obligation to such Agent or Lender), (ii) to the extent requested by any applicable regulatory or supervisory body or authority, by applicable laws or regulations or by any subpoena, oral question posed at any deposition, interrogatory or similar legal process (including, for the avoidance of doubt, to the extent requested in connection with any pledge or assignment pursuant to <u>Section 10.04(h)</u>); <u>provided</u> that the party from whom disclosure is being required shall give notice thereof to the Borrower as soon as practicable (unless restricted from doing so and except where disclosure is to be made to a regulatory or supervisory body or authority during the ordinary course of its supervisory or regulatory function), (iii) to any other

US-DOCS\~~120330147.2~~120747417.14

party to this Agreement, (iv) subject to an agreement containing provisions substantially the same as those of this paragraph, to any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement, (v) with the written consent of the Borrower, (vi) to the extent such Information (A) becomes publicly available other than as a result of a breach of this paragraph or (B) becomes available to any Agent or any Lender on a nonconfidential basis from a source other than the Borrower and such source is not, to the knowledge of such Agent or Lender, subject to subject to a confidentiality agreement with any Loan Party or (vii) to any Person with whom any Loan Party, an Agent or a Lender has entered into (or potentially may enter into), whether directly or indirectly, any transaction under which payments are to be made or may be made by reference to one or more Financing Documents and/or the Loan Parties or to any of such Person's Affiliates and Representatives. For the purposes of this paragraph, "Information" means all information received from any Loan Party or relating to any Borrower Group Member, or its respective business (including, for the avoidance of doubt, any information with respect to which any Loan Party owes any duty or obligation of confidentiality to any third-party), other than any such information that is available to the Agents or any Lender on a nonconfidential basis prior to disclosure by a Loan Party. Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

(b)    Upon written request after a discharge contemplated by <u>Section 9.03</u>, but no later than ten (10) Business Days thereafter, by any Loan Party, each Agent and Lender agrees to promptly return or destroy all copies of confidential Information and all notes, correspondence, documents or other records based thereon or which contain confidential Information ("<u>Derivate Documents</u>") which are then in the such Agent's or Lender's possession. Notwithstanding the foregoing, the Agents and Lenders and their Representatives shall be entitled to (i) retain copies of all Information provided to such Agent or Lender for legal, regulatory, and compliance purposes, in a manner consistent with the such Agent's or Lender's document archiving procedures, and which information shall remain confidential for the term of this Agreement so long as such Information is retained in a manner consistent with such Agent's or Lender's internal confidentiality policies, or (ii) to the extent that such Agent or Lender and its Representatives have copies of computer records and files containing Information, which have been created as a result of automatic archiving or backup procedures, may retain such number of copies of the Information for legal, regulatory, and compliance purposes, in a manner consistent with such Agent's or Lender's and its Representatives' document archiving procedure, and which information shall remain confidential so long as such Information is retained in a manner consistent with such Agent's or Lender's and its Representatives' internal confidentiality policies. The Loan Party remains the owner of all its Information contained in all Derivate Documents. In addition, the Agents and Lenders shall not be obligated to return or destroy any Information contained in any documents or packages prepared for its board of directors or like body, but may retain such documents or packages in a manner consistent with such Agent's or Lender's internal confidentiality policies.

(c)    Notwithstanding anything to the contrary contained herein, the parties hereto acknowledge that the Administrative Agent and its respective affiliates and advisors and investors in funds managed by the foregoing Persons (collectively, the "<u>Orion Energy Persons</u>")

are subject to compliance obligations mandated by various regulators, governmental agencies and taxation authorities; and in satisfaction of those compliance obligations, the Orion Energy Persons may disclose confidential Information in response to a broad information request not specifically targeted at Borrower, as required by such regulators, governmental agencies, and taxation authorities without notice to the Borrower and without obtaining assurances that information will be treated confidentially; and such disclosure shall not be a violation of this agreement; provided that if such regulators, governmental agencies and taxation authorities make information requests specifically targeted at or regarding the Borrower or any of its affiliates, the Orion Energy Persons will promptly notify the Borrower of such information request.

Section 10.12 <u>No Third Party Beneficiaries</u>. The agreement of the Lenders to make the Loans to the Borrower on the terms and conditions set forth in this Agreement, is solely for the benefit of the Loan Parties, the Agents and the Lenders, and no other Person (including any Material Counterparty, contractor, subcontractor, supplier, workman, carrier, warehouseman or materialman furnishing labor, supplies, goods or services to or for the benefit of the Business) shall have any rights under this Agreement or under any other Financing Document or Material Agreement as against the Agent or any Lender or with respect to any extension of credit contemplated by this Agreement.

Section 10.13 <u>Reinstatement</u>. The obligations of the Borrower under this Agreement shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of the Borrower in respect of the Secured Obligations is rescinded or must be otherwise restored by any holder of any of the Secured Obligations, whether as a result of any proceedings in Bankruptcy or reorganization or otherwise, and the Borrower agrees that it will indemnify each Secured Party on demand for all reasonable costs and expenses (including fees of counsel) incurred by such Secured Party in connection with such rescission or restoration, including any such costs and expenses incurred in defending against any claim alleging that such payment constituted a preference, fraudulent transfer or similar payment under any Bankruptcy, insolvency or similar law.

Section 10.14 <u>USA PATRIOT Act</u>. Each Lender hereby notifies the Loan Parties that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "<u>USA PATRIOT Act</u>"), it is required to obtain, verify and record information that identifies such Loan Party, which information includes the name and address of such Loan Party and other information that will allow such Lender to identify such Loan Party in accordance with the USA PATRIOT Act.

[Remainder of page intentionally left blank]

117

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

[Signature Pages provided separately]

**ANNEX III**

**Tranche B Minimum Return**

As used herein and in the Credit Agreement, the "Tranche B Minimum Return" as of any date shall mean the following:

| | Conditions and Milestones | Minimum Return amount in respect of Tranche B Loans |
|---|---|---|
| 1. | The date that the Tranche B Obligations are repaid in full in cash. | $1,000,000 |

**EXHIBIT B**

**ANNEX I
TO
CREDIT AGREEMENT**

**Loans; Commitments**

| LENDER | EXISTING TRANCHE A LOANS | TRANCHE B LOANS | TRANCHE C COMMITMENTS |
|---|---|---|---|
| Orion Energy Credit Opportunities Fund II, L.P. | $18,481,126.83 | $1,940,518.32 | $1,034,943.10 |
| Orion Energy Credit Opportunities Fund II PV, L.P. | $29,698,172.62 | $3,118,308.12 | $1,663,097.67 |
| Orion Energy Credit Opportunities Fund II GPFA, L.P. | $1,820,700.56 | $191,173.56 | $101,959.23 |
| Orion Energy Credit Opportunities CarbonLITE Co-Invest, L.P. | $30,000,000.00 | $0 | $0 |
| **TOTAL** | $80,000,000.00 | $5,250,000.00 | $2,800,000.00 |

# EXHIBIT C

**SCHEDULE 5.13(C)**
**TO**
**CREDIT AGREEMENT**

[Attached.]

## Tranche C Use of Proceeds

Payments to the below vendors in compliance with the California Prepetition Budget.

ACCO Engineering Systems
AlixPartners, LLP
Allan Company
Athens Services
Bantam Materials International
Duris Corporation
Everrank Investment Group, Inc.
Fairmont Logistics
Force 10 Partners
Go Green Industries, Inc.
GP Harmon Recycling LLC
Indorama Ventures
Latham & Watkins LLP
Miles Chemical Company, Inc.
OCI International, Inc.
Pachulski Stang Ziehl & Jones LLP
Plastic Recycling Corp. of California
Polyquest, Inc.
Prologis, Inc.
Quality Freight Logistics, Inc.
RePET, Inc.
Riverside Public Utilities
rPlanet Earth of Los Angeles LLC
Shell Energy North America (US), L.P.
Southern California Edison Company
Southern California Gas Company
Trinity Logistics, Inc.
Wyse Logistics, Inc.

**EXHIBIT D**

**INITIAL CALIFORNIA PREPETITION BUDGET**

[Attached.]

**Tranche C: California Prepetition Budget**
**Consolidated**

| US$<br>Week Ending: | Week 1<br>02/05/21 | Week 2<br>02/12/21 | Week 3<br>02/19/21 | Week 4<br>02/26/21 | Week 5<br>03/05/21 | Total | Remarks |
|---|---|---|---|---|---|---|---|
| **Riverside Budget Summary** | | | | | | | |
| Total Cash Receipts | 2,021,846 | 2,845 | 246,555 | 26,532 | 2,021,209 | 4,318,985 | See "Riverside Budget" for detailed line items |
| (-) Total Manufacturing Expenditures | (425,120) | (432,370) | (432,370) | (432,370) | (620,549) | (2,342,779) | |
| (-) Total Operating Expenditures | (597,683) | (804,153) | (724,242) | (158,963) | (724,145) | (3,009,186) | Includes payment of Past Due Rent & ACCO Mechanics' Lien, which is only approved by Orion Energy if paid in connection with a renewal of the Riverside facility lease |
| (-) Total Capital Expenditures | - | - | - | - | - | - | |
| (-) Plant-Specific Restructuring Costs | | | | | | | |
| (-) Vendor Deposits | (627,125) | - | (313,562) | - | (313,562) | (1,254,250) | See "Riverside Budget" for further breakout by critical vendor |
| (-) Utility Deposits | - | - | - | - | - | - | |
| (-) 503b9 | - | - | - | - | - | - | |
| (-) Total Financing Cash Flow | 1,200,000 | - | - | - | (55,000) | 1,145,000 | |
| **Riverside Total Change in Cash** | **1,571,917** | **(1,233,678)** | **(1,223,620)** | **(564,801)** | **307,953** | **(1,142,230)** | |
| | | | | | | | |
| **PinnPack Budget Summary** | | | | | | | |
| Total Cash Receipts | 392,690 | 768,119 | 356,459 | 631,822 | 1,479,953 | 3,629,043 | See "PinnPack Budget" for detailed line items |
| (-) Total Manufacturing Expenditures | (291,914) | (333,155) | (327,948) | (327,854) | (364,877) | (1,645,748) | |
| (-) Total Operating Expenditures | (289,946) | (310,684) | (222,714) | (507,401) | (291,696) | (1,622,440) | |
| (-) Total Capital Expenditures | - | - | - | - | - | - | |
| (-) Plant-Specific Restructuring Costs | | | | | | | |
| (-) Vendor Deposits | (275,793) | - | (137,896) | - | (137,896) | (551,585) | See "PinnPack Budget" for further breakout by critical vendor |
| (-) Utility Deposits | - | - | - | - | - | - | |
| (-) 503b9 | - | - | - | - | - | - | |
| (-) Total Financing Cash Flow | 300,000 | - | - | - | - | 300,000 | |
| **PinnPack Total Change in Cash** | **(164,962)** | **124,280** | **(332,099)** | **(203,433)** | **685,483** | **109,269** | |
| | | | | | | | |
| **Restructuring Professional Fees** | | | | | | | |
| Force 10 | - | (94,715) | (220,000) | - | (275,000) | (589,715) | Final week includes accelerated payment at filing |
| (-) Debtor's Restructuring Counsel (Pachulski) | - | - | (100,000) | - | (600,000) | (700,000) | |
| (-) Debtor's Investment Banker (Jefferies) | - | - | (25,000) | - | (37,500) | (62,500) | |
| (-) Debtor's Corporate Counsel (ReedSmith) | - | - | (30,000) | - | (30,000) | (60,000) | |
| (-) Lender's Counsel (Latham) | (500,000) | - | - | - | - | (500,000) | For accrued expenses since 1/1/2021 and estimated expenses through 3/1/2021 |
| (-) Lender's Financial Advisor (AlixPartners) | (150,000) | - | - | - | - | (150,000) | |
| (-) UCC Counsel & FA | - | - | - | - | - | - | |
| (-) Noticing Agent | - | - | - | - | - | - | |
| (-) U.S. Trustee Fee | - | - | - | - | - | - | |
| **Total Restructuring Professional Fees** | **(650,000)** | **(94,715)** | **(375,000)** | **-** | **(942,500)** | **(2,062,215)** | |
| | | | | | | | |
| **Combined Cash Needs** | | | | | | | |
| Beginning Cash | - | 756,955 | (447,158) | (2,377,878) | (3,146,112) | - | |
| (+/-) Riverside Total Change in Cash | 1,571,917 | (1,233,678) | (1,223,620) | (564,801) | 307,953 | (1,142,230) | |
| (+/-) PinnPack Total Change in Cash | (164,962) | 124,280 | (332,099) | (203,433) | 685,483 | 109,269 | |
| (-) Restructuring Professional Fees | (650,000) | (94,715) | (375,000) | - | (942,500) | (2,062,215) | |
| **Ending Cash** | **756,955** | **(447,158)** | **(2,377,878)** | **(3,146,112)** | **(3,095,176)** | **(3,095,176)** | |

| Tranche C Fundings | |
|---|---|
| Initial Draw - specified spend per budget (incl. Latham and AlixPartners fees) | 2,437,500 |
| Initial Draw - loan discount | 62,500 |
| **Total Initial Draw** | **2,500,000** |
| Further availability for Subsequent Draw(s), subject to Orion Energy approval | 292,500 |
| Loan discount for Subsequent Draw(s), if fully utilized | 7,500 |
| **Total Tranche C Approved** | **2,800,000** |

**Tranche C: California Prepetition Budget**
**Riverside Plant (CarbonLITE Industries)**

| US$<br>Week Ending: | Week 1<br>02/05/21 | Week 2<br>02/12/21 | Week 3<br>02/19/21 | Week 4<br>02/26/21 | Week 5<br>03/05/21 | Total | Remarks |
|---|---|---|---|---|---|---|---|
| **Cash Receipts** | | | | | | | |
| Industries Collections - Current AR | 2,021,846 | 2,845 | 246,555 | 26,532 | 1,564,209 | 3,861,986 | Per Company budget |
| Industries Collections - Aged AR | - | - | - | - | 456,999 | 456,999 | Per Company budget |
| Industries Collections - New Sales | - | - | - | - | - | - | Per Company budget |
| Inventory Reduction | - | - | - | - | - | - | Per Company budget |
| Application of Customer Deposit | - | - | - | - | - | - | Fully deferred |
| Cal Recycle | - | - | - | - | - | - | Per Company budget |
| **Total Cash Receipts** | **2,021,846** | **2,845** | **246,555** | **26,532** | **2,021,209** | **4,318,986** | |
| | | | | | | | |
| **Manufacturing Expenditures** | | | | | | | |
| Raw Materials | 160,136 | 224,190 | 224,190 | 224,190 | 292,820 | 1,125,528 | Per Company budget |
| Flake Purchases | 72,665 | 101,731 | 101,731 | 101,731 | 99,769 | 477,625 | Per Company budget |
| Chemicals | 42,288 | 45,155 | 45,155 | 45,155 | 55,906 | 233,659 | Per Company budget |
| Other Manufacturing Spend | 134,940 | 46,203 | 46,203 | 46,203 | 148,874 | 422,424 | Per Company budget |
| Freight (In & Out) | 15,091 | 15,091 | 15,091 | 15,091 | 23,180 | 83,544 | Per Company budget |
| Starlinger Extrusion Line Cap Lease | - | - | - | - | - | - | Fully deferred |
| **Total Manufacturing Expenditures** | **425,120** | **432,370** | **432,370** | **432,370** | **620,549** | **2,342,779** | |
| | | | | | | | |
| **Operating Expenditures** | | | | | | | |
| Payroll (Incl taxes, medical & 401k) | 286,974 | 121,365 | 288,724 | 103,099 | 293,435 | 1,093,597 | Reduced $1,750 per month per Riverside and PinnPack ($3.5k/mo. total across the two) |
| Temporary Labor (Admin Staff) | - | - | - | - | - | - | Per Company budget |
| Facility Rent | 244,897 | - | - | - | 244,897 | 489,793 | Per Company budget |
| Past Due Rent & ACCO Mechanics' Lien | - | 396,414 | - | - | 120,000 | 516,414 | Only approved by Orion Energy if paid in connection with a renewal of the Riverside facility lease |
| Temporary Storage Facility | 51,061 | - | - | - | 51,061 | 102,122 | Per Company budget |
| Personal Property Tax | - | - | - | - | - | - | Per Company budget |
| Utilities | - | - | 387,422 | - | - | 387,422 | Per Company budget |
| Corporate Insurance | - | 271,622 | 33,345 | - | - | 304,966 | Per Company budget |
| Other G&A | 14,752 | 14,752 | 14,752 | 14,752 | 14,752 | 73,759 | Per Company budget |
| HPC Management Fee | - | - | - | 41,112 | - | 41,112 | Per Company budget |
| Current AP Balance | - | - | - | - | - | - | Fully deferred |
| Past Due AP Balance | - | - | - | - | - | - | Fully deferred |
| **Total Operating Expenditures** | **597,683** | **804,153** | **724,242** | **158,963** | **724,145** | **3,009,186** | |
| | | | | | | | |
| **Capital Expenditures** | | | | | | | |
| PP&E Purchases | - | - | - | - | - | - | Fully deferred |
| Starlinger Line Not Financed by Bank Leumi | - | - | - | - | - | - | Fully deferred |
| Past Due Capex Spend | - | - | - | - | - | - | Per Company budget |
| **Total Capital Expenditures** | **-** | **-** | **-** | **-** | **-** | **-** | |
| | | | | | | | |
| **Plant-Specific Restructuring Costs** | | | | | | | |
| Vendor Deposits | 627,125 | - | 313,562 | - | 313,562 | 1,254,250 | See breakout by critical vendor below |
| Utility Deposits | - | - | - | - | - | - | Per Company budget |
| 503b9 | - | - | - | - | - | - | Per Company budget |
| **Total Plant-Specific Restructuring Costs** | **627,125** | **-** | **313,562** | **-** | **313,562** | **1,254,250** | |
| | | | | | | | |
| **Cash Flow Before Financing** | **371,917** | **(1,233,678)** | **(1,223,620)** | **(564,801)** | **362,953** | **(2,287,230)** | |

**Tranche C: California Prepetition Budget**
**Riverside Plant (CarbonLITE Industries)**

| US$<br>Week Ending: | Week 1<br>02/05/21 | Week 2<br>02/12/21 | Week 3<br>02/19/21 | Week 4<br>02/26/21 | Week 5<br>03/05/21 | Total | Remarks |
|---|---|---|---|---|---|---|---|
| **Financing Cash Flow** | | | | | | | |
| Orion Interest Payments | - | - | - | - | - | - | Per Company budget |
| Bank Leumi Interest Payments | - | - | - | - | 55,000 | 55,000 | Per Company budget |
| Shareholder Interest Payments | - | - | - | - | - | - | Per Company budget |
| Niagara Waters Interest Payments | - | - | - | - | - | - | Fully deferred |
| Niagara Waters Principal Payments | - | - | - | - | - | - | Fully deferred |
| Orion Advances | - | - | - | - | - | - | Transfers out of the Borrower Blocked Account to be approved per Credit Agreeement |
| Line of Credit Activity (Borrow)/Repay | (1,200,000) | - | - | - | - | (1,200,000) | Per Company budget |
| **Total Financing Cash Flow** | **(1,200,000)** | **-** | **-** | **-** | **55,000** | **(1,145,000)** | |
| | | | | | | | |
| Beginning Cash | - | 1,571,917 | 338,239 | (885,381) | (1,450,182) | - | |
| Change in Cash | 1,571,917 | (1,233,678) | (1,223,620) | (564,801) | 307,953 | (1,142,230) | |
| **Ending Cash** | **1,571,917** | **338,239** | **(885,381)** | **(1,450,182)** | **(1,142,230)** | **(1,142,230)** | |

| Vendor Deposit Budget | Based On Amt. 0-30 |
|---|---|
| **For Critical Vendors** | **Days' Past Due (as of 12/10/20)** |
| Allan Company | 347,825 |
| Everank Investment Group, Inc. | 105,402 |
| Bantam Materials International | 188,009 |
| Plastic Recycling Corp. of California | - |
| rPlanet Earth Los Angeles LLC | 430,211 |
| RePET Inc. | - |
| Fairmont Logistics LLC | 70,297 |
| Miles Chemical Company Inc. | 12,922 |
| Lexmar Distribution, Inc. | 99,584 |
| **Critical Vendor Deposit Budget** | **1,254,250** |

| Budgeted Timing of Vendor Deposit | |
|---|---|
| Initial - Week 2 | 50.0% |
| Week 5 | 25.0% |
| Week 8 | 25.0% |

**Tranche C: California Prepetition Budget**
**PinnPack**

| US$ Week Ending: | Week 1 02/05/21 | Week 2 02/12/21 | Week 3 02/19/21 | Week 4 02/26/21 | Week 5 03/05/21 | Total | Remarks |
|---|---|---|---|---|---|---|---|
| **Cash Receipts** | | | | | | | |
| PinnPack Collections - Current AR | 392,690 | 768,119 | 356,459 | 631,822 | 625,709 | 2,774,799 | Per Company budget |
| PinnPack Collections - Aged AR | - | - | - | - | 854,244 | 854,244 | Per Company budget |
| PinnPack Collections - New Sales | - | - | - | - | - | - | Per Company budget |
| Inventory Reduction | - | - | - | - | - | - | Per Company budget |
| **Total Cash Receipts** | **392,690** | **768,119** | **356,459** | **631,822** | **1,479,953** | **3,629,043** | |
| | | | | | | | |
| **Manufacturing Expenditures** | | | | | | | |
| Raw Materials | 155,467 | 217,654 | 217,654 | 217,654 | 202,609 | 1,011,037 | Per Company budget |
| Sheet Purchases | - | - | - | - | - | - | Per Company budget |
| Chemicals | - | - | - | - | - | - | Per Company budget |
| Other Manufacturing Spend | 86,226 | 50,537 | 50,537 | 50,537 | 97,172 | 335,008 | Per Company budget |
| Freight | 50,221 | 64,964 | 59,758 | 59,664 | 65,097 | 299,704 | Per Company budget |
| Reifenhauser/Erema Cap Lease | - | - | - | - | - | - | Fully deferred |
| **Total Manufacturing Expenditures** | **291,914** | **333,155** | **327,948** | **327,854** | **364,877** | **1,645,748** | |
| | | | | | | | |
| **Operating Expenditures** | | | | | | | |
| Payroll (Incl taxes, medical & 401k) | 95,465 | 211,847 | 97,215 | 388,205 | 97,215 | 889,947 | Reduced $1,750 per month per Riverside and PinnPack ($3.5k/mo. total across the two) |
| Temporary Labor | 55,518 | 55,518 | 55,518 | 55,518 | 55,518 | 277,589 | Per Company budget |
| Facility Rent | 106,116 | - | - | - | 106,116 | 212,232 | Per Company budget |
| Property Tax | - | - | - | - | - | - | Per Company budget |
| Utilities | - | - | 37,133 | - | - | 37,133 | Per Company budget |
| Corporate Insurance | - | 10,471 | - | 10,471 | - | 20,942 | Per Company budget |
| Other G&A | 32,847 | 32,847 | 32,847 | 32,847 | 32,847 | 164,237 | Per Company budget |
| HPC Management Fee | - | - | - | 20,360 | - | 20,360 | Per Company budget |
| Current AP Balance | - | - | - | - | - | - | Fully deferred |
| Past Due AP Balance | - | - | - | - | - | - | Fully deferred |
| **Total Operating Expenditures** | **289,946** | **310,684** | **222,714** | **507,401** | **291,696** | **1,622,440** | |
| | | | | | | | |
| **Capital Expenditures** | | | | | | | |
| PP&E Purchases | - | - | - | - | - | - | Fully deferred |
| New Equipment Leases | - | - | - | - | - | - | Per Company budget |
| Past Due Capex Spend | - | - | - | - | - | - | Per Company budget |
| **Total Capital Expenditures** | **-** | **-** | **-** | **-** | **-** | **-** | |
| | | | | | | | |
| **Plant-Specific Restructuring Costs** | | | | | | | |
| Vendor Deposits | 275,793 | - | 137,896 | - | 137,896 | 551,585 | See breakout by critical vendor below |
| Utility Deposits | - | - | - | - | - | - | Per Company budget |
| 503b9 | - | - | - | - | - | - | Per Company budget |
| **Total Plant-Specific Restructuring Costs** | **275,793** | **-** | **137,896** | **-** | **137,896** | **551,585** | |
| | | | | | | | |
| **Cash Flow Before Financing** | **(464,962)** | **124,280** | **(332,099)** | **(203,433)** | **685,483** | **(190,731)** | |

**Tranche C: California Prepetition Budget**
**PinnPack**

| US$<br>Week Ending: | Week 1<br>02/05/21 | Week 2<br>02/12/21 | Week 3<br>02/19/21 | Week 4<br>02/26/21 | Week 5<br>03/05/21 | Total | Remarks |
|---|---|---|---|---|---|---|---|
| **Financing Cash Flow** | | | | | | | |
| Orion-A Interest At 40% | - | - | - | - | - | - | Per Company budget |
| Orion-B Interest At 40% | - | - | - | - | - | - | Per Company budget |
| RMDZ-1 Principal | - | - | - | - | - | - | Fully deferred |
| RMDZ-1 Interest | - | - | - | - | - | - | Fully deferred |
| RMDZ-2 Principal | - | - | - | - | - | - | Fully deferred |
| RMDZ-2 Interest | - | - | - | - | - | - | Fully deferred |
| Orion Advances | - | - | - | - | - | - | Transfers out of the Borrower Blocked Account to be approved per Credit Agreement |
| Line of Credit Activity (Borrow)/Repay | (300,000) | - | - | - | - | (300,000) | Per Company budget |
| **Total Financing Cash Flow** | **(300,000)** | **-** | **-** | **-** | **-** | **(300,000)** | |
| | | | | | | | |
| Beginning Cash | - | (164,962) | (40,682) | (372,781) | (576,215) | - | |
| Change in Cash | (164,962) | 124,280 | (332,099) | (203,433) | 685,483 | 109,269 | |
| **Ending Cash** | **(164,962)** | **(40,682)** | **(372,781)** | **(576,215)** | **109,269** | **109,269** | |

| Vendor Deposit Budget | Based On Amt. 0-30 |
|---|---|
| **For Critical Vendors** | **Days' Past Due (as of 12/10/20)** |
| Polyquest, Inc. | 301,899 |
| Quality Freight Logistics, Inc. | 203,465 |
| Fairmont Logistics LLC | 46,221 |
| **Critical Vendor Deposit Budget** | **551,585** |

| **Budgeted Timing of Vendor Deposit** | |
|---|---|
| Initial - Week 2 | 50.0% |
| Week 5 | 25.0% |
| Week 8 | 25.0% |

## **EXHIBIT E**

### INITIAL PENNSYLVANIA PREPETITION BUDGET

[Attached.]

**Cash Flow Forecast**

Entity: Pennsylvania
Location: Reading, PA
Niagara Volume Sold To: Niagara
Scenario: Ch 11

| | Balance | Week 1 02/05/21 | Week 2 02/12/21 | Week 3 02/19/21 | Week 4 02/26/21 | Week 5 03/05/21 | Week 6 03/12/21 | Week 7 03/19/21 | Totals Thru 3/19 |
|---|---|---|---|---|---|---|---|---|---|
| Week Ended | | | | | | | | | |
| **Cash Receipts** | | | | | | | | | |
| Pennsylvania Collections - Current AR | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania Collections - Aged AR | 103,745 | 0 | 0 | 5,904 | 0 | 0 | 0 | 0 | 5,904 |
| Pennsylvania Collections - New Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Application of Customer Deposit | 20,000,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 20,103,745 | **0** | **0** | **5,904** | **0** | **0** | **0** | **0** | **5,904** |
| **Manufacturing Expenditures** | | | | | | | | | |
| Raw Materials | | 0 | 0 | 0 | 0 | 84,808 | 118,731 | 118,731 | 322,271 |
| Flake Purchases | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Chemicals | | 0 | 0 | 0 | 0 | 12,241 | 17,137 | 17,137 | 46,516 |
| Other Manufacturing Spend | | 16,195 | 0 | 0 | 0 | 43,966 | 38,881 | 38,881 | 137,923 |
| Freight | | 0 | 0 | 0 | 0 | 11,590 | 11,590 | 11,590 | 34,771 |
| Starlinger Extrusion Line Cap Lease | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | 16,195 | **0** | **0** | **0** | **152,606** | **186,340** | **186,340** | **541,480** |
| **Operating Expenditures** | | | | | | | | | |
| Payroll (Incl taxes, medical & 401k) | | 111,256 | 0 | 111,256 | 77,080 | 117,180 | 0 | 117,180 | 533,953 |
| Temporary Labor (Admin Staff) | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Facility Rent | | 140,500 | 0 | 0 | 0 | 140,500 | 0 | 0 | 281,000 |
| Property Tax | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Utilities | | 0 | 0 | 130,952 | 0 | 0 | 0 | 187,075 | 318,027 |
| Corporate Insurance | | 0 | 237,234 | 0 | 29,432 | 0 | 0 | 0 | 266,667 |
| Equipment Leases | | 16,195 | 0 | 0 | 0 | 16,195 | 0 | 0 | 32,389 |
| Other G&A | | 25,383 | 25,383 | 25,383 | 25,383 | 25,383 | 25,383 | 25,383 | 177,684 |
| HPC Management Fee | | 0 | 0 | 0 | 41,112 | 0 | 0 | 0 | 41,112 |
| Unallocated Cash Spend | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 175,000 |
| Current AP Balance | 147,255 | 13,232 | 57,627 | 33,146 | 27,008 | 8,903 | 0 | 7,337 | 147,255 |
| Past Due AP Balance | 2,913,471 | 56,028 | 56,028 | 56,028 | 56,028 | 56,028 | 56,028 | 56,028 | 392,198 |
| | | 387,594 | **401,274** | **381,766** | **281,044** | **389,190** | **106,412** | **418,004** | **2,365,284** |
| **Capital Expenditures** | | | | | | | | | |
| PP&E Purchases -->> Include Spare Parts? | No | 9,000,000 | 0 | 0 | 1,800,000 | 0 | 0 | 0 | 1,800,000 | 3,600,000 |
| New Equipment Leases | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Past Due Capex Spend | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | **0** | **0** | **1,800,000** | **0** | **0** | **0** | **1,800,000** | **3,600,000** |
| **Restructuring** | | | | | | | | | |
| Vendor Deposits | | 0 | 0 | 0 | 0 | 194,098 | 0 | 0 | 194,098 |
| Utility Deposits | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 503b9 | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Force 10 | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pachulski | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Jefferies | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| ReedSmith | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| UCC Counsel & FA | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Noticing Agent | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| U.S. Trustee Fee | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | **0** | **0** | **0** | **0** | **194,098** | **0** | **0** | **194,098** |
| **Cash Flow Before Financing** | | **(403,789)** | **(401,274)** | **(2,175,862)** | **(281,044)** | **(735,894)** | **(292,752)** | **(2,404,344)** | **(6,694,959)** |
| **Financing Cash Flow** | | | | | | | | | |
| PEDFA-19 Principal | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| PEDFA-19 Interest | | 299,738 | 0 | 0 | 0 | 299,738 | 0 | 0 | 599,475 |
| PEDFA-20 Principal | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| PEDFA-20 Interest | | 45,208 | 0 | 0 | 0 | 40,833 | 0 | 0 | 86,042 |
| | | 344,946 | **0** | **0** | **0** | **340,571** | **0** | **0** | **685,517** |
| Beginning Cash | 0 | (748,735) | (1,150,008) | (3,325,870) | (3,606,915) | (4,683,380) | (4,976,131) | | |
| Change in Cash | | (748,735) | (401,274) | (2,175,862) | (281,044) | (1,076,465) | (292,752) | (2,404,344) | (7,380,476) |
| **Ending Cash** | | **(748,735)** | **(1,150,008)** | **(3,325,870)** | **(3,606,915)** | **(4,683,380)** | **(4,976,131)** | **(7,380,476)** | **(7,380,476)** |
| **Cash Flow Levers** | | | | | | | | | |
| Defer PEDFA-19 Principal | Yes | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Defer PEDFA-19 Interest | Yes | 299,738 | 0 | 0 | 0 | 299,738 | 0 | 0 | 599,475 |
| Defer PEDFA-20 Principal | Yes | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Defer PEDFA-20 Interest | Yes | 45,208 | 0 | 0 | 0 | 40,833 | 0 | 0 | 86,042 |
| Defer Personal Loan | Yes | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Defer Customer Deposit Collections | Yes | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Defer Capex Spend | Yes | 0 | 0 | 1,800,000 | 0 | 0 | 0 | 1,800,000 | 3,600,000 |
| One-time pymt for Capex | Yes | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Defer Payment of Aged AP | Yes | 56,028 | 56,028 | 56,028 | 56,028 | 56,028 | 56,028 | 56,028 | 392,198 |
| Defer Payment of Current AP | Yes | 0 | 0 | 0 | 27,008 | 8,903 | 0 | 7,337 | 43,248 |
| Defer Payment of Capital Lease | Yes | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Defer Payment of Personal Property Tax | Yes | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Adjusted Cash** | | (347,761) | (693,006) | (1,012,840) | (1,210,848) | (1,881,810) | (2,118,534) | (2,659,512) | (2,659,512) |

# **EXHIBIT F**

## **INITIAL TEXAS PREPETITION BUDGET**

[Attached.]

**Cash Flow Forecast**

Entity: Recycling
Location: Dallas, TX
Niagara Volume Sold To: Niagara
Scenario: Ch 11
Week Ended: Balance

| | Balance | Week 1 02/05/21 | Week 2 02/12/21 | Week 3 02/19/21 | Week 4 02/26/21 | Week 5 03/05/21 | Week 6 03/12/21 | Week 7 03/19/21 | Totals Thru 3/19 |
|---|---|---|---|---|---|---|---|---|---|
| **Cash Receipts** | | | | | | | | | |
| Recycling Collections - Current AR | 798,180 | 708,670 | 17,200 | 3,437 | 0 | 68,874 | 0 | 0 | 798,180 |
| Recycling Collections - Aged AR | 1,414,231 | 0 | 0 | 0 | 0 | 660,873 | 0 | 0 | 660,873 |
| Recycling Collections - New Sales | 0 | 0 | 0 | 0 | 0 | 0 | 109,210 | 936,600 | 1,045,810 |
| PPP Loan Proceeds | 1,587,275 | 1,587,275 | 0 | 0 | 0 | 0 | 0 | 0 | 1,587,275 |
| Application of Customer Deposit | 21,634,743 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 25,434,428 | 2,295,945 | 17,200 | 3,437 | 0 | 729,747 | 109,210 | 936,600 | 4,092,138 |
| **Manufacturing Expenditures** | | | | | | | | | |
| Raw Materials | | 89,082 | 124,714 | 124,714 | 124,714 | 166,286 | 182,914 | 182,914 | 995,339 |
| Flake Purchases | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Chemicals | | 11,455 | 16,037 | 16,037 | 16,037 | 21,382 | 23,521 | 23,521 | 127,989 |
| Other Manufacturing Spend | | 51,193 | 33,262 | 33,262 | 33,262 | 71,783 | 48,784 | 48,784 | 320,329 |
| Freight | | 6,679 | 6,679 | 6,679 | 6,679 | 6,679 | 5,645 | 5,645 | 44,686 |
| Starlinger Extrusion Line Cap Lease | 59,157 | 0 | 0 | 0 | 59,157 | 0 | 0 | 0 | 59,157 |
| | | 158,408 | 180,692 | 180,692 | 239,849 | 266,131 | 260,864 | 260,864 | 1,547,501 |
| **Operating Expenditures** | | | | | | | | | |
| Payroll (Incl taxes, medical & 401k) | | 347,144 | 2,439 | 347,144 | 178,930 | 347,144 | 2,439 | 347,144 | 1,572,383 |
| Temporary Labor (Admin Staff) | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Facility Rent | | 130,146 | 0 | 0 | 0 | 130,146 | 0 | 0 | 260,291 |
| Utilities | | 0 | 0 | 148,781 | 0 | 0 | 0 | 148,781 | 297,561 |
| Corporate Insurance | | 0 | 127,614 | 0 | 31,904 | 0 | 0 | 0 | 159,518 |
| Other G&A | | 20,112 | 20,112 | 20,112 | 20,112 | 20,112 | 20,112 | 20,112 | 140,784 |
| HPC Management Fee | | 0 | 0 | 0 | 41,112 | 0 | 0 | 0 | 41,112 |
| Unspecified Cash Spend | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 175,000 |
| Current AP Balance | 1,242,061 | 277,796 | 374,397 | 206,999 | 98,701 | 138,227 | 23,028 | 68,307 | 1,187,455 |
| Past Due AP Balance | 14,828,401 | 285,162 | 285,162 | 285,162 | 285,162 | 285,162 | 285,162 | 285,162 | 1,996,131 |
| | | 1,085,359 | 834,724 | 1,033,197 | 680,920 | 945,790 | 355,741 | 894,505 | 5,830,235 |
| **Capital Expenditures** | | | | | | | | | |
| PP&E Purchases -->> Include Spare Parts?  No | 1,000,000 | 83,333 | 0 | 0 | 0 | 83,333 | 0 | 0 | 166,667 |
| New Equipment Leases | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Past Due Capex Spend | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | 83,333 | 0 | 0 | 0 | 83,333 | 0 | 0 | 166,667 |
| **Restructuring** | | | | | | | | | |
| Vendor Deposits | | 0 | 0 | 0 | 0 | 375,336 | 0 | 0 | 375,336 |
| Utility Deposits | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 503b9 | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Force 10 | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pachulski | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Jefferies | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| ReedSmith | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| UCC Counsel & FA | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Noticing Agent | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| U.S. Trustee Fee | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | 0 | 0 | 0 | 0 | 375,336 | 0 | 0 | 375,336 |
| **Cash Flow Before Financing** | | 968,844 | (998,216) | (1,210,453) | (920,769) | (940,844) | (507,395) | (218,769) | (3,827,602) |
| **Financing Cash Flow** | | | | | | | | | |
| MEDFA Principal | | 194,167 | 0 | 0 | 0 | 194,167 | 0 | 0 | 388,333 |
| MEDFA Interest | | 247,894 | 0 | 0 | 0 | 247,894 | 0 | 0 | 495,788 |
| Line of Credit Activity (Borrow)/Repay | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | 442,060 | 0 | 0 | 0 | 442,060 | 0 | 0 | 884,121 |
| Beginning Cash | | 4,565 | 531,349 | (466,867) | (1,677,320) | (2,598,089) | (3,980,993) | (4,488,388) | 4,565 |
| Change in Cash | | 526,784 | (998,216) | (1,210,453) | (920,769) | (1,382,904) | (507,395) | (218,769) | (4,711,722) |
| **Ending Cash** | | 531,349 | (466,867) | (1,677,320) | (2,598,089) | (3,980,993) | (4,488,388) | (4,707,157) | (4,707,157) |
| **Cash Flow Levers** | | | | | | | | | |
| Defer MEDFA Principal | Yes | 194,167 | 0 | 0 | 0 | 194,167 | 0 | 0 | 388,333 |
| Defer MEDFA Interest | Yes | 247,894 | 0 | 0 | 0 | 247,894 | 0 | 0 | 495,788 |
| Niagara at Pepsi rates | Yes | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Defer Customer Deposit Collections | Yes | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Defer Capex Spend | Yes | 83,333 | 0 | 0 | 0 | 83,333 | 0 | 0 | 166,667 |
| Defer Payment of Aged AP | Yes | 285,162 | 285,162 | 285,162 | 285,162 | 285,162 | 285,162 | 285,162 | 1,996,131 |
| Defer Payment of Current AP | Yes | 0 | 0 | 0 | 98,701 | 138,227 | 23,028 | 68,307 | 328,263 |
| Defer Payment of Capital Lease | Yes | 0 | 0 | 0 | 59,157 | 0 | 0 | 0 | 59,157 |
| **Adjusted Ending Cash** | | 1,341,904 | 628,849 | (296,442) | (774,191) | (1,208,312) | (1,407,518) | (1,272,819) | (1,272,819) |

# **EXHIBIT G**

## **CUSTOMER DISCUSSIONS PLAN**

[Attached.]

**CarbonLITE**
**Customer Discussions Plan - Status of Price Increases**

| | Monthly Volumes (in lbs) | Current Pricing Formula (cpp) | Target New Pricing Formula (cpp) | Target Implementation Date of New Pricing Formula | Cumulative Status of Negotiations | Future Key Dates / Steps |
|---|---|---|---|---|---|---|
| **Riverside:** | | | | | | |
| Nestle | 2,250,000 | 63.59 | 69.35 | 3/1/2021 | 1/29/21. Call was initiated with the customer. A detail memo was sent with the new pricing formulas and benchmarks. The pricing formulas were communicated to be effective 3/1/21. | Awaiting feedback during the w/e 2/8/21. |
| Pepsi | 2,007,500 | 63.09 | 69.35 | 3/1/2021 | A call is scheduled for 2/1/21 with senior management. The follow- up transmittal memo has been prepared and will be sent after the call. | Zoom call is at 11:30am PST on Monday, 2/1 |
| Coca-Cola | 862,500 | 63.30 | 69.35 | 3/1/2021 | A call is scheduled for 2/1/21 with senior management. The follow- up transmittal memo has been prepared and will be sent after the call. | Coke agreed to the price increases. |
| KDP/Amcor | - | 66.50 | 69.35 | 3/1/2021 | The call is expected on Tuesday, 2/2. | |
| Niagara | 2,000,000 | 46.01 | 69.35 | 3/1/2021 | No communication is scheduled at this time due to the customer providing feedstock to restart the CA and TX plants. The customer will be approached in late February. | |
| **Dallas:** | | | | | | |
| Nestle | 3,000,000 | 54.30 | 64.82 | 3/1/2021 | See above | |
| Pepsi | 700,000 | 54.58 | 64.82 | 3/1/2021 | See above | |
| Coca-Cola | 1,083,333 | 54.26 | 64.82 | 3/1/2021 | See above | |
| KDP/Amcor | - | 58.61 | 64.82 | 3/1/2021 | See above | |
| Niagara | 2,000,000 | 47.01 | 64.82 | 3/1/2021 | See above | |
| **Reading:** | | | | | | |
| Nestle | 2,250,000 | 51.71 | 63.69 | 3/1/2021 | See above | |
| Pepsi | - | 51.51 | 63.69 | 3/1/2021 | See above | |
| Coca-Cola | 1,333,333 | 51.61 | 63.69 | 3/1/2021 | See above | |
| KDP/Amcor | 2,666,667 | 55.77 | 63.69 | 3/1/2021 | See above | |
| Niagara | 1,500,000 | 47.01 | 63.69 | 3/1/2021 | See above | |

| New Customer Initiatives | Prospect | Status of Discussions | Future Key Dates / Steps |
|---|---|---|---|
| Riverside | | | Pending results of existing customer negotiations. Need to have a good understanding of available product volumes and price acceptance. |
| Dallas | | | Pending results of existing customer negotiations. Need to have a good understanding of available product volumes and price acceptance. |
| Reading | | | Pending results of existing customer negotiations. Need to have a good understanding of available product volumes and price acceptance. |

| | Monthly Vol | Current Formula | | | | | | |
| | | + | + | + | / | = | + | = |
| | | Index [3] | Premium | Freight | Yield | Material | Processing | **Price** |
|---|---|---|---|---|---|---|---|---|
| **Riverside:** | | | | | | | | |
| Nestle | 2,250,000 | 17.38 | - | 2.00 | 69.0% | 28.09 | 35.50 | **63.59** |
| Pepsi | 2,007,500 | 17.38 | 4.14 | 2.00 | 69.0% | 34.09 | 29.00 | **63.09** |
| Coca-Cola | 862,500 | 17.38 | - | 2.00 | 71.0% | 27.30 | 36.00 | **63.30** |
| KDP/Amcor | - | 17.38 | - | 2.00 | 68.0% | 28.50 | 38.00 | **66.50** |
| Niagara | 2,000,000 | | | | | | | **46.01** |
| **Dallas:** | | | | | | | | |
| Nestle | 3,000,000 | 9.75 | - | 2.00 | 62.5% | 18.80 | 35.50 | **54.30** |
| Pepsi | 700,000 | 9.75 | 3.60 | 2.00 | 60.0% | 25.58 | 29.00 | **54.58** |
| Coca-Cola | 1,083,333 | 9.75 | - | 2.00 | 61.0% | 19.26 | 35.00 | **54.26** |
| KDP/Amcor | - | 9.75 | - | 2.00 | 57.0% | 20.61 | 38.00 | **58.61** |
| Niagara | 2,000,000 | | | | | | | **47.01** |
| **Reading:** | | | | | | | | |
| Nestle | 2,250,000 | 8.13 | - | 2.00 | 62.5% | 16.21 | 35.50 | **51.71** |
| Pepsi | - | 8.13 | 3.60 | 2.00 | 60.0% | 22.51 | 29.00 | **51.51** |
| Coca-Cola | 1,333,333 | 8.13 | - | 2.00 | 61.0% | 16.61 | 35.00 | **51.61** |
| KDP/Amcor | 2,666,667 | 8.13 | - | 2.00 | 57.0% | 17.77 | 38.00 | **55.77** |
| Niagara | 1,500,000 | | | | | | | **47.01** |

[1] IHS based on 1/22/2021 Issue 620; Deposit for Riverside, Curbside for Dallas and Reading

[2] ICIS based on 1/21/2021 Issue; USWC for Riverside, USEC for Reading

[3] Secondary Material Market Index at 1/18/2021

| | |
|---|---|
| Riverside | 17.38 |
| Dallas | 9.75 |
| Reading | 8.13 |

[4] In the event that Niagara does not accept the price increase, CarbonLITE will no longer ship likely resulting in ⌀

| | New Formula | | | | | | Comparable Indices | | Invoices |
| + | + | + | / | = | + | = | IHS [1] | ICIS [2] | Jan |
| Index | Premium | Freight | Yield | Material | Processing | Price | | | |
| 17.38 | 1.00 | 2.00 | 65.0% | 31.35 | 38.00 | **69.35** | 72-77.5 | 67-71 | $0.609 |
| 17.38 | 1.00 | 2.00 | 65.0% | 31.35 | 38.00 | **69.35** | 72-77.5 | 67-71 | $0.600 |
| 17.38 | 1.00 | 2.00 | 65.0% | 31.35 | 38.00 | **69.35** | 72-77.5 | 67-71 | |
| 17.38 | 1.00 | 2.00 | 65.0% | 31.35 | 38.00 | **69.35** | 72-77.5 | 67-71 | N/A |
| 17.38 | 1.00 | 2.00 | 65.0% | 31.35 | 38.00 | **69.35** | 72-77.5 | 67-71 | $0.430 |
| | | | | | | | | | |
| 9.75 | 2.00 | 3.00 | 55.0% | 26.82 | 38.00 | **64.82** | 65-70.5 | 62-71 | |
| 9.75 | 2.00 | 3.00 | 55.0% | 26.82 | 38.00 | **64.82** | 65-70.5 | 62-71 | |
| 9.75 | 2.00 | 3.00 | 55.0% | 26.82 | 38.00 | **64.82** | 65-70.5 | 62-71 | |
| 9.75 | 2.00 | 3.00 | 55.0% | 26.82 | 38.00 | **64.82** | 65-70.5 | 62-71 | |
| 9.75 | 2.00 | 3.00 | 55.0% | 26.82 | 38.00 | **64.82** | 65-70.5 | 62-71 | |
| | | | | | | | | | |
| 8.13 | 3.00 | 3.00 | 55.0% | 25.69 | 38.00 | **63.69** | 65-70.5 | 62-66 | |
| 8.13 | 3.00 | 3.00 | 55.0% | 25.69 | 38.00 | **63.69** | 65-70.5 | 62-66 | |
| 8.13 | 3.00 | 3.00 | 55.0% | 25.69 | 38.00 | **63.69** | 65-70.5 | 62-66 | |
| 8.13 | 3.00 | 3.00 | 55.0% | 25.69 | 38.00 | **63.69** | 65-70.5 | 62-66 | |
| 8.13 | 3.00 | 3.00 | 55.0% | 25.69 | 38.00 | **63.69** | 65-70.5 | 62-66 | |

costly litigation

| s from Acct System | | Current Formula | | |
| Dec | Nov | Freight | Yield | Process |
|---|---|---|---|---|
| $0.595 | $0.578 | 2.00 | 69.0% | $0.355 |
| $0.650 | $0.650 | 6.14 | 65.0% | $0.290 |
| $0.617 | $0.603 | 2.00 | 71.0% | $0.385 |
| N/A | N/A | | | |
| $0.430 | $0.430 | | | |
| | | | | |
| $0.546 | $0.534 | 2.00 | 62.5% | $0.355 |
| $0.540 | $0.531 | 2.00 | 61.0% | $0.375 |
| $0.545 | $0.533 | 2.00 | 61.0% | $0.375 |
| | $0.440 | | | |
| | | | | |
| $0.546 | $0.534 | 2.00 | 62.5% | $0.355 |
| | $0.650 | 2.00 | 57.0% | $0.380 |
| | | 2.00 | 61.0% | $0.375 |
| $0.440 | $0.440 | | | |

# **EXHIBIT H**

## **OPERATIONAL IMPROVEMENTS PLAN**

[Attached.]

**COMPANY CONFIDENTIAL**
**As of January 12, 2021**

1. **Operational Improvements**
    a. Capacity Utilization
        i. Riverside
            1. Utilization – we should be able to get **80% to 85% by April** (currently 70%).  There are 3 major factors: (1) lower throughput rate when producing for Nestle, (2) inherent inefficiency of the line, including "prewash", primarily due to the line configuration and age, and (3) lack of steady supply of feedstock.  We have already obtained agreement from Nestle to ship them Starlinger material with no need to slow down washing line and Erema pelletizing, which takes care of the item (1)
                a. Need to minimize Nestle or move them to "flake-pellet". When running material for Nestle, the line is operated at lower speed and capacity utilization drops by ~20%, and yields drop to barely above 50%.  As of today, buying flake in Riverside makes perfect sense, less so in Dallas – because of index price differences.  In any case, Nestle is a contract we need to adjust to account for higher conversion costs due to extreme sensitivity of Nestle to the level of benzene.  Niagara contract will have to be also renegotiated, due to extremely low selling prices.
                b. Key spare parts - Cost analysis under investigation, but preliminary data shows we need $300K in Riverside for immediate spare part purchases to minimize machine down time.
                c. Installation of 3rd Line by March (Starlinger) –  ~$1M for installation, including civil, mechanical, and electrical. Pennsylvania owes Starlinger ~$1.6M by 1/31/Need to verify Bank Leumi payment arrangement for the Riverside line.
                d. Total production capacity (~9 Million lbs./month) @~80%.
                    i. Utilization determined by nameplate capacity of 2 EREMA lines and 2 Starlinger lines (second Starlinger line is in transit and operations can reach 80% utilization by April).  The whole effort will take approximately 2-3 months to achieve this level assuming adequate supply of feedstock.
                    ii. Longer-term capacity utilization on washing line can be as high as 90% (confirmed by Sorema), but the time to reach that level should NOT impact our overall capacity

        iii. Until we get there, we need enough flake to run extrusion @ 90%.  We are structurally "short" in flake production in Riverside and have to buy supplemental flake, if we were to achieve maximum output.  Throughput capacity of our extrusion is higher than our current capacity of Sorema/Erema line, even if we operate at 90% efficiency.  If we get to 85-90% on the washing line utilization, that should be economically better than it is now, but we would still need to buy flake.

        iv. Within 2-3 month (by March-April) we should get close to 90% utilization on pellet production

2. Yield – looking into running Grade B flake (economic considerations).

    a. There are 2 grades of bale, with Grade A being primarily deposit (e.g., cleaner material), and Grade B being mostly "curbside".  Grade B is ~40 to 50% less expensive, but we lose in yield and output rate.  However, economically speaking, it may make sense to run some combination of Grade A and Grade B bales to maintain higher yields while lowering feedstock costs.  rPlanet Earth is only running Grade B to produce flake we like to use, even for Nestle (we run Grade A), however their yields are very low (less than 50% clear).  True economic impact of this effort can only be estimated by a steady processing of Grade A and Grade B bale mix for at least several days to evaluate capacity utilization and yield impact

3. Conversion Costs – we are in the process of performing a bottom-up review of costs, including labor, utility, centralization of certain functions.

    a. Goal is to get an accurate cost to be incorporated into product pricing formulas.  Currently, here is the best estimate we have.  See table below for comparison.

  ii. Dallas

1. Capacity utilization – currently @ 50% with a target of 75% by April, and 85% by June-July

2. Key Spare Parts - Cost analysis indicates we need ~$350K in immediate spare part needs to maintain uninterrupted production

3. Total production capacity - 7.5-8.0 Million lbs./month

4. Conversion Costs – bottom-up review of costs, including labor, utility, and centralization of certain functions

  iii. Reading

1. Large washing Line startup by mid-March with the small line in a startup mode now. Projected utilization:

|              | 21-Jan | 21-Feb | 21-Mar | 21-Apr | 21-May | 21-Jun |
|--------------|--------|--------|--------|--------|--------|--------|
| Sorema 1     | 10%    | 50%    | 70%    | 75%    | 75%    | 75%    |
| Sorema 2     | -      | -      | 25%    | 50%    | 70%    | 75%    |
|              |        |        |        |        |        |        |
| Starlinger 1 | 85%    | 85%    | 85%    | 85%    | 85%    | 85%    |
| Starlinger 2 | 85%    | 85%    | 85%    | 85%    | 85%    | 85%    |
| Starlinger 3 | *      | 85%    | 85%    | 85%    | 85%    | 85%    |

*- the Starlinger 3 line is installed, need commissioning (normally 1 week)

2. Capacity utilization – target of 85% by the end of April, assuming funds availability for flake purchases. The whole forecast on running producing green pellet should be evaluated separately. Freight is very expensive. In any case, it is a one-time effort, it is probably better to produce green pellet in CA and ship to a customer directly. Our capacity in PA is sold out

2. **Customer Contracts & Pricing**
   a. Renegotiation or elimination of Niagara contracts (all locations), to achieve reasonable margin. Initially, as the first step, our current contract pricing "floor" of 43-44 c/lb. needs to be raised to at least 50 c/lb. Eventually, the whole concept of "floor" price needs to be eliminated.
   b. Enhancement of our contract with Nestle (in Riverside) to reflect higher conversion costs (see descriptions above). This may not be as critical as the renegotiation of Niagara deals, but we need to start talking to Nestle about the impact their benzene requirements are having on our processing costs in Riverside.
   c. Increase of conversion cost component in our standard pricing formulas
      i. Currently ~38 c/lb. (it is 38.5 for Coke in CA and 39.5 for Coke out of CA, taking into account additional 2.5 c/lb. effective Jan. 1st, 37.5 c/lb. for Pepsi at all locations with additional 2.5 c/lb. effective Jan. 1st, and 38 c/lb. straight in the formula for KDP). Needs to be increased to 42-44 c/lb., so we can be totally independent of the index movements.
      ii. If we assume ~5 c/lb. across the board price increase
         1. At 70% capacity equates to ~$12m in additional revenue with 100% flow through to the bottom line
         2. At 80% capacity equates to ~$14M in additional revenues with 100% flow through to the bottom line.
            Incremental revenue breakdown by entity Riverside – 40%, Dallas - 30% and Reading - 30%. See table below.

    d. Need to move to assure at least **15 c/lb. (maybe more) on "flake-to-pellet"**, and to benchmark our internal cost on bale-to-flake conversion cost (WORK IS UNDERWAY). The problem is to identify cost savings running "flake-to-pellet" relative to the full cycle, bunch of assumptions here, and no real actual data until we start running second Starlinger line in Riverside.

    e. Transition to larger share of non-beverage customers – should be at least 1/3 in our portfolio, some of this via converters, such as Amcor, Axium, etc.

        i. Difficult to assess premiums without mentioning specific brands, volumes, and timing.  Preliminary estimates range from 5 to 10 c/lb. premium for "non-beverage" brands (household products, beauty products, etc.).

        ii. Less demanding on decontamination thresholds, unlike Nestle or Pepsi. Saves on processing times/costs, but it takes time to get large volumes going.

            1. Good news is that the pressure on all these brands (including non-food) is increasing, so they are looking for quality rPET, and CarbonLITE is the only large "game" in town.

**3. Organization Chart Changes**

    a. With Reading plant coming online, there should be a true matrix structure that is being developed (plants with specific functions and holding company))

    b. Implementation of the matrix structure to reflect nature of the manufacturing business with centralized commercial functions

    c. Targeted assessment of "bench" for longer-term stability

**Plant Summary**

| | | Riverside, CA | Dallas, TX | Reading, PA | Total |
|---|---|---|---|---|---|
| Annual Capacity (M lbs.) | | | | | |
| Nameplate | | ~135M* | ~100M | ~100M | ~340M |
| 80% utilization | | ~110M* | ~73M | ~73M | ~275M |
| 85% utilization | | ~117M* | ~88M | ~88M | ~295M |
| *includes new Starlinger line (1.8 tons/hr.) | | | | | |
| | | | | | |
| Capacity Utilization | | | | | |
| Current (average 2020) | % | 70 | 50 | - | |
| Best Month | % | 83 | 62 | - | |
| Projected – Apr 2021 | % | 80-85 | 75 | 85 | |
| Projected – June 2021 | % | Min 85 | Min 85 | Min 85 | |
| | | | | | Total |
| Output impact for 1% Change in production at | lb. | 1.4m | 1.0m | 1.0m | 3.4m |

| | | | | |
|---|---|---|---|---|
| Profit impact for 1% Change in Output | | | | |
| Profit impact for $0.01 change in customer pricing: | | | | |
|   70% Utilization | | | | $2.4m |
|   80% Utilization | | | | $2.75m |
| Profit impact for $0.01 per lb. change in bale costs @ 70% utilization | | | | $4.0m |
| Profit impact for $0.01 per lb. change in flake costs @ 70% utilization | | | | |
| Change in customer from water to non-water beverage (per lb.) | | | | $0.05 to $0.10 |
| Conversion Cost | c/lb. | | | | |
|   -   Current utilization | | x | x | x | |
|   -   Projected utilization (80%) | | x | x | x | |
| Immediate Spare Parts Needs (in process) | | ~$300K | ~$350K | n/a | |

# **EXHIBIT I**

## **INVESTMENT BANKER REPORT**

[Attached.]

CONFIDENTIAL
DRAFT – SUBJECT TO MATERIAL CHANGE

# CarbonLITE Holdings LLC

Orion Discussion Materials

February 2021  /  Confidential

Jefferies

# Process Summary

CONFIDENTIAL
DRAFT – SUBJECT TO MATERIAL CHANGE

- **On January 13, 2021, Jefferies LLC ("Jefferies") launched outreach to prospective investors in connection with a strategic process for CarbonLITE Holdings LLC ("CarbonLITE" or the "Company")**

  – CarbonLITE is exploring the sale of part or all the business, including the potential sale of PinnPack

- **The universe of prospective investors includes competitors, traditional private equity sponsors, and certain turnaround / special situation investors**

  – 33 parties have been contacted, consisting of 24 strategics and 9 sponsors

- **Jefferies, as investment banker to CarbonLITE, has prepared the following report to update Orion Energy Partners ("Orion") on the following:**

  – Status of process to date

  – Summary of outreach

  – Process timeline

  – Marketing materials to date

**Jefferies**

CONFIDENTIAL
DRAFT – SUBJECT TO MATERIAL CHANGE

# Process Summary (cont'd)
Outreach Summary

> **Jefferies has reached out to 33 parties to date to explore the sale of part or all of CarbonLITE**

## CarbonLITE Process

- 20 parties have been contacted

  – 7 parties have executed NDAs

  – 7 parties currently have access to the VDR

    ▪ VDR was shared on February 1, 2021 and continues to be populated with additional data

- 6 parties have declined to date

## PinnPack Process

- 13 parties have been contacted

  – 7 parties have executed NDAs

  – 0 parties currently have access to the VDR

    ▪ VDR is currently being staged and is planned to open on February 4, 2021

- 1 party has declined to date

| Buyer | Outreach | | | NDA | | Round 1 | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Initial Outreach | Sent CarbonLITE Teaser | Sent PinnPack Teaser | In Process | Executed | Received Process Letter | Received Exec Sum | Received PinnPack CIP | Received CarbonLITE CIP | Dataroom Access | Post NDA Banker Call | Mgmt. Call | Submitted Initial Bid |
| **Active Buyers** | | | | | | | | | | | | | |
| Strategics | 19 | 7 | 3 | 1 | 9 | 6 | 5 | 6 | - | 3 | 2 | 1 | - |
| Sponsor | 7 | 4 | 1 | 1 | 5 | 1 | 4 | 1 | - | 4 | - | - | - |
| **Total Active** | 26 | 11 | 4 | 2 | 14 | 7 | 9 | 7 | - | 7 | 2 | 1 | - |
| **Declined Buyers** | | | | | | | | | | | | | |
| Strategics | 5 | 5 | - | - | - | - | - | - | - | - | - | - | - |
| Sponsor | 2 | 2 | - | - | - | - | - | - | - | - | - | - | - |
| **Total Declined** | 7 | 7 | - | - | - | - | - | - | - | - | - | - | - |
| **Grand Total** | 33 | 18 | 4 | 2 | 14 | 7 | 9 | 7 | - | 7 | 2 | 1 | - |

**Jefferies**

# List of Potential Investors Contacted

CONFIDENTIAL
DRAFT – SUBJECT TO MATERIAL CHANGE

## PinnPack

*Strategics*

- Anchor Packaging (The Jordan Company)
- Berry Plastics
- D&W Finepack (Mid Oaks)
- DirectPack (PMC Global)
- EasyPak (Graham Partners)
- Genpak
- Lacerta (SK Capital)
- Novolex (The Carlyle Group)
- Pactiv
- Sonoco
- Tekni-Plex (Genstar)

*Sponsors*

- Endeavour Capital[1]
- Stonehenge Partners[2]

## CarbonLITE

*Strategics*

- Alpek Polyester
- BASF
- Dow
- FCC Environmental
- Indorama
- Ineos
- LyondellBasell
- Polychem (The Sterling Group)
- Purecycle Technologies
- Ravago
- Revolution (Arsenal Capital Partners)
- Sabic
- Total / Corbion

*Sponsors*

- Atlas Holdings
- Cerberus
- LongueVue Capital
- Metalmark Capital
- Oaktree Capital
- Prophet Equity
- Teleo Capital

(1) Would pursue in connection with a privately held company.
(2) Owns Revere Packaging.

**Jefferies**

# Parties Who Have Provided Definitive Feedback

CONFIDENTIAL
DRAFT – SUBJECT TO MATERIAL CHANGE

| Company | Type | Status | Commentary |
|---|---|---|---|
| BASF We create chemistry | Strategic Buyer | Declined | ▪ BASF concluded to not pursue further as they saw no fit from neither a recycling or market approach standpoint |
| Berry | Strategic Buyer | Declined | ▪ Declined due to food thermoforming not being an area of focus as well as concerns about the fundamentals of RPET supply base and customer dynamics in North America. Their focus is on Europe for the collection network is more developed |
| INEOS | Strategic Buyer | Declined | ▪ Ineos noted that this is not something of for them at this time |
| Metalmark Capital | Financial Buyer | Declined | ▪ Metalmark concluded that the asset is not of interest |
| Prophet Equity | Financial Buyer | Declined | ▪ Prophet Equity concluded that the asset is not of interest |
| PURECYCLE TECHNOLOGIES | Strategic Buyer | Declined | ▪ Purecycle has their hands full and CarbonLITE is not a strategic fit for them. The only remote possibility of them being interested would be if Nestle came to them and wanted their involvement |
| TOTAL \| Corbion | Strategic Buyer | Declined | ▪ Total / Corbion concluded that it is both geographically and product wise too far left field from where they want to seek opportunities. |

**Jefferies**

# Near-Term Process Timeline

CONFIDENTIAL
DRAFT – SUBJECT TO MATERIAL CHANGE

**January 2021**

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|  |  |  |  |  | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |
| 31 |  |  |  |  |  |  |

**February 2021**

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|  | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 |  |  |  |  |  |  |

**March 2021**

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|  | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | 31 |  |  |  |

☐ Denotes Holiday    ■ Key Date

| Week Of | Sale Process |
|---|---|
| **1/11/21** | ▪ Formally launched outreach process |
| **1/18/21** | ▪ Execute NDAs, provide teaser |
| **1/25/21** | ▪ Continue to execute NDAs, provide teaser<br>▪ Facilitate initial discussions with prospective investors<br>▪ Set up and populate data room |
| **2/1/21** | ▪ Provide CIP / financial model<br>▪ Facilitate Q&A, diligence and virtual management meetings |
| **2/8/21** | ▪ <u>2/10/21</u>: Deadline to provide initial proposals |
| **2/15/21 – 2/28/21** | ▪ <u>2/15/21</u>: Deadline to provide initial proposals for PinnPack<br>▪ Second stage diligence |
| **3/1/21** | ▪ Finalize diligence and definitive documentation |
| **3/8/21** | ▪ Execution of purchase agreement |

**Jefferies**

CONFIDENTIAL
DRAFT – SUBJECT TO MATERIAL CHANGE

**Appendix**



**Jefferies**

Jefferies LLC
520 Madison Avenue
New York, NY 10022
www.jefferies.com

**February 3, 2021**

**PRIVATE AND CONFIDENTIAL**

On behalf of CarbonLITE Holdings, LLC ("CarbonLITE" or the "Company"), Jefferies LLC ("Jefferies") is pleased to invite you to evaluate the potential acquisition opportunity of PinnPack Packaging LLC ("PinnPack") (the "Transaction") and to submit a written preliminary, non-binding indication of interest (the "Proposal"). To help facilitate your diligence review, Jefferies is pleased to provide you with certain Company information, including marketing materials, preliminary financial projections prepared by management, and access to a virtual data room ("VDR"). This information is being provided to you pursuant to the confidentiality agreement that was previously executed by you with CarbonLITE (the "Confidentiality Agreement"). We have been requested by the Company to inform you of the timing and procedures for submitting the Proposal.

**Preliminary Proposal**

To facilitate the evaluation of your interest in pursuing the Transaction, we request that you submit to Jefferies the Proposal based upon a review of the provided Company information, preliminary financial projections, and VDR, together with, among other things, your knowledge of the industry. This letter sets forth the guidelines for submitting your Proposal. All Proposals must be submitted no later than **4:00pm (EST) on Monday, February 15, 2021.**

Your Proposal should reflect your best and most attractive offer based on the information available to you and should address, at a minimum, each of the items set forth below.

*Transaction*

1.  **Valuation and Other Key Assumptions:** Your Proposal should confirm that the proposed form of consideration will be U.S. Dollars and include your proposed enterprise value of PinnPack on a debt-free, cash-free basis. Please also include all relevant assumptions that you made to determine your valuation.

2.  **Identity of the Purchaser.** Please confirm the identity of the purchaser as well as the identity of any controlling person(s) of such entity. To the extent that your Proposal is a joint effort of multiple persons or entities, whether acting together through a single purchaser or otherwise, please identify all such persons or entities.

3.  **Financing Source(s):** Please provide a description of how you intend to finance your Proposal, including your expected sources of equity, and if applicable, external financing. If your Proposal requires external financing, please provide a description of your expected sources of financing, including the form, amounts and institutions you intend to work with to provide such financing.

4.  **Due Diligence Requirements:** Please indicate: (i) the time-period within which you expect to complete due diligence in order to finalize a definitive binding proposal, and (ii) the names, telephone numbers, and e-mail addresses for the primary contacts involved with the proposed Transaction, including any advisors you have engaged or plan to engage to assist in your evaluation of the

---

February 3, 2021
Page 2

Transaction. Please provide confirmation that all advisors are aware of and agree to the terms of the Confidentiality Agreement.

5.  **Operations:** Please describe your preliminary plans with respect to operating PinnPack following consummation of a Transaction.

6.  **Approvals:** The Proposal should also provide a list of any investment committee, regulatory or other approvals required to complete the Transaction and the timing to obtain such approvals.

7.  **Due Diligence Requirements:** Detail any further due diligence information and/or investigation you may require, including (i) specific areas of concern or major documents you require to review; (ii) whether you will require site visits as part of your diligence; (iii) the identity of your key due diligence team members; and (iv) the time period within which you expect to complete due diligence in order to finalize and enter a definitive binding proposal.

8.  **Timing:** Your Proposal should also provide an indication of the estimated time required to satisfy all of the above items and close the proposed Transaction.

9.  **Other:** Any other substantive conditions or terms regarding the ultimate completion of a Transaction or any other factor that you believe should be evaluated by CarbonLITE (including with respect to timing of consummation of the Transaction).

10. **Contacts:** Provide the names, telephone numbers, and e-mail addresses for the primary contacts and advisors involved with the proposed Transaction.

**Subsequent Process**

Upon receipt and review of the Proposals, one or more parties may be selected to continue discussions with the Company in support of a final bid date in early March. Participants who are invited to continue in the process will also be provided with additional information, including a discussion with management and further instructions for providing final, binding proposals. The Company reserves the right to alter the schedule for or to modify or terminate the process related to a possible Transaction, including the process for consideration of proposals, in any manner and at any time in its sole discretion.

**Proposal Timing & Submission**

All Proposals must be submitted via email no later than **4:00pm (EST) on February 15, 2021** and should be directed to mbowersox@jefferies.com; rmorgner@jefferies.com; bpeacock@jefferies.com; pshin@jefferies.com; Project_Celtic_All@jefferies.com.

| | | | |
|---|---|---|---|
| Matthew Bowersox | Richard Morgner | Ben Peacock | Paul Shin |
| Managing Director | Managing Director | Vice President | Vice President |
| (312) 750-4453 | (212) 284-1746 | (917) 421-1974 | (212) 323-3997 |
| mbowersox@jefferies.com | rmorgner@jefferies.com | bpeacock@jefferies.com | pshin@jefferies.com |

The disclaimers set forth in any previously provided Company materials are incorporated into this letter by this reference. More specifically, the Company and Jefferies disclaim any and all liability for information supplied to you, either written or oral, and no representation or warranty, expressed or implied, is made as



CONFIDENTIAL
DRAFT – SUBJECT TO MATERIAL CHANGE

February 3, 2021
Page 3

to the accuracy or completeness of such information. The Company makes no commitment to provide any particular diligence materials and reserves the right, at any time and without notice, to stop providing materials and/or access thereto to any prospective bidder. The scope of any representations and warranties to be given by the Company will be negotiated along with other terms and conditions in arriving at a mutually acceptable definitive acquisition agreement should discussions between you and the Company progress to such a point.

By submitting a Proposal, you acknowledge that you are relying solely on your own independent investigation and evaluation of PinnPack and the Transaction. You will bear all costs incurred in connection with your investigation and evaluation of PinnPack and the Transaction, including fees and disbursements of your own representatives. Your participation in the process outlined above shall constitute your agreement with the terms of this letter.

All communications or inquiries relating to a possible Transaction must be directed to Jefferies. Interested parties shall not directly or indirectly contact or communicate with management, employees, customers or suppliers of PinnPack other than as expressly approved in writing by and arranged through Jefferies.

Please note that the terms of this letter and any related communications are subject to the Confidentiality Agreement. If you do not wish to make a Proposal, please handle all confidential information as specified in the Confidentiality Agreement previously executed between you and CarbonLITE. Your determination not to proceed in no way limits your obligations set forth in the Confidentiality Agreement.

**************

On behalf of the Company, we appreciate your interest in this opportunity. If you have any questions regarding the proposed Transaction or process, please feel free to contact any of the Jefferies professionals named above.

Sincerely,

The Jefferies Team



## **EXHIBIT J**

## **DIP PROPOSAL**

[Attached.]

*L&W Draft 2/3/2021*

***Privileged & Confidential***
***Attorney Work Product***

**NOT A COMMITMENT TO LEND**

## CARBONLITE HOLDINGS LLC

$[_____] Senior Secured DIP Loan Facility

**Summary of Principal Terms and Conditions**

**THIS SUMMARY OF TERMS AND CONDITIONS OUTLINES CERTAIN TERMS OF THE PROPOSED DIP FACILITY REFERRED TO BELOW.  THIS SUMMARY OF TERMS AND CONDITIONS WAS PREPARED FOR DISCUSSION PURPOSES ONLY AND DOES NOT CONSTITUTE A COMMITMENT TO PROVIDE ANY FINANCING TO THE BORROWER. THIS PROPOSED TERM SHEET IS NOT EXHAUSTIVE AS TO ALL OF THE TERMS AND CONDITIONS THAT WOULD GOVERN THE TRANSACTIONS DESCRIBED HEREIN.  THE STATEMENTS CONTAINED IN THIS TERM SHEET AND ALL DISCUSSIONS BETWEEN AND AMONG THE PARTIES IN CONNECTION THEREWITH CONSTITUTE CONFIDENTIAL SETTLEMENT COMMUNICATIONS ENTITLED TO PROTECTION UNDER RULE 408 OF THE FEDERAL RULES OF EVIDENCE.**

***Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Existing Term Loan Credit Agreement (as defined herein).***

| | |
|---|---|
| **Borrower**: | CarbonLITE Holdings, LLC (the "***Borrower***"), as debtor and debtor-in-possession. |
| **Guarantors**: | Each of the entities listed on <u>Exhibit B</u>, each as debtor and debtor-in-possession[1] (collectively, the "***Guarantors***").  Such Guarantors, together with the Borrower, are referred to herein each as a "***Loan Party***" and collectively, as the "***Loan Parties***". |
| | "***Chapter 11 Cases***" mean proceedings under chapter 11 of title 11 of the U.S. Code (the "***Bankruptcy Code***") of the Borrower and the Guarantors before that certain U.S. Bankruptcy Court in the District of Delaware (the "***Bankruptcy Court***"). |
| **DIP Facility**: | A senior secured debtor-in-possession loan facility to be provided to the Loan Parties (the "***DIP Facility***") consisting of: (i) term loans (the "***DIP Term Loans***" and the "***DIP Term Loan Facility***"), on terms and conditions to be set forth in a DIP Term Loan Credit Agreement among the Loan Parties, the Existing Term Loan Agent and the Existing Term Lenders (the "***DIP Term Loan Credit Agreement***"), consisting of (A) an aggregate principal amount of $[_____] in "new money" loans ("***New Money DIP Term Loans***"), and (B) an aggregate principal amount of |

---

[1] NTD: Inclusion of Pennsylvania and Texas facility entities as guarantors under the DIP remains under review.

1

$[_____][2] of "rolled-up" Existing Term A/C Loans (the ***"Rolled-Up Term Loans"***); and (ii) revolving loans[3] (the ***"DIP ABL Loans"*** and "***DIP ABL Facility"***), on terms and conditions set forth in a DIP ABL Credit Agreement among the Loan Parties, the Existing ABL Agent and the Existing ABL Lender (the ***"DIP ABL Credit Agreement"***), consisting of (A) an aggregate principal amount of $[_____] in "new money" revolving loans ("***New Money DIP ABL Loans"***), and (B) an aggregate principal amount of $[_____] of "rolled-up" Existing ABL Loans (as defined below) (the ***"Rolled-Up ABL Loans"***).

For the avoidance of doubt, none of the Tranche B Loans (as defined in the Existing Term Loan Credit Agreement) shall constitute "Rolled-Up Term Loans" and shall be paid in accordance with the Existing Term Loan Credit Agreement.

"***Existing Term Loan Credit Agreement***" means that certain Credit Agreement, dated as of August 2, 2019 (as amended, amended and restated, supplemented or otherwise modified from time to time prior to the Petition Date) among the Borrower, the guarantors party thereto, Orion Energy Partners Investment Agent, LLC, as administrative agent and collateral agent (in such capacities, the ***"Existing Term Loan Agent"***), and the other agents and lenders party thereto from time to time (the ***"Existing Term Lenders"***) relating to the Tranche A Loans, Tranche C Loans (the Tranche C Loans and the Tranche A Loans, collectively, the ***"Existing Term A/C Loans"***) and the Tranche B Loans (the Tranche B Loans and the Existing Term A/C Loans, collectively, the ***"Existing Term Loans"***) made thereunder.

"***Existing ABL Credit Agreement***" means that certain Credit Agreement, dated as of September 16, 2019, among CL PI, CL Industries, CL P, Pinnpack and Bank of Leumi, as lender (in such capacity, the ***"Existing ABL Lender"***; also, as applicable, the "***Existing ABL Agent***") relating to the loans made thereunder (the ***"Existing ABL Loans"***).

"***Existing Intercreditor Agreement***" means that certain Intercreditor Agreement, dated as of September 16, 2019, among the Existing ABL Agent and the Existing Term Loan Agent, as amended by that certain First Amendment to Intercreditor Agreement, dated as of December 10, 2020 and as further amended, amended and restated, supplemented or otherwise modified from time to time prior to the Petition Date.

**Administrative and Collateral Agents**:    The Existing Term Loan Agent shall serve as the ***"DIP Term Loan Agent"***, and the Existing ABL Agent shall serve as the ***"DIP ABL Agent"*** (together, the "***DIP Agents"***).

---

[2] NTD: To include Term Loans outstanding as a result of application of the Prepayment Premium, which applies upon filing of a bankruptcy as per the Existing Term Loan Credit Agreement.

[3] NTD: Leumi/ABL participation in DIP subject to further discussion.

| | |
|---|---|
| **DIP Lenders**: | The Existing Term Lenders shall constitute the ***"DIP Term Lenders"***, and the Existing ABL Lender shall constitute the ***"DIP ABL Lender"***, in each case subject to the terms of the DIP Term Loan Credit Agreement and the DIP ABL Credit Agreement, as applicable (such lenders being individually a "***DIP Lender***" and collectively the "***DIP Lenders***"). |
| **Use of Cash Collateral:** | In addition to the liquidity provided by the New Money DIP Term Loans and the New Money DIP ABL Loans under the DIP Facility, the Interim DIP Order and Final DIP Order (each as defined below) will authorize the Loan Parties to use any collateral that constitutes "cash collateral" as such term is defined in section 363(a) of the Bankruptcy Code and that constitutes ABL Priority Collateral, Term Priority Collateral, Other Encumbered Collateral, Unencumbered Collateral[, Texas Facility Group Collateral or Pennsylvania Facility Group Collateral] (each as defined herein) ("***Cash Collateral***") in accordance with the terms hereof. |
| **Purpose/Use of Proceeds**: | The Cash Collateral and the proceeds of the DIP Facility will be used in accordance with the initial 13-Week Budget and any subsequent 13-Week Budget (as defined below) for working capital and general corporate purposes of the Loan Parties, including allowed administrative expenses incurred during the Chapter 11 Cases. |
| **DIP Term Loan Availability**: | Up to $[_____] (or such lesser amount that is specified in the Interim DIP Order) of New Money DIP Term Loans may be made available under the DIP Term Loan Facility upon entry of the Interim DIP Order by the Bankruptcy Court with the remainder to be made available following entry of the Final DIP Order, subject to the satisfaction of certain conditions precedent, including, without limitation, the Bankruptcy Court's approval of the Rolled-Up Term Loans on terms satisfactory to the DIP Term Loan Agent in its sole discretion.  Amounts borrowed under the DIP Term Loan Facility that are repaid or prepaid may not be reborrowed.

The New Money DIP Term Loans shall be funded into a blocked controlled segregated deposit account, which will be an account of the Borrower, but which will be subject to a blocked account control agreement in favor of the DIP Term Agent ("***DIP Term Loan Funding Account***") and from which the Loan Parties may draw on a [weekly/monthly] basis in accordance with the 13-Week Budget. |
| **DIP ABL Loan Availability**: | Up to $[_____] (or such lesser amount that is specified in the Interim DIP Order) of New Money DIP ABL Loans may be made available under the DIP ABL Facility upon entry of the Interim DIP Order by the Bankruptcy Court with the remainder to be made available following entry of the Final DIP Order, subject to the satisfaction of certain conditions precedent, including, without limitation, the Bankruptcy Court's approval of the Rolled-Up ABL Loans on terms satisfactory to the DIP ABL Agent in its sole discretion.  Amounts borrowed under the DIP ABL Facility that are repaid may be reborrowed subject to the terms of the DIP ABL Credit Agreement. |

US-DOCS\120568724.17

| **Mandatory Prepayments**: | Subject to the Carve-Out (as defined below), obligations under the DIP Facility shall be prepaid in accordance with the terms of the DIP Term Loan Credit Agreement, the DIP ABL Credit Agreement and the Existing Intercreditor Agreement, as applicable, with 100% of the net cash proceeds of: |
|---|---|

    (a)    all asset sales or other dispositions of property outside the ordinary course of business of any Loan Party, including dispositions of DIP Collateral and unencumbered (or partly encumbered) assets that are subject to a superpriority claim in favor of the DIP Agents and the DIP Lenders;

    (b)    all issuances or incurrences of debt-for-borrowed money not permitted by the DIP Term Loan Credit Agreement and the DIP ABL Credit Agreement (it being understood that the DIP Facility will permit unsecured indebtedness under the "paycheck protection program" so long as such amounts are used for eligible uses to qualify for forgiveness); and

    (c)    all casualty and condemnation events, in certain cases subject to a threshold and a limited reinvestment right; and

    (d)    all proceeds of any Loan Party in connection with (i) the issuance of any additional shares of capital stock in any Loan Party, (ii) without duplication of clause (b) above, incurrence by the Loan Parties of any subordinated notes and (iii) any prepayment received by any Loan Party under any customer agreement.

| **DIP Collateral; Lien Priority**: | The DIP Orders shall grant and approve, among other things, the liens, claims and security interests in the order of priority described below and on <u>Exhibit D</u> hereto: |
|---|---|

    (a)    pursuant to Bankruptcy Code Section 364(c)(1), a joint and several superpriority administrative expense claim in the Chapter 11 Cases in respect of all obligations under the DIP Facility (the "***DIP Superpriority Claim***") with priority over all other administrative expenses in the Chapter 11 Cases (and all other superpriority administrative claims, including the ABL Superpriority Adequate Protection Claim and the Term Loan Superpriority Adequate Protection Claim (each as defined below)), subject only to the Carve-Out (as defined below); *provided* that the DIP Superpriority Claims granted to (x) the DIP ABL Lenders shall, at all times be in respect of any assets or property that constitute, or, but for the commencement of the Chapter 11 Cases would have constituted, ABL Priority Collateral, senior to the DIP Superpriority Claims granted to the DIP Term Lenders, and (y) the DIP Term Lenders shall, at all times be in respect of any assets or property that constitute, or, but for the commencement of the Chapter 11 Cases would have constituted, Term Priority Collateral, Other Encumbered

US-DOCS\120568724.17

Collateral and Unencumbered Collateral, senior to the DIP Superpriority Claims granted to the DIP ABL Lenders.

(b)     pursuant to Bankruptcy Code Section 364(d)(1), (i) all obligations under the DIP Term Loan Facility shall be secured by valid, perfected, enforceable and unavoidable priming liens on, and security interests in, all of each Loan Party's present and future assets and properties that secure the Existing Term Loans (the "***Term Priority Collateral***"), in each case senior in priority to the liens thereon that secure the Existing Term Loans, subject only to the Carve-Out; and (ii) all obligations under the DIP ABL Facility shall be secured by valid, perfected, enforceable and unavoidable priming liens on, and security interests in, all of each Loan Party's present and future assets and properties that secure the obligations under the Existing ABL Credit Agreement (the "***ABL Priority Collateral***"), in each case senior in priority to the liens thereon that secure the Existing ABL Loans, subject only to the Carve-Out;

(c)     [pursuant to Bankruptcy Code Section 364(d)(1), (i) up to $[____] of obligations under the DIP Term Loan Facility shall be secured by valid, perfected, enforceable and unavoidable priming liens on, and security interests in, all of each Loan Party's present and future assets and properties constituting the Texas Facility Group (the "***Texas Facility Group Collateral***"), in each case senior in priority to the liens thereon that secure any and all obligations under the Texas Bond Documents, subject only to the Carve-Out; and (ii) up to $[____] of obligations under the DIP Term Loan Facility shall be secured by valid, perfected, enforceable and unavoidable priming liens on, and security interests in, all of each Loan Party's present and future assets and properties constituting the Pennsylvania Facility Group (the "***Pennsylvania Facility Group Collateral***"), in each case senior in priority to the liens thereon that secure any and all obligations under the Pennsylvania Bond Documents, subject only to the Carve-Out;]

(d)     pursuant to Bankruptcy Code Section 364(c)(3), all obligations under the DIP Term Loan Facility (but not the DIP ABL Facility) shall be secured by valid, perfected, enforceable and unavoidable junior liens on, and security interests in, all of each Loan Party's present and future assets and properties, in each case other than the Term Priority Collateral and ABL Priority Collateral, that is subject to any validly perfected, enforceable and unavoidable security interest or lien in existence as of the Petition Date (as defined below) (the "***Other Encumbered Collateral***"), subject only to the Carve-Out; and

(e)     pursuant to Bankruptcy Code Section 364(c)(2), all obligations under the DIP Term Loan Facility (but not the DIP ABL Facility) shall be secured by first priority valid, perfected, enforceable and unavoidable liens on, and security interests in, all assets of the

5

Loan Parties that are not otherwise subject to valid, perfected, enforceable and unavoidable liens and security interests in existence as of the Petition Date or valid liens perfected (but not granted) after the Petition Date (to the extent such perfection in respect of a prepetition claim is expressly permitted under the Bankruptcy Code) (the "***Unencumbered Collateral***"), subject only to the Carve-Out.[4]

The Term Priority Collateral, together with the ABL Priority Collateral, Other Encumbered Collateral, Unencumbered Collateral[, the Texas Facility Group Collateral, the Pennsylvania Facility Group Collateral] and proceeds of Avoidance Actions (as defined herein) is referred to herein as the "***DIP Collateral***".  The DIP Collateral will include all assets of each Loan Party existing on the date of the filing by such Loan Party of their petitions to commence the Chapter 11 Cases (the "***Petition Date***") and the assets of such Loan Party arising or acquired after the Petition Date.  The DIP Collateral shall not include actions for preferences, fraudulent conveyances, and other avoidance power claims under Sections 544, 545, 547, 548, 550 and 553 of the Bankruptcy Code (the *"Avoidance Actions"*), but, subject to the entry of the Final DIP Order, shall include the proceeds of Avoidance Actions.

At no time shall the DIP Facility be subject to marshalling or, subject to the entry of the Final DIP Order, to surcharge under section 506(c) of the Bankruptcy Code or the "equities of the case" exception under section 552(b) of the Bankruptcy Code.

Pursuant to section 363(k) of the Bankruptcy Code, whether at public auction or in a private sale process, the right of the DIP Agents, on behalf of the DIP Lenders, to credit bid the full amount of their claims under the DIP Facility shall be fully preserved.

All of the security interests and liens described herein with respect to the Loan Parties shall be effective and perfected as of the entry of the Interim DIP Order and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements, but without limitation of the right of the DIP Agent and DIP Lenders to require any such agreements.

| | |
|---|---|
| **Adequate Protection of Existing Term Lenders' Interests in the Term Priority Collateral:** | The Existing Term Loan Agent and the Existing Term Lenders (together, the "***Term Loan Secured Parties***") shall receive as adequate protection of any diminution in the value of their interests in the Term Priority Collateral securing the obligations (including the Prepayment Premium) under the Existing Term Loan Credit Agreement (the "***Term Loan Secured Obligations***"), the following forms of adequate protection set forth below; *provided, however,* that holders of Tranche B Loans shall only receive the forms of adequate protection set forth in clauses (a) and |

---

[4] NTD: Leasehold mortgages for PinnPack and Riverside and 0.7% equity held by a third party in PinnPack Packaging to be covered here.

(b) below, in each case, subject to the terms of the Existing Term Loan Credit Agreement:

(a) pursuant to Bankruptcy Code Section 361(2), adequate protection replacement liens on the DIP Collateral (the "***Term Loan Replacement Liens***") in the priority set forth in <u>Exhibit D</u>;

(b) a superpriority administrative expense claim as contemplated by Sections 507(b) and 364(c)(1) of the Bankruptcy Code (the "***Term Loan Superpriority Adequate Protection Claim***"), subject to (i) the Carve-Out and (ii) the DIP Superpriority Claims granted in respect of the DIP Facility obligations, and *pari passu* with the ABL Superpriority Adequate Protection Claim (as defined below);

(c) upon entry of the Interim DIP Order, payment in cash of all interest (including any Default Interest (as defined in the Existing Term Loan Agreement) calculated from January 4, 2021[5] through the Petition Date) and fees under the Existing Term Loan Credit Agreement that have accrued as of the Petition Date at the applicable rates provided for under the Existing Term Loan Credit Agreement (including, without limitation, at the default rate specified therein), and thereafter at the rates and times specified in the Existing Term Loan Credit Agreement (including, without limitation, at the default rate specified therein); and

(d) without duplication of amounts required to be paid pursuant to the DIP Facility, upon entry of the Interim Order, payment in cash of all reasonable professional fees and expenses of the Existing Term Loan Agent as provided for in the Existing Term Loan Credit Agreement.

**Adequate Protection of Existing ABL Lender's Interests in the ABL Priority Collateral:**

As adequate protection of any diminution in the value of the interests of the Existing ABL Agent and the Existing ABL Lender (together, the "***ABL Secured Parties***") in the ABL Priority Collateral securing the obligations under the Existing ABL Credit Agreement (the "***ABL Secured Obligations***"), the ABL Secured Parties shall receive:

(a) pursuant to Bankruptcy Code Section 361(2), adequate protection replacement liens on the DIP Collateral (the "***ABL Replacement Liens***") in the priority set forth in <u>Exhibit D</u>;

(b) a superpriority administrative expense claim as contemplated by Sections 507(b) and 364(c)(1) of the Bankruptcy Code (the "***ABL Superpriority Adequate Protection Claim***"), subject to (i) the Carve-Out and (ii) the DIP Superpriority Claims granted in favor of the DIP Facility obligations, and *pari passu* with the Term Loan Superpriority Adequate Protection Claim;

(c) upon entry of the Interim DIP Order, payment in cash of all interest and unused commitment and other fees under the Existing ABL Credit Agreement that have accrued as of the Petition Date at the applicable rate

---

[5] NTD: This date is tied to the date that Orion notified the Borrower of a cross-EoD.

provided for under the Existing ABL Credit Agreement (including, without limitation, at the default rate specified therein), and thereafter at the rate and times specified in the Existing ABL Credit Agreement (including, without limitation, at the default rate specified therein); and

(d) without duplication of amounts required to be paid pursuant to the DIP Facility, upon entry of the Interim Order, payment in cash of all reasonable professional fees and expenses of the Existing ABL Agent as provided for in the Existing ABL Credit Agreement.

| | |
|---|---|
| **Carve-Out:** | The ***"Carve-Out"*** means the sum of: (i) all fees required to be paid to the Clerk of the Court and to the U.S. Trustee under 28 U.S.C. § 1930(a) plus interest at the statutory rate (without regard to the notice set forth in clause (iv) below); (ii) fees and expenses up to [$25,000] incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in clause (iv) below); (iii) to the extent allowed at any time, whether by interim or final compensation order, all professional Fees of professional persons (collectively, the ***"Allowed Professional Fees"***) incurred at any time before delivery of a Carve-Out Trigger Notice (as defined below), including success or transaction fees earned by or payable to a professional person, whether allowed by the Bankruptcy Court prior to or after delivery of a Carve-Out Trigger Notice (as defined below) and without regard to whether such fees and expenses are provided for in the 13-Week Budget; and (iv) Allowed Professional Fees incurred after the first business day following delivery of the Carve-Out Trigger Notice in an aggregate amount not to exceed [$500,000] with respect to professional persons (the amount set forth in this clause (iv) being the ***"Post-Carve-Out Trigger Notice Cap"***).

***"Carve-Out Trigger Notice"*** means written notice to the Borrower that the Carve-Out is invoked, which notice shall be delivered only after the occurrence and during the continuation of an Event of Default (after giving effect to any applicable grace periods). |
| **Limitations on Use of Carve-Out, Loan Proceeds and Cash Collateral:** | No portion of the Carve-Out, proceeds of the DIP Facility, or DIP Collateral (including, without limitation, any Cash Collateral) may be used to (or support any other party to) litigate, object to, contest or challenge in any manner or raise any defenses to the debt, collateral position, liens or claims of the DIP Lenders, the DIP Agents, the Term Loan Secured Parties, or the ABL Secured Parties, whether by challenging the validity, extent, amount, perfection, priority or enforceability of the indebtedness under the DIP Facility, the Existing Term Loan Credit Agreement or the Existing ABL Credit Agreement, or the validity, extent, perfection, priority or enforceability of any mortgage, security interest or lien with respect thereto or any other rights or interests or replacement liens with respect thereto or any other rights or interests of the DIP Agents, the DIP Lenders, the Term Loan Secured Parties, or the ABL Secured Parties, or by seeking to subordinate or recharacterize the DIP Facility (or amounts outstanding thereunder), the Existing Term Credit Agreement (or amounts outstanding thereunder), or the Existing ABL Credit Agreement (or amounts outstanding thereunder), or to |

8

disallow or avoid any claim, mortgage, security interest, lien, or replacement lien or by asserting any claims or causes of action, including, without limitation, any actions under chapter 5 of the Bankruptcy Code, against any of the DIP Lenders, the DIP Agents, the Term Loan Secured Parties, or the ABL Secured Parties, or any of their respective officers, directors, agents, or employees.

In addition, none of the Carve-Out, proceeds of Loans, nor any DIP Collateral (including, without limitation, any Cash Collateral) shall be used in connection with (a) preventing, hindering or delaying the DIP Lenders', the DIP Agents', the Term Loan Secured Parties', or the ABL Secured Parties' enforcement or realization upon the DIP Collateral or the exercise of rights once an event of default has occurred and is continuing, (b) using or seeking to use Cash Collateral or selling or otherwise disposing of the DIP Collateral other than as provided herein, (c) using or seeking to use any insurance proceeds related to the DIP Collateral without the consent of the DIP Agent, the Existing ABL Agent or the Existing Term Loan Agent, as applicable; or (d) incurring Indebtedness other than in accordance with the 13-Week Budget or other than as permitted in the DIP Documentation; provided that the foregoing limitations shall not prevent the Loan Parties and their professionals from being heard on whether an event of default has occurred and is continuing.

| | |
|---|---|
| **Cash Management:** | Subject to approval by the Bankruptcy Court, after commencement of the Chapter 11 Cases, the Loan Parties shall use a cash management system satisfactory to the DIP Agents and DIP Lenders, which shall be administered by the Loan Parties' Chief Restructuring Officer. |
| **Challenge Period:** | The Interim DIP Order and Final DIP Order shall provide that any official unsecured creditors' committee appointed in the Loan Parties' Chapter 11 Cases (a **"Committee"**) and any other party in interest must file a pleading with the Bankruptcy Court challenging the validity, extent, perfection and/or priority of any claims or security interest of the Term Loan Secured Parties or the ABL Secured Parties prior to the later of (a) 60 days after a Committee is appointed in the Chapter 11 Cases, or (b) 75 days after the Petition Date (the **"Challenge Period"**). Failure of the Committee or any other party in interest to file such a pleading with the Bankruptcy Court shall forever bar such party from making such a challenge. |
| **Closing Date**: | The date on which the Interim DIP Order is entered by the Bankruptcy Court and the conditions precedent under the DIP Facility have been satisfied or waived (the "**Closing Date**"), but in no event later than three (3) business days after the Petition Date.

The DIP Agent and DIP Lenders will not provide any loans other than those authorized under the Interim DIP Order unless, on or before the 35th day following the Petition Date, a final DIP Order shall have been entered and shall not have been reversed, modified, amended, stayed or vacated and shall not be subject to a stay pending appeal, and which shall be in |

form and substance acceptable to the DIP Agents in all respects, the "***Final DIP Order***", and together with the Interim DIP Order, collectively, "***DIP Orders***" and individually, a "***DIP Order***").

**Maturity**:     The DIP Facility shall be repaid in full in cash (and, to the extent not already terminated, all commitments thereunder shall automatically and permanently terminate) on the earliest of following dates (each a "***Maturity Date***"):

(a)     the date that is [5] months after the Petition Date  (the "***Stated Maturity Date***"),

(b)     35 days after the Petition Date if the Final DIP Order has not been entered,

(c)     the "effective date" of a plan of reorganization filed in the Chapter 11 Cases that is confirmed pursuant to an order entered by the Bankruptcy Court,

(d)     the date the Chapter 11 Cases are dismissed or converted to chapter 7 case(s),

(e)     the acceleration and termination of the DIP Term Loan Facility or the DIP ABL Facility, or

(f)     the closing date of any sale of all or substantially all of the assets of the Loan Parties.

**Interest Rates**:     Substantially consistent with the rates set forth in the Existing Term Loan Credit Agreement and the Existing ABL Credit Agreement.

**Fees**:     The Borrower will pay certain fees in connection with the DIP Facility as set forth on <u>Exhibit C</u> to this Term Sheet.

**Expenses**:     The Borrower will pay all reasonable and documented out-of-pocket costs and expenses (including reasonable and documented fees and expenses of counsel (including New York counsel, bankruptcy counsel and local counsel in each appropriate jurisdiction) and a financial advisor) for each of the DIP Term Loan Agent and the DIP ABL Agent in connection with administering the DIP Facility, preparing all documents and enforcing any and all obligations relating to the DIP Facility.

**Documentation**:     The DIP Term Loan Credit Agreement, the DIP ABL Credit Agreement and the other documentation with respect to the DIP Facility (collectively, the "***DIP Documentation***") shall be based upon the Existing Term Loan Credit Agreement and Existing ABL Credit Agreement, respectively, with such changes to reflect the terms hereof, and shall otherwise to be in form and substance reasonably satisfactory to the DIP Agents.  For the avoidance of doubt, the DIP Term Loan Credit Agreement will not include the provisions in the Existing Term Loan

10

Agreement that permit or contemplate the sale of the facility owned by Pinnpack.

The DIP Lenders and the DIP Agents will enter into an intercreditor agreement (the "***DIP Intercreditor Agreement***"), which shall be based upon the terms and conditions [of the Existing Intercreditor Agreement with changes][6] to be agreed, but in any case, to require the DIP ABL Agent and DIP ABL Lender to vote or consent in conformity with the DIP Term Agent in respect of any consent rights in the DIP Documentation, except to the extent such vote or consent would disproportionately, materially and adversely affect the holders of the DIP ABL Loans as compared to the holders of the DIP Term Loans.[7]

| | |
|---|---|
| **Compliance with Budget**: | The Loan Parties shall comply with the Initial 13-Week Budget and any subsequent 13-Week Budget (each as defined below), subject to an adverse variance for total "Receipts" of 10% (except as set forth below) and an adverse variance for total operating "Disbursements" of 10% (except as set forth below).  Compliance with the 13-Week Budget shall be tested weekly, commencing after the first full week after the Petition Date.  Any adverse deviation from the 13-Week Budget beyond any applicable permitted adverse variance shall constitute an event of default unless waived in writing by the DIP Lenders (a "***Budget Event***").  For the avoidance of doubt, professional fees and any adequate protection payments made on account of obligations under the Existing ABL Credit Agreement or Existing Term Loan Credit Agreement shall be included in the 13-Week Budget; *provided, however,* that such included amounts shall not constitute a cap on the amount of any such payments that the Loan Parties are obligated to pay.  Professional fees shall not be included in any calculations for purposes of testing compliance with the 13-Week Budget and permitted variances. |
| **Reporting**: | Substantially consistent with the Existing Term Loan Credit Agreement and the Existing ABL Credit Agreement with additional customary reporting to reflect the debtor-in-possession nature of the DIP Facility, including, without limitation: |

    (a)    an initial 13-Week statement of projected receipts, disbursements, net cash flow, liquidity and loans for the immediately following consecutive 13 weeks, set forth on a weekly basis (the "***Initial 13-Week Budget***");

    (b)    on Wednesday of each week (commencing after the first full week after the Petition Date), a variance report in form acceptable to the DIP Agents (each, a "***Variance Report***") with respect to the immediately prior week ended the last business day of such week, setting forth (i)

---

[6] NTD: Priority arrangements as between DIP ABL Lender and DIP Term Lenders are subject to further review and discussion.

[7] NTD: Certain Orion-only voting rights to be discussed between Orion and Leumi.

US-DOCS\120568724.17

the actual cash receipts and disbursements for such immediately preceding week on a line-item basis and available cash on hand as of the end of such week, (ii) the variance in dollar amounts of the actual receipts and disbursements for each weekly period from those reflected for the corresponding period in the 13-Week Budget, (iii) a description of the nature of any material positive or negative variance in certain line items to be agreed, and (iv) whether the Loan Parties complied with the budget covenant for the applicable testing period;

(c)    on Wednesday of every fourth week after the Petition Date (commencing after the fourth full week after the Petition Date), an updated proposed rolling 13-Week cash flow projection (a "***Proposed 13-Week Budget***"). Unless the DIP Agents notify the Loan Parties in writing (which may be by email) on or before the Wednesday of the week following the delivery of any Proposed 13-Week Budget that such Proposed 13-Week Budget is not in form and substance satisfactory to the DIP Agents, such Proposed 13-Week Budget shall on such Wednesday become the "13-Week Budget" for all purposes.  If the DIP Agents deliver such notice that such Proposed 13-Week Budget is not in form and substance satisfactory to the DIP Agents, the 13-Week Budget then in effect (or, if the Initial 13-Week Budget is then in effect, the Initial 13-Week Budget) (the "***13-Week Budget***") shall continue as the then-effective 13-Week Budget;

(d)    on Wednesday of each week, a call with representatives of each of the Loan Parties (including the Chief Operating Officer and the Chief Restructuring Officer) and the DIP Agents to discuss updates and progress towards the Customer Discussions Plan, the Operational Improvements Plan, and the applicable weekly Variance Report; and

(e)    on Wednesday of each week, a report from Jefferies (the "***Jefferies Report***"), as the financial restructuring advisor to the Loan Parties, which shall include updates on the process of securing potential investors/purchasers, a list of contacted and target investors/purchasers, any material feedback from such investors/purchasers, upcoming process milestones, and drafts of all marketing materials associated with the capital raise / asset sale process.

| | |
|---|---|
| **Representations and Warranties**: | Substantially consistent with the Existing Term Loan Credit Agreement and the Existing ABL Credit Agreement with additional customary |

representations and warranties to reflect the debtor-in-possession nature of the DIP Facility.

**Affirmative Covenants**:   Substantially consistent with the Existing Term Loan Credit Agreement and the Existing ABL Credit Agreement with additional customary affirmative covenants to reflect the debtor-in-possession nature of the DIP Facility, including, without limitation:

(a)   all "first day" and "second day" orders will be reasonably satisfactory to the DIP Agents,

(b)   the Loan Parties promptly provide not later than [10] days prior to the filing thereof all proposed forms of any plan of reorganization or liquidation, and/or any disclosure statement related to such plan,

(c)   the Loan Parties provide all notices of litigation, defaults, and unmatured defaults and certain other information (including all documents filed with the Bankruptcy Court or distributed to any Committee),

(d)   the Loan Parties provide notice of any event, occurrence, or circumstance in which a material portion of the DIP Collateral is damaged, destroyed, or otherwise impaired or adversely affected,

(e)   the Loan Parties promptly and diligently oppose any motion filed by persons in the Bankruptcy Court to lift the stay on the DIP Collateral (other than motions filed by the DIP Agent or DIP Lenders), any motion filed by persons in the Bankruptcy Court to terminate the exclusive ability of the Loan Parties to file a plan of reorganization, and any other motion filed by persons in the Bankruptcy Court that, if granted, could reasonably be expected to have a material adverse effect on the DIP Agents, the DIP Lenders or any DIP Collateral, and

(f)   Satisfaction of each of the following (each, a ***"Milestone"***):

  1.   Prior to or on the Petition Date, the Borrower shall have installed a Chief Restructuring Officer acceptable to the DIP Agents.

  2.   By no later than [__] days following the Petition Date, the Bankruptcy Court shall enter the Interim DIP Order, in form and substance acceptable to the DIP Agents.

  3.   By no later than [__] days following the Petition Date, the Debtors shall have filed a motion seeking approval of the bidding procedures in form and substance acceptable to the DIP Agents.

13

4. By no later than [__] days following the Petition Date, the Bankruptcy Court shall enter the Final DIP Order, in form and substance acceptable to the DIP Agents.

5. By no later than [__] days following the Petition Date, the Borrower shall have obtained entry of an order from the Bankruptcy Court approving bidding procedures in respect of a sale of all or substantially all of the Loan Parties' assets to be implemented pursuant to section 363 of the Bankruptcy Code (a *"Sale Transaction"*), which procedures are in form and substance acceptable to the DIP Agents (the *"Bidding Procedures Order"*).

6. By no later than [__] days following the Petition Date, the Borrower shall conduct the auction, if necessary, for all or substantially all of the Borrower's consolidated assets pursuant to Section 363 of the Bankruptcy Code and in accordance with the Bidding Procedures Order.

7. By no later than [__] days following the Petition Date, the Bankruptcy Court shall hold a hearing regarding approval of the Sale Transaction.

8. By no later than [__] days following the Petition Date, the Bankruptcy Court shall have approved the Sale Transaction and entered an order in form and substance acceptable to the DIP Agents approving the Sale Transaction.

9. By no later than [__] days following the Petition Date, the Sale Transaction shall have closed; *provided* that if regulatory approvals associated with a Sale Transaction remain pending as of such date, such date shall be automatically extended to the date that is the third Business Day following receipt of all necessary regulatory approvals.

10. The Loan Parties shall satisfy the milestones set forth in the Customer Discussions Plan in accordance with the requirements set forth therein.

11. The Loan Parties shall satisfy the milestones set forth in the Operational Improvements Plan in accordance with the requirements set forth therein.

12. Following the Petition Date, the Loan Parties shall satisfy the milestones set forth in the Jefferies

US-DOCS\120568724.17

Report, in a form to be agreed between the Loan Parties and the DIP Agents, in accordance with the requirements set forth therein.

**Negative Covenants**:  Substantially consistent with the Existing Term Loan Credit Agreement and the Existing ABL Credit Agreement with (a) modifications to (i) reduce additional debt capacity, (ii) remove the ability to pay junior debt, including Shareholder Notes (as defined in the Existing Term Loan Agreement), (iii) reduce the ability to buy and sell assets without consent, (iv) limit the ability to make restricted payments for the payment of management fees, (v) removing the ability to enter into intercompany indebtedness among the Loan Parties, (vi) removing the ability to enter into certain other intercompany transactions among the Loan Parties, (vii) other changes to be agreed and (b) (i) limitations on changes to any personnel of the Loan Parties, (ii) restrictions on engaging in any customer pricing discussions in breach of the Customer Discussions Plan and (iii) additional customary negative covenants to reflect the debtor-in-possession nature of the DIP Facility.

**Events of Default**:  Substantially consistent with the Existing Term Loan Credit Agreement and the Existing ABL Credit Agreement with additional customary events of default to reflect the debtor-in-possession nature of the DIP Facility, including, without limitation, the following:

(a)  the filing of any pleading, motion or application seeking, or the entry of an order authorizing, approving or granting:

(i)  conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code;

(ii)  the dismissal of any of the Chapter 11 Cases (or any subsequent Chapter 7 case);

(iii)  appointment of a trustee, examiner or disinterested person with expanded powers relating to the operations or the business of any Loan Party in the Chapter 11 Cases;

(iv)  additional post-petition financing or liens on the DIP Collateral, in each case, without the consent of the DIP Agents and the DIP Lenders;

(v)  any action adverse to the DIP Agents or the DIP Lenders or their rights and remedies in the DIP Collateral;

(vi)  relief from the automatic stay for the benefit of any other creditor with respect to any material DIP Collateral without the consent of the DIP Agents; or

(vii)  any Loan Party's motion to disallow in whole or in part the DIP Lenders' claim in respect of the obligations

under the DIP Facility or contest any material provision of any DIP Documentation;

(b)    the failure of any Loan Party to comply with any DIP Order;

(c)    an order is entered by the Bankruptcy Court in any of the Chapter 11 Cases without the express prior written consent of the DIP Agents (i) to revoke, reverse, stay, modify, supplement or amend the DIP Orders in a manner that is inconsistent with the DIP Facility that adversely affects, and is not otherwise consented to by, the DIP Agents, (ii) to grant or permit the grant of a lien on the DIP Collateral (other than liens permitted under the DIP Facility);

(d)    the payment by any Loan Party of any pre-petition claim without the prior written consent of the DIP Agents other than as permitted by the 13-Week Budget;

(e)    the commencement of, support of or failure to oppose any action against any of the DIP Agent or any DIP Lender by or on behalf of any Loan Party or any Loan Party's affiliates or officers;

(f)    any administrative expense claim is allowed having priority to or ranking in parity with the rights of the DIP Agents and DIP Lenders;

(g)    any plan of reorganization is confirmed without the DIP Agents' consent;

(h)    the filing of any plan of reorganization that does not provide for repayment in full in cash of the DIP Facility without the DIP Agents' consent;

(i)    payment of or granting adequate protection with respect to any of the existing secured debt of any of the Loan Parties, other than as set forth herein without the consent of the DIP Agents;

(j)    liens or super-priority claims with respect to the DIP Facility shall at any time cease to be valid, perfected and enforceable in all respects with the priority described herein;

(k)    allowance of any claim under Bankruptcy Code Section 506(c) or otherwise against any or all of the DIP Agent, the DIP Lenders or the DIP Collateral;

(l)    any termination or modification of the exclusivity periods set forth in Bankruptcy Code Section 1121;

(m)  any subsidiary of a Loan Party that is not subject to the Chapter 11 Cases becomes subject to an insolvency proceeding without the consent of the DIP Agents;

(n)  the occurrence of a Budget Event; or

(o)  the failure to meet any Milestone.

The DIP Agents may exercise remedies consistent with the DIP Documentation and the DIP Orders upon five (5) business' days' notice from the DIP Agents to the Loan Parties of the occurrence of an event of default; *provided, however,* that the DIP Agent and the DIP Lenders agree not to oppose a request by the Loan Parties for an expedited hearing during such five-business-day period to re-impose or continue the automatic stay under section 362 of the Bankruptcy Code.

**Conditions Precedent to Initial Borrowing**:

The conditions precedent to the initial borrowings under the DIP Facility on the Closing Date shall consist of those conditions precedent customarily required in similar financings, including the conditions applicable to the DIP Facility set forth on <u>Exhibit A</u> hereto.

**Conditions to Subsequent Borrowing and Withdrawals**:

The conditions precedent to subsequent borrowing and the withdrawals from the DIP Term Loan Funding Account under the DIP Facility after the Closing Date will consist of those conditions precedent customarily required in similar financings, including, without limitation:

(a)  entry of the Final DIP Order;

(b)  receipt by the DIP Agents of a borrowing notice or a withdrawal notice, as applicable, in form and substance satisfactory to the DIP Agents;

(c)  all reasonable and documented out-of-pocket costs, fees, expenses (including, without limitation, reasonable and documented legal fees and expenses) set forth in the DIP Documentation or otherwise required to be paid to the DIP Agents on or before such date shall have been paid;

(d)  all representations and warranties of the Loan Parties set forth in the DIP Documentation shall be true and correct in all material respects (or if qualified by materiality, in all respects) and no default or event of default shall have occurred or be continuing; and

(e)  the amount to be withdrawn from the DIP Term Loan Funding Account shall not exceed the amount set forth in the 13-Week Budget.

**Indemnification**:

Substantially consistent with the Existing Term Loan Credit Agreement and the Existing ABL Credit Agreement.

US-DOCS\120568724.17

| | |
|---|---|
| **Governing Law**: | New York but excluding any principles of conflicts of law or other rule of law that would cause the application of the law of any jurisdiction other than the State of New York. |
| | The Loan Parties will submit to the exclusive jurisdiction and venue of the Bankruptcy Court, or in the event that the Bankruptcy Court does not have or does not exercise jurisdiction, then in any state or federal court of competent jurisdiction in the State, County and City of New York, borough of Manhattan. |
| **Counsel to the DIP Term Loan Agent:** | Latham & Watkins LLP. |
| **Counsel to the DIP ABL Agent:** | [●]. |

18

**EXHIBIT A**

Conditions Precedent to Initial Borrowings under DIP Facility on the Closing Date:

(a)     The Loan Parties shall have commenced the Chapter 11 Cases in the Bankruptcy Court by no later than [●], 2021. The Loan Parties shall have complied in full with the notice and other requirements of the Bankruptcy Code, in a manner acceptable to the DIP Agents with respect to the Interim DIP Order and the DIP Agents shall have received such evidence thereof as it shall reasonably require. No trustee, or other disinterested person with expanded powers pursuant to Section 1104(c) of the Bankruptcy Code, shall have been appointed or designated with respect to any Loan Party or their respective business, properties or assets and no motion shall be pending seeking any such relief. All of the "first day orders" and "second day orders" entered by the Bankruptcy Court at the time of the commencement of the Chapter 11 Cases and prior to the Interim DIP Order shall be in form and substance reasonably satisfactory to the DIP Agents. A cash management order approving the cash management arrangements of the Loan Parties consistent with the requirements under the DIP Facility, and otherwise in form and substance reasonably satisfactory to the DIP Agents, shall have been entered and shall be in full force and effect.

(b)     The Interim DIP Order shall have been entered by the Bankruptcy Court.

(c)     Receipt by the DIP Agents, each in form and substance reasonably satisfactory to the DIP Agents, of (i) the Initial 13-Week Budget, (ii) a monthly DIP forecast for the period through the end of the term of the DIP Facility, and (iii) a pro forma balance sheet for the Loan Parties.

(d)     Execution and delivery of all DIP Documentation for the DIP Facility by the parties thereto.

(e)     The DIP Agents shall have received at least 3 business days prior to the Closing Date all documentation and information as is reasonably requested by the DIP Agents that is required by regulatory authorities under applicable "know your customer" and anti-money-laundering rules and regulations in applicable jurisdictions, including, without limitation, the PATRIOT Act and the beneficial ownership regulations, in each case to the extent requested in writing at least 10 business days prior to the Closing Date.

(f)     No material adverse change in the business, operations, profits, assets or financial condition of the Borrower and Guarantors shall have occurred since December 31, 2020 (it being understood that the commencement of the Chapter 11 Cases, the events that customarily occur following the commencement of a proceeding under Chapter 11 of the Bankruptcy Code, any defaults under agreements that have no material adverse effect on the Loan Parties under the terms of the Bankruptcy Code as a result of the commencement of the Chapter 11 Cases, and any "going concern" or other qualification, exception or explanatory note in the Loan Parties' audited financial statements shall not be deemed a material adverse change). No defaults or events of default on the Closing Date under any of the DIP Documentation shall exist. The DIP Agents shall have received the payment of all fees required to be paid on the Closing Date under the terms hereof or otherwise

under the DIP Documentation.  The DIP Agents shall have received payment of all reasonable and documented out-of-pocket costs and expenses (including, without limitation, the reasonable and documented fees and expenses of counsel) incurred for the period through and including the Closing Date.

(g)   Receipt by the DIP Agents of borrowing notices in form and substance satisfactory to the DIP Agents.

(h)   All representations and warranties of the Loan Parties set forth in the DIP Documentation shall be true and correct in all material respects (or if qualified by materiality, in all respects).

(i)   Prior to or on the Petition Date, the Borrower shall have installed a Chief Restructuring Officer acceptable to the DIP Agents.

(j)   Delivery of mortgages of the Pinback and Riverside Facilities in favor of the DIP Term Loan Agent, each in form and substance acceptable to the DIP Term Loan Agent.

(k)   [The requisite bondholders and secured parties party to the Texas Bond Documents and the Pennsylvania Bond Documents (as each such term is defined in the Existing Term Credit Agreement) shall have (i) provided their consent to the Loan Parties entering in the DIP Facility, with such consent in form and substance acceptable to the DIP Term Loan Agent, (ii) the requisite bondholders and secured parties party to the Texas Bond Documents and the DIP Term Loan Agent shall have agreed to a valuation and application of payments waterfall for the Texas facility and (iii) the requisite bondholders and secured parties party to the Pennsylvania Bond Documents and the DIP Term Loan Agent shall have agreed to a valuation and application of payments waterfall for the Pennsylvania facility.]

(l)   Receipt by the DIP Term Agent of (i) a detailed customer pricing discussions plan, in form and substance acceptable to the DIP Term Agent (the "***Customer Discussions Plan***"), which Customer Discussions Plan shall include (1) updates and milestones regarding increasing product finished-product pricings to target customers, (2) details of current discussions with customers, including customer "asks", (3) target volumes by location and cost analysis, (4) a schedule of upcoming meetings, (5) a summary of prior meetings with customers, (6) an outreach program for targeting new customers and (7) other information requested by the DIP Term Agent and (ii) a detailed operational improvement plan, in form and substance acceptable to the DIP Term Agent (the "***Operational Improvements Plan***"), which Operational Improvements Plan shall include (1) preventative and required repairs and maintenance), (2) a labor management and retention plan, (3) opportunities to improve throughput volumes and finished product yield, (4) feedstock sourcing initiatives (including analysis around quality, price, and logistics), (5) any other initiatives to lower operating costs and (6) other information requested by the DIP Term Agent.

(m)   LF Investment Holdings LLC shall have acknowledged entry into the DIP Facility.

A-2

## EXHIBIT B

### Guarantors[8]

CarbonLITE Sub-Holdings LLC ("***CL Intermediate Holdco***"), a Delaware limited liability company

CarbonLITE PI  Holdings LLC ("***CL PI***"), a Delaware limited liability company

CarbonLITE Industries  LLC ("***CL Industries***"), a Delaware limited liability company

CarbonLITE PinnPack LLC ("***CL Pinnpack***"), a Delaware limited liability company

PinnPack Packaging LLC ("***Pinnpack***"), a Delaware limited liability company

Pinnpack P, LLC ("***Pinnpack P***"), a Delaware limited liability company

[CarbonLite Recycling LLC ("***CL Recycling***"), a Delaware limited liability company

CarbonLite Recycling Holdings LLC ("***CL Recycling Holdings***"), a Delaware limited liability company]

[CarbonLite P LLC ("***CL P***"), a Delaware limited liability company

CarbonLite P Holdings LLC ("***CL P Holdings***"), a Delaware limited liability company]

---

[8] NTD: Inclusion of PA/TX entities to be updated based on final DIP structure.

B-1

## EXHIBIT C

### Fees and Premiums under DIP Facility

The Borrower agrees to pay (or cause to be paid) the following:

| | |
|---|---|
| **Commitment Fee**: | With respect to the New Money DIP Term Loans, an amount equal to [___]% of the commitment to extend such New Money DIP Term Loans, [half] of which shall be paid on the Closing Date and [half] of which shall be paid upon entry of the Final DIP Order. |
| | With respect to the New Money DIP ABL Loans, an amount equal to [___]% of the commitment to extend such New Money DIP ABL Loans, [half] of which shall be paid on the Closing Date and [half] of which shall be paid upon entry of the Final DIP Order. |
| **Exit Premium**: | [[___]% of the DIP Term Loan Facility, payable upon repayment of loans at exit, and payable either in equity of the reorganized Loan Parties (at Plan value), cash or in the form of additional exit loans.] |

C-1

**EXHIBIT D**

Lien Priority Ranking

| Lien Priority On DIP Collateral | Term Priority Collateral | ABL Priority Collateral | Unencumbered Collateral (other than Avoidance Action Proceeds) | Avoidance Action Proceeds | Other Encumbered Collateral (not ABL Priority Collateral or Term Priority Collateral) | [Texas Facility Group Collateral] | [Pennsylvania Facility Group Collateral] |
|---|---|---|---|---|---|---|---|
| **1** | Carve-Out | Carve-Out | Carve-Out | Carve-Out | Other Liens | Carve-Out | Carve-Out |
| **2** | DIP Term Loan Facility Liens | DIP ABL Loan Facility Liens | DIP Term Loan Facility Liens | DIP Term Loan Facility Liens [to the extent of New Money DIP Term Loans] | Carve-Out | Up to $[____] of DIP Term Loan Facility Liens | Up to $[____] of DIP Term Loan Facility Liens |
| **3** | Existing Term Loan Liens; Term Loan Replacement Liens | Existing ABL Loan Liens; ABL Replacement Liens | Existing Term Loan Liens; Term Loan Replacement Liens | DIP Term Loan Facility Liens [to the extent of Rolled-Up Term Loans] | DIP Term Loan Facility Liens | Texas Bond Document Liens | Pennsylvania Bond Document Liens |
| **4** | DIP ABL Loan Facility Liens | DIP Term Loan Facility Liens | | Existing Term Loan Liens; Term Loan Replacement Liens | Existing Term Loan Liens; Term Loan Replacement Liens | | |
| **5** | Existing ABL Loan Liens; ABL Replacement Liens | Existing Term Loan Liens; Term Loan Replacement Liens | | | | | |
| **6** | | | | | | | |

D-1