# **EXHIBIT A**

Asset Purchase Agreement

DOCS_NY:43170.11 13044/002

ASSET PURCHASE AGREEMENT

BY AND AMONG

CARBONLITE RECYCLING, LLC, AS SELLER,

CARBONLITE HOLDINGS, LLC, AS HOLDINGS,

AND

INDORAMA VENTURES HOLDINGS L.P., AS PURCHASER

Dated as of May 25, 2021

# TABLE OF CONTENTS

Page

**ARTICLE I**

**DEFINITIONS** ...................................................................................... 1
1.1     Definitions.................................................................................. 1

**ARTICLE II**

**PURCHASE AND SALE; CLOSING**...................................................... 15
2.1     Purchase and Sale ...................................................................... 15
2.2     Excluded Assets ......................................................................... 18
2.3     Assumed Liabilities ................................................................... 19
2.4     Excluded Liabilities ................................................................... 21
2.5     Non-Transferable Contracts and Permits..................................... 22
2.6     Apportionments.......................................................................... 22
2.7     Calculation and Payment of Purchase Price ................................ 22
2.8     Closing ...................................................................................... 26
2.9     Addition/Removal of Acquired Agreements and Permits ............ 27

**ARTICLE III**

**REPRESENTATIONS AND WARRANTIES OF SELLER**.................. 28
3.1     Due Incorporation ...................................................................... 28
3.2     Due Authorization....................................................................... 28
3.3     Consents and Approvals; Governmental Authority Relative to This
        Agreement.................................................................................. 28
3.4     Compliance With Laws............................................................... 29
3.5     Litigation.................................................................................... 31
3.6     Certain Financial Information...................................................... 31
3.7     Real Property ............................................................................. 33
3.8     Material Contracts...................................................................... 33
3.9     Employees and Labor Matters .................................................... 35
3.10    Benefit Plans .............................................................................. 37
3.11    Permits ....................................................................................... 39
3.12    Intellectual Property ................................................................... 39
3.13    Environmental Matters................................................................ 41
3.14    Title to Assets; Sufficiency of Assets; Condition of Assets ........ 42
3.15    Taxes .......................................................................................... 43
3.16    Key Business Relationships ........................................................ 45
3.17    Insurance .................................................................................... 46
3.18    Brokers and Finders ................................................................... 46
3.19    Product Quality .......................................................................... 46
3.20    Affiliate Transactions.................................................................. 46
3.21    Absence of Certain Changes ....................................................... 46

| | | |
|---|---|---|
| 3.22 | Privacy and Data Security Matters | 47 |
| 3.23 | Disclaimer of Additional Representations and Warranties | 47 |

**ARTICLE IV**

**REPRESENTATIONS AND WARRANTIES OF PURCHASER** ......... 48

| | | |
|---|---|---|
| 4.1 | Due Organization | 48 |
| 4.2 | Due Authorization | 48 |
| 4.3 | Consents and Approvals; No Violations | 48 |
| 4.4 | Purchaser's Examination | 49 |
| 4.5 | Investigation; Limitation on Warranties | 49 |
| 4.6 | Available Funds | 50 |
| 4.7 | Brokers and Finders | 50 |

**ARTICLE V**

**COVENANTS** ...... 50

| | | |
|---|---|---|
| 5.1 | Access to Information and Acquired Location | 50 |
| 5.2 | Preservation of Business | 51 |
| 5.3 | Efforts | 51 |
| 5.4 | Consents | 52 |
| 5.5 | Preservation of Records; Post-Closing Access and Cooperation | 52 |
| 5.6 | Employees and Benefits | 53 |
| 5.7 | Public Announcements | 54 |
| 5.8 | Transfer Taxes | 54 |
| 5.9 | Bulk Sales | 54 |
| 5.10 | Tax Proration | 55 |
| 5.11 | Information Requested by FTC | 55 |
| 5.12 | No Successor Liability | 56 |
| 5.13 | 401(k) Plan | 56 |
| 5.14 | Purchased Assets held by Affiliates | 56 |
| 5.15 | Benefit Plan Cooperation | 56 |
| 5.16 | Assumption and Assignment of Contracts | 57 |
| 5.17 | ERP/IT Cooperation and Access | 57 |
| 5.18 | Restrictive Covenants | 57 |
| 5.19 | Refunds and Remittances | 59 |

**ARTICLE VI**

**CONDITIONS PRECEDENT TO OBLIGATIONS OF
PURCHASER** ...... 59

| | | |
|---|---|---|
| 6.1 | Warranties True as of Present Date | 59 |
| 6.2 | Compliance with Agreements and Covenants | 59 |
| 6.3 | Deliveries | 59 |
| 6.4 | No Prohibition | 59 |
| 6.5 | Entry of Sale Order | 59 |
| 6.6 | No Material Adverse Effect | 60 |

**ARTICLE VII**

CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLER ............... 60

7.1     Warranties True as of Present Date ............................................. 60
7.2     Compliance with Agreements and Covenants ............................. 60
7.3     Deliveries .................................................................................... 60
7.4     No Prohibition .............................................................................. 60
7.5     Entry of Sale Order ..................................................................... 60

**ARTICLE VIII**

TERMINATION ................................................................................. 61

8.1     Termination .................................................................................. 61
8.2     Expenses ...................................................................................... 63
8.3     Effect of Termination ................................................................... 63

**ARTICLE IX**

BANKRUPTCY COURT MATTERS ................................................ 64

9.1     Motion for Approvals ................................................................... 64
9.2     Bidding Procedures ...................................................................... 65

**ARTICLE X**

MISCELLANEOUS ........................................................................... 65

10.1    Amendment ................................................................................... 65
10.2    Notices ......................................................................................... 65
10.3    Waivers ........................................................................................ 66
10.4    Counterparts ................................................................................. 66
10.5    Interpretation ............................................................................... 66
10.6    APPLICABLE LAW ..................................................................... 67
10.7    Binding Agreement; Assignment ................................................. 67
10.8    Third Party Beneficiaries ............................................................. 67
10.9    Further Assurances ...................................................................... 67
10.10   Entire Understanding ................................................................... 68
10.11   EXCLUSIVE JURISDICTION OF BANKRUPTCY COURT ................... 68
10.12   WAIVER OF JURY TRIAL .......................................................... 68
10.13   Disclosure Schedule .................................................................... 68
10.14   Severability .................................................................................. 69
10.15   Attorneys' Fees ........................................................................... 69
10.16   Construction ................................................................................ 69
10.17   Survival ........................................................................................ 69
10.18   No Vicarious Liability .................................................................. 70

SCHEDULES:

1.     Schedule 1.1 (*Closing Cash Consideration*)

2.     Schedule 2.1(a) (*Purchased Equipment*)

3.     Schedule 2.1(c) (*Acquired Contracts*)

4.     Schedule 2.1(e) (*Acquired Real Property Leases*)

5.     Schedule 2.1(f) (*Acquired Personal Property Leases*)

6.     Schedule 2.1(i) (*Open Customer Orders*)

7.     Schedule 2.1(j) (*Open Supplier Orders*)

8.     Schedule 2.1(k) (*Acquired Receivables*)

9.     Schedule 2.1(l) (*Acquired Intellectual Property Rights*)

10.     Schedule 2.1(m) (*Acquired L/Cs*)

11.     Schedule 2.2(g) (*Excluded Assets*)

12.     Disclosure Schedule

13.     Schedule 5.6(a) (*Subject Employees*)

<u>EXHIBITS</u>:

1.  Exhibit 1 (*Escrow Agreement*)

2.  Exhibit 1.1 (*Sale Order*)

3.  Exhibit 2.7(e) (*Target Closing Net Working Capital Calculation Statement Applicable Methodology*)

4.  Exhibit 2.8(b)(i) (*Bill of Sale, Assignment and Assumption*)

5.  Exhibit 2.8(b)(ii) (*IP Assignment*)

6.  Exhibit 2.8(b)(vi) (*Real Property Lease Assignment and Assumption Agreement*)

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement") is made as of May 25, 2021, by and among Indorama Ventures Holdings L.P. ("Purchaser"), CarbonLITE Recycling, LLC ("Seller"), being a chapter 11 debtor and debtor in possession in Case No. 21-10527 (JTD) (jointly administered) (the "Bankruptcy Case") filed on March 8, 2021 (the "Petition Date") and pending in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), and CarbonLite Holdings, LLC ("Holdings"), also a chapter 11 debtor and debtor in possession in the Bankruptcy Case, hereby joins in this Agreement for the sole and exclusive purpose of agreeing to transfer to Purchaser at the Closing, all of Holdings' right, title and interest in and to any Wayward Assets (as defined herein) pursuant to an assignment document in the same form and content, in all material respects, as the Bill of Sale, Assignment and Assumption (the "Holdings Assignment"). Certain capitalized terms used herein are defined in ARTICLE I.

## W I T N E S S E T H:

**WHEREAS**, Holdings is the indirect owner of all the membership interests in Seller;

**WHEREAS**, Seller is engaged in the conduct of the Business (as defined below) at the Acquired Location (as defined below);

**WHEREAS**, Purchaser desires to purchase from Seller (either by itself or through one or more Purchaser Assignee), and Seller desires to sell to Purchaser (either to it or to one or more Purchaser Assignee), pursuant to, among other provisions thereof, Section 363 of Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"), substantially all of the assets of the Business, for the consideration and upon the terms and conditions contained in this Agreement; and

**WHEREAS**, contemporaneously with the execution and delivery of this Agreement, and as a condition and inducement to the willingness of the parties to enter into this Agreement and consummate the transactions contemplated hereby, Purchaser, Seller, and Citibank, N.A. (the "Escrow Holder") are entering into an Escrow Agreement (the "Escrow Agreement"), substantially in the form and content attached as Exhibit 1 (*Escrow Agreement*) to this Agreement with respect to the Adjustment Fund Amount.

**NOW**, **THEREFORE**, in consideration of the mutual covenants, agreements, representations and warranties contained herein, and for their mutual reliance, and for other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I

## DEFINITIONS

1.1     Definitions. The following terms shall have the following meanings for the purposes of this Agreement:

"<u>Accounts Receivable</u>" means (a) all trade accounts receivable and other rights to payment from customers of the Business and the full amount of all security for such accounts or rights to payment, including all trade accounts receivable representing amounts receivable in respect of goods shipped or products sold or services rendered to customers of the Business, (b) all other accounts and notes receivable (whether current or non-current) of the Business, and (c) all causes of action, claims, remedies, and other rights pertaining to the foregoing, in each case of the foregoing clauses <u>(a)</u>–<u>(c)</u>, without offsetting any amounts with respect to any commitments made by or on behalf of Seller to any customer of Seller or the Business. For the avoidance of all doubt, in no event shall "Accounts Receivable" include (i) rights or claims to proceeds under Insurance Policies or (ii) accounts or notes receivable from Affiliates or other related parties of Seller.

"<u>Accrued Expenses</u>" is defined in the definition of "Net Working Capital" below.

"<u>Acquired Agreements</u>" shall mean the Acquired Contracts, the Acquired Real Property Leases, and the Acquired Personal Property Leases.

"<u>Acquired Contracts</u>" shall have the meaning set forth in <u>Section 2.1(c)</u>.

"<u>Acquired Intellectual Property Rights</u>" shall have the meaning set forth in <u>Section 2.1(l)</u>.

"<u>Acquired Inventories</u>" shall have the meaning set forth in <u>Section 2.1(d)</u>.

"<u>Acquired L/Cs</u>" is defined in <u>Section 2.1(m)</u> hereof.

"<u>Acquired Location</u>" means the Dallas Leased Property and the Dallas Facility.

"<u>Acquired Personal Property Leases</u>" shall have the meaning set forth in <u>Section 2.1(f).</u>

"<u>Acquired Real Property Leases</u>" shall have the meaning set forth in <u>Section 2.1(e).</u>

"<u>Acquired Receivables</u>" is defined in <u>Section 2.1(k)</u>.

"<u>Adjustment Fund</u>" is defined in <u>Section 2.7(c)</u>.

"<u>Adjustment Fund Amount</u>" shall mean an amount equal to twenty percent (20%) of the Estimated Closing Net Working Capital.

"<u>Affiliate</u>" shall mean, with respect to any specified Person, any other Person which, directly or indirectly, controls, is under common control with, or is controlled by, such specified Person. For purposes of this definition, "control" (and any similar term) means possession, directly or indirectly, of the power to direct or cause the direction of the affairs, management, or policies of another Person by reason of ownership of voting stock or equity, by Contract, or otherwise.

"<u>Agreement</u>" shall mean this Agreement, including the Disclosure Schedule and all other exhibits and schedules hereto, as it and they may be amended from time to time.

"Applicable Laws" shall mean all laws (common or otherwise), statutes, Orders, ordinances, treaties, interpretations, codes, rules, and regulations promulgated or enforced by any Governmental Authorities, and judgments, decisions or Orders entered by any Governmental Authority applicable to Seller or the Business.

"Applicable Methodology" shall have the meaning set forth in Section 2.7(e).

"Assumed Accounts Payable" is defined in the definition of "Net Working Capital" below.

"Assumed Liabilities" shall have the meaning set forth in Section 2.3.

"Auction" shall have the meaning set forth in the Bid Procedures Order.

"Auction Completion" shall have the meaning set forth in Section 2.7(a).

"Author" shall have the meaning set forth in Section 3.12(f).

"Avoidance Action" shall mean, except for any Excluded Avoidance Actions, any avoidance claims, rights, recoveries, subordinations or causes of action or remedies under Chapter 5 of the Bankruptcy Code, including any proceeds thereof, and any analogous state law claims, in each case, of the Seller and its estate, that relate to the Purchased Assets or the Business.

"Bankruptcy Case" has the meaning ascribed to such term in the preamble.

"Bankruptcy Code" has the meaning ascribed to such term in the recitals of this Agreement.

"Bankruptcy Court" has the meaning ascribed to such term in the preamble.

"Benefit Plans" shall mean (i) any "employee welfare benefit plan" or "employee pension benefit plan" (as those terms are respectively defined in Sections 3(1) and 3(2) of ERISA), including a Multiemployer Plan; (ii) any "employee benefit plan" within the meaning of Section 3(3) of ERISA (whether or not subject to ERISA) (including a Multiemployer Plan); and (iii) any other employee benefit plans, agreements, programs, policies, arrangements or payroll practices, whether or not subject to ERISA, including any retirement, pension, savings, or deferred compensation plan, compensation, employment, change-in-control, collective bargaining, retention, compensation, employee loan, or consulting, severance, retention benefit, incentive compensation plan, stock plan, share appreciation right, stock option, phantom stock or other equity-based compensation arrangement, unemployment compensation plan, vacation pay, sick leave, severance or termination pay, salary continuation, bonus arrangement, health benefit plan, group insurance, hospitalization, medical, dental, life, Code Section 125 "cafeteria" or "flexible" benefit, employee loan, educational assistance, profit-sharing plan, death or disability plan, agreement, commitment, program, policy, practice or arrangement or any other welfare or fringe benefit arrangements in each case in which is sponsored, maintained or contributed to by Seller, or for which Seller has any obligation to sponsor, maintain or contribute to, or for which Seller has any direct or indirect Liability, whether contingent or otherwise, and in which any former or

current Employees (or their respective beneficiaries) participate or have any present or future right to benefits.

"Bid Procedures Order" shall mean and refer to that certain *Order (A) Approving Bid Procedures For The Sale Of Certain Assets, (B) Approving Procedures For The Assumption And Assignment Of Executory Contracts Or Unexpired Leases In Connection With The Sale, (C) Approving Certain Bidder Incentives In Connection With The Debtors' Entry Into Any Potential Stalking Horse Agreement, (D) Scheduling A Sale Hearing, And (E) Granting Certain Related Relief* Docket No. 266, issued by the Bankruptcy Court and entered in the Bankruptcy Case on April 9, 2021 Docket No. 266.

"Bidding Procedures" shall mean and refer to the process and procedures established in the Bid Procedures Order with respect to the conduct of the transactions contemplated herein and Seller's disposition of the Purchased Assets.

"Bill of Sale, Assignment and Assumption" shall have the meaning set forth in Section 2.8(b)(i).

 "Business" shall mean the business conducted by Seller as of the date hereof at or with respect to the Acquired Location, including the business of processing post-consumer and post-industrial recycled polyethylene terephthalate ("rPET") plastic products.

"Business Day" shall mean any day other than a Saturday, Sunday or other day on which banking institutions in the State of New York, State of California or State of Texas are authorized or required by law or other action of a Governmental Authority to close.

"Business Product" shall mean any product or service designed, developed, marketed, distributed, provided, licensed, or sold by Seller in connection with the Business.

"Capital Lease Obligations" shall have the meaning set forth in Section 3.6(g).

"CARES Act" means the Coronavirus Aid, Relief, and Economic Security Act (P.L. 116-136) as signed into law by the President of the United States on March 27, 2020 (or any similar provision of Applicable Law or any predecessor or successor thereof, including the Paycheck Protection Program and Health Care Enforcement Act of 2020).

"Cash and Cash Equivalents" means, collectively, all of Seller's cash (including petty cash and checks received prior to the close of business on the Closing Date), checking account balances, marketable securities, certificates of deposits, time deposits, bankers' acceptances, commercial paper, government securities and other cash equivalents, in each case whether on hand, in transit or in banks or other financial institutions, security entitlements, securities accounts, commodity contracts and commodity accounts and including any cash collateral that is collateralizing any letters of credit or insurance policies, or any obligations with respect thereto, net of (i) uncleared checks and drafts issued by Seller (including any ACH transaction and other wire transfers) that are not yet reflected in the applicable bank account of Seller, (ii) cash or cash equivalents held for, or on behalf of, a customer or client of the Business or which are subject to a restriction on use or access as of the Closing (including any cash held in escrow, cash securing

letters of credit or otherwise as collateral, and cash held as a security deposit, vendor deposit or other deposit), and (iii) cash otherwise restricted in use or access as of the Closing.

"Claim" shall mean any action, cause of action, suit, hearing, inquiry, investigation, lawsuit, litigation, mediation, arbitration, charge, citation, complaint, debt, lien, liability, proceeding, claim, counterclaim, cross-claim, demand, audit, notice of violation or investigation, damage, loss, attorneys' or consultants' fees, costs or expenses, of any nature whatsoever, in law or in equity, in each case, whether public or private and whether adversarial, civil, commercial, administrative, criminal, or investigative, and whether brought, conducted, or heard by or before, or otherwise involving, a Governmental Authority or arbitrator.

"Closing" shall mean the consummation of the transaction contemplated herein.

"Closing Cash Consideration" shall have the meaning set forth on Schedule 1.1 (*Closing Cash Consideration*).

"Closing Date" shall have the meaning set forth in Section 2.8(a).

"Closing Payment" shall have the meaning set forth in Section 2.7(b).

"Closing Purchase Price" shall have the meaning set forth in Section 2.7(f).

"COBRA" shall mean and refer to the applicable requirements of Part 6 of Subtitle B of Title I of ERISA and Section 4980B of the Code (and predecessors thereof).

"Code" shall mean the Internal Revenue Code of 1986, as amended.

"Confidential Information" shall have the meaning set forth in Section 3.12(e).

"Confidentiality Agreement" means and refers to that certain Confidentiality Agreement, dated as of January 25, 2021, by and between Indorama Ventures Public Company Limited, on the one hand, and Seller and its Affiliates, on the other hand.

"Consent" shall mean any approval, consent, ratification, waiver or other authorization.

"Contamination" or "Contaminated" shall mean the presence of Hazardous Material in, on, at, under, or migrating to or from any environmental media (including soil, sediment, groundwater, surface water, and air) or building materials to an extent that any Response Action is legally required by any Governmental Authority under any Environmental Law with respect to such presence of Hazardous Material.

"Contract" means any contract, agreement, grant, sub-grant, arrangement, understanding, commitment, ground lease, lease, sublease, license, sublicense, mortgage, deed of trust, indenture, bond, note or other instrument (including any instrument evidencing indebtedness), or other commitment, undertaking, obligation, arrangement, instrument, or legally binding obligation or understanding, and all exhibits, schedules, annexes, amendments, supplements and modifications thereof (whether written or oral and whether express or implied).

"COVID-19" means the novel coronavirus, SARS-CoV-2, or COVID-19 (and all related strains and sequences), including any intensification, resurgence, or evolutions or mutations thereof, or related epidemics, pandemics, disease outbreaks, or public health emergencies.

"COVID-19 Measures" means any quarantine, "shelter in place", "stay at home", workforce reduction, shut down, closure, or any other Applicable Law, Order, directive, guideline, or recommendation by any Governmental Authority in connection with or in response to COVID-19, including the CARES Act.

"Cure Costs" means any cure, monetary, or similar amounts that must be paid under Sections 365(b)(1)(A) and (B) of the Bankruptcy Code in connection with the assumption and/or assignment of any Acquired Agreement, at the Closing or thereafter, necessary to cure all defaults, if any, and to pay all actual or pecuniary losses that have resulted from such defaults under the Acquired Agreements.

"Dallas Facility" shall mean and refer to the facility operated at and from the Dallas Leased Property.

"Dallas Leased Property" shall mean and refer to that certain real property commonly known as 4685 Mountain Creek Parkway, Dallas, Texas 75236, together with all buildings, structures, fixtures and improvements erected thereon, and any and all rights, privileges, easements, licenses, hereditaments and other appurtenances relating thereto, and used, or held for use, in connection with the operation of the Business.

"Defense Production Act" means the provisions of 50 U.S.C. Sections 4501, et seq., as amended.

"Deficiency Amount" shall have the meaning set forth in Section 2.7(i).

"Deposit" means a cash amount equal to Six Million Three Hundred Thousand Dollars ($6,300,000).

"Deposit Escrow" is defined in Section 2.7(a).

"Disclosure Schedule" shall mean the Disclosure Schedule delivered by Seller to Purchaser on the date of this Agreement.

"Dispute Notice" shall have the meaning set forth in Section 2.7(g).

"DOJ" shall have the meaning ascribed to such term in Section 5.11.

"Employees" shall mean all full-time and part-time employees, whether or not actively at work, who are employed by Seller in connection with the Business.

"Environmental Claim" shall mean any Claim or other communication by any Person alleging harm or potential harm to any Person or the environment or seeking restoration or remediation of or damages to natural resources or any violation of, or Liability or potential Liability under or relating to, any Environmental Law.

"Environmental Law" shall mean any federal, state, or local statute, Order, regulation, or ordinance pertaining to the protection of human health and safety or the environment, the protection, restoration, or remediation of or payment of damages for natural resources, the regulation, including the manufacture, processing, distribution, use, treatment, storage, disposal, arrangement for disposal, Release, recycling, transport, or handling of Hazardous Materials or the response to Contamination or the threat of Contamination and any applicable Orders, judgments, decrees, Permits, licenses, or other authorizations or mandates under such Laws, each as in existence on the date hereof.

"Environmental Permit" means any and all Permits required under any applicable Environmental Law.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliates" means any Person that would be considered a single employer with Seller under Section 414(b), (c), (m), or (o) of the Code.

"Escrow Agreement" has the meaning ascribed to such term in the recitals of this Agreement.

"Escrow Holder" has the meaning ascribed to such term in the recitals of this Agreement.

"Estimated Purchase Price" shall have the meaning set forth in Section 2.7(e).

"Excess Amount" shall have the meaning set forth in Section 2.7(i).

"Excluded Assets" shall have the meaning set forth in Section 2.2.

"Excluded Avoidance Action" shall mean any avoidance claims, rights, recoveries, subordinations or causes of action or remedies under Chapter 5 of the Bankruptcy Code, including any proceeds thereof, and any analogous state law claims, and any commercial tort or preference claims, including any proceeds thereof, in each case, (i) between or among the Seller or any of its affiliated debtors in the Bankruptcy Case, or (ii) against any current or former officer, director, employee, advisor or consultant of the Seller or any of its affiliated debtors in the Bankruptcy Case.

"Excluded Liabilities" shall have the meaning set forth in Section 2.4.

"Expenses" shall have the meaning set forth in Section 8.2.

"Export Approvals" shall have the meaning set forth in Section 3.4(e).

"Export Control Laws" shall have the meaning set forth in Section 3.4(e).

"Final Allocation Statement" shall have the meaning set forth in Section 2.7(j).

"Final Purchase Price" shall have the meaning set forth in Section 2.7(i).

"FTC" shall have the meaning ascribed to such term in <u>Section 5.11</u>.

"GAAP" shall mean U.S. generally accepted accounting principles, as in effect from time to time, as historically consistently applied by Seller.

"Good Funds" is defined in <u>Section 2.7(a)</u>.

"Governmental Authority" shall mean any U.S., state, local or foreign governmental, regulatory or administrative body, agency or authority, any court or judicial authority or arbitration tribunal, whether national, Federal, state or local or otherwise, or any Person lawfully empowered by any of the foregoing to enforce or seek compliance with any applicable law, statute, regulation, order or decree.

"Hazardous Material" shall mean any pollutants, contaminants, chemicals, or other industrial, toxic, solid, or hazardous substances or wastes, as such terms may be defined, listed, or regulated under any Environmental Law, including petroleum, any petroleum-based product, any radioactive substance, polychlorinated biphenyls, asbestos, per- and poly-fluoroalkyl substances, or any material posing a threat or potential threat to human health and safety or the environment.

"Holdings" has the meaning ascribed to such term in the preamble of this Agreement.

"Holdings Assignment" shall have the meaning set forth in the preamble to this Agreement.

"Import Control Laws" shall have the meaning set forth in <u>Section 3.4(f)</u>.

"Independent Auditor" shall have the meaning set forth in <u>Section 2.7(h)</u>.

"Intellectual Property Rights" shall mean all of the following in any jurisdiction throughout the world: (a) patents, patent applications, patent disclosures and statutory invention registrations, including reissues, divisions, continuations, continuations in part, extensions and reexaminations thereof, all rights therein provided by international treaties or conventions ("Patents"); (b) trademarks, service marks, trade dress, trade names, logos (and all translations, adaptations, derivations and combinations of the foregoing) and Internet domain names, together with all goodwill associated with each of the foregoing, any and all common law rights, and registrations and applications for registration thereof, all rights therein provided by international treaties or conventions, and all reissues, extensions and renewals of any of the foregoing; (c) copyrightable works (including computer software source code, executable code, databases and related documentation and maskworks), copyrights, whether or not registered, and registrations and applications for registration thereof, and all rights therein provided by international treaties or conventions; (d) confidential and proprietary information, including trade secrets, unpatented inventions, data (including Personal Information), and know-how ("Trade Secrets"); and (e) the right to sue or otherwise recover for any and all past, present and future interference, infringement, dilution, and misappropriation of each of the foregoing.

"IP Assignment" shall have the meaning set forth in <u>Section 2.8(b)(ii)</u>.

"Item of Dispute" shall have the meaning set forth in Section 2.7(g).

"Key Customers" shall have the meaning set forth in Section 3.16.

"Key Vendors" shall have the meaning set forth in Section 3.16.

"Knowledge" shall mean, with respect to Seller, the actual knowledge of Leon Farahnik, Brian Weiss, Alex Delnik, and Gregg Milhaupt, after reasonable due inquiry of each such person solely with such person's direct reports.

"L/C Consideration" is defined in the definition of Purchase Price.

"Liability" means any debt, liability, obligation, guarantee, claim, expense, and commitment of whatever kind or nature (whether primary or secondary, direct or indirect, known or unknown, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, matured or unmatured, determined or determinable, or due or to become due), and including all costs and expenses relating thereto.

"Lien" shall mean all liens, encumbrances, mortgages, charges, claims, restrictions, pledges, security interests, title defects, easements, rights of way, covenants, encroachments, and other liens or encumbrances of any nature.

"Loss" or "Losses" shall mean any and all losses of any kind or nature including any and all Liabilities, claims, interest, fines, penalties, deficiencies, damages, Taxes, fees, costs, expenses, or amounts paid in settlement (in each case, including costs of investigation, reasonable attorneys' and experts' fees, expenses, and costs) incurred, suffered, or sustained.

"Material Adverse Effect" shall mean any change, event, occurrence, condition, development, fact, or state of facts that, individually or in the aggregate (taking into account all other such changes, events, occurrences, conditions, developments, facts, or states of fact), has had or would reasonably be expected to have a material adverse change in or material adverse effect on (a) the assets, condition (financial or otherwise), or results of operations of the Business or the Purchased Assets, taken as a whole or (b) Seller's ability to consummate the transactions contemplated by this Agreement or to perform any of its obligations under this Agreement; provided, however, that, in the case of the foregoing clause (a), the following shall be disregarded in determining whether there has been a Material Adverse Effect or whether a Material Adverse Effect could or would reasonably be expected to occur: (i) general economic, business, industry or credit, financial or capital market conditions (whether in the United States or internationally), including conditions affecting generally all companies engaged in the Business or a segment thereof, or the industries served by the Business, (ii) the taking of any action required by this Agreement or the Related Agreements, (iii) the announcement of this Agreement or pendency of the transactions contemplated hereby, (iv) the breach of this Agreement or any Related Agreement by Purchaser or any Purchaser Assignee, (v) pandemics (including the COVID-19 pandemic existing and continuing as of the date of this Agreement), earthquakes, tornados, hurricanes, floods and acts of God, (vi) acts of war (whether declared or not declared), sabotage, terrorism, military actions or the escalation thereof, (vii) any changes or prospective changes in applicable laws, regulations or accounting rules, including GAAP or interpretations thereof, or any changes or prospective changes in the interpretation or

enforcement of any of the foregoing, or any changes in general legal, regulatory or political conditions, (viii) adverse changes or effects on the Business or the Purchased Assets that result from the filing or pendency of the Bankruptcy Case, and (ix) any existing event, occurrence or circumstance described or set forth in the Disclosure Schedule (for the avoidance of doubt, excluding any worsening thereof); except, in the case of the foregoing clauses (i), (v), (vi), and (vii), to the extent that the Business or the Purchased Assets are disproportionately adversely affected thereby relative to other similarly situated Persons operating in the industries in which the Business operates.

"Multiemployer Plan" shall have the meaning set forth in Section 3(37) of the Code.

"Net Working Capital" shall mean the total of (a) the sum of (i) Acquired Receivables, (ii) Acquired Inventories, and (iii) Prepaid Assets as of the Closing Date, *less*, (b) the sum of (i) trade payables incurred with respect to the Business during the period between initiation of the Bankruptcy Case and the Closing Date (the "Relevant Period") (collectively, the amounts described in this clause (i) are referred to herein as the "Assumed Accounts Payable") and (ii) accrued expenses of Seller incurred or accrued with respect to the Business during the Relevant Period (collectively, the amounts described in this clause (ii) are referred to herein as the "Accrued Expenses"). All of the foregoing shall be determined in accordance with the Applicable Methodology, subject only to such exceptions thereto as may be agreed to in writing by Purchaser and Seller.

"Non-Tax Prorations" shall mean closing adjustments, which should be included in the calculation of Closing Net Working Capital, of utilities, rents, and other pro-ratable items which shall be estimated at Closing and as per the Closing Date and re-prorated upon the determination of actual amounts as herein provided.

"Notice of Successful Bidder" shall have the meaning set forth in the Bid Procedures Order.

"OFAC" shall have the meaning set forth in Section 3.4(e).

"Open Customer Orders" shall have the meaning set forth in Section 2.1(i).

"Open Supplier Orders" shall have the meaning set forth in Section 2.1(j).

"Order" means any award, decision, injunction, order, ruling, judgment, decree, writ, subpoena, verdict, settlement, or assessment or arbitration award entered, issued, made, or rendered by any court, administrative agency, or other Governmental Authority or by any arbitrator.

"Ordinary Course" means, with respect to any Person, an action that is (a) consistent in all material respects in nature, scope and magnitude with the past practices of such Person (but, with respect to Seller, only taking into account past practices since the commencement of the Bankruptcy Case) and (b) does not require authorization by the board of directors, manager(s), or similar governing body or equity holders of such Person (or any Person or group of Persons exercising similar authority).

"Pachulski" shall have the meaning set forth in Section 2.7(a).

"Patents" has the meaning set forth in the definition of Intellectual Property Rights.

"Periodic Non-Income Taxes" means any real or personal property Taxes or other similar periodic Taxes not based on income or receipts.

"Permits" shall have the meaning set forth in Section 2.1(g).

"Permitted Access Parties" is defined in Section 5.5.

"Permitted Post-Closing Encumbrance" shall mean, as of the Closing Date, all (a) non-exclusive licenses granted with respect to Intellectual Property Rights; (b) Liens for Taxes, assessments and governmental charges or levies not yet delinquent or for which adequate reserves are maintained on the financial statements of Seller and set forth as a current liability on the Target Closing Net Working Capital Calculation Statement; (c) Liens imposed by law, such as materialmen's, mechanics', carriers', workmen's and repairmen's liens and other similar liens arising in the Ordinary Course securing obligations that are not overdue for a period of more than sixty (60) days or which are being contested in good faith by appropriate proceedings and set forth as a current liability on the Target Closing Net Working Capital Calculation Statement; (d) pledges or deposits to secure obligations under workers' compensation laws or similar legislation or to secure public or statutory obligations and set forth as a current liability on the Target Net Closing Working Capital Calculation Statement; (e) deposits to secure the performance of bids, trade contracts, leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the Ordinary Course and set forth as a current liability on the Target Closing Net Working Capital Calculation Statement, and, (f) to the extent that none of the following materially adversely affect or impair the occupancy or use of the real property for the purposes for which it is currently used or occupied in connection with the business of Seller (i) all matters of record, including survey exceptions, reciprocal easement agreements and other encumbrances on title to real property, (ii) all applicable zoning, entitlement, conservation restrictions and other land use and environmental regulations, and (iii) all exceptions, restrictions, easements, charges, rights-of-way and other Liens set forth in any permits, any deed restrictions, groundwater or land use limitations or other institutional controls utilized in connection with any required environmental remedial actions, or other state, local or municipal franchise applicable to Seller or any of its respective properties.

"Person" shall mean an individual, corporation, partnership, joint venture, trust, association, estate, joint stock company, limited liability company, Governmental Authority or any other organization of any kind.

"Personal Information" shall mean any information that identifies or, alone or in combination with any other information, could reasonably be used to identify a natural Person or that relates directly or indirectly to a particular household or device, which may include name, street address, telephone number, email address, identification number issued by a Governmental Authority, credit card number, bank information, customer or account number, online identifier, device or unique identifier, IP address, browsing history, search history, or other website, application, or online activity or usage data, location data, genetic, genome and biometric data,

information about sexual health or activity, medical, insurance or health information, or any other information that is considered "personally identifiable information," "personal information," "special categories of personal data," "protected health information" or "personal data" under applicable Privacy Laws.

"PPP Loans" shall have the meaning set forth in Section 3.15(h).

"Pre-Auction Deposit" means a cash amount equal to Four Million Five Hundred Thousand Dollars ($4,500,000).

"Prepaid Assets" means all cash deposits (including, without duplication of any amounts included in the L/C Consideration, the amount of any security deposit held by a landlord under a Real Property Lease(s) that exceeds the equivalent of one (1) month's fixed rent under the applicable Real Property Lease), advance payments and other prepaid items relating to or arising in connection with the operation of the Business.

"Privacy Laws" means all Applicable Laws issued by any Governmental Authority or self-regulatory entity concerning the privacy, security, or Processing of Personal Information (including Applicable Laws of jurisdictions where Personal Information was collected or Processed), including, as applicable, data breach notification laws, consent and consumer preference laws, consumer protection laws, laws concerning requirements for website and mobile application privacy policies and practices including accessibility requirements, social security number protection laws, data security laws, and laws concerning advertising, marketing, email, faxes, notifications, text, MMS and OTT messages, or automated or telephone communications. Without limiting the foregoing, Privacy Laws include, if and to the extent applicable to the Business: the Federal Trade Commission Act, the Telephone Consumer Protection Act, the Telemarketing and Consumer Fraud and Abuse Prevention Act, the Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003, Canada's Anti-Spam Law, the Video Privacy Protection Act, the Children's Online Privacy Protection Act, the California Consumer Privacy Act of 2018, as amended, the Confidentiality of Medical Information Act, the Computer Fraud and Abuse Act, the Electronic Communications Privacy Act, the Fair Credit Reporting Act, the Fair and Accurate Credit Transaction Act, the Health Insurance Portability and Accountability Act of 1996, as amended and supplemented by the Health Information Technology for Economic and Clinical Health Act of the American Recovery and Reinvestment Act of 2009, Payment Card Industry Data Security Standard, the Gramm-Leach-Bliley Act, the General Data Protection Regulation, the Data Protection Act, the Personal Information Protection and Electronic Documents Act, the ePrivacy Directive, the Privacy and Electronic Communications Regulations and all other similar international, federal, state, provincial, and local Applicable Laws.

"Process" or "Processing" means any operation performed on Personal Information, including the collection, creation, receipt, access, use, handling, compilation, analysis, monitoring, maintenance, retention, storage, transmission, transfer, protection, disclosure, distribution, destruction, or disposal of Personal Information.

"Product" means any product or service designed, developed, marketed, distributed, provided, licensed, or sold by the Seller or the Business.

"Proposed Allocation" shall have the meaning set forth in Section 2.7(j).

"Purchase Price" shall mean (i) an aggregate amount equal to the sum of (A) the Closing Cash Consideration, *plus* (B) the aggregate amount of all Cash and Cash Equivalents backing or securing the Acquired L/Cs as of the Closing in the amount set forth on Schedule 2.1(m) (the "L/C Consideration"), *minus* (C) any amounts drawn under any Acquired L/C as of the Closing but only to the extent not replenished prior to Closing, *plus* or *minus* (as applicable) (D) the amount, if any, by which the Final Closing Net Working Capital as of the Closing Date is greater or less than, as applicable, the Target Closing Net Working Capital, *plus* or *minus* (as applicable) (E) without duplication of any amount taken into account in calculating the Net Working Capital or the Purchase Price, Seller's applicable portion of the Tax Prorations and Non-Tax Prorations *plus* (ii) without duplication of any item described in clause (i) of this definition, and solely for purposes of the Purchase Price allocation in Section 2.7(j), the Assumed Liabilities.

"Purchased Assets" shall have the meaning set forth in Section 2.1.

"Purchased Equipment" shall have the meaning set forth in Section 2.1(a).

"Purchaser" shall have the meaning set forth in the preamble.

"Purchaser Assignee" shall mean any Affiliate of Purchaser nominated by Purchaser prior to the Closing Date.

"R&W Policy" is defined in Section 5.3.

"Real Property Lease Assignment and Assumption Agreement" shall have the meaning set forth in Section 2.8(b)(vi).

"Related Agreements" shall mean the Bill of Sale, Assignment and Assumption, the IP Assignment, the Real Property Lease Assignment and Assumption Agreement, and the Escrow Agreement.

"Release" means any spilling, emitting, discharging, leaking, pumping, injecting, depositing, disposing, dispersing, escaping, leaching or migrating into the environment (including ambient or indoor air, surface water, groundwater, sediment, and surface or subsurface strata), including the movement of any Hazardous Material through, to, in, or from air, soil, surface water, groundwater, sediment, or surface or subsurface strata.

"Relevant Period" is defined in the definition of "Net Working Capital" above.

"Response Action" shall mean any action taken to assess, investigate, abate, treat, remediate, clean up, remove, or mitigate any violation of Environmental Law, any Contamination at or originating from any property owned, leased, or used by the Business or any Release or threatened Release of Hazardous Materials. Without limitation, Response Action shall include any action that would be a response, removal or remedial action as defined by the Comprehensive Environmental Response, Compensation and Liability Act, as amended at the date of Closing, 42 U.S.C. §9601 (25).

"Sale Hearing" shall have the meaning set forth in the Bid Procedures Order.

"Sale Order" shall mean an order of the Bankruptcy Court entered in the Bankruptcy Case approving and authorizing this Agreement and the transaction contemplated herein (including approving and authorizing Seller's assumption and assignment pursuant to Section 365 of the Bankruptcy Code of the Acquired Agreements), which Sale Order shall be substantially in the form and content attached as Exhibit 1.1 (*Sale Order*) to this Agreement, with such changes that are reasonably mutually acceptable to Seller and Purchaser in their respective reasonable discretion.

"Sanctioned Person" shall have the meaning set forth in Section 3.4(e).

"Security Incident" shall have the meaning set forth in Section 3.22(d).

"Selected Employees" shall have the meaning set forth in Section 5.6(a).

"Seller" shall have the meaning set forth in the preamble.

"Seller Intellectual Property" shall mean Owned Intellectual Property, together with all other Intellectual Property Rights used by Seller in, or that is otherwise necessary for, the operation of the Business.

"Seller Privacy and Data Security Policies" means Seller's applicable internal and public-facing policies and notices concerning the privacy, security, or Processing of Personal Information.

"Subject Employees" shall have the meaning set forth in Section 5.6(a).

"Target Closing Net Working Capital" shall mean Zero Dollars ($0).

"Target Closing Net Working Capital Calculation Statement" shall have the meaning set forth in Section 2.7(e).

"Tax" (and, with correlative meaning, "Taxes," "Taxable" and "Taxing") shall mean, without limitation, (i) any and all U.S. federal, state, local or non-U.S. net income, capital gains, gross income, gross receipts, sales, use, transfer, ad valorem, franchise, profits, license, capital, withholding, payroll, estimated, employment, excise, goods and services, severance, stamp, occupation, premium, property, social security, environmental (including Code section 59A), alternative or add-on, value added, registration, windfall profits or other taxes, duties, charges, fees, levies or other assessments imposed by any Governmental Authority, or any interest, penalties, or additions to tax incurred under Applicable Laws with respect to taxes and (ii) any Liability in respect of any item described in clause (i) above that arises by reason of a contract, assumption, transferee or successor liability, operation of law (including by reason of participation in a consolidated, combined or unitary Tax Return) or otherwise.

"Tax Authority" means any Governmental Authority charged with the administration of any Law relating to Taxes, including the imposition, assessment or collection of Taxes.

"Tax Prorations" shall mean prorations between Seller and Purchaser for Periodic Non-Income Taxes pursuant to the procedures set forth in Section 5.10 to the extent unpaid at the Closing.

"Tax Returns" shall mean any report, return (including any information return), declaration or other filing required or permitted to be supplied to any Tax Authority or jurisdiction with respect to Taxes, including any amendments or attachments to such reports, returns, declarations or other filings.

"Termination Date" shall have the meaning set forth in Section 8.1(b).

"Trade Secrets" has the meaning set forth in the definition of Intellectual Property Rights.

"Transfer Taxes" shall have the meaning set forth in Section 5.8.

"Transferred Employees" shall have the meaning set forth in Section 5.6(a).

"Upset Agreement" is defined in Section 9.1(a).

"Upset Purchaser" is defined in Section 9.1(a).

"WARN Act" shall mean the Worker Adjustment and Retraining Notification Act of 1988, as amended.

"Wayward Assets" is defined in Section 5.14.

## ARTICLE II

## PURCHASE AND SALE; CLOSING

2.1     Purchase and Sale. Upon the terms and subject to the conditions set forth in this Agreement (including entry of the Sale Order), at the Closing, Seller shall (and, to the extent necessary, Holdings shall or shall cause any applicable Affiliate(s) of Holdings who own or otherwise hold any of the Purchased Assets to) sell, convey, transfer, assign and deliver to Purchaser or one or more Purchaser Assignees, and Purchaser or one or more Purchaser Assignees shall purchase and accept from Seller (and, to the extent applicable, Holdings or any applicable Affiliate(s) of Holdings), all of Seller's (and, to the extent applicable, Holdings' or any applicable Affiliate(s)' of Holdings) right, title and interest in and to all of the tangible and intangible assets, properties, and related rights of any kind or nature, wherever located, whether at the Acquired Location or in transit thereto or otherwise, of Seller or that are used in or are otherwise related primarily to the Business, including the following assets, in each case except to the extent that the same are Excluded Assets (the "Purchased Assets"), in each case free and clear of all Claims (as defined in the Bankruptcy Code) and all Liens (other than Permitted Post-Closing Encumbrances):

(a)     All machinery, production equipment, forklifts, furniture, fixtures, structures, improvements, office furnishings, apparatuses, appliances, implements, telephone systems, signage, spare parts, leasehold improvements, tools and dies, molds and parts, capital

spares, vehicles, computer hardware and software, and other tangible personal property of every kind and description (including communications equipment, information technology assets, and any attached and associated hardware, routers, devises, panels, cables, manuals, cords, connectors, cards, and vendor documents) (and including all warranties of the vendors applicable thereto) owned by Seller, located at the Acquired Location, or used primarily in connection with the Business, including those located at, on, or affixed to the Acquired Location, and including, without limitation, the tangible personal property identified on <u>Schedule 2.1(a)</u> (collectively, the "<u>Purchased Equipment</u>");

(b)     all warranties, guarantees, and similar rights to the extent assignable or transferable under Applicable Law and to the extent related to the Purchased Assets, including warranties and guarantees made by manufacturers, vendors, suppliers, and contractors under the Purchased Assets (including, for the avoidance of doubt, warranties and licenses received from manufacturers or vendors of Purchased Equipment), and claims against suppliers and other third parties in connection with the Acquired Contracts and the Purchased Equipment;

(c)     all Contracts which are primarily related to the Business, including those identified on <u>Schedule 2.1(c)</u> (collectively, the "<u>Acquired Contracts</u>"). Notwithstanding the foregoing, references herein to Acquired Contracts shall not be deemed to include Acquired Real Property Leases, Acquired Personal Property Leases, or Permits;

(d)     all inventories, materials, raw materials, work in process, finished goods and products, parts (including manufactured, purchased, and spare parts), office supplies, packing materials, containers, janitorial supplies, other supplies, materials used for maintaining production machinery and equipment, and merchandise, owned by Seller located at the Acquired Location, or used primarily in connection with the Business, including any and all rights to the warranties received from suppliers with respect to such inventory and related claims, credits, rights of recovery, and set-off with respect thereto (collectively, the "<u>Acquired Inventories</u>");

(e)     Seller's leasehold interest in the Acquired Location, including those arising under the lease identified in <u>Schedule 2.1(e)</u> (the "<u>Acquired Real Property Lease</u>"), and the right to use the Acquired Location including all right, title, and interest of Seller in, to, or under, or to use, all buildings, structures, improvements, paved parking lots, roads, easements, other rights of way, and fixtures thereon and all other appurtenances thereto;

(f)     all leasehold rights in personal property leased by Seller, located at the Acquired Location, or used primarily in connection with the Business, including those arising under the leases identified in <u>Schedule 2.1(f)</u> (the "<u>Acquired Personal Property Leases</u>");

(g)     to the extent assignable or transferable under Applicable Law, all the permits (including Environmental Permits), licenses, approvals, franchises, registrations, and other governmental licenses, permits, authorizations, certificates, or approvals issued to Seller, relating to the Acquired Location, or used or held for use by Seller primarily in connection with the Business or the construction, maintenance, or operation of the Acquired Location or any Purchased Assets or the conduct of the Business (collectively, the "<u>Permits</u>");

(h)     other than the books and records contemplated by Section 2.2(b), all books, records, files, invoices, supplier lists, promotional materials, technical documentation, data (including Personal Information), and other papers (whether in hard copy or electronic format) held by Seller or related to the Business or the Purchased Assets, including financial records and data, engineering drawings of machinery and equipment relating to the Acquired Location or currently used or held for use primarily in connection with the Business; blueprints and other technical papers; user manuals; inventory, maintenance, and asset history records; construction plans and specifications; administrative libraries; environmental records required by law or regulation; and systems documentation and other data processing information and records, except, in each instance, to the extent they relate primarily to any Excluded Asset;

(i)     to the extent not fulfilled prior to Closing, all open purchase orders for goods and services with customers of the Business at the Acquired Location outstanding as of the Closing Date (collectively, the "Open Customer Orders"), which, as of the date set forth thereon, are as set forth on Schedule 2.1(i); provided, that Schedule 2.1(i) of the Disclosure Schedule shall be updated prior to the Closing to reflect additional open purchase orders arising in the Ordinary Course after the date hereof which Seller may hereafter enter into so long as such purchase order includes terms reasonably comparable to the generally prevailing terms of the Open Customer Orders set forth on Schedule 2.1(i) as of the date hereof;

(j)     the right to receive all goods or services to be provided to Seller in connection with the Business at the Acquired Location pursuant to open orders for goods and services with suppliers that remain unfulfilled as of the Closing Date (the "Open Supplier Orders"), which, as of the date set forth thereon, are as set forth on Schedule 2.1(j); provided, that Schedule 2.1(j) shall be updated prior to the Closing to reflect additional open orders arising in the Ordinary Course after the date hereof which Seller may hereafter enter into so long as such orders include terms reasonably comparable to the generally prevailing terms of the Open Supplier Orders set forth on Schedule 2.1(j) of the Disclosure Schedule as of the date hereof.

(k)     all Accounts Receivable of Seller listed in Section 2.1(k) of the Disclosure Schedules, as well as any Accounts Receivable which arise out of transactions (on terms consistent in the Ordinary Course) occurring after the mutual execution and delivery of this Agreement which are both (i) specifically related to products produced at the Acquired Location on or before the Closing Date, and (ii) owing to Seller by customers who have placed orders with or purchased goods from Seller prior to the Closing, in each case of the foregoing clauses (i) and (ii), without offsetting any amounts with respect to any commitments made by or on behalf of Seller to any customer of Seller or the Business (collectively, the foregoing are referred to as the "Acquired Receivables"), it being agreed that Section 2.1(k) shall be updated at or prior to the Closing to include additional Accounts Receivable meeting the requirements for inclusion set forth in this Section 2.1(k);

(l)     all Intellectual Property Rights, excluding the name "CarbonLite", wherever located, owned or purported to be owned by Seller, or used primarily in connection with the Business, including any enterprise resource planning system relating to the Business or the Purchased Assets, and including those Intellectual Property Rights set forth on Schedule 2.1(l) (the "Acquired Intellectual Property Rights");

(m) those letters of credit or similar financial accommodations issued to third party(ies) for the account of Seller (and any collateral therefor) which are described on Schedule 2.1(m) (collectively, the "Acquired L/Cs");

(n) all claims and causes of action owned by or available to Seller, including any Avoidance Action (but, in all events, excluding Excluded Avoidance Actions), (i) relating to the Purchased Assets, the Assumed Liabilities or the acquisition, ownership, management, operation, use, function or value of the Business or any Purchased Asset or (ii) against any counterparty to an Acquired Agreement or any Affiliate of such counterparty;

(o) all Prepaid Assets; provided that Schedule 3.6(f) shall be updated prior to the Closing to reflect additional cash deposits, advance payments and other prepaid items of the types specified in the definition of Prepaid Assets and arising in the Ordinary Course after the date hereof so long as such cash deposit, advance payment or other prepaid item is (i) of a type consistent with the Prepaid Assets set forth on Schedule 3.6(f) as of the date hereof and (ii) incurred on commercially reasonable terms and included (either initially or by way of modification as additional items to be included arise pursuant to this Section 2.1(o)) on Schedule 3.6(f) in good faith;

(p) all insurance policies and performance bonds of Seller covering the Purchased Assets and any rights, proceeds, and claims of and from such bonds or policies, including, for the avoidance of doubt, all rights to insurance proceeds for recoupment, reimbursement, or coverage under property damage insurance policies with respect to the Purchased Assets that have been damaged or destroyed and not replaced or otherwise remedied by Closing;

(q) all employee-related files, records, and data, including occupational health and safety records, assessments and audits; industrial hygiene files; workers compensation records; workers compensation claims files; and personnel employment and medical records (in each case, including any Personal Information contained therein and to the extent the transfer thereof is not prohibited by law) for Employees at the Acquired Location;

(r) the cash collateral securing any of the Acquired L/Cs in the amount set forth on Schedule 2.1(m); and

(s) all goodwill generated by or associated with the Business.

2.2 Excluded Assets. Notwithstanding anything to the contrary contained in Section 2.1 or any other provision of this Agreement or any Related Agreement, the following assets are not being sold, assigned, transferred or conveyed to Purchaser or any Purchaser Assignee by Seller hereunder (collectively, the "Excluded Assets"):

(a) the corporate seals, organizational documents, minute books, stock books, Tax Returns, books of account and other records having to do with the corporate organization of Seller;

(b)     the basic books and records of account and all supporting vouchers, invoices and other records and materials primarily relating to any or all Taxes of Seller or the Business;

(c)     all claims for refunds due to Seller for Taxes of any nature paid by Seller with respect to any period ending on or prior to the Closing Date;

(d)     all Benefit Plans and all assets held with respect to such Benefit Plans;

(e)     data files, archive files, systems documentation and other data processing information and records to the extent relating solely to the Excluded Assets;

(f)     all Contracts not included in the Acquired Agreements or Purchased Assets;

(g)     any assets, properties and rights specifically described or set forth on Schedule 2.2(g);

(h)     the rights which accrue or will accrue to Seller under this Agreement and the Related Agreements;

(i)     any rights, claims or causes of action comprising or related to (i) Excluded Assets and (ii) intercompany obligations between Seller and any of its Affiliates;

(j)     any tangible or intangible asset held by Seller pursuant to a lease, license, contract, or other agreement where such lease, license, contract or other agreement is not among the Acquired Agreements or Permits assumed by Seller and assigned to Purchaser or any Purchaser Assignee at the Closing in accordance with the Bankruptcy Code;

(k)     other than the Acquired L/Cs, any letters of credit or similar financial accommodations issued to any third party(ies) for the account of Seller and any collateral therefor;

(l)     all securities, whether capital stock or debt, of Seller or any other entity;

(m)     all Accounts Receivable, other than Acquired Receivables;

(n)     all Cash and Cash Equivalents, for the avoidance of doubt, excluding Cash and Cash Equivalents backing or securing the Acquired L/Cs as of the Closing Date and excluding cash collateral securing the Acquired L/Cs;

(o)     all bank accounts of Seller;

(p)     the name "CarbonLite" and any and all derivations thereof; and

(q)     all Excluded Avoidance Actions.

2.3     <u>Assumed Liabilities</u>. Upon the terms and conditions contained in this Agreement, Purchaser or the applicable Purchaser Assignee shall upon, from and after the Closing Date,

assume and be solely liable and responsible for paying and satisfying, solely and only the following liabilities and obligations (all items not specifically set forth below in this Section 2.3 being excluded) (all liabilities and obligations so assumed, the "Assumed Liabilities"):

(a)	all liabilities arising in connection with or from the use of the Purchased Assets or operation of the Business at the Acquired Location, including claims by employees of any of the foregoing, or other persons, solely to the extent attributable to the use of the Purchased Assets or the operation of the Business at the Acquired Location after the Closing Date, including claims resulting from injuries alleged to occur as a result of the condition of any of the Purchased Assets first existing from and after the Closing Date;

(b)	all obligations solely to the extent arising from any actions taken by Purchaser or any Purchaser Assignee after the Closing Date with respect to Transferred Employees or operation of the Business conducted at the Acquired Location;

(c)	all post-Closing obligations of Seller to deliver products or services pursuant to Open Customer Orders outstanding as of Closing;

(d)	all Assumed Accounts Payable and Accrued Expenses of Seller, in each case, solely to the extent taken into account in the calculation of the Final Purchase Price;

(e)	the Tax Prorations and the Non-Tax Prorations, in each case, solely to the extent taken into account in the calculation of the Final Purchase Price;

(f)	all Liabilities in respect of the Acquired Agreements and Permits, including Environmental Permits, solely to the extent arising after Closing, other than any Cure Costs;

(g)	any and all obligations arising under the WARN Act or similar state statutes as a result of (A) the termination of any Subject Employee, or (B) any termination or layoff of any Transferred Employee by Purchaser on or after the Closing, it being agreed that (i) in no event shall any such obligation be deemed to be an Accrued Expense or otherwise taken into account in the calculation of Seller's Net Working Capital as of the Closing Date, and (ii) any such obligation relating to Employees to whom Purchaser does not extend employment offers shall in any event be deemed Assumed Liabilities;

(h)	all accrued and unpaid vacation, holidays, sick pay and other paid time-off (whether accrued prior to or during the Bankruptcy Case) to which the Transferred Employees are entitled with respect to all periods of service up to and including the Closing Date under the policies and practices of Seller or its Affiliates, but only to the extent included as a reduction in Net Working Capital;

(i)	without duplication of any amounts assumed by Purchaser pursuant to Section 2.3(g) above, all obligations of Seller for severance and other termination payments owing to any Subject Employee that is not a Selected Employee, which severance or other termination payments are set forth on Section 2.3(i) of the Disclosure Schedule;

(j)     any and all liabilities and obligations (whenever arising or accruing) solely to the extent relating to Environmental Claims with respect to the Acquired Location after Closing;

(k)     all obligations and liability with respect to any product liability or warranty claims solely to the extent relating to the operation of the Business after Closing;

(l)     without duplication of any other item described in this <u>Section 2.3</u>, the Capital Lease Obligations;

(m)     all post-Closing obligations of the Business pursuant to Open Supplier Orders outstanding as of the Closing; and

(n)     all other obligations expressly assumed by Purchaser or any Purchaser Assignee under the other terms and provisions of this Agreement or any of the Related Agreements or other documents and agreements executed in connection with the Closing.

2.4     <u>Excluded Liabilities</u>. Except for the Assumed Liabilities expressly set forth in <u>Section 2.3</u>, notwithstanding anything to the contrary herein or otherwise neither Purchaser nor any Purchaser Assignee shall assume or become responsible, or deemed for any purpose to have assumed or become responsible, for any of Seller's or any Affiliate's duties, obligations or liabilities of any nature or character (such excluded liabilities are collectively referred to herein as the "<u>Excluded Liabilities</u>") and Seller shall remain fully and solely responsible for all Excluded Liabilities, including the following to the extent they are not an Assumed Liability: (i) all Liabilities with respect to Claims pending on or before the Closing Date or to the extent against or giving rise to Liability related to, arising from, or in respect of the Business or the Purchased Assets prior to the Closing Date even if such Claims is first instituted after the Closing Date (including in respect of any violation of Applicable Law (including any export control law) occurring prior to the Closing), including any Liability relating to (A) warranty obligations, (B) infringement, dilution, misappropriation, or other violation of Intellectual Property Rights, (C) alleged or actual hazard or defect in design, manufacture, materials, or workmanship based on any theory, including negligence, strict products liability, and any failure to warn or disclose or alleged or actual breach of express or implied warranty or representation, (D) the return after the Closing of any Business Product sold prior to the Closing, and (E) human exposure to Hazardous Materials or Business Products, (ii) all Indebtedness of Seller other than pursuant to any Acquired Agreement, (iii) all trade accounts payable by Seller to the extent in respect of periods prior to Closing (other than Assumed Accounts Payable), (iv) all Liabilities existing prior to the filing of the Bankruptcy Case that are subject to compromise under the Bankruptcy Code, (v) Liabilities under any Contract that is not an Acquired Agreement, or Liabilities, subject to <u>Section 5.16</u>, in respect of any Acquired Agreement to the extent arising or resulting from any breach thereof prior to the Closing, (vi) any Liability for Taxes of Seller or its Affiliates, whether arising prior to, on, or after the Closing Date, (vii) any Liability for Taxes relating to the Business or the Purchased Assets, including, for the avoidance of doubt, any such Taxes with respect to any Employee, for that portion of any Taxable period which begins before the Closing Date and ends on and includes the Closing Date, whether imposed or assessed before or after the Closing Date, (viii) all fines and penalties for violations of or other Liabilities arising under or relating to Environmental Laws or Hazardous Materials, as well as all Environmental Claims,

prior to Closing arising out of or relating to the Business or the Purchased Assets, and (ix) all Liabilities to the extent arising out of or relating to Seller at any time being the owner or occupant of, or the operator of activities conducted at, the Acquired Location, prior to Closing. For the avoidance of doubt, neither Purchaser nor any Purchaser Assignee is assuming hereunder and neither Purchaser nor any Purchaser Assignee shall have Liability to any party for any Taxes that are attributable to Taxable periods (or portions thereof) ending on or prior to the Closing Date.

2.5    Non-Transferable Contracts and Permits. Notwithstanding anything to the contrary in this Agreement, to the extent delivery of notice to or obtainment of consent from, as applicable, the counterparty to or issuer of any Acquired Agreement or Permit in order to comply with the requirements or prevent the results, as applicable, described in Section 3.3(a)(iv) (the "Required Consents") has not been satisfied as of the Closing, this Agreement shall not constitute an agreement to assign or transfer such Acquired Agreement or Permit or any claim or right or any benefit or obligation thereunder or resulting therefrom. If such Required Consent has not been satisfied or if an attempted assignment or transfer is ineffective or prohibited, Seller shall use commercially reasonable efforts to (i) obtain such applicable consent or deliver such notice as soon as practicable after the Closing at no additional cost to Purchaser or any Purchaser Assignee; provided that, for the avoidance of all doubt, in no event shall Seller be obligated to pay any consideration or initiate or join in any lawsuit or other proceeding in order to obtain such consent, and (ii) cooperate with Purchaser and any Purchaser Assignee in any reasonable arrangement requested and approved by Purchaser or any Purchaser Assignee to provide for Purchaser or the applicable Purchaser Assignee all of the benefits under any such Acquired Agreement or Permit. In connection with any such arrangement, (i) Purchaser or the applicable Purchaser Assignee shall bear the expense of structuring and implementing the arrangement and (ii) Purchaser or the applicable Purchaser Assignee shall honor Seller's commitments set forth in any such Acquired Agreement or Permit to the extent arising following the close of business on the Closing Date in connection with Purchaser's or the applicable Purchaser Assignee's use of any such Acquired Agreement or Permit that is the subject of such arrangement (or assets or rights relating thereto).

2.6    Apportionments. Except with respect to any Cure Costs, to the extent the following costs and expenses (and credits therefor to the extent paid prior to the Closing Date) of the Business relate to an Acquired Agreement, in each case, for a period that begins prior to the Closing Date and ends after the Closing Date, such costs and expenses are to be apportioned between Seller, on the one hand, and Purchaser, on the other hand, as of the Closing Date: (a) a portion of monthly rent for the number of days remaining, as of the Closing Date, in the month during which Closing occurs, (b) annual utility assessments, water meter charges, and sewer rents, if any, on the basis of the year for which assessed, and (c) charges and fees payable for telephone services, water, heat, steam, electric power, gas, and other utilities, at the price charged by the suppliers, including any taxes thereon and based upon applicable meter readings, where available, made on or immediately prior to or immediately after the Closing Date. If, after apportioning the foregoing expenses, a party has borne more than its allocable share of such expenses, the other parties will promptly make the appropriate compensating payment(s) to such party.

2.7    Calculation and Payment of Purchase Price.

(a)     Deposit; Liquidated Damages. Prior to the execution and delivery of this Agreement, Purchaser has deposited into an escrow or trust account (the "Deposit Escrow") with Pachulski Stang, Ziehl & Jones LLP, counsel for the Seller ("Pachulski"), an amount equal to the Pre-Auction Deposit in immediately available, good funds of the United States of America (funds delivered in this manner are referred to herein as "Good Funds"). Concurrently with the mutual execution and delivery of this Agreement, Purchaser shall deposit an additional One Million Eight Hundred Thousand Dollars ($1,800,000) in Good Funds into the Deposit Escrow, bringing the total amount held in the Deposit Escrow to an amount equal to the Deposit. Purchaser and Seller shall cause the Deposit (and any interest accrued thereon) to be distributed as follows (i) if the Closing occurs, the Deposit (and any interest accrued thereon) shall be delivered to Seller (pursuant to Section 2.7(b)) and credited and applied toward payment of the Purchase Price at the Closing, (ii) if this Agreement is terminated by Seller pursuant to Section 8.1(c) or Section 8.1(e), the Deposit (and any interest accrued thereon) shall be deposited by Pachulski in the account(s) designated in writing by Seller, and (iii) if this Agreement is terminated other than pursuant to Section 8.1(c) or Section 8.1(e), the Deposit (and any interest accrued thereon) shall be returned to Purchaser. For the avoidance of doubt, if the Auction shall not have been held, conducted, and concluded ("Auction Completion") on or before June 11, 2021 or if this Agreement is not duly executed and delivered by the Seller and Holdings on or before June 11, 2021, notwithstanding anything to the contrary herein or otherwise, Purchaser, in its sole and absolute discretion, shall have the option to revoke the binding and irrevocable nature of this Agreement and terminate this Agreement upon written notice given to Seller prior to Auction Completion and, in such event, Purchaser shall be entitled to a full refund of the Deposit (and any interest accrued thereon) from Pachulski in accordance with directions and instructions given by Purchaser, and Seller and Holdings expressly acknowledge and agree to the foregoing.

(b)     Payment at Closing. On the Closing Date, subject to the satisfaction of the conditions set forth herein, Purchaser shall (i) cause Pachulski to deliver the Deposit (together with all accrued interest thereon) to Seller, and (ii) pay and deliver (or cause to be paid and delivered), in Good Funds, to Seller an aggregate amount equal to (A) the Closing Cash Consideration, *plus* (B) the L/C Consideration, *minus* (C) any amounts drawn under any Acquired L/C as of the Closing but only to the extent not replenished prior to Closing, *plus* or *minus* (as applicable) (D) the amount, if any, by which the Estimated Closing Net Working Capital as of the Closing Date is greater than or less than, as applicable, the Target Closing Net Working Capital, *plus* or *minus* (as applicable) (E) without duplication of any amount taken into account in calculating the Net Working Capital or the Purchase Price, Seller's applicable portion of the Tax Prorations and Non-Tax Prorations (the aggregate amount of the foregoing clauses (A) through (E), collectively, the "Closing Payment"), *minus* (F) the Adjustment Fund Amount, *minus* (G) the amount of the Deposit (together with all accrued interest thereon), which aggregate amount Purchaser shall pay and deliver (or cause to be paid and delivered) to Seller in Good Funds by wire transfer in accordance with written wire instructions provided by Seller to Purchaser not later than two (2) Business Days prior to Closing.

(c)     Adjustment Fund Amount. On the Closing Date, Purchaser shall deposit or cause to be deposited to the Escrow Holder by wire transfer of immediately available funds, the Adjustment Fund Amount, to be held in an escrow account (together with any earnings thereon,

less any losses or disbursements therefrom, the "<u>Adjustment Fund</u>"), and held and distributed by the Escrow Holder in accordance with the terms of this Agreement and the Escrow Agreement.

(d)    <u>Escrow Holder Fees</u>. On the Closing Date, Purchaser shall pay or cause to be paid by wire transfer of immediately available funds pursuant to the wire instructions designated by the Escrow Holder, the total amount of expenses, fees, and disbursements payable to the Escrow Holder under the Escrow Agreement.

(e)    <u>Estimated Purchase Price</u>. Not less than five (5) Business Days prior to the Closing Date, Seller shall in good faith and in prior consultation with Purchaser prepare and deliver to Purchaser a good faith estimated calculation of the Closing Payment (the "<u>Estimated Purchase Price</u>") and all components thereof, including the Net Working Capital of Seller as of the Closing Date. Seller's calculation of the Estimated Purchase Price shall be made in accordance with the methodology (the "<u>Applicable Methodology</u>") set forth in <u>Exhibit 2.7(e)</u> hereto (the "<u>Target Closing Net Working Capital Calculation Statement</u>"). In connection with such consultation between Seller and Purchaser, the Estimated Purchase Price will be revised before the Closing to the extent necessary to take into account Purchaser's reasonable comments.

(f)    <u>Closing Purchase Price</u>. Within sixty (60) days after the Closing Date, Purchaser shall prepare (again, utilizing the Applicable Methodology) and deliver to Seller a good faith estimated calculation of the Purchase Price (the "<u>Closing Purchase Price</u>") and all components thereof, including the Net Working Capital of Seller as of the Closing Date. Seller will have reasonable access to all work papers and books and records of the Business used by Purchaser in its calculation of the Closing Purchase Price.

(g)    <u>Dispute Notice</u>. Purchaser's determination of the Closing Purchase Price will be final, conclusive and binding on Purchaser and Seller unless Seller provides a written notice (a "<u>Dispute Notice</u>") to Purchaser no later than the fifteenth (15th) day after delivery of Purchaser's calculation of the Closing Purchase Price setting forth in reasonable detail (i) any item of Purchaser's calculation of the Closing Purchase Price which Seller believes has not been prepared in accordance with this Agreement (an "<u>Item of Dispute</u>") and (ii) the correct amount of such Item of Dispute in accordance with this Agreement. Any item or amount to which no dispute is raised in a timely fashion under the Dispute Notice will be final, conclusive and binding on Purchaser and Seller.

(h)    <u>Resolution of Disputes</u>. If any Item of Dispute remains unresolved for a period of fifteen (15) days after Purchaser's receipt of the Dispute Notice, either Purchaser or Seller may submit the remaining Items of Dispute to BDO or another mutually agreeable nationally recognized certified public accounting firm with no preexisting material relationship with Purchaser or Seller (the "<u>Independent Auditor</u>"). Purchaser and Seller shall request that the Independent Auditor render a determination (which determination shall be solely based on whether the Item of Dispute was prepared in accordance with the terms of this <u>Section 2.7</u> or whether a mathematical error was made) as to each unresolved Item of Dispute within fifteen (15) Business Days after its retention, and Purchaser and Seller shall cooperate in all reasonable respects with the Independent Auditor so as to enable it to make such determination as quickly and as accurately as practicable. The Independent Auditor's determination as to each Item of Dispute shall be (i) based solely on presentations by Purchaser and Seller which are in

accordance with the guidelines and procedures set forth in this Agreement (i.e., not on the basis of an independent review), (ii) in writing and (iii) conclusive and binding upon Purchaser and Seller, and the Closing Purchase Price shall be modified to the extent necessary to reflect such determination. The Independent Auditor shall consider only the remaining Items of Dispute and the Independent Auditor may not assign a value to any Item of Dispute greater than the greatest value assigned by Purchaser, on the one hand, or Seller, on the other hand, or less than the smallest value for such item assigned by Purchaser, on the one hand, or Seller, on the other hand. The costs and expenses of the Independent Auditor shall be borne by Seller, on the one hand, and Purchaser, on the other hand, in inverse proportion as they may prevail on matters resolved by the Independent Auditor, which proportionate allocations shall also be determined by the Independent Auditor at the time the determination of the Independent Auditor is rendered on the merits of the matters submitted. The Independent Auditor will act as an expert and not as an arbitrator.

(i)     Final Purchase Price Adjustment. The final Closing Purchase Price as finally determined pursuant to Section 2.7(f), if there is no dispute, or Section 2.7(g) and Section 2.7(h), if there is a dispute, is referred to as the "Final Purchase Price." If the Final Purchase Price exceeds the Estimated Purchase Price (such excess amount, the "Excess Amount"), then (i) within five (5) Business Days of the determination of the Final Purchase Price, Purchaser and Seller will deliver a joint written instruction, in accordance with the Escrow Agreement, to the Escrow Holder instructing the Escrow Holder to disburse to Seller the entire balance in the Adjustment Fund, and (ii) Purchaser shall within five (5) Business Days of the determination of the Final Purchase Price pay to Seller the Excess Amount (but in no event more than an amount equal to the amount of the Adjustment Fund Amount).  If the Final Purchase Price is less than the Estimated Purchase Price (such shortfall amount, the "Deficiency Amount"), then (i) if the Deficiency Amount is less than the Adjustment Fund, then, within five (5) Business Days of the determination of the Final Purchase Price, Purchaser and Seller will deliver to the Escrow Holder a joint written instruction, in accordance with the Escrow Agreement, instructing the Escrow Holder to disburse (A) to Purchaser a portion of the Adjustment Fund equal to the Deficiency Amount and (B) to Seller the remaining portion of the Adjustment Fund, and (ii) if the Deficiency Amount is equal to or greater than the Adjustment Fund, then within five (5) Business Days of the determination of the Final Purchase Price, Purchaser and Seller will deliver to the Escrow Holder a joint written instruction, in accordance with the Escrow Agreement, instructing the Escrow Holder to disburse the entire balance in the Adjustment Fund to Purchaser. Any payments made pursuant to this Section 2.7(i) will be treated as an adjustment to the Final Purchase Price, unless otherwise required by Applicable Law.  For the avoidance of all doubt, Purchaser hereby acknowledges that its right to receive amounts from the Adjustment Fund as and when provided in this Section 2.7(i) shall be Purchaser's sole recourse against Seller in connection with any adjustment of the Purchase Price pursuant to the provisions of this Section 2.7.

(j)     Purchase Price Allocation. Within thirty (30) days after the determination of the Final Purchase Price, Purchaser shall prepare or cause to be prepared and delivered to Seller an allocation of the Final Purchase Price (and any other items constituting consideration for Tax purposes) among the Purchased Assets in accordance with Section 1060 of the Code and the Treasury Regulations thereunder (the "Proposed Allocation"). Seller will have fifteen (15) Business Days following delivery of the Proposed Allocation during which to notify Purchaser in

writing of any objections to such allocation, setting forth in reasonable detail the basis of its objections. If Seller fails to deliver such objections in accordance with this <u>Section 2.7(j)</u>, then the Proposed Allocation will be conclusive and binding on all parties and will become the "<u>Final Allocation Statement</u>". If Seller submits any objections in accordance with this <u>Section 2.7(j)</u>, then for fifteen (15) Business Days (subject to extension upon the mutual agreement of the parties) after the date Purchaser receives such objections, Purchaser and Seller will work in good faith and use their commercially reasonable efforts to resolve all such objections and agree on the allocation. In the event that the parties are not able to resolve all such objections within such fifteen (15) Business Day period (or such longer period as mutual agreed upon by the parties), then the Proposed Allocation shall be amended to reflect all undisputed items to which the parties have agreed and all disputed items will be resolved in the manner described in <u>Section 2.7(h)</u>. Seller and Purchaser acknowledge that the allocation of the Purchase Price set forth in the Final Allocation Statement shall be binding upon the parties for all applicable federal, state, local and foreign Tax purposes. Seller and Purchaser covenant (i) to revise the allocation in accordance with this <u>Section 2.7(j)</u> to reflect any adjustments to the Purchase Price, (ii) to report gain or loss or cost basis, as the case may be, in a manner consistent with such allocation, (iii) to prepare and file, and cause their respective Affiliates to prepare and file, their Tax Returns, including Internal Revenue Service Form 8594, on a basis consistent with the allocation, (iv) not to voluntarily take any position inconsistent therewith for federal, state or local income Tax purposes, including in any proceeding relating to Tax Returns, (v) to use commercially reasonable efforts to sustain such allocation in any subsequent Tax audit or Tax dispute, and (vi) not to permit any Affiliates from otherwise acting in a manner inconsistent with this <u>Section 2.7(j)</u>.

2.8     <u>Closing</u>.

(a)     The Closing shall take place on the date that is three (3) Business Days after the satisfaction or waiver of the conditions precedent set forth in <u>ARTICLE VI</u> and <u>ARTICLE VII</u> (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at or prior to the Closing) or on such other date, and at such time and place, as may be agreed by Purchaser and Seller; <u>provided</u>, <u>however</u>, that the date of the Closing shall be automatically extended from time to time for so long as any of the conditions set forth in <u>ARTICLE VI</u> and <u>ARTICLE VII</u> shall not be satisfied or waived, subject, however, to the provisions of <u>Section 8.1</u>. The date on which the Closing occurs in accordance with the preceding sentence is referred to in this Agreement as the "<u>Closing Date</u>."

(b)     At the Closing, Seller shall deliver the following documents and other items to Purchaser:

(i)     a bill of sale and assignment and assumption agreement in the form attached hereto as <u>Exhibit 2.8(b)(i)</u> (the "<u>Bill of Sale, Assignment and Assumption</u>") duly executed by Seller;

(ii)     an assignment of the Acquired Intellectual Property Rights in the form attached hereto as <u>Exhibit 2.8(b)(ii)</u> (the "<u>IP Assignment</u>");

(iii)     a certificate of Seller, dated as of the Closing Date, as to the satisfaction of the conditions set forth in <u>Section 6.1</u>, <u>Section 6.2</u>, and <u>Section 6.6</u>;

(iv)     a certified copy of the Sale Order as entered by the Bankruptcy Court, vesting the Purchased Assets in Purchaser free and clear of any Liens (except for Permitted Post-Closing Encumbrances), and a certified copy of the docket for the period following entry of the Sale Order and through the date immediately prior to the date of the Closing;

(v)     a certificate of non-foreign status of Seller (or, if such Seller is disregarded for U.S. federal income tax purposes, its regarded owner(s)) meeting the requirements of Treasury Regulations Section 1.1445-2(b)(2);

(vi)     a lease assignment and assumption agreement for each of the Acquired Real Property Leases in the form attached hereto as Exhibit 2.8(b)(vi) (each a "Real Property Lease Assignment and Assumption Agreement") duly executed by the Seller and dated as of the Closing Date;

(vii)     a certificate of the Secretary or an Assistant Secretary of the Seller certifying as to the incumbency and signatures of the executing officers of the Seller;

(viii)     the Holdings Assignment, duly executed by Holdings; and

(ix)     such other instruments and documents as may be reasonably requested by Purchaser at least five (5) Business Days prior to Closing in order to consummate the transactions contemplated under this Agreement.

(c)     At the Closing, Purchaser or any applicable Purchaser Assignee shall deliver the following documents and other items to Seller:

(i)     the amount payable to Seller at the Closing described in Section 2.7(b)(ii) pursuant to the payment procedures described in Section 2.7;

(ii)     duly executed counterparts of each of the Related Agreements;

(iii)     a certificate of Purchaser, dated as of the Closing Date, as to the satisfaction of the conditions set forth in Section 7.1 and Section 7.2;

(iv)     a certificate of the Secretary (or other authorized officer) of Purchaser certifying as to the incumbency and signatures of the executing officers of the Purchaser; and

(v)     such other instruments and documents as may be reasonably requested by Seller at least five (5) Business Days prior to Closing in order to consummate the transactions contemplated under this Agreement.

2.9     Addition/Removal of Acquired Agreements and Permits.  Purchaser may, in its sole discretion, add any Contract, permit or license to (or remove any Contract, permit or license from) the Contracts, permits and licenses included in the Acquired Agreements and Permits up to the date that is three (3) days prior to the date of the Closing; provided, however, in no event shall Purchaser have the right to add (and the Acquired Agreements shall not include) any

Contract between Seller and WC of Texas existing as of the date hereof. The Seller shall comply with the terms of the Bid Procedures Order and the Notice of Proposed Assumption and Assignment of Designated Executory Contracts and Unexpired Leases Docket No. 269 with respect to all such added or removed Contracts, permits, and licenses. Any removal or addition of Contracts, permits, or licenses pursuant to this <u>Section 2.9</u> shall have no effect upon the Purchase Price payable to Seller hereunder.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants as of the date hereof and as of the Closing to Purchaser and any Purchaser Assignee that, except as set forth in the Disclosure Schedule:

3.1 <u>Due Incorporation</u>. Seller is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, and, subject to the limitations imposed on Seller as a result of having filed a petition for relief under the Bankruptcy Code, has the requisite power and authority to (a) enter into this Agreement and its Related Agreements and to consummate the transactions contemplated hereby and thereby and (b) own, lease, hold and operate and use the assets and properties owned, leased, held or operated by it and to carry on its business as it is currently conducted. Seller is duly qualified or licensed and in good standing to do business in each jurisdiction in which the property owned, leased, held or operated by it or the nature of its business makes such qualification or licensing necessary for the operation of the Business as now conducted, except where the failure to be so qualified, licensed or in good standing has not been, and would not reasonably be expected to be, material to the Business or the Purchased Assets.

3.2 <u>Due Authorization</u>. Subject to entry of the Sale Order, the execution, delivery and performance by Seller of this Agreement and the Related Agreements has been duly and validly approved on behalf of the Board of Directors of Holdings and the managing member of Seller and no other corporate or entity actions or proceedings on the part of Seller are necessary to authorize this Agreement, Seller's Related Agreements and the transactions contemplated hereby and thereby. Seller has duly and validly executed and delivered this Agreement and has duly and validly executed and delivered (or prior to or at the Closing will duly and validly execute and deliver) its Related Agreements. Subject to entry of the Sale Order, (i) this Agreement constitutes the legal, valid and binding obligation of Seller and (ii) Seller's Related Agreements, upon execution and delivery by Seller, will constitute legal, valid and binding obligations of Seller, in each case, enforceable in accordance with their respective terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, moratorium, reorganization or similar laws in effect which affect the enforcement of creditors' rights generally and by equitable principles.

3.3 <u>Consents and Approvals; Governmental Authority Relative to This Agreement</u>.

(a) Except as set forth in <u>Section 3.3(a)</u> of the Disclosure Schedule, the execution, delivery and performance by Seller of this Agreement and its Related Agreements, the consummation of the transactions contemplated hereby and thereby, and compliance by Seller with any of the provisions hereof and thereof, subject to entry of the Sale Order, (a) will not

result in the creation of any Lien upon any of the Purchased Assets that is not extinguished pursuant to the Sale Order and (b) are not prohibited by, do not conflict with, and will not result in any breach or violation of or default (with or without notice or lapse of time, or both), require a Consent, result in the loss of any material benefit under, require payment pursuant to, or give rise to a right of acceleration, termination, cancellation, modification or loss of benefits under (i) any provision of the certificate of formation or operating agreement (or similar organizational or governance document) of Seller, (ii) any Permit, Order, or Applicable Law, or (iii) any Acquired Agreement or Permit, other than, in the case of clause (i) and (ii) above, as would not reasonably be expected to be material to the Business.

(b)     No consent, waiver, approval, Order, permit, or authorization of, or declaration or filing with, or notification to, any Person or Governmental Authority is required on the part of Seller in connection with the execution and delivery of this Agreement or any Related Agreement, the compliance by Seller with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby or the taking by Seller of any other action contemplated hereby or thereby, except for the entry of the Sale Order.

3.4     Compliance With Laws.

(a)     Except as otherwise set forth on Section 3.4 of the Disclosure Schedule, Seller is and has been operating the Business in compliance in all material respects with all Applicable Laws.

(b)     For the past five (5) years (or, if a shorter period, since formed) Seller has owned and operated the Purchased Assets in accordance, in all material respects, with all Applicable Law, Order, and Permits applicable to Seller and the Purchased Assets during such period, and the Business is in compliance in all material respects with all Applicable Law, Order, and Permits (including any export control or any anti-bribery law) and has obtained all approvals necessary for owning and operating the Purchased Assets and the Business and has made all necessary filings with all Governmental Bodies having jurisdiction necessary for owning and operating the Purchased Assets and the Business.

(c)     Except as otherwise set forth on Section 3.4 of the Disclosure Schedule, neither Seller nor, to the Knowledge of Seller, any of its Representatives have received within the past five (5) years any written notice or other communication from any Person that alleges that the Purchased Assets or the Business is not in compliance with any Applicable Law, Order, or Permit or that threatens or states the intention on the part of any issuing Governmental Authority to revoke, cancel, suspend, or modify any material Permit necessary for the ownership, construction, and operation or conduct of the Business and the Purchased Assets (except with respect to regular periodic expirations and renewals thereof). Seller has not had any material Permits that are necessary for the current operation and conduct of the Business and the Purchased Assets appealed, denied, revoked, restricted, or suspended during the past five (5) years, and Seller is not currently a party to any proceedings involving the possible appeal, denial, revocation, restriction, modification, or suspension of any material Permits that are necessary for the current operation and conduct of the Business and the Purchased Assets or any of the privileges granted thereunder (except where the obligation to hold such a Permit is being

contested in good faith by appropriate proceedings diligently conducted or is excused by the Bankruptcy Court).

(d)     Neither Seller nor any director, manager, officer, agent, employee, or other Person acting on behalf of Seller has (i) given or agreed to give any gift or similar benefit of more than nominal value to any customer, supplier, or governmental employee or official or any other Person who is or may be in a position to help or hinder such party or assist such party in connection with any proposed transaction, which gift or similar benefit, if not given in the past, might have materially and adversely affected the business of such party, or that, if not continued in the future, might materially and adversely affect the business of such party, and no future business with any customer is dependent upon the making of any such gift or similar payment, (ii) created or used any "off-book" bank or cash account or "slush fund", in each case that would violate any Applicable Law, or otherwise engaged in any conduct constituting a violation of the Foreign Corrupt Practices Act of 1977, or (iii) used any corporate or other funds for unlawful contributions, payments, gifts, or entertainment, or made any unlawful expenditures relating to political activity to government officials or others or established or maintained any unlawful or unrecorded funds. Neither Seller nor any director, manager, officer, agent, employee, or other Person acting on behalf of Seller has accepted or received any unlawful contributions, payments, gifts, or expenditures. Without limiting the foregoing, (i) there are no pending internal or external allegations or investigations into actual or alleged material violations of the anti-corruption or anti-money laundering laws and regulations by Seller and (ii) Seller is not and has not submitted any disclosures to any Governmental Authority with respect to any such violations or encountered or identified any issues, or to the extent notified to Seller, been the subject of any inquiry, investigation, or enforcement Claims by a Governmental Authority relating to any anti-corruption or anti-money laundering laws.

(e)     In connection with the conduct of the Business, Seller is in compliance in all material respects with the International Emergency Economic Powers Act, the International Traffic in Arms Regulations, the Export Administration Regulations, the Export Control Reform Act, the laws, regulations, and orders administered by the U.S. Department of Treasury's Office of Foreign Assets Control ("OFAC"), the Applicable Laws relating to anti-boycott requirements administered by the U.S. Department of Commerce and the U.S. Department of the Treasury, and any other Applicable Laws and Orders governing the export, re-export, or transfer of items, materials, technology, services, or data (collectively, the "Export Control Laws"). Without limiting the foregoing, in connection with the Business: (i) neither Seller, nor any of its respective directors, officers, employees, or any Person acting for, at the direction, or on behalf of Seller: (A) is designated on, or is 50% or more owned, directly or indirectly, individually or in the aggregate, or is controlled, by any party that has been or is designated on, any list of restricted parties maintained by any Governmental Authority, including OFAC's Specially Designated Nationals and Blocked Persons List, OFAC's list of Foreign Sanctions Evaders, OFAC's Sectoral Sanctions Identifications List, Commerce's Denied Persons List, the Commerce Entity List, and the Debarred List maintained by the U.S. Department of State ("Sanctioned Person") or (B) engaged in any dealings or transactions with any Sanctioned Person or in any country or region that is, or has been during the last five (5) years, the subject or target of a comprehensive embargo under Export Control Laws (including Cuba, Iran, North Korea, Sudan, Syria, Venezuela, and the Crimea region of Ukraine), to the extent such activities violate applicable Export Control Laws, (ii) Seller has obtained in a timely manner all material

export licenses, authorizations, and permits from, and has made and filed all necessary material permits and material filings with, any Governmental Authority ("Export Approvals"), (iii) Seller has been and is in compliance in all material respects with the terms of all applicable Export Approvals, and (iv) there are no pending or threatened Claims involving Seller in connection with the Business with respect to Export Approvals or Export Control Laws that would reasonably be expected to be material, individually or in the aggregate, to the Business.

(f)    Seller is and has been in compliance in all material respects with the customs and import Applicable Laws, including Applicable Laws administered by U.S. Customs and Border Protection ("Import Control Laws"). Seller in connection with the Business has not made or provided any material false statement or omission to any Governmental Authority or to any purchaser of products, in connection with the importation of items, the valuation or classification of imported items, the duty treatment of imported items, the eligibility of imported items for favorable duty rates or other special treatment, country-of-origin marking, North American Free Trade Agreement certificates, marking and labeling requirements, other statements or certificates concerning origin, quota or visa rights, export permits or other export authorizations, or U.S.-content requirements or other Permits required by a foreign Governmental Authority.

(g)    Seller has not received from any Governmental Authority any written notice, inquiry, or internal or external allegation, made any voluntary or involuntary disclosure to a Governmental Authority, or conducted any internal investigation or audit concerning any actual or potential violation or wrongdoing related to Export Control Laws or Import Control Laws.

(h)    Seller is not a "TID U.S. business" under 31 C.F.R. §800.248, as defined under the referenced regulations in effect at the time of the Closing.

3.5    Litigation.    Except (i) for the general pendency of the Bankruptcy Case and related Claims that would not reasonably be expected to be, individually or in the aggregate, material to the Business or the Purchased Assets and (ii) for the Claims described in Section 3.5 of the Disclosure Schedule: (a) there are no, and within the past five (5) years there have not been any, Claims pending or threatened in writing against Seller or the Purchased Assets, whether at law or in equity, whether civil or criminal in nature or by or before any arbitrator or Governmental Authority, nor, to the Knowledge of Seller, are there any investigations relating to the Business pending or, to Knowledge of the Seller, threatened in writing by or before any arbitrator or any Governmental Authority, which would reasonably be expected to be material to the Business or the Purchased Assets and (b) there is no Order to which Seller is a party, which affects the Business or any Purchased Assets, or that prohibits or otherwise restricts the ability of Seller or any of its Affiliates to consummate fully the transactions contemplated by this Agreement or any other Related Agreements.

3.6    Certain Financial Information.

(a)    Attached to Section 3.6(a) of the Disclosure Schedule are true and complete copies of (i) the audited, consolidated balance sheets of Holdings and its Subsidiaries as of December 31, 2018 and December 31, 2019 and the related audited consolidated statements

of operations and non-controlling interest, members' deficit, and cash flows for the years then ended and (ii) the unaudited, consolidated balance sheet of Holdings and its Subsidiaries as of December 31, 2020 and the related unaudited consolidated statement of operations for the year then ended (the financial statements referred to in the immediately preceding clauses (i) and (ii), the "Financial Statements"). The Financial Statements (i) have, except for those relating to the period ending December 31, 2020, been prepared in accordance with GAAP applied on a consistent basis throughout all of the periods covered by the Financial Statements, (ii) present fairly, in all material respects, the financial condition and results of operations of Holdings and its Subsidiaries covered by the particular Financial Statements at the respective dates and for the respective periods described above and (iii) have been prepared from, and are consistent with, the books and records of Holdings and its Subsidiaries.

(b)     Except for liabilities (i) reflected or reserved against on the Schedules of Assets and Liabilities for CarbonLite Recycling, LLC, as filed with the Bankruptcy Court on April 5, 2021(as such schedules have been modified or amended), or (ii) disclosed on Section 3.6(b) of the Disclosure Schedule and/or in claims filed by creditors of Sellers in the Bankruptcy Cases and/or in claims filed by creditors of the Seller in the Bankruptcy Cases, Seller does not have any material liabilities, other than (x) liabilities that have been incurred in the Ordinary Course since the commencement of the Bankruptcy Case and which are included in the Final Purchase Price, or (y) contractual liabilities incurred in the Ordinary Course that are not material and, in the case of clauses (x) and (y), none of which is a liability for breach of Contract, breach of representation or warranty, violation of Applicable Law, tort or infringement by Seller.

(c)     All Acquired Receivables resulted from bona fide sales in the Ordinary Course and represent the genuine, valid, undisputed, and legally enforceable claims of the Business not subject to claims of set-off or other defenses or counterclaims other than normal cash discounts accrued in the Ordinary Course.  Section 3.6(c) of the Disclosure Schedule sets forth a true and complete list of (i) all Accounts Receivable that are more than thirty (30) days past due as of the date hereof and (ii) all Accounts Receivable that have been outstanding for one hundred and twenty (120) days or more as of the date hereof. To the Knowledge of Seller, all Acquired Receivables are collectible in full within ninety (90) days after billing.

(d)     The Acquired Inventories are in all material respects (a) free of any material defect or deficiency, (b) in good, usable, and currently marketable condition in the Ordinary Course (subject, in the case of raw materials and work-in-process, to the completion of the production process), (c) of a quality and quantity usable and salable in the Ordinary Course, and (d) properly stated on the books and records of Seller at the lesser of cost and fair market value, with adequate obsolescence reserves, all as determined in accordance with GAAP. Since March 31, 2021, there have not been any material write-downs of the value of, or establishment of any reserves against, any Acquired Inventories, except for write-downs and reserves in the Ordinary Course. No Acquired Inventory is held on a consignment basis.  All Acquired Inventories are located at the Acquired Location or are in transit thereto.

(e)     Each Acquired L/C is a validly issued and outstanding standby letter of credit that is in full force and effect. Each Acquired L/C has been cash collateralized in a manner satisfactory to the issuer of such Acquired L/C. Schedule 2.1(m) accurately lists the amounts of cash collateral posted for each Acquired L/C.  Except as set forth on Section 3.6(e) of the

Disclosure Schedule, no amounts are currently drawn under any Acquired L/C, and the Seller has not received a draw request from any Acquired L/C beneficiary.

(f)     Section 3.6(f) of the Disclosure Schedule accurately lists the amounts of the Prepaid Assets as of the execution of this Agreement and Seller's reasonable good faith estimate of the items and amounts of the Cure Costs and the Tax Prorations.

(g)     Section 3.6(g) of the Disclosure Schedule sets forth a true and complete list of all capital leases secured by any of the Purchased Assets (the "Capital Lease Obligations").

3.7     Real Property.

(a)     Seller does not hold fee title to any real property used or held for use in the Business.  Section 3.7(a) of the Disclosure Schedule sets forth a complete and correct list of all of the real property leased by Seller, and Seller enjoys peaceful and undisturbed possession of the Acquired Location.  Seller has not granted any options with respect to the purchase of any Acquired Location or any portion thereof or any other unexpired rights in favor of third Persons to purchase or otherwise acquire a leasehold interest in any Acquired Location or any portion thereof.  Except as set forth on Section 3.7(a) of the Disclosure Schedule, (i) none of the Seller nor, to the Knowledge of Seller, any other party to the Acquired Real Property Leases are in material default under the Acquired Real Property Leases, (ii) no written notice of any material default under the Acquired Real Property Leases, which default remains uncured, has been sent or received by Seller, (iii) no conditions or circumstances exist which, with the lapse of time or the giving of notice, or both, would constitute a material default or breach under the Acquired Real Property Leases, and (iv) there have been no draws in whole or part under any Acquired L/Cs, letters of credit, and/or cash deposits constituting security for any Acquired Real Property Lease affecting any Acquired Location. Seller has not leased, subleased, assigned, licensed or otherwise granted to any Person the right to use or occupy any portion of any Acquired Location. Except for collateral assignments and security interests that will be extinguished at Closing pursuant to the Sale Order, Seller has not collaterally assigned or granted any other security interest in any Acquired Real Property Lease.

(b)     Except for Liens that will be extinguished at Closing pursuant to the Sale Order or otherwise satisfied at Closing, Seller has valid leasehold interests in and exclusive possession of each parcel of the Acquired Locations free and clear of all Liens, other than Permitted Post-Closing Encumbrances.  Section 3.7(b) of the Disclosure Schedules lists each executory Contract providing for any material repairs, work, and/or capital improvements at any of the Acquired Locations.  There are no material structural defects (whether latent or patent) relating to any Acquired Location, and there is no material physical damage to any Acquired Location for which there is no insurance in effect.

3.8     Material Contracts.

(a)     The Acquired Contracts constitute all material Contracts to which Seller is a party and all material Contracts related to the Business. Section 3.8 of the Disclosure Schedule contains a true and complete list of all of the following types of Contracts, including Contracts to

which the Seller or any of its Affiliates is a party or bound, in each case (i) relating to the Business or (ii) by which any of the Purchased Assets are bound or affected (each Contract listed, and each Contract that should be listed, on Section 3.8 of the Disclosure Schedule being referred to as a "Material Contract"), a complete and correct copy of which (as in effect on the date hereof), and including all amendments, supplements, restatements, waivers, side letters, addenda, exhibits, schedules and modifications thereto, and summaries of any oral versions of same, has been furnished to Purchaser by Seller:

(i)  any Contract pursuant to which Seller leases any real property, including the Acquired Real Property Leases;

(ii)  any Contract (other than a purchase order) with a Key Customer or Key Vendor;

(iii)  any Contract for the distribution of products of the Business, including any dealer, representative, agency or similar Contract;

(iv)  any Contract with any Governmental Authority or any instrumentality of any such Governmental Authority;

(v)  any (A) employment and similar Contract with an officer or other member of management and (B) Contract with a consultant pursuant to which the Business is or could become obligated to make payments exceeding $100,000 per annum;

(vi)  any Contract involving a change of control or retention bonus, "stay bonus" or similar arrangement or providing for the grant or acceleration of any benefit payable to any Employee;

(vii)  any Contract entered into on or after January 1, 2020 between any current or former employee of Seller or its Affiliates or current or former consultant of the Seller or its Affiliates, on the one hand, and the Seller or its Affiliates, on the other hand, that restricts any such Person (A) from competing, directly or indirectly, with Seller, the Business or any other Person or (B) from soliciting or hiring current or former employees or customers of Seller, the Business or any other Person;

(viii)  any Acquired Agreement that includes a "most favored nation," "meet or release" or similar pricing and delivery arrangement or that includes a minimum volume commitment or any other similar performance or financial goal, or involves the payment by the Business of amounts that include "take or pay" requirements or output terms or similar pricing or delivery arrangements;

(ix)  any Acquired Agreement that restricts the ability of Seller or the Business to compete with any Person, engage in any business or operate in any geographical area;

(x)  any Acquired Agreement by which any material Intellectual Property Rights are (A) licensed by the Seller or its Affiliates to a third party or (B) licensed to Seller (other than Contracts that are shrink-wrap, click-wrap or other similar

non-negotiable terms granted to Seller for third-party software that are available to the general public as of the Closing Date);

(xi)     any performance bond or surety Contract;

(xii)    any Contract entered into since January 1, 2021 that settled any Claim for monetary payments to or by Seller or any of its Affiliates in excess of $100,000 or that involves any equitable or other non-monetary relief;

(xiii)   any collective bargaining, works council, shop, enterprise or recognition Contract; and

(xiv)    the Acquired Personal Property Leases.

(b)     With respect to each Material Contract and each Acquired Agreement: (i) such Material Contract or Acquired Agreement is the legal and valid obligation of the Seller and each other party thereto, and constitutes the binding and enforceable obligation of Seller and each other party thereto, in accordance with its terms; (ii) Seller is not, nor, to Seller's Knowledge, is any other Person, in breach or default thereunder and, except as otherwise set forth in <u>Section 3.8(b)</u> of the Disclosure Schedule, no condition exists or event has occurred (including any condition or event that with notice or lapse of time, or both) that would constitute a breach or default, or permit termination, modification in any manner materially adverse to the Business or the Purchased Assets or acceleration thereunder, or would cause the acceleration of any obligation of Seller or, to the Knowledge of Seller, any other party thereto or the creation of a Lien upon any Purchased Asset; (iii) no party has asserted in writing nor has (except by operation of law) any right to offset, discount or otherwise abate any amount owing under such Material Contract or Acquired Agreement; and (iv) no amendment or modification has been made thereto except those, if any, reflected in the copies previously furnished to Purchaser. There are no material disputes asserted in writing under any Material Contract or Acquired Agreement.

3.9     <u>Employees and Labor Matters</u>.

(a)     <u>Section 3.9(a)</u> of the Disclosure Schedule sets forth the following information for each current Employee (including each current Employee on leave of absence) and independent contractor, as applicable: employer; name; date of hire; location; job title or position; current compensation paid or payable; status as exempt or non-exempt under the Fair Labor Standards Act of 1938, as amended; full or part time status; visa status; current base salary or rate of pay; bonus compensation (if any) paid or payable for calendar year 2020 and 2021; accrued and unused vacation and other paid time-off; and leave status (including nature and duration of any leave).

(b)     To the Knowledge of Seller, no Employee is a party to, or is otherwise bound by, any agreement, including any confidentiality, noncompetition, or proprietary rights agreement, between such Employee and any other Person that in any way (i) adversely affects the performance of his or her duties as an Employee; (ii) adversely affects the ability of Seller, or could reasonably be expected to adversely affect the ability of Purchaser after the Closing Date,

to conduct the Business; or (iii) is being violated by virtue of the Employee's provision of services to Seller or its Affiliates.

(c)     Neither Seller nor any of its Affiliates is a party to, bound by, subject to or has any obligations under any current or expired collective bargaining agreement or other labor union Contract applicable to the Employees and there are not any activities or Claims of any labor union to organize any of the Employees nor has there ever been collective labor representation involving Seller.

(d)     The employment or other engagement of all Employees is terminable at will without, except as set forth on <u>Section 3.9(d)</u> of the Disclosure Schedule, any penalty or severance obligation of any kind on the part of the employer.  All sums due for employee compensation and benefits and all vacation time or paid time off owing to any Employees have been duly and adequately accrued on the accounting records of Seller.

(e)     Any individual who performs or performed services for Seller or any of its Affiliates and who is not treated as an employee for federal income tax purposes by such Seller or an Affiliate, as applicable, is not an employee under Applicable Laws or for any purpose, including, without limitation, for Tax withholding purposes or Benefit Plan purposes.

(f)     Seller has not effectuated (i) a "plant closing" (as defined in the WARN Act) in connection with the Business; or (ii) a "mass layoff" (as defined in the WARN Act) of individuals employed at or who primarily provided service to the Business.  Seller has heretofore made available to Purchaser a true and complete list of layoffs, by location, implemented by Seller since January 1, 2021.

(g)     Seller does not have any material Liability with respect to any Taxes (or the withholding thereof) in connection with any independent contractor that would result in any Liability to Purchaser.

(h)     Seller is in compliance in all material respects with all Applicable Laws related to COVID-19 in the workplace, including occupational health and safety laws, laws pertaining to confidentiality of employee medical information, and laws pertaining to sick leave or family and medical leave. Seller is and has been in compliance in all material respects with all applicable provisions of the Families First Coronavirus Response Act, including the provision of paid leave benefits required thereunder and any applicable recordkeeping requirements.

(i)     During the past five years there have not been (i) any allegations or formal or informal complaints made to or filed with Seller related to sexual harassment or sexual misconduct, (ii) any other claims initiated, filed or threatened against Seller related to sexual harassment or sexual misconduct, or (iii) any other allegations, formal or informal complaints or any other claims initiated, filed or threatened against any director, officer, employee, agent, or representative of Seller related to sexual harassment or sexual misconduct, in each case by or against any current or former director, officer or employee of Seller.

(j)     Seller has not (since January 1, 2020) nor does Seller intend to terminate or furlough any employee or independent contractor of Seller, or materially defer or reduce any employee's or independent contractor's compensation or work schedule, in each case, as a result

of COVID-19, whether due to unexpected economic downturn, government-imposed orders temporarily closing, reducing, or otherwise impacting the Business, or any other COVID-19-related business constraints.

(k)     There are no, and in the past five (5) years have not been any, (i) picketing actions, strikes, work stoppages, work slowdowns, lockouts, or other job actions pending or threatened against or involving Seller, or (ii) unfair labor practice charges, or any material grievances or complaints, pending or threatened by or on behalf of any Employee or former Employee of Seller. There are no, and in the past five (5) years have not been any, complaints, charges, or claims against Seller pending, brought, filed, or threatened with any Governmental Authority based on, arising out of, in connection with or otherwise relating to the employment or termination of employment or failure to employ by Seller, of any individual.

(l)     For the past five (5) years, Seller has been in compliance in all material respects with Applicable Law relating to labor and employment, including all Applicable Law relating to employment practices, discrimination, disability, equal employment opportunities, labor relations, wages and hours, the collection and payment of withholding and/or employment taxes, classification of independent contractors, immigration, workers' compensation, background and credit checks, working conditions, data privacy and data protection, occupational safety and health, and family and medical leave. Each of the Employees has all required work permits, visas or other authorizations required by Applicable Law for such Employee to be employed in the Employee's current position. There is no action, claim, proceeding or investigation pending, or to the Knowledge of Seller, threatened against or relating to Seller of any Affiliate of Seller with respect to any employment or labor matter with respect to the Business, and to the Knowledge of Seller no reasonable basis for any claim, proceeding or investigation exists

3.10    Benefit Plans.

(a)     Section 3.10(a) of the Disclosure Schedule sets forth an accurate and complete list of all Benefit Plans.  Seller has made available to Purchaser or its counsel a true and complete copy of all plan documents (including related trust agreements, funding arrangements, Form 5500s and insurance contracts and all amendments thereto) with respect to each Benefit Plan in which any Employees participate or are eligible to participate. No Benefit Plan has terms requiring assumption by Purchaser or its Affiliates. Seller does not have a legally binding plan, contract or commitment to create any new employee benefit or compensation plans, policies or arrangements for any Transferred Employee or, except as may be required by applicable Law, to modify any Benefit Plan. Seller has paid and discharged promptly when due all Liabilities arising under ERISA or the Code of a character which if unpaid or unperformed could result in the imposition of a Lien or any other claim against any of the Purchased Assets.

(b)     Each Benefit Plan has been established, funded, maintained and administered in all material respects in accordance with its terms, and in compliance with the applicable provisions of ERISA, the Code and other Applicable Law.  With respect to each Benefit Plan that is intended to qualify under Section 401(a) of the Code, Seller  has received a currently effective favorable determination, opinion or advisory letter with respect to such Benefit Plan and its related trust that has not been revoked and no circumstances exist and no

events have occurred that could adversely affect the qualified status of such Benefit Plan or the related trust. Seller has no obligation to provide retiree health or life insurance benefits except as may be required by Section 4980B of the Code and Section 601 of ERISA, any other Applicable Law or at the sole expense of the participant or the participant's beneficiary. No Benefit Plan that provides health insurance or medical coverage is self-funded or self-insured and all premiums that have become due have been paid in full.

(c)     Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will (either alone or in combination with another event) (i) result in any payment becoming due and payable from Seller, or increase the amount of any compensation due and payable from Seller, to any Employee, (ii) increase any benefits otherwise payable under any Benefit Plan, (iii) result in the acceleration of the time of payment or vesting of any compensation or benefits under any Benefit Plan, (iv) result in the triggering or imposition of any restrictions or limitations on the rights of Seller or any of its ERISA Affiliates to amend or terminate any Benefit Plan, or (v) result in any amount or benefit that may not be deductible by reason of Section 280G of the Code or that will be subject to an excise tax under Section 4999 of the Code (or any corresponding provision of state, local, or non-U.S. Tax law).

(d)     Each Benefit Plan that is or has ever been a "nonqualified deferred compensation plan" (as defined under Section 409A of the Code) has at all times complied with all applicable document requirements of, and been operated in compliance with, Section 409A of the Code.

(e)     Seller has not had any actual or anticipated changes to any Benefit Plan resulting from disruptions caused by COVID-19 or COVID-19 Measures, nor are any such changes currently contemplated.

(f)     Other than routine claims for benefits, no liens, lawsuits, or complaints to or by any Person or Governmental Authority are pending against any Benefit Plan or against Seller with respect to any Benefit Plan and, to the Knowledge of Seller, no such material liens, lawsuits, or complaints are threatened with respect to any Benefit Plan. There is no audit or investigation of any Benefit Plan by any Governmental Authority pending or to the Knowledge of Seller threatened. Seller has paid and discharged promptly when due all Liabilities due under each Benefit Plan.

(g)     All contributions or premium payments required by Applicable Law or by the terms of any Benefit Plan or any agreement relating thereto have been timely made (taking into account any waivers granted with respect thereto) to any funds or trusts established thereunder or in connection therewith or have been reflected on the applicable financial statements. There are no corrections, audits or proceedings initiated pursuant to the IRS Employee Plans Compliance Resolution System or similar proceedings pending with the IRS or Department of Labor with respect to any Benefit Plan.

(h)     Within the past three (3) years, there has been no "reportable event" (as defined in Section 4043 of ERISA and the regulations thereunder) with respect to any Benefit

Plan that is subject to Title IV of ERISA that would require the giving of notice to the PBGC under Section 4041(c)(3)(C) or 4063(a) of ERISA.

(i)    Neither Seller nor any other "party in interest" or "disqualified person" with respect to any Benefit Plan has engaged in a non-exempt "prohibited transaction" within the meaning of Section 406 of ERISA or Section 4975 of the Code involving such Benefit Plan which, individually or in the aggregate, could reasonably be expected to subject Purchaser or any of its Affiliates to Liability, tax or penalty imposed by Section 4975 of the Code or Sections 501, 502 or 510 of ERISA.

(j)    Neither Seller nor any of its ERISA Affiliates sponsored, was obligated to contribute within the past six (6) years to, currently sponsors, is obligated to contribute to, or has any Liability in respect of (i) an "employee pension plan", as defined in Section 3(2) of ERISA, subject to Title IV of ERISA or Section 412 of the Code (including any Multiemployer Plan), (ii) a "multiple employer plan" as defined in Section 413(c) of the Code, or (iii) a "multiple employer welfare arrangement" within the meaning of Section 3(40) of ERISA.

3.11    Permits.    Seller holds all of the material permits and licenses necessary for the current operation and conduct of the Business and the Purchased Assets in compliance with Applicable Law, the absence of which would be immaterial to the operation of the Business or the Purchased Assets from and after the Closing. The Permits set forth on Section 3.11 of the Disclosure Schedule are all of the permits or licenses held, or applied for, by Seller with respect to the ownership, construction, and maintenance of the Purchased Assets and the Acquired Location, and the operation and conduct of the Business, and as required, the application for renewal of such Permits has been timely made. Seller has made all filings and paid all fees and duties, in each case, necessary to maintain the Permits, each of which is valid and in full force and effect.  Except as otherwise set forth in Section 3.11 of the Disclosure Schedule, (i) Seller is in compliance in all material respects with all of the Permits, and no condition exists that with notice or passage of time or both would reasonably be expected to constitute a material default under any such Permits and (ii) Seller has not received any notice of any violation of any Permits or notice of any proposal to revoke, cancel, rescind, modify or refuse to renew any of such Permits.

3.12    Intellectual Property.

(a)    Section 3.12(a) of the Disclosure Schedule is a true and complete list of all (i) Patents; (ii) registered trademarks, service marks and trade names and those for which an application is pending; (iii) registered or applied for copyrights; and (iv) Internet domain names and social media accounts, in each case, owned or purported to be owned by Seller (items (i) through (iii), the "Registered Intellectual Property," together with all other Intellectual Property Rights owned or purported to be owned by each of the Seller, collectively the "Owned Intellectual Property"). Other than pending applications included in the Registered Intellectual Property, the Registered Intellectual Property is subsisting, valid and enforceable. Seller is not subject to any Order which (i) permits any third party to use any Owned Intellectual Property or restricts Seller's ability to enforce its rights with respect to such Acquired Intellectual Property Rights, (ii) that restricts or impairs its use of any Owned Intellectual Property, (iii) restricts Seller's business in order to accommodate any other Person's Intellectual Property Rights, or (iv)

requires any payment by Seller to any Person in connection with any Intellectual Property Rights of such Person. No Person has alleged in writing or in a Claim to which Seller is a party that any Owned Intellectual Property is not owned by Seller or that rights thereto are invalid or unenforceable.

(b)     Seller exclusively owns all right, title and interest in and to all Registered Intellectual Property and material Owned Intellectual Property, free and clear of all Liens (other than those which will be removed at the Closing, either by the effect of the Sale Order or otherwise by satisfaction thereof at the Closing). Seller has valid, subsisting and enforceable licenses to use all Seller Intellectual Property owned by any third party, including sufficient quantities of seat, server core, or other license units. Seller is in compliance in all material respects with all licenses, and all license fees, renewal fees and maintenance fees that have become due have been timely paid by Seller, including with respect to seat, server core or other unit license restrictions. The consummation of the transactions contemplated by this Agreement will not alter or impair the Acquired Intellectual Property Rights, other than such alterations and impairments which would not reasonably be expected to be material to the Business or the Purchased Assets.

(c)     Except as set forth in Section 3.12(c) of the Disclosure Schedule, (i) the operation of the Business as conducted as of the date hereof does not, and the services provided by Seller do not, infringe, misappropriate, or otherwise violate in any material respect, and have not infringed, misappropriated or otherwise violated in any material respect, the Intellectual Property Rights of any third party, and no third party is infringing, misappropriating, or otherwise violating the Owned Intellectual Property, (ii) neither Seller nor any of its Affiliates has received any written communication regarding any actual, alleged or suspected material infringement, misappropriation or other material violation of Intellectual Property Rights of a third party by Seller, and (iii) neither Seller nor any of its Affiliates has sent any written notice, charge, complaint, claim or other written assertion asserting or threatening to assert in any Claims against any Person regarding the material infringement, misappropriation, dilution or other material violation of any Owned Intellectual Property.

(d)     No current or former employee or officer of Seller and no current or former consultant or contractor of Seller has any right, title or interest in or to any material Seller Intellectual Property. No funding, facilities or personnel of any Governmental Authority or academic or research institution were used to develop or create, in whole or in part, any Owned Intellectual Property. Seller has never been a member or promoter of, or a contributor to, any industry standards body or similar organization that could compel the Seller to grant or offer to any third party any license or right to any Owned Intellectual Property.

(e)     Seller has taken commercially reasonable actions to safeguard and maintain the secrecy and the confidentiality of, and its proprietary rights in and to, all non-public information of Seller or provided by any third party to Seller ("Confidential Information"). All current and former employees and contractors of the Seller and third parties having access to the Confidential Information have executed and delivered to the Seller a written legally binding agreement regarding the protection of such Confidential Information. The Seller has implemented and maintain a reasonable security plan consistent with industry practices of companies offering similar products or services. Seller has not experienced any breach of

security or otherwise unauthorized access by third parties to the Confidential Information in the Seller's possession, custody or control.

(f)     The Seller has secured from all consultants, advisors, employees and independent contractors who independently or jointly contributed to or participated in the conception, reduction to practice, creation or development of any Intellectual Property for the Seller (each, an "Author"), unencumbered and unrestricted exclusive ownership of all of the Authors' Intellectual Property in such contribution that the Seller does not already own by operation of law and has obtained the waiver of all non-assignable rights.  No current or former employee, contractor or consultant of the Seller has a valid claim of ownership over any Owned Intellectual Property, nor has any such claim been asserted in writing.

(g)     The Systems that are used or relied on by Seller are adequate for the operation of Seller's respective businesses as currently conducted, and contemplated to be conducted, are sufficient for the current needs of such businesses and Seller. The Purchased Assets include all Systems necessary for the operation of the Business. With respect to the Systems, (i) there has not been any material malfunction that has not been remedied or replaced, or any material unplanned downtime or service interruption; (ii) Seller has implemented or are in the process of implementing (or, in the exercise of reasonable business judgment, has determined that implementation is not yet in the best interest of Seller) in a timely manner all security patches or security upgrades that are generally available for the Systems; (iii) Seller has taken reasonable steps and implemented reasonable procedures to ensure that such Systems used in connection with the operation of Seller's respective businesses are free from contaminants, including the use of commercially available antivirus Software with the intention of protecting the Systems from becoming infected by viruses and other harmful code; and (iv) Seller has implemented reasonably appropriate security, back-ups, disaster recovery arrangements, and hardware and Software support and maintenance to minimize the risk of material error, breakdown, failure, or security breach occurring.

3.13   Environmental Matters. Except as set forth on Section 3.13 of the Disclosure Schedule, As of the date of this Agreement:

(a)     The operations of the Business are, and have been for the past five (5) years, in material compliance with applicable Environmental Laws.

(b)     There is no Environmental Claim pending or, to Seller's Knowledge, threatened against the Seller or with respect to the Business or the Purchased Assets, and all past Environmental Claims have been finally and fully resolved.  There are no past or present actions, activities, circumstances, conditions, events or incidents, including the Release, presence, handling, treatment, recycling, storage, management, use, generation, disposal, or arrangement for disposal of any Hazardous Materials at or from the Acquired Location or any other location, that could form the basis of any material Environmental Claim or otherwise result in any material costs or Liabilities under Environmental Law with respect to the Business or the Purchased Assets, including costs or Liabilities regarding any Response Action, corrective action, personal injury, property damage, or natural resources damages.

(c)     No Release or, to Seller's Knowledge, threatened Release of Hazardous Material has occurred or is currently occurring at or from any property owned, operated, leased or used or any other property formerly owned, operated, leased or used by Seller or any of its predecessors or the Business for which Environmental Law requires (i) notice to any Person or (ii) any form of Response Action. Seller has not received any notice that the operation of the Business has caused Contamination of any other property that has resulted or would reasonably be expected to result in a material Environmental Claim against, or material liability under Environmental Law for or relating to, the Business or the Purchased Assets.

(d)     Seller has not, either expressly or by operation of law, assumed responsibility for or agreed to indemnify or hold harmless any Person for any Environmental Claims or environmental Liability with respect to the Business or the Purchased Assets.

(e)     Seller has identified and made available to Purchaser complete and correct copies of all material studies, audits, assessments, reports, data, memoranda, investigations, and other material information relating to Hazardous Materials, Environmental Claims, environmental Liabilities or other environmental matters that are in Seller's or its Affiliates' possession or control pertaining to the Business or the Purchased Assets or the compliance (or noncompliance) by Seller or any of its predecessors with Environmental Laws.

(f)     Seller is not required by any Environmental Law or by virtue of the transactions set forth herein and contemplated hereby, or as a condition to the effectiveness of any transactions contemplated hereby, (i) to remove or remediate Hazardous Materials, (ii) to notify or receive approval from any Governmental Authority or other Person, or to record any disclosure document or statement pertaining to environmental matters, or (iii) to alter, modify, renew, change or update any Environmental Permit, in each case with respect to the Business or the Purchased Assets.

(g)     Seller (i) holds and is, and for the past five (5) years has been, in material compliance with all Environmental Permits (each of which is in full force and effect and is not subject to appeal, except in such instances where Seller is contesting the requirement to hold an Environmental Permit in good faith by appropriate, diligently conducted proceedings) required to be held by Seller under applicable Environmental Law for the operation of the Business or for the ownership, operation, or use of the Acquired Location or the Purchased Assets, or, to the extent currently required, any pending construction or expansion related thereto, (ii) for the past five (5) years has used commercially reasonable efforts to cause all contractors, lessees, and other Persons occupying, operating, or using the Acquired Location to materially comply with applicable Environmental Law and obtain all necessary material Permits required under applicable Environmental Law, (iii) has timely renewed or applied to renew any required Environmental Permits, and (iv) has not received notice that any Environmental Permits will not be renewed or will be renewed with conditions that are materially more restrictive or that cannot be met without incurring material additional costs.

3.14    Title to Assets; Sufficiency of Assets; Condition of Assets.  Seller has good and valid legal and beneficial title to, or a valid, binding and enforceable leasehold interest in, as applicable, all of the Purchased Assets, and such Purchased Assets are not subject to any Liens (other than Permitted Post-Closing Encumbrances and Liens which will be removed at the

Closing by the effect of the Sale Order or otherwise satisfied at the Closing), and, subject to the entry of the Sale Order and receipt of any Required Consents, at the Closing, Purchaser or the applicable Purchaser Assignee will be vested with good and valid title to such Purchased Assets, free and clear of all Claims (as defined in the Bankruptcy Code) and Liens (other than Permitted Post-Closing Encumbrances), to the fullest extent permissible under Section 363(f) of the Bankruptcy Code. The Purchased Assets constitute (a) all of the tangible and intangible rights, assets and properties that are owned, used or held for use by Seller or any of its Affiliates in connection with the Business and the construction, maintenance, and operation of the Acquired Location, and (b) all of the assets, rights and properties necessary for the conduct of the Business in the Ordinary Course following the Closing and are adequate to conduct the operations of the Business as currently conducted. The Purchased Assets are in good working condition, have been maintained in accordance with normal industry practice, and are suitable for the purposes for which they are used (subject to normal wear and tear) including for Purchaser to conduct and operate the Business in the Ordinary Course. Other than those services that would reasonably be expected to be commercially available when and as required on commercially reasonable terms, the Purchased Assets: (i) comprise all of the property interests necessary to secure any right material to the acquisition, leasing, development, construction, installation, completion, operation, and maintenance of the Acquired Location in accordance with all Applicable Laws, (ii) are sufficient to enable the Acquired Location to be located, constructed, developed, owned, occupied, operated, maintained, and used at the Acquired Location, and (iii) provide adequate ingress and egress from the Acquired Location for any reasonable purpose in connection with the construction and operation of the Acquired Location. Except as would not reasonably be expected to be material to the construction, maintenance, or operation of the Acquired Location, there are no services, materials, or rights required in any material respect for the construction or operation of the Acquired Location, other than those that would reasonably be expected to be commercially available at or for delivery to the Acquired Location on commercially reasonable terms. Section 3.14 of the Disclosure Schedule sets forth a true and complete list of all Wayward Assets that, to the Knowledge of Seller, are owned or held by an Affiliate of the Seller as of the date hereof.

3.15    Taxes. Except to the extent an inaccuracy of the following would neither result in a Lien on any of the Purchased Assets nor a Liability for Taxes to the Purchaser or its Affiliates or except as set forth on Section 3.15 of the Disclosure Schedule:

(a)    All Tax Returns required to be filed by Seller or otherwise related to the Purchased Assets or the Business have been duly and timely filed and each such Tax Return is true, correct and complete in all material respects. All Taxes owed by Seller or otherwise related to the Purchased Assets or the Business for which Purchaser may be liable that are or have become due have been paid in full and all other Taxes attributable to pre-Closing periods have been fully accrued through Closing on the financials statements of Seller.

(b)    Seller does not have in force any waiver of any statute of limitations in respect of Taxes or any extension of time related to a Tax assessment or deficiency, in each case, where such waiver or such extension could result in the assessment of any Liability for Taxes, reporting or other compliance obligations or any other successor Liability with respect to the Purchased Assets or the Business. Except with respect to Seller's Tax Returns relating to the period ending December 31, 2020, no extension of time within which to file any Tax Return that

could result in the assessment of any Liability for Taxes, reporting or other compliance obligations or any other successor Liability with respect to the Purchased Assets or the Business is currently in effect.  There is no audit, litigation or other Claim, assessment, deficiency, or adjustment that remains unpaid or otherwise outstanding, or is pending, asserted, proposed or, to Seller's Knowledge, threatened with respect to Taxes of Seller or otherwise with respect to the Purchased Assets or the Business.  All of the Purchased Assets have been properly listed and described on the property Tax rolls for all periods prior to and including the Closing Date and no portion of the Purchased Assets constitutes omitted property for property Tax purposes. Purchaser will not be held liable for any unpaid Taxes that are or have become due on or prior to the Closing Date as a successor or transferee, by statute, contract or otherwise, as a result of the transfer of the Purchased Assets pursuant to this Agreement.

(c) Other than assets held for resale in the ordinary course of business and motor vehicles, the sale of the Purchased Assets qualifies as an occasional sale pursuant to Texas Comptroller's Sales Tax Rule 34 Tex. Admin. Code § 3.316 and Texas Tax Code § 151.304.

(d) As of the date hereof, there are no Liens that arose in connection with any failure (or alleged failure) to pay any Tax on any of the assets of the Seller that could result in a Lien or assessment of any Liability for Taxes, reporting or other compliance obligations or any other successor Liability with respect to the Purchased Assets or the Business.

(e) Seller has not executed nor entered into any agreement with, or obtained any consents or clearances from, any Tax Authority, or have been subject to any ruling guidance specific to Seller, that would be binding on Purchaser for any Taxable period beginning after the Closing.

(f) Seller is not party to any Tax allocation or sharing agreement that would be binding on Purchaser for any Taxable period beginning after the Closing.

(g) Prior to the Closing Date, Seller has not claimed any Tax benefits under the CARES Act (or any corresponding or similar provision of state, local, or non-U.S. Applicable Law), including any (i) deferral of any portion of any payroll, social security, unemployment, withholding, or other Taxes or (ii) any Tax benefits or employee retention credits, in each case, where such benefits could result in the assessment of any Liability for Taxes, reporting or other compliance obligations or any other successor Liability with respect to the Purchased Assets or the Business.

(h) Section 3.15(h) of the Disclosure Schedule sets forth a true, correct, and complete list of any and all loans applied for or received by Seller (whether repaid or forgiven), and any and all indebtedness or other obligations otherwise incurred by Seller (including a description of all Contracts related thereto) in connection with any loan under the CARES Act, including the Small Business Administration's "Paycheck Protection Program" or under any of the "Main Street Loan Programs" established by the Federal Reserve (collectively, the "PPP Loans") and the amount of funds received by Seller under each program. Seller has made available to Purchaser true, correct, and complete copies of all (i) applications, forms, and other documents filed or submitted by Seller relating to any CARES Act programs and (ii) notices, letters, or other correspondence to Seller from any Governmental Authority in connection with

any application related to any CARES Act programs, and all statements and information made by Seller contained in such applications, forms, and other documents are true, correct, and complete in all respects. With respect to each item set forth on <u>Section 3.15(h)</u> of the Disclosure Schedule, Seller was eligible to participate in the applicable program pursuant to the rules and regulations applicable to such program. All funds received by Seller for the PPP Loans (the "<u>CARES Act Funds</u>") have been used by Seller in compliance with all conditions and other applicable statutory, regulatory, and other requirements under the terms of such program(s), including with respect to the application of all proceeds therefrom, and Seller has maintained accounting and other records relating to the CARES Act Funds and the use thereof which comply with all conditions and other applicable statutory, regulatory, and other requirements under the terms of such program(s) (including records that track the costs and other expenses for which the CARES Act Funds have been used, and all documentation and other information supporting or otherwise documenting Seller's certification of need for any CARES Act Funds), true, correct, and complete copies of which have been made available to Purchaser. The consummation and closing of the transactions contemplated hereby shall not cause or result in an event of default under any PPP Loan. All certifications and representations made by Seller in all application(s) and any other documents relating to the PPP Loans were made in good faith and are true and correct in all material respects and Seller qualified in all respects to obtain the PPP Loans under the terms and conditions of the applicable statutory, regulatory, and other requirements of such program(s) and Seller has complied in all material respects with all agreements and all applicable Laws with respect to the PPP Loans.

3.16    <u>Key Business Relationships</u>. <u>Section 3.16(i)</u> of the Disclosure Schedules sets forth a true and complete list of (i) the top 10 customers of the Business based on revenue generated for the fiscal year period ended December 31, 2020 (each, a "<u>Key Customer</u>", and together, the "<u>Key Customers</u>") and the amount of such revenue generated with respect to each Key Customer, and (ii) the top 15 vendors or suppliers of the Business based on purchases for the fiscal year period ended December 31, 2020 (each, a "<u>Key Vendor</u>", and together, the "<u>Key Vendors</u>") and the amount of such expenses incurred with respect to each Key Vendor.  Except as set forth on <u>Section 3.16(i)</u> of the Disclosure Schedules, since January 1, 2020 (i) no Key Customer has (A) materially decreased or notified Seller or any Affiliate of Seller of the foregoing of its intention to materially decrease its aggregate level of purchases of services from Seller relative to such Key Customer's purchasing history during the twelve (12) months prior to such change or (B) requested reduced pricing (whether through increased credits or otherwise) from that in effect under an existing Contract, in each case, other than with respect to commercial negotiations in the Ordinary Course with respect to such Key Customer and not as a result of a deterioration in the business relationship with such Key Customer and (ii) no Key Vendor has adversely altered or notified any of the Seller or its Affiliates of the foregoing of its intention to adversely alter in any material respect the terms (including price) on which it sells goods or services to the Business. Except as set forth on <u>Section 3.16</u> of the Disclosure Schedule, Seller has not received any notice, and has no reason to believe, that any of material customers of the Business has ceased, or intends to cease, to use the goods or services of the Business or to otherwise terminate or materially reduce its relationship with the Business. Seller has not received any notice, and has no reason to believe, that any of the material suppliers of the Business has ceased, or intends to cease, to supply goods or services to the Business or to otherwise terminate or materially reduce its relationship with the Business.

3.17    Insurance. Section 3.17 of the Disclosure Schedule sets forth a true and complete list of all insurance policies maintained by the Seller or its Affiliates with respect to the Business or covering the Purchased Assets or the Business (including policies providing property, casualty, liability, and workers' compensation coverage) (collectively, the "Insurance Policies"). Each Insurance Policy is in full force and effect and, except as otherwise set forth on Section 3.17 of the Disclosure Schedule, all premiums due to date thereunder have been paid in full, or if not yet due have been properly accrued for as payables, and neither Seller nor any of its Affiliates is in material default thereunder.  Neither Seller nor any of its Affiliates, has received notice of cancellation or nonrenewal, in whole or in part, in respect of any Insurance Policy. To the Knowledge of Seller, Seller has not done anything by way of action or inaction that invalidates any such policies in whole or in part.

3.18    Brokers and Finders. Other than as set forth on Section 3.5 of the Disclosure Schedule, no Person has acted, directly or indirectly, as an agent, broker, finder, investment banker, financial advisor or other firm or person entitled to any brokerage, finder's, financial advisor's or other similar fee or commission for Seller or any of its Affiliates in connection with the transactions contemplated by this Agreement, and Purchaser and its Affiliates shall not be liable for, and no Person is entitled to, any brokerage, finder's, financial advisor's or other similar fee or commission or like payment in connection with the transactions contemplated by this Agreement as a result of any action taken by or on behalf of Seller or any of its Affiliates.

3.19    Product Quality. All products manufactured, fabricated, sold or distributed by the Business prior to the Closing Date comply in all material respects with applicable customer specifications and Applicable Laws for the intended use of such products.

3.20    Affiliate Transactions. Except as set forth on Section 3.20 of the Disclosure Schedule, no Affiliate, principal, owner, stockholder, member, partner, director, manager, officer, or Employee of Seller or any Affiliate of Seller, or any individual related by blood, marriage, or adoption to any such Person, is a party to any Acquired Agreement.

3.21    Absence of Certain Changes. Except as otherwise set forth on Section 3.21 of the Disclosure Schedule, since the Petition Date through the date hereof, there has not been a Material Adverse Effect. Except as expressly contemplated by this Agreement or any Order entered in the Bankruptcy Case, from and after the Petition Date, Seller has not: (a) terminated, modified, or amended any material Contract except for (i) executory contracts and unexpired leases rejected by Seller with the prior written consent of Purchaser, (ii) those listed on a rejection motion filed before the date hereof, or (iii) due to the expiration of the term or automatic renewals, in each case, in accordance with the terms of any such material Contract, (b) purchased or otherwise acquired any material properties or assets (tangible or intangible) or, except for obsolete properties or assets, sold, leased, transferred, or otherwise disposed of any material properties or assets (tangible or intangible) that would be Purchased Assets if owned by Seller on the date of this Agreement, (c) (i) permitted, allowed, or suffered any of the Purchased Assets to be subjected to any Lien (other than Permitted Post-Closing Encumbrances) or (ii) removed any material equipment or other material tangible assets from the Acquired Location (except for obsolete assets or for the purpose of replacement or repair thereof), (d) suffered any material damage or destruction to or loss of any material assets or properties whether or not

covered by insurance, (e) allowed any material Permit held by Seller to terminate, or (f) agreed or committed in writing to do any of the foregoing.

3.22    Privacy and Data Security Matters.

(a)    Seller and, to the Knowledge of Seller, its vendors or processors that Process Personal Information, comply and at all times in the past five (5) years have complied in all material respects with all of the following, in each case, to the extent applicable to Seller: (i) Privacy Laws, (ii) Seller Privacy and Data Security Policies, (iii) rules of self-regulatory organizations, and (iv) contractual requirements or terms of use concerning the Processing of Personal Information to which Seller is a party or otherwise bound.

(b)    The execution, delivery, and performance of this Agreement and the consummation of the transactions contemplated hereby do not and will not: (i) materially conflict with or result in a material violation or breach of any applicable Privacy Laws or applicable Seller Privacy and Data Security Policies (as currently existing or as existing at the time during which any Personal Information was collected or Processed by or for Seller) or (ii) require the consent of or notice to any Person concerning such Person's Personal Information.

(c)    No disclosure or representation made or contained in Seller Privacy and Data Security Policy has been materially inaccurate, misleading, deceptive, or in material violation of any applicable Privacy Laws (including by containing any material omission).

(d)    In the past five (5) years, to the Knowledge of Seller, (i) no Personal Information in the possession or control of Seller, or held or Processed by any vendor, processor, or other third party for or on behalf of Seller, has been subject to any data breach or other security incident that resulted in the unauthorized access, disclosure, use, denial of use, alteration, corruption, destruction, compromise, or loss of such Personal Information or is otherwise considered a "data breach," "personal data breach" or "data security breach" under applicable Privacy Laws (a "Security Incident") and (ii) Seller has not notified and, to the Knowledge of Seller, there have been no facts or circumstances that would require Seller to notify any Governmental Authority or other Person of any Security Incident.

(e)    Seller has for the past five (5) years implemented and maintained commercially reasonable security measures, including written information security programs, to (i) implement and maintain adequate administrative, technical, and physical safeguards designed to protect such Personal Information and the availability, integrity, and security of its software, systems, applications, and websites involved in the Processing of Personal Information in connection with the Business and (ii) provide notification in compliance with applicable Privacy Laws in the case of any Security Incident.

3.23    Disclaimer of Additional Representations and Warranties. EXCEPT AS SPECIFICALLY SET FORTH IN THIS AGREEMENT, AND EXCLUDING IN ALL RESPECTS CLAIMS BASED ON ACTUAL FRAUD, NEITHER SELLER NOR ANY OF ITS AFFILIATES OR ANY OF ITS RESPECTIVE AFFILIATES' DIRECTORS, OFFICERS, EMPLOYEES, CONTROLLING PERSONS, AGENTS OR REPRESENTATIVES MAKES OR HAS MADE ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND, EXPRESS

OR IMPLIED, INCLUDING IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR THE ACCURACY OR COMPLETENESS OF ANY PROJECTIONS, ESTIMATES OR OTHER FORWARD LOOKING INFORMATION PROVIDED OR OTHERWISE MADE AVAILABLE TO PURCHASER OR ANY OF ITS DIRECTORS, OFFICERS, EMPLOYEES, AFFILIATES, CONTROLLING PERSONS, AGENTS OR REPRESENTATIVES.

Purchaser hereby expressly acknowledges and agrees none of the provisions of this ARTICLE III (including, without limitation, anything in Section 3.6) shall be deemed to affect or influence in any manner the provisions set forth in Article II and Section 5.16 of this Agreement relating to the calculation of the Purchase Price or any elements, components, or methodology thereof or applicable thereto (including, without limitation, the Applicable Methodology).

## ARTICLE IV

### REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Seller, as of the date hereof and as of the Closing, that:

4.1     Due Organization. Purchaser is a limited partnership duly organized, validly existing and in good standing under the laws of the State of Delaware with all requisite power and authority to own and operate its assets and properties as they are now being owned and operated. Any applicable Purchaser Assignee is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization with all requisite power and authority to own and operate its assets and properties.

4.2     Due Authorization. Purchaser and any applicable Purchaser Assignee has full power and authority to enter into this Agreement and its Related Agreements, as applicable, and to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance by Purchaser or any applicable Purchaser Assignee of this Agreement and its Related Agreements, as applicable, have been duly authorized by all necessary entity action of Purchaser or such Purchaser Assignee. Purchaser has duly and validly executed and delivered this Agreement and Purchaser and any applicable Purchaser Assignee has duly and validly executed and delivered (or prior to or at the Closing will duly and validly execute and deliver) its Related Agreements. This Agreement constitutes the legal, valid and binding obligation of Purchaser and its Related Agreements, upon execution and delivery by Purchaser or the applicable Purchaser Assignee, will constitute legal, valid and binding obligations of Purchaser or such Purchaser Assignee enforceable in accordance with their respective terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, moratorium, reorganization or similar laws in effect which affect the enforcement of creditors' rights generally and by equitable principles.

4.3     Consents and Approvals; No Violations. The execution, delivery and performance by Purchaser or any applicable Purchaser Assignee of this Agreement and its Related Agreements will not (i) violate any law, regulation or order of any Governmental Authority applicable to Purchaser or such Purchaser Assignee; (ii) except for filings that may be required pursuant to ARTICLE IX, require any filing or registration by Purchaser or such Purchaser

Assignee with, or consent or approval with respect to Purchaser or such Purchaser Assignee of, any Governmental Authority; (iii) violate or conflict with or result in a breach or default under any Contract to which Purchaser or such Purchaser Assignee is a party or by which Purchaser or such Purchaser Assignee or any of its assets or properties are bound; or (iv) violate or conflict with the organizational or governance documents of Purchaser or such Purchaser Assignee, except where any such filing, registration, consent or approval, if not made or obtained, or any such violation, conflict, breach or default, would not have a material adverse effect on Purchaser's ability to consummate the transactions contemplated hereby.

4.4     Purchaser's Examination. Purchaser and its representatives have been afforded the opportunity to meet with, ask questions of and receive answers from the management of Seller in connection with the determination by Purchaser to enter into this Agreement and the Related Agreements and consummate the transactions contemplated hereby and thereby.

4.5     Investigation; Limitation on Warranties.

(a)     Purchaser acknowledges and agrees that neither Seller, nor any other Person acting on behalf of Seller or any of its Affiliates or representatives has made any representation or warranty, express or implied, as to the accuracy or completeness of any information regarding Seller, the Business or the Purchased Assets, except as expressly set forth in this Agreement or as and to the extent required by this Agreement or the Related Agreements to be set forth in the Disclosure Schedule. Purchaser further agrees that, except only as expressly provided in this Agreement or the Related Agreements, Seller will not have or be subject to any liability to Purchaser or any other Person resulting from the distribution or use by Purchaser, any of its Affiliates or any of their respective directors, officers, employees, agents, consultants, accountants, counsel or other representatives of any such information, and any legal opinions, memoranda, summaries or any other information, document or material made available to Purchaser or its Affiliates or representatives in certain "data rooms," management presentations or any other form otherwise provided in expectation of the transactions contemplated by this Agreement.

(b)     Purchaser acknowledges and agrees that except for the representations and warranties of Seller expressly set forth in <u>ARTICLE III</u> and the Related Agreements, the Purchased Assets are being acquired AS IS WITHOUT ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR INTENDED USE OR OTHER EXPRESSED OR IMPLIED WARRANTY. Purchaser acknowledges and agrees that it is consummating the transactions contemplated hereby without any representation or warranty, express or implied, by any Person, except for the representations and warranties of Seller expressly set forth in <u>ARTICLE III</u>. Following the Closing, Seller will have no liability for a breach of representation or warranty except in the case of actual, intentional fraud.

(c)     In connection with Purchaser's investigation of Seller and the Business, Purchaser has received from or on behalf of Seller certain projections, including projected statements of operating revenues and income from operations of the Business and certain business plan information of Seller. Purchaser acknowledges that there are uncertainties inherent in attempting to make such estimates, projections and other forecasts and plans, that Purchaser is familiar with such uncertainties, that Purchaser is taking full responsibility for making its own

evaluation of the adequacy and accuracy of all estimates, projections and other forecasts and plans so furnished to it (including the reasonableness of the assumptions underlying such estimates, projections and forecasts), and that Purchaser shall have no claim against Seller or any other Person with respect thereto. Accordingly, Seller makes no representations or warranties whatsoever with respect to such estimates, projections and other forecasts and plans (including the reasonableness of the assumptions underlying such estimates, projections and forecasts) except as set forth in ARTICLE III. Purchaser is relying on the representations and warranties of Seller regardless of the knowledge obtained through its own investigation, diligence or otherwise.

(d) Notwithstanding anything to the contrary herein or otherwise, the parties hereto acknowledge that nothing in this Section 4.5 shall be deemed to limit or otherwise modify in any respect Purchaser's rights to pursue any claim based on actual, intentional fraud.

4.6 Available Funds. Purchaser has access to cash resources in an aggregate amount sufficient to pay in cash any and all amounts required to be paid by it pursuant to this Agreement, including the Closing Cash Consideration and all fees and expenses related to the transactions contemplated by this Agreement to be paid by Purchaser.

4.7 Brokers and Finders. No agent, broker, investment banker, financial advisor or other firm or person is entitled to any brokerage, finder's, financial advisor's or other similar fee or commission for which Seller or any of its Affiliates could become liable in connection with the transactions contemplated by this Agreement as a result of any action taken by or on behalf of Purchaser or any of its Subsidiaries.

## ARTICLE V

## COVENANTS

5.1 Access to Information and Acquired Location.

(a) From the date of this Agreement to the earlier of the Closing Date or the date this Agreement is terminated, subject to the Confidentiality Agreement, Seller and its Affiliates shall give Purchaser and Purchaser's representatives, upon reasonable notice, full and free access during normal business hours to the offices, facilities, assets, properties, employees, and books and records of or relating to the Business (including financial, operating, and other data and information related to the Purchased Assets and the Assumed Liabilities), and shall make the officers and employees of Seller and its Affiliates available to Purchaser and its representatives as Purchaser and its representatives shall from time to time reasonably request, in each case to the extent that such access and disclosure would not obligate Seller to take any actions that would be unreasonably burdensome to the normal course of its businesses or materially violate the terms of any contract to which Seller is bound or any Applicable Law. Notwithstanding the foregoing, other than appropriate contacts designated by Seller (including Gregg Milhaupt and Alex Delnik), Purchaser is not authorized to and shall not (and shall cause its employees, agents, representatives and Affiliates to not) contact any officer, director, employee, franchisee, customer, supplier, distributor, lender or other material business relation of Seller prior to the Closing without the prior written consent of any such designated contact (it

being agreed that if any such designated contact elects to give any such consent, the consent may be conditioned upon, among other things, Seller being able to monitor or participate in any such contacts and any discussions or dialogue resulting therefrom).

(b)     Purchaser and its representatives shall treat and hold strictly confidential any confidential information (in whatever form) provided by or on behalf of Seller to the extent required by the Confidentiality Agreement.

5.2     <u>Preservation of Business</u>. From the date of this Agreement until the earlier of the Closing or the date this Agreement is terminated, other than as specifically contemplated by this Agreement or with the prior consent of Purchaser (such consent not to be unreasonably withheld or delayed), Seller shall (a) operate the Acquired Location and the Business in the Ordinary Course, (b) use commercially reasonable efforts to (i) maintain the Purchased Assets in the condition in which they exist as of the date hereof (ordinary wear and tear excepted), (ii) preserve the business relationships with material customers, suppliers, and key business relationships of the Business, (iii) maintain and continue all applicable turn-around, inspection, maintenance, and capital expenditure activities, plans, and schedules in all material respects, (iv) maintain all Acquired Intellectual Property Rights free from lapse or abandonment, (v) maintain its books and records to the extent related to the Purchased Assets or the Business in the Ordinary Course, (vi) maintain in full force and effect all Permits used or held for use by Seller in connection with the construction, maintenance, and operation of the Acquired Location or the Business, (vii) maintain in full force and effect (and not to lapse), and to renew prior to the expiration thereof with coverages substantially identical to the coverages in effect on the date hereof, each of the insurance policies covering the Purchased Assets and the Business set forth on <u>Section 3.17</u> of the Disclosure Schedule, (viii) not assign, license, transfer, convey, lease, or otherwise dispose of any of the Purchased Assets (except for the sale of inventory at arm's length in the Ordinary Course), (ix) take reasonable actions to defend and protect the Purchased Assets from infringement or deterioration, (x) not enter into, amend, modify or terminate any Acquired Agreement, (xi) comply with Applicable Laws in all material respects and comply with any Order of the Bankruptcy Court requiring Seller to perform its obligations under an Acquired Agreement in all material respects, and (xii) not license the right to use any Acquired Intellectual Property Rights to any Person, and (c) use commercially reasonable efforts to take such action as may be reasonably requested by Purchaser to preserve intact, or to protect, the Purchased Assets.

5.3     <u>Efforts</u>. Subject to the terms and conditions hereof, each party hereto shall use its commercially reasonable efforts to consummate the transactions contemplated hereby as promptly as practicable. The "commercially reasonable efforts" of any party hereto shall not require such party, its Affiliates or representatives to incur or expend any material sums of money to remedy any breach of any representation or warranty hereunder or to provide financing to any other party hereto for consummation of the transactions contemplated hereby; provided, that if such party, its Affiliates or representatives remedy any such breach, such party shall not be deemed to be in breach of such representation or warranty for purposes of determining the other parties' obligations to consummate the transactions contemplated hereby pursuant to <u>Section 6.1</u>, in the case of Purchaser, or <u>Section 7.1</u>, in the case of Seller. Purchaser may obtain customary buyer-side representation and warranty insurance (the "<u>R&W Policy</u>") (payable solely by Purchaser) in connection with the transactions contemplated by this Agreement. Any R&W Policy so obtained shall specify that there is no right of, and that the insurer under the R&W

Policy expressly waives any claims of, subrogation, contribution, or otherwise against Seller or any of its Affiliates, employees, or direct or indirect shareholders, members, directors, officers, or partners, except in the case of actual, intentional fraud by Seller in connection with the negotiation, execution, or performance of this Agreement. The cost of the R&W Policy (including the premium, underwriting fee, surplus lines taxes, and other fees (including the brokerage fees)) shall be paid by Purchaser. From and after the binding of the R&W Policy (which shall include the waivers described above), Purchaser shall provide Seller with a true and complete copy thereof and shall not amend, modify, or cancel the R&W Policy if such amendment, modification, or cancellation could reasonably be expected to adversely affect the rights of Seller thereunder without the prior written consent of Seller (which consent may be granted or withheld in Seller's sole discretion). As set forth above, Seller shall reasonably cooperate with Purchaser in connection with obtaining the R&W Policy (at Purchaser's sole cost and expense), including by making its officers and senior management available to Purchaser at reasonable times and for reasonable periods of time; provided that, in no event, shall (i) the issuance of an R&W Policy be a condition to or otherwise affect Purchaser's obligation to consummate the transactions set forth herein, or (ii) Seller or any employee, officer, director, agent or other representative of Seller be required to provide any affidavit, certificate, application, agreement, or other covenant or assurance to Purchaser, the insurer under the R&W Policy, or any other person in connection with the underwriting or issuance thereof. The "commercially reasonable efforts" of Seller shall not require Seller, its Affiliates or representatives to incur or expend any material sums of money to remedy any breach of any representation or warranty hereunder or to provide financing to Purchaser for consummation of the transactions contemplated hereby; provided that if Seller, its Affiliates or representatives elect to remedy any such breach, Seller shall not be deemed to be in breach of such representation or warranty, or in violation of any covenant pursuant to Section 5.2, for purposes of determining Purchaser's obligations to consummate the transactions contemplated hereby pursuant to Section 6.1.

5.4     Consents. Seller will use its commercially reasonable efforts, and Purchaser will cooperate with Seller, to obtain at the earliest practicable date all Required Consents (including any consents and approvals necessary to transfer or reissue any Permits); provided that, for the avoidance of all doubt, in no event shall Seller be obligated to pay any consideration or initiate or join in any lawsuit or other proceeding in order to obtain any such Required Consent..

5.5     Preservation of Records; Post-Closing Access and Cooperation. For a period of six (6) years after the Closing Date or such other period (if longer) required by applicable law, Purchaser and Seller shall preserve and retain, all corporate, accounting, legal, auditing, human resources and other books and records in its possession (including any documents relating to any governmental or non-governmental claims, actions, suits, proceedings or investigations) relating to the Business and the Purchased Assets prior to the Closing. Purchaser and Seller shall, after the Closing Date, (a) permit Seller's and Purchaser's, as applicable, counsel and other professionals and counsel for any successor to Seller or Purchaser, as applicable, and its respective professionals (collectively, "Permitted Access Parties") reasonable access to the financial and other books and records relating to the Purchased Assets or the Business and the systems containing such information, books and records, which access shall include (i) the right of such Permitted Access Parties to copy or remove, as applicable, at such Permitted Access Parties' expense, such documents and records as they may request in furtherance of the purposes

described above, and (ii) Purchaser's or Seller's, as applicable, copying and delivering to the relevant Permitted Access Parties such documents or records as they may reasonably request, but only to the extent such Permitted Access Parties furnish Purchaser or Seller, as applicable, with reasonably detailed written descriptions of the materials to be so copied and the applicable Permitted Access Party reimburses Purchaser or Seller, as applicable, for the reasonable costs and expenses thereof, and (b) Purchaser or Seller, as applicable, shall provide the Permitted Access Parties (at no cost to the Permitted Access Parties) with reasonable access to Purchaser or Seller, as applicable, during regular business hours to assist Seller or Purchaser, as applicable, and the other Permitted Access Parties in their post-Closing activities (including preparation of Tax Returns, collecting Accounts Receivable, determining the amount of any Purchase Price adjustment pursuant to Section 2.7, and other activities in connection with the administration and wind-down of the Bankruptcy Case); provided that such access does not unreasonably interfere with the Purchaser's operation of the Business and Purchaser shall not be required to provide access for requests unrelated to the Business or the Purchased Assets. Nothing in this Section 5.5 shall require Purchaser to take any such action if (a) such action (i) could result in a waiver or breach of any attorney-client, attorney work product or other legally recognized privileges or immunity from disclosure or (ii) would result in the disclosure of any trade secrets of third parties or violate any Applicable Laws related to the exchange of information or any obligation of Purchaser with respect to confidentiality, or (b) such access or information is requested in relation to disputes involving Purchaser, its equity holders or any of their respective Affiliates or the Business or Purchased Assets, including disputes arising under this Agreement or any other Related Agreement.

5.6     Employees and Benefits.

(a)     As of the Closing, Seller shall terminate the employment of all of those Employees identified on Schedule 5.6(a) (the "Subject Employees"). Schedule 5.6(a) hereto may be amended from time to time prior to the Closing to (i) delete any individuals who are no longer employed by Seller or (ii) upon written notice from Purchaser to Seller, to add or remove any other individuals. Purchaser or a Purchaser Assignee, in cooperation with Seller, shall, prior to the Closing Date and effective as of the Closing, extend a written offer of employment to those employees selected by Purchaser or a Purchaser Assignee, in its sole and absolute discretion (the "Selected Employees"), at a wage or salary and benefits and other compensation (other than equity based benefits, benefits under a defined benefit plan or benefits under any nonqualified deferred compensation benefits) that is comparable in the aggregate to the respective wages or salaries and benefits and other compensation specified for such Selected Employees on Schedule 5.6(a). Those Selected Employees who accept offers of employment with Purchaser or a Purchaser Assignee and who become employees of Purchaser or a Purchaser Assignee as of the Closing Date are referred to as "Transferred Employees." Notwithstanding the foregoing, nothing herein will, after the Closing Date, impose on Purchaser or any Purchaser Assignee any obligation to retain any Transferred Employee in its employment for any amount of time or on any terms and conditions of employment.

(b)     Purchaser shall be solely responsible for any severance or other termination-related payments or benefits required to be paid or provided to any Subject Employee that is not a Selected Employee.

(c)     Seller shall be solely responsible for any severance or other termination-related payments or benefits required to be paid or provided to any Selected Employee that is triggered by such Selected Employee's rejection of any offer of employment or by such Selected Employee's transfer to Purchaser's or a Purchaser Assignee's employment.

(d)     It is understood and agreed between the parties that all provisions contained in this Agreement with respect to Benefit Plans or employee compensation are included for the sole benefit of the respective parties hereto and do not and shall not create any right in any other person, including any Employee, any participant in any benefit or compensation plan or any beneficiary thereof.

(e)     In any termination or layoff of any Transferred Employee by Purchaser on or after the Closing, Purchaser will comply fully, if applicable, with the WARN Act and all other applicable foreign, Federal, state and local laws, including those prohibiting discrimination and requiring notice to employees.  Purchaser shall not at any time prior to sixty (60) days after the Closing Date, effectuate a "plant closing" or "mass layoff" as those terms are defined in the WARN Act affecting in whole or in part any facility, site of employment, operating unit or employee of the Business without complying fully with the requirements of the WARN Act. Purchaser shall be solely responsible for, and will bear the entire cost of, compliance with (or failure to comply with) any such laws following the Closing Date.

(f)     Purchaser shall be responsible for providing COBRA continuation coverage to "M&A qualified beneficiaries" (as defined in COBRA) of Seller who experience a "qualifying event" (as defined in COBRA) in respect of the transactions contemplated by this Agreement.

5.7     Public Announcements. Purchaser and Seller will consult with each other before issuing any press release or otherwise making any public statements or disclosures with respect to the transactions contemplated by this Agreement, including the terms hereof, and no party shall, without the prior written consent of the other party, issue any such press release or make any such public statement, except as may be required by applicable law in which case such party shall advise the other of such obligation; provided, however, that the parties may make public statements or disclosures with respect to this Agreement and the transactions contemplated herein as may be required in connection with the Bankruptcy Case, including to comply with the Bidding Procedures Order and/or in seeking issuance of the Sale Order, or other Applicable Laws.

5.8     Transfer Taxes. To the extent that any sales, purchase, transfer, stamp, documentary stamp, registration, use or similar taxes are payable by reason of the sale of the Purchased Assets under this Agreement ("Transfer Taxes"), such Transfer Taxes shall be borne and timely paid by Purchaser.  Purchaser and Seller shall reasonably cooperate in good faith to minimize, to the extent permissible under Applicable Law, the amount of any Transfer Taxes that might otherwise be imposed in connection with the transactions contemplated by this Agreement.

5.9     Bulk Sales. Purchaser hereby waives compliance by Seller with the requirements and provisions of any "bulk transfer" Applicable Laws of any jurisdiction that may otherwise be

applicable with respect to the sale of any or all of the Purchased Assets to Purchaser or any Purchaser Assignee. Pursuant to Section 363(f) of the Bankruptcy Code, the transfer of the Purchased Assets shall be free and clear of any security interests in the Purchased Assets (other than Permitted Post-Closing Encumbrances), including any Liens or claims arising out of the bulk transfer Applicable Laws and any derivative, successor, transferee, or vicarious Liability of any kind or character and the parties hereto shall take such steps as may be necessary or appropriate to so provide in the Sale Order.

5.10    <u>Tax Proration</u>. All Periodic Non-Income Taxes levied with respect to the Purchased Assets for any taxable period falling entirely within the period ending on or before the Closing Date shall be the responsibility of Seller.  All Periodic Non-Income Taxes levied with respect to the Purchased Assets for any Taxable period that includes the Closing Date and ends after the Closing Date, whether imposed or assessed before or after the Closing Date will be prorated based on the number of days in such period that occur before the Closing Date, on the one hand, and the number of days in such period that occur on or after the Closing Date, on the other hand, the amount of such Periodic Non-Income Taxes allocable to the portion of the period ending before the Closing Date being the responsibility of Seller and the remainder being the responsibility of Purchaser. If the exact amount of any Periodic Non-Income Tax is not known on the Closing Date, such Tax shall be estimated based upon the best available information at the time of Closing (i.e., the taxable value currently assigned to the real property).  There shall be no re-proration of Periodic Non-Income Taxes after Closing.  The amount of such Periodic Non-Income Taxes allocable to Seller pursuant to this <u>Section 5.10</u> that have not been paid prior to Closing, if any, shall be paid to the appropriate Governmental Authority by Purchaser, but shall result in a reduction of the Closing Cash Consideration in like amount pursuant to the definition of Purchase Price and <u>Section 2.7(b)</u>.

5.11    <u>Information Requested by FTC</u>.

(a)    Purchaser and Seller shall each use commercially reasonable efforts, promptly after execution of this Agreement, and to the extent any information is requested by the Federal Trade Commission ("<u>FTC</u>") or Antitrust Division of the United States Department of Justice ("<u>DOJ</u>") in connection with the transactions contemplated by this Agreement, to give, submit, make and deliver information and documents in connection with the same.

(b)    Purchaser and Seller shall each use commercially reasonable efforts to promptly (i) supply the other with any information which reasonably may be required in order to respond to any FTC or DOJ requests described in Section <u>5.11(a)</u>, and (ii) supply any additional information which reasonably may be required by the competition or merger control authorities of any other jurisdiction and which the parties may reasonably deem appropriate. Except where prohibited by applicable legal requirements, Seller and Purchaser shall each consult with the other prior to taking a position with respect to any such filing, shall permit the other to review and discuss in advance, and consider in good faith the views of the other in connection with any analyses, appearances, presentations, memoranda, briefs, white papers, other materials, arguments, opinions and proposals before making or submitting any of the foregoing to any Governmental Authority in connection with any investigations or proceedings in connection with this Agreement or the transactions contemplated hereby, coordinate with the other in preparing and providing such information and promptly provide the other (and its counsel) copies of all

filings, presentations and submissions (and a summary of oral presentations) made by such party to or with any Governmental Authority in connection with this Agreement and the transactions contemplated hereby.

(c)     Purchaser and Seller shall each notify the other promptly upon the receipt of (i) any comments from any officials of any Governmental Authority in connection with any submissions made pursuant hereto, and (ii) any request by any officials of any Governmental Authority for amendments or supplements to any submissions made pursuant to, or information provided to comply in all materials respect with, applicable legal requirements. Whenever any event occurs that is required to be set forth in an amendment or supplement to any filing made pursuant to this Section 5.11, Purchaser or Seller, as the case may be, will promptly inform the other of such occurrence and cooperate in submitting with the applicable Governmental Authority such amendment or supplement.

(d)     Notwithstanding the foregoing provisions of this Section 5.11, neither Purchaser nor Seller shall be required to litigate with any Governmental Authority.

5.12     No Successor Liability.  The parties hereto agree that the Sale Order shall provide that to the fullest extent permitted by Applicable Law (including under Section 363(f) of the Bankruptcy Code), (a) Purchaser shall not be liable for any liability or Lien (other than Assumed Liabilities) against the Seller or any of the Seller's predecessors or Affiliates and (b) Purchaser shall have no successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the Business, the Purchased Assets or any liabilities of Seller arising prior to the Closing.

5.13     401(k) Plan. Following the Closing each Transferred Employee will be permitted to (i) participate in a 401(k) plan sponsored by Purchaser or one of its Affiliates and (ii) elect to take distributions (subject to applicable Law) of his or her accounts in Seller's or its Affiliate's 401(k) plans and rollover to such qualified plan sponsored by Purchaser or one of its Affiliates.

5.14     Purchased Assets held by Affiliates.  Without limiting Seller's obligations under Section 10.9 hereof, in the event that, at any time following the date of this Agreement (whether prior to or after the Closing), it is discovered by Holdings, Purchaser or the Seller that an Affiliate of the Seller or Holdings owns or holds any of the Purchased Assets ("Wayward Assets"), Seller and Holdings shall cause such Affiliate to transfer and assign, for no additional consideration, such Wayward Assets to Purchaser as soon as reasonably practicable following such discovery by transfer documents in form and content not inconsistent with the terms and provisions hereof and otherwise in form and content reasonably requested by Purchaser.  Prior to the Closing, Seller shall (a) cause its Affiliates to transfer and assign to Seller the Wayward Assets set forth on Section 3.14 of the Disclosure Schedule and (b) provide Purchaser with evidence reasonably satisfactory to Purchaser of such transfer and assignment.

5.15     Benefit Plan Cooperation.  Prior to the Closing, Seller shall, without limiting Seller's obligations under Section 10.9 hereof, cooperate in good faith with and provide reasonable assistance to Purchaser in connection with and to facilitate Purchaser and/or its Affiliates' establishment of new health, welfare and retirement plans for the Transferred Employees (including Seller's prompt execution and delivery of broker access and change of broker forms in respect of Benefit Plans in form and content reasonably satisfactory to Seller and

the delivery of claims and other participant information, in each case, as reasonably requested by Purchaser and not prohibited or restricted by applicable law).

5.16    Assumption and Assignment of Contracts. At or prior to the Closing, Seller shall assume and assign to Purchaser the Acquired Contracts, Acquired Real Property Leases, Acquired Personal Property Leases and Permits and Licenses, and Purchaser shall pay in full the Cure Costs as a deduct against the Closing Cash Consideration (provided, however, that Purchaser shall pay the Cure Costs which are denoted with two asterisks (**) on Section 3.6(f) of the Disclosure Schedule without a deduction against the Closing Cash Consideration), in each case pursuant to Section 365 of the Bankruptcy Code, the Sale Order and Section 2.1, subject to Purchaser's provision of adequate assurance as may be required under Section 365 of the Bankruptcy Code. Notwithstanding anything to the contrary in this Agreement, Purchaser expressly acknowledges that Seller's inability to assume and assign any Acquired Contracts, Acquired Real Property Leases, Acquired Personal Property Leases and/or Permits and Licenses by reason of Purchaser's failure to provide adequate assurance of future performance with respect thereto to the Bankruptcy Court's satisfaction shall have no effect on Purchaser's obligation to consummate the transactions set forth herein and any such Acquired Contracts, Acquired Real Property Leases, Acquired Personal Property Leases and/or Permits and Licenses Seller fail to so assume and assign at the Closing shall for all purposes thereafter be deemed Excluded Assets.

5.17    ERP/IT Cooperation and Access. Without limiting the generality of Section 2.1(l) or Section 5.1, Seller shall, and shall cause its Affiliates to, in good faith and using commercially reasonable efforts cooperate with and provide reasonable access and assistance to Purchaser and its Affiliates during normal business hours in connection with and to facilitate Purchaser's and/or its Affiliates' transitioning of any enterprise resource planning system or information technology system relating to the Business or the Purchased Assets to the enterprise resource planning systems or information technology systems of Purchaser and/or its Affiliates.

5.18    Restrictive Covenants.

(a)    Seller understands that Purchaser and any Purchaser Assignee shall be entitled to protect and preserve the going concern value of the Business to the extent permitted by Applicable Law and that Purchaser would not have entered into this Agreement absent the provisions of this Section 5.18 and, therefore, subject to the provisions of this Section 5.18, Seller agrees that for a period of five (5) years from the Closing Date, neither Seller nor any Affiliate of Seller shall directly or indirectly engage in, own, have any financial interest in, finance, manage, or operate anywhere in the world any business, the primary activity of which is to develop, manufacture, sell or distribute any of the Business Products produced, sold, or distributed by the Business prior to the Closing (each, a "Competitive Activity"); provided, however, that it shall not be a Competitive Activity for Seller or any of its Affiliates: (i) to beneficially own (for non-strategic, passive financial investment purposes) within the meaning of Section 13(d) of the Securities Exchange Act of 1934, as amended, less than one percent (1%) of the outstanding common stock of a publically-held corporation that is engaged in a Competitive Activity, (ii) to invest in any Person which invests in, manages, or operates a Competitive Activity, so long as Seller's or its Affiliates' investment is for non-strategic, passive financial investment purposes and less than one percent (1%) of the outstanding ownership interest in such

Person and Seller do not control such Person or Competitive Activity, and (iii) to own any securities through any employee benefit plan.

(b)     For a period of five (5) years following the Closing Date, Seller agrees that neither it nor its Affiliates will (i) encourage any customer, client, supplier, or other Person having a business relationship with the Business to terminate or alter such relationship to the disadvantage of Purchaser or any of its Affiliates in connection with the Business or (ii) encourage any Person not to enter into a business relationship with Purchaser or any of its Affiliates in connection with the Business.

(c)     For a period of five (5) years following the Closing Date, Seller agrees that neither it nor its Affiliates will, without Purchaser's prior written consent, directly or indirectly, solicit for employment or hire (whether as an officer, director, employee, consultant, or temporary employee) any Transferred Employee, except that this paragraph shall not preclude Seller or any other person from entering into discussions with or soliciting any person (i) who responds to any public advertisement or general solicitation or who is contacted by the soliciting party's recruitment agency (provided, however, that the soliciting party did not instruct such agency to target the other party's employees), (ii) who initiates discussions with the soliciting party regarding such employment on his or her own initiative and without any direct or indirect solicitation by the soliciting party, its representatives, or its Affiliates, or (iii) who has been terminated by Purchaser or its Affiliates or resigns prior to commencement of discussions with the soliciting party.

(d)     Other than in connection with any action between the parties, after the Closing Date, each party shall not, and shall cause its Affiliates not to, directly or indirectly, through any Person, make or publish any statement to a third party, whether orally or in writing, regardless of whether such statement is truthful, that criticizes, ridicules, disparages, or is otherwise derogatory to the other party or its Affiliates, or which could reasonably be expected to harm the reputation or goodwill of such other party or its Affiliates.

(e)     The nature and scope of the provisions of this Section 5.18 have been carefully considered by the parties. Seller agrees and acknowledges that the duration, scope, and geographic areas contemplated by this Section 5.18 are fair, reasonable, and necessary and that adequate compensation has been received by Seller for such obligations. If, however, for any reason any court determines that any such restrictions are not reasonable or that consideration is inadequate, such restrictions shall be interpreted, modified, or rewritten to include as much of the duration, scope, and geographic area identified in this Section 5.18 as will render such restrictions valid and enforceable.

(f)     In the event of a breach or threatened breach of this Section 5.18, Purchaser and its Affiliates shall be entitled, without the posting of a bond, to an injunction restraining such breach. Nothing herein contained shall be construed as prohibiting Purchaser or its Affiliates from pursuing any other remedy available to it for such breach or threatened breach.

(g)     For the avoidance of doubt, this Section 5.18 shall not (i) prohibit Seller or its Affiliates from conducting their other businesses existing as of the date hereof or (ii) restrict any third-party purchaser of Seller's or its Affiliate's assets or businesses.

5.19    Refunds and Remittances. To the extent Seller, on the one hand, and Purchaser or any Purchaser Assignee, on the other hand, receives any payment to which the other party is entitled, each of Purchaser or the applicable Purchaser Assignee, on the one hand, and Seller, on the other hand, agree to promptly remit the proceeds to the other party, as appropriate. The parties acknowledge and agree there is no right of offset regarding such payments and a party may not withhold funds received from third parties for the account of the other party in the event there is a dispute regarding any other issue under this Agreement or any other agreement or document contemplated hereby. The provisions of this Section 5.19 shall not apply with respect to Taxes.

## ARTICLE VI

## CONDITIONS PRECEDENT TO OBLIGATIONS OF PURCHASER

The obligations of Purchaser and any Purchaser Assignee to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or waiver by Purchaser to the extent permitted by Applicable Law) of the following conditions precedent on or before the Closing Date:

6.1    Warranties True as of Present Date. Each of the representations and warranties of Seller contained in Section 3.1, Section 3.2, Section 3.3, Section 3.4, and Section 3.18 (a) that are qualified as to Material Adverse Effect shall be true and correct in all respects on and as of the Closing Date as if made anew as of such date (except to the extent such representations and warranties expressly relate to an earlier date (in which case, as of such earlier date)) and (b) that are not so qualified shall be true and correct (without giving effect to any qualifications as to "materiality" or similar qualifications as to materiality) in all respects on and as of the Closing Date as if made anew as of such date (except to the extent such representations and warranties expressly relate to an earlier date (in which case, as of such earlier date)), except, in the case of the foregoing clause (b), where the failure of such representations and warranties to be true and correct do not and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

6.2    Compliance with Agreements and Covenants. Seller shall have performed and complied in all material respects with all of the covenants, obligations and agreements contained in this Agreement to be performed and complied with by them on or prior to the Closing Date.

6.3    Deliveries. Seller shall have delivered, or caused to be delivered, to Purchaser all of the documents and other items referred to in Section 2.8(b).

6.4    No Prohibition. No law or injunction shall have been adopted, promulgated or entered by any Governmental Authority which restrains, enjoins, or otherwise prohibits and no lawsuit or proceeding shall be pending, which would be reasonably expected to restrain, enjoin, or otherwise prohibit the consummation of the transactions contemplated hereby.

6.5    Entry of Sale Order. The Sale Order shall have been entered by the Bankruptcy Court, in substantially the form attached hereto, including with respect to all findings of fact and

conclusions of law, shall be in full force and effect, and shall not have been vacated, reversed, stayed, modified or amended as of the Closing Date.

6.6     No Material Adverse Effect. No Material Adverse Effect shall have occurred since the mutual execution and delivery of this Agreement.

Any waiver of a condition by Purchaser shall be effective only if such waiver is stated in writing and signed by Purchaser; provided, however, that the consent of Purchaser to the Closing shall constitute a waiver by Purchaser of any conditions to Closing as to Purchaser not satisfied as of the Closing Date. Purchaser may not rely on the failure of any condition set forth in this ARTICLE VI if such failure was caused by Purchaser's failure to comply with any provision of this Agreement.

## ARTICLE VII

CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLER

The obligations of Seller to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or waiver by Seller to the extent permitted by Applicable Law) of the following conditions precedent on or before the Closing Date:

7.1     Warranties True as of Present Date. Each of the representations and warranties of Purchaser contained in ARTICLE IV (a) that are qualified as to "material adverse effect" shall be true and correct in all respects as of the Closing Date as if made anew as of such date (except to the extent such representations and warranties expressly relate to an earlier date (in which case, as of such earlier date)) and (b) that are not so qualified shall be true and correct in all respects as of the Closing Date as if made anew as of such date (except to the extent such representations and warranties expressly relate to an earlier date (in which case, as of such earlier date)), except, in the case of the foregoing clause (b), where the failure of such representations and warranties to be true and correct do not and would not reasonably be expected to have, in the aggregate, a material adverse effect on Purchaser's ability to consummate the transactions contemplated hereby.

7.2     Compliance with Agreements and Covenants. Purchaser shall have performed and complied with all of its covenants, obligations and agreements contained in this Agreement to be performed and complied with by it on or prior to the Closing Date, in all material respects.

7.3     Deliveries. Purchaser shall have delivered, or caused to be delivered, to Seller all of the documents and other items referred to in Section 2.8(c).

7.4     No Prohibition. No law or injunction shall have been adopted, promulgated or entered by any Governmental Authority which restrains, enjoins, or otherwise prohibits and no lawsuit or proceeding shall be pending, which would be reasonably expected to restrain, enjoin, or otherwise prohibit the consummation of the transactions contemplated hereby.

7.5     Entry of Sale Order. The Sale Order shall have been entered by the Bankruptcy Court, in substantially the form attached hereto, including with respect to all findings of fact and

conclusions of law, shall be in full force and effect, and shall not have been vacated, reversed, stayed, modified or amended as of the Closing Date.

Any waiver of a condition by Seller shall be effective only if such waiver is stated in writing and signed by Seller; provided, however, that the consent of Seller to the Closing shall constitute a waiver by Seller of any conditions to Closing as to Seller not satisfied as of the Closing Date. Seller may not rely on the failure of any condition set forth in this ARTICLE VII if such failure was caused by Seller's failure to comply with any provision of this Agreement.

## ARTICLE VIII

### TERMINATION

8.1     Termination. This Agreement may be terminated at any time on or prior to the Closing:

(a)     With the mutual written consent of Purchaser and Seller; or

(b)     By either Purchaser or Seller if the Closing shall not have occurred on or before June 11, 2021 (or such date as extended pursuant to Section 8.1(i)) (the "Termination Date"); provided, the right to terminate this Agreement under this Section 8.1(b) shall not be available to any party whose failure to fulfill any obligation under this Agreement has been the primary cause of, or primarily resulted in, the failure of the Closing to occur on or before the Termination Date; or

(c)     By Seller, if Purchaser shall have breached or failed to perform any of its representations, warranties, covenants or other agreements contained in this Agreement, which breach or failure to perform (A) would give rise to the failure of a condition set forth in ARTICLE VII and (B) has not been or is incapable of being cured by Purchaser within five (5) Business Days after its receipt of written notice thereof from Seller; or

(d)     By Purchaser, if Seller shall have breached or failed to perform any of its representations, warranties, covenants or other agreements contained in this Agreement, which breach or failure to perform (A) would give rise to the failure of a condition set forth in ARTICLE VI and (B) has not been or is incapable of being cured by Seller within five (5) Business Days after its receipt of written notice thereof from Purchaser; or

(e)     By Seller if (i) all of the conditions set forth in ARTICLE VI have been satisfied or waived (other than those conditions that by their terms are to be satisfied at the Closing) and (ii) Purchaser breaches its obligations hereunder to proceed with and consummate the Closing within five (5) Business Days after receipt of written notice from Seller that Seller is ready, willing and able to proceed with and consummate the Closing; or

(f)     By Purchaser if (i) all of the conditions set forth in ARTICLE VII have been satisfied or waived (other than those conditions that by their terms are to be satisfied at the Closing) and (ii) Seller breaches its obligations hereunder to proceed with and consummate the Closing within five (5) Business Days after receipt of written notice from Purchaser that Purchaser is ready, willing and able to proceed with and consummate the Closing; or

(g)     By either Purchaser or Seller if any Governmental Authority shall have issued an order, decree or ruling or taken any other action permanently restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement, and such order, decree, ruling or other action shall have become final and nonappealable; or

(h)     By Purchaser if (i) Seller files a motion to have the Bankruptcy Court enter an Order (A) dismissing the Bankruptcy Case or (B) converting the Bankruptcy Case into cases under chapter 7 of the Bankruptcy Code or appointing a trustee in the Bankruptcy Case or appointing an examiner with enlarged power related to the operation of the Business (beyond those set forth in Section 1106(a)(3) or (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code, (ii) an Order is entered (A) dismissing the Bankruptcy Case or (B) converting the Bankruptcy Case into cases under chapter 7 of the Bankruptcy Code or appointing a trustee or examiner in the Bankruptcy Case, and, in each case, such Order is not reversed or vacated within fourteen (14) days after entry thereof, (iii) the Sale Order (A) shall not have been entered by the Bankruptcy Court by June 9, 2021 (unless, prior to termination of this Agreement by Purchaser, the Bankruptcy Court shall have entered the Sale Order), (B) shall have been entered in a form not acceptable to Purchaser, or (C) shall have been stayed, vacated, modified, or supplemented without Purchaser's prior written consent, (iv) Seller publicly announces, files, or otherwise takes material steps in furtherance of any chapter 11 plan(s) of reorganization or plan(s) of liquidation with respect to the Bankruptcy Case that fail to provide for or otherwise contemplate the Closing pursuant to the terms hereof, or (v) any of the conditions set forth in ARTICLE VI has become incapable of fulfillment and such condition is not waived by Purchaser; or

(i)     By Purchaser if: (i) the Auction shall not have been held, conducted and concluded on or before May 26, 2021; (ii) Purchaser is not selected and designated as the Successful Bidder or Back-Up Bidder in the Notice of Successful Bidder to be filed by Seller on or before June 4, 2021; (iii) the Sale Hearing shall not have been held and concluded on or before June 8, 2021; (iv) the Sale Order shall not have been entered on or before June 9, 2021; or (v) the Closing of the transactions contemplated by this Agreement shall not have occurred on or before June 11, 2021; provided that Seller and Purchaser may mutually agree in writing to extend such milestones. For the avoidance of doubt, Purchaser shall not have the right to terminate this Agreement pursuant to this Section 8.1(i) with respect to any of the milestone dates set forth in this Section 8.1(i) in the event that Seller has obtained agreement from the existing secured lenders having the right to approve the transaction timeline for the transaction contemplated herein an extension of the applicable date; provided, that no such date may be extended (A) by more than ten (10) Business Days or (B) more than once, in each case, without first obtaining Purchaser's written consent, which consent Purchaser may grant or withhold in its sole discretion; and, provided further, that in the event the milestone dates set forth in this Section 8.1(i) are extended as provided herein, the Termination Date shall automatically be extended by the same amount of time.

Notwithstanding anything else contained in this Agreement, the right to terminate this Agreement under this Section 8.1 shall not be available to any party (a) that is in material breach of its obligations hereunder or (b) whose failure to fulfill its obligations or to comply with its covenants under this Agreement has been the primary cause of, or primarily resulted in, the failure to satisfy any condition to the obligations of either party hereunder. Each event of

termination set forth in this <u>Section 8.1</u>, pursuant to which this Agreement may be terminated, shall be considered separate and distinct from each other event of termination. If more than one of the events set forth in this <u>Section 8.1</u> is applicable, the applicable party shall have the right to choose the termination event pursuant to which this Agreement is to be terminated, except as otherwise provided in this <u>Section 8.1</u>.

8.2    <u>Expenses</u>. Except as otherwise provided in <u>Section 10.15</u>, whether or not the Closing occurs, all Expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such Expenses. As used in this Agreement, "<u>Expenses</u>" means the out-of-pocket fees and expenses of the party's independent advisor, counsel and accountants, incurred or paid by the party or on its behalf in connection with this Agreement and the transactions contemplated hereby.

8.3    <u>Effect of Termination</u>. In the event of termination of this Agreement by either Purchaser or Seller as provided in <u>Section 8.1</u>, this Agreement will forthwith become void and have no further force or effect, without any liability on the part of Purchaser or Seller; <u>provided</u>, <u>however</u>, that the provisions of <u>Section 8.2</u>, this <u>Section 8.3</u>, and <u>ARTICLE X</u> (and, to the extent necessary to effectuate the foregoing enumerated provisions, <u>ARTICLE I</u>) will survive any termination hereof; <u>provided</u>, <u>further</u>, <u>however</u>, that subject to the terms of this <u>Section 8.3</u>, nothing in this <u>Section 8.3</u> shall relieve any party of any liability for any breach by such party of this Agreement prior to the date of any such termination. Upon termination of this Agreement pursuant to <u>Section 8.1(c)</u> or <u>Section 8.1(e)</u>, Seller's sole damages remedy against Purchaser or any of its Affiliates shall be limited to the amount of the Deposit (and all interest accrued thereon) (the "<u>Damages Cap</u>") which Seller shall have the right to collect from Pachulski as liquidated damages, and notwithstanding anything to the contrary contained in this Agreement or otherwise, such Damages Cap shall constitute the amount of Seller's full and complete liquidated damages and Seller's sole and exclusive remedy against Purchaser or any of its Affiliates or their respective owners, directors, managers, and officers for any and all damages suffered or incurred by Seller in connection with this Agreement or any related document, any of the transactions contemplated hereby or thereby (or the abandonment or termination thereof), or any matters forming the basis for such abandonment or termination. Without limiting the foregoing, Purchaser and Seller acknowledge and agree that it would be impracticable and extremely difficult to estimate the damages Seller may suffer or incur in the event that the transaction contemplated herein terminates pursuant to <u>Section 8.1(c)</u> or <u>Section 8.1(e)</u>.  Accordingly, notwithstanding anything to the contrary herein, Purchaser and Seller further hereby agree that considering all of the circumstances existing at the execution of this Agreement, the Deposit amount constitutes a reasonable estimate of the total detriment that Seller would suffer in the event that the transactions contemplated herein are terminated pursuant to <u>Section 8.1(c)</u> or <u>Section 8.1(e)</u> hereof. The payment of such amount as liquidated damages is not intended as a forfeiture or penalty, but rather is intended to constitute liquidated damages to Seller.  For the avoidance of doubt, in connection with any termination pursuant to this Agreement (other than pursuant to <u>Section 8.1(c)</u> or <u>Section 8.1(e)</u>), (i) Purchaser shall be entitled to the prompt return of the Deposit (and all interest accrued thereon) and (ii) Purchaser and Seller shall deliver a joint written instruction to Pachulski instructing Pachulski to disburse the Deposit (and all interest accrued thereon) to Purchaser.

**ARTICLE IX**

BANKRUPTCY COURT MATTERS

9.1     Motion for Approvals.

(a)     No later than the times set forth in the Bid Procedures Order (as may be modified pursuant to the terms thereof), Seller will (subject to Purchaser's and Seller's rights and obligations set forth in Section 9.1(c) below), make all filings and give all notices relating to this Agreement as Seller is required to make and give pursuant to the Bid Procedures Order. Seller shall take all actions as may be reasonably necessary to obtain entry of the Sale Order, including furnishing affidavits, declarations or other documents or information for filing with the Bankruptcy Court. Purchaser agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining entry of the Sale Order and a finding of adequate assurance of future performance by Purchaser, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" Purchaser under Section 363(m) of the Bankruptcy Code. Seller shall use commercially reasonable efforts to obtain the Sale Order. Except for Seller's obligations under Section 9.1(b) hereof, both Purchaser's and Seller's obligations to consummate the transactions contemplated in this Agreement shall be conditioned upon the Bankruptcy Court's entry of the Sale Order. If the Bankruptcy Court refuses to issue the Sale Order or to approve a sale of Seller's assets to Purchaser at the Sale Hearing, then this transaction shall automatically terminate and Seller and the Purchaser shall be relieved of any further liability or obligation hereunder, except for Seller's obligations under Section 9.1(b). In the event that a third party (an "Upset Purchaser" and the underlying purchase agreement between the Upset Purchaser and Seller, the "Upset Agreement") is approved by the Bankruptcy Court as the purchaser of the Purchased Assets at the Sale Hearing, and Purchaser's bid is the next highest bid at the Auction, then notwithstanding anything to the contrary in this Agreement, in accordance with the terms of the Bid Procedures Order, and any supplemental order to the Bid Procedures Order, this Agreement shall not terminate, but rather shall become a "back-up bid" which shall (subject to Purchaser's other rights of termination hereunder) remain open for acceptance by Seller for a period of thirty (30) days following such hearing, but subject and subordinate in all respects to the rights of the Upset Purchaser under the Upset Agreement. Upon entry of the Sale Order in accordance with the provisions of this Section 9.1(a), the condition set forth in this Section 9.1(a) shall conclusively be deemed satisfied.

(b)     If the Sale Order, or any other orders of the Bankruptcy Court relating to this Agreement or the transactions contemplated hereby are appealed by any Person (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacatur, stay, rehearing or re-argument shall be filed with respect to the Bid Procedures Order and the Sale Order, or other such order) subject to the rights otherwise arising from this Agreement, Seller shall take all actions as may be reasonably necessary to prosecute such appeal, petition or motion and obtain an expedited resolution of any such appeal, petition or motion; provided, however, nothing herein shall be deemed to require Seller to so pursue any such appeal or other actions beyond the Termination Date if this Agreement is terminated in accordance with its terms after the Termination Date.

(c)     Purchaser and Seller shall consult with each other regarding pleadings, notices and filings that any of them intends to file with the Bankruptcy Court in connection with, or which might reasonably be expected to adversely affect, the Bankruptcy Court's approval of the Sale Order, including, sharing in advance any drafts for the other's review and comment, it being agreed that each party shall give reasonable consideration to, and incorporate into the relevant pleading, notice or filing, any reasonable comments the other(s) may provide within a reasonable time prior to the filing of any such pleading, notice or filing.  No party hereto shall seek any modification to the Sale Order by the Bankruptcy Court or any other Governmental Authority of competent jurisdiction to which a decision relating to the Bankruptcy Case has been appealed, in each case, without prior written consent of the other(s) in its/their sole discretion.

9.2     <u>Bidding Procedures</u>. Purchaser and Seller acknowledge entry of the Bid Procedures Order.  Seller shall take all actions as may be reasonably necessary to carry out the process contemplated in the Bidding Procedures, including (i) holding the Auction to be held pursuant to the terms of the Bidding Procedures, on or before May 26, 2021, and (ii) filing and having entered the Sale Order on or before June 9, 2021.

## ARTICLE X

## MISCELLANEOUS

10.1     <u>Amendment</u>. This Agreement may be amended, modified or supplemented only in a writing signed by Purchaser and Seller.

10.2     <u>Notices</u>. Any notice, request, instruction or other document to be given hereunder by a party hereto shall be in writing and shall be deemed to have been given, (i) when received if given in person or by courier or a courier service, (ii) on the date of transmission if sent by electronic mail (with confirmation of delivery), (iii) on the next Business Day if sent by an overnight delivery service, or (iv) five (5) Business Days after being deposited in the U.S. mail, certified or registered mail, postage prepaid:

(a)     If to Seller, addressed as follows:

CarbonLite Recycling, LLC
c/o Force 10 Partners
5271 California Avenue
Suite 270
Irvine, CA 92617
Attention: Mr. Brian Weiss
Email: bweiss@force10partners.com

With a copy (which shall not constitute notice) to:

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Attention: Gabriel I Glazer, Esq. and Steven W. Golden, Esq.

Email: gglazer@pszjlaw.com and sgolden@pszjlaw.com

(b)     If to Purchaser, addressed as follows:

c/o Indorama Venture Global Services Ltd.
75/65-67, 32nd Floor, Ocean Tower 2
Soi Sukhumvit 19, Wattana
Bangkok 10110
Thailand
Attention: SK Agrawal and Mrinal Dawar
Email: ska@indorama.net and mrinal.d@indorama.net

with a copy (which shall not constitute notice) to:

Lowenstein Sandler LLP
1251 Avenue of the Americas,
New York, NY 10020
Telephone: 973-597-2572 or 973-597-6372
Attention: Nicholas San Filippo IV and Samiul E. Khan
Email: nsanfilippo@lowenstein.com and skhan@lowenstein.com

or to such other individual or address as a party hereto may designate for itself by notice given as herein provided.

10.3     Waivers. The failure of a party hereto at any time or times to require performance of any provision hereof shall in no manner affect its right at a later time to enforce the same. No waiver by a party of any condition or of any breach of any term, covenant, representation or warranty contained in this Agreement shall be effective unless in writing, and no waiver in any one or more instances shall be deemed to be a further or continuing waiver of any such condition or breach in other instances or a waiver of any other condition or breach of any other term, covenant, representation or warranty.

10.4     Counterparts. This Agreement may be executed in counterparts and such counterparts may be delivered in electronic format (including by email), all of which shall be considered an original and one and the same agreement and shall become effective when counterparts have been signed by each of the parties and delivered to the other parties, it being understood that all parties need not sign the same counterpart. Such delivery of counterparts shall be conclusive evidence of the intent to be bound hereby and each such counterpart and copies produced therefrom shall have the same effect as an original. To the extent applicable, the foregoing constitutes the election of the parties to invoke any law authorizing electronic signatures.

10.5     Interpretation. The headings preceding the text of Articles and Sections included in this Agreement and the headings to Sections of the Disclosure Schedule are for convenience only and shall not be deemed part of this Agreement or the Disclosure Schedule or be given any effect in interpreting this Agreement or the Disclosure Schedule. The use of the masculine, feminine or neuter gender herein shall not limit any provision of this Agreement. The use of the

terms "including" or "include" shall in all cases herein mean "including, without limitation" or "include, without limitation," respectively. The term "made available to Purchaser" means made available in the Data Room at least two (2) Business Days prior to the date hereof. References to Articles, Sections, Exhibits or Schedules shall refer to those portions of this Agreement, unless the context otherwise specifies or requires. Time is of the essence of each and every covenant, agreement and obligation in this Agreement. Neither Purchaser nor Seller shall be deemed to be in breach of any covenant contained in this Agreement if such party's deemed breach is the result of any action or inaction on the part of the other.

10.6    <u>APPLICABLE LAW</u>. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF DELAWARE WITHOUT GIVING EFFECT TO THE PRINCIPLES OF CONFLICTS OF LAW THEREOF.

10.7    <u>Binding Agreement; Assignment</u>. This Agreement and the Related Agreements shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns; <u>provided</u>, that neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned (including by operation of law) by any party without the prior written consent of the other party(ies). For all purposes hereof, a transfer, sale or disposition of a majority of the capital stock or other voting interest of a party (whether by contract or otherwise) shall be deemed an assignment requiring consent hereunder. Any purported assignment in contravention of this <u>Section 10.7</u> shall be null and void. Notwithstanding the foregoing or anything else in this Agreement to the contrary, Purchaser and any Purchaser Assignee may assign any or all of its rights and obligations hereunder to (a) one or more of its Affiliates, (b) to any of its lenders as collateral security, or (c) in connection with a sale of its or any of its Affiliates' equity interests or assets; provided, however, that, in the case of the foregoing clause <u>(a)</u> or <u>(c)</u>, Purchaser shall provide Seller with written notice of any such assignment.  Notwithstanding anything to the contrary herein, no assignment of this Agreement or any rights, interests or obligations hereunder (including any assignment pursuant to the immediately preceding sentence) shall be deemed to release, relieve or otherwise affect the assigning party's continuing liability hereunder.

10.8    <u>Third Party Beneficiaries</u>. This Agreement is solely for the benefit of the parties hereto and no provision of this Agreement shall be deemed to confer upon third parties, either express or implied, any remedy, claim, liability, reimbursement, cause of action or other right.

10.9    <u>Further Assurances</u>. Upon the reasonable request of Purchaser (or a Purchaser Assignee) or Seller, each party will on and after the Closing Date execute and deliver to the other parties such other documents, assignments and other instruments as may be reasonably required (without imposing any material monetary obligations or other obligations beyond those specifically imposed on the cooperating party(ies) by the other provisions of this Agreement or the Related Agreements) to effectuate completely the transactions contemplated hereby, and to effect and evidence the provisions of this Agreement and the Related Agreements and the transactions contemplated hereby. For the avoidance of doubt, as to Seller, the obligations set forth in this <u>Section 10.9</u> shall lapse and cease to be of any further force or effect upon the closing of the Bankruptcy Case.

10.10 _Entire Understanding_. The Exhibits, Schedules and Disclosure Schedules identified in this Agreement are incorporated herein by reference and made a part hereof. This Agreement and the Related Agreements set forth the entire agreement and understanding of the parties hereto and supersedes any and all prior agreements, arrangements and understandings among the parties.

10.11 <u>EXCLUSIVE JURISDICTION OF BANKRUPTCY COURT</u>. IN THE EVENT ANY PARTY TO THIS AGREEMENT COMMENCES ANY LITIGATION, PROCEEDING OR OTHER LEGAL ACTION IN CONNECTION WITH OR RELATING TO THIS AGREEMENT, ANY RELATED AGREEMENT OR ANY MATTERS DESCRIBED OR CONTEMPLATED HEREIN OR THEREIN, THE PARTIES TO THIS AGREEMENT HEREBY (A) AGREE ANY LITIGATION, PROCEEDING OR OTHER LEGAL ACTION SHALL BE INSTITUTED ONLY IN THE BANKRUPTCY COURT, WHICH SHALL HAVE SOLE AND EXCLUSIVE JURISDICTION OVER ANY SUCH MATTERS; (B) CONSENT AND SUBMIT TO PERSONAL JURISDICTION OF THE BANKRUPTCY COURT AND TO SERVICE OF PROCESS UPON THEM IN ACCORDANCE WITH THE RULES AND STATUTES GOVERNING SERVICE OF PROCESS; AND (C) AGREE TO WAIVE TO THE FULL EXTENT PERMITTED BY LAW ANY OBJECTION THAT THEY MAY NOW OR HEREAFTER HAVE TO THE VENUE OF ANY SUCH LITIGATION, PROCEEDING OR ACTION IN ANY SUCH COURT OR THAT ANY SUCH LITIGATION, PROCEEDING OR ACTION WAS BROUGHT IN AN INCONVENIENT FORUM.

10.12 <u>WAIVER OF JURY TRIAL</u>. EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH SUCH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (i) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (ii) EACH PARTY UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (iii) EACH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (iv) EACH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 10.12</u>.

10.13 _Disclosure Schedule_. The inclusion of information in the Disclosure Schedule shall not be construed as an admission that such information is material to Seller or the Business. In addition, matters reflected in the Disclosure Schedule are not necessarily limited to matters required by this Agreement to be reflected in the Disclosure Schedule. Such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature. Neither the specifications of any dollar amount in any provision of this Agreement nor the inclusion of any specific item in the Disclosure Schedule is intended to imply that such amount, or higher or lower amounts, or the item so included or other items, are or are not material, and no party shall use the fact of the setting forth of any such amount or the

inclusion of any such item in any dispute or controversy between the parties as to whether any obligation, item or matter not described herein or included in the Disclosure Schedule is or is not material for purposes of this Agreement. Further, neither the specification of any item or matter in any representation, warranty or covenant contained in this Agreement nor the inclusion of any specific item in the Disclosure Schedule is intended to imply that such item or matter, or other items or matters, are or are not in the Ordinary Course, and no party shall use the fact of setting forth or the inclusion of any such items or matter in any dispute or controversy between the parties as to whether any obligation, item or matter not described herein or included in the Disclosure Schedule is or is not in the Ordinary Course for purposes of this Agreement. Schedules 2.1(i), 2.1(j), 2.1(k), 2.1(m), and 5.6(a) shall be amended at the times, and subject to the terms and conditions, specified therein. Seller shall update Section 3.6(f) of the Disclosure Schedule (i) at least five (5) Business Days prior to the Closing to reflect an accurate list of the final Cure Costs and (ii) at the times, and subject to the terms and conditions specified in Section 2.1(o).

10.14   Severability. Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other situation or in any other jurisdiction. If the final judgment of a court of competent jurisdiction declares that any term or provision hereof is invalid or unenforceable, the parties agree that the court making the determination of invalidity or unenforceability shall have the power to reduce the scope, duration, or area of the term or provision, to delete specific words or phrases, or to replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and this Agreement shall be enforceable as so modified after the expiration of the time within which the judgment may be appealed.

10.15   Attorneys' Fees. In the event that Seller or Purchaser (or a Purchaser Assignee) bring an action or other proceeding to enforce or interpret the terms and provisions of this Agreement, the prevailing party(ies) in that action or proceeding shall be entitled to have and recover from the non-prevailing party(ies) all such reasonable, out of pocket fees, costs and expenses (including all court costs and reasonable attorneys' fees) as the prevailing party(ies) may suffer or incur in the pursuit or defense of such action or proceeding.

10.16   Construction. The parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, the language shall be construed as mutually chosen by the parties to express their mutual intent, and no rule of strict construction shall be applied against any party. Any reference to any federal, state, local, or foreign statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise.

10.17   Survival. Except for Purchaser's representations and acknowledgments set forth in Section 4.5 and Section 4.7 hereof and Seller's representations set forth in Section 3.1, Section 3.2, and Section 3.3 of this Agreement (all of which shall survive and continue in force following the Closing) and without in any way affecting Seller's disclaimer set forth in Section 3.23 hereof, the respective representations and warranties of Purchaser and Seller under this Agreement shall

lapse and cease to be of any further force or effect effective immediately following the Closing, other than with respect to actual, intentional fraud. Except as provided in the immediately preceding sentence, the covenants and agreements of Seller and Purchaser herein, or in any certificates or other documents delivered prior to or at the Closing, shall not be deemed waived or otherwise affected by the Closing.

10.18   No Vicarious Liability.  This Agreement may only be enforced against the parties hereto and their respective successors and permitted assigns.  Any Claims that may be based upon, arise out of, or relate to this Agreement or the negotiation, execution or performance of this Agreement (including any representation or warranty made in or in connection with this Agreement or as an inducement to enter into this Agreement) may be made only against the Persons that are signatories to this Agreement, and their respective successors and permitted assigns, and no agent, Affiliate or representative of any such Person (including any Person negotiating or executing this Agreement on behalf of such Person), will have any liability with respect to this Agreement or with respect to any Claim that may arise out of or relate to this Agreement, or the negotiation, execution, or performance of this Agreement (including a representation or warranty made in connection with this Agreement or as an inducement to enter into this Agreement).  Nothing in this Section 10.18 will impair or adversely affect the rights of Purchaser or any other Person set forth in any other agreement executed and delivered in connection with the consummation of the transactions contemplated under this Agreement and the Related Agreements.

*[Signature Pages Follow]*

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed and delivered as of the date first above written.

<u>**SELLER**</u>**:**

**CARBONLITE RECYCLING, LLC**
A Debtor and Debtor in Possession

By: _____
Name: Brian Weiss
Title: Chief Restructuring Officer

<u>**HOLDINGS**</u>**:**

**CARBONLITE HOLDINGS, LLC**

By: _____
Name: Brian Weiss
Title: Chief Restructuring Officer

<u>**PURCHASER**</u>**:**

**INDORAMA VENTURES HOLDINGS L.P.**

By: _____
Name: Satyanarayan Mohta
Title: President

## SCHEDULE 1.1

### CLOSING CASH CONSIDERATION

1.  Dallas, Texas: Sixty-Three Million Dollars ($63,000,000) in cash.

**Section 2.1(a): Purchased Equipment**

Please see attached report prepared by Gordon Brothers Asset Advisors, LLC.



# CarbonLITE Recycling, LLC

## Inspection Report

INVENTORY  |  **MACHINERY & EQUIPMENT**  |  BUSINESS VALUATIONS  |
BRANDS & INTELLECTUAL PROPERTY  |  REAL ESTATE

**EFFECTIVE DATE:** April 23, 2021
**REPORT DATE:** May 3, 2021

# TABLE OF CONTENTS

**Inspection Report performed for:**
Force Ten Partners LLC
Mr. Brian Weiss
Co-Founder
20341 SW Birch Street, Suite 220
Newport Beach, CA 92660

**Report Contacts:**
Gordon Brothers Asset Advisors, LLC
Prudential Tower
800 Boylston St., 27th Floor
Boston, MA 02199

**President, Valuations**
Chris Carmosino

**Senior Managing Director,
North American Sales**
Frank Grimaldi

**Managing Director**
Jerome (Jerry) Galaszewski

**Project Manager**
James A. Brodie, ASA, CEA

**For inquiries, please contact**
Aaron Walton
Relationship Manager
+1.512.673.7835
awalton@gordonbrothers.com

MACHINERY & EQUIPMENT LISTING ...............................................................3
   Dallas, Texas ...........................................................................................4

MACHINERY & EQUIPMENT PHOTO REPORT...............................................21

**APPENDIX**
   Project Manager Qualifications





May 3, 2021


Mr. Brian Weiss
Co-Founder
Force Ten Partners LLC
5271 California Avenue, Suite 270
Irvine, CA  92617


**Re: Inspection Report –  CarbonLITE Recycling, LLC**
                                          **4685 Mountain Creek Pkwy.**
                                          **Dallas, Texas**
                                          **Machinery & Equipment**

Dear Mr. Weiss:

Gordon Brothers Asset Advisors, LLC ("Gordon Brothers"), an affiliate of Gordon Brothers Group, LLC ("Gordon Brothers Group") is pleased to submit to you the following Inspection Report.

On April 23, 2021, Gordon Brothers personnel inspected the machinery and equipment of CarbonLITE Recycling, LLC, located at:

- 4685 Mountain Creek Pkwy., Dallas, Texas

The inspection was conducted to gather data relative to the assets and provide an asset listing to be used as documentation for business planning purposes.

The Effective Date of the asset listing is **April 23, 2021**.


## GENERAL CONDITION OF THE ASSETS

The general condition of the assets was considered to be fair to very good.  During the inspection, Gordon Brothers interviewed Company personnel familiar with the overall age and condition of the assets and internal maintenance practices. In some instances, machinery was not in operation at the time of inspection.  The inspection report has assumed that all equipment is in working order, unless otherwise specifically indicated in the asset descriptions included in this report.

Prudential Tower        +1.617.422.3233
800 Boylston Street, 27th floor    gordonbrothers.com
Boston, MA 02199 USA

Any condition statements that appear in the listing of the assets are based only on general observations made during visual inspection. It is impossible to judge the actual mechanical condition of the assets without relying on the accuracy of the representations made by Company management. This inspection report is not a technical or engineering survey.

The following are Gordon Brothers' guidelines for each condition classification. If no classification is noted in the machinery listing, the asset(s) are considered to be in average condition for their age.

| Classification | Description |
|---|---|
| New | New, unused, installed, or uninstalled property in excellent condition |
| Very Good | Like new condition, only slightly used, capable of full capacity per design specifications without modifications or requiring repairs or abnormal maintenance |
| Good | Used property, capable of operating at or near full specified capacity, that has undergone repairs as part of regular maintenance |
| Average | Used property, requiring some repairs or ordinary replacement of wear parts, with the condition of the item being consistent with its actual age, assuming normal usage |
| Fair | Used property, operating below fully specified capacity due to age and/or application, requiring general maintenance and/or replacement of components and/or wear parts in the foreseeable future |
| Poor | Used property, operating below fully specified capacity due to age and/or application, requiring major rebuild and/or maintenance in the near future of its major components and/or wear parts |
| Scrap | Used property, salvage value only, no longer serviceable, not economically feasible to repair and/or modify, salable only for the recovery of the property's basic material content or reusable component parts |

## STATEMENT OF OWNERSHIP

Gordon Brothers is providing an asset listing of owned and leased assets. Gordon Brothers has assumed that the Company has accurately represented the ownership interest in all of the personal property and has not conducted Uniform Commercial Code ("UCC") searches to determine the ownership. A search of this type is outside the scope of this assignment. It is recommended that any parties with or considering an interest in the assets independently confirm the ownership and determine what potential impact any encumbrances may have on the asset.

The inspection report that follows provides an identification of the machinery and equipment inspected.

It has been a pleasure being of service to you.

Very truly yours,

**Gordon Brothers Asset Advisors, LLC**

James A. Brodie, ASA, CEA
Senior Manager, Valuations





# Machinery & Equipment Listing

**CARBONLITE RECYCLING, LLC**
**4685 MOUNTAIN CREEK PKWY.**
**DALLAS, TEXAS**

**Department Evaluation Summary**

Effective Date: April 23, 2021

| Departments: |
| --- |
| Plastics Recycling |
| Extrusion |
| Plant Utility |
| Laboratory |
| Maintenance |
| Throughout Plant |
| Rolling Stock |
| Leased Assets |

**COMPANY NAME**  CarbonLITE Recycling, LLC
**EFFECTIVE DATE**  April 23, 2021
**REPORT DATE**  May 3, 2021
**JOB NUMBER**  3096749



## Description

### Plastics Recycling

*Item #1*

Qty (1)    Plastics Recycling Line, To Include:

(1)    Cross Wrap Dewiring Machine; with Infeed Conveyor; Operator Platform; Stairway; and PLC Controls
(1)    Bulk Handling Systems Model CBI-72 72"W Power Belt Conveyor, Asset #010; System Infeed Chainbelt #1
(1)    SSI Model Pri-Max Scrap Shredder, Asset #600; with Hydraulic Power Unit, with 200 hp Motor; and Controls
(1)    Bulk Handling Systems Model CBI-60 60"W Power Belt Conveyor, Asset #012; System Infeed Chainbelt #2
(1)    Eriez Magnetic Separator, Asset #602; Drum Magnet
(1)    Bulk Handling Systems Model LPST-48 48"W Power Belt Conveyor, Asset #014; Inspection Loop Reversing Conveyor
(1)    Bulk Handling Systems Model HDPC-36 36"W Power Belt Conveyor, Asset #072; Fall Back Hopper Conveyor
(1)    Bulk Handling Systems Model LPSS-30 30"W Power Belt Conveyor, Asset #074; Inspection Loop Sort Conveyor
(1)    Bulk Handling Systems Model MDG Chute, Asset #076; Inspection Diverter Chute
(1)    Bulk Handling Systems Model LPSTC-30 30"W Power Belt Conveyor, Asset #078; Inspection Loop Transfer Conveyor
(1)    Bulk Handling Systems Platform, Asset #316; Inspection Loop Sort Platform
(1)    Bulk Handling Systems Model LPST-48 48"W Power Belt Conveyor, Asset #016; Infeed Buffer Reversing Conveyor
(2)    Bulk Handling Systems Model CLS-24 24"D Screw Conveyors, Asset #020; and Asset #021; Screw Conveyors #1 and #3
(2)    Bulk Handling Systems Model LBB Buffers, Asset #018; and Asset #019; Infeed Buffers #1 and #2
(2)    Bulk Handling Systems Model CBI-48 48"W Power Belt Conveyors, Asset #022; and Asset #023; Infeed Buffer Chainbelts #1 and #2
(2)    Bulk Handling Systems Scales, Asset #659; and Asset #658; Infeed Belt Scales #1 and #2
(2)    Bulk Handling Systems Model IC-48 48"W Power Belt Conveyors, Asset #200; and Asset #201; Infeed Scale Conveyors #1 and #2
(2)    Eriez Model SE-7625-SC2 Electromagnets, Asset #604; and Asset #605; Electromagnets #1 and #2
(2)    Bulk Handling Systems Model ST-MAG-SS Structures, Asset #319; and Asset #318; Pre Sort Magnet Structures #1 and #2
(1)    Bulk Handling Systems Model LPST-36 36"W Power Belt Conveyor, Asset #080; Ferrous Loadout Conveyor
(1)    Bulk Handling Systems Power Belt Conveyor, Asset #138; Loadout Conveyor
(1)    Bulk Handling Systems Power Belt Conveyor, Asset #140; Loadout Conveyor
(2)    Bulk Handling Systems Model LPSS-54 54"W Power Belt Conveyors, Asset #025; and Asset #024; Presort Conveyors #1 and #2
(2)    Bulk Handling Systems Model DRS60-15 60"W Disc Screens, Asset #026; and Asset #027; Debris Roll Screens #1 and #2
(2)    Bulk Handling Systems Model DRSOC Chutes, Asset #700; and Asset #702; Debris Roll Screens #1 and #2 Overs Chutes
(2)    Bulk Handling Systems Chutes, Asset #706; and Asset #704; Debris Roll Screens #1 and #2 Under Chutes
(1)    Bulk Handling Systems Structure, Asset #302; Debris Roll Screens #1 and #2 Support Structure
(2)    Bulk Handling Systems Model LPSTC-48 48"W Power Belt Conveyors, Asset #029; and Asset #028; Windshifter Feed Conveyors #1 and #2
(2)    Nihot Model WS-S 1200 Windshifter Separators, Asset #607; and Asset #606, (2016); Windshifters #1 and #2
(2)    Nihot Model WS-S 1200 Windshifter Separators, Asset #664; and Asset #665; Windshifter Fans #1 and #2
(2)    Bulk Handling Systems Eddy Current Separators, Asset #609; and Asset #608; Eddy Current Separators #1 and #2; Each with Vibratory Feeder
(2)    Bulk Handling Systems Chutes, Asset #710; and Asset #708; Eddy Current Separators #1 and #2 Default Chutes
(2)    Bulk Handling Systems Chutes, Asset #714; and Asset #712; Eddy Current Separators #1 and #2 Aluminum Chutes



COMPANY NAME CantonLITE Recycling, LLC
EFFECTIVE DATE April 23, 2021
REPORT DATE May 3, 2021
JOB NUMBER 3095749



## Description

*Item #1 (continued)*

(1) Bulk Handling Systems Structure, Asset #304; Eddy Current Separator Support Structure

(2) Eriez Vibratory Conveyors, Asset #611; and Asset #610; Optical Infeed Vibratory Feeders #1 and #2

(2) Bulk Handling Systems Model ACL-96 96"W Power Belt Conveyors, S/N 1966-031-1114, Asset #031; and S/N 1966-030-1114, Asset #030; ACCL Conveyors #1 and #2

(2) NRT Model SpydIR-T-96 Optical Sorters, S/N SPY-T-188, Asset #612; and S/N SPY-T-189, Asset #613, (2014); Optical Sorters #1 and #2

(2) Bulk Handling Systems Chutes, Asset #720; and Asset #718; Optical Sorters #1 and #2 Default Chutes

(2) Bulk Handling Systems Chutes, Asset #722; and Asset #718; Optical Sorters #1 and #2 Eject Chutes

(2) Bulk Handling Systems Model LPSTC-72 72"W Power Belt Conveyors, S/N 1966-033-1114, Asset #033; and S/N 1966-032-1114, Asset #032; Incline Transfer Conveyors #1 and #2

(2) Bulk Handling Systems Model ACL-96 96"W Power Belt Conveyors, S/N 1966-034-1114, Asset #034; and S/N 1966-035-1114, Asset #035; ACCL Conveyors #3 and #4

(2) NRT Model ColorPlus T-96 Optical Sorters, S/N COLOR-047, Asset #614; and S/N COLOR-048, Asset #615, (2014); Optical Sorters #3 and #4

(2) Bulk Handling Systems Chutes, Asset #724; and Asset #728; Optical Sorters #3 and #4 Default Chutes

(2) Bulk Handling Systems Chutes, Asset #726; and Asset #730; Optical Sorters #3 and #4 Eject Chutes

(1) Bulk Handling Systems Structure, Asset #306; Optical Sort Structure #1

(1) Bulk Handling Systems Model LPST-24 24"W Power Belt Conveyor, S/N 1966-086-1114, Asset #086; Recovery Transfer Conveyor #3

(1) Bulk Handling Systems Model LPST-30 30"W Power Belt Conveyor, S/N 1966-036-1114, Asset #036; PET Collection Conveyor

(1) Bulk Handling Systems Model LPST-18 18"W Power Belt Conveyor, Asset #114; Label Transfer Conveyor #1

(1) Bulk Handling Systems Model LPST-24 24"W Power Belt Conveyor, S/N 1966-115-1114, Asset #115; Label Transfer Conveyor #2

(1) Bulk Handling Systems Model LPST-24 24"W Power Belt Conveyor, Asset #084; Recovery Transfer Conveyor #2

(1) Bulk Handling Systems Model LPST-30 30"W Power Belt Conveyor, Asset #094; Recovery Transfer Conveyor #6

(1) Bulk Handling Systems Model MDP-24 24"W Power Belt Conveyor, S/N 1966-082-1114, Asset #082; Recovery Transfer Conveyor #1

(1) Bulk Handling Systems Model LPST-18 18"W Power Belt Conveyor, Asset #116; Label Collection Conveyor

(2) Nihot Model RAS-35 Rotary Air Separators, Asset #632; and Asset #634; Rotary Air Separators #1 and #2

(2) Bulk Handling Systems Chutes, Asset #762; and Asset #760; Rotary Air Separators #1 and #2 Under Chutes

(1) Bulk Handling Systems Structure, Asset #314; Rotary Air Separator Support Structure #1

(1) Bulk Handling Systems Model LPST-30 30"W Power Belt Conveyor, S/N 1966-037-1114, Asset #037; PET Transfer Conveyor #1

(1) Bulk Handling Systems Model LPST-36 36"W Power Belt Conveyor, Asset #039; PET Transfer Conveyor #2

(1) AMUT Model COSFE30 Hopper, S/N L0046 DP, (2016); with Bottom Feed Conveyor

(1) AMUT Model DOSPO Weight Metering System, S/N L0046 DQ, (2016)

(1) AMUT Model TNS 1.40X10.50 55"W x 34'L Power Belt Conveyor, S/N L0046 DR, (2016)

(1) X2 Solutions Model X-CONV 400X3000 16"D x 10'L Screw Conveyor, S/N 048.18, (2018)

(1) X2 Solutions Screw Conveyor, (2018)

(1) AMUT Model VDSG 2.90 9.5'L Rotating Disc Screen, S/N L0046 DT, (2016)

(1) SEFT Model BSA 250 Double Screw Conveyor, S/N 10986, (2017)

COMPANY NAME CarbonLITE Recycling, LLC
EFFECTIVE DATE April 23, 2021
REPORT DATE May 3, 2021
JOB NUMBER 3096749



## Description

### Item #1 (continued)

| | |
|---|---|
| (1) | AMUT Model DLB1800 Delabeler, S/N L0046 AA, (2016) |
| (1) | SEFT Model TSA 400 Screw Conveyor, S/N 11186, (2017) |
| (1) | AMUT Model TNS 1,40X10,50 55"W x 34'L Power Belt Conveyor, S/N L0046 DS, (2016) |
| (1) | Screw Conveyor |
| (1) | AMUT Model FIROG/3672 Rotating Plate Filter, S/N L0046 AC, (2016) |
| (1) | SEFT Model TSA 400 Screw Conveyor, S/N 10886, (2017) |
| (1) | AMUT Model DLB1800 Delabeler, S/N F0250AR, (2015) |
| (1) | AMUT Screw Conveyor |
| (1) | AMUT Power Belt Conveyor |
| (1) | AMUT Tank, S/N L0046 AD, (2016) |
| (1) | AMUT Rotating Disc Screen |
| (1) | AMUT Power Belt Conveyor |
| (1) | AMUT Power Belt Conveyor, Asset #049; Debris Roll Screen #3 Infeed Conveyor |
| (1) | Bulk Handling Systems Model DRS72-11-1-236 72"W Disc Screen, Asset #042; Debris Roll Screen #3 |
| (1) | Bulk Handling Systems Chute, Asset #752; Debris Roll Screen #3 Over Chute |
| (1) | Bulk Handling Systems Chute, Asset #754; Debris Roll Screen #3 Under Chute |
| (1) | Bulk Handling Systems Structure, Asset #308; Debris Roll Screen #3 Support Structure |
| (1) | Bulk Handling Systems Air Knife System, Asset #662; Debris Roll Screen Air Knife System |
| (1) | KWS Screw Conveyor, S/N 0R23-00392664, Asset #113; Debris Roll Screen Under Wet Screw Conveyor |
| (1) | Bulk Handling Systems Model CBI-48 48"W Power Belt Conveyor, Asset #040; Buffer #3 Chainbelt |
| (1) | Bulk Handling Systems Vibratory Feeder, Asset #618; Optical Infeed Vibratory Feeder #3 |
| (1) | Bulk Handling Systems Structure, Asset #326; Vibratory Feeder #3 Support Structure |
| (1) | Bulk Handling Systems Model ACL-96 96"W Power Belt Conveyor, S/N 2115-00046-0418, Asset #046; ACCL Conveyor #5 |
| (1) | NRT Model Spydir-R-96 Optical Sorter, S/N SPY-R-192, Asset #620, (2014); Optical Sorter #5 |
| (1) | Bulk Handling Systems Chute, Asset #734; Optical Sorter #5 Default Chute |
| (1) | Bulk Handling Systems Chute, Asset #732; Optical Sorter #5 Eject Chute |
| (1) | Bulk Handling Systems Model LPST-36 36"W Power Belt Conveyor, Asset #093; Recovery Transfer Conveyor #5 |
| (1) | Bulk Handling Systems Model ACL-96 96"W Power Belt Conveyor, S/N 1966-047-1114, Asset #047; ACCL Conveyor #6 |
| (1) | NRT Model Spydir-T Optical Sorter, Asset #621; Optical Sorter #6 |
| (1) | Bulk Handling Systems Chute, Asset #784; Optical Sorter #6 Default Chute |
| (1) | Bulk Handling Systems Chute, Asset #782; Optical Sorter #6 Eject Chute |
| (1) | Bulk Handling Systems Model ACL-96 96"W Power Belt Conveyor, S/N 1966-048-1114, Asset #048; ACCL Conveyor #7 |
| (1) | NRT Model ColorPlus T-96 Optical Sorter, S/N COLOR+049, Asset #622, (2014); Optical Sorter #7 |
| (1) | Bulk Handling Systems Chute, Asset #738; Optical Sorter #7 Default Chute |
| (1) | Bulk Handling Systems Chute, Asset #736; Optical Sorter #7 Eject Chute |

COMPANY NAME CarbonLITE Recycling, LLC
EFFECTIVE DATE April 23, 2021
REPORT DATE May 3, 2021
JOB NUMBER 3096749



## Description

*Item #1 (continued)*

(1) Bulk Handling Systems Structure, Asset #310; Optical Sort Structure #2
(1) Bulk Handling Systems Model LPSTC-48 48"W Power Belt Conveyor, Asset #050; Post Sort Buffer Feed Conveyor
(1) Bulk Handling Systems Model CBI-48 48"W Power Belt Conveyor, Asset #056; Post Sort Infeed Chainbelt
(1) Bulk Handling Systems Chute, Asset #058; Post Sort Splitter Chute
(1) Eriez Model Xtreme 8M 52" x 20" Metal Detectors, S/N 316249-1, Asset #624; and S/N 316249-2, Asset #625; Metal Detectors #1 and #2; (Not In Service)
(2) Vibratory Conveyors
(2) NRT Model MAX Dual AQC-2 Optical Sorters, S/N Max-D2-031, Asset #MAX1; and S/N Max-D2-032, Asset #MAX2, (2020)
(2) Bulk Handling Systems Model LPSS-48 48"W Power Belt Conveyors, S/N 1966-061-1114, Asset #061; and S/N 1966-060-1114, Asset #060; Post Sort Conveyors #1 and #2
(1) Bulk Handling Systems Motor Control Center, Asset #400
(1) Bulk Handling Systems Presort Cabin, Asset #648
(1) Bulk Handling Systems Model LPST-36 36"W Power Belt Conveyor, Asset #062; Prewash Buffer Infeed Conveyor
(1) Bulk Handling Systems Platform, Asset #300; Presort/Post Sort Platform
(1) Bulk Handling Systems Model CLS-24 24"D Screw Conveyor, Asset #054; Screw Conveyor #3
(1) Bulk Handling Systems Model CBI-48 48"W Power Belt Conveyor, Asset #063; Prewash Infeed Chainbelt
(1) Bulk Handling Systems Scale, Asset #660; Grinder Feed Belt Scale
(1) Bulk Handling Systems Model ICC-54 54"W Power Belt Conveyor, Asset #064; Grinder Infeed Scale Conveyor
(1) Bulk Handling Systems PNR Roller, Asset #067; Powered Nose Roller
(2) Bulk Handling Systems Model LPST-48 48"W Power Belt Conveyors, Asset #068; and Asset #069; Reversing Grinder Feed Conveyors #1 and #2
(1) Bulk Handling Systems Structure, Asset #320; Grinder Conveyor Support Structure
(3) Bruno Folcieri Grinders, Asset #804; Asset #806; and Asset #808, (2017); Each with Dump Hopper
(1) Oberlin Model OPF24 Pressure Filter, S/N 232SD, (2020)
(1) AMUT Model COMUD Sludge Collection Screw Conveyor, S/N L0046 CL, (2016); with Hopper
(1) Bulk Handling Systems Model LPST-18 18"W Power Belt Conveyor, Asset #110; PET Recovery Transfer Conveyor #2
(1) Bulk Handling Systems Model LPST-18 18"W Power Belt Conveyor, Asset #108; PET Recovery Transfer Conveyor #1
(1) Bulk Handling Systems Model 80TR10HEI Dust Collector, Asset #638
(2) Bulk Handling Systems Model PTS-16-15HP Pneumatic Transfers, Asset #644; and Asset #646; Mixed Plastics and PP/PE Pneumatic Transfers; Each with Chicago Blower 15 hp Blower
(1) Bulk Handling Systems Model LPST-30 30"W Power Belt Conveyor, Asset #118; Contaminants Collection Conveyor
(1) NRT Model SpydIR-R-48 Optical Sorter, S/N SPY-R-191, Asset #630, (2014); Optical Sorter #10
(1) Bulk Handling Systems Chute, Asset #748; Optical Sorter #10 Default Chute
(1) Bulk Handling Systems Chute, Asset #750; Optical Sorter #10 Eject Chute
(1) Bulk Handling Systems Model ACL-48 48"W Power Belt Conveyor, Asset #106; ACCL Conveyor #10
(1) Bulk Handling Systems Structure, Asset #312; Optical Sort Structure #3
(1) Bulk Handling Systems Model LPSTC-36 36"W Power Belt Conveyor, Asset #102; Recovery Transfer Conveyor #8

COMPANY NAME CarbonLITE Recycling, LLC
EFFECTIVE DATE April 23, 2021
REPORT DATE May 3, 2021
JOB NUMBER 3096749



## Description

### Item #1 (continued)

(1) NRT Model SpydIR-T-60 Optical Sorter, S/N SPY-T-190, Asset #628, (2014); Optical Sorter #9
(1) Bulk Handling Systems Chute, Asset #744; Optical Sorter #9 Default Chute
(1) Bulk Handling Systems Chute, Asset #746; Optical Sorter #9 Eject Chute
(1) Bulk Handling Systems Model ACL-60 60"W Power Belt Conveyor, Asset #100; ACCL Conveyor #9
(1) Bulk Handling Systems Model MDP-18 18"W Power Belt Conveyor, Asset #104; PET Recovery Collection Conveyor
(1) Bulk Handling Systems Model LPSTC-48 48"W Power Belt Conveyor, Asset #096; Recovery Transfer Conveyor #7
(1) Bulk Handling Systems Model LPST-30 30"W Power Belt Conveyor, Asset #099; Aluminum Collection Conveyor
(1) Bulk Handling Systems Model PTS-16-15HP Pneumatic Transfer, Asset #640; PET Pneumatic Transfer; with Chicago Blower 25 hp Blower
(1) Bulk Handling Systems Model PTS-14-15HP Pneumatic Transfer, Asset #642; Aluminum Pneumatic Transfer; with Chicago Blower 15 hp Blower
(1) NRT Model ColorPlus 48 Optical Sorter, Asset #626; Optical Sorter #8
(1) Bulk Handling Systems Chute, Asset #740; Optical Sorter #8 Default Chute
(1) Bulk Handling Systems Chute, Asset #742; Optical Sorter #8 Eject Chute
(1) Bulk Handling Systems Model ACL-48 48"W Power Belt Conveyor, Asset #090; ACCL Conveyor #8
(1) Bulk Handling Systems Model MDP-24 24"W Power Belt Conveyor, S/N 1966-098-1114, Asset #098; PET Collection Conveyor #2
(1) Bulk Handling Systems Model LPSTC-48 48"W Power Belt Conveyor, Asset #088; Recovery Transfer Conveyor #4
(5) Bulk Handling Systems Model CBIN-H Container Bins, Asset #126E; Asset #126C; Asset #126D; Asset #126A; and Asset #126B; with Bunker Bridge,
    Asset #130; (5) 1-Ton Chain Hoists; and Motors
(1) Bulk Handling Systems Model CBI-60 60"W Power Belt Conveyor, Asset #128; Baler Infeed Chainbelt
(1) Hopper, Asset #766; Baler Infeed Hopper
(1) Harris Horizontal Hydraulic Baler, Asset #650; with Hydraulic Power Unit, with 50 hp Motor; Accent Wire Tie; and PLC Controls
(1) Bulk Handling Systems Scale, Asset #652; Infeed Bale Scale
(1) Bulk Handling Systems Scale, Asset #654; Baler Bale Scale
(1) Bulk Handling Systems Model LPST-30 30"W Power Belt Conveyor, Asset #120; Contaminants Loadout Conveyor
(1) Bulk Handling Systems Power Belt Conveyor, Asset #121; Contaminants Conveyor

*(Asset Documentation In Photograph Section)*

### Item #2

QTY (1) Flake Line, To Include:

(1) Bunting Magnetics Separator; with 30" x 60'L Infeed Conveyor; (2) 42" x 10'L Conveyors, S/N 9339447-3-1, and S/N Unknown; and 18WA Centrifugal
    Blower, Powered By 15 hp Electric Motor
(1) Aerzen Model Delta Blower GM15L Positive Displacement Blower, S/N 1571053, (2017)
(1) Aerzen Model Delta Blower GM25S Positive Displacement Blower, S/N 1572636, (2017)
(1) Aerzen Model Delta Blower GM15L Positive Displacement Blower, S/N 1572482, (2017)
(1) Aerzen Model Delta Blower GM15L Positive Displacement Blower, S/N 1571054, (2017)

COMPANY NAME CarbonLITE Recycling, LLC
EFFECTIVE DATE April 23, 2021
REPORT DATE May 3, 2021
JOB NUMBER 3096749



## Description

**Item #2 (continued)**

(1) Premier Plastic Handling System, S/N 2017107950I; with Control Panel; (2) Buhler Model SORTEX A ColorVision Separating Units, S/N 700065890, and S/N 700065888; (2) Unisensor Model Powersort 200V16 Separation Machines, S/N 042P2117V16, and S/N 041P2117V16; Top Mounted Hoppers; LCD Touch Screen; (10) Pelletron Roots Type Blowers; Situated Below Separators

(1) Product Bagging System; with (1) Pelletron 6' Square x 10'H Feed Hopper, Pyramid Bottom, with Discharge to Bag, (1) Flexicon Bagging Station; and Pelletron Model HDBI-180 Centrifugal Blower, S/N SY16-1117, Powered By 25 hp Electric Motor

(Asset Documentation In Photograph Section)

**Item #3**

QTY:(1) Wash Line, To Include:

(1) AMUT Model MAS150-83-53 Granulator, S/N L0046BY, (2016)

(1) AMUT Model Sepva 3000 Approximately 4'W x 20'L Vibratory Separator, S/N L0046BS, (2016); with Bottom Discharge

(1) AMUT Model Sepva 3000 Approximately 4'W x 20'L Vibratory Separator, S/N L0046BT, (2016); with Bottom Discharge

(2) AMUT Model ESSPI170 Dehydrators, S/N L0046DD; and S/N L0046DE, (2016)

(2) AMUT Model GR250 Feeders, S/N 212241611057S; and S/N 212251611057S

(2) Model VG710/N2 Centrifugal Blowers, S/N B17003213; and S/N B17003214; Powered By Electric Motor

(2) AMUT Model CENTR 3000 Centrifuges, S/N L0046BF; and S/N L0046BF; Each with Approximately 10'D Auger Screw Conveyor

(1) AMUT Model Idrofilter Rotary Filter, S/N Unknown; with (6) Filter Screens, Approximately 36"D

(1) AMUT Model RISVA/PET6000-CL Approximately 4'W x 15'L Separator, S/N L0046BD; with (4) Internal Augers, Each Powered By Electric Motor, with Gear Drive

(2) AMUT Rotary Cleaners; Each with Approximately 42"D x 14'L Drum

(1) AMUT Model RISVA/PET6000 Approximately 5'W x 15'L Separator, S/N L0046AW; with (4) Internal Augers

(3) AMUT Model FIROD3 Filter Units, S/N L0046BL; S/N L0046AP; and S/N L0046AQ; Each with (6) 36"D Filters

(2) Barmesa Model 816U Centrifugal Pumps, S/N 190719/02; and S/N Unknown; Each Powered By 30 hp Electric Motor

(1) AMUT Model UDC345 Filtration Unit, S/N L0046BO; with Elevated Catwalk

(1) Aerzen Model Delta Blower GM25S Positive Displacement Blower, S/N 1572651, (2017)

(1) Flexicon Bagging System; with (1) Section For Smaller Bags, Top Mounted Hopper Infeed, with Control Valves; and (1) Section with (8) Stations, Each For Larger Bags, with Blower Infeed, Steel Frame

(Asset Documentation In Photograph Section)

**Item #4**

QTY:(1) Sorema Model MU 610 PRT Grinder, S/N MU610-170, (2020); (Not In Service; To Be Installed On New Line)

(Asset Documentation In Photograph Section)

COMPANY NAME CarbonLITE Recycling, LLC
EFFECTIVE DATE April 23, 2021
REPORT DATE May 3, 2021
JOB NUMBER 3096749



## Description

### Extrusion

**Item #5**

Qty(1) Extrusion Line #1, To Include:
- (1) EREMA Model DBS_40 Day Bin System, (2017)
- (1) EREMA Compression Conveying System, (2017)
- (1) EREMA Final Big Bag Filling Station, (2017)
- (2) EREMA Model KT_MULTI_2300_560 Crystallization Dryers, (2017)
- (1) EREMA Model STC_2KT_2300 Crystallization Dryers Support Structure, (2017)
- (1) EREMA Vacuum Slider, (2017)
- (3) EREMA Model RVP_4000 Reactor Vacuum Pumps, (2017)
- (2) EREMA Model VBF_F2 Self-Cleaning Vacuum Filters, (2017)
- (1) EREMA Model VBF_1 Self-Cleaning Vacuum Filter, (2017)
- (1) EREMA Model VACUREMA V_2321_T+50 Plastics Extruder, S/N P-20140052, (2017)
- (1) EREMA Model RVP_CONDENSER Condensate Separator, (2017)
- (1) EREMA Model SW_12_170_RTF Backflush Filter, (2017)
- (1) EREMA Model OVM_03_50 Inline Viscometer, (2017)
- (1) EREMA Model SD_300_ASP Strand Die, (2017)
- (1) EREMA Model ASP_C_320 Automatic Strand Pelletizer, (2017)
- (1) EREMA Model PWA_1000 Automatic Strand Pelletizer Water System, (2017)
- (1) EREMA Model CIC_300 Continuous Inline Crystallization System, (2017)
- (5) EREMA Model PF_900 Pellet Flushers, (2017)
- (2) EREMA Pellet Cyclones, (2017)
- (2) Jost Model SUZ 800-X1500 Pellet Classifying Screens, Asset #1770082; and Asset #1770083, (2017)
- (1) Lot of Control Cabinets

(Asset Documentation In Photograph Section)

**Item #6**

Qty(4) Pelletron Model 70 18 12-0 x 76-0 6,687-Cubic Feet Silos, S/N I-83149-1; and S/N I-83149-2; Cone Bottom; Each with Pelletron Model GRM400-300 Blower, Powered By Electric Motor, with Gear Drive

(Asset Documentation In Photograph Section)

**Item #7**

Qty(8) Pelletron Model 45-55-10-6x25-9 Silos, S/N I-83148-3; S/N I-83148-1; S/N I-83148-2; S/N I-83148-5; S/N I-83148-4; S/N I-83148-8; S/N I-83148-7; and S/N I-83148-6; Each with Pelletron Model GRH200-150 Blower, Powered By Electric Motor, Cone Bottom

(Asset Documentation In Photograph Section)

## Description

### Item #8

Qty (1) Extrusion Line #2, To Include:

(1) Feeder System; with FDM Hopper, Approximately 5W x 10H, Pyramid Bottom, with Pelletron Blower, Baratti Blower Motor; and (2) Feed Silos, Approximately 5'D x 10'H, with Blowers

(1) EREMA Model VACUREMA Prime 2321T Plastics Extruder, S/N E_A107935/10/1; with Mixing Barrel; and Die Section, with (6) Side Acting Cylinders

(1) Manufacturer Unknown Pelletizer; (Partially Disassembled)

(1) EREMA Model ASP-Z-320 Centrifuge, S/N P20140048; with 42"D x 6"H Hopper; Bottom Mounted Blower; and Crystallizer

(4) Hoppers; (3) Approximately 5'D x 20'H, (1) Approximately 4'D x 12'H, Used For Process, Cooling and Fire Pass; Each with (2) Centrifugal Blowers, Powered By 10 hp Electric Motor; and Blower Filters

(2) Jost Model SUZ 800-X1500 Pellet Classifying Screens, S/N 1770081; and S/N 1770080; Each with Hopper Infeed

(1) Eisbar Model PDS9000E Air Filtration Unit, S/N V47088-01-5114; In Approximately 6'W x 15'L Housing

(Asset Documentation In Photograph Section)

### Item #9

Qty (2) Aigner Dust Collectors; with (4) Sections, Each with Pyramid Bottom, Side Mounted Ductwork, Top Mounted Blower

(Asset Documentation In Photograph Section)

## Plant Utility

### Item #10

Qty (1) Ingersoll-Rand Model IRN200H-OF Packaged Rotary Screw Air Compressor, S/N TN1094U17052, (2017), 200 hp; 23,828 Hours Indicated

(Asset Documentation In Photograph Section)

### Item #11

Qty (1) Ingersoll-Rand Model Sierra-H200A Packaged Rotary Screw Air Compressor, S/N TS5631U17045, (2017), 200 hp; 9,486 Hours Indicated

(Asset Documentation In Photograph Section)

### Item #12

Qty (1) Ingersoll-Rand Model Sierra-H200A Packaged Rotary Screw Air Compressor, S/N TS5634U17047, (2017), 200 hp; 14,728 Hours Indicated

(Asset Documentation In Photograph Section)

### Item #13

Qty (1) Ingersoll-Rand Model Sierra-H200A Packaged Rotary Screw Air Compressor, S/N TS5633U17046, (2017), 200 hp; 14,605 Hours Indicated

(Asset Documentation In Photograph Section)

### Item #14

Qty (1) Ingersoll-Rand Model Sierra-H200A Packaged Rotary Screw Air Compressor, S/N TS5632U17046, (2017), 200 hp; 14,503 Hours Indicated

(Asset Documentation In Photograph Section)

### Item #15

Qty (1) Ingersoll-Rand Model NVC4000A40V 400-cfm Refrigerated Air Dryer, S/N WCH1016775, (2018); 8,292 Hours Indicated, (2) Modules

(Asset Documentation In Photograph Section)

Gordon Brothers



## Description

**Item #16**
Qty(1)   Ingersoll-Rand Model NVC4000A40V 400-cfm Refrigerated Air Dryer, S/N WCH1016776, (2018); 1,518 Hours Indicated, (2) Modules
(Asset Documentation In Photograph Section)

**Item #17**
Qty(1)   Ingersoll-Rand Model F61001A Air Filter, S/N 23553373

**Item #18**
Qty(1)   Approximately 6'D x 16'H Vertical Air Receiving Tank

**Item #19**
Qty(1)   Carrier Model 30RAP0906DB00100 90-Ton Chiller, S/N 2416Q84246; (3) Sections; Each with (2) Exhaust Fans
(Asset Documentation In Photograph Section)

**Item #20**
Qty(1)   Carrier Model 30RAP0906DB00100 90-Ton Chiller, S/N 2416Q84247; (3) Sections; Each with (2) Exhaust Fans
(Asset Documentation In Photograph Section)

**Item #21**
Qty(1)   Carrier Model 30RAP0906DB00100 90-Ton Chiller, S/N Unknown; (3) Sections; Each with (2) Exhaust Fans; ID Sticker Removed
(Asset Documentation In Photograph Section)

**Item #22**
Qty(1)   Carrier Model 30RAP0906DB00100 90-Ton Chiller, S/N Unknown; (3) Sections; Each with (2) Exhaust Fans; ID Sticker Removed
(Asset Documentation In Photograph Section)

**Item #23**
Qty(1)   Aerzen Model Delta Blower Positive Displacement Blower, S/N 1572485, (2017)
(Asset Documentation In Photograph Section)

**Item #24**
Qty(1)   Frigel Model 3HM290-HT-EH-BP+EP+PP+Tank Chiller, S/N 1803150, (2018); (2) Sections; Each with (2) Fans
(Asset Documentation In Photograph Section)

**Item #25**
Qty(2)   Approximately 8'D x 12'H Plastic Storage Tanks

**Item #26**
Qty(2)   Miura Model LX-200 Gas Fired Steam Boilers, S/N US01030048, Asset #2; and S/N US01030047, Asset #1, (2017); Each with Top Mounted Burner Assembly; Blower; and 60"D x 84"H Plastic Reverse Osmosis Water Tank
(Asset Documentation In Photograph Section)

**Item #27**
Qty(1)   Evoqua Model MST-M83R006XMYAD Water Filtration Unit, S/N 1629753; with ROPV Cylinders; (2) 36" x 72" Composite Tanks, S/N 04417001, and S/N 04417002; and (1) 30" x 72" Composite Tank, S/N 04117006
(Asset Documentation In Photograph Section)



## Description

## Laboratory

**Item #28**
QTY:(1) W.S. Tyler Model Ro-Tap RX-29 Sieve Shaker, S/N 11817; Powered By Electric Motor; with Cabinet

**Item #29**
QTY:(1) Thomas Scientific Model 4 Lab Mill, S/N Unknown

**Item #30**
QTY:(1) Binder Approximately 24" Square Lab Oven, S/N 2018000015319

**Item #31**
QTY:(1) Hemco Model EcoFlow 48" Fume Hood, S/N Unknown

**Item #32**
QTY:(1) Hunter Model LabScan XE Scanner, S/N 18823; with Dell Computer

**Item #33**
QTY:(1) Mettler Toledo Model XS4002S Precision Scale, S/N B710783100; with LCD Readout

**Item #34**
QTY:(1) Mettler Toledo Model HE73 Moisture Analyzer, S/N B702553342

**Item #35**
QTY:(1) Binder Approximately 24" Square Lab Oven, S/N Unknown

**Item #36**
QTY:(1) Dynisco Model LMI5000 Sample Melt Flow Indexer, S/N 206FAG6472

**Item #37**
QTY:(1) Binder Approximately 24" Square Lab Oven, S/N 2020000005779

**Item #38**
QTY:(1) Thermo Scientific Model Cimarec Stirring Hot Plate; with Pan; Stand; and Pipette

**Item #39**
QTY:(1) Ohaus Model Ranger R31P3 Precision Balance, S/N 8339320261; with LCD Readout

**Item #40**
QTY:(2) PerkinElmer Model Clarus 680 Gas Chromatographs, S/N Unknown; and S/N 680S17022703; Each with LCD Touch Screen
(Asset Documentation In Photograph Section)



## Description

### Item #41
Qty:(2) PerkinElmer Model TurboMatrix 40 Headspace Samplers, S/N HS40S1703023; and S/N HS40L17030024; Each with LCD Touch Screen; and 40-Position Sample Carousel

### Item #42
Qty:(1) Mettler Toledo Model XS204 Precision Scale, S/N B773882168

## Maintenance

### Item #43
Qty:(1) Jet Model JDP-17 Floor-Type Drill Press, S/N 17021762
(Asset Documentation In Photograph Section)

### Item #44
Qty:(1) Jet Model J-4400A Disc Sander, S/N 17020002
(Asset Documentation In Photograph Section)

### Item #45
Qty:(1) DeWalt Pedestal Grinder
(Asset Documentation In Photograph Section)

### Item #46
Qty:(1) Miller Model Trailblazer 325 EFI 325-Amp Arc Welder Generator, S/N MJ200140R, (2018); with Cart
(Asset Documentation In Photograph Section)

### Item #47
Qty:(1) Miller Model Diversion 180 180-Amp Tig Welder; with Cart
(Asset Documentation In Photograph Section)

### Item #48
Qty:(1) Miller Model Millermatic 211 200-Amp Mig Welder, S/N NB091031N, (2021); with Cart
(Asset Documentation In Photograph Section)

### Item #49
Qty:(1) Hypertherm Model Powermax 65 Plasma Cutter, S/N 65-057979
(Asset Documentation In Photograph Section)

### Item #50
Qty:(1) DeWalt 15" Chop Saw; On Metal Worktable
(Asset Documentation In Photograph Section)

### Item #51
Qty:(1) Lot of Spare Parts, To Include: Couplers; Fittings; Cap Screws; Flat Washers; Lock Washers; Bolts, Assorted Sizes and Lengths; Nuts, Assorted Sizes; Stored In (18) Metal Parts Bins, 36"W x 5-1/2"H
(Asset Documentation In Photograph Section)

COMPANY NAME CarbonLITE Recycling, LLC
EFFECTIVE DATE April 23, 2021
REPORT DATE May 3, 2021
JOB NUMBER 3096749

## Description

### Item #52
Qty(1)  Cyclone Model 422-4 Shot Blast Cabinet, S/N 11944

### Item #53
Qty(1)  Ekuma Model Ekuma 700 Super Cleaner, S/N MO.170259, (2017)

## Throughout Plant

### Item #54
Qty(1)  Rice Lake Model Survivor Approximately 10W x 66'L Truck Scale; Above Ground; with Rice Lake Model LaserLight 2 Digital Readout
*(Asset Documentation In Photograph Section)*

### Item #55
Qty(8)  8'W x 8'H x 40'L Storage Containers, Asset #2; Asset #1; Asset #3; Asset #4; Asset #5; Asset #7; Asset #6; and Asset #8

### Item #56
Qty(1)  Approximately 6'W x 18'L Belt Conveyor, Asset #009; (Out of Service)

## Rolling Stock

### Item #57
Qty(1)  E-Z-Go Electric Golf Cart
*(Asset Documentation In Photograph Section)*

### Item #58
Qty(1)  GNB Model 1800-48VUS Battery Charger, S/N 1926001685; *(Leased)*
*(Asset Documentation In Photograph Section)*

### Item #59
Qty(1)  Ametek Model 1200EC3F-18SP Battery Charger, S/N 217CS57926; *(Leased)*
*(Asset Documentation In Photograph Section)*

### Item #60
Qty(1)  Cargotec 4x2 Yard Truck, S/N 329482, (2012); 51,793 Miles Indicated
*(Asset Documentation In Photograph Section)*

### Item #61
Qty(1)  Komatsu Model FG50AT2-8 5,000-Lb. LP Gas Lift Truck, S/N 132412A
*(Asset Documentation In Photograph Section)*

### Item #62
Qty(1)  Ametek Model 1200EC3F-18SP Battery Charger, S/N 217CS59813
*(Asset Documentation In Photograph Section)*

COMPANY NAME CarbonLITE Recycling, LLC
EFFECTIVE DATE April 23, 2021
REPORT DATE May 3, 2021
JOB NUMBER 3096749





## Description

**Item #63**
QTY(1)  Ametek Model 1200EC3F-18SP Battery Charger, S/N 318672821
(Asset Documentation In Photograph Section)

**Item #64**
QTY(1)  Wabash National 53' Tandem Axle Van Trailer, VIN 1JJV532W3YL723482, Asset #540041, (2000)

**Item #65**
QTY(1)  Wabash National 53' Tandem Axle Van Trailer, VIN 1JJV532W01L724899, Asset #541458, (2001)

**Item #66**
QTY(1)  Wabash National 53' Tandem Axle Van Trailer, VIN 1JJV532W71L724060, Asset #540619, (2001)

**Item #67**
QTY(1)  Wabash National 53' Tandem Axle Van Trailer, VIN 1JJV532W91L724514, Asset #541073, (2001)

**Item #68**
QTY(1)  Wabash National 53' Tandem Axle Van Trailer, VIN 1JJV572W7XL637694, Asset #T65056, (1999)

**Item #69**
QTY(1)  Wabash National 53' Tandem Axle Van Trailer, VIN 1JJV532W1YL648040, Asset #994710, (2000)

**Item #70**
QTY(1)  Wabash National 53' Tandem Axle Van Trailer, VIN 1JJV532W8YL645619, Asset #994745, (2000)

**Item #71**
QTY(1)  Wabash National 53' Tandem Axle Van Trailer, VIN 1JJV532F7WF452616, Asset #990001, (1998)

**Item #72**
QTY(1)  Wabash National 53' Tandem Axle Van Trailer, VIN 1JJV532W6YL723458, Asset #540017, (2000)

**Item #73**
QTY(1)  Wabash National 53' Tandem Axle Van Trailer, VIN 1JJV532W81L724729, Asset #541288, (2001)
(Asset Documentation In Photograph Section)

**Item #74**
QTY(1)  Wabash National 53' Tandem Axle Van Trailer, VIN 1JJV532W21L724922, Asset #541481, (2001)

**Item #75**
QTY(1)  Wabash National 53' Tandem Axle Van Trailer, VIN 1JJV532W51L759034, Asset #542169, (2001)

**Item #76**
QTY(1)  Wabash National 53' Tandem Axle Van Trailer, VIN 1JJV532W8YL694786, Asset #TLS1071, (2000)

**Item #77**
QTY(1)  Wabash National 53' Tandem Axle Van Trailer, VIN 1JJV532WX1L756923, Asset #542435, (2001)

**Item #78**
QTY(1)  Wabash National 53' Tandem Axle Van Trailer, VIN 1JJV532W8YL723722, Asset #540281, (2000)

COMPANY NAME CarbonLITE Recycling, LLC
EFFECTIVE DATE April 23, 2021
REPORT DATE May 3, 2021
JOB NUMBER 3096749

## Description

**Item #79**
Qty(1) Wabash National 53' Tandem Axle Van Trailer, VIN 1JJV532W8YL723672, Asset #540231, (2000)

**Item #80**
Qty(1) Wabash National 53' Tandem Axle Van Trailer, VIN 1JJV532W41L772437, Asset #542868, (2001)

**Item #81**
Qty(1) Wabash National 53' Tandem Axle Van Trailer, VIN 1JJV532W91L724030, Asset #540589, (2001)

**Item #82**
Qty(1) Wabash National 53' Tandem Axle Van Trailer, VIN 1JJV532W05L942461, Asset #997279, (2005)
(Asset Documentation In Photograph Section)

**Item #83**
Qty(1) Wabash National 53' Tandem Axle Van Trailer, VIN 1JJV532W9YL723762, Asset #540321, (2000)

**Item #84**
Qty(1) Wabash National 53' Tandem Axle Van Trailer, VIN Unknown, Asset #530342

**Item #85**
Qty(1) Wabash National 53' Tandem Axle Van Trailer, VIN 1JJV532W11L723891, Asset #540450, (2001)

**Item #86**
Qty(1) Wabash National 53' Tandem Axle Van Trailer, VIN 1JJV532W4YL723586, Asset #540145, (2000)

**Item #87**
Qty(1) Wabash National 53' Tandem Axle Van Trailer, VIN 1JJV532W71L756782, Asset #542294, (2001)

**Item #88**
Qty(1) Wabash National 53' Tandem Axle Van Trailer, VIN Unknown, Asset #535227

**Item #89**
Qty(1) Wabash National 53' Tandem Axle Van Trailer, VIN 1JJV532Y4VL396720, Asset #994556, (1997)

**Item #90**
Qty(1) Wabash National 53' Tandem Axle Van Trailer, VIN 1JJV532W21L756222, Asset #541734, (2001)

**Item #91**
Qty(1) Wabash National 53' Tandem Axle Van Trailer, VIN 1JJV532W2YL723866, Asset #540425, (2001); (Trailer Damage At Landing Gear)

**Item #92**
Qty(1) Wabash National 53' Tandem Axle Van Trailer, VIN 1JJV532W8YL723753, Asset #540312, (2000); (Trailer Damage At Landing Gear)

**Item #93**
Qty(1) Genie Model Z-40/23NRJ Electric Personnel Lift, S/N Z40NF-5090, (2018)

**Item #94**
Qty(1) Toyota Model 8FBCU25 5,000-Lb. Electric Lift Truck, S/N 72707, with Bale Clamp

COMPANY NAME CarbonLITE Recycling, LLC
EFFECTIVE DATE April 23, 2021
REPORT DATE May 3, 2021
JOB NUMBER 3096749



## Description

### Leased Assets

**Item #95**
QTY:(1) GNB Model 1800-48VUS Battery Charger, S/N 1923001650; *(Leased)*
(Asset Documentation In Photograph Section)

**Item #96**
QTY:(1) EnerSys Model EI3-HL-4Y Battery Charger, S/N RE530614; *(Leased)*
(Asset Documentation In Photograph Section)

**Item #97**
QTY:(1) Ametek Model 1200EC3F-18SP Battery Charger, S/N 317CS61875; *(Leased)*
(Asset Documentation In Photograph Section)

**Item #98**
QTY:(1) Ametek Model 1200EC3F-18SP Battery Charger, S/N 217CS57927; *(Leased)*
(Asset Documentation In Photograph Section)

**Item #99**
QTY:(1) Toyota Model 8FBCU25 5,000-Lb. Electric Lift Truck, S/N 8FBCU25-75329; *(Leased)*
(Asset Documentation In Photograph Section)

**Item #100**
QTY:(1) Toyota Model 8FBCU25 5,000-Lb. Electric Lift Truck, S/N 77783; *(Leased)*
(Asset Documentation In Photograph Section)

**Item #101**
QTY:(1) Toyota Model 8FBCU25 5,000-Lb. Electric Lift Truck, S/N 74936; *(Leased)*
(Asset Documentation In Photograph Section)

**Item #102**
QTY:(1) Toyota Model 8FBCU25 5,000-Lb. Electric Lift Truck, S/N 77934; 4-Stage Mast; *(Leased)*
(Asset Documentation In Photograph Section)

**Item #103**
QTY:(1) Ametek Model 1200EC3F-18SP Battery Charger, S/N 318CS2822; *(Leased)*
(Asset Documentation In Photograph Section)

**Item #104**
QTY:(1) Ametek Model 1200EC3F-18SP Battery Charger, S/N 318CS72820; *(Leased)*
(Asset Documentation In Photograph Section)

**Item #105**
QTY:(1) Toyota Model 8FBCU25 5,000-Lb. Electric Lift Truck, S/N 80016; *(Leased)*
(Asset Documentation In Photograph Section)


Gordon Brothers



## Description

### Item #06

Qty (1)    Toyota Model 8FBCU25 5,000-Lb. Electric Lift Truck, S/N 74913; *(Leased)*

     (Asset Documentation In Photograph Section)

### Item #07

Qty (1)    Toyota Model 8FBCU25 5,000-Lb. Electric Lift Truck, S/N 72410; *(Leased)*

     (Asset Documentation In Photograph Section)

### Item #08

Qty (1)    Toyota Model 8FBCU25 5,000-Lb. Electric Lift Truck, S/N 77940; 4-Stage Mast; *(Leased)*

     (Asset Documentation In Photograph Section)

### Item #09

Qty (1)    Genie Model GS2632 Electric Scissor Lift, S/N Unknown; *(Leased)*

### Item #10

Qty (1)    Genie Model GS-3232 Scissor Lift, S/N Unknown; *(Leased)*

### Item #11

Qty (1)    Extrusion Line #3, To Include:

     (1) Starlinger Model recoSTAR PET 125 Extruder, S/N 18-00019-00113; with Die Section; (2) Side Mounted Hydraulic Cylinders; and (4) Top Mounted Hydraulic Cylinders; *(Leased)*

     (1) Maag Model Sphero 70 Pelletizer, S/N 1020537, with Shaker Table; *(Leased)*

     (1) Busch Model RA0305D523 Vacuum Pump, S/N C1749000736; *(Leased)*

     (1) Flush System; with Energy Recovery Kit; (2) Columns; (1) Fluid Grade Flush Hopper, with Bagger; (1) Non-Fluid Grade Flush Hopper, with Bagger; and (1) Flush Hopper, with Bagger; *(Leased)*

     (1) Kaeser Model DB236 Rotary Lobe Blower, S/N 2171216973; *(Leased)*

     (1) Kaeser Model DB236C Rotary Lobe Blower, S/N 2171216972; *(Leased)*

     (1) Approximately 5'D x 12'H SSP Reactor; with Bottom Cooling Vessel; *(Leased)*

     (1) Piovan Air Dryer; Model and S/N Unknown; with Insulated Piping; *(Leased)*

     (1) Piovan Model CDF4000 Fume Condenser, S/N 00618FC02, (2018); (2) Sections; *(Leased)*

     (1) Virto Model VPM15001/X Rotary Separator, S/N FD04188523, (2018); with Screw Conveyor Infeed From Fine Flake Hopper, Feeding to Florandi Hopper, Approximately 48" Square x 5'H, Pyramid Bottom, with Auger; and (1) Piovan Silo, Approximately 5'D x 20'H, Cone Bottom; *(Leased)*

     (Asset Documentation In Photograph Section)

COMPANY NAME CarbonLITE Recycling, LLC
EFFECTIVE DATE April 23, 2021
REPORT DATE May 3, 2021
JOB NUMBER 3096749



# Machinery & Equipment Photo Report



*Item #1 - 1* Cross Wrap Dewiring Machine



*Item #1 - 2* SSI Model Pri-Max Scrap Shredder



*Item #1 - 3* Bulk Handling Systems Model LBB Buffers



*Item #1 - 4* Bulk Handling Systems Model DRS60-15 60"W Disc Screens



**Gordon Brothers**





Item #1 - 5 Nihot Model WS-S 1200 Windshifter Separators



Item #1 - 6 Bulk Handling Systems Eddy Current Separators



Item #1 - 7 NRT Model SpydIR-T-96 Optical Sorters



Item #1 - 8 NRT Model SpydIR-T-96 Optical Sorters



*Item #1 - 9* Bulk Handling Systems Model LPSTC-72 72"W Power Belt Conveyors



*Item #1 - 11* NRT Model ColorPlus T-96 Optical Sorters



*Item #1 - 10* NRT Model ColorPlus T-96 Optical Sorters



*Item #1 - 12* Nihot Model RAS-35 Rotary Air Separators


Gordon Brothers

CARBONLITE RECYCLING, LLC
JOB NUMBER: 3096749





Item #1 - 13 AMUT Model COSFE30 Hopper



Item #1 - 14 AMUT Model VDSG 2,90 9.5L Rotating Disc Screen



Item #1 - 15 AMUT Model DLB1800 Delabeler



Item #1 - 16 AMUT Model FIROG/3672 Rotating Plate Filter



*Item #1 - 18* AMUT Rotating Disc Screen



*Item #1 - 20* Bulk Handling Systems Model DRS72-11-11-236 72"W Disc Screen



*Item #1 - 17* AMUT Model DLB1800 Delabeler



*Item #1 - 19* AMUT Power Belt Conveyor



Gordon
Brothers