IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>CARBONLITE HOLDINGS LLC, *et al.*,[1]<br><br>     Debtors. | Chapter 11<br><br>Case No. 21-10527 (JTD)<br><br>Jointly Administered<br><br>Re: Docket Nos. 384 & 508<br>Hearing Date: June 8, 2021 at 1:00 p.m. |

## PURCHASER'S REPLY TO THE OBJECTIONS OF PROLOGIS TARGETED U.S. LOGISTICS FUND, L.P. REGARDING BUYER'S PROVISION OF ADEQUATE ASSURANCE OF FUTURE PEFORMANCE

TSG Shelf II Acquisition, LLC ("Purchaser"), the Successful Bidder for the Riverside Facility, hereby submits this reply (the "Reply") to the *Response of Prologis Targeted U.S. Logistics Fund, L.P. to Notice of Proposed Assumption and Assignment of Designated Executory Contracts and Unexpired Leases* [Docket No. 384] (the "Prologis Response") and the *Limited Objection of Prologis Targeted U.S. Logistics Fund, L.P. to Notice of Successful Bidder and Auction Results for Sale of the Assets of CarbonLite Industries LLC (The Riverside Facility)* [Docket No. 508] (the "Prologis Limited Objection" and, together, the "Prologis Objections") filed by landlord Prologis Logistics Fund, L.P. ("Prologis").[2] In support of the Reply, Purchaser submits the *Declaration of Scott MacLaren in Support of Purchaser's Reply to the Objection of Prologis Targeted U.S. Logistics Fund, L.P. Regarding Buyer's Provision of Adequate Assurance of Future Performance* (the

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: CarbonLite Holdings LLC (8957); CarbonLite Industries LLC (3596); CarbonLite P Holdings LLC (8957); CarbonLite P LLC (5453); CarbonLite PI Holdings LLC (8957); CarbonLite Pinnpack LLC (8957); CarbonLite Recycling Holdings LLC (8957); CarbonLite Sub-Holdings, LLC (8957); Pinnpack P, LLC (8322); CarbonLite Recycling LLC (3727); and Pinnpack Packaging LLC (9948). The address of the Debtors' corporate headquarters is 10250 Constellation Blvd., Los Angeles, CA 90067.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Prologis Objections or that certain *Asset Purchase Agreement (Riverside) by and between CarbonLite Industries, LLC and TSG Shelf II Acquisition, LLC* (the "APA") [Docket No. 498-2], as applicable.

"MacLaren Declaration"), filed contemporaneously herewith. In further support of the Reply, Purchaser respectfully represents as follows:

## PRELIMINARY STATEMENT

1. Prologis objects to the assignment by Debtor CarbonLITE Industries LLC ("Tenant") of two real property leases to Purchaser of the Debtors' Riverside Facility (the Palmyrita Lease and the Michigan Avenue Lease) on a number of grounds, but primarily on the basis that there has not been a sufficient showing of adequate assurance of future performance by Purchaser under the leases. The Prologis Objections should be overruled.

2. As demonstrated below and in the MacLaren Declaration, adequate assurance of future performance has been provided to Prologis with respect to the Michigan Avenue Lease by, among other things, provision of financial statements, a *pro forma* balance sheet and other pertinent financial information relating to Evergreen Recycling LLC ("Evergreen"),[3] the assignee of the Michigan Avenue Lease, and its current direct parent.

3. Further, Purchaser is not seeking to take assignment of the Palmyrita Lease pursuant to the APA.[4] Accordingly, that issue is moot and not before the Court.

4. Accordingly, Purchaser respectfully requests that the Prologis Objections be overruled and that the Court authorize the Debtors to assume and assign the Michigan Avenue Lease to Purchaser.

---

[3] Pursuant to Section 10.7 of the Riverside APA, Purchaser has the right to assign its rights and obligations under the APA to affiliates of Purchaser, provided Purchaser remains obligated under the APA. Purchaser has informed Prologis that Evergreen (Purchaser's affiliate) is being assigned Purchaser's rights and obligations under the APA in connection with consummation of the APA.

[4] The Palmyrita Lease is not an Acquired Real Property Lease under the APA. Instead, under Section 5.16 of the APA, "as soon as practicable following the Closing, Purchaser shall remove, or cause to be removed, all of the Purchased Assets located at the Palmyrita Site. Seller shall grant, and use reasonable best efforts to cause [Prologis] to grant, Purchaser and its representatives access to the Palmyrita Site during normal business hours as reasonably necessary to facilitate such removal." Purchaser is discussing with the Debtors the manner in which Seller will provide Purchaser with access to the Palmyrita Site following the Closing, as required by the Riverside APA, to allow Purchaser to remove Purchased Assets located at the site.

## RELEVANT FACTUAL BACKGROUND

5. The Michigan Avenue Lease was entered into on October 1, 2010 and provides for the lease of approximately 221,224 square feet in Building B located at 875 Michigan Avenue, Riverside, CA and a portion of the 12.71 acres of land associated with the Riverside Facility. The Michigan Avenue Lease expires by its own terms on March 31, 2026. The current monthly rent under the Michigan Avenue Lease is $121,673.20 per month, or $1,460,078.40 annually, and increases approximately 3.25% each year.

6. On March 5, 2021, just three days prior to the Petition Date, the Debtors and Prologis amended the Michigan Avenue Lease to extend the lease term by five years (to its current expiration date of March 31, 2026) and require a $500,000 letter of credit (the "Letter of Credit") from the Debtors in favor of Prologis to further secure the Debtors' obligations under the lease given their financial difficulties and impending bankruptcy filing. The Letter of Credit is in addition to the $100,000 cash security deposit Prologis currently holds for this location.

7. Purchaser is a Delaware limited liability company formed by one or more funds affiliated with The Sterling Group ("Sterling"). Sterling (www.sterling-group.com) is an operationally-focused private equity firm founded in 1982 and headquartered in Houston, Texas. Sterling and its affiliated funds have owned 57 platform companies with a total enterprise value of over $14 billion. Sterling is a majority owner of Greenbridge f/k/a Polychem, LLC ("Greenbridge"), a North American manufacturer of polyester and polypropylene strapping and recycler of PET. Greenbridge presently is the parent company of Evergreen.

8. Evergreen's operations are very similar to many of the Riverside Facility's operations. In this regard, Evergreen is the sole owner and operator of a PET recycling facility in Clyde, Ohio (the "Clyde Facility") which processes nearly 100 million lbs. of post-consumer PET plastic annually. The assets of the Clyde Facility that are owned by Evergreen include thirty plus acres of land, a

230,000 square foot building, and all recycling machinery and equipment used at the Clyde Facility – all of which are owned outright with no debt. The Clyde Facility is profitable and has been since 1998 when it was first operated by Greenbridge. In the fiscal year ended December 31, 2020, the Clyde Facility had positive EBITDA of approximately $3.4 million and it is projected to have EBITDA of more than $5 million in 2021 and has performed generally in line with projections through the first 5 months of the year.

9. In connection with consummation of the APA, Greenbridge is going to contribute Evergreen, which includes the Clyde Facility, to Purchaser and Purchaser also is going to assign all of its rights and obligations under the APA to Evergreen. Thus, following consummation of the APA, Purchaser will be the parent company of Evergreen, who will own all of the Purchased Assets being transferred under the APA (which are being sold for $57.5 million) as well as its existing assets (including the Clyde Facility, which is debt free, profitable and has an enterprise value of approximately $40 million).

10. Following the filing of the Prologis Limited Objection, Purchaser (i) confirmed to Prologis that the existing $500,000 Letter of Credit would remain in place following closing and/or that Purchaser would replace it within no more than thirty days following the closing, (ii) provided Prologis with three years of audited financial statements (the "Financial Information") for Greenbridge, which included historical information regarding the Clyde Facility (including the information outlined in footnote 3),[5] and (iii) provided Prologis with a post-closing *pro forma* balance

---

[5] Separate audited financial information was not provided for Evergreen because it does not exist, as Evergreen has historically existed as a part of Greenbridge for more than 20 years and information on its historical financial performance is therefore embedded within the financial information provided for Greenbridge. Evergreen is approximately one fourth of the overall Greenbridge business. Nevertheless, the financial information provided as it relates to Greenbridge shows that in the fiscal year ending in 2020, Greenbridge had $174 million in total assets and generated unadjusted EBITDA of nearly $19 million; adjusted EBITDA for the business, as defined by its current creditors, was nearly $27 million for the year. As it relates to the Clyde Facility, Note 14 of the 2020 audited financial statements specifically addresses Greenbridge spending $11,014,000 in 2020 alone to upgrade and restore the Clyde Facility after a fire occurred at the facility in August of 2020, and receiving $2,493,882 related to business interruption

sheet for Evergreen (a copy of which is attached to the MacLaren Declaration). The balance sheet shows that Evergreen will be capitalized with $5 million of cash upon consummation and that Purchaser will also have access to a $20 million revolving credit facility to support its working capital needs.[6]

11. During the course of discussions between Purchaser and Prologis, Purchaser and its counsel emphasized Purchaser's position regarding adequate assurance of future performance – namely, that given (i) the $100,000 existing cash deposit, (ii) the additional $500,000 Letter of Credit put in place just three days prior to the bankruptcy filing (which was not required as of the time the Michigan Avenue Lease was entered into), (iii) the significant reduction in debt from Debtor-Tenant CarbonLITE Industries LLC (who currently has approximately $110 million of debt encumbering its assets) to Evergreen (who will only have $21 million of debt and $1.8 million of capital leases on its balance sheet at closing), (iv) Evergreen's estimated $35 million of tangible net worth at closing, and (v) the operational experience and capabilities of Evergreen's management, that Evergreen easily had satisfied the requirements of adequate assurance of future performance under section 365 of the Bankruptcy Code. Unfortunately, like it did just prior to the Petition Date, Prologis demanded additional security. No further security is warranted or appropriate under the circumstances and Prologis' objections to adequate assurance of future performance should be overruled.

## APPLICABLE LEGAL STANDARD

12. Section 365 of the Bankruptcy Code does not require that a contract assignee guarantee its ability to perform every contractual obligation. Rather, the assignee must demonstrate that it is

---

for lost profitability during the five month period from August to December. The amount of $2,493,882 was audited, and if extrapolated across 12 months would imply profitability for Clyde that exceeds $5 million annually.

[6] Evergreen expects to have the revolving based facility in place within 14 days of the closing. The lender will be Texas Capital Bank (NYSE: TCB), a lender with whom Sterling has a strong, long-lasting relationship. All fieldwork for this facility has been completed, and the parties are working through documentation.

more likely than not that it can perform the existing contractual obligations required by the contract or lease being assigned.

13. More specifically, section 365(a) of the Bankruptcy Code provides, in relevant part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Further, section 365(f) of the Bankruptcy Code provides that the "trustee may assign an executory contract . . . only if -- the trustee assumes such contract . . . and adequate assurance of future performance . . . is provided" 11 U.S.C. § 365(f)(2). The statutory requirement for an assignee to provide adequate assurance of future performance affords "protection to the non-debtor party because the assignment relieves the trustee and the bankruptcy estate from liability for breaches arising after the assignment. *See Cinicola v. Scharffenberger*, 248 F.3d 110, 120 (3d Cir. 2001); *Carlisle Homes v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988) (recognizing section 365's attempt "to strike a balance between two sometimes competing interests, the right of the contracting nondebtor to get the performance it bargained for and the right of the debtor's creditors to get the benefit of the debtor's bargain) (quotation marks and alterations omitted).

14. The phrase "adequate assurance of future performance" is not defined in the Bankruptcy Code. *See In re Fleming Cos., Inc.*, 499 F.3d 300, 305 (3d Cir. 2007). Rather, the requirement to show "adequate assurance of future performance" depends on the facts and circumstances of each case, and should be given a "practical, pragmatic construction." *In re DBSI, Inc.*, 405 B.R. 698, 708 (Bankr. D. Del. 2009); *see also Cinicola v. Scharffenberger*, 248 F.3d at 120 n.10 (holding "'[a]dequate assurance of future performance' are not words of art; the legislative history of the Code shows that they were intended to be given a practical, pragmatic construction[,]" and noting that what constitutes adequate assurance "must be determined by consideration of the facts of the proposed assumption.").

15. An absolute guarantee is not necessary to meet the standard for providing adequate assurance. *See, e.g., In re DBSI, Inc.*, 405 B.R. at 708; *In re Carlisle,* 103 B.R. at 538 ("Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance."); *In re Decora Indus.*, No. 00-4459 (JJF), 2002 WL 32332749, at *8 (D. Del. May 20, 2002) ("[A]dequate assurance falls short of an absolute guaranty of payment.").

16. Adequate assurance may be provided by demonstrating the assignee's financial stability and experience in managing the type of enterprise or property assigned. *In re Filenes Basement, LLC*, No. 11-13511 (KJC), 2014 WL 1713416, at *11-12 (Bankr. D. Del. April 29, 2014) (approving assignment under section 365(f)(2) based on testimony that assignee would be able to satisfy obligations going forward through ongoing equity contributions and assignee had incentive to perform to avoid losing investment); *In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding adequate assurance of future performance present when the prospective assignee had the financial resources to perform, had experience in same industry, and had expressed a willingness to devote sufficient funding to the business if needed in order to give it a strong likelihood of succeeding); *In re Decora Indus.*, 2002 WL 32332749, at *8 (finding that debtors demonstrated adequate assurance of future performance through the financial solvency of the assignee and the assignee's investment in the debtor).

17. Moreover, an "[assignee] need not prove that it will thrive and make a profit, or provide an absolute guarantee of performance. It must simply appear that the rent will be paid and other lease obligations met." *In re M. Fine Lumber Co.*, 383 B.R. 565, 573 (Bankr. S.D.N.Y. 2008) (internal citations omitted). The emphasis is on protecting the landlord's rights; assumption and assignment is not designed to afford a landlord with a benefit in addition to that which he originally bargained for under the original lease. *In re Bygaph, Inc.*, 56 B.R. at 605.

18. In this case, Purchaser and Evergreen have provided financial information sufficient to demonstrate adequate assurance of future performance, which includes $5 million of cash on the balance sheet at closing, access to a $20 million revolving credit facility to provide Evergreen with additional liquidity following the closing, and the fact that the $57.5 million acquisition is being funded by one or more funds affiliated with Sterling who thus has the incentive to see Evergreen succeed in the event of unforeseen difficulties, as Evergreen also includes the Clyde Facility, which is currently debt-free, owned outright, has an enterprise value of approximately $40 million, and has operated profitably for more than 20 years. Purchaser also will retain its full $100,000 cash security deposit and the additional $500,000 Letter of Credit provided to it just prior to the bankruptcy filing, when Prologis agreed to a five year lease extension with the Tenant even though it was just days in advance of its bankruptcy.

19. In short, Evergreen has the financial resources to perform, significant experience in the same industry, and the backing of a firm with the incentive to devote sufficient funding to the business if needed in order to give it a reasonable likelihood of succeeding. Despite Purchaser's and Evergreen's demonstrated wherewithal and assurances, Prologis nevertheless contends that Purchaser has failed to show that Evergreen can provide adequate assurance of its ability to perform under the Michigan Avenue Lease. Prologis is wrong.

20. Under controlling case law, Purchaser does not have to demonstrate to a certainty or provide an absolute guaranty that it will be able to satisfy every obligation under the Michigan Avenue Lease; it need only provide adequate (*i.e.*, reasonable) assurance that it will be able to pay rent and perform. *In re M. Fine Lumber Co.*, 383 B.R. at 573. As demonstrated to Prologis and above, Evergreen is a privately-held manufacturer of polyester and polypropylene strapping and recycler of PET with management that has extensive experience operating plastic recycling facilities like the Riverside Facility. Its management possesses the skill and knowledge in the industry to perform under

the Michigan Avenue Lease. It is being appropriately capitalized and will be provided with access to a more than adequate working capital facility. Following the closing, in addition to the assets of the Riverside Facility being purchased pursuant to the APA, Evergreen also will continue to own and operate the profitable Clyde Facility, which historically has been profitable since 1998. The Clyde Facility generated approximately $3.4 million of EBITDA in 2020 and is expected to generate more than $5 million of EBITDA in 2021. This is all in addition to the existing $100,000 cash security deposit and $500,000 Letter of Credit put in place when Prologis agreed to extend the lease term by five years just prior to the bankruptcy filing.

21. Accordingly, Prologis' argument that adequate assurance of future performance is lacking is without merit and should be overruled.

## OTHER PROLOGIS OBJECTIONS

22. Prologis also objected on the grounds that Purchaser should not be permitted to purchase any of Prologis' property on the premises. Purchaser hereby confirms that it does not seek to purchase any property not owned by the Debtors pursuant to the APA, including Prologis' property.

23. While Prologis did not assert the necessity of payment or escrow of specific cure amounts in the Prologis Objections as a condition to assignment, Purchaser also understands that a dispute exists between the Tenant and Prologis regarding certain roof repairs and related work that Purchaser has been informed Prologis believes must be completed and/or reserved for as part of an assignment of the Michigan Avenue Lease, as well as an outstanding prepetition invoice related to such work. Under the APA, amounts that must be paid under sections 365(b)(1)(A) and (B) of the Bankruptcy Code (which relate to the curing of monetary defaults under a lease and related pecuniary losses) are required to be paid by Purchaser upon consummation of the APA (as a deduct to cash consideration being paid by Purchaser); provided that if there is an objection that has not been consensually resolved at or prior to the Sale Hearing, Purchaser shall pay such disputed Cure Cost

into an escrow pending final resolution of the dispute (as a deduct to cash consideration being paid by Purchaser), with it being agreed that Seller will be entitled to any amount remaining in escrow after final resolution of the disputed cure amount.  Purchaser believes this is an issue between Tenant and Prologis and is agreeable to an appropriate escrow (acceptable to Purchaser) being maintained out of cash consideration so that any necessary repair work can take place following closing.

# CONCLUSION

WHEREFORE, Purchaser respectfully requests that the Court (a) overrule the Prologis Objections, (b) enter an order approving the assumption and assignment of the Michigan Avenue Lease pursuant to the APA, and (c) grant such other and further relief as is just.

Dated: June 7, 2021
      New York, New York

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

*/s/ Joseph C. Barsalona II*
Robert J. Dehney (No. 3578)
Joseph C. Barsalona II (No. 6102)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Tel.: (302) 658-9200
rdehney@morrisnichols.com
jbarsalona@morrisnichols.com

-and-

**WILLKIE FARR & GALLAGHER LLP**
Paul V. Shalhoub
Ciara A. Copell
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 728-8000

*Counsel for Purchaser*