**<u>Exhibit A</u>**

**Michigan Avenue Lease**

ACTIVE.133215360.01

# COLUMBIA BUSINESS CENTER

# BUILDING LEASE

### BETWEEN

# COLUMBIA BUSINESS CENTER, LLC

## AS LANDLORD

### AND

# CARBONLITE INDUSTRIES, LLC

## AS TENANT

Columbia Business Center                                              CarbonLITE Industries, LLC

## **TABLE OF CONTENTS**

**Page**

PREMISES................................................................................. 1

ARTICLE 1: TERM .................................................................. 1

ARTICLE 2: RENT .................................................................. 1

ARTICLE 3: OPERATING EXPENSE RENT
ADJUSTMENT PAYABLE BY TENANT. .... 2

ARTICLE 4: LETTER OF CREDIT AS SECURITY
DEPOSIT .............................................................. 7

ARTICLE 5: USE OF PREMISES........................................... 12

ARTICLE 6: ACCEPTANCE OF PREMISES ...................... 15

ARTICLE 7: ALTERATIONS AND EQUIPMENT .............. 16

ARTICLE 8: LIENS. ................................................................ 17

ARTICLE 9: MAINTENANCE AND REPAIR ..................... 17

ARTICLE 10: ENTRY AND INSPECTION ........................... 20

ARTICLE 11: INSURANCE AND LIABILITY ..................... 21

ARTICLE 12: WAIVER OF SUBROGATION....................... 23

ARTICLE 13: ASSIGNMENT AND SUBLETTING.............. 24

ARTICLE 14: TRANSFER OF LANDLORD'S
INTEREST........................................................ 24

ARTICLE 15: DAMAGE OR DESTRUCTION...................... 24

ARTICLE 16: EMINENT DOMAIN ....................................... 27

ARTICLE 17: DEFAULTS AND REMEDIES........................ 27

ARTICLE 18: SURRENDER OF PREMISES:
REMOVAL OF PROPERTY ........................... 29

ARTICLE 19: OPTION TO RENEW ...................................... 30

ARTICLE 20: COSTS OF SUIT. ............................................. 31

ARTICLE 21: WAIVER............................................................ 32

ARTICLE 22: HOLDING OVER............................................. 32

-i-

347947

Columbia Business Center                                              CarbonLITE Industries, LLC

## **TABLE OF CONTENTS**

| | Page |
|---|---|
| ARTICLE 23: SUBORDINATION | 33 |
| ARTICLE 24: COVENANTS CONDITIONS AND RESTRICITONS | 34 |
| ARTICLE 25: DEFINED TERMS | 34 |
| ARTICLE 26: HEIRS AND ASSIGNS | 34 |
| ARTICLE 27: TIME OF ESSENCE. | 34 |
| ARTICLE 28: SEVERABILITY | 35 |
| ARTICLE 29: ENTIRE AGREEMENT | 35 |
| ARTICLE 30: TENANT IMPROVEMENTS | 35 |
| ARTICLE 31: RIGHT OF LANDLORD TO PERFORM | 35 |
| ARTICLE 32: PARKING FACILITIES | 36 |
| ARTICLE 33: NOTICES. | 36 |
| ARTICLE 34: QUIET ENJOYMENT | 36 |
| ARTICLE 35: ESTOPPEL CERTIFICATES | 36 |
| ARTICLE 36: ACCESS, CHANGES IN PARK FACILITIES, NAME | 37 |
| ARTICLE 37: FORCE MAJEURE. | 37 |
| ARTICLE 38: BROKERS | 38 |
| ARTICLE 39: CONSENT NOT UNREASONABLY WITHHELD | 38 |
| ARTICLE 40: SIGNAGE | 39 |

EXHIBIT "A" SITE PLAN
EXHIBIT "B" LEASE SUMMARY
EXHIBIT "C" WORK LETTER AGREEMENT

-ii-

347947

## COLUMBIA BUSINESS CENTER
## BUILDING LEASE

This Columbia Business Center Building Lease ("Lease"), dated for reference purposes October 1, 2010, is entered into by and between **COLUMBIA BUSINESS CENTER, LLC**, a California limited liability company, hereinafter called "Landlord," and **CARBONLITE INDUSTRIES, LLC**, a Delaware limited liability company, authorized to do business in California, hereinafter called "Tenant."

### PREMISES

Landlord hereby leases to Tenant and Tenant hereby hires from Landlord, subject to all the terms and conditions of this Lease, Building B ("Building") and a portion of the 12.71 acres of land ("Land") associated with the Building described in the plan attached hereto as Exhibit A and by this reference incorporated herein, located at 875 Michigan Avenue ("Premises") in the Columbia Business Center, located in the City of Riverside, Riverside County, California (hereinafter "Industrial Park"). Tenant's rights under this Lease shall include the right to have access to and from the Premises through the roads in the Industrial Park.

### TERM
### ARTICLE 1

1.1 The term of this Lease ("Lease Term") shall commence on November 1, 2010 (the "Commencement Date").

1.2 After mutual execution of the Lease, Landlord shall permit Tenant to access the Building to set up racking, telecommunications equipment and trade fixtures, provided Tenant has paid the full month's rent for the fourth full month of the Lease in the amount of $29,865.24 and a Letter of Credit (defined below) pursuant to Article 4, and has provided proof of the insurance that Tenant is required to have under Article 11 and under the Work Letter Agreement attached hereto as Exhibit C. Tenant shall be responsible for obtaining all necessary permits and governmental approval, and associated costs, for such early occupancy of the Premises.

### RENT
### ARTICLE 2

2.1 Tenant shall pay monthly installments of basic rent for the Premises in the amounts shown on the Lease Summary, attached hereto as Exhibit "B" and incorporated herein by this reference, on or before the first day of each calendar month, in advance. In addition to said basic rent, Tenant agrees to pay additional rent as and when hereinafter provided in this Lease. Said basic rent and additional rents are sometimes hereinafter referred to collectively as the "rent." Except as otherwise

Columbia Business Center                                                                 CarbonLITE Industries, Inc.

expressly provided in this Lease, the rent shall be payable to Landlord, in lawful moneys of the United States of America, at the address for Landlord set forth in Exhibit "B" or to such other person or at such other place as Landlord may from time to time designate in writing.

2.2  If Tenant fails to pay the rent due within three (3) business days after receipt of written notice from Landlord that rent has not been received, Tenant agrees to pay a late charge of three percent (3%) of the rent payment that was due plus interest from the due date on the unpaid rent at two percent (2%) per annum above the prime rate of interest reported in the Wall Street Journal for short term commercial loans when the payment was due ("Default Rate"). All payments received by Landlord shall be applied first to the late charge, then unpaid interest, then any unpaid rent until the payment has been applied in full.

2.3  Concurrently with the signing of the Lease, Tenant shall pay to Landlord the rent for the fourth full month of the Lease Term in the amount of $29,865.24, which shall be so applied when due, along with the Letter of Credit as set forth in Article 4 hereinbelow.

## OPERATING EXPENSE RENT ADJUSTMENT
## PAYABLE BY TENANT
## ARTICLE 3

3.1  The monthly rent payable by Tenant during the term of this Lease shall be adjusted in accordance with the provisions of this Article 3.

3.2  <u>Common Area Maintenance Costs</u>. Tenant shall pay its Proportionate Share of the common area maintenance costs and operating expenses (collectively the "CAM") of the Industrial Park and the Building in the percentages shown in this Section 3.2. During each calendar year or partial calendar year of the Lease Term, Tenant shall pay Landlord, in advance concurrently with each monthly installment of basic rent, an amount equal to the total estimated CAM charges for such year or part thereof divided by the number of months therein. From time to time, Landlord may estimate and re-estimate the CAM charges due by Tenant and deliver a copy of the estimate or re-estimate to Tenant. Thereafter, the monthly installments of CAM charges payable by Tenant shall be appropriately adjusted in accordance with the estimations so that, by the end of the calendar year in question, Tenant shall have paid all of the CAM charges as estimated by Landlord. Any amounts paid based on such an estimate shall be subject to adjustment as herein provided with the actual CAM charges are available for each calendar year.

A.  <u>Tenant's Proportionate Share</u>. Tenant's Proportionate Share of the Building CAM charges shall be 100.00%. Tenant's Proportionate Share of the

2

Industrial Park CAM charges shall be 29.35%, which is the percentage obtained by dividing the 221,224 rentable square feet in the Premises by (b) the total rentable square feet rented or available for rent in the buildings in the Industrial Park, which at the time of execution of the Lease is 753,626 rentable square feet. Landlord and Tenant stipulate the number of rentable square feet in the Premises, Building and the buildings in the Industrial Park set forth above is conclusive as to the rentable square footage in existence on the Commencement Date. Tenant's proportionate share of Industrial Park CAM charges shall be adjusted accordingly if and when additional rentable square feet of building space are added in the Industrial Park.

        B.  Industrial Park CAM charges to be computed under this Section 3.2 shall mean all costs, operating expenses, and disbursements (subject to the limitations set forth below) that Landlord incurs in connection with the ownership, operation, maintenance, repair and replacement of the Industrial Park, determined in accordance with sound accounting principles, consistently applied, including, but not limited to, the following costs: (a) wages and salaries of all on-site employees at or below the grade of senior building manager engaged in the management, operation, maintenance or repair of the Industrial Park or the control of access thereto (in each case together with Landlord's reasonable allocation of expenses of off-site employees at or below the grade of senior building manager who perform a portion of their services in connection with the operation, maintenance or repair of the Industrial Park or the control of access thereto), including taxes, insurance and benefits relating thereto; (b) all supplies and materials used in the operation, maintenance, repair or replacement of the Industrial Park or the control of access thereto; (c) monument signs, common landscaping costs, lighting, trash removal in the Industrial Park, and such other expenses that are customarily included as common area maintenance charges in industrial parks in the Riverside, California area; (d) costs for improvements made to the Industrial Park, whether prior to or during Tenant's tenancy in the Premises, which, although capital in nature, are (i) expected to reduce the normal CAM charges (including all utility costs) of the Industrial Park as amortized using a commercially reasonable interest rate over the time period reasonably estimated by Landlord to recover the costs thereof taking into consideration the anticipated cost savings, as determined by Landlord using its good faith, commercially reasonable judgment, as well as (ii) improvements made in order to comply with any law hereafter promulgated by any governmental authority or any interpretation hereafter rendered with respect to any existing law, as amortized using a commercially reasonable interest rate over the useful economic life of such improvements as determined by Landlord in its reasonable discretion, as well as (iii) improvements made to improve the health, safety and welfare of the Building and its occupants, as amortized using a commercially reasonable interest rate over the useful economic life of such improvements as determined by Landlord in its reasonable discretion, as well as (iv) property repairs or replacements which provide a functional benefit for Tenant and the other tenants of the Industrial Park for the duration of their respective lease terms, as amortized using a

3

commercially reasonable interest rate over the useful economic life of such repairs or replacements as determined by Landlord in its reasonable discretion; (e) repairs, replacements and general maintenance of the Industrial Park; (f) fair market rental and other costs with respect to the management office for the Building or the Industrial Park, if any; and (g) service, maintenance and management contracts with independent contractors for the operation, maintenance, management, repair or replacement of the Industrial Park or the control of access thereto. Industrial Park CAM charges may be prorated among the Building and the other buildings in the Industrial Park, as reasonably determined by Landlord.

Industrial Park CAM charges shall not include: (1) repair, replacement and general maintenance paid by proceeds of insurance (not including a reasonable deductible, which shall be an Industrial Park CAM charge) or by Tenant or other third parties; (2) interest, amortization or other payments on loans to Landlord; (3) depreciation; (4) leasing commissions; (5) legal expenses for services, other than those that benefit the Industrial Park tenants, as applicable (e.g., tax disputes); (6) renovation or otherwise improving space for leased premises of the Industrial Park, as available or vacant space in the Industrial Park; (7) Taxes and Insurance which are paid separately pursuant to this Article 3; (8) the costs of security patrols; and (9) any federal income taxes imposed on or measured by the income of Landlord from the operation of the Industrial Park.

C.  Building CAM charges to be computed under this Section 3.2 include costs, operating expenses, and disbursements that Landlord incurs in connection with the operation, maintenance, repair and replacement of the Building and associated Land that are not included in, or expressly excluded from, Industrial Park CAM charges. Building CAM charges shall include the costs of any inspection and maintenance contract for the HVAC related units, including but not limited to evaporative coolers, exhaust fans, barometric relief dampers and compressor driven air conditioning/heating roof top package units, serving the Premises

3.3   Taxes.

(a)  Real Property Taxes.  Landlord shall pay all real property taxes, as defined below, on the Building and Land.  During the Lease Term, Tenant shall reimburse Landlord for all Taxes attributable to the Building and Land and assessments (including, but not limited to, any tax related fees, taxes or assessments against, or a as a result of, any tenant improvements installed on the Premises by or for the benefit of Tenant).  The Building and Land are a separately assessed tax parcel. Landlord shall reimburse Tenant for any Taxes paid by Tenant covering any period of time prior to or after the Lease Term.  If the Tenant fails to reimburse Landlord for the Taxes when due, Tenant shall promptly pay Landlord for the amount of such tax payment and all related penalties and interest as rent.

4

(b) Definition of "Taxes." "Taxes" "Taxes" shall mean taxes, assessments, and governmental charges or fees whether federal, state, county or municipal, and whether they be by taxing districts or authorities presently taxing or by others, subsequently created or otherwise, and any other taxes and assessments (including non-governmental assessments for common charges under a restrictive covenant or other private agreement that are not treated as part of CAM charges) now or hereafter attributable to the Industrial Park (or its operation), excluding, however, penalties and interest thereon, except as provided in Section 3.3(a), and federal and state taxes on income (if the present method of taxation changes so that in lieu of or in addition to the whole or any part of any Taxes, there is levied on Landlord a capital tax directly on the rents received therefrom or a franchise tax, assessment, or charge based, in whole or in part, upon such rents for the Industrial Park, then all such taxes, assessments, or charges, or the part thereof so based, shall be deemed to be included within the term "Taxes" for purposes hereof). Taxes shall include the costs of consultants retained in an effort to lower taxes and all costs incurred in disputing any taxes or in seeking to lower the tax valuation of the Industrial Park. For property tax purposes, to the extent allowed by law, Tenant waives all rights to protest or appeal the appraised value of the Premises, as well as the Industrial Park, and all rights to receive notices of reappraisement. Landlord shall use commercially reasonable efforts and take actions reasonably necessary to ensure that the Building and Land are properly assessed in a manner that will limit real property taxes on the Building and Land.

3.4 Personal Property Taxes.

(a) Tenant shall pay all taxes charged against trade fixtures, furnishings, equipment, inventory, or any other personal property belonging to Tenant. Tenant shall take any actions reasonably requested by Landlord for the purpose of having personal property taxes taxed separately from the Taxes.

(b) If any of Tenant's personal property is taxed with the Premises, Tenant shall reimburse Landlord for such taxes for the personal property with the Taxes.

3.5 Utilities and Services. Tenant shall pay, directly to the appropriate supplier, the cost of all natural gas, heat, light, power, sewer service, telephone, water, refuse disposal, and other utilities and services supplied to the Premises. Any utilities and services which are jointly charged to the Building or Industrial Park ("Shared Utilities"), including the maintenance of the evaporative coolers, drains and gutters, parking lot sweeping, landscaping around the Building, the ESFR pump and pump house, and such other utilities and services provided to multi-tenant buildings by landlords of industrial buildings in the Riverside, California, area, shall be included in the Building or Industrial Park CAM charges.

5

3.6 <u>Property Insurance.</u> Tenant shall reimburse Landlord for the Insurance for the Premises for each year and partial year falling within the Lease Term. "Insurance" shall mean property, liability, earthquake, and other insurance carried by Landlord, including without limitation deductibles and risk retention programs and an allocation of a portion of the cost of blanket insurance policies maintained by Landlord and/or its affiliates. Landlord also shall carry general liability insurance covering the Industrial Park. If the insurance carried by Landlord applied to more than just the Building and Land, then the costs of such insurance shall be equitably prorated among the Building and the other covered buildings in accordance with industry practice, as reasonably determined by Landlord. All such insurance carried by Landlord shall provide for Landlord to be the named insured, and proceeds of the insurance shall be used by Landlord to rebuild the Building and Tenant's Premises pursuant to Article 15 below.

3.7 <u>Payment of CAM Charges, Taxes and Insurance Statement</u>. By May 1 of each calendar year, or as soon as practicable thereafter, Landlord shall furnish to Tenant a statement of CAM charges (including Shared Utilities), Taxes and Insurance for the previous year, (the "CAM, Taxes, and Insurance Statement"). If Tenant's estimated payments of CAM or Taxes or Insurance for the year covered by the CAM, Taxes, and Insurance Statement exceed Tenant's share of such items as indicated in the CAM, Taxes, and Insurance Statement, then Landlord shall promptly credit or reimburse Tenant for such excess; likewise, if Tenant's estimated payments of CAM, Taxes and Insurance for such year are less than Tenant's share of such items as indicated in the CAM, Taxes, and Insurance Statement, then Tenant shall promptly pay Landlord such deficiency, notwithstanding that the Lease Term has expired and Tenant has vacated the Premises. Tenant's obligation to pay its Proportionate Share of Industrial Park and Building CAM charges, Taxes and Insurance shall commence on the Commencement Date. Notwithstanding anything to the contrary herein, for purposes of calculating the amount payable by Tenant under this Section 3.7, total CAM charges [with the exception of Uncontrollable Expenses (defined below)] shall not increase more than six percent (6%) per year, compounded annually. The term "Uncontrollable Expenses" means expenses related to the cost of utilities, insurance, taxes and other uncontrollable expenses (such as, but not limited to, increases in the minimum wage which may affect the cost of service contracts).

3.8 <u>Tenant's Right to Audit</u>. Upon the request of Tenant not later than ninety (90) days from the date Tenant receives the statement of CAM, Taxes, and Insurance expenses actually incurred ("Statement Date"), Landlord shall permit Tenant or its representative to inspect and copy at Landlord's offices all paid invoices and calculations concerning Tenant's share of such charges (or any other expenses reimbursed by Tenant hereunder) and, at the election of Tenant, at Tenant's sole cost and expense, to have an audit of such records conducted by a reputable firm in the

business of auditing operating expenses for industrial buildings that is reasonably approved by Landlord prior to the performance of any such audit; provided that the chosen firm shall not be compensated on a contingency fee basis. Any such audit must be completed no later than ninety (90) days from the Statement Date. In the event that such audit of Landlord's records reveals that the amount of Taxes, Insurance and/or CAM charges paid by Tenant for the subject period is less than or greater than the actual amount properly payable by Tenant under the terms of this Lease, Tenant shall promptly pay any deficiency to Landlord or Landlord shall promptly refund any excess payment to Tenant, as the case may be.

## LETTER OF CREDIT AS SECURITY DEPOSIT
### ARTICLE 4

4.1 <u>Letter of Credit</u>. Contemporaneously with Tenant's execution of this Lease, Tenant shall deliver to Landlord, as protection for the full and faithful performance by Tenant of all of its obligations under this Lease and for all losses and damages Landlord may suffer as a result of any breach or default by Tenant under this Lease beyond any applicable notice and cure period, an irrevocable, unconditional letter of credit (the "Letter of Credit") in the amount of $360,000.00. Each and every Letter of Credit required by this Lease shall:

      (i)    be addressed to Landlord;

      (ii)    be issued in a form and substance reasonably acceptable to Landlord by Bank of America, N.A., BB&T Co., Citibank, N.A., JPMorgan Chase Bank, National City Bank, Northern Trust Bank, PNC Bank, Regions Bank, US Bank N.A., Wells Fargo Bank N.A., or another financial institution acceptable to Landlord in Landlord's sole discretion, upon which presentment may be made in Riverside, California;

      (iii)    be issued in the amount of $360,000.00, except as hereinafter provided;

      (iv)    be for a term of one (1) year, subject to automatic one-year extensions so that the Letter of Credit is in effect until a date which is at least three (3) months after the expiration of the Lease Term (as the same may be renewed);

      (v)    be "callable" on sight, irrevocable and unconditional, other than a condition that Landlord asserts to the issuer that Landlord is entitled to draw upon the Letter of Credit pursuant to the terms of this Lease;

7

(vi)    be conditioned for payment solely upon presentation of the Letter of Credit and a sight draft stating that Landlord is entitled to draw upon the Letter of Credit pursuant to the terms of this Lease;

(vii)   permit partial draws and multiple presentations and drawings;

(viii)  be fully assignable and freely transferable one or more times, without approval of the issuer, by, and without fee to, Landlord, its successors and assigns for the first five (5) such transfers; and

(ix)    be otherwise subject to the International Standby Practices-ISP98, International Chamber of Commerce Publication 590.

4.2  Amendment or Replacement of Letter of Credit.

(a)  Tenant shall reasonably cooperate with Landlord in promptly obtaining any and all amendments or replacements of the Letter of Credit to reflect any change in beneficiary under the Letter of Credit, and Tenant shall pay the cost thereof to the extent the issuer charges for such change in beneficiary.

(b)  Tenant shall, on or before the date which is sixty (60) days prior to the expiration of the Letter of Credit, deliver to Landlord, without any action whatsoever on the part of Landlord, a new Letter of Credit, or a certificate of renewal or extension, satisfying the foregoing requirements in lieu of the Letter of Credit then being held by Landlord.

(c)  If the issuer of such existing or new Letter of Credit elects to not renew such Letter of Credit for any additional period, Tenant shall be required to deliver a new Letter of Credit on or before the date which is sixty (60) days prior to the expiration of the term of the Letter of Credit then being held by Landlord.  If neither a new Letter of Credit nor a renewal of the Letter of Credit is timely delivered to Landlord, then Landlord may (without prejudicing any other right or remedy available to Landlord) draw down the entire Letter of Credit and, until Tenant delivers to Landlord the new Letter of Credit as required by this paragraph, hold the drawn cash as a security deposit pursuant to this Lease to be used for the same purposes as the Letter of Credit is intended to be used or as otherwise permissible under applicable laws.

(d)  Tenant shall promptly replace the Letter of Credit with a new Letter of Credit if the issuing financial institution: (i) has assets which fall below

8

· CarbonLITE Industries, Inc.

$10,000,000,000.00; (ii) enters into any form of regulatory or governmental proceeding such as a receivership instituted or commenced by the Federal Deposit Insurance Corporation (the "FDIC") based upon the insolvency of the issuing financial institution; (iii) is otherwise declared insolvent or is determined to be less than adequately capitalized in compliance with FDIC regulations by the appropriate Federal banking agency under the prompt corrective action rules of the FDIC, or closes for any reason; or (iv) in any manner communicates (including without limitation communications sent by or on behalf of the FDIC) its unwillingness to honor the terms of the Letter of Credit. If Tenant fails to deliver to Landlord a replacement Letter of Credit within ten (10) business days following Landlord's written demand for same, Landlord shall be entitled to draw down the entire Letter of Credit and, until Tenant delivers to Landlord a replacement Letter of Credit as required by this paragraph, hold the drawn cash as a security deposit pursuant to this Lease to be used for the same purposes as the Letter of Credit is intended to be used or as otherwise permissible under applicable laws.

4.3  Draws.

(a)  Tenant acknowledges and agrees that Landlord is entering into this Lease in material reliance on the ability of Landlord to draw on the Letter of Credit on the occurrence of any breach or default on the part of Tenant under this Lease. If Tenant should breach any provision of this Lease or otherwise be in default under this Lease beyond any applicable notice and cure period, Landlord may, but without obligation to do so, and without notice to Tenant, draw on the Letter of Credit and/or any Additional Letter of Credit (as defined below), in whole or in part, to cure any breach or default of Tenant and to compensate Landlord for any and all damages of any kind or nature sustained as a result of Tenant's breach or default, including any damages that accrue upon termination of the Lease under the Lease and/or any applicable statutory provision. The use, application, or retention of any proceeds of the Letter of Credit and/or any Additional Letter of Credit, or any portion of either of them, by Landlord shall not prevent Landlord from exercising any other right or remedy provided by this Lease or by any applicable law, it being intended that Landlord shall not first be required to proceed against the Letter of Credit and/or any Additional Letter of Credit, and shall not operate as a limitation on any recovery to which Landlord is otherwise entitled. Tenant agrees not to interfere in any way with payment to Landlord of the proceeds of the Letter of Credit and/or any Additional Letter of Credit, either before or following a draw by Landlord of any portion of the Letter of Credit and/or any Additional Letter of Credit, regardless of whether any dispute exists between Tenant and Landlord as to Landlord's right to draw on the Letter of Credit and/or any Additional Letter of Credit. No condition or term of this Lease shall be deemed to render the Letter of Credit and/or any Additional Letter of Credit conditional to justify the issuer of the Letter of Credit and/or any Additional Letter of Credit in failing to honor a drawing on such Letter of Credit in a timely

manner.  Tenant agrees and acknowledges that (i) the Letter of Credit and /or any Additional Letter of Credit constitute separate and independent contracts between Landlord and the financial institution issuing the Letter of Credit and/or any Additional Letter of Credit; (ii) Tenant is not a third party beneficiary of such contract; (iii) Tenant has no property interest whatsoever in the Letter of Credit and/or any Additional Letter of Credit; and (iv) if Tenant becomes a debtor under any chapter of the U.S. Bankruptcy Code or any similar state law (collectively the "Bankruptcy Code"), neither Tenant, any trustee, nor Tenant's bankruptcy estate shall have any right to restrict or limit Landlord's claim or rights to the Letter of Credit and/or any Additional Letter of Credit or proceeds from either of them by application of Section 502(b)(6) of the U.S. Bankruptcy Code or otherwise.  Notwithstanding anything to the contrary herein, Tenant shall not be deemed to have waived any legal rights or legal action for monetary damages Tenant may have against Landlord for breach of this Lease by Landlord in connection with Landlord's drawing down on a Letter of Credit.

(b)  Landlord shall also have the right to draw down an amount up to the face amount of the Letter of Credit and/or any Additional Letter of Credit if any of the following shall have occurred or be applicable: (i) such amount is due to the Landlord under the terms and conditions of the Lease; (ii) Tenant has filed a voluntary petition under any chapter of the Bankruptcy Code; (iii) Tenant has assigned any or all of its assets to creditors; (iv) an involuntary petition has been filed against Tenant under any chapter of the Bankruptcy Code and such petition is not terminated or withdrawn within thirty (30) days of such filing; or (v) the issuing bank has notified Landlord that the Letter of Credit and/or any Additional Letter of Credit will not be renewed or extended through the expiration date of the Letter of Credit and Tenant fails to deliver a replacement Letter of Credit within the time set forth above.  Tenant agrees that upon the occurrence of any of the foregoing, Landlord shall have the right, without giving any further notice to Tenant, to make a partial draw as set forth above (such draw to be in an amount sufficient to cure such default or satisfy Tenant's liability on account thereof), or Landlord may receive payment of the entire amount of the Letter of Credit at such time, and any such amounts received by Landlord shall be held by Landlord (and need not be segregated or accrue interest unless otherwise required by Law) and applied in accordance with this Lease as a cash security deposit.  Any amounts so drawn shall, at Landlord's election, be applied first to any unpaid rent and other charges which were due prior to the filing of any petition for protection under the Bankruptcy Code.

(c)  Tenant hereby covenants and agrees not to oppose, contest or otherwise interfere with any attempt by Landlord to draw down from said Letter of Credit and/or any Additional Letter of Credit including, without limitation, by commencing an action seeking to enjoin or restrain Landlord from making such draw.  Tenant also hereby expressly waives any right or claim Tenant may have to seek such equitable relief.  In addition to whatever other rights and remedies Landlord may have

10

against Tenant if Tenant breaches its obligations under this paragraph, Tenant hereby acknowledges that Tenant shall be liable for any and all damages which Landlord may suffer as a result of such breach (including without limitation recovery of Landlord's reasonable attorneys' fees and court costs). Notwithstanding anything to the contrary herein, Tenant shall not be deemed to have waived any legal rights or legal action for monetary damages Tenant may have against Landlord for breach of this Lease by Landlord in connection with Landlord's drawing down on a Letter of Credit.

(d) Following a draw down by Landlord, at Landlord's election, the Letter of Credit shall: (i) be replaced by Tenant within fifteen (15) business days after written notice from Landlord by a new Letter of Credit in the amount required at that time by this Article 4, in which event the Letter of Credit then held by Landlord shall be terminated; or (ii) be augmented by Tenant within fifteen (15) business days after written notice from Landlord by an additional Letter of Credit in the amount of any such partial draw (the "Additional Letter of Credit") subject to all the requirements set forth above, in which event the Letter of Credit then held by Landlord and Additional Letter of Credit shall both be held by Landlord and shall both remain in full force and effect.

4.4 <u>Decrease in Amount</u>. Provided Tenant is not then in default under this Lease beyond applicable notice and cure periods and has not instituted any legal action seeking to enjoin the then issuing bank from paying the Letter of Credit, then: (i) at the expiration of the twelfth (12th) full month of the Lease Term Tenant may substitute the $360,000.00 Letter of Credit with a similar Letter of Credit in the amount of $260,000.00; and (ii) at the expiration of the twenty-fourth (24th) full month of the Lease Term Tenant may substitute the $260,000.00 Letter of Credit with a similar Letter of Credit in the amount of $160,000.00, and (iii) at the expiration of the thirty-sixth (36th) full month of the Lease Term Tenant may substitute the $160,000.00 Letter of Credit with a similar Letter of Credit in the amount of $100,000.00. Except for the amount, all substitute letters of credit issued pursuant to this Section 4.4. shall satisfy the requirements for a Letter of Credit under this Article 4.

4.5 <u>Replacement of Letter of Credit with Cash Security Deposit</u>. Provided Tenant has not been in default under this Lease beyond any applicable cure period, after the thirty-sixth (36th) full month of the Lease Term, Tenant shall have the option to replace the Letter of Credit with a cash security deposit in the amount of $100,000,00. If Tenant elects to substitute a cash security deposit for the Letter of Credit, Tenant shall deposit with Landlord the sum of $100,000.00 as security for the full and faithful performance of every provision of this Lease to be performed by Tenant, hereinafter referred to as the "Security Deposit." If Tenant defaults with respect to any provisions of this Lease, including but not limited to the provisions relating to the payment of rent, the construction of tenant improvements, the repair of damage to the Premises caused by Tenant and/or cleaning the Premises upon

11

Columbia Business Center                                        CarbonLITE Industries, Inc.

termination of this Lease, Landlord may use, apply or retain all or any part of this Security Deposit including any interest earned thereon, for the payment of any rent or any other sum in default, the repair of such damage to the Premises, the cost of such cleaning or the payment of any other amount which Landlord may spend or become obligated to spend by reason of Tenant's default or to compensate Landlord for any other loss or damage which Landlord may suffer by reason of Tenant's default to the full extent permitted by law. If any portion of said deposit is so used or applied, Tenant shall, within ten (10) days after written demand therefor, deposit cash with Landlord in an amount sufficient to restore the Security Deposit to its original amount and Tenant's failure to do so shall be a material breach of this Lease. Landlord shall not be required to keep this Security Deposit in a separate account for the benefit of Tenant nor shall Landlord be required to pay Tenant any interest on the Security Deposit. If Tenant shall fully and faithfully perform every provision of this Lease to be performed by it, the Security Deposit, or any balance thereof, shall be returned to Tenant (or, at Landlord's option, to the last assignee of Tenant's interest hereunder) within thirty (30) days of the expiration of the Lease Term.

4.6 <u>Cooperation by Tenant</u>. Tenant hereby agrees to cooperate, at its expense, with Landlord to promptly execute and deliver to Landlord any and all modifications, amendments and replacements of the Letter of Credit, as Landlord may reasonably request to carry out the terms and conditions of this Article 4.

## USE OF PREMISES
## ARTICLE 5

5.1 Tenant shall use and occupy the Premises only for general warehouse, distribution, light manufacturing and office purposes, and any uses incident to the foregoing, and any other lawful use allowed by zoning. The use of Hazardous Materials (as defined in 5.2) on the Premises shall be governed by paragraphs 5.2 through 5.9 below.

5.2 <u>Definition of Hazardous Materials</u>. As used in this Lease, the term "Hazardous Materials" means any hazardous or toxic substances, materials or wastes, including, but not limited to, those substances, materials, and wastes listed in the United States Department of Transportation Hazardous Materials Table (49 CFR 172.101) or by the Environmental Protection Agency as hazardous substances (40 CFR Part 302) and amendments thereto, or such substances, materials and wastes which are or become regulated under any applicable local, state or federal law including, without limitation, any material, waste or substance which is (i) petroleum, (ii) asbestos, (iii) polychlorinated biphenyls, or (iv) defined as a "hazardous waste," "hazardous material," or "hazardous substance" under any federal or state law, rule or regulation.

12

336534.4

5.3 <u>Representations, Warranties and Covenants of Landlord</u>. Landlord represents, warrants and covenants that: (i) the Premises (including land and improvements) have not been used by any act of Landlord or its predecessors, agents, invitees, or employees for the purpose of processing, producing, using, storing, handling or disposing of any urea formaldehyde, polychlorinated biphenyls, asbestos, petroleum products (including gasoline, fuel oil, crude oil and various constituents of such products) or any other toxic or hazardous substance as defined by federal, state and local laws, except in compliance with all local, state and federal requirements for their use, storing, handling and disposal; (ii) there are no storage tanks located on, under or within the Premises; and (iii) the Premises is not listed on any national, state or local priority list, nor have the Premises been found to be in violation of any federal, state or local law or regulation concerning the storage, disposal or handling of toxic or hazardous substances. In the context above, used on the Premises includes, without limitation, such toxic or hazardous substances that may become a part of the building or any improvement, fixture, furnishing or equipment in the building or on the Premises placed there by Landlord or its employees and agents. Landlord agrees to indemnify, defend and hold harmless Tenant for breach of any of the foregoing representations, warranties and covenants, all of which shall survive the termination of this Lease, and for any claims, liabilities, costs and expenses (including legal and other professional fees) in connection therewith.

5.4 Tenant shall, at its own expense, procure, maintain in effect and comply with all conditions of any and all permits, licenses and other governmental and regulatory approvals required for Tenant's use of the Premises, including, without limitation, discharge of appropriately treated materials or wastes into or through any sanitary sewer serving the Premises. Except as discharged into the sanitary sewer in strict accordance and conformity with all applicable Hazardous Materials laws, rules and regulations, Tenant shall cause any and all Hazardous Materials used, stored, released, generated, manufactured or disposed of on the Premises to be disposed of in accordance with all laws, ordinances or regulations governing the transport and disposal of Hazardous Materials. In no event shall Tenant dispose of any Hazardous Materials on the Premises. Tenant shall in all respects handle, treat, deal with and manage any and all Hazardous Materials in, on, under, or about the Premises in strict conformity with all applicable Hazardous Materials laws, rules and regulations. Upon expiration or earlier termination of the Lease Term, Tenant shall cause all Hazardous Materials brought into the Industrial Park by Tenant, or Tenant's employees, agents or invitees, to be removed from the Industrial Park and transported for use, storage or disposal in accordance and compliance with all applicable Hazardous Materials laws, rules and regulations. Tenant shall not take any remedial action in response to the presence of any Hazardous Materials on or about the Industrial Park, nor enter into any settlement agreement, consent decree or other agreement in respect to any complaint or claim relating to any Hazardous Materials present on the Industrial Park without first notifying Landlord of Tenant's intention to do so and affording Landlord reasonable

13

opportunity to appear, intervene and otherwise appropriately assert and protect Landlord's interest in the contemplated action.

5.5  Tenant shall supply to Landlord as promptly as possible, and in any event no later than fifteen (15) calendar days after Tenant first receives or sends the same, with copies of all complaints, notices or warnings from governmental authorities, or asserted violations relating in any way to the presence of Hazardous Materials on the Premises and non-privileged reports relating to the Premises. At least once each year, Tenant shall deliver to Landlord copies of hazardous waste permits Tenant is required to have by applicable Hazardous Materials laws, rules and regulations for the legal and proper use, storage, generation, manufacture or presence of Hazardous Materials on the Premises, or for the disposal of all Hazardous Materials removed from the Premises.

5.6  Tenant hereby agrees to protect, defend, indemnify and hold harmless Landlord, its officers, directors, employees and agents, CB Richard Ellis, Invesco Advisers, Inc., and the Operating Engineers Pension Trust and its Trustees, and any successors to Landlord's interest from and against any and all liability (i) claimed by any governmental agency or private party directly or indirectly arising out of the use, generation, storage, mixing, repackaging treatment, release, threatened release, or disposal of Hazardous Materials by Tenant, Tenant's employees or Tenant's agents on the Premises or on the Industrial Park and (ii) for the cost of any required or necessary repair, cleanup, or detoxification and the preparation of any closure or other required plans to the full extent that such action is attributable, directly or indirectly to the presence of, use, generation, storage, repackaging, release, threatened release or disposal of Hazardous Materials on the Industrial Park by Tenant, Tenant's employees or Tenant's agents. Tenant's obligations pursuant to the foregoing indemnity shall survive the termination or expiration of this Lease.

5.7  Landlord hereby agrees to protect, defend, indemnify and hold harmless Tenant, its trustees, employees, officers, directors, agents and any successor to Tenant's interest from and against any and all liability (i) claimed by any governmental agency or private party directly or indirectly arising out of the usage, generation, storage, mixing, repackaging, treatment, release or threatened release, or disposal of Hazardous Materials by Landlord, Landlord's employees, Landlord's contractors or the prior owners of the Premises, and (ii) for the cost of any required or necessary repair, cleanup, monitoring or detoxification and the preparation of any closure or other required plans to the full extent that such action is attributable, directly or indirectly to the presence of, use, generation, storage, repacking, release, threatened release or disposal of Hazardous Materials on the Premises by Landlord, Landlord's employees or Landlord's contractors. Landlord's obligations pursuant to the foregoing indemnity shall survive the termination or expiration of this Lease.

14

5.8  The cost of constructing any government mandated containment system or other government mandated capital improvement to the Premises for the use, storage, or disposal of Hazardous Materials used or brought onto or manufactured by Tenant on the Premises shall be paid for by Tenant.

5.9  Tenant may install up to four (4) above ground silos for the storage of recycled polyethylene terephthalate resin, provided that each such tank shall be no larger than sixty (60) feet high by twelve (12) feet in diameter, and shall be installed at a location on the Premises mutually agreeable to Landlord and Tenant.  At all times Tenant shall comply, at Tenant's sole cost expense, with all applicable governmental statutes, ordinances and regulations concerning the design, use, reporting, monitoring, inspection, sealing, screening and removal of all storage silos located on or within the Premises installed by Tenant.  Upon termination of the Lease, Tenant shall, at its sole cost and expense, remove any silo installed or used by Tenant from the Premises, remove and replace any soil contaminated by the installation or use of any such silo, and compact the replaced soil if and as then required by law.  Tenant shall repair any damage to the Premises or Industrial Park caused by Tenant's removal of storage silos.  Except for the aforementioned four (4) storage tanks, Tenant shall not install any above ground or below ground storage tanks on the Premises without Landlord's written consent, which consent may be denied in Landlord's sole discretion.  Notwithstanding anything to the contrary in this Section 5.9, Tenant may, without Landlord's written consent, receive and store non-hazardous water based adhesive in original shipping containers for use in Tenant's manufacturing of product in the Premises within the Building.

## ACCEPTANCE OF PREMISES
## ARTICLE 6

6.1  Tenant acknowledges that, except as expressly set forth in this Lease, neither Landlord nor any agent of Landlord has made any representation or warranty with respect to the Premises or with respect to the suitability or fitness of the Building for the conduct of Tenant's business or for any other purpose.  Nothing contained in this Article 6 shall affect the commencement of the term of this Lease or the obligation of Tenant to pay rent hereunder as provided in Article 2 above.

6.2  Landlord shall be responsible for the Building being in compliance with the Americans with Disabilities Act ("ADA") as of the commencement date, unless the Building is not ADA compliant because of tenant improvements constructed by Tenant, in which case Tenant shall be responsible for the Building being in compliance with the ADA.  Landlord covenants that the Building (except those fixtures and equipment installed by Tenant), including, but not limited to, the structural components, foundations, roof, existing HVAC, windows and seals, and electrical and plumbing systems are in good condition as of the Commencement Date.

15

6.3  Tenant shall comply with all applicable statutes, ordinances, rules and regulations of federal, state and municipal governments ("Government Rules") as such Government Rules pertain to Tenant's use of the Premises during the term of the Lease, including but not limited to Government Rules on ESFR, the ADA, and fire sprinklers.  In the event Government Rules enacted after the commencement of the Lease require changes to the Building's structure, roof, walls, HVAC, plumbing, electric systems, ESFR or fire sprinklers (excluding any changes required because of Tenant's particular use of the Building, which change shall be paid by Tenant), and the useful life of such change is greater than the remaining term of the Lease, then the cost of such change shall be allocated between Landlord and Tenant based upon the ratio of the remaining term of the Lease to the useful life of the change (the parties acknowledging that useful life as used herein shall not be equated to the useful life for tax depreciation purposes, but shall be determined under generally accepted accounting principles).

## ALTERATIONS AND EQUIPMENT
## ARTICLE 7

7.1  Tenant shall make no alterations, additions or improvements to the foundations, exterior walls, roof structure or floor of the Premises (collectively "Structural Modifications") without the prior written consent of Landlord, and Landlord may impose as a condition to such consent such reasonable requirements as Landlord reasonably deems necessary or desirable, including, without limiting the generality of the foregoing, that all Structural Modifications (and all other construction work in the Building) shall be performed by a contractor signatory to a current collective bargaining agreement covering such employees with the appropriate labor organization affiliated with the Building and Construction Trades Department of the , AFL-CIO, or with the National Construction Alliance, and shall recognize the jurisdiction of the International Union of Operating Engineers, Local No. 12, in the assignment of work.  Landlord shall have the right to impose as a condition to its consent thereto the approval by Landlord's architect, or electrical or mechanical engineers.  All such Structural Modifications shall become the property of Landlord and shall be surrendered with the Premises, as a part thereof, at the end of the term hereof, except trade fixtures including but not limited to conveyor systems, shelving and racking.  If and when the Industrial Park or Building is sold, the terms of this Section 7.1 may be re-negotiated between Tenant and the new owner.

7.2  All articles of personal property and all business and trade fixtures, machinery and equipment, including but not limited to manufacturing equipment, racking, shelving, conveyor, phone and security systems, freestanding cabinet work, furniture and movable partitions owned by Tenant or installed by Tenant at its expense in the Premises shall be and remain the property of Tenant and may be removed by

16

Tenant at any time during the Lease Term, provided that Tenant repairs all damage to the Premises, Building or Industrial Park caused by such removal. On the expiration of the term of this Lease, or on any earlier termination of this Lease, Tenant shall remove all such personal property, and repair all damage to the Premises caused by the installation, use or removal of such personal property, including but not limited to patching all roof penetrations, floor, wall, and ceiling patching, removal of all toxic and non-toxic wastes, removal of all equipment fasteners and tie-downs, normal wear and tear excepted. The Premises shall be left by Tenant in a broom clean condition.

## LIENS
## ARTICLE 8

8.1  Tenant shall keep the Premises free from any mechanic's liens arising out of any work performed, materials furnished or obligations incurred by Tenant, and agrees to defend, indemnify and hold harmless Landlord from and against any such lien or claim or action thereon, together with costs of suit and reasonable attorneys' fees reasonably incurred by Landlord in connection with any such claim or action.

8.2  Landlord shall keep the Premises free from any mechanic's liens arising out of any work performed, materials furnished or obligations incurred by Landlord, and agrees to defend, indemnify and hold harmless Tenant from and against any such lien or claim or action thereon, together with costs of suit and reasonable attorneys' fees reasonably incurred by Tenant in connection with any such claim or action.

8.3  Landlord expressly waives and disclaims any lien or right of lien upon the goods, wares, machinery, equipment, merchandise and other personal property of the Tenant, located on the Premises or elsewhere, to secure the payment of rent by the Tenant or the performance by the Tenant of any other covenant of this Lease, whether such lien or right of lien shall be created by statute, court decision, common law, custom, or otherwise, but excluding any court judgment for money in favor of Landlord against Tenant.

## MAINTENANCE AND REPAIR
## ARTICLE 9

9.1  Existing Conditions.  Tenant shall accept the Premises as-is, where is, and with all faults and conditions as of the Commencement Date.

9.2  Landlord's Obligations.

17

Columbia Business Center                                                  CarbonLITE Industries, Inc.

(a) Except as provided in Article 15 (Damage or Destruction), Landlord shall be responsible for the structural integrity of the following: the foundations, exterior walls (except plate glass; windows, doors and other exterior openings; window and door frames, molding, closure devices, locks and hardware; special store fronts; lighting, HVAC, plumbing and other electrical, mechanical and electromotive installation, equipment and fixtures; signs, placards, decorations or other advertising media of any type; and interior painting or other treatment of exterior walls), and roof structure (except ceiling foil insulation; lighting, HVAC, plumbing and other electrical, mechanical and electromotive installation, equipment and fixtures; signs, placards, decorations or other advertising media of any type) of the Premises. Landlord shall not be responsible for any other part of the Building or Premises. Landlord shall make repairs under this Section 9.2 promptly after receipt of written notice from Tenant of the need for such repairs. Notwithstanding anything to the contrary herein, Landlord shall be responsible for necessary repairs of the HVAC, plumbing, electrical and mechanical equipment on the Premises for the first year of the Lease Term.

(b) Upon Landlord's refusal or failure to make or commence repairs to the Premises as required under this Lease, Tenant may, after ten (10) days written notice to Landlord, contract and complete repairs as necessary. All such work shall be performed by licensed contractors signatory to a current collective bargaining agreement covering such employees with the appropriate labor organization affiliated with the Building and Construction Trades Department of the AFL-CIO or with the National Construction Alliance, and shall recognize the jurisdiction of the International Union of Operating Engineers, Local No. 12, in the assignment of work. Landlord shall reimburse Tenant for the reasonable cost of such repairs promptly following receipt of demand therefore. Tenant shall not set-off such amounts against rents otherwise due and payable to Landlord. Notwithstanding the foregoing provisions of this paragraph, either Landlord or Tenant shall have the right in good faith to contest against each other or against a third party any such payment which, in the opinion of counsel, is illegal or excessive provided, however, the party so contesting such payment shall give such bond or surety as the other party may reasonably request in order to protect its interests in the Premises or the quiet enjoyment thereof, as the case may be.   If and when the Industrial Park or Building is sold, the terms of this Section 9.2(b) may be re-negotiated between Tenant and the new owner.

9.3  Tenant's Obligations.

(a) Except as provided in Section 9.2, and Article 15 (Damage or Destruction), Tenant shall keep all portions of the Premises and associated Land (including non structural, interior systems and equipment) in good order, condition and repair (including interior repainting and refinishing, as needed). All such work shall be performed by licensed contractors signatory to a current collective bargaining agreement covering such employees with the appropriate labor organization affiliated

18

with the Building and Construction Trades Department of the AFL-CIO or with the National Construction Alliance, and shall recognize the jurisdiction of the International Union of Operating Engineers, Local No. 12, in the assignment of work. If any portion of the Premises or any system or equipment in the Premises which Tenant is obligated to repair cannot be fully repaired or restored, Tenant shall promptly replace such portion of the Premises or system or equipment in the Premises, regardless of whether the benefit of such replacement extends beyond the Lease Term; but if the benefit of useful life of such replacement extends beyond the Lease Term (as such term may be extended by exercise of any options), the useful life of such replacement shall be prorated over the remaining portion of the Lease Term (as it may be extended), and Tenant shall be liable only for that portion of the cost which is applicable to the Lease Term (as it may be extended).   As a CAM expense for the Building included in Article 3 expenses, Landlord shall obtain a preventive maintenance contract providing for the regular inspection and maintenance of the ESFR system by a licensed ESFR contractor and the roof by a licensed roofing contractor. If any part of the Premises is damaged by any act or omission of Tenant, Tenant shall pay Landlord the cost of repairing or replacing such damaged property, whether or not Landlord would otherwise be obligated to pay the cost of maintaining or repairing such property; provided, however, that if (1) Tenant has maintained the insurance Tenant is required to maintain hereunder and (2) Tenant's insurance is insufficient to pay for all the cost of such repair or replacement and (3) the remaining cost of such repair or replacement is covered by insurance required to be maintained by Landlord hereunder, then Tenant shall only be responsible hereunder for reimbursing to Landlord any deductible under such insurance applicable to such loss.

(b)  Tenant shall maintain the portions of the Premises and associated Land that Tenant is obligated to maintain in an attractive, first class and fully operative condition, reasonable wear, tear and damage by casualty excepted. Tenant shall keep the Premises in good, clean and habitable condition and shall at its sole cost and expense keep the same free of dirt, rubbish, insects, rodents, vermin and other pests and make all needed repairs and replacements, including replacement of cracked or broken glass, except for repairs and replacements required to be made by Landlord. Without limiting the coverage of the previous sentence, it is understood that Tenant's responsibilities therein include the repair and replacement in accordance with all applicable Laws of all lighting, plumbing and other electrical, mechanical and electromotive installation, equipment and fixtures and also include all utility repairs in ducts, conduits, pipes and wiring, and any sewer stoppage located in, under and above the Premises, regardless of when or how the defect or other cause for repair or replacement occurred or became apparent. At the expiration of this Lease, Tenant shall surrender the Premises in good condition, excepting reasonable wear and tear and losses required to be restored by Landlord. All personal property of Tenant, including goods, wares, merchandise, inventory, trade fixtures and other personal property of Tenant, shall be stored at the sole risk of Tenant. Landlord or its agents shall not be

19

Columbia Business Center                                                              CarbonLITE Industries, Inc.

liable for any loss or damage to persons or property resulting from fire, explosion, falling plaster, steam, gas, electricity, water or rain which may leak from any part of the Project or from the pipes, appliances or plumbing works therein or from the roof, street or subsurface or from any other places resulting from dampness or any other cause whatsoever, or from the act or negligence of any other tenant or any officer, agent, employee, contractor or guest of any such tenant. It is generally understood that mold spores are present essentially everywhere and that mold can grow in most any moist location. Emphasis is properly placed on prevention of moisture and on good housekeeping and ventilation practices. Tenant acknowledges the necessity of housekeeping, ventilation and moisture control (especially in kitchens, janitor's closets, bathrooms, break rooms and around outside walls) for mold prevention. Without limiting the generality of the foregoing, Tenant shall adopt and implement the following guidelines: (A) report any maintenance problems involving water, moist conditions or mold to the property manager for the Industrial Park (the "Property Manager") promptly and conduct its required activities in a manner that prevents unusual moisture conditions or mold growth; (B) do not block or inhibit the flow of return or make-up air into the HVAC system; (C) adequately ventilate the Premises to prevent excessive moisture from accumulating; (D) regularly conduct janitorial activities, especially in bathrooms, kitchens and janitorial spaces, to remove mildew and prevent or correct moist conditions; and (E) maintain water in all drain taps at all times. In signing this Lease, Tenant has first inspected the Premises and certifies that it has not observed mold, mildew or moisture within the Premises. Tenant agrees to immediately notify Landlord if it observes mold/mildew and/or moisture conditions (from any source, including leaks), and allow Landlord to evaluate and make recommendations and/or take appropriate corrective action. Tenant relieves Landlord from any liability for any bodily injury or damages to property caused by or associated with moisture or the growth of or occurrence of mold or mildew on the Premises. In addition, execution of this Lease constitutes acknowledgement by Tenant that control of moisture and mold prevention are integral to its Lease obligations.

        (c)  Tenant shall fulfill all of Tenant's obligations under this Section 9.3 at Tenant's sole expense. If Tenant fails to maintain, repair or replace the property as required by this Section 9.3, Landlord may, upon ten (10) days prior written notice to Tenant (except that no notice shall be required in the case of an emergency), enter the Premises and perform such maintenance or repair (including replacement, as needed) on behalf of Tenant. In such case, Tenant shall reimburse Landlord for all costs incurred in performing such maintenance or repair immediately upon demand.

## ENTRY AND INSPECTION
## ARTICLE 10

        Upon prior notice to Tenant and when accompanied by an employee of Tenant, Tenant will permit Landlord and its agents at all reasonable times from 7:00

20

336534.4

a.m. to 5:00 p.m., Monday through Friday, and at any time in case of emergency, in such manner as to cause as little disturbance to Tenant as reasonably practicable to enter into and upon the Premises for the purpose of inspecting the same, or for the purpose of protecting the interest therein of Landlord, or to post notices of non-responsibility, without any rebate of rent to Tenant for any loss of occupancy or quiet enjoyment of the Premises, or damage, injury or inconvenience thereby occasioned. Upon prior notice to Tenant and when accompanied by an employee of Tenant, Tenant shall also permit Landlord and its agents, upon request, to enter and/or pass through the Premises, or any part thereof, at reasonable times from 7:00 a.m. to 5:00 p.m., Monday through Friday, to show the Premises to the fee owners, holders of encumbrances on the interest of Landlord under the Lease, or prospective purchasers, mortgagees or lessees of the Building as an entirety, and during the period of six (6) months prior to the expiration date of this Lease, Landlord may exhibit the Premises to prospective tenants. Landlord shall also have the right to enter and/or pass through the Premises, or any part thereof, at such times as such entry shall be required by circumstances of emergency affecting the Premises or any other portion of the Building in which the Premises are located.

Notwithstanding the foregoing provisions of this Article to the contrary, Landlord's rights hereunder shall be subject to the following provisions:

(i)     Landlord shall give at least 24 hours prior notice to Tenant before entering the Premises pursuant to this Article, except in case of emergency, in which case Landlord shall notify Tenant thereof as soon as practicable;

(ii)    Landlord agrees to exercise reasonable diligence to minimize to the extent practicable any interference with Tenant's use of the Premises; and

(iii)   Landlord agrees to comply with such reasonable requirements as Tenant may impose in order to minimize to the extent practicable any interference with Tenant's use of the Premises and/or any damage to Tenant's property therein.

### INSURANCE AND LIABILITY
### ARTICLE 11

11.1 Tenant shall maintain in full force and effect at all times during the term of this Lease, for the protection of Tenant and Landlord, policies of insurance issued by a responsible carrier or carriers licensed and admitted to do business in the state where the Premises is located and with an A. M. Best's rating of A- or better which afford the following coverage on a primary basis:

21

(a)  Employers Liability and Statutory
     Workers Compensation;
(b)  Commercial Liability Insurance with
     respect to the Premises - Not
     less than $5,000,000 combined single
     limit, with Landlord named as an additional insured;
(c)  Personal Property Insurance for all perils, except theft, for
     all Tenant's personal property, including all signs, on an
     actual cash value basis (not replacement cost);
(d)  Business interruption coverage; and
(e)  Pollution liability insurance.

11.2  Tenant may, without the written consent of Landlord, elect to have reasonable deductibles in connection with coverage required by Paragraph 11.1(c).

11.3  The Tenant shall deliver to Landlord at least thirty (30) days prior to the time such insurance is first required to be carried by Tenant, and thereafter at least thirty (30) days prior to expiration of such policy, certificates of insurance evidencing the above coverage with limits not less than those specified above. The Commercial Liability Insurance certificate shall include a copy of the additional named insured endorsement. Such certificates of insurance shall expressly provide that the interest of Landlord shall not be affected by a breach by Tenant of any policy provision for which such Certificates evidence coverage.

11.4  If, on account of the failure of Tenant to comply with the foregoing provisions, Landlord is adjudged to be a co-insurer by its insurance carrier, then any loss or damage Landlord shall sustain by reason thereof shall be borne by Tenant and shall be immediately paid by Tenant upon receipt of a bill therefor and evidence of such loss.

11.5  Landlord makes no representation that the limits of liability specified to be carried by Tenant or by Landlord under the terms of this Lease are adequate to protect Tenant against Tenant's undertaking under this Paragraph 11 and in the event Tenant believes that any such insurance coverage called for under this Lease is insufficient, Tenant shall provide, at its own expense, such additional insurance as Tenant deems adequate.

11.6  Landlord shall not be liable for any loss, damage or injury to person or property from any cause whatsoever occurring upon the Premises, or occurring in any means of entrance to or exit therefrom, except for the sole negligence, contributory gross negligence, or willful misconduct of Landlord and its officers, employees, or agents. The Landlord shall not be liable for any loss, damage or injury arising from the act or neglect or of any owners or occupants of adjacent or contiguous property.

22

Columbia Business Center                                                          CarbonLITE Industries, Inc.

Tenant agrees to indemnify and save harmless Landlord and its agents and employees, and any and all affiliates of Landlord, including without limitation the Operating Engineers Pension Trust and its Trustees, from and against any and all loss, liability, claims, demands and actions of any kind or nature (and to defend the same) arising out of the use or misuse of the Premises by Tenant or Tenant's officers, employees, agents, invitees, guests or licensees, or arising from the failure of Tenant to keep the Premises in good condition and repair, or growing out of the breach or nonperformance of any material covenant or condition hereof, except for the sole negligence, contributory gross negligence or willful misconduct of Landlord or its officers, employees or agents. Landlord agrees that in respect of those matters where Tenant is obligated to indemnify Landlord, Tenant shall have the first right to defend such claims and for so long as Tenant has acknowledged its responsibility to do so and is defending such claims with reasonable diligence, Landlord may not settle such claims and Tenant shall not be liable for Landlord's attorneys' fees.

## WAIVER OF SUBROGATION
## ARTICLE 12

Notwithstanding any other provision of this Lease to the contrary, Landlord and Tenant each agree to look first to any insurance in their own favor before making any claim against the other party for recovery for loss or damage resulting from fire or other casualty, and to the extent that such insurance is in force and collectible and to the extent permitted by law, Landlord and Tenant each hereby releases and waives all right of recovery against the other or anyone claiming through or under each of them by way of subrogation or otherwise. Each party hereto shall be responsible for any cost to obtain the waiver of subrogation from its insurance carrier. Landlord and Tenant shall each reasonably promptly after the date hereof use reasonable efforts to secure an appropriate clause in, or an endorsement upon, each insurance policy obtained by it and covering or applicable, in the case of Tenant, to the use of the Premises and Tenant's property located therein and, in the case of Landlord, the Building, the Industrial Park and any of Landlord's equipment and personal property located therein or thereon, pursuant to which the insurance company waives its right of subrogation or permits the insured, prior to any loss, to agree with a third party to waive any claim the insured might have against such third party without invalidating the coverage under the insurance policy. The release of liability referred to in the foregoing provisions of this Article shall also apply in favor of Landlord's managing agents CB Richard Ellis and Invesco Advisers, Inc., the Operating Engineers Pension Trust and its trustees, and the shareholders, directors, officers and employees of each of the parties hereto and such managing agent and trustees, with respect to any claim (including any claim based on negligence) which either Landlord or Tenant might otherwise have against the other party hereto or such person(s).

23

## ASSIGNMENT AND SUBLETTING
## ARTICLE 13

13.1  Tenant shall be permitted to sublease or assign all or any portion of the Premises upon first receiving Landlord's written consent, which consent shall not be unreasonably withheld, conditioned or delayed, provided Tenant shall remain liable under the terms of the Lease.  Subject to rights of Landlord herein, Tenant shall have the sole right to determine the terms and conditions of any sublease or assignment.

13.2  Notwithstanding the foregoing, Tenant shall be permitted to sublease or assign the Lease without Landlord's consent to (a) any related entity of Tenant, provided that Tenant shall remain liable under the terms of the Lease, or (b) to any entity with which Tenant or any such related entity of Tenant may merge or consolidate.  Tenant shall give Landlord not less than thirty (30) days' prior written notice of the assignment with reasonably sufficient documentation of the transaction including current financial statements of the proposed assignee.  Such assignee shall assume Tenant's obligations hereunder arising subsequent to such assignment.  For the purposes of this paragraph a "related entity" shall be any subsidiary or legal entity with a controlling interest which is directly or indirectly owned by Tenant, an entity that shares at least 50% common ownership with Tenant or a wholly owned subsidiary of Tenant, or any direct or indirect parent of Tenant.

## TRANSFER OF LANDLORD'S INTEREST
## ARTICLE 14

In the event of any transfer or transfers of Landlord's interest in the Premises or in the real property of which the Premises are a part, other than a transfer for security purposes only, the transferor shall be automatically relieved of any and all obligations and liabilities on the part of Landlord accruing from and after the date of such transfer (but shall not be relieved of any such obligations or liabilities occurring prior to the date of such transfer), provided such obligations and liabilities are assumed in writing by the transferee, and provided transferee assumes any existing obligation to Tenant at the time of transfer.

## DAMAGE OR DESTRUCTION
## ARTICLE 15

15.1  If more than fifty percent (50%) of the Premises is damaged by any casualty, or there is damage that renders more than fifty percent (50%) of the Premises untenantable for more than five (5) business days, Landlord shall promptly obtain and furnish to Tenant an estimate from a reputable qualified independent union contractor of the time which will be required to substantially complete the repair of such damage and restore the Premises to the same condition Premises was in on the Commencement

24

Date. If such estimated time is greater than seven (7) months from the date Landlord is notified of the occurrence of the casualty, either Landlord or Tenant shall have the right to terminate this Lease by a written notice given within thirty (30) days after their respective receipts of such estimate. If neither Landlord nor Tenant shall have the right to terminate or shall elect to waive their rights herein despite the time estimates, Landlord shall promptly commence the repair of the damage and shall complete such repair with reasonable diligence as soon as practicable and in any case within the greater of seven (7) months after Landlord is notified of the date of the casualty or the period set forth in such estimate, as such latter period shall be extended by not more than thirty (30) days due to causes beyond Landlord's reasonable control (i.e., Force Majeure as defined in Article 37 below). For the purposes of this section the term "substantially complete" shall mean repairs which are sufficiently complete that Tenant can carry on its business in the Premises without material interference from the completion of details of construction or decoration or mechanical adjustments which are minor in character. Tenant agrees that such details and adjustments may be completed after the end of the applicable period and Landlord agrees to thereafter complete the same with due diligence. Until such repairs are completed the rent shall be abated in proportion to the part of the Premises which is unusable for the purpose actually used by Tenant in the conduct of its business. Notwithstanding anything to the contrary in this Section 15.1, if Tenant is unable to conduct any substantial manufacturing in the Premises due to damage to the Building not caused by Tenant or Tenant's employees or agents, then Landlord shall use commercially reasonable efforts to relocate Tenant into other premises in the Industrial Park of sufficient size to allow Tenant to conduct the same type of manufacturing Tenant performed in the Premises before such damage, and if Landlord is unable to so relocate Tenant within three (3) months after such damage, then Tenant may terminate this Lease by giving written notice to Landlord within ten (10) business days after said three (3) month period or within ten (10) business days after Landlord notifies Tenant in writing that Landlord will not relocate Tenant, whichever is earlier.

      15.2 If fifty percent (50%) or less of the Premises is damaged by any casualty, or there is damage such that for more than five (5) business days it would be unreasonable for Tenant to continue to conduct any substantial business in the Premises, Landlord shall promptly obtain and furnish to Tenant an estimate from a reputable, qualified independent union contractor of the time which will be required to substantially complete the repair of such damage. If such estimated time is greater than three (3) months from the date Landlord is notified of the occurrence of the casualty, Tenant shall have the right to terminate the Lease as applied to the Premises covered by the casualty by a written notice given within fourteen (14) days after its respective receipt of such estimate. If Tenant does not have the right to partially terminate or elects to waive in writing its rights hereunder, Landlord shall promptly commence the repair of the damage and shall complete such repair with reasonable diligence as soon as practicable, and in any case within four (4) months after the date

Columbia Business Center

CarbonLITE Industries, Inc.

Landlord is notified of the casualty, and such period shall be extended by not more than sixty (60) days due to causes beyond Landlord's reasonable control (i.e., Force Majeure).  Until such repairs are completed, the rent shall be abated in proportion to the part of the Premises which is unusable by Tenant based on Tenant's actual use in the conduct of its business.  Notwithstanding anything to the contrary in this Section 15.2, if Tenant is unable to conduct any substantial manufacturing in the Premises due to damage to the Building not caused by Tenant or Tenant's employees or agents, then Landlord shall use commercially reasonable efforts to relocate Tenant into other premises in the Industrial Park of sufficient size to allow Tenant to conduct the same type of manufacturing Tenant performed in the Premises before such damage, and if Landlord is unable to so relocate Tenant within three (3) months after such damage, then Tenant may terminate this Lease by giving written notice to Landlord within ten (10) business days after said three (3) month period or within ten (10) business days after Landlord notifies Tenant in writing that Landlord will not relocate Tenant, whichever is earlier.

15.3  No damage, compensation or claim shall be payable by Landlord for inconvenience, loss of business or annoyance arising from any repair or restoration of any portion of the Premises or other portion of the Building.  Landlord shall use its best efforts to effect such repair or restoration promptly and in such manner as not to unreasonably interfere with Tenant's use and occupancy.

15.4  Landlord shall not be required to carry insurance of any kind on Tenant's property and, except by reason of the breach by Landlord of any of its obligations hereunder (subject to the provisions of Article 14 above), shall not be obligated to repair any damage thereto or replace the same.

15.5  A total destruction of the Building shall automatically terminate this Lease immediately.

15.6  Notwithstanding that Landlord would otherwise be obligated to repair the Building and/or the Premises, Landlord shall not be obligated to repair a casualty of more than ten percent (10%) of Tenant's Premises or which would take more than four (4) months to repair if there is less than one year remaining in the term of this Lease at the time the casualty occurs unless Tenant has made (or makes within ten (10) business days from the time the casualty occurs) an irrevocable commitment to exercise its option, if any, to extend the term of the Lease under Article 19 when such option may be executed by Tenant.  Landlord shall make such election by providing written notice to Tenant.  In the event landlord makes such election, the rent shall be abated in proportion to the part of the Premises which is unusable by Tenant in the conduct of its business for the remainder of the Lease.

26

Columbia Business Center                                                    CarbonLITE Industries, Inc.

## EMINENT DOMAIN
## ARTICLE 16

16.1  If the whole of the Premises or so much thereof as to render the balance unusable by Tenant in the conduct of its business shall be taken under power of eminent domain, this Lease shall automatically terminate as of the date of such condemnation, or as of the date possession is taken by the condemning authority, whichever is earlier.  No award for any partial or entire taking shall be apportioned, and Tenant hereby assigns to Landlord any award which may be made in such taking or condemnation, together with any and all rights of Tenant now or hereafter arising in or to the same or any part thereof; provided, however, that nothing contained herein shall be deemed to give Landlord any interest in or to require Tenant to assign to Landlord any award made to Tenant for the taking of personal property and fixtures belonging to Tenant and/or for the interruption of or damage to Tenant's business and/or for Tenant's unamortized cost of Leasehold Improvements and/or specifically for Tenant's relocation costs.

16.2  In the event of a partial taking that does not result in a termination of this Lease, rent shall be abated in proportion to the part of the Premises so made unusable by the partial taking.

## DEFAULTS AND REMEDIES
## ARTICLE 17

17.1  The occurrence of any of the following shall constitute a material default and breach of this Lease by Tenant:

(i)     The failure by Tenant to pay the rent or make any other payment required to be made by Tenant hereunder as and when due, where such failure continues for three (3) business days after written notice of such failure by Landlord to Tenant; provided, however, that any such notice shall be in lieu of and not in addition to any notice required under the laws of the state of California.

(ii)     The failure by Tenant to observe or perform any other material provision of this Lease to be observed or performed by Tenant, where such failure continues for thirty (30) days after written notice thereof by Landlord to Tenant; provided, however, that if the nature of such default is such that the same cannot reasonably be cured within such thirty (30) day period, Tenant shall not be deemed to be in default if Tenant shall within such period commence such cure and thereafter diligently prosecute the same to completion.  Such thirty (30) day notice shall be in lieu of and not in addition to any notice required under the laws of the State of California.

27

336534.4

17.2  In the event of any such uncured default by Tenant, then, in addition to any other remedies available to Landlord at law or in equity, Landlord shall have the immediate option to terminate this Lease and all rights of Tenant hereunder by giving Tenant thirty (30) days acknowledged written notice of such election to terminate.  In the event that Landlord shall elect to so terminate this Lease then Landlord may recover from Tenant:

(i)     the worth at the time of award of any unpaid rent which had been earned at the time of such termination; plus

(ii)    the worth at the time of award of the amount by which the unpaid rent which would have been earned after termination until the time of award exceeds the amount of such rental loss which Tenant proves could have been reasonably avoided; plus

(iii)   the worth at the time of award of the amount by which the unpaid rent for the balance of the Lease Term (calculated without regard to any early termination of the Lease) after the time of award exceeds the amount of such rental loss that Tenant proves could be reasonably avoided; plus

(iv)   all reasonable attorney fees incurred by Landlord relating to the default and termination of this Lease; plus

(v)    interest on all sums due Landlord by Tenant at the Default Rate from their respective due dates until paid.

The term "rent" as used herein shall be deemed to be and to mean the basic annual rent and all other sums required to be paid by Tenant pursuant to the terms of this Lease.  All such sums, other than the basic annual rent, shall be computed on the basis of the average monthly amount thereof accruing during the 24-month period immediately prior to default, except that if it becomes necessary to compute such rental before such 24-month period has occurred, then on the basis of the average monthly amount accruing during such shorter period.

As used in subparagraph (iii) above, the "worth at the time of award" is computed by discounting such amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of award plus one percent (1%).

17.3  In the event of the breach of this Lease and abandonment of the Premises by Tenant, if Landlord does not elect to terminate this Lease as provided in Section 17.2 above, Landlord may from time to time without terminating this Lease, enforce all of its rights and remedies under this Lease, including the right to recover all

28

Columbia Business Center                                        CarbonLITE Industries, Inc.

rent as it becomes due. For the purposes of the foregoing, the following do not constitute a termination of Tenant's right to possession:

(i)    acts of maintenance or preservation or efforts to relet the Premises;

(ii)    the appointment of a receiver upon initiative of Landlord to protect Landlord's interests under this Lease.

17.4  If either party fails to pay, when due, any assessments or taxes required to be paid by it hereunder or to promptly discharge any liens created by it which might affect the Premises leased hereunder (including, but not limited to mechanics and/or materialman's liens) or fails to promptly undertake or pay the costs of any maintenance, restoration, or repairs required to be or made by it hereunder or if Tenant fails to pay, when due all personal property tax payable by it which might affect said Premises, or fails to pay when due any items of additional rent hereinabove required, the Landlord or Tenant, as the case may be, shall have the right, on twenty (20) days written acknowledged notice to the defaulting party, to make the payments so required of the defaulting party. Any such payments made by Landlord shall be added as additional rent payable hereunder and shall be construed as unpaid rent. Any such payments made by Tenant shall be deducted by it from the rent payable hereunder.

17.5  If any party undertakes litigation, including but not limited to voluntary arbitration, against the other party arising out of or in connection with this Lease, the prevailing party shall be entitled to recover from the other party reasonable attorneys' fees and court costs incurred.

## SURRENDER OF PREMISES:  REMOVAL OF PROPERTY
## ARTICLE 18

18.1  The voluntary or other surrender of this Lease by Tenant to Landlord, or a mutual termination thereof, shall not work as a merger, and shall, at the option of Landlord, operate as an assignment to it of any or all subleases or sub-tenancies affecting the Premises.

18.2  Upon the expiration of the Lease Term, or upon any earlier termination of this Lease, Tenant shall quit and surrender possession of the Premises to Landlord in good order and condition, reasonable wear and tear, damage by casualty, and repairs which are Landlord's obligations excepted, and shall, without expense to Landlord, remove or cause to be removed from the Premises all debris and rubbish ("broom clean"), all furniture, equipment, business and trade fixtures, free-standing cabinet work, movable partitioning and other articles of personal property owned by Tenant or installed or placed by Tenant at its expense in the Premises, and all similar

29

articles of any other persons claiming under Tenant unless Landlord exercises its option to have any subleases or subtenancies assigned to it, and Tenant shall repair all damage to the Premises, Building and Industrial Park resulting from such removal. Unless caused by structural defects, construction defects or subsoil conditions, all damage to the floor of the Premises, including cracking, gouges and chips shall be repaired by Tenant to a condition of a level and smooth surface that may be used by industrial forklifts.

18.3  Tenant shall, at its expense, repair any damage caused by the removal of its trade fixtures or equipment.  Any permanently installed trade fixture or equipment which would permanently damage the structure of the Building by its removal shall remain attached to the Building and shall become the property of Landlord.  Tenant shall advise Landlord in writing in advance of the installation of any such equipment which would be subject to remaining in the Building.  Tenant shall have the option, if possible, to design the installation of the equipment so that it would not permanently damage the structure of the Building when it is removed.  All other fixtures, equipment, alterations, additions, improvements and/or appurtenances permanently attached to or built into the Premises prior to or during the Lease Term, whether at the expense of Landlord or at the expense of Tenant or both, shall be and remain part of the Premises and shall not be removed by Tenant at the end of the term unless otherwise expressly provided for in this Lease (including without limitation Article 7 hereof) or unless such removal is required by Landlord pursuant to the provision of this Article 18, with the exception of Tenant's personal property.

## OPTION TO RENEW
## ARTICLE 19

19.1  Provided that Tenant is not in default of the Lease, Tenant shall have two (2) options to renew this Lease for an additional term of five (5) years for each option with the basic annual rent for the renewal period calculated at the then prevailing fair market rent for comparably sized and equipped Buildings in the Industrial Park and within five (5) miles of the Building.  However, in no event shall the option rent be less than the last rent in effect during the original Lease Term.

19.3  Each five (5) year option shall be personal to Tenant, and shall be exercised as follows:  Tenant must give Landlord written notice not more than twelve (12) months and not less than nine (9) months before the end of the Lease term of Tenant's intent to renew the Lease.  Not more than nine (9) months and not less than six (6) months before the expiration of this Lease, Landlord shall give written notice to Tenant of Landlord's determination of the fair market rent for the option term.  Such determination shall not be binding on Tenant (except as provided below), nor shall Landlord's failure to give such a notice preclude Tenant from exercising its renewal option hereunder.  Tenant shall give written notice of its exercise of the option to

Columbia Business Center                                                    CarbonLITE Industries, Inc.

extend in person or by certified mail, return receipt requested, to the Landlord at least fourteen (14) calendar days from the date of notice. The rental rates set forth in Landlord's notice shall be binding on Landlord and also shall be binding on Tenant unless Tenant shall state in Tenant's notice to Landlord a lower rental rate for the Premises which Tenant asserts is the rate which should be applicable; provided that any such rental rate asserted by Tenant must be equal to or greater than the last rent in effect during the original Lease Term. If any dispute over the applicable rental rate is not resolved sixty (60) days before the expiration of the initial Lease term, Tenant and Landlord each shall have the right to demand binding arbitration of the basic rental rate for the option term, such arbitration shall be conducted in the Riverside, California area before a MAI Real Estate Appraiser or real estate broker, approved by Landlord and Tenant, who has been actively involved in industrial real estate in the Riverside, California, market for at least the previous three years and who has not previously worked for either Landlord or Tenant (the "Arbitrator"). The Arbitrator will be required to select either Landlord's last offer or Tenant's last offer and such rate shall be the basic rental rate for the option term. It shall be a condition of the exercise of the renewal that Tenant shall not be in default of the terms of this Lease (as provided in Article 17 above) following the expiration of any applicable cure periods at the time of the exercise of the option. In the event the Arbitrator's decision is not made by the date of the commencement of the option term, Tenant shall pay to Landlord the last offer made by Landlord until the decision is made. In the event the Arbitrator selects Tenant's last offer, Landlord shall refund to Tenant any overages actually paid with interest at the Default Rate from the date paid to Landlord. Fees payable to the Arbitrator shall be paid by the party whose offer is not selected.

### COSTS OF SUIT
### ARTICLE 20

20.1  If Tenant or Landlord shall bring any action, including but not limited to any voluntary arbitration, for any relief against the other, declaratory or otherwise, arising out of or under this Lease, including any suit by Landlord for the recovery of rent or possession of the Premises or payment for the construction of tenant improvements, the losing party shall pay the successful party a reasonable sum for attorneys' fees and court costs in such action.

20.2  Should Landlord, without fault on Landlord's part, be made party to any litigation instituted by Tenant or by any third party against Tenant, or by or against any person holding under or using the Premises by license of Tenant, or for the foreclosure of any lien for labor or material furnished to or for Tenant arising out of or resulting from any act or transaction of Tenant or of any other person, Tenant covenants to save and hold Landlord harmless from any judgment rendered against Landlord or the Premises or any part thereof, and all costs and expenses, including reasonable attorneys' fees, incurred by Landlord in connection with such litigation.

31

Landlord agrees that it will promptly notify Tenant if Tenant is obligated to save and hold Landlord harmless under this Article and that Landlord shall have no right to settle any claim or other action or proceeding covered hereby for so long as Tenant shall acknowledge its obligations hereunder in respect of such claim or other action or proceeding and shall be defending the same with reasonable diligence and for so long as Tenant is so doing, Tenant shall not be liable for Landlord's attorneys' fees incurred in respect of such claim, action or proceeding.

      20.3  Should Tenant, without fault on Tenant's part, be made party to any litigation for the foreclosure of any lien for labor or material furnished to or for Landlord, Landlord covenants to save and hold Tenant harmless from any judgment rendered against Tenant, and all costs and expenses, including reasonable attorneys' fees, incurred by Tenant in connection with such litigation.  Tenant agrees that it will promptly notify Landlord if Landlord is obligated to save and hold Tenant harmless under this Article and that Tenant shall have no right to settle any claim or other action or proceeding covered hereby for so long as Landlord shall acknowledge its obligations hereunder in respect of such claim or other action or proceeding and shall be defending the same with reasonable diligence and for so long as Landlord is so doing, Landlord shall not be liable for Tenant's attorneys' fees incurred in respect of such claim, action or proceeding.

## WAIVER
## ARTICLE 21

      The waiver by Landlord or Tenant of any breach of any term, covenant or condition herein contained shall not be deemed to be a waiver of such term, covenant or condition as to any subsequent breach of the same or any other term, covenant or condition herein contained.  The subsequent acceptance of rent hereunder by Landlord or payment of rent by Tenant shall not be deemed to be a waiver of any preceding breach by Tenant of any term, covenant or condition of this Lease, other than the failure of Tenant to pay the particular rent so accepted, or by Landlord of any term, covenant or condition of this Lease, or any right Landlord may have to recover possession of the Premises, regardless of Landlord's or Tenant's knowledge of such preceding breach at the time of acceptance or payment of such rent.

## HOLDING OVER
## ARTICLE 22

      If Tenant holds over after the term hereof, with or without the express or implied consent of Landlord, such tenancy shall be from month to month only, and not a renewal hereof or an extension for any further term, and in such case base rent shall be payable monthly in advance in the amount of one hundred twenty-five percent (125%) of the base rent paid by Tenant during the last month of the Lease

Term before the hold over for the first four (4) months hold over period or at the then fair market value, which ever is higher.  Thereafter, for the fourth month and all subsequent months rent shall be payable monthly in advance in the amount of one hundred fifty percent (150%) of the base rent paid by Tenant during the last month of the Lease Term before the hold over or at the then fair market value, which ever is higher.  In addition, during the term of any hold over, Tenant shall pay Landlord the Building Operating Expenses and Tenant's Pro Rata Share of the Industrial Park Operating Expenses.  Any such month to month tenancy shall be subject to every other term, covenant and agreement contained herein.  Nothing contained in this Article 22 shall be construed as consent by Landlord to any holding over by Tenant and Landlord expressly reserves the right to require Tenant to surrender possession of the Premises to Landlord as provided in Article 18 above forthwith upon the expiration of the term of this Lease or other termination of this Lease.

## SUBORDINATION
## ARTICLE 23

Landlord represents and warrants to Tenant that on the date of this Lease Landlord is the sole owner of the Land and Building and that there are no mortgages, trust deeds, ground leases or other like encumbrances in existence which affect the Land, the Building, or the Premises.  Tenant agrees that upon written request of Landlord, and upon the receipt of a written non-disturbance agreement acceptable to Tenant from the lender, this Lease may be subject and subordinate to any mortgage, trust deed or like encumbrance hereafter placed by Landlord or its successors in interest upon its interest in said Premises to secure the payment of moneys loaned, interest thereon, and other obligations.  Tenant agrees to execute and deliver, within thirty (30) days of receipt of an acceptable written non-disturbance agreement from the lender, any and all commercially reasonable instruments desired by Landlord subordinating, in the manner requested by Landlord, this Lease to such mortgage, trust deed or like encumbrance.  The subordination of this Lease to any such mortgage, deed of trust or other encumbrance shall, however, be subject to the following:

(a) In the event of the sale of the real property of which the Premises are a part or upon foreclosure or upon the exercise of a power of sale, or by transfer in lieu of foreclosure, Tenant will upon written request attorn to the purchaser, or transferee, and recognize the purchaser, or transferee, as the Landlord under this Lease.

(b) Notwithstanding such subordination, Tenant's right to quiet possession of the Premises shall not be disturbed so long as Tenant shall pay the rent to Landlord or its written agent or designee and observe and perform all of the provisions of this Lease to be observed and performed by Tenant unless this Lease is terminated pursuant to specific provisions contained herein.

33

## COVENANTS CONDITIONS AND RESTRICTIONS
### ARTICLE 24

Landlord has promulgated and recorded, or will promulgate and record, reasonable and customary covenants conditions and restrictions ("C C & Rs") for the Industrial Park. Tenant agrees to abide by and comply with said C C & Rs and any reasonable and non-discriminatory amendments, modifications and additions thereto as may hereafter be adopted and published by written notice to tenants by Landlord for the safety, care, security, good order and cleanliness of the Industrial Park. Landlord shall enforce all C C & Rs against all other lessees in the Industrial Park. In the event such enforcement action is unsuccessful, Landlord shall not be liable to Tenant for any violation of such C C & Rs by any other tenant. Landlord shall not enforce a rule or regulation against Tenant that it is not enforcing against other similarly situated tenants in the Industrial Park in similar circumstances.

## DEFINED TERMS
### ARTICLE 25

The words "Landlord" and "Tenant," as used herein, shall include the plural as well as the singular. Words used in neuter gender include the masculine and feminine and words in the masculine or feminine gender include the neuter. If there be more than one (1) Tenant, the obligations hereunder imposed upon Tenant shall be joint and several. The headings or titles to the articles of this Lease are not a part of this Lease and shall have no effect upon the construction or interpretation of any part thereof.

## HEIRS AND ASSIGNS
### ARTICLE 26

Subject to the provisions of Article 13 hereof relating to assignment and subletting, this Lease is intended to and does bind the heirs, executors, administrators, successors and assigns of any and all of the parties hereto.

## TIME OF ESSENCE
### ARTICLE 27

Time is of the essence with respect to Landlord's and Tenant's respective obligations under this Lease.

34

## SEVERABILITY
## ARTICLE 28

If any term or provision of this Lease shall be held invalid or unenforceable to any extent, the remainder of this Lease shall not be affected thereby and every other remaining term and provision of this Lease shall be valid and enforceable to the fullest extent permitted by law.

## ENTIRE AGREEMENT
## ARTICLE 29

This instrument along with the exhibits and attachments or other documents affixed hereto or referred to herein (including without limitation the Work Letter Agreement and Exhibit B) constitutes the entire and exclusive agreement between Landlord and Tenant relative to the Premises herein described, and this agreement and said exhibits and attachments and other documents may be altered, amended or revoked only by an instrument in writing signed by the party to be charged therewith. Landlord and Tenant hereby agree that all prior or contemporaneous oral agreements, understandings and/or practices relative to the leasing of the Premises are merged in or revoked by this agreement. If there is any discrepancy between the Lease, the Lease Summary or the Work Letter Agreement, the Lease shall take precedence over the other documents.

## TENANT IMPROVEMENTS
## ARTICLE 30

The design and construction of Tenant's Premises shall be completed pursuant to the Work Letter Agreement attached hereto as Exhibit C.

## RIGHT OF LANDLORD TO PERFORM
## ARTICLE 31

Except as expressly provided herein, all covenants and agreements to be performed by Tenant under any of the terms of this Lease shall be performed by Tenant at Tenant's sole cost and expense. If Tenant shall fail to pay any sum of money, other than rent, required to be paid by it hereunder or shall fail to perform or commence to perform any other act on its part to be performed hereunder, Landlord may, but shall not be obligated to, and without waiving or releasing Tenant from any obligations of Tenant, make any such payment or perform any such other act on Tenant's part to be made or performed as is in this Lease provided. All sums so paid by Landlord and all necessary incidental costs, shall be payable to Landlord on demand and Tenant covenants to pay any such sums, and Landlord shall have (in addition to any other right or remedy of Landlord) the same rights and remedies in the

35

Columbia Business Center                                                      CarbonLITE Industries, Inc.

event of the nonpayment thereof by Tenant as in the case of default by Tenant in the payment of the rent.

## PARKING FACILITIES
### ARTICLE 32

During the term of this Lease, Tenant shall be entitled to use the parking spaces for the Premises free of charge.  Tenant shall not be permitted to park in other lots of the Industrial Park or on the adjacent streets without the express written permission of Landlord.

## NOTICES
### ARTICLE 33

All notices which Landlord or Tenant may be required, or may desire, to serve on the other may be served, as an alternative to personal service, by fax, Federal Express or mailing the same by registered or certified mail, postage prepaid, addressed to the Landlord and Tenant at the addresses set forth in Exhibit B, or addressed to such other address or addresses as either Landlord or Tenant may from time to time designate to the other in writing.  Such notices shall be deemed given upon receipt.

## QUIET ENJOYMENT
### ARTICLE 34

Landlord covenants and agrees that Tenant, upon paying the basic rent, additional rent and all other charges herein provided for and observing and keeping the covenants, agreements and conditions of this Lease on its part to be kept, shall lawfully and quietly hold, occupy and enjoy the Premises during the term of this Lease without molestation of anyone lawfully claiming by, through or under Landlord, subject, however, to the matters herein set forth.

## ESTOPPEL CERTIFICATES
### ARTICLE 35

35.1  Tenant agrees at any time and from time to time, upon not less than thirty (30) days' prior notice by Landlord, to execute, acknowledge and deliver to Landlord a statement in writing certifying that this Lease is unmodified and in full force and effect (or if there have been modifications, that the same is in full force and effect as modified and stating the modifications), and the dates to which the basic rent, additional rent and other charges have been paid in advance, if any, and stating whether or not to the best knowledge of the signer of such certificate, Landlord is in default in performance of any covenant, agreement or condition contained in this Lease and, if so, specifying each such default of which the signer may have knowledge, it

36

Columbia Business Center                                              CarbonLITE Industries, Inc.

being intended that any such statement delivered pursuant to this section may be relied upon by any prospective purchasers of the fee of the Building or any mortgagee thereof or any assignee of any mortgage upon the fee of the Building.

35.2  Landlord agrees at any time and from time to time upon not less than thirty (30) days' prior notice by Tenant to execute, acknowledge and deliver to Tenant a statement in writing certifying that this Lease is unmodified and in full force and effect (or if there shall have been modifications that the same is in full force and effect as modified and stating the modifications) and the dates to which the basic rent, additional rent and other charges have been paid in advance, if any, and stating whether or not to the best knowledge of the signer of such certificate Tenant is in default in the performance of any covenant, agreement or condition contained in this Lease and, if so, specifying each such default of which the signer may have knowledge, it being intended that any such statement delivered pursuant to this Section may be relied upon by any prospective subleasee or assignee of the Tenant's interest in this Lease.

35.3  Estoppel letters or certificates hereunder shall not contain new provisions or modify existing provisions of this Lease.

## ACCESS, CHANGES IN PARK
## FACILITIES, NAME
## ARTICLE 36

36.1  Landlord reserves the right, without incurring any liability to Tenant therefor, to make such changes in or to the Industrial Park and the fixtures and equipment thereof, as well as in or to the street entrances, and other improvements thereof, as it may deem necessary or desirable; provided, however, that no such change shall unreasonably impact Tenant's access or permitted use of the Premises.

36.2  Landlord may adopt any name for the Industrial Park and Landlord reserves the right to change the name of the Industrial Park at any time.

## FORCE MAJEURE
## ARTICLE 37

Force Majeure shall mean any delay in Landlord's obligations or Tenant's obligations under this Lease and/or under the attached Work Letter Agreement (with the exception of any obligation to pay monetary amounts due) which is due to strikes, lockouts or other labor or industrial disturbance (whether or not on the part of the employees of either party hereto), civil disturbance, future government orders claiming jurisdiction, act of the public enemy, war, riot, sabotage, terrorist act, blockade, embargo, inability to secure customary materials, supplies or labor through

37

ordinary sources by reason of regulation or order of any government or regulatory body, delays due to the inability to secure building permits and approvals within time periods that normally prevail for obtaining such permits and approvals, or because of delays in completing the Development Plans and/or Working Drawings (as those terms are defined in the Work Letter Agreement) due to changes in building and related codes, or the interpretation thereof, lightning, earthquake, fire, storm, rain, hurricane, tornado, flood, washout, explosion, or any other similar causes beyond the reasonable control of the party from whom performance is required, or any of its contractors or other representatives. Any prevention, delay or stoppage due to Force Majeure shall excuse the performance of the party affected for a period of time equal to any such prevention, delay or stoppage, except the obligation to pay money, including rent pursuant to this Lease.

## BROKERS
## ARTICLE 38

The parties recognize as the brokers who procured this Lease the firms specified in Exhibit B, and agree that Landlord shall be solely responsible for the payment of any brokerage commission to said brokers, and that Tenant shall have no responsibility therefor unless written provision to the contrary has been made a part of this Lease. If Tenant has dealt with any other person or real estate broker in respect to leasing or renting space in the Building, Tenant shall be solely responsible for the payment of any fee due said person or firm and Tenant shall hold Landlord free and harmless against any liability in respect thereto. If Landlord has dealt with any other person or real estate broker in respect to leasing or renting space in the Building, Landlord shall be solely responsible for the payment of any fee due said person or firm and Landlord shall hold Tenant free and harmless against any liability in respect thereto.

## CONSENT NOT UNREASONABLY WITHHELD
## ARTICLE 39

Except as otherwise specifically provided, whenever consent or approval of Landlord or Tenant is required under the terms of this Lease, such consent or approval shall not be unreasonably conditioned, withheld or delayed. If either party withholds any consent or approval, such party shall deliver to the other party a written statement giving the reasons therefore concurrently with notice of such disapproval.

Columbia Business Center                                           CarbonLITE Industries, Inc.

## SIGNAGE
## ARTICLE 40

Upon written approval by Landlord, which approval shall not be unreasonably withheld, conditioned or delayed, Tenant may install signage(on the interior and exterior of the Building) at Tenant's sole cost and expense, provided that said signage conforms to all C C & Rs affecting the Premises and complies with the Riverside, California, regulating codes, and that Tenant, at Tenant's expense, insures said sign for all perils.

IN WITNESS WHEREOF, the parties hereto have executed this Lease as of the date written below.

DATE: _9-27-10_                     LANDLORD:

Columbia Business Center, LLC,
a California limited liability company,

By Invesco Advisers, Inc., its Manager

By _____

Title _KEVIN JOHNSON_
       _ASSISTANT VICE PRESIDENT_

DATE: _9-22-10_                     TENANT:

CARBONLITE INDUSTRIES, LLC,
a Delaware limited liability company,

By _____

Title _____EVP_____

39

336534.4

COLUMBIA BUSINESS CENTER

LEASE SUMMARY

1.   Tenant:        CarbonLITE Industries, LLC

2.   Premises:      Building B
                    875 Michigan Avenue
                    Columbia Business Center
                    City of Riverside, County of Riverside, California

3.   Total Building Area: 221,224 square feet
     Total Land area: 12.71 Acres
     Total Land area in Park: 3,305,174 square feet

4.   (a)   Basic Monthly Rent, payable monthly in advance:

| Months | Basic Rent Per Month |
|--------|----------------------|
| 1 – 3 | Free of Basic Rent |
| 4 – 10 | $29,865.24 |
| 11 - 30 | $59,509.26 |
| 31 - 60 | $64,154.96 |
| 61 - 72 | $69,021.89 |
| 73 - 84 | $71,234.13 |
| 85 - 96 | $73,225.14 |
| 97 - 108 | $75,437.38 |
| 109 - 120 | $77,649.62 |
| 121 - 125 | $80,083.09 |

*(Handwritten annotations in left margin):*
11/2010 – 1/2011
2/2011 – 8/2011
9/2011 – 4/2013
5/2013 – 10/2015
11/2015 – 10/2016
11/2016 – 10/2017
11/2017 – 10/2018
11/2018 – 10/2019
11/2019 – 10/2020
11/2020 – 3/2021

   (b)   Commencing on the Commencement Date, Tenant shall pay Landlord Tenant's proportionate share of taxes, insurance and Common Area Maintenance and other operating expenses pursuant to Article 3 of the Lease, and Tenant shall pay for all utilities consumed by the Premises pursuant to Section 3.4 of the Lease.

   (c)   Advance Rent Payment: Upon signing the Lease, Tenant shall pay Landlord basic rent of $29,865.24 for fourth full month of the lease term, to be applied when due, and the Letter of Credit pursuant to Article 4 of the Lease.

5.   Commencement Date: November 1, 2010.

6.   Term: One Hundred Twenty-Five (125) months, plus two (2) renewal options for five (5) years each at the then fair market rental rates.

7.   Operating Expenses: NNN.

EXHIBIT B
- 1 -

8.    Tenant's pro rata share of Industrial Park Operating Expenses: 29.35%.
      Tenant's share of Building Operating Expenses: 100.00%.

9.    Security Deposit:    $360,000.00 letter of credit, reduced in accordance with
                          Article 4 of the Lease.

10.   Address for Payments and Notices:

      (a) Landlord:                CB Richard Ellis
                                   4365 Executive Drive, Suite 1600
                                   San Diego, California 92121
                                   Attention: Real Estate Manager

      With a mandatory copy to:    Invesco Real Estate
                                   Three Galleria Tower, Suite 500
                                   13155 Noel Road
                                   Dallas, Texas 75240
                                   Attention: Columbia Business Center Asset Manager

      (b) Tenant:                  Prior to the Commencement Date:
                                   CarbonLITE
                                   10250 Constellation Blvd., Suite 2820
                                   Los Angeles, California 90067

                                   Thereafter:
                                   CarbonLITE
                                   875 Michigan Avenue
                                   Riverside, California 92501

11.   Brokers:   Kevin McKenna, David Consani, CB Richard Ellis, 4141 Inland Empire
Boulevard, Ontario, California 91764, for Landlord; Jay Dick, Janet Valentin, CB Richard Ellis,
4141 Inland Empire Boulevard, Ontario, California 91764, for Tenant.

[SIGNATURES ON NEXT PAGE]

EXHIBIT B
- 2 -

336536.4

LANDLORD:

Columbia Business Center, LLC,
a California limited liability company,

By Invesco Advisers, Inc., its Manager

By _____
Title _____
         KEVIN JOHNSON
         ASSISTANT VICE PRESIDENT

TENANT:

CARBONLITE INDUSTRIES, LLC,
a Delaware limited liability company,

By _____
Name/Title _____

## FIRST AMENDMENT TO LEASE AGREEMENT

**THIS FIRST AMENDMENT TO LEASE AGREEMENT** (this "Amendment") is entered into as of March 5, 2021 (the "Effective Date"), by and between PROLOGIS TARGETED U.S. LOGISTICS FUND, L.P., a Delaware limited partnership  ("Landlord") AND CARBONLITE INDUSTRIES, LLC, a Delaware limited liability company ("Tenant").

## W I T N E S S E T H:

WHEREAS, Landlord (as successor-in-interest to Columbia Business Center, LLC, a California limited liability company) and Tenant have entered into that certain Building Lease dated October 1, 2010, pursuant to which Landlord leased to Tenant certain premises consisting of approximately 221,224 square feet located at 875 Michigan Avenue, Riverside California (the "Premises"), such lease, as heretofore modified, being herein referred to as the "Lease".

WHEREAS, Landlord and Tenant desire to modify the Lease on the terms and conditions set forth below.

## A G R E E M E N T:

NOW THEREFORE, in consideration of the Premises and the mutual covenants hereinafter contained, the parties hereto agree as follows:

1. The Lease Term is extended for sixty (60) months, such that the expiration date of the Lease Term is amended to be March 31, 2026 (the "First Extension Term").  All of the terms and conditions of the Lease shall remain in full force and effect during the First Extension Term except that the monthly basic rent shall be as follows:

| PERIOD | MONTHLY BASIC RENT |
|---|---|
| April 1, 2021 through March 31, 2022 | $121,673.20 |
| April 1, 2022 through March 31, 2023 | $125,627.58 |
| April 1, 2023 through March 31, 2024 | $129,710.48 |
| April 1, 2024 through March 31, 2025 | $133,926.07 |
| April 1, 2025 through March 31, 2026 | $138,278.66 |

2. The effectiveness of the extension of the Lease Term shall be conditioned upon all of the following occurring within four (5) days following the Effective Date of this Amendment:  (i) Tenant increasing the existing cash security deposit being held by Landlord in the amount of $100,000.00 by providing with an additional security deposit in the amount of $500,000.00 (the "Additional Security Deposit") in accordance with the terms set forth in Paragraph 3 below; and (ii) Tenant shall pay to Landlord an amount equal to $28,271.24 for late fees incurred by Tenant for past due rental (the foregoing conditions are hereinafter referred to collectively as the "Lease Extension Conditions").  In the event the Lease Extension Conditions are not timely completed, Landlord shall have the right to unilaterally terminate this Amendment effective upon Landlord's delivery of notice to Tenant such that this amendment shall have no further effect.  Furthermore, in the event the lien recorded against the Building which the Premises is located by Acco is not removed by March 15, 2021, Landlord shall have the right to unilaterally terminate this Amendment effective upon Landlord's delivery of notice to

Tenant such that this amendment shall have no further effect. Time is of the essence with respect to Tenant's obligations under this Amendment.

3. The Additional Security Deposit under this Amendment shall be in the form of an unconditional, irrevocable letter of credit from a bank reasonably acceptable to Landlord and in compliance with the material terms shown in Exhibit A attached hereto ("Letter of Credit"). The Letter of Credit shall either provide that it does not expire until 60 days following the expiration date of the Lease Term, as extended by this Amendment, or, if it is for less than the full Lease Term, shall be renewed by Tenant at least 60 days prior to its expiration during the Lease Term. The Letter of Credit shall provide that it may be drawn down upon by Landlord at any time Landlord delivers its site draft to the bank. If Landlord sells or conveys the Premises, Tenant shall, at Landlord's request, cooperate in having the Letter of Credit transferred to the purchaser and Landlord agrees to notify Tenant in the event of such transfer. If the Letter of Credit is ever drawn upon by Landlord pursuant to the terms of the Lease, Tenant shall within ten (10) days thereafter cause the Letter of Credit to be restored to the then existing amount at the time immediately prior to the draw down. Tenant waives any limitations set forth in California Civil Code Section 1950.7 which may limit the application (including application against future rent damages) of any proceeds from the Letter of Credit or any other security deposit under the Lease in the event of a default under the Lease or a termination of the Lease.

Notwithstanding anything contained herein to the contrary, in the event Tenant fails to renew the Letter of Credit in accordance with the terms and conditions as set forth in this Paragraph 3 or in the event that Tenant shall commence any proceeding for relief, as set forth in Article 17 of the Lease, an immediate event of default shall be deemed to have occurred, without the requirement of notice or opportunity to cure, in which case Landlord may immediately draw down on the Letter of Credit.

Notwithstanding anything contained in this Paragraph 3 to the contrary, Landlord shall accept the Additional Security Deposit in the form of cash delivered to Landlord via EFT or ACH for the first thirty (30) days following the Effective Date provided Tenant shall replace the cash Additional Security Deposit with the Letter of Credit as provided herein no later than thirty (30) days of the Effective Date. In the event Tenant fails to provide a Letter of Credit as provided herein within such thirty (30) day period, Tenant shall be deemed to have failed to meet the Lease Extension Conditions as provided herein.

4. Except as otherwise expressly provided herein, all defined terms used in this Amendment shall have the same respective meanings as are provided for such defined terms in the Lease. Tenant shall accept the Premises in its "as is" condition and shall pay monthly installments of CAM charges and other reimbursable costs as provided in the Lease during the First Extension Term.

5. Notwithstanding anything provided in the Lease to the contrary, effective on the Effective Date, all payments required to be made by Tenant to Landlord (or to such other party as Landlord may from time to time specify in writing) may only be made by Electronic Fund Transfer ("EFT") of immediately available federal funds before 11:00 a.m., Eastern Time at such place, within the continental United States, as Landlord may from time to time designate to Tenant in writing.

6. The notice addresses for Landlord and Tenant during the Lease Term, as extended, shall be as follows:

Landlord:        Prologis
3546 Concours St., Suite 100
Ontario, California 91764
Attention: Market Officer

With a copy to:    Prologis
1800 Wazee Street, Suite 500
Denver, Colorado 80202
Attention: General Counsel

Tenant:    CarbonLITE
875 Michigan Avenue
Riverside, California 92705
Attention: Chief Financial Officer

7.  Within fifteen (15) days of Landlord's written request, Tenant agrees to deliver to Landlord such information and/or documents as Landlord requires for Landlord to comply with California Public Resources Code Section 25402.10, or successor statute(s), and California Energy Commission adopted regulations set forth in California Code of Regulations, Title 20, Division 2, Chapter 4, Article 9, Sections 1680-1685, and successor and related California Code of Regulations, relating to commercial building energy ratings. Landlord makes the following statement based on Landlord's actual knowledge in order to comply with California Civil Code Section 1938: The Building and Premises have not undergone an inspection by a Certified Access Specialist (CASp). A Certified Access Specialist (CASp) can inspect the subject Premises and determine whether the subject Premises comply with all of the applicable construction-related accessibility standards under state law. Although state law does not require a CASp inspection of the subject Premises, the Landlord may not prohibit the Tenant from obtaining a CASp inspection of the subject Premises for the occupancy or potential occupancy of the Tenant, if requested by the Tenant. The parties shall mutually agree on the arrangements for the time and manner of the CASp inspection, the payment of the fee for the CASp inspection, and the cost of making any repairs necessary to correct violations of construction-related accessibility standards within the premises. Landlord and Tenant hereby agree that a Tenant-requested CASp inspection shall be at Tenant's sole cost and expense and that the cost of making any repairs necessary to correct violations of construction-related accessibility standards within the Premises shall be governed by Article 6 of the Lease.

8.  Tenant represents and warrants that it has dealt with no broker, agent or other person in connection with this transaction and that no broker, agent or other person brought about this transaction, and Tenant agrees to indemnify and hold Landlord harmless from and against any claims by any other broker, agent or other person claiming a commission or other form of compensation by virtue of having dealt with Tenant with regard to this leasing transaction.

9.  Except as provided in Exhibit B attached hereto, all Tenant options to extend the Lease Term, terminate the Lease, or expand or contract the Premises, if any, which exist under the Lease are hereby null and void.

10.  Insofar as the specific terms and provisions of this Amendment purport to amend or modify or are in conflict with the specific terms, provisions and exhibits of the Lease, the terms and provisions of this Amendment shall govern and control; in all other respects, the terms, provisions and exhibits of the Lease shall remain unmodified and in full force and effect.

11.  Landlord and Tenant hereby agree that (i) this Amendment is incorporated into and made a part of the Lease, (ii) any and all references to the Lease hereinafter shall include this Amendment, and (iii) the Lease and all terms, conditions and provisions of the Lease are in full force and effect as of the date hereof, except as expressly modified and amended hereinabove.

IN WITNESS WHEREOF, the parties hereto have signed this Amendment as of the Effective Date.

**TENANT:**                                    **LANDLORD:**

CARBONLITE INDUSTRIES, LLC                      PROLOGIS TARGETED U.S. LOGISTICS FUND, L.P.
a Delaware limited liability company            a Delaware limited partnership

By:     Prologis, L.P.
        a Delaware limited partnership
        its general partner

By:     Prologis, Inc.
        a Maryland corporation
        its general partner

By: _____              By: _____

Name: _LEON FARAHNIK___                     Name: _Kim B. Snyder___

Title: _C.E.O.___                           Title: _President___

**EXHIBIT A**

**LETTER OF CREDIT FORM**

IRREVOCABLE STANDBY LETTER OF CREDIT NO. _____


DATE: _____

BENEFICIARY:                                    APPLICANT:

_____       _____

1800 Wazee Street, Suite 500          _____
Denver, Co 80202                            _____
Attn: Legal Department                    _____


BENEFICIARY:

By order of our client, _____, as tenant ("**Tenant**") in that certain lease agreement dated _____, 20___ by and between Beneficiary and Tenant for that certain premises located at _____ (the "**Lease Agreement**"), we hereby establish this Irrevocable Transferable Letter Of Credit No. _____ in your favor for an amount up to but not exceeding the aggregate sum of _____ _____ and no/100 U.S. Dollars ($_____) (as reduced from time to time in accordance with the terms hereof, the "**Letter Of Credit Amount**"), effective immediately, and expiring on the close of business one year from the date hereof at our office at _____ Attn: _____ _____ unless renewed as hereinafter provided.

Funds under this Letter Of Credit are available to you on or prior to the expiry date against presentation by you of your (i) sight drafts drawn on us in the form of **Annex 1** hereto, indicating this letter of credit number and (ii) request in the form of **Annex 2** hereto (such sight draft and request, together referred to as a "**Drawing Request**"), sight draft(s), completed and signed by an agent of the Beneficiary. Presentation of your Drawing Request may be made by you to us at the address set forth above or may be made by facsimile transmission, to the following facsimile number _____. You may present to us one or more Drawing Request from time to time prior to the expiry date in an aggregate amount not to exceed the Letter Of Credit Amount then in effect (it being understood that the honoring by us of each drawing request shall reduce the Letter Of Credit Amount then in effect). The proceeds of any draw under this Letter of Credit shall be remitted to an account designated by the Beneficiary in the Draw Letter, whether such account is in the name of the Beneficiary or any other named

entity.

This Letter Of Credit will be automatically renewed for a one-year period upon the expiration date set forth above and upon each anniversary of such date, unless at least sixty (60) days prior to such expiration date, or prior to any anniversary of such date, we notify both you and the applicant in writing by certified mail that we elect not to so renew the Letter Of Credit.  In the event that we elect not to renew the Letter Of Credit, you may immediately draw down on the full amount of the Letter Of Credit by presentation of your drawing request.  Further, in the event that the Applicant commences any proceeding for relief as defined in the Lease Agreement, you may immediately draw down on the full amount of the Letter Of Credit by presentation of your drawing request.

This Letter Of Credit sets forth in full the terms of our undertaking and such undertaking shall not in any way be modified, amended or amplified by reference to any document or instrument referred to herein or in which this Letter Of Credit is referred to or to which this Letter Of Credit relates, and no such reference shall be deemed to incorporate herein by reference any document or instrument.

All bank charges and commission incurred in this transaction are for the Applicant's account.

This Letter Of Credit is transferable by you and your successors and assigns any number of times in its entirety and not in part, to any successor of the Beneficiary's interests in the Lease Agreement, but only by delivery to us of a Notice Of Transfer in the form of **Annex 3** hereto. Our transfer fee will be payable by the Applicant.

We hereby agree with the drawers, endorsers, and bona fide holders of drafts drawn under and in compliance with the terms of this Letter Of Credit that such drafts will be duly honored upon presentation to the drawee from our own funds and not the funds of the Applicant and shall be available to such drawers, endorsers, and bona fide holders, as the case may be, on or before 4:00 p.m., _____ time, on the business day (defined below) next following the date on which such drafts are received by us.  "Business Day" shall mean any day which is not a Saturday, Sunday or day on which we are required or authorized by law to be closed in _____.

To the extent not inconsistent with the express terms hereof, this Letter Of Credit shall be governed by, and construed in accordance with, the terms of the International Standby Practices 1998 Publication 590 ("ISP 98") and as to matters not governed by the ISP 98, this Letter Of Credit shall be governed by and construed in accordance with the laws of the State of _____.

Very truly yours,


_____                          _____
Name:                                                                    Name:
Title:                                                                    Title:

## **Annex 1**
### Sight Draft

_____, 20__

[Name & address of issuing bank]


For value received, at sight pay to the order of [name of Beneficiary], the sum of [amount in words] [amount in figures] United States Dollars drawn under _____ Irrevocable Transferable Letter Of Credit No. _____ dated _____, 20__.


[Beneficiary]


By: _____
Name:_____
Title:_____

**Annex 2**
Drawing Request

_____, 20__

[Name & address of bank]

RE: Irrevocable Transferable Letter Of Credit No. _____ (the "**Letter Of Credit**")

The undersigned (the "**Beneficiary**"), hereby certifies to _____ (the "**Issuer**") that:

    (A) The Beneficiary is making a request for payment in lawful currency of the United States Of America under Irrevocable Transferable Letter Of Credit No. _____ (the "**Letter Of Credit**") in the amount of $_____.

    (B) The Letter Of Credit Amount (as defined in the Letter Of Credit) as of the date hereof and prior to payment of the amount demanded in this drawing request is $_____. The amount requested by this drawing request does not exceed the Letter Of Credit Amount.

    (C) Demand is made for payment under the Letter Of Credit as a result of the occurrence and continuation of an event of default under the Lease Agreement (as defined in the Letter Of Credit) or as a result of non-renewal of the Letter Of Credit or as a result of the Applicant or Tenant (as defined in said Lease Agreement) commencing a proceeding of relief (as defined in said Lease Agreement).

Please wire the proceeds of the drawing to the following account of the Beneficiary at the financial institution indicated below:

_____

_____

Unless otherwise defined, all capitalized terms used herein have the meanings provided in, or by reference in, the Letter Of Credit.

IN WITNESS WHEREOF, the undersigned has duly executed and delivered this drawing request as of the __ day of _____, 20__.

[Beneficiary]

By: _____
Name:_____
Title:_____

## Annex 3
Notice Of Transfer

_____, 20__

[Name & address of issuing bank]

RE: Irrevocable Transferable Letter Of Credit No. _____

The undersigned (the "**Beneficiary**"), hereby notifies _____ (the "**Issuer**") that it has irrevocably transferred the above-referenced Letter Of Credit to _____ (the "**Transferee**") with an address at _____ effective as of the date the Issuer receives this Notice Of Transfer.  The Transferee acknowledges and agrees that the Letter Of Credit Amount may have been reduced pursuant to the terms thereof, and that the Transferee is bound by any such reduction.

IN WITNESS WHEREOF, the undersigned has duly executed and delivered this Notice Of Transfer this ___ day of _____, 20__.

[Beneficiary]

By: _____

Name:

Title:

Agreed:

[Transferee]

By:_____

Name:_____

Its:_____

Yardi [ine01604]

**EXHIBIT B: ONE RENEWAL OPTION AT MARKET**

(a)     Provided that as of the time of the giving of the Second Extension Notice and the Commencement Date of the Second Extension Term, (x) Tenant is the Tenant originally named herein, (y) Tenant actually occupies all of the Premises initially demised under this Lease and any space added to the Premises, and (z) no Tenant default or beach of the Lease has existed, or exists or would exist but for the passage of time or the giving of notice, or both; then Tenant shall have the right to extend the Lease Term for an additional term of 5 years (such additional term is hereinafter called the "Second Extension Term") commencing on the day following the expiration of the Lease Term (hereinafter referred to as the "Commencement Date of the Second Extension Term"). Tenant shall give Landlord notice (hereinafter called the "Second Extension Notice") of its election to extend the term of the Lease Term at least 9 months, but not more than 12 months, prior to the scheduled expiration date of the First Extension Term.

(b)     The Base Rent payable by Tenant to Landlord during the Second Extension Term shall be the greater of (i) the Base Rent applicable to the last year of the initial Lease Term and (ii) the then prevailing market rate for comparable space in the Industrial Park and comparable buildings in the vicinity of the Industrial Park, taking into account the size of the Lease, the length of the renewal term, market escalations and the credit of Tenant. The Base Rent shall not be reduced by reason of any costs or expenses saved by Landlord by reason of Landlord's not having to find a new tenant for such premises (including, without limitation, brokerage commissions, costs of improvements, rent concessions or lost rental income during any vacancy period). In the event Landlord and Tenant fail to reach an agreement on such rental rate and execute the Amendment (defined below) at least 8 months prior to the expiration of the Lease, then Tenant's exercise of the renewal option shall be deemed withdrawn and the Lease shall terminate on its original expiration date.

(c)     The determination of Base Rent does not reduce the Tenant's obligation to pay or reimburse Landlord for CAM, Taxes and other reimbursable items as set forth in the Lease, and Tenant shall reimburse and pay Landlord as set forth in the Lease with respect to such CAM, Taxes, and other items with respect to the Premises during the Second Extension Term without regard to any cap on such expenses set forth in the Lease.

(d)     Except for the Base Rent as determined above, Tenant's occupancy of the Premises during the Second Extension Term shall be on the same terms and conditions as are in effect immediately prior to the expiration of the First Extension Term; provided, however, Tenant shall have no further right to any allowances, credits or abatements or any options to expand, contract, renew or extend the Lease.

(e)     If Tenant does not give the Second Extension Notice within the period set forth in paragraph (a) above, Tenant's right to extend the Lease Term shall automatically terminate. Time is of the essence as to the giving of the Second Extension Notice.

(f)     Landlord shall have no obligation to refurbish or otherwise improve the Premises for the Second Extension Term. The Premises shall be tendered on the Commencement Date of the Second Extension Term in "as-is" condition.

(g)     If the Lease is extended for the Second Extension Term, then Landlord shall prepare and Tenant shall execute an amendment to the Lease confirming the extension of the Lease Term and the other provisions applicable thereto (the "Amendment").

(h)      If Tenant exercises its right to extend the term of the Lease for the Second Extension Term pursuant to this Exhibit, the term  "Lease Term" as used in the Lease, shall be construed to include, when practicable, the Second Extension Term except as provided in (d) above.