## Exhibit A

*Riverside Asset Purchase Agreement*

DOCS_DE:234522.2 13044/001

ASSET PURCHASE AGREEMENT

(RIVERSIDE)

BY AND BETWEEN

CARBONLITE INDUSTRIES, LLC

AND

TSG SHELF II ACQUISITION, LLC

Dated as of May 21, 2021

SCHEDULES

1.      Section 2.1(a): Purchased Equipment

2.      Section 2.1(c): Acquired Contracts

3.      Section 2.1(c)-1: Excluded Vendor Contracts

4.      Section 2.1(e): Acquired Real Property Leases

5.      Section 2.1(f): Acquired Personal Property Leases

6.      Section 2.1(g):  Permits and Licenses

7.      Section 2.1(i): Open Customer Orders

8.      Section 2.1(j): Open Supplier Orders

9.      Section 2.1(l): Acquired Intellectual Property Rights

10.     Section 2.1(m): Acquired L/Cs

11.     Section 2.2(h): Additional Excluded Assets

12.     Section 3.3: Consents and Approvals; Governmental Authority

13.     Section 3.4: Compliance with Laws

14.     Section 3.5:  Litigation

15.     Section 3.6(a):  Financial Statements

16.     Section 3.6(b): Material Liabilities

17.     Section 3.6(c): Accounts Receivable Over 30 Days and 120 Days Outstanding

18.     Section 3.6(e): L/C Draws

19.     Section 3.6(f):  DIP Budgeted Capital Expenditures

20.     Section 3.6(g):  Prepaid Assets, Cure Costs, and Tax Prorations

21.     Section 3.6(h): Capital Lease Obligations

22.     Section 3.7(a):  Real Property Leases

23.     Section 3.7(b):  Contracts Related to Material Repairs, Work or Improvements

24.     Section 3.8(a):  Material Contracts

i

25.     Section 3.8(b):  Defaults Under Material Contracts

26.     Section 3.9(a):  Employee Information

27.     Section 3.9(d): Severance Obligations

28.     Section 3.10(a): Benefit Plans

29.     Section 3.11: Permits and Licenses Compliance

30.     Section 3.12(a): Owned Intellectual Property

31.     Section 3.12(c): Intellectual Property Matters

32.     Section 3.12(f): Computer Systems

33.     Section 3.13(c): Environmental Liabilities

34.     Section 3.14:  Wayward Assets

35.     Section 3.15:  Description of Tax Liabilities

36.     Section 3.16(a)(i): Key Business Relationships

37.     Section 3.16(a)(ii): Disclosures Relative to Key Business Relationships

38.     Section 3.16(b):  Discounts and Allowances

39.     Section 3.17:  Insurance Policies

40.     Section 3.18: Brokers

41.     Section 3.20: Intercompany Agreements

42.     Section 5.5(a):  Subject and Selected Employees

EXHIBITS:

Exhibit A – Form of Note Purchase Agreement
Exhibit B-1 – Equity Consideration Term Sheet and Form of Amended and Restated Limited
                 Liability Company Agreement of TSG Shelf II Investments, LLC
Exhibit B-2 – Form of Subscription Agreement
Exhibit 1.1 – Form of Sale Order
Exhibit 1.3 – Certain Non-Transferred Employees
Exhibit 2.6(a) – Form of Escrow Agreement
Exhibit 2.6(c) – Applicable Methodology
Exhibit 2.7(b)(i) – Form of Bill of Sale, Assignment and Assumption
Exhibit 2.7(b)(ii) – Form of IP Assignment
Exhibit 2.7(b)(vi) – Form of Real Property Assignment and Assumption Agreement

ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement") is made as of May 21, 2021, by and between TSG Shelf II Acquisition, LLC, a Delaware limited liability company (the "Purchaser"), and CarbonLite Industries, LLC, a Delaware limited liability company ("Seller"), the Seller being a chapter 11 debtor and debtor in possession in Case No. 21-10527(JTD) (jointly administered) (the "Bankruptcy Case") pending in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). CarbonLite Holdings LLC, a Delaware limited liability company ("Holdings"), hereby joins in this Agreement for the sole and exclusive purposes of (a) agreeing to transfer to Purchaser at the Closing, all of Holdings' right, title and interest in and to any Acquired Intellectual Property Rights (as defined herein) and any Wayward Assets (as defined herein) described in Section 3.14 of the Disclosure Schedule pursuant to an assignment document in the same form and content, in all material respects, as the IP Assignment (the "Holdings Assignment") and (b) Section 5.15 of this Agreement.  Certain capitalized terms used herein are defined in ARTICLE I.

W I T N E S S E T H:

WHEREAS, Holdings is the indirect owner of all the membership interests in Seller;

WHEREAS, Seller is engaged in the conduct of the Business (as defined below) at the Riverside Facility (as defined below); and

WHEREAS, Purchaser desires to purchase from Seller, and Seller desires to sell to Purchaser, pursuant to, among other provisions thereof, Section 363 of Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"), the Purchased Assets (as defined below), for the consideration and upon the terms and conditions contained in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants, agreements, representations and warranties contained herein, and for their mutual reliance, the parties hereto agree as follows:

ARTICLE I

DEFINITIONS

1.1    Definitions. The following terms shall have the following meanings for the purposes of this Agreement:

"A&R LLC Agreement" has the meaning given to it in the definition of Equity Subscription Documents.

"Accounts Receivable" means accounts and notes receivable (whether current or non-current) and all causes of action specifically pertaining to the collection of the foregoing, in each case to the extent arising out of the operation of the Business.  For the avoidance of all doubt, in no event shall "Accounts Receivable" include (a) rights or claims to proceeds under Insurance Policies held by Seller or (b) accounts and notes receivable from related parties of Seller.

"Accrued Expenses" is defined in the definition of "Net Working Capital" below.

"Acquired Contracts" shall have the meaning set forth in Section 2.1(c).

"Acquired Intellectual Property Rights" shall have the meaning set forth in Section 2.1(l).

"Acquired Inventories" shall have the meaning set forth in Section 2.1(d).

"Acquired L/Cs" is defined in Section 2.1(m) hereof.

"Acquired Personal Property Leases" shall have the meaning set forth in Section 2.1(f).

"Acquired Real Property Leases" shall have the meaning set forth in Section 2.1(e).

"Acquired Receivables" is defined in Section 2.1(k) hereof.

"Adjustment Fund" means the Adjustment Fund Amount, together with any earnings thereon, less any losses or disbursements therefrom.

"Adjustment Fund Amount" means $1,000,000, which, notwithstanding anything to the contrary in this Agreement, shall be set aside in escrow at the Closing solely and exclusively for the purpose of facilitating payment of any Deficiency Amount (as defined below) to which Purchaser may be entitled in accordance with Section 2.6(g) hereof.

"Affiliate" shall mean, with respect to any specified Person, any other Person which, directly or indirectly, controls, is under common control with, or is controlled by, such specified Person. For purposes of this definition, "control" (and any similar term) means the power of one or more Persons to direct, or cause the direction of, the affairs of another Person by reason of ownership of voting stock or by Contract or otherwise.

"Agreement" shall mean this Agreement, including the Disclosure Schedule and all other exhibits and schedules hereto, as it and they may be amended from time to time.

"Alternative Transaction" means any transaction or series of transactions (whether pursuant to section 363 or 1129 of the Bankruptcy Code or pursuant to any applicable non-bankruptcy law) involving the direct or indirect sale, transfer, or other disposition of all, or a material portion of, the Purchased Assets to a purchaser or purchasers other than Purchaser or effecting any other transaction the consummation of which would be substantially inconsistent with the transactions contemplated by this Agreement.

"Applicable Laws" shall mean all laws, statutes, orders, rules, and regulations of Governmental Authorities, and judgments, decisions or orders entered by any Governmental Authority applicable to Seller or the Business.

"Applicable Methodology" shall have the meaning set forth in Section 2.6(c).

"Assumed Accounts Payable" is defined in the definition of "Net Working Capital" below.

2

"Assumed Liabilities" shall have the meaning set forth in Section 2.3.

"Auction" shall have the meaning set forth in the Bid Procedures Order.

"Avoidance Action" shall mean, except for any Excluded Avoidance Actions, any avoidance claims, rights, recoveries, subordinations or causes of action or remedies under Chapter 5 of the Bankruptcy Code, including any proceeds thereof, and any analogous state law claims, in each case, of Seller and its estate, that relate to the Purchased Assets or the Business.

"Back-Up Bidder" shall have the meaning set forth in the Bid Procedures Order.

"Bankruptcy Case" has the meaning ascribed to such term in the preamble.

"Bankruptcy Code" has the meaning ascribed to such term in the recitals of this Agreement.

"Bankruptcy Court" has the meaning ascribed to such term in the preamble.

"Benefit Plans" shall mean (i) any "employee welfare benefit plan" or "employee pension benefit plan" (as those terms are respectively defined in Sections 3(1) and 3(2) of ERISA), other than a Multiemployer Plan; and (ii) any retirement or deferred compensation plan, incentive compensation, employment, change-in-control, collective bargaining, retention, compensation, employee loan, consulting, severance, stock, share appreciation right, unemployment compensation, vacation pay, severance pay, bonus arrangement, health benefit, profit-sharing, death or disability plan, agreement, commitment, program, policy, practice or arrangement or any other welfare or fringe benefit arrangements in each case in which any Employees participate or with respect to which Seller has or may have any liability.

"Bidding Procedures" shall mean and refer to the process and procedures established in the Bid Procedures Order with respect to the conduct of the transactions contemplated herein and Seller's disposition of the Purchased Assets.

"Bid Procedures Order" shall mean and refer to that certain order (a) Approving Bid Procedures For The Sale Of Certain Assets, (b) Approving Procedures For The Assumption And Assignment Of Executory Contracts Or Unexpired Leases In Connection With The Sale, (c) Approving Certain Bidder Incentives In Connection With The Debtors' Entry Into Any Potential Stalking Horse Agreement, (d) Scheduling A Sale Hearing, and (e) Granting Certain Related Relief, issued by the Bankruptcy Court and entered in the Bankruptcy Case on April 9, 2021 Docket No. 266.

"Bill of Sale, Assignment and Assumption" shall have the meaning set forth in Section 2.7(b)(i).

"Business" shall mean the business of processing post-consumer and post-industrial recycled polyethylene terephthalate ("rPET") plastic products, as conducted by Seller at the Riverside Facility in the Ordinary Course of Business during the Look-Back Period.

"Business Day" shall mean any day other than a Saturday, Sunday or other day on which banking institutions in the State of California or State of Texas are authorized or required by law or other action of a Governmental Authority to close.

"Capital Lease Obligations" shall have the meaning set forth in Section 3.6(h).

"Cash and Cash Equivalents" means, collectively, all of Seller's cash (including petty cash and checks received prior to the close of business on the Closing Date), checking account balances, marketable securities, certificates of deposits, time deposits, bankers' acceptances, commercial paper, government securities and other cash equivalents, net of uncleared checks issued by Seller that are not yet reflected in the applicable bank account of Seller.

"Cash Consideration" has the meaning given to it in the definition of Purchase Price.

"Claim" shall mean any action, cause of action, suit, debt, lien, liability, claim, counterclaim, cross-claim, demand, damage, loss, attorneys' or consultants' fees, costs or expenses, of any nature whatsoever, in law or in equity.

"Closing" shall mean the consummation of the transaction contemplated herein.

"Closing Cash Consideration" shall have the meaning set forth in Section 2.6(d).

"Closing Date" shall have the meaning set forth in Section 2.7(a).

"COBRA" shall mean and refer to the applicable requirements of Part 6 of Subtitle B of Title I of ERISA and Section 4980B of the Code (and predecessors thereof).

"Code" shall mean the Internal Revenue Code of 1986, as amended.

"Computer Systems" shall have the meaning set forth in Section 3.12(f).

"Confidentiality Agreement" means and refers to that certain Confidentiality Agreement dated January 13, 2021, by Purchaser in favor of Seller.

"Consent" shall mean any approval, consent, ratification, waiver or other authorization.

"Contamination" or "Contaminated" shall mean the presence of Hazardous Material in, on or under the soil, groundwater, surface water or other environmental media to an extent that any Response Action is legally required by any Governmental Authority under any Environmental Law with respect to such presence of Hazardous Material.

"Contract" means any contract, agreement, grant, sub-grant, arrangement, understanding, commitment, ground lease, lease, sublease, license, mortgage, bond, note or other instrument (including any instrument evidencing indebtedness), or other legally binding obligation, and all amendments thereof (whether written or oral and whether express or implied).

"Cure Costs" means the monetary amounts that must be paid under Sections 365(b)(1)(A) and (B) of the Bankruptcy Code in connection with the assumption and/or assignment of any

Acquired Contract, Acquired Real Property Lease, Acquired Personal Property Lease, or Permits and Licenses, as agreed upon by Seller and Purchaser or determined by the Bankruptcy Court pursuant to the Bid Procedures Order.

"Dallas Facility" shall have the meaning set forth in Section 5.11.

"Data Room" shall mean that certain virtual data room entitled Project Celtic established by Seller and certain of its Affiliates on Datasite Diligence.

"Deficiency Amount" shall have the meaning set forth in Section 2.6(g).

"Deposit" means a cash amount equal to $4,250,000 (together with all interest from time to time earned thereon).

"Designated Contacts" shall have the meaning set forth in Section 5.1(a).

"DIP Budgeted Capital Expenditures" shall have the meaning set forth in Section 3.6(f).

"Disclosure Schedule" shall mean the Disclosure Schedule delivered by Seller to Purchaser on the date of this Agreement, as amended, modified or supplemented in accordance with this Agreement.

"Dispute Notice" shall have the meaning set forth in Section 2.6(e).

"Employees" shall mean all full-time and part-time employees employed by Seller at the Riverside Facility.

"Environmental Claim" shall mean any Claim by any Person alleging liability (including liability for Response Action, investigatory costs, governmental response costs, remediation or clean-up costs, natural resources damages, property damages, personal injuries, attorneys' fees, fines or penalties) arising out of, based on, resulting from or relating to (a) the presence, Release or threatened Release of, or exposure to any Hazardous Materials; (b) circumstances forming the basis of any violation, or alleged violation, of any Environmental Law; or (c) any other matters for which liability is imposed under Environmental Laws.

"Environmental Law" shall mean any federal, state or local statute, order, regulation or ordinance relating to (a) the protection of the natural environment, including natural resources, (b) the protection of human health and safety as it pertains to exposure to Hazardous Materials, (c) the manufacture, registration, distribution, formulation, packaging or labeling of Hazardous Materials or products containing Hazardous Materials, or (d) the handling, use, presence, generation, treatment, storage, disposal, Release or threatened Release of or exposure to any Hazardous Materials.

"Environmental Liabilities" means any indebtedness, liability, Claim, loss, damage, fine, penalty, cost, expense, deficiency or responsibility, whether known or unknown, arising under, based on or relating to any Environmental Law, whether based on negligence, strict liability or otherwise, including liability or responsibility for the costs of enforcement proceedings, investigations, Response Action, governmental response, removal, remediation, cleanup,

restoration, abatement, monitoring, personal injury, property damage, medical monitoring, penalties, contribution, indemnification, injunctive relief, natural resource damages, court costs and reasonable attorneys' fees.

"Environmental Permit" means any Permits and Licenses required or issued by any Governmental Authority under or in connection with any Environmental Law, including any and all orders, consent orders or binding agreements issued by or entered into with a Governmental Authority under any applicable Environmental Law.

"Equity Consideration" shall have the meaning set forth in the definition of Purchase Price.

"Equity Subscription Documents" shall mean the (a) Equity Consideration Term Sheet and Amended and Restated Limited Liability Company Agreement of TSG Shelf II Investments, LLC, substantially in the form attached hereto as Exhibit B-1 (the "A&R LLC Agreement"), and (b) Subscription Agreement, substantially in the form attached hereto as Exhibit B-2 (the "Subscription Agreement").

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended.

"Escrow Agreement" shall mean the Escrow Agreement, substantially in the form attached hereto as Exhibit 2.6(a), to be entered into among Purchaser, Seller and Escrow Holder concurrently with the execution of this Agreement by all parties hereto.

"Escrow Holder" is defined in Section 2.6(a)(i) hereof.

"Estimated Cash Consideration" shall have the meaning set forth in Section 2.6(c).

"Excess Amount" shall have the meaning set forth in Section 2.6(g).

"Excluded Assets" shall have the meaning set forth in Section 2.2.

"Excluded Avoidance Action" shall mean any avoidance claims, rights, recoveries, subordinations or causes of action or remedies under Chapter 5 of the Bankruptcy Code, including any proceeds thereof, and any analogous state law claims, and any commercial tort or preference claims, including any proceeds thereof, in each case, (i) between or among Seller or any of its affiliated debtors in the Bankruptcy Case, or (ii) against any current or former officer, director, employee, advisor or consultant of Seller or any of its affiliated debtors in the Bankruptcy Case that is not a Transferred Employee (provided that, for purposes of this definition, Transferred Employees shall not include any person set forth on Exhibit 1.3).

"Excluded Liabilities" shall have the meaning set forth in Section 2.4.

"Expenses" shall have the meaning set forth in Section 8.2.

"Facility" shall mean the Riverside Facility.

"Final Cash Consideration" shall have the meaning set forth in Section 2.6(g).

"Financial Statements" shall have the meaning set forth in Section 3.6(a).

"GAAP" shall mean U.S. generally accepted accounting principles, as in effect from time to time, consistently applied.

"Good Faith Objection" shall have the meaning set forth in Section 6.4.

"Good Funds" is defined in Section 2.6(a)(i) hereof.

"Governmental Authority" shall mean any U.S., state, local or foreign governmental, regulatory or administrative body, agency or authority, any court or judicial authority or arbitration tribunal, whether national, Federal, state or local or otherwise, or any Person lawfully empowered by any of the foregoing to enforce or seek compliance with any applicable law, statute, regulation, order or decree.

"Hazardous Material" shall mean any chemicals, materials, or substances defined as or included in the definition of "hazardous substances," "hazardous wastes," "hazardous materials," "hazardous constituents," "restricted hazardous materials," "extremely hazardous substances," "toxic substances," "contaminants," "pollutants," "toxic pollutants," under any Environmental Law or for which liability or standards of conduct may be imposed pursuant to Environmental Law, including petroleum and petroleum products, by-products, derivatives or wastes, radioactive materials, asbestos or asbestos-containing materials or products, per- and polyfluoroalkyl substances, polychlorinated biphenyls (PCBs) or materials containing same, lead or lead-based paints or materials, radon, fungus, mold in quantities or concentrations that may adversely affect human health or materially affect the value or utility of the building(s) in which it is present, or other substances that may have an adverse effect on human health or the environment.

"Holdings" has the meaning ascribed to such term in the preamble of this Agreement.

"Holdings Assignment" shall have the meaning set forth in the preamble to this Agreement.

"Income Tax" means any United States or foreign, federal, state, provincial, municipal or county Tax that, in whole or in part, is based on, measured by or calculated by reference to net income, profits or gains, including any state or local franchise Tax, and including any interest, penalty or addition thereto, whether disputed or not.

"Income Tax Returns" means any Tax Return with respect to Income Taxes.

"Independent Auditor" shall have the meaning set forth in Section 2.6(f).

"Insurance Policies" shall have the meaning set forth in Section 3.17.

"Intellectual Property Rights" shall mean all of the following in any jurisdiction throughout the world:  (a) patents, patent applications, patent disclosures and statutory invention

registrations, including reissues, divisions, continuations, continuations in part, extensions and reexaminations thereof, all rights therein provided by international treaties or conventions ("Patents"); (b) trademarks, service marks, trade dress, trade names, logos (and all translations, adaptations, derivations and combinations of the foregoing) and Internet domain names, together with all goodwill associated with each of the foregoing, any and all common law rights, and registrations and applications for registration thereof, all rights therein provided by international treaties or conventions, and all reissues, extensions and renewals of any of the foregoing; (c) copyrightable works (including computer software source code, executable code, databases and related documentation and maskworks), copyrights, whether or not registered, and registrations and applications for registration thereof, and all rights therein provided by international treaties or conventions; and (d) confidential and proprietary information, including trade secrets, unpatented inventions, data and know-how ("Trade Secrets").

"IP Assignment" shall have the meaning set forth in Section 2.7(b)(ii).

"Item of Dispute" shall have the meaning set forth in Section 2.6(e).

"Key Customers" shall have the meaning set forth in Section 3.16(a).

"Key Vendors" shall have the meaning set forth in Section3.16(a).

"Knowledge" shall mean, with respect to Seller, the actual knowledge as of the date hereof and the Closing, of Leon Farahnik, Brian Weiss, Alex Delnik and Gregg Milhaupt.

"L/C Consideration" is defined in the definition of Purchase Price.

"Lien" shall mean all liens, encumbrances, mortgages, charges, claims, restrictions, pledges, security interests, title defects, easements, rights of way, covenants and encroachments.

"Look-Back Period" means the period beginning on January 1, 2019.

"Material Adverse Effect" shall mean any change, event, occurrence, condition, development, fact, or state of facts occurring that has had or would reasonably be expected to have a material adverse effect on (i) the condition (financial or otherwise) or results of operations of the Business, the Purchased Assets, or the Assumed Liabilities, taken as a whole, or (ii) Seller's ability to consummate the transactions contemplated by this Agreement; provided, however, the following shall be disregarded in determining whether there has been a Material Adverse Effect or whether a Material Adverse Effect could or would reasonably be expected to occur: (i) general economic, business, industry or credit, financial or capital market conditions (whether in the United States or internationally), including conditions affecting generally all companies engaged in the Business or a segment thereof, or the industries served by the Business; (ii) the taking of any action by Seller expressly required or permitted to be taken by this Agreement or the Related Agreements; (iii) the announcement of this Agreement or pendency of the transactions contemplated hereby; (iv) the breach of this Agreement or any Related Agreement by Purchaser; (v) pandemics (including, without limitation, the COVID-19 pandemic existing and continuing as of the date of this Agreement), earthquakes, tornados, hurricanes, floods and acts of God; (vi) acts of war (whether declared or not declared), sabotage,

terrorism, military actions or the escalation thereof; (vii) any changes or prospective changes in applicable laws, regulations or accounting rules, including GAAP or interpretations thereof, or any changes or prospective changes in the interpretation or enforcement of any of the foregoing, or any changes in general legal, regulatory or political conditions; (viii) adverse changes or effects on the Business or the Purchased Assets that directly result from the filing or pendency of the Bankruptcy Case; and (ix) solely for purposes of the condition set forth in Section 6.5, any existing event, occurrence or circumstance described or set forth in the Disclosure Schedule, except, in the case of the foregoing clauses (i), (v), (vi), and (vii), to the extent that the Business or the Purchased Assets are disproportionately adversely affected thereby relative to other similarly situated Persons operating in the industries in which the Business operates.

"Material Contract" shall have the meaning set forth in Section 3.8(a).

"Multiemployer Plan" shall have the meaning set forth in Section 3(37) of the Code.

"Net Working Capital" shall mean the total of (a) the sum of (i) Acquired Receivables, (ii) Acquired Inventories, and (iii) Prepaid Assets as of the Closing Date, less (b) the sum of (i) trade payables incurred with respect to the Business during the period between initiation of the Bankruptcy Case and the Closing Date (the "Relevant Period") (collectively, the amounts described in this clause (i) are referred to herein as the "Assumed Accounts Payable", which Assumed Accounts Payable shall exclude, for the avoidance of doubt, any amounts payable to related parties of Seller) and (ii) accrued expenses of Seller incurred or accrued with respect to the Business during the Relevant Period (collectively, the amounts described in this clause (ii) are referred to herein as the "Accrued Expenses"). All of the foregoing shall be determined in accordance with the Applicable Methodology.

"Non-Tax Prorations" shall mean closing adjustments to be included in the calculation of (a) Estimated Cash Consideration at Closing in accordance with Section 2.6(c) and (b) Final Cash Consideration in accordance with Section 2.6(d) or, if there is a dispute, Section 2.6(e) and (f), based on the proration of utilities and rents but not Property Taxes.

"Note Consideration" shall have the meaning set forth in the definition of Purchase Price.

"Note Purchase Agreement" shall mean the Note Purchase Agreement among Purchaser, as Issuer, the subsidiary guarantors party thereto and the noteholders party thereto, substantially in the form attached hereto as Exhibit A.

"Notice of Successful Bidder" shall have the meaning set forth in the Bid Procedures Order.

"Open Customer Orders" shall have the meaning set forth in Section 2.1(i).

"Open Supplier Orders" shall have the meaning set forth in Section 2.1(j).

"Order" means any award, decision, injunction, order, ruling, subpoena, or verdict entered, issued, made, or rendered by any court, administrative agency, or other Governmental Authority or by any arbitrator.

"Ordinary Course of Business" means, with respect to any Person, actions that are taken in the ordinary course of business and consistent with the past practices of such Person.

"Orion" shall mean, collectively, the affiliates of Orion Energy Partners, LP who are existing lenders under that certain Credit Agreement, dated as of August 2, 2019, among CarbonLite Holdings, LLC, as Borrower, the subsidiaries of CarbonLite Holdings, LLC party thereto as guarantors, the lenders party thereto, and Orion Energy Partners Investment Agent, LLC, as administrative agent and collateral agent.

"Owned Intellectual Property" shall have the meaning set forth in Section 3.12(a).

"Palmyrita Expenditures" shall have the meaning set forth in Section 2.7(b)(xii).

"Palmyrita Lease" shall have the meaning set forth in Section 2.2(i).

"Palmyrita Site" shall have the meaning set forth in the definition of Riverside Leased Property.

"Patents" has the meaning set forth in the definition of Intellectual Property Rights.

"Pending Good Faith Review" shall have the meaning set forth in Section 6.4.

"Permits and Licenses" shall have the meaning set forth in Section 2.1(g).

"Permitted Access Parties" is defined in Section 5.4 hereof.

"Permitted Post-Closing Encumbrance" shall mean (i) the following non-monetary encumbrances: (a) licenses and similar rights granted with respect to Intellectual Property Rights, (b) with respect to any real property interest, zoning restrictions, building codes and other land use laws regulating the use or occupancy of real property and imperfections in title, charges, and easements, in each case that do not materially interfere with the operation of the assets or property to which they relate, and (c) with respect to any real property interest, Liens on the interest of any third party landlord or sublandlord or underlying fee interest of any Acquired Real Property Lease, but only those not extinguished by the Sale Order, and (ii) all Liens relating to or arising in connection with (A) the Note Consideration, and (ii) ad valorem Taxes encumbering any Purchased Asset which are both (x) a Lien not yet due and payable as of the Closing and (y) included in the Tax Prorations made between Purchaser and Seller in accordance with Section 5.8 hereof.

"Person" shall mean an individual, corporation, partnership, joint venture, trust, association, estate, joint stock company, limited liability company, Governmental Authority or any other organization of any kind.

"Personal Information" means, in addition to any definition for "personal information" or any similar term (e.g., "personal data" or "personally identifiable information") provided by Applicable Law, or by Seller in any of its privacy policies, notices or contracts applicable to the Business or the Purchased Assets, all information that identifies, could be used to identify or is otherwise associated with an individual person.

10

"Post-Petition Costs" shall have the meaning set forth in Section 2.7(b)(xi).

"Prepaid Assets" means (a) the items listed on Section 3.6(g) of the Disclosure Schedule delivered as of the date hereof and (b) all cash deposits (including, without limitation, and excluding duplication of any amounts included in the L/C Consideration, the amount of any security deposit held by a landlord under an Acquired Real Property Lease(s) that exceeds the equivalent of one (1) month's fixed rent under the applicable Acquired Real Property Lease), advance payments and other prepaid items (except for advances for capital projects), in each case, (i) relating to or arising in connection with the operation of the Business, (ii) that are made after the date hereof and (iii) that are added to Section 3.6(g) of the Disclosure Schedule in accordance with Section 2.1(o); provided, that Prepaid Assets will not include items relating to (A) the Palmyrita Lease, (B) prepaid D&O/EPLI insurance with US Specialty Insurance Co., (C) any Contract with Lexmar Distribution, Inc. or (D) any other Excluded Asset.

"Privacy Laws" means any and all Applicable Laws, legal requirements and self-regulatory guidelines relating to the receipt, collection, compilation, use, storage, processing, sharing, safeguarding, security (both technical and physical), disposal, destruction, disclosure or transfer (including cross-border) of Personal Information, including the Federal Trade Commission Act, California Consumer Privacy Act, Gramm-Leach-Bliley Act, Payment Card Industry Data Security Standard, EU General Data Protection Regulation, and any and all Applicable Laws relating to breach notification or marketing in connection with Personal Information.

"Proceeding" means any judicial, administrative or arbitral actions, arbitrations, suits, hearings, disputes, audits, administrative proceedings, condemnation or eminent domain proceedings.

"Property Taxes" shall mean ad valorem, property, excise or similar Taxes (including any interest, fine, penalty or additions to tax imposed by any Governmental Authority in connection with such Taxes) based upon the acquisition, operation or ownership of the Purchased Assets but excluding, for the avoidance of doubt, Income Taxes and Transfer Taxes.

"Purchase Price" shall mean $43,500,000 consisting of (i) cash in the amount of $22,500,000, plus (A) the aggregate amount of all Cash or Cash Equivalents backing or securing the Acquired L/Cs as of the Closing Date in the amount set forth on Schedule 2.1(m) (the "L/C Consideration"), minus (B) any amounts drawn under any Acquired L/C as of the Closing Date, minus (C) the amount of any Cure Costs paid or escrowed by Purchaser in accordance with Section 5.13, plus or minus (as applicable) (D) the amount, if any, by which the Net Working Capital as of the Closing Date is greater or less than, as applicable, the Target Closing Net Working Capital, plus or minus (as applicable) (E) the Non-Tax Prorations, minus (F) Transfer Taxes to the extent not paid by Seller at the Closing plus (ii) senior secured notes in the aggregate principal amount of $21,000,000 and having the terms set forth in the Note Purchase Agreement, plus (iii) Class C Units in TSG Shelf II Investments, LLC having the terms set forth in the Equity Subscription Documents, plus (iv) without duplication of any item described in clause (i) of this definition and solely for purposes of the Purchase Price allocation in Section 2.6(h), the Assumed Liabilities. The consideration described in clause (i) of this definition is referred to as the "Cash Consideration," which is subject to adjustment pursuant to Section 2.6.

The consideration described in clause (ii) of this definition is referred to as the "Note Consideration." The consideration described in clause (iii) of this definition is referred to as the "Equity Consideration."

"Purchased Assets" shall have the meaning set forth in Section 2.1.

"Purchased Equipment" shall have the meaning set forth in Section 2.1(a).

"Purchaser" shall have the meaning set forth in the preamble.

"Purchaser's 401(k) Plan" shall have the meaning set forth in Section 5.14.

"R&W Policy" is defined in Section 5.3 of this Agreement.

"Reading Facility" shall have the meaning set forth in Section 5.11.

"Real Property Lease Assignment and Assumption Agreement" shall have the meaning set forth in Section 2.7(b)(vi).

"Registered Intellectual Property" shall have the meaning set forth in Section 3.12(a).

"Related Agreements" shall mean the Bill of Sale, Assignment and Assumption, the IP Assignment, the Real Property Lease Assignment and Assumption Agreement, and the Escrow Agreement.

"Release" means any release, spill, emission, discharge, leaking, pumping, injection, deposit, placing, disposal, dispersal, leaching or migration into the environment (including, without limitation, ambient air, surface water, groundwater and surface or subsurface strata) or into or out of any property, including the movement of any Hazardous Material through or in the air, vapor, soil, surface water, groundwater or property.

"Relevant Period" is defined in the definition of "Net Working Capital" above.

"Response Action" shall mean any action taken to investigate, abate, treat, remediate, clean up, remove or mitigate any violation of Environmental Law, any Contamination of any property owned, leased or used by the Business or any release or threatened release of Hazardous Materials. Without limitation, Response Action shall include any action that would be a response as defined by the Comprehensive Environmental Response, Compensation and Liability Act, as amended at the date of Closing, 42 U.S.C. § 9601 (25).

"Riverside Facility" shall mean and refer to the facility operated at and from the Riverside Leased Property.

"Riverside Leased Property" shall mean and refer collectively to that certain real property commonly known as (i) 875 Michigan Avenue, Riverside, California 92507, and (ii) 555 Palmyrita, Riverside, California 92507 (the "Palmyrita Site"), in each case together with all buildings, structures, fixtures and improvements erected thereon, and any and all rights,

12

privileges, easements, licenses, hereditaments and other appurtenances relating thereto, and used, or held for use, in connection with the operation of the Business.

"Sale Hearing" shall have the meaning set forth in the Bid Procedures Order.

"Sale Order" shall mean an order of the Bankruptcy Court entered in the Bankruptcy Case approving and authorizing this Agreement and the transaction contemplated herein (including, without limitation, approving and authorizing Seller's assumption and assignment pursuant to Section 365 of the Bankruptcy Code of the Acquired Contracts, Acquired Personal Property Leases and Acquired Real Property Leases), which Sale Order shall be in the form attached as Exhibit 1.1 (Sale Order) to this Agreement, with such changes that are acceptable to Seller and Purchaser in their respective sole discretion (provided that changes to the Sale Order that do not adversely affect Purchaser or Seller need only be reasonably acceptable to Seller or Purchaser, as applicable).

"Selected Employees" shall have the meaning set forth in Section 5.5(a).

"Seller" shall have the meaning set forth in the preamble.

"Seller Intellectual Property" shall mean Owned Intellectual Property, together with all other Intellectual Property Rights licensed to Seller or which Seller otherwise has the right to use.

"Seller's 401(k) Plan" shall have the meaning set forth in Section 5.14.

"Subject Employees" shall have the meaning set forth in Section 5.5(a).

"Subscription Agreement" has the meaning given to it in the definition of Equity Subscription Documents.

"Successful Bidder" shall have the meaning set forth in the Bid Procedures Order.

"Target Closing Net Working Capital" shall mean $-0-.

"Tax" (and, with correlative meaning, "Taxes," "Taxable" and "Taxing") shall mean (i) any net income, capital gains, gross income, gross receipts, sales, use, transfer, ad valorem, franchise, profits, license, capital, withholding, payroll, estimated, employment, excise, goods and services, severance, stamp, occupation, premium, property, social security, environmental (including Code section 59A), alternative or add-on, value added, registration, windfall profits or other taxes, duties, charges, fees, levies or other assessments imposed by any Governmental Authority, or any interest, penalties, or additions to tax incurred under Applicable Laws with respect to taxes and (ii) any liability in respect of any item described in clause (i) above that arises by reason of a contract, assumption, transferee or successor liability, operation of law (including by reason of participation in a consolidated, combined or unitary Tax Return) or otherwise.

"Tax Prorations" shall mean the Property Taxes allocable to Seller pursuant to the procedures set forth in Section 5.8 to the extent unpaid at the Closing.

13

"Tax Returns" shall mean any report, return (including any information return), declaration or other filing required or permitted to be supplied to any taxing authority or jurisdiction with respect to Taxes, including any amendments or attachments to such reports, returns, declarations or other filings.

"Termination Date" shall have the meaning set forth in Section 8.1(b).

"Trade Secrets" has the meaning set forth in the definition of Intellectual Property Rights.

"Transfer Taxes" shall have the meaning set forth in Section 5.7.

"Transferred Employees" shall have the meaning set forth in Section 5.5(a).

"Upset Agreement" is defined in Section 9.1(a) below.

"Upset Purchaser" is defined in Section 9.1(a) below.

"WARN Act" shall mean the Worker Adjustment and Retraining Notification Act of 1988, as amended.

"Wayward Assets" is defined in Section 5.15 below.

## ARTICLE II

## PURCHASE AND SALE; CLOSING

2.1     Purchase and Sale. Upon the terms and subject to the conditions set forth in this Agreement (including, without limitation, entry of the Sale Order), at the Closing, Seller shall sell, convey, transfer, assign and deliver to Purchaser, and Purchaser shall purchase and accept from Seller, good title in and to all of the assets of Seller, wherever located, whether at the Riverside Facility or in transit thereto which are used or are held for use primarily in the Business, including, without limitation, the following assets (the "Purchased Assets"), in each case free and clear of all Liens to the extent provided in the Sale Order (other than Permitted Post-Closing Encumbrances):

(a)     All owned machinery, equipment, furniture, fixtures, structures, improvements, office furnishings, tools and dies, molds and parts, spares, vehicles, computer hardware and software, and other tangible personal property owned by Seller for use primarily in connection with the Business, including those located at, on or affixed to the Riverside Facility, including, without limitation, the tangible personal property identified on Section 2.1(a) of the Disclosure Schedule (collectively, the "Purchased Equipment");

(b)     to the extent assignable, all rights in all warranties of any manufacturer or vendor in connection with the Purchased Equipment;

(c)     all contracts and agreements, licenses, utility supply arrangements, and other contracts and agreements, whether written or oral, which are related primarily to the Business at the Riverside Facility and identified on Section 2.1(c) of the Disclosure Schedule

14

(collectively, the "Acquired Contracts"). For the avoidance of doubt, references herein to Acquired Contracts shall not be deemed to include Acquired Real Property Leases, Acquired Personal Property Leases, Permits and Licenses or any contract with any of the vendors listed on Section 2.1(c)-1 of the Disclosure Schedule;

(d)     all inventories of raw materials, work in process, finished goods, parts, office supplies, packing materials, janitorial supplies and other supplies owned by Seller and used or held for use primarily in connection with the Business that are: (i) in each case, taken into account in the determination of Net Working Capital and less than 90 days aged as of the Closing Date and (ii) other inventory items mutually agreed to by Purchaser and Seller after the date hereof (collectively, the "Acquired Inventories");

(e)     Seller's leasehold interest in the Riverside Facility arising under the leases identified in Section 2.1(e) of the Disclosure Schedule (the "Acquired Real Property Leases");

(f)     all leasehold rights in personal property leased by Seller and used or held for use primarily in connection with the Business at the Riverside Facility, as set forth in the leases identified in Section 2.1(f) of the Disclosure Schedule (the "Acquired Personal Property Leases");

(g)     all the permits, including environmental permits, licenses, approvals, franchises and registrations and other governmental licenses, permits or approvals issued to Seller or any Affiliate thereof with respect to the ownership or operation of the Riverside Facility or Purchased Assets or the conduct of the Business at the Riverside Facility, as identified in Section 2.1(g) of the Disclosure Schedule (collectively, the "Permits and Licenses");

(h)     other than the books and records contemplated by Section 2.2(b) below, all books and records maintained by Seller or its Affiliates to the extent related to the Business or the Purchased Assets, including without limitation, engineering drawings of machinery and equipment currently used or held for use primarily in connection with the Business; blueprints and other technical papers; user manuals; inventory, maintenance, and asset history records; construction plans and specifications; administrative libraries; environmental records required by law or regulation; and systems documentation and other data processing information and records, except, in each instance, to the extent they relate to the Excluded Assets;

(i)     to the extent not fulfilled prior to Closing, the open purchase orders that are set forth on Section 2.1(i) of the Disclosure Schedule and that arose on or after March 15, 2021 for goods and services with customers of the Business at the Riverside Facility outstanding as of the Closing Date (collectively, the "Open Customer Orders"); provided, that Section 2.1(i) of the Disclosure Schedule shall be updated prior to the Closing to reflect additional open purchase orders arising after the date hereof which Seller may hereafter enter into so long as such order includes terms reasonably comparable to the generally prevailing terms of the Open Customer Orders set forth on Section 2.1(i) of the Disclosure Schedule as of the date hereof;

(j)     the right to receive all goods or services to be provided to Seller in connection with the Business at the Riverside Facility pursuant to the open orders set forth on Section 2.1(j) of the Disclosure Schedule (the "Open Supplier Orders") for goods and services

15

with suppliers that remain unfulfilled as of the Closing Date; provided, that Section 2.1(j) of the Disclosure Schedule shall be updated prior to the Closing to reflect additional open orders arising after the date hereof which Seller may hereafter enter into so long as such order includes terms reasonably comparable to the generally prevailing terms of the Open Supplier Orders set forth on Section 2.1(j) of the Disclosure Schedule as of the date hereof;

       (k)     all Accounts Receivable (other than from Niagara Bottling, Bantam Materials, Everrank, Banyan Plastics, Worldwide of New York, GP Harmon Recycling, Reterra, Encina Renewables, Indorama, Graham Packaging, Oldcastle Infrastructure, Pactiv, Resilux America, LLC and, in each case, their respective Affiliates, and CarbonLite P, LLC, CarbonLite Recycling, LLC, and PinnPack Packaging, LLC), wherever located, of Seller which (i) are specifically related to products produced at the Riverside Facility on or before the Closing Date, (ii) are owing to Seller by customers who have placed orders with or purchased goods from Seller prior to the Closing and (iii) have been outstanding for (A) less than 120 days as of the Closing Date or (B) solely with respect to Accounts Receivable that relate to products sold to California Department of Resources Recycling and Recovery (CalRecycle), less than 210 days as of the Closing Date (collectively, the foregoing are referred to as the "Acquired Receivables");

       (l)     all Intellectual Property Rights, wherever located, owned by Seller and/or its Affiliates and used or held for use in the Business at the Riverside Facility, including any enterprise resource planning system relating to the Business or the Purchased Assets, the name "CarbonLITE" and those Intellectual Property Rights set forth on Section 2.1(l) of the Disclosure Schedule (the "Acquired Intellectual Property Rights");

       (m)     those letters of credit or similar financial accommodations issued to third party(ies) for the account of Seller (and any collateral therefor) which are described on Section 2.1(m) of the Disclosure Schedule (collectively, the "Acquired L/Cs"); provided, that Section 2.1(m) of the Disclosure Schedule shall be updated prior to the Closing to reflect additional letters of credit or similar financial accommodation issued to third party(ies) for the account of Seller and relating to or arising in connection with the operation of the Business, solely to the extent such letters of credit or similar financial accommodation is fully cash collateralized;

       (n)     all claims and causes of action owned by or available to Seller, including any preference claim or Avoidance Action (but, in all events, excluding Excluded Avoidance Actions), (i) relating to the Purchased Assets, the Assumed Liabilities or the acquisition, ownership, management, operation, use, function or value of the Business or any Purchased Asset or (ii) against any counterparty to an Acquired Contract, Acquired Real Property Lease, Acquired Personal Property Lease, or Permits and Licenses or any Affiliate of such counterparty;

       (o)     all Prepaid Assets; provided that Section 3.6(g) of the Disclosure Schedule shall be updated prior to the Closing to reflect additional cash deposits, advance payments and other prepaid items (except for advances for capital projects) of the types specified in the definition of Prepaid Assets and arising after the date hereof that are (i) of a type consistent with the Prepaid Assets set forth on Section 3.6(g) of the Disclosure Schedule as of the date hereof and (ii) incurred on commercially reasonable terms and included (either initially or by way of modification as additional items to be included arise pursuant to this Section 2.1(o)) on Schedule 3.6(g) of the Disclosure Schedule in good faith;

(p)    all employee-related files and records, including occupational health and safety records, assessments and audits; industrial hygiene files; workers compensation records; workers compensation claims files; and personnel employment and medical records (in each case, to the extent the transfer thereof is not prohibited by law) for Transferred Employees at the Riverside Facility; and

(q)    the cash collateral securing any of the Acquired L/Cs in the amount set forth on Section 2.1(m) of the Disclosure Schedule; provided, that Section 2.1(m) of the Disclosure Schedule shall be updated prior to the Closing to reflect the amount of cash collateral securing any of the Acquired L/Cs as of the Closing Date.

2.2    Excluded Assets.  Notwithstanding anything to the contrary contained in Section 2.1 above or any other provision of this Agreement or any Related Agreement, the following assets are not being sold, assigned, transferred or conveyed to Purchaser by Seller hereunder (collectively, the "Excluded Assets"):

(a)    the corporate seals, organizational documents, minute books, stock books, Income Tax Returns, books of account and other records having to do with the corporate organization of Seller;

(b)    the basic books and records of account and all supporting vouchers, invoices and other records and materials primarily relating to any or all Income Taxes of Seller;

(c)    all claims for refunds due to Seller for Taxes of any nature paid by Seller with respect to any period ending on or prior to the Closing Date;

(d)    all Insurance Policies and performance bonds of Seller covering the Purchased Assets and any rights, proceeds and claims of and from such bonds or policies;

(e)    all Benefit Plans and Benefit Plan assets;

(f)    data files, archive files, systems documentation and other data processing information and records relating solely to any of the foregoing Excluded Assets;

(g)    all contracts, agreements, licenses, utility supply arrangements, and other contracts, whether written or oral, other than those explicitly identified as Acquired Contracts on Section 2.1(c) of the Disclosure Schedule, Acquired Real Property Leases on Section 2.1(e) of the Disclosure Schedule, Acquired Personal Property Leases on Section 2.1(f) of the Disclosure Schedule, or Permits and Licenses on Section 2.1(g) of the Disclosure Schedule;

(h)    any assets, properties and rights specifically described or set forth on Section 2.2(h) of the Disclosure Schedule;

(i)    the Lease Agreement between Prologis Targeted U.S. Logistics Fund, L.P. and CarbonLite Industries, LLC, dated January 21, 2020 (the "Palmyrita Lease"), and the structures and improvements at the Palmyrita Site;

(j)    the rights which accrue or will accrue to Seller under this Agreement and the Related Agreements;

(k)    any rights, claims or causes of action to the extent related to (i) Excluded Assets described above and (ii) intercompany obligations between Seller and any of its Affiliates;

(l)    any tangible or intangible asset held by Seller pursuant to a lease, license, contract, or other agreement where such lease, license, contract or other agreement is not among the Acquired Contracts, Acquired Personal Property Leases, Acquired Real Property Leases, and/or Permits and Licenses assumed by Seller and assigned to Purchaser at the Closing in accordance with the Bankruptcy Code;

(m)    other than the Acquired L/Cs, any letters of credit or similar financial accommodations issued to any third party(ies) for the account of Seller or any of its Affiliates and any collateral therefor;

(n)    all securities, whether capital stock or debt, of Seller or any other entity;

(o)    all Accounts Receivable, other than the Acquired Receivables;

(p)    all Cash and Cash Equivalents other than cash collateral securing the Acquired L/Cs, whether on hand, in transit or in banks or other financial institutions, security entitlements, securities accounts, commodity contracts and commodity accounts and including any cash collateral that is collateralizing any letters of credit (other than cash collateral securing the Acquired L/Cs) or Insurance Policies, or any obligations with respect thereto;

(q)    all bank accounts of Seller;

(r)    all inventory of raw materials, work in process, finished goods, parts, office supplies, packing materials, janitorial supplies and other supplies owned by Seller and used or held for use primarily in connection with the Business of Seller other than the Acquired Inventories or those which are otherwise not taken into account in the determination of Net Working Capital;

(s)    all open purchase orders for goods and services with customers of the Business outstanding as of the Closing Date, other than the Open Customer Orders;

(t)    all open orders for goods and services with suppliers of the Business that remain unfulfilled as of the Closing Date, other than the Open Supplier Orders; and

(u)    all Excluded Avoidance Actions.

2.3    <u>Assumed Liabilities</u>.  Upon the terms and conditions contained in this Agreement, Purchaser shall upon, from and after the Closing Date, assume and be solely liable and responsible for paying and satisfying, solely and only the following liabilities and obligations, all items not specifically set forth below in this <u>Section 2.3</u> being excluded (all liabilities and obligations so assumed, the "<u>Assumed Liabilities</u>"):

18

(a)     all liabilities arising in connection with or from the use of the Purchased Assets or operation of the Business at the Riverside Facility (other than at the Palmyrita Site), including, without limitation, claims by employees of any of the foregoing, or other persons, in each case, solely attributable to the use of the Purchased Assets or the operation of the Business at the Riverside Facility (other than at the Palmyrita Site) on or after the Closing Date, including, without limitation, claims resulting from injuries alleged to occur as a result of the condition of any of the Purchased Assets first existing from and after the Closing Date;

(b)     all obligations arising from any actions taken by Purchaser after the Closing Date with respect to Transferred Employees or operation of the Business conducted at the Riverside Facility (other than at the Palmyrita Site);

(c)     all post-Closing obligations of Seller to deliver products or services pursuant to Open Customer Orders outstanding as of the Closing Date;

(d)     all Assumed Accounts Payable and Accrued Expenses of Seller, in each case, to the extent taken into account in the calculation of the Final Cash Consideration;

(e)     the Tax Prorations and the Non-Tax Prorations, in each case, to the extent taken into account in the calculation of the Final Cash Consideration;

(f)     subject to the accuracy of the representations and warranties in Section 3.9(f), any and all obligations arising under the WARN Act or similar state statutes as a result of the consummation of the transaction contemplated by this Agreement, it being agreed that (i) in no event shall any such obligation be deemed to be an Accrued Expense or otherwise taken into account in the calculation of Seller's Net Working Capital as of the Closing Date, and (ii) any such obligation relating to Employees to whom Purchaser does not extend employment offers shall in any event be deemed Assumed Liabilities;

(g)     all accrued and unpaid vacation, holidays, sick pay and other paid time-off (whether accrued prior to or during the Bankruptcy Case) to which the Transferred Employees are entitled with respect to all periods of service up to and including the Closing Date under the policies and practices of Seller or its Affiliates, but only to the extent included as a reduction in Net Working Capital; provided, however, to the extent that any Transferred Employee employed in California requires payment of any of the foregoing to such Transferred Employee in cash at the Closing in accordance with the Transferred Employee's rights under applicable California law, (i) Purchaser shall pay such amounts to the applicable Transferred Employees in cash at the Closing and (ii) any amounts paid by Purchaser pursuant to this proviso shall be included as a dollar-for-dollar reduction in the calculation of Net Working Capital;

(h)     any and all liabilities arising under or relating to any Environmental Laws with respect to the Riverside Facility (other than the Palmyrita Site) and its environmental condition, including, without limitation, any Response Actions that may at any time, or from time to time, be required with respect to the Riverside Facility (other than the Palmyrita Site) under Environmental Law arising out of facts, events or conditions first existing or first occurring from and after the Closing;

(i)    all obligations and liability with respect to any product liability or warranty claims relating to the Business and arising out of facts, events, or conditions first existing or first occurring from and after the Closing;

(j)    without duplication of any other item described in this <u>Section 2.3</u>, the Capital Lease Obligations;

(k)    all post-Closing obligations of Seller to receive products or services pursuant to Open Suppliers Orders outstanding as of the Closing Date;

(l)    any and all post-Closing obligations of Seller under those agreements described in <u>Section 2.1(f)</u> of the Disclosure Schedules to which Stonebriar Commercial Finance LLC is a counterparty; and

(m)    all other obligations expressly assumed by Purchaser under the other terms and provisions of this Agreement or any of the Related Agreements or other documents and agreements executed in connection with the Closing.

2.4    <u>Excluded Liabilities</u>.  Except for the Assumed Liabilities expressly set forth in <u>Section 2.3</u>, Purchaser shall not assume or become responsible for any of Seller's or any of its Affiliates' obligations or liabilities other than those expressly set forth in <u>Section 2.3</u> (such excluded liabilities are collectively referred to herein as the "<u>Excluded Liabilities</u>") and Seller and its Affiliates shall remain fully and solely responsible for all Excluded Liabilities.  For the avoidance of doubt, any liability or obligation arising out of or relating to any breach of Contract or non-compliance with law occurring at any time prior to the Closing shall be an Excluded Liability.

2.5    <u>Non-Transferable Contracts and Permits</u>.  Anything in this Agreement to the contrary notwithstanding, this Agreement shall not constitute an agreement to assign or transfer any Acquired Contract, Acquired Personal Property Lease, Acquired Real Property Lease or any of the Permits and Licenses, or any claim or right or any benefit or obligation thereunder or resulting therefrom if, an assignment or transfer thereof is prohibited or, without the consent of a third party thereto, would, notwithstanding the provisions of section 365(f) of the Bankruptcy Code and the effect of the Sale Order, be prohibited and such consent has not been obtained.  If such consent is required and has not been obtained or if an attempted assignment or transfer is ineffective or prohibited, Seller shall, and shall cause its Affiliates to, use commercially reasonable efforts to cooperate with Purchaser in any reasonable arrangement requested and approved by Purchaser to provide for Purchaser all of the benefits under any such Acquired Contract, Acquired Personal Property Lease, Acquired Real Property Lease, or Permit and License.  In connection with any such arrangement, (i) Purchaser shall bear the expense of structuring and implementing the arrangement and (ii) Purchaser shall honor Seller's commitments set forth in any such Acquired Contract, Acquired Personal Property Lease, Acquired Real Property Lease, or Permit and License to the extent arising following the close of business on the Closing Date in connection with Purchaser's use of any such Acquired Contract, Acquired Personal Property Lease, Acquired Real Property Lease, or Permit and License that is the subject of such arrangement (or assets or rights relating thereto).

2.6    <u>Calculation and Payment of Cash Consideration</u>.

(a)    <u>Deposit; Liquidated Damages</u>.

(i)    The parties acknowledge and agree that Purchaser has previously deposited with Seller's bankruptcy counsel an amount equal to the Deposit in immediately available, good funds of the United States of America (funds delivered in this manner are referred to herein as "<u>Good Funds</u>"). Concurrently with the execution and delivery of this Agreement by all parties hereto, Seller shall cause its bankruptcy counsel to transfer into an escrow account with Citibank, N.A. (the "<u>Escrow Holder</u>") an amount equal to the Deposit in Good Funds. The Deposit (and any interest accrued thereon) shall be credited and applied toward payment of the Cash Consideration at the Closing.

(ii)    PURCHASER AND SELLER HEREBY ACKNOWLEDGE THAT, IN THE EVENT PURCHASER FAILS TO CLOSE THE PURCHASE OF THE PURCHASED ASSETS WHEN REQUIRED TO DO SO UNDER THE TERMS OF THIS AGREEMENT WITHIN THREE BUSINESS DAYS AFTER THE LATER OF (A) THE CLOSING DATE AND (B) RECEIPT OF NOTICE FROM SELLER THAT IT IS READY, WILLING AND ABLE TO PROCEED WITH AND CONSUMMATE THE CLOSING (A "<u>DEFAULT</u>"), IT WOULD BE IMPRACTICABLE AND EXTREMELY DIFFICULT TO ESTIMATE THE DAMAGES SELLER MAY SUFFER OR INCUR IN THE EVENT THAT THE TRANSACTION CONTEMPLATED HEREIN FAILS TO CLOSE BY REASON OF SUCH DEFAULT. ACCORDINGLY, NOTWITHSTANDING ANYTHING TO THE CONTRARY HEREIN, PURCHASER AND SELLER HEREBY AGREE THAT CONSIDERING ALL OF THE CIRCUMSTANCES EXISTING AT THE EXECUTION OF THIS AGREEMENT, THE DEPOSIT AMOUNT CONSTITUTES A REASONABLE ESTIMATE OF THE TOTAL DETRIMENT THAT SELLER WOULD SUFFER IN THE EVENT THAT THE TRANSACTIONS CONTEMPLATED HEREIN ARE TERMINATED PURSUANT TO <u>SECTION 8.1(c)</u> OR <u>(e)</u> HEREOF. EXCEPT AS OTHERWISE PROVIDED IN CLAUSES (i), (ii) AND (iii) BELOW, SAID AMOUNT SHALL REPRESENT THE AGREED AND LIQUIDATED DAMAGES TO WHICH SELLER IS ENTITLED BY REASON OF PURCHASER'S DEFAULT. THE PAYMENT OF SUCH AMOUNT AS LIQUIDATED DAMAGES IS NOT INTENDED AS A FORFEITURE OR PENALTY, BUT RATHER IS INTENDED TO CONSTITUTE LIQUIDATED DAMAGES TO SELLER.    UPON PURCHASER'S DEFAULT AS DESCRIBED ABOVE AND SELLER'S ELECTION TO TERMINATE THIS AGREEMENT BY REASON THEREOF PURSUANT TO <u>SECTION 8.1(c)</u> OR <u>8.1(e)</u>, THIS AGREEMENT SHALL TERMINATE AND, EXCEPT FOR (i) SELLER'S RIGHT TO COLLECT THE AMOUNT OF SUCH LIQUIDATED DAMAGES, (ii) SELLER'S RIGHTS UNDER <u>SECTION 10.15</u> HEREOF TO THE EXTENT RELATING TO THE COLLECTION OF THE DEPOSIT PURSUANT TO THIS <u>SECTION 2.6(a)(ii)</u>, AND (iii) ANY PROVISIONS AND OBLIGATIONS OF THIS AGREEMENT WHICH BY THEIR TERMS SURVIVE ANY TERMINATION OF THIS AGREEMENT, THE PARTIES HERETO SHALL BE RELIEVED OF ANY FURTHER LIABILITY OR OBLIGATION UNDER THIS AGREEMENT.  BY EXECUTING AND DELIVERING

21

THIS AGREEMENT, EACH PARTY SPECIFICALLY ACKNOWLEDGES AND CONFIRMS THE ACCURACY OF THE STATEMENTS SET FORTH ABOVE AND THAT IT WAS REPRESENTED BY COUNSEL OF ITS CHOICE WHO FULLY EXPLAINED THE CONSEQUENCES OF THIS LIQUIDATED DAMAGES PROVISION AT THE TIME OF EXECUTION OF THIS AGREEMENT.

(b)     Payment at Closing.  On the Closing Date, subject to the satisfaction of the conditions set forth herein, Purchaser shall (i) cause the Escrow Holder to deliver the Deposit (together with all accrued interest thereon) to Seller, (ii) pay and deliver, in Good Funds, the Adjustment Fund Amount to the Escrow Holder, and (iii) pay and deliver to Seller, in Good Funds, the Estimated Cash Consideration (as defined below) less the Deposit and less the Adjustment Fund Amount, by wire transfer in accordance with written wire instructions provided by Seller to Purchaser not later than two (2) Business Days prior to Closing.

(c)     Estimated Cash Consideration.  Not less than five (5) Business Days prior to the Closing Date, Seller shall in good faith and in consultation with Purchaser prepare and deliver to Purchaser a good faith estimated calculation of the Cash Consideration (the "Estimated Cash Consideration") and all components thereof, including the Net Working Capital as of the Closing Date. Seller's calculation of the Estimated Cash Consideration shall be made in accordance with the methodology (the "Applicable Methodology") set forth in Exhibit 2.6(c) hereto.  In connection with such consultation between Seller and Purchaser, the Estimated Cash Consideration will be revised before the Closing to the extent necessary to take into account Purchaser's reasonable comments.

(d)     Closing Cash Consideration.  Within sixty (60) days after the Closing Date, Purchaser shall prepare (again, utilizing the Applicable Methodology) and deliver to Seller a good faith estimated calculation of the Cash Consideration (the "Closing Cash Consideration") and all components thereof, including the Net Working Capital as of the Closing Date. Seller will have reasonable access to all work papers and books and records of the Business used by Purchaser in its calculation of the Closing Cash Consideration.

(e)     Dispute Notice.    Purchaser's determination of the Closing Cash Consideration will be final, conclusive and binding on Purchaser and Seller unless Seller provides a written notice (a "Dispute Notice") to Purchaser no later than the fifteenth (15th) Business Day after delivery of Purchaser's calculation of the Closing Cash Consideration setting forth in reasonable detail (i) any item of Purchaser's calculation of the Closing Cash Consideration which Seller believes has not been prepared in accordance with this Agreement (an "Item of Dispute") and (ii) the correct amount of such Item of Dispute in accordance with this Agreement. Any item or amount to which no dispute is raised in a timely fashion under the Dispute Notice will be final, conclusive and binding on Purchaser and Seller.

(f)     Resolution of Disputes.  If any Item of Dispute remains unresolved for a period of thirty (30) days after Purchaser's receipt of the Dispute Notice, either Purchaser or Seller may submit the remaining Items of Dispute to a nationally recognized certified public accounting firm which is "independent" as to Purchaser, Seller and, in each case, their respective Affiliates, or another mutually agreeable accounting firm (the "Independent Auditor"). Purchaser and Seller shall request that the Independent Auditor render a determination (which

22

determination shall be solely based on whether the Item of Dispute was prepared in accordance with the terms of this Section 2.6 or whether a mathematical error was made) as to each unresolved Item of Dispute within fifteen (15) Business Days after its retention, and Purchaser and Seller shall cooperate in all reasonable respects with the Independent Auditor so as to enable it to make such determination as quickly and as accurately as practicable. The Independent Auditor's determination as to each Item of Dispute shall be (i) based solely on presentations by Purchaser and Seller which are in accordance with the guidelines and procedures set forth in this Agreement (i.e., not on the basis of an independent review), (ii) in writing and (iii) conclusive and binding upon Purchaser and Seller, and the Closing Cash Consideration shall be modified to the extent necessary to reflect such determination. The Independent Auditor shall consider only the remaining Items of Dispute and the Independent Auditor may not assign a value to any Item of Dispute greater than the greatest value assigned by Purchaser, on the one hand, or Seller, on the other hand, or less than the smallest value for such item assigned by Purchaser, on the one hand, or Seller, on the other hand. The costs and expenses of the Independent Auditor shall be borne by the non-prevailing party as determined by the Independent Auditor. The Independent Auditor will act as an expert and not as an arbitrator.

(g)     Final Cash Consideration. The Closing Cash Consideration as finally determined pursuant to Section 2.6(d), if there is no dispute, or Section 2.6(e) and (f), if there is a dispute, is referred to as the "Final Cash Consideration." If the Final Cash Consideration exceeds the Estimated Cash Consideration (such excess amount, the "Excess Amount"), then (i) Purchaser and Seller will deliver a joint written instruction, in accordance with the Escrow Agreement, to the Escrow Holder instructing the Escrow Holder to disburse to Seller the entire balance in the Adjustment Fund, and (ii) Purchaser shall within five (5) Business Days of the determination of the Final Cash Consideration pay to Seller the Excess Amount. If the Final Cash Consideration is less than the Estimated Cash Consideration (such shortfall amount, the "Deficiency Amount"), then (i) if the Deficiency Amount is less than the Adjustment Fund, then, within five (5) Business Days of the determination of the Final Cash Consideration, Purchaser and Seller will deliver to the Escrow Holder a joint written instruction, in accordance with the Escrow Agreement, instructing the Escrow Holder to disburse (A) to Purchaser a portion of the Adjustment Fund equal to the Deficiency Amount and (B) to Seller the remaining portion of the Adjustment Fund, and (ii) if the Deficiency Amount is equal to or greater than the Adjustment Fund, then within five (5) Business Days of the determination of the Final Cash Consideration, Purchaser and Seller will deliver to the Escrow Holder a joint written instruction, in accordance with the Escrow Agreement, instructing the Escrow Holder to disburse the entire balance in the Adjustment Fund to Purchaser. For the avoidance of all doubt, Purchaser hereby acknowledges that its right to receive amounts from the Adjustment Fund as and when provided in this Section 2.6(g) shall be Purchaser's sole recourse against Seller in connection with any adjustment of the Cash Consideration pursuant to the provisions of this Section 2.6.

(h)     Purchase Price Allocation. Within 30 days after the determination of the Final Cash Consideration, Purchaser will prepare or cause to be prepared and delivered to Seller an allocation of the Purchase Price (and any other items constituting consideration for Tax purposes) among the Purchased Assets in accordance with Section 1060 of the Code and the Treasury Regulations thereunder. Seller and Purchaser shall cooperate in good faith to finalize a mutually agreeable allocation within 30 Business Days after the delivery of the allocation by

23

Purchaser to Seller. If the parties reach agreement on the allocation, Seller and Purchaser covenant (i) to revise the allocation in accordance with this Section 2.6(h) to reflect any adjustments to the Purchase Price, (ii) to report gain or loss or cost basis, as the case may be, in a manner consistent with such allocation, (iii) to prepare and file, and cause their respective Affiliates to prepare and file, their Tax Returns, including Internal Revenue Service Form 8594, on a basis consistent with the allocation, (iv) not to voluntarily take any position inconsistent therewith in any proceeding relating to Taxes, and (v) to use commercially reasonable efforts to sustain such allocation in any subsequent Tax audit or Tax dispute.

    2.7    Closing.

    (a)    The Closing shall take place on the date that is three (3) Business Days after the satisfaction or waiver of the conditions precedent set forth in Articles VI and VII or on such other date, and at such time and place, as may be agreed by Purchaser and Seller. The date on which the Closing occurs in accordance with the preceding sentence is referred to in this Agreement as the "Closing Date."

    (b)    At the Closing, Seller shall deliver counterparts of the following to Purchaser:

    (i)    a bill of sale and assignment and assumption agreement in the form attached hereto as Exhibit 2.7(b)(i) (the "Bill of Sale, Assignment and Assumption") duly executed by Seller;

    (ii)    an assignment of the Acquired Intellectual Property Rights in the form attached hereto as Exhibit 2.7(b)(ii) (the "IP Assignment");

    (iii)    a certificate of Seller, dated as of the Closing Date, as to the satisfaction of the conditions set forth in Sections 6.1, 6.2, and 6.5 hereof;

    (iv)    a certified copy of the Sale Order as entered by the Bankruptcy Court, vesting the Purchased Assets in Purchaser free and clear of any Liens (except for Permitted Post-Closing Encumbrances), and a certified copy of the docket for the period following entry of the Sale Order and through the date immediately prior to the date of the Closing;

    (v)    a certificate of non-foreign status of Seller (or, if Seller is disregarded for U.S. federal income tax purposes, its regarded owner) meeting the requirements of Treasury Regulations Section 1.1445-2(b)(2);

    (vi)    a lease assignment and assumption agreement for each of the Acquired Real Property Leases in the form attached hereto as Exhibit 2.7(b)(vi) (each a "Real Property Lease Assignment and Assumption Agreement") duly executed by Seller and dated as of the Closing Date;

    (vii)    [Reserved];

    (viii)    [Reserved];

24

(ix)     a certificate of the Secretary or an Assistant Secretary of Seller certifying as to the incumbency and signatures of the executing officers of Seller;

(x)     evidence reasonably satisfactory to Purchaser that the tax liabilities described in <u>Section 3.15</u> of the Disclosure Schedule have been paid in full; provided, that if Seller does not provide such evidence at or prior to the Closing, Purchaser may pay all or a portion of such tax liabilities described in <u>Section 3.15</u> of the Disclosure Schedule that remain unpaid as of the Closing as well as any unpaid Transfer Taxes, and any amounts so paid by Purchaser shall reduce the Cash Consideration payable to Seller on a dollar-for-dollar basis;

(xi)     evidence reasonably satisfactory to Purchaser that all undisputed amounts due and payable pursuant to the Acquired Contracts and arising during the Relevant Period (the "<u>Post-Petition Costs</u>") have been, or will concurrently with the Closing, be paid in full.  With respect to Post-Petition Costs for which an objection has been filed that has not been consensually resolved by the parties or determined by the Bankruptcy Court at or prior to the Sale Hearing, Seller shall deliver evidence reasonably satisfactory to Purchaser that Seller has deposited the full amount of the disputed Post-Petition Costs in an escrow in accordance with the Sale Order pending final resolution thereof.  If Seller does not provide such evidence at or prior to the Closing of payment in full of all undisputed Post-Petition Costs and escrows required above, Purchaser may pay all or a portion of such undisputed Post-Petition Costs that remain unpaid as of the Closing and may itself escrow any amount that Seller is required to escrow, and any amounts so paid or escrowed by Purchaser shall reduce the Cash Consideration payable to Seller on a dollar-for-dollar basis, with it being agreed that Seller will be entitled to any amount remaining in escrow after the final resolution of all disputed Post-Petition Costs and the payment from escrow of all amounts finally determined to be owed;

(xii)     evidence reasonably satisfactory to Purchaser that the DIP Budgeted Capital Expenditures, other than capital expenditures in respect of facility enhancements at the Palmyrita Site in the amount of $916,615.00 (the "<u>Palmyrita Expenditures</u>"), have been incurred and paid in full; provided, that if Seller does not provide such evidence at or prior to the Closing, Purchaser may pay all or a portion of the DIP Budgeted Capital Expenditures that have not been incurred or that remain unpaid as of the Closing (other than the Palmyrita Expenditures), and any amounts so paid by Purchaser shall reduce the Cash Consideration payable to Seller on a dollar-for-dollar basis;

(xiii)     the Holdings Assignment, duly executed by Holdings; and

(xiv)     such other instruments and documents as may be reasonably requested by Purchaser at least five (5) Business Days prior to Closing in order to consummate the transactions contemplated under this Agreement.

(c)     At the Closing, Purchaser shall deliver the following to Seller (or, in the case of clauses (ii) and (iii) below, directly to the counterparties thereto specified in such clauses):

25

(i)       the amount described in <u>Section 2.6(b)(iii)</u> pursuant to the payment procedures described in <u>Section 2.6(b)</u>;

(ii)      the Note Consideration to be issued to the Persons and in the amounts set forth in the Note Purchase Agreement;

(iii)     the Equity Consideration to be issued to Orion (or its designee);

(iv)     duly executed counterparts of each of the Related Agreements referred to in <u>Section 2.7(b)</u>;

(v)      a certificate of good standing of Purchaser from the Secretary of State of the State of Delaware dated not earlier than ten (10) days prior to the Closing Date;

(vi)     a certificate of an authorized officer of Purchaser certifying as to: (i) the certificate of formation of Purchaser, as certified by the Secretary of State of the State of Delaware not earlier than ten (10) days prior to the Closing Date; (ii) the incumbency and signatures of the executing officers of Purchaser; and (iii) resolutions duly adopted by the managing member of Purchaser approving the transactions contemplated by this Agreement;

(vii)    a certificate of Purchaser, dated as of the Closing Date, as to the satisfaction of the conditions set forth in <u>Sections 7.1</u> and <u>7.2</u>;

(viii)   a counterpart of each Real Property Lease Assignment and Assumption Agreement, executed by Purchaser and dated as of the Closing Date; and

(ix)     such other instruments and documents as may be reasonably requested by Seller at least five (5) Business Days prior to Closing in order to consummate the transactions contemplated under this Agreement.

2.8       <u>Addition/Removal of Acquired Contracts, Acquired Real Property Leases, Acquired Personal Property Leases and Permits and Licenses</u>.  Purchaser may, in its sole discretion, add any Contract, permit or license to (or remove any Contract, permit or license from) the Acquired Contracts on <u>Section 2.1(c)</u> of the Disclosure Schedule (it being acknowledged and agreed that in no event will any Contract between Seller and Lexmar Distribution, Inc. in effect as of the date hereof be added to <u>Section 2.1(c)</u> of the Disclosure Schedule), the Acquired Real Property Leases on <u>Section 2.1(e)</u> of the Disclosure Schedule, the Acquired Personal Property Leases on <u>Section 2.1(f)</u> of the Disclosure Schedule, or the Permits and Licenses on <u>Section 2.1(g)</u> of the Disclosure Schedule up to the date that is three (3) days prior to the date of the Closing.  Seller shall comply with the terms of the Bid Procedures Order and the Notice of Proposed Assumption and Assignment of Designated Executory Contracts and Unexpired Leases Docket No. 269 with respect to all such Contracts, permits and licenses added to (or removed from) the relevant sections of the Disclosure Schedule.  Any removal or addition of Contracts, permits or licenses pursuant to this <u>Section 2.8</u> shall have no effect upon the Purchase Price payable to Seller hereunder.

ARTICLE III

REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to Purchaser, as of the date hereof and as of the Closing Date, as follows:

3.1    Due Incorporation. Seller is duly organized, validly existing and in good standing under the laws of the State of its formation.

3.2    Due Authorization. Subject to entry of the Sale Order, Seller has full power and authority to (a) enter into this Agreement and its Related Agreements and to consummate the transactions contemplated hereby and thereby and (b) own, lease, hold and operate the assets and properties owned, leased, held or operated by it and to carry on its business as it is currently conducted.  Seller is duly qualified or licensed and in good standing to do business in each jurisdiction in which the property owned, leased, held or operated by it or the nature of its business makes such qualification or licensing necessary, except where the failure to be so qualified, licensed or in good standing has not been, and would not reasonably be expected to be, material to the Business or the Purchased Assets.  Subject to entry of the Sale Order, the execution, delivery and performance by Seller of this Agreement and the Related Agreements have been duly and validly approved on behalf of the Board of Directors of Holdings and the managing member of Seller and no other corporate or entity actions or proceedings on the part of Seller are necessary to authorize this Agreement, Seller's Related Agreements and the transactions contemplated hereby and thereby.  Seller has duly and validly executed and delivered this Agreement and has duly and validly executed and delivered (or prior to or at the Closing will duly and validly execute and deliver) its Related Agreements.  Subject to entry of the Sale Order, (i) this Agreement constitutes the legal, valid and binding obligation of Seller and (ii) Seller's Related Agreements, upon execution and delivery by Seller, will constitute legal, valid and binding obligations of Seller, in each case, enforceable in accordance with their respective terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, moratorium, reorganization or similar laws in effect which affect the enforcement of creditors' rights generally and by equitable principles.

3.3    Consents and Approvals; Governmental Authority Relative to This Agreement. Except as set forth in Section 3.3 of the Disclosure Schedule, the execution, delivery and performance by Seller of this Agreement and its Related Agreements will not, subject to entry of the Sale Order, (a) result in the creation of any Lien upon any of the Purchased Assets that is not extinguished pursuant to the Sale Order or (b) violate, conflict with or result in a breach of (with or without notice or lapse of time, or both), require a Consent, result in the loss of any material benefit under, require payment pursuant to, or give rise to a right of acceleration, termination, modification or loss of benefits under (i) any provision of any of the Certificate of Formation or Operating Agreement of Seller, (ii)  any Permits and Licenses, order, writ, injunction, decree, statute, treaty, rule or regulation applicable to the Business, the Purchased Assets, Seller or any of its assets or (iii) any Contract included in the Purchased Assets other than, in the case of clause (ii) and (iii) above, as would not reasonably be expected to result in a Material Adverse Effect.

27

3.4    Compliance With Laws. Except as otherwise set forth on Section 3.4 of the Disclosure Schedule, Seller is and has been during the Look-Back Period operating the Business in compliance in all material respects with all Applicable Laws.

3.5    Litigation. Except (i) for the general pendency of the Bankruptcy Case and related Proceedings that would not reasonably be expected to be, individually or in the aggregate, material to the Business or the Purchased Assets and (ii) for the Proceedings described in Section 3.5 of the Disclosure Schedule: (a) during the Look-Back Period, there have not been, and there are no, Proceedings pending or threatened against Seller or the Purchased Assets and (b) Seller is not subject to any outstanding Order that prohibits or otherwise restricts the ability of Seller or any of its Affiliates to consummate fully the transactions contemplated by this Agreement or any other Related Agreements.

3.6    Certain Financial Information.

(a)    Attached to Section 3.6(a) of the Disclosure Schedule are true and complete copies of (i) the audited, consolidated balance sheets of Holdings and its subsidiaries as of December 31, 2018 and December 31, 2019 and the related audited consolidated statements of operations and non-controlling interest, members' deficit, and cash flows for the years then ended and (ii) the unaudited, consolidated balance sheet of Holdings and its subsidiaries as of December 31, 2020 and the related unaudited consolidated statement of operations for the year then ended (the financial statements referred to in the immediately preceding clauses (i) and (ii), the "Financial Statements"). The Financial Statements (i) have, except for those relating to the period ending December 31, 2020, been prepared in accordance with GAAP applied on a consistent basis throughout all of the periods covered by the Financial Statements, (ii) present fairly, in all material respects, the financial condition and results of operations of Holdings and its subsidiaries covered by the particular Financial Statements at the respective dates and for the respective periods described above and (iii) have been prepared from, and are consistent with, the books and records of Holdings and its subsidiaries.

(b)    Except for liabilities (i) reflected or reserved against on the Schedules of Assets and Liabilities for CarbonLite Industries LLC, as filed with the Bankruptcy Court on April 5, 2021, or (ii) disclosed on Section 3.6(b) of the Disclosure Schedule, Seller does not have any material liabilities, other than (x) liabilities that have been incurred in the Ordinary Course of Business since the commencement of the Bankruptcy Case and which are included in the Final Cash Consideration, or (y) contractual liabilities incurred in the Ordinary Course of Business that are not material and, in the case of clauses (x) and (y), none of which is a liability for breach of Contract, breach of representation or warranty, violation of Applicable Law, tort or infringement by Seller.

(c)    All Acquired Receivables resulted from bona fide sales in the Ordinary Course of Business and represent the genuine, valid and legally enforceable indebtedness of the account debtor. Section 3.6(c) of the Disclosure Schedule sets forth a true and complete list of (i) all Accounts Receivable that are more than thirty (30) days past due as of the date hereof and (ii) all Accounts Receivable that have been outstanding for one hundred and twenty (120) days or more as of the date hereof.

(d)     All Acquired Inventories consist of a quality and quantity usable and salable in the Ordinary Course of Business.  No Acquired Inventory is held on a consignment basis.  All Acquired Inventories are located at the Riverside Facility or are in transit thereto.

(e)     Each Acquired L/C is a validly issued and outstanding standby letter of credit that is in full force and effect. Each Acquired L/C has been cash collateralized in a manner satisfactory to the issuer of such Acquired L/C. Section 2.1(m) of the Disclosure Schedule accurately lists the amounts of cash collateral posted for each Acquired L/C.  Except as set forth on Section 3.6(e) of the Disclosure Schedule, no amounts are currently drawn under any Acquired L/C, and Seller has not received a draw request from any Acquired L/C beneficiary.

(f)     Section 3.6(f) of the Disclosure Schedule sets forth a true and complete list of all of the capital expenditures budgeted, at any time, to be paid by Seller under its debtor in possession financing facilities during the Relevant Period (the "DIP Budgeted Capital Expenditures"), and, except for the Palmyrita Expenditures, all DIP Budgeted Capital Expenditures either (i) have been incurred and paid in full or (ii) are included in the Cure Costs.

(g)     Section 3.6(g) of the Disclosure Schedule accurately lists the amounts of the Prepaid Assets as of the execution of this Agreement and Seller's reasonable good faith estimate of the items and amounts of the Cure Costs and the Tax Prorations.

(h)     Section 3.6(h) of the Disclosure Schedule sets forth a true and complete list of all capital leases secured by any of the Purchased Assets (the "Capital Lease Obligations").

3.7     Real Property.

(a)     Seller does not hold fee title to any real property used or held for use in the Business.  Section 3.7(a) of the Disclosure Schedule sets forth a complete and correct list of all of the real property leased by Seller.  Seller has not granted any options with respect to the purchase of the Riverside Facility or any portion thereof or any other unexpired rights in favor of third Persons to purchase or otherwise acquire a leasehold interest in the Riverside Facility or any portion thereof. Except as set forth on Section 3.7(a) of the Disclosure Schedule, (i) neither Seller nor, to Seller's Knowledge, any other party to the Acquired Real Property Leases is in material default under the Acquired Real Property Leases, (ii) no written notice of any material default under the Acquired Real Property Leases, which default remains uncured, has been sent or received by Seller, and (iii) no conditions or circumstances exist which, with the lapse of time or the giving of notice, or both, would constitute a material default or breach under the Acquired Real Property Leases. Seller has not leased, subleased, assigned, licensed or otherwise granted to any Person the right to use or occupy any portion of the Riverside Facility.  Except for collateral assignments and security interests that will be extinguished at Closing pursuant to the Sale Order, Seller has not collaterally assigned or granted any other security interest in any Acquired Real Property Lease.

(b)     Except for Liens that will be extinguished at Closing pursuant to the Sale Order or otherwise satisfied at Closing, Seller has valid leasehold interests in and exclusive possession of each parcel of the Riverside Facility free and clear of all Liens, other than

29

Permitted Post-Closing Encumbrances.  Section 3.7(b) of the Disclosure Schedules lists each executory Contract providing for any material repairs, work, and/or capital improvements at the Riverside Facility.  There are no material structural defects (whether latent or patent) relating to the Riverside Facility, and there is no material physical damage to the Riverside Facility for which there is no insurance in effect.

    3.8    Material Contracts.

    (a)    Section 3.8(a) of the Disclosure Schedule contains a true and complete list of all of the following types of Contracts, including Contracts to which Seller or any of its Affiliates is a party or bound, in each case (i) relating to the Business or (ii) by which any of the Purchased Assets are bound or affected (each Contract listed, and each Contract that should be listed, on Section 3.8(a) of the Disclosure Schedule being referred to as a "Material Contract"), a complete and correct copy of which (as in effect on the date hereof), and including all amendments, supplements, restatements, waivers, side letters, addenda, exhibits, schedules and modifications thereto, and summaries of any oral versions of same, has been furnished to Purchaser by Seller:

    (i)    any Contract pursuant to which Seller leases any real property, including the Acquired Real Property Leases;

    (ii)    any Contract (other than a purchase order) with a Key Customer or Key Vendor;

    (iii)    any Contract for the distribution of products of the Business, including any dealer, representative, agency or similar Contract;

    (iv)    any Contract with any Governmental Authority or any instrumentality of any such Governmental Authority;

    (v)    any (A) employment and similar Contract with an officer or other member of management and (B) Contract with a consultant pursuant to which the Business is or could become obligated to make payments exceeding $100,000 per annum;

    (vi)    any Contract involving a change of control or retention bonus, "stay bonus" or similar arrangement or providing for the grant or acceleration of any benefit payable to any Employee;

    (vii)    any Contract entered into on or after January 1, 2020 between any current or former employee of Seller or its Affiliates or current or former consultant of Seller or its Affiliates, on the one hand, and Seller or its Affiliates, on the other hand, that restricts any such Person (A) from competing, directly or indirectly, with Seller, the Business or any other Person or (B) from soliciting or hiring current or former employees or customers of Seller, the Business or any other Person;

    (viii)    any Acquired Contract that includes a "most favored nation," "meet or release" or similar pricing and delivery arrangement or that includes a minimum

volume commitment or any other similar performance or financial goal, or involves the payment by the Business of amounts that include "take or pay" requirements or output terms or similar pricing or delivery arrangements;

(ix)    any Acquired Contract that restricts the ability of Seller or the Business to compete with any Person, engage in any business or operate in any geographical area;

(x)    any Acquired Contract by which any material Intellectual Property Rights are (A) licensed by Seller or its Affiliates to a third party or (B) licensed to Seller (other than Contracts that are shrink-wrap, click-wrap or other similar non-negotiable terms granted to Seller for third-party software that are available to the general public as of the Closing Date);

(xi)    any performance bond or surety Contract;

(xii)    any Contract that settled any Proceeding (A) since January 1, 2021 for monetary payments to or by Seller or any of its Affiliates in excess of $100,000 or (B) that involves any equitable or other non-monetary relief and that is binding on Seller or the Business;

(xiii)    any collective bargaining, works council, shop, enterprise or recognition Contract; and

(xiv)    the Acquired Personal Property Leases.

(b)    With respect to each Material Contract: (i) such Material Contract is the legal and valid obligation of Seller and each other party thereto, and constitutes the binding and enforceable obligation of Seller and each other party thereto, in accordance with its terms; (ii) Seller is not, nor is any other Person, in material breach or default thereunder and, except as otherwise set forth in Section 3.8(b) of the Disclosure Schedule, no condition exists or event has occurred (including any condition or event that with notice or lapse of time, or both) that would constitute a material breach or default, or permit termination, modification in any manner adverse to the Business or the Purchased Assets or acceleration thereunder; (iii) no party has asserted nor has (except by operation of law) any right to offset, discount or otherwise abate any amount owing under such Material Contract; and (iv) no amendment or modification has been made thereto except those, if any, reflected in the copies previously furnished to Purchaser. There are no material disputes under any Material Contract.

3.9    Employees and Labor Matters.

(a)    Section 3.9(a) of the Disclosure Schedule sets forth the following information for each current Employee (including each current Employee on leave of absence): employer; name; date of hire; job title or position; current compensation paid or payable; status as exempt or non-exempt under the Fair Labor Standards Act of 1938, as amended; current base salary or rate of pay; bonus compensation (if any) paid or payable for calendar year 2020;

accrued and unused vacation and other paid time-off; and leave status (including nature and duration of any leave).

(b)     To the Knowledge of Seller, no Employee is a party to, or is otherwise bound by, any agreement, including any confidentiality, noncompetition, or proprietary rights agreement, between such Employee and any other Person that in any way (i) adversely affects the performance of his or her duties as an Employee; (ii) adversely affects the ability of Seller, or could reasonably be expected to adversely affect the ability of Purchaser after the Closing Date, to conduct the Business; or (iii) is being violated by virtue of the Employee's provision of services to Seller or any of its Affiliates.

(c)     Neither Seller nor any of its Affiliates is a party to any collective bargaining agreement or other labor union Contract applicable to the Employees and there are not any activities or Proceedings of any labor union to organize any of the Employees.

(d)     The employment or other engagement of all Employees is terminable at will without, except as set forth on Section 3.9(d) of the Disclosure Schedule, any penalty or severance obligation of any kind on the part of the employer. All sums due for employee compensation and benefits and all vacation time or paid time off owing to any Employees have been duly and adequately accrued on the accounting records of Seller.

(e)     Any individual who performs or performed services for Seller or any of its Affiliates and who is not treated as an employee for federal income tax purposes by Seller or an Affiliate, as applicable, is not an employee under Applicable Laws or for any purpose, including, without limitation, for Tax withholding purposes or Benefit Plan purposes.

(f)     Seller has not effectuated (i) a "plant closing" (as defined in the WARN Act) in connection with the Business; or (ii) a "mass layoff" (as defined in the WARN Act) of individuals employed at or who primarily provided service to the Business. Seller has heretofore made available to Purchaser a true and complete list of layoffs, by location, implemented by Seller since January 1, 2021.

3.10     Benefit Plans.

(a)     Section 3.10(a) of the Disclosure Schedule sets forth an accurate and complete list of all Benefit Plans. Seller has made available to Purchaser or its counsel a true and complete copy of all plan documents (including related trust agreements, funding arrangements, Form 5500s and insurance contracts and all amendments thereto) with respect to each Benefit Plan in which any Employees participate or are eligible to participate.

(b)     Each Benefit Plan has been established, funded, maintained and administered in all material respects in accordance with its terms, and in compliance with the applicable provisions of ERISA, the Code and other Applicable Law. With respect to each Benefit Plan that is intended to qualify under Section 401(a) of the Code, Seller has received a favorable determination, opinion or advisory letter with respect to such Benefit Plan and its related trust that has not been revoked and no circumstances exist and no events have occurred that could adversely affect the qualified status of such Benefit Plan or the related trust. No

32

Benefit Plan provides retiree health or life insurance benefits except as may be required by Section 4980B of the Code and Section 601 of ERISA, any other Applicable Law or at the sole expense of the participant or the participant's beneficiary. No Benefit Plan that provides health insurance or medical coverage is self-funded or self-insured and all premiums that have become due have been paid in full.

(c)    No Benefit Plan is (i) a "defined benefit plan" (as defined in Section 3(35) of ERISA), (ii) an "employee pension benefit plan" (as defined in Section 3(2) of ERISA) that is subject to Title IV of ERISA or Sections 412 or 430 of the Internal Revenue Code, (iii) a "multiemployer plan" (as defined in Section 3(37) or 4001(a)(3) of ERISA), or (iv) a "multiple employer plan" within the meaning of Section 413(c) of the Code.

3.11    Permits. Seller has made all filings and paid all fees and duties, in each case, necessary to maintain the Permits and Licenses, each of which is valid and in full force and effect. Except as otherwise set forth in Section 3.11 of the Disclosure Schedule, (i) Seller is in compliance in all material respects with all of the Permits and Licenses included in the Purchased Assets, and no condition exists that with notice or passage of time or both would reasonably be expected to constitute a material default under any such Permits and Licenses and (ii) Seller has not received any notice of any violation of any Permits and Licenses included in the Purchased Assets or notice of any proposal to revoke, cancel, rescind, modify or refuse to renew any of such Permits and Licenses.

3.12    Intellectual Property.

(a)    Section 3.12(a) of the Disclosure Schedule is a true and complete list of all (i) Patents; (ii) registered trademarks, service marks and trade names and those for which an application is pending; (iii) registered or applied for copyrights; and (iv) Internet domain names and social media accounts, in each case, owned or purported to be owned by Seller (items (i) through (iii), the "Registered Intellectual Property," together with all other Intellectual Property Rights owned or purported to be owned by Seller, collectively the "Owned Intellectual Property"). Other than pending applications included in the Registered Intellectual Property, the Registered Intellectual Property is subsisting, valid and enforceable. Seller is not subject to any Order that restricts or impairs its use of any Owned Intellectual Property. No Person has alleged in writing or in a Proceeding to which Seller is a party that any Owned Intellectual Property is not owned by Seller or that rights thereto are invalid or unenforceable.

(b)    Seller exclusively owns all right, title and interest in and to all Registered Intellectual Property and material Owned Intellectual Property, free and clear of all Liens (other than those which will be removed at the Closing, either by the effect of the Sale Order or otherwise by satisfaction thereof at the Closing). Seller has valid, subsisting and enforceable licenses to use all Seller Intellectual Property owned by any third party, including sufficient quantities of seat, server core, or other license units. Seller is in compliance in all material respects with all licenses, and all license fees, renewal fees and maintenance fees that have become due have been timely paid by Seller, including with respect to seat, server core or other unit license restrictions. The consummation of the transactions contemplated by this Agreement will not alter or impair any rights of Seller to any Seller Intellectual Property other than such

33

alterations and impairments which would not reasonably be expected to be material to the Business or the Purchased Assets.

(c)    Except as set forth in Section 3.12(c) of the Disclosure Schedule, (i) the operation of the Business as conducted as of the date hereof does not, and the services provided by Seller do not, infringe, misappropriate, or otherwise violate in any material respect, and have not during the Look-Back Period infringed, misappropriated or otherwise violated in any material respect, the Intellectual Property Rights of any third party, and no third party is infringing, misappropriating, or otherwise violating the Owned Intellectual Property, (ii) during the Look-Back Period, neither Seller nor any of its Affiliates has received any communication regarding any actual, alleged or suspected material infringement, misappropriation or other material violation of Intellectual Property Rights of a third party by Seller, and (iii) during the Look-Back Period, neither Seller nor any of its Affiliates has sent any written notice, charge, complaint, claim or other written assertion asserting or threatening to assert in any Proceedings against any Person regarding the material infringement, misappropriation, dilution or other material violation of any Owned Intellectual Property.

(d)    No current or former employee or officer of Seller and no current or former consultant or contractor of Seller has any right, title or interest in or to any material Seller Intellectual Property.  No funding, facilities or personnel of any Governmental Authority or academic or research institution were used to develop or create, in whole or in part, any Owned Intellectual Property.

(e)    Seller has taken commercially reasonable actions to safeguard and maintain the secrecy and the confidentiality of, and its proprietary rights in and to, all non-public Owned Intellectual Property.

(f)    The computer software, computer hardware, firmware, networks, interfaces and related systems included in the Purchased Assets (collectively, "Computer Systems") are sufficient in all material respects for the Seller's operation of the Business and the Purchased Assets as conducted as of the date hereof and as contemplated to be conducted as of the date hereof and, except as set forth on Section 3.12(f) of the Disclosure Schedule, there have been no material failures, crashes, ransomware attacks, security breaches or similar adverse events affecting the Computer Systems.  Seller provides for the backup and recovery of material data and has implemented and maintains commercially reasonable disaster recovery plans, procedures and facilities.  Seller has taken commercially reasonable steps, as necessary and appropriate, to protect the integrity and security of the Computer Systems and the information stored therein, processed thereon or transmitted therefrom from misuse or unauthorized use, access, disclosure or modification by third parties, and there has been no such misuse or unauthorized use, access, disclosure or modification thereof.  None of the Computer Systems are used in any business other than the Business.

3.13    Environmental Matters.

(a)    There is no Environmental Claim pending or, to Seller's knowledge, threatened against Seller or with respect to the Business or the Purchased Assets, and all past Environmental Claims have been finally and fully resolved.  There are no past or present actions,

34

activities, circumstances, conditions, events or incidents, including the Release, presence, handling, management, use, generation, or disposal of any Hazardous Materials at any location that could form the basis of any material Environmental Claim or otherwise result in any material costs or liabilities under Environmental Law with respect to the Business or the Purchased Assets.

(b)     No Release or imminently threatened Release of Hazardous Material has occurred or is currently occurring at or from any property owned, operated, leased or used or any other property formerly owned, operated, leased or used by Seller or any of its predecessors or the Business for which Environmental Law requires (i) notice to any Person or (ii) any form of Response Action and Seller has not received any notice that the operation of the Business has caused the contamination of any other property with Hazardous Material, which has resulted or would reasonably be expected to result in a material Environmental Claim against the Business or the Purchased Assets.

(c)     Except as otherwise set forth in Section 3.13(c) of the Disclosure Schedule, Seller has not, either expressly or by operation of law, assumed responsibility for or agreed to indemnify or hold harmless any Person for any Environmental Liability with respect to the Business or the Purchased Assets.

(d)     Seller has identified and made available to Purchaser complete and correct copies of all material studies, audits, assessments, reports, data, memoranda and investigations, and other material information relating to Hazardous Materials, Environmental Claims, Environmental Liabilities or other environmental matters that are in its possession or control pertaining to, or the environmental condition of, the Business and the Purchased Assets or the compliance (or noncompliance) by Seller or any of its predecessors with Environmental Laws.

(e)     Seller is not required by any Environmental Law or by virtue of the transactions set forth herein and contemplated hereby, or as a condition to the effectiveness of any transactions contemplated hereby, (i) to remove or remediate Hazardous Materials, (ii) to give notice to or receive approval from any Governmental Authority or other Person, or to record any disclosure document or statement pertaining to environmental matters, or (iii) to alter, modify, renew, change or update any Environmental Permit, in each case with respect to the Business or the Purchased Assets.

3.14   Title to Assets; Sufficiency of Assets; Condition of Assets.  Seller has good and valid legal and beneficial title to, or a valid, binding and enforceable leasehold interest in, as applicable, all of the Purchased Assets, and such Purchased Assets are not subject to any Liens (other than Permitted Post-Closing Encumbrances and Liens which will be removed at the Closing by the effect of the Sale Order or otherwise satisfied at the Closing).  The Purchased Assets constitute (a) all of the tangible and intangible assets and properties that are used or held for use by Seller or any of its Affiliates in connection with the Business, and (b) all of the assets, rights and properties necessary for the conduct of the Business in all material respects in the Ordinary Course of Business following the Closing. The Purchased Assets are in good working condition and are suitable for the purposes for which they are used (subject to normal wear and tear) including for Purchaser to conduct and operate the Business in all material respects in the Ordinary Course of Business.  Section 3.14 of the Disclosure Schedule sets forth a true and

complete list of all Wayward Assets that, to the Knowledge of Seller, are owned or held by an Affiliate of Seller as of the date hereof.

3.15    Taxes. Except to the extent an inaccuracy of the following would neither result in a Lien on any of the Purchased Assets nor a Tax liability to the Purchaser or its Affiliates or except as set forth on Section 3.15 of the Disclosure Schedule:

(a)    All Tax Returns required to be filed by Seller or otherwise related to the Purchased Assets or the Business have been duly and timely filed and each such Tax Return is true, correct and complete in all material respects. All Taxes owed by Seller or otherwise related to the Purchased Assets or the Business for which Purchaser may be liable that are or have become due have been paid in full and all other Taxes attributable to pre-Closing periods have been fully accrued through Closing on the financials statements of Seller.

(b)    Seller does not have in force any waiver of any statute of limitations in respect of Taxes or any extension of time related to a Tax assessment or deficiency with respect to the Purchased Assets or the Business. Except with respect to Seller's Tax Returns relating to the period ending December 31, 2020, no extension of time within which to file any Tax Return with respect to the Purchased Assets or the Business is currently in effect. There is no audit, litigation or other Proceeding, Claim, assessment, deficiency, or adjustment pending, asserted, proposed or threatened with respect to Taxes of Seller or otherwise with respect to the Purchased Assets or the Business. All of the Purchased Assets have been properly listed and described on the property tax rolls for all periods prior to and including the Closing Date and no portion of the Purchased Assets constitutes omitted property for property tax purposes. Purchaser will not be held liable for any unpaid Taxes that are or have become due on or prior to the Closing Date as a successor or transferee, by statute, contract or otherwise, as a result of the transfer of the Purchased Assets pursuant to this Agreement.

(c)    Other than assets held for resale in the ordinary course of business and motor vehicles, the sale of the Purchased Assets qualifies as an occasional sale pursuant to Cal. Rev. & Tax. Cd. § 6367 and Cal. Rev. & Tax. Cd. §6006.5.

3.16    Key Business Relationships.

(a)    Section 3.16(a)(i) of the Disclosure Schedules sets forth a true and complete list of (i) the top 10 customers of the Business based on revenue generated for the fiscal year period ended December 31, 2020 (each, a "Key Customer", and together, the "Key Customers") and the amount of such revenue generated with respect to each Key Customer, and (ii) the top 15 vendors or suppliers of the Business based on purchases for the fiscal year period ended December 31, 2020 (each, a "Key Vendor", and together, the "Key Vendors") and the amount of such expenses incurred with respect to each Key Vendor. Except as set forth on Section 3.16(a)(ii) of the Disclosure Schedules, since September 30, 2020 (i) no Key Customer has (A) materially decreased or notified Seller or any Affiliate of Seller of the foregoing of its intention to materially decrease its aggregate level of purchases of services from Seller relative to such Key Customer's purchasing history during the twelve (12) months prior to such change or (B) requested reduced pricing (whether through increased credits or otherwise) from that in effect under an existing Contract, in each case, other than with respect to commercial

36

negotiations in the Ordinary Course of Business with respect to such Key Customer and not as a result of a deterioration in the business relationship with such Key Customer and (ii) no Key Vendor has adversely altered or notified Seller or any of its Affiliates of the foregoing of its intention to adversely alter in any material respect the terms (including price) on which it sells goods or services to the Business.

(b)     Section 3.16(b) of the Disclosure Schedule sets forth a true and complete list of all discounts, allowances, free goods or services, rebates, programs or other promotions that had a value, individually or in the aggregate, to any one customer of Seller in excess of $250,000 in the calendar year ended December 31, 2020. Seller has not changed in any material respect its policies, procedures or guidelines in respect of any discounts, allowances, free goods or services, rebates, programs or other promotions offered to any customer other than in the Ordinary Course of Business.

3.17    Insurance. Section 3.17 of the Disclosure Schedule sets forth a true and complete list of all insurance policies maintained by Seller or any of its Affiliates with respect to the Business, the Employees or the Purchased Assets (collectively, the "Insurance Policies"). Each Insurance Policy is in full force and effect and, except as otherwise set forth on Section 3.17 of the Disclosure Schedule, all premiums due to date thereunder have been paid in full and neither Seller nor any of its Affiliates is in material default thereunder. Neither Seller nor any of its Affiliates has received notice of cancellation or nonrenewal, in whole or in part, in respect of any Insurance Policy.

3.18    Brokers and Finders. Other than as set forth on Section 3.18 of the Disclosure Schedule, no agent, broker, investment banker, financial advisor or other firm or person is entitled to any brokerage, finder's, financial advisor's or other similar fee or commission for which Purchaser or any of its Affiliates could become liable in connection with the transactions contemplated by this Agreement as a result of any action taken by or on behalf of Seller or any of its Affiliates.

3.19    Product Quality. All products manufactured, fabricated, sold or distributed by the Business prior to the Closing Date comply with applicable customer specifications and Applicable Laws for the intended use of such products.

3.20    Intercompany Agreements.  Other than as set forth on Section 3.20 of the Disclosure Schedule, there are no Contracts between Seller, on the one hand, and any Affiliate of Seller, on the other hand, relating to the ownership, management or operation of the Business or the Purchased Assets.

3.21    Data Privacy.

(a)     With respect to the Business and the Purchased Assets, Seller and, to the Knowledge of Seller, any Person acting for or on Seller's behalf have for the past three (3) years, as applicable, materially complied with (i) all applicable Privacy Laws, (ii) all of the Seller's policies and notices regarding Personal Information, and (iii) all of the Seller's contractual obligations with respect to Personal Information. Seller has not received any written notice of any claims of or investigations or regulatory inquiries related to, or been charged with, the

violation of any Privacy Laws, applicable privacy policies, or contractual commitments with respect to Personal Information in connection with the Business or the Purchased Assets. To the Knowledge of Seller, there are no facts or circumstances that could reasonably form the basis of any such notice or claim.

(b)     With respect to the Business and the Purchased Assets, Seller has (i) implemented and for the past three (3) years, as applicable, maintained reasonable and appropriate technical and organizational safeguards, at least consistent with practices in the industry in which the Seller operates, to protect Personal Information and other confidential data in its possession or under its control against loss, theft, misuse or unauthorized access, use, modification, alteration, destruction or disclosure, and (ii) taken reasonable steps to ensure that any third party with access to Personal Information collected by or on behalf of Seller has implemented and maintained the same. To the Knowledge of Seller, any third party who has provided Personal Information to Seller in connection with the Business or the Purchased Assets has done so in material compliance with applicable Privacy Laws. Except as would not reasonably be expected to be material to the Business or the Purchased Assets, there have been no breaches, security incidents, misuse of or unauthorized access to or disclosure of any Personal Information in the possession or control of Seller or collected, used or processed by or on behalf of Seller. Seller has not provided or been legally required to provide any notices to any Person in connection with a disclosure of Personal Information in connection with the Business or the Purchased Assets. The transfer of Personal Information in connection with the transactions contemplated by this Agreement will not violate in any material respect any applicable Privacy Laws or the Seller's privacy policies as they currently exist or as they existed at any time during which any of the Personal Information was collected or obtained.

3.22   Disclaimer of Additional Representations and Warranties. EXCEPT AS SPECIFICALLY SET FORTH IN THIS AGREEMENT, NEITHER SELLER NOR ANY OF ITS AFFILIATES OR ANY OF THEIR RESPECTIVE AFFILIATES' DIRECTORS, OFFICERS, EMPLOYEES, CONTROLLING PERSONS, AGENTS OR REPRESENTATIVES MAKES OR HAS MADE ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, INCLUDING IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR THE ACCURACY OR COMPLETENESS OF ANY PROJECTIONS, ESTIMATES OR OTHER FORWARD LOOKING INFORMATION PROVIDED OR OTHERWISE MADE AVAILABLE TO PURCHASER OR ANY OF ITS DIRECTORS, OFFICERS, EMPLOYEES, AFFILIATES, CONTROLLING PERSONS, AGENTS OR REPRESENTATIVES.

Purchaser hereby expressly acknowledges and agrees none of the provisions of this ARTICLE III (including, without limitation, anything in Section 3.6) shall be deemed to affect or influence in any manner the provisions of this Agreement relating to the calculation of the Purchase Price or any elements, components, or methodology thereof or applicable thereto (including, without limitation, the Applicable Methodology); provided, that the foregoing will not affect the last sentence of Section 4.5(b).

ARTICLE IV

REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Seller as of the date hereof and as of the Closing, as follows:

4.1     Due Organization. Purchaser is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware with all requisite power and authority to own and operate its assets and properties as they are now being owned and operated.

4.2     Due Authorization. Purchaser has full power and authority to enter into this Agreement and its Related Agreements and to consummate the transactions contemplated hereby and thereby.  The execution, delivery and performance by Purchaser of this Agreement and its Related Agreements have been duly authorized by all necessary entity action of Purchaser. Purchaser has duly and validly executed and delivered this Agreement and has duly and validly executed and delivered (or prior to or at the Closing will duly and validly execute and deliver) its Related Agreements.  This Agreement constitutes the legal, valid and binding obligation of Purchaser, and its Related Agreements, upon execution and delivery by Purchaser, will constitute legal, valid and binding obligations of Purchaser enforceable in accordance with their respective terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, moratorium, reorganization or similar laws in effect which affect the enforcement of creditors' rights generally and by equitable principles.

4.3     Consents and Approvals; No Violations. The execution, delivery and performance by Purchaser of this Agreement and its Related Agreements will not (i) violate any law, regulation or order of any Governmental Authority applicable to Purchaser; (ii) except for filings that may be required pursuant to ARTICLE IX, require any filing or registration by Purchaser with, or consent or approval with respect to Purchaser of, any Governmental Authority; (iii) violate or conflict with or result in a breach or default under any Contract to which Purchaser is a party or by which Purchaser or any of its assets or properties are bound; or (iv) violate or conflict with the certificate of formation or limited liability company agreement of Purchaser, except where any such filing, registration, consent or approval, if not made or obtained, or any such violation, conflict, breach or default, would not have a material adverse effect on Purchaser's ability to consummate the transactions contemplated hereby.

4.4     Purchaser's Examination. Purchaser and its representatives have been afforded the opportunity to meet with, ask questions of and receive answers from the management of Seller in connection with the determination by Purchaser to enter into this Agreement and the Related Agreements and consummate the transactions contemplated hereby and thereby, and all such questions have been answered to the reasonable satisfaction of Purchaser.

4.5     Investigation; Limitation on Warranties.

(a)     Purchaser acknowledges and agrees that neither Seller, nor any other Person acting on behalf of Seller or any of its Affiliates or representatives has made any

representation or warranty, express or implied, as to the accuracy or completeness of any information regarding Seller, the Business or the Purchased Assets, except as expressly set forth in this Agreement or the Related Agreements or as and to the extent required by this Agreement to be set forth in the Disclosure Schedule. Purchaser further agrees that, except only as expressly provided in this Agreement or the Related Agreements, Seller will not have or be subject to any liability to Purchaser or any other Person resulting from the distribution or use by Purchaser, any of its Affiliates or any of their respective directors, officers, employees, agents, consultants, accountants, counsel or other representatives of any such information, and any legal opinions, memoranda, summaries or any other information, document or material made available to Purchaser or its Affiliates or representatives in certain "data rooms," management presentations or any other form otherwise provided in expectation of the transactions contemplated by this Agreement.

(b)    Purchaser acknowledges and agrees that except for the representations and warranties of Seller expressly set forth in ARTICLE III hereof and the Related Agreements, the Purchased Assets are being acquired AS IS WITHOUT ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR INTENDED USE OR OTHER EXPRESSED OR IMPLIED WARRANTY.  Purchaser acknowledges and agrees that it is consummating the transactions contemplated hereby without any representation or warranty, express or implied, by any Person, except for the representations and warranties of Seller expressly set forth in ARTICLE III hereof.  Following the Closing, Seller will have no liability for a breach of representation or warranty (and no breach of representation or warranty will require Seller to return any portion of the Purchase Price to Purchaser) except in the case of actual, intentional fraud.

(c)    In connection with Purchaser's investigation of Seller and the Business, Purchaser has received from or on behalf of Seller certain projections, including projected statements of operating revenues and income from operations of the Business and certain business plan information of Seller.  Purchaser acknowledges that there are uncertainties inherent in attempting to make such estimates, projections and other forecasts and plans, that Purchaser is familiar with such uncertainties, that Purchaser is taking full responsibility for making its own evaluation of the adequacy and accuracy of all estimates, projections and other forecasts and plans so furnished to it (including the reasonableness of the assumptions underlying such estimates, projections and forecasts), and that Purchaser shall have no claim against Seller or any other Person with respect thereto. Accordingly, Seller makes no representations or warranties whatsoever with respect to such estimates, projections and other forecasts and plans (including the reasonableness of the assumptions underlying such estimates, projections and forecasts) except as set forth in ARTICLE III.  Purchaser is relying on the representations and warranties of Seller regardless of the knowledge obtained through its own investigation, diligence or otherwise.

4.6    Available Funds. Purchaser has sufficient cash resources on hand or available to it in an aggregate amount sufficient to pay in cash any and all amounts required to be paid by it pursuant to this Agreement, including the Cash Consideration and all fees and expenses related to the transactions contemplated by this Agreement to be paid by Purchaser.

4.7     Brokers and Finders. No agent, broker, investment banker, financial advisor or other firm or person is entitled to any brokerage, finder's, financial advisor's or other similar fee or commission for which Seller or any of its Affiliates could become liable in connection with the transactions contemplated by this Agreement as a result of any action taken by or on behalf of Purchaser or any of its subsidiaries.

ARTICLE V

COVENANTS

5.1     Access to Information and Applicable Locations.

(a)     From the date of this Agreement to the earlier of the Closing or the date this Agreement is terminated, subject to the Confidentiality Agreement, Seller and its Affiliates shall give Purchaser and Purchaser's representatives, upon reasonable notice, reasonable access during normal business hours to the offices, Facility, employees, and books and records relating to the Business, and shall make the officers and employees of Seller and its Affiliates available to Purchaser and its representatives as Purchaser and its representatives shall from time to time reasonably request, in each case to the extent that such access and disclosure would not obligate Seller to take any actions that would unreasonably disrupt the normal course of its business or violate the terms of any contract to which Seller is bound or any Applicable Law; provided, that all requests for access shall be directed to Gregg Milhaupt and/or Alex Delnik (collectively, the "Designated Contacts"). Notwithstanding the foregoing, other than the Designated Contacts, Purchaser is not authorized to and shall not (and shall cause its employees, agents, representatives and Affiliates to not) contact any officer, director, employee, franchisee, customer, supplier, distributor, lender or other material business relation of Seller prior to the Closing without the prior written consent of a Designated Contact (it being agreed that if the Designated Contact elects to give any such consent, the consent may be conditioned upon, among other things, Seller being able to monitor or participate in any such contacts and any discussions or dialogue resulting therefrom).

(b)     Purchaser and their representatives shall treat and hold strictly confidential any confidential information (in whatever form) provided by or on behalf of Seller to the extent required by the Confidentiality Agreement.

5.2     Preservation of Business. From the date of this Agreement until the earlier of the Closing or the date this Agreement is terminated, (i) other than as specifically contemplated by this Agreement or with the prior consent of Purchaser, Seller shall operate the Riverside Facility and the Business in the ordinary course of business since the commencement of the Bankruptcy Case and use commercially reasonable efforts to preserve intact the Purchased Assets and the Business, retain the present officers and employees and consultants of the Business at their current compensation and benefits levels, and preserve the Business's goodwill and relationships with customers, suppliers, distributors and others having material business dealings with Seller or the Business, (ii) neither Seller nor any of its Affiliates shall sell or otherwise dispose of any of the Purchased Assets other than inventories of finished goods at arm's length in the ordinary course of business as Seller has conducted the Business since the commencement of the Bankruptcy Case and (iii) Seller shall not enter into any Contract (excluding ordinary course

41

purchases of feedstock) which (A) involves the payment or receipt by Seller of amounts in excess of $250,000 (in the aggregate) or (B) has a duration of longer than six months.

    5.3    <u>Efforts</u>. Subject to the terms and conditions hereof, each party hereto shall use its commercially reasonable efforts to consummate the transactions contemplated hereby as promptly as practicable. The "commercially reasonable efforts" of any party hereto shall not require such party, its Affiliates or representatives to divest or encumber any of the Purchased Assets or any of the assets of the Purchaser or any of its Affiliates or to incur or expend any material sums of money to remedy any breach of any representation or warranty hereunder or to provide financing to any other party hereto for consummation of the transactions contemplated hereby; provided, that if such party, its Affiliates or representatives remedy any such breach, such party shall not be deemed to be in breach of such representation or warranty for purposes of determining the other parties' obligations to consummate the transactions contemplated hereby pursuant to <u>Section 6.1</u>, in the case of Purchaser, or <u>Section 7.1</u>, in the case of Seller.  Without limiting the foregoing, Seller will reasonably cooperate (as more particularly addressed below) with Purchaser, at Purchaser's expense, in Purchaser's efforts to obtain customary buyer-side representation and warranty insurance (the "<u>R&W Policy</u>") (payable solely by Purchaser) in connection with the transactions contemplated by this Agreement. Any R&W Policy so obtained shall specify that there is no right of, and that the insurer under the R&W Policy expressly waives any claims of, subrogation, contribution, or otherwise against Seller or any of its Affiliates, employees, or direct or indirect shareholders, members, directors, officers, or partners, except in the case of actual, intentional fraud by Seller in connection with the negotiation, execution, or performance of this Agreement. The cost of the R&W Policy (including the premium, underwriting fee, surplus lines taxes, and other fees (including the brokerage fees)) shall be paid by Purchaser. From and after the binding of the R&W Policy (which shall include the waivers described above), Purchaser shall provide Seller with a true and complete copy thereof and shall not amend, modify, or cancel the R&W Policy if such amendment, modification, or cancellation could reasonably be expected  to adversely affect the rights of Seller thereunder without the prior written consent of Seller (which consent may be granted or withheld in Seller's sole discretion). As set forth above, Seller shall reasonably cooperate with Purchaser in connection with obtaining the R&W Policy (at Purchaser's sole cost and expense), including by making its officers and senior management available to Purchaser at reasonable times and for reasonable periods of time; provided that, in no event, shall (i) the issuance of an R&W Policy be a condition to or otherwise affect Purchaser's obligation to consummate the transactions set forth herein, or (ii) Seller or any employee, officer, director, agent or other representative of Seller be required to provide any affidavit, certificate, application, agreement or other covenant or assurance to Purchaser, the insurer under the R&W Policy or any other person in connection with the underwriting or issuance thereof.

    5.4    <u>Preservation of Records; Post-Closing Access and Cooperation</u>.  For a period of six (6) years after the Closing Date or such other period (if longer) required by Applicable Law, Purchaser shall preserve and retain, all corporate, accounting, legal, auditing, human resources and other books and records included in the Purchased Assets that are in its possession relating to the Business and the Purchased Assets prior to the Closing Date.  Purchaser shall, after the Closing Date, (a) permit Seller's counsel and other professionals and counsel for any successor to Seller and its respective professionals (collectively, "<u>Permitted Access Parties</u>") reasonable

access, for the purpose of Seller's tax reporting requirements, financial accounting and compliance with Applicable Law, to the material financial and other books and records included in the Purchased Assets that are in its possession, during regular business hours and upon reasonable advance notice, which access shall include (i) the right of such Permitted Access Parties to copy, at such Permitted Access Parties' expense, such documents and records as they may reasonably request in furtherance of the purposes described above, and (ii) Purchaser's copying and delivering to the relevant Permitted Access Parties such documents or records as they may reasonably request in furtherance of the purposes described above, but only to the extent such Permitted Access Parties furnish Purchaser with reasonably detailed written descriptions of the materials to be so copied and the applicable Permitted Access Party reimburses the Purchaser for the reasonable costs and expenses thereof, and (b) Purchaser shall provide the Permitted Access Parties (at no cost to the Permitted Access Parties) with reasonable access to Joe Italiano and/or Omar Abuaita during regular business hours and upon reasonable advance notice so that Seller and the other Permitted Access Parties have information necessary for the preparation of tax returns, collection of those Accounts Receivable that are Excluded Assets, determination of the amount of any adjustment to the Cash Consideration pursuant to Section 2.6 hereof, and other activities in connection with the administration and wind-down of the Bankruptcy Case; provided that such access does not unreasonably interfere with the Purchaser's operation of the Business and Purchaser shall not be required to provide access for requests unrelated to the Business or the Purchased Assets. Nothing in this Section 5.4 shall require Purchaser to take any such action if (a) such action (i) could result in a waiver or breach of any attorney-client, attorney work product or other legally recognized privileges or immunity from disclosure or (ii) would result in the disclosure of any Trade Secrets of third parties or violate any Applicable Laws related to the exchange of information or any obligation of Purchaser with respect to confidentiality, or (b) such access or information is requested in relation to disputes involving Purchaser, its equity holders or any of their respective Affiliates or the Business or Purchased Assets, including disputes arising under this Agreement or any other Related Agreement.

5.5     Employees and Benefits.

(a)     As of the Closing, Seller shall terminate the employment of all of those Employees identified on Section 5.5(a) of the Disclosure Schedule (the "Subject Employees"). Section 5.5(a) of the Disclosure Schedule hereto shall be amended from time to time prior to the Closing (i) to delete any individuals who are no longer employed by Seller or (ii) upon written notice from Purchaser to Seller, to add or remove any other individuals. Purchaser, in cooperation with Seller, shall, at least five (5) Business Days prior to the Closing Date and effective as of the Closing Date, extend a written offer of employment to those employees selected by Purchaser, in its sole and absolute discretion (the "Selected Employees"), at a level and with responsibilities that are substantially commensurate with their employment with Seller and at a wage or salary and benefits and other compensation not less than the respective wages or salaries and benefits and other compensation specified for such Selected Employees on Section 5.5(a) of the Disclosure Schedule. Those Selected Employees who accept offers of employment with Purchaser and who become employees of Purchaser as of the Closing Date are referred to as "Transferred Employees."

(b)    It is understood and agreed between the parties that all provisions contained in this Agreement with respect to Benefit Plans or employee compensation are included for the sole benefit of the respective parties hereto and do not and shall not create any right in any other person, including, but not limited to, any Employee, any participant in any benefit or compensation plan or any beneficiary thereof.

(c)    In any termination or layoff of any Transferred Employee by Purchaser on or after the Closing, Purchaser will comply fully, if applicable, with the WARN Act and all other applicable foreign, Federal, state and local laws, including those prohibiting discrimination and requiring notice to employees. Purchaser shall not at any time prior to sixty (60) days after the Closing Date, effectuate a "plant closing" or "mass layoff" as those terms are defined in the WARN Act affecting in whole or in part any facility, site of employment, operating unit or employee of the Business without complying fully with the requirements of the WARN Act. Purchaser shall be solely responsible for, and will bear the entire cost of, compliance with (or failure to comply with) any such laws following the Closing Date.

(d)    Solely to the extent required by COBRA and the regulations promulgated thereunder, Purchaser shall be responsible for providing COBRA continuation coverage to "M&A qualified beneficiaries" (as defined in COBRA) of Seller who experience a "qualifying event" (as defined in COBRA) in respect of the transactions contemplated by this Agreement.

5.6    <u>Public Announcements</u>. Purchaser and Seller will consult with each other before issuing any press release or otherwise making any public statements or disclosures with respect to the transactions contemplated by this Agreement, including the terms hereof, and no party shall, without the prior written consent of the other party, issue any such press release or make any such public statement, except as may be required by Applicable Law; provided, however, that Seller may make public statements or disclosures with respect to this Agreement and the transactions contemplated herein as may be necessary or advisable in connection with the Bankruptcy Case, including, without limitation, to comply with the Bid Procedures Order and/or in seeking issuance of the Sale Order.

5.7    <u>Transfer Taxes</u>. To the extent that any sales, purchase, transfer, stamp, documentary stamp, registration, use or similar taxes are payable by reason of the sale of the Purchased Assets under this Agreement ("<u>Transfer Taxes</u>"), such Transfer Taxes shall be borne and timely paid by Seller. Purchaser and Seller shall reasonably cooperate in good faith to minimize, to the extent permissible under Applicable Law, the amount of any Transfer Taxes that might otherwise be imposed in connection with the transactions contemplated by this Agreement.

5.8    <u>Tax Proration</u>. All Property Taxes levied with respect to the Purchased Assets for any taxable period falling entirely within the period ending on or before the Closing Date shall be the responsibility of Seller. All Property Taxes levied with respect to the Purchased Assets for any taxable period that includes the Closing Date and ends after the Closing Date, whether imposed or assessed before or after the Closing Date will be prorated based on the number of days in such period that occur before the Closing Date, on the one hand, and the number of days in such period that occur on or after the Closing Date, on the other hand, the amount of such Property Taxes allocable to the portion of the period ending before the Closing Date being the

44

responsibility of Seller and the remainder being the responsibility of Purchaser. If the exact amount of any Property Taxes is not known on the Closing Date, such taxes shall be estimated based upon the best available information at the time of Closing (i.e., the taxable value currently assigned to the real property). There shall be no re-proration of Property Taxes after Closing. Accordingly, the amount of such Property Taxes allocable to Seller pursuant to this 5.8 5.8 that have not been paid prior to Closing, if any, will be included in Net Working Capital and shall be paid to the appropriate Governmental Authority by Purchaser.

5.9     [Reserved].

5.10    [Reserved].

5.11    Use of Names and Marks. As soon as reasonably practicable after the Closing, but in no event more than thirty (30) Business Days after the Closing, Seller shall cause an amendment to the certificate or articles of incorporation or formation (or any equivalent organizational documents) of Seller to be filed with the appropriate Governmental Authority and shall take all other action necessary to change Seller's legal, registered, assumed, trade and "doing business as" name, as applicable, to a name or names not containing any Acquired Intellectual Property Rights, including "CarbonLITE" or any name confusingly similar to the foregoing, and will cause to be filed as soon as practicable after the Closing, in all jurisdictions in which Seller is qualified to do business, any documents necessary to reflect such change in its legal, registered, assumed, trade and "doing business as" name, as applicable, or to terminate its qualification therein. Seller further agrees that (i) from and after the date hereof until the earlier of the Closing and the date on which this Agreement is validly terminated in accordance with its terms, neither Seller nor any of its Affiliates will sell or license the right to use any of the Acquired Intellectual Property Rights, including the name CarbonLITE, to any third party (other than Purchaser) and (ii) from and after the Closing, Seller and its Affiliates will cease, and will use reasonable best efforts to cause any purchaser or purchasers (other than Purchaser) of the facilities owned by Affiliates of Seller in Reading, Pennsylvania (subject to the last sentence of this Section 5.11), Dallas, Texas (subject to the last sentence of this Section 5.11), and Oxnard, California to cease, to make any use of all Acquired Intellectual Property Rights, the name "CarbonLITE," and any similar names indicating affiliation with Purchaser, any of its Affiliates, the Business, the Purchased Assets or the business or activities engaged in by Purchaser or any of its Affiliates. Notwithstanding the foregoing, as to the facilities owned by Affiliates of Seller and located in Reading, Pennsylvania (the "Reading Facility") and Dallas, Texas (the "Dallas Facility"), Purchaser agrees that, if requested by Seller and/or a purchaser(s) of the Reading Facility and/or Dallas Facility (other than Purchaser), Purchaser will grant Seller and/or its Affiliates or such purchaser(s) a short term license (in form and content reasonably satisfactory to Purchaser) for a period of not to exceed ninety (90) days following the date of the Closing hereunder to continue to use the name "CarbonLITE" as such purchaser(s) seeks to end and permanently transition out of such use in connection with operations at the Reading Facility and/or the Dallas Facility.

5.12    No Successor Liability. The parties hereto agree that the Sale Order shall provide that to the fullest extent permitted by Applicable Law (including under Section 363(f) of the Bankruptcy Code), (a) Purchaser shall not be liable for any liability or Lien (other than Assumed Liabilities) against Seller or any of Seller's predecessors or Affiliates and (b) Purchaser shall

45

have no successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the Business, the Purchased Assets or any liabilities of Seller arising prior to the Closing Date.

5.13    Assumption and Assignment of Contracts. At or prior to the Closing, Seller shall assume and assign to Purchaser the Acquired Contracts, Acquired Real Property Leases, Acquired Personal Property Leases and Permits and Licenses, and Purchaser shall pay in full the Cure Costs (as a deduct against the Cash Consideration), in each case pursuant to Section 365 of the Bankruptcy Code, the Sale Order and Section 2.1, subject to Purchaser's provision of adequate assurance as may be required under Section 365 of the Bankruptcy Code; provided, however, that with respect to Cure Costs for which an objection has been filed that has not been consensually resolved by the parties or determined by the Bankruptcy Court at or prior to the Sale Hearing, Purchaser shall pay such disputed Cure Cost amount into an escrow in accordance with the Sale Order pending final resolution of such dispute, and any amounts so paid by Purchaser into escrow shall reduce the Cash Consideration payable to Seller on a dollar-for-dollar basis, with it being agreed that Seller will be entitled to any amount remaining in escrow after the final resolution of all disputed Cure Costs and the payment from escrow of all amounts finally determined to be owed.    Notwithstanding anything to the contrary in this Agreement, Purchaser expressly acknowledges that Seller's inability to assume and assign any Acquired Contracts, Acquired Real Property Leases, Acquired Personal Property Leases and/or Permits and Licenses by reason of Purchaser's failure to provide adequate assurance of future performance with respect thereto to the Bankruptcy Court's satisfaction shall have no effect on Purchaser's obligation to consummate the transactions set forth herein and any such Acquired Contracts, Acquired Real Property Leases, Acquired Personal Property Leases and/or Permits and Licenses Seller fails to so assume and assign at the Closing shall for all purposes thereafter be deemed Excluded Assets.

5.14    Transfer of 401(k) Plan.    As soon as practicable following (a) Purchaser's presentation to Seller of evidence reasonably satisfactory to Seller that Purchaser's 401(k) plan ("Purchaser's 401(k) Plan") meets the requirements for qualification under Section 401(a) of the Code, (b) Seller's presentation to Purchaser of evidence reasonably satisfactory to Purchaser that Seller's 401(k) plan ("Seller's 401(k) Plan") meets the requirements for qualification under Section 401(a) of the Code (including, without limitation, evidence reasonably satisfactory to Purchaser that the operational compliance failures identified in the most recent independent auditor's report for the Seller's 401(k) Plan have been fully corrected under the pending correction procedure process), and (c) the presentation to Seller of instructions for the transfer of the assets of Seller's 401(k) Plan to the trustee of Purchaser's 401(k) Plan, Seller shall cause to be transferred to Purchaser's 401(k) Plan the assets and liabilities, including participant loan receivables, from Seller's 401(k) Plan for the Transferred Employees (excluding those employees who retired effective on or prior to the date of transfer) in accordance with applicable requirements of the Code.  Purchaser shall direct the trustee of Purchaser's 401(k) Plan to accept such transfer of assets from Seller's 401(k) Plan. Upon such transfer of assets, Purchaser's 401(k) Plan shall assume the accrued benefit liabilities under Seller's 401(k) Plan solely with respect to the amount of the transferred accrued benefits with respect to the Transferred Employees and their respective beneficiaries. In order to implement this Section 5.14, Purchaser

46

and Seller shall cooperate in the exchange of information, the notification of Transferred Employees and the preparation of any documentation required to be filed with any governmental agency. Without limiting the generality of the foregoing, Seller shall promptly provide Purchaser with such documents and other information as Purchaser shall reasonably request to assure itself that the trust-to-trust transfer described herein may be accepted into Purchaser's 401(k) Plan in accordance with Applicable Law.    Notwithstanding the foregoing, Purchaser, in its sole discretion, may in lieu of a trustee-to-trustee transfer, allow direct rollovers of the account balances of Transferred Employees (including participant loan receivables) to Purchaser's 401(k) Plan; provided, for the avoidance of all doubt, that Purchaser shall either (x) accept a trustee-to-trustee transfer, or (y) direct rollover of any assets or liabilities of Seller's 401(k) Plan so long as Seller delivers evidence reasonably satisfactory to Purchaser that the operational compliance failures identified in the most recent independent auditor's report for the Seller's 401(k) Plan have been fully corrected under the pending correction procedure process and that the Seller's 401(k) Plan otherwise meets the requirements for qualification under Section 401(a) of the Code.

5.15    Purchased Assets held by Affiliates.  Without limiting Seller's obligations under Section 10.9 hereof, in the event that an Affiliate of Seller owns or holds any assets, rights or properties that, if owned or held by Seller at the Closing, would constitute Purchased Assets ("Wayward Assets"), Holdings shall cause each such Affiliate to transfer and assign, for no additional consideration, such Wayward Assets to Purchaser by transfer documents in form and content not inconsistent with the terms and provisions hereof and otherwise in form and content reasonably requested by Purchaser. At the Closing, Holdings shall execute and deliver the Holdings Assignment to Purchaser.

5.16    Purchased Assets at Palmyrita Site.  As soon as practicable following the Closing, Purchaser shall remove, or cause to be removed, all of the Purchased Assets located at the Palmyrita Site.  Seller shall grant, and use reasonable best efforts to cause the landlord under the Palmyrita Lease to grant, Purchaser and its representatives access to the Palmyrita Site during normal business hours as reasonably necessary to facilitate such removal.

5.17    Benefit Plan Cooperation.  Prior to the Closing, Seller shall cooperate in good faith with and provide reasonable assistance to Purchaser in connection with and to facilitate Purchaser and/or its Affiliates' establishment of new health, welfare and retirement plans for the Transferred Employees (including, without limitation, Seller's prompt execution and delivery of broker access and change of broker forms in respect of Benefit Plans in form and content reasonably satisfactory to Seller and the delivery of claims and other participant information, in each case, as reasonably requested by Purchaser and not prohibited or restricted by applicable law).

5.18    ERP/IT Cooperation and Access.  Without limiting the generality of Section 2.1(l) or Section 5.1, from the date of this Agreement to the earlier of the Closing or the date this Agreement is terminated, Seller shall, and shall cause its Affiliates to, cooperate in good faith (but at no material cost or expense to Seller) with and provide reasonable access and assistance to Purchaser and its Affiliates during normal business hours in connection with and to facilitate Purchaser's and/or its Affiliates' transitioning of any enterprise resource planning system or information technology system relating to the Business or the Purchased Assets to the enterprise

resource planning systems or information technology systems of Purchaser and/or its Affiliates so that such transitioning can be effectuated at Closing or as soon thereafter as possible.

ARTICLE VI

CONDITIONS PRECEDENT TO OBLIGATIONS
OF PURCHASER

The obligations of Purchaser at Closing under this Agreement are subject to the satisfaction (or waiver by Purchaser) of the following conditions precedent on or before the Closing Date:

6.1    Warranties True as of Present Date. Each of the representations and warranties of Seller contained in Sections 3.1, 3.2, 3.3, 3.4 and 3.18 (a) that are qualified as to Material Adverse Effect shall be true and correct in all respects as of the Closing Date as if made anew as of such date (except to the extent such representations and warranties expressly relate to an earlier date (in which case, as of such earlier date)), except to the extent of changes or developments contemplated by the terms of this Agreement or caused by the transactions contemplated hereby; and (b) that are not so qualified shall be true and correct (without giving effect to any qualifications as to "materiality," "Material Adverse Effect" or similar qualifications as to materiality) as of the Closing Date as if made anew as of such date (except to the extent such representations and warranties expressly relate to an earlier date (in which case, as of such earlier date)), except to the extent of changes or developments contemplated by the terms of this Agreement or caused by the transactions contemplated hereby and except for failures of such representations and warranties to be true and correct as do not and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

6.2    Compliance with Agreements and Covenants. Seller shall have performed and complied with all of the covenants, obligations and agreements contained in this Agreement to be performed and complied with by it on or prior to the Closing Date, in all material respects, including delivery of the documents referred to in Section 2.7(b).

6.3    No Prohibition. No law or injunction shall have been adopted, promulgated or entered by any Governmental Authority which prohibits, and no lawsuit or proceeding shall be pending, which would be reasonably expected to prohibit, the consummation of the transactions contemplated hereby.

6.4    Entry of Sale Order. The Sale Order shall have been entered by the Bankruptcy Court, shall be in full force and effect, shall not have been vacated, reversed, stayed, modified or amended in any manner not approved by Purchaser, shall have become final and no longer be subject to (or subject to a pending) appeal, vacatur, reversal or motion for reconsideration, and shall not be subject to a stay; provided, however, that if no person, entity or governmental unit has specifically questioned, challenged or objected to the good faith (as such term is used within the meaning of section 363 of the Bankruptcy Code) of Purchaser at or before the Sale Hearing (any such question, challenge or objection, a "Good Faith Objection"), and the Sale Order is not subject to a pending appeal, vacatur, reversal or motion for reconsideration based on a Good Faith Objection or the Bankruptcy Court's determination that Purchaser is a good faith purchaser

48

within the meaning of section 363 of the Bankruptcy Code (a "Pending Good Faith Review"), and is not subject to a stay, as of the Closing, then the Sale Order need only have been entered by the Bankruptcy Court and be in full force and effect and not subject to a stay as of the Closing.

6.5     No Material Adverse Effect. Since the date of this Agreement, no Material Adverse Effect shall have occurred.

Any waiver of a condition by Purchaser shall be effective only if such waiver is stated in writing and signed by Purchaser; provided, however, that the consent of Purchaser to the Closing shall constitute a waiver by Purchaser of any conditions to Closing as to Purchaser not satisfied as of the Closing Date.

ARTICLE VII

CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLER

The obligations of Seller at Closing under this Agreement are subject to the satisfaction (or waiver in writing by Seller) of the following conditions precedent on or before the Closing Date:

7.1     Warranties True as of Present Date. Each of the representations and warranties of Purchaser contained in ARTICLE IV (a) that are qualified as to "material adverse effect" shall be true and correct as of the Closing Date as if made anew as of such date (except to the extent such representations and warranties expressly relate to an earlier date (in which case, as of such earlier date)), except to the extent of changes or developments contemplated by the terms of this Agreement or caused by the transactions contemplated hereby, and (b) that are not so qualified shall be true and correct as of the Closing Date as if made anew as of such date (except to the extent such representations and warranties expressly relate to an earlier date (in which case, as of such earlier date)), except to the extent of changes or developments contemplated by the terms of this Agreement or caused by the transactions contemplated hereby and except for failures of the representations and warranties referred to in this clause (b) to be true and correct as do not and would not reasonably be expected to have, in the aggregate, a material adverse effect on Purchaser's ability to consummate the transactions contemplated hereby.

7.2     Compliance with Agreements and Covenants. Purchaser shall have performed and complied with all of its covenants, obligations and agreements contained in this Agreement to be performed and complied with by it on or prior to the Closing Date, in all material respects, including delivery of the documents referred to in Section 2.7(b) hereof.

7.3     No Prohibition. No law or injunction shall have been adopted, promulgated or entered by any Governmental Authority which prohibits, and no lawsuit or proceeding shall be pending, which would be reasonably expected to prohibit, the consummation of the transactions contemplated hereby.

7.4     Entry of Sale Order. The Sale Order shall have been entered by the Bankruptcy Court, shall be in full force and effect, shall not have been vacated, reversed, stayed, modified or amended in any manner not approved by Seller, shall have become final and no longer be subject

49

to (or subject to a pending) appeal, vacatur, reversal or motion for reconsideration, and shall not be subject to a stay; provided, however, that if no person, entity or governmental unit has made a Good Faith Objection at or before the Sale Hearing, and the Sale Order is not subject to a Pending Good Faith Review, and is not subject to a stay, as of the Closing, then the Sale Order need only have been entered by the Bankruptcy Court and be in full force and effect and not subject to a stay as of the Closing.

Any waiver of a condition by Seller shall be effective only if such waiver is stated in writing and signed by Seller; provided, however, that the consent of Seller to the Closing shall constitute a waiver by Seller of any conditions as to Seller to Closing not satisfied as of the Closing Date.

ARTICLE VIII

TERMINATION

8.1    Termination. This Agreement may be terminated at any time on or prior to the Closing Date:

(a)    With the mutual written consent of Purchaser and Seller;

(b)    By either Purchaser or Seller if the Closing shall not have occurred on or before June 10, 2021 (as extended pursuant to Section 8.1(k)) (the "Termination Date"); provided, the right to terminate this Agreement under this Section 8.1(b) shall not be available to any party whose failure to fulfill any obligation under this Agreement has been the primary cause of, or primarily resulted in, the failure of the Closing to occur on or before the Termination Date;

(c)    By Seller, if Purchaser shall have breached or failed to perform any of its representations, warranties, covenants or other agreements contained in this Agreement, which breach or failure to perform (A) would give rise to the failure of a condition set forth in Section 7.1 or Section 7.2 and (B) has not been or is incapable of being cured by Purchaser within ten (10) Business Days after its receipt of written notice thereof from Seller;

(d)    By Purchaser, if Seller shall have breached or failed to perform any of their representations, warranties, covenants or other agreements contained in this Agreement, which breach or failure to perform (A) would give rise to the failure of a condition set forth in Section 6.1 or Section 6.2 and (B) has not been or is incapable of being cured by Seller within ten (10) Business Days after their receipt of written notice thereof from Purchaser;

(e)    By Seller if (i) all of the conditions set forth in ARTICLE VI have been satisfied or waived (other than those conditions that by their terms are to be satisfied at the Closing) and (ii) Purchaser fails to proceed with and consummate the Closing within three Business Days after receipt of written notice from Seller that Seller is ready, willing and able to proceed with and consummate the Closing;

(f)    By Purchaser if (i) all of the conditions set forth in Article VII have been satisfied or waived (other than those conditions that by their terms are to be satisfied at the

50

Closing) and (ii) Seller fails to proceed with and consummate the Closing within three Business Days after receipt of written notice from Purchaser that Purchaser is ready, willing and able to proceed with and consummate the Closing;

(g)    By Purchaser, if (i) after the conclusion of the Auction if Purchaser is the Successful Bidder, Seller or any of its Affiliates take steps in furtherance of any Alternative Transaction or seeks to have the Bankruptcy Court enter an Order dismissing, or converting into cases under Chapter 7 of the Bankruptcy Code, any of the cases commenced by Seller under Chapter 11 of the Bankruptcy Code and comprising part of the Bankruptcy Case, or appointing a trustee in the Bankruptcy Case or appointing a responsible officer or an examiner with enlarged powers (other than a fee examiner) relating to the operation of Seller's business pursuant to Section 1104 of the Bankruptcy Code, or such an order of dismissal, conversion or appointment is entered for any reason and is not reversed or vacated within five (5) days after the entry thereof, or (ii) after the conclusion of the Auction if Purchaser is the Back-Up Bidder, Seller or any of its Affiliates take steps in furtherance of any Alternative Transaction other than that of the Successful Bidder or seeks to have the Bankruptcy Court enter an Order dismissing, or converting into cases under Chapter 7 of the Bankruptcy Code, any of the cases commenced by Seller under Chapter 11 of the Bankruptcy Code and comprising part of the Bankruptcy Case, or appointing a trustee in the Bankruptcy Case or appointing a responsible officer or an examiner with enlarged powers (other than a fee examiner) relating to the operation of Seller's business pursuant to Section 1104 of the Bankruptcy Code, or such an order of dismissal, conversion or appointment is entered for any reason and is not reversed or vacated within five (5) days after the entry thereof;

(h)    By either Purchaser or Seller if any Governmental Authority shall have issued an order, decree or ruling or taken any other action permanently restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement, and such order, decree, ruling or other action shall have become final and nonappealable;

(i)    [Reserved];

(j)    [Reserved]; or

(k)    By Purchaser if: (i) the Auction for the Riverside Facility shall not have been held, conducted and concluded on or before May 21, 2021; (ii) Purchaser is not selected and designated as the Successful Bidder or Back-Up Bidder in the Notice of Successful Bidder to be filed by Seller on or before May 23, 2021; (iii) the Sale Hearing shall not have been held and concluded on or before June 3, 2021; (iv) the Sale Order shall not have been entered on or before June 4, 2021; or (v) the Closing of the transactions contemplated by this Agreement shall not have occurred on or before June 10, 2021; provided that Seller and Purchaser may mutually agree in writing to extend such milestones. For the avoidance of doubt, Purchaser shall not have the right to terminate this Agreement pursuant to this Section 8.1(k) with respect to any of the milestone dates set forth in clauses (iii), (iv) and (v) of this Section 8.1(k)  (but no others) in the event that Seller has obtained agreement from the existing secured lenders having the right to approve the transaction timeline for the transaction contemplated herein an extension of the applicable date; provided, that no such date may be extended (A) by more than five Business Days or (B) more than once, in each case, without first obtaining Purchaser's written consent,

which consent Purchaser may grant or withhold in its sole discretion; and, provided further, that in the event the milestone dates set forth in clauses (iii), (iv) or (v) of this Section 8.1(k) are extended as provided herein, the Termination Date shall automatically be extended by the same amount of time.

Notwithstanding anything else contained in this Agreement, the right to terminate this Agreement under this Section 8.1 shall not be available to any party (a) that is in material breach of its obligations hereunder or (b) whose failure to fulfill its obligations or to comply with its covenants under this Agreement has been the primary cause of, or primarily resulted in, the failure to satisfy any condition to the obligations of either party hereunder.

8.2    Expenses. Except as otherwise provided in Section 10.15, whether or not the Closing occurs, all Expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such Expenses.  As used in this Agreement, "Expenses" means the out-of-pocket fees and expenses of the party's independent advisor, counsel and accountants, incurred or paid by the party or on its behalf in connection with this Agreement and the transactions contemplated hereby.

8.3    Effect of Termination.  In the event of termination of this Agreement by either Purchaser or Seller as provided in Section 8.1, this Agreement will forthwith become void and have no further force or effect, without any liability on the part of Purchaser or Seller; provided, however, that the provisions of Section 8.2, this Section 8.3, Section 2.6(a)(ii), Section 9.2 and Sections 10.11, 10.12 and 10.15 will survive any termination hereof; provided, further, however, that subject to the terms of this Section 8.3, nothing in this Section 8.3 shall relieve any party of any liability for any breach by such party of this Agreement prior to the date of any such termination. For the avoidance of all doubt, upon any termination of this Agreement pursuant to Section 8.1(c) or (e) above, (a) Seller shall have the right to collect the Deposit (and all interest accrued thereon) from the Escrow Holder as liquidated damages in accordance with Section 2.6(a)(ii) above and (b) Purchaser and Seller shall deliver a joint written instruction, in accordance with the Escrow Agreement, to the Escrow Holder instructing the Escrow Holder to disburse the Deposit (and all interest accrued thereon), less an amount equal to Seller's share of the Escrow Holder's fees and charges, to Seller.  In connection with any termination pursuant to this Agreement (other than pursuant to Section 8.1(c) or Section 8.1(e)), (i) Purchaser shall be entitled to the prompt return of the Deposit (and all interest accrued thereon), less an amount equal to Purchaser's share of the Escrow Holder's fees and charges and (ii) Purchaser and Seller shall deliver a joint written instruction, in accordance with the Escrow Agreement, to the Escrow Holder instructing the Escrow Holder to disburse the Deposit (and all interest accrued thereon) to Purchaser.

ARTICLE IX

BANKRUPTCY COURT MATTERS

9.1    Motion for Approvals.

(a)    No later than the times set forth in the Bid Procedures Order (as may be modified pursuant to the terms thereof with the prior written consent of Purchaser to the extent

52

such modifications relate to this Agreement and adversely affect Purchaser, such consent not to be unreasonably withheld), Seller will (subject to Purchaser's and Seller's rights and obligations set forth in Section 9.1(c) below) make all filings and give all notices, relating to this Agreement as Seller is required to make and give pursuant to the Bid Procedures Order (as may be modified pursuant to the terms thereof with the prior written consent of Purchaser to the extent such modifications relate to this Agreement and adversely affect Purchaser, such consent not to be unreasonably withheld). Seller shall take all actions as may be reasonably necessary to obtain entry of the Sale Order, including furnishing affidavits, declarations or other documents or information for filing with the Bankruptcy Court. Purchaser agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining entry of the Sale Order and a finding of adequate assurance of future performance by Purchaser, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" Purchaser under Section 363(m) of the Bankruptcy Code. Both Purchaser's and Seller's obligations to consummate the transactions contemplated in this Agreement shall be conditioned upon the Bankruptcy Court's entry of the Sale Order. If the Bankruptcy Court refuses to issue the Sale Order or to approve a sale of the Purchased Assets to Purchaser at the Sale Hearing, then this transaction shall automatically terminate and Seller and the Purchaser shall be relieved of any further liability or obligation hereunder. In the event that a third party (an "Upset Purchaser" and the underlying purchase agreement between the Upset Purchaser and Seller, the "Upset Agreement") is approved by the Bankruptcy Court as the purchaser of the Purchased Assets at the Sale Hearing, and Purchaser's bid as reflected in this Agreement is the next highest bid at the Auction, then notwithstanding anything to the contrary in this Agreement, this Agreement shall not terminate, but rather shall become a "back-up bid" which shall (subject to Purchaser's other rights of termination hereunder) remain open for acceptance by Seller until the closing of the sale transaction with the Upset Purchaser, but subject and subordinate in all respects to the rights of the Upset Purchaser under the Upset Agreement. Upon entry of the Sale Order in accordance with the provisions of this Section 9.1(a), the condition set forth in this Section 9.1(a) shall conclusively be deemed satisfied.

(b)     If the Sale Order or any other orders of the Bankruptcy Court relating to this Agreement or the transactions contemplated hereby are appealed by any Person (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacatur, stay, rehearing or re-argument shall be filed with respect to the Bid Procedures Order (as may be modified pursuant to the terms thereof with the prior written consent of Purchaser, not to be unreasonably withheld) and the Sale Order, or other such order) subject to the rights otherwise arising from this Agreement, Seller shall take all actions as may be reasonably necessary to prosecute such appeal, petition or motion and obtain an expedited resolution of any such appeal, petition or motion; provided, however, nothing herein shall be deemed to require Seller to so pursue any such appeal or other actions beyond the Termination Date if this Agreement is terminated in accordance with its terms after the Termination Date.

(c)     Purchaser and Seller shall consult with each other regarding pleadings, notices and filings that any of them intends to file with the Bankruptcy Court in connection with, or which might reasonably be expected to adversely affect, the Bankruptcy Court's approval of

the Sale Order, including, sharing in advance any drafts for the other's review and comment, it being agreed that each party shall give reasonable consideration to, and incorporate into the relevant pleading, notice or filing, any reasonable comments the other(s) may provide within a reasonable time prior to the filing of any such pleading, notice or filing. No party hereto shall seek any modification to the Sale Order by the Bankruptcy Court or any other Governmental Authority of competent jurisdiction to which a decision relating to the Bankruptcy Case has been appealed, in each case, without prior written consent of the other(s) in its/their sole discretion.

9.2     Bidding Procedures.    Purchaser and Seller acknowledge entry of the Bid Procedures Order. Seller shall take all actions as may be reasonably necessary to carry out the process contemplated in the Bidding Procedures, including (i) holding the Auction for the Riverside Facility on or before May 21, 2021, and (ii) filing and having entered the Sale Order on or before June 4, 2021.

ARTICLE X

MISCELLANEOUS

10.1     Amendment. This Agreement may be amended, modified or supplemented only in a writing signed by Purchaser and Seller.

10.2     Notices. Any notice, request, instruction or other document to be given hereunder by a party hereto shall be in writing and shall be deemed to have been given (i) when received if given in person or by courier or a courier service, (ii) on the date of transmission if sent by confirmed electronic mail, (iii) on the next Business Day if sent by an overnight delivery service, or (iv) five Business Days after being deposited in the U.S. mail, certified or registered mail, postage prepaid:

(a)     If to Seller, addressed as follows:

CarbonLite Industries, LLC
c/o Force 10 Partners
5271 California Avenue, Suite 270
Irvine, CA 92617
Attn: Mr. Brian Weiss
Email: bweiss@force10partners.com

With a copy (which shall not constitute notice) to:

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Attention: Gabriel I Glazer, Esq. and Steven W. Golden, Esq.
Email: gglazer@pszjlaw.com and sgolden@pszjlaw.com

(b)     If to Purchaser, addressed as follows:

TSG Shelf II Acquisition, LLC
c/o The Sterling Group, L.P.
9 Greenway Plaza, Suite 2400
Houston, Texas 77046
Attention: Scott Maclaren; Max Klupchak
Email: smaclaren@sterling-group.com; mklupchak@sterling-group.com

with a copy (which shall not constitute notice) to:

Willkie Farr & Gallagher LLP
600 Travis Street, Suite 2100
Houston, Texas 77002
Attention: Bruce C. Herzog and Paul Shalhoub
Email: bherzog@willkie.com and pshalhoub@willkie.com

or to such other individual or address as a party hereto may designate for itself by notice given as herein provided.

10.3    Waivers. The failure of a party hereto at any time or times to require performance of any provision hereof shall in no manner affect its right at a later time to enforce the same. No waiver by a party of any condition or of any breach of any term, covenant, representation or warranty contained in this Agreement shall be effective unless in writing, and no waiver in any one or more instances shall be deemed to be a further or continuing waiver of any such condition or breach in other instances or a waiver of any other condition or breach of any other term, covenant, representation or warranty.

10.4    Counterparts. This Agreement may be executed in counterparts and such counterparts may be delivered in electronic format (including by email). Such delivery of counterparts shall be conclusive evidence of the intent to be bound hereby and each such counterpart and copies produced therefrom shall have the same effect as an original. To the extent applicable, the foregoing constitutes the election of the Parties to invoke any law authorizing electronic signatures.

10.5    Interpretation. The headings preceding the text of Articles and Sections included in this Agreement and the headings to Sections of the Disclosure Schedule are for convenience only and shall not be deemed part of this Agreement or the Disclosure Schedule or be given any effect in interpreting this Agreement or the Disclosure Schedule. The use of the masculine, feminine or neuter gender herein shall not limit any provision of this Agreement. The use of the terms "including" or "include" shall in all cases herein mean "including, without limitation" or "include, without limitation," respectively. The term "made available to Purchaser" means made available in the Data Room at least two (2) Business Days prior to the date hereof. Underscored references to Articles, Sections, Exhibits or Schedules shall refer to those portions of this Agreement. Time is of the essence of each and every covenant, agreement and obligation in this Agreement. Neither Purchaser nor Seller shall be deemed to be in breach of any covenant contained in this Agreement if such party's deemed breach is the result of any action or inaction on the part of the other.

55

10.6   Applicable Law. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF DELAWARE WITHOUT GIVING EFFECT TO THE PRINCIPLES OF CONFLICTS OF LAW THEREOF.

10.7   Binding Agreement; Assignment. This Agreement and the Related Agreements shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns; provided that neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned (including by operation of law) by any party without the prior written consent of the other party(ies). For all purposes hereof, a transfer, sale or disposition of a majority of the capital stock or other voting interest of a party (whether by contract or otherwise) shall be deemed an assignment requiring consent hereunder.   Any purported assignment in contravention of this Section 10.7 shall be null and void. Notwithstanding the foregoing or anything else in this Agreement to the contrary, Purchaser may (a) transfer or assign its rights, interests or obligations under this Agreement, in whole or from time to time in part, to one or more of its Affiliates, provided that Purchaser will remain liable for the performance of its obligations and will provide notice to Seller of such assignment and (b) collaterally assign its rights hereunder to any lender of Purchaser.

10.8   Third Party Beneficiaries. This Agreement is solely for the benefit of the parties hereto and no provision of this Agreement shall be deemed to confer upon third parties, either express or implied, any remedy, claim, liability, reimbursement, cause of action or other right.

10.9   Further Assurances. Upon the reasonable request of Purchaser or Seller, each party will on and after the Closing Date execute and deliver to the other parties such other documents, assignments and other instruments as may be reasonably required (without imposing any material monetary obligations or other obligations beyond those specifically imposed on the cooperating party(ies) by the other provisions of this Agreement or the Related Agreements) to effectuate completely the transactions contemplated hereby, and to effect and evidence the provisions of this Agreement and the Related Agreements and the transactions contemplated hereby.   For the avoidance of doubt, as to Seller, the obligations set forth in this Section 10.9 shall lapse and cease to be of any further force or effect upon the closing of the Bankruptcy Case.

10.10   Entire Understanding. The Exhibits, Schedules and Disclosure Schedules identified in this Agreement are incorporated herein by reference and made a part hereof.  This Agreement and the Related Agreements set forth the entire agreement and understanding of the parties hereto and supersedes any and all prior agreements, arrangements and understandings among the parties.

10.11   EXCLUSIVE JURISDICTION OF BANKRUPTCY COURT. IN THE EVENT ANY PARTY TO THIS AGREEMENT COMMENCES ANY LITIGATION, PROCEEDING OR OTHER LEGAL ACTION IN CONNECTION WITH OR RELATING TO THIS AGREEMENT, ANY RELATED AGREEMENT OR ANY MATTERS DESCRIBED OR CONTEMPLATED HEREIN OR THEREIN, THE PARTIES TO THIS AGREEMENT HEREBY (A) AGREE ANY LITIGATION, PROCEEDING OR OTHER LEGAL ACTION SHALL BE INSTITUTED ONLY IN THE BANKRUPTCY COURT, WHICH SHALL HAVE SOLE AND EXCLUSIVE JURISDICTION OVER ANY SUCH MATTERS; (B) CONSENT

AND SUBMIT TO PERSONAL JURISDICTION OF THE BANKRUPTCY COURT AND TO SERVICE OF PROCESS UPON THEM IN ACCORDANCE WITH THE RULES AND STATUTES GOVERNING SERVICE OF PROCESS; AND (C) AGREE TO WAIVE TO THE FULL EXTENT PERMITTED BY LAW ANY OBJECTION THAT THEY MAY NOW OR HEREAFTER HAVE TO THE VENUE OF ANY SUCH LITIGATION, PROCEEDING OR ACTION IN ANY SUCH COURT OR THAT ANY SUCH LITIGATION, PROCEEDING OR ACTION WAS BROUGHT IN AN INCONVENIENT FORUM.

10.12  WAIVER OF JURY TRIAL. EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH SUCH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (i) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (ii) EACH PARTY UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (iii) EACH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (iv) EACH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.12.

10.13  Disclosure Schedule. The inclusion of information in the Disclosure Schedule shall not be construed as an admission that such information is material to Seller or the Business. In addition, matters reflected in the Disclosure Schedule are not necessarily limited to matters required by this Agreement to be reflected in the Disclosure Schedule. Such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature. Neither the specifications of any dollar amount in any provision of this Agreement nor the inclusion of any specific item in the Disclosure Schedule is intended to imply that such amount, or higher or lower amounts, or the item so included or other items, are or are not material, and no party shall use the fact of the setting forth of any such amount or the inclusion of any such item in any dispute or controversy between the parties as to whether any obligation, item or matter not described herein or included in the Disclosure Schedule is or is not material for purposes of this Agreement. Further, neither the specification of any item or matter in any representation, warranty or covenant contained in this Agreement nor the inclusion of any specific item in the Disclosure Schedule is intended to imply that such item or matter, or other items or matters, are or are not in the ordinary course of business, and no party shall use the fact of setting forth or the inclusion of any such items or matter in any dispute or controversy between the parties as to whether any obligation, item or matter not described herein or included in the Disclosure Schedule is or is not in the ordinary course of business for purposes of this Agreement. Provided that any such amended disclosure does not materially affect the value of the Purchased Assets or result in additional liability to Purchaser, Purchaser and Seller may mutually agree at any time prior to Closing to amend all schedules to correct errors and to add omitted items, or new items that first arise or occur after the date hereof. The sections of the

Disclosure Schedule described in <u>Section 2.1(i)</u>, <u>Section 2.1(j)</u>, <u>Section 2.1(m)</u>, <u>Section 2.1(q)</u>, <u>Section 2.8</u> and <u>Section 5.5(a)</u> shall be amended at the times, and subject to the terms and conditions, specified therein. Seller shall update <u>Section 3.6(g)</u> of the Disclosure Schedule (i) at least five Business Days prior to the Closing to reflect an accurate list of the final Cure Costs and (ii) at the times, and subject to the terms and conditions specified in <u>Section 2.1(o)</u>.

10.14  <u>Severability</u>. Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other situation or in any other jurisdiction. If the final judgment of a court of competent jurisdiction declares that any term or provision hereof is invalid or unenforceable, the parties agree that the court making the determination of invalidity or unenforceability shall have the power to reduce the scope, duration, or area of the term or provision, to delete specific words or phrases, or to replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and this Agreement shall be enforceable as so modified after the expiration of the time within which the judgment may be appealed.

10.15  <u>Attorneys' Fees</u>. In the event that Seller or Purchaser bring an action or other proceeding to enforce or interpret the terms and provisions of this Agreement, the prevailing party(ies) in that action or proceeding shall be entitled to have and recover from the non-prevailing party(ies) all such reasonable, out of pocket fees, costs and expenses (including, without limitation, all court costs and reasonable attorneys' fees) as the prevailing party(ies) may suffer or incur in the pursuit or defense of such action or proceeding.

10.16  <u>Construction</u>. The parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, the language shall be construed as mutually chosen by the parties to express their mutual intent, and no rule of strict construction shall be applied against any party. Any reference to any federal, state, local, or foreign statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise.

10.17  [Reserved].

10.18  <u>Survival</u>. Except for Purchaser's representations and acknowledgments set forth in <u>Sections 4.5</u> and 4.7 hereof and Seller's representations set forth in <u>Sections 3.1</u>, <u>3.2</u> and 3.18 of this Agreement (all of which shall survive and continue in force following the Closing) and without in any way affecting Seller's disclaimer set forth in <u>Section 3.22</u> hereof, the respective representations and warranties of Purchaser and Seller under this Agreement shall lapse and cease to be of any further force or effect effective immediately following the Closing. Except as provided in the immediately preceding sentence, the covenants and agreements of Seller and Purchaser herein, or in any certificates or other documents delivered prior to or at the Closing, shall not be deemed waived or otherwise affected by the Closing.

10.19  <u>No Vicarious Liability</u>. This Agreement may only be enforced against the parties hereto and their respective successors and permitted assigns. Any Claims or Proceedings that

may be based upon, arise out of, or relate to this Agreement or the negotiation, execution or performance of this Agreement (including any representation or warranty made in or in connection with this Agreement or as an inducement to enter into this Agreement) may be made only against the Persons that are signatories to this Agreement, and their respective successors and permitted assigns, and no agent, Affiliate or representative of any such Person (including any Person negotiating or executing this Agreement on behalf of such Person) will have any liability with respect to this Agreement or with respect to any Claim that may arise out of or relate to this Agreement, or the negotiation, execution, or performance of this Agreement (including a representation or warranty made in connection with this Agreement or as an inducement to enter into this Agreement). Nothing in this Section 10.19 will impair or adversely affect the rights of Purchaser or any other Person set forth in any other Contract executed and delivered in connection with the consummation of the transactions contemplated under this Agreement and the Related Agreements.

10.20   Specific Performance.   The parties agree that irreparable damage would occur if any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached. Accordingly, from and after the entry of the Sale Order, Seller, on the one hand, and Purchaser on the other hand, will be entitled to obtain an injunction or injunctions to prevent breach of the provisions of this Agreement and to enforce specifically this Agreement and its terms and provisions, without the necessity of proving the inadequacy of money damages as a remedy, in addition to any other remedy to which they may be entitled, at law or in equity.

*[Signature page follows]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered as of the date first above written.

**SELLER:**

**CarbonLite Industries, LLC**, a Delaware limited liability company and Debtor and Debtor in Possession

By: _____
    Name: Brian Weiss
    Title:  Chief Restructuring Officer

**PURCHASER:**

**TSG Shelf II Acquisition, LLC**, a Delaware limited liability company

By: _____
    Name: Scott MacLaren
    Title:  Vice President

THE UNDERSIGNED HEREBY JOINS IN THIS AGREEMENT FOR THE LIMITED PURPOSE EXPRESSLY SET FORTH IN THE PREAMBLE TO THIS AGREEMENT:

CarbonLite Holdings LLC, a Delaware limited liability company

By: _____
Name: Brian Weiss
Title:  Chief Restructuring Officer

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered as of the date first above written.

**SELLER:**

**CarbonLite Industries, LLC,** a Delaware limited liability company and Debtor and Debtor in Possession

By:_____
     Name: Brian Weiss
     Title:  Chief Restructuring Officer

**PURCHASER:**

**TSG Shelf II Acquisition, LLC,** a Delaware limited liability company

By:_____
     Name: Scott MacLaren
     Title:  Vice President

THE UNDERSIGNED HEREBY JOINS IN THIS AGREEMENT FOR THE LIMITED PURPOSE EXPRESSLY SET FORTH IN THE PREAMBLE TO THIS AGREEMENT:

CarbonLite Holdings LLC, a Delaware limited liability company

By: _____
Name: Brian Weiss
Title:  Chief Restructuring Officer

*Signature Page for Asset Purchase Agreement*

SCHEDULES AND EXHIBITS

[See attached]

EXHIBIT "A"

FORM OF NOTE PURCHASE AGREEMENT

[See attached]

NOTE PURCHASE AGREEMENT

dated as of [_____], 2021

among

TSG SHELF II ACQUISITION PARENT, LLC,
as Holdings,

TSG SHELF II ACQUISITION, LLC
as Issuer,

THE SUBSIDIARY GUARANTORS PARTY HERETO

THE NOTEHOLDERS PARTY HERETO,

and

UMB BANK, N.A.
as Agent

$21,000,000 Senior Secured Fixed Rate Notes

# TABLE OF CONTENTS

ARTICLE I DEFINITIONS ...................................................................................................1
    Section 1.01  Certain Defined Terms.............................................................................1
    Section 1.02  Terms Generally....................................................................................27
    Section 1.03  Accounting Terms..................................................................................28

ARTICLE II THE NOTES ..................................................................................................28
    Section 2.01  Sale and Purchase of Notes...................................................................28
    Section 2.02  Issuance of the Notes.............................................................................28
    Section 2.03  Termination and Reduction of the Commitments...................................28
    Section 2.04  Repayment of Notes; Evidence of Debt................................................29
    Section 2.05  Prepayment of the Notes.......................................................................29
    Section 2.06  Agent Fees. ...........................................................................................31
    Section 2.07  Interest..................................................................................................31
    Section 2.08  [Reserved].............................................................................................32
    Section 2.09  Taxes.....................................................................................................32
    Section 2.10  Payments Generally; Pro Rata Treatment; Sharing of Setoffs...................35
    Section 2.11  Mitigation Obligations..........................................................................36
    Section 2.12  Acknowledgement and Consent to Bail-In of EEA Financial
                Institutions..........................................................................................36
    Section 2.13  Additional Notes. .................................................................................37

ARTICLE III REPRESENTATIONS AND WARRANTIES .............................................38
    Section 3.01  Due Organization, Etc...........................................................................38
    Section 3.02  Authorization, Etc. ...............................................................................38
    Section 3.03  No Conflict............................................................................................39
    Section 3.04  Approvals, Etc. .....................................................................................39
    Section 3.05  Use of Proceeds....................................................................................39
    Section 3.06  Litigation...............................................................................................39
    Section 3.07  Environmental Matters..........................................................................40
    Section 3.08  Compliance with Laws and Obligations. ..............................................41
    Section 3.09  No Material Adverse Effect...................................................................41
    Section 3.10  Intellectual Property; Licenses..............................................................41
    Section 3.11  Taxes.....................................................................................................41
    Section 3.12  [Reserved].............................................................................................42
    Section 3.13  Solvency................................................................................................42
    Section 3.14  Regulatory Restrictions on the Notes. ..................................................42
    Section 3.15  Title; Security Documents. ....................................................................42
    Section 3.16  ERISA...................................................................................................42
    Section 3.17  Insurance...............................................................................................43
    Section 3.18  [Reserved].............................................................................................43
    Section 3.19  Capital Stock and Related Matters.........................................................43
    Section 3.20  [Reserved].............................................................................................43
    Section 3.21  [Reserved].............................................................................................43

Section 3.22   No Bank Accounts. ................................................................43
Section 3.23   No Default or Event of Default................................................43
Section 3.24   Foreign Assets Control Regulations. .......................................44
Section 3.25   Commercial Activity; Absence of Immunity............................44

ARTICLE IV CONDITIONS .................................................................................44
Section 4.01   Conditions to the Closing Date. ..............................................44
Section 4.02   [Reserved]. ............................................................................48

ARTICLE V AFFIRMATIVE COVENANTS..........................................................48
Section 5.01   Corporate Existence; Etc........................................................48
Section 5.02   Conduct of Business. ..............................................................48
Section 5.03   Compliance with Laws and Obligations. .................................48
Section 5.04   [Reserved]. ............................................................................48
Section 5.05   Maintenance of Title. ..............................................................49
Section 5.06   [Reserved]. ............................................................................49
Section 5.07   Keeping of Books. ..................................................................49
Section 5.08   [Reserved]. ............................................................................49
Section 5.09   Taxes. .....................................................................................49
Section 5.10   Financial Statements; Other Reporting Requirements.............49
Section 5.11   Notices. ..................................................................................50
Section 5.12   Noteholder Calls. ...................................................................51
Section 5.13   [Reserved]. ............................................................................51
Section 5.14   Security. ..................................................................................51
Section 5.15   Further Assurances..................................................................51
Section 5.16   Additional Collateral; Additional Guarantors..........................51
Section 5.17   [Reserved]. ............................................................................53
Section 5.18   Intellectual Property................................................................53
Section 5.19   Certain Post-Closing Obligations. ..........................................54
Section 5.20   Additional Covenants..............................................................54

ARTICLE VI NEGATIVE COVENANTS ..............................................................54
Section 6.01   [Reserved]. ............................................................................54
Section 6.02   Indebtedness...........................................................................54
Section 6.03   Liens, Etc. ..............................................................................55
Section 6.04   Investments. ...........................................................................57
Section 6.05   Change of Jurisdiction, Corporate Name or Location; Change of
                        Fiscal Year; Business Activities. .............................................58
Section 6.06   Restricted Payments................................................................59
Section 6.07   Fundamental Changes; Asset Dispositions..............................59
Section 6.08   [Reserved]. ............................................................................60
Section 6.09   Transactions with Affiliates.....................................................61
Section 6.10   Passive Holding Company.......................................................61
Section 6.11   No Further Negative Pledge.....................................................61
Section 6.12   Limitations on Restricted Actions. ..........................................62

Section 6.13   [Reserved]. .................................................................................................62
Section 6.14   No Hedging or Speculative Transactions. ..................................................62

ARTICLE VII EVENTS OF DEFAULT..................................................................................62
Section 7.01   Events of Default. .........................................................................................62
Section 7.02   Application of Proceeds. ...............................................................................66

ARTICLE VIII THE AGENT...................................................................................................66
Section 8.01   Appointment and Authorization of the Agent. ...........................................66
Section 8.02   Rights as a Noteholder. .................................................................................67
Section 8.03   Duties of Agent; Exculpatory Provisions. ...................................................67
Section 8.04   Reliance by Agent. ........................................................................................68
Section 8.05   Delegation of Duties. .....................................................................................69
Section 8.06   [Reserved]. .....................................................................................................69
Section 8.07   Resignation of Agent. ....................................................................................69
Section 8.08   Non-Reliance on Agent or Other Noteholders.............................................70
Section 8.09   No Other Duties; Etc. .....................................................................................70
Section 8.10   Agent May File Proofs of Claim; Credit Bidding........................................70
Section 8.11   Collateral and Guaranty Matters ..................................................................71
Section 8.12   Withholding Taxes..........................................................................................73

ARTICLE IX GUARANTY .......................................................................................................74
Section 9.01   Guaranty. ........................................................................................................74
Section 9.02   Guaranty Unconditional. ...............................................................................74
Section 9.03   Discharge Only Upon Payment in Full; Reinstatement in Certain
               Circumstances. ..............................................................................................75
Section 9.04   Waiver by the Guarantors. ............................................................................75
Section 9.05   Subrogation. ...................................................................................................76
Section 9.06   Acceleration. ..................................................................................................76
Section 9.07   Subordination. ................................................................................................76
Section 9.08   Contribution with Respect to Guaranty Obligations.....................................76

ARTICLE X MISCELLANEOUS...............................................................................................77
Section 10.01 Notices. ..........................................................................................................77
Section 10.02 Waivers; Amendments....................................................................................78
Section 10.03 Expenses; Indemnity; Etc. .............................................................................79
Section 10.04 Successors and Assigns...................................................................................81
Section 10.05 Survival. ..........................................................................................................84
Section 10.06 Counterparts; Integration; Effectiveness........................................................84
Section 10.07 Severability. ....................................................................................................85
Section 10.08 Right of Setoff. ...............................................................................................85
Section 10.09 Governing Law; Jurisdiction; Etc. .................................................................85
Section 10.10 Headings. ........................................................................................................86
Section 10.11 Confidentiality. ...............................................................................................86
Section 10.12 No Third Party Beneficiaries. .........................................................................88

Section 10.13 Reinstatement.............................................................................................88
Section 10.14 USA PATRIOT Act....................................................................................88

| | |
|---|---|
| Annex I | Commitments |
| Schedule 3.01(b) | Equity Shareholders |
| Schedule 3.07 | Environmental Matters |
| Schedule 3.11 | Taxes |
| Schedule 3.17 | Insurance |
| Schedule 3.19(b) | Subsidiaries |
| Schedule 5.04 | Governmental Authorizations |
| Schedule 5.20 | Certain Post-Closing Obligations |
| Schedule 6.02 | Permitted Indebtedness |
| Schedule 6.03 | Permitted Liens |
| Schedule 6.04 | Permitted Investments |
| Schedule 6.11 | Permitted Negative Pledges |
| Schedule 6.12 | Permitted Restrictive Actions |
| | |
| Exhibit A | Form of Assignment and Assumption |
| Exhibits B-1 through B-4 | Tax Certificates |
| Exhibit C | Form of Note |
| Exhibit D | Additional Covenants |

This NOTE PURCHASE AGREEMENT is dated as of [_____], 2021, among TSG SHELF II ACQUISITION, LLC, a Delaware limited liability company (the "Issuer"), TSG SHELF II ACQUISITION PARENT, LLC, a Delaware limited liability company ("Holdings"), CERTAIN SUBSIDIARIES OF THE ISSUER, as Subsidiary Guarantors, the noteholders from time to time party hereto (collectively, the "Noteholders" and individually, a "Noteholder") and UMB Bank, N.A., as Agent.

WHEREAS, pursuant that certain Asset Purchase Agreement, dated as of [_____], 2021 (the "Purchase Agreement"), by and among CarbonLite Recycling, LLC, a Delaware limited liability company, CarbonLite Industries, LLC, a Delaware limited liability company (collectively, the "Sellers") and the Issuer, the Issuer has agreed to purchase from the Sellers, and the Sellers have agreed to sell to the Noteholder, pursuant to, among other provisions thereof, Section 363 of Chapter 11 of Title 11 of the Bankruptcy Code, the Purchased Assets;

WHEREAS, the Issuer desires to issue the Notes in an aggregate amount equal to $21,000,000 to the Noteholders as the Note Consideration contemplated under the Purchase Agreement on the terms and conditions set forth herein;

WHEREAS, each of the Note Parties has agreed to secure all of its Obligations by granting to Agent, for the benefit of Secured Parties, a Lien on substantially all of its assets, including a pledge of all of the equity interests of certain of its Subsidiaries on the terms and conditions set forth herein and the Security Documents;

WHEREAS, the Guarantors have agreed to guarantee the obligations of the Issuer hereunder pursuant to Article IX hereof, and to secure their respective Obligations by granting to Agent, for the benefit of Secured Parties, a Lien on substantially all of their respective assets, including a pledge of all of the equity interests of certain of their respective Subsidiaries on the terms and conditions set forth herein and the Security Documents; and

WHEREAS, the Noteholders are willing to accept the Notes issued by the Issuer on the Closing Date as the Note Consideration on the terms and subject to the conditions set forth herein.

NOW, THEREFORE, in consideration of the premises and the agreements, provisions and covenants herein contained, the parties hereto agree as follows:

ARTICLE I

DEFINITIONS

Section 1.01  Certain Defined Terms. As used in this Agreement, the following terms shall have the following meanings:

"ABL Priority Collateral" means any Note Party's (i) accounts or proceeds arising from the sale of inventory or the provision of services, (ii) segregated proceeds of the foregoing (including any deposit accounts, securities accounts or commodities accounts holding solely such

proceeds), (iii) books and records relating to the foregoing, (iv) other assets related to the foregoing that would customarily secure any asset-based facility with priority over the Liens securing a secured term loan or note purchase facility in a split collateral structure, (v) supporting obligations in respect of any of the property described in the foregoing clauses (i) through (iv) and (vi) substitutions, replacements, accessions, products or proceeds of any of the property described in the foregoing clauses (i) through (v).

"Acquisition" means the acquisition by the Issuer of the Purchased Assets pursuant to the Purchase Agreement.

"Additional Agreement" has the meaning assigned to such term in Section 8.01(c).

"Additional Covenants" means the covenants of the Issuer and the other Note Parties as set forth in Exhibit D hereto.

"Additional Notes" has the meaning assigned to such term in Section 2.13.

"Additional Notes Amendment" has the meaning assigned to such term in Section 2.13.

"Affected Property" means any property of any Note Party that suffers an Event of Loss.

"Affiliate" means, with respect to a specified Person, another Person that at such time directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified. Each Guarantor and Non-Guarantor Subsidiary shall be considered an "Affiliate" of the Issuer.

"Agent" means UMB Bank, N.A., in its capacity as administrative agent and collateral agent for the Secured Parties under the Note Documents, and any successor thereto pursuant to Article VIII.

"Agent Fee Letter" means the fee letter, dated as of the Closing Date, between the Issuer and the Agent.

"Agreement" means this Note Purchase Agreement, as amended, restated, replaced, supplemented or otherwise modified from time to time.

"Allocable Amount" has the meaning assigned to such term in Section 9.08(a).

"Anti-Corruption Laws" means any law, rule or regulation of any jurisdiction relating to bribery or corruption in which any Note Party performs business or any jurisdiction otherwise applicable to Holdings and its Subsidiaries, including without limitation, the FCPA and where applicable, legislation relating to bribery or corruption enacted by member states and signatories implementing the OECD Convention Combating Bribery of Foreign Officials.

"Anti-Corruption Prohibited Activity" means the offering, payment, promise to pay, authorization of the payment of any money or the offer, promise to give, giving, or authorizing the giving of anything of value, to any Government Official or to any person under the circumstances

where the Person, such Person's Affiliate's or such Person's representative knew or had reason to know that all or a portion of such money or thing of value would be offered, given or promised, directly or indirectly, to any Government Official, for the purpose of (a) influencing any act or decision of such Government Official in his or her official capacity, (b) inducing such Government Official to do or omit to do any act in relation to his or her lawful duty, (c) securing any improper advantage, or (d) inducing such Government Official to influence or affect any act or decision of any Governmental Authority, in each case, in order to assist such Person in obtaining or retaining business for or with, or in directing business to, any Person.

"Anti-Money Laundering Laws" means the U.S. Currency and Foreign Transaction Reporting Act of 1970, as amended, and all money laundering-related laws of the United States and other jurisdictions where such Person conducts business or owns assets, and any related or similar law issued, administered or enforced by any Governmental Authority.

"Applicable Law" means with respect to any Person, property or matter, any of the following applicable thereto: any constitution, writ, injunction, statute, law, regulation, ordinance, rule, judgment, principle of common law, order, decree, court decision, Authorization, approval, concession, grant, franchise, license, agreement, directive, guideline, policy, requirement, or other governmental restriction or any similar form of decision of, or determination by, or any interpretation or administration of any of the foregoing, by any Governmental Authority, whether in effect as of the date hereof or thereafter and in each case as amended, including Environmental Laws.

"Assignment and Assumption" means an assignment and assumption entered into by a Noteholder and an assignee (with the consent of any party whose consent is required by Section 10.04), in the form of Exhibit A or any other form approved by the Required Noteholders.

"Authorization" means any consent, waiver, variance, registration, filing, declaration, agreement, notarization, certificate, license, tariff, approval, permit (including water and environmental permits), order, authorization, exception or exemption from, by or with any Governmental Authority, whether given by express action or deemed given by failure to act within any specified period, and all corporate, creditors', shareholders' and partners' approvals or consents.

"Authorized Representative" means, with respect to any Person, the chief executive officer, the chief financial officer, president, secretary, assistant secretary or any other officer or authorized representative of such Person as may be designated from time to time by such Person in writing by a notice delivered to the Agent and the Noteholders. Any document or certificate delivered under the Note Documents that is signed by an Authorized Representative may be conclusively presumed by the Agent and Noteholders to have been authorized by all necessary corporate, limited liability company or other action on the part of the relevant Person.

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"Bail-In Legislation" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European

Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"Bankruptcy Code" means Title 11, United States Code.

"Board" means the Board of Governors of the Federal Reserve System of the United States of America.

"Business" means, collectively, (A) the recycling and/or conversion of PET materials into products for resale directly or through one or more Subsidiaries, including (i) the acquisition of plastic waste or any derivative products thereof, (ii) the recycling of plastic waste or any derivative products thereof, including all aspects of the recycling process, (iii) the sale to other converters of PET or any derivative products thereof and (iv) the conversion of PET into finished products, including but not limited to rPET Resins; and (B) activities reasonably related or incidental thereto or representing a reasonable expansion thereof.

"Business Day" means a day other than a Saturday, Sunday or other day on which commercial banks in New York City, New York are authorized or required by law to close.

"Capital Expenditures" means with respect to any Person, the aggregate of all expenditures and costs (whether paid in cash or accrued as liabilities and including that portion of payments under Capital Lease Obligations that are capitalized on the balance sheet of such Person) by such Person and its Subsidiaries which are required to be capitalized under GAAP on a balance sheet of such Person.

"Capital Lease Obligations" means, with respect to any Person, the obligations of such Person to pay rent or any other amounts under any lease of (or other arrangements conveying the right to use) real or personal property, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person in accordance with GAAP.

"Capital Stock" means, with respect to any Person, any and all shares, interests, participations and/or rights in or other equivalents (however designated, whether voting or nonvoting, ordinary or preferred) in capital stock of such Person (if such Person is a corporation), any and all equivalent ownership interests in such Person (if other than a corporation), including partnership interests and membership interests, now or hereafter outstanding, and any and all rights, warrants or options exchangeable for or convertible into any of the foregoing.

"Cash Equivalent Investments" means:

(a)    direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the United States of America), in each case maturing within one year from the date of acquisition thereof;

(b)    investments in commercial paper maturing within one year from the date of acquisition thereof and having, at such date of acquisition, the highest credit rating obtainable from S&P or from Moody's;

- 4 -

(c)    investments in certificates of deposit, banker's acceptances and time deposits maturing within one year from the date of acquisition thereof issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, any domestic office of any commercial bank organized under the laws of the United States of America or any State thereof that has a combined capital and surplus and undivided profits of not less than $100,000,000;

(d)    fully collateralized repurchase agreements with a term of not more than thirty (30) days for securities described in clause (a) above and entered into with a financial institution satisfying the criteria described in clause (c) above; and

(e)    money market funds that (x)(i) comply with the criteria set forth in SEC Rule 2a-7 under the Investment Company Act of 1940, (ii) are rated AAA by S&P and Aaa by Moody's and (iii) have portfolio assets of at least $5,000,000,000 or (y) invest exclusively in Investments described in clauses (a) through (d) above.

"Change of Control" means:

(a)    the Sponsor ceases to own, directly or indirectly, a majority of the economic and voting Capital Stock of the Issuer;

(b)    Holdings ceases to own, directly, 100% of the issued and outstanding Capital Stock of the Issuer;

(c)    the Issuer ceases to own, directly or indirectly, any of the Facilities (or all of the Capital Stock of any Subsidiary that owns a Facility); or

(d)    an IPO of Holdings, the Issuer or any parent entity of any of the foregoing.

"CFC" means any Subsidiary that is a "controlled foreign corporation" for United States federal income tax purposes within the meaning of Section 957 of the Code and any direct or indirect subsidiary of a CFC.

"Change of Control Prepayment Offer" has the meaning assigned to such term in Section 2.05(b)(i).

"Closing Date" means the date on which all conditions precedent specified in Section 4.01 are satisfied (or waived by the Agent and the Noteholders in their sole and absolute discretion in accordance with Section 10.02).

"Code" means the U.S. Internal Revenue Code of 1986, as amended.

"Collateral" means all Property of the Note Parties (including all Capital Stock of the Issuer and the Subsidiaries of the Issuer) now owned or hereafter acquired, which is intended to be subject to the security interests or Liens granted pursuant to any of the Security Documents.

"Collateral Accounts" means (a) the Issuer Account, and (b) any other any securities account, deposit account or commodities account established by a Note Party with the prior written consent of the Required Noteholders, such consent not to be unreasonably withheld, delayed or conditioned, and, in each case, subject to a Control Agreement, other than any Excluded Account.

"Commitment" means, with respect to each Noteholder, the commitment of such Noteholder to accept Notes from the Issuer pursuant to Section 2.01 as Note Consideration, in an aggregate principal amount not to exceed the amount set forth opposite such Noteholder's name on Annex I under the heading "Commitment".

"Compliance Certificate" has the meaning assigned to such term in Section 5.10(d).

"Compliance Period" has the meaning assigned to that term in the definitions of "Pro Forma Basis" and "Pro Forma Effect".

"Condemnation" means any taking, seizure, confiscation, requisition, exercise of rights of eminent domain, public improvement, inverse condemnation, condemnation, expropriation, nationalization or similar action of or proceeding by any Governmental Authority affecting the Business.

"Consolidated EBITDA" means, for any period, the sum, without duplication, of the amounts for such period of (i) Consolidated Net Income, (ii) Consolidated Interest Expense, (iii) provision for U.S. federal, state, local and non-U.S. income taxes, franchise taxes and other taxes in lieu of income taxes payable, (iv) total depreciation expense, (v) total amortization expense, (vi) transaction expenses incurred by the Issuer or any of its Subsidiaries in such period in connection with Permitted Acquisitions, (vii) Transaction Costs, (viii) out-of-pocket financial advisory fees, accounting fees, legal fees and any other similar third party out-of-pocket fees and expenses incurred in connection with the pursuit of any acquisition, offering of Capital Stock, Investment, disposition, Restricted Payment, recapitalization or the incurrence, issuance, repayment, amendment or modification of Indebtedness (in each case, regardless of whether such transaction is consummated); provided that the aggregate amount added to Consolidated EBITDA pursuant to this clause (viii) for such four Fiscal Quarter period shall not exceed $10,000,000, (ix) management and other fees and reimbursement of expenses permitted pursuant to Section 6.09(e), (x) impairment of goodwill and other non-cash items (other than any such non-cash item to the extent it represents an accrual of or reserve for cash expenditures in any future period) including, without limitation, the write up of inventory to its estimated fair market value pursuant to Financial Accounting Standards Board Accounting Standards Codification No. 805 in excess of its manufacturing cost, (xi) to the extent actually reimbursed, expenses incurred to the extent covered by indemnification provisions in any agreement in connection with a Permitted Acquisition, (xii) all business optimization expenses and other restructuring and integration charges (including, without limitation, the costs associated with business optimization programs, including costs of consultants, relocation and recruiting expenses, back office closures, retention costs, severance costs, system establishment and integration of information technology and information systems costs) and expenses and charges incurred in connection with the implementation of cost savings initiatives, business optimization charges and restructuring charges; provided that the aggregate amount added to Consolidated EBITDA pursuant to this clause (xii) and clause (xiii) below in the

aggregate in any four Fiscal Quarter period shall not exceed 20.0% of Consolidated EBITDA for such four Fiscal Quarter period (calculated before giving effect to such amounts added to Consolidated EBITDA), (xiii) the amount of pro forma "run rate" cost savings, operating expense reductions, operating improvements and synergies (in each case, net of amounts actually realized) related to the Transactions, Permitted Acquisitions and other Investments, Dispositions, other similar transactions, and cost savings, business optimization or restructuring initiatives, in each case, that are reasonably identifiable, factually supportable and projected by the Issuer in good faith to result from actions that have been taken or with respect to which substantial steps have been taken or are expected to be taken (in the good faith determination of the Issuer) within twelve (12) months after the Transactions, such Permitted Acquisition or other Investment, Disposition, other similar transaction, or cost savings, business optimization or restructuring initiative; provided that the aggregate amount added to Consolidated EBITDA pursuant to this clause (xiii) and clause (xii) above in the aggregate in any four Fiscal Quarter period shall not exceed 20.0% of Consolidated EBITDA for such four Fiscal Quarter period (calculated before giving effect to such amounts added to Consolidated EBITDA), (xiv) [reserved], (xv) non-cash expenses recognized due to purchase accounting, (xvi) any non-cash equity-based compensation expense, (xvii) to the extent covered by insurance and actually reimbursed, or, so long as the Issuer has made a determination that there exists reasonable evidence that such amount will in fact be reimbursed by the insurer and only to the extent that such amount is (A) not denied by the applicable carrier in writing and (B) in fact reimbursed within 365 days of the date of the determination by the Issuer that there exists such evidence (with a deduction for any amount so added back to the extent not so reimbursed within such 365 days), expenses with respect to liability or casualty events or business interruption, in each case under this clause (xvii) to the extent not included in Consolidated Net Income, (xviii) [reserved], (xix) to the extent not included in determining Consolidated Net Income, proceeds of business interruption insurance actually received in cash by the Issuer and its Subsidiaries during such period, and (xx) fees, expenses, and indemnities paid or accrued in such period to directors (not to exceed $500,000 in the aggregate for any four Fiscal Quarter period), but only, in the case of each of the foregoing clauses (ii) through (xx), to the extent deducted in the calculation of Consolidated Net Income, less the sum of (i) non-cash items added in the calculation of Consolidated Net Income (other than any such non-cash item to the extent it will result in the receipt of cash payments in any future period), (ii) gains from the purchase of Notes pursuant to Section 2.01, (iii) the amount added back to Consolidated EBITDA pursuant to clause (xvii) above to the extent such reimbursement amounts were not received within the time period required by such clause, all of the foregoing as determined on a consolidated basis for Issuer and its Subsidiaries in conformity with GAAP other than with respect to the use of the Equity Investment Calculation Period for Joint Ventures.

"Consolidated Interest Expense" means, for any period, total interest expense (including that portion attributable to Capital Lease Obligations in accordance with GAAP and capitalized interest) of the Issuer and its Subsidiaries on a consolidated basis with respect to all outstanding Indebtedness of the Issuer and its Subsidiaries, including all commissions, discounts and other fees and charges owed with respect to letters of credit and bankers' acceptance financing, net costs under Hedging Agreements and fees payable to the Agent and Noteholders and the holders of other Indebtedness that are considered interest expense in accordance with GAAP; provided that Consolidated Interest Expense shall exclude unrealized gains and losses with respect to Hedging Agreements.

"Consolidated Net Income" means, for any period, the net income (or loss) of Holdings and its Subsidiaries on a consolidated basis for such period taken as a single accounting period determined in conformity with GAAP, which shall be calculated (x) less (or plus) net income (or loss) attributable to non-controlling interests and (y) inclusive of net income (or loss) from equity investments; provided, that there shall be excluded (i) except as provided in the definition of "Pro Forma Basis", the income (or loss) of any Person accrued prior to the date it becomes a Subsidiary of the Issuer or is merged into or consolidated with Issuer or any of its Subsidiaries or that Person's assets are acquired by the Issuer or any of its Subsidiaries, (ii) any after-tax gains or losses attributable to asset sales or returned surplus assets of any Pension Plan, (iii) (to the extent not included in clauses (i) through (ii) above) any net non-recurring or extraordinary gains or net non-recurring or extraordinary losses, (iv) the impact of currency translation gains and losses and mark to market gains and losses on any Hedging Agreement, (v) the cumulative effect of a change in accounting principles during such period, and (vi) gains and losses from the early extinguishment of Indebtedness (including any cancellation of debt income as a result of any purchases of Notes by the Issuer pursuant to Section 2.01), hedging obligations or other derivative instruments.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Control Agreement" means an account control agreement in respect of one or more deposit accounts or securities accounts of the Note Parties, in form and substance reasonably satisfactory to the Agent, executed by the financial institution at which an account is maintained, pursuant to which such financial institution agrees that such financial institution will comply with instructions or entitlement orders originated by the Agent as to disposition of funds in such account, without further consent by any other Person.

"Controlled Investment Affiliate" shall mean, with respect to The Sterling Group, L.P., any fund, investment vehicle or other Person (other than a natural Person) that (i) is organized by The Sterling Group, L.P. or by any Person that directly or indirectly controls The Sterling Group, L.P., for the purpose of making investments in one or more companies and (ii) is controlled by or is under common control with The Sterling Group, L.P.  For purposes of this definition "control" means the power to direct or cause the direction of management and policies of a Person, whether by contract or otherwise.

"Copyrights" means all works of authorship, United States and foreign copyrights (whether or not the underlying works of authorship have been published), designs, whether registered or unregistered, registrations and applications for registration of the foregoing and all extensions, renewals, and restorations thereof.

"Debtor Relief Laws" means the Bankruptcy Code and all other liquidation, conservatorship, bankruptcy, general assignment for the benefit of creditors, moratorium, arrangement, rearrangement, scheme of arrangement, receivership, insolvency, reorganization, winding up or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Debt Service Coverage Ratio" means for any given period of time, the ratio of (a) Consolidated EBITDA to (b) the total of all principal, interest, premium (if any), fees and other amounts due and payable during such period in connection with the Notes, all as determined in accordance with GAAP.

"Debt Service Coverage Ratio Covenant" means the Debt Service Coverage Ratio covenant set forth in Section 1.18(b) of the Additional Covenants.

"Debt Prepayment Offer" has the meaning assigned to such term in Section 2.05(b)(iv).

"Default" means any event, condition or circumstance that, with notice or lapse of time or both, would (unless cured or waived) become an Event of Default.

"Disposition" means any sale, transfer or other disposition (in one transaction or in a series of transactions and whether effected pursuant to a division of a limited liability company or an allocation of assets to a series of a limited liability company) of any assets or property by any Note Party or Subsidiary thereof (including any issuance of Capital Stock by a Subsidiary of such Person (other than (a) any issuance of directors' qualifying shares, (b) nominal shares issued to foreign nationals to the extent required by Applicable Laws and (c) other than issuing shares of Capital Stock of Holdings in compliance with Section 6.04(a)), other than any Event of Loss.

"Disqualified Investor" means any entity (a) engaged in the business of virgin PET production or (b) engaged in the business of PET recycling in competition with the Issuer Group Members and, in the case of clause (a) or (b), identified by name in writing by the Issuer to the Noteholders from time to time; provided that any such notice shall not apply to retroactively disqualify such persons that have previously acquired an assignment of any Noteholder's rights and obligations under this Agreement or to retroactively require the consent of the Issuer to such assignment.

"Disqualified Stock" means, with respect to any Person, any Capital Stock of such Person which, by its terms, or by the terms of any security into which it is convertible or for which it is putable or exchangeable, or upon the happening of any event, matures or is mandatorily redeemable (other than (i) as a result of a change of control or asset sale, provided that such change of control or asset sale results in the payment in full of the Obligations (ii) solely for Capital Stock in such Person that does not constitute Disqualified Stock and cash in lieu of fractional shares of such Capital Stock) pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof (other than (i) solely as a result of a change of control or asset sale or (ii) solely for Capital Stock in such Person that does not constitute Disqualified Stock and cash in lieu of fractional shares of such Capital Stock), in whole or in part, in each case prior to the date that is 91 days after the Maturity Date; provided however that (i) if such Capital Stock are issued to any employee or to any plan for the benefit of employees of Holdings or its Subsidiaries or by any such plan to such employees, such Capital Stock will not constitute Disqualified Stock solely because they may be required to be repurchased by Holdings or any of its Subsidiaries in order to satisfy applicable statutory or regulatory obligations or a result of such employee's termination, death or disability.

"Dollars" or "$" refers to the lawful currency of the United States of America.

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clause (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Environmental Claim" means any administrative or judicial action, suit, proceeding, notice, claim or demand (including any request for information pursuant to Section 104(e) of the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. ss. 9601 et seq.) by any Person seeking to enforce any obligation or responsibility arising under or relating to Environmental Law or alleging or asserting liability for investigatory costs, cleanup or other remedial costs, legal costs, environmental consulting costs, governmental response costs, damages to natural resources or other property, personal injuries, fines or penalties related to (a) the presence, or Release into the environment, of any Hazardous Material at any location, whether or not owned by the Person against whom such claim is made, or (b) any noncompliance with, or alleged noncompliance with, or liability arising under any Environmental Law. The term "Environmental Claim" shall include, without limitation any claim by any Person for damages, contribution, indemnification, cost recovery, compensation or injunctive relief or costs associated with any remediation plan, in each case, under any Environmental Law.

"Environmental Laws" means any Applicable Laws regulating or imposing liability or standards of conduct concerning or relating to pollution or the protection of human health, safety the environment, natural resources or special status species and their habitat, including all Applicable Laws concerning the presence, use, manufacture, generation, transportation, Release, threatened Release, disposal, arrangement for disposal, dumping, discharge, treatment, storage, handling, control or cleanup of Hazardous Materials.

"Equity Investment Calculation Period" has the meaning assigned to that term in the definition of "Consolidated Net Income".

"Equity Shareholders" means the equity owners of Holdings set forth on Schedule 3.01(b) as of the Closing Date.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that, together with the Issuer, is treated as a single employer under Sections 414(b), (c), (m) or (o) of the Code.

"ERISA Event" means (a) a Reportable Event with respect to any Pension Plan, (b) the failure by any Pension Plan to satisfy the minimum funding standard (within the meaning of Section 412 of the Code or Section 302 of ERISA) applicable to such plan, whether or not waived, (c) the filing of a notice of intent to terminate a Pension Plan in a distress termination (as described in Section 4041(c) of ERISA), (d) a complete or partial withdrawal by the Issuer or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization or insolvent (within the meaning of Title IV of ERISA), (e) the imposition or incurrence of any liability under Title IV of ERISA, other than PBGC premiums due but not delinquent under Section 4007 of ERISA, upon the Issuer or any ERISA Affiliate, (f) the institution by the PBGC of proceedings to terminate a Pension Plan or Multiemployer Plan, (g) the appointment of a trustee to administer any Pension Plan under Section 4042 of ERISA, or (h) the imposition of a Lien upon the Issuer pursuant to Section 430(k) of the Code or Section 303(k) of ERISA.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Event of Default" has the meaning assigned to such term in Section 7.01.

"Event of Loss" means any loss of, destruction of or damage to, or any Condemnation or other taking of any property of any Issuer Group Member.

"Event of Loss/Disposition Prepayment Offer" has the meaning assigned to such term in Section 2.05(b)(ii).

"Excluded Account" means (a) any deposit account that is used solely as a payroll account for the employees of Issuer or its Subsidiaries or the funds in which consist solely of funds held by the owner of such deposit account in trust for any director, officer or employee of any Note Party or any employee benefit plan maintained by any Note Party or funds representing deferred compensation for the directors and employees of any Note Party, (b) escrow accounts and trust accounts, in each case holding assets that are pledged or otherwise encumbered pursuant to Permitted Liens, (c) accounts containing no (zero) balance at any time, and accounts that by their terms are swept to a zero balance on a daily basis to a deposit account that is subject to a control agreement in favor of Agent and (d) other deposit accounts, securities accounts and commodities accounts, except to the extent the value of all such accounts in this clause (d) shall exceed at any time $250,000 in the aggregate shall not be "Excluded Accounts"; provided that the aggregate daily maximum balance for all accounts described in clauses (a) through (d) on any day shall not exceed $500,000.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to the Agent, any Noteholder or any other recipient of any payment to be made by or on account of any obligation of any Note Party hereunder, (a) Taxes imposed on or measured by net income, franchise Taxes (imposed in lieu of net income tax) or branch profits Taxes, in each case, (i) imposed by the jurisdiction under the laws of which such recipient is organized, in which its principal office (or other fixed place of business) is located or, in which its applicable lending office is located, in each case, as a result of such recipient's being organized under the laws of the jurisdiction imposing such Taxes or having its principal office or lending office located therein, or

(ii) that are Other Connection Taxes, (b) any Taxes attributable to the failure of the Agent, Noteholder or any such other applicable recipient to comply with Section 2.09(e), (c) in the case of the Agent or a Noteholder (other than an assignee pursuant to a request by the Issuer under Section 2.11), any U.S. federal withholding Tax that is imposed on amounts payable to such Agent or Noteholder under the laws effective at the time the Agent or Noteholder becomes a party hereto (or designates a new lending office) (other than pursuant to an assignment request by the Issuer under Section 2.11), except, in each case, to the extent that the Agent or Noteholder (or its assignor, if any) was entitled immediately before becoming a party hereto or immediately before designation of a new lending office (or assignment), to receive amounts with respect to such Tax pursuant to Section 2.09, and (d) any United States federal withholding Taxes imposed under FATCA.

"Evergreen Facility" means the Issuer's rPET processing facility located in Clyde, Ohio (other than the Strapping Assets).

"Existing Indebtedness" means Indebtedness of the Sellers contemplated to be extinguished in connection with the issuance of the Notes on the Closing Date.

"Facilities" means, individually and collectively, the Evergreen Facility and the Riverside Facility.

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with) and any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Code.

"FCPA" means the United States Foreign Corrupt Practices Act of 1977, as amended.

"Fiscal Quarter" means a fiscal quarter of any Fiscal Year.

"Fiscal Year" means the Fiscal Year of the Issuer and its Subsidiaries ending on December 31 of each calendar year. For purposes of this Agreement, any particular Fiscal Year may be designated by reference to the calendar year in which such Fiscal Year ends.

"Foreign Plan" means any employee pension benefit plan, program, policy, arrangement or agreement maintained or contributed to by any Note Party or with respect to which any Note Party would have any liability, in each case with respect to employees employed outside the United States (as such term is defined in Section 3(10) of ERISA) (other than any arrangement with the applicable Governmental Authority).

"GAAP" means generally accepted accounting principles in effect from time to time in the United States of America, applied on a consistent basis.

"Governmental Authority" means any federal, regional, state or local government of the United States of America or any other nation, or political subdivision thereof, and any authority,

regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government, including all agencies and instrumentalities of such governments and political subdivisions.

"Government Official" means any official of any Governmental Authority, including, without limitation, all officers or employees of a government department, agency, instrumentality or permitting agency.

"Guarantee" means as to any Person (the "*guaranteeing person*"), any obligation of (a) the guaranteeing person or (b) another Person (including any bank under any letter of credit), if to induce the creation of such obligation of such other Person, the guaranteeing person has issued a reimbursement, counterindemnity or similar obligation, in either case guaranteeing or in effect guaranteeing any Indebtedness, leases, dividends or other obligations (the "*primary obligations*") of any other third Person (the "*primary obligor*") in any manner, whether directly or indirectly, including any obligation of the guaranteeing person, whether or not contingent, (w) to purchase any such primary obligation or any Property constituting direct or indirect security therefor, (x) to advance or supply funds (i) for the purchase or payment of any such primary obligation or (ii) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (y) to purchase Property, securities or services, in each case, primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (z) otherwise to assure or hold harmless the owner of any such primary obligation against loss in respect thereof; provided that the term Guarantee shall not include endorsements of instruments for deposit or collection in the ordinary course of business. The amount of any Guarantee of any guaranteeing person shall be deemed to be the lower of (A) an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee is made and (B) the maximum amount for which such guaranteeing person may be liable pursuant to the terms of the instrument embodying such Guarantee, unless such primary obligation and the maximum amount for which such guaranteeing person may be liable are not stated or determinable, in which case the amount of such Guarantee shall be such guaranteeing person's maximum reasonably anticipated liability in respect thereof as determined by the Issuer in good faith.

"Guaranteed Obligations" means, with respect to any Guarantor, the Obligations whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest, reimbursements and fees that accrue after the commencement by or against any Note Party or any Affiliate thereof of any proceeding under any debtor relief law naming such Person as the debtor in such proceeding, regardless of whether such interest, reimbursements and fees are allowed claims in such proceeding.

"Guarantor Payment" has the meaning assigned to such term in Section 9.08(a).

"Guarantors" means Holdings and each Subsidiary Guarantor.

"Hazardous Material" means any hazardous, toxic or dangerous substances, materials and wastes, including, without limitation, hydrocarbons (including naturally occurring or man-made

petroleum and hydrocarbons), flammable explosives, asbestos, urea formaldehyde insulation, radioactive materials, biological substances, polychlorinated biphenyls, pesticides, herbicides and any other kind and/or type of pollutants or contaminants (including, without limitation, materials which include hazardous constituents), sewage, sludge, industrial slag, solvents and/or any other similar substances, materials, or wastes and including any other substances, materials or wastes that are or become regulated under any Environmental Laws (including, without limitation, any that are or become classified as hazardous or toxic under any Environmental Laws).

"Hedging Agreement" means any agreement with respect to any swap, cap, collar, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions entered into in connection with the operation of a Facility.

"Indebtedness" of any Person means, without duplication, all (a) indebtedness for borrowed money and every reimbursement obligation with respect to letters of credit, bankers' acceptances or similar facilities, (b) obligations evidenced by bonds, debentures, notes or other similar instruments, (c) obligations to pay the deferred purchase price of property or services, except accounts payable and accrued expenses arising in the ordinary course of business and payable within ninety (90) days after the due date therefor as specified in, or determined from, the applicable contract or purchase order, (d) the Net Hedging Obligations under interest rate or currency Hedging Agreements and all other agreements or arrangements designed to protect against fluctuations in interest rates, commodity prices and currency exchange rates, (e) the capitalized amount (determined in accordance with GAAP) of all payments due or to become due under all leases and agreements to enter into leases required to be classified and accounted for as a capital lease in accordance with GAAP, (f) reimbursement obligations (contingent or otherwise) pursuant to any performance bonds or collateral security, (g) Indebtedness of others described in clauses (a) through (f) above secured by (or for which the holder thereof has an existing right, contingent or otherwise, to be secured by) a Lien on the property of such Person, whether or not the respective Indebtedness so secured has been assumed by such Person, (h) Guarantees by such Person of Indebtedness of others described in clauses (a) through (g) above and (i) all Disqualified Stock. The Indebtedness of any Person shall include the Indebtedness of any partnership in which such Person is a general partner to the extent such Person is liable therefor as a result of such Person's general partner interest in such partnership, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor.

"Indemnified Party" has the meaning assigned to such term in Section 10.03(b).

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Note Parties under any Note Document and (b) to the extent not otherwise described in (a), Other Taxes.

"Independent Auditor" means (i) any "big four" accounting firm selected by the Issuer and notified to the Noteholders and (ii) any other firm of independent public accountants of recognized

national standing in the United States selected by the Issuer and reasonably acceptable to the Required Noteholders

"Insurance Covenant" means Section 1.4 of the Additional Covenants.

"Intellectual Property" means (a) the collective reference to all rights, priorities and privileges relating to intellectual property, whether arising under United States, multinational or foreign laws or otherwise, including, without limitation, all Copyrights, Patents, Trademarks and trade secrets, (b) all rights to sue or otherwise recover for any past, present and future infringement, dilution, misappropriation, or other violation or impairment thereof, (c) all proceeds of any of the foregoing, including without limitation license fees, royalties, income payments, claims, damages and proceeds of suit, now or hereafter due and/or payable with respect thereto, (d) all written agreements, licenses and covenants providing for the grant to or from any Person any rights in any such intellectual property that is owned by another Person.

"Interest Rate" means 5.00% per annum.

"Investment" means for any Person (a) the acquisition (whether for cash, Property of such Person, services or securities or otherwise) of Capital Stock, bonds, notes, debentures, debt securities, partnership or other ownership interests or other securities of, or any Property constituting an ongoing business, line of business, division or business unit of or constituting all or substantially all the assets of, or the making of any capital contribution to, any other Person, (b) the making of any advance, loan or other extension of credit to, any other Person (including the purchase of Property from another Person subject to an understanding or agreement, contingent or otherwise, to resell such Property to such Person, but excluding any such advance, loan or extension of credit having a term not exceeding ninety (90) days representing the purchase price of inventory or supplies sold in the ordinary course of business), (c) the entering into of any Guarantee with respect to Indebtedness or other liability of any other Person, and (d) any other investment that would be classified as such on a balance sheet of such Person in accordance with GAAP. For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment but giving effect to any returns or distributions of capital or repayment of principal actually received in case by such Person with respect thereto.

"IPO" means the initial public offering (other than a public offering pursuant to a registration statement on Form S-8) of the Capital Stock of the Issuer, Holdings or a direct or indirect parent entity of Holdings, including the merger, acquisition or other consolidation of the Issuer, Holdings, or any direct or indirect parent of Holdings with a SPAC.

"Issuer" has the meaning assigned to such term in the introductory paragraph.

"Issuer Account" means the account of the Issuer maintained at [_____] with the account number [_____].

"Issuer Group Members" means, collectively, (a) the Issuer, (b) the Guarantors and (c) the Non-Guarantor Subsidiaries.

"Joint Venture" means a joint venture, partnership or other similar arrangement, whether in corporate, partnership or other legal form.

"Lien" means any mortgage, charge, pledge, lien (statutory or other), privilege, security interest, hypothecation, collateral assignment or preference, priority or other security agreement, mandatory deposit arrangement, preferential arrangement or other encumbrance upon or with respect to any property of any kind, real or personal, movable or immovable, now owned or hereafter acquired (including, without limitation, any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing).

"Loss Proceeds" means insurance proceeds, condemnation awards or other similar compensation, awards, damages and payments or relief (exclusive, in each case, of proceeds of business interruption, workers' compensation, employee theft or embezzlement, employment practices, environmental or product liability, automobile liability, builders' all risk liability, directors and officers insurance and general liability insurance) with respect to any Event of Loss.

"Material Adverse Effect" means a material adverse effect on: (a) the business, assets, properties, operations or financial condition of the Issuer Group Members, taken as a whole; (b) the ability of any Note Party to perform its material obligations under the Note Documents; (c) the validity of, enforceability of the material rights or remedies of, or benefits available to the Secured Parties under, the Note Documents or (d) all of the Collateral (or any material portion thereof) or the Liens in favor of the Secured Parties on the Collateral or the validity, enforceability, perfection or priority of such Liens.

"Material Real Property" means any parcel of real property (other than a parcel with a fair market value (as reasonably estimated by the Issuer) of more than $1,000,000) owned in fee by a Note Party.

"Maturity Date" means December 31, 2027.

"Mortgage" means, collectively, the deeds of trust, trust deeds, mortgages in respect of Mortgaged Properties made by the Note Parties in favor or for the benefit of the Agent on behalf of the Secured Parties in form and substance reasonably satisfactory to the Agent.

"Mortgaged Properties" means the Evergreen Facility and any other Material Real Property.

"Multiemployer Plan" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA that is subject to Title IV of ERISA to which any Note Party contributes or is obligated to contribute, or with respect to which any Note Party has or could reasonably be expected to have any liability.

"Net Available Amount" means:

(a)     in the case of any Event of Loss, the aggregate amount of Loss Proceeds received by the Issuer Group Members or any of their respective Affiliates in respect of

such Event of Loss, net of reasonable costs and expenses incurred by the Note Parties (including, as a distribution from a Non-Guarantor Subsidiary) in connection with the collection of such Loss Proceeds; and

(b)    in the case of any Disposition, the aggregate amount received by the Note Parties (including, as a distribution from a Non-Guarantor Subsidiary) or any of their respective Affiliates in respect of such Disposition, net of reasonable costs and expenses incurred by the Issuer Group Members in connection with such Disposition.

"Net Hedging Obligations" means, as of any date, the Termination Value of any Hedging Agreement on such date.

"Non-Guarantor Subsidiaries" means (i) any Subsidiary of the Issuer approved in writing by, subject to Section 10.02(b)(vii), the Required Noteholders as a Non-Guarantor Subsidiary and (ii) each CFC and U.S. Foreign HoldCo, to the extent that making such CFC or U.S. Foreign HoldCo a Guarantor could reasonably be expected to give rise to material adverse tax consequences to Holdings (or any direct or indirect parent entity thereof), the Issuer and/or any of its Subsidiaries (as reasonably determined by the Issuer).

"Note Consideration" has the meaning given to such term in the Purchase Agreement.

"Note Documents" means (a) this Agreement, (b) any Additional Notes Amendment, (c) each Note, (d) the Agent Fee Letter, (e) the Security Documents and (f) each certificate, agreement, instrument, amendment, waiver, consent or document executed by a Note Party and delivered to the Agent or any Noteholder in connection with or pursuant to any of the foregoing and designated as a "Note Document".

"Note Parties" means, collectively, the Issuer and the Guarantors.

"Noteholders" has the meaning assigned to such term in the preamble. For the avoidance of doubt, the term "Noteholders" includes any Additional Noteholders.

"Notes" means (a) the notes purchased by the Noteholders from (and issued by) the Issuer pursuant to Section 2.01, substantially in the form of Exhibit C hereto and (b) any Additional Notes purchased by the Additional Noteholders from (and issued by) the Issuer pursuant to Section 2.13, substantially in the form of Exhibit C hereto.

"Obligations" means all debts (including accrued interest, interest accruing after the maturity of the Notes and interest and fees that accrue after the commencement by or against any Note Party or any Subsidiary thereof of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding), liabilities, obligations, covenants and duties of, any Note Party arising under any Note Document, in each case whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest, reimbursements and fees that accrue after the commencement by or against Holdings, the Issuer or any of its Subsidiaries of any proceeding under any debtor relief law

naming such Person as the debtor in such proceeding, regardless of whether such interest, reimbursements and fees are allowed claims in such proceeding.

"Officer's Certificate" means, with respect to any Note Party, a certificate signed by an Authorized Representative of such Note Party.

"Operating Budget" means an annual operating plan and budget of the Issuer and each of the Facilities, prepared by the Issuer, of anticipated Operating Expenses and Capital Expenditures limited to direct wages, other manufacturing overhead, general and administrative expense, maintenance capital expense and growth capital expense, in each case, detailed for the following calendar year.

"Operating Expenses" means any and all of the expenses paid or payable by or on behalf of any Note Party in relation to the operation and maintenance (except as set forth below) of the Business, including consumables, payments under any operating lease, taxes (including franchise taxes, property taxes, sales taxes and excluding income taxes), insurance (including the costs of premiums and deductibles and brokers' expenses), costs and fees attendant to obtaining and maintaining in effect the Authorizations relating to the Business payable during such period, payments made to security, police services, and legal, accounting and other professional fees attendant to any of the foregoing items payable during such period, but exclusive of Capital Expenditures and payments in respect of payments of principal and interest in respect of the Obligations or any other Indebtedness. Operating Expenses do not include non-cash charges, including, without limitation, depreciation, amortization, income taxes, non-cash taxes or other bookkeeping entries of a similar nature.

"Organizational Documents" means, with respect to any Person, (i) in the case of any corporation, the certificate of incorporation and by-laws (or similar documents) of such Person, (ii) in the case of any limited liability company, the certificate of formation and operating agreement (or similar documents) of such Person, (iii) in the case of any limited partnership, the certificate of formation and limited partnership agreement (or similar documents) of such Person, (iv) in the case of any general partnership, the partnership agreement (or similar document) of such Person and (v) in any other case, the functional equivalent of the foregoing.

"Other Connection Taxes" means, with respect to the Agent or any Noteholder, Taxes imposed as a result of a present or former connection between the Agent or Noteholder and the jurisdiction imposing such Tax (other than connections arising from the Agent or Noteholder having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Note Document, or sold or assigned an interest in any Note or Note Document).

"Other Taxes" means any and all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes arising from any payment made under any Note Document or from the execution, delivery, performance, registration or enforcement of, from the receipt or perfection of a security interest under or otherwise with respect to, any Note Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 2.11).

- 18 -

"Participant" has the meaning assigned to such term in Section 10.04(f).

"Participant Register" has the meaning assigned to such term in Section 10.04(f).

"Patents" means all patentable inventions and designs, United States, foreign, and multinational patents, certificates of invention, and similar industrial property rights, and applications for any of the foregoing, including, without limitation, all reissues, substitutes, divisions, continuations, continuations-in-part, extensions, renewals, and reexaminations thereof.

"PBGC" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

"Pennsylvania Facility" means the Sellers' rPET processing facility located in Reading, Pennsylvania.

"Pennsylvania Facility Acquisition" means the purchase by the Issuer of the Sellers' right, title and interest in and to all of the assets of the Sellers used or held for use with respect to the rPET business conducted at the Pennsylvania Facility pursuant to, among other provisions thereof, Section 363 of Chapter 11 of Title 11 of the Bankruptcy Code.

"Pension Plan" means any employee pension benefit plan as defined in Section 3(2) of ERISA (other than a Multiemployer Plan) that is subject to the provisions of Title IV or Section 302 of ERISA, or Section 412 of the Code, and in respect of which any Note Party is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA or with respect to which any Note Party has or would have any liability.

"Permitted ABL Facility" means any secured or unsecured asset-based revolving credit facility satisfying the following conditions: (i) such Indebtedness is incurred by a Note Party (other than Holdings) and is not secured by any asset or property that is not Collateral; (ii) the aggregate principal amount of such Indebtedness does not at any time exceed the greater of (x) $30,000,000 and (y) the "borrowing base" (or such equivalent term) as defined therein; (iii) to the extent secured, shall only be secured by Liens on the ABL Priority Collateral; (iv) the Lien and/or payment priorities thereunder are, as among the holders of such Indebtedness, *pari passu* (e.g., there are no "first-out" or "last-out" tranches); and (v) the providers of such Indebtedness (or an agent on their behalf) shall have executed an intercreditor agreement in favor of the Agent, in form and substance satisfactory to the Agent and Required Noteholders (for the avoidance of doubt, such intercreditor agreement shall provide that the Agent, for the benefit of the Noteholders, a second-ranking Lien on the ABL Priority Collateral).

"Permitted Acquisition" means (a) the Texas Facility Acquisition, (b) the Pennsylvania Facility Acquisition and (c) any other purchase or other acquisition, by merger, consolidation or otherwise, by the any Issuer Group Member (other than Holdings) of not less than 100% of the Capital Stock in, or all or substantially all the assets of (or all or substantially all the assets constituting a business unit, division, product line or line of business of), any Person (referred to herein as the "Target"); provided that,

(i)     the aggregate consideration, no matter how composed, does not exceed $10,000,000, unless such acquisition shall have been approved by a resolution adopted by the majority of the governing body of the Issuer (and a copy thereof attached to the certification referred to clause (ix) below);

(ii)     all transactions in connection therewith shall be consummated, in all material respects, in accordance with all Applicable Laws and in conformity in all material respects with all applicable permits, licenses, authorizations, plans, directives, consent orders or consent decrees of or from any Governmental Authority;

(iii)     in the case of an acquisition of a publicly-held Person, such acquisition shall have been approved by the board of directors of the Target (or similar governing body if such Target is not a corporation) which is the subject of such acquisition and such Target shall not have publicly announced that it will oppose such acquisition or shall not have commenced any action which alleges that such acquisition will violate Applicable Law (unless such announcement or action shall have been withdrawn, dismissed or terminated);

(iv)     the Target shall be in the same business or similar line of business as that of the Issuer Group Members are engaged as of the Closing Date;

(v)     the Issuer or a Subsidiary Guarantor shall be the surviving entity in the case of any such acquisition consummated pursuant to a merger or other combination;

(vii)     immediately prior to, and after giving effect thereto, no Default or Event of Default shall have occurred and be continuing or would result therefrom;

(viii)     after giving Pro Forma Effect to such transaction, and to any other event occurring after such period as to which giving Pro Forma Effect thereto is appropriate, the Issuer shall be in compliance with the Debt Service Coverage Ratio as of such date;

(ix)     the Issuer shall have delivered to the Noteholders at least five (5) Business Days prior to any such acquisition, (A) notice of the Issuer Group Members' intent to consummate such acquisition, along with a certificate of an Authorized Representative of the Issuer, certifying as to compliance with the foregoing clauses (i) (to the extent applicable), (vii) and (viii) and containing reasonably detailed calculations in support thereof, in form and substance satisfactory to the Required Noteholders, (B) all other relevant financial information with respect to such acquired assets and any other information of the Target, (C) a copy of the most recent draft of the purchase agreement related to the proposed acquisition and (D) if aggregate consideration payable for such acquisition exceeds $10,000,000, (i) to the extent available, quarterly and annual financial statements of the Target whose Capital Stock or assets are being acquired for the twelve month (12) month period immediately prior to such proposed acquisition, including any audited financial statements that are available and (ii) copies of any material due diligence reports or other results of any material due diligence investigation with respect to such acquisition or the applicable Target (in each case, in this clause (D)(ii), to the extent prepared by or otherwise reasonably available to the Issuer) and (iii) all such other

- 20 -

information and data relating to such transaction or the Target or business or assets to be acquired as may be reasonably requested by the Required Noteholders;

(x)      in the case of an acquisition of Capital Stock of a Person, all of the Capital Stock acquired or otherwise issued by such Person or any newly formed Subsidiary of the Issuer in connection with such acquisition shall be owned 100% by the Issuer or a Subsidiary Guarantor free and clear of all Liens (other than Liens under the Note Documents); and

(xi)      upon consummation of such transaction, the Note Parties shall comply with the requirements of Section 5.16 and cause the property, assets and businesses acquired in such purchase or other acquisition shall become Collateral.

"Permitted Contest Conditions" means, with respect to any Note Party, a contest, pursued in good faith, challenging the enforceability, validity, interpretation, amount or application of any law, tax or other matter (legal, contractual or other) by appropriate proceedings timely instituted if (a) such Note Party diligently pursues such contest in good faith, (b) such Note Party establishes and maintains adequate reserves with respect to the contested claim in accordance with GAAP and (c) such contest (i) would not reasonably be expected to have a Material Adverse Effect, (ii) does not involve any material risk or danger of any criminal or unindemnified civil liability being incurred by the Agent or the Noteholders and (iii) effectively stays the enforcement of any remedies against the Collateral.

"Permitted Indebtedness" has the meaning assigned to such term in Section 6.02.

"Permitted Lien" has the meaning assigned to such term in Section 6.03.

"Permitted Tax Distributions" means, for so long as the Issuer and Holdings are each considered a partnership or a "disregarded entity" for U.S. federal income tax purposes, distributions to any direct or indirect parent entity of Holdings to discharge such parent entity's respective U.S. federal (and to the extent applicable, state or local) income tax liabilities attributable to its allocable share of the net taxable income of the Issuer and Holdings and their flow-through subsidiaries; provided that the amount of such distributions shall (i) take into account all losses realized in prior years or any other available reductions to net taxable income or tax liability and (ii) be determined assuming each direct or indirect parent entity of Issuer is subject to tax at the highest effective federal, state and local tax rate imposed on the income of the Issuer (taking into account the character of such income and the deductibility of any state and local taxes, to the extent deductible) that applies to any direct or indirect member of the Issuer. Permitted Tax Distributions shall also be modified to take into account any adjustments to income, gain, loss, deduction and credit made pursuant to a tax audit; and be made on a quarterly basis in order to permit each direct or indirect parent entity of Issuer to pay any estimated tax payments in respect of the net taxable income of the Issuer and Holdings and their Subsidiaries.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"PET" means polyethylene terephthalate.

"Post-Default Rate" means 7.00% per annum.

"Pro Forma Basis" and "Pro Forma Effect" mean, as of any date of determination, the calculation of the compliance of the Issuer with the Debt Service Coverage Ratio Covenant, after giving effect on a pro forma basis to any Permitted Acquisition made during the four Fiscal Quarter period most recently ended on or prior to such date of determination (a "Compliance Period") (or made after the end of such Compliance Period but on or before the date of determination), and any disposition made during such Compliance Period (or made after the end of such Compliance Period but on or before the date of determination), on the following basis:

(i)    any Indebtedness incurred or assumed by the Issuer or any of its Subsidiaries in connection with such Permitted Acquisitions and any Indebtedness repaid in connection with such Permitted Acquisitions or dispositions shall be deemed to have been incurred or repaid, respectively, as of the first day of such Compliance Period;

(ii)    if such Indebtedness incurred or assumed by the Issuer or any of its Subsidiaries in connection with any such Permitted Acquisition has a floating or formula rate, then the rate of interest for such Indebtedness for the applicable period shall be computed as if the rate in effect for such Indebtedness on the relevant measurement date had been the applicable rate for the entire applicable period; and

(iii)    income statement items (whether positive or negative) attributable to the property or business acquired or disposed of in such Permitted Acquisitions or dispositions shall be included or excluded, as the case may be, as if such Permitted Acquisitions or dispositions took place on the first day of such Compliance Period on a pro forma basis.

With respect to any such Permitted Acquisitions, such pro forma calculations shall be based on the consolidated balance sheet of such acquired Person or business and its consolidated Subsidiaries as at the end of its most recent Fiscal Year or the most recent fiscal period preceding such Permitted Acquisition and the related consolidated statements of income and of cash flows for such period, which shall have been previously provided to the Noteholders and shall either (1) have been reported on without a qualification arising out of the scope of the audit by independent certified public accountants of nationally recognized standing or (2) have been found reasonably acceptable by the Required Noteholders.

"Property" means any right or interest in or to property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible.

"Purchase Agreement" has the meaning assigned to such term in the preamble.

"Purchased Assets" has the meaning given to such term in the Purchase Agreement.

"Register" has the meaning assigned to such term in Section 10.04(c).

"Regulation D" means Regulation D of the Board.

"Regulation U" means Regulation U of the Board.

"Related Fund" means with respect to any Noteholder, any fund that invests in notes and is managed or advised by the same investment advisor as such Noteholder, by such Noteholder or an Affiliate of such Noteholder.

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, employees, agents and advisors of such Person and such Person's Affiliates.

"Release" means any release, spill, emission, emanation, leaking, pumping, injection, deposit, disposal, discharge, dispersal, leaching or migration into or through the indoor or outdoor environment, including, the movement through ambient air, soil, surface water, ground water, wetlands, land or subsurface strata.

"Reportable Event" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the 30-day notice period has been waived.

"Required Noteholders" means, at any time, Noteholders holding more than 50% of the sum of the aggregate unpaid principal amount of the Notes then outstanding.

"Restoration" means, with respect to any Affected Property, the rebuilding, repair, restoration or replacement of such Affected Property.

"Restricted Payment" means:

(a)    all dividends paid by any Note Party (in cash, Property or obligations) on, or other payments or distributions on account of, or the setting apart of money for a sinking or other analogous fund for, or the purchase, redemption, retirement or other acquisition by any Note Party of, any portion of any class of Capital Stock in any Note Party or any warrants, rights or options to acquire any such class of Capital Stock;

(b)    any payment of development, management or other fees, or of any other amounts, by any Note Party to any Affiliate thereof;

(c)    any other payment in cash, Property or obligations to a parent company of the Note Parties or Affiliate of the Note Parties; and/or

(d)    any other payment in cash, Property or obligations to a parent company of the Note Parties or Affiliate of the Note Parties in respect of any Indebtedness subordinated to the Obligations hereunder.

"Riverside Facility" means the Issuer's rPET processing facility located in Riverside, California.

"rPET Resins" means recycled polyethylene terephthalate resins.

"S&P" means Standard & Poor's Ratings Services, or any successor to the rating agency business thereof.

- 23 -

"Sanctioned Country" means, at any time, a country or territory that is subject to comprehensive Sanctions. For the avoidance of doubt, as of the Closing Date, Sanctioned Countries are the Crimea region of Ukraine, Cuba, Iran, North Korea and Syria.

"Sanctioned Person" means, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, or by the United Nations Security Council, the European Union or any EU member state, (b) any Person operating, organized or resident in a Sanctioned Country, or (c) any Person owned or controlled by any such Person.

"Sanctions" means economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, or (b) the United Nations Security Council, the European Union or Her Majesty's Treasury of the United Kingdom.

"Secured Obligations" has the meaning assigned to such term in the Security Agreement.

"Secured Parties" means (a) the Agent and (b) the Noteholders.

"Security Agreement" means the Security Agreement, dated as of the Closing Date, by and among the Note Parties and the Agent.

"Security Documents" means the Security Agreement, any Control Agreement, all Uniform Commercial Code financing statements required by any Security Document, all Mortgages and any other security agreement, or other similar agreements or instrument to be executed and delivered to the Agent (on behalf of the Noteholders) pursuant hereto or any Security Document.

"Sellers" has the meaning assigned to such term in the preamble.

"Semi-Annual Payment Date" means the last Business Day of June and December in each Fiscal Year.

"Solvent" means, with respect to any Person on a particular date that on such date (a) the fair value of the property of such Person is greater than the total amount of liabilities, including contingent liabilities of such Person, (b) the present fair saleable value of the assets of such Person is not less than the amount that will be required to pay the probable liability of such Person on its debts as they become absolute and matured, (c) such Person does not intend to, and does not believe that it will, incur debts or liabilities beyond such Person's ability to pay such debts and liabilities as they mature, (d) such Person is not engaged in business or a transaction, and is not about to engage in business or a transaction, for which such Person's property would constitute an unreasonably small capital and (e) such Person is not insolvent as defined under applicable Debtor Relief Laws; provided that unless otherwise provided under Applicable Law, the amount of contingent liabilities at any time shall be computed as the amount that, in light of all the facts and circumstances existing at such date, represents the amount that can reasonably be expected to become an actual or matured liability.

"SPAC" means any special purpose acquisition entity which has completed an initial public offering initial public offering (other than a public offering pursuant to a registration statement on Form S-8) of its Capital Stock.

"Sponsor" means, collectively, The Sterling Group, L.P. and its Controlled Investment Affiliates.

"Strapping Assets" means the strapping assets used in the business of the Evergreen Facility on or prior to the Closing Date (it being understood and agreed that such assets shall be transferred from the Evergreen Facility to a strapping extrusion facility operated by Polychem LLC).

"Subsidiary" means, with respect to any Person (the "parent"), any other corporation, limited liability company, partnership, association or other entity (a) of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date, owned, controlled or held, or (b) that is, as of such date, otherwise controlled, by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.

"Subsidiary Guarantor" means each Subsidiary of the Issuer other than the Non-Guarantor Subsidiaries.

"Super-Majority Noteholders" means, at any time, Noteholders holding more than 66 2/3% of the sum of the aggregate unpaid principal amount of the Notes then outstanding.

"Target" has the meaning assigned to such term in the definition of "Permitted Acquisition".

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Termination Value" means, in respect of any one or more Hedging Agreement, after taking into account the effect of any legally enforceable netting agreement relating to such Hedging Agreements, (a) for any date on or after the date such Hedging Agreements have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) or any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Hedging Agreements, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Hedging Agreements (which may include a Noteholder or any Affiliate of a Noteholder).

"Texas Facility" means the Sellers' rPET processing facility located in Dallas, Texas.

"Texas Facility Acquisition" means the purchase by the Issuer of the Sellers' right, title and interest in and to all of the assets of the Sellers used or held for use with respect to the rPET

business conducted at the Texas Facility pursuant to, among other provisions thereof, Section 363 of Chapter 11 of Title 11 of the Bankruptcy Code.

"Trademarks" means all domestic, foreign and multinational trademarks, service marks, trade names, corporate names, company names, business names, fictitious business names, trade dress, trade styles, logos, Internet domain names, other indicia of origin or source identification, and general intangibles of a like nature, whether registered or unregistered, and, with respect to the foregoing, all registrations and applications for registration thereof, all extensions and renewals thereof, and all of the goodwill of the business connected with the use of and symbolized by any of the foregoing.

"Transaction Costs" means the fees, costs and expenses, regardless of when paid, incurred by the Issuer on or before the Closing Date in connection with the Transactions.

"Transactions" means (i) the execution and delivery of this Agreement and the other Note Documents, the issuance of the Notes and the incurrence of Indebtedness thereunder, (ii) the extinguishment of the Indebtedness outstanding under the Existing Indebtedness, (iii) the consummation of the Acquisition pursuant to the Purchase Agreement and the transactions contemplated thereby, and (iv) the payment of Transaction Costs incurred in connection therewith.

"U.S. Foreign HoldCo" means (i) any U.S. Subsidiary that is treated as a corporation for U.S. federal income tax purposes substantially all the assets of which consist (directly or indirectly) of stock or securities of one or more CFCs and (ii) any U.S. Subsidiary that is treated as either a partnership or disregarded entity for U.S. federal income tax purposes substantially all of the assets of which consist (directly or indirectly) of stock or securities of one or more CFCs.

"UCC" means the Uniform Commercial Code as in effect from time to time in the State of New York; provided that if, with respect to any filing statement or by reason of any mandatory provisions of law, the perfection or the effect of perfection or non-perfection of the security interests granted to the Agent pursuant to the applicable Security Document is governed by the Uniform Commercial Code as in effect in a jurisdiction of the United States other than New York, UCC means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions of each applicable Note Document and any filing statement relating to such perfection or effect of perfection or non-perfection.

"Uniform Commercial Code" means the Uniform Commercial Code as in effect from time to time in the applicable jurisdiction.

"US Person" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"USA PATRIOT Act" has the meaning assigned to such term in Section 10.14.

"Vehicle" means any vehicle covered by a certificate of title law of any jurisdiction of the United States.

"Voting Stock" means, with respect to any Person, Capital Stock the holders of which are ordinarily, in the absence of contingencies, entitled to vote for the election of directors (or persons performing similar functions) of such Person, even if the right so to vote has been suspended by the happening of a contingency.

"Write-Down and Conversion Powers" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

Section 1.02    Terms Generally. Except as otherwise expressly provided, the following rules of interpretation shall apply to this Agreement and the other Note Documents:

(a)    the definitions of terms herein shall apply equally to the singular and plural forms of the terms defined;

(b)    whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms;

(c)    the words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation";

(d)    the word "will" shall be construed to have the same meaning and effect as the word "shall";

(e)    unless the context requires otherwise, any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or therein) and shall include any appendices, schedules, exhibits, clarification letters, side letters and disclosure letters executed in connection therewith;

(f)    any reference herein to any Person shall be construed to include such Person's successors and assigns to the extent permitted under the Note Documents and, in the case of any Governmental Authority, any Person succeeding to its functions and capacities;

(g)    the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision;

(h)    all references herein to Articles, Sections, Appendices, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Appendices, Exhibits and Schedules to, this Agreement;

(i)    the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights; and

- 27 -

(j)     any reference herein to a merger, transfer, consolidation, amalgamation, consolidation, assignment, sale, disposition or transfer, or similar term, shall be deemed to apply to a division of or by a limited liability company, or an allocation of assets to a series of a limited liability company (or the unwinding of such a division or allocation), as if it were a merger, transfer, consolidation, amalgamation, consolidation, assignment, sale or transfer, or similar term, as applicable, to, of or with a separate Person. Any division of a limited liability company shall constitute a separate Person hereunder (and each division of any limited liability company that is a Subsidiary, joint venture or any other like term shall also constitute such a Person or entity).

Section 1.03   Accounting Terms. Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP. If the Issuer notifies the Agent and the Noteholders that the Issuer wishes to amend any provision hereof to eliminate the effect of any change occurring after the date hereof in GAAP or in the application thereof on the operation of such provision, regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then the Required Noteholders and the Issuer shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP; provided that, until so amended, ( such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein; provided that Capital Lease Obligations shall be construed in accordance with GAAP as in effect on the Closing Date, notwithstanding any changes to GAAP occurring after the Closing Date. Notwithstanding any provision contained herein or in any other Note Document, any lease (or similar arrangement) that would have been characterized, classified or reclassified as an operating lease in accordance with GAAP prior to the date of the Issuer's adoption of ASC 842 (or any other ASC having a similar result or effect) (and related interpretations) (whether or not such lease was in effect on such date) shall not constitute a Capital Lease Obligation, and any such lease shall be, for all purposes of this Agreement and the other Note Documents, treated as though it were reflected on the Issuer's consolidated financial statements in the same manner as an operating lease would have been reflected prior to the Issuer's adoption of ASC 842.

ARTICLE II

THE NOTES

Section 2.01   Sale and Purchase of Notes. Subject to the terms and conditions set forth herein (including, without limitation, the conditions set forth in Section 4.01), each Issuer agrees to issue Notes to the Noteholders on the Closing Date, in an aggregate principal amount equal to its Commitment for the consideration set forth opposite such Noteholder's name on Annex I hereto

Section 2.02   Issuance of the Notes. On the Closing Date, each Noteholder shall receive a Note as Note Consideration in the original principal amount set forth opposite such Noteholder's name on Annex I hereto

Section 2.03   Termination and Reduction of the Commitments. Each Noteholder's Commitment shall automatically terminate without further action upon the issuance of the Notes on the Closing Date.

Section 2.04    Repayment of Notes; Evidence of Debt.

(a)    Promise to Repay at Maturity.  The Issuer hereby unconditionally promises to pay to the Noteholders, the unpaid principal amount of the Notes then outstanding and all accrued and unpaid interest on the Notes on the Maturity Date.  Issuer hereby further agrees to pay interest on the unpaid principal amount of each Note from time to time outstanding from the Closing Date until payment in full in cash thereof at the rates per annum, and on the dates, set forth in Section 2.07.

(b)    Evidence of Debt.  Each Noteholder may maintain in accordance with its usual practice an account or accounts evidencing the Indebtedness of the Issuer to such Noteholder resulting from the Notes purchased by such Noteholder, including the amounts of principal and interest payable and paid to such Noteholder from time to time hereunder. In the case of a Noteholder that does not request. Such account or accounts shall be conclusive and binding on the Issuer absent manifest error; provided that the failure of any Noteholder to maintain such account or accounts or any error in any such account shall not limit or otherwise affect any obligations of the Issuer.

(c)    Amortization.  The Notes shall be repaid by the Issuer on each date set forth in the table below in the aggregate principal amount of Notes set forth opposite such date.

| Date | Amount |
|---|---|
| [＿＿＿＿＿＿]¹ | $210,000 |
| [＿＿＿＿＿＿]² | $210,000 |
| [＿＿＿＿＿＿]³ | $420,000 |
| [＿＿＿＿＿＿]⁴ | $630,000 |
| [＿＿＿＿＿＿]⁵ | $630,000 |

Section 2.05    Prepayment of the Notes.

(a)    Optional Prepayments. The Issuer shall have the right at any time and from time to time, upon at least ten (10) days and not more than sixty (60) days' prior written notice to the Noteholders stating the prepayment date and aggregate principal amount of the prepayment, to

---

[1] NTD: Second Anniversary of the Closing Date.

[2] NTD: Third Anniversary of the Closing Date.

[3] NTD: Fourth Anniversary of the Closing Date.

[4] NTD: Fifth Anniversary of the Closing Date.

[5] NTD: Sixth Anniversary of the Closing Date.

prepay the Notes in whole or in part, in each case, subject to the requirements of this <u>Section 2.05(a)</u>. Each partial prepayment of Notes under this <u>Section 2.05(a)</u> shall be in an aggregate amount for the Notes of all Noteholders of at least $5,000,000 or an integral multiple of $500,000 in excess thereof (or such lesser amount as may be necessary to prepay the aggregate principal amount then outstanding with respect to all Notes of all Noteholders).

(b)    <u>Mandatory Prepayments and Offers to Prepay</u>.

(i)    <u>Change of Control Prepayment Offer</u>. If a Change of Control occurs, the Issuer shall, within five (5) Business Days after the occurrence thereof, offer to prepay the Notes in an amount equal to 100% of the outstanding principal amount thereof, pursuant to a written notice sent to the Noteholders describing in reasonable detail the event giving rise to the obligation under this <u>Section 2.05(b)(i)</u> to make such offer (each such offer to prepay referred to in this <u>Section 2.05(b)(i)</u>, a "<u>Change of Control Prepayment Offer</u>").

(ii)    <u>Event of Loss/Disposition Prepayment Offer</u>. If the Net Available Amount received by the Note Parties (including without limitation, as a distribution from any Non-Guarantor Subsidiary) in respect of any Event of Loss or any Disposition by the Issuer Group Members (other than any Disposition by the Issuer Group Members in the ordinary course of business) shall be in excess of (x) $250,000 per item of equipment subject to such Disposition or Event of Loss, as the case may be, or (y) $1,000,000 in the aggregate per calendar year across all Events of Loss and Dispositions, then the Issuer shall, subject to the immediately succeeding sentence, promptly (and in any event not later than ten (10) Business Days after such Event of Loss or Disposition, as applicable) offer to prepay the Notes with an amount equal to 100% of the Net Available Amount with respect to such Event of Loss or such Disposition, as applicable, pursuant to a written notice sent to the Agent and the Noteholders describing in reasonable detail the event giving rise to the obligation under this Section <u>2.05(b)(ii)</u> to make such offer (each such offer to prepay referred to in this Section <u>2.05(c)(ii)</u>, an "<u>Event of Loss/Disposition Prepayment Offer</u>"). Notwithstanding the foregoing, the Issuer shall have the option (to be exercised by the Issuer notifying the Agent and the Noteholders of its intention to reinvest prior to the date any such prepayment is required to be made) to not prepay the Notes pursuant to this <u>Section 2.05(b)(ii)</u> to the extent that (A) the Issuer reinvests the Net Available Amount (or any portion thereof) of any such Event of Loss or Disposition in assets that are necessary or useful for the Business pursuant to a transaction not prohibited hereunder (including without limitation, in the case of any Event of Loss, Restoration of the related Affected Property) and such Net Available Amount is so reinvested within three hundred sixty-five (365) days after receipt thereof (or, if committed to be so reinvested pursuant to a written agreement on or prior to the expiration of such three hundred sixty-five (365) day period, within five hundred forty-five (545) days after receipt thereof) and (B) such assets shall become Collateral subject to and in accordance with this Agreement.

(iii)    [Reserved].

(iv)    <u>Incurrence of Debt</u>. If any Issuer Group Member issues or incurs any Indebtedness (other than Permitted Indebtedness), Issuer shall, within one (1) Business Day of the receipt of the net cash proceeds therefrom, offer to prepay the Notes with an amount equal to 100% of the cash proceeds of such Indebtedness, pursuant to a written notice sent to the Agent and the

Noteholders describing in reasonable detail the event giving rise to the obligation under this Section 2.05(b)(iv) to make such offer (each such offer to prepay referred to in this Section 2.05(b)(iv), a "Debt Prepayment Offer").

Notwithstanding the foregoing Sections 2.05(b)(i) through (iv), Issuer shall be permitted to request a waiver of the requirement to deliver a Change of Control Prepayment Offer, an Event of Loss/Disposition Prepayment Offer or a Debt Prepayment Offer, which waiver may be accepted or rejected by the Required Noteholders.

    (c)    Terms of All Prepayments.

    (i)    All partial prepayments of the Notes shall be applied, on a *pro rata* basis to the Notes of each Noteholder.

    (ii)    Each prepayment of Notes shall be accompanied by payment of all accrued interest on the amount prepaid, any additional amounts required pursuant to Section 2.09 and without any make-whole amount or premium.

    (iii)    No later than ten (10) Business Days after receiving a Change of Control Prepayment Offer, an Event of Loss/Disposition Prepayment Offer or a Debt Prepayment Offer, each Noteholder shall advise the Issuer in writing whether it has elected to accept such prepayment offer, which it shall determine in its sole and absolute discretion. Each of the Noteholders shall have the right, but not the obligation, to accept or reject such prepayment offer by the Issuer. In connection with any prepayment pursuant to Section 2.05(b)(i) or (ii), the amount of the Notes prepaid shall be calculated so that the total amount of Notes prepaid, the accrued but unpaid interest on such Notes shall be no more than the Net Available Amount. If a Noteholder fails to deliver a notice of election declining receipt of its ratable share of any prepayment offer to the Issuer within the time frame specified above, any such failure will be deemed to constitute an acceptance of such Noteholder's share of the total amount of such prepayment offer.

Section 2.06  Agent Fees. The Issuer agrees to pay to the Agent, for its own account, amounts payable in the amounts and at the times expressly set forth in the Agent Fee Letter.

Section 2.07  Interest.

    (a)    Notes. With respect to each Note, for each day on and after the Closing Date until the date on which such Note has been fully repaid in cash (including the first day but excluding the last), the outstanding principal amount of such Note shall bear interest at a rate per annum equal to the Interest Rate.

    (b)    Default Interest. If all or a portion of the principal amount of any Note, interest in respect thereof or any other amount due under the Note Documents shall not be paid when due (whether at the stated maturity, by acceleration or otherwise and after giving effect to any applicable grace periods), then the outstanding principal amount of the Notes (whether or not overdue) (to the extent legally permitted) shall bear interest at a rate per annum equal to the Post-Default Rate, from the date of such nonpayment (after giving effect to any applicable grace periods) until such amount is paid in full (after as well as before judgment), and, in each case, such

default interest shall be payable on demand. To the greatest extent permitted by law, interest shall continue to accrue after the filing by or against the Issuer of any petition seeking any relief under any Debtor Relief Law.

(c)    Payment of Interest. Accrued interest on each Note shall be payable in arrears in cash on each Semi-Annual Payment Date; provided that (i) interest accrued pursuant to paragraph (b) of this Section shall be payable on demand and (ii) in the event of any repayment or prepayment of any Note, accrued interest on the principal amount repaid or prepaid shall be payable in cash on the date of such repayment or prepayment. Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law.

(d)    Computation. All interest hereunder shall be computed on the basis of a year of 360 days, and, in each case, shall be payable for the actual number of days elapsed (including the first day but excluding the last). The computation by any Noteholder of any interest payable to it shall be determined by such Noteholder, as the case may be, and such determination shall be conclusive absent manifest error.

Section 2.08    [Reserved].

Section 2.09    Taxes.

(a)    Payments Free of Taxes. Any and all payments by or on account of any obligation of any Note Party hereunder or under any other Note Document shall be made without withholding or deduction for any Taxes except as required by Applicable Law; provided that if the applicable withholding agent shall be required by Applicable Law (as determined in the good faith discretion of the applicable withholding agent) to withhold or deduct any Taxes from such payments, then (i) to the extent such Taxes are Indemnified Taxes, the sum payable shall be increased as necessary so that after making all required withholdings and deductions (including withholdings and deductions applicable to additional sums payable under this Section), the Noteholder receives an amount equal to the sum it would have received had no such withholdings or deductions been made, (ii) such Note Party shall make or shall cause to be made such withholdings and deductions and (iii) such Note Party shall timely pay or shall cause to be timely paid the full amount withheld and deducted to the relevant Governmental Authority in accordance with Applicable Law.

(b)    Payment of Other Taxes by the Issuer. In addition, the Note Parties shall timely pay or cause to be paid any Other Taxes to the relevant Governmental Authority in accordance with Applicable Law.

(c)    Indemnification by the Issuer. The Note Parties shall jointly and severally indemnify, or cause to be indemnified, the Agent and each Noteholder, within fifteen (15) days after written demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) paid or payable by (or required to be withheld or deducted from a payment to) the Agent or such Noteholder, as the case may be, and any reasonable expenses arising therefrom or with respect thereto whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant

Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Issuer by the Agent or a Noteholder, shall be conclusive absent manifest error.

(d)    <u>Evidence of Payments</u>. As soon as practicable after any payment of Indemnified Taxes or Other Taxes by any Note Party to a Governmental Authority, the relevant Note Party shall deliver or cause to be delivered to the Noteholders the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment satisfactory to the Noteholders.

(e)    <u>Forms</u>. (i) The Agent or any Noteholder (including any assignee Noteholder) that is legally entitled to an exemption from or reduction of withholding tax under the law of the jurisdiction in which any Note Party is located with respect to payments under any Note Document shall deliver to the Issuer, at the time or times reasonably requested by the Issuer, such properly completed and executed documentation prescribed by Applicable Law as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Noteholder, if reasonably requested by the Issuer, shall deliver such other documentation prescribed by Applicable Law or reasonably requested by the Issuer as will enable the Issuer to determine whether or not such Noteholder is subject to information reporting requirements. Upon the reasonable written request of the Issuer, or if any form or certification previously delivered expires or becomes obsolete or inaccurate, a Noteholder shall update any such form or certification previously delivered pursuant to this <u>Section 2.09(e)</u>. Notwithstanding anything to the contrary in the preceding three sentences, the completion, execution and submission of such documentation (other than such documentation set forth in <u>Section 2.09(e)(ii)(A)</u>, <u>(B)</u> and <u>Section 2.09(g)</u>) shall not be required if in the Noteholder's reasonable judgment such completion, execution or submission would subject such Noteholder to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Noteholder.

(ii)    Without limiting the generality of the foregoing, in the event that the Issuer is a US Person,

(A)    any Noteholder that is a US Person shall deliver to the Issuer and the Agent on or about the date on which such Noteholder becomes a party to this Agreement (and from time to time thereafter upon the reasonable request of the Issuer or the Agent), executed copies of IRS Form W-9 certifying that such Noteholder is exempt from U.S. federal backup withholding tax;

(B)    any Noteholder who is not a US Person shall, to the extent it is legally entitled to do so, deliver to the Issuer and the Agent (in such number of copies as shall be requested by the recipient) on or about the date on which such Noteholder becomes a party to this Agreement (and from time to time thereafter upon the reasonable request of the Issuer or the Agent), whichever of the following is applicable:

(I)    in the case of a Noteholder who is not a US Person claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under this Agreement or any Note Document, executed copies of IRS Form W- 8BEN or W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding

Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under this Agreement or any Note Document, IRS Form W-8BEN or W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(II)    executed copies of IRS Form W-8ECI;

(III)    in the case of a Noteholder who is not a US Person claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit B-1 to the effect that such Noteholder is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Issuer within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code and (y) executed copies of IRS Form W-8BEN or W-8BEN-E; or

(IV)    to the extent a Noteholder who is not a US Person is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN or W-8BEN-E, a U.S. Tax compliance certificate substantially in the form of Exhibit B-2 or Exhibit B-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if such Noteholder is a partnership and one or more direct or indirect partners of such Noteholder are claiming the portfolio interest exemption, such Noteholder may provide a U.S. Tax compliance certificate substantially in the form of Exhibit B-4 on behalf of each such direct and indirect partner.

(f)    If the Agent or any Noteholder (each, a "Recipient") determines, in its sole discretion exercised in good faith, that it has received a refund of any Indemnified Taxes or Other Taxes as to which it has been indemnified pursuant to this Section by a Note Party or with respect to which a Note Party has paid additional amounts pursuant to this Section 2.09, such Recipient shall pay an amount equal to such refund (but only to the extent of indemnity payments made under this Section 2.09 with respect to the Taxes giving rise to such refund) to the Issuer, net of out-of-pocket expenses (including Taxes of such Recipient) and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); provided that the Issuer, upon the request of such Recipient, shall promptly repay the amount paid over to the Issuer (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to such Recipient, in the event the Recipient, is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this paragraph (f), in no event will any Recipient be required to pay any amount to the Issuer pursuant to this paragraph (f) the payment of which would place such Recipient, in a less favorable net after-Tax position than it would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This paragraph shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(g)    If a payment made to any Recipient under this Agreement would be subject to U.S. federal withholding Tax imposed by FATCA if such Recipient were to fail to comply with the

applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Recipient shall deliver to the Issuer and (if such Recipient is a Noteholder) the Agent at the time or times prescribed by law and at such time or times reasonably requested by the Issuer or (if such Recipient is a Noteholder) the Agent, such documentation prescribed by Applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Issuer or (if such Recipient is a Noteholder) the Agent as may be necessary for the Issuer and (if such Recipient is a Noteholder) the Agent to comply with their obligations under FATCA and to determine that such Recipient has complied with such Person's obligations under FATCA or to determine the amount, if any, to deduct and withhold from such payment. Solely for purposes of this clause, "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(h)     Survival. Each party's obligations under this Section shall survive the resignation or replacement of the Agent or any assignment of rights by, or the replacement of, a Noteholder, the termination of the Commitments and the repayment, satisfaction or discharge of all Obligations under any Note Document.

Section 2.10   Payments Generally; Pro Rata Treatment; Sharing of Setoffs.

(a)     Payments by the Issuer. Unless otherwise specified, the Issuer shall make each payment required to be made by it hereunder (whether of principal, interest, reimbursements, fees, or under Section 2.09 or otherwise) or under any other Note Document (except to the extent otherwise provided therein) prior to 1:00 p.m., New York City time, on the date when due, in Dollars and immediately available funds, without setoff or counterclaim. Any amounts received after such time on any date may, in the discretion of the applicable Noteholders (or the Agent, in the case of any such payment made to the Agent) be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon. All such payments shall to except as otherwise expressly provided in the relevant Note Document, shall be made directly to the Persons entitled thereto. If any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be set to the immediately preceding Business Day and, in the case of any payment accruing interest, interest thereon shall be payable for the period up to and including such immediately preceding Business Day, with the day(s) following such immediately preceding Business Day to be included in the calculation of interest for the following quarterly period in accordance with the terms hereof. All amounts owing under this Agreement or under any other Note Document are payable in Dollars.

(b)     Application of Insufficient Payments. If at any time insufficient funds are received by and available to any Noteholder to pay fully all amounts of principal, interest, reimbursements, fees and other amounts then due hereunder to it, as the case may be, such funds shall be applied (i) first, to pay interest, reimbursements, fees and other amounts (except for the amounts required to be paid pursuant to the following clause (ii)) then due hereunder in accordance with the amounts of interest, reimbursements, fees and such other amounts then due to such Noteholder, and (ii) second, to pay principal on the Notes then due hereunder in accordance with the amounts of principal then due to such Noteholder.

- 35 -

(c)    <u>Pro Rata Treatment</u>. Except to the extent otherwise provided herein: (i) each payment or prepayment of principal of the Notes by the Issuer shall be made *pro rata* amongst the Noteholders in accordance with the respective unpaid principal amounts of the Notes held by them being paid or prepaid; and (ii) each payment of interest on the Notes by the Issuer shall be made *pro rata* in accordance with the amounts of interest on the Notes then due and payable to the respective Noteholders.

(d)    <u>Sharing of Payments by Noteholders</u>. If any Noteholder shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment or recover any amount in respect of any principal of or interest on any of its Note resulting in such Noteholder receiving a greater proportion of the aggregate amount of the Notes and accrued interest thereon then due than the proportion received by any other Noteholder, then, unless otherwise agreed in writing by the Noteholders, the Noteholder receiving such greater proportion shall purchase (for cash at face value) participations in the Notes of other Noteholders to the extent necessary so that the benefit of all such payments shall be shared by the Noteholders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Notes; <u>provided</u> that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this paragraph shall not be construed to apply to any payment made by the Issuer pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a Noteholder as consideration for the assignment of or sale of a participation in any of its Notes to any assignee or Participant, other than to the Issuer or any Affiliate thereof (as to which the provisions of this paragraph shall apply). Each Note Party consents to the foregoing and agrees, to the extent it may effectively do so under Applicable Law, that any Noteholder acquiring a participation pursuant to the foregoing arrangements may exercise against such Note Party rights of setoff and counterclaim with respect to such participation as fully as if such Noteholder were a direct creditor of such Note Party in the amount of such participation.

Section 2.11   <u>Mitigation Obligations</u>. If the Issuer is required to pay any Indemnified Taxes or additional amount to any Noteholder or any Governmental Authority for the account of any Noteholder pursuant to Section 2.09 then such Noteholder shall (at the reasonable request of the Issuer) (i) use commercially reasonable efforts to file any certificate or document required by law and/or (ii) use reasonable efforts to designate a different lending office for issuing its Note hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the reasonable judgment of such Noteholder, such designation or assignment (x) would eliminate or reduce amounts payable pursuant to Section 2.09 in the future and (y) would not subject such Noteholder to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Noteholder in any material respect. The Issuer hereby agrees to pay all reasonable costs and expenses incurred by any Noteholder in connection with any such designation or assignment.

Section 2.12   <u>Acknowledgement and Consent to Bail-In of EEA Financial Institutions</u>. Notwithstanding anything to the contrary in any Note Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any

liability of any EEA Financial Institution arising under any Note Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)     the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)     the effects of any Bail-In Action on any such liability, including, if applicable:

(c)     a reduction in full or in part or cancellation of any such liability;

(d)     a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Note Document; or

(e)     the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of any EEA Resolution Authority.

Section 2.13   Additional Notes.  The Issuer may, from time to time, in its sole discretion and without the consent of any Noteholder or Agent, but subject to the terms and conditions of this Section 2.13, issue additional Notes under this Agreement (the "Additional Notes") to additional Persons (the "Additional Noteholders") pursuant to an Additional Notes Amendment (as defined below) as consideration (in whole or in part) for the Texas Facility Acquisition and/or the Pennsylvania Facility Acquisition.  The Additional Notes issued pursuant to an Additional Notes Amendment shall be subject to the following terms and conditions:

(a)     the Additional Notes shall be dated the date of issue thereof, bear interest at such rate or rates, mature on such date or dates, be subject to such mandatory and optional prepayment on such dates and at such premiums, if any, have such additional or different conditions precedent to closing, such representations and warranties and such additional or different covenants as shall be specified in an amendment to this Agreement (an "Additional Notes Amendment") to be executed by Issuer and each Additional Noteholder (whereupon, this Agreement will be amended by such Additional Notes Amendment without further action by the then Noteholders or Agent); provided, that, any additional or different covenants, any additional rights to mandatory or optional prepayment, any increased pricing or premiums and any other term or condition of such Additional Notes that is more favorable than the terms of the Notes then outstanding hereunder shall inure to the benefit of all Noteholders;

(b)     such Additional Notes shall constitute Notes hereunder, shall rank *pari passu* with all other Notes issued hereunder and be entitled to the same rights and be subject to the same obligations of all other Notes issued hereunder;

(c)     the Additional Noteholders will become Noteholders hereunder upon execution of the applicable Additional Notes Amendment; and

- 37 -