(d)      such Additional Notes shall vote (including for all consents, approvals and waivers under this Agreement to be made by all Noteholders including Additional Noteholders) as a single class with all other Notes issued hereunder and therefore will not be entitled to tranche or class voting, consent, approval or waiver.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES

Each Note Party represents and warrants (to its knowledge, in the case of any representation or warranty related to the Riverside Facility made on the Closing Date) to the Agent and each of the Noteholders that:

Section 3.01    Due Organization, Etc.

(a)      Each Note Party (and, as of the Closing Date, each Non-Guarantor Subsidiary, if any) is duly organized or incorporated, validly existing and in good standing under the laws of the jurisdiction of its organization or incorporation. Each Note Party (and, as of the Closing Date, each Non- Guarantor Subsidiary) (i) has all requisite limited liability company, corporate or other organizational power and authority to own or lease and operate its assets and to carry on its business as now conducted and as proposed to be conducted by it and (ii) is duly qualified to do business and is in good standing in each jurisdiction where necessary in light of its business as now conducted and as proposed to be conducted, in the case of this clause (ii), where the failure to so qualify would not reasonably be expected to have a Material Adverse Effect. No filing, recording, publishing or other act by a Note Party (and, as of the Closing Date, each Non-Guarantor Subsidiary), that has not been made or done, is necessary in connection with the existence or good standing of such Issuer Group Member.

(b)      As of the Closing Date, the Equity Shareholders listed on Schedule 3.01(b) are the only members of Holdings.

(c)      The only member of the Issuer is Holdings, with Holdings owning, directly, 100% of the Issuer's Capital Stock

(d)      The only member or stockholder, as applicable, of each Subsidiary Guarantor is the Issuer or another Guarantor, with the Issuer owning, directly or indirectly, 100% of each Subsidiary Guarantor's Capital Stock. All Capital Stock in each Subsidiary Guarantor is beneficially owned and controlled by the Issuer free and clear of all Liens other than non-consensual Permitted Liens.

(e)      The only member or stockholder, as applicable, of each Non-Guarantor Subsidiary is a Subsidiary Guarantor, with a Guarantor owning 100% of each Non-Guarantor Subsidiary's Capital Stock.

Section 3.02    Authorization, Etc. Each Note Party has full limited liability company, corporate or other organizational powers, authority and legal right to enter into, deliver and perform its respective obligations under each of the Note Documents to which it is a party and to consummate each of the transactions contemplated herein and therein, and has taken all necessary limited

liability company, corporate or other organizational action to authorize the execution, delivery and performance by it of each of the Note Documents to which it is a party. Each of the Note Documents to which any Note Party is a party has been duly executed and delivered by such Note Party and is in full force and effect and constitutes a legal, valid and binding obligation of such Note Party, enforceable against such Note Party in accordance with its respective terms, except as enforcement may be limited (i) by bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance or other similar laws affecting creditors rights generally, (ii) by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law) and (iii) by implied covenants of good faith and fair dealing.

Section 3.03   No Conflict. The execution, delivery and performance by each Note Party of each of the Note Documents to which it is a party and all other documents and instruments to be executed and delivered hereunder by it, as well as the consummation of the transactions contemplated herein and therein, do not and will not (i) conflict with the Organizational Documents of such Note Party, (ii) conflict with or result in a breach of, or constitute a default under, any indenture, loan agreement, mortgage, deed of trust or other material instrument or agreement to which such Note Party is a party or by which it is bound or to which such Note Party's (and, as of the Closing Date, any Non-Guarantor Subsidiary's) property or assets are subject, (iii) conflict with or result in a breach of, or constitute a default under, in any material respect, any Applicable Law or (iv) with respect to each Note Party (and, as of the Closing Date, each Non-Guarantor Subsidiary), result in the creation or imposition of any Lien (other than a Permitted Lien) upon any of such Issuer Group Member's property or the Collateral.

Section 3.04   Approvals, Etc.

(a)      Each Note Party has obtained all material Authorizations required under any Applicable Law to be issued to, assigned to, or otherwise assumed by, such Issuer Group Member and necessary for (i) the Business or (ii) the execution, delivery and performance by each Note Party of the Note Documents to which it is a party.

(b)      As of the Closing Date, all of the material Authorizations required under any Applicable Law to be issued to, assigned to, or otherwise assumed by, any Note Party and necessary for (i) the Business or (ii) the execution, delivery and performance by any Note Party of the Note Documents to which it is a party, other than, in each case, Authorizations that are not currently necessary and are obtainable in the ordinary course of business, are set forth in Schedule 5.04 hereto.

(c)      Each Note Party is in compliance with each Authorization by a Governmental Authority currently in effect, except as would not have a Material Adverse Effect.

Section 3.05   Use of Proceeds. The Notes have been issued directly to the Noteholders as assignees of the Sellers as the Note Consideration contemplated under the Purchase Agreement.

Section 3.06   Litigation.

(a)      There is no pending or, to the knowledge of any Authorized Representative of any Note Party (and, as of the Closing Date, each Non-Guarantor Subsidiary), threatened (in writing)

litigation, investigation, action or proceeding of or before any court, arbitrator or Governmental Authority (in the case of any of the foregoing not involving the Note Parties, to the knowledge of any Authorized Representative of any Issuer Group Member) (i) seeking to restrain or prohibit the consummation of the transactions contemplated by the Note Documents or (ii) purporting to affect the legality, validity or enforceability of any of the Note Documents.

(b)    There is no pending or, to the knowledge of any Authorized Representative of any Note Party threatened (in writing) litigation, investigation, action or proceeding of or before any court, arbitrator or Governmental Authority against any Note Party that affects the Business which (either individually or in the aggregate) would have a Material Adverse Effect.

Section 3.07    Environmental Matters. (a) Except as set forth on Schedule 3.07, or as would not have a Material Adverse Effect:

(i)    each Note Party (and, as of the Closing Date, each Non-Guarantor Subsidiary) and the conduct of the Business is in compliance with all applicable Environmental Laws;

(ii)    each Note Party (and, as of the Closing Date, each Non-Guarantor Subsidiary), (A) holds or has applied for all Authorizations required under Environmental Laws (each of which is in full force and effect) required for the conduct of the Business and any of its current operations or for any property owned, leased or otherwise operated by it; and (B) is in compliance with all Authorizations required under Environmental Law;

(iii)    to the knowledge of any Authorized Representative of any Note Party (and, as of the Closing Date, each Non-Guarantor Subsidiary), (x) there are no pending Environmental Claims asserted against any Note Party (and, as of the Closing Date, each Non-Guarantor Subsidiary) or the Business and (y) no Note Party (and, as of the Closing Date, each Non-Guarantor Subsidiary) has received any written notice, claim or information regarding, or otherwise has knowledge of, a past or threatened Environmental Claim asserted against any Note Party (and, as of the Closing Date, each Non-Guarantor Subsidiary) or the Business, except for such Environmental Claims that have been fully resolved;

(iv)    there are no outstanding consent decrees, orders, settlements or other agreements concerning any Note Party (and, as of the Closing Date, each Non-Guarantor Subsidiary) or the Business relating to compliance with or liability under Environmental Law; and

(v)    no Note Party (and, as of the Closing Date, each Non-Guarantor Subsidiary) and, to the knowledge of any Authorized Representative of any Note Party, no other Person has Released Hazardous Materials at, on, in, to, from or under any real property currently or formerly owned, leased or operated by any Note Party (and, as of the Closing Date, each Non-Guarantor Subsidiary) in a manner that would reasonably be expected to result in a material liability of any Note Party (and, as of the Closing Date, each Non-Guarantor Subsidiary) pursuant to Environmental Laws.

(b)    Each Note Party (and, as of the Closing Date, each Non-Guarantor Subsidiary) has made available copies of all significant reports, correspondence and other documents in its

possession, custody or control regarding compliance by any Note Party (and, as of the Closing Date, each Non-Guarantor Subsidiary), or potential liability of any Note Party (and, as of the Closing Date, each Non-Guarantor Subsidiary) under Environmental Laws or Authorizations required under Environmental Laws.

Section 3.08    Compliance with Laws and Obligations. Subject to Section 3.07, each Note Party and the Business are in compliance with all Applicable Laws applicable to the Issuer Group Members and the Business, except where the failure to do so, individually or in the aggregate, would not result in a Material Adverse Effect.

Section 3.09    No Material Adverse Effect. Since the Closing Date there has been no development or event which has had or would reasonably be expected to have a Material Adverse Effect.

Section 3.10    Intellectual Property; Licenses.

(a)      Each Note Party owns, or is licensed to use, free and clear of all Liens except for Permitted Liens, all Intellectual Property necessary for its business and that are necessary for the performance by it of its obligations under the Note Documents to which it is a party, in each case, as to which the failure of such Issuer Group Member to so own or be licensed would have a Material Adverse Effect, and the use thereof by such Issuer Group Member does not, to the knowledge of any Note Party (and, as of the Closing Date, each Non-Guarantor Subsidiary), infringe in any material respect upon the rights of any other Person.

(b)      Each Note Party (and, as of the Closing Date, each Non-Guarantor Subsidiary) has obtained the necessary intellectual property licenses that the Issuer Group Members other than any Non-Guarantor Subsidiary (and, as of the Closing Date, each Non-Guarantor Subsidiary) reasonably believe are required for the Business, the absence of any of which would have a Material Adverse Effect.

(c)      With respect to each material license in or to Intellectual Property held by each Note Party (and, as of the Closing Date, each Non-Guarantor Subsidiary): (i) such license is valid and binding and in full force and effect and represents the entire agreement between the respective licensor and licensee with respect to the subject matter of such license; and (ii) such license will not cease to be valid and binding and in full force and effect on terms identical to those currently in effect as a result of the rights and interests granted herein, nor will the grant of such rights and interests constitute a breach or default under such license or otherwise give the licensor or sublicensor a right to terminate such license.

Section 3.11    Taxes. Except as specified on Schedule 3.11:

(a)      each Note Party and each of its Subsidiaries has timely filed or caused to be timely filed all material U.S. federal, state, non-U.S. and other tax returns and reports required to have been filed by it and has timely paid, or has caused to be timely paid, all material taxes, assessments, fees and other governmental charges levied or imposed upon them or their properties, income or assets, other than taxes that are being contested in accordance with the Permitted Contest Conditions; and

(b)    as of the Closing Date, each Note Party and each Non-Guarantor Subsidiary has been properly treated as a disregarded entity or a partnership for U.S. federal income tax purposes.

Section 3.12    [Reserved].

Section 3.13    Solvency. The Issuer Group Members, on a consolidated basis, are Solvent.

Section 3.14    Regulatory Restrictions on the Notes. No Note Party is an "investment company", or a company "controlled" by an "investment company", within the meaning of the Investment Company Act of 1940, as amended..

Section 3.15    Title; Security Documents.

(a)    Each Note Party owns and has good, legal and defensible title, or valid leasehold interests in, all of its property material to its Business, free and clear of all Liens other than Permitted Liens.

(b)    The provisions of the Security Documents to which any Note Party is a party that have been delivered on or prior to the date this representation is made are, effective to create, in favor of the Agent for the benefit of the Secured Parties, a legal, valid and enforceable Lien on and security interest in all of the Collateral (other than any Vehicles) purported to be covered thereby, and all necessary recordings and filings have been or will concurrently be made in all necessary public offices (other than with respect to any Vehicles), and all other necessary and appropriate action has been taken, so that the security interest created by each Security Document is a first-priority perfected Lien on and security interest in all right, title and interest of such Note Party in the Collateral purported to be covered thereby (other than any Vehicles), prior and superior to all other Liens other than (i) in the case of any ABL Priority Collateral, as provided in the intercreditor agreement entered into in connection with any Permitted ABL Facility, (ii) Permitted Liens, to the extent any such Permitted Lien would have priority over the Liens in favor of the Agent (on behalf of the Noteholders) pursuant to any Applicable Law and (iii) Liens perfected only by possession (including possession of any certificate of title), to the extent that the Agent has not obtained or does not maintain possession of such Collateral.

Section 3.16    ERISA.

(a)    No ERISA Event has occurred or is reasonably expected to occur which has or would reasonably be expected to have a Material Adverse Effect. Each Pension Plan has complied in all material respects with the applicable provisions of ERISA and the Code. No termination of a Pension Plan has occurred resulting in any liability that has remained underfunded and no Lien against any Note Party or any of its ERISA Affiliates in favor of the PBGC or a Pension Plan has arisen during the five-year period prior to the date hereof.

(b)    None of the Note Party (and, as of the Closing Date, each Non-Guarantor Subsidiary) has incurred any obligation which has or would reasonably be expected to have a Material Adverse Effect on account of the termination or withdrawal from any Foreign Plan.

Section 3.17   Insurance. Except as set forth in Schedule 3.17, all insurance policies required to be obtained by the Issuer Group Members other than any Non-Guarantor Subsidiary (and, as of the Closing Date, each Non-Guarantor Subsidiary) pursuant to the Insurance Covenant have been obtained and are in full force and effect as required under Insurance Covenant and all premiums then due and payable thereon have been paid in full. No Note Party (and, as of the Closing Date, each Non-Guarantor Subsidiary) has received any notice from any insurer that any insurance policy has ceased to be in full force and effect or claiming that the insurer's liability under any such insurance policy can be reduced or avoided.

Section 3.18   [Reserved].

Section 3.19   Capital Stock and Related Matters.

(a)      [Reserved].

(b)      Other than as set forth on Schedule 3.19(b), no Note Party has any Subsidiaries and no Note Party owns any equity interest in, or otherwise Controls any Voting Stock of or has any ownership interest in, any Person.

(c)      All of the Capital Stock in the Issuer and each Guarantor have been duly authorized and validly issued in accordance with its Organizational Documents, are fully paid and non-assessable (subject to the applicable Note Parties' obligation to contribute capital to another Note Party, in accordance with the terms of such Note Party's governing documents) and free and clear of all Liens. Neither the Issuer nor any Guarantor has outstanding any securities convertible into or exchangeable for any of its Capital Stock in or any rights to subscribe for or to purchase, or any warrants or options for the purchase of, or any agreements providing for the issuance (contingent or otherwise) of, or any calls, commitments or claims of any character relating to any such Capital Stock (except as expressly provided for or permitted herein or in the Security Documents).

(d)      Other than consents that have been obtained, no consent of any Person, including any general or limited partner, any other member or manager of a limited liability company, any shareholder, any other trust beneficiary or derivative counterparty, is necessary in connection with the creation, perfection or first priority status (or the maintenance thereof) of the security interest of the Agent under the Security Documents or the exercise by the Agent or any Noteholder of the voting or other rights provided for in the Security Documents or the exercise of remedies in respect of such Capital Stock.

Section 3.20   [Reserved].

Section 3.21   [Reserved].

Section 3.22   No Bank Accounts. No Note Party maintains any accounts other than the Collateral Accounts and Excluded Accounts.

Section 3.23   No Default or Event of Default. No Default or Event of Default has occurred and is continuing.

Section 3.24   <u>Foreign Assets Control Regulations</u>.

(a)    None of the Issuer Group Members, and none of their respective, principals, owners, officers or directors, or, to any of the Note Parties' knowledge, their respective Affiliates or agents (i) is a Sanctioned Person; or (ii) engages in any dealings or transactions in or with a Sanctioned Country or that are otherwise prohibited by Sanctions.

(b)    Each of the Issuer Group Members maintains reasonable policies and procedures to ensure compliance with Sanctions, Anti-Corruption Laws and Anti-Money Laundering Laws (as such compliance is required under this Agreement).

(c)    Each of the Issuer Group Members and their respective officers, directors, employees and, to the Issuer Group Members' knowledge, agents are in compliance with Anti-Corruption Laws, Anti-Money Laundering Laws and Sanctions.

(d)    [Reserved].

(e)    Each of the Issuer Group Members has disclosed to the Noteholders all facts known to it regarding (a) all claims, damages, liabilities, obligations, losses, penalties, actions, judgment, and/or allegations of any kind or nature that are asserted against, paid or payable by such Person, any of its Affiliates or any of its representatives in connection with non-compliance with Anti-Corruption Laws, Sanctions or Anti-Money Laundering Laws by such Person, and (b) any investigations involving possible non-compliance with Anti-Corruption Laws, Sanctions or Anti-Money Laundering Laws by such Person or such Affiliate or such representative. No proceeding by or before any Governmental Authority involving any Issuer Group Member with respect to Anti- Corruption Laws, Sanctions or Anti-Money Laundering Laws is pending or, to the knowledge of the Issuer Group Members, threatened.

Section 3.25   <u>Commercial Activity; Absence of Immunity</u>.Each Note Party is subject to civil and commercial law with respect to its obligations under the Note Documents, and the making and performance of the Note Documents by the Note Parties constitute private and commercial acts rather than public or governmental acts. The Note Parties are not entitled to any immunity on the ground of sovereignty or the like from the jurisdiction of any court or from any action, suit, setoff or proceeding, or the service of process in connection therewith, arising under the Note Documents.

ARTICLE IV

CONDITIONS

Section 4.01   <u>Conditions to the Closing Date</u>. The occurrence of the Closing Date, the effectiveness of this Agreement and the obligations of each Noteholder hereunder (including without limitation, to purchase the Notes pursuant to <u>Section 2.01</u> on the Closing Date) hereunder are subject to the receipt by the Noteholders (except as set forth otherwise below) of each of the following documents, and the satisfaction of the conditions precedent set forth below, each of which must be satisfied to the reasonable satisfaction of the Required Noteholders (unless waived in accordance with <u>Section 10.02</u>):

(a)     <u>Execution of Certain Note Documents</u>. This Agreement, the Agent Fee Letter and the Security Agreement shall have been duly executed and delivered by each of the Note Parties, the Agent and Noteholders intended to be parties thereto.

(b)     <u>Execution of Notes</u>. Each Noteholder shall have received a Note or Notes, duly executed by the Issuer and payable to such Noteholder in a principal amount equal to the amount contemplated to be purchased by such Noteholder pursuant to <u>Section 2.01</u>.

(c)     <u>Corporate Documents</u>. The following documents, each certified as of the Closing Date as indicated below:

(i)     copies of the Organizational Documents, together with any amendments thereto, of each Note Party and a certificate of good standing or its equivalent (if any) for the applicable jurisdiction for each such party (in each case such good standing certificate or its equivalent dated no more than ten (10) days prior to the Closing Date);

(ii)     an Officer's Certificate of each Note Party dated as of the Closing Date, certifying:

(A)     that attached to such certificate is a true and complete copy of the Organizational Documents referred in <u>clause (i)</u> above for such Person;

(B)     that attached to such certificate is a true and complete copy of resolutions duly adopted by the board of directors, member(s), manager(s), partner(s) or other authorized governing body of such Person authorizing the transactions contemplated by the Note Documents, and that such resolutions or other evidence of authority have not been modified, rescinded or amended and are in full force and effect;

(C)     that the certificate of incorporation, certificate of formation, charter or other Organizational Documents (as the case may be) referred in <u>clause (i)</u> above for such Person has not been amended since the date of the certification furnished pursuant to <u>clause (i)</u> above;

(D)     as to the incumbency and specimen signature of each officer, member, manager or partner (as applicable) of such Person executing the Note Documents to which such Person is or is intended to be a party (and each Noteholder may conclusively rely on such certificate until it receives notice in writing from such Person); and

(E)     as to the qualification of such Person to do business in each jurisdiction where its operations require qualification to do business and as to the absence of any pending proceeding for the dissolution or liquidation of such Person.

(d)     <u>Authorizations</u>. All Authorizations required under any Applicable Law to be issued to, assigned to, or otherwise assumed by any Note Party and necessary for (i) conduct of the Business or (ii) the execution, delivery and performance by such Note Party of the Note Documents to which it is a party, other than, in each case, Authorizations that are not currently necessary and are obtainable in the ordinary course of business, (A) have been duly obtained and, to the knowledge of Issuer, validly issued, (B) are in full force and effect and not subject to any pending

or, to the knowledge of Issuer, threatened, appeal or legal proceeding that could reasonably be expected to result in a material adverse modification to or withdrawal, cancellation, suspension or revocation of such Authorization, (C) are issued to, assigned to, or otherwise assumed by, a Note Party (or such Note Party is entitled to the benefit thereof), (D) are free from any unsatisfied condition the failure of which to satisfy would reasonably be expected to have a Material Adverse Effect and (E) with respect to such Authorizations, all applicable statutory, judicial and administrative review periods have expired.

(e)    Operating Budget. A copy of the current Operating Budget in substantially the form presented to the Noteholders prior to the Closing Date.

(f)    Regulatory Information. Each Noteholder shall have received all documentation and other written information required by under applicable anti-money laundering rules and regulations, including the USA PATRIOT Act.

(g)    Representations and Warranties. The representations and warranties of each of the Note Parties set forth in the Note Documents shall be true and correct in all material respects on and as of the Closing Date (except where already qualified by materiality or Material Adverse Effect, in which case, in all respects).

(h)    Officer's Certificate. An Officer's Certificate of the Issuer dated as of the Closing Date certifying that each of the conditions set forth in this Section 4.01 have been satisfied.

(i)    Payoff Letters. The Agent shall have received payoff letters or other evidence of termination of Indebtedness with respect to the Existing Indebtedness, together with such UCC termination statements as shall be requested by the Required Noteholders, in each case, in form and substance satisfactory to the Required Noteholders.

(j)    Fees and Expenses. The Issuer has arranged for payment on the Closing Date of all reasonable and documented out-of-pocket fees, reimbursements and expenses then due and payable pursuant to the Note Documents.

(k)    Collateral Perfection Matters.

(i)    The security interests in and to the Collateral intended to be created under the Security Documents shall have been created in favor of the Agent for the benefit of the Secured Parties, are in full force and effect and all notices, consents, acknowledgments, filings, registrations, recordings and other actions necessary to preserve, protect and perfect the security interests in the Collateral have been made or taken immediately prior to the Closing Date such that the security interests granted in favor of the Agent for the benefit of the Secured Parties will constitute a first priority (subject to Permitted Liens, to the extent any such Permitted Lien would have priority over the Liens in favor of the Agent (on behalf of the Noteholders) pursuant to any Applicable Law), perfected security interest in the Collateral free and clear of any Liens, other than Permitted Liens, and all related recordation, registration and/or notarial fees of such Collateral have been paid to the extent required.

(ii)     Appropriately completed UCC-1 financing statements, which have been duly authorized for filing by the appropriate Person, naming the Note Parties as debtors and Agent as secured party, in form appropriate for filing under each jurisdiction as may be necessary to perfect the security interests purported to be created by the Security Documents, covering the applicable Collateral.

(iii)     Copies of UCC, judgment lien, tax lien and litigation lien search reports, which reports will be for the period between the Closing Date and a recent date acceptable to the Agent in its sole and absolute discretion, listing all effective financing statements that name any Note Party as debtor and that are filed in the jurisdictions in which the UCC-1 financing statements will be filed in respect of the Collateral, none of which shall cover the Collateral except to the extent evidencing Permitted Liens.

(iv)     Appropriately completed copies of all other recordings and filings of, or with respect to, the Security Documents as may be requested by Agent and necessary to perfect the security interests purported to be created by the Security Documents.

(v)     Subject to <u>Section 5.20</u>, the Agent and the Required Noteholders shall be satisfied with arrangements to receive all certificates representing the shares of Capital Stock constituting "certificated securities" under the UCC that are pledged pursuant to the Security Agreement, together with an undated stock power for each such certificate executed in blank by a duly Authorized Representative of the applicable Note Party.

(vi)     Evidence that all other actions requested by Agent and necessary to perfect and protect the security interests purported to be created by the Security Documents entered into on or prior to the Closing Date have been taken immediately prior to the Closing Date.

(l)     <u>Insurance Deliverables</u>. The Issuer shall have obtained the insurance required to be in effect under the Insurance Covenant and such insurance shall be in full force and effect, and the Issuer shall have furnished the Agent with certificates signed by the insurer or an agent authorized to bind the insurer, together with loss payee endorsements in favor of the Agent, evidencing such insurance, identifying underwriters, the type of insurance, the insurance limits and the policy terms, and stating that such insurance (x) is, in each case, in full force and effect and (y) complies with Insurance Covenant and that all premiums then due and payable on such insurance have been paid.

(m)     <u>Opinions of Counsel</u>. A written opinion (dated the Closing Date and addressed to the Noteholders and the Agent) of Willkie Farr & Gallagher LLP, special New York counsel to the Note Parties.

(n)     [Reserved].

(o)     [Reserved].

(p)     <u>Sale</u>. The sale of the Purchased Assets (as defined in the Purchase Agreement) shall be consummated substantially concurrently with the issuance of the Notes on the Closing

Date in accordance with the Purchase Agreement and the Sale Order (as defined in the Purchase Agreement.

(q)    Contribution of the Evergreen Facility. The contribution of the Evergreen Facility to the Issuer shall have occurred pursuant to _____.

Without limiting the generality of the provisions of this Section, for purposes of determining compliance with the conditions specified in this Section, each Noteholder that has signed this Agreement shall be deemed to have consented to, approved of, accepted or been satisfied with each document or other matter required thereunder to be consented to, approved by or acceptable or satisfactory to a Noteholder unless the Agent shall have received notice from such Noteholder prior to the proposed Closing Date specifying its objection thereto.

Section 4.02   [Reserved].

## ARTICLE V
## AFFIRMATIVE COVENANTS

Each Note Party hereby agrees that, from and after the Closing Date until all of the Obligations (other than contingent obligations as to which no claim exists or has been asserted) have been paid in full:

Section 5.01   Corporate Existence; Etc. Each Issuer Group Member shall at all times preserve and maintain in full force and effect (a) its existence as a corporation or a limited liability company, as applicable, (b) its good standing under the laws of the jurisdiction of its organization, and (c) its qualification to do business and its good standing in each jurisdiction in which the character of properties owned by it or in which the transaction of its business as conducted or proposed to be conducted makes such qualification necessary, except in the case of this clause (c), where the failure to do so would not reasonably be expected to have a Material Adverse Effect.

Section 5.02   Conduct of Business. Each Issuer Group Member shall operate, maintain and preserve or cause to be operated, maintained and preserved, the Business in compliance with all Applicable Laws and Authorizations by Governmental Authorities and the terms of its insurance policies, in each case, except as would not reasonably be expected to have a Material Adverse Effect.

Section 5.03   Compliance with Laws and Obligations.

(a)    Each Issuer Group Member shall (i) comply with all applicable Environmental Laws, including occupational health and safety regulations, and all other Applicable Laws and Authorizations and (ii) comply with and perform its respective contractual obligations, in each case, except as would not reasonably be expected to have a Material Adverse Effect. Each Issuer Group Member shall not violate applicable Sanctions, Anti-Money Laundering Laws, the FCPA or any other Anti-Corruption Laws and shall not undertake or cause to be undertaken any Anti-Corruption Prohibited Activity.

Section 5.04   [Reserved].

Section 5.05  Maintenance of Title. Each Issuer Group Member shall maintain (a) good title to the property owned by such Issuer Group Member necessary for the conduct of the Business free and clear of Liens, other than Permitted Liens, (b) legal and valid and subsisting leasehold interests to the properties leased by such Issuer Group Member necessary for the conduct of the Business, free and clear of Liens, other than Permitted Liens and (c) legal and valid possessory rights to the properties possessed and not otherwise held in fee or leased by such Issuer Group Member necessary for the conduct of the Business.

Section 5.06  [Reserved].

Section 5.07  Keeping of Books. Each Note Party shall maintain an accounting and control system, management information system and books of account and other records, which together adequately reflect truly and fairly the financial condition of such Note Party and the results of operations in accordance with GAAP and all Applicable Laws.

Section 5.08  [Reserved].

Section 5.09  Taxes. Each Note Party and its Subsidiaries shall timely and fully pay and discharge, before the same shall become delinquent, all material Taxes imposed upon it or upon its property, including to the extent required under the Note Documents to which such Note Party is a party or as required under Applicable Law; provided that the foregoing shall not apply for any such Tax liability that is being contested in accordance with the Permitted Contest Conditions (but only for so long as such Note Party satisfies the Permitted Contest Conditions in relation to such tax, assessment, charge or claim).

Section 5.10  Financial Statements; Other Reporting Requirements.Each Note Party shall, or cause the applicable Non-Guarantor Subsidiary to, furnish to the Noteholders:

(a)      as soon as available and in any event within thirty (30) days after the end of each fiscal month (other than the last fiscal month of each Fiscal Quarter), commencing with the fiscal month ending October 31, 2021, (i) the unaudited consolidated balance sheet of the Issuer Group Members as of the end of such fiscal month and the related unaudited statement of income for such fiscal month and for the portion of such Fiscal Year ending on the last day of such fiscal month, all in reasonable detail prepared in accordance with GAAP, subject to the absence of footnotes and normal year-end adjustments (it being understood that the financial statements to be delivered pursuant to this clause (a) for the fiscal months ending October 31, 2021, November 30, 2021 and January 31, 2021 shall be limited in nature) and (ii) a monthly report containing (A) information (in summary form) as to the consolidated operational and financial performance of the Issuer Group Members;

(b)      as soon as available and in any event within forty-five (45) days after the end of each Fiscal Quarter, commencing with Fiscal Quarter ending on March 31, 2022, the unaudited consolidated balance sheet of the Issuer Group Members as of the end of such Fiscal Quarter and the related statements of income and cash flows for such Fiscal Quarter and for the portion of such Fiscal Year ending on the last day of such Fiscal Quarter, all in reasonable detail and accompanied

by customary management discussion and analysis, prepared in accordance with GAAP, subject to the absence of footnotes and normal year-end adjustments;

(c)    as soon as available and in any event within one hundred twenty (120) days after the end of each Fiscal Year (or one hundred eighty (180) days after the end of the Fiscal Year ending on December 31, 2021), commencing with Fiscal Year ending on December 31, 2021, the audited consolidated financial statements of the Issuer Group Members for such Fiscal Year, including therein the consolidated balance sheet as of the end of such Fiscal Year and the related statements of income, retained earnings and cash flows for such year, all in reasonable detail and accompanied by customary management discussion and analysis and an audit opinion thereon by the Independent Auditor, which opinion shall state that said financial statements present fairly, in all material respects, the financial position of the Issuer Group Members, as the case may be, at the end of, and for, such Fiscal Year in accordance with GAAP;

(d)    at the time of the delivery of the financial statements under Section 5.10(b) or (c) above, a certificate of an the chief financial officer, chief accounting officer, treasurer or corporate controller (or other similar officer) of the Issuer (i) certifying that such financial statements fairly present in all material respects the financial condition and results of operations of the Issuer Group Members on the dates and for the periods indicated in accordance with GAAP, subject, in the case of interim financial statements, to the absence of footnotes and normally recurring year-end adjustments, (ii) certifying that no Default or Event of Default has occurred and is continuing, or if a Default or Event of Default has occurred and is continuing, a statement as to the nature thereof and (iii) certifying and providing calculations for the Debt Service Coverage Ratio as of such date (such certificate, the "Compliance Certificate"); and

(e)    not later than sixty (60) days after the commencement of each Fiscal Year, beginning with the Fiscal Year commencing on January 1, 2022, an Operating Budget for such Fiscal Year (it being understood that any failure to comply with any such Operating Budget shall not constitute a default or Event of Default, or require the consent of the Agent or any Noteholder as a result of such failure to so comply).

Section 5.11    Notices. The Note Parties shall, or cause the applicable Non-Guarantor Subsidiary to promptly (and, unless a subsection of this Section 5.11 is expressly made subject to another time period, within five (5) Business Days) upon an Authorized Representative of any Note Party obtaining actual knowledge thereof (or as otherwise provided in the case of clause (a) below), give notice to the Noteholders of:

(a)    the filing or commencement of any litigation, investigation, action or proceeding (including any Environmental Claim) of or before any court, arbitrator or Governmental Authority against or affecting any Issuer Group Member or the Business (x) in which the amount involved is in excess of $1,250,000, (y) has resulted in or, if adversely determined, would reasonably be expected to result in a Material Adverse Effect or (z) which relates to a material Authorization (including all material Authorizations required by Environmental Law) necessary for the Business;

(b)    the occurrence of a Default or an Event of Default;

(c)    the occurrence of any ERISA Event, together with a written notice setting forth the nature thereof and the action, if any, that such Note Party or ERISA Affiliate proposes to take with respect thereto; and

(d)    promptly following any request therefor, such other information regarding the operations, business affairs and financial condition of any Issuer Group Member, or compliance with the terms of any Note Document as the Agent or any Noteholder may reasonably request in writing.

Section 5.12    Noteholder Calls. At the request of the Required Noteholders (through the Agent), the Note Parties shall hold a quarterly telephonic meeting by conference call with the Agent and all Noteholders who chose to attend such meeting, at such reasonable times during normal business hours upon reasonable advance notice from the Agent (but in no event shall the timing of or reasonable delay in scheduling such calls constitute a Default or Event of Default or require the consent of any Noteholder).

Section 5.13    [Reserved].

Section 5.14    Security. The Note Parties shall preserve and maintain the security interests granted under the Security Documents and undertake all actions which are necessary or appropriate to: (a) maintain the Agent's security interest in the Collateral in full force and effect at all times (including the priority thereof (subject to Permitted Liens)), and (b) preserve and protect the Collateral and protect and enforce the Note Parties' rights and title and the rights of the Agent and the other Secured Parties to the Collateral (subject to Permitted Liens), including the making or delivery of all filings and recordations, the payment of all reimbursements, fees and other charges and the issuance of supplemental documentation.

Section 5.15    Further Assurances.The Note Parties shall execute, acknowledge where appropriate, and deliver, and cause to be executed, acknowledged where appropriate, and delivered, from time to time promptly at the reasonable request of the Agent all such instruments and documents as are necessary or appropriate to carry out the intent and purpose of the Note Documents (including filings, recordings or registrations required to be filed in respect of any Security Document or assignment thereto) necessary to maintain, to the extent permitted by Applicable Law, the validity, enforceability, perfection and the priority of the Agent's Lien in the Collateral to the extent and in the priority required by the Note Documents.

Section 5.16    Additional Collateral; Additional Guarantors.

(a)    With respect to any Person that is or becomes a Subsidiary (other than any Non-Guarantor Subsidiary) of the Issuer after the Closing Date, promptly (and in any event within forty-five (45) days after such Person becomes a Subsidiary, unless extended by the Required Noteholders in writing in their reasonable discretion) (i) deliver to the Agent the certificates, if any, representing all of the Capital Stock of such Subsidiary, together with undated stock powers or other appropriate instruments of transfer executed and delivered in blank by a duly authorized officer of the holder(s) of such Capital Stock, and, to the extent required under the Security Agreement, all intercompany notes owing from such Subsidiary to any Note Party together with instruments of transfer executed and delivered in blank by a duly authorized officer of such Note

Party and (ii) cause such new Subsidiary (A) to become a Subsidiary Guarantor and execute and deliver to the Agent a joinder agreement to this Agreement in form and substance satisfactory to the Required Noteholders, (B) to become a [grantor] under the Security Agreement and execute and deliver to the Agent a joinder to the Security Agreement in form and substance satisfactory to the Required Noteholders, (C) deliver customary opinions of counsel to the Issuer in form and substance, and from counsel, reasonably satisfactory to the Required Noteholders, and (D) to take all actions necessary or advisable in the opinion of the Agent or the Required Noteholders to cause the Lien created by the applicable Security Document to be duly perfected to the extent required by such Security Document in accordance with all Applicable Laws, including the filing of financing statements (or equivalent registrations) in such jurisdictions as may be reasonably requested by the Agent or the Required Noteholders. Notwithstanding any other provisions of this Agreement or any other Note Document to the contrary, (i) no Non-Guarantor Subsidiary shall be required to execute and deliver the Guarantee or the Security Agreement, (ii) in no event shall more than 65% of the total combined voting power of all classes of capital stock entitled to vote of any "first tier" CFC or any U.S. Foreign HoldCo be pledged pursuant to the provisions of the Security Agreement or any other Note Document (to the extent that such pledge in excess of 65% could reasonably be expected to give rise to material adverse tax consequences to Holdings (or any direct or indirect parent entity thereof), the Issuer and/or any of its Subsidiaries (as reasonably determined by the Issuer), and (iii) in no event shall any of the stock of a Subsidiary that is owned by a CFC be pledged pursuant to the provisions of the Security Agreement or any other Note Document (to the extent that such pledge could reasonably be expected to give rise to material adverse tax consequences to Holdings (or any direct or indirect parent entity thereof), the Issuer and/or any of its Subsidiaries (as reasonably determined by the Issuer).

(b)      The Note Parties shall deliver to the Agent within 120 days after the Closing Date (with respect to Evergreen Facility) or 120 days after the acquisition thereof (in the case of Material Real Properties acquired by the Note Parties after the Closing Date) (i) counterparts of a Mortgage with respect to such Material Real Property duly executed and delivered by the record owner of such Material Real Property, (ii) a policy or policies of title insurance, naming the Agent as the insured for the benefit of the Secured Parties, issued by a nationally recognized title insurance company reasonably acceptable to the Agent insuring the Lien of each such Mortgage as a valid and enforceable Lien on the Material Real Property described therein, free of any other Liens except Permitted Liens, together with such endorsements, coinsurance and reinsurance as the Agent may reasonably request, (iii) prior to the execution and delivery of each Mortgage, a completed "Life-of-Loan" Federal Emergency Management Agency standard flood hazard determination with respect to the Material Real Property encumbered by such Mortgage (together with a notice about special flood hazard area status and flood disaster assistance duly executed by the Issuer), and if any Material Real Property is located in an area determined by the Federal Emergency Management Agency to have special flood hazards, a copy of, or a certificate as to coverage under, and a declaration page relating to, the flood insurance policies required by Section 1.4 of Exhibit D and the applicable provisions of the Security Documents, each of which shall (v) be endorsed or otherwise amended to include a "standard" or "New York" lender's loss payable or mortgagee endorsement (as applicable), (w) identify the addresses of each property located in a special flood hazard area, (x) indicate the applicable flood zone designation, the flood insurance coverage and the deductible relating thereto, (y) provide that the insurer will give the Agent 45 days written notice of cancellation or non-renewal and (z) shall be otherwise in form and substance

satisfactory to the Agent and (iv) such surveys, abstracts, appraisals, legal opinions and other documents as the Agent may reasonably request with respect to any such Mortgage or Material Real Property.

Section 5.17    [Reserved].

Section 5.18    Intellectual Property.

(a)    Each Note Party shall own, or be licensed to use, all Intellectual Property that such Note Party reasonably believes is necessary for its conduct of the Business, except where failure of such Note Party to so own or be licensed would have a Material Adverse Effect.

(b)    If a Note Party licenses any Intellectual Property from another Person and such Intellectual Property is material to the conduct of the business of any Note Party, and the license is rejected in an insolvency proceeding, such Note Party shall use commercially reasonable efforts to maintain its rights under the license, which efforts shall include making an election under Section 365(n) of the Bankruptcy Code, if an election is available to such Note Party.

(c)    Each Note Party agrees that, should it hereafter (i) obtain an ownership interest in any issued Copyrights, Trademarks, or Patents, (ii) obtain an exclusive license to any Copyrights, (iii) either by itself or through any agent, employee, licensee, or designee, file any application for the registration or issuance of any Copyrights, Trademarks or Patents with the United States Patent and Trademark Office or the United States Copyright Office, or (iv) should it file a statement of use or an amendment to allege use with respect to any "intent-to-use" Trademark application (the items in clauses (i), (ii), (iii) and (iv), collectively, the "After-Acquired Intellectual Property"), then, unless it constitutes Excluded Assets under the Pledge and Security Agreement, any such After-Acquired Intellectual Property shall automatically become part of the Collateral, and such Note Party shall give written notice thereof within 60 days of the registration or issuance thereof to the Agent in accordance herewith.

(d)    Each Note Party agrees to use commercially reasonable efforts so as not to permit the inclusion in any contract to which it hereafter becomes a party of any provision that would materially impair or prevent the creation of a security interest in such Note Party's rights and interests in any property described in Section 5.19(c) that is material to the business of any Note Party, other than the Note Documents and any loan documentation relating to the Permitted ABL Facility.

(e)    Each Note Party shall promptly notify the Agent if it knows or has reason to know that any registered or issued Copyrights, Trademarks or Patents that it owns or licenses becomes (i) abandoned or dedicated to the public or placed in the public domain, (ii) invalid or unenforceable, (iii) subject to any adverse determination or development regarding such Note Party's ownership, registration or use or the validity or enforceability of such item of Intellectual Property (including the institution of, or any adverse development with respect to, any action or proceeding in the United States Patent and Trademark Office, the United States Copyright Office, any state registry, any foreign counterpart of the foregoing, or any court) or (iv) the subject of any reversion or termination rights.

(f)      Each Note Party shall not intentionally infringe, misappropriate, dilute, or otherwise violate the Intellectual Property rights of any other Person in any manner which would reasonably be expected to have a Material Adverse Effect. In the event that any Person initiates, or threatens in writing to initiate, any action or proceeding alleging that such Note Party, or the conduct of such Note Party's business, infringes, misappropriates, dilutes, or otherwise violates the Intellectual Property of any other Person, and such action or proceeding would reasonably be expected to have a Material Adverse Effect, such Note Party shall promptly notify the Agent after it learns thereof.

Section 5.19    Certain Post-Closing Obligations. Each Note Party shall deliver the documents or take the actions specified on Schedule 5.20 in accordance with the provisions thereunder.

Section 5.20    Additional Covenants. Each Note Party shall comply with the Additional Covenants in accordance with the provisions thereunder.

ARTICLE VI

NEGATIVE COVENANTS

Each Note Party agrees that from and after the Closing Date until all of the Obligations (other than contingent obligations as to which no claim exists or has been asserted) have been paid in full:

Section 6.01    [Reserved].

Section 6.02    Indebtedness. No Issuer Group Member shall create, incur, assume or suffer to exist any Indebtedness, other than (each of the following, "Permitted Indebtedness"):

(a)      Indebtedness incurred under the Note Documents (including without limitation, any Indebtedness incurred under any Additional Notes);

(b)      Capital Lease Obligations or purchase money obligations (i) to the extent incurred to finance the acquisition or licensing of intellectual property or discrete items of equipment (and Indebtedness incurred to finance any such obligations); provided that the aggregate principal amount of Indebtedness that is outstanding in reliance on this clause (b)(i) does not exceed $5,000,000 and (ii) to the extent incurred to finance the expansion of capital expenditures of any Issuer Group Member (including without limitation, any debottlenecking and other efficiency undertakings in respect of the Business); provided that the aggregate principal amount of Indebtedness that is outstanding in reliance on this clause (b)(ii) does not exceed $15,000,000

(c)      current accounts payable not more than ninety (90) days past due or which are that are being contested in accordance with the Permitted Contest Conditions, interest thereon, regulatory bonds, surety obligations and accrued expenses incurred, in the ordinary course of business;

(d)      [Reserved];

(e)    Indebtedness incurred under any Permitted ABL Facility;

(f)    Indebtedness existing on the Closing Date and set forth in Schedule 6.02 and extensions, renewals and replacements of any such Indebtedness that do not increase the outstanding principal amount thereof except by an amount equal to a reasonable premium or other amount paid, and reasonable fees and expenses incurred, in connection with such extension, renewal or replacement or change any direct or contingent obligor with respect thereto or shorten the average life to maturity thereof;

(g)    (i) Guarantees by any Note Party of Indebtedness otherwise permitted hereunder of any other Note Party and (ii) performance guarantees provided by a Note Party to support the obligations of any Note Party in the ordinary course of business;

(h)    unsecured Indebtedness of Holdings, provided that such Indebtedness (i) does not mature prior to the date is 91 days following the Maturity Date and (ii) is subordinated to the Obligations pursuant to a subordination agreement in form and substance reasonably acceptable to the Agent and the Required Noteholders;

(i)    unsecured intercompany Indebtedness among the Note Parties (other than Holdings);

(j)    Indebtedness in respect of any sale and leaseback transaction consummated by any Issuer Group Member with any Person that is not an Affiliate of any Issuer Group Member for cash consideration for fair market value (as reasonably determined in good faith by the Issuer); provided that the Issuer shall offer to prepay the Notes with the Net Available Amount of any such sale and leaseback transaction;

(k)    Indebtedness in respect of any letter of credit issued in favor of the landlord under any real property leases in an aggregate face amount not to exceed $2,000,000 at any one time outstanding;

(l)    [reserved]; and

(m)    other unsecured Indebtedness in an aggregate principal amount not exceeding $2,500,000 at any time outstanding (as such amount may be increased with the consent of the Required Noteholders in their sole and absolute discretion).

Section 6.03    Liens, Etc. No Issuer Group Member shall create, incur, assume or suffer to exist any Lien upon or with respect to any of its properties of any character (including accounts receivables) whether now owned or hereafter acquired, or assign any accounts or other right to receive income, other than (each of the following, a "Permitted Lien"):

(a)    Liens arising by reason of:

(i)    Taxes which are not yet due or which are being contested pursuant to the Permitted Contest Conditions;

(ii)    security, pledges or deposits in the ordinary course of business for payment of workmen's compensation or unemployment insurance or other types of social security benefits; and

(iii)    good faith deposits or pledges incurred or created in connection with or to secure the performance of bids, tenders, contracts (other than contracts for the payment of money), leases, statutory obligations, surety bonds or appeal bonds entered into in the ordinary course of business or under Applicable Law;

(b)    Liens of mechanics, carriers, landlords, warehousemen, materialmen, laborers, repairmen's, employees or suppliers or any similar Liens arising by operation of law, incurred in the ordinary course of business with respect to obligations which are not overdue by more than forty-five (45) days, or which are adequately bonded and which are being contested pursuant to the Permitted Contest Conditions;

(c)    Liens arising out of judgments, orders or awards not constituting an Event of Default that have been adequately bonded, are fully covered by insurance (subject to applicable deductibles) or with respect to which a stay of execution has been obtained pending an appeal or proceeding for review pursuant to the Permitted Contest Conditions;

(d)    Liens arising with respect to zoning restrictions, easements, licenses, reservations, covenants, rights-of-way, utility easements, building restrictions and other similar charges or encumbrances on the use of real property which, individually or in the aggregate, do not materially detract from the value of the affected property and do not materially interfere with the ordinary conduct of the business of such Issuer Group Member;

(e)    Liens or the interests of lessors to secure purchase money obligations permitted under Section 6.02(b); provided that such Lien encumbers only the specific goods, equipment or software so financed, any accessions thereto, proceeds thereof and related books and records;

(f)    [reserved];

(g)    to the extent constituting Liens, leases, licenses, subleases or sublicenses granted to others in the ordinary course of business that do not (i) interfere in any material respect with the ordinary conduct of the Business of the Issuer Group Members, (ii) secure any Indebtedness or (iii) individually or in the aggregate detract from the expected value of the property of the Issuer Group Members in any material respect;

(h)    (i) Liens arising solely by virtue of any statutory or common law provision relating to banker's liens, rights of set-off or similar rights and remedies and burdening only deposit accounts or other funds maintained with a creditor depository institution, in each case, granted in the ordinary course of business in favor of such creditor depositary institution, provided that no such deposit account is a dedicated cash collateral account or is subject to restrictions against access by the depositor in excess of those set forth by regulations promulgated by the Board and no such deposit account is intended by the Issuer to provide collateral to the depository institution and (ii) Liens in favor of a banking or other financial institution arising as a matter of law or in the ordinary course of business under customary general terms and conditions encumbering deposits

or other funds maintained with a financial institution (including the right of setoff) and that are within the general parameters customary in the banking industry or arising pursuant to such banking institution's general terms and conditions;

(i)    any Lien on any property or asset of the Issuer or any of its Subsidiaries existing on the Closing Date and set forth in Schedule 6.03; provided that such Lien shall not apply to any other property or asset of the Issuer or any Subsidiary;

(j)    Liens arising under the Note Documents;

(k)    Liens, securing obligations under any Permitted ABL Facility on the applicable ABL Priority Collateral, so long as such Liens are at all times subject to the intercreditor agreement referred to in the definition of Permitted ABL Facility;

(l)    [reserved];

(m)    cash collateral arrangements with respect to letters of credit issued in accordance with Section 6.02(k) securing not greater than 105% of the principal amount of such letters of credit in the aggregate;

(n)    Liens on the assets of the Issuer or any Subsidiary that are sold pursuant to any sale and leaseback transaction permitted under Section 6.02(j);

(o)    Liens consisting of Investments permitted in reliance on Section 6.04(j); and

(p)    Liens that extend, renew or replace in whole or in part a Lien referred to above.

Section 6.04    Investments. No Issuer Group Member shall make any Investment, except:

(a)    cash equity investments and/or contributions made by a Note Party to a Non-Guarantor Subsidiary solely to the extent such investment or contribution is made using the direct or indirect cash proceeds of the issuance of additional shares of Capital Stock of Holdings in exchange for cash after the Closing Date (to the extent not constituting a Change of Control); provided that, at the time of such issuance, no Event of Default is continuing;

(b)    (i) intercompany loans by any Note Party to any Subsidiary of the Issuer that is not a Note Party, to the extent unsecured and pledged to the Agent, for the benefit of the Secured Parties, under the Security Agreement, in an aggregate amount not to exceed $1,000,000 at any time and (ii) Investments between Note Parties (other than to Holdings);

(c)    (i) Cash Equivalent Investments and (ii) bank deposits in the ordinary course of business;

(d)    deposits described in Section 6.03(a)(ii);

(e)    Investments consisting of extensions of credit in the nature of deposits, accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of

business, and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors to the extent reasonably necessary in order to prevent or limit loss;

(f)     non-cash consideration received, to the extent permitted by the Note Documents, in connection with the Disposition of property permitted by this Agreement;

(g)     Investments listed on Schedule 6.04 as of the Closing Date;

(h)     discounts given to customers of any Note Party in the ordinary course of business and in the good faith business judgment of the Issuer;

(i)     Investments by any Non-Guarantor Subsidiary in any other Non-Guarantor Subsidiary;

(j)     Investments consisting of security deposits with utilities, landlords and other like Persons made in the ordinary course of business;

(k)     Permitted Acquisitions;

(l)     Investments consisting of loans or advances to employees, officers, members and directors of any Issuer Group Member for reasonable and customary business-related travel, entertainment, relocation and analogous ordinary business purposes;

(m)     other Investments not otherwise permitted pursuant to this Agreement in an aggregate amount not to exceed $2,500,000 at any time.

Section 6.05   Change of Jurisdiction, Corporate Name or Location; Change of Fiscal Year; Business Activities.

(a)     No Note Party shall, and no Note Party shall permit any of its Subsidiaries to, (a) change its jurisdiction of organization and/or organizational identification number (if any), unless the Agent has been provided with no less than five (5) days' prior notice of same, (b) change its name unless Agent has been provided no less than five (5) days' prior written notice of same or (c) change its chief executive office or principal place of business or (d) change the locations at which Collateral is held or stored (other than Collateral in transit in the ordinary course of business, items out for repair in the ordinary course of business, equipment in the possession of an employee in the ordinary course of business and Collateral with a fair market value (as determined in good faith by the Issuer), not to exceed $1,000,000 in the aggregate for all such locations), or the location of its records concerning the Collateral, in any case without at least five (5) days' prior written notice to Agent. Without limiting the foregoing, no Note Party shall, and no Note Party shall permit any of its Subsidiaries to, change its location, name, identity or organizational structure in any manner which might make any financing or continuation statement filed in connection herewith seriously misleading within the meaning of Section 9-506 of the UCC or any other then applicable provision of the UCC except upon prior written notice to Agent and after Agent's written acknowledgment that any reasonable action requested by Agent in connection therewith, including to continue the perfection of any Liens in favor of Agent, on behalf of itself and the other Secured Parties, in any Collateral, has been completed or taken. No Note Party shall, and no Note

Party shall permit any of its Subsidiaries to, change its fiscal year or method of determining fiscal quarters or fiscal months.  No Issuer Group Member shall at any time to any material extent conduct any activities other than those related to the Business.

Section 6.06   Restricted Payments.No Issuer Group Member shall declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment other than:

(a)     Dividends, distributions or other payments in respect of Investments by any Issuer Group Member to any Note Party;

(b)     any Note Party may declare and pay dividends with respect to its equity interests payable solely in additional shares of its common stock;

(c)     so long as no Default or Event of Default has occurred and is continuing or would result therefrom, any Note Party may make Restricted Payments to redeem, acquire, retire, repurchase or settle equity interests of any nature from current and former officers, directors, employees and consultants of any Issuer Group Member that are not an Affiliate of the Sponsor; provided that the aggregate amount thereof does not exceed $2,000,000 during any Fiscal Year;

(d)     [reserved];

(e)     [reserved];

(f)     Permitted Tax Distributions; and

(g)     Restricted Payments made by any Non-Guarantor Subsidiary to any Note Party.

Section 6.07   Fundamental Changes; Asset Dispositions.No Issuer Group Member shall:

(a)     in one transaction or a series of transactions, merge into or consolidate with, or acquire all or any substantial part of the assets or any class of stock or other ownership interests of, any other Person or sell, transfer or otherwise Dispose of all or substantially all of its assets to any other Person; provided that (i) any Subsidiary may participate in a merger or consolidation with the Issuer (provided that the Issuer shall be the continuing or surviving corporation) or any other Subsidiary Guarantor and (ii) any Non-Guarantor Subsidiary may participate in a merger or consolidation with another Non-Guarantor;

(b)     change its legal form, liquidate or dissolve (provided that any Non-Guarantor Subsidiary may do any of the foregoing so long as any such liquidation or dissolution is to a Note Party (other than Holdings);

(c)     make or agree to make any amendment to its Organizational Documents to the extent that such amendment could reasonably be expected to be materially adverse to the interests of the Agent or the Noteholders;

(d)     [reserved];

(e)     Dispose of, in one transaction or a series of transactions, all or any part of Holdings, the Issuer's or any other Issuer Group Members' businesses, assets or properties of any kind, whether real, personal or mixed and whether tangible or intangible, whether now owned or hereafter acquired, leased or licensed, including the Capital Stock of the Issuer or any of its Subsidiaries, except:

(i)     (x) sales or other Dispositions of equipment that is worn out or defective, or no longer used or useful, for fair market value to the extent that the Issuer reinvests the Net Available Amount (or any portion thereof) of any such Disposition in substantially similar assets that are necessary or useful for the Business pursuant to a transaction not prohibited hereunder and such Net Available Amount is so reinvested within three hundred sixty-five (365) days after receipt thereof (or, if committed to be so reinvested pursuant to a written agreement on or prior to the expiration of such three hundred sixty-five (365) day period, within five hundred forty-five (545) days after receipt thereof) and (y) Dispositions of equipment to the extent that such property is exchanged for credit against the purchase price of similar replacement property; provided that, in the case of clauses (x) and (y), to the extent the property being transferred or Disposed of constitutes Collateral such replacement property shall constitute Collateral,

(ii)     Dispositions of assets, including equity interests, from any Note Party (other than Holdings) to any other Note Party (other than Holdings),

(iii)     Dispositions of cash and Cash Equivalent Investments in the ordinary course of business and for fair market value,

(iv)     licensing of Intellectual Property in the ordinary course of business, so long as it does not interfere in any material respect with the ordinary conduct of the Business of the Issuer Group Members,

(v)     the sale of inventory (if any) in ordinary course of business,

(vi)     [reserved], and

(vii)     Dispositions (or group of related Dispositions); provided, (x) at the time of such Disposition, no Default or Event of Default shall have occurred and be continuing or would result therefrom, and (x) such consideration shall be (A) in an amount at least equal to the fair market value of the asset(s) subject to such Disposition (as determined in good faith by the Issuer), (B) at least 75% of the consideration for such Disposition consists of cash or Cash Equivalent Investments, and (C) to the extent required by Section 2.05(b)(ii), the Issuer shall make an Event of Loss/Disposition Prepayment Offer with the Net Available Amount from any such Disposition or reinvest such Net Available Amount, in each case, in accordance with Section 2.05(b)(ii).

For the avoidance of doubt, maintenance capital expenditures treated as a disposition for accounting purposes shall not be subject to this clause (e) solely by virtue of such accounting treatment.

Section 6.08    [Reserved].

Section 6.09   <u>Transactions with Affiliates</u>. No Issuer Group Member shall directly or indirectly enter into any transaction or series of related transactions with an Affiliate of such Issuer Group Member, except for (a) transactions set forth on <u>Schedule 3.21</u> hereto, (b) transactions in the ordinary course of such Issuer Group Member's (and such Affiliate's) business and upon fair and reasonable terms no less favorable to such Issuer Group Member than it would obtain in comparable arm's-length transactions with a Person acting in good faith which is not an Affiliate, (c) transactions between or among the Issuer Group Members not involving any other Affiliate, (d) any transaction permitted by <u>Section 6.02 (h)</u>, <u>6.03</u>, <u>6.04</u> and <u>6.06</u>, in each case, which are implemented in a manner consistent with the Sponsor's historical agreements and practices (as in effect as of the Closing Date) and (e) so long as no Default or Event of Default has occurred and is continuing or would result therefrom, transactions of any Issuer Group Member with any of its Affiliates under and in accordance with any management or advisory agreement between the Sponsor and one or more Issuer Group Members as in effect on the Closing Date (including without limitation, the payment of (i) management, advisory, consulting or other fees of and (ii) reasonable costs and expenses of, and indemnities provided on behalf of, in each case, the Sponsor pursuant to the terms and conditions thereunder).

Section 6.10   <u>Passive Holding Company</u>. Holdings shall not engage in any material business activities or own any material property other than (i) ownership of the Capital Stock of the Issuer, (ii) activities and contractual rights incidental to maintenance of its corporate existence, (iii) performance of its obligations under this Agreement or any of the other Note Documents to which it is a party, (iv) the performance of its rights and obligations, if any, under its Organization Documents, (v) the execution, delivery and performance of its rights and obligation sunder any employment agreements to which it is a party, (vii) guarantees of obligations in connection with the making or entering into of leases or subleases with respect to any leasehold interests of any of the Issuer Group Members and (viii) if applicable, performance of obligations under any management or advisory agreement between the Sponsor and one or more Issuer Group Members as in effect on the Closing Date.

Section 6.11   <u>No Further Negative Pledge</u>. No Issuer Group Member shall into any agreement, instrument, deed or lease which prohibits or limits the ability of any Note Party to create, incur, assume or suffer to exist any Lien upon any of its properties or assets, whether now owned or hereafter acquired, or which requires the grant of any security for an obligation if security is granted for another obligation, except the following:  (a) this Agreement and the other Note Documents; (b) any prohibition or limitation in existence on the Closing Date and set forth on <u>Schedule 6.11</u> hereto, (c) covenants in documents creating Liens permitted by <u>Section 6.03</u> prohibiting further Liens (other than Liens permitted under <u>Section 6.03(j)</u>) on the properties encumbered thereby; (d) any prohibition or limitation that consists of customary restrictions and conditions contained in any agreement relating to the sale of any property pending the consummation of such sale; <u>provided</u> that (1) such restrictions apply only to the property to be sold and such sale is permitted hereunder, and (2) such sale is permitted hereunder, or (iii) restricts subletting or assignment of any lease governing a leasehold interest of the Issuer or one of its Subsidiaries; (e) prohibitions and limitations contained in any agreement to which a Subsidiary is a party that was in effect at the time such Subsidiary became a Subsidiary of the Issuer, so long as such agreement was not entered into in anticipation or contemplation of such Person becoming a Subsidiary and such prohibitions and limitations only relate to such Subsidiary; (f) customary non-

assignment provisions in customer contracts and licenses of (or any other grants of rights to use) Intellectual Property, in each case entered into in the ordinary course of business; and (g) is imposed by any amendments that are otherwise permitted by the Note Documents of the contracts, instruments or obligations referred to in this <u>Section 6.11</u>; <u>provided</u> that such amendments are no more restrictive with respect to the prohibitions and limitations in such contracts, instruments or obligations as in effect prior to any such amendment.

Section 6.12   <u>Limitations on Restricted Actions</u>. No Issuer Group Member shall, directly or indirectly, create or otherwise cause or suffer to exist or become effective any encumbrance or restriction on the ability of any such Person to (a) pay dividends or make any other distributions to any Note Party on its Capital Stock, (b) pay any Indebtedness or other obligation owed to any Note Party, (c) make loans or advances to any Note Party, (d) sell, lease or transfer any of its properties or assets to any Note Party, or (e) act as a Guarantor and pledge its assets pursuant to the Note Documents, except (in respect of any of the matters referred to in clauses (a)-(d) above) for such encumbrances or restrictions existing under or by reason of (i) this Agreement and the other Note Documents, (ii) applicable law, (iii) restrictions or conditions in existence on the Closing Date and set forth on <u>Schedule 6.12</u> hereto, (iii) restrictions or conditions imposed by any agreement relating to purchase money Indebtedness, capital leases and other secured Indebtedness permitted by this Agreement if such restrictions or conditions apply only to the property or assets securing such Indebtedness, (iv) any Permitted Lien or any document or instrument governing any Permitted Lien; <u>provided</u> that any such restriction contained therein relates only to the asset or assets subject to such Permitted Lien, (v) customary restrictions and conditions contained in agreements relating to the sale of Capital Stock or assets of any Subsidiary pending such sale, provided such restrictions and conditions apply only to the Subsidiary to be sold and such sale is permitted hereunder, (vi) customary provisions in leases, licenses and other contracts restricting the assignment thereof, (vii) customary provisions in joint venture agreements restricting the assignment thereof or upon the assets of such joint venture and (viii) any agreement in effect at the time any Person becomes a Subsidiary of the Issuer; <u>provided</u> that such agreement was not entered into in contemplation of such Person becoming a Subsidiary of the Issuer.

Section 6.13   [Reserved].

Section 6.14   <u>No Hedging or Speculative Transactions</u>. No Note Party shall enter into, or suffer to exist, any Hedging Agreement for speculative purposes or any other speculative transaction.

ARTICLE VII

EVENTS OF DEFAULT

Section 7.01   <u>Events of Default</u>. If any of the following events ("<u>Events of Default</u>") shall occur:

(a)   any Note Party shall fail to pay (i) any principal of any Note when and as the same shall become due and payable, whether at the due date thereof or, in the case of payments of principal due pursuant to <u>Section 2.04(c)</u> or <u>2.05(b)</u>, at a date fixed for repayment or prepayment thereof, or otherwise; or (ii)(x) any interest or (y) any fee or any other amount (other than an amount referred to in <u>clause (i)</u> of this <u>Section 7.01(a)</u>), in each case, payable under this Agreement

or any other Note Document, when and as the same shall become due and payable where such failure shall continue unremedied for (I) in the case of clause (ii)(x), a period of three (3) Business Days after the occurrence thereof or (II) in the case of clause (ii)(y), a period of five (5) Business Days after the occurrence thereof.

(b)    any representation or warranty made by or deemed made by any Note Party in this Agreement or any other Note Document, or in any certificate furnished to any Secured Party by or on behalf of such Note Party in accordance with the terms hereof or thereof, shall prove to have been incorrect in any material respect (to the extent not already qualified by materiality) as of the time made or deemed made, confirmed or furnished; unless (i) the fact, event or circumstance resulting in such incorrect representation or warranty is capable of being changed such that such representation or warranty would be correct in all material respects, (ii) such fact, event or circumstance shall have been changed within five (5) days from the earlier of (x) the date an Authorized Representative of any Note Party obtains knowledge thereof and (y) the date notice is given to any Note Party by the Agent or the Required Noteholders, such that such representation or warranty is correct in all material respects by such deadline, and (iii) such fact, event or circumstance (as so changed) would not reasonably be expected to result in a Material Adverse Effect; or

(c)    any Note Party shall fail, or fail to cause any Non-Guarantor Subsidiary, to observe or perform any covenant, condition or agreement contained in (i) Sections 5.01, 5.11(b), Section 1.18(b) of the Additional Covenants or in Article VI, or (ii) this Agreement or any other Note Document to which it is a party (other than those specified in Sections 7.01(a), (b), (c)(i)), and such failure shall continue unremedied for a period of thirty (30) days after the earlier of (x) written notice thereof to such Note Party and (y) knowledge of such default by an Authorized Representative of any Note Party; or

(d)    [reserved]; or

(e)    (i) any Issuer Group Member becomes unable or admits in writing its inability or fails generally to pay its debts as they become due, or (ii) any writ or warrant of attachment or execution or similar process is issued or levied against all or any material part of the property of the Note Parties, taken as a whole, and is not released, vacated or fully bonded within sixty (60) days after its issue or levy; or

(f)    any Issuer Group Member institutes or consents to the institution of any proceeding under any Debtor Relief Law, or makes an assignment for the benefit of creditors; or applies for or consents to the appointment of any receiver, trustee, custodian, conservator, liquidator, rehabilitator, administrator, administrative receiver or similar officer for it or for all or any material part of its property; or any receiver, trustee, custodian, conservator, liquidator, rehabilitator, administrator, administrative receiver or similar officer is appointed without the application or consent of such Person and the appointment continues undischarged or unstayed for sixty (60) calendar days; or any proceeding under any Debtor Relief Law relating to any such Person or to all or any material part of its property is instituted without the consent of such Person and continues undismissed or unstayed for sixty (60) calendar days, or an order for relief is entered in any such proceeding; or

(g)     a final non-appealable judgment or order for the payment of money is entered against any Issuer Group Member in an amount exceeding $2,500,000 (exclusive of judgment amounts covered by insurance or bond where the insurer or bonding party has admitted liability in respect of such judgment), and such judgment remains unsatisfied without any procurement of a stay of execution for a period of sixty (60) days or more after the date of entry of judgment; or

(h)     (i) any Security Document (A) is revoked, terminated or otherwise ceases to be in full force and effect (except in connection with its expiration in accordance with its terms in the ordinary course (and not related to any default thereunder)), or the validity or enforceability thereof shall be challenged in writing by any Issuer Group Member or any Issuer Group Member contests in writing the validity or priority of a Lien as required by the Security Documents on a material portion of the Collateral, (B) ceases to provide (to the extent permitted by law and to the extent required by the Note Documents) a first priority perfected Lien on the assets purported to be covered thereby in favor of the Agent (other than any Vehicles), free and clear of all other Liens (other than Permitted Liens), except, in the case of each clauses (A) and (B) above, to the extent that such cessation (x) is expressly permitted under any Note Document or (y) is caused solely and directly by any act or omission by the Agent or the Noteholders, or (C) becomes unlawful or is declared void, (ii) any Note Document (A) is revoked, terminated or otherwise ceases to be in full force and effect (except in connection with its expiration in accordance with its terms in the ordinary course (and not related to any default thereunder) and except to the extent such revocation, termination or cessation (x) is expressly permitted under any Note Document or (y) is caused by any act or omission by the Agent or the Noteholders), or the validity or enforceability thereof shall be challenged in writing by any Issuer Group Member, or (B) becomes unlawful or is declared void, or (iii) any Note Party denies in writing that it has any or further liability or obligations under any Note Document (other than as a result of repayment in full in cash of the Obligations), or purports in writing to revoke or rescind any Note Document; or

(i)     [reserved]; or

(j)     a Change of Control has occurred; or

(k)     (i) an ERISA Event occurs which has resulted or could reasonably be expected to result in liability of an Issuer Group Member in an aggregate amount which could reasonably be expected to result in a Material Adverse Effect, or (ii) an Issuer Group Member or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan and a Material Adverse Effect could reasonably be expected to result.

(l)     [reserved]; or

(m)     [reserved]; or

(n)     [reserved]; or

(o)     [reserved]; or

(p)      any Issuer Group Member shall (i) default in making any payment of any principal, interest or premium of any Indebtedness (excluding the Obligations) the outstanding principal amount of which exceeds at such time $2,500,000 ("Material Indebtedness") on the scheduled or original due date with respect thereto, in each case, beyond any grace periods applicable thereto; or (ii) default in the observance or performance of any other agreement or condition relating to any such Indebtedness (excluding the Obligations) or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist, in each case, beyond any grace periods applicable thereto, the effect of which default or other event or condition is to cause, or to permit the holder or beneficiary of Material Indebtedness (or a trustee or agent on behalf of such holder or beneficiary) to cause, with or without the giving of notice, the lapse of time or both, such Material Indebtedness to become due prior to its stated maturity or to become subject to a mandatory offer to purchase by the obligor thereunder or (in the case of any such Indebtedness constituting a Guarantee) to become payable;

then, and in every such event (other than an event with respect to any Issuer Group Member described in Section 7.01(f)), and at any time thereafter during the continuance of such event, the Required Noteholders (or the Agent at the direction of the Required Noteholders) shall by notice to the Issuer, take any or all of the following actions, at the same or different times: declare the Notes and all other amounts due under the Note Documents then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Notes so declared to be due and payable, together with accrued interest thereon and all reimbursements, fees and other obligations of the Issuer accrued hereunder or under the Note Documents shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Note Parties; and in case of any event with respect to any Issuer Group Member described in Section 7.01(f), the principal of the Notes then outstanding, together with accrued interest thereon and all reimbursements, fees and other obligations of the Issuer accrued hereunder and under the Note Documents, shall automatically become due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Note Parties. Upon the occurrence and during the continuance of any Event of Default, in addition to the exercise of remedies set forth above in this paragraph, each Secured Party shall be, subject to the terms of the Security Agreement, entitled to exercise the rights and remedies available to such Secured Party under and in accordance with the provisions of the other Note Documents to which it is a party or any Applicable Law. For the purpose of enabling the Agent to exercise the rights and remedies under this Section 7.01 (including in order to take possession of, collect, receive, assemble, process, appropriate, remove, realize upon, sell, assign, license out, convey, transfer or grant options to purchase any Collateral) at such time as the Agent shall be lawfully entitled to exercise such rights and remedies, each Note Party hereby grants to the Agent, for the benefit of the Agent and each other Secured Party, a nonexclusive and assignable license (exercisable without payment of royalty or other compensation to such Note Party), subject, in the case of Intellectual Property licenses, to the terms of the applicable license, and subject, in the case of Trademarks, to sufficient rights to quality control and inspection in favor of such Note Party to avoid the risk of invalidation of such Trademarks, to use, practice, license, sublicense, and otherwise exploit any and all Intellectual Property now owned or held or hereafter acquired or held by such Note Party.

Section 7.02   Application of Proceeds. The proceeds of any collection, sale or other realization of all or any part of the Collateral shall be applied in the following order of priority:

(a)      first, to any fees, costs, charges, expenses and indemnities then due and payable to the Agent under any Note Document;

(b)      second, to the respective outstanding fees, costs, charges, expenses and indemnities then due and payable to the other Secured Parties under any Note Document *pro rata* based on such respective amounts then due to such Persons;

(c)      third, to any accrued but unpaid interest on the Obligations owed to the Secured Parties *pro rata* based on such respective amounts then due to the Secured Parties;

(d)      fourth, to any principal amount of the Obligations owed to the Secured Parties *pro rata* based on such respective amounts then due to the Secured Parties;

(e)      fifth, to any other unpaid Obligations then due and payable to Secured Parties *pro rata* based on such respective amounts then due to the Secured Parties; and

(f)      sixth, after final payment in full of the amounts described in clauses *first* through *fifth* above and the payment in full of all of the Obligations (other than contingent obligations as to which no claim exists or has been asserted), to the Issuer or as otherwise required by Applicable Law.

It is understood that the Note Parties shall remain liable to the extent of any deficiency between the amount of the proceeds of the Collateral and the aggregate of the sums referred to in clauses *first* through *fifth* above.

## ARTICLE VIII

## THE AGENT

Section 8.01   Appointment and Authorization of the Agent.

(a)      Each of the Noteholders hereby irrevocably appoints the Agent to act on its behalf as its agent hereunder and under the other Note Documents and authorizes the Agent in such capacity, to take such actions on its behalf and to exercise such powers as are delegated to it by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto. The Agent, by executing this Agreement, hereby accepts such appointment.

(b)      The Agent is hereby authorized to execute, deliver and perform each of the Note Documents to which the Agent is intended to be a party. The Agent hereby agrees, and each Noteholder hereby authorizes the Agent, to enter into the amendments and other modifications of the Security Documents (subject to Section 10.02(b)).

(c)      The Agent is authorized to enter into any intercreditor agreement permitted under this Agreement (on terms reasonably satisfactory to the Required Noteholders with respect to

Indebtedness permitted hereby that is (i) required or permitted to be subordinated hereunder and/or (ii) secured by Liens permitted hereunder and which Indebtedness contemplates an intercreditor, subordination or collateral trust agreement (any such intercreditor agreement, an "Additional Agreement"), and the parties hereto acknowledge that this Agreement and any Additional Agreement is binding upon them. Each Noteholder (a) hereby consents to the subordination of the Liens on the Collateral securing the Obligations on the terms set forth in any Additional Agreement, to the extent such subordination is contemplated by this Agreement, (b) hereby agrees that it will be bound by and will take no actions contrary to the provisions of any Additional Agreement and (c) hereby authorizes and instructs the Agent to enter into any Additional Agreement and to subject the Liens on the Collateral securing the Obligations to the provisions thereof.

Section 8.02    Rights as a Noteholder. The Agent shall, if applicable, have the same rights and powers in its capacity as a Noteholder as any other Noteholder and may exercise the same as though it were not the Agent, and such Person and its Affiliates may accept deposits from, lend money to and generally engage in any kind of business with the Issuer or any of Subsidiary or other Affiliate thereof as if it were not the Agent hereunder.

Section 8.03    Duties of Agent; Exculpatory Provisions. The Agent shall not have any duties or obligations except those expressly set forth herein and in the other Note Documents. Without limiting the generality of the foregoing, the Agent shall not (a) be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred and is continuing, (b) have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Note Documents that the Agent is required to exercise as directed in writing by the Required Noteholder (or such other number or percentage of the Noteholders as shall be necessary, or as the Agent shall believe in good faith to be necessary, under the circumstances as provided in the Note Documents), as applicable, provided that the Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, could expose the Agent to liability or be contrary to any Note Document or applicable law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any bankruptcy or similar law, and (c) except as expressly set forth herein and in the other Note Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Issuer or any of its Subsidiaries that is communicated to or obtained by the financial institution serving as the Agent or any of its Affiliates in any capacity. The Agent shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Noteholders (or such other number or percentage of the Noteholders as shall be necessary, or as the Agent shall believe in good faith shall be necessary, under the circumstances provided herein) or (ii) in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction in a final, non-appealable decision. The Agent shall not be deemed to have knowledge of any Default or Event of Default unless and until written notice thereof is given to the Agent by the Issuer or a Noteholder, and no Agent shall be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Note Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein, (iv) the validity,

- 67 -

enforceability, effectiveness or genuineness of this Agreement, any other Note Document or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in Article IV or elsewhere herein or therein, other than to confirm receipt of items expressly required to be delivered to the Agent.  The Agent shall not be responsible or have any liability for, or have any duty to ascertain, inquire into, monitor or enforce, compliance with the provisions hereof relating to Disqualified Investors. Without limiting the generality of the foregoing, the Agent shall not (a) be obligated to ascertain, monitor or inquire as to whether any Noteholder or Participant or prospective Lender or Participant is a Disqualified Investor or (b) have any liability with respect to or arising out of any assignment or participation of Notes, or disclosure of confidential information, to any Disqualified Investor.  The Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any recital, statement, warranty or representation made in or in connection with this Agreement or any other Note Document, (ii) the contents of any certificate, report, statement or agreement or other document delivered hereunder or thereunder or in connection herewith or therewith or referred to or provided for in, or received by the Agent under or in connection with this Agreement or any other Note Document, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Note Document or any other agreement, instrument or document, or the creation, perfection or priority of any Lien purported to be created by the Security Documents, (v) the value or the sufficiency of any Collateral, or (vi) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Agent, or to inspect the properties, books or records of any Note Party or any Affiliate thereof.

Section 8.04   Reliance by Agent. The Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing believed by it to be genuine and to have been signed or sent by the proper Person. The Agent also may rely upon any statement made to it orally or by telephone and believed by it to be made by the proper Person, and shall not incur any liability for relying thereon. The Agent may consult with legal counsel (who may be counsel for the Issuer), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.  The Agent shall be fully justified in failing or refusing to take any action that is not required or explicitly approved by the Noteholders under any Note Document unless it shall first receive such advice or concurrence of the Required Noteholders as it deems appropriate and, if it so requests, it shall first be indemnified to its satisfaction by the Noteholders against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action. The Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement or any other Note Document in accordance with a request or consent of the Required Noteholder (or such greater number of Noteholders as may be expressly required hereby in any instance) and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Noteholders; provided that the Agent shall not be required to take any action that, in its opinion or in the opinion of its counsel, may expose the Agent to liability or that is contrary to any Note Document or Applicable Law. The Agent may, without incurring any liability hereunder, rely on the latest version of the Register received by the Agent in accordance with Section 10.04(c) in performing its obligations under the Note Documents.

Section 8.05   <u>Delegation of Duties</u>. The Agent may perform any and all its duties and exercise its rights and powers by or through any one or more sub-agents appointed by the Agent. The Agent and any such sub-agent may perform any and all its duties and exercise its rights and powers through their respective Related Parties. The exculpatory provisions of the preceding paragraphs shall apply to any such sub-agent and to the Related Parties of The Agent and any such sub-agent, and shall apply to their respective activities as well as activities as The Agent. The Agent shall not be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and non-appealable judgment that the Agent acted with gross negligence or willful misconduct in the selection of such sub agents

Section 8.06   [Reserved].

Section 8.07   <u>Resignation of Agent</u>. The Agent may resign at any time upon thirty (30) days' notice by notifying the Noteholders and the Issuer, and the Agent may be removed at any time by the Required Noteholders with the consent of the Issuer (such consent not to be unreasonably withheld or delayed) unless an Event of Default shall have occurred and be continuing (in which case, prior written notice to the Issuer of the proposed appointment shall only be required). Upon any such resignation or removal, the Agent shall have the right, with the consent of the Issuer (such consent not to be unreasonably withheld and such consent not to be required if an Event of Default has occurred and is continuing), to appoint a successor. If no successor shall have been so appointed by the Agent and approved by the Issuer and shall have accepted such appointment within thirty (30) days after the retiring Agent gives notice of its resignation of the retiring Agent or after the notice of removal is provided to the removed Agent, then the retiring Agent may, on behalf of the Noteholders, appoint a successor Agent, which shall be a Noteholder with an office in New York, New York, an Affiliate of a Noteholder or a financial institution with an office in New York, New York having a combined capital and surplus that is not less than $250,000,000. If no qualifying Person has accepted appointment as the Agent by the date which is thirty (30) days following the Agent's notice of resignation or removal, the retiring or removed Agent's resignation or removal shall nonetheless become effective in accordance with such notice and (a) the retiring or removed Agent shall be discharged from its duties and obligations hereunder and under the other Note Documents (except that in the case of any collateral security held by the Agent on behalf of the Noteholders under any of the Note Documents, the retiring or removed Agent shall continue to hold such collateral security until such time as a successor of the Agent is appointed) and (b) except for any indemnity payments or other amounts owed to the retiring or retired Agent, all payments, communications and determinations provided to be made by, to or through the Agent shall instead be made by or to each Noteholders directly, until such time as the Required Noteholders appoint a successor Agent as provided for above in this Section. Upon the acceptance of its appointment as Agent hereunder by a successor, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring (or retired) Agent and the retiring Agent shall be discharged from its duties and obligations hereunder (if not already discharged therefrom as provided above in this paragraph). The reimbursements and fees payable by the Issuer to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Issuer and such successor. After the Agent's resignation or removal hereunder, the provisions of this Article and <u>Section 10.03</u> shall continue in effect for its benefit in respect of any actions taken or omitted to be taken by it while it was acting as Agent.

Section 8.08   <u>Non-Reliance on Agent or Other Noteholders</u>. Each Noteholder acknowledges that it has, independently and without reliance upon the Agent, the Affiliates of the Agent or any other Noteholder and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Noteholder also acknowledges that it will, independently and without reliance upon the Agent, the Affiliates of the Agent or any other Noteholder and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Note Document or any related agreement or any document furnished hereunder or thereunder.

Section 8.09   <u>No Other Duties; Etc</u>. The parties agree that neither the Agent nor the Agent shall have any obligations, liability or responsibility under or in connection with this Agreement and the other Note Documents and that none of the Agent shall have any obligations, liabilities or responsibilities except for those expressly set forth herein and in the other Note Documents. The Agent shall have all of the rights (including indemnification rights), powers, benefits, privileges, exculpations, protections and immunities granted to the Agent under the other Note Documents, all of which are incorporated herein *mutatis mutandis*.

Section 8.10   Agent May File Proofs of Claim; Credit Bidding. In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Note Party, the Agent (irrespective of whether the principal of any Note shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Required Noteholders shall have made any demand on the Issuer) shall be entitled and empowered (but not obligated), by intervention in such proceeding or otherwise:

(a)      to file a verified statement pursuant to rule 2019 of the Federal Rules of Bankruptcy Procedure that, in its sole opinion, complies with such rule's disclosure requirements for entities representing more than one creditor;

(b)      to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Notes and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Noteholders and the Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Noteholders or the Agent and their respective agents and counsel and all other amounts due the Noteholders and the Agent) allowed in such judicial proceeding; and

(c)      to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Noteholder to make such payments to the Agent and, in the event that the Agent shall consent to the making of such payments directly to the Noteholders, to pay to the Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Agent and its agents and counsel, and any other amounts due the Agent under this Agreement.

Nothing contained herein shall be deemed to authorize the Agent to authorize or consent to or accept or adopt on behalf of any Noteholder any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Noteholder or to authorize the Agent to vote in respect of the claim of any Noteholder in any such proceeding.

The Secured Parties hereby irrevocably authorize the Agent, at the direction of the Required Noteholders, to credit bid all or any portion of the Obligations (including accepting some or all of the Collateral in satisfaction of some or all of the Secured Obligations pursuant to a deed in lieu of foreclosure or otherwise) and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral (i) at any sale thereof conducted under the provisions of the Bankruptcy Code of the United States, including under Sections 363, 1123 or 1129 of the Bankruptcy Code of the United States, or any similar Laws in any other jurisdictions to which a Note Party is subject, (ii) at any other sale or foreclosure or acceptance of collateral in lieu of debt conducted by (or with the consent or at the direction of) the Agent (whether by judicial action or otherwise) in accordance with any applicable law. In connection with any such credit bid and purchase, the Obligations owed to the Secured Parties shall be entitled to be, and shall be, credit bid on a ratable basis (with Obligations with respect to contingent or unliquidated claims receiving contingent interests in the acquired assets on a ratable basis that would vest upon the liquidation of such claims in an amount proportional to the liquidated portion of the contingent claim amount used in allocating the contingent interests) in the asset or assets so purchased (or in the Capital Stock or debt instruments of the acquisition vehicle or vehicles that are used to consummate such purchase). In connection with any such bid (A) the Agent (or any designee thereof) shall be authorized to form one or more acquisition vehicles to make a bid, (B) the Agent (or any designee thereof) shall be authorized to adopt documents providing for the governance of the acquisition vehicle or vehicles (provided that any actions by the Agent (or designee thereof) with respect to such acquisition vehicle or vehicles, including any disposition of the assets or Capital Stock thereof shall be governed, directly or indirectly, by the vote of the Required Noteholders, irrespective of the termination of this Agreement and without giving effect to the limitations on actions by the Required Noteholders contained in Section 10.02 of this Agreement), (C) the Agent shall be authorized to assign the relevant Obligations to any such acquisition vehicle pro rata by the Noteholders, as a result of which each of the Noteholders shall be deemed to have received a pro rata portion of any Capital Stock and/or debt instruments issued by such an acquisition vehicle on account of the assignment of the Obligations to be credit bid, all without the need for any Secured Party or acquisition vehicle to take any further action and (D) to the extent that Obligations that are assigned to an acquisition vehicle are not used to acquire Collateral for any reason (as a result of another bid being higher or better, because the amount of Obligations assigned to the acquisition vehicle exceeds the amount of debt credit bid by the acquisition vehicle or otherwise), such Obligations shall automatically be reassigned to the Noteholders pro rata and the Capital Stock and/or debt instruments issued by any acquisition vehicle on account of the Obligations that had been assigned to the acquisition vehicle shall automatically be cancelled, without the need for any Secured Party or any acquisition vehicle to take any further action.

Section 8.11    Collateral and Guaranty Matters.

(a)     Each of the Noteholders irrevocably authorizes the Agent to be the agent for and representative of the Noteholders with respect to the guaranty of the Obligations of the Guarantors contained herein, the Collateral and the Security Documents; provided that the Agent shall not owe any fiduciary duty, duty of loyalty, duty of care, duty of disclosure or any other obligation whatsoever to any holder of Obligations.

(b)     The Agent, each Noteholder and each other Secured Party agrees that:

(i)   Liens on any property granted to or held by the Agent or in favor of any Secured Party under any Note Document will be automatically released and directs the Agent to enter into the necessary or advisable documents associated therewith,

(A)     upon payment in full in cash of all Obligations (other than contingent indemnification obligations for which claims has been made);

(B)     at the time the property subject to such Lien is transferred (or to be transferred) as part of, or in connection with, any transfer permitted under the Note Documents to any Person that is not a Note Party pursuant to a transaction permitted under this Agreement; and

(D)     subject to Section 10.02 (in respect of releases of all or substantially all of the Collateral), if the release of such Lien is approved, authorized or ratified in writing by the Required Noteholders;

(ii)   it will release or subordinate any Lien on any property granted to or held by the Agent under any Note Document to the holder of any Lien on such property that is permitted by Section 6.03(e).

The Agent, each Noteholder and each other Secured Party agrees that it will take such action and execute any such documents as may be reasonably requested by the Issuer, at the Issuer's sole cost and expense, in connection with any of the foregoing releases or any such subordination. The Agent shall be entitled to (and the Noteholders and other Secured Parties hereby authorize and direct the Agent to) rely exclusively and conclusively on an officer's certificate of the Issuer certifying that the applicable transaction giving rise to such release or subordination is permitted under Note Documents in performing its obligations under this Section 8.11. Each Noteholder and each Secured Party irrevocably authorizes the Agent to take such action and execute any such document and consents to such reliance. The Agent shall not be responsible for or have a duty to ascertain or inquire into any representation or warranty regarding the existence, value or collectability of the Collateral, the existence, priority or perfection of the Agent's Lien thereon, or contained in any certificate prepared or delivered by the Issuer or any Note Party in connection with the Collateral or compliance with the terms set forth above or in a Note Document, nor shall the Agent be responsible or liable to the Noteholders for any failure to monitor or maintain any portion of the Collateral.

(c)     Anything contained in any of the Note Documents to the contrary notwithstanding, the Agent and each Noteholder hereby agree that:

(i)     no Noteholder shall have any right individually to realize upon any of the Collateral or to enforce the Guaranty or any other Note Document, it being understood and agreed that all powers, rights and remedies hereunder and under any of the Note Documents may be exercised solely by the Agent for the benefit of the Noteholders in accordance with the terms hereof and thereof, and all powers, rights and remedies under the Collateral Documents may be exercised solely by the Agent for the benefit of the Noteholders in accordance with the terms thereof; and

(ii)     in the event of a foreclosure or similar enforcement action by the Agent on any of the Collateral pursuant to a public or private sale or other disposition (including, without limitation, pursuant to Section 363(k), Section 1129(b)(2)(a)(ii) or otherwise of the U.S. Bankruptcy Code), the Agent (or any Noteholder, except with respect to a "credit bid" pursuant to Section 363(k), Section 1129(b)(2)(a)(ii) or otherwise of the U.S. Bankruptcy Code) may be the Noteholder or licensor of any or all of such Collateral at any such sale or other disposition, and the Agent, as agent for and representative of Noteholders (but not any Noteholder or Noteholders in its or their respective individual capacities), shall be entitled, upon instructions from the Required Noteholders, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such sale or disposition, to use and apply any of the Obligations as a credit on account of the purchase price for any collateral payable by the Agent at such sale or other disposition.

Section 8.12   <u>Withholding Taxes</u>. To the extent required by any applicable law, the Agent may withhold from any payment to any Noteholder an amount equivalent to any applicable withholding Tax. If the IRS or any other Governmental Authority asserts a claim that the Agent did not properly withhold Tax from amounts paid to or for the account of any Noteholder because the appropriate form was not delivered or was not properly executed or because such Noteholder failed to notify the Agent of a change in circumstance which rendered the exemption from, or reduction of, withholding Tax ineffective or for any other reason, or if the Agent reasonably determines that a payment was made to a Noteholder pursuant to this Agreement without deduction of applicable withholding Tax from such payment, such Noteholder shall indemnify the Agent fully, within 10 days after written demand therefor, for all amounts paid, directly or indirectly, by the Agent as Tax or otherwise, including any penalties or interest and together with all expenses (including legal expenses, allocated internal costs and out-of-pocket expenses) incurred. A certificate as to the amount of such payment or liability delivered to any Noteholder by the Agent shall be conclusive absent manifest error. Each Noteholder hereby authorizes the Agent to set off and apply any amounts at any time owing to such Noteholder under this Agreement or any other Note Document against any amounts due the Agent under this <u>Section 8.12</u>. The agreements in this <u>Section 8.12</u> shall survive the resignation and/or replacement of the Agent, any assignment of rights by, or the replacement of, a Noteholder, the termination of the Commitments and the repayment, satisfaction or discharge of all other Obligations.

ARTICLE IX

GUARANTY

Section 9.01   Guaranty.

(a)    For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Guarantor hereby unconditionally and irrevocably, jointly and severally, Guarantees the full and punctual payment and performance (whether at stated maturity, upon acceleration or otherwise) of all Guaranteed Obligations, in each case as primary obligor and not merely as surety and with respect to all such Guaranteed Obligations howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, now or hereafter existing, or due or to become due. This is a guaranty of payment and not merely of collection.

(b)    All payments made by any Guarantor under this Article IX shall be payable in the manner required for payments by the Issuer hereunder, including: (i) the obligation to make all such payments in Dollars, free and clear of, and without deduction for, any Taxes, and subject to the gross-up and indemnity as provided under Section 2.09, (ii) the obligation to pay interest at the Post-Default Rate and (iii) the obligation to pay all amounts due under the Notes in Dollars.

(c)    Any term or provision of this guaranty to the contrary notwithstanding the aggregate maximum amount of the Guaranteed Obligations for which such Guarantor shall be liable under this guaranty shall not exceed the maximum amount for which such Guarantor can be liable without rendering this guaranty or any other Note Document, as it relates to such Guarantor, void or voidable under Applicable Law relating to fraudulent conveyance or fraudulent transfer.

Section 9.02   Guaranty Unconditional.   The Guaranteed Obligations shall be unconditional and absolute and, without limiting the generality of the foregoing, shall not be released, discharged or otherwise affected by:

(a)    any extension, renewal, settlement, compromise, waiver or release in respect of any obligations of any Note Party under the Note Documents, by operation of law or otherwise (other than with respect to any such extension, renewal, settlement, compromise, waiver or release agreed in accordance with the terms hereunder as expressly applying to the Guaranteed Obligations),

(b)    any modification or amendment of or supplement to this Agreement or any other Note Document (other than with respect to any modification, amendment or supplement agreed in accordance with the terms hereunder as expressly applying to the Guaranteed Obligations),

(c)    any release, impairment, non-perfection or invalidity of any Collateral,

(d)    any change in the corporate existence, structure or ownership of any Note Party or any other Person, or any event of the type described in Sections 5.01 or 6.07 with respect to any Person,

- 74 -

(e)    the existence of any claim, set-off or other rights that any Guarantor may have at any time against any Note Party, any Secured Party or any other Person, whether in connection herewith or with any unrelated transactions,

(f)    any invalidity or unenforceability relating to or against any Note Party for any reason of any Note Document, or any provision of Applicable Law purporting to prohibit the performance by any Note Party of any of its obligations under the Note Documents (other than any such invalidity or unenforceability with respect solely to the Guaranteed Obligations),

(g)    any change in the time, manner or place of payment of, or in any other term of, all or any of the Obligations, or

(h)    any other act or omission to act or delay of any kind by any Note Party, any Secured Party or any other Person or any other circumstance whatsoever that might, but for the provisions of this Section 9.02, constitute a defense available to, or legal or equitable discharge of the obligations of, any Note Party under the Note Documents.

Section 9.03    Discharge Only Upon Payment in Full; Reinstatement in Certain Circumstances. The Guaranteed Obligations shall remain in full force and effect until all of the Issuer's obligations under the Note Documents shall have been paid or otherwise performed in full. If at any time any payment made under this Agreement or any other Note Document is rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy, reorganization or similar event of any Note Party or any other Person or otherwise, then the Guaranteed Obligations with respect to such payment shall be reinstated at such time as though such payment had been due but not made at such time.

Section 9.04    Waiver by the Guarantors.

(a)    Each Guarantor hereby irrevocably and unconditionally waives, to the fullest extent permitted by Applicable Law: (i) notice of acceptance of the guaranty provided in this Article IX and notice of any liability to which this guaranty may apply, (ii) all notices that may be required by Applicable Law or otherwise to preserve intact any rights of any Secured Party against any Note Party, including any demand, presentment, protest, proof of notice of non-payment, notice of any failure on the part of any Note Party to perform and comply with any covenant, agreement, term, condition or provision of any agreement and any other notice to any other party that may be liable in respect of the Guaranteed Obligations (including any Note Party) except any of the foregoing as may be expressly required hereunder, (iii) any right to the enforcement, assertion or exercise by any Secured Party of any right, power, privilege or remedy conferred upon such Person under the Note Documents or otherwise and (iv) any requirement that any Secured Party exhaust any right, power, privilege or remedy, or mitigate any damages resulting from any Default or Event of Default under any Note Document, or proceed to take any action against any Collateral or against any Note Party or any other Person under or in respect of any Note Document or otherwise, or protect, secure, perfect or ensure any Lien on any Collateral.

(b)    Each Guarantor agrees and acknowledges that the each Noteholder and each holder of any Guaranteed Obligations may demand payment of, enforce and recover from any Guarantor or any other Person obligated for any or all of such Guaranteed Obligations in any order and in

any manner whatsoever, without any requirement that such Noteholder or such holder seek to recover from any particular Guarantor or other Person first or from any Guarantors or other Persons *pro rata* or on any other basis.

Section 9.05    Subrogation. Upon any Guarantor making any payment under this Article IX, such Guarantor shall be subrogated to the rights of the payee against the Issuer with respect to such obligation; provided that no Guarantor shall enforce any payment by way of subrogation, indemnity, contribution or otherwise, or exercise any other right, against any Note Party (or otherwise benefit from any payment or other transfer arising from any such right) so long as any obligations under the Note Documents (other than on-going but not yet incurred indemnity obligations) remain unpaid and/or unsatisfied.

Section 9.06    Acceleration. All amounts then subject to acceleration under Section 7.01 of this Agreement shall be payable by the Guarantors hereunder immediately upon demand by the Agent.

Section 9.07    Subordination. Each Guarantor hereby agrees that all Indebtedness owed by it to any Subsidiary shall be fully subordinated to the indefeasible payment in full in cash of the Obligations.

Section 9.08    Contribution with Respect to Guaranty Obligations.

(a)    To the extent that any Note Party shall make a payment under this Article IX of all or any of the Obligations (a "Guarantor Payment") which, taking into account all other Guarantor Payments then previously or concurrently made by any other Note Party, exceeds the amount which such Note Party would otherwise have paid if each Note Party had paid the aggregate Obligations satisfied by such Guarantor Payment in the same proportion that such Note Party's "Allocable Amount" (as defined below) (as determined immediately prior to such Guarantor Payment) bore to the aggregate Allocable Amounts of each of the Note Parties as determined immediately prior to the making of such Guarantor Payment, then, following the occurrence of the payment in full in cash of all Obligations, such Note Party shall be entitled to receive contribution and indemnification payments from, and be reimbursed by, each other Note Party for the amount of such excess, pro rata based upon their respective Allocable Amounts in effect immediately prior to such Guarantor Payment.

(b)    As of any date of determination, the "Allocable Amount" of any Note Parties shall be equal to the maximum amount of the claim which could then be recovered from such Note Parties under this Article IX without rendering such claim voidable or avoidable under Section 548 of Chapter 11 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law.

(c)    This Section 9.08 is intended only to define the relative rights of Notes Parties and nothing set forth in this Section 9.08 is intended to or shall impair the obligations of Note Parties, jointly and severally, to pay any amounts as and when the same shall become due and payable in accordance with the terms of this Agreement. Nothing contained in this Section 9.08 shall limit the liability of any Note Party to pay the Loans made directly or indirectly to that Note Party and accrued interest, fees and expenses with respect thereto for which such Note Party shall be primarily liable.

- 76 -

(d)     The parties hereto acknowledge that the rights of contribution and indemnification hereunder shall constitute assets of the Note Party to which such contribution and indemnification is owing.

(e)     The rights of the indemnifying Note Parties against other Note Parties under this Section 9.08 shall be exercisable upon and after the payment in full in cash of all Obligations.

ARTICLE X

MISCELLANEOUS

Section 10.01 Notices.  Except as otherwise expressly provided herein or in any Note Document, all notices and other communications provided for hereunder or thereunder shall be (i) in writing and (ii) sent by overnight courier (if for inland delivery) or international courier (if for overseas delivery); provided, that such notice or communication may be sent by email so long as (x) such email or electronic transmission is promptly followed by a communication or notice in sent in accordance with (i) and (ii) above, (y) any Note Party is delivering documents and information required to be provided under Article IV, Article V or Article VI, or (z) the express terms of any Note Document permit electronic transmissions, in each case, to a party hereto at its address and contact number specified below, or at such other address and contact number as is designated by such party in a written notice to the other parties hereto:

(a)     Issuer or Guarantors:

[_____]
[_____]
[_____]
Attention:     [_____]
Email:          [_____]


With a copy to:

[_____]
[_____]
[_____]
Attention:     [_____]
Email:          [_____]


(b)     Agent:

[_____]
[_____]
[_____]
Attention:     [_____]

Email:          [_____]

(c)     If to a Noteholder, to it at its address (mail or email) set forth on its signature page hereto.

All notices and communications shall be effective when received by the addressee thereof during business hours on a Business Day in such Person's location as indicated by such Person's address in paragraphs (a) to (c) above, or at such other address as is designated by such Person in a written notice to the other parties hereto.

Section 10.02 Waivers; Amendments.

(a)     No Deemed Waivers; Remedies Cumulative. No failure or delay on the part of the Agent or any Noteholder in exercising any right, power or privilege hereunder or under any other Note Document and no course of dealing between any Note Party, or any of the Issuer's Affiliates, on the one hand, and the Agent or Noteholder on the other hand, shall impair any such right, power or privilege or operate as a waiver thereof; nor shall any single or partial exercise of any right, power or privilege hereunder or under any other Note Document preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder or thereunder. The rights, powers and remedies herein or in any other Note Document expressly provided are cumulative and not exclusive of any rights, powers or remedies which any party thereto would otherwise have. No notice to or demand on the Issuer in any case shall entitle the Issuer to any other or further notice or demand in similar or other circumstances or constitute a waiver of the rights of the Agent or any Noteholder to any other or further action in any circumstances without notice or demand.

(b)     Amendments. No amendment or waiver of any provision of this Agreement or any other Note Document (other than any Security Document, each of which may only be waived, amended or modified in accordance with such Security Document), and no consent to any departure by the Issuer shall be effective unless in writing signed by Required Noteholders and the Issuer; provided that (x) no such amendment, waiver or consent shall (i) increase the Commitment of any Noteholder, change any ratable sharing or payment provision or modify Section 7.02 (it being understood that a waiver of any condition precedent set forth in Section 4.01 or the waiver of any Default, Event of Default or mandatory prepayment or redemption hereunder shall not constitute an extension or increase of any Commitment of any Noteholder), (ii) reduce the principal amount of any Note (it being understood that a waiver of any Default, Event of Default or mandatory prepayment or redemption hereunder shall not constitute a reduction or forgiveness of principal) or reduce the rate of interest thereon, or reduce any fees payable hereunder; provided that only the consent of the Required Noteholders shall be necessary to waive any obligation of the Noteholder to pay interest at the Post-Default Rate pursuant to Section 2.07(b), (iii) postpone the maturity of any Note, or the date of any scheduled amortization payment of the principal amount of any Note under Section 2.04(c), or any date for the payment of any interest or fees payable hereunder (it being understood that a waiver of any Default, Event of Default or mandatory prepayment or redemption hereunder shall not constitute an extension of any maturity date, any scheduled amortization payment or the date for payment of any interest or fees), (iv) change any

of the provisions of this Section 10.02(b) or any provision in any other Note Document which sets forth the rights of the parties thereunder to waive, amend or modify any of the parties' rights thereunder, (v) change the definition of "Required Noteholders", (vi) release all or substantially all the Collateral from the Liens of the Security Documents, or (vii) permit any Subsidiary of the Issuer to become a Non-Guarantor Subsidiary to the extent such designation or permission would disproportionately and adversely affect any Noteholder as compared to the other Noteholders, in each case of the foregoing clauses (i) through (vii), without the prior written consent of each Noteholder directly and adversely affected thereby; provided further that (A) no amendment, waiver or consent shall, (i) change the definition of "Change of Control" (or the waiver of any Change of Control), or (ii) amend, waive or modify any provision of Section 6.06, in each case of foregoing clauses (i) and (ii), without the prior written consent of the Super-Majority Noteholders, (B) no amendment, waiver or consent shall, without the written consent of the Agent, affect the rights or duties of the Agent under this Agreement or any other Note Document and (C) any separate reimbursement or fee agreement between the Issuer and the Agent in its capacity as such (including without limitation the Agent Fee Letter as such may be amended or modified by such parties. Notwithstanding anything herein to the contrary, (x) the Note Parties and the Agent may (but shall not be obligated to) amend or supplement any Security Document without the consent of the Noteholders to cure any ambiguity, defect or inconsistency which is not material, or to make any change that would provide any additional rights or benefits to the Noteholders and (y) any Note Party may amend, modify or supplement any annexes or schedules to the Security Documents as expressly provided therein (without the consent of the Agent, Noteholder or other secured party).

Section 10.03 Expenses; Indemnity; Etc.

(a)     Costs and Expenses. The Issuer agrees to pay or reimburse each of the Agent and the Noteholders for: (i) all reasonable and documented out-of-pocket costs and expenses of the Agent and the Noteholders (including the reasonable fees and expenses of, (w) a single firm of New York counsel to the Agent, (x) a single firm of New York counsel to various funds and Affiliates of Orion Energy Partners and (y) a single firm of New York counsel to the other Noteholders and (z) experts engaged by the Agent and/or the Noteholders from time to time) in connection with any amendment, modification or waiver of any of the terms of this Agreement or any other Note Documents, (ii) all reasonable and documented out-of-pocket costs and expenses of the Noteholders (including payment of the fees and reimbursements provided for herein) and the Agent (including reasonable and documented outside counsels' fees and expenses and reasonable and documented outside experts' fees and expenses) in connection with (A) any Default or Event of Default and any enforcement or collection proceedings resulting from such Default or Event of Default or in connection with the negotiation of any restructuring or "work-out" (whether or not consummated) of the obligations of the Issuer under this Agreement and (B) the enforcement of this Section 10.03 or the preservation of their respective rights (provided that such counsel fees Noteholders shall limited to one counsel for all Noteholders) and (iii) all costs, expenses, Taxes, assessments and other charges incurred in connection with any filing, registration, recording or perfection of any security interest contemplated by any Security Document or any other document referred to therein.

(b)     Indemnification by the Issuer. Each Note Party agrees to indemnify and hold harmless each of the Noteholders and the Agent and each of their respective Related Parties (each, an "Indemnified Party") from and against any and all losses, claims, damages, liabilities obligations, penalties, demands, actions, judgments, suits, costs, expenses and disbursements, joint or several, to which such Indemnified Party may become subject related to or arising out of any transaction contemplated by the Note Documents or the execution, delivery and performance of the Note Documents or any other document in any way relating to the Note Documents and the transactions contemplated by the Note Documents (including, for avoidance of doubt, any liabilities arising under or in connection with Environmental Law) and will reimburse any Indemnified Party for all expenses (including reasonable and documented outside counsel fees and expenses) as they are incurred in connection therewith. No Note Party shall be liable under the foregoing indemnification provision to an Indemnified Party to the extent that any 1 losses, claims, damages, liabilities obligations, penalties, demands, actions, judgments, suits, costs, expenses and disbursements is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct. Each Note Party also agrees that no Indemnified Party shall have any liability (whether direct or indirect, in contract or tort or otherwise) to it, or any of its security holders or creditors related to or arising out of the execution, delivery and performance of any Note Document or any other document in any way relating to the Note Documents or the other transactions contemplated by the Note Documents, except to the extent that any loss, claim, damage or liability is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct as determined by a court of competent jurisdiction. To the extent permitted by Applicable Law, no party hereto shall assert and each party hereto hereby waives, any claim against any Indemnified Party or any other party hereto, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any Note Document or any agreement or instrument contemplated hereby, any Note or the use of the proceeds thereof. Paragraph (b) of this Section shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

(c)     Indemnification by Noteholders. To the extent that the Issuer fails to pay any amount required to be paid to the Agent or its Related Parties under Section 10.03(a) or (b), each Noteholder severally agrees to pay ratably in accordance with the aggregate principal amount of the Notes held by the Noteholder to the Agent, affiliate or agent such unpaid amount; provided that the unreimbursed expense or indemnified losses, claims, damages, liabilities obligations, penalties, demands, actions, judgments, suits, costs, expenses and disbursements, as the case may be, was incurred by or asserted against the Agent, affiliate or agent in its capacity as such.

(d)     Settlements; Appearances in Actions. The Issuer agrees that, without each Indemnified Party's prior written consent, it will not settle, compromise or consent to the entry of any judgment in any pending or threatened claim, action or proceeding in respect of which indemnification could be sought by or on behalf of such Indemnified Party under this Section (whether or not any Indemnified Party is an actual or potential party to such claim, action or proceeding), unless such settlement, compromise or consent includes an unconditional release of such Indemnified Party from all liability arising out of such claim, action or proceeding. In the event that an Indemnified Party is requested or required to appear as a witness in any action brought

- 80 -

by or on behalf of or against the Issuer or any Affiliate thereof in which such Indemnified Party is not named as a defendant, the Issuer agrees to reimburse such Indemnified Party for all reasonable expenses incurred by it in connection with such Indemnified Party's appearing and preparing to appear as such a witness, including the reasonable and documented fees and disbursements of its legal counsel. In the case of any claim brought against an Indemnified Party for which the Issuer may be responsible under this Section 10.03, the Agent agrees (at the expense of the Issuer) to execute such instruments and documents and cooperate as reasonably requested by the Issuer in connection with the Issuer's defense, settlement or compromise of such claim, action or proceeding.

Section 10.04 Successors and Assigns.

(a)    Assignments Generally. The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) the Note Parties may not assign or otherwise transfer any of their rights or obligations hereunder without the prior written consent of the Agent and the Noteholders (and any attempted assignment or transfer by such Note Party without such consent shall be null and void) and (ii) no Noteholder may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section 10.04. Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants (to the extent provided in paragraph (f) of this Section) and, to the extent expressly contemplated hereby, the Indemnified Parties referred to in Section 10.03(b) and the Related Parties of each of the Agent and the Noteholders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    Assignments by Noteholders. Any Noteholder may assign to one or more Persons all or a portion of its rights and obligations under this Agreement (including all or a portion of its Note at the time owing to it); provided that:

(i)    except in the case of an assignment to a Noteholder or an Affiliate or Related Fund of a Noteholder, the amount of the Notes of the assigning Noteholder subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Issuer) shall not be less than $500,000 (or such lesser amount as shall be the then outstanding principal balance thereof) unless the Issuer otherwise consents;

(ii)    no consent shall be required for any such assignment, except (i) to the extent required under clause (b)(i) above and (ii) the consent of the Issuer shall be required for any assignment to any Disqualified Investor;

(iii)    each partial assignment shall be made as an assignment of a proportionate part of all the assigning Noteholder's rights and obligations under this Agreement; and

(iv)    except in the case of an assignment to an Affiliate, the parties to each assignment shall execute and deliver to the Issuer an Assignment and Assumption.

Upon acceptance and recording pursuant to paragraph (d) of this Section, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be

a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Noteholder under this Agreement, and the assigning Noteholder thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Noteholder's rights and obligations under this Agreement, such Noteholder shall cease to be a party hereto but shall continue to be entitled to the benefits of <u>Sections 2.09</u>, <u>2.10</u> and <u>10.03</u>). Any assignment or transfer by a Noteholder of rights or obligations under this Agreement that does not comply with this paragraph shall be treated for purposes of this Agreement as a sale by such Noteholder of a participation in such rights and obligations in accordance with paragraph (f) of this Section.

(c)    <u>Maintenance of Register by the Issuer</u>. The Issuer shall maintain at one of its offices in the United States a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Noteholders, and the Commitments of, and principal amounts (and stated interest) of the Notes owing to each Noteholder pursuant to the terms hereof from time to time and the amount of any accrued interest owing from time to time (the "<u>Register</u>"). The entries in the Register shall be conclusive absent manifest error, and the Issuer, the Agent and the Noteholders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Noteholder hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Agent and any Noteholder, at any reasonable time and from time to time upon reasonable prior notice.

(d)    <u>Effectiveness of Assignments</u>. Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Noteholder and an assignee, the Issuer shall accept such Assignment and Assumption and record the information contained therein in the Register. No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

(e)    <u>Limitations on Rights of Assignees</u>. An assignee Noteholder shall not be entitled to receive any greater payment under <u>Sections 2.09</u> or <u>2.10</u> than the assigning Noteholder would have been entitled to receive with respect to the interest assigned to such assignee (based on the circumstances existing at the time of the assignment), unless the Issuer's prior written consent has been obtained therefor.

(f)    <u>Participations</u>. Any Noteholder may, without the consent of the Issuer or the Agent, sell participations to one or more banks or other entities (a "<u>Participant</u>") in all or a portion of such Noteholder's rights and obligations under this Agreement and the other Note Documents (including all or a portion of the Notes owing to it); <u>provided</u> that (i) such Noteholder's obligations under this Agreement and the other Note Documents shall remain unchanged, (ii) such Noteholder shall remain solely responsible to the other parties hereto for the performance of such obligations, (iii) the Note Parties, the Agent and the other Noteholders shall continue to deal solely and directly with such Noteholder in connection with such Noteholder's rights and obligations under this Agreement and the other Note Documents. Any agreement or instrument pursuant to which a Noteholder sells such a participation shall provide that such Noteholder shall retain the sole right to enforce this Agreement and the other Note Documents and to approve any amendment, modification or waiver of any provision of this Agreement or any other Note Document; <u>provided</u>

that, such agreement or instrument may provide that such Noteholder will not, without the consent of the Participant, agree to any amendment, modification or waiver described in the first proviso to Section 10.02(b) that affects such Participant. Subject to paragraph (g) of this Section, the Issuer agrees that each Participant shall be entitled to the benefits of Sections 2.09 and 2.10 (subject to the requirements and limitations therein, including the requirements under Section 2.09(e) (it being understood that the documentation required under Section 2.09(e) shall be delivered to the participating Noteholder)) to the same extent as if it were a Noteholder and had acquired its interest by assignment pursuant to paragraph (b) of this Section. Each Noteholder that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Issuer, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Notes or other obligations under the Note Documents held by it (the "Participant Register"); provided that no Noteholder shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any Commitments, Note or its other obligations under any Note Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan or other obligation is in registered form under Section 5f.103-1(c) of the regulations promulgated under the Code by the U.S. Department of the Treasury. The entries in the Participant Register shall be conclusive absent manifest error, and such Noteholder shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Agent (in its capacity as Agent) shall have no responsibility for maintaining a Participant Register.

(g)     Limitations on Rights of Participants. A Participant shall not be entitled to receive any greater payment under Sections 2.09 or 2.10 than the applicable Noteholder would have been entitled to receive with respect to the participation sold to such Participant. A Participant shall not be entitled to the benefits of Section 2.09 unless the Participant agrees, for the benefit of the Issuer, to comply with Section 2.09(e) as though it were a Noteholder (it being understood that the documentation required under Section 2.09(e) shall be delivered to the participating Noteholder).

(h)     Certain Pledges.

(i)     Any Noteholder may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Noteholder, including any such pledge or assignment to a Federal Reserve Bank, the European Central Bank or any other central bank or similar monetary authority in the jurisdiction of such Noteholder, and this Section shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release a Noteholder from any of its obligations hereunder or substitute any such pledgee or assignee for such Noteholder as a party hereto; and provided further that any payment in respect of such pledge or assignment made by any Note Party to or for the account of the pledging or assigning Noteholder in accordance with the terms of this Agreement shall satisfy such Note Party's obligations hereunder in respect of such pledged or assigned Note to the extent of such payment.

(ii)     Notwithstanding any other provision of this Agreement, any Noteholder may, without informing, consulting with or obtaining the consent of any other Party to the Note

Documents and without formality under any Note Document, assign by way of security, mortgage, charge or otherwise create security by any means over, its rights under any Note Document to secure the obligations of that Noteholder to any Person that would be a permitted assignee (without the consent of the Issuer or the Agent) pursuant to <u>Section 10.04(b)</u> including (A) to the benefit of any of its Affiliates and/or (B) within the framework of its, or its Affiliates, direct or indirect funding operations.

(i)     <u>No Assignments to the Issuer or Affiliates.</u> Anything in this Section to the contrary notwithstanding, no Noteholder may assign or participate any interest in any Note held by it hereunder to any Note Party or any Affiliate of the Issuer without the prior written consent of each other Noteholder.

Section 10.05 <u>Survival.</u>All covenants, agreements, representations and warranties made by the Note Parties herein and in the certificates or other instruments delivered in connection with or pursuant to this Agreement shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement and the issuance of any Note, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Agent or any Noteholder may have had notice or knowledge of any Default or Event of Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Note or any reimbursement, fee or any other amount payable under this Agreement (other than any contingent indemnification or reimbursement amount not then due and payable) is outstanding and unpaid. The provisions of <u>Sections 2.09</u>, <u>2.10</u>, <u>10.03</u>, <u>10.12</u>, <u>10.13</u> and <u>Article VIII</u> shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the payment in full of the Obligations, the expiration or termination of the Commitments or the termination of this Agreement or any provision hereof.

Section 10.06 <u>Counterparts; Integration; Effectiveness.</u>   This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement and the other Note Documents to which a Note Party is party constitute the entire contract between and among the parties relating to the subject matter hereof and thereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Delivery of an executed counterpart of a signature page to this Agreement by electronic transmission shall be effective as delivery of a manually executed counterpart of this Agreement.  The words "execution," "execute", "signed," "signature," and words of like import in or related to any document to be signed in connection with this Agreement and the transactions contemplated hereby (including without limitation Assignment and Assumptions, amendments, waivers and consents) shall be deemed to include electronic signatures, the electronic matching of assignment terms and contract formations on electronic platforms approved by the Agent, or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

Section 10.07 <u>Severability</u>.   Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

Section 10.08 <u>Right of Setoff</u>. If an Event of Default shall have occurred and be continuing, each Noteholder and any of its Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held, and any other indebtedness at any time owing, by such Noteholder or any such Affiliate to or for the credit or the account of the Issuer against any of and all the obligations of the Issuer now or hereafter existing under this Agreement held by such Noteholder, irrespective of whether or not such Noteholder shall have made any demand under this Agreement and although such obligations may be unmatured or denominated in a currency other than Dollars. The rights of each Noteholder or any such Affiliate under this Section are in addition to other rights and remedies (including other rights of setoff) which such Noteholder may have.

Section 10.09  <u>Governing Law; Jurisdiction; Etc.</u>

     (a)    <u>Governing Law</u>. This Agreement shall be construed in accordance with and governed by the law of the State of New York.

     (b)    <u>Submission to Jurisdiction</u>. Any legal action or proceeding with respect to this Agreement or any other Note Document to which a Note Party is a party shall, except as provided in clause (d) below, be brought in the courts of the State of New York, or of the United States District Court for the Southern District of New York, in each case, seated in the County of New York and, by execution and delivery of this Agreement, each party hereto hereby irrevocably accepts for itself and in respect of its property, generally and unconditionally, the exclusive jurisdiction of the aforesaid courts. Each party hereto agrees that a judgment, after exhaustion of all available appeals, in any such action or proceeding shall be conclusive and binding upon it, and may be enforced in any other jurisdiction, including by a suit upon such judgment, a certified copy of which shall be conclusive evidence of the judgment.

     (c)    <u>Waiver of Venue</u>. Each party hereto hereby irrevocably waives any objection that it may now have or hereafter have to the laying of the venue of any suit, action or proceeding arising out of or relating to this Agreement or any other Note Document to which it is a party brought in the Supreme Court of the State of New York or in the United States District Court for the Southern District of New York, in each case, seated in the County of New York and hereby further irrevocably waives any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

     (d)    <u>Rights of the Secured Parties</u>. Nothing in this <u>Section 10.09</u> shall limit the right of the Secured Parties to refer any claim against a Note Party to any court of competent jurisdiction anywhere else outside of the State of New York, nor shall the taking of proceedings by any Secured

- 85 -

Party before the courts in one or more jurisdictions preclude the taking of proceedings in any other jurisdiction whether concurrently or not.

(e)    WAIVER OF JURY TRIAL. EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING UNDER ANY FINANCING DOCUMENT OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO ANY NOTE DOCUMENT, OR THE TRANSACTIONS RELATED THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER FOUNDED IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE SIGNATORIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

(f)    Service of Process. Each party hereto irrevocably consents to the service of process in the manner provided for notices in Section 10.01.

(g)    Waiver of Immunity. To the extent that a Note Party has or hereafter may acquire any immunity from jurisdiction of any court or from any legal process (whether through service of notice, attachment prior to judgment, attachment in aid of execution, execution, sovereign immunity or otherwise) with respect to itself or its property, it hereby irrevocably waives such immunity, to the fullest extent permitted by law, in respect of its obligations under this Agreement and the other Note Documents.

Section 10.10 Headings.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

Section 10.11 Confidentiality.

(a)    Each of the Agent and the Noteholders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (i) to its and its Affiliates' directors, officers, employees, board members (and members of committees thereof), current or prospective limited partners, agents, consultants, Persons providing administration and settlement services and other professional advisors, including accountants, auditors, legal counsel and other advisors with a need to know (for purposes of this Section 10.11, the "Representatives") (it being understood that the Representatives will be informed of the confidential nature of such Information and instructed to keep such Information confidential, and that the Agent or Noteholder responsible for such disclosure shall be responsible for any non-compliance with the foregoing by any such Representatives that do not have a separate confidentiality obligation to the Agent or Noteholder), (ii) to the extent requested by any applicable regulatory or supervisory body or authority, by applicable laws or regulations or by any subpoena, oral question posed at any deposition, interrogatory or similar legal process (including, for the avoidance of doubt, to the

extent requested in connection with any pledge or assignment pursuant to <u>Section 10.04(h)</u>); <u>provided</u> that the party from whom disclosure is being required shall give notice thereof to the Issuer as soon as practicable (unless restricted from doing so and except where disclosure is to be made to a regulatory or supervisory body or authority during the ordinary course of its supervisory or regulatory function), (iii) to any other party to this Agreement, (iv) subject to an agreement containing provisions substantially the same as those of this paragraph, to any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement, (v) with the written consent of the Issuer, (vi) to the extent such Information (A) becomes publicly available other than as a result of a breach of this paragraph or (B) becomes available to the Agent or any Noteholder on a nonconfidential basis from a source other than the Issuer and such source is not, to the knowledge of the Agent or Noteholder, subject to subject to a confidentiality agreement with any Note Party or (vii) to any other party to this Agreement or any Person with whom any Note Party, the Agent or a Noteholder has entered into (or potentially may enter into), whether directly or indirectly, any transaction under which payments are to be made or may be made by reference to one or more Note Documents and/or the Note Parties or to any of such Person's Affiliates and Representatives. For the purposes of this paragraph, "Information" means all information received from any Note Party or relating to any Issuer Group Member, or its respective business (including, for the avoidance of doubt, any information with respect to which any Note Party owes any duty or obligation of confidentiality to any third-party), other than any such information that is available to the Agent or any Noteholder on a nonconfidential basis prior to disclosure by a Note Party. Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

(b)     Upon written request after a discharge contemplated by <u>Section 9.03</u>, but no later than ten (10) Business Days thereafter, by any Note Party, The Agent and Noteholder agrees to promptly return or destroy all copies of confidential Information and all notes, correspondence, documents or other records based thereon or which contain confidential Information ("<u>Derivate Documents</u>") which are then in the Agent's or Noteholder's possession. Notwithstanding the foregoing, the Agent and Noteholders and their Representatives shall be entitled to (i) retain copies of all Information provided to the Agent or Noteholder for legal, regulatory, and compliance purposes, in a manner consistent with the Agent's or Noteholder's document archiving procedures, and which information shall remain confidential for the term of this Agreement so long as such Information is retained in a manner consistent with the Agent's or Noteholder's internal confidentiality policies, or (ii) to the extent that the Agent or Noteholder and its Representatives have copies of computer records and files containing Information, which have been created as a result of automatic archiving or backup procedures, may retain such number of copies of the Information for legal, regulatory, and compliance purposes, in a manner consistent with the Agent's or Noteholder's and its Representatives' document archiving procedure, and which information shall remain confidential so long as such Information is retained in a manner consistent with the Agent's or Noteholder's and its Representatives' internal confidentiality policies. The Note Party remains the owner of all its Information contained in all Derivate Documents. In addition, the Agent and Noteholders shall not be obligated to return or destroy any Information contained in any documents or packages prepared for its board of directors or like

body, but may retain such documents or packages in a manner consistent with the Agent's or Noteholder's internal confidentiality policies.

(c)     Notwithstanding anything to the contrary contained herein, the parties hereto acknowledge that the Agent and its respective affiliates and advisors and investors in funds managed by the foregoing Persons (collectively, the "Related Persons") are subject to compliance obligations mandated by various regulators, governmental agencies and taxation authorities; and in satisfaction of those compliance obligations, the Related Persons may disclose confidential Information in response to a broad information request not specifically targeted at any Note Party, as required by such regulators, governmental agencies, and taxation authorities without notice to any Note Party and without obtaining assurances that information will be treated confidentially; and such disclosure shall not be a violation of this agreement; provided that if such regulators, governmental agencies and taxation authorities make information requests specifically targeted at or regarding the Issuer or any of its affiliates, the Related Persons will promptly notify the Note Parties of such information request.

Section 10.12 No Third Party Beneficiaries.The agreement of the Noteholders to purchase the Notes from the Issuer on the terms and conditions set forth in this Agreement, is solely for the benefit of the Note Parties, the Agent and the Noteholders, and no other Person (including any contractor, subcontractor, supplier, workman, carrier, warehouseman or materialman furnishing labor, supplies, goods or services to or for the benefit of the Business) shall have any rights under this Agreement or under any other Note Document as against the Agent or any Noteholder or with respect to any extension of credit contemplated by this Agreement.

Section 10.13 Reinstatement. The obligations of each Note Party under this Agreement shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of any Note Party in respect of the Secured Obligations is rescinded or must be otherwise restored by any holder of any of the Secured Obligations, whether as a result of any proceedings under any Debtor Relief Law or reorganization or otherwise, and the Issuer agrees that it will indemnify each Secured Party on demand for all reasonable costs and expenses (including fees of counsel) incurred by such Secured Party in connection with such rescission or restoration, including any such costs and expenses incurred in defending against any claim alleging that such payment constituted a preference, fraudulent transfer or similar payment under any Debtor Relief Law.

Section 10.14 USA PATRIOT Act. Each Noteholder hereby notifies the Note Parties that pursuant  to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "USA PATRIOT Act"), it is required to obtain, verify and record information that identifies such Note Party, which information includes the name and address of such Note Party and other information that will allow such Noteholder to identify such Note Party in accordance with the USA PATRIOT Act.

[Remainder of page intentionally left blank]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their duly authorized officers as of the day and year first above written.

HOLDINGS:


TSG SHELF II ACQUISITION HOLDINGS, LLC


By: _____
      Name:
      Title:


ISSUER:


TSG SHELF II ACQUISITION, LLC


By: _____
      Name:
      Title:


SUBSIDIARY NOTE PARTIES:


[_____]


By: _____
      Name:
      Title:

**UMB BANK, NA.**, as Agent

By: _____
     Name:
     Title:

[_____], as a Noteholder

By: _____
      Name:
      Title:

Address for Notices:

[_____]
[_____]
[_____]
Attention:      [_____]
Email: [_____]

**ANNEX I**
**TO**
**NOTE PURCHASE AGREEMENT**

<u>**Commitments**</u>

| NOTEHOLDER | COMMITMENTS |
|:---:|:---:|
| [Orion][6] | $21,000,000 |
| **TOTAL** | $21,000,000 |

---

[6] NTD: Orion entities TBC.

**EXHIBIT D**
**TO**
**NOTE PURCHASE AGREEMENT**

**ADDITIONAL COVENANTS[1]**

SECTION 1.1.        <u>Right of Access to Facilities/Records</u>.  Each Note Party agrees that during the term of the Agreement, the Noteholders, the Collateral Agent and the duly authorized agents of either of them shall have the right (i) at all commercially reasonable times during normal business hours to enter upon each Facility and to examine and inspect such Facility and examine and make copies of the books of record and accounts of such Facility; <u>provided</u> that twenty-four hours' notice shall be given to the Issuer prior to such examination or inspection.

SECTION 1.2.        [Reserved].

SECTION 1.3.        [Reserved].

SECTION 1.4.        <u>Insurance</u>. (a) Beginning on the date of execution hereof and thereafter throughout the term of the Agreement, each Note Party shall provide, maintain and keep in force or cause to be provided, maintained and kept in force, the following insurance coverages relating to the Facilities, paying as the same become due and payable all premiums with respect thereto:

(i)        A title insurance policy or policies, to the extent required by the Agreement.

(ii)        Insurance against loss or damage to the Facilities and all improvements therein (including, during any period of time when any Note Party is making alterations, repairs or improvements to the Facilities, improvements and betterments coverage), all subject to standard form exclusions, with uniform standard extended coverage endorsement limited only as may be provided in the standard form of extended coverage endorsement at the time in use in the jurisdiction where such Facility is located.

(iii)        Commercial comprehensive general liability, property and automobile liability insurance against claims arising in, on or about the Facilities and its Business, including in, on or about the sidewalks or premises adjacent to the Facilities.

(iv)        Business interruption or rent loss insurance (or a combination of the two).With respect to each Mortgaged Property that is located in an area identified by the Federal Emergency Management Agency (or any successor agency) as a special flood hazard area with respect to which flood insurance has been made available under Flood Insurance Laws (it being understood and agreed that as of the Closing Date, the Evergreen Property is not so classified, and as such, the following requirements of this clause (iv) shall not apply with respect to the Evergreen Facility), then, the applicable Note Party (x)

---

[1] NTD: to be included in body of final form NPA.

43006417.2

shall maintain, or cause to be maintained, with financially sound and reputable insurance companies (as reasonably determined in good faith by the Issuer), such flood insurance in an amount and otherwise sufficient to comply with all applicable rules and regulations promulgated pursuant to the Flood Insurance Laws and (y) deliver to the Collateral Agent upon reasonable written request, evidence of such compliance in form and substance reasonably acceptable to the Collateral Agent, including, without limitation, evidence of annual renewals of such insurance.

(v)     Without limiting the foregoing, the Issuer shall maintain with insurance companies that are financially sound and reputable at the time the relevant coverage is placed or renewed or with a property insurance, casualty insurance and general liability insurance policies with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business, of such types and in such amounts as are customarily carried under similar circumstances by such other Persons, and furnish to the Noteholders, upon reasonable written request from the Required Noteholders, information presented in reasonable detail as to the insurance so carried.

(vi)     Such other forms of insurance as are customary in the industry or as such Note Party is required by law or written agreement to provide with respect to the Facilities, including, without limitation, any legally required worker's compensation insurance and disability benefits insurance.

(b)     All the insurance coverage required by this Section 1.4 of this Exhibit D shall be in such amounts, and may be subject to deductible clauses in such amounts, as are customary for facilities of similar size, type and character within the jurisdictions where the Facilities are located.

(c)     [Reserved].

(d)     All policies maintained (or caused to be maintained) by each Note Party pursuant to this Section 1.4 of this Exhibit D shall be taken out and maintained with generally recognized, responsible insurance companies rated not less than "A" by A.M. Best (or any successor), authorized to write insurance in the jurisdictions where the Facilities are located, which may include "captive" insurance companies or governmental insurance pools, selected by the Issuer. The insurance policies required by subsections (a)(i), (a)(ii) and (a)(iv) and (a)(v) of this Section 1.4 of this Exhibit D shall name the Collateral Agent and such Note Party as insureds or lenders' loss payee, as applicable, as their respective interests may appear (provided that with respect to insurance maintained pursuant to subsection (a)(i) of this Section 1.4 of this Exhibit D, the Collateral Agent shall also be named as a mortgagee, and the Collateral Agent shall also be named as an additional insured on the policies required by subsections (a)(iii) and (a)(iv) of this Section 1.4 of this Exhibit D). Such policies or certificates of insurance shall provide that the insurer will endeavor to mail not less than thirty (30) nor more than sixty (60) days' written notice to the Collateral Agent of any amendment or cancellation prior to expiration of such policy.

43006417.2

(e)    The Note Parties shall deliver to the Collateral Agent (i) upon the Closing Date, the certificate(s) of insurance which the Note Parties are then required to maintain pursuant to this Section 1.4 of this Exhibit D, together with evidence as to the payment of all premiums then due thereon, (ii) at least 15 days prior to the expiration of any such policies evidence as to the renewal thereof, if then required by this Section 1.4 of this Exhibit D, and the payment of all premiums then due with respect thereto, and (iii) promptly upon request by the Collateral Agent, but in any case within 90 days after the end of each fiscal year, a certificate of an Authorized Representative of the Issuer setting forth the particulars as to all insurance policies maintained by the Note Parties pursuant to this Section 1.4 of this Exhibit D and certifying that such insurance policies are in full force and effect, that such policies comply with the provisions of this Section 1.4 of this Exhibit D and that all premiums then due thereon have been paid.

SECTION 1.5.        Maintenance and Repair; Taxes; Utility and Other Charges.

(a)    Each Note Party agrees to (i) maintain each Facility, or cause each Facility to be maintained, during the term of the Agreement in as reasonably safe condition as its operations shall permit and (ii) do or cause to be maintained in good repair and in good operating condition, ordinary wear and tear excepted, all properties material to the conduct of the Business making from time to time all necessary repairs thereto and renewals and replacements thereof necessary in order that the business carried on in connection therewith may be properly conducted at all times, except, in each case, where the failure to do so would not have a Material Adverse Effect.

(b)    Each Note Party agrees to timely and fully pay when due, or cause to be timely and fully paid when due during the term of the Agreement all material taxes, governmental charges of any kind assessed or levied upon the Facilities or any part thereof, including any material taxes levied against any portion of the Facilities which, if not paid, will become a charge on the revenues or other receipts from the Facilities prior to or on a parity with the charge thereon and the pledge or assignment thereof to be created therefrom or under the Agreement, all utility and other charges incurred in the operation, maintenance, use, occupancy and upkeep of any portion of the Facilities and all assessments and charges lawfully made by any governmental body for public improvements that may be secured by a lien on the Facilities; provided that with respect to special assessments or other governmental charges that may lawfully be paid in installments over a period of years, such Note Party shall be obligated to pay only such installments as are required to be paid during the term of the Agreement. Any Note Party may, at such Note Party's expense and in such Note Party's name, in good faith and in accordance with the Permitted Contest Conditions, contest any such taxes, assessments and other charges and, in the event of any such contest, may permit the taxes, assessments or other charges so contested to remain unpaid during that period of such contest and any appeal therefrom (provided the requirements of the Permitted Contest Conditions at all times continue to be satisfied) unless by such nonpayment any Facility or any part thereof will be subject to seizure, tax sale, loss, forfeiture or similar taking.

SECTION 1.6.        [Reserved]

SECTION 1.7.        [Reserved].

43006417.2

SECTION 1.8.    <u>Payment of Obligations; Compliance with Liens</u>. Each Note Party agrees to promptly pay or otherwise satisfy and discharge all obligations, indebtedness, demands and claims as and when the same become due and payable, other than any thereof whose validity, amount or collectability is being contested in accordance with the Permitted Contest Conditions and shall at all times comply with all terms, covenants and provisions contained in any mortgages, deeds of trust, security agreements or instruments evidencing any Liens at any time existing upon its properties or any part thereof securing any indebtedness incurred or assumed by it and pay or cause to be paid, or to be renewed, refunded or extended or to be taken up, by it, all bonds, notes or other evidences of indebtedness secured by any such mortgage or other Lien, as and when the same shall become due and payable, in each case except as would not result in a Material Adverse Effect. For the avoidance of doubt, in the event of any conflict between this <u>Section 1.8</u> of this <u>Exhibit D</u> and <u>Section 5.09</u> of the Agreement, the provisions of <u>Section 5.09</u> shall control.

SECTION 1.9.        <u>[Reserved]</u>.

SECTION 1.10.        <u>[Reserved]</u>.

SECTION 1.11.        <u>[Reserved]</u>.

SECTION 1.12.        <u>[Reserved]</u>.

SECTION 1.13.        <u>[Reserved]</u>.

SECTION 1.14.        <u>[Reserved]</u>.

SECTION 1.15.        <u>[Reserved]</u>.

SECTION 1.16.        <u>[Reserved]</u>.

SECTION 1.17.        <u>[Reserved]</u>.

SECTION 1.18.        <u>Financial Covenants</u>.

(a)        <u>[Reserved]</u>.

(b)        <u>Debt Service Coverage</u>.

For each period of four consecutive Fiscal Quarters, commencing with the period of four consecutive Fiscal Quarters ending on March 31, 2023, the Note Parties shall maintain a Debt Service Coverage Ratio equal to at least 1.25 to 1.00, calculated as of the last day of each such period of four consecutive Fiscal Quarters, based upon the financial statements of the Issuer Group Members delivered in respect of such date.

SECTION 1.19.        <u>[Reserved]</u>.

SECTION 1.20.        <u>ERISA</u>.

D-4

43006417.2

(a)    Each of the Note Parties will not, with respect to any Pension Plan: (1) incur any "accumulated funding deficiency," as such term is defined in Section 412 of the Code, whether or not waived, if the amount of such accumulated funding deficiency, plus any accumulated funding deficiencies previously incurred with respect to such Pension Plan and not eliminated, would aggregate more than $100,000; provided that the incurring of such an accumulated funding deficiency will not be an Event of Default under Section 7.01(c) of the Agreement if it is reduced below $100,000 or eliminated within 90 days after the date upon which any Note Party becomes aware of such accumulated funding deficiency; or (2) terminate any such Pension Plan in a manner which could result in the imposition of a material lien on the property of such Note Party pursuant to Section 4068 of ERISA and which could materially adversely affect the business, earnings, properties or financial condition of the Note Parties, taken as a whole; or (3) withdraw from a Multiemployer Plan in a "complete withdrawal" or a "partial withdrawal" as defined in Sections 4203(a) and 4205(a), respectively, of ERISA, if such withdrawal could materially adversely affect the ability of any Note Parties, taken as a whole, to comply at any time with any of the provisions of the Agreement.

(b)    Each of the Note Parties will: (1) fund all current and past service pension liabilities under the provisions of all Pension Plans such that if all such Pension Plans were terminated at the same time by such Note Party any liens imposed on such Note Party under Section 4068 of ERISA would not be in an amount in the aggregate which would materially affect the such Note Party's ability to comply at any time with any of the provisions of the Agreement; and (2) otherwise comply in all material respects with the provisions applicable to its Pension Plans contained in ERISA, the Code and the regulations published thereunder; and (3) notify the Noteholders promptly after any Note Party knows or has reason to know (i) of the happening of any material ERISA Event with respect to any Pension Plan and, in any event, at least five days prior to any notification of such material ERISA Event given to the PBGC pursuant to the terms of Section 4043 of ERISA or (ii) of an assessment against any Note Party or any Common Control Entity of any withdrawal liability to a Multiemployer Plan. Notwithstanding anything herein to the contrary, the Note Parties need not notify the Noteholders of such material ERISA Event or withdrawal liability unless it would materially adversely affect the business, prospects, earnings, properties or condition (financial or otherwise) of any Note Party.

For purposes of subsections (a) and (b) of this Section 1.20 of this Exhibit D, the term "Common Control Entity" means any entity which is a member of a "controlled group of corporations" with, or is under "common control" with, any Note Party as defined in Section 414(b) or (c) of the Code.

EXHIBIT "B-1"

EQUITY CONSIDERATION TERM SHEET AND FORM OF AMENDED AND RESTATED LIMITED
LIABILITY COMPANY AGREEMENT OF TSG SHELF II INVESTMENTS, LLC

[See attached]

Exhibit B-1
to Asset Purchase Agreement

## SUMMARY OF MATERIAL TERMS OF
## EQUITY CONSIDERATION AND EQUITY INVESTMENT OPPORTUNITY

This Equity Consideration and Equity Investment Opportunity Term Sheet (this "Term Sheet") is attached as Exhibit B-1 to and made a part of the Asset Purchase Agreement, dated as of May [•], 2021 (the "TSG Shelf II Purchase Agreement"), by and between CarbonLITE Industries, LLC and TSG Shelf II Acquisition, LLC, and is intended as an outline of certain of the material terms of the equity consideration and equity investment opportunity that would be made available to Orion Energy Partners ("Orion") under certain circumstances described in the TSG Shelf II Purchase Agreement and herein. Capitalized terms used but not defined herein shall have the meanings ascribed to them in the TSG Shelf II Purchase Agreement.

| EQUITY CONSIDERATION | |
|---|---|
| **Equity Consideration**<br><br>**Profits Interests** | At Closing TSG Shelf II Investments, LLC ("Investments") will issue to Orion profits interests in the form of Class C-1 Units in Investments. The number of Class C-1 Units issued to Orion will equal 1.5% of all units outstanding 180 days after Closing (the "Class C-1 Units"). The Class C-1 Units will be structured to participate in distributions made by Investments once The Sterling Group, L.P. and its Affiliates ("Sterling") and Investments' other investors receive distributions (other than tax distributions attributable to allocations of operating income) equal to 200% of the capital invested by such investors as of 180 days after the Closing. The Class C-1 Units will be non-voting securities and will be subject to the limited liability company agreement of Investments substantially in the form attached hereto, as amended from time to time (the "Investments LLC Agreement"), the material terms of which are described below. Investments hereby represents and warrants that it owns, or prior to Closing shall own all right, title and interest to the Evergreen facility located in Clyde, OH and all assets and rights primarily used in connection with such business. |

| INVESTMENT OPPORTUNITY OVERVIEW | |
|---|---|
| **Investment Opportunity** | During the 90-day period following the Closing Date, Orion will have the right, but not the obligation, to purchase, without duplication: (a) up to $7 million of Class A Units in Investments if Sterling, or its affiliates acquires Sellers' facility located in Riverside, CA but no other facility, (b) up to $10 million of Class A Units in Investments if Sterling or its affiliates acquire Sellers' facility located in Riverside, CA and either Sellers' facility located in Dallas, Texas or Reading, Pennsylvania, or (c) up to $12.5 million of Class A Units in Investments if Sterling or its affiliates acquire Sellers' facilities located in Dallas, Texas, Riverside, California, and Reading, Pennsylvania (the "Equity Investment Option"), at the same issue price as paid by Sterling to purchase its Class A Units at the Closing. The Class A Units will be voting securities and will be subject to the Investments LLC Agreement, the material terms of which are described below. The parties acknowledge and agree that Orion and its permitted transferees that beneficially own Units shall be deemed an "Institutional Holder", "Eligible Purchaser" (solely with respect to its Class A Units)", "VCOC Member" and "Lender Member" for purposes of the Investments LLC Agreement.<br><br>During such 90-day period, Investments will provide Orion with (i) monthly operating reports (only if any such reports are produced by Investments and without any representation of accuracy) and general information on the turnaround plan for the Business and (ii) a meeting with management and a tour of the Business property located in Clyde, Ohio, so Orion may evaluate such investment opportunity. |
| **Governing Documents** | The documentation governing Orion's investment in Investments, should it be entitled to make such investment and elect to do so, will consist of a subscription agreement between Orion and Investments in the form attached as Annex I to this term sheet (the "Subscription Agreement") and the Investments LLC Agreement. Any amendment to the Investments LLC Agreement that is disproportionately adverse to Orion- specific rights shall require Orion's prior written consent. |
| **MATERIAL INVESTMENTS LLC AGREEMENT TERMS** | |
| **GOVERNANCE PROVISIONS** | |
| **Board of Directors** | Investments is managed by a board of directors (the "Board") controlled by Sterling. |
| **Director Protection** | The Investments LLC Agreement contains customary exculpation, indemnification, expense advancement and insurance provisions for the benefit of directors. |

| Fiduciary Duties | The Investments LLC Agreement eliminates fiduciary duties but includes restrictions on related party transactions. |
|---|---|
| **TRANSFER RELATED PROVISIONS** | |
| Permitted Transfers | Members have the ability to transfer their Class A Units and Class C Units to affiliates and certain other related parties without Board consent and without triggering the tag-along and ROFR provisions described below. |
| Right of First Refusal | Transfers of Class A Units and Class C Units will trigger a right of first refusal ("ROFR") in favor of holders of Class A Units unless the transfer involves total consideration less than $2 million in which case only the Company will have a ROFR. |
| Tag-Along | The Investments LLC Agreement contains customary tag-along rights with respect to transfers of Class A Units, subject to customary minority protections. |
| Drag-Along | If the Board or holders of a majority of the Class A Units approve a sale transaction, the approving parties will have the right to require each Member to participate in such transaction on the same terms as the approving parties, subject to customary minority protections.    Sale proceeds from any drag- along sale shall be distributed as if such sale was distributed through the distribution waterfall set forth in the Investments LLC Agreement. |
| Blocker Sales | Any Member that identifies itself as a blocker entity (or as having a blocker entity in its investment structure) is permitted to sell all (but not less than all) of the equity of its blocker in a sale transaction so long as such Member provides a creditworthy indemnity covering all liabilities of its Blocker. |
| **ADDITIONAL RIGHTS** | |
| Preemptive Rights | Subject to customary exceptions (including employee issuances and securities issued as consideration in an acquisition), each holder of Class A Units will have the right to purchase its pro rata percentage of any units or other equity securities issued by the Company or any subsidiary.  If any such Member elects to purchase less than its pro rata portion, Sterling will have the first right to purchase such unpurchased securities. |
| Information Rights | The Investments LLC Agreement provides Holders of Class A Units or Class C Units with audited financial statements following the end of each fiscal year, unaudited financial statements following the end of each fiscal quarter and K-1s. |

| | |
|---|---|
| **Inspection Rights** | The Investments LLC Agreement grants holders of Class A Units or Class C Units customary inspection rights. |
| **VCOC** | Each Member that is required to qualify as a venture capital operating company has been granted such management or inspection rights as are needed for its investment in the Company to qualify as qualifying investment. |
| **Registration Rights** | Each Member will have piggyback registration rights in connection with IPOs and other public offerings. |
| **MISCELLANEOUS TERMS** | |
| **Governing Law; Exclusive Forum** | The Investments LLC Agreement is governed by Delaware law and all disputes thereunder must be submitted for resolution in Delaware courts. |
| **Sterling Advisory Agreement** | Investments and Sterling are parties to a customary advisory agreement pursuant to which Sterling is compensated for providing customary services to its portfolio companies, provided that any amendment thereto shall require the same approval as is required for any related-party transaction or agreement. |

**Annex I**

SUBSCRIPTION AGREEMENT


This Subscription Agreement (this "<u>Agreement</u>"), dated as of [●], 2021, is made by and between TSG Shelf II Investments, LLC, a Delaware limited liability company (the "<u>Company</u>"), and [＿＿＿＿＿＿] (the "<u>Subscriber</u>").

RECITALS

**WHEREAS**, the Subscriber desires to purchase [●] Class A Units (the "<u>Purchased Units</u>") for an aggregate cash purchase price of $[●] and the Company desires to issue and sell the Purchased Units to the Subscriber, in each case, on the terms and conditions set forth in this Agreement.

**NOW, THEREFORE**, in consideration of the foregoing and of the mutual covenants and agreements contained herein, the parties hereto agree as follows:

AGREEMENTS

**ARTICLE 1**
SUBSCRIPTION FOR CLASS A UNITS

1.1.    <u>Defined Terms</u>.  Capitalized terms used in this Agreement that are not otherwise defined herein will have the respective meanings ascribed to such terms in the Amended and Restated Limited Liability Company Agreement of the Company, dated as of [●], 2021 (as further amended or restated in accordance with its terms, the "<u>LLC Agreement</u>").

1.2.    <u>Purchase and Sale</u>.  The Subscriber agrees to purchase and pay for on the date hereof, and the Company agrees to issue and sell to the Subscriber on the date hereof, the Purchased Units for a cash purchase price of $[●] per Unit or $[●] in the aggregate.  Payment will be made on the date hereof by wire transfer in immediately available funds to an account designated by the Company to the Subscriber.

1.3.    <u>Limited Liability Company Agreement</u>.  Upon receipt of the purchase price specified in <u>Section 1.2</u>, the Company will immediately admit the Subscriber as a Member and designate the Subscriber as an "Institutional Holder" as such term is used in the LLC Agreement. The Subscriber hereby adopts, accepts and agrees to be bound by the terms and conditions of the LLC Agreement and agrees that the Purchased Units issued to the Subscriber will be bound by and subject to the terms of the LLC Agreement.  The Subscriber will execute and deliver a counterpart to the LLC Agreement to evidence its agreement to the foregoing.

**ARTICLE 2**
REPRESENTATIONS, WARRANTIES AND COVENANTS OF THE SUBSCRIBER

2.1.    <u>Representations, Warranties and Covenants</u>.  The Subscriber hereby represents and warrants to, and agrees with, the Company as follows as of the date hereof:

(a)    Power and Authority.  The Subscriber has all requisite power and authority (i) to enter into this Agreement, the LLC Agreement and such other documents, instruments, certificates and agreements that are executed and delivered by the Subscriber hereunder and thereunder (collectively, the "Investment Documents"), (ii) to perform its obligations under each of the Investment Documents and (iii) to consummate the transactions that are the respective subjects of each such Investment Document.  This Agreement has been duly authorized, executed and delivered by the Subscriber and constitutes the valid and legally binding agreement of the Subscriber enforceable in accordance with its terms against the Subscriber, except as such enforceability may be limited by (A) bankruptcy, insolvency, reorganization, fraudulent conveyance, moratorium or other laws of general application relating to or affecting the enforcement of creditors' rights and remedies, as from time to time may be in effect, (B) application of equitable principles (regardless of whether such enforceability is considered in a proceeding in equity or at law) and (C) considerations of public policy.

(b)    No Violation of Laws or Other Instruments.  The execution and delivery of the Investment Documents by the Subscriber and the consummation by the Subscriber of the transactions contemplated by the Investment Documents do not (with or without the giving of notice or the lapse of time or both) conflict with or result in any violation of or default under any provision of any applicable Law or any charter, bylaws, trust agreement, partnership agreement, or other organizational document, as the case may be, of the Subscriber or any material agreement, certificate or other instrument to which the Subscriber is a party or by which the Subscriber is bound.

(c)    Accredited Investor.  The Subscriber is an "accredited investor" as defined in Rule 501(a) of Regulation D promulgated under the Securities Act.

(d)    Investment Intent.  The Subscriber is acquiring the Purchased Units for its own account for investment, and not with a view to any distribution, resale, subdivision or fractionalization thereof in violation of the Securities Act or any other applicable securities laws, and the Subscriber has no present plans to enter into any contract, undertaking, agreement or arrangement for any such distribution, resale, subdivision or fractionalization.

(e)    Access.  The Subscriber has carefully reviewed and is familiar with the terms of this Agreement and the LLC Agreement.  The Subscriber has had the opportunity to ask questions of and receive answers from the Company concerning the terms and conditions of this investment.

(f)    Illiquidity.  The Subscriber understands that substantial restrictions exist on transferability of the Class A Units, that no market for resale of any such Class A Units exists or is expected to develop, and that the Subscriber may not be able to liquidate its investment in the Company. The Subscriber represents and warrants further that it has no contract, understanding, agreement or arrangement with any Person to sell or transfer or pledge to such Person or anyone else any of the Purchased Units for which the Subscriber hereby subscribes (in whole or in part); and the Subscriber represents and warrants that it has no present plans to enter into any such contract, undertaking, agreement or arrangement. The Subscriber understands that the Purchased Units may not be sold except in accordance with the terms of the LLC Agreement and this

3

Agreement. The Subscriber understands that any certificate representing the Class A Units will bear legends restricting the transfer thereof. The Subscriber undertakes and agrees that it will not offer for sale, resell, assign, pledge or otherwise dispose of the Purchased Units at any time, except in accordance with the provisions of Regulation D under the Securities Act, pursuant to registration under the Securities Act, or pursuant to an available exemption from registration under the Securities Act. The Subscriber agrees not to engage in any hedging transactions with regard to the Purchased Units unless in compliance with the Securities Act.

(g)     Awareness of Risks; Taxes. The Subscriber understands that investment in the Company entails a high degree of risk and understands the risks associated with the operation of the Company and the Subscriber's investment in the Company. The Subscriber is aware that ownership of the Class A Units involves a substantial degree of risk of loss of the Subscriber's entire investment and that there is no assurance of any return on such investment. The Subscriber further represents that it is relying solely on its own conclusions or the advice of its own counsel or investment representative with respect to tax aspects of any investment in the Company.

(h)     Economic Loss, Suitability and Sophistication. The Subscriber (i) is able to bear the economic risk of losing its entire investment in the Company and (ii) is able to bear such risk for an indefinite period of time. The Subscriber has evaluated the risks involved in investing in the Class A Units and has determined that the Class A Units are a suitable investment for the Subscriber. The Subscriber has such knowledge and experience in financial and business matters that it is capable of evaluating the risks and merits of this investment.

(i)     No Advice. The Subscriber acknowledges and agrees that the Board has the exclusive power and discretion to make all investment decisions on behalf of the Company, subject to the terms of the LLC Agreement. Accordingly, the Subscriber acknowledges that neither the Board nor the Company, nor any Affiliate of the Company, has rendered or will render any financial or tax advice or securities valuation advice to the Subscriber, and that the Subscriber is neither subscribing for nor acquiring any Class A Units in reliance upon, or with the expectation of, any such advice.

(j)     No Fiduciary Duties. The Subscriber understands and acknowledges that applicable Delaware law permits the members of a Delaware limited liability company to modify and even eliminate fiduciary duties of members and managers (i.e., directors). By executing the LLC Agreement, the Subscriber agrees that the terms of the LLC Agreement modify and eliminate fiduciary duties of the members and managers as otherwise may be imposed by applicable law or in equity. The Subscriber hereby releases, discharges and acquits the members and the managers of the Company from any claims based on fiduciary duties imposed by applicable law or equity that are not set forth in the LLC Agreement.

(k)     Disclosure; No Reliance. The Subscriber understands and agrees that, other than the representations and warranties of the Company set forth in Article 3 herein, neither the Company nor any other Person makes any representation or warranty, express or implied, as to the accuracy or completeness of the information provided or to be provided to the Subscriber by or on behalf of the Company or related to the transactions contemplated hereby, and nothing contained in any other documents provided or statements made by or on behalf of the Company to the

4

Subscriber is, or will be relied upon as, a promise or representation by the Company or any other Person that any such information is accurate or complete.

(l)    <u>Disclaimer of Other Representations and Warranties</u>. NOTWITHSTANDING ANY PROVISION OF THIS AGREEMENT TO THE CONTRARY, THE SUBSCRIBER MAKES NO REPRESENTATIONS OR WARRANTIES TO THE COMPANY OR ANY OTHER PERSON IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, EXCEPT AS SPECIFICALLY SET FORTH IN THIS <u>SECTION 2.1</u> AND THE OTHER INVESTMENT DOCUMENTS.    ALL OTHER REPRESENTATIONS AND WARRANTIES, WHETHER EXPRESS OR IMPLIED, ARE HEREBY DISCLAIMED BY THE SUBSCRIBER.

2.2.    <u>Survival</u>.  The Subscriber acknowledges that the Company has relied and will rely upon the representations and warranties of, and information furnished by, the Subscriber set forth in this Agreement and that all such representations and warranties, and furnished information, will survive the closing of the issuance of the Class A Units pursuant to this Agreement.

**ARTICLE 3**
REPRESENTATIONS, WARRANTIES AND COVENANTS OF THE COMPANY

3.1.    <u>Representations, Warranties and Covenants</u>.  The Company hereby represents and warrants to, and agrees with, the Subscriber as of the date hereof as follows:

(a)    <u>Organization</u>.  The Company is a limited liability company duly formed, validly existing and in good standing under the laws of the State of Delaware.  The Company has the full limited liability company power and authority to own its property, carry on its business as now being conducted, and to carry out the transactions contemplated by the Investment Documents.  The Company has provided or made available to the Subscriber true and correct copies of the LLC Agreement and certificate of formation of the Company (or other applicable organizational documents), including all amendments thereto.

(b)    <u>Power and Authority</u>.  The Company has all requisite power, authority and legal capacity to enter into each Investment Document to which it is a party, to perform its respective obligations under each such Investment Document, and to consummate the transactions that are the respective subjects of each such Investment Document.  The signature of the respective individual signing any Investment Document on behalf of the Company is binding upon the Company.  All actions required hereunder to be taken by the Company as a condition to the issuance and sale of the Class A Units purchased by the Subscriber have been taken.  This Agreement has been duly authorized, executed and delivered by the Company and, upon due authorization, execution and delivery by the Subscriber, will constitute the valid and legally binding agreement of the Company, enforceable in accordance with its terms against the Company, except as such enforceability may be limited by (i) bankruptcy, insolvency, reorganization, fraudulent conveyance, moratorium or other laws of general application relating to or affecting the enforcement of creditors' rights and remedies, as from time to time may be in effect, (ii) application of equitable principles (regardless of whether such enforceability is considered in a proceeding in equity or at law) and (iii) considerations of public policy.

5

(c)    Offer of Class A Units.  Assuming the investment representations set forth in Section 2.1 are true, the offer, sale and issuance by the Company of the Purchased Units are exempt from the registration requirements of the Securities Act, and neither the Company nor anyone acting on its behalf has taken or will take any action that would subject the issuance or sale of the Purchased Units acquired by the Subscriber to the registration and prospectus delivery provisions of the Securities Act.

(d)    Capitalization.  As of immediately prior to giving effect to the Company's issuance of the Purchased Units on the date hereof, Schedule 1 to the LLC Agreement is true and correct.  After giving effect to the Company's issuance of the Purchased Units on the date hereof, the Company's outstanding equity capitalization will consist [solely of [●] Class A Units and [●] Class C Units].  Other than the foregoing, there are no equity interests (including any profits interests, options, warrants or other rights, convertible securities or exchangeable securities) of the Company issued, reserved for issuance or otherwise outstanding.  All of the issued and outstanding Units and other equity interests in the Company issued by the Company on or before the date hereof, including the Purchased Units issued to the Subscriber hereunder, have been duly authorized and validly issued and will be fully paid and non-assessable, free and clear of all liens and encumbrances, and have been issued free of any pre-emptive rights.  Except for the LLC Agreement, this Agreement and the other Investment Documents, the Company has not entered into any agreement with respect to voting rights, preemptive or similar rights, registration rights or transfer restrictions with respect to any Units or other equity interests in the Company.

(e)    Investment Company Act.  Neither the Company nor any of its Subsidiaries is an "investment company" or a company "controlled" by an "investment company" within the meaning of the Investment Company Act.

(f)    No Conflict.  The execution and delivery of this Agreement and the other Investment Documents by the Company does not, and the consummation of the transactions contemplated hereby and thereby will not (with or without the giving of notice or the lapse of time or both), (i) violate or conflict with or result in any default under any provision of the organizational documents of the Company or any of its Subsidiaries including the LLC Agreement, (ii) violate any provision of any Law, or any order, judgment or decree of any court or other governmental authority applicable to the Company or any of its Subsidiaries or any of their respective assets or properties, (iii) violate or result in the cancellation, modification, revocation or suspension of any material license, franchise or permit held by the Company or any of its Subsidiaries, or (iv) violate or result in a breach of or default under any material contract to which the Company is a party or by which any of the Company's assets are bound.

(g)    Proceedings.  There is no pending or, to the knowledge of the Company, threatened action, arbitration, audit, litigation or suit (whether civil, criminal, administrative or investigative) commenced, brought, conducted or heard by or before, or otherwise involving, any governmental authority, against or otherwise relating to or involving the Company or its equityholders or any of their respective assets, at law or in equity, that challenges, or would reasonably be expected to have the effect of preventing, delaying, making illegal or otherwise interfering with, the ability of the Company to enter into and perform its obligations under the Investment Documents. The Company is not subject to any outstanding order, judgment or decree

6

that prohibits or otherwise restricts the ability of the Company to consummate fully the transactions contemplated by the Investment Documents.

(h)    Disclaimer of Other Representations and Warranties. NOTWITHSTANDING ANY PROVISION OF THIS AGREEMENT TO THE CONTRARY, THE COMPANY MAKES NO REPRESENTATIONS OR WARRANTIES TO THE SUBSCRIBER OR ANY OTHER PERSON IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, EXCEPT AS SPECIFICALLY SET FORTH IN THIS SECTION 3.1 AND THE OTHER INVESTMENT DOCUMENTS.    ALL OTHER REPRESENTATIONS AND WARRANTIES, WHETHER EXPRESS OR IMPLIED, ARE HEREBY DISCLAIMED BY THE COMPANY.

3.2.    Survival.  The Company acknowledges that the Subscriber has relied and will rely upon the representations and agreements of the Company set forth in this Agreement, and that all such representations and agreements will survive the closing of the issuance of the Class A Units pursuant to this Agreement.

## ARTICLE 4
## MISCELLANEOUS

4.1.    Amendments and Modifications; Waivers.  This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each of the Company and the Subscriber.  No waiver by either the Company or the Subscriber of any of the provisions hereof will be effective unless explicitly set forth in writing and signed by the party so waiving.  No waiver by any party hereto will operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver.  No failure to exercise, or delay in exercising, any rights, remedy, power or privilege arising from this Agreement will operate or be construed as a waiver thereof; nor will any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

4.2.    Notices.  Except as expressly set forth to the contrary in this Agreement, all notices, requests or consents provided for or permitted to be given under this Agreement must be in writing and must be delivered to the recipient in person, by courier or mail (including electronic mail) or by facsimile, or similar transmission; and a notice, request or consent given under this Agreement is effective on receipt by the Person to receive it.  Notices given by facsimile will be deemed to have been received (a) on the day on which the sender receives answer back confirmation if such confirmation is received before or during normal business hours of any Business Day or (b) on the next Business Day after the sender receives answer back confirmation if such confirmation is received (i) after normal business hours on any Business Day or (ii) on any day other than a Business Day.  All notices, requests and consents to be sent to the Subscriber must be sent to or made at the addresses given for the Subscriber in the LLC Agreement or such other address as the Subscriber may specify by notice to the Company.  Whenever any notice is required to be given by Law, the Certificate or this Agreement, a written waiver thereof, signed by the Person entitled

7

to notice, whether before or after the time stated therein, will be deemed equivalent to the giving of such notice.

4.3.    Governing Law; Jurisdiction; Venue.  This Agreement will be enforced, governed and construed in all respects in accordance with the Laws of the State of Delaware, without giving effect to any conflict-of-laws rule or principle that might refer the construction or interpretation of this Agreement to the Laws of another State or jurisdiction.  Any action or proceeding against any party hereto relating in any way to this Agreement may be brought and enforced in the courts of the State of Delaware located in New Castle County and, to the extent subject matter jurisdiction exists therefor, in the courts of the United States for the District of Delaware, and the parties hereto hereby irrevocably submit to the exclusive jurisdiction of the foregoing courts in respect of any such action or proceeding.  The parties hereby irrevocably waive, to the fullest extent permitted by Law, any objection that they may now or hereafter have to the laying of venue of any such action or proceeding in the courts of the State of Delaware located in New Castle County or the United States District Court for the District of Delaware, and any claim that any such action or proceeding brought in any such court has been brought in an inconvenient forum.

4.4.    Assignment; Binding Effect.  This Agreement and the other Investment Documents and the rights and obligations set forth herein and therein will be binding upon, and will inure to the benefit of, the Subscriber, the Company and their respective successors and permitted assigns. Each provision of this Agreement will be considered severable and if for any reason any provision that is not essential to the effectuation of the basic purposes of this Agreement is determined by a court of competent jurisdiction to be invalid or unenforceable under Law, such invalidity will not impair the operation of or affect any other provisions of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.  In that case, this Agreement will be construed so as to limit any term or provision so as to make it enforceable or valid within the requirements of any applicable Law, and in the event such term or provision cannot be so limited, this Agreement will be construed to omit such invalid or unenforceable term or provision.  No party hereto may assign any of its rights or obligations under this Agreement without the prior written consent of the other party hereto, except that the Subscriber may, without the consent of the Company, assign its rights and obligations hereunder to any Person to whom the Subscriber transfers all or any portion of its Purchased Units in compliance with the LLC Agreement.

4.5.    Entire Agreement.

(a)    This Agreement, including the exhibits hereto, and the other Investment Documents between the Company and the Subscriber, constitute the entire agreement directly relating to the Subscriber's purchase of the Purchased Units, and supersede all prior agreements or understandings between the parties hereto directly relating to the Subscriber's purchase of the Purchased Units.  Notwithstanding the foregoing, this Agreement does not supersede or otherwise affect or have any impact upon the LLC Agreement (unless explicitly stated otherwise therein), any other definitive agreement entered into by and between the Subscriber and the Company after the date hereof, or any of the Other Agreements (as defined below), or the rights and obligations thereunder.

8

(b)    [For clarification, the parties hereto acknowledge and agree that Subscriber, on the one hand, and the Company, on the other hand, have certain rights and obligations under the following agreements (collectively, the "Other Agreements"): (i) that certain [●] Agreement, dated as of [DATE], by and among [●], the Subscriber and the other parties thereto, (ii) that certain [●] Agreement, dated as of [DATE], by and between the Subscriber and [●], and (iii) other agreements and documents that do not expressly govern the Subscriber's purchase of the Purchased Units, all of which other agreements remain in full force and effect in accordance with their terms.][1]

4.6.    Counterparts; Facsimile.   This Agreement may be executed in one or more counterparts, all of which will constitute one and the same instrument.  Any counterparts of this Agreement or any signatures thereon delivered by facsimile transmission or other electronic method (including by email in portable document format (pdf)) will be deemed an original executed document for all purposes hereof.

4.7.    No Vicarious Liability.   Notwithstanding anything in this Agreement to the contrary, the liabilities of the parties to this Agreement will be limited to such parties, and no Person that is not a party to this Agreement will have any liability hereunder or with respect to the matters contemplated hereby.

4.8.    Waiver of Damages.   Notwithstanding anything to the contrary in this Agreement, no party to this Agreement will be liable to or otherwise responsible to any other party hereto for the punitive damages that arise out of or relate to this Agreement or the performance or breach hereof or any liability retained or assumed hereunder other than damages paid to an unaffiliated third party claimant.

*[Signature pages follow.]*

---

[1] **Note to Draft**: Definition of Other Agreements should be customized for the parties to the Subscription Agreement.

IN WITNESS WHEREOF, the undersigned has executed this Agreement as of the date first written above.

**<u>THE SUBSCRIBER</u>**:
[_____]

By: _____
Name: _____
Title: _____

IN WITNESS WHEREOF, the undersigned has executed and accepted this Agreement as of the date first written above.

**<u>THE COMPANY</u>:**
**TSG SHELF II INVESTMENTS, LLC**

By: _____
Name: Scott MacLaren
Title:  Vice President

---

TSG SHELF II INVESTMENTS, LLC

---

AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT

[•], 2021

THE UNITS REFERENCED HEREIN HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS. ACCORDINGLY, SUCH UNITS MAY NOT BE SOLD, ASSIGNED, PLEDGED OR OTHERWISE DISPOSED OF AT ANY TIME WITHOUT EFFECTIVE REGISTRATION UNDER SUCH ACT AND LAWS OR EXEMPTION THEREFROM, AND COMPLIANCE WITH THE OTHER RESTRICTIONS ON TRANSFERABILITY SET FORTH OR REFERRED TO IN THIS AGREEMENT.

---

# TABLE OF CONTENTS

**Page**

## ARTICLE 1
### DEFINITIONS AND CONSTRUCTION

1.1   Definitions.................................................................................................1
1.2   Construction............................................................................................2
1.3   Applicability of the Act ...........................................................................2

## ARTICLE 2
### ORGANIZATIONAL MATTERS

2.1   Formation.................................................................................................2
2.2   Name.......................................................................................................2
2.3   Offices.....................................................................................................2
2.4   Purposes; Power......................................................................................3
2.5   Foreign Qualification...............................................................................3
2.6   Term........................................................................................................3
2.7   No State Law Partnership ........................................................................3
2.8   Title to Company Assets..........................................................................3
2.9   Waiver of Dissenters' and Appraisal Rights.............................................4

## ARTICLE 3
### REPRESENTATIONS AND WARRANTIES

3.1   Representations and Warranties of Each Member.......................................4
3.2   Representations and Warranties of the Company .......................................6

## ARTICLE 4
### MEMBERS; UNITS

4.1   Members .................................................................................................6
4.2   Units.......................................................................................................7
4.3   Preemptive Rights.................................................................................10
4.4   Transfer Related Provisions...................................................................12
4.5   Registration Rights...............................................................................28
4.6   Additional Terms Relating to Members .................................................32

## ARTICLE 5
### CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS

5.1   Capital Contributions............................................................................32
5.2   Return of Capital Contributions.............................................................32
5.3   Advances by Members...........................................................................32
5.4   Capital Accounts...................................................................................32

i

## ARTICLE 6
## DISTRIBUTIONS; ALLOCATIONS

6.1    Distributions ........................................................................................................33
6.2    Other Distribution Provisions ..............................................................................33
6.3    Allocations of Net Profits and Net Losses ...........................................................34
6.4    Income Tax Allocations ........................................................................................34
6.5    Regulatory Allocations ........................................................................................35
6.6    Curative Allocations ............................................................................................36
6.7    Other Allocation Rules ........................................................................................36

## ARTICLE 7
## GOVERNANCE

7.1    Manager (Director) Managed Company ...............................................................36
7.2    Board of Directors ................................................................................................37
7.3    Board Observers ...................................................................................................39
7.4    Meetings of the Members .....................................................................................40
7.5    Provisions Applicable to All Meetings ................................................................41
7.6    Officers ................................................................................................................41

## ARTICLE 8
## ADDITIONAL COVENANTS

8.1    Information; Confidentiality .................................................................................42
8.2    Insider Members' Time Commitment; Company Opportunities .............................42
8.3    Reports .................................................................................................................43
8.4    Related Party Transactions ...................................................................................43
8.5    Inspection Rights .................................................................................................44
8.6    Power of Attorney ................................................................................................44
8.7    VCOC Related Rights ..........................................................................................45
8.8    Internal Restructure ..............................................................................................45
8.9    Blocker Member Covenant ..................................................................................46

## ARTICLE 9
## LIABILITY STANDARDS; EXCULPATION AND INDEMNIFICATION

9.1    Elimination of Fiduciary Duties ...........................................................................46
9.2    Actions at Direction of Members ..........................................................................47
9.3    Burden of Proof ...................................................................................................47
9.4    Corporate Opportunities ......................................................................................47
9.5    Exculpation ..........................................................................................................48
9.6    Indemnification of Members, Directors and Officers ...........................................49
9.7    Advance Payment ................................................................................................49
9.8    Indemnification of Employees and Agents ..........................................................50
9.9    Appearance as a Witness .....................................................................................50
9.10   Nonexclusivity of Rights .....................................................................................50

ii

9.11    Insurance .................................................................................................................50

## ARTICLE 10
## TAX, ACCOUNTING, BOOKKEEPING AND RELATED PROVISIONS

10.1    Tax Returns ..............................................................................................................50
10.2    Tax Partnership ........................................................................................................51
10.3    Tax Elections ...........................................................................................................51
10.4    Bank Accounts .........................................................................................................51
10.5    Fiscal Year ...............................................................................................................51
10.6    Bipartisan Budget Act of 2015 ...............................................................................51
10.7    Cooperation and Assistance .....................................................................................52

## ARTICLE 11
## DISSOLUTION, WINDING-UP AND TERMINATION

11.1    Dissolution ...............................................................................................................52
11.2    Winding-Up and Termination ...................................................................................53
11.3    Deficit Capital Accounts ..........................................................................................54
11.4    Certificate of Cancellation .......................................................................................54

## ARTICLE 12
## GENERAL PROVISIONS

12.1    Books ........................................................................................................................54
12.2    Offset ........................................................................................................................54
12.3    Notices ......................................................................................................................55
12.4    Entire Agreement; Supersedure ...............................................................................55
12.5    Effect of Waiver or Consent ....................................................................................55
12.6    Amendment or Restatement ......................................................................................55
12.7    Binding Effect ..........................................................................................................57
12.8    Governing Law; Venue .............................................................................................57
12.9    Severability ...............................................................................................................58
12.10   Independent Legal Advice ........................................................................................58
12.11   Further Assurances ...................................................................................................58
12.12   Waiver of Certain Rights ..........................................................................................58
12.13   Directly or Indirectly ................................................................................................58
12.14   Counterparts .............................................................................................................58
12.15   Equitable Relief ........................................................................................................58
12.16   Lender Rights ...........................................................................................................59
12.17   No Vicarious Liability ..............................................................................................59

## SCHEDULES:

Schedule 1    Members, Units and Information Related Thereto

iii

## EXHIBITS:

Exhibit A      Defined Terms

42992628.2

# AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT
## OF
## TSG SHELF II INVESTMENTS, LLC

This **AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT** of **TSG SHELF II INVESTMENTS, LLC**, a Delaware limited liability company (the "Company"), dated as of [•], 2021 (the "First A&R Date"), is adopted, executed and agreed to, for good and valuable consideration, by and among the Company, the other signatories hereto and each other Person who becomes bound by this Agreement whether as a signatory to this Agreement, pursuant to a Joinder Agreement, as a holder of any Unit or otherwise, including the Members (as defined below) (each, a "Party").

## RECITALS

**WHEREAS**, the Company was formed as a Delaware limited liability company by filing a Certificate of Formation on March 5, 2021 (the "Formation Date") under and pursuant to the Act (such Certificate of Formation as amended or restated from time to time in accordance with this Agreement, is referred to herein as the "Certificate");

**WHEREAS**, TSG Shelf II Investments Holdings, L.P., a Delaware limited partnership, as the sole and managing member of the Company, entered into a limited liability company agreement of the Company (the "Original Agreement") on March 5, 2021;

**WHEREAS**, in connection with the consummation of the transactions contemplated by that certain Asset Purchase Agreement, dated as of May [•], 2021, by and among TSG Shelf II Acquisition, LLC, a Delaware limited liability company, and the other parties signatory thereto (the "CarbonLite Purchase Agreement"), the signatories to this Agreement desire to amend and restate the Original Agreement in its entirety; and

**WHEREAS**, this Agreement sets forth, among other things, terms applicable to capitalization of the Company, the Persons that will be admitted as Members in connection therewith, the Units to be issued to such Members and the manner by which the business and affairs of the Company will be managed and certain rights and obligations in respect of Units issued on or after the First A&R Date;

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Members (whether admitted on or prior to the First A&R Date or admitted hereafter in accordance with the terms of this Agreement) and the Company hereby agree that the Original Agreement is hereby amended and restated in its entirety as follows:

## AGREEMENTS

## ARTICLE 1
## DEFINITIONS AND CONSTRUCTION

1.1    Definitions. In addition to terms defined in the body of this Agreement, capitalized terms used herein will have the meanings given to them in Exhibit A.

1

**1.2** <u>Construction</u>.  Unless the context requires otherwise:  (a) the gender (or lack of gender) of all words used in this Agreement includes the masculine, feminine and neuter; (b) references to Articles and Sections refer to articles and sections of this Agreement; (c) references to Exhibits and Schedules are to exhibits and schedules attached to this Agreement, each of which is made a part of this Agreement for all purposes; (d) references to money refer to legal currency of the United States of America unless specifically stated otherwise; (e) the word "including" means "including without limitation;" (f) words in the singular or plural form include the plural and singular form, respectively; and (g) references to Laws, as well as to contracts, agreements and other instruments, mean such Laws, contracts, agreements and instruments as in effect at the time of determination (taking into account any amendments thereto effective at such time without regard to whether such amendments were enacted or adopted after the First A&R Date) and will include all successor Laws, contracts, agreements and instruments. In the event an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the Parties and no presumption or burden of proof will arise favoring or disfavoring any party hereto by virtue of the authorship of any of the provisions of this Agreement.

**1.3** <u>Applicability of the Act</u>.  The rights and obligations of the Members and the other Parties with respect to the Company and the Units will be determined in accordance with the terms and conditions of this Agreement and, to the extent not inconsistent with this Agreement or to the extent non-waivable, the Act.  On any matter upon which this Agreement is silent, the Act will control.  No provision of this Agreement will be in violation of the Act and to the extent any provision of this Agreement is in violation of the Act, such provision will be void and of no effect and will not affect the validity of the other provisions of this Agreement; provided, where the Act provides that a provision of the Act will apply "unless otherwise provided in a limited liability company agreement" or words of similar effect, the provisions of this Agreement will in each instance control.

## ARTICLE 2
## ORGANIZATIONAL MATTERS

**2.1** <u>Formation</u>.  The Company was organized as a limited liability company under the Act by the filing of the Certificate with the Secretary of State of the State of Delaware.  All actions by any Member or authorized person of the Company in making such filing are hereby ratified, adopted and approved.

**2.2** <u>Name</u>.  The name of the Company is TSG Shelf II Investments, LLC and all Company business must be conducted in that name or such other names that comply with Law and as the Board may select from time to time.

**2.3** <u>Offices</u>.  The registered office of the Company required by the Act to be maintained in the State of Delaware will be the office of the initial registered agent named in the Certificate or such other office (which need not be a place of business of the Company) as the Board may designate in the manner provided by Law.  The registered agent of the Company in the State of Delaware will be the initial registered agent named in the Certificate or such other Person or Persons as the Board may designate in the manner provided by Law.  The principal office of the Company in the United States will be at such place as the Board may designate, which need not

be in the State of Delaware. The Company may have such other offices as the Board may designate.

     **2.4**    <u>Purposes; Power</u>. The purposes of the Company are to serve as a holding company to acquire, own, exercise rights with respect to and dispose of equity interests in Subsidiaries that directly or indirectly own assets and properties and operate businesses and to engage in any and all activities necessary, convenient, desirable or incidental to the foregoing that are not forbidden by the Law of the jurisdiction in which the Company engages in that business. However, notwithstanding such limited purpose, the Company has the power to engage in any lawful act or activity for which limited liability companies may be organized under the Act and to engage in any business not forbidden by the Law of the jurisdiction in which the Company engages in that business.

     **2.5**    <u>Foreign Qualification</u>. To the extent that the nature of the business conducted by the Company requires the Company to qualify as a foreign limited liability company under the Laws of a jurisdiction other than the State of Delaware, the Company will satisfy all requirements necessary to so qualify. At the request of the Company, each Member will execute, acknowledge, swear to and deliver all certificates and other instruments conforming with this Agreement that are necessary or appropriate to qualify, continue and terminate the Company as a foreign limited liability company in all such jurisdictions in which the Company may conduct business.

     **2.6**    <u>Term</u>. The existence of the Company commenced upon the filing of the Certificate, and the Company will have a perpetual existence unless and until dissolved and terminated in accordance with <u>Article 11</u>.

     **2.7**    <u>No State Law Partnership</u>. The Members do not intend for the Company to be a partnership (including a limited partnership) or joint venture, and no Member will be a partner or joint venturer of any other Member by reason of this Agreement for any purpose other than federal and, if applicable, state income tax purposes, and this Agreement will not be interpreted to provide otherwise. The Members intend that the Company will be treated as a partnership for United States federal and, if applicable, state income tax purposes, and each Member and the Company will file all tax returns and will otherwise take all tax and financial reporting positions in a manner consistent with such treatment. The Company will not, nor will it cause or allow any of its Subsidiaries that are not treated as corporations for tax purposes on the First A&R Date, to make any election to be treated as a corporation for federal and, if applicable, state income tax purposes, except with the approval of the Board and then only following at least 10 days' prior notice to the Institutional Holders.

     **2.8**    <u>Title to Company Assets</u>. Title to the Company's assets, whether real, personal or mixed and whether tangible or intangible, will be vested in the Company as an entity, and no Member, Director, Officer or employee will have any ownership interest in the Company's assets or any portion thereof. Each Member hereby waives any right such Member may at any time have to cause the Company's assets to be partitioned among the Members or to file any complaint or to institute any Proceeding at Law or in equity seeking to have any one or all of the Company's assets partitioned.

42992628.2

**2.9**     Waiver of Dissenters' and Appraisal Rights.  Notwithstanding anything to the contrary herein or in the Act, no Member will have dissenters' or appraisal rights under any circumstances including in connection with an Approved Transaction, and each Member hereby waives and releases, and will execute such further instruments as the Company or the Board reasonably requests to further evidence the waiver and release of, such rights.

# ARTICLE 3
# REPRESENTATIONS AND WARRANTIES

**3.1**     Representations and Warranties of Each Member.  Each Member (as to itself only) represents and warrants to the Company and to the other Members (including other Members admitted after the First A&R Date) as follows as of the date such Member is first admitted as a "Member":

(a)     Organization; Existence; Good Standing.  Such Member, if such Member is an Entity, is duly organized, validly existing and in good standing under the Laws of the jurisdiction of its formation.

(b)     Power; Qualification.  Such Member, if such Member is an Entity, has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder, and the execution and delivery by such Member of this Agreement and the performance of all obligations hereunder have been duly authorized by all necessary action.

(c)     Authority; Enforceability.  This Agreement has been duly and validly executed and delivered by such Member and, assuming due execution and delivery of this Agreement by the Company or one or more other Parties, constitutes the binding obligation of such Member enforceable against such Member in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization or similar Laws affecting creditors' rights generally, and by principles of equity.

(d)     No Conflicts.  The execution, delivery and performance by such Member of this Agreement will not, with or without the giving of notice or the lapse of time, or both, (i) violate any provision of Law to which such Member is subject, (ii) violate any order, judgment or decree applicable to such Member or (iii) conflict with, or result in a breach or default under, any term or condition of its certificate of incorporation or by-laws, certificate of limited partnership or partnership agreement, certificate of formation or limited liability company agreement, or trust agreement, as applicable, or any employment, non-compete, non-solicit or any other material agreement or instrument to which such Member is a party.  No consent, approval, authorization or order of any court or governmental agency or authority or of any third party which has not been obtained is required in connection with the execution, delivery and performance by such Member of this Agreement.

(e)     Investment Matters.  Such Member is acquiring Units for its own account, for investment purposes, and not with a view to or in connection with the resale or other distribution of such Units in violation of applicable securities Laws.  Such Member is an "accredited investor" as defined in Rule 501(a) of Regulation D under the Securities Act; provided, the representation and warranty in this sentence will be deemed not to have been made by any

4

Member whose sole Membership Interest consists of Class C Units granted for no monetary consideration or issued in a Company offering pursuant to Rule 701 under the Securities Act. Such Member understands and agrees that the Units have not been registered under the Securities Act and are "restricted securities." Such Member has sufficient knowledge of finance, securities and investments generally, has experience and skill in investments based on actual participation, and has the ability to bear the economic risks of such Member's investment in the Company for an indefinite period of time.

(f)     <u>LLC Agreement</u>.  Such Member understands that the Units acquired by it will, upon issuance by the Company, without any further action on the part of the Company or such Member, be subject to the terms, conditions and restrictions contained in this Agreement including all amendments, modifications and restatements thereof made in accordance with this Agreement from time to time.

(g)     <u>No Brokers</u>.  Neither such Member nor any of its Affiliates has employed or retained any broker, agent or finder in connection with this Agreement or the transactions contemplated herein, or paid or agreed to pay any brokerage fee, finder's fee, commission or similar payment to any Person on account of this Agreement or the transactions provided for herein which fee, commission or payment will constitute an obligation payable by the Company, any subsidiary thereof, or any other Member.

(h)     <u>Marital Status</u>.  If such Member is a natural person, such Member is not married unless otherwise indicated on such Member's signature page hereto or other instrument by which such individual becomes bound by this Agreement.

(i)     <u>SPV Member or BDC Member Status</u>.  Such Member is not (i) an SPV Member unless noted as an "SPV Member" on <u>Schedule 1</u> or (ii) a BDC Member unless noted as a "BDC Member" on Schedule 1.

(j)     <u>Competitive Activities</u>.  Such Member is not engaged in Competitive Activities and is not a direct Competitor or a potential Competitor of the Company or any Subsidiary.

(k)     <u>Blocker Entity</u>.  If such Member is designated as a "Blocker Member" on <u>Schedule 1</u>, such <u>Blocker</u> Member is either a Blocker Entity or such Member's Related Blocker Entity is correctly identified on <u>Schedule 1</u>. Such Member (and its Related Blocker Entity, if applicable) was formed for the sole purpose of directly or indirectly investing in the Company, holds no assets other than a direct or indirect interest in such Blocker Member, Units, cash and other immaterial assets relating to its formation, existence, good standing and ongoing administrative matters and has incurred no liabilities other than those arising from its direct or indirect interest in such Blocker Member or being a Member or owning Units and immaterial liabilities relating to its formation, existence, good standing and ongoing administrative matters and liabilities arising under applicable Laws.

(l)     <u>Survival of Representations and Warranties</u>.  All representations and warranties made by each Member in this Agreement will be considered to have been relied upon

5

by the Company and the other Parties regardless of any investigation made by or on behalf of the Company or any such Party and will survive the execution and delivery of this Agreement.

**3.2**    <u>Representations and Warranties of the Company</u>.  The Company represents and warrants to the Members as of the First A&R Date as follows:

(a)    <u>Formation</u>.  The Company was formed in the State of Delaware on the Formation Date.

(b)    <u>Organization; Existence; Good Standing</u>.  The Company is duly organized, validly existing and in good standing under the Laws of the State of Delaware and has all requisite power and authority to enter into this Agreement.

(c)    <u>Authority; Enforceability</u>.  This Agreement has been duly and validly executed and delivered by the Company and constitutes the binding obligation of the Company enforceable against it in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization or similar Laws affecting creditors' rights generally, and by principles of equity.

(d)    <u>No Conflicts</u>.  The execution, delivery and performance by the Company of this Agreement will not, with or without the giving of notice or the lapse of time, or both, (i) violate any provision of Law to which the Company is subject, (ii) violate any order, judgment or decree applicable to the Company or (iii) conflict with, or result in a breach or default under, any term or condition of its certificate of formation or limited liability company agreement, as applicable, or any other material agreement or instrument to which the Company is a party.  No consent, approval, authorization or order of any court or governmental agency or authority or of any third party which has not been obtained is required in connection with the execution, delivery and performance by the Company of this Agreement.

(e)    <u>Exempt Issuance</u>.  The Units issued on or before the First A&R Date have been duly authorized and validly issued.  Assuming the accuracy of the representations and warranties of the Members in this Agreement and in any other agreement entered into in connection with the issuance of Units to which any Member is a party, the issuance of such Units does not require registration under applicable federal or state securities Laws.

## ARTICLE 4
## MEMBERS; UNITS

**4.1**    <u>Members</u>.

(a)    <u>Existing Members</u>.  Sterling Group Partners V, L.P. was admitted as a Member on the Formation Date. Each other Person listed on <u>Schedule 1</u> hereto is hereby admitted as a Member as of the "Admission Date" specified opposite its name on <u>Schedule 1</u>.

(b)    <u>Additional Members</u>.  All Members will be listed on <u>Schedule 1</u>.  <u>Schedule 1</u> will be maintained by the Company and from time to time will be amended and supplemented in accordance with this Agreement. The following Persons will be deemed to be Members and will

6

be admitted as Members without any further action by the Company or any Member: (i) any Person (other than the Company) to whom Units are Transferred by a Member after the First A&R Date so long as such Transfer is made in accordance with this Agreement and (ii) any Person to whom the Company issues Units after the First A&R Date in accordance with this Agreement. TSG Shelf II Holdings, LLC, a Delaware limited liability company ("Holdings"), is a Subsidiary and is the entity (A) in which certain Persons including employees of, and service providers to, the Company or one or more Subsidiaries have been or may be given the opportunity to invest and (B) that may grant options to purchase equity interests in Holdings to such employees and service providers. Pursuant to the limited liability company agreement of Holdings, as amended from time to time, the Company, in its capacity as the sole managing member of Holdings, may require each Holdings member (other than the Company) to exchange its equity interests in Holdings for newly issued Units. To effect such contribution and exchange, the Board may approve the creation of a new class or series of Units and the Company may issue such Units in exchange for the equity interests in Holdings. Members of Holdings will be admitted as Members in the Company upon receipt of Units.

(c)    Cessation of Members.  Any Person admitted or deemed admitted as a Member pursuant to Section 4.1(a) or Section 4.1(b) will cease to have the rights of a Member under this Agreement at such time that such Person is no longer a record owner of any Units (except as provided under Article 9, which rights will not cease), but such Person will continue to be bound by and obligated with respect to all of the provisions of this Agreement other than those that relate solely to a Person that holds Units.

4.2    Units.

(a)    Units; Class and Series.  From and after the First A&R Date, the Membership Interests will be reflected solely as "units" (each, a "Unit"), and the Company may issue whole or fractional Units, in each case, to the extent approved by the Board. The Unit designations as of the First A&R Date are set forth in Section 4.2(c). From time to time, the Company may designate and, subject to Section 4.3, issue additional Units having such rights, preferences and designations as the Board approves (including (i) assigning a designation to such Units as "Preferred Units," "Common Units," "Incentive Units" or any other designation, (ii) subject to compliance with any restrictions applicable to any class or series of Units then outstanding, specifying such Units as senior or junior to, or *pari passu* with, any Units then outstanding or to be issued thereafter and (iii) specifying the voting rights (if any) of such Units). Subject to 4.3, the Board may increase the number of authorized Units in any then-existing class or series. Upon due authorization of any Unit issuance by the Board, the Company is hereby authorized to take all actions that it deems reasonably necessary or appropriate in connection with the authorization (including the increase in number of authorized Units of any class or series), designation, creation and issuance of the Units to be issued and the fixing of the designations, preferences and rights applicable thereto and such action may include an amendment to this Agreement adopted solely by the Company, subject to Board approval (each, a "New Terms Amendment") and without the approval of any Member, except for any Member approval expressly required under Section 12.6.

(b)    Unit Certificates.  Ownership of Units may, but need not, be evidenced by certificates similar to customary stock certificates. As of the First A&R Date, Units are

7

uncertificated, but the Board may determine to certificate all or any Units at any time by resolution thereof. In such event, the Board will prescribe the forms of certificates to be issued by the Company, including the forms of legends to be affixed thereto. Any such certificate will be delivered by the Company to the applicable record owner of the Units represented by such certificate. Certificates evidencing Units will provide that they are governed by Article 8 of the Uniform Commercial Code. Certificates need not bear a seal of the Company but will be signed by the Chief Executive Officer, President, any Vice President or any other Person authorized by the Board to sign such certificates who will certify the Units represented by such certificate. In the event any Officer who has signed, or whose facsimile signature or signatures will have been placed upon, any such certificate or certificates ceases to be such an Officer before such certificate is issued by the Company, such certificate may nevertheless be issued by the Company with the same effect as if such person were such an Officer at the date of issue. The Board may determine the conditions upon which a new certificate may be issued in place of a certificate which is alleged to have been lost, stolen or destroyed and may, in its discretion, require the owner of such certificate or its legal representative to give bond, with sufficient surety, to indemnify the Company against any and all losses or claims that may arise by reason of the issuance of a new certificate in the place of the one so lost, stolen or destroyed.

(c)     Initial Unit Designations; Authorized Units.

(i)     A class of Units is hereby designated as "Class A Units." The Company is authorized to issue as many Class A Units as the Board approves from time to time, and any Class A Unit issued in accordance with this Agreement will be deemed to have been duly authorized and validly issued.

(ii)     A class of Units is hereby designated as "Class B Units." The Company is authorized to issue as many Class B Units as the Board approves from time to time, and any Class B Unit issued in accordance with this Agreement will be deemed to have been duly authorized and validly issued. A holder of Class B Units may elect at any time to exchange all or some of its Class B Units for a like number of Class A Units. The Class A Units and the Class B Units will be identical in all respects except as specifically set forth in this Agreement.

(iii)     A class of Units is hereby designated as "Class C Units." Each Class C Unit will also bear a numeric sub-classification. Initially, there will be two sub-classifications of the Class C Units: "Class C-1 Units" and "Class C-2 Units." All Class C Units (regardless of the numeric sub-classifications thereof) will be identical in all respects except as expressly set forth in this Agreement. The Company hereby confirms that the Board has authorized the issuance of a number of Class C-1 Units equal to 1.5% of the total number of Class A Units, Class B Units and Class C-1 Units outstanding as of the 180th day after the First A&R Date and no more other than increases to effect a proportionate unit split or similar proportionate reclassification. The Company is authorized to issue as many Class C Units as the Board approves from time to time, other than Class C-1 Units which are covered by the preceding sentence. Any Class C Unit issued in accordance with this Agreement and with approval of the Board will be deemed to have been duly authorized and validly issued. The Class C-2 Units and other Class C Unit sub-classifications (other than the Class C-1 Units) are sometimes referred to herein

8

as the "Incentive Units." For clarification, the Class C-1 Units are not Incentive Units. Incentive Units may only be issued by the Company to Eligible Incentive Participants from time to time for no consideration or *de minimis* consideration as such interests are intended to constitute "profits interests" within the meaning of Revenue Procedures 93-27 and 2001-43. The Company will assign a Participation Level to each Incentive Unit upon its issuance in such amount that the Company determines is needed in order for each Incentive Unit to qualify as a profits interest for U.S. federal income tax purposes. Incentive Units will be granted and issued pursuant to separate Restricted Unit Agreements between the Company and each grantee thereof, and the Participation Level assigned to any Class C Unit will be specified in the Restricted Unit Agreement entered into upon the issuance of such Unit. Incentive Units will be further subject to restrictions on transfer, vesting and forfeiture and other terms set forth in a Restricted Unit Agreement. The terms of each Restricted Unit Agreement must be approved by the Board and may differ from other Restricted Unit Agreements. The Company expressly disclaims any obligation, and each holder of Class C Units hereby releases the Company from any obligation, to grant Class C Units to any Person on the same terms as to any other Person.

(d)    Options; Warrants. Subject to Board approval and the provisions of Section 4.3, the Company may grant, award, issue or sell options or warrants to acquire Units, and the Company will issue Units upon exercise of such options or warrants in accordance with the terms of documentation related to such options or warrants approved by the Board.

(e)    Issued and Outstanding Units; Unit Ledger. The Company will maintain a ledger (the "Unit Ledger") listing all of the record holders of Units and the number, class or series of Units held thereby; provided, notwithstanding the foregoing, to maintain the confidentiality of individual Incentive Unit grants, the Unit Ledger may list only certain information about Incentive Unit grants (such as the aggregate number and weighted average Participation Level of Incentive Units outstanding from time to time). Until the Board determines otherwise, Schedule 1 will serve as the Unit Ledger. A separate Incentive Unit ledger (the "Incentive Unit Ledger") will be maintained by the Company that lists the holders of Incentive Units, the number of Incentive Units outstanding and the Participation Level applicable to each outstanding Incentive Unit. The Incentive Unit Ledger will be kept in confidence from Persons other than members of the Board and other Persons authorized by the Board. The Company will update the Unit Ledger and Incentive Unit Ledger as Units are issued, forfeited, repurchased or Transferred from time to time in accordance with this Agreement. Modifications to the Unit Ledger and Incentive Unit Ledger for the foregoing purposes will not require consent or approval from any of the Members and will not be considered amendments to this Agreement.

(f)    Safe Harbor Election. Without any further action by the Board or any Member, the Company may make an election to value any Incentive Units at liquidation value (the "Safe Harbor Election") as the same may be permitted pursuant to or in accordance with the finally promulgated successor rules to Proposed Treasury Regulations Section 1.83-3(1) and IRS Notice 2005-43. The Board will cause the Company to make any allocations of items of income, gain, deduction, loss or credit (including forfeiture allocations under Proposed Treasury Regulations Section 1.704-1(b)(4)(xii)(c) and elections as to allocation periods) necessary or appropriate to effectuate and maintain the Safe Harbor Election.

(g)    <u>Voting Rights</u>.

(i)    *Voting Units*. The Class A Units will be Voting Units and will vote on all matters submitted for approval of the Members. Each Class A Unit will entitle the holder thereof to one vote for each such Unit. Whenever action is to be taken by the Sterling Holders under this Agreement, the decision, act or vote of the holders of a majority of the Class A Units held by all of the Sterling Holders at the time will be the decision, act or vote of all of the Sterling Holders. Notwithstanding the foregoing, the Board is authorized to eliminate the voting rights of any Voting Unit held by a Member who is not in Good Standing.

(ii)    *Non-Voting Units*. The Class B Units and the Class C Units will be non-voting except with respect to such matters, if any, on which such Units are entitled to vote as a matter of mandatory, non-waivable Law and, in such cases, such votes will be cast on a combined basis (and not as a separate class) with all Voting Units.

**4.3**    <u>Preemptive Rights</u>.

(a)    At any time the Company or any Subsidiary proposes to issue Units, Unit Equivalents or other Equity Interests, in each case, other than Exempted Units (each such issuance, an "<u>Offering</u>," and the Units, Unit Equivalents or other Equity Interests of any Subsidiary offered in each Offering are referred to as the "<u>Offered Units</u>"), each Eligible Purchaser will have the right to purchase a portion of the Offered Units on the terms set forth in <u>Section 4.3(b)</u>. Any Eligible Purchaser that is a Blocker Member may assign its preemptive rights under this <u>Section 4.3</u> to a Permitted Transferee of such Blocker Member.

(b)    Except under the circumstances described in <u>Section 4.3(e)</u>, the Company will give each Eligible Purchaser at least 15 days' prior notice before issuing any Offered Units (the "<u>First Notice</u>"), which notice will set forth in reasonable detail the proposed terms and conditions of such issuance (including a range of terms and conditions if the terms and conditions of the issuance have not been finalized) and will offer to each Eligible Purchaser the opportunity to purchase its Preemptive Right Percentage of the Offered Units at the same price, on the same economic and other material terms and conditions (including, if more than one type of security is issued, each type of security in the same proportion offered) and at the same time as the Offered Units are proposed to be issued by the Company or any Subsidiary to the other Persons participating in the Offering. If, following the giving of the First Notice, the terms of the proposed issuance materially change, the Company will furnish a supplemental notice (a "<u>Supplemental Notice</u>") describing the revised terms; provided, the Supplemental Notice will not restart the foregoing 15-day period, but the Company will give each Eligible Purchaser a reasonable period of time (which may be as few as five Business Days after the initial 15-day period) (such 15-day period, as and if so extended, being referred to as the "<u>Election Period</u>") to consider the revised terms. If any Eligible Purchaser wishes to exercise its preemptive rights, it must do so by delivering notice (which will constitute such Eligible Purchaser's acceptance of the offer contained in the First Notice, as modified by a Supplemental Notice, if applicable) to the Company within the Election Period specifying the maximum dollar amount of Offered Units such Eligible Purchaser (each a "<u>Requesting Investor</u>") would like to purchase (as to each Requesting Investor, its "<u>Maximum Dollar Amount</u>"), which may be equal to or be more or less than its Preemptive

Right Percentage of the Offered Units (the "Participation Commitment Notice"). The acceptance of each Requesting Investor will be irrevocable, and each Requesting Investor will be bound and obligated to purchase up to the number of Offered Units that have an aggregate purchase price equal to such Requesting Investor's Maximum Dollar Amount on the terms and conditions set forth in the First Notice, as modified by a Supplemental Notice, if applicable. If one or more Eligible Purchasers does not elect to purchase its full Preemptive Right Percentage of the Offered Units, except as provided in the last sentence of this Section 4.3(b), the Company will allocate the right to purchase the unsubscribed portion (the "Unsubscribed Portion") to each Requesting Investor whose Maximum Dollar Amount exceeds the dollar amount represented by its Preemptive Right Percentage of the Offered Units (with the rights being allocated to such Requesting Investors based on their relative Preemptive Right Percentages). Any Eligible Purchaser that fails to deliver its Participation Commitment Notice to the Company before the termination of the Election Period will be deemed to have waived its preemptive rights with respect to such Offering. Notwithstanding the foregoing, each Sterling Holder that specifies a Maximum Dollar Amount in excess of the purchase price of its Preemptive Right Percentage of the Offered Units (each, an "Oversubscribing Sterling Holder") will have the first right to purchase all or a portion of the Unsubscribed Portion, and the Sterling Holders will specify the manner in which the Unsubscribed Portion will be allocated among the Oversubscribing Sterling Holders.

(c)     If fewer than all of the Offered Units are subscribed for by the Eligible Purchasers pursuant to Section 4.3(b), the Company or the applicable Subsidiary will have the right to issue and sell the unsubscribed-for portion of the Offered Units to any Person at any time during the 90 days following the termination of the Election Period only on terms and conditions that are not materially more favorable to the offeree than those set forth in the First Notice, as modified by a Supplemental Notice, if applicable, without any further notice to such Eligible Purchasers.

(d)     In connection with the issuance and sale of Offered Units subscribed for by the Members pursuant to the preemptive rights provisions of this Section 4.3, the Board may, in its sole and reasonable discretion, impose such other reasonable and customary terms and procedures such as setting a closing date and rounding the number of the Units to be issued to any subscriber to the nearest whole number. Each Member in its capacity as a Requesting Investor will take or cause to be taken all such reasonable actions as may be necessary or desirable in order to expeditiously consummate each Offering pursuant to this Section 4.3 and any related transactions, including executing, acknowledging and delivering customary closing deliveries such as accredited investor certificates, representations of due authority and otherwise cooperating with the Company, the other Requesting Investors and each other Person to whom the Offered Units are proposed to be issued, if any. Without limiting the generality of the foregoing, each Member in its capacity as a Requesting Investor agrees to execute and deliver such subscription and other agreements specified by the Company. If any Eligible Purchaser defaults on the purchase of Offered Units which it had agreed to purchase pursuant to the exercise of preemptive rights granted under this Section 4.3, in addition to any other rights the Company has available to it at Law or in equity, such Member will not be considered an Eligible Purchaser for any future rights granted under Section 4.3(a) unless the Board expressly designates such Person as an Eligible Purchaser (which the Board, in its sole discretion, may do on an offer-by-offer basis or not at all). Notwithstanding anything to the contrary in this Section 4.3, the Company or the applicable

11

Subsidiary may terminate an Offering of Offered Units at any time prior to the closing of such Offering whereupon the Company or the applicable Subsidiary will have no obligation or liability to an Eligible Purchaser even if such Eligible Purchaser had elected to participate in such Offering.

(e)    The Parties acknowledge that, under certain circumstances, the Company or a Subsidiary may require capital on an expedited basis such that the full preemptive rights process described above cannot be completed in a timely manner.  In such case, notwithstanding anything to the contrary in this <u>Section 4.3</u>, (i) the Company or a Subsidiary may issue Offered Units to one or more of the Eligible Purchasers to raise the required funds in the required timeframe so long as, within 60 days after the completion of the initial sale, the Company or the applicable Subsidiary makes the same investment opportunity available to all Eligible Purchasers that were not offered the opportunity in connection with the closing of the initial Offering, to the same extent as would have been required under <u>Section 4.3(a)</u> through <u>Section 4.3(d)</u> and (ii) until all Eligible Purchasers have so acquired such Offered Units (or the applicable period during which Eligible Purchasers have the option to acquire a portion of such Offered Units pursuant to the foregoing provisions of this <u>Section 4.3</u> has lapsed), the Company or the applicable Subsidiary will not make any distribution in respect of any class of Units that is the same as the Offered Units or consummate any Strategic Transaction.  The Company or the applicable Subsidiary may elect to make such same investment opportunity available to such other Eligible Purchasers either by requiring the initial subscribers to sell down a portion of their investment, by issuing additional Offered Units or a combination of the foregoing or by taking any other action which effectively provides such other Eligible Purchasers with the same investment opportunity as would have been required under <u>Section 4.3(a)</u> through <u>Section 4.3(d)</u>.  If the Company elects to fulfill its obligation under the preceding sentence by issuing additional Offered Units to those Eligible Purchasers that were not given the opportunity to participate in the initial Offering, the Offered Units issued by the Company or the applicable Subsidiary will constitute "Exempted Units" so as not to trigger preemptive rights with respect to the issuance thereof so long as the issuance is in satisfaction of the obligations under this <u>Section 4.3(e)</u>.

(f)    The rights granted in this <u>Section 4.3</u>, other than the catch-up rights set forth in <u>Section 4.3(e)</u> in respect of issuances subject to this <u>Section 4.3</u>, will terminate immediately prior to, but conditioned on the consummation of, an Initial Public Offering.

**4.4**    <u>Transfer Related Provisions</u>.

(a)    <u>General Rules</u>.

(i)    *Required Compliance*.  No Transfer of Units will be valid unless it is made in accordance with the terms of this <u>Section 4.4</u> and, in the case of Incentive Units, in accordance with any Transfer restrictions set forth in the Restricted Unit Agreement applicable thereto.  Any attempted Transfer that is not in accordance with this <u>Section 4.4</u> and, in the case of Incentive Units, in accordance with any Transfer restrictions set forth in the Restricted Unit Agreement applicable thereto will be, and is hereby declared, null and void *ab initio*.

(ii)    *Prohibited Transfers*.  Unless expressly approved by the Board through a prior written consent on a case by case basis, no Member will Transfer all or any

of its Units (including any of its Incentive Units) (A) if such Transfer would subject the Company to the reporting requirements of the Exchange Act, (B) if such Transfer would cause the Company to lose its status as a partnership for United States federal income tax purposes or cause the Company to be classified as a "publicly traded partnership" within the meaning of Code Section 7704, (C) if the Board determines such Transfer would damage the Company or any Subsidiary because such Transfer would violate, give rise to a default under or cause any material payment to become due under any credit agreement, guaranty or similar credit document or any other material contract to which the Company or any Subsidiary is bound, or (D) to an Adverse Person. Transfers prohibited by this Section 4.4(a)(ii) are referred to herein as "Prohibited Transfers."

(iii)    *Involuntary Transfers*. An Involuntary Transfer of Units (including an Involuntary Transfer that is a Permitted Transfer) will be deemed to have been made in accordance with this Agreement if (A) such Transfer is not a Prohibited Transfer and (B) each transferee (other than the Company) in such Involuntary Transfer joins in and agrees to be bound by this Agreement (and therefore agrees to become a Member) with respect to the Units acquired thereby, in accordance with Section 4.4(a)(xi).

(iv)    *Permitted Transfers*. A Member may make a Voluntary Transfer to a Permitted Transferee subject to compliance with Section 4.4(a)(xi) and, in the case of Incentive Units, subject to compliance with any Transfer restrictions set forth in the Restricted Unit Agreement applicable thereto.

(v)    *Transfers by Sterling Holders*. In addition to Transfers permitted under Section 4.4(a)(iii) or Section 4.4(a)(iv), a Sterling Holder may make a Voluntary Transfer of Units (other than a Prohibited Transfer) at any time and in its sole discretion, subject to compliance with Section 4.4(a)(xi) and Section 4.4(c) to the extent such sections apply to the Transfer at hand.

(vi)    *Other Institutional Holder Transfers*. In addition to Transfers permitted under Section 4.4(a)(iii) or Section 4.4(a)(iv), an Institutional Holder (other than the Sterling Holders, who are covered under Section 4.4(a)(v) rather than this Section 4.4(a)(vi)) may make a Voluntary Transfer of Units (other than a Prohibited Transfer) at any time and in its sole discretion, subject to compliance with Section 4.4(a)(xi), Section 4.4(b) and Section 4.4(c) to the extent such sections apply to the Transfer at hand.

(vii)    *Transfers by Other Holders*. In addition to the Transfers permitted under Section 4.4(a)(iii) or Section 4.4(a)(iv), any Member (other than the Sterling Holders, who are covered under Section 4.4(a)(v), and the other Institutional Holders, who are covered under Section 4.4(a)(vi)) may make a Voluntary Transfer of Units (other than a Prohibited Transfer) only if the Board consents to such Transfer in its sole discretion and such Transfer is made subject to compliance with Section 4.4(a)(xi), Section 4.4(b) and Section 4.4(c) to the extent such sections apply to the Transfer at hand.

(viii)    *Indirect Transfers*. Any Member that is an Entity will be deemed to have Transferred any Unit held thereby if (A) such Entity, or any Entity that has a direct or indirect ownership interest in such Entity, issues equity or equity-linked securities

13

therein or any equity or equity-linked security therein is Transferred, in each case, other than to a Permitted Transferee of such Entity, (B) the fair market value of the Entity's Units at the time of the issuance or Transfer described in clause (A) exceeds 30% of the fair market value of all of the assets of the Entity as a whole (a "<u>Deemed Indirect Transfer</u>") and (C) assets are contributed to, or otherwise obtained by, such Entity in order to avoid the application of clause (B) preceding. If a Deemed Indirect Transfer occurs without the approval of the Board, the Entity that makes such Deemed Indirect Transfer will be deemed to have violated this <u>Section 4.4</u>, and, in addition to such rights and remedies as the Company and other Members have against such defaulting Member as set forth in this Agreement, such defaulting Member will take all action required to void such Deemed Indirect Transfer.

  (ix) *SPV Members*.

   (A) The Company will identify on <u>Schedule 1</u> which of the Members is known to the Company as an SPV Member (based on its representations and warranties set forth in this Agreement, any Joinder Agreement or any Individual Insider Member Agreement or based on other information that becomes known to the Company); provided, the Company is not obligated to determine whether a Member is an SPV Member and therefore will have no liability for failing to identify any Member as such.

   (B) Direct and indirect changes in the ownership of an SPV Member have the effect of indirectly shifting some or all of the economic benefits and burdens of Unit ownership similar to shifts that result from direct Transfers of Units, which are regulated by this <u>Section 4.4</u>. Accordingly, each SPV Member (other than any Sterling Holder that is an SPV Member, which is covered by <u>Section 4.4(a)(ix)(C)</u>) will not permit direct or indirect changes in the ownership thereof (other than those that result from Involuntary Transfers) without the prior consent of the Board or the Majority Holders.

   (C) Voluntary Transfers of equity interests in the Sterling Holders to any particular transferee are permitted without restriction so long as (1) the other Members that would have co-sale rights under <u>Section 4.4(c)</u> (assuming such Sterling Holder Transferred Units to such transferee (rather than equity interests in such Sterling Holder)) are given economically equivalent (and the same other material) co-sale rights to sell Units to such transferee alongside the Transfer of equity interests in any Sterling Holder and (2) any Member described in clause (1) preceding that is a Blocker Member is given the opportunity to allow its owners (or the owners of its Related Blocker Entity, if applicable) to sell equity interests in such Blocker Member or, if applicable, Related Blocker Entity on the same economic and other material terms that the owners of such Sterling Holder agree to in connection with their sale of equity interests in such Sterling Holder (subject to the co-sale related limitations contained in the Customary Transaction Terms).

(x)    *Blocker Entities.*

(A)    The Company will indicate on Schedule 1 each Member who has requested to be treated as a Blocker Member prior to its admission as a Member and each Related Blocker Entity of such Blocker Member identified as such by such Blocker Member.

(B)    The Members and the Company acknowledge that, for tax reasons, Blocker Members may prefer to effect sales and other Transfers of Units indirectly by selling or otherwise Transferring ownership in the Blocker Entity itself (or ownership in a Related Blocker Entity, if applicable) rather than the Blocker Member directly selling or otherwise Transferring any of its Units. The terms of this Section 4.4 regulate Transfers of Units and, to the extent set forth in this Section 4.4, Transfers of equity and other ownership changes in Blocker Members themselves and in their Related Blocker Entities. However, the principles set forth in this Section 4.4 that apply to Transfers of Units also will apply to Transfers of equity and other ownership changes in the Blocker Members themselves and in their Related Blocker Entities. Accordingly, each Blocker Member (other than any Sterling Holder that is a Blocker Member, which is covered by Section 4.4(a)(v)) agrees that it will not permit direct or indirect changes in the ownership thereof or in the ownership of its Related Blocker Entity unless such change is approved by the Board or the Majority Holders in their sole discretion; provided, Transfers of ownership in any Blocker Member or in any Related Blocker Entity to Permitted Transferees of such Blocker Member will be permitted to the same and extent, and subject to the same conditions, as Transfers of Units by such Blocker Member to its Permitted Transferees.

(C)    In connection with any Approved Transaction (other than an Initial Public Offering which is covered by Section 4.4(a)(x)(E)) in which any Blocker Member is required or permitted to participate, if requested by such Blocker Member, the Company will ensure that such Blocker Member is permitted to participate in such transaction by allowing all or a portion of the equityholders (as designated by such Blocker Member) of such Blocker Member or its Related Blocker Entity to Transfer their equity interests in such Blocker Member or its Related Blocker Entity, subject to the same limitations contained in the Customary Transaction Terms. Notwithstanding the fact that an acquiror of equity interests of a Blocker Member or a Related Blocker Entity may ascribe a different value to such equity interests than the Units held thereby, the aggregate consideration in any Approved Transaction will be disbursed in the manner described in Section 4.4(d)(iv).

(D)    In connection with any Proposed Co-Sale Transfer by a Co-Sale Seller that is not a Blocker Member, such Co-Sale Seller will give each Blocker Member that would have co-sale rights under Section 4.4(c) the opportunity to have all or a portion of the equityholders (as designated by such Blocker Member) of such Blocker Member or its Related Blocker Entity sell equity interests in such Blocker Member or its Related Blocker Entity (rather than the

15

Units held by such Blocker Member) alongside the Co-Sale Seller's Transfer of Units on economically equivalent (and the same other material) terms to those set forth in Section 4.4(c) (subject to the co-sale related limitations contained in the Customary Transaction Terms) but with such changes to such terms (but subject to such limitations) as the Board or the Majority Holders establish to reflect the differences between the direct Transfer of Units and the sale of equity in a Blocker Member or its Related Blocker Entity including the governance terms that will apply among the co-owners of such Blocker Member or Related Blocker Entity after such Transfer; provided, notwithstanding the fact that an acquiror of equity interests of a Blocker Member or Related Blocker Entity may ascribe a different value to such equity interests than the Units acquired directly thereby in a Proposed Co-Sale Transfer, the aggregate consideration in any Proposed Co-Sale Transfer will be disbursed as if the transferors of equity in any Blocker Member or Related Blocker Entity had directly transferred a corresponding percentage of the Class A Units and Class B Units held by the applicable Blocker Member (but such proceeds will be payable to the sellers of equity in such Blocker Member or its Related Blocker Entity equity rather than the Blocker Member itself).

(E)     In connection with an Initial Public Offering, the Company will use commercially reasonable efforts to allow the Blocker Members or their Related Blocker Entities to merge into the IPO Issuer, to allow the owners of each such Blocker Member or Related Blocker Entity to contribute their equity interests in such Blocker Member or its Related Blocker Entity to the IPO Issuer in exchange for equity therein or to utilize another structure deemed acceptable by the Board or the Majority Holders to address the United States Federal income tax inefficiencies that would arise if a Blocker Member or its Related Blocker Entity itself (rather than its equityholders) owned securities in the IPO Issuer.

(xi)     *Transfer Conditions.*

(A)     *Joinder.*  As a condition to any Transfer permitted under this Section 4.4 (other than an Approved Transaction that is structured as an asset sale or a sale of all of the outstanding Units), unless waived by the Board or the Majority Holders, a transferee of Units will be required to become a party to this Agreement by executing (together with such Person's spouse, if applicable) a Joinder Agreement.   If any Person acquires Units from a Member in a Transfer, notwithstanding such Person's failure to execute a Joinder Agreement in accordance with the preceding sentence (including an Involuntary Transfer), such Person and such Units will be bound by and subject to this Agreement.

(B)     *Securities Laws Compliance.*  No Units may be Transferred by a Person unless the transferor first delivers to the Company, at the transferring Member's sole cost and expense, evidence reasonably satisfactory to the Company (such as an opinion of counsel) to the effect that such Transfer is not required to be registered under the Securities Act; provided, the Board or the Majority Holders may waive the foregoing opinion requirement.

16

(C)    *Prohibited Transfers*.  Notwithstanding anything to the contrary in this Agreement, no Transfer will be effective unless and until the Company provides notice to the proposed transferor that the proposed Transfer will not, if effected, constitute a Prohibited Transfer.  The Company will indicate whether a proposed Transfer will or will not be a Prohibited Transfer within 15 days after receipt of any request for such determination from any proposed transferor.

(D)    *Expense Reimbursement*.  Unless waived by the Board or the Majority Holders, no Transfer of Units will be effective unless the transferor reimburses, or causes the transferee to reimburse, the Company for any out of pocket expenses incurred by it that would not have been incurred but for such Transfer.

(E)    *Related Individual*.  No Transfer of Units by an Insider Member that is an Entity will be effective unless and until Schedule 1 specifies a Related Individual for the transferee thereof.

(b)    Right of First Refusal.

(i)    The remaining provisions of this Section 4.4(b) will not apply to the following (each, an "Exempt ROFR Transfer"): (A) a Voluntary Transfer made by a Sterling Holder in accordance with Section 4.4(a)(v), (B) an Involuntary Transfer made in accordance with Section 4.4(a)(iii), (C) a Permitted Transfer made in accordance with Section 4.4(a)(iv), (D) a Voluntary Transfer that is made at the request of the Board or the Majority Holders as part of an Approved Transaction, (E) a Voluntary Transfer that results from the exercise of co-sale (tag-along) rights under Section 4.4(c), (F) a Voluntary Transfer that results from the exercise of demand or piggyback registration rights granted by the Company or any Subsidiary or (G) any other specific Transfer that the Board exempts from the remaining provisions of this Section 4.4(b), which the Board may do in its sole discretion.

(ii)    Except for any Exempt ROFR Transfer, before any Member Transfers any Units to any Person (including to another Member), such Member (the "Disposing Holder") must give notice (a "Disposition Notice") of the proposed Transfer (the "Proposed Transfer") to the Company setting forth: (A) the name and address of the prospective acquiror (the "Proposed Transferee") and the number and type of Units proposed to be Transferred (the "Sale Units"), (B) the per Unit purchase price offered by such Proposed Transferee and the Disposing Holder's calculation of the fair market value of any non-cash portion of the proposed consideration, if any, along with reasonable detail concerning such non-cash consideration, to allow the Board to evaluate the proposed fair market value of such non-cash consideration, (C) the contemplated timetable for consummating such Proposed Transfer, (D) material conditions to closing of the Proposed Transfer, (E) details of financing of the Proposed Transfer and (F) all other material terms and conditions of the Proposed Transfer that are then known to the Disposing Holder and a copy of any written offer, letter of intent or term sheet with respect to such Proposed Transfer (whether binding or non-binding).  Based on the information set forth in the

17

Disposition Notice, the Board will determine if the Proposed Transfer is a Prohibited Transfer and, if not, whether Board consent is required under Section 4.4(a)(vii). If the Board determines that the Proposed Transfer is not a Prohibited Transfer and if the Proposed Transfer either does not require Board consent or if the Board consents thereto, then the Board will determine the fair market value of any non-cash consideration described in the Disposition Notice. If the consideration is all cash or if the fair market value of any such non-cash consideration as determined by the Board is equal to or greater than the fair market value of such consideration as specified by the Disposing Holder in the Disposition Notice, then the provisions of Section 4.4(b)(iv) will next apply, otherwise the provisions of Section 4.4(b)(iii) will next apply.

(iii)    If the fair market value of any non-cash consideration included in a Disposition Notice as determined by the Board is less than the fair market value specified by the Disposing Holder in the Disposition Notice, and if the Board and the Disposing Holder are unable to mutually agree upon the fair market value of such non-cash consideration within five Business Days after the Board notifies the Disposing Holder of its determination thereof, then the Company will promptly engage and instruct a qualified investment bank or other qualified appraiser (the "Firm") to determine the fair market value of such non-cash consideration. The Firm will be instructed to return its decision within 30 days after all material information is submitted thereto, which decision will be Final, and notice of such decision will be given by the Company to the Disposing Holder no later than the third Business Day following such decision. All costs of the Firm will be equitably apportioned by the Firm between the Disposing Holder and the Company in the manner the Firm determines reflects the relative merits of each of their valuation determinations with the party having the greater relative merit bearing a lesser relative share of such costs. The Firm will be instructed to provide a written statement and analysis in reasonable detail in support of its determination of the fair market value of the non-cash consideration. If the Firm's determination of the value of any non-cash consideration is equal to or greater than the fair market value of such consideration as determined by the Disposing Holder in the Disposition Notice, then the provisions of Section 4.4(b)(iv) will next apply. If the Firm's determination of the value of any non-cash consideration is less than the fair market value of such consideration as determined by the Disposing Holder in the Disposition Notice, then the Disposing Holder may decide whether to abandon the Proposed Transfer or continue with the procedures in this Section 4.4(b). If the Disposing Holder decides to proceed with the Proposed Transfer, then the Company and the Disposing Holder will amend the Disposition Notice to substitute the Firm's determination of fair market value of the non-cash consideration for the Disposing Holder's determination thereof and the Disposition Notice will be deemed to have been given to the Company on the date such amended Disposition Notice is delivered to the Company. Thereupon, the provisions of Section 4.4(b)(iv) will next apply.

(iv)    If the total value of the Sale Units is less than or equal to $2,000,000, the Company may elect to purchase all, but not less than all, of the Sale Units for the ROFR Unit Purchase Price so long as the Company notifies the Disposing Holder of its election no later than the 10th day after the later of the date on which the Disposition Notice is given or deemed to have been given (the "Company Acceptance Deadline"), after which the

provisions of Section 4.4(b)(v) will next apply. If the total value of the Sale Units as described in the Disposition Notice is greater than $2,000,000 or if the Company does not timely elect to purchase the Sale Units pursuant to the foregoing sentence, then the remainder of this Section 4.4(b)(iv) will next apply. The following provisions of this Section 4.4(b)(iv) will apply at any time any of the preceding provisions in this Section 4.4(b) direct for the provisions of this Section 4.4(b)(iv) to apply. The Company will furnish a copy of the Disposition Notice (as amended in accordance with the above provisions, if applicable) to the ROFR Offerees within 30 days after the later of the date on which such Disposition Notice is given or deemed to have been given to the Company. The giving of such Disposition Notice will constitute an offer by the Disposing Holder to sell all of the Sale Units to the Company and/or the ROFR Offerees. Each of the ROFR Offerees will have the option, but not the obligation, exercisable by giving notice at any time prior to the 15th day (the "ROFR Acceptance Deadline") after the later of the date on which the Disposition Notice is given or deemed to have been given to the ROFR Offerees (which deadline will be specified by the Company in the Disposition Notice or cover letter transmitting same), to acquire a portion of the Sale Units for the ROFR Unit Purchase Price. To exercise the right of first refusal offer granted hereby, a ROFR Offeree must notify the Company before the ROFR Acceptance Deadline, and such exercise notice (which will constitute such ROFR Offeree's irrevocable acceptance of the offer contained in the Disposition Notice) must set forth the number of Sale Units such ROFR Offeree elects to purchase, which may be more or less than, or equal to, its ROFR Percentage Interest of the Sale Units. If any ROFR Offeree elects not to purchase any Sale Units or elects to purchase a fewer number of Sale Units than its ROFR Percentage Interest, the Company will allocate the residual Sale Units to the ROFR Offerees that elect to purchase more than their ROFR Percentage Interest of the Sale Units, and such allocation will be made in proportion to the ROFR Percentage Interests of the oversubscribing ROFR Offerees or in such other proportion upon which the oversubscribing ROFR Offerees unanimously agree. A ROFR Offeree that fails to make its purchase election before the ROFR Acceptance Deadline will be deemed to have waived its right of first refusal rights with respect to such Proposed Transfer. The Company will have the right to purchase any or all of the Sale Units not purchased by the ROFR Offerees on the same terms offered to the ROFR Offerees so long as the Company notifies the Disposing Holder of its election no later than the 10th day after the ROFR Acceptance Deadline.

(v)    The closing of the purchase and sale of the Sale Units to the electing ROFR Offerees and, if applicable, the Company (each, an "Accepting Investor") pursuant to this Section 4.4(b) will take place on the 20th Business Day following the later of the Company Acceptance Deadline or, if applicable, the ROFR Acceptance Deadline. At the closing, each Accepting Investor's purchase consideration will be delivered by such Accepting Investor to the Disposing Holder, the Disposing Holder will represent and warrant in writing to each Accepting Investor that the Sale Units are free and clear of all liens, encumbrances and adverse claims (other than the terms of this Agreement), and the Disposing Holder will deliver to each Accepting Investor such unit certificates representing the Sale Units (if the Units are then certificated) so purchased, accompanied by duly executed transfer instruments and such other matters as are deemed reasonably necessary by the Company for the proper transfer of such Sale Units on the books of the Company.

19

The Company, the Disposing Holder, and each Accepting Investor will cooperate in good faith in obtaining all necessary governmental and other third party approvals, waivers and consents required for the closing of such purchase and sale. Any such closing will be delayed, to the extent required, until the third Business Day following the expiration of any required waiting periods under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended; provided, such delay will not exceed more than 60 days and, if governmental approvals and waiting periods are not obtained or have not expired, as the case may be, by such 60th day, then the Accepting Investors affected by such delay will be deemed to have waived the right of first refusal with respect to the Sale Units to be purchased by them.

(vi)    If, in connection with any Transfer under this Section 4.4(b), any record date for any distribution by the Company (other than tax distributions in accordance with Section 6.1(b)) or any record date for the issuance of any Units or Equity Interests of any other Person in respect of Units in connection with any exchange, merger, recapitalization, consolidation, reorganization or other transaction involving the Company occurs on or after the date of the Disposition Notice and prior to the closing of the purchase of any Sale Units pursuant to Section 4.4(b)(v), then the Accepting Investors will be entitled to receive any such distributions or issuances of Units or Equity Interests, as the case may be, in respect of the Units they acquire pursuant to the exercise of their preferential purchase rights, and appropriate documentation will be delivered at the closing by the Disposing Holder to evidence the Accepting Investors' rights to receive such distributions or issuances of Units or Equity Interests.

(vii)    If any Sale Units are not purchased pursuant to the procedures above in this Section 4.4(b) (the "Remaining Sale Units"), then the Disposing Holder will be permitted to Transfer the Remaining Sale Units to the Proposed Transferee (so long as it is not a Prohibited Transfer) on the terms set forth in the original Disposition Notice, subject first to the co-sale (tag-along) provisions of Section 4.4(c), prior to the later of (A) 90 days after the later of the ROFR Acceptance Deadline or the Company Acceptance Deadline, and (B) 10 days after the satisfaction of all governmental approval or filing requirements. Any Transfer to which this Section 4.4(b) applies that is not made before such deadline will require the reapplication of the provisions of this Section 4.4(b).

(viii)    Blocker Members whose Transfers of Units are subject to the terms of this Section 4.4(b) (i.e. Blocker Members other than the Sterling Holders) will not permit direct or indirect changes in the ownership thereof (including in its Related Blocker Entities, if any) without entering into arrangements, which must be approved by the Board or the Majority Holders, that provide the Members with rights comparable to those in this Section 4.4(b).

(ix)    The rights granted in this Section 4.4(b) will terminate immediately prior to, but conditioned on the consummation of, an Initial Public Offering.

(c)    Co-Sale (Tag-Along) Rights.

(i)    The remaining provisions of this Section 4.4(c) will not apply to the following (each, an "Exempt Tag Transfer"): (A) an Involuntary Transfer made in

20

accordance with Section 4.4(a)(iii), (B) a Permitted Transfer made in accordance with Section 4.4(a)(iv), (C) a Transfer that results from the exercise of the right of first refusal provisions under Section 4.4(b), (D) a Transfer that results from the exercise of demand or piggyback registration rights granted by the Company or any Subsidiary, (E) a Transfer that is made at the request of the Board or the Majority Holders as part of an Approved Transaction so long as each Member that holds Class A Units or Class B Units (or, in the case of Blocker Members, the equityholders of such Blocker Member or the equityholders of its Related Blocker Entity) has the opportunity (whether by choice or by requirement) to participate in such Approved Transaction at least to the same extent such Blocker Member (or the equityholders of such Blocker Member or the equityholders of its Related Blocker Entity) would be entitled to participate in any Transfer under this Section 4.4(c) if the exception in this clause (E) were disregarded and (F) any other specific Transfer by a Person (other than a Sterling Holder) so long as the Board exempts such Transfer from this Section 4.4(c), which the Board may determine in its sole discretion.

(ii)    If (A) any Member, including a Sterling Holder, proposes to Transfer any of its Class A Units or Class B Units (each such Member, a "Co-Sale Seller," and each such proposed Transfer, a "Proposed Co-Sale Transfer"), (B) such Transfer is neither a Prohibited Transfer nor an Exempt Tag Transfer and (C) either the right of first refusal provisions of Section 4.4(b) do not apply to such Proposed Co-Sale Transfer or Remaining Sale Units exist after application of Section 4.4(b) to such Transfer, then such Co-Sale Seller will offer (the "Co-Sale Offer") to include in such Transfer a number of Class A Units and Class B Units owned by each Eligible Co-Sale Participant in accordance with the remaining terms of this Section 4.4(c).

(iii)    The Co-Sale Seller will notify the Company (the "Co-Sale Notice") at least 20 calendar days prior to the scheduled closing of the Proposed Co-Sale Transfer. The Co-Sale Notice will include the name and address of the prospective acquiror (the "Proposed Co-Sale Transferee"), the number of Class A Units or Class B Units proposed to be Transferred (the "Co-Sale Units"), the per Unit purchase price offered by such Proposed Co-Sale Transferee (which must be the same for each Class A Unit and each Class B Unit because Class B Units can be exchanged for Class A Units at any time), reasonable detail concerning any non-cash portion of the proposed consideration, the contemplated timetable for consummating such transaction, material conditions to closing, details of financing and all other material terms and conditions of the Proposed Co-Sale Transfer that are then known to the Co-Sale Seller and a copy of any written offer, letter of intent, term sheet or agreement with respect to such Proposed Co-Sale Transfer (whether or not binding or non-binding). The Company will promptly provide each Eligible Co-Sale Participant with a copy of the Co-Sale Notice. If any Eligible Co-Sale Participant wishes to accept the Co-Sale Offer and participate in the Proposed Co-Sale Transfer, such Eligible Co-Sale Participant must notify the Company within 15 days after the Co-Sale Notice is given. If an Eligible Co-Sale Participant elects to participate in such Proposed Co-Sale Transfer (each, an "Electing Co-Sale Member"), then such Person will have the right to include Units in such Transfer as provided in the remaining terms of this Section 4.4(c), but only if such Person executes and delivers the Customary Transaction Documents evidencing such Person's agreement to the Customary Transaction Terms.

21

(iv)     Unless otherwise unanimously agreed to by all of the Electing Co-Sale Members and the Co-Sale Seller, each Electing Co-Sale Member may elect, by notice delivered to the Company within 15 days after the Co-Sale Notice is given, to include in such Transfer up to its Co-Sale Percentage of the Co-Sale Units. The number of Units each Electing Co-Sale Member elects to sell in accordance with the foregoing is referred to as such Electing Co-Sale Member's "Co-Sale Elected Units." If requested by the Proposed Co-Sale Transferee, any Co-Sale Units or Co-Sale Elected Units that are Class B Units will be exchanged for a like number of Class A Units immediately upon the consummation of the Proposed Co-Sale Transfer or acquisition by the Co-Sale Seller, as applicable. The Co-Sale Seller will reduce the number of Units it includes in the Proposed Co-Sale Transfer by the Co-Sale Elected Units or, if the Proposed Co-Sale Transferee refuses to purchase Units from any Electing Co-Sale Member, the Co-Sale Seller will purchase the Co-Sale Elected Units from the Electing Co-Sale Member on the same economic terms as those described in the Co-Sale Notice.

(v)     Except as provided below in this Section 4.4(c)(v) with respect to participants who are not accredited investors, all consideration payable as a result of the consummation of a Proposed Co-Sale Transfer will be aggregated, handled, adjusted and disbursed in the manner described in Section 4.4(d)(iv). If the Proposed Co-Sale Transferee refuses to allocate the consideration in the manner described in Section 4.4(d)(iv) or requires transaction terms that are more onerous than the Customary Transaction Terms, none of the Members (including the Co-Sale Seller) will be permitted to consummate such Proposed Co-Sale Transfer (and none of the Members who are Blocker Members will permit their direct or indirect equity owners to consummate such Proposed Co-Sale Transfers). Notwithstanding the foregoing rule that requires allocation of the net consideration payable in a Proposed Co-Sale Transfer in the manner described in Section 4.4(d)(iv), if such consideration includes Equity Interests in a transaction not involving a Public Offering and any Person who would otherwise receive a portion of such Equity Interests is not an accredited investor (as defined under Rule 501 of Regulation D under the Securities Act) or is a former employee of the Company or any of its Subsidiaries, then the Company may require each such Person (A) to receive solely cash in such transaction, (B) to otherwise be cashed out (by redemption, retirement or otherwise) by the Company, any Member or any other Person approved by the Majority Holders prior to the consummation of such transaction or (C) to appoint a purchaser representative (as contemplated by Rule 506 of Regulation D under the Securities Act) selected by the Company, with the intent being that such Person receive cash equal to the Fair Market Value of the Equity Interests it would have received in the absence of this sentence.

(vi)     The date on which the Proposed Co-Sale Transfer will be consummated will be the date specified in the Co-Sale Notice unless such longer period of time is required to obtain, make or satisfy governmental approval or filing requirements, if any, required to consummate the Proposed Co-Sale Transfer.

(vii)     Blocker Members whose Transfers of Units are subject to the terms of this Section 4.4(c) will not permit direct or indirect changes in the ownership thereof (including in its Related Blocker Entities, if any) without entering into arrangements, which

22

must be approved by the Board or the Majority Holders, that provide the Members with rights comparable to those in this Section 4.4(c).

(viii)    The rights granted in this Section 4.4(c) will terminate immediately prior to, but conditioned on the consummation of, an Initial Public Offering.

(d)    Strategic Transactions.

(i)    *Processes.*  At any time, the Board or the Majority Holders may request the Company to initiate an auction or other process with a view to consummating a Strategic Transaction.  Following such request, the Company will initiate the process as requested including, if requested, engaging an investment banker and counsel selected by the Board (a "Transaction Process").

(ii)    *Required Participation.*

(A)    If, whether or not as a result of a Transaction Process, the Board or the Majority Holders approve a Strategic Transaction and such Strategic Transaction does not require consent under Section 8.4(b) or consent is obtained for such transaction under Section 8.4(b) (each, an "Approved Transaction"), then the Company and each Member will comply with the remaining terms of this Section 4.4(d) and will take all other actions (in their capacities as Members) reasonably requested by the Majority Holders or the Board that do not conflict with the remaining terms of this Section 4.4(d) to effect such Approved Transaction.

(B)    If the Approved Transaction is structured as the sale, exchange, redemption or other Transfer of Units, each Member (other than any Blocker Member that, pursuant to Section 4.4(a)(x)(C), elects for its direct or indirect equityholders to sell equity interests in such Blocker Member or its Related Blocker Entity in such Approved Transaction and takes all actions reasonably requested by the Board or the Majority Holders in connection with participating in such manner) will sell, exchange, deliver, surrender and Transfer its Units in the manner and in the amount requested by the Board or the Majority Holders.

(C)    If the Approved Transaction is structured as a merger in which the Company is a constituent entity (whether or not the surviving entity) or a sale of the Company's assets (including a sale of all or substantially all of its assets), each Member (in its capacity as a Member) agrees (1) that, to the maximum extent permitted by Law (including the Act), no Member vote will be required and, as provided in Section 2.9, no Member will have dissenters' or appraisal rights with respect to such transaction and (2) to support and, if applicable Law does not permit the elimination of a Member's vote with respect to such transaction, to vote in favor of such transaction and to waive all dissenters' and appraisal rights with respect thereto.

(iii)    *Transaction Documentation.*  If requested by the Board or the Majority Holders, in connection with an Approved Transaction, a Member will be required

23

to execute and deliver the Customary Transaction Documents applicable to such transaction evidencing such Member's agreement to the Customary Transaction Terms applicable to such transaction. For purposes of clarification, without the consent of a particular Member, such Member will not be required to agree to terms that are more onerous than the Customary Transaction Terms (disregarding deviations from the Customary Transaction Terms that are not, in the aggregate, materially adverse to such Member). The Members acknowledge and agree that, subject to the express requirements contained in the definition of Customary Transaction Documents, the Board or the Majority Holders may not require all of the Members to enter into the same documentation as one another. In particular, as the lead investors, the Sterling Holders (or their direct or indirect equityholders) may rollover a portion of their investment in the Company (directly or by rolling over an indirect interest in the Company through a rollover of ownership in a Blocker Member itself or its Related Blocker Entity) as part of an Approved Transaction and nothing in this Agreement will entitle the other Members (or their direct or indirect equityholders) to rollover any of their investment in the Company or in a Blocker Member (or Related Blocker Entity, if applicable) as part of such Approved Transaction so long as the rollover amount invested by the Sterling Holders does not exceed 30% of the pre-tax proceeds that would have been payable to all Sterling Holders in such transaction (the "Sterling Rollover Exception").

(iv)    <em>Expenses; Disbursement of Consideration.</em>

(A)    Regardless of the manner in which an Approved Transaction is structured, all of the consideration payable to the Company, the Members the Blocker Members' direct or indirect owners, or any other transaction beneficiary of such Approved Transaction (collectively, the "Transaction Beneficiaries") by reason of such Approved Transaction will be handled by or at the direction of the Deal Representative whom the Members hereby appoint as the sole representative of the Transaction Beneficiaries to carry out the matters described in this Section 4.4(d)(iv). The Deal Representative is authorized (1) to reduce the aggregate consideration payable to the Transaction Beneficiaries by all fees and expenses approved by the Board or the Majority Holders that are incurred in connection with the Approved Transaction (including those payable to investment banks, legal counsel, diligence consultants, financing and accounting consultants, tax advisors and other customary transaction advisors) by the Company, any Subsidiary thereof, the Sterling Holders (including the owners of the Sterling Holders) or any other Person whose expense reimbursement is approved by the Deal Representative and (2) to make such arrangements as the Board or the Majority Holders approve to provide for the payment of such fees and expenses. The Deal Representative may also withhold, escrow or otherwise reserve from the consideration payable to the Transaction Beneficiaries other amounts deemed advisable by the Deal Representative to cover post-closing fees and expenses, purchase price adjustment obligations and indemnification obligations.

(B)    After making the holdbacks, transaction expense and other payments, withholdings and reserves to the aggregate consideration payable to the Transaction Beneficiaries as contemplated by Section 4.4(d)(iv)(A), the Deal

24

Representative will make such arrangements as it deems necessary or advisable, including (if the Deal Representative chooses) engaging a third-party paying agent, to disburse the net consideration to the Transaction Beneficiaries in the same amounts such consideration would have been distributed had such distribution been made under Section 6.1 (including by taking into account each Member's Advance Amount). For purposes of such disbursement, the Blocker Members or, if applicable, their Related Blocker Entities will be deemed to have sold Units directly and proceeds otherwise distributable to a Blocker Member or its Related Blocker Entity in respect of such Blocker Member's or Related Blocker Entity's Units will be distributed to direct or indirect equityholders of such Blocker Member or its Related Blocker Entity that sold equity interests in such transaction. For purposes of clarification, no transaction proceeds from an Approved Transaction will be distributed under Section 6.2(b). Notwithstanding the foregoing in this Section 4.4(d)(iv)(B), if the Approved Transaction involves the issuance of any stock or other equity consideration in a transaction not involving a Public Offering and any Member or other selling equityholder otherwise entitled to receive consideration in such transaction is not an accredited investor (as defined under Rule 501 of Regulation D under the Securities Act) or is a former employee of the Company or any of its Affiliates, then the Company may require each such Person (1) to receive solely cash in such transaction, (2) to otherwise be cashed out (by redemption or otherwise) by the Company or any other Person prior to the consummation of such transaction and/or (3) to appoint a purchaser representative (as contemplated by Rule 506 of Regulation D under the Securities Act) selected by the Company, with the intent being that such Person receive cash equal to the Fair Market Value of the Equity Interests it would have received in the absence of this sentence.

(v)    *Power of Attorney*. Each Member (other than the Institutional Holders) hereby makes, constitutes and appoints the Company and the Deal Representative as its true and lawful attorney-in-fact for it and in its name, place, and stead and for its use and benefit, to sign, execute, certify, acknowledge, swear to, file and record any instrument or other documentation deemed necessary by the Company or the Deal Representative in its reasonable discretion to carry out fully the provisions of this Section 4.4(d) including to execute and deliver all definitive documentation that such Member is required to execute and deliver in accordance with this Section 4.4(d) if such Member does not execute and deliver such documentation within seven days after request by the Company or the Deal Representative. The power of attorney granted pursuant to this paragraph is a special power of attorney, coupled with an interest, and is irrevocable, and will survive the bankruptcy, insolvency, dissolution or cessation of existence of the applicable Member.

(vi)    *Termination*. The rights granted in this Section 4.4(d) will terminate immediately prior to, but conditioned on the consummation of, an Initial Public Offering.

(e)    Insider Members.

(i)    *Additional Transfer Restrictions*. Insider Members may be subject to additional Transfer restrictions and repurchase obligations set forth in an individual Restricted Unit Agreement or other subscription, contribution, employment, incentive

25

compensation or option grant or other agreements between each such Member and the Company (each, an "Individual Insider Member Agreement"). Such additional Transfer restrictions are also binding on any Person (other than the Company) that is the direct or indirect transferee of Units from an Insider Member. If a conflict exists between repurchase provisions in this Agreement and repurchase provisions in an Individual Insider Member Agreement, the repurchase provisions in the Individual Insider Member Agreement will control. Insider Members that are Entities will not permit any change to occur in the ownership of such Entity (other than by reason of Involuntary Transfers) without the prior consent of the Board or the Majority Holders.

      (ii)    *Repurchase Provisions.*  With respect to any Units (including Eligible Class C Units) held by an Insider Member (each, a "Specified Unit"), the following repurchase provisions will apply whether such Specified Units are held by such Insider Member or any Person taking by, through or under such Insider Member, directly or indirectly. At any time (A) following the termination of any Insider Member's employment (or, if such Insider Member is an Entity, termination of the employment of such Insider Member's Related Individual) with the Company or its Subsidiary for any reason or no reason or (B) following the date on which any Insider Member (or such Insider Member's Related Individual) becomes employed by any Competitor or otherwise becomes involved in Competitive Activities, then the Company will have the right, but not the obligation, to purchase all or any portion of the Specified Units held thereby from such Insider Member (whether such Units are then owned by such Insider Member) or any other Person for the Fair Market Value per Unit (the "Repurchase Price"). If the Company does not elect to purchase all such Specified Units, the Majority Holders may repurchase all or some of the remaining Specified Units, may designate another Person to repurchase all or some of the remaining Specified Units or may allow the Insider Member to retain all or some of the remaining Specified Units. In order to exercise the repurchase rights granted in this Section 4.4(e)(ii), the Company and any other Person granted repurchase rights hereunder, as applicable, must deliver an election notice (each, a "Repurchase Notice") to the Company (and the Company in turn will deliver such Repurchase Notice to the record holder of the Specified Units) within 90 days of (x) such Insider Member's termination of employment (or, if such Insider Member is an Entity, termination of the employment of such Insider Member's Related Individual) or (y) the date on which all of the Directors become actually aware of such Insider Member's (or, if such Insider Member is an Entity, such Insider Member's Related Individual's) employment by any Competitor or involvement in Competitive Activities, which notice must contain a statement of the Repurchase Price and the number and type of Specified Units that the Company or any such other Person, as applicable, elects to purchase. Such purchase and sale will be consummated at a closing at the Company's principal office (unless otherwise agreed) within 30 days from the delivery of the Repurchase Notice. At such closing, the Repurchase Price (in the form of a cashier's check or such other mutually acceptable form) multiplied by the number of Specified Units to be purchased (as specified in the Repurchase Notice) will be delivered to the Insider Member (or its transferee, as applicable), and the Insider Member (or its transferee, as applicable) will deliver to the Company or other Person purchasing such Specified Units the certificates representing all of the Specified Units to be purchased as specified in the Repurchase Notice (if Specified

26

Units are then certificated by the Company), duly endorsed for transfer, and duly executed Unit transfer instruments which will be deemed to include representations as to such Insider Member's good title to such Specified Units and the absence of liens, encumbrances and adverse claims with respect thereto (other than those created by the terms of this Agreement) and such other matters as are necessary for the proper transfer of such Specified Units to the Company or other purchasing Person, as applicable, on the books and records of the Company.

(f)  Divorce; Death of Spouse.

(i)  *Divorce*. If the marital relationship of a Member (the "Divorced Member") is terminated by divorce, and pursuant to such divorce or any property settlement in connection with such divorce, Units previously issued in the name of the Divorced Member or any community property interest, similar marital property interest or other interest therein is transferred to, retained by or vested in the former spouse of such Divorced Member (the "Divorced Spouse") (such Units or interest therein so transferred to, retained by or vested in the Divorced Spouse being referred as the "Divorced Spouse Units"), the Divorced Member will promptly give notice to the Company of such event containing the name and address for purposes of notice of the Divorced Spouse (the "Divorce Notice"). Within 60 days after receipt of the Divorce Notice by the Company, the Board will determine or cause to be determined the Fair Market Value of the Divorced Spouse Units for purposes of determining the purchase price per Unit and deliver notice thereof to the Divorced Member and the Divorced Spouse (the "Divorce FMV Notice"). The Divorced Member will have the option to purchase all or any portion of the Divorced Spouse Units for the purchase price per Unit set forth in the Divorce FMV Notice, and the Divorced Spouse will be obligated to sell such Divorced Spouse Units to the Divorced Member for the purchase price per Unit set forth in the Divorce FMV Notice. Such option must be exercised, and the purchase consummated, within 30 days after the later of (A) the entry by a court of a final order, judgment or decree not subject to appeal awarding the ownership of the Divorced Spouse Units to the Divorced Spouse and divesting the Divorced Member of all right, title and claim thereto and (B) the delivery of the Divorce FMV Notice to the Divorced Member and the Divorced Spouse. The option will be exercised by the giving of notice of exercise to the Divorced Spouse. The Divorced Member will, within five days after the expiration of such option period, deliver notice to the Company as to whether the Divorced Member has purchased any of the Divorced Spouse Units. The Company will have the right, but not the obligation, to purchase all or any portion of the Divorced Spouse Units from the Divorced Spouse on the same terms as the Divorced Member, and will have 45 days to exercise such right after the Divorced Member notifies the Company that it has elected to purchase less than all of the Divorced Spouse Units. The foregoing provisions of this Section 4.4(f)(i) will apply *mutatis mutandis* to the divorce of any Related Individual of an Insider Member that is an Entity so that if any ownership interest in the Insider Member passes to the ex-spouse of such Related Individual, a portion of the Insider Member's Units that corresponds to such passing interest will be subject to the repurchase provisions herein.

(ii)  *Death of Spouse*. If the spouse of a Member dies (such spouse, the "Deceased Spouse"), and all or any portion of the Units issued in the name of such Member

27

(the "Surviving Member") or any interest therein vests in or is transferable to any heir or legatee of the Deceased Spouse other than the Surviving Member (such Units or interest therein vesting in or transferable to any heir or legatee of the Deceased Spouse other than the Surviving Member being referred to herein as the "Deceased Spouse Units"), the Surviving Member will promptly give notice to the Company of such event, containing the name(s) and address(es) for purposes of notice of the estate of the Deceased Spouse and each heir or legatee in or to which any portion of the Deceased Spouse Units has vested or is transferable (the "Passing Interest Notice").  Within 60 days after receipt of the Passing Interest Notice by the Company, the Board will determine or cause to be determined the Fair Market Value of the Deceased Spouse Units for purposes of determining the purchase price per Unit and will deliver notice thereof to the Surviving Member, the estate of the Deceased Spouse and the heirs and legatees identified in the Passing Interest Notice (the "Deceased FMV Notice").  The Surviving Member will have the option to purchase all or any portion of the Deceased Spouse Units for the purchase price per Unit set forth in the Deceased FMV Notice, and the estate of the Deceased Spouse will be obligated to sell the Deceased Spouse Units to the Surviving Member for the purchase price per Unit set forth in the Deceased FMV Notice.  Such option must be exercised by the Surviving Member, and the purchase consummated, within 30 days after the last to occur of (A) the entry of an order of a probate or similar court having jurisdiction over the estate of the Deceased Spouse (1) admitting to probate the will of the Deceased Spouse and (2) determining the heirs of the Deceased Spouse if the Deceased Spouse is determined to have died intestate, (B) the appointment of the executor, administrator or legal representative of the estate of the Deceased Spouse and (C) the delivery of the Deceased FMV Notice to the Surviving Member and the estate of the Deceased Spouse.  The option will be exercised by the giving of notice of exercise to the executor, administrator or legal representative of the Deceased Spouse's estate.  The Surviving Member will, within five days after the expiration of such 30-day period, deliver notice to the Company as to whether the Surviving Member has purchased any of the Deceased Spouse Units.  The Company will have the right, but not the obligation, to purchase all or any portion of the Deceased Spouse Units from the Deceased Spouse on the same terms as the Surviving Member, and will have 45 days to exercise such right after the Surviving Member notifies the Company that it has elected to purchase less than all of the Deceased Spouse Units. The foregoing provisions of this Section 4.4(f)(ii) will apply *mutatis mutandis* to the death of any Related Individual of an Insider Member that is an Entity so that if any ownership interest in the Insider Member passes to the surviving spouse or other legatees or heirs of such deceased Related Individual, a portion of the Insider Member's Units that corresponds to such passing interest will be subject to the repurchase provisions herein.

**4.5**   Registration Rights.  Each Member understands and agrees that the Units have not been registered under the Securities Act and are restricted securities within the meaning of the Securities Act. However, as a material condition to the Members acquiring the Units, the Company has agreed to grant each Member certain demand and piggy-back registration rights with respect to all Registrable Securities held thereby. The Company currently has no plans to engage in a Public Offering, but if it does it is unknown in which jurisdictions such offering will take place and on which exchanges or markets the equity securities of the Company will be listed and/or traded.   Furthermore, in connection with an Initial Public Offering, it may be advisable to

42992628.2

restructure the Company into a corporation pursuant to the Internal Restructure provisions in Section 8.8. Accordingly, in light of these unknown factors, it would be impracticable to specify the detailed registration rights that are being granted at this time. Nevertheless, because the granting of registration rights is a material condition to the Members' acquisition of the Units, the parties hereto desire to indicate, in general terms that will need to be refined when the details of any Public Offering become known, the registration rights that each Member will have, and that are hereby granted. Prior to an Initial Public Offering, the terms of this Section 4.5 will be further developed into a customary registration rights agreement the terms of which will be consistent with this Agreement. The form of such registration rights agreement will be subject to Board, but not Member, approval. Such registration rights will consist of the following:

(a)    Public Offering; Piggyback Registration Rights. In connection with a Public Offering, including an Initial Public Offering, initiated by the Company, the Company will adopt reasonable and customary procedures to allow each Member to participate in such offering on a "piggyback" basis with the Company with respect to such Member's Registrable Securities; provided, the Company's right to sell securities in such offering will be senior to each Member's so that, if the managing underwriter determines that a cut-back in includable securities is required, the Members will be cut-back entirely (on a proportionate basis) before the Company's securities are cut-back at all. Such reasonable and customary procedures will also include (i) deadlines by which each Member must indicate the number of Registrable Securities it desires to sell in the offering, which number of Registrable Securities may be limited by the Company to such Member's pro rata number of Registrable Securities (based on the number of Registrable Securities held of record by each Member that elects to participate in the offering), (ii) requirements to provide customary selling Member information for inclusion in the prospectus or other offering materials together with customary indemnification and contribution obligations to protect the underwriters, the Company and its directors, officers, employees and agents, and the other Members from losses in the event the information furnished by any such Member is incorrect, (iii) requirements that any participating Member enter into customary agreements governing the sale of its Registrable Securities in the offering (including the underwriting agreement, custody agreement, standstill agreement and power of attorney) and (iv) the Company's agreement to pay for all Registration Expenses incurred by a Member in connection with participating in such offering pursuant to the exercise of its piggyback registration rights.

(b)    Demand and Piggyback Registration Rights. At any time after 180 days after the consummation of the Company's Initial Public Offering, the Members will have the following registration rights:

(i)    *Demand Rights*. The Sterling Holders, as a group, will have three demand rights to require the Company to sell, pursuant to a Public Offering, the number of Registrable Securities indicated by them upon exercise of any of their three demand rights; provided, (A) the Company will not be required to honor any demand rights during customary trading blackout periods, during any other offering of securities being conducted by the Company or whenever the Company, as determined in good faith by the Board, believes the Company is likely to suffer a material adverse effect from engaging in a Public Offering at such time, (B) the Company will not be required to honor any demand unless the number of the Registrable Securities the Members exercising such demand rights elect to sell in such offering is reasonably likely to result in gross sale proceeds of at least

29

$10,000,000, (C) the Company will not be required to honor more than one demand right exercise in any 270-day period from the Members exercising such demand rights; provided, any such 270-day period may be shortened by the Board if the Board determines, in its sole discretion, that shortening such period would not materially and adversely affect the Company or any holder of Equity Interests of the Company, (D) the Company will pay for all Registration Expenses incurred by a Member in connection with participating in such offering pursuant to the exercise of its demand registration rights and (E) any participating Member will be required (1) to provide customary selling Member information for inclusion in the prospectus or other offering materials together with customary indemnification and contribution obligations to protect the underwriters, the Company and its directors, officers, employees and agents, and the other Members from losses in the event the information furnished by any such Member is incorrect and (2) to enter into customary agreements governing the sale of its Registrable Securities in the offering (including the underwriting agreement, custody agreement, standstill agreement and power of attorney). If, as a result of the piggyback registration rights granted in <u>Section 4.5(b)(ii)</u>, market conditions or otherwise, the Members that make demand under this <u>Section 4.5(b)(i)</u> do not sell at least 80% of the Registrable Securities requested to be registered within 180 days after the applicable registration statement becomes effective, such demand will not count against their three demand rights hereunder.

(ii)     *Piggyback Registration Rights*. The Company will adopt reasonable and customary procedures to allow each Member to participate in each Public Offering initiated by a Member's valid exercise of its demand registration rights. Such procedures will be similar to those described above that apply to a Public Offering initiated by the Company except that in connection with any Public Offering initiated by a Member's valid exercise of its demand registration rights, any cut-back required in an underwritten offering would be applied on a pro rata and *pari passu* basis to all Members electing to participate in such registration process whether such participating right arises because of the demand rights granted in <u>Section 4.5(b)(i)</u> or the piggyback rights granted in this <u>Section 4.5(b)(ii)</u>.

(c)     <u>Indemnification for Vicarious Liability</u>.

(i)     In connection with each Public Offering, the Company will defend, indemnify and hold each Member, its Affiliates and their respective direct and indirect partners (including partners of partners and stockholders and members of partners), members, stockholders, directors, officers, employees and agents and each person who controls any of them within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act (the "<u>Covered Persons</u>") harmless from and against any and all damages, liabilities, losses, taxes, fines, penalties, diminution in value, reasonable costs and expenses (including reasonable fees of a single counsel representing all the Covered Persons or, if the representation of all the Covered Persons by the same counsel would be inappropriate under applicable standards of professional conduct, then as many counsel as may be needed under such standards of professional conduct to represent all of the Covered Persons) of any kind or nature whatsoever (including all amounts paid in investigation, defense or settlement of the foregoing and consequential damages) ("<u>Covered Losses</u>") sustained or suffered by any such Covered Person based upon, relating to, arising out of, or by reason of any third party or governmental claims against such Covered Person based

30

upon such Covered Person's status as a Covered Person (including any and all Covered Losses under the Securities Act, the Exchange Act or other federal or state statutory law or regulation, at common law or otherwise, which relate directly or indirectly to the registration, purchase, sale or ownership of any securities of the Company); provided, the Company will not be liable to any Covered Person to the extent that such Covered Losses arise from and are based on (A) an untrue statement or omission or alleged untrue statement or omission in a registration statement or prospectus which is made in reliance on and in conformity with written information furnished to the Company by or on behalf of such Covered Person or (B) conduct by such Covered Person which is found to constitute fraud or willful misconduct in a non-appealable, final judgment.

(ii)    If the indemnification provided for in this <u>Section 4.5(c)</u> for any reason is held by a court of competent jurisdiction to be unavailable to a Covered Person in respect of any Covered Losses referred to herein, then the Company, in lieu of indemnifying such Covered Person hereunder, will contribute to the amount paid or payable by such Covered Person as a result of such Covered Losses (A) in such proportion as is appropriate to reflect the relative benefits received by the Company and the Members, or (B) if the allocation provided by clause (A) above is not permitted by applicable law, in such proportion as is appropriate to reflect not only the relative benefits referred to in clause (A) above but also the relative fault of the Company and the Covered Person in connection with the action or inaction which resulted in such Covered Losses, as well as any other relevant equitable considerations. The relative fault of the Company and the Covered Person will be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by the Company and the Covered Person and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission. Each of the Company and the Members agrees that it would not be just and equitable if contribution pursuant to this <u>Section 4.5(c)</u> were determined by pro rata or per capita allocation or by any other method of allocation which does not take account of the foregoing equitable considerations.

(d)    <u>Standstill Agreement</u>. At any time that the Company is engaged in a Public Offering (on its own behalf, on behalf of selling Members or both), no Member will make any Transfer on any securities exchange or in the over-the-counter or any other public trading market for whatever period of time the Company (upon the recommendation of its underwriters) requests by notice to each Member; provided, (i) such request will not be for a period extending longer than 180 days after the later of (A) the effective date of the registration statement relating to such Public Offering and (B) the date of the underwriting agreement relating to such Public Offering, (ii) this <u>Section 4.5(d)</u> will not limit any Member's right to include equity securities in any such underwritten public offering pursuant to any demand or piggyback registration rights that such Member may have pursuant to this <u>Section 4.5</u> or any registration rights or similar agreement binding upon the Company and (iii) all Members are subject to the same restrictions on Transfer. The obligations in this <u>Section 4.5(d)</u> will survive the termination of this Agreement for any standstill period in effect as of the date of such termination, after which time the obligations in this <u>Section 4.5(d)</u> will terminate.

**4.6**    <u>Additional Terms Relating to Members</u>.  No Member has the right or power to Resign, and no Member may be Expelled from the Company.  No Member will be liable for the debts, obligations or liabilities of the Company, nor will any Member be obligated to guaranty any debt, obligation or liability of the Company.

## ARTICLE 5
## CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS

**5.1**    <u>Capital Contributions</u>.  No Member will have any obligation to make any Capital Contribution after its admission as a "Member" unless it elects to do so pursuant to <u>Section 4.3</u>.

**5.2**    <u>Return of Capital Contributions</u>.  A Member is not entitled to the return of any part of its Capital Contributions or to be paid interest in respect of either its Capital Account or its Capital Contributions.  An unpaid Capital Contribution is not a liability of the Company or of any Member.  A Member is not required to contribute or to lend any cash or property to the Company to enable the Company to return any Member's Capital Contributions.

**5.3**    <u>Advances by Members</u>.  Advances of monies by any Member to the Company are not void or voidable but must be approved by the Board and may be subject to <u>Section 8.4(b)</u>.

**5.4**    <u>Capital Accounts</u>.

(a)    A separate capital account (a "<u>Capital Account</u>") will be maintained for each Member.  Each Member's Capital Account will be increased by:  (i) such Member's Capital Contributions; and (ii) allocations to such Member of Profits and other items of income and gain in accordance with the allocation provisions of this Agreement.  Each Member's Capital Account will be decreased by:  (A) the amount of money distributed to such Member by the Company; (B) the fair market value of property distributed to such Member by the Company (net of liabilities secured by such distributed property that such Member is considered to assume or take subject to as described in Section 1.704-1(b)(2)(iv)(c) of the Treasury Regulations); and (C) allocations to such Member of Losses and other items of deduction and credit in accordance with the allocation provisions of this Agreement.

(b)    In the event of a Transfer of Units, the Capital Account of the transferor will become the Capital Account of the transferee to the extent it relates to the Transferred Units in accordance with Section 1.704-1(b)(2)(iv)(l) of the Treasury Regulations.

(c)    The manner in which Capital Accounts are to be maintained pursuant to this <u>Section 5.4</u> is intended to comply with the requirements of Code Section 704(b) and the Treasury Regulations promulgated thereunder.  If the Board determines that the manner in which Capital Accounts are to be maintained pursuant to the preceding provisions of this <u>Section 5.4</u> should be modified in order to comply with Code Section 704(b) and the Treasury Regulations, then notwithstanding anything to the contrary contained in the preceding provisions of this <u>Section 5.4</u>, the method in which Capital Accounts are maintained will be so modified.

42992628.2