## ARTICLE 6
## DISTRIBUTIONS; ALLOCATIONS

**6.1**    Distributions.

(a)    Regular Distributions.  Subject to Section 6.2, Available Cash and other property will be distributed in respect of outstanding Units solely at such times and in such amounts as the Board determines and approves (such amount, the "Distributable Amount").  Subject to the remaining provisions of this Article 6, the Distributable Amount will be distributed pro rata in proportion to the number of Class A Units, the Class B Units and the Eligible Class C Units outstanding immediately before such distribution is made.  If any Distributable Amount consists of both cash and other property, proportions of cash and other property distributed in respect of a class of Units will be consistent to the extent possible.

(b)    Tax Distributions.  Notwithstanding anything to the contrary in Section 6.1(a), at least two Business Days before each estimated individual quarterly United States Federal income tax payment is due in each Fiscal Year, the Company will distribute from Available Cash, if any, to each Member such Member's quarterly Estimated Maximum Tax Liability, if any. Neither the Company nor the Directors will have any liability to any Member for penalties arising from non-payment or incorrect estimates of such Member's estimated tax payments or incorrect estimates of the portion of allocable income attributable to capital assets sales rather than operations.  If sufficient Available Cash is not available, as determined by the Board, to distribute to each Member the full amount of such Member's quarterly Estimated Maximum Tax Liability for any estimated individual quarterly federal income tax payment date, the amount available for distribution under this Section 6.1(b) will be distributed to the Members in proportion to each Member's full quarterly Estimated Maximum Tax Liability.  The Company will maintain in its books and records an accounting of the aggregate amount distributed pursuant to this Section 6.1(b) in respect of each Unit.  The amount of distributions made under this Section 6.1(b) in respect of any Unit (including, for the avoidance of doubt, a Class C Unit) that exceeds the amount that would have been distributed in respect of such Unit had all distributions been made under Section 6.1(a) and none under this Section 6.1(b) is referred to as such Unit's "Advance Amount". Amounts distributable in respect of each Unit under Section 6.1(a) will first be used to reduce such Unit's Advance Amount to $0, and therefore the Company will retain such distributable amounts as "repayment" of the Advance Amount until the Advance Amount is reduced to $0.  In connection with any Transfer of a Unit in accordance with this Agreement, at the request of the transferor and transferee, the Company will indicate the balance of the Advance Amount that remains as a credit to future distributions under Section 6.1(a) in respect of such Unit, and such balance will continue to apply to such Unit following such Transfer.

**6.2**    Other Distribution Provisions.  Notwithstanding anything to the contrary in Section 6.1:

(a)    No distribution will be declared and paid unless, (i) after the distribution is made, the fair value of the Company's assets is at least equal to all of the Company's liabilities and (ii) the distribution or payment would not cause the Company or any Subsidiary to be in violation of any material agreement binding on the Company or any Subsidiary.

(b)    The Company is hereby authorized to withhold from any distribution to any Member and to pay over to any federal, state, local or foreign government any amounts required to be so withheld pursuant to federal, state, local or foreign Law.  All amounts required to be withheld pursuant to federal, state, local or foreign tax laws will be treated as amounts actually distributed to the affected Members under Section 6.1 for all purposes under this Agreement.

(c)    The Board may impose conditions on the receipt of any distribution under Section 6.1 relating to the proceeds received by the Company or any Subsidiary from an Approved Transaction similar to the Customary Transaction Terms that would apply to an Approved Transaction.  If the Board imposes such conditions, distributions will be made only to those Members that agree to the conditions imposed by the Board.

**6.3**    Allocations of Net Profits and Net Losses.  Net Profits and Net Losses for each Fiscal Year or other period will be allocated among the Members, after giving effect to the allocations pursuant to Section 6.4 for such Fiscal Year or other period, in such a manner as will cause the Capital Accounts of the Members (as adjusted through the end of such Fiscal Year or other period) to equal, as nearly as possible, in the same proportionate amounts as (a) the amount such Members would receive if all assets of the Company on hand at the end of such Fiscal Year or other period were sold for cash equal to their Book Values, all liabilities of the Company were satisfied in cash in accordance with their terms (limited in the case of non-recourse liabilities to the Book Value of the property securing such liabilities), all outstanding Incentive Units vested as a result of such sale and all remaining or resulting cash were distributed to the Members under Section 6.1, minus (b) such Member's share of Minimum Gain and Member Nonrecourse Debt Minimum Gain, computed immediately prior to the hypothetical sale of assets.

**6.4**    Income Tax Allocations.

(a)    All items of income, gain, loss and deduction for United States federal income tax purposes will be allocated in the same manner as the corresponding item of Profits or Losses is allocated, except as otherwise provided in this Section 6.4.

(b)    In accordance with Code Section 704(c) and the applicable Treasury Regulations thereunder, income, gain, loss, and deduction with respect to any property contributed to the Company will, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its initial Book Value using any permissible method chosen by the Board. In the event the Book Value of any property is adjusted pursuant to clause (b) or (d) of the definition of Book Value, subsequent allocations of income, gain, loss, and deduction with respect to such property will take account of any variation between the adjusted basis of such property for United States federal income tax purposes and its Book Value using any permissible method chosen by the Board under Code Section 704(c) and the applicable regulations thereunder.

(c)    If, as a result of an exercise of a noncompensatory option to acquire an interest in the Company, a Capital Account reallocation is required under Treasury Regulations Section 1.704-1(b)(2)(iv)(s)(3), the Company will make corrective allocations pursuant to Treasury Regulations Section 1.704-1(b)(4)(x).

42992628.2

(d)     Allocations pursuant to this <u>Section 6.4</u> are solely for purposes of United States federal, state, and local taxes and will not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Profits, Losses, other items or distributions pursuant to any provision of this Agreement.

**6.5**     <u>Regulatory Allocations</u>.  The following allocations will be made in the following order.

(a)     Nonrecourse Deductions will be allocated to the Members pro rata in accordance with the number of Units held thereby.

(b)     Member Nonrecourse Deductions attributable to Member Nonrecourse Debt will be allocated to the Members bearing the Economic Risk of Loss for such Member Nonrecourse Debt as determined under Treasury Regulations Section 1.704-2(b)(4). If more than one (1) Member bears the Economic Risk of Loss for such Member Nonrecourse Debt, the Member Nonrecourse Deductions attributable to such Member Nonrecourse Debt will be allocated among the Members according to the ratio in which they bear the Economic Risk of Loss. This <u>Section 6.5(b)</u> is intended to comply with the provisions of Treasury Regulations Section 1.704-2(i) and will be interpreted consistently therewith.

(c)     Notwithstanding any other provision hereof to the contrary, if there is a net decrease in Minimum Gain for a Fiscal Year (or if there was a net decrease in Minimum Gain for a prior Fiscal Year and the Company did not have sufficient amounts of income and gain during prior years to allocate among the Members under this <u>Section 6.5(c)</u>), items of income and gain will be allocated to each Member in an amount equal to such Member's share of the net decrease in such Minimum Gain (as determined pursuant to Treasury Regulations Section 1.704-2(g)(2)). This <u>Section 6.5(c)</u> is intended to constitute a minimum gain chargeback under Treasury Regulations Section 1.704-2(f) and will be interpreted consistently therewith.

(d)     Notwithstanding any provision hereof to the contrary except <u>Section 6.5(c)</u> (dealing with Minimum Gain), if there is a net decrease in Member Nonrecourse Debt Minimum Gain for a Fiscal Year (or if there was a net decrease in Member Nonrecourse Debt Minimum Gain for a prior Fiscal Year and the Company did not have sufficient amounts of income and gain during prior years to allocate among the Members under this <u>Section 6.5(d))</u>, items of income and gain will be allocated to each Member in an amount equal to such Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain (as determined pursuant to Treasury Regulations Section 1.704-2(i)(4)). This <u>Section 6.5(d)</u> is intended to constitute a partner nonrecourse debt minimum gain chargeback under Treasury Regulations Section 1.704-2(i)(4) and will be interpreted consistently therewith.

(e)     Notwithstanding any provision hereof to the contrary except <u>Section 6.5(c)</u> and <u>Section 6.5(d)</u> (dealing with Minimum Gain and Member Nonrecourse Debt Minimum Gain), a Member who unexpectedly receives an adjustment, allocation or distribution described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6) will be allocated items of income and gain (consisting of a pro rata portion of each item of income, including gross income, and gain for the Fiscal Year) in an amount and manner sufficient to eliminate any deficit balance in such Member's Adjusted Capital Account as quickly as possible. This <u>Section 6.5(e)</u> is intended to

constitute a qualified income offset under Treasury Regulations Section 1.704- 1(b)(2)(ii)(d) and will be interpreted consistently therewith.

(f)    In the event that any Member has a negative Adjusted Capital Account at the end of any Fiscal Year, such Member will be allocated items of Company income and gain in the amount of such deficit as quickly as possible; provided an allocation pursuant to this Section 6.5(f) will be made only if and to the extent that such Member would have a negative Adjusted Capital Account after all other allocations provided for in this Section 6.5 have been tentatively made as if this Section 6.5(f) were not in this Agreement.

(g)    To the extent an adjustment to the adjusted tax basis of any Company properties pursuant to Code Section 734(b) or Code Section 743(b) is required pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(2) or 1.704-1(b)(2)(iv)(m)(4) to be taken into account in determining Capital Accounts as the result of a distribution to any Member in complete liquidation of such Member's Membership Interest, the amount of such adjustment to Capital Accounts will be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss will be allocated to the Members in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(2) if such Section applies, or to the Member to whom such distribution was made if Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(4) applies.

6.6    Curative Allocations.    The Regulatory Allocations are intended to comply with certain requirements of Treasury Regulations Sections 1.704-1(b) and 1.704-2. The Regulatory Allocations may be inconsistent with the manner in which the Members intend to divide Company distributions. Accordingly, the Board is authorized to divide other allocations of Profits, Losses and other items among the Members, to the extent that they exist, so that the net amount of the Regulatory Allocations and the Curative Allocations to each Member is zero. The Board will have discretion to accomplish this result in any reasonable manner that is consistent with Code Section 704 and the related Treasury Regulations.

6.7    Other Allocation Rules.

(a)    All items of income, gain, loss, deduction and credit allocable to a Unit that is transferred may be allocated between the transferor and the transferee using any permissible method, as determined by the Board.

(b)    Members' proportionate share of the "excess nonrecourse liabilities" of the Company, within the meaning of Treasury Regulations Section 1.752-3(a)(3), will be in proportion to the number of Units held thereby.

## ARTICLE 7
## GOVERNANCE

7.1    Manager (Director) Managed Company.    The Company will be managed by "managers" (as such term is used in the Act) according to the remaining provisions of this Article 7. Except with respect to certain consent or approval requirements expressly delegated to the Members in this Agreement, no Member by virtue of having the status of a Member will have any

42992628.2

management power over the business and affairs of the Company or actual or apparent authority to enter into contracts on behalf of, or to otherwise bind, the Company. The "managers" are referred to at times as "Directors" in this Agreement. The business and affairs of the Company will be managed through a committee of Directors to be known as the "Board of Directors" of the Company (the "Board") in accordance with this Agreement. Under the direction of the Board, the day-to-day activities of the Company will be conducted on the Company's behalf by the Officers, who will be agents of the Company, subject to the scope of authority delegated to the Officers by the Board. In addition to the powers that now or hereafter can be granted under the Act and to all other powers granted under any other provision of this Agreement, subject to any consent of the Members expressly required by this Agreement, if any, the Board will have full power and authority to do all things on such terms as it may deem necessary or appropriate to conduct, or cause to be conducted, the business and affairs of the Company. Without limiting the foregoing, the Parties acknowledge that the Board will have the power, without any Member consent or approval, (a) to approve and effect any Strategic Transaction (subject to compliance with Section 8.4 if applicable to such transaction) or an Internal Restructure, (b) to vote, pledge or otherwise dispose of any Equity Interests held by the Company including Equity Interests issued by any Subsidiary and (c) to initiate and conduct any Offering, including an Initial Public Offering.

    **7.2**    Board of Directors.

    (a)    Size; Designation Rights; Composition; Initial Directors. Each Member will vote its Units and take such other action in its capacity as a Member, including executing and delivering written consents, to cause the Board to be sized and composed in the manner set forth in this Section 7.2(a).

    (i)    *Size*. The Board is composed of [•] Directors. The size of the Board may be increased or decreased from time to time by resolution adopted by the Board in accordance with remaining terms of this Section 7.2 or by the written consent of the Majority Holders; provided, the Board will be deemed to have no fewer seats than necessary to provide a seat for each individual designated in accordance with the remaining provisions of this Section 7.2 to serve on the Board.

    (ii)    *Designees; Initial Directors*. Each Director will be elected by the vote of the Majority Holders.

    (iii)    *Chairperson*. The chairperson of the Board, if any, will be designated by, and may be replaced by, the Majority Holders or by a majority of the then serving Directors.

    (b)    Removal. The Majority Holders may remove any Director at any time with or without cause.

    (c)    Vacancies. Any vacancy created by the death, disability, retirement, resignation or removal of any Director may be filled solely by the Majority Holders. Actions taken at a duly convened Board meeting or by consent when a vacancy exists will not affect the validity of such action.

(d)    <u>Quorum; Required Vote for Board Action</u>.  A quorum for the transaction of business at a meeting of the Board will exist when a majority of the Directors then serving on the Board are present in person, by proxy or by telephone.  All decisions of the Board will require the affirmative vote of a majority of the Directors who are present in person, by proxy or by telephone at any meeting of the Board at which a quorum is present.

(e)    <u>Location; Order of Business</u>.  The Board may hold its meetings and may have an office and keep the books of the Company, in such place or places, within or without the State of Delaware, as the Board may from time to time determine by resolution.  At all meetings of the Board, business will be transacted in such order as will from time to time be determined by resolution of the Board.

(f)    <u>Meetings of the Board; Notices</u>.  The Board will meet at least quarterly. Regular meetings of the Board will be held at such places as will be designated from time to time by resolution of the Board.  Special meetings of the Board may be called by any two or more Directors on at least 48 hours' notice to each Director, with such notice containing a statement of the purposes for such special meeting.

(g)    <u>Reimbursement; Compensation</u>.  The Company will reimburse all Directors for their respective reasonable out-of-pocket costs and expenses incurred in the course of their services as such, including travel expenses in accordance with the Company's travel reimbursement policies.  Independent Directors may be compensated by the Company and any Subsidiary on such terms as the Board approves.

(h)    <u>Committees of the Board</u>.

(i)    The Board may, by resolution, designate one or more committees, including an audit, compensation, disclosure, governance, executive and nomination committee, with each such committee consisting of such number of committee members as the Board specifies.  Any such designated committee will have and may exercise such of the powers and authority of the Board in the management of the business and affairs of the Company as may be provided in such resolution.

(ii)    Any committee designated in accordance with this <u>Section 7.2(h)</u> will have a chairman either appointed by the Board or chosen by the committee, will keep regular minutes of its proceedings and report the same to the Board when requested, will fix its own rules or procedures, and will meet at such times and at such place or places as may be provided by such rules or procedures, or by resolution of such committee or Board. At every meeting of any such committee, the presence of a majority of all the members thereof will constitute a quorum, and the affirmative vote of a majority of the members present at any meeting at which a quorum is present will be necessary for the adoption of any resolution.

(iii)    The Board may designate one or more Directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of such committee.  In the absence or disqualification of a member of a committee, the member or members present at any meeting and not disqualified from voting, whether

38

or not constituting a quorum, may unanimously appoint another member of the Board to act at the meeting in the place of the absent or disqualified member.

(iv)    Each of the Members agrees to take such action, or refrain from taking such action, as is within its reasonable control to effect the provisions of this Section 7.2(h), including causing any Director nominated thereby to take or refrain from taking action for the foregoing purpose.

(i)    Subsidiary Governance.  The Company and each Member acknowledge that the Company may from time to time form or acquire Subsidiaries.  The governance arrangements and rules pertaining to such Subsidiaries, including the composition, quorum and voting provisions of the governing body (and each committee thereof) of each such Subsidiary, will be determined from time to time by the Board.  Notwithstanding the foregoing, to the extent permitted by Law, the powers of any Subsidiary that is a limited liability company will be exercised by or under the authority of, and the business and affairs of such Subsidiary will be managed under the direction of, the Board.

7.3    Board Observers.

(a)    Observer Rights.  The Company will permit each Observer to attend each meeting of the Board as a non-voting observer; provided, (i) such rights will not extend to meetings of any committee of the Board and (ii) the Company reserves the right to withhold any information and exclude any Observer from any such meeting or portion thereof to the extent that such information or such meeting: (A) is reasonably likely to adversely affect the attorney-client privilege between the Company or any Subsidiary and its counsel, (B) is reasonably likely to result in a conflict of interest between the Company or any Subsidiary and such Observer or any Affiliate of such Observer or (C) involves personnel decisions (e.g. selecting, hiring, compensating, promoting or terminating) or discussions regarding the capital structure of the Company and any Subsidiary that may, directly or indirectly, impact the lender-borrower relationship between the Company or any Subsidiary, on the one hand, and the Observers or their respective Affiliates, on the other hand (the matters referenced in clauses (i) and (ii) above are referred to herein as "Excluded Matters").  Notice of the time and place of any such meeting will be given to each Observer in the same manner and at the same time as notice is given to the Directors, which notice will, to the extent practicable, be given at least two Business Days prior to such meeting.  Each Observer will be given copies of all notices, reports, minutes, consents and other documents and materials related to such meetings at the time and in the manner as are provided to the Board, other than, (1) if the Company chooses, to the extent covering any Excluded Matter and (2) any written consent of the Board relating to grants of equity interest to employees of the Company or any of its Subsidiaries or other ministerial matters and upon written request by such Observer to the Company (which written request must contain a specific description of the written consent being so requested and not by reference to all such written consents or categories of written consents), the Company will provide a copy thereof to the requesting Observer.  Each Observer will be entitled to participate in discussions and consult with, and make proposals and furnish advice to, the Board, in each case, other than with respect to the Excluded Matters; provided, the Board will not be under any obligation to take any action with respect to any proposals made or advice furnished by any Observer.

(b)    Reimbursement.  The Company will reimburse the Member entitled to designate an Observer for the reasonable and documented out-of-pocket costs and expenses incurred in connection with such Observer's attendance of Board meetings including travel expenses.

**7.4**    Meetings of the Members.

(a)    Meetings.  All meetings of the Members for the transaction of such business as may be properly considered at a meeting may be held at the principal office of the Company, or at such other place within or without the State of Delaware on such date, and at such time as the Board may fix and set forth in the notice of such meeting.  The Board will provide at least 72 hours' prior notice of any meeting of the Members.  Annual meetings are not required for any purpose and are not envisioned to occur.

(b)    Quorum; Required Vote for Member Action; Adjournment of Meetings. The Majority Holders will constitute a quorum at any meeting of Members, and the affirmative vote of the Members of a majority of the Voting Units so present or represented at such meeting, voting together as a single class, will constitute the act of the Members.  No matter will require the approval of any separate class of Units except to the extent required by mandatory, non-waivable provisions of the Act.  The Members present at a duly organized meeting may continue to transact business until adjournment, notwithstanding the withdrawal of sufficient Members to destroy the quorum.

(c)    Record Date.

(i)    For the purpose of determining Members entitled to notice of or to vote at any meeting of Members, or any adjournment thereof, or entitled to consent to any matter, or entitled to exercise any rights in connection with any change, conversion or exchange of Units, or for the purpose of any other lawful action, the Board may fix a record date, which record date will not precede the date upon which the resolution fixing such record date is adopted by the Board, and which record date will not be more than 60 days prior to the date of such meeting.  If no record date is fixed by the Board, the record date for determining Members entitled to notice of or to vote at a meeting of Members will be the close of business on the day next preceding the day on which notice of such meeting is given, or, if notice is waived in accordance with this Agreement, the close of business on the day next preceding the day on which the meeting of Members is held.  Persons who only hold Incentive Units will not be entitled to notice of or to vote at any meeting of the Members, except as required by Law.

(ii)    If action without a meeting is to be taken, the Board may fix a record date for determining Members entitled to consent to such action, which record date will not precede the date upon which the resolution fixing the record date is adopted by the Board, and which record date will not be more than 10 days subsequent to the date upon which the resolution fixing the record date is adopted by the Board.  If no record date has been fixed by the Board, the record date for determining Members entitled to consent to action without a meeting will be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Company by delivery to

its registered office, to its principal place of business, or to an Officer having custody of the book in which proceedings of meetings of Members are recorded.

(iii)   A determination of Members of record entitled to notice of or to vote at a meeting of Members will apply to any adjournment of the meeting; provided, that the Board may fix a new record date for the adjourned meeting.

**7.5**   <u>Provisions Applicable to All Meetings</u>.   In connection with any meeting of the Board or any committee thereof or any meeting of the Members, the following provisions will apply:

(a)   <u>Waiver of Notice Through Attendance</u>.   Attendance of a Person at such meeting (including attendance by telephone pursuant to <u>Section 7.5(d)</u>) will constitute a waiver of notice of such meeting, except where such Person attends the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

(b)   <u>Proxies</u>.   A Director or committee member may vote at a Board or committee meeting by a written proxy executed by that Person and delivered to another Director or committee member. A Member entitled to vote at a meeting of Members may vote at a meeting of Members by a written proxy executed by that Person and delivered to the secretary of the Company. A proxy will be revocable unless it is stated to be irrevocable.

(c)   <u>Action by Written Consent</u>.   Any action required or permitted to be taken at such a meeting may be taken without a meeting and without a vote if a consent or consents in writing, setting forth the action or actions so taken, is signed by such Directors or members of a committee of the Board or the Members, as applicable, required to constitute a quorum and carry the vote at any duly convened meeting thereof. Written consent signed by fewer than all of the Directors or members of a committee of the Board, as applicable, will promptly be furnished to the other Directors or the other members of such committee of the Board, as applicable, and entered into the Company's corporate minute book. Written consent signed by fewer than all of the Members holding Voting Units will promptly be furnished to the other Members holding Voting Units and the Institutional Holders and entered into the Company's corporate minute book.

(d)   <u>Meetings by Telephone</u>.   Directors, members of any committee of the Board, or the Members, as applicable, may participate in and hold any meeting by means of conference telephone, video conference or similar communications equipment by means of which all Persons participating in the meeting can hear each other, and the votes of any Directors, members of any committee of the Board, or the Members, as applicable, participating by conference telephone, video conference or similar communications equipment will be given full effect.

**7.6**   <u>Officers</u>.   The Board may appoint certain agents of the Company to be referred to as "officers" of the Company ("<u>Officers</u>") and designate such titles (such as Chief Executive Officer, President, Vice-President, Secretary and Treasurer) as are customary for corporations under the Laws of the State of Delaware, and such Officers will have the power, authority and duties described by resolution of the Board or as is customary for each such position. In addition

41

to or in lieu of Officers, the Board may authorize any Person to take any action or perform any duties on behalf of the Company (including any action or duty reserved to any particular Officer) and any such Person may be referred to as an "authorized person." An employee or other agent of the Company will not be an authorized person unless specifically appointed as such by the Board. Duly elected and designated Officers will have primary responsibility for the day-to-day operations of the Company, subject to oversight by the Board.

# ARTICLE 8
# ADDITIONAL COVENANTS

8.1    Information; Confidentiality. No Member will be entitled to obtain or access any information relating to the Company or any Subsidiary or any information described in Section 18-305 of the Act except as expressly provided in this Agreement. Each Member will keep confidential and will not disclose or use any Confidential Information (other than for the business of the Company and any Subsidiary or for any Institutional Holder's or its Affiliates' marketing or fund raising efforts, compliance requirements, investor relations, portfolio company management and oversight responsibilities, in each case (other than with respect to compliance requirements), so long as the recipient of such Confidential Information is subject to customary confidentiality obligations), except for disclosures (a) compelled by Law or required or requested by subpoena or request from a court or a stock exchange (but the Member will (provided such is legally permitted) notify the Company promptly of any request for that information before disclosing it if practicable), (b) to Representatives of the Member (provided each Representative is informed of the confidential nature of such information, and that the disclosing Member remains liable for any breach of this provision by its Representatives) who need to know such information to provide advice or services to such Member, (c) of information that a Member has received from a source or otherwise developed independent of the Company and any Subsidiary, (d) to any Person to whom such Member Transfers or offers to Transfer any of its Units in compliance with this Agreement so long as the Transferring party first obtains a confidentiality agreement from the proposed transferee, in form reasonably acceptable to the Company, (e) of information in connection with litigation against the Company or any Member to which the disclosing Member is a party (provided the Member notifies the Company or the Member affected by such disclosure, as applicable, as promptly as practicable prior to making such disclosure, if practicable, and discloses only that portion of such information required to be disclosed), (f) permitted by the Company or (g) to any bank, insurance or other regulatory authority having jurisdiction over such Member (including the National Association of Insurance Commissioners and similar state agencies), or to any ratings agencies.

8.2    Insider Members' Time Commitment; Company Opportunities. While an Insider Member who is an individual is employed on a full-time basis by the Company or any Subsidiary, such Insider Member agrees (a) to dedicate his or her full business time to the business and affairs of the Company and the Subsidiaries unless the Board determines otherwise and to refer all Company Opportunities to the Company and (b) not to pursue any Company Opportunity for his or her account even if the Company and its Subsidiaries do not pursue it for their own account. The preceding sentence will continue to apply in accordance with its terms to any individual who ceases to be an Insider Member by reason of a Permitted Transfer so long as such individual is employed on a full-time basis by the Company or any Subsidiary. While an individual who is a Related Individual of an Insider Member (but not an Insider Member itself) is employed on a full-

42

time basis by the Company or any Subsidiary, such related Insider Member will cause such individual to dedicate his or her full business time to the business and affairs of the Company and the Subsidiaries unless the Board determines otherwise and will cause such individual to refer all Company Opportunities to the Company and not to pursue any Company Opportunity for his or her account even if the Company and the Subsidiaries do not pursue it for their own account.

**8.3**    Reports.  The Company will deliver the following reports and information to each Institutional Holder and to each other Member that the Majority Holders or the Board selects to receive some or all of the following reports or information; provided, the Company may suspend providing any of the following reports to any Member who is not in Good Standing:

(a)    As promptly as reasonably practicable and in any event within 120 days after the end of each Fiscal Year, (i) a consolidated audited balance sheet of the Reporting Entity as of the end of such Fiscal Year, (ii) the related consolidated audited statements of operations, owners' equity and cash flows for such fiscal year, and (iii) a general description of the Reporting Entity's activities during such Fiscal Year.

(b)    As promptly as reasonably practicable and in any event within 60 days after the end of each of the first three fiscal quarters of each Fiscal Year, (i) an unaudited consolidated balance sheet of the Reporting Entity as of the end of such fiscal quarter, (ii) the related unaudited consolidated statements of operations, owners' equity and cash flows for such fiscal quarter (in each case, which will be subject to revision at the end of the applicable Fiscal Year), and (iii) a general description of the Reporting Entity's activities during such fiscal quarter.

(c)    As promptly as reasonably practicable, a copy of all tax information required to be provided to the Members, including IRS Schedule K-1.  The Company will use reasonable efforts to provide IRS Schedule K-1s within 90 days after the end of each Fiscal Year. Upon the request of any Member, the Company will provide tax estimates to such Member within 75 days after the end of each year.

**8.4**    Related Party Transactions.

(a)    Any transaction or agreement between the Company or any Subsidiary, on the one hand, and any Member or Affiliate thereof, on the other hand, (i) approved (or deemed approved) in accordance with Section 8.4(b) or (ii) that does not require the approval set forth in Section 8.4(b) but is approved by the Board, is not subject to being enjoined and is neither void nor voidable. No Director or Member (including any Controlling Member) will have any liability for having approved any transaction or agreement described in the preceding sentence so long as such transaction or agreement is approved (or deemed approved) in accordance with Section 8.4(b) or does not require the approval set forth in Section 8.4(b) but is otherwise approved by the Board.

(b)    At any time (i) individuals who are employed by, or who devote substantially all of their business time to providing services to, Sterling, constitute a majority of all Directors then serving on the Board or (ii) the Sterling Holders have the right to designate a majority of the Directors to serve on the Board, neither the Company nor any Subsidiary, on the one hand, will enter into, renew or amend any agreement or engage in any transaction, in each case, with the Sterling Holders or any Affiliate thereof (the term "Affiliate" as used immediately

43

preceding does not include the Company or any Subsidiary) or any director, officer, full-time employee or immediate family member of such Sterling Holder or any such Affiliate, on the other hand (each, a "Sterling Related Party Transaction") unless (A) the Sterling Related Party Transaction is approved by the affirmative vote or consent of the holders of a majority of the Voting Units then outstanding held of record by Persons other than the Sterling Holders, (B) the Sterling Related Party Transaction is approved by a majority of the Independent Directors, (C) the Company or the Board receives a fairness opinion from a qualified investment bank to the effect that the terms of the Sterling Related Party Transaction are, from a financial point of view, fair to the Company and its Subsidiaries or the Members, as applicable, in which case such transaction will be deemed to have been approved under this Section 8.4(b) or (D) the terms of the Sterling Related Party Transaction are not materially less favorable to the Company, any of its Subsidiaries or the Members than those available from an unrelated third party in an arms-length transaction, in which case such transaction will be deemed to have been approved under this Section 8.4(b); provided, notwithstanding the foregoing, the following matters are deemed to have received the approval required by this Section 8.4(b): (x) the execution and delivery by the Company and its Subsidiaries (and the joinder of any such Subsidiary), and the performance of their obligations under, the Sterling Advisory Agreement and any of the transactions covered by the Sterling Advisory Agreement in the form furnished to the Members on or before the First A&R Date (which, for clarification, will not be amended unless such amendment is approved in the manner described in this Section 8.4(b) as if this proviso were not part of this Section 8.4(b)) and (y) the issuance of any Units or Unit Equivalents in accordance with Section 4.3.

     **8.5**    Inspection Rights. The Company will, and will cause each Subsidiary to, permit (a) the Institutional Holders, (b) any VCOC Member and (c) any other Member approved by the Majority Holders on a case-by-case basis to visit and inspect any of the properties of the Company or of any Subsidiary, to inspect, copy and take extracts from its and their financial and accounting records, and to discuss its and their affairs, finances and accounts with its and their officers and independent public accountants (provided the Company may, if it so chooses, be present at or participate in any such discussion), all upon reasonable notice and at such reasonable times during normal business hours and as often as may reasonably be requested. No Member other than (i) an Institutional Holder, (ii) a VCOC Member and (iii) a Member approved by the Majority Holders on a case-by-case basis will have inspection rights.

     **8.6**    Power of Attorney. Each Member (other than the Institutional Holders) hereby makes, constitutes and appoints the secretary of the Company as its true and lawful attorney-in-fact for it and in its name, place and stead and for its use and benefit, to sign, execute, certify, acknowledge, swear to, file and record this Agreement and any amendment or restatement hereof that is adopted in accordance with Section 12.6, and any other instrument that is now or may hereafter be deemed necessary by the Company in its reasonable discretion to carry out fully the provisions and the agreements, obligations and covenants of such Member. Each Member (other than the Institutional Holders) hereby gives such attorney-in-fact full power and authority to do and perform each and every act or thing whatsoever requisite or advisable to be done in connection with such Member's obligations and agreements as fully as such Member might or could do personally, and hereby ratifies and confirms all that any such attorney-in-fact will lawfully do or cause to be done by virtue of the power of attorney granted hereby. The power of attorney granted pursuant to this Section 8.6 is a special power of attorney, coupled with an interest, and is

irrevocable, and will survive the bankruptcy, insolvency, dissolution or cessation of existence of the applicable Member.

**8.7**    <u>VCOC Related Rights</u>.  At the request of any Institutional Holder, the Company will enter into one or more letter agreements in such form as is approved by the Board with such Institutional Holder or any direct or indirect owner thereof, in each case, that intends to qualify as a "venture capital operating company" within the meaning of United States Department of Labor Regulation § 2510.3-101(d)(1) ("<u>VCOC Member</u>") for the purpose of providing such Institutional Holders with "management rights" within the meaning of United States Department of Labor Regulation § 2510.3-101(d)(3)(ii) (including the right to consult with and advise the management of the Company and any Subsidiary on matters relating to the business and financial affairs of the Company and any Subsidiary).  Any "management rights" provided directly to a VCOC Member under this Agreement or in any such letter agreement may be assigned by such VCOC Member to another VCOC Member, and thereupon the assigning party will not exercise any "management rights" provided to it hereunder or thereunder.  Notwithstanding anything to the contrary contained in this <u>Section 8.7</u>, or in any letter agreement contemplated hereby, the Board will have full and exclusive power and authority on behalf of the Company and any member-managed Subsidiary to acquire, manage, control, administer and operate the property, business and affairs of the Company and such Subsidiaries in accordance with <u>Article 7</u> and the other applicable provisions of this Agreement.

**8.8**    <u>Internal Restructure</u>.

(a)    In connection with an Initial Public Offering or an acquisition of another business or Entity, the Board may determine that the Company should undergo an Internal Restructure.  Accordingly, if the Board makes such determination, the Company and the Members will take commercially reasonable steps to effect an Internal Restructure on such terms as the Board in good faith deems advisable.  Each Member hereby agrees that it will execute and deliver, at the Company's expense, all agreements, instruments and documents as are required, in the reasonable judgment of the Board (and not in conflict with this <u>Section 8.8</u>), to be executed by such Member in order to consummate the Internal Restructure.  Each Member agrees that it will consent to and raise no objections to any such Internal Restructure.

(b)    Subject to <u>Section 4.4(a)(x)(E)</u> with respect to Blocker Members, in connection with an Initial Public Offering, the Board may require each outstanding Unit to be converted into or exchanged for equity securities of the IPO Issuer ("<u>IPO Securities</u>") having a value, based on the price in the Initial Public Offering to the public, equal to value that would be distributed in respect of such Unit if (i) the Pre-IPO Value were distributed by the Company under <u>Section 6.1</u> in complete liquidation and (ii) all Unvested Class C Units were Vested Class C Units; provided, the IPO Securities issued with respect to Unvested Class C Units will remain subject to any applicable time vesting in accordance with, and to the extent provided in, the applicable Restricted Unit Agreement.  Each Member will sell any fractional IPO Securities owned by such Member (after taking into account all IPO Securities held by such Member) to the IPO Issuer, upon the request of the Company in connection with or in anticipation of the consummation of an Initial Public Offering, for cash consideration equal to the fair market value of such fractional IPO Securities, as determined by the Board.  If the foregoing provisions would result in a Class C Unit receiving no IPO Securities, then the Board may determine to have such Class C Unit canceled for

45

no consideration. The Board may elect, in connection with a proposed Initial Public Offering where a Subsidiary or another Entity that is not the Company or its successor is the IPO Issuer, not to effect an Internal Restructure and, in such case, this Agreement may continue in effect after an Initial Public Offering in accordance with its terms.

(c)    Notwithstanding anything to the contrary in this Section 8.8, if the Internal Restructure involves the issuance of any stock or other security in a transaction not involving a Public Offering and any Member otherwise entitled to receive securities in such Internal Restructure in exchange for the Units held thereby is not an "accredited investor" (as defined under Rule 501 of Regulation D of the Securities Act (disregarding Rule 501(a)(4))), then the Company may require each Member that is not an accredited investor (i) to receive solely cash in such transaction, (ii) to otherwise be cashed out (by redemption, retirement or otherwise) by the Company or any other Member prior to the consummation of such restructure and/or (iii) to appoint a "Purchaser Representative" (as contemplated by Rule 506 of Regulation D of the Securities Act) selected by the Company with the intent being that such Member that is not an accredited investor receive substantially the same value in cash that such Member would have otherwise received in securities had such Member been an accredited investor.

**8.9**    Blocker Member Covenant.  Each Blocker Member agrees that it will not acquire, and it will not permit its Related Blocker Entity to acquire, assets other than the Units, a direct or indirect interest in such Blocker Member, assets distributed or otherwise obtained, directly or indirectly, by reason of the Units and immaterial assets related to such entity's formation, existence, good standing or ongoing administrative matters nor will it incur any liabilities other than those associated with holding the Units, a direct or indirect interest in such Blocker Member, immaterial liabilities related to such entity's formation, existence, good standing or ongoing administrative matters and liabilities arising under applicable Laws.

# ARTICLE 9
# LIABILITY STANDARDS; EXCULPATION AND INDEMNIFICATION

**9.1**    Elimination of Fiduciary Duties.  The Members agree that this Agreement and the Certificate, and no other agreement, document, instrument or Law, contain the entire agreement among the Company, the Members and the Directors with respect to the governance of the Company and the responsibilities that Directors and Members (including Controlling Members) owe to the Company and the Members. **ACCORDINGLY, WITH THE INTENT THAT THIS AGREEMENT AND THE CONTRACTUAL OBLIGATIONS SET FORTH HEREIN SERVE AS THE SOLE BASIS OF ESTABLISHING THE GOVERNANCE OBLIGATIONS OF THE DIRECTORS AND THE MEMBERS (INCLUDING CONTROLLING MEMBERS), THE MEMBERS AND THE COMPANY AGREE THAT, TO THE FULLEST EXTENT PERMITTED BY THE ACT, FIDUCIARY DUTIES OF DIRECTORS AND MEMBERS (INCLUDING CONTROLLING MEMBERS) (SUCH AS THE DUTIES OF CARE, LOYALTY AND CANDOR) ARE HEREBY ELIMINATED, AND IMPLIED COVENANTS AND OTHER STANDARDS OF CONDUCT THAT ARE NOT EXPRESSLY PROVIDED IN THIS AGREEMENT WILL NOT APPLY AND ARE HEREBY WAIVED AND THAT DEFAULT FIDUCIARY DUTIES WILL NOT BE READ**

**INTO THIS AGREEMENT OR OTHERWISE APPLY**. Each Member waives to the fullest extent permitted by the Act, any duty or other obligation, if any, that a Director or Member (including a Controlling Member) may have to the Company or another Member, pursuant to the Act or any other applicable Law, to the extent such waiver is necessary to give effect to the terms of this Section 9.1. The Members acknowledge, affirm and agree that (a) the Members would not be willing to make any investment in the Company, and no person designated by the Members to serve on the Board would be willing to so serve, in the absence of this Section 9.1 and (b) they have reviewed and understand the provisions of §§18-1101(b) and (c) of the Act.

  **9.2** Actions at Direction of Members. Without limiting the foregoing, to the fullest extent permitted by the Act, a Director, in performing his duties and obligations in such capacity, will be entitled to act or omit to act at the direction of the Members that designated such person to serve as a Director, considering only such factors, including the separate interests of the Members that have designated such Director, as such Director or such Members choose to consider so long as such acts or omissions (a) impact each Unit of a particular class or series in the same manner as each other Unit in such class or series and (b) do not violate any express provision contained in this Agreement. A Director will not have any liability for acting in a manner consistent with this Section 9.2.

  **9.3** Burden of Proof. The burden of proof to establish that any provision of this Agreement has been breached will be borne by the Person alleging such breach, and such burden of proof will not be shifted even in the context of a Sterling Related Party Transaction. This Section 9.3 does not alter, amend, restrict or limit any rights or obligations of (a) any Member (including any Insider Member) or Director arising under any other agreement with the Company or any Subsidiary (such as employment agreements, non-compete agreements or confidentiality agreements) to which such Person is a party or by which such Person is bound or (b) any Member (including any Insider Member but excluding any Institutional Holder) or Director arising under any policy, plan, program or procedure applicable to the employees of the Company or any Subsidiary.

  **9.4** Corporate Opportunities.

    (a) Each Director and each Member including Controlling Members (other than any Insider Member or Person who is an Affiliate of an Insider Member unless the Board determines otherwise) will have the right to have financial interests in, govern, control, provide services to, engage in and possess interests in other business ventures of every type and description, including those engaged in the same or similar business activities or lines of business as the Company and any Subsidiary, or deemed to be competing with the Company or any Subsidiary, on its own account, or in partnership with, or as an employee, manager, officer, director, member, Controlling Person, equity holder, general or limited partner or shareholder of any other Person, with no obligation to offer to the Company or any Subsidiary or any other Member the right to participate therein; provided, such Director or Member will promptly provide the Board with written notice of any of the foregoing. In the event that any Director or Member (other than any Insider Member or Affiliate of an Insider Member unless the Board determines otherwise) acquires knowledge of a potential transaction or matter that may be a corporate or other business opportunity for the Company, no such Director and no such Member will have any duty (fiduciary, contractual or otherwise) to communicate or present such opportunity to the Company or any

42992628.2

Subsidiary or any other Member, as the case may be, and, notwithstanding any provision of this Agreement to the contrary, will not be liable to the Company or any Subsidiary or any other Member (or their respective Affiliates) under any theory by reason of the fact that such Director or any such Member, directly or indirectly, pursues or acquires such opportunity for itself, directs such opportunity to another Person or does not present such opportunity to the Company or any of its Subsidiaries or any other Member. The Company hereby renounces any interest or expectancy in any business opportunity, transaction or other matter in which any Member (other than any Insider Member or Person who is an Affiliate of an Insider Member unless the Board determines otherwise) participates or desires to participate (each such business opportunity is referred to as a "Renounced Business Opportunity"). The Company acknowledges that such Renounced Business Opportunities may involve transactions or ventures that compete directly with the Company's business.

(b)    Notwithstanding anything to the contrary in Section 9.4(a), a Director or Member may be restricted from pursuing corporate opportunities for its own account pursuant to a separate agreement (such as an employment agreement, non-compete agreement, confidentiality agreement or other agreement), and neither this Section 9.4 nor any other provision of this Agreement will override or otherwise affect any restriction in any other agreement.

(c)    Each Member hereby agrees that (i) the terms of this Section 9.4, to the extent that they eliminate or modify a duty or other obligation that a Director may have to the Company or any other Member under the Act or other applicable Law, are reasonable in form, scope and content; and (ii) the terms of this Section 9.4 will control to the fullest extent possible if it is in conflict with a duty, if any, that a Director may have to the Company or another Member, under the Act or any other applicable Law. Each Member waives to the fullest extent permitted by the Act, any duty or other obligation, if any, that a Director or Member (including a Controlling Member) may have to the Company or another Member, pursuant to the Act or any other applicable Law, to the extent such waiver is necessary to give effect to the terms of this Section 9.4. The Members acknowledge, affirm and agree that (A) the Members would not be willing to make any investment in the Company, and no person designated by the Members to serve on the Board would be willing to so serve, in the absence of this Section 9.4 and (B) they have reviewed and understand the provisions of §§18-1101(b) and (c) of the Act.

**9.5**    Exculpation.

(a)    No Director, Observer or Sterling Officer in his capacity as such and no Director, Observer or Sterling Officer who is or was serving at the request of the Company as a member, manager, director, officer, partner, venturer, proprietor, trustee, employee, authorized person, agent, or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise will be liable to the Company or any Member for monetary damages arising from any actions taken, or actions failed to be taken, in his or her capacity as such except for (i) liability for acts that involve fraud, willful misconduct or bad faith, (ii) liability with respect to any transaction from which such Person derived a personal benefit unless such transaction is permitted by or approved or deemed approved in accordance with this Agreement or (iii) liability arising from a breach of this Agreement.

48

42992628.2

(b)    No Member (including a Controlling Member) will be liable to the Company or any other Member for monetary damages arising from any actions taken, or actions failed to be taken, in its capacity as such except for liability arising from a breach of this Agreement.

**9.6**    Indemnification of Members, Directors and Officers.  Subject to the limitations set forth in this Section 9.6, each Person who was or is made a party or is threatened to be made a party to or is involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, arbitrative or investigative (hereinafter a "Proceeding"), or any appeal in such a Proceeding or any inquiry or investigation that could lead to such a Proceeding, by reason of the fact that it, or a Person of whom it is the legal representative, is or was a Member, Director or Officer or while a Director or Officer is or was serving at the request of the Company as a member, manager, director, officer, partner, venturer, proprietor, trustee, employee, authorized person, agent, or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise will be indemnified by the Company to the fullest extent permitted by the Act, as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Company to provide broader indemnification rights than said Law permitted the Company to provide prior to such amendment), against judgments, penalties (including excise and similar taxes and punitive damages), fines, settlements and reasonable expenses (including reasonable attorneys' fees) actually incurred by such Person in connection with such Proceeding, and indemnification under this Section 9.6 will continue as to a Person who has ceased to serve in the capacity which initially entitled such Person to indemnity hereunder.  Notwithstanding anything to the contrary in this Section 9.6, a Person will not be entitled to indemnification hereunder if it is determined by a non-appealable order of a court of competent jurisdiction or arbitrator that, with respect to the matter for which such Person seeks indemnification, (a) such Person did not act in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the Company, (b) that such Person's actions constituted fraud, willful misconduct or bad faith or, with respect to any criminal action or proceeding, had reasonable cause to believe that his conduct was unlawful, (c) the matter for which such Person seeks indemnification is a Proceeding that primarily relates to a breach of this Agreement or any other agreement between such Person and the Company or any Subsidiary or (d) the matter for which such Person seeks indemnification would not have arisen but for such Person's or such Person's Affiliates' acting in a capacity other than in its capacity as a Member, Director or Officer.  The termination of any action, suit or Proceeding by judgment, order, settlement, conviction, or upon a plea of *nolo contendere* or its equivalent, will not, of itself, create a presumption that the Person did not act in good faith and in a manner which he reasonably believed to be in or not opposed to the best interests of the Company and, with respect to any criminal action or Proceeding, had reasonable cause to believe that his conduct was unlawful.

**9.7**    Advance Payment.  The right to indemnification conferred on the Members, Directors and Officers referenced under Section 9.6 will include the right to be paid or reimbursed by the Company the reasonable expenses incurred by a Person entitled to be indemnified under Section 9.6 who was, is or is threatened to be made a named defendant or respondent in a Proceeding (other than Proceedings for matters described in clauses (a) through (d) of Section 9.6) in advance of the final disposition of the Proceeding and without any determination as to the

49

Person's ultimate entitlement to indemnification; provided, payment of such expenses incurred by any such Person in advance of the final disposition of a Proceeding will be made only upon delivery to the Company of a written affirmation by such Person of its good faith belief that it has met the standard of conduct necessary for indemnification under Section 9.6 and a written undertaking by such Person to repay all amounts so advanced if it is ultimately determined by a court of competent jurisdiction that such Protected Person is not entitled to be indemnified under Section 9.6 or otherwise.

      **9.8**    Indemnification of Employees and Agents. The Company, by adoption of a resolution of the Board, may, but will not be obligated to, indemnify and advance expenses to an employee or agent of the Company or any Subsidiary to the same extent and subject to the same conditions under which it may indemnify and advance expenses to the Members, Directors and Officers under Section 9.6 and Section 9.7.

      **9.9**    Appearance as a Witness. The Company may, by adoption of a resolution of the Board, pay or reimburse expenses incurred by a Member, Director, Officer, employee or other agent of the Company or representative of a Member (such as employees and partners of Sterling) in connection with its appearance as a witness or other participation in a Proceeding at a time when the Company is not a named defendant or respondent in the Proceeding.

      **9.10**    Nonexclusivity of Rights. The right to indemnification and the advancement and payment of expenses conferred in this Article 9 will not be exclusive of any other right that any such Person indemnified pursuant to this Article 9 (each, a "Protected Person") may have or hereafter acquire by vote of the Board or otherwise. If a Protected Person is indemnified by a Third-Party Indemnitor for a loss covered by Section 9.6 or receives from a Third-Party Indemnitor expense reimbursement or advancement of an expense covered by Section 9.7, such Third-Party Indemnitor will be subrogated to the rights of the Protected Person under this Article 9 to recover such amount from the Company on the terms of this Article 9. The Company will not be subrogated to the rights a Protected Person may have against a Third-Party Indemnitor. A Protected Person is not required to assert any claim for indemnification protection or expense reimbursement or advance against any Third-Party Indemnitor prior to asserting a claim against, or receiving an indemnification or expense reimbursement payment from, the Company.

      **9.11**    Insurance. Without limiting the Company's other obligations under this Article 9, if approved by the Board, the Company will procure and at all times maintain directors and officers liability insurance coverage, unless otherwise determined by the Board.

### ARTICLE 10
### TAX, ACCOUNTING, BOOKKEEPING AND RELATED PROVISIONS

      **10.1**    Tax Returns. The Company will prepare, or cause to be prepared, and timely file all tax returns and reports required to be filed by the Company. The Company will deliver to each Member with respect to each Fiscal Year an IRS Schedule K-1 as contemplated in Section 8.3(c). Each Member will furnish to the Company all pertinent information in its possession relating to the Company's operations that is necessary to enable the Company's tax returns to be timely prepared and filed. The Company will bear the costs of the preparation and filing of its tax returns and reports.

**10.2**   Tax Partnership. The Members acknowledge that, subject to Section 8.8 and the impact of an Internal Restructure, the Company will be treated as a partnership for federal income tax purposes and the Members will not otherwise characterize the Company for purposes of any federal tax returns, statements or reports filed by them or their Affiliates.

**10.3**   Tax Elections. The Company will make the following elections on the appropriate tax returns:

(a)    to adopt, as the Company's Fiscal Year, the calendar year or such other Fiscal Year as the Partnership Representative designates;

(b)    to adopt the accrual method of accounting unless the cash method of accounting is available and the Partnership Representative designates the cash method of accounting for use by the Company;

(c)    if a distribution of the Company's property as described in Code Section 734 occurs or a Transfer of Units as described in Code Section 743 occurs, the Company may elect, at the discretion of the Board, pursuant to Code Section 754, to adjust the basis of the Company's properties;

(d)    any election that would ensure that the Company will be treated as a partnership for federal income tax purposes; and

(e)    any other election the Board may deem appropriate and in the best interests of the Members.

Neither the Company nor any Member may make an election for the Company to be excluded from the application of the provisions of subchapter K of chapter 1 of subtitle A of the Code or any similar provisions of applicable state Law and no provision of this Agreement will be construed to sanction or approve such an election.

**10.4**   Bank Accounts. The Company may establish one or more separate bank and investment accounts and arrangements, which will be maintained in the Company's name with financial institutions and firms that the Board may determine. The Company will not commingle the Company's funds with the funds of any Member or any Affiliate of a Member.

**10.5**   Fiscal Year. The fiscal year of the Company (the "Fiscal Year") will end on December 31 of each calendar year unless, for United States federal income tax purposes, another fiscal year is required. The Company will have the same fiscal year for United States federal income tax purposes and for accounting purposes.

**10.6**   Bipartisan Budget Act of 2015. Sterling Group Partners V, L.P., or such other Member designated by the Board from time to time, will be designated, and will be specifically authorized to act as, the "partnership representative" (the "Partnership Representative") under Section 6223 of the Code (or any successor thereto), as amended by the Bipartisan Budget Act of 2015 (the "2015 Act"), and, if required by the 2015 Act, the Board will also appoint a Designated Individual. Both the Partnership Representative and the Designated Individual are subject to

42992628.2

replacement from time to time by the Board. The Partnership Representative will apply the provisions of subchapter C of Chapter 63 of the Code, as amended by the 2015 Act (or any successor rules thereto) with respect to any audit, imputed underpayment, other adjustment, or any such decision or action by the Internal Revenue Service with respect to the Company or the Members for such taxable years, in the manner determined by the Partnership Representative, as approved by the Board. For the avoidance of doubt, the Partnership Representative may make, as approved by the Board, an election to apply Section 6221(b) or Section 6226 of the Code or an election to file an administrative adjustment pursuant to Section 6227 of the Code, in each case as amended by the 2015 Act and in the manner determined by Partnership Representative and approved by the Board. The Partnership Representative will promptly inform the Members of any tax deficiencies assessed by any taxing authority against the Company or the Members. Each Member does hereby agree to indemnify and hold harmless the Company from and against any liability with respect to its share of any tax deficiency paid or payable by the Company that is allocable to the Member (as reasonably determined by the Board) with respect to an audited or reviewed taxable year for which such Member was a Member (for the avoidance of doubt, including any applicable interest and penalties); such obligation will survive such Member's ceasing to be a Member and/or the termination, dissolution, liquidation and winding up of the Company. For the avoidance of doubt, the Partnership Representative will not make any election under this Section 10.6, unless required by Law, without the approval of the Board.

**10.7**    Cooperation and Assistance. Each Member will provide such cooperation and assistance, including but not limited to executing and filing forms or other statements and providing information about the Member, as is reasonably requested by Partnership Representative, to enable the Company to satisfy any applicable tax reporting or compliance requirements, to make any tax election or to qualify for an exception from or reduced rate of tax or other tax benefit or be relieved of liability for any tax regardless of whether such requirement, tax benefit or tax liability existed on the date such Member was admitted to the Company. If a Member fails to provide any such forms, statements, or other information requested by the Partnership Representative, such Member will be required to indemnify the Company for the share of any tax deficiency paid or payable by the Company that is due to such failure (as reasonably determined by the Board). The obligations set forth in this Section 10.7 will survive such Member's ceasing to be a member of the Company and/or the termination, dissolution, liquidation and winding up of the Company.

## ARTICLE 11
## DISSOLUTION, WINDING-UP AND TERMINATION

**11.1**    Dissolution.

(a)    General. Subject to Section 11.1(b), the Company will dissolve and its affairs will be wound up on the first to occur of the following events (each a "Dissolution Event"), and no other event will cause the Company's dissolution:

(i)    the approval of the Board; and

(ii)    the entry of a decree of judicial dissolution of the Company under Section 18-802 of the Act.

52

(b)    <u>Continuance of the Company</u>.  To the maximum extent permitted by the Act, the death, retirement, resignation, expulsion, bankruptcy or dissolution of a Member will not constitute a Dissolution Event and, notwithstanding the occurrence of any such event or circumstance, the business of the Company will be continued without dissolution.

**11.2**    <u>Winding-Up and Termination</u>.  On the occurrence of a Dissolution Event, the Board may select one or more Persons to act as liquidator or may itself act as liquidator.  The liquidator will proceed diligently to wind up the affairs of the Company and make final distributions as provided herein and in the Act.  The costs of winding up will be borne as a Company expense, including reasonable compensation to the liquidator if approved by the Board.  Until final distribution, the liquidator will continue to operate the Company properties with all of the power and authority of the Board.  The steps to be accomplished by the liquidator are as follows:

(a)    <u>Accounting</u>.  As promptly as possible after dissolution and again after final winding up, the liquidator will cause a proper accounting to be made by the Accounting Firm of the Company's assets, liabilities, and operations through the last calendar day of the month in which the dissolution occurs or the final winding up is completed, as applicable.

(b)    <u>Satisfaction of Obligations</u>.  The liquidator will pay, satisfy or discharge from Company funds all of the debts, liabilities and obligations of the Company (including all expenses incurred in winding up and any advances described in <u>Section 5.3</u>); provided, the liquidator may establish one or more cash escrow funds (in such amounts and for such terms as the liquidator may reasonably determine) for the payment of contingent liabilities.

(c)    <u>Distribution of Assets</u>.  All remaining assets of the Company will be distributed to the Members as follows:

(i)    the liquidator may sell any or all Company property, including to the Members, and any resulting gain or loss from each sale will be computed and allocated to the Capital Accounts of Members in accordance with the allocation provisions in this Agreement;

(ii)    with respect to all Company property that has not been sold, the fair market value of that property will be determined and the Capital Accounts of Members will be adjusted to reflect the manner in which the unrealized income, gain, loss, and deduction inherent in property that has not been reflected in the Capital Accounts previously would be allocated among Members if there were a taxable disposition of that property for the fair market value of that property on the date of distribution; and

(iii)    the property of the Company will be distributed in accordance with <u>Section 6.1</u> and <u>Section 6.2</u>.

All distributions in kind to the Members will be made subject to the liability of each distributee for costs, expenses and liabilities theretofore incurred or for which the Company has committed prior to the date of termination and those costs, expenses and liabilities will be allocated to the distributee pursuant to this <u>Section 11.2</u>; provided no Member will be liable for any such Company cost, expense or liability in excess of the fair market value of the property so distributed

42992628.2

in kind to such Member. The distribution of cash and/or property to a Member in accordance with the provisions of this Section 11.2 constitutes a complete return to the Member of its Capital Contributions and constitutes a compromise to which all Members have consented within the meaning of Section 18-502(b) of the Act; provided no Member will be deemed, under this Section 11.2(c), to have agreed to be liable for any such Company cost, expense or liability in excess of the fair market value of the property so distributed in kind to such Member. To the extent that a Member returns funds to the Company, it has no claim against any other Member for those funds.

(d)     Final Capital Account Balances. The Members intend that the allocations provided under Section 6.3, Section 6.4, and Section 6.5 will produce final Capital Account balances for the Members that equal the amount of permit liquidating distributions pursuant to Section 11.2(c)(iii) to be made under Section 6.1 (after taking into account all previous distributions made to the Members pursuant to Section 6.1). If the allocations otherwise made under Section 6.3, Section 6.4, and Section 6.5 would fail to produce such final Capital Account balances, the Board will cause the allocations of Profit or Loss (including items therein) and, to the extent necessary, guaranteed payments to be made in the final Fiscal Year of the Company in a manner that achieves the foregoing intent as closely as possible.

**11.3**     Deficit Capital Accounts. No Member will be required to pay to the Company, to any other Member or to any third party any deficit balance which may exist from time to time in the Member's Capital Account.

**11.4**     Certificate of Cancellation. On completion of the distribution of Company assets as provided herein, the Board (or any Person or Persons as the Act may require or permit) will file a certificate of cancellation with the Secretary of State of Delaware, cancel any other filings made pursuant to Section 2.5 and take such other actions as may be necessary to terminate the existence of the Company. Upon the effectiveness of the certificate of cancellation, the existence of the Company will cease, except as may be otherwise provided by the Act or other applicable Law.

## ARTICLE 12
## GENERAL PROVISIONS

**12.1**     Books. To the extent required by the Act, the Company will maintain or cause to be maintained complete and accurate records and books of account of the Company's affairs at the principal office of the Company.

**12.2**     Offset.

(a)     Whenever the Company is to pay any sum to any Member, any amounts that such Member owes the Company or any Subsidiary may be deducted from that sum before payment, after notice to the Member describing the nature of the offset and the amount to be offset.

(b)     In general, Rollover Units are issued in connection the Company's or its Subsidiaries' business acquisitions. In some cases, the definitive acquisition agreements or rollover, contribution or subscription agreements contain provisions that call for the forfeiture or cancellation of Rollover Units or that entitle the Company to withhold or offset distributions in respect of Rollover Units, in each case, if obligations owing to the Company or a Subsidiary remain

unsatisfied. Such forfeiture, cancellation, withholding and offset provisions can continue to burden Rollover Units even following Transfers thereof. Accordingly, the Company may enforce its forfeiture, cancellation, withholding and offset rights granted thereto under any such definitive acquisition agreement or rollover, contribution or subscription agreement against a holder of Rollover Units if such Rollover Units are burdened by such provisions, and the provisions in this Agreement will be applied to allow for Transfers to the Company to effect any forfeiture or cancellation remedy and to allow the Company to modify the distribution provisions set forth herein to effect any distribution withholding or offset remedy.

**12.3**   Notices. Except as expressly set forth to the contrary in this Agreement, all notices, requests or consents provided for or permitted to be given under this Agreement must be in writing and must be delivered to the recipient in person, by courier or mail, by email or similar transmission; and a notice, request or consent given under this Agreement is effective on receipt by the Person to receive it. Any notice given in accordance herewith will be deemed to have been received upon actual receipt when delivered in person, including delivery by the United States Postal Service; on the Business Day that receipt is confirmed by a reputable courier; or on the Business Day following the date the party giving notice receives electronic confirmation of delivery, in the case of an email or similar transmission. If the date specified in this Agreement for giving notice or taking any action is not a Business Day (or if the period during which any notice is required to be given or any action taken expires on a date which is not a Business Day), then the date for giving such notice or taking such action (and the expiration date of such period during which notice is required to be given or action taken) will be the next day which is a Business Day. All notices, requests and consents to be sent to a Member must be sent to or made at the addresses given for that Member on Schedule 1 or such other address as that Member may specify by notice to the Company and the other Members. Whenever any notice is required to be given by Law, the Certificate or this Agreement, a written waiver thereof, signed by the Person entitled to notice, whether before or after the time stated therein, will be deemed equivalent to the giving of such notice.

**12.4**   Entire Agreement; Supersedure. This Agreement and any other agreements expressly mentioned herein constitute the entire agreement of the Members and their respective Affiliates relating to the matters covered hereby and supersede all prior contracts or agreements with respect to the Company, whether oral or written.

**12.5**   Effect of Waiver or Consent. A waiver or consent, express or implied, to or of any breach or default by any Person in the performance by that Person of its obligations with respect to the Company is not a consent or waiver to or of any other breach or default in the performance by that Person of the same or any other obligations of that Person with respect to the Company. Failure on the part of a Person to complain of any act of any Person or to declare any Person in default with respect to the Company, irrespective of how long that failure continues, does not constitute a waiver by that Person of its rights with respect to that default until the applicable statute-of-limitations period has run.

**12.6**   Amendment or Restatement. This Agreement (including the Exhibits and Schedules) may only be amended or restated by, and the rights of the Company or any other Party under this Agreement only may be waived by, a written instrument adopted, executed and agreed to by the Company and the Majority Holders; provided, in addition to the foregoing approvals:

(a)      in no event will any amendment, modification, waiver or restatement of this Agreement that would disproportionately and adversely impair the rights of any Member (including the rights, designations or preferences of any class or series of Units held by any such Member) (each, an "Adversely Affected Member") be effective against any such Member unless such amendment, modification, waiver or restatement is approved by Adversely Affected Members who hold at least two-thirds of the Voting Units held by all of the Adversely Affected Members; provided, pro rata dilution of all Units will be deemed not to disproportionately or adversely impair the rights of any Member;

(b)      in no event will any amendment, modification, waiver or restatement impose any obligation to make additional capital contributions upon any Member, and no existing monetary obligation of a Member will be increased, in each case, without such Member's consent;

(c)      in no event will any amendment, modification, waiver or restatement adversely affect the rights of an Observer under Section 7.3 without the prior consent of the Member designating such Observer;

(d)      in no event will any amendment, modification, waiver or restatement (i) reclassify an Institutional Holder as a Member that is not an Institutional Holder without the prior consent of such Member, (ii) reclassify a Lender Member as a Member that is not a Lender Member without the prior consent of such Member, or (iii) reclassify an Exempt Institutional Holder as a Member that is not an Exempt Institutional Holder without the prior consent of such Member;

(e)      in no event will any amendment, modification, waiver, or restatement reclassify a Blocker Member as a Member that is not a Blocker Member without the prior consent of such Blocker Member.

(f)      in no event will any amendment, modification, waiver or restatement to the references to, use of, or definitions of, "Customary Transaction Terms" or "Customary Transaction Documents" be effective against any Member without the prior consent of the Members that hold at least 90% of the outstanding Class A Units, the Class B Units and the Class C-1 Units, voting as a single, combined class; provided, notwithstanding the foregoing, no amendment, modification, waiver or restatement to the following Customary Transaction Terms will be effective against any Member without such Member's consent: (i) any amendment, modification, waiver or restatement that would require any Member, other than the Insider Members, to enter into a non-compete agreement; (ii) any amendment, modification, waiver or restatement that would require any Member to make representations and warranties about the Company or any Subsidiary in connection with an Approved Transaction and (iii) any amendment, modification, waiver or restatement that would require a Member to be liable for more than the proceeds received thereby in an Approved Transaction;

(g)      in no event will any amendment, modification, waiver or restatement be made to Section 4.3, Section 4.4(a), Section 4.4(c) or this Section 12.6 without the prior consent of the Members that hold at least 90% of the outstanding Class A Units, the Class B Units and the Class C-1 Units, voting as a single, combined class, which Members must include the Institutional Holders who hold at least 75% of the outstanding Class A Units, the Class B Units and the Class

C-1 Units, as a single, combined class, held by all Institutional Holders other than the Sterling Holders; provided, (i) this clause (g) will not apply to a New Terms Amendment so long as the co-sale rights granted to holders of the Units created by the New Terms Amendment are no more favorable to such holders than the rights granted in <u>Section 4.4(c)</u> as in effect immediately prior to the New Terms Amendment and (ii) no amendment or modification to the proviso in <u>Section 12.6(f)</u> will be effective against any Member without such Member's consent;

(h)    in no event will any amendment, modification, waiver or restatement to <u>Section 12.16</u> be effective against a Lender Member without such Lender Member's consent; and

(i)    no amendment, modification, waiver or restatement to this <u>Section 12.6(i)</u>, or any of the foregoing clauses (a) through (h) of this <u>Section 12.6</u> that adversely affects the rights or obligations of any Institutional Holder will be effective against such Institutional Holder without either (i) such Institutional Holder's prior consent or (ii) in the case of amendments, modifications, waivers or restatements to clauses (a) through (h) above, without first obtaining the consent expressly referenced in the clause being amended or modified;

(j)    in no event will any amendment, modification, waiver or restatement to the distribution rights of the Class C-1 Units be effective without the consent of the holders of a majority of the Class C-1 Units then outstanding if any such amendment, modification, waiver or restatement would alter the relative distribution rights of the Class C-1 Units compared to the distribution rights of the Class A Units or Class B Units (it being understood that proportionate dilution caused by the issuance of additional Units would not require consent hereunder);

provided, notwithstanding the foregoing provisions of this <u>Section 12.6</u>, at the request of any Member who experiences a Regulatory Problem and provides the Company with a written request detailing such Regulatory Problem and requesting that this Agreement be amended or particular provisions hereof waived to address any time limitations imposed on such Member to effect a Transfer due to such Regulatory Problem, the Company may adopt any such amendment or waiver without the consent or approval of any Member so long as such amendment, modification, waiver or restatement is approved by the Board.

The Company will provide notice to any Member that does not vote in favor of an amendment that is approved in accordance with this <u>Section 12.6</u> within 10 days after the effective date of such amendment.

**12.7**    <u>Binding Effect</u>.  This Agreement is binding on and inures to the benefit of the Members and their respective heirs, legal representatives, successors and permitted assigns.

**12.8**    <u>Governing Law; Venue</u>.  This Agreement is governed by and will be construed in accordance with the Laws of the State of Delaware.  The Members covenant and agree that the state courts located in the State of Delaware, or in a case involving diversity of citizenship or a federal question, the federal courts located in the State of Delaware will have exclusive jurisdiction of any action or Proceeding under this Agreement or related to the matters contemplated by this Agreement or any agreement entered into in connection therewith.

57

**12.9**    Severability.  If a direct conflict exists between the provisions of this Agreement and (a) any provision of the Certificate or (b) any mandatory, non-waivable provision of the Act, such provision of the Certificate or the Act will control.  If any provision of the Act provides that it may be varied or superseded in the agreement of a limited liability company (or otherwise by agreement of the members or managers of a limited liability company), such provision will be deemed superseded and waived in its entirety if this Agreement contains a provision addressing the same issue or subject matter.  If any provision of this Agreement or the application thereof to any Person or circumstance is held invalid or unenforceable to any extent, the remainder of this Agreement and the application of that provision to other Persons or circumstances will be enforced to the greatest extent permitted by Law.

**12.10**    Independent Legal Advice.  Each of the Members and their spouses, as applicable, acknowledge that he, she or it has read and understands this Agreement, has consulted with legal counsel with respect to the terms and conditions hereof, is fully aware of its legal effect, has not acted in reliance upon any representations or promises made by the Company other than those contained in writing herein, and has entered into this Agreement freely based on his, her or its own judgment with the advice of legal counsel and other advisers as he, she or it has deemed necessary or advisable.

**12.11**    Further Assurances.  In connection with this Agreement and the transactions contemplated hereby, each Member will execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and those transactions.

**12.12**    Waiver of Certain Rights.

(a)    Each Member irrevocably waives any right it may have to maintain any action for dissolution of the Company or for partition of the property of the Company.

(b)    Each Member irrevocably waives any contractual appraisal right in connection with any merger or consolidation of the Company with or into any other Entity, unless expressly set forth in an agreement of merger or consolidation or a plan of merger approved by the Board.

**12.13**    Directly or Indirectly.  Where any provision of this Agreement refers to action to be taken by any Person, or which such Person is prohibited from taking, such provision will be applicable whether such action is taken directly or indirectly by such Person, including actions taken by or on behalf of any Affiliate of such Person.

**12.14**    Counterparts.  This Agreement may be executed in any number of counterparts, including facsimile counterparts or electronic PDF transmission (including via e-mail delivery) of counterparts, with the same effect as if all signing Parties had signed the same document.  All counterparts will be construed together and constitute the same instrument.

**12.15**    Equitable Relief.  Each Member acknowledges and agrees that any breach of this Agreement by such Member or any transferee or any legal representative thereof may cause irreparable injury to the Company or the other Members for which monetary damages (or other

42992628.2

remedy at law) are inadequate in view of (a) the complexities and uncertainties in measuring the actual damages that would be sustained by reason of the failure of a Member to comply with such provisions and (b) the uniqueness of the Company's and each other Member's business. Accordingly, each Member consents to the issuance of an injunction or the enforcement of other equitable remedies against such Member at the suit of an aggrieved party without the posting of any bond or other security, to compel specific performance of all of the terms of this Agreement, and waives any defenses thereto, including the defenses of: (i) failure of consideration, (ii) breach of any other provision of this Agreement and (iii) availability of relief in damages.

**12.16** <u>Lender Rights</u>.   Notwithstanding anything in this Agreement to the contrary, nothing contained in this Agreement will affect, limit or impair the rights or remedies of any Lender Member or any other lender in their capacity as lender (or as agent for lenders) to or with respect to the Company or any Subsidiary pursuant to any agreement (including the Applicable Credit Documents) under which the Company or such Subsidiary has borrowed money.  Without limiting the generality of the foregoing, no Lender Member, in exercising its rights as a lender (or as an agent for lenders) to the Company or any Subsidiary including making its decision on whether to foreclose on any collateral security will have any duty by reason of this Agreement or as a direct or indirect holder of Units to consider (a) its status as a direct or indirect holder of Units or other equity securities of the Company, (b) the interests of the Company or any Subsidiary or (c) any duty it may have to any other direct or indirect holder of Units other than equity securities of the Company, except to the extent arising under the Applicable Credit Documents.

**12.17** <u>No Vicarious Liability</u>.   Notwithstanding anything in this Agreement to the contrary, this Agreement may only be enforced against the Parties and their respective successors and permitted assigns. All claims or causes of action (whether in contract, tort or otherwise) that may be based upon, arise out of, or relate to this Agreement, or the negotiation, execution or performance of this Agreement (including any representation or warranty made in or in connection with this Agreement or as an inducement to enter into this Agreement), may be made only against the Parties and their respective successors and permitted assigns, and no officer, director, partner, manager, equityholder, employee or Affiliate of any Party (including any Person negotiating or executing this Agreement on behalf of such Party) will have any liability or obligation with respect to this Agreement or with respect to any claim or cause of action (whether in contract, tort or otherwise) that may arise out of or relate to this Agreement or the negotiation, execution or performance of this Agreement (including a representation or warranty made in connection with this Agreement or as an inducement to enter into this Agreement). Each Party hereby agrees not to bring any action or claim arising under or relating to this Agreement against any Person that is not a Party.

**[Signature Pages Follow]**

IN WITNESS WHEREOF, the undersigned has executed this Agreement as of the First A&R Date.

COMPANY:

**TSG SHELF II INVESTMENTS, LLC**


By: _____
Name: Max Klupchak
Title: Secretary

*[Signature Page to A&R LLC Agreement of TSG Shelf II Investments, LLC]*

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the First A&R Date.

> **MEMBER**:
>
> **TSG SHELF II INVESTMENTS HOLDINGS, L.P.**
>
> By: Sterling Group Partners V GP, L.P.,
> its General Partner
> By: Sterling Group Partners V UGP, Ltd.,
> its General Partner
>
>
> By: _____
> Name: Max Klupchak
> Title: Secretary

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the First A&R Date.

**MEMBER**:

**TSG SHELF II CREDIT BLOCKER CORP.**

By: _____
Name: Max Klupchak
Title: Secretary

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the First A&R Date.

**MEMBER**:

**STERLING GROUP CREDIT FUND, L.P.**

By: Sterling Group Credit GP, L.P.,
its General Partner
By: Sterling Group Credit UGP, LLC
its General Partner


By:_____
Name: Sean Davenport
Title: Authorized Investment Officer

<u>Spousal Consent and Marital Statement</u>

I, _____, am the spouse of the above signed Member, a holder of Units of TSG Shelf II Investments, LLC, a Delaware limited liability company (the "<u>Company</u>"). I understand that my spouse is a party to this Agreement, and that this Agreement contains certain provisions regarding my acquiring or retaining any Units, or rights to receive Units. I agree that I may not acquire any such Units (whether by gift, purchase, will, intestate succession, operation of law or decree, order or injunction of any court, division of community or marital property, or otherwise), except in compliance with the terms of this Agreement. I acknowledge and understand that if I ever propose to acquire any such Units in compliance with this Agreement, I must first agree to become a party to this Agreement. I further acknowledge and agree that any interest I may have in Units (whether as a result of community property rights or otherwise) as of the date hereof are subject to the provisions of this Agreement.

Executed as of the _____ day of _____, 20_____

Name: _____
Address: _____
_____

If this signature page is delivered without the above Spousal Consent and Marital Statement executed by the spouse of the Member executing above, then such Member hereby represents and warrants to the Company and the other Members that he or she is not married and does not have a common law spouse as of the date hereof.

The above signed Member will promptly notify the Company whenever there is a change in such Member's marital status. If the above signed Member marries or remarries after the date hereof such Member will promptly provide the Company with the name and address of his or her spouse. The above signed Member will use his or her best efforts to cause his or her current or future spouse to execute and deliver to the Company the above Spousal Consent and Marital Statement or an instrument substantially in the form of the above Spousal Consent and Marital Statement.

**SCHEDULE 1**
**MEMBERS, UNITS AND INFORMATION RELATED THERETO**
**AS OF THE FIRST A&R DATE**

(See Attached)

| Members | Numbers and Classes of Units | Admission Date | Eligible Co-Sale Participant (Y/N) | Eligible Purchaser (Y/N) | Exempt Institutional Holder (Y/N) | Institutional Holder (Y/N) | VCOC Member (Y/N) | Insider Member (Y/N) | Related Individual | Lender Member (Y/N) | BDC Member (Y/N) | SPV Member (Y/N) | Blocker Member (Y/N) | Related Blocker Entity |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TSG Shelf II Investments Holdings, L.P. Notice Information: c/o The Sterling Group, L.P. Greenway Plaza, Suite 2400 Houston, TX 77046 Attention: [] | [] Class A Units | May [], 2021 | Yes | Yes | No | Yes | Yes | No | N/A | No | No | No | Yes | TSG Shelf II Blocker Corp. |
| TSG Shelf II Credit Blocker Corp. [] Attention: [] | [] Class A Units | May [], 2021 | Yes | Yes | Yes | Yes | Yes | No | N/A | Yes | No | No | Yes | N/A |
| Sterling Group Credit Fund, L.P. [] Attention: [] | [] Class A Units | May [], 2021 | Yes | Yes | Yes | Yes | Yes | No | N/A | Yes | No | No | No | N/A |

## EXHIBIT A

### DEFINED TERMS

"2015 Act" has the meaning specified in Section 10.6.

"Accepting Investor" has the meaning specified in Section 4.4(b)(v).

"Accounting Firm" means such accounting firm of nationally recognized standing as the Board will from time to time determine.

"Act" means the Delaware Limited Liability Company Act and any successor statute, as amended from time to time.

"Adversely Affected Member" has the meaning specified in Section 12.6(a).

"Adjusted Capital Account" means the Capital Account maintained for each Member, (a) increased by any amounts that such Member is obligated to restore (or is treated as obligated to restore under Treasury Regulations Sections 1.704-1(b)(2)(ii)(c), 1.704-2(g)(1) and 1.704-2(i)(5)), and (b) decreased by any amounts described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6) with respect to such Member.

"Advance Amount" has the meaning specified in Section 6.1(b).

"Adverse Person" means any Person whom the Board reasonably determines is engaged in Competitive Activities or is a direct Competitor or a potential Competitor; provided, no BDC Member will be deemed a Competitor, a potential Competitor or engaged in any Competitive Activity solely due to such BDC Member's loan to, or investment in, a Person that is a Competitor, a potential Competitor or that is engaged in any Competitive Activity.

"Affiliate" of a Person means any Person Controlling, Controlled by, or under common Control with such Person. Whether the Person is an Affiliate of another Person (other than the Company or any of its Subsidiaries) will be determined without regard to ownership in or control of the Company and any of its Subsidiaries.

"Agreement" means this Amended and Restated Limited Liability Company Agreement of the Company, as amended and restated from time to time, including the Exhibits and Schedules hereto.

["Applicable Credit Documents" means that certain Credit Agreement, dated as of [•], by and among [•], LLC, a Delaware limited liability company, as borrower, the lenders party thereto from time to time, [•], as term loan administrative agent and [•], as administrative agent, and each of the other "Loan Documents" (as such term is defined therein), in each case as amended, restated, supplemented or otherwise modified from time to time.]

"Approved Transaction" has the meaning specified in Section 4.4(d)(ii)(A).

42992628.2

"Available Cash" means all cash held by the Company less such reserves as the Board deems reasonably necessary for the proper operation of the Company's business and satisfaction of the Company's debts and obligations.

"BDC Member" means a Business Development Company (as defined in Section 2(a)(48) of the Investment Company Act of 1940) or any Subsidiary thereof that is designated as a "BDC Member" on Schedule 1.

"Blocker Entity" means an Entity that is treated as a corporation for United States federal income tax purposes.

"Blocker Member" means a Member that is designated as a "Blocker Member" on Schedule 1.

"Board" has the meaning specified in Section 7.1.

"Book Value" means, with respect to any property of the Company, such property's adjusted basis for federal income tax purposes, except as follows:

(a)    The initial Book Value of any property contributed by a Member to the Company will be the fair market value of such property as of the date of such contribution as reasonably determined by the Board;

(b)    The Book Values of all properties will be adjusted to equal their respective fair market values as reasonably determined by the Board in connection with (i) the acquisition of an additional interest in the Company by any new or existing Member; (ii) the distribution by the Company to a Member of more than a *de minimis* amount of property (other than a distribution made in accordance with Section 6.1 as consideration for an interest in the Company), (iii) the liquidation of the Company within the meaning of Treasury Regulation Section 1.704-1(b)(2)(ii)(g)(*1*) (other than pursuant to Section 708(b)(1)(B) of the Code); (iv) the acquisition of an interest in the Company by any new or existing Member upon the exercise of a noncompensatory option in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv)(*s*) or (v) any other event to the extent determined by the Board to be permitted and necessary to properly reflect Book Values in accordance with the standards set forth in Treasury Regulation Section 1.704(v)(2)(iv)(*q*); provided, adjustments pursuant to clauses (i), (ii) and (iv) above will be made only if the Board reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company, and provided, further, if any noncompensatory options are outstanding upon the occurrence of an event described in clauses (i) through (v) in this paragraph, the Company will adjust the Book Values of its properties in accordance with Treasury Regulation Sections 1.704-1(b)(2)(iv)(*l*) and 1.704-1(b)(2)(iv)(*h*)(2);

(c)    The Book Value of property distributed to a Member will be the fair market value of such property as of the date of such distribution as reasonably determined by the Board; and

(d)    The Book Value of all property will be increased (or decreased) to reflect any adjustments to the adjusted basis of such property pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining

Capital Accounts pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(m) and clause (e) of the definition of Profits or Losses.

"Business" means, as of any date of determination, all lines of business conducted by the Company or its Subsidiaries at such date or any time during the 24-month period prior to such date, including, without limitation, the business of processing post-consumer and post-industrial recycled polyethylene terephthalate plastic products.

"Business Day" means any day other than a Saturday, a Sunday, or a holiday on which national banking associations in New York City are authorized by Law to close.

"Capital Account" has the meaning specified in Section 5.4(a).

"Capital Contribution" means, with respect to any Member, the amount of money and the initial Book Value of any property, other than money (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to as described in Section 1.704-1(b)(2)(iv)(c) of the Treasury Regulations), contributed to the Company by such Member (provided, that the Company may direct that any such Capital Contribution be made directly to a Subsidiary). Any reference in this Agreement to the Capital Contribution of a Member with respect to a Unit held thereby will include Capital Contributions made in respect of such Unit by any predecessor-in-interest of such Unit.

"Certificate" has the meaning specified in the recitals to this Agreement.

"Class A Units" has the meaning specified in Section 4.2(c)(i).

"Class B Units" has the meaning specified in Section 4.2(c)(ii).

"Class C Units" has the meaning specified in Section 4.2(c)(iii).

"Class C-1 Units" has the meaning specified in Section 4.2(c)(iii).

"Code" means the United States Internal Revenue Code of 1986, as amended from time to time. All references herein to Sections of the Code will include any corresponding provision or provisions of succeeding Law.

"Company" has the meaning specified in the preamble to this Agreement.

"Company Acceptance Deadline" has the meaning specified in Section 4.4(b)(iv).

"Company Opportunity" means any business opportunity related to the business, operations and purposes of the Company or any Subsidiary (whether in the past or from time to time).

"Competitive Activities" means, as of any date of determination, any business activity that is competitive with the then-current or demonstrably planned business activities of the Company or any Subsidiary.

42992628.2

"Competitor" means any Person that (a) is engaged in any business or activity that is, or could reasonably be considered, competitive with the Business or the Company's or any Subsidiary's actual business or demonstrable, planned business as of the date of such termination, (b) was engaged in any business or activity described in clause (a) preceding at any time during the 12-month period before the date of such termination or (c) has articulated plans to engage in any business or activity described in clause (a) preceding beginning in the 12-month period following such termination date.

"Confidential Information" means any information which is currently held by the Company or any Subsidiary or is hereafter acquired, developed or used by the Company or any Subsidiary relating to business opportunities or other operational, economic, financial, management or other aspects of the business, operations, properties or prospects of the Company or any Subsidiary, whether oral or in written form; but does not include (a) information which is or becomes generally available to the public other than as a result of a disclosure that is known to be in violation of this Agreement or (b) information made available to a Member on a non-confidential basis from a Person other than the Company, any Subsidiary, another Member or any of their representatives.

"Control," including the correlative terms "Controlling," "Controlled by" and "under common Control with" means possession, directly or indirectly, of the power to direct or cause the direction of management or policies (whether through ownership of securities or any partnership or other ownership interest, by contract or otherwise) of a Person.  For the purposes of the preceding sentence, control will be deemed to exist when a Person possesses, directly or indirectly, through one or more intermediaries (a) in the case of a corporation, more than 50% of the outstanding voting securities thereof; (b) in the case of a limited liability company, partnership, limited partnership or venture, the right to more than 50% of the distributions therefrom (including liquidating distributions); or (c) in the case of any other Person, more than 50% of the economic or beneficial interest therein.

"Co-Sale Elected Units" has the meaning specified in Section  4.4(c)(iv).

"Co-Sale Notice" has the meaning specified in Section 4.4(c)(iii).

"Co-Sale Offer" has the meaning specified in Section 4.4(c)(ii).

"Co-Sale Percentage" means, as to any Electing Co-Sale Member, a fraction (expressed as a percentage), the numerator of which equals the number of Class A Units and Class B Units held of record by such Electing Co-Sale Member and the denominator of which equals the aggregate number of Class A Units and Class B Units held by the Co-Sale Seller and all Electing Co-Sale Members.

"Co-Sale Seller" has the meaning specified in Section 4.4(c)(ii).

"Co-Sale Units" has the meaning specified in Section 4.4(c)(iii).

"Covered Losses" has the meaning specified in Section 4.5(c)(i).

"Covered Persons" has the meaning specified in Section 4.5(c)(i).

Exhibit A-4

"Curative Allocations" means the allocations pursuant to Section 6.6.

"Customary Transaction Documents" means, with respect to a Proposed Co-Sale Transfer or an Approved Transaction, such definitive documentation that governs the Proposed Co-Sale Transfer or Approved Transaction and is approved by the Board or the Majority Holders and that is customarily entered into in connection with such type of transaction including purchase and sale agreements, merger agreements, restrictive covenant agreements that include, among other terms, confidentiality provisions and provisions restricting competition, soliciting and hiring any of the Company's or any Subsidiary's employees or soliciting any of the Company's or any of its Subsidiary's customers, Unit transfer instruments, incumbency certificates, certificates of existence and good standing, FIRPTA certificates and joinder or support agreements. The definitive documentation will designate the Deal Representative to serve as the representative of all of the Members and the Blocker Member owners to take all action under such documentation (such as, but not limited to, agreeing to amendments or waivers, waiving closing conditions, prosecuting, defending, settling and authorizing payments with respect to indemnification claims, managing and making all decisions with respect to post-closing purchase price adjustment procedures, settlements and payments, engaging counsel and other advisors and receiving and disbursing transaction consideration, net of expenses, and incurring expenses in connection with any of the foregoing).

"Customary Transaction Terms" means, with respect to a Member and with respect to a Proposed Co-Sale Transfer or Approved Transaction:

(a)      representations and warranties from such Member about itself and its Units (but not representations or warranties about any other Member, the Company or any Subsidiary or their respective businesses) covering such Member's corporate or other entity power, due authorization, execution and delivery, enforceability, receipt of necessary approvals, absence of conflicts and ownership of unencumbered title to its Units;

(b)      if such Member is a Blocker Member Transferring Equity Interests therein rather than Units, in addition to the representations and warranties in clause (a) above, representations and warranties from such Member's equity holders (i) confirming that such Blocker Member has never owned assets other than Units, tax assets related to the Company (such as net operating losses), cash and cash equivalents and immaterial assets related to such entity's formation, existence, good standing, or ongoing administrative matters and that such Blocker Member's only liabilities are those arising under this Agreement including tax liabilities arising from allocations of income or gain from the Company, immaterial liabilities relating to its formation, existence, good standing and ongoing administrative matters and liabilities arising under applicable Laws and (ii) with respect to the capitalization and ownership of such Blocker Member;

(c)      (i) such Member's agreement to bear (i) up to 100% of the losses arising from a breach of any of such Member's representations and warranties described in clause (a) and any covenants that are personal to such Member (such as restrictive covenants, confidentiality provisions and releases (in such Member's capacity as a Member)), (ii) if such Member is a Blocker Member, such Blocker Member's owners' agreement to bear up to 100% of the losses arising from a breach of any of such Member's or such Blocker Member's owners' representations

and warranties described in clause (b) and to indemnify against up to 100% the liabilities of the Blocker Member other than those that a buyer of Units directly from such Blocker Member would have been exposed to and (iii) such Member's agreement or, if such Member is a Blocker Member, such Blocker Member's owners' agreement to bear up to such Member's pro rata share (but not more than its pro rata share) of any escrow amount, holdback, purchase price adjustment and post-closing indemnity obligation (other than losses arising from representations and warranties about another Member and other than covenants of another Member that are personal to such Member); provided, in no event will the Customary Transaction Terms require a Member or, in the case of a Blocker Member, such Blocker Member's owners, to agree to bear more than 100% of the aggregate proceeds received by such Member or Blocker Member owners from the Approved Transaction or Proposed Co-Sale Transfer, as applicable, except in the case of fraud.  For clarification, the post-closing indemnity obligations described in clause (iii) preceding may arise from a breach of the Company's representations or warranties, a violation of the Company's covenants or other indemnity items (including tax indemnities, indemnities for indebtedness or transaction expenses, purchase price adjustment items and fundamental representation losses) that are not personal to a particular Member.  For purposes of clause (ii) preceding, a Member's pro rata share of any such loss will be the reduced amount such Member would have received if the amount of such loss had first reduced the aggregate transaction consideration distributable to the Members and such reduced amount (rather than the unreduced amount) had been distributed as required by Section 4.4(d)(iv);

(d)    a release of such Member's claims (in its capacity as a Member and not in any other capacity such as a director, officer or employee) other than rights under the Customary Transaction Documents governing the Approved Transaction or Proposed Co-Sale Transfer, rights under Article 9 of this Agreement, if any, and rights of such Member under any third-party directors and officers (or similar) insurance policy maintained by the Company or any of its Subsidiaries;

(e)    solely in the context of a Sale Transaction (and otherwise not in any Proposed Co-Sale Transfer or other Approved Transaction), an agreement not to solicit or hire employees of the Company or any Subsidiary (provided, this non-solicitation requirement will not apply to any Exempt Institutional Holder) and an agreement not to solicit any customers of the Company or any Subsidiary (provided, this non-solicitation requirement will also not apply to any Exempt Institutional Holder) and, solely with respect to Insider Members, the Insider Members' agreement not to compete, and to cause its Affiliates not to compete, with the Company or its Subsidiaries for up to five years after the closing of an Approved Transaction;

(f)    if any Member is given an option as to the form of financial consideration to be received, each other Member holding the same class of Units will be given the same option with respect to the same class of Units, except with respect to the Sterling Rollover Exception or as otherwise provided in the third sentence of Section 4.4(c)(v) or the last sentence of Section 4.4(d)(iv)(B);

(g)    if the consideration to be paid in the Proposed Co-Sale Transfer or Approved Transaction consists of any securities or other property other than cash and/or Freely Marketable Securities, (i) each Member participating in such transaction (or in the case of a Blocker Member, the owners of such Blocker Member) will have been offered the right to enter

into an agreement with the Majority Holders providing such Member (or owners of such Blocker Member) with substantially the same co-sale rights with respect to any Transfer by the Majority Holders of such securities or other property as the rights, if any, such Member has under Section 4.4(c); and

(h)    in any Approved Transaction, each Member that is forced to participate in such Approved Transaction will be required to sell the same percentage of each class of Units or other Equity Interests held by such Member as each other Member (i.e., if the Sterling Holders sell 90% of their respective Class A Units (counting rollover investments as being sold for these purposes), each other Member will sell 90% of the Class A Units held by each other Member).

For clarification, Customary Transaction Terms will not include a requirement for any Institutional Holder to enter into a non-compete agreement.

"Deal Representative" means Sterling or any Affiliate of Sterling that is designated by Sterling.

"Deceased FMV Notice" has the meaning specified in Section 4.4(f)(ii).

"Deceased Spouse" has the meaning specified in Section 4.4(f)(ii).

"Deceased Spouse Units" has the meaning specified in Section 4.4(f)(ii).

"Deemed Indirect Transfer" has the meaning specified in Section 4.4(a)(viii).

"Designated Individual" means an individual meeting the requirements of proposed Treasury Regulations Section 301.6223-1(b)(2) and (4) that is appointed as the sole individual through whom the Partnership Representative will act for purposes of subchapter C of chapter 63 of the Code, as provided in the proposed Treasury Regulations.

"Directors" has the meaning specified in Section 7.1.

"Disposing Holder" has the meaning specified in Section 4.4(b)(ii).

"Disposition Notice" has the meaning specified in Section 4.4(b)(ii).

"Dissolution Event" has the meaning specified in Section 11.1(a).

"Distributable Amount" has the meaning specified in Section 6.1(a).

"Divorce FMV Notice" has the meaning specified in Section 4.4(f)(i).

"Divorce Notice" has the meaning specified in Section 4.4(f)(i).

"Divorced Member" has the meaning specified in Section 4.4(f)(i).

"Divorced Spouse" has the meaning specified in Section 4.4(f)(i).

"Divorced Spouse Units" has the meaning specified in Section 4.4(f)(i).

"Electing Co-Sale Member" has the meaning specified in Section 4.4(c)(iii).

"Election Period" has the meaning specified in Section 4.3(b).

"Eligible Class C Unit" means, as of any time of determination, (a) each Vested Class C-1 Unit but only from and after the date each Class A Unit and each Class B Unit that is outstanding as of the 180 day after the First A&R Date has received cumulative distributions from the Company (disregarding distributions under Section 6.1(b)) of cash or other property in an amount equal to [2x pre-money per unit value] and (b) each other Vested Class C Unit but only from and after the date each Class A Unit and each Class B Unit that is outstanding has received cumulative distributions from the Company (disregarding distributions under Section 6.1(b)) of cash or other property in an amount equal to Participation Level of such Class C Units; provided, for purposes of this clause (b) only distributions made after the issuance of the Class C Unit will be counted in determining whether the Participation Level of any Class C Unit has been achieved.

"Eligible Co-Sale Participant" means, in connection with any Transfer that triggers the co-sale (tag-along) rights under Section 4.4(c), (a) each Member designated as an "Eligible Co-Sale Participant" on Schedule 1 and its respective Permitted Transferees and (b) any other Member designated by the Majority Holders or the Board as an Eligible Co-Sale Participant for purposes of such Transfer; provided, notwithstanding the foregoing, a Member will not be an Eligible Co-Sale Participant unless it is in Good Standing or unless the Board expressly waives the Good Standing requirement for such Member in connection with such Transfer.

"Eligible Incentive Participant" means a Person acting as an officer, manager, director or employee of, or providing services to, the Company or any Subsidiary, or an Affiliate of such Person (or an Entity in which such Person owns equity interests) but only if such Affiliate is designated as an "Eligible Incentive Participant" by the Board.

"Eligible Purchaser" means, in connection with any offering that triggers the preemptive rights set forth in Section 4.3, (a) each Member designated as an "Eligible Purchaser" on Schedule 1 and its respective Permitted Transferees and (b) any other Member designated by the Majority Holders or the Board as an Eligible Purchaser for purposes of such offering.

"Entity" means any Person other than a natural person.

"Equity Interest" means any and all shares, interests, participations, or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation) such as membership or partnership interest (whether undivided, unitized or otherwise denominated) and any and all warrants, options, or other rights to purchase or acquire any of the foregoing.

"Estimated Maximum Tax Liability" means, for each Member, the product of (a) an amount determined by the Board (on an actual or estimated basis) for such Member for a completed fiscal quarter equal to the sum of the portion of the Company's net income allocated or to be allocated and guaranteed payments made or to be made to such Member for federal, state or local income tax purposes for such fiscal quarter (provided, unless otherwise determined by the Board, Net Profit arising from a Sale Transaction or from transactions undertaken in connection with the winding-up or liquidation of the Company will be disregarded for purposes of this clause (a) so

42992628.2

that tax distributions under <u>Section 6.1(b)</u> are not made in respect of such Net Profit) multiplied by (b) the Tax Rate. In determining the Estimated Maximum Tax Liability for any such Member, the Board will take into account rate differences that may apply to the character of the income so allocated. In addition, in determining the Estimated Maximum Tax Liability for any Member, Net Losses allocated to such Member for a Fiscal Year that are allowed to be carried forward under applicable tax Laws to a later Fiscal Year will be deducted from Net Profit in that later year.

"<u>Exchange Act</u>" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated by the SEC thereunder, together with any successor Law.

"<u>Excluded Matters</u>" has the meaning specified in <u>Section 7.3(a)</u>.

"<u>Exempt Institutional Holder</u>" means each Member designated as an "Exempt Institutional Holder" on <u>Schedule 1</u> and its respective Permitted Transferees.

"<u>Exempt ROFR Transfer</u>" has the meaning specified in <u>Section 4.4(b)(i)</u>.

"<u>Exempt Tag Transfer</u>" has the meaning specified in <u>Section 4.4(c)(i)</u>.

"<u>Exempted Units</u>" means any (a) Units issued, sold or otherwise Transferred in connection with a Public Offering or an Internal Restructure, (b) Units, Unit Equivalents or Equity Interests of any Subsidiary distributed or set aside ratably to all Members pro rata based on their respective Class A Units, Class B Units and Class C Units, including any distribution to effect any split of Units or class of Units or similar reclassification or an Internal Restructure, (c) Units, Unit Equivalents or Equity Interests of any Subsidiary issued, sold or otherwise Transferred to any Person that is not a Sterling Holder or an Affiliate of a Sterling Holder as consideration in a business acquisition (with a Person or Persons that are not Affiliates of a Sterling Holder) whether structured as a merger, consolidation, equity purchase, asset purchase, recapitalization, or otherwise, including customary "rollover" equity arrangements with such Persons including the Class C-1 Units, (d) Unit Equivalents issued to any Eligible Incentive Participant (or to any Entity whose owners of economic interests consist solely of Eligible Incentive Participants so long as such Entity is approved by the Board), (e) Units, Unit Equivalents or Equity Interests of any Subsidiary issued to any Person that is not a Member or an Affiliate of any Member so long as (i) the Board determines that there are strategic reasons to exempt such issuance from the preemptive rights terms of <u>Section 4.3</u> and (ii) none of the Members or any of their Affiliates participates in such issuance or otherwise co-invests in any related issuance or related transaction, (f) any Units, Unit Equivalents or Equity Interests of any Subsidiary issued, sold or otherwise Transferred to any lender (including the Members and their Affiliates, but excluding the Sterling Holder and its Affiliates, unless approved or deemed approved under <u>Section 8.4</u>) in connection with any loan or commitment to lend made by such lender to the Company or any Subsidiary, (g) the Units designated as "Exempted Units" in <u>Section 4.3(e)</u>, (h) Units issued in exchange for equity interests in Holdings contributed to the Company by Persons other than the Sterling Holders or their Affiliates at the request of the Company to facilitate a Strategic Transaction, (i) Units issued, sold or otherwise Transferred to fulltime employees of Sterling or its affiliated management company so long as (A) the per Unit issue price paid by any such employee upon the issuance of any such Unit is no less than the issue price paid most recently by an Institutional Holder to acquire its then most recently acquired Unit and (B) the aggregate issue price of all Units issued pursuant to the

exemption in this clause (i) does not exceed $1,000,000 in the aggregate, (j) Units issued, sold or otherwise Transferred by any Subsidiary to the Company or another Subsidiary and (k) up to _____ Class A Units issued to Orion if and to the extent Orion elects to purchase Class A Units pursuant to the Equity Term Sheet attached to the CarbonLite Purchase Agreement.

"Expelled" means the expulsion or removal of a Member from the Company as a member.

"Fair Market Value" means the Board's or the Majority Holders' determination in its sole discretion of the fair market value of any equity or Entity, which determination will be Final. The Board or the Majority Holders may use the most recent carrying value of the equity or Entity reported by Sterling to its fund investors as the basis for the Board's or Majority Holders' determination of Fair Market Value, and none of the Board, the Majority Holders, their limited partners, or other investors, or any of their respective Affiliates will have any liability to any Person for such determination or the Board's or Majority Holders' reliance thereon.

"Final" means final, conclusive and binding on the Company and all Members without opportunity for judicial review, challenge or appeal of any kind.

"FINRA" means the Financial Industry Regulatory Authority.

"Firm" has the meaning specified in Section 4.4(b)(iii).

"FIRPTA" means the Foreign Investment in Real Property Act.

"First A&R Date" has the meaning specified in the preamble to this Agreement.

"First Notice" has the meaning specified in Section 4.3(b).

"Fiscal Year" has the meaning specified in Section 10.5.

"Formation Date" has the meaning specified in the recitals to this Agreement.

"Freely Marketable Securities" means securities listed on a national securities exchange or quoted on the NASDAQ Global Market and which are not subject to a contractual prohibition on the sale of such securities for a period of time.

"Good Standing" means, with respect to any Member, (a) that neither such Member, nor any of such Member's direct or indirect Permitted Transferees from whom such Member received, directly or indirectly, any Unit in a Permitted Transfer is in material breach of this Agreement or any non-compete, non-solicit, no-hire or confidentiality obligation that inures to the benefit of the Company or any Subsidiary or (b) that such Member is deemed to be in Good Standing by the Board in connection with any particular matter set forth in this Agreement.

"Holdings" has the meaning specified in Section 4.1(b).

"Incentive Unit" has the meaning specified in Section 4.2(c)(iii).

"Incentive Unit Ledger" has the meaning specified in Section 4.2(e).

"Independent Director" means, as of any date of determination, any individual other than (a) an individual who is employed on a full-time basis by, or who otherwise dedicates substantially all of his business time to, Sterling or (b) an individual that has received cash remuneration from Sterling for services rendered in excess of $250,000 in any of the three calendar years preceding such date of determination.

"Individual Insider Member Agreement" has the meaning specified in Section 4.4(e)(i).

"Initial Public Offering" means the initial sale of any class of shares or equity securities of the Company or any Subsidiary or any successor thereto or an IPO Issuer pursuant to an effective registration statement under the Securities Act (other than a registration statement on Form S-8, Form S-4 or any successor forms) or other applicable legislation, regulation or rules in any applicable jurisdiction that results in the initial public sale of the equity securities and the listing or admission to trading of the equity securities on a Recognized Stock Exchange.

"Insider Member" means, as of any date of determination, (a) any individual who is an employee of the Company or any Subsidiary at the time such individual is admitted as a Member, (b) any Member who, when first admitted as a Member, is Majority-Owned by one or more individuals described in clause (a) preceding, (c) any Member that is designated as an "Insider Member" on Schedule 1 when first admitted as a Member and (d) any Permitted Transferee of any of the foregoing; provided, an Institutional Holder will not be an Insider Member unless specifically designated as such by the Majority Holders or the Board upon first being admitted as a Member.

"Institutional Holder" means (a) each Sterling Holder and each other Member designated as an "Institutional Holder" on Schedule 1 to this Agreement and (b) each Member that is a private equity fund, investment fund, governmental pension plan, managed account or similar investment vehicle that is an Affiliate of, and receives Units from, a Member described in clause (a) or this clause (b) in a Permitted Transfer made in accordance with this Agreement. Notwithstanding anything to the contrary herein, including the amendment provisions in Section 12.6, no Member that is an Institutional Holder will cease to be an Institutional Holder unless such Member ceases to be a Member or consents to such change in designation.

"Internal Restructure" means, with respect to the Company, any re-formation, conversion, transfer of assets, Transfer by Members of their Units, merger, incorporation, liquidation or other similar transaction undertaken for the primary purpose of changing the Company's corporate structure for a legitimate business purpose, such as effecting a Strategic Transaction.

"Involuntary Transfer" means (a) a Transfer resulting from the death or permanent incapacity of a Member and (b) a Transfer pursuant to a judgment, decree or order made pursuant to applicable domestic relations Law.

"IPO Issuer" means the Company, a successor to the Company that is an Affiliate of the Company or any Affiliate of the Company, in each case, which will be the issuer in an Initial Public Offering.

"IPO Securities" has the meaning specified in Section 8.8(b).

"Joinder Agreement" means an agreement in form approved by the Board and pursuant to which a Person (a) agrees to be bound by the terms of this Agreement, (b) agrees that any Units held thereby will be bound by the terms of this Agreement and (c) makes representations and warranties about itself including whether or not such Person is an SPV Member confirming that such Person is not an Adverse Person.

"Law" means any applicable federal, state, provincial, municipal, local or foreign statute, law, treaty, ordinance, regulation, rule, code, order or rule of common law.

"Lender Member" means any Member designated as a "Lender Member" on Schedule 1 and any Permitted Transferee thereof.

"Majority Holders" means, as of any date of determination, the Members who, among them, hold a majority of the Voting Units of all Members, as of such date.

"Majority-Owned" means, when used to associate a Person or Persons with a particular Entity, that such Person or Persons have both (a) the right to more than 50% of distributions on liquidation of such Entity and (b) the right to elect directors, managers or similar governing persons of such Entity who, among them, hold a majority of the voting power of all such directors, managers or similar governing persons of such Entity.

"Maximum Dollar Amount" has the meaning specified in Section 4.3(a).

"Member" means any Person other than the Company (a) that executes this Agreement as of the First A&R Date or (b) who is hereafter admitted to the Company as a Member as provided in Section 4.1(b), but such term does not include any Person who has ceased to be a Member in the Company as provided in Section 4.1(c).

"Member Nonrecourse Debt" has the meaning assigned to the term "partner nonrecourse debt" in Treasury Regulations Section 1.704-2(b)(4).

"Member Nonrecourse Debt Minimum Gain" has the meaning assigned to the term "partner nonrecourse debt minimum gain" set forth in Treasury Regulations Section 1.704-2(i)(2).

"Member Nonrecourse Deduction" has the meaning assigned to the term "partner nonrecourse deduction" in Treasury Regulations Section 1.704-2(i)(1).

"Membership Interest" means the interest of a Member, in its capacity as such, in the Company, including rights to distributions (liquidating or otherwise), allocations, information, vote, and all other rights, benefits and privileges enjoyed by that Member (under the Act, the Certificate, this Agreement or otherwise) in its capacity as a Member; and all obligations, duties and liabilities imposed on that Member (under the Act, the Certificate, this Agreement, or otherwise) in its capacity as a Member.

"Minimum Gain" has the meaning assigned to that term in Treasury Regulations Section 1.704-2(d).

"Net Loss" means, for each Fiscal Year or other period, the excess of the Company's Loss over Profit.

"Net Profit" means, for each Fiscal Year or other period, the excess of the Company's Profit for such Fiscal Year or other period over the Company's Loss for such Fiscal Year or other period.

"New Terms Amendment" has the meaning specified in Section 4.2(a).

"Nonrecourse Deduction" has the meaning assigned to that term in Treasury Regulations Section 1.704-2(b)(1).

"Observer" means one representative designated by _____ to attend meetings of the Board and have other rights as further provided in 7.3.

"Offered Units" has the meaning specified in Section 4.3(a).

"Offering" has the meaning specified in Section 4.3(a).

"Officers" has the meaning specified in Section 7.6.

"Original Agreement" has the meaning specified in the recitals to this Agreement.

"Orion" means Orion Energy Partners.

"Oversubscribing Sterling Holder" has the meaning specified in Section 4.3(c).

"Participation Commitment Notice" has the meaning specified in Section 4.3(a).

"Participation Level" means with respect to any Incentive Unit the dollar amount determined by the Board, which at a minimum will be the amount necessary to qualify such Unit as a "profits interests" within the meaning of Revenue Procedures 93-27 and 2001-43.

"Partnership Representative" has the meaning specified in Section 10.6.

"Party" has the meaning specified in the preamble to this Agreement.

"Passing Interest Notice" has the meaning specified in Section 4.4(f)(ii).

"Permitted Transfer" means:

(a)    with respect to any Member other than the Sterling Holder, (i) any Transfer expressly approved as a "Permitted Transfer" by a majority of Directors who do not have a direct and meaningful interest in such Transfer and (ii) any Transfer to the Company pursuant to repurchase provisions in this Agreement or in any Individual Insider Member Agreement;

(b)    with respect to any Member that is a natural person, (i) an Involuntary Transfer and (ii) a Transfer to any trust, limited liability company, limited partnership or other entity having as its sole beneficiaries or owners such Member or any spouse, parent, sibling, child

42992628.2

or grandchild of such Member, or any combination of the foregoing, so long as such trust, limited liability company, limited partnership or other entity is Controlled by such transferring Member or, in the case of a trust, by an independent trustee who is not a beneficiary of such trust;

(c)    with respect to any Sterling Holder, (i) a Transfer to any full-time employee of Sterling or its affiliated management company so long as (A) the per Unit price paid by any such employee in any such Transfer is no less than the issue price paid most recently by a Sterling Holder to acquire such Unit from the Company and (B) the aggregate price of all Units purchased by all such employees in all Transfers covered by this clause (c) does not exceed $1,000,000 in the aggregate, and (ii) Transfers by the Sterling Holders to their respective limited partners so long as the aggregate number does not exceed 20% of the number of Class A Units held by the Sterling Holders as of the First A&R Date;

(d)    with respect to any Institutional Holder, a Transfer to (i) any of its Affiliates, (ii) the beneficiaries, partners, security holders or members of such Institutional Holder as a pro rata distribution in respect of the equity held by such beneficiaries, partners, security holders or members in such Institutional Holder or (iii) any managed account, investment fund or other vehicle for which such Institutional Holder or Affiliate thereof is the controlling investment advisor or portfolio manager; and

(e)    any forfeiture or cancellation of Rollover Units, or withholding or offset of distributions in respect of Rollover Units, by the Company pursuant to any definitive acquisition agreements or rollover, contribution or subscription agreements entered into by the Company or its Subsidiaries in connection with their business acquisitions as contemplated in Section 12.2(b).

"Permitted Transferee" means, with respect to any Member, any Person that receives, directly or indirectly, Units from such Member pursuant to a Permitted Transfer.

"Person" means any natural person, limited liability company, corporation, limited partnership, general partnership, joint stock company, joint venture, association, company, trust, bank trust company, land trust, business trust, or other organization, whether or not a legal entity, and any government or agency or political subdivision thereof.

"Preemptive Right Percentage" means, as to any Requesting Investor, a fraction (expressed as a percentage), the numerator of which equals the number of Class A Units and Class B Units held of record thereby and the denominator of which equals the total number of Class A Units and Class B Units then outstanding.

"Pre-IPO Value" means (a) the quotient obtained by dividing (i) the net proceeds to the IPO Issuer (or if the IPO Issuer will not receive proceeds in connection with such Initial Public Offering, then the net proceeds to the sellers of publicly offered securities in the Initial Public Offering) (in each case, less the reasonably estimated expenses of such Initial Public Offering incurred by the IPO Issuer) by (ii) a fraction (expressed as a percentage), the numerator of which is the number of publicly offered IPO Securities to be sold to the public in the Initial Public Offering and the denominator of which is the total number of securities of the same class or series as the publicly offered IPO Securities (including the publicly offered securities) that will be

outstanding immediately after the Initial Public Offering less (b) the proceeds to the IPO Issuer net of the reasonably estimated expenses of such Initial Public Offering incurred by the IPO Issuer.

"Proceeding" has the meaning specified in Section 9.6.

"Profits" or "Losses" means, for each Fiscal Year or other period, an amount equal to the Company's taxable income or loss for such Fiscal Year or other period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) will be included in taxable income or loss), with the following adjustments (without duplication):

(a)    any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits and Losses pursuant to this definition of "Profits" or "Losses" will be added to such taxable income or loss;

(b)    any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(*i*), and not otherwise taken into account in computing Profits or Losses pursuant to this definition of "Profits" or "Losses" will be subtracted from such taxable income or loss;

(c)    in the event the Book Value of any asset is adjusted pursuant to clause (b) or clause (c) of the definition of Book Value, the amount of such adjustment will be treated as an item of gain (if the adjustment increases the Book Value of the asset) or an item of loss (if the adjustment decreases the Book Value of the asset) from the disposition of such asset and will be taken into account for purposes of computing Profits or Losses;

(d)    gain or loss resulting from any disposition of property with respect to which gain or loss is recognized for federal income tax purposes will be computed by reference to the Book Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Book Value; and

(e)    to the extent an adjustment to the adjusted tax basis of any asset pursuant to Code Section 734(b) is required, pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(*m*)(4), to be taken into account in determining Capital Account balances as a result of a distribution other than in liquidation of a Member's interest in the Company, the amount of such adjustment will be treated as an item of gain (if the adjustment increases the basis of the asset) or an item of loss (if the adjustment decreases such basis) from the disposition of such asset and will be taken into account for purposes of computing Profits or Losses.

"Prohibited Transfers" has the meaning specified in Section 4.4(c)(ii).

"Proposed Co-Sale Transfer" has the meaning specified in Section 4.4(c)(ii).

"Proposed Co-Sale Transferee" has the meaning specified in Section 4.4(c)(iii).

"Proposed Transfer" has the meaning specified in Section 4.4(b)(ii).

"Proposed Transferee" has the meaning specified in Section 4.4(b)(ii).

"Protected Person" has the meaning specified in Section 9.10.

"Public Offering" means any primary or secondary public offering of equity securities of the Company or any Subsidiary pursuant to an effective registration statement under the Securities Act other than pursuant to a registration statement filed in connection with a transaction of the type described in Rule 145 under the Securities Act or for the purpose of issuing securities pursuant to an employee benefit plan.

"Recognized Stock Exchange" means the New York Stock Exchange, The NASDAQ Stock Market or any comparable stock exchange acceptable to the Board.

"Registrable Securities" means, at any time, with respect to any Member, any Units, or any securities into which Units are converted or for which Units are exchanged in connection with an Internal Restructure, which are held of record by such Member until (a) a registration statement covering such Units has been declared effective by the SEC and such Units have been disposed of pursuant to such effective registration statement, (b) such Units have been sold under circumstances in which all of the applicable conditions of Rule 144 (or any similar provisions then in force) under the Securities Act are met or such Units become eligible to be sold to the public through a broker, dealer, or market maker pursuant to Rule 144 (or any similar provision then in force) during a single 90-day period, or (c) such Units have been otherwise Transferred and in connection therewith the Company has delivered a new certificate or other evidence of ownership for such Units not bearing the legend required pursuant to this Agreement and such Units may be resold without subsequent registration under the Securities Act.

"Registration Expenses" means (a) all registration and filing fees, (b) fees and expenses of compliance with securities or blue sky laws (including reasonable fees and disbursements of counsel in connection with blue sky qualifications of the securities registered), (c) printing expenses, (d) internal expenses of the Company (including all salaries and expenses of its officers and employees performing legal or accounting duties), (e) reasonable fees and disbursements of counsel for the Company and customary fees and expenses for independent certified public accountants retained by the Company, (f) the reasonable fees and expenses of any special experts retained by the Company in connection with such registration, (g) reasonable fees and expenses of up to one counsel for the Members participating in the offering chosen by the participating Members holding a majority of the Registrable Securities to be included in the offering, (h) fees and expenses in connection with any review of underwriting arrangements by FINRA including fees and expenses of any "qualified independent underwriter" and (i) fees and disbursements of underwriters customarily paid by issuers or sellers of Registrable Securities, but will not include any underwriting discounts attributable to the sale of any Member's Registrable Securities, or any out-of-pocket expenses (except as set forth in clause (g) above) of the applicable selling Members.

"Regulated Holder" means any Member that (a) is subject to the provisions of Regulation Y (directly or indirectly due to its ownership by an entity subject to Regulation Y); (b) is affiliated with any entity subject to the provisions of Regulation Y (if such Affiliate holds securities of the Company); or (c) otherwise is subject to federal or state regulation as (i) a bank, (ii) an insurance company, (iii) an investment or other fund or (iv) an entity described in Rule 144A(a)(i)(A)-(I) under the Securities Act.  A Member will be deemed not to be a Regulated Holder unless designated as such by the Board or Majority Holders at the time of its admission.

42992628.2

"<u>Regulation Y</u>" means 12 C.F.R. Part 225 (or any successor to such regulation) promulgated under the federal Bank Holding Company Act of 1956, as amended.

"<u>Regulatory Allocations</u>" means the allocations pursuant to <u>Section 6.5</u>.

"<u>Regulatory Problem</u>" means, with respect to any Regulated Holder, any set of facts, events or circumstances the existence of which would cause such Regulated Holder to (a) be in violation of any Law or other requirement of any governmental authority (including Regulation Y) or (b) reasonably believe that it is not entitled to hold or exercise any significant right with respect to the Units, including, pursuant to the relevant provisions of the Bank Holding Company Act of 1956, as amended, and including any regulations, orders and rules promulgated or issued thereunder and the International Bank Act of 1978, as amended, and the "Volcker Rule" under the United States Dodd-Frank Wall Street Reform and Consumer Protection Act.

"<u>Related Blocker Entity</u>" means, with respect to any Blocker Member that is not a Blocker Entity, any Blocker Entity that is a direct or indirect equity owner of such Blocker Member and that such Blocker Member identifies as such to the Company at the time such Blocker Member is admitted as a Member.

"<u>Related Individual</u>" means, with respect to an Insider Member and any Member who acquires Units through one or more Permitted Transfers of Units first issued by the Company to an Insider Member, the individual listed under the column labeled "Related Individual" opposite such Insider Member's name on Schedule 1.

"<u>Remaining Sale Units</u>" has the meaning specified in <u>Section 4.4(b)(vii)</u>.

"<u>Renounced Business Opportunity</u>" has the meaning specified in <u>Section 9.4(a)</u>.

"<u>Reporting Entity</u>" means [TSG Shelf II Acquisition, LLC], a Delaware limited liability company.

"<u>Representative</u>" means (a) with respect to any Member, such Member's attorneys, accountants, tax advisors, consultants, financial advisors and other professionals but only to the extent necessary to provide services to such Member for purposes that are not competitive with the Company's business and (b) with respect to a Sterling Holder, or any Sterling Fund, their respective investors, limited partners, general partners, management companies, rating agencies, financial institutions, placement agents and investment banking firms.

"<u>Repurchase Notice</u>" has the meaning specified in <u>Section 4.4(e)(ii)</u>.

"<u>Repurchase Price</u>" has the meaning specified in <u>Section 4.4(e)(ii)</u>.

"<u>Requesting Investor</u>" has the meaning specified in <u>Section 4.3(a)</u>.

"<u>Resign</u>" means the resignation, withdrawal or retirement of a Member from the Company. Such terms will not include any Transfer of Units, even though the Member making a Transfer may cease to be a Member as a result of such Transfer.

"Restricted Unit Agreement" means, with respect to each Member holding Incentive Units, that certain agreement dated as of the date of issuance of such Member's Incentive Units between the Company and such Member.

"ROFR Acceptance Deadline" has the meaning specified in Section 4.4(b)(iv).

"ROFR Offerees" means, with respect to any Transfer to which Section 4.4(b) applies, (a) any Member that, at the time such Transfer is proposed, is either an Institutional Holder or a Permitted Transferee thereof and (b) any other Person designated by the Majority Holders or the Board as a "ROFR Offeree" with respect to such Transfer, which designation may be made by the Board or the Majority Holders in their sole discretion on a transfer-by-transfer basis; provided, notwithstanding the foregoing, a Person will not be a ROFR Offeree unless it is in Good Standing or unless the Board or the Majority Holders waive such Good Standing requirement.

"ROFR Percentage Interest" means, as to any ROFR Offeree determined as of the date of the Disposition Notice, a fraction (expressed as a percentage), the numerator of which equals the number of Units held of record thereby as of such date and the denominator of which equals the number of Units held of record by all of the ROFR Offerees as of such date.

"ROFR Unit Purchase Price" means the per Unit purchase price set forth in the Disposition Notice except that the cash equivalent value (determined pursuant to the provisions of Section 4.4(b)) of any non-cash consideration will replace any non-cash consideration included in the Disposition Notice.

"Rollover Units" means any Class A Units issued to any Person that is a seller in connection with the Company's or its Subsidiaries' business acquisitions pursuant to any definitive acquisition agreement or rollover, contribution or subscription agreement.

"Safe Harbor Election" has the meaning specified in Section 4.2(f).

"Sale Transaction" means any transaction or series of related transactions (whether such transaction occurs by a sale or exchange of assets, sale or exchange of Units, merger, conversion, recapitalization, other business combination or indirect sale of Unit Equivalents) that results in (a) all or substantially all of the consolidated assets of the Company and any Subsidiary being transferred to or owned by a Person or Persons that are not directly or indirectly Majority-Owned by the record holders of the Units immediately prior to such transaction or series of related transactions or their Affiliates or (b) the Company no longer being Majority-Owned, directly or indirectly, by the record holders of the Units immediately prior to such transaction or series of related transactions or their Affiliates.  Because of the existence of Blocker Members in the Company's ownership structure and the likelihood that the equity of some or all of the Blocker Members may be transferred, sold, exchanged, converted or cancelled in lieu of the Units held thereby in sale transactions, the Board or the Majority Holders may designate any transaction or series of related transactions as a "Sale Transaction" so long as either of them determines in good faith that such transaction or series of related transactions has a substantially similar economic objective as a transaction described in the preceding sentence.

"Sale Units" has the meaning specified in Section 4.4(b)(ii).

"SEC" means the United States Securities and Exchange Commission.

"Securities Act" means the Securities Act of 1933, as amended from time to time, and the rules and regulations promulgated by the SEC thereunder, together with any successor statute.

"Specified Unit" has the meaning specified in Section 4.4(e)(ii).

"SPV Member" means (a) any Member denoted as an "SPV Member" on Schedule 1 and (b) any other Member whose Units comprise more than 30% of the fair market value of all of the assets of such Member (disregarding assets that the Board determines in good faith have been contributed to, or otherwise acquired by, such Member in order to avoid the 30% test set forth in this definition).

"Sterling" means The Sterling Group, L.P. and its Affiliates; provided, "Affiliates" as used in this definition does not include the Company or any Subsidiary.

"Sterling Advisory Agreement" means that certain letter agreement, dated as of [•], and as amended from time to time, by Sterling Group Management V, L.P. governing certain advisory services to be performed for the benefit of the [•] (as defined therein).

"Sterling Credit Holders" means, collectively, the Sterling Group Credit Fund, L.P., a Delaware limited partnership, TSG Shelf II Blocker Corp., a Delaware corporation, and their direct or indirect Permitted Transferees.

"Sterling Fund" means any pooled investment entity that is an Affiliate of Sterling.

"Sterling Holder" means, collectively, Sterling Group Partners V, L.P., a Cayman Islands exempted limited partnership, Sterling Group Partners V (Parallel), L.P., a Cayman Islands exempted limited partnership, TSG Shelf II Investments Holdings, LP, a Delaware limited partnership, and their direct or indirect Permitted Transferees.

"Sterling Officer" means any Officer that is a partner or full-time employee of Sterling or who otherwise dedicates substantially all of his or her business time to the management of Sterling and its portfolio companies.

"Sterling Related Party Transaction" has the meaning specified in Section 8.4(b).

"Sterling Rollover Exception" has the meaning set forth in Section 4.4(d)(iii).

"Strategic Transaction" means a Sale Transaction, a Public Offering including an Initial Public Offering and any other transaction expressly designated by the Board or the Majority Holders as a "Strategic Transaction."

"Subsidiary" means (a) any corporation or other Entity (including a limited liability company) a majority of the Equity Interests of which having ordinary voting power to elect a majority of the board of directors or other Persons performing similar functions is at the time owned, directly or indirectly, with power to vote, by the Company or any direct or indirect

subsidiary of the Company or (b) a partnership in which the Company or any Person described in the foregoing clause(a) is a general partner.

"Supplemental Notice" has the meaning specified in Section 4.3(a).

"Surviving Member" has the meaning specified in Section 4.4(f)(ii).

"Tax Rate" means the highest combined federal, state and local tax rates imposed on the income of the Company that apply to an individual residing in New York County, New York, or such other applicable tax rate selected by the Board, which Tax Rate will be the same for all Members of the Company, regardless of such Member's actual rate of taxation.

"Third-Party Indemnitor" means, with respect to each Protected Person, any Person (other than the Company or a Subsidiary thereof or any of their respective insurers) that indemnifies or provides expense advancement or reimbursement to such Protected Person with respect to a loss for which such Protected Person also has indemnification and/or expense reimbursement and/or advancement rights under Article 9.

"Transaction Beneficiaries" has the meaning specified in Section 4.4(d)(iv)(A).

"Transaction Process" has the meaning specified in Section 4.4(d)(i).

"Transfer," including the correlative terms "Transferring" or "Transferred," means any transfer, assignment, sale, gift, pledge, hypothecation or other encumbrance, or any other disposition (whether voluntary or involuntary or by operation of Law), of Units (or any interest (pecuniary or otherwise) therein or right thereto), including derivative or similar transactions or arrangements whereby a portion or all of the economic interest in, or risk of loss or opportunity for gain with respect to, Units are transferred or shifted to another Person; provided none of the following will be deemed a Transfer for purposes hereof: (a) an exchange, merger, recapitalization, consolidation or reorganization involving an Internal Restructure, (b) a transfer of securities in any Person that directly or indirectly owns equity interests in a Member to the extent such securities are (i) traded on an established United States national securities exchange or (ii) quoted on an established United States national over-the-counter trading system or (c) a transfer of limited partnership interests (or equivalent equity interests) in a conventional private equity fund or a conventional institutional debt fund.

"Treasury Regulations" means the regulations promulgated by the United States Department of the Treasury pursuant to and in respect of provisions of the Code. All references herein to Sections of the Treasury Regulations will include any corresponding provision or provisions of succeeding, similar, substitute, proposed or final Treasury Regulations.

"Unit" has the meaning specified in Section 4.2(a).

"Unit Equivalent" means any Unit or any other Membership Interest and any right, warrant, option, convertible security or exchangeable security, in each case, exercisable for or convertible or exchangeable into, directly or indirectly, any Unit or any other Membership Interest, whether at the time of issuance or upon the passage of time or the occurrence of some future event.

"Unit Ledger" has the meaning specified in Section 4.2(e).

"Unsubscribed Portion" has the meaning set forth in Section 4.3(a).

"Unvested Class C Unit" means, as of any date of determination, each Class C Unit that has been granted and issued by the Company to an Eligible Incentive Participant pursuant to a Restricted Unit Agreement and which, as of such date, has not "vested" or become non-forfeitable (except for cause) under the terms of such Restricted Unit Agreement.

"VCOC Member" has the meaning specified in Section 8.7.

"Vested Class C Unit" means, as of any date of determination, (a) each Class C-1 Unit and (b) each other Class C Unit (other than a Class C-1 Unit) that has been granted and issued by the Company to an Eligible Incentive Participant pursuant to a Restricted Unit Agreement and which (i) has not been forfeited to the Company pursuant to the terms of such Restricted Unit Agreement and is, as of such date, "vested" under the terms of such Restricted Unit Agreement or (ii) is specified as being a Vested Class C Unit by the Board as of such date of determination.

"Voluntary Transfer" means a Transfer that is not an Involuntary Transfer or a Prohibited Transfer.

"Voting Units" means the Class A Units and any other class or series of Units that is designated by the Board as voting.

Exhibit "B-2"

Form of Subscription Agreement

[See attached]

## SUBSCRIPTION AGREEMENT

This Subscription Agreement (this "Agreement"), dated as of [●], 2021, is made by and between TSG Shelf II Investments, LLC, a Delaware limited liability company (the "Company"), and [_____] (the "Subscriber").

### RECITALS

**WHEREAS**, the Subscriber desires to purchase [●] Class A Units (the "Purchased Units") for an aggregate cash purchase price of $[●] and the Company desires to issue and sell the Purchased Units to the Subscriber, in each case, on the terms and conditions set forth in this Agreement.

**NOW**, **THEREFORE**, in consideration of the foregoing and of the mutual covenants and agreements contained herein, the parties hereto agree as follows:

### AGREEMENTS

## ARTICLE 1
## SUBSCRIPTION FOR CLASS A UNITS

1.1. <u>Defined Terms</u>. Capitalized terms used in this Agreement that are not otherwise defined herein will have the respective meanings ascribed to such terms in the Amended and Restated Limited Liability Company Agreement of the Company, dated as of [●], 2021 (as further amended or restated in accordance with its terms, the "LLC Agreement").

1.2. <u>Purchase and Sale</u>. The Subscriber agrees to purchase and pay for on the date hereof, and the Company agrees to issue and sell to the Subscriber on the date hereof, the Purchased Units for a cash purchase price of $[●] per Unit or $[●] in the aggregate. Payment will be made on the date hereof by wire transfer in immediately available funds to an account designated by the Company to the Subscriber.

1.3. <u>Limited Liability Company Agreement</u>. Upon receipt of the purchase price specified in <u>Section 1.2</u>, the Company will immediately admit the Subscriber as a Member and designate the Subscriber as an "Institutional Holder" as such term is used in the LLC Agreement. The Subscriber hereby adopts, accepts and agrees to be bound by the terms and conditions of the LLC Agreement and agrees that the Purchased Units issued to the Subscriber will be bound by and subject to the terms of the LLC Agreement. The Subscriber will execute and deliver a counterpart to the LLC Agreement to evidence its agreement to the foregoing.

## ARTICLE 2
## REPRESENTATIONS, WARRANTIES AND COVENANTS OF THE SUBSCRIBER

2.1. <u>Representations, Warranties and Covenants</u>. The Subscriber hereby represents and warrants to, and agrees with, the Company as follows as of the date hereof:

(a)    <u>Power and Authority</u>. The Subscriber has all requisite power and authority (i) to enter into this Agreement, the LLC Agreement and such other documents, instruments, certificates and agreements that are executed and delivered by the Subscriber hereunder and thereunder (collectively, the "<u>Investment Documents</u>"), (ii) to perform its obligations under each of the Investment Documents and (iii) to consummate the transactions that are the respective subjects of each such Investment Document. This Agreement has been duly authorized, executed and delivered by the Subscriber and constitutes the valid and legally binding agreement of the Subscriber enforceable in accordance with its terms against the Subscriber, except as such enforceability may be limited by (A) bankruptcy, insolvency, reorganization, fraudulent conveyance, moratorium or other laws of general application relating to or affecting the enforcement of creditors' rights and remedies, as from time to time may be in effect, (B) application of equitable principles (regardless of whether such enforceability is considered in a proceeding in equity or at law) and (C) considerations of public policy.

(b)    <u>No Violation of Laws or Other Instruments</u>. The execution and delivery of the Investment Documents by the Subscriber and the consummation by the Subscriber of the transactions contemplated by the Investment Documents do not (with or without the giving of notice or the lapse of time or both) conflict with or result in any violation of or default under any provision of any applicable Law or any charter, bylaws, trust agreement, partnership agreement, or other organizational document, as the case may be, of the Subscriber or any material agreement, certificate or other instrument to which the Subscriber is a party or by which the Subscriber is bound.

(c)    <u>Accredited Investor</u>. The Subscriber is an "accredited investor" as defined in Rule 501(a) of Regulation D promulgated under the Securities Act.

(d)    <u>Investment Intent</u>. The Subscriber is acquiring the Purchased Units for its own account for investment, and not with a view to any distribution, resale, subdivision or fractionalization thereof in violation of the Securities Act or any other applicable securities laws, and the Subscriber has no present plans to enter into any contract, undertaking, agreement or arrangement for any such distribution, resale, subdivision or fractionalization.

(e)    <u>Access</u>. The Subscriber has carefully reviewed and is familiar with the terms of this Agreement and the LLC Agreement. The Subscriber has had the opportunity to ask questions of and receive answers from the Company concerning the terms and conditions of this investment.

(f)    <u>Illiquidity</u>. The Subscriber understands that substantial restrictions exist on transferability of the Class A Units, that no market for resale of any such Class A Units exists or is expected to develop, and that the Subscriber may not be able to liquidate its investment in the Company. The Subscriber represents and warrants further that it has no contract, understanding, agreement or arrangement with any Person to sell or transfer or pledge to such Person or anyone else any of the Purchased Units for which the Subscriber hereby subscribes (in whole or in part); and the Subscriber represents and warrants that it has no present plans to enter into any such contract, undertaking, agreement or arrangement. The Subscriber understands that the Purchased Units may not be sold except in accordance with the terms of the LLC Agreement and this

3

Agreement.  The Subscriber understands that any certificate representing the Class A Units will bear legends restricting the transfer thereof.  The Subscriber undertakes and agrees that it will not offer for sale, resell, assign, pledge or otherwise dispose of the Purchased Units at any time, except in accordance with the provisions of Regulation D under the Securities Act, pursuant to registration under the Securities Act, or pursuant to an available exemption from registration under the Securities Act.  The Subscriber agrees not to engage in any hedging transactions with regard to the Purchased Units unless in compliance with the Securities Act.

(g)    Awareness of Risks; Taxes.  The Subscriber understands that investment in the Company entails a high degree of risk and understands the risks associated with the operation of the Company and the Subscriber's investment in the Company.  The Subscriber is aware that ownership of the Class A Units involves a substantial degree of risk of loss of the Subscriber's entire investment and that there is no assurance of any return on such investment.  The Subscriber further represents that it is relying solely on its own conclusions or the advice of its own counsel or investment representative with respect to tax aspects of any investment in the Company.

(h)    Economic Loss, Suitability and Sophistication.  The Subscriber (i) is able to bear the economic risk of losing its entire investment in the Company and (ii) is able to bear such risk for an indefinite period of time.  The Subscriber has evaluated the risks involved in investing in the Class A Units and has determined that the Class A Units are a suitable investment for the Subscriber.  The Subscriber has such knowledge and experience in financial and business matters that it is capable of evaluating the risks and merits of this investment.

(i)    No Advice.  The Subscriber acknowledges and agrees that the Board has the exclusive power and discretion to make all investment decisions on behalf of the Company, subject to the terms of the LLC Agreement.  Accordingly, the Subscriber acknowledges that neither the Board nor the Company, nor any Affiliate of the Company, has rendered or will render any financial or tax advice or securities valuation advice to the Subscriber, and that the Subscriber is neither subscribing for nor acquiring any Class A Units in reliance upon, or with the expectation of, any such advice.

(j)    No Fiduciary Duties.  The Subscriber understands and acknowledges that applicable Delaware law permits the members of a Delaware limited liability company to modify and even eliminate fiduciary duties of members and managers (i.e., directors).  By executing the LLC Agreement, the Subscriber agrees that the terms of the LLC Agreement modify and eliminate fiduciary duties of the members and managers as otherwise may be imposed by applicable law or in equity.  The Subscriber hereby releases, discharges and acquits the members and the managers of the Company from any claims based on fiduciary duties imposed by applicable law or equity that are not set forth in the LLC Agreement.

(k)    Disclosure; No Reliance.  The Subscriber understands and agrees that, other than the representations and warranties of the Company set forth in Article 3 herein, neither the Company nor any other Person makes any representation or warranty, express or implied, as to the accuracy or completeness of the information provided or to be provided to the Subscriber by or on behalf of the Company or related to the transactions contemplated hereby, and nothing contained in any other documents provided or statements made by or on behalf of the Company to the

4

Subscriber is, or will be relied upon as, a promise or representation by the Company or any other Person that any such information is accurate or complete.

(l)     Disclaimer    of    Other    Representations    and    Warranties. NOTWITHSTANDING ANY PROVISION OF THIS AGREEMENT TO THE CONTRARY, THE SUBSCRIBER MAKES NO REPRESENTATIONS OR WARRANTIES TO THE COMPANY OR ANY OTHER PERSON IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, EXCEPT AS SPECIFICALLY SET FORTH IN THIS SECTION 2.1 AND THE OTHER INVESTMENT DOCUMENTS.    ALL OTHER REPRESENTATIONS AND WARRANTIES, WHETHER EXPRESS OR IMPLIED, ARE HEREBY DISCLAIMED BY THE SUBSCRIBER.

2.2.    Survival.  The Subscriber acknowledges that the Company has relied and will rely upon the representations and warranties of, and information furnished by, the Subscriber set forth in this Agreement and that all such representations and warranties, and furnished information, will survive the closing of the issuance of the Class A Units pursuant to this Agreement.

# ARTICLE 3
# REPRESENTATIONS, WARRANTIES AND COVENANTS OF THE COMPANY

3.1.    Representations, Warranties and Covenants.  The Company hereby represents and warrants to, and agrees with, the Subscriber as of the date hereof as follows:

(a)     Organization.  The Company is a limited liability company duly formed, validly existing and in good standing under the laws of the State of Delaware.  The Company has the full limited liability company power and authority to own its property, carry on its business as now being conducted, and to carry out the transactions contemplated by the Investment Documents.  The Company has provided or made available to the Subscriber true and correct copies of the LLC Agreement and certificate of formation of the Company (or other applicable organizational documents), including all amendments thereto.

(b)     Power and Authority.  The Company has all requisite power, authority and legal capacity to enter into each Investment Document to which it is a party, to perform its respective obligations under each such Investment Document, and to consummate the transactions that are the respective subjects of each such Investment Document.  The signature of the respective individual signing any Investment Document on behalf of the Company is binding upon the Company.  All actions required hereunder to be taken by the Company as a condition to the issuance and sale of the Class A Units purchased by the Subscriber have been taken.  This Agreement has been duly authorized, executed and delivered by the Company and, upon due authorization, execution and delivery by the Subscriber, will constitute the valid and legally binding agreement of the Company, enforceable in accordance with its terms against the Company, except as such enforceability may be limited by (i) bankruptcy, insolvency, reorganization, fraudulent conveyance, moratorium or other laws of general application relating to or affecting the enforcement of creditors' rights and remedies, as from time to time may be in effect, (ii) application of equitable principles (regardless of whether such enforceability is considered in a proceeding in equity or at law) and (iii) considerations of public policy.

5

(c)    Offer of Class A Units.  Assuming the investment representations set forth in Section 2.1 are true, the offer, sale and issuance by the Company of the Purchased Units are exempt from the registration requirements of the Securities Act, and neither the Company nor anyone acting on its behalf has taken or will take any action that would subject the issuance or sale of the Purchased Units acquired by the Subscriber to the registration and prospectus delivery provisions of the Securities Act.

(d)    Capitalization.  As of immediately prior to giving effect to the Company's issuance of the Purchased Units on the date hereof, Schedule 1 to the LLC Agreement is true and correct.  After giving effect to the Company's issuance of the Purchased Units on the date hereof, the Company's outstanding equity capitalization will consist [solely of [●] Class A Units and [●] Class C Units].  Other than the foregoing, there are no equity interests (including any profits interests, options, warrants or other rights, convertible securities or exchangeable securities) of the Company issued, reserved for issuance or otherwise outstanding.  All of the issued and outstanding Units and other equity interests in the Company issued by the Company on or before the date hereof, including the Purchased Units issued to the Subscriber hereunder, have been duly authorized and validly issued and will be fully paid and non-assessable, free and clear of all liens and encumbrances, and have been issued free of any pre-emptive rights.  Except for the LLC Agreement, this Agreement and the other Investment Documents, the Company has not entered into any agreement with respect to voting rights, preemptive or similar rights, registration rights or transfer restrictions with respect to any Units or other equity interests in the Company.

(e)    Investment Company Act.  Neither the Company nor any of its Subsidiaries is an "investment company" or a company "controlled" by an "investment company" within the meaning of the Investment Company Act.

(f)    No Conflict.  The execution and delivery of this Agreement and the other Investment Documents by the Company does not, and the consummation of the transactions contemplated hereby and thereby will not (with or without the giving of notice or the lapse of time or both), (i) violate or conflict with or result in any default under any provision of the organizational documents of the Company or any of its Subsidiaries including the LLC Agreement, (ii) violate any provision of any Law, or any order, judgment or decree of any court or other governmental authority applicable to the Company or any of its Subsidiaries or any of their respective assets or properties, (iii) violate or result in the cancellation, modification, revocation or suspension of any material license, franchise or permit held by the Company or any of its Subsidiaries, or (iv) violate or result in a breach of or default under any material contract to which the Company is a party or by which any of the Company's assets are bound.

(g)    Proceedings.  There is no pending or, to the knowledge of the Company, threatened action, arbitration, audit, litigation or suit (whether civil, criminal, administrative or investigative) commenced, brought, conducted or heard by or before, or otherwise involving, any governmental authority, against or otherwise relating to or involving the Company or its equityholders or any of their respective assets, at law or in equity, that challenges, or would reasonably be expected to have the effect of preventing, delaying, making illegal or otherwise interfering with, the ability of the Company to enter into and perform its obligations under the Investment Documents.  The Company is not subject to any outstanding order, judgment or decree

6

that prohibits or otherwise restricts the ability of the Company to consummate fully the transactions contemplated by the Investment Documents.

(h) <u>Disclaimer of Other Representations and Warranties</u>. NOTWITHSTANDING ANY PROVISION OF THIS AGREEMENT TO THE CONTRARY, THE COMPANY MAKES NO REPRESENTATIONS OR WARRANTIES TO THE SUBSCRIBER OR ANY OTHER PERSON IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, EXCEPT AS SPECIFICALLY SET FORTH IN THIS <u>SECTION 3.1</u> AND THE OTHER INVESTMENT DOCUMENTS.   ALL OTHER REPRESENTATIONS AND WARRANTIES, WHETHER EXPRESS OR IMPLIED, ARE HEREBY DISCLAIMED BY THE COMPANY.

3.2.   <u>Survival</u>.  The Company acknowledges that the Subscriber has relied and will rely upon the representations and agreements of the Company set forth in this Agreement, and that all such representations and agreements will survive the closing of the issuance of the Class A Units pursuant to this Agreement.

## ARTICLE 4
## MISCELLANEOUS

4.1.   <u>Amendments and Modifications; Waivers</u>.  This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each of the Company and the Subscriber.  No waiver by either the Company or the Subscriber of any of the provisions hereof will be effective unless explicitly set forth in writing and signed by the party so waiving.  No waiver by any party hereto will operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver.  No failure to exercise, or delay in exercising, any rights, remedy, power or privilege arising from this Agreement will operate or be construed as a waiver thereof; nor will any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

4.2.   <u>Notices</u>.  Except as expressly set forth to the contrary in this Agreement, all notices, requests or consents provided for or permitted to be given under this Agreement must be in writing and must be delivered to the recipient in person, by courier or mail (including electronic mail) or by facsimile, or similar transmission; and a notice, request or consent given under this Agreement is effective on receipt by the Person to receive it.  Notices given by facsimile will be deemed to have been received (a) on the day on which the sender receives answer back confirmation if such confirmation is received before or during normal business hours of any Business Day or (b) on the next Business Day after the sender receives answer back confirmation if such confirmation is received (i) after normal business hours on any Business Day or (ii) on any day other than a Business Day.  All notices, requests and consents to be sent to the Subscriber must be sent to or made at the addresses given for the Subscriber in the LLC Agreement or such other address as the Subscriber may specify by notice to the Company.  Whenever any notice is required to be given by Law, the Certificate or this Agreement, a written waiver thereof, signed by the Person entitled

7

to notice, whether before or after the time stated therein, will be deemed equivalent to the giving of such notice.

4.3.    <u>Governing Law; Jurisdiction; Venue</u>. This Agreement will be enforced, governed and construed in all respects in accordance with the Laws of the State of Delaware, without giving effect to any conflict-of-laws rule or principle that might refer the construction or interpretation of this Agreement to the Laws of another State or jurisdiction. Any action or proceeding against any party hereto relating in any way to this Agreement may be brought and enforced in the courts of the State of Delaware located in New Castle County and, to the extent subject matter jurisdiction exists therefor, in the courts of the United States for the District of Delaware, and the parties hereto hereby irrevocably submit to the exclusive jurisdiction of the foregoing courts in respect of any such action or proceeding. The parties hereby irrevocably waive, to the fullest extent permitted by Law, any objection that they may now or hereafter have to the laying of venue of any such action or proceeding in the courts of the State of Delaware located in New Castle County or the United States District Court for the District of Delaware, and any claim that any such action or proceeding brought in any such court has been brought in an inconvenient forum.

4.4.    <u>Assignment; Binding Effect</u>. This Agreement and the other Investment Documents and the rights and obligations set forth herein and therein will be binding upon, and will inure to the benefit of, the Subscriber, the Company and their respective successors and permitted assigns. Each provision of this Agreement will be considered severable and if for any reason any provision that is not essential to the effectuation of the basic purposes of this Agreement is determined by a court of competent jurisdiction to be invalid or unenforceable under Law, such invalidity will not impair the operation of or affect any other provisions of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. In that case, this Agreement will be construed so as to limit any term or provision so as to make it enforceable or valid within the requirements of any applicable Law, and in the event such term or provision cannot be so limited, this Agreement will be construed to omit such invalid or unenforceable term or provision. No party hereto may assign any of its rights or obligations under this Agreement without the prior written consent of the other party hereto, except that the Subscriber may, without the consent of the Company, assign its rights and obligations hereunder to any Person to whom the Subscriber transfers all or any portion of its Purchased Units in compliance with the LLC Agreement.

4.5.    <u>Entire Agreement</u>.

(a)    This Agreement, including the exhibits hereto, and the other Investment Documents between the Company and the Subscriber, constitute the entire agreement directly relating to the Subscriber's purchase of the Purchased Units, and supersede all prior agreements or understandings between the parties hereto directly relating to the Subscriber's purchase of the Purchased Units. Notwithstanding the foregoing, this Agreement does not supersede or otherwise affect or have any impact upon the LLC Agreement (unless explicitly stated otherwise therein), any other definitive agreement entered into by and between the Subscriber and the Company after the date hereof, or any of the Other Agreements (as defined below), or the rights and obligations thereunder.

8

(b)    [For clarification, the parties hereto acknowledge and agree that Subscriber, on the one hand, and the Company, on the other hand, have certain rights and obligations under the following agreements (collectively, the "Other Agreements"): (i) that certain [●] Agreement, dated as of [DATE], by and among [●], the Subscriber and the other parties thereto, (ii) that certain [●] Agreement, dated as of [DATE], by and between the Subscriber and [●], and (iii) other agreements and documents that do not expressly govern the Subscriber's purchase of the Purchased Units, all of which other agreements remain in full force and effect in accordance with their terms.][1]

4.6.    Counterparts; Facsimile.    This Agreement may be executed in one or more counterparts, all of which will constitute one and the same instrument.  Any counterparts of this Agreement or any signatures thereon delivered by facsimile transmission or other electronic method (including by email in portable document format (pdf)) will be deemed an original executed document for all purposes hereof.

4.7.    No Vicarious Liability.    Notwithstanding anything in this Agreement to the contrary, the liabilities of the parties to this Agreement will be limited to such parties, and no Person that is not a party to this Agreement will have any liability hereunder or with respect to the matters contemplated hereby.

4.8.    Waiver of Damages.    Notwithstanding anything to the contrary in this Agreement, no party to this Agreement will be liable to or otherwise responsible to any other party hereto for the punitive damages that arise out of or relate to this Agreement or the performance or breach hereof or any liability retained or assumed hereunder other than damages paid to an unaffiliated third party claimant.

*[Signature pages follow.]*

---

[1] **Note to Draft**: Definition of Other Agreements should be customized for the parties to the Subscription Agreement.

IN WITNESS WHEREOF, the undersigned has executed this Agreement as of the date first written above.

**THE SUBSCRIBER**:

[_____]


By: _____
Name: _____
Title: _____

IN WITNESS WHEREOF, the undersigned has executed and accepted this Agreement as of the date first written above.

**THE COMPANY**:

**TSG SHELF II INVESTMENTS, LLC**

By: _____
Name: Scott MacLaren
Title:  Vice President

EXHIBIT 1.1

FORM OF SALE ORDER

[See attached]

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CARBONLITE HOLDINGS LLC, *et al.*,[1] | ) | Case No. 21-10527 (JTD) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**ORDER (A) APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE
DEBTORS' ASSETS RELATING TO THE RIVERSIDE FACILITY FREE AND CLEAR
OF LIENS, CLAIMS, ENCUMBRANCES,AND OTHER INTERESTS; (B) APPROVING
ASSUMPTION AND ASSIGNMENT OF CERTAIN UNEXPIRED LEASES AND
EXECUTORY CONTRACTS; AND (C) GRANTING RELATED RELIEF**

Upon the motion [Docket No. 112] (the "Motion") of the above-captioned debtors and

debtors in possession (the "Debtors") pursuant to sections 105(a), 363, 365, 503, 507, 1107,

and 1108 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002 and 6004

of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1

and 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States

Bankruptcy Court for the District of Delaware (the "Local Rules") for (a) approval of a sale of

substantially all of the assets of the Debtors relating to the Riverside Facility[2] free and clear of

all liens, claims, encumbrances, and other interests; (b) approval of assumption and assignment

of certain unexpired leases and executory contracts; and (c) approval of related relief, all as

contemplated in the *Order (A) Approving Bid Procedures for the Sale of Substantially All of*

*the Debtors' Assets; (B) Approving Procedures for the Assumption and Assignment of*

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: CarbonLite Holdings LLC (8957); CarbonLite Industries LLC (3596); CarbonLite P Holdings LLC (8957); CarbonLite P LLC (5453); CarbonLite PI Holdings LLC (8957); CarbonLite Pinnpack LLC (8957); CarbonLite Recycling Holdings LLC (8957); CarbonLite Sub-Holdings, LLC (8957); Pinnpack P, LLC (8322); CarbonLite Recycling LLC (3727); and Pinnpack Packaging LLC (9948). The address of the Debtors' corporate headquarters is 10250 Constellation Blvd., Los Angeles, CA 90067.

[2] The Riverside Facility is a recycling facility operated by Debtor CarbonLite Industries, LLC ("Industries") located in Riverside, California.

*Executory Contracts and Unexpired Leases; (C) Approving Certain Bid Protections in Connection With the Debtors' Entry Into Any Potential Stalking Horse Agreements; (D) Scheduling the Auction and Sale Hearing; (E) Approving the Form and Manner of Notice Thereof; and (F) Granting Related Relief* [Docket No. 266] (as may be amended, supplemented or modified)[3] (the "Bid Procedures Order")[4] entered by this Court on April 9, 2021; and [the Auction having taken place on May [ • ], 2021, in accordance with the Bid Procedures Order]; and **TSG Shelf II Acquisition, LLC** having been chosen as the Successful Bidder (the "Successful Bidder" or the "Buyer") for the Riverside Facility; and the Debtor party to the APA (as defined below) (the "Seller")[5] having agreed to enter into and consummate the Asset Purchase Agreement attached hereto as Exhibit A with the Buyer (the "APA"); and the hearing to approve the sale (the "Sale" or "Sale Transaction") of the Purchased Assets (as defined in the APA) and the APA (the "Sale Hearing") having been held on May [ • ], 2021 in accordance with the Bid Procedures Order; and this Court having found that proper and adequate notice of the Motion and the relief requested therein has been provided in accordance with the Bid Procedures Order, Bankruptcy Rules and Local Rules, and that, except as otherwise ordered herein, no other further notice is necessary; and upon the record at the Sale Hearing and all of the proceedings before this Court; and this Court having

---

[3] *See Order Approving Stipulation Among Debtors, the Official Committee of Unsecured Creditors and the DIP Lenders, Extending Certain Deadlines Under the Bid Procedures Order* [Docket No. 312], entered by this Court on April 20, 2021; *Order Approving Second Stipulation Among Debtors and the DIP Lenders, Extending Certain Deadlines Under the Bid Procedures Order* [Docket No. 357], entered by this Court on April 27, 2021; and *Order Approving Amended Third Stipulation Among Debtors and the DIP Lenders Extending Certain Deadlines Under (I) TX Debtors' Final DIP Order; (II) PA Debtors' Final DIP Order; (III) CA Debtors' Final DIP Order; and (IV) Bid Procedures Order* [Docket No. 401], entered on May 4, 2021.

[4] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Bid Procedures Order and, as applicable, the Bid Procedures (as defined in and attached to the Bid Procedures Order).

[5] Debtor CarbonLite Holdings LLC ("Holdings") is also party to the APA for the sole and exclusive purposes of (a) agreeing to transfer to Buyer at the Closing, all of Holdings' right, title and interest in and to any Acquired Intellectual Property Rights (as defined in the APA) and any Wayward Assets (as defined in the APA) and (b) Section 5.15 of APA, and for purposes of this Order is a Seller hereunder to that extent.

2

reviewed any objections asserted at the Sale Hearing and having found and determined that the relief sought at the Sale Hearing, and entry of this Order, is in the best interests of the Seller, the Seller's estate, its creditors, and all other parties in interest; and after due deliberation thereon and sufficient cause appearing therefore, the Court makes the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

A.    **Findings and Conclusions:** The findings and conclusions set forth herein and in the record of the Sale Hearing constitute the Court's findings of fact and conclusions of law under Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Bankruptcy Rules 7052 and 9014. To the extent any of the following conclusions of law constitute findings of fact, or *vice versa*, they are adopted as such.

B.    **Jurisdiction, Venue and Core Proceeding:** This Court has jurisdiction over these chapter 11 cases pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012. The matters covered by this Order are core proceedings under 28 U.S.C. § 157(b)(2). Venue is proper in this district and before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. Venue in this district and before this Court was proper as of the Petition Date and continues to be proper. The Court may enter a final order with respect to the Motion, the Sale, the Sale Transaction, and all related relief, in each case, consistent with Article III of the United States Constitution.

C.    **Statutory Predicates.** The statutory predicates for the relief sought in the Motion are sections 105(a), 363, 365, 503, 507, 1107 and 1108 of the Bankruptcy Code, Rules 2002, 6004, 6006, 9008, and 9014 of the Bankruptcy Rules and Rules 2002-1 and 6004-1 of the Local

Rules. The consummation of the Sale Transaction contemplated by the Motion, the APA, and this Order, and the assumption and assignment of the Acquired Contracts, the Assumed Real Property Leases, the Assumed Personal Property Leases and the Licenses and Permits (as defined in the APA) (the "Acquired Contracts"), are legal, valid, and properly authorized under the cited provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and all of the applicable requirements of such sections and rules have been complied with in respect of such transactions.

D.    **Sufficiency of Notice.** As evidenced by the affidavits of service filed with the Court, proper, timely, adequate, and sufficient notice of the Motion, the Bid Procedures Hearing, the Bid Procedures, the Assumption and Assignment Procedures, the proposed assumption and assignment of the Acquired Contracts, the Auction, the Sale Hearing, the Sale, the Sale Transaction, and all transactions contemplated therein or in connection therewith, and all deadlines related thereto, was given under the particular circumstances and no further notice need be provided.

E.    **Actual Notice.** Actual written notice of the Motion, the Bid Procedures Hearing, the Bid Procedures, the Assumption and Assignment Procedures, the proposed assumption and assignment of Acquired Contracts, the Auction, the Sale Hearing, the Sale, the Sale Transaction and all transactions contemplated therein or in connection therewith, and all deadlines related thereto has been given to all interested persons and entities, including, without limitation: (i) the DIP Term Agent, DIP Term Lenders, and Prepetition Term Secured Parties, and each of their counsel; (ii) the DIP ABL Lender and Prepetition ABL Secured Parties, and each of their counsel (iii) the TX/PA Dip Agents and Prepetition Trustees, and each of their counsel; (iv) counsel to the Official Committee of Unsecured Creditors (the "Committee"); (v) the Office of The United

States Trustee; (vi) the counterparty to each unexpired lease and executory contract to be assumed and assigned pursuant to this Order, and each of their counsel (if known) (vii) all persons known or reasonably believed to have asserted an interest in the Purchased Assets; (viii) the Attorneys General in the States where the Assets are located; (ix) all federal, state, and local taxing authorities in the States where the Assets are located; (x) all parties who have asserted liens against the Purchased Assets; (xi) all parties included on the Debtors' consolidated creditor matrix; and (xii) any other party that has filed a request for notices with the Court (collectively, the "Notice Parties").

F.      **Extensive Efforts by Debtors.**  The Seller has worked with its counsel, its investment banker Jefferies, LLC ("Jefferies"), and other advisors, as well as, as applicable, the Consultation Parties and the Consent Parties, to implement a viable Sale Transaction that would allow it to maximize the value of its Assets.  The Sale Transaction for the Purchased Assets that is the subject of this Order is the result of the Seller's extensive efforts in seeking to maximize recoveries to the Debtors' estates, for the benefit of all of the Debtors' creditors.

G.      **Business Justification.**  The Seller has demonstrated good, sufficient, and sound business purposes and justifications for, and compelling circumstances to promptly consummate, the Sale Transaction contemplated by the APA and related documents, including, without limitation, the assumption, assignment, and/or transfer of the Acquired Contracts pursuant to sections 105, 363, and 365 of the Bankruptcy Code, prior to and outside of a plan of reorganization, and such action is an appropriate exercise of the Seller's business judgment and in the best interests of the Seller, its estates, and its creditors.  Such business reasons include, but are not limited to, the fact that: (i) there is substantial risk of depreciation of the value of the Purchased Assets (as defined in the APA) if the Sale is not consummated promptly; (ii) the Sale

Transaction contemplated by the APA presents the best opportunity to maximize the value of the Seller's estate; (iii) at Closing, in accordance with the CA DIP Order, the cash proceeds of the Sale Transaction will be used to indefeasibly pay the DIP Obligations (as defined in the CA DIP Order); and (iv) unless the Sale is concluded expeditiously as provided for in this Order and pursuant to the APA, potential creditor recoveries may be substantially diminished.

H.      **Bid Procedures Order.** On April 9, 2021, this Court entered the Bid Procedures Order approving, among other things, Bid Procedures for the sale of substantially all of the Debtors' Assets and Assumption and Assignment Procedures for the related assumption and assignment of any unexpired leases and executory contracts relating to any sale. The Bid Procedures provided a full, fair, and reasonable opportunity for any entity to make an offer to purchase the Debtors' Assets. The Assumption and Assignment Procedures provided a full, fair, and reasonable opportunity for any counterparty to any unexpired lease or executory contract to object to any proposed Cure Amount, assumption and assignment of its applicable unexpired lease or executory contract, or the Buyer's adequate assurance of future performance. The Debtors, the Buyer, and their respective counsel and other advisors have complied with the Bid Procedures Order, the Bid Procedures, and the Assumption and Assignment Procedures in all respects.

I.      **Adequate Marketing; Highest or Best Offer.** As demonstrated by (i) the testimony and other evidence proffered or adduced at the Sale Hearing, and (ii) the representations of counsel made on the record at the Sale Hearing, (a) the Seller has adequately marketed the Purchased Assets and conducted the Sale process in compliance with the Bid Procedures Order in good faith and in a fair and open manner; (b) the Sale Process and the Bid Procedures were non-collusive, duly noticed, and provided a full, fair, reasonable and adequate

opportunity for any interested party to conduct due diligence and make an offer to purchase the Debtors' Assets, and submit higher and better offers for the Purchased Assets than the Buyer's Successful Bid; (c) the consideration provided by the Buyer in the APA constitutes the highest and best offer for the Purchased Assets; (d) the consideration is fair and reasonable consideration for the Purchased Assets and constitutes reasonably equivalent value under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia; (e) the Sale will provide a greater recovery to the Seller's creditors with respect to the Purchased Assets than would be provided by any other available alternative; (f) taking into consideration all relevant factors and circumstances, no other entity has offered to purchase the Purchased Assets for greater economic value to the Seller or its estate than the Buyer; and (g) the Seller's determination that the APA constitutes the highest or best offer for the Purchased Assets, maximizes value for the Debtors' estates, and constitutes a valid and sound exercise of the Seller's business judgment. There is no legal or equitable reason to delay Closing of the Sale Transaction contemplated by the APA.

J. **Opportunity to Object.** A reasonable opportunity to object or be heard with respect to the Motion, and all relief requested therein has been afforded to all interested parties.

K. **Property of the Estate.** The Purchased Assets are property of the Seller's estate and title thereto is vested in the Seller's estate.

L. **Sale in Best Interests.** The actions to be taken by the Seller and the Buyer are appropriate under the circumstances of these chapter 11 cases and are in the best interests of the Seller, its estate, its creditors, and other parties in interest. Approval of the APA and the Sale Transaction set forth therein, and all related transactions at this time is in the best interests of the Seller, its creditors, its estate, and all other parties in interest.

M.    **Arm's-Length Sale.**    The APA, the Sale, the Sale Transaction, and any transactions contemplated therein and associated therewith were negotiated, proposed, and entered into by the Seller and the Buyer without collusion, in good faith, and from arm's-length bargaining positions.  Neither the Seller, its insiders and affiliates, the CA DIP Lenders, and the CA Prepetition Secured Parties nor the Buyer have engaged in any conduct that would cause or permit the APA, the Sale, or any part of the Sale Transaction to be avoided under section 363(n) of the Bankruptcy Code.

N.    **Good Faith Buyer.**    The Buyer has proceeded in good faith in all respects, is a good faith buyer under section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby, including in the event this Order or any portion hereof is reversed or modified on appeal.  In particular, (i) Buyer recognized that the Seller was free to deal with any other party interested in purchasing the Purchased Assets; (ii) Buyer in no way induced or caused the chapter 11 filings by the Seller or other Debtors; (iii) Buyer has not violated section 363(n) of the Bankruptcy Code by any action or inaction; (iv) no common identity of directors, managers, officers or controlling stockholders exist between Buyer, on the one hand, and any of the Seller or other Debtors, on the other hand; (v) Buyer complied with the Bid Procedures and all provisions of the Bid Procedures Order; and (vi) all payments to be made, and all other material agreements or arrangements entered into or to be entered into by Buyer in connection with the Sale Transaction have been disclosed.

O.    **Corporate Authority.**    The Seller (i) has full corporate power and authority to execute the APA and all other documents contemplated thereby, and the Sale Transaction and Sale of the Purchased Assets has been duly and validly authorized by all necessary corporate action of the Seller, (ii) has all of the corporate power and authority necessary to consummate

the transactions contemplated by the APA, (iii) has taken all corporate action necessary to authorize and approve the APA and the consummation by the Seller of the transactions contemplated thereby, and (iv) needs no consents or approvals, other than those expressly provided for in the APA, subject to the waiver of such consents or approvals to the extent provided in the APA and as may be permitted under applicable law.

P.     **Free and Clear Findings Required by the Buyer.**  The Buyer would not have entered into the APA and would not consummate the Sale if the Sale of the Purchased Assets to the Buyer were not, pursuant to section 363(f) of the Bankruptcy Code, free and clear of (i) all liens, claims, pledges, options, charges, hypothecations, easements, security interests, rights-of-way, encroachments, mortgages and deeds of trusts or other encumbrances, other than Permitted Post-Closing Encumbrances (as defined in the APA) (collectively, the "Liens"), (ii) all claims as defined in section 101(5) of the Bankruptcy Code, including all rights or causes of action (whether in law or in equity), warranties, guarantees, indemnities, rights of recovery, setoff, recoupment, indemnity or contribution, obligations, demands, restrictions, indemnification claims or liabilities relating to any act or omission of the Debtors or any other person prior to the Closing, consent rights, options, contract rights, covenants and interests of any kind or nature whatsoever (known or unknown, matured or unmatured, accrued or contingent and regardless of whether currently exercisable), whether arising prior to or subsequent to the commencement of the above-captioned case, and whether imposed by agreement, understanding, law, equity or otherwise (collectively the "Claims"), and (iii) all debts, liabilities, obligations, contractual rights and claims and labor, employment and pension claims, in each case, whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-

9

contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, whether arising prior to or subsequent to the commencement of these chapter 11 cases, and whether imposed by agreement, understanding, law, equity or otherwise (collectively the "Interests").  Upon entry of this Order, the Seller is authorized to transfer all its right, title and interest in and to the Purchased Assets free and clear of, and the Buyer shall not be responsible for, any Liens, Claims, or Interests, including, without limitation, in respect of the following: (i) any rights or Claims based on any successor or transferee liability, (ii) any Liens, Claims or Interests that purport to give to any party a right or option to effect any forfeiture, modification, right of first refusal, or termination of the Seller's or the Buyer's interest in the Assets, or any similar rights; (iii) any labor or employment agreements; (iv) any pension, multiemployer plan (as such term is defined in Section 3(37) or Section 4001(a)(3) of ERISA), health or welfare, compensation or other Benefit Plans, agreements, practices and programs, including, without limitation, any pension plans of the Debtors or any multiemployer plan to which the Debtors have at any time contributed to or had any liability or potential liability; (v) any other employee, worker's compensation, occupational disease or unemployment or temporary disability related claim, including, without limitation, claims that might otherwise arise under or pursuant to (a) ERISA, (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Age Discrimination and Employment Act of 1967 and Age Discrimination in Employment Act, as amended, (g) the Americans with Disabilities Act of 1990, (h) Section 4980B of the Internal Revenue Code of 1986 and Part 6 of Title I of ERISA, together in each case, with applicable regulations, in each case, as amended and in effect from time to time (collectively, "COBRA"), (i) state discrimination laws, (j) state unemployment compensation

10

laws or any other similar state laws, or (k) any other state or federal benefits or claims relating to any employment with the Debtor or any of its predecessors; (vi) any bulk sales or similar law; (vii) any tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder, and any taxes arising under or out of, in connection with, or in any way relating to the operation of the Assets prior to the Closing; or (viii) any unexpired and executory contract or unexpired lease to which any Debtor is a party that is not a contract or lease that will be assumed and assigned pursuant to this Order and the APA (the "Successor or Other Liabilities"). A sale of the Purchased Assets other than one free and clear of all Liens, Claims, and Interests would yield substantially less value for the Seller's estate, with less certainty, than the Sale as contemplated. Therefore, the Sale contemplated by the APA free and clear of all Liens, Claims, and Interests is in the best interests of the Seller, its estate, its creditors, and all other parties in interest.

Q.    **Environmental Protection Agency.**  Notwithstanding the foregoing, nothing in this Order or the APA releases, nullifies, precludes or enjoins the enforcement of any police or regulatory liability to a governmental unit that any entity would be subject to as the post-sale owner or operator of property after the date of entry of this Order. Nothing in this Order or the APA authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization, or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police or regulatory law. Nothing in this Order divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Order or to adjudicate any defense asserted under this Order.

R.     **Assumption and Assignment of Unexpired Leases and Executory Contracts.**
Pursuant to section 365 of the Bankruptcy Code, the Debtors are authorized to assume all Acquired Contracts[6] and assign such Acquired Contracts to the Buyer.  To the extent a Cure Amount is owed to the counterparty of any Assumed/Assigned Contract (the "Contract Counterparty"), the applicable Cure Amount will be paid in accordance with this Order and the APA.  The Buyer has, in accordance with the Assumption and Assignment Procedures, provided adequate assurance of future performance to any Contract Counterparty as required by section 365(b)(1)(C).  In accordance with the Assumption and Assignment Procedures and the terms of this Order, following the Closing, Buyer shall be fully and irrevocably vested with all of the Seller's right, title and interest in and under the Acquired Contracts in connection with the Purchased Assets, free and clear of any Liens, Claims and Interests, and each Acquired Contract shall be fully enforceable by Buyer in accordance with its respective terms and conditions, except as limited by this Order.  Following assignment of the Acquired Contracts to Buyer, the Seller shall be relieved from any further liability with respect to such Acquired Contracts.

S.     The Acquired Contracts being assigned to Buyer are an integral part of the Sale Transaction and, accordingly, their assumption and assignment is reasonable and an enhancement to the value of the Debtors' estates.  To the extent any Acquired Contract is not an executory contract within the meaning of section 365 of the Bankruptcy Code, it shall be transferred to Buyer in accordance with the terms of the APA and, other than with respect to Permitted Post-Closing Encumbrances and Assumed Liabilities, Buyer shall have no liability or obligation for any (i) defaults or breaches under such agreement that relate to acts or omissions that occurred in the period, or otherwise arose, prior to the Closing Date and (ii) claims,

---

[6] Notwithstanding the name of the Debtors listed on any Acquired Contract, the Acquired Contracts identified in the APA are deemed assumed and assigned by the applicable Debtors party to the APA.

12

counterclaims, offsets, or defenses (whether contractual or otherwise, including, any right of recoupment) with respect to such Acquired Contract, that relate to any acts or omissions that arose or occurred prior to the Closing Date.

T.     **Binding and Valid Transfer.**  The transfer of the Purchased Assets to the Buyer will be a legal, valid, and effective sale and transfer of the Purchased Assets and will vest the Buyer with all right, title, and interest of the Seller to the Purchased Assets free and clear of all Liens, Claims, and Interests and any liabilities of the Seller, except as otherwise expressly set forth in the APA or in this Order.

U.     **Satisfaction of Standards of Section 363(f).**  The Seller may sell the Purchased Assets free and clear of all Liens, Claims, and Interests of any kind or nature whatsoever, because, in each case, one or more of the standards set forth in section 363(f)(1) - (5) of the Bankruptcy Code have been satisfied.  Those holders of Liens, Claims, and Interests who did not object, or who withdrew their objections, to the Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code.  Holders of Liens, Claims, or Interests are adequately protected by having their Liens, Claims, or Interests attach to the proceeds received by the Seller (if any) that are ultimately attributable to the property against or in which such Liens, Claims, or Interests are asserted, subject to the terms of such Liens, Claims, or Interests, with the same validity, force, and effect, and in the same order of priority, which such Liens, Claims, or Interests now have against the Purchased Assets or their proceeds, if any.  In all cases, each such person with Liens, Claims, or Interests in the Purchased Assets is enjoined from taking any action against the Buyer, the Buyer's affiliates, or any agent of the foregoing to recover any such Lien, Claim, or Interest.

V.    **Consideration for Transfer of Purchased Assets Free and Clear**.  Buyer would not have entered into the APA if the transfer of the Purchased Assets were not free and clear of all Liens, Claims and Interests as set forth in the APA and this Order, or if in the future Buyer would or could be liable for any such Liens, Claims or Interests.  The total consideration to be provided under the APA reflects Buyer's reliance on this Order to provide, pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, that, upon the Closing, Buyer has title to, interest in and possession of the Purchased Assets free and clear of all Liens, Claims and Interests.

W.    **Repayment of DIP Obligations.**  Pursuant to the CA DIP Order, the Purchased Assets constitute DIP Collateral (as defined in the CA DIP Order) and are subject to the DIP Liens (as defined in the CA DIP Order).  At Closing, the Seller is authorized and directed to distribute the proceeds of the Sale Transaction in accordance with the CA DIP Order and applicable DIP Documents (as defined in the CA DIP Order).

X.    **No *Sub Rosa* Plan**.  The Sale, Sale Transaction, the APA, and the other transactions contemplated thereby do not constitute a *sub rosa* chapter 11 plan.  The Sale Transaction neither impermissibly restructures the rights of the Seller's creditors nor impermissibly dictates a liquidating chapter 11 plan for the Seller.

Y.    **Assets Assignable**.  To the maximum extent possible under the Bankruptcy Code, each and every provision of the documents governing the Purchased Assets or applicable non-bankruptcy law that purports to prohibit, restrict, or condition, or could be construed as prohibiting, restricting, or conditioning assignment of any of the Purchased Assets, if any, has been or will be satisfied or is otherwise unenforceable under section 365 of the Bankruptcy Code.

Z.    **Necessity of Order.**  The Buyer would not have entered into the APA and would not consummate the Sale Transaction contemplated therein without all of the relief provided for in this Order (including, but not limited to, that the sale and transfer of the Assets to Buyer be free and clear of all Liens, Claims, and Interests).  The consummation of the Sale Transaction pursuant to this Order and the APA is necessary for the Seller to (i) comply with the terms of the CA DIP Order and DIP Documents, including the milestones and repayment provisions set forth therein, and (ii) maximize the value of its estate for the benefit of all creditors.

AA.    **Final Order.** This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), the Court expressly finds that there is no just reason for delay in the implementation of this Order and expressly directs entry of judgment as set forth herein.

BB.    **Best Interests.** Entry of this Order is in the best interests of the Seller, the Seller's estate, its creditors, and all other parties in interest.

## ORDER

Based on the foregoing Findings of Fact and Conclusions of Law, it is hereby **ORDERED, ADJUDGED, AND DECREED** as follows:

1.    **Findings of Fact and Conclusions of Law.**    The above-referenced findings of fact and conclusions of law are hereby incorporated by reference as though fully set forth herein and shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable herein by Bankruptcy Rule 9014.  To the extent that any finding of fact shall be determined to be a conclusion of law, it shall be deemed so, and *vice versa*.

2.      **Motion Granted.** The Motion is granted with respect to the Sale Transaction contemplated by the APA, and the relief requested therein with respect to the Sale is granted and approved in its entirety, as set forth herein.

3.      **Objections are Overruled.** Except for any objections to adequate assurance of future performance by any Contract Counterparty that are contemplated to be heard post-Sale Hearing in accordance with the Assumption and Assignment Procedures, all objections, reservations of rights regarding, or other responses to the Motion or the relief requested therein, the APA, all other ancillary agreements, the Sale Transaction, the entry of this Order or to the relief granted herein that have not been withdrawn, waived, settled, or not otherwise resolved pursuant to the terms hereof, if any, hereby are denied and overruled on the merits with prejudice. All persons and entities that failed to timely object to the Motion are deemed to have consented to the relief granted herein for all purposes.

4.      **Approval.** The APA, and all the terms and conditions thereof, is approved. Pursuant to sections 105, 363, and 365 of the Bankruptcy Code, the Seller is authorized to perform its obligations under, and comply with the terms of, the APA and consummate the Sale and the related transactions pursuant to, and in accordance with, the terms and conditions of the APA and this Order. The Seller is authorized to execute and deliver, and empowered to perform under, consummate, and implement, the APA and the Sale Transaction contemplated therein, together with all additional instruments and documents that the Seller or the Buyer deem necessary or appropriate to implement the APA and effectuate the Sale Transaction contemplated therein, and to take all further actions as may reasonably be required by the Buyer for the purpose of assigning, transferring, granting, conveying, and conferring to the Buyer the Purchased Assets as may be necessary or appropriate to the performance of their obligations

under the APA. The Buyer and the Seller shall have no obligation to consummate the Sale Transaction except as contemplated by and provided for in the APA and the Bid Procedures. The Buyer shall not be required to seek or obtain relief from the stay under section 362 of the Bankruptcy Code to enforce any of its remedies under the APA or related documents. The automatic stay imposed by section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the provisions of this Order.

5.     **Notice**. Notice of the Motion, the Bid Procedures Hearing, the Bid Procedures, the Assumption and Assignment Procedures, the assumption and assignment of the Acquired Contracts to Buyer, the Auction, the Sale Hearing, the Sale, all transactions contemplated therein or in connection therewith, including the Sale Transaction, all deadlines related thereto, and the relief granted in this Order was fair, sufficient, proper, and equitable under the circumstances and complied in all respects with sections 102(1) and 363 of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Bid Procedures Order, the Bid Procedures, the Assumption and Assignment Procedures, and the procedural due process requirements of the United States Constitution.

6.     **Assumption and Assignment of Unexpired Leases and Executory Contracts.** Pursuant to section 365 of the Bankruptcy Code, the Seller is authorized to assume the Acquired Contracts and assign such Acquired Contracts to the Buyer. To the extent a Cure Amount is owed to a Contract Counterparty, the applicable Cure Amount will be paid (or if disputed, escrowed) on or before Closing of the Sale subject to and in accordance with the APA. Any objection of any Contract Counterparty to the assumption or assignment of any Acquired Contracts, any Cure Amount, or seeking further adequate assurance of future performance than that provided in the APA, to the extent not otherwise resolved by agreement, contemplated to be

heard after the Sale Hearing in accordance with the Assumption and Assignment Procedures, or by separate order of this Court, is hereby overruled. There shall be no accelerations, assignment fees, increases, or any other fees charged to Buyer or Seller as a result of the assignment of the Purchased Assets or the assumption and assignment of the Acquired Contracts. Disputed Cure Amounts escrowed pursuant to the APA and this Order shall be held in escrow and disbursed to satisfy the payment of Cure Amounts only upon agreement of the Seller, the Buyer and the applicable Contract Counterparty, or upon further order of the Court. Upon payment of the Cure Amount, the Seller shall be released by the applicable Contract Counterparty from any and all claims and causes of action of any nature whatsoever based on, arising from or relating to the Acquired Contracts.

7.    **Transfer of Security and Other Deposits**. To the extent provided for in the APA, any and all of the Seller's security deposits, or other security held by landlords, lessors, and other Contract Counterparties to the Acquired Contracts are being transferred and assigned to, and shall be the property of, the Buyer from and after the Closing, which transfer and assignment of security deposits, other deposits, or security shall satisfy in full the requirements of section 365(l) of the Bankruptcy Code for all Acquired Contracts assumed and assigned pursuant to this Order or the APA.[7] Except as expressly set forth in the APA, the Buyer shall have no responsibility for the payment of any Cure Amounts.

8.    **Binding Effect of Order.** This Order shall be binding in all respects upon (i) all known and unknown creditors of, and holders of equity security interests in, the Debtors, including any holders of Liens, Claims, and Interests; (ii) the Buyer; (iii) the Debtors; (iv) the Purchased Assets; (v) any trustee(s) appointed in the Debtors' chapter 11 cases or upon a

---

[7] The deposits referenced herein and being transferred pursuant to the APA do not include any Good Faith Deposits made by other potential bidders for the Assets of the Debtors pursuant to the Bid Procedures.

conversion to cases under chapter 7 of the Bankruptcy Code; and (vi) all successors and assigns of each of the foregoing, and this Order shall not be subject to amendment or modification and the APA shall not be subject to rejection.

9.      **[Release of Back-Up Bidder.**  The Back-Up Bidder will be released at Closing and any Good Faith Deposit of any Back-Up Bidder will be refunded within three (3) days of Closing.]

10.     **Injunction.**  All persons and entities are prohibited and enjoined from taking any action to adversely affect or interfere with the ability of the Seller to transfer the Purchased Assets to the Buyer in accordance with the APA and this Order. Following the Closing, all persons (including, but not limited to, the Seller and the other Debtors, creditors, investors, current and former employees and shareholders, administrative agencies, governmental units, secretaries of state, federal, state, and local officials, including those maintaining any authority relating to any environmental, health and safety laws, and the successors and assigns of each of the foregoing) holding Liens, Claims, or Interests in the Purchased Assets or against the Seller and the other Debtors in respect of the Purchased Assets of any kind or nature whatsoever shall be, and hereby are, forever barred, estopped, and permanently enjoined from asserting, prosecuting, or otherwise pursuing any Liens, Claims, or Interests of any kind or nature whatsoever against the Buyer or any affiliate of the Buyer or any of its respective property, successors and assigns, or the Purchased Assets, as an alleged successor or on any other grounds.  No person shall assert, and the Buyer and the Purchased Assets shall not be subject to, any defaults, breaches, counterclaims, offsets, defenses (whether contractual or otherwise, including, without limitation, any right of recoupment), liabilities, claims and interests, or basis of any kind or nature whatsoever to delay, defer, or impair any right of the Buyer under, or with

respect to, any Purchased Assets, with respect to any act or omission that occurred prior to the Closing or with respect to any other agreement or any obligation of the Seller or the other Debtors that  is not an assumed liability under the APA.

11.    **General Assignment.**  Upon the Closing, this Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of the Seller's interests in the Purchased Assets and a bill of sale transferring good and marketable title in the Purchased Assets to the Buyer free and clear of all Liens, Claims and Interests.   Each and every federal, state, and local governmental agency, quasi-agency, or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the Sale Transaction contemplated under the APA.

12.    **Transfer Free and Clear.** Upon the Closing, pursuant to sections 105(a), 363(b), 363(f), 365(b) and 365(f) of the Bankruptcy Code, the Purchased Assets, including the Acquired Contracts, shall be transferred to the Buyer in accordance with the APA, and such transfer shall be free and clear of all Liens, Claims, and Interests of any person, including, without limitation, all such Liens, Claims, and Interests specifically enumerated in paragraph P of this Order, whether arising by agreement, by statute, or otherwise and whether occurring or arising before, on, or after the Petition Date, whether known or unknown, occurring or arising prior to such transfer, with all such Liens, Claims, and Interests attaching to the proceeds of the Sale ultimately attributable to the property against or in which the holder of a Lien, Claim, or Interest claims or may claim a Lien, Claim, or Interest, in the order of its priority, with the same validity, force, and effect which they now have and had against the Purchased Assets immediately prior to Closing, subject to any claims and defenses the Debtors may possess with respect thereto (other

than with respect to any Lien, Claim, or Interest of any of the DIP ABL Lender, the DIP Term Agent, the DIP Term Lender, or the CA Prepetition Secured Parties).

13. **Licenses and Permits**. To the greatest extent available under applicable law, the Buyer shall be authorized, as of the Closing Date, to operate under any license, permit, registration, and governmental authorization or approval of the Seller with respect to the Purchased Assets, and all such licenses, permits, registrations, and governmental authorizations and approvals are deemed to have been, and hereby are, deemed to be transferred to the Buyer as of the Closing Date. To the extent provided by section 525 of the Bankruptcy Code, no Governmental Entity may revoke or suspend any grant, permit, or license relating to the operation of the Purchased Assets sold, transferred, assigned, or conveyed to the Buyer on account of the filing or pendency of these chapter 11 cases or the consummation of the Sale Transaction.

14. **Environmental Protection Agency**. Notwithstanding the foregoing, nothing in this Order or the APA releases, nullifies, precludes or enjoins the enforcement of any police or regulatory liability to a governmental unit that any entity would be subject to as the post-sale owner or operator of property after the date of entry of this Order. Nothing in this Order or the APA authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization, or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police or regulatory law. Nothing in this Order divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Order or to adjudicate any defense asserted under this Order.

21

15.    **Valid Transfer.**  The transfer of the Purchased Assets to the Buyer pursuant to the APA constitutes a legal, valid, and effective transfer of the Purchased Assets and shall vest the Buyer with all right, title, and interest of the Seller in and to the Purchased Assets free and clear of all Liens, Claims, and Interests of any kind or nature whatsoever.

16.    **Exculpation and Release.**  Neither the Buyer nor any of its affiliates, successors, and assigns, nor any of its professionals, shall have, or incur any liability to, or be subject to any action by, the Debtors or any of their predecessors, successors, or assigns, arising out of the negotiation, investigation, preparation, execution, or delivery of the APA and the entry into and consummation of the Sale Transaction, except as expressly provided in the APA and this Order. Neither the Debtors nor any of their affiliates, successors, and assigns, nor any of their professionals, shall have, or incur any liability to, or be subject to any action by, the Buyer or any of its predecessors, successors, or assigns, arising out of the negotiation, investigation, preparation, execution, or delivery of the APA and the entry into and consummation of the Sale Transaction, except as expressly provided in the APA and this Order.

17.    **Direction to Release Interests.**  Upon the Closing, each of the Debtors' creditors and any other holder of a Lien, Claim, or Interest is authorized and directed to execute such documents and take all other actions as may be reasonably necessary to release its Lien, Claim, or Interest in the Purchased Assets, if any, as such Lien, Claim, or Interest may have been recorded or may otherwise exist.  If any person or entity that has filed financing statements, mortgages, mechanic's liens, *lis pendens*, or other documents or agreements evidencing a Lien, Claim, or Interest in all or any portion of the Purchased Assets being sold pursuant to the Sale Transaction and the APA shall not have delivered to the Debtors prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of

satisfaction, releases of all Liens, Claims, and Interests, which such person or entity has with respect to all or any portion of the Purchased Assets being sold pursuant to the Sale Transaction and the APA , then (i) the Seller is authorized to execute and file such statements, instruments, releases, and other documents on behalf of such person or entity with respect to all or any portion of the Purchased Assets being sold pursuant to the Sale Transaction and the APA, and (ii) the Buyer is authorized to file, register, or otherwise record a certified copy of this Order, which shall constitute conclusive evidence of the release of all Liens, Claims, and Interests of any kind or nature whatsoever in the Purchased Assets being sold pursuant to the Sale Transaction and the APA. Each and every federal, state, and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the APA, including, without limitation, recordation of this Order. This Order shall be binding upon and shall govern the acts of all persons including without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of such assets or other property interests.

18.    **No Interference.** Following the Closing, no holder of any Lien, Claim or Interest in the Purchased Assets shall interfere with the Buyer's title to, or use and enjoyment of, the Purchased Assets being sold pursuant to the Sale Transaction and the APA based on, or related

to, any such Lien, Claim, or Interest, or based on any actions the Debtors may take in these chapter 11 cases.

19. **Surrender of Possession.** All persons or entities that are currently, or as of the Closing, may be, in possession of some or all of the Purchased Assets are hereby directed to surrender possession of the Purchased Assets to the Buyer at the Closing, unless the Buyer otherwise agrees.

20. **Standing to Object to Claims**. The Buyer shall have standing to object to the allowance of claims (as such term is defined in section 101(5) of the Bankruptcy Code) asserted against the Seller *solely* in regard to any unresolved or disputed Assumed Liabilities (as defined in the APA), that constitute obligations assumed by the Buyer pursuant to the terms of the APA.

21. **Standing**. The APA shall be in full force and effect, regardless of the Seller's lack of good standing in any jurisdiction in which Seller is formed or authorized to transact business.

22. **Post-Closing Actions and Transactions.** The Seller and the Buyer, and each of their respective officers, employees, and agents, will be authorized and empowered to take all actions and execute and deliver any and all documents and instruments that either the Seller or the Buyer deem necessary or appropriate to implement and effectuate the terms of the APA, the Sale Transaction contemplated therein and this Order.

23. **Sale is Self-Executing**. The Sale is self-executing, and neither the Seller nor the Buyer shall be required to execute or file releases, termination statements, assignments, consents, or other instruments to effectuate, consummate, and implement the provisions of this Order.

24. **No Discriminatory Treatment.** To the extent provided by section 525 of the Bankruptcy Code, no governmental unit may deny, revoke, suspend, or refuse to renew any permit, license, or similar grant relating to the operation of the Purchased Assets sold,

24

transferred, or conveyed to the Buyer on account of the filing or pendency of these chapter 11 cases or the consummation of the transactions contemplated by the APA.

25.    **No Successor Liability.**    Neither the Buyer, nor any of its successors or assigns, or any of their respective affiliates shall have any liability for any Lien, Claim, or Interest that arose or occurred prior to the Closing, or otherwise may be asserted against the Seller or other Debtors or is related to the Purchased Assets prior to the Closing.  The Buyer is not and shall not be deemed a "successor" to the Seller or other Debtors or their estates; the Buyer has not, *de facto* or otherwise, merged with or into the Seller or other Debtors; the Buyer does not have any common law or successor liability in relation to any employment plans; the Buyer is not liable for any liability or Lien (other than Assumed Liabilities) against the Seller or other Debtors or any of the Seller's or other Debtors' predecessors or Affiliates (other than those transferred to the Buyer pursuant to the Sale); and the Buyer is not an alter ego or mere continuation or substantial continuation of the Seller or other Debtors or the enterprise of the Seller or other Debtors under any theory of law or equity as a result of any action taken in connection with the APA, the Sale Transaction or any transactions or documents ancillary thereto or contemplated thereby or in connection with the acquisition of the Purchased Assets.

26.    **Limitations on Liability.**    Without limiting the foregoing, and except as otherwise set forth in the APA, the Buyer shall not have any successor, transferee, derivative, or vicarious liabilities of any kind or character for any Liens, Claims, or Interests, including under any theory of successor or transferee liability, *de facto* merger or continuity, whether known or unknown as of the Closing, now existing or hereafter arising, whether fixed or contingent, asserted or unasserted, liquidated or unliquidated, with respect to the Successor or Other Liabilities.

27.     **Fair Consideration.** The consideration provided by the Buyer for the Purchased Assets under the APA shall be deemed to constitute reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia. The Sale may not be avoided under section 363(n) of the Bankruptcy Code. The APA was not entered into, and the Sale is not being consummated, for the purpose of hindering, delaying, or defrauding creditors of the Seller or other Debtors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof, or the District of Columbia, or any other applicable law. Neither the Seller nor the Buyer have entered into the APA or any agreement contemplated thereby or are consummating the Sale with any fraudulent or otherwise improper purpose, including, without limitation, to evade any pension liabilities. No other person or entity or group of persons or entities has offered to purchase the Purchased Assets for an amount that would provide greater value to the Seller and its estate than the value provided by the Buyer. The Court's approval of the Motion and the APA are in the best interests of the Debtors, their estates, their creditors, and all other parties in interest.

28.     **No Modification by Subsequent Orders or Plan Provisions**. Nothing contained in any chapter 11 plan confirmed in the Debtors' chapter 11 cases, any order confirming any such plan, or in any other order entered in these chapter 11 cases (including any order entered after any conversion of any of these chapter 11 cases to a case under chapter 7 of the Bankruptcy Code) or any related proceeding subsequent to entry of this Order shall modify, alter, conflict with, or derogate from, the provisions of the APA or this Order.

29.     **Retention of Jurisdiction.** This Court retains jurisdiction, pursuant to its statutory powers under 28 U.S.C. § 157(b)(2), to, among other things, interpret, implement, and

enforce the terms and provisions of this Order and the APA, all amendments thereto, and any waivers and consents thereunder, and each of the agreements executed in connection therewith in all respects, including, but not limited to, retaining jurisdiction to (i) compel delivery of the Purchased Assets to the Buyer; (ii) interpret, implement, and enforce the provisions of this Order and the APA; (iii) protect the Buyer, any of the Buyer's affiliates, or any agent of the foregoing, against any Liens, Claims, or Interests against the Seller or other Debtors or the Purchased Assets of any kind or nature whatsoever; and (iv) enter any order under sections 363 and 365 of the Bankruptcy Code.

30.    **Good Faith Buyer.**  The transactions contemplated by the APA are undertaken by the Buyer without collusion and in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and, accordingly, the reversal or modification on appeal of the authorization provided in this Order to consummate the transactions shall not affect the validity of the transactions (including the assumption and assignment of the Acquired Contracts) nor the transfer of the Purchased Assets owned by the Seller to the Buyer fee and clear of all Liens pursuant to the APA.  The Buyer is a buyer in good faith of the Purchased Assets and is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.  In particular, (i) Buyer recognized that the Seller was free to deal with any other party interested in purchasing the Purchased Assets; (ii) Buyer in no way induced or caused the chapter 11 filings by the Seller or the other Debtors; (iii) Buyer has not violated section 363(n) of the Bankruptcy Code by any action or inaction; (iv) no common identity of directors, managers, officers or controlling stockholders exist between Buyer, on the one hand, and the Seller or the other Debtors, on the other hand; (v) Buyer complied with the Bid Procedures and all provisions of the Bid Procedures Order; and (vi) all payments to be made, and all other material agreements or arrangements

entered into or to be entered into by Buyer in connection with the Sale Transaction have been disclosed. The Seller and the Buyer will be acting in good faith if they proceed to consummate the Sale at any time after entry of this Order.

31.    **Approval of Repayment of DIP Obligations**.    At Closing, the Seller is authorized and directed to distribute the proceeds of the Sale Transaction with respect to the applicable Purchased Assets to the CA DIP Lenders in accordance with the CA DIP Order and the applicable DIP Documents (as defined in the CA DIP Order).

32.    **Repayment of Prepetition Obligations and Adequate Protection Obligations/Remaining Prepetition Obligations and Adequate Protection Obligations.**    To the extent the proceeds of the Sale Transaction are sufficient to pay the DIP Obligations (as defined in the CA DIP Order) owed the CA DIP Lenders in full at Closing and any other costs and expenses that are required to be paid at Closing, the remaining proceeds of the Purchase Price will be distributed in accordance with the APA and this Order.

33.    **Release of Secured Parties.**    In consideration of the consent by each of the DIP ABL Lender, the DIP Term Agent, the DIP Term Lender, and the CA Prepetition Secured Parties to the Sale Transaction, each of the Debtors, on behalf of themselves, anyone who may bring a claim on their behalf (including derivative claims), and their successors and assigns, and each of their respective officers, directors, employees, agents, sub-agents, attorneys, consultants, advisors and affiliates (collectively, the "Releasors"), hereby, forever release, discharge and acquit each of the DIP ABL Lender, the DIP Term Agent, the DIP Term Lender, and the CA Prepetition Secured Parties, and their respective successors and assigns, and their present and former shareholders, affiliates, subsidiaries, divisions, predecessors, directors, officers, partners, members, managers, attorneys, employees, consultants, advisors and other representatives in

their respective capacities as such (collectively, the "Released Secured Parties") of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, of every kind, nature and description, including, without limitation, any so-called "lender liability" claims or defenses, that Releasors had, have or hereafter can or may have against any Released Secured Party as of the date hereof, in respect of events that occurred on or prior to the date hereof with respect to any Debtor or any subsidiary thereof, the DIP Documents (as defined in the CA DIP Order), the Prepetition Documents (as defined in the CA DIP Order), and any other financial accommodations made by any of the Released Secured Parties to the Debtors, including any action or omission of a Released Secured Party in such person's capacity as an officer, director, employee, consultant, or agent of, or advisor to, any Debtor or any subsidiary thereof (the "Secured Party Release"). In addition, upon the Closing, Released Secured Parties are hereby released from any and all obligations, liabilities, actions, duties, responsibilities and causes of action arising or occurring in connection with or related to the DIP Documents (as defined in the CA DIP Order), the CA DIP Order, these chapter 11 cases, or this Order, and the Debtors are authorized to execute and deliver a termination and release agreement, in form and substance satisfactory to each of the Released Secured Parties. *Notwithstanding the foregoing*, the effectiveness of the Secured Party Releases set forth herein are expressly subject to the Challenge Deadline (as defined in the CA DIP Order) as may be extended in accordance with the terms of the applicable DIP Order.

34.    **No Bulk Law Application.**  No bulk sales law or similar law shall apply in any way to the transactions contemplated by the Sale, the APA, the Motion, and this Order.

35.    **Inconsistencies with Prior Orders, Pleadings or Agreements**.  To the extent this Order is inconsistent with any prior order or filing with respect to the Motion in these

chapter 11 cases, the terms of this Order shall govern and any prior orders shall be deemed amended or otherwise modified to the extent required to permit consummation of the Sale Transaction. To the extent there is any inconsistency between the terms of this Order and the terms of the APA (including all ancillary documents executed in connection therewith), the terms of this Order shall govern. Nothing in the APA or this Order shall be deemed to amend, modify, or limit the rights and claims of each of the Prepetition Secured Parties (each as defined in the CA DIP Order), until the Closing of the Sale Transaction and only to the extent contemplated by this Order, the APA and the Sale Transaction contemplated therein, unless expressly agreed to in writing by the foregoing as applicable.

36.    **Failure to Specify Provisions.** The failure to specifically include any particular provision of the APA in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the APA be authorized and approved in its entirety.

37.    **Non-Material Modifications.** The APA and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment, or supplement does not have any adverse effect on the Seller's estate. Notwithstanding anything to the contrary set forth in this Order, the APA, any ancillary agreement or related agreement, document, or other instrument, any amendments, modifications, supplements to or waivers of any obligations or rights of the parties thereto that could reasonably adversely impact or affect the rights of the CA Secured Parties or the Prepetition Secured Parties (each as defined in the CA DIP Order) shall require the prior written consent of the applicable Required Lenders (as defined in the DIP Credit Agreement or Prepetition Documents (as defined in the CA DIP Order)).

38.    **No Stay of Order.**  Notwithstanding the provisions of Bankruptcy Rules 6004(h) and 6006(d), this Order shall not be stayed for fourteen (14) days after its entry and shall be effective immediately upon entry, and the Seller and the Buyer are authorized to close the Sale Transaction immediately upon entry of this Order.  Time is of the essence in closing the Sale Transaction referenced herein, and the Seller and the Buyer intend to close the Sale Transaction as soon as practicable.  This Order is a final order and the period in which an appeal must be filed shall commence upon the entry of this Order.  Any party objecting to this Order must exercise due diligence in filing an appeal and pursuing a stay, or risk its appeal being foreclosed as moot.

39.    **Headings.**  Headings utilized in this Order are for convenience of reference only, and do not constitute a part of this Order for any other purpose.

40.    **Time Periods.**  All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

41.    **Non-severability.**  The provisions of this order are non-severable and mutually dependent.

# EXHIBIT A

Asset Purchase Agreement

EXHIBIT 1.3

CERTAIN NON-TRANSFERRED EMPLOYEES

[See attached]

1. Farahnik, Leon

2. Maroofian, Ira

3. Delnik, Alex

4. Farahnik, Jason

5. Cruz, Aniceta

6. Milhaupt, Gregg

7. Xia, Daniel

8. Smith, Kimball

9. Diaz, Michele

10. Franco, Jose

11. Costa, Rich

12. Siddhi, Vijendra

EXHIBIT 2.6(A)

FORM OF ESCROW AGREEMENT

[See attached]

## ESCROW AGREEMENT

**THIS ESCROW AGREEMENT** (this "<u>Agreement</u>") is made and entered into as of May__, 2021, by and among TSG Shelf II Acquisition, LLC, a Delaware limited liability company ("<u>Purchaser</u>"), and CarbonLite Industries, LLC, a Delaware limited liability company ( "<u>Seller</u>") (Purchaser and Seller, sometimes referred to individually as a "<u>Party</u>" and collectively as the "<u>Parties</u>"), and Citibank, N.A., as escrow agent (the "<u>Escrow Agent</u>").  Capitalized terms used but not defined herein shall have the meanings assigned to them in that certain Asset Purchase Agreement, dated as of May __, 2021 (as amended from time to time, the "<u>Purchase Agreement</u>"), by and between Purchaser and Seller, Seller being a chapter 11 debtor and debtor in possession in Case No. 21-10527(JTD) (jointly administered) (the "<u>Bankruptcy Case</u>") pending in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>") and, solely for the purposes specified therein, CarbonLite Holdings LLC.

## RECITALS

**WHEREAS**, the Purchase Agreement contemplates the execution and delivery of this Agreement and (a) the deposit by Seller's bankruptcy counsel with the Escrow Agent concurrently with the execution and delivery of this Agreement of $4,250,000 (such amount having been previously deposited by Purchaser with the Seller's bankruptcy counsel) (the "<u>Deposit Amount</u>") and (b) the deposit by Purchaser of $1,000,000 on the Closing Date (the "<u>Adjustment Fund Amount</u>" and, together with the Deposit Amount, the "<u>Escrow Funds</u>"), in each case to provide sources of funding solely for the purposes set forth in the Purchase Agreement; and

**WHEREAS**, the Parties wish for such deposits to be subject to the terms and conditions set forth herein and in the Purchase Agreement.

**NOW THEREFORE**, in consideration of the foregoing recitals and of the mutual covenants hereinafter set forth, and other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the parties hereto agree as follows:

1.     <u>Appointment</u>.  The Parties hereby appoint the Escrow Agent as their escrow agent for the purposes set forth herein, and the Escrow Agent hereby accepts such appointment and agrees to act as escrow agent in accordance with the terms and conditions set forth herein.

2.     <u>Escrow Funds</u>.  Concurrently with the execution and delivery of this Agreement, Seller will cause its bankruptcy counsel to deposit with the Escrow Agent the Deposit Amount in immediately available funds into a separate and distinct sub-account (the "<u>Deposit Escrow Account</u>") and, on the Closing Date, Purchaser will deposit with the Escrow Agent the Adjustment Fund Amount in immediately available funds into a separate and distinct sub-account (the "<u>Adjustment Escrow Account</u>" and together with the Deposit Escrow Account, the "<u>Escrow Accounts</u>").  The Escrow Agent hereby acknowledges receipt of the Deposit Amount.

3.     <u>Investment of Escrow Funds</u>.

(a)     Unless otherwise instructed in a joint written notice signed by an Authorized Representative of each of the Parties, the Escrow Agent shall hold the Escrow Funds

in "noninterest-bearing deposit accounts" insured by the Federal Deposit Insurance Corporation ("FDIC") to the applicable limits. The Escrow Funds shall at all times remain available for distribution to the Parties in accordance with Section 4 below.

(b)     The Escrow Agent shall send an account statement or statements to each of the Parties on a monthly basis reflecting activity in each Escrow Account for the preceding month.

4.     Disposition of the Escrow Funds and Termination of the Escrow Accounts.

(a)     Escrow Funds. The Parties shall act in accordance with, and the Escrow Agent shall hold and release the Escrow Funds solely as provided in, this Section 4(a) as follows:

(i)     Upon receipt of a Joint Release Instruction (as defined herein) with respect to the Escrow Funds (whether held in the Deposit Escrow Account or in the Adjustment Escrow Account), the Escrow Agent shall promptly, but in any event within two Business Days after receipt of such Joint Release Instruction, disburse all or part of the applicable Escrow Funds from the applicable Escrow Account(s) in accordance with such Joint Release Instruction.

(ii)     Upon distribution of the entire Deposit Amount or Adjustment Fund Amount, Escrow Agent shall close the applicable Escrow Account.

(iii)     If at any time any of the Parties receives a Final Determination (as defined herein), then upon receipt by the Escrow Agent of a copy of such Final Determination from any Party, the Escrow Agent shall (A) promptly deliver a courtesy copy of such Final Determination to the other Parties and (B) on the fifth Business Day following receipt by the Escrow Agent of the Final Determination, disburse to Purchaser and/or Seller, as applicable, part or all, as the case may be, of the applicable Escrow Funds from the applicable Escrow Account(s) (but only to the extent funds are available in the applicable Escrow Account(s)) in accordance with such Final Determination. Subject to the terms of this Section 4(a), the Escrow Agent will be entitled to act on such Final Determination without further inquiry.

(iv)     All payments of any part of the Escrow Funds to Purchaser or Seller, as the case may be, shall be made by wire transfer of immediately available funds as set forth in the Joint Release Instruction or Final Determination, as applicable. The Parties shall prepare and deliver to the Escrow Agent any Joint Release Instruction or Final Determination, as applicable, that is required for disbursement (A) in accordance with Section 2.6 of the Purchase Agreement with respect to the Escrow Funds from the Adjustment Escrow Account and (B) in accordance with Section 2.6 and Section 8.3 of the Purchase Agreement with respect to the Escrow Funds from the Deposit Escrow Account.

(v)     Any instructions setting forth, claiming, containing, objecting to, or in any way related to the transfer or distribution of any funds on deposit in any Escrow Account under the terms of this Agreement must be in writing, executed by the appropriate Party or Parties as evidenced by the signatures of the person or persons set forth on Exhibit A-1 and Exhibit A-2 (an "Authorized Representative") and delivered to the Escrow Agent attached to an e-mail received in accordance with Section 11 below. In the event a Joint Release Instruction or Final Determination is delivered to the Escrow Agent, whether in writing, by e-mail or

otherwise, the Escrow Agent is authorized to seek confirmation of such instruction by telephone call back to the person or persons designated on <u>Exhibit A-1</u> or <u>Exhibit A-2</u> annexed hereto (the "<u>Call Back Authorized Individuals</u>"), and the Escrow Agent may rely upon the confirmations of anyone purporting to be a Call Back Authorized Individual.  To assure the accuracy of the instructions it receives, the Escrow Agent may record such call backs.  If the Escrow Agent is unable to verify the instructions, or is not satisfied with the verification it receives, it will not execute the instruction until all such issues have been resolved; it being understood that the Escrow Agent shall use its commercially reasonable efforts to resolve all such issues.  The persons and telephone numbers for call backs may be changed only in writing, executed by an Authorized Representative of the applicable Party actually received and acknowledged by the Escrow Agent.

    (b)   <u>Certain Definitions</u>.

    (i)   "<u>Business Day</u>" means any day, other than a Saturday, Sunday or any other day on which banks located in New York, New York are required or authorized by law to be closed.

    (ii)   "<u>Final Determination</u>" means (A) a final non-appealable order of any court of competent jurisdiction which may be issued, together with a certificate executed by an Authorized Representative of the prevailing Party to the effect that such order is final and non-appealable and from a court of competent jurisdiction having proper authority, or (B) with respect to the Adjustment Escrow Account, a final determination made by the Independent Auditor as set forth in the Purchase Agreement, and in the case of each of clauses (A) and (B), together with the written payment instructions executed by an Authorized Representative of each Party to whom funds are to disbursed to effectuate such order.

    (iii)   "<u>Joint Release Instruction</u>" means the joint written instruction of Purchaser and Seller which is executed by an Authorized Representative of each of Purchaser and each Seller and delivered to the Escrow Agent directing the Escrow Agent to disburse all or a portion of the Escrow Funds from the Deposit Escrow Account and/or the Adjustment Escrow Account, as applicable.

    (iv)   "<u>Person</u>" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization or a governmental entity or any department, agency or political subdivision thereof.

   5.   <u>Escrow Agent</u>.  The Escrow Agent undertakes to perform only such duties as are expressly set forth herein, which shall be deemed purely ministerial in nature, and no other duties, including but not limited to any fiduciary duty, shall be implied (other than the implied covenant of good faith and fair dealing).  The Escrow Agent shall neither be responsible for, nor chargeable with, knowledge of, nor have any requirements to comply with, the terms and conditions of any other agreement, instrument or document between the Parties, in connection herewith, if any, including without limitation the Purchase Agreement, nor shall the Escrow Agent be required to determine if any Person has complied with any such agreements, nor shall any additional obligations of the Escrow Agent be inferred from the terms of such agreements,

even though reference thereto may be made in this Agreement. Notwithstanding the terms of any other agreement between the Parties, the terms and conditions of this Agreement will control the action of the Escrow Agent. The Escrow Agent may rely upon and shall not be liable for acting or refraining from acting upon any Joint Release Instruction or Final Determination furnished to it hereunder and reasonably believed by it to be genuine and to have been signed by an Authorized Representative of the proper Party or Parties. Concurrent with the execution of this Agreement, the Parties shall deliver to the Escrow Agent authorized signers' forms in the form of Exhibit A-1 and Exhibit A-2 attached hereto. The Escrow Agent shall be under no duty to inquire into or investigate the validity, accuracy or content of any such document, notice, instruction or request. The Escrow Agent shall have no duty to solicit any payments which may be due it or the Escrow Funds. In the event that the Escrow Agent, acting reasonably, shall be uncertain as to its duties or rights hereunder or shall receive instructions, claims or demands from any Party hereto which, in its opinion, conflict with any of the provisions of this Agreement, it shall be entitled to refrain from taking any action and its sole obligation shall be to keep safely all property held in escrow until it shall be directed otherwise in a Joint Release Instruction or Final Determination. The Escrow Agent may interplead all of the assets held hereunder into a court of competent jurisdiction or may seek a declaratory judgment with respect to certain circumstances, and thereafter be fully relieved from any and all liability or obligation with respect to such interpleaded assets or any action or nonaction based on such declaratory judgment. The Escrow Agent may consult with legal counsel of its selection in the event of any dispute or question as to the meaning or construction of any of the provisions hereof or its duties hereunder. The Escrow Agent will not be liable for any action taken, suffered or omitted to be taken by it in good faith pursuant to this Agreement except to the extent that the Escrow Agent's fraud, gross negligence or willful misconduct was the cause of any direct losses or damages to any Party or the Escrow Funds. To the extent practicable, the Parties agree to pursue any redress or recourse in connection with any dispute (other than with respect to a dispute involving the Escrow Agent) without making the Escrow Agent a party to the same. Anything in this Agreement to the contrary notwithstanding, in no event shall the Escrow Agent be liable for any special, indirect, punitive, incidental or consequential losses or damages of any kind whatsoever (including but not limited to lost profits), even if the Escrow Agent has been advised of the likelihood of such losses or damages and regardless of the form of action. Notwithstanding anything to the contrary herein, in no event shall the Parties' remedies against the Escrow Agent, the Escrow Agent's liabilities hereunder, or any limitations or protections in favor of the Escrow Agent set forth in this Section 5 (including, without limitation, any limitations on losses or damages or the knowledge of the Escrow Agent), be limited, prohibited or restricted in the event of the Escrow Agent's fraud or willful misconduct.

6.    Resignation and Removal of Escrow Agent. The Escrow Agent (a) may resign and be discharged from its duties or obligations hereunder by giving 30 calendar days' advance notice in writing of such resignation to the Parties specifying a date when such resignation shall take effect or (b) may be removed, with or without cause, by Purchaser and Seller acting jointly at any time by providing a joint written notice to the Escrow Agent. Any corporation or association into which the Escrow Agent may be merged or converted or with which it may be consolidated, or any corporation or association to which all or substantially all of the escrow business of the Escrow Agent's line of business may be transferred, shall be the Escrow Agent under this Agreement without further act. The Escrow Agent's sole responsibility after such 30-day notice period expires or after receipt of written notice of removal shall be to hold and

safeguard the Escrow Funds (without any obligation to reinvest the same) and to deliver the same (i) to a substitute or successor escrow agent pursuant to a joint written designation from the Parties, (ii) as set forth in a Joint Release Instruction or (iii) in accordance with the directions of a Final Determination, and, at the time of such delivery, the Escrow Agent's obligations hereunder shall cease and terminate. In the event the Escrow Agent resigns, if the Parties have failed to appoint a successor escrow agent prior to the expiration of 30 calendar days following receipt of the notice of resignation, the Escrow Agent may petition any court of competent jurisdiction for the appointment of such a successor escrow agent or for other appropriate relief, and any such resulting appointment shall be binding upon all of the parties hereto.

7.    <u>Fees and Expenses</u>.  All fees and expenses of the Escrow Agent are waived as described in <u>Schedule 1</u> attached hereto.

8.    <u>Indemnity</u>.  Each of the Parties shall jointly and severally indemnify, defend and hold harmless the Escrow Agent and its affiliates and their respective successors, assigns, directors, officers, agents and employees (the "<u>Indemnitees</u>") from and against any and all losses, damages, claims, liabilities, penalties, judgments, settlements, actions, suits, proceedings, litigation, investigations, costs or expenses (including the reasonable and documented fees and expenses of one outside counsel and experts and their staffs and all expense of document location, duplication and shipment) (collectively "<u>Escrow Agent Losses</u>") arising out of or in connection with (a) the Escrow Agent's execution and performance of this Agreement, tax reporting or withholding, the enforcement of any rights or remedies under or in connection with this Agreement, or as may arise by reason of any act, omission or error of the Indemnitee, or (b) its compliance with any instructions or other directions from Purchaser or Seller. Notwithstanding anything to the contrary herein, Purchaser and Seller agree, solely as between themselves, that any obligation for indemnification under this <u>Section 8</u> (or for reasonable and documented fees and expenses of the Escrow Agent described in <u>Section 7</u>) shall be borne by the Party or Parties determined by a court of competent jurisdiction to be responsible for causing the loss, damage, liability, cost or expense against which the Escrow Agent is entitled to indemnification or, if no such determination is made, then 50% by Purchaser and 50% by Seller. The Parties hereto acknowledge that the foregoing indemnities shall survive the resignation or removal of the Escrow Agent or the termination of this Agreement. In connection with clause (a) above, in no event shall any Indemnitee be indemnified, defended or held harmless in respect of any Escrow Agent Losses in the event of any fraud, gross negligence or willful misconduct of such Indemnitee (as adjudicated by a court of competent jurisdiction).

9.    <u>Tax Matters</u>.

(a)    Prior to the date hereof, the Parties shall provide (or shall cause to be provided) the Escrow Agent with certified tax identification numbers by furnishing appropriate forms W-9 or W-8 as applicable and such other forms and documents that the Escrow Agent may reasonably request.

(b)    The Escrow Agent shall be responsible only for income reporting, if any, to the Internal Revenue Service with respect to income earned on the Escrow Funds.  The Escrow Agent shall withhold any taxes required to be withheld by applicable law, including but

42992706.2
DOCS_LA:337525.3 13044/001

not limited to required withholding in the absence of proper tax documentation, and shall remit such taxes to the appropriate authorities.

(c)    The Escrow Agent, its affiliates, and its employees are not in the business of providing tax or legal advice to any taxpayer outside of Citigroup, Inc. and its affiliates.  This Agreement and any amendments or attachments hereto are not intended or written to be used, and may not be used or relied upon, by any such taxpayer or for the purpose of avoiding tax penalties.   Any such taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor.

10.    <u>Covenant of Escrow Agent</u>.  The Escrow Agent hereby agrees and covenants with Purchaser and Seller that it shall perform all of its obligations under this Agreement and shall not deliver custody or possession of any of the Escrow Funds to anyone except pursuant to the express terms of this Agreement or as otherwise required by law.

11.    <u>Notices</u>.  All notices, requests, demands and other communications required under this Agreement shall be in writing, in English, and shall be deemed to have been duly given if delivered (i) personally, (ii) on the day of transmission if sent by electronic mail ("<u>e-mail</u>") with a PDF attachment executed by an authorized signer of the Party/Parties to the e-mail address given below, provided, no "bounce-back", system error message or other notification of non-delivery is received by the sender, (iii) by overnight delivery with a reputable national overnight delivery service, or (iv) by mail or by certified mail, return receipt requested, and postage prepaid.  If any notice is sent pursuant to clause (iv) of the immediately preceding sentence, it shall be deemed given upon the earlier to occur of (A) the date that is five Business Days after the date such notice is deposited with the United States Postal Service and (B) the actual receipt of such notice by the intended recipient thereof.  If notice is given to a Party, it shall be given at the address for such Party set forth below. It shall be the responsibility of the Parties to notify the Escrow Agent and the other Party in writing of any name or address changes.

if to Purchaser, then to:

TSG Shelf II Acquisition, LLC
c/o The Sterling Group, L.P.
9 Greenway Plaza, Suite 2400
Houston, Texas 77046
Attention:  Scott Maclaren; Max Klupchak
Email: smaclaren@sterling-group.com; mklupchak@sterling-group.com

with a copy (which shall not constitute notice) to:

Willkie Farr & Gallagher LLP
600 Travis Street, Suite 2100
Houston, TX  77002
Attention: Bruce C. Herzog and Paul Shalhoub
Email:  bherzog@willkie.com and pshalhoub@willkie.com

if to Seller, then to:

>     CarbonLite Industries, LLC
>     c/o Force 10 Partners
>     5271 California Avenue, Suite 270
>     Irvine, CA  92617
>     Attn:  Mr. Brian Weiss
>     Email:  bweiss@force10partners.com

>     with a copy (which shall not constitute notice) to:
>
>     Pachulski Stang Ziehl & Jones LLP
>     10100 Santa Monica Blvd., 13th Floor
>     Los Angeles, CA  90067
>     Attention: Gabriel I Glazer, Esq. and Steven W. Golden, Esq.
>     Email:  gglazer@pszjlaw.com and sgolden@pszjlaw.com

or, if to the Escrow Agent, then to:

>     Citibank, N.A.
>     c/o Citi Private Bank
>     388 Greenwich St., 29th Fl
>     New York, NY  10013
>     Attention:     Rola Tseng-Pappalardo
>     E-mail:        rola.tsengpappalardo@citi.com

Notwithstanding the above, in the case of notices, requests, demands or other communications delivered to the Escrow Agent pursuant to the foregoing clause (i) through (iii) of this Section 11, such communications shall be deemed to have been given on the date received by the Escrow Agent.  In the event that the Escrow Agent, in its sole discretion, shall determine that an emergency exists, the Escrow Agent may use such other means of communication as the Escrow Agent deems appropriate.

12.    Termination.  This Agreement shall terminate on the first to occur of (a) the distribution of all of the amounts in the Escrow Funds in accordance with this Agreement or (b) delivery to the Escrow Agent of a written notice of termination executed jointly by Purchaser and Seller after which this Agreement shall be of no further force and effect except that the provisions of Section 8 hereof shall survive termination.

13.    Miscellaneous.  The provisions of this Agreement may be waived, altered, amended or supplemented, in whole or in part, only by a writing signed by all of the parties hereto.  Neither this Agreement nor any right or interest hereunder may be assigned in whole or in part by any party, except as provided in Sections 6 and 16, without the prior consent of the other parties.  This Agreement shall be governed by and construed under the laws of the State of Delaware without regard to any conflicts of law, rules or principles that would result in the

application of the laws of any other jurisdiction.  Notwithstanding anything to the contrary in this Agreement, each Party to this Agreement hereby irrevocably (i) waives any objection on the grounds of venue, forum non-conveniens or any similar grounds, (ii) consents to service of process by mail or in any other manner permitted by applicable law, and (iii) consents to the exclusive jurisdiction of the Bankruptcy Court over all disputes, matters and issues arising under or relating to the interpretation or enforcement of this Agreement (including, without limitation, any interpleader Escrow Agent may hereafter bring or file in connection with this Agreement). The parties hereto hereby waive any right to a trial by jury with respect to any lawsuit or judicial proceeding arising from or relating to this Agreement.  This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  All signatures of the parties to this Agreement may be transmitted by electronic transmission in portable document format (.pdf), and such .pdf will, for all purposes, be deemed to be the original signature of such party whose signature it reproduces, and will be binding upon such party.  If any provision of this Agreement is determined to be prohibited or unenforceable by reason of any applicable law of a jurisdiction, then such provision shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions thereof, and any such prohibition or unenforceability in such jurisdiction shall not invalidate or render unenforceable such provisions in any other jurisdiction.  Each Party represents, warrants and covenants to the Escrow Agent, solely with respect to such Party, that each document, notice, instruction or request provided by such Party to the Escrow Agent shall comply with applicable laws and regulations and the applicable provisions of the Purchase Agreement.  Where, however, the conflicting provisions of any such applicable law may be waived, they are hereby irrevocably waived by the parties hereto to the fullest extent permitted by law, to the end that this Agreement shall be enforced as written. Except as expressly provided in <u>Sections 7</u> and <u>8</u>, nothing in this Agreement, whether express or implied, shall be construed to give to any person or entity other than the Escrow Agent and the Parties (and their successors and any permitted assignees) any legal or equitable right, remedy, interest or claim under or in respect of this Agreement or any funds escrowed hereunder.

14.  <u>Compliance with Court Orders</u>.  In the event that any escrow property shall be attached, garnished or levied upon by any court order, or the delivery thereof shall be stayed or enjoined by an order of a court, or any order, judgment or decree shall be made or entered by any court order affecting the property deposited under this Agreement, the Escrow Agent is hereby expressly authorized, in its sole discretion, to obey and comply with all writs, orders or decrees so entered or issued, which it is advised by legal counsel of its own choosing is binding upon it, whether with or without jurisdiction, and in the event that the Escrow Agent obeys or complies with any such writ, order or decree it shall not be liable to any of the Parties or to any other Person, by reason of such compliance notwithstanding such writ, order or decree be subsequently reversed, modified, annulled, set aside or vacated.

15.  <u>Further Assurances</u>.  Following the date hereof, each party hereto shall deliver to the other parties hereto such further information and documents and shall execute and deliver to the other parties hereto such further instruments and agreements as any other party hereto shall reasonably request to consummate or confirm the transactions provided for herein, to accomplish the purpose hereof or to assure to any other party hereto the benefits hereof; provided, however, as between Purchaser and Seller, nothing herein shall be deemed to require them to execute or

deliver any of the foregoing to the extent they would not be required to provide the same pursuant to Section 10.9 of the Purchase Agreement.

16.     Assignment.  No assignment of the interest of any of the Parties hereto shall be binding upon the Escrow Agent unless and until written notice of such assignment shall be filed with and consented to by the Escrow Agent (such consent not to be unreasonably withheld, conditioned or delayed).   Any transfer or assignment of the rights, interests or obligations hereunder in violation of the terms hereof shall be void and of no force or effect.

17.     Force Majeure.  The Escrow Agent shall not incur any liability for not performing any act or fulfilling any obligation hereunder by reason of any occurrence beyond its control (including, but not limited to, any provision of any present or future law or regulation or any act of any governmental authority, any act of God or war or terrorism, or the unavailability of the Federal Reserve Bank wire services or any electronic communication facility), it being understood that the Escrow Agent shall use commercially reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as reasonably practicable under the circumstances.

18.     Compliance with Federal Law. To help the U.S. Government fight the funding of terrorism and money laundering activities and to comply with Federal law requiring financial institutions to obtain, verify and record information on the source of funds deposited to an account, the Parties agree to provide the Escrow Agent with the name, address, taxpayer identification number, and remitting bank for all Parties depositing funds at Citibank pursuant to the terms and conditions of this Agreement.  For a non-individual Person such as a business entity, a charity, a trust or other legal entity, the Escrow Agent will ask for documentation to verify its formation and existence as a legal entity.  The Escrow Agent may also ask to see financial statements, licenses, an identification and authorization documents from individuals claiming authority to represent the entity or other relevant documentation.

19.     Use of Citibank Name.  Except as requested or required by applicable law, rule or regulation, by any governmental authority, self-regulatory authority or regulatory auditor, or by any order, subpoena or legal, regulatory or self-regulatory procedure, proceeding or process, no publicly distributed printed or other material in any language, including prospectuses, notices, reports, and promotional material which mentions "Citibank" by name or the rights, powers, or duties of the Escrow Agent under this Agreement shall be issued by any other parties hereto, or on such party's behalf, without the prior written consent of the Escrow Agent.

20.     Publication; Disclosure.  By executing this Agreement, the Parties and the Escrow Agent acknowledge that this Agreement (including all related attachments) contains certain information that is sensitive and confidential in nature and agree that such information needs to be protected from improper disclosure, including the publication or dissemination of this Agreement and related information to Persons that are not a party to this Agreement. The Parties and the Escrow Agent each further agree to take commercially reasonable measures to mitigate any risks associated with the publication or disclosure of this Agreement and/or any of the information contained herein (including all related attachments).  If any Party or the Escrow Agent becomes aware of any threatened or actual unauthorized disclosure, publication or use of this Agreement and/or any of the information contained herein (including all related

attachments), such Person shall promptly notify each other Party and the Escrow Agent in writing thereof. Further, the Parties and the Escrow Agent agree that (i) any Party's or the Escrow Agent's disclosure of information as may be requested or required by applicable law, rule or regulation, by any governmental authority, self-regulatory authority or regulatory auditor, or by any order, subpoena or legal, regulatory or self-regulatory procedure, proceeding or process, and/or (ii) Seller's disclosure of this Agreement or any information contained herein pursuant to any filing Seller may be required to make (or which may be appropriate to make) in the Bankruptcy Case, shall not be considered an unauthorized release or disclosure.

\* \* \* \* \*

42992706.2
DOCS_LA:337525.3 13044/001

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date set forth above.

PURCHASER:

**TSG SHELF II ACQUISITION, LLC**

By: _____
Name: Scott MacLaren
Title:   Authorized Person

SELLER:

**CARBONLITE INDUSTRIES, LLC**

By: _____
Name: Brian Weiss
Title:   Chief Restructuring Officer

ESCROW AGENT:

**CITIBANK, N.A.**

By: _____
Name: _____
Title: _____

*Signature Page To Escrow Agreement*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date set forth above.

PURCHASER:

**TSG SHELF II ACQUISITION, LLC**

By: _____
Name: _____
Title: _____

SELLER:

**CARBONLITE INDUSTRIES, LLC**

By: _____
Name:  Brian Weiss
Title:  Chief Restructuring Officer

ESCROW AGENT:

**CITIBANK, N.A.**

By: _____
Name: _____
Title: _____