**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| CL H WINDDOWN LLC, *et al.*,[1] | ) | Case No. 21-10527 (JTD) |
| Debtors. | ) | (Jointly Administered) |
| | ) | **Ref. Docket No. 749** |

**MEMORANDUM OF LAW IN SUPPORT OF CONFIRMATION OF DEBTORS' FIRST AMENDED CHAPTER 11 PLAN OF LIQUIDATION**

Dated: August 27, 2021

PACHULSKI STANG ZIEHL & JONES LLP
Richard M. Pachulski (CA Bar No. 90073)
Gabriel I. Glazer (CA Bar No. 246384)
James E. O'Neill (DE Bar No. 4042)
Steven W. Golden (NY Bar No. 5374152)
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899 (Courier 19801)
Tel: (302) 652-4100
Fax: (302) 652-4400
Email: rpachulski@pszjlaw.com
gglazer@pszjlaw.com
joneill@pszjlaw.com
sgolden@pszjlaw.com

Attorneys for Debtors and Debtors in Possession

[1] The Debtors were formerly called CarbonLite Holdings, LLC and the subsidiaries thereof. The current names of the Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: CL H Winddown LLC f/k/a CarbonLite Holdings LLC (8957); CL I Winddown LLC f/k/a CarbonLite Industries LLC (3596); CL PH Winddown LLC f/k/a CarbonLite P Holdings, LLC (8957); CL PA Winddown LLC f/k/a CarbonLite P, LLC (5453); CL PIH Winddown LLC f/k/a CarbonLite PI Holdings LLC (8957); CL PP Winddown LLC f/k/a CarbonLite Pinnpack LLC (8957); CL RH Winddown LLC f/k/a CarbonLite Recycling Holdings LLC(8957); CL Sub Winddown LLC f/k/a CarbonLite Sub-Holdings, LLC (8957); PP PA Winddown LLC f/k/a Pinnpack P, LLC (8322); CL R Winddown LLC f/k/a CarbonLite Recycling LLC (3727); and PSS Winddown LLC f/k/a Pinnpack Packaging LLC (9948).

## TABLE OF CONTENTS

**Page**

Preliminary Statement ........ 1

U.S. Trustee's objection ........ 4

Relevant Background ........ 9

- A. Filing of the Debtors' Chapter 11 Cases ........ 9
- B. The Sale Process ........ 10
- C. The Solicitation Process ........ 12
- D. Pending Objections & Responses Thereto ........ 13

The Plan Satisfies the Requirements of Section 1129 of the Bankruptcy Code ........ 14

- A. The Plan Complies with the Applicable Provisions of the Bankruptcy Code (§ 1129(a)(1)). ........ 14
- B. The Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code. ........ 14
- C. The Plan Satisfies the Mandatory Plan Requirements of Section 1123(a) of the Bankruptcy Code ........ 16
- D. The Plan Complies with the Discretionary Provisions of Section 1123(b) of the Bankruptcy Code. ........ 18
- E. The Plan Complies with Section 1123(d) of the Bankruptcy Code. ........ 20
- F. The Plan's Release, Exculpation, and Injunction Provisions Comply with the Bankruptcy Code ........ 20
- G. The Debtor Release is Appropriate and Complies with the Bankruptcy Code. ........ 20
- H. The Third Party Release is Appropriate and Complies with the Bankruptcy Code. ........ 24
- I. The Exculpation Provision is Appropriate and Complies with the Bankruptcy Code. ........ 26
- J. The Injunction Provision is Appropriate and Complies with the Bankruptcy Code. ........ 28
- K. The Debtors Complied with the Applicable Provisions of the Bankruptcy Code (§ 1129(a)(2)). ........ 29
- L. The Debtors Complied with Section 1125 of the Bankruptcy Code. ........ 29
- M. The Debtors Complied with Section 1126 of the Bankruptcy Code. ........ 30
- N. The Plan was Proposed in Good Faith (§ 1129(a)(3)). ........ 30

O. The Plan Provides that the Debtors' Payment of Professional Fees and Expenses are Subject to Court Approval (§ 1129(a)(4)). .................................... 31

P. The Debtors Disclosed All Necessary Information Regarding Directors, Officers, and Insiders (§ 1129(a)(5)). ................................................................. 32

Q. The Plan Does Not Require Governmental Regulatory Approval (§ 1129(a)(6)). ............................................................................................. 33

R. The Best Interests of Creditors Test Has Been Satisfied (§ 1129(a)(7)). ............ 34

S. The Plan is Confirmable Notwithstanding the Requirements of Section 1129(a)(8) of the Bankruptcy Code. .................................................................. 35

T. The Plan Provides for Payment in Full of All Allowed Priority Claims (§ 1129(a)(9)). ................................................................................................ 35

U. At Least One Impaired Non-Insider Class of Claims Accepted the Plan (§ 1129(a)(10)). ........................................................................................... 37

V. The Plan is Feasible (§ 1129(a)(11)). ................................................................. 37

W. All Statutory Fees Have Been or Will Be Paid (§ 1129(a)(12)). ......................... 38

X. No Retiree Benefits Exist (§ 1129(a)(13)). .......................................................... 39

Y. Sections 1129(a)(14) through 1129(a)(16) Do Not Apply to the Plan. ............... 39

Z. The Plan Satisfies the "Cram Down" Requirements of Section 1129(b) of the Bankruptcy Code. ............................................................................... 39

AA. Section 1129(c) of the Bankruptcy Code is Satisfied. ......................................... 41

BB. The Debtors Complied with Section 1129(d) of the Bankruptcy Code. .............. 41

CC. Modifications to the Plan. ..................................................................................... 41

DD. The Confirmation Order Should Be Effective Immediately. ............................... 42

Conclusion ................................................................................................................... 43

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors") submit this memorandum of law in support of confirmation of the *Debtors' First Amended Chapter 11 Plan of Liquidation* dated July 21, 2021 (as modified, amended, or supplemented from time to time, the "Plan"),[2] pursuant to sections 1125, 1126, and 1129 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"). In support of confirmation of the Plan, the Debtors concurrently filed the *Declaration of Brian Weiss in Support of Confirmation of Debtors' First Amended Chapter 11 Plan of Liquidation*.

**Preliminary Statement**

1. The Plan represents a significant achievement for the Debtors and should greatly enhance the Debtors' ability to effectuate an efficient liquidation through the bankruptcy process. As a result of the solicitation process, the Plan has obtained the overwhelming support of each voting class.

2. The Debtors were formerly on the forefront of processing post-consumer recycled polyethylene terephthalate ("rPET") plastic products and producing high-quality rPET and polyethylene terephthalate ("PET") beverage and food packaging products. As of the Petition Date, the Debtors operated three facilities at which they processed PET bottles and flake into rPET pellets, which were later incorporated into other products and packaging. The Debtors also operated the PinnPack Facility, which processed the rPET and PET into high-quality thermoformed tubs, bowls, domes, and clamshell packaging for food applications. A detailed description of the Debtors' former business and facts precipitating the filing of the Chapter 11

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Plan.

Cases are set forth in the *Declaration of Brian Weiss in Support of Debtors' Chapter 11 Petitions and First Day Relief* (the "First Day Declaration"), incorporated herein by reference.[3]

3. The Plan is a plan of liquidation which, among other things, provides for a Liquidation Trustee to liquidate or otherwise dispose of the remaining assets of the Estates, to the extent such assets were not previously monetized to Cash or otherwise transferred by the Debtors prior to the Effective Date (including, without limitation, the postpetition Court-approved sales of the Dallas Facility, Reading Facility, Riverside Facility, and Pinnpack Facility). The Liquidation Trustee would also distribute all net proceeds to creditors, including payment in full of all Allowed Administrative Expense Claims (except for the DIP Facility Claims of the DIP Term Lenders), Priority Tax Claims, Other Priority Claims (Class 1) and Other Secured Claims (Class 2), generally in accordance with the priority scheme under the Bankruptcy Code, subject to the terms of the Plan and the UCC Settlement.[4]

4. In these Chapter 11 Cases, the Debtors have already liquidated substantially all of their respective assets, excluding Causes of Action that have not been waived or settled in accordance with or pursuant to the Plan. The net proceeds remaining from such prior liquidations, together with the net proceeds from the sale or other disposition of the remaining assets of the Estates after the Effective Date, will be used to fund recoveries under the Plan to creditors of each Debtor Group; the Plan does not provide for the substantive consolidation of the Debtors or their

---

[3] Capitalized terms not otherwise defined herein or in the Plan shall have the meanings ascribed to them in the First Day Declaration.

[4] As to the applicable Debtors party to the DIP Term Credit Agreement, the Plan is contingent upon the DIP Term Lenders agreeing to accept less than full payment on account of their DIP Facility Claims. The unpaid DIP Facility Claims of the DIP Term Lenders total approximately $6.5 million.

liabilities. The Debtor Groups, individually or collectively as applicable, consist of the Pennsylvania Debtors, the Texas Debtors, the Industries Debtor, the Pinnpack Debtors, and the HoldCo Debtors (each as defined in the Plan).

5. Through the Plan, the Debtors will be in the best possible position under the circumstances to maximize the value of their estates for the benefit of all constituents. Having provided broad notice of the Plan and obtained the overwhelming support of all Impaired stakeholders, the Debtors are now in position to confirm the Plan and consummate an orderly liquidation consistent therewith. A proposed form of Confirmation Order is attached hereto as **Exhibit 1**.

6. The Debtors received certain informal comments from various parties that have been incorporated into the proposed Confirmation Order. No other amendments to the Plan are required.

7. The only pending objection to the Plan [Docket No. 850] was filed by the U.S. Trustee on the discrete issue of whether the Liquidation Trust should be required to pay quarterly fees under 28 U.S.C. § 1930(a)(6) for disbursements made to beneficiaries from potential litigation recoveries in the future. Consistent with Judge Sontchi's recent decision in *In re Paragon Offshore PLC*, 2021 Bankr. LEXIS 1725 (Bankr. D. Del. June 28, 2021) (attached hereto as **Exhibit 2**),[5] the Debtors, with the support of the Committee, submit that future payments that may be made by the Liquidation Trust from assets that may be liquidated in the future do not constitute

[5] The Debtors understand that the *Paragon* decision has not been appealed.

"disbursements" by or on behalf of the Debtors and, hence, are not subject to 28 U.S.C. § 1930(a)(6). The Plan should therefore be confirmed in its present form.

**U.S. Trustee's objection**

8. The U.S Trustee's objection on the narrow issue of whether the Liquidation Trust should be required to pay quarterly fees under 28 U.S.C. § 1930(a)(6) for disbursements made to beneficiaries from potential litigation recoveries in the future should be overruled for the reasons set forth in the *Paragon* decision. To be clear, the Debtors will be reporting and paying quarterly fees for all *cash* that will be distributed to the Liquidation Trust or to anyone else under the Plan. However, the Liquidation Trust is not obligated to pay quarterly fees at some unspecified time in the future for *non-cash assets* that are transferred to it by the Debtors on the Effective Date and which may (or may not) be liquidated by the Liquidation Trust and distributed to its beneficiaries. This situation is no different from one involving the transfer of non-cash assets by a debtor to a third party under a plan. Such third party is not required to later report the value that it may realize from such non-cash assets.

9. Judge Sontchi's decision in *Paragon* is directly on point. That case involved over $90 million of settlement payments that a litigation trust recovered from various parties nearly four years after a plan went into effect in 2017. *Id*. at *6. The U.S. Trustee filed a motion to compel the litigation trust to pay all quarterly fees when due from such proceeds. *Id*. at *8. One of the settlement payments at issue in the amount of $7.7 million was received from another post-confirmation debtor (Noble) in a bankruptcy case pending in Texas. *Id*. at *6-7. Noble had already reported the disbursement of the settlement payment to the Paragon litigation trust and paid a

quarterly fee. *Id*. The U.S. Trustee sought to tax those proceeds a second time, which is not the issue here. However, Judge Sontchi's decision did not rely on the double-taxation issue. Rather, Judge Sontchi's reasoning, which applies equally here, is that distributions of trust assets from the litigation trust to trust beneficiaries do not constitute "disbursements" under 28 U.S.C. § 1930(a)(6).

10. As stated in the *Paragon* decision:

> Section 1930(a)(6) requires the payment of quarterly fees to the United States Trustee on "disbursements." "Several circuits define 'disbursements' as 'all payments by or on behalf of the debtor.' The word "disbursements" is "commonly understood in this context to apply to payments made with the funds generated from the liquidation of the debtor's assets." Although courts have taken different approaches to interpreting section 1930(a)(6), "the common thread that appears to bind many of those decisions together is the fact that the debtor had some interest in, or control over, the money disbursed."

*Id*. at *8 (citations omitted).

11. Judge Sontchi went on to rule in *Paragon* that the U.S. Trustee was not entitled to any quarterly fees on the settlement payments at issue because any disbursements therefrom were coming from the Paragon litigation trust and not the debtor. The disbursements by the debtor came at the time that the plan became effective nearly four years earlier when the debtor's assets were transferred to the trust.

> Applying the common understanding that only "payments by or on behalf of the debtor" trigger quarterly fees, the [U.S. Trustee's] Motion fails. By distributing the "corpus of the Litigation Trust Pro Rata to the beneficiaries of the Litigation Trust," the Trust is not paying expenses on behalf of any Debtors. Rather, all "disbursements" related to any of the Debtors' obligations to the Trust beneficiaries and the claims against Noble occurred at the Effective Date in 2017.

*Id*. at *9-10.

12. The same reasoning applies in the instant case. As set forth in both the Plan and the Liquidation Trust Agreement, the transfer of the Debtors' assets to the Liquidation Trust, for the benefit of the Liquidation Trust Beneficiaries, occurs on the Effective Date and the Liquidation Trust is then vested with such assets, including Causes of Action, for all purposes. The Debtors will have no further interest in the Liquidation Trust Assets from and after the Effective Date.

> On the Effective Date, the Liquidation Trust Assets shall vest automatically in the Liquidation Trust. The transfer of the Liquidation Trust Assets to the Liquidation Trust shall be made for the benefit and on behalf of the Liquidation Trust Beneficiaries. The assets comprising the Liquidation Trust Assets will be treated for tax purposes as being transferred by the Debtors to the Liquidation Trust Beneficiaries pursuant to the Plan in exchange for their Allowed Claims and then by the Liquidation Trust Beneficiaries to the Liquidation Trust in exchange for the Liquidation Trust Interests in the Liquidation Trust. The Liquidation Trust Beneficiaries shall be treated as the grantors and owners of the Liquidation Trust. ***Upon the transfer of the Liquidation Trust Assets, the Liquidation Trust shall succeed to all of the Debtors' rights, title and interest in the Liquidation Trust Assets, and the Debtors will have no further interest in or with respect to the Liquidation Trust Assets***.

Plan at Art. V.D (emphasis added).

> In order to declare the terms and conditions hereof, and in consideration of the confirmation of the Plan, the Debtors and the Liquidation Trustee have executed this Liquidation Trust Agreement and, effective on the Effective Date, ***all of the right, title, and interest of the Debtors and the Debtors' Estates in and to the Liquidation Trust Assets shall be absolutely and irrevocably assigned to and vested in the Liquidation Trust and to its successors in trust and its successors and assigns, to have and to hold unto the Liquidation Trustee and his or her successors and assigns, to be held by the Liquidation Trust and applied on behalf of the Liquidation Trust by the Liquidation Trustee, on and subject to the terms and conditions of this Liquidation Trust Agreement, the Plan and the Confirmation Order, solely for the benefit of the Beneficiaries and their successors and assigns*** as provided for in this Liquidation Trust Agreement and in the Plan and Confirmation Order, and for no other party, provided that the Liquidation Trust shall be required to satisfy the obligations set forth in the Plan to the extent required thereby.

Liquidation Trust Agreement, § 1.2.

> On the Effective Date, pursuant to section 1123(b)(3) of the Bankruptcy Code, the Liquidation Trust Assets shall vest in the Liquidation Trust, free and clear of all Claims, Liens, interests, encumbrances, and contractually imposed restrictions, except as otherwise specifically provided in the Plan or in the Confirmation Order.

*Id*., § 1.3.

13. The Plan further provides that all quarterly fees will be paid with respect to all transfers made by the Debtors to the Liquidation Trustee on the Effective Date and any further disbursements that may be made by the Debtors as of or following the Effective Date. *See* Plan at Art. XIV.B.[6] However, the Liquidation Trust should not be obligated to pay quarterly fees on distributions that it may make in the future from assets, such as Causes of Action, that the Liquidation Trust may realize at some unspecified point in the future. Any such distributions are not "on behalf of the Debtors", but rather are made on behalf of the Liquidation Trust itself, just as Judge Sontchi concluded in the *Paragon* case.

14. In contrast, much of the U.S. Trustee's argument depends on broad, out-of-context dicta from readily distinguishable cases. Most of the cases involved the decades-old "controversy" created by the 1996 amendments to section 1930(a)(6) about which "post-confirmation" payments

---

[6] Art. XIV.B provides, in relevant part as follows:

> Prior to the Effective Date, the Debtors shall pay or reserve for the payment of, in full in Cash, any fees due and owing pursuant to 28 U.S.C. § 1930 (the "Statutory Fees") on or before the Effective Date. On and after the Effective Date, the Liquidation Trustee shall pay the applicable Statutory Fees with respect to each Debtor that accrue after the Effective Date (or remain unpaid from the period prior to the Effective Date) until the earlier of (1) a final decree closing such Debtor's Chapter 11 Case or (2) conversion or dismissal of such Debtor's Chapter 11 Case. The Debtors or the Liquidation Trustee shall pay any Statutory Fees due and payable with respect to any disbursements made to the Liquidation Trust on the Effective Date. The Liquidation Trust shall not owe any Statutory Fees with respect to any distributions of Liquidation Trust Assets to Liquidation Trust Beneficiaries. Any such distributions do not constitute "disbursements" made by or on behalf of the Debtors for which the United States Trustee is entitled to assess Statutory Fees.

by reorganized or liquidating debtors trigger fees.[7] Moreover, none of the cases cited in paragraphs 25 through 28 of the U.S. Trustee's objection invalidate the conclusions Judge Sontchi reached in the *Paragon* case.

15. First, several of those cases (all of which are from outside this Circuit) focused on specific language in the plan and or trust agreement to impose liability on the liquidating trust to pay quarterly fees.[8] Here, while the Plan and the Liquidation Trust Agreement require the Liquidation Trustee to pay any post-Effective Date statutory fees that are properly imposed on the Debtors, as the U.S. Trustee's objection acknowledges, the Plan and the Liquidation Trust Agreement are explicit that distributions of Liquidation Trust Assets to Liquidation Trust Beneficiaries do not constitute "disbursements" for which the U.S. Trustee is entitled to assess a

---

[7] *Accord Walton v. Jamko, Inc. (In re Jamko, Inc.)*, 240 F.3d 1312, 1313 (11th Cir. 2001) (holding that section 1930 covers "all post-confirmation disbursements made by a reorganized debtor, from whatever source, including ordinary operating expenses"); *Robiner v. Danny's Mkts., Inc. (In re Danny's Mkts., Inc.)*, 266 F.3d 523, 526 (6th Cir. 2001) (holding that "the debtor's day-to-day, post-confirmation operating expenses, must be accounted for in the calculation of the trustee's quarterly fee"); *In re Quality Truck & Diesel Injection Serv., Inc.*, 251 B.R. 682, 686 (S.D. W. Va. 2000) (holding that section 1930 applies to "all disbursements made by the debtor, even those made in its ordinary course of business with no relation to the original plan of reorganization"); *U.S. Tr. v. Kroy (Eur.) Ltd. (In re Kroy (Eur.) Ltd.)*, 244 B.R. 816, 818 (D. Ariz. 2000) (holding that the debtor needed to pay post-confirmation fees even though the debtor "did not 'use' the bankruptcy system subsequent to the amendment of section 1930(a)(6) other than simply keeping the action open"); *In re Maruko, Inc.*, 219 B.R. 567, 573 (S.D. Cal. 1998) ("quarterly fees should be applied to all of Maruko's post-confirmation payments"); *In re A.H. Robins Co.*, 219 B.R. 145, 150-51 (Bankr. E.D. Va. 1998) (interpreting the "term 'disbursements' as it is used in the Amendment" to encompass all postconfirmation payments made by reorganized debtors); *In re Corp. Bus. Prods. Inc.*, 209 B.R. 951, 952 (Bankr. C.D. Cal. 1997) (agreeing with the U.S. Trustee that "all postconfirmation payments made by Reorganized Debtors constitute 'disbursements'"); *In re N. Hess' Sons, Inc.*, 218 B.R. 354, 361 (Bankr. D. Md. 1998) ("the term disbursements in 11 U.S.C. § 1930(a)(6) (1996) includes all postconfirmation expenditures by debtor"); U*.S. Tr. v. Boulders on the River, Inc. (In re Boulders on the River, Inc.)*, 218 B.R. 528, 531 (D. Or. 1997) (analyzing "whether the term disbursements in section 1930(a)(6) includes distributions made by a reorganized debtor").

[8].*See In re CSC Industries, Inc.*, 226 B.R. 402, 406 (Bankr. N.D. Ohio 1998) ("In the case presently before the Court, according to the plan, the Liquidation Trust is the "successor in interest to and representative of the Estate ... [and] the Liquidation Trust shall pay the charges incurred on or after the Effective Date for disbursements, expenses or related support services…"); *In re Atna Res. Inc.*, 576 B.R. 214, 217-19 (Bankr. D. Colo. 2017) (plan provisions and trust agreement imposed obligation on trust to pay quarterly fees and "it is clear from numerous sections of the Plan that the Trust is the successor in interest to the Debtors."); *In re Hudson Oil Co., Inc.*, 210 B.R. 380, 384, n.3 (D. Kan. 1997) ("A review of the provisions of the agreement which established the trust reveals the trust is a liquidating and disbursing agent for the debtors, and would have to pay the fees if they apply to the debtors.").

statutory fee. Moreover, the Plan expressly states that the Liquidation Trust is not a successor of the Debtors.[9]

16. Second, the cases cited by the U.S. Trustee in paragraphs 25 through 28, unlike the *Paragon* decision, fail to analyze ***which entity*** owns the assets in question and ***which entity*** is making the distributions. As Judge Sontchi noted in *Paragon*:

> The absurdity of the OUST's position is easily observed by extending its argument to its logical conclusion. What if, under a plan of reorganization, creditors received out of the money warrants? If the reorganized debtor thrived and those warrants were to come into the money, according to the OUST's position, every time a creditor were to exercise its warrant it would constitute a disbursement by the debtor triggering a fee. This cannot be the law.

*In re Paragon Offshore PLC*, 2021 LEXIS 1725 at *10, n.30 (Bankr. D. Del. 2021).

17. For these reasons, the U.S. Trustee's objection to the Plan should be overruled.

## <u>Relevant Background</u>

### A. <u>Filing of the Debtors' Chapter 11 Cases</u>

18. On March 8, 2021 (the "<u>Petition Date</u>"), the Debtors each commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code. The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee has been appointed in these chapter 11 cases.

[9] Plan, Art. V.D ("The Liquidation Trust, however, shall not be considered a successor of any Debtor and shall not assume any obligations of the Debtors other than expressly provided for by the Plan and the Liquidation Trust Agreement."). The U.S. Trustee's objection cites *Atna* out of context when stating that "The court held that the liquidating trust was liable for payment of post-confirmation quarterly fees under the language of section 1930(a)(6) and the provisions of the debtors' plan, "even without an express provision requiring the Trust to pay the statutory fee." U.S.. Trustee Objection ¶ 26.

19. The cases have been jointly administered pursuant to order entered on March 9, 2021 [Docket No. 64].

20. On March 23, 2021, the Office of the U.S. Trustee appointed the Committee in these cases [Docket No. 118]. On April 15, 2021, the Office of the United States Trustee filed the *Amended Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 289].

## B. The Sale Process

21. On March 18, 2021, the Debtors filed a Bid Procedures Motion [Docket No. 112], which the Court approved, as modified by agreement between the Debtors, certain secured parties, and the Committee, on April 9, 2021. *See* Bid Procedures Order [Docket No. 266].

### a. The Reading Sale

22. In accordance with the Bid Procedures Order, on May 3, 2021, the Debtors filed the *Notice of Designation of Stalking Horse Bidder for the Sale of the Reading Facility* [Docket No. 396], designating DAK Americas LLC (the "PA Stalking Horse Bidder") as the Stalking Horse Bidder for the Sale of the Assets of CarbonLite P, LLC, including the Reading Facility (the "Reading Assets"). On May 7, 2021, the Court entered the *Order Approving Stalking Horse Bid Protections for DAK Americas LLC on Reading Facility* [Docket No. 411].

23. On May 24, 2021, the Debtors conducted a virtual Auction for the sale of the Reading Facility (the "Reading Auction"). At the conclusion of the Reading Auction, the Debtors declared the PA Stalking Horse Bidder as the Successful Bidder for the Reading Assets (the "Reading Successful Bidder") with the highest or otherwise best Bid of $98,100,000.00 plus net working capital in excess of $0.00 or less net working capital if less than $0.00. At a hearing held

on June 3, 2021, the Court approved the sale of the Reading Assets. *See* Reading Sale Order [Docket No. 575]. The sale of the Reading Facility closed on June 10, 2021 and the proceeds of the sale were distributed in accordance with the Reading Sale Order.

b. The Riverside Sale

24. On May 21, 2021, the Debtors conducted a virtual Auction (the "Riverside Auction") for the Assets of CarbonLite Industries LLC, including the Riverside Facility (the "Riverside Assets"). Two (2) Qualified Bidders participated in the Riverside Auction. At the conclusion of the Riverside Auction, the Debtors declared TSG Shelf II Acquisition, LLC, as the Successful Bidder for the Riverside Assets (the "Riverside Successful Bidder") with the highest or otherwise best Bid of $57,500,000.00 plus net working capital in excess of $0.00. At a hearing held on May 26, 2021, the Court approved the sale of the Riverside Assets. *See* Riverside Sale Order [Docket No. 597]. The sale of the Riverside Facility closed on June 9, 2021 and the proceeds of the sale were distributed in accordance with the Riverside Sale Order.

c. The Dallas Sale

25. On May 24, 2021, the Debtors conducted a virtual Auction (the "Dallas Auction") for the Assets of CarbonLite Recycling LLC, including the Dallas Facility (the "Dallas Assets"). Three (3) Qualified Bidders participated in the Dallas Auction. At the conclusion of the Dallas Auction, the Debtors declared Indorama Ventures Holdings L.P. as the Successful Bidder for the Dallas Assets (the "Dallas Successful Bidder") with the highest or otherwise best Bid of $63,870,196.45 plus net working capital in excess of $0.00 or less net working capital if less than $0.00. At a hearing held on June 3, 2021, the Court approved the sale of the Dallas Assets. The

*See* Dallas Sale Order [Docket No. 576]. The sale of the Dallas Facility closed on June 11, 2021 and the proceeds of the sale were distributed in accordance with the Dallas Sale Order.

d. The Pinnpack Sale

26. On June 16, 2021, the Debtors conducted a virtual Auction (the "Pinnpack Auction") for the Pinnpack Assets. Only one Qualified Bidder, Pinnpack Capital Holdings LLC ("PCH"), participated in the Pinnpack Auction. At the conclusion of the Pinnpack Auction, the Debtors declared PCH as the Successful Bidder for the Pinnpack Assets (the "Pinnpack Successful Bidder") with the highest and best Bid of $9,600,000.00. At a hearing held on June 22, 2021, the Court approved the sale of the Pinnpack Assets. *See* Pinnpack Sale Order [Docket No. 652]. The sale of the Pinnpack Facility closed on June 23, 2021 and the proceeds of the sale were distributed in accordance with the Pinnpack Sale Order.

**C. The Solicitation Process**

27. On July 21, 2021, this Court entered its *Order (I) Approving Disclosure Statement; (II) Scheduling Confirmation Hearing; (III) Approving Form and Manner of Notice of Confirmation Hearing; (IV) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject Plan, Including (A) Approving Form and Content of Solicitation Package; (B) Establishing Record Date and Approving Procedures for Distribution of Solicitation Packages; (C) Approving Forms of Ballots; (D) Establishing Voting Deadline for Receipt of Ballot; and (E) Approving Procedures for Vote Tabulations; (V) Establishing Deadline and Procedures for Filing Objections to Confirmation of Plan; and (VI) Granting Related Relief* [Docket No. 747] (the "Solicitation Procedures Order").

28. Also on July 21, 2021, the Debtors filed the Plan and the *Disclosure Statement for Debtors' First Amended Chapter 11 Plan of Liquidation* [Docket No. 750] (the "Disclosure Statement").

29. Also on July 27, 2021, the Debtors filed and served the *Notice of (A) Hearing to Consider Confirmation of Debtors' First Amended Chapter 11 Plan of Liquidation; (B) Deadline for Voting to Accept or Reject Plan; and (C) Related Matters* [Docket No. 759] (the "Confirmation Hearing Notice"), which contained the date and time set for the hearing (the "Confirmation Hearing") to consider confirmation of the Plan ("Confirmation") and the deadline for filing objections to the Plan.

30. Following entry of the Solicitation Procedures Order and in accordance with the terms thereof, the Debtors commenced a solicitation of votes to accept or reject the Plan, and distributed therewith (i) the Disclosure Statement and (ii) ballots for voting on the Plan to Holders of Claims entitled to vote on the Plan.

31. On August 16, 2021, the Debtors filed the *Plan Supplement* [Docket No. 824] and, on August 25, 2021, filed the *Amended Plan Supplement* [Docket No. 861] (as modified, amended, or supplemented from time to time, the "Plan Supplement" and which, for purposes of the Plan and herein, is included in the definition of the Plan).

**D. Pending Objections & Responses Thereto**

32. As noted above, the Debtors received certain informal comments from various parties that have been incorporated into the proposed Confirmation Order. No other amendments

to the Plan are required. The only pending objection to the Plan [Docket No. 850] is filed by the U.S. Trustee and is addressed above.

**The Plan Satisfies the Requirements of Section 1129 of the Bankruptcy Code**

33. In the following sections, the Debtors set forth their arguments demonstrating that the Plan satisfies section 1129 of the Bankruptcy Code and, accordingly, request that the Court confirm the Plan.[10]

### A. The Plan Complies with the Applicable Provisions of the Bankruptcy Code (§ 1129(a)(1)).

34. Under section 1129(a)(1) of the Bankruptcy Code, a plan must "compl[y] with the applicable provisions of [the Bankruptcy Code]." The legislative history of section 1129(a)(1) of the Bankruptcy Code explains that this provision also encompasses the requirements of sections 1122 and 1123 of the Bankruptcy Code, which govern the classification of claims and the contents of a plan of reorganization, respectively.[11] As explained below, the Plan complies with the requirements of sections 1122 and 1123 of the Bankruptcy Code, as well as other applicable provisions.

### B. The Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code.

35. The classification requirement of section 1122(a) of the Bankruptcy Code provides, in pertinent part, as follows:

---

[10] *See In re Armstrong World Indus., Inc.*, 348 B.R. 111, 119–20 (D. Del. 2006) (stating that a court must determine whether a plan meets the requirements of section 1129 in order to confirm such plan).

[11] 31 S. Rep. No. 95-989, at 126, *reprinted in* 1978 U.S.C.C.A.N. 5787, 5912 (1978); H.R. Rep. No. 95-595, at 412, reprinted in 1978 U.S.C.C.A.N. 5963, 6368 (1977); *In re S&W Enter.*, 37 B.R. 153, 158 (Bankr. N.D. Ill. 1984) ("An examination of the Legislative History of [section 1129(a)(1)] reveals that although its scope is certainly broad, the provisions it was most directly aimed at were [s]ections 1122 and 1123."); *In re Nutritional Sourcing Corp.*, 398 B.R. 816, 824 (Bankr. D. Del. 2008).

> Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.

11 U.S.C. § 1122(a).

36. For a classification structure to satisfy section 1122 of the Bankruptcy Code, not all substantially similar claims or interests need to be grouped in the same class.[12] Instead, claims or interests designated to a particular class must be substantially similar to each other.[13]

37. The Plan's classification of Claims and Equity Interests satisfies the requirements of section 1122 of the Bankruptcy Code because the Plan places Claims and Equity Interests into nine (9) separate Classes (with General Unsecured Claims against each Debtor Group constituting a separate sub-Class of Claims under Class 7), with each Class differing from the Claims and Equity Interests in each other Class in a legal or factual nature or based on other relevant criteria.[14] Specifically, the Plan provides for the separate classification of Claims and Equity Interests into the following Classes:

| **Class** | **Designation** |
|---|---|
| 1 | Other Priority Claims |
| 2 | Other Secured Claims |
| 3 | Pennsylvania Secured Bonds Claims |
| 4 | Texas Secured Bonds Claims |
| 5 | Prepetition ABL Secured Claims |
| 6 | Prepetition Term Secured Claims |
| 7 | General Unsecured Claims |
| 8 | Intercompany Claims |
| 9 | Equity Interests in the Debtors |

---

[12] *See Armstrong World Indus., Inc.*, 348 B.R. at 159.

[13] *Id.*

[14] *See* Plan at Article III.

38. Claims and Equity Interests assigned to each particular Class (or sub-Class) described above are substantially similar to the other Claims and Equity Interests in such Class. In addition, valid business, legal, and factual reasons justify the separate classification of the particular Claims or Equity Interests into the Classes created under the Plan, and no unfair discrimination exists between or among holders of Claims and Equity Interests. Namely, the Plan separately classifies the Claims because each holder of such Claims or Equity Interests may hold (or may have held) rights in the Estates legally dissimilar to the Claims or Equity Interests in other Classes. For example, Claims (rights to payment) are classified separately from Equity Interests (representing ownership in the business). Secured Claims are classified separately from unsecured Claims because the Debtors' obligations with respect to the former are secured by collateral. Accordingly, the Plan satisfies section 1122(a) of the Bankruptcy Code.

## C. The Plan Satisfies the Mandatory Plan Requirements of Section 1123(a) of the Bankruptcy Code.

39. Section 1123(a) of the Bankruptcy Code sets forth seven criteria that every chapter 11 plan filed by a corporate debtor must satisfy. The Plan satisfies each of these requirements.

a. Designation of Classes of Claims and Equity Interests (§ 1123(a)(1)).

40. Article III of the Plan properly designates classes of Claims and Equity Interests and thus satisfies the requirement of section 1122 of the Bankruptcy Code, and no party has asserted otherwise.

b. Specification of Unimpaired Classes (§ 1123(a)(2)).

41. Section 1123(a)(2) of the Bankruptcy Code requires that the Plan "specify any class of claims or interests that is not impaired under the plan." The Plan meets this requirement by identifying each Class in Article III of the Plan that is Unimpaired.

c. Treatment of Impaired Classes (§ 1123(a)(3)).

42. Section 1123(a)(3) of the Bankruptcy Code requires that the Plan "specify the treatment of any class of claims or interests that is impaired under the plan." The Plan meets this requirement by setting forth the treatment of each Class in Article III of the Plan that is Impaired.

d. Equal Treatment within Classes (§ 1123(a)(4)).

43. Section 1123(a)(4) of the Bankruptcy Code requires that the Plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." The Plan meets this requirement because Holders of Allowed Claims or Equity Interests will receive the same rights and treatment as other Holders of Allowed Claims or Equity Interests within such Holders' respective class.

e. Means for Implementation (§ 1123(a)(5)).

44. Section 1123(a)(5) of the Bankruptcy Code requires that the Plan provide "adequate means" for its implementation. The Plan satisfies this requirement because Article V of the Plan, as well as other provisions thereof, provide for the means by which the Plan will be implemented, including the creation of a Liquidation Trust to liquidate or otherwise dispose of the remaining

assets of the Estates, to the extent such assets were not previously monetized to Cash or otherwise transferred by the Debtors prior to the Effective Date.

f. Issuance of Non-Voting Securities (§ 1123(a)(6)).

45. Section 1123(a)(6) of the Bankruptcy Code requires that a debtor's corporate constituent documents prohibit the issuance of non-voting equity securities. By its own terms, section 1123(a)(6) applies only to corporations. Although each of the Debtors is a limited liability company, the Plan nonetheless provides that the Debtors' organizational documents will include, among other things, a provision prohibiting the issuance of non-voting equity securities to the extent required by section 1123(a)(6) of the Bankruptcy Code. As such, the Plan satisfies section 1123(a)(6) of the Bankruptcy Code, and no party has asserted otherwise.

g. Directors and Officers (§ 1123(a)(7)).

46. Section 1123(a)(7) of the Bankruptcy Code requires that plan provisions with respect to the manner of selection of any director, officer, or trustee, or any other successor thereto, be "consistent with the interests of creditors and equity security holders and with public policy." Pursuant to Article V.C of the Plan, the Liquidation Trustee shall control the Debtors and shall be deemed the sole manager of the Debtors, which accords with applicable state law, the Bankruptcy Code, and the interests of creditors and equity security holders, and public policy. Accordingly, the Plan satisfies section 1123(a)(7) of the Bankruptcy Code, and no party has asserted otherwise.

## D. The Plan Complies with the Discretionary Provisions of Section 1123(b) of the Bankruptcy Code.

47. Section 1123(b) of the Bankruptcy Code sets forth various discretionary provisions that may be incorporated into a chapter 11 plan. Among other things, section 1123(b) of the

Bankruptcy Code provides that a plan may: (a) impair or leave unimpaired any class of claims or interests; (b) provide for the assumption or rejection of executory contracts and unexpired leases; (c) provide for the settlement or adjustment of any claim or interest belonging to the debtor or the estate; and (d) include any other appropriate provision not inconsistent with the applicable provisions of chapter 11.[15]

48. The Plan is consistent with section 1123(b) of the Bankruptcy Code. Specifically, under Article III of the Plan, each Class of Claims and Equity Interests is classified as either Impaired or Unimpaired and the treatment for each Class is specified. In addition and under section 1123(b)(2) of the Bankruptcy Code, Article VI of the Plan provides for the rejection of all Executory Contracts, other than those specifically assumed. Courts approve a debtor's assumption or rejection of executory contracts where such decision is made in the exercise of the debtor's sound business judgment and benefits the estate.[16] The Debtors' decision regarding the rejection of their executory contracts is the result of the exercise of the Debtors' sound business judgment. Finally, for the reasons set forth below, the Plan's release, exculpation, and injunction provisions are consistent with section 1123(b) of the Bankruptcy Code. No party has asserted that the Plan does not comply with section 1123(b).

[15] 11 U.S.C. § 1123(b)(1)–(3), (6).

[16] *See, e.g., In re Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36 (3d Cir. 1989).

## E. The Plan Complies with Section 1123(d) of the Bankruptcy Code.

49. Section 1123(d) of the Bankruptcy Code provides that "if it is proposed in a plan to cure a default the amount necessary to cure the default shall be determined in accordance with the underlying agreement and nonbankruptcy law."

50. The Plan complies with section 1123(d) of the Bankruptcy Code. The Plan provides for the satisfaction of cure amounts under each Executory Contract identified to be assumed under the Plan by payment of the cure amount, if any, on the Effective Date, or as soon as reasonably practicable thereafter, subject to the limitations described in Article VI of the Plan. No party has asserted that the Plan does not comply with section 1123(d).

## F. The Plan's Release, Exculpation, and Injunction Provisions Comply with the Bankruptcy Code.

51. The Plan includes certain Debtor and third party releases, an exculpation provision, and an injunction provision. These provisions comply with the Bankruptcy Code and prevailing law because, among other things, they are the product of extensive good faith and arm's-length negotiations. No Holder of a Claim against, or Equity Interest in, any Debtor has objected to the Plan's release, exculpation, and injunction provisions.

## G. The Debtor Release is Appropriate and Complies with the Bankruptcy Code.

52. Article X.B of the Plan provides for releases by the Debtors of any and all Claims and Causes of Action, including any derivative claims, the Debtors could assert against the Released Parties (the "Debtor Release"). The Released Parties are collectively, each in its capacity as such: (a) the Debtors' current and former officers, directors, and managers, including the Debtors' chief restructuring officer and Force Ten, but excluding in all events Leon Farahnik,

Gregg Milhaupt and Ira Maroofian (b) the Committee and the current and former members thereof, (c) the Pennsylvania Secured Bonds Trustee, (d) each of the Pennsylvania Secured Bondholders, (e) the Texas Secured Bonds Trustee, (f) each of the Texas Secured Bondholders, (g) the DIP Agent (PA), (h) each of the DIP Lenders (PA), (i) the DIP Agent (TX), (j) each of the DIP Lenders (TX), (k) the Prepetition ABL Lender, (l) the DIP ABL Lender, (m) the Prepetition Term Agent, (n) each of the Prepetition Term Lenders, (o) the DIP Term Agent, (p) each of the DIP Term Lenders, and (q) the Related Persons of each of (a) through (p) of the foregoing.[17] In no event shall any Excluded Debtor Party be a "Released Party."[18]

53. The Released Parties were instrumental to the settlements and resolutions incorporated into the Plan, including the various sales that occurred during the course of these cases.

54. Section 1123(b)(3)(A) of the Bankruptcy Code provides that a chapter 11 plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate." Accordingly, pursuant to section 1123(b)(3)(A), the Debtors may release estate causes of action as consideration for concessions made by their various stakeholders pursuant to the Plan. In considering the appropriateness of such releases, courts in the Third Circuit generally consider

[17] The term "Related Persons" means, (i) with respect to any Person other than a Debtor, such Person's financial advisors, attorneys, accountants, investment bankers, investment advisors, consultants, representatives, and other professionals, in each case acting solely in such capacity at any time, and any Person claiming by or through any of them and (ii) with respect to any Debtor, such Debtor's Professionals retained in these Chapter 11 Cases. In no event shall an Excluded Debtor Party be a "Related Person."

[18] The term "Excluded Debtor Party" means (i) any financial advisor, auditor, attorney, accountant, investment banker, consultant, representative and other professional of any of the Debtors, other than the Debtors' Professionals retained in the Chapter 11 Cases and solely in their capacities as such and (ii) any Person that is an Affiliate or Relative of Leon Farahnik, Gregg Milhaupt, or Ira Maroofian, including HPC Industries, LLC and LF Investment Holdings, LLC, and each of their respective Related Persons.

"if the release is a valid exercise of the debtor's business judgment, is fair, reasonable, and in the best interests of the estate."[19] The "fair and equitable" prong is generally interpreted, consistent with that term's usage in section 1129(b) of the Bankruptcy Code, to require compliance with the Bankruptcy Code's absolute priority rule,[20] while courts generally determine whether a release is proper by reference to the following factors:

a. whether the non-debtor has made a substantial contribution to the debtor's reorganization;

b. whether the release is essential to the debtor's reorganization;

c. agreement by a substantial majority of creditors to support the release;

d. identity of interest between the debtor and the third party; and

e. whether a plan provides for payment of all or substantially all of the claims in the class or classes affected by the release.[21]

55. Not all of the above factors need to be satisfied for a court to approve a debtor release.[22]

56. The Debtor Release at issue here easily meets the controlling standard. ***First***, the Debtor Release is consensual in that no party has objected to it. The lack of objection provides

---

[19] *In re Spansion, Inc.*, 426 B.R. 114, 143 (Bankr. D. Del. 2010); *see also In re Wash. Mut., Inc.*, 442 B.R. 314, 327 (Bankr. D. Del. 2011) ("In making its evaluation [whether to approve a settlement], the court must determine whether 'the compromise is fair, reasonable, and in the best interest of the estate.") (internal citations omitted).

[20] *See In re Mirant Corp*., 348 B.R. 725, 738 (Bankr. N.D. Tex. 2006).

[21] *See e.g.*, *In re Zenith Elecs.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999) (citing *In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. 930, 935 (Bankr. W.D. Mo. 1994)); *Spansion*, 426 B.R. at 143 n.47 (citing the *Zenith* factors); *Wash. Mut.*, 442 B.R. at 346 (same).

[22] *See, e.g.*, *Wash. Mut.*, 442 B.R. at 346 ("These factors are neither exclusive nor conjunctive requirements, but simply provide guidance in the [c]ourt's determination of fairness."); *In re Exide Techs.*, 303 B.R. 48, 72 (Bankr. D. Del. 2003) (finding that *Zenith* factors are not exclusive or conjunctive requirements).

clear evidence that the Plan, including the releases that are an indispensable feature of the Plan, maximizes the value of the Debtors' estates.

57.    ***Second***, an identity of interest exists between the Debtors and the parties to be released.  Most of the Released Parties are stakeholders and critical participants in the Plan and chapter 11 process and share a common goal with the Debtors in seeing that the Plan and the Debtors' ongoing liquidation efforts succeed.  Like the Debtors, these parties seek to confirm the Plan and implement the transactions contemplated thereunder.  *See In re Tribune Co*., 464 B.R. 126, 187 (Bankr. D. Del. 2011), *modified*, 464 B.R. 208 (Bankr. D. Del. 2011) (noting that an identity of interest between the debtors and the settling parties where such parties "share[d] the common goal of confirming the [plan] and implementing [a settlement]"); *see also Zenith*, 241 B.R. at 110 (concluding that certain releasees who "were instrumental in formulating the Plan" shared an identity of interest with the debtor "in seeing that the Plan succeed and the company reorganize").  As to the Debtors' present and former officers, directors, and managers who are being released, there is an identity of interest between the Debtors and certain of these parties as they may have postpetition indemnity obligations against the Debtors.  Notably, the Debtor Release expressly excludes certain officers and directors – the Excluded Debtor Parties -- against whom claims potentially exist.

58.    ***Third***, the Debtor Release is predicated on substantial contributions by many of the parties benefitting from that release.  For instance, the Debtor Release includes the DIP Term Agent and the DIP Term Lenders who are agreeing to accept less than full payment on account of their DIP Facility Claims.  The unpaid DIP Facility Claims of the DIP Term Lenders total

approximately $6.5 million. Without the support of these parties, there would be no Plan as to the applicable Debtors party to the DIP Term Credit Agreement and no ability by the Debtors to successfully reorganize. As to the Debtors' Related Persons, these parties have provided direct benefits to the Debtors' estates by diligently discharging their duties and contributing to the overall success of the Plan and these Chapter 11 Cases. Further, the terms of the Plan, including the Debtor Release, were negotiated amongst the various constituents, including the Committee. The result is a compromise that reflects a true arm's-length negotiation process.

59. Accordingly, the Debtor Release is fair, equitable, and in the best interest of the estate, is justified under the controlling Third Circuit standard, and should be approved.

### H. The Third Party Release is Appropriate and Complies with the Bankruptcy Code.

60. Article XI.A of the Plan contains a Third Party release provision (the "Third Party Release") that should be approved pursuant to Third Circuit law. The Third Party Release provides that the Released Parties shall be released and discharged from any and all Claims and Causes of Action as set forth in the Plan by the following releasing parties: (a) the Holders of all Claims who vote to accept the Plan and do not opt out of granting the releases set forth in the Plan, (b) the Holders of Claims that are Unimpaired under the Plan, (c) the Holders of Claims whose vote to accept or reject the Plan is solicited and who do not vote either to accept or to reject the Plan and who do not return a Ballot with the opt-out box checked, (d) the Holders of Claims who vote to reject the Plan but do not opt out of granting the releases set forth in the Plan, and (e) each of the other Released Parties.[23]

[23] The Released Parties are the same as those identified above as the beneficiaries of the Debtor Release.

61. Courts in this jurisdiction routinely approve such release provisions if they are consensual, and even non-voting creditors may be deemed to consent to provide releases of non-debtor third parties in the context of a chapter 11 plan, particularly where the creditor-releasors' claims are Unimpaired by the Plan.[24] Courts have also held that third party releases may be binding even upon Impaired holders of claims who have the option to opt out of releases, but decline to do so.[25]

62. The Third Party Release satisfies this standard. ***First***, certain Holders of Claims under the Plan are Unimpaired and therefore deemed to consent to the Plan. By contrast, Impaired Holders of Claims in voting Classes were given the opportunity to opt out of the Third Party Release as part of the voting process on the Plan. The Debtors provided extensive notice of these chapter 11 proceedings, the Plan, and the deadline to object to confirmation of the Plan to all parties in interest. There was specific mention of such Third Party Release and the requirement to object to such release in the Confirmation Hearing Notice sent by the Debtors to all parties in interest in these Chapter 11 Cases. No one has objected to the Third Party Release. Impaired

---

[24] *See Wash. Mut.*, 442 B.R. at 352 (observing that consensual Third Party releases are permissible); *Zenith*, 241 B.R. at 111 (approving non-debtor releases for creditors that voted in favor of the plan); *see also In re Indianapolis Downs, LLC*, 486 B.R. 286, 304-05 (Bankr. D. Del. 2013) (approving as consensual Third Party release that applied to unimpaired holders of claims deemed to accept the plan because the releasing creditors received consideration by payment in full and did not object to the releases); *In re Spansion, Inc.*, 426 B.R. 114, 144 (Bankr. D. Del. 2010) (finding "the silence of the unimpaired classes . . . was persuasive" in determining that releases of third parties by unimpaired creditors who did not object to the releases were permissible).

[25] In *In re Indianapolis Downs, LLC*, the court confirmed a plan whereby creditors who either: (i) voted to reject or accept the plan and failed to "opt-out"; (ii) failed to return their ballots; or (iii) whose claims were unimpaired, and therefore, were not entitled to vote consented to the plan's Third Party release provision. 486 B.R. 286, 305 (Bankr. D. Del. 2013); *see also In re Conseco Inc.*, 301 B.R. 525, 528 (Bankr. N.D. Ill. 2003) (finding a release provision binding unimpaired creditors who abstained from voting on the plan and did not otherwise opt out to be consensual); *In re Local Insight Media Holdings, Inc.*, Case No. 10-13677 (KG) (Bankr. D. Del. Nov. 3, 2011) (confirming plan that treated holders of claims and interest that did not vote to reject plan or were not members of a class deemed to reject plan as releasing parties); *In re Majestic Star Casino, LLC*, No. 09-14136 (KG) (Bankr. D. Del. Mar. 10, 2011) (confirming plan that treated holders of claims and interests that did not vote to accept plan as releasing parties).

voting Holders of Claims also had the ability to opt out of the Third Party Release by voting against the Plan and choosing to opt out of the Third Party Release by checking a box on their ballots.

63. ***Second***, the Third Party Release is integral to the Plan and the Debtors' ongoing liquidation efforts – the provisions of which were vigorously negotiated amongst the various constituents, including the Committee.

64. ***Third***, the Third Party Release was given for good and valuable consideration, including the efforts of the Released Parties to facilitate the Debtors' sale and liquidation process. All parties in interest benefit from the Plan, which will enable the Debtors to maximize the value of their remaining assets and make distributions to creditors as soon as possible. The alternative is the potential for a value-destructive conversion to chapter 7.

65. ***Fourth***, there are no pending objections to the Third Party Release.

66. Accordingly, the Third Party Release is justified under Third Circuit law and the circumstances here, and should be approved.

## I. The Exculpation Provision is Appropriate and Complies with the Bankruptcy Code.

67. Article XI.C of the Plan provides that the Exculpated Parties[26] will neither have nor incur any liability to any Entity for any claims or Causes of Action arising before, on or after the Petition Date and prior to or on the Effective Date for any act taken or omitted to be taken in connection with, or related to the Chapter 11 Cases, formulating, negotiating, preparing, disseminating, implementing, administering, confirming, pursuing or effecting the Consummation

[26] The Exculpated Parties are, collectively: (a) the Debtors, (b) the Debtors' directors, officers, and managers who served in such capacity on and after the Petition Date, including the Debtors' chief restructuring officer and Force Ten, (c) the Committee and the current and former members thereof, and (d) the Debtors' and the Committee's professionals retained in the Chapter 11 Cases.

of the Plan, the Disclosure Statement or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan, pursuing confirmation of the Plan or soliciting votes on the Plan; *provided, however*, that the foregoing provisions will have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order of the Bankruptcy Court or other court of competent jurisdiction to have constituted actual fraud, gross negligence or willful misconduct; *provided, further*, however that the foregoing provisions will not apply to any acts, omissions, Claims, Causes of Action or other obligations expressly set forth in and preserved by the Plan or the Plan Supplement (the "Exculpation Provision").

68. At the outset, it is important to underscore the difference between the Third Party Release and the Exculpation Provision. Unlike the Third Party Release, the Exculpation Provision is limited to estate fiduciaries (*i.e.*, the Debtors, the Committee, and their respective representatives and professionals who are serving in such capacity during the Chapter 11 Cases) and does not affect the liability of third parties *per se*, but rather sets a standard of care of gross negligence or actual fraud in hypothetical future litigation against an Exculpated Party for acts arising out of the Debtors' liquidation.[27] A bankruptcy court has the power to approve an exculpation provision in a chapter 11 plan because a bankruptcy court cannot confirm a chapter 11 plan unless it finds that the plan has been proposed in good faith.[28] As such, an exculpation provision represents a legal conclusion that flows inevitably from several different findings a

[27] *See, e.g., In re PWS Holding Corp.*, 228 F.3d 224, 246 (3d Cir. 2000) (holding that an exculpation provision "is apparently a commonplace provision in Chapter 11 plans, [and] does not affect the liability of these parties, but rather states the standard of liability under the Code.").

[28] *See* 11 U.S.C. § 1129(a)(3).

bankruptcy court must reach in confirming a plan.[29] Once the court makes its good faith finding, it is appropriate to set the standard of care of the parties involved in the formulation of that chapter 11 plan.[30] Exculpation provisions, therefore, appropriately prevent future collateral attacks. Here, the Exculpation Provision is likewise appropriate and vital because it provides protection to those estate fiduciaries who served to further the Debtors' Chapter 11 Cases and falls squarely within the "fresh start" principles underlying the Bankruptcy Code.

69. Further, the Exculpation Provision represents an integral piece of the overall terms of the Plan and is narrowly tailored to exclude acts of actual fraud, gross negligence, or willful misconduct, and relates only to acts or omissions in connection with, or arising out of the administration of the Debtors' Chapter 11 Cases. There are also no pending objections to the Exculpation Provision. Accordingly, the Exculpation Provision should be approved.

## J. The Injunction Provision is Appropriate and Complies with the Bankruptcy Code.

70. The injunction provision set forth in Article XI.D of the Plan (the "Injunction Provision") merely implements the Plan's release and exculpation provisions, in part, by permanently enjoining all entities from commencing or continuing in any manner, any suit, action or other proceeding, or creating, perfecting or enforcing any lien of any kind, on account of or respecting any claim, demand, liability, obligation, debt, right, cause of action, equity interest, or remedy released or to be released or exculpated or to be exculpated pursuant to the Plan or the Confirmation Order. The Injunction Provision is thus a key provision of the Plan because it

---

[29] *See* 28 U.S.C. § 157(b)(2)(L).

[30] *See PWS*, 228 F.3d at 246-247 (observing that creditors providing services to the debtors are entitled to a "limited grant of immunity . . . for actions within the scope of their duties . . . .").

enforces the release and exculpation provisions that are centrally important to the Plan. Further, the Injunction Provision is consensual in that it is not the subject of a pending objection. As such, the Court should approve the Injunction Provision.[31]

**K. The Debtors Complied with the Applicable Provisions of the Bankruptcy Code (§ 1129(a)(2)).**

71. The Debtors have satisfied section 1129(a)(2) of the Bankruptcy Code, which requires that the plan proponent comply with the applicable provisions of the Bankruptcy Code. The legislative history to section 1129(a)(2) reflects that this provision is intended to encompass the disclosure and solicitation requirements set forth in sections 1125 and 1126 of the Bankruptcy Code.[32] As discussed below, the Debtors have complied with sections 1125 and 1126 of the Bankruptcy Code regarding disclosure of the Plan.

**L. The Debtors Complied with Section 1125 of the Bankruptcy Code.**

72. In accordance with the Disclosure Statement Order, the Debtors have complied with the notice requirements of section 1125 of the Bankruptcy Code, and no party has asserted otherwise.

[31] *See, e.g.*, *In re Physiotherapy Holdings, Inc.*, Case No. 13-12965 (KG) (Bankr. Dec. 23, 2013) (stating that injunctions in the plan were necessary to preserve and enforce the releases and exculpations granted by the plan and were narrowly tailored to achieve that purpose); *In re Dex One Corp.*, Case No. 13-10533 (KG) (Bankr. D. Del. Apr. 29, 2013) (same); *In re Chi. Newspaper Liquidation Corp.*, Case No. 09-11092 (CSS) (Bankr. D. Del. Aug. 17, 2011) (same); *In re Premier Int'l Holdings, Inc.*, Case No. 09-12019 (CSS), 2010 WL 2745964, at *10 (Bankr. D. Del. Apr. 29, 2010) (same).

[32] *See In re Lapworth*, No. 97-34529 (DWS), 1998 WL 767456, at *3 (Bankr. E.D. Pa. Nov. 2, 1998) ("The legislative history of § 1129(a)(2) specifically identifies compliance with the disclosure requirements of § 1125 as a requirement of § 1129(a)(2)."); *In re Worldcom, Inc.*, No. 02-13533 (AJG), 2003 WL 23861928, at *49 (Bankr. S.D.N.Y. Oct. 31, 2003) (stating that section 1129(a)(2) requires plan proponents to comply with applicable provisions of the Bankruptcy Code, including "disclosure and solicitation requirements under sections 1125 and 1126 of the Bankruptcy Code").

**M. The Debtors Complied with Section 1126 of the Bankruptcy Code.**

73. Section 1126 of the Bankruptcy Code specifies the requirements for acceptance of a plan of reorganization. Specifically, under section 1126 of the Bankruptcy Code, only holders of allowed claims and allowed interests in impaired classes of claims or interests that will receive or retain property under a plan on account of such claims or interests may vote to accept or reject such plan. Here, Holders of Claims in Classes 6 and 7 are Impaired and entitled to vote to accept or reject the Plan under section 1126 of the Bankruptcy Code.

74. Based upon the foregoing, the Debtors submit that they satisfies the requirements of section 1129(a)(2) of the Bankruptcy Code, and no party has asserted otherwise.

**N. The Plan was Proposed in Good Faith (§ 1129(a)(3)).**

75. Section 1129(a)(3) of the Bankruptcy Code requires that a chapter 11 plan be "proposed in good faith and not by any means forbidden by law." Where a plan satisfies the purposes of the Bankruptcy Code and has a good chance of succeeding, the good faith requirement of section 1129(a)(3) of the Bankruptcy Code is satisfied.[33] To determine whether a plan seeks relief consistent with the Bankruptcy Code, courts consider the totality of the circumstances surrounding the development of the plan.[34]

76. The Plan satisfies section 1129(a)(3) of the Bankruptcy Code. The fundamental purpose of chapter 11 is to enable a distressed business to reorganize its affairs to prevent job

---

[33] *See, e.g., PWS Holding Corp.*, 228 F.3d at 242 (*quoting In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 150 n.5 (3d Cir. 1986)); *Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship)*, 116 F.3d 790, 802 (5th Cir. 1997 (*quoting Brite v. Sun Country Dev., Inc. (In re Sun Country Dev., Inc.)*, 764 F.2d 406, 408 (5th Cir. 1985)); *In re Century Glove*, Cir. A. Nos. 90-400 and 90-401, 1993 WL 239489, at *4 (D. Del. Feb. 10, 1993) ; *In re NII Holdings, Inc.*, 288 B.R. 356, 362 (Bankr. D. Del. 2002).

[34] *See, e.g., T-H New Orleans*, 116 F.3d at 802 (*quoting In re Sun Country Dev., Inc.*, 764 F.2d at 408); *In re W.R. Grace & Co.*, 475 B.R. 34, 87 (D. Del. 2012); *Century Glove*, 1993 WL 239489, at *4.

losses and the adverse economic effects associated with disposing of assets at liquidation value.[35] Here, the Plan was proposed in good faith in order to enable the Debtors to implement an orderly liquidation and maximize the value of the Debtors' Estates for the benefit of all creditors. Moreover, the Plan is the product of extensive arm's-length negotiations among various constituencies, including the Committee. Finally, as set forth herein, the Plan complies with bankruptcy and applicable nonbankruptcy law. No party has asserted that the Plan does not comply with section 1129(a)(3) of the Bankruptcy Code.

### O. The Plan Provides that the Debtors' Payment of Professional Fees and Expenses are Subject to Court Approval (§ 1129(a)(4)).

77. Section 1129(a)(4) of the Bankruptcy Code requires that certain fees and expenses paid by the plan proponent, by the debtor, or by a person receiving distributions of property under the plan, be subject to approval by the Court as reasonable. Courts have construed this section to require that all payments of professional fees paid out of estate assets be subject to review and approval by the Court as to their reasonableness.[36]

78. The Plan satisfies section 1129(a)(4) of the Bankruptcy Code. The Debtors submit that payments of Professional Fee Claims arising prior to the Effective Date are the only category of payments that fall within the ambit of section 1129(a)(4) of the Bankruptcy Code in these Chapter 11 Cases, and the Debtors may not pay such Professional Fee Claims absent Court

---

[35] *See NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 528 (1984); *B.D. Int'l Disc. Corp. v. Chase Manhattan Bank, N.A. (In re B.D. Int'l Disc. Corp.)*, 701 F.2d 1071, 1075 n.8 (2d Cir. 1983) (stating that "the two major purposes of bankruptcy [are] achieving equality among creditors and giving the debtor a fresh start").

[36] *See In re Lisanti Foods, Inc.*, 329 B.R. 491, 503 (Bankr. D.N.J. 2005) ("Pursuant to § 1129(a)(4), a [p]lan should not be confirmed unless fees and expenses related to the [p]lan have been approved, or are subject to the approval, of the Bankruptcy Court"), *aff'd*, 241 F. App'x 1 (3d Cir. 2007); *In re Future Energy Corp.*, 83 B.R. 470, 488 (Bankr. S.D. Ohio 1988); *In re Chapel Gate Apartments, Ltd.*, 64 B.R. 569, 573 (Bankr. N.D. Tex. 1986) (noting that before a plan may be confirmed, "there must be a provision for review by the Court of any professional compensation").

approval. Further, all Professional Fee Claims arising prior to the Effective Date and corresponding payments are subject to prior Court approval and the reasonableness requirements under sections 328 and/or 330 of the Bankruptcy Code. Article II of the Plan, moreover, provides that Professionals shall file all final requests for payment of Professional Fee Claims no later than thirty (30) days after the Effective Date, thereby providing an adequate period of time for interested parties to review such Professional Fee Claims. No party has asserted that the Plan does not comply with section 1129(a)(4) of the Bankruptcy Code.

**P. The Debtors Disclosed All Necessary Information Regarding Directors, Officers, and Insiders (§ 1129(a)(5)).**

79. Section 1129(a)(5)(A)(i) of the Bankruptcy Code requires that the proponent of a plan disclose the identity and affiliations of the proposed officers and directors of the reorganized debtors. Section 1129(a)(5)(B) of the Bankruptcy Code requires a plan proponent to disclose the identity of an "insider" (as defined by section 101(31) of the Bankruptcy Code) to be employed or retained by the reorganized debtor and the nature of any compensation for such insider. Additionally, the Bankruptcy Code provides that the appointment or continuance of such officers and directors be consistent with the interests of creditors and equity security holders and with public policy.[37] The "public policy requirement would enable [the court] to disapprove plans in which demonstrated incompetence or malevolence is a hallmark of the proposed management."[38]

80. As set forth in the Plan Supplement, the Debtors have disclosed the identity and compensation of the Liquidation Trustee and the members of Liquidation Trust Oversight

[37] *See* 11 U.S.C. § 1129(a)(5)(A)(ii).

[38] *See* 7 Collier on Bankruptcy ¶ 1129.02[5][b] (16th ed. 2012).

Committee. Further, pursuant to Article V.C of the Plan, the Liquidation Trustee shall control the Debtors and shall be deemed the sole manager of the Debtors. No such parties are insiders of the Debtors.

81. The Debtors' appointment of officers, directors and managers is "consistent with the interests of creditors and equity security holders and with public policy."[39] The Debtors believe that control of the Debtors and the Liquidation Trust by the proposed individuals will be beneficial, and no party in interest has objected to the Plan on these grounds. Therefore, the requirements under section 1129(a)(5)(A)(ii) of the Bankruptcy Code are satisfied.

82. Finally, the Debtors satisfied section 1129(a)(5)(B) of the Bankruptcy Code because the Debtors sufficiently disclosed the identity of all insiders that the Debtors will employ or retain and the nature of any compensation for such insiders in compliance with the Bankruptcy Code.[40] No party has asserted that the Plan does not comply with section 1129(a)(5) of the Bankruptcy Code.

**Q. <u>The Plan Does Not Require Governmental Regulatory Approval (§ 1129(a)(6)).</u>**

83. Section 1129(a)(6) of the Bankruptcy Code permits confirmation only if any regulatory commission that has or will have jurisdiction over a debtor after confirmation has approved any rate change provided for in the plan. Section 1129(a)(6) of the Bankruptcy Code is inapplicable to these Chapter 11 Cases.

[39] 11 U.S.C. § 1129(a)(5)(A)(ii).

[40] *See Armstrong World Indus.*, 348 B.R. at 165 (finding disclosure of identities and nature of compensation of persons to serve as directors and officers on the effective date sufficient for section 1129(a)(5) of the Bankruptcy Code).

**R. The Best Interests of Creditors Test Has Been Satisfied (§ 1129(a)(7)).**

84. Section 1129(a)(7) of the Bankruptcy Code, commonly known as the "best interests test," provides, in relevant part:

> With respect to each impaired class of claims or interests—
>
> (A) each holder of a claim or interest of such class—
>
> (i) has accepted the plan; or
>
> (ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of [the Bankruptcy Code] on such date . . . .

11 U.S.C. § 1129(a)(7).

85. The best interests test applies to individual dissenting holders of impaired claims and interests rather than classes, and is generally satisfied through a comparison of the estimated recoveries for a debtor's stakeholders in a hypothetical chapter 7 liquidation of that debtor's estate against the estimated recoveries under that debtor's plan of reorganization.[41] As noted elsewhere, Classes 1, 2, 3, 4 and 5 are Unimpaired under the Plan, and thus none of the Holders of Claims in those Classes can invoke section 1129(a)(7). The only Impaired classes are Classes 6 and 7, which are comprised of Prepetition Term Secured Claims and General Unsecured Claims, respectively.

---

[41] *See Bank of Amer. Nat. Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441 n.13 (1999) ("The 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan."); *In re Adelphia Commc'ns. Corp.*, 368 B.R. 140, 251 (Bankr. S.D.N.Y. 2007) (stating that section 1129(a)(7) is satisfied when an impaired holder of claims would receive "no less than such holder would receive in a hypothetical chapter 7 liquidation").

86. As set forth in the Disclosure Statement[42] and as will be established at the Confirmation Hearing, the Debtors, with the assistance of their advisors, prepared a liquidation analysis that estimates recoveries for members of each class under the Plan. The projected recoveries under the Plan are equal to or in excess of the recoveries estimated in a hypothetical chapter 7 liquidation.[43] Hence, under the Plan, Holders of Impaired Claims are projected to realize a substantially greater recovery than liquidation value, thereby satisfying the "best interests test" under section 1129(a)(7) of the Bankruptcy Code.

### S. The Plan is Confirmable Notwithstanding the Requirements of Section 1129(a)(8) of the Bankruptcy Code.

87. Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests must either accept a plan or be unimpaired under a plan.

88. Here, Class 8 (Intercompany Claims) and Class 9 (Equity Interests) under the Plan are Impaired and, pursuant to section 1126(g) of the Bankruptcy Code, are deemed to reject the Plan because they will not receive or retain any property under the Plan on account of such Claims and Interests. Although the Plan does not satisfy section 1129(a)(8) of the Bankruptcy Code with respect to such Impaired rejecting Classes, the Plan is confirmable nonetheless because it satisfies sections 1129(a)(10) and 1129(b) of the Bankruptcy Code, as discussed below.

### T. The Plan Provides for Payment in Full of All Allowed Priority Claims (§ 1129(a)(9)).

89. Section 1129(a)(9) of the Bankruptcy Code requires that certain priority claims be paid in full on the effective date of a plan and that the holders of certain other priority claims

[42] *See* Disclosure Statement at Ex. C.

[43] *Id*.

receive deferred cash payments. In particular, pursuant to section 1129(a)(9)(A) of the Bankruptcy Code, holders of claims of a kind specified in section 507(a)(2) of the Bankruptcy Code—administrative expense claims allowed under section 503(b) of the Bankruptcy Code—must receive on the effective date cash equal to the allowed amount of such claims. Section 1129(a)(9)(B) of the Bankruptcy Code requires that each holder of a claim of a kind specified in section 507(a)(1) or (4) through (7) of the Bankruptcy Code—generally domestic support obligations, wage, employee benefit, and deposit claims entitled to priority—must receive deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim (if such class has accepted the plan), or cash of a value equal to the allowed amount of such claim on the effective date of the plan (if such class has not accepted the plan). Finally, section 1129(a)(9)(C) provides that holders of a claim of a kind specified in section 507(a)(8) of the Bankruptcy Code—*i.e.*, priority tax claims—must receive cash payments over a period not to exceed five years from the petition date, the present value of which equals the allowed amount of the claim.

90. The Plan satisfies section 1129(a)(9) of the Bankruptcy Code. First, Article II.A of the Plan satisfies section 1129(a)(9)(A) of the Bankruptcy Code because it provides that each holder of an Allowed Administrative Expense Claim, unless otherwise agreed, will be paid in full on account of such Allowed Administrative Expense Claim. Specifically as to the applicable Debtors party to the DIP Term Credit Agreement, the Plan is contingent upon the DIP Term Lenders agreeing to accept less than full payment on account of their DIP Facility Claims. Second, the Plan satisfies section 1129(a)(9)(B) of the Bankruptcy Code because no holders of the types of

Claims specified by 1129(a)(9)(B) are Impaired under the Plan. Finally, Article II.B of the Plan satisfies section 1129(a)(9)(C) of the Bankruptcy Code because it specifically provides that each holder of an Allowed Priority Tax Claim, unless otherwise agreed, will be paid in full on account of such Allowed Priority Tax Claim. Thus, the Debtors submit that the Plan satisfies each of the requirements set forth in section 1129(a)(9) of the Bankruptcy Code.

**U. At Least One Impaired Non-Insider Class of Claims Accepted the Plan (§ 1129(a)(10)).**

91. Section 1129(a)(10) of the Bankruptcy Code provides that, to the extent there is an impaired class of claims, at least one impaired class of claims, excluding insiders, must accept the plan as an alternative to the requirement under section 1129(a)(8) of the Bankruptcy Code that each class of claims or interests must either accept the plan or be unimpaired under the plan.

92. Two Impaired Classes of Claims under the Plan – Class 6 (Prepetition Term Secured Claims) and Class 7 (General Unsecured Claims) (including each sub-Class of Class 7 at each Debtor Group) – have voted to accept the Plan.

**V. The Plan is Feasible (§ 1129(a)(11)).**

93. Section 1129(a)(11) of the Bankruptcy Code requires that the Court find that a plan is feasible as a condition precedent to confirmation. To demonstrate that a plan is feasible, it is not necessary for a debtor to guarantee success.[44] Rather, a debtor must provide only a reasonable

[44] *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988) ("[T]he feasibility standard is whether the plan offers a reasonable assurance of success. Success need not be guaranteed."); *In re Flintkote Co.*, 486 B.R. 99, 139 (Bankr. D. Del. 2012); *In re W.R. Grace & Co.*, 475 B.R. 34, 115 (D. Del. 2012); *In re U.S. Truck Co.*, 47 B.R. 932, 944 (E.D. Mich. 1985) ("'Feasibility' does not, nor can it, require the certainty that a reorganized company will succeed."), *aff'd*, 800 F.2d 581 (6th Cir. 1986).

assurance of success.[45] There is a relatively low threshold of proof necessary to satisfy the feasibility requirement.[46] As demonstrated below, the Plan is feasible within the meaning of section 1129(a)(11) of the Bankruptcy Code.

94. As will be established at the Confirmation Hearing, the Plan is feasible. The plan recovery analysis encompassed within the Disclosure Statement:[47] (a) is reasonable and credible as of the dates such analysis was prepared; (b) utilizes reasonable and appropriate methodologies and assumptions; (c) has not been controverted by other evidence; (d) establishes that the Plan is feasible and confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization of the Debtors or any successor to the Debtors under the Plan; and (e) establishes that the Debtors and the Liquidation Trust will have sufficient funds available to meet their obligations under the Plan. Thus, the Plan satisfies section 1129(a)(11) of the Bankruptcy Code, and no party has asserted otherwise.

**W. <u>All Statutory Fees Have Been or Will Be Paid (§ 1129(a)(12)).</u>**

95. Section 1129(a)(12) of the Bankruptcy Code requires the payment of "[a]ll fees payable under section 1930 of title 28 [of the United States Code], as determined by the court at

---

[45] *See Kane*, 843 F.2d at 649; *Flintkote Co.*, 486 B.R. 99, 139 (Bankr. D. Del. 2012); *W.R. Grace & Co.*, 475 B.R. at 115; *see also Pizza of Hawaii, Inc. v. Shakey's, Inc.* (*In re Pizza of Hawaii, Inc.)*, 761 F.2d 1374, 1382 (9th Cir. 1985) (citations omitted) (holding that "[t]he purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation"); *accord In re Capmark Fin. Grp. Inc.*, No. 09-13684 (CSS), 2011 WL 6013718, at *61 (Bankr. D. Del. Oct. 5, 2011) (same).

[46] *See, e.g.*, *In re Prussia Assocs.*, 322 B.R. 572, 584 (Bankr. E.D. Pa. 2005) (quoting approvingly that "[t]he Code does not require the debtor to prove that success is inevitable, and a relatively low threshold of proof will satisfy § 1129(a)(11) so long as adequate evidence supports a finding of feasibility") (internal citations omitted); *In re Sea Garden Motel & Apartments*, 195 B.R. 294, 305 (D.N.J. 1996); *In re Tribune Co.*, 464 B.R. 126, 185 (Bankr. D. Del. 2011), *on reconsideration*, 464 B.R. 208 (Bankr. D. Del. 2011).

[47] *See* Disclosure Statement at Ex. C.

the hearing on confirmation of the plan." Section 507(a)(2) of the Bankruptcy Code provides that "any fees and charges assessed against the estate under [section 1930 of] chapter 123 of title 28" are afforded priority status.

96.     The Plan satisfies section 1129(a)(12) of the Bankruptcy Code because Article XIV.B of the Plan provides for the payment of all fees payable by the Debtors under 28 U.S.C. § 1930(a).  As addressed above, the U.S. Trustee's objection on this point should be overruled.

**X.      No Retiree Benefits Exist (§ 1129(a)(13)).**

97.     Section 1129(a)(13) of the Bankruptcy Code requires that all retiree benefits continue post-confirmation at any levels established in accordance with section 1114 of the Bankruptcy Code.  The requirements of section 1129(a)(13) of the Bankruptcy Code do not apply to the Plan because the Debtors are not liable for any "retiree benefits," as such term is defined in section 1114 of the Bankruptcy Code.

**Y.      Sections 1129(a)(14) through 1129(a)(16) Do Not Apply to the Plan.**

98.     The requirements of sections 1129(a)(14), 1129(a)(15), and 1129(a)(16) of the Bankruptcy Code do not apply to the Plan because the Debtors owe no domestic support obligations, are not individuals, and are not nonprofit corporations, respectively.

**Z.      The Plan Satisfies the "Cram Down" Requirements of
        Section 1129(b) of the Bankruptcy Code.**

99.     Section 1129(b)(1) of the Bankruptcy Code provides that, if all applicable requirements of section 1129(a) of the Bankruptcy Code are met other than section 1129(a)(8) of the Bankruptcy Code, a plan may be confirmed so long as the requirements set forth in section 1129(b) of the Bankruptcy Code are satisfied.  To confirm a plan that has not been accepted by all

impaired classes (thereby failing to satisfy section 1129(a)(8) of the Bankruptcy Code), the plan proponent must show that the plan does not "discriminate unfairly" and is "fair and equitable" with respect to the non-accepting impaired classes.[48]

100. A plan is "fair and equitable" with respect to an impaired class of claims or interests that rejects a plan (or is deemed to reject a plan) if it follows the "absolute priority" rule.[49] This requires that an impaired rejecting class of claims or interests either be paid in full or that a class junior to the impaired accepting class not receive any distribution under a plan on account of its junior claim or interest.[50] The Debtors submit that the Plan satisfies the "fair and equitable" requirement notwithstanding that Class 8 Intercompany Claims and Class 9 Equity Interests in Debtors are deemed to reject the Plan.

101. Under the Plan, Intercompany Claims are excluded from the definition of General Unsecured Claims primarily because inter-Debtor claims will require substantial reconciliation and forensic analysis and may impact the Causes of Action vested in the Liquidation Trust. Further, the Liquidation Trustee is authorized under the Plan to take into account intercompany obligations when determining allocations of Net Distributable Assets under certain circumstances. Given that Holders of Class 7 General Unsecured Claims are not receiving a full recovery under the Plan, it is entirely fair and equitable and not unfairly discriminatory for Holders of Class 8

---

[48] *See John Hancock*, 987 F.2d at 157 n.5; *In re Ambanc La Mesa L.P.*, 115 F.3d 650, 653 (9th Cir. 1997) ("the [p]lan satisfies the 'cramdown' alternative . . . found in 11 U.S.C. § 1129(b), which requires that the [p]lan 'does not discriminate unfairly' against and 'is fair and equitable' towards each impaired class that has not accepted the [p]lan.").

[49] *See Bank of Amer.*, 526 U.S. at 441–42 ("As to a dissenting class of impaired unsecured creditors, such a plan may be found to be 'fair and equitable' only if the allowed value of the claim is to be paid in full, § 1129(b)(2)(B)(i), or, in the alternative, if 'the holder of any claim or interest that is junior to the claims of such [impaired unsecured] class will not receive or retain under the plan on account of such junior claim or interest any property,' § 1129(b)(2)(B)(ii). That latter condition is the core of what is known as the 'absolute priority rule.'").

[50] *See id.*

Intercompany Claims and Class 9 Equity Interests in the Debtors to receive no recovery under the Plan.

**AA. Section 1129(c) of the Bankruptcy Code is Satisfied.**

102. Section 1129(c) of the Bankruptcy Code provides that the only one plan can be confirmed. Because the Plan is the only plan before the Court, section 1129(c) is satisfied.

**BB. The Debtors Complied with Section 1129(d) of the Bankruptcy Code.**

103. The purpose of the Plan is not to avoid taxes or the application of section 5 of the Securities Act of 1933. Moreover, no governmental unit or any other party has requested that the Court decline to confirm the Plan on such grounds. Accordingly, the Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code, and no party has asserted otherwise.

**CC. Modifications to the Plan.**

104. Section 1127(a) of the Bankruptcy Code provides that a plan proponent may modify its plan at any time before confirmation as long as such modified plan meets the requirements of sections 1122 and 1123 of the Bankruptcy Code. Further, when the proponent of a plan files a modification of such plan with the court, the plan as modified becomes the plan. Bankruptcy Rule 3019 provides that modifications after a plan has been accepted will be deemed accepted by all creditors and equity security holders who have previously accepted the plan if the court finds that the proposed modifications do not adversely change the treatment of the claim of any creditor or the interest of any equity security holder.[51]

[51] *See, e.g.*, *In re Global Safety Textiles Holdings LLC*, Case No. 09-12234 (KG), 2009 WL 6825278, at *4 (Bankr. D. Del. Nov. 30, 2009) (finding that nonmaterial modifications to plan do not require additional disclosure or resolicitation); *In re Burns & Roe Enters., Inc.*, Case No. 08-4191 (GEB), 2009 WL 438694, at *23 (D.N.J. Feb. 23, 2009) (confirming plan as modified without additional solicitation or disclosure because modifications did "not adversely affect creditors").

105. Any proposed modifications to the Plan incorporated in the proposed Confirmation Order will not adversely change the treatment of any Claim against the Debtors.

**DD. <u>The Confirmation Order Should Be Effective Immediately.</u>**

106. Bankruptcy Rule 3020(e) provides that "[a]n order confirming a plan is stayed until the expiration of 14 days after the entry of the order, unless the Court orders otherwise." Bankruptcy Rules 6004(h) and 6006(d) provide similar stays to orders authorizing the use, sale or lease of property (other than cash collateral) and orders authorizing a debtor to assign an executory contract or unexpired lease under section 365(f) of the Bankruptcy Code. These Bankruptcy Rules also permit modification of the imposed stay upon court order.

107. The Debtors submit that good cause exists for waiving and eliminating any stay of the proposed Confirmation Order pursuant to Bankruptcy Rules 3020, 6004, and 6006 so that the proposed Confirmation Order will be effective immediately upon its entry.[52] As addressed above, the Chapter 11 Cases and the related transactions have been negotiated and implemented in good faith and with a high degree of transparency and public dissemination of information. The sooner the transactions contemplated by the Plan are implemented, the less cost the Debtors' estates will be forced to incur, which is in the best interests of the Debtors, their estates, and all parties in interest. Under the circumstances, there is no reason for further delay if the Debtors, with the reasonable consent of the Committee, determine that declaring the effectiveness of the Plan should

---

[52] *See, e.g.*, *In re Article Sentinel, Inc.*, Case No. 15-12465 (CSS) (Bankr. D. Del. Nov. 30, 2016) (waiving stay of confirmation order and causing it to be effective and enforceable immediately upon its entry by the court*) In re Variant Holding Company, LLC*, Case No. 14-12021 (BLS) (Bankr. D. Del. May 10, 2016) (same); *In re Physiotherapy Holdings, Inc.*, Case No. 13-12965 (KG) (Bankr. D. Del. Dec. 23, 2013) (same); *In re Gatehouse Media, Inc.*, Case No. 13-12503 (MFW) (Bankr. D. Del. Nov. 6, 2013) (same); *In re Dex One Corp.*, Case No. 13-10533 (KG) (Bankr. D. Del. Apr. 29, 2013) (same); *In re Geokinetics Inc.*, Case No. 13-10472 (KJC) (Bankr. D. Del. Apr. 25, 2013) (same); *In re CHL, Ltd.*, Case No. 12-12437 (KJC) (Bankr. D. Del. Oct. 4, 2012) (same).

occur promptly. The Debtors believe that good cause exists to waive any stay imposed by the Bankruptcy Rules so that the proposed Confirmation Order may be effective immediately upon its entry.

## Conclusion

108. For all of the reasons set forth herein, the Debtors respectfully request that the Court enter the proposed Confirmation Order (i) confirming the Plan, (ii) waiving the fourteen (14) day stay of the proposed Confirmation Order, and (iii) granting such other and further relief as is just and proper.

Dated: August 27, 2021

PACHULSKI STANG ZIEHL & JONES LLP

*/s/ James E. O'Neill*

Richard M. Pachulski (CA Bar No. 90073)
Gabriel I. Glazer (CA Bar No. 246384)
James E. O'Neill (DE Bar No. 4042)
Steven W. Golden (NY Bar No. 5374152)
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899 (Courier 19801)
Tel: (302) 652-4100
Fax: (302) 652-4400
Email: rpachulski@pszjlaw.com
gglazer@pszjlaw.com
joneill@pszjlaw.com
sgolden@pszjlaw.com

Attorneys for Debtors and Debtors in Possession